Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  CHINESE-MANUFACTURED       :  MDL NO. 2047
DRYWALL PRODUCTS LIABILITY         :
LITIGATION                         :  SECTION:   L
                                   :
-------------------------------    :  JUDGE FALLON
This Document Relates to:          :
ALL CASES                          :  MAG. JUDGE
                                   :  WILKINSON


CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

MONDAY, OCTOBER 1, 2012

- - -


        Videotaped deposition of JAMES GEARY,
held at the Law Offices of Galloway, Johnson,
Tompkins, Burr & Smith, One Shell Square, 701
Poydras Street, 40th Floor, New Orleans, Louisiana,
commencing at 11:25 a.m., on the above date, before
Leslie B. Doyle, Certified Court Reporter (LA),
Registered Diplomate Reporter, Certified LiveNote
Reporter.


- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

EXHIBIT
3

Confidential - Subject to Further Confidentiality Review

Page 2

```
 1   A P P E A R A N C E S:
 2
 3   APPEARING ON BEHALF OF THE PLAINTIFFS' STEERING
 4   COMMITTEE:
 5        CHRISTOPHER A. SEEGER, ESQUIRE
              Email:  Cseeger@seegerweiss.com
 6            Phone:  (212) 584-0700
          SEEGER WEISS, LLP
 7        77 Water Street
          New York, New York  10005
 8
 9        SCOTT ALAN GEORGE, ESQUIRE
              Email:  Sgeorge@seegerweiss.com
10            Phone:  (215) 553-7982
          SEEGER WEISS, LLP
11        1515 Market Street, Suite 1380
          Philadelphia, Pennsylvania  19102
12
13        GERALD E. MEUNIER, ESQUIRE
              Email:  Gmeunier@gainsben.com
14            Phone:  (504) 522-2304
          GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
15            WARSHAUER, LLC
          2800 Energy Centre
16        1100 Poydras Street
          New Orleans, Louisiana  70163
17
18   APPEARING ON BEHALF OF INTERIOR/EXTERIOR BUILDING
19   SUPPLY, L.L.C.:
20        RICHARD G. DUPLANTIER, JR., ESQUIRE
              Email:  Rduplantier@gjtbs.com
21        BENJAMIN R. GRAU, ESQUIRE
              Email:  Bgrau@gjtbs.com
22            Phone:  (504) 525-6802
          GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, PLC
23        701 Poydras Street, 40th Floor
          New Orleans, Louisiana  70139
24
25
```

Confidential - Subject to Further Confidentiality Review

Page 3

```
 1   APPEARANCES (CONTINUED):
 2
 3   APPEARING ON BEHALF OF NORTH RIVER INSURANCE
 4   COMPANY:
 5       KEVIN F. RISLEY, ESQUIRE
             Email:  Krisley@thompsoncoe.com
 6       BRIAN S. MARTIN, ESQUIRE
             Email:  Bmartin@thompsoncoe.com
 7       Phone:  (713) 403-8210
         THOMPSON, COE, COUSINS & IRONS, L.L.P.
 8       One Riverway, Suite 1600
         Houston, Texas  77056
 9
10   APPEARING ON BEHALF OF LANDMARK AMERICAN INSURANCE
11   COMPANY:
12       JUDY L. BURNTHORN, ESQUIRE
             Email:  Jburnthorn@dkslaw.com
13       Phone:  (504) 593-0689
         DEUTSCH, KERRIGAN & STILES, LLP
14       755 Magazine Street
         New Orleans, Louisiana  70130
15
16   APPEARING ON BEHALF OF NATIONAL SURETY CORPORATION
17   AND FIREMAN'S FUND INSURANCE COMPANY:
18       MEGAN E. DONOHUE, ESQUIRE
             Email:  Mdonohue@joneswalker.com
19       Phone:  (337) 593-7600
         JONES, WALKER, WAECHTER, POITEVENT, CARRERE &
20         DENEGRE, L.L.P.
         600 Jefferson Street, Suite 1600
21       Lafayette, Louisiana  70501
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

Page 4

```
 1   APPEARANCES (CONTINUED):
 2
 3   APPEARING ON BEHALF OF KNAUF:
 4       JAY P. MAYESH, ESQUIRE
             Email:  Jmayesh@kayescholer.com
 5           Phone:  (212) 836-7606
         KAYE SCHOLER, LLP
 6       425 Park Avenue
         New York, New York  10022-3598
 7
 8   APPEARING ON BEHALF OF THE STATE OF LOUISIANA:
 9       L. CHRISTOPHER STYRON, ASSISTANT AG
             Email:  Styronl@ag.state.la.us
10           Phone:  (225) 326-6468
         OFFICE OF THE ATTORNEY GENERAL
11       PUBLIC PROTECTION DIVISION
         1885 North 3rd Street
12       Baton Rouge, Louisiana  70802
13       DAVID L. BLACK, ESQUIRE (VIA TELEPHONE)
             Email:  Dblack@perkinscoie.com
14           Phone:  (303) 291-2300
         PERKINS COIE, L.L.P.
15       1900 Sixteenth Street, Suite 1400
         Denver, Colorado  80202
16
17   APPEARING ON BEHALF OF VARIOUS HOME BUILDERS:
18   (VIA TELEPHONE)
19       BRIAN A. EVES, ESQUIRE
             Email:  Beves@defensecounsel.com
20           Phone:  (305) 774-9966
         MINTZER, SAROWITZ, ZERIS, LEDVA & MEYERS, LLP
21       1000 NW 57th Court, Suite 300
         Miami, Florida  33126
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
                                                    Page 5
 1   APPEARANCES (CONTINUED):

 2

 3   APPEARING ON BEHALF OF VARIOUS HOME BUILDERS:

 4   (VIA TELEPHONE)

 5        STEPHANIE L. CHERALLA, ESQUIRE
              Email:  Scheralla@degan.com

 6          Phone:  (504) 529-3333

          DEGAN, BLANCHARD & NASH, PLC

 7          400 Poydras Street, Suite 2600

          New Orleans, Louisiana  70130

 8

 9   ALSO PRESENT:

10        CLAY GEARY

11

12   VIDEOGRAPHER:

13        HANK COBB

          Golkow Technologies, Inc.

14

15                          ---

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
                                                    Page 6

 1                     INDEX OF EXAMINATIONS

 2      EXAMINATION

 3         BY MR. SEEGER...............................7

 4         BY MR. MAYESH.............................42

 5      ACKNOWLEDGMENT OF DEPONENT...................51

 6      ERRATA......................................52

 7      LAWYER'S NOTES..............................53

 8      CERTIFICATE.................................54

 9                           * * *

10

11                     INDEX OF EXHIBITS

12      EXHIBIT 1...................................21

13         LETTERS OF CERTIFICATE

14         (INT/EXT06045 - INT/EXT06051)

15      EXHIBIT 2...................................24

16         6/20/06 LETTER FROM METRO RESOURCES TO

17         INEX, WITH ATTACHED DOCUMENTS

18         (INT/EXT00967 - INT/EXT000971)

19      EXHIBIT 3...................................36

20         E-MAIL CHAIN (INT/EXT05948 - INT/EXT05953)

21      EXHIBIT 4...................................39

22         E-MAIL CHAIN (INT/EXT02176)

23      EXHIBIT 5...................................40

24         E-MAIL CHAIN (INT/EXT02293 - INT/EXT02294)

25                           * * *
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 7

```
 1                    PROCEEDINGS
 2              THE VIDEOGRAPHER:  We are now on the
 3         record.  My name is Henry Cobb.  I'm the
 4         videographer for Golkow Technologies.
 5         Today's date is October 1st, 2012.  The
 6         time now is 11:25 a.m.
 7              This video deposition is being held in
 8         New Orleans, Louisiana, in the matter of
 9         Chinese Drywall.  The deponent today is
10         James Geary.
11              Counsel will be noted on the
12         stenographic record.  The court reporter
13         today is Leslie Doyle, and will now swear
14         in the witness.
15                     * * *
16                  JAMES GEARY,
17    after having been first duly sworn, was examined and
18              testified as follows:
19                     * * *
20                  EXAMINATION
21    BY MR. SEEGER:
22       Q.  Hi, Mr. Geary.  I'm Chris Seeger.  You
23    were here listening while I was questioning your
24    brother this morning, correct?
25       A.  Yes, I was.
```

Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.  So many of the questions I've

2   asked, I'm going to have to ask again of you.

3      A.   Fine.

4      Q.   Let's start with the relationship with

5   the -- how you guys got hooked up with the Taishan

6   board.  I'm going to ask some questions in that

7   context.

8           When was the first purchase by INEX made?

9      A.   The first purchase of Taishan?

10     Q.   Yes, yes.

11     A.   Okay.  I'm sorry.  We had essentially --

12   your question is, when did the first shipment come

13   in, or when did we make the purchase?  I'm not sure

14   I understand.

15     Q.   Let's start with the purchase, and then we

16   can...

17     A.   Okay.  The purchase was done in the summer

18   of '06.  We received -- these came in in containers,

19   so we had, I believe, four separate shipments coming

20   in --

21     Q.   Okay.

22     A.   -- coming in through the course of the

23   summer.  I believe the last shipment came in in

24   September.

25     Q.   Do you know when they began to arrive?

Confidential - Subject to Further Confidentiality Review

Page 9

1      A.    I believe in August.

2      Q.    Okay.

3      A.    I'm not positive, but I believe that to be

4    true.

5      Q.    All right.

6            MR. MAYESH:  Can we get the year on

7            that?

8            THE WITNESS:  2006.

9            MR. SEEGER:  I thought he said that,

10           but okay.

11           MR. MAYESH:  Oh, I'm sorry.

12           MR. SEEGER:  No, no, no.  I might not

13           have gotten it.

14           MR. DUPLANTIER:  You did.

15   BY MR. SEEGER:

16     Q.    All right.  Now, talk to me a little bit

17   about how you became introduced to the Taishan

18   board.

19     A.    The Taishan board that we got in, we

20   bought through Metro Resources.

21     Q.    Okay.

22     A.    To the best of my recollection, we had had

23   a couple of contacts with Metro Resources, and we

24   had even had one early on in the whole process.

25   Then we started getting in the Knauf board, so we

Confidential - Subject to Further Confidentiality Review

Page 10

1    didn't have any further dealings with him until

2    later, when we had issues getting more Knauf

3    product.

4        Q.   Okay.  And that's when you began to deal

5    with Metro Resources, and that's the David Zhang?

6    Is that how you say his name?

7        A.   Yes.  That's correct.

8        Q.   Okay.  How does Susan Li fit into the

9    picture with the Taishan board, if at all?

10       A.   I don't believe she has any connection

11   whatsoever.

12       Q.   Why were you guys dealing with Susan Li?

13       A.   Susan Wei?

14            MR. GEORGE:  Li, L-I.

15   BY MR. SEEGER:

16       Q.   L-I.

17       A.   Susan Li.  Oh.  I'm not sure.  She may

18   have been an employee of his, but I'm not certain of

19   that.

20       Q.   Let me try to help you.  Susan Li.  It

21   says, Weida Freight Systems.  Does that help you

22   out?

23       A.   Okay.  Weida Freight.  We used Weida

24   Freight, as Clay said earlier, with regards to the

25   Knauf shipments.

Confidential - Subject to Further Confidentiality Review

Page 11

1      Q.   You didn't use them at all with regard to

2   Taishan?

3      A.   Correct.

4      Q.   And the e-mail that I previously marked as

5   Exhibit 2 to your brother's deposition -- do we

6   still have that here?  So just for the record,

7   without marking it again, it's Exhibit 2 to Clay

8   Geary's deposition from this morning.  Can you take

9   a look at that?

10          You're not on this; your brother is,

11   right?

12      A.   I don't see my name on this, correct.

13      Q.   Okay.  Thanks.

14          I think you said this.  I just want to

15   make sure I understand it completely.  You turned to

16   Taishan once you believed the Knauf resources dried

17   up on the drywall; is that correct?

18      A.   That's correct.

19      Q.   Okay.  Now, what investigation, research,

20   inquiries did you make to make sure that your

21   decision to purchase drywall from Taishan was a

22   sound decision, good for you, good for your

23   customers?

24      A.   I'm trying to remember.  Very limited

25   research.  I don't recall any other -- any research

Confidential - Subject to Further Confidentiality Review

Page 12

```
 1   really we did.
 2       Q.   Would you add anything to your brother's
 3   answer on that topic?
 4       A.   Nothing that I can recall.
 5       Q.   Did you have any prior experience -- I'm
 6   talking to you now, because I think we got your
 7   brother's --
 8       A.   I understand.
 9       Q.   Did you have any prior experience with
10   Taishan prior to this time?
11       A.   No, did not.
12       Q.   Okay.  Did you -- were you personally
13   involved in any importing from -- any goods from
14   China prior to this time?
15       A.   As Clay mentioned earlier, we have
16   brought -- actually, many, many years ago, yeah, we
17   have brought some products from overseas, and I
18   think we had some come in from China we got years
19   ago.  We got some screws in, and then we got some
20   wire, but that was, again, many, many years ago.
21   It's been a long time since we did any of that.
22       Q.   Any recollection of any problems with
23   those products?
24       A.   None whatsoever.
25       Q.   Okay.  Let me ask you also some of the
```

Confidential - Subject to Further Confidentiality Review

Page 13

1    questions I asked him that may sound a little silly,

2    but do you read a newspaper generally today?

3         A.   Yes.

4         Q.   And which one is it?  Times-Picayune?

5         A.   Yes.

6         Q.   Okay.  What about news stations?

7         A.   Typically, WWL.

8         Q.   And would that have been the same around

9    2005, 2006?

10        A.   Yes.

11        Q.   And before?

12        A.   Yes.

13        Q.   Did you have any direct communication with

14   Taishan, you, personally?

15        A.   I did not.

16        Q.   Did you ever discuss -- and, again, I'm

17   just trying to get your testimony.  I know I asked

18   your brother this, so this might be a little -- I

19   don't want to confuse you, but did you personally --

20   were you ever involved in any discussions regarding

21   your ability to go to Taishan, to go to China, to

22   actually inspect their operations there?

23        A.   We did not have any conversations to that

24   regard, that I recall.

25        Q.   Okay.  Were you ever involved in making a

Confidential - Subject to Further Confidentiality Review

Page 14

1    request of that nature?

2          A.   I don't believe so.

3          Q.   Did you check any references on Taishan?

4          A.   On Taishan?

5          Q.   Yeah.  Like other supply houses that might

6    have purchased goods from them?

7          A.   I'm not sure.  No, I don't recall.

8          Q.   Okay.  Now, with regard to the Knauf board

9    from China, I believe your brother's testimony

10   was -- and I'm characterizing a little.  If you want

11   to correct me, please do.  But there was a

12   pre-existing relationship with the Knauf company,

13   correct?

14         A.   Yes, that's correct.

15         Q.   It was Knauf insulation?

16         A.   Correct.

17         Q.   Talk to me a little about the board

18   from -- that your brother referenced from Indonesia.

19   I believe he also referenced some board from

20   Thailand; is that --

21         A.   Yes.

22         Q.   -- correct?  Did he get that right?  Okay.

23              Is that the same board, the Elephant

24   Board?

25         A.   The Elephant Board was the brand name for

Confidential - Subject to Further Confidentiality Review

1    the product that came from Thailand.

2         Q.   Okay.  And was that the board that you had

3    some problems with regard to it being heavy and

4    brittle?

5              MR. RISLEY:  Object to the form.

6              MR. DUPLANTIER:  Join in the

7         objection.

8              You can answer it.

9         A.   Yeah.  I mean, we had some comments to the

10   effect that it was heavy and brittle.

11   BY MR. SEEGER:

12        Q.   Okay.  Now, and I want to get your

13   testimony.  So other than Indonesia and Thailand,

14   prior to 2005, 2006, had you ever bought drywall

15   from any country outside the U.S.?

16        A.   We have received product from Mexico.

17        Q.   From Mexico.  Your brother did say that.

18   Okay.

19        A.   Yes.

20        Q.   The Indonesian board, did you have any

21   problems with that back in '99?

22        A.   No, other than the same thing, the brittle

23   and the heavy.

24        Q.   Okay.  Did you ever look into why it was

25   brittle and heavy; did you do any testing of the

Confidential - Subject to Further Confidentiality Review

Page 16

1  gypsum or anything?

2       A.   We did not.

3       Q.   Okay.  Did you ever become aware after

4  1999, why it was brittle or heavy; like, did

5  somebody else do it and bring it to your attention,

6  hey, this is the reason --

7       A.   No, did not.

8       Q.   Were you involved -- with regard to the

9  drywall that came from Taishan, were you involved in

10  inspecting any of the shipments, either before or

11  after it was offloaded off the boat?

12       A.   Well, again, these came in containers, so

13  they came directly to our warehouse, and I was

14  present when we had to unload those containers.

15       Q.   Okay.  But did -- you were present when it

16  came to your warehouse.  What about when it was

17  offloaded from the -- at the dock?

18       A.   They would have been in enclosed

19  containers.

20       Q.   Okay.  So you wouldn't have been able to

21  inspect it?

22       A.   That's my understanding, yes.

23       Q.   Who would have been in charge of, with

24  regard to the Taishan board, ensuring that the board

25  was ASTM compliant?  Would that have been you or

Confidential - Subject to Further Confidentiality Review

1    your brother, or the two of you?

2              MR. DUPLANTIER:  Object to the form of

3         the question.

4              But subject to that, you can --

5         A.   Repeat that, please.

6    BY MR. SEEGER:

7         Q.   Sure.

8              MR. SEEGER:  Can you read that?

9              COURT REPORTER:  Sure.

10             "Who would have been in charge of,

11        with regard to the Taishan board, ensuring

12        that the board was ASTM compliant?  Would

13        that have been you or your brother, or the

14        two of you?"

15        A.   Since I handled the transactions for the

16   Taihe board, yes, that would have been me, to make

17   sure that we made the request on the letter of

18   credit that we got the certification that it

19   complied with the ASTM standards.

20   BY MR. SEEGER:

21        Q.   Okay.  Now, earlier when I was questioning

22   your brother, I showed him a document which was --

23   which purports to show that the Taishan board was

24   ASTM compliant; it was partly in Chinese.  If you

25   want, we can pull it out.  I forgot...

Confidential - Subject to Further Confidentiality Review

Page 18

1      A.    Which one is it?

2      Q.    Thumb through.

3            MR. DUPLANTIER:   Exhibit 1.

4            MR. SEEGER:   Oh, is it Exhibit 1?

5   BY MR. SEEGER:

6      Q.    So go to the front.

7      A.    There you go.

8      Q.    So that -- this was earlier marked in Clay

9   Geary's deposition as Exhibit 1.  Other than that,

10  did you receive any document -- other than that and

11  the representations and warranties from the company

12  itself, from Taishan, did you receive anything

13  showing that the board was ASTM compliant?

14     A.    I believe that for the letter of credit

15  itself, we had something stating that it did comply

16  or conform to ASTM standards, and that was, again,

17  within the whole letter of credit, one of the

18  stipulations.

19     Q.    The stipulation by the bank?

20     A.    By us.

21     Q.    By you?  Okay.

22     A.    Yeah.

23     Q.    And what would that thing have been?

24  Would it have been that, what you're looking at,

25  that we're showing was ASTM compliant?

Confidential - Subject to Further Confidentiality Review

Page 19

1              MR. DUPLANTIER:  Object to the form of

2         the question.

3              You can answer it if you understand.

4      A.    If I understand you correctly, what -- I

5  think I understand what you're saying is -- yeah, we

6  received some document from them saying that -- from

7  Metro Resources saying that it complied with the

8  ASTM standards.

9  BY MR. SEEGER:

10      Q.    From Metro Resources?

11      A.    Yes.

12      Q.    Do you recall what that document looked

13  like?  Was it an e-mail?  Was it a certification of

14  some sort?

15      A.    I believe it was, you know, something

16  similar to what we got with the warranty.

17      Q.    Let me see if I can find a document to

18  help.

19      A.    I could be wrong here.  That was my

20  recollection.  I could be wrong if you can't find

21  it.

22      Q.    Take a look at Exhibit 3 right there from

23  your brother's deposition.

24              I think you're looking at 2 right now.

25      A.    I am, 2.  Got it.

Confidential - Subject to Further Confidentiality Review

Page 20

1      Q.   All right.  Would it have been something
2   other than this e-mail from David Zhang?  If you
3   look actually at the bottom of the e-mail, which was
4   marked in your brother's deposition as Exhibit 3, at
5   the bottom -- it's one, two, three four paragraphs
6   down -- it says, for half-inch drywall, we provide
7   CCIC certificate, which he defines as Chinese
8   government inspection certificate.  CCIC will show
9   these cargoes quality meet with ASTMC36 standard.
10  Do you see that?
11     A.   I see that.
12     Q.   Is that what you're talking about?
13     A.   No.  What I -- and I could be mistaken,
14  but what I thought that we did receive with the
15  letter of credit was -- along with the warranty,
16  something saying that it complied with the letter --
17  with the ASTM standards.  Again, I could be wrong
18  there, and maybe what -- it was also in one of the
19  stipulations of the letter of credit, so...
20     Q.   All right.  But I want to note that
21  stipulation there --
22              MR. SEEGER:  Can you mark that?
23              MR. GEORGE:  We're up to 10, I think?
24              MR. DUPLANTIER:  Yeah.  Well, this is
25          a new deposition, --

Confidential - Subject to Further Confidentiality Review

Page 21

1                    MR. GEORGE:  All right, so 1.

2                    MR. DUPLANTIER:  -- so let's start

3            over.

4                    MR. SEEGER:  Just start at 1.  You're

5            right.

6                    MR. GEORGE:  Very wise.

7            (Deposition Exhibit 1 was marked for

8                       identification.)

9    BY MR. SEEGER:

10           Q.   Mr. Geary, before I hand this to you, I

11   just want to ask you a question.  You would agree

12   with me that there's probably nothing more important

13   with regard to importing drywall than ensuring that

14   it's ASTM compliant; that's something you'd want to

15   do, not just for yourself, but for your customers?

16           A.   Well, obviously, we requested that.

17           Q.   Okay.  But you'd want to be sure of that,

18   wouldn't you?

19           A.   Yes.

20           Q.   Okay.  I would like you to look at what we

21   just marked as Exhibit 1, and tell me if that's what

22   you're talking about with regard to thinking that

23   the condition in the letter of credit was satisfied

24   as to AS -- meeting ASTM standards.

25           A.   I thought that there may have been -- that

Confidential - Subject to Further Confidentiality Review

1    there was another document similar to this that --

2    where they said the product complied with ASTM

3    standards.

4         Q.   Okay.  Because --

5         A.   I could be mistaken.

6         Q.   Okay.  I got to push it a little bit, --

7         A.   Sure.

8         Q.   -- so forgive me for a second.

9         A.   No problem.

10        Q.   Just with regard to what we're looking

11   at now we've just marked as -- in your deposition

12   as Exhibit 1, you understand that this is not a

13   government-issued document; this is a representation

14   from the company itself, from Taishan,

15   correct?

16        A.   I understand.

17        Q.   All right.  So other than what we looked

18   at from your brother's deposition, which is

19   Exhibit 1 in his deposition, and that, just -- I'm

20   going to ask you to push your memory.  Is there

21   anything else, a document that I should go back and

22   look for, that gave you comfort that this board was

23   ASTM compliant?

24        A.   Nothing I can think of, other than that

25   they agreed to those -- to that in the stipulations

Confidential - Subject to Further Confidentiality Review

Page 23

1   on the letter of credit.

2        Q.   Okay.  Now, Mr. Geary, if you saw the

3   board yourself when it came to your warehouse, would

4   you be able to, just by eyeballing it -- do you know

5   the regulation well enough to say, hey, that looks

6   like it's complied with all the ASTM requirements,

7   or something looks like it's missing?

8        A.   Just to make sure I understand your

9   question, if I could just look at the board and say,

10  look at that board -- you're not referring to any

11  markings or anything?

12       Q.   I'm referring to the markings, actually.

13       A.   You are?

14       Q.   Yeah.

15       A.   Pardon me.

16       Q.   No, that's a fair clarification.  Yeah,

17  just by looking at the board and seeing, like,

18  what's stamped on the board, --

19       A.   Right.

20       Q.   -- the bond tape, things like that, would

21  you be able to -- are you knowledgeable enough about

22  the ASTM rule to know that, okay, that board is or

23  isn't ASTM compliant?

24            MR. DUPLANTIER:  Let me object to the

25            form of the question.

Confidential - Subject to Further Confidentiality Review

Page 24

1           If you can answer it, Jim, answer it,

2        but I'm a little confused myself by your

3        question, so...

4           MR. SEEGER:  We'll swear you in after.

5     A.   The -- you know, the product should -- as

6   we requested, was stamped with the designation that

7   it complied with ASTM.

8   BY MR. SEEGER:

9     Q.   Okay.  Mr. Geary, take a look at what I've

10  just marked as -- I need one to look at, too.

11          MR. GEORGE:  Oh, I'm sorry.

12          MR. SEEGER:  That's all right.  That's

13       okay.  Give me one second.

14      (Deposition Exhibit 2 was marked for

15             identification.)

16  BY MR. SEEGER:

17    Q.   I just want to know -- Mr. Geary, take a

18  look at Exhibit 2.  Tell me, is that one of the

19  documents that you were just -- when you said you

20  had a recollection of there being a document, that

21  it was a condition to the letter of credit, is this

22  it?

23    A.   I believe this to be the document that I

24  was referring to and thinking of, yes.

25    Q.   Okay.  And it's -- this is a -- the cover

Confidential - Subject to Further Confidentiality Review

1   letter is MRC.  That's Metro Resources Corporation,

2   correct?

3        A.   Yes.

4        Q.   For the record, it's Bates stamped

5   INEX00967 through 971.  And this is a certification,

6   again from Metro Resources, not from Taishan, and

7   it's not a government-issued certification on ASTM.

8   This is just from Metro Resources; fair enough?

9        A.   Correct.

10       Q.   Okay.  It says, "Metro Resources certifies

11  that the gypsum boards shipped were properly

12  palletized."

13            That means they were prepared for shipping

14  properly, correct, No. 1?

15       A.   Yes.

16       Q.   That the board, gypsum boards, have end

17  tape and tapered edges?

18       A.   Yes.

19       Q.   Why is that important?

20       A.   That's pretty much industry standard.

21       Q.   Okay.  And that each sheet marked on back

22  "Made in China" and meet or exceed ASTM C1396 ASTM

23  standard.  That's what you're talking about?

24       A.   Correct.

25       Q.   Okay.  And did you confirm that each

Confidential - Subject to Further Confidentiality Review

Page 26

1  board, in fact, had that stamp?

2      A.   Didn't look at every board, but we saw a

3  good sampling that they did have that labeling on

4  it.

5      Q.   Okay.  Now, I asked you earlier about

6  Susan Li.  Do you recall that?

7      A.   Yes, I do.

8      Q.   And you said that she was not involved in

9  Taishan board, but there's an e-mail that we marked

10  with your brother, if you want to go back to it.

11          No. 2, Exhibit 2 from your brother's

12  deposition.  One more page, I believe.  There you

13  go.

14      A.   Okay.

15      Q.   Do you see the subject line on that?

16      A.   Gypsum board -- gypsum wallboard market in

17  china.

18      Q.   Market in China.  Okay.  And then down

19  below, I believe on that -- let me see if I can find

20  that.  I keep moving things around, and I can't find

21  it.  Okay.  Give me a second.

22          On the very first page of this, do you see

23  where it says -- the subject line, as you said, is

24  gypsum wallboard market in China.  And then it says,

25  ASTMC36 have not got license; it means the factory

Confidential - Subject to Further Confidentiality Review

1    of Taihe do not supply ASTMC36 authentication in

2    America.

3              Do you see that?

4         A.   I see that.

5         Q.   Now, that's the kind of thing that would

6    put you on notice that there could be an issue as to

7    whether something is ASTM certified; wouldn't you

8    agree with that?

9                   MR. DUPLANTIER:  Object to the form of

10             the question.

11                  Subject to that, you can answer, Jim.

12                  MR. RISLEY:  Join in the objection.

13        A.   Can you repeat the question, please?

14   BY MR. SEEGER:

15        Q.   Basically, the question is, when you look

16   at this e-mail from Susan Li, from Weida Freight,

17   who you'd acknowledge has a lot of experience in

18   importing from China to the U.S.; is that fair

19   enough?

20                  MR. DUPLANTIER:  I object to the form

21             of the question.

22        A.   I don't know if she does or not.

23   BY MR. SEEGER:

24        Q.   Okay.  Do you know why anybody

25   from INEX is even on this e-mail, what this

Confidential - Subject to Further Confidentiality Review

Page 28

1    is about?  Do you know anything about this

2    e-mail at all?

3        A.    I'm not familiar with it, no.

4        Q.    Okay.  You can put it aside.

5            All right.  Just to close out the loop on

6    this last exhibit I marked for you with Metro

7    Resources, this is -- these are -- this is just a

8    certification from Metro Resources, correct?

9                MR. DUPLANTIER:  Asked and answered,

10           but you can answer it again.

11       A.    Yes.

12   BY MR. SEEGER:

13       Q.    Okay.  And if you look through the pages,

14   what it says is, Metro Resources Corp certifying

15   gypsum board manufactured and sold to

16   Interior/Exterior Building Supply are warranted to

17   be free from defects in materials and workmanship,

18   correct?

19       A.    Correct.

20       Q.    There's no -- like, there's no ASTM

21   certificate attached to this that you can see, is

22   there?

23       A.    I don't -- I don't know.

24       Q.    All right.

25       A.    I'm sorry.

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   There's no ASTM certification attached to
 2   that, is there?
 3      A.   Correct.  I don't see that.
 4      Q.   Mr. Geary, with regard to -- I want to go
 5   back to the Indonesian Thai board.  Did the
 6   experience you had with that board cause you to
 7   implement any policies within INEX from '99 and
 8   after with regard to importing either drywall or any
 9   products from countries -- you know, foreign
10   countries?
11      A.   No, we did not implement any different
12   policies.  As a matter of fact, the thing had gone
13   so well it kind of incentivized us to pursue it
14   again.
15      Q.   Do you have any, like, official quality
16   assurance or quality control, like people in your
17   shop?
18      A.   We do not.
19      Q.   Do you and your brother do that kind of
20   work, quality control, quality assurance?
21      A.   We rely upon the manufacturers.
22      Q.   Okay.  Now, were you aware of Metro
23   Resources having any specific expertise in the area
24   of importing drywall?  Because one of the -- some of
25   the documents I've seen reference them as having a
```

Confidential - Subject to Further Confidentiality Review

Page 30

1    lot of experience in carpets and carpet recycling.

2    I didn't see much on them with regarding -- with

3    regard to drywall.  So are you aware of any

4    expertise that they had in assisting and importing

5    drywall from China or anywhere else?

6        A.   I'm not aware.

7        Q.   How did you come -- how did you first meet

8    David Zhang?

9        A.   I really don't recall.  He -- as I said,

10   early on, he had contacted us, just as many others

11   had.

12       Q.   Uh-huh.

13       A.   We lost contact with him when we were

14   receiving the Knauf product, and then I think he

15   contacted me again later in the day when we were

16   having the issues with Knauf, and then we started

17   talking more in-depth.

18       Q.   Mr. Geary, I want to ask you a question.

19   It might strike you as a little strange, but just,

20   you know, because we all live in this country and we

21   read the news and we hear the news.  You know, if

22   somebody were to say to me -- and I'm not being

23   deposed -- if somebody would say to me, hey, are you

24   generally aware of Chinese products, what do you

25   think of Chinese products, I would be thinking of

Confidential - Subject to Further Confidentiality Review

1    things like toys recalled, baby bottles recalled, so

2    I would have -- I'd be thinking as a consumer.  I'd

3    be thinking maybe products from China, I need to be

4    aware of.  Did you have that mindset back in 2005,

5    where you had any concern?

6                    MR. DUPLANTIER:  I'm going to object

7              to the form of the question.

8              Subject to that, you can answer it.

9              Go ahead.

10        A.    Sure.  I've heard those stories, but I

11   know that China also is -- ships more product in the

12   United States than anyone else, so...

13   BY MR. SEEGER:

14        Q.    Uh-huh.  Doesn't mean the product is good,

15   though, right, just because they ship a lot of it?

16        A.    It's good and not so good, I guess.

17        Q.    Well, I mean, you're not buying Chinese

18   drywall anymore, right?

19        A.    Correct.

20        Q.    Okay.  Do you know anybody who's importing

21   Chinese drywall right now as we sit --

22        A.    I do not.

23        Q.    Okay.  I'm looking through my notes.  When

24   I turn the page, that's good.

25              Now, you have -- with regard to products

Confidential - Subject to Further Confidentiality Review

Page 32

1  that you've purchased, either from domestic

2  manufacturers, as well as manufacturers outside the

3  country, you've asked for certifications showing

4  that those products were ASTM compliant, right?  I'm

5  talking about just on a general basis.  Isn't that

6  true?

7       A.   Domestic products, as well?

8       Q.   Yeah.

9       A.   Yes.  You know, we -- let me change that

10 answer.  We -- you know, we get a lot of products in

11 all the time, and it's not like it's one of your

12 first questions, can I see that your product

13 complies with ASTM standards.

14      Q.   What if you were dealing with a new

15 manufacturer?

16      A.   Then you would look into it more in-depth,

17 yes.

18      Q.   Okay.  And what would that -- looking into

19 it more in-depth, what would that entail?

20      A.   You know, I guess it all depends.

21      Q.   Okay.  It depends on what, like?

22      A.   Depends on the circumstances, the product.

23 I don't know.

24      Q.   Okay.  So it's a new manufacturer from

25 China.  What would that entail?  How would you look

Confidential - Subject to Further Confidentiality Review

Page 33

1    into that?

2              MR. DUPLANTIER:  Object to the form of

3              the question, but subject to that, you can

4              answer it, Jim.

5       A.   Making -- you know, our appreciation has

6    always been the ASTM standard is the most important

7    thing.

8    BY MR. SEEGER:

9       Q.   And you'd want to make sure it was, in

10   fact, ASTM compliant?

11      A.   That's why we had it in the letter of

12   credit, right.

13      Q.   And to you, that was making sure it was

14   ASTM compliant; that was enough?

15      A.   That was our request, yeah.

16      Q.   You were satisfied with that?

17      A.   Yes.

18      Q.   I was asking your brother questions about

19   a material safety data sheet.  Did you recall

20   hearing that?

21      A.   I do.

22      Q.   Okay.  And remind me again, what's a

23   material safety data sheet?

24      A.   I don't know if I can give you the exact

25   definition, but it's a listing of the properties of

Confidential - Subject to Further Confidentiality Review

Page 34

```
 1   the product, anything that could be of a hazardous

 2   nature.  I think there are three different

 3   categories, and then the third category would be how

 4   to treat, if someone got something, you know,

 5   ingested or got something in their eye, something of

 6   that nature.

 7        Q.   Okay.  And I was questioning your brother,

 8   I think you heard it, where he acknowledged that you

 9   did get one of those material safety data sheets

10   from the Knauf manufacturer.  Do you recall ever

11   getting one from the Taishan manufacturer?

12        A.   I don't believe we did.

13        Q.   Okay.

14             MR. SEEGER:  Let's take a five-minute

15             break.  Is that all right?

16             MR. DUPLANTIER:  Sure.  Lunch is here,

17             if you guys want to --

18             MR. SEEGER:  I'm always hungry.

19             MR. DUPLANTIER:  It's in conference

20             room 3.  If people want to grab it and

21             come here, or if you guys want to get it

22             and meet in there, it's up to you.

23             THE VIDEOGRAPHER:  The time is

24             11:52 a.m.  We're now off the record.

25   (Recess.)
```

Confidential - Subject to Further Confidentiality Review

Page 35

1                THE VIDEOGRAPHER:  The time now is

2           12:16 p.m.  We are now back on the record.

3           This is a continuation of tape 2.

4    BY MR. SEEGER:

5       Q.   Mr. Geary, I want to ask you a question

6    about a document I marked when I was questioning

7    your brother.  I just don't remember where it is.

8    Is that the stack in front of you?

9       A.   Yes.

10      Q.   It was the Susan Li e-mail.  At the very

11   top, it says, Rudy Remont.

12      A.   Exhibit 2?  Yeah.

13      Q.   Exhibit 2.  Could you take a look at that?

14      A.   Yes.

15      Q.   If you look through this e-mail and look

16   to the third page, it's pretty clear that Ms. Li is

17   talking about the fact that she studied gypsum

18   wallboard market in China, and she says the quality

19   factories are Beijing New Building Material Company

20   in Beijing and then Taihe, which is Shandon Taihe

21   Tongxing, Limited.

22           Do you see that?

23      A.   Where are you?  I'm sorry.

24      Q.   On the last page of the e-mail.  I'm

25   sorry.

Confidential - Subject to Further Confidentiality Review

1        A.    Three of three.  Okay.

2        Q.    Why didn't you buy or order drywall from

3    BNBM?

4        A.    We -- pardon me.  We actually -- and when

5    I say "we," I believe Clay did -- had some

6    conversations with BNBM.  There was conversations

7    about getting some of their product.  It never came

8    to fruition.

9        Q.    Do you recall why?

10       A.    I do not.

11       Q.    Okay.  Let's mark this one.  It's already

12   marked.  No, it's not.

13                 MR. GEORGE:  Not yet.

14                 MR. SEEGER:  I'm sorry.  What are we

15             up to for Mr. Geary?

16                 COURT REPORTER:  3.

17                 MR. SEEGER:  3?

18                 COURT REPORTER:  Yes.

19   BY MR. SEEGER:

20       Q.    Mr. Geary, please take a look at what I've

21   marked as Exhibit 3.  This is an e-mail to you.  You

22   can see that at the top right, dated December 9th,

23   2005?

24            (Deposition Exhibit 3 was marked for

25                    identification.)

Confidential - Subject to Further Confidentiality Review

Page 37

1      A.   Yes, I do.

2      Q.   And I believe it's a communication between

3   you and a representative from SGS; is that fair

4   enough?

5      A.   Yes.

6      Q.   And toward the top of this, I guess you're

7   talking about there seems to be a discussion -- and

8   if I'm characterizing it wrong, tell me -- but a

9   discussion about what might be expected of SGS as

10  far as their inspection services; is that fair?

11     A.   Correct.

12     Q.   Okay.  And at the very top, it says --

13  there's one, two and then the third paragraph -- "We

14  are not looking for you."

15          Do you see that?

16     A.   Yes.

17     Q.   "We are not looking for you to do any

18  testing of the product, just a random review, as you

19  mentioned, of dimensions, overall condition,

20  damages, construction and a visual external

21  verification of specifications."

22          Did I read that correctly?

23     A.   Yes.

24     Q.   You wrote that, correct?

25     A.   Yes, I did.

Confidential - Subject to Further Confidentiality Review

1     Q.    Okay.  And I believe we talked to your

2  brother a little bit about this, but did SGS ever

3  wind up doing any of this work for you, or they did

4  nothing or what?  What was the --

5     A.    To my understanding, they did nothing.

6     Q.    Do you know why?

7     A.    They -- we -- at the end of the day, we

8  did not need them, because our freight forwarder,

9  J.W. Allen, sent one -- someone over there to do

10  that for us.

11     Q.    To do exactly what they were offering to

12  do?

13     A.    I don't know if it was the exact things

14  that SGS was going to do, but it was -- they were

15  going to do the inspection of the product loading on

16  the ships.

17     Q.    Do you know if they did some of what's

18  here, the dimensions, overall condition, damages,

19  construction?

20     A.    I'm really not sure.

21     Q.    Okay.  Now, in this e-mail, SGS actually

22  offers to do in-depth or detailed type of

23  inspections for you, but you never took them up on

24  any of that; is that correct?

25     A.    That is correct.

Confidential - Subject to Further Confidentiality Review

Page 39

1      Q.   Mr. Geary, please take a look at what I've
2  just marked as Exhibit 4.  And for the record -- I
3  forgot to do this with the last one -- it's
4  INEX02176.
5           (Deposition Exhibit 4 was marked for
6                    identification.)
7      A.   Yes.
8      Q.   Who is David Alexander?
9      A.   David Alexander is a guy from Florida.  He
10  contacted me at some point that year.  As I
11  understand it, he's a broker and deals with -- with
12  China quite a bit.
13     Q.   Did you do any business with him?
14     A.   We did not.
15     Q.   Okay.  Do you recall why?
16     A.   We did not need him.
17     Q.   Okay.  I don't have anything else on that.
18          Oh, what manufacturers did he represent;
19  do you recall?
20     A.   I don't recall.
21     Q.   Okay.
22              MR. SEEGER:  Jay, any questions?
23              MR. MAYESH:  Yeah, just a couple.
24              MR. SEEGER:  Oh, I'm sorry.  Jay, let
25          me just ask -- I'm sorry about that.  I

Confidential - Subject to Further Confidentiality Review

1                got one more, one more.  I made a mistake.

2                You need the mic anyway.

3     BY MR. SEEGER:

4          Q.   Sorry, Mr. Geary.  One last one.

5          A.   Sure.

6                    MR. MAYESH:  Is this 5?

7                    MR. SEEGER:  Yeah.

8               (Deposition Exhibit 5 was marked for

9                    identification.)

10    BY MR. SEEGER:

11         Q.   Here you go.  Take a look at that while I

12    grab one for me to look at.

13               Okay.  Again now, Mr. Geary, you're on

14    this e-mail, right, in 2007, January of 2007?

15         A.   Yes, I am.

16         Q.   What's being discussed here?  I'm having a

17    hard time figuring out the context of this.  Can you

18    help?

19         A.   Yeah.  We went through this in the -- in

20    our corporate deposition.  Allan Colley is an

21    acquaintance of mine.

22         Q.   Uh-huh.

23         A.   He owns and runs Dupuy Storage.

24         Q.   Okay.

25         A.   And sometime after we had sold all of our

Confidential - Subject to Further Confidentiality Review

Page 41

1    Chinese drywall, somehow in the course of
2    conversation he had mentioned to me that he had
3    quite a bit of Chinese drywall in one of his
4    warehouses.
5         Q.    Okay.
6         A.    Then when all of the things started
7    surfacing about the issues with Chinese drywall, I
8    believe that I contacted Allan and just asked him a
9    few questions about what he had, if he still had it.
10   That was pretty much the extent of it.
11        Q.    Mr. Geary, I thought the testimony that
12   you and your brother had given -- and I just want to
13   be clear on it -- was that you weren't aware of
14   problems with Chinese drywall till around 2009; do I
15   have that wrong?
16        A.    Correct.
17        Q.    This e-mail is dated 2007.  So you were
18   aware of problems with Chinese drywall in 2007?
19        A.    No, I was not.  I think -- then I will
20   change what I said -- that we had -- I had some
21   conversation with Allan Colley, and he mentioned
22   that he had this Chinese drywall, and I just had
23   asked him some questions about it.
24        Q.    Did you take this drywall?
25        A.    We did not.

Confidential - Subject to Further Confidentiality Review

Page 42

```
 1        Q.    Whatever happened with it?
 2        A.    I have no idea.
 3              MR. DUPLANTIER:  Habitat for Humanity
 4         sold it.
 5              MR. SEEGER:  I'm going to swear you in
 6         if you keep it up.
 7              MR. DUPLANTIER:  Sorry.
 8  BY MR. SEEGER:
 9        Q.    Why didn't you buy it?
10        A.    We didn't need it.
11        Q.    You had enough?  I mean, in --
12        A.    Domestic board, yes.
13        Q.    You had enough domestic board in 2007?
14        A.    Yes.
15              MR. SEEGER:  That's all I have.
16              Jay?  You need this.
17                      * * *
18                   EXAMINATION
19  BY MR. MAYESH:
20        Q.    Mr. Geary, just a couple of follow-up
21  questions from what I had asked your brother.
22              Were you aware that several of your
23  customers had expressed this negative preference for
24  Knauf board?
25        A.    We may have heard some comments made by
```

Confidential - Subject to Further Confidentiality Review

1    some of our salespeople, but I wasn't aware of that

2    on a regular basis.  Clay had mentioned earlier,

3    we're -- in our jobs, we don't handle the daily

4    transactions in sales.

5        Q.    Did you have any discussion with any

6    customer concerning any deficiencies in the Knauf

7    board?

8        A.    Not that I recall.

9        Q.    Did you have any discussions with any of

10   your salespeople concerning customer complaints or

11   rejections of Knauf board?

12       A.    Not that I specifically recall.  The only

13   thing I may have heard -- I think I may have heard

14   was that, you know, over lunch or something with

15   someone, they made the comment they got a call about

16   a customer complaining about the board being heavy

17   and/or brittle.

18       Q.    Heaviness and brittleness is a common

19   complaint in your industry, isn't it?

20       A.    Is a common complaint in our industry?  I

21   wouldn't call it a common complaint, no.

22       Q.    Don't you -- it's not unusual for people

23   who hang wallboard to complain that one particular

24   brand is heavier than another particular brand?

25       A.    Most definitely.  Some people have brand

Confidential - Subject to Further Confidentiality Review

1    preferences.  They say this particular brand will

2    cut and sharp -- a sharp edge and snap quickly,

3    whereas the other brand is not as crisp.

4          Q.    And it's not unusual that one customer

5    will say, boy, this XYZ is -- brand cuts quick and

6    snaps and does everything I want, and the other

7    customer says, oh, that XYZ brand, I don't like it,

8    I want ABC brand.  That's not unusual, is it?

9          A.    I don't think you normally hear that.  I

10   think what you'd normally hear is a guy say, I want

11   USG, or I want National Gypsum, for whatever reason

12   he prefers.

13         Q.    In any event, you never said to any of

14   your salespeople, find out why our customers are

15   expressing this negative preference for Knauf board;

16   you never did that?

17         A.    Correct.  We did not.

18         Q.    At your prior deposition, there were a few

19   invoices marked which had this negative preference

20   on them, no Knauf, no China board, right?  Do you

21   remember that?

22         A.    Yes, I do.

23         Q.    Can you point us to any other invoices or

24   purchase orders during that time period in which a

25   customer expressed a negative preference for any

Confidential - Subject to Further Confidentiality Review

1   board other than Knauf board?

2          A.    We have submitted all of the invoices, so

3   you can look in the documents yourself.

4          Q.    All invoices for all customers for all

5   kinds of board?

6          A.    No, sir.  For all 4 by 12 half-inch.

7          Q.    All right.  Have you given us all of your

8   invoices for all of your customers for that

9   dimension of board?

10          A.    For that -- that period of time.

11          Q.    Yes.

12          A.    Yes.

13          Q.    So that if a customer had expressed

14   negative preference for USG board, I don't want any

15   USG board, that would be in and among the invoices

16   that you've produced to us?

17          A.    Not necessarily.  I mean, you may have a

18   situation where the guy said, I don't want USG, and

19   he just -- as he was ordering it, he would tell the

20   salesperson to make sure you send me National Gypsum

21   board or something to that effect.

22          Q.    Are you aware of any instance in the year

23   2005, '6, '7 and '8 -- 2005, '6 and '7, where any

24   customer expressed a negative preference for any of

25   your board products other than the negative

Confidential - Subject to Further Confidentiality Review

1    preference for the Knauf board?

2              MR. RISLEY:  Objection; form.

3        A.   I believe we have, but I can't cite or

4    recall any specific situation.

5    BY MR. MAYESH:

6        Q.   So as you sit here today, the only brand

7    of board that you can remember some customer saying,

8    I don't want it, was the Knauf board?

9              MR. DUPLANTIER:  I'm going to object

10             to the form of the question.  Subject to

11             that, you can answer it.

12       A.   I'd like you to repeat that, please.

13             MR. MAYESH:  Please.

14             COURT REPORTER:  "So as you sit here

15             today, the only brand of board that you

16             can remember some customer saying, I don't

17             want it, was the Knauf board?"

18       A.   Well, in reviewing the documents, we saw

19   some invoices that said they didn't want any China

20   board.

21   BY MR. MAYESH:

22       Q.   All right.  Putting aside the term "China

23   board," putting aside the identification of Knauf

24   board, can you, sitting here today, recall any other

25   situation where a customer said, don't send me that

Confidential - Subject to Further Confidentiality Review

1   type of board or kind of board or brand of board?

2        A.   I can't tell you that specifically, no.

3        Q.   And if there were any documents which

4   would reflect that kind of preference, they'd be in

5   and among the invoices that you've already produced

6   to us; is that right?

7        A.   As long as we're referring to 4 by 12

8   half-inch, yes.

9        Q.   Did you ever go back to Knauf and say, you

10  know, we've had people rejecting your board?  Did

11  you ever tell them that?

12       A.   We did not.

13       Q.   Okay.  You were here when your brother

14  testified to his initial conversation with Kurt

15  Heider in, I think it was the end of September 2005.

16  We just had that an hour ago?

17       A.   The conversation with Kurt Heider was

18  the -- the one that I had you're referring to?

19       Q.   No.  I'm talking about Mr. Clay Geary told

20  us in response to exhibit -- let me find the

21  exhibit.  You'll find -- probably Exhibit 4 or 5 --

22            MR. SEEGER:  It is.

23  BY MR. MAYESH:

24       Q.   -- you'll find an e-mail from Kurt Heider.

25       A.   It looks like 5, maybe.

Confidential - Subject to Further Confidentiality Review

1          MR. SEEGER:  I think it's 5 or 6.

2          MR. MAYESH:  Let's make sure we're

3      working with the same...

4          MR. GEORGE:  Yeah, 5.

5          MR. MAYESH:  It's 5?

6          MR. GEORGE:  Yes, sir.

7          MR. MAYESH:  I have it here somewhere.

8  BY MR. MAYESH:

9      Q.   Yeah.  I'm looking at Exhibit 5.  Okay.

10  And Mr. Clay Geary testified to the conversation

11  that he had with Kurt Heider?

12      A.   Yes.

13      Q.   Okay.  Do you have any reason to doubt

14  Mr. Clay Geary's testimony about that conversation?

15      A.   None.

16      Q.   Did you have some separate conversation

17  with Mr. Heider other than Mr. Clay Geary's

18  conversation?

19      A.   My recollection would be that I had an

20  earlier conversation with Jeff Brisley.

21      Q.   An earlier conversation with Jeff Brisley.

22  Earlier than September 23rd, 2005?

23      A.   Well, I say that because, to my

24  recollection, I remember speaking to Clay and

25  telling him that Brisley had called and he asked us

Confidential - Subject to Further Confidentiality Review

Page 49

1   if we had any interest in bringing China board in --
2   I'm sorry -- if we had any interest in bringing in
3   imported board, and, again, I referred that
4   conversation to Clay.
5       Q.   Do you have any memorandum of that
6   conversation?
7       A.   No, it was a telephone conversation.
8       Q.   And the conversation that you're talking
9   about occurred -- let's see.  We're in 2012.  This
10  occurred back in 2005?
11      A.   Yeah.
12      Q.   And, sir, you have a present
13  recollection -- as you sit here now, you have --
14      A.   I have a recollection because I remember
15  telling Clay about that conversation and him being
16  somewhat taken back and having -- expressing some
17  interest, like it was something new to him.
18      Q.   So you remember Mr. Brisley calling you
19  before you or Clay had made any request of Knauf and
20  say, hey, you want to buy some China board?  Is that
21  your recollection?
22      A.   Yes, it is.
23      Q.   Thank you.
24           MR. MAYESH:  Nothing further.
25           MR. SEEGER:  Thank you.

Confidential - Subject to Further Confidentiality Review

Page 50

```
1              MR. DUPLANTIER:  You're welcome,
2         gentlemen.
3              THE VIDEOGRAPHER:  The time now is
4         12:34 p.m.  We're now off the record.
5         This is the end of tape 2 -- tape 1.
6              (DEPOSITION CONCLUDED.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

Page 51

1              ACKNOWLEDGMENT OF DEPONENT

2

3         I,_____, do hereby

4    certify that I have read the foregoing pages and

5    that the same is a correct transcription of the

6    answers given by me to the questions therein

7    propounded, except for the corrections or changes in

8    form or substance, if any, noted in the attached

9    Errata Sheet.

10        _____

11        JAMES GEARY                    DATE

12

13   Subscribed and sworn to before me this

14   _____ day of _____, 20 _____.

15   My commission expires: _____

16

17   Notary Public

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

Page 52

```
 1                     - - - - - -

 2                        ERRATA

 3                     - - - - - -

 4     PAGE    LINE    CHANGE/REASON

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25     _____   _____   _____
```

Confidential - Subject to Further Confidentiality Review

Page 53

```
 1                        - - - - - -

 2                     LAWYER'S NOTES

 3                        - - - - - -

 4    PAGE  LINE

 5    _____ _____  _____

 6    _____ _____  _____

 7    _____ _____  _____

 8    _____ _____  _____

 9    _____ _____  _____

10    _____ _____  _____

11    _____ _____  _____

12    _____ _____  _____

13    _____ _____  _____

14    _____ _____  _____

15    _____ _____  _____

16    _____ _____  _____

17    _____ _____  _____

18    _____ _____  _____

19    _____ _____  _____

20    _____ _____  _____

21    _____ _____  _____

22    _____ _____  _____

23    _____ _____  _____

24    _____ _____  _____

25    _____ _____  _____
```

Confidential - Subject to Further Confidentiality Review

Page 54

```
 1                     CERTIFICATE
 2            I, LESLIE B. DOYLE, Certified Court
 3   Reporter (LA), NCRA Registered Professional Reporter
 4   and Certified LiveNote™ Reporter, do hereby certify
 5   that prior to the commencement of the examination,
 6   JAMES GEARY was duly sworn by me to testify to the
 7   truth, the whole truth and nothing but the truth.
 8            I DO FURTHER CERTIFY that the foregoing is
 9   a verbatim transcript of the testimony as taken
10   stenographically by and before me at the time, place
11   and on the date hereinbefore set forth, to the best
12   of my ability.
13            I DO FURTHER CERTIFY that I am neither a
14   relative nor employee nor attorney nor counsel of
15   any of the parties to this action, and that I am
16   neither a relative nor employee of such attorney or
17   counsel, and that I am not financially interested in
18   the action.
19            This 12th day of October, 2012.
20
21
22            _____
              LESLIE B. DOYLE, RMR, RDR
23            Certified Court Reporter (LA)
              Certified LiveNote™ Reporter
24
25
```