Confidential - Subject to Further Confidentiality Review

Page 1

          IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF LOUISIANA
                     -  -  -

IN RE:                    :
CHINESE-MANUFACTURED      :
DRYWALL PRODUCTS          :  MDL NO. 2047
LIABILITY LITIGATION      :
                          :  SECTION L
                          :
_____  :
                          :  JUDGE FALLON
This Document Relates     :
to:                       :  MAG. JUDGE
                          :  WILKINSON
All Actions               :


                     -  -  -


               February 3, 2016


                     -  -  -


          - C O N F I D E N T I A L -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

              Videotaped deposition of
CURTIS J. MILHAUPT, JD, taken pursuant to
notice, was held at the law offices of
Dentons USA, 1221 Avenue of the Americas,
New York, New York, beginning at 9:07
a.m., on the above date, before Michelle
L. Gray, a Registered Professional
Reporter, Certified Shorthand Reporter
and Notary Public.


                     -  -  -

         GOLKOW TECHNOLOGIES, INC.
   877.370.3377 ph | 917.591.5672 fax
          deps@golkow.com

**EXHIBIT 79**

Confidential - Subject to Further Confidentiality Review

Page 2

```
 1    APPEARANCES:
 2
          COUNSEL FOR PLAINTIFF CLASS:
 3
 4        LEVIN FISHBEIN SEDRAN & BERMAN
          BY:  FEDERICK S. LONGER, ESQUIRE
 5        BY:  ARNOLD LEVIN, ESQUIRE
          510 Walnut Street, Suite 500
 6        Philadelphia, Pennsylvania 19106
          (215) 592-1500
 7        flonger@lfsblaw.com
          alevin@lfsblaw.com
 8
             - and -
 9
          STECKLER, LLP
10        BY:  BRUCE W. STECKLER, ESQUIRE
          12720 Hillcrest Road, Suite 1045
11        Dallas, Texas 75230
          (972) 387-404
12        Bruce@StecklerLaw.com
13
14        COUNSEL FOR THE STATE OF LOUISIANA:
15
          PERKINS COIE, LLP
16        BY:  DAVID L. BLACK, ESQUIRE
          1900 Sixteenth Street, Suite 1400
17        Denver, Colorado 80202
          (303) 291-2304
18        Dblack@perkinscoie.com
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 3

```
 1      APPEARANCES:  (Cont'd.)
 2
        COUNSEL FOR BNBM DEFENDANTS:
 3
 4      DENTONS US, LLP
        BY:  RICHARD L. FENTON, ESQUIRE
 5      233 South Wacker Drive, Suite 5900
        Chicago, Illinois 60606-6361
 6      (312) 876-8000
        Richard.fenton@dentons.com
 7
           -  and -
 8
        DENTONS US, LLP
 9      BY:  KENNETH J. PFAEHLER, ESQUIRE
        1301 K Street, NW
10      Suite 600, East Tower
        Washington, DC 20005-3364
11      (202) 408-6400
        Kenneth.pfaehler@dentons.com
12
13
        COUNSEL FOR TAISHAN GYPSUM COMPANY:
14
        ALSTON + BIRD, LLP
15      BY:  DAVID R. VENDERBUSH, ESQUIRE
        1201 W. Peachtree Street, NE
16      Atlanta, GA 30309
        (404) 881-7000
17      david.venderbush@alston.com
18
19      COUNSEL FOR CNBM DEFENDANTS:
20
        ORRICK, HERRINGTON & SUTCLIFFE, LLP
21      BY:  IAN JOHNSON, ESQUIRE
        The Orrick Building
22      405 Howard Street
        San Francisco, California 94105
23      (415) 773-5700
        Ijohnson@orrick.com
24
```

Confidential - Subject to Further Confidentiality Review

Page 4

1       TELEPHONIC APPEARANCES:

2

        COUNSEL FOR BNBM DEFENDANTS:

3

        DENTONS US, LLP
4       BY:  C. MICHAEL MOORE, ESQUIRE
        2000 McKinney Avenue, Suite 1900
5       Dallas, Texas 75201
        (214) 259-0900
6       Mike.moore@dentons.com

7

8

        VIDEOTAPE TECHNICIAN:
9          Sally Browne

10

11

12                      -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

Page 5

```
 1                      -  -  -
 2                    I N D E X
 3                      -  -  -
 4
    Testimony of:     CURTIS J. MILHAUPT, JD
 5
            By Mr. Fenton            10, 411
 6
            By Mr. Johnson              365
 7
            By Mr. Longer              393
 8
 9
10
11                      -  -  -
12                 E X H I B I T S
13                      -  -  -
14
15  NO.          DESCRIPTION          PAGE
16  Milhaupt-1   Declaration of        53
                 Professor Milhaupt
17
    Milhaupt-2   Partial Translation   103
18               Of BNBM Group
                 Chapters 1-6
19               General Provisions
                 BG
20
    Milhaupt-3   Partial Translation   132
21               Present the People,
                 the Object, and the
22               Mindset, Integrate
                 Strictness with
23               Reliability, and Change
                 the Work Style
24
```

Confidential - Subject to Further Confidentiality Review

Page 6

```
 1                        -  -  -
 2            E X H I B I T S  (Cont'd.)
 3                        -  -  -
 4
 5     NO.           DESCRIPTION            PAGE
 6     Milhaupt-4    Partial Translation    180
                     Board of Directors
 7                   Meeting Minutes
                     2/26/14
 8
       Milhaupt-5    We are the (National)  199
 9                   Champions:  Understanding
                     The Mechanisms of State
10                   Capitalism in China
11     Milhaupt-6    Chinese Corporate      217
                     Capitalism in
12                   Comparative Context
                     10/13/15
13
       Milhaupt-7    Why Mixed-Ownership    223
14                   Reforms Cannot Fix
                     China's State Sector
15                   January 2016
16     Milhaupt-8    Beyond Ownership:      237
                     State Capitalism and
17                   the Chinese Firm
18     Milhaupt-9    Oxford Handbooks       247
                     Online
19                   The Governance Ecology
                     Of China's State-Owned
20                   Enterprises
21     Milhaupt-10   Beijing New Building   264
                     Materials Public
22                   Limited Company
                     Articles of Association
23                   5/16/06
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -
 2           E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5   NO.           DESCRIPTION          PAGE
 6   Milhaupt-11  BNBMPLC Annual        273
                  Report 2007
 7
     Milhaupt-12  BNBMPLC Annual        286
 8                Report 2008
 9   Milhaupt-13  BNBMPLC Annual        288
                  Report 2009
10
     Milhaupt-14  Articles of          290
11                Incorporation of
                  Taishan Gypsum Co.
12                Ltd.
                  6/20/07
13
     Milhaupt-15  Declaration of       308
14                Yu Chen
15   Milhaupt-16  Declaration of       329
                  Yanjun Yang
16
     Milhaupt-17  Excerpts of the      336
17                Transcript of
                  Yu Chen
18
     Milhaupt-18  CNBM                 343
19                Global Offering
                  3/13/06
20                ALRMH-CNBM-1-162
21   Milhaupt-19  Declaration of       357
                  Jianglin Cao
22
     Milhaupt-20  BNBM Annual          393
23                Report, 2007
                  BNBMPLC-722-841
24
```

Confidential - Subject to Further Confidentiality Review

Page 8

```
 1                       -   -   -
 2             DEPOSITION SUPPORT INDEX
 3                       -   -   -
 4
 5   Direction to Witness Not to Answer
 6   PAGE    LINE
     None.
 7
 8   Request for Production of Documents
 9   PAGE    LINE
     38      12
10   401     18
11
     Stipulations
12
     PAGE    LINE
13   None.
14
     Questions Marked
15
     PAGE    LINE
16   None.
17
18
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 9

```
 1                    -  -  -
 2               THE VIDEOGRAPHER:  We are
 3          now on the record.
 4               My name is Sally Browne.  I
 5          am a videographer for Golkow
 6          Technologies.
 7               Today's date is February 3,
 8          2016, and the time is 9:07 a.m.
 9               This video deposition is
10          being held in New York City, New
11          York, In Re: Chinese-Manufactured
12          Drywall Products Liability
13          Litigation, for the United States
14          District Court, Eastern District
15          of Louisiana.
16               The deponent is Professor
17          Curtis J. Milhaupt.
18               Counsel will now be noted on
19          the stenographic record.
20               The court reporter is
21          Michelle Gray, and she will swear
22          in the witness.
23                    -  -  -
24          ... CURTIS J. MILHAUPT, JD, having
```

Confidential - Subject to Further Confidentiality Review

Page 10

1    been first duly sworn, was examined and

2    testified as follows:

3                     -  -  -

4              DIRECT EXAMINATION

5                     -  -  -

6    BY MR. FENTON:

7        Q.    Good morning, Professor.

8        A.    Good morning.

9        Q.    We met a little earlier.  My

10   name is Rick Fenton.  I represent the

11   BNBM companies that are defendants in

12   this litigation.

13       A.    Yes, sir.

14       Q.    And I've got some questions

15   for you today.  Have you ever had your

16   deposition taken before?

17       A.    I have not.

18       Q.    Okay.  I know you are a

19   lawyer and a law professor, so I assume

20   you know the general process.  But let me

21   just go over a few of the ground rules.

22              I'm going to be asking you a

23   series of questions.  I'd like you to

24   answer the questions as truthfully and

Confidential - Subject to Further Confidentiality Review

Page 11

1     honestly as you can.

2                 And obviously you are under

3     oath while you are doing so.

4                 If at any time you don't

5     understand one of my questions, either

6     because I haven't phrased it well or

7     because you didn't hear it properly or

8     whatever the case may be, please let me

9     know, and I'll rephrase it or restate it.

10          A.    Okay.

11          Q.    Fair enough?

12          A.    Yes.

13          Q.    And if you do answer my

14    question, I will assume that you

15    understood the question and answered it

16    accordingly.  Fair enough?

17          A.    Fair enough.

18          Q.    Okay.  If at any time during

19    this deposition, Professor, you feel the

20    need for a break, you want to stretch

21    your legs or need to use the restroom,

22    whatever it may be, just let me know.

23    And we won't break while a question is

24    pending --

Confidential - Subject to Further Confidentiality Review

Page 12

1          A.      Sure.

2          Q.      -- or I may want to finish

3    up a line.  But we'll take a break at the

4    next convenient opportunity.

5          A.      Okay.  Thank you.

6          Q.      Okay.  Professor Milhaupt,

7    just can you give me about a two-minute

8    bio, where you're from originally, your

9    educational background, professional

10   background.  I know a lot of it's in your

11   CV.

12         A.      Sure.

13         Q.      If you can just cover the

14   highlights for me.

15         A.      Okay.  Sure.  I grew up in

16   Wisconsin.  I went to the University of

17   Notre Dame.  I attended -- participated

18   in a foreign study program in Japan.  I

19   studied in Japan on a Japanese government

20   scholarship after graduation, then

21   attended Columbia Law School where I sort

22   of married my interest in corporate law

23   and Japan.

24                 I worked at Shearman &

Confidential - Subject to Further Confidentiality Review

Page 13

1    Sterling from 1990 -- sorry -- 1989 after

2    my graduation until 1994, although I took

3    two leaves of absence in that time to do

4    academic things.  Went back to Japan.

5         Q.    Is that Shearman & Sterling

6    in New York here?

7         A.    Tokyo.  New York and Tokyo.

8    After -- around 1994, I decided to go

9    into academia.  And so I applied on the

10   academic circuit.  And my first teaching

11   job was at Washington University in

12   St. Louis, where I was from 1994 to 1999,

13   when I was invited to join the Columbia

14   Law School faculty, where I have been

15   since 1999.

16            And my research has focused

17   initially on Japan, particularly Japanese

18   corporate law and corporate governance,

19   although as far back as 1997, I wrote an

20   article which tries to lay out

21   analytically the relationship between the

22   government or the state and business in a

23   variety of different countries, using the

24   U.S., Korea, and Japan as kind of -- to

Confidential - Subject to Further Confidentiality Review

1  set up a sort of spectrum.

2            I also got involved around

3  that same time in a project on Korean

4  unification sponsored by the Korean

5  government.  And that turned out to be

6  premature, obviously.  But my task was to

7  think about the privatization of Korean

8  SOEs.

9            So I looked very extensively

10  at the literature on Eastern European

11  privatization, for example.

12            So then fast-forward to

13  about the mid-2000s; I had significant

14  exposure in Japan, significant exposure

15  in Korea.  I felt it was time to gain

16  significant exposure in China.  I began

17  to study the language intensively in

18  preparation for a sabbatical.

19            I spent two months in 2006

20  at Tsing Hua University in Beijing.

21  That's where I really began to dive into

22  corporate ownership structures, state

23  ownership structures in China.

24            For the last seven or

Confidential - Subject to Further Confidentiality Review

1    eight years, my research has focused

2    predominately on that -- on that topic.

3         Q.    Okay.  Very good.  Now, I

4    see you have a copy of your report in

5    front of you.  And we'll be marking that

6    a little bit later.  But, you know, feel

7    free to refer to it if it will assist you

8    in --

9         A.    Thank you.

10        Q.    -- your testimony today.

11              But let me ask you this

12   question:  Are there any additions or

13   changes to your -- let me talk first

14   about the substance of your report since

15   it was submitted to us.

16        A.    No.

17        Q.    All right.  What about with

18   respect to the CV, the list of

19   publications, those cases in which

20   you've --

21        A.    No change.  I noticed that I

22   omitted a teaching stint at East China

23   University School of Political Science

24   and Law in 2014.  A speech that I gave

Confidential - Subject to Further Confidentiality Review

1   there appears in the speech section, but

2   I omitted the actual appointment as a

3   distinguished visiting professor from my

4   CV.

5         Q.   Okay.  I appreciate your

6   supplementing that.

7              All right.  Since the last

8   session of your deposition, have you

9   reviewed any documents other than those

10  that were identified in your report?

11        A.   Well, I was given a copy of

12  the plaintiffs' response to your motions.

13  And that had several additional exhibits

14  that were not made available to me at the

15  time that I prepared the declaration.  So

16  I did review those.

17        Q.   All right.  Do you -- do you

18  happen to recall which exhibits those

19  were?

20        A.   I do not recall at this

21  moment.  It may come to me later.  It

22  was -- it was several additional

23  exhibits.  I can't recall them at the --

24  at the moment.

Confidential - Subject to Further Confidentiality Review

1            Q.    All right.  Do you -- do you

2     know whether -- well, let me ask you this

3     question:  Did reviewing those exhibits

4     in any way change your opinions?

5            A.    No, none whatsoever.

6            Q.    All right.  And do you

7     intend to rely on those additional

8     exhibits for your opinions?

9            A.    No.  I mean, since I can't

10    remember them, I won't be relying on them

11    unless they -- unless they come to me.

12           Q.    All right.  Professor, how

13    much -- first of all, you said you

14    studied the Chinese language.  Are you at

15    this point fluent in one or more Chinese

16    dialects?

17           A.    No.  Unfortunately, I

18    studied intensively, as I said, in 2005.

19    I did not continue my study, because I

20    got busy with other things.

21                 And so I am familiar with

22    the language.  I can read some of the

23    characters because of my fluency in

24    Japanese, although the mainland Chinese

Confidential - Subject to Further Confidentiality Review

1    have simplified the characters.  So it's

2    not a straight translation.

3              But I have -- I have some

4    comfort level with the language, but I

5    would not use it professionally.

6         Q.    Okay.  Are you able to read

7    professional literature in Chinese?

8         A.    No.

9         Q.    So you would need an English

10   translation?

11        A.    Yes.

12        Q.    Are you able to converse in

13   Chinese?

14        A.    Basic, basic conversational

15   Chinese.

16        Q.    When we are talking about

17   Chinese, are we talking about essentially

18   Mandarin?

19        A.    Mandarin.

20        Q.    You are fluent in Japanese?

21        A.    Yes.

22        Q.    Okay.  And how much time

23   altogether have you spent in the People's

24   Republic of China in your various

Confidential - Subject to Further Confidentiality Review

1   academic and professional pursuits?

2          A.    Right, it would take me a

3   minute to --

4          Q.    Ballpark?

5          A.    -- accumulate the

6   experience.

7                I would say ballpark four

8   months.

9          Q.    Okay.  And in the total of

10  four months that you've spent in the

11  People's Republic of China, have you made

12  acquaintances and friends among Chinese

13  academics?

14         A.    Yes.

15         Q.    Okay.  And have you also met

16  and made acquaintance with businessmen in

17  China, whether in state-owned enterprises

18  or private enterprises?

19         A.    Not -- no such acquaintances

20  really come to mind, no.  I have -- I

21  have not had extensive contact with

22  business people.

23         Q.    All right.  And as a result

24  of your work here in the U.S., you have

Confidential - Subject to Further Confidentiality Review

1    also made contacts and acquaintances with

2    some of your counterparts in Chinese

3    academia, haven't you?

4              A.    Correct.

5              Q.    Okay.  And so you have a

6    number of friends and acquaintances in

7    the People's Republic of China that you

8    deal with on a regular basis; is that

9    correct?

10             A.    Somewhat regular.  We are

11   not in daily contact or anything like

12   that.

13             Q.    Sure.

14             A.    But sure, I'm in contact

15   with Chinese academics.

16             Q.    All right.  And do you -- do

17   you hold them in high regard?

18             A.    Yes.

19             Q.    All right.  Do you -- do you

20   hold them in high regard for their

21   scholarship?

22             A.    Yes.

23             Q.    Do you hold them in high

24   regard for their integrity?

Confidential - Subject to Further Confidentiality Review

1          A.      Yes.

2          Q.      Do you hold them in high

3     regard for their honesty?

4          A.      Yes.

5          Q.      Okay.  If someone were to

6     say to you that you can't believe a thing

7     the Chinese say because they lie all the

8     time, you wouldn't buy that, would you?

9          A.      I think that would be an

10    overly broad statement.

11         Q.      Okay.  That -- that's --

12    that's not a statement -- that's not a

13    belief that you would subscribe to, would

14    you?

15         A.      You're asking me if I would

16    believe that all Chinese lie all the

17    time?

18         Q.      Yep.

19         A.      No, I would not ascribe to

20    that belief.

21         Q.      Okay.  Now, Professor, when

22    were you engaged for this litigation?

23         A.      I believe it was on or about

24    January 12th.

Confidential - Subject to Further Confidentiality Review

 1          Q.    Okay.  Of this year?

 2          A.    Of this year.

 3          Q.    2016?

 4          A.    Mm-hmm.

 5          Q.    All right.  And so by my

 6    calculations, that was about three weeks

 7    ago?

 8          A.    Correct.

 9          Q.    Okay.  And who contacted

10    you?

11          A.    Both gentlemen here, Fred

12    and Bruce.  Fred Longer and Bruce

13    Steckler.

14          Q.    Okay.  And was that contact

15    by telephone?

16          A.    An initial inquiry by e-mail

17    and then follow-up by telephone.

18          Q.    Okay.  And you understood

19    that they were seeking your possible

20    assistance with respect to expert

21    testimony in the Chinese drywall

22    litigation?

23          A.    Correct.

24          Q.    Did you know anything about

Confidential - Subject to Further Confidentiality Review

Page 23

1    the Chinese drywall litigation prior to

2    your first discussion with Mr. Longer or

3    Mr. Steckler?

4         A.    I recall reading press

5    accounts about the litigation some years

6    ago.  I didn't remember more than that,

7    that I had seen, you know, mention of

8    this litigation in the press.  That was

9    it.

10        Q.    All right.  And after Mr. --

11   after you had this initial phone call

12   with Mr. Longer and Mr. Steckler, were

13   you engaged at that point?  Had you been

14   hired?

15        A.    Well, I think I told them

16   that I was interested.  I indicated

17   interest.  They indicated that, you know,

18   that was good, and could I get back to

19   them as soon as possible.

20             I don't recall exactly how

21   much time elapsed between the initial

22   contact and when I said yes.  But it was

23   not a long period of time.  It was no

24   more than, say, 36 to 48 hours.

Confidential - Subject to Further Confidentiality Review

Page 24

1    Q.    And in that 36-to-48-hour

2   period, had you been sent any materials

3   on the litigation by counsel for the

4   plaintiffs?

5    A.    No.  And I was told that

6   none could be sent until -- there was a

7   protective order and that none could be

8   sent until I had signed that and

9   obviously had accepted the assignment.

10    Q.    All right.  So the 36 to

11   48 hours was basically your trying to

12   determine in your own mind whether you

13   had the time and/or desire to take this

14   on?

15    A.    Correct.

16    Q.    Okay.  Fair enough.  All

17   right.  After that initial call, you got

18   back to Mr. Steckler and Mr. Longer

19   within a couple of days?

20    A.    Yes.  At most.

21    Q.    And you -- did you have

22   another telephone conversation with them?

23    A.    Well, to indicate that I

24   would accept the assignment, yes.

Confidential - Subject to Further Confidentiality Review

Page 25

1          Q.    All right.  And then what
2     was the next step in your process?
3          A.    I was sent the protective
4     order, the confidentiality order to
5     review and sign.
6          Q.    Okay.  And after you
7     reviewed and signed the confidential and
8     protective order, I assume you returned
9     it to them?
10         A.    Correct.
11         Q.    And then what happened next?
12         A.    Then I received -- I
13    received the defendants' briefing, I
14    believe --
15         Q.    Mm-hmm.
16         A.    -- on the Foreign
17    Sovereignty Immunity Act or -- it was
18    either your briefing or the -- the
19    plaintiffs' response brief.  I don't have
20    a precise recollection.
21         Q.    Okay.  Would it refresh your
22    recollection if I told you that -- that
23    the defendants who had briefed the
24    Foreign Sovereign Immunities Act issue

Confidential - Subject to Further Confidentiality Review

Page 26

1   were the CNBM defendants?

2          A.    Um, perhaps.  I'm -- I'm

3   quite certain it was the -- it was the

4   plaintiffs' papers in connection with

5   it --

6          Q.    Oh, the plaintiffs'

7   papers --

8          A.    Yeah.

9          Q.    -- in connection with the

10  Foreign Sovereign Immunities Act.  Okay.

11             Any other materials that --

12  that you were sent?

13         A.    Not at that point in time,

14  no.

15         Q.    Okay.  And what was the date

16  of your report?

17         A.    The 21st of January, I

18  believe.

19         Q.    Okay.  And when did you

20  receive these materials?

21         A.    Well, it would have been

22  very shortly after -- I mean, assuming

23  I -- I dated the initial conversation on

24  the 12th, so it was approximately the

Confidential - Subject to Further Confidentiality Review

1    14th of January.

2           Q.    Okay.  All right.  And

3    then -- so on the 14th of January -- that

4    is to say, approximately one week before

5    you submitted your report -- you received

6    the first materials in this case, and

7    that consisted of the plaintiffs'

8    briefing and the Foreign Sovereign

9    Immunities Act?

10          A.    Correct.

11          Q.    All right.  And -- and do

12   you -- did you review those materials

13   when you received them?

14          A.    I did.

15          Q.    Okay.  And after you

16   reviewed those materials, what was the

17   next thing you did in connection with

18   this engagement?

19          A.    Well, I began studying the

20   voluminous discovery record, the exhibits

21   that had been attached, and began

22   learning -- learning the case basically.

23          Q.    All right.  So you began

24   studying the voluminous discovery record.

Confidential - Subject to Further Confidentiality Review

Page 28

1    When you say the exhibits attached, you

2    are talking about the exhibits that were

3    attached to the plaintiffs' Sovereign

4    Immunity Act papers?

5          A.    Correct.

6          Q.    Did you review the exhibits

7    that were attached to the defendants'

8    Sovereign Immunity Act?

9          A.    You know, I -- I may have

10   misspoken when I said I was sent the

11   defendants' papers.  I -- I was sent the

12   plaintiffs' papers and -- and the

13   exhibits thereto.

14         Q.    Okay.  Have you reviewed any

15   of the defendants' briefs or papers in

16   this case?

17         A.    I have.

18         Q.    Okay.  And when did you

19   first review those?

20         A.    Well, it certainly would

21   have been in the few days following the

22   acceptance of my assignment.  I tried to

23   really do a deep dive into all of the

24   papers at -- at that time.

Confidential - Subject to Further Confidentiality Review

1          Q.    Mm-hmm.  Well, when did --

2     okay.  I -- I want -- I just want to make

3     sure that the sequence is correct.

4                You said that the first

5     thing that was sent to you was the

6     plaintiffs' Foreign Sovereign Immunity

7     Act papers?

8          A.    Correct.

9          Q.    Okay.  At what point in

10    time, if you recall -- and if you don't

11    that's fine.  Just tell me.

12                At what point in time did

13    you receive the defendants' briefs in

14    this case, either with respect to

15    jurisdiction or sovereign immunity?

16         A.    Yeah, I'm afraid I don't

17    have a specific recollection of that.

18         Q.    Okay.  Was it sometime after

19    you received the plaintiffs' papers?

20         A.    Yes.

21         Q.    All right.  So you knew from

22    reviewing the plaintiffs' papers at the

23    outset that plaintiffs were seeking to

24    establish essentially alter-ego liability

Confidential - Subject to Further Confidentiality Review

1    against the BNBM companies and the CNBM

2    companies with respect to the activities

3    of Taishan, correct?

4            A.    Correct.  And I mean, this

5    is also -- it jogged my memory.  I was

6    sent the two Circuit Court opinions --

7            Q.    Mm-hmm.

8            A.    -- on -- on the -- this

9    jurisdiction on this alter-ego issue.

10                 So, yes, correct.

11           Q.    When you say the "Circuit

12   Court opinions," do you mean the District

13   Court opinion?

14           A.    The -- this -- the Fifth

15   Circuit.  The Fifth Circuit opinions

16   affirming the -- the District Court

17   findings.

18           Q.    Okay.  And was that with

19   respect to alter ego, or was that with

20   respect to jurisdiction over Taishan?

21           A.    Well, it's -- it's with

22   respect to piercing to reach the

23   subsidiary of Taishan.

24           Q.    All right.  And -- and it's

Confidential - Subject to Further Confidentiality Review

1   your testimony the Fifth Circuit has made

2   a ruling on that issue in this case?

3           A.    Well, it has -- it has

4   rendered an issue on -- a ruling on

5   that -- on that issue, yes.  It has

6   rendered a ruling on that issue.

7           Q.    Okay.  That's your

8   testimony?

9           A.    To the best of my

10  recollection, yes.

11          Q.    Okay.  Any other cases that

12  you rely on with respect to the issue of

13  alter-ego liability or, as it's referred

14  to in your report, single business

15  enterprise?

16          A.    Mm-hmm.

17               MR. LONGER:  Object to the

18          form.

19               THE WITNESS:  Well, could

20          you -- could you clarify the

21          question when you say am I relying

22          on any other cases?  Do you mean

23          have I encountered other cases in

24          my scholarship or in my teaching,

Confidential - Subject to Further Confidentiality Review

Page 32

```
 1            or do you mean with respect to the
 2            prep -- specifically with respect
 3            to the prep --
 4    BY MR. FENTON:
 5            Q.    Specifically with respect to
 6    preparing your opinion.
 7                  Let me ask you this
 8    question.  Did you do any research, legal
 9    research into the areas of alter ego or
10    single business enterprises as you were
11    preparing your report, or did you
12    simply rely -- rely on your general
13    knowledge of the area?
14            A.    I relied mostly on my
15    general knowledge.  But I consulted
16    Bloomberg, for example, his famous book
17    on business enterprises, as a way of
18    simply sort of recalling this into my
19    mind.  But beyond that, I did not do deep
20    research.
21                  I did read -- there is a --
22    there is a case, an -- an arbitral case
23    that's cited in the plaintiffs' briefs
24    that deals with alter-ego issues.  You
```

Confidential - Subject to Further Confidentiality Review

Page 33

1    know, again, but I did not specifically

2    rely on any of those cases in preparing

3    my opinion.

4            Because my assignment was

5    not to determine alter-ego status.  It

6    was to provide context for understanding

7    this issue.

8        Q.    Okay.  So you are not

9    rendering an opinion in your report on

10   whether or not the BNBM companies are

11   alter egos of Taishan; is that correct?

12       A.    Correct.  I think that's for

13   the judge.

14       Q.    Okay.  And you are not

15   rendering an opinion on whether the CNBM

16   companies are or are not alter egos of

17   Taishan, correct?

18       A.    Correct.  I'm trying to

19   provide helpful context for the judge to

20   make what is a very fact-intensive

21   inquiry.  But I'm not reaching that legal

22   conclusion.

23       Q.    Okay.  Fair enough.

24            In reaching your conclusion

Confidential - Subject to Further Confidentiality Review

Page 34

1    about what should be considered in order

2    for the judge to reach his conclusion,

3    did you rely on the law of any particular

4    jurisdiction?

5              A.    Well, my opinion --

6                    MR. LONGER:  Just going to

7             object to form and foundation.

8                    THE WITNESS:  I guess I

9             would -- I would like to ask

10            clarification.  When you say did I

11            rely on it, could you specify what

12            you mean by that?

13   BY MR. FENTON:

14            Q.    Sure.  You are aware -- or

15   maybe you're not, but you'll tell me --

16   that there are various plaintiffs in this

17   case, some of whom are located in

18   different states, such as Louisiana,

19   Florida, Texas; I think we even have some

20   from California, North Carolina,

21   South Carolina.  You are aware of that,

22   aren't you?

23            A.    Yes.

24            Q.    All right.  And -- and you

Confidential - Subject to Further Confidentiality Review

Page 35

1    are aware that each state jurisdiction,

2    while the laws may or may not to a degree

3    be similar, has its own body of

4    jurisprudence with respect to issues of

5    corporate law and, more specifically,

6    issues of alter ego or single business

7    enterprise law.

8            A.    Correct, mm-hmm.

9            Q.    Okay.  And my -- my question

10   is, in formulating your opinion, did you

11   look to the law of any of those

12   particular jurisdictions, such as

13   Louisiana?

14           A.    No, I did not.  I -- I

15   certainly familiarized myself in reading

16   the briefs.  I certainly confronted those

17   discussions of those laws --

18           Q.    Mm-hmm.

19           A.     -- to the extent to which

20   they may differ or not.  But I did not

21   rely on those in -- in drafting this

22   declaration.

23           Q.    All right.  And did you rely

24   on the discussion in the briefs, in the

Confidential - Subject to Further Confidentiality Review

1    plaintiffs' briefs, on the law of those

2    various jurisdictions as part of your

3    background into the area of alter ego and

4    single business enterprise?

5         A.    Well, again, I guess -- I

6    don't mean to take issue with your use of

7    the word "rely."  But as a part of

8    educating myself about the case and the

9    legal issues therein, of course I -- I

10   tried to absorb that information.

11        Q.    All right.  So you --

12        A.    But I didn't see that as

13   directly bearing upon my expert opinion.

14        Q.    Fair enough.  So you -- you

15   did, however, look to the plaintiffs'

16   briefs to educate yourself about the law

17   of alter ego and single business

18   enterprise in connection with your

19   opinion?

20        A.    Yes.

21             MR. LONGER:  Object to the

22        form and foundation.

23        Mischaracterizes his testimony.

24             MR. FENTON:  You did get the

Confidential - Subject to Further Confidentiality Review

Page 37

1           answer?

2                   THE REPORTER:  Mm-hmm.

3     BY MR. FENTON:

4           Q.    All right.  How much time

5     did you spend with the materials that

6     were given to you between the -- the

7     point in time that you received them on

8     or about January 14th, and when you

9     finalized your report on or about

10    January 21st?

11          A.    About -- about somewhere in

12    the ballpark of 50 to 55 hours.

13          Q.    Okay.  Now, at that time --

14    that is to say, between January 14th and

15    January 21st -- did you also have a

16    teaching schedule at Columbia?

17          A.    No.  We were not in session

18    yet.

19          Q.    Okay.  And so you basically

20    spent that entire week on this project?

21          A.    Correct.

22          Q.    Nothing else going on?

23          A.    Well, other things that may

24    have -- I -- I would have done had -- had

Confidential - Subject to Further Confidentiality Review

Page 38

1    it not been for this -- this assignment.

2    Let me put it that way.

3         Q.   All right.  And do you keep

4    time records?

5         A.   Yes.

6         Q.   Of -- of the time that

7    you've spent?

8         A.   Yes.

9         Q.   Okay.  Do you have those

10   with you today?

11        A.   No, I don't.

12        Q.   Okay.  Could you provide

13   those to Mr. Longer, and I'm going to ask

14   Mr. Longer to provide those to me when he

15   has an opportunity.

16             MR. LONGER:  We will

17        consider the request.

18             MR. FENTON:  Okay.  I know

19        you will.

20   BY MR. FENTON:

21        Q.   All right.  In connection

22   with your work, Professor, were any

23   assumptions given to you by counsel for

24   the PSC?

Confidential - Subject to Further Confidentiality Review

 1                    And do you know who I mean

 2    when I talk about the PSC?

 3          A.    Well, I think I do, but I'd

 4    be happy to have you explain it to me.

 5          Q.    What I mean by the PSC is

 6    the plaintiffs' steering committee in

 7    this case.  Okay.  I may also refer to

 8    the PRC, which is the People's Republic

 9    of China.  But that's a different body.

10                MR. LEVIN:  It certainly is.

11    BY MR. FENTON:

12          Q.    We understand that.

13          A.    Yes.

14          Q.    So I think my question is,

15    were any assumptions provided to you by

16    the PSC to utilize in connection with

17    your work in this case?

18          A.    No.

19          Q.    Okay.  So your knowledge

20    about the case came principally from your

21    review of the plaintiffs' briefs and

22    supporting materials in this matter,

23    correct?

24          A.    Correct.  I also did some

Confidential - Subject to Further Confidentiality Review

1    Internet searches to see what else

2    would -- would turn up in the press and

3    the like.

4         Q.    Okay.  And do you have the

5    results of those Internet searches

6    memorialized somewhere?

7         A.    No.

8         Q.    Do you have any particular

9    websites or Internet materials in

10   connection with your research?

11        A.    No.

12        Q.    Did anything that turned up

13   on the Internet constitute part of the

14   basis for your opinion?

15        A.    No.

16        Q.    Okay.  Did everything that

17   constituted part of the basis for your

18   opinion get listed in your report?

19        A.    Yes.

20        Q.    Okay.  Now, I know you said

21   that you have been at Columbia Law School

22   since -- I believe it was 1999?

23        A.    Correct.

24        Q.    All right.  And Jeff Gordon

Confidential - Subject to Further Confidentiality Review

1    has taught there --

2           A.     Yeah.

3           Q.     -- during your entire

4    tenure?

5           A.     Yes.

6           Q.     Isn't that correct?

7           A.     It is correct.

8           Q.     Matter of fact, you two

9    office near each other?

10          A.     They are -- yes, we're good

11   friends.

12          Q.     Okay.  I'm glad to hear

13   that.  He's a nice man.

14                 And so you know Professor

15   Gordon very well?

16          A.     I do.

17          Q.     Okay.  And you read his

18   report --

19          A.     I have.

20          Q.     -- in this case.

21                 First of all, do you hold

22   Professor Gordon in high regard for the

23   quality of his scholarship and academic

24   rigor?

Page 42

1          A.     Yes.

2          Q.     Do you hold Professor Gordon

3    in high regard for his honesty and

4    integrity?

5          A.     Yes, I do.

6          Q.     Okay.  And Professor Gordon,

7    in your view, does not issue frivolous or

8    ill-founded opinions, correct?

9          A.     Well --

10               MR. LONGER:  At what point

11          in time?  In what subject?

12               THE WITNESS:  Yeah, I have

13          no basis for answering that.

14   BY MR. FENTON:

15          Q.     Well, in your experience,

16   have you ever known Professor Gordon to

17   take a position that you considered

18   ill-founded or frivolous?

19               MR. LONGER:  Objection.

20               THE WITNESS:  He's a law

21          professor.  Of course -- of course

22          I do.  You know, law professors

23          disagree.

24   BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

Page 43

1          Q.    Okay.  Well, let me ask you

2     this question.  Have you ever known

3     Professor Gordon to take a position that

4     was insincere?

5               MR. LONGER:  Object to the

6          form.

7               Go ahead and answer.

8               THE WITNESS:  Well, I mean,

9          it's -- I really don't know how to

10          answer that kind of a question.  I

11          hold Jeff in high regard.  I think

12          he's an honest person.

13     BY MR. FENTON:

14          Q.    Okay.  And as you sit here

15     now, can you tell me of any instance that

16     you ever recall Professor Gordon being

17     disingenuous in any way?

18          A.    No.

19          Q.    And holding him in high

20     regard, you believe that when Professor

21     Gordon gives an opinion on something,

22     it's an opinion that should be taken

23     seriously, whether one agrees with it or

24     not, correct?

Confidential - Subject to Further Confidentiality Review

Page 44

```
 1          A.    Yes.
 2          Q.    Yeah.  And certainly an
 3   opinion within his area of expertise,
 4   which is corporate law and comparative
 5   corporate governance; isn't that right?
 6                MR. LONGER:  Object to the
 7          form.
 8                THE WITNESS:  Well, I mean,
 9          as you expand outward in -- I
10          guess I'm feeling a little bit of
11          pushback.  I mean, I don't agree
12          with everything that he says or
13          writes, if that's what you're
14          asking me.
15   BY MR. FENTON:
16          Q.    And I'm sure the same -- he
17   would say the same of you, sir.  I'm
18   simply asking you, when Professor Gordon
19   says something or writes something, it's
20   something that you will take seriously,
21   whether you agree with it or not.  You'll
22   consider it, right?
23          A.    Yes.
24          Q.    It's worthy of
```

Confidential - Subject to Further Confidentiality Review

 1    consideration?

 2            A.    Yes.

 3            Q.    Okay.  When did you review

 4    Professor Gordon's report?

 5            A.    Well, I don't have an exact

 6    date.  But it was one of the first things

 7    that I looked at.

 8            Q.    All right.  Now, I notice

 9    that other than listing his report in

10    your own report, I don't believe that you

11    ever refer to it or cite it.  I may be

12    incorrect about that, but I don't --

13            A.    I think that's correct.  I

14    think that's correct.

15            Q.    All right.  And is that to

16    say that you are not expressing any

17    opinion on Professor Gordon's report

18    itself?

19            A.    Well, if I could refer to my

20    own declaration.  Paragraph 37 says,

21    "Given the importance and distinctiveness

22    of the political and institutional in

23    which the Chinese SOE business groups

24    operate, in my opinion it's not possible

Confidential - Subject to Further Confidentiality Review

1   to assess Taishan's corporate

2   separateness from other CNBM business

3   group companies by comparing CNBM

4   business group structures and practices

5   with those of a U.S. conglomerate,

6   because there are no examples in the

7   United States that would facilitate a

8   meaningful apples-to-apples comparison."

9           Q.    Okay.  And I'm sorry.  What

10  paragraph are you --

11          A.    That's Paragraph 37.

12          Q.    37.  Okay.  What work did

13  you do in the 55 hours that you spent on

14  this case between January 14th and

15  January 21st to study the practices of

16  U.S. conglomerates, other than reviewing

17  Professor Gordon's report?

18          A.    I didn't spend much time on

19  that, because I teach U.S. corporate law,

20  and I think I'm quite familiar with the

21  corporate governance and practices of

22  U.S. conglomerates.

23          Q.    Okay.  Did you review the

24  report that was done by Mr. Deal?

Confidential - Subject to Further Confidentiality Review

```
 1          A.     I did.

 2          Q.     Okay.  And you're aware that

 3   Mr. Deal collected certain data regarding

 4   S&P 500 companies?

 5          A.     Correct.  I think it was

 6   S&P 1500.

 7          Q.     S&P 1500.  You're quite

 8   correct.

 9                 And that -- first of all, do

10   you -- do you have any reason to dispute

11   the accuracy of the data that Mr. Deal

12   reports in his report?

13          A.     No.

14          Q.     Do you have any reason to

15   believe that Mr. Deal did not report it

16   accurately?

17          A.     No.

18          Q.     Do you agree that many

19   S&P 1500 companies are structured as

20   conglomerates?

21          A.     Yes.  I suppose we could --

22   you know, we could quibble over the

23   definition of conglomerate.  It's

24   obviously not a legal term.  But, sure,
```

Confidential - Subject to Further Confidentiality Review

Page 48

1    I'll take that.

2         Q.    I don't want to quibble.

3    Let's just use the plain everyday sense

4    of the term.

5         A.    Sure.  No problem.

6         Q.    And the conglomerates

7    typically have numerous subsidiaries and

8    sometimes multiple levels of

9    subsidiaries?

10        A.    Yes.

11        Q.    Okay.  You'd agree with

12   that?

13        A.    Yes.

14        Q.    Okay.  And that in a U.S.

15   conglomerate, many of those subsidiaries

16   are either substantially or wholly owned

17   by the ultimate parent, either directly

18   or indirectly, correct?

19        A.    Yes.

20        Q.    All right.  And that it's

21   not uncommon in U.S. conglomerates for

22   corporate parents and their subsidiaries

23   to be classified in the same primary

24   industry, correct?

Confidential - Subject to Further Confidentiality Review

1          A.     Correct.

2          Q.     Okay.  And that boards of

3   director seats in conglomerates of a

4   corporate -- or in subsidiaries of a

5   corporate family may well be filled by

6   persons employed with or holding

7   positions with the ultimate parent,

8   correct?

9          A.     Yes.

10          Q.     That's very commonplace in

11   the U.S., isn't it?

12          A.     Uhm --

13          Q.     You're also aware that --

14                 MADAM REPORTER:  I didn't

15          get an answer to that.

16   BY MR. FENTON:

17          Q.     I'm sorry.  My question was,

18   that's very commonplace in the U.S.,

19   isn't it?

20          A.     You know, again, I don't

21   want to quibble with commonplace.  But,

22   yes, it's a -- it is a known phenomenon.

23   It's not unusual.

24          Q.     Certainly not a basis on

Confidential - Subject to Further Confidentiality Review

Page 50

1   which to pierce the corporate veil, is

2   it?

3          A.    In and of itself, that

4   factor alone would not constitute a

5   grounds for a piercing.

6          Q.    Okay.  And you're also aware

7   that in many U.S. conglomerates,

8   sometimes the income or revenue generated

9   by the subsidiaries can approach or

10  exceed the income generated by the parent

11  company, correct?

12         A.    Yes.

13         Q.    All right.  You're also

14  aware that Mr. Deal in his report did

15  some case studies?

16         A.    Correct.

17         Q.    Some of which were also

18  relied upon by Professor Gordon in his

19  report?

20         A.    Yes.

21         Q.    All right.  Do you consider

22  Disney and its direct and indirect

23  subsidiaries to be a single business

24  enterprise for which corporate separation

Confidential - Subject to Further Confidentiality Review

Page 51

1    should be disregarded?

2          A.    Well, I mean, I guess I

3    would just preface my response by saying

4    my job in the declaration was not to pass

5    judgment on whether Disney is a single

6    business entity.  That wasn't --

7          Q.    Professor, with all due

8    respect, your job at this deposition is

9    to answer my questions.  Please answer my

10   question.

11              MR. LONGER:  I think he was

12         answering your question.

13   BY MR. FENTON:

14         Q.    Do you consider Disney and

15   its direct and indirect subsidiaries to

16   be a single business enterprise for which

17   corporate separation should be

18   disregarded?

19              MR. LONGER:  Hold on.  In

20         all candor, Rick, he's answering

21         your questions directly.  So be

22         patient.  You'll get through the

23         deposition.

24              MR. FENTON:  I'm very

Confidential - Subject to Further Confidentiality Review

Page 52

```
 1          patient.  I just want him to

 2          answer my question.

 3   BY MR. FENTON:

 4          Q.    You may answer the question,

 5   please.

 6                MR. LONGER:  Object to the

 7          form.

 8                THE WITNESS:  I don't have

 9          enough information on which to

10          draw a conclusion -- to draw a

11          conclusion.  I don't know enough

12          about the Disney corporation.

13          Certainly I wouldn't base my

14          answer on what's been provided in

15          these -- in these declarations.

16   BY MR. FENTON:

17          Q.    Well, you based your -- your

18   report on what was provided to you by the

19   PSC, correct?

20          A.    But I'm not drawing a legal

21   conclusion about single business

22   enterprise of these corporations.

23          Q.    Okay.  Let me ask you this

24   question, Professor.
```

Confidential - Subject to Further Confidentiality Review

Page 53

1                    In your report -- and

2      actually, let's mark that as Exhibit 1.

3                    (Document marked for

4            identification as Exhibit

5            Milhaupt-1.)

6      BY MR. FENTON:

7           Q.    If you look at -- if you

8      turn to Page 3 of your report.

9                    Paragraph 12, you talk about

10     a contextualized analysis being required

11     to assess the separate legal personality

12     of members of the CNBM business group in

13     the above-referenced matter.  And then a

14     little further down the paragraph you

15     use, I believe, for the first time, the

16     phrase "single business entity."

17          A.    Mm-hmm.

18          Q.    Okay.  And that is

19     footnoted.  And in the footnote, you say,

20     "As used in this declaration, the term

21     'single business entity' encompasses

22     alter-ego theory as well."

23          A.    Mm-hmm.

24          Q.    Okay.  And I -- I guess my

Confidential - Subject to Further Confidentiality Review

Page 54

1    question to you, Professor, is:  What do

2    you mean in this report by single

3    business entity?  How are you defining

4    that?

5         A.    Well, I -- I'm defining it

6    as a group of -- a group of companies

7    that is deemed to be operating as a

8    single business enterprise.

9         Q.    All right.  Forgive me,

10   Professor, but that seems to me to be a

11   little bit of a tautology.  That if I

12   understand what you just testified to,

13   you said a single business entity is a

14   group of companies deemed to be operating

15   as a single business enterprise --

16        A.    Well -- okay.  I mean,

17   obviously there's going to --

18             MR. LONGER:  Excuse me.  Is

19        that a question?

20             MR. FENTON:  No.

21   BY MR. FENTON:

22        Q.    My -- my -- so my question

23   is, can you -- can you tell me more

24   specifically how one determines whether a

Confidential - Subject to Further Confidentiality Review

Page 55

```
 1   particular group of companies is

 2   operating as a single business

 3   enterprise?

 4          A.    Well, you know, again, this

 5   is a -- this -- this term has legal

 6   consequence.  So if a factfinder

 7   determines that a group of companies is a

 8   single business enterprise, then it would

 9   not respect the corporate separateness of

10   those member entities.

11          Q.    Okay.  I think you just said

12   the same thing in slightly different

13   words.

14                What are the factors that a

15   factfinder would need to look to to

16   determine whether it is a single business

17   enterprise?

18          A.    Respective corporate

19   formalities.  Commingling of operations,

20   finance, business.

21          Q.    Anything else?

22          A.    Well, I think it's, you

23   know, these typical factors in piercing

24   or alter ego or single business
```

Confidential - Subject to Further Confidentiality Review

Page 56

1    enterprise tend to cut toward the same

2    thing:  disrespect of corporate

3    formalities, exercise of control or

4    domination with respect to the downstream

5    entities.

6           Q.    Are you aware of any

7    authority in the U.S. or otherwise,

8    holding that companies organized under

9    the laws of a communist country should be

10   regarded as alter egos, without more?

11          A.    I just -- I just want to

12   make sure I heard the question.  You said

13   am I aware of the -- the laws of any

14   communist country?

15          Q.    Are you aware of any legal

16   authority holding that the laws -- or --

17   or holding that the corporations

18   organized under the laws of a communist

19   country should be deemed alter egos?

20          A.    Per se?  Without --

21          Q.    Per se, yes.

22          A.    No, I'm not aware of that.

23          Q.    Okay.  Are you aware of any

24   authority, in the U.S. or elsewhere,

Confidential - Subject to Further Confidentiality Review

1      holding that business groups organized in

2      the People's Republic of China should be

3      deemed alter egos without more?

4                   MR. LONGER:  Object to the

5            form.

6                   THE WITNESS:  No.

7      BY MR. FENTON:

8            Q.    Are you aware of any

9      authority in the U.S. or elsewhere

10     holding that state-owned enterprises

11     under the supervision of SASAC in the

12     People's Republic of China should be

13     deemed alter egos without more?

14                  MR. LONGER:  You're saying,

15           per se?

16                  MR. FENTON:  Per se.

17                  MR. LONGER:  Object to form.

18                  THE WITNESS:  If -- if all

19           these questions are assuming a per

20           se rule, no, I'm not aware of any

21           such rule.

22     BY MR. FENTON:

23           Q.    Okay.  Now, I'm on a -- sort

24     of apropos of nothing.  Let's go back to

Confidential - Subject to Further Confidentiality Review

Page 58

1    Japan.

2            A.    Okay.

3            Q.    Okay.  Because you -- you

4    obviously have done a lot of work in --

5    in the field of Japanese law.

6                  Okay.  Are state-owned

7    enterprises prevalent in Japan?

8            A.    No.

9            Q.    Does Japan have any

10   state-owned enterprises?

11           A.    It does.  It does, although

12   they have been largely privatized and

13   they recently partially -- they floated

14   the shares of Japan post.

15           Q.    Mm-hmm.  So what you're

16   saying is that Japan at one time had much

17   more in the way of state-owned

18   enterprises than they do now?

19           A.    They had more, certainly.

20           Q.    Okay.

21           A.    But they were never

22   particularly prevalent.

23           Q.    Okay.  And are you aware of

24   any authority in the U.S. or otherwise

Confidential - Subject to Further Confidentiality Review

Page 59

1    holding that Japanese state-owned

2    enterprises are -- should, per se, be

3    regarded as alter egos?

4            A.    No.

5            Q.    Okay.  We talked about China

6    and Japan having state-owned enterprises.

7    Have you studied state-owned enterprises

8    in other countries?

9            A.    North Korea, for whatever

10   that's worth.

11           Q.    Okay.  Any other countries

12   where you've looked closely at

13   state-owned enterprises?

14           A.    I'm in the process of -- of

15   sort of a global study of best practices

16   in so-called mixed ownership enterprises.

17   So this would be a firm in which the

18   state owns a share, typically a

19   controlling share.  But it's listed on a

20   stock exchange, so it also has private

21   investors.  But I'm at the very early

22   stages of that.

23           Q.    So let me ask you this

24   question.  Other than China, Japan, and

Confidential - Subject to Further Confidentiality Review

Page 60

```
 1   North Korea, are you aware of other
 2   countries that have state-owned
 3   enterprises, wholly owned or -- or
 4   partially owned?
 5        A.    Yes.
 6        Q.    Could you give me a list?
 7        A.    Brazil.
 8        Q.    Okay.
 9        A.    India.  I think those are
10   the two probably most relevant in terms
11   of global economy.  But there -- many
12   countries have state-owned enterprises.
13        Q.    Give me -- give me some
14   more.
15        A.    Italy, France.
16        Q.    Any other members of NATO
17   that have state-owned enterprises?
18        A.    I -- offhand I can't think
19   of others.
20        Q.    Any other U.S. allies.  How
21   about Canada?  Doesn't Canada have some
22   Crown corporations?
23        A.    Yes, I believe so.
24        Q.    Okay.  And -- and the United
```

Confidential - Subject to Further Confidentiality Review

Page 61

1    Kingdom, don't they have some Crown

2    corporations that are state-owned?

3           A.    I haven't done any study

4    on -- on UK SOEs.

5           Q.    Okay.  So you have no reason

6    to know one way or the other, correct?

7           A.    Correct.  I mean, I know

8    they used to have.  I know there was a

9    massive privatization wave under

10   Thatcher, but I haven't -- I have not

11   followed -- I have not followed that.

12          Q.    How about here in the U.S.?

13   Are there any corporations that are owned

14   in whole or in part by the U.S.

15   government?

16          A.    Amtrak.

17          Q.    Okay.  What else?

18          A.    I mean, Fannie and Freddie

19   typically make the list.

20          Q.    You're talking about Fannie

21   Mae and Freddie Mac?

22          A.    Yes.

23          Q.    Okay.  They -- they make the

24   list of corporations that are owned by

Confidential - Subject to Further Confidentiality Review

Page 62

1    the U.S. government?

2         A.    Well, I wouldn't say they

3    are owned by the U.S. government, but if

4    one is creating a list of corporations

5    that have links to the government, Fannie

6    and Freddie typically make the list.

7         Q.    Okay.  And that's because

8    the U.S. government holds warrants in

9    Fannie Mae and Freddie Mac whereby it can

10   take a controlling interest anytime it

11   wants; isn't that right?

12        A.    I'm not -- I'm not extremely

13   familiar with the structure of those

14   organizations.

15        Q.    All right.  Well, you say

16   that they frequently make the list.  So

17   you understand that the U.S. government

18   does have some role?

19        A.    Yes.

20        Q.    Would you say that the U.S.

21   government has a controlling interest in

22   Fannie Mae and Freddie Mac?

23        A.    I don't have a basis to

24   respond.  I'm sorry.

Confidential - Subject to Further Confidentiality Review

 1          Q.    What about the Federal

 2   Deposit Insurance Corporation?  Is that a

 3   state-owned enterprise?

 4          A.    Well, I'm not an -- I'm not

 5   an expert on this, but I would not

 6   categorize it as a state-owned

 7   enterprise.  I think it's a -- it's a --

 8   partly a regulatory body.

 9          Q.    Like SASAC, right?  SASAC is

10   a -- partly a regulatory body, isn't it?

11              MR. LONGER:  Object to the

12         form and foundation.

13              THE WITNESS:  SASAC is a

14         part of a regulatory body.

15   BY MR. FENTON:

16          Q.    Okay.  And SASAC issues

17   various regulations for Chinese

18   companies, much the way the FDIC does for

19   banking institutions in the U.S., don't

20   they?

21          A.    Well, I think the comparison

22   is -- with all due respect, I don't -- I

23   don't think it's apt.

24          Q.    You are aware that the FDIC

Confidential - Subject to Further Confidentiality Review

Page 64

1    does issue regulations which U.S. banks

2    are required to follow?

3            A.    Yes.

4            Q.    And SASAC issued regulations

5    of its own which various Chinese

6    companies are required to follow.

7            A.    Yes.

8            Q.    All right.  Would you say

9    that the FDIC is an alter ego of the U.S.

10   government?

11           A.    It would have never occurred

12   to me to ask the question --

13           Q.    I'm sure not.

14           A.    -- so the answer would be

15   no.

16           Q.    When the FDIC takes over a

17   bank in the United States, does that bank

18   become an alter ego of the Federal

19   Deposit Insurance Corporation?

20               MR. LONGER:  Object to form

21           and foundation.

22               THE WITNESS:  I think it

23           would not typically be

24           characterized that -- that way.

Confidential - Subject to Further Confidentiality Review

Page 65

 1   BY MR. FENTON:

 2         Q.    Oh, I would think not

 3   either.

 4               Are you familiar with any

 5   case holding that when the FDIC takes

 6   over a bank in the United States, that

 7   the bank becomes the alter ego of the

 8   FDIC?

 9               MR. LONGER:  Same

10         objections.

11               THE WITNESS:  No, I'm not

12         aware of any sort to that effect.

13   BY MR. FENTON:

14         Q.    Okay.  How about the

15   Tennessee Valley Authority?  Is that a

16   U.S. state-owned enterprise?

17         A.    I have seen it categorized

18   as such.  I don't have a basis for

19   evaluating that.

20         Q.    Okay.  And do you know what

21   amount of control the U.S. government

22   exercises over the Tennessee Valley

23   Authority?

24         A.    I do not.

Confidential - Subject to Further Confidentiality Review

Page 66

1          Q.    Okay.  Amtrak.  Do you know

2     how many different subsidiary and

3     affiliated corporations Amtrak has?

4          A.    I do not.

5          Q.    You haven't studied that?

6          A.    No.

7          Q.    You didn't think that was

8     important in rendering your opinion?

9               MR. LONGER:  Object to the

10          form.  Argumentive.

11               MR. FENTON:  Thank you.

12          Yes, it is.

13     BY MR. FENTON:

14          Q.    Please answer my question.

15          A.    I actually did do a bit of

16     research on ownership structure at

17     Amtrak.  In preparation for this, I did.

18          Q.    Okay.  And what did you find

19     about the ownership structure of Amtrak?

20          A.    That it is created by

21     statute in -- in the 1970s, and it's a

22     hundred percent owned by -- by the U.S.

23     government.

24          Q.    All right.  And is that in

Confidential - Subject to Further Confidentiality Review

Page 67

1  your report?

2              MR. LONGER:  Object to the

3         form.  Argumentative.

4  BY MR. FENTON:

5         Q.    I just asked if it's in your

6  report.

7         A.    No, it's not.

8         Q.    Why not?

9         A.    Because I was asked to opine

10  on corporate governance structure in

11  Chinese SOEs.

12         Q.    So why were you looking at

13  Amtrak?

14         A.    Because I thought that

15  for -- with all, you know, due respect, I

16  thought that Professor Gordon's approach

17  of looking at, and -- and Mr. Deal's

18  approach of looking at S&P 1500

19  companies, or Disney or FedEx, was not an

20  apt comparison.

21         Q.    But you thought Amtrak was

22  perhaps an apt comparison?

23         A.    Well, I was looking for apt

24  comparisons.  I didn't find any.

Confidential - Subject to Further Confidentiality Review

Page 68

1          Q.    Why didn't you mention in

2     your report that, in looking for apt

3     comparisons, you didn't find any?   What

4     other apt comparisons did you look for?

5                MR. LONGER:   Object to form.

6          Compound.

7                THE WITNESS:   Could you

8          repeat the question?

9     BY MR. FENTON:

10         Q.    Yes.   You said you were

11    looking at Amtrak because you were

12    looking for apt comparisons.   Okay.   What

13    other apt comparisons did you look for?

14         A.    I did not find any.   And I

15    don't think Amtrak is an apt comparison.

16    I don't think there are any apt

17    comparisons in the United States.

18         Q.    Okay.   What about the

19    Government National Mortgage Corporation?

20    Did you look at that as a potential apt

21    comparison?

22                MR. LONGER:   Object to the

23         form.   It's asked and answered.

24                MR. FENTON:   Never asked

Confidential - Subject to Further Confidentiality Review

1        that one.

2                MR. LONGER:  I think it's

3        subsumed in his past answer.  So

4        I'm objecting to the form.  You

5        can go through a whole litany of

6        these things.  And his answer is

7        probably going to be quite the

8        same.

9                We'll do it however you

10       want.  It's your deposition.

11               THE WITNESS:  No.

12   BY MR. FENTON:

13       Q.   Okay.  How about the

14   Commodity Credit Corporation?

15       A.   No.

16               MR. LONGER:  Objection.

17   BY MR. FENTON:

18       Q.   How about the Export-Import

19   Bank?

20               MR. LONGER:  Same objection.

21   BY MR. FENTON:

22       Q.   Did you look at that?

23       A.   No.

24       Q.   How about the Federal Prison

Confidential - Subject to Further Confidentiality Review

Page 70

1    Industries or UNICOR?

2                    MR. LONGER:   Same

3         objections.

4    BY MR. FENTON:

5         Q.    Did you look at that?

6         A.    No.

7         Q.    Okay.  How many comparisons

8    did you look at other than Amtrak?

9         A.    Well, I looked for

10   comparisons.  The one that I found that

11   was even conceivably in the realm of

12   relevant in my mind was Amtrak.

13        Q.    Did you make -- did you look

14   at the -- at the corporate structure of

15   Amtrak?  Did you look at whether Amtrak

16   has subsidiaries and affiliates?

17        A.    I did not look deeply into

18   the corporate structure of Amtrak, no.

19        Q.    All right.  Well, as thinly

20   or as deeply that you looked, did you

21   determine that Amtrak does in -- does, in

22   fact, have subsidiary corporations?

23        A.    I would assume that it does.

24   I did not -- I did not study it deeply.

Confidential - Subject to Further Confidentiality Review

Page 71

1          Q.    Okay.  And are you aware of

2     any case that holds that by virtue of its

3     ownership and control of, or by -- let me

4     rephrase the question.

5               Are you aware of any case

6     that holds by virtue of the U.S.

7     government's ownership and control of

8     Amtrak, that Amtrak and its subsidiaries

9     should be regarded as alter egos?

10         A.    I'm not aware of that, no.

11         Q.    Are you aware of something

12    called government-sponsored entities in

13    the U.S.?

14         A.    Well, I think Fannie and

15    Freddie are typically categorized as

16    government-sponsored entities.

17         Q.    Okay.  And that's because

18    the U.S. holds an ultimate controlling

19    interest in those companies should it

20    choose to exercise it?

21              MR. LONGER:  It's been asked

22         and answered.

23              THE WITNESS:  I don't have a

24         basis for saying that.  What I

Confidential - Subject to Further Confidentiality Review

1      said was they are typically so

2      categorized.

3  BY MR. FENTON:

4      Q.    Well, but, Professor, I

5  mean, you are the expert.  When you were

6  asked to find comparisons in the U.S. --

7      A.    I was not --

8      Q.    -- didn't you think to

9  look -- didn't you think to look at

10  government-sponsored entities in the

11  U.S.?

12          MR. LONGER:  Let me just

13      object.

14          It mischaracterizes his

15      testimony.  He's never said that

16      he was asked by us to do exactly

17      what you're saying.  And he

18      wasn't.

19          So you can answer the

20      question, but...

21          MR. FENTON:  All right.

22      Well --

23          THE WITNESS:  I was not

24      asked to do that.

Confidential - Subject to Further Confidentiality Review

Page 73

 1                    MR. FENTON:  Let's note the

 2            speaking objection.

 3   BY MR. FENTON:

 4        Q.    You weren't asked to do it,

 5   and you didn't think it was important to

 6   do, did you?

 7                    MR. LONGER:  Object to the

 8            form.

 9                    THE WITNESS:  That's not

10            what I said.

11   BY MR. FENTON:

12        Q.    How about the 11 Federal

13   Home Loan Banks that are

14   government-sponsored entities in the

15   U.S.?  Are you aware of any authority

16   that they are regarded as alter egos

17   because the U.S. government has ultimate

18   control if it chooses to exercise its

19   warrants?

20                    MR. LONGER:  Excuse me.

21            And by "authority," you mean

22            caselaw?  What you do you mean by

23            "authority"?

24                    MR. FENTON:  Caselaw,

Confidential - Subject to Further Confidentiality Review

Page 74

    1        statutes, academic literature,

    2        anything.

    3            THE WITNESS:  I have not

    4        studied this issue.

    5   BY MR. FENTON:

    6        Q.    And you didn't think it was

    7   important to study the issue for your

    8   work here, did you?

    9            MR. LONGER:  Objection.

   10            THE WITNESS:  Was that a

   11        question?

   12   BY MR. FENTON:

   13        Q.    Yes.

   14        A.    I did not think it was

   15   relevant.

   16        Q.    Okay.  So the fact that

   17   there are government-sponsored entities

   18   in which the United States government

   19   holds warrants that if exercised would

   20   give it a controlling interest in these

   21   companies did not seem to you to be

   22   relevant in assessing whether Chinese

   23   state-owned enterprises can be considered

   24   comparable to companies here in the U.S.?

Confidential - Subject to Further Confidentiality Review

1              MR. LONGER:  Object to the

2         form.

3              THE WITNESS:  I mean, all I

4         can answer -- you know, all I can

5         say by way of answering is, your

6         own experts apparently didn't deem

7         it to be relevant.

8    BY MR. FENTON:

9         Q.   No, no, no, sir.  They used

10   a different measure of comparison.  I'm

11   asking what you deemed to be relevant.

12              MR. LONGER:  If that's the

13         question, object to the form.

14              THE WITNESS:  I mean, I

15         guess I can just simply repeat

16         what I said, which was, that was

17         not the scope of my assignment.

18   BY MR. FENTON:

19        Q.   Okay.  You defined the scope

20   of your assignment to what the

21   plaintiffs' lawyers asked you to do,

22   right?

23        A.   Yes.

24        Q.   And the result was your

Confidential - Subject to Further Confidentiality Review

Page 76

1    opinion that we marked as Exhibit 1,

2    correct?

3              A.    That's correct.

4                    MR. FENTON:   Let's take a

5              break.

6                    THE VIDEOGRAPHER:   The time

7              is 10:02 a.m.   We are going off

8              the record.

9                    (Short break.)

10                   THE VIDEOGRAPHER:   The time

11             is 10:16 a.m., and we are back on

12             the record.

13                   THE WITNESS:   One

14             misstatement in my prior testimony

15             I'd like to correct is that I had

16             earlier said I think that I had

17             looked at the exhibits in the

18             plaintiffs' papers.   But I -- I

19             also looked at the exhibits in the

20             defendants' papers as well.

21                   I received a Dropbox

22             containing all of those exhibits.

23    BY MR. FENTON:

24             Q.    Okay.   So you looked at the

Confidential - Subject to Further Confidentiality Review

1    exhibits on both sides?

2              A.    Correct.

3              Q.    Okay.

4                    MR. STECKLER:  And -- and I

5              think we provided him, Rick, the

6              moving papers --

7                    MR. FENTON:  Yeah.

8                    MR. STECKLER:  -- by

9              defendant responding to the --

10                   MR. LEVIN:  Okay.  Look,

11             it's not your testimony.

12                   THE WITNESS:  If you look at

13             the reliance material, it's there.

14   BY MR. FENTON:

15             Q.    All right.  So when you were

16   testifying a bit earlier, you had

17   neglected to mention that you had also

18   looked at defense materials and you've

19   now corrected the record on that?

20             A.    Correct.

21             Q.    Any other corrections to

22   your previous testimony?

23             A.    No.

24             Q.    Okay.  And thank you for

Confidential - Subject to Further Confidentiality Review

Page 78

1    that, Professor.

2              All right.  Now, Professor,

3    in terms of the -- well, let -- let's

4    come back to your report.

5              In Paragraph 6 of your

6    report, you mention that you testified

7    before the U.S.-China Economic and

8    Security Review Commission on the policy

9    implications of global Chinese SOE

10   investment and trade equity.

11        A.    Correct.

12        Q.    Did any of your testimony

13   before the U.S.-China Economic and

14   Security Review Commission involve the

15   question of whether the influence of the

16   Chinese Communist party rendered Chinese

17   SOEs to be alter egos?

18        A.    No.

19        Q.    Have you ever expressed that

20   opinion anywhere before producing your

21   report here?

22              And I'm not suggesting your

23   report says that, but have you ever

24   expressed that opinion anywhere?

Confidential - Subject to Further Confidentiality Review

1          A.     No.

2          Q.     Okay.

3          A.     Although if I could just

4     add, I -- I did flag similar issues, I

5     think, in the -- in my testimony.  I just

6     flagged as a possible issue, in the

7     antitrust area, what is the relevant unit

8     of analysis.

9          Q.     For purposes of determining

10    monopolization of markets and those kinds

11    of things?

12         A.     Correct.  Correct.

13         Q.     Okay.  In other words, it's

14    sort of the -- the Copperweld issue about

15    whether corporate affiliates can conspire

16    with one another, that kind of thing?

17         A.     Well, an issue like that.  I

18    mean, there's issues that have arisen in

19    the EU, in which the E -- EEC has been

20    forced to, you know, confront the issue.

21    What is the undertaking --

22         Q.     Mm-hmm.

23         A.     -- exactly what is the

24    undertaking?  Is it this corporation?  Is

Confidential - Subject to Further Confidentiality Review

Page 80

1    it the group?  Is it the entire network

2    of -- of SOEs?  So I did not opine as to

3    that.  I simply raised it as an issue

4    for -- for policymakers.

5         Q.    All right.  So you've

6    never -- you've never expressed an

7    opinion with respect to alter ego or

8    single business enterprise with respect

9    to Chinese state-owned enterprises?

10        A.    Correct.

11        Q.    All right.  Now, is it your

12   understanding, Professor, that -- let's

13   stick with China for the moment -- that

14   the Chinese government only has influence

15   over state-owned enterprises as opposed

16   to privately owned enterprises?

17        A.    I think they have forms of

18   controls over SOEs and -- and private

19   S -- private enterprise.

20        Q.    And is it your testimony

21   that the United States government has no

22   forms of controls over private

23   enterprises?

24        A.    Oh, of course they do.

Confidential - Subject to Further Confidentiality Review

Page 81

```
 1   Regulation and taxation is a form of

 2   government influence over private

 3   enterprise.

 4           Q.     Okay.  So in the United

 5   States, we have various regulatory bodies

 6   that oversee various industries.  And

 7   that, to a greater or lesser degree, can

 8   influence the policies of private

 9   corporation through the regulations that

10   they issue, correct?

11           A.     That's certainly true.  But

12   I think the forms of control and

13   influence in China are different.  They

14   go well beyond the standard forms of

15   regulation and taxation.

16           Q.     My question had to do with

17   the United States.  In the United States,

18   the government does have influence over

19   the conduct of private corporations

20   through the issuance and implementation

21   of the laws and regulations and the

22   oversight of regulatory structures,

23   correct?

24           A.     Certainly.
```

Confidential - Subject to Further Confidentiality Review

Page 82

1          Q.    Okay.  And so if, for

2     example, in the agricultural industry, if

3     the United States government wants to

4     support agricultural prices, they

5     sometimes pay farmers to not grow as many

6     crops, correct?  That's happened in the

7     U.S., right?

8          A.    I'm certainly not an expert

9     in this field.  I don't hold myself out

10    as one.  But that's my general

11    understanding.

12         Q.    Okay.  And that is a form of

13    the U.S. government influencing private

14    enterprise?

15              MR. LONGER:  In the broadest

16         sense of the term "influence"?  Is

17         that what you're --

18              MR. FENTON:  In any sense of

19         the term.

20              MR. LONGER:  Object to form.

21         Go ahead and answer.

22              THE WITNESS:  It is a form

23         of influence.

24    BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

Page 83

1          Q.    Okay.  And you also

2    mentioned that tax policy can influence

3    the conduct of U.S. enterprises, correct?

4          A.    Correct.

5          Q.    As a matter of fact, I think

6    Professor Gordon points out in his report

7    that the reason that the U.S. has

8    developed conglomerates as opposed to the

9    kinds of business groups that one sees in

10   other countries is largely driven by tax

11   considerations, right?

12         A.    That's one academic theory.

13         Q.    Okay.  Is it a theory

14   that -- that you think is -- is

15   supportable?

16         A.    I think, my own personal

17   view if you're interested, my academic

18   view, is that a broader variety of

19   factors probably influence why business

20   groups or, slash, conglomerates develop

21   in one economy versus another.  I don't

22   think it's all driven by tax.

23         Q.    Okay.  Fair enough.  And

24   there are other regulations other than

Confidential - Subject to Further Confidentiality Review

Page 84

```
 1   tax regulations, correct?

 2          A.    As to what?

 3          Q.    As to -- as to the conduct

 4   of private industry, correct?

 5          A.    Of course.

 6          Q.    Okay.  You have the SEC

 7   regulating.  You have in, on a -- on a

 8   state level, you have regulation of the

 9   insurance industry, correct?

10               MR. LONGER:  I've lost the

11          question.  Object to form.

12               Go ahead.

13               THE WITNESS:  Yes.

14   BY MR. FENTON:

15          Q.    Okay.  And certainly the

16   insurance commissioners of various states

17   can influence the behavior of private

18   insurance companies within that state to

19   the issuance and implementation of

20   regulations.

21          A.    Yes.  Again, using

22   influence, in the broadest sense of the

23   term, that's hard to argue with.

24          Q.    Okay.  And the government of
```

Confidential - Subject to Further Confidentiality Review

Page 85

```
 1   the United States through its

 2   investigatory power can influence the

 3   conduct of private companies; isn't that

 4   right?

 5               MR. LONGER:  It's a very

 6         vague question.

 7               Go ahead and answer it.

 8               Objection.

 9               THE WITNESS:  Yes.

10   BY MR. FENTON:

11         Q.   Okay.  And, in fact, the

12   Justice Department from time to time does

13   launch investigations of certain

14   industries as part of its law enforcement

15   operations, doesn't it?

16               MR. LONGER:  Objection.

17         Vague.  Overbroad.  Irrelevant.

18               Go ahead and answer the

19         question.

20               THE WITNESS:  Yes.

21   BY MR. FENTON:

22         Q.   Is it your testimony that

23   those kinds of investigations have no

24   influence on the conduct of private
```

Confidential - Subject to Further Confidentiality Review

Page 86

1    corporations in the United States?

2                    MR. LONGER:  Same

3           objections.

4                    THE WITNESS:  That's not my

5           testimony.

6    BY MR. FENTON:

7           Q.    Okay.  During the financial

8    crisis, I seem to recall this picture

9    that was on the front page of the New

10   York Times of half a dozen or so CEOs

11   with their right hands raised testifying

12   before Congress on the financial

13   collapse.

14                   Is that a form of U.S.

15   government influence over the conduct of

16   private companies?

17                   MR. LONGER:  Same

18          objections.

19                   THE WITNESS:  Again, it's

20          hard to quarrel or say no, because

21          influence, yes, sure, it would

22          influence behavior.  The

23          government influences behavior.

24   BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

Page 87

1          Q.    Well, I understand that,

2     sir.  So the government influences

3     behavior.  And it doesn't always

4     influence behavior through official

5     proclamations or through corporate

6     resolutions; isn't that right?

7                MR. LONGER:  Very vague.

8          Object.

9                Go ahead and answer if you

10         can.

11               THE WITNESS:  The government

12         does not always act through

13         government proclamations, yes.

14    BY MR. FENTON:

15         Q.    The government has the power

16    to regulate, does it not?

17         A.    Yes.

18         Q.    The government has the power

19    to tax, does it not?

20         A.    Correct.

21         Q.    The government has the power

22    to prosecute, does it not?

23         A.    Correct.

24         Q.    The government has the power

Confidential - Subject to Further Confidentiality Review

Page 88

1  to sue for civil penalties, does it not?

2          A.     Correct.

3          Q.     Okay.  And all of those

4  powers can be exercised in a way or

5  threatened in a way that can influence

6  the behavior of private participants in

7  the marketplace; isn't that true?

8          A.     That is true.

9          Q.     Have you ever written an

10 article positing that U.S. conglomerates

11 should be regarded as alter egos because

12 of these influences that the government

13 wields over their behavior?

14         A.     I have not.

15         Q.     Okay.  Have you ever seen

16 such an article?

17         A.     I have not looked for such

18 an article, but, no, I have not seen such

19 an article.

20         Q.     Okay.  Now, you reviewed

21 this mass of materials that was sent to

22 you by the PSC, and it included both

23 plaintiffs' submissions and defendants'

24 submissions.

Confidential - Subject to Further Confidentiality Review

1            What is the methodology that

2     you then applied to your work?

3            A.    Are you talking about the

4     methodology in crafting my declaration?

5            Q.    In reaching the conclusions

6     that you reached.

7            A.    Well, I first absorbed

8     myself in the facts of the case.

9                 And I focused on my

10    assignment, which was, as I understood

11    it, to provide context on corporate

12    governance practices in a Chinese SOE

13    group supervised by SASAC, as it would

14    have a bearing on the legal issues in

15    this case around the issue of personal

16    jurisdiction and alter ego or single

17    business entity status, again, with a

18    focus on context, not conclusion.

19           Q.    Okay.  Now, is there some

20    name for this kind of methodology?

21           A.    Well, comparative corporate

22    governance is a name that could be given

23    to what I did.

24           Q.    Okay.  And it is -- it is

Confidential - Subject to Further Confidentiality Review

1   very much the process that you understand

2   Professor Gordon followed; that is to

3   say, he looked at all the facts; he tried

4   to construct an analytical framework and

5   render and opinion, correct?

6           MR. LONGER:  Object to form.

7       Assumes facts not in evidence.

8           THE WITNESS:  Well, again, I

9       can't say what he did.  But I can

10      say that, in my own view, he

11      committed a fundamental error,

12      which is only looking for things

13      that were familiar to him and

14      omitting things that were not

15      familiar.

16  BY MR. FENTON:

17      Q.   Well, you omitted some

18  things that were not familiar, didn't

19  you?  We went through a whole long list.

20      A.   Because I didn't think they

21  were --

22          MR. LONGER:  Wait, wait,

23      wait.  Excuse me.  I don't want

24      you talking over one another,

Confidential - Subject to Further Confidentiality Review

Page 91

1          first.

2                  Second, when he asks an

3          argumentive question like that,

4          I'd like to be able to object

5          before you answer.  My objection

6          is noted.

7                  Go ahead and answer.

8     BY MR. FENTON:

9          Q.    Do you remember the

10    question?

11         A.    Could you repeat it for me.

12         Q.    Probably not.  But I can ask

13    the reporter to read it back.

14                (Whereupon, the court

15         reporter read back the requested

16         portion of the record.)

17    BY MR. FENTON:

18         Q.    Of the government-sponsored

19    and government-owned entities in the

20    United States.  You omitted that from

21    your analysis.

22         A.    Correct, because --

23                MR. LONGER:  Object to the

24         form.

Confidential - Subject to Further Confidentiality Review

Page 92

1              THE WITNESS:  -- I felt that

2         they were irrelevant, because I

3         think it is -- again, my

4         assignment was to focus on Chinese

5         SOEs.  And there is quite a body

6         of literature that indicates that

7         these are distinctive entities,

8         and if you just try to compare

9         them to United States, you're

10         going to miss very important,

11         relevant factors.

12    BY MR. FENTON:

13         Q.    Is it -- is it your

14    testimony that Professor Gordon cited no

15    professional literature or articles on

16    Chinese SOEs in his report?

17         A.    I believe he did.

18         Q.    Okay.  So he took it into

19    account.  You may think he didn't take it

20    into account enough, but he took it into

21    account, didn't he?

22         A.    He cited, to my

23    recollection, two articles.

24         Q.    Okay.  And the thrust of

Confidential - Subject to Further Confidentiality Review

Page 93

1    Professor Gordon's report was that he
2    didn't see any evidence of party or SASAC
3    influence that would justify piercing the
4    corporate veil; isn't that right?  Not
5    that he didn't think it was relevant, his
6    report said he didn't think there was
7    evidence of that, correct?
8         A.   I'm not sure he addresses
9    the topic at all.
10         Q.   Did you read his deposition?
11         A.   I did.
12         Q.   Okay.  Do you recall his
13    testimony that he did not see any
14    evidence of SASAC or Communist Party
15    control over the affairs of Taishan or
16    BNBM?
17         A.   I don't have an exact
18    recollection verbatim of what he
19    testified to.  But I think that's
20    probably a fair characterization of
21    his -- of his testimony.
22         Q.   Okay.  And what evidence did
23    you see of SASAC -- let's start with
24    SASAC, and then we'll move on to the

Confidential - Subject to Further Confidentiality Review

Page 94

1    Chinese Communist Party.

2              What specific evidence did

3    you see in the record of SASAC control

4    over the affairs of Taishan in connection

5    with the sale and distribution of Chinese

6    drywall?

7         A.   Well, let me start with the

8    articles of association of CNBM Group,

9    the corporate charter, which state -- I

10   want to focus -- you want me to focus on

11   SASAC?

12        Q.   Yes.

13        A.   Okay.  Provision of the

14   articles of incorporation state that the

15   board of directors will implement SASAC's

16   decision with respect to the running of

17   the corporation.

18              Those same articles also

19   provide a long list of important

20   decisions that are to be made by SASAC

21   rather than the board of directors.

22              I also saw in a document --

23   I'm going to forget the precise title,

24   but it's something like "Leading the

Confidential - Subject to Further Confidentiality Review

1    People."  It's a record of the leadership

2    team of Taishan, which refers to a

3    supervision team from SASAC as well as

4    CNBMG as well as BNBM.  It's not clear

5    from the record whether it's G or PLC.

6                    Those three supervisory

7    committees, from SASAC on down, going

8    into Taishan to, I assume, explore

9    problems there.  And the record states

10   that there is some kind of a

11   rectification plan that was devised for

12   Taishan.

13         Q.    Anything else that comes to

14   mind?

15         A.    Well, I can speak more about

16   SASAC if you'd like me to.

17         Q.    Well, you know, I think you

18   may have misunderstood my question.  So

19   let me -- and perhaps I didn't phrase it

20   properly.

21                    My question is, what

22   specific evidence did you see in the

23   record of SASAC control or direction over

24   the sale and distribution of Chinese

Confidential - Subject to Further Confidentiality Review

1    drywall by Taishan in the United States?

2    And what I mean is, have you seen

3    anything that ties SASAC directly to

4    those decisions or transactions?

5         A.    Well, I mean, I think by

6    implication the -- the record that I just

7    referred to, this meeting at Taishan,

8    suggests that SASAC exercises supervisory

9    authority over the downstream entities.

10                It has appointment and

11   removal power with respect to senior

12   executives throughout this corporate

13   hierarchy.

14                So, you know, in some sense,

15   I wouldn't expect to see a fulsome record

16   on this -- on this point, because we are

17   talking about, in essence, a kind of

18   parallel system or a system in which

19   SASAC has powers that go beyond what is

20   normally thought to be the power of a --

21   of a controlling shareholder.

22         Q.    All right.  Who at SASAC,

23   and I want the name of the person, who at

24   SASAC was involved in Taishan's decision

Confidential - Subject to Further Confidentiality Review

Page 97

1    to market drywall in the U.S. in the 2006

2    to 2 -- 2009 period?

3              A.    I -- I don't have --

4                   MR. LONGER:   Object to the

5         form.

6                   THE WITNESS:   Sorry.   I

7         don't have a name.

8    BY MR. FENTON:

9              Q.    Do you -- are you aware of

10   any documents issued by SASAC or a

11   representative thereof directed to

12   Taishan in the period 2006 to 2009

13   relating to Taishan's sale of drywall in

14   the U.S.?

15             A.    I'm -- I'm not aware of such

16   a document.   I -- I am told that there

17   are thousands of pages of documents that

18   have yet to be translated and processed.

19   So I obviously don't know what's in those

20   documents.

21             Q.    Yes, you obviously do not.

22                   My question is based on what

23   you have reviewed.   Have you seen any

24   document --

Confidential - Subject to Further Confidentiality Review

Page 98

1                MR. LONGER:  Object to the

2         colloquy.

3    BY MR. FENTON:

4         Q.    -- whereby SASAC or one of

5    its representatives is issuing any

6    directives to Taishan in connection with

7    the sale of drywall in the U.S. between

8    2006 and 2009?

9                MR. LONGER:  Object to the

10        colloquy.

11               Go ahead and answer the

12        question.

13               THE WITNESS:  No.

14   BY MR. FENTON:

15        Q.    Okay.  Have you seen any

16   documents from the leadership of CNBM to

17   Taishan directing them or telling them

18   how to sell drywall in the U.S. generated

19   between 2006 and 2009?

20        A.    I don't recall seeing such a

21   document.

22        Q.    Can you name for me any

23   senior executive, or junior executive,

24   for that matter, of CNBM who was involved

Confidential - Subject to Further Confidentiality Review

Page 99

1   with Taishan's decision to sell drywall

2   in the U.S. between 2006 and 2009?

3          A.    Well, by way of answer, I

4   would point to the articles of

5   administration --

6          Q.    No, I asked for the name of

7   a person, sir.

8          A.    I -- I do not have such a

9   name.

10          Q.    Can you name for me any

11   individual associated -- strike that.

12                Can you name for me any

13   person from BNBM PLC or BNBM Group who

14   was directly or indirectly involved in

15   Taishan's decision to sell drywall in the

16   U.S. during the period 2006 to 2009?

17          A.    I mean, they had board --

18   they had people on the board of Taishan.

19   They had three of the five board seats.

20          Q.    Okay.  Can you tell me

21   when -- whether the board of Taishan ever

22   considered the issue?

23          A.    No.  And the record is

24   rather thin on formal corporate actions

Confidential - Subject to Further Confidentiality Review

Page 100

1    by the board or shareholders.

2            Q.      Have you reviewed all of the

3    board minutes of BNBM, CNBM, and Taishan?

4            A.      If they -- if they were in

5    the record, I have -- I have looked at

6    them.

7            Q.      Okay.  And as you sit here

8    now, you don't recall any issues raised

9    by the board -- and I'm talking about

10   contemporaneously with the sales -- about

11   to whether or not Taishan should sell

12   drywall in the U.S. during the period

13   2006 to 2009, right?

14           A.      I do not recall, no.

15           Q.      All right.  And that is an

16   issue that would normally be handled by a

17   company's management, right?  That's an

18   operational issue that you would normally

19   expect maybe the -- the CEO or maybe even

20   a deputy CEO or administrator to address,

21   right?

22           A.      Yes.  Not necessarily on a

23   formal record, though.

24           Q.      Right.  But that's not the

Confidential - Subject to Further Confidentiality Review

Page 101

1    kind of thing that necessarily would rise

2    to a board-level decision, right?

3         A.    I'm -- well, I'm -- I'm not

4    sure I agree with you about -- about

5    that.

6         Q.    Well, in these articles of

7    incorporation that you talk about for

8    CNBM, is there anything in there that

9    says that if you want to sell drywall in

10   the U.S., you have to come to us for

11   permission?

12        A.    Well, the -- if I may refer

13   to these articles of association or

14   administration, which is the overarching

15   contract that governs the relations among

16   the firms in the group, there's a long

17   list of important decisions that need to

18   be -- for which the top group, for which

19   group company, needs to give a reply.

20        Q.    Right.  And that concerns

21   things like major sales of assets,

22   correct?  Mergers and acquisitions,

23   correct?

24        A.    Correct.

Confidential - Subject to Further Confidentiality Review

1          Q.    Divestitures, correct?

2                Okay.  Expenditures --

3                THE REPORTER:  Did he --

4                MR. JOHNSON:  Professor

5          Milhaupt, if you could answer

6          instead of nodding your head.

7                MR. FENTON:  Yes, we need an

8          audible answer.

9                THE WITNESS:  Correct.

10               MR. FENTON:  Okay.  As a

11         matter of fact, let's get the

12         document, Ken.  Let's get the

13         articles so we know what we are

14         talking about.

15    BY MR. FENTON:

16         Q.    You didn't see anything

17    about drywall in the articles, did you?

18         A.    No, I did not.

19         Q.    It might be helpful, sir, if

20    you could -- do you recall where you

21    refer to these articles in your report?

22         A.    Yes.  Footnote 11.

23               (Document marked for

24         identification as Exhibit

Confidential - Subject to Further Confidentiality Review

1              Milhaupt-2.)

2       BY MR. FENTON:

3              Q.    Okay.  All right.  Let me

4       show you what we've marked as -- as

5       Exhibit 2.  And this is labeled "Partial

6       Translation."

7                    Did you ever read the whole

8       translation, by the way?

9              A.    No.

10             Q.    Okay.

11                   China National Building

12      Material Group Corporation,

13      Administrative Measures for Appointing

14      Representatives of Capital Contributors.

15                   And I believe this is the

16      document you're talking about, but if

17      you -- if you can confirm that for me,

18      I'd appreciate it.

19             A.    Yes.

20             Q.    Okay.  And what you were

21      referring to, if I'm not mistaken, is

22      Article 15 of the document; isn't that

23      right?

24             A.    Correct.

Confidential - Subject to Further Confidentiality Review

    1          Q.    All right.  And let's look

    2   at the list of items for which CNBM Group

    3   must be consulted if its subsidiaries

    4   want to engage in the -- in the -- in the

    5   action, correct?

    6          A.    Yes.

    7          Q.    One is that the enterprise

    8   has the board of directors and selects

    9   and appoints or changes its general

   10   managers, chief -- chief financial

   11   officer or chief accountant --

   12              MR. LONGER:  Excuse me one

   13         second --

   14   BY MR. FENTON:

   15         Q.    -- correct?

   16              MR. LONGER:  -- before

   17         you -- before you answer the

   18         question.

   19              I think you're chasing down

   20         a rabbit trail here on something

   21         irrelevant.  So I'm going to

   22         object to the line of questioning.

   23              If -- can -- if I can have a

   24         standing objection, it will avoid

Confidential - Subject to Further Confidentiality Review

Page 105

1           me repeating it.

2                   MR. FENTON:  Fred, you can

3           even have a sitting objection.

4                   MR. LONGER:  You're so kind.

5                   MR. FENTON:  I don't -- I

6           just don't want to tire you out.

7           That's all.

8                   MR. LONGER:  Like I said,

9           you are a gentleman.

10                  MR. FENTON:  Standing

11          objection on the record.  Okay.

12   BY MR. FENTON:

13          Q.    The first decision that can

14   only be implemented after the group

15   corporation gives a reply is that the

16   enterprise that has the board of

17   directors selects and appoints or changes

18   its general manager, chief financial

19   officer, or chief accountant, correct?

20          A.    Correct.

21          Q.    Okay.  That doesn't have

22   anything to do with drywall, does it?

23                  MR. LEVIN:  Well --

24                  MR. LONGER:  If -- I -- I

Confidential - Subject to Further Confidentiality Review

Page 106

1          almost have troubles with the

2          standing objection.

3              MR. LEVIN:  Then stand,

4          Fred.  On that one, you have my

5          permission to stand.

6              MR. LONGER:  It -- it --

7          it's totally irrelevant --

8              MR. FENTON:  Let me rephrase

9          the question.  It's a bad

10         question --

11             MR. LONGER:  -- and it's

12         argumentive.

13             MR. FENTON:  Fred, you just

14         won.  Let me rephrase it.

15             MR. LONGER:  Okay.

16             MR. LEVIN:  Don't encourage

17         me.

18    BY MR. FENTON:

19         Q.    Are you familiar --

20             MR. JOHNSON:  Don't be

21         discouraged.  It was a perfectly

22         fine question.

23    BY MR. FENTON:

24         Q.    All right.  Are you familiar

Confidential - Subject to Further Confidentiality Review

1    with any point in time between 2006 and

2    2009 when Taishan went to CNBM for

3    permission to change its general manager,

4    chief financial officer, or chief

5    accountant?

6           A.    I'm not aware.

7           Q.    Okay.  Number 2, "Is there

8    are any decisions on significant

9    investments and directions of

10   operations?"

11              Are you aware of any point

12   in time when Taishan went to CNBM for

13   permission between 2006 and 2009 on

14   significant investments and directions of

15   operation?

16          A.    I'm not --

17              MR. LONGER:  Objection.

18   BY MR. FENTON:

19          Q.    Are you aware of Taishan at

20   any time going to CNBM for permission

21   about anything regarding its sale of

22   drywall in the U.S. between 2006 and

23   2009?

24          A.    Well, there is the episode

Confidential - Subject to Further Confidentiality Review

1    of Chairman Jia visiting the board to

2    inform them of the decision to withdraw

3    from litigation and the board --

4           Q.    Yes, and that was well after

5    the fact.

6                 I'm asking you between 2006

7    and 2009.

8           A.    I'm not aware.

9           Q.    Okay.  Number 3, the

10   enterprise has an investment increase

11   plan, profit income distribution plan, or

12   bond issue.

13                Are you aware of Taishan

14   going to CNBM with respect to any of

15   those matters between 2006 and 2009?

16          A.    I'm not aware, no.

17          Q.    Number 4, the enterprise

18   provides guarantees to any other

19   entities.

20                Are you aware of Taishan

21   going to CNBM for permission to provide

22   guarantees to other entities at any time

23   between 2006 and 2009?

24          A.    No, I'm not aware of that.

Confidential - Subject to Further Confidentiality Review

1          Q.    All right.  Five, the

2     enterprise's asset collaterals exceed

3     one-third of its net assets.

4                Are you aware at any time of

5     Taishan going to CNBM with respect to its

6     asset collateral exceeding one-third of

7     its net assets?

8          A.    No.

9          Q.    Okay.  Number 6, the

10    enterprise experiences significant losses

11    in operation or is in liquidation and is

12    being acquired.

13                Are you aware of any point

14    in time between 2006 and 2009 when

15    Taishan advised CNBM that it is

16    experiencing significant losses in

17    operation or is in liquidation and is

18    being acquired?

19         A.    No.

20         Q.    Okay.

21                And let me ask you this

22    question, sir.

23                In point of fact, Taishan

24    has been a quite profitable company

Confidential - Subject to Further Confidentiality Review

Page 110

1   during the period from 2006 all the way

2   up to the present day, based on what

3   you've seen; isn't that correct?

4          A.    It's my understanding based

5   on what I've seen.

6          Q.    All right.  Do you have any

7   reason to dispute either Mr. Deal's

8   analysis of Taishan's profitability or

9   the analysis of profitability that

10  Professor Gordon set forth relying on

11  Mr. Deal?

12         A.    No, no reasons.

13         Q.    Okay.  Number 7, "The

14  enterprise discards, reports damages of,

15  writes off, or transfers fixed assets,

16  excluding the normal discarding and

17  write-off of fixed assets."

18               Are you aware of Taishan

19  going to CNBM at any point in time

20  between 2006 and 2009 with respect to

21  Item 7?

22         A.    No.

23         Q.    All right.  Mr. Pfaehler has

24  just handed me a note saying I should

Page 111

1    have been asking 2005 to 2009 --

2              A.    Okay.

3              Q.    -- as opposed to 2006.  So

4    if I were to amend my prior questions to

5    cover the period 2009 to -- I'm sorry --

6    2005 to 2009, would that change your

7    answers in any way?

8              A.    It would not.

9              MR. LONGER:  Thank you,

10         Mr. Pfaehler, because I objected

11         earlier about the 2006 time frame.

12              MR. FENTON:  Then I

13         shouldn't have cut you off.

14              MR. LONGER:  Just say I'm

15         right again, and I'll just keep

16         going.

17              MR. FENTON:  You're right.

18         Music to his ears.

19    BY MR. FENTON:

20              Q.    Okay.  Eight, "The

21    enterprises involved in mergers,

22    split-up, dissolution, acquisition, being

23    acquired, or any plans that involve asset

24    changes."

Confidential - Subject to Further Confidentiality Review

Page 112

1                    Are you aware of any point

2      in time where, between 2005 and 2009,

3      Taishan went to CNBM with respect to the

4      items set forth in Paragraph 8?

5           A.    I am not aware, no.

6           Q.    The next paragraph, 9, is,

7      "The enterprise causes losses of

8      state-owned assets or jeopardizes the

9      safety of state-owned assets because it

10     violates laws or makes a significant

11     operational mistake or the enterprise is

12     involved in litigation."

13                    Okay.  Are you aware of any

14     point in time between 2005 and 2009 when

15     Taishan went to CNBM with respect to

16     those issues?

17          A.    Not within that time frame,

18     no.

19          Q.    Right.  But as you did point

20     out earlier, in 2014 Taishan did report

21     to CNBM on the conduct of the U.S.

22     litigation?

23          A.    Correct.

24          Q.    All right.  But you're well

Confidential - Subject to Further Confidentiality Review

Page 113

1    aware that the actual sales and

2    installation of the drywall had occurred

3    years earlier, correct?

4         A.    Yes.

5         Q.    Okay.  Number 10 is, "Any

6    other matters that may affect the capital

7    contributor's rights and interests."

8              Are you aware of Taishan at

9    any time going to CNBM with respect to

10   Item 10 between 2005 and 2009?

11        A.    I am not.

12        Q.    All right.  So have we now

13   covered all of the items in these

14   articles that require consent by the CNBM

15   group as to its subsidiaries?

16        A.    We have.

17        Q.    Okay.  And that's what you

18   were referring to in your earlier

19   testimony?

20        A.    That's correct.

21        Q.    Correct.  Now, wouldn't you

22   expect a U.S. subsidiary to report to its

23   wholly owned parent on these same types

24   of things?

Confidential - Subject to Further Confidentiality Review

```
 1           A.    I would not.  I would not
 2    expect to see it in this type of
 3    contractual form, which is a form that's
 4    used by all SOE business groups under
 5    SASAC supervision.
 6           Q.    That was not my question.
 7           MR. FENTON:  Please read
 8      back my question.
 9           (Whereupon, the court
10      reporter read back the requested
11      portion of the record.)
12    BY MR. FENTON:
13           Q.    Let me rephrase the
14    question.
15           Wouldn't you expect a wholly
16    owned U.S. subsidiary to report to its
17    parent, in the ordinary course, on
18    exactly these same types of things,
19    Items 1 through 10?
20           MR. LONGER:  It's -- object.
21      It's been asked and answered.
22      Go ahead, please.
23           THE WITNESS:  Well, I think
24      what's different here from the way
```

Confidential - Subject to Further Confidentiality Review

```
 1          you phrased your question is that
 2          Taishan is many tiers below the
 3          parent company.  So it does seem a
 4          bit extraordinary that a third- or
 5          fourth-tier subsidiary would be
 6          reporting to the ultimate parent.
 7   BY MR. FENTON:
 8          Q.    All right.  Well, in -- is
 9   there anything unusual about the
10   subsidiary reporting through the
11   subsidiaries?
12              In other words, let's say
13   you have a third- or fourth-tier
14   subsidiary, and the fourth-tier
15   subsidiary decides, "Gee, I want to do a
16   merger tomorrow."
17              Okay.  It would report to
18   the subsidiary above, which would report
19   to the subsidiary above, which would
20   report to the ultimate parent, right?
21              MR. LONGER:  And we're
22          talking about United States
23          corporations?
24              MR. FENTON:  In the U.S.,
```

Confidential - Subject to Further Confidentiality Review

Page 116

1          wouldn't you expect that?

2                    MR. LONGER:  Still a vague

3          question.

4                    Go ahead and answer.

5                    Objection.

6                    THE WITNESS:  I would expect

7          formal corporate action in the

8          tiers above that subsidiary.

9     BY MR. FENTON:

10          Q.    Sir, I'm not talking about

11     formal corporate action.  I'm talking

12     about reporting.

13                    MR. LONGER:  I don't

14          understand the question.  If you

15          do...

16     BY MR. FENTON:

17          Q.    Let me put it this way, sir.

18                    Okay.  Let's say I am a

19     fourth-tier subsidiary of Disney.  Okay?

20                    And I've got a couple of

21     Disney officers sitting on my board.  And

22     in this fourth-tier subsidiary, we decide

23     that we want to sell all or substantially

24     all of our assets.

Confidential - Subject to Further Confidentiality Review

1              Wouldn't you expect that

2    that would get reported in some way to

3    the ultimate parent at Disney holdings?

4              MR. LONGER:  Objection.

5         Hypothetical.

6              THE WITNESS:  I mean, would

7         it be reported in some way?

8    BY MR. FENTON:

9         Q.    Yes.

10        A.    Well, it's hard to say no to

11   that.

12        Q.    Okay.  Whether it's reported

13   up the corporate chain or whether the CEO

14   of the subsidiary picks up the phone and

15   calls the chairman of Disney and says,

16   "This is what we want to do," it would

17   get reported, right?

18             MR. LONGER:  Objection.

19        Incomplete hypothetical.

20             But answer the question if

21        you can.

22             THE WITNESS:  Well, I think

23        I already answered it.

24   BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

Page 118

1          Q.    All right.   That would apply

2     to all ten of these types of transactions

3     or events that are listed in Article 15

4     of Exhibit 2; isn't that right?

5          A.    Subject to what I said

6     earlier, which is I think it would be

7     very unusual to see it formalized in this

8     sort of a document, skipping over many

9     tiers of intervening subsidiaries.

10          Q.    Well, does it say anything

11     about skipping?  It simply says has to

12     give a written report to the group

13     corporation beforehand.

14          A.    The decision can only be

15     implemented after the group corporation

16     gives a reply.

17          Q.    Right.  So maybe they do it

18     a little differently in China.  Does that

19     mean it's wrong?

20               MR. LONGER:  Objection to

21          the form.

22               THE WITNESS:  I'm not here

23          to say anything is right or wrong.

24          I'm here to describe how the

Confidential - Subject to Further Confidentiality Review

Page 119

1        system operates.

2   BY MR. FENTON:

3        Q.    Well, are you aware of any

4   case that says that if somebody reports

5   these kinds of events directly to the

6   parent corporation as opposed to going

7   through three different levels of

8   executives between the parent and the

9   subsidiary, that that in and of itself is

10  a basis for piercing the corporate veil?

11       A.    No.

12       Q.    Now, you've made some

13  references to the record in this case.

14  And I -- and I simply want to understand.

15  When you are talking about the record in

16  this case, you're talking about the

17  record that has been made available to

18  you, correct?

19       A.    That's correct.

20       Q.    That has all come to you

21  through the PSC, right?

22       A.    That's correct.

23       Q.    I haven't sent you anything?

24       A.    Correct.

Confidential - Subject to Further Confidentiality Review

Page 120

```
 1           Q.    Okay.  Mr. Venderbush hasn't
 2    sent you anything?
 3           A.    Correct.
 4           Q.    Mr. Johnson hasn't sent you
 5    anything?
 6           A.    Correct.
 7           Q.    It's all come to you from
 8    the PSC.  That is the source of your
 9    knowledge and the source of your record,
10    correct?
11           A.    Well, when you say the
12    source of my knowledge, I mean, I have
13    knowledge --
14           Q.    About the facts.
15           A.    Correct.
16           Q.    Okay.  And all of what the
17    PSC provided to you is listed on your
18    report, as you testified to earlier
19    today?
20           A.    That's correct.
21           Q.    All right.  And that's what
22    you're talking about when you talk about
23    the record?
24           A.    That's correct.
```

Confidential - Subject to Further Confidentiality Review

Page 121

1          Q.    Okay.  Now, by the -- when

2     it comes to mergers and acquisitions and

3     this reporting business, okay, you

4     understand that SASAC has some say in

5     whether certain mergers and acquisitions

6     can be done?  Is that your understanding?

7          A.    Yes.

8               MR. LONGER:  Objection.

9     BY MR. FENTON:

10         Q.    Did you ever hear of a piece

11    of legislation in the United States

12    called Hart-Scott-Rodino?

13         A.    Yes, I have.

14         Q.    Okay.  What is

15    Hart-Scott-Rodino?

16         A.    It regulates certain aspects

17    of merger activity.

18         Q.    All right.  And private

19    companies that hold a certain amount of

20    market share are required to report to

21    the U.S. government before completing any

22    kind of a transaction that might create

23    antitrust issues; isn't that right?

24         A.    My general understanding of

Confidential - Subject to Further Confidentiality Review

Page 122

1    how the statute operates.

2           Q.    In order to give the

3    government the opportunity to try and

4    block the transaction; isn't that right?

5           A.    Yes.

6           Q.    All right.  So things aren't

7    all that different in various parts of

8    the world, are they?

9                 MR. LONGER:  Objection to

10          the form.  You may say that.  It's

11          argumentive.

12   BY MR. FENTON:

13          Q.    Can you answer that?

14          A.    Well, was that a question?

15          Q.    Yes.

16          A.    Things aren't all that

17   different in the United States and China?

18   I would have to disagree.

19          Q.    Okay.  You're right.  We

20   don't have the Forbidden City.

21                All right.  Let's move along

22   with your report here.

23                MR. LONGER:  A lot more

24          different than that.  But go

Confidential - Subject to Further Confidentiality Review

1        ahead.

2              They have Chicago.

3    BY MR. FENTON:

4        Q.    As a matter of fact, sir, I

5    got a little bit ahead of myself.  But

6    what I was referring to was in

7    Paragraph 28.  And I believe you're

8    talking about the SOE asset law in China.

9        A.    Correct.

10       Q.    Okay.  It says, "Article 34

11   requires that SASAC obtain government

12   approval before exercising its rights as

13   a shareholder with respect to the merger,

14   splitting, dissolution, or petition for

15   bankruptcy of an important SOE under its

16   supervision."

17       A.    Correct.

18       Q.    Correct?

19              And it was in that context

20   that I was raising Hart-Scott-Rodino with

21   respect to mergers and acquisitions.

22   With respect to bankruptcies of important

23   companies, hasn't the U.S. government

24   come to the rescue of certain companies

Confidential - Subject to Further Confidentiality Review

Page 124

1    that were deemed too big to fail?

2         A.    When you say "come to the

3    rescue of," I mean, that's a broad term.

4         Q.    Well, let's start with AIG.

5         A.    No, I'm -- I'm familiar with

6    what you're saying.  I'm just -- "come to

7    the rescue of" is kind of a broad

8    characterization.  You know, it was

9    injected with capital --

10        Q.    Would you prefer "bailout"?

11             MR. LONGER:  I'm going to

12        object to the form.  If -- if

13        that's a question, I object to the

14        form.

15   BY MR. FENTON:

16        Q.    Okay.  So, in other words,

17   the U.S. government has stepped in, in

18   one form or another, from time to time to

19   avoid the bankruptcy of major companies

20   where it was felt that it would have a --

21   a deleterious impact on the interests of

22   the country or the overall economy,

23   correct?

24        A.    Yes.

Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.

2                 (Discussion held off the

3          record.)

4     BY MR. FENTON:

5          Q.     Now, let's talk a little bit

6     about this parallel structure.

7          A.     Yes.

8          Q.     The -- if I understand what

9     you're saying is that if one is to make a

10    proper determination regarding what

11    you've termed "single business entity

12    analysis," one needs to understand the

13    parallel influence of both SASAC and the

14    Communist Party, correct?

15         A.     That's correct.

16         Q.     All right.  And we've talked

17    a little bit about SASAC.  Let's talk

18    about now about the Communist Party.

19                Who in the Chinese Communist

20    Party directed the actions of Taishan

21    between 2005 and 2009?  And when I say

22    "who," I would like you to name for me

23    the individual or individuals who played

24    that role.

Confidential - Subject to Further Confidentiality Review

1         A.    I could name the

2    organization within SASAC responsible for

3    the appointment of Chairman Song.

4         Q.    Mm-hmm.

5         A.    And -- but I cannot name a

6    specific individual.

7         Q.    I'm asking about the Chinese

8    Communist Party, not SASAC.

9               Who are the party

10   apparatchiks?

11        A.    Well, the -- the party also

12   exists within SASAC.

13        Q.    And the party is an integral

14   part of the political system in China;

15   isn't that right?

16        A.    Correct.

17        Q.    Okay.  And so there -- there

18   is an interrelationship under the Chinese

19   form of government between SASAC and the

20   Communist Party?

21        A.    Correct.

22        Q.    So are you saying that --

23   that the Chinese Communist Party

24   exercises its influence through SASAC?

Confidential - Subject to Further Confidentiality Review

Page 127

 1         A.     In part.

 2         Q.     Okay.  And what's the other

 3    part?

 4         A.     Its control of the entire

 5    governmental apparatus.

 6         Q.     Okay.  And how has the

 7    Chinese Communist Party exercised control

 8    of the entire governmental apparatus to

 9    force Taishan to sell drywall in the U.S.

10    between 2005 and 2009?

11         A.     Well, every corporate entity

12    in China, particularly the SOEs, must

13    have a Communist Party committee internal

14    to the firm.  That's -- that's right in

15    the company law, and that's right in CNBM

16    Group's corporate charter.

17                It says, "The firm must

18    establish an organization of the party to

19    carry out its political" -- "its

20    political work with respect to the major

21    business decisions of the corporation."

22                And you will find such a

23    provision in every corporate entity in

24    China.

Confidential - Subject to Further Confidentiality Review

Page 128

1              That's the mechanism through

2     which the party exercises its influence

3     over corporations.

4           Q.    All right.  So are you

5     saying there's a -- there's a political

6     committee within Taishan?

7           A.    Yes.

8           Q.    Okay.  Who is on that

9     committee?

10          A.    I -- I don't know, because

11    the -- the bios of the individuals is not

12    typically listed.  With respect to CNBM

13    G, the party affiliations are listed.

14    But for public companies, where they need

15    to report this information, you also --

16    you get the corporate position and the

17    party position.

18          Q.    All right.  What -- what

19    evidence have you seen that this

20    Communist Party committee at Taishan

21    directed Taishan to sell drywall in the

22    U.S. between 2005 and 2009?  Can you

23    point me to a document that evidences

24    that?

Confidential - Subject to Further Confidentiality Review

1          A.     Well, I can point you to a

2     document in which the party committee of

3     Taishan says, in the first line, and I'm

4     quoting verbatim, "We are owned by the

5     party committee of CNBM G."  That to me

6     is suggestive of party -- extensive party

7     influence down through this corporate

8     hierarchy.

9          Q.     Fine.  Then let's talk about

10    the Communist Party committee at CNBM G.

11    What did the Communist Party committee at

12    CNBMG do to direct Taishan to sell

13    drywall in the United States between 2005

14    and 2009?

15         A.     Well, I think the party's

16    supervisory function, its appointment and

17    removal power, its maintaining of

18    personnel files on all key executives, is

19    a -- is a significant form of influence.

20    I -- I cannot point you to a specific

21    directive of the Communist Party, but I

22    would not expect to see that.  Indeed, I

23    would be very surprised to see such a

24    directive in corporate documentation.

Confidential - Subject to Further Confidentiality Review

1          Q.    So what -- are you telling

2    me that everything that Taishan does is

3    in one way or another directed by the

4    Communist Party?

5          A.    No.  I'm talking about

6    capacity to control.  I'm talking about

7    capacity to control.

8          Q.    All right.  And my question

9    has to do with exercise of control.  What

10   did C -- the Communist Party committee at

11   CNBMG do in the exercise of control to

12   force Taishan to sell drywall in the U.S.

13   between 2005 and 2009?

14         A.    I -- I did not see

15   documentation that would allow me to

16   answer that.

17         Q.    And would the same be true

18   if I asked you about BNBMG?

19         A.    Yes.

20         Q.    And would the same be true

21   if I asked you about BNBM PLC?

22         A.    Yes.

23         Q.    And would the same be true

24   if I asked you about Taishan's own

Confidential - Subject to Further Confidentiality Review

1    Communist Party committee?

2         A.    Well, again, I did refer you

3    to a document which discusses the -- the

4    party.

5         Q.    Mm-hmm.

6         A.    And it's apparent, at least

7    in its view, its ownership of Taishan by

8    the Communist Party of CNBM Group.  I

9    think that's evocative.  I mean, it -- it

10   raises questions in my mind.

11              But, no, I -- I cannot point

12   you to a specific document.

13        Q.    Well, we know Taishan

14   ultimately is -- is owned by the CNBM

15   Group, right?

16        A.    Well, I think the phrasing

17   was interesting.  The specific language

18   is, "We are owned by the Communist Party

19   committee of CNBM G."

20        Q.    Okay.  And what -- what

21   you're saying is you have no evidence

22   that you can point to right now that the

23   Communist Party committee of CNBMG

24   exercised its ownership or control, if

Confidential - Subject to Further Confidentiality Review

Page 132

1  that's what one calls it, to force

2  Taishan to make drywall sales in the U.S.

3  between 2005 and 2009?

4      A.    I saw no documentation to

5  that effect.

6      Q.    Okay.  What is the document

7  that you were referring to, the one that

8  you said --

9      A.    Yes.  If you'd just bear

10  with me for one minute.  It is

11  Footnote 21, "Present the People," et

12  cetera.

13      Q.    Okay.  Why don't we pull

14  that document and take a look at Tab 12.

15          (Document marked for

16          identification as Exhibit

17          Milhaupt-3.)

18  BY MR. FENTON:

19      Q.    Now, this is a document --

20  it -- it's -- again, it's a partial

21  translation.  Did you ever read the full

22  translation?

23      A.    I did not.

24      Q.    Okay.  And we've marked this

Confidential - Subject to Further Confidentiality Review

Page 133

1    as Exhibit 3, is it?

2            A.     Correct.

3            Q.     Okay.  And Exhibit 3 is

4    entitled "Present the People, the Object,

5    and the Mindset, Integrate Strictness

6    With Reliability and Change the Work

7    Style."

8                   And then there is a

9    subheading "Main measures taken by the

10   leadership team of Taishan Gypsum at the

11   special Democratic life meeting," right?

12           A.     Correct.

13           Q.     Okay.  When was this meeting

14   held?

15           A.     I see a reference to June.

16   I do not see a date.

17           Q.     Can you tell me whether this

18   meeting was held before or after 2009?

19           A.     If you would just bear with

20   me one more time.

21           Q.     Take your time, Professor.

22           A.     Well, I -- I assume that it

23   was relatively recently, because there's

24   a reference to the four forms of

Confidential - Subject to Further Confidentiality Review

Page 134

1    decadence on the next page, which is a

2    political campaign or slogan of President

3    Xi Jinping, who came to power in 2012.

4              So I would -- I would assume

5    that document is prepared after that --

6    that time period.

7         Q.    Okay.  So this is a document

8    that would have been generated post 2012,

9    in your view, based on the -- the

10   campaign slogan of -- of China's

11   president?

12        A.    That would be my assumption,

13   yes.

14        Q.    All right.  And it's the

15   four -- I'm sorry.

16        A.    Four forms of decadence.

17        Q.    Four forms of decadence.

18   You're familiar with them all?

19        A.    Please don't ask me to

20   recite them, although I think I do know

21   them.

22        Q.    Well, let me see if I can

23   refresh your -- let me see if I can

24   refresh your recollection.

Confidential - Subject to Further Confidentiality Review

Page 135

```
 1                    Are the four forms of -- of
 2    decadence, formalism, bureaucratism,
 3    hedonism, and extravagance?
 4          A.     That's my -- that's my
 5    understanding.
 6                    MR. LEVIN:  I'm glad you
 7          didn't ask me that question.
 8    BY MR. FENTON:
 9          Q.     All right.  Now, what does
10    this document have to do with Taishan
11    operations, other than telling people not
12    to be decadent?
13          A.     Well, it says that various
14    supervision teams, including the party's
15    supervision team --
16          Q.     Mm-hmm.
17          A.     -- from SASAC, from CNBM G,
18    went into Taishan to, as I read the
19    document, to discuss problems going on in
20    that -- in that company.
21          Q.     Okay.  Wouldn't you expect
22    in the United States, if a parent
23    corporation was having problems with a
24    particular subsidiary, whether direct or
```

Confidential - Subject to Further Confidentiality Review

Page 136

1    indirect, that they might send in a team

2    of people to deal with it?

3              MR. LONGER:  Objection to

4         the form.  It's assuming facts

5         that are not in evidence.  It's

6         actually an incomplete

7         hypothetical.  It would be more

8         appropriate to say, "Is the

9         Republican Party doing that?"

10             MR. FENTON:  Fred, let me --

11        there's four words:  Object to the

12        form.

13             If you would stick to that,

14        I'd appreciate it.

15             MR. LONGER:  I've been doing

16        a pretty good job with that.  This

17        one just seemed over the top, so I

18        just went with it.  You'll have to

19        forgive me on that.

20             MR. FENTON:  I'm a very

21        forgiving guy.

22             MR. LONGER:  You look like

23        it.

24    BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

Page 137

```
 1            Q.    Please answer my question,
 2    Professor.  And if you don't remember it,
 3    I'll forgive that too, and read it back.
 4                  THE WITNESS:  I actually
 5            would appreciate it if you'd read
 6            it back.
 7                  (Whereupon, the court
 8            reporter read back the requested
 9            portion of the record.)
10                  THE WITNESS:  Well --
11                  MR. LONGER:  Please note my
12            objection to the form.
13                  THE WITNESS:  I would not --
14            well, first of all, I would not
15            see a party committee in any
16            corporation of the United States.
17            I would simply not see Republican
18            or --
19    BY MR. FENTON:
20            Q.    Really?  Have you looked at
21    the Koch brothers' operation lately?
22            A.    I don't think there's a
23    Republican committee specified in its
24    charter.  I don't think that it coexists
```

Confidential - Subject to Further Confidentiality Review

Page 138

1    with the Sarbanes-Oxley reporting

2    requirements.  So I don't see it as part

3    of the internal control structure.

4            Q.    We don't have a Chinese

5    Communist Party here in the United

6    States.  My question was, if a U.S.

7    conglomerate determined that there were

8    problems at a subsidiary company, even

9    two or three levels down, that the parent

10   might want to send in a team to deal with

11   those problems, whatever they may be.

12            MR. LONGER:  Objection.

13    Vague.

14   BY MR. FENTON:

15            Q.    Let me ask you this

16   question, sir.

17            A.    Well --

18            Q.    Go ahead and answer.

19            A.    No.

20            Q.    I didn't mean to cut you

21   off.

22            A.    That's fine.

23            Q.    Let me ask you this

24   question:  Isn't it common in U.S.

Confidential - Subject to Further Confidentiality Review

Page 139

1    corporations for conglomerates, and

2    non-conglomerates, for that matter, to

3    require all of their subsidiary operating

4    companies to have some form of mandatory

5    sexual harassment training?

6            A.    I don't have a basis to

7    answer that.  I'm not familiar with such

8    a requirement.  I'm not saying it doesn't

9    exist.  I'm just not -- I don't have a

10   basis --

11           Q.    You're not familiar with

12   mandatory sexual harassment training?

13           A.    Well, yes, I am.  But I

14   don't know precisely where such a

15   requirement -- where in the law it comes

16   from.  That's what I'm saying.

17           Q.    I'm not talking about the

18   law.  I'm talking about as a matter of

19   corporate policy, isn't it true that

20   major corporations in the United States

21   require mandatory sexual harassment

22   training for the entire corporate

23   organization?

24                 MR. LONGER:  I think that's

Confidential - Subject to Further Confidentiality Review

Page 140

1            a different question.  I object to

2            the form.

3                    Go ahead and answer.

4                    THE WITNESS:  Are you asking

5            me whether every corporation has a

6            mandatory policy for every

7            employee?

8   BY MR. FENTON:

9            Q.    I'm not asking --

10           A.    I just don't have a basis

11   for answering that.

12           Q.    -- whether every

13   corporation --

14                   MR. LONGER:  He's saying

15           major corporations.

16   BY MR. FENTON:

17           Q.    I am asking you whether it

18   is common in the United States for major

19   corporations, major corporate

20   conglomerates, to require all of their

21   employees, including employees of

22   subsidiaries, to undergo mandatory sexual

23   harassment training.

24           A.    It's probably common.

Confidential - Subject to Further Confidentiality Review

Page 141

1          Q.    Okay.  I bet you even have

2     it at Columbia, don't you?

3          A.    We sure do.

4          Q.    Okay.  And the same goes for

5     diversity training; isn't that right?

6          A.    Whether this is -- I can't

7     say that it's mandatory.  I mean, I just

8     don't have a basis for saying that it's

9     mandatory in every major corporation.

10         Q.    And that wasn't my question,

11    sir.  What I'm saying is it's not

12    uncommon in the U.S.

13         A.    It's not uncommon.

14         Q.    And that is to deal with

15    behavior patterns that may be detrimental

16    to the workplace, correct?

17         A.    Correct.

18         Q.    Such as hedonism or

19    extravagance, right?

20              MR. LONGER:  Object to the

21         form.

22              THE WITNESS:  I think it

23         would be unusual for major

24         corporations in the United States

Confidential - Subject to Further Confidentiality Review

```
 1          to be promulgating President

 2          Obama's latest -- whatever topic

 3          he's picked up on and to be having

 4          a government owner and major party

 5          committees in upper-tiered

 6          subsidiaries going down into the

 7          lower-tiered subsidiaries to talk

 8          about President Obama's latest

 9          slogan on whatever he's interested

10          in.  Yes, I would find that

11          extremely unusual.

12   BY MR. FENTON:

13          Q.   Well, but is it unusual in

14   response to major decisions of courts in

15   the U.S. to deal with that by way of

16   things like sexual harassment training,

17   diversity training?

18          A.   I'm not sure I followed the

19   question.

20          Q.   Well, you raised the issue

21   of President Obama.  But you understand

22   that we have other political bodies

23   besides the president of the United

24   States.
```

Confidential - Subject to Further Confidentiality Review

1          A.     I do.

2          Q.     We have the Congress.  Okay.

3    We have the Supreme Court.

4          A.     Yes.  We have the Supreme

5    Court.

6          Q.     Okay.  And we have the

7    Congress, right?

8          A.     Yes.

9          Q.     And the legitimate corporate

10   response to court decisions dealing with

11   sexual harassment in the workplace would

12   be for a corporate parent to require

13   sexual harassment training all the way up

14   and down the corporate ladder, correct?

15         A.     Correct.

16              MR. LONGER:  Objection to

17         the form.

18              THE WITNESS:  Correct.

19   BY MR. FENTON:

20         Q.     Okay.  Now, would you please

21   tell me where in this document that's

22   been marked as Exhibit 3 there is

23   evidence of this committee telling

24   Taishan how much it has to produce or who

Confidential - Subject to Further Confidentiality Review

Page 144

1    it can sell to or how its operations are

2    to be conducted?  Is there anything in

3    this document that relates to that?

4         A.     Well, as to the last thing,

5    how its operations should be conducted,

6    it says that -- you see I'm reading from

7    the second page, "SASAC's third circuit

8    supervision teams, CNBM Group, BNBM, et

9    cetera, provided three-tier supervision,

10   insisting on maintaining strictness and

11   reliability, strength and coordination,

12   communication of the work, cooperated

13   exercise joint forces of supervision,

14   passed on the pressure when

15   appropriate" -- whatever that means

16   exactly -- "and provided targeted and

17   effective guidance and assistance for

18   Taishan Gypsum to fully understand the

19   spirits of the central government to good

20   control of the key points and to

21   straighten out the ideas of the

22   activities."

23              That sounds to me like

24   intervention in the operations of

Confidential - Subject to Further Confidentiality Review

Page 145

 1    Taishan.

 2         Q.    All right.  And what

 3    operations were they intervening in?

 4         A.    I wasn't there.  I don't

 5    know.

 6         Q.    And what operational

 7    decisions did they make?

 8         A.    It's not apparent from the

 9    document.

10         Q.    What operational decisions

11    did they force the managers of Taishan to

12    make?

13         A.    It's not apparent from the

14    document.

15         Q.    In the exercise of avoiding

16    hedonism, formalism, bureaucratism, or

17    extravagance?

18         A.    Well, I see the latter as

19    being somewhat connected of what went

20    before, which goes to operations.  This

21    strikes me as kind of a political add-on.

22         Q.    Okay.  And when you say it's

23    a political add-on, they're dealing with

24    forms of behavior in the workplace that

Confidential - Subject to Further Confidentiality Review

Page 146

1    the party or SASAC or whoever deems

2    detrimental, right?

3         A.    Correct.

4         Q.    Okay.  Just the way in the

5    U.S., sexual harassment would be

6    detrimental, or racial or ethnic

7    discrimination would be detrimental,

8    correct?

9         A.    Well, when you say "just the

10   way that," I think -- I mean, again, I'm

11   not trying to quibble.  But when you say

12   "just the way that," I would have to say

13   no.

14        Q.    Fine.  Let me rephrase the

15   question.

16             Okay.  They are dealing with

17   forms of behavior in the workplace in

18   this document, Exhibit 3, that are deemed

19   detrimental?

20        A.    Correct.

21        Q.    Okay.  There's nothing

22   specific in here about their operation,

23   how much they produce, where they buy

24   their product, where they sell their

Confidential - Subject to Further Confidentiality Review

1   product, nothing of that nature in this

2   document, right?

3          A.    That's correct.

4          Q.    Okay.  And U.S. companies,

5   conglomerates up and down the corporate

6   chain may also try to influence workplace

7   behavior through things like sexual

8   harassment training and diversity

9   training, correct?

10         A.    Correct.

11               MR. FENTON:  Okay.  And with

12         that, let's take a break.

13               THE VIDEOGRAPHER:  The time

14         is 11:17 a.m. on February 3rd,

15         2016.  And this completes DVD

16         Number 1.

17               (Short break.)

18               THE VIDEOGRAPHER:  The time

19         is 11:36 a.m. on February 3rd,

20         2016.  And this is DVD Number 2.

21   BY MR. FENTON:

22         Q.    All right.  Professor, I

23   remind you, you're still under oath.

24               We talked about Exhibits 2

Confidential - Subject to Further Confidentiality Review

Page 148

```
 1    and 3.  Are there any other documents
 2    that you're aware of in the record that
 3    you reviewed which you would consider to
 4    be showing the evidence of exercise of
 5    control over Taishan by either the BNBM
 6    companies, the CNBM companies, or SASAC?
 7              A.    Well, there were -- I mean
 8    the deposition of Ms. Hu, which is
 9    referred to in my Footnote 10, talking
10    about what I took to be quite a
11    hierarchical governance structure,
12    supervisory structure by the upstream
13    entities over downstream entities.  She
14    refers to her auditing activities as a --
15    as a cascade form of management.
16              So that suggested potential
17    and some exercise, actually, of control.
18              Q.    Well, you understand that
19    under Chinese law, the various members of
20    the CNBM corporate group are required to
21    file consolidated financial statements?
22              A.    Yeah, that's right.
23              Q.    Just as in the U.S.,
24    corporate conglomerates file consolidated
```

Confidential - Subject to Further Confidentiality Review

Page 149

```
 1    financial statements?

 2             A.    Yes.

 3             Q.    Did you see anything in this

 4    deposition of Hu Jinyu that indicated to

 5    you any commingling of assets among the

 6    various companies that make up the CNBM

 7    Group?

 8             A.    No.

 9             Q.    Did you see anything in the

10    testimony of Hu Jinyu that suggested to

11    you that different members of the CNBM

12    Group were financing the operations of

13    other members?

14             A.    Were financing the

15    operations of other members?

16             Q.    Yes.  Giving them money,

17    supporting them?

18             A.    No.

19             Q.    Okay.  Did you see any

20    evidence in this deposition of Hu Jinyu

21    that suggested that upper-tier companies

22    were looting the assets of lower-tier

23    companies within the CNBM corporate

24    group?
```

Confidential - Subject to Further Confidentiality Review

Page 150

 1          A.     No.

 2          Q.     How about vice versa?

 3          A.     No.

 4          Q.     Okay.  All right.  Any other

 5     evidence that you can point to in the

 6     record that you reviewed that you say

 7     demonstrates the exercise of control over

 8     Taishan by any member of the CNBM

 9     corporate group?

10          A.     There was a deposition of

11     Mr. Zhou, I believe, Z-H-O-U, who I

12     believe serves as the secretary to the

13     board of BNBMG.  I think he may also be

14     the deputy general manager.

15                 And when he was asked about

16     his job responsibilities, he included,

17     quote/unquote, party activities.  When he

18     was asked what does that mean, he said

19     disciplining party members.

20                 So again, I think it points

21     out the -- this parallel control

22     structure of the party which is embedded

23     in the corporate structures, which

24     exercises monitoring and potential

Confidential - Subject to Further Confidentiality Review

1  disciplining over members of the party.

2        Q.    Okay.  What to -- what does

3  that mean, discipline?  Discipline can

4  take many forms.

5        A.    Yes.

6        Q.    Okay.  It can mean, you

7  know, a pay cut, right?

8        A.    Yes.

9        Q.    It can mean not getting a

10  raise, right?

11        A.    Correct.

12        Q.    These are all forms of

13  discipline in the corporate structure?

14        A.    Yes.

15        Q.    Okay.  We have those forms

16  of discipline in U.S. corporate

17  structures.  Somebody may not get a bonus

18  one year because the boss didn't like the

19  way they were behaving, right?

20              MR. LONGER:  Are you

21        limiting your definition of

22        discipline to just that?

23              MR. FENTON:  No.  But I'm

24        giving those by way of examples.

Confidential - Subject to Further Confidentiality Review

Page 152

1          MR. LONGER:  All right.  So

2      I object to the scope and the

3      question.

4              Please answer.

5              THE WITNESS:  Let me answer

6      at two levels.  So one, I mean,

7      this is -- again, this is a --

8      this is a political party

9      monitoring and supervisory

10      structure, to which there is

11      absolutely no counterpart in a

12      U.S. corporation.

13  BY MR. FENTON:

14      Q.    Okay.

15      A.    Secondly, SASAC, which also

16  has a party committee internal to it, has

17  appointment, removal, remuneration, and

18  supervisory power with respect to all of

19  the downstream companies under its

20  supervision.

21              That's an extraordinary

22  power.

23      Q.    Yes.  Okay.  Can you tell me

24  any instance where this disciplining

Confidential - Subject to Further Confidentiality Review

Page 153

1    party members power was exercised in

2    order to force Taishan to sell drywall

3    into the U.S. between 2005 and 2009?

4          A.     Well, you know, again, my

5    role is to provide context on the Chinese

6    system.   And people respond to

7    incentives.

8                 And so if you have this

9    party committee structure and you have

10   SASAC with this quite extraordinary power

11   of appointment, removal, remuneration,

12   supervision, I think people would respond

13   accordingly.

14                So I think it would shape

15   behavior in these -- in these corporate

16   groups.

17         Q.     All right.  Please tell me

18   specifically the actions taken by the

19   Chinese Communist Party that influenced

20   Taishan to sell drywall in the U.S.

21   between 2005 and 2009.

22         A.     Well, I think there would be

23   government approvals required for major

24   overseas investments or trade.

Confidential - Subject to Further Confidentiality Review

Page 154

1        Q.    Are you aware of any

2   government approvals that Taishan was

3   required to obtain before selling drywall

4   into the U.S. between 2005 and 2009?

5        A.    I'm not specifically aware.

6        Q.    Are you generally aware?

7        A.    I'm generally aware that

8   Chinese corporations face many

9   bureaucratic hoops in investing and

10  operating overseas.

11       Q.    Okay.  But you're not aware

12  of any requirement that Taishan would

13  have needed government approval or party

14  approval, for that matter, to sell

15  drywall into the U.S. between 2005 and

16  2009?

17       A.    Well, I mean, again, I have

18  to say something about Chinese context

19  here within -- we're talking about a

20  state-owned enterprise, a very large

21  state-owned enterprise, which is

22  considered to be a, quote/unquote, pillar

23  industry by the Chinese party state.

24            Okay.  A pillar industry.

Confidential - Subject to Further Confidentiality Review

Page 155

1    That means that they care a lot about the

2    construction industry and the materials

3    industry.

4             I would assume that the

5    activities of important players in this

6    group are monitored and supervised quite

7    closely, actually, by government and

8    party officials.

9         Q.    You would assume?

10        A.    Knowing -- based on my

11   experience and my research on how SOEs

12   operate and their connections to the

13   Chinese government.

14        Q.    All right.  Who are the

15   Chinese party officials who monitor or

16   who monitored the activities of Taishan

17   between 2005 and 2009?  Name them for me.

18             MR. LONGER:  That may have

19        been already asked and, I believe,

20        answered.  And I may be mistaken.

21        But I think it was directly asked

22        and answered.

23             If you want him to repeat

24        his testimony, he can.  If he

Page 156

```
 1          wants to answer it differently.
 2    BY MR. FENTON:
 3          Q.    And if it was not
 4    answered -- if it was asked and answered
 5    before, Professor, I apologize.  Please
 6    answer it.
 7          A.    I do not have the name of a
 8    specific individual or individuals.
 9          Q.    All right.  And I believe I
10    did ask you before:  You also don't have
11    any document showing a directive to
12    Taishan from the Communist Party to sell
13    drywall into the U.S. between 2005 and
14    2009?
15          A.    No, but there are references
16    in the -- in the documents to so-called
17    red letterhead documents which
18    Chairman Song laments having to circulate
19    downward to group member companies.  And
20    by red letterhead documents, I assume he
21    means directives from the party.
22          Q.    Well, that's fine.  Show me
23    a red letterhead document that has
24    anything to do with sales of Chinese
```

Confidential - Subject to Further Confidentiality Review

1    drywall into the United States between

2    2005 and 2009.

3            A.    I haven't seen any.  I

4    wouldn't expect to find those in the --

5    in the record.

6            Q.    So why did you bring them

7    up?

8                  MR. LONGER:  Objection to

9            the form.  It's argumentive.

10                 THE WITNESS:  You're

11           asking --

12                 MR. LONGER:  You were asking

13           him --

14    BY MR. FENTON:

15           Q.    What in the world -- what in

16    the world does that have to do --

17           A.    You asked about --

18           Q.    -- with the sales of drywall

19    in the United States?

20           A.    You asked about government

21    or party approvals for the activities of

22    Taishan.

23           Q.    Yes --

24           A.    And I said that --

Confidential - Subject to Further Confidentiality Review

Page 158

1          Q.    -- with respect to sales of

2    drywall in the United States between 2005

3    and 2009.

4          A.    Was that a question?

5          Q.    Yes.

6                You're not aware of any such

7    documents, are you?

8          A.    Correct.

9          Q.    Are you aware of any party

10   positions or favors that were handed out

11   to members of Taishan's management as a

12   result of drywall sales in the United

13   States between 2005 and 2009?

14         A.    I mean, again, I -- I really

15   have to go back to my answer, which is,

16   you know, we are talking about incentive

17   structures here.  So I can't -- no, I

18   cannot point to a specific.  But it

19   stands to reason that this environment

20   would have influenced managerial

21   behavior.  I mean, people are the same in

22   China as they are here.  They respond to

23   their incentive structure.

24         Q.    Right.  And we have

Confidential - Subject to Further Confidentiality Review

Page 159

1    incentive structures in the U.S., don't

2    we?

3         A.    But they're not linked to a

4    political party.

5         Q.    No.  But they can be linked

6    to government organizations, can't they?

7         A.    But I'm talking --

8         Q.    They can be linked to acts

9    of Congress, can't they?

10        A.    But I'm talking about

11   internal to the firm.

12        Q.    They can be linked to acts

13   of Congress, can they not?

14        A.    The only remuneration that I

15   can think of linked to an act of Congress

16   would be with respect to S&P and the

17   like.  But that's not really what we are

18   talking about, with all due respect.

19   We're talking about a Chinese state-owned

20   enterprise --

21        Q.    I -- I understand that.  But

22   we have been talking about -- in your

23   earlier testimony, you testified that the

24   U.S. government has the power to tax, it

Confidential - Subject to Further Confidentiality Review

Page 160

1    has the power to regulate, it has the

2    power to prosecute, it has the power to

3    investigate.

4              And those powers may be

5    exercised differently depending on which

6    political party is in power at a given

7    time; isn't that right?

8              MR. LONGER:  I -- you're so

9         far afield.  This is irrelevant.

10              But go ahead.

11              Object to the form of the

12         question.

13              THE WITNESS:  Well, I -- I

14         agree.

15   BY MR. FENTON:

16         Q.    All right.  So again, just

17   to tie down the question that I started

18   with, you are not aware of any favors or

19   positions that the party handed out to

20   anybody at Taishan based on their

21   decision to sell drywall into the U.S.

22   between 2005 and 2009; isn't that

23   correct?

24         A.    Correct.  Although there

Confidential - Subject to Further Confidentiality Review

Page 161

1   does seem to be some disciplining going

2   on with respect to Chairman Jia and his

3   share ownership in -- in Taishan.  So I

4   can't point to a reward, but I can point

5   to a punishment.

6            Q.    Who is being punished?  How

7   was he being punished?

8            A.    Jia was reprimanded by -- by

9   SASAC for his ownership in BNBM PLC.

10            Q.    What you are talking about

11   there is the fact that Mr. Jia had a

12   board position at BNBM PLC which the

13   regulators viewed to be a potential

14   conflict of interest and asked him to

15   step down, right?

16            A.    Correct.

17            Q.    Okay.  And do directors in

18   U.S. companies ever develop conflicts of

19   interest?

20            A.    Yes.  But again --

21            Q.    Are directors in U.S.

22   companies sometimes asked to step down

23   because of conflict of interest?

24                  MR. LEVIN:  Finish your

Page 162

```
 1            answer.
 2                 THE WITNESS:  What I was
 3            going to add to that is we are
 4            talking about SASAC, which is a
 5            combination of controlling
 6            shareholder and regulator.
 7    BY MR. FENTON:
 8            Q.    Mm-hmm.
 9            A.    It's a -- it's a participant
10    in the market at the same time it's a
11    regulator.  I think that's quite unusual.
12    And I think it's an important part of the
13    context that is required to understanding
14    how Chinese SOE business groups are
15    structured and the relationships among
16    them.
17            Q.    Well, that may be.  But are
18    you aware of any authority that says just
19    because one acts as a shareholder and a
20    regulator, that one must pierce the
21    corporate veil?
22            A.    No, but it would certainly
23    be relevant to me if I were conducting
24    the analysis.
```

Confidential - Subject to Further Confidentiality Review

Page 163

 1          Q.    Okay.  Are U.S. directors

 2     ever asked to step down by regulatory

 3     bodies because of potential conflicts of

 4     interest?

 5                    MR. LONGER:  Objection.

 6          Vague.

 7     BY MR. FENTON:

 8          Q.    Let's think about the SEC

 9     for a minute.

10          A.    Certainly -- certainly --

11                    MR. LONGER:  If that's a

12          question, I object to the form.

13          It's vague too.

14                    THE WITNESS:  Directors in

15          U.S. companies can be barred from

16          serving.

17     BY MR. FENTON:

18          Q.    Okay.  And if a director in

19     a U.S. company develops a conflict of

20     interest, are you aware of any authority

21     that says that that is a ground for

22     piercing the corporate veil?

23          A.    I mean, my declaration

24     relates to Chinese SOEs; it doesn't

Confidential - Subject to Further Confidentiality Review

Page 164

1    relate to the SEC.  I'm sorry.  I'm not

2    trying to be argumentative.  But we are

3    talking about Chinese SOEs.  We are

4    talking about state capitalism where a

5    regulator is also a participant in the

6    market.

7              I don't think you can draw a

8    straight line to comparisons to the

9    United States government in the operation

10   of the market.

11        Q.    I'm just asking questions

12   here.  I'm not drawing any comparison.

13            Okay.  Now let me ask my

14   next question.

15            Are you aware during the

16   period of time that Chairman Jia held

17   this position with BNBM that was deemed a

18   conflict of interest, are you aware of

19   any action taken by that board that was

20   not supported by a disinterested

21   majority?

22        A.    Well -- I'm not sure -- can

23   you define "designated majority"?

24        Q.    Yeah.  Everybody except

Confidential - Subject to Further Confidentiality Review

Page 165

1    Chairman Jia.

2          A.    We are talking about a

3    disinterested majority of BNBM PLC.

4          Q.    The board, yes.  That was --

5    that was the seat that he had --

6          A.    Correct.

7          Q.    -- that was deemed a

8    conflict of interest.  All right.

9          A.    Mm-hmm, mm-hmm.

10         Q.    Is there any vote that was

11   taken during the period of time that he

12   sat on the board where, even if you took

13   him out of the equation, it wouldn't have

14   passed?

15         A.    I'm not aware of any.

16         Q.    Okay.  All right.  Let's go

17   to the conclusions of your report on

18   Page 9 if we can.

19         A.    Yes.

20         Q.    Okay.  And Paragraph 38, my

21   understanding there is what you're saying

22   is that because of this group structure

23   that you have been talking about

24   throughout your testimony, it allows the

Confidential - Subject to Further Confidentiality Review

Page 166

1    Chinese government and CCP, working

2    through SASAC, to operate the

3    subsidiaries of SOE business group

4    companies outside of the formal dictates

5    of the corporate law.

6         A.    Yes.

7         Q.    Okay.  And what you are

8    talking about there is not the actual

9    exercise of control, but simply the

10   ability to control, correct?

11        A.    Certainly the -- the

12   capacity to control, correct.

13        Q.    Okay.  And that capacity may

14   be exercised, or it may not be exercised,

15   right?

16        A.    Yes.

17        Q.    And it can be exercised in a

18   proper way, and it can be abused, can't

19   it?

20        A.    Well, the whole exercise is

21   out of the norm of best practices in

22   corporate governance from a global

23   perspective.  I mean, that's basically my

24   point.  The whole system is off the ranch

Page 167

1    as compared to global best practices for

2    corporate governance.

3         Q.    It's -- it's different,

4    right?  It's different?

5         A.    It is different.

6         Q.    Okay.  We've established

7    that.

8              MR. LONGER:  Can we go home

9         now?

10   BY MR. FENTON:

11        Q.    Let's go to your next

12   opinion.  And -- and I just want to make

13   clear because you said earlier you are

14   not expressing an opinion --

15        A.    Correct.

16             MR. LONGER:  Wait, wait,

17        wait.

18             THE WITNESS:  I am

19        expressing an opinion.  Sorry.

20             MR. FENTON:  Let's --

21        let's -- you know what, let's stop

22        here.  Have a good trip home.

23             MR. LEVIN:  I wanted to go

24        home after your statement.

Confidential - Subject to Further Confidentiality Review

1                MR. LONGER:  I thought we

2          were done after the second

3          question if that was...

4                Go ahead.

5    BY MR. FENTON:

6          Q.    All right.  Professor, you

7    are not expressing an opinion on whether

8    either of the BNBM companies or CNBM

9    companies are, in fact, alter egos --

10         A.    That's correct.

11         Q.    -- of Taishan.

12               Okay.  But you do say in the

13   last paragraph, you say, "Considering

14   these features," that you referenced

15   above, "there is evidence in the record

16   to support a finding that the CNBM

17   business group is a single business

18   entity."

19         A.    Yes.

20         Q.    Okay.  Are those your words,

21   "There is evidence to" -- "in the record

22   to support a finding," or are those words

23   that were suggested to you by someone?

24         A.    No, those are my words.

Confidential - Subject to Further Confidentiality Review

1          Q.     Those are your words.  Okay.

2                 And we've already talked

3     about what you mean by single business

4     entity.

5                 When you say, "There is

6     evidence in the record to support the

7     finding," is that the evidence that we

8     have discussed in your testimony up until

9     now?  That is to say, Exhibits 2, 3 --

10         A.     Well, the --

11         Q.     -- and the other things that

12    you've mentioned?

13         A.     Yes.  Let me -- let me give

14    you a fulsome response to that.

15                So I'm writing the opinion

16    based on my study and knowledge of how

17    Chinese SOEs operate.

18         Q.     Mm-hmm.

19         A.     I have looked through the

20    record, and I have found illustrations or

21    examples that are very consistent with my

22    research and knowledge of how Chinese

23    SOEs are structured and operate --

24         Q.     Mm-hmm.

Confidential - Subject to Further Confidentiality Review

Page 170

1          A.     -- and the extralegal forms

2     of control and capacity for control that

3     result from those.

4          Q.     Mm-hmm.

5          A.     And, yes, I have referenced

6     specific illustrations of that consistent

7     with my research in the -- in this

8     declaration.  But I am not -- you know, I

9     was not charged with finding every piece

10    of evidence you could possibly find to

11    support that.

12         Q.     And I understand that.

13         A.     So -- so in that sense, it's

14    a combination of my knowledge and skill

15    or research, and the fact that I find

16    some evidence that is reflective of my

17    understanding of how these firms operate.

18         Q.     And my only question is,

19    because I just want to make sure the

20    record is complete, when you talk about

21    that evidence -- and I understand that

22    it's illustrative, and I understand that

23    you may not have found everything that's

24    out there -- but when you talk about that

Confidential - Subject to Further Confidentiality Review

Page 171

1    evidence, that's the evidence that we

2    have discussed this morning, Exhibit 2,

3    Exhibit 3, and the other things you

4    mentioned in your testimony, correct?

5          A.    Yes, although, I mean, I

6    could expand on my understanding of how

7    the SOEs operate and their possible

8    relevance to a judge's determination of

9    single entities.  I don't want to say yes

10   and then have it assumed that, you know,

11   that's all I have to say --

12         Q.    I just want --

13         A.    -- because I have other

14   things to say.

15         Q.    Yeah.  I just want to make

16   sure there's no other document or

17   testimony that you'd like to point us to

18   to illustrate this point.

19         A.    I mean, there are -- there

20   are some other things.  I mean, you have

21   a document in which CNBM Group is

22   instructing the downstream entities to

23   establish trade unions, which are also --

24   they don't exist separate from the party.

Confidential - Subject to Further Confidentiality Review

Page 172

1          Q.     What's the date of that

2      document?

3          A.     I'm afraid that I don't

4      have -- I don't have that in front of me.

5          Q.     Did that document have any

6      connection to Taishan's sale of drywall

7      in the U.S. between 2005 and 2009?

8                  MR. LONGER:   Object to the

9             form.

10                 THE WITNESS:   I don't have a

11            basis for answering.   Not to my

12            knowledge.

13     BY MR. FENTON:

14         Q.     What else?   And, by the way,

15     was the CNBM Group, when it was

16     instructing its downstream entities,

17     acting pursuant to a direction of the

18     Chinese government, the People's Republic

19     of China, to establish trade unions?

20         A.     I would have to refresh my

21     recollection, but it may have referenced

22     national legislation or some other higher

23     authority.   But I don't -- I don't

24     recall.

Confidential - Subject to Further Confidentiality Review

Page 173

1          Q.    All right.  Any other

2      documents or testimony that you'd like to

3      point to?

4                    MR. LONGER:  Some gentleman

5              is just trying to get your

6              attention.  I'm sorry to

7              interrupt.

8                    Was there a question

9              pending?

10                    MR. FENTON:  Yes.  I'm

11              asking if there are any other

12              documents or testimony that he

13              wishes to point us to, to

14              illustrate the point that there is

15              evidence in the record.

16                    THE WITNESS:  I mean, as I'm

17              sitting here right now, that --

18              that seems to me to be the

19              evidence.

20      BY MR. FENTON:

21          Q.    Fair enough.  If something

22      comes to you later, let me know.

23          A.    Thank you.

24          Q.    Okay.  Now, is there

Confidential - Subject to Further Confidentiality Review

Page 174

1    evidence in this record that would

2    support a finding that CNBM business

3    group is not a single business entity?

4                    MR. LONGER:  Object to the

5            form.

6                    THE WITNESS:  Well, as

7            everyone at the table is aware,

8            this is a fact-intensive inquiry.

9            So the finder of fact is going to

10           consider all -- do a 360-degree

11           analysis of these facts.

12                   So would there be some facts

13           that could cut against the finding

14           of single business entity?  Yes.

15   BY MR. FENTON:

16           Q.    Okay.  And we talked about

17   some of those facts.  In other words, you

18   haven't seen any evidence of commingling

19   of funds between the different

20   subsidiaries in the CNBM business group,

21   correct?

22           A.    Correct.

23           Q.    Okay.  You haven't seen

24   evidence of different companies financing

Page 175

 1    the operations of other companies,

 2    keeping them afloat, that kind of thing,

 3    correct?

 4         A.    I mean, there are guarantees

 5    going on.

 6         Q.    Yes.  Yes.

 7         A.    Yes.

 8         Q.    And you are also familiar

 9    with Mr. Deal's research into the

10    prevalence of intercompany guarantees in

11    the U.S., correct?

12         A.    Yes.  Yes.

13         Q.    And you would agree,

14    wouldn't you, that it is very common in

15    U.S. conglomerates for members of the

16    conglomerate to guarantee the debts of

17    the other members?

18              MR. LONGER:  And you're

19         focused only on the United States

20         in that question?

21              MR. FENTON:  Well, we can

22         talk about the rest of the world,

23         but within the U.S. --

24              MR. LONGER:  You're

Confidential - Subject to Further Confidentiality Review

Page 176

```
 1          differentiating between China and

 2          United States.

 3              MR. FENTON:  I'm asking a

 4          question, Fred.  I want an answer.

 5              MR. STECKLER:  About

 6          corporations or SOEs?

 7  BY MR. FENTON:

 8          Q.    My question has to do with

 9  U.S. conglomerates.  I thought that was

10  pretty clear.  Okay.  You are aware that

11  it is common in U.S. conglomerates for

12  members of the group to guarantee the

13  debts of each other?

14          A.    These --

15              MR. LONGER:  Note my

16          objection.

17              THE WITNESS:  It is common,

18          but, again, I'm here to talk about

19          China.  And I think it's relevant

20          that those loans would be made by

21          an SOE bank to an SOE corporate

22          group, guaranteed by an upstream

23          member of the corporate group.

24              So the context, yes, we can
```

Confidential - Subject to Further Confidentiality Review

Page 177

```
 1          see outward manifestations of the

 2          same kind of behavior in the

 3          United States.  But the context is

 4          relevant.

 5               I mean, that really -- with

 6          all respect, that's the point of

 7          my declaration.  The context is

 8          relevant in thinking about, for

 9          the judge, thinking about running

10          this analysis of alter ego or

11          single business enterprise.

12   BY MR. FENTON:

13          Q.   All right.  So the answer to

14   my question was yes, correct?

15          A.   As to the U.S., yes.

16          Q.   Okay.  And with respect to,

17   again, U.S. conglomerates, the use of

18   intercompany guarantees for members of

19   one business group to guarantee the debts

20   of another business group is commonly

21   known as credit enhancement; isn't that

22   right?

23          A.   Yes.

24          Q.   Okay.  Because it's, again,
```

Confidential - Subject to Further Confidentiality Review

Page 178

1  the whole being greater than the sum of

2  the parts.  If you use the

3  creditworthiness of the entire group, you

4  can generally get a more favorable

5  interest rate, correct?

6          A.    That's correct.

7          Q.    Okay.  Does CNBM Group have

8  a bank?

9          A.    You mean a finance company?

10  It does not have a bank.  And to my

11  knowledge, it does not have a finance

12  company.

13              MR. FENTON:  Okay.  Is lunch

14          ready?

15              MR. PFAEHLER:  Let me check.

16          You want to take a break, or you

17          want to --

18              MR. FENTON:  Well, if it's

19          here, let's eat, because I'm about

20          to move on.

21              (Whereupon, a discussion was

22          held off the record.)

23              THE VIDEOGRAPHER:  The time

24          is 12:03 p.m.  We are going off

Confidential - Subject to Further Confidentiality Review

Page 179

1              the record.

2                    (Lunch break.)

3                    THE VIDEOGRAPHER:  The time

4              is 1:03 p.m., and we are back on

5              the record.

6    BY MR. FENTON:

7              Q.    All right, Professor.  I'll

8    remind you that you're still under oath.

9              A.    Yes.

10                   May I -- may I -- you had

11   asked me -- I don't mean to interrupt,

12   but you asked me if anything else came to

13   mind.  You were referring to my last

14   sentence, referring to evidence in the

15   record to support a finding.

16             Q.    Yes.

17             A.    One thing did occur to me

18   over the break.  It's a document that

19   I've already referenced or alluded to,

20   but I wanted to mention it explicitly.

21   And that's the document mentioned in

22   Footnote 24.

23             Q.    Okay.  Which page of your

24   report, sir?

Confidential - Subject to Further Confidentiality Review

Page 180

 1                    MR. LONGER:  Page 9.

 2                    THE WITNESS:  It's Page 9,

 3             Footnote 24.  Meeting minutes of

 4             the seminar and deepening reform.

 5                    (Document marked for

 6             identification as Exhibit

 7             Milhaupt-4.)

 8      BY MR. FENTON:

 9             Q.    We've now marked that

10      document -- that is to say, the meeting

11      minutes of the seminar on deepening

12      reform -- as Exhibit 4 to your

13      deposition.  That's the document that you

14      were just referring to, sir?

15             A.    Yes, it is.

16             Q.    All right.  And again, this

17      is a partial translation; is that

18      correct?

19             A.    That's the way it's titled,

20      yes.

21             Q.    All right.  As a matter of

22      fact, it looks like there's sort of

23      little bits and snippets taken out of the

24      document.  Is that the way it appears to

Confidential - Subject to Further Confidentiality Review

Page 181

1    you?

2          A.    It does appear to be

3    excerpted, yes.

4          Q.    All right.  Who did the

5    excerpting?

6          A.    I assume that the machine

7    translation was turned into a -- this

8    translation that we are seeing here, a

9    more polished translation.

10         Q.    My question is --

11         A.    I don't know --

12         Q.    -- do you know who did the

13   excerpting?

14         A.    -- who did -- I don't

15   know -- no.

16              MR. STECKLER:  Do you have

17         another translation of it?

18              MR. FENTON:  Well, I'll ask

19         the questions for now, Bruce.

20              MR. LONGER:  If you like,

21         it's my understanding that

22         plaintiffs had it partially

23         translated.  I think if it was

24         used at a deposition, you all may

Confidential - Subject to Further Confidentiality Review

Page 182

 1          have redlined it and given a

 2          separate translation.

 3               But this is the translation

 4          that I think has been agreed to by

 5          the parties for --

 6               MR. FENTON:  I've just asked

 7          the witness if he knows who did

 8          the excerpting.

 9               MR. LEVIN:  We'll stipulate

10          the plaintiffs did the excerpting.

11               MR. FENTON:  Thank you.

12     BY MR. FENTON:

13          Q.   Did you ever ask to see a

14     full translation of this document?

15          A.   I did not.

16          Q.   Okay.  And nobody has shown

17     you one, have they?

18          A.   Correct.

19          Q.   Okay.  Now, what is it in

20     this -- well, first of all, is there

21     anything in this document where CNBM is

22     issuing any directives to Taishan

23     management?

24          A.   No.

Confidential - Subject to Further Confidentiality Review

Page 183

1          Q.    Is there anything in this

2    document where CNBM executives are

3    issuing directives to BNBM management?

4          A.    No.  This appears to be a

5    board discussion about reform of the

6    group.

7          Q.    So it's a discussion?

8          A.    Correct.

9          Q.    And there doesn't appear to

10   be any official action taken at this

11   meeting.  This is a bunch of board

12   members throwing out ideas, correct?

13         A.    From the -- from the

14   context, that appears to be the case,

15   yes.

16         Q.    Okay.  And what conclusion

17   do you draw from that with respect to the

18   exercise of control by CNBM over any of

19   its subsidiary companies?

20         A.    Well, if I may refer to the

21   sentence in which I cited this document,

22   which is at Paragraph 36, the last

23   sentence.  And here I'm talking about the

24   importance for looking at noncorporate

Confidential - Subject to Further Confidentiality Review

Page 184

1    structures, noncorporate governance in

2    assessing this alter-ego question.

3              I say, "In fact, the

4    evidence suggests that senior managers of

5    the CNBM business group recognize the

6    complications that state ownership and

7    related noncorporate governance practices

8    create for Chinese SOEs on the issue of

9    separate corporate identity."

10        Q.   All right.  And what -- what

11   in this document tells you that?

12        A.   It's Page -- this isn't

13   numbered.  I -- I believe it's Page 6

14   or -- I mean, it really --

15             MR. LONGER:  You can

16        reference the Bates numbers here.

17             THE WITNESS:  Okay.  Well --

18        for example, it's 23369.

19   BY MR. FENTON:

20        Q.   Okay.

21        A.   I mean, first, if I could

22   just set the context here.  I think that

23   what they are discussing, what is being

24   discussed at the board level here is a

Confidential - Subject to Further Confidentiality Review

Page 185

1    so-called mixed ownership reform, which

2    is a current reform agenda of the -- of

3    the Chinese government.

4            Q.    Right.  This is a meeting

5    that took place in 2014.

6            A.    Right.

7            MR. STECKLER:  Let him

8            finish the question.

9            THE WITNESS:  So he says

10           the -- these red -- turning the

11           page now, "These red letterhead

12           documents are actually harmful,"

13           "a lawsuit on gypsum board in the

14           U.S.," "how did it become like

15           this," et cetera.

16               Because there is a law

17           piercing the corporate veil, if

18           they think you surpass the

19           authority as a shareholder, or

20           action and control, the limited

21           company would not -- the company

22           limited would not be independent,

23           et cetera.

24               If you have a -- board of

Confidential - Subject to Further Confidentiality Review

Page 186

1           directors documents, fine.  If you

2           have shareholder meeting

3           documents, fine.  But if there are

4           a lot of noncorporate governance,

5           nonstandard content in them that

6           surpass the scope of the corporate

7           system, these would be seized

8           by -- these would be seized by

9           attorneys.

10              Although Tai-An is a limited

11          company, it's not independent, et

12          cetera.

13              So, you know, it seems to me

14          this is in -- an insight into the

15          mindset of senior managers and a

16          recognition that the features that

17          I'm describing, the specific

18          distinctive features of Chinese

19          corporate governance in the SOE

20          world, may be problematic from the

21          standpoint of this -- this single

22          business entity inquiry.

23     BY MR. FENTON:

24          Q.   Well, doesn't it look to you

Confidential - Subject to Further Confidentiality Review

Page 187

1    as if somebody in this meeting is

2    describing the very allegations that the

3    plaintiffs have made in this litigation?

4              I mean, isn't that what they

5    are talking about?

6         A.   Well, yes indeed.  I'm sure

7    that's what he's -- I'm sure that's what

8    he's -- he's referencing, but --

9         Q.   Yes, I agree.

10             MR. STECKLER:  Let him

11        finish his answer.

12             MR. FENTON:  You want to

13        know something?  Can we have one

14        lawyer for the plaintiffs do the

15        talking?

16             MR. LEVIN:  Yes.  You can

17        and you should.

18             MR. LONGER:  And I was about

19        to say two things:  one, to stop

20        cutting him off.

21             Two, this references red

22        letterhead documents --

23             MR. FENTON:  Just a minute,

24        Fred.  Don't start testifying.

Confidential - Subject to Further Confidentiality Review

Page 188

1                   MR. LONGER:  No, I'm not.

2                   MR. FENTON:  If your

3          objection was that I cut him off,

4          that's a fair objection.  I

5          believe you are correct, and I did

6          not do it intentionally.  But I

7          believe you are correct.  I

8          believe the witness was about to

9          finish his answer.

10                  So why don't we both let him

11         finish his answer before you start

12         characterizing documents.

13                  MR. LONGER:  If you would --

14         that's fine with me, but before

15         you ask him that question --

16   BY MR. FENTON:

17         Q.    Please finish your answer,

18   Professor Milhaupt.

19                  MR. LONGER:  -- I'd like to

20         ask -- make one point.

21                  MR. FENTON:  Okay.  That's

22         fine.  But let Mr. -- Professor

23         Milhaupt finish his answer.

24                  THE WITNESS:  So I -- I was

Confidential - Subject to Further Confidentiality Review

1          saying that I think the -- the

2          context for this discussion is

3          important, because they're clearly

4          talking about mixed ownership

5          reform, which entails reducing the

6          share of state ownership in -- in

7          these enterprises.

8                   And he seems to be saying

9          here that if we were to -- it

10          says -- if I could refer back to

11          23369, the beginning of this

12          paragraph.  If we say CNBM is an

13          investment company, this is a

14          state-owned enterprise, et cetera;

15          it holds boards -- meetings as

16          usual, et cetera.  However, this

17          company is liberated.  Then if we

18          receive letterhead documents, we

19          don't need to forward it...

20                   So, in other words, it seems

21          to me that the context here is

22          state ownership is a complicating

23          factor for our -- for our group.

24                   And he mentions elsewhere in

Confidential - Subject to Further Confidentiality Review

Page 190

1          this document that he has spoken

2          to SASAC about the need for reform

3          of the enterprise.  And so, to me,

4          that's -- that's revealing of a

5          recognition that this structure,

6          these distinctive features, may be

7          problematic from a -- the

8          perspective of

9          piercing-the-corporate-veil

10         analysis.

11    BY MR. FENTON:

12         Q.    My question was very simple,

13    Curtis.

14              MR. FENTON:  Did you want to

15         say something, Fred?

16              MR. LONGER:  I did.

17              MR. FENTON:  Okay.

18              MR. LONGER:  So to the

19         extent this document references

20         red letterhead documents --

21              MR. FENTON:  Okay.  Now, the

22         witness hasn't said anything about

23         red letterhead documents --

24              MR. LONGER:  He's reading

Confidential - Subject to Further Confidentiality Review

Page 191

1           the document.  And I'm reading the

2           document myself.

3                 To the extent that there are

4           red letterhead documents, we're

5           not aware of them being produced

6           in this litigation.

7                 MR. FENTON:  All right.  We

8           can take that up -- we can take

9           that up.

10                MR. LONGER:  And I request

11          on the record that they be

12          produced.  I have not seen any

13          state secret privilege log where

14          they are identified --

15                MR. FENTON:  This is not the

16          appropriate time --

17                MR. LONGER:  -- and to the

18          extent that it mentions with any

19          of these parties, we would like to

20          have them.

21                MR. FENTON:  All right.

22          Fred, you have had this document

23          for ages.  It's cited in your

24          expert report.  If you have a

Confidential - Subject to Further Confidentiality Review

Page 192

1          document request to make, there is

2          a time, a place, and a manner to

3          do it.

4                  The middle of this

5          deposition is not it.  I move to

6          strike counsel's remarks.

7                  If you wish to confer on

8          that issue later on, I'm happy to

9          confer with you.  This isn't the

10         place.

11                 MR. LONGER:  Well, consider

12         this a --

13   BY MR. FENTON:

14         Q.    Professor, would you

15   please --

16                 MR. FENTON:  We don't do

17         meet-and-confers in the middle of

18         a deposition, Fred.  I'm sorry.

19                 MR. LONGER:  You asked me

20         for documents in this deposition.

21                 MR. FENTON:  Okay.  Anything

22         else that you'd like to put on

23         record, Counsel?

24                 MR. LONGER:  No, sir.

Confidential - Subject to Further Confidentiality Review

1                    MR. LEVIN:  Do you have to

2          go to the bathroom?

3                    MR. FENTON:  All right.

4     BY MR. FENTON:

5          Q.    Professor, my question, I

6     think, was a very simple one.

7                    Whoever is speaking -- by

8     the way, who is speaking in this passage

9     that you just read?

10         A.    Well, the -- in -- in the

11    top of the page, it's -- references

12    Chairman Song.  I continue with what I

13    was saying, and it continues from there.

14         Q.    But -- yes, but then there's

15    ellipses --

16                   MR. STECKLER:  He's not

17         finished.

18    BY MR. FENTON:

19         Q.    -- and one, two, three,

20    four, five sets of ellipses before you

21    get to the paragraph that you just

22    referenced, correct?

23         A.    That's correct.

24         Q.    So you don't know who is

Confidential - Subject to Further Confidentiality Review

Page 194

1    speaking in this paragraph --

2                    MR. LONGER:  Object to the

3           form.

4    BY MR. FENTON:

5           Q.    -- correct?

6                    MR. LONGER:  He's already

7           testified who he thought was

8           testifying -- or speaking.

9    BY MR. FENTON:

10          Q.    You don't know --

11          A.    I would infer --

12          Q.    -- because you haven't seen

13   the rest of the document.

14                   MR. STECKLER:  Excuse me.

15          Let him finish.

16                   THE WITNESS:  I would infer

17          from this structure --

18                   MR. FENTON:  I thought we

19          were going to have one lawyer

20          talking for the plaintiffs.

21                   MR. STECKLER:  I appreciate

22          that.  I'm listening to the depo,

23          and he's trying to answer and

24          you're interrupting --

Confidential - Subject to Further Confidentiality Review

Page 195

1           MR. FENTON:  Bruce, I don't

2       care.

3           MR. STECKLER:  Okay --

4           MR. FENTON:  Fred is

5       perfectly capable.

6           MR. STECKLER:  -- for the

7       record, I'm asking as a matter of

8       courtesy.  I'm not asking you as

9       contentious.  Just please let him

10      finish.

11  BY MR. FENTON:

12      Q.   All right.  We identified

13  five sets of ellipses between the

14  reference to Chairman Song and the

15  paragraph that you read.  Okay.

16          So while you may assume it

17  is Chairman Song speaking, you don't know

18  that for a fact; is that correct?

19          MR. LONGER:  Let me object.

20          And if you had something

21      that you wanted to say that you

22      were interrupted before this

23      question, please continue your

24      answer.

Confidential - Subject to Further Confidentiality Review

Page 196

1              THE WITNESS:  Well, I -- the

2          only thing I would add is it seems

3          to me apparent from the context of

4          the rest of the discussion that

5          Chairman Song, particularly as the

6          chairman, is speaking his mind

7          about this -- this issue.  The

8          other parties seem to be simply

9          interjecting small side comments.

10    BY MR. FENTON:

11         Q.    Okay.  But whoever the

12    speaker is, be it Chairman Song or

13    somebody else, they are describing the

14    allegations about alter ego in connection

15    with the U.S.-Chinese drywall litigation;

16    isn't that correct?

17         A.    Correct.

18         Q.    Do you consider to be

19    chairman's -- do you consider Chairman

20    Song to be an expert in U.S. alter-ego

21    law?

22         A.    I have no basis for -- for

23    answering.

24         Q.    Okay.  Do you consider any

Confidential - Subject to Further Confidentiality Review

Page 197

1   of the other participants at this meeting

2   as being experts in U.S. alter-ego law?

3         A.    Again, I have no basis

4   for -- for answering.

5         Q.    Okay.  And the problem of

6   alter ego that they were identifying was

7   a problem because it was raised by the

8   plaintiffs in this very litigation; isn't

9   that right?

10            That's what they are talking

11  about, correct?

12            MR. LONGER:  Objection to

13        the form.  Foundation.  And it

14        mischaracterizes his testimony.

15            THE WITNESS:  The context of

16        the document suggests that it's a

17        much broader discussion than

18        simply about this -- this

19        litigation.

20            It -- it -- to me, the

21        discussion is about the reform of

22        state-owned enterprises.  And this

23        litigation is being offered --

24        this is my -- this is my

Confidential - Subject to Further Confidentiality Review

1       interpretation.

2            This litigation is being

3       offered as an example of the sort

4       of problems that can befall

5       state-owned enterprises in the --

6       in the Chinese system.

7   BY MR. FENTON:

8       Q.    Do they -- do they reference

9   any alter-ego problems that they've

10  encountered other than this litigation?

11      A.    Well, I mean, certainly they

12  do not speak in terms of alter ego, no.

13      Q.    Okay.  To your knowledge,

14  was there any official action taken as a

15  result of this meeting?

16      A.    Not to my knowledge.

17      Q.    Any directives issued to

18  Taishan as a result of this meeting?

19      A.    Not to my knowledge.

20      Q.    Any directives issued to

21  BNBM, either PLC or Group, as a result of

22  this meeting?

23      A.    Not to my knowledge.

24      Q.    Any directives issued to

Confidential - Subject to Further Confidentiality Review

Page 199

```
 1    CNBM or CNBMG as a result of this
 2    meeting?
 3            A.     Not to my knowledge.
 4            Q.     All right.  Any other
 5    documents that you would like to call to
 6    my attention as further supporting your
 7    opinion at this time?
 8            A.     Not at this time.
 9            Q.     Okay.  So let me call to
10    your attention Tab 3 --
11                   (Document marked for
12                   identification as Exhibit
13                   Milhaupt-5.)
14    BY MR. FENTON:
15            Q.     -- a document which we have
16    marked as Exhibit 5.
17                   And it's a document that
18    appeared in the Stanford Law Review,
19    Volume 65, beginning at 697.  And it's
20    entitled "We Are the (National)
21    Champions:  Understanding the mechanism
22    of state capitalism in China."  And it
23    says that it was authored by Li-Wen Lin
24    and Curtis J. Milhaupt.
```

Confidential - Subject to Further Confidentiality Review

Page 200

1          A.     Yes indeed.

2          Q.     And that's -- that's

3     Curtis J. Milhaupt --

4          A.     That's me.  That's me.

5          Q.     Okay.  And this is an

6     article that you published in the

7     Stanford Law Review in approximately

8     April of 2013?

9          A.     That's correct.

10         Q.     Okay.  And in -- this is

11    part of your body of scholarship --

12         A.     Correct.

13         Q.     -- with respect to Chinese

14    state-owned enterprises and -- and, in

15    particular, the -- the role of SASAC in

16    the Communist Party, correct?

17         A.     I'm not sure if it's in

18    particular with respect to that.  But it

19    is certainly part of the body of my

20    research and knowledge on the corporate

21    governance structure of Chinese SOEs,

22    absolutely.

23         Q.     All right.  I wonder if you

24    could do me the kindness, Professor, of

Confidential - Subject to Further Confidentiality Review

 1   turning to Page 734 of the article.

 2                 All right.  And in the first

 3   paragraph, under III, which is entitled

 4   "The party's state as controlling

 5   shareholder" --

 6          A.    Yes.

 7          Q.    -- you make the following

 8   statement, or I guess I should say you

 9   and Professor Lin make the following

10   statement -- but you agree that this

11   represents both your views?

12          A.    Absolutely, absolutely.

13          Q.    So you make the following

14   statement.  And let me quote it.

15                "Atop the national groups is

16   SASAC, ostensibly 'the world's largest

17   controlling shareholder.'  Controlling

18   shareholder regimes are prevalent

19   throughout the world.  And in this sense,

20   China's variety of capitalism shares an

21   important trait with corporate capitalism

22   in many other developing and recently

23   developed countries."

24                Have I read that accurately?

Confidential - Subject to Further Confidentiality Review

Page 202

1          A.     Yes.

2          Q.     And was that and is that

3    your view?

4          A.     Yes.

5          Q.     And then if you turn to the

6    next page, Page 735, at the very top of

7    the page, you say, and I quote, "More

8    importantly, as we explained below, it is

9    misleading to attribute to SASAC the same

10   bundle of control rights associated with

11   controlling shareholders and other

12   regimes."

13               Was that and is that your

14   view?

15          A.    It is.  But you've skipped a

16   very important section in between those

17   two.  I mean, it says -- the paragraph

18   after the one from which you quoted says,

19   "Macro-level generalizations and

20   comparisons with other controlling

21   shareholder regimes, however, are likely

22   to mislead, because several aspects of

23   China's regime make it highly

24   distinctive."  I mean, that is -- that is

Confidential - Subject to Further Confidentiality Review

Page 203

1    the basis.  That is the gist of my

2    declaration.

3              MR. PFAEHLER:  I regret to

4          make the statement I'm about to

5          make on the record, but

6          Mr. Steckler jumped up when

7          Mr. Fenton was asking the next

8          question, signaling in an obvious

9          way to you, and Mr. Milhaupt

10         observed that and then gave his

11         answer.  I do have a problem with

12         that.

13             MR. STECKLER:  Hold on.  My

14         conversation with Mr. Longer

15         actually had nothing to do with

16         that section.  But I don't

17         appreciate what is clearly a

18         mischaracterization of my

19         communications with Mr. Longer.

20             If you want to ask Professor

21         Milhaupt how he came about that, I

22         have no problem with that, because

23         I know it had nothing to do with

24         what we were talking about.  Feel

Confidential - Subject to Further Confidentiality Review

Page 204

```
 1          free to do so.
 2                  MR. FENTON:  Hold on.  We're
 3          not going to make an issue out of
 4          this.  First of all, I did, out of
 5          the corner of my eye, happen to
 6          see Mr. Steckler conferring with
 7          Mr. Longer.  And as co-counsel,
 8          he's certainly entitled to do
 9          that.
10                  I do not know what was said.
11          I didn't see any suggestions being
12          made to the witness.  That doesn't
13          mean they weren't.  But I
14          certainly didn't see it.
15                  MR. LONGER:  I didn't see it
16          either.
17                  MR. FENTON:  Okay.  And
18          also, Ken, what I have said for
19          counsel on the other side goes for
20          us as well.  We will have one
21          lawyer doing the speaking.  If
22          there's something that you want to
23          call to my attention, you let me
24          know.
```

Confidential - Subject to Further Confidentiality Review

Page 205

1              MR. PFAEHLER:  Fair enough.

2              MR. STECKLER:  Okay.  And

3         let me say something.  I agree

4         with you.  Thank you for your

5         professionalism.  And throughout

6         this case, you have our word that

7         we will act professionally and in

8         accordance with the rules, and in

9         no way would interfere with

10         anybody's testimony.  You have my

11         word.  And I know you all feel

12         that way.  I've always trusted

13         your judgment in that regard too.

14         So thank you.

15              MR. FENTON:  All right.

16         Let's consider this matter closed

17         and move on.

18    BY MR. FENTON:

19         Q.    Okay.  Thank you for that

20    addition, Professor.

21              But I'd like to go on to the

22    next section on Page 735 where you talk

23    about SASAC as controller.

24         A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 206

1          Q.    And you point out there that

2     SASAC has a staff of about 800 employees,

3     correct?

4          A.    That's correct.

5          Q.    All right.  And to the best

6     of your knowledge, is that how SASAC was

7     staffed in 2014?

8          A.    I have no basis for saying

9     what the staffing was.  I mean, this

10    research was conducted probably about

11    2012 or so.

12         Q.    Okay.  But do you have any

13    more recent information that the level of

14    staffing has changed in any significant

15    way?

16         A.    No.

17         Q.    Okay.  And those 800

18    employees are in charge of how many

19    Chinese SOEs?

20         A.    Well, I guess when you say

21    in charge of, could you clarify that?

22         Q.    Well, you talked about the

23    role that SASAC has in both being a

24    shareholder and a regulator.

Confidential - Subject to Further Confidentiality Review

1          So how many Chinese

2    state-owned enterprises does SASAC

3    own/regulate?

4          A.    It -- it supervises

5    approximately -- it holds the shares of

6    the core companies of and supervises

7    approximately 110 SOE groups.

8          Q.    And CNBM is one of those SOE

9    groups, correct?

10         A.    Correct.

11         Q.    All right.  And if you were

12   to count up all of the first- and second-

13   and third-level subsidiaries of all of

14   those groups, how many different

15   companies are we talking about?

16         A.    Many.  I couldn't give you a

17   number.

18         Q.    Thousands?

19         A.    I couldn't give you a

20   number.

21         Q.    Well, you did -- well, do

22   you know how many different subsidiaries

23   the CNBM Group has, direct and indirect,

24   approximately?

Confidential - Subject to Further Confidentiality Review

```
 1            A.    I guess an approximate
 2    estimation would be something like 100.
 3            Q.    Okay.   That's just for the
 4    CNBM Group alone.
 5                  And if you were to take the
 6    CNBM Group as representative, and maybe
 7    it is and maybe it isn't, there's 100
 8    different subsidiaries in the CNBM Group.
 9    SASAC is regulating 100 such groups.   100
10    times 100, that would be 10,000 companies
11    being monitored and regulated by these
12    800 employees, correct?
13                  MR. LONGER:   I'm going to
14            object.   Calls for speculation.
15            I'll just leave it at that.
16                  THE WITNESS:   Yeah.   Again,
17            I mean, I really -- I have no
18            basis for quantifying, other than
19            to say there clearly are many,
20            many corporations involved here.
21    BY MR. FENTON:
22            Q.    Well, do you think it is
23    realistic to expect that the 800
24    employees at SASAC exercise control over
```

Confidential - Subject to Further Confidentiality Review

Page 209

1    day-to-day decisions of second- and

2    third- and fourth-tier subsidiaries in

3    the state-owned enterprises in which

4    SASAC has an interest?

5         A.    Well, I think we -- I think

6    we have to distinguish capacity from

7    actual micromanagement.  I'm certainly

8    not saying in my declaration and in my

9    scholarship that SASAC is micromanaging

10   every downstream decision.  They are not

11   telling Taishan that they need to export

12   X number of drywall.

13              The question is, what is

14   their capacity to regulate and to

15   monitor?

16              And I think it's magnified

17   by the structures that we've already

18   alluded to.  The fact that SASAC can

19   appoint and remove and remunerate and

20   supervise the downstream entities, and

21   it's working in cooperation with the

22   party, which has, you know, as we've

23   explored, has these party committees at

24   each level.

Confidential - Subject to Further Confidentiality Review

1           So if we're talking about

2    capacity to intervene, it clearly has

3    that capacity.

4           Q.    Let me read you a little

5    more of that paragraph.  And I'm going to

6    start with the sentence I referred to,

7    but I'm going to read after there.  And

8    you wrote, quote --

9               MR. LONGER:  What page are

10          you on?  I'm sorry.

11              MR. FENTON:  I'm on 735.

12          Last full -- or last paragraph on

13          the page.

14   BY MR. FENTON:

15          Q.    You're talking about SASAC.

16   And you say, "It has a staff of about 800

17   employees organized into diverse bureaus,

18   ranging from enterprise restructuring to

19   foreign affairs.  But despite outward

20   appearances of consolidated control over

21   the SOEs it formally supervises" -- "over

22   the SOEs it formally supervises, SASAC is

23   a work in progress, and the SOE's legacy

24   of shared control rights was not overcome

Confidential - Subject to Further Confidentiality Review

Page 211

1    simply by SASAC's establishment.

2                    "This is particularly true

3    given SASAC's location in the

4    governmental organization chart.

5    Although SASAC is a ministry-level

6    agency, so are 53 of the most important

7    SOEs under its supervision.

8                    "SASAC faces potential

9    resistance, not only from the firms it

10   supervises, but also from the competing

11   agendas pursued by other important

12   ministries, such as the Ministry of

13   Finance.

14                   "As one commentator notes,

15   'In practice, SASAC has faced an uphill

16   struggle to establish its authority over

17   the SOEs that it supposedly controls as a

18   representative of the state owner.'"

19                   Was that and is that your

20   view?

21        A.    I certainly stand by what I

22   wrote.  But I'd like to offer a little

23   bit of context for what -- for what this

24   means.

Confidential - Subject to Further Confidentiality Review

Page 212

1        Q.   No, sir.  I think you've

2   answered my question.

3             MR. LONGER:  Well, let him

4        answer his question -- or answer

5        your question.

6             MR. FENTON:  The question

7        was, "Was that your view?"

8             MR. LONGER:  No, no, no.

9        I'm sorry.  I'm sorry.  Let him

10       answer the question.

11            MR. FENTON:  Fred, if you

12       want to elicit something further,

13       you are perfectly entitled to do

14       that on cross-examination.

15            MR. LONGER:  I think you're

16       cutting him off.  You agreed you

17       shouldn't cut him up.

18            Sir, I'd ask you to answer

19       the question fully.

20   BY MR. FENTON:

21       Q.   Go ahead.

22       A.   What I was saying is I agree

23   with it.  But I think context is

24   important to understand what we're saying

Confidential - Subject to Further Confidentiality Review

Page 213

1    here.

2              We're talking -- SASAC is

3    part shareholder and part regulator.

4    It's very unusual in that -- in that

5    regard.

6              In its regulatory capacity,

7    what we said here, I think, is accurate.

8    There are other regulators that may be

9    more powerful than SASAC with respect to

10   some of the activities of the SOEs.  But

11   that's looking at SASAC purely in its

12   regulatory role.

13             It's not just a regulator.

14   It's also a conduit for the party, for

15   the party to exercise its influence over

16   the SOEs, and it's also an actor in the

17   economy, as a shareholder.

18             So when you bundle those

19   things together, it is a distinctively

20   powerful actor.  If you just look at it

21   as a regulator, then, yes, it faces some

22   of the resistance that we mention here.

23         Q.    Well, let's go a few lines

24   down.  I'm looking at the middle of that

Confidential - Subject to Further Confidentiality Review

1    next paragraph, right after Footnote 113.

2              "In essence, the law

3    formally recognizes SASAC as an investor,

4    a shareholder in the national SOEs with

5    the ordinary rights and duties of a

6    shareholder.

7              "Ostensibly, the law

8    confines SASAC to that role and governs

9    the agency's performance of its functions

10   as an investor.  But there are no formal

11   mechanisms in the law to enforce SASAC's

12   responsibilities.  And in reality the law

13   grants SASAC powers greater than those

14   available to it as a shareholder under

15   China's corporate law.

16             "In short, SASAC has both

17   less and more power as a controlling

18   shareholder than meets the eye."

19             Was that and is that your

20   view?

21        A.   Again, yes, in the full

22   context of what I just explained.  So it

23   has less power, perhaps, as a pure

24   regulator.  If we would think of a

Confidential - Subject to Further Confidentiality Review

Page 215

1    purely -- it's pure regulatory function,

2    but it has more power, because I don't --

3    I'm not aware of any other controlling

4    shareholder in the world that has this

5    combination of attributes of regulator,

6    investor, and investor with superpowers

7    under the law as well as a conduit for

8    party and state influence over the -- the

9    SOEs that it supervises.  So that --

10    that's the full meaning of what we are

11    saying there.

12         Q.    Okay.  And let's take a look

13    at Page 745 if we may.

14         Under the Subheading B,

15    "Consequences," you write, "SASAC is not

16    only the largest controlling shareholder

17    in the world, at least in formal terms,

18    it may be also the most idiosyncratic.

19    Deconstructing SASAC's control rights in

20    the firms it ostensibly owns reveals that

21    it's simultaneously weaker and more

22    powerful than a typical shareholder in

23    other regimes.

24         "It is weaker because it

Confidential - Subject to Further Confidentiality Review

Page 216

 1    lacks the exclusive power to appoint top

 2    management of the most important

 3    enterprises whose shares it controls and

 4    defers to other agencies and even to the

 5    SOEs themselves on substantive issues

 6    outside of its realm of expertise.

 7                 "It is more powerful due to

 8    the vast scope of its holdings over the

 9    most important firms in the national

10    economy, and because of its supercontrol

11    rights which trumps standard corporate

12    norms in state enterprise assets."

13                 Was that and is that your

14    view?

15           A.    Yes.  And at some point --

16    I -- I'm not going to be able to put my

17    fingers on the precise language here, but

18    we say that SASAC is an organizational

19    manifestation of the party state in its

20    role as controlling shareholder.

21           Q.    All right.  And you wrote

22    the words that I read, or at least they

23    were published, in April of 2013; is that

24    correct?

Confidential - Subject to Further Confidentiality Review

Page 217

1          A.    That's correct.

2          Q.    Okay.  Let's take a look at

3    another article.

4               (Document marked for

5               identification as Exhibit

6               Milhaupt-6.)

7    BY MR. FENTON:

8          Q.    We have marked as Exhibit 6

9    a working paper entitled "Chinese

10   Corporate Capitalism in Comparative

11   Context," authored by Curtis J. Milhaupt,

12   Columbia Law School.

13              And again, that is you?

14         A.    That is me.

15         Q.    And, in fact, you did author

16   this paper?

17         A.    I did.

18         Q.    And this paper was presented

19   in October of 2015; isn't that right?

20         A.    I'm not sure it was

21   presented then, but I -- I -- I published

22   it, if you will -- I posted it to SSRN

23   in -- in October of 2015; that's correct.

24         Q.    All right.  When you say you

Confidential - Subject to Further Confidentiality Review

Page 218

1    "posted it to SSRN," what do you mean?

2          A.    SSRN is a website for

3    working papers, works in progress that

4    have not yet reached final -- final stage

5    of publication.

6               So this is a work in

7    progress.

8          Q.    Okay.  But nonetheless,

9    you -- you considered it sufficiently

10   mature to post on SSRN to get comments?

11         A.    Correct.

12         Q.    All right.  And have you, at

13   this stage of the game, prepared any

14   modifications or revisions to this draft?

15         A.    I mean, I am still -- I am

16   still working on it in the sense that I

17   will certainly go back to this and

18   potentially revise it, but I am not

19   currently in the process of -- of doing

20   that.  This is not yet at a stage where

21   deadlines are forcing me to -- to

22   finalize it.  So it is still truly a work

23   in progress.

24         Q.    Okay.  Well, at least in its

Confidential - Subject to Further Confidentiality Review

Page 219

 1    current form -- and -- and this is a --

 2    this is a document that you prepared?

 3            A.    It is.

 4            Q.    Okay.  At least in its

 5    current form, if you'd turn to Page 13.

 6    And I'm looking at Item 2 on that page.

 7                  You wrote as follows -- and

 8    I'm quoting:

 9                  "Organizational forms

10    matter.  While history indicates that

11    countries can grow dramatically without

12    strong formal institutions, no country in

13    the last 300 years has achieved

14    significant development except in

15    reliance upon corporate capitalism.  In

16    other words, the corporate form is common

17    to all national development stories.  For

18    all the discussion about varieties of

19    capitalism and the law/finance

20    connection, a particular legal form, the

21    corporation is an indispensable component

22    of any functional national system

23    regardless of the legal family to which

24    the country belongs, the left/right

Confidential - Subject to Further Confidentiality Review

Page 220

1   dimension of its politics, or the

2   libertarian-to-authoritarian range of the

3   roots of its political economy."

4               MR. LONGER:  You -- you left

5           out the word "economic system."

6           But keep going.

7               MR. FENTON:  I don't believe

8           I did.  But if I did, I apologize.

9   BY MR. FENTON:

10          Q.    But you see the paragraph

11  that I'm referring to --

12          A.    Yes.

13          Q.    -- Professor?

14              Okay.  Now that was your

15  view when you posted this paper in

16  October of 2015; is that correct?

17          A.    Yes.  But if I could just --

18  again, if I can just provide a little bit

19  fuller flavor for what I'm saying here,

20  so there's no misunderstanding.  It says,

21  at the end of that, "It's not surprising,

22  then, that the corporate form has also

23  been readily adapted to the Chinese party

24  state.  The corporate form can be

Confidential - Subject to Further Confidentiality Review

Page 221

1    shareholder-centric, board-centric,

2    employee-centric, or state-centric,

3    depending on the institutional setting

4    and the political economy in which it is

5    nested."

6           Q.    Well, that was what I was

7    going to read next.  But thank you.

8                 MR. LONGER:  He did a good

9           job.

10   BY MR. FENTON:

11          Q.    So taking -- taking both of

12   those -- that is to say, the passage that

13   I quoted and the passage that you just

14   added -- those were your views in October

15   2015, and they are your views today, are

16   they not?

17          A.    Yes.

18          Q.    And -- and, in fact, if we

19   can go to the very end of the article,

20   sir, in -- in your rather pithy

21   concluding paragraph, you say as follows:

22                "China has developed

23   spectacularly over the last" -- "over the

24   past three decades.  Its success is a

Confidential - Subject to Further Confidentiality Review

1    function of many factors, including the

2    navigational skills of its economic

3    strategists and the growth focus of its

4    authoritarian leadership.  But if a

5    consensus is to be formed around

6    Beijing's developmental miracle, it just

7    might begin with the genius of a legal

8    fiction available to dictators and

9    democrats alike throughout the world, the

10   corporation."

11              Did I read that accurately,

12   sir?

13        A.    You did.  And thanks for

14   the -- what I think is a compliment.

15        Q.    That was -- that was

16   your view -- I thought that was very well

17   put.

18              That was your view in

19   October 2015, was it not?

20        A.    Yes.

21        Q.    And that is your view as we

22   sit here today, is it not?

23        A.    It is.  And again I would

24   just like to stress though that the

Confidential - Subject to Further Confidentiality Review

Page 223

1    article does go through the way in which,

2    in my view, the corporate form has been

3    adapted to and effected by the ecology of

4    Chinese capitalism, which I set out at

5    Pages 10 and 11.

6              And so my point is that this

7    is a very adaptable form, legal fiction,

8    and it has been adapted by the Chinese

9    authoritarian regime.

10        Q.    Right.  And -- and part of

11   the -- the corporate legal fiction that

12   one sees throughout the world is the

13   notion of limited liability; isn't that

14   right?

15        A.    Yes.

16              (Document marked for

17              identification as Exhibit

18              Milhaupt-7.)

19              THE WITNESS:  Thank you.

20   BY MR. FENTON:

21        Q.    Professor, I'm going to hand

22   you what we have marked as Milhaupt

23   Exhibit 7.

24        A.    Mm-hmm.

Confidential - Subject to Further Confidentiality Review

Page 224

```
 1          Q.    And this is a document that
 2   bears the logo of the Paulson Institute.
 3   What is the Paulson Institute?
 4          A.    It's set up by Henry Paulson
 5   at the University of Chicago, and it's a
 6   policy-oriented institute that directs
 7   policy issues toward -- related to China
 8   and China's economic system and reform.
 9          Q.    All right.  And this
10   particular memorandum is entitled "Why
11   mixed ownership reforms cannot fix
12   China's state sector."  And it bears a
13   date of January 2016.  That is to say
14   just a few weeks ago.
15          A.    Yes.
16          Q.    And the authors are listed
17   as Curtis J. Milhaupt -- that's you?
18          A.    It is.
19          Q.    -- and Wentong Zheng.
20   Who -- who is Professor Zheng?
21          A.    He's a professor of law at
22   the University of Florida.
23          Q.    Mm-hmm.
24          A.    He has a J.D. and a Ph.D. in
```

Confidential - Subject to Further Confidentiality Review

1    economics from Stanford.

2            Q.    Okay.  And again, in this

3    article, you discuss the development of

4    China's SOEs, do you not?

5            A.    Yes.

6            Q.    Okay.  And you point out on

7    Page 2 of the article, don't you, and I'm

8    quoting -- this is toward the bottom of

9    the first column:

10                "China's institutional

11   environment blurs the boundary between

12   SOEs and privately owned firms, which

13   permits the state to exercise significant

14   influence over firms irrespective of its

15   equity ownership stakes and where firms

16   of all ownership types compete for

17   state-generated rents.

18                "As a result, SOEs" --

19   that's state-owned enterprises, right?

20           A.    Yes.

21           Q.    -- "and many large privately

22   owned firms in China actually share

23   substantial similarities."

24                That was your view as of

Confidential - Subject to Further Confidentiality Review

1    last month, was it not?

2         A.    Yeah, I just want to make

3    sure, because the -- they wrote a --

4    their own sort of executive summary for

5    this, which I've seen in some versions.

6    I just want to make sure that you're

7    reading my language and not their --

8    their executive summary.

9         Q.    If I did, it was

10   inadvertent.

11        A.    No, I'm not --

12        Q.    But I do want you to

13   confirm.

14        A.    Yeah.

15        Q.    I don't want to be putting

16   somebody else's words in your mouth --

17        A.    Right.

18        Q.    -- unless they're mine.

19             MR. LEVIN:  That's fair.  I

20        will never give you attribution

21        for that comment.  But I will use

22        it.

23             THE WITNESS:  Yeah, this

24        is -- this is our language.

Confidential - Subject to Further Confidentiality Review

Page 227

1    BY MR. FENTON:

2          Q.     And that's you and Professor

3    Zheng?

4          A.     Yes.

5          Q.     And if we turn over to

6    Page 5, the concluding paragraph on that

7    page, you say, "Specifically, the Chinese

8    state does not exercise control over SOEs

9    to the degree that its equity ownership

10   would indicate.

11               "At the same time, it is

12   misleading to view private firms in China

13   as insulated from the state in ways that

14   set them apart from SOEs.  Rather, the

15   human agents managing Chinese SOEs and

16   private firms respond in similar fashion

17   to their institutional environment

18   fostering close ties to state bodies,

19   seeking state largess, and resisting

20   government policies that are not in their

21   interests."

22               Was that your view as of a

23   few weeks ago when this article was

24   published?

Confidential - Subject to Further Confidentiality Review

Page 228

1          A.    It is.

2          Q.    And is it your view as you

3    sit here today?

4          A.    It is.  Although, again, I

5    think that if you -- one just reads this

6    paragraph, it may somewhat -- you may get

7    a misimpression of what we're arguing.

8                And we're suggesting that,

9    given the -- given the entire

10   institutional context in China and all of

11   the different mechanisms that the Chinese

12   party state has to influence firm

13   behavior, that equity ownership is not

14   the key indicia of control.  You have to

15   look at the larger institutional

16   structure in which both SOEs and private

17   firms are operating.

18         Q.    All right, sir.  If we go to

19   Page 8.  Again, towards the bottom of the

20   first column, under the heading

21   "Implementing Operational and Policy

22   Decisions at SOEs," you say, "It is

23   widely considered to be good practice for

24   any state to avoid involvement in the

Confidential - Subject to Further Confidentiality Review

Page 229

1   day-to-day management of SOEs.  That is

2   because government agents generally lack

3   the expertise, information, and

4   incentives necessary to effectively run a

5   commercial enterprise.

6                 "At the same time, however,

7   market failure is a principal theoretical

8   justification for the existence of SOEs.

9                 "From this perspective, it

10  would be anomalous if a government were

11  unable to implement major operational

12  decisions at SOEs on issues that directly

13  implicate important state objectives."

14                 Continuing on, you say, "And

15  yet, at times, this is precisely the case

16  in China.

17                 "One example of the Chinese

18  government's imperfect record in

19  implementing major operational or policy

20  decisions at SOEs can be found in the

21  government's failure to prevent them from

22  investing in the real estate sector

23  during the recent boom.

24                 "In an effort to reign in

Confidential - Subject to Further Confidentiality Review

Page 230

1    skyrocketing housing prices, SASAC in

2    March 2010 ordered 78 central SOEs to

3    withdraw from the real estate sector.

4              "But almost three years

5    later, as of December 2012, less than

6    one-quarter of the affected SOEs had

7    complied with that order.  In fact, many

8    of the SOEs subject to the order actually

9    expanded their real estate-related

10   business during this period."

11             Was that your view and

12   understanding as of a few weeks ago when

13   this article was published by the Paulson

14   Institute?

15        A.   It is.  And again, if I

16   could be permitted to contextualize what

17   you've read, this is -- part of this is

18   simply an acknowledgment that any

19   enterprise -- this is kind of a basic

20   corporate governance principle.  Any

21   enterprise suffers from an agency problem

22   between its owner and its managers.

23             All we are saying here is

24   China is no different in that respect.

Confidential - Subject to Further Confidentiality Review

1    This is not a centrally planned economy

2    from 30, 40 years ago.

3                    So of course there can be

4    times in which the government faces

5    resistance from the SOEs.  That's -- I

6    mean, that's kind of a truism, I would

7    think, almost.

8                    What we're -- what we're

9    also saying here is that the theoretical

10   justification for the existence of SOEs

11   is market failure.  It's not clear that

12   there is market failure in China.  Why

13   haven't the firms been privatized?

14                   If the government and the

15   party don't care about the capacity to

16   control these enterprises, why haven't --

17   why haven't they privatized them?

18                   The fact that they have not

19   is a pretty strong indication that the

20   government and the party care a great

21   deal about their capacity to control.

22                   It's not -- no one is

23   100 percent successful in any endeavor.

24   And so we're pointing out an -- this

Confidential - Subject to Further Confidentiality Review

Page 232

1    is -- this is the most prominent example.

2    I actually can't find -- I could not draw

3    your attention to other examples.

4                    But I think that the mere

5    fact that the SASAC does not always get

6    its way doesn't really undercut the idea

7    that SASAC has very considerable power in

8    connection with and capacity in

9    connection with the party to influence

10   behavior.  And if it didn't care about

11   that, it would have privatized these

12   enterprises 20 years ago.

13                   But it refuses to privatize

14   them.  To me, that is proof positive that

15   they care a hell of a lot about retaining

16   the capacity to control these

17   enterprises.

18        Q.    Okay.  Whether they

19   successfully exercise that capacity or

20   not, right?

21        A.    Well, they are continuing to

22   try to increase their capacity to

23   exercise that, because even with respect

24   to the mixed share ownership reform,

Confidential - Subject to Further Confidentiality Review

Page 233

1    despite the rhetoric about privatization,

2    privatization is not on the table.

3    They're actually combining SOEs to make

4    them stronger.

5                   So the number is going down.

6    But they're getting larger, and they're

7    subjecting even more private capital to

8    this system, which is under this very

9    distinctive mechanism of control that we

10   have been talking about.

11              Q.    Professor, you related an

12   instance in this article, okay, where

13   with respect to a major directive handed

14   down by SASAC, three years later, less

15   than one-quarter of the affected

16   state-owned enterprises had complied.

17   Okay.

18                   Now, I understand you're

19   saying that that may be an extreme

20   example.  But doesn't that tell you that

21   SASAC is not all powerful and that the

22   PRC is not all powerful when it comes to

23   the operation of Chinese companies,

24   whether or not owned by the state?

Confidential - Subject to Further Confidentiality Review

Page 234

1          A.     Nowhere in my scholarship or

2    my declaration have I asserted that the

3    Chinese government or SASAC is all

4    powerful.  Absolutely correct.

5          Q.     And what you do say in the

6    following paragraph is, to the extent

7    that the Chinese state does successfully

8    intervene in SOE operations to achieve

9    policy objectives, it often does so as a

10   regulator, not as a controlling

11   shareholder, correct?

12          A.     I said that.  I mean, I --

13   you know, I think that what -- this gives

14   the impression that somehow the party --

15   or it might give the impression that

16   somehow the alternatives are SASAC or

17   noncorporate regulation.

18               But, of course, we -- as a

19   scholar, I mean, I'm not able to see

20   party influence.  I mean, I can't see

21   that from what I'm looking at.

22               So I think I stand by this.

23   But my only caveat is I think that this

24   paragraph would have been better had it

Confidential - Subject to Further Confidentiality Review

Page 235

 1    acknowledged the possibility of party

 2    influence that doesn't take place through

 3    SASAC as a controller or through the

 4    government in its regulatory capacity.

 5            Q.    When was this published,

 6    sir?

 7            A.    Very early.  Recently.

 8            Q.    Well, January 2016?

 9            A.    Correct.

10            Q.    Before or after you were

11    retained in this case?

12            A.    Well, I have to think about

13    it.  I mean, it was certainly written

14    before.  I mean, this was accepted for

15    publication in -- I'm going to say

16    roughly December, early December.

17                 We had been talking to

18    Paulson.  They had been trying to get us

19    to write something for a long time.  We

20    submitted a draft, I believe in December.

21    It was finalized.

22                 So I don't know precisely

23    when this appeared on the Web.  But it

24    was certainly written prior to my

Confidential - Subject to Further Confidentiality Review

Page 236

```
 1   retention in this case.
 2           Q.    Okay.  And the article -- I
 3   understand the caveat you've outlined.
 4   But the article reflects your views as
 5   you sit here today, right?
 6           A.    Yes.
 7           Q.    By the way, you do mention
 8   in this article that -- let me see if I
 9   can find the passage.
10              I believe you referenced in
11   this article that SASAC had chosen about
12   a dozen SOEs for some type of special
13   treatment.  There it is, top of Page 2.
14              It says, "Subsequent to the
15   third plenum in July 2013, the
16   State-Owned Assets, Supervision, and
17   Administration Commission, the agency
18   responsible for supervising China's 107
19   central SOEs, selected six of these SOEs
20   for a mixed-ownership pilot program."
21              Do you see that?
22           A.    Mm-hmm.
23           Q.    And you've got a footnote
24   there, and that's Footnote 2.  That
```

Confidential - Subject to Further Confidentiality Review

1    indicates that CNBM was one of the SOEs

2    that was selected?

3           A.    Correct.

4           Q.    Okay.

5                 MR. LONGER:  Are we through

6           with this document?

7                 MR. FENTON:  In a moment.

8           We may be through with it forever,

9           but --

10                MR. LONGER:  I'm just

11          wondering --

12                MR. FENTON:  -- it can be

13          retired.

14                MR. LONGER:  I'm just

15          wondering if I should put it down.

16                (Document marked for

17          identification as Exhibit

18          Milhaupt-8.)

19   BY MR. FENTON:

20          Q.    All right.  Professor, we

21   have marked as Milhaupt Exhibit 8 an

22   article that appeared in the Georgetown

23   Law Journal 2015 at Page 665 entitled

24   "Beyond Ownership:  State Capitalism and

Confidential - Subject to Further Confidentiality Review

Page 238

1   the Chinese Firm," and the authors are

2   Curtis J. Milhaupt and, again, Wentong

3   Zheng.  That's the same gentleman --

4           A.    Yes.  I didn't receive a

5   copy of that.

6           Q.    I'm about to hand it to you.

7           A.    Oh, okay.  Yes.

8           Q.    Okay.  And -- and are you

9   the co-author of this article?

10          A.    I am.

11          Q.    And does the article reflect

12   your views?

13          A.    Yes.

14          Q.    Okay.  I would like to

15   direct you, if I could, to Page 677 of

16   this article.  And I'm -- I'm going to

17   start reading four lines down in that

18   last paragraph on the page.

19               Where you say, "To meet its

20   governance goals, the Chinese state has

21   to delegate a significant amount of

22   discretion to its local agents and

23   accommodate their special interests to

24   ensure their participation and

Confidential - Subject to Further Confidentiality Review

Page 239

1    cooperation.  The frequent rotations of

2    senior SOE executives may be a reflection

3    of the weakness, rather than the

4    strength, of top-down political control,

5    because they suggest that the state lacks

6    other effective means of keeping SOE

7    executives in check.  This is all the

8    more likely given the enormous size and

9    complexity of China's SOEs.

10                "At the national level,

11   SASAC is formally responsible for

12   exercising the interest of the state as

13   an investor in over 100 massive SOE

14   business groups, some of which have over

15   100 downstream subsidiaries.  How likely

16   is it that a group of bureaucrats in

17   Beijing actually controls such a vast

18   business enterprise?"

19                And now departing from the

20   document itself, I take it, sir, that

21   that last question that was in your

22   article -- that is to say, "How likely is

23   it that a group of bureaucrats in Beijing

24   actually controls such a vast business

Confidential - Subject to Further Confidentiality Review

Page 240

1   empire" -- was a rhetorical one?

2          A.    Well, it's rhetorical in

3   that we don't -- we don't know the answer

4   to that.  I wouldn't pretend to know the

5   answer to that question.

6          Q.    Well, how would you answer

7   the question as to how likely it is that

8   a group of 800 bureaucrats in Beijing

9   actually controls over 100 massive SOE

10  business groups, some of which have over

11  100 downstream subsidiaries?

12             MR. LONGER:  Object to the

13          form and foundation.

14          Mischaracterizes his testimony.

15             THE WITNESS:  I -- I am

16          going to say -- give you a

17          response very similar to the one I

18          gave with respect to the Paulson

19          memo which is, we are not

20          asserting, and I don't think

21          anything in my testimony rests on

22          the assumption, that China's

23          essentially planned economy in

24          which, you know, a few people

Confidential - Subject to Further Confidentiality Review

Page 241

```
 1          behind a curtain are dictating
 2          downstream decisions.
 3                 We are talking about, and
 4          my -- my declaration goes to the
 5          unique structures in which Chinese
 6          SOEs exist, structures which are
 7          unlike any other that I'm aware of
 8          anywhere in the world.
 9                 So it -- it seems to me
10          that -- you know, I'm not
11          asserting that the party can
12          simply snap its fingers and have
13          all of these downstream entities
14          just -- just fall into line.
15          That's -- that's essentially a
16          planned economy.  China is not an
17          essentially planned economy.
18                 So of course SASAC faces
19          some resistance, particularly when
20          it's trying to get the SOEs to
21          take actions that are not in their
22          interest.
23                 I don't see -- you know,
24          just bringing this back to our
```

Confidential - Subject to Further Confidentiality Review

Page 242

1          case, I don't see any evidence

2          that SASAC was trying to get CNBM

3          Group to do something that it

4          would not have wanted to -- to do.

5          So I don't see any basis for --

6          for resistance.

7               And again, we're talking

8          about the capacity to exercise

9          influence over downstream

10          entities.  And I think that

11          nothing that is written here

12          undermines the idea that there is

13          tremendous capacity to exercise

14          influence on these groups.

15    BY MR. FENTON:

16          Q.    All right, sir.  Reading on

17    in the article, same page.

18               You say, "Efforts to

19    revitalize the state-owned sector in many

20    formerly Communist countries, including

21    China, include a delegation of managerial

22    discretion to SOE insiders to varying

23    degrees.

24               "In China, the delegation of

Confidential - Subject to Further Confidentiality Review

Page 243

1    authority has been an overarching theme

2    of SOE reforms since the late 1970s.  As

3    a result of such policies throughout the

4    transition economies, irreversible

5    jurisdictional authority was conferred on

6    managers within their own SOEs.  These

7    reforms, together with privatization of

8    SOEs into the hands of entrenched

9    managers, led to rampant insider control.

10                "Thus, in theory, the sheer

11   size and complexity of the SOE sector and

12   the obvious consequences of economic

13   transition policies in China suggest far

14   greater managerial autonomy from the

15   state in the SOE sector than a focus of

16   ownership alone would suggest."

17                Was that your view when you

18   wrote those words in -- when was this

19   published? -- in 2015?

20        A.    Yeah.  They were probably

21   written in 2014.

22        Q.    Okay.  Was -- was that your

23   view when they were written in 2014?

24        A.    Yes.  And let me --

Confidential - Subject to Further Confidentiality Review

Page 244

1          Q.    Is it your view as you sit

2     here today?

3               MR. LONGER:  Let him finish

4          answering his question.

5               THE WITNESS:  Yes, but I

6          would like to underline the

7          passage that says "greater

8          managerial autonomy than a focus

9          on ownership alone would suggest."

10              The foundation of this

11         article, our jumping-off point, is

12         that equity ownership in corporate

13         governance literature, 50 years of

14         corporate governance literature,

15         are based around the idea, the

16         central idea, that equity

17         ownership is the driving

18         determinant of control, and from

19         that springs all kinds of

20         consequences for dispersed versus

21         concentrated ownership for the

22         monitoring of management, the

23         incentives of management.

24              Our starting point for this

Confidential - Subject to Further Confidentiality Review

Page 245

1            article is given China's

2            institutional environment and the

3            fact that the Chinese party state

4            exercises influence, so much

5            influence, and intervenes so

6            extensively in the economy, this

7            focus on ownership alone is and

8            could be highly misleading.

9    BY MR. FENTON:

10           Q.    So you've got to look at

11    actions, not just ownership, right?

12           A.    You have to look at the

13    entire structure.  I mean, I know I'm

14    repeating myself, but I'm a big context

15    guy.  I mean, my entire professional

16    career as an academic is about the

17    importance of context in understanding

18    corporate structures.  And that's really

19    the point of my declaration, and so you

20    have to look at it in context.

21           Q.    All right.  Fair enough.

22           MR. FENTON:  Why don't we

23    take a break here.

24           THE VIDEOGRAPHER:  The time

Confidential - Subject to Further Confidentiality Review

Page 246

 1          is 2:05 p.m.

 2                    We are going off the record.

 3                    (Short break.)

 4                    THE VIDEOGRAPHER:  The time

 5          is 2:14 p.m., on February 3rd,

 6          2016.  And this is DVD Number 3.

 7   BY MR. FENTON:

 8          Q.    All right.  Professor, we're

 9   back on the record.  By the way, I don't

10   think I asked you this.  I know the

11   information has been given to us, but I'm

12   not sure I recall exactly.

13                    You're being paid by the

14   hour for this engagement, correct?

15          A.    Correct.

16          Q.    And what's your hourly rate?

17          A.    $650.

18          Q.    All right.  And you do

19   differentiate between testimonial time

20   and --

21          A.    No, I do not.

22          Q.    Okay.  So it's $650 an hour

23   for research, writing, testimony --

24          A.    Correct.

Confidential - Subject to Further Confidentiality Review

Page 247

1          Q.     -- whatever it may be.

2                 All right.  Have you been

3     asked to prepare any supplements or

4     additional work in this case?

5          A.     No.

6          Q.     And have you sent a bill for

7     your services to date?

8          A.     Not yet.

9          Q.     Okay.  All right.  Were you

10    paid a retainer upfront?

11         A.     No.

12         Q.     Okay.  All right.  I'd like

13    to show you --

14                MR. LONGER:  We're good for

15         the money.

16                (Document marked for

17         identification as Exhibit

18         Milhaupt-9.)

19    BY MR. FENTON:

20         Q.     I'll show you what we marked

21    as Milhaupt Exhibit 9, which is Oxford

22    Handbooks Online, "The Governance Ecology

23    of China State-Owned Enterprises" by

24    Curtis J. Milhaupt, edited by Jeffrey

Confidential - Subject to Further Confidentiality Review

Page 248

1   Gordon and Wolf-Georg Ringe.

2             This bears an online

3   publication date of June 2015, correct?

4        A.    Well, this is interesting,

5   because I have not seen this before.  I

6   was not notified this was going online.

7   And I've actually never signed a contract

8   to -- I've been shown a contract, but

9   I've never signed it.  So this is news to

10  me.

11       Q.    Okay.  Well, I'll let you

12  and Professor Gordon deal with that.  So

13  I guess that leads to the question, sir,

14  did you write it?

15       A.    Let me take a careful look

16  at it.

17       Q.    Take a look.

18       A.    Yes, if I can -- if I can --

19  I mean, because this is coming as a bit

20  of a surprise to me.  If I can provide

21  some context for this document, which I

22  have never -- have not reviewed.

23             They held a conference for

24  this volume quite some time ago.

Confidential - Subject to Further Confidentiality Review

1        Q.     "They" being?

2        A.     Professor Gordon and

3   Professor Ringe.  I don't remember the

4   date.  It's well over a year, maybe close

5   to two years ago.

6              I did indeed prepare a draft

7   for that, but I had heard nothing further

8   about the progress toward publication.

9              And I had been getting

10  pinged by Oxford to sign a contract.  But

11  I had some problems with it because of

12  the various stipulations that were in the

13  contract which I said I can't -- I can't

14  stipulate to.  So that's -- that's the

15  status of this.  So I am surprised to see

16  this.

17       Q.     Okay.  And I was not aware

18  of that background.  Be that as it may,

19  I'm actually interested in --

20              MR. LONGER:  Before you ask

21           a question, can I ask of the

22           provenance?  Did you obtain this

23           online, or did you get this from

24           Professor Gordon?

Confidential - Subject to Further Confidentiality Review

Page 250

1              MR. FENTON:  I believe -- I

2         believe we obtained it online.

3         I'm not entirely sure about that.

4              MR. LONGER:  All right.

5    BY MR. FENTON:

6         Q.    In any event, what I'd like

7    to do is direct your attention -- and

8    feel free to refamiliarize yourself with

9    the article to the extent that you feel

10   necessary, Professor.

11             But I'd like to direct your

12   attention specifically to the last full

13   paragraph on Page 3, under Section 2.2.1,

14   "A Simple Analytical Construct."

15        A.    Okay.

16        Q.    Do you recall approximately

17   when that document was prepared?

18             MR. LONGER:  I object to the

19        form of the question, because I'm

20        not sure that he prepared it.

21             MR. FENTON:  I'm sorry.  I

22        thought we established that.

23   BY MR. FENTON:

24        Q.    I thought we established

Confidential - Subject to Further Confidentiality Review

Page 251

1    that you, in fact, wrote this.

2         A.    I prepared a draft for a

3    conference a long time ago.  But I

4    have -- I had never reviewed it.  Never

5    revised it.  And as I said, this comes as

6    a surprise to me.  And it's a little

7    unsettling to see it in print in this

8    form.

9         Q.    Okay.  All right.  Be that

10   as it may, what I'd like to ask you about

11   is the last paragraph on Page 3, last

12   full paragraph on Page 3.  And I would

13   simply like to ask you whether it

14   reflects your views.  Okay.

15              And it reads as follows:

16   "The hierarchical aspects of Chinese

17   industrial organization are readily

18   apparent.  They range from the vertical

19   integration of firms along the production

20   chain to the top-down character of

21   industrial policy formulation and

22   transmission in an authoritarian

23   political regime.

24              "But the Chinese system is

Confidential - Subject to Further Confidentiality Review

 1   not simply one in which vertically

 2   integrated groups transmit commands from

 3   state economic planners to SASAC and down

 4   through a chain to vertically integrated

 5   firms.  These hierarchical structures are

 6   embedded in dense networks, not only of

 7   other firms, but also of party and

 8   government organs.

 9                    "These networks appear to

10   facilitate information flow from the

11   bottom up as well as from the top down.

12   They foster relational exchange and

13   collaboration on many levels of the

14   production and policy implementation

15   processes, and they provide high-powered

16   incentives to leaders within the system,

17   because success in business leads to

18   promotion and accompanying rewards in the

19   political realm and vice versa.

20                    "The combination of

21   authoritarian hierarchy and collaboration

22   within high-powered incentive structures

23   is reminiscent of another mechanism

24   economic transitions, private equity

Confidential - Subject to Further Confidentiality Review

Page 253

1    investments."

2                    Now, let me first ask you,

3    Professor, given the question of where it

4    came up.

5                    Do you recall writing that?

6           A.    You know, certainly this was

7    in an early draft.  That's all I can say.

8                    I mean, I -- as I said, I

9    have not seen this document in probably a

10   year and a half.

11          Q.    All right.  And -- and at

12   the time that you wrote this, that did

13   reflect your views; is that correct?

14          A.    Yes.  Although, you know,

15   again I -- with respect to this last

16   sentence, the -- the reference to private

17   equity investments, I mean, this is a bit

18   of, if I can -- if I can use this term,

19   "poetic license" or "argumentation by

20   analogy."  Certainly not suggesting that

21   this is a literal translation of private

22   equity into the Chinese context.

23                    I just want to make it clear

24   that the -- the reference here is by way

Confidential - Subject to Further Confidentiality Review

Page 254

1    of figurative analogy.

2          Q.    I -- I'm just asking if you

3    wrote the words.

4          A.    To the best of my knowledge,

5    this looks familiar from -- from my -- my

6    earlier draft.

7          Q.    All right.  And does it

8    reflect your views as you sit here today?

9          A.    Yes.

10          Q.    All right.  Professor,

11    moving away from your writings,

12    interesting though they may be, and I

13    mean -- I mean that sincerely, you are

14    aware, are you not, that the Taishan was

15    a functioning standalone company in its

16    own right before it was acquired by BNBM

17    PLC?

18          A.    Yes.

19          Q.    Okay.  So, in other words,

20    BNBM PLC didn't incorporate Taishan for

21    some purpose.  It acquired what was

22    already a fully up and running,

23    functioning business, correct?

24          A.    That's my understanding.

Confidential - Subject to Further Confidentiality Review

Page 255

1          Q.    Okay.  And do you have any

2    reason to believe that BNBM's acquisition

3    of its interests in Taishan in 2005 and

4    2006 were conducted in anything other

5    than what we here in America would call

6    an arm's-length transaction?

7          A.    I have no -- no reason to

8    believe otherwise.

9          Q.    Okay.  And -- and -- and

10   Taishan was purchased for fair value?

11         A.    Well, I mean, that --

12   that -- I mean, I don't think I have a

13   basis to respond to that.

14         Q.    But you have no reason to

15   believe it was not purchased for fair

16   value -- for fair value?

17              MR. LONGER:  It's the same

18         question in a way.  Object to the

19         form.

20              THE WITNESS:  I mean,

21         it's -- it's hard to -- it's hard

22         to give an -- an answer on fair

23         value.  I mean, I just don't have

24         a basis for -- for answering that.

Confidential - Subject to Further Confidentiality Review

Page 256

1    BY MR. FENTON:

2          Q.    Did you review -- in the

3    materials that you were given, did you

4    review any appraisal reports that were

5    prepared in connection with the BNBM

6    acquisition of Taishan shares?

7          A.    I -- I believe there were

8    appraisal reports in the -- in the

9    record, yes.

10         Q.    All right.  Do you have any

11   reason to believe that those appraisal

12   reports were in any way inaccurate?

13         A.    No.  Mm-hmm.

14         Q.    All right.  And --

15              THE REPORTER:  I didn't hear

16         an answer.

17              THE WITNESS:  I said no.

18              MR. FENTON:  He said it in

19         this direction, and it was very

20         soft.

21              MR. LONGER:  He's from

22         Wisconsin.

23   BY MR. FENTON:

24         Q.    Now, you are also aware that

Confidential - Subject to Further Confidentiality Review

Page 257

1    Taishan itself, because we talked about
2    this a little earlier, has shown
3    substantial profits between the time BNBM
4    acquired its initial interest and the
5    present, correct?
6            A.    Correct.
7            Q.    That is to say, throughout
8    the period of 2004 all the way up to the
9    present day, Taishan has shown
10   substantial profit growth, and in some
11   cases, greater growth than its parent
12   corporation, correct?
13           A.    I mean, that's -- that's my
14   general understanding, yes.  I -- I --
15   you know, I don't know exactly
16   substantial, depending -- but, yeah, I
17   have no reason to dispute your
18   characterization.
19           Q.    It's a profitable company?
20           A.    Profitable company.
21           Q.    Okay.  And you are also
22   aware that -- that Taishan maintains its
23   own manufacturing facilities?
24           A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 258

```
 1          Q.     Separate from BNBM?
 2          A.     Yes.
 3          Q.     That goes for PLC and Group,
 4    correct?
 5          A.     Yes.
 6          Q.     Does BNBM Group have any
 7    direct ownership interest in Taishan at
 8    this point, to your knowledge?
 9          A.     I did not see any indication
10    of that.
11          Q.     And you are also aware that
12    Taishan has separate management from the
13    BNBM companies and the CNBM companies?
14               MR. LONGER:  Object to the
15          form.
16               THE WITNESS:  I mean, there
17          are -- there are certainly PLC
18          directors on the board of Taishan.
19    BY MR. FENTON:
20          Q.     Mm-hmm.  Okay.  But the
21    management, the officers of the company
22    are separate, aren't they?
23          A.     I mean, that's -- that's my
24    recollection.
```

Confidential - Subject to Further Confidentiality Review

Page 259

1          Q.    All right.  And, in fact,

2    Chairman Jia, who is Taishan's chairman,

3    ran Taishan before BNBM acquired its --

4    its interest and continues to run it up

5    to the present day, correct?

6          A.    Yes.

7          Q.    And you are also aware,

8    because we talked about this earlier,

9    that Taishan maintains separate

10   accounting functions, correct?

11         A.    Yes.  I -- I don't have

12   reason to dispute that.

13         Q.    All right.  And it has its

14   own employees, correct?

15         A.    Yes.

16         Q.    Has its own sales force,

17   correct?

18         A.    Yes.

19         Q.    Okay.  Are you familiar with

20   the difference in the -- the target

21   customer or customer base as between

22   Taishan and PLC with respect to drywall

23   sales?

24         A.    My understanding from

Confidential - Subject to Further Confidentiality Review

```
 1   reading the documents is that the PLC

 2   board is pitched at a somewhat higher

 3   market than the Taishan board.

 4        Q.    In other words, the -- the

 5   PS -- the BNBM PLC drywall is sold more

 6   to the commercial and high-end market and

 7   the Taishan gypsum board is sold more in

 8   the consumer market?

 9        A.    That is my understanding --

10   I'm sorry.

11             MR. LONGER:  Sorry.

12             I didn't understand that to

13        be a question.  It sounded more

14        like a statement, but you answered

15        it --

16   BY MR. FENTON:

17        Q.    Well, in other words, in any

18   event, you agree with my statement, do

19   you not?

20        A.    It's my understanding from

21   reading the documentation.  I have no

22   independent source of, you know,

23   authority for that.

24        Q.    All right.  And -- and given
```

Confidential - Subject to Further Confidentiality Review

Page 261

1    the fact that Taishan has its -- its own

2    management, its own sales force, its own

3    manufacturing facilities, its own

4    customer base, and earns substantial

5    profits, do you think it's fair to

6    describe Taishan as a shell?

7                    MR. LONGER:  Object to the

8            form.  Foundation.

9                    THE WITNESS:  I mean,

10           it's -- I think it's calling for

11           me to, in essence, reach a legal

12           conclusion.  I mean, I think a

13           shell is a term that has

14           significant -- legal significance

15           in the context of this -- of the

16           question that is before the court.

17                    I -- I don't have a basis

18           for rendering a legal decision

19           about that.

20   BY MR. FENTON:

21           Q.    Well, I'm not asking for a

22   legal opinion.  In the ordinary parlance

23   when somebody talks about a shell

24   corporation, would you describe Taishan

Confidential - Subject to Further Confidentiality Review

Page 262

1   as a shell?

2               MR. LONGER:  You know -- you

3         know, I'm going to object and say

4         that it does call for a legal

5         conclusion.

6               MR. FENTON:  That's fine.

7   BY MR. FENTON:

8         Q.    Answer it anyway.

9         A.    It appears to have operating

10  assets.

11        Q.    Which is another way of

12  saying that it's not a shell, correct?

13        A.    Yes.

14        Q.    Okay.  Did you read BNBM

15  PLC's articles of incorporation in

16  connection with the work that you did?

17        A.    I -- you know, in the mass

18  of documentation, I'm sure I looked at

19  them.  I -- I'm sure I looked at them.

20        Q.    Okay.  And let me just show

21  you...

22              Okay.  We have the entire

23  articles here.  I think what we're going

24  to mark, Professor, is just an excerpt.

Confidential - Subject to Further Confidentiality Review

Page 263

1    But if you want to review the entire

2    document, I've got it here for you to

3    review.

4              A.    Okay.

5              (Document marked for

6              identification as Exhibit

7              Milhaupt-10.)

8    BY MR. FENTON:

9              Q.    And we're marking as

10   Exhibit 10 excerpts from the Beijing New

11   Building Materials public limited company

12   annual report.

13             MR. FENTON:  Wait.  This is

14             not it.  This is not it.  This is

15             not the articles.

16             (Exhibit 10 withdrawn.)

17             (Whereupon, a discussion was

18             held off the record.)

19             MR. LONGER:  Do you want to

20             go off the record for a minute?

21             MR. FENTON:  Yeah, let's go

22             off the record.

23             THE VIDEOGRAPHER:  The time

24             is 2:32 p.m.  We are going off the

Confidential - Subject to Further Confidentiality Review

Page 264

1           record.

2                   (Short break.)

3                   THE VIDEOGRAPHER:  The time

4           is 2:42 p.m.  We are back on the

5           record.

6                   (Brief pause.)

7                   THE VIDEOGRAPHER:  The time

8           is 2:42.  We are off the record.

9                   (Brief pause.)

10                  THE VIDEOGRAPHER:  We are

11          going back on the record.  The

12          time is 2:45 p.m.  We are back on

13          the record.

14                  (Document remarked for

15          identification as Exhibit

16          Milhaupt-10.)

17    BY MR. FENTON:

18          Q.    Professor Milhaupt, there

19    was a little confusion with respect to

20    the exhibits before the break.  I

21    apologize for that, because I know your

22    time is valuable, unlike the rest of us.

23                  Let me show you what has now

24    been marked as Milhaupt Exhibit 10, which

Confidential - Subject to Further Confidentiality Review

Page 265

1    is a copy of the Beijing New Materials

2    Public Limited Company articles of

3    association, dated May 16, 2006.

4             Now, I will tell you there

5    have been subsequent amendments to these

6    articles, but not to the provision that

7    I'm going to ask you about.  But if you'd

8    like to review any of the subsequent

9    amendments, we have them here for you to

10   do so.

11        A.    Okay.

12        Q.    My first question, after

13   you've had a chance to review the

14   document, is whether you reviewed this

15   document or a similar document in

16   connection with your work in this case.

17        A.    I reviewed it as an exhibit

18   to the briefs, but I did not consider it

19   to be central to the preparation of my

20   declaration.  So I have not deeply

21   studied this document.

22        Q.    All right.  And when you say

23   that you did not consider it central to

24   the -- to your declaration, is that to

Confidential - Subject to Further Confidentiality Review

Page 266

1   say that you did not consider it to be

2   relevant?

3            A.    Well, my -- again, the

4   thrust of my research into this world of

5   Chinese SOEs and the thrust of my

6   declaration is that the corporate

7   features need to be understood in

8   context, and indeed the formal corporate

9   features may not be the most important

10  aspect of governance in a Chinese SOE.

11                So in that context, the

12  articles of incorporation are relevant,

13  but again, I did not deem them to be

14  central, because I view the group as the

15  most important entity in a Chinese SOE as

16  opposed to the particular members of the

17  group.

18           Q.    The context of your opinion

19  was also what one should consider in

20  assessing whether or not, in essence, to

21  pierce the corporate veil, correct?

22           A.    Yes.

23           Q.    And I understand that you're

24  not expressing an opinion on ultimately

Confidential - Subject to Further Confidentiality Review

Page 267

1    whether it should or should not be

2    pierced, but your opinion was rendered in

3    the context of what is relevant to

4    consider.

5          A.    Yes.

6          Q.    All right.  And is it

7    relevant to consider -- in addressing

8    that question, I'm going to direct you to

9    Article 39 of these articles of

10   association.  And the Bates number on the

11   bottom is 3766, if that's of assistance.

12   Let me know when you get there.

13               MR. LONGER:  You said 39?

14               MR. FENTON:  Article 39.

15               THE WITNESS:  Yes, I've read

16        it.

17   BY MR. FENTON:

18          Q.    Okay.  And article 39 says

19   as follows:  "The controlling shareholder

20   and the actual controller of the company

21   shall not impair the interests of the

22   company by use of their association

23   relationship.  In case of any violation

24   of provisions and any lost" -- "losses to

Confidential - Subject to Further Confidentiality Review

Page 268

1   the company, they shall bear the

2   liabilities for compensation.

3           "The controlling shareholder

4   and the actual controller of the company

5   shall have the duty of good faith to the

6   company and other shareholders of the

7   company.  The controller shareholders

8   shall strictly exercise the rights of

9   contributor according to law and should

10  not impair the legitimate rights and

11  interests of the company and other

12  shareholders of the company by use of

13  profit distribution, asset restructuring,

14  foreign investment, occupation of funds,

15  security for loan and others, or impair

16  the interest of the company and other

17  shareholders of the company by taking

18  advantage of his/her" -- and then this is

19  a translation correction that I believe

20  everybody agreed to -- "controlling

21  position."

22          Do you see that?

23      A.    Yes.

24      Q.    All right.  And you did not

Confidential - Subject to Further Confidentiality Review

Page 269

1    consider this relevant to any inquiry

2    about whether corporate formalities were

3    being observed?

4              MR. LONGER:  Objection to

5         the form.  Mischaracterizes his

6         testimony.

7              THE WITNESS:  Yes, I was

8         going to say that isn't what I

9         said.

10             And actually, the point of

11        the literature that I cite to

12        motivate the declaration, is to

13        say that, yes, Chinese SOEs have

14        taken on the garb of the corporate

15        form.  Yes, there are minority

16        shareholder protections in these

17        articles.

18             But they have to be

19        understood in the context of

20        China's legal system.  And one can

21        be misled by focusing too much on

22        the formal legal garb in which

23        these entities have wrapped

24        themselves.

Confidential - Subject to Further Confidentiality Review

Page 270

1               So a question that arises

2       from reading this is, you know, I

3       see the language, but who is going

4       to enforce this provision?

5       Chinese courts, as your own

6       expert, Donald Clark, has written,

7       will not touch the assets of

8       state-owned enterprises.

9               And they are particularly

10      reluctant to pierce, to reach a

11      public company.  So I see the

12      language.

13              But this is really kind of

14      the central piece of my -- of my

15      declaration.

16              Don't be -- don't be overly

17      fixated on the formal corporate

18      form.  These companies have

19      recently moved out of a centrally

20      planned economy.  They have been

21      corporatized, but they have not

22      been privatized.  And they're

23      operating in a legal system with

24      very weak concepts of minority

Confidential - Subject to Further Confidentiality Review

Page 271

1              shareholder protections and courts

2              that are not independent of the

3              party and which are particularly

4              reluctant to rule against the

5              controlling shareholder, which is

6              ultimately the state.

7      BY MR. FENTON:

8              Q.    All right.  Are you aware of

9      any instance where the controlling

10     shareholder or actual controller of BNBM

11     PLC violated Article 39?

12             A.    I don't have a basis,

13     really, for answering that.  I mean, I've

14     read what's in the documentation.

15             Q.    So as you sit here right

16     now, despite the vast record that you

17     reviewed, you cannot cite to me a single

18     instance where either the controlling

19     shareholder or the actual controller of

20     BNBM PLC violated the dictates of

21     Article 39?

22             A.    Again, as I -- I mean, I can

23     only say what I said before, which is I

24     don't have a basis for answering -- for

Confidential - Subject to Further Confidentiality Review

Page 272

1   answering.

2          Q.    Because you haven't seen

3   such an instance, correct?

4                MR. LONGER:  Asked and

5          answered.

6                THE WITNESS:  It did not

7          appear to me from the record that

8          I reviewed.

9   BY MR. FENTON:

10         Q.    Thank you.  BNBM PLC, you

11   understand, is limited on the Shenzhen

12   Stock Exchange?

13         A.    Yes.

14         Q.    Are you familiar with the

15   rules of the Shenzhen Stock Exchange?

16         A.    I am not -- I am not deeply

17   familiar with them, no.

18         Q.    All right.  Do you

19   understand that they -- that they

20   generally provide for things like

21   disclosures of major corporate events,

22   accuracy in reporting, those kinds of

23   things?

24         A.    Yes.

Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  And the annual

2     reports of listed companies have to

3     comply with the rules?

4          A.    Yes.

5          Q.    Let me show you...

6               (Document marked for

7               identification as Exhibit

8               Milhaupt-11.)

9     BY MR. FENTON:

10         Q.    Let me show you, Professor,

11    what has been marked as Milhaupt

12    Exhibit 11, which is excerpts.  Again, we

13    have the entire report here if you'd like

14    to review it.

15               These are excerpts of the

16    BNBM PLC annual report for 2007.  Bears a

17    date of March 24, 2008.

18               What I would like to direct

19    your attention to in this document that

20    was subject to the rules of the Shenzhen

21    Stock Exchange, is Roman III, which is

22    titled "Separation of the Company and the

23    Controlling Shareholder in Operations,

24    Personnel, Assets, Organization, and

Confidential - Subject to Further Confidentiality Review

Page 274

1    Finance."

2                Do you see that section?

3         A.    Yes.

4         Q.    All right.  Now, was this

5    something -- by "this" I mean this

6    document in its entirety or this section

7    in particular.  Was this something that

8    you reviewed in connection with the

9    materials that you looked at?

10        A.    Again, I would give the same

11   answer, which is yes -- yes, I reviewed

12   it as an exhibit to the briefs.  It's not

13   something that I have -- that I focused

14   on in the preparation of my -- of my

15   declaration.

16        Q.    All right.  And is that

17   because you did not believe it was

18   particularly relevant to your inquiry?

19        A.    Well, I mean, I'm sorry, but

20   I give the same answer that I gave

21   before, which is, given the scope of my

22   assignment, which was to talk about the

23   governance characteristics of SOEs under

24   SASAC, my approach and my -- my approach

Confidential - Subject to Further Confidentiality Review

Page 275

1   was to provide an accounting of the

2   entire set of circumstances that's

3   relevant.

4              And so I focused in

5   particular on those factors which were

6   not -- which were noncorporate.  I'm not

7   saying this isn't relevant.  I'm saying

8   the spirit of my declaration is that we

9   can be overly persuaded by formal

10  governance structures in the SOEs.

11       Q.    All right.  So in the spirit

12  of your declaration, you did not think it

13  important to mention that this Shenzhen

14  Stock Exchange-listed company in its 2008

15  annual report stated as follows:

16              "One, operational

17  independence.  The company is an

18  independent and complete business entity

19  in its own right and is capable of

20  operating independently.  The controlling

21  shareholder and any subordinate entity

22  thereof are not engaged in business

23  activities that are the same as or

24  similar to those of the company?"

Confidential - Subject to Further Confidentiality Review

1              MR. LONGER:  Object to the

2         form.  It mischaracterizes his

3         testimony, and it actually

4         misstates his testimony.

5    BY MR. FENTON:

6         Q.    Well, my question is, did

7    you cite to that provision in your

8    report?

9         A.    I did not, but I wouldn't

10   find the statement to be particularly

11   surprising.  The fact that they state

12   that they are independent, I mean, this

13   is -- this is a company that is

14   ultimately under the control of the CNBM

15   Group and ultimately, ultimately SASAC.

16   So, to me, that context is more important

17   than a statement by the company that it's

18   independent.

19        Q.    Are you saying that this is

20   something that a court should disregard

21   in considering whether or not to pierce

22   the corporate veil?

23             MR. LONGER:  Object to the

24        form.

Confidential - Subject to Further Confidentiality Review

Page 277

```
 1              THE WITNESS:  Well, again,
 2         you know, a Court is obviously
 3         free to consider anything that it
 4         wants.  I think the spirit of my
 5         declaration is that there's a much
 6         wider context for these formal
 7         corporate structures and
 8         formalities and listings and that
 9         that context is actually crucial
10         to understanding and
11         contextualizing these kinds of
12         disclosures.
13    BY MR. FENTON:
14         Q.    All right.  And -- and while
15    we are talking about the spirit of your
16    declaration, it was also not within the
17    spirit of your declaration to make
18    reference to Paragraph 2, which reads as
19    follows:
20              "About personnel separation.
21    The company's personnel are independent
22    of the controlling shareholder.  None of
23    the senior executives, including the
24    general manager, the deputy general
```

Confidential - Subject to Further Confidentiality Review

Page 278

1   manager, the chief financial officer, and

2   the secretary of the board of directors

3   hold any position in the controlling

4   shareholder.  The controlling

5   shareholder's senior executives who serve

6   concurrently as the company's directors

7   have enough time and energy to work for

8   the company.  The company is completely

9   separated from the controlling

10  shareholder in the labor personnel, in

11  payroll management, and manages its

12  personnel independently."

13              That also was not within the

14  spirit of your declaration, was it?

15              MR. LONGER:  Object to the

16          form.  Mischaracterizes his

17          testimony.

18              You can answer the question.

19              THE WITNESS:  Well, I mean,

20          there is no discussion, for

21          example -- you know, understanding

22          what this says, there is no

23          discussion of SASAC's appointment

24          and removal powers.  There is no

Confidential - Subject to Further Confidentiality Review

Page 279

1              discussion of the party role in

2              the enterprise.  And from what I

3              am seeing, it's hard to really

4              even get a picture of where this

5              corporation fits into the CNBM

6              Group.

7                      So again, I'm -- I'm not

8              overly -- I would not put a lot of

9              emphasis on this blanket

10             statement, because there's very

11             little context for -- for

12             understanding -- for understanding

13             this.

14    BY MR. FENTON:

15             Q.    Well, are you saying that

16    the -- the -- the BNBM, the

17    Shenzhen-listed company, was violating

18    disclosure rules of the Shenzhen exchange

19    when it put out its -- when it put out

20    its annual report?

21                   MR. LONGER:  Object to the

22             form.  Mischaracterizes his

23             testimony.

24    BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

Page 280

1          Q.    Is that a charge that you're

2    leveling here, Professor?

3               MR. LONGER:   It's

4          argumentive.   Mischaracterizes his

5          testimony.   Object to the form.

6    BY MR. FENTON:

7          Q.    Good.   Answer my question.

8          A.    I'm not an expert on

9    Shenzhen's listing requirements, so I'm

10   certainly not leveling any charges

11   against anyone.

12         Q.    All right.   And the spirit

13   of your declaration also did not include

14   Item Number 3, "Integrity of Assets."

15              "The company's assets are

16   independent and complete.   There is a

17   clear line of demarcation between the

18   company and the controlling shareholder

19   in terms of industrial property and

20   nonpatented technology.   The company is

21   completely separated from the controlling

22   shareholder and operates independently in

23   production, supply, and marketing."

24              That's not referenced in

Confidential - Subject to Further Confidentiality Review

Page 281

1   your report either --

2                   MR. LONGER:   Objection to

3           the form.   Mischaracterizes his

4           testimony.

5   BY MR. FENTON:

6           Q.     -- correct?

7                   MR. LONGER:   Answer it.

8                   THE WITNESS:   I -- I just

9           have to give -- can I just say I

10          give the same answer that I gave

11          with respect to the other two

12          points.

13  BY MR. FENTON:

14          Q.     Sure.   That will shorten

15  things up.

16                  But let me read the next two

17  paragraphs.   And if your answer is the

18  same, all you have to do is say so.

19                  Number 4, "Organizational

20  Independence."

21                  "The company's board of

22  directors, supervisory committee, and

23  other internal bodies operate

24  independently.   There is no

Confidential - Subject to Further Confidentiality Review

Page 282

1    superior-subordinate relationship between

2    the controlling shareholder and its

3    functional departments and the listed

4    company and its" -- "and its functional

5    departments."

6              That's not in your

7    declaration either, right?

8        A.    Correct --

9              MR. LONGER:  I have the same

10        objections --

11   BY MR. FENTON:

12        Q.    Either in letter or spirit,

13   correct?

14              MR. LONGER:  Same

15        objections.

16              THE WITNESS:  It -- it's not

17        in my declaration.

18   BY MR. FENTON:

19        Q.    Okay.  And last, "Financial

20   Separation."

21              "The company is completely

22   financially independent and completely

23   separated from the controlling

24   shareholder, has its own independent

Confidential - Subject to Further Confidentiality Review

Page 283

1    finance department, independent financial

2    accounting system, and independent

3    financial management system, and has

4    established a strict financial management

5    system for its subsidiaries.  The company

6    has set up a separate bank account and

7    does not share a bank account with the

8    controlling shareholder.  The company

9    pays taxes independently according to

10   law."

11              That is not in the letter or

12   the spirit of your declaration either, is

13   it?

14              MR. LONGER:  Objection to

15         the form.  Mischaracterizes his

16         testimony and his declaration.

17              You can answer the question.

18              THE WITNESS:  It's not in my

19         declaration.

20   BY MR. FENTON:

21         Q.   All right.  And these --

22   these passages that I have read from the

23   2007 BNBM PLC annual report, 1 through 5,

24   are you in a position as you sit here

Confidential - Subject to Further Confidentiality Review

1    today, Professor, to dispute the factual

2    accuracy of any of the statements

3    contained therein?

4                    MR. LONGER:  Objection to

5            the form.

6    BY MR. FENTON:

7            Q.    I understand you say they

8    don't talk about the party.  I understand

9    you say they don't talk about SASAC.

10                   My question is, are you in a

11   position to dispute anything they do say?

12           A.    Well, I -- I mean, I would

13   have to take a -- I would have to take a

14   very careful look at the document,

15   because I -- I don't think I'm in a

16   position sitting here to -- to respond to

17   that.

18           Q.    All right.  Well, do you

19   think, perhaps, you might have taken a

20   more careful look at the document before

21   you prepared your report?

22                   MR. LONGER:  Objection to

23           the form.  Argumentive.

24                   MR. JOHNSON:  Can I suggest

Confidential - Subject to Further Confidentiality Review

Page 285

1          we take a short break for to look

2          at those five points and then

3          maybe you can give answer after

4          review, Professor.

5                MR. FENTON:  I don't think

6          we need to break.

7                MR. LONGER:  It's his

8          deposition, not yours.

9                MR. JOHNSON:  I just want a

10         clean record.

11    BY MR. FENTON:

12         Q.    At least as you sit here

13    right now, you are not in a position to

14    dispute any of the statements that appear

15    in Paragraphs 1 through 5 that we've read

16    into the record?

17                MR. LONGER:  Asked and

18         answered.  Still argumentive.

19                THE WITNESS:  I have no

20         basis to dispute these statements.

21    BY MR. FENTON:

22         Q.    All right.  And we are going

23    to mark -- I'm sorry.  Professor, what

24    exhibit was that?

Confidential - Subject to Further Confidentiality Review

Page 286

1              MR. LONGER:  Exhibit 11.

2              THE WITNESS:  11.

3              (Document marked for

4         identification as Exhibit

5         Milhaupt-12.)

6  BY MR. FENTON:

7         Q.   All right.  We're going to

8  mark as Exhibit 12 --

9              MR. STECKLER:  By the way --

10        I'm sorry -- these are just

11        portions.  11 is just portions?

12             MR. FENTON:  That's what I

13        said.  We have the full documents

14        here if anybody wants to look at

15        them.

16             MR. STECKLER:  You have the

17        full documents?  Could I look

18        at --

19             MR. FENTON:  Yeah.  We can

20        get you those at the next break.

21             MR. PFAEHLER:  It's 120

22        pages.

23  BY MR. FENTON:

24        Q.   All right.  I have marked as

Confidential - Subject to Further Confidentiality Review

Page 287

1   Milhaupt Exhibit 12, the BNBM PLC annual
2   report for 2008, dated March 17, 2009.
3   Again, the report issued by BNBM as a
4   Shenzhen-listed company.
5              And I'm not going to tarry
6   too long, Professor Milhaupt, but if I
7   can address your attention to the third
8   page of the -- I'm sorry -- the fourth
9   page of the document that has been handed
10  to you.
11             You'll see a III, and you'll
12  see the same statements that appeared in
13  the previous annual report from 2007.
14        A.    Yes, I see that.
15             MR. LEVIN:  It's Page 19.
16             MR. LONGER:  Object to the
17        form, foundation, and the comments
18        of counsel.
19  BY MR. FENTON:
20        Q.    It's actually Pages 20 and
21  21.
22             All right.  And my -- my
23  only question is this, Professor:
24             If I were to ask you the

Confidential - Subject to Further Confidentiality Review

Page 288

1    same questions regarding these statements

2    in the 2008 annual report that I asked

3    you about the 2007 annual report, would

4    your answers be the same?

5                MR. LONGER:  I'd have the

6          same objections.

7                But go ahead.  Subject to

8          that.

9    BY MR. FENTON:

10         Q.    Instead of going through

11   them one by one, I'm trying to speed

12   things up.

13         A.    I would have the same

14   response.

15         Q.    Okay.

16               (Document marked for

17         identification as Exhibit

18         Milhaupt-13.)

19   BY MR. FENTON:

20         Q.    And then next I'd like to

21   show you the -- the BNBM PLC annual

22   report for 2009.  Again, these are

23   excerpts.

24               And we'll mark that as

Confidential - Subject to Further Confidentiality Review

Page 289

1    Milhaupt-13.

2           A.    Thank you.

3           Q.    And again, directing your

4    attention to Page 17, you'll see III,

5    "Separation of the company and the

6    controlling shareholder and operations

7    personnel, operations organization and

8    finance."  You'll see the same five

9    paragraphs.

10              And my question, sir, is, if

11   I were to ask you the same questions

12   about these statements as I did with

13   respect to the 2007 and 2008 annual

14   reports, would your answers be the same?

15              MR. LONGER:  Same

16        objections.

17              THE WITNESS:  Same response.

18   BY MR. FENTON:

19        Q.    Same response, meaning your

20   answers would have been the same?

21        A.    Correct.

22        Q.    Okay.  Then we don't have to

23   tarry too long on that.

24              MR. FENTON:  Why don't we

Confidential - Subject to Further Confidentiality Review

Page 290

1        take a short break here.  I've

2        still got more.  But I think if I

3        take a few minutes, I might be

4        able to shorten things up and get

5        people out of here at a reasonable

6        hour.

7               THE VIDEOGRAPHER:  The time

8        is 3:07 p.m., and we are going off

9        the record.

10              (Short break.)

11              THE VIDEOGRAPHER:  The time

12       is 3:30 p.m.  We are back on the

13       record.

14              (Document marked for

15       identification as Exhibit

16       Milhaupt-14.)

17   BY MR. FENTON:

18       Q.    All right.  Professor, let

19   me hand you what's been marked as

20   Milhaupt Exhibit 14.

21       A.    Thank you.

22       Q.    This document -- and again,

23   I believe we've included some excerpts --

24   are the articles of association of

Confidential - Subject to Further Confidentiality Review

Page 291

1   Taishan Gypsum, dated June 20, 2007.

2                 Take your time and

3   familiarize yourself with -- with the

4   document, but I'm specifically going to

5   be asking you about Article 64 and

6   Article 103.

7                 Actually, 64 and

8   Articles 102 and 103.  Just let me know

9   when you're ready.

10          A.    I'm sorry.  It was 64.

11          Q.    62.

12          A.    62.

13          Q.    I'm sorry.  64 and 102 and

14   103.  Page 10 and then Page 15.

15          A.    Okay.  All right.

16          Q.    You see Article 64 on

17   Page 10 deals with the powers of the

18   board of directors?

19          A.    Yes.

20          Q.    All right.  This is for

21   Taishan, correct?

22          A.    Yes.

23          Q.    Now, was this a document

24   that you considered in connection with

Confidential - Subject to Further Confidentiality Review

Page 292

1    your work?

2         A.    Again, I looked at it.  I

3    reviewed it in connection with my -- my

4    perusal of the entire record.

5         Q.    All right.  This, again, was

6    another document that wasn't within the

7    spirit of your declaration?

8              MR. LONGER:  Objection to

9         the form.

10             THE WITNESS:  It was not --

11        we -- deep study of this document

12        was not within the scope of the --

13        squarely within the scope of

14        the -- my assignment in connection

15        with the preparation of my -- of

16        my declaration.

17   BY MR. FENTON:

18        Q.    All right.  Well, I'm going

19   to -- I'm going to give you another

20   assignment and ask you to -- to take a

21   look at this Article 64 now.

22             Before we get to that,

23   Article 63 provides that "The board of

24   directors shall be constituted to five

Confidential - Subject to Further Confidentiality Review

```
 1   directors and shall have one chairman."

 2              Do you see that?

 3       A.    Yes.

 4       Q.    Okay.  And it says, "Of the

 5   five directors, Beixin Group Construction

 6   Materials Company, Ltd., and Tai'an

 7   Donglian Investment & Trading Company,

 8   Ltd., shall jointly nominate three

 9   directors, Tai'an Stated-Owned Assets

10   Corporation Company, Ltd., shall nominate

11   one director, and Tai-an Anxin Investment

12   & Trading Company and Jia Tongchun shall

13   jointly nominate one director."

14              Do you see that?

15       A.    Yes.

16       Q.    All right.  And those are

17   the various -- those parties who nominate

18   the various directors were the various

19   interest holders in Taishan.  Is that --

20   to your knowledge?

21       A.    Yes.

22       Q.    All right.  Do you see

23   anything in there about CNBM nominating

24   any directors?
```

Confidential - Subject to Further Confidentiality Review

Page 294

```
 1                MR. LONGER:  We'll stipulate

 2          that the document says what it

 3          says.

 4   BY MR. FENTON:

 5          Q.    That's fine.  Please answer

 6   my question.

 7          A.    I -- I do not see that.

 8          Q.    Okay.  Do you see anything

 9   in here about SASAC nominating any

10   directors?

11                MR. LONGER:  Same

12          stipulation is offered.

13                THE WITNESS:  Well, I

14          think -- I think SASAC's ability

15          to nominate and -- and remove

16          senior personnel is -- it's baked

17          into their powers as -- as SASAC.

18   BY MR. FENTON:

19          Q.    That's fine.  I'm asking you

20   if you see anything in this document

21   about SASAC nominating any directors.

22          A.    I do not.

23          Q.    Okay.  And do you see

24   anything in this document about the
```

Confidential - Subject to Further Confidentiality Review

Page 295

1    Chinese Communist Party nominating any

2    directors?

3                MR. LONGER:   Objection to

4         the form.   We'll stipulate that

5         the document says what it says.

6                THE WITNESS:   I do not.

7    BY MR. FENTON:

8         Q.    Were any Taishan directors

9    party appointed by SASAC or the Chinese

10   Communist Party to your knowledge?

11        A.    I -- I have no basis for

12   answering that.

13        Q.    So, to your knowledge, the

14   answer is no, correct?

15        A.    I have no basis for

16   answering.   I -- I don't know what the

17   Communist Party has done with respect to

18   the -- the managers of the -- of the

19   company.

20        Q.    In the mass of materials

21   that you reviewed in connection with your

22   work, did you see any evidence that

23   either the Chinese Communist Party or

24   SASAC appointed any directors to the

Confidential - Subject to Further Confidentiality Review

Page 296

1    Taishan board?

2                    MR. LONGER:  Objection.  It

3          mischaracterizes his testimony.

4          The document speaks for itself.

5                    THE WITNESS:  I did not, and

6          I would not expect to see such

7          documentation.

8    BY MR. FENTON:

9          Q.    All right.  Now, Article 64

10   says that the board of directors shall

11   exercise the -- the following powers, and

12   there is a list 1 through 14, and let me

13   read it.

14                   "1, convening general

15   meetings and reporting its work to the

16   same.

17                   "2, implementing resolutions

18   of the general meeting."

19                   That's a shareholders

20   meeting, correct?

21         A.    Correct.

22         Q.    Determine -- "3, determining

23   the operation plan and investment

24   projects of the company.

Page 297

```
 1                    "4, formulating annual
 2    financial budgets and financial
 3    accounting plans of the company."
 4                    There's a second 4, but it
 5    should be 5.
 6                    "Formulating the profit
 7    distribution and loss covering plans of
 8    the company.
 9                    "6, formulating plans for
10    registered capital increase or reduction,
11    the issuing of corporate bonds or other
12    securities, and listing of the company's
13    securities.
14                    "7, formulating plans of
15    major acquisition, redemption of shares,
16    merger, division, or dissolution of the
17    company.
18                    "8, determining the venture
19    investments and mortgage and other
20    security created on the assets of the
21    company within the authority vested in it
22    by the general meeting."
23                    I'm going to stop there for
24    the moment.  We'll continue with the rest
```

Confidential - Subject to Further Confidentiality Review

Page 298

```
 1    of those, but aren't those typical powers

 2    of a board of directors that one would

 3    expect to see in corporations generally,

 4    regardless of the -- of the country in

 5    which they are incorporated?

 6              A.    Yes.  This looks like a

 7    pretty normal list.

 8              Q.    All right.  And then let's

 9    continue with the list.

10                    "9, determining the

11    establishment of internal management

12    organs of the company.

13                    "10, hiring or dismissing

14    general manager, board secretary, and the

15    openly recruited financial principal of

16    the company; hiring and dismissing deputy

17    general manager and other senior

18    management personnel of the company based

19    on nomination by general manager, and

20    determining remuneration and rewards and

21    punishment matters of such personnel.

22                    "11, formulating basic

23    management systems of the company.

24                    "12, drafting amendments to
```

Page 299

1    these articles of association of the

2    company.

3              "13, listening to operation

4    reports of the general manager and

5    inspecting its performance.

6              And, "14, other powers

7    provided by laws, regulations, and these

8    articles of association of the company or

9    vested in it by the general meeting."

10             And again, the ones I've

11   just read, 9 through 14, are also fairly

12   typical powers that one would expect to

13   see in a -- in a articles of association

14   for a corporation, again regardless of

15   the country of origin; is that correct?

16             MR. FENTON:  We'll bid

17        farewell to Mr. Levin.  Good to

18        see you, Arnie.

19             THE WITNESS:  Well, I mean,

20        in the United States, one would

21        not find a list like this.  It

22        would simply say that the board of

23        directors manages the company.  So

24        in that sense, I think this is

Confidential - Subject to Further Confidentiality Review

1        somewhat distinctive.

2   BY MR. FENTON:

3        Q.    Well, it's a little more

4   detailed, right, but all of these would

5   be powers that would be within the normal

6   U.S. board?

7             MR. LONGER:

8        Mischaracterizes his testimony.

9   BY MR. FENTON:

10       Q.    Is that correct?

11       A.    Yes.  These would be powers

12  within -- within the board's jurisdiction

13  in the United States.

14       Q.    All right.  And now I'd like

15  to -- to direct your attention to

16  Page 15, Section 2 of the board of

17  supervisors.

18            Now, typically U.S.

19  companies don't have a board of

20  supervisors; is that correct?

21       A.    Correct.

22       Q.    Okay.  Are you familiar with

23  any countries where they do typically

24  have a board of supervisors?

Confidential - Subject to Further Confidentiality Review

Page 301

1          A.     Yes, I am.

2          Q.     Okay.  And -- and let me

3     take a guess.  That happens to be the

4     country of Japan?

5          A.     Japan does, Germany does,

6     and of course China does.

7          Q.     Okay.  And -- and does the

8     board of supervisors serve similar roles

9     in all three countries?

10         A.     No.

11         Q.     Okay.  What does the board

12    of supervisors do in Japanese companies?

13         A.      In -- in Japanese companies,

14    the board of supervisors monitors the

15    director's compliance with the law

16    essentially --

17         Q.     Mm-hmm.

18         A.      -- and ensures or tries to

19    ensure accurate accounting.

20         Q.     So it's like a combined

21    compliance audit committee in a U.S.

22    corporation?

23         A.     Well, I -- I -- you know,

24    this is my field, so I guess I would

Confidential - Subject to Further Confidentiality Review

1    resist a generalization.

2              Q.    Okay.

3              A.    It does have audit powers

4    and it does have compliance powers, but

5    the reality is that the powers of the

6    board of supervisors in Japan, and I

7    think it's fair to say in China as well,

8    are actually very limited.

9              Q.    Okay.  And so are -- are you

10   saying that the board of supervisors

11   serve similar roles in Japan and in

12   China?

13             A.    On a -- on a formal level,

14   if one were to look at the corporate law,

15   yes, you would see very similar

16   descriptions of those -- of those organs.

17             Q.    All right.  And you also

18   mentioned Germany.

19             A.    Correct.

20             Q.    And I take it from your

21   previous answers that a board of

22   supervisors in a German corporation

23   serves a somewhat different role?

24             A.    It has more power because it

Confidential - Subject to Further Confidentiality Review

Page 303

1    appoints the management board.

2              Q.      Mm-hmm.

3              A.      Whereas in Japan and China,

4    the board of supervisors does not have

5    any appointments power with respect to

6    the board.  It does not have a vote at

7    the -- at the board level.

8              Q.      Okay.  And is it fair to say

9    that in both Japan and China, the board

10   of supervisors provides sort of an extra

11   layer of oversight over the board of

12   directors?

13             A.      In theory, yes.  The

14   reality, I think, in -- in both countries

15   is -- is that it is a weak corporate

16   governance organ.

17             Q.      Okay.  The -- Article 103

18   talks about the power of the board of

19   supervisors.  It -- it talks about

20   inspecting the financial matters of the

21   company.

22                     Number 2 is "Supervising the

23   directors, general manager, and other

24   senior management personnel in their

Confidential - Subject to Further Confidentiality Review

Page 304

```
 1    performance of duties with the company,

 2    and proposing the removal of any of the

 3    directors, the general manager, and other

 4    senior management personnel who has

 5    violated any provision of the laws,

 6    administrative regulations, or these

 7    articles or the resolutions of the

 8    board."

 9              Number 3 is where "any

10    activity of the directors, the general

11    manager, or other senior management

12    personnel violates the interests of the

13    company, requesting correction of such

14    personnel and, if necessary, reporting

15    such activity to the general meeting or

16    relevant government authority."

17              Number 4 is "proposing the

18    convening of interim general meetings and

19    where the board of directors fails to

20    perform its responsibilities of convening

21    and presiding over general meetings as

22    provided in the company law, these

23    articles of association, convening, and

24    presiding over general meetings."
```

Confidential - Subject to Further Confidentiality Review

Page 305

```
 1                5 is submitting proposals to
 2     general meetings.
 3                6 is bringing lawsuits
 4     against directors and senior management
 5     personnel pursuant to the provisions of
 6     Section 152 of company law; and 7 is
 7     other powers vested by these articles of
 8     association or the general meeting.
 9                Is -- is that the typical
10     function -- or are those the typical
11     functions of a board of supervisors,
12     again at least theoretically in -- in
13     Chinese companies as you understand them?
14          A.    Yes.
15          Q.    All right.  So this is a
16     fairly typical provision?
17          A.    I think so.
18          Q.    And would it be a fairly
19     typical provision if we were looking at
20     Japanese companies?
21          A.    Well, this is a little bit
22     more expansive than I think you would
23     typically find.  But in general terms,
24     yes.
```

Confidential - Subject to Further Confidentiality Review

Page 306

1          Q.    Okay.  And do you see

2     anything in this Article 103 about

3     fulfilling the will of the Chinese

4     Communist Party?

5               MR. LONGER:  Objection.  The

6          document speaks for itself.

7               THE WITNESS:  No, I don't.

8          If I could add one thing, though,

9          which is that the board of

10          supervisors is elected or

11          appointed by the very same

12          shareholders who are electing

13          the -- the board of directors.

14               So there's a -- there's a

15          kind of inherent weakness in -- in

16          the structure of this provision.

17          And I -- I would not expect to see

18          the directors -- the supervisors,

19          rather, really pushing back and

20          actually exercising any of these

21          powers.

22               And indeed, I'm not going to

23          be able to point -- recall the

24          specific document.  But there was

Confidential - Subject to Further Confidentiality Review

Page 307

```
 1          a -- a supervisor who was asked,
 2          "What do you actually do?"
 3              And he or she said, "Well, I
 4          monitor compliance of the law
 5          of the" -- "of the directors."
 6              And the questioning
 7          continued.  "Well, what is it that
 8          you actually do?  How do you do
 9          that?"
10              And there was really not
11          much of a response.
12              And so -- I mean, that's
13          very consistent with my sense of
14          the lack of power of the board of
15          supervisors in -- in a Chinese
16          corporation.
17     BY MR. FENTON:
18          Q.   All right.  Is that a
19     document you're referring to in this
20     case?
21          A.   Yes.
22          Q.   Okay.  Do you recall the --
23     whose testimony it was?
24          A.   I'm -- I'm afraid -- I'm --
```

Confidential - Subject to Further Confidentiality Review

Page 308

 1   I'm afraid that I -- I don't have it.

 2   But this -- one of the -- someone was a

 3   supervisor on the board.  I don't have

 4   the instant recall of who that was.  I'm

 5   sorry.

 6          Q.    Okay.  Fair enough.  If it

 7   comes to you, let me know.

 8          A.    I will.

 9          Q.    All right.  In any event,

10   did you think it important for your work

11   to consider the fact that -- that Taishan

12   has its own separate articles of

13   association that contain these and other

14   provisions that we've just reviewed?

15          A.    Well, I -- I'm not surprised

16   that it has articles of association, no.

17                (Document marked for

18                identification as Exhibit

19                Milhaupt-15.)

20   BY MR. FENTON:

21          Q.    Let me show you what we've

22   marked as Milhaupt Exhibit 15, which is

23   the declaration of Yu Chen that was filed

24   in this action on October 23, 2015.  And

Confidential - Subject to Further Confidentiality Review

Page 309

1    take a minute to familiarize yourself

2    with it, Professor.  But my first

3    question is going to be, have you ever --

4    have you ever reviewed this document?

5         A.    I have.

6         Q.    Okay.  And is this among the

7    materials that you reviewed in connection

8    with your work in this case?

9         A.    Yes.

10        Q.    Okay.  And you don't mention

11   this declaration in your report; is that

12   correct?

13        A.    That's correct.

14        Q.    Okay.  That's because it was

15   not within the spirit of your report or

16   within the scope of your assignment; is

17   that right?

18        A.    It was not directly relevant

19   to my assignment, as I -- as I understood

20   it.

21        Q.    All right.  Well, you do see

22   that Yu Chen is the general manager of

23   Beijing New Building Materials Public

24   Limited Company?

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.
 2          Q.    Okay.  Which owns a
 3   controlling interest in Taishan?
 4          A.    Yes.
 5          Q.    Is that correct?
 6                Okay.  And you see that Yu
 7   Chen states in Paragraph 5 that BNBM PLC
 8   complies with all corporate requirements
 9   of the Chinese law, including
10   shareholders meetings, board meetings,
11   and corporate authorizations for major
12   transactions.
13                Is that something that you
14   think is important for a court to
15   consider in terms of making a decision
16   about alter ego or single business
17   enterprise liability?
18                MR. LONGER:  Object to the
19          form.  And the document speaks for
20          itself.  But what the judge
21          considers or not is going to be up
22          to his discretion.
23                MR. FENTON:  Well, I don't
24          know.  This witness has offered an
```

Confidential - Subject to Further Confidentiality Review

Page 311

1          opinion on what should be

2          considered.  And I'm just asking

3          him if this is something that

4          should be considered.

5                MR. LONGER:  I think that

6          that mischaracterizes the

7          witness's testimony as well.

8                MR. FENTON:  We can agree to

9          disagree.

10                MR. LONGER:  Is there a

11          question?  I lost it.

12   BY MR. FENTON:

13          Q.   Yes.  My question is, the

14   statement in Paragraph 5, is that

15   something that you believe it's important

16   for a prior effect in taking into account

17   in assessing corporate veil or single

18   enterprise liability?

19                MR. LONGER:  Subject to my

20          objections, go ahead and answer.

21                THE WITNESS:  Compliance

22          with corporate formalities is

23          typically a factor that is

24          considered in these analyses.

Confidential - Subject to Further Confidentiality Review

Page 312

1  BY MR. FENTON:

2        Q.    So the court should

3  consider?

4        A.    Well, compliance for

5  corporate formalities should be

6  considered.  I'm not -- I'm not saying

7  about the weight that should be given to

8  this document.

9        Q.    I understand.  You also see

10  that the affiant is stating that "Since

11  November 2014, I" -- that is to say, Yu

12  Chen -- "have served on the board of

13  directors of Taishan Gypsum Company,

14  Limited"?

15        A.    I'm sorry.  Excuse me.

16  Where are you reading from?

17        Q.    Paragraph 7.

18            MR. LONGER:  I thought you

19        said 14.

20            THE WITNESS:  Yeah, I

21        thought you had said 14.

22  BY MR. FENTON:

23        Q.    Since November 2014.

24        A.    Got it.

Confidential - Subject to Further Confidentiality Review

Page 313

1              MR. LONGER:  Sorry.  Where

2        are you?  Paragraph 7?

3              MR. FENTON:  Yes.

4              MR. LONGER:  And what's your

5        question, now?

6    BY MR. FENTON:

7        Q.    My question is, do you see

8    that statement?

9        A.    I do.

10        Q.    And then the affiant goes on

11    to say, "In my capacity as a director on

12    Taishan's board of directors, I act in

13    the best interest of Taishan."  And then

14    Number 9, "BNBM PLC does not exercise

15    management or operational control over

16    Taishan."

17              Are those factors that are

18    appropriate for a prior effect to

19    consider in assessing alter ego and

20    single enterprise liability?

21              MR. LONGER:  Well, I'm going

22        to object to the characterization

23        of this gentleman's declarence

24        affidavit to be factors that

Confidential - Subject to Further Confidentiality Review

Page 314

```
 1          should be considered.
 2                  The witness can answer the
 3          question subject to that.
 4                  THE WITNESS:  Well, I mean,
 5          I have the same reaction, which is
 6          the fact that whether or not BNBM
 7          PLC exercises or does not exercise
 8          management, operation, or control,
 9          is a factor that I would think
10          would be relevant.
11                  But again, I'm not putting
12          any particular weight.  I'm not
13          commenting on what weight the
14          judge should give to this
15          affidavit.
16  BY MR. FENTON:
17          Q.    I understand that.
18                  You didn't weigh the
19  evidence that was in front of you as part
20  of your assignment, right?
21          A.    Well, it's not exactly what
22  I said.  I did not -- my assignment was
23  not to reach a legal conclusion about the
24  separate identity of these actors.
```

Page 315

1       Q.    I understand that.  But your
2  opinion that you rendered in this case
3  stated simply that you believe there is
4  evidence in the record to support a
5  finding of single business enterprise,
6  correct?
7       A.    There is evidence in the
8  record to support such a finding.
9       Q.    All right.  And you also
10  testified earlier today that there is
11  also evidence in the record to support
12  the opposite finding, correct?
13       A.    I don't recall specifically.
14       Q.    Well, is there evidence in
15  the record, and this is part of what's in
16  the record, to support a finding that
17  Taishan, BNBM, and CNBM are not a single
18  business enterprise?
19            MR. LONGER:  I'm going
20         object to the form of that
21         question and the foundation.
22            I do think that you're
23         asking him to go into matters that
24         are --

Confidential - Subject to Further Confidentiality Review

Page 316

```
 1                    MR. FENTON:  Fred, we

 2           discussed the speaking objections.

 3           Just object to the form.

 4   BY MR. FENTON:

 5           Q.    Professor, please answer my

 6   question.

 7                    MR. LONGER:  I think my

 8           objection is complete.

 9                    THE WITNESS:  I have no

10           comment on what weight the trier

11           of fact should give to this

12           affidavit.

13   BY MR. FENTON:

14           Q.    I'm not asking you to

15   comment on its weight, sir.  I'm simply

16   asking you whether these are factors that

17   it's appropriate for a court to consider

18   in making its determination.

19           A.    I think I already answered

20   that.

21                    MR. LONGER:  Excuse me.  I'm

22           going to object.  There's a

23           difference between factors and

24           presenting --
```

Confidential - Subject to Further Confidentiality Review

1          MR. FENTON:  Fred, I am not

2      here to argue with you.  If you

3      have an objection, state your

4      objection to the form and let the

5      witness answer the questions.

6          MR. LONGER:  That's fine.  I

7      object to the form of the

8      question.  You're asking --

9          MR. FENTON:  Fine.  You've

10     objected to the form of the

11     question.

12         MR. LONGER:  Your question

13     is misleading.

14         MR. FENTON:  If you think my

15     questions are misleading, take me

16     up in front of the bar

17     association.

18         Okay.  Could you read back

19     the question?

20         (Whereupon, the court

21     reporter read back the requested

22     portion of the record.)

23         THE WITNESS:  Well, could

24     you clarify what you mean by

Confidential - Subject to Further Confidentiality Review

Page 318

1          "these factors"?

2     BY MR. FENTON:

3          Q.    Yes.  I read you

4     Paragraphs 7, 8, and 9 where the witness

5     said that he -- I'm not sure whether it's

6     a he or she -- but where the witness said

7     that they served on the board of

8     directors of Taishan; in their capacity

9     as a director on Taishan's board of

10    directors, they act in the best interest

11    of Taishan; and that BNBM PLC does not

12    exercise management or operational

13    control over Taishan.

14              Okay.  Now, putting aside

15    what weight should be given to this

16    affiant's under-oath declaration, are

17    those things that a court ought to

18    consider in making a determination about

19    whether there is an alter ego or single

20    business enterprise liability?

21              MR. LONGER:  Object to the

22              form.  Foundation.  And

23              mischaracterizes the document and

24              his testimony.

Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Speaking in
 2        the abstract -- and I think I
 3        already said this.  Speaking in
 4        the abstract, an alter ego or a
 5        piercing analysis is a factually
 6        pregnant analysis.  Among the
 7        factors considered would be
 8        whether an entity exercises
 9        control over another entity and
10        whether corporate formalities are
11        followed.
12  BY MR. FENTON:
13        Q.    Okay.  So the answer to my
14  question is yes; is that right?
15              MR. LONGER:  Object to the
16        form.
17              THE WITNESS:  I don't think
18        that's what I said.
19  BY MR. FENTON:
20        Q.    Let's move on.
21              Paragraph 10.  The affiant
22  says, "With the exception of Tong Chun
23  Jia, who held an honorary title of the
24  deputy general manager at BNBM PLC from
```

Confidential - Subject to Further Confidentiality Review

Page 320

1   August 2005 to September 2012, Taishan

2   and BNBM PLC have never had overlapping

3   officers or employees.  Mr. Jia had no

4   actual duties or responsibilities at BNBM

5   PLC and performed no management functions

6   at BNBM PLC."

7            My first question is, do you

8   have any facts at your disposal, sir, to

9   dispute the accuracy of what is stated in

10  Paragraph 10?

11       A.    I have no -- I really have

12  no basis for responding.  This is what

13  someone is asserting in a declaration.  I

14  have -- I can't comment about it.

15       Q.    Yes, I know what it is.  I'm

16  asking if you have any facts at your

17  disposal to dispute what is being

18  asserted here.

19            MR. LONGER:  I believe it's

20       been asked and answered.

21            THE WITNESS:  I do not have

22       such facts at my disposal.

23  BY MR. FENTON:

24       Q.    And then my next question

Confidential - Subject to Further Confidentiality Review

Page 321

1    is, is that something that a trier of

2    fact is entitled to consider in

3    determining whether there is corporate

4    veil or single business enterprise

5    liability, i.e., that Taishan and BNBM

6    PLC, with the exception of Mr. Jia, never

7    had overlapping officers or employees?

8             MR. LONGER:  Objection to

9          the form and foundation.

10             THE WITNESS:  Again, in the

11          abstract, these are factors that a

12          finder of fact may consider in

13          rendering an opinion about

14          alter-ego status.

15   BY MR. FENTON:

16        Q.    All right.  And is your

17   answer the same with respect to

18   Paragraph 11, which says, "Since BNBM

19   PLC's acquisition of its interest in

20   Taishan, Taishan has complied with all

21   corporate legal requirements under

22   Chinese law, including shareholders

23   meetings, board meetings, and corporate

24   authorizations for major transactions."

Confidential - Subject to Further Confidentiality Review

Page 322

```
 1            A.    I'm sorry.  Your --
 2            Q.    I'm asking if your answer
 3     would be the same, i.e., that these are
 4     things that a court can consider in
 5     determining whether there's alter ego or
 6     single business enterprise liability.
 7                  MR. LONGER:  That
 8           incorporates my objections.
 9                  You can answer.
10                  MR. FENTON:  You can have a
11           standing objection to the whole
12           line, Fred.
13                  MR. LONGER:  Thank you.
14                  THE WITNESS:  Compliance
15           with legal requirements --
16           compliance with legal requirements
17           could be a factor that would be
18           considered by a court.
19     BY MR. FENTON:
20            Q.    All right.  And does the
21     same thing go for Paragraph 12, which
22     says, "BNBM PLC has never paid for
23     Taishan's expenses"?
24            A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

Page 323

1          Q.    And does the same thing go

2     for Paragraph 13 where it says, "BNBM PLC

3     has never paid Taishan's employees'

4     salaries nor paid for Taishan's losses"?

5          A.    Yes.

6          Q.    And does the same thing go

7     for Paragraph 14 where it says, "BNBM PLC

8     has never used the same office space,

9     secretarial staff, and office supplies as

10    Taishan"?

11         A.    Yes.

12         Q.    Okay.  Does the same thing

13    go for paragraph 15, which says, "Taishan

14    has never acted to fulfill BNBM PLC's

15    independent contractual obligations, and

16    BNBM PLC has never acted to fulfill

17    Taishan's independent contractual

18    obligations."

19              MR. LONGER:  I --

20              Mr. Steckler has to leave.  I'd

21              like to take a break when you get

22              this question done.

23              I'm not sure if your

24              question is just reading these

Page 324

1          things out and --

2               MR. FENTON:  Well, I'm

3          trying to go to --

4               MR. LONGER:  -- asking if

5          his answer is going to be the

6          same.

7               MR. FENTON:  I'm trying to

8          go through --

9     BY MR. FENTON:

10          Q.    First, let's get the answer

11     to the last question -- okay? -- which

12     was Paragraph 15, is your response the

13     same?  That is to say, that is something

14     that a court can consider in making a

15     determination of alter ego or single

16     business enterprise liability?

17               MR. LONGER:  I'm going to

18          object to the form.  Same

19          objections.

20               Go ahead and answer.

21               THE WITNESS:  Yes.

22               MR. FENTON:  All right.

23          Now, I plan to go through the rest

24          of the paragraphs, but do you need

Confidential - Subject to Further Confidentiality Review

1           to take a break right now?

2                   MR. STECKLER:  Yeah, I

3           just -- I'm leaving, and I want to

4           just chat with Fred before I head

5           out --

6                   MR. FENTON:  Fair enough.

7           We'll take a break now and --

8                   THE VIDEOGRAPHER:  The time

9           is 3:57 p.m.  We are going off the

10          record.

11                  (Short break.)

12                  THE VIDEOGRAPHER:  The time

13          is 4:04 p.m.  We are back on the

14          record.

15      BY MR. FENTON:

16          Q.    All right.  Professor, we

17      are back on the record, continuing

18      with -- with Exhibit 15.  I'm going to

19      try to speed things up --

20          A.    Okay.

21          Q.    -- so I'm just going to read

22      the remaining paragraphs here and then --

23      and then ask you my question.

24                  Starting with Paragraph 16,

Confidential - Subject to Further Confidentiality Review

Page 326

1    Yu Chen states, "BNBM PLC and Taishan

2    maintain separate production facilities.

3              "17, BNBM PLC and Taishan

4    have manufactured products under their

5    respective own brands.

6              "18, Taishan has never been

7    authorized to act as an agent of BNBM PLC

8    in entering into contracts or binding

9    BNBM PLC.

10              "19, BNBM PLC has never been

11    authorized to act as an agent of Taishan

12    in entering into contracts or binding

13    Taishan.

14              "20, BNBM PLC and Taishan

15    have their own procurement teams, sign

16    procurement contracts separately, and

17    carry out procurement contract" --

18    "procurement activities independently.

19              "21, BNBM PLC and Taishan

20    each have their own sales and marketing

21    forces.  There is no overlap of BNBM

22    PLC's and Taishan's sales and marketing

23    forces.

24              "22, no person at BNBM PLC

Confidential - Subject to Further Confidentiality Review

Page 327

1    controls the finances of Taishan.

2    Taishan is financially independent and is

3    responsible for its own debt and loss.

4                    "23, BNBM PLC and Taishan

5    have their own separate management.

6                    "24, BNBM PLC did not create

7    or incorporate Taishan, but rather

8    acquired an ownership interest in Taishan

9    through BNBM PLC's subscription of the

10   new shares issued by Taishan in 2005.

11                   And, "25, BNBM PLC and

12   Taishan manage and use their own assets

13   separately."

14                   My first question with

15   respect to the paragraphs that I just

16   read, Professor Milhaupt, is, do you have

17   any facts at your disposal to dispute

18   anything that is stated in those

19   Paragraphs 16 through 25?

20        A.    Again, I have no basis for

21   commenting on -- on these, on -- on the

22   veracity of these statements.

23        Q.    Okay.  So as you sit here

24   now, you have no facts at your disposal

Confidential - Subject to Further Confidentiality Review

 1   with which to dispute these statements?

 2                   MR. LONGER:  Objection to

 3           the form and foundation, and it

 4           mischaracterizes his testimony.

 5   BY MR. FENTON:

 6           Q.    Is that correct?

 7           A.    I have -- I have no basis

 8   for evaluating the -- the veracity of

 9   these statements.

10           Q.    All right.  So you have

11   nothing with which to dispute them,

12   correct?

13                   MR. LONGER:  Same objection.

14                   THE WITNESS:  Correct.

15   BY MR. FENTON:

16           Q.    And are the facts set forth

17   in Paragraphs 16 through 25, again

18   putting aside whatever weight may -- one

19   may assign to them, facts that a court

20   would be entitled to consider in making a

21   determination as to whether or not there

22   is alter ego or single enterprise

23   liability?

24                   MR. LONGER:  Objection.

Confidential - Subject to Further Confidentiality Review

Page 329

1          Incomplete hypothetical.

2          Foundation.

3               THE WITNESS:  Again, without

4          making any comment on the veracity

5          of these statements in the

6          abstract, the factors listed are

7          things that a court may take into

8          account in -- in performing its

9          analysis.

10   BY MR. FENTON:

11        Q.    Okay.  Let me hand you,

12   Professor Milhaupt, Exhibit 16, which is

13   the declaration of Yanjun Yang, which was

14   filed in this case on October 23, 2015.

15               (Document marked for

16          identification as Exhibit

17          Milhaupt-16.)

18   BY MR. FENTON:

19        Q.    Take a few minutes to

20   familiarize yourself with the documents.

21               But my first question will

22   be:  Did you look at this document in

23   connection with your work in this matter?

24        A.    I did.

Confidential - Subject to Further Confidentiality Review

Page 330

1        Q.    Okay.  And you see that

2   Yanjun Yang, in Paragraph 2, indicates

3   that he or she, as the case may be, is

4   the deputy general manager and chief

5   financial officer of BNBM PLC?

6        A.    Yes, I see that.

7        Q.    And has held the positions

8   at BNBM PLC since September 2005?

9        A.    Yes.

10        Q.    Okay.  Starting at

11   Paragraph 5, the declaration reads -- I'm

12   going to quote, "5, BNBM PLC is

13   independently incorporated and has its

14   own articles of association and an

15   independent board of directors and board

16   of supervisors.

17              "6, I hold no position with

18   Beijing New Building Material Group

19   Company Limited, BNBM Group.

20              "7, Since April 2006, I have

21   served on the board of directors of

22   Taishan Gypsum Company Limited, Taishan.

23              "8, BNBM acquired 42 percent

24   equity interest in Taishan in 2005

Confidential - Subject to Further Confidentiality Review

Page 331

```
 1    through subscription of the new shares

 2    issued by Taishan.  BNBM PLC indirectly

 3    acquired an additional 23 percent equity

 4    interest in Taishan in 2006 by purchasing

 5    100 percent equity interest of Taishan

 6    Donglian Investment and Trading Company

 7    Limited, one of Taishan's shareholders.

 8              "Currently BNBM PLC directly

 9    and indirectly owns 65 percent equity

10    interest aggregately in Taishan."

11              Let me stop there and ask

12    you, Professor, with respect to the

13    paragraphs I've just read, 5 through 8,

14    do you have any facts at your disposal

15    with which to dispute the statements made

16    therein?

17         A.    I do not.

18         Q.    And with respect to

19    Paragraphs 5 through 8, are the facts set

20    forth therein the kinds of things that a

21    court can consider in making a

22    determination as to whether there is

23    alter ego or single business enterprise

24    liability?
```

Confidential - Subject to Further Confidentiality Review

Page 332

```
 1          A.    Again, subject to
 2    qualification -- and I'm not commenting
 3    on the veracity of these assertions -- in
 4    general, in the abstract, these are
 5    things that a court may consider.
 6          Q.    Picking up with Paragraph 9.
 7    "Since BNBM PLC's acquisition of its
 8    interest in Taishan, Taishan has been
 9    adequately capitalized and has had
10    sufficient funding for its operations.
11              "10, BNBM PLC has never
12    financed Taishan's operations by
13    providing non-repayable funds.
14              "11, BNBM PLC has never had
15    a joint bank account with Taishan.
16              "12, Since I held my current
17    positions, BNBM PLC and Taishan have
18    never had common accounting books.
19              "13, BNBM PLC has never made
20    undocumented transfers of funds to
21    Taishan, and Taishan has never made
22    undocumented transfers of funds to BNBM
23    PLC.
24              "14, Since I held my current
```

Confidential - Subject to Further Confidentiality Review

Page 333

```
 1   positions, BNBM PLC has never had the
 2   authority to withdraw money from
 3   Taishan's bank accounts and has never
 4   done so.
 5              "15, since I held my current
 6   positions, Taishan has never had the
 7   authority to withdraw money from BNBM
 8   PLC's bank accounts and has never done
 9   so."
10              And my question, sir, with
11   respect to Paragraphs 9 through 15,
12   first, is, do you have any facts at your
13   disposal to dispute anything stated in
14   what I just read?
15         A.   Again, I really have no
16   basis for answering, particularly with
17   respect to undocumented transfers.
18              I would have absolutely no
19   way of commenting on that.
20         Q.   So you have no facts at your
21   disposal with which to dispute these
22   statements, correct?
23         A.   Correct.
24         Q.   Okay.  And are these facts
```

Confidential - Subject to Further Confidentiality Review

Page 334

1    set forth in Paragraphs 9 through 15 that

2    I just read factors that a court is

3    entitled to consider in making a

4    determination of alter ego or corporate

5    veil analysis?

6           A.    Again, same response.

7    Without commenting on the veracity of

8    these statements, these are factors that

9    a court may consider.

10          Q.    All right.  And then I'm

11   going to read the final three paragraphs.

12               "16, except as required

13   under Chinese laws, regulations, and

14   relevant accounting principles, BNBM PLC

15   and Taishan prepare their financial

16   statements independently and file their

17   tax returns separately.

18               "17, BNBM PLC's and

19   Taishan's financial statements are

20   separately audited by a third-party

21   accounting firm, which is independent

22   from BNBM PLC and Taishan.

23               "18, BNBM PLC has never paid

24   any debt for Taishan."

Confidential - Subject to Further Confidentiality Review

Page 335

1                    And again, with respect to

2    Paragraphs 16 through 18, do you have any

3    facts at your disposal with which to

4    dispute the statements made therein?

5         A.    No basis for -- for really

6    knowing, so I have no -- I have no facts

7    to dispute this.

8         Q.    Okay.  And with respect to

9    the facts stated in Paragraphs 16 through

10   18, are those facts that a court is

11   entitled to consider in making a

12   determination regarding alter ego or

13   single business enterprise liability?

14        A.    Again, without commenting on

15   the veracity of the statements, these are

16   factors that a court may consider.

17        Q.    Let me show you what has

18   been marked as Milhaupt 17, Professor.

19   Beijing New Building Materials Public

20   Limited Company, through the testimony of

21   Yu Chen, and the date was July 8, 2015.

22             (Document marked for

23             identification as Exhibit

24             Milhaupt-17.)

Confidential - Subject to Further Confidentiality Review

Page 336

1   BY MR. FENTON:

2          Q.    Let me hand that to you.

3                 And again, you can flip

4   through it.  My first question is going

5   to be, was this among the materials that

6   you reviewed?  But my specific questions

7   are really going to start on Page 599.

8                 And again, these are

9   excerpts.  This is not the entire

10  transcript.

11                MR. LONGER:  As I understand

12          it, this was Exhibit 2 to your

13          motion to dismiss.  Is that why it

14          has that legend?

15                MR. FENTON:  I believe -- I

16          know it was an exhibit, Fred.  If

17          it was Exhibit 2, I don't know.

18                MR. PFAEHLER:  I believe it

19          was Exhibit 2.

20                MR. LONGER:  All right.

21          That's why it's redacted and

22          excerpted the way it is?

23                MR. PFAEHLER:  I wouldn't

24          say redacted, but certainly

Confidential - Subject to Further Confidentiality Review

 1          excerpted.

 2                  MR. LONGER:  What I saw is

 3          redacted.

 4                  MR. PFAEHLER:  Pages are

 5          selected.

 6                  Oh, yeah, this is -- fair

 7          enough.  Because it was filed

 8          under seal, I suppose.

 9                  MR. LONGER:  All right.

10          Well, you've handed him something

11          that's been redacted.

12                  MR. FENTON:  I have

13          absolutely no intention of asking

14          him about the redacted portion

15          which appears on Page 283.  My

16          questions are going to have to do

17          with Page 599.  And if you want to

18          pull out the full transcript,

19          Fred, and introduce it, be my

20          guest.

21                  MR. LONGER:  I'll wait and

22          see what your question is.

23      BY MR. FENTON:

24          Q.   Is this among the materials

Confidential - Subject to Further Confidentiality Review

Page 338

```
 1   that you reviewed?
 2           A.     I reviewed a full --
 3           Q.     You reviewed a full
 4   transcript?
 5           A.     The full transcript, yes.
 6           Q.     Okay.  And is this -- the
 7   testimony of Yu Chen for BNBM PLC, is
 8   that something that you considered to be
 9   important in your analysis?
10           A.     Well, it's something --
11                  (Brief interruption.)
12                  MR. LONGER:  I'm sorry.  I
13           lost track.
14                  MR. FENTON:  Let me ask it
15           again.
16   BY MR. FENTON:
17           Q.     Was the testimony of Yu Chen
18   for BNBM PLC something that you
19   considered to be important in your
20   analysis?
21                  MR. LONGER:  Objection to
22           the form.
23                  THE WITNESS:  It's something
24           that I reviewed in connection with
```

Confidential - Subject to Further Confidentiality Review

Page 339

 1          the preparation of my declaration.

 2   BY MR. FENTON:

 3          Q.    Okay.  And did you consider

 4   it to be important?

 5               MR. LONGER:  Objection to

 6          the form.

 7               THE WITNESS:  I did not see

 8          it to be central to the assignment

 9          that I was given.

10   BY MR. FENTON:

11          Q.    Did you see any testimony --

12   strike that.

13               Directing your attention

14   to -- directing your attention to

15   Page 599, picking up at Line 21.

16               The testimony -- it's only

17   going for a couple pages, so I'm going to

18   read it into the record -- is as

19   follows -- and I believe this is the

20   examination by Mr. Barr.

21               MR. LONGER:  What line?

22               MR. FENTON:  Picking up on

23          21, on 599.

24   BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

Page 340

1          Q.    "Question:  Did Mr. Jia have

2     any duties or responsibilities at BNBM

3     PLC during that period of time" --

4     referring to the previous question,

5     August 2005 to September 2012.

6                 "Answer:  No.

7                 "Question:  Did he perform

8     any management functions at BNBM PLC

9     during that period?

10                "Answer:  No.

11                "Question:  Has BNBM PLC

12    ever paid for any of Taishan's expenses?

13                "Answer:  No.

14                "Question:  Has BNBM PLC

15    ever paid Taishan's employees' salary or

16    for Taishan's losses?

17                "Answer:  No.

18                "Question:  Does BNBM PLC

19    use the same office spaces, secretarial

20    staff, and office supplies as Taishan

21    does?

22                "Answer:  No.

23                "Question:  Do BNBM PLC and

24    Taishan maintain separate production

Confidential - Subject to Further Confidentiality Review

Page 341

1    facilities?

2              "Answer:  They are

3    independent from each other.

4              "Question:  During the

5    period of time that you've been general

6    manager at BNBM PLC, to your knowledge,

7    has Taishan ever been authorized to act

8    as an agent of BNBM PLC in entering any

9    contracts that bind PLC?"

10             There is an objection from

11   Mr. Levin.

12             "Answer:  No.

13             "Question:  Has BNBM PLC

14   ever been authorized to act as an agent

15   of Taishan in entering into contracts

16   that would bind Taishan?"

17             There's some colloquy:

18             "Answer:  No.

19             "Question:  Do BNBM PLC and

20   Taishan each have their own procurement

21   team?

22             "Answer:  Yes.

23             "Question:  Do they each

24   sign procurement contracts separately?

Confidential - Subject to Further Confidentiality Review

Page 342

1           "Answer:  Yes."

2           My first question,

3    Professor, is:

4           Do you have any facts at

5    your disposal with -- with which to

6    dispute any of the testimony that I have

7    just read to you?

8        A.   Again, I have no basis

9    for -- for commenting on the accuracy of

10   these statements.

11       Q.   So you have no evidence at

12   your disposal with -- with which to

13   dispute those statements; is that

14   correct?

15       A.   That's correct.

16       Q.   All right.  And the next

17   question, Professor, is:

18           Are the facts set forth in

19   the testimony of Yu Chen for BNBM PLC

20   facts that a Court can consider in making

21   a determination as to whether to impose

22   alter ego or single enterprise liability?

23       A.   Again, without making any

24   comment on the veracity of these

Confidential - Subject to Further Confidentiality Review

Page 343

1    statements, they are factors that a Court

2    may consider.

3         Q.    Okay.

4              (Document marked for

5              identification as Exhibit

6              Milhaupt-18.)

7    BY MR. FENTON:

8         Q.    All right.  Professor, I'm

9    going to hand you what's been marked as

10   Milhaupt-18.  This is a copy of the

11   global offering statement for CNBM

12   Company -- CNBM Company Ltd. issued by

13   Morgan Stanley and bears the date of

14   March 13, 2006.

15        A.    Thank you.

16        Q.    Okay.  Okay.  And that --

17   that consists of the -- that's basically

18   the text of the document.

19              MR. PFAEHLER:  Yeah, much of

20         the text of the document or at

21         least --

22              MR. FENTON:  It's the first

23         158 pages, so it's --

24              MR. LONGER:  It's not a

Confidential - Subject to Further Confidentiality Review

Page 344

1          complete document?

2                  MR. PFAEHLER:  We have a

3          complete document literally

4          sitting in my office.  At,

5          Professor Gordon's deposition,

6          Mr. Steckler marked just the first

7          100 pages or so, so --

8                  MR. LONGER:  All right.  I

9          understand what you're doing.

10                 MR. FENTON:  None of

11         which -- none of which is going to

12         be particularly pertinent, because

13         my questions are going to have to

14         do with Page 78.

15                 MR. PFAEHLER:  But I do have

16         a full copy if you'd like to see

17         it, Mr. Longer.

18                 MR. FENTON:  Or Professor --

19         Professor Milhaupt, as the case

20         may be.

21                 MR. PFAEHLER:  Exactly.

22                 MR. LONGER:  Has anything

23         been redacted from the -- the

24         pages that we have?

Confidential - Subject to Further Confidentiality Review

Page 345

1              MR. PFAEHLER:  I don't

2        believe so.

3              MR. FENTON:  Not that I'm

4        aware of.  I think this is a

5        public document.

6              MR. LONGER:  All right.

7        Well --

8              MR. FENTON:  I'm quite

9        certain it is a public document.

10       It is a global offering

11       memorandum.

12             MR. PFAEHLER:  I'll be upset

13       if anything is redacted.

14             MR. LONGER:  I'll be upset

15       too.  Be right beside you.  So...

16             MR. FENTON:  You guys get

17       upset very easily.

18             MR. LONGER:  So why don't

19       you have a look at it and --

20       and --

21             THE WITNESS:  Mm-hmm.

22             MR. LONGER:  -- you let us

23       know if you have any issues.

24             The -- your -- your question

Confidential - Subject to Further Confidentiality Review

Page 346

1          is about a particular page?

2                    MR. FENTON:   I'm going to

3          direct the witness's attention to

4          Page 78.

5                    MR. LONGER:   78.

6                    MR. FENTON:   Mm-hmm.   But I

7          have a few preliminary questions

8          when you get there.

9      BY MR. FENTON:

10          Q.    You just tell me when you're

11     ready.

12          A.    Right.   So you -- just to

13     confirm, it looks like the -- basically

14     what's been omitted here is the -- is the

15     financials, financial information.

16          Q.    I think that's correct.

17          A.    Okay.

18          Q.    All right.   And my first

19     question is, Professor, did you review

20     this document in connection with your

21     work?

22          A.    I did.

23          Q.    Okay.   And is this a

24     document that you considered to be

Confidential - Subject to Further Confidentiality Review

Page 347

1     important?

2                    MR. LONGER:   Objection to

3          form.

4                    THE WITNESS:   It certainly

5          formed the basis of my

6          understanding of the facts as to

7          the -- the defendants in this --

8          in this company -- sorry -- in

9          this litigation.

10    BY MR. FENTON:

11         Q.    All right.  And with respect

12    to the description of the companies that

13    appears at Page -- the industry overview

14    and -- and the description of the

15    companies appears at Page 78.

16                    Is there any discussion in

17    there about the role of the Communist

18    Party with respect to the affairs of CNBM

19    Company Ltd.?

20                    MR. LONGER:   Object, and the

21         document speaks for itself.

22                    THE WITNESS:   On Page 78, I

23         see no such reference.

24    BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

1          Q.    All right.  And -- and are

2    you aware of any such reference in the

3    document, based on your recollection of

4    having reviewed it in connection with

5    your work?

6          A.    I don't recall.  I mean, if

7    I could -- if I could add to that

8    statement, I would not expect to see a

9    discussion of -- of the party, because

10   the whole point of the global offering is

11   to raise capital from foreign investors.

12   And so I wouldn't expect to see -- I

13   would expect to see an emphasis on the

14   corporate -- recognizable, familiar

15   corporate forms.  I would not expect to

16   see a fulsome discussion of what I'm

17   calling the noncorporate aspect to

18   Chinese SOE groups.

19         Q.    Well, another purpose of the

20   document, though, is to provide full

21   disclosure to investors; isn't that

22   right?

23              MR. LONGER:  Objection to

24        the form.

Confidential - Subject to Further Confidentiality Review

Page 349

1              THE WITNESS:  Yes.  Subject

2         to the laws of the jurisdiction in

3         which the shares are floated.

4    BY MR. FENTON:

5         Q.    And -- and subject to the

6    rules of the Shenzhen Stock -- Stock

7    Exchange; isn't that right?

8         A.    Well, what this --

9              MR. LONGER:  Wait.

10        Objection to the form.  This is

11        CNBM Group.

12             MR. FENTON:  All right.  I

13        take -- I take that back.

14   BY MR. FENTON:

15        Q.    Hong Kong.

16        A.    This is Hong Kong.

17        Q.    Okay.  Are you familiar with

18   the rules of the Hong Kong Stock

19   Exchange?

20        A.    Generally.  I'm not an

21   expert.

22        Q.    All right.  And -- and do

23   the rules of the Hong Kong Stock Exchange

24   generally require listed companies to

Confidential - Subject to Further Confidentiality Review

1    provide adequate disclosures to

2    investors?

3            A.   I -- I am sure they do.  But

4    I have no basis to comment on what

5    materiality means for purposes of Hong

6    Kong disclosures.

7            Q.   Well, would you -- would --

8    would you assume that if the party had

9    the pervasive role in Chinese companies

10   that you have talked about here today,

11   that that is something that might be

12   material to investors?

13               MR. LONGER:  Objection to

14        form and foundation.

15               THE WITNESS:  I mean, I --

16        well, I think you are a asking me

17        for a legal conclusion.

18        Materiality is a term of art in

19        the securities laws, and I have no

20        basis for commenting on what the

21        Hong Kong Stock Exchange deems to

22        be material information.

23   BY MR. FENTON:

24        Q.   Well, let me put it a little

Confidential - Subject to Further Confidentiality Review

Page 351

```
 1   bit differently.
 2              If you were considering an
 3   investment in a Chinese company and you
 4   were looking at the disclosure documents
 5   that were put out in accordance with
 6   Exchange rules, would it be important for
 7   you as an investor -- I'm talking about
 8   you personally, Professor Milhaupt -- to
 9   know whether the Chinese Communist Party
10   has a pervasive role in the operations
11   and management of the company?
12              MR. LONGER:  I'm going to
13         object to the form of the
14         question.  It's irrelevant what
15         Mr. Milhaupt -- or Professor
16         Milhaupt thinks about it as from
17         an investment standpoint.
18              I also object to the
19         foundation of the question.  And
20         again, the document speaks for
21         itself.
22   BY MR. FENTON:
23         Q.    Answer my question.
24         A.    If you're asking me entirely
```

Confidential - Subject to Further Confidentiality Review

```
 1   my personal capacity, would I -- would I

 2   be interested in this information, the

 3   answer is yes.

 4          Q.    Okay.  So it would be

 5   material, at the very least, to you,

 6   right?

 7          A.    It would be material to me.

 8          Q.    Okay.  Do you think that the

 9   Morgan Stanley firm would mislead

10   investors about a company that it was

11   underwriting on the Hong Kong Stock

12   Exchange?

13              MR. LONGER:  I object to the

14          form of the question.  Object to

15          the foundation of the question.  I

16          think it lacks foundation.  I

17          think it is irrelevant, and --

18              MR. FENTON:  Come on, Fred.

19          You can come up with more than

20          that.

21              MR. LONGER:  I could keep

22          going, is right.  But I'll stop

23          with that and just say, "Carry

24          on."
```

Confidential - Subject to Further Confidentiality Review

Page 353

```
 1               MR. FENTON:  Thank you.
 2               MR. LONGER:  Godspeed.
 3   BY MR. FENTON:
 4         Q.    Can you -- can you answer my
 5   question, Professor?
 6         A.    Well, I -- you know, I have
 7   no idea what -- what Morgan Stanley's
 8   practices and procedures are in listing
 9   securities in the Hong Kong Stock
10   Exchange.  I don't know what materiality
11   means for purposes of the Hong Kong Stock
12   Exchange.  I am not accusing anyone of
13   misleading or trying to mislead anyone.
14               All I know is the
15   information isn't in this document.
16         Q.    Professor -- and I
17   appreciate the answer.  Professor
18   Milhaupt, okay, with all due respect,
19   sir --
20               MR. LONGER:  That means he
21        has no respect.
22   BY MR. FENTON:
23         Q.    -- you are a -- a professor
24   of corporate governance at one of the
```

Confidential - Subject to Further Confidentiality Review

Page 354

1    major law schools in the United States.

2    You have written extensively on the

3    subject of Chinese SOEs.  You have

4    rendered to the Court here an opinion

5    that talks about consideration of the

6    role of the Communist Party, and you

7    can't answer a question about whether

8    that's material?

9              MR. LONGER:  If you have a

10        relevant question, I'd like you to

11        ask it, but to --

12             MR. FENTON:  I'd like an

13        answer to what I just asked.

14             MR. LONGER:  Object to the

15        question.  It lacks -- I object to

16        the form, foundation.  It's

17        argumentive, and that's enough.

18   BY MR. FENTON:

19        Q.    Would you like the question

20   back?

21        A.    Well, I think I already

22   answered it.  You asked me personally

23   would I consider it to be material, and I

24   said yes.

Confidential - Subject to Further Confidentiality Review

Page 355

1          Q.    Okay.  But then I thought
2     you had said that you cannot comment on
3     materiality.
4                  MR. LONGER:  For the reasons
5            that he already testified to.
6            He -- he's not -- said he's not an
7            expert on the Hong Kong Stock
8            Exchange.
9     BY MR. FENTON:
10         Q.    All right.  We're getting --
11    we're getting off track here, and I
12    apologize, Professor.  It's getting late
13    in the day.  So why don't we move on.
14                  MR. LONGER:  Do you want to
15           take a break?
16                  MR. FENTON:  No.
17                  MR. LONGER:  Okay.
18    BY MR. FENTON:
19         Q.    Unless you do, Professor.
20         A.    No.  I'm fine.  Thank you.
21         Q.    Okay.  In any event, let me
22    direct your attention to Page 78 of the
23    document.
24                  And I -- I can read it.  But

Confidential - Subject to Further Confidentiality Review

Page 356

1    let me give you the gist and just see if

2    you agree with my characterization.

3              It appears that what they're

4    basically saying there is that there's

5    two categories of gypsum producers, the

6    first consisting of BNBM, which is a

7    higher product line with superior

8    physical characteristics, higher

9    durability and better dimensional

10   consistency and stability?

11             And that BNBM has a market

12   share of about 36 percent in that market.

13             And then it talks about in

14   the next paragraph a second category of

15   producers that have low capital

16   investment and low production costs.

17             And they satisfy the needs

18   of mid-tier customers with competitive

19   pricing.  And that Taishan has about a --

20   58.4 percent of that market share.

21             Do you see that?

22        A.   Yes.

23        Q.   Okay.  And that formed part

24   of your understanding of the difference

Confidential - Subject to Further Confidentiality Review

Page 357

1    in the product lines and the

2    differentiation in customer base between

3    BNBM and Taishan; is that correct?

4           A.    That's correct.

5                 (Document marked for

6                 identification as Exhibit

7                 Milhaupt-19.)

8    BY MR. FENTON:

9           Q.    Professor Milhaupt, I'm

10   going to hand you what's been marked as

11   Milhaupt-19.  This is the declaration of

12   Jianglin Cao, which was filed in this

13   action on June 22nd, 2015.  Take a look

14   at that.  And my first question is going

15   to be whether that's a document that you

16   reviewed in connection with your work.

17          A.    Yes, it is.

18          Q.    Okay.  And did you consider

19   this document to be important?

20                MR. LONGER:  Objection to

21                the form.

22                THE WITNESS:  I certainly

23                reviewed it in connection with the

24                preparation of my declaration.

Confidential - Subject to Further Confidentiality Review

Page 358

1  BY MR. FENTON:

2       Q.    You understand that Mr. Cao

3  is a general manager of CNBM Group and

4  was since April of 2014 and was a

5  director of CNBM Group since October of

6  2005?

7       A.    I see that.

8       Q.    Okay.  And that he was also

9  the president and the executive director

10  of CNBM company since March 2005?

11      A.    Yes, I see that.

12      Q.    Okay.  Starting with

13  Paragraph 11 on Page 3, Mr. Cao --

14  Jianglin Cao states under oath, "11, CNBM

15  Group is a shareholder in several other

16  Chinese entities, including CNBM company,

17  approximately 12 percent; BNBM Group,

18  approximately 70 percent; CNBM Import and

19  Export, 100 percent; and China Building

20  Materials Academy, 100 percent, among

21  others, collectively the sharehold

22  entities.

23           "CNBM Group holds an

24  additional approximately 32 percent

Confidential - Subject to Further Confidentiality Review

Page 359

1    indirect interest in CNBM Co. through

2    BNBM Group, CNBM Import and Export, and

3    China Building Materials Academy, and an

4    additional approximately 30 percent

5    indirect interest in BNBM Group through

6    CNBM Import and Export."

7                    Do you see that?

8         A.    I do.

9         Q.    Okay.  And do you have any

10   basis on which to dispute the statement

11   made by Mr. Jianglin in Paragraph 11?

12                    MR. LONGER:  Object to the

13           form.

14                    THE WITNESS:  I have no

15           basis for verifying this

16           information.  But I have no

17           information to contradict it.

18   BY MR. FENTON:

19        Q.    Okay.  And Paragraph 12, the

20   affiant goes on to say, "Each sharehold

21   entity is adequately capitalized and had

22   sufficient funds for its operations.  To

23   my knowledge, CNBM Group has never had a

24   joint bank account with any sharehold

Confidential - Subject to Further Confidentiality Review

Page 360

1    entity or had the ability to withdraw or

2    deposit funds in the account of a

3    sharehold entity without express

4    authorization of that entity.

5                "13, except as required

6    under Chinese laws, regulations, and

7    relevant accounting principles, CNBM

8    Group and the sharehold entities prepare

9    independent financial statements and file

10   their tax returns separately.

11               "Where required by law or

12   regulations, sharehold entity financial

13   statements are audited by an independent

14   third-party accounting firm.

15               "14, CNBM Group does not

16   directly manage or make ordinary business

17   decisions for any of the sharehold

18   entities.  Each sharehold entity is

19   independently incorporated and has its

20   own articles of association and, where

21   required by law or regulation, has a

22   separate board of directors, board of

23   supervisors and corporate officers that

24   manage the daily operations of the entity

Confidential - Subject to Further Confidentiality Review

Page 361

1    and make business decisions regarding

2    that entity."

3                    With respect to those

4    paragraphs that I just read, 12 through

5    14, Professor, do you have any facts at

6    your disposal to -- with which to dispute

7    any of the statements made therein?

8                    MR. LONGER:  I object to the

9            question and the form and

10           foundation.  And his testimony

11           today has covered quite a lot of

12           this.

13                   So go ahead.

14                   THE WITNESS:  I mean, again

15           with respect to what CNBM Group

16           does and the management and so on,

17           I mean, we have covered this.  So

18           I would say I do have -- to some

19           extent, I do have facts at my

20           disposal which challenges or

21           contradicts some of these -- some

22           of these statements.

23    BY MR. FENTON:

24           Q.    All right.  Which statements

Confidential - Subject to Further Confidentiality Review

Page 362

1    are you contradicting here?  Are you

2    contradicting that each sharehold entity

3    is adequately capitalized?

4           A.    No.  I'm looking in

5    particular at 14.

6           Q.    Okay.  Which statement

7    there?

8           A.    "CNBM Group does not

9    directly manage or make ordinary business

10   decisions for any of the sharehold

11   entities."

12              I mean, I think in the

13   context of the administrative articles

14   that we've -- that we've talked about and

15   the right of CNBM Group to appoint and

16   remove managers, I think there is some --

17   I think there is some tension between

18   what we've discussed and this statement.

19          Q.    All right.  So give me a

20   specific instance where CNBM Group

21   directly managed or made ordinary

22   business decisions for any of these

23   sharehold entities.

24          A.    I don't have one.

Confidential - Subject to Further Confidentiality Review

Page 363

1          Q.    Anything else that you'd

2    like to challenge?

3          A.    No.  Thank you.

4          Q.    Paragraph 16 states as

5    follows:  "I am presently aware that BNBM

6    PLC, Taishan Gypsum Company Limited, and

7    Tai'an Taishan Plasterboard Company, TTP,

8    engaged in transactions to sell drywall

9    to United States purchasers.  To my

10   knowledge, BNBM PLC, Taishan, and TTP did

11   not consult CNBM Group regarding their

12   decisions to market or sell drywall into

13   the United States."

14                With respect to Paragraph 16

15   that I have just read, Professor

16   Milhaupt, do you have any facts at your

17   disposal with which to dispute the

18   statements that were made?

19         A.    Again, I have no basis for

20   knowledge.  But I have no facts at my

21   disposal to dispute this.

22         Q.    All right.  And again, is

23   this something that a court would be

24   entitled to take into account in making a

Confidential - Subject to Further Confidentiality Review

Page 364

1    determination as to alter ego or single

2    enterprise liability?

3              MR. LONGER:  Object to the

4         form.

5              THE WITNESS:  Again, without

6         commenting on the veracity, this

7         is a factor that a court may take

8         into account.

9              MR. FENTON:  What I'd like

10        to do right now, Fred, is take

11        15 minutes.  I am, if not done,

12        very close.

13             I just want to go through my

14        notes, go through a few documents,

15        and we'll be out of here in fairly

16        short order.  Thank you.

17             THE VIDEOGRAPHER:  The time

18        is 4:41 p.m. on February 3, 2016.

19        And this completes DVD Number 3.

20             (Short break.)

21             THE VIDEOGRAPHER:  The time

22        is 5:03 p.m. on February 3, 2016.

23        This is DVD Number 4.

24             MR. FENTON:  Professor, I am

Confidential - Subject to Further Confidentiality Review

Page 365

```
 1          finished.  I think some of the
 2          other lawyers in the room may have
 3          some questions for you.  But I do
 4          want to thank you for your
 5          patience today.  The depositions
 6          are never a pleasant process.  I
 7          hope it wasn't too unpleasant for
 8          you.  I do appreciate your --
 9              THE WITNESS:  Thank you.
10              MR. FENTON:  -- testimony
11          today.  Thank you.
12              THE WITNESS:  Thank you.
13                  -  -  -
14              EXAMINATION
15                  -  -  -
16  BY MR. JOHNSON:
17          Q.   Hi, Professor Milhaupt.  My
18  name is Ian Johnson.  We met before.
19          A.   Yes.
20          Q.   I represent CNBM Company and
21  CNBM Group.
22          A.   Okay.
23          Q.   And I'll apologize in
24  advance if I'm not as organized as Rick
```

Confidential - Subject to Further Confidentiality Review

Page 366

1    was.  I'm trying to build on the

2    testimony of today.

3         A.    Okay.  I understand.

4         Q.    And I also apologize if I

5    cover ground that we've already covered.

6    I hope I do it in a way that's somewhat

7    different and helpful.

8              Earlier you talked about

9    some of the elements that might be

10   relevant to an alter-ego analysis.  You

11   talked about respectful corporate

12   formalities, intermingling or commingling

13   of operations and management.  Do you

14   recall that testimony?

15        A.    Yes.

16        Q.    Now, in your report, I'm

17   going to try to describe what I see as

18   its overall import, and tell me if I'm

19   right or wrong.

20             Your report -- your report

21   talks about sort of a dual system of

22   control in Chinese state-owned

23   enterprises, one system of corporate

24   control and another of noncorporate

Confidential - Subject to Further Confidentiality Review

Page 367

1   control; is that correct?

2                   MR. LONGER:  Object to the

3           form.

4                   THE WITNESS:  I mean, that's

5           a -- that's a very brief summary.

6           But those are -- you know, this

7           ideal of dual forms of control is

8           certainly one piece of the

9           analysis, yes.

10  BY MR. JOHNSON:

11          Q.    And you do refer to

12  noncorporate control, correct?

13          A.    Yes.

14          Q.    That's control by the

15  Chinese state or state organs; is that

16  right?

17          A.    It's -- well, it's control

18  outside of the ordinary mechanisms of

19  control that we are all familiar with.

20                  So anything outside of that

21  corporate -- the standard forms of

22  corporate control, I would consider to be

23  noncorporate forms of control.

24          Q.    Okay.  So some of that

Confidential - Subject to Further Confidentiality Review

Page 368

1    noncorporate control is exercised by the

2    Chinese state or state organs or the

3    Chinese Communist Party; is that right?

4           A.    Yes, they certainly have the

5    capacity to do so.

6           Q.    Okay.  And let's talk about

7    the sort of control those organs

8    exercise.

9                 If I understand your report

10   correctly and other things that you've

11   written, primarily it relates to

12   political or policy concerns; is that

13   correct?

14                MR. LONGER:  Object to the

15         form.

16                THE WITNESS:  Well, I would

17         say not exactly, in the sense that

18         SASAC's authority is sort of

19         extraordinary in the sense that it

20         has what I would say is

21         superpowers as a shareholder, by

22         which I mean shareholders don't

23         typically have the right to bypass

24         boards of directors through the

Confidential - Subject to Further Confidentiality Review

Page 369

```
 1          corporate hierarchy to be involved

 2          in or direct transfers of shares

 3          or assets.  SASAC does that.

 4                 Shareholders don't typically

 5          have the right to appoint, remove,

 6          and remunerate downstream senior

 7          executives.

 8                 So that's an -- that's an

 9          element of sort of super-corporate

10          control, if you will.  It's an

11          unusual form of control that

12          the -- that the state shareholder

13          exercises.

14                 In addition to that,

15          certainly there are these

16          political -- there's the political

17          dimensions in the capacity of

18          control and the fact that the

19          Communist Party is, in essence, a

20          giant -- or one function of it is

21          as a giant personnel committee to

22          monitor people's behavior and

23          compliance with the party policies

24          and so on.
```

Confidential - Subject to Further Confidentiality Review

```
 1                 So, yes, there is a

 2          political dimension.

 3                 There is also this -- what

 4          I'm calling kind of super --

 5          super-corporate dimension to the

 6          capacity to control as well.

 7   BY MR. JOHNSON:

 8          Q.    Okay.  So on the political

 9   front, you testified about what you view

10   as these extraordinary shareholder powers

11   of SASAC.  But putting that to one side

12   for just a moment, on the political side,

13   a political policy that the state might

14   embrace, for example, would be they don't

15   want to see corruption in state-owned

16   enterprise.

17                 Would that be a political

18   policy?

19                 MR. LONGER:  Objection.  I

20          don't know if that's a

21          hypothetical or not.  So I object

22          to the form and foundation.

23                 THE WITNESS:  Well, I mean

24          I'm not sure I would characterize
```

Confidential - Subject to Further Confidentiality Review

Page 371

1         that particular example as -- as

2         political.  It may have a

3         political dimension or it may not.

4         I mean, anticorruption could also

5         just be part of good -- good

6         governance.

7    BY MR. JOHNSON:

8         Q.    Okay.  What about full

9    employment?

10        A.    I would say -- I mean, I --

11   that's a -- I would say that's a social

12   objective.  So SOEs clearly can be tasked

13   with performing social objectives like --

14   like full employment.

15        Q.    Okay.  And environmental

16   concerns, those sorts of things, also

17   political policymaking?

18             MR. LONGER:  I don't even

19        know if that's a question.  So I

20        object to form.

21   BY MR. JOHNSON:

22        Q.    Would you include that

23   within a -- on the political side of

24   things?

Confidential - Subject to Further Confidentiality Review

1          A.     Not -- not necessarily, no.

2          Q.     It could be either; is that

3    right?

4          A.     It could also be a -- I

5    mean, it could simply be government

6    policy.  I mean, I -- I'm not -- I'm not

7    characterizing all government regulation

8    or government policy as -- as,

9    quote/unquote, political.

10         Q.     Okay.

11         A.     I just want to draw that

12   distinction.

13         Q.     Sure.  In Exhibit 6, we

14   looked at this earlier.  It's entitled

15   "Chinese Corporate Capitalism Comparative

16   Context."

17         A.     Yeah.

18         Q.     This was a working paper?

19         A.     Mm-hmm.

20         Q.     You wrote on Page 11 under

21   the heading --

22              MR. LONGER:  Can you give us

23         one second.

24              MR. JOHNSON:  Oh, sure.

Confidential - Subject to Further Confidentiality Review

Page 373

1                    MR. LONGER:  On what page?

2                    MR. FENTON:  Page 11.

3                    THE WITNESS:  Yes, I believe

4          so --

5     BY MR. JOHNSON:

6          Q.    So about halfway down, you

7     can refresh your recollection on this,

8     you wrote it.  But, you wrote, "Thus its

9     objectives are not limited to serving the

10    interests of its first-degree

11    stakeholders, but also encompass

12    political and policy agendas via external

13    dimensions."

14                   Do you see that sentence?

15         A.    Yes, I see that sentence.

16         Q.    So what are the political

17    and policy agendas?  Give me some

18    examples.

19         A.    A political objective or a

20    political agenda in operating and

21    supervising the SOEs is, I would say -- I

22    would say threefold.

23                   Ideology, so operating SOEs

24    fits with the idea of a socialist market

Confidential - Subject to Further Confidentiality Review

Page 374

 1   system in which assets are at least

 2   theoretically owned by the people, the

 3   whole people.

 4          Q.    Mm-hmm.

 5          A.    I think this is a -- I think

 6   there's a dimension of power,

 7   maintaining -- maintaining power.  I

 8   don't think it's really a controversial

 9   assertion to say that -- I don't think

10   it's a controversial assertion to say

11   that the party does not permit

12   alternative sources of power or

13   organization to form in society.

14               And I would say that the

15   third is a very practical reason, which

16   is, the party obtains many rents and

17   sources of patronage from operating

18   the -- the SOEs.

19               So, to me, none of that is

20   a -- that's -- that's political.

21          Q.    And we talked about policy

22   objectives, full employment, and those

23   sorts of things, correct?

24          A.    Yes.  Full employment would

Confidential - Subject to Further Confidentiality Review

Page 375

1    be a good example of a policy objective.

2         Q.    Okay.  So U.S. corporations,

3    U.S. business groups, as business groups

4    also adopt normative policy

5    considerations for the entire group;

6    isn't that correct?

7              MR. LONGER:  Object to the

8         form and foundation.

9              THE WITNESS:  Can you

10        clarify what you mean by -- I

11        think you said the term "normative

12        policy objectives"?

13   BY MR. JOHNSON:

14        Q.    If -- if -- if a -- if a

15   U.S. business group, by way of example,

16   took a policy line that they were going

17   to focus on environmentally sound and

18   environmentally sustainable business

19   models, would that be an example of a --

20   of a policy objective?

21        A.    Well, I mean, I think today

22   we would call that corporate social

23   responsibility.  You know, a firm that

24   wants to promote itself as being

Confidential - Subject to Further Confidentiality Review

Page 376

1    environmentally sound, I think we would

2    say that this is part of the corporate

3    social responsibility program.

4              I guess policy, to me,

5    implies some sort of governmental action.

6    I don't think of private actors as having

7    policy objectives.

8         Q.    Okay.  But putting aside the

9    word then, if you don't want to use

10   "policy," but that is a -- that is a

11   stance taken by the company, correct?

12        A.    Could be.

13        Q.    And it could take that as

14   a -- as a business group, correct?

15              MR. LONGER:  Object to the

16         form and foundation.

17              THE WITNESS:  You're -- are

18         you asking me whether a -- what

19         Professor Gordon has characterized

20         as a U.S. conglomerate could --

21         could have a corporate social

22         responsibility platform?

23   BY MR. JOHNSON:

24        Q.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 377

```
 1          A.    Yes.

 2          Q.    And would -- would adopting

 3   such a platform be in itself indicative

 4   of some -- would -- would -- would it in

 5   itself be some reason to pierce the veil

 6   or find alter ego?

 7               MR. LONGER:  It's an

 8          incomplete hypothetical.  I think

 9          I object to the form, foundation.

10          Incomplete hypothetical.

11               If you can answer the

12          question.

13               THE WITNESS:  It -- it is

14          hard to answer the question,

15          because, I mean, it's completely

16          divorced from the context in which

17          I'm talking -- you know, you

18          started by pointing me to this

19          passage which has to do with the

20          characteristics, at least as I see

21          them, of Chinese state capitalism.

22          I don't really see much of a

23          bridge to talking about, you know,

24          Disney's corporate social
```

Confidential - Subject to Further Confidentiality Review

Page 378

```
 1            responsibility program as -- as a
 2            factor for piercing the corporate
 3            veil.  I -- I don't see a link
 4            there.
 5                 The --
 6    BY MR. JOHNSON:
 7            Q.    Go ahead.
 8            A.    Well, I mean, this is taken
 9    in the context of discussion about the
10    role of SASAC, the role of the party,
11    parallel systems of supervision, control,
12    monitoring.
13                 So that's the context in
14    which I'm talking about political or
15    policy agenda.  So it's very hard for me
16    to now move and talk about a corporate
17    social responsibility program as being
18    relevant to a -- a piercing exercise.
19            Q.    Well, would it be relevant
20    to a piercing exercise?
21            A.    Well, let me put it this
22    way.  If we are talking about U.S.
23    corporate law --
24            Q.    Mm-hmm.
```

Confidential - Subject to Further Confidentiality Review

Page 379

1          A.    -- I have not seen a

2    corporate social responsibility program

3    viewed as a factor inclining toward

4    piercing.

5          Q.    Okay.  So the -- the fact

6    that a corporate group adopts some

7    normative policy platform, a social

8    responsibility platform, is not relevant

9    to an alter-ego analysis, correct?

10              MR. LONGER:  Object to form.

11         Mischaracterizes testimony.

12              THE WITNESS:  I am talking

13         about -- what I said was I've

14         never seen it under U.S. law.  I

15         did not say it -- it would never

16         be relevant.

17   BY MR. JOHNSON:

18         Q.    Well, under the prongs

19   you -- of the alter-ego tests as you

20   described them, which are with respect to

21   corporate formalities, commingling of

22   finance, and operations, et cetera, would

23   the fact that a U.S. corporation adopted

24   a social responsibility platform for its

Confidential - Subject to Further Confidentiality Review

Page 380

```
 1    entire business group be relevant to the

 2    alter-ego analysis?

 3              MR. LONGER:  Again, I object

 4         to the form.  I -- I think you are

 5         mischaracterizing his testimony.

 6         And I don't think that the list

 7         was, you know, exclusive.

 8              So if you can answer the

 9         question, go ahead.

10              THE WITNESS:  I'm -- I'm

11         sorry.  Can you -- can you repeat

12         what you're -- I'm losing you a

13         little bit on exactly what you're

14         asking me.

15              MR. JOHNSON:  Can I have it

16         read back.

17              (Whereupon, the court

18         reporter read back the requested

19         portion of the record.)

20              THE WITNESS:  Yeah.  I mean,

21         I think you are talking about a

22         corporate social responsibility

23         program.  I mean, divorced from

24         any other fact about what would go
```

Confidential - Subject to Further Confidentiality Review

Page 381

```
 1          into the piercing analysis with

 2          respect to a particular set of

 3          corporations, I -- I mean, it's

 4          very hard to answer that question.

 5               If you had -- if you had

 6          commingling and you had all these

 7          other factors, you know, a -- a

 8          judge can consider almost anything

 9          in an alter ego or a

10          piercing-the-corporate-veil

11          analysis.

12               And I -- you know, it's hard

13          to pick out one -- one thing and

14          say, yes, that would be relevant

15          or -- or, no, it would not be

16          relevant.

17     BY MR. JOHNSON:

18          Q.    Absent all those other

19     factors, absent the commingling of

20     finances and operations, is the fact that

21     a U.S. corporation adopts a normative

22     policy of social responsibility

23     irrelevant to an alter-ego analysis?

24               MR. LONGER:  Object to the
```

Confidential - Subject to Further Confidentiality Review

Page 382

```
 1            form.  I think -- and I think it's

 2            been asked and answered now twice.

 3                  THE WITNESS:  In and of

 4            itself, divorced from all other

 5            factors, the fact that a -- a

 6            company pursues a corporate social

 7            responsibility program, divorced

 8            from all other factors, that

 9            clearly is not a, per se, reason

10            to pierce the corporate veil.

11    BY MR. JOHNSON:

12            Q.    Okay.  And generally

13    speaking, then, if a parent corporation

14    with a business group adopts some

15    corporate culture and there's no evidence

16    of any commingling of assets, et cetera,

17    would it be appropriate to find -- to

18    pierce the veil or find alter ego?

19                  MR. LONGER:  Are we talking

20            about a United States corporation?

21            a Chinese corporation?  a Timbuktu

22            corporation?

23    BY MR. JOHNSON:

24            Q.    U.S. corporation.
```

Confidential - Subject to Further Confidentiality Review

Page 383

```
 1              MR. LONGER:  Object to the
 2         form.
 3              THE WITNESS:  I -- this is
 4         purely hypothetical.
 5              I mean, it -- it's difficult
 6         to answer.  I mean, it's -- it's
 7         completely hypothetical.  I have
 8         no -- there's no context in which
 9         to answer yes or no to that
10         question.
11              I -- what I can tell you is
12         that I am not aware of a case in
13         which a Court has said, "This
14         corporate group has adopted a
15         corporate social responsibility
16         program; therefore, I am piercing
17         the corporate veil."
18              I am not aware of any such
19         legal authority in the United
20         States.
21    BY MR. JOHNSON:
22         Q.    And U.S. corporations do
23    adopt cultural norms; isn't that correct?
24              MR. LONGER:  Object.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Overbroad.  Vague.
 2               THE WITNESS:  Yeah.  I mean,
 3          I -- I would have to ask for
 4          clarification.  What do you mean
 5          by adopting a cultural norm?  I
 6          mean, in some sense, that's an
 7          oxymoron.  You can't adopt a
 8          cultural norm.  A cultural norm
 9          emerges through human interaction.
10   BY MR. JOHNSON:
11          Q.   Or it can be imposed
12   top-down, correct?
13               MR. LONGER:  Objection.
14          Same objection.
15               THE WITNESS:  Frankly, I
16          don't know how to answer that.  I
17          don't -- I don't see how you can
18          impose a cultural norm from the
19          top down.  And I don't know what
20          context you are talking about.
21   BY MR. JOHNSON:
22          Q.   Do U.S. corporations -- do
23   the corporate cultures of U.S.
24   corporations vary from one to the other?
```

Confidential - Subject to Further Confidentiality Review

Page 385

```
 1              MR. LONGER:  If you can
 2         answer it.
 3              THE WITNESS:  I mean, I'm
 4         not really sure.  I mean, can you
 5         define corporate culture for me?
 6    BY MR. JOHNSON:
 7         Q.    Professor, I thought the
 8    term was sort of self-explanatory.
 9         A.    Actually, no.  In the
10    literature, it's -- there's a lot of
11    definitions about what it may mean,
12    whether it may or may not actually exist
13    as a thing.  So it's actually quite a
14    pregnant question.
15         Q.    Okay.  Who -- who owns CNBM
16    Group?
17         A.    100 percent of the shares of
18    CNBM, it is a wholly state-owned
19    limited -- sorry -- limited liability
20    company.  That is its structure under
21    the -- under the Chinese corporate law.
22    100 percent of its shares are held by
23    SASAC on behalf of -- at least ostensibly
24    on behalf of the Chinese people.
```

Confidential - Subject to Further Confidentiality Review

Page 386

1          Q.     And that ownership structure

2     was relative to your opinions here,

3     correct?

4          A.     Yes.

5          Q.     So it's significant to you

6     that SASAC held 100 percent of CNBM Group

7     shares in rendering your opinion?

8          A.     Well, it's significant to me

9     that CNBM Group -- and I'll now use the

10    defined term that I said, Business Group,

11    capital B, capital G -- it is certainly

12    significant to me that it is a group

13    under SASAC.  It is an SOE under SASAC

14    supervision.

15         Q.     You would agree that

16    state-owned enterprises vary

17    considerably, that they differ quite a

18    bit, one from the other; isn't that

19    right?

20              MR. LONGER:  Objection.

21         Overbroad.  Vague.

22              THE WITNESS:  They operate

23         in different industries.  And

24         that's one basis for

Confidential - Subject to Further Confidentiality Review

Page 387

 1            differentiating them.

 2    BY MR. JOHNSON:

 3            Q.    Have you ever cautioned

 4    readers in anything that you've written

 5    that, you know, one should try to avoid

 6    any generalizations about Chinese

 7    state-owned enterprises because they vary

 8    from one to the other?

 9            A.    I'm not sure I've said

10    precisely what you're saying.  But I

11    certainly have cautioned against viewing

12    all SOEs as a -- as a monolith.  Yes.

13            Q.    And so one would take -- one

14    would need to take care to look at the

15    specifics, the actual facts relating to

16    control, et cetera, when looking at any

17    particular Chinese SOE; is that correct?

18    In making an alter-ego analysis; is that

19    right?

20                    MR. LONGER:  Objection to

21            the form and foundation.

22                    THE WITNESS:  Well, clearly

23            an alter-ego analysis is

24            fact-specific, absolutely.

Confidential - Subject to Further Confidentiality Review

Page 388

1    BY MR. JOHNSON:

2         Q.    Okay.  So you need to look

3    at the actual, for example, involvement

4    of the state or SASAC in a particular

5    Chinese SOE in effecting that analysis;

6    is that correct?

7              MR. LONGER:  As opposed to

8         the capacity to control?

9              MR. JOHNSON:  That really is

10        a speaking objection.  That was a

11        fair question.

12             MR. LONGER:  I don't know

13        that it was.

14             MR. JOHNSON:  I said actual

15        control.

16             MR. LONGER:  All right.

17        Actual.  I object to the form of

18        the question.

19             THE WITNESS:  Well, I think

20        that you have to look at the -- I

21        mean, again, I really am going to

22        say what I said before, which is

23        context is crucial.  It is

24        relevant that these companies are

Confidential - Subject to Further Confidentiality Review

Page 389

 1          owned by SASAC.  It is relevant to

 2          the alter-ego question, in my

 3          opinion.

 4              The judge can decide whether

 5          he feels it's relevant or not.

 6          But, in my opinion, the fact that

 7          SASAC is involved, the fact that

 8          these are corporate groups under

 9          SASAC's supervision, the fact of

10          party involvement in these

11          enterprises is a factor that is

12          relevant to the issue of control.

13   BY MR. JOHNSON:

14          Q.   Are you suggesting the court

15   should take general context into

16   consideration in running the alter-ego

17   analysis or look at the specific facts

18   relevant to CNBM -- what has been

19   described as the CNBM business group?

20              MR. LONGER:  Object to the

21          form.

22              THE WITNESS:  Well, I mean,

23          I'm not sure you can separate the

24          two.  I mean, of course -- of

Confidential - Subject to Further Confidentiality Review

1              course the factfinder is focused

2              on CNBM business group, is not

3              focused on Chinese SOEs in the

4              abstract.

5                    So to that extent, of course

6              they're focused on the individual

7              characteristics of the enterprise.

8                    But those characteristics

9              include everything that we have

10             been talking about with respect to

11             SASAC's powers, the role of the

12             party, et cetera.

13    BY MR. JOHNSON:

14             Q.    But what you just said,

15    isn't that general?  That's not -- that

16    doesn't look specifically at what's going

17    on in CNBM business group, correct?

18                  MR. LONGER:  Objection to

19             the form.

20                  THE WITNESS:  Well, I've

21             pointed in my declaration to

22             evidence that I saw that was very

23             consistent with, from my academic

24             study, the way I see SOEs under

Confidential - Subject to Further Confidentiality Review

Page 391

```
 1          SASAC supervision being operated
 2          and the influence of SASAC and the
 3          party.
 4               So I'm having a hard time
 5          really disentangling what you're
 6          calling the specific from the --
 7          from the general.
 8    BY MR. JOHNSON:
 9          Q.   You gave in your report --
10    unless I misread it, you gave some
11    general context.  And then you gave some
12    three, I believe, examples; is that
13    correct?
14          A.   I'm not sure about the
15    example -- the number of examples.  We
16    talked about them extensively.
17               I certainly attempted to set
18    up in a general way the characteristics
19    of SOE business groups, hopefully for the
20    benefit of the judge so that he could
21    understand, you know, some context for
22    the specific defendants at issue here.
23    And I tried to find, by way of
24    illustration and emphasis, some examples,
```

Confidential - Subject to Further Confidentiality Review

1    concrete examples from the record that

2    indicated that the general -- that CNBM

3    partook of these general characteristics.

4              So I refer to it as a

5    typical SOE under SASAC supervision.

6              The expert, Donald Clark,

7    referred to them in precisely the same

8    way.  He uses almost identical language

9    to that.  He says these are typical

10   characteristics of an SOE in the Chinese

11   SOE system.

12       Q.    Okay.  But as Mr. Fenton

13   established, those -- the examples that

14   you put in your report are the examples

15   that you have; is that correct, sir?

16       A.    Yes.  And as I said earlier,

17   that my task was not to find every

18   example that I possibly could.  My task

19   was to provide helpful context hopefully

20   for the judge in rendering his decision,

21   reaching his legal conclusion.

22              MR. JOHNSON:  Bear with me

23        one moment.  I think that's it.

24        Thanks.

Confidential - Subject to Further Confidentiality Review

Page 393

1                    THE WITNESS:  Thank you.

2                    MR. VENDERBUSH:  I have no

3          questions.

4                    MR. LONGER:  I just have a

5          few questions.

6                    Actually, let's go off the

7          record just for one second.

8                    THE VIDEOGRAPHER:  The time

9          is 5:28 p.m.  We are going off the

10         record.

11                   (Brief pause.)

12                   THE VIDEOGRAPHER:  The time

13         is 5:29 p.m.  We are back on the

14         record.

15                   (Document marked for

16         identification as Exhibit

17         Milhaupt-20.)

18                        -  -  -

19                   CROSS EXAMINATION

20                        -  -  -

21    BY MR. LONGER:

22         Q.   Professor Milhaupt, good

23    afternoon.  Close to evening, but still

24    afternoon.

Confidential - Subject to Further Confidentiality Review

Page 394

1               I'm Fred Longer.  I have a

2    few questions for you.  And I wanted to

3    start -- I had marked over the break what

4    defense counsel gave to us as the full

5    copy of the 2007 annual report of BNBM

6    PLC.

7               And if I didn't say it

8    already, I marked it as Exhibit 20.  I

9    want to show it to you.

10              You were asked questions in

11   connection with the section which had the

12   heading, as I understood it to say,

13   "Separation of the Company and the

14   Controlling Shareholder and Operations

15   Personnel, Assets, Organization, and

16   Finance."

17              Do you recall those

18   questions?

19         A.    Yes, I do.

20         Q.    And this document talks in

21   terms -- or that heading talks in terms

22   of controlling shareholder.  And the

23   version --

24              MR. FENTON:  Can you -- can

Confidential - Subject to Further Confidentiality Review

```
 1          you just --
 2                  MR. LONGER:  I'm on Page --
 3                  MR. FENTON:  -- point me to
 4          the page.
 5                  MR. LONGER:  It's Bates
 6          Number 740.  Number 19 of 120.
 7                  MR. FENTON:  Got it.
 8                  MR. LONGER:  Are you with
 9          me?
10                  MR. PFAEHLER:  We're with
11          you now.
12   BY MR. LONGER:
13          Q.   Okay.  So it talks -- that
14   section dealt with the separation of the
15   company and the controlling shareholder
16   and operations.
17                  And the document, which this
18   was Exhibit Number 11, I believe, did not
19   talk in terms of the definitions of
20   controlling shareholder.  And this
21   document, which is the complete document,
22   as I understand it, does.
23                  Is that your understanding
24   from looking at the document?
```

Confidential - Subject to Further Confidentiality Review

Page 396

```
 1                    MR. FENTON:  Object to the

 2          form of the question.  I have no

 3          idea what you're asking.

 4                    MR. LONGER:  I can reframe

 5          the question.

 6    BY MR. LONGER:

 7          Q.    Does the definition

 8    "controlling shareholder" appear in this

 9    document, Exhibit Number 20, on Page 10

10    of the document?

11          A.    Yes, it does.

12          Q.    All right.  And who is the

13    controlling shareholder of the company,

14    as you see the definition?

15          A.    The controlling shareholder

16    is defined as China National Building

17    Material Company Limited.

18          Q.    Okay.  And who is the actual

19    controller of the company?

20          A.    That's listed as China

21    National Building Materials Group

22    Corporation.

23          Q.    All right.  And in the next

24    page, there is a graphic, is there not?
```

Confidential - Subject to Further Confidentiality Review

Page 397

1          A.     There is.

2          Q.     And what does this graphic

3     say about the actual controller and the

4     actual controller's owner, as you see it?

5          A.     This graphic shows that the

6     actual controller -- that is, Group

7     Corporation -- is -- 100 percent of its

8     shares are held by SASAC.

9          Q.     All right.  And does SASAC

10    have within it a Communist Party

11    component?

12               MR. FENTON:  Object to the

13               lack of foundation.

14    BY MR. LONGER:

15          Q.     To your knowledge, does

16    SASAC have a Communist Party component?

17          A.     Yes.  SASAC has within it

18    a -- a Communist Party committee.

19          Q.     All right.  And does -- does

20    the presence of SASAC in BNBM's annual

21    report suggest that the Communist Party

22    committee has some influence on BNBM?

23               MR. FENTON:  Object to the

24               form.  Leading your own witness.

Confidential - Subject to Further Confidentiality Review

Page 398

```
 1              THE WITNESS:  The fact that
 2         SASAC is listed as the ultimate
 3         controller of this group is, to my
 4         mind, highly relevant to questions
 5         of group status.
 6              And it also indicates that
 7         there is a -- although it's not
 8         graphically illustrated here, it
 9         indicates that there is a
10         Communist Party involvement or
11         parallel structure set apart
12         from -- both embedded within SASAC
13         but also apart from SASAC.
14 BY MR. LONGER:
15      Q.    All right.  And is that a
16 consideration, the presence of the
17 Communist Party being embedded all the
18 way as you describe, a characteristic
19 that is of concern to you when evaluating
20 the alter-ego issues that are in this
21 litigation?
22      A.    Yes.  As my declaration
23 states, I believe, given -- based on my
24 study of Chinese SOEs under SASAC
```

Confidential - Subject to Further Confidentiality Review

1    supervision, that it is a relevant -- it

2    is a distinctive and relevant

3    consideration for a court in considering

4    single entity or alter-ego status of

5    the -- of the defendants.

6            Q.    Thank you.

7                  You were also provided, as

8    Exhibit Number 1, your declaration?

9            A.    Yes.

10           Q.    And I just want to ask you a

11   few questions about this.

12                 So did you, in the course of

13   preparing this declaration, apply the

14   same sort of rigor, if you will,

15   intellectual rigor, to preparing this

16   declaration as you would to any of the

17   many studies that you have seen and been

18   provided that you have previously

19   authored?

20           A.    Yes.  The -- the foundation

21   for the declaration is based heavily on a

22   significant amount of scholarly research

23   and publications that I've done into

24   Chinese SOEs under SASAC supervision.

Confidential - Subject to Further Confidentiality Review

1          Q.     And those prior studies and

2     the prior research that you've done,

3     has -- it's been published, correct?

4          A.     Correct.

5          Q.     And -- and in the course of

6     publication, has any of your work been

7     peer-reviewed?

8          A.     Yes.  The -- the book, the

9     Oxford book that just came out, was

10    extensively subjected to -- subjected to

11    quite an extensive peer-review process,

12    both with respect to the concept of the

13    book -- that is a description or summary

14    of the book -- plus the synopsis of every

15    chapter.  That is read by several outside

16    reviewers on a blind basis.  And the

17    contract is obtained on the basis of

18    those reviews.  And then the actual

19    chapters were subjected to intensive

20    discussion at a workshop at Columbia Law

21    School in June of 2014 in which every

22    author's paper was subjected to

23    discussion by every other author.

24               And then, finally, Professor

Page 401

1    Liebman and myself reviewed and edited

2    extensively every chapter before it was

3    finally published.

4         Q.    And the title of that book

5    is "Regulating the Visible Hand?"

6         A.    Yes.

7         Q.    And --

8               MR. FENTON:  May I see the

9         book, please, Fred.

10              MR. LONGER:  It's my copy.

11        You are certainly welcome to it.

12              MR. FENTON:  You can

13        autograph it.

14              MR. LONGER:  It's already

15        been autographed.

16              MR. FENTON:  It certainly

17        has.

18              Can I get one, Professor?

19              THE WITNESS:  Certainly.

20              MR. FENTON:  I'd appreciate

21        it.

22              Go ahead with your

23        examination.

24              MR. LONGER:  I'll take it

Confidential - Subject to Further Confidentiality Review

Page 402

1          back too.  Thank you.

2     BY MR. LONGER:

3          Q.    So -- and the other

4     articles, some that you've co-authored,

5     your co-authors have published

6     extensively in their discipline; is that

7     correct?

8          A.    Yes.

9          Q.    And did they -- they agreed,

10    I take it, because it was a co-authored

11    article, some of them, with your

12    opinions?

13         A.    Well, the work that -- that

14    went into, for example, the Stanford Law

15    Review article, which -- which I will

16    just say, as an aside, was informally

17    peer-reviewed, but the work that went

18    into the Stanford Law Review article and

19    the Georgetown Law Review article were

20    completely collaborative.  So it's -- I

21    mean, I wouldn't even characterize it as

22    us agreeing.  I mean, we -- we came -- we

23    developed those projects and we came to

24    those conclusions together as part of a

Confidential - Subject to Further Confidentiality Review

Page 403

1  team -- team production effort.

2      Q.   All right.  And in -- in the

3  general scope of your field, dealing with

4  state capitalism and the interplay of

5  state-owned enterprises in China, are

6  you -- do you consider yourself to be an

7  expert in that field?

8      A.   I mean, I was born in the

9  Midwest, so I'm totally modest.  But,

10  yes, I would consider myself an expert,

11  and I think -- I think more relevantly

12  for me, I am considered to be, perhaps,

13  the leading expert in the United States

14  on -- on Chinese state capitalism,

15  particularly as it relates to

16  corporate -- SOE governance issues.

17      Q.   Right.  And in the

18  declaration that you've provided to me on

19  behalf of the plaintiffs' steering

20  committee, which was Exhibit Number 1, is

21  your -- are your opinions, do they

22  reconcile with your published work?

23          MR. FENTON:  Object to the

24      form.

Confidential - Subject to Further Confidentiality Review

Page 404

1            MR. LONGER:  And if -- I can

2       restate it.

3  BY MR. LONGER:

4       Q.    Is what you wrote consistent

5  with what you've been studying?

6            MR. FENTON:  Object to the

7       form.

8            THE WITNESS:  The -- the

9       declaration really grew out of my

10      entire body of study into Chinese

11      SOEs.  And so in -- in that sense,

12      I think it is entirely consistent

13      with my prior -- my prior study.

14  BY MR. LONGER:

15      Q.    And what was the methodology

16  you employed to arrive at the findings

17  that you made in your declaration?

18      A.    Well, obviously, I studied

19  the -- I studied the record.  But as to

20  setting the -- the framework for the --

21  the declaration, again that is based on

22  my study of this subject matter.  And let

23  me talk specifically about the Stanford

24  Law Review article.

Confidential - Subject to Further Confidentiality Review

Page 405

1              So we discovered quite early

2   on that almost all existing literature on

3   Chinese corporate governance, to the

4   extent that it was oriented at all to

5   a -- a Western audience, focused

6   exclusively on listed companies.  So it

7   looked at the -- the number of

8   independent directors and listing

9   standards and -- and the like.

10              And we felt that that was

11   missing a significant part of the context

12   or the picture that was relevant to

13   thinking about corporate governance of

14   Chinese SOEs.  We decided -- I mean we --

15   we saw that these groups, the listed

16   companies, were part of a much larger

17   group.  And so we determined that the

18   group would be an interesting and

19   fruitful area of analysis or unit of

20   analysis.  So that was our -- that was

21   our approach.

22              In terms of specific

23   methodology, we adopted at least in some

24   measure an approach from sociology that's

Confidential - Subject to Further Confidentiality Review

```
 1    known as a network analysis, which

 2    involves delving deeply into who the

 3    actors are in a given realm, looking at

 4    how those actors are linked, how do those

 5    linkages form, and then what are the

 6    consequences of those -- of those

 7    linkages.  So that's the basic

 8    methodology that we used to -- to produce

 9    the -- the Stanford Law Review article.

10              And I would say that a very

11    similar approach underlies my approach

12    to -- to drafting the declaration.

13         Q.   All right.  Now, obviously,

14    and -- and you have testified, you --

15    you -- you have about 55 hours of time in

16    this.  It strikes me that it probably

17    took a lot more time for you to write

18    your Stanford Law Review article than the

19    declaration.

20              But tell us how, even with

21    the less time, you're -- you feel

22    comfortable -- if whether you feel

23    comfortable that your results

24    are reliable.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. FENTON:  Object to the
 2         form.
 3              THE WITNESS:  Well, the --
 4         the characteristics that I saw
 5         when -- when investigating the
 6         companies at issue here, the
 7         CNBM -- what I'm calling the CNBM
 8         business group, they were very
 9         consistent with my scholarly
10         research; hence my statement that
11         it is a typical business group
12         under SASAC supervision.
13              So I feel very confident
14         that the description that I've
15         given of the main characteristics
16         of the CNBM business group, as
17         I've defined it, are consistent
18         with SOEs under SASAC supervision
19         in general, and that gives me
20         confidence in fleshing out some of
21         the issues of -- relating to
22         control or capacity for control
23         that we have -- that we have
24         talked about.
```

Confidential - Subject to Further Confidentiality Review

Page 408

1               I would just add one other

2          thing, which is, I'm really not

3          aware of any literature, any

4          literature, that fundamentally

5          contradicts the description of

6          Chinese SOEs under SASAC

7          supervision that we have

8          presented.  And, in fact, Donald

9          Clark has written in much the same

10         thing about many of these -- these

11         issues.

12              The other authors that I've

13         cited, to the extent that someone

14         focuses on SOEs under SASAC

15         supervision -- now, some people

16         don't.  I mean, Chinese corporate

17         law scholars often just focus on

18         the corporate law because that's

19         their -- that's their disciplinary

20         focus.

21              To the extent that

22         someone -- that a scholar focuses

23         on SOEs under SASAC supervision,

24         as I said, I'm not aware of any

Confidential - Subject to Further Confidentiality Review

1              literature that fundamentally

2              contradicts the picture that we --

3              that I have painted in the

4              declaration or that we have

5              painted in our scholarship.

6      BY MR. LONGER:

7              Q.    Now, that description of

8      your whole declaration where -- you've

9      been here for probably seven or

10     eight hours today alone, but you've

11     described this dual system of control

12     within the state of China, the People's

13     Republic, correct?

14             A.    When you say "dual system of

15     control," you're talking about a

16     corporate system -- a familiar corporate

17     system and a "less familiar to outsiders"

18     party system?

19             Q.    Yes, sir.

20             A.    Yes.

21             Q.    All right.  And that

22     analysis, you're saying, has been

23     corroborated as you see it throughout the

24     literature, that you're not aware of any

Confidential - Subject to Further Confidentiality Review

Page 410

1    inconsistent literature?

2         A.    That's correct.

3         Q.    I don't know if you're

4    familiar with the Daubert opinion.  But

5    Daubert requires that there be a fit

6    between the analysis and the facts of the

7    case.

8              Do you see a fit, if you

9    understand that term as used by the

10   Supreme Court, between what you did and

11   the analysis -- or the facts and the

12   analysis that you performed?

13             MR. FENTON:  Objection to

14        form.  Leading.  Calls for a legal

15        conclusion.

16             THE WITNESS:  I see the

17        assignment that I received as

18        providing context on corporate

19        governance of SOEs under SASAC

20        supervision.  I see that as -- in

21        my opinion, as being relevant and

22        helpful context for a judge in

23        rendering his legal conclusion.

24             And the facts that I saw

```
 1        from the record corroborated or --

 2        corroborated my scholarly

 3        understanding of this route, the

 4        SOE universe under SASAC

 5        supervision.

 6              MR. LONGER:  Thank you,

 7        Professor.  I have no further

 8        questions.

 9              -  -  -

10        REDIRECT EXAMINATION

11              -  -  -

12   BY MR. FENTON:

13        Q.   I just have a few,

14   Professor, if you'll indulge me.

15              You've described your level

16   of scholarship.  You consider Professor

17   Gordon to be every bit the scholar you

18   are, don't you?

19        A.   We have different fields and

20   strengths, but he is -- he is a very

21   reputed scholar.  I respect him.

22        Q.   Okay.  And he has published

23   peer-reviewed articles just as you have,

24   correct?
```

Confidential - Subject to Further Confidentiality Review

 1          A.    I'm not -- I can't speak to

 2    that, because I don't know.  I would not

 3    be surprised to learn of that fact.  But

 4    I can't say yes or no.

 5          Q.    Well, you also talked about

 6    informal peer review.  You've reviewed

 7    some of his articles from time to time

 8    while they were works in progress --

 9          A.    Yes.

10          Q.    -- and gave him some

11    comments?

12          A.    Yes.  Sure.

13          Q.    Okay.  And he's done the

14    same for you, correct?

15          A.    He has.

16          Q.    Okay.  Who peer-reviewed

17    your report that we marked as Milhaupt

18    Exhibit 1?

19          A.    Who peer-reviewed my

20    declaration?

21          Q.    Yes.  Who peer-reviewed your

22    declaration?

23          MR. LONGER:  Object to form

24    and foundation.  It's -- it

Confidential - Subject to Further Confidentiality Review

Page 413

```
 1          wasn't -- it's even outside the
 2          scope of the limited inquiry that
 3          I made.
 4                  MR. FENTON:  I don't think
 5          so.
 6   BY MR. FENTON:
 7          Q.    Who peer-reviewed it?  You
 8   talk about someone peer-reviewing your
 9   book.  I want to know who peer-reviewed
10   your declaration.
11          A.    I'm not aware that
12   declarations by experts are to be
13   peer-reviewed.  That would seem to be
14   inappropriate and perhaps in violation of
15   the confidentiality order that I signed.
16          Q.    So the answer to my question
17   is nobody, right?  The declaration isn't
18   peer-reviewed, right?
19          A.    Correct.  The scholarship
20   underlying it has been peer-reviewed.
21          Q.    Well, I understand that in
22   terms of your articles and so on.
23                  Did anybody peer-review your
24   review of the factual materials in this
```

Confidential - Subject to Further Confidentiality Review

Page 414

1    case?

2            A.    No.

3            Q.    Okay.  Did you -- did you go

4    out and get a peer review?  Did you go

5    out and find a colleague and say, "This

6    is how I intend to approach this project.

7    Will you peer-review my methodology for

8    giving an opinion in this case"?

9                 MR. LONGER:  Objection.

10           Argumentative.

11                THE WITNESS:  Well, and I

12           mean, to the extent that we're

13           talking about the analytical basis

14           or framework for my declaration,

15           it has been peer-reviewed.

16   BY MR. FENTON:

17           Q.    Yes, sir.  Did you tell --

18   you described a methodology whereby you

19   took the materials provided to you by the

20   PSC in the case.  You reviewed the facts

21   within the analytical framework --

22           A.    Well, I reviewed all --

23           Q.    -- that you previously had.

24   Okay.  My question is, before you did

Confidential - Subject to Further Confidentiality Review

Page 415

1    that, did you go out and grab a colleague

2    and say, "This is what I intend to do.

3    Will you peer-review this methodology for

4    me?"

5          A.    No, I did not, but I did not

6    review the facts -- I mean, I want to

7    just correct one impression you made --

8    misimpression.  I did not say I reviewed

9    the facts in a way to -- by way of

10   corroborating my scholarly understanding

11   of this SOE.

12              I said that the facts that I

13   saw did tend to corroborate that.  But I

14   didn't read the record in an attempt to

15   verify my scholarly understanding of

16   SOEs.

17         Q.    All right.  And so the facts

18   that you saw corroborated your

19   preconceived notions, did they?

20         A.    That's not what I said.

21         Q.    Okay.  Well, based on the

22   facts that you saw, all of the materials

23   provided to you by the PSC, can you name

24   me one instance where SASAC,

Confidential - Subject to Further Confidentiality Review

Page 416

1    notwithstanding its 100 percent ownership

2    in CNBM Group Corporation, has interfered

3    in the affairs of Taishan, of BNBM PLC,

4    of BNBM Group, of CNBM PLC, or of CNBM

5    Group?

6                    Can you, as the leading

7    expert in the United States on Chinese

8    state capitalism, particularly as it

9    relates to corporate SOE governance

10   issues, give me a single instance where

11   that has happened?

12                   MR. LONGER:  Objection to

13           the form.

14                   THE WITNESS:  Well, I think

15           we discussed one.

16                   I mean, we're going back to

17           ground we already covered.  But we

18           talked about the SASAC supervision

19           committee, together with

20           supervision committees from other

21           group companies going down into

22           Taishan and examining the

23           situation and coming up with a

24           rectification plan and stressing

Confidential - Subject to Further Confidentiality Review

Page 417

```
 1          the importance of following

 2          governmental spirit and

 3          regulations, et cetera.  That's

 4          what we discussed earlier.

 5   BY MR. FENTON:

 6          Q.    This was the decadence stuff

 7   we talked about?

 8          A.    I'm not referring

 9   specifically to that, but we talked

10   about --

11          Q.    So that's the document that

12   you're referring to?

13          A.    That's the document --

14          MR. LONGER:  Wait, wait,

15          wait.  We're talking over one

16          another.

17          You have a question.  He can

18          answer.

19   BY MR. FENTON:

20          Q.    Go ahead, Professor.

21          A.    That's the document that I

22   was referring to.

23          Q.    Milhaupt Exhibit 3?

24          A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  And I believe you

2    said that from the context you believe

3    that this meeting took place sometime

4    after 2012?

5          A.    That's correct.

6          Q.    And we talked about this

7    before.  There's nothing in here

8    directing Taishan or BNBM PLC or BNBM

9    Group or CNBM PLC or CNBM Group what they

10   are to produce or how they are to produce

11   it or where they are to produce it or who

12   they are supposed to sell to, right?

13              MR. LONGER:  Objection to

14          the form.  Mischaracterizes his

15          testimony.

16              THE WITNESS:  This document

17          does not relate to those -- to

18          those issues, no.

19   BY MR. FENTON:

20          Q.    Right.  They're related to

21   the four forms of decadence that we

22   talked about earlier.

23          A.    Well, that's -- I mean, I've

24   said -- I've stressed this several times

Page 419

1    now.  That's not what I'm referring to.

2    I'm referring to supervision teams from

3    three tiers, which carefully reviewed the

4    checking and assessing of materials, et

5    cetera, see whether the materials

6    complied with the requirements of the

7    central government, whether they

8    reflected the actual situations of the

9    enterprise, to see whether the leadership

10   team and the members identified the

11   problems accurately, dug into the cause

12   of the problems in depth, and made solid

13   rectification plans.  That's what I'm

14   referring to.

15            Q.    So you don't even know what

16   problems they're talking about, do you?

17                 MR. LONGER:  Objection to

18            the form.

19   BY MR. FENTON:

20            Q.    You don't know what problems

21   are being addressed in this document, do

22   you?

23            A.    Well, I mean, I have -- I

24   have some -- I have my ideas about that,

Confidential - Subject to Further Confidentiality Review

Page 420

```
 1   yes.

 2          Q.     Okay.  Do you know?

 3          A.     No.  From the context, it

 4   seems fairly obvious.

 5          Q.     And when you say, "From the

 6   context, it seems fairly obvious," are

 7   they addressing operational issues at

 8   Taishan?  That is to say, production

 9   management, production lines, how much to

10   make, who to sell to, what to sell.

11          A.     It's not apparent from the

12   document.

13          Q.     Okay.  So other than this

14   document from sometime after 2012,

15   dealing with four forms of decadence and

16   some addressing of some problems that we

17   don't know what they are, can you give me

18   any other instance where SASAC interfered

19   in the affairs of CNBM Group, CNBM PLC,

20   BNBM Group, BNBM PLC, or Taishan?

21                 MR. LONGER:  Object to the

22          form.  You're using the term

23          "interfere."  You mean that in the

24          sense of any effect?
```

Confidential - Subject to Further Confidentiality Review

Page 421

1                MR. FENTON:  Intermeddled.

2                MR. LONGER:  Same objection.

3                If you can answer the

4           question, go ahead.

5                THE WITNESS:  I mean, they

6           have supervisory control and they

7           have a right to appoint or replace

8           personnel.  I mean, is that -- how

9           would you characterize that?

10  BY MR. FENTON:

11           Q.   I would characterize that as

12  ability to control.

13                I'm asking, do you have any

14  other instance, other than this

15  Exhibit 3, which we have been through ad

16  nauseam, of actual exercise of control by

17  SASAC over the operations of Taishan,

18  BNBM Group, BNBM PLC, CNBM Group, or CNBM

19  PLC?  Can you give me any specific

20  instance?

21                MR. LONGER:  Asked and

22           answered.

23                THE WITNESS:  I mean, I

24           think we have been through all of

Confidential - Subject to Further Confidentiality Review

Page 422

```
 1          this, haven't we?
 2    BY MR. FENTON:
 3          Q.    The answer to my question is
 4    no, correct?
 5                MR. LONGER:  Objection.
 6                THE WITNESS:  Well, I mean,
 7          my -- my declaration goes to, and
 8          I think speaks of, capacity,
 9          capacity to influence and capacity
10          to control.
11    BY MR. FENTON:
12          Q.    All right.  And so as the
13    leading expert in the United States on
14    Chinese state -- I can't even read my own
15    writing at this point.
16                Leading expert in the United
17    States on Chinese state capitalism --
18                MR. LONGER:  You said he's
19          the leading expert, and I'll --
20          I'll live with that --
21    BY MR. FENTON:
22          Q.    -- particularly as it
23    relates to corporate SOE governance
24    issues.
```

Confidential - Subject to Further Confidentiality Review

```
 1              As the leading expert on
 2    that, Professor, that's the best you can
 3    do?
 4         A.    Well --
 5              MR. LONGER:  Objection.
 6         Argumentive.
 7              THE WITNESS:  I would just
 8         say that I said I think that that
 9         is how I am -- I am considered.
10         I -- I would just clarify that.
11    BY MR. FENTON:
12         Q.    Okay.  But that last answer
13    that you just gave me, that's the best
14    you can do for me on that question,
15    right?
16         A.    I -- I don't have anything
17    else to respond to -- to that.
18         Q.    Okay.
19              MR. FENTON:  Okay.
20         Professor, thank you again.
21              THE WITNESS:  Thank you.
22              MR. FENTON:  I am done.
23              MR. LONGER:  We're
24         concluded.
```

Confidential - Subject to Further Confidentiality Review

Page 424

1           THE VIDEOGRAPHER:  The time

2      is 5:57 p.m. on February 3, 2016.

3           And this completes the

4      deposition of Professor Curtis J.

5      Milhaupt.

6           (Witness excused.)

7           (Deposition concluded at

8      approximately 5:57 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

Page 425

```
 1
 2                    CERTIFICATE
 3
 4
 5           I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
 6   deposition is a true record of the
     testimony given by the witness.
 7
             It was requested before
 8   completion of the deposition that the
     witness, CURTIS J. MILHAUPT, JD, have the
 9   opportunity to read and sign the
     deposition transcript.
10
11
12   _____
         MICHELLE L. GRAY,
13       A Registered Professional
         Reporter, Certified Shorthand
14       Reporter and Notary Public
         Dated:  February 3, 2016
15
16
17           (The foregoing certification
18   of this transcript does not apply to any
19   reproduction of the same by any means,
20   unless under the direct control and/or
21   supervision of the certifying reporter.)
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 426

1            INSTRUCTIONS TO WITNESS

2

3            Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8            After doing so, please sign

9    the errata sheet and date it.

10           You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14           It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Confidential - Subject to Further Confidentiality Review

Page 427

```
 1                    -  -  -  -  -  -

                     E R R A T A

 2                    -  -  -  -  -  -

 3

 4    PAGE   LINE   CHANGE

 5    ____   ____   _____

 6       REASON:    _____

 7    ____   ____   _____

 8       REASON:    _____

 9    ____   ____   _____

10       REASON:    _____

11    ____   ____   _____

12       REASON:    _____

13    ____   ____   _____

14       REASON:    _____

15    ____   ____   _____

16       REASON:    _____

17    ____   ____   _____

18       REASON:    _____

19    ____   ____   _____

20       REASON:    _____

21    ____   ____   _____

22       REASON:    _____

23    ____   ____   _____

24       REASON:    _____
```

Confidential - Subject to Further Confidentiality Review

Page 428

```
 1
 2            ACKNOWLEDGMENT OF DEPONENT
 3
 4              I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, 1 - 429, and that the
 7   same is a correct transcription of the
 8   answers given by me to the questions
 9   therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16    CURTIS J. MILHAUPT, JD           DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22

     _____
23   Notary Public
24
```

Confidential - Subject to Further Confidentiality Review

Page 429

 1                    LAWYER'S NOTES

 2    PAGE   LINE

 3    _____  _____  _____

 4    _____  _____  _____

 5    _____  _____  _____

 6    _____  _____  _____

 7    _____  _____  _____

 8    _____  _____  _____

 9    _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24    _____  _____  _____