**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | CIVIL ACTION |
| | NO. 09-02047 |
| | SECTION "L" (5) |
| THIS DOCUMENT RELATES TO: ALL CASES | |

## ORDER & REASONS

Before this Court is Defendant China New Building Materials Group's ("CNBM Group") Motion to Dismiss for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") (R. Doc. 19527). Having read the parties' briefs, reviewed the applicable law, and heard the parties on oral argument, the Court now issues this Order and Reasons.

## I.    INTRODUCTION

The present litigation arises from alleged property damage and personal injuries sustained as a result of the presence of Chinese-manufactured drywall in homes and other buildings in a number of states. During approximately 2005 to 2008, hundreds-of-millions of square feet of gypsum wallboard manufactured in China ("Chinese drywall") were exported to the United States, primarily along the East Coast and Gulf South, as a result of an exceptionally high demand for building supplies in the aftermaths of Hurricanes Rita and Katrina, as well as a general new-housing boom. The Chinese drywall was then installed in newly-constructed and reconstructed properties. After installation of this drywall, owners and occupants of the properties began noticing unusual odors, blackening of silver and copper items and components,

and the failure of appliances, including microwaves, refrigerators, and air-conditioning units. Some also experienced health problems, such as skin and eye irritation, respiratory issues, nose bleeds, and headaches. As a result, these property owners began filing suit in both state and federal courts against those involved with Chinese drywall, including the installers, homebuilders, suppliers, importers, exporters, and manufacturers, as well as their insurers and sureties. One of the defendants is CNBM Group.

In the instant motion, CNBM Groups contends that it is not properly a part of this litigation because it is in an "agency or instrumentality of a foreign state" within the meaning of FSIA. 28 U.S.C. § 1603(b). FSIA provides the "sole basis" for obtaining jurisdiction over a foreign state or its agency or instrumentality. *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 611 (1992). A foreign state and its agencies and instrumentalities are "presumptively immune" from suit under the Act "unless a specified exception applies." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see* 28 U.S.C. § 1604. According to the Plaintiffs, both the commercial activity exception and the tortious activity exception apply.

However, CNBM Group argues that the Plaintiffs have not overcome CNBM Group's presumptive immunity from suit as they have not sufficiently shown that CNBM Group's actions fall within the Act's exceptions to immunity, including the commercial activity and tort exceptions to immunity. CNBM Group asserts that it played no role in the manufacture or distribution of the drywall at issue in this litigation, and its status as an indirect shareholder of other companies that allegedly engaged in such activity is insufficient to bring it within any FSIA exception. CNBM Group argues further that other companies' actions cannot be attributed to CNBM Group for purposes of FSIA because CNBM Group did not exercise extensive control over those companies. Against these contentions, Plaintiffs argue that CNBM Group's control

2

over BNBM Group, CNBM, BNBM and Taishan renders these entities a single business enterprise and alter egos of each other under applicable law. Plaintiffs argue further that due to the commercial activity and tortious conduct of BNBM and Taishan in manufacturing and selling defective Chinese Drywall to customers in the United States, CNBM Group is not entitled to sovereign immunity. To address these arguments, this Order and Reasons proceeds as follows. First, the Court describes the relevant procedural and factual background. Then, the Court analyzes whether either the commercial activity exception or the tortious activity exception to the presumption of immunity under FSIA applies to CNBM Group itself. Finally, the Court considers whether CNBM Group's control over Taishan and BNBM is sufficient to render them alter egos of one another so that Taishan's conduct can be attributed to CNBM Group.

## II.    PROCEDURAL BACKGROUND

From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials, including drywall.  As a result, drywall manufactured in China was brought into the United States and used in the construction and refurbishing of homes in coastal areas of the country, notably the Gulf Coast and East Coast.  Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes.  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 829 (E.D.La. 2012), *aff'd*, 742 F. 3d 576 (5th Cir. 2014).  Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall.  Accordingly, these homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and

3

manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 2047 in the U.S. District Court, Eastern District of Louisiana.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities, and (2) the Taishan Entities. The litigation has focused upon these two entities and their downstream associates, and has proceeded on strikingly different tracks for the claims against each group as described below.

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts. The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009. *See* (R. Doc. 18). Thereafter, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall. *See* (R. Doc. 2713). The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed Findings of Fact and Conclusions of Law and entered a Judgment in the amount of $164,049.64, including remediation damages in the amount of $136,940.46, which represented a cost of $81.13 per square foot based on the footprint square footage of the house. *See* (R. Doc. 3012).

Subsequently, the Knauf Entities entered into a pilot remediation program with the Plaintiffs' Steering Committee ("PSC") in the MDL. This program was largely based upon the remediation protocol formulated by the Court in *Hernandez*. The Knauf pilot remediation

4

program is ongoing and has, at present, remediated over 2,000 homes containing KPT Chinese drywall using the same protocol.  At the Court's urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which is designed to resolve all Knauf-related, Chinese drywall claims.  *See* (R. Doc. 12061-5). In addition to the Knauf Settlement Agreement, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation.  Although the Court occasionally must deal with settlement administration and enforcement issues, the Knauf portion of this litigation is largely resolved.

In stark contrast to the straightforwardness with which the MDL litigation proceeded against the Knauf Defendants, the litigation against the Chinese entities has taken a different course. The Chinese Defendants in the litigation, include the principal Chinese-based Defendant Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities").  Other Chinese-based Defendants include the CNBM and BNBM Entities.

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687; (2) *The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115; (3) *Gross v. Knauf Gips KG*, Case No. 09-6690; and (4) *Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361.  The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case.  *See* (R. Doc. 52);

5

(R. Doc. 1-7) (Case No. 09-6687).  Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both of these cases.  *See* (R. Docs. 277, 487).

Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the Preliminary Default in *Germano* on the Plaintiffs' claimed damages.  *See* (R. Doc. 502, 1223, 1258, 2380).  At this hearing, the Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases.  Following this hearing, which occurred on February 19 and 20, 2010, the Court issued detailed Findings of Fact & Conclusions of Law.  *See* (R. Doc. 2380).  On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano*, in favor of the Plaintiffs.  (R. Doc. 3031).  On the last day to timely do so, June 10, 2010, Taishan filed a Notice of Appeal of the Default Judgment in *Germano* and entered its appearance in *Germano* and *Mitchell*.  (R. Docs. 3668, 3670).

After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction.  *See* (R. Docs. 5436, 5583).  In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010, *see e.g.* (R. Docs. 5839, 5840).  Discovery has included the production of both written and electronic documents, as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion.  This discovery has often been contentious, requiring close supervision by the Court.  The Court has presided over regularly-scheduled status

6

conferences to keep the parties on track, and conducted hearings and issued rulings to resolve numerous discovery-related disputes.  *See e.g.* (R. Docs. 7136, 7511).

In April 2012, Taishan filed various motions, including its motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions.  The Court coordinated its hearing with Judge Joseph Farina of the 11th Judicial Circuit Court of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss, and held that it maintained personal jurisdiction over Taishan. *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 894 F.Supp.2d 819 (E.D. La. 2012). The Court also ruled that TTP was operating as the alter ego of TG. The Court certified an interlocutory appeal and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over the Taishan Entities (TG and TTP). *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 753 F.3d 521 (5th Cir. 2014); *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 742 F.3d 576 (5th Cir. 2014). The time for writs of certiorari passed and the issue of personal jurisdiction over Taishan became firmly settled.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. (R. Doc. 17774).  Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination and the Court held Taishan in contempt and ordered that Taishan pay $15,000.00 in attorney's fees to Plaintiffs' counsel; that Taishan pay $40,000.00 as a penalty

for contempt; that Taishan, and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process, and if Taishan violates the injunction, it must pay a further penalty of 25% of the profits earned by the Company or its affiliate who violate the Order for the year of the violation. (R. Doc. 17869).

On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). (R. Doc. 17883). Taishan did not appear and, on September 26, 2014, this Court certified a class of "[a]ll owners of real properties in the United States, who are named Plaintiffs [in the various MDL complaints] asserting claims for remediated damages arising from, or otherwise related, Taishan drywall. *See* (R. Doc. 18028 at 34-35).

Taishan entered an appearance with the Court in February 2015 and, to satisfy the contempt, Taishan paid both the sum of $15,000 in attorney's fees to Plaintiffs' counsel and the contempt penalty of $40,000 in March 2015. (R. Doc. 18764). On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists." (R. Doc. 17869). The instant motions are directly concerned with this relationship.

### III. FACTUAL BACKGROUND

#### a. The Corporate Structure of the CNBM Business Group

##### i. CNBM Group's Role as Parent of the CNBM Business Group

At the top of the CNBM Corporate family tree is CNBM Group, an entity organized under the laws of the People's Republic of China. CNBM Group is—and was, at the time this suit was filed—directly and wholly owned by the People's Republic of China. *See* Cao Decl. ¶¶ 3-6. CNBM Group conducts no business in the United States, and does not itself manufacture,

produce, market, distribute, ship or sell any building products or construction materials, including drywall. *Id.* ¶ 9.  Since 2005, CNBM Group has been a controlling shareholder[1] of BNBM Group by directly and/or indirectly holding 100% of BNBM Group's shares. *See* Zhao Dep. at 385:4-24. Beginning in 2005, CNBM Group was the sole shareholder of BNBM Group, directly holding 100% of BNBM Group's stock. *See* 2005 CNBM Annual Report at 8 [PSC Ex. 8][2]. On December 31, 2005, CNBM Group transferred 25% of its equity holding in BNBM Group to CNBM Import and Export, another wholly-owned subsidiary of CNBM Group. *See* 2005 BNBM Group Auditor's Report at 6 [PSC Ex. 6]. Thereafter, CNBM Group continued to maintain total ownership of BNBM Group's stock, although the percentages of CNBM Group's direct holdings of BNBM Group's shares, and the corresponding percentages of its indirect holdings, have shifted over the years. No entity in which CNBM Group is *directly* invested, including BNBM Group, is engaged in any aspect of the drywall business.

As the ultimate parent, CNBM Group acts as the strategic center for the business conglomerate in four primary aspects:

> First, Strategy Management: the Group Corporation [CNBM Group] guides all subsidiaries to strictly adhere to the Group Corporation's determined strategy on business activities, to ensure the realization of the Group Corporation's strategic goals. Second, Decision-Making Management:…the Group exercises the decision making power as the fund contributor on major issues such as its subsidiaries' investment and financing, restructuring, etc. Third, Resource Management: The Group Corporation coordinates and integrates various domestic and overseas resources… Fourth, Culture Management: the Group Corporation guides all subsidiaries…[in] forming a set of unified enterprise culture values within the Group Corporation.

---

[1] "Controlling Shareholder" is defined as "any shareholder…entitled to exercise, or control the exercise of 30%...or more of the voting power at general meetings of a new applicant or who is in a position to control the composition of a majority of the board of directors of the new applicant." HKSE Rules, Sec. 19A.14

[2] Exhibits refer to those attached to the briefing of the instant motion.

Case 2:09-md-02047-EEF-MBN   Document 20150   Filed 03/10/16   Page 10 of 32

"CNBM Group Corporation Year of 2015-2017 Development and Strategy Plan" dated April, 2015 at 1.

CNBM Group issues certain directives to its subsidiaries. Specifically, CNBM Group requires that its subsidiaries complete annual Comprehensive Risk Management Reports "stating what are the risks for [the particular] year, what are the things that need to be done and how to prevent." Taishan's 2011 Risk Management Report [PSC Ex. 47].

CNBM Group provides training to the middle- and senior-level leaders of BNBM Group, CNBM, BNBM, and Taishan.  In 2011, CNBM Group held a three-day course for "people in charge of a functional department in the headquarters of the Group Corporation and the people of a higher level, and the personnel who come from a subsidiary (group) company or a research institute but are managed by the Group Corporation or are subject to the pre-placement archival management." Email and attachment to Jia Tongchun re: Notice on Matters Relevant to CNBM Group's Training Class in 2011 for Leaders at Middle and Senior Levels dated 6/29/2011 at 3 [PSC Ex. 51]. CNBM Group's Chairman Song Zhiping was a lecturer at this seminar.

CNBM Group and its direct and indirect subsidiaries share common employees. For example, since 2005, Song Zhiping has been the Chairman of CNBM Group and the Chairman and Executive Director of CNBM. He is also the Chairman of BNBM Group. Additionally, since 2005, Cao Jianglin has been a Director of CNBM Group, Chairman of the Supervisory Committee of BNBM Group, and President and Executive Director of CNBM. From 2005 to 2011, he was Supervisor and Chairman of the Supervisory Committee of Taishan, and from 2005 to 2009, he was the Chairman and Secretary to the Party Committee of BNBM. Notably, however, CNBM Group has no officers or directors at Taishan. *See* Cao Decl. ¶ 9.

Since 2005, CNBM Group, BNBM Group, and CNBM have shared registered addresses and physical office addresses. For instance, from 2005 through 2007, BNBM Group, CNBM, and BNBM had the same registered address: No. 11 (A) Sanlihe Road, Haidian District, Beijing China. *See* 2005 BNBM Group Auditor's Report at 6 [PSC Ex. 6]. BNBM Group's corporate witness confirmed that BNBM Group and BNBM PLC have, in fact, shared common office space. *See* Zhao Dep. at 73:19-76:20; 249:3-250:13. However, while CNBM, BNBM Group, and BNBM have or had its office in the same building, Taishan's office is located hundreds of miles away. *See* Yang Decl. ¶¶ 4-5. Additionally, while CNBM Group and its CNBM- and BNBM-named subsidiaries share the same hexagonal logo, Taishan does not use this logo.

### ii. CNBM Group is a Shareholder in CNBM

Like its parent (CNBM Group), CNBM is not directly engaged in the manufacture or sale of building materials. It is a holding company with investments in other Chinese entities engaged in various businesses related to the building industry, including cement, fiberglass, solar energy, lumber, steel, and drywall. CNBM does not manufacture, produce, market, distribute, ship or sell any drywall. *See* Chang Decl. ¶ 3. On March 28, 2005, CNBM was converted into a publicly traded joint stock limited company on the Hong Kong Stock Exchange ("HKSE"), with CNBM Group and several wholly-owned CNBM Group subsidiaries possessing approximately 95% of the share capital of CNBM immediately prior to the Global Offering. *See* CNBM Global Offering Prospectus [PSC Ex. 5].  To accomplish this Public Offering, CNBM Group executed a reorganization of its subsidiaries aimed to "position the Company [CNBM], then a wholly-owned subsidiary of [CNBM Group] as the holding company" of its building materials products and engineering services businesses. *Id.* at 89.

"As part of this reorganization, Parent Group [CNBM Group, BNBM Group, China Building Academy, CNBM Trading] has transferred to [CNBM] substantially all of its building materials business, including all relevant properties, equipment, and necessary employees necessary to carry on such business" through a series of asset transfers for "nil consideration." *Id.* at 4, 94-95. That said, those transfers were described and disclosed in public filings and were not unlawful. *See* 2006 CNBM Global Offering Prospectus [PSC Ex. 5].

The conversion of CNBM into a publicly listed company on the HKSE shifted CNBM Group's ownership of share capital in CNBM. CNBM Group "is deemed to own the shares directly held by BNBM Group, CNBM Import & Export, and Building Materials Academy." *See* 2006 CNBM Annual Report at 45 n.1. Thus, by virtue of its shareholdings, after completion of the Global Offering, CNBM Group directly and indirectly held 60.34% of CNBM's total share capital, making CNBM Group the "Controlling Shareholder" of CNBM.[3]  *Id.* at 43-45. Following the Global Offering, CNBM Group's direct and indirect ownership in CNBM's shares has declined slightly.[4] However, it continued to control the highest percentage of CNBM's total shares, and consequently, has been and remains the "Controlling Entity" of CNBM.[5] That said, over half the shares of CNBM are owned by public investors. *See* 2014 CNBM Annual Report.

### iii.   CNBM is a Majority Shareholder in BNBM

---

[3] "Controlling Shareholder" is defined as "any shareholder...entitled to exercise, or control the exercise of 30%...or more of the voting power at general meetings of a new applicant or who is in a position to control the composition of a majority of the board of directors of the new applicant." HKSE Rules, Sec. 19A.14
[4] CNBM Group's direct ownership in CNBM ranged from 16.9% in 2005 to 13.67% in 2009; its direct/indirect ownership ranged from 60.34% in 2005 following the Global Offering to 44.10% in 2010.
[5] "Controlling Entity" is defined as a person who, either alone or with any of his associates is entitled to exercise or control the exercise of not less than 20%, has the right to nominate any of the directors of the corporation; or has an interest in shares carrying the right to veto any resolution; or amend, modify, limit or add conditions to any resolution, at general meetings of the corporation. *See* Chapter 571 (Securities and Futures Ordinance of the Hong Kong Special Administrative Region of the PRC).

BNBM is a subsidiary of CNBM, which, as discussed above, is itself a subsidiary of CNBM Group via direct and indirect equity interest.  In each of BNBM's annual reports from 2005 to 2014, CNBM is defined at BNBM's "Controlling Shareholder" and CNBM Group is defined as its "Actual Controller."[6] In June 2006, CNBM Group paid for a "share conversion of BNBM stock in order to transfer 45,630,000 of CNBM's non-tradeable BNBM shares into tradable shares.  *See* 2006 CNBM Annual Report at 101 n. (a). As a result of this share conversion, CNBM directly held 52.40% equity interest in BNBM, which it retained through 2013.  *See* 2007 CNBM Annual Report at 10, 17 & 113; 2013 BNBM Annual Report at 53. From 2005 to 2010, CNBM held between 60.33% and 52.40% direct ownership interest in BNBM's shares; and, CNBM Group, by virtue of its direct and indirect ownership in CNBM, held between 41.16% and 23.11% indirect ownership interest in BNBM.  Additionally, from 2005 through 2015, among the top ten shareholders of BNBM, CNBM has been the sole shareholder with a 5% or higher stake in BNBM. *See* 2005-2014 BNBM Annual Reports.

Because its stock is listed on the Hong Kong Stock Exchange, CNBM is subject to the rules and regulations of the Exchange. Under HKSE rules, CNBM Group is a "Close Associate" of CNBM, which in turn is a "Close Associate" of BNBM, which is a "Close Associate" of Taishan, meaning that each company is able to "exercise or control the exercise of 30%...or more of the voting power at general meetings, or to control the composition of a majority of the board of directors and any subsidiary of this other company." *See* HKSE Rules, Chapter 1.  Further,

---

[6] Under the stock listing riles of the Shenzen Stock Exchange ("SZSE"), where BNBM's stock is listed, "Controlling Shareholder" is defined as the "shareholder whose equity shares account for more than 50% of the Company's total stock; or the shareholder who holds less than 50% of equity shares, but still has major influence on the resolutions made by the general meeting of shareholders because of the voting rights entitled to the equity shares thereof." Partial Translation of SZSE Stock Listing Rules (2014 Revision) No. 378, Chapter XVIII, 18.1(5). "Actual Controller" is defined as "any natural person, legal person or other organization that is capable of dominating and actually dominating the conducts of the Company by virtue of investment relationship, agreement or any other arrangement." *Id.* at Chapter XVIII, 18.1 (6).

under HKSE Rules, CNBM Group is the "Controlling Shareholder"[7] of CNBM; CNBM is a

"Substantial Shareholder"[8] of BNBM and BNBM is a "Substantial Shareholder" of Taishan.

Additionally, CNBM, BNBM, and BNBM Group have shared the same accounting firm. CNBM

has used the accounting firm of Baker Tilley Hong Kong Ltd. since 2010; BNBM Group has

used the same firm since 2012 and BNBM has used Baker Tilley since 2013.

### iv.   BNBM's Relationship with its Subsidiary Taishan

BNBM manufactures building materials, including drywall, in China. BNBM is a public

company traded on the Shenzhen Stock Exchange, with over 21,000 shareholders. It is a majority

shareholder of Taishan. *See* 2014 BNBM PLC Annual Report. BNBM neither created nor

incorporated Taishan. Taishan began as a separate and independent manufacturer of drywall.

When BNBM first purchased shares, Taishan already had revenues of RMB 48.2 million. *See*

2005 Asset Appraisal Report. BNBM acquired its equity stake in Taishan in two separate

actions. BNBM paid fair value to acquire its interest in Taishan, subject to a third-party audit and

asset valuation process. *See* Yang Decl. ¶ 8. In March and April 2005, BNBM entered into a

Share Subscription Agreement to purchase 65,362,500 shares of Taishan, representing 42% of

the registered capital of the company. *See* March 19, 2005 Share Subscription Agreement. The

subscription price paid by BNBM was approximately RMB 117.65 million. *Id.* A professional

third-party appraisal of the value of Taishan confirmed the adequacy of the purchase price with

reference to the net asset value of Taishan. *See* 2005 Asset Appraisal Report.  Taishan's

---

[7] "Controlling Shareholder" is defined as "any shareholder…entitled to exercise, or control the exercise of 30%...or more of the voting power at general meetings of a new applicant or who is in a position to control the composition of a majority of the board of directors of the new applicant." HKSE Rules, Sec. 19A.14

[8] "Substantial Shareholder" is defined as "a person…who is entitled to exercise, or control the exercise of, 10% or more of the voting power at any general meeting of the company…"

shareholders and BNBM's Board of Directors voted on and approved the acquisition in compliance with each company's articles of association.

CNBM's August 2008 Announcement regarding BNBM's acquisition of a controlling interest in Taishan states the following as the reason for the purchase:

> Following BNBM's acquisition of the 42% equity interest of Taihe, the Company [CNBM] has become the largest producer of gypsum boards in the PRC. The acquisition has also enhanced the Company's ability to serve a broader base of customers. The directors of the Company believe that the Acquisition will enable *CNBM Group* to further enhance its competitiveness and consolidate the leading position in the PRC gypsum board market *as it will participate more actively in the daily operations and management of Taihe* with a view to improving its profitability.

*See* CNBM Announcement: "Connected Transaction Acquisition" [PSC Ex. 37].

Taishan's articles of incorporation were amended as part of the transaction. In addition to providing minority stockholder protections, the articles were amended to provide for a seven person Board of Directors (four nominated by BNBM). *Id.* at Art. 67. The Taishan Board was later downsized to five directors, with three BNBM designees.

In 2006, BNBM acquired an additional, indirect 23% equity interest in Taishan through the purchase of one of Taishan's shareholders, Taian Donglian Investment Trade Co., Ltd. ("Donglian"). *See* Song Dep. at 51:20-52:2.[9] The acquisition left BNBM with 65% equity interest in Taishan. *See* Yang Decl. ¶ 8. Taishan's Chairman and General Manager Jia Tongchun (who was also Deputy General Manager and Director of BNBM from 2005-2012) personally retained 5% equity ownership in Taishan, and was the majority shareholder and legal representative of an investment company, which owned 14% of Taishan's equity shares. *See*

---

[9] CNBM published BNBM's increased equity acquisition of Taishan as a "Connected Transaction" on the HKSE, stating that the acquisition was made to "enable CNBM Group to further enhance its competiveness and consolidate its leading position in the PRC gypsum board market." *See* 8/26/2006 Connected Transaction Announcement.

8/28/2006 Connected Transaction Announcement [PSC Ex. 37]. Under Chinese law, BNBM is the "Controlling Shareholder" of Taishan.[10]

From 2005 to 2012, Jia Tongchun held concurrent positions at Taishan and BNBM while also owning 5% equity shares in Taishan.  Holding these dual roles while owning 5% stock in Taishan was flagged as an issue in an 2012 SASAC-sponsored audit of BNBM. *See* "Main Issues in SASAC's Audit of Economic Responsibility" [PSC Ex. 74]. To rectify the situation, CNBM Group requested that BNBM "improve relevant management regulations, seriously clean up wrong behaviors, and make adjustments and changes according to the relevant requirements of SASAC. *Id.* Accordingly, Mr. Jia resigned his position as Deputy General Manager at BNBM in September 2012 to ensure no conflict existed with his Taishan share ownership.

**b.  Defendant Entities' Response to the Instant Litigation**

On April 21, 2009, the Chairman of Knauf wrote to CNBM Group's Chairman, SONG Zhiping, regarding the U.S. Chinese Drywall lawsuits. *See* 5/15/2009 Knauf Letters [PSC Ex. 84]. On May 8, 2009, Taishan was served with process under the Hague Convention in the first of hundreds of lawsuits complaining of defects with Taishan's Chinese-manufactured drywall. Three days later, Taishan compiled for its leaders at CNBM Group an "Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan Gypsum Company Limited." Taishan prepared this report for CNBM Group "so that the leaders can understand the facts of the case and give relevant instructions." *Id.* Despite acknowledging that more than 70 million square feet of its drywall were sent to the U.S. and were the subject of complaints from customers, Taishan reported that "[it] is not inclined to respond to the lawsuit" and asked Chiefs Song and

---

[10] "Controlling Shareholder" is defined as "any shareholder…entitled to exercise, or control the exercise of 30%...or more of the voting power at general meetings of a new applicant or who is in a position to control the composition of a majority of the board of directors of the new applicant." HKSE Rules, Sec. 19A.14

Cao for instructions and approval as to whether such inaction was appropriate. *Id.* Taishan

further proposed that "when necessary, it will provide documents that are beneficial to Taishan

Company to the court that accepted the case." *Id.*

On May 15, 2009, Knauf again wrote to request "that CNBM and BNBM…take effective

measures to respond to the U.S. consumer lawsuits and media coverage as soon as possible;"

Knauf expressed its "willing[ness] to, under the leadership of CNBM, safeguard the international

reputation of Chinese-made building materials…" *See* Knauf Letter [PSC Ex. 84]]. Shortly after

Knauf's second entreaty to CNBM Group, Peng Wenlong of Taishan, at the "arrangements of the

Company's leaders," corresponded with China Buildings Materials Academy, a wholly-owned

subsidiary of CNBM Group that took the lead in researching and analyzing the issues related to

American reports of defective gypsum board. *See* 7/9/2010 CNBM Group Corporation Meeting

Minutes of the 5th Work Meeting of Managers of CNBM Group.[11]

On June 3, 2010, less than a month after the *Germano* judgment was entered, CNBM

Group hosted two telephonic conferences. First, the Manager of CNBM Group's Business

Administration Department had a telephonic meeting with Wang Bing of BNBM, Jia Tongchun

of Taishan, and two attorneys to discuss the strategy for responding to the litigation. *See* Course

of Events on Hiring Foreign Law Firms [PSC Ex. 86]. A memorandum produced by BNBM in

this litigation provides a summary of the meeting:

> Mr. Knauf visited Zhiping Song, chairman of the board of directors,
> and hoped that CNBM Group could offer a helping hand to them in
> responding to the United States drywall event.
> …
> Chairman Song agreed that CNBM Group should organize the
> response to the litigation, but the purposes of the response are: 1. for
> the images of Chinese products and Chinese enterprises; 2. for the

---

[11] In this correspondence, Peng Wenlong offered a report on Taishan's drywall manufacturing and attached
a questionnaire that included answers to questions imposed upon Taishan about the quality of its drywall, shipping
and loading information for the boards exported to the U.S., and whether the packages were sealed.

> friendship with Mr. Knauf of more than years. Reluctant to see the
> Knauf Company fighting alone; 3. insisting on the position that our
> products do not have any problems. We should consider the situations
> as we deal with the litigation. The Company may ask the Knauf
> Company to help recommend attorneys for us and delay the
> effectiveness of judgment.

*Id.*.[12] A second teleconference also took place on June 3, 2010, which included Chiefs Cao and

Zhang Jian of CNBM Group, Chang Zanghli of CNBM, Yu Chen of BNBM, Jia Tongchun of

Taishan, and attorney Dong Chungang. *Id.* The topic of the call was "the strategy for responding

to the United States gypsum board litigation." *Id.* The discussion addressed the strengths and

weaknesses of hiring the Hogan Lovells law firm. *Id.* The summary memorandum memorializing

these teleconferences indicates that (1) the owner of Taishan's competitor invited Song Zhiping

and CNBM Group to consider a collaborative effort in responding to the lawsuit; (2) Chairman

Song would organize the response to the litigation; (3) CNBM Group's Board of Directors would

decide the direction of the litigation; and (4) Taishan should retain Hogan Lovells.  *Id.*

Also on June 3, 2010, Zhang Jian of CNBM Group circulated via email to Wang Bing

(BNBM Chairman, CNBM VP, and Taishan Director), BNBM's General Manager and Director,

and Jia Tongchun (Taishan Chairman and BNBM Director) an "Opinion Soliciting Draft" from

CNBM Groups' Board of Directors titled, "Informational Report on Seriously and Proactively

Doing a Good Job in Responding to the Incident of 'Problematic Gypsum Boards Shipped to the

United States.'" [PSC Supp. Resp. Ex. 151]   The report, which describes the timeline of the

lawsuit in great detail, states that "[d]uring the entire development process of the incident,

CNBM Group has required and arranged BNBM PLC and Taishan Gypsum to actively cooperate

---

[12] Song did not have a clear recollection as to most of the facts set forth in the memorandum of this
meeting.  *See* Song Dep. at 107-108. He did, however, recall that he was not in any way involved in a plan to delay
the effectiveness of the judgment against Taishan. *Id.* at 108:2-4. ("as a shareholder, I encouraged Taishan to
actively respond to the litigation. That I remember.").  The PSC contends, however, that the weight of the evidence
refutes Song's testimony on this point.

with quality examinations, various kinds of investigations, surveys, and field inspections organized by the government departments based on the attitude of being responsible for the consumers." *Id.*

On June 27, 2010, Taishan's Foreign Sales Manager, Peng Wenlong, wrote to Chief Zhang of CNBM Group in an effort to comply with a request from CNBM Group to report the relevant statistics to CNBM Group. *See* Email from Peng Wenlong to Zhang Jian dated 6/27/10 [PSC Ex. 81]. The email included a detailed analysis of the lawsuits, the origin of the gypsum used in Taishan's boards, and a spreadsheet showing Taishan's U.S. exports for the years 2005-2007. *Id.* The Chairman and Secretary of Taishan were copied on the email. *Id.*

Throughout the litigation, the Defendants have shared attorneys and law firms.  On November 29, 2010, all of the parties—CNBM Group, CNBM, CNBM (USA), BNBM, Taishan, TTP, and Weifang—signed a Common Interest, Joint Defense and Confidentiality Agreement ("2010 JDA"). *See* [PSC Ex. 93].  Chris Vejnoska (who is the current counsel of record for the CNBM Entities) then represented BNBM.  Joe Cyr of Hogan Lovells represented Taishan and Weifang, and his firm had been retained previously by BNBM.  *See* Chen Dep. at 509.  Since the beginning of the litigation, attorney Dong Chungang has appeared at numerous meetings of all of the CNBM/BNBM and Taishan Defendants. None of the Defendants claim Dong as their legal counsel, but he is a signatory to the more-recent Joint Defense Agreement. *See* [PSC Ex. 94].

CNBM Group approved Taishan's decision not to appear at the Court-ordered Judgment Debtor Examination on July 17, 2014.  On July 7, 2014, CNBM Group issued a notice summoning Taishan's Chairman Jia to appear at its Board of Directors meeting scheduled for July 11, 2014. *See* Notice of 17th Meeting. The third item on the agenda was "[d]eliberating on the proposal on strategies of coping with the event of gypsum board transported to the U.S." *Id.*

At the July 11, 2014 CNBM Group Board of Directors meeting, CNBM Group deliberated on and signed a unanimous resolution (11-0) authorizing Taishan's decision "not to attend the judgment debtor hearing on July 17, 2014." *See* CNBM Group Resolution No. 17. CNBM Group's Chairman Song stated that the Board of Directors unanimously resolved to "respect" the decision for Taishan not to appear before this Court, but he disclaimed any "support" for the decision.

However, also on July 7, 2014—with awareness of the Plaintiffs' effort to collect on the *Germano* judgment and in anticipation of the repercussions of Taishan's contempt of court—CNBM Group directed its subsidiaries to cease depositing any funds in New York banks and to have personnel use their own personal email accounts, rather than company emails, when doing business internationally. *See* Requirements for International Business Risk Prevention. Also on July 7, 2014, attorney DONG Chungang informed Hogan Lovells via email that "It's not Mr. Jia who can make the decision.  This case involves many high-level officers at CNBM group now." *See* Email from Dong Chungang to Hogan Lovells dated 7/7/14 [PSC Ex. 99].

Following entry of the Contempt Order in this case, CNBM Group continued to monitor the litigation. During CNBM Group's Board of Directors meeting on August 15, 2014, Zhang Jian indicated that the CNBM Group need not be concerned about an American judgment: "Regardless of the ruling in the United States, the domestic assets will not be subject to enforcement." *See* CNBM Group 18th Meeting of the Third Session of the Board of Directors dated 8/15/14 [PSC Ex. 96]. At the same meeting, Cao (General Manager of CNBM Group) stated that "There is one thing we need preliminary decision on: Beijing New Building Materials is not going to respond to the lawsuit." *Id.* Similarly, CNBM Group's Chairman Song stated that SASAC "wrote a letter to have us engage in litigation. Engage in limited response to the lawsuit,

dealing with an order of over 2 million [presumably referring to *Germano*]. Now we really can't engage." *Id.* There is clearly a signficiant relationship between CNBM Group and the other Chinese entities, including Taishan. The question is whether this is sufficient to overcome the protection of immunity provided under FSIA.

IV.     **CNBM GROUP IS PRESUMPTIVELY IMMUNE FROM SUIT**

   a.  **Legal Standard Under FSIA**

The FSIA provides the "sole basis" for obtaining jurisdiction over a foreign state. *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 611 (1992).  A foreign state is "presumptively immune" from suit under the Act; "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S.  349, 355 (1993); *see* 28 U.S.C. § 1604.  Once a defendant presents a prima facie case that it is a foreign state, "the burden shifts to the party opposing immunity to present evidence that one of the exceptions to immunity applies." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F. 3d 841, 847 (5th Cir. 2000).

For purposes of FSIA, a "foreign state" includes an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a).  An entity qualifies as an agency or instrumentality if it is *either* "an organ of a foreign state" "*or* [if] a majority of its shares or other ownership interest is owned by a foreign state or political subdivision thereof." *Id.* § 1603(b)(2) (emphasis added); *see also* The Foreign Sovereign Immunities Act: A Guide for Judges (2013) at 30 (hereinafter "FSIA Guide").[13] In other words, "there are two ways in which an entity can fulfill the requirements of 1603(b)(2)": by demonstrating state ownership *or* by qualifying as an "organ." *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 639 (9th Cir. 2003)

---

[13] *Available online at* http://www.fjc.gov/public/pdf.nsf/lookup/fsiaguide2013.pdf$file/fsiaguide2013.pdf.

(emphasis added). "The terms of § 1603(b)(2) are explicit and straightforward. Majority ownership by a foreign state…is the benchmark of instrumentality status." *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003); *see also Hester Int'l Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 176 n.5 (5th Cir. 1989) ("NGPC is clearly an 'agency or instrumentality' of Nigeria for purposes of the FSIA, because Nigeria owned 100% of NGPC's stock."); *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1176 (5th Cir. 1989) (finding agency/instrumentality status because "the government of Brazil owns the majority of Petrobras' shares").

CNBM Group qualifies as an "agency or instrumentality of a foreign state" within the meaning of FSIA because a majority of its shares are owned by a foreign state, namely the People's Republic of China. CNBM Group is a state-owned company incorporated under the Chinese law; it enjoys the rights of a separate corporate legal person; and it is—and was, at the time this suit was filed—directly and wholly owned by the People's Republic of China ("PRC"). *See* 28 U.S.C. § 1603(b). Given the either/or standard articulated above, Plaintiffs' argument that CNBM Group is not an "organ" of the PRC is irrelevant. Indeed, Plaintiffs' own authority observes that the vast majority of cases "have determined § 1603(b)(2) agency/instrumentality status using the 'ownership', rather than the 'organ', prong" of the statute. *Kelly*, 213 F.3d at 846. Thus, because it is directly and wholly owned by the PRC, CNBM Group is an instrumentality of a foreign state and, pursuant to FSIA, is presumptively immune from suit. *See Stena Reder AB v. Comision de Contratos del Comite Ejecutive General*, 923 F.2d 380, 390 & n.14 (5th Cir. 1991). But the analysis does not end here.

## V.   NO STATUTORY EXCEPTION TO SOVEREIGN IMMUNITY APPLIES TO CNBM GROUP

Under FSIA, a plaintiff can overcome a foreign state's presumptive immunity from suit by establishing one of the statute's exceptions to immunity. *Nelson*, 507 U.S. at 355; *see also Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994)("[T]he plaintiff seeking to litigate in the district court bears the burden of coming forward with facts showing that an exception applies."). Because CNBM Group presented a prima facie case that it is an instrumentality of the PRC, "the burden shifts to the [Plaintiffs] to present evidence that one of the exceptions to immunity applies." *Kelly*, 213 F.3d at 847. Here, Plaintiffs have asserted that their claims fall within the tort exception contained in § 1605(a)(5) and the commercial activity exception contained in § 1605(a)(2). The Court analyzes these exceptions in turn.

### a.   The Tortious Activity Exception

The tortious activity exception contained in § 1605(a)(5) applies only when alleged injury *and* the foreign state's tortious conduct occurred within the United States. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439-41 (1989); *Jones v. Petty-Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061, 1065 (5th Cir. 1992) (the tort exception "requires not only that personal injury or property damage occur in the United States, but also that the tortious act or omission occur here"). CNBM Group did not engage in any drywall-related conduct in the United States. Any limited role CNBM Group may have played as a shareholder occurred in China. Because Plaintiffs fail to establish this geographical requirement, the Court "need not pause to consider" whether CNBM Group engaged in tortious conduct "because it is clear that the conduct complained of lacks the required nexus with the United States." *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1524 (D.C. Cir. 1984). Further, whether other Defendants, including Taishan, engaged in tortious activity in the United States is irrelevant to the instant inquiry because even if a tort occurs in the United States, a foreign

sovereign's alleged support of the tort does not confer jurisdiction where the sovereign's support "took place completely outside the United States." *In re Terrorist Attacks*, 714 F.3d 109, 117 (2d Cir. 2013). Because the Plaintiffs fail to specify what tortious conduct *CNBM Group* allegedly committed in the United States, the tort exception does not apply to CNBM Group.

### b. Commercial Activity Exception

To establish jurisdiction under the commercial activity exception, a plaintiff must demonstrate that its claims are "based upon" (1) "a commercial activity carried on in the United States by the foreign state; (2) an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

Plaintiffs base their claim of the applicability of the commercial activity exception on two theories: (1) CNBM Group engaged in commercial activity; and (2) CNBM Group's subsidiaries, including Taishan, engaged in commercial activities and their actions are attributable to CNBM Group. The Court will discuss the first theory in this section and the second theory in the following section.

In analyzing the first theory, it should be noted at the outset that the commercial activity exception applies only if Plaintiffs' claims are "based upon" an act or activity by CNBM Group. 28 U.S.C. § 1605(a)(2); *see De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1391 (5th Cir. 1985); *Nelson*, 507 U.S at 356. Here, the commercial activity that forms the basis of Plaintiffs' claims is the manufacture, sale, and export of allegedly defective drywall.[14] Critically,

---

[14] This Court has found that this commercial activity was conducted by Taishan and the Fifth Circuit affirmed this finding. Thus, as will be analyzed in the following section, the critical question is whether Taishan's actions are attributable to CNBM Group on a theory of alter ego.

however, CNBM Group has *never* manufactured, inspected, sold, supplied, distributed, marketed, exported, or delivered drywall. *See* Cao Decl. ¶ 9.  Further, neither Taishan nor BNBM PLC ever consulted with CNBM Group regarding their decisions to market or sell drywall into the United States. *See id.* at ¶ 16. Rather, CNBM Group merely invested in companies that invested in other companies that engaged in the activity on which the Plaintiffs' product liability claims are based.[15]

Having failed to show that CNBM Group actually manufactured, sold, or exported drywall, Plaintiffs point to other activity by CNBM Group that they contend provides a basis for applying the commercial activity exception. Specifically, Plaintiffs point to the fact that (1) CNBM Group coordinated other defendants' response to the drywall litigation, including Taishan's decision not to appear for its debtor examination hearing and (2) that CNBM Group was involved in "analyzing the volume of Taishan's sales" of drywall to the United States. *See* PSC. Resp. at 103-04. However, these alleged acts by CNBM Group cannot strip it of its presumptive immunity because they are not the basis of Plaintiffs' claims.

First, the allegation that CNBM Group coordinated other defendants' response to the drywall litigation, including Taishan's decision not to appear for its debtor examination hearing—even if it were true—has no bearing on the applicability of the commercial activity exception because Plaintiffs' claims are "based on allegedly defective drywall (and not on Taishan's decision regarding the debtor examination)." (R. Doc. 19612 at 3-4). Any role CNBM

---

[15] Any indirect role it may have played as an indirect shareholder is not "commercial" within the meaning of FSIA. *See Kato v. Ishihara*, 360 F.3d 106, 111-12 (2d Cir. 2004) (defendant did not engage in "commercial activity" under FSIA when it "provided general business development assistance, including product promotion, to Japanese businesses.")

Group may have played in coordinating a response to the drywall litigation obviously occurred after the facts that gave rise to Plaintiffs' claims, and thus cannot form the basis of those claims.

Second, Plaintiffs' assertion that the commercial activity exception applies because CNBM Group was involved in "analyzing the volume of Taishan's sales" of drywall to the U.S. fails for a similar reason as the one articulated above. The evidence Plaintiffs produce in support of their assertion indicated that CNBM Group requested export data from Taishan in 2010 i.e., after the litigation was filed and the allegedly defective drywall was sold. Thus, like CNBM Group's alleged coordination of the litigation strategy, this is not activity on which the Plaintiffs' claims are based. Plaintiffs' claims are based upon the manufacture and sale of drywall—not the post hoc analysis of export data. Reviewing export data after the fact cannot form the "basis" of Plaintiffs' product liability claims. Thus, because Plaintiffs have not produced any evidence sufficient to show that CNBM Group engaged in the acts or activities on which Plaintiffs' claims are based, the commercial activity exception does not apply to CNBM Group itself.

## VI.    OTHER DEFENDANTS' ACTIONS CANNOT BE ATTRIBUTED TO CNBM GROUP

Because CNBM Group enjoys a presumption of immunity and did not itself engage in activity that can trigger an exception to its immunity, the critical issue before the Court is whether the actions of the other Defendant companies such as Taishan can be attributed to CNBM Group to deprive CNBM Group of its immunity under FSIA.

"[D]uly created instrumentalities of a foreign state are to be accorded a presumption of independent status" for purposes of FSIA. *First Nat'l City Bank v. Banco para el Comercio Exterior de Cuba ("Banec")*, 462 U.S. 611, 627 (1983).[16]  A plaintiff seeking to defeat an

---

[16] This presumption applies not only in cases brought against a sovereign state itself, but also, in cases brought against nationally owned companies. *See Arriba Ltd v. Petroleos Mexicanos*, 962 F.2d 528, 533 (5th Cir. 1992); *see also, e.g., First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176-77 (2d Cir. 1998); *Gates*

agency or instrumentality's presumption of separate status faces a high bar. This presumption applies when, as here, a plaintiff seeks to establish jurisdiction through an exception to immunity.  *See Arriba Ltd v. Petroleos Mexicanos*, 962 F.2d 528, 533-34 (5th Cir. 1992). It can only be overcome "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created." *Banec*, 462 U.S. at 629. Complete ownership and appointment of a board of directors are not enough. *Hester*, 879 F. 2d at 181. Nor is it sufficient for the defendant to exercise a "supervisory role" over its subsidiaries. *See Id*; *see also First Inv. Corp. of the Marshall Islands v. Fujian Mawei Shipbuilding, Ltd.*, 858 F. Supp. 2d 658, 676 (E.D. La.) *aff'd sub nom.*, 703 F.3d 742 (5th Cir. 2012) (even a "significant amount of supervisory control" does not "overcome the presumption of separateness"). Rather, a plaintiff must prove that the sovereign exercised "extensive control" over the "day-to-day management" of the subsidiary. *See Hester*, 879 F.2d at 181; *see also Walter Fuller Aircraft Sales, Inc., v. Republic of Philippines*, 965 F.2d 1375, 1382 (5th Cir. 1992) (the Fifth Circuit pays "particularly close attention to whether the [sovereign defendant] is involved in day-to-day operations" of its purported alter ego).

Where, as here, jurisdiction depends on an allegation that one entity acted as the alter ego of a sovereign defendant, "the plaintiff bears the burden of proving this relationship." *Arriba*, 962 F.2d at 533-34. There is undeniably some control by CNBM Group but Plaintiffs have not "demonstrate[d] the level of control necessary to overcome the presumption in favor of [CNBM Group's] separate identity." *First Inv. Corp. of Marshall Islands v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 754 (5th Cir. 2012). Plaintiffs' evidence demonstrates only that CNBM Group held an indirect ownership interest in companies that manufactured or sold drywall and

---

*v. Victor Fine Foods*, 54 F.3d 1457, 1464-65 (9th Cir. 1995); *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1287 (3d Cir. 1993).

exerted some supervisory influence over its subsidiaries. It does not sufficiently demonstrate that CNBM Group exercised the requisite extensive, day-to-day control over its subsidiaries so that the actions of the subsidiaries can be attributed to CNBM Group for jurisdictional purposes under FSIA.

As indicated above, even complete ownership and appointment of a board of directors does not overcome the presumption of separate status absent a showing of extensive control and routine, day-to-day involvement. *See Hester*, 879 F.2d at 181; *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 448 (D.C. Cir. 1990) ("Majority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent under FSIA."). Here, the relationship is even more strained given that CNBM Group itself has no direct investments in companies that are actually engaged in the drywall business i.e., Taishan and BNBM PLC.

Moreover, the fact that CNBM Group and some of its subsidiaries share (1) common officers and directors; (2) office buildings; and (3) logos is insufficient to overcome the presumption of independent status for purposes of FSIA. First, some overlap among officers and directors does not indicate an alter ego relationship because it is a "'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately.'" *United States v. Bestfoods*, 542 U.S. 51, 69 (1998) (quoting *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997). Second, the sharing of a common logo and part of a common name does not evince alter ego status. *See e.g., Fletcher v. Alex, Inc.*, 68 F.3d 1451, 1460 (2d Cir. 1995) (sharing of conglomerate logo does not justify piercing the corporate veil).[17] Additionally, it must be noted

---

[17] Similarly, the fact that defendant companies were marketed to investors "as one – one group" and CNBM Group management focused "on ensuring strong integration across different business's segments by

that CNBM Group does not share any of the aforementioned characteristics with Taishan, the company that engaged in the manufacture and sale of defective drywall i.e., the activity on which the Plaintiffs' claims are based.

Moreover, the fact that CNBM Group supervised its subsidiaries' high-level decisions, consistent with its shareholder rights, is equally insufficient to overcome the presumption of separate status accorded pursuant to FSIA. Even when a sovereign defendant's rights as shareholders give it a "significant amount of supervisory control" over its subsidiaries, the presumption of separate status is not overcome "[w]ithout more evidence of [the sovereign defendant's] involvement in the day-to-day operation and management" of its subsidiaries. *See Fujian Mawei*, 858 F. Supp. 2d at 679.

CNBM Group's influence as an indirect minority owner does not show day-to-day control. CNBM Group itself has held only an indirect, minority equity interest in Taishan that never rose above 21%. CNBM Group holds a minority interest in CNBM Company; CNBM Company holds a minority interest in BNBM PLC; and BNBM PLC holds a majority interest in Taishan. Given that complete ownership and appointment of a board of directors has been held to be insufficient to overcome the presumption of status, *see Hester*, 879 F.2d at 181, an indirect minority ownership filtered through multiple levels of investment cannot overcome the presumption. *See Freund v. Republic of France*, 592 F. Supp. 2d 540, 556-57 (S.D.N.Y. 2008) (a sovereign defendant "cannot control the business decisions" of an indirect subsidiary "through its 35% ownership interest" in another intermediate subsidiary").

---

cultivating a unified corporate culture and establishing coordinated purchasing sales, logistics and other operational processes and procedures" does not demonstrate control. *See* Keyes Dep. at 253:5-7, 253:22-254:6; *see also In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*, 735 F. Supp. 2d 277, 323 (W.D.Pa. 2010) ("[C]ommon marketing imaging and joint use of trademarked logos fails to render [one company] an alter ego of [another]. [A company may be] portrayed as a single brand to the public, but this evidence does not demonstrate the necessary control by defendant parent over the subsidiaries."), *aff'd* 683 F.3d 462 (3d Cir. 2012)

Plaintiffs' assertion that CNBM Group appoints directors of its subsidiaries also does not demonstrate the requisite control. Notably, CNBM Group only nominates and votes for directors of subsidiaries in which it directly holds an ownership interest, such as CNBM Company and BNBM Group. It does not have the ability to appoint directors of companies in which it holds only indirect equity interests, such as BNBM PLC or Taishan i.e., the companies allegedly engaged in the manufacture and sale of defective drywall.

The fact that CNBM Group is a "Controlling Entity" or "Actual Controller" of certain other defendant companies reflects basic ownership structure and shareholding influence, not day-to-day control, which is necessary for alter ego status. "Controlling Entity" refers to an entity that owns 20% or more of another company's stock and has the right to nominate directors. Similarly, BNBM PLC's reference to CNBM Group in annual reports as an "Actual Controller" is not an evidence that CNBM Group controls its day-to-day operations; it is simply an indication that CNBM Group's indirect equity interest in BNBM PLC is sufficient to give it influence over the board of directors—a fact that is not in dispute and does not affect the companies' separate status. *See Foremost-McKesson*, 905 F.2d at 448 ("majority control over a board of directors" is "not sufficient to establish a relationship of principal to agent under FSIA.").

CNBM Group explained that it does not "manage the daily operations of" or "make ordinary business decisions for" any of its subsidiaries. Cao Decl. at ¶ 14; *see Fujian Mawei*, 858 F. Supp. 2d at 677 (rejecting an alter ego allegation where the defendant's "uncontroverted declaration" showed a "lack of involvement in the day-to-day operations" of the subsidiaries). Indeed, rather than showing involvement in daily operations, Plaintiffs' evidence shows that CNBM Group behaves as a responsible shareholder: by issuing guidance to its representatives on

the boards of directors of its *direct* subsidiaries (CNBM Company and BNBM Group) and
instructing those directors to consult with CNBM Group for "significant decisions"—e.g.,
changes in high-level executive officers, significant investments, and financial guarantees to
other entities.  CNBM Group Admin. Measures at 6 (PSC Resp. Ex. 43). Ensuring that directors
share the sovereign's goals with respect to significant decisions does not support an alter ego
relationship; "[t]he sovereign must instead use its influence over these directors in order to
interfere with the [subsidiary's] ordinary business affairs. *EM Ltd. v. Banco Central De La
Republica Argentina*, 800 F.3d 78, 93 (2d Cir. 2015).

Similarly, the fact that CNBM Group issues "group-wide policies and procedures" to its
subsidiaries by, for example, setting "strategic goals," requiring annual risk management reports,
and exercising its shareholder rights on "major issues" related to "investment and financing," *see*
(PSC Resp. at 30-35, 43-47), does not indicate an alter ego relationship. "[M]onitoring of the
subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions,
and articulation of general policies and procedure" is "consistent with the parent's investor
status." *United States v. Bestfoods*, 524 U.S. 51, 72 (1998) (internal quotation marks omitted).
Thus, the fact that CNBM Group "guides" subsidiaries in "establishing…a set of unified
enterprise values" and issues policies regarding "risk management," "significant personnel
appointments," and " business decisions," does not show that it "so extensively controlled" their
day-to-day operations as to "transform" them into its alter ego. *See* PSC Resp. at 30-31; *see also
EM Ltd.*, 800 F.3d at 94; *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1072-73 (9th Cir.
2002) ("policymaking" represents "supervision" and does not show the "day-to-day control
sufficient to overcome" the presumption of separate status).

Finally, *assuming arguendo*, that CNBM Group coordinated its subsidiaries' response to this litigation, such direction by CNBM Group would not demonstrate the kind of "day-to-day, routine involvement" necessary to overcome the presumption of separate status. The fact that a parent of a conglomerate corporation supervises, coordinates, or even controls its corporate response to international litigation seeking "massive" damages against its subsidiaries "hardly qualifies" as exercising control over routine, daily business. *See Transamerica*, 200 F.3d at 851.

## VII.   CONCLUSION

First, as a state-owned entity, CNBM Group enjoys a presumption of immunity under FSIA. Second, because it does no business in the United States, and has never manufactured, marketed, sold, or shipped drywall in China or anywhere else, no exception to immunity applies to CNBM Group. Finally, and most critically, Plaintiffs have not put forth sufficient evidence to show that CNBM Group controlled the day-to-day operations of Taishan and its subsidiaries as required under FSIA to demonstrate an alter ego relationship and overcome the presumption of separate status.  Other than evidence of instances of supervision, general corporate governance structure, or high-level policy directives, the majority of the Plaintiffs evidence shows that CNBM Group played a role in coordinating the conglomerate corporation, including Taishan's, response to the litigation. However, as stated above, control over massive litigation is not equivalent to control over day-to-day operations. This Court therefore lacks subject-matter jurisdiction over CNBM Group because it is entitled to sovereign immunity under FSIA.

Accordingly, CNBM Group's Motion to Dismiss is **GRANTED**.


New Orleans, Louisiana this 9th day of March 2016.

_____
UNITED STATES DISTRICT JUDGE