RECEIVED

MAR 11 2016

CHAMBERS OF
U.S. DISTRICT JUDGE
ELDON E. FALLON

To the Honorable Judge Eldon E. Fallon,

My name is Joanne C. LeClair. My husband Richard R. LeClair and I are members of the Chinese Drywall Settlement Program MDL 2047. Our claimant ID number is 101395. We chose option 1 contactor Moss and Associates to do the remediation of our home at 5512 Moss Hill Ln. Moss' subcontractor for our home's remediation is Jason B. Wade of J.B. Wade Custom Homes, Austin Texas.

We are writing this letter to you since this remediation started on March 4, 2015, and is still ongoing as of today (March 10, 2016). The following is the time line explaining what has occurred during this time Period.

March 4, 2015, the kick-off meeting and remediation's hard demolition process commenced After demolition was completed, the house was further cleaned, had Odorox treatment, and was power washed.

March 14, 2015, the house was inspected and certified by Pete Martinez of GFA International to be CDW free and ready for rebuild. My husband and I requested of Mr. Lloyd Jordan (JB Wade's employee) to be present during this inspection, which was to occur at 1:00 PM on this date (March 14). When we arrived at the home for the 1:00 p.m. meeting (at approximately 1:05 PM) we were told the GFA inspector had already been there and completed the inspection of our 4300 sq. ft. home and that we had just missed him. We were both dumfounded as to how that size of home could be inspected in 10 to 15 minutes. As proof, Mr. Jordan showed us a cell phone picture of the inspector's report. New wiring and HVAC units and air ducting were installed shortly after this inspection.

March 16, 2015, I informed Kyle Kuberski of Moss and Associates that a strong sulfurous odor remained in the home.

March 26, 2015, Kyle Kuberski met me at my CDW house located at 5512 Moss Hill Ln. His proposed solution, after briefly inspecting the house, was to have Odorox treatment again for an additional 4 days.

March 29, 2015, I noticed the newly installed wiring was turning dark. The sulfurous odor remained strong throughout the house. The sheetrock for the rebuild was already distributed in piles throughout the house. The following Monday the crew would have begun hanging sheetrock. Because the new wiring was turning dark and with the strong smell of sulfur remaining in the house, I spoke with our attorney, Chip Lane.

March 30, 2015, our attorney, Chip Lane contacted Moss and their subcontractor (Jason Wade) to stop work on the house until further notice. (Something was very wrong, and building on top of it would cover up the, as yet, undetermined cause.)

March 30, 2015, to May 4, 2015, I began to try to find the source and cause of the sulfurous odor and darkening electrical wiring. I found CDW debris in my house in the headers over doorways, in the commode tanks, in my kitchen and bathroom cabinets, in the fireplace, in electrical junction boxes, window sills, in the floor decking, stuck between the studs, and on the trusses. Drywall dust remained on the framework throughout the house and old insulation remained in the soffit vents. In short, my house was left with Chinese drywall dust and debris from attic to lower story. Also, drywall dust mixed with water from the power washing was found to be caked on walls, studs, and wrought iron stair rail bases. I have thoroughly photographed all of the areas mentioned above.

May 4, 2015, some of the storage pod contents were set back into my house, since Jason Wade was planning on returning it to the vendor. Those contents consisted of cabinets with CDW debris in them, the commode tanks with CDW in them, the cultured marble counter tops from the bathrooms with CDW still attached to them.

May 6, 2015, we had air corrosivity testing done by Jerome Spear, CIH. Attached are his test results.

May 11, 2015, Jason Wade's crew set the remainder of the pod contents back in my house.

May 13, 2015, the drywall for the rebuild was removed from my house. After the condition Moss' contractor left our house in. We did not want them to return. The GFA certification was highly questionable.

Late May 2015, Moss representatives told our attorney, Chip Lane, there was only approximately $90,000 left of the allotted funds to finish the remediation and rebuild of our home. This is what they were going to give us if we continued to keep them from proceeding with the job.

June 2, 2015, I called your office and spoke with Toni Leard about my dilemma. You were present at the time and told her to have me contact Lenny Davis and have this turned over to the ombudsman, Louis Velez.

June 19, 2015, the following occurred:

- Through working with the ombudsman, a meeting was held with Moss to discuss returning to the job. Attending this meeting were my husband and I; Moss representatives Phil Adams, Kyle Kuberski, Tim Harris, and their subcontractor Jason Wade; Tom Ortner (representing GFA International); and our attorney Chip Lane.

- At this meeting, Tom Ortner made a thorough inspection of the house and informed all who were present that it was not free of CDW and that the wiring and HVAC systems, already installed, needed to be removed and replaced before further cleaning commenced. At the end of this meeting, it was agreed that Moss and their contractor, Jason Wade, would return to finish this remediation.

- At this meeting we brought up the testing and sample results that we had done on May 6, 2015, to Tom Ortner and he stated that they were no good since they were not recognized by the court as a valid testing method.

August 10, 2015, a kick off meeting was held for the work to resume on removing the remaining CDW and it started on August 11, 2015. At this time, we had our attorney request additional living expenses because this remediation was going over the contracted time of 5 months. We were turned down on this request.

Mid to late August 2015, I found CDW debris was behind the vapor barrier that went around the interior of the lower story. Some of this debris has fallen through and remains next to the foundation. It could not be vacuumed out.

September 2, 2015, the cleaning was finished. GFA certification was given by Tom Ortner of GFA International who had returned to follow up on the removal of CDW. The buildout commenced immediately with new wiring being the first thing installed.

September 4, 2015, I made carpet and tile selections at Pride Flooring. The carpet and pad installed in my home remain in dispute with Moss. Louis Velez has shared all emails concerning this with the court.

September 5, 2015, I left Texas to go to Wyoming to care for my terminally ill mother.

November 19, 2015, the punch list meeting was held. In attendance; Richard LeClair, Danielle LeClair (our daughter), Jason Wade, Lloyd Jordan, and another employee of Jason Wade. The carpet and underlayment were put on the list.

January 23, 2016, I returned to Texas and on January 24, 2016 saw my rebuilt house for the first time. I believed all that remained to be done was the punch list items and settle the dispute about the carpet. That was until I decided to look at the wiring in a kitchen outlet. I was shocked to find:

1. The new wiring is turning dark and appearing to corrode as I have seen it do before. Why? The house is supposed to be remediated.

2. Outlets in all rooms on both floors have dark ground wires, and I have found a blackened loaded wire also.

3. The copper tubing in the attic coming from the air handlers appear to be corroding. I can rub the tarnish off of them.

4. In my garage is a pile of bricks with old debris in them. There is a sulfurous odor in the garage. The garage door opener was replaced on January 29th. 2016. The new one seems to be malfunctioning. The new garage refrigerator's compressor is making a loud intermittent noise. The coils of this new refrigerator have black corrosion on them.

(Note: This refrigerator is a replacement for one we had in the garage pre-remediation. It was probably placed there in October of 2015.)

5. Perhaps of greatest concern other than the fear that my home is still tainted and damaging the wiring, new appliances, and air handlers, is that my husband and I have had to continue renting storage space, and still have the financial burden of maintaining another residence for over one year instead of the 3-4 months it was supposed to take. Moss' incompetence and negligence has dragged this on and we have received no further additional living expenses despite requests to Moss after the failed GFA inspection (please refer to Thomas Ortner's GFA report). We need additional living expenses to be paid for this extended time out of our home.

Based on the appearance of the corrosion of the above mentioned items, we are requesting that the house be tested by Benchmark Remediation. We cannot afford to do this testing.

As stated previously, this remediation is now past the one-year mark and we are requesting additional living expenses since none of the delays should be attributable to us.

You Honor, we appreciate your time in reviewing this letter on our behalf.

Respectfully Submitted by,


Richard R. and Joanne C. LeClair

Attachment 1. Contractor and GFA certification March 14, 2015

## CONTRACTOR CERTIFICATION

... drywall, including all debris and waste dust, electrical wiring, fire safety and security equipment and copper gas lines have been removed in accordance with the Scope of Work related to the Settlement Agreement for the remediation. Removal work has been confirmed by a visual inspection of all surfaces in the work area and any adjacent areas (including but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) that found no dust, debris or residue. Also there was no detectable odor of Chinese drywall at the completion of removal and cleaning work and prior to the start of new drywall installation. Evaluation for odor was performed at first entry to the house after it had been vacant and with all windows and doors closed for a period of at least 8 hours.

Contractor Name: _____

By: _____
(Signature)

(Print Name): _____

(Print Title): _____



COMPLIES
YES    NO

PHOTOS TAKEN
YES    NO

N/A    YES

6. PHOTOS TAKEN AREA OF FRONT OF HOME, HOUSE NUMBER & 2 GEHEM FROM EACH FLOOR

7. PHOTOS TAKEN OF ALL NON COMPLIANT ITEMS

COMMENTS/ACTION REQUIRED

Inspection Performed By: _____

Print Name                Signature

... approval of GFA International



**Since 1988**        *Florida's Leading Engineering Source*

Environmental • Geotechnical • Construction Materials Testing • Threshold and Special Inspections • Plan Review & Code Compliance

## ENVIRONMENTAL CERTIFICATION

I certify that I have verified the Contractor's certification that all drywall has been removed, including all debris and visible dust, as set forth in the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047. This certification is based upon an independent visual inspection of all surfaces in the work area and any adjacent areas (including, but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) that found no dust, debris or residue. Also there was no detectable odor of Chinese drywall at the completion of removal and cleaning work and prior to the start of new drywall installation. In addition, the atmosphere in the house was found to be representative of the atmosphere in houses built without "problem" drywall.

Name:   LeClaire-Roshar Residence

Property Address:   5512 Moss Hill Lane, Rosharon, TX

Date Inspection Completed:   3/14/15

GFA International, Inc.
Certificate of Authorization #14382



3/16/15

Paul H. Danforth, P.E.
Professional Engineer #116221
State of Texas

Attachment 2. Indoor Air Quality Investigation prepared by Jerome E. Spear, CSP, CIH.   J.E. Spear Consulting, LP

# Indoor Air Quality Investigation

For

## Richard and Joanne LeClair
5512 Moss Hill Lane
Rosharon, Texas 77583

Prepared By:

**Jerome E. Spear, CSP, CIH**
**J.E. Spear Consulting, LP**
19314 Timber Ridge Drive
Magnolia, Texas 77355
Telephone (281) 252-0005

May 30, 2015



## EXECUTIVE SUMMARY

Richard and Joanne LeClair requested that J.E. Spear Consulting, LP conduct an indoor environmental assessment of their single-family residential property 5512 Moss Hill Lane in Rosharon, Texas.  The purpose of this survey was to evaluate the cleanup and remediation of corrosive drywall (CDW) from the home prior to proceeding with the installation of new construction materials.

The initial CDW on-site survey was performed on May 4, 2015 by Jerome E. Spear, CSP, CIH. Air corrosivity sampling was subsequently performed from May 6 to 11, 2015.  A bulk sample of the moisture barrier sheathing was also collected from the wall in the dining room on May 6, 2015 for a chamber emissions test.

The results of this CDW assessment is summarized below.

- The air corrosivity measurements resulted in levels that are commonly found in homes with corrosive drywall.

- The visual assessment included observations and signs of visible corrosion in the electrical wiring.  Copper tubing recently installed in the home also has signs of visible corrosion.  Residual drywall dust and debris was observed on the floor and other surfaces and in electrical junction boxes.  Insulation was not removed from the soffits.  A slight "burnt-match" odor was also observed inside the home on the date of the assessment.

- The emissions test of the moisture barrier sheathing resulted in non-detectable levels for the 20 sulfur compounds that were analyzed.

## Conclusions and Recommendations

The following conclusions and recommendations are provided:

1. The dust and debris remaining in the home are likely the source of elevated air corrosivity in the home.

2. All items with residual drywall dust and debris should be removed from the home.  After removal of debris and larger particles, all surfaces should be cleaned until no visible

1

demolition dust is present.  The removal of dust and debris from surfaces should be performed by high-efficiency vacuuming followed by damp wiping.

3. Any existing junction boxes for electrical switches and/or outlets should be replaced.

4. When the cleanup is complete, a third-party consultant should verify the cleanup results prior to proceeding with the installation of new structural materials.  The air corrosivity should be within acceptable levels prior to the installation of new structural materials.

5. The electrical wiring installed in the home should be inspected by a qualified/licensed electrician to determine if the electrical wiring is required to be replaced in order to meet applicable electrical codes and regulations.

6. The HVAC system should be inspected by a qualified/licensed HVAC technician system to determine if any components need to be repaired and/or replaced as needed for the system to be in functional condition.

7. The existing plumbing lines and water heater should be inspected by a qualified/licensed plumber to determine if any plumbing components need to be repaired and/or replaced as needed.

### Limitations

*This survey was conducted to evaluate the cleanup and air corrosivity following the demolition and removal of corrosive drywall.  J.E. Spear Consulting, LP has prepared this report in accordance with generally accepted practices at the time of work.  Results of this report are based on the observations and testing conducted at the time of the survey.  Actual conditions may vary from day to day and throughout the year.  Hidden conditions and areas not investigated may be different from the areas investigated by J.E. Spear Consulting, LP.*

## BACKGROUND

The subject home was built by Brighton Homes in 2006. The home is a two-story home with 4301 square feet. During construction, corrosive drywall (CDW) was installed in the home. Subject to the Knauf Class Settlement Agreement, CDW was being remediated from the home in accordance with the Work Authorization Agreement between the property owners and the contractor, Moss and Associates, LLC, as agent for the Knauf Defendants.

The lead contractor, based in Fort Lauderdale, Florida, hired a subcontractor, J.B. Wade Custom Homes based in Austin, Texas to perform the demolition and removal of CDW and the build-back construction work. The owner's (and occupants) moved out of home on March 3, 2015. The demolition activities, including the drywall removal started on March 4, 2015 by J.B. Wade Custom Homes.

Reportedly, approximately 60 to 70% of the existing drywall in the home consisted of CDW. On the first floor, CDW was located in the ceiling, the living room (great room), kitchen, breakfast nook, dining room, master bedroom closet, laundry room, bathroom adjacent to the laundry room, and the computer room. On the second floor, CDW was located in the northwest bedroom (one sheet), bathroom (multiple sheets), southwest bedroom (multiple sheets), and game room (multiple sheets).

The remediation protocol prepared for this project specifies the removal and replacement of all drywall in the home, electrical wiring, insulation, carpet and flooring, HVAC (and associated components), all affected plumbing components, and appliances. The protocol also specified the removal, storage, and reinstallation of fixtures. See the Remediation Protocol for the scope of work specifications.

Fixtures such as cabinets, countertops, ceiling fans, doors, etc. were stored in a POD placed in the driveway of the home. Residual drywall and dust were not completely removed from these items and these items were not completely cleaned from drywall dust and debris prior to placing these items in storage during the CDW demolition activities.

A post-remediation environmental inspection was reportedly performed on March 14, 2015. The project reportedly passed the environmental inspection; however, no inspection report was provided to the owner. The owner reported that the inspector was at the house for about 10 minutes.

3

New electrical wiring was installed in the home prior to March 19, 2015.  A new HVAC system and ductwork was installed in the home around March 20, 2015.  A new water heater was also installed in March of 2015.  Due to "burnt match" odors persisting in the home and the new copper wiring recently installed was already turning black and starting to corrode, the owner stopped the build-back construction activities until an environmental assessment was performed.

## VISUAL ASSESSMENT

A visual assessment of the home was conducted on May 4, 2015.  On the morning prior to the assessment, personnel arrived from J.B. Wade Custom Homes and removed items from the POD located in the driveway and placed the items in the garage, living room, and great room. The items removed from the POD contained residual drywall dust and debris; thus, they were not cleaned or decontaminated prior to placing them in the POD (see Attachment 1 - Photos).

New electrical wiring was installed in the home on March 19, 2015 and had evidence of corrosion (see Attachment 1 - Photos).  The junction boxes for switches were not replaced prior to installing the new wire.  There was visual evidence of residual dust remaining in the junction boxes for switches and outlets at the time of the visual assessment.  Copper tubing recently installed in the home also showed signs of visible corrosion (see Attachment 1 – Photos).

A slight "burnt-match" like odor was present at the time of the visual assessment.  There was evidence of residual dust and debris on surfaces in the home, including but not limited to window sills, granite bar countertops, steps and railings, and on wood frame members (see Attachment 1 – Photos).

The moisture barrier sheathing located along the perimeter/exterior walls had holes in some areas, which were reportedly damaged during the demolition and removal of the drywall.  In addition, insulation material was not full removed from the soffits (see Attachment 1 – Photos).

## EFFECTS OF CORROSIVE DRYWALL EMISSIONS

Corrosive drywall (CDW) contains gypsum contaminated with sulfur and can emit gaseous pollutants associated with blackening of metal surfaces, and a burnt-match-like odor.  The

4

earliest reports of CDW installation date back to 2001, and the importation of CDW from China ceased in 2007. Peak years of CDW use appear to have been between 2005 and 2007.

Drywall containing elemental sulfur is consistently associated with corrosive emissions. These emissions are a complex, variable mixture of contaminants in the parts per billion (ppb) level, which includes corrosive and odorous sulfide gases. The sulfides appear to be produced by a chemical/physical mechanism, with emissions increasing with temperature and moisture.

Sulfide gases produced by CDW react with metal surfaces to form black corrosion (i.e., copper sulfide, silver sulfide, etc.). Corrosion of metal surfaces caused by CDW emissions has a unique appearance – a black, soot-like coating, some of which rubs off when touched. This corrosion has been associated with the failure of air-conditioning coils as well as damage to electrical and mechanical systems and contents of the building belonging to the occupant(s). This type of corrosion can be visually differentiated from corrosion related to oxidation, which is green or white in color, and from tarnishing caused by moisture, which is gray.

Individual compounds in emission from CDW are in low ppb concentrations. Health effects of exposure to sulfide mixtures in this range are poorly understood. A Center for Disease Control (CDC) toxicological evaluation suggested that air contaminant concentrations associated with emissions from CDW are below levels that present a health hazard.

## REMEDIATION STANDARDS AND GUIDELINES

To effectively control emissions from CDW, remediation should 1) remove all corrosive drywall, 2) eliminate visible demolition dust, 3) eliminate residual CDW odors from remaining surfaces, and 4) restore electrical and mechanical systems to a safe, reliable, and code-compliant condition. Some CDW remediation projects treat drywall without removal; however, the efficacy of these methods has not been established.

Where CDW is widespread throughout the home, removal of all drywall may be considered the most cost-effective remedial strategy. Drywall replacement should include the removal of adjacent trim and millwork for access to and removal of insulation for control of residual emissions. Sulfide emissions may continue to be released from remaining demolition dust or sulfide compounds sorbed on remaining surfaces.

5

Volatile air contaminants often adsorb to porous surfaces, releasing odors after removal of the primary source. This "sink effect" is resolved after residues off-gas. In some cases, CDW odor has been reported to persist for months after drywall removal and cleanup. Elimination of this odor is facilitated by airing out the structure by opening windows and using portable fans. The length of time required to control CDW odor by air-out alone ranges from several days to several months, but should be completed before installation of new structural materials. Opinions vary as to whether air-out is necessary.

After removal of debris and larger particles, all surfaces should be cleaned until no demolition dust is present. Frequently, this is done by HEPA vacuuming followed by damp wiping. When cleanup is complete, a third-party should verify the cleanup results. All remnants associated with drywall specified for removal must be eliminated.

Chemical testing for airborne sulfide mixtures lacks the sensitivity and selectivity to document ambient concentrations of CDW emissions. Composite parameters such as air corrosivity and sulfur deposition can be used to evaluate indoor air quality (IAQ) in homes with CDW emissions.

Refer to the American Industrial Hygiene Association's (AIHA's) *White Paper on Corrosive Drywall* (October 10, 2010) and AIHA's guidance document, Assessment and Remediation of Corrosive Drywall (October 30, 2013) for more information on the assessment and remediation of CDW.

## AIR CORROSIVITY IN CORROSIVE DRYWALL HOMES

Air corrosivity is a parameter used by cleanroom industries to monitor the cumulative impact of airborne contaminants. The protocol used for IAQ evaluation is a modification of the industrial method. The corrosivity of air is determined by the concentration of a wide variety of different compounds and is influenced by moisture. Air corrosivity integrates the net effect of all reactive airborne pollutants, similar in principle to the monitoring of combustible gas. For example, moisture, salt, bleach, and ammonia cause oxidation while sewer gas and water containing hydrogen sulfide cause sulfidation.

Air corrosivity is measured by passive dosimetry, exposing a microscope slide with attached copper strips which are measured for metal loss. The air corrosivity measurement is based on the electrical resistance of the copper sensor. As the element corrodes, the corrosion products are non-conductive, while the underlying metal is conductive. Resistance of the measurement

6

element increases as it corrodes due to the thinning of the element.  Temperature effects are controlled by measuring the exposed copper element against a reference element with a protective coating.  A direct-reading meter is used to measure this resistance ratio and to compute the metal film thickness that had corroded, displaying the change in metal loss over time in Angstroms.  Cumulative metal loss is calculated to produce a corrosion rate in terms of Angstroms per month (Aº/30d).

A minimum of three days of sample time is required to measure the air corrosivity in order to classify IAQ with respect to the investigation of CDW contamination and remediation.  IAQ is rated based on the highest probe reading in a home.  Relative criteria for data interpretation is based on air corrosivity data collected in 38 homes.  Homes were classified as non-CDW if an inspection failed to identify a strong source of corrosive emissions.  Measurements from these homes were considered to represent normal background.  Homes included in the study did not have other strong source of corrosion as determined by an inspection.   Background air corrosivity in homes without strong sources of corrosive emissions is generally below 20 Aº/30d.  Most peak air corrosivity readings in homes with CDW exceeded 200 Aº/30d.  The distribution of peak air corrosivity readings in homes with and without CDW (in Angstroms per 30 days are represented in **Figure 1** (Light et al., 2011).

**Figure 1**
**Distribution of Peak Air Corrosivity Readings**



Ambient sulfide concentrations produced by CDW emissions vary based on the characteristics and loading of corrosive panels present, ventilation, humidity, and temperature.  Other sources of airborne sulfides include water and sewer gas.  Air corrosivity testing may also be affected by dust, moisture, cleaning agents with bleach or ammonia, salt water spray, and other indoor

pollutants with corrosive properties.   Such potential sources should be minimized during sampling.   All windows and doors should be closed at least 24 hours prior to sampling and remain closed during sampling.   The temperature should be greater than 60 ºF and the relative humidity should be between 40-80% during sampling.   In addition, air circulation should be provided in the test area (i.e., thermostat set to "on" or use of a small portable fan).

Four samples were collected in the subject home by exposing probes to indoor air from May 6, 2015 to May 11, 2015.   The probes were each placed on a horizontal surface inside the home during sampling.   The home was closed at least 24 hours prior to and during the sampling in accordance with the generally accepted protocol.   The temperature and relative humidity measured in the home at the time sampling was initiated ranged from 77.3-78.9 ºF and 64.9-68.1%, respectively.   The temperature and relative humidity measured in the home at the time sampling was completed ranged from 78.4-79.0 ºF and 70.7-71.2%, respectively.   Drain and/or other plumbing lines were sealed prior to and during sampling and there were no identified sources of corrosion (such as moisture, salt, bleach, ammonia, sewer gas, and/or water containing hydrogen sulfide).   A small fan was placed in each general sample location in the home to provide air circulation during sampling.

The samples were analyzed by ALS Environmental for corrosivity in air using a Checkmate meter in accordance with the procedure described in Light, E., Little, B., Barclay, M., et al. *Measuring the Corrosivity of Indoor Air*, presented at the Indoor Air 2011, 12th International Conference on Indoor Air Quality and Climate, Austin, TX, June 5-10, 2011.

The results of the air corrosivity measurements from the samples collected in the subject home are provided in **Table 1** and are summarized as follows:

- The air corrosivity measured in the subject home ranged from 574.3 to 896.4 Angstroms per month.

- The air corrosivity measurements resulted in levels that are commonly found in homes with corrosive drywall.


### CHAMBER EMISSION TESTING FOR SULFUR ANALYSIS

A sample of the moisture barrier sheathing was obtained from the dining room area and submitted to ALS Environmental for a chamber emission analysis.   The purpose of this chamber

8

emission test was to evaluate the potential emissions from the moisture barrier sheathing due possible "sink effects."

An aliquot of the sample was weighed and placed into a chamber. The sample was allowed to equilibrate at 37 ºC for about 24 hours. A chamber blank was run along with the sample in this batch under the same set of conditions for QC purposes. The samples were analyzed for 20 sulfur compounds per ASTM D 5504-12 using a gas chromatograph equipped with a sulfur chemiluminaescence detector (SCD). All compounds with the exception of hydrogen sulfide and carbonyl sulfide are quantitated against the initial calibration curve for methyl mercaptan.

The results of the chamber emission testing results are provided in **Table 2**. The emissions test resulted in non-detectable levels for the 20 sulfur compounds that were analyzed.

## CONCLUSIONS AND RECOMMENDATIONS

The dust and debris remaining in the home are likely the source of elevated air corrosivity in the home.

1. The dust and debris remaining in the home are likely the source of elevated air corrosivity in the home.

2. All items with residual drywall dust and debris should be removed from the home. After removal of debris and larger particles, all surfaces should be cleaned until no visible demolition dust is present. The removal of dust and debris from surfaces should be performed by high-efficiency vacuuming followed by damp wiping.

3. Any existing junction boxes for electrical switches and/or outlets should be replaced.

4. When the cleanup is complete, a third-party consultant should verify the cleanup results prior to proceeding with the installation of new structural materials. The air corrosivity should be within acceptable levels prior to the installation of new structural materials.

5. The electrical wiring installed in the home should be inspected by a qualified/licensed electrician to determine if the electrical wiring is required to be replaced in order to meet applicable electrical codes and regulations.

6. The HVAC system should be inspected by a qualified/licensed HVAC technician system to determine if any components need to be repaired and/or replaced as needed for the system to be in functional condition.

7. The existing plumbing lines and water heater should be inspected by a qualified/licensed plumber to determine if any plumbing components need to be repaired and/or replaced as needed.

## TABLE 1

### Air Corrosivity Readings
5512 Moss Hill Lane
Rosharon, Texas 77583
May 6-11, 2015

| Sample No. | Location | Start Date/Time | Stop Date/Time | Duration (Days) | Air Corrosivity Reading ($A^o$/30d) |
|---|---|---|---|---|---|
| 021 | Kitchen | 5/6/2015 11:04 AM | 5/11/2015 09:22 AM | 4.9 | 810.3 |
| 022 | Master Bedroom | 5/6/2015 11:10 AM | 5/11/2015 09:24 AM | 4.9 | 603.7 |
| 023 | Upstairs | 5/6/2015 11:15 AM | 5/11/2015 09:25 AM | 4.9 | 574.3 |
| 024 | Entry/Stairs | 5/6/2015 11:18 AM | 5/11/2015 09:26 AM | 4.9 | 896.4 |
| -- | *Recommended IAQ Criteria* *Background Air Corrosivity without Strong Sources of Corrosive Emissions* | -- | -- | -- | *20* |

$A^o$/30d – Angstroms per month

## TABLE 2

### Chamber Emissions Test of Moisture Barrier/Sheathing
### Sulfur Analysis
5512 Moss Hill Lane
Rosharon, Texas 77583
Sample Collected:  May 6, 2015

| CAS # | Compound | Result (ng/Sample) | MRL (ng/Sample) |
|---|---|---|---|
| 7783-06-4 | Hydrogen Sulfide | ND | 2.8 |
| 463-58-1 | Carbonyl Sulfide | ND | 4.9 |
| 74-93-1 | Methyl Mercaptan | ND | 3.9 |
| 75-08-1 | Ethyl Mercaptan | ND | 5.1 |
| 75-18-3 | Dimethyl Sulfide | ND | 5.1 |
| 75-15-0 | Carbon Disulfide | ND | 3.1 |
| 75-33-2 | Isopropyl Mercaptan | ND | 6.2 |
| 75-66-1 | tert-Butyl Mercaptan | ND | 6.2 |
| 107-03-9 | n-Propyl Mercaptan | ND | 6.2 |
| 624-89-5 | Ethyl Methyl Sulfide | ND | 6.2 |
| 110-02-1 | Thiophene | ND | 6.9 |
| 513-44-0 | Isobutyl Mercaptan | ND | 7.4 |
| 352-93-2 | Diethyl Sulfide | ND | 7.4 |
| 109-79-5 | n-Butyl Mercaptan | ND | 7.4 |
| 624-92-0 | Dimethyl Disulfide | ND | 3.9 |
| 616-44-4 | 3-Methylthiophene | ND | 8.0 |
| 110-01-0 | Tetrahydrothiophene | ND | 7.2 |
| 638-02-8 | 2,5-Dimethylthiophene | ND | 9.2 |
| 872-55-9 | 2-Ethylthiophene | ND | 9.2 |
| 110-81-6 | Diethyl Disulfide | ND | 5.0 |

ND = Compound was analyzed for, but not detected above the laboratory reporting limit.

MRL = Method Reporting Limit.  The minimum quantity of a target that can be confidently determined by the referenced method.

Attachment 3.  Thomas Ortner's report dated July 7, 2015



**Since 1988**                                    *Florida's Leading Engineering Source*

Environmental · Geotechnical · Construction Materials Testing · Threshold and Special Inspections · Plan Review & Code Compliance

July 7, 2015

Mr. Kerry Miller
**Baker, Donelson, Bearman, Caldwell & Berkowitz, PC**
201 St. Charles Avenue
Suite 3600
New Orleans, LA 70170

**Site:   LeClair Residence
            5512 Moss Hill Lane
            Rosharon, Texas
            GFA Project # 10-1311**

**Re:     Problem Drywall Inspection**

Dear Mr. Miller:

Please find herein GFA International, Inc's. (GFA's) report of the post "Problem Drywall" remediation findings at the subject Residence (the "Residence").


**Background**

The subject home was remediated by Moss Construction (Moss) sometime during the time period of February – March of 2015 pursuant to the protocol set forth in the settlement agreement's Exhibit F. The home was inspected by GFA on March 15, 2015 to verify the remediation was complete and a remediation certificate was issued. Subsequent to the certificate being issued, the Contractor (Moss) proceeded to start the re-construction process.

GFA received a call on June 4, 2015 and was informed that the homeowner had issues with the work completed and that the work was halted sometime in April, 2015. GFA received several e-mails with photos along with an Indoor Air Quality (IAQ) Investigation report prepared by J.E. Spear Consulting, LP.  GFA reviewed the photo documentation and the IAQ report. GFA suggested a follow up inspection be performed based on most of the photographs showing debris from the re-construction as well as the IAQ report not being recognized as an industry standard for Corrosive Drywall testing; nor does the IAQ report take into account the background (naturally occurring) air quality of the project location.

On June 19, 2015 GFA and Moss arrived on site to meet with the homeowner and to perform an inspection of the property. The homeowner briefly expressed numerous concerns regarding the quality of the remediation process.  Subsequent to the brief meeting with the homeowner, Mr. Tom Ortner of GFA performed a thorough visual inspection of the subject Residence.

Baker, Donelson, Bearman, Caldwell & Berkowitz          July 7, 2015
LeClaire Residence                                       Page 2 of 3
GFA Project No.: 10-1311

## Inspection and Observations (June 19, 2015)

➢   Upon entry into the Residence, no unusual odor was detected.

➢   The current status of the reconstruction of the Residence includes the complete installation of the rough electrical, rough mechanical and rough plumbing trades.

➢   Debris throughout the Residence from the reconstruction process was noted.

➢   Electrical fixtures, cabinets, sinks and toilets were stored in the home (contents of storage pod).

➢   All electrical boxes were inspected. Discoloration or blackening, typically associated with problematic drywall contamination, was observed mostly in the ground floor area; however, unlike discoloration associated with problematic drywall contamination, the blackening does not wipe off.

➢   The panel cover(s) of the heating, ventilation and air conditioning (HVAC) air handler unit(s) was removed.  However the coils are not visible and could not be inspected.

➢   Unidentified dust was found to be on the top framing member of walls and trusses

➢   Numerous clumps of ceiling insulation were found throughout the roof structure and soffits

➢   Carpet padding was noted still attached to stair tread and risers at the staple locations.

➢   Inside of electrical boxes and switches had unidentified dust inside.  In addition, in several locations, there was remaining caulk stuck to the outside of the boxes with a small piece of drywall still attached.

➢   The home has thermo-ply exterior barrier on the outside of the home in some areas instead of plywood sheathing.

➢   The contents stored in the pod where not cleaned and drywall debris was found in some cabinets and adhered to counter tops.



Baker, Donelson, Bearman, Caldwell & Berkowitz
LeClaire Residence
GFA Project No.: 10-1311

July 7, 2015
Page 3 of 3

GFA retrieved a sample of the thermo-ply board to verify no off gassing was occurring. The sample was retrieved from the front dining area. The sample was sent to ALS laboratories for testing of sulfur compounds (ASTM D 5504-12).  The results indicated a small level of Carbonyl Sulfide 1.1 ug/Kg. This amount is insignificant and Carbonyl Sulfide is not a known source of corrosion and is common in many products.

## Conclusion

Based upon the levels of blackening of copper within the home, the residual dust and debris within the home is likely causing the observed corrosion and must be remediated. This remediation includes removal and replacement of all copper components within the home, all duct work and A/C/heating units. The home must be re-cleaned pursuant to the original protocol and re-inspected prior to proceeding with any re-construction.

Attachments
Photos
ALS Report

GFA International, Inc.
Certificate of Authorization #14382

7/8/15

Paul H. Danforth, P.E.
Professional Engineer #116221
State of Texas

Thomas Ortner
Senior Project Manager/Inspector



Attachment 4. Recent Photos taken at 5512 Moss Hill Ln. These photos are of the copper tubing in the garage refrigerator, upstairs outlet in the southeast bedroom, and blackened load bearing wire in the foyer downstairs.



This is our garage refrigerators coils
and copper tubing. There is black
corrosion and what appears to be
copper sulfide deposits here. I took
this photo 3/02/2016.



Garage refrigerator 3/02/2016
Photo taken by JoAnne CLeClair

This outlet is upstairs in the southeast bedroom.
I have sent pictures from my printer to
you, so that you may have a visual referance.
I can provide clear images of better quality
via email.



Blackened load bearing wire at
5512 Moss Hill Ln. Photographed 1/29/2016
This is the switch area
at the bottom of stairs Foyer.



3/22/2016
Ground wire darkened.