

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED
MAR 25 2016
WILLIAM W. BLEVINS
CLERK

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF LOUISIANA

DOMENICO BELLITTI,

Plaintiff

-vs-

MDL-2047 CHINESE-MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION,

Defendant(s)

TENDERED FOR FILING

MAR 25 2016

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

CIVIL ACTION

No. 09-MD-2047

Section L

## OBJECTION TO SETTLEMENT

The Plaintiff, **DOMENICO BELLITTI**, acting as **pro-se** due to the lack of time to contract a lawyer to represent him before this Court and has no other option but to represent himself.

The plaintiff is an average person who is not familiar with the complex Court system law and its procedures. I am trying to present this in a manner acceptable to the **UNITED STATES DISTRICT COURT EASTERN DISTRICT OF LOUISIANA,** it may not be perfect in comparison to someone being represented by an attorney, whom are trained professionals in the legal field and are knowledgeable with legal terminology and the laws.

Respectfully to the Court, I acknowledge my lack of legal expertise in preparing an objection to settlement, as in comparison to that of a licensed attorney. I respectfully ask the Court to take this into account when presenting my appeal.

The reason why I, DOMENICO BELLITTI, am objecting to the Special Master Award Reconsideration final determination is because I feel the amount after Potential Pro Rata Reduction on the amount of $82,652.63 is not sufficient to fully compensate me because; I lost a lot more than the offer.

The Resolution Offer is not sufficient to fully compensate me because; I purchased the property on May 2007, Purchased price $265,000.00 I obtained a 30 Yr Conv. Jumbo PayOption Adjustable Rate Mortgage (ARM) for $212,000.00, that means I had 4 options to make my monthly payments, Amortized payment it varied from $1,063.52 to $1,646.55, 15-year amortized payment it varied from $1,631.56

Fee _____
Process _____
X  Dktd _____
CtRmDep _____
Doc. No. _____

to $2,119.48, Minimum payment it varied from $900.48 to $837.66, and Interest only payment of $1520.77 and no less than minimum payment; as you could see, I made a total of $59,639.37 for the loan principal and interests I paid each month an average of $2,385.57, obviously every month I paid extra, and in excess over the amount of any of my obligations or payment options. (EXHIBIT A - EXHIBIT B) additional to that I paid the Property taxes; I made 23 monthly payments on the amount of $8,083.00 for HOA and maintenance.

This payment history proves my good intentions on keeping the property; I would not have been in need of short selling the property, if it did not have Chinese drywall.

The short sale resulted on me, owing taxes; I had to hire an accountant to fix the tax problems. Not to mention the lost income since I could not rent the property, tenants moved out and left unpaid balances (EXHIBIT C), I incurred on attorney's expenses, to go after them legally with no positive outcome since the authorities were not able to locate them. I did not have only monetary losses, the inevitable short sale impacted negatively my credit score and ruined it, consequences that today, I am still paying for, I still can not obtain FHA loans or any other government loan program and for that reason I pay higher interests than somebody that would not had such of dent on the credit history, every time I apply for a credit card I get denied, the lines of credit I had before the short sale were reduced by 50%. I can't lease a vehicle, only purchase with higher interests rates.

The break down is as follow:

-Purchased price on May 2007:   $265,000.00 (EXHIBIT D)
-Down payment + Initial deposit: $ 53,000.00 (EXHIBIT D – EXHIBIT E)
-Closing costs:                 $  8,500.00 (EXHIBIT D)
-Loan principal + interests     $ 59,639.37 (EXHIBIT F)
-HOA and Maintenance            $  8,083.00  (EXHIBIT G - EXHIBIT H )
-Property Taxes                 $  6,183.91 (EXHIBIT I - EXHIBIT J )  - Inability to
-rent the property              $  4,050.00 (EXHIBIT K)

TOTAL                           $139,457.03

**Lost Equity = $265,000.00 (purchase price) - $212,000.00 (initial mortgage) + $8,500.00 (Closing Costs) + $59,639.37 (loan principal $29,652.63 + interests $29,987.37) + 8,050.00  (HOA and maintenance) + $4,050 (3 months for inability to rent the property) + $6,183.91 (Property Taxes)  = $139,457.03 (Total loss)**

2

I had no other option than to short sold the property for $39,000.00 (EXHIBIT L – EXHIBIT M)


ALSO FIND INCLUDED PROPERTY APPRAISAL AT PURCHASE (EXHIBIT N)

WHEREFORE, The Plaintiff, Domenico Bellitti, acting pro-se respectfully requests that this Court

1. Takes in account the evidence presented on the included Exhibits.

2. Revises the special Master award Reconsideration final determination awarded to me, the Post-Reconsideration determination, do not justify the losses.

3. Considers the damages and the time (7 years), I had to burden without any remedy or relief.

## CONCLUSION

The Special Master Award Reconsideration final determination **amount** of $82,652.63 minus, an unknown Pro Rata Reduction, is not sufficient to compensate the monetary losses and damages caused to me.


Dated: 3/ 23/2016

_____
Domenico Bellitti, Pro-se
Claimant ID 114093
Claim ID 10214
3800 Battersea rd
Miami, Fl 33133
561-789-8326


### Certificate of Service
I hereby certify that I have served a copy of this document on all counsel for record either in person or by mailing it postage prepaid on this

23 day of March , 20 16

_____
Signature

3

Cc:

Kerry Miller Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
201 St. Charles Avenue, Suite 3600
New Orleans, LA  70170
Phone: (504) 566-8646
Fax: (504) 585-6946
E-Mail:

Harry Rosenberg Phelps Dunbar LLP
365 Canal Street, Suite 200
New Orleans, LA  70130
Phone: (504) 566-1311
Fax: (504) 568-9130
E-Mail:

Arnold Levin
Levin, Fishbein, Sedran & Berman,
510 Walnut Street, Suite 500,
Philadelphia, PA 19106

**LIST OF EXHIBIT**

| **EXHIBIT** | **DESCRIPTION** |
|---|---|
| Exhibit A.a | MORTGAGE BANK STATEMENTS (Countrywide) |
| Exhibit A.b | MORTGAGE BANK STATEMENTS (Bank Of America) |
| Exhibit A.c | NOTICE OF INTENT TO ACCELERATTE (Bank Of America) |
| Exhibit B | MORTGAGE AND NOTE |
| Exhibit C | LEASE CONTRACTS THAT WERE BROKEN BY THE TENANTS |
| Exhibit D | PURCHASE HUD |
| Exhibit E | $23,165.00 INITIAL DEPOSIT AFFIDAVIT |
| Exhibit F | Monthly payments BANK PAYMENT HISTORY |
| Exhibit G | Monthly payments PARTIAL PAYMENT HISTORY |
| Exhibit H | PROPERTY MANAGER LETTER |
| Exhibit I | YEAR 2007 PROPERTY TAXES $1,472.78 |
| Exhibit J | YEAR 2008 PROPERTY TAXES $4,711.13 |
| Exhibit K | CONTRACT (SHORT SALE) EXECUTED BY LICENSED REALTOR |
| Exhibit L | SHORT SALE HUD |
| Exhibit M | PROPERTY APPRAISER PRINT OUT SHOWS PURCHASE PRICE AND SHORT SALE PRICE |
| Exhibit N | PROPERTY APPRAISAL AT PURCHASE $265,000.00 |
| Exhibit O | PROPERTY APPRAISAL AT SHORT SALE $38,000.00 |

# **Countrywide**
## HOME LOANS

| | |
|---|---|
| **Account Number 166647418** | **Statement date** 12/10/2007  1 of 4 |

Property address
1660 Renaissance Way # 2122-B

## MONTHLY HOME LOAN STATEMENT

0 0 4 2 8 1 8 01 AT 0.334 **AUTO  T5 0 3964 33483-6487
PO XW AG 000-----0--2-1- M18797 IN P42860
DOMENICO BELLITTI
2115 S. OCEAN BLVD # 12
DELRAY BEACH, FL 33483-6487

### **How Your Loan Amount Can Change**
If your Minimum Payment is less than the Interest Only Payment:
* Your monthly Minimum Payment will not be enough to cover the interest due.
* The interest due, which is not covered by your Minimum Payment, is known as Deferred Interest and will be added to the amount you owe on your loan. Your Principal balance will then increase, which is known as "Negative Amortization".
* Negative Amortization results in reducing the amount of equity you have in your home. Negative Amortization should be managed carefully, so that you are not surprised by significant increases in future Minimum Payments.

## Your Monthly Home Loan Statement
### Snapshot of your Home Loan as of December 10, 2007

| | |
|---|---|
| Type of Loan | 30 Yr Conv Jumbo PayOption ARM |
| Current Principal Balance | $208,562.13 |
| Original Loan Amount | $212,000.00 |
| Maximum Limit (see explanation at bottom of page) | 115.00% |
| Margin | 4.000% |
| Interest Rate this Month | 8.750% |
| Remaining Term | 29 Years, 6 Months |

**Payment Due Date: Jan 1, 2008**
**Late Payment Charge:** $41.88 if payment is not received by **Jan 16, 2008**

## Your Payment Options this Month
The amounts listed below are total payments, including amounts collected for escrow items such as taxes and insurance premiums.

| Payment Options | Total Payment | Deferred Interest | Principal/ Interest Owed | Outstanding Late Charges** | Escrow | Optional Products*** | TARP |
|---|---|---|---|---|---|---|---|
| Option 1 Amortized Payment | $1,646.55 | | $1,646.55 | | | | |
| Option 2 15-Year Amortized Payment | $2,119.48 | | $2,119.48 | | | | |
| Option 3 Minimum Payment | $837.66 | -$683.11* | $1,520.77 | | | | |
| Option 4 Interest Only Payment | $1,520.77 | | $1,520.77 | | | | |

Please note: Amounts above are estimates and may change based on payments made.
*Negative amounts ((-) minus sign) shown in the deferred interest column are <u>added</u> to the principal balance. This results from making a Minimum Payment that is less than the interest due.
**Outstanding late charges up to $400.00 are reflected in the payment option amount.

---

## Subtract the paper. Add up the benefits.

Tired of writing checks, licking envelopes, and mailing payments every month?
**Sign up for PayPlan Services** through Countrywide's Service Plus and enjoy the:

↘ **SPEED** of paying online
↘ **CONVENIENCE** of an automatic payment
↘ **FLEXIBILITY** to place a hold on a draft

## Get started today!
1. Log on to **customers.countrywide.com.**
2. Access your existing account or set up a new account.
3. Click on the **"Payment Services"** link.
4. Select the **PayPlan** option that's right for you.   18797



EXHIBIT
A.a
page 1 of 4

## Your Home Loan Activity this Month

### Breakdown of Payments and Other Amounts

| Date | Description | Amount | Principal/ Deferred Interest** | Interest | Additional Principal | Escrow | Late Charges | Optional Products You Requested | Buy-down Assistance | Unapplied |
|------|-------------|--------|-------------------------------|----------|---------------------|--------|--------------|-------------------------------|---------------------|-----------|
| 12/07/2007 | December payment | $2,134.77 | $587.93 | $1,546.84 | | | | | | |
| | **Ending balance | | $208,562.13 | | | | | | | |

*Amounts preceded by a (-) sign have been added to the principal balance.

**Please note: The ending principal balance shown above may not be the amount required to pay off your loan. For payoff information, you may use our 24-hour automated information system. Call 1-800-669-5833.

*Pre-Payment Penalty: In accordance with your loan agreement, if you choose to prepay the principal or pay off the loan in full, before the expiration date of the Pre-Payment Penalty, you will be required to pay the fee which will be due and payable and cannot be waived.  Please review your loan agreement for the expiration date, amount and terms of the Pre-Payment Penalty.

## Mortgage-Related Expenses You're Responsible for Paying

| Type of Payment | Who Receives the Payment | Your Policy Number or Tax ID | Frequency of Payment | Next Payment Due | Amount Due |
|-----------------|--------------------------|------------------------------|---------------------|------------------|------------|
| Hazard insurance | Qbe Insurance Corporation | QFW4847 | Annual | 01/28/2008 | $0.12 |

**DID YOU KNOW?**

**Payments**
We may charge you a fee for any payment returned or rejected by your financial institution, subject to applicable law.

All accepted payments of principal and interest will be applied to the longest outstanding installment due, unless otherwise expressly prohibited by law.

**GET ONLINE AND GO PAPERLESS!**
Save time and stamps by utilizing our FREE electronic statements service. Log in to customers.countrywide.com and go paperless today!

Want more flexibility? Countrywide's online payment service, **MortgagePay on the Web**, allows you to make your payments around the clock. Visit **customers.countrywide.com** and check out the demo to see just how easy it is.

**TO CONTACT US**

**CREDIT REPORTING NOTICE**
We may report information about your account to credit bureaus. Late payments, missed payments or other defaults on your account may be reflected in your credit report.

**For up-to-the-minute information about the account,** use our 24-hour automated information system. To ask us about this statement or account information, call **1-866-653-6183** Monday-Friday, 6AM-5PM Pacific Time. Calls may be monitored and/or recorded for service quality purposes. *Se habla español.* 1-800-295-0025.
**Please have the account number available when you call.**

Or write to us at:
The address for general inquiries and all RESPA Qualified Written Requests is: Countrywide Home Loans, Attn:
Customer Service  SVB-314 P O Box 5170, Simi Valley, CA 93062-5170

Tax Dept SV-24 P O Box 10211, Van Nuys, CA 91499-6089
Insurance Dept P.O. Box 961206, FTWX-22 Fort Worth, TX 76161-0206
Payments, Attn: Remittance Processing
P O Box 10219, Van Nuys, CA 91410-0219
Overnight deliveries 400 Countrywide Way, Simi Valley, CA 93065
Our website customers.countrywide.com
Your account information is available in Spanish on the site mentioned above.

EXHIBIT
A.a
page 7 of 4

 Countrywide Bank, FSB and Countrywide Home Loans, Inc. are Equal Housing Lenders. © 2007 Countrywide Financial Corp. Trade/servicemarks are the property of Countrywide Financial Corporation and/or its subsidiaries. All rights reserved.

0042818 0106147

**Bank of America**

Home Loans

Customer Service
PO Box 5170
Simi Valley, CA 93062-5170

Statement Date: 05/08/2009
**Account Number 166647418**
Property address
1660 Renaissance Way # 2122-B

## MONTHLY HOME LOAN STATEMENT

0000599 01 AT 0.357 **AUTO  T4 1 1760 33133-6704
PO A4 AM 000-----0--2-1- M20820 IN 14 P00599

DOMENICO BELLITTI
3800 Battersea Rd
Miami FL 33133-6704

### ! How Your Loan Amount Can Change

If your Minimum Payment is less than the Interest Only Payment:

* Your monthly Minimum Payment will not be enough to cover the interest due.
* The interest due, which is not covered by your Minimum Payment, is known as Deferred Interest and will be added to the amount you owe on your loan. Your Principal balance will then increase, which is known as "Negative Amortization".
* Negative Amortization results in reducing the amount of equity you have in your home. Negative Amortization should be managed carefully, so that you are not surprised by significant increases in future Minimum Payments.

## Your Monthly Home Loan Statement

**Snapshot of your Home Loan as of May 08, 2009**

| | |
|---|---|
| Type of Loan | 30 Yr Conv Jumbo PayOption ARM |
| Current Principal Balance | $182,347.37 |
| Original Loan Amount | $212,000.00 |
| Maximum Limit (see explanation at bottom of page) | 115.00% |
| Margin | 4.000% |
| Interest Rate this Month | 5.500% |
| Remaining Term | 28 Years, 1 Month |

**Payment Due Date: June 1, 2009**
**Late Payment Charge:** $45.02 if payment is not received by **June 16, 2009**

## Your Payment Options this Month

The amounts listed below are total payments, including amounts collected for escrow items such as taxes and insurance premiums.

| Payment Options | Total Payment | Deferred Interest | Principal/ Interest Owed | Outstanding Late Charges** | Escrow | Optional Products*** |
|---|---|---|---|---|---|---|
| Option 1 Amortized Payment | $1,063.52 | | $1,063.52 | | | |
| Option 2 15-Year Amortized Payment | $1,631.56 | | $1,631.56 | | | |
| Option 3 Minimum Payment | $900.48 | | $900.48 | | | |

**Option 4 Interest Only Payment** - This option is not available this month.

Please note: Amounts above are estimates and may change based on payments made.

*Negative amounts ((-) minus sign) shown in the deferred interest column are <u>added</u> to the principal balance. This results from making a Minimum Payment that is less than the interest due.
**Outstanding late charges up to $400.00 are reflected in the payment option amount.

---

## Subtract the paper. Add up the benefits.

Tired of writing checks, licking envelopes, and mailing payments every month?
**Sign up for PayPlan Services** through BAC Home Loans Servicing, LP and enjoy the:

↘ **SPEED** of paying online
↘ **CONVENIENCE** of an automatic payment
↘ **FLEXIBILITY** to place a hold on a draft

---

## Get started today!

1. Log on to **www.bankofamerica.com/cwcustomers.**
2. Access your existing account or set up a new account.
3. Click on the **"Payment Services"** link.
4. Select the **PayPlan** option that's right for you.

*EXHIBIT*
*A.b*
*page 1 oF 4*

---

**Maximum Limit** - Per your loan documents, the Maximum Limit is the maximum amount your loan can grow to before you are required to make the Full Payment. If you reach the Maximum Limit, your Minimum Payment will increase to the amount sufficient to repay your unpaid principal balance in full on the Maturity Date in substantially equal payments at the then current interest rate.

**Account Number 166647418**
E-mail use: Providing your e-mail address(es) below will allow us to send you information on your account
Domenico Bellitti
E-mail address

**Account Number 166647418**
E-mail use: Providing your e-mail address(es) below will allow us to send you information on your account
Domenico Bellitti
E-mail address



**Account Number 166647418**
E-mail use: Providing your e-mail address(es) below will allow us to send you information on your account
Domenico Bellitti
E-mail address

**How we post your payment:** All accepted payment of principal and interest will be applied to the longest outstanding installment due, unless otherwise expressly prohibited or limited by law. If you submit an amount in addition to your scheduled monthly amount, we will apply your payments as follows: (i) to outstanding monthly payments of principal and interest, (ii) escrow deficiencies, (iii) late charges and other amounts you owe in connection with your loan and (iv) to reduce the outstanding principal balance of your loan.

Please specify if you want an additional amount applied to future payments, rather than principal reduction.

For all full month payment periods, interest is calculated on a monthly basis. Accordingly, interest for all full months, including February, is calculated as 30/360 of annual interest, irrespective of the actual number of days in the month. For partial months, interest is calculated daily on the basis of a 365 day year.

EXHIBIT

A.b

page 2. of 4

Postdated checks will be processed on the date received unless a loan counselor agrees to honor the date written on the check as a condition of a repayment plan. Payments by phone received by 6:00 PM Pacific Time on a business day will be effective the same day. Payments by phone received after 6:00 PM Pacific Time or on a nonbusiness day/holiday will be applied to your account no later than the next business day.

2 of 4

24-hour Online Account Information - Visit us at **www.bankofamerica.com/cwcustomers**

## Your Home Loan Activity this Month

Breakdown of Payments and Other Amounts

| Date | Description | Amount | Principal/ Deferred Interest* | Interest | Additional Principal | Escrow | Late Charges | Optional Products You Requested | Buy-down Assistance | Unapplied |
|------|-------------|--------|------------------------------|----------|---------------------|--------|--------------|--------------------------------|--------------------|-----------|
| 05/07/2009 | May payment | $900.48 | $64.43 | $836.05 | | | | | | |
| | **Ending balance | $182,347.37 | | | | | | | | |

*Amounts preceded by a (-) sign have been added to the principal balance.

**Please note: The ending principal balance shown above may not be the amount required to pay off your loan. For payoff information, you may use our 24-hour automated information system. Call 1-800-669-5833.

## Mortgage-Related Expenses You're Responsible for Paying

| Type of Payment | Who Receives the Payment | Your Policy Number or Tax ID | Frequency of Payment | Next Payment Due | Amount Due |
|-----------------|--------------------------|------------------------------|----------------------|------------------|------------|
| Hazard insurance | Qbe Insurance Corporation | QFW4647 | Annual | 01/26/2010 | $0.12 |



**DID YOU KNOW?**

**Payments**

We may charge you a fee for any payment returned or rejected by your financial institution, subject to applicable law.

All accepted payments of principal and interest will be applied to the longest outstanding installment due, unless otherwise expressly prohibited by law.

Want more flexibility? BAC Home Loans Servicing, LP online payment service, MortgagePay on the Web, allows you to make your payments around the clock. Visit www.bankofamerica.com/cwcustomers and check out the demo to see just how easy it is.

**Payments By Phone.** If you pay by phone, there is a $15 fee prior to the late payment date, or if more than one payment is made. For a single late payment, a $9 fee is charged after the late payment date.

**TO CONTACT US**

**CREDIT REPORTING NOTICE**

We may report information about your account to credit bureaus. Late payments, missed payments or other defaults on your account may be reflected in your credit report.

**For up-to-the-minute information about the account,** use our 24-hour automated information system. To ask us about this statement or account information, call **1-866-653-6183** Monday-Friday, 8am to 9pm Eastern Time. Calls may be monitored and/or recorded for service quality purposes. *Se habla español.* 1-800-295-0025.

**Please have the account number available when you call.**

Or write to us at:
The address for general inquiries and all RESPA Qualified Written Requests is: BAC Home Loans Servicing, LP, Attn: Customer Service CA6-919-01-41, PO Box 5170, Simi Valley, CA 93062-5170

Tax Dept CA6-913-LB-01, PO Box 10211, Van Nuys, CA 91410-0211

Insurance Department, TX2-977-01-03, PO Box 961206, Fort Worth, TX 76161-0206

Payments, Attn: Remittance Processing PO Box 660694, Dallas, TX 75266-0694

Overnight deliveries 7105 Corporate Drive, TX2-981-03-03, Plano, TX 75024-4100

Our website www.bankofamerica.com/cwcustomers
Your account information is available in Spanish on the site mentioned above.

EXHIBIT
A.b.
page 3 of 4

Bank of America, N.A. Member FDIC. Bank of America, N.A. and BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A., are Equal Housing Lenders. © 2009 Bank of America Corporation. Trademarks are the property of Bank of America Corporation. All rights reserved.

0000599 0001302

## OPTION 1
## Amortized Payment (principal and interest) - based on your remaining term

The amount necessary to pay the loan off (principal and interest) at the maturity date, in substantially equal payments (unless your loan has a balloon payment due on the maturity date). Under the terms of your Note, this payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term of your loan.

| Account number | 166647418 | (2) | Payment due **June 1, 2009** | $1,085.52 |
|---|---|---|---|---|
| | | | After **June 16, 2009** late payment | **$1,108.54** |

Domenico Bellitti
1660 Renaissance Way # 2122-B
Boyton Beach, FL 33426

Please update e-mail information on the reverse side of this coupon.

Additional Principal

Additional Escrow

1769

Check total

BAC Home Loans Servicing, LP
PO Box 660694
Dallas, TX 75266-0694

16664741820000010635200011085 4

⑆586990058⑆ 1666474 18⑊

## OPTION 2
## 15-Year Amortized Payment (principal and interest)

The amount necessary to pay the loan off (principal and interest) within a 15-year term from the first payment due date, in substantially equal payments (unless your loan has a balloon payment due on the maturity date). Under the terms of your Note, this payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term of your loan.

| Account number | 166647418 | (2) | Payment due **June 1, 2009** | $1,631.56 |
|---|---|---|---|---|
| | | | After **June 16, 2009** late payment | **$1,676.58** |

Domenico Bellitti
1660 Renaissance Way # 2122-B
Boyton Beach, FL 33426

Please update e-mail information on the reverse side of this coupon.

Additional Principal

Additional Escrow

1769

Check total

BAC Home Loans Servicing, LP
PO Box 660694
Dallas, TX 75266-0694

16664741820000016315600016765 8

⑆586990058⑆ 1666474 18⑊

## OPTION 3
## Minimum Payment

Important: If this amount is less than the Interest Only, paying this will not be enough to pay all of the interest due, will not reduce your principal, and the unpaid interest will be added to your principal. This is called "negative amortization", meaning the amount you owe increases. You will be charged interest on the entire principal. Negative Amortization will reduce the equity you have in your home. Negative Amortization should be managed carefully, so that you are not surprised by significant increases in future Minimum Payments.

| Account number | 166647418 | (2) | Payment due **June 1, 2009** | $900.48 |
|---|---|---|---|---|
| | | | After **June 16, 2009** late payment | **$945.50** |

Domenico Bellitti
1660 Renaissance Way # 2122-B
Boyton Beach, FL 33426

Please update e-mail information on the reverse side of this coupon.

Additional Principal

Additional Escrow

1769

Check total

BAC Home Loans Servicing, LP
PO Box 660694
Dallas, TX 75266-0694

16664741820000009004800009455 0

⑆586990058⑆ 1666474 18⑊

## OPTION 4
## Interest-Only Payment

You pay only the interest charged on your loan for the previous month. By making an Interest Only Payment, you will avoid negative amortization, but no portion of the payment will be applied to reduce the principal balance of your loan.

**This option is not available this month because this amount is equal to or less than the minimum payment.**

EXHIBIT
A.b
page 4 of 4


**Bank of America**

**Home Loans**
P.O. Box 650070
Dallas, TX 75265-0070

Business Address:                    Send Payments to:
450 American Street                  P.O. Box 650070
Simi Valley, CA 93065-6285          Dallas, TX 75265-0070

*EXHIBIT*
*A.c*
*Page 1 of 2*

July 17, 2009

Sent Certified Mail:
7113 8257 1473 4674 9508
<u>Return Receipt Requested</u>

Domenico Bellitti
3800 BATTERSEA RD
MIAMI, FL 33133-6704

Account No.: 166647418
Property Address:
1660 Renaissance Way   2122-B
Boyton Beach, FL 33426

<u>**NOTICE OF INTENT TO ACCELERATE**</u>

Dear Domenico Bellitti:

BAC Home Loans Servicing, LP (hereinafter "BAC Home Loans Servicing, LP") services the home loan described above on behalf of the holder of the promissory note (the "Noteholder").  The loan is in serious default because the required payments have not been made.  The total amount now required to reinstate the loan as of the date of this letter is as follows:

| | | |
|---|---|---|
| <u>Monthly Charges:</u> | 06/01/2009 | $900.48 |
| | 07/01/2009 | $968.02 |
| <u>Late Charges:</u> | 06/01/2009 | |
| | | $45.02 |
| <u>Other Charges:</u> | Total Late Charges: | $0.00 |
| | Uncollected Costs: | $0.00 |
| | Partial Payment Balance: | ($0.00) |
| | **TOTAL DUE:** | **$1,913.52** |

You have the right to cure the default. To cure the default, on or before August 16, 2009,  BAC Home Loans Servicing, LP must receive the amount of $1,913.52 plus any additional regular monthly payment or payments, late charges, fees and charges, which become due on or before August 16, 2009.

The default will <u>not</u> be considered cured unless BAC Home Loans Servicing, LP receives "good funds" in the amount $1,913.52 on or before August 16, 2009.  If any check (or other payment) is returned to us for insufficient funds or for any other reason, "good funds" will not have been received and the default will not have been cured.  No extension of time to cure will be granted due to a returned payment. BAC Home Loans Servicing, LP reserves the right to accept or reject a partial payment of the total amount due without waiving any of its rights herein or otherwise.  For example, if less than the full amount that is due is sent to us, we can keep the payment and apply it to the debt but still proceed to foreclosure since the default would not have been cured.

If the default is not cured on or before August 16, 2009, the mortgage payments **will be accelerated** with the full amount remaining accelerated and becoming due and payable in full, and foreclosure proceedings will be initiated at that time. As such, the failure to cure the default may result in the foreclosure and sale of your property. If your property is foreclosed upon, the Noteholder may pursue a deficiency judgment against you to collect the balance of your loan, if permitted by law.

You may, if required by law or your loan documents, have the right to cure the default after the acceleration of the mortgage payments and prior to the foreclosure sale of your property if all amounts past due are paid within the time permitted by law. However, BAC Home Loans Servicing, LP and the Noteholder shall be entitled to collect all fees and costs incurred by BAC Home Loans Servicing, LP and the Noteholder in pursuing any of their remedies, including but not limited to reasonable attorney's fees, to the full extent permitted by law.  Further, you may have the right to bring a court action to assert the non-existence of a default or any other defense you may have to acceleration and foreclosure.

Your loan is in default.  Pursuant to your loan documents, BAC Home Loans Servicing, LP may, enter upon and conduct an inspection of your property. The purposes of such an inspection are to (i) observe the physical condition of your property, (ii) verify that the property is occupied and/or (iii) determine the identity of the occupant.  If you do not cure the default prior to the inspection, other actions to protect the mortgagee's interest in the property (including, but not limited to, winterization, securing the property, and valuation services) may be taken. **The costs of the above-described inspections and property preservation efforts will be charged to your account as provided in your security instrument and as permitted by law.**

If you are unable to cure the default on or before August 16, 2009, BAC Home Loans Servicing, LP wants you to be aware of BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A.

Please write your account number on all checks and correspondence.
We may charge you a fee for any payment returned or rejected by your financial institution, subject to applicable law.

BLQNSENV 8795 12/11/2008

**Payment Instructions:**

• Make your check payable to BAC Home Loans Servicing, LP
• Don't send cash
• Please include coupon with your payment

Account Number: 166647418-2
Domenico Bellitti
1660 Renaissance Way   2122-B
Boyton Beach, FL 33426

Balance Due for charges listed above: $1,913.52 as of July 17, 2009.

Please update e-mail information on the reverse side of this coupon.

For all full month payment periods, interest is calculated on a monthly basis. Accordingly, interest for all full months, including February, is calculated as 30/360 of annual interest, irrespective of the actual number of days in the month. For partial months, interest is calculated daily on the basis of a 365 day year.

BLQNSENV

**BAC Home Loans Servicing, LP**
PO BOX 650070
Dallas, TX 75265-0070

Additional Principal

Additional Escrow

Check Total

1666474182000001913520001913352

⑆586990058⑉ ⑈16664741⑉ 8ᴵᴵ⑇

various options that may be available to you through BAC Home Loans Servicing, LP to prevent a foreclosure sale of your property. For example:

- **Repayment Plan:** It is possible that you may be eligible for some form of payment assistance through BAC Home Loans Servicing, LP. Our basic plan requires that BAC Home Loans Servicing, LP receive, up front, at least ½ of the amount necessary to bring the account current, and that the balance of the overdue amount be paid, along with the regular monthly payment, over a defined period of time. Other repayment plans also are available.

- **Loan Modification:** Or, it is possible that the regular monthly payments can be lowered through a modification of the loan by reducing the interest rate and then adding the delinquent payments to the current loan balance. This foreclosure alternative, however, is limited to certain loan types.

- **Sale of Your Property:** Or, if you are willing to sell your home in order to avoid foreclosure, it is possible that the sale of your home can be approved through BAC Home Loans Servicing, LP even if your home is worth less than what is owed on it.

- **Deed-in-Lieu:** Or, if your property is free from other liens or encumbrances, and if the default is due to a serious financial hardship which is beyond your control, you may be eligible to deed your property directly to the Noteholder and avoid the foreclosure sale.

If you are interested in discussing any of these foreclosure alternatives with BAC Home Loans Servicing, LP, you must contact us immediately. If you request assistance, BAC Home Loans Servicing, LP will need to evaluate whether that assistance will be extended to you. In the meantime, BAC Home Loans Servicing, LP will pursue all of its rights and remedies under the loan documents and as permitted by law, unless it agrees otherwise in writing. Failure to bring your loan current or to enter into a written agreement by August 16, 2009 as outlined above will result in the acceleration of your debt.

Additionally, the U.S. Department of Housing and Urban Development (HUD) funds free or very low cost housing counseling across the nation. Housing counselors can help you understand the law and your options. They can also help you to organize your finances and represent you in negotiations with your lender if you need this assistance. You may find a HUD-approved housing counselor near you by calling 1-800-569-4287. For the hearing impaired, HUD Counseling Agency (TDD) numbers are available at 1-800-877-8339.

Time is of the essence. Should you have any questions concerning this notice, please contact Loan Counseling Center immediately at 1-800-669-6654. Our office hours are between 8am to 9pm Eastern Time.

Sincerely,

Loan Counseling Center

**EXHIBIT
A.C
Page 2 of 2**

BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A.

Account Number: 186647416

E-mail use: Providing your e-mail address below will allow us to send you information on your account.
Domenico Bellitti E-mail address:

**How we post your payments:** All accepted payments of principal and interest will be applied to the longest outstanding installment due, unless otherwise expressly prohibited or limited by law. If you submit an amount in addition to your scheduled monthly amount, we will apply your payments as follows: (i) to outstanding monthly payments of principal and interest, (ii) escrow deficiencies, (iii) late charges and other amounts you owe in connection with your loan and (iv) to reduce the outstanding principal balance of your loan. Please specify if you want an additional amount applied to future payments, rather than principal reduction.

**Postdated checks:** Postdated checks will be processed on the date received unless a loan counselor agrees to honor the date written on the check as a condition of a repayment plan.

Page 2 of 112
Account No.: 166647418

Prepared by: ARICEL MARTINEZ

LOAN #: 166647418

# MONTHLY ADJUSTABLE RATE PAYOPTION NOTE
### (MTA-Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

THIS NOTE CONTAINS A PREPAYMENT PENALTY.

MAY 15, 2007          MIAMI                    FLORIDA
[Date]                [City]                   [State]

1660 RENAISSANCE WAY # 2122-B, BOYTON BEACH, FL 33426
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 212,000.00           ("Principal"), plus interest, to the order of Lender. The Principal may increase as provided under the terms of this Note but will never exceed           115   percent of the Principal amount I originally borrowed. This is called the "Maximum Principal Limit." Lender is Countrywide Bank, FSB.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or its successors or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

### (A)  Interest Rate

Interest will be charged on unpaid Principal until the full amount has been paid. I will initially pay interest at a yearly rate of 9.000 %. This is my initial interest rate and is the rate for determining the interest I owe until it changes as provided below. Interest will be charged on the basis of a twelve-month year and a thirty-day month.

The interest rate used to calculate the initial Minimum Payment described in Section 3 is     2.500 %. When I make a Minimum Payment which is based on an interest rate that is less than the rate of interest due, the unpaid interest is added to the Principal amount. This is known as "deferred interest" or "negative amortization."

### (B)  Interest Rate Change Dates

The interest rate I owe may change on the first day of the first scheduled monthly payment, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C)  Index

On each Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the

PayOption MTA Note - No Intro Period (FL)
1E622-FL (10/06)(d/i)

Page 1 of 5





EXHIBIT
B
page 1 of 5

LOAN #: 166647418

"Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D)  Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding FOUR                              percentage point(s)    4.000   (this amount is the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than    9.950 % or lower than the Margin. The interest rate required by this Section 2 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

3.  **PAYMENTS**

**(A)  Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the **first**             day of each month beginning on JULY 01, 2007       . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  JUNE 01, 2037       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 660694, Dallas, TX 75266-0694 or at a different place if required by the Note Holder.

**(B)  Amount of My Initial Minimum Payment**

The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment. Each of my initial Minimum Payments until the first Payment Change Date will be in the amount of U.S. $ 837.66             , unless adjusted under Section 3(F). If the Minimum Payment is not sufficient to cover the amount of the interest due negative amortization will occur.

**(C)  Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the  **first**             day of JULY, 2008       , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The Minimum Payment is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) applies, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than    7.500% of my prior monthly payment. This limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by multiplying the amount of my Minimum Payment due the month preceding the Payment Change Date by the number    1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment.

**(E)  Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the Payment Cap described in Section 3(D), my Minimum Payment could be insufficient to pay the interest portion of the monthly

EXHIBIT
B
Page 2 of 5

Account No.: 166647418

LOAN #: 166647418

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any Minimum Payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be       5.000 % of the Minimum Payment. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each Minimum Payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the Minimum Payment by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.  DOCUMENT CORRECTION**

In the event that Note Holder at any time discovers that this Note, Security Instrument, Addenda, Rider or any other document related to this loan is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan, or otherwise contains an error, such as a clerical mistake, calculation error, computer error, printing error, electronic transmission error, or similar error, I agree, upon notice from Note Holder, to re-execute any documents that are necessary to replace or correct any such documents and return them within ten (10) days of receipt. I also agree that I will not hold Lender responsible for any damages which result from any such error.

**12.  SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not



EXHIBIT
B
Page 4 of 5

LOAN #: 166647418

keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender. To the extent permitted by Applicable Law, Lender may charge reasonable fees as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**13. DOCUMENT TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

I agree to the Prepayment Penalty Addendum attached hereto and made a part hereof.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____

DOMENICO BELLITTI                                          -Borrower

_____                          -Borrower

_____                          -Borrower

_____                          -Borrower

* PayOption MTA Note - No Intro Period (FL)
1E622-FL (10/06)                          Page 5 of 5

EXHIBIT
B
page 5 of 5

**RENAISSANCE COMMONS REALTY,**
Megan Dolente
Renaissance Commons Leasing
1690 Renaissance Commons Blvd Unit 1116
Boynton Beach, Florida 33426



**Residential Lease for Unit
in Condominium or Cooperative
FLORIDA ASSOCIATION OF REALTORS®**

**(FOR A TERM NOT TO EXCEED ONE YEAR)**
(Not To Be Used For Commercial, Agricultural, or Other Residential Property)

WARNING: IT IS VERY IMPORTANT TO READ ALL OF THE LEASE CAREFULLY. THE LEASE IMPOSES IMPORTANT LEGAL OBLIGATIONS. AN ASTERISK ( * ) OR A BLANK SPACE ( _____ ) INDICATES A PROVISION WHERE A CHOICE OR A DECISION MUST BE MADE BY THE PARTIES. NO CHANGES OR ADDITIONS TO THIS FORM MAY BE MADE UNLESS A LAWYER IS CONSULTED.

I.   **TERM AND PARTIES.** This is a lease ("the Lease") for a period of _7_ _____ months (the "Lease Term"). *PLEASE INITIAL*
beginning *March 23 2009*  and ending *October 22 2009* , between
      [month, day, year]                     [month, day, year]
*Dominic Belliti* _____ [name of owner of the property]
and ~~Candice~~ *Candace* ~~Weaver~~
                                [name/s of person/s to whom the property is leased]
(In the Lease, the owner, whether one or more, of the property is called "Landlord." All persons to whom the property is leased are called "Tenant.")

II.  **PROPERTY RENTED.** Landlord leases to Tenant unit no. *2122* _____ in the building located at
*1660 Renaissance Commons Blvd unit 2122 Boynton beach FL 33426*
                                [street address]
known as *Renaissance Commons*
                                [name of condominium development]
*Boynton Beach* _____ Florida *33426*
      [city]                                    [zip code]
together with the following furniture and appliances:
*Washer, Dryer, Fridge, Range,Hot Water Heater*

[List all furniture and appliances. If none, write "none.") (In the Lease, the property leased, including furniture and appliances, if any, is called "the Premises.")

III. **COMMON AREAS.** Landlord grants to Tenant permission to use, along with others, the common areas of the building and the development of which the Premises are a part.

IV.  **RENT PAYMENTS AND CHARGES.** Tenant shall pay rent for the Premises in installments of $ *1,275.00* _____
each on the *X23* day of each *Month* _____ (A "Rental Installment Period," as used in the Lease, shall be a
                                [month, week]
month if rent is paid monthly, and a week if rent is paid weekly.) Tenant shall pay with each rent payment all taxes imposed on the rent by taxing authorities. The amount of taxes payable on the beginning date of the Lease is
$ _____ for each installment. The amount of each installment of rent plus taxes ("the Lease Payment"), as of the date the Lease begins, is $ _____ Landlord will notify Tenant if the amount of the tax changes. Tenant shall pay the rent and all other charges required to be paid under the Lease by cash, valid check, or money order. Landlord may appoint an agent to collect the Lease Payment and to perform Landlord's obligations.

*  ☒ Landlord ☐ Tenant (check one) shall pay the common area maintenance fees attributable to the Premises during the Lease Term. Such fees are $ _____ per ☐ month / ☐ quarter (check one) and are payable at the following address: _____
Failure by Tenant to pay any such fees that are Tenant's obligations shall be a default in payment of rent.
*  The Lease Payments must be paid ☐ in advance ☐ in arrears (check one) beginning *March 21 2009*
                                                                                            [date]

V.   **DEPOSITS, ADVANCE RENT, AND LATE CHARGES.** In addition to the Lease Payments described above, Tenant shall pay the following: (check only those items that apply)
      ☒ a security deposit of $ *1,275.00* _____ to be paid upon signing the Lease.
      ☒ advance rent in the amount of $ *1,275.00* _____ for the Rental Installment Periods of *First Months Rent* _____ to be paid upon signing the Lease.
      ☐ a pet deposit in the amount of $ _____ to be paid upon signing the Lease.
      ☒ a late charge in the amount of $ *50.00* _____ for each Lease Payment made more than *5* ____ number of days after the date it is due.
      ☒ a bad check fee in the amount of $ *45.00* _____ (not to exceed $20.00, or 5% of the Lease Payment, whichever is greater) if Tenant makes any Lease Payment with a bad check. If Tenant makes any Lease Payment with a bad check, Landlord can require Tenant to pay all future Lease Payments in cash or by money order.   *PLEASE INITIAL*

*EXHIBIT "C" page 1 of 7*

VI. **SECURITY DEPOSITS AND ADVANCE RENT.**  If Tenant has paid a security deposit or advance rent the following provisions apply:

   A.   Landlord shall hold the money in a separate interest-bearing or noninterest-bearing account in a Florida banking institution for the benefit of Tenant. If Landlord deposits the money in an interest-bearing account, Landlord must pay Tenant interest of at least 75% of the annualized average interest paid by the bank or 5% per year simple interest, whichever Landlord chooses. Landlord cannot mix such money with any other funds of Landlord or pledge, mortgage, or make any other use of such money until the money is actually due to Landlord; or

   B.   Landlord must post a surety bond in the manner allowed by law. If Landlord posts the bond, Landlord shall pay Tenant 5% interest per year.

   At the end of the Lease, Landlord will pay Tenant, or credit against rent, the interest due to Tenant. No interest will be due Tenant if Tenant wrongfully terminates the Lease before the end of the Lease Term.

   If Landlord rents five or more dwelling units, then within 30 days of Tenant's payment of the advance rent or any security deposit, Landlord must notify Tenant in writing of the manner in which Landlord is holding such money, the interest rate, if any, that Tenant will receive, and when such payments will be made.

VII. **NOTICES.** *RCR Rentals, LLC* _____ is Landlord's Agent. All notices to Landlord
   [name]
   and all Lease Payments must be sent to Landlord's Agent at

   _____
   [address]

   unless Landlord gives Tenant written notice of a change. Landlord's Agent may perform inspections on behalf of Landlord. All notices to Landlord shall be given by certified mail, return receipt requested, or by hand delivery to Landlord or Landlord's Agent.

   Any notice to Tenant shall be given by certified mail, return receipt requested, or delivered to Tenant at the Premises. If Tenant is absent from the Premises, a notice to Tenant may be given by leaving a copy of the notice at the Premises.

VIII. **USE OF PREMISES.** Tenant shall use the Premises only for residential purposes. Tenant also shall obey, and require anyone on the Premises to obey, all laws and any restrictions that apply to the Premises. Landlord will give Tenant notice of any restrictions that apply to the Premises.

   The Premises are located in a condominium or cooperative development. The Lease, and Tenant's rights under the lease, shall be subject to all terms, conditions, provisions, and restrictions set out in the Declaration of Condominium, the plat, and restrictions, rules, and regulations as now exist or may be adopted, modified, amended, or repealed by the governing association during the Lease Term.

   Tenant acknowledges that the governing association may adopt, modify, amend, or repeal rules and regulations for the use of the common areas and the Premises during the Lease Term.

 - Occasional overnight guests ☒ are ☐ are not **(check one)** permitted. An occasional overnight guest is one who does not stay more than _7_ nights in any calendar month. Landlord's written approval ☒ is ☐ is not **(check one)** required to allow anyone else to occupy the Premises.

 - Tenant ☐ may ☒ may not **(check one)** keep or allow pets or animals on the Premises without Landlord's approval of the pet or animal in writing.
   Tenant shall not keep any dangerous or flammable items that might increase the danger of fire or damage on the Premises without Landlord's consent.
   Tenant shall not create any environmental hazards on or about the Premises.
   Tenant shall not destroy, deface, damage, impair, or remove any part of the Premises belonging to Landlord, nor permit any person to do so.

 - Tenant ☐ may ☒ may not **(check one)** make any alterations or improvements to the Premises without first obtaining Landlord's written consent to the alteration or improvement.
   Tenant must act, and require all other persons on the Premises to act, in a manner that does not unreasonably disturb any neighbors or constitute a breach of the peace.

IX. **MAINTENANCE.** Landlord and Tenant agree that the maintenance of the Premises must be performed by the person indicated below:

   A.   Structural and Building Codes. Landlord and Tenant acknowledge that the maintenance of the structural elements and common areas is performed by the condominium association as part of the common area maintenance. Landlord shall assure that the association complies with applicable building, housing, and health codes relating to the Premises. If there are no applicable building, housing, or health codes, Landlord shall assure that the association maintains and repairs the roofs, porches, windows, exterior walls, screens, foundations, floors, structural components, and steps, and keeps the plumbing in reasonable working order. Landlord will be responsible for the maintenance of any items listed above for which the association is not responsible.

RLOC – Rev. 9/92 Approved for use under rule 10-1.1(b) of The Rules Regulating The Florida Bar. Licensed to Alta Star Software.
**Software and Added Formatting Copyright 2004 Alta Star Software, Inc. All Rights Reserved. (305) 279-8898**

EXHIBIT
C
Page 2 of 7

B.   Elective Maintenance. Fill in each blank space in this section with Landlord or Tenant to show who will take care of the item noted. If a space is left blank, Landlord will be required to take care of that item.

| | | | | | |
|---|---|---|---|---|---|
| *Landlord* | Smoke detectors | *Landlord* | Running water | *Landlord* | Appliances |
| *Tenant* | Extermination of rats, mice, roaches, ants, wood-destroying organisms, and bedbugs | *Landlord* | Hot water | *Landlord* | Fixtures |
| | | *Landlord* | Lawn | *Landlord* | Pool (including filters, machinery, & equipment) |
| *Landlord* | Locks and keys | *Landlord* | Heat | | |
| *Tenant* | Clean and safe condition of outside areas | *Landlord* | Air conditioning | *Landlord* | Heating and air conditioning filters |
| | | *Tenant* | Furniture | | Other: |
| *Tenant* | Garbage removal and outside garbage receptacles | | | | |

Tenant's responsibility, if any, indicated above, ☐ shall ☒ shall not (check one) include major maintenance or major replacement of equipment.

Landlord shall be responsible for major maintenance or major replacement of equipment, except for equipment for which Tenant has accepted responsibility for major maintenance or major replacement in the previous paragraph.

Major maintenance or major replacement means a repair or replacement that costs more than $ __50.00__

Tenant shall be required to vacate the Premises on 7 days' written notice, if necessary, for extermination pursuant to this subparagraph. When vacation of the Premises is required for extermination, Landlord shall not be liable for damages but shall abate the rent.

Nothing in this section makes Landlord responsible for any condition created or caused by the negligent or wrongful act or omission of Tenant, any member of Tenant's family, or any other person on the Premises with Tenant's consent.

C.   Tenant's Required Maintenance. At all times during the Lease Term, Tenant shall:
1.   comply with all obligations imposed upon tenants by applicable provisions of building, housing, and health codes;
2.   keep the Premises clean and sanitary;
3.   remove all garbage from the dwelling unit in a clean and sanitary manner;
4.   keep all plumbing fixtures in the dwelling unit clean, sanitary, and in repair; and
5.   use and operate in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning, and other facilities and appliances, including elevators.

X.   UTILITIES. Tenant shall pay all charges for hook-up, connection, and deposit for providing all utilities and utility services to the Premises during this lease except

*Water, Cable Internet trash and sewer*

which Landlord agrees to provide at Landlord's expense.   (Specify any utilities to be provided and paid for by Landlord such as water, sewer, oil, gas, electricity, telephone, garbage removal, etc.).

XI.   LANDLORD'S ACCESS TO PREMISES. Landlord or Landlord's Agent may enter the Premises in the following circumstances:
A.   At any time for the protection or preservation of the Premises.
B.   After reasonable notice to Tenant at reasonable times for the purpose of repairing the Premises.
C.   To inspect the Premises; make necessary or agreed-upon repairs, decorations, alterations, or improvements; supply agreed services; or exhibit the Premises to prospective or actual purchasers, mortgagees, tenants, workers, or contractors under any of the following circumstances:
1.   with Tenant's consent;
2.   in case of emergency;
3.   when Tenant unreasonably withholds consent; or
4.   if Tenant is absent from the Premises for a period of at least one-half a Rental Installment Period. (If the rent is current and Tenant notifies Landlord of an intended absence, then Landlord may enter only with Tenant's consent or for the protection or preservation of the Premises.)

XII.   PROHIBITED ACTS BY LANDLORD.
A.   Landlord cannot cause, directly or indirectly, the termination or unreasonable interruption of any utility service furnished to Tenant, including, but not limited to, water, heat, light, electricity, gas, elevator, garbage collection, or refrigeration (whether or not the utility service is under the control of, or payment is made by, Landlord).

RLDD-1 Rev. 5/02 Approved for use under rule 10-1.1(b) of The Rules Regulating The Florida Bar. Licensed to Alta Star Software.
Software and Added Formatting Copyright 2004 Alta Star Software, Inc. All Rights Reserved. (305) 279-8898



EXHIBIT
C
page 3 of 7

B.   Landlord cannot prevent Tenant's access to the Premises by any means, including, but not limited to, changing the locks or using any boollock or similar device.

C.   Landlord cannot remove the outside doors, locks, roof, walls, or windows of the Premises except for purposes of maintenance, repair, or replacement. Landlord cannot remove Tenant's personal property from the Premises unless the action is taken after surrender, abandonment, or a lawful eviction. If provided in a written agreement separate from the Lease, upon surrender or abandonment by Tenant, Landlord shall not be liable or responsible for storage or disposition of Tenant's personal property. (For the purposes of this section, abandonment means Tenant is absent from the Premises for at least one-half a Rental Installment Period without paying rent or giving Landlord reasonable notice of Tenant's absence.)

XIII.  **CASUALTY DAMAGE.** If the Premises are damaged or destroyed other than by wrongful or negligent acts of Tenant or persons on the Premises with Tenant's consent, so that the use of the Premises is substantially impaired, Tenant may terminate the Lease within 30 days after the damage or destruction and Tenant will immediately vacate the premises. If Tenant vacates, Tenant is not liable for rent that would have been due after the date of termination. Tenant may vacate the part of the Premises rendered unusable by the damage or destruction, in which case Tenant's liability for rent shall be reduced by the fair rental value of the part of the Premises that was damaged or destroyed.

XIV.  **DEFAULT.**

A.   Landlord's Default. Except as noted below, Landlord will be in default if Landlord fails to comply with Landlord's required maintenance obligations under Section IX(A) or fails to comply with other material provisions of the Lease and such failure continues for more than 7 days after Tenant delivers a written notice to Landlord that tells Landlord how Landlord has violated the Lease.

If Landlord's failure to comply is due to causes beyond the Landlord's control and if Landlord has made, and continues to make, every reasonable effort to correct the problem, the Lease may be altered by the parties, as follows:

1.   If Landlord's failure to comply makes the Premises uninhabitable and Tenant vacates, Tenant shall not be liable for rent during the period the Premises remains uninhabitable.

2.   If Landlord's failure to comply does not make the Premises uninhabitable and Tenant continues to occupy the Premises, the rent for the period of noncompliance will be reduced by an amount in proportion to the loss of rental value caused by the noncompliance.

B.   Tenant's Default. Tenant will be in default if any of the following occur:

1.   Tenant fails to pay rent when due and the default continues for 3 days, excluding Saturday, Sunday, and legal holidays, after delivery of written demand by Landlord for payment of the rent or possession of the Premises.

2.   Tenant fails to perform its obligations under the Lease, and the failure is such that Tenant should not be given an opportunity to correct it or the failure occurs within 12 months of a written warning by Landlord of a similar failure. Examples of such failures which do not require an opportunity to correct include, but are not limited to, destruction, damage, or misuse of Landlord's or other Tenant's property by an intentional act or a subsequent or continued unreasonable disturbance.

3.   Except as provided above, Tenant fails to perform any other obligation under the Lease and the default continues for more than 7 days after delivery of written notice to Tenant from Landlord specifying the default.

C.   Waiver of Default. If Landlord accepts rent knowing of Tenant's default or accepts performance by Tenant of any provision of the Lease different from the performance required by the Lease, or if Tenant pays rent knowing of Landlord's default or accepts performance by Landlord of any provision of the Lease different from the performance required by the Lease, the party accepting the rent or performance or making the payment shall not have the right to terminate the Lease or to bring a lawsuit for that default, but may enforce any later default.

XV.  **REMEDIES AND DEFENSES.**

A.   Tenant's Remedies

1.   If Landlord has defaulted under the Lease and if Tenant has given Landlord a written notice describing the default and Tenant's intention to withhold rent if the default is not corrected within 7 days, Tenant may withhold an amount of rent equal to the loss in rental value caused by the default. If Tenant's notice advises Landlord that Tenant intends to terminate the lease if the default is not cured within 7 days and the default is not cured within the 7 days, Tenant may terminate the Lease.

2.   If Tenant has given the notice referred to in subparagraph (1) above, and if Landlord has not corrected the default within 7 days, Tenant may, in addition to withholding the applicable amount of rent, file a lawsuit in county court to require Landlord to correct the default and for damages.

3.   If Landlord's default makes the Premises uninhabitable, and if Tenant has given Landlord a notice describing the default and informing Landlord that Tenant intends to terminate the Lease, then if Landlord does not cure the default within the 7-day period, Tenant may terminate the Lease at the end of the 7 days.

4.   If Landlord violates the provisions of section XII, Landlord shall be liable to Tenant for actual and consequential damages or 3 months' rent, whichever is greater, for each violation.

RLCC-1 Rev. 5/02 Approved for use under rule 10-1.1(b) of The Rules Regulating The Florida Bar. Licensed to Alta Star Software.
**Software and Added Formatting Copyright 2004 Alta Star Software, Inc. All Rights Reserved.** (305) 279-8898

PLEASE INITIAL

EXHIBIT
C
Page 4 of 7

B.   Landlord's Remedies.

1.   If Tenant remains on the Premises after expiration or termination of the Lease without Landlord's permission, Landlord may recover possession of the Premises in the manner provided for by law. Landlord also may recover double rent for the period during which Tenant refuses to vacate the Premises.

2.   If Tenant defaults under the Lease by failing to pay rent, as set forth in section XIV(B)(1), Landlord may terminate Tenant's rights under the Lease and Tenant shall vacate the Premises immediately. If Tenant defaults under the Lease for any other reason, as set forth in sections XIV(B)(2) or (3) above, Landlord may terminate Tenant's rights under the Lease and Tenant shall vacate the Premises within 7 days of delivery of the notice of termination.

3.   If Tenant fails to cure a default within the time specified in the notice to Tenant, Landlord may recover possession of the Premises as provided by law.

4.   Landlord shall not recover possession of the Premises except:
   a.   in a lawsuit for possession;
   b.   when Tenant has surrendered possession of the Premises to Landlord; or
   c.   when Tenant has abandoned the Premises. Absent actual knowledge of abandonment, the Premises shall be considered abandoned if Tenant is absent from them for at least one-half a Rental Installment Period, the rent is not current, and Tenant has not notified Landlord, in writing, of an intended absence.

5.   If Tenant has defaulted under the Lease and Landlord has obtained a writ of possession, if Tenant has surrendered possession of the Premises to Landlord, or if Tenant has abandoned the Premises, Landlord may:
   a.   treat the Lease as terminated, retake possession for Landlord's own account, and any further liability of Tenant will be ended;
   b.   retake possession of the Premises for Tenant's account. Tenant will remain liable for the difference between rent agreed to be paid under the Lease and rent Landlord is able to recover in good faith from a new tenant; or
   c.   do nothing, and Tenant will be liable for the rent as it comes due.

6.   If Landlord retakes possession of the Premises for Tenant's account, Landlord must make a good faith effort to re-lease the Premises. Any rent received by Landlord as a result of the new lease shall be deducted from the rent due from Tenant. For purposes of this section, "good faith" in trying to re-lease the Premises means that Landlord shall use at least the same efforts to re-lease the Premises as were used in the initial rental or at least the same efforts as Landlord uses in attempting to lease other similar property. It does not require Landlord to give a preference in leasing the Premises over other vacant properties that Landlord owns or has the responsibility to rent.

C.   Other Remedies. Each party also may have other remedies available at law or in equity.

D.   Defenses. In a lawsuit by Landlord for possession of the Premises based upon nonpayment of rent or in a lawsuit by Landlord seeking to obtain unpaid rent, Tenant may assert as a defense Landlord's failure to perform required maintenance, as set forth in Section IX(A) above. Landlord's failure to provide elective maintenance, as set forth in Section IX(B) above, shall not be a defense to any lawsuit by Landlord for possession of the Premises unless otherwise provided by the Lease or applicable law. Tenant also may raise any other defense, whether legal or equitable, that Tenant may have, including the defense of retaliatory conduct.

E.   Payment of Rent to Court. In any lawsuit by Landlord for possession of the Premises, if Tenant raises any defense other than payment, Tenant must pay into the registry of the court the past due rent set forth in Landlord's complaint, or an amount determined by the court, and the rent which comes due during the lawsuit, as it comes due. Failure of Tenant to pay the rent into the registry of the court will be a waiver of Tenant's defenses other than payment.

F.   Attorney's Fees. In any lawsuit brought to enforce the Lease or under applicable law, the party who wins may recover its reasonable court costs and attorneys' fees from the party who loses.

* XVI. **ASSIGNMENT AND SUBLEASING.** Tenant ☐ may ☐ may not **(check one)** assign the Lease or sublease all or any part of the Premises without first obtaining Landlord's written approval and consent to the assignment or sublease.

* XVII. **RISK OF LOSS.** Landlord ☐ shall ☐ shall not **(check one)** be liable for any loss by reason of damage, theft, or otherwise to the contents, belongings, and personal effects of the Tenant, or Tenant's family, agents, employees, guests, or visitors located in or about the Premises, or for damage or injury to Tenant or Tenant's family, agents, employees, guests, or visitors. Landlord shall not be liable if such damage, theft, or loss is caused by Tenant, Tenant's family, agents, employees, guests, or visitors. Nothing contained in this provision shall relieve Landlord or Tenant from responsibility for loss, damage, or injury caused by its own negligence or willful conduct.

XVIII. **SUBORDINATION.** The Lease is subordinate to the lien of any mortgage encumbering the fee title to the Premises from time to time.

XIX. **LIENS.** Tenant shall not have the right or authority to encumber the Premises or to permit any person to claim or assert any lien for the improvement or repair of the Premises made by Tenant. Tenant shall notify all parties performing work on the Premises at Tenant's request that the Lease does not allow any liens to attach to Landlord's interest.

* XX. **APPROVAL CONTINGENCY.** The Lease ☒ is ☐ is not **(check one)** conditioned upon approval of Tenant by the association that governs the Premises.

XXI. **RENEWAL/EXTENSION.** The Lease can be renewed or extended only by a written agreement signed by both Landlord and Tenant, but **no renewal may extend the term to a date more than 1 year after the lease begins. A new lease is required for each year.**

RLOL-1 Rev. 5/02 Approved for use under rule 10-1.1(b) of The Rules Regulating The Florida Bar. Licensed to Alta Star Software
**Software and Added Formatting Copyright 2004 Alta Star Software, Inc. All Rights Reserved. (305) 279-8898**

PLEASE INITIAL

EXHIBIT
C
Page 5 of 7

## XXII. MISCELLANEOUS:

A. Time is of the essence of the Lease.

B. The Lease shall be binding upon and for the benefit of the heirs, personal representatives, successors, and permitted assigns of Landlord and Tenant, subject to the requirements specifically mentioned in the Lease. Whenever used, the singular number shall include the plural or singular and the use of any gender shall include all appropriate genders.

C. The agreements contained in the Lease set forth the complete understanding of the parties and may not be changed or terminated orally.

D. No agreement to accept surrender of the Premises from Tenant will be valid unless in writing and signed by Landlord.

E. All questions concerning the meaning, execution, construction, effect, validity, and enforcement of the Lease shall be determined pursuant to the laws of Florida.

F. The place for filing any suits or other proceedings with respect to the Lease shall be the county in which the Premises is located.

G. Landlord and Tenant will use good faith in performing their obligations under the Lease.

H. As required by law, Landlord makes the following disclosure: "RADON GAS" Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

The Lease has been executed by the parties on the dates indicated below.
Executed by Landlord in the presence of:

Print Landlord Name _Domenico Bellitti_

Print Name: _____

By: _____
Landlord's Signature

Print Name: _____

As: _____

2 witnesses needed for Landlord

Date: _____

Executed by Tenant in the presence of:

_SIGN HERE_

Tenant's Signature

Print Name: _____

Print Tenant Name _Candace S. Weaver_

Print Name: _____

Date: _3/19/2009_

Print Name: _____

Tenant's Signature

Print Tenant Name _____

Print Name: _____

Date: _____

2 witnesses needed for each Tenant

This form was completed
with the assistance of
Name:
Address:

Telephone No:

FLCC-1 Rev. 9/92 Approved for use under rule 10-1.1(b) of The Rules Regulating The Florida Bar. Licensed to Alta Star Software.
**Software and Added Formatting Copyright 2004 Alta Star Software, Inc. All Rights Reserved. (305) 279-8898.**

EXHIBIT
C
Page 6 of 7

**Residential Lease for Unit
in Condominium or Cooperative**
FLORIDA ASSOCIATION OF REALTORS®

### (FOR A TERM NOT TO EXCEED ONE YEAR)

**INSTRUCTIONS:**

1. Licensee: Give this disclosure to the Landlord prior to your assisting with the completion of the attached Lease.
2. Licensee: As the person assisting with the completion of the attached form, insert your name in the first (5) blank "Name" spaces below.
3. Licensee: **SIGN** the disclosure below.
4. Landlord and Tenant: Check the applicable provision regarding English contained in the disclosure and **SIGN** below.
5. Licensee, Landlord and Tenant: Retain a copy for your files.

**DISCLOSURE:**

*Megan Dolente* _____    told me that he/she is not a lawyer
(Name)                              and may not give legal advice or represent me in court.

*Megan Dolente* _____    told me that he/she may only help me fill out a form
(Name)                              approved by the Supreme Court of Florida.

*Megan Dolente* _____    may only help me
(Name)                              by asking me factual questions to fill in the form.

*Megan Dolente* _____    may also tell me how to file the form.
(Name)

*Megan Dolente* _____    told me that he/she is not an attorney and cannot tell
(Name)                              me what my rights or remedies are or how to testify in court.

Tenant:                                        Landlord:

☒ I can read English.                          ☒ I can read English.

☐ I cannot read English but this               ☐ I cannot read English but this
   notice was read to me by                        notice was read to me by

_____ (Name)                        _____ (Name)

in _____                            in _____
   (Language)                                     (Language)

_____                               _____
(Licensee)  *Megan Dolente*                    (Landlord)

_____
(Tenant)

RLCC-1 Rev. 9/03 Licensed to Alta Star Software
**Software and Added Formatting Copyright 2004 Alta Star Software, Inc. All Rights Reserved. (305) 279-8898**





EXHIBIT
C
Page 7 of 7

HUD-1

| A. Settlement Statement | U.S. Department of Housing and Urban Development | OMB No. 2502-0265 |
|---|---|---|

B. Type of Loan

| ○ 1. FHA | ○ 2. FmHA | ● 3. Conv. Unins. | 6. File Number 2007-311 | 7. Loan Number 166847418 | 8. Mortg. Ins. Case Num. |
|---|---|---|---|---|---|
| ○ 4. VA | ○ 5. Conv. Ins. | | | | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown here. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME OF BORROWER: Domenico Bellini a single man.
   Address of Borrower: 2115 s Ocean Blvd., Unit 12, Delray Beach, Florida 33483

E. NAME OF SELLER: RCR Holdings II, Inc., a Florida Limited Liability Company
   Address of Seller: 980 N. FEDERAL HIGHWAY, SUITE 203, Boca Raton, Florida 33432      TIN:

F. NAME OF LENDER: Countrywide Bank FSB
   Address of Lender: 8400 NW 36th Street, Suite 420, Miami, Florida 33165

G. PROPERTY LOCATION: 160C Renaissance Commons Bl, Unit 312C, Boynton Beach, Florida 33426

H. SETTLEMENT AGENT: Global Title, LLC, d/b/a Global Title Group     TIN: 20-5408790
   Place of Settlement: 2828 Coral Way , Suite 530, Miami, Florida 33145     Phone: 305-445-8085

I. SETTLEMENT DATE: 5/15/07     DISBURSEMENT DATE: 5/15/07

| J. Summary of Borrower's transaction | | K. Summary of seller's transaction | |
|---|---|---|---|
| 100. Gross amount due from borrower | | 400. Gross amount due to seller | |
| 101. Contract sales price | 265,000.00 | 401. Contract sales price | 265,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (Line 1400) | 8,997.39 | 403. | |
| 104. 2654 Closing Charge | 5,300.00 | 404 2654 Closing Charge | 6,300.00 |
| 105. CDD Maintenance Charge | 322.03 | 405. CDD Maintenance Charge | 322.03 |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. Cit/town taxes | | 406. Cit/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross amount due from borrower | 279,319.32 | 420. Gross amount due to seller | 279,622.03 |
| 200. Amounts paid by or in behalf of borrower | | 500. Reductions in amount due to seller | |
| 201. Deposit or earnest money | 25,164.90 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 212,000.00 | 502. Settlement charges to seller (line 1400) | 11,943.80 |
| 203. existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Principal amount of second mortgage | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. Deposit held by seller | 25,164.90 |
| 207. Principal of new mortgage paid by seller | | 507. Principal of mortgage held by seller | |
| 208. Seller Contribution | 13,687.10 | 508. Seller Contribution | 13,687.10 |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. Cit/town taxes | | 510. Cit/town taxes | |
| 211. County taxes from 01/01/07 to 05/15/07 | 325.91 | 511. County taxes from 01/01/07 to 05/15/07 | 325.91 |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total paid by/for borrower | 249,044.50 | 520. Total reductions in amount due seller | 46,195.10 |
| 300. Cash at settlement from/to borrower | | 600. Cash at settlement to/from seller | |
| 301. Gross amount due from borrower (line 120) | 279,129.32 | 601. Gross amount due to seller (line 420) | 279,622.03 |
| 302. Less amount paid by/for the borrower (line 220) | (249,046.50) | 602. Less total reductions in amount due seller (line 520) | (46,795.10) |
| 303. Cash ( ☑ From ☐ To ) Borrower | 30,082.82 | 603. Cash ( ☑ To ☐ From ) Seller | 231,826.93 |

Substitute Form 1099 Seller Statement: The information contained in blocks E, G, H, and I and on line 401 is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

Seller Instructions: If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

Borrower's Initials: _____     Seller's Initials: _____

DoubleTime®

EXHIBIT
D
Page 1 of 2

HUD-1

**U.S. Department of Housing and Urban Development**

Page 2

| L. Settlement Charges | | | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|---|
| 700. Total Sales/Broker's Com. based on price | $365,600.00 @ | % = 7,950.00 | | |
| 701. | 7,360.00 | to Renaissance Realty Inc | | |
| 702. | | to | | |
| 703. Commission paid at settlement | | | | 7,910.00 |
| 704. | | | | |
| **800. Items payable in connection with loan** | | Borrower POC Seller POC | | |
| 801. Loan origination fee | % to | | | |
| 802. Loan discount | % to | | | |
| 803. Appraisal fee | to Principal Appraiser | | 335.00 | |
| 804. Credit report | to Broker PRO Landsafe Credit | | 18.00 | |
| 805. Broker Application Fee | to EMC FINANCE CO | | 129.00 | |
| 806. VSP Paid to Broker by Lender | to EMC FINANCE CO | $265.90 | | |
| 807. Tax Service Fee | to Countrywide Tax Service Corporation | | 70.00 | |
| 808. Flood Check Fee | to Landsafe Flood Data | | 26.00 | |
| 809. Underwriting Fees | to Countrywide Bank FSB | | 172.00 | |
| 810. Doc Prep | to Countrywide Bank FSB | | 230.00 | |
| 811. | to | | | |
| **900. Items required by lender to be paid in advance** | | Borrower POC Seller POC | | |
| 901. Interest from 05/15/07 to 06/01/07 @$2.2900 /day | | 468.49 | | |
| 902. Mortgage insurance premium for months to | | | | |
| 903. Hazard insurance premium for years to | | | | |
| 904. Flood insurance premium for years to | | | | |
| 905. | years to | | | |
| **1000. Reserves deposited with lender** | | Borrower POC Seller POC | | |
| 1001. Hazard insurance | months @ per month | | | |
| 1002. Mortgage insurance | months @ per month | | | |
| 1003. City property taxes | months @ per month | | | |
| 1004. County property taxes | months @ per month | | | |
| 1005. Annual assessments | months @ per month | | | |
| 1006. Flood insurance | months @ per month | | | |
| 1007. | months @ per month | | | |
| 1008. | months @ per month | | | |
| 1009. Aggregate accounting adjustment | | | | |
| **1100. Title charges** | | Borrower POC Seller POC | | |
| 1101. Settlement or closing fee | to Global Title, LLC, d/b/a Global Title Group | | 200.00 | |
| 1102. Abstract or title search | to Global Title, LLC, d/b/a Global Title Group | | 225.00 | |
| 1103. Title examination | to Global Title, LLC, d/b/a Global Title Group | | 200.00 | |
| 1104. Title insurance binder | to | | | |
| 1105. Document preparation | to Global Title, LLC, d/b/a Global Title Group | | 300.00 | |
| 1106. Notary fees | to | | | |
| 1107. Attorney's Fees | to Eddleman Bay and Sons | | | 1,820.00 |
| (includes above item numbers) | | | | |
| 1108. Title insurance | to Global Title, LLC, d/b/a Global Title Group | | 1,820.00 | |
| (includes above item number) | | | | |
| 1109. Lender's coverage (Premium) $212,098.00 ($0.00) | | | | |
| 1110. Owner's coverage (Premium) $365,600.00 ($1,400.00) | | | | |
| 1111. Endorse 4.1-22/F9 $-141.00 | | | 169.20 | |
| 1112. Wire Transfer/Electronic Delivery | to Global Title, LLC, d/b/a Global Title Group | | 72.00 | |
| 1113. Courier | to Global Title, LLC, d/b/a Global Title Group | | 97.00 | |
| **1200. Government recording and transfer charges** | | | | |
| 1201. Recording fees Deed $19.10 Mortgage $252.50 Releases $19.15 | | | 252.10 | 38.10 |
| 1202. City/county tax/stamps Deed Mortgage $434.00 | | | 434.00 | |
| 1203. State tax/stamps Deed $1,525.00 Mortgage $742.00 | | | 742.00 | 1,525.00 |
| 1204. | to | | | |
| 1205. | to | | | |
| **1300. Additional settlement charges** | | Borrower POC Seller POC | | |
| 1301. Bring of Deed / Post Closure | to Global Title, LLC, d/b/a Global Title Group | | 130.00 | |
| 1302. Lien Letters | to Florida Lien Search, Inc | | 110.00 | |
| 1304. Re-Cure of Title | to Palm Beach County | 1,378.42 | | |
| 1305. 3 months Crystal Contribution | to Villa Lago Condo | | 693.00 | |
| 1306. July Maintenance | to Villa Lago Condo | | 343.00 | |
| 1307. June Maintenance | to Villa Lago Condo | | 316.00 | |
| 1309. Courier | to Dickenson Ray and Sons P.A. | | 35.00 | |
| 1309. | | | | |
| **1400. Total settlement charges** | | | 2,293.99 | 11,343.10 |
| ( Enter on lines 103, Section J and 502, Section K) | | | | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____    Borrower        _____    Seller

Download Batfiled

_____    Borrower        _____    Seller

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused, or will cause, the funds to be disbursed in accordance with this statement.

Global Title, LLC, d/b/a Global Title Group

By _____        Date    5/15/07

As its Authorized Representative

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. U.S. Code Section 1001 and Section 1010.

DoubleTime®

**EXHIBIT**

**D**

**page 2 of 2**

August 12, 2014

**AFFIDAVIT**

State of Florida

County of Palm Beach

BEFORE ME, the undersigned Notary, Beverly Samuelson , on this 12th day of August, 2014, personally appeared Jacqueline Winslow,  known to me to be a credible person and of lawful age, who being by me first duly sworn, on her oath, deposes and says:

That on March 9, 2005 Dominic Belletti entered into a contract to purchase unit 2122, a Villa Lago Condominium at1660 Renaissance Commons Blvd, Boynton Beach, Florida.  Mr. Belletti made a total deposit of $23,165.00 which was held in escrow.

Jacqueline Winslow

36 SE 3rd St
Boca Raton, FL  33432

State of Florida

County of Palm Beach

Sworn to (or affirmed) and subscribed before me this 12th day of AUGUST 2014 (year), by JACQUELINE WINSLOW (name of person making statement).

(Signature of Notary Public – State of Florida)

BEVERLY A. SAMUELSON
(Print, Type, or Stamp Commissioned Name of Notary Public)

BEVERLY A. SAMUELSON
MY COMMISSION # FF067518
EXPIRES: December 26, 2017

Personally Known _____✓_____ OR Produced Identification _____

Type of Identification Produced _____

EXHIBIT
E

C3_1631 LNHIST 17694 04/24/2012

**Bank of America**

**Home Loans**

*P.O. Box 5170*
*Simi Valley, CA 93062-5170*



||||||||||||||||||||||||||||||||||||||||||||||||||||
AT1        -772-16969-0000129-001-1-000-000-000-000

DOMENICO BELLITTI
3800 BATTERSEA RD
MIAMI, FL 33133

**Notice Date:** 01/21/2015

**Loan No.:** 166647418

**Property Address:**
1660 RENAISSANCE WAY # 2122-B
BOYTON BEACH, FL 33426

---

**IMPORTANT MESSAGE ABOUT YOUR HOME LOAN**

Enclosed is the loan history statement you requested that provides a detailed outline of transactions for the above-referenced loan number. This statement provides a history or information on payments we have received from you, servicing expenses we have paid to third parties, tax and insurance payments paid on your behalf, and any late charges assessed and paid.

---

**QUESTIONS?**

We appreciate the opportunity to serve your home loan needs. If you have any questions, please call us at 1-800-669-6607, Monday-Friday 7a.m. to 7p.m. Local Time.

EXHIBIT
F
page 1of 7

This communication is from Bank of America, N.A., the servicer of your home loan.

EXHIBIT
F
page 2 of 7



**Bank of America** Home Loans



Loan Number: 166647418
Statement Period: 06/2007 - 01/2015
Date Prepared: 01/21/2015

Property Address:
1660 RENAISSANCE WAY #2122-B
BOYNTON BEACH, FL 33426

*EXHIBIT F — Page 3 of 7* (handwritten)

Page 3



| Transaction Date | Description | Total Payment | PMT/Mo | Principal Balance | Interest | Escrow Balance | Optional | Buydown | Late Charges Total | Unapplied Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Beginning Balance** | | | **212,000.00** | | **.00** | | | | **.00** |
| 06/01/2007 | MISC. POSTING | 888.59 | 06/2007 | .00 / 212,000.00 | 888.59 | .00 | .00 | .00 | .00 | .00 |
| 07/02/2007 | REGULAR PAYMENT | 2,150.25 | 07/2007 | 560.25 / 211,439.75 | 1,590.00 | .00 | .00 | .00 | .00 | .00 |
| 08/17/2007 | REGULAR PAYMENT | 2,150.25 | 08/2007 | 564.45 / 210,875.30 | 1,585.80 | .00 | .00 | .00 | .00 | .00 |
| 09/12/2007 | REGULAR PAYMENT | 2,192.13 | 09/2007 | 568.69 / 210,306.61 | 1,581.56 | .00 | .00 | .00 | 41.88 | .00 |
| 10/02/2007 | REGULAR PAYMENT | 2,150.24 | 10/2007 | 572.94 / 209,733.67 | 1,577.30 | .00 | .00 | .00 | -41.88 | .00 |
| 11/08/2007 | REGULAR PAYMENT | 2,134.77 | 11/2007 | 583.61 / 209,150.06 | 1,551.16 | .00 | .00 | .00 | .00 | .00 |
| 12/07/2007 | REGULAR PAYMENT | 2,134.77 | 12/2007 | 587.93 / 208,562.13 | 1,546.84 | .00 | .00 | .00 | .00 | .00 |
| 01/07/2008 | REGULAR PAYMENT | 1,646.55 | 01/2008 | 125.78 / 208,436.35 | 1,520.77 | .00 | .00 | .00 | .00 | .00 |
| 02/28/2008 | REGULAR PAYMENT | 2,109.09 | 02/2008 | 610.95 / 207,825.40 | 1,498.14 | .00 | .00 | .00 | .00 | .00 |
| 02/28/2008 | MISC. POSTING | 52.27 | 02/2008 | 52.27 / 207,773.13 | .00 | .00 | .00 | .00 | .00 | .00 |
| 02/11/2008 | PAYMENT REVERSAL | -2,093.48 | 02/2008 | -621.75 / 207,773.13 | -1,471.73 | .00 | .00 | .00 | .00 | .00 |
| 03/2008 | MISC. POSTING | -2,067.88 | 03/2008 | -2,067.88 / 207,151.38 | .00 | .00 | .00 | .00 | .00 | .00 |
| 02/05/2008 | REGULAR PAYMENT | 2,093.48 | 03/2008 | 621.75 / 207,151.38 | 1,471.73 | .00 | .00 | .00 | .00 | .00 |
| 03/2008 | MISC. POSTING | 2,067.88 | 03/2008 | 2,067.88 / 205,083.50 | .00 | .00 | .00 | .00 | .00 | .00 |
| 02/11/2008 | MISC. POSTING | 4,161.36 | 02/2008 | 4,161.36 / 203,611.77 | .00 | .00 | .00 | .00 | .00 | .00 |
| 02/28/2008 | REGULAR PAYMENT | 2,051.55 | 03/2008 | 609.30 / 203,002.47 | 1,442.25 | .00 | .00 | .00 | .00 | .00 |

Case 3:09-md-02043-EEF-MBN   Document 20195   Filed 03/25/16   Page 31 of 112

**Bank of America**
Home Loans



# EXHIBIT F
## Page 4 of 7

Page 4

| Transaction Date | Description | Total Payment | PMT/Mo | Principal Balance | Interest | Escrow Balance | Optional | Buydown | Late Charges Total | Unapplied Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/28/2008 | MISC. POSTING | 741.93 | 03/2008 | 741.93 / 202,280.54 | .00 | .00 | | | .00 | .00 |
| 02/07/2008 | REGULAR PAYMENT | 2,029.45 | 04/2008 | 817.84 / 201,642.70 | 1,411.61 | .00 | | | .00 | .00 |
| | REGULAR PAYMENT | 2,029.45 | 04/2008 | 817.84 / 201,642.70 | 1,411.61 | .00 | | | .00 | .00 |
| | MISC. POSTING | 15,022.10 | 04/2008 | 15,022.10 / 186,620.60 | .00 | .00 | | | .00 | .00 |
| | REGULAR PAYMENT | 1,851.49 | 05/2008 | 587.91 / 186,032.69 | 1,263.58 | .00 | | | .00 | .00 |
| | MISC. POSTING | 2,178.00 | 05/2008 | 2,178.00 / 183,854.69 | .00 | .00 | | | .00 | .00 |
| | MISC. POSTING | -2,178.00 | 05/2008 | -2,178.00 / 186,032.69 | .00 | .00 | | | .00 | .00 |
| | PAYMENT REVERSAL | -1,851.49 | 04/2008 | -587.91 / 186,620.60 | -1,263.58 | .00 | | | .00 | .00 |
| | PAYMENT REVERSAL | -15,022.10 | 04/2008 | -15,022.10 / 201,642.70 | .00 | .00 | | | .00 | .00 |
| | PAYMENT REVERSAL | -2,029.45 | 03/2008 | -817.84 / 202,260.54 | -1,411.81 | .00 | | | .00 | .00 |
| | MISC. POSTING | 628.94 | 05/2008 | 628.94 / 199,642.66 | 1,351.75 | .00 | | | .00 | .00 |
| | REGULAR PAYMENT | 1,980.69 | 05/2008 | 628.94 / 199,013.72 | 1,351.75 | .00 | | | .00 | .00 |
| | MISC. POSTING | 2,000.04 | 04/2008 | 2,000.04 / 199,642.66 | .00 | .00 | | | .00 | .00 |
| | MISC. POSTING | 1,370.80 | 05/2008 | 1,370.80 / 197,642.92 | .00 | .00 | | | .00 | .00 |
| 06/06/2008 | REGULAR PAYMENT | 1,924.98 | 06/2008 | 648.54 / 196,994.38 | 1,276.44 | .00 | | | .00 | .00 |
| 06/06/2008 | MISC. POSTING | 1,926.51 | 06/2008 | 1,926.51 / 195,067.87 | .00 | .00 | | | .00 | .00 |
| 07/07/2008 | REGULAR PAYMENT | 1,878.78 | 07/2008 | 659.61 / 194,408.26 | 1,219.17 | .00 | | | .00 | .00 |
| 07/07/2008 | MISC. POSTING | 1,972.71 | 07/2008 | 1,972.71 / 192,435.55 | .00 | .00 | | | .00 | .00 |
| 08/07/2008 | REGULAR PAYMENT | 1,832.96 | 08/2008 | 670.33 / 191,765.22 | 1,162.63 | .00 | | | .00 | .00 |



Bank of America
Home Loans

EXHIBIT
F
Page 5 of 5

Page 5

| Transaction Date | Description | Total Payment | PMT/Mo | Principal Balance | Interest | Escrow Balance | Optional | Buydown | Late Charges Total | Unapplied Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 08/07/2008 | MISC. POSTING | 1,000.00 | 08/2008 | 1,000.00 / 190,765.22 | .00 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 08/04/2008 | REGULAR PAYMENT | 1,810.23 | 09/2008 | 877.56 / 190,087.66 | 1,132.67 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 09/04/2008 | MISC. POSTING | 1,022.73 | 09/2008 | 1,022.73 / 189,064.93 | .00 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 10/06/2008 | REGULAR PAYMENT | 1,774.57 | 10/2008 | 691.39 / 188,373.54 | 1,083.18 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 10/06/2008 | MISC. POSTING | 1,500.00 | 10/2008 | 1,500.00 / 186,873.54 | .00 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 11/06/2008 | REGULAR PAYMENT | 1,735.06 | 11/2008 | 703.36 / 186,170.18 | 1,031.70 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 12/04/2008 | REGULAR PAYMENT | 1,722.51 | 12/2008 | 714.09 / 185,456.09 | 1,008.42 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 01/08/2009 | REGULAR PAYMENT | 1,697.68 | 01/2009 | 731.76 / 184,724.33 | 965.92 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 02/05/2009 | REGULAR PAYMENT | 1,673.18 | 02/2009 | 749.56 / 183,974.77 | 923.62 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 02/05/2009 | MISC. POSTING | 24.50 | 02/2009 | 24.50 / 183,950.27 | .00 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 03/05/2009 | REGULAR PAYMENT | 1,660.85 | 03/2009 | 760.26 / 183,190.01 | 900.59 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 04/07/2009 | REGULAR PAYMENT | 1,636.91 | 04/2009 | 778.21 / 182,411.80 | 858.70 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 05/07/2009 | REGULAR PAYMENT | 900.48 | 05/2009 | 64.43 / 182,347.37 | 836.05 | .00 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |
| 08/26/2010 | COUNTY TAX PMT | -4.50 | 05/2009 | .00 / 182,347.37 | .00 | -4.50 / -4.50 | .00 | .00 | .00 / .00 | .00 / .00 |
| 08/26/2010 | COUNTY TAX PMT | -2,288.20 | 05/2009 | .00 / 182,347.37 | .00 | -2,288.20 / -2,292.70 | .00 | .00 | .00 / .00 | .00 / .00 |
| 12/22/2010 | COUNTY TAX PMT | -1,914.39 | 05/2009 | .00 / 182,347.37 | .00 | -1,914.39 / -4,207.09 | .00 | .00 | .00 / .00 | .00 / .00 |
| 06/02/2011 | PRINCIPAL ADJUST. | 182,347.37 | 05/2009 | 182,347.37 / .00 | .00 | .00 / -4,207.09 | .00 | .00 | .00 / .00 | .00 / .00 |
| 08/15/2011 | MISC. POSTING | 4,207.09 | 05/2009 | .00 / .00 | .00 | 4,207.09 / .00 | .00 | .00 | .00 / .00 | .00 / .00 |



Bank of America 🇺🇸
Home Loans

**Fee Transaction Activity (06/2007 - 01/2015)**

EXHIBIT F
page 6 of 6



| Transaction Date | Fee Description | Charges | Payments |
|---|---|---|---|
| 06/03/2009 | Property Inspection | 15.00 | .00 |
| 08/03/2009 | Property Inspection | 15.00 | .00 |
| 09/23/2009 | Property Inspection-Vacant | 15.00 | .00 |
| 09/25/2009 | Title Fee | 325.00 | .00 |
| 10/19/2009 | Property Inspection | 15.00 | .00 |
| 10/27/2009 | Property Inspection-Vacant | 15.00 | .00 |
| 11/13/2009 | Vacant Property Registration | 150.00 | .00 |
| 11/24/2009 | Property Inspection-Vacant | 15.00 | .00 |
| 11/30/2009 | Attorney/Trustee Fee | 650.00 | .00 |
| 11/30/2009 | Court Filing Fee | 941.60 | .00 |
| 12/28/2009 | Property Inspection-Vacant | 15.00 | .00 |
| 01/05/2010 | Attorney/Trustee Fee | 260.00 | .00 |
| 01/05/2010 | Process Server | 425.85 | .00 |
| 02/01/2010 | Property Inspection-Vacant | 15.00 | .00 |
| 03/25/2010 | Property Inspection-Vacant | 15.00 | .00 |
| 03/29/2010 | Property Inspection-Vacant | 15.00 | .00 |
| 05/07/2010 | Property Inspection-Vacant | 15.00 | .00 |
| 06/04/2010 | Property Inspection | 15.00 | .00 |
| 06/29/2010 | Property Inspection | 15.00 | .00 |
| 08/10/2010 | Property Inspection | 15.00 | .00 |
| 09/03/2010 | Property Inspection | 15.00 | .00 |
| 10/20/2010 | Property Inspection | 15.00 | .00 |
| 02/19/2011 | Property Inspection - Adjustment | -15.00 | .00 |
| 02/19/2011 | Property Inspection - Adjustment | -15.00 | .00 |
| 02/26/2011 | Property Inspection - Adjustment | -15.00 | .00 |

Case 1:09-md-02041-BEF-GMN Document 2919 Filed 07/28/11 Page 34 of 112

| Transaction Date | Fee Description | Charges | Payments |
|---|---|---|---|
| 02/26/2011 | Property Inspection - Adjustment | -15.00 | .00 |
| 04/05/2011 | Expedited Payoff Service Fee | 30.00 | .00 |
| 04/20/2011 | Expedited Payoff Service Fee | 30.00 | .00 |
| 07/08/2011 | Title Fee - Adjustment | -325.00 | .00 |
| 07/08/2011 | Court Filing Fee - Adjustment | -941.60 | .00 |
| 07/28/2011 | Process Server - Adjustment | -425.85 | .00 |
| 08/10/2011 | Clear Escrow | 4,207.09 | .00 |
| 08/30/2011 | Expedited Payoff Service Fee - Adjustment | -30.00 | .00 |
| 08/30/2011 | Expedited Payoff Service Fee - Adjustment | -30.00 | .00 |
| 10/04/2011 | Property Inspection-Vacant - Adjustment | -15.00 | .00 |
| 10/04/2011 | Property Inspection-Vacant - Adjustment | -15.00 | .00 |
| 10/04/2011 | Property Inspection-Vacant - Adjustment | -15.00 | .00 |
| 10/04/2011 | Property Inspection-Vacant - Adjustment | -15.00 | .00 |
| 10/04/2011 | Property Inspection-Vacant - Adjustment | -15.00 | .00 |
| 10/04/2011 | Property Inspection-Vacant - Adjustment | -15.00 | .00 |
| 10/04/2011 | Property Inspection-Vacant - Adjustment | -15.00 | .00 |
| 10/04/2011 | Property Inspection-Vacant - Adjustment | -15.00 | .00 |
| 10/04/2011 | Property Inspection-Vacant - Adjustment | -15.00 | .00 |
| 10/04/2011 | Attorney/Trustee Fee - Adjustment | -650.00 | .00 |
| 10/04/2011 | Attorney/Trustee Fee - Adjustment | -260.00 | .00 |
| 10/04/2011 | Property Inspection - Adjustment | -15.00 | .00 |
| 10/04/2011 | Property Inspection - Adjustment | -15.00 | .00 |
| 10/04/2011 | Property Inspection - Adjustment | -15.00 | .00 |
| 10/04/2011 | Property Inspection - Adjustment | -15.00 | .00 |
| 10/04/2011 | Clear Escrow - Adjustment | -4,207.09 | .00 |
| 10/04/2011 | Property Inspection - Adjustment | -15.00 | .00 |
| 10/04/2011 | Vacant Property Registration - Adjustment | -150.00 | .00 |

Resident Transaction Report

4128 Villa Lago Condominium Assoc.@
Renaissance Commons Inc
Date: 01/01/2006 - 12/19/2008

Building: 0000    Villa Lago Condo

c/o Prime Management Group Inc

6300 Park of Commerce Blvd

Boca Raton, FL 33487

| Res ID | Resident Name Unit Address | Type | Date | Code | Charge Code Desc Bill Address | Check No | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| 2122 01 | Dominic Belletti | | | | | | | |
| | 1660 Renaissance Commons Blvd Unit #2122 | | | | 2115 S Ocean Blvd Unit 12 | | | |
| | Boynton Bch, FL 33426 | | | | Delray Beach, FL 33483 | | | |
| | Current Credit History Code: | | DM | | Effective Date: 01/28/2008 | | | |
| | | | | | | | Beg Bal | 00.00 |
| | | Charge | 09/01/2007 | MM | Maintenance Fees | | 316.00 | 316.00 |
| | | Charge | 09/16/2007 | LF | Late Fees | | 25.00 | 341.00 |
| | | Charge | 10/01/2007 | MM | Maintenance Fees | | 316.00 | 657.00 |
| | | Pay | 10/31/2007 | | Receipt Processing | 37143 | -341.00 | 316.00 |
| | | Charge | 11/01/2007 | MM | Maintenance Fees | | 316.00 | 632.00 |
| | | Pay | 11/14/2007 | | Receipt Processing | 37270 | -316.00 | 316.00 |
| | | Charge | 12/01/2007 | MM | Maintenance Fees | | 316.00 | 632.00 |
| | | Pay | 12/20/2007 | | Receipt Processing | 37630 | -632.00 | 00.00 |
| | | Charge | 01/01/2008 | MM | Maintenance Fees | | 323.35 | 323.35 |
| | | Charge | 02/01/2008 | MM | Maintenance Fees | | 323.35 | 646.70 |
| | | Pay | 02/01/2008 | | Receipt Processing | 37954 | -348.35 | 298.35 |
| | | Pay | 02/14/2008 | | Receipt Processing | 38089 | -341.00 | -42.65 |
| | | Pay | 02/22/2008 | | Receipt Processing | 381.03 | -323.35 | -366.00 |
| | | Charge | 03/01/2008 | MM | Maintenance Fees | | 323.35 | -42.65 |
| | | Pay | 03/06/2008 | | Receipt Processing | 38313 | -323.35 | -366.00 |
| | | Charge | 04/01/2008 | MM | Maintenance Fees | | 323.35 | -42.65 |
| | | Pay | 04/07/2008 | | Receipt Processing | 38596 | -325.35 | -368.00 |
| | | Charge | 05/01/2008 | MM | Maintenance Fees | | 323.35 | -44.65 |
| | | Pay | 05/06/2008 | | Lockbox | 038921 | -323.35 | -368.00 |
| | | Charge | 06/01/2008 | MM | Maintenance Fees | | 323.35 | -44.65 |
| | | Pay | 06/04/2008 | | Lockbox | 039169 | -323.35 | -368.00 |
| | | Charge | 07/01/2008 | MM | Maintenance Fees | | 323.35 | -44.65 |
| | | Pay | 07/09/2008 | | Lockbox | 039401 | -323.35 | -368.00 |
| | | Charge | 08/01/2008 | MM | Maintenance Fees | | 323.35 | -44.65 |
| | | Pay | 08/12/2008 | | Lockbox | 039673 | -323.35 | -368.00 |
| | | Charge | 09/01/2008 | MM | Maintenance Fees | | 323.35 | -44.65 |
| | | Pay | 09/03/2008 | | Lockbox | 039909 | -323.35 | -368.00 |
| | | Charge | 10/01/2008 | MM | Maintenance Fees | | 323.35 | -44.65 |
| | | Pay | 10/07/2008 | | Lockbox | 040141 | -323.35 | -368.00 |
| | | Charge | 11/01/2008 | MM | Maintenance Fees | | 323.35 | -44.65 |
| | | Pay | 11/06/2008 | | Lockbox | 040374 | -323.35 | -368.00 |
| | | Charge | 12/01/2008 | MM | Maintenance Fees | | 323.35 | -44.65 |
| | | Pay | 12/04/2008 | | Lockbox | 040723 | -323.35 | -368.00 |
| | | | | | | | Res Balance | -368.00 |

EXHIBIT
G
page 1 of 3

EXHIBIT
G
Page 2 of 3

**Villa Lago at Renaissance Commons**
1690 and 1660 Renaissance Commons Blvd.
Boynton Beach, Florida 33426

Phone: 561-572-0702
Fax: 561-572-0705

Dominic Belletti
2115 S Ocean Blvd
Unit 12
Delray Beach, FL 33483

Account: 4128-0000-2122-01
Unit Address: 1660 Renaissance Commons BlvdUnit #2122

**Villa Lago at Renaissance Commons**

| Type | Charge Code | Adjusted Code | Date | Description | Amount | Balance |
|------|------------|---------------|------|-------------|--------|---------|
| Charge | MM | RI | 02/01/2008 | Maintenance Fees | 323.35 | $646.70 |
| Pay | | | 02/01/2008 | Receipt Processing Check No: 37954 | -348.35 | $298.35 |
| Pay | | | 02/14/2008 | Receipt Processing Check No: 38089 | -341.00 | -$42.65 |
| Pay | | | 02/22/2008 | Receipt Processing Check No: 381.03 | -323.35 | -$366.00 |
| Charge | MM | RI | 03/01/2008 | Maintenance Fees | 323.35 | -$42.65 |
| Pay | | | 03/06/2008 | Receipt Processing Check No: 38313 | -323.35 | -$366.00 |
| Charge | MM | RI | 04/01/2008 | Maintenance Fees | 323.35 | -$42.65 |
| Pay | | | 04/07/2008 | Receipt Processing Check No: 38596 | -325.35 | -$368.00 |
| Charge | MM | RI | 05/01/2008 | Maintenance Fees | 323.35 | -$44.65 |
| Pay | | | 05/06/2008 | Lockbox Check No: 038921 | -323.35 | -$368.00 |
| Charge | MM | RI | 06/01/2008 | Maintenance Fees | 323.35 | -$44.65 |
| Pay | | | 06/04/2008 | Lockbox Check No: 039169 | -323.35 | -$368.00 |
| Charge | MM | RI | 07/01/2008 | Maintenance Fees | 323.35 | -$44.65 |
| Pay | | | 07/09/2008 | Lockbox Check No: 039401 | -323.35 | -$368.00 |
| Charge | MM | RI | 08/01/2008 | Maintenance Fees | 323.35 | -$44.65 |
| Pay | | | 08/12/2008 | Lockbox Check No: 039673 | -323.35 | -$368.00 |
| Charge | MM | RI | 09/01/2008 | Maintenance Fees | 323.35 | -$44.65 |
| Pay | | | 09/03/2008 | Lockbox Check No: 039909 | -323.35 | -$368.00 |
| Charge | MM | RI | 10/01/2008 | Maintenance Fees | 323.35 | -$44.65 |
| Pay | | | 10/07/2008 | Lockbox Check No: 040141 | -323.35 | -$368.00 |

| Charge MM | RI | 11/01/2008 | Maintenance Fees | 323.35 | -$44.65 |
|-----------|-----|-----------|------------------|--------|---------|
| Pay | | 11/06/2008 | Lockbox Check No: 040374 | -323.35 | -$368.00 |
| Charge MM | RI | 12/01/2008 | Maintenance Fees | 323.35 | -$44.65 |
| Pay | | 12/04/2008 | Lockbox Check No: 040723 | -323.35 | -$368.00 |
| Charge MM | RI | 01/01/2009 | Maintenance Fees | 323.35 | -$44.65 |
| | | | Balance | | -$44.65 |

EXHIBIT
G
page 3 of 3

STATE of Florida

County of Palm Beach County

BEFORE ME, the undersigned authority Personally appeared Megan Dolente who, after being sworn, deposed and said follows:

1. My name is Megan Dolente. I am over 18 years of age and have personal knowledge of the facts contained within this affidavit.
2. I am a licensed realtor in the State of Florida and have working in Palm Beach County from 2006 to the present.
3. I have over 8 years experience renting residential selling residential real estate properties.
4. I am aware that the property located at 1660 Renaissance Commons Blvd unit 2122 Boynton Beach FL 33426 contained/ contains Chinese drywall.
5. It is my professional opinion that the inability to sell the above property and having to sell it short sale prior to remediation was substantially caused by the presence of Chinese Drywall.
6. The information contained in this Affidavit is true and correct and to the best of my knowledge, information and belief.

_____        _____
**Printed Name**                      **Signature**

The foregoing instrument was acknowledged before me this ___ day of
_____, 2014 by _____ who is personally known to me or
who has produced _____ as identification and who did take an oath.

_____        _____
**Printed Notary Name**                **Notary Signature**

Commission Number: _____
Commission Expires: _____



Notary Public State of Florida
Hope Alley
My Commission EE111210
Expires 07/11/2015

# EXHIBIT H



**ANNE M. GANNON**
CONSTITUTIONAL TAX COLLECTOR
*Serving Palm Beach County*

**Serving** *you.*

Anne M. Gannon
Constitutional Tax Collector
Serving Palm Beach County
P.O. Box 3353
West Palm Beach, FL 33402-3353

## Tax Account

| Property Control Number | Property Type | Status |
|---|---|---|
| 08-43-45-17-18-000-2122 | Real Property | Active |

| Mailing Address: | Property Address: |
|---|---|
| GONZALEZ NICOLLE | 1660 RENAISSANCE COMMONS BLVD 2122 |
| 1660 RENAISSANCE COMMONS BLVD UNIT 2122 | BOYNTON BEACH FL 33426 |
| BOYNTON BEACH , FL 33426-7216 | |
| Geo CD: | Deed Number: |
| | 0 |

| Legal Description |
|---|
| VIZCAYA LAKES CONDO UNIT 2122 |

## Tax & Assessment

| Ad Valorem | Gross Tax | Credit | Net Tax | Savings |
|---|---|---|---|---|
| CITY OF BOYNTON BEACH | $221.20 | $0.00 | $221.20 | $0.00 |
| COUNTY | $135.89 | $0.00 | $135.89 | $0.00 |
| SO FLA WATER MANAGEMENT DIST. | $21.30 | $0.00 | $21.30 | $0.00 |
| SCHOOL | $251.09 | $0.00 | $251.09 | $0.00 |
| CHILDRENS SERVICES COUNCIL | $19.88 | $0.00 | $19.88 | $0.00 |
| F.I.N.D. | $1.18 | $0.00 | $1.18 | $0.00 |
| PBC HEALTH CARE DISTRICT | $30.38 | $0.00 | $30.38 | $0.00 |
| Sub Total | **$680.92** | **$0.00** | **$680.92** | **$0.00** |
| Non Ad Valorem | Gross Tax | Credit | Net Tax | Savings |
| LAKE WORTH DRAINAGE DISTRICT MAINT | $33.05 | $0.00 | $33.05 | $0.00 |
| RENAISSANCE COMMONS CDD DEBT | $730.70 | $0.00 | $730.70 | $0.00 |
| RENAISSANCE COMMONS CDD MAINT | $42.99 | $0.00 | $42.99 | $0.00 |
| Sub Total | **$806.74** | **$0.00** | **$806.74** | **$0.00** |
| Total Tax | **$1,487.66** | **$0.00** | **$1,487.66** | **$0.00** |

## Tax Installment

| Period | Bill Number | Due Date | Bill Year | Tax | Discount | Penalty/Fee | Interest | Total Due |
|---|---|---|---|---|---|---|---|---|
| INST 1 | 301393250 | 3/31/2008 | 2007 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | **Total Due:** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |

## Notice to Tax Payer

### Tax Certificates

Property Tax Help

Payments made between 5/31 – 6/7 of any year indicates the purchase of a Tax Certificate for delinquent taxes only.  Tax Certificate purchase(s) ARE **NOT** a payment of taxes.  "Paid By" information displays the name of the Tax Certificate purchaser.

If your bill number begins with a year (i.e. 2012-001234), a Tax Certificate was sold for delinquent property taxes. An additional collection fee of **$6.25** must be added to the total amount due for each delinquent tax year once a tax certificate has been sold. The amount due is shown above in the "Tax Installment" section under the Total Due column. **If no other payments or receipt numbers display for that year in the Tax Payment section, delinquent taxes are due.**

** This Icon ⚠ indicates delinquent taxes and the tax bill cannot be paid on-line at this time. It may also indicate a recent TDA where additional fees are required. Contact our office at 561-355-2264 or email ClientAdvocate@taxcollectorpbc.com for additional details.

**EXHIBIT
I**
Double side →

Tax Payment



ANNE M. GANNON
CONSTITUTIONAL TAX COLLECTOR
*Serving Palm Beach County*

Serving *you*.

Anne M. Gannon
Constitutional Tax Collector
Serving Palm Beach County
P.O. Box 3353
West Palm Beach, FL 33402-3353

## Tax Account

| Property Control Number | Property Type | Status |
|---|---|---|
| 08-43-45-17-18-000-2122 | Real Property | Active |

Mailing Address:
GONZALEZ NICOLLE
1660 RENAISSANCE COMMONS BLVD UNIT 2122
BOYNTON BEACH , FL 33426-7216
Geo CD:

Property Address:
1660 RENAISSANCE COMMONS BLVD 2122
BOYNTON BEACH FL 33426

Deed Number:
0

### Legal Description

VIZCAYA LAKES CONDO UNIT 2122

## Tax & Assessment

| Ad Valorem | Gross Tax | Credit | Net Tax | Savings |
|---|---|---|---|---|
| CITY OF BOYNTON BEACH | $1,232.56 | $0.00 | $1,232.56 | $0.00 |
| COUNTY | $754.26 | $0.00 | $754.26 | $0.00 |
| SO FLA WATER MANAGEMENT DIST. | $118.68 | $0.00 | $118.68 | $0.00 |
| SCHOOL | $1,379.14 | $0.00 | $1,379.14 | $0.00 |
| CHILDRENS SERVICES COUNCIL | $114.29 | $0.00 | $114.29 | $0.00 |
| F.I.N.D. | $6.56 | $0.00 | $6.56 | $0.00 |
| PBC HEALTH CARE DISTRICT | $189.72 | $0.00 | $189.72 | $0.00 |
| **Sub Total** | **$3,795.21** | **$0.00** | **$3,795.21** | **$0.00** |
| Non Ad Valorem | Gross Tax | Credit | Net Tax | Savings |
| LAKE WORTH DRAINAGE DISTRICT MAINT | $38.00 | $0.00 | $38.00 | $0.00 |
| RENAISSANCE COMMONS CDD DEBT | $730.56 | $0.00 | $730.56 | $0.00 |
| RENAISSANCE COMMONS CDD MAINT | $39.95 | $0.00 | $39.95 | $0.00 |
| SOLID WASTE AUTHORITY OF PBC | $87.00 | $0.00 | $87.00 | $0.00 |
| BOYNTON BEACH FIRE RESCUE ASSESSMENT | $68.00 | $0.00 | $68.00 | $0.00 |
| **Sub Total** | **$963.51** | **$0.00** | **$963.51** | **$0.00** |
| **Total Tax** | **$4,758.72** | **$0.00** | **$4,758.72** | **$0.00** |

## Tax Installment

| Period | Bill Number | Due Date | Bill Year | Tax | Discount | Penalty/Fee | Interest | Total Due |
|---|---|---|---|---|---|---|---|---|
| INST 1 | 302569760 | 3/31/2009 | 2008 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | **Total Due:** | | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |

## Notice to Tax Payer

### Tax Certificates

Property Tax Help

Payments made between 5/31 – 6/7 of any year indicates the purchase of a Tax Certificate for delinquent taxes only.  Tax Certificate purchase(s) ARE **NOT** a payment of taxes.  "Paid By" information displays the name of the Tax Certificate purchaser.

If your bill number begins with a year (i.e. 2012-001234), a Tax Certificate was sold for delinquent property taxes. An additional collection fee of $6.25 must be added to the total amount due for each

delinquent tax year once a tax certificate has been sold. The amount due is shown above in the "Tax Installment" section under the Total Due column. **If no other payments or receipt numbers display for that year in the Tax Payment section, delinquent taxes are due.**

** This Icon ⚖ indicates delinquent taxes and the tax bill cannot be paid on-line at this time. It may also indicate a recent TDA where additional fees are required. Contact our office at 561-355-2264 or email ClientAdvocate@taxcollectorpbc.com for additional details.

EXHIBIT "J"
Double side →

# "AS IS" Residential Contract For Sale And Purchase

**THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR**

FloridaRealtors·

1*  PARTIES: _____ **DOMENICO BELLITTI** _____ ("Seller"),
2*  and _____ **NICOLLE GONZALEZ** _____ ("Buyer"),
3   agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal
4   Property (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale
5   And Purchase and any riders and addenda ("Contract"):
6   **1. PROPERTY DESCRIPTION:**
7*    (a) Street address, city, zip: _____ **1660 Renaissance Way # 2122-B Boyton Beach Fl 33426** _____
8*    (b) Property is located in: ____ **PALM BEACH** ____ County, Florida. Real Property Tax ID No: _____
9*    (c) Legal description of the Real Property: **VILLA LAGO CONDOMINIUM UNIT 2122** _____
10* _____
11    together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and
12    attached wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded below.
13    (d) Personal Property: The following items owned by Seller and existing on the Property as of the date
14    of the initial offer are included in the purchase ("Personal Property"): (i) range(s)/oven(s), dishwasher(s),
15    disposal, ceiling fan(s), intercom, light fixtures, rods, draperies and other window treatments, garage door
16    openers, and security gate and other access devices; and (ii) those additional items checked below. If
17*   additional details are necessary, specify below. **If left blank, the item below is not included:**

| | | | |
|---|---|---|---|
| ☒ Refrigerator(s) | ☐ Smoke detector(s) | ☐ Pool barrier/fence | ☐ Storage shed |
| ☒ Microwave oven | ☐ Security system | ☐ Pool equipment | ☐ TV antenna/satellite dish |
| ☒ Washer | ☐ Window/wall a/c | ☐ Pool heater | ☐ Water softener/purifier |
| ☒ Dryer | ☐ Generator | ☐ Spa or hot tub with heater | ☐ Storm shutters and |
| ☐ Stand-alone ice maker | | ☐ Above ground pool | panels |

18    The only other items of Personal Property included in this purchase, and any additional details regarding
19*   Personal Property, if necessary, are:_____
20* _____
21    Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
22*   (e) The following items are excluded from the purchase:_____
23* _____
24*  **2. PURCHASE PRICE** (U.S. currency):...........................................................$____39,000.00
25*   (a) Initial deposit to be held in escrow in the amount of (checks subject to **COLLECTION**) $_____
26    The initial deposit made payable and delivered to "Escrow Agent" named below
27*   (**CHECK ONE**):☐ accompanies offer or ☐ is to be made upon acceptance (Effective Date)
28*     or ☐ is to be made within _____ (if blank, then 3) days after Effective Date
29*   Escrow Agent Information: Name:_____ **SOUTHERN TITLE GROUP** _____
30*   Address:__ **9425 SW 72 ST SUITE 142 MIAMI FL 33173** __ Phone:__ **786-497-2810** __
31*   E-mail:_____ Fax:_____
32*   (b) Additional deposit to be delivered to Escrow Agent within _____ (if blank, then 3)
33*   days after Effective Date..................................................................$_____
34    (All deposits paid or agreed to be paid, are collectively referred to as the "Deposit")
35*   (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8.........
36*   (d) Other:____ **DEPOSIT TO BE DELIVER UPON SHORT SALE APPPROVAL** ......$____1,000.00
37    (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
38*   transfer or other COLLECTED funds.........................................................$_____
39    **NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.**
40   **3. TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:**
41*   (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before _____
42*   _____. this offer shall be deemed withdrawn and the Deposit, if any, will be returned to Buyer.
43    Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the day the
44    counter-offer is delivered.
45    (b) The effective date of this Contract will be the date when the last one of the Buyer and Seller has signed or
46    initialed this offer or final counter-offer ("Effective Date").
47   **4. CLOSING DATE:** Unless modified by other provisions of this Contract, the closing of this transaction shall occur
48    and the closing documents required to be furnished by each party pursuant to this Contract shall be delivered
49*   ("Closing") on **45 DAYS FROM APPROVAL** ("Closing Date"), at the time established by the Closing Agent.

Buyer's Initials _____ _____ Page 1 of 10 Seller's Initials _____ _____
FloridaRealtors/FloridaBar-ASIS-1 Rev. 6/10 © 2010 Florida Realtors® and The Florida Bar. All rights reserved.

EXHIBIT
K
Page 1 of 10

**5. EXTENSION OF CLOSING DATE:**
(a) If Closing funds from Buyer's lender(s) are not available at time of Closing due to Truth In Lending Act (TILA) notice requirements, Closing shall be extended for such period necessary to satisfy TILA notice requirements, not to exceed 7 days.
(b) If extreme weather or other condition or event constituting "Force Majeure" (see STANDARD G) causes: (i) disruption of utilities or other services essential for Closing, or (ii) Hazard, Wind, Flood or Homeowners' insurance, to become unavailable prior to Closing, Closing will be extended a reasonable time up to 3 days after restoration of utilities and other services essential to Closing, and availability of applicable Hazard, Wind, Flood or Homeowners' insurance. If restoration of such utilities or services and availability of insurance has not occurred within _____ (if left blank, 14) days after Closing Date, then either party may terminate this Contract by delivering written notice to the other party, and Buyer shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract.

**6. OCCUPANCY AND POSSESSION:** Unless otherwise stated herein, Seller shall at Closing, have removed all personal items and trash from the Property and shall deliver occupancy and possession, along with all keys, garage door openers, access devices and codes, as applicable, to Buyer. If Property is intended to be rented or occupied beyond Closing, the fact and terms thereof and the tenant(s) or occupants shall be disclosed pursuant to STANDARD D. If occupancy is to be delivered before Closing, Buyer assumes all risks of loss to Property from date of occupancy, shall be responsible and liable for maintenance from that date, and shall be deemed to have accepted Property in its existing condition as of time of taking occupancy.

**7. ASSIGNABILITY: (CHECK ONE)** Buyer ☐ may assign and thereby be released from any further liability under this Contract; ☐ may assign but not be released from liability under this Contract; or ☐ may not assign this Contract.

**FINANCING**

**8. FINANCING:**
☒ (a) Buyer will pay cash or may obtain a loan for the purchase of the Property. There is no financing contingency to Buyer's obligation to close.
☐ (b) This Contract is contingent upon Buyer obtaining a written loan commitment for a ☐ conventional ☐ FHA ☐ VA loan on the following terms within _____ (if blank, then 30) days after Effective Date ("Loan Commitment Date") for: **(CHECK ONE):** ☐ fixed, ☐ adjustable, ☐ fixed or adjustable rate loan in the principal amount of $_____ or _____ % of the Purchase Price, at an initial interest rate not to exceed _____ % (if blank, then prevailing rate based upon Buyer's creditworthiness), and for a term of _____ years ("Financing").

Buyer will make mortgage loan application for the Financing within _____ (if blank, then 5) days after Effective Date and use good faith and diligent effort to obtain a written loan commitment for the Financing ("Loan Commitment") and close this Contract. Buyer shall keep Seller and Broker fully informed about the status of mortgage loan application and Loan Commitment and authorizes Buyer's mortgage broker and Buyer's lender to disclose such status and progress to Seller and Broker.

If Buyer does not receive Loan Commitment, then Buyer may terminate this Contract by delivering written notice to Seller, and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all further obligations under this Contract.

If Buyer does not deliver written notice to Seller of receipt of Loan Commitment or Buyer's written waiver of this financing contingency, then after Loan Commitment Date Seller may terminate this Contract by delivering written notice to Buyer and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all further obligations under this Contract.

If Buyer delivers written notice of receipt of Loan Commitment to Seller and this Contract does not thereafter close, the Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's default; (2) Property related conditions of the Loan Commitment have not been met (except when such conditions are waived by other provisions of this Contract); (3) appraisal of the Property obtained by Buyer's lender is insufficient to meet terms of the Loan Commitment; or (4) the loan is not funded due to financial failure of Buyer's lender, in which event(s) the Deposit shall be returned to Buyer, thereby releasing Buyer and Seller from all further obligations under this Contract.

☐ (c) Assumption of existing mortgage (see rider for terms).
☐ (d) Purchase money note and mortgage to Seller (see riders; addenda; or special clauses for terms).

Buyer's Initials _____ _____    Page 2 of 10    Seller's Initials _____ _____
FloridaRealtors/FloridaBar-ASIS-1   Rev. 6/10 © 2010 Florida Realtors® and The Florida Bar. All rights reserved.

**CLOSING COSTS, FEES AND CHARGES**

103

104 **9. CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:**

105*    **(a) COSTS TO BE PAID BY SELLER:**
- Documentary stamp taxes and surtax on deed, if any
- Owner's Policy and Charges (if Paragraph 9(c)(i) is checked)
- Title search charges (if Paragraph 9(c)(iii) is checked)
- Other: _____
- HOA/Condominium Association estoppel fees
- Recording and other fees needed to cure title
- Seller's attorneys' fees

106     If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11
107     a sum equal to 125% of estimated cost to meet the AS IS Maintenance Requirement shall be escrowed at
108     Closing. If actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall
109     pay such actual costs. Any unused portion of escrowed amount shall be returned to Seller.

110*    **(b) COSTS TO BE PAID BY BUYER:**
- Taxes and recording fees on notes and mortgages
- Recording fees for deed and financing statements
- Owner's Policy and Charges (if Paragraph 9(c)(ii) is checked)
- Survey (and elevation certification, if required)
- Lender's title policy and endorsements
- HOA/Condominium Association application/transfer fees
- Other: _____
- Loan expenses
- Appraisal fees
- Buyer's Inspections
- Buyer's attorneys' fees
- All property related insurance

111*    **(c) TITLE EVIDENCE AND INSURANCE:** At least _____ (if blank, then 5) days prior to Closing Date, a title
112     insurance commitment issued by a Florida licensed title insurer, with legible copies of instruments listed as
113     exceptions attached thereto ("Title Commitment") and, after Closing, an owner's policy of title insurance (see
114     STANDARD A for terms) shall be obtained and delivered to Buyer. If Seller has an owner's policy of title
115     insurance covering the Real Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after
116     Effective Date. The owner's title policy premium and charges for owner's policy endorsements, title search,
117     and closing services (collectively, "Owner's Policy and Charges") shall be paid, as set forth below
118     **(CHECK ONE):**
119*     ☒ **(i)** Seller will designate Closing Agent and pay for Owner's Policy and Charges (but not including charges
120     for closing services related to Buyer's lender's policy and endorsements and loan closing, which amounts
121     shall be paid by Buyer to Closing Agent or such other provider(s) as Buyer may select); or
122*     ☐ **(ii)** Buyer will designate Closing Agent and pay for Owner's Policy and Charges and charges for closing
123     services related to Buyer's lender's policy, endorsements, and loan closing; or
124*     ☐ **(iii) [MIAMI-DADE/BROWARD REGIONAL PROVISION]:** Seller will furnish a copy of a prior owner's policy
125     of title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title evidence,
126     which is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search; and
127     (C) municipal lien search. Buyer shall obtain and pay for post-Closing continuation and premium for Buyer's
128     owner's policy, and if applicable, Buyer's lender's policy. Seller shall not be obligated to pay more than
129*     $ _____ (if blank, $200.00) for abstract continuation or title search ordered or performed by Closing
130     Agent.

131    **(d) SURVEY:** At least 5 days prior to Closing, Buyer may, at Buyer's expense, have the Real Property surveyed
132     and certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real Property, a
133     copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.

134*    **(e) HOME WARRANTY:** At Closing, ☐ Buyer ☐ Seller ☐ N/A will pay for a home warranty plan issued by
135*     _____ at a cost not to exceed $_____. A home
136     warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in
137     appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.

138    **(f) SPECIAL ASSESSMENTS:** At Closing, Seller will pay: (i) the full amount of liens imposed by a public body
139     ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and
140     ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an
141     improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being
142     imposed on the Property before Closing. Buyer will pay all other assessments. **If special assessments may**
143     **be paid in installments (CHECK ONE):**
144*     ☐ **(a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after**
145     **Closing. Installments prepaid or due for the year of Closing shall be prorated.**
146*     ☐ **(b) Seller shall pay the assessment(s) in full prior to or at the time of Closing.**
147     **IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.**
148     This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district
149     (CDD) pursuant to Chapter 190 F.S. which lien shall be treated as an ad valorem tax and prorated pursuant to
150     STANDARD K.

FloridaRealtors/FloridaBar-ASIS-1   Rev. 6/10 © 2010 Florida Realtors® and The Florida Bar.  All rights reserved.

**DISCLOSURES**

10. **DISCLOSURES:**

(a) **RADON GAS:** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

(b) **PERMITS DISCLOSURE: Except as may have been disclosed by Seller to Buyer in a written disclosure, Seller does not know of any improvements made to the Property which were made without required permits or made pursuant to permits which have not been properly closed.**

(c) **MOLD:** Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or desires additional information regarding mold, Buyer should contact an appropriate professional.

(d) **FLOOD ZONE; ELEVATION CERTIFICATION:** Buyer is advised to verify by elevation certificate which flood zone the Property is in, whether flood insurance is required by Buyer's lender, and what restrictions apply to improving the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area" or "Coastal High Hazard Area" and finished floor elevation is below minimum flood elevation, Buyer may terminate this Contract by delivering written notice to Seller within 20 days after Effective Date, failing which Buyer accepts existing elevation of buildings and flood zone designation of Property.

(e) **ENERGY BROCHURE:** Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information Brochure required by Section 553.996, F.S.

(f) **LEAD-BASED PAINT:** If Property includes pre-1978 residential housing, a lead-based paint rider is mandatory.

(g) **HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE: BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE, IF APPLICABLE.**

(h) **PROPERTY TAX DISCLOSURE SUMMARY:** BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(i) **TAX WITHHOLDING:** If Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act ("FIRPTA"), Buyer and Seller will comply with FIRPTA, which may require Seller to provide additional cash at Closing.

(j) **SELLER DISCLOSURE:** Seller knows of no facts materially affecting the value of the Real Property which are not readily observable and which have not been disclosed to Buyer. Except as stated in the preceding sentence or otherwise disclosed in writing: (1) Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation; and (2) Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to the physical condition or history of the Property.

**PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS**

11. **PROPERTY MAINTENANCE:** Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the Property, including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS IS Maintenance Requirement").

12. **PROPERTY INSPECTION; RIGHT TO CANCEL:**

(a) *PROPERTY INSPECTIONS AND RIGHT TO CANCEL: Buyer shall have _____ (if blank, 15) days from Effective Date ("Inspection Period") within which to have such inspections of the Property performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely terminates this Contract, the Deposit paid shall be immediately returned to Buyer, thereupon, Buyer and Seller shall be released of all further obligations under this Contract; however, Buyer shall be responsible for prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to terminate granted herein, Buyer accepts the physical condition of the Property and any violation of governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all repairs and improvements required by Buyer's lender.*

Buyer's Initials ___ NG ___ Page 4 of 10 Seller's Initials  ___

(b) **WALK-THROUGH INSPECTION/RE-INSPECTION:** On the day prior to Closing Date, or on Closing Date prior to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS Maintenance Requirement and has met all other contractual obligations.

(c) **SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS:** If Buyer's inspection of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open or needed Permits, and shall promptly cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations, consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to expend, any money.

(d) **ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES:** At Buyer's option and cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties to Buyer.

## ESCROW AGENT AND BROKER

13. **ESCROW AGENT:** Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow within the State of Florida and, subject to COLLECTION, disburse them in accordance with terms and conditions of this Contract. Failure of funds to become COLLECTED shall not excuse Buyer's performance. When conflicting demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent may take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties or liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall determine the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve escrow disputes through mediation, arbitration, interpleader or an escrow disbursement order. Any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder, or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent. Agent shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing or termination of this Contract.

14. **PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify Property condition, square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or public records. **BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL, WRITTEN OR OTHERWISE) OF BROKER.** Buyer and Seller (individually, the "Indemnifying Party") each individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees at all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection with or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of information provided by the Indemnifying Party or from public records; (ii) Indemnifying Party's misstatement(s) or failure to perform contractual obligations; (iii) Broker's performance, at Indemnifying Party's request, of any task beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral, recommendation or retention of any vendor for, or on behalf of, Indemnifying Party; (iv) products or services provided by any such vendor for, or on behalf of, Indemnifying Party; and (v) expenses incurred by any such vendor. Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors and paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not relieve Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14,

268 Broker will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this
269 Contract.

270 **DEFAULT AND DISPUTE RESOLUTION**

271 **15. DEFAULT:**
272    (a) **BUYER DEFAULT:** If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract,
273       including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the
274       Deposit for the account of Seller as agreed upon liquidated damages, consideration for execution of this
275       Contract, and in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further
276       obligations under this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity
277       to enforce Seller's rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon
278       default by Buyer, shall be split equally between Listing Broker and Cooperating Broker; provided however,
279       Cooperating Broker's share shall not be greater than the commission amount Listing Broker had agreed to pay
280       to Cooperating Broker.
281    (b) **SELLER DEFAULT:** If for any reason other than failure of Seller to make Seller's title marketable after
282       reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract,
283       Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting
284       from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific
285       performance. This Paragraph 15 shall survive Closing or termination of this Contract.
286 **16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and
287    Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be
288    settled as follows:
289    (a) Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to
290       resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under
291       Paragraph 16(b).
292    (b) Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida
293       Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules").
294       The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be
295       sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16
296       may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph 16
297       shall survive Closing or termination of this Contract.
298 **17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted
299    by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in
300    conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to
301    recover from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting
302    the litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

303 **STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")**
304 **18. STANDARDS:**
305 **A.  TITLE:**
306 **(i) TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS:** Within the time period provided in
307 Paragraph 9(c), the Title Commitment, with legible copies of instruments listed as exceptions attached thereto, shall
308 be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by Seller at or
309 before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title insurance in the
310 amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the Real Property,
311 subject only to the following matters: (a) comprehensive land use plans, zoning, and other land use restrictions,
312 prohibitions and requirements imposed by governmental authority; (b) restrictions and matters appearing on the Plat
313 or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of record without right of entry;
314 (d) unplatted public utility easements of record (located contiguous to real property lines and not more than 10 feet in
315 width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes for year of Closing and subsequent
316 years; and (f) assumed mortgages and purchase money mortgages, if any (if additional items, attach addendum);
317 provided, that none prevent use of the Property for **RESIDENTIAL PURPOSES.** If there exists at Closing any
318 violation of items identified in (b) - (f) above, then the same shall be deemed a title defect. Marketable title shall be
319 determined according to applicable Title Standards adopted by authority of The Florida Bar and in accordance with
320 law.
321 **(ii) TITLE EXAMINATION:** Buyer shall have 5 days after receipt of Title Commitment to examine it and notify
322 Seller in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and it
323 is delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after
324 date of receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period")
325 after receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Buyer fails to so notify Seller,
326 Buyer shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller will

**STANDARDS FOR REAL ESTATE TRANSACTIONS (CONTINUED)**

327
328 deliver written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties will
329 close this Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of Seller's
330 notice). If Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after expiration of
331 Cure Period, deliver written notice to Seller: (a) extending Cure Period for a specified period not to exceed 120 days
332 within which Seller shall continue to use reasonable diligent effort to remove or cure the defects ("Extended Cure
333 Period"); or (b) electing to accept title with existing defects and close this Contract on Closing Date (or if Closing Date
334 has passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's receipt of Seller's notice), or
335 (c) electing to terminate this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from
336 all further obligations under this Contract. If after reasonable diligent effort, Seller is unable to timely cure defects,
337 and Buyer does not waive the defects, this Contract shall terminate, and Buyer shall receive a refund of the Deposit,
338 thereby releasing Buyer and Seller from all further obligations under this Contract.
339 **B. SURVEY:** If Survey discloses encroachments on the Real Property or that improvements located thereon
340 encroach on setback lines, easements, or lands of others; or violate any restrictions, covenants, or applicable
341 governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of such
342 matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later than
343 Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and Survey
344 shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a prior
345 survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the
346 preparation of such prior survey, to the extent the affirmations therein are true and correct.
347 **C. INGRESS AND EGRESS:** Seller represents that there is ingress and egress to the Real Property and title to
348 the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of access.
349 **D. LEASES:** Seller shall, within 5 days after Inspection Period, furnish to Buyer copies of all written leases and
350 estoppel letters from each tenant specifying nature and duration of tenant's occupancy, rental rates, advanced rent
351 and security deposits paid by tenant, and income and expense statements for preceding 12 months ("Lease
352 Information"). If Seller is unable to obtain estoppel letters from tenant(s), the same information shall be furnished by
353 Seller to Buyer within that time period in the form of a Seller's affidavit, and Buyer may thereafter contact tenant(s)
354 to confirm such information. If terms of the lease(s) differ materially from Seller's representations, Buyer may deliver
355 written notice to Seller within 5 days after receipt of Lease Information, but no later than 5 days prior to Closing
356 Date, terminating this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all
357 further obligations under this Contract. Seller shall, at Closing, deliver and assign all original leases to Buyer who
358 shall assume Seller's obligation thereunder.
359 **E. LIENS:** Seller shall furnish to Buyer at Closing an affidavit attesting; (i) to the absence of any financing
360 statement, claims of lien or potential lienors known to Seller, and (ii) that there have been no improvements or repairs
361 to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been improved or
362 repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all general
363 contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth names of all
364 such general contractors, subcontractors, suppliers and materialmen, further affirming that all charges for
365 improvements or repairs which could serve as a basis for a construction lien or a claim for damages have been paid
366 or will be paid at Closing.
367 **F. TIME:** Calendar days shall be used in computing time periods. Any time periods provided for in this Contract
368 which shall end on a Saturday, Sunday, or a national legal holiday (see 5 U.S.C. 6103) shall extend to 5:00 p.m.
369 (where the Property is located) of the next business day. **Time is of the essence in this Contract.**
370 **G. FORCE MAJEURE:** Buyer or Seller shall not be required to perform any obligation under this Contract or be
371 liable to each other for damages so long as performance or non-performance of the obligation is delayed, caused or
372 prevented by Force Majeure. "Force Majeure" means: hurricanes, earthquakes, floods, fire, acts of God, unusual
373 transportation delays, wars, insurrections, acts of terrorism, and any other cause not reasonably within control of
374 Buyer or Seller, and which, by exercise of reasonable diligent effort, the non-performing party is unable in whole or in
375 part to prevent or overcome. All time periods, including Closing Date, will be extended for the period that the Force
376 Majeure prevents performance under this Contract, provided, however, if such Force Majeure continues to prevent
377 performance under this Contract more than 14 days beyond Closing Date, then either party may terminate this
378 Contract by delivering written notice to the other and the Deposit shall be refunded to Buyer, thereby releasing Buyer
379 and Seller from all further obligations under this Contract.
380 **H. CONVEYANCE:** Seller shall convey marketable title to the Real Property by statutory warranty, trustee's,
381 personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters described
382 in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be transferred by
383 absolute bill of sale with warranty of title, subject only to such matters as may be provided for in this Contract.
384 **I. CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:**
385 (i) **LOCATION:** Closing will take place in the county where the Real Property is located at the office of the
386 attorney or other closing agent ("Closing Agent") designated by the party paying for the owner's policy of title

### STANDARDS FOR REAL ESTATE TRANSACTIONS (CONTINUED)

387
388  insurance, or, if no title insurance, designated by Seller. Closing may be conducted by mail or electronic means.
389  (ii) **CLOSING DOCUMENTS:** At Closing, Seller shall furnish and pay for, as applicable, deed, bill of sale,
390  certificate of title, construction lien affidavit, owner's possession affidavit, assignments of leases, and corrective
391  instruments. Seller shall provide Buyer with paid receipts for all work done on the Property pursuant to this Contract.
392  Buyer shall furnish and pay for, as applicable, mortgage, mortgage note, security agreement, financing statements,
393  survey, base elevation certification, and other documents required by Buyer's lender.
394  (iii) **PROCEDURE:** The deed shall be recorded upon COLLECTION of all closing funds. If the Title
395  Commitment provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the
396  escrow closing procedure required by STANDARD J shall be waived, and Closing Agent shall, **subject to**
397  **COLLECTION of all closing funds,** disburse at Closing the brokerage fees to Broker and the net sale proceeds to
398  Seller.
399  **J. ESCROW CLOSING PROCEDURE:** If Title Commitment issued pursuant to Paragraph 9(c) does not provide
400  for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following escrow
401  and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent for a period
402  of not more than 10 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault of Buyer, Buyer
403  shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days from date of receipt
404  of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit and all Closing funds
405  paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and, simultaneously with
406  such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-convey the Property to
407  Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand for refund of the
408  Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect except as may be
409  available to Buyer by virtue of warranties contained in the deed or bill of sale.
410  **K. PRORATIONS; CREDITS:** The following recurring items will be made current (if applicable) and prorated as of
411  the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes
412  (including special benefit tax assessments imposed by a CDD), interest, bonds, association fees, insurance, rents
413  and other expenses of Property. Buyer shall have option of taking over existing policies of insurance, if assumable, in
414  which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may be required by
415  prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will be credited to
416  Buyer. Escrow deposits held by Seller's mortgagee will be paid to Seller. Taxes shall be prorated based on current
417  year's tax with due allowance made for maximum allowable discount, homestead and other exemptions. If Closing
418  occurs on a date when current year's millage is not fixed but current year's assessment is available, taxes will be
419  prorated based upon such assessment and prior year's millage. If current year's assessment is not available, then
420  taxes will be prorated on prior year's tax. If there are completed improvements on the Real Property by January 1st of
421  year of Closing, which improvements were not in existence on January 1st of prior year, then taxes shall be prorated
422  based upon prior year's millage and at an equitable assessment to be agreed upon between the parties, failing which,
423  request shall be made to the County Property Appraiser for an informal assessment taking into account available
424  exemptions. A tax proration based on an estimate shall, at either party's request, be readjusted upon receipt of
425  current year's tax bill. This STANDARD K shall survive Closing.
426  **L. ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH:** Seller
427  shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections,
428  including a walk-through (or follow-up walk-through if necessary) prior to Closing.
429  **M. RISK OF LOSS:** If, after Effective Date, but before Closing, Property is damaged by fire or other casualty
430  ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does not
431  exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed
432  pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated
433  cost to complete restoration (not to exceed 1.5% of Purchase Price), will be escrowed at Closing. If actual cost of
434  restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not in excess of 1.5% of Purchase
435  Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of
436  Purchase Price, Buyer shall elect to either take Property "as is" together with the 1.5%, or receive a refund of the
437  Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation
438  with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.
439  **N. 1031 EXCHANGE:** If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneous with
440  Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate
441  in all reasonable respects to effectuate the Exchange, including execution of documents; provided, however,
442  cooperating party shall incur no liability or expense related to the Exchange, and Closing shall not be contingent
443  upon, nor extended or delayed by, such Exchange.
444  **O. CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; COPIES:** Neither this Contract nor any
445  notice of it shall be recorded in any public records. This Contract shall be binding on, and inure to the benefit of, the
446  parties and their respective heirs or successors in interest. Whenever the context permits, singular shall include plural

447         **STANDARDS FOR REAL ESTATE TRANSACTIONS (CONTINUED)**
448 and one gender shall include all. Notice and delivery given by or to the attorney or broker (including such broker's real
449 estate licensee) representing any party shall be as effective as if given by or to that party. All notices must be in
450 writing and may be made by mail, personal delivery or electronic (including "pdf") media. A legible facsimile or
451 electronic (including "pdf") copy of this Contract and any signatures hereon shall be considered for all purposes as an
452 original.
453 **P. INTEGRATION; MODIFICATION:** This Contract contains the full and complete understanding and agreement
454 of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or
455 representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or change
456 in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties intended
457 to be bound by it.
458 **Q. WAIVER:** Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this
459 Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or
460 rights.
461 **R. RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS:** Riders, addenda, and typewritten
462 or handwritten provisions shall control all printed provisions of this Contract in conflict with them.
463 **S. COLLECTION or COLLECTED: "COLLECTION" or "COLLECTED" means any checks tendered or received,**
464 **including Deposits, have become actually and finally collected and deposited in the account of Escrow Agent**
465 **or Closing Agent. Closing and disbursement of funds and delivery of Closing documents may be delayed by**
466 **Closing Agent until such amounts have been COLLECTED in Closing Agent's accounts.**
467 **T. LOAN COMMITMENT:** "Loan Commitment" means a statement by the lender setting forth the terms and
468 conditions upon which the lender is willing to make a particular mortgage loan to a particular borrower.
469 **U. APPLICABLE LAW AND VENUE:** This Contract shall be construed in accordance with the laws of the State of
470 Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the county in
471 which the Real Property is located.
472 **X. BUYER WAIVER OF CLAIMS:** *Buyer waives any claims against Seller and, to the extent permitted by*
473 *law, against any real estate licensee involved in the negotiation of this Contract, for any defects or other*
474 *damage that may exist at Closing of this Contract and be subsequently discovered by the Buyer or anyone*
475 *claiming by, through, under or against the Buyer.*

476         **ADDENDA AND ADDITIONAL TERMS**
477 **19. ADDENDA:** The following additional terms are included in the attached addenda and incorporated into this
478• Contract (Check if applicable):

| | | | |
|---|---|---|---|
| ☐ A. Condominium Assn. | ☐ L. RESERVED | ☐ R. Rezoning | ☐ Y.   Seller's Attorney |
| ☐ B. Homeowners' Assn. | | ☐ S. Lease Purchase/ |      Approval |
| ☐ C. Seller Financing | ☐ M. Defective Drywall |     Lease Option | ☐ Z.   Buyer's Attorney |
| ☐ D. Mortgage Assumption | ☐ N. Coastal Construction | ☐ T. Pre-Closing |      Approval |
| ☐ E. FHA/VA Financing |     Control Line |     Occupancy | ☐ AA. Licensee-Personal |
| ☐ F. Appraisal Contingency | ☐ O. Insulation Disclosure | ☐ U. Post-Closing |      Interest in Property |
| ☐ G. Short Sale | ☐ P. Pre-1978 Housing |     Occupancy | ☐ BB. Binding Arbitration |
| ☐ H. Homeowners' Insurance |     Statement (Lead | ☐ V. Sale of Buyer's | ☐   Other _____ |
| ☐ I. FIRPTA |     Based Paint) |     Property | |
| ☐ J. Interest-Bearing Acct. | ☐ Q. Housing for Older | ☐ W. Back-up Contract | _____ |
| ☐ K. RESERVED |     Persons | ☐ X. Kick-out Clause | _____ |

479• **20. ADDITIONAL TERMS:** _____
480• _____
481• **1. THIS CONTRACT IS SUBJECT TO THIRD PARTY SHORT SALE APPROVAL.** _____
482• _____
483• **2. THE TITLE COMPANY FOR THIS TRANSACTION WILL BE SOUTHERN TITLE GROUP, INC.** ___
484• _____
485• **3. BUYER WILL PAY FLORIDA REALTY OF MIAMI A DOCUMENT STORAGE PROCESSING FEE OF $299.00 AT**
486• **CLOSING. FREC REQUIRES THAT REAL ESTATE COMPANIES STORE AND MAINTAIN ALL THEIR FILES FOR 5**
487• **YEARS. THESE DOCUMENTS WILL BE DIGITALLY AVAILABLE DURING THIS PERIOD.**
488• _____
489• _____
490• _____
491• _____
492• _____
493• _____

Buyer's Initials _____      Page 9 of 10      Seller's Initials _____ _____
FloridaRealtors/FloridaBar-ASIS-1   Rev. 6/10 © 2010 Florida Realtors® and The Florida Bar. All rights reserved.

494                                    **COUNTER-OFFER/REJECTION**
495* ☐ Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and
496 deliver a copy of the acceptance to Seller).
497* ☐ Seller rejects Buyer's offer.

498 **THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE ADVICE**
499 **OF AN ATTORNEY PRIOR TO SIGNING.**

500 **THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.**

501 *Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the terms*
502 *and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and conditions*
503 *should be negotiated based upon the respective interests, objectives and bargaining positions of all interested*
504 *persons.*

505 AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK TO
506 BE COMPLETED.

507* Buyer: _____     Date: 3-1-2011

508* Buyer: _____     Date: _____

509* Seller: _____     Date: 03-2-11

510* Seller: _____     Date: _____

511 Buyer's address for purposes of notice          Seller's address for purposes of notice
512* _____          _____
513* _____          _____
514* _____          _____

515 **BROKER:** Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers entitled
516 to compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct Closing Agent
517 to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage
518 agreements with the parties and cooperative agreements between the Brokers, except to the extent Broker has
519 retained such fees from the escrowed funds. This Contract shall not modify any MLS or other offer of compensation
520 made by Seller or Listing Broker to Cooperating Brokers.

521* _____
522 **Cooperating Sales Associate, if any**          **Listing Sales Associate**

523*      **FLORIDIAN REAL ESTATE CORP**               **FLORIDA REALTY OF MIAMI**
524 **Cooperating Broker, if any**                   **Listing Broker**

FloridaRealtors/FloridaBar-ASIS-1   Rev. 6/10 © 2010 Florida Realtors® and The Florida Bar.  All rights reserved.



OMB Approval No. 2502-0265

# A.  Settlement Statement (HUD-1)

## B.  Type of Loan

| 1. ☐ FHA    2. ☐ RHS    3. ☐ Conv. Unins. | 6. File Number: 2011-018 | 7. Loan Number: | 8. Mortgage Insurance Case Number: |
|---|---|---|---|
| 4. ☐ VA    5. ☐ Conv. Ins. | | | |

**C.  Note:** *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*

| D.  Name and Address of Buyer: | E.  Name and Address of Seller: | F.  Name and Address of Lender: |
|---|---|---|
| NICOLLE GONZALEZ<br>1660 Renaissance Commons Blvd., Unit 2122-B<br>Boynton Beach, FL 33426 | DOMINIC BELLETTI<br>1660 Renaissance Commons Blvd., Unit 2122-B<br>Boynton Beach, FL 33426 | |

| G.  Property Location:<br>1660 Renaissance Commons Blvd., Unit 2122-B<br>Boynton Beach, FL 33426<br>Palm Beach County, Florida | H.  Settlement Agent:<br>Pointe Group Title<br>350 Sevilla Ave, Ste 101<br>Coral Gables, Fl 33134        Ph.  786-282-7717<br>Place of Settlement:<br>350 Sevilla Ave, Ste 101<br>Coral Gables, Fl 33134 | I.  Settlement Date:<br>May 20, 2011 |

| J.   Summary of Buyer's transaction | | K.   Summary of Seller's transaction | |
|---|---|---|---|
| **100.  Gross Amount Due from Buyer** | | **400.  Gross Amount Due to Seller** | |
| 101.  Contract sales price | 39,000.00 | 401.  Contract sales price | 39,000.00 |
| 102.  Personal property | | 402.  Personal property | |
| 103.  Settlement Charges to Buyer (Line 1400) | 11,190.85 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by Seller in advance** | | **Adjustments for items paid by Seller in advance** | |
| 106.  City/Town Taxes            to | | 406.  City/Town Taxes            to | |
| 107.  County Taxes            to | | 407.  County Taxes            to | |
| 108.  Assessments            to | | 408.  Assessments            to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120.  Gross Amount Due from Buyer** | 50,190.85 | **420.  Gross Amount Due to Seller** | 39,000.00 |
| **200.  Amounts Paid by or in Behalf of Buyer** | | **500.  Reductions in Amount Due Seller:** | |
| 201.  Deposit or earnest money | | 501.  Excess deposit (see instructions) | |
| 202.  Principal amount of new loan(s) | | 502.  Settlement charges to Seller (Line 1400) | 4,746.35 |
| 203.  Existing loan(s) taken subject to | | 503.  Existing loan(s) taken subject to | |
| 204. | | 504.  Payoff First Mortgage to Bank of America | 33,597.65 |
| 205. | | 505.  Payoff Second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by Seller** | | **Adjustments for items unpaid by Seller** | |
| 210.  City/Town Taxes            to | | 510.  City/Town Taxes            to | |
| 211.  County Taxes    01/01/11  to  05/20/11 | 656.00 | 511.  County Taxes    01/01/11  to  05/20/11 | 656.00 |
| 212.  Assessments            to | | 512.  Assessments            to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220.  Total Paid by/for Buyer** | 656.00 | **520.  Total Reduction Amount Due Seller** | 39,000.00 |
| **300.  Cash at Settlement from/to Buyer** | | **600.  Cash at settlement to/from Seller** | |
| 301.  Gross amount due from Buyer (line 120) | 50,190.85 | 601.  Gross amount due to Seller (line 420) | 39,000.00 |
| 302.  Less amount paid by/for Buyer (line 220) | ( 656.00) | 602.  Less reductions due Seller (line 520) | ( 39,000.00) |
| **303.  Cash  ☒ From  ☐ To Buyer** | 49,534.85 | **603.  Cash  ☐ To  ☐ From Seller** | 0.00 |

\* Paid outside of closing by borrower(B), seller(S), lender(L), or third-party(T)
By signing page 2 of this statement, the signatories acknowledge receipt of a completed copy of page 1 of this two page statement.

**EXHIBIT
L
page 1 of 2**

The Public Reporting Burden for this collection of information is estimated at 35 minutes per response for collecting, reviewing, and reporting the data. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. No confidentiality is assured; this disclosure is mandatory. This is designed to provide the parties to a RESPA covered transaction with information during the settlement process.

HUD-1
(2011-018.PFD/2011-018/2)

| L. Settlement Charges | | Paid From Buyer's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| **700. Total Real Estate Broker Fees** $ 2,999.10 | | | |
| Division of commission (line 700) as follows: | | | |
| 701. $ 1,499.55 to Floridian Real Estate Corp | | | |
| 702. $ 1,499.55 to Florida Realty of Miami | | | |
| 703. Commission paid at settlement | | | 2,999.10 |
| 704. | | | |
| 705. | | | |
| **800. Items Payable in Connection with Loan** | | | |
| 801. Our origination charge $ (from GFE #1) | | | |
| 802. Your credit or charge (points) for the specific interest rate chosen $ (from GFE #2) | | | |
| 803. Your adjusted origination charges (from GFE #A) | | 0.00 | |
| 804. Appraisal fee to (from GFE #3) | | | |
| 805. Credit Report to (from GFE #3) | | | |
| 806. Tax service to (from GFE #3) | | | |
| 807. Flood certification to (from GFE #3) | | | |
| 808. (from GFE #3) | | | |
| 809. (from GFE #3) | | | |
| 810. (from GFE #3) | | | |
| 811. (from GFE #3) | | | |
| **900. Items Required by Lender to Be Paid in Advance** | | | |
| 901. Daily interest charges from to @ $/day (from GFE #10) | | | |
| 902. MIP Tot Ins. for Life of Loan months to (from GFE #3) | | | |
| 903. Homeowner's insurance for years to (from GFE #11) | | | |
| 904. (from GFE #11) | | | |
| 905. (from GFE #11) | | | |
| **1000. Reserves Deposited with Lender** | | | |
| 1001. Initial deposit for your escrow account (from GFE #9) | | | |
| 1002. Homeowner's insurance months @ $ per month $ | | | |
| 1003. Mortgage insurance months @ $ per month $ | | | |
| 1004. Property taxes $ | | | |
| 1005. $ | | | |
| 1006. months @ $ per month $ | | | |
| 1007. months @ $ per month $ | | | |
| 1008. $ | | | |
| 1009. $ | | | |
| **1100. Title Charges** | | | |
| 1101. Title services and lender's title insurance (from GFE #4) | | 700.00 | |
| 1102. Settlement or closing fee to Pointe Group Title $ 550.00 | | | 750.25 |
| 1103. Owner's title insurance to WFG National Title Insurance Company (from GFE #5) | | | 224.00 |
| 1104. Lender's title insurance to WFG National Title Insurance Company $ | | | |
| 1105. Lender's title policy limit $ | | | |
| 1106. Owner's title policy limit $ 39,000.00 | | | |
| 1107. Agent's portion of the total title insurance premium to Pointe Group Title $ 156.72 | | | |
| 1108. Underwriter's portion of the total title insurance premium to WFG National Title Insurance Company $ 67.28 | | | |
| 1109. $ | | | |
| 1110. $ | | | |
| 1111. $ | | | |
| 1112. $ | | | |
| 1113. $ | | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Government recording charges to County Clerk of the Circuit Court (from GFE #7) | | 36.10 | |
| 1202. Deed $ 36.10 Mortgage $ Releases $ Other $ | | | |
| 1203. Transfer taxes (from GFE #8) | | | |
| 1204. City/County tax/stamps Deed $ Mortgage $ | | | |
| 1205. State tax/stamps Deed $ 273.00 Mortgage $ | | | 273.00 |
| 1206. | | | |
| 1207. | | | |
| **1300. Additional Settlement Charges** | | | |
| 1301. Required services that you can shop for (from GFE #6) | | | |
| 1302. HOA Balance to Villa Lago Condo Association $ | | 10,454.75 | 500.00 |
| 1303. $ | | | |
| 1304. $ | | | |
| 1305. $ | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | 11,190.85 | 4,746.35 |

* Paid outside of closing by borrower(B), seller(S), lender(L), or third-party(T)

Certified to be a true copy.
The undersigned hereby acknowledge receipt of a completed copy of this statement & any attachments referred to herein.

Buyer _____  Seller _____
NICOLLE GONZALEZ                 DOMINIC BELLETTI

TO THE BEST OF MY KNOWLEDGE, THE HUD-1 SETTLEMENT STATEMENT WHICH I HAVE PREPARED IS A TRUE AND ACCURATE ACCOUNT OF THE FUNDS WHICH WERE RECEIVED AND HAVE BEEN OR WILL BE DISBURSED BY THE UNDERSIGNER AS PART OF THE SETTLEMENT OF THIS TRANSACTION.

_____
Pointe Group Title, Settlement Agent

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE: TITLE 18 U.S. CODE SECTION 1001 & SECTION 1010.

EXHIBIT "L"
page 2 of 2

HUD-1
(2011-018.PFD/2011-018/2)

Gary R. Nikolits, CFA          Homestead Exemption  **E-file**

# Property Appraiser
Palm Beach County

| | |
|---|---|
| Location Address | **1660 RENAISSANCE COMMONS BLVD 2122** |
| Municipality | **BOYNTON BEACH** |
| Parcel Control Number | **08–43–45–17–18–000–2122** |
| Subdivision | **VILLA LAGO CONDOMINIUM** |
| Official Records Book | **24562**          Page **1339** |
| Sale Date | **MAY–2011** |
| Legal Description | **VILLA LAGO CONDOMINIUM UNIT 2122** |

| Owners | Mailing address |
|---|---|
| GONZALEZ NICOLLE | 1660 RENAISSANCE COMMONS BLVD UNIT 2122 |
| | BOYNTON BEACH FL 33426 7216 |

| Sales Date | Price | OR Book/Page | Sale Type | Owner |
|---|---|---|---|---|
| MAY–2011 | $39,000 | 24562 / 1339 | WARRANTY DEED | GONZALEZ NICOLLE |
| MAY–2007 | $265,000 | 21924 / 0405 | WARRANTY DEED | BELLETTI DOMINIC |

**No Exemption Information Available.**

| Number of Units | *Total Square Feet **1119** | Acres |
|---|---|---|

Use Code **0400 – CONDOMINIUM**                    Zoning –

| Tax Year | 2013 | 2012 | 2011 |
|---|---|---|---|
| Improvement Value | **$48,000** | **$38,000** | **$0** |
| Land Value | **$0** | **$0** | **$0** |
| Total Market Value | **$48,000** | **$38,000** | **$41,500** |

**All values are as of January 1st each year**

| Tax Year | 2013 | 2012 | 2011 |
|---|---|---|---|
| Assessed Value | **$41,800** | **$38,000** | **$41,500** |
| Exemption Amount | **$0** | **$0** | **$0** |
| Taxable Value | **$41,800** | **$38,000** | **$41,500** |

| Tax Year | 2013 | 2012 | 2011 |
|---|---|---|---|
| Ad Valorem | **$996** | **$862** | **$942** |
| Non Ad Valorem | **$999** | **$994** | **$994** |
| Total tax | **$1,995** | **$1,856** | **$1,936** |

EXHIBIT
M

## APPRAISER DISCLOSURE STATEMENT

Summary Appraisal
File No.   07-041

Name of Appraiser:   Carlos M. Insignares

Class of Certification/Licensure:
- ☐ Certified General
- ☒ Certified Residential
- ☐ Licensed Residential
- ☐ Temporary   ☐ General   ☐ Licensed

Certification/Licensure Number:   St.Cert.Res.REA RD3976

Scope:      This Report      ☒ is within the scope of my Certification or License
                             ☐ is not within the scope of my Certification or License

Service Provided By:   ☒ Disinterested & Unbiased Third Party
                       ☐ Interested & Biased Third Party
                       ☐ Interested Third Party on Contingent Fee Basis

Signature of person preparing and reporting the Appraisal:

This form must be included in conjunction with all appraisal assignments or specialized services
performed by a state-certified or state-licensed real estate appraiser.

Form DISCLA — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

EXHIBIT
N
page 1 of 29

 

Principal Appraisal Services, Inc.
8502 SW 146 Court
Miami, FL 33183
Phone: (305) 388-3356  Fax: (305) 387-9241

principalapprais@bellsouth.net

SBC Finance Corporation
12940 SW 128 Street Suite #204-B
Miami, Fl 33186

Re: Property:   1660 Renaissance Way
                Boynton Beach, FL 33426
    Borrower:   Domenico Belitti
    File No.:    07-041

In accordance with your request, we have appraised the above referenced property.  The report of that appraisal is
attached.

The purpose of this appraisal is to estimate the market value of the property described in this appraisal report, as
improved, in unencumbered fee simple title of ownership.

This report is based on a physical analysis of the site and improvements, a locational analysis of the neighborhood and
city, and an economic analysis of the market for properties such as the subject.  The appraisal was developed and the
report was prepared in accordance with the Uniform Standards of Professional Appraisal Practice.

The value conclusions reported are as of the effective date stated in the body of the report and contingent upon the
certification and limiting conditions attached.

It has been a pleasure to assist you.  Please do not hesitate to contact me or any of my staff if we can be of additional
service to you.

Sincerely,

Carlos M. Insignares
St.Cert.Res.REA RD3976

FROM:
Principal Appraisal Services Inc.
8502 SW 146 Court
Miami, Firolda 33183
Phone:(305) 388-3356 * Fax:(305) 387-9241
principalapprais@bellsouth.net

File No. 07-041 | Page #1

| INVOICE | DATE | REFERENCE |
|---------|------|-----------|
| 07-041 | 01/23/2007 | Summary Appr. |

TO:
SBC Finance Corp.

Borrower: Domenico Bellitti

| DESCRIPTION | | AMOUNT |
|---|---|---|
| 1660 Renaissance Way #2-122 Boyton Beach, Florida 33426 | PAYMENT DUE | 325.00 |
| | Subtotal $ | 325.00 |
| | Late Fee $ | |
| | TOTAL $ | 325.00 |

Carlos Insignares (305)388-3398

File No. 07-041 Page #25

# FIRREA / USPAP ADDENDUM

| | | | | |
|---|---|---|---|---|
| Borrower | Domenico Bellitti | | File No. 07-041 | |
| Property Address | 1660 Renaissance Way | | | |
| City | Boyton Beach | County Palm Beach | State FL | Zip Code 33426 |
| Lender/Client | SBC Finance Corporation | | | |

**Purpose:**
The purpose of this appraisal report is to estimate the most probable price of the subject,requisite to the described definition of value,for the purpose of assisting the client/lender in supporting the collateral portion of said property

**Scope of Work**
The scope of the appraisal is described in the Multipurpose Supplemental Addendum,attached and made part of this report.

**Intended Use / Intended User**
Intended Use:    The intended use of this appraisal is for lending purposes only.

Intended User(s):  The intended user is the client/lender only

**History of Property**
Current listing information:  Any sales history or listing are described in the body of the appraisal report.It is described in the Multipurpose Supplemental Addendum attached to this report.

Prior sale:  All prior sales & transfers have been noted on URAR & Multipurpose forms of this Appraisal Report.

**Exposure Time / Marketing Time**
The market time is listed in the appraisal report and is refelective of market trends, supply & demand, property type, condition and price range.

**Personal (non-realty) Transfers**
Personal non-realty items if any have been described in the Multipurpose Supplemental Addendum attached.

**Additional Comments**
This appraisal report is subject to all attached addenda,including limiting conditions form 1004b(03/05),USPAP Identification,Multipurpose Supplemental Addendum,and any additional comment addenda. All attachments such as Qualifications, building sketches,maps,picture pages,report forms are part of the appraisal report. Removal or alterations of any of the attachments can only be made by signing appraiser.If removal or alternations of any portion of this report is made by anyone other than the signing appraiser the report  will be invalid.

**Certification Supplement**
1. This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or an approval of a loan.
2. My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result or the occurrence of a subsequent event.
This report is subject to all attached addendums.This report is not valid without all attached addenda.

| | | | | |
|---|---|---|---|---|
| Appraiser: | Carlos M. Insignares | Supervisory Appraiser: | N/A | |
| Signed Date: | February 1,2007 | Signed Date: | | |
| Certification or License #: | St.Cert.Res.REA RD3976 | Certification or License #: | N/A | |
| Certification or License State: | Fl   Expires:  11/30/2008 | Certification or License State: | N/   Expires: | |
| Effective Date of Appraisal: | 01/23/2007 | Inspection of Subject | ☐ Did Not   ☐ Exterior Only   ☐ Interior and Exterior | |

Form RIA_LG — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE



Carlos Insignares (305)388-3398

File No. 07-041 Page #24

| | | | File No. 07-041 |
|---|---|---|---|
| Borrower | Domenico Bellitti | | |
| Property Address | 1660 Renaissance Way | | |
| City | Boyton Beach | County Palm Beach | State FL   Zip Code 33426 |
| Lender/Client | SBC Finance Corporation | | |

## APPRAISAL AND REPORT IDENTIFICATION

**This Appraisal Report is one of the following types:**

☐ Self Contained   (A written report prepared under Standards Rule  2-2(a) , pursuant to the Scope of Work, as disclosed elsewhere in this report.)

☒ Summary   (A written report prepared under Standards Rule  2-2(b) , pursuant to the Scope of Work, as disclosed elsewhere in this report.)

☐ Restricted Use   (A written report prepared under Standards Rule  2-2(c) , pursuant to the Scope of Work, as disclosed elsewhere in this report, restricted to the stated intended use by the specified client or intended user.)

## Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no (or the specified) present or prospective interest in the property that is the subject of this report and no (or the specified) personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
- I have (or have not) made a personal inspection of the property that is the subject of this report.
- No one provided significant real property appraisal assistance to the person signing this certification. (If there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report.)

## Comments on Appraisal and Report Identification

Note any USPAP related issues requiring disclosure and any State mandated requirements:

This report is of a condo which are typically not used as income producing properties therefore limited rental information is available. Due to lack of rental information deriving at an accurate GRM is not possible. The income approach & cost are not applicable

**APPRAISER:**

Signature:
Name: Carlos M. Insignares
Date Signed:  February 1, 2007
State Certification #:  St.Cert.Res.REA RD3976
or State License #:
State:  Fl
Expiration Date of Certification or License: 11/30/2008

Effective Date of Appraisal:  01/23/2007

**SUPERVISORY APPRAISER (only if required):**

Signature:
Name:  N/A
Date Signed:
State Certification #:
or State License #:  N/A
State:  N/
Expiration Date of Certification or License:
Supervisory Appraiser Inspection of Subject Property:
☐ Did Not   ☐ Exterior-only from street   ☐ Interior and Exterior

File No. 07-0411 Page #23

## Five Star Appraisers
### E&O Program

118 South Clinton Street, Suite 450 * Chicago, IL 60661
(800)497-4644 * Fax: (312)879-1335

## PROOF OF COVERAGE

1. Name and Address of Insured:

   Carlos M. Insignares
   dba Principal Appraisal Services
   8592 SW 146th Court
   MIAMI          FL  33183

2. Insurer:    Illinois Union Insurance Company
   Rating:   AM Best:  A (Excellent)      S&P:   A+ (Good)

3. Coverage:          Errors and Omissions

4. Policy Number:    N0 12 83 23 6

5. Limits of Liability:        $1,000,000        Each Claim, including Claims Expenses
                               $1,000,000        Annual Aggregate, including Claims Expenses

6. Deductible:             $500             Each Claim, including Claims Expenses

7. Annual Policy Premium:      $788.05       Gross Premium
                               35.00         Processing Fee
                               $0.00         2% TRIA Coverage:
                               $41.15        FL   Surplus Lines Tax @   5.00%
                               $1.65         FL   Stamp Tax @        0.20%
                               ─────────
                               $865.85       Total Premium

8. Policy Period      04/29/06    to    04/29/07
                      12:01 a.m. standard time at the location stated above.

9. Retroactive Date:     04/29/2003

   Definition:  Retroactive Date (Prior Acts Coverage) - This is the date from which the insured warrants that
   "CONTINUOUS" Professional Liability coverage has existed without interruption.  Appraisers obtaining this
   insurance for the FIRST time or renewing insurance after a lapse in coverage will have a retroactive date the
   same as the policy inception date.  A retroactive date indicates how far back in time this insurance will provide
   coverage for prior acts.  Any claims made for an appraisal done prior to the retroactive date will be excluded
   under this policy.

10. Based On:  1     Appraiser   Carlos M. Insignares

11. This "Proof of Coverage" notice is your formal "Evidence of Insurance" to be used (or copies thereof)
    to notify banks, and other third parties that such coverage exists.

Date of Issuance:  May 15, 2006

**Kevin M. Ottley**

Authorized Representative

File No. 07-0417 Page #22

AC# 2825111

**STATE OF FLORIDA**

DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION
FLORIDA REAL ESTATE APPRAISAL BD          SEQ#L04081901316

| DATE | BATCH NUMBER | LICENSE NBR | | |
|------|--------------|-------------|--|--|
| 09/18/2004 | 068038105 | RD3976 | | |

The CERTIFIED RESIDENTIAL APPRAISER
Named below IS CERTIFIED
Under the provisions of Chapter 475 FS.
Expiration date: NOV 30, 2006

DISIGMALES, CARLOS MANUEL
8502 SW 142 CT
MIAMI                           FL 33183

JEB BUSH
GOVERNOR G          DISPLAY AS REQUIRED BY LAW          SIMONE MARSTILLER
                                                        SECRETARY



**Location Map**

| Borrower/Client | Domenico Belitti | | | | File No. 07-041] Page #21 |
|---|---|---|---|---|---|
| Property Address 1660 Renaissance Way | | | | | |
| City Boynton Beach | County Palm Beach | State FL | Zip Code 33426 | | |
| Lender SBC Finance Corporation | | | | | |



 

File No. 07-0411 Page #20

## Comparable Photo Page

| | |
|---|---|
| Borrower/Client | Domenico Bellitti |
| Property Address | 1660 Renaissance Way |
| City Boynton Beach | County Palm Beach   State FL   Zip Code 33426 |
| Lender | SBC Finance Corporation |



### Comparable 1

4 Renaissance Way #4-304

| | |
|---|---|
| Prox. to Subject | 0.01 miles (Same Project) |
| Sale Price | 285,000 |
| Gross Living Area | 1,240 |
| Total Rooms | 4 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2 |
| Location | Urban/Avg |
| View | Rsdntl/Lagoon |
| Site | Condo/Average |
| Quality | CBS/Good |
| Age | 2006 |



### Comparable 2

1 Renaissance Way #301

| | |
|---|---|
| Prox. to Subject | 0.01 miles (Same Project) |
| Sale Price | 265,000 |
| Gross Living Area | 1,119 |
| Total Rooms | 4 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2 |
| Location | Urban/Avg |
| View | Rsdntl/Average |
| Site | Condo/Average |
| Quality | CBS/Good |
| Age | 2006 |



### Comparable 3

2 Renaissance Way #417

| | |
|---|---|
| Prox. to Subject | 0.01 miles (Same Project) |
| Sale Price | 270,000 |
| Gross Living Area | 1,119 |
| Total Rooms | 4 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2 |
| Location | Urban/Avg |
| View | Rsdntl/Average |
| Site | Condo/Average |
| Quality | CBS/Good |
| Age | 2006 |



**File No. 07-041 Page #19**

## Subject Interior Photo Page

| Borrower/Client | Domenico Belitti | | | | |
|---|---|---|---|---|---|
| Property Address | 1660 Renaissance Way | | | | |
| City Boynton Beach | | County Palm Beach | | State FL | Zip Code 33426 |
| Lender SBC Finance Corporation | | | | | |



**Subject Interior**

1660 Renaissance Way, # 2122-B

| | |
|---|---|
| Sales Price | 265,000 |
| Gross Living Area | 1,119 |
| Total Rooms | 4 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2 |
| Location | Urban/Avg |
| View | Residential/Avg |
| Site | Condo/Average |
| Quality | CBS/Good |
| Age | 2007 |



**Subject Interior**

**Subject Interior**

 

File No. 07-0411 Page #18

## Subject Interior Photo Page

| Borrower/Client  Domenico Bellitti | | | |
|---|---|---|---|
| Property Address  1660 Renaissance Way | | | |
| City  Boynton Beach | County  Palm Beach | State  FL | Zip Code  33426 |
| Lender  SBC Finance Corporation | | | |



**Subject Interior**

1660 Renaissance Way, # 2122-B
| | |
|---|---|
| Sales Price | 265,000 |
| Gross Living Area | 1,119 |
| Total Rooms | 4 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2 |
| Location | Urban/Avg |
| View | Residential/Avg |
| Site | Condo/Average |
| Quality | CBS/Good |
| Age | 2007 |



**Subject Interior**



**Subject Interior**

 

[File No. 07-941] [Page # 17]

### Subject Interior Photo Page



| | | | |
|---|---|---|---|
| Borrower/Client | Domenico Bellitti | | |
| Property Address | 1660 Renaissance Way | | |
| City | Boynton Beach | County | Palm Beach | State | FL. | Zip Code | 33426 |
| Lender | SBC Finance Corporation | | |



**Subject Interior**

1660 Renaissance Way, # 2122-B

| | |
|---|---|
| Sales Price | 265,000 |
| Gross Living Area | 1,119 |
| Total Rooms | 4 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2 |
| Location | Urban/Avg |
| View | Residential/Avg |
| Site | Condo/Average |
| Quality | CBS/Good |
| Age | 2007 |



**Subject Interior**



**Subject Interior**

 

File No. 07-041] Page #16

## Subject Photo Page

| Borrower/Client | Domenico Bellitti | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1660 Renaissance Way | | | | | |
| City Boylon Beach | | County Palm Beach | | State Fl. | | Zip Code 33426 |
| Lender SBC Finance Corporation | | | | | | |



### Subject Front

| 1660 Renaissance Way, # 2122-B | |
|---|---|
| Sales Price | 265,000 |
| Gross Living Area | 1,119 |
| Total Rooms | 4 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2 |
| Location | Urban/Avg |
| View | Residential/Avg |
| Site | Condo/Average |
| Quality | CBS/Good |
| Age | 2007 |



### Subject Rear



### Subject Street



**Building Sketch (Page – 1)**

File No. 07-941 Page # 16

| | |
|---|---|
| Borrower/Client   Domenico Bellitti | |
| Property Address  1660 Renaissance Way | |
| City   Boynton Beach   County  Palm Beach   State  Fl.   Zip Code  33426 | |
| Lender   SBC Finance Corporation | |



Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Net Totals |
| GLA1 | First Floor | 1119.00 | 1119.00 |
| | | | |
| | | | |
| **TOTAL LIVABLE   (rounded)** | | | **1119** |

| LIVING AREA BREAKDOWN | |
|---|---|
| Breakdown | Subtotals |
| First Floor | |
| 25.8 x 36.0 | 927.00 |
| 8.0 x 12.0 | 96.00 |
| 8.0 x 12.0 | 96.00 |
| | |
| **3 Calculations Total (rounded)** | **1119** |

File No. 07-0411 Page #14

## SUMMARY OF SALIENT FEATURES

| SUBJECT INFORMATION | | |
|---|---|---|
| | Subject Address | 1660 Renaissance Way |
| | Legal Description | Unit 2122 Villa Lago, A Condominium Parcel  & Int In Common Elements Renaissance |
| | City | Boyton Beach |
| | County | Palm Beach |
| | State | FL |
| | Zip Code | 33426 |
| | Census Tract | |
| | Map Reference | 43-45-20 |

| SALES PRICE | | |
|---|---|---|
| | Sale Price | $ 265,000 |
| | Date of Sale | 3/15/2005 |

| CLIENT | | |
|---|---|---|
| | Borrower / Client | Domenico Bellitti |
| | Lender | SBC Finance Corporation |

| DESCRIPTION OF IMPROVEMENTS | | |
|---|---|---|
| | Size (Square Feet) | 1,119 |
| | Price per Square Foot | $ 236.82 |
| | Location | Urban/Avg |
| | Age | 2007 |
| | Condition | New/Good |
| | Total Rooms | 4 |
| | Bedrooms | 2 |
| | Baths | 2 |

| APPRAISER | | |
|---|---|---|
| | Appraiser | Carlos M. Insignares |
| | Date of Appraised Value | 01/23/2007 |

| VALUE | | |
|---|---|---|
| | Final Estimate of Value | $ 265,000 |

 

☒ **CURRENT SALES CONTRACT**

☐ The subject property is currently not under contract.
☐ The contract and/or escrow instructions were not available for review. The unavailability of the contract is explained later in the addenda section.

☒ The contract and/or escrow instructions were reviewed. The following summarizes the contract:

| Contract Date | Amendment Date | Contract Price | Seller |
|---|---|---|---|
| 03/15/2005 | Unknown | 265,000 | RCR Holdings II, LLC |

☒ The contract indicated that personal property was not included in the sale.
☐ The contract indicated that personal property was included. It consisted of ___NA___
Estimated contributory value is $ _____

☒ Personal property was not included in the final value estimate.
☐ Personal property was included in the final value estimate.
☒ The contract indicated no financing concessions or other incentives.
☐ The contract indicated the following concessions or incentives: ___NA___

☒ If concessions or incentives exist, the comparables were checked for similar concessions and appropriate adjustments were made, if applicable, so that the final value conclusion is in compliance with the Market Value defined herein.

☒ **MARKET OVERVIEW**   Include an explanation of current market conditions and trends.

___3-6___ months is considered a reasonable marketing period for the subject property based on Current trends in the subject's immediate market area.

☒ **ADDITIONAL CERTIFICATION**

The Appraiser certifies and agrees that:

(1) The analyses, opinions and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP"), except that the Departure Provision of the USPAP does not apply.
(2) Their compensation is not contingent upon the reporting of predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.
(3) This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

☒ **ADDITIONAL (ENVIRONMENTAL) LIMITING CONDITIONS**

The value estimated is based on the assumption that the property is not negatively affected by the existence of hazardous substances or detrimental environmental conditions unless otherwise stated in this report. The appraiser is not an expert in the identification of hazardous substances or detrimental environmental conditions. The appraiser's routine inspection of and inquiries about the subject property did not develop any information that indicated any apparent significant hazardous substances or detrimental environmental conditions which would affect the property negatively unless otherwise stated in this report. It is possible that tests and inspections made by a qualified hazardous substance and environmental expert would reveal the existence of hazardous substances or detrimental environmental conditions on or around the property that would negatively affect its value.

☒ **ADDITIONAL COMMENTS**

This is a summary appraisal report.

☒ **APPRAISER'S SIGNATURE & LICENSE/CERTIFICATION**

Appraiser's Signature _____   Effective Date January 23, 2007   Date Prepared February 1, 2007
Appraiser's Name (print) Carlos M. Insignares   Phone # (305) 388-3356
State FL   ☐ License   ☒ Certification # St.Cert.Res.REA RD3976   Tax ID # NA

☐ **CO-SIGNING APPRAISER'S CERTIFICATION**

☐ The co-signing appraiser has personally inspected the subject property, both inside and out, and has made an exterior inspection of all comparable sales listed in the report. The report was prepared by the appraiser under direct supervision of the co-signing appraiser. The co-signing appraiser accepts responsibility for the contents of the report including the value conclusions and the limiting conditions, and confirms that the certifications apply fully to the co-signing appraiser.
☐ The co-signing appraiser has not personally inspected the interior of the subject property and:
☐ has not inspected the exterior of the subject property and all comparable sales listed in the report.
☐ has inspected the exterior of the subject property and all comparable sales listed in the report.
☐ The report was prepared by the appraiser under direct supervision of the co-signing appraiser. The co-signing appraiser accepts responsibility for the contents of the report, including the value conclusions and the limiting conditions, and confirms that the certifications apply fully to the co-signing appraiser with the exception of the certification regarding physical inspections. The above describes the level of inspection performed by the co-signing appraiser.
☐ The co-signing appraiser's level of inspection, involvement in the appraisal process and certification are covered elsewhere in the addenda section of this appraisal.

☐ **CO-SIGNING APPRAISER'S SIGNATURE & LICENSE/CERTIFICATION**

Co-Signing
Appraiser's Signature _____   Effective Date _____   Date Prepared _____
Co-Signing Appraiser's Name (print) NA   Phone # _____
State NA   ☐ License   ☐ Certification # NA   Tax ID # NA

Form MPA3 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

 

**File No. 07-043 | Case #12**

# MULTI-PURPOSE SUPPLEMENTAL ADDENDUM
# FOR FEDERALLY RELATED TRANSACTIONS

Carlos Insignares (305)388-3396

| | |
|---|---|
| Borrower/Client  Domenico Bellitti | |
| Property Address 1660 Renaissance Way | |
| City  Boynton Beach | County  Palm Beach | State  FL | Zip Code  33426 |
| Lender  SBC Finance Corporation | |

This Multi-Purpose Supplemental Addendum for Federally Related Transactions was designed to provide the appraiser with a convenient way to comply with the current appraisal standards and requirements of the Federal Deposit Insurance Corporation (FDIC), the Office of the Comptroller of Currency (OCC), The Office of Thrift Supervision (OTS), the Resolution Trust Corporation (RTC), and the Federal Reserve.

> **This Multi-Purpose Supplemental Addendum is for use with any appraisal. Only these statements which have been checked by the appraiser apply to the property being appraised.**

## ☒ PURPOSE & FUNCTION OF APPRAISAL

The purpose of the appraisal is to estimate the market value of the subject property as defined herein. The function of the appraisal is to assist the above-named Lender in evaluating the subject property for lending purposes. This is a federally related transaction.

## ☒ EXTENT OF APPRAISAL PROCESS

☒ The appraisal is based on the information gathered by the appraiser from public records, other identified sources, inspection of the subject property and neighborhood, and selection of comparable sales within the subject market area. The original source of the comparables is shown in the Data Source section of the market grid along with the source of confirmation, if available. The original source is presented first. The sources and data are considered reliable. When conflicting information was provided, the source deemed most reliable has been used. Data believed to be unreliable was not included in the report nor used as a basis for the value conclusion.

☐ The Reproduction Cost is based on   N/A
supplemented by the appraiser's knowledge of the local market.

☐ Physical depreciation is based on the estimated effective age of the subject property. Functional and/or external depreciation, if present, is specifically addressed in the appraisal report or other addenda. In estimating the site value, the appraiser has relied on personal knowledge of the local market. This knowledge is based on prior and/or current analysis of site sales and/or abstraction of site values from sales of improved properties.

☒ The subject property is located in an area of primarily owner-occupied single family residences and the Income Approach is not considered to be meaningful. For this reason, the Income Approach was not used.

☐ The Estimated Market Rent and Gross Rent Multiplier utilized in the Income Approach are based on the appraiser's knowledge of the subject market area. The rental knowledge is based on prior and/or current rental rate surveys of residential properties. The Gross Rent Multiplier is based on prior and/or current analysis of prices and market rates for residential properties.

☐ For income producing properties, actual rents, vacancies and expenses have been reported and analyzed. They have been used to project future rents, vacancies and expenses.

## ☒ SUBJECT PROPERTY OFFERING INFORMATION

According to  Public Records/Owner/Broker/Fares/MDG                                          the subject property:
☐ has not been offered for sale in the past:  ☐ 30 days  ☐ 1 year  ☐ 3 years.
☒ Is currently offered for sale for $   265,000
☐ was offered for sale within the past:  ☐ 30 days  ☐ 1 year  ☐ 3 years     for $ _____
☐ Offering information was considered in the final reconciliation of value.
☒ Offering information was not considered in the final reconciliation of value.
☐ Offering information was not available.  The reasons for unavailability and the steps taken by the appraiser are explained later in this addendum.

## ☒ SALES HISTORY OF SUBJECT PROPERTY

According to  Public Record/Owner/Broker/MLS/Fares/MDG                                          the subject property:
☒ Has not transferred  ☐ In the past twelve months.  ☒ In the past thirty-six months.  ☐ In the past 5 years.
☐ Has transferred  ☐ In the past twelve months.  ☐ In the past thirty-six months.  ☐ In the past 5 years.
☒ All prior sales which have occurred in the past 3 years are listed below and reconciled to the appraised value, either in the body of the report or in the addenda.

| Date | Sales Price | Document # | Seller | Buyer |
|---|---|---|---|---|
| N/A | | | | |
| | | | | |
| | | | | |

## ☒ FEMA FLOOD HAZARD DATA

☐ Subject property is not located in a FEMA Special Flood Hazard Area.
☒ Subject property is located in a FEMA Special Flood Hazard Area.

| Zone | FEMA Map/Panel # | Map Date | Name of Community |
|---|---|---|---|
| A5 | 1201960005C | 9/30/1982 | Villa Lago |

☐ The community does not participate in the National Flood Insurance Program.
☒ The community does participate in the National Flood Insurance Program.
☒ It is covered by a regular program.
☐ It is covered by an emergency program.

Page 1 of 2

 **Supplemental Addendum**  File No. 07-041| Page #11

File No. 07-041

| Borrower/Client | Domenico Belitti | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1660 Renaissance Way | | | | | | |
| City Boynton Beach | | County Palm Beach | | State FL | | Zip Code 33426 | |
| Lender SBC Finance Corporation | | | | | | | |

• Supplemental Addendum :

**SCOPE OF THE APPRAISAL:**

The scope of the appraisal is to analyze market conditions as of the effective date of the appraisal and to consider all approaches to value in order to estimate the subject's market value, as defined, for its highest and best use.

**FUNCTION OF THE APPRAISAL:**

The function of this appraisal is to provide an estimate of the current market value, as defined, for financing and/or decision making by the client.

Contents of this report are of a confidential nature.

Information contained herein will not be disclosed to anyone other than:

(A) The client and those persons specifically authorized by the client to receive such information;

(B) Third parties, when and to the extent that the appraiser is legally required to do so by statute, ordinance, or order of a Florida Court; and

(C) The duly authorized commute of the Appraisal Institute (Peer Review).

The appraisal assignment was prepared on an independent basis and not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

My analysis, opinions, and conclusions were developed and this report has been prepared in conformity with the Uniform Standards of Professional Practice and in accordance with the regulations developed by the lender's Federal Regulatory Agency as required by FIRREA. The Departure Provision was not utilized.

The appraiser has no knowledge of the existence of any hazard existing on or near the subject property or any site within the vicinity unless otherwise stated in the appraisal.

Unless otherwise noted specifically in the appraisal, no personal property is included in the market evaluation.

In accordance with the competency provision in USPAP, the appraisal certifies that his education, experience and knowledge is sufficient to appraise the type of property being appraised and that no appraiser has provided significant professional assistance to the person inspecting the subject property and in the completion of the analysis other than the co-signing appraiser or the appraiser's employer.

Password protected encrypted electronic signatures were used in this report. Original signatures are on file.

The enclosed is a summary report.

**Comment On Electronic Signature:**
The software utilized by Appraiser to generate the appraisal protects signature security by means of a digital signature security feature for each appraiser signing the report .Each appraiser maintains sole control of their related signature through a password, hardware device, or other means. Appraiser is fully responsible for the integrity and authenticity of data and signatures transmitted electronically.Adobe's Distiller or equivalent is utilized by Appraiser to transmit this encrypted pdf. formatted appraisal. Signature of Appraiser of this report is valid.

 

File No. 07-041 | Page #10

### Individual Condominium Unit Appraisal Report

Summary Appraisal
File # 07-041

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Carlos M. Inclan et al. | Name  N/A |
| Company Name  Principal Appraisal Services Inc. | Company Name |
| Company Address  8502 SW 146 Court | Company Address |
| Miami, Fl. 33183 | |
| Telephone Number  (305) 388-3356 | Telephone Number |
| Email Address  principalapprais@bellsouth.net | Email Address |
| Date of Signature and Report  February 1,2007 | Date of Signature |
| Effective Date of Appraisal  01/23/2007 | State Certification # |
| State Certification #  St.Cert.Res.REA RD3976 | or State License #  N/A |
| or State License # | State  N/ |
| or Other  N/A  State # N/A | Expiration Date of Certification or License |
| State  Fl | |
| Expiration Date of Certification or License  11/30/2008 | **SUBJECT PROPERTY** |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 1660 Renaissance Way, # 2122-B | Date of Inspection |
| Boyton Beach, Fl. 33426 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY $  265,000 | Date of Inspection |
| LENDER/CLIENT | |
| Name | **COMPARABLE SALES** |
| Company Name  SBC Finance Corporation | ☐ Did not inspect exterior of comparable sales from street |
| Company Address  12940 SW 128 Street Suite #204-B, Miami, Fl | ☐ Did inspect exterior of comparable sales from street |
| 33186 | Date of Inspection |
| Email Address | |

Freddie Mac Form 465 March 2005                    Page 6 of 6                    Fannie Mae Form 1073 March 2005

 

File No. 07-041 Page #5

**Individual Condominium Unit Appraisal Report**

Summary Appraisal
File # 07-041

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Form 1073 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE



## Individual Condominium Unit Appraisal Report

Summary Appraisal
File # 07-041

This report form is designed to report an appraisal of a unit in a condominium project or a condominium unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject unit, (2) inspect and analyze the condominium project, (3) inspect the neighborhood, (4) inspect each of the comparable sales from at least the street, (5) research, verify, and analyze data from reliable public and/or private sources, and (6) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 1073 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE




File No. 07-041 Page #7

### Individual Condominium Unit Appraisal Report
Summary Appraisal
File # 07-041

| There are | 155 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 139,900 | to $ 625,000 |
|---|---|---|---|
| There are | 44 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 340,000 | to $ 170,000 |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address and Unit # | 1660 Renaissance Way, # 212 Boylton Beach, Fl. 33426 | 4 Renaissance Way #4-304. Boylton Beach, Fl. 33426 | | 1 Renaissance Way #301 Boylton Beach, Fl. 33426 | | 2 Renaissance Way #417 Boylton Beach, Fl. 33426 | |
| Project Name and Phase | Vista Lago , A Condominium    2 | San Raphael Condominium | | San Raphael Condominium | | San Raphael Condominium | |
| | | 1 Renaissance Common | | 1 Renaissance Common | | 1 Renaissance Common | |
| Proximity to Subject | | 0.01 miles (Same Project) | | 0.01 miles (Same Project) | | 0.01 miles (Same Project) | |
| Sale Price | $ 265,000 | $ 285,000 | | $ 265,000 | | $ 270,000 | |
| Sale Price/Gross Liv. Area | $ 236.82sq. ft.S | $ 229.84 sq. ft. | | $ 236.82 sq. ft. | | $ 241.29 sq. ft. | |
| Data Source(s) | | FARES/P.R./P.C.P.A/Real Quest | | FARES/P.R./P.C.P.A/Real Quest | | FARES/P.R./P.C.P.A/Real Quest | |
| Verification Source(s) | | Exterior View/MLS#Z730573 | | Exterior View/MLS#Z732651 | | Exterior View/MLS#Z650914 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Conv.Mtg. None Noted | | Conv.Mtg. None Noted | | Conv.Mtg. None Noted | |
| Date of Sale/Time | | 12/2006 | | 12/2006 | | 11/2006 | |
| Location | Urban/Avg | Urban/Avg | | Urban/Avg | | Urban/Avg | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| HOA Mo. Assessment | 316.00 | Similar | | Similar | | Similar | |
| Common Elements and Rec. Facilities | See Front page of Rept | See Front page of Rept | | See Front page of Rept | | See Front page of Rept | |
| Floor Location | 1st Floor | 3rd Floor | No Adj. | 3rd Floor | No Adj. | 4th Floor | No Adj. |
| View | Residential/Avg | Rsdntl/Lagoon | -10,000 | Rsdntl/Average | | Rsdntl/Average | |
| Design (Style) | Condo/Good | Condo/Good | | Condo/Good | | Condo/Good | |
| Quality of Construction | CBS/Good | CBS/Good | | CBS/Good | | CBS/Good | |
| Actual Age | 2007 | 2006 | | 2006 | | 2006 | |
| Condition | New/Good | New/Good | | New/Good | | New/Good | |
| Above Grade | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths |
| Room Count | 4 | 2 | 2 | 4 | 2 | 2 | 4 | 2 | 2 | Same | 4 | 2 | 2 | Same |
| Gross Living Area | 1,119 sq. ft. | 1,240 sq. ft. | -3,000 | 1,119 sq. ft. | Model | 1,119 sq. ft. | Model |
| Basement & Finished Rooms Below Grade | None Noted | No Basement None Noted | | No Basement None Noted | | No Basement None Noted | |
| Functional Utility | Adequate | Adequate | | Adequate | | Adequate | |
| Heating/Cooling | Central A/C | Central A/C | | Central A/C | | Central A/C | |
| Energy Efficient Items | Standard | Standard | | Standard | | Standard | |
| Garage/Carport | Open Parking(2) | Open Parking(2) | | Open Parking(2) | | Open Parking(2) | |
| Porch/Patio/Deck | Cvrd.Terrace (1) | Balcony (1) | No Adj. | Balcony (1) | No Adj. | Balcony (1) | No Adj. |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - $ | 13,000 | ☐ + ☐ - $ | | ☐ + ☐ - $ | |
| Adjusted Sale Price of Comparables | | Net Adj. 4.6 % Gross Adj. 4.6 % $ | 272,000 | Net Adj. % Gross Adj. % $ | 265,000 | Net Adj. % Gross Adj. % $ | 270,000 |

Summary of Sales Comparison Approach   The above sales are the most recent comparable sales found within the subject area. Comparable sales #1, #2 and #3 are located within the subject project. No closed sales as of yet on subject building, this does not adversely affect the subject nor it's marketability in any way. The sales have been adjusted for any differences and are considered good value indicators for the subject property. Equal emphasis has been placed on all three comparable sales.

Indicated Value by Sales Comparison Approach $ 265,000

#### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $ | N/A | X Gross Rent Multiplier | N/A | = $ | | Indicated Value by Income Approach $ |
|---|---|---|---|---|---|---|

Summary of Income Approach (including support for market rent and GRM)   N/A

Indicated Value by: Sales Comparison Approach $ 265,000   Income Approach (if developed) $

Only the market data approach was applicable to this report which reflects the action of both buyers and sellers in the subject market place. The income approach is not applicable.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair. Value estimate is subject to the attached statement of limiting conditions & all addendum attached. See front page for any other condition.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 265,000 , as of 01/23/2007 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 465 March 2005     Page 3 of 6     Fannie Mae Form 1073 March 2005

Form 1073 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

 

File No. 07-041 Page #6

## Individual Condominium Unit Appraisal Report

Summary Appraisal
File # 07-041

**Describe the condition of the project and quality of construction.** The subject project appears to be well maintained by H.O.A. No special assessments were noted at time of inspection. No HOA warranty letter provided.

**Describe the common elements and recreational facilities.** Common elements, pool, 24hr security.

**Are any common elements leased to or by the Homeowners' Association?** [ ] Yes [X] No  If Yes, describe the rental terms and options.   N/A

**Is the project subject to a ground rent?** [ ] Yes [X] No  If Yes, $ N/A   per year (describe terms and conditions)   N/A

**Are the parking facilities adequate for the project size and type?** [X] Yes [ ] No  If No, describe and comment on the effect on value and marketability.   Subject project has off-site parking adequate for owners/tenants & adequate parking for guest.

I [ ] did [ ] did not analyze the condominium project budget for the current year. Explain the results of the analysis of the budget (adequacy of fees, reserves, etc.), or why the analysis was not performed.   Budget/Rules were not made available to the appraiser. It's recommended that they be reviewed by an Accountant/Attorney.

**Are there any other fees (other than regular HOA charges) for the use of the project facilities?** [ ] Yes [X] No  If Yes, report the charges and describe.   None noted at time of inspection.

**Compared to other competitive projects of similar quality and design, the subject unit charge appears** [ ] High [X] Average [ ] Low  If High or Low, describe

**Are there any special or unusual characteristics of the project (based on the condominium documents, HOA meetings, or other information) known to the appraiser?** [ ] Yes [X] No   If Yes, describe and explain the effect on value and marketability.  Note: The appraiser was not provided with the condo doc's &/or HOA warranty letter. It's recommended that they be reviewed by an Attorney & Owner. Budget/Rules were not made available to the appraiser.

Unit Charge $ 316.00   per month X 12 = $ 3,792.00   per year   Annual assessment charge per year per square foot of gross living area = $ 3.39
Utilities included in the unit monthly assessment [ ] None [ ] Heat [ ] Air Conditioning [ ] Electricity [ ] Gas [X] Water [X] Sewer [X] Cable [X] Other (describe)
Garbage, maintenance of common grounds, hazard insurance, high speed internet, recreation center.

| General Description | Interior    materials/condition | Amenities | Appliances | Car Storage |
|---|---|---|---|---|
| Floor #       1st Floor | Floors        Tile/Carpet/New/Gd | [X] Fireplace(s) # N/A | [X] Refrigerator  Stnless. | [X] None |
| # of Levels   One Level | Walls         Drywall/New/Good | [X] Wood Stove(s) # N/A | [X] Range/Oven  Stnless. | [ ] Garage [ ] Covered [X] Open |
| Heating Type R/C   Fuel Elec. | Trim/Finish   C.Tile/New/Good | [ ] Deck/Patio    N/A | [X] Disp [X] Microwave | # of Cars   2.0 |
| [X] Central AC [ ] Individual AC | Bath Wainscot C.Tile/New/Good | [X] Porch/Balcony  Cvrd. | [X] Dishwasher  Stnless. | [ ] Assigned [ ] Owned |
| [ ] Other (describe) | Doors         Wood/H.C/New/Gd | [ ] Other    N/A | [X] Washer/Dryer Stacked | Parking Space #  #204 & #206 |
| Finished area above grade contains: | 4  Rooms    2  Bedrooms | 2 Bath(s) | 1,119  Square Feet of Gross Living Area Above Grade |  |

**Are the heating and cooling for the individual units separately metered?** [X] Yes [ ] No  If No, describe and comment on compatibility to other projects in the market area.
N/A————// *Estimated using tax rolls./ H.O.A. letter provided.
Additional features (special energy efficient items, etc.)   None Noted

**Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).** No functional or physical inadequacies noted at time of inspection. The subject property is new construction and will be in overall new/good condition when completed and is of good quality of construction.

**Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?** [ ] Yes [X] No  If Yes, describe
No physical deficiencies or adverse conditions were noted at time field inspection. Structural integrity appears sound with no affect on livability.

**Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?** [X] Yes [ ] No  If No, describe
Subject property is of similar style, condition & functional utilities to other properties within the subject's project & immediate market area and generally conforms to the neighborhood.

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain     At time of inspection Appraiser researched the subject property and comparable sales for any transfers of prior sales. All information required is listed below.

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s)   FARES/Public Records/P.B.C.P.A Real Quest/Sales Office
My research [X] did [ ] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s)   FARES/Public Records/P.B.C.P.A/Real Quest/MLS/Sales Office
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | No sale/transfer | 04/2006 | 02/2006 | 04/2006 |
| Price of Prior Sale/Transfer | within 3 years./Sales Office | $240,900 | $183,900 | $240,900 |
| Data Source(s) | FARES/R.Q/P.C.P.A/P.R. | FARES/R.Q/P.C.P.A/P.R. | FARES/R.Q/P.C.P.A/P.R. | FARES/R.Q/P.C.P.A/P.R. |
| Effective Date of Data Source(s) | 01/23/2007 | 01/23/2007 | 01/23/2007 | 01/23/2007 |

Analysis of prior sale or transfer history of the subject property and comparable sales.   Appraiser has analyzed prior sale & transfer history of subject & comparables properties utilized in this report. Subject property shows no prior sales or transfers within the prior 3 years. Comparable sale's #1, #2, #3  did  show prior sales  within the past 12 month's.  These are resales within the subject project  and 2 of same model design. This does not adversely affect the subject nor it's marketability in any way.




Carlos Insignares (305)388-3398

File No. 07-041 Page #5

## Individual Condominium Unit Appraisal Report

Summary Appraisal
File # 07-041

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| SUBJECT | | | | | |
|---|---|---|---|---|---|
| Property Address 1660 Renaissance Way | | Unit # 2122-B | City Boynton Beach | State FL | Zip Code 33426 |
| Borrower Domenico Bellitti | | Owner of Public Record RCR Holdings II, LLC | | County Palm Beach | |

Legal Description  Unit 2122 Villa Lago, A Condominium Parcel & Int In Common Elements Renaissance Common
Assessor's Parcel #  Not Yet Assessed          Tax Year 2006          R.E. Taxes $ N.Y.A
Project Name  Villa Lago , A Condominium          Phase #   2          Map Reference 43-45-20          Census Tract
Occupant ☐ Owner ☐ Tenant ☒ Vacant          Special Assessments $ None Noted          HOA $ 316.00 ☐ per year ☒ per month
Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)
Assignment Type ☒ Purchase Transaction ☐ Refinance Transaction ☐ Other (describe)
Lender/Client  SBC Finance Corporation          Address  12940 SW 128 Street Suite #204-B, Miami, Fl 33186
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?  ☒ Yes ☐ No
Report data source(s) used, offering price(s), and date(s).  Contract/Developers Office - Pre-construction Sale price $231,647 - Contract executed on
03/15/2005 as a pre-construction sale.
☒ I did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.  The transaction is arms-length.  Both buyer and seller are knowledgeable.  Both parties have signed contract and agree on sales price.
No concessions or incentives noted on copy of contract or per broker, seller, borrower.

| CONTRACT | | | | |
|---|---|---|---|---|
| Contract Price $ 265,000 | Date of Contract 3/15/2005 | Is the property seller the owner of public record? ☒ Yes ☐ No | Data Source(s) Dvlpr./Broker/Cntrct. | |

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?  ☐ YES ☒ NO
If Yes, report the total dollar amount and describe the items to be paid.  None Noted    No concessions, incentives, gift or downpayment noted on copy
contract.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| NEIGHBORHOOD | Neighborhood Characteristics | | Condominium Unit Housing Trends | | | Condominium Housing | | Present Land Use % |
|---|---|---|---|---|---|---|---|---|
| | Location ☒ Urban ☐ Suburban ☐ Rural | Property Values ☒ Increasing ☐ Stable ☐ Declining | | | PRICE | AGE | One-Unit | 05 % |
| | Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | $ (000) | (yrs) | 2-4 Unit | ## % |
| | Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | | 139 Low | New | Multi-Family | 75 % |
| | | | | | 625 High | 3 | Commercial | 20 % |
| | | | | | 290's Pred. | 1 | Other | 0 % |

Neighborhood Boundaries  The subject property is situated within an overall good neighborhood located
North of NW 2 Ave., South of Gateway Blvd,West of N.Congress Ave. and East of I-95.
Neighborhood Description  The subject property is within reasonable proximity to major amenities such as: Schools, commercial facilities, shopping,
public transportation, and service facilties.  Most homes and condominium projects appeared to be adequately maintained therefore providing
average appeal to the market. No unfavorable conditions observed during the course of our field inspection.
Market Conditions (including support for the above conclusions)   A thorough research was performed of the subject's immediate area. Said research
evidenced an active market with no unfavorable conditions noted. The role of single family, multifamily, and commercial uses does not adversely
affect the subject property.  Most forms of financing such as Conv., FHA, Seller, PMM, etc are readily available in the area.

| SITE | | | |
|---|---|---|---|
| Topography Level to Road Grade | Size  Typical of Area | Density Average/Typical | View Residential/Avg |

Specific Zoning Classification 0400          Zoning Description Multifamily Residential Condominium
Zoning Compliance ☒ Legal ☐ Legal Nonconforming – Do the zoning regulations permit rebuilding to current density? ☒ Yes ☐ No
☐ No Zoning ☐ Illegal (describe)
Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe  Present use is
the highest & best use  as improved as of time of inspection.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ F.P.L. | Water | ☒ | ☐ Municipal | Street Paved Asphalt | ☒ | ☐ |
| Gas | ☐ | ☒ None Noted | Sanitary Sewer | ☒ | ☐ Municipal | Alley None/Typical | ☐ | ☐ |

FEMA Special Flood Hazard Area ☒ Yes ☐ No  FEMA Flood Zone A5          FEMA Map # 1201960005C          FEMA Map Date 9/30/1982
Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe
No visible adverse environmental conditions were observed during the normal course of the inspection  This is not to be mistaken as a certification
of such.

| PROJECT INFORMATION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Data source(s) for project information    FARES/Public Recorder/P.B.P.A./MLS/Developer | | | | | | | | |
| Project Description ☐ Detached ☐ Row or Townhouse ☐ Garden ☒ Mid-Rise ☐ High-Rise ☐ Other (describe) N/A | | | | | | | | |

| General Description | | Subject Phase | | If Project Completed | | If Project Incomplete | |
|---|---|---|---|---|---|---|---|
| # of Stories  Six | Exterior Walls  CBS | # of Units | 328 | # of Phases | 3 | # of Planned Phases | N/A |
| # of Elevators  Three | Roof Surface  B.Tile | # of Units Completed | 328 | # of Units | 570 | # of Planned Units | N/A |
| ☒ Existing ☐ Proposed | Total # of Parking  570 | # of Units For Sale | 10+/- | # of Units for Sale | 5+/- | # of Units for Sale | N/A |
| ☐ Under Construction | Ratio (spaces/units) 1-2 | # of Units Sold | 328 | # of Units Sold | 590 | # of Units Rented | N/A |
| Year Built  2007 | Type ☒ Open ☐ Other | # of Units Rented | 11+/- | # of Owner Occupied Units | 5% | # of Units Rented | N/A |
| Effective Age  New | Guest Parking  Adeq | # of Owner Occupied Units | 317 | # of Owner Occupied Units | 95% | # of Owner Occupied Units | N/A |

Project Primary Occupancy ☒ Principle Residence ☐ Second Home or Recreational ☐ Tenant  N/A
Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☒ No
Management Group – ☐ Homeowners' Association ☐ Developer ☐ Management Agent – Provide name of management company.  H.O.A.

Does any single entity (the same individual, investor group, corporation, etc.) own more than 10% of the total units in the project? ☐ Yes ☒ No  If Yes, Describe
N/A

Was the project created by the conversion of existing building(s) into a condominium? ☐ Yes ☒ No  If Yes, describe the original use and date of conversion.
N/A

Are the units, common elements, and recreation facilities complete (including any planned rehabilitation for a condominium conversion)? ☒ Yes ☐ No  If No, describe
All common elements and recreation facilities are complete and have been well maintained throughout the years.

Is there any commercial space in the project? ☐ Yes ☒ No  If Yes, describe and indicate the overall percentage of the commercial space.
No commercial space available predominant owner occupied



File No. 07-0411 Page #4



**APPRAISAL OF REAL PROPERTY**

**LOCATED AT:**

1660 Renaissance Way #2-122
Boyton Beach, FL  33426

**FOR:**

SBC Finance Corp
12940 SW 128 Street Suite #204-B
Miami, Fl  33186

**AS OF:**

01/23/2007

**BY:**

Carlos M. Insignares
Principal Appraisals Services Inc.
8502 SW 146 Court
Miami,Florida 33183
Phone: (305) 388-3356
principalapprais@bellsouth.net

Form GA1 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE





File No. 07-041 Page #3

## APPRAISER DISCLOSURE STATEMENT

Summary Appraisal

File No.  07-041

Name of Appraiser:    Carlos M. Insignares

Class of Certification/Licensure:
☐ Certified General
☒ Certified Residential
☐ Licensed Residential
☐ Temporary    ☐ General    ☐ Licensed

Certification/Licensure Number:    St.Cert.Res.REA RD3976

Scope:    This Report    ☒ Is within the scope of my Certification or License
☐ Is not within the scope of my Certification or License

Service Provided By:    ☒ Disinterested & Unbiased Third Party
☐ Interested & Biased Third Party
☐ Interested Third Party on Contingent Fee Basis

Signature of person preparing and reporting the Appraisal:

This form must be included in conjunction with all appraisal assignments or specialized services
performed by a state-certified or state-licensed real estate appraiser.

Form DISCLA — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 07-041 Page #2

Principal Appraisal Services, Inc.
8502 SW 146 Court
Miami, FL 33183
Phone: (305) 388-3356  Fax: (305) 387-9241

principalapprais@bellsouth.net

SBC Finance Corporation
12940 SW 128 Street Suite #204-B
Miami, Fl 33186

Re: Property:   1660 Renaissance Way
                Boynton Beach, FL 33426
    Borrower:   Domenico Bellifi
    File No.:    07-041

In accordance with your request, we have appraised the above referenced property.  The report of that appraisal is attached.

The purpose of this appraisal is to estimate the market value of the property described in this appraisal report, as improved, in unencumbered fee simple title of ownership.

This report is based on a physical analysis of the site and improvements, a locational analysis of the neighborhood and city, and an economic analysis of the market for properties such as the subject.  The appraisal was developed and the report was prepared in accordance with the Uniform Standards of Professional Appraisal Practice.

The value conclusions reported are as of the effective date stated in the body of the report and contingent upon the certification and limiting conditions attached.

It has been a pleasure to assist you.  Please do not hesitate to contact me or any of my staff if we can be of additional service to you.

Sincerely,

Carlos M. Rasignares
St.Cert.Res.REA RD3976

FROM:
Principal Appraisal Services Inc.
8502 SW 146 Court
Miami, Florida 33183
Phone:(305) 388-3356 * Fax:(305) 387-9241
principalapprais@bellsouth.net

File No. 07-041 Page # 1

| INVOICE | DATE | REFERENCE |
|---------|------|-----------|
| 07-041 | 01/23/2007 | Summary Appr. |

Borrower: Domenico Belitti

TO:
SBC Finance Corp.

| DESCRIPTION | | AMOUNT |
|-------------|--|--------|
| 1660 Renaissance Way #2-122     **PAYMENT DUE** Boyton Beach, Florida 33426 | | 325.00 |
| | | |
| | Subtotal $ | 325.00 |
| | Late Fee $ | |
| | TOTAL $ | 325.00 |

C3_7627  Loan Documents Enclosed  16003  03/28/2013



**Bank of America**

**Home Loans**

*Customer Service Department, CA6-919-02-41*
*PO Box 5170*
*Simi Valley, CA  93062-5170*

|  |  |
|---|---|
| **Notice Date:** | September 10, 2014 |

Domenico Bellitti
3800 Battersea Rd
Miami, FL  33133

**Loan No.:**   166647418

**Property Address:**
1660 Renaissance Way   2122-B
Boyton Beach, FL  33426

---

**IMPORTANT MESSAGE ABOUT YOUR HOME LOAN DOCUMENT REQUEST**

Your request for loan documents related to the above referenced home loan was received.

We've enclosed the following requested loan documents:

Appraisal/Value Determination

---

**WE'RE HERE TO HELP**

If you have any questions, please call us at (800) 669-6607 between the hours of 7 am to 7 pm local time. We appreciate the opportunity to serve your home loan needs.

---

EXHIBIT
N
page 29 of 29

This communication is from Bank of America, N.A., the servicer of your home loan.

# FACSIMILE COVER SHEET

**450 American Street, MSN**
**Simi Valley, California 93065-6285**

## *From:*

| | |
|---|---|
| Name: | Yaglowski, Tobias |
| Fax Number: | |
| Voice Phone: | |

## *To:*

| | |
|---|---|
| Name: | **DOMENICO BELLITTI** |
| Company: | |
| Fax Number: | **5617343553** |
| Voice Phone: | |

## *Fax notes:*

Date and time of transmission: **Tuesday, September 09, 2014 5:10:12**
Number of pages including this cover sheet:  **06**

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL OR EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECIEVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND DESTROY THIS DOCUMENT.                                            **THANK YOU.**

EXHIBIT
O
Page 1 of 29

 **LandSafe.** Real Estate Closing Services

| LARA |
|---|

Order #: 16025249                    Date Review Signed: 03/31/2011

Borrower: na

Client: Bank of America-CLS Title Operation   Branch: 7019486                    Fax/Email:

Property Address: 1660 RENAISSANCE WAY 2122-B   City: BOYNTON BEACH   State: FL   Zip Code: 33426

### Basic Input Per Original Appraisal Report

Fannie Mae Appraisal Form Under Review: ☐ 1004 ☐ 1025 ☒ 1073 ☐ 2055 ☐ 1004C ☐ Other:

Appraisal's Effective Date: 03/28/2011   Date Signed: 03/31/2011   Appraised Value: $ 38,000.00

Property Rights Appraised: ☒ Fee Simple Estate ☐ Leasehold Estate ☐ Other

Rate/Term Refinance: ☒   Purchase: ☐        Appraiser: matthew osborne

If purchase, Sale Price: $ XXXXXX        Supervisory Appraiser:

### ANALYSIS OF APPRAISAL RISK FACTORS

**Subject Property and Neighborhood:**

☐ Rural Property
☐ Highest & Best Use is Not Current Land Use
☐ Illegal Use
☐ Manufactured/Doublewide Home or Modular Home
☐ Functionality of Additions and/or Garage Conversions
☐ Non-permitted Additions

☐ Below-Average Condition Rating
☒ Safety and/or Health Issues
☐ External Obsolescence
☐ Subject and/or Neighborhood Inadequately Described
☐ Differing Supplemental Subject Details
  (Physical or Other per Secondary Sources)

**Sales Comparison Approach:**

☐ Dated Sales (>6 months prior to effective date of value)
☐ No Bracketing of Sale Prices vs. reported Market Value
☐ Most Sales Out of Neighborhood or Across Major Borders
☐ No Bracketing of Sales vs. Subject's Actual Home Age
☐ No Bracketing of Sales vs. Subject's GLA Square Footage
☒ Significant Across-the-Board Adjustments

☐ Most Sales' Characteristics Not Physically Similar to Subject
☒ Net/Gross/Line-item Adjustments Exceed Guidelines
☐ Excessive Adjusted Value Range
☐ New Construction/All Sales by Same Builder as Subject
☐ Manufactured Land/Home Package Sales Unacceptable
☐ Contradictory Secondary Data

**Cost and Income Approaches:**

☐ Income Approach does not support reported Market Value
☐ No Bracketing of Listings vs. reported Market Value
☐ Rental Comparables do not support reported Market Rent

☐ No Bracketing of Sale GRMs vs. reported Market GRM
☐ Cost Approach does not support reported Market Value
☐ Very High Subject Land-to-Value Ratio w/o Support

**Appraisal Report Exhibit Factors:**

☐ No Subject Building Sketch and/or GLA Calculations
☐ No Sale Comparable Map or Map Illegible

☐ Fax Photo Clarity Issue or No Subject or Comp Photos
☐ No Signed Appraiser Certification

**Other Potential Risk Factors:**

☐ Secondary Market Data Not Available or Inconclusive
☐ Secondary Market Data Evidences Lower Sale Prices

☐ Subject History Not Disclosed or Adequately Analyzed
  (subject last sold during _____ for $ 0.00 )
☐ Inappropriate Comp Weights/Inadequate Reconciliation

### APPRAISAL RISK ANALYSIS CONCLUSION

**APPRAISAL RISK RATING:**

☐ ONE - Unacceptable Appraisal
☐ TWO - Unacceptable Value Opinion, Reviewer Opinion
   of Value is Stated Below

☒ THREE - Acceptable/Moderate Appraisal Risk
☐ FOUR - Acceptable/Low Appraisal Risk
☐ FIVE - Acceptable/Nominal Appraisal Risk

**Comments:**

See Addendum section 1

Appraised Value or LandSafe Reviewer's Opinion of Value, if applicable: $ 38,000.00

LandSafe Appraisal Services (LSA) is a national provider of Real Estate Valuation and Collateral Services

**Scope of Appraisal Review:** The LARA's scope of work is limited to a "desktop" analysis using the information included in the appraisal report under review, together with available secondary market data to determine if the appraisal report is credible (i.e., not deficient). The reviewer is not required to make physical inspections of the subject, sales or listings referenced in the OAR, review any other data found in supplemental data bases, or reconfirm the factual data in the OAR. (An Extraordinary Assumption is made that the OAR includes credible factual information for the subject, market data and related market area, unless otherwise noted in this review report.)

In all cases, the scope of this appraisal review includes:

1. Review of the appraisal report for completeness, adequacy, relevance, and reasonableness of the analysis in the appraisal under review, given law, regulations, or intended user requirements applicable to the appraisal under review
2. Review of available secondary market data
3. Development of an opinion as to the completeness, adequacy, relevance, and reasonableness of the analysis in the appraisal under review, given law, regulations, or intended user requirements applicable to the appraisal under review
4. Base the appraisal report score on the Appraisal Review Scoring Criteria

If appraisal report is acceptable, the review appraiser must:

1. Complete LARA form, checking all relevant checkboxes and include appropriate review comments
2. Score the appraisal report based on the Appraisal Review Scoring Criteria

If appraisal report IS ordered by LandSafe and is NOT acceptable, reviewer must request corrections from the appraiser.

1. If an acceptable revised appraisal is obtained from appraiser:
   a. Complete LARA form, checking all relevant checkboxes and include relevant review comments
   b. Score the appraisal report based on the Appraisal Review Scoring Criteria
   c. Describe any unacceptable appraisal practices (if applicable)
2. If an acceptable revised appraisal report cannot be obtained and the reviewer IS geographically competent and has adequate market data resources to develop and report an alternate value opinion in accordance with USPAP and applicable federal, state and any applicable GSE requirements, then the reviewer must:
   a. Complete LARA form, checking all relevant checkboxes and include relevant review comments
   b. Describe any unacceptable appraisal practices (if applicable)
   c. Develop and report reasons for any value disagreement
   d. Develop and report an alternate value opinion in accordance with USPAP, applicable federal and state requirements (including, licensing laws), and any applicable GSE requirements
   e. Describe, analyze and reconcile approaches or exclusion of approaches and specific market data used to support an alternate value opinion
   f. Score the appraisal report based on the Appraisal Review Scoring Criteria
3. If an acceptable revised appraisal report cannot be obtained and reviewer is NOT geographically competent and does not have adequate market data resources to develop and report an alternate value opinion in accordance with USPAP, applicable federal, state and any applicable GSE requirements, the reviewer must:
   a. Complete LARA form, checking all relevant checkboxes and include relevant review comments
   b. Describe any unacceptable appraisal practices (if applicable)
   c. Score the appraisal report based on the Appraisal Review Scoring Criteria
   d. NOT develop and report an alternate value opinion
   e. Escalate the assignment to a reviewer that is geographically competent OR fail the report with an Appraisal Review Score of one (1)

If appraisal report is NOT ordered by LandSafe and is NOT acceptable, reviewer must report any unacceptable appraisal practices in the review.

1. If the reviewer IS geographically competent and has adequate market data resources to develop and report an alternate value opinion in accordance with USPAP and applicable federal, state and any applicable GSE requirements, then the reviewer must:
   a. Complete LARA form, checking all relevant checkboxes and include relevant review comments
   b. Describe any unacceptable appraisal practices (if applicable)
   c. Develop and report reasons for any value disagreement
   d. Develop and report an alternate value opinion in accordance with USPAP, applicable federal and state requirements (including licensing laws) and any applicable GSE requirements
   e. Describe, analyze and reconcile approaches or exclusion of approaches and specific market data used to support an alternate value opinion
   f. Score the appraisal report based on the Appraisal Review Scoring Criteria

2. If the reviewer is NOT geographically competent or does not have adequate market data resources to develop and report an alternate value opinion in accordance with USPAP and applicable federal, state and any applicable GSE requirements, the reviewer must:
   a. Complete LARA form, checking all relevant checkboxes and include relevant review comments
   b. Describe any unacceptable appraisal practices (if applicable)
   c. Score the appraisal based on the Appraisal Review Scoring Criteria
   d. NOT develop and report an alternate value opinion
   e. Escalate the assignment to a reviewer that is geographically competent OR fail the report with a Appraisal Review Score of one (1)

## Appraisal Review Scoring Criteria

**If the scope of work for the review includes the development of an alternate value opinion:**

The appraisal review score must be a one (1) if any one of the following is true:
- The appraisal under review is clearly misleading (by omission or commission), due to UAPs and/or USPAP credibility issues.
- The appraised under review is unacceptable due to one or more UAPs that are not cured and the resulting difference between the QC reviewer's opinion of value and the original value opinion stated in the appraisal under review being greater than 10%.
- The appraised value is not supported due to UAPs and/or USPAP issues that clearly impact the credibility of the appraisal. Examples include, but are not limited to:
  o Appraised value is $100,000 but all data and analyses in the appraisal under review clearly indicate a substantially higher (such as $200,000) or lower (such as $50,000 value).
  o All comparables are clearly dissimilar (superior or inferior) in quality, condition and design without adequate analysis to support use of the sales, corresponding adjustments or lack of adjustments.

The score must be a two (2) if all of the following are true:
- The appraisal under review is questionable due to one or more UAPs that that are not cured and potentially impact the value or credibility of the appraisal.
- The resulting variance between the reviewer's opinion of value and the original value stated in the appraisal under review is less than or equal to 10%. (Value variance less than or equal to 5% is to be utilized on appraisal reviews for Corporate Investment Group (CIG) loans.)

The score can be a three (3) if all of the following are true:
- The variance between the reviewer's opinion of value and the value opinion stated in the appraisal under review is 10% or less.
- UAPs were identified in the review process and were cured in the final appraisal.

The score can be a four (4) if all of the following are true:
- The variance between the reviewer's opinion of value and the value opinion stated in the appraisal under review is 5% or less.
- UAPs were identified in the review process and were cured in the final appraisal.

The score can be a five (5) if all of the following are true:
- The variance between the reviewer's opinion of value and the value opinion stated in the appraisal under review is 5% or less.
- No UAPs were identified at any point in the review process.

**If the scope of work for the review does NOT include the development of an alternate value opinion:**

The appraisal review score must be a one (1) if any one of the following is true:
- The appraisal under review is clearly misleading (by omission or commission), due to UAPs and/or USPAP credibility issues.
- The appraisal under review is unacceptable due to one or more UAPs that are not cured.

The appraisal review score of two (2) is not applicable if the reviewer is unable to provide an alternate value.

The score can be a three (3) if all of the following are true:
- The final submission of the appraisal under review is acceptable.
- UAPs were identified in the review process and were cured in the final appraisal.

The score can be a four (4) if all of the following are true:
- The final submission of the appraisal under review is acceptable.
- UAPs were identified in the review process and were cured in the final appraisal.

The score can be a five (5) if all of the following are true:
- The final submission of the appraisal under review is acceptable.
- No UAPs were identified at any point in the review process.

**Note:** *Distinction between levels of passing scores should be based on the overall quality of the report.*

Exception to Appraisal Review Scoring Criteria for FHA Scoring Loans

In some cases, technology limitations or barriers between the LandSafe reviewer and the appraiser who provided the appraisal under review will require an exception to the Appraisal Review Scoring Criteria in regard to failing scores of 1 and 2). Examples of these scenarios include appraisals reviewed for FHA Loans or non LandSafe ordered appraisals reviewed for Correspondent Lending. Scoring exceptions can only be made for appraisals being reviewed in relation to loan transactions. Any exceptions to the Appraisal Review Scoring Criteria must be approved by LandSafe Governance and Valuation Services executive management. In addition, any established exception to the appraisal review scoring criteria must be documented within LandSafe/Bank of America Policy. There are no scoring exceptions permitted if the appraisal is being reviewed for a post funding quality control audit.

**Regulation Y Compliance:** The appraisal that is the subject of this review has been checked for the following: (1) USPAP compliance; (2) Sufficient data is presented in the report which support the value conclusion; (3) Sufficient analysis and comments to support the value conclusion; (4) Correct Market Value Definition used and presented; (5) State licensed or Certified Appraiser completed the report; (6) Certified Appraiser was used for Complex Property; (7) The appraiser has appropriate *license* for transaction amount ($1,000,000 or greater requires Certified); (8) If a financial services institution is listed as the client, it is assumed that it directly engaged the appraiser; (9) There is no evidence that Professional Organization membership was the sole selection criteria for the appraiser, unless otherwise noted and addressed, as necessary.

**Definition of Market Value:** *Market* value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) Buyer and seller are typically motivated; (2) Both parties are well informed or well advised, and acting in what they consider their own best interests; (3) A reasonable time is allowed for exposure in the open market; (4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (The source of this definition of market value is section 12 CFR Part 34, Subpart C-Appraisals, from Title XI of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) of 1989. This definition is also referenced in the Interagency Appraisal and Evaluation Guidelines which is jointly published by the OCC, OTS, RFS, and FDIC.)

**Intended User:** The intended user is the above-named Client (see page 1) and its assigns.

**Intended Use:** The LARA's intended use is to assist in mortgage loan underwriting or related transactions. The LARA is a supplement intended for use in conjunction with the APPRAISAL.

**Effective Date of LARA Value Opinion:** The effective date of this review is the same as the effective date of the appraisal under review (see page 1).

**Date of Review Report/Signature:** The date of this review report and the date signed are the same, as shown on page 1 for *Date Review Signed.*

**Contingent and Limiting Conditions:** The subsequent reviewer's certification is subject to the following conditions and such other specific and limiting conditions as are set forth by the Reviewer herein: (1) The Reviewer assumes no responsibility for matters of a legal nature affecting the property which is the subject of this review or the title thereto, nor does the Reviewer render any opinion as to the title, which is assumed to be good and marketable; (2) The Reviewer is not required to give testimony or appear in court because of having made the review, unless such arrangements have been previously made; (3) The Reviewer assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The Reviewer assumes no responsibility for such conditions, or for engineering which might be required to discover such factors; (4) Information, estimates, and opinions furnished to the Reviewer, and contained in this review report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished to the Reviewer can be assumed by the Reviewer; (5) Disclosure of the contents of this report is governed by the *Uniform Standards of Professional Appraisal Practice* (6) Neither all, nor any part of the content of this review report, or a copy thereof (including the conclusions of the review, the identity of the Reviewer, professional designations, reference to any professional appraisal organizations, or the company with which the Reviewer is connected), shall be used for any purposes by anyone but the client specified in this review report, its successors and assigns, professional appraisal organizations, any state or federally approved financial institution, any department, agency, or instrumentality of the United States or any state or the District of Columbia, without the previous written consent and approval of the Reviewer; (7) No change of any item in this review report shall be made by anyone other than the Reviewer and the Reviewer shall have no responsibility for any such unauthorized change; (8) This review was performed for internal purposes of LandSafe Appraisal Services, Inc.; and (9) The Reviewer makes the extraordinary assumption that the factual information contained in the report under review is true and correct.

**Reviewer's Certification:** I certify that, to the best of my knowledge and belief: (1) The facts and data reported by the Reviewer and used in the review process are true and correct; (2) The analyses, opinions, and conclusions in this review report are limited only by the assumptions and limiting conditions stated in this review report and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions; (3) I have no present or prospective interest in the property that is the subject of the work under review and no personal interest with respect to the parties involved; (4) I have no bias with respect to the property that is the subject of the work under review or to the parties involved with this assignment; (5) My engagement in this assignment was not contingent upon developing or reporting predetermined results; (6) My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in this review or from its use; (7) My analyses, opinions, and conclusions were developed and this review report was prepared in conformity with the *Uniform Standards of Professional Appraisal Practice*; (8) I have not made a personal inspection of the Subject Property of the work under review; (9) No one provided significant professional appraisal, appraisal review, or appraisal consulting assistance to the person signing this certification.

**Supervisory Reviewer's Certification:** The Supervisory Reviewer certifies and agrees that: (1) I have read the review and data under consideration and agree with the Reviewer's analysis, opinions, statements, conclusions, and the reviewer's certification. The Supervisory Reviewer may include supporting supplemental information in the review. (2) I accept full responsibility for the contents of this review including, but not limited to, the reviewer's analysis, opinions, statements, conclusions, and the reviewer's certification. (3) The Reviewer and Supervisory Reviewer identified in this review are qualified to perform this review, and capable to perform this review under the applicable state law. (4) This review complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this review was prepared. (5) If this review was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable Federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this review containing a copy or representation of my signature, the review shall be as effective, enforceable and valid as if a paper version of this review were delivered containing my original hand written signature.

*M.Lindsey*

**Reviewer Signature:**

Reviewer Name: MAGGIE LINDSEY StCertRes REA 1371
State Certification #: StCertResREARD1371
Or State License #:
State: FL
Expiration Date of Certification or License: 11/30/2012

**Supervisory Reviewer Signature (only if required):**

Reviewer Name:
State Certification #:
Or State License #:
State:
Expiration Date of Certification or License:

License Verbiage:

**ADDENDUM**

| | |
|---|---|
| Borrower: | Order #: 16025249 |
| Property Address: 1660 RENAISSANCE WAY 2122-B | |
| City: BOYNTON BEACH | State: FL | Zip: 33426 |
| Lender: Bank of America-CLS Title Operations, FR | |

section 1 continued.....

REVISED INTENDED USE:
The intended use of this report is for the client to evaluate the subject property for foreclosure and/or asset

management related purposes.

The appriaser indicates property values are declining with anoveruspply of available properties on the market and marketing time

between 3-6 months. Valuefinder concurs with -17.4% decline in values over the past 12 months in the subjects

zip code.THe MC addendum indicates declining values in the subjects submarket based on current mls data of like

properties and is considered a good value trend indicator.  As a result, time adjustments were applied to the

sales comparables.

The subject is a vacant condo that was originally listed in 09/2009 for $115,000 and gradually reduced to $41000, it is currently in pending status. The subjects condo complex is known to be infected with Chinese Drywall.  The appraiser indicates the subject was reported to have the drywall and also has the "smell" associated with the contaminated  drywall. There is a class action lawsuit filed by the developer and unit owner and the cost of remediation for each unit has not been provided or calculated.  The developer still owns 130 of the 328 units and uses them as rentals.  the unit is a 2007 built 4/2/2 with 1066 sqft. Comp #1 is the most recent similar sale in the subjects development. Comps 2 and 3 are simliar units from an alternate complex that is not infected with with drywall.  Comps 4-6 are current pending sales in the subjects development. OVerall these sales are considered to be reasonable value indicators.  A drywall inspection is recommended to confirm the existence of the drywall.  the estimated market vlaue of $38000 appears reasonable and supported.

Scope of work additional comments: I am licensed in the property state and I have access to appropriate data

sources. I have the knowledge and experience to appraise the subject property with respect to specific property

type and geographical location.  The scope of work of this review allows for the development of an alternate

value by the reviewer

Page 5

# FACSIMILE COVER SHEET

**450 American Street, MSN**
**Simi Valley, California 93065-6285**

*From:*

| | |
|---|---|
| Name: | Yaglowski, Tobias |
| Fax Number: | |
| Voice Phone: | |

*To:*

| | |
|---|---|
| Name: | **DOMENICO BELLITTI** |
| Company: | |
| Fax Number: | **5617343553** |
| Voice Phone: | |

*Fax notes:*

---

Date and time of transmission:  **Tuesday, September 09, 2014 5:20:40**
Number of pages including this cover sheet:  **35**

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL OR EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECIEVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND DESTROY THIS DOCUMENT.                                                              **THANK YOU.**

# Individual Condominium Unit Appraisal Report

File # 11-1046mo

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | |
|---|---|
| Property Address 980 Renaissance Commons Blvd | Unit # 2122  City Boynton Beach  State FL  Zip Code 33426 |
| Borrower N/A | Owner of Public Record Bellato  County Palm Beach |

Legal Description  Villa Lago Condominium  Unit 2122

| | | | |
|---|---|---|---|
| Assessor's Parcel # 08-43-45-17-18-000-2122 | | Tax Year 2010 | R.E. Taxes $ 1994.16 |
| Project Name Villa Lago | Phase # N/A | Map Reference 45-43-17 | Census Tract 58.03 |

Occupant ☐ Owner ☐ Tenant ☒ Vacant   Special Assessments $ N/A   HOA $ 499.90  ☐ per year ☒ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Sell the asking price for deposit as an REO property

Lender/Client  CLS Title Operations, FREM Short Sales/LandSale  Address  430 American St  Simi Valley CA 93065-6285

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☒ Yes ☐ No

Report data source(s) used, offering price(s), and date(s). 

The subject was listed in the MLS on 9/21/09 at $115,000; expired 2/17/11; relisted 3/4/11 at $41,000; shows pending on 3/8/11.  No other listing noted in the MLS within the past 12 months.

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. A current value is being requested by a foreclosure specialist who is not using the report for a mortgage origination or sales transaction. Therefore, a purchase agreement is not available.

| | | | |
|---|---|---|---|
| Contract Price $ | Date of Contract | Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s) | |

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid.

**Note: Race and the racial composition of the neighborhood are not appraisal factors.**

| | | | |
|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☐ Increasing ☒ Stable ☐ Declining | PRICE $(000) | AGE (yrs) | One-Unit 80 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | 2-4 Unit 5 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | 30 Low 3 | Multi-Family 5 % |
| | | 250 High 28 | Commercial 15 % |
| | | 88 Pred. 20 | Other Vac 10 % |

Neighborhood Boundaries

This area lies west of I-95, north of Boynton Beach Blvd., south of Hypoluxo Road and east of Military Trail.

Neighborhood Description

Location is reasonably convenient to employment centers, schools, shopping and normal community amenities.  Protection from detrimental conditions and police and fire protection are adequate as typically available in the market area.  No apparent adverse factors which would affect the subject's marketability were noted.

Market Conditions (including support for the above conclusions)

See Attached Addendum.

| | | | |
|---|---|---|---|
| Topography Level at road area | Size Typical | Density Typical | View Residential |

Specific Zoning Classification SMU   Zoning Description Suburban Mixed Use

Zoning Compliance ☒ Legal ☐ Legal Nonconforming - Do the zoning regulations permit rebuilding to current density? ☒ Yes ☐ No

☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements-Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt/Brick Pvd. | ☒ | ☐ |
| Gas | ☐ | None | Sanitary Sewer | ☒ | | Alley | ☐ | ☐ |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone B  FEMA Map # 120195-0005C  FEMA Map Date 9/30/82

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No  If Yes, describe.

Subject site appears typical and conforming in size and format with many condominiums in the neighborhood.  No survey or title search undertaken; no visually obvious adverse easements or encroachment noted.

Data source(s) for project information  Managers Office

Project Description ☐ Detached ☐ Row or Townhouse ☐ Garden ☒ Mid-Rise ☐ High-Rise ☐ Other (describe)

| | | | |
|---|---|---|---|
| # of Stories 6 | Exterior Walls Conc Stucco | # of Units 328 | # of Phases 1 | # of Planned Phases N/A |
| # of Elevators 2 pax | Roof Surface 3-Tile | # of Units Completed 328 | # of Units 328 | # of Planned Units N/A |
| ☒ Existing ☐ Proposed | Total # of Parking 375 | # of Units for Sale 25 | # of Units for Sale 25 | # of Units for Sale |
| ☐ Under Construction | Ratio (spaces/units) 1.14 | # of Units Sold 198 | # of Units Sold 198 | # of Units Sold |
| Year Built 2007 | Type Covered/Open | # of Units Rented Unkn | # of Units Rented Unkn | # of Units Rented |
| Effective Age 3 | Guest Parking Adeq | # of Owner Occupied Units Unkn | # of Owner Occupied Units Unkn | # of Owner Occupied Units |

Project Primary Occupancy ☒ Principle Residence ☐ Second Home or Recreational ☐ Tenant

Is the developer/builder in control of the Homeowners' Association (HOA)? ☒ Yes ☐ No

Management Group - ☐ Homeowners' Association ☒ Developer ☐ Management Agent - Provide name of management company.

The developer is still in control of the association which includes planned for turning over control.

Does any single entity (the same individual, investor group, corporation, etc.) own more than 10% of the total units in the project? ☒ Yes ☐ No  If Yes, describe

See Attached Addendum.

Was the project created by the conversion of an existing building(s) into a condominium? ☐ Yes ☒ No  If Yes, describe the original use and the date of conversion.

Are the units, common elements, and recreation facilities complete (including any planned rehabilitation for a condominium conversion)? ☒ Yes ☐ No  If No, describe

The subject's common elements for the buildings that have been completed are complete.

Is there any commercial space in the project? ☐ Yes ☒ No  If Yes, describe and indicate the overall percentage of the commercial space.

| | | |
|---|---|---|
| Freddie Mac Form 465  March 2005 | Page 1 of 6  AI Ready | Fannie Mae Form 1073  March 2005 |

## Individual Condominium Unit Appraisal Report

File # 11-1046mo

Describe the condition of the project and quality of construction.
The project appears to be in average condition and adequately maintained; however, it has been reported that the project contains a substantial amount of chinese drywall throughout the individual units and common areas. No functional or external inadequacies were noted at the time of the inspection.

Describe the common elements and recreational facilities.
Pool, spa, clubhouse, social room, fitness center, parking garage, and green areas.

Are any common elements leased to or by the Homeowners' Association? ☐ Yes ☒ No If Yes, describe the rental terms and options.

Is the project subject to ground rent? ☐ Yes ☒ No If Yes, $ _____ per year (describe terms and conditions)

Are the parking facilities adequate for the project size and type? ☒ Yes ☐ No If No, describe and comment on the effect on value and marketability.

I ☐ did ☒ did not analyze the condominium project budget for the current year. Explain the results of the analysis of the budget (adequacy of fees, reserves, etc.), or why the analysis was not performed.
No unusual characteristics are known; however, the condominium documents are budget were not provided for inspection.

Are there any other fees (other than regular HOA charges) for the use of the project facilities? ☐ Yes ☒ No If Yes, report the charges and describe.

Compared to other competitive projects of similar quality and design, the subject unit charge appears ☐ High ☒ Average ☐ Low If High or Low, describe.

Are there any special or unusual characteristics of the project (based on the condominium documents, HOA meetings, or other information) known to the appraiser?
☐ Yes ☒ No If Yes, describe and explain the effect on value and marketability.
No known unusual characteristics; however, condo docs were not made available for appraiser's review.

Unit Charge $ 406.90 per month X 12 = $ 4882.80 per year Annual assessment charge per year per square feet of gross living area = $ 4.58
Utilities included in the unit monthly assessment ☐ None ☐ Heat ☐ Air Conditioning ☐ Electricity ☐ Gas ☒ Water ☒ Sewer ☒ Cable ☐ Other (describe)

| | | | |
|---|---|---|---|
| Floor # 1st | Floors Ct/Cpt Good | Fireplace(s) # | ☒ Refrigerator | ☐ None |
| # of Levels 1 | Walls Drywall Good | Woodstove(s) # | ☒ Range/Oven | ☒ Garage ☐ Covered ☐ Open |
| Heating Type Cent Fuel Elec | Trim/Finish Wood Good | ☐ Deck/Patio | ☒ Disp ☒ Microwave | # of Cars Two |
| ☒ Central AC ☐ Individual AC | Bath Wainscot Ceramic Good | ☒ Porch/Balcony | ☒ Dishwasher | ☐ Assigned ☐ Owned |
| ☐ Other (describe) | Doors Wood Good | ☐ Other | ☒ Washer/Dryer | Parking Space # Unit |

Finished area above grade contains: 4 Rooms 2 Bedrooms 2 Bath(s) 1088 Square Feet of Gross Living Area Above Grade
Are the heating and cooling for the individual units separately metered? ☒ Yes ☐ No If No, describe and comment on compatibility to other projects in the market area.

Additional features (special energy efficient items, etc.)
Granite counters, Wood cabinets, Recessed lights, Security system Balcony.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.)
The subject property appears in overall average condition; however, it was reported to the appraiser that the unit has chinese drywall. Due to this being reported to the appraiser and the "smell" that was noted at the time of inspection it is assumed that the unit does possess chinese drywall. Due to a current class action lawsuit filed by the developer and unit owners the cost of remediation has not been provided or calculated as this is not specific to the subject unit only. No external inadequacies noted during the interior and exterior inspection of the subject.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe.
The subject's project is known to have units that contain chinese drywall. The subject may or may not contain this product; however, it was reported that it does and the "smell" at the time of inspection may confirm this fact. Existence of chinese drywall in the individual unit and the project as a whole adversely affect the subject's marketability.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe.

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s) Public Records, MLS, ISC
My research ☒ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s) Public Records, MLS, ISC
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | No prior sales | 10/10 | 10/10 | 09/10 |
| Price of Prior Sale/Transfer | history in the past 36 | 100 | 100 | 64600 |
| Data Source(s) | months | Public Records | Public Records | Public Records |
| Effective Date of Data Source(s) | 03/11 | 03/11 | 03/11 | 03/11 |

Analysis of prior sale or transfer history of the subject property and comparable sales.
There are no known prior sales of the subject within the past 36 months. There are no other known prior sales of the comparable sales within the past 12 months. The prior transactions of the sales was the recording of foreclosure proceedings and not arms length transactions. The use of foreclosure sales was unavoidable and does not adversely affect the current estimate of value.

## Individual Condominium Unit Appraisal Report

File # 11-1046/mo

There are __41__ comparable properties currently offered for sale in the subject neighborhood ranging in price from $ __40000__ to $ __179900__

There are __21__ comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ __40000__ to $ __118000__

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 1660 Renaissance Commons Blvd | 1660 Renaissance Commons Blvd | | 2 Renaissance Way | | 2 Renaissance Way | |
| Unit # | 2122 | 2218 | | 215 | | 105 | |
| Project Name and Villa Lago | Villa Lago | Villa Lago | | San Raphael | | San Raphael | |
| Phase | 1 | 1 | | 1 | | 1 | |
| Proximity to Subject | | 0.00 MILES | | 0.42 MILES GSW | | 0.42 MILES GSW | |
| Sale Price | $ | | $ 46199 | | $ 41000 | | $ 75100 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 35.45 sq. ft. | | $ 75.98 sq. ft. | | $ 60.56 sq. ft. | |
| Data Source(s) | | Public Records | | Public Records | | Public Records | |
| Verification Source(s) | | MLS/SBC/Realtor/R3149684 | | MLS/SBC/Realtor/R3147307 | | MLS/SBC/Realtor/R3150388 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sale or Financing | | Cash | | Cash | | Cash | |
| Concessions | | No Str. Concess. | -1400 | No Str. Concess. | | No Str. Concess. | |
| Date of Sale/Time | | 12/19/10 CoE | Adj. Below | 03/07/11 CoE | No Adj. | 12/30/10 | Adj. Below |
| Location | Suburban | Suburban | | Suburban | | Suburban | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| HOA Mo. Assessment | $406.90 | 498 | | 450 | | 437 | |
| Common Elements | Pool/Clubhouse | Pool/Clubhouse | | Pool/Clubhouse | | Pool/Clubhouse | |
| and Rec. Facilities | Common Areas | Common Areas | | Common Areas | | Common Areas | |
| Floor Location | 1st Floor | 2nd Floor | No Adj. | 2nd Floor | No Adj. | 1st Floor | |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | Flat | Flat | | Flat | | Flat | |
| Quality of Construction | Good | Good | | Good | | Good | |
| Actual Age | 2007 | 2007 | | 2006 | | 2006 | |
| Condition | Average/Chinese | Average/Chinese | | Average | 30000 | Average | 30000 |
| Above Grade | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths |
| Room Count | 4 | 2 | 2 | 4 | 2 | 2 | 4 | 2 | 2 | 4 | 2 | 2 |
| Gross Living Area | 1096 sq. ft. | 1340 sq. ft. | -5200 | 1066 sq. ft. | 0 | 1240 sq. ft. | -5200 |
| Basement & Finished | N/A | N/A | | N/A | | N/A | |
| Rooms Below Grade | | DOM: 19 | | DOM: 507 | | DOM: 14 | |
| Functional Utility | Average | Typical | | Typical | | Average | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Typical | Adequate | | Typical | | Typical | |
| Garage/Carport | 2-Garage | 2-Garage | | 2-Garage | | 2-Garage | |
| Porch/Patio/Deck | Balcony | Balcony | | Balcony | | Balcony | |
| Sellers Name | Bellletti | Bellletti | | Chase Home | | Merit Adjust Tr | |
| Contract Date | 03/08/11 | 11/20/11 | 1800 | 1/14/11 | No Adj. | 2/27/10 | 2300 |
| RHEqp/Upgrd | Typical | Similar | | Similar | | Similar | |
| Net Adjustment (Total) | | [ ] + [X] - | $ 9400 | [X] + [ ] - | $ 30000 | [ ] + [X] - | $ 37500 |
| Adjusted Sale Price | | Net Adj. -18.5 % | | Net Adj. 37.0 % | | Net Adj. 49.9 % | |
| of Comparables | | Gross Adj. 16.9 % | $ 36799 | Gross Adj. 37.0 % | $ 51000 | Gross Adj. 49.9 % | $ 37600 |

Summary of Sales Comparison Approach

Sale 1 is from the subject's project/building and was similarly affected by chinese drywall. Sales 2 and 3 are from a competing project that was not affected by chinese drywall. The adjustment made is inclusive of the cost to remediate and the stigma perceived by the market for this condition. Comparables 4 - 6 are pending sales from the subject's project that have similar chinese drywall. The contract amount for sale 4 was provided by the listing agent; however, the closing date is not scheduled at this time. All of the comparables were given consideration in the value estimate as they have varying degrees of comparability with the subject. Please see the attached addendum.

Original list price and contract date of sales: 1) $44,900, 2) $22,000, 3) $74,000

Indicated Value by Sales Comparison Approach $ __33000__

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

Estimated Monthly Market Rent $ __N/A__    X Gross Rent Multiplier __N/A__    = $ __N/A__ Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)

N/A

Indicated Value by: Sales Comparison Approach $ __33000__    Income Approach (if developed) $ __N/A__

All weight is placed on the Sales Comparison Approach which best reflect the actions of the marketplace. The Cost and Income Approaches are not applicable in this instance. No consideration was given to non-realty/personal property.

This appraisal is made [X] "as is", [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

This is a Summary Report subject to the attached Limiting Conditions and Certification. Personal property was not considered in the estimate of value.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ __33000__ , as of __March 28, 2011__ , which is the date of inspection and the effective date of this appraisal.

## Individual Condominium Unit Appraisal Report

File # 11-1046mo

This report form is designed to report an appraisal of a unit in a condominium project or a condominium unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject unit, (2) inspect and analyze the condominium project, (3) inspect the neighborhood, (4) inspect each of the comparable sales from at least the street, (5) research, verify, and analyze data from reliable public and/or private sources, and (6) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**Individual Condominium Unit Appraisal Report**

File # 44-1046/no

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) as predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

## Individual Condominium Unit Appraisal Report

File # 11-1046mb

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable, and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name Matthew S. Osborne | Name |
| Company Name Allstate Appraisal Group | Company Name |
| Company Address 1500 NW 3rd Street, 101 | Company Address |
| Deerfield Beach FL 33442 | |
| Telephone Number 954-596-8759 | Telephone Number |
| Email Address MSO@FDN.com | Email Address |
| Date of Signature and Report 03/31/2011 | Date of Signature |
| Effective Date of Appraisal March 28, 2011 | State Certification # |
| State Certification # St.Cert.Res.REA RD2746 | or State License # |
| or State License # | State |
| or Other _____ State # _____ | Expiration Date of Certification or License _____ |
| State FL | |
| Expiration Date of Certification or License 11/30/2012 | **SUBJECT PROPERTY** |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 1860 Renaissance Commons Blvd | Date of Inspection |
| Boynton Beach FL 33426 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY $ 38000 | Date of Inspection |
| LENDER/CLIENT | **COMPARABLE SALES** |
| Name CLS Title Operations; FREM Short Sales/LandSafe Appraisal Services | ☐ Did not inspect exterior of comparable sales from street |
| Company Name CLS Title Operations; FREM Short Sales/LandSafe | ☐ Did inspect exterior of comparable sales from street |
| Company Address 450 American St. Simi Valley CA 93065-6285 | Date of Inspection |
| Email Address | |

## Individual Condominium Unit Appraisal Report

File # 11-1046/mo

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 1660 Renaissance Commons Blvd. | 1660 Renaissance Commons Blvd. | | 1690 Renaissance Commons Blvd. | | 1660 Renaissance Commons Blvd. | |
| Unit # | 2122 | 2416 | | 1202 | | 2106 | |
| Project Name and | Villa Lago | Villa Lago | | Villa Lago | | Villa Lago | |
| Phase | 1 | 1 | | 1 | | 1 | |
| Proximity to Subject | | 0.00 MILES SSW | | 0.00 MILES WNW | | 0.00 MILES SSW | |
| Sale Price | $ | | $ 41000 | | $ 40000 | | $ 48500 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 38.45 sq. ft. | | $ 32.26 sq. ft. | | $ 45.50 sq. ft. | |
| Data Source(s) | | Public Records | | Public Records | | Public Records | |
| Verification Source(s) | | MLS/ISC/Realtor/R2112454 | | MLS/ISC/R3089483 | | MLS/ISC/R2177326 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sale or Financing Concessions | | Pending Sale | | Pending | | Pending | |
| Date of Sale/Time | | Price Provided | No Adj. | Sale (-2%) | -800 | Sale (-2%) | -1000 |
| Location | Suburban | Suburban | | Suburban | | Suburban | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| HOA Mo. Assessment | $406.90 | 450 | | 400 | | 531 | |
| Common Elements and Rec. Facilities | Pool,Clubhouse Common Areas | Pool,Clubhouse Common Areas | | Pool,Clubhouse Common Areas | | Pool,Clubhouse Common Areas | |
| Floor Location | 1st Floor | 4th Floor | No Adj. | 2nd Floor | No Adj. | 1st Floor | |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | Flat | Flat | | Flat | | Flat | |
| Quality of Construction | Good | Good | | Good | | Good | |
| Actual Age | 2007 | 2007 | | 2007 | | 2007 | |
| Condition | Average/Chinese | Average/Chinese | | Average/Chinese | | Average/Chinese | |
| Above Grade | Total | Bdrms. | Baths | Total | Bdrms. | Baths | |
| Room Count | 4 | 2 | 2 | 4 | 2 | 2 | |
| Gross Living Area | 1066 sq. ft. | 1066 sq. ft. | 0 | 1240 sq. ft. | 5200 | 1066 sq. ft. | 0 |
| Basement & Finished Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| | DOM: 19 | DOM: 127 | | DOM: 730 | | DOM: 35 | |
| Functional Utility | Average | Typical | | Typical | | Typical | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Typical | Adequate | | Adequate | | Adequate | |
| Garage/Carport | 2-Garage | 2-Garage | | 2-Garage | | 2-Garage | |
| Porch/Patio/Deck | Balcony | Balcony | | Balcony | | Balcony | |
| Sellers Name | Bellelli | Zhou | | Leone | | Aurora Loan Srvc | |
| Contract Date | 03/08/11 | 01/07/11 | No Adj. | 3/2/11 | No Adj. | 03/28/11 | No Adj. |
| Kit./Equ/Appnt | Typical | Similar | | Similar | | Similar | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 0 | ☐ + ☒ - | $ 6000 | ☐ + ☒ - | $ 1000 |
| Adjusted Sale Price of Comparables | | Net Adj. 0.0 % Gross Adj. 0.0 % | $ 41000 | Net Adj. 15.0 % Gross Adj. 15.0 % | $ 34000 | Net Adj. 2.1 % Gross Adj. 2.1 % | $ 47500 |

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | No prior sales | 10/10 | 10/10 | 10/10 |
| Price of Prior Sale/Transfer | history in the past 36 | 100 | 100 | 100 |
| Data Source(s) | months | Public Records | Public Records | Public Records |
| Effective Date of Data Source(s) | 03/11 | 03/11 | 03/11 | 03/11 |

Summary of Sales Comparison Approach

## ADDITIONAL LISTINGS

File # 11-7046mo

| FEATURE | SUBJECT | LISTING # 1 | | LISTING # 2 | | LISTING # 3 | |
|---|---|---|---|---|---|---|---|
| Address | | | | | | | |
| Proximity to Subject | | | | | | | |
| List Price | $ | $ | | $ | | $ | |
| List Price/Gross Liv. Area | $  sq.ft. | $  sq.ft. | | $  sq.ft. | | $  sq.ft. | |
| Last Price Revision Date | | | | | | | |
| Data Source(s) | | | | | | | |
| Verification Source(s) | | | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sale or Financing Concessions | | | | | | | |
| Days on Market | | | | | | | |
| Location | | | | | | | |
| Leasehold/Fee Simple | | | | | | | |
| Site | | | | | | | |
| View | | | | | | | |
| Design (Style) | | | | | | | |
| Quality of Construction | | | | | | | |
| Actual Age | | | | | | | |
| Condition | | | | | | | |
| Above Grade | Total  Bdrms.  Baths | Total  Bdrms.  Baths | | Total  Bdrms.  Baths | | Total  Bdrms.  Baths | |
| Room Count | | | | | | | |
| Gross Living Area | sq.ft. | sq.ft. | | sq.ft. | | sq.ft. | |
| Basement & Finished Rooms Below Grade | | | | | | | |
| Functional Utility | | | | | | | |
| Heating/Cooling | | | | | | | |
| Energy Efficient Items | | | | | | | |
| Garage/Carport | | | | | | | |
| Porch/Patio/Deck | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ +  ☐ - | $ | ☐ +  ☐ - | $ | ☐ +  ☐ - | $ |
| Adjusted Listing Price of Comparables | | Net Adj.  %  Gross Adj.  % | $ | Net Adj.  %  Gross Adj.  % | $ | Net Adj.  %  Gross Adj.  % | $ |

| ITEM | SUBJECT | LISTING # 1 | LISTING # 2 | LISTING # 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | | | | |
| Effective Date of Data Source(s) | | | | |

Comments

TEXT ADDENDUM

File No. 11-1046mc

| Borrower/Client | N/A |
| Property Address | 1660 Renaissance Commons Blvd. |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33426 |
| Lender | CLS Title Operations, FREM Short Sales/LandSafe Appraisal Services | | | CLS Title Operations, FREM Short Sales/LandSafe Appraisal Services |

Form data: Type of Appraisal
Altair Appraisal Group

**Neighborhood Market Conditions**
General market conditions in the neighborhood have contracted over the past 12 to 24 months as indicated in MLS and Public Records with declining property values. Foreclosure and "short sale" activity is noted to be increasing and becoming common type of transaction. Supply currently is greater than demand with seller concessions and special financing incentives available on individual properties from motivated sellers.

**Single Entity Owns More Than 10% of Units**
The developer still owns 130 of the 326 units that are complete. Public records does not indicate any other entity owning greater than 10% of the units.

Form data: Amenities: Porch/Balcony
Yes

**Comments on Sales Comparison**
SCOPE OF WORK - INDIVIDUAL CONDOMINIUM UNIT (1073)
 The Individual Condominium Unit Appraisal (1073) Report Scope of Work is a combination of the scope of work stated in the 1073 form, (March 2005 version), LandSafe Engagement Letter Instructions, and the LandSafe Appraisal Development and Reporting Standards specified below to provide an opinion of market value.
LandSafe Appraisal Development and Reporting Standards for 1073:
1. Utilize the Fannie Mae 1073 Form
1 The subject property is an individual condominium unit; therefore, the Fannie Mae 1073 form is utilized. Contact the LandSafe Scheduler if the subject is a different property type.
The appraiser must provide a written summary of their analysis and conclusions in compliance with the Uniform Standards of Professional Appraisal Practice (USPAP).
2. Subject Information
Assessor's Parcel number - Provide the parcel number assigned by the local tax assessor. For those areas that do not have assessor numbers, utilize the tax identification number. Combined parcel ID numbers must be explained.
Legal Description - Enter the actual legal description; if lengthy indicate "see attached addendum" and include the description as an attachment. Do not submit the report without a legal description.
Neighborhood Name - Neighborhood name is to be the PUD name or subdivision name or commonly known local neighborhood description.
3. Contract Analysis - If the appraisal assignment is for a purchase transaction, the LandSafe Appraiser must:
Obtain a legible copy of the most recent version of the subject's complete, signed, and fully ratified sales contract, including all addenda, and riders.
Analyze the contract for sales concessions, HOA dues or PITI paid on behalf of the borrower, inclusion of personal property, credits to the buyer, non-standard clauses, etc. If any of these items are present in the contract, or if there is any indication that the sale was not an arm's-length transaction, the appraiser must consider, analyze, and report the impact on the price paid for the property.
If the contract is not provided by LandSafe or the lender, the appraiser must attempt to obtain the contract from the real estate agent/broker, builder, buyer, seller, etc.
In the case of new construction, a builder sales summary report or contract summary is not sufficient and does not satisfy the requirement for obtaining and analyzing the sales contract.
The appraiser must contact the LandSafe Scheduler if a contract can not be obtained. Do not submit a completed appraisal without obtaining and analyzing the sales contract.
If a sales contract can not be obtained and the order is cancelled, the appraiser will be compensated for work completed.
4. Inspection and Reporting of the Subject Neighborhood
The LandSafe Appraiser must inspect the subject neighborhood.
Provide a description of the North, South, East, and West boundaries of the neighborhood.
5. Subject Project Site
The appraisal must include the actual size of the subject project site and not a hypothetical portion of the site.
The project site should be of a size, shape, and topography that is generally conforming and acceptable in the market area. It must have comparable utilities, street improvements, and adequate vehicular access. Provide descriptive comments on any marketability issues.
Site dimensions and area should, at a minimum, be verified by public records or a reliable source that is disclosed in the appraisal report.
Adverse site conditions, such as a busy street, commercial uses, railroad tracks, power lines, airport, land uses, or environmental concern that impact

***CONTINUED ON NEXT PAGE***

TEXT ADDENDUM

| | | File No. 17-1046ms |
|---|---|---|
| Borrower/Client | N/A | |
| Property Address | 1660 Renaissance Commons Blvd. | |
| City | Boynton Beach | County Palm Beach  State FL  Zip Code 33426 |
| Lender | CLS Title Operations; FREM Short Sales/LandSafe Appraisal Services  CLS Title Operations; FREM Short Sales/LandSafe Appraisal Services |

the marketability of the subject must be addressed in the Site Section of the appraisal report.

6. Zoning

Describe what the specific zoning classification used by the local municipality or jurisdiction (For example: R-1 = Residential - Single Family).

If no zoning, please state whether this is common to the area, whether it is typical for properties to be rebuilt if destroyed in areas the subject's area, and describe the prevalent use of sites in the neighborhood and surrounding the subject property.

Legal, Non-conforming use - If the subject property's zoning is Legal, non-conforming, provide answers to the following:

Why the property is non-conforming?

Does the non-conformity affect the value and/or marketability?

Could the property be 100% re-built if partially or completely destroyed?

7. Inspection and Reporting of the Subject Property Improvements

The LandSafe Appraiser must perform a complete visual inspection of the interior and exterior areas of the subject property.

The LandSafe Appraiser must measure the interior of the condominium residence.

You must provide sufficient description to adequately identify the subject as to the physical and economic property characteristics relevant to the assignment.

Reporting of the condition of the subject must be factual and descriptive.

For the current subject condition, the appraiser must provide an explanation of what factors are contributing to a "fair" or "poor" rating on the subject property.

If there is evidence of structural settlement, such as hairline cracks, "mark the appropriate box" and provide a comment in the Improvement Section regarding whether or not this appears to be typical settlement due to the age and location of the property, If there are signs of water damage or excessive dampness or structural integrity concerns, "mark the appropriate box", provide a comment describing the issue, and make the report "subject to repair" or "subject to inspection" in the Reconciliation Section.

8. Reporting Year Built (Date of Completion) - Appraiser must report the subject improvements' date of completion

1 If the subject property was completed less than 12 months prior to the appraisal date, report both the month and year completed (in MM/YYYY format; for example: 09/2008).

2 If the subject property was completed more than 12 months prior to the appraisal date, report only the year completed (in YYYY format)

If the subject property is not completed on the date of appraisal (proposed construction), report the expected month and year of completion (as specified above)

9. Project Data Analysis

The LandSafe Appraiser must analyze pertinent project data such as:

Development Status (completed?, conversion of an existing building?, etc.)

Current Ownership Status (How many units owned by developer, individuals, or investors?)

Common Areas/Amenities in the condo project (pools, fitness centers, park areas, etc.)

Overall Project Condition

The LandSafe Appraiser is required to contact LandSafe before completing assignment If Condotel features are observed, such as:

Registration desk

Concierge Service

Maid service

Food service

Availability of a Bellman and/or other room services

Signage advertising available units for short term rental periods.

Limited owner use

Existence of a Rental Pool (permits sharing revenues between the Management Firm and the unit owner(s).

Controlled by a Management Firm that establishes budgets and rental rates for the entire property.

Internet web sites advertising unit availability in the subject project

3 10. Sales Comparison Approach Section - if the LandSafe Appraiser is unable to provide any of the following items, a detailed explanation is required.

4 Comparable Sale Selection

The LandSafe Appraiser must inspect the comparables sales, listings, pendings and rentals selected for the appraisal. Select comparable sales, listings, pendings, and rentals based on their proximity to the subject property and physical similarities - The LandSafe Appraiser must analyze and present relevant or current market data.

Comparable sales, listings, pendings and rentals must not be selected based on a suggested sales price or range of prices. The appraiser must utilize the sales in the appraisal that will result in the most credible opinion of market value.

A minimum of three (3) comparable sales that closed within 12 months of

***CONTINUED ON NEXT PAGE***

TEXT ADDENDUM                                              File No.  T7-1046mc

| Borrower/Client | N/A |
| Property Address | 1660 Renaissance Commons Blvd |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33426 |
| Lender | CLS Title Operations; FREM Short Sales/LandSafe Appraisal Services | CLS Title Operations; FREM Short Sales/LandSafe Appraisal Services |

the effective date of the appraisal must be included in the Sales Comparison Approach grid - more than three may be necessary to adequately support the opinion of market value. Use sales that closed within 90 days of the date of the appraisal report, if available. Additional sales may be required to produce a credible appraisal report.

Always use comparable sales from the subject neighborhood, if available. If the appraisal includes comparable sales located outside the neighborhood/ market area when closer comparables sales appear to be available in MLS or public records, the appraiser must provide an explanation as to why these specific sales were used in the report. In addition, when using sales outside of the neighborhood the appraiser must:

o Provide market evidence that show the similarities or differences between the subject's neighborhood and neighborhood of the sales located outside.

o The comparison should include differences or similarities in:

a. Housing price ranges

b. Predominant value variation

c. Property characteristics (design, market appeal, quality of construction).

Location adjustments must be explained and supported.

Do not expand the subject neighborhood boundaries to encompass these sale - clearly state that these sales were outside of the defined subject neighborhood boundaries.

5 Provide paired sales analysis of similar sales in the neighborhood to similar sales in the competing neighborhood that occurred in a similar time frame to support location differences.

6 The comparables must bracket the subject by gross living area and gross sale price or the differences should result in minimal adjustments. Do not make unsupported across the board adjustments.

If the subject property is near an adverse influence, such as railroad tracks, freeways, flight paths of an airport, shopping centers or commercial, at least one of the comparable sales and one active listing (when available) with a similar adverse influence must be presented in the appraisal report.

7 Comparable sales similar in condition and design as the subject property must be presented in the appraisal. Additional comparable selection requirements may apply - if applicable, these requirements will be noted in the Lender Specific Appraisal Assignment Conditions in the body of the Engagement Letter.

Listing or Pending Comparable(s) Requirement

8 The LandSafe Appraiser must include a competitive listing or pending sale in addition to a minimum of three closed sales.

9 Display the listing or pending sale data on a Sales Comparison grid as comparable 4-6 using an Additional Comparable Sales page and label the data as LISTING OR PENDING under "Date of Sale/Time" field.

10 Adjust for differences between the subject and the listing/pendings features.

11 If appropriate in the subject's market, adjust the listing price appropriately using the typical sale-to-listing price ratio adjustment that is occurring in the market area.

12 Additional Listings or Pending requirements may apply - if applicable, these requirements will be noted in the Lender Specific Appraisal Assignment Conditions or in the body of the Engagement Letter.

Reporting Requirements

Report the total number of Days on the Market (DOM) on all comparable sales, listings, or pendings, in the "Sales or Financing Concessions" field, if available. Provide an explanation for DOM that do not approximate time frames reported in the Neighborhood section of the appraisal report or that do not coincide with the DOM noted in the Market Conditions Addendum (1004MC), if applicable.

Substantial adjustments must be supported by data presented in the appraisal report and supported by narrative explanation.

Adjustments to the comparable must be made for special or creative financing or sales concessions.

1 No adjustments are necessary for those costs which are normally paid by sellers. These costs are readily identifiable since the seller pays these costs in virtually all sales transactions.

An increase in the number of sellers providing concessions may be indicative of declining market conditions and does not necessarily set a baseline of typical concessions being paid but rather reflects the reduction in profit by the seller. Adjustments for time may be considered in the adjustment for concessions or vice versa; either way, the adjustments must be explained and supported.

Adjustments are based on


***CONTINUED ON NEXT PAGE***

TEXT ADDENDUM

| | | File No. | 11-1046 |
|---|---|---|---|
| Borrower/Client | N/A | | |
| Property Address | 1660 Renaissance Commons Blvd. | | |
| City | Boynton Beach | County Palm Beach | State FL Zip Code 33426 |
| Lender | CLS Title Operations; FREM Short Sales/LandSafe Appraisal Services   CLS Title Operations; FREM Short Sales/LandSafe Appraisal Services | | |

the market's reaction to the concession and not mechanical dollar for dollar adjustments.
Do not use unknown in the appraisal report
2 Calculate a market condition adjustment from the comparable's contract date; adjustments must be supported and consistent with market conditions that are described in the Neighborhood section. Indicate if the date in the grid reflects the Contract Date (CD) or Sale Date/Close to Escrow Date (COE). Report both the Contract Date and the Sale Date/Close to Escrow Date when adjustments for contract date are required.
Fully disclose the actual age of the comparable. If effective age is different from the actual age, the appraiser must explain the difference. When adjustments are made to the comparable for effective age, the appraiser must provide an explanation for the adjustment and the condition of the property.
Quality of construction description must correspond to typical cost data ratings (e.g. Good, Fair, Average - Not equal or similar).
Use a condition rating of "Poor, Fair, Average, Good, or Excellent" to describe the subject property's condition - Do not use "Below Average" or "Average (-)" condition for the subject property. The comparables may be rated as Poor, Fair, Fair to Average, Average (-), Average, Average (+), Good (+), or Excellent. Describe condition differences between the subject and the comparables and make appropriate market supported adjustments.
Provide support if the opinion of value is notably higher than the predominant value in the market - describe the superior attributes that place the subject in the higher range. The appraiser must demonstrate and support the contributory value of the subject improvements by comparing them to other similar sales in the subject's market area.
If any sale closed >6 months prior to the date of the appraisal, the appraiser must provide documentation and explanation as to why more recent sales were unavailable in the subject's market area.
If there are limitations in obtaining sales or listing data, summarize the sources and research completed to give the client a better understanding of the availability of historical sales and listed properties in the subject's market area.
An explanation must be provided if adjustments exceed 25% on gross adjustments, 15% net adjustments, or 10% line item adjustment. Explanations are to be consistent, logical and market supported.
3 Reconcile the adjusted values of active listings or pending sales with the adjusted values of the settled sales provided. If the adjusted values of the settled comparables are higher than the adjusted values of the active listings or pending sales, the appraiser must determine if a market condition adjustment is appropriate. The final value conclusion should not be based solely on the comparable listing or pending sales data.

11. Verification of Comparable Sales
1 Comparable sales used in the appraisal report be verified by reliable sources who were involved in the sale.
The appraiser must verify, from a disinterested party, all information in the appraisal report that was provided by parties who have a financial interest in the sale or financing of the subject property.
When appraising new construction, the appraiser may need to rely on the builder of the property they are appraising to provide them with comparable sales data, as this data may not yet be available through typical data sources such as courthouse records, MLS, etc. In this scenario the appraiser should verify the transaction of the comparable sale by viewing a copy of the HUD-1 settlement statement.
The source used to verify sales must be documented in the work file and summarized in the appraisal report.
Note: MLS is a data source but is not considered a verification source
12. Prior Subject Sale and Comparable History Analysis
The sale history of the subject, at least 3 years prior to the effective date of the report, must be analyzed and reported.
The sale history of the comparable sales, at least 1 year prior to the date of the comparable sale, must be analyzed and reported.
Significant value changes indicated by the sales history analysis must be reconciled in the appraisal report.
13. Cost Approach - The Cost Approach is not applicable in the valuation of an individual condominium unit. The appraiser is to provide an explanation that the Cost Approach is not required.
14. Site Value - The site

***CONTINUED ON NEXT PAGE***

TEXT ADDENDUM                                                    File No. 11-1048810

| Borrower/Client | N/A |
| Property Address | 1660 Renaissance Commons Blvd. |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33426 |
| Lender | CLS Title Operations, FREM Short Sales/LandSafe Appraisal Services | | CLS Title Operations, FREM Short Sales/LandSafe Appraisal Services |

value is not applicable in the valuation of an individual condominium unit.

15. Income Approach - The Income Approach should be considered in the valuation of an individual condominium unit. The appraiser is to provide an explanation if the Income Approach is not developed.

16. Completion of Appraisal and Signature

The assigned LandSafe Appraiser must develop and complete the appraisal report, inspect the interior of the subject, and the exterior of the comparables, and sign the appraisal certification.

The LandSafe Appraiser must disclose anyone that provided significant assistance in the development of the appraisal report.

The assigned LandSafe Appraiser is allowed to sign as the Supervisory Appraiser under the following conditions:

The signature page indicates:

o Did inspect interior and exterior of subject property

o Did inspect exterior of comparables sales from street

If a trainee signs as the appraiser, it must be acceptable under State law.

Note: Even though the assigned approved LandSafe appraiser may sign as the Supervisory Appraiser, LandSafe reserves the right to restrict an unapproved appraiser from assisting with the completion of a LandSafe appraisal assignment.

17. State Licensing and Certification Requirements

1 If a certified appraiser is required for this assignment, it may be completed by either a state certified general appraiser or a state certified residential appraiser.

2 All other assignments may be completed by either a state certified general appraiser, a state certified residential appraiser or a state licensed appraiser who has met the Appraiser Qualification Board (AQB) standards for licensure.

3 The licensed or certified appraiser must inspect the property and sign the report

18. Subject Property Photos

At a minimum, at least 3 photos of the exterior including views of the front, rear, street scene, and any amenities or deficiencies that substantially affect marketability and/or value must be included in the appraisal report.

Photographs of all improvements must be taken of the exterior and should be taken of the interior.

Always take photos, interior or exterior, of any significant deferred maintenance or required repair items and present them in the appraisal.

Photographs must be taken of common areas and project amenities.

19. Comparable Property Photos

The appraiser must personally take a front view photo of all comparable sales, pendings, rentals, and listings presented in the appraisal report and provide those photos in the report. Photos may be black and white or color, but must be clear and descriptive.

If access to the comparable property is not possible or the comparable is not visible from a public street, a photo of the entrance or what the appraiser is able to view (e.g. the entrance gate of the community, distant view of the comparable or obstructed view of the comparable) must be presented in the report. Supplemental photos of the comparables from other sources may be provided in the additional photo pages of the report. The source of the supplemental photos must be disclosed.

20. Sketch of Improvements

A floor plan sketch with dimensions and living area calculations (above and below grade) must be included in the appraisal report.

Include in the sketch structures such as patios, porches, basements, attached or detached garages, accessory units and offsets.

State "covered" or "uncovered" to indicate roof or no roof (such as over a patio).

Always include the room locations on the sketch.

Interior walls should be included in the sketch and are required if the floor plan is atypical or if a functional problem is identified.

21. Location Map

A location map must be included in the appraisal report and at a minimum, show accurate locations of the subject property and all comparable sales and listings used in the appraisal.

The scale of the map should be large enough to delineate the subject's neighborhood boundaries and identify changes in development patterns and land use.

22. Fair Housing and Nondiscriminatory Compliance

The LandSafe Appraiser is required to consider all factors that have an effect on value and to be objective and unbiased in his or her development of the opinion of market value in the appraisal report.

Under no circumstances can appraisal commentary, the appraisal analysis, or the opinion of value be based on the race, color, religion,

***CONTINUED ON NEXT PAGE***

TEXT ADDENDUM

File No.  11-104696

| Borrower/Client | N/A |
| Property Address | 1660 Renaissance Commons Blvd. |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33426 |
| Lender | CLS Title Operations; FREM Short Sales/LandSafe Appraisal Services | | CLS Title Operations; FREM Short Sales/LandSafe Appraisal Services |

national origin, gender, familial status, marital status, age, receipt of public assistance income or handicap of residents of the neighborhood or the various parties involved in the transaction.

The appraiser's comments that address an unfavorable condition - such as the existence of an adverse environmental or economic factor - must discuss how the condition affects the value and/or marketability of the property being appraised in factual terms and explain how the condition was taken into consideration in the valuation process. Comparables should be analyzed with similar conditions.

An appraiser must not use subjective phrases or comments in the appraisal report. Examples of unacceptable terminology include "pride of ownership, no pride of ownership, lack of pride of ownership, poor neighborhood, good neighborhood, crime-ridden area, desirable neighborhood or location, and undesirable neighborhood or location. Other subjective terminology that can result in erroneous conclusions being reached.

People should not appear in any photographs.

23. Other data necessary to provide an adequately supported, credible report - If comments needed to support opinions stated do not fit within the spaces provided in the appraisal report, additional comments must be detailed and appropriately referenced in the Addendum.

**Intended User**

The Intended User of this appraisal report is the Lender/Client. The Intended Use is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and Definition of Market Value. No additional Intended Users are identified by the appraiser.

**Intended Use**

The appraisal will be used: as the basis to set the asking price for the subject property for its disposal as an REO property and to determine the financial feasibility of making repairs or to evaluate a Short Sale transaction. The appraisal may also be used for mortgage lending purposes.

**Extent of Appraisal Process**

The appraisal is based on a physical inspection of the neighborhood and the subject property, information gathered from public and private records and subsequent exterior inspection of the comparable sales. The data obtained are verified through public records, published and on-line information services, and sources involved or familiar with each respective transfer.

**State Certification**

One or more of the appraisers identified herein are certified under Florida Statute 475.610 through 475.630. Accordingly, the Certification herein is amended to include the following:

- The analyses, opinions, and conclusions were developed and this report has been prepared in conformity with the requirements of the State of Florida for state-certified appraisers.

- The use of the report is subject to the requirements of the State of Florida relating to review by the  Florida Real Estate appraisal Board.

**Subject Property Information**

The appraisers make no guarantees or warranties as to whether the improvements to the subject site have been properly permitted in accordance with the applicable count and/or municipal governing body. The appraiser assume that all improvements to the subject site have been properly permitted and are in compliance with the proper governing body. The appraisers accept no responsibility for any disputes which may arise over any such issue.

**Estimated Marketing Time of Subject**

The estimated marketing time for the subject is 3 to 6 months. This is the amount of time necessary to exposed a property to the open market in order to achieve a sale. Implicit in this definition are the following characteristics:

- The property will be actively exposed and marketed to potential purchasers through marketing  channels commonly used by sellers of similar type properties.

The property will be offered at a price reflecting the most probable mark-up over market value used by sellers of similar type properties.

A sale will be consummated under the terms and conditions of the definition of market value.

**APPRAISAL PROCESS**

**The Sales Comparison Approach**

The Sales Comparison Approach is based on the comparison of the subject property with sales of similar properties. Adjustments are made to each of the sales to equate differences with the subject. This is generally

***CONTINUED ON NEXT PAGE***

TEXT ADDENDUM                          File No. 11-1046mo

| Borrower/Client | N/A |
| Property Address | 1650 Renaissance Commons Blvd. |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33426 |
| Lender | CLS Title Operations, FREM Short Sales/LandSafe Appraisal Services | | CLS Title Operations, FREM Short Sales/LandSafe Appraisal Services |

considered the most reliable approach to value for this property type.

Due to the location and physical characteristics of the subject property, an extended sales search was required with specific respect to date of sale and/or proximity to the subject. Those sales utilized were considered to be the most comparable recent sales in reasonable proximity to the subject available as of the effective date of valuation.

Although the number and magnitude of individual adjustments is larger than desired, each individual adjustment was extracted from the market and was considered reflective of current market trends. The sales utilized were considered the most comparable sales available as of the effective date of valuation and remain reliable value indicators.

Adjustments to the comparables conditions are based on Realtor information. All adjustments are market derived. All sales were given consideration in the final value estimate.

The Cost Approach

The subject property is an individual unit within a condominium complex, the cost approach is not applicable.

The Income Approach

The Income Approach is a primary method of estimating the value of income-producing properties, which are usually purchased for investment purposes. When the Income Approach is deemed inappropriate for a particular assignment, it is so noted. This determination is based on the type of predominant occupancy (owner versus tenant) and the availability of accurate rental data. In neighborhoods where most homes are owner-occupied (and therefore not purchased for income production), the Income Approach is not applied due to the lack of sufficient rental data.

Flood Map Statement

Since the flood maps published by the National Flood Insurance Program are vague and poorly defined in some areas, the Appraiser has used his best judgement as to the subject property both by visual inspection and plotting on the map. In the absence of a survey, the Appraiser assumes no responsibility for the flood zone classification.

Signatures

Please be advised that the attached file contains "Electronic Signatures" these signatures are accessed only by security code and are considered original signatures by all National Banks and Lending Institutions as well as Fannie Mae.

## DIMENSION LIST ADDENDUM

File No. 11-1045/60

| | |
|---|---|
| Borrower or Owner | N/A |
| Property Address | 1660 Renaissance Commons Blvd. |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33426 |
| Lender or Client | CLS Title Operations, FREM Short Sales/LandSafe Appraisal Services |

Gross Living Area (GLA)     1066          s.f.

Gross Building Area (GBA)   1066          s.f.

| Areas | Square Footage | | |
|---|---|---|---|
| Basement | 0 | s.f. | % of GBA |
| Level 1 | 1069.6 | s.f. 100.00 | % of GBA |
| Level 2 | 0 | s.f. 0.00 | % of GBA |
| Level 3 | 0 | s.f. 0.00 | % of GBA |
| Garage | 0 | s.f. | % of GBA |
| Other | 0 | s.f. 0.00 | % of GBA |

| Area Dimensions | | | | Type of Area | | | | Level | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Measurements | | Factor | Area | Living | Bsmnt | Garage | Other | One | Two | Three |
| 36.50 x 24.00 | x | 1.00 | = | 876.00 | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 12.00 x 8.00 | x | 1.00 | = | 96.00 | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 11.70 x 8.00 | x | 1.00 | = | 93.60 | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |

FHA CASE

**SUPPLEMENTAL REAL ESTATE OWNED APPRAISAL ADDENDUM**

15972531

File No.: 11-1046ono

| | |
|---|---|
| Property Address | 1660 Renaissance Commons Blvd. City Boynton Beach State FL Zip Code 33426 |
| Legal Description | Villa Lago Condominium, unit 2122 County Palm Beach |
| Is the subject property currently listed? | ☑ Yes  ☐ No   Current List Price $ 41000   Agent Yamel Valdes |
| Listing Company/Address/Phone | Florida Realty of Miami, 9415 SW 72nd Street, 236, Miami, FL |

**COMPETING LISTINGS**

| ITEM | SUBJECT | LISTING #1 | LISTING #2 | LISTING #3 |
|---|---|---|---|---|
| Address | 1660 Renaissance Commons Blvd. Boynton Beach | 1660 Renaissance Commons Blvd. 2416, Boynton | 1690 Renaissance Commons Blvd. 1202, Boynton | 2196, Boynton |
| Proximity to Sub./Location | | 0.08 MILES SSW | 0.08 MILES WNW | 0.00 MILES SSW |
| Original List Price | 41000 | 58900 | 135000 | 48500 |
| Current List Price | 41000 | 40000 | 40000 | 48500 |
| Last Price Revision Date | 03/04/11 | 11/30/10 | 03/02/11 | 02/22/11 |
| Days-on-Market | 19 | 177 | 730 | 35 |
| Site/View | Condominium/Resid. | Condominium/Resid. | Condominium/Resid. | Condominium/Resid. |
| Design (Style) | Flat | Flat | Flat | Flat |
| Age | 2007 | 2007 | 2007 | 2007 |
| Condition | Average/Chinese | Average/Chinese | Average/Chinese | Average/Chinese |
| Above Grade Room Count | Tot: 4  Bdrms: 2  Ba: 2 | Tot: 4  Bdrms: 2  Ba: 2 | Tot: 4  Bdrms: 2  Ba: 2 | Tot: 4  Bdrms: 2  Ba: 2 |
| Approx. Gross Living Area | 1066 sq.ft | 1066 sq.ft | 1240 sq.ft | 1066 sq.ft |
| Basement Area | None | None | None | None |
| Car Storage | 2-Garage | 2-Garage | 2-Garage | 2-Garage |
| Other (special / financing concessions, amenities, etc.) | | | | |

Describe the value-related differences between the subject property and the competing listings (including financing, terms, condition, location, appeal, deferred maintenance, utility, style, view, days-on-market, and other amenities). In addition, comment on supply and demand, marketing times, sale-to-list price ratios, REO and new construction activity, and other factors associated with, and/or influenced by, current listings in the subject neighborhood.

The listings shown are similar units and are good indicators of listing activity.  See comparables 4, 5 and 6 for adjustments to the above listings.

Describe positive and negative factors that affect the marketability and value of properties in the subject subdivision, and specifically the subject property. Discuss current economic trends – employment, increasing/decreasing property values, supply and demand, and/or seasonal marketing factors.

** OVERFLOW - SEE "ADDITIONAL FIELD TEXT ADDENDA" **

Provide an itemized list of repairs recommended to bring the property into marketable condition. Cost estimates should be based on reliable published cost sources and/or local cost resources. The appraiser is not an expert in the field of building construction and actual costs may vary from those provided. Repair costs and opinions reported herein are subject to future revision based on new repair estimates and evaluations by a licensed building contractor.

| REPAIR ITEM | ESTIMATED COST |
|---|---|
| The subject is known to be infected with chinese drywall; however, a cost to repair is not feasible | $ |
| as this does not remediate the surrounding common areas and units and how they would still affect | $ |
| the subject. | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| TOTAL ESTIMATED COST OF RECOMMENDED REPAIRS | $ 0 |

List any recommended inspections (code compliance, structural, environmental, etc.). Provide an explanation why the inspection is recommended, and comment on the affect on marketability and value. When no inspections are recommended, provide a statement to that effect.

The subject's project is known to contain chinese drywall with a sulfur smell noted during the inspection; an inspection is recommended to verify this fact.

List the number of days-on-market for the comparable sales used in the appraisal report: Comparable #1: 16 DOM; Comparable #2: 23 DOM; Comparable #3: 14 DOM.
Comments: DOM's listed are from the most recent price change noted in the MLS.

In addition to the "AS-IS" market value estimated on the attached appraisal report, which is based on a reasonable market exposure time determined by current market conditions and described in the Neighborhood Section of the report, the following value estimates for the subject are required. Note: The difference between the "AS IS" and "AS-REPAIRED" value should approximate the market's reaction to the needed repairs, not necessarily the dollar-for-dollar cost to place the subject in marketable condition.

| | |
|---|---|
| "AS-IS" estimate of market value based on a reasonable market exposure time as rendered in the attached appraisal report | $ 38000 |
| "AS-REPAIRED" estimate of market value based on a reasonable market exposure time | $ 38000 |
| "AS-IS" estimate of market value based on a client-imposed restricted market exposure time of 30 days (not to exceed 120 days) | $ 38000 |
| "AS-REPAIRED" estimate of market value based on a client-imposed restricted market exposure time of ___ days (not to exceed 120 days) | $ Not requested |

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature | Signature |
| Name Matthew S. Osborne | Name |
| Date Report Signed 03/31/2011 | Date Report Signed |
| State Certification # St.Cert.Res. REA RD2746  State FL | State Certification #  State |
| Or State License # | Or State License # |

## Market Conditions Addendum to the Appraisal Report

15072531
File # 11-1046mc

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

Property Address 1680 Renaissance Commons Blvd    City Boynton Beach    State FL    ZIP Code 33426

Borrower N/A

Instructions: The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| | | | | Increasing | Stable | Declining |
| Total # of Comparable Sales (Settled) | 8 | 7 | 6 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | 1.33 | 2.33 | 2.00 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Total # of Comparable Active Listings | N/A | N/A | 41 | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | N/A | N/A | 20.50 | ☐ Declining | ☐ Stable | ☐ Increasing |
| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Increasing | Stable | Declining |
| Median Comparable Sale Price | 97500 | 85000 | 86650 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | 96 | 132 | 99 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Median Comparable List Price | N/A | N/A | 85000 | ☐ Increasing | ☐ Stable | ☐ Declining |
| Median Comparable Listings Days on Market | N/A | N/A | 189 | ☐ Declining | ☐ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | 98.62 | 93.42 | 100.76 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Seller-(developer, builder, etc.) paid financial assistance prevalent? | ☒ Yes | ☐ No | | ☐ Declining | ☒ Stable | ☐ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).

Local data service (MLS) does not report seller concessions; consequently, a trend pattern was not developed. Seller concessions are are offered by motivated sellers and are prevalent with FHA/VA and high LTV conventional loans and typically range from 3 to 6%. The median sale list price percentage over the 12 months is 98.1% and a days on market of 181 days.

Shaded areas above have not been completed as historical data of active listings is not available on the local MLS.

Are foreclosure sales (REO sales) a factor in the market? ☒ Yes ☐ No  If yes, explain (including the trends in listings and sales of foreclosed properties).

Foreclosure and "short sale" activity is noted to be increasing and becoming a common transaction type. Local MLS does not have a search function or delineation for REO sales, consequently statistical data is not available.

Cite data sources for above information.

Multiple Listing Service for Palm Beach County.

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.

General market conditions in the neighborhood have contracted over the past 12 to 24 months as indicated in MLS and Public Records with declining property values. Foreclosure and "short sale" activity is noted to be increasing and becoming common type of transaction. Supply currently is greater than demand with seller concessions and special financing incentives available on individual properties from motivated sellers.

If the subject is a unit in a condominium or cooperative project, complete the following:  Condominium    Project Name: Villa Lago

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| | | | | Increasing | Stable | Declining |
| Total # of Comparable Sales (Settled) | 2 | 2 | 1 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | 0.33 | 0.67 | 0.33 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Total # of Active Comparable Listings | N/A | N/A | 25 | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab. Rate) | N/A | N/A | 75.76 | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project? ☒ Yes ☐ No  If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

The association would not give information regarding the number of units behind on association fees or that number of units in foreclosure proceedings. Foreclosure and "short sale" activity is noted to be increasing and becoming a common transaction type in the project. Local MLS does not have a search function or delineation for REO sales; consequently statistical data is not available. Short sale history of the project is noted to be 2 sales and 15 currently on the market.

Summarize the above trends and address the impact on the subject unit and project.
* OVERFLOW - SEE "ADDITIONAL FIELD TEXT ADDENDA**

Signature

Appraiser Name Matthew S. Osbone                    Supervisory Appraiser Name
Company Name Altair Appraisal Group                  Company Name
Company Address 1500 NW 3rd Street, 101             Company Address
State License/Certification # St.Cert.Res.REA RD3746  State FL    State License/Certification #    State
Email Address MSD@FDN.com                            Email Address

**ADDITIONAL FIELD TEXT**

File No.  11-1046mo

| | |
|---|---|
| Borrower/Client | N/A |
| Property Address | 1660 Renaissance Commons Blvd. |
| City | Boynton Beach | County | | State | FL | Zip Code | 33426 |
| Lender | |

**REVIEWER COMMENTS**

Due to the lack of market activity and ongoing concerns of chinese drywall infestation within the subject's project statistical data is considered to be unreliable and a trend pattern was not established.

## TEXT ADDENDUM

File No. 11-1046ao

| | |
|---|---|
| Borrower/Client | N/A |
| Property Address | 1660 Renaissance Commons Blvd. |
| City | Boynton Beach | County | State FL | Zip Code 33426 |
| Lender | |

**Form data: Type of Appraisal**
Altair Appraisal Group

## SUBJECT PHOTOGRAPH ADDENDUM



| | | | | | |
|---|---|---|---|---|---|
| Borrower/Client | N/A | | | | |
| Property Address | 1600 Renaissance Commons Blvd. | | | | |
| City Boynton Beach | | County Palm Beach | | State FL | Zip Code 33426 |
| Lender | CLS Title Operations, FREM Short Sales/LandSafe   CLS Title Operations, FREM Short Sales/LandSafe Appraisal |



FRONT OF
SUBJECT PROPERTY

Appraised Date: March 28,
Appraised Value: $38000



REAR OF
SUBJECT PROPERTY



STREET SCENE

EXHIBIT
O
Page 29 of 29

Package is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express™ shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP13-C © U.S. Postal Service; July 2013; XIN Rights reserved.

Please Recycle

**PRIORITY MAIL EXPRESS™**

**UNITED STATES POSTAL SERVICE®**

EL 374103075 US

**Scheduled Delivery**
03/24/2016
3:00PM

U.S. POSTAGE
$22.95
PME 1-DAY
33152 0007
03/23/16
906 2S00
A08680322040311823
08310287

**EXPRESS™**

**OUR FASTEST SERVICE IN THE U.S.**

PICKUP AVAILABLE

SIGNATURE INCLUDED UPON REQUEST

WRITE FIRMLY WITH BALL POINT PEN ON HARD SURFACE TO MAKE ALL COPIES LEGIBLE.

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)  PHONE ( 361 ) 789-8326
Domenico Belli, III
3800 BATTERSEA RD
Miami, Fl 33133

**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No.    Federal Agency Acct. No. or Postal Service™ Acct. No.

**DELIVERY OPTIONS (Customer Use Only)**
☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
☐ 10:30 AM Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)  PHONE ( 504 ) 589-7600
US DISTRICT COURT EASTERN DISTRICT
of LOUISIANA
500 Poydras Street
Room C-151
New Orleans, LA

ZIP + 4® (U.S. ADDRESSES ONLY)
7 0 1 3 0 - 3 3 1 9

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

**ORIGIN (POSTAL SERVICE USE ONLY)**
☐ 1-Day   ☐ 2-Day   ☐ Military   ☐ DPO

PO ZIP Code    Scheduled Delivery Date (MM/DD/YY)    Postage
$

Date Accepted (MM/DD/YY)    Scheduled Delivery Time    Insurance Fee    COD Fee
☐ 10:30 AM  ☐ 3:00 PM    $    $

Time Accepted  ☐ AM  ☐ PM    ☐ 12:00 NOON

Weight    ☐ Flat Rate    10:30 AM Delivery Fee    Return Receipt Fee    Live Animal Transportation Fee
lbs.    ozs.    $    $    $

    Sunday/Holiday Premium Fee    Total Postage & Fees
    $    $

    Acceptance Employee Initials

**DELIVERY (POSTAL SERVICE USE ONLY)**
Delivery Attempt (MM/DD/YY)  Time  ☐ AM  ☐ PM    Employee Signature

Delivery Attempt (MM/DD/YY)  Time  ☐ AM  ☐ PM    Employee Signature

LABEL 11-B, SEPTEMBER 2015    PSN 7690-02-000-9996    1-ORIGIN POST OFFICE COPY

| Bill Year | Bill Number | Receipt Number | Amount Paid | Last Paid | Paid By |
|-----------|-------------|----------------|-------------|-----------|---------|
| 2007 | 301393250 | 967273 | $1,472.78 | 2/28/2008 | BELLETTI DOMINIC |