# Exhibit A



**Since 1988**

*Florida's Leading Engineering Source*

Environmental · Geotechnical · Construction Materials Testing · Threshold and Special Inspections · Plan Review & Code Compliance

Mr. Phil Adams                                                                                    May 5, 2016
**Moss Construction**
2101 North Andrews Ave, Suite 300
Fort Lauderdale, FL 33311

Subject:      Ferchaud Residence 6021-6025 Canal Blvd, New Orleans, LA
Reference:    Air Testing Associates, LLC Report dated 4/13/16

On April 4th 2016, GFA International, Inc. (GFA) received from Mr. Adams a report prepared by Air Testing Associated LLC. (ATA) on the subject residence. The report indicated that observations and sampling was performed on 3/18/16. As indicated in their report, the purpose of their inspection was to *"qualify the absence or presence of drywall residuals as it pertained to particle identification and corrosion concerns"*. Upon receipt of the report, GFA reviewed relative documentation pertaining to the above home that included GFA's field Inspector's report and photographs as well as the Contractor Certification. The inspection by GFA was performed on December 1st, 2014 in accordance with the Remediation Protocol, Exhibit F, "Remediation Protocol" to the Settlement Agreement regarding claims against the Knauf Defendants in MDL No. 2047 **(Exhibit A).** The certification provided by GFA is based upon an independent **visual** (emphases added) inspection of all surfaces in the work area and any adjacent areas (including, but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) that found no dust, debris or residue. Also, there was no detectable odor of Chinese drywall at the completion of the removal process and cleaning activities and prior to the start of new drywall installation (which never occurred at this residence). In addition, the atmosphere in the house was found to be representative of the atmosphere in houses built without "problem" drywall. Attached to this report as **"Exhibit B and Exhibit C"** are photographs of the remediation taken on 12/1/14.

GFA cannot comment as to what has transpired with the home since December 1, 2014. This is evidenced by the installation of electrical wires, copper plumbing, HVAC lines and new framing members since photos taken by GFA on 12/1/14 as illustrated in the photos in the ATA report.

**Analysis:**

We have reviewed the laboratory tests performed by ATA and offer the following comments:

**FPID-1 Composite microvac sample – identified 32% Gypsum/Anhydrite**: The method of sampling utilizing a MicroVac this is not pursuant to the remediation protocol. The total weight of sample retrieved is not identified. The test results indicate a small percentage of the components found in drywall in addition to other construction related debris. This is expected in the remediation protocol as defined in Exhibit F as no high efficiency particulate air (HEPA) vacuums are required. Furthermore, the Consumer Products Safety Commission (CPSC) "Remediation Guidance for Homes with Corrosion from Problem Drywall as of March 15, 2013" **(Exhibit D)** also addresses the utilization of HEPA vacuums as no scientific basis to recommend these steps.

*"Staff of the CPSC and HUD are aware that some parties who are remediating homes with problem drywall use HEPA (high efficiency particulate air) vacuums and wipe surfaces to remove drywall dust, and ventilate the home for a period between removal and replacement of drywall to ensure that all reactive sulfur gases have dissipated. We do not have a scientific basis for recommending such steps"*

**SEM-1 and SEM-2 are two (2) copper wire samples taken from the home and analyzed by SEM/EDX**.

Scanning Electron Microscopy (SEM)
Energy-dispersive X-Ray Spectrometry (EDX)

This methodology is not part of the protocol established by the CPSC "SUMMARY OF IDENTIFICATION GUIDANCE FOR HOMES WITH CORROSION FROM PROBLEM DRYWALL AS OF MARCH 18, 2011" **(Exhibit E)**.   The test results only note a low amount of sulfur and offers no quantitative value of the indicated sulfides.   Many building products contain components such as Carbonyl Sulfide and Carbon Disulfides amongst others and the report does not differentiate this from Hydrogen sulfide (the leading indicator of corrosive off gassing). The report also does not conduct a referee sample of new copper wire as a comparison. Furthermore, no ambient air samples were taken to measure atmospheric sulfur compounds found in the environment.

**SEM-3 Is a prep wipe of a copper wire and is tested utilizing the same methodology of above and does not indicate any Copper sulfides present.**
.
The photographs from ATA also indicate that construction has at some point in time recommenced. Any construction activities will create dust and debris. It is also noted that it appears there is mold forming on some framing members that would be consistent with a long-term indoor air environment without effective air exchange. This closed up condition can cause any number of indoor air quality issues that could lead to tarnishing or blackening of copper.

**Conclusion:**

GFA re-confirms that the remediation protocol was followed by the contractor and the home was cleaned, inspected and certified for reconstruction in December of 2014.  As previously stated, the presence of small of amounts of residual drywall dust and construction debris is expected based on the remediation protocol requirements.  Even recent industry assessment protocols recognize this.  In the American Industrial Hygiene's Association publication "Assessment of Remediation of Corrosive Drywall: An AIHA Guidance Document, October 30, 2013" **(Exhibit F)**, Section 3.2:

**3.2 Remediation**
Where CDW is found to be present, the overall remediation goal is to restore air quality to non-CDW conditions. This is generally achieved by replacing all drywall ("full removal") or replacing only corrosive panels ("selective removal"). During drywall removal, be sure to:
- protect workers and occupants during demolition and cleanup
- replace insulation behind drywall panels
- **eliminate dust to the extent feasible**
- resolve residual odor

The report and conditions noted by the homeowner and ATA are indicative of a home undergoing construction and sitting idle for 14 months.



**Exhibits:**

A. Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims against the Knauf Defendants in MDL No. 2047.
B. GFA Inspection Report with Photos – December 1, 2014 – 6021 Canal Blvd
C. GFA Inspection Report with Photos – December 1, 2014 – 6025 Canal Blvd
D. Remediation Guidance for Homes with Corrosion from Problem Drywall as of March 15, 2013
E. Identification Guidance for Homes with Corrosion from Problem Drywall as of March 18, 2011
F. Assessment of Remediation of Corrosive Drywall: An AIHA Guidance Document, October 30, 2013



Respectfully
**GFA International, Inc**


**Thomas Ortner**
Vice President



**EXHIBIT A**



**Exhibit F**

**REMEDIATION PROTOCOL**

I.    **Scope of Work**

The remediation work to be performed in a KPT Property is described generally below. In conducting the remediation work and in resolving any disputes pursuant to the dispute resolution process in the Settlement Agreement (reprinted in Paragraph V below), the KPT Property Owner and Lead Contractor or Other Assigned Contractor agree that the objective of the remediation work is to remove on a cost effective basis all drywall, problem drywall-related odors, and contamination, including, but not limited to, corrosion, tarnishing and pitting ("Contamination"); and to leave the KPT Property with the same construction quality and finishes, including remediating any damage to such quality and finishes that was caused by the drywall, as existed prior to the start of the remediation work.

A.    **Drywall Removal**.  Removing and replacing all drywall in the home, including ceilings, with the exception of the following materials unless removal of such materials is required in order to complete the Remediation Work pursuant to this Scope of Work:

1.    Type X fire rated board

2.    Thicknesses other than ½"

3.    Moisture Resistant Drywall ("Green board")

4.    Sag Resistant Gypsum Board

5.    Tile Backer Board

B.    **Electrical Wiring**.  Remove and replace all electrical wiring (including low-voltage wiring), switches, service panels, circuit breakers, receptacles, and all Contaminated circuit boards.

C.    **Fire Safety and Home Security Equipment**.  Remove and replace all fire safety equipment, including security alarms, intercoms, smoke detectors, fire suppression sprinkler systems, and carbon monoxide alarms.

D.    **Copper gas lines.** Replace all copper gas lines and fittings.  All other gas lines and fittings will be inspected for Contamination and replaced if Contamination is found.

E.    **Fixtures.**  Remove, store and reinstall the following to the extent such fixtures interfere with the removal of the drywall as described in Paragraph A.  Otherwise, such fixtures will remain in place with suitable protection.  In the event of any

Contamination to such fixtures caused by the possible problem drywall or damage from the drywall removal and replacement, such fixtures will be replaced.[1]

1.     Hot water heaters

2.     Cabinets

3.     Countertops

4.     Doors

5.     Moldings and trim as required to remove drywall as described in Paragraph A

6.     Sinks

7.     Toilets

8.     Bathtubs, shower enclosures

9.     Mirrors

10.     Lighting fixtures

11.     Ceiling fans

12.     Plumbing fixtures

13.     Exhaust Grills and Diffusers

14.     Marble, granite and other natural-stone pieces

15.     Doors and attached door hardware

F.     **Dust Control and Removal**.  Remove the drywall using methods for dust control routinely used in drywall renovation projects.

1.     These control methods typically include installation of drop cloths and walk-off mats, negative pressurization of work area with exhaust fans, and cleanup of dust and debris.

2.     Following the removal of all drywall as described in Paragraph A, sweep all bulk debris and remove from site.

3.     Following the sweeping, vacuum all surfaces including wall cavities using vacuums equipped with drywall bags and/or, where appropriate or

---

[1]     In the event that equipment, appliances or fixtures need replacement, the replacement will be with new equipment, appliances or fixtures and not with reconditioned ones.

necessary, HEPA (high efficiency particulate air) filters, to remove drywall dust.

    4.    Damp wipe all surfaces with water.

    5.    As a final step, use Odorox® hydroxyl generators to resolve any residual indoor air problems.

G.    **HVAC**.  The following HVAC repairs will be performed by a manufacturer-qualified firm, but if such firm is not available, by a licensed HVAC technician.

    1.    Remove and replace all air handler units, including the coils.

    2.    Remove and replace all line sets.

    3.    Replace thermostats in affected areas and control boards in affected air handling units; and otherwise clean and/or replace as needed the air handler.

    4.    Replace over limit controls on electric heating coils in affected units.

    5.    Remove and replace the flexible duct work.

    6.    Inspect and clean the metal duct work.

    7.    Remove and replace all other damaged HVAC system components.

H.    **Insulation.**  Remove and replace porous insulation and repair or replace as necessary non-porous insulation in direct contact with the drywall to be removed.

    1.    Porous Insulation

        a)    Fiber glass insulation

        b)    Cellulose insulation

        c)    Open cell foam insulation

    2.    Non-Porous Insulation

        a)    Closed cell foam insulation

        b)    Reflective insulation

I.    **Carpet and Flooring.**  Remove and replace all carpet, carpet padding, laminate flooring and laminate padding.  All other flooring will remain in place and be protected during the remediation work.

J.       **Plumbing**.

1.       Remove and replace all affected plumbing components that either show discoloring or pitting on exposed components such as faucets, and handles.

2.       All other piping, fittings and components to be inspected, cleaned of any Contamination, and, if functionally unaffected, remain in place.

K.       **Appliances**.   Appliances shall mean refrigerators, freezers, dishwashers, washers, dryers, garbage disposals, wine coolers, ice machines, microwaves, cooktops, ovens, ranges and warming drawers.

1.       For KPT Properties that are less than or equal to 3,500 square feet "under air," as determined by the Lead Contractor or Other Approved Contractor ("Under Air Area") and as set forth in the attached Sample Contractor-KPT Property Owner Agreement, remove and replace refrigerators and freezers located in the kitchen, wine coolers, ice machines, microwaves, cooktops and ovens.  All other Appliances, including, secondary and auxiliary refrigerators and freezers, shall be removed and replaced where the performance or appearance is compromised, for example, where there is Contamination.

2.       For KPT Properties that have an Under Air Area greater than 3,500 square feet, all Appliances shall be removed and replaced where the performance or appearance is compromised.

L.       **Items not Replaced**.  Building materials, building systems, fixtures and Appliances that will be removed and reinstalled shall be placed in storage.  Building materials, building systems, fixtures and Appliances that will be retained in place will be protected during the remediation work.  Any Building materials, building systems, fixtures or Appliances that are retained, but damaged during the remediation work, will be restored to the condition that existed prior to the start of the remediation work, and where necessary, replaced.

M.      **Finishing**.  Finish and paint all new drywall using a primer and two coats of paint of the same color and finish (*e.g.* flat, eggshell, satin, semi-gloss, and glossy).

N.       **Final Cleaning**.  Clean the Home to pre-repair condition, which will be documented prior to the start of the remediation work.

O.       **Documentation and Preservation**.  In the course of remediation, the contractor will fully document the remediation work using photographic and other documentation methods, including but not limited to identification of the manufacturer and condition of the possible problem drywall on a room by room, wall by wall and board by board basis.  At the option and sole expense of KPT, all possible problem drywall and fixtures, wiring, fire safety equipment, plumbing, wiring, carpets, and appliances or other items removed from the home will be maintained for scientific analysis.

P.     **Government Agency Access.**  Relevant government agencies, including but not limited to the Consumer Product Safety Commission, will be allowed to observe the remediation work and given access to the documentation materials and items described in Paragraph I (O).

II.     **Form of Agreement between Contractor and KPT Property Owner**

The agreement by which the Lead Contractor, or Other Approved Contractor, will perform the remediation work in the KPT Property shall take the form of the attached Sample Agreement between Contractor and KPT Property Owner.

III.     **Contractor and Environmental Certification**

A.     After completion of the Drywall Removal and Dust Control and Removal pursuant to Paragraphs I (A) and (F) above, the Lead Contractor or Other Approved Contractor will provide the Settlement Administrator and KPT Property Owner with a Contractor Certification substantially in the form of Exhibit 6 to the attached Sample Agreement between Contractor and KPT Property Owner.

B.     After receiving the Contractor Certification, the Settlement Administrator will assign an environmental inspector to certify the absence in the KPT Property of any remaining problem drywall-associated odors and contamination, including, but not limited to, corrosion, tarnishing, and pitting.

1.     If the environmental inspector concludes the KPT Property is free of any and all KPT Chinese Drywall and Non KPT Chinese Drywall ("Problem Drywall") associated odors and contamination, the environmental inspector will provide an Environmental Certificate (in the form attached as Exhibit B to the Settlement Agreement) to the Settlement Administrator and the KPT Property Owner certifying that the home is free of any and all Problem Drywall-associated odors and contamination.

2.     If the Environmental Inspector concludes the KPT Property is not free of any and all Problem-Drywall associated odors and contamination, the Lead Contractor, or Other Approved Contractor, will continue to remediate any issues identified by the environmental inspector until such time that the environmental inspector concludes the KPT Property is free of any and all Problem-Drywall associated odors and contamination, in which case the environmental inspector will provide the Environmental Certificate as specified in the above subparagraph II (B) (1).

C.     The KPT Property Owner and/or his counsel, upon sufficient notice, shall have the right to be present, but not to interfere with, any environmental inspection by the environmental inspector, and to videotape, or otherwise make a record of, such inspection.  The costs of the environmental inspector will be paid by the Remediation Fund.

**EXHIBIT B**
















**Exhibit G**

## CONTRACTOR CERTIFICATION

I certify that all drywall, including all debris and visible dust, electrical wiring, fire safety and home security equipment, and copper gas lines have been removed in accordance with the Scope of Work, Exhibit D to the Settlement Agreement for the Demonstration Remediation of Homes with KPT Drywall. Completion of removal work has been confirmed by a visual inspection of all surfaces in the work area and any adjacent areas (including but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) that found no dust, debris or residue. Also there was no detectable odor of Chinese drywall at the completion of removal and cleaning work and prior to the start of new drywall installation. Evaluation for odor was performed at first entry to the house after it had been vacant and with all windows and doors closed for a period of at least 8 hours.

Contractor Name: _Moss & Assoc._

By:
(Signature) _Scott Hodges for Moss_   Date _11/25/14_

(Print Name) _Scott Hodges_

(Print Title) _Asst. Superintendent_

Ferchaud--6021Canal Blvd New Orleans, LA

5851 Country Lakes Drive • Fort Myers, FL 33905



(239) 489-2443 • (239) 489-3438 (fax)

## GENERAL INSPECTION REPORT

**PROJECT ID:** 10-1311

**PROJECT NAME:** Ferchaud

**PROJECT ADDRESS:** 6021 Canal Blvd

New Orleans, LA

**DATE** 12/1/14

| DAY | S | M | T | W | TH | F | S |
|---|---|---|---|---|---|---|---|
| | | X | | | | | |

| WEATHER | BRIGHT SUN | CLEAR | OVERCAST | RAIN |
|---|---|---|---|---|
| | | X | | |
| TEMPERATURE | BELOW 60 | 60-75 | 75-90 | ABOVE 90 |
| | | | X | |
| WIND | LOW | MODERATE | HIGH | Report No |
| | X | | | |
| HUMIDITY | LOW | MODERATE | HIGH | |
| | X | | | |

**TYPE OF INSPECTION:** Environmental Certification

**MEMBERS/AREA INSPECTED:** The above residence was inspected per the Environmental Certificate presented in Exhibit B
of the the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047.
Specifically the residence was inspected to ensure all drywall has been removed, all debris and visible dust has been cleaned from
all surfaces including but not limited to floor, walls, ceiling, wall cavities, trusses joists, studs, pipes, beams, ledges and framing.
There was no detectable odor of Chinese drywall and the contractors certification was verified.

**REMARKS:**

THE FOLLOWING ITEMS HAVE BEEN VERIFIED.

**COMPLIES**

| YES | NO | | |
|---|---|---|---|
| ✓ | | 1. | ALL DRYWALL HAS BEEN REMOVED (exceptions detailed in Exhibit F) |
| ✓ | | 2. | ALL POTENTIALLY AFFECTED COMPONENTS HAVE BEEN REMOVED (or cleaned per Exhibit F) |
| ✓ | | 3. | ALL DRYWALL DEBRIS,VISIBLE DUST AND RESIDUE HAS BEEN REMOVED AND CLEANED |
| ✓ | | 4. | CONTRACTORS CERTIFICATION WAS VERIFIED AND IS ATTACHED TO THIS REPORT |
| ✓ | | 5. | HOME WAS FREE OF ANY DETECTABLE ODOR OF CHINESE DRYWALL |

**PHOTOS TAKEN**

| YES | NO | | |
|---|---|---|---|
| ✓ | | 6. | PHOTOS TAKEN OF FRONT OF HOME, HOUSE NUMBER, & 2 GENERAL FROM EACH FLOOR |

| N/A | YES | | |
|---|---|---|---|
| ✓ | | 7 | PHOTOS TAKEN OF ALL NON COMPLIANT ITEMS |

**COMMENTS/ACTION REQUIRED:**

**Inspection Performed By:** Steven P. Owens      SPOwens
Print Name                          Signature

Test report shall not be reproduced, except in full, without the written approval of GFA International

Revised 11/15/2012



**Since 1988**

*Florida's Leading Engineering Source*

Environmental · Geotechnical · Construction Materials Testing · Threshold and Special Inspections · Plan Review & Code Compliance

## ENVIRONMENTAL CERTIFICATION

I certify that I have verified the Contractor's certification that all drywall has been removed, including all debris and visible dust, as set forth in the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047. This certification is based upon an independent visual inspection of all surfaces in the work area and any adjacent areas (including, but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) that found no dust, debris or residue. Also there was no detectable odor of Chinese drywall at the completion of removal and cleaning work and prior to the start of new drywall installation. In addition, the atmosphere in the house was found to be representative of the atmosphere in houses built without "problem" drywall.


Name: _____Ferchaud Residence_____

Property Address:____6021 Canal Blvd., New Orleans, LA____

Date Inspection Completed:____12/1/14____


GFA International, Inc.
Certificate of Authorization #4761

STATE OF LOUISIANA
PAUL H. DANFORTH
License No. 38506
PROFESSIONAL ENGINEER

12/2/14

Paul H. Danforth, P.E.
Professional Engineer #38506
State of Louisiana

**EXHIBIT C**



















**Exhibit G**

## CONTRACTOR CERTIFICATION

I certify that all drywall, including all debris and visible dust, electrical wiring, fire safety and home security equipment, and copper gas lines have been removed in accordance with the Scope of Work, Exhibit D to the Settlement Agreement for the Demonstration Remediation of Homes with KPT Drywall. Completion of removal work has been confirmed by a visual inspection of all surfaces in the work area and any adjacent areas (including but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) that found no dust, debris or residue. Also there was no detectable odor of Chinese drywall at the completion of removal and cleaning work and prior to the start of new drywall installation. Evaluation for odor was performed at first entry to the house after it had been vacant and with all windows and doors closed for a period of at least 8 hours.

Contractor Name: _Moss & Assoc._

By:
(Signature) _Scott Hodges for Moss_ Date _11/25/14_

(Print Name) _Scott Hodges_

(Print Title) _Asst. Superintendent_

Ferchaud--6025 Canal Blvd New Orleans, LA

5851 Country Lakes Drive ● Fort Myers, FL 33905                                    (239) 489-2443 ● (239) 489-3438 (fax)

## GENERAL INSPECTION REPORT

**PROJECT ID:** 10-1311

**PROJECT NAME:** Ferchaud

**PROJECT ADDRESS:** 6025 Canal Blvd

New Orleans, LA

**DATE** 12/1/14

| DAY | S | M | T | W | TH | F | S |
|-----|---|---|---|---|----|----|---|
|     |   | X |   |   |    |    |   |

| WEATHER | BRIGHT SUN | CLEAR | OVERCAST | RAIN |
|---------|-----------|-------|----------|------|
|         |           | X     |          |      |

| TEMPERATURE | BELOW 60 | 60-75 | 75-90 | ABOVE 90 |
|-------------|----------|-------|-------|----------|
|             |          |       | X     |          |

| WIND | LOW | MODERATE | HIGH | Report No |
|------|-----|----------|------|-----------|
|      | X   |          |      |           |

| HUMIDITY | LOW | MODERATE | HIGH |
|----------|-----|----------|------|
|          | X   |          |      |

**TYPE OF INSPECTION:**    Environmental Certification

**MEMBERS/AREA INSPECTED:**    The above residence was inspected per the Environmental Certificate presented in Exhibit B

of the the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047.

Specifically the residence was inspected to ensure all drywall has been removed, all debris and visible dust has been cleaned from

all surfaces including but not limited to floor, walls, ceiling, wall cavities, trusses joists, studs, pipes, beams, ledges and framing.

There was no detectable odor of Chinese drywall and the contractors certification was verified.

**REMARKS:**

THE FOLLOWING ITEMS HAVE BEEN VERIFIED.

**COMPLIES**

| YES | NO | | |
|-----|----|--|--|
| ✓ | ☐ | 1. | ALL DRYWALL HAS BEEN REMOVED (exceptions detailed in Exhibit F) |
| ✓ | ☐ | 2. | ALL POTENTIALLY AFFECTED COMPONENTS HAVE BEEN REMOVED (or cleaned per Exhibit F) |
| ✓ | ☐ | 3. | ALL DRYWALL DEBRIS,VISIBLE DUST AND RESIDUE HAS BEEN REMOVED AND CLEANED |
| ✓ | ☐ | 4. | CONTRACTORS CERTIFICATION WAS VERIFIED AND IS ATTACHED TO THIS REPORT |
| ✓ | ☐ | 5. | HOME WAS FREE OF ANY DETECTABLE ODOR OF CHINESE DRYWALL |

**PHOTOS TAKEN**

| YES | NO | | |
|-----|----|--|--|
| ✓ | ☐ | 6. | PHOTOS TAKEN OF FRONT OF HOME, HOUSE NUMBER, & 2 GENERAL FROM EACH FLOOR |

| N/A | YES | | |
|-----|-----|--|--|
| ✓ | ☐ | 7 | PHOTOS TAKEN OF ALL NON COMPLIANT ITEMS |

**COMMENTS/ACTION REQUIRED:**

**Inspection Performed By:**    Steven P. Owens                    SGD Owens

Print Name                          Signature

Test report shall not be reproduced, except in full, without the written approval of GFA International           Revised 11/15/2012

Environmental ● Geotechnical ● Construction Materials Testing ● Special & Threshold Inspections ● Plan Review & Code Compliance
**Florida's Leading Engineering Source**
www.teamgfa.com

 

**Florida's Leading Engineering Source**

Environmental · Geotechnical · Construction Materials Testing · Threshold and Special Inspections · Plan Review & Code Compliance

## ENVIRONMENTAL CERTIFICATION

I certify that I have verified the Contractor's certification that all drywall has been removed, including all debris and visible dust, as set forth in the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047. This certification is based upon an independent visual inspection of all surfaces in the work area and any adjacent areas (including, but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) that found no dust, debris or residue. Also there was no detectable odor of Chinese drywall at the completion of removal and cleaning work and prior to the start of new drywall installation. In addition, the atmosphere in the house was found to be representative of the atmosphere in houses built without "problem" drywall.

Name: _____Ferchaud Residence_____

Property Address:___6025 Canal Blvd., New Orleans, LA___

Date Inspection Completed:____12/1/14____

GFA International, Inc.
Certificate of Authorization #4761

*(seal: STATE OF LOUISIANA · PAUL H. DANFORTH · License No. 38506 · PROFESSIONAL ENGINEER)*  12/2/14

Paul H. Danforth, P.E.
Professional Engineer #38506
State of Louisiana

**EXHIBIT D**



**Remediation Guidance**
**for Homes with Corrosion from Problem Drywall as of March 15, 2013[1]**

**by the U.S. Consumer Product Safety Commission**
**and the U.S. Department of Housing and Urban Development**

## Introduction

This Remediation Guidance summarizes what the staffs of the U.S. Consumer Product Safety Commission (CPSC) and the U.S. Department of Housing and Urban Development (HUD) believe is an effective approach to addressing potential health and safety issues to remediate houses affected by problem drywall, given the information now available.[2]  Initial studies found a strong association between the presence of problem drywall and corrosion of metal in homes.  Based upon those findings, the CPSC and HUD have developed this Guidance, which focuses on the replacement of problem drywall and building components for which drywall-induced corrosion might cause a health or safety problem.  This version supersedes prior versions of the Guidance.

The CPSC and HUD recognize that many homeowners want to begin the process of repairing their homes. This revised Guidance is designed to be a conservative, commonsense approach to assist homeowners in making some of the challenging decisions they face remediating their homes.  Should additional scientific information become available that suggests less extensive or less costly remediation methods would work, the CPSC and HUD will consider the evidence, and we will update our guidance, as appropriate.

## Remediation Guidance

This Remediation Guidance for homes with problem drywall calls for the replacement of all:

1.  possible problem drywall (as identified in the CPSC and HUD Identification Guidance[3]);
2.  smoke alarms and carbon monoxide alarms;
3.  electrical distribution components (including receptacles, switches, and circuit breakers, but not necessarily wiring); and
4.  fusible-type fire sprinkler heads.[4]

All testing and remediation work should be conducted in compliance with applicable building codes, occupational safety and health standards, and environmental regulations.  Gas service piping should be inspected and pressure-tested to ensure that the materials comply with the relevant building code(s), in

---

[1] This staff document has not been reviewed or approved by, and it may not necessarily reflect the views of, the Consumer Product Safety Commission.  It has been cleared by the Department of Housing and Urban Development in accordance with the HUD Directives System Handbook.

[2] This Remediation Guidance is not intended to address any non-health and safety remediation requirements; nor does it address what, if any, additional elements of a home may require remediation in order to accomplish the principles set forth here.  The Task Force recognizes that additional considerations for repair of economic damages have been included in both court-ordered remediation plans and voluntary remediation plans agreed upon by various parties, including homeowners and those in the supply chain.  This Remediation Guidance does not address such economic considerations that lie outside the scope of health and safety but that are nonetheless of great importance to all parties involved.

[3] www.cpsc.gov/PageFiles/114210/IDguidance031811.pdf, March 18, 2011.

[4] Glass bulb sprinkler heads should be tested or replaced in accordance with National Fire Protection Association (NFPA) Standard 25, *Standard for Testing and Inspection of Water-Based Fire Protection Systems*.  For corrosive environments (which should be assumed for the purpose of the remediation), NFPA Standard 25 calls for testing at 5-year intervals. When remediation is completed, the environment should no longer be treated as corrosive, and the expected life span of the fire sprinkler heads—normally 20 years—should apply.

accordance with the International Fuel Gas Code and National Fire Protection Association (NFPA) Standard 54, *National Fuel Gas Code.* Problematic drywall removed from homes pursuant to the guidance should not be reused or used as a component in production of new drywall.

## Discussion

This Remediation Guidance addresses the emission of corrosive sulfur gases by problem drywall and the safety systems in the homes possibly affected by a corrosive environment by: (1) eliminating the source of the corrosion—the problem drywall, and (2) replacing certain building components for safety systems for which drywall-induced corrosion may affect performance, such as smoke and carbon monoxide alarms, electrical components, and fusible-type fire sprinkler heads, in addition to inspecting and testing gas service piping and glass bulb fire sprinkler heads.  Furthermore, in accordance with the Drywall Safety Act of 2012 (Public Law 112-266), problematic drywall removed from homes pursuant to the guidance should not be reused or used as a component in production of new drywall.

As a threshold matter, before remediation, care should be taken to determine whether the home contains problem drywall.  CPSC staff and HUD staff issued guidance[3] to assist in the identification of problem drywall.

Where a home has been identified as having problem drywall, the scientific and practical challenges of finding individual problem sheets of drywall remain.  Until such challenges are overcome, this Remediation Guidance calls for the general replacement of all drywall in an identified home.  If some of the drywall in a home can be identified reasonably not to be problem drywall—because it is known to have been installed prior to the relevant time period (*i.e.*, before 2001)—and if there are no other corroborating conditions (as provided in the CPSC and HUD guidance on identification) to indicate that the drywall is problem drywall, then one option would be to leave that drywall in place.

This Guidance includes replacement of the home safety systems at greatest risk of being affected by drywall-induced corrosion that may affect their performance: smoke alarms and carbon monoxide alarms; electrical components (but not necessarily the wiring); and fusible-type fire sprinkler heads.  In addition, glass bulb fire sprinkler heads should be tested or replaced in accordance to NFPA Standard 25, and gas distribution piping should be inspected and pressure tested, in accordance with NFPA Standard 54.

CPSC staff's assessment of the effect of problem drywall-related corrosion on electrical distribution components, gas service piping, fire sprinkler heads, and smoke alarms has not revealed any safety-related failures.[5,6,7,8,9]

Corrosion of exposed electrical contact surfaces was observed on electrical devices harvested from affected homes, as well as on new devices subjected to an accelerated corrosion regimen at Sandia National Laboratories to simulate 40 years of exposure.  However, although no significant degradation of the electrical connections to the devices was noted, extensive corrosion was present and replacement of receptacles, switches, ground-fault circuit interrupters, and circuit breakers is recommended, out of an abundance of caution.

---

[5] www.cpsc.gov/PageFiles/96074/electrical031811.pdf, March 18, 2011.
[6] www.cpsc.gov/PageFiles/114477/NISTsmoke.pdf, September 15, 2011.
[7] www.cpsc.gov/PageFiles/114480/NISTsprinkler.pdf, September 15, 2011.
[8] www.cpsc.gov/PageFiles/114485/NISTgas.pdf, September 15, 2011.
[9] One fusible-type sprinkler head out of the set of 18 tested failed to operate after being subjected to an accelerated corrosion regimen at Sandia National Laboratories to simulate 20 years of exposure to problem drywall.  NIST analyzed but could not identify a definitive cause for the functional test failure of this sprinkler.  Irrespective of this event, the Task Force recommends replacement of this type of sprinkler head, based on the changes that were observed.

2

CPSC staff's assessment of the effect of problem drywall-related corrosion on electrical distribution wiring indicated that exposed copper wires were corroded.[5]  However, the corrosion was superficial, and it did not reduce the overall cross-section of copper significantly.  Thus, the corrosion did not decrease the wire's ability to carry its rated current.  Removal or cleaning of the exposed ends of the wiring to reveal a clean/uncorroded surface is recommended.  Removal/replacement of cable runs is not necessary, unless the remaining cable has been damaged during drywall removal.  However, all repairs must comply with local codes, and final approval of the installation is at the discretion of the authority having jurisdiction.

The corrosion seen on gas service piping materials was found to be superficial and uniform without pin holing.  No meaningful loss of thickness was observed, and there was no evidence that the ability to carry gas and hold pressure was compromised.  Out of an abundance of caution, and considering the wide variety of environmental conditions that might exist in different homes, this guidance recommends inspecting and pressure-testing gas service piping according to all applicable standards.  Any changes to gas service piping should be done in strict accordance with locally applicable codes and standards.

A small but significant difference in performance for certain types of fusible-type sprinkler heads was found after accelerated corrosion, although these sprinklers continued to meet the appropriate performance standards.  This Guidance recommends the replacement of all fusible-type sprinkler heads and either testing or replacement of glass bulb sprinkler heads out of an abundance of caution, based on the finding of a small difference in performance for certain sprinkler heads after accelerated corrosion, as well as recognition of NFPA Standard 25, requiring either testing or replacement of sprinkler heads in corrosive environments (which may be present prior to remediation) every 5 years.[9]

In the case of smoke alarms, there were small but significant changes to performance in some cases, although the alarms continued to meet applicable safety standards.  The CPSC recommends replacement of smoke alarms every 10 years and carbon monoxide alarms after their limited lifespan, typically every 5–7 years.  Therefore, as part of this Remediation Guidance, it is recommended that all smoke alarms and carbon monoxide alarms be replaced.

Staffs of the CPSC and HUD are aware that some remediation efforts have included the replacement of electrical wiring, water service plumbing, HVAC (heating, ventilation and air conditioning) evaporator coils, furnishings, and carpeting.  Homeowners may seek to replace such items, but their replacement is not included in this Guidance because of the absence of a direct connection to safety.

Staffs of the CPSC and HUD continue to recognize that other remediation approaches ultimately could prove more cost-effective and/or less invasive; however, this Guidance is believed to be a conservative, commonsense approach and represents all applicable CPSC staff studies on corrosion effects from problem drywall.

Homeowners should recognize that homes can suffer from corrosion unrelated to drywall, and that such other corrosion problems may not be resolved by addressing the drywall.

   *Other Building Materials and Contents*:

Underlying the CPSC and HUD staff's recommendations is the view that removal of the source material (*i.e.*, the problem drywall), will eliminate the cause of the corrosive environment.  Staffs of CPSC and HUD do not have a scientific basis to believe that emissions from the problem drywall require replacement of non-problem drywall, wood studs, flooring, cabinetry, insulation, or other household components and fixtures that may have been exposed to the drywall emissions.

Staffs of the CPSC and HUD understand, however, that certain other building materials and contents could be affected or require replacement in the course of the practical construction or engineering steps required to

3

undertake the remediation described in this Guidance.  Staffs of the CPSC and HUD do not offer any view on the replacement of other affected metals, home electronics, or personal property.

*Drywall Dust Clean-Up:*

During the remediation, it is important to ensure that the home is cleaned to remove any visible drywall dust and debris that was created during the removal of problem drywall, including material that is on and around framing material, prior to commencing reconstruction.

Staffs of the CPSC and HUD are aware that some parties who are remediating homes with problem drywall use HEPA (high efficiency particulate air) vacuums and wipe surfaces to remove drywall dust, and ventilate the home for a period between removal and replacement of drywall to ensure that all reactive sulfur gases have dissipated.  We do not have a scientific basis for recommending such steps, but homeowners may consider these options as they seek to make an informed decision in their particular situation.

*Additional Issues*:

Staffs of the CPSC and HUD are aware that some parties offer remediation approaches other than the replacement of problem drywall and affected metal components.  We do not have a scientific basis to provide an opinion of such approaches, and urge property owners to use caution in making decisions about them.

Consumers should exercise caution in contracting for testing and remediation and should be diligent in confirming the references, qualifications, and backgrounds of individuals and firms that offer such services.[10] Consumers should request that individuals and firms that offer remediation strategies that differ significantly from this Guidance explain those strategies and their benefits to the consumer's satisfaction before the consumer's purchase of those services or products.

## Conclusion

The scientific work completed by the Federal Interagency Task Force has been essential to building the foundation for decisions by homeowners and local, state, and federal authorities.[11]  The results of the Task Force studies conducted to date are sufficient to provide this Remediation Guidance for homes with corrosion from problem drywall.

More information on problem drywall is available at the Federal Drywall Information Center website, http://cpsc.gov/en/Safety-Education/Safety-Education-Centers/Drywall/.

*    *    *

---

[10] FTC Consumer Alert, "Defective Imported Drywall:  Don't Get Nailed by Bogus Tests and Treatments," www.ftc.gov/bcp/edu/pubs/consumer/alerts/alt164.pdf, December 2009.
[11] Reports and information regarding problem drywall can be found at http://cpsc.gov/en/Safety-Education/Safety-Education-Centers/Drywall/.

**EXHIBIT E**



SUMMARY OF IDENTIFICATION GUIDANCE FOR HOMES WITH CORROSION
FROM PROBLEM DRYWALL AS OF MARCH 18, 2011

In its continuing effort to provide accurate and helpful information, the Federal Interagency Task Force[1] believes that it is appropriate to update Revision 1 to the Interim Guidance–Identification of Homes with Corrosion from Problem Drywall, August 27, 2010,[2] to reflect additional information uncovered by the Task Force concerning the installation dates of problem drywall imported from China. Specifically, the CPSC has found a number of homes where problem drywall previously imported from China was not installed in homes until calendar year 2009. Previously, the CPSC believed that all such problem drywall installations were completed by the end of calendar year 2008. In this updated Identification Guidance for Homes with Corrosion from Problem Drywall as of March 18, 2011, the years of installation are adjusted accordingly, to include calendar year 2009.

There are no other substantive changes in this updated Identification Guidance for Homes with Corrosion from Problem Drywall as of March 18, 2011.

---

[1] All references to the Federal Interagency Task Force in this document refer to the staff of the U.S. Consumer Product Safety Commission (CPSC) and the U.S. Department of Housing and Urban Development (HUD). This is a staff document, and has not been reviewed or approved by, and may not necessarily reflect the views of, the Commission or the Department.
[2] http://www.cpsc.gov/info/drywall/guidance0827.pdf.

## Identification Guidance for Homes with Corrosion
## from Problem Drywall as of March 18, 2011[3]
### by the U.S. Consumer Product Safety Commission
### and the U.S. Department of Housing and Urban Development

### March 18, 2011

### Executive Summary

The identification guidance was first revised on August 27, 2010, to reflect a change in the understanding of the usefulness of strontium as a marker to confirm the presence of problem drywall.  The August 2010 revision relied upon the draft report prepared by the CPSC's contractor, Environmental Health and Engineering (EH&E), on Identification of Problematic Drywall: Source Markers and Detection Methods, May 28, 2010, available at www.DrywallResponse.gov.  The identification guidance is being updated further to reflect additional information uncovered by the Task Force concerning the installation dates of problem drywall imported from China.  Specifically, the CPSC has found a number of homes where problem drywall  from China was installed in homes during 2009.[4]  Previously, the CPSC believed that all such problem drywall installations were completed by the end of calendar year 2008.   In this updated Identification Guidance for Homes with Corrosion from Problem Drywall as of March 18, 2011, the years of installation are adjusted accordingly, to include calendar year 2009.  This guidance continues to represent what the Federal Interagency Task Force on Problem Drywall believes is the best approach based upon the information available today.  This identification guidance is based primarily on the presence of metal corrosion in homes, as well as other indicators of problem drywall.  This version supersedes prior versions of this Guidance.  Additional work will continue to validate these methods, and the identification guidance will be modified as necessary.

**Identification Method**
The identification process requires two steps: (1) an initial or threshold inspection to find visual signs of metal corrosion and evidence of drywall installation during the relevant time period, and (2) the identification of corroborating evidence or characteristics.

**Step 1:  Threshold Inspection**
Visual inspection[5] must show:
    (a)  Blackening of copper electrical wiring and/or air conditioning evaporator coils; and
    (b)  The installation of new drywall (for new construction or renovations) between 2001 and 2009.
A positive result for the first step (including both criteria) is a prerequisite to any further consideration.

**Step 2:  Corroborating Evidence**
Because it is possible that corrosion of metal in homes can occur for other reasons, it is important to obtain additional corroborating evidence of problem drywall.  Homes with the characteristic metal corrosion problems must also have at least two of these corroborating conditions if the new drywall was

---

[3] All references to the Federal Interagency Task Force in this document refer to the staff of the U.S. Consumer Product Safety Commission (CPSC) and the U.S. Department of Housing and Urban Development (HUD).  This is a staff document, and has not been reviewed or approved by, and may not necessarily reflect the views of, the Commission or the Department.
[4] Importantly, the drywall installed in 2009 had been previously imported during the years 2006-2007 and does not represent any new importation of problem drywall.
[5]  For example, the Florida Department of Health's Self-Assessment Guide on signs that a home may be affected by drywall-associated corrosion (http://www.doh.state.fl.us/environment/community/indoor-air/inspections.html) has questions that may be helpful; mention in this guidance of this or other references does not imply endorsement.

installed between 2005 and 2009.  For installations between 2001 and 2004, at least four of the following conditions must be met:

(a)  Elemental sulfur levels in samples of drywall core found in the home exceeding 10 ppm;[6]

(b)  Corrosive conditions in the home, demonstrated by the formation of copper sulfide on copper coupons (test strips of metal) placed in the home for a period of two weeks to 30 days or confirmation of the presence of sulfur in the blackening of the grounding wires and/or air conditioning coils;

(c)  Confirmed markings of Chinese[7] origin for drywall in the home;

(d)  Elevated levels of hydrogen sulfide, carbonyl sulfide, and/or carbon disulfide emitted from samples of drywall from the home when placed in test chambers using ASTM Standard Test Method D5504-08 or similar chamber or headspace testing;[8] and

(e)  Corrosion of copper metal to form copper sulfide when copper is placed in test chambers with drywall samples taken from the home.

Collecting evidence of these corroborating conditions, in some cases, will require professional assessors and/or testing by analytical laboratories.

---

[6] Note that a preliminary screening for strontium levels exceeding 1,200 parts per million may be useful to identify boards to test for elemental sulfur. The Task Force emphasizes, however, that such preliminary screening for strontium does not necessarily indicate the presence of problem drywall, rather, only that additional testing in those areas may be advised.

[7] This does not imply that all Chinese drywall or that only Chinese drywall is associated with these problems, but that among homes with the characteristic corrosion, Chinese drywall is a corroborating marker for the characteristic problems.

[8] ASTM International. Standard D5504-08: Standard Test Method for Determination of Sulfur Compounds in Natural Gas and Gaseous Fuels by Gas Chromatography and Chemiluminescence. 2008. http://www.astm.org/Standards/D5504.htm.  Subsequent revisions by ASTM of this standard will be considered to be "similar chamber or headspace testing" methods.

**Detailed Description**

**March 18, 2011**

**Introduction**

This updated identification guidance represents what the Federal Interagency Task Force on Problem Drywall believes is the best approach based upon the information available today.  We recognize that important additional guidance is still needed to clarify qualifications for inspectors and test laboratories and to describe methods for making the measurements in the criteria defined in this report.  This identification guidance is being released in recognition of the immediate need for homeowners to have this information.  Consumers should exercise caution in contracting for testing and should be diligent in confirming the references, qualifications, and background of individuals and firms that offer such testing.[9] Scientific investigations have moved as quickly as possible to understand the complex problems presented by Chinese[10] drywall.  The scientific work completed by the Federal Interagency Task Force, to date, has been essential to building the foundation for decision-making by homeowners and local, state, and federal authorities.[11]  The investigation continues on several fronts to expand our understanding of this issue—but the Task Force believes that current information is sufficient to revise the guidance on how to identify homes with problems associated with this drywall.

Findings have shown a strong association between the presence of problem drywall and metal corrosion in homes.  The results of investigations reported by the Federal Interagency Task Force provide criteria and indicators for identifying those homes.  The Task Force updated the identification guidance based upon these findings.

This updated identification guidance is based primarily on the presence of metal corrosion in homes, as well as other indicators of problem drywall.  It is possible to misclassify homes because of other possible sources of metal corrosion, such as volatile sulfur compounds from sewer gas, well water, and outdoor contaminants that may enter the home independent of the presence of problem drywall in the home.  Homes may also be misclassified as having no drywall problem due to the absence of characteristics found to be typical in the limited testing to date.  Given these limitations, additional work will continue to validate these methods, and the identification guidance will be modified as necessary.

**Identification Method**

The identification process will require two steps: (1) an initial or threshold inspection to find visual signs of metal corrosion and evidence of drywall installation in the relevant time period, and (2) the identification of corroborating evidence or characteristics.

**Step 1:  Threshold Inspection**

A visual inspection will seek to identify blackening of copper electrical wiring and/or air conditioning evaporator coils (or documentation of replacement of evaporator coils due to blackened corrosion causing

---

[9] FTC Consumer Alert, "Defective Imported Drywall:  Don't Get Nailed by Bogus Tests and Treatments," http://www.ftc.gov/bcp/edu/pubs/consumer/alerts/alt164.pdf, December 2009.

[10]  The Interagency Task Force on Problem Drywall is conducting a broad investigation, and its studies have included Chinese and non-Chinese samples.  While this work does reference "Chinese" drywall as a general term, we have not concluded that all Chinese-manufactured drywall presents corrosion or health issues or that drywall made elsewhere will never present these issues.

[11]  Reports and information released regarding problem drywall can be found at: www.drywallresponse.gov.

failure), and the installation of new drywall (for new construction or renovations) between 2001 and 2009.  Meeting both criteria for this step is a prerequisite to further consideration.

**Rationale**

A visual observation of corroded air conditioning evaporator coils and/or electrical wiring by trained inspectors is believed to be a prerequisite for consideration of a home as having problem drywall.  The Florida Department of Health has long included such corrosion as part of its definition of problem drywall homes.[12,13]  It is appropriate to limit the dates of installation to the relevant time period because this corresponds to the majority of complaints received by the U.S. Consumer Product Safety Commission (CPSC).  In addition, older homes with earlier dates of installation could exhibit corrosion due to different sources acting over longer periods of time.

A CPSC contractor completed a detailed study of 51 homes in Alabama, Florida, Louisiana, Mississippi, and Virginia.  The report was issued on November 23, 2009, and is available on www.drywallresponse.gov.  This investigation included inspections of each home for the presence and extent of corrosion.  Copper and silver metal test strips, called "coupons," were placed in each home for two weeks to test the corrosive environment.  The copper and silver coupons showed significantly higher rates of corrosion in homes where complaints had been registered than in the control homes.  The dominant types of corrosion on the coupons were copper sulfide and silver sulfide, respectively, as determined by additional laboratory tests.  Copper sulfide and silver sulfide appear as a black coating on copper or silver metal.  Visual inspection and evaluation of electrical (ground) wire corrosion also revealed statistically significant greater corrosion in complaint homes compared to the control homes.

**Step 2:  Corroborating Evidence**

Because it is possible that corrosion of metal in homes can occur for other reasons, it is important to obtain additional corroborating evidence of problem drywall.  Homes with the characteristic metal corrosion problems must also have at least two of these corroborating conditions if the new drywall was installed between 2005 and 2009.  For installations between 2001 and 2004, at least four of the following conditions must be met:

(a)  Elemental sulfur levels in samples of drywall core found in the home exceeding 10 ppm[14];

(b)  Corrosive conditions in the home, demonstrated by the formation of copper sulfide on copper coupons (test strips of metal) placed in the home for a period of two weeks to 30 days or confirmation of the presence of sulfur in the blackening of the grounding wires and/or air conditioning coils;

(c)  Confirmed markings of Chinese[15] origin for drywall in the home;

(d)  Elevated levels of hydrogen sulfide, carbonyl sulfide, and/or carbon disulfide emitted from samples of drywall from the home when placed in test chambers using ASTM Standard Test Method D5504-08 or similar chamber or headspace testing[16]; and/or

---

[12] Case Definition (03-31-09) for Premature Copper Corrosion in Residences Possibly Associated with the Presence of Imported Drywall from China.

[13] Case Definition (12-18-09) for Drywall Associated Corrosion in Residences.
(http://www.doh.state.fl.us/ENVIRONMENT/COMMUNITY/indoor-air/casedefinition.html.)

[14] Note that a preliminary screening for strontium levels exceeding 1,200 parts per million may be useful to identify boards to test for elemental sulfur. The Task Force emphasizes, however, that such preliminary screening for strontium does not necessarily indicate the presence of problem drywall, rather, only that additional testing in those areas may be advised.

[15] This does not imply that all Chinese drywall, or that only Chinese drywall, is associated with these problems, but that among homes with the characteristic corrosion, Chinese drywall is a corroborating marker for the characteristic problems.

[16] ASTM International. Standard D5504-08: Standard Test Method for Determination of Sulfur Compounds in Natural Gas and Gaseous Fuels by Gas Chromatography and Chemiluminescence, 2008.

(e) Corrosion of copper metal to form copper sulfide when copper is placed in test chambers with drywall samples taken from the home.

Collecting this corroborating evidence, in some cases, will require professional assessors and/or testing by analytical laboratories.

**Rationale**

The Federal Interagency Task Force's study of the elemental and chemical composition of 17 drywall samples shows higher concentrations of elemental sulfur and strontium in certain Chinese drywall than in non-Chinese drywall.[17]  Although, the 51-home study (41 homes with reported problems and 10 control homes) also found a correlation between elevated strontium levels and problem homes,[18] additional testing conducted on a wide range of drywall samples found that the use of strontium as a marker resulted in false-positives where some non-problem drywall samples (based on chamber testing) were found to contain elevated strontium levels.[19]  The Task Force does not believe strontium has a causative role, and in light of the possibility for false-positives, we no longer consider elevated strontium levels to be valid corroborating evidence for problem drywall.  However, in many cases, screening for strontium can be an effective tool in identifying what boards may warrant additional testing for elemental sulfur.[17, 18, 19, 20]  The additional testing in the contractor's draft report[19] found that elemental sulfur (also known as orthorhombic sulfur) was highly correlated with problem drywall.  Thus, the presence of elevated levels of elemental sulfur is believed to be corroborating evidence for homes with problem drywall.

The 51-home study and the preliminary corrosion reports[18,21,22] also found that the type of corrosion present on copper coupons, copper electrical wire, and air conditioning evaporator coils was copper sulfide.  Thus, the confirmation of copper sulfide or sulfur in the corrosion of the copper (and similarly silver sulfide or sulfur in the corrosion on silver coupons) is believed to be a corroborating marker.

Chinese drywall installed in the identified period has been associated with the types of corrosion problems reported.  This does not imply that all Chinese drywall, or that only Chinese drywall, is associated with these problems, but that among homes with the characteristic corrosion, Chinese drywall is a corroborating marker.  It is not absolutely necessary for the markings to be found because, in some cases, Chinese drywall does not have markings that identify the nation of origin of the drywall.

Additionally, the EH&E report on source markers (May 28, 2010), together with the Lawrence Berkeley National Laboratory Chamber Study Report (October 2010), indicate that higher emission factors for reactive sulfur gases, including hydrogen sulfide, show a connection between certain Chinese drywall and

---

http://www.astm.org/Standards/D5504.htm.  Subsequent revisions by ASTM of this standard will be considered to be "similar chamber or headspace testing" methods.

[17] Statistical Analysis of the Chemical Screening of a Small Sample of Unused Chinese and non-Chinese Drywall, October 30, 2009, http://www.cpsc.gov/info/drywall/TabA.pdf.

[18] U.S. Consumer Product Safety Commission Staff Summary of Contractor's Indoor Air Quality Assessment of Homes Containing Chinese Drywall, November 23, 2009, http://www.cpsc.gov/info/drywall/51homeStudy.pdf.

[19] Identification of Problematic Drywall: Source Markers and Detection Methods, May 28, 2010, http://www.cpsc.gov/library/foia/foia10/os/EHESourceMarkers.pdf.

[20] The Task Force emphasizes, however, that such identification of strontium does not necessarily indicate the presence of problem drywall, rather, only that additional testing in those areas is advised.

[21] Status Report on the Preliminary Analysis of HVAC, Gas Distribution, and Fire Safety Equipment Installed in Homes with Chinese Drywall, November 23, 2009, http://www.cpsc.gov/info/drywall/PrelimHVACGasDistFireSyst.pdf.

[22] Interim Report on the Status of the Analysis of Electrical Components Installed in Homes with Chinese Drywall, November 23, 2009, http://www.cpsc.gov/info/drywall/prelimelectrical.pdf.

corrosion in homes.  In addition, the patterns of reactive sulfur compounds emitted from drywall samples show a clear distinction between certain Chinese drywall samples manufactured in 2005/2006, and other Chinese and non-Chinese drywall samples.  Also, the 51-home study reported an association between hydrogen sulfide levels in homes and corrosion in those homes.  Thus, it is believed that one of the possible corroborating tests that could be considered is emissions testing from suspect drywall from homes.  Another similar corroborative test could be determining whether corrosion of copper metal to form copper sulfide occurs when copper is placed in test chambers at elevated humidity with drywall from the home.  Chamber tests may be costly and time consuming options.

**Continuing Development of this Guidance**

We will incorporate future findings, as appropriate, to improve upon this guidance.  More information on problem drywall is available at the federal Drywall Information Center website, www.drywallresponse.gov.

**EXHIBIT F**



# *Assessment and Remediation of Corrosive Drywall:*
## *An AIHA® Guidance Document*

## American Industrial Hygiene Association®
*Developed by the AIHA Construction Committee and the AIHA Indoor Environmental Quality Committee*

Approved by AIHA Board of Directors, October 30, 2013

<u>Project Team</u>
Ed Light, CIH  Project Team Lead
Lila C. Albin, PhD (deceased)
Ronald B. Bailey,
Christopher P. D'Andrea
Matt Divine, CIH, CIAQM
Tracey Dodd
Howard E. Ehrsham, PE
Alyson  Fortune
Benjamin L. Kollmeyer, CIH
John R. Kominsky, CIH, CSP, CHMM, ROH
Shawn Macomber
Roger G. Morse
Michael Tuday

*For background information on corrosive drywall, see AIHA's "White Paper on Corrosive Drywall," available on the AIHA website.*

# Assessment and Remediation of Corrosive Drywall:
## An AIHA Guidance Document

## Table of Contents

1. Introduction .................................................................................................................................. 2

2. Background .................................................................................................................................. 3

3. Performance Objectives ............................................................................................................. 3
   3.1. Assessment ........................................................................................................................ 3
   3.2. Remediation ...................................................................................................................... 3

4. Assessment Procedures .............................................................................................................. 4
   4.1. Decision-making Process .................................................................................................. 4
   4.2. Initial Screening ............................................................................................................... 4
   4.3. Detailed Investigation ...................................................................................................... 5
   4.4. Laboratory Analysis of Bulk Drywall Samples ............................................................... 6
   4.5. Information Needed to Design Corrective Measures ......................................................... 7
   4.6. Federal Guidance .............................................................................................................. 7

5. Remediation Procedures ............................................................................................................. 8
   5.1. Interim Controls ............................................................................................................... 8
   5.2. Scope of Removal ............................................................................................................. 8
   5.3. Project Management .......................................................................................................... 8
   5.4. Worker Protection ............................................................................................................. 9
   5.5. Site Preparation ................................................................................................................ 9
   5.6. Demolition ........................................................................................................................ 10
   5.7. Dust Cleanup .................................................................................................................... 10
   5.8. Control of Residual Odor ................................................................................................. 10
   5.9. HVAC System ................................................................................................................... 11
   5.10. Contents .......................................................................................................................... 11
   5.11. Clearance ........................................................................................................................ 11
   5.12. Air Monitoring ............................................................................................................... 11
   5.13. Documentation ............................................................................................................... 12

6. Emerging Technologies .............................................................................................................. 12
   6.1. Monitoring Air Quality by Sulfur Deposition ................................................................. 12
   6.2. Hybrid Remediation (Removal/Treatment) ...................................................................... 12

7. Electrical and Mechanical Considerations ................................................................................. 13

8. References .................................................................................................................................. 14

Appendix A: Example CDW Assessment Procedure ...................................................................... 16
Appendix B: Example CDW Remediation Protocol ....................................................................... 19
Appendix C: Interview Form .......................................................................................................... 22

# Assessment and Remediation of Corrosive Drywall:
# An AIHA Guidance Document



Photo 1:  Most corrosive drywall was imported from China between 2005 and 2007.

## 1.0    Introduction

Corrosive drywall (CDW) contains gypsum contaminated with sulfur and can emit gaseous pollutants associated with blackening of metal surfaces, and a burnt-match-like odor.  This document focuses on assessing structures for CDW and overseeing corrective measures. It includes procedures and supporting information for field practitioners and is intended to help answer basic questions such as, "Does my home or building have CDW?" and "How can I restore normal air quality?" In this document, the term "remediation" is limited to the decontamination process (i.e., removal/ treatment) and will not address restoration of corrosion damage.   Consideration of corrosion damage is outside the expertise of most industrial hygienists and is discussed only in general terms.  In addition, assessment of health risks is *not* included.

Collection of evidence for legal purposes and documentation for real estate transactions are also beyond the scope of this document.

CDW is a relatively new source of indoor environmental contamination and there are significant gaps in our understanding of this complex issue.  This guidance is based on available data, field experience, and professional judgment, and will be updated as the subject evolves.  While the assessment procedures included in this document are generally supported by scientific research and verified by field experience, remediation procedures are based on field experience only and have not been scientifically validated.

## 2.0   Background

The earliest reports of CDW installation date back to 2001, and the importation of CDW from China ceased in 2007.  Peak years of CDW use appear to have been between 2005 and 2007, and more recent use is relatively rare.  It is estimated that tens of thousands of U.S. homes and buildings contain CDW.  CDW appears to have originated from China, where naturally occurring high-sulfur gypsum was processed into drywall.  Drywall containing elemental sulfur is consistently associated with corrosive emissions.  These emissions are a complex, variable mixture of contaminants at the parts per billion (ppb) level, which includes corrosive and odorous sulfide gases. The sulfides appear to be produced by a chemical/ physical mechanism, with emissions increasing along with temperature and moisture.

Sulfide gases produced by CDW react with metal surfaces to form black corrosion (i.e., copper sulfide, silver sulfide).  This corrosion has been associated with the failure of air-conditioning coils as well as damage to electrical and mechanical systems and contents of the building belonging to the occupant.



Photo 2:  Blackening of copper surfaces indicates sulfur corrosion.

## 3.0   Performance Objectives

### 3.1   Assessment

The primary goal of an initial screening is to determine whether CDW is likely to be present in a structure.  The initial screening can be followed by a more detailed investigation to conclusively establish whether a structure has CDW and to locate CDW within the structure.  The results of a detailed investigation can be used to compile information needed to develop a mitigation plan.

### 3.2   Remediation

Where CDW is found to be present, the overall remediation goal is to restore air quality to non-CDW conditions. This is generally achieved by replacing all drywall ("full removal") or replacing only corrosive panels ("selective removal").

During drywall removal, be sure to:

- protect workers and occupants during demolition and cleanup
- replace insulation behind drywall panels
- eliminate dust to the extent feasible
- resolve residual odor

Additional requirements for CDW remediation may include:

- documenting drywall products for legal proceedings
- including procedures consistent with court decisions and federal guidelines where needed to resolve liability concerns
- adding more detailed testing and documentation to support real estate transactions or a warrantee

Budgetary limitations and time constraints may preclude full achievement of these objectives. In such cases, CDW emissions should be minimized to the extent feasible.

CDW remediation also includes corrective measures to address corroded electrical and mechanical systems. These issues are generally addressed either by full replacement (i.e., replacing all systems) or repair to a functional condition (i.e., replace or clean components as needed).

## 4.0    Assessment Procedures

Guidance for CDW identification has previously been issued by the U.S. Consumer Product Safety Commission (CPSC). This AIHA document provides a more comprehensive approach to the assessment of structures with respect to CDW. Federal CDW guidance is summarized in Section 4.6.

### 4.1    Decision-making Process

The basic goal of assessment is to determine whether CDW is present. CDW is generally ruled out where drywall was installed before 2001. A simple screening may be considered sufficient to classify the structure, with negative findings suggesting that CDW is unlikely to be present. However, more information is needed for a conclusive negative finding. If an initial screening establishes that CDW is widespread (i.e., present in most rooms), further investigation may not be needed. However, if CDW appears to be localized, further investigation is needed to consider selective removal.

After initial screening, additional evaluation may be needed to:

- confirm a negative finding
- confirm and map the location of corrosive panels
- delineate areas free of CDW
- determine source(s) of surface blackening where sewer gas or water containing hydrogen sulfide is suspected
- confirm that blackening is sulfide corrosion

- assess occupant exposure
- collect information needed to develop a mitigation plan

Please note that information needed to support litigation (i.e., identify CDW manufacturers) is beyond the scope of this document.

### 4.2    Initial Screening

An initial screening for CDW should generally include five basic steps:

- **Step One: Site Documentation**. Record dates of drywall installation and product information, where available. Construction history can help localize areas where CDW was used.
- **Step Two: Interviews.** Ask occupants and other knowledgeable parties about conditions they have observed, including detection of "burnt-match" odors, failures of electrical or mechanical systems, or blackening of personal contents, such as jewelry. Appendix C lists some example interview questions.
- **Step Three: General Observations**. Note site conditions that are potentially related to the presence of CDW or other sources of indoor contaminants. References 3 and 4, listed on page 14, discuss how to evaluate and classify odors.
- **Step Four: Product Identification.** Document accessible drywall labels and check against lists that suggest which drywall types are corrosive. One such list can be found at www.chinesedrywall.com.
- **Step Five: Corrosion Inspection**. Inspect metal surfaces for blackening. An initial screening typically includes opening one electric receptacle per room and viewing accessible piping and contents. Testing of the drywall may be needed to confirm the presence of CDW where other sulfide sources are suspected.

Corrosion of metal surfaces caused by CDW emissions has a unique appearance: a black, soot-like coating, some of which rubs off when touched (often called "blackening"). This type of corrosion

4

can be visually differentiated from corrosion related to oxidation, which is green or white in color, and from tarnishing caused by moisture, which is gray. Photographs are useful in documenting corrosive conditions.

The examination of the condition of the electrical system focuses on exposed copper and silver components, such as uninsulated ground wires and wire tips at connections.  These can be observed by opening electric outlet covers.  An outlet or switch usually has to be pulled out from the wall to allow for appropriate inspection.  Investigators should be cognizant of electric shock hazards.  This process should be performed with the electrical system shut off at the breaker controlling the circuit with lockout, tag, and try out (LOTTO) procedures.  Note that "try out" is important to ensure the correct breaker is turned off.  The receptacles can then be removed, and the bare ground wire or screw connections where the insulated coating has been removed can be inspected for corrosion.

Mechanical inspection for corrosion focuses on accessible metal plumbing fixtures and uninsulated copper piping, such as a cold water pipe to a water heater or a refrigerant line to an air conditioner. Blackening is often most severe on the evaporator coils inside air conditioning units.  Investigators should open A/C units and look for discoloration of coils and wiring.

The inspection should also note discoloration of other susceptible metal contents, such as mirrors and silverware.

Appendix A includes an example procedure for initially screening a structure for CDW.

## 4.3     Detailed Investigation

Detailed CDW investigations should include one or more of the following procedures:

- Perform a comprehensive corrosion inspection of all accessible locations.
- Scan drywall using a hand-held X-ray fluorescence instrument (XRF) to determine strontium content.

- Identify non-CDW sources of sulfide emissions.
- Locate drywall labels.
- Perform contact tests (i.e., in-place identification of CDW by attaching silver strips).
- Perform XRF scanning of discolored metal surfaces to confirm the presence of sulfur.
- Perform laboratory analysis (i.e., analyze bulk drywall samples for elemental sulfur content, perform chamber testing for sulfide emissions, or observe for copper corrosion in a jar test).

Air quality monitoring is normally not needed to determine whether CDW is present or to locate CDW panels.  Measurement of air corrosivity can provide an indication of relative exposure for risk assessment and is important to the verification of remedial work (see Section 5.10).

**Corrosion Inspection:**  All accessible sites, including light fixtures and breaker boxes, are evaluated following the procedure described in Initial Screening Step Five in Section 4.2.

**Strontium Measurement (XRF):**  To measure metal content, scan materials with XRF.  CDW is generally associated with elevated concentrations of strontium, although that element does not contribute to CDW emissions.   Hand-held XRF monitors are available for field use and can be used to scan accessible drywall, although paint and wall coverings may reduce or increase the drywall strontium reading. The use of XRF is a regulated practice with limitations specific to each state.  XRF use must be performed by individuals who are familiar with the limitations of the method and specific instruments.

Potential classification errors stemming from the use of XRF can be avoided as follows:

- While strontium levels exceeding 1,200 to 1,800 ppm generally correlate with CDW, a few non-CDW drywall products also have elevated strontium content.  False positive conclusions can be avoided by laboratory

analysis of high-strontium drywall in areas without blackening, or by observation of drywall labels.

- Very rarely, some CDW may have low strontium content. This may be suspected where blackening is observed near low-strontium drywall and can also be resolved by bulk analysis or label observation.

- Where drywall is inaccessible (i.e., covered by attached cabinetry), similar strontium readings to those around the perimeter can be assumed unless corrosion inspection of the area suggests the presence of a different drywall product.

- Readings should not be considered representative where drywall mud/joint compound is likely to be present (i.e., around panel edges). This source of error can be avoided by taking multiple readings of a drywall panel and discounting the lowest values.

- In some areas, CDW may have only been used in small strips or patches. The XRF testing pattern areas must be of sufficient detail to find such exceptions in low strontium areas.

- To minimize classification errors, confirmatory laboratory analysis of drywall suspected of being CDW should be considered (see Section 4.4).

A series of detailed XRF readings throughout the structure can produce an accurate map of CDW locations, as long as potential errors are recognized and corrected. References 3 through 6 discuss how to adjust XRF readings to account for interferences from surface coatings.

**Other Sulfide Sources:**  Blackening of metal surfaces may also be caused by a release of sewer gas or the presence of water containing hydrogen sulfide. Such sources may be readily apparent during initial odor evaluation (i.e., "rotten-egg" odor is detected). Intermittent sources may also be identified by compiling site history and conducting a detailed inspection. Outside the structure, note the presence of "rotten-egg" odor by irrigation water, standing water, or treatment facilities. The indoor screening should check for "rotten-egg" odor from the initial discharge of water taps, dry traps (commonly found in unused sinks or vacant homes), or unintended venting of sewer gas.

**Product Labels:**  Where accessible, product labels, drywall end tape, or other markings on installed drywall may indicate whether or not it is corrosive. Labels can be observed on unfinished drywall (i.e., in return air plenums, drywall ceilings open to the attic, unfinished areas where drywall remains open at the back, and through cut access holes). Identifying the bar code on an end tape allows the inspector to identify the drywall manufacturer, or, at a minimum, its country of origin. End tapes can often be identified behind removed baseboards with no boring necessary, though inspection holes can also be cut. Font, size, and color of lettering may be important for label classification. Lists of markings and labels that establish whether drywall is corrosive are available from sources such as www.chinesedrywall.com.

**Contact Tests:**  If a drywall panel is corrosive, copper or silver placed in contact with the gypsum core will turn black in several days. This reaction can be utilized as a test procedure by inserting a pin, nail, or wire into the drywall. A commercially available test system provides silver strips to be placed over a small slit cut through the drywall face.

**Corrosion Confirmation:**  While visual observation of metal blackening is generally accepted as a sign of sulfide corrosion, these confirmatory methods are available:

- An XRF analyzer with a silicon drift detector can be used to determine if sulfur has been deposited on a metal surface.
- Laboratory analysis by electron microscopy can also be used to confirm sulfide corrosion.
- Cleanroom coupons (copper and silver) can be placed in the suspect environment and then analyzed for sulfides.

**4.4     Laboratory Analysis of Bulk Drywall Samples**

CDW emissions are consistently associated with the presence of an allotrope of elemental sulfur in

drywall: orthorhombic cyclooctasulfur. Bulk drywall samples can be analyzed for cyclooctasulfur by gas chromatography/electron capture detection. Sulfide emissions from CDW can be detected in a static chamber test. Another test, the jar test, exposes copper to a piece of CDW in a closed container, with visible blackening suggestive of CDW emissions. False positive readings may result from emission testing of non-corrosive drywall that has become a sink for nearby CDW emissions. Where this is suspected, drywall classification should be based on elemental sulfur analysis. Although CDW can be confirmed by laboratory testing, each finding is directly applicable only to the site sampled. The result may be applied to a wider area that has been demonstrated to have the same type of drywall (i.e., by XRF scanning).

Appendix A includes an example of a detailed CDW investigation.



Photo 3: On-site XRF analysis can be helpful for locating corrosive drywall panels, but several factors must be considered in data interpretation.

## 4.5  Information Needed to Design Corrective Measures

Where CDW is found in a structure, an assessment can document other information needed to facilitate the mitigation process, such as:

- extent of corrosion damage
- materials that must be removed to access CDW
- relocation requirements for occupants and contents
- coordination with adjoining units
- layout to plan containment locations and work procedures
- scope of electrical and mechanical repair and/or replacement



Photo 4: Most CDW remediation projects replace all drywall, but selective removal can be considered in some cases. Note that the workers are improperly wearing their respirator straps and the workers' street clothes are exposed to contaminated dust. This can be avoided by properly wearing a respirator mask and protective coveralls.

## 4.6  Federal Guidance

CDW assessment recommendations by the Consumer Product Safety Commission (CPSC) are limited to a "threshold inspection" (i.e., is metal blackening present where drywall was installed between 2001 and 2009?) and "corroborating evidence" (i.e., data confirming that an individual drywall panel is corrosive). CPSC classifies a drywall panel as corrosive if at least two of the following conditions are found:

- a laboratory test is positive for elemental sulfur
- Chinese markings are present
- elevated sulfide emissions are measured in a chamber test

- copper corrosion is observed in a jar test
- corrosion tests positive for sulfide

AIHA discusses evaluation procedures for these factors in Sections 4.3 and 4.4.  AIHA's assessment guidance is more comprehensive than CPSC's.

# 5.0    Remediation Procedures

CPSC's remediation guidance provides broad guidelines regarding the cleanup of dust.  The only mandatory requirements governing remediation of structures with CDW are found in the Virginia Building Code in Section 112.5.  In rooms where CDW is present, Virginia requires the removal of the following for remediation:

- drywall
- insulation
- carpet
- vinyl flooring
- dust

AIHA addresses gaps in previously issued decontamination guidance.  It also clarifies and updates available protocols.

## 5.1    Interim Controls

Because CDW emissions may persist for years and remediation is expensive, lower-cost measures to temporarily reduce emissions would be beneficial where source removal cannot be accomplished quickly.  Various methods have been suggested, such as operating portable dehumidifiers, fogging, and air cleaning, but insufficient data are available at this time regarding the efficacy of these methods.

## 5.2    Scope of Removal

Most remediation efforts include removal of CDW.  Where CDW is widespread throughout the home, removal of all drywall may be considered the most cost-effective remedial strategy.   However, this alone may not eliminate sulfide emissions, which may continue to be released from remaining demolition dust or sulfide compounds sorbed on remaining surfaces (this situation is addressed in Sections 5.7 and 5.8).

Drywall replacement includes the removal of adjacent trim and millwork for access to and removal of insulation for control of residual emissions.   Where damage to cabinets and countertops can be avoided, they may be removed and reset following the installation of non-CDW.

Other building materials and furnishings are sometimes left in place, if they can be protected against damage during remediation.   Items considered acceptable for re-use may include doors, cabinets, vanities, sinks, bathtubs, toilets, items made of marble, granite, etc., as well as metal items without visible blackening, such as light fixtures and appliances.   The need for carpet replacement should be determined on a case-by-case basis.

Home construction often includes installation of more than one type of drywall.  CPSC's CDW guidelines discuss removal of only those drywall panels that are actually producing corrosive emissions.  However, selective drywall removal may not be feasible unless a detailed inspection establishes that large areas are free of CDW.  Construction history can be useful in delineating areas free of CDW, such as areas where new drywall was only used for restoration of a flooded lower floor, or for renovation or an addition.  In areas with multiple drywall products, non-CDW panels may still need to be removed if they block access necessary to control residual dust or to repair corrosion damage.   Successful selective removal requires detailed mapping of drywall types and a conservative scope of work (i.e., removing material when in doubt).   After initial removal, accessed cavities should be checked to identify any remaining CDW.  Observations of hidden ½" drywall or additional blackening may indicate that more drywall must be removed.

Some CDW remediation projects treat drywall without removal (see Section 6.2). Efficacy of these methods has not been established.

## 5.3    Project Management

After the remediation and repair objectives are determined, the project manager or environmental

8

consultant should develop a site-specific plan. Elements of this plan may include the following:

- proposed specifications, including the location of drywall to be removed, materials that must be removed for access (trim, cabinetry, furnishings, stairways, piping, etc.), and adjacent insulation that must be removed to control demolition dust
- identification of materials and furnishings to be reused versus replaced
- location for storage of items to be reused
- proposed sequence of work and procedures for preparation, cleanup, and odor control
- coordination of remediation with electrical and mechanical repair and reconstruction

The project manager or environmental consultant should also ensure that the contractor understands the scope of work and procedures to be followed and has the necessary equipment and personnel. Successful decontamination is facilitated by on-site inspection during startup and periodically during the work process. Early identification and correction of improper practices is necessary to achieve project objectives in a timely manner.

CDW remediation involves a variety of trades accomplishing a sequence of tasks. The project manager must coordinate these activities, establish a clear chain of command, and encourage regular communication between parties.

Work should stop at critical points in the process pending approval by the project manager and/or environmental consultant. Stopping points should include:

- pre-demolition, to verify that contents have been removed or covered, surfaces are protected, and dust controls are in place;
- post-demolition, to verify that all specified materials have been removed and demolition dust eliminated; and
- final assessment, during which additional evaluation (i.e., air corrosivity testing) should be considered where residual emissions are of concern (i.e., CDW odor is still detected).

If project objectives are not achieved, additional remediation may be needed.

### 5.4    Worker Protection

The contractor is responsible for the protection of workers at the job site. Basic protection during demolition work includes an N-95 respirator (a high quality dust mask), goggles, and work gloves. If workers are required to wear a respirator, then the contractor must have a respiratory protection program. Specific worker sensitivities should also be considered. During removal of CDW, workers are also exposed to nuisance sulfide odors and potentially irritating particles. These exposures have not been measured and additional protective measures are not required at this time; however, they may be incorporated as an additional margin of safety for workers. Care should be taken to not track CDW dust or wear contaminated clothing out of the work area.



Photo 5: During demolition, workers should wear a minimum of goggles, gloves, and an N-95 respirator for protective gear. The worker above lacks eye protection and is improperly wearing his respirator straps.

### 5.5    Site Preparation

To prepare work areas for drywall demolition, contents and furnishings must be relocated or protected. Use of air scrubbers can also be

considered to limit the distribution of airborne dust and to facilitate cleanup.

Where drywall is to be selectively removed, non-CDW areas should be fully isolated using sealed dust barriers or cleaning of demolition dusts will have to be performed in non-protected areas post-demolition.

Multifamily residences or commercial buildings with CDW require comprehensive planning to protect adjacent units from work activities and to protect cleared areas from recontamination. Each work area should be isolated from adjoining units and common spaces.

An example of site preparation procedures is included in Appendix B.

## 5.6    Demolition

When removing drywall, be sure to:

- minimize dust generation
- remove waste without contaminating surfaces outside the work area
- isolate remediated areas from subsequent work sites

CDW debris can be disposed of as general construction waste (local requirements may vary) but should never be recycled.



Photo 6: CDW can be disposed of as general demolition waste, but must never be recycled.

## 5.7    Dust Cleanup

Elimination of demolition dust requires a systematic cleaning pattern and attention to detail. After removal of debris and larger particles, all surfaces should be cleaned until no demolition dust is present. Frequently, this is done by HEPA vacuuming followed by damp wiping. When site personnel believe that cleanup is complete, the project manager or third-party consultant should verify the cleanup results. First, the inspector should determine whether all remnants associated with drywall specified for removal have been eliminated. Air-moving devices in use should be shut off prior to the inspection to allow for suspended dust to settle. Dust inspection should be performed with a bright flashlight and is facilitated by wiping surfaces with a dark cloth. To the extent feasible, the inspector should access hidden surfaces for inspection. Further guidance on conducting dust inspections can be found in ASTM E1368-05, *Standard Practice for Visual Inspection of Asbestos Abatement Projects*. The contractor should be encouraged to perform additional spot cleaning during the inspection, but should not be permitted to continue with other work until all surfaces in the work area are considered dust-free.



Photo 7: Inspector identifies visible dust after attempted cleanup. The presence of dust indicates that additional work is required.

## 5.8    Control of Residual Odor

Volatile air contaminants often adsorb to porous surfaces, releasing odors after the removal of the

primary source. This "sink effect" is resolved after surface residues off-gas. In some cases, CDW odor has been reported to persist for months after drywall removal and cleanup. Elimination of this odor is facilitated by airing out the structure by opening windows and using portable fans. The length of time required to control CDW odor by air-out alone ranges from several days to several months. Air-out can be concurrent with other work, but should be completed before installation of new structural materials. Opinions vary as to whether air-out is necessary.

A variety of odor treatments are in use to supplement or replace the air-out process. These include surface application of or fogging with solutions that oxidize or scavenge sulfides. Products used in this manner must not be strongly corrosive (some have been known to cause additional corrosion damage). Control of CDW emissions may be only short-term if the product does not achieve sufficient contact with the gypsum core, other affected surfaces, and remaining dust. Odors and further corrosion have been reported after some treatments produced initial improvement. Some vendors claim that these products provide ongoing control against future odors. Vendors do not address potential risks associated with exposures to residues remaining after treatment. While anecdotal information suggests that some treatments may be effective, supporting data is not conclusive.

Other methods currently in use as CDW odor controls include:

- **Bake-out.** Elevated temperature increases emissions, but may damage materials.
- **Air cleaning.** Hydroxyl generators and ozonators create irritating by-products; treated filters have not been demonstrated to consistently control CDW odor.
- **Washing remaining surfaces.** Damp wiping with a bleach solution may oxidize surface residues. Pressure-washing surfaces with water creates moisture problems and may spread dust into inaccessible areas.
- **Surface steaming.**

It should be noted that efficacy has not been established for any of these methods.

**5.9     HVAC System**

The most severe corrosion in CDW homes is generally found on air conditioning coils, and these are generally replaced. Other components of the mechanical system specific to each property should be considered on a site-specific basis. Treatment, cleaning, or replacement may be considered necessary to control dust and/or residual odor.

**5.10     Contents**

Contents and furnishings in homes with CDW may retain odors that eventually dissipate over time. Contents' odor is often resolved by removing contents from CDW areas, cleaning (i.e., vacuuming surfaces or laundering), and then airing out.

**5.11     Clearance**

To date, research has not established the effectiveness of any CDW remediation procedure, so verification of each project should be determined on a site-specific basis. This clearance process should first confirm that all drywall and insulation has been removed as specified and that dust has been eliminated to the extent feasible.

Odor evaluation and/or air testing should not commence until after the work area has been closed up for a sufficient period of time for air quality to stabilize, and for temperature/relative humidity in the contained area to exceed that needed to generate CDW emissions.

The Virginia Building Code requires air quality testing before and after reconstruction of structures with CDW. References 3, 4, 8, 9, and 10 include procedures for clearing CDW remediation projects.

**5.12     Air Monitoring**

Chemical testing for airborne sulfide mixtures lacks the sensitivity and selectivity to document ambient

11

concentrations of CDW emissions. Composite parameters such as air corrosivity and sulfur deposition can be used to evaluate indoor air quality (IAQ) in homes with CDW emissions. Reference 7 presents a three-day test employing a passive dosimeter, which has been peer-reviewed and validated for air corrosivity evaluation of indoor air. This test system is commercially available.

Air corrosivity is a parameter used by cleanroom industries to monitor the cumulative impact of airborne contaminants. The protocol used for IAQ evaluation is a modification of the industrial method. Metal loss is measured on probes, which can be read in the field using an electro-conductivity meter or shipped to a laboratory for analysis. Since air corrosivity measures all types of corrosion, false positive conclusions are possible where sources of oxidative corrosive emissions are present. Such interferences can be minimized by identifying and controlling non-CDW sources during the test period (i.e., prevent the use of bleach ammonia-based cleaners).

During the interpretation of air quality data in relation to CDW, consider the following:

- False negative findings are possible under dry and/or cold conditions when CDW emissions temporarily decrease or stop. Such a condition may be suspected where blackening is present and relative humidity (RH) is below 40 percent.
- Sulfide emissions from sources other than CDW sources, such as sewer gas or water containing hydrogen sulfide, are also detected by the air corrosivity test. Such sources can generally be identified during the inspection and should either be eliminated or accounted for when interpreting air corrosivity data.
- CDW emissions consist of a complex mixture of sulfide compounds with varying thresholds for odor and corrosivity. "Burnt-match" odor may be detected where measured air corrosivity appears to be within normal background. Therefore, monitoring of air quality should be supplemented by odor evaluation and detectable "burnt-match"

odor should not be considered acceptable, even where air corrosivity is normal.

Another method being used to monitor air in CDW homes is measurement of sulfur deposition by XRF on copper or silver dosimeters (see Section 6.1).

The Virginia Building Code requires air monitoring for clearance using either the air corrosivity probes cited previously or air reactivity coupons. The latter method is used in industry but has not been validated for IAQ evaluation.

### 5.13   Documentation

The investigator should prepare a report including basic findings used for assessment and summarizing the remediation process. Some situations require additional documentation, such as the type of drywall removed. More detailed reports may also be necessary to support real estate transactions, property rental, etc.

## 6.0   Emerging Technologies

### 6.1   Monitoring Air Quality by Sulfur Deposition

This method analyzes deposited sulfur on copper or silver coupons utilizing XRF. Sulfur is a by-product of the metal's corrosion from sulfide gases. CDW emits sulfide gases that react with copper and silver to form copper sulfide and silver sulfide, respectively, on the surface of passive dosimeters ("coupons"). This process can be accelerated utilizing forced air over a set period of time. XRF is utilized to quantify the sulfur deposits on the coupons in micrograms per square centimeter. A non-detect reading suggests that sulfide gases were not present during the exposure period. Positive readings for sulfur are compared to a database of readings made under known environmental conditions to classify air quality.

### 6.2   Hybrid Remediation (Removal/Treatment)

Although various oxidizing solutions to treat CDW are in commercial use, control effectiveness is

dependent on sufficient contact with the contaminants associated with CDW emissions. For treatment of CDW panels in-place, the solution should spread throughout the drywall core. For residual odor treatment, all remaining surfaces and dust particles should be coated. One treatment process attempts to achieve full contact with sulfides associated with CDW emissions by foaming the solution into each drywall panel and fogging all remaining surfaces and particles with an electrostatic paint sprayer.

During a pilot project in which reconstruction would be more expensive, CDW panels were left in the kitchen and bathrooms of a home. The backs of these panels were treated with solution applied through the wall opened in the adjacent room. For residual emission control, all surfaces and remaining dust were fogged with an electrostatic paint sprayer, allowing charged aerosol droplets of the treating solution to adhere to all surfaces.

Treated CDW and dust from this process were tested for emissions in a static chamber, with sulfides below the detection limit. Air corrosivity measurements in the pilot home after this treatment were within normal background and no CDW odor was detected. While this method appeared to be effective in the pilot study, it requires expertise, planning, and quality control to execute effectively.

## 7.0   Electrical and Mechanical Considerations

Although electrical and mechanical issues are outside the expertise of many industrial hygienists, the resolution of corrosion damage is included in most CDW remediation projects and must be coordinated with decontamination. The scope of electrical and mechanical work depends on the property owner's objectives, which may include:

- restoring all potentially damaged components to pre-existing condition (i.e., replace all systems)
- repairing components to a functional condition (i.e., replacing coils, cutting blackened wires, cleaning blackened pipes, ensuring that low-voltage electronics are operable)
- addressing only immediate safety concerns (i.e., replacing smoke and carbon monoxide detectors)

A detailed assessment of electrical and mechanical systems is generally not needed for either full restoration or minimal safety repairs. However, the repair strategy should be based on a detailed assessment by a qualified electrician and mechanic and may be subject to approval by Code officials.

# 8.0    References

1.    **American Industrial Hygiene Association:** "White Paper on Corrosive Drywall," AIHA (2010). www.aiha.org/government-affairs/Pages/Position-Statements-and-White-Papers.aspx.

2.    **Burdack-Freitag, A.; Mayer, F.; and Breuer, K.:** "Identification of Odor-active Organic Sulfur Compounds in Gypsum Products," *Clean 6(37):*459-465 (2009).

3.    **Light, E.:** "Assessment and Remediation of Corrosive Drywall," *Proceedings of Indoor Air 2011,* Austin, TX, Building Dynamics, LLC (2011). [Reprint available from: ELight@Building-Dynamics.com.]

4.    **Macomber, Shawn:** "Corrosive Drywall: The Role of the Indoor Environmental Professional as a CDW Consultant," *Indoor Air Quality Association National Conference* (2011). [Reprint available from: HealthyHomeSolutionsllc@gmail.com.]

5.    **Kominsky, J.R.:** "XRF Analysis of Strontium in Drywall and Effects of Drywall Finish on Strontium Measurement," *Proceedings of Air & Waste Management Conference,* Orlando, FL (June 2011). [Reprint available from: JKominsky@EQM.com.]

6.    **Kominsky, J.R.:** "Relationship Between Orthorhombic Cyclooctasulfur, Strontium, and Reduced Sulfur Gases:  Imported and Domestic Drywall," *AIHce 2012*, Indianapolis, IN (June 19, 2012). [Reprint available from: JKominsky@EQM.com.]

7.    **Light, E.:** "Measuring the Corrosivity of Indoor Air," *Proceedings of Indoor Air 2011*. [Reprint available from: ELight@Building-Dynamics.com.]

8.    **Light et al:** "Measuring Air Corrosivity in Corrosive Drywall Homes," *AIHce 2012,* Indianapolis, IN. [Reprint available from: ELight@Building-Dynamics.com.]

9.    **Virginia Department of Housing and Community Development, Division of Building and Fire Regulation:** "*Amendments to the Virginia Uniform Statewide Building Code for Defective Drywall*," (2011).

10.    **National Association of Homebuilders:** "Imported Problematic Drywall:  Identification Strategies and Remediation Guidelines," (March 2011). www.nahb.org/form.aspx?formID=8026.

11.    **Tuday, M., and Fortune, A.:** "Measurement of Corrosive and Odorous Gases from Imported and Domestic Wallboard," *Paper 2011--A--174--AWMA*, Air and Waste Management Association, (2011). [Reprint available from: KHoriuchi@CASlab.com.]

12.    **Babich, M., M.A. Danello, K. Hatfield, et al.:** "CPSC Staff Preliminary Evaluation of Drywall Chamber Test Results – Reactive Sulfur Gases," U.S. Consumer Product Safety Commission (CPSC) (March 2010). www.cpsc.gov/info/drywall/investigation.html#scireps.

13.    **CPSC and HUD:** "Identification Guidance and Remediation Guidance for Homes with Corrosion from Problem Drywall, March 18, 2011." www.cpsc.gov/info/drywall/investigation.html#scireps.

14.    **Innov-X Systems:** "X-Ray Fluorescence (XRF) Spectrometry," (accessed April 11, 2011).

15.    **U.S. Department of Housing and Urban Development:** "Chapter 7: Lead-Based Paint Inspection," *Guidelines for the Evaluation and Control of Lead-based Paint Hazards in Housing* (1997). www.hud.gov/offices/lead/lbp/hudguidelines/Ch07.pdf.

16.    **U.S. Environmental Protection Agency:** "Field Portable X-ray Fluorescence Spectrometry for the Determination of Elemental Concentrations in Soil and Sediment," *Method 6200* (February 2007). www.epa.gov/osw/hazard/testmethods/sw846/pdfs/6200.pdf.

14

17.      **Environmental Health & Engineering:**
"Identification of Problematic Drywall:  Source
Markers and Detection Methods," *EH&E Report
16512* (May 28, 2010).
www.cpsc.gov/library/foia/foia10/os/EHESourceMa
rkers.pdf.

## Appendix A:  Example CDW Assessment Procedure

*The following is provided as a generic example of procedures and criteria that may be useful in assessing structures for CDW.  This assessment model contains three phases:  initial classification, screening inspection, and detailed evaluation.  Alternative strategies that meet the performance objectives can be considered (see Section 3.0).*

**Initial Classification:**

- Determine if any drywall may have been installed after the year 2000.  *If not, CDW is assumed to be "not present."*

**Screening Inspection:**

- **Interview occupants and other persons with information about the property.**
  - Where is CDW suspected of being installed?  *Location of CDW must be confirmed by further investigation.*
  - Where has CDW odor, which resembles "burnt-match" odor, or hydrogen sulfide odor from sewer gas or water, which resembles "rotten-egg" odor, been detected?  *Further investigation is needed to identify sources.*
  - Is there a history of air conditioning or electronics failure?  *If failure was corrosion-related, it may suggest presence of CDW.*

See Appendix C for additional interview questions.

- **Evaluate odor.**
  - Walk around the outside of the home or building.
  - Note first impression when entering the structure.
  - Note locations where odor appears to be stronger.
  - Note the character of the odor.
    - "Burnt-match" odor suggests that CDW may be present.
    - Lack of "burnt-match" odor does not rule out CDW, which can be intermittent or masked by other odors.

- "Rotten-egg" odor is generally associated with sewer gas or water, not CDW.
- Further investigation is needed to confirm any of these findings.

- **Inspect air-conditioning coils.**
  - Open all A/C units to access coils.  *This may require a special tool.*
  - Check for discoloration on copper coils, coolant line, and uninsulated wiring.
    - Blackening, a black coating, or staining on metal that rubs off when touched suggests sulfur corrosion.  Recently changed or corrosion-resistant coils may not show blackening.
    - Other discoloration (i.e., green, white, brown, or gray*)* suggests stains unrelated to CDW.
    - Further investigation is needed to confirm source of blackening.

- **Inspect electrical wiring.**
  - Access at least one outlet in each room.
  - Evaluate opened receptacle and behind cover plate.
    - Blackening of uninsulated wires suggests a source of sulfide emission in the immediate area.
    - Detection of "burnt-match" odor from electric outlet suggests CDW in wall cavity.

16

- **Inspect susceptible materials.**
  — Check accessible metal piping, fittings, fixtures, mirrors, and contents.
  — Blackening suggests a source of sulfide emissions in the immediate area.

- **Locate other potential sulfide sources.**
  — "Rotten-egg" odors from sewer gas or sulfide-containing water may cause localized blackening.
  — No presence of "rotten-egg" odor, sewer gas, or sulfide-containing water suggests that the drywall located near metal blackening is corrosive.  *Further investigation may be needed for confirmation.*

- **Examine accessible drywall labels.** These labels may be observed on unfinished walls, from the attic (top of ceiling), or in air return plenums.  Inspection should note the date, manufacturer name, or country of origin.
  — Font, size, and color of lettering may be important for label classification.
  — Compare to lists of labels and other markings with known emission characteristics. A helpful website to check is www.chinesedrywall.com.

- **Classify findings as one of the following**:
  — No suspect blackening, odor, or labels.  *Structure appears to be free of CDW.*
  — Blackening is present in most areas and non-drywall sulfide sources are not suspected.  *This may be considered sufficient basis to support removing all drywall.*
  — Blackening is localized and owner-selective removal is being considered.  *Drywall mapping by type is needed to determine feasibility.*
  — Blackening from non-drywall sources may be observed.

— Initial findings are unclear or conflicting.  Detailed investigation is needed to confirm findings.

**Detailed Investigation:**

*Select from the following procedures to clarify preliminary findings from a screening inspection:*

- **Check all accessible wiring and breaker boxes per procedure in Section 4.2.**

- **Check refrigerator.**
  — Open up the panel on the back of the refrigerator.
  — Check cooling system for blackening.

- **Check low-voltage electronics,** such as thermostats, speakers, security system panels, garage door openers, door bells, and appliances with circuit boards.
  — Check for blackening on exposed silver or copper components.
  — Determine if electronics are functional.

- **Scan all drywall for strontium content.**
  — Use a portable XRF instrument.
  — Note that different XRF instruments have different use characteristics.
  — The use of XRF is a state-regulated practice with limitations specific to each state.
  — Individuals performing inspections must be knowledgeable of XRF benefits and limitations of use.
  — See Section 4.3 and References 3–6 for suggested procedures.

- **Document sources of hydrogen sulfide other than drywall.**
  — Sources may contribute to metal blackening in nearby areas.
  — Inspect outside structure for potential odor sources, such as irrigation water, standing water, sewage, nearby industrial facilities, or sewage treatment plants.
  — Reports of past sulfide odors may be from intermittent sources.

17

— Detection of "rotten-egg" odor suggests sulfide emissions.
— Sniff initial discharge of water from tap.
— Search for dry traps or drain line opening.
— Surface tarnishing may be caused by excess moisture.

- **Collect bulk samples.**
  — Cut a small piece of drywall.
  — Analyze for elemental sulfur (orthorhombic cyclooctasulfur by gas chromatography/electron capture detection).
  — Detectable $S_8$ verifies that drywall is potentially corrosive.
  — Test for sulfide emissions in a static chamber.
  — Expose copper to a piece of CDW in a closed container and observe for blackening.
  — Consider the possibility of false positive results from emission testing of non-corrosive drywall that has become a sink for nearby CDW emissions.
  — Note that each result is directly applicable only to the sample.
  — Similar properties may be assumed for other panels of the same type of drywall as determined by XRF mapping.

- **Confirm the presence of sulfide corrosion on metal surfaces.**
  — Scan surface with XRF attachment or coupon analysis.

- **Expand the search for product labels.**
  — Access may require damage of drywall to locate markings behind wall.
  — Drill or cut holes for observation.  The use of a boroscope, where feasible, allows for smaller holes.
  — Note the date, manufacturer name, and country of origin.
  — Font, size, and color of lettering may be important for label classification.
  — Compare findings to lists of known CDW manufacturers' labels and markings.

- **Findings are classified as one of the following:**
  — Confirms the presence of CDW (and may establish locations).
  — Confirms no evidence of CDW.
  — Inconclusive, with a more detailed investigation needed.

18

## Appendix B:  Example CDW Remediation Protocol

*The following is provided as example of procedures and criteria that may be useful for the remediation of structures with CDW.  These specifications generally assume complete removal of drywall throughout a single-family home.  Options for selective removal and work in multifamily or commercial buildings are also described.  Procedures are generic and can be modified to meet site-specific objectives and conditions.  Other procedures can also be used to achieve the overall performance objectives discussed in Section 3.0.*

1. **Move furnishings and contents to a storage area.**
   - Items should be isolated from CDW remediation activities.
   - Store items allowing air circulation to help eliminate residual odors.
   - Carpets may be replaced, protected in place, or stored.

2. **Protect items left in place.**
   - Cover surfaces not to be removed with plastic sheeting.
   - Floors inside the work area and also along the egress route must be covered to protect flooring (i.e., with plywood or cardboard).
   - Seal HVAC vents and HVAC components not to be replaced.

3. **Isolate areas for selective removal or phased remediation (for multifamily or commercial buildings).**
   - Erect sealed barriers around work areas.
   - Seal all penetrations and allow for access.
   - Maintain work area under negative pressure relative to adjacent areas where feasible.

5. **Place HEPA-filtered fan units in the work area.**
   - Can be operated as air scrubbers or negative-air machines.

6. **Exclude occupants and visitors from work areas.**
   - Vacate the home for full removal.
   - Partial occupancy may be considered for selective removal if complete isolation of the work area can be ensured.
   - Occupancy may be allowed in adjoining units in multifamily or commercial buildings contingent on inspections during demolition and cleanup.

7. **Approve site preparation before starting removal.**
   - Approved by an independent inspector when possible.

8. **Remove materials to access drywall.**
   - May include baseboards, trim, cabinetry, doors, fixtures, and countertops.
   - For items to be reused, protect or store in area isolated from removal activities.

8. **Don personal protection (for demolition and cleanup workers).**
   - Minimum good practice for demolition: use N-95 disposable face masks, goggles, and work gloves.
   - Avoid tracking dust out of work area.
   - Change out of dusty clothing when leaving the job site.

9. **Remove all drywall specified in remediation plan.**
   - Minimize dust generation.
   - Locate and remove all drywall remnants, nails, etc.

10. **Remove all batt insulation behind corrosive drywall.**

11. **Remove debris and heavy dust.**
    - Haul to waste storage without contaminating surfaces outside the work area.
    - Do not recycle waste drywall.

19

**12. Perform detailed cleaning.**
- Use a HEPA vacuum on all surfaces, from top to bottom, if available.
- Clean all surfaces with damp wiping.
- Repeat as necessary to eliminate visible demolition dust.

**13. Verify removal and cleanup.**
- Inspector should confirm that all specified drywall and insulation has been removed and no demolition dust is visible.
- For multifamily or commercial buildings, also inspect surfaces in adjoining areas.
- Contractor is to re-clean until area is cleared by inspector.

**14. Mitigate residual emissions.**
- Address residual emission concerns (i.e., consider air-out and/or surface treatment) where needed to eliminate CDW odor and restore air quality to normal background.
- Restore contents:
    - Clean contents, furnishings, and fixtures (i.e., HEPA-vacuum, launder, and dry-clean, as needed) before returning to site.
    - Evaluate for odor.
    - Consider additional treatment if CDW odor is detected.

**15. Establish site conditions for clearance evaluation.**
- Close all windows and doors.
- Shut down exhausts.
- Cease all work activity.
- Maintain RH of 40–80%; T>70 F˚.
- If HVAC is operable, set to continuous fan; if not, circulate air with small portable fans.
- Prevent smoking or use of corrosive products.
- Seal sources of sewer gas and $H_2S$-containing water.
- For selective removal, establish the above conditions in adjacent areas for evaluation.

**16. Evaluate odor.**
- Close up inspection area for at least 24 hours before evaluating.
- Evaluation includes initial impression of two or more persons able to detect environmental odors (i.e., not congested).
- Area fails to clear if any CDW-type odor is detected, such as "burnt-match" odor.

**17. Conduct air quality test.**
- Complete the test after CDW odor is no longer detected.
- Maintain site conditions established in Step 16.
- Do not base air quality on chemical tests due to insufficient sensitivity.
- Measure air corrosivity with probes (passive dosimeters).
- Place probes in representative areas and analyze per specified method.
- For selective removal, also test representative non-CDW areas.
- Sulfur deposition tests can be used as an alternative.
- The site is clear if all readings are within normal background range per method protocol.
- If any reading is elevated and non-CDW sulfide sources are suspected in the area, further investigation is needed.

**18. Address clearance test failures.**
- Re-evaluate remediated areas.
- Perform additional cleanup and/or odor control.

**19. Protect remediated areas in phased/selective removal.**
- Maintain barriers separating remaining CDW and future decontamination activity from remediated areas.
- Keep penetrations sealed to adjacent space(s).
- Establish positive pressure in the remediated area, if feasible.

**20. Evaluate drywall to be reinstalled.**
- Drywall suspected of being corrosive should test negative or not be used.

20

**21.  Re-evaluate site after the next cooling system.**
- Confirm that no CDW odor is detected.
- Verify that no new CDW-related blackening has occurred.  *When inspecting new A/C coils, note that corrosion-resistant coils do not blacken at the same rate as non-corrosion-resistant coils.*
- Consider repeating the air quality test.  *Results should remain within normal background.*

21

## Appendix C:  Interview Form

*The following set of questions is useful in assessing and investigating suspected CDW sites.  Data gathered can refine further investigation efforts and determine available courses of action.*

1.   Why are you having your home inspected for CDW? What are your objectives?

2.   Have you previously had an inspection for the purpose of identifying CDW?

3.   When was the home built? When was drywall installed?  Who did it?  Where did the drywall come from?

4.   Describe any additions and renovations.

5.   Do you notice an odor that smells like matchbooks?

6.   If you are in a development, do any of your neighbors have a problem?

7.   How old is your current HVAC system?  Have you had to replace the coils on your air conditioning system?  How many times?

8.   Have you noticed any unusual tarnishing or pitting on your faucets, mirrors, or silver jewelry and housewares?

9.   Are you having problems with any of your electronics, such as your computers, microwave control panel, TVs, or other items?

10.   Describe any past water or smoke damage.

11.   How do you operate your thermostat? When are windows open?

12.   What is the square footage of the building and how tall are the ceilings?

13.   Do you have any photos from the construction/renovation of your home that may show the drywall before it was hung or painted?