**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION                                          MDL NO. 2047

                                                    SECTION: L

                                                    JUDGE FALLON
                                                    MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO:
*ALL CASES*
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF THE FEE COMMITTEE'S**
**MOTION TO DETERMINE THE ALLOCATION OF THE GLOBAL**
**FEE AWARD AS BETWEEN COMMON BENEFIT FEES AND**
**INDIVIDUAL COUNSEL'S FEES PURSUANT TO PTO 28(F)**

**MAY IT PLEASE THE COURT:**

In support of its Motion to Determine the Allocation of the Global Fee Award as
Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) [Rec.Doc.
20282], the Fee Committee ("FC") submits the following:

**(I) Introduction and Procedural Background**

There are thousands of U.S. citizens who have appeared as claimants in this litigation.
Most had been the victims of Hurricane Katrina and other devastating storms, and were forced to
rebuild their homes and properties when there was a shortage of domestically-made materials.
They then had to endure yet another displacement and rebuilding, this time due to the corrosive
effects of Chinese drywall manufactured by the Knauf entities ("Knauf") and/or the Taishan
defendants ("Taishan").

1

After years of investigation, discovery, trials on the merits and intense negotiations, these claimants with predominantly property damages now are the beneficiaries of a series of complex and interrelated class settlements.  Class members with KPT Chinese drywall (manufactured by Knauf) in their homes have been afforded an opportunity for a complete, environmentally-certified remediation of their properties and compensation for other losses.  Other class members have received monetary benefits to compensate them, at least partially, for their damages.[1]  The total value conferred through these settlements is calculated to be in excess of $1.1 billion.

In this historic and global resolution, no homeowner who received remediation or other benefits through settlement has been obliged to pay fees for the services of the attorneys who have labored over seven years on their behalf.  Rather, as part of these settlements, the PSC negotiated an obligation on the part of the defendants to contribute substantial funds in order to satisfy all such fee obligations, as well as reimburse certain litigation expenses incurred by plaintiffs' counsel.  The Court has approved a total of $192,981,363.35 in such payments.  *See* Order of May 17, 2016 [Rec. Doc. 20257].  These funds remain on deposit in reserves administered by the Court-appointed CPA Phillip Garrett, pending distribution to counsel.

Before this occurs, however, Your Honor must determine (a) the portion of the total fees to be awarded to common benefit/class counsel for their services, and (b) the allocation of that common benefit fee award among those firms which, by adhering to Court-ordered protocol and guidelines, are entitled to participate in such an award.  *See id.*; *see also* PTO 28 and amendments thereto.  The instant motion addresses only the first of these determinations, *i.e.*, the

---

[1] Litigation on behalf of property owners with drywall manufactured by Taishan or BNBM, is ongoing against Taishan and its parent companies (BNBM, CNBM, BNBM Group, and related entities).

2

portion of the total available fee which should be designated as a common benefit/class counsel fee award.[2]

### (II) The Legal Authority and Policy Rationale for Awarding Common Benefit/Class Counsel Fees

The Fifth Circuit has made clear that a district court is charged with responsibility to make an independent determination of a requested common benefit fee award, utilizing the methodology and principles of analysis set forth in its governing jurisprudence. *See In re: High-Sulfur Content Gasoline Prods. Liab. Litig.,* 517 F.3d 220, 227-28 (5th Cir. 2008). *See also* PTO 28(F) [Rec. Doc. 20282]. The FC is committed to adhering to that methodology and those principles. At the same time, the FC recognizes that Your Honor ultimately will apply such guidelines based upon first-hand insights and judgments derived from your active management of these proceedings.

In presiding over Multi-District Litigation (MDL) and/or class actions certified under Fed. R. Civ. P. 23, district judges are vested with authority not only to assure that the overall legal fees sought by plaintiffs' counsel are reasonable, but also to award that portion of the total fees which will fairly compensate Court-appointed and/or class counsel who labored for the benefit of all plaintiffs. This doctrine of "common benefit fees" is a time-honored one in our system, rooted in case law dating from the nineteenth century. *See* Eldon E. Fallon, *Common Benefit Fees in Multi-District Litigation* [hereafter "*Common Benefit Fees*"], 74 La. L. Rev. 371 (2014). Moreover, the common benefit fee doctrine is one that originally was — and most commonly still is — applied in class action litigation (*see id.* at 375 & *fn.* 23), a fact made

---

[2] The Court-appointed Fee Committee ("FC") is prepared to recommend to Your Honor an allocation of the awarded common benefit fee among all eligible firms and counsel, which recommendation will follow in a separate motion and supporting memorandum.

especially relevant herein since class settlements have established the common recovery for plaintiffs.  Rule 23 codified the doctrine in 2003 by adding a provision expressly authorizing district judges to award "reasonable attorney's fees" to class counsel.  *See* Fed.R.Civ.P. 23(h).

Independent of Rule 23, the presiding judge in an MDL, being authorized by the MDL statute to "promote the just and efficient conduct of such actions," also is vested with the authority to award common benefit fees to counsel appointed by the Court to prosecute common issues on plaintiffs' behalf.  *See* 28 U.S.C. §1407(a); *see also In re Diet Drugs Prods. Liab. Litig.*, MDL 1203, 2002 WL 32154197, *17 (E.D. Pa. Oct. 3, 2002) (recognizing that assisting with the management of the complex docket, in addition to creating a fund, serves as a benefit for which a "court must be permitted to compensate fairly the attorneys who serve on...a [court-appointed] committee."); *In re Genetically Modified Rice Litig.*, MDL 1811, 2010 WL 716190, *4 (E.D. Mo. Feb. 24, 2010) ("An MDL court's authority to...order contributions to compensate leadership counsel derives from its 'managerial' power over the consolidated litigation, and, to some extent, from its inherent equitable power."), *aff'd*, 764 F.3d 864 (8th Cir. 2014), *cert. denied*, 135 S.Ct. 1455 (2015).  This fee award authority is a necessary corollary of the authority to appoint such counsel, serving to "assure that these attorneys receive reasonable compensation for their work."  *In re Linerboard Antitrust Litig.*, 292 F.Supp.2d 644, 653 (E.D. Pa. 2003) (citing *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1016 (5th Cir. 1977); *see also Smiley v. Sincoff*, 958 F.2d 498, 501 (2d Cir. 1992) (noting the authority of district judges to establish fees to compensate committee members for work performed on behalf of all plaintiffs involved in a consolidated litigation).  Over the years, the common benefit fee doctrine has been applied repeatedly in an MDL context, both in the Fifth Circuit and elsewhere.  *See Fla.*

*Everglades,* 549 F.2d at 1021.  *See also In re Vioxx Prods. Liab. Litig.*, 760 F.Supp.2d 640, 647-48 (E.D. La. 2010);  *In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.,* MDL No. 1871, Pretrial Order No. 70, at 1 (E.D. Pa. Aug. 26, 2009)[3]; *In re Protegen Sling and Vesica Sys. Prods. Liab. Litig.*, MDL No. 1387, 2002 WL 31834446, at *1 (D. Md. Apr. 12, 2002); *In re Rezulin Prods. Liab. Litig.*, No. 00 CIV. 2843, 2002 WL 441342, at *2 (S.D.N.Y. Mar. 20, 2002); *Diet Drugs*, 2001 WL 497313, at **6-8 (E.D. Pa. May 9, 2001); *In re Orthopedic Bone Screw Prods. Liab. Litig.,* No. MDL 1014, 1998 WL 118060, at *2 (E.D. Pa. Jan. 12, 1998); *In re MGM Grand Hotel Fire Litig.*, 660 F.Supp. 522, 529 (D. Nev. 1987).[4]

The policy rationale for the exercise of judicial authority to award common benefit fees is the same regardless of whether it occurs in a Rule 23 or an MDL context.  As this Court has written, common benefit fee awards derive from "equity and her blood brother, *quantum merit*," for they avoid the unjust enrichment of successful litigants which otherwise would occur if the attorneys who created a common fund for the litigants' benefit were not fairly compensated (from the fund) for their services.  *See Common Benefit Fees*, 74 La. L. Rev. at 376; *see also Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 857 (E.D. La. 2007) [quoting from 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §13:76 (4th ed. 2002)].  Additionally,

---

[3] Available at http://www.paed.uscourts.gov/documents/MDL/MDL1871/PTO70.pdf.

[4] The essential interdependence of the judicial authority to appoint "lead," *i.e.*, common benefit, counsel and the authority to compensate such counsel, has been expressly articulated in the case law of this Court:

> In matters of complex litigation, the district court must be instilled with the power necessary to order appropriate compensation to lead counsel [for] the services lead counsel provide to all parties involved.  'The court's power is illusory if it is dependent on lead counsel's performing the duties desired of them for no additional compensation.'

*In re Clearsky Shipping Corp.*, 2003 WL 1563820 at *4 (E.D. La. Feb. 26, 2003) (citing *Fla. Everglades*, 549 F.2d at 1016-17).

common benefit fee awards serve to encourage attorneys to accept the considerable risks associated with prosecuting complex, multi-plaintiff matters for the benefit and protection of all plaintiffs' rights. *See id*. As one district judge has observed in a Rule 23 case,

> [g]iven the extensive financing and large numbers of skilled lawyers needed to bring a complex class action and prosecute it to a successful conclusion, and the large risk of no recovery — or of a limited one — even when a case appears to have merit, substantial legal fees must be provided when a substantial fund is created if attorneys are to be induced to prosecute these actions.

*In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1296, 1303 (E.D. N.Y. 1985), *aff'd in part, rev'd in part*, 818 F.2d 226 (2d Cir. 1987).

The consolidated claims of thousands of property owners in these proceedings, asserted against not only a foreign defendant manufacturer (Knauf) but also approximately 2000 defendant builders, installers, suppliers and insurers, have been thoroughly prosecuted and successfully settled through the efforts of the PSC (including non-PSC plaintiffs' counsel working with and under the PSC's direction). Initially as Court-appointed counsel in the MDL, and thereafter as Court-appointed class counsel who obtained Court approval of and then finalized and administered these property damage settlements under Rule 23, the PSC has achieved a settlement outcome for the class plaintiffs which is valued in excess of $1.1 billion. *See* pp. 36-50, *infra*. An integral part of these settlements includes an agreement on the part of the Knauf defendants and others to contribute to a fund for the payment of all attorney fees (private and common benefit) and the reimbursement of both common benefit litigation costs and (through a "cost stipend award") individual case inspection costs. With the exception of the Virginia litigants whose discrete settlements were not intended to provide for remediation,

homeowners have thereby obtained full property remediation without deduction for either legal fees or case expenses.

The services of counsel in conferring such a "net of fee/cost" settlement benefit on all plaintiff class members with the exception of those in Virginia, make the policy rationale for a common benefit fee award especially viable and warranted in this case.[5]

### (III) The Methodology for Calculation of Common Benefit/Class Counsel Fees

Different methods have been considered by federal district courts in calculating the amount of a "reasonable" common benefit fee. The lodestar method is one which simply multiplies the total hours expended by counsel in the litigation by a selected hourly rate, adding "multipliers" as appropriate. The percentage-of-fund method compensates counsel by awarding a percentage of the total value of the common monetary fund or benefit established for all plaintiffs. The blended method combines these two approaches: it first calculates the fee by taking an appropriate percentage of the common fund or benefit, but then undertakes a "cross-check" of the resulting amount by applying the lodestar analysis as an indicator of reasonableness. *See Common Benefit Fees*, 74 La. L. Rev. at 381.

In *Turner*, *supra*, claims were brought by thousands of residents and property owners in St. Bernard Parish, who had sustained damages due to an oil spill from a refinery's storage tank which ruptured during Hurricane Katrina. On approving a class settlement under Rule 23, this Court determined the amount of an appropriate class counsel fee award, which, under the

---

[5] In *Turner*, the class settlement similarly provided that the defendant would fund all class plaintiffs' legal fees, separate and apart from the settlement benefits and payments to be received by the class. The Court "commended" class counsel for focusing their efforts on the class' recovery without having legal fee issues detract from that focus. *See* 472 F.Supp.2d at 857.

settlement agreement, was to be funded by the defendant in addition to payments made to class members.

Your Honor noted a "growing trend" in the case law of the time to forego the lodestar method in calculating such fees and instead rely on the percentage-of-fund approach, a trend fostered by the 1985 report of a Third Circuit Task Force which identified a number of "theoretical and practical problems" in applying the lodestar method in common fund cases. *See* 472 F.Supp.2d at 859 and *fn.* 25 (listing "deficiencies" in the lodestar method cited by the Task Force). The Court also noted that the U.S. Supreme Court (without having actually approved the percentage-of-fund approach in common fund cases) had never adopted the lodestar method in any type of case, and that the Fifth Circuit had indicated it was amenable to the percentage-of-fund method provided there were both (a) reference to the so-called "*Johnson* factors" in the final determination of the percentage,[6] and (b) a calculation using the lodestar method to ensure that the resulting percentage-of-fund fee amount was reasonable. *See id.* at 860, and cases cited therein, including *Blum v. Stenson*, 465 U.S. 886, 900 (1984).

The Court thus adopted the blended method in order to calculate the class counsel fee amount in *Turner*; and, several years later, it utilized the same method to calculate a common benefit fee award in the *Vioxx* MDL. *See Turner, supra,* at 472 F.Supp. at 860-61; *Vioxx*, 760 F.Supp.2d at 652.

In the intervening years, this Court's choice of methodology has proved prescient. The blended methodology to calculate common benefit fees now has gained express endorsement in the Fifth Circuit. *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir.),

---

[6] The "*Johnson* factors" are twelve criteria articulated by the Fifth Circuit as guides in the determination of a "reasonable" attorney's fee. *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). They are enumerated and discussed further, *infra*.

*cert. denied*, 133 S.Ct. 317 (2012).  Indeed, it has become the method "used by a plethora of district courts."  *Common Benefit Fees, supra*, 74 La. L. Rev. at 385 and *fn.* 61.

The FC proposes that this method again be used by the Court to calculate the amount of a common benefit/class counsel fee award herein.

### (IV) The "Benchmark" Percentage to be Utilized
### for the Calculation of Common Benefit Fees

The starting point under the blended method is the selection of an appropriate "benchmark" percentage of the plaintiffs' recovery or settlement fund, which percentage then may be subject to an upward or downward adjustment based on an application of the *Johnson* factors to the particular case.  *See Turner, supra*, 472 F.Supp.2d at 861.

The *Manual for Complex Litigation* suggests that a "typical" benchmark in percentage-of-fund cases is 25% of the common fund. *See Manual for Complex Litigation* (4th ed. 2004), §14.121, at 188 (and cases cited therein).  Of course, as recognized by this Court and others, no single or even "typical" percentage should be viewed as presumptively applicable, for no "one size fits all" percentage can be said to fit the facts and circumstances of every case.[7]  *See Turner, supra*, 472 F.Supp.2d at 862.  Suffice it to say that the 25% benchmark suggested in the *Manual for Complex Litigation* is nonetheless one that is not purely conceptual, but rather is one drawn from reported cases.  *See Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 774-75 (11th Cir. 1991) (establishing 20% - 30% as a benchmark when awarding a common fund fee); *Evans*

---

[7] Hardly typical, this litigation may well justify an approach in setting the benchmark percentage which is less influenced by precedent than ordinarily would be the case.  The common fund here not only provides for compensation to class counsel who worked to establish the fund, but also serves to remunerate individually-retained counsel.  In this manner, each class member obtains full remediation without being "short" in funding such repairs because of percentage fee payments.  In addition, the PSC negotiated a Major Builders Settlement that paved the way for the Homebuilders to resolve their claims against Knauf for approximately $100,000,000, as to which recovery the above common fund analysis does not apply.  The PSC's award for these contributions awaits resolution in the allocation process.

*v. TIN, Inc.*, 2013 WL 4501061, *6 (E.D. La. Aug. 21, 2013) (Africk, J.) (recognizing 25% as the benchmark and awarding 25.89% of the common fund); *Burford v. Cargill, Inc.*, 2012 WL 5471985, * 2 (W.D. La. Nov. 8, 2012) (Hicks, J.)("While there is no general rule as to what constitutes a reasonable percentage of a common fund, "district courts in the Fifth Circuit have awarded percentages of approximately one-third contingency fee."), *quoting In re Combustion, Inc.*, 968 F.Supp. 1116, 1133 (W.D. La. 1997); *In re: Bayou Sorrel Class Action*, 2006 WL 3230771 (W.D. La. Oct. 31, 2006) (36% of the common fund); *In re Catfish Antitrust Litig.*, 939 F.Supp. 493, 504 (N.D. Miss. 1996) (25% of the common fund).  *See*, *generally*, Russ M. Herman, *Percentage-of-Benefit Fee Awards in Common Fund Cases*, 74 Tul. L. Rev. 2033 (2000) (discussing range of percentage fee awards).

Another reference in the Court's selection of a benchmark percentage might be the empirical studies of fee awards in class action cases.  *See Common Benefit Fees, supra,* 74 La. L. Rev. at 385.  These most notably include two surveys co-authored by the late Professor Theodore Eisenberg, the so-called "Eisenberg I" and "Eisenberg II" studies.  *See* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27 (2004) ["Eisenberg I"] & Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (2010) ["Eisenberg II"].  *See also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. Empirical Legal Stud. 811 (2010).

These studies demonstrate that the various percentages of common funds selected by district judges to calculate class counsel fees tend to move along a "sliding scale," being lower in those cases with higher-amount global settlements and higher in cases with lower-amount

settlements.  Thus, a fundamental logic is applied by courts in setting common benefit fees on a percentage basis:  the percentages should be in proportion to the amount of a given fund.  By considering the total fund amount before selecting an appropriate benchmark percentage, it can be assured that fee awards are not unreasonably high in so-called "mega-settlement" cases.  The same proportionality, of course, also can guard against the outcome of an unreasonably low fee award where the efforts of counsel might not fully be reflected in the amount of plaintiffs' recovery.

Despite their sliding scale logic, the above case studies should not be interpreted as endorsing a mechanical or formulaic computation of appropriate benchmark percentages.  The *Eisenberg I & II* studies were based upon reported settlements between 1993 and 2002, and 1993 and 2008 (respectively).  Not only do they fail to capture data more recent than eight years ago, but, more importantly, they were never meant to contain a truly comprehensive sample of relevant outcomes.  As the authors themselves took pains to note, the surveys were limited to <u>published</u> case decisions only, and for this reason reflected only a fraction of all class settlements and fee awards occurring during the study periods.  *See Eisenberg II*, 7 J. Empirical Legal Stud. at 253 ("[O]ur data include only opinions that were published in some readily available form. Obviously, therefore, we have not included the full universe of cases….[P]ublished opinions are not necessarily representative of the universe of cases.").

Helpful as *The Manual for Complex Litigation* and the *Eisenberg* studies may be as rough guides for the Court, the FC therefore submits that neither source is entitled to determinative weight in the selection of the benchmark percentage herein.  The "appropriate" and "reasonable" benchmark percentage ultimately must be one informed by the facts and circumstances of a

particular case and a particular recovery outcome.  More precisely, the percentage should derive principally from the presiding Judge's direct evaluation of case-specific facts and circumstances, particularly where, as here, that evaluation is facilitated by the close and consistent monitoring of counsel's activity and contributions to outcome.

Your Honor's fee decisions in both *Turner* and *Vioxx* are apt illustrations of the point:

The total class recovery in *Turner* was valued at $195 million, and the 2004 Eisenberg study available at the time placed this fund in the "greater than 90%" decile of surveyed class recoveries.  The latter category, however, broadly included all recovery funds greater than $190 million; and, not surprisingly given the category's breadth, the survey reported a wide range of the "typical" percentages, *i.e.,* 12% of recovery as the mean, with a standard deviation of 8.1% (a 12-20.1% range).  *See Turner, supra,* 472 F.Supp.2d at 864.  The Court selected a benchmark percentage of 15% of the class settlement recovery to calculate the class counsel fee, and then made an upward adjustment of 2% using the "*Johnson* factors" to increase the fee to 17% of the settlement recovery by the plaintiff class.  *See* 472 F.2d at 864 and 869. [8]

That the 17% fee percentage in *Turner* falls toward the higher end of the *Eisenberg* survey range of 12-20.1% , no doubt can be related to the fact that the settlement value  in the case ($195 million) falls toward the lower end of "greater than $190 million" recovery category. But Your Honor's detailed, case-specific analysis of the *Johnson* factor adjustment of the percentage, and the lodestar cross-check, would suggest that the selected percentage was based

---

[8] It is important to note that the fee at issue in *Turner* was earmarked for the payment of a class counsel fee only (and not private fees).  It was agreed among all plaintiffs' counsel in that case, both PSC and non-PSC attorneys alike, that they would share in the defendant-funded fee under the class settlement strictly based on their "demonstrating contributions to the common benefit."  *See* 472 F.Supp.2d at 858.

far more on first-hand observations of the class counsel efforts in the case than on any strict adherence to the published case studies.  *See Turner, supra*, 472 F.Supp.2d at 864-68.

In the *Vioxx* MDL, the Court presided over a nationwide settlement agreement that was valued at $4.85 billion, resolving approximately 50,000 consolidated personal injury claims.  *See Vioxx,* 760 F.Supp.2d at 652.  Based on the large amount of that settlement fund, Your Honor acknowledged at the outset that empirical studies (*Eisenberg I & II*) would be "of limited usefulness in determining a reasonable benchmark percentage for a common benefit fee award." *See id.* at 652.  Under the rubric of quasi-class and related jurisprudence, the Court also considered "comparable MDL set-aside assessments and awards of common benefit fees," citing both the *Zyprexa* MDL and the *Guidant* MDL.  *See id.* at 654.  But the results in these cases were disparate:  The judge in *Zyprexa* calculated the PSC fee through a set-aside of 1% of the gross amount of a Master Settlement, and then added interest on the amount held in escrow as well as a 3% hold-back of subsequent recoveries to be divided evenly between the claimant's recovery and the fees otherwise payable to the individual attorney.  *See id.*  In *Guidant*, the district judge simply awarded 14.375% of a global settlement as a common benefit fee award.

Having noted these (and other) case examples of the calculation of common benefit fee awards, all showing a high degree of variance from MDL to MDL, Your Honor concluded in *Vioxx* that there simply was "no mathematical formula" for determining a "correct" common benefit fee.  *See id.* at 654-55.  The Court added that the *Vioxx* PSC itself, after it initially requested a common benefit fee award of 8%, subsequently reduced its request to 7.5%, justifying the observation that if <u>both</u> such percentages (8% and 7.5%) were deemed

"reasonable" by common benefit counsel themselves, it necessarily followed that a "reasonable" benchmark percentage in a given case remains a "flexible concept." *See id.* at 655.

As in *Turner*, it was this Court's first-hand familiarity with the *Vioxx* litigation which appears to have been as important as any outside source or guideline in the final determination of the starting-point benchmark percentage:

> In light of the foregoing, and guided by this Court's observations over the last five years of the nature and scope of the work and effort of those attorneys who performed common benefit work, the Court finds that 6% of the settlement amount is a reasonable benchmark percentage for a common benefit fee award.

760 F.Supp.2d at 655. Subjecting this benchmark to analysis under the *Johnson* factors, Your Honor likewise relied heavily on a first-hand familiarity with the proceedings to adjust the benchmark percentage upward by 0.5%, resulting in a common benefit fee award amounting to 6.5% of the total settlement value. *See id.* at 655-59 & 662.

The FC does not propose to the Court a benchmark percentage nearly as robust as the 25% benchmark cited in *The Manual for Complex Litigation* from the composite of the several settlements, nor, for that matter, as high as the 15% benchmark percentage selected in the *Turner* class action.[9]  Consistent with the logical fund-amount/percentage nexus reflected in the *Eisenberg* survey results, the class settlement recovery value of $1.1 billion in this case admittedly warrants selection of a lesser benchmark percentage than that selected in *Turner*.  By the same token, since the class recovery of $1.1 billion in this case, although significant, is well below the $4.85 billion dollar recovery in *Vioxx,* the starting benchmark percentage here certainly ought to be higher than that selected by the Court in the *Vioxx* MDL.

---

[9] Several of the class settlements referenced in the *Manual* were approved without objection to a set-aside of attorneys' fees amounting to at or near 32% of plaintiffs' recovery.  A benchmark percentage of less than 32% from the composite set-aside for all attorneys' fees is therefore amply justified.

To the extent the *Vioxx* and *Turner* matters serve as rough goalposts for the Court in the current analysis, two important factual distinctions remain to be noted, if only briefly:

The distinction in the case of *Turner* primarily is durational. That matter, as the Court knows all too well, was handled against the backdrop of Hurricane Katrina; and the plight of the plaintiffs in *Turner* was part of a larger, important story. Those homeowners represented the core segment of the St. Bernard Parish community struggling to re-establish itself in the wake of an unprecedented catastrophe. Under appropriately vigorous case management by the Court, and with the objective of restoring to their residences and businesses those who had been simultaneously impacted by Katrina flooding <u>and</u> a massive oil spill, the *Turner* case resolved in virtually record time as a multi-plaintiff mass tort/class action proceeding. It commenced in <u>September 2005</u> and a proposed class settlement agreement was negotiated in <u>September 2006</u>. Taking nothing away from the intensity of class counsel's effort in *Turner* to recover from the single defendant in that case, the services and commitment demanded of class counsel and the PSC in this case are of a different order entirely. Over a period of several years, the PSC here achieved an integrated resolution of multiple class settlements resolving claims of thousands of plaintiffs from numerous jurisdictions throughout the United States against a foreign manufacturer and approximately 2,000 defendants, which at some points garnered extensive involvement by the Consumer Products Safety Commission.

As to *Vioxx,* a chief distinction relates to the status of the case when it commenced in this Court. The *Vioxx* litigation already had "matured" to a significant extent through discovery and trial activities in state court proceedings by the time the MDL commenced before Your Honor. Again, taking nothing away from the spectacular efforts by plaintiffs' counsel and the results

obtained in *Vioxx*, the status of this litigation was far different on arrival in this Court. Despite activity in state courts having occurred before MDL 2407 was formed, plaintiffs' core case on the merits, the key scientific research and investigation of the drywall defects, the hiring of experts to support plaintiffs' case, the development of damage assessment tools and inspection protocols, the technical and practical blueprint for a "back to studs" remediation, critical trials on the merits, and a successful, formulaic model to calculate remediation costs, all occurred for the common benefit of plaintiffs only after the PSC and class counsel were appointed to serve in these proceedings.

From an even broader perspective, neither *Turner* nor *Vioxx* encompassed the litigation risk factors posed by the presence of not only multiple defendants, but also foreign entities defending their product on a global, commercial stage. Seeking recovery from the German and Chinese corporate defendants in these proceedings necessitated the expenditure of considerable attorney effort and resources, particularly since the ability of these defendants to challenge service of process and personal jurisdiction constituted obstacles for plaintiffs to overcome before the merits of their claims could be addressed, and greatly extended the timeline of the litigation. In contrast, the plaintiffs in *Turner* and *Vioxx* did not face the fundamental challenge of collectability as to any judgment which might be obtained (indeed, before this MDL, few if any judgments in litigation such as this had been entered against foreign corporations). Compounding the risks for class plaintiffs and their counsel in MDL 2047, the German Privacy Act and the threat of Chinese punishment for violations of the Chinese Secrecy Act, also erected significant legal barriers to traditional discovery activity. Even on that score, the difficulty in collecting any insurance proceeds due to policy exclusions and the economic loss rule made

16

recovery especially uncertain.  This was proven to be the case when the PSC was unsuccessful in its efforts to recover from the excess insurer of InEx, the North River Insurance Company.

In short, the unique and daunting challenges for plaintiffs in these proceedings serve to distinguish this from virtually all other mass tort/MDL litigation in the United States.  These challenges should weigh significantly in the Court's selection of a case-appropriate benchmark percentage.

The FC thus submits that an appropriate benchmark percentage to calculate a common benefit fee award herein, one that is reasonable not simply by reference to published guidelines and case precedent but, more importantly, one that is supportable by Your Honor's familiarity with this unique MDL and the required services of common benefit counsel, is 8% of the value of the plaintiffs' total class recoveries from all settlements.  As explained below, the FC proposes an upward adjustment of 2.65% of the benchmark based on an analysis of the *Johnson* factors, resulting in a common benefit percentage of 10.65%.

### (V) Analysis of the Johnson Factors for Adjustment of the Benchmark Percentage

As noted *supra*, needed adjustment to a starting benchmark percentage under the blended percentage-of-fund method, occurs by reference to the criteria set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974):

1.     the time and labor required for the legal services in question;

2.     the novelty and difficulty of the questions presented;

3.     the skill required to perform the legal services properly;

4.      the preclusion of other employment by counsel as a consequence of accepting

responsibilities in the case;

5.      the customary (percentage) fee in similar matters;

6.      whether the fee is fixed or contingent;

7.      the time limitations imposed by either the client or case circumstances;

8.      the amount of the fund involved and/or the results obtained for the clients;

9.      the experience, reputation and ability of counsel;

10.    the "undesirability" of the case as an undertaking by counsel;

11.    the nature and length of the professional relationship between counsel and the

client; and

12.    awards of fees in similar matters.

*See id.* at 717-19.

These factors now will be addressed separately:

1.      <u>The time and labor required</u>

The PSC and non-PSC counsel who fulfilled their common benefit responsibilities in this

litigation, have a total of 232,309.35 hours accepted by Mr. Garrett for these services through

December 31, 2013.  Their submissions adhered to Court-ordered protocol and procedures and

have been audited and verified by Mr. Garrett.  *See* Revised and Updated Affidavit of Phillip A.

Garrett, C.P.A. Pursuant to Pretrial Order No. 28(F) ¶16 (hereafter "Garrett Affid.") [attached

hereto as Exhibit "A"].  It is an hourly total commensurate with, and reflective of, the extensive

work that was required of these attorneys.[10]  The rates reflected in Mr. Garrett's attached report likewise should be seen by the Court as consistent with the level of professional services rendered.  *See Id.*  ¶15.

Moreover, a uniquely intense attorney effort was required on plaintiffs' behalf in these proceedings.  Organizing, prosecuting, overseeing, and successfully resolving thousands of claims typically represent significant undertakings by plaintiffs' counsel in any MDL; but in this litigation there were such multiple "moving parts," both procedural and substantive in nature, that a truly Herculean effort was demanded on the part of common benefit counsel.  During the course of this MDL, not only did approximately 9,300 plaintiffs submit individual filed claims, but approximately 2,000 defendants and their liability insurers appeared in response to the claims.  The responsibility for both handling the issues common to so many claims and responding to the defenses asserted by so large and disparate a group of litigants, entailed lawyering on levels ranging from claims data management to "big picture" case strategy.  Each defendant was individually and vigorously defended by able counsel, raising barriers to recovery which invariably affected each and every class member.  Jurisdiction, fault, the applicable science, causation, damages, and insurance coverage were all, in various stages of the case, contested matters.  The adversarial demands on Court-appointed counsel in prosecuting claims thus called for an unrelenting commitment to plaintiffs' cause.  It is doubtful there are many

---

[10] The commitment of the same core group of counsel to plaintiffs' cause, continues to be evident in time and labor not reflected in this brief.  First, the hours submitted up to December 31, 2013 do not include much of the considerable work performed by common benefit/class counsel to administer, finalize and effectuate the class settlement agreements, without which work the full benefits of these settlements would not be actually delivered to plaintiff class members.  Secondly, the ongoing prosecution of claims against the Taishan defendants, an effort which has proven to be at times all-consuming for the core group of PSC and common benefit counsel, seeks to assure that plaintiff class members with non-Knauf Chinese drywall will be in a position to be made whole through this litigation, and not limited to the partial relief made possible through the Global/Banner/InEx ("GBI") settlements.

other cases in the federal judicial system, past or pending, which compare to this one in regard to the prolix array of both defendants (foreign and domestic) and defense contentions.

The PSC assumed a full leadership role in (1) negotiating and presenting every pretrial, scheduling and case management order, (2) conducting extensive common-issue discovery (including the review of hundreds of thousands of documents produced by the major defendants and third parties), (3) scheduling and taking multiple depositions (both here and abroad) in the development of all common issues, (4) formulating and implementing successful case themes and strategies for plaintiffs, (5) managing, maintaining and analyzing an inventory of 23,099 Plaintiff Profile Forms and 4,544 Defendant Profile Forms, and (6) preparing, researching and filing voluminous pleadings and motions.

The institution of original actions for thousands of claimants was emblematic of this latter effort.  Early in the case the PSC proposed the first-known judicial use of "Omni complaints," which pleading devices proved invaluable for plaintiffs and their individual counsel as a means to file and preserve claims and theories of recovery.  At the same time, this relieved individual counsel and their clients of costly and challenging foreign service efforts.  The preparation of these complaints was not a simple "follow form" exercise, but rather entailed sweeping efforts by the PSC to investigate and verify case-specific facts, compile material allegations, and perfect service of process both domestically and abroad.  The translation and service of the complaints on foreign defendants, pursuant to the Hague Convention, also involved extraordinary cost and effort.  This undertaking by the PSC significantly advanced the litigation by creating the needed "critical mass" of cases in the MDL inventory, even as private attorneys were allowed to represent their clients without exposure to the potentially-prohibitive

efforts of pleading translation and service abroad.  The PSC member firms, through assessments, advanced substantial sums for these case-initiating activities, incurring the risk of non-recovery at a time when the outcome of settlement clearly was beyond any realistic expectation.

In preparation of the Omni complaints, the PSC also seized the opportunity to achieve an essential preservation of key physical evidence.  These efforts culminated in a program, the Threshold Inspection Program ("TIP"), which was used to investigate and comprehensively document the presence of Chinese drywall in thousands of properties, identifying the manufacturer in each case.  Claimants thus were able to both provide necessary product verification and properly preserve essential evidence in support of a claim.  A catalogue of markings, brands, intakes and other identifying markers was developed, to assist claimants in determining the proper defendants as to each claimant.  *See In re: Chinese-Manufactured Drywall Products Liab. Litig.,* MDL 2047, PTO 10 (E.D.La. Aug. 21, 2009) [Rec. Doc. No. 171].  Numerous meetings and consultations with contractors and experts were undertaken to establish a process for identifying the type of damage caused by defective drywall in a home, and formulate the proper method of remediation.  These efforts ultimately were indispensable in negotiating a class settlement agreement with Knauf and other defendants.

The sheer number of defendants herein also necessitated a significant effort in regard to expert and scientific proof.  The PSC was obliged to respond to hundreds of motions by a number of defendants, raising complex legal issues ranging from the applicability of the economic loss doctrine to the methodology requirements of *Daubert*.  An enormous investment of time and labor was needed in order to brief and argue these often-dispositive issues of law, issues which were common to all plaintiffs.  Important questions of product liability, redhibition

21

(under Louisiana law), seller/distributor negligence and insurance coverage, also were among those which the PSC researched, analyzed and advocated on plaintiffs' behalf.

The discovery efforts of the PSC laid the groundwork for all plaintiffs' claims to be presented on the merits; and this activity was made possible only through a substantial commitment on the part of Court-appointed counsel.  In particular, it proved necessary in this case to: (1) conduct discovery of hundreds of entities in the Chinese Drywall supply chain, including depositions (often with interpreters) in Frankfurt, London, Hong Kong, and cities throughout the United States; (2) establish a document depository of more than 400,000 pages of documents received pursuant to production requests, many of which required translation into English; (3) test and preserve the drywall in plaintiffs' homes; (4) prepare and serve requests upon the CPSC under the Freedom of Information Act; and (5) retain experts in corrosion, metallurgy, electrical engineering, power electronics, electrical machinery, and failure analysis.

A substantial (and, arguably, along with settlement negotiations, the most outcome-determinative) investment of time, labor and resources, occurred in connection with exemplar and bellwether trial activity.  The Court utilized these merits trials to develop and test the common issues of fault, causation and damages.  Much was at stake from plaintiffs' standpoint, motivating PSC counsel to commit themselves to the exhaustive preparation and effective presentation of lay and expert witness testimony, video and deposition excerpts, well-organized and substantial exhibits, and (in one case) jury arguments and charges.  The defectiveness and consequences of Chinese-manufactured drywall were fully litigated in two bench trials (*Germano* and *Hernandez*).  A third trial, by jury, had to be conducted by the PSC against the

defendant InEx and its excess carrier (*North River*), as a prerequisite to finalizing the Knauf class settlement.

This Court, from its own experience, well knows the strenuous and consuming nature of carrying the plaintiff's burden of proof in a complex, product liability trial on the merits. This responsibility was magnified by the prospective impact of a trial outcome on thousands of homeowners; and, in order to properly try the bellwether claims in question, PSC counsel committed long and arduous hours of review, preparation, analysis, strategy, research, strategic decision-making and courtroom presentation. In *Germano*, this effort was manifest in a two-day hearing involving 535 exhibits and 17 witnesses (14 live and 3 by deposition). In the five-day trial of *Hernandez*, 216 of the 278 exhibits were offered by plaintiffs, and 15 witnesses appeared to testify (2 by deposition). In the *InEx/North River* jury trial, which lasted 6 days, there were 116 exhibits introduced into evidence and 22 witnesses who testified (16 live and 6 by deposition).

Each of these trials constituted a landmark contribution for the common benefit of plaintiffs, starting with *Germano*. A litigation team of common benefit counsel assembled by the PSC began conducting an investigation of reports of Chinese drywall contamination in Virginia homes as early as February 2009. These counsel spent substantial time meeting with homeowners, doing the needed legal research to support claims under Virginia law, and engaging highly-qualified scientific experts from around the country to develop a testing program which would document and confirm both the presence of, and the damages caused by, Chinese manufactured drywall. This early investigation confirmed that hundreds of homes in the state of Virginia contained Chinese drywall that had been primarily, if not exclusively,

manufactured by Shandong Taishe Dongxin Co., Ltd. (which on September 10, 2007, changed its name to Taishan Gypsum Co., Ltd. ("Taishan")), and then supplied to property owners by Venture Supply, Inc. ("Venture") of Norfolk, Virginia. *See Germano* FOFCOL [Rec. Doc. 2380], at p. 8.

Shortly after the MDL was established, this Court called for an evidentiary hearing to address the nature and scope of the necessary and appropriate remediation, and the cost of same, in homes affected by Chinese drywall. Based upon the investigative and legal work which had gone forward in Virginia, the PSC was able to select seven bellwether plaintiff families in the *Germano* class action whose properties and claims would allow these issues to be suitably developed and addressed. Although Taishan at that time had failed to appear or answer, Knauf intervened in the case to defend against the plaintiffs' claims.

Through significant efforts in connection with the *Germano* trial, common benefit/class counsel developed the scientific proof of property contamination and damage due to the presence of Chinese-manufactured drywall. PSC members consulted with dozens of experts, prepared them for their deposition and trial testimony, drafted and argued *Daubert* motions, and, in deposition and at trial, cross-examined Knauf's experts. The *Germano* team of common benefit counsel also were involved in overseeing the extensive laboratory testing of multiple copper and silver components taken from the Virginia homes, which allowed corrosion to be identified and proven as the reason for the failure of HVAC coils and appliance connections in the affected homes. *See Germano* FOFCOL, at 15 & 26. The Court-issued findings in *Germano* laid the groundwork for a scientifically-valid analysis of the cause of plaintiffs' damages, assured for plaintiffs an adequate damages recovery, and made it possible for homeowners to consider their

24

families' living environment safe and habitable only if the established remediation protocol were followed.  Additionally, the *Germano* evidence established that the base, average cost per square foot to repair homes was $86, setting the benchmark for subsequent remediation and settlements.

It is worth noting that prior to the PSC's research, expert analysis, laboratory testing, and investigation for the *Germano* bellwether trial, the findings made by this Court would not have been possible on the basis of any known or reported industry or governmental protocol, because one simply did not exist.  The common benefit work that supported the findings in *Germano* was not only extensive, but groundbreaking.

Since Knauf chose to withdraw as an intervenor prior to the *Germano* hearing, the second bellwether trial of *Hernandez* became all the more important.  Although stipulating to its liability under Louisiana law for trial purposes, Knauf vigorously contested the plaintiffs' evidence as to causation and damages.  The bench trial in *Hernandez* thus became the first opportunity for the Court to resolve the vigorously opposed positions of the litigants as to the common issue of plaintiffs' recoverable damages, and, more particularly, the nature, scope and cost of "made whole" remediation. The PSC's trial team again devoted extensive time and effort in order to prepare and present expert testimony which explained not only the science of CDW corrosion, but both the scientific <u>and</u> practical justifications for the "back-to-studs" remediation activity (such as was undertaken by a builder in Florida, Beazer Homes).  These trial efforts succeeded in challenging and overcoming the far more limited scope of remediation proposed by Knauf at trial; and the Court's ultimate acceptance of plaintiffs' position proved to be a common benefit milestone which cleared the path to meaningful settlement discussions with Knauf, builders, suppliers and insurers.

The PSC also prepared two additional cases selected for bellwether trials, *Campbell v. KPT*, No. 09-7628 (E.D. La.) and *Clement v. KPT*, No. 09-7628 (E.D. La.).   Extensive stipulations were compiled, negotiated and entered into with the Knauf defendants.   The cases were fully worked up for trial purposes (in a similar manner as prior trials).   The PSC spent extensive time pre-trying these cases to a mock jury, which enabled the PSC to develop trial themes and strategy.   Extensive Plaintiff and property-specific depositions were taken, and experts were worked up and prepared for trial.   On the eve of trial, these cases were settled.

The undertaking by a PSC trial team to prosecute plaintiffs' claims in the *North River* jury trial against an excess insurer of the CDW supplier InEx, was an extremely arduous effort.   The necessary proof that a local drywall distributor "knew or should have known" of the defect in Chinese-manufactured drywall prior to sale and distribution, was most challenging to assemble and effectively advocate to a jury.   But the conduct of this trial was expressly required by Knauf as a condition of finalizing the class settlement with this defendant.   The verdict notwithstanding, therefore, it was this effort which cleared the last obstacle to the delivery of substantial benefits to thousands of class members.   Conversely, had PSC counsel been unable or unwilling to shoulder the onerous responsibility of trying the *North River* case to a jury, these homeowners still might be denied the habitable living conditions now restored to them through a settlement-funded remediation.

In parallel Virginia and Florida state court proceedings as well, merits trials served the interests of all plaintiffs; and these proceedings, overseen by the Honorable Mary Jane Hall and Joseph Farina, were fully and closely coordinated with the PSC and the common benefit activities in the MDL.   The Honorable Joseph P. Farina, for example, presided over a Florida state

court jury trial which resulted in a plaintiffs' verdict of $2.5 million in damages against Banner Supply Company for selling drywall it knew to be defective. *See Seifart v. Banner Supply Co.*, Case No. 09-38887 CA 01 (42) (Cir. Ct. Miami-Dade Cty June 18, 2010). This verdict was instrumental in demonstrating the potential liabilities of Banner, which, within a year of the Florida trial, agreed to the class settlement that was presented and approved in this MDL. It would be difficult to find MDL precedent where the common benefit of thousands of related claims was pursued through the kind of productive federal-state coordination that was accomplished in these proceedings. Indeed, strategic coordination with state court litigation in the Seventeenth Judicial Circuit Court in Broward County, Florida, presiding over the Honorable Charles M. Greene, led to entry of a stay order on the eve of a class certification hearing sought by a competing Florida class of homeowners making claims against the Banner Supply entities.

Finally, as previously alluded to, the negotiation of the global settlements with Knauf, GBI and related class settlements encompassed an extremely challenging and time-consuming effort on the part of common benefit counsel. Each settlement was negotiated over an extended period of time. These inter-related class settlements resulted in a resolution that enabled all claimants to make an application for settlement funds. Obliged by Knauf to resolve class claims against other entities, the PSC succeeded in reaching five global class settlements with more than 700 defendants, not including the four additional settlements in Virginia. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2013 WL 499474 (E.D. La. Feb. 7, 2013) (Knauf, Banner, InEx, L&W, and Global Settlements). The leadership of the PSC was obliged to skillfully negotiate these settlement agreements as conditions precedent to Knauf's willingness to

entertain its own settlement. The PSC also negotiated the Major Homebuilders Agreement, a resolution which inured to the benefit of all participating Homebuilders. *See* p. 9, *fn.* 7, *supra*.

Beginning in November 2009, the Court appointed a Special Master to explore opportunities for an ultimate resolution of claims in the MDL. Following many months of settlement negotiations, the PSC reached an agreement in October 2010 with the Knauf defendants, referred to as the "Pilot Program," for the remediation of homes containing KPT Chinese Drywall. The success of this remediation undertaking served as the basis upon which the Knauf, Global, Banner, InEx, and other settlements ultimately were negotiated.

None of these settlements would have occurred without the working relationship that was diligently and purposefully developed between the PSC leadership and Defendants' Liaison Counsel, Kerry Miller.[11] It was this professional rapport between and among opposing counsel, which, for example, facilitated an agreement to designate funds recovered through additional Knauf remediation settlements providing for payment of an additional $13 million in attorneys' fees made the subject of this motion. Indeed, the ability of the PSC to work cooperatively with opposing counsel directly enabled the crowning common benefit achievement herein: a global resolution of thousands of claims against a multitude of defendants in both the MDL and state courts, through complex, inter-related class settlements.

The InEx, Banner, Knauf, L&W, and Global Settlements are five separate but interrelated Rule 23(b)(3) class settlements that provide cash, remediation and/or other benefits to owners and tenants of Affected Properties damaged by Chinese Drywall. Each settlement was the result of serious arms-length negotiations, strategic maneuvering, extensive briefing, motions practice,

---

[11] A similar relationship of trust was established with counsel for the insurance interests, Mr. Minor Pipes, who was instrumental in negotiating the Global Settlement agreement.

and great labor and effort.  Beginning on May 13, 2011, the PSC obtained preliminary approval of the InEx Settlement.  Three months later on August 11, 2011, the PSC obtained preliminary approval of the Banner Settlement.  On September 1, 2011, the PSC entered into a Term Sheet Agreement for the Knauf Entities Settlement Agreement with Homebuilders (*i.e.,* the "Major Homebuilders Agreement"), which made it possible for the Homebuilders to obtain a recovery from Knauf.  The PSC also negotiated with the Homebuilders, mindful of their ability to participate in the Banner and Global settlements.  These Homebuilders received the benefit of the class settlements without advancing one dollar in cost.[12]  In comparison, the PSC alone expended $508,532.27 of the $3,488,457.71 of the total costs for notice.  *See infra* at pp. 44-45.

On January 10, 2012, the Court granted preliminary approval to the Knauf Settlement.  Then, on April 26, 2012, the Court preliminarily approved the L&W Settlement.  Finally, on May 31, 2012, the Court preliminarily approved the Global Settlement.  Once all of these inter-related settlements were preliminarily approved, the PSC collectively sought and obtained final approval on February 7, 2013.

With respect to parallel litigation in Virginia state court, certain members of the PSC engaged in multiple negotiations with four major insurance companies – Nationwide, State Farm Insurance Company, Citizens/Hanover Insurance Company, and Builders Mutual – to achieve resolution of claims against multiple builders, suppliers, and installers of CDW.  These PSC counsel dedicated months to drafting the four Virginia class settlement agreements.  The PSC also assisted in the development of a Notice plan for the Virginia settlements, and engaged in extensive research regarding insurance coverage limitations and factual investigation regarding

---

[12]  Despite the Homebuilders' unwillingness to contribute to obtain the settlements, the allocation for Homebuilders must and will be addressed separately pursuant to PTO 28(F).

the extent of damage to homes in Virginia.  Ultimately, the PSC reached four class settlements, totaling $17.4 million. These four settlements relating to Virginia and certain other remaining claims were approved by the Court on July 9, 2013.

A total of nine class settlements (including Virginia) have been concluded in these proceedings.   These agreements have resolved thousands of claims arising out of an environmental and defective product catastrophe of nearly historic proportions.   They include claims resolution with a major manufacturer operating in the People's Republic of China (Knauf), hardly known to be a country friendly to the litigation of consumer claims.   Almost 3,000 homes have been remediated fully by the removal of defective Chinese drywall and the contaminating effects of same.   The rehabilitation of these homes has been certified by environmental specialists.   Moreover, and far more complex than the traditional lump-sum payment of settlement funds to claimants, the settlement program for remediation by a qualified contractor (Moss) has entailed substantial time and effort on the part of the PSC to administer and finalize the work.  This aspect of the settlement entailed a level of satisfaction on the class members' part that a once-habitable living space again was safe for families and loved ones.

All of these agreements required lengthy and intensive mediation efforts.  There were times when PSC negotiators were called upon to literally work "around the clock" in order to address unforeseen and complicated settlement issues.  The defendant interests to be accounted for in settlement involved not one defendant, but rather numerous defendants, including a foreign manufacturer and hundreds of insurers, builders, distributors and suppliers.   The Knauf settlement alone culminated after more than a year of in-person and telephonic negotiation

sessions.  The remaining agreements grew out of discussions and meetings that were likewise protracted.

The fruits of this labor are self-evident from the standpoint of plaintiffs:  a "made whole" remediation in all Knauf cases, combined with monetary relief for all (even non-Knauf) class members.  Most remarkably perhaps, with the exception of the Virginia litigants, counsel achieved these remediation benefits without obliging a single class member to deduct any legal fees or case costs from his or her settlement recovery.  In a non-statutory fee-shifting case, this is a significant accomplishment.  In addition, the PSC-negotiated Knauf settlement made available to plaintiff property owners the dispute-resolution service of a court-approved Ombudsman to assist class members in the remediation process with the remediation contractor, Moss.  The PSC also supported the services of a *pro se* curator to assure that unrepresented class members also might navigate the litigation and participate fully in the settlement process and benefits.

The FC requests that the Court consider an upward adjustment of the benchmark percentage pursuant to *Johnson* factor number 1.

2.    The novelty and difficulty of the questions involved

The corrosive environment shown to have resulted from the sulfur off-gassing of defective Chinese drywall is an event unprecedented in the drywall industry.  The PSC was obliged to retain experts who were willing and qualified to conduct original research, in effect developing a new area of science.  The *Daubert*-proof support and legal arguments needed to present plaintiffs' theory of the case, were thus as novel as they were demanding.  In the course of giving final approval of the class settlements, Your Honor acknowledged that "the litigation is complex, expensive, uncertain, and [failing settlement] has the potential for lengthy duration."

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2013 WL 499474, *10 (E.D. La. Feb. 7, 2013).

Indeed, the willingness of the same core group of counsel who prosecuted claims against the settling defendants, to continue in the prosecution of a uniquely challenging case against the Taishan defendants, amply demonstrates that novel and complex issues are not a deterrent in the discharge of responsibilities by Your Honor's Court-appointed PSC.  Such counsel remain at plaintiffs' service to pursue additional recovery on their behalf, notwithstanding formidable challenges and financial risk.

An upward adjustment of the benchmark percentage under the second *Johnson* factor appears justified in this matter.

3.  <u>The skill required to perform the legal services properly</u>

The level of legal skills required to bring about the class settlement outcome in this case was by no means ordinary.  Common benefit counsel were called upon to excel professionally in a number of areas, including organization and strategy in a case with a thousand defendants, merits discovery and trials involving a unique defect in a product made in China, and the negotiations of multiple, inter-related class settlements.  Counsel not only had to develop a liability case through ground-breaking proof of a corrosive environment caused by Chinese-manufactured drywall, but, facing formidable adversaries with significant resources, had to make the case credible enough to convince a foreign manufacturer and numerous non-manufacturer defendants to resolve thousands of claims at substantial economic cost.

It is respectfully submitted that the third *Johnson* factor justifies an upward adjustment of the benchmark percentage.

4.      The preclusion of other employment by counsel as a consequence of accepting responsibilities in the case at hand

As the time records and submissions herein suggest, this litigation required that some members of the PSC devote themselves and their offices to the handling of this matter on a virtually full-time basis.  The urgency of restoring plaintiffs to safe and habitable homes was recognized from the outset, and the intense pace of the litigation as managed by the Court was correspondingly appropriate.  Given the often-extraordinary time demands imposed on them, it was unavoidable that members of the PSC were precluded from other employment by having accepted responsibilities as common benefit and class counsel herein.  It would by no means be speculative to suggest that many of the professional opportunities thus denied counsel, would have proven to be less onerous and complex than the undertaking of plaintiffs' claims in this litigation.

The "preclusion of employment" *Johnson* factor applies in this case so as to warrant an upward benchmark percentage adjustment.

5.      The customary (percentage) fee in similar matters

As suggested in the initial Joint Petition of the FC and PSC to approve the total reserve for all fees earned in connection with the class settlements (both common benefit and individually retained attorneys), the amount in reserve represents a percentage of the class settlement recovery which is fair and reasonable on its face.  Whatever portion of that fee may be allocated by the Court to common benefit/class counsel, the fee typically earned by individual plaintiffs' counsel in a product liability case such as this (33-1/3% - 40% of recovery) is sure to be greater than the percentage of class recovery sought by common benefit/class counsel.  Obviously, these traditional percentages of a $1.1 billion settlement recovery such as the one

herein, would yield a fee multiple higher in amount than the percentage fee award now sought by common benefit/class counsel.[13]

*Johnson* factor number 5 clearly warrants no downward adjustment in the proposed benchmark percentage, and should be considered neutral.

    6.    <u>Whether or not the fee at issue is fixed or contingent</u>

The risk of plaintiffs' counsel receiving little or no fee is a valid factor in considering fee awards generally.  *See, e.g, In re Enron Corporation Securities, Derivative & "ERISA" Litig.,* 586 F.Supp.2d 732, 791 (S.D. Tex. 2008).  It is assumed that all, or virtually all, plaintiffs' counsel undertook this litigation on a contingent fee basis, since this is the custom and practice; the injured or damaged clients represented by plaintiffs' counsel tend to be individuals not financially equipped to pay legal fees on an hourly basis.  Although the risk of receiving no fee therefore is common to all plaintiffs' counsel in this litigation, it still could fairly be argued that <u>common benefit</u> counsel, by proceeding on a contingent fee basis on behalf of <u>all</u> plaintiffs, undertook a responsibility in the case that entailed a far greater financial risk to their firms than that of an attorney with an individual client. This is especially the case here, where the target defendants are foreign entities located in Germany and China, countries where legal fora for the enforcement of American judgments are not necessarily available.

The FC nonetheless proposes that this *Johnson* factor warrants no upward adjustment in the benchmark percentage selected by the Court, and applies neutrally in the current analysis.

---

[13] The 10.65% of class recovery requested as a common benefit fee award herein (8% plus an upward adjustment of 2.65% as explained *supra*) is especially reasonable considering that 32% of recovery was negotiated as a total fee fund in the Global, Banner & InEx settlements, consistent with this Court's ruling in the *Vioxx* litigation.  *See* Vioxx, 760 F.Supp. 2d at 650 n.17 (employing its authority in a quasi-class action, the court capped individually retained counsels' fees at 32%, which figure became the benchmark for the 32% attorneys fee awards in the InEx, Banner & Global settlements).

7.      The time limitations imposed by either the client or the circumstances of the case

This Court more than once has cautioned against the potential for MDL litigation to become so entangled in procedural complexities as to create the legal equivalent of a "black hole."  Therefore, MDLs before this Court typically have been managed to avoid delay, without sacrificing the rights and interests of the litigants.  Your Honor has held regular status and telephone conferences, has required periodic reports by counsel regarding case developments and problems which may cause potential delays in discovery, and has adhered to a rigorous schedule for all case activities.  Relatively early on in the proceedings, bellwether trials were set and pretrial activities conducted under firm deadlines, all within a timeframe which  intensified the efforts by common benefit counsel but  proved necessary to bring these class settlements to fruition.  Aware of the need to deliver closure for thousands of distressed property owners, common benefit counsel from the outset of this MDL have been diligent in accommodating the pace of the litigation.

It is respectfully submitted that the "time limit" demands on common benefit/class counsel justify an upward adjustment in the benchmark percentage based on *Johnson* factor number 7.

8.      The amount of the fund involved and/or the results obtained for the clients

The eighth *Johnson* factor – the amount involved and the results achieved – is entitled to considerable weight when, as here, the efforts of common benefit counsel were instrumental in achieving a highly-beneficial outcome on behalf of all class plaintiffs.  In fact, the U.S. Supreme Court has observed that "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained."  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).  *See also*

*Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir.1998) ("...Where recovery of private damages is the purpose,...consideration to the amount of damages awarded as to the amount sought represents the primary means to evaluate that concern."). The proper valuation of these class settlements thus warrants particular attention and careful analysis.

The FC includes in its proposed valuation the following categories of benefits which have been conferred on property owners through the Knauf, GBI and related class settlements:

(A) the market value of the remediation and environmental certification of Knauf drywall properties through Moss/GFA International, pursuant to remediation "Option 1" of the Knauf class settlement agreement;[14]

(B) payments made by Knauf pursuant to the class settlement agreement, other than those which Knauf made to Moss/GFA International under Option 1;

(C) payments made to class members by settling Defendants pursuant to the Global/Banner/InEx (GBI) and related class settlements through their "Other Loss Funds" and other sources;

(D) funds contributed by settling defendants for plaintiffs' legal fees, which otherwise would be payable by class members;

(E) funds recovered for MDL class plaintiffs through settlements reached in Virginia state court proceedings; and

(F) the administrative costs and value of services which were essential in order to administer, implement and finalize the class settlements.

---

[14] The Knauf class settlement agreement offered three options to property owners. Under "Option 1," the owner submitted to a remediation performed by Moss. Under "Option 2," the owner received certain funds toward the payment of a remediation contractor of his or her choice. Under "Option 3," the owner simply opted for a lump-sum cash payment. For properties remediated by Moss under Option 1, Knauf paid GFA International to provide post-remediation environmental certification.

Each of these benefit categories now will be discussed in the order indicated, and all categories also are referenced and summarized on the attached "Components of Class Settlements" Table prepared by the FC.  *See* "Components of Class Settlements" Table [attached hereto as Exhibit "B"].

(A) <u>The market value of the remediation and environmental<br>certification of Knauf drywall properties through Moss/GFA International,<br>pursuant to remediation Option 1 of the Knauf class settlement agreement</u>

While there is a discernible total paid by Knauf to Moss & Associates for the class-wide remediation of properties conducted by or through this sale Knauf contractor (under Option 1 of the settlement agreement), Knauf's payment does not, and cannot, reflect the true value of the remediation benefit conferred on each class member participating in the program.  Rather, any amount paid to a single contractor for its work on literally thousands of properties reflects a significant "economy of scale" discount when compared to the sum of payments which each individual owner would have been obliged to make in hiring a contractor to perform the same nature and extent of Chinese drywall remediation.  In order for the Court to discern the true value of the remediation benefit which each class member received, therefore, the discounted payment made by Knauf must be replaced, in the case of each property remediation, with the amount that particular plaintiff-owner would have paid "in the marketplace" to have that property remediated at the same point in time, in the same way, and to the same extent the property was remediated by Moss.

Fortunately, this calculation is made possible through a costing methodology which already has been made part of the record, both in the bellwether trials of certain MDL plaintiffs (the *Germano* and *Hernandez* plaintiffs) and in the Taishan class damages hearing conducted in

this Court on June 9, 2015.   The cost to complete the "back to studs" Chinese drywall remediation which has been recognized by experts, and by this Court, as necessary to make a property owner "whole" (*i.e.*, the nature and scope of remediation implemented by Knauf/Moss in the class settlement program), can be calculated on a dollar amount per square-footage basis through the R.S. Means software system.   This is the cost calculation method utilized and explained by PSC experts Ron Wright and George Inglis (professional engineers) in testimony presented to Your Honor in each of the above-referenced trials.   The FC submits that such a calculation method is particularly suitable for present purposes, for it not only tracks the same nature and scope of remediation which occurred in the Knauf/Moss program, but likewise enables the Court to discern value on a property-specific basis.   In this way, the Court may arrive at a valuation which reflects marketplace reality, rather than a discounted payment which is simply not applicable to the remediation benefit each individual homeowner received.

The PSC accordingly engaged George Inglis to perform a calculation of the remediation costs which would have been incurred by the class members whose properties were remediated through Moss under Option 1 of the Knauf class settlement, assuming these owners paid individual contractors for the same remediation service and at the same point in time.   In making this calculation, Mr. Inglis utilized the same average remediation cost per square foot which his firm (including Mr. Wright) derived from both the contractor bids on the *Germano* properties and his firm's extensive investigation of properties affected by Chinese drywall.   The resulting price of $86/square foot is further adjusted by a percentage increase in cost to reflect the additional amount each owner likely would have paid to obtain a post-remediation environmental

inspection and certification, *i.e.*, the same post-remediation environmental clearance which was afforded in the Knauf/Moss program.[15]

Furthermore, Mr. Inglis included in his calculation two variables to make the valuation even more precise on a property-by-property basis. He took into account (1) the zip code location of each Option 1 property, and (2) the calendar year in which the remediation occurred. Both variables can be, and have been, inputted through R.S. Means to adjust the base cost per square foot in each case. This allows cost adjustments to be made in light of local market influences on the price of materials and labor, as well as price changes caused by the passage of time between 2010 (when the Wright/Inglis square foot price initially was established for the *Germano* trial) and the year in which the Moss remediation for a given class member actually occurred.

The attached "Components" Table not only references but is accompanied by the valuation calculation of Mr. Inglis. Relying upon a list of all Moss-remediated Option 1 properties provided to him by Jake Woody of Brown Greer (the Court-appointed Settlement Administrator), a list reflecting the total square footage of the Option 1 properties arranged by zip code and year of remediation, Mr. Inglis has concluded that the "market" valuation of the Chinese drywall remediation benefit conferred on all class members through the Knauf/Moss settlement program, is in the total amount of $515,643,751.00. *See* Inglis Affidavit of March 18, 2016 (with Exhibit 1 & 2), attached to Components Table.

---

[15] This cost per square foot incorporation by Mr. Inglis of post-remediation/environmental inspection fees on a per-property basis, also properly substitutes for the total amount Knauf paid to a single environmental contractor (GFA) to provide post-remediation certifications in the Moss program. Knauf's payment was discounted due to the same "economy of scale" principle discussed *supra*, since the same contractor agreed to service thousands of properties.

(B) <u>Payments made by Knauf pursuant to the class settlement
agreement, other than those which Knauf made to Moss/GFA
International under Option 1</u>

This benefit category consists of three components: Knauf's payments pursuant to Options 2 and 3 of the settlement agreement, *i.e.,* remediation payments <u>other than</u> its Option 1 payments to Moss/GFA; Knauf's reimbursement to class members for the properties they previously had remediated at their expense, *i.e.,* payments for "already remediated homes" under the class settlement agreement; and Knauf's contribution to the fund disbursed to plaintiff class members making "other loss" claims under the settlements.

As explained in *fn.* 2 of the Table, Knauf paid $201,435,764.25 for property remediation under the class settlement agreement <u>after</u> the defendant's payments to Moss/GFA under Option 1 are deducted. This deduction for Option 1 payments, as discussed *supra*, is necessary because the PSC, through George Inglis, has substituted a truer, "market" valuation of the Option 1 class benefit. As the Table further confirms, Knauf additionally paid a total of $41,714,601.42 to reimburse class members for "already remediated homes." All such payments to plaintiffs were verified by Knauf as both documented and reasonable on a case-by-case basis. Finally, the Table reflects Knauf's "other loss" fund payment of $4,232,227.01.

(C) <u>Payments made to class members by settling
Defendants pursuant to the Global/Banner/InEx (GBI) and
related class settlements</u>

The Court-appointed GBI Settlement Administrator Brown Greer (through Jake Woody) has provided the amounts which correspond to the two components of this benefit category specified in the attached Table: first, a total of $40,279,825.14 paid by the GBI settling defendants to non-Knauf claimants (plaintiffs with Taishan drywall) to defray repair and

relocation costs; and, second, Brown Greer's disbursement of a total of $38,436,961.41 in "Other

Loss Fund" payments to GBI class settlement plaintiffs.

(D) Funds contributed by settling defendants for plaintiffs'
legal fees, which otherwise would be payable by class members

The total amount of $233,078,270.33 has been funded by settling defendants to cover all

attorneys' fees and common benefit expenses.  *See* Garrett Affidavit and reconciliation attached

thereto.[16]   This payment of fees and costs relieves each and every class member of all

contingency fee and cost reimbursement obligations to both retained and common benefit class

counsel, with the exception of the Virginia litigants, and thus represents an amount which

otherwise would have been payable by plaintiffs out of their settlement recovery.

It is well-settled that, when a settlement calls for the defendant to fund the payment of

attorneys' fees (or costs) so as to relieve class members of the burden of paying these amounts

out of recovery, the total fees/costs paid by defendants is properly included in the valuation of

the settlement for purposes of the Court's calculation of a fee award.  The rationale underlying

such jurisprudential precedent is clear:  the amount funded by defendants in such instances

effectively enhances the settlement benefit achieved for the plaintiffs.  *See, e.g., Johnston v.

Comerica Mortg. Corp.,* 83 F.3d 241, 246 (8th Cir. 1996) ("The award to the class and the

agreement on attorney fees represent a package deal.  Even if the fees are paid directly to the

attorneys, those fees are still best viewed as an aspect of the class' recovery."); *In re General

Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.* ("*G.M. Truck*"), 55 F.3d 768, 802

(3rd Cir.), *cert. denied,* 516 U.S. 824 (1995) (noting that the first edition of the *Manual For*

---

[16] As Mr. Garrett's reconciliation indicates, certain common benefit costs incurred through December 31, 2014, have been disbursed, or will be disbursed, from this total funded amount of $233,078,270.33, resulting in the fee-only balance of $192,981,363.35 which is the subject of this allocation motion.  If held costs through year-end 2013 are employed, a minor adjustment will be required.

*Complex Litigation* provided that fees "paid by the defendant(s) are properly part of the settlement funds"); *In re Prudential of America Sales Practices Litig.*, 148 F.3d 283, 330 (3rd Cir. 1998) ("although the class settlement and the attorneys' fee award were negotiated independently, [defendant] was responsible for both and therefore they are drawn from the same 'fund'"); *Heartland Payment Systems*, 851 F. Supp. 2d at 1078 ("The award to the class and the agreement on attorney fees represent a package deal.  Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery."); *In re Domestic Air Transportation Antitrust Litig.*, 148 F.R.D. 297, 354 (N.D. Ga. 1993) ("the Court rejects the argument that the calculation of the value of the common fund should exclude all cash used to pay attorneys' fees and the expenses of administration."); *Vista Healthplan, Inc. v. Warner Holdings Co. III*, 246 F.R.D. 349, 364 (D.D.C. 2007) (explaining that "because the attorneys' fees are borne by defendants and not plaintiffs, they represent a valuable part of the settlement.").

(E) <u>Funds recovered for MDL class plaintiffs through</u>
<u>settlements reached in Virginia state court proceedings</u>

The Virginia state court settlements which the PSC was active in negotiating, are discussed *supra* at pages 30-31.  The amounts of settlement funds net of attorneys fees paid under these settlements, are itemized in the attached "Components" Table.  These settlements resulted in a total recovery of $17,400,000.00 by plaintiff class members.

(F) <u>The administrative costs and value of services which were</u>
<u>essential in order to administer, implement and finalize class settlements</u>

In cases such as this, where class settlements contemplate non-monetized, class-wide services, the full valuation of plaintiffs' recovery necessarily must account not only for cash amounts paid directly to class members, but also for the value of such services.  Indeed, in

42

calculating common benefit fee awards, the responsibility of a district judge to valuate such "intangible" (not previously monetized) benefits conferred through class-wide/global settlements, is well-supported by the jurisprudence. *Wing v. Asarco, Inc*., 114 F.3d 986, 990 (9th Cir. 1997) (estimating value of a settlement that included non-monetary "medical monitoring" benefits); *G.M. Truck*, 55 F.3d at 822 (requiring court to calculate the value of intangible contract rights provided by class settlement and award fees as a percentage of that value); *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 775 (11th Cir. 1991) ("[F]actors which will impact upon [fee award include] any non-monetary benefits conferred upon the class by the settlement"); *Strong v. Bellsouth Communications, Inc*., 173 F.R.D. 167, 170 (W.D. La. 1997), *aff'd*, 137 F.3d 844 (5th Cir. 1998) (including "additional intangible economic value of market education" in the value of the settlement); *In re Dun & Bradstreet Credit Servs. Customer Litig*., 130 F.R.D. 366, 373 (S.D. Ohio 1990) (recognizing importance of "significant non-monetary benefits" in awarding common benefit fees); *Cullen v. Whitman Medical Corp.*, 197 F.R.D. 136, 147 (E.D. Pa. 2000) (finding it appropriate, in valuing a settlement under the percentage-of-recovery methodology, to include value of non-monetary benefits such as debt forgiveness).

This final benefit category accordingly addresses, and assigns value to, those "non-monetized" administrative services which inured directly to the benefit of class members, and without which the property remediation and funds received by class members through these settlements would not have been possible.

The case law recognizes that class settlement valuation should include the cost of notifying the class of the proposed settlement and the Court's settlement process. *Staton v.*

43

*Boeing Co.*, 327 F.3d 938, 975 (9th Cir. 2003) ("The post-settlement cost of providing notice to the class can reasonably be considered a benefit to the class. … [W]here the defendant pays the justifiable cost of notice to the class…it is reasonable…to include that cost in a putative common fund benefiting the plaintiffs for all purposes, including the calculation of attorneys' fees."); *Burford*, 2012 WL 5471985 at *1 ("Th[e] valuation amount includes administrative costs and attorneys' fees, which are generally viewed as an aspect of the class recovery."); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 569 & n.8, 597 (N.D. Ill. 2011); *Serrano v. Sterling Testing Systems, Inc.*, 711 F. Supp. 2d 402, 419 (E.D. Pa. 2010); *Heartland Payment Systems,* 851 F. Supp. 2d 1040, 1078 (S.D. Tex. 2012) ("Courts often include the costs of notice in valuing a class-action settlement. … District Courts routinely include …administrative costs in calculating attorneys' fees awards.").  Hence, the attached Table itemizes the class notice costs which were incurred by the PSC and by Defendants in these proceedings, in the total amount of $3,488,457.71.

The PSC advanced the sum of $508,532.37 in paying for notices to class members with respect to the various class settlements.  For the InEx settlement, Plaintiffs advanced half of the costs for notice, almost $100,000.00.  For the Banner settlement alone, the PSC incurred the entire costs of notice in the amount of $385,063.20.  These funds were put at risk for the benefit of the class, just as other litigation costs were advanced with no assurance as to outcome.  <u>Both Banner and its insurers refused to advance the cost of notice yet, thanks to the risk undertaken by the PSC to advance these notice costs, Banner and its insurers were able to exit the litigation without surrendering any out-of-pocket funds, and avoid bankruptcy</u>.  Likewise shirking any responsibility for advancing the costs of notice were the Homebuilders,  which not only received

44

settlement funds but whose counsel hope to recover a refund of the assessment of common benefit fees  despite having avoided any responsibility for investing in the infrastructure necessary to advance the settlement.  Indeed, due to the PSC's efforts, Banner did not make any settlement administration payment from its own assets, since the Banner settlement was completely funded through its insurance coverage.

No decisional law can be found supporting a similarly substantial expenditure of class-notice costs by a PSC, without which none of the inter-related settlements would have prospered. This advance of resources exemplifies the dedication of class counsel in seeing that their Knauf clients were fully compensated, and these are the same counsel who still strive to achieve the same result for those clients unfortunate enough to have the Taishan Defendants' products installed in their properties.

As reflected on the attached Table, the Brown Greer settlement and claims administration services are valued in the total amount of $4,600,000, which refers to services paid for by the (settling) defendants only.  The services of Brown Greer clearly and directly benefited class members, and were rendered pursuant to Court order as prerequisites to class recovery.

The Table further sets forth that the settlement and claims administration services of the Garretson Group in the companion Virginia state court settlements, were rendered at a cost of $289,689.41.  These services also were essential prerequisites to the class recovery in the MDL, given the inter-dependent relationship between the MDL and state court settlements.

The services of Robert Johnston, the Court-appointed *Pro Se* Curator, were rendered pursuant to Court Order.  See Order of November 8, 2011 [Rec. Doc. 11327].  The PSC has been responsible to contribute payments for the regular invoices of the *Pro Se* Curator, and not a

single settlement recovery by a *pro se* class member was made the subject of any fee deduction or assessment. This Court-ordered legal service to unrepresented class members constituted an important, and indeed essential, class benefit in the finalization of the class settlement agreements. The Table confirms that a total of $734,209.37 was paid for these *Pro Se* Curator services.

The next series of valuable administrative services reflected on the attached Table collectively may be characterized as payments made by Knauf in order to administer and implement of class settlement Option 1, separate and apart from Knauf's payments to Moss and GFA for actual remediation and environmental certification of class properties.

The first such payment was made to Mr. Louis Velez, the "Ombudsman" designated under the Knauf/Moss remediation settlement agreement. Mr. Velez was responsible for resolving disputes that might arise between the contractor and the property owner as to the scope or details of the remediation activity. His services were made possible through the payment of $291,448.39, and this figure clearly is appropriate to include in the overall valuation of the "non-monetized" settlement benefits conferred on class members.

The next entry on the Table reflects payments made by Knauf for the pre-remediation inspection of the class properties to be remediated through Moss. These inspections were required by Knauf in order to establish the necessary indicia of Knauf drywall and document the contamination in the property, before the remediation activity by Moss was authorized to begin. Knauf paid the total of $6,078,195 to have such inspections performed by Benchmark, and the total of $2,330,325.28 for the inspections conducted by MZA. These were payments which

directly and concretely benefitted all class members whose properties were cleared by inspection for remediation under Option 1.

The bidding process utilized by Knauf in the Moss remediation program is the next item on the Table, since the Option 1 remediation of properties did not, and could not, commence without this essential cost-bidding step being completed for each property.  Knauf paid a total of $11,667,699 for the bidding of the class property remediation by Moss.

Moss also charged Knauf for certain start-up and administrative costs, as well as consultant services, in connection with the essential role played by Moss under the class settlement.  Specifically, the Table confirms that Knauf paid $900,000 for Moss' initial startup costs for the remediation program, $3,587,500 for Moss' "core" staff costs to carry out the remediation activity, and $319,551.01 for consulting services rendered by Moss in connection with already-remediated homes.  Each of these payments to Moss was necessary to implement the property remediation program, and each therefore delivered a benefit of value to class members.

No class settlement can be implemented or finalized without a transparent and thorough claims process, which invariably requires the services of a Court-appointed Special Master.  This case was no exception.  Dan Balhoff of the Perry Atkinson firm has served as Special Master for the review of claims data pertinent to the allocation of settlement funds among class members, and Special Master Balhoff not only made allocation recommendations to the Court, but also helped resolve disputes and objections raised in the allocation process.  The Special Master's charges for these services were paid in the total amount of $687,720.51, as confirmed by the

Table.  Beyond question, such payments delivered material benefit to the plaintiffs, and should be included in the total valuation of the class settlement.

Pending the finalization of the Knauf class settlement, the parties required that certain physical evidence/drywall be stored and preserved as potential evidence.  The same material ultimately was disposed of, once the class settlement was finalized and fully implement.  As indicated by the Table, Knauf made a total payment in the amount of $210,463 for this drywall preservation and disposal.  Since these preservation and disposal services were required by the pendency of the class settlement and the process of judicial approval of the settlement, and preserved critical evidence for the benefit of class members, the FC submits that Knauf's payment constitutes a "non-monetized" value to be included in the current analysis.

Finally, there are a series entries in the attached Table, which refer to the services of:  the Court-appointed CPA, Philip Garrett; the charges from certain financial institutions for the handling and deposit of the class settlement funds; the charges of the bank (Deutsche Bank) which issued the Letter of Credit for Knauf in the process of settlement; and other bank charges (of U.S. Bank) for administering the account where settlement funds were escrowed.  No dollar value is assigned to these entries at this time.  Nonetheless, the FC has identified them as necessary aspects of class settlement administration and finalization which the Court may see fit to include in a valuation analysis.  Each activity represents an activity without which class members would not have received the benefits of settlement.

The discrete components of the class settlement which have been addressed *supra* for valuation, then, may be summarized as follows:

48

| | |
|---|---|
| (A) Market Valuation of Option 1, Moss Remediation | $ 515,643,751.00 |
| (B) Knauf Payments for Options 2 and 3, Already Remediated Homes (ARH), and "Other Loss" Claims | $ 247,382,592.71 |
| (C) GBI Settlement Payments | $  78,716,786.55 |
| (D) Attorney's Fees/Costs | $ 233,078,270.33 |
| (E) Virginia Settlement Payments | $  10,962,000.00 |
| (F) Administrative Services | $  34,529,905.31 |
| **GRAND TOTAL** | **$1,120,313,305.90** |

By any measure, the inter-related settlements achieved in this MDL, which provided "made whole" remediation and other relief having a total value of approximately **$1.1 billion**, represents an extraordinarily beneficial result for plaintiffs. Pursuant to *Johnson* factor number 8, the Court is asked to consider a substantial upward adjustment in the benchmark percentage.

9.   The experience, reputation and ability of counsel

When this MDL litigation began, the Court undertook an arduous selection process in order to identify and appoint experienced, reputable and able counsel to serve on the PSC. *See* Pretrial Order No. 8. (Rec. Doc. 144-2). Likewise, all counsel authorized by the PSC to do common benefit and class counsel work were highly-skilled and capable professionals.

This *Johnson* factor also weighs for purposes of an upward adjustment in the benchmark percentage.

10.   The "undesirability" of the case as an undertaking by counsel

As noted, significant economic risks were accepted by plaintiffs' counsel in agreeing to prosecute a product liability case of this magnitude against foreign defendants and thousands of

domestic defendants. The fact that the major settling defendant was a foreign manufacturer in both Germany and China only added to that degree of risk given the renowned difficulty enforcing judgments in those countries. Beyond these risks, the presence of these foreign manufacturers (both Knauf and the Taishan-affiliated Defendants) ensured that substantial litigation costs for travel would exist, and that difficulties with service of process (including Chinese companies' notorious reputation for refusing valid service of process), foreign discovery, translation services, sovereign immunity defenses and other jurisdictional defenses, etc. would present themselves. At the same time, the FC does not suggest that the present matter is one that was "undesirable" to undertake; the plaintiff class is comprised of innocent home and property owners harmed by a Chinese-manufactured, defective product, and theirs is a just cause. To this date, some of Class Counsel continue to labor practically full time on the administration of the settlements as well as pursuing an obstinate group of Chinese Defendants who continue to deny their accountability for their defective and problematic drywall. At the time that the Knauf Settlement was consummated, the PSC determined to continue to pursue the Chinese defendants so as to avoid any adverse impact to Knauf's ability to compete in the market place.

*Johnson* factor number 10 may be neutral in the current analysis.

11. <u>The nature and length of the professional relationship between counsel and the client</u>

This factor was designed to consider those instances in which "a lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office." *Johnson,* 488 F.2d at 719. Since few (if any) longstanding client relations between common benefit counsel and class members preceded this MDL, this *Johnson* factor number 11 also should be neutral as it relates to the benchmark percentage.

12.   <u>Awards of fees in similar matters</u>

As already discussed, the proposed benchmark percentage of 8% of plaintiffs' global settlement recovery to calculate the common benefit/class counsel fee award, compares to the *Turner* (15%) and *Vioxx* (6%) benchmark percentages in ways that are both consistent with precedent and reasonable under the distinguishing facts and circumstances of these proceedings.[17]   The requested benchmark also is consistent with the *Eisenberg* case survey for the applicable category of settlement funds; the "over $19.5 million" global recovery category in *Eisenberg I* reflects a percentage-of-fund range that is actually higher, *i.e.,* between 12 and 20.1%.   The FC does propose that the 8% benchmark percentage be adjusted based on the *Johnson* factors.   *See* pp. 53-54, *infra*.   But, as the following chart demonstrates, the Court-approved, percentage-of-fund fees awarded to common benefit counsel in a number of reported decisions, would place the "8% +" fee percentage proposed herein by the FC squarely within the parameters of case precedent:

| Case | Fund Value | Percentage Award |
|---|---|---|
| *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 2008 WL 4178130 (S.D.Tex. 2008) | $7.2 billion | 9.52% |
| *In re Nasdaq Market-Makers Antitrust Litigation*, 187 F.R.D. 465 (S.D.N.Y. 1998) | $1.07 billion | 14% |
| *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F.Supp. 2d 942 (E.D.Tex. 2000) | $1 to $1.1 billion | 15% |
| *In re Sulzer Hip Prosthesis and Knee Prosthesis liability Litigation*, 268 | $1.045 billion | 4.8% |

---

[17] In *Orthopedic Bone Screws, supra*, the court recognized that common benefit counsel were entitled to an assessment on all plaintiffs of 17% of their recovery (12% fee/5% costs), and while there were numerous defendants in that action, the efforts of that PSC did not reach the same levels as those expended by the PSC in this litigation.

| F.Supp. 2d 907 (N.D.Ohio 2003) | | |
|---|---|---|
| *DeLoach v. Philip Morris Cos.*, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003) | >$1 billion | 5.9% |
| *Visa Check/Mastermoney*, 297 F.Supp. 2d 503 (E.D.N.Y. 2003), *aff'd, Wal-Mart Stores, Inc. v. Visa, U.S.A., Inc.*, 396 F.3d 96 (2nd Cir. 2005) | $3.383 billion | 6.5% |
| *In re WorldCom, Inc. Sec. Litig.*, 388 F.Supp. 2d 319 (S.D.N.Y. 2005) | $6.133 billion | 5.5% |
| *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 WL 3057232 (S.D.N.Y. 2006) | $2.65 billion | 5.9% |
| *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F.Supp. 2d 383 (D.Md. 2006) | $1.1 billion | 12% |
| *In re Tyco Int'l, Ltd.*, 535 F.Supp 2d 249 (D.N.H. Dec. 19, 2007) | $3.3 billion | 14.5% |
| *In re Diet Drugs Products Liability Litigation*, 553 F.Supp.2d 442 (E.D.Pa. Apr. 9, 2008) | $6.44 billion | 6.75% |

In considering this final *Johnson* factor, therefore, no <u>downward</u> adjustment of the benchmark percentage is warranted; the Court may decide whether this factor in fact warrants an <u>upward</u> adjustment.

### (VI) <u>The Resulting Adjustment of the Benchmark Percentage</u>

Based upon the foregoing analysis of the *Johnson* factors as applied herein, the FC requests that the Court adjust the proposed benchmark percentage upward by <u>2.65%</u>. This would result in a <u>10.65%</u>-of-settlement-recovery fee award for common benefit/class counsel.

An adjustment to this extent would not be inconsistent with the 2% adjustment made by the Court in *Turner*, where, the Court concluded that <u>six</u> *Johnson* factors warranted a 2% increase in the benchmark percentage. *See* 472 F.Supp.2d at 867. Here, at least <u>seven</u> *Johnson* factors arguably do so. Neither would such an adjustment conflict with *Vioxx,* where the Court considered "at least three" of the *Johnson* factors as warranting an upward 0.5% adjustment but where, as noted, the amount of the settlement fund ($4.85 billion) was significantly greater, resulting in a 6.5% common benefit fee of $315,250,000. *See* 760 F.Supp.2d 640, 658.

A fee award amounting to 10.65% of the total of all class settlement recoveries in this case likewise would not be inconsistent with the guidelines of *The Manual for Complex Litigation*. This percentage of recovery is significantly lower than the *Manual's* 25% (unadjusted) benchmark. Moreover, even after the requested adjustment of benchmark, this 10.65% fee is also lower than the 12-20.1% "sliding scale" range of awards in the *Eisenberg* survey for the "greater than $190 million" category in which these class settlements herein fall.

Accordingly, employing the blended methodology as fairly applied to the specific circumstances herein, the FC requests that the Court approve a common benefit/class counsel fee award in the amount of **$119,313,367.08** (10.65% a class settlement recovery of $1,120,313,305.90).

### (VII) <u>The Lodestar Cross-Check</u>

The remaining step in the analysis is a lodestar "cross-check" to assure that such a percentage fee award would be reasonable in outcome in the matter at hand.

As has been calculated in the attached submission by the Court-appointed CPA, a time-based fee value using appropriate blended market rates for common benefit counsel alone, would

be $\underline{131,588,525.35}$ for the calendar period addressed in the FC fee request.[18]  *See* Garrett Affid. ¶17; *see also* Memo in Support of FC and PSC Joint Petition for global fee approval (Rec. Doc. 17700-1), at p. 24, *fn.* 33.   An hourly lodestar calculation of the fee earned by common benefit counsel collectively, is well in excess of the percentage award, *i.e.,* the amount of the requested common benefit/class counsel fee.   To the extent the "lodestar" methodology is a reliable cross-check, the negative multiplier applicable to the time based fee value under the blended method manifestly demonstrates that the proposed fee amount, is fair and reasonable.

### (VIII) <u>The Impact of the Common Benefit Fee Award on the Fees of Privately-Retained Counsel</u>

Where, as here, all fees must be satisfied out of a single, sum-certain fund, the award of a common benefit/class counsel fee creates an inherent tension between the interests of common benefit/class counsel and those of individually-retained (private) counsel.   This inevitable tension has been analogized by this Court to a "taffy pull."   *See Vioxx*, 760 F.2d at 653.   The final matter for the Court to consider is how the proposed common benefit/class counsel fee award will affect the amount of fees remaining and available in the reserved funds for the payment of fees under individual retainer agreements with clients.

As an initial matter, it is important to note that all individually-retained plaintiffs' counsel whose clients have participated in these class settlements, necessarily are aware that the settling defendants funded a sum-certain reserve to satisfy <u>all</u> legal fees, inclusive of both the fees awarded by this Court to common benefit/class counsel and the fees payable to privately-retained counsel.   This aspect of the approved settlements not only benefited plaintiffs, as already noted,

---

[18] For purposes of this allocation, blended rates were employed.   However, Mr. Garrett made similar calculations using rates at inception and current rates, both of which are equally consistent with the percentage award requested. Using current rates the time-based fee value is $146,854,654.40, and using rates at inception the time-based fee value is $115,712,271.30.   *See* Garrett Affid. ¶17.

but also revised any percentage-fee agreements individually executed with class members. Inherent in the acceptance of a class settlement establishing a fixed-amount fund to pay all fees is the understanding that this available fund is both subject to a Court-ordered allocation for common benefit fees, and "capped" in amount.  No private counsel should be heard to oppose a common benefit fee award on the basis of an inviolable right of contract.   Whatever fee percentages might be specified in retainers with client, these counsel surely must concede that all such retainer fee percentages have been made subject to modification by virtue of the fee provisions of these class settlements.

Furthermore, it is well-settled that percentage-fee retainer agreements with litigants are subject to an MDL/Rule 23 district judge's authority to "cap" or limit fees to a percentage deemed "reasonable" in the case *sub judice*.  As noted *supra* (*fn.* 11, p. 33), this Court concluded in the *Vioxx* MDL that 32% of recovery was a reasonable maximum to impose on all contingent fees.  *See In re Vioxx Prods. Liab. Litig.,* 650 F.Supp.2d 549, at 562-64 (E.D. La. 2009).  In the pending MDL arising out of the BP oil spill of April 20, 2010, Judge Carl Barbier likewise has ordered that the fee agreements of all attorneys representing plaintiffs who or which participate in the settlements made in that litigation "will be capped at 25%...." of recovery.  *See* Order [setting caps on individual attorneys' fees] dated 6/15/12 (Rec. Doc. 6684) (Ex. 2), *In re Oil Rig "Deepwater Horizon" MDL No. 2179* (E.D. La. 2010).  *See also In re Zyprexa Prod. Liab. Litig.,* 424 F.Supp.2d 488, 491 (E.D. NY 2006) [35% cap on percentage attorneys' fees by retainer].

Against the backdrop of these initial observations, the determination of how the requested common benefit/class counsel fee of $119,313,367.08 would affect the amount of available

private fees, first should recognize that the common benefit fee to be awarded by the Court will be funded from two sources: (1) by payment from the fund of the total approved fees of $192,981,363.35 to be shared with private counsel, and (2) by receipt of those funds which have been set aside and earmarked to compensate common benefit counsel only.  As noted in this Court's Order of May 17, 2016, certain common benefit fees and costs have been made pursuant to "Voluntary Common Benefit Payments" under certain settlements.  *See* Order of 5/17/16 [Rec. Doc. 20257], at p. 3, *fn.* 3.  The FC is advised by Mr. Garrett, and his attached "reconciliation" confirms, that these payments are in the total amount of $3,332,058.26.  Garrett Affid., Exb. 2.  In addition, a total of $2,400,000 was negotiated by the parties (PSC lead and liaison counsel and Knauf) for the payment of costs <u>and</u> fees to those PSC counsel who were involved in the preparations and trial of the case against North River to a jury.  *See* Order of 5/17/16, *supra*.  This North River payment further has been allocated as $1 million for costs and $1.4 million for fees, pursuant to stipulation and Court order.  *See* 7/31/13 Stipulation and Order Regarding Attorneys' Fees and Costs in the InEx/North River Trial [Rec. Doc. 16968].  Accordingly, combining the "voluntary contributions" and fee portion of the North River payment, it appears that common benefit fees in the total amount of $4,732,058.26 are available from these "earmarked" sources.  It thus is only the remaining portion of the requested total common benefit award, *i.e.,* $114,581,308.82 ($119,313,367.08 less $4,732,058.26), which must be allocated from the shared fund of $192,981,363.35.

If the instant fee award sought by the FC were allowed, therefore, there would remain a total amount of $78,400,054.53 for private attorney fees in connection with these class settlements ($192,981,363.35 less $114,581,308.82).  It is a "split" of available fees between the

two groups of counsel representing an allocation of 59.37% of the shared fee fund to common benefit/class counsel, and 40.63% to privately-retained counsel.  The FC submits that such a percentage division would be eminently fair and reasonable under the specific facts and circumstances of these proceedings.

In so arguing, the FC does not seek to deny the value of private counsel services to clients.  While much in this brief has been made of the common benefit value conferred by Court-appointed counsel in discharging their professional responsibilities, none of that discussion is intended to diminish the fundamental importance and value of what individually-retained attorneys contribute to the successful handling of multi-district litigation and class actions.  Private counsel obviously are responsible for the "critical mass" of claims of which the litigation is comprised, without which the performance of common benefit work at even the highest level would be of little, or no, practical consequence.  It also is important that privately-retained counsel be incentivized through the payment of reasonable fees to do more than simply accumulate a case inventory, but also maintain and attend to that inventory in a diligent manner throughout the various stages of litigation.  For example, the gathering of case-specific information and documents in support of individual claims and ongoing communication with claimants as important case developments occur, are crucial activities if matters such as this are to be concluded on a global and successful basis.

In dividing a total fee amount allocation between the two groups of counsel, common benefit and private, it ultimately becomes a question of balance.  The competing interests of each group are legitimate.  It is the proper and comparative weighing of these interests which falls to the Court.

To assess the respective contributions by common benefit and private counsel, Your Honor is invited to consider the following itemization of legal services. These may be considered typical in the handling of personal injury/property damage cases on behalf of plaintiffs, and to one degree or another each of these activities has been required in the present case:

1. Meeting with the client and reviewing initial documents provided by the client.

2. Researching and formulating theories of fault, causation and damages.

3. Conducting an inspection of the property to identify the product and manufacturer.

4. Preparing and filing a lawsuit.

5. Serving the lawsuit on all defendants.

6. Negotiating a "profile form" to substitute for interrogatories answered by plaintiff.

7. Completing and executing the plaintiff's profile form.

8. Negotiating a defendant(s) "profile form" to substitute for interrogatories served on defendants.

9. Addressing any foreclosure/bankruptcy issues.

10. Obtaining and reviewing insurance policies to resolve coverage issues.

11. Devising a discovery strategy as to fault, causation and damages.

12. Conducting discovery activity as to fault, causation and damages.

13. Preparing the plaintiff for a deposition.

14. Participating in the plaintiff's deposition.

15. Identifying and retaining all needed experts on fault, causation and damages.

16. Meeting with experts in preparation for their reports/testimony.

17. Negotiating all case management, pretrial and scheduling orders.

18. Preparing, briefing (and, if necessary, arguing) motions on behalf of plaintiffs.

19. Briefing (and, if necessary, arguing) defendants' motions.

20. Securing all needed expert reports by deadline.

21. Preparing experts for their depositions and participating in same.

22. Preparing for and taking defendant expert depositions.

23. Participating in *Daubert* motion practice, as needed.

24. Participating in mediation/settlement negotiations.

25. Participating in mock trial/focus groups.

26. Preparing, briefing and arguing pretrial motions.

27. Merits trial preparation.

28. Preparing jury questionnaires to streamline *voir dire*.

29. Preparing and conducting *voir dire* for merits trials.

30. Jury charges (research and preparation).

31. Participating in merits trials.

32. Preparing a verdict form.

33. Preparing, briefing and arguing post-trial motions.

34. Briefing and arguing appeals.

35. Negotiating settlements.

36. Finalizing settlements (approval under Rule 23).

37. Processing and administering settlements (including the resolution of common remediation issues).

The FC respectfully submits that the overwhelming majority of these necessary services were carried out and performed on behalf of all plaintiffs by common benefit/class counsel in this case.  In these proceedings, it simply proved unnecessary for individually-retained counsel to be active in any degree regarding the vast majority of these services; and, where individually-retained counsel was called on to participate, many activities typically occurred in close collaboration with, and under the direction of, common benefit/class counsel.  Indeed, many of the services which individual counsel did provide (*e.g.*, initial property inspections, the drafting of complaints) occurred through the hands-on involvement of PSC counsel.

Furthermore, as this Court previously has observed, not all legal services are created equal.  In terms of weight and contribution to outcome, the most demanding and substantive of the above activities were performed <u>exclusively</u> by common benefit/class counsel, *i.e.,* merits discovery, science and expert witness development, the presentation of plaintiffs' case through merits trials, state coordination, and settlement negotiations and settlement administration.  Likewise, the important effort by the PSC as class counsel to seek and obtain the Court's recent approval of an overall fee/cost payment of approximately $193 million under these class action settlements, utterly relieved private attorneys of the burden of petitioning for or justifying their contract fees pursuant to Rule 23.[19]

---

[19] That individually retained counsel share in the class fee recovery is extraordinary.  It bears repeating that the fees at issue were obtained through recovery of class actions that were prosecuted exclusively by Class Counsel.  Many of these class actions were traditional class proceedings, in the sense that absent class members were present, *e.g.,* Global, Banner and Inex.  In none of the class proceedings was there ever a single objection to the fee award, which traditionally would have the totality of the fee award inure to class counsel.  That the fees were agreed to be shared between common benefit counsel and individually retained counsel, with common benefit counsel undertaking the entire burden to recover, petition and administer the distribution of fees, is significant.  Individually retained counsel were relieved of every burden of proving their entitlement to fees, including providing contemporaneously retained records of their time to satisfy the lodestar cross-check requirement ordinarily imposed in common fund fee jurisprudence.  These counsel have reaped the rewards for their services without the need to establish any of the

Perhaps the most intensive effort of private counsel related to the processing of individual profile and claim forms, especially for class settlement participation; and, as to the Knauf remediation program, it is acknowledged that addressing remediation details involving Moss and its contractors, etc., required significant and important effort.  That most of these settlement-related services could be performed by competent <u>non-attorney</u> staff, however, is an observation meant not to devalue the service, but simply to weigh it in comparison to the nature and level of professional services and skills which were demanded of common benefit/class counsel throughout the litigation.

In sum, the common benefit/class counsel and private counsel fee allocation of roughly 59%/41% is appropriate and fully justified under the circumstances of this case.  It also is consistent with case precedent in this court:

In the case of *In re: Educational Testing Service*, 555 F.Supp.2d 661 (E.D.La. 2007), Judge Sarah Vance approved a class settlement value at $11.1 million, and awarded 29% of that amount as a common fund for all attorneys' fees.  She then appointed an "Attorneys' Fee Compensation Committee" (AFCC) and tasked it with the assignment of confecting "an agreement for the distribution of the award among the group of plaintiffs' counsel.  *See id.* at 663.  The AFCC prepared a protocol for distributing fees which contemplated a division between common benefit and individually-retained counsel.  In doing so, it recognized that common benefit counsel did work for the plaintiffs as a whole, as opposed to the work done by other counsel on behalf of particular claimants.  After the AFCC made its presentation to Judge Vance,

---

*bona fides* that regularly attend class action/common fund fee petitions.  This is a remarkable accommodation to counsel whose contributions to the actual prosecution of the action were limited to those described above.

61

she ordered that the global fee award be divided evenly, *i.e.*, 50/50, between the common benefit and privately-retained groups of counsel.

In the case of *In re: FEMA Trailer Formaldehyde Products Liab. Litig.*, MDL No. 07-1873 (E.D. La.), Judge Engelhardt approved several district class action settlements under Rule 23.  He then approved a percentage-of-fund award of 28% from each settlement to collectively compensate all counsel, common benefit and private, for their services.  Of this total set-aside of 28% of the settlements, Judge Engelhardt approved an equal, 50/50 division between common benefit counsel and individually-retained counsel.  *See* Order & Reasons of May 2, 2014 [Doc. 26047], *In re: FEMA Trailer Formaldehyde Prods. Liab. Litig.*, MDL No. 07-1873 (E.D. La.) (Ex. 3).

As was true in both setting the appropriate benchmark fee, and in adjusting it by application of the *Johnson* factors, no two cases are identical.  But the above (50/50) allocations of common benefit/class counsel and private fees, while indicative of the fact that common benefit/class counsel might well undertake a significant portion of the most substantive responsibilities in MDL's and class actions conducted in this Court, do not reflect  the extraordinary "common benefit" complexities present in this case.  Whereas both *FEMA Trailer* and *ETS* involved domestic litigants, they pale in comparison to the variety of foreign and domestic defendants in this litigation, whose numbers were in the thousands, not handfuls.  In further contrast, this litigation required extensive and necessary leadership by the PSC:  to prepare Omni Complaints; to depose foreign witnesses in Germany, Hong Kong, and other distant venues; to develop ground-breaking scientific proof; and to advance certain costs ordinarily borne by defendants (*e.g.*, the costs of settlement notice), all the while enduring the

risks of litigating a matter against numerous defendants over an extended period in excess of six years, without any compensation and to the exclusion of practically all other sources of revenue. In circumstances as extraordinary as these, traditional allocation considerations are not justified. Counsel should be compensated in proportion to the work they performed and the results they achieved for plaintiffs. Based on the particular record of the instant matter, one with which this Court is well-familiar, the proposed 59/41% allocation of the shared fee reserve between common benefit/class counsel and individually-retained counsel, should be deemed reasonable by the Court. It is an allocation not only consistent with precedent, but, more importantly, one which reflects each counsel's group's respective contributions to the global recovery achieved through the class settlements at issue.

## (IX) Conclusion

Based on its unparalleled experience presiding over multi-district litigation, this Court has observed that each such proceeding "is usually complex and always unique…." *See Common Benefit Fees*, 74 La. L. Rev. at 389. The calculation of an appropriate common benefit fee likewise must fit and reflect the complex, unique circumstances of the litigation in question. Your Honor has exercised a degree of "hands-on" case management in these proceedings which makes such a case-specific fee award not only appropriate but possible. The Court's decision ultimately will be, and should be, grounded on a first-hand, evaluative view of the role and services of counsel in achieving the class settlements through which legal fees are now payable.

The FC is confident that this evaluation of its services on plaintiffs' behalf, properly framed by established jurisprudential principles of analysis, fully supports the requested award. Common benefit/class counsel in this case have earned a fee amounting to 10.65% of the class

settlement recovery; and the Court therefore is asked to approve such an award in the amount of $119,313,367.08.

Respectfully submitted,

Dated: June 6, 2016             /s/ Russ M. Herman

Russ M. Herman, Esquire (Bar 6819) (on the brief)
Leonard A. Davis, Esquire (Bar No. 14190) (on the brief)
Stephen J. Herman, Esquire (Bar No. 23129)
HERMAN, HERMAN & KATZ, L.L.C.
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
LDavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel MDL 2047*

Arnold Levin (on the brief)
Fred S. Longer (on the brief)
Sandra L. Duggan (on the brief)
Matthew C. Gaughan
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*

Gerald E. Meunier (LA Bar No. 9471) (On the Brief)
Gainsburgh, Benjamin, David,
Meunier & Warshauer, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com
*Co-Counsel for Plaintiffs and PSC Member*

**ON BEHALF OF THE FEE COMMITTEE**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 6th day of June, 2016.

<u>/s/ Leonard A. Davis</u>
Leonard A. Davis, Esquire
Herman, Herman & Katz, L.L.C.
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
Plaintiffs' Liaison Counsel MDL 2047
*Co-counsel for Plaintiffs*