**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION                  **MDL NO. 2047**

                                   **SECTION: L**

                                   **JUDGE FALLON**
                                   **MAG. JUDGE WILKINSON**

THIS DOCUMENT RELATES TO:
*ALL CASES*
*********************************************************************************

**PRIMARY COUNSEL'S REQUEST TO ALLOCATE THE GLOBAL FEE AWARD
BETWEEN COMMON BENEFIT COUNSEL AND PRIMARY COUNSEL AND
OBJECTIONS TO THE FEE COMMITTEE'S MOTION TO DETERMINE THE
ALLOCATION OF THE GLOBAL FEE AWARD AS BETWEEN COMMON BENEFIT
ATTORNEYS AND INDIVIDUAL COUNSEL FEES PURSUANT TO PTO 28(F)**

COMES NOW Primary Counsel, K. Edward Sexton, II of Gentle, Turner, Sexton &
Harbison, LLC (hereafter "Sexton") and Eric D. Hoaglund of McCallum, Hoaglund, Cook &
Irby, LLP (hereafter "Hoaglund") (collectively referred to as "Sexton/Hoaglund firms") and
request this Honorable Court to allocate the Global Fee Award between Primary Counsel
(hereafter "PC") and Common Benefit Counsel (hereafter "CBC") as requested herein and object
to the Fee Committee's (hereafter "FC") Motion to Determine the Allocation of the Global Fee
Award as Between Common Benefit Attorneys and Individual Counsel Fees Pursuant to PTO
28(F) requesting $114,581,308.82.  In support of said request and objection, Sexton/Hoaglund
state as follows:

**I. INTRODUCTION**

On June 16, 2016 the FC requested a fee allocation split of $114,581,308.82 to CBC and
$78,400,054.53 to PC.  The current attorneys' fee fund of $192,981,363.65 is inadequate to
accommodate such an award to CBC and leaves PC with an 11.9% contract fee for the benefits

obtained for a homeowner.  The FC's request provides the FC with 60% of the available funds. The FC's basis for their allocation is flawed because the PSC failed to create an adequate common fund, but their fee request implies a 32% common fund of a $1.1 billion settlement is available.  In addition, the FC inflates the value of the benefit obtained for the Plaintiffs and requests a benchmark percentage and *Johnson* adjustment which are entirely too high for an inadequate and limited common fund.  Further, the FC grossly underestimates the work performed by PC and other similarly situated individual counsel in evaluating the fee allocation.

The total amount of the common benefit should be reasonable under the circumstances, and the method for distributing it should be fair, transparent and based on accurately recorded data.  *See* Eldon E. Fallon, *Common Benefit Fees in Multi-district litigation*, 74 La. L. Rev. 371, 381 (2014).   The FC is responsible for allocation between CBC and PC must "'apply a *universally fair* standard of allocation to all participants, including itself.'" *See In re High Sulfur Content Gasoline Prod. Liab. Litig.,* 517 F.3d 220, 232 (5th Cir. 2008).  The contributions of all plaintiffs' attorneys should be compared rather than focusing on CBC's contributions.  *See id.* at 232 (reversing and criticizing order accepting a fee committee allocation for its failure to make meaningful comparison).  The Fifth Circuit also stated:

> [O]ur precedents do not permit courts simply to defer to a fee allocation proposed by a select committee of attorneys, in no small part, because "counsel have inherent conflicts." *In re Diet Drugs Products Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring). As Judge Ambro noted, "They make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?" *Id.*
>
> Here, members of the Fee Committee "had a direct conflict of interest: they were suggesting to the District Court how to proceed on matters near and dear— dividing a limited fund among themselves and other firms. Such a direct conflict

of interest strongly suggests that affording substantial deference is inappropriate."
*Id.* at 173–74.

*Id.* at 234-235.

*In re Vioxx Prods. Liab. Litig.,* 760 F. Supp. 2d 640, 661 (E.D. La. 2010), this Court provided CBC with 6.5% of the total benefit obtained, which equated to 21% of the total attorneys' fees available. The primary attorneys in *Vioxx* received 25.5% of the total benefit obtained and 79% of the total fees available. *See id.* In the case at hand, PC suggests a fee allocation which is in line with the award in *Vioxx* and other MDL awards. Under PC's suggestion, CBC receives 5% of the total benefit obtained, which equals 22% of the total fees available. PC's allocation provides PC with 17.6% of the total benefit obtained, which equals 78% of the total attorneys' fees available. This amounts to a much more equitable and supportable split pursuant to *Vioxx* and other MDLs of 22/78 between PC and CBC as opposed to the FC's proposed 60/40 split in its favor.

## II.  REPRESENTATION BY PRIMARY COUNSEL

The FC's motion for allocation grossly underestimates the work performed by PC and other similarly situated individual counsel. PC believes a review of the impact the proposed allocation request will have on PC and an explanation of the work performed by PC will prove helpful to the Court.

### A.  The FC's Allocation Request and Impact on Primary Counsel.

The FC's allocation request reduces PC's contract fees from an average of 35% to an 11.9% fee of the benefit provided to a client.

The Plaintiffs' Steering Committee (hereafter "PSC") and CBC were solely responsible for the negotiation of the common fund for attorneys' fees, and PC had no involvement in the fee

3

negotiations. The PSC and CBC failed to create an adequate common fund to accommodate their request for $114 million in common benefit fees. The risk of creating an inadequate common benefit fund should be borne by the PSC and the CBC since they were solely responsible for the fee negotiations. Instead, the PSC and CBC now seek to punish PC by reducing their individual contract fees from an average of 35% to an 11.9% fee. If the FC's request for $114,581,308.82 of the proposed available $192,981,363.65 is granted, PC will be left with a fund of $78,400,054.53. Based upon the formula set forth by the Court in PTO 28(F), ¶5, PC will receive a fee of 11.9% of the benefit provided to a client. For example, if a homeowner remediated their home at a total cost of $100,000, PC will receive only $11,900 in fees as opposed to $35,000 under their typical fee agreement.

In an attempt to justify the fee request, the PSC and CBC grossly underestimate the amount of work conducted by PC. In light of PC's work set forth below, the FC's request for common benefit funds in the amount of $114 million is unreasonable.

### B. Explanation of Representation by Primary Counsel Typical to Each Homeowner.

The PSC recognizes that PC representing the individual homeowners with homes containing Chinese Drywall faced numerous challenges in each case depending on the individual circumstances presented. (*See* Memorandum of Law in Support of Consolidated Joint Petition of the FC and the Plaintiffs' Steering Committee for Global Award of Attorneys' Fees and Reimbursement of Expenses, filed pursuant to PTO 28 at p. 32 (hereafter Global Fee Petition). In fact, the Global Fee Petition filed on May 16, 2014 sets forth a detailed six (6) page analysis of work performed by PC. (*See* Global Fee Petition at pp. 92-98). The FC and PSC now seek to discount PC's work for purposes of the allocation of the common fee fund.

4

The FC's current position that the majority of the necessary services to complete this litigation were carried out and performed on behalf of all Plaintiffs by CBC is completely inaccurate. Contrary to the earlier Global Fee Petition, the FC now seeks to discount PC's work by setting forth a number of steps in its Fee Allocation Motion that it asserts are needed to complete a typical personal injury/property damage case and asserts that CBC performed the great majority of this work. (*See* Memorandum in Support of the FC's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and PC's Fees Pursuant to PTO 28(F) at pp. 58-59 (hereafter "FC's Fee Allocation Motion.) A Chinese Drywall case is far from a typical personal injury and property damage case. Such an assertion shows a lack of understanding by the FC of the individual issues involved in a Chinese Drywall case and the work needed by PC to provide an individual homeowner with a positive resolution. In addition, the FC's assertion that most of the settlement-related services could be performed by non-attorney staff, once again displays the FC's lack of understanding regarding the implementation of the settlement. (*See* FC's Fee Allocation Motion at p. 61.)

In dealing with a home suffering property damage and potentially causing health issues, a homeowner requires a very high level of individual attention and attorney involvement in all aspects of the litigation and settlement process. (*See* Affidavit of Eric D. Hoaglund attached as Ex. 1; Affidavit of K. Edward Sexton, II attached as Ex. 2.) Even if litigation work may be conducted by a non-lawyer, it is the responsibility of PC to oversee and monitor. (*Id.*) Each PC determined how to properly represent his clients in a Chinese Drywall case. The FC has no right to retrospectively determine that work performed by PC was work that should have been performed by a non-lawyer. Their conclusions are not supported by facts and no evidence was

submitted to support this conclusion.

Unlike other mass litigation, the individual issues addressed by PC in Chinese Drywall were unprecedented. The PSC produced a settlement that required PC to implement and oversee a remediation construction project for each qualifying home. (*Id.*) This is an unprecedented requirement of individual counsel and the PSC could have produced a settlement that did not require such a high level of involvement from PC in the implementation of the settlement. As a result of the structure of the settlement negotiated by the PSC, PC spent years overseeing construction projects. (*Id.*) Further, these issues were left to the responsibility of PC with little or no involvement by CBC. (*Id.*) In fact, few, if any, individual clients had any contact with CBC and would not know CBC purporting to represent them. (*Id.*) All individual client contact outlined herein took place through PC. (*Id.*)

In order to complete the resolution of a Chinese Drywall claim, PC performed many, if not all of the following tasks for each client:

- Case generation
  - Determination of location of home with Chinese Drywall
  - Determination of suppliers of Chinese Drywall
  - Research and determination of builders using Chinese Drywall
  - Research and determination of location of homes containing Chinese Drywall
  - Correspondence to potential Chinese Drywall homeowners
  - Newspaper interviews
  - Conducted radio talk show interviews
  - Conducted local TV interviews
  - Research and review of building permits in Alabama during years 2006 and 2007
- Conducted initial client interviews
- Established criteria for homes which may contain Chinese Drywall
- Set up inspection of home
- Established standards for inspection and evidence needed through inspection
- Research regarding identifying marks of various Chinese Drywall manufacturers
- Research and review of INEX/suppliers invoices
- Research and review of builder's licensing information and builder's incorporation information

- Attendance at initial inspection of the property
  - Evaluation of home for contaminated Chinese Drywall
  - Evaluation of manufacturer of contaminated Chinese Drywall
  - Evaluation of potential damages to home, including electrical, plumbing and HVAC damages
  - Evaluation of potential number of Chinese Drywall sheets in the home
- Evaluation of client's potential claims
- Evaluation of possible defendants, including builder, supplier, manufacturer, and installer
- Evaluation of possible caveat emptor issues regarding builder
- Evaluation of possible bodily injury claims and health issues
- Meeting with client to discuss possible legal claims and expectations for relief
- Evaluation of possible repair/remediation scenarios, including protocol to properly repair a Chinese Drywall home
- Discussions with client regarding preservation protocols and option for self-remediation
- Preparation of fee agreement for client
- Discussion with client regarding fee agreement and issues regarding damages in property damage cases
- Completion of New Client Questionnaire
- Preparation of list of documentation needed from client
- Review of all documents received from client
- Preparation of information for filing of Omnibus Complaint
- Preparation of and filing of initial indicia information for Omnibus Complaint
- Review of Omnibus Complaint to make sure Plaintiff was included
- Preparation of Plaintiff Profile Form and documents needed for Plaintiff Profile Form
- Preparation of amended Plaintiff Profile Form
- Evaluation of number of HVAC units contained in each home and number of HVAC coil replacements for each home
- Discussions with client regarding homeowner insurance issues and possible homeowner insurance claims
- Discussions with client regarding protest of tax assessment and preparation of possible tax assessment reduction and appeal with the county authority
- Attendance at appeal hearing regarding tax assessment reduction
- Discussions with client regarding IRS casualty loss issues
- Research and discussions with clients regarding health issues, potential bodily injury issues, and the Center for Disease Control's studies of health issues related to Chinese Drywall
- Discussions with clients and reporting to clients regarding status conferences and progress in the MDL
- Discussions regarding moving out of the home and potential recoupment of damages for moving out
- Attendance at several town hall meetings with clients
- Discussions with clients regarding mortgage forbearance and foreclosure issues
- Negotiations with mortgage companies regarding forbearance and foreclosure issues
- Attendance at *Germano* trial and reporting to clients

- Attendance at *Hernandez* trial and reporting to clients
- Evaluation of possible builder claim and SOL issues regarding builder claims
- Review of applicable building code and possible building code violations by builder
- Preparation of complaint and filing complaint against builder in Alabama state court
- Review of pleadings generated by defendants in builder cases
- Preparation of discovery requests to builder
- Negotiations with builder attorneys regarding builder's liability
- Attendance at status conferences and motion dockets regarding builder lawsuits
- Preparation of draft case management orders for state court judges regarding various discovery tracks for builder cases
- Receipt and review of Case Management Order for each builder lawsuit
- Receipt and review of discovery from builder attorneys
- Response to builder discovery
- Preparation of response to builder Motion to Stay Alabama state court cases
- Attendance at oral argument regarding builder's Motion to Stay Alabama state court cases
- Review of all cases regarding possible cases for inclusion in the Pilot Program
- Attendance at meeting in New Orleans with PSC regarding Pilot Program
- Review of all Pilot Program documentation and information
- Explanation of Pilot Program to clients and the program's possible benefits
- Meetings with clients to discuss Pilot Program and possible submission of their home to Pilot Program
- Preparation of Pilot Program eligibility packet
- Review of Knauf Settlement Agreement
- Explanation to clients of Knauf Settlement Agreement
- Evaluation of possible opt-out options of Knauf Settlement Agreement with client
- Meeting with clients to discuss Knauf settlement and choosing of Option 1, 2 or 3
- Discussion with client regarding time line for remediation and next steps towards remediation
- Coordinating inspection of home with MZA for initial Knauf inspection
- Attendance at the MZA inspection
- Oversight of MZA's compliance with inspection protocol
- Review of MZA inspection results
- Confirmation from Knauf that home meets threshold requirements for Knauf remediation
- Meeting or correspondence with client regarding results of MZA inspection
- Coordinating Moss walk-through inspection for Xactimate estimate
- Attendance at Moss walk-through inspection for Xactimate estimate
- Discussions with client regarding results of Moss walk-through inspection
- Review of Xactimate estimate for compliance with Exhibit F of Remediation Protocol
- Discussions/meeting with client regarding Xactimate inspection
- Approval by client of Xactimate inspection and ANSI square footage
- Review of Xactimate cost for remediation of home
- Review of Final Cost estimates for remediation of home
- Review of work authorization package and information provided by BrownGreer

8

- Preparation of work authorization package specific to client
- Correspondence to client with copy of work authorization package and instructions prior to meeting
- Meeting with client regarding explanation of work authorization package and remediation program, including scope of the work, releases, and signing of various work authorization documents
- Return of work authorization to BrownGreer
- Correspondence from BrownGreer regarding additional documents or corrections to work authorization package
- Advice to clients regarding possible move out dates, moving companies, and alternate living arrangements
- Review of move out notice
- Review of notice regarding kickoff meeting
- Receipt of lump sum payment
- Review of amount of lump sum payment to determine if it matches ANSI square footage
- Distribution of move out money
- Attendance at kickoff meeting with client and contractors
- Discussions with contractors regarding Xactimate scope, Exhibit F scope and additions and corrections to the scope of work
- Oversight of compliance with Xactimate scope of work and Exhibit F scope of work during remediation
- Review of appliance binder and oversight of compliance with Exhibit F and Xactimate
- Discussions with client regarding appliance binder and options regarding replacement of appliances
- Approval of appliance binder
- Multiple trips to the project site to monitor progress and compliance with Exhibit F and Xactimate remediation protocol and resolve disputes
- Resolution of construction deficiencies, water damage, and termite damage found during remediation
- Oversight of GFA inspection compliance
- Mediation of disputes between homeowner and contractor regarding remediation issues
- Negotiations with contractor regarding delays in project and delay payments owed to client
- Attendance at walk through with client and contractor for development of punchlist items and oversight of compliance with Exhibit F and Xactimate
- Attendance at close out meeting with contractor and client
- Determination of final cost of construction
- Review of close out documents, including GFA certification, GFA inspection, warranty information, and contractor's certification
- Preparation of close out package for client, including a copy of the GFA certification, warranty information, GFA inspection report, and contractor's certification
- Oversight and monitoring of completion of punchlist items and execution of homeowner release of contractor
- Oversight and monitoring of warranty claims and completion of warranty work

- Advice to clients regarding W9 forms and potential tax consequences
- Discussions with client regarding what disclosures are required for subsequent sales of remediated homes
- Evaluation of possible claims for each client under the Knauf Settlement Agreement and Additional Settlement Agreements
- Preparation of claims forms and information for claims
- Inspection by expert for pre-remediation move out claims
- Approval from Knauf for dismissal of builder suits
- Preparation of dismissals of builder suits
- Preparation of W9 forms for claim eligibility
- Preparation of verification of claims forms for claim eligibility
- Updates to clients regarding status of pending claims
- Receipt and review of notice of claim eligibility
- Discussion with client regarding notice of claims eligibility and acceptance or appeal of the notice
- Preparation of acceptance or appeal form for claims
- Receipt and review of claims funds and releases
- Possible appeals of claims notices
- Evaluation of each file regarding potential stipend claim
- Disputing claim denials and arbitrating claim denials for self-remediated homes, foreclosures and move out expense payments

Although it is impossible to include all thought processes and individual issues for each individual client, a brief description of the tasks involved in a Chinese Drywall case, as listed above, should be helpful to the Court. Of course, the above list and the following explanations do not cover all the individual nuances and questions regarding each homeowner. Each homeowner and their particular situation required individual attention by PC and changed throughout the years requiring continued evaluation. The list above and the following explanation are based upon the undersigned PC's experience and recollection of the litigation.

The first step in the Chinese Drywall litigation was to determine where the Chinese Drywall was located and the time frame for installation. (*Id.*) This process took hours of research, review of thousands of supplier invoices, review of builder permits, correspondence to potential clients, phone interviews and hundreds of inspections. (*Id.*) Early in the process, PC

did not have a clear profile for a Chinese Drywall home and inspected homes that, after inspection, PC discovered did not contain Chinese Drywall.  These inspections were necessary in PC's attempt to determine the typical profile of a Chinese Drywall home.  (*Id.*)  As such, PC spent countless hours and expenses on inspection costs for homes that did not contain Chinese Drywall.  (*Id.*)  These expenses cannot be recovered and must be paid from fees received by PC. (*Id.*)

PC spent time and incurred costs advertising, corresponding with potential Chinese Drywall owners, and participating in newspaper interviews, talk radio shows, and television interviews to provide awareness to the community regarding the presence of Chinese Drywall and the ramifications thereof.  (*Id.*)  Once public awareness of Chinese Drywall began to increase, PC addressed with individual homeowners the possibility that their homes contained Chinese Drywall.  (*Id.*)  PC fielded hundreds of phone calls and emails from homeowners concerned that their home contained Chinese Drywall.  (*Id.*)  Accordingly, PC established the criteria to determine if a particular home might contain Chinese Drywall, including the time frame of the construction, the builder and supplier involved in the construction, and the symptoms of Chinese Drywall damage.  (*Id.*)

If PC determined the home might contain Chinese Drywall, an inspection was conducted by PC with an inspector to determine if the home contained Chinese Drywall.  (*Id.*)  PC attended the inspections and, with an independent inspector, verified the presence of Chinese Drywall and assessed any damages to electrical, plumbing and HVAC units typically seen with Chinese Drywall homes.  (*Id.*)  PC attended each inspection and typically attempted to determine the manufacturer of the sheet rock, the number of and the percentage of defective sheets in the home,

and the level of damage. (*Id.*)

Following the inspection process, PC made a determination to accept or reject cases. (*Id.*) This required a legal analysis and evaluation of various factors, including, but not limited to, the possible builders, suppliers, installers, which Chinese Drywall manufacturer was involved, the availability of insurance, and caveat emptor/second homeowner issues. (*Id.*)

PC would then meet with the homeowner to discuss possible legal claims, possible repair scenarios, possible outcomes of litigation, and negotiate the fee agreement. (*Id.*) Clients sought advice regarding possible health effects and the ramifications of moving out of their home. (*Id.*) Clients wanted to know if they should move out because of health issues, and, if they moved out because of health issues, whether they would be compensated for their expenses. (*Id.*)

PC would next issue to the client a New Client Questionnaire requesting specific information regarding the history of the home and certain documents, including contracts for construction, deeds, HUD-1 statements, warranties, and appraisals. (*Id.*) PC reviewed this documentation and prepared information for the inclusion of the homeowner on an Omnibus Complaint or prepared a separate complaint for filing. (*Id.*) To include a homeowner on an Omnibus Complaint, PC had to obtain and provide detailed information regarding the owners of the home and information regarding the property, including an inspection report. (*Id.*)

Once the Omnibus Complaint was filed, PC was responsible for ensuring all homeowners were included on the proper complaint and all Defendants were properly named. (*Id.*) In addition, as a requirement by the PSC, PC provided a Plaintiff Profile Form providing information and documentation for each home, and, in many cases, PC had to provide an amended Plaintiff Profile Form to supply additional information. (*Id.*) Further, in conjunction

with Plaintiff Profile Forms, PC provided to the PSC information regarding the number of HVAC coils replaced in each home. (*Id.*) As such, PC completed a survey of all homeowners regarding the number of HVAC units in each home and the number of affected HVAC coil replacements. (*Id.*)

During the course of the litigation process, PC consistently responded to questions and advised homeowners regarding homeowner insurance claims, possible tax assessment protests, and IRS casualty loss issues. (*Id.*) PC also drafted tax assessment protests and attended a number of hearings with the local tax assessor's office representing homeowners in their appeals of the valuation of their home. (*Id.*) Homeowners consistently sought advice regarding the potential health issues associated with Chinese Drywall, whether they should move out of their homes, and/or whether they should stop paying their mortgages. (*Id.*) Homeowners required research regarding health issues and information regarding the results of studies about health risks associated with Chinese Drywall. (*Id.*) Potential health issues proved to be very difficult for PC because so little scientific information was available, but yet clients wanted reassurances that their health was not in jeopardy. (*Id.*)

PC participated in and attended various town hall meetings with homeowners. (*Id.*) Further, PC attended trials and reported on the status of the trials and the Court's findings. (*Id.*) Throughout the litigation process, PC provided regular updates to clients regarding the status of the MDL and progress of their case towards resolution. (*Id.*)

Between the discovery of Chinese Drywall in homes and remediation of the home, PC advised homeowners regarding mortgage forbearance issues and possible foreclosure issues. (*Id.*) On many occasions, PC negotiated directly with mortgage companies regarding

forbearance or foreclosure issues. (*Id.*)

Since the MDL Court did not have personal jurisdiction over Alabama builders that constructed homes in Alabama with Chinese Drywall, PC evaluated the statute of limitations for claims against Alabama builders and assessed builder liability and insurance availability for each homeowner. PC determined the applicable building code for each jurisdiction and determined possible building code violations. (*Id.*) As a result, PC prepared and filed numerous builder lawsuits on behalf of homeowners with Chinese Drywall. (*Id.*) PC undertook the usual responsibilities of litigation in the builder filed cases, including generation of pleadings, review of defendant's pleadings, and preparation and review of paper discovery. (*Id.*) Further, PC engaged in settlement negotiations with builder attorneys. (*Id.*) PC also attended status conferences and motion dockets associated with builder lawsuits and was appointed as liaison counsel for Alabama state court Plaintiffs. (*Id.*) As liaison counsel, PC designed and drafted case management orders for various state court judges regarding the various discovery tracks needed for builder cases. (*Id.*) Further, PC responded to Motions to Stay filed by Knauf and INEX and represented homeowners at oral argument on this issue. (*Id.*)

Once the PSC announced the Pilot Program as a possible settlement resolution, PC undertook a review of each file to determine if the home was eligible for the Pilot Program. (*Id.*) PC negotiated directly with Knauf for the inclusion of many homes in the pre-settlement Knauf remediation program. (*Id.*) In addition, PC met with and discussed with clients the possibility of enrolling their home in the pre-settlement Knauf remediation program and the possible benefits and legal ramifications of the Program. (*Id.*) Once a client agreed to participate, PC prepared an eligibility packet containing certain information required by Knauf to consider a home for the

14

Knauf Program. (*Id.*)  Once accepted into the Program, a series of inspections took place to determine the eligibility for homes. (*Id.*)  Prior to the December 2011 Knauf settlement, we had the majority of our properties in the Knauf remediation program.

As the Program was proceeding, the Knauf Settlement Agreement was announced. (*Id.*) Following the Knauf Settlement Agreement, PC spent numerous hours reviewing the Settlement Agreement, interpreting the Settlement Agreement, and explaining the Settlement Agreement to clients. (*Id.*)  An evaluation of each file was once again required to determine the possible impact on each homeowner. (*Id.*)  PC conferred with each client regarding the possibility of opting out of the settlement.  PC filed objections on behalf of several clients and negotiated resolutions of the objections with Knauf.

PC met with each client to explain the benefits of the settlement under Option 1, 2 or 3, explained the inspection and remediation process, scope of remediation, and determined which option was best for each client. (*Id.*)  After a client chose a particular option, PC reported to Knauf and BrownGreer which clients were participating in which option. (*Id.*)  Due to the benefits of possible cost increases during construction and the availability of change orders for these cost increases, the vast majority of clients chose Option 1, requiring a remediation construction project. (*Id.*)

Following the choice of an option under the Knauf Settlement Agreement, PC coordinated an inspection of each home by MZA that had not been previously inspected. (*Id.*) PC attended and oversaw the MZA inspection for compliance with the inspection protocol. (*Id.*) Often times, PC provided the inspectors with vital information regarding the location of the Knauf Chinese Drywall and information regarding damages to the home. (*Id.*)  In addition, the

homeowners often had additional questions and concerns regarding the Knauf Settlement Agreement that arose at the inspections and required responses from an attorney familiar with the settlement. (*Id.*) Following the MZA inspection, PC monitored the inspection results to determine if the home qualified for benefits under the Knauf Settlement Agreement. (*Id.*) Responses to these questions required an attorney familiar with the process.

If the home qualified for benefits following the MZA inspection, a second inspection and estimate was performed by Moss or another qualified contractor. (*Id.*) PC coordinated and attended the Moss inspection and estimate to ensure compliance with the ANSI square footage measurements and the Exhibit F remediation protocol. (*Id.*) Again, during many inspections, clients asked additional questions regarding the remediation process, scope of the remediation, and the legal ramifications of settling under the Knauf Settlement Agreement. (*Id.*)

Following the inspection by Moss, PC received an Xactimate estimate which provided a scope of work for the home and the ANSI square footage that determined the lump sum payment for each client. (*Id.*) PC reviewed the Xactimate estimate to ensure compliance with the Exhibit F protocol, confirmed that all areas of home were listed in the scope of work, and verified the ANSI square footage. (*Id.*) The estimates often required corrections. PC then conferred with each homeowner to explain the Xactimate scope of work and seek approval of the Xactimate scope and ANSI square footage. (*Id.*) Once the Xactimate scope was approved, PC monitored the Xactimate estimated cost for the home and the Final Cost Estimates to ensure that the costs were in line with the size of the home, the quality of the original construction of the home, and the Xactimate scope of work. (*Id.*)

Assuming the homeowner chose Option 1, after the inspection and estimate process was

complete, BrownGreer prepared a generic work authorization package to be completed by PC and homeowner. (*Id.*) PC then prepared a work authorization package specific to the particular homeowner and provided the package to the homeowner for review. (*Id.*) PC then met with each homeowner to review the work authorization package and discuss the remediation program. (*Id.*) This meeting included discussions regarding legal implications of executing the work authorization and signing of releases. (*Id.*) In addition, the practical aspects of implementing the remediation, moving out, lump sum payments, and other moving and repair issues were discussed. (*Id.*)

If the homeowner chose Option 2 or 3, a separate set of paperwork was required. PC was required to coordinate the Option 2 or 3 package and meet with the homeowners to execute certain documents and provide legal advice regarding such documentation. (*Id.*)

In Option 1 scenarios, following the return of the work authorization package, BrownGreer provided a move out notice indicating when the homeowner must be out of the home in order for remediation to begin. (*Id.*) In addition, BrownGreer and/or Knauf provided a date and time for a kickoff meeting between the contractors, PC, and homeowners. Between the time of the receipt of the move out notice and the kickoff meeting, PC received the lump sum payment for the homeowner. (*Id.*) PC verified the amount of the lump sum payment and disbursed the funds to the clients. (*Id.*)

PC then attended the kickoff meeting at the home. (*Id.*) At this meeting, PC oversaw compliance with the Exhibit F remediation protocol and the Xactimate scope of work. (*Id.*) Often issues regarding the scope of work, including appliance issues and HVAC issues, were discussed and corrected onsite. (*Id.*) Typically, numerous return trips to the project were

required during the remediation process to ensure compliance with the remediation protocol and to monitor the timing and completion of the construction. (*Id.*) Usually during the construction process, the homeowner raised questions regarding the scope and quality of the contractor's work. (*Id.*) For most homes, PC mediated disputes and disagreements between homeowners and the contractors regarding the scope and the quality of work. (*Id.*) There were often disputes regarding the replacement of "like-for-like" materials, as required by the Knauf Settlement Agreement. (*Id.*) This process of monitoring the remediations and mediating the disputes resulted in countless hours of time expended by PC. (*Id.*) Further, this process of dispute resolution required a firm grasp of the Knauf Settlement Agreement and legal interpretations of the agreement, work authorizations, and remediation protocols. (*Id.*)

Once a home was stripped of the Chinese Drywall, sometimes construction deficiencies or water and termite damage were discovered. (*Id.*) At this point, PC were required to determine if the costs associated with such repairs were costs associated with the Knauf remediation or the responsibility of the homeowner. (*Id.*) There were often disputes regarding which party was responsible for the payment of such repair costs, which required PC to determine a suitable resolution. (*Id.*)

Following the kickoff meeting, Moss provided an appliance binder to PC outlining the appliances to be replaced and setting forth the choices the homeowner had in regards to replacement of the appliances. (*Id.*) Once again, PC had to determine if the appliance binder complied with the Knauf Settlement Agreement, the Exhibit F protocol, and the Xactimate scope of work. (*Id.*) Often, some appliances were not included in the binder, or the wrong appliances were included and corrections or adjustments to the binder had to be made. (*Id.*) This required

18

intimate knowledge of the Knauf Settlement Agreement and the remediation protocols to determine which appliances were to be replaced. (*Id.*) PC then explained the appliance binder and potential choices to the homeowner and reported to Moss the homeowner's decision regarding appliances. (*Id.*)

As a project neared completion, there were delays which required negotiations for delay payments owed to the homeowner. (*Id.*) PC was responsible for monitoring the deadlines, calculating the delay payments, and negotiating the delay payments for homeowners. (*Id.*)

After a project obtained a Certificate of Occupancy, the contractor, PC, and the owner met onsite to review the completed work. (*Id.*) PC was responsible for determining if the scope and quality of work complied with the Knauf Settlement Agreement and the remediation protocols. (*Id.*) At this meeting the homeowner and contractor created a punch list of items for the contractor to complete prior to returning the home to the owner. (*Id.*) Disputes between the contractor and the owner often arose at this stage and were resolved by PC. (*Id.*) In order to resolve these issues, PC was required to have a thorough understanding of the Knauf Settlement Agreement, remediation protocols, and interpretations of the Knauf Settlement Agreement. (*Id.*)

Once the punch list items were complete or the contractor and homeowner reached an agreement regarding the completion dates for punch list items, a close out meeting was held at the home with the contractor, PC, and the homeowner in attendance. (*Id.*) At this point, the contractor sought to return the home to the owner and have the homeowner sign a release required by the Knauf Settlement Agreement upon substantial completion of the project. (*Id.*) Disputes regarding whether the release should be signed often arose at this stage, and PC had to determine a resolution. (*Id.*) In addition, at this meeting, PC provided the homeowner with a

close out package, including documents from the remediation such as the Knauf inspection report, the GFA certification, the warranty information, the Certificate of Occupancy, and the contractor's certification. (*Id.*)

Further, once the home was released to the homeowner, PC was required to monitor ongoing punch list items and disputes regarding punch list items. (*Id.*) For many homes it took months to complete the punch list and resolve these issues. (*Id.*) It was not unusual for a three (3) month remediation project to take six (6) months or longer for a total completion of the construction. (*Id.*) In addition, the homeowners received a one (1) year warranty from the contractor regarding all work performed on the home. (*Id.*) As such, the homeowners often required warranty work to be performed by the contractor. (*Id.*) PC monitored and oversaw the warranty requests and completion of the warranty requests. (*Id.*) Disputes often arose involving whether the repairs fell within the scope of the warranty and legal consultation was required. (*Id.*) Due to this one (1) year warranty, each three (3) month project took a minimum of a one (1) year and three (3) months to bring to a complete and total resolution. (*Id.*)

The final step in resolving homeowners' claims involved the filing and monitoring of claims under the various settlements, including, but not limited to, bodily injury claims, global builder and supplier claims, foreclosure claims, pre-remediation move out claims, and miscellaneous claims. (*Id.*) This process required an evaluation of all potential claims available under all settlements and an evaluation of each client's circumstances to determine if a client was eligible for a particular claim. (*Id.*) This involved legal interpretations of the Knauf Settlement Agreement, the various other settlement agreements, and the various claims materials. (*Id.*) Once a determination was made for each client, PC was responsible for drafting the claim form,

gathering the required documentation, and timely filing the claims. (*Id.*) Once the claims were filed, PC monitored the progress of the claims and updated clients regarding the progress of the claims. (*Id.*) Eventually, BrownGreer issued a Notice of Claim Eligibility form. PC discussed the Notice of Claim Eligibility with each client and determined whether to accept or appeal the notice. (*Id.*) If the claim was accepted, PC was responsible for the execution of the Verification of Claim form, execution of a W9 form, verification of the payment of the claims, and execution of releases. (*Id.*) If the eligibility notice was appealed, PC was responsible for the appeals process to the Special Master or the Court. (*Id.*) Some appeals are still proceeding to date. (*Id.*)

In short, in order to bring a client to a complete resolution, PC invested countless hours and significant expenses not reimbursed by the expense stipend to accomplish tasks that could not be accomplished by CBC. (*Id.*) In fact, many of the tasks required of PC to provide a homeowner with a complete resolution were tasks which were required by the PSC or because the PSC negotiated a settlement that required PC to implement the settlement on his own. (*Id.*) The resolution of homeowners' claims required extensive client contact and involvement which was handled exclusively by PC. (*Id.*) A resolution of a homeowner's claims required consistent work on behalf of the client over a four (4) to six (6) year period of time. PC contributed the majority of their practice over these time periods to resolve homeowner's Chinese Drywall disputes, and, without PC involvement, the resolution of these claims would have proved impossible. (*Id.*)

**C.    Explanation of Primary Counsel Work Unique to Sexton/Hoaglund Firm.**

The Sexton/Hoaglund firms are PC representing homeowners with Chinese Drywall. (*Id.*) The Sexton/Hoaglund firms did not make and were not authorized to make any claims for

21

common benefit work.  (*Id.*)  Sexton/Hoaglund performed Chinese Drywall-related work that was unique from other PC but benefited all Chinese Drywall homeowners as a whole.  (*Id.*)

Sexton/Hoaglund were involved in investigating and discovery of distribution channels and in lawsuits filed months before the MDL was established.  (*Id.*)  Moreover, Sexton submitted cases for selection in the process established for *Bellwether* claims.  (*Id.*)

As discussed previously and outlined in the attached Affidavits, Sexton/Hoaglund filed numerous lawsuits against builders of homes containing Chinese Drywall in various state courts in Alabama.  (*Id.*)  Since the MDL Court did not have personal jurisdiction over Alabama builders that constructed homes in Alabama with Chinese Drywall, Sexton/Hoaglund evaluated the statute of limitations for builders' claims and determined builder liability for each homeowner.  We reviewed the applicable building code for each jurisdiction and determined possible building code violations.  (*Id.*)  As a result, we prepared and filed numerous builder lawsuits on behalf of homeowners with Chinese Drywall.  (*Id.*)  As such, we undertook the usual responsibilities of litigation in the builder filed cases, including generation of pleadings, review of defendant's pleadings and preparation, and review of paper discovery.  (*Id.*)  Further, we undertook settlement negotiations with builder attorneys.  (*Id.*)  We attended status conferences and motion dockets associated with builder lawsuits and were appointed as liaison counsel for Alabama state court Plaintiffs.  (*Id.*)  As liaison counsel, we designed and drafted case management orders for various state court judges regarding the various discovery tracks needed for builder cases.  (*Id.*)  Further, we responded to Motions to Stay filed by Knauf and INEX and represented homeowners at the oral argument on this issue.  (*Id.*)  This work was performed without the help of the PSC or CBC.  (*Id.*)

In addition, Sexton/Hoaglund modified and established the initial Knauf inspection protocols for the MZA inspections that were required to qualify a home for the Pilot Program or the Knauf remediation program. (*Id.*) When MZA began inspections in Alabama, the inspection protocol was based upon Florida construction. (*Id.*) Due to differences in the construction process and the use of the different types of sheet rock, the Florida inspection protocol needed modifications to fit construction standards in Alabama. (*Id.*) The Sexton/Hoaglund firms worked with MZA and Knauf's attorneys to modify the inspection protocols to fit with Alabama construction standards. (*Id.*) This work was performed without the help of the PSC or CBC. (*Id.*)

Prior to the December 2011 Knauf settlement, PC, working through the PSC, attempted to include some of their cases in the program, but were unsuccessful. PC then began negotiating directly with Knauf for the inclusion of homes in a Knauf remediation program. By August of 2011, PC had a majority of their homes cleared for inspection for inclusion in a Knauf remediation program.

Further, Sexton/Hoaglund modified the Exhibit F repair protocol for the repair of homes in Alabama. (*Id.*) Once remediations began, Moss took the position that the Exhibit F protocol did not require the complete replacement of the interior air handler but only repairs to certain interior parts in the air handler. (*Id.*) After negotiations with Moss and consultations with HVAC subcontractors, Moss modified the Exhibit F protocol to include the replacement of the entire interior air handler in every Chinese Drywall home in Alabama, enhancing the benefit for all Alabama homeowners with Chinese Drywall. (*Id.*) This work was performed without help from the PSC or CBC. (*Id.*)

Sexton/Hoaglund also established the requirements and protocol for a homeowner to qualify for benefits under Option 2 and 3 of the Knauf Settlement Agreement. (*Id.*) Under the Knauf Settlement Agreement, a homeowner could hire his own contractor to perform the remediation work under certain circumstances. (*Id.*) Under Option 3, a homeowner could receive a discounted cash payout under certain circumstances. (*Id.*) However, at the time of the Knauf settlement, the requirements and documentation needed to qualify and complete a remediation under Option 2 and a cash payout under Option 3 were not developed. (*Id.*) Sexton/Hoaglund worked directly with Knauf to establish the requirements and documentation needed to qualify and complete a remediation under Option 2 and a cash payout under Option 3. (*Id.*) This work was performed without help from the PSC or CBC. (*Id.*)

Lastly, Sexton/Hoaglund enhanced the Knauf Settlement Agreement by objecting to the original Settlement Agreement and negotiating with Knauf for the inclusion of Section 4.9 of the Amended Knauf Settlement Agreement providing Lower-Case Knauf homeowners with relief under the Knauf settlement. (*Id.*) Further, Sexton/Hoaglund enhanced the Knauf Settlement Agreement by objecting to the original Settlement Agreement and negotiating with Knauf for the inclusion of Section 4.7.3.1 of the Knauf Settlement Agreement providing possible relief to Chinese Drywall homeowners by the inclusion of a claim for miscellaneous expenses not otherwise provided for in the settlement. (*Id.*)

The Sexton/Hoaglund firms, provided unique Chinese Drywall-related work, which provided additional and enhanced benefits to homeowners with Chinese Drywall. (*Id.*) This work was performed by Sexton/Hoaglund independent of the PSC and CBC. (*Id.*)

### III.  METHOD AND DETERMINATION OF FEE SPLIT BETWEEN PRIMARY COUNSEL AND COMMON BENEFIT COUNSEL

#### A.  <u>Methodology for Calculation of Common Benefit Counsel Fees</u>.

The PSC proposes the use of the "blended method" to calculate an appropriate fee for common benefit work.  This approach requires the Court to establish the valuation of the benefit obtained.  Then the Court evaluates and approves a percentage of the fund created for the benefit of the plaintiffs and finally undertakes a calculation using the lodestar method to "cross-check" the percentage-of-fund fee.  This method has been endorsed by the Fifth Circuit.  *See Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F. 3d 632, 644 (5th Cir. 2012) *cert. denied*, 133 S. Ct. 317 (2012), and employed by this Court in comparable MDLs.  *See Vioxx*, 760 F. Supp. 2d at 655-61 (applying Johnson factors to benchmark then confirming with lodestar cross-check).

PC have no objection to use of this methodology, but take issue with the FC's application of this method insofar as it fails to distinguish between a common benefit fee award and a class action fee award.  These fees are not the same thing and different considerations apply. *See* William Rubenstein, "On What a 'Common Fee' Is, Is Not, and Should Be, Class Action Fee Digest (Mar. 2009) at 87 [hereafter, *Common Fee*] ("The one thing a common benefit is not is a class action fee award").  Common benefit fees are a creature of mass torts.  Unlike class actions, where attorneys' fees are taken from the benefits available to the class members, in mass torts, the fees payable to CBC are taken from the fees payable to PC who have retainer agreements with the clients.  The common benefit fee award in mass tort litigation is therefore necessarily smaller than the overall attorney fee award.  As Professor Rubenstein explains:

> It is fair to ask why the common benefit fee need be lower than the class action fee… The common benefit attorneys who helped manufacture the benefit might also even have a lodestar that could, with some multiplier, justify [an award of 100 percent of the attorneys' fees]. But here's the hitch – in the mass tort case there are also local counsel who have contingent fee contracts with claimants, and more importantly, who contributed important attorney work to producing the settlement as well. The common benefit lawyers simply did not do 100% of the legal work in the case.

*Id.* at 87.

The distinction between class counsel fee awards and common benefit fee awards appear to have escaped the FC. From the start, its brief blends the two concepts. As a consequence of this incorrect analysis, the FC makes the mistake of relying on class actions (and their higher percentage awards) to justify its overreaching fee request. *See* FC Allocation Motion at 51 (citing class actions which did not award common benefit fees); *see also Common Fee* at 90 (criticizing common benefit lawyers who justified their request of 18% by relying on a study of class action attorneys' fees; "class action fees are not the same thing as common benefit fees and [are] hence … inapposite.")   When applying the *Johnson* factors and evaluating the FC's arguments, the Court must be careful to separate the class action cases from the cases awarding fees for common benefit work.

The determination of common benefit fees therefore requires careful attention to both the work performed by PC and a comparison with the fees awarded to common benefit counsel in other mass torts. The work performed by PC in this case is actually far more extensive than the work typically performed by the primary attorneys in a pharmaceutical or other mass tort. (*See* §II B *infra* outlining representation by PC.)  At the same time, the work done by the PSC in this case, while impressive, is no more impressive or "herculean" than the work done by other PSC's

(which often include many of the same lawyers) in pharmaceutical MDLs.  In these comparable circumstances, the common benefit lawyers have typically been awarded 4-6%, not the 10.6% requested here.

### B.      Attorneys' Fees Funds Available.

The FC asserts the attorneys' fee funds available for allocation between PC and CBC are $192,981,363.35.  However, PC take issue with the calculation of available funds.  The fee fund should not be used to fund the separate Taishan litigation.  Accordingly, the $10,000,000 "set aside" for Taishan litigation should be made available as part of the common fund.  Second, Voluntary Contributions paid by Counsel that settled Chinese Drywall cases outside the MDL were paid in the amount of $3,332,058.26.  (*See* Ex. 2 to Phil Garret's Affidavit attached as Ex. A to the FC's Fee Allocation Motion.)   The FC mistakenly asserts that these voluntary contributions have already been awarded to compensate common benefit work when the money is to be allocated at a future date.  The Voluntary Contributions should be part of the fee fund as these payments were at all times subject to a future allocation.   As such, the sum of $13,332,058.26 should be added to the fee fund for a total available amount of $206,313,421.50.

### C.      Establishment of the Valuation of the Benefit Obtained.

The FC asserts that the Plaintiffs received a total benefit of $1,120,313,305.90.  (*See* FC's Fee Allocation Motion at p. 49.)  However, this figure is inflated.  In order to determine the allocation of fees to CBC, the Court must establish the actual value of the settlement or the actual benefit received by the Plaintiffs.

Under the Knauf Settlement Agreement, a homeowner that qualified for a remediation had the choice of Option 1, using Knauf's contractor; Option 2, using their own contractor; or

Option 3, accepting a cash payout.  As such, the benefit obtained for the homeowners under these options is determined by the actual cost of the remediation under Options 1, by the cost of the actual benefits paid to the homeowner and homeowners' contractors under Option 2, and the actual cost of the benefits paid to the homeowners under Option 3.

The actual value of the settlement, or the benefit obtained for the Plaintiffs, is $910,856,292.05 and not the $1.1 billion asserted by the FC in their brief.  The FC does not use the actual value received by the clients, but instead inflates the value of the settlement by including figures that are not the true measure of the settlement value in order to inflate their fee request.

The FC asserts that the total value of the settlement is $1,120,313,305.90 and breaks this figure down into categories A – F.  (*See* FC's Fee Allocation Motion at p. 49.)  As the Court can see from categories A & B, the FC asserts a total benefit provided to the Plaintiffs for Option 1, Option 2, Option 3, Already Remediated Homes, GFA payments, and Knauf's "Other Loss" fund payments in the amount of $763,026,343.71.  (*See* FC's Fee Allocation Motion at p. 49, combining categories A & B.)

The FC purposefully uses an inflated figure for categories A & B to inflate the valuation of the benefit obtained.  The FC admits "there is a discernable total paid by Knauf and Moss & Associates for the classwide remediation of the properties conducted by the Knauf contractor under Option 1 of the Settlement Agreement."  (*See* FC's Fee Allocation Motion at p. 37.) However, the FC simply ignores this figure.  Instead the FC asserts a "market place analysis" formula that does not reflect the actual cost and does not reflect the actual scope of work performed pursuant to the Exhibit F protocol for the actual Knauf remediations performed.  The

28

"market place analysis" figures are based upon a scope of work that is more extensive than the actual scope of work used in the Knauf remediation program. In addition, the "market place analysis" figures are based upon an $86 per square foot remediation figure which does not reflect the actual cost of the remediations.

The actual cost for categories A & B is $594,128,973.04, some $168,000,000 less than asserted by the FC. The actual cost for categories A & B, including costs for Option 1, Option 2, Option 3, Already Remediated Homes, GFA payments, and Knauf's "Other Loss" fund payments are as follows:

| | |
|---|---|
| Option 1 | $345,586,974.09 |
| Option 2 & Option 3 | $201,435,764.28 |
| GFA | $ 1,159,406.24 |
| Already Remediated Homes | $ 41,714,061.42 |
| Knauf "Other Loss" | $ 4,232,227.01 |
| | $594,128,973.04 |

The actual payment figures of $594,128,973.04 listed above are contained in the "Component's Table" attached as Exhibit B to the FC's Fee Allocation Motion and footnote 2 of the Component's Table attached as Exhibit B to the FC's Fee Allocation Motion. As such, the FC asserts that categories A & B provide a settlement value of $763,026,347.71, which is inflated by $168,897,370.67. The actual cost of categories A & B are readily obtainable as outlined above and there is no justification for the use of a "market place analysis" figure or any other figure besides the actual cost.

In addition, the FC includes administrative services and costs associated with the

litigation to inflate the value of the settlement.  In category F, the FC asserts the administration costs of $34,529,905.31 should be considered to support the valuation of the benefit to the Plaintiffs.  (*See* FC's Allocation Motion at p. 49.)  Further, the FC asserts that litigation costs, including held costs of $3,842,737.87 and unreimbursed cash assessments of $2,187,000.00, should be considered to support the value of the benefit.  (*See* Ex. 2 to FC's Allocation Motion.)

The administrative services and costs should not be included in the valuation of the benefit obtained.  This is especially true where there is no disclosure or itemization of time and expenses incurred for KPT versus Taishan.  Awarding attorney fees based on a percentage of gross recovery has been sharply criticized as resulting in "disproportionately high fees," *In re Immunex Sec. Litig.*, 864 F. Supp. 142, 145 (W.D. Wash. 1994), and essentially allowing counsel to "profit" off of costs.  *Morganstein v. Esber*, 768 F. Supp. 725, 728 (C.D. Cal. 1991).  For this reason, numerous district courts throughout the country have rejected awarding percentage-of-the-recovery attorney fees based on gross settlement amounts, including costs and administration fees, in favor of basing the award on net settlement.  *See, e.g., In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 770-71 (S.D. Ohio 2007) (awarding attorney fees based on percentage of net settlement instead of gross settlement amount); *Montgomery v. Aetna Plywood, Inc.*, 231 F. 3d 399, 408 (7th Cir. 2000) (affirming district court's percentage fee award based on net recovery and noting that the court found no authority indicating that "gross recovery is to be preferred over net recovery as the basis for calculating a fee under the percentage-of-recovery method"); *In re Ikon Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 193 (E.D. Pa. 2000) (basing fee percentage on the net settlement fund because it promotes "cautious expenditure" and "align[s] the interests of the class . . . with those of counsel"); *Lachance v. Harrington*, 965 F. Supp. 630,

30

647 (E.D. Pa. 1997) ("[A]ttorneys who know that their fee will be based on the net recovery of the class, rather than the gross settlement, will have an incentive to keep costs to a minimum in order to maximize not only the class' return, but also their own attorney fee award."); *Immunex*, 864 F. Supp. at 145 (finding the "better approach" in awarding a reasonable fee is to "award the percentage fee on the net award to the class") (internal quotes omitted)); *Wells v. Dartmouth Bancorp, Inc.*, 813 F. Supp. 126, 129 (D.N.H. 1993) (rejecting class counsel's request for 27.5 percent of the gross recovery and awarding 30 percent only after all administrative costs and out-of-pocket expenses have been paid); *Morganstein*, 768 F. Supp. at 727-28 (awarding percentage fee on the net benefit to the class after deduction of costs because it will "prevent the class from being 'double charged' for costs, *i.e.*, paying the costs and also paying 25 percent as attorneys' fees"); *Levit v. Filmways, Inc.*, 620 F. Supp. 421, 426 (D. Del. 1985) (finding fee award of one-third of the difference between the common fund and the litigation expenses appropriate); *see also* 2003 Advisory Committee Notes, Fed. R. Civ. P. 23(h) (explaining that a "fundamental focus" of awarding a reasonable attorney fee is "the result <u>actually achieved</u> for class members") (emphasis added)). As such, the FC, by including the administration costs and litigation costs in its valuation, inflates the value of the settlement by an additional $40,559,643.18.

In summary, the FC claims the total value of the settlement is $1,120,313,305.90. By removing the "market analysis figure" of $763,026,347.71 for categories A & B in the FC's valuation chart and replacing it with the actual cost of categories A & B of $594,128,973.04, the total value of the benefit obtained for the Plaintiffs is reduced from $1.1 billion to $951,415,935.23. Further, by eliminating the administrative services and litigation costs of $40,559,643.18 from the valuation of the benefit received by the Plaintiffs, the value of the

31

benefit is further reduced to $910,856,292.05.

    **D.**      **Establishment of the "Benchmarking" Percentage for the Calculation of Common Benefit Fees.**

      The FC contends that the appropriate benchmark to calculate a common benefit fee award is 8%. The FC's failure to understand the difference between a class action fee award and a common benefit fee leads to the elevated percentage request. When evaluated in the context of common benefit fee awards, it is clear that starting with a benchmark of 8% is unprecedented and unreasonable.

      The FC relies on the *Manual for Complex Litigation* to support its contention that 25% is a "typical" benchmark for percentage-of-the-fund cases. The *Manual*, however, is referring to class action cases, not mass torts and common fee awards. Indeed, all of the cases cited by the FC at pages 9-10 of their brief are class action cases. The various studies relied upon by the FC, including the "Eisenberg I" and "Eisenberg II" studies are also of little use since these studies are focused on class action awards, not common benefit awards. For this reason, this Court has previously found that these studies "are of limited usefulness in determining a reasonable benchmark for a common benefit fee award." *Vioxx*, 760 F. Supp. 2d at 652. Like the lawyers in the Kugel Mesh Hernia Patch MDL who tried to justify their fee request by relying on a study of class action attorney fees, the FC "has failed to advise the judge that class action fees are not the same as common benefit fees and hence that the study upon which they relied is inapposite." *Common Fee*, at 90.

      PC submit that 5% of the settlement amount is a reasonable benchmark percentage for a common benefit fee award. Based on a review of previous common benefit awards in MDLs, it is clear that the vast majority of awards range from 4% to 6% of the clients' recovery value and

average 5%. *See, e.g., In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 2012 WL 161194, at *1-2 (E.D. La. Jan. 18, 2012) (ordering assessments of 6% on settlements with private claimants and 4% on settlements with state or local governments); *Vioxx*, 760 F. Supp. 2d at 655 (finding 6% of the settlement amount a reasonable benchmark percentage for a common benefit fee award); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 457-58, 491-96 (E.D. Pa. 2008) (describing 9% federal and 6% state assessments later reduced to 6% and 4% respectively); *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 261-63 (E.D.N.Y. 2006) (1% and 3% of separate settlement amounts); *In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 909, 919 n. 19 (N.D. Ohio 2003) (awarding common benefit fees representing 4.8% of settlement value); *In re Rezulin Prods. Liab. Litig.*, MDL No. 1348, 2002 WL 441342, at *1 (S.D.N.Y. Mar. 20, 2000) (6% withholding in federal cases, 4% in participating state cases); *see also* 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:9 (4th ed. 2002) ("Most courts have assessed common benefit fees at about a 4-6% level . . . .").

In addition, the court in *Vioxx* cites authority supporting the proposition that most common benefit assessments range from 4% - 6% of the settlement value. *See Vioxx*, 760 F. Supp. 2d at 654, 658. This court in *Vioxx* settled on a 6% benchmark. *Id.* at 655. However, the amount of work performed by PC in this case is far in excess of the work performed by primary attorneys in *Vioxx*. (*See* Section II. B. herein.) Based upon the above case law averaging a 5% benchmark, and the disparity in workload for PC in this case compared to *Vioxx*, PC suggests a

33

benchmark of 5%. Further, *Vioxx*, unlike the case at bar, did not involve a negotiated capped contribution from a primary defendant.

The FC's reliance on *Turner v. Murphy Oil*, 472 F. Supp. 2d 830 (E.D. La. 2007), is misplaced because *Turner* is a class action. The 15% benchmark used in *Turner* and the 25% suggested by the *Manual* are misused by the FC to make their proposed 8% benchmark look reasonable.

In addition, the FC's chart with percentage-of-fund fees submitted in support of the 8% benchmark is largely composed of class fee awards and not common benefit fee awards. Of the eleven (11) cases listed, nine (9) are class actions and not relevant to this analysis.[1] The two (2) remaining cases cited by the FC present an average benchmark of less than 6%, lending further support to PC's proposed 5% benchmark.

When compared with studies limited to common benefit fees, which have generally found the typical benchmark to be 4-6%, a benchmark of 8% is not reasonable. The FC tries to compare and contrast the PSC's efforts in this case relative to the PSC's in *Turner* and *Vioxx* to further justify its enhanced benchmark beyond 6%. While factors such as heightened risk and complexity may weigh in favor of an upward adjustment of the benchmark under *Johnson* (and indeed the FC seeks an upward adjustment of an additional 2.5%), this is not a reason to adjust

---

[1] Class actions: *In re Enron Corp. Securities Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008); *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998); *Shaw v Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000); *DeLoach v. Phillip-Morris Cos.*, No. 1:00CV01234, 2003 U.S. Disrict LEXIS 23240 (M.D.N.C. Dec. 19, 2003); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd Wal-Mart Stores, Inc. v. VISA, U.S.A., Inc.*, 396 F. 3d 96 (2nd Cir. 2005); *In re WorlCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02 Civ. 5575, 2006 U.S. Dist. LEXIS 77926 (S.D.N.Y. Sept. 28, 2006); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006); *In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249 (D.N.H. 2007).

the benchmark beyond 4% to 6%. The benchmark is merely a starting point reflective of general trends in fee awards and subject to adjustment under the *Johnson* factors, either up or down.

For all of the above reasons, the PC submit that 5% of the total benefit is the appropriate benchmark.

### E.   Analysis of the Johnson Factors for Consideration of Adjustment of the Benchmark Percentage.

PC disagree with the FC's analysis of the *Johnson* factors, and assert that an upward adjustment of 2.65 is not warranted.  Such an adjustment would significantly exceed adjustments made by courts to benchmarks in other MDLs.  The FC's proposed 8% benchmark with an adjustment to a 10.65% common benefit award would never be appropriate under the circumstances of this case.

### (i)   The Time and Labor Required; Time Limitations Imposed By the Client or the Circumstance the Preclusion of Other Employment by the Attorney Due to Acceptance of the Case.

As in *Vioxx*, "[m]embers of the PSC and others who performed common benefit work in the MDL are undoubtedly entitled to compensation."  *Vioxx*, 760 F. Supp. 2d at 653.  In both cases, the PSC operated under intense pressure for an expedited resolution and necessarily precluded counsel from working on other matters.  The Court in *Vioxx* held that the "time and labor" factor warranted a "moderate" upward adjustment of the benchmark percentage, *id.* at 656, but in this case, unlike *Vioxx*, the upward adjustment would come at the expense of the deserving individual lawyers who did significantly more work in this matter than their peers in *Vioxx*. In *Vioxx*,  the individual plaintiffs' attorneys "were able to simply wait while a $4.8 billion settlement was negotiated and then do no more than enroll their clients in the settlement and monitor their progress through the claims valuation process." *In re Vioxx Prods. Liab. Litig.*,

650 F. Supp. 2d 549, 563 (E.D. La. 2009). No such luxury was available to the individual attorneys in this MDL.

As noted herein PC, like all the individual attorneys representing Chinese Drywall homeowners, did far more work on behalf of their clients than expected in a typical pharmaceutical MDL. The problems faced by homeowners were acute and affected many of them in real time, often requiring immediate and intense attention by their retained attorneys. This was not a mass tort where the individual attorneys could sit back and wait for the PSC to announce a settlement, nor was it a class action where all the work is done by the lead counsel. This was a mass tort, not a class action, and the PSC did not do all the work as suggested.

These *Johnson* factors might ordinarily support a moderate upward adjustment of the common benefit fee benchmark percentage, but under the circumstance of this case, no such upward adjustment is warranted. To the contrary, these factors weigh heavily in favor of a significant reduction in the benchmark percentage.

### (ii)    The Novelty and Difficulty of the Questions; The "Undesirability" of the Case.

The FC contends that the Chinese Drywall litigation presented novel and demanding challenges but admit that the matter was not "undesirable" given what the homeowners had at stake. Cases involving novel and difficult questions often warrant an upward adjustment. *See Vioxx,* 760 F. Supp. 2d at 656 (litigation presented novel and difficult questions weighing in favor of an upward adjustment). PC agree this factor may weigh toward a moderate upward adjustment.

(iii)    **The Skill Requisite to Perform the Legal Service; The Experience, Reputation and Ability of the Attorneys.**

The attorneys who undertook the common benefit work were among the most highly experienced and skilled practitioners in mass torts. However, this factor does not support an upward adjustment of the benchmark percentage. PC and all counsel representing individual attorneys also applied substantial skill and effort to assist their clients, in scope and depth, performing work far beyond what individual lawyers typically perform in a mass tort case. (*See* §II B *supra*.)  It cannot be said that the skill required by the PSC "was so superior to that possessed by PC representing individual clients as to warrant a *Johnson* adjustment which would in effect shift attorneys' fees from one group to another." *Vioxx*, 760 F. Supp. at 657. Accordingly, PC submit that these factors do not warrant an upward adjustment of the benchmark percentage and this factor is neutral.

(iv)    **Nature and Length of the Professional Relationship with the Client.**

The FC states that this factor is neutral since few (if any) longstanding client relations between CBC and class members preceded this MDL.  PC agrees.

(v)    **Customary Fee; Whether the Fee is Fixed or Contingent.**

The FC states that this factor is also neutral since the 10.65% of class recovery requested is especially reasonable considering 32% of recovery was negotiated as a total fee fund in the Global, Banner & InEx settlements, consistent with this Court's ruling in the *Vioxx* litigation. The FC is gravely mistaken and turns *Vioxx* on its head.  The relevant figure from *Vioxx* to compare with the FC's requested 10.65% is not the 32% cap the Court imposed on total available attorneys' fees.  Rather, the relevant comparable figure is the 6% benchmark the Court selected

for the determination of common benefit fees. *See id.* at 655. By this measure, the percentage requested by the FC is grossly excessive.

The FC ignores completely the impact its request would have on the customary fee of PC and the expectations set by the Court by previous orders. Most of the individual attorneys in this matter, including PC, have retainer agreements with their clients that provide for an average of a 35% contingency fee. Consistent with *Vioxx*, PC entered this litigation with the expectation that this Court would likely cap fees at 32%.

The PSC, however, was unable to secure fees amounting to 32% of the settlement benefit. By their own accounting, the amount available to pay all attorneys' fees amounts to only 17% of the benefit. The FC's request for 10.65% of the benefit, if allowed, would leave PC with a mere 11.9% of the benefit. This low return to PC is unprecedented in mass tort ligation. The primary counsel in *Vioxx*, for example, retained 79% of the total attorney fees, while the PSC received only 21% of the available fees. Stated differently, the primary attorneys in *Vioxx* retained 25.5% of the total benefits obtained for their clients, while the PSC were paid 6.5%. By contrast, the award sought by this PSC would flip this allocation, allocating 40% of the fee to the primary attorneys and 60% to the PSC.

In the typical MDL, the PSC retains 4% - 6% of the total recovery and the primary attorneys retain 26% or more. A reduction of contract fees from 35% to 11.9% would discourage lawyers in the future from participating in MDLs and assisting victims of defective products. Future PSCs will be unable to achieve the results obtained here if the prospect of fees is grossly below market rates, further discouraging attorneys from representing individual victims and participating in future MDLs.

For these reasons, this factor weighs heavily against any upward adjustment to the benchmark percentage and weighs in favor of a downward adjustment.

### (vi)    The Amount Involved and the Results Obtained

PC agree that the PSC achieved a favorable and meaningful global resolution. However, because the majority of the settlement benefits were directed to property remediation, the settlements did not provide class members with access to substantial amounts of cash. The decision to accept a settlement requiring a remediation was made solely by the PSC. PC notes that most construction defect class actions result in cash settlements or settlements providing a choice between cash and repair. (*See* Chart attached hereto as Ex. 3.) Consequently, many class members found themselves left with large economic losses despite the settlement. For homeowners eligible for remediation, the payment from the economic loss fund was, often times, not adequate to cover the costs of temporary relocation during the remediation. Compensation for renters was limited to three months, even though many class members were unable to rent properties for such short terms. Property owners who were unable to sell their property at full value due to Chinese Drywall or lost their property due to foreclosure rarely recovered their full loses.

The lack of cash in the settlement also impacts the availability of funds to pay attorneys' fees and costs. In total, the PSC secured $233,078,270.33 from the settling defendants to cover all attorneys' fees and expenses. Using the FC's calculation of the settlement benefit, this amount represents 21% of the settlement benefit. This recovery compares poorly with recoveries by PSCs in other MDLs, which have generally been around 32% or more. Consequently, there are simply insufficient funds to compensate all the attorneys for their time and expenses

commensurate with other MDLs.  Exacerbating the problem, the PSC has taken "off the top" nearly $17,435,000 for "reimbursement of advanced costs and assessments, including "held" costs and does not seek to credit those amounts to lessen the fees it seeks. PC were not given the same recovery for expenses.  The Court approved a stipend of $1,000 per property to cover inspections and other costs.  However, this amount did not fully reimburse PC for costs.  The PSC also received a $1,000 stipend for their clients' properties, even though they were also reimbursed their held costs.

PC entrusted the PSC to obtain a settlement that would both fully compensate their clients and provide them with reasonable attorneys' fees and costs. The settlements may be fair and reasonable but do not fully achieve these goals.  Having failed to negotiate sufficient cash to provide full and fair compensation to all attorneys in this matter, the PSC has only itself to blame if their fees fall short of their expectations.  The PSC was solely responsible for the negotiation of the available attorney fee fund and it should bear responsibility for the inadequate fund.  PC, who had no input and were not even consulted, should not be penalized.

This factor supports a reduction of the percentage benchmark.

### (vii)   Awards in Similar Cases

PC do not agree that 8% is an appropriate percentage benchmark.  The FC's attempt to justify this percentage is flawed because they rely on awards in class action cases and do not limit their survey to awards of common benefit fees.  The use of the 15% benchmark in *Turner* is not appropriate.  *Turner* was a class action, not a mass tort.  Further, there was no differentiation in *Turner* between the members of the PSC and PC.  All plaintiffs' counsel who did common

benefit work could share in the fee award but *only* for common benefit work. *Turner*, 472 F. Supp. at 857.

As discussed previously, from a review of common benefit awards, it is clear that most common benefit assessments range from 4% - 6% of the settlement value with an average of 5%. *See, e.g., DEEPWATER HORIZON*, 2012 WL 161194 at *1-2 (ordering assessments of 6% on settlements with private claimants and 4% on settlements with state or local governments); *Vioxx*, 760 F. Supp. 2d at 655 (finding 6% of the settlement amount a reasonable benchmark percentage for a common benefit fee award); *Diet Drugs*, 553 F. Supp. 2d at 457-58, 491-96 (describing 9% federal and 6% state assessments later reduced to 6% and 4% respectively); *Zyprexa*, 467 F. Supp. 2d at 261-63 (1% and 3% of separate settlement amounts); *Sulzer*, 268 F. Supp. 2d at 909, 919 n. 19 (awarding common benefit fees representing 4.8% of settlement value); *Rezulin*, 2002 WL 441342, at *1 (6% withholding in federal cases, 4% in participating state cases); *see also Newberg on Class Actions* § 14:9 ("Most courts have assessed common benefit fees at about a 4-6% level . . . .").

In addition, the FC's chart of percentage-of-fund fees submitted in support of the 8% benchmark is largely composed of class fee awards and not common benefit awards.  Of the 11 cases listed, nine are class actions and not relevant to this analysis. The remaining two cases– *Sulzer* and *Diet Drugs* – present an average percentage benchmark of less than 6%, lending further support to PC's proposed 5% benchmark.  *See Sulzer*, 268 F. Supp. 2d at 909; *Diet Drugs*, 553 F. Supp. 2d at 457-58.  This factor supports a reduction.

### (viii)   Adjusted Benchmark Percentage

Based upon the above analysis, PC asserts no adjustment to the FC's proposed benchmark is warranted.

### F.   The Lodestar Cross-Check.

The lodestar method is not without flaws, especially when employed in common fund cases. *Vioxx,* 670 F. Supp. 2d at 650.  As an influential report by the Third Circuit Task Force concluded, the drawbacks of the lodestar method include:

> (1)   increased workload on an already overtaxed judicial system,
>
> (2)   inconsistent application of the approach and widely varied fee awards,
>
> (3)   illusory mathematical precision unwarranted by the realities of the practice of law,
>
> (4)   potential for manipulation,
>
> (5)   reward of wasteful and excessive attorney effort,
>
> (6)   disincentive for early settlement,
>
> (7)   insufficient flexibility for judicial control of litigation,
>
> (8)   discouragement of public interest litigation, and
>
> (9)   confusion and lack of predictability in setting fee awards.

*Id.* (citations omitted).

The lodestar method is not relevant or appropriate as a tool to cross-check the value of the settlement when the attorneys' fee fund negotiated by the PSC is inadequate.  As discussed, the PSC negotiated the common fund for the fees available to CBC and PC.  The PSC failed to provide an adequate fund to support their $119 million lodestar claim.  As such, the lodestar cross-check in this case is irrelevant because of the inadequate fund.  In short, the lodestar cross-check results in a negative multiplier due to the inadequate fund.

If the Court believes that the lodestar cross-check is appropriate, the Court must consider that the PSC lodestar figures include substantial time associated with the separate Taishan

litigation. The PSC in the Global Fee Petition discusses the PSC's efforts in support of its lodestar figures. (*See* Global Fee Petition at pp. 38-55.) It is clear from the Global Fee Petition that the PSC includes in the lodestar figures a substantial amount of time and effort in regards to the Taishan litigation.

As the Court is aware, the records to support the lodestar figure are filed under seal and PC cannot review the records to determine the actual hours spent by the PSC in the Knauf litigation. PC does not have adequate information to determine the lodestar hours accumulated in the Knauf litigation versus the Taishan litigation and determine if the hours are proportional to the settlement funds received. If the Court deems the lodestar figure as relevant to a determination of the fee allocation, PC requests the records supporting the lodestar figure be produced for review by all primary counsel and allow opportunity for those records to be challenged.

In sum, the lodestar cross-check is not appropriate due to the inadequate common fund, but, if the Court determines it is appropriate, PC should have the opportunity to review the records supporting the lodestar figures.

## IV. PRIMARY COUNSEL'S FEE ALLOCATION REQUEST AND IMPACT ON PRIMARY COUNSEL AND COMMON BENEFIT COUNSEL

The total value of the benefit obtained for Plaintiffs is $910,856,292.05. The total funds available for attorneys' fees as discussed herein are $206,313,421.61. The undersigned PC request this Court to allocate $160,770,607.01 to PC and $45,542,814.60 to Common Benefit Counsel.

This allocation to CBC is based upon a percentage benchmark of 5% with no adjustment under the *Johnson* factors, equaling a total common benefit fee percentage of 5%. The common

benefit percentage of 5% is applied to the total settlement value of $910,856,292.05.  As such, PC request that $45,542,814.60 be allocated to the CBC and the remaining $160,770,607.01 allocated to the primary attorneys.

This allocation provides PC with 17.6% of the total settlement value and 78% of the total fees available for disbursement.  As a result, based upon PTO 28(F), PC will receive a fee contract percentage of 24% of the benefit provided to each individual client.

This allocation provides CBC with 5% of the total settlement value and 22% of the total fees available for disbursement.  In *Vioxx,* the CBC received 6.5% of the total benefit obtained which equated to 21% of the total attorneys' fees available.  PC's suggested allocation is reasonable in light of the funds available, work performed, and is consistent with *Vioxx* and the case law provided.

Respectfully submitted,

Dated:  June 28, 2016

/s/ Eric D. Hoaglund_____
Eric D. Hoaglund
McCallum, Hoaglund, Cook & Irby, LLP
905 Montgomery Highway
Suite 201
Vestavia Hills, Alabama  35216
Telephone:  (205)824-7767
Facsimile:  (205)824-7768
Email:  ehoaglund@mhcilaw.com

K. Edward Sexton, II
Gentle, Turner, Sexton & Harbison, LLC
501 Riverchase Parkway East
Suite 100
Hoover, Alabama 35244
Telephone:  (205)716-3000
Email:  esexton@gtandslaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 28th day of June, 2016.

/s/ Eric D. Hoaglund
Eric D. Hoaglund
McCallum, Hoaglund, Cook & Irby, LLP
905 Montgomery Highway
Suite 201
Vestavia Hills, Alabama  35216
Telephone:  (205)824-7767
Facsimile:  (205)824-7768
Email:  choaglund@mhcilaw.com