# Exhibit 1

## AFFIDAVIT OF ERIC D. HOAGLUND

My name is Eric D. Hoaglund and I am over the age of nineteen (19) and have personal knowledge of the facts contained herein.

I graduated from Cumberland School of Law in 1995 and have been a member of the Alabama State Bar since 1995, continuously practicing in the State of Alabama.

I have been involved as Primary Counsel (hereafter "PC") in Chinese Drywall litigation since approximately September 2009 in conjunction with K. Edward Sexton, II of Gentle, Turner, Sexton & Harbison, LLC. I inspected several hundred Chinese Drywall properties. In addition, I have been involved in the litigation of more than 200 Chinese Drywall cases, including Knauf and Taishan cases. In conjunction with Eddie Sexton, I have participated in the remediation of approximately 160 properties through the Knauf drywall remediation settlement.

A Chinese Drywall case is far from a typical personal injury and property damage case. In dealing with a home suffering property damage and potentially causing health issues, a homeowner requires a very high level of individual attention and attorney involvement in all aspects of the litigation and settlement process. Even if litigation work may be conducted by a non-lawyer, it is the responsibility of PC to oversee and monitor.

Unlike other mass litigation, the individual issues addressed by PC in Chinese Drywall were unprecedented. The Plaintiffs' Steering Committee (hereafter "PSC") produced a settlement that required PC to implement and oversee a remediation construction project for each qualifying home. As a result of the structure of the settlement negotiated by the PSC, PC spent years overseeing construction projects. Further, these issues were left to the responsibility of PC with little or no involvement by Common Benefit Counsel (hereafter "CBC"). All individual client contact outlined herein took place through PC.

The first step in the Chinese Drywall litigation was to determine where the Chinese Drywall was located and the time frame for installation. This process took hours of research, review of thousands of supplier invoices, review of builder permits, correspondence to potential clients, phone interviews and hundreds of inspections. Early in the process, PC did not have a clear profile for a Chinese Drywall home and inspected homes that, after inspection, PC discovered did not contain Chinese Drywall. These inspections were necessary in PC's attempt to determine the typical profile of a Chinese Drywall home. As such, PC spent countless hours and expenses on inspection costs for homes that did not contain Chinese Drywall. These expenses cannot be recouped and must be paid from fees payable to PC.

PC spent time and costs advertising, corresponding with potential Chinese Drywall owners, and participating in newspaper interviews, talk radio shows, and television interviews to provide awareness to the community regarding the presence of Chinese Drywall and the ramifications thereof. Once public awareness of Chinese Drywall began to increase, PC addressed with individual homeowners the possibility that their homes contained Chinese Drywall. PC fielded hundreds of phone calls and emails from homeowners concerned that their home contained Chinese Drywall. Accordingly, PC established the criteria to determine if a particular home might contain Chinese Drywall, including the time frame of the construction, the builder and supplier involved in the construction, and the symptoms of Chinese Drywall damage.

If PC determined the home might contain Chinese Drywall, an inspection was conducted by PC with an inspector to determine if the home contained Chinese Drywall. PC attended the inspections and, with an independent inspector, verified the presence of Chinese Drywall and assessed any damages to electrical, plumbing and HVAC units typically seen with Chinese

Drywall homes. PC attended each inspection and typically attempted to determine the manufacturer of the sheet rock, the number of and the percentage of defective sheets in the home, and the level of damage.

Following the inspection process, PC made a determination to accept or reject cases. This required a legal analysis and evaluation of various factors, including, but not limited to, the possible builders, suppliers, installers, which Chinese Drywall manufacturer was involved, the availability of insurance, and caveat emptor/second homeowner issues.

PC would then meet with the homeowner to discuss possible legal claims, possible repair scenarios, possible outcomes of litigation, and negotiate the fee agreement. Clients sought advice regarding possible health effects and the ramifications of moving out of their home. Clients wanted to know if they should move out because of health issues, and, if they moved out because of health issues, whether they would be compensated for their expenses.

PC would next issue to the client a New Client Questionnaire requesting specific information regarding the history of the home and certain documents, including contracts for construction, deeds, HUD-1 statements, warranties, and appraisals. PC reviewed this documentation and prepared information for the inclusion of the homeowner on an Omnibus Complaint or prepared a separate complaint for filing. To include a homeowner on an Omnibus Complaint, PC had to obtain and provide detailed information regarding the owners of the home and information regarding the property, including an inspection report.

Once the Omnibus Complaint was filed, PC was responsible for ensuring all homeowners were included on the proper complaint and all Defendants were properly named. In addition, as a requirement by the PSC, PC provided a Plaintiff Profile Form providing information and

documentation for each home, and, in many cases, PC had to provide an amended Plaintiff Profile Form to supply additional information. Further, in conjunction with Plaintiff Profile Forms, PC provided to the PSC information regarding the number of HVAC coils replaced in each home. As such, PC completed a survey of all homeowners regarding the number of HVAC units in each home and the number of affected HVAC coil replacements.

During the course of the litigation process, PC consistently responded to questions and advised homeowners regarding homeowner insurance claims, possible tax assessment protests, and IRS casualty loss issues. PC also drafted tax assessment protests and attended a number of hearings with the local tax assessor's office representing homeowners in their appeals of the valuation of their home. Homeowners consistently sought advice regarding the potential health issues associated with Chinese Drywall, whether they should move out of their homes, and/or whether they should stop paying their mortgages. Homeowners required research regarding health issues and information regarding the results of studies about health risks associated with Chinese Drywall. Potential health issues proved to be very difficult for PC because so little scientific information was available, but yet clients wanted reassurances that their health was not in jeopardy.

PC participated in and attended various town hall meetings with homeowners. Further, PC attended trials and reported on the status of the trials and the Court's findings. Throughout the litigation process, PC provided regular updates to clients regarding the status of the MDL and progress of their case towards resolution.

Between the discovery of Chinese Drywall in homes and remediation of the home, PC advised homeowners regarding mortgage forbearance issues and possible foreclosure issues. On

4

many occasions, PC negotiated directly with mortgage companies regarding forbearance or foreclosure issues.

Since the MDL Court did not have personal jurisdiction over Alabama builders that constructed homes in Alabama with Chinese Drywall, PC evaluated the statute of limitations for claims against Alabama builders and assessed builder liability and insurance availability for each homeowner. PC determined the applicable building code for each jurisdiction and determined possible building code violations. As a result, PC prepared and filed numerous builder lawsuits on behalf of homeowners with Chinese Drywall. PC undertook the usual responsibilities of litigation in the builder filed cases, including generation of pleadings, review of defendant's pleadings, and preparation and review of paper discovery. Further, PC engaged in settlement negotiations with builder attorneys. PC also attended status conferences and motion dockets associated with builder lawsuits and was appointed as liaison counsel for Alabama state court Plaintiffs. As liaison counsel, PC designed and drafted case management orders for various state court judges regarding the various discovery tracks needed for builder cases. Further, PC responded to Motions to Stay filed by Knauf and INEX and represented homeowners at oral argument on this issue.

Once the PSC announced the Pilot Program as a possible settlement resolution, PC undertook a review of each file to determine if the home was eligible for the Pilot Program. PC negotiated directly with Knauf for the inclusion of many homes in the pre-settlement Knauf remediation program. In addition, PC met with and discussed with clients the possibility of enrolling their home in the pre-settlement Knauf remediation program and the possible benefits and legal ramifications of the Program. Once a client agreed to participate, PC prepared an

5

eligibility packet containing certain information required by Knauf to consider a home for the Knauf Program. Once accepted into the Program, a series of inspections took place to determine the eligibility for homes. Prior to the December 2011 Knauf settlement, we had the majority of our properties in the Knauf remediation program.

As the Program was proceeding, the Knauf Settlement Agreement was announced. Following the Knauf Settlement Agreement, PC spent numerous hours reviewing the Settlement Agreement, interpreting the Settlement Agreement, and explaining the Settlement Agreement to clients. An evaluation of each file was once again required to determine the possible impact on each homeowner. PC conferred with each client regarding the possibility of opting out of the settlement. PC filed objections on behalf of several clients and negotiated resolutions of the objections with Knauf.

PC met with each client to explain the benefits of the settlement under Option 1, 2 or 3, explained the inspection and remediation process, scope of remediation, and determined which option was best for each client. After a client chose a particular option, PC reported to Knauf and BrownGreer which clients were participating in which option. Due to the benefits of possible cost increases during construction and the availability of change orders for these cost increases, the vast majority of clients chose Option 1, requiring a remediation construction project.

Following the choice of an option under the Knauf Settlement Agreement, PC coordinated an inspection of each home by MZA that had not been previously inspected in the pre-settlement remediation program. PC attended and oversaw the MZA inspection for compliance with the inspection protocol. Often times, PC provided the inspectors with vital

information regarding the location of the Knauf Chinese Drywall and information regarding damages to the home. In addition, the homeowners often had additional questions and concerns regarding the Knauf Settlement Agreement that arose at the inspections and required responses from an attorney familiar with the settlement. Following the MZA inspection, PC monitored the inspection results to determine if the home qualified for benefits under the Knauf Settlement Agreement. Responses to these questions required an attorney familiar with the process.

If the home qualified for benefits following the MZA inspection, a second inspection and estimate was performed by Moss or another qualified contractor. PC coordinated and attended the Moss inspection and estimate to ensure compliance with the ANSI square footage measurements and the Exhibit F remediation protocol. Again, during many inspections, clients asked additional questions regarding the remediation process, scope of the remediation, and the legal ramifications of settling under the Knauf Settlement Agreement.

Following the inspection by Moss, PC received an Xactimate estimate which provided a scope of work for the home and the ANSI square footage that determined the lump sum payment for each client. PC reviewed the Xactimate estimate to ensure compliance with the Exhibit F protocol, confirmed that all areas of home were listed in the scope of work, and verified the ANSI square footage. The estimates often required corrections. PC then conferred with each homeowner to explain the Xactimate scope of work and seek approval of the Xactimate scope and ANSI square footage. Once the Xactimate scope was approved, PC monitored the Xactimate estimated cost for the home and the Final Cost Estimates to ensure that the costs were in line with the size of the home, the quality of the original construction of the home, and the Xactimate scope of work.

Assuming the homeowner chose Option 1, after the inspection and estimate process was complete, BrownGreer prepared a generic work authorization package to be completed by PC and homeowner. PC then prepared a work authorization package specific to the particular homeowner and provided the package to the homeowner for review. PC then met with each homeowner to review the work authorization package and discuss the remediation program. This meeting included discussions regarding legal implications of executing the work authorization and signing of releases. In addition, the practical aspects of implementing the remediation, moving out, lump sum payments, and other moving and repair issues were discussed.

If the homeowner chose Option 2 or 3, a separate set of paperwork was required. PC was required to coordinate the Option 2 or 3 package and meet with the homeowners to execute certain documents and provide legal advice regarding such documentation.

In Option 1 scenarios, following the return of the work authorization package, BrownGreer provided a move out notice indicating when the homeowner must be out of the home in order for remediation to begin. In addition, BrownGreer and/or Knauf provided a date and time for a kick off meeting between the contractors, PC, and homeowners. Between the time of the receipt of the move out notice and the kick off meeting, PC received the lump sum payment for the homeowner. PC verified the amount of the lump sum payment and disbursed the funds to the clients.

PC then attended the kick off meeting at the home. At this meeting, PC oversaw compliance with the Exhibit F remediation protocol and the Xactimate scope of work. Often times, issues regarding the scope of work, including appliance issues and HVAC issues, were

8

discussed and corrected onsite. Typically, numerous return trips to the project were required during the remediation process to ensure compliance with the remediation protocol and to monitor the timing and completion of the construction. Usually during the construction process, the homeowner raised questions regarding the scope and quality of the contractor's work. For most homes, PC mediated disputes and disagreements between homeowners and the contractors regarding the scope and the quality of work. There were often disputes regarding the replacement of "like-for-like" materials, as required by the Knauf Settlement Agreement. This process of monitoring the remediations and mediating the disputes resulted in countless hours of time expended by PC. Further, this process of dispute resolution required a firm grasp of the Knauf Settlement Agreement and legal interpretations of the agreement, work authorizations, and remediation protocols.

Once a home was stripped of the Chinese Drywall, sometimes construction deficiencies or water and termite damage were discovered. At this point, PC were required to determine if the costs associated with such repairs were costs associated with the Knauf remediation or the responsibility of the homeowner. There were often disputes regarding which party was responsible for the payment of such repair costs, which required PC to determine a suitable resolution.

Following the kick off meeting, Moss provided an appliance binder to PC outlining the appliances to be replaced and setting forth the choices the homeowner had in regards to replacement of the appliances. Once again, PC had to determine if the appliance binder complied with the Knauf Settlement Agreement, the Exhibit F protocol, and the Xactimate scope of work. Often, some appliances were not included in the binder, or the wrong appliances were

9

included and corrections or adjustments to the binder had to be made. This required intimate knowledge of the Knauf Settlement Agreement and the remediation protocols to determine which appliances were to be replaced. PC then explained the appliance binder and potential choices to the homeowner and reported to Moss the homeowner's decision regarding appliances.

As a project neared completion, there were delays which required negotiations for delay payments owed to the homeowner. PC was responsible for monitoring the deadlines, calculating the delay payments, and negotiating the delay payments for homeowners.

After a project obtained a Certificate of Occupancy, the contractor, PC, and the owner met onsite to review the completed work. PC was responsible for determining if the scope and quality of work complied with the Knauf Settlement Agreement and the remediation protocols. At this meeting the homeowner and contractor created a punch list of items for the contractor to complete prior to returning the home to the owner. Disputes between the contractor and the owner often arose at this stage and were resolved by PC. In order to resolve these issues, PC was required to have a thorough understanding of the Knauf Settlement Agreement, remediation protocols, and interpretations of the Knauf Settlement Agreement.

Once the punch list items were complete or the contractor and homeowner reached an agreement regarding the completion dates for punch list items, a close out meeting was held at the home with the contractor, PC, and the homeowner in attendance. At this point, the contractor sought to return the home to the owner and have the homeowner sign a release required by the Knauf Settlement Agreement upon substantial completion of the project. Disputes regarding whether the release should be signed often arose at this stage, and PC had to determine a resolution. In addition, at this meeting, PC provided the homeowner with a close out package,

10

including documents from the remediation such as the Knauf inspection report, the GFA certification, the warranty information, the Certificate of Occupancy, and the contractor's certification.

Further, once the home was released to the homeowner, PC was required to monitor ongoing punch list items and disputes regarding punch list items. For many homes it took months to complete the punch list and resolve these issues. It was not unusual for a three (3) month remediation project to take six (6) months or longer for a total completion of the construction. In addition, the homeowners received a one (1) year warranty from the contractor regarding all work performed on the home. As such, the homeowners often required warranty work to be performed by the contractor. PC monitored and oversaw the warranty requests and completion of the warranty requests. Disputes often arose involving whether the repairs fell within the scope of the warranty and legal consultation was required. Due to this one (1) year warranty, each three (3) month project took a minimum of a one (1) year and three (3) months to bring to a complete and total resolution.

The final step in resolving homeowners' claims involved the filing and monitoring of claims under the various settlements, including, but not limited to, bodily injury claims, global builder and supplier claims, foreclosure claims, pre-remediation move out claims, and miscellaneous claims. This process required an evaluation of all potential claims available under all settlements and an evaluation of each client's circumstances to determine if a client was eligible for a particular claim. This involved legal interpretations of the Knauf Settlement Agreement, the various other settlement agreements, and the various claims materials. Once a determination was made for each client, PC was responsible for drafting the claim form,

11

gathering the required documentation, and timely filing the claims. Once the claims were filed, PC monitored the progress of the claims and updated clients regarding the progress of the claims. Eventually, BrownGreer issued a Notice of Claim Eligibility form. PC discussed the Notice of Claim Eligibility with each client and determined whether to accept or appeal the notice. If the claim was accepted, PC was responsible for the execution of the Verification of Claim form, execution of a W9 form, verification of the payment of the claims, and execution of releases. If the eligibility notice was appealed, PC was responsible for the appeals process to the Special Master or the Court. Some appeals are still proceeding to date.

In short, in order to bring a client to a complete resolution, PC invested countless hours and significant expenses not reimbursed by the expense stipend to accomplish tasks that could not be accomplished by CBC. In fact, many of the tasks required of PC to provide a homeowner with a complete resolution were tasks which were required by the PSC or because the PSC negotiated a settlement that required PC to implement the settlement on his own. The resolution of homeowners' claims required extensive client contact and involvement which was handled exclusively by PC. A resolution of a homeowner's claims required consistent work on behalf of the client over a four (4) to six (6) year period of time. PC contributed the majority of their practice over these time periods to resolve homeowner's Chinese Drywall disputes, and, without PC involvement, the resolution of these claims would have proved impossible.

The Sexton/Hoaglund firms are PC representing homeowners with Chinese Drywall. The Sexton/Hoaglund firms did not make and were not authorized to make any claims for common benefit work. The Sexton/Hoaglund firms performed Chinese Drywall-related work that was unique from other PC but benefited all Chinese Drywall homeowners as a whole.

As discussed previously, the Sexton/Hoaglund firms filed numerous lawsuits against builders of homes containing Chinese Drywall in various state courts in Alabama. Since the MDL Court did not have personal jurisdiction over Alabama builders that constructed homes in Alabama with Chinese Drywall, Sexton/Hoaglund evaluated the statute of limitations for builders' claims and determined builder liability for each homeowner. We reviewed the applicable building code for each jurisdiction and determined possible building code violations. As a result, we prepared and filed numerous builder lawsuits on behalf of homeowners with Chinese Drywall. As such, we undertook the usual responsibilities of litigation in the builder filed cases, including generation of pleadings, review of defendant's pleadings and preparation, and review of paper discovery. Further, we undertook settlement negotiations with builder attorneys. We attended status conferences and motion dockets associated with builder lawsuits and were appointed as liaison counsel for Alabama state court Plaintiffs. As liaison counsel, we designed and drafted case management orders for various state court judges regarding the various discovery tracks needed for builder cases. Further, we responded to Motions to Stay filed by Knauf and INEX and represented homeowners at the oral argument on this issue. This work was performed without the help of the PSC or CBC.

In addition, the Sexton/Hoaglund firms modified and established the initial Knauf inspection protocols for the MZA inspections that were required to qualify a home for the Pilot Program or the Knauf remediation program. When MZA began inspections in Alabama, the inspection protocol was based upon Florida construction. Due to differences in the construction process and the use of the different types of sheet rock, the Florida inspection protocol needed modifications to fit construction standards in Alabama. The Sexton/Hoaglund firms worked with

MZA and Knauf's attorneys to modify the inspection protocols to fit with Alabama construction standards. This work was performed without the help of the PSC or CBC.

Prior to the December 2011 Knauf settlement, PC, working through the PSC, attempted to include some of their cases in the program, but were unsuccessful. PC then began negotiating directly with Knauf for the inclusion of homes in a Knauf remediation program. By August of 2011, PC had a majority of their homes cleared for inspection for inclusion in a Knauf remediation program.

Further, the Sexton/Hoaglund firms modified the Exhibit F repair protocol for the repair of homes in Alabama. Once remediations began, Moss took the position that the Exhibit F protocol did not require the complete replacement of the interior air handler but only repairs to certain interior parts in the air handler. After negotiations with Moss and consultations with HVAC subcontractors, Moss modified the Exhibit F protocol to include the replacement of the entire interior air handler in every Chinese Drywall home in Alabama, enhancing the benefit for all Alabama homeowners with Chinese Drywall. This work was performed without help from the PSC or CBC.

The Sexton/Hoaglund firms also established the requirements and protocol for a homeowner to qualify for benefits under Option 2 and 3 of the Knauf Settlement Agreement. Under the Knauf Settlement Agreement, a homeowner could hire his own contractor to perform the remediation work under certain circumstances. Under Option 3, a homeowner could receive a discounted cash payout under certain circumstances. However, at the time of the Knauf settlement, the requirements and documentation needed to qualify and complete a remediation under Option 2 and a cash payout under Option 3 were not developed. The Sexton/Hoaglund

14

firms worked directly with Knauf to establish the requirements and documentation needed to qualify and complete a remediation under Option 2 and a cash payout under Option 3. This work was performed without help from the PSC or CBC.

Lastly, the Sexton/Hoaglund firms enhanced the Knauf Settlement Agreement by objecting to the original Settlement Agreement and negotiating with Knauf for the inclusion of Section 4.9 of the Amended Knauf Settlement Agreement providing Lower-Case Knauf homeowners with relief under the Knauf settlement. Further, the Sexton/Hoaglund firms enhanced the Knauf Settlement Agreement by objecting to the original Settlement Agreement and negotiating with Knauf for the inclusion of Section 4.7.3.1 of the Knauf Settlement Agreement providing possible relief to Chinese Drywall homeowners by the inclusion of a claim for miscellaneous expenses not otherwise provided for in the settlement.

The Sexton/Hoaglund firms, as PC, provided unique Chinese Drywall-related work, which provided additional and enhanced benefits to homeowners with Chinese Drywall. This work was performed by PC independent of the PSC and CBC.

_____
Eric D. Hoaglund

STATE OF ALABAMA    )
                    )
JEFFERSON COUNTY    )

      SWORN TO AND SUBSCRIBED before me the undersigned Notary Public on this the 28th day of June, 2016.

_____
Notary Public
My Commission Expires: 8/14/16