UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | ) | MDL NO. 2047 |
| | ) | |
| | ) | |
| _____ | ) | SECTION: L |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| ALL CASES | ) | JUDGE FALLON |
| | ) | MAG. JUDGE WILKINSON |
| | ) | |
| _____ | ) | |

**OPPOSITION OF PLAINTIFFS REPRESENTED BY MILSTEIN
ADELMAN, LLP AND ROBERTS AND DURKEE, LLP TO THE
MOTION OF THE PSC FEE COMMITTEE FOR ALLOCATION OF
THE GLOBAL FEE AWARD BETWEEN COMMON BENEFIT FEES
AND INDIVIDUAL COUNSEL FEES PURSUANT TO PTO 28(F)**

Plaintiffs represented by Milstein, Adelman, LLP and Roberts and Durkee, LLP

(herein "Milstein/Durkee") respectfully  submit the following in Opposition to the Fee

Committee's ("FC") Motion to Determine the Allocation of the Global Fee Award as

Between Common Benefit Fees and Individual Counsel's Fees:

**INTRODUCTION**

While it is appropriate to appoint a fee committee to make recommendations, this

Court has recognized that it should not "rubber stamp" those recommendations,

particularly in light of the potential conflict in that members of the fee committee may

benefit from its recommendations.  *In re Vioxx Products Liability Litigation*, 802 F.

Supp. 2d 740, 772, 773-774 (E.D. La. 2011).  The Fee Committee's Motion for

Allocation exemplifies that conflict.

1

The FC's recommendations are nothing more than an inappropriate effort to deprive individual private counsel of their fair allocation of fees for work performed by private counsel under agreements with their respective clients. The percentage requested by the FC is outrageous and without precedent, and should be rejected by this Court.

While Milstein/Durkee does not dispute the excellent and exhaustive work performed by common benefit counsel, the approach to fees suggested by the FC benefits only common benefit counsel and almost wholly disregards efforts of private counsel, many of whom took on these cases and worked tireless hours litigating these matters in various state courts at significant financial risk.

It should also be emphasized that the PSC negotiated the total fees available in this matter with no input from private counsel.  Now the FC seeks to enrich its own members and common benefit counsel to the detriment of private counsel and without regard to the cap created by its own negotiations.

As will be discussed below, the FC's Motion is littered with misrepresentations and falsehoods. Milstein/Durkee requests that this court disregard the FC's recommendations in their entirety and instead adopt an allocation that is both fair and consistent with applicable authorities.

1.      **The FC Has Overstated the Value of the Settlement in Order to Obtain a Common Benefit Fund that Is Grossly Excessive**

In an effort to increase or justify its share of fees, the FC misrepresents the amount of the settlement, asserting, without any authority whatsoever, that the settlement value includes not only the benefits paid to affected homeowners but also such items as settlements outside the MDL ($10,962,000.00), "Administrative Services"

($34,529,905.31) and, outrageously, even the "Attorney's Fees/Costs" themselves ($233,078,270.33). Memo in Support of Motion for Allocation, p. 49.   In so doing, the FC is artificially inflating its share of the settlement by applying its 10.65% to a much higher number than the actual settlement number.  Milstein/Durkee is not aware of any precedent, in this district or anywhere else, where such a strained interpretation of a settlement value has been adopted for purposes of justifying a fee.

Perhaps most revealing, in directing Brown-Greer, the court appointed settlement administrator, to communicate with private counsel regarding private counsel fees, the FC did not use the approximately $1,120,000,000 number but instead used the *actual* Recovery Amount of $658,713,629.62 to calculate the proposed private attorney fee awards.  In its e-mail earlier this month, Brown-Greer stated:

> The total amount of recovery paid to all claimants, including the costs of remediation of Affected Properties, the Other Loss Funds and any lump sum payments, paid to the Affected Property Owners from Class Settlements to which individually retained counsel are entitled to compensation for attorneys' fees is $658,713,629.62.

See **Exhibit 1** attached hereto, p. 1.

It is unfathomable that the FC seeks to use one number to exaggerate the settlement value to enrich common benefit counsel while at the same time, directing Brown-Greer to use an entirely different (albeit accurate) number in computing proposed private counsel fees.

Applying the FC's suggested 10.65% of fees to the actual settlement value of $658,713,629.62 yields a total common benefit fee of $70,153,001.55 or 36.4% of the

total fees available for distribution.[1]  10.65% of the actual recovery, or 36.4% of the total

fees, is certainly beyond the very high end of historical ranges for common benefit fees,

but is at least more palatable than the gross excess sought by the FC.

Such an allocation would also leave a total of $122,828,361.80 in fees for private

counsel.  Applying the Brown-Greer analysis to this number would result in a contractual

fee percentage to private counsel of approximately 18.6%.  Again, this is far below

historic norms, but less egregious than the allocation suggested by the PSC.  As shown

below, however, a benchmark of 10.65% is still too high for a case like this one.

### a.  The Actual Value of the Settlement Is $658,713,629.62, <u>Not</u> the $1,120,313,305.90 that the FC States in Its Moving Papers

There is no justification for the inclusion of legal fees, administrative fees, and

settlements outside the MDL in the total value of the settlement used to compute the

"benchmark" for the award of common interest fees.

First, while the FC cites to a number of cases which stand generally for the idea

that the payment of attorney fees by a defendant is part of the overall recovery (Memo in

Support of Motion for Allocation, pp. 41-42), it does not cite to a single case stating that

they should be viewed as such for the purposes of determining the amount of a common

benefit fee, much less in a situation where the amount of the fee is in direct competition

with the amount awarded to private counsel.  And, to do so would make no sense.  In

seeking to add in this amount, the FC is unjustifiably amplifying the benchmark that it

uses to determine the amount of the common benefit fee.  It should be remembered that

---

[1] The total available for distribution is $192,981,363.35.  Memo in Support of Motion for Allocation, p. 56.  See also **Exhibit 2** attached hereto, p. 3.

there is nothing inherently superior or senior about a claim for common benefit fees vis a vis a competing claim for private counsel fees.

Second, there is no justification for the use of the figure of $233,078,270.33 for the total amount of attorney fees in this part of the FC's moving papers, when it admits elsewhere that the fee amount is only $192,981,363.35, plus an additional $4,732,058.26. See *infra*, f.n. 2.

Third, the inclusion of administrative costs is even less justified than the inclusion of fees.  It is both unsupported by any law and fundamentally senseless, since there is no separate award for "administrative costs" as part of the settlement.  Such costs were never recovered from any defendant, so there is no basis for them to be included as part of the overall value of the settlement.

Finally, the Virginia settlements in the amount of $10,962,000.00 are outside of the MDL, so there is no basis for including them in the value of the settlement of the action before this Court.

### b.   The 36.4% of the Total Recovery the FC Seeks Is Far Beyond the Allowable Allocation for Common Benefit Fees

Several courts have observed that in "megafund" cases such as this one, the benchmark for the common benefit fund typically around four percent, even where "bellwether" trials precede the settlement.

*In re Zyprexa Products Liability Litigation*, 2006 U.S. Dist LEXIS 100746 (E.D. NY 2006), involved a settlement of more than 8,000 individual cases pending in an MDL.  *Id.* at *83.  The court awarded a common benefit fund in the amount of $28,445,000.00, which it found to be between one and four percent of the total amount of

the settlement. *Id*. at *93-*94, and *101. The court stated, "Either calculation (i.e., one or four percent) is well within the range of percentage awards in megafund cases." *Id*. at *94, citing to *In re WorldCom, Inc. Securities Litigation*, 388 F.Supp.2d 319, 353, 356-357, in which court found that 5.5% was likewise within the appropriate range for common benefit fees in "megafund" cases.

More recently, in *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, 2014 U.S. Dist. LEXIS 180723 (S.D. Ill. 2014), the court upheld a special master's recommendation for a common benefit fee of four percent, based on the fact that this amount was "consistent with comparable MDL set-aside assessments involving case settled before the first bellwether trial." *Id*. at *11. However, the court went on to cite to a number of cases in which a comparable portion was awarded even after one or more bellwether trials had taken place. *Id* at *11-13, citing to, e.g., *In re Sulzer Hip Prosthesis & Knee Prosthesis Liability Litigation*, 268 F.Supp.2d 907, 909, 919, f.n. 19 (N.D. Ohio 2003) [awarding 4.8% in common benefit fees following single bellwether trial], *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*, 553 F.Supp.2d 442, 457-458, 491-496 (E.D. Pa. 2008) [awarding 6% and 4%, respectively, for state and federal court assessments following numerous state and federal court trials], and *In re Vioxx Products Liability Litigation*, 760 F.Supp.2d 640, 658 (E.D. La. 2010) [6.5% awarded following 19 federal and state court trials].

This is a "megafund" case in which the FC claims that three bellwether trials took place prior to the settlement, one of which was before a jury. See Memo in Support of Motion for Allocation, pp. 22-23. There is nothing in this case that justifies a departure from four or five percent as a benchmark, at the most.

**2.      The Proposed 60%/40% Split Sought by the FC Is Inequitable in
Light of Private Counsel's Fee Agreements, the Amount of Work and
Expenses Incurred by Private Counsel, and Applicable Precedent**

As discussed above, the FC asks this Court to award common benefit counsel
10.65% of the "common fund," which the FC defines as the "total value conferred
through these settlements."  Memo in Support of Motion for Allocation, p. 2.  Of course,
the amount of *fees* available to pay all counsel in the MDL is set by these same
settlements.  This amount--the "fund of total approved fees"--is $192,981,363.35.  Memo
in Support of Motion for Allocation, p. 56.

As discussed above, however, in coming up with its figure of 10.65%, the FC is
indifferent to the total amount of fees that are available to all counsel.  Memo in Support
of Motion for Allocation, pp. 7-52.   The amount of fees does not matter--as far as the FC
is concerned, common benefit counsel is entitled to 10.65% of every conceivable dollar
of value that goes to the plaintiffs under the settlements.  This amount is then deducted
from the total of the fees awarded, leaving private counsel to divide whatever remains.

Toward the end of its Motion, the FC reckons that, if common benefit counsel gets
its 10.65%, then the split of the total fee award is $114,581,308.82 to common benefit
counsel, and the remaining $78,400,054.53 to private counsel.  In terms of percentages,
this works out to 59.37% to common benefit counsel and 40.63% to private counsel, or
roughly 60-40.  Memo in Support of Motion for Allocation, pp. 56-57.

Assuming the accuracy of the FC's method of calculation, this percentage-division of fees is an outrage.[2]  There is no basis for a 60-40 fee allocation between common benefit counsel and private counsel who, like Milstein/Durkee, have devoted many years and many thousands of hours to the representation of their clients, have assumed great risk and opportunity cost in doing so, have seen no return on their astronomical investment for nearly a decade, and have derived limited benefit from the efforts of the PSC.

### a.   The Proposed 60%/40% Split Is Unsupported by Any Precedent

As this Court has recognized, in determining the calculation of common benefit fees "[t]he total amount of the common benefit fund should be reasonable under the circumstances, and the method for distributing it should be fair, transparent, and based upon accurately recorded data."  Edward E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 381 (2014).

In the *Vioxx* litigation, this Court set a contractual fee percentage of 32% and it was out of those fees that common benefit fees were paid.  *In re Vioxx Products Liability Litigation*, 574 F. Supp. 2d 606, 617-618 (E.D. La.  2008).  See also *In re Zyprexa*

---

[2] The FC's calculation is not entirely accurate.  The FC admits that, in addition to the $192,981,363.35 in fees that are available to all counsel, the PSC has been "earmarked" an additional $4,732,058.26.  Memo in Support of Motion for Allocation, p. 56.  The total of the 10.65% that the FC has allocated to common benefit counsel is $119,313,367.08.  Memo in Support of Motion for Allocation, p. 53.  The FC subtracted the $4,732,058.26 in fees that were "earmarked" to the PSC to come up with its figure of $114,581,308.82, as the amount that it seeks to subtract from the fund of available fees and give to common benefit counsel.  Memo in Support of Motion for Allocation, p. 56.  But there is no reason (and certainly none is articulated by the FC) why these "earmarked" fees should be treated any differently than any other fees in determining the percentage which goes to common benefit counsel and to private counsel.  Fees are fees.  The real fee-split proposed by the FC is $119,313,367.08 to common benefit counsel, and $78,400,054.53 to private counsel.  By percentages, this is not a split of 59.37% to 40.63% in favor of common benefit counsel, as the FC claims, but a split of 60.34% to 39.66% in favor of common benefit counsel (a full percentage point difference).

*Products Liability Litigation*, 424 F.Supp.2d 488, 490-491, 497 (E.D. NY 2006) [in settlement resolving over 8,000 individual claims, where common benefit fees were to be paid out of general settlement fund, court capped percentage fee for private counsel at 30%-37.5%].  Of the cases catalogued in the FC's moving papers, *Vioxx* is the most comparable to this case both for this reason and because, like *Vioxx*, this case involves thousands of individual claims centralized in the MDL court for handling.  *Id*. at 608-609.

In *Vioxx*, this Court ordered a common benefit fee of 6.5%, based upon a benchmark of 6.0%, to be extracted from the 32% contractual fee of private counsel.  *In re Vioxx Products Liability Litigation*, *supra*, 760 F.Supp.2d at 658.  Application of this percentage to the total settlement of $4.85 billion resulted in a common benefit fee of $315,250,000.  *Id*. at 658.  The total settlement in *Vioxx* was thus more than seven times the size of the settlement in this matter--yet here the FC seeks a common benefit award that is *36% of the common benefit award granted in Vioxx*.

Also, in *Vioxx*, private counsel's fees totaled $1,236,750,000, or **25.5%** of the total settlement of $4.85 billion.  *Vioxx*, *supra*, 760 F.Supp.2d at 658.  In the present case, by contrast, the FC's proposal would result in private counsel receiving only approximately **11.9%**[3] of the total settlement, despite the fact that private counsel in this case performed far more work and clearly took on far more financial risk than did any private counsel in the *Vioxx* litigation.

In its moving papers, the FC discusses at length this Court's opinion in *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830 (E.D. La. 2007).  See Memo in Support of Motion for Allocation, pp. 7-8, 9, and 12-15.  However, *Turner* is unlike both this matter

---

[3] $78,400,054.53 is 11.9% of the total settlement amount of $658,713,629.62.

and *Vioxx* in that the settlement there at issue did not provide for the common benefit fee to be taken from fees that would otherwise be available to compensate private counsel. See *Turner* at 839, 857-858 [settlement provides that the Court would determine the amount of the common benefit fee, and that it would be paid by the defendant]. The FC alludes very briefly to this fact in its moving papers. See Memo in Support of Motion for Allocation, p. 12, f.n. 8.

This is important because in *Turner*, this Court straightforwardly assessed the value of the common benefit. It did not have any reason to consider that the valuation should be affected by the competing claims of private counsel, or that every dollar put into the common benefit fee would be a dollar taken out of the fund which would compensate private counsel. In a matter such as *this* one, however, the risk, investment, and significance of the work performed by private counsel are as relevant to the Court's determination of the common benefit fee as are the risk, investment, and significance of the work performed by common benefit counsel.

And, in this case, a strong argument may in fact be made that the percentage assessed against the contractual fee for common benefit should be even lower than in *Vioxx*. This is because unlike in the *Vioxx* matter, here, Milstein/Durkee litigated a huge number individual cases in state court, expending very considerable time and resources to advance their respective clients' interests.

In all, Milstein/Durkee has expended over 15,000 hours of attorney time, incurred in excess of $750,000.00 in litigation expenses, filed over 200 individual cases in 16 different counties throughout the state of Florida involving 281 separate residential properties, made hundreds of court appearances, spent countless hours dealing directly

with its clients and consultants, and did all of this work under retainer agreements with its clients which, in most cases, specified that it should receive 40% of any recovery.  See **Exhibit 2**, p. 1.

According to Brown-Greer, the Milstein/Durkee clients account for in excess of 3% of the total recoveries in the entire case.  See **Exhibit 1**, p. 3.  [Milstein/Durkee claims total $20,637,048.03, approximately 3.13% of total recovery of $658,713,629.62.] Further, contrary to the FC's contentions, the vast majority of homes impacted by defective Chinese drywall were not Katrina rebuilds but instead were located throughout the state of Florida, where Milstein/Durkee's work occurred.

In short, in determining the amount of the common benefit fee, this Court must assess the importance of the work performed by common benefit counsel *as against* the work performed by private counsel.  Viewed in this manner, it is clear that there is no justification for splitting the total fee award 60-40 in favor of common benefit counsel.

> **b.  The Proposed 60%/40% Split Is Inequitable Based on an Application of the *Johnson* Factors**

As explained above, in the present case, private counsel's equitable entitlement to fees is as relevant to the Court's determination of the common benefit fee as is common benefit counsel's.  For this reason, the Court should apply the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974), not only to the claim of common benefit counsel, but also to the competing claims of private counsel.

These factors include: (1) the time and labor required (Milstein/Durkee expended more than 15,000 collective hours working on these matters in 16 separate counties in a total of over 200 separate actions filed over a more than five-year period on behalf of the

plaintiff-owners of 281 separate properties; (2) the novelty and difficulty of the questions (these matters involved complex issues ranging from damages to causation to insurance coverage, all of which were confronted by Milstein/Durkee on an ongoing basis in virtually all of its cases); (3) the skill requisite to perform the legal service properly (Mr. Durkee has devoted more than 50% of his time to these cases in the seven years since the first action was filed, and, along with attorneys from the Milstein firm, acted with the highest level of competence in all areas of the litigation.  In fact, Mr. Durkee served as appointed or defacto lead counsel in state matters and was relied upon extensively by the state trial court judges for his expertise); (4) the preclusion of other employment due to the acceptance of the case (Mr. Durkee devoted upwards more than 50% of his practice to these matters during the relevant time frame, along with an associate who spent more than 90% of her time on these cases.  Mr. Durkee's entire practice consisted of three lawyers during this time frame.  Mr. Milstein, who oversees a 25 lawyer firm, devoted approximately 20% of his own time to these matters, had an associate assigned to the cases who spent approximately 95% of her time on these cases and also utilized other partners in his firm on a regular basis to work on these matters; 5) the customary fee (Milstein/Durkee's retainer agreements generally provided for a 40% contingency fee in these matters (see **Exhibit 2**, exemplar redacted retainer agreement)); 6) whether the fee is fixed or contingent (the fee is contingent, thereby involving a greater degree of risk); 7) time limitations imposed by the client or the circumstances (this factor is not clearly applicable); 8) the amount involved and the results obtained (Milstein/Durkee's clients recovered in excess of $20,000,000 in cash payments and/or value, which equates to over 3% of the total recoveries for all plaintiffs in the MDL -- see **Exhibit 1**, p. 3); 9) the

experience, reputation, and ability of the attorneys (see above); 10) the "undesirability" of the case (these cases required significant financial outlays, had never been previously litigated, and from the start faced difficult insurance issues and concerns about collectability of defendants); 11) the nature and length of the professional relationship with the client (these cases have taken more than six years to resolve and remain ongoing in some instances); and, 12) awards in similar cases (as discussed, the proposed reduction of private counsel fees is by the FC is inconsistent with any and all prior cases).

If the FC's proposed allocation were adopted by this Court, the Milstein/Durkee 40% contractual fee would be reduced to only approximately 11.9% based upon the Brown-Greer communication (see **Exhibit 1**, p. 3), which is unprecedented.  Similarly, under the FC's proposed allocation, Milstein/Durkee would achieve an hourly rate of less than $165 per hour for its tireless efforts and, if the lack of recovery for the majority of its litigation expenses was factored in, that rate would drop to as low as $115 per hour.

These levels are unprecedented, unfair and unreasonable and should be rejected by this Court.

3. **The Fee Committee's Common Fund Analysis Does Not Apply, Because These Cases Were Not Actually Prosecuted as Class Actions and the Class Action Vehicle Was Only Used for Settlement Purposes**

At numerous points in their Motion, the Fee Committee suggests that these matters are class actions that and as such, the common benefit percentages applicable to class actions should apply in the context of its "blended" approach.  See Memo in Support of Motion for Allocation, pp. 51-52.

Importantly, unlike the matters cited by the FC, the cases before this Court were not prosecuted as class claims wherein class counsel performed work for a small number of named representatives for the benefit of an entire class. Rather, the cases were prosecuted as individual matters, many of which involved extensive work by private counsel. The class mechanism was only used at the time of settlement but the cases were, until that time, not really "class" matters. As such, it would be improper to rely, at least extensively, on a traditional common fund fee analysis here.

4. **The Cap on Fees of $192 Million Must Be Weighed in Allocating Available Fees Between Common Benefit and Private Counsel**

The PSC negotiated the settlement and agreed to accept the approximately $192 million to compensate both common benefit and private counsel, subject to this Court's approval. Although a very significant sum, particularly in relation to the actual $658 million settlement value (rather than the FC's fictional $ 1.2 billion number), given the FC's request for approximately $114 million in common benefit fees, it appears the FC may be experiencing "buyer's remorse."

The FC should not be permitted to alleviate its remorse and free itself from the consequences of the PSC's negotiations solely on the backs of private counsel who were not consulted and had nothing to do with the negotiations of the fee cap.

## CONCLUSION

Based upon the foregoing and upon any such further evidence and argument that may be presented, Milstein/Durkee respectfully requests that this court deny the FC's request for $114,581,308.82 in common benefit attorneys' fees and instead award a total of $42,816,385.92, based on the same percentage of 6.5% used by this court in the *Vioxx*

matter for common benefit fees, and thereby setting aside $150,164,977.43 for private counsel fees.

Milstein/Durkee also respectfully requests that this court order an accounting of all litigation expense reimbursements made to the PSC to date out of funds which might otherwise have been available to reimburse private counsel for their own litigation expenses.

Respectfully submitted,

Dated: June 28, 2016    /s/ C. David Durkee, Esq.
            ROBERTS & DURKEE, P.A.
            2665 South Bayshore Drive, Suite 300
            Coconut Grove, FL  33133
            Phone:  (305) 442-1700
            Fax:  (305) 442-2559
            durkee@rdlawnet.com
            *Counsel for Individual Plaintiffs*

            Mark Milstein, Esq.
            MILSTEIN ADELMAN JACKSON
             FAIRCHILD & WADE, LLP
            10250 Constellation Blvd., 14th Floor
            Los Angeles, CA  90067
            Phone:  (310) 396-9600
            Fax:  (310) 396-9635
            mmilstein@majfw.com
            *Counsel for Individual Plaintiffs*