UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |

## DECLARATION OF RICHARD H. TAYLOR

I, Richard H. Taylor, declare as follows:

1. My name is Richard H. Taylor. I am over the age of nineteen years and competent to testify. I am an attorney licensed to practice law in the states of Alabama and Mississippi, including federal courts in both states. I am a partner in the law firm of Taylor Martino, P.C. ("TM"). TM represents Prichard Housing Authority ("PHA") in the above-referenced litigation.

2. I am submitting this Declaration in support of PHA's and TM's Motion for Payment of Attorneys' Fees and Expenses Pursuant to Stand-Alone Settlement Agreement with Knauf, and in support of TM's Opposition to the Fee Committee's Fee Allocation Motion.

3. In 2006, PHA contracted with The Mitchell Company, a general contractor, to build 36 HUD homes under the Federal Hope VI program in Mobile, Alabama. PHA initially owned all 36 homes in the Bessemer Subdivision, but seven of the homes were sold by PHA, leaving PHA with the 29 homes at issue in this litigation. In late 2008, Knauf KPT Chinese Drywall was discovered in all 29 of the PHA-owned homes. Most, if not all, of the homes were under a "rent-to-own" program aiding low-income families in their quest to gain home ownership. The houses were quickly vacated after PHA

**EXHIBIT E**

discovered the Chinese Drywall. As a result, PHA sustained substantial damages, including lost rents and reduction in property values due to vandalism.

4. On June 17, 2009, PHA, represented by TM, filed a lawsuit against The Mitchell Company in the Circuit Court of Mobile County, Alabama. The filed Complaint is Exhibit A to the Memorandum in Support of PHA's and TM's Motion for Payment of Attorneys' Fees and Expenses Pursuant to Stand-Alone Settlement Agreement with Knauf and Opposition to the Fee Committee's Fee Allocation Motion. The Mitchell Company filed third-party complaints against Interior Exterior, Creola Ace Hardware, a local supplier, and George's Drywall, the installer. Interior Exterior brought Knauf Plasterboard Tiajin ("KPT"), the manufacturer, into the lawsuit with a fifth-party complaint. Exhibit B is KPT's answer.

5. A separate law firm represented the seven homeowners who had purchased homes in the Bessemer Subdivision. The homeowners filed lawsuits and named PHA as a defendant. The cases were consolidated. The consolidated cases were vigorously litigated by the parties in state court, including taking and defending numerous depositions, preparing, filing and defending various motions – including motions for summary judgment – voluminous document production, and an extensive pleading practice. Exhibit C is the Mobile County Circuit Court docket sheet. TM incurred $53,660.21 in litigation costs, as reflected in Exhibit D.

6. While the PHA case was being litigated, the PSC began soliciting TM to join MDL 2047. After several meetings and phone calls with PSC members regarding the alleged benefits of joining the MDL proceedings, PHA joined the MDL litigation on December 9, 2009, based on the solicitations and representations of the PSC. It was

included in MDL Omnibus I Complaint as Plaintiff 1117. PHA then had the same case filed in two separate courts, but no one objected to this. The seven homeowners consolidated in the PHA's state-court action did not join the MDL. Thus, the state-court action continued to move forward and PHA continued to vigorously litigate the state-court action after it was persuaded to join the MDL proceedings.

7. Steve Usdin with the New Orleans law firm of Barrasso, Usdin, counsel for The Mitchell Company, suggested a mediation with all the state-court parties, including KPT. Mr. Usdin arranged for KPT to attend. The first mediation was held on October 18, 2010, in New Orleans. A verbal agreement on terms was reached at the end of the October 2010 mediation, but a final written agreement could not be reached. Knauf filed a motion with this Court to enforce the verbal agreement and PHA joined Knauf in the motion. The Court, after hearing arguments, ordered all parties to a second mediation, which occurred in New Orleans on June 24, 2011, eight months after the failed first mediation.

8. The attorneys for PHA had to prepare for and mediate the new issue of the vandalism that damaged the PHA properties during the eight-month disagreement. Counsel for PHA were successful in obtaining an additional $125,000.00 for the vandalism. The case was finally settled in the Fall of 2011 with Knauf agreeing to remediate the 29 houses for a total cost of over $2 million. The Defendants also agreed to pay PHA $597,500 cash, with Knauf paying $95,000 of that sum. Knauf also agreed at mediation to pay TM's reasonable attorneys' fees and expenses. Exhibit F is a copy of the formal executed settlement agreement. The stand-alone settlement agreement between PHA and Knauf was reached before the PSC's settlement agreement with

Knauf was executed on December 20, 2011. Although the date of execution of the stand-alone settlement agreement by the various Knauf entities does not appear on the signature pages, all Knauf entities had signed by August of 2011 to the best of my recollection. Accordingly, the stand-alone settlement agreement was finally executed in counterpart by all parties in the Fall of 2011. The stand-alone settlement agreement was reached outside the Pilot Program. An email from BrownGreer PLC, the Court-appointed Settlement Administrator, confirms this. The email is Exhibit G.

9. TM has a private contingency-fee agreement with PHA for one-third of any recovery, in addition to payment of expenses. Exhibit H is the Contingency Fee Contract. TM must also pay a one-third referral fee.

10. The Remediation Agreement referred to in the stand-alone settlement agreement is Exhibit I. Remediation of the PHA's homes was finalized on July 25, 2012, so TM sent a letter to Knauf's counsel seeking payment of the attorneys' fees and expenses. This letter is Exhibit J. Exhibit K is a letter from Kasie M. Braswell of the Braswell Murphy, LLC, law firm. Mrs. Braswell was associated with TM during the litigation and settlement of PHA's claims against Knauf, and has an interest in the attorneys'-fee award. Counsel for Knauf responded with a letter stating that "it is premature at this time to prioritize for attorney fee purposes any one set of claims over any of the additional claims." This letter is Exhibit L.

11. Knauf and the PSC had not agreed on a reasonable attorneys' fee when TM filed its previous motion seeking payment of fees and expenses, and they still have not agreed. No agreement on a reasonable attorneys' fee has been communicated to TM. On June 14, 2016, TM sent a letter via email to Knauf's counsel and the PSC's

Arnold Levin, advising that if Knauf did not agree to pay as a reasonable attorneys' fee one-third of the total value conferred on PHA by the settlement, before the close of business on June 20, 2016, TM would file an appropriate motion with this Court. This letter is Exhibit M. Neither Knauf nor the PSC responded. The total value conferred upon PHA consists of the amount spent on the remediation of the PHA homes ($2,032,653.26) plus the cash amount of the settlement ($597,500), for a total $2,630,153.26. One-third of this sum is $876,717.75. Exhibit Q confirms the cash value of the remediation.

12. I will now address the *Peebles* factors applicable under Alabama law for the determination of a reasonable attorneys' fee

13. (1) The nature and value of the subject matter of the employment. PHA owed 29 homes that were on a rent-to-own program for low-income families and PHA discovered all of the homes were contaminated with KPT drywall. The nature and value of the subject matter of the employment was therefore of the utmost importance to PHA. TM had to coordinate with PHA and HUD concerning the problem. TM and executives with the PHA had to meet with the homeowners and inform them they had to vacate the homes, which resulted in zero income to PHA. When the PHA homes were vacated due to the presence of KPT drywall, the housing complex began to deteriorate and become subject to vandalism. TM has undertaken substantial responsibility on behalf of PHA and TM's representation of PHA was of great value to PHA.

(2) The learning, skill, and labor requisite to the employment's proper discharge. After TM was retained, several members of the firm had to educate themselves on Chinese drywall at the outset. TM then had to review numerous construction

5

documents to determine the rights and responsibilities of the parties during the construction process. TM has been involved in several construction-litigation cases over the years and recognizes that it is time consuming and expensive to pursue construction litigation. TM has also been involved in many product-defect cases. The PHA litigation required the skills of TM's lawyers in both areas. TM employed investigators, inspectors, paralegals, associates, and independent contractors to identify and confirm the presence of KPT drywall in each home. TM then filed a lawsuit against The Mitchell Company and strenuously litigated with numerous parties for approximately two years before the case was finally settled through the efforts of TM. However, TM has spent countless hours over the past five years attempting to get PHA reimbursed for its expenses and for payment of TM's earned fee.

(3) The time consumed. TM had two partners and three to four associates when it litigated the PHA case. I was one of its partners and I was lead counsel. Kasie Braswell was a TM associate at the time. Mrs. Braswell and I spent hundreds of hours on this litigation. TM reconstructed its time in the PHA litigation after the PSC represented to TM that TM could submit the hours spent in the state-court litigation for common-benefit time. TM spent hours, days, and weeks reconstructing this time, which consists of 552.7 hours. This is a conservative estimate of the time TM consumed on this litigation and does not include the time and efforts of TM to get reimbursed of PHA's cost and TM's fee for TM's successful representation of PHA.

(4) The professional experience and reputation of the attorney. TM has been in existence for over 30 years and has an excellent reputation with the Mobile County, Alabama, bench and bar. I have been licensed to practice in Alabama and Mississippi

for approximately thirty years, and I have appeared in many other state courts and many federal courts. I have tried hundreds of cases, many of which involved construction litigation and defective products. I am peer-review rated AV-Preeminent in Martindale-Hubbell. Mrs. Braswell is a member of the Alabama and Mississippi bars who worked with a defense firm before joining TM. Mrs. Braswell has extensive litigation experience and likewise has an excellent reputation with the Mobile County bench and bar.

(5) The weight of the attorney's responsibilities. TM took on a huge responsibility with regard to the PHA case. The houses were practically new and all were occupied by renters or rent-to-own tenants. Seven of the houses had been sold on the rent-to-own program and these tenants in turn sued PHA. TM not only prosecuted PHA's case against The Mitchell Company but also participated in defending PHA against the seven homeowners who were on the rent-to-own program. The occupancy rate of the 36 homes went from 36 to zero. The income from the property went to zero, the property began to deteriorate, and the property was subject to vandalism. PHA and TM were also accountable to HUD since the construction was partly financed by HUD. The longer the litigation dragged on, the greater the loss of income and property value. Therefore, TM had a great responsibility in taking on representation of PHA.

(6) The measure of success achieved. and (7) The reasonable expenses incurred. TM litigated extensively in State Court for approximately two years until Steve Usdin, the attorney for defendant The Mitchell Company, suggested a mediation in New Orleans, Louisiana. TM obtained an excellent result for PHA. Twenty-nine homes were remediated for over $2,000,000 and the Defendants collectively paid $597,500. The

total value of the settlement was $2,630,153.26. TM did not take an attorneys' fee from the cash settlement because of the stand-alone fee agreement with Knauf, and has yet to receive a fee. TM incurred $53,660.21 in expenses. This litigation cost was deducted from the settlement's cash proceeds; nonetheless, Knauf agreed to pay reasonable litigation costs and once they are paid, PHA will be reimbursed for the litigation expenses it incurred and paid. These litigation expenses were necessarily incurred for the prosecution of PHA's claiMrs. Their amounts were reasonable and generally in keeping with the charges incurred for litigation expenses by other law firms in the Mobile, Alabama, area for the prosecution of construction and product-defect cases.

(8) <u>Whether the fee is fixed or contingent.</u> PHA signed a one-third contingency-fee agreement with TM. The case was referred to TM and TM must pay a one-third referral fee. TM will typically charge 40% in a case of this magnitude and complexity. Nonetheless, TM agreed to a one-third contingency fee because TM was concerned that a greater contingency fee would result in PHA not being made whole. When TM entered into the one-third contingency fee agreement, it was unknown that Knauf would eventually agree to pay fees and expenses in addition to remediating the properties.

(9) <u>The nature and the length of the professional relationship.</u> TM had never represented PHA prior to this case. PHA's regular attorney, Greg Harris, referred the case to TM. Mr. Harris and TM have had a professional relationship for over 25 years. TM began its representation of PHA in 2009 and the litigation relationship continues to this day, as TM attempts to recoup the litigation costs paid by PHA. In short, the relationship with PHA has existed for seven years.

(10) <u>The fee customarily charged in the locality for similar legal services.</u> It is customary in Mobile County to charge a one-third to fifty-percent fee in a complex product-defect case. In a construction case it is customary to charge one-third to forty percent. TM entered into a one-third contingency-fee contract with PHA, which is in the low end of fees customarily charged.

(11) <u>The likelihood that a particular employment may preclude other employment.</u> Without question, TM had to turn down cases as a result of the time demands of the PHA litigation. TM had only two partners and three to four associates during this period.

(12) <u>The time limitations imposed by the client or by the circumstances.</u> Time was of the essence in TM's representation of PHA. Again, the property went from 100% occupancy to 0% occupancy. The income went to zero, the property was abandoned, and vandalism became rampant. TM was accountable to PHA and HUD to obtain compensation, so PHA could remediate the property, find new tenants, and generate income. TM met often with PHA's Board and regular attorney during the course of the litigation.

14. At present, under the Fee Committee's ("FC") Fee Allocation Motion, TM has been excluded from the group of firms receiving common-benefit fees for common-benefit time expended, and excluded from the group of firms receiving private-attorney fees.

15. TM was assured early on that it would receive a common-benefit fee. The PSC's first substantive involvement with the PHA case was when Leonard Davis and Arnold Levin appeared at the failed first mediation to discuss fees. TM's attorneys expressed their attorney-fee concerns to Mr. Levin at the mediation. TM explained that

9

the PHA case should not be treated like all other cases because of the time and expense TM had invested in the state-court proceedings. Mr. Levin advised that the PSC would allow the time spent by PHA attorneys litigating the state-court action to be "common-benefit time" in the MDL. That is, the PHA attorneys would receive a portion of the common-benefit fee at the conclusion of the MDL. Exhibit N is a letter to Mr. Levin confirming this arrangement. Based on these representations, TM and its staff reconstructed the common-benefit time expended in the state-court litigation, as explained above. Exhibit O is a copy of my Affidavit previously submitted in this litigation, detain TM's common-benefit contributions to the MDL litigation.

16. At the request of the PSC and pursuant to an agreement with the PSC, TM reconstructed the 552.7 hours spent litigating the PHA case in state court. The PSC represented to me that TM could submit TM's hours in the state-court litigation as common-benefit hours to offset any deduction the PSC may take from TM's fee in the PHA case. TM conservatively estimated that only 392 of the 552.7 hours in the state-court litigation were reasonably related to the common benefit of the MDL. Exhibit R is the reconstruction and itemization of these hours. TM also deposited the depositions taken in the PHA case into the MDL deposition depository as instructed by the PSC.

17. The PHA attorneys met via teleconference with the FC long ago. TM reminded Mr. Levin and the other members of the FC that TM performed 99.9% of the work and that Mr. Levin had represented that the time spent litigating the state-court action would be considered common-benefit time. TM learned that the members of the FC contacted other common-benefit law firms and informed those law firms generally

how much money they would be entitled to from the common-benefit fund. TM was never contacted by the FC.

18. TM called and sent emails to Mr. Levin and other members of the FC, but the letters and phone calls were to no avail. TM was told Mr. Levin and the other FC members were too busy, the emails were not replied to, and the telephone calls were not returned. Exhibit P is one of these email communications from TM. TM was never told that it would receive no common-benefit fees because it had reached a stand-alone fee agreement with Knauf.

19. The litigation activities recited in the FC's Memorandum supporting its Fee Allocation Motion (Doc. 20290-4, pp. 58-59) were performed by TM in the PHA case. As a practical matter, the only service performed by common-benefit/class counsel specific to the PHA case was when PSC members attended a mediation, that eventually failed, for a few hours in New Orleans, Louisiana, in October 2010.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 28, 2016, at Mobile, Alabama.

_____
RICHARD H. TAYLOR