**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: CHINESE MANUFACTURED | ) | |
| DRYWALL PRODUCTS | ) | MDL NO. 2047 |
| LIABILITY LITIGATION | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | SECTION: L |
| | ) | |
| | ) | JUDGE FALLON |
| ALL CASES | ) | |
| | ) | |
| | ) | MAG. JUDGE WILKINSON |
| | ) | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**OPPOSITION OF WHITFIELD BRYSON & MASON LLP, PENDLEY BAUDIN &
COFFIN, RHINE LAW FIRM, AND LUCKEY & MULLINS TO FEE COMMITTEE'S
MOTION TO DETERMINE THE ALLOCATION OF THE GLOBAL FEE AWARD AS
BETWEEN COMMON BENEFIT FEES AND
INDIVIDUAL COUNSEL FEES PURSUANT TO PTO 28(F)**

Pursuant to Pre-Trial Order No. 28(F), the law firms of Whitfield Bryson & Mason LLP,

Pendley Baudin & Coffin, Rhine Law Firm, and Luckey & Mullins (collectively, the "Primary

Attorneys" or "PA"), though counsel, file this opposition to the Fee Committee's Motion To

Determine The Allocation Of The Global Fee Award As Between Common Benefit Fees And

Individual Counsel Fees (the "Allocation Motion"), and for their objection state as follows:

## I. <u>INTRODUCTION</u>

For more than seven years the Primary Attorneys have invested thousands of hours and

hundreds of thousands of dollars representing more than 850 owners of homes built with Chinese

Drywall in Alabama, Florida, Georgia, Louisiana, Mississippi and Texas.  As detailed below, the

work of the Primary Attorneys began immediately after the general public first became aware of

the odors and corrosive effects associated with Chinese drywall.  Using their resources

individually and collectively, the Primary Attorneys communicated with thousands of

homeowners, construction professionals, realtors, bankers and other interested parties to counsel and advise them of the emerging disaster, including the science, developments with the CPSC, impact of disclosure on sales and foreclosure proceedings, and available legal remedies. Ultimately, the Primary Attorneys were retained by many hundreds of homeowners and individual cases were filed on their behalf.  Together, the Primary Attorneys represent approximately 10 percent of the homes included in the class settlements and have secured for their clients more than 10 percent of the recovery paid to all claimants.[1]

Due to the extensive efforts of the Primary Attorneys, all of these homeowners have been able to take advantage of the benefits offered by the settlements.  Most homeowners have had their homes completely remediated and received some amount of cash compensation and others received only cash, though some were unable to obtain any benefit from the settlements. The Primary Attorneys have challenged and appealed nearly 100 compensation determinations, a process that is on-going.  Among a myriad of support services spanning the years, the Primary Attorneys worked intensively with homeowners to collect the necessary information for them to qualify for the benefits of the settlement.  The "down to the studs" remediation protocol required the Primary Attorneys to extensively counsel their clients as to what to expect before the work was performed and assistance afterward to resolve "punch lists" and other post-remediation concerns.

As anticipated by their careful selection, the Plaintiffs Steering Committee ("PSC") was instrumental in driving this case towards settlement. Its efforts  not only resulted in the benefits made available to the Primary Attorneys' clients, but also led to the creation of a $233 million fund approved by the Court for payment of attorneys' fees and costs. The Fee Committee ("FC")

---

[1] The Primary Attorneys represent 464 of the 4,540 homes participating in the class action settlements and have been advised that the amounts paid to their clients is in excess of 10 percent of the total recovery to all claimants. *See*

now proposes that this fund, after deductions of approximately 5 percent for "costs" (some of which are inappropriate and subject to this objection), be allocated roughly 60 percent to the PSC and 40 percent to the Primary Attorneys.  Under this proposal, *the PSC would get 17 percent of the actual benefits obtained for the class*, leaving the Primary Attorneys with approximately 11.9 percent.[2]  In return for their seven years of uncompensated toil, the FC proposes that the Primary Attorneys reduce their fee, pro-rata, from a fund representing only 40 percent of the fund approved for payment of all attorneys' fees and costs.  The remaining *60 percent would inure to the PSC.*  Stated another way, the FC is proposing *rewarding the PSC 10.65 percent of the total benefit created.* By any measure, the proposed allocation is without precedent and orders of magnitude greater than awards in comparable mass torts. More profoundly, the proposed fee allocation would discourage lawyers from alerting the general public about defective construction materials and advising them of their rights.

The FC's request for a fee amounting to 10.65 percent of the benefit created should be denied.  The common benefit fee should be based upon a substantially reduced benchmark. For the reasons which follow, the Primary Attorneys contend that the benchmark percentage should be *5 percent.*

## II. <u>BACKGROUND</u>

### A. <u>The Work Performed By the Primary Attorneys.</u>

As detailed by the FC in the Allocation Motion [Doc. No. 17700-01, p. 32], the Primary Attorneys representing the individual homeowners with homes containing Chinese Drywall "were faced with a variety of challenges, on a case-by-case basis."

---

Declaration of Gary E. Mason,  ¶ 2, June 28, 2016 ("Mason Decl.") (Exhibit A, hereto).
[2] As reported by BrownGreer,  the  "Total Amount of Recovery Paid to All Claimants" is $658,713,629.62.  The common benefit fee request of $114,581,308.82  therefore represents 17% of the total recovery to all claimants.

In the course of its six page discussion, the FC accurately captures the tremendous variety of daunting tasks faced by the Primary Attorneys, including:

- Property Inspections;
- Product Identification;
- Identification of responsible parties;
- Counseling homeowners with unmarketable and completely devalued homes;
- Mitigating foreclosure by contacting lenders;
- Advocating for tax reassessments;
- Counseling on potential insurance claims;
- Counseling on mortgage on homeowner association fees and IRS deductions;
- Counseling on emerging expert opinions concerning health effects and remediation;
- Counseling on foreclosure strategies;
- Counseling on scope of remediation for those who remediate prior to settlement, including preservation of evidence;
- Satisfying eligibility requirements under Knauf remediation program;
- Counseling as to remediation and protocol and rights under the Knauf settlement;
- Resolving "punch list" issues;
- Determining percentages for Mixed Property claimants;
- Satisfying proof requirement for prior remediation;
- Selection and satisfaction of eligibility requirements for available claim options; including preparation of affidavits, accumulation of documents, advice to clients;
- Handling appeals from claims administrator resolution offers.

*See* Mason Decl.,  ¶ 6; *see also generally* Declaration of Nicholas Rockforte, June 28, 2016 (Exhibit B, hereto); Affidavit of Eric Hoaglund, June 27, 2016 (Exhibit C, hereto); Declaration of Brian Collins, June 28, 2016 (Exhibit D, hereto); Affidavit of Stephen W. Mullins, June 28, 2013 (Exhibit E, hereto) .[3]

In addition, the Primary Attorneys worked closely with their paralegals to provide an extraordinary range of services for its clients unique to this litigation.  These services included:

- Corresponded with potential Chinese Drywall homeowners;
- Initial client interviews;
- Completed New Client Questionnaires;
- Scheduled inspections with our retained experts;

---

[3] The Primary Attorneys co-counseled with Mr. Collins and  Mr. Hoaglund (and his co-counsel  Edward Sexton) on their Chinese Drywall cases.  These firms and others, including Reich & Binstock, entered into agreements with the Primary Attorneys to assist them in this litigation due to our extensive experience litigating defective construction products and access to our attorneys and paralegals who have been trained to perform the tasks described above. Chinese Drywall clients represented by Collins & Horsley, P.C, Gentle, Turner, Sexton & Harbison, LLC, and Reich & Binstock, LLP have been included on the Omni complaints with Whitfield Bryson & Mason identified as lead counsel.

- Oversaw samples for testing and testing results;
- Determined of the manufacture of the Chinese Drywall identified;
- Evaluated potential defendants (i.e. building, installer, supplier);
- Obtained required documents from clients (photo indicia, completed Plaintiff Profile Form with attached supporting documentation);
- Prepared information for filing claimants claim on Omnibus Complaints;
- Corresponded with PSC to verify all required information was supplied;
- Assisted with tax assessment reduction with local county governments;
- Assisted with negotiations with mortgage companies regarding forbearance and foreclosure issues;
- Assisted with preservation of evidence for self-remediated homes;
- Counseled clients regarding health issues/concerns which lead claimants to move out of their Chinese Drywall home;
- Counseled clients regarding Option 1, 2, or 3 for remediation of their home;
- Assisted in the scheduling of MZA inspections for participating in the Pilot Program;
- Coordinated with Moss for walk-through inspections;
- Reviewed and discussed Xactimate with claimants;
- Assisted claimants and oversaw the signing of various work authorization documents received from Brown Greer;
- Advised client of move-out date, kick-off meeting and lump sum payments;
- Reviewed appliance binders and options regarding replacement of appliances;
- Assisted claimants in the resolution of construction deficiencies, water damage, termite damage or code violations found during remediation;
- Assisted with punch list items and execution of homeowner release of contractor forms;
- Mediated disputes between homeowner and Moss regarding construction deficiencies;
- Reviewed and provided claimants with close out documents, including, GFA Certification, warranty information, Certificate of Occupancy;
- Assisted each claimant in evaluation of possible claims to be filed under the Knauf Settlement Agreement;
- Prepared claim forms and required documentation for Knauf claim;
- Submitted documents to Brown Greer and cured deficiency notices;
- Counseled claimants regarding notice of claims eligibility and acceptance or appeal of the notice;
- Prepared acceptance or appeal forms for claimants;
- Reviewed claim funds and releases;
- Evaluated each claimant file for potential stipend claim;
- Reviewed multiple Brown Greer spreadsheets for accuracy (i.e. stipend and fee); and
- Maintained contact with each claimant, correct contact information, and provided updates to claimants during each step of the Chinese Drywall claims process.

Mason Decl., ¶ 7.

Even these extensive lists are incomplete because, naturally, each client/homeowner's particular situation required individual attention and each had their own anxieties, fears and concerns that required individualized attention. Often, resources were intensively devoted to individuals with unique circumstances (e.g., pending foreclosure). In addition, substantial time and expense was devoted to several individuals who opted out of the settlement and whose claims were litigated and/or negotiated to successful resolution. Mason Decl., ¶ 7.

**B.   The Petition and Approval of Class Counsel Fees.**

In May, 2014, the FC and PSC jointly petitioned the Court for an award of class counsel fees totaling $193,552,383.68. This request was later amended and on May 17, 2016, the Court entered an order granting the joint petition for a global award of attorneys' fees and costs totaling $192,981,363.35. [Doc. No. 20257]. The Attorney Fee Reconciliation prepared by Philip Garrett CPA indicates that, as of February 28, 2016, the full amount of attorneys fees available for payment of attorneys fees and costs totals $233,078,270.33. The PC values the benefits created by this litigation as $1,120,313,305.90. [Doc. No. 20290-4, p. 49]. Thus, the percentage of the benefit awarded by the Court is 17 percent, if measured by the net amount approved for payment of fees or 21 percent if measured by the gross attorneys' fees received for distribution.

**C.   The Voluntary Payment Order.**

The Court's Order re Voluntary Payment [Doc. 8545] ordered settling parties to voluntarily deposit with the Court 17 percent of all settlement proceeds. Ultimately, $3,332,058.62 was deposited with the Court pursuant to this Order. The Primary Attorneys made deposits from two settlements: 1) a deposit from the Villa Lago settlement of $908,277.96 and 2) a deposit from two opt-out settlements of $80,750. The Order provides that the "funds may be allocated at a future date to common benefit costs."

**D.  The Petition for Common Benefit Fee.**

On May 6, 2016, the FC filed the Allocation Motion and requested the Court to allocate the previously approved fee of $192 million 60-40 in favor of the PSC.[4] Applying the formula established by the Court in PTO No. 28(F) for compensation of counsel for individual claimants, the proposed allocation would provide the Primary Attorneys with fees totaling approximately 11.9 percent of the actual recovery amount paid to their clients and the PSC with 17.1 percent.

**III.  The Methodology for Determining Common Benefit Fees**

**A.  Generally**

The PSC proposes the use of the "blended method" to calculate an appropriate fee for common benefit work.  This approach requires the Court to first evaluate and approve a percentage of the fund created for the benefit of the plaintiffs and then undertake a calculation using the lodestar method to "cross-check" the percentage-of-fund fee.  This method has been endorsed by the Fifth Circuit, *see Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 317 (2012), and employed by this Court in other MDLs. *See In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 655-61 (E.D. La. 2010) (applying *Johnson* factors to determine percentage than confirming with lodestar cross-check). The Primary Attorneys have no objection to use of this methodology.

Nonetheless, the Primary Attorneys take issue with the FC's application of this method insofar as it has failed to distinguish between a common benefit fee and a class action fee award. There can be no mistaking this action for a class action.  It is not.  Even though it was resolved as

a class action, this MDL, like most MDLs, is a mass action and the fee now being requested by the FC is a common benefit fee, not a class action fee. The two kinds of fees are not the same and different considerations apply. *See* William Rubenstein, "On What a "Common Fee" Is, Is Not, and Should Be," Class Action Fee Digest (Mar. 2009) at 87 [hereafter, *Common Fee*] ("The one thing a common benefit is not is a class action fee award").

In class actions, a small number of attorneys, often appointed by the court as a PSC, represent a small number of retained plaintiffs and seek to represent a larger number of absent class members. If the case is successfully resolved, the attorneys may seek fees for their work, all of which can be fairly characterized as common benefit work. The attorneys' fees are taken from the benefits made available to the class members. A mass tort, by contrast, is formed by a large number of plaintiffs retaining individual counsel and filing individual cases. The Court may appoint a PSC to perform the common work on behalf of the plaintiffs while the retained counsel, often referred to as the "primary" or "individual" attorneys, provide individualized services for them as well. In the end, the PSC may apply for compensation for its common benefit work, but in a mass tort, unlike a class action, the fees payable to attorneys working for the common benefit are payable from the fees otherwise payable to the attorneys who have retainer agreements with the clients. As Professor Rubenstein explains:

> But here's the hitch - in the mass tort case there are also local counsel who have contingent fee contracts with claimants, and more importantly, who contributed important attorney work to producing the settlement as well. The common benefit lawyers simply did not do 100 percent of the legal work in the case.

*Common Fee* at 89. This matter has all the earmarks of a mass tort. The fact that this Court has been asked to determine an allocation between the PSC and attorneys with retainer agreements

---

[4] The PSC's math actually works out closer to 59-41%.

leaves no room to question the nature of this case: it is a mass tort.  The FC is requesting a common benefit fee, not a class action fee.

Unfortunately, the distinction between class counsel fees and common benefit fees appears to have escaped the FC.  From the start, its brief blends the two concepts.  *See, e.g.,* Allocation Mem., p. 3 ("(The Legal Authority and Rational for Awarding **Common Benefit/Class Counsel Fees**") (emphasis added). As a consequence of its muddled analysis, the FC makes the mistake of relying on class actions (and their commensurate higher percentage fee awards) to justify its exorbitant  percentage benchmark.  *See* Allocation Motion, p. 51 (citing nine class actions which did not actually award common benefit fees); *see also Common Fees* at 90 (criticizing common benefit lawyers who justified their request of 18 percent by relying on a study of class action attorneys' fees).

As will be seen below, proper application of the *Johnson* factors requires careful separation of cases awarding fees for common benefit work from class actions awarding class action fees.

**B.  Valuation of the Benefit Obtained**

The  Primary  Attorneys  object  to  the  FC's  valuation  of  the  benefit  conferred  as $1,120,313,305.90.  *See* Allocation Motion, p. 49.  The Primary Attorneys do not believe that the "market valuation" of the remediation and environmental certification is an appropriate measure of value obtained and overstates the benefit obtained.

Under the Knauf Settlement Agreement, a homeowner that qualified for a remediation had the choice of thee options:  remediation by Knauf's contractor (Option 1); remediation by self-selected contractor (Option 2), or a cash payout (Option 3).   The benefit obtained for the homeowners  under  these  options  is  most  accurately  measured  by  the  actual  cost  of  the remediation  under  Options 1,   the  cost  of  the  actual  benefits  paid  to  the  homeowner  and

homeowners' contractors under Option 2,  and the actual cost of the benefits paid to the homeowners under Option 3.  These figures can be found  contained in the "Component's Table" attached as Exhibit B to the FC's Allocation and are as follows:

| | |
|---|---|
| Option 1 | $345,586,974.09 |
| Option 2 & Option 3 | $201,435,764.28 |
| GFA (Inspections) | $   1,159,406.24 |
| Already Remediated Homes | $  41,714,061.42 |
| Knauf "Other Loss" | $    4,232,227.01 |
| | $594,128,973.04 |

The FC, by contrast, claims that the value of the total benefit provided to the Plaintiffs for Options 1-3, Already Remediated Homes, GFA payments and Knauf "Other Loss" fund payments amounts to $763,026,343.71, a difference of $168,897, 370.67.  (Allocation Motion, p. 49, combining categories A & B.)

In addition, the Primary Attorneys object to the FC's inclusion of administrative costs in the calculation of the benefit obtained.  Administrative services and costs should not be included in the valuation of the benefit obtained.  *See, e.g., Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000) (affirming district court's percentage fee award based on net recovery and noting that the court found no authority indicating that "gross recovery is to be preferred over net recovery as the basis for calculating a fee under the percentage-of-recovery method"); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 770-71 (S.D. Ohio 2007) (awarding attorney fees based on percentage of net settlement instead of gross settlement amount); *In re Ikon Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 193 (E.D. Pa. 2000) (basing fee percentage on

the net settlement fund because it promotes "cautious expenditure" and "align[s] the interests of the class . . . with those of counsel");  *see also* 2003 Advisory Committee Notes, Fed. R. Civ. P. 23(h) (explaining that a "fundamental focus" of awarding a reasonable attorney fee is "the result actually achieved for class members") (emphasis added).  Accordingly, the Primary Attorneys submit that administration costs and litigation costs of $40,559,643.18 should not be included in the calculation of the benefit.

Accordingly, the Primary Attorneys submit that for purposes of calculating the common benefit fee, the value of the benefit is $910,856,291.90 ($1,120,313,305.90- $168,897,370.67- $40,559,643.18).

### C.   The Benchmark Percentage

The FC contends that the appropriate benchmark to calculate a common benefit fee award is 8 percent.   The Primary Attorneys object.  The FC's failure to understand the difference between a class action fee award and a common benefit fee has led it to a wrong conclusion. When evaluated in the context of common benefit fee awards, it is obvious that starting with a benchmark of 8 percent is unprecedented and unreasonable.

The FC relies on the *Manual for Complex Litigation* to support its contention that 25 percent is a "typical" benchmark for percentage-of-the fund cases.  The *Manual*, however, is referring to class action cases, not mass torts and common benefit awards.  Indeed, all of the cases cited by the FC at pages 9-10 of its brief are class action cases.  The various studies relied upon by the FC, including the "Eisenberg I" and "Eisenberg II" studies, are also of little use since these studies are focused on class action awards, not common benefit awards. For this reason, this Court has previously found that these same studies "are of limited usefulness in determining a reasonable benchmark for a common benefit fee award." *In re Vioxx Prods. Liab. Litig.*, 760 F.

11

Supp. 2d 640, 652 (E.D. La. 2010). Like the lawyers in the Kugel Mesh Hernia Patch MDL, who tried to justify their fee request by relying on a study of class action attorney fees, the FC "has failed to advise the judge that class action fees are not the same as common benefit fees and hence that the study upon which they rel[y] is inapposite." *Common Fees*, at 90.

The FC's reliance on *Turner v. Murphy Oil*, 472 F. Supp. 2d 830 (E.D. La. 2007), as a guidepost is also misplaced because *Turner* is a class action. It follows that the 15 percent benchmark used in *Turner,* and the 25 percent suggested by the *Manual*, are merely "strawmen" trotted out by the FC to make its proposed 8 percent benchmark look reasonable. It is not. When compared with studies limited to common benefit fees, which have generally found the typical benchmark to be 4-6 percent, a benchmark of 8 percent is not reasonable. *See Vioxx,* 760 F. Supp. at 654 (collecting cases and studies). The FC tries to compare and contrast the PSC's efforts in this case relative to the PSC's in *Turner* and *Vioxx* to further justify its enhanced benchmark. While factors such as heightened risk and complexity may weigh in favor of an upward adjustment of the benchmark under *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974) (and indeed the FC seeks an upward adjustment of an additional 2.65 percent), this is not a reason to adjust the benchmark. The benchmark is merely a starting point reflective of general trends in fee awards and subject to adjustment, either up or down.

For the same reasons 6 percent was a reasonable benchmark in *Vioxx*, it is so here. The authorities cited by the Court remain sound and continue to support the proposition that most common benefit assessments range from 4-6 percent of the settlement amount. In selecting this benchmark percentage in *Vioxx*, the Court noted that 32 percent of the benefit was the total amount of possible attorney compensation, including work done by the individual attorneys and

the common benefit attorneys, and that this figure represented about 20 percent of the total attorney fees and over 25 percent of the total settlement value. *See id*.

The Primary Attorneys therefore submit that 6 percent of the settlement amount is a reasonable benchmark percentage for a common benefit fee award, subject to further adjustment. This figure represents 34 percent of the total available attorneys' fees, more than 50 greater than the starting point used by the Court in *Vioxx*.

## IV. CONSIDERATION OF THE *JOHNSON* FACTORS

The Primary Attorneys object, in part, to the FC's analysis of the *Johnson* factors. The Primary Attorneys agree that some of the factors weigh in favor of a moderate upward adjustment, but other factors – notably the work done by the individual attorneys -- weigh heavily in favor of a significant downward adjustment. The requested upward adjustment of 2.65 percent would itself significantly exceed adjustments made by courts to benchmarks in other MDLs. The Primary Attorneys object to the proposed 8 percent benchmark and submit that a 10.65 percent common benefit award is not reasonable or appropriate under the circumstances of this case. The *Johnson* factors support a benchmark percentage of *no more than 5 percent*.

### A. The Time and Labor Required; Time Limitations Imposed By the Client or the Circumstance the Preclusion of Other Employment by the Attorney Due to Acceptance of the Case.

As in *Vioxx*, "[m]embers of the PSC and others who performed common benefit work in the MDL are undoubtedly entitled to compensation" and while the work performed was not as extensive as that done in *Vioxx*, the effort was nonetheless herculean. *Compare* Joint Fee Petition at 106 (reporting 245,871.19 hours of common benefit time) *with In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d at 655 (560,000 hours of common benefit time). In both cases, the

PSC operated under intense pressure for an expedited resolution that necessarily precluded counsel from working on other matters.

The Court in *Vioxx* held that the "time and labor" factor warranted a "moderate" upward adjustment of the benchmark percentage, but in this case, unlike *Vioxx*, the upward adjustment would come at the expense of the deserving individual lawyers who did significantly more work in this matter than their peers in *Vioxx*. In *Vioxx*, the individual plaintiffs' attorneys "were able to simply wait while a $4.8 billion settlement was negotiated and then do no more than enroll their clients in he settlement and monitor their progress through the claims valuation process." *In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549, 562 (E.D. La. 2009). No such luxury was available to the individual attorneys in this MDL.

As noted above,[5] the Primary Attorneys, like all the individual attorneys representing Chinese Drywall homeowners, did far more work on behalf of their clients than expected in a typical pharmaceutical MDL. The problems faced by homeowners was acute and affected many of them in real time, often requiring immediate and intense attention by their retained attorneys. This was not a mass tort where the individual attorneys could sit back and wait for the PSC to announce a settlement, nor was it a class action where <u>all</u> the work is done by the lead counsel. The facts are this was a mass tort, not a class action, and the PSC did not do all the work. Not even close.

These *Johnson* factors might ordinarily support a moderate upward adjustment of the common benefit fee benchmark percentage, but under the circumstance of this case, no such upward adjustment is warranted. To the contrary, these factors weigh heavily in favor of a significant reduction in the benchmark percentage.

B.  **The Novelty and Difficulty of the Questions; The "Undesirability" of the Case.**

The FC contends that the Chinese Drywall litigation presented novel and demanding challenges but admits that the matter was not "undesirable" given what the homeowners had at

stake. Cases involving novel and difficult questions often warrant an upward adjustment.  *See Vioxx,*  760 F. Supp. 2d at 655 (litigation presented novel and difficult questions weighing in favor of an upward adjustment).  The Primary Attorneys do not object to a moderate upward adjustment on this basis.

C.  **The Skill Requisite to Perform the Legal Service; The Experience, Reputation and Ability of the Attorneys.**

The attorneys who undertook the common benefit work are among the most highly experienced and skilled practitioners in mass torts. However, this factor does not support an upward adjustment of the benchmark percentage. The Primary Attorneys and other counsel representing individual attorneys also applied substantial skill and effort to assist their clients, and performed work of scope and depth far beyond what individual lawyers typical perform in a mass tort case.  It cannot be said that the skill required by the PSC "was so superior to that possessed by primary attorneys representing individual clients as to warrant a *Johnson* adjustment which would in effect shift attorneys' fees from one group to another." *Vioxx*, 760 F. Supp. at 656. Accordingly, the Primary Attorneys submit that the skill factors do not warrant an upward adjustment of the benchmark percentage.

D.  **Nature and Length of the Professional Relationship with the Client.**

---

[5]  *See*, supra, Section II. A.

The FC states that this factor is neutral since "few (if any) longstanding client relations between common benefit counsel and class members preceded this MDL." The Primary Attorneys agree.

### E.  Customary Fee; Whether the Fee is Fixed or Contingent.

The FC states that its request for 10.65 of class recovery is "especially reasonable considering the 32 percent of recovery was negotiated as a total fee fund in the Global, Banner & InEx settlements, consistent with this Court's ruling in the *Vioxx* litigation." Allocation Motion, p. 34 & n. 13.  The FC is gravely mistaken and turns *Vioxx* on its head.  The relevant figure from *Vioxx* to compare with the FC's requested 10.65 percent is not the 32 percent cap the Court imposed on total available attorneys' fees, but the 6 percent benchmark the Court selected for the determination of common benefit fees.  By this measure, the percentage requested by the FC is grossly excessive.

Moreover, the FC ignores completely the impact its request would have on the customary fee of the Primary Attorneys and the expectations set by the Court by previous orders.  Most of the individual attorneys in this matter, including the Primary Attorneys, have retainer agreements with their clients that provide for a 1/3 (33 1/3 percent) contingent fee.  Consistent with *Vioxx*, the Primary Attorneys entered this litigation with the expectation that this Court would likely cap fees at 32 percent.  This expectation was confirmed by the Court's Order re Voluntary Payment [Doc. No. 8545] that ordered settling parties to voluntarily deposit with the Court 17 percent of all settlement proceeds.  This set-aside would amount to just over 50 percent of any fee, an exorbitant but not unprecedented allocation.[6]  The Primary Attorneys were one of just a handful of lawyers who actually deposited this set-aside from its settlements. But the Primary Attorneys

---

[6] *See, e.g., In re: FEMA Trailer Formaldehyde Products Liability Litig.,* MDL No. 07-1873 (E.D. La.) (allocating 50 percent of the available fees to common benefit fees and 50 percent to payment of individual attorney fees).

did not give up any of their rights to object by doing so.  The Court's Order made clear that the "funds may be allocated at a future date to common benefit costs."  Funds not disbursed remain the property of the Primary Attorneys and if not allocated to the PSC should revert to them. *Common Fees*, at 89.

The PSC, however, was unable to secure fees amounting to 32 percent of the settlement benefit.  By its own accounting, the amount available to pay <u>all</u> attorneys fees amounts to only 17.5 percent of the benefit.  The FC's request for 10.65 percent of the benefit, if allowed, would leave the Primary Attorneys with less than 7 percent of the benefit.  By contrast, primary attorneys in other MDLs have received in the range of 15 percent to 28 percent of the benefit. In *Vioxx*, for example, the individual attorneys retained  about 25 percent of the benefit or nearly 80 percent of the total attorney fees, while the PSC received 6 percent of the benefit or about 20 percent of the available fees.[7]  The award sought by this PSC would flip this allocation around, allocating 40 percent of the fee to the individual attorneys and 60 percent to the PSC.  Such an allocation is without precedent in the annals of mass torts.

In the typical MDL, the PSC retains 4-6 percent of the recovery and the individual attorneys retain 25 percent or more. *See id*. at 654 (collecting cases and studies). A reduction of contract fees from 33.33 percent to 6.35 percent would not just be without precedent, it would set a destructive precedent by discouraging lawyers from assisting victims of defective products, a particularly ironic outcome since the FC admits that the class  is comprised of innocent property owners with a just cause. Allocation Motion at 50. Future PSCs will be unable to achieve the results obtained here if the prospect of fees grossly below market rates discourages attorneys from representing individual victims in future MDLs.

---

[7]As another example, in *FEMA Trailer* the individual attorneys received 14.5 percent of the benefit.

For these reasons, this factor weighs heavily against <u>any</u> upward adjustment to the benchmark percentage.  To the contrary, this factor weights in favor of a significant downward adjustment of the benchmark allocation to insure a fair allocation for the individual attorneys.

### F.  <u>The Amount Involved and the Results Obtained.</u>

The Primary Attorneys agree that the PSC achieved a favorable and meaningful global resolution, but because the bulk of the settlement benefits was directed to property remediation, the settlements did not provide class members with access to substantial amounts of cash.[8] Consequentially, many class member found themselves left with large economic losses despite the settlement.  For homeowners eligible for remediation, the payment from the economic loss fund was often times not adequate to cover the costs of temporary relocation during the remediation.  Compensation for renters was limited to three months of lost rent, even though many class members were unable to rent their properties for several years.  Property owners who were unable to sell their property at full value due to CDW or lost their property due to foreclosure rarely recovered their full loses.

The lack of cash in the settlement also impacts the availability of funds to pay attorneys' fees and costs. In total, the PSC secured $233,078,270.33 from the settling defendants to cover all attorneys' fees and expenses.  Using the FC's calculation of the settlement benefit and amount available to pay fees, the fee recovery amounts to 17.5 percent of the settlement benefit.  This recovery compares poorly with recoveries by PSCs in other MDLs, which have generally been around 32 percent or more.  Consequently, there are simply insufficient funds to compensate all the attorneys who worked on this for their time and expenses commensurate with other MDLs. Exacerbating the problem, the PSC has taken "off the top" nearly $17,435,000 for

"reimbursement of advanced costs/assessments," which  included the PSC's "held" costs. The individual attorneys were not given the same recovery opportunity.[9]

The Primary Attorneys entrusted the PSC to obtain a settlement that would both fully compensate their clients and provide them with reasonable attorneys' fees and costs. The settlements are fair and reasonable, but do not fully achieve these goals.  Having failed to negotiate sufficient cash to provide full and fair compensation to all attorneys in this matter, the PSC has only itself to blame if their fees fall short of their expectations.  That is not a reason to depart from decades of precedent and take a disproportionate amount of the available fees away from the individual attorneys.

This factor is therefore supports a reduction of the percentage benchmark.

### G.  Awards in Similar Cases.

The 8 percent benchmark requested by the FC simply lacks support in similar cases. The FC's attempt to justify this percentage is flawed because it relies on awards in class action cases, and it does not limit its survey to awards of common benefit fees. Thus, while the FC is correct that the 6 percent benchmark in *Vioxx* is an appropriate data point, the 15 percent benchmark in *Turner* is not.  *Turner* was a class action, not a mass tort.  Further, there was no differentiation in *Turner* between the members of the PSC and the individual attorneys. There, all plaintiffs' counsel who did common benefit work could share in the fee award, but *only* for common benefit work. *Turner*, 472 F. Supp. at 857.

---

[8]The decision to accept a remediation settlement was one made by the PSC.  The Primary Attorneys note that many construction defect class actions resolve in cash settlements or settlements providing a meaningful choice between cash and repair. *See* Exhibit F, hereto (chart of exemplar class action settlements).

[9] The Court has approved a stipend of $1,000 per property to cover inspections and other costs. [Pre-Trial Order No. 30 (Stipend Award) [Doc. No. 19787]. This amount, however, does not fully reimburse the Primary Attorneys' held costs. The PSC also received stipends for their clients' properties, even though they were also reimbursed their held costs.  This procedure raises the specter of "double-dipping" by the PSC.

The FC fares no better with its chart of percentage-of-fund fees submitted in support of an "8 percent+" fee percentage. Of the 11 cases listed, nine are class actions and not relevant to this analysis.[10] The remaining two cases– *In re Sulzer Hips Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907 (N.D. Ohio 2003) (4.8 percent) and *In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. Apr. 9, 2008) (6.75 percent) – actually support the proposed 5 percent benchmark since the average of these two percentage benchmarks is 5.77 percent.

The empirical data also supports the Primary Attorneys' proposed 5 percent fee and shows that a 10.65 percent fee would excessive. A database of 35 instances of common benefit assessments compiled by Professor Rubenstein and reported on in *Newberg on Class Action* reveals that the mean assessment for a common benefit fee (separate from any assessment for costs) was 4.99 percent. For 29 instances in which common benefit fees were finally approved, the mean percentage was 7.32 percent and the median award percentage was 6 percent. 5 *Newberg on Class Actions* (5th Ed. 2015) at §15:117.

This *Johnson* factor supports a 5 percent common benefit fee.

## H.  The Adjusted Benchmark Percentage.

In sum, the Primary Attorneys' analysis identifies two *Johnson* factors supporting an upward adjustment of the benchmark and at least two supporting a downward adjustment. Consequently, Primary Counsel propose a 1 percent downward adjustment of percentage benchmark, yielding a percentage benchmark of 5 percent.

---

[10] Class actions: *Newby v. Enron Corp. Sec.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008); *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998); *Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000); *DeLoach v. Phillip Morris Cos.*, No. 1:00CV01234, 2003 U.S. Dist. LEXIS 23240 (M.D.N.C. Dec. 19, 2003); *In re Visa C heck/Mastermoney*, 297 F, Supp. 2d 503 (E.D.N.Y. 2003), *aff'd Wal-Mart Stores, Inc. v. Visa, U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. MDL Docket No. 1500, 02 Civ. 5575 (SWK), 2006 U.S. Dist. LEXIS 77926 (S.D.N.Y. Oct. 25, 2006); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006); *In re Tyco Int'l*, 535 F. Supp. 2d 249 (D.N.H. Dec. 19, 2007).

Applying this percentage to the benefit as calculated by the FC results in fees to the PSC of $56,065,665.25 (.05 * $1,120,313,305.90).  If applied to the benefit as calculated by the Primary Attorneys, the result is  lower -  $45,542,814.60 (.05 * $910,856,292.05). The balance of the fee fund available to pay attorneys' fees to the individual attorneys would be $126,965,698.10 ($192,981,363.35 - $56,065,665.25).  However, the Primary Attorneys take issue with the calculation of the available funds.  The fee fund should not be used to fund the separate Taishan litigation.  Accordingly, the $10,000,000 "set aside" for this purpose should be made available to pay fees for the Knauf attorneys.  Second, the Voluntary Contributions should also be part of the fee fund as these payments were at all times subject to a future allocation.  *See* Order [Doc. No. 8545]; *see also Common Fees,* p. 89 ( funds not disbursed to PSC should revert to the individual attorneys).  Accordingly, the sum of $13,332,058.26 should be added to the fee fund for a total amount available of $206,313,421.50.

Taking into account this upward adjustment to the available fee funds, and the downward adjustment to the benefit obtained, the Primary Attorneys contend that the correct allocation of attorneys fee (to which they would not object) is $45,542,814.60 to the PSC and $160,770,607.45 to the individual attorneys.  This amounts to a much more equitable and supportable allocation of  about 22-78 between the PSC and the individual attorneys (as opposed to the FC's proposed 60-40 split), an allocation considerably more in line with *Vioxx* (20-80) and other precedential MDLs.

**I.   The Lodestar Cross-Check.**

Whether evaluated using the fee proposed by the FC or the fee proposed by the Primary Attorneys, it is evident that the common benefit fee award will result in a negative multiplier.

The lodestar cross-check therefore supports both the common benefit fee proposed by the FC and the common benefit fee proposed by the Primary Attorneys.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Primary Attorneys object to the FC's proposed benchmark percentage of 10.65 and submit that a common benefit fee of 5 percent of the class settlement recovery (as calculated by the Primary Attorneys) is fair and reasonable under the circumstances of this case. The Court should therefore allocate the available fee fund of $206,313,421.50 as follows:  PSC - $45,542,814.60 (22 percent); Individual Attorneys - $160,770,607.45 (78 percent).

DATED: June 28, 2016                              Respectfully submitted,

<u>/s/ Val Patrick Exnicios</u>
Val Patrick Exnicios, Esq.
LISKA, EXNICIOS & NUNGESSER
1515 Poydras Street
14th Floor, Ste. 1400
New Orleans, LA.  70112
Telephone: (504) 410-9611
Facsimile: (504) 410-9937
Cell: (504) 495-9666

Counsel for WHITFIELD BRYSON & MASON LLP, RHINE LAW FIRM, PENDLEY BAUDIN & COFFIN, LP, and LUCKEY & MULLINS

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the above and forgoing has been served upon Plaintiffs'
Liaison Counsel, Russ Herman, by U.S. Mail and email or hand delivery and email and upon all
parties by electronically uploading same to Lexis Nexis File and Serve® in accordance with Pre-
Trial Order No.: 6, and that the foregoing was electronically filed with the Clerk of Court of the
United States District Court for the Eastern District of Louisiana by using the CM/ECF System,
which will send a notice of electronic filing in accordance with procedures established in MDL
2047 on this 28th day of June, 2016.

/s/ Val Patrick Exnicios
Val Patrick Exnicios