# AFFIDAVIT

STATE OF LOUISIANA

PARISH OF IBERVILLE

I, Nicholas R. Rockforte, after being duly sworn, depose and state as follows:

1.   I am over eighteen years of age and fully competent to make this Affidavit. I do so based on my personal knowledge of the facts stated herein.

2.   I have been an attorney with Pendley, Baudin & Coffin, LLP since 2008 and have tirelessly and zealously represented and prosecuted claims on behalf of homeowners affected by Chinese Drywall since 2009.

3.   My firm, along with Whitfield Bryson & Mason LLP, Lucky & Mullins and Rhine Law Firm, P.C. and associated counsel represent and have been involved with approximately 616 cases involving Knauf Chinese Drywall.

4.   I have represented hundreds of clients in over a dozen MDL litigations, but none have required as much post-settlement attention, involvement, time and resources as have the clients I have gratefully represented in this Chinese Drywall MDL. The obvious difference between other MDL litigations and the Chinese Drywall litigation is that the structure of the Knauf settlement agreement did not result in a monetary settlement, but rather one that required meticulous, and often daily, involvement by the client contracted attorneys in advising and overseeing the inspection of the homes, assisting clients in qualifying for the settlement benefits and overseeing the construction process. I spent many years, after the finalization of the settlement agreement, in essence serving as a supervisor or foreman of construction projects, which included, but was not limited to, qualifying homeowners under the settlement, resolving scope of work, delay damage and punch-list disputes, forcing change orders, and identifying and correcting

1

construction deficiencies. Put simply, my work on behalf of individual clients in this MDL was unparalleled in comparison to other MDLs.

5. Prior to participating in the Remediation Pilot Program, I advised homeowners of their options, benefits and legal ramifications, which required an exhaustive understanding of the settlement agreement. Since Pendley, Baudin & Coffin, LLP was one of the first firms to have its clients enrolled and actively participating in the Pilot Program, we were instrumental in resolving issues and establishing benchmarks with Knauf and Moss which were believed to be utilized with other eligible Pilot Program homes, such as establishing benchmarks for "substantial completion" and working with punch-lists, assessing and calculating delay damages, replacing certain appliances and handling various issues related to "Already Remediated Home" ("ARH") claims.

6. As this Court is likely aware, the Remediation Pilot Program required tireless involvement by the contract attorneys, with no assistance from common benefit counsel. The process was initiated by an inspection of the home in order to identify and determine whether the home contained sufficient evidence of Knauf drywall and to pinpoint the locations of this defective board. As a result, I traveled to many affected properties and identified the drywall board, often times searching through attics in South Louisiana in extreme temperatures for evidence of Chinese drywall and mapping out the locations throughout the home. Following my identification of Knauf Drywall, I typically attended and was involved with the formal inspection of homes with Benchmark and MZA. With some of our Pilot Program homes, I also spent countless hours researching and reviewing documents produced by builders and suppliers in order to identify invoices evidencing Knauf drywall shipments to the homes in order to confirm the presence of KPT drywall in a particular home or neighborhood. After the inspection, we

2

communicated with Benchmark/MZA in an effort to ensure that our clients qualified for the Pilot Program in order to assist in moving the home to the next phase of the Pilot Program process.

7. The next phase of the process involved scheduling, coordinating and participating in the initial walk-through of the home by Moss, the court-appointed remediation contractor. Once scheduled, I would frequently travel out to the home and participated in the walk-through with the Moss representatives and the homeowners. This process resulted in the creation of a "scope of work" document by Moss that identified which appliances/components of the home would be "detached and reset" or "removed and replaced". The scope of work detailed the work to be performed at the home.

8. I was extensively involved in reviewing and discussing the Moss "scope of work" and Xactimate with the homeowners and discussing, and often negotiating substantial changes to these documents. As every home is unique, we had frequent calls and meetings with Moss and the homeowners to resolve often contentious disputes concerning items that should be replaced with new items rather than removing the Chinese Drywall-compromised items or building components and simply re-installing them after construction was completed. This process required the attorney to often times inspect each individual item at the home in order to ensure that the "scope of work" properly accounted for all items to be replaced and to ensure the quality of the replacement items. As part of this process, I reviewed appliance binders and options regarding replacement of appliances to ensure that they complied with the settlement agreement.

9. Once the work authorization/scope of work package had been finalized, my office was responsible for organizing and scheduling the homeowners move from the

3

affected home and commencement of construction. During this process, I was responsible for making sure that the lump sum payments for rental, storage and other items were funded to the homeowners, and the amounts complied with the settlement agreement by ensuring that the homeowners square footage calculations were accurate. Frequently, finalization of the Xactimate/scope of work process required the resolution of disputes between Moss and the homeowners. During this phase, I also oversaw and discussed the legal ramifications of signing various work authorization documents received from Brown Greer.

10. During the construction phase, the homeowners reported frequently, often daily, to my firm about problems and concerns with the work being performed by Moss, which required my intervention. This often times required the resolution of disputes concerning various issues, including construction deficiencies, code violations prior to or during remediation, water damage, or whether certain items being replaced in the home, (*i.e.* crown molding, flooring, tile, back-splash, etc), were identical to the ones removed from the home prior to remediation. In many instances, there were no simple solutions to these problems as the original items were no longer available and the attorneys were instrumental in reaching a resolution to these disputes. With problems relating to deficiencies in construction, water damage, or code violations, I was involved in determining whether the homeowner, Knauf/Moss or some other third party was responsible for the repairs, and I was instrumental in reaching a compromise between Moss and the homeowner. My involvement with these homes during the construction phase was time-consuming, stressful, and often times required me to conduct additional home visits and inspections.

11. During the first year to year and a half of the implementation of the Pilot Program, Moss admittedly hired subcontractors to handle homes in certain parts of

4

Louisiana who were not performing quality and timely work. This created a host of additional problems which required my full attention. On quite a few occasions, Moss damaged items during the demolition and construction phase. Consequently, I was called on and resolved these disputes on behalf of the homeowners.

12. With the ordinary Pilot Program home, once the home had reached "substantial completion", as declared by Moss, Moss and the homeowners created a punch-list that needed to be finalized by Moss in order complete the project. One of the problems with the punch-list process was that Moss, in order to avoid delay damages, would at times declare that the home was substantially complete--although it was not--and would place all remaining items on the punch-list in order to meet the scheduled completion date. This again was an often contentious process which required substantial involvement by my office.

13. Once the construction process had been finalized, I provided oversight and advised clients on the execution of homeowner release of contractor forms. Additionally, I reviewed and provided claimants with close-out documents, including GFA Certification, warranty information and Certificate of Occupancy documents.

14. I was actively involved in resolving delay damages disputes between homeowners and Moss when homes were not completed timely. Since Moss worked with a very thin profit margin on Pilot Program homes, Moss was reluctant to pay delay damages to the homeowners, which required my intervention. These disputes were extremely time consuming and often required multiple home visits to confirm the nature and extent of the items left to be repaired in the home at various times, and ultimately, whether the home was available for occupancy. The final walk-throughs revealed construction deficiencies and items not replaced or repaired in compliance with the settlement agreement. Unlike ordinary punch-list projects which should be completed

within a few days at most, it frequently took Moss several months to complete punch-list items, which was the source of unnecessary homeowner frustration. I served as the conduit for ensuring that these issues were resolved to the homeowner's satisfaction. Furthermore, Moss provided a one-year warranty for its work, and I was involved with negotiating and resolving warranty issues that arose after the completion of construction.

15. I also mediated issues of delay damages, scope of work and punch-list items with Knauf's counsel through the court appointed neutral, Dan Balhoff.

16. I handled and successfully resolved many "Already Remediated Homes" claims with Knauf's counsel. Although the settlement agreement outlined a process for resolving these claims, discussion and negotiation of these settlements was handled entirely by me with no assistance of common benefit lawyers, and required months, sometimes than a year, of protracted negotiations in order to resolve a single case. The "Already Remediated Homes" raised a host of unique issues and problems which required resolution. Most, if not all, of the homes had been remediated prior to the establishment of the settlement agreement, and therefore, any remediation protocols. However, Knauf insisted that the Already Remediated homeowners be compensated on a much more limited scope of work than the work actually performed on the home.

17. As one can see, the problems arose as the AR homeowners, before the time of remediation protocols, removed and replaced all items affected by Chinese Drywall without the benefit of a remediation protocol. This often times created large discrepancies between the actual costs incurred by the homeowner in remediating the home and the amount that Knauf was willing to pay. As a result, I negotiated settlements on the ARH homeowners behalf. This required a detailed understanding of the homeowner's home and the construction process and often times required many calls and/or meetings with the homeowners and their contractors. This process required full

6

blown settlement negotiations, without the assistance of the PSC or common benefit lawyers.

18. In addition, my office assisted the AR homeowners in documenting all expenses incurred in connection with the remediation of the homes and providing proof of these losses, which led to negotiation with Knauf as many of the items did not neatly fit into Knauf's limited settlement authority. Additionally, Knauf required that the homeowners produce detailed documentation evidencing each item of loss in which the homeowner was seeking compensation. This created an enormous challenge in which my office had to develop innovative solutions in order to resolve the cases. Some of these homes required telephonic mediations with Knauf's counsel in order to resolve.

19. Chinese drywall homeowners were justifiably concerned with understanding the potential health implications of living in a home with Chinese drywall and requested information and advice in order to make decisions of whether to move their family out, or to quit paying the mortgage on the home. Consequently, with little scientific information available through the MDL litigation, I spent countless hours researching these issues and discussing with homeowners in order to assist them in making these difficult decisions.

20. Throughout the process, I discussed and advised clients concerning various other legal issues, including, but not limited to, homeowners insurance coverage, the subsequent purchaser doctrine and disclosure issues under Louisiana law.

21. Furthermore, we filed "Other Loss" claims on behalf of eligible homeowners. This was a time-consuming process which required a thorough understanding of the settlement agreement, claim forms and compensable losses available to each client, which included, but was not limited to, claims for personal injury, damage

to and loss of personal belongings, other home repairs, and damages associated with foreclosures and rental properties.

22. In addition to the work I performed in reaching resolutions for homes under the Pilot Program and Already Remediated Homes, I handled a multitude of reoccurring issues that arose, such as assisting with negotiations with mortgage companies regarding forbearance and foreclosure issues, assisted with tax assessment reductions with local parish and county governments, handled and even litigated disputes on behalf of homeowners where their homeowners insurance carriers threatened to drop their homeowner's insurance coverage due to vacancy of the home and advised clients who utilized affected properties as rentals.

23. The previous paragraphs discuss my extensive involvement with our Chinese Drywall clients AFTER the settlement was put in place, but the list of tasks I performed for Chinese Drywall claimants, along with my paralegal Renee Dupont, is extensive and includes, but is not limited to, the following:

- Correspondence to potential Chinese Drywall homeowners;
- Raising public awareness of Chinese Drywall through homeowners and HOA meetings;
- Initial client interviews;
- Completion of New Client Questionnaires;
- Scheduling of inspections with our retained experts;
- Oversaw samples for testing and testing results;
- Determination of the manufacturer of the Chinese Drywall identified;
- Evaluation of potential defendants (i.e. building, installer, supplier);
- Obtained required documents from clients (photo indicia, completed Plaintiff Profile Form with attached supporting documentation);
- Prepared information for filing claimants' claim on Omnibus Complaints;
- Correspondence with PSC to verify all required information was supplied;
- Assisted with preservation of evidence for self-remediated homes;
- Discussions with clients regarding health issues/concerns, which led claimants to move out of their Chinese Drywall homes;
- Discussion with clients regarding Option 1, 2, or 3 for remediation of their home;
- Coordinated with Moss for walk-through inspections;

- Assisted each claimant in evaluation of possible claims to be filed under the Knauf Settlement Agreement;
- Preparation of claim forms and required documentation for Knauf claim;
- Submitted documents to Brown Greer and cured deficiency notices;
- Discussions with claimants regarding notice of claims eligibility and acceptance or appeal of the notice;
- Preparation of acceptance or appeal form for claimants;
- Receipt and review of claim funds and releases;
- Evaluated each claimant's file for potential stipend claim;
- Review of multiple Brown Greer spreadsheets for accuracy (i.e. stipend and fee); and
- Maintained contact with each claimant, corrected contact information, and provided updates to claimants during each step of the Chinese Drywall claims process.

23. The list above does not cover all the individual nuisance and questions raised by each homeowner. Each homeowner and their particular situation required individual attention.

24. The resolution of claimant's claims required extensive client contact and involvement which was handled exclusively by me and/or my paralegal. A resolution of a claimant's claims required consistent work on behalf of the client over a four (4) to six (6) year period of time, and further, some claims are still pending.

SWORN TO AND SUBSCRIBED BEFORE ME this the 28th day of June, 2016.

By: _____
Nicholas Rockforte

Sworn to and subscribed before me this 28th day of June, 2016.

_____
Notary Public
LSBA 10421
Patrick W. Pendley

__AT Death__
My Commission Expires

9