**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: CHINESE MANUFACTURED<br>DRYWALL PRODUCTS<br>LIABILITY LITIGATION | MDL NO. 2047 |
| THIS DOCUMENT RELATES TO: | SECTION: L |
| ALL CASES | MAG. JUDGE WILKINSON |

### AFFIDAVIT OF STEPHEN W. MULLINS

I, STEPHEN W. MULLINS, after being first duly sworn, depose and state as follows:

• I am Partner and Co-Founder of Luckey and Mullins, P.L.L.C. in the impacted area of Ocean Springs, Mississippi, along the Mississippi Gulf Coast. This area was directly struck by Hurricane Karina and heavily impacted by Chinese Drywall.

• I serve as Plaintiffs' counsel, who in conjunction with several other firms, represent over 800 owners of homes built with Chinese Drywall and over 600 with Knauf. My role in these cases is appropriate because as I am one of few Plaintiffs' attorneys in Mississippi that prosecutes defective building and construction cases. I am well-known to the building and legal community, having served as President of the Jackson County Bar Association, President of the Mississippi Association for Justice and frequent commentator on legal issues for the media. I also have significant experience in mass tort and class actions involving numerous parties, complicated legal issues, insurance disputes, and MDL's. Finally, I am licensed to practice in Mississippi, Louisiana, and Alabama.

• I am submitting this Affidavit in Opposition to the Fee Committee's Motion To Determine The Allocation Of The Global Fee Award As Between Common Benefit Fees ("Allocation Motion"). I make this affidavit based upon my personal knowledge.

• As individual or primary counsel for our clients, our team of law firms has been intimately involved in all aspects of this litigation. Each firm has devoted senior partners and associates to work on these cases, along with having paralegals working full time on our cases.

• My work on these cases was intense, time consuming, involved and prolonged. As one of the principal attorneys on the ground in this matter, I was primarily responsible for most all activity on the Mississippi cases, and all Alabama cases not in the Birmingham area.

- We advocated for a cash settlement of this matter due to concerns involving the construction process. The PSC could have easily produced a cash settlement that did not require such a high level of involvement for the individual counsel in the implementation of the settlement. As a result of the structure of the settlement negotiated by the PSC, I was required to spend years dealing with form after form, communicating with clients, overseeing inspections and construction projects, appeals, etc., which required enormous time, effort and expense.

- Case evaluations: My involvement in this matter started much earlier than this MDL when Dan Bryson, an attorney I know through my work with AAJ Toxic Mold Litigation and Defective Construction Litigation Group, called me about a drywall problem he was seeing surface in Florida and tracked a shipment to New Orleans. As a result of this conversation and my research, I was quickly able to identify we had a problem along the Mississippi Gulf Coast. Hence, I began working to identify the scope of this problem which included:

    - Determination of local suppliers of Chinese Drywall
    - Research and discussions with builders using about Chinese Drywall
    - Research and determination of location of homes containing Chinese Drywall
    - Correspondence to potential Chinese Drywall homeowners
    - Newspaper, radio and local TV interviews

- Research and review building permits in 2006 and 2007, Inex invoices, and drywall shipments.

- I conducted hundreds of individual home inspections in Mississippi and Alabama and helped train and educate the inspectors for Bright Claims as I had already done close to a hundred inspections before they were retained. Hence, I personally worked with our inspection companies to establish an inspection protocol and monitoring the results to assure adequate evidence was obtained to support our trial theories. Each inspection had its own nuances, and many of these issues required direct attorney involvement. Often we consulted with each other to assure we were comfortable with the data received and that the same would be compelling at trial. As a result of these consultations, we were able to discover the problem with the Strontium analysis before anyone except the Florida Department of Health, and I was able to consult directly with the CPSC and experts on this factor and work on a more accurate test.

- Product Identification: This was initially difficult as we did not have a picture book, and the Taishan markings were irregular and difficult to find. Additionally, the decision to recognize a lower-case Knauf, and in fact it was perceived as less corrosive, was not developed until late in the process which required inspections of dozens of properties. I was typically at all inspections of my clients' properties and the homeowners in Mississippi and Alabama expected my presence there.

- Attempting to mitigate foreclosure by contacting lenders: I was constantly forced to deal with these lenders in an effort to convince them that expediency did not override the economic benefit that the settlement would bring and intervene on clients' behalves, talked with Mississippi's Congressional delegation and had to deal with these issues on a house-by-house basis since there was no serious effort by the PSC to do anything on a global level to deal with these issues.

- Advocating for tax reassessments, code variations, etc.: In many instances this was instigated by our clients, but often required significant negotiation with local building inspectors to avoid new building restrictions or requirements and penalties. This was also a time-consuming activity for those homes that had these issues.

- Counseling on potential insurance claims: After conducting legal research in my respective states, we were required to review nearly every clients' insurance policies and, at the very least, explain the rights and obligations to our clients. In most of my cases, claims were not pursued against homeowners' coverages as they had been excluded in a series of declaratory actions. I also had to monitor the declaratory actions and litigation by the builders seeking coverage for CDW claims under their policies.

- Counseling on mortgage, homeowner association fees and IRS deductions: Most of these discussions required a review of pertinent documentation and research (both legal and factual) and were unique to the property involved.

- Counseling on emerging expert opinions concerning health effects and remediation: Nearly every client required a detailed explanation from an attorney who had scientific knowledge to provide critical information. Of course, this work required each lawyer to consult health care professionals and other experts in order to communicate sound advice, data and research materials. I was involved in dozens of cases where the client was trying to determine whether to move out of the impacted property or not. In order to do this, they had to know what health problems they were having that were possibly related to their Chinese Drywall exposure.

- Counseling on foreclosure strategies: Obviously, we were not always successful in convincing the lenders to wait until our litigation had run its course.

- Counseling on scope of remediation for those who remediated prior to settlement, including preservation of evidence: Our construction expertise and expert witness work was invaluable during these activities, and the fact that I was familiar with most all of the clients' situations and homes helped me to properly advise the clients on what was best course of action for them.

- Satisfying eligibility requirements under Knauf remediation program: As discussed previously, this was a moving target.

- Counseling as to remediation and protocol and rights under the Knauf settlement: These documents were complicated and extensive, and clients wanted to know exactly what to expect before the process began—how long would it take, how much would they be paid, who was responsible for utilities, disposal of the toxic drywall, new code regulations, etc.

- Resolving "punch list" issues: Dealing with repair contractors for angry homeowners is not an easy or quick task, and it was as we feared, a huge time commitment and waste of legal time. I handled everything from wrong paint color or finish to damaged floors and landscaping and everything in-between. Moss' construction manager and I spoke weekly for over two years during this process.

- Selection and satisfaction of eligibility requirements for available claim options including preparation of affidavits, accumulation of documents, advice to clients.

- Handling appeals from claims administrator resolution offers: This again was a huge time commitment for lawyers. I was able to successfully resolve or win all of these on appeal but not without serious effort and time commitment.

- As stated by other associated lawyers in this matter, each office had paralegals who worked full time on Chinese Drywall. As one of the attorneys on the ground in the impacted area, I worked almost daily with Amanda on the following tasks for each Chinese Drywall claimant:

    - Correspondence to potential Chinese Drywall homeowners;
    - Initial client interviews;
    - Completion of New Client Questionnaires;
    - Scheduling of inspections with our retained experts;
    - Oversaw samples for testing and testing results;
    - Determination of the manufacture of the Chinese Drywall identified;
    - Evaluation of potential defendants (i.e. building, installer, supplier);
    - Obtained required documents from clients (photo indicia, completed Plaintiff Profile Form with attached supporting documentation);
    - Prepared information for filing clients claim on Omnibus Complaints;
    - Correspondence with PSC to verify all required information was supplied;
    - Assisted with tax assessment reduction with local county governments;
    - Assisted with negotiations with mortgage companies regarding forbearance and foreclosure issues;
    - Assisted with preservation of evidence for self-remediated homes;
    - Discussions with clients regarding health issues/concerns which lead clients to move out of their Chinese Drywall home;
    - Discussion with clients regarding Option 1, 2, or 3 for remediation of their home;
    - Assisted in the scheduling of inspections for participating in the Pilot Program;
    - Coordinated with Moss and usually present for walk-through inspections;
    - Reviewed and discussed Xactimate with clients;
    - Assisted clients and oversaw the signing of various work authorization documents received from Brown Greer;

- Advised client of move-out date, kick-off meeting and lump sum payments;
- Reviewed appliance binders and options regarding replacement of appliances;
- Assisted clients in the resolution of construction deficiencies, water damage, termite damage or code violations found during remediation;
- Assisted with punch list items and execution of homeowner release of contractor forms;
- Mediation of disputes between homeowner and Moss regarding construction deficiencies;
- Reviewed and provided clients with close out documents, including, GFA Certification, warranty information, Certificate of Occupancy;
- Assisted each client in evaluation of possible claims to be filed under the Knauf Settlement Agreement;
- Preparation of claim forms and required documentation for Knauf claim;
- Submitted documents to Brown Greer and cured deficiency notices;
- Discussions with clients regarding notice of claims eligibility and acceptance or appeal of the notice;
- Preparation of acceptance or appeal form for clients;
- Receipt and review of claim funds and releases;
- Evaluated each client for potential stipend claim;
- Review of multiple Brown Greer spreadsheets for accuracy (i.e. stipend and fee); and
- Maintained contact with each claimant, correct contact information, and provided updates to clients during each step of the Chinese Drywall claims process.

Of course, the above lists do not cover nearly all the work for each client because each homeowner and their particular situation required individual attention, some much more than others. My involvement in this matter was so extensive and time consuming, that it essentially consumed my practice for several years.

RESPECTFULLY SUBMITTED this, the 28th day of June, 2016.

STEPHEN W. MULLINS

SWORN TO AND SUBSCRIBED BEFORE ME this, the 28th day of June, 2016.

Linda L. Scott
NOTARY PUBLIC