# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 |
| | SECTION: L |
| THIS DOCUMENT RELATES TO: | JUDGE FALLON |
| ALL *CASES* | MAG. JUDGE WILKINSON |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## PARKER WAICHMAN LLP'S OPPOSITION TO THE FEE COMMITTEE'S MOTION TO DETERMINE THE ALLOCATION OF THE GLOBAL FEE AWARD AS BETWEEN COMMON BENEFIT FEES AND INDIVIDUAL COUNSEL'S FEES PURSUANT TO PTO 28(F), REQUEST FOR DISCOVERY,  ADDITIONAL BRIEFING AND A CONTRADICTORY HEARING REGARDING THE PROPOSED ALLOCATION

The Fee Committee's (the "FC") *Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F)* (Doc. 20293) (the "Allocation Motion") seeks an allocation of common benefit fees which is unprecedented, unwarranted, unfair and patently inequitable.  Accordingly, Parker Waichman LLP ("Parker Waichman") files this opposition to the Allocation Motion pursuant to Pre-trial Order Nos. 28 (Doc. 17379) and 28(F) (Doc. 20282).  For the following reasons, the Court should deny the Allocation Motion, allow discovery, additional briefing following discovery, and a contradictory hearing before allocating fees as between individual counsel and common benefit counsel.

## RELEVANT HISTORY

On May 17, 2016, the Court approved an award of $192,981,363.35 for the payment of *all* attorney fees (the "Global Award") and reimbursement of expenses.[1]  As explained by Plaintiffs' Liaison Counsel and Plaintiffs' Lead Counsel when seeking approval of the Global Award, this fee award covers "the full panoply of counsel involved in the CDW litigation, i.e., both individually retained counsel and common benefit counsel"[2] and thus "presents the unique circumstance where both individually retained counsel and common benefit counsel are to share from the same pool of funds."[3]

Pursuant to Pre-Trial Order ("PTO") 28(F) (Doc. 20282), the FC was tasked with filing the Allocation Motion to apportion the Global Award between common benefit fees and individual counsel's fees.[4]  The Court issued no guidance or criteria for this allocation.

On June 7, the FC filed the Allocation Motion (Doc. 20293) seeking a grossly disproportionate split between common benefit and individual counsel fees.  Specifically, the FC seeks 59.37% ($114,581,308.82) of the entire Global Award,[5] leaving 40.63% ($78,400,054.53)

---

[1] Doc. 20257 and 20282.  The Global Award does not include any Voluntary Common Benefit Payments made in accordance with the Court's Order on March 25, 2011 (Doc. 8389), which allows settling parties to voluntarily set aside 17% of the proceeds from any settlement outside of the nine settlements included in the Global Award to compensate common benefit counsel and the PSC.

[2] *See* Memorandum of Law in Support of Consolidated Joint Fee Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses (hereinafter the "Global Fee Memorandum"), Doc. 17700-1 at p. 92.

[3] *Id.* at p. 94. Regrettably, this recognition of the scope of the Global Award and fidelity to the primacy of individually-retained counsel is absent in the Allocation Motion.

[4] Various PTOs address the procedure for submitting time and expenses for reimbursement, the disallowance of certain fees, and the process for allocating the common benefit fees among counsel conducting common benefit work.  *See* PTO 9 (Doc. 147) and 28 (Doc. 17379).

[5] At this point, the FC appears to be seeking a total of $119,313,367.82, which will come from two sources: $114,581,308.82 from the Global Award and $4,732,058.26 from the funds earmarked for common benefit counsel. *See* Doc. 20293-1 at p. 56. There are 43 firms eligible for common benefit fees.  *See* Revised and Updated Affidavit of Phillip A. Garrett, C.P.A. Pursuant to Pretrial Order No. 28(F) attached as Exhibit A to Allocation Memorandum, Doc. 20293-2 at ¶ 11.

for allocation among the attorneys representing the individual claimants, most of whom have contingency fee contracts ranging from 33 1/3% to 40% (the division is hereinafter simplified as "60/40").  Under the FC's proposed fee allocation, these private counsels' contractual fees will be gutted.  In particular, Parker Waichman's fees due on their retainer agreements with their clients will be reduced from 40% to **11.9%**.[6]

The blunt fee allocation proposed by the FC would impermissibly strain the Court's authority to "alter" contingent fee contracts for these property damages claims, distort the "symbiotic relationship between the fee for common benefit work and the fee of the primary attorney," and undermine the public's faith in the judicial resolution of mass tort litigation.  *See* Eldon E. Fallon, *Common Benefit Fees in Multi-District Litigation*, 74 La. L. Rev. 371, 379 (2014) ("*Common Benefit Fees*").

## ARGUMENT

### I.      The Court's Authority to Alter Contractual Fee Agreements

As observed in *Common Benefit Fees*, "[b]y and large, the legal bases relied on by courts that have reviewed and altered contingent fee contracts in MDL cases for reasonableness are similar to justifications for creating a common benefit fund, namely: (1) a court's equitable authority to oversee the administration of a global settlement, (2) a court's inherent authority to exercise ethical supervision over the parties, and (3) the court's express authority pursuant to the terms of the MDL settlement agreement."[7]

---

[6] This percentage is based on the actual recovery amount of Parker Waichman claimants and the estimated individual counsel compensation, both as per information received from court-appointed CPA, Phillip Garrett.

[7] *Id.* at 379.  The Court canvassed the authority on this issue in *In re Vioxx Prods. Litig.*, 760 F.Supp.2d 640, 653 (E.D. La. 2010).

The first justification is grounded in Rule 23's requirement that courts scrutinize the reasonableness of class action fee awards to assure that such awards are reasonable under the circumstances and do not "cannibalize" the recovery of the class participants.  *See In re: Katrina Canal Breaches Litigation*, 608 F.3d 185, 196 (5th Cir. 2010).  This is part and parcel of a broader obligation to ensure "that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants."  *Id*. at 195, *quoting* 2 ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 11.46 at 133 (4th ed. 2002).  "In a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel."  *In re High Sulphur Content Gasoline Products Liability Litigation*, 517 F.3d 220 (5th Cir. 2008); *see also Manual for Complex Litigation* § 14.211 (4th ed. 2004) ("Judges have an independent duty to review fees and specifically determine if they are reasonable, applying traditional legal tests.").   In this instance, the duty to protect the class participants was fulfilled when the Court approved the Global Award.  The remaining obligation under Rule 23 is for the benefit of the public's confidence in the judicial administration of mass tort litigation, to "guard against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class."  *In re High Sulfur Content*, 517 F.3d at 228, *quoting Strong v. BellSouth Telecomms., Inc.,* 137 F.3d 844, 849 (5th Cir. 1998).  A 60-40 division of fees in favor of appointed common benefit counsel and against privately retained counsel would disserve the public's confidence in the class action device.

The second justification given by courts for altering private fee agreements is not applicable in this instance, because there is no potential conflict with clients regarding fees.  *See Common Benefit Fees* at p. 380 ("District courts argue that they necessarily retain the authority to

examine attorney fees sua sponte because the attorneys' interest in this regard are in conflict with those of their clients.").

The terms of the settlement agreements likewise do not provide justification for the proposed draconian cuts to the fee agreements of primary counsel.  The Knauf Settlement includes the most explicit provision regarding fees, stating:

> 14.3    The Court's award of attorneys' fees and costs shall settle and finally resolve any claim for attorneys' fees or costs that can be claimed by any counsel representing or working for the benefit either of a Participating Class Member or the Class.

This language makes clear that all counsel accepted the Global Award as the final pot for fees.  It did not authorize the Court to disregard private fee agreements when making allocations from that pot.  It did not even address the authority of the Court or the issue of allocations among attorneys.

## II.    The FC's Proposed Allocation is Facially Unreasonable

In determining the proper award of attorney's fees in a common fund case, the most important determination is whether the court's award of attorney' fees is reasonable under the circumstances.  *In re High Sulphur Content*, 517 F.3d at 227-29; *Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642-43 (5th Cir. 2012) (endorsing "use of the percentage method cross-checked with the *Johnson* factors" to ensure reasonableness).[8]  As written by Your Honor, "[t]he total amount of the common benefit fund should be reasonable under the circumstances, and the method for distributing it should be fair, transparent, and based on accurately recorded data."[9]

---

[8] *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974).

[9] *Common Benefit Fees,* at p. 381.

The leadership of the PSC praised the contributions of primary counsel while requesting approval of the Global Award[10] and insisted that the award was "more than reasonable"[11] to all attorneys in the "panoply" of counsel.  Having secured the Global Award without mentioning the impending common benefit fee request, it is patently unreasonable to now request that privately-retained counsel absorb a 60-70% reduction in their contractual fee agreements with their clients.[12]

**III.    The FC's Proposed Methodology Wrongly Diminishes the Primacy of Privately-Retained Counsel**

As Your Honor has observed, "the common benefit fee comes out of the fee for the primary attorney – a slice out of that pie, so to speak."[13]  In this instance, the FC is requesting not a slice, but a large majority of the entire pie, leaving the primary attorneys to share an unforeseen and disproportionately small slice.  This request runs counter to the premise that private counsel, as the client's attorney of choice, is the *primary* attorney and that a common benefit fee is supposed to be a subset of the primary fee.  *See* William B. Rubenstein, *On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3 Class Action Att'y Fee Dig. 87, 89 (2009) ("As a judicially imposed portion of a larger privately-negotiated contingent fee, the common benefit fee is logically, therefore, generally a lower fee than the class action fee award.").

---

[10] Doc. 17700-1 at p. 43-49; *see also* Section V, *infra*.

[11] *See* Consolidated Joint Fee Petition, Doc. 1770 at p. 4.

[12] In their Declaration in support of the Global Award, Liaison Counsel and Lead Counsel pointed out that the Global Award would be low compared to other mass tort actions, but did not signal that privately-retained counsel would be asked to carry the brunt of that discount:  "This hybrid approach – with attorneys' fees for the principal class settlement (Knauf Settlement) being paid separately by the settling defendants at no cost to the Plaintiffs, and attorneys' fees form the supplemental class settlements (InEx, Banner, Global, and Virginia) being awarded as a percentage of the common funds created, in order to pay both common benefit counsel and individually retained counsel's contingent fees – will result in a global fee award that is very low when compared to the range in other mass tort actions."  Doc. 17700-5 at ¶ 21.

[13] 74 La. L. Rev. 371 at 379.

To divert attention away from the facial inequity of its proposed fee split, the FC devotes the majority of its Allocation Memorandum to the methodologies and factors for calculating a common benefit fee where there is no contest between primary counsel and common benefit counsel over a fixed pool of fees.[14]   In such instances, the focus is on the court's authority to determine the reasonableness of the fee award as between class claimants and counsel.  Here, by contrast, the reasonableness of the global fee *vis-à-vis* the total recovery has already been determined and the "taffy pull"[15] between primary counsel and common benefit counsel is all that remains.  Parker Waichman agrees with the "fundamental logic" that in calculating a benchmark for a common benefit fee "the percentage should be in proportion to the amount of a given fund."[16] But here the primary focus should be the amount of the Global Award. The total recovery represents mere context.  By focusing on the relationship between the total class recovery and the proposed common benefit fee, the FC wrongly relegates the interests of privately-retained counsel to a mere factor to consider *after* establishing a benchmark percentage and applying the *Johnson* factors.[17]  The interest of primary counsel should be considered at the outset and then throughout the process.

A similar issue was before the Court in *Turner v. Murphy*, 472 F.Supp.2d 830 (E.D. La. 2007), which involved the setting of a common benefit fee where the defendant had agreed to pay attorney fees, but the amount was unresolved.  The PSC in *Turner* requested a fee in relation to the total recovery, but the Court found a lesser sum "is the appropriate pot from which to calculate

---

[14] See cases cited at on pages 9-10 of the Allocation Memorandum.

[15] *In re Vioxx Prods. Litig.*, 760 F.Supp.2d 640, 653 (E.D. La. 2010).

[16] Allocation Memorandum at p. 11.

[17] The FC's discussion of "The Impact of the Common Benefit Fee Award on the Fees of Privately-Retained Counsel" is the last section in the Allocation Memorandum. Doc. 20293-1 at p. 54.

attorneys' fees," after deducting certain sums for voluntary settlements and pre-settlement remediation payments. Ultimately, the Court awarded 17% of the $195,000,000, rather than 35% of $330,126,000 as requested by the PSC.[18]  Whereas the attorneys in *Turner* argued for a larger pot from which to calculate fees, which the Court rejected, the FC in the instant matter points to the *wrong* pot.  Here, the allocation of fees must be determined from the Global Award, not the total recovery.

The FC's treatment of the *Vioxx* fee allocation is emblematic of its distorted analysis.  The FC relies on *Vioxx's* benchmark calculation[19] and the Court's recognition of its authority to alter contingency fee agreements,[20] but avoids any recognition of the Court's careful treatment of the allocations between individual counsel and common benefit counsel.  Simply put, the FC avoids the most relevant aspect of *Vioxx* for purposes of the specific task at hand.

First, the Court in *Vioxx* recognized the unique characteristic of a common benefit fee in an MDL proceeding and that primary attorneys, not the claimants, are principal parties to the "tension" over fee allocations:

> In a typical application for a class action fee award, the Court allocates a percentage of the class's recovery to class counsel as compensation. Fed. R. Civ. P. 23(h). Class counsel perform all the work on behalf of the class and are the sole attorneys for the class members. With few exceptions, all work done by class counsel benefits all members in the class and not just the lead plaintiffs.  Thus, in a typical class action fee award the tension is between the interests of counsel in receiving reasonable compensation for their work, and class members in ensuring that counsel does not receive a windfall.
>
> The dynamic involved in the fee application in the present case is different. The Settlement Agreement was not a class action settlement, but was rather a

---

[18] 472 F.Supp.2d at 862, 869.

[19] Allocation Memorandum at p. 13.

[20] *Id*. at 55.

complicated opt-in resolution of individual personal injury claims. The vast majority of these personal injury claims were governed by a contingent fee contract between the individual claimant and his or her primary attorney. The Court, as mentioned, previously capped the amount of those contingent fee contracts at 32%. By the terms of the Settlement Agreement and this Court's Order capping fees, ***a common benefit award is deducted not from the claimant's portion but from the total amount of counsel fees payable under the individual contingent fee arrangements***. Thus, 32% of $4.85 billion represents the total amount of possible attorney compensation, including work done by the claimant's primary attorney on his or her behalf and work done by common benefit attorneys on behalf of all Vioxx claimants. ***The tension in this case is between the attorneys who have done common benefit work and the primary attorneys who have not***.[21]

Likewise, in the instant proceeding, the vast majority of the claims are "governed" by contingent fee contracts, the Global Award effectively establishes a capped fund for attorneys' fees, and the tension is solely between primary counsel and common benefit counsel.

As in *Vioxx*, most of the settlement agreements approved in this case limit attorneys' fees to 32% of the settlement amount with no more than 15% allocated to common benefit counsel, a 46.9%/53.1% allocation.[22]   The Allocation Memorandum does not apply these provisions when seeking an across the board 60/40 allocation.   While Parker Waichman in no way concedes that common benefit counsel is entitled to 46.9% of that portion of the Global Award resulting from

---

[21] 760 F.Supp.2d at 653 (emphasis added).

[22] Amended Settlement Agreement Regarding Claims Against Interior-Exterior in MDL No. 2047 (Doc. 12258-3) at §16.7; Settlement Agreement in MDL No. 2047 Regarding Claims Involving Builders, Installers, Suppliers, and Participating Insurers (Doc. 15695-2) at § 16.6; Settlement Agreement in MDL No. 2047 Regarding Chinese Drywall Claims Against Non-manufacturing Defendants Insured by Nationwide (Doc. 15969-5) at § 17.8; Settlement Agreement in MDL No. 207 regarding Chinese Drywall Claims Against the Porter-Blaine Corp. and Venture Supply, Inc., and Certain of Their Insurers (Doc. 15969-6) at § 16.8; Settlement Agreement in MDL No. 2047 Regarding Chinese Drywall Claims Against Tobin Trading, Inc.; Builders Plaster & Drywall, LLC; JMM Drywall Co., LLC; and Participating Insurers (Doc. 15969-7) at § 17.8; Settlement Agreement in MDL No. 2047 Regarding Chinese Drywall Claims Against Defendants Insured by Builders Mutual Insurance Company (Doc. 16478-3) at § 17.8; Order Preliminarily Approving Amended Stipulation and Agreement of Settlement of Banner Class Action (Doc. 10064) at ¶ 14.7 (only limiting attorneys' fees to 32%).

those agreements,[23] under no circumstances should common benefit counsel receive more than that. To be clear, the Knauf settlement agreement does not limit attorneys' fees to 32% of the settlement amount; rather, it sets attorneys' fees at $160,000,000.[24]  Using the other settlement agreements as guide posts, however, it is clear that primary counsel expected a similar allocation with primary counsel receiving a majority of the fees.  They did not nor could not contemplate their contingency fees being discounted so drastically as now proposed by the FC.

In addition to recognizing the tension between primary and common benefit counsel, the Court in *Vioxx* recognized that the interest of primary counsel should be considered in the context of the defined pool of fees *while* establishing a benchmark percentage:

> . . . the Court finds that 6% of the settlement amount is a reasonable benchmark percentage for a common benefit fee award. This figure represents about 20% of the total attorneys' fees. This figure is within the range of MDL awards and assessments described above. No part of this 6% will come from the recovery of any Vioxx claimant; rather, ***it will be assessed against the contingent fee recoveries*** of all Vioxx primary plaintiffs' attorneys. Furthermore, in recommending the Settlement Agreement to their clients and participating in the Settlement Program, all Vioxx primary plaintiffs' attorneys consented to a common benefit assessment of up to 8%. Accordingly, an assessment of 6% is clearly acceptable to them. It is now appropriate to test this percentage in the crucible of the *Johnson* factors to determine whether an adjustment, upwards or downwards, is in order.[25]

And then again *after* applying the *Johnson* factors:

> The Court has found that at least three of the *Johnson* factors warrant an upward adjustment of the benchmark percentage. Based on its observation and knowledge of the amount and nature of the common benefit work done in this case, the Court concludes that a reasonable adjustment is 0.5%. Accordingly, the Court will increase

---

[23] *See* Declaration of Russ M. Herman and Arnold Levin, Doc. 17700-2 at ¶19 (setting forth the amount of attorneys' fees resulting from each settlement agreement).

[24] Third Amended Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047, Doc. 16407-3.

[25] *Id*. at 655 (emphasis added).  Similarly, in this case, the Court ordered a voluntary assessment of 17% of settlement proceeds from any settlement for a particular property.  Doc. 8545.  For counsel, such as Parker Waichman, who executed 40% contingency fee contracts with clients, this assessment would result in a 42.5%/57.5% allocation of total attorneys' fees.  This division further supports Parker Waichman's position that the FC's proposed allocation is utterly unreasonable and arbitrary.

the benchmark percentage upward from 6% to 6.5% of $4,850,000,000, or $315,250,000. ***Primary Vioxx attorneys will still receive over 25% of the total settlement value in this matter***, amounting to approximately $1,236,750,000. This should be adequate compensation for the primary attorneys, particularly in light of the benefits of economies of scale and for the relief of the burden of pretrial discovery and settlement negotiation.[26]

Only then does the Court turn to the Lodestar cross-check.

By comparison, in the instant matter, the FC proposes establishing a benchmark percentage, applying the *Johnson* factors to arrive at a proposed fee award for common benefit counsel, and then cross-checking with Lodestar *before* even considering the "impact" on privately retained counsel.[27] This approach effectively results in a cram-down for primary counsel and is inconsistent with the methodology employed in *Vioxx*.

The other case precedent from this Court cited by the FC likewise does not support the 60/40 split in favor of common benefit counsel based on such a harsh and blatantly arbitrary reduction of the contingency fee of primary counsel. *In re: Educational Testing Services*, 555 F.Supp.2d 661 (E.D. La. 2007), involved a 50/50 split between primary counsel and common benefit counsel based on protocol that expressly weighed the contribution and rights of individual counsel.[28] In the instant matter, the FC utilized no court-sanctioned protocol (perhaps none at all) and devotes a single paragraph to describing the contribution of individual counsel.[29] This bare

---

[26] *Id*. at 658 (emphasis added).

[27] *See* Allocation Memorandum at p. 54.  The FC does not actually include the interest of primary counsel as part of the analysis, but instead confronts the issue out of necessity after arriving at a proposed common benefit fee award, as though attempting to explain to the Court why primary counsel should be satisfied with the size of the slice left over.

[28] 555 F.Supp.2d at 664.  The Court initially set the total fee award at 29% of the total recovery and then split the fees evenly between individual counsel and common benefit counsel, 14.5% each.  *In re: FEMA Trailer Formaldehyde Products Liab. Litig*., MDL No. 0718-73 (E.D. La.) likewise involved an equal split of a 28% total contingency award.

[29] The FC claims that it "does not seek to deny the value of private counsel services to clients. . . Private counsel obviously are responsible for the 'critical mass' of claims which the litigation is comprised, without which the performance of common benefit work at even the highest level would be of little, if no practical consequence."  Allocation Memorandum, Doc. 20293-1 at p. 57.

depiction stands in sharp contrast to the more thorough, glowing depiction in the Global Fee Memorandum.[30]  Further, the FC makes short rift of the contractual rights of individual counsel in a single sentence: "Whatever fee percentages might be specified in retainers with clients, these counsel surely must concede that all such retainer fee percentages have been made subject to modification by virtue of the fee provisions of these class settlements."[31]  The FC cites no specific language in the settlement agreements and provides no analysis of the extent to which its proposed fee allocation would "modify" the retainer agreements of primary counsel.  To be clear, Parker Waichman has not and will not consent to its fee agreements being reduced from 40% to 11.9% nor to any allocation based on rationale that primary counsel should be required to absorb a disproportionate discount to common benefit counsel.  There is no authority for such a preposterous claim.

## IV.    The FC's Allocation is Arbitrary

The FC's proposed allocation is devoid of justification for the 60/40 split with good reason – there is none.  Such an arbitrary figure demonstrates the need for a court-mandated protocol to determine the allocation of the Global Award.  This protocol should establish an allocation method that is "fair, transparent, and based on accurately recorded data"[32] and recognizes the rights of private parties to enter into legally binding contracts.

In *In re Educational Testing Services*, an attorney fee compensation committee established a protocol that sought "to compensate Common Benefit Counsel in proportion to the work they performed that meaningfully advanced the position of the plaintiffs as a whole, while also fairly

---

[30] Doc. 17700-1 at pp. 32-38.

[31] Allocation Memorandum, Doc. 20293-1 at p. 55.

[32] 74 La. L. Rev. 371 at 381.

rewarding the value of the work performed by Individual Claimants' Counsel."[33]  All counsel were notified of the protocol and requested to file brief memoranda explaining their common benefit contribution to the litigation, along with any work performed on behalf of individual claimants. Factors considered by the compensation committee included: "meaningful participation in status conferences, discovery, preparation of expert witnesses, preparation of pleadings and motions, committee work, developing and coordinating litigation and settlement strategy, providing assistance to the Special Master and Court Appointed Disbursing Agent (CADA), and the total number of hours spent on the litigation."[34]

A similar protocol should be established in this case for the purpose of allocating the Global Award between primary and common benefit counsel and among common benefit counsel after the initial allocation is made.  While not the subject matter of this Opposition, Parker Waichman suggests there are other factors, which will be briefed at a later date, that must be evaluated in the part of the fees that are allocated to the common benefit.  At this juncture, a fair and proper process would promote fairness, transparency and accuracy while allowing all interested parties to conduct discovery and obtain the information needed to fully evaluate and compare the contributions of common benefit counsel and individual counsel.  Discovery would include, but not be limited to, depositions of the FC members, production of meeting transcripts, time and rate entries submitted by each firm and approved by Mr. Garrett, and an accounting of the number of clients and recovery for each primary counsel.  With this information, counsel can adequately brief the facts and issues and suggest a more appropriate allocation, commensurate with the work and effort expended.

---

[33] *In re Educational Testing Services*, 555 F.Supp.2d at 663-664.

[34] *Id.* at 664.

## V.      The FC Undervalues the Contributions of Primary Counsel.[35]

The proposed allocation unfairly bolsters the claims of common benefit counsel at the

expense of primary counsel.  In so doing, it demeans the foundational role primary counsel served

in this litigation.  As an initial matter, this litigation and the resulting settlements would not exist

but-for primary counsel who, because of their reputations, skill and relationships, were the chosen

representatives of approximately 9,300 (Doc.20293-1 at p. 19) homeowners.  As Your Honor has

recognized, "Undercompensating attorneys who handle such litigation would result in too few

meritorious private suits being brought and less competent representation in the cases that are

brought."[36]  Parker Waichman, along with all other privately retained counsel, initially identified

and contracted with actual claimants/plaintiffs; they were the driving force behind this MDL.  In

fact, Parker Waichman was at the forefront of this litigation and filed the first class action lawsuit

in federal court in the Middle District of Florida in *Allen v. Plasterboard Tianjin Co., Ltd.*, Case

No. 2:09-cs-00054 and subsequently filed suit on behalf of individual plaintiffs in the Middle

District of Florida in *Schatlze v. Knauf Gips KG,* Case No. 2;09-cs-419.[37]

The time and labor expended by primary counsel, in these lawsuits, **which preceded this**

**MDL,** simply cannot be fairly discounted from a 40% contractual fee to the absurdly low 11.9%

proposed by the FC.  Representation of the affected homeowners encompassed matters far beyond

---

[35] Section V outlines the key activities conducted by primary counsel.  For a more in-depth discussion regarding the activities undertaken by primary counsel in connection with this MDL, Parker Waichman hereby references and adopts *Primary Counsel's Request to Allocate the Global Fee Award Between Common Benefit Counsel and Primary Counsel and Objections to the Fee Committee's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Attorneys and Individual Counsel Fees Pursuant to PTO 28(F)*, Doc. 20336 at pp. 6-21.

[36] *In re Vioxx Products Liability Litigation*, 574 F.Supp.2d 608, 611 (E.D. La. 2008) (citing *Gair v. Peck*, 6 N.Y.S.2d 491, 160 N.E.2d 43, 48 (N.Y. 1959)).

[37] While a full explanation of specific efforts of Parker Waichman will be provided in the requested additional briefing and/or in the impending dispute over the common benefit fee allocation, these efforts are discussed briefly herein to provide context to Parker Waichman's position that primary counsel deserve more than 40% of the Global Award.

the direct impact of Chinese Drywall.  As aptly explained by the FC and PSC in support of their

request for the Global Award:

> [T]he representation of some of the individual homeowners
> impacted by Chinese Drywall required substantial efforts by
> individual attorneys separate and apart from the common benefit
> work performed by the PSC.  For example, attorneys representing
> homeowners may have been required, depending on the
> circumstances, to provide individual advice on matters such as
> mortgage relief, property tax relief, homeowner insurance claims,
> homeowner association responsibilities, IRS casualty loss claims,
> competing remediation solutions, preservation protocols, disclosure
> for subsequent sales, foreclosure and health concerns.[38]

With regard to the property damage caused by the Chinese Drywall, significant effort was

undertaken by primary counsel and specifically the staff at Parker Waichman.  In ascertaining

whether Chinese Drywall, and a resulting claim, was present, counsel conducted an inspection, or

multiple inspections, of each property, absent "published guidelines or criteria."[39]  If Chinese

Drywall was used in the property, counsel had to determine who was responsible and identify the

manufacturer(s) of the drywall; oftentimes, there were multiple manufacturers in one home or

property.  This "identification of the supplier and installer was a labor intensive effort on the part

of the individual attorneys."[40]  Once the responsible parties were identified, Parker Waichman and

privately retained counsel had to organize[41] information specific to the clients including, *inter alia*,

the extent of the damage(s), the manufacturer(s) and others in the chain of commerce of the subject

CDW.

---

[38] Global Fee Memorandum, Doc. 17700-1 at p. 44-45.

[39] *Id.* at 44.  In many instances, these attorneys incurred costs which will not be reimbursed pursuant to the settlement agreements.  Doc. 17700-1 at 49.  These sunk costs will necessarily further erode the fees of individual counsel.

[40] *Id.* at 45.

[41] Parker Waichman had approximately 515 individual clients who benefitted from the Knauf settlements, not to mention the other hundreds of clients who did not have Knauf CDW or ultimately settled with builders and for whom Parker Waichman received no fee.

Additionally, Parker Waichman sought out, identified and retained experts with regard to liability, causation and damages.  Working with those experts, it consequently determined indicia and symptoms of CDW damage.  The firm met with the Florida Department of Health and provided other local, state and federal agencies with documentation regarding CDW damages, protocols for inspections and other issues.  Parker Waichman held informational town hall meetings where its experts made presentations and otherwise educated homeowners as to the signs of Chinese Drywall, their potential remedies, their rights and obligations as clients and the preservation of evidence.

As a consequence of Chinese Drywall, affected property values plummeted and homes became unmarketable – setting off a chain of events requiring attention by primary counsel. "[I]ndividual attorneys put extended efforts into contacting [mortgage holders], seeking to abate mortgage obligations so homeowners could either move out or stop the potential and continuing financial losses associated with having a CDW-impacted home."[42]  Similarly, "attorneys were asked in some cases to advocate for a reduction of assessed property taxes from local Property Tax Assessors" which required significant communication and documentation.[43]  Beyond mortgage abatement and tax reduction, primary counsel wore many other hats.  To name only a few, they were responsible for providing advice and handling issues pertaining to homeowners' insurance policies, homeowners' association fees, remediation efforts, health effects of Chinese Drywall, strategies for negotiating with mortgagees and the resulting paperwork, preservation of evidence once remediation was complete, and homeowners' rights under various remediation programs.[44]

---

[42] *Id.* at 46.

[43] *Id.*

[44] *Id.* at 44-49.

While much other work was performed by Parker Waichman, the time and effort it made with regard to the "omnibus" actions must be specifically noted.  To facilitate the continued litigation of the CDW claims, the Court ordered the filing and litigation of specific omnibus complaints/lawsuits.  These omnibus complaints, approximately eighteen (18) of which were filed, were organized based on the identity of the CDW entity that manufactured the product.  At the request of the PSC leadership, Parker Waichman investigated the claims of individual class members, identified the relevant CDW defendants and otherwise assisted in obtaining the proper plaintiffs for the omnibus complaints.  Parker Waichman next undertook significant discovery and further litigation efforts in regards to these groups of plaintiffs.  Ultimately, the FC disingenuously determined this was purely for the benefit of Parker Waichman's clients and not of common benefit.

Finally, another essential function performed by privately retained counsel, including Parker Waichman, and **absolutely ignored by the FC**, has been and continues to be the plethora of matters involved in administering an individual client's claims following the settlements.  The volume of work for the individual clients far exceeds that required in more routine personal injury or property damage cases.   Many of the affected properties required remediation.   Parker Waichman and presumably other privately retained counsel coordinated most of these efforts between the defendants, the contractors and the clients.  Information was gathered and sometimes created before it was uploaded to the settlement administrator's website, including inspection reports, plaintiff profile forms and proof of damage documents.  After a determination was made as to how much an individual client was entitled, the client could choose to accept or reject the award.  If accepted, Parker Waichman facilitated the exchange of forms, information and funds between the payor and the client and assisted with the completion of tax documents and

verifications.  If an award was rejected, further work by Parker Waichman was necessary in undertaking an appeal.  **The PSC and other common benefit counsel did not have these duties and responsibilities.**[45]

Surely, an undertaking such as this deserves more than a mere 11.9% of the benefits conferred on the clients (or 40% of the proverbial pie).

## VI.     Common Benefit Time Entries Must be Analyzed

Common benefit counsel should be compensated only to the extent their time advanced the interests of the entire class,[46] was reasonably necessary,[47] not excessive[48] and not duplicative.[49] Mr. Garrett, the court-appointed CPA, approved 202,309.35 hours in common benefit time.[50] While Mr. Garrett has audited this time to ensure objective compliance with PTO 9 (Doc. 147),[51] no one other than the FC has been allowed to review and scrutinize this time for value-added to the litigation, necessity, excessiveness or duplication.  Parker Waichman suspects that many of the activities, upon which the FC relies in seeking the 60/40 allocation, were self-serving, duplicative,

---

[45] Parker Waichman utilized and hired office staff, paralegals and attorneys to assist in this massive undertaking. Parker Waichman estimates over 5000 hours of time has been expended by these professionals alone.

[46] PTO 9, Doc. 147; *In re: Sulzer Hip Prosthesis*, 268 F. Supp.2d at 924-925 (N.D. Ohio 2003).

[47] *Id.* at 925.

[48] *Id.*

[49] *See Walker v. U.S. Dep't of House. & Urban Dev.*, 99 F.3d 761, 768 (5th Cir.1996).

[50] *See* Doc. 20293-1 at p. 18.

[51] Mr. Garret reviewed all submitted entries to ensure compliance with the form requirements of PTO 9 and verify to the "arithmetic accuracy of the summaries of time and expense submitted by each counsel."  Revised and Updated Affidavit of Philip A. Garrett, C.P.A. Pursuant to Pretrial Order No. 28(F), attached as Exhibit A to Allocation Memorandum, Doc. 20293-2 at ¶ 13.  While Mr. Garrett acknowledged that he conducted a review of counsel submissions "to determine if there were circumstances present which would require [him] to disallow items of time and expense from inclusion under the terms of PTO 9," he failed to divulge those circumstances to anyone other than counsel whose time was disallowed and, therefore, others counsel are left guessing what this review entailed.  At a minimum, one can conclude that because PTO 9 does not address necessity, excessiveness, duplication or reasonableness, time entries were not reviewed on these bases.

unnecessary, assigned to particular personnel not based on ability or merit and not for the benefit of the class.

While articulating specific examples is impossible with the scarce information available to it, Parker Waichman believes that, in general, many of the tasks undertaken in this litigation were unnecessary and self-serving.  For instance, superfluous depositions were conducted abroad "in Germany, Hong Kong, and other distant venues . . . ."[52]  Compounding the expense and fees incurred for these depositions, multiple attorneys, purportedly acting for the common benefit, were in attendance unnecessarily.  Reportedly, some may have used this opportunity for personal endeavors.

Further, Parker Waichman believes there could be extensive duplication in common benefit time entries, serving to further inflate the request for common benefit fees.  In scrutinizing fee awards for duplication of efforts, the Fifth Circuit has warned:

> The first [objection] is that there were duplicative billings, in that two or three attorneys came to hearings and depositions. The district court is required to determine whether particular hours claimed were reasonably expended. If more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized. The time of two or three lawyers in a courtroom or conference when one would do, may obviously be discounted.[53]

The above are only a few examples of why additional discovery is critical in this case where only a select few were privy to the activities of common benefit counsel.  Individual counsel, who are now being asked to reduce their fees to a paltry 11.9% when they originally contracted with their clients for 33 1/3%-40%, should be allowed to analyze and test the sufficiency of the common benefit fee request.

---

[52] Allocation Memorandum, Doc. 20293-1 at p. 62.

[53] *Walker*, 99 F.3d at 768 (internal citations omitted).

**CONCLUSION**

For the reasons set forth above, Parker Waichman respectfully requests this Court to deny the FC's proposed fee allocation, order the parties to conduct discovery for the purpose of allocating fees between common benefit counsel and individual counsel and allow additional briefing and a contradictory hearing.

Respectfully submitted,

**FAIRCLOTH, MELTON & SOBEL, LLC**

By:    /s/ Jimmy R. Faircloth, Jr.

Jimmy R. Faircloth, Jr.        La. Bar Roll #20645
jfaircloth@fairclothlaw.com
105 Yorktown Drive
Alexandria, LA 71303
Phone: (318) 619-7755
Fax: (318) 619-7744

Brook L. Villa                La. Bar Roll #31988
Franklin "Drew" Hoffmann   La. Bar Roll #35824
bvilla@fairclothlaw.com
dhoffmann@fairclothlaw.com
301 Main Street, Suite 920
Baton Rouge, LA 70801
Phone: (225) 343-9535
Fax: (225) 343-9538

***ON BEHALF OF PARKER WAICHMAN LLP***

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Opposition has been served on Plaintiffs'
Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and
e-mail <u>or</u> by hand delivery and e-mail <u>and</u> upon all parties by electronically uploading the same to
Lexis Nexis File & Serve in accordance with Pretrial Order No. 6, and that the foregoing was
electronically filed with the Clerk of Court of the United States District Court for the Eastern
District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing
in accordance with the procedures established in MDL 2047, on this 28th day of June, 2016.


_____/s/ Jimmy R. Faircloth, Jr._____

OF COUNSEL