**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL | : | MDL NO. 2047 |
| PRODUCT LIABILITY LITIGATION | : | |
| | : | SECTION: L |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE FALLON |
| | : | |
| | : | MAG. JUDGE |
| ALL CASES | : | WILKINSON |
| | : | |

**COLLINS & HORSLEY, P.C.'S BRIEF IN SUPPORT OF INDIVIDUAL COUNSEL'S REQUEST TO ALLOCATE THE GLOBAL FEE AWARD BETWEEN COMMON BENEFIT COUNSEL AND INDIVIDUAL COUNSEL AND OBJECTION TO THE FEE COMMITTEE'S MOTION TO DETERMINE THE ALLOCATION OF THE GLOBAL FEE AWARD AS BETWEEN COMMON BENEFIT AND ATTORNEYS AND INVIDIAUAL COUNSEL FEES PURSUANT TO PTO 28(F)**

Comes now the Law Firm of Collins & Horsley, P.C. (hereinafter "Primary Counsel" or "PC") and files its Brief in Support of Individual Counsel's Request to Allocate the Global Fee Award Between Common Benefit Counsel and Individual Counsel and Objections to the Fee Committee's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Attorneys and Individual Counsel Fees Pursuant to PTO 28(F). As grounds Claimant shows onto the Court the following:

### I. INTRODUCTION AND SUMMARY OF ARGUMENTS

After Hurricane Katrina, and in connection with the housing boom, a drywall shortage occurred in the United States. Suppliers sought alternative sources to domestically produced drywall and began to import it from many countries, among them, China. Knauf, in conjunction with Chinese companies, and Taishan, a Chinese owned company, were two of the producers of drywall that were imported into the United States. It was soon discovered that these brands of drywall were problematic and caused corrosion in homes.

1

Individual lawsuits were filed in state and federal courts and in June 2009, all Chinese drywall litigation was transferred to the Eastern District of Louisiana, MDL 2047, before the Honorable Eldon Fallon.  This Court appointed the initial steering committee on July 7, 2009. The first Omni Complaints were filed on January 15, 2010, *Sean Payton, et al. v. Knauf Gips KG, et al*.  Over the course of the next three years various settlements were negotiated including Knauf Settlement, Knauf II Settlement, Banner Supply, L&W Supply, InEx, Builder and Global.

On May 19, 2016, this Court granted a global attorneys' fee award of $192,981,363.35. On June 6, 2016, the Fee Committee ("FC") filed its Allocation Motion requesting a common benefit fee of 10.65% of the total settlement equaling $119,313,367.08 ($114,581,308.21 after reduction of common benefit set asides) and minimizing privately retained counsels' total fee to $78,400,054.53.  Based on the extent of work required by PC and for the reasons laid out in this pleading, this fee is proper for the reasons enumerated below.

### B. SUMMARY OF THE ARGUMENT

The 10.65% common benefit fee requested by the FC is excessive andt he FC's reliance on Class Action settlements to support the 8% initial benchmark is improper in light of the circumstances surrounding this case.  PC's evaluation is that a 5% benchmark is appropriate. Additionally, utilizing this Court's analysis in *In re: Vioxx* and taking into consideration the *Johnson* factors, PC position is that 3 *Johnson* factors weigh in favor of a small or moderate increase (time, novelty and amount involved) but the additional 9 factors weigh in favor of a decrease or against any increase in the benchmark.  Accordingly, PC requests this Court find that an appropriate common benefit fee is 5%.

Additional there are several problems with the FC's Allocation Motion:

1. Common Benefit Counsel, by claiming hours expended on Taishan, is seeking common benefit fees for Taishan, a matter that has not settled, and has knowingly reported to the Court false information of the impact of the Taishan litigation.

2. FC's Valuation of the Settlement is improper, as FC has provided a grossly inflated number in an attempt to garner a higher fee.

3. FC's benchmark is based on class actions rather than MDL/mass tort litigation..

4. Common Benefit Counsel breached their fiduciary duty to the individually retained/primary counsel by utilizing assessment fees to defend a lawsuit where they were personally named and negotiation a fund for attorney's fees that is inadequate.

5. The *Johnson* factors do not weigh in favor of an upward adjustment to the benchmark.

6. FC attempts to undermine the scope of work performed by individually retained/primary counsel.

7. FC does not allocate all funds available for fees, and by doing so has violated its duty of candor to the Court.

## II. REPRESENTATION BY INDIVIDUAL COUNSEL

**A.**    **The Fee Committee's Allocation Request and Impact on Individual Counsel.**

The FC's allocation request reduced PC's contract fees from an average of 35% to an 11.9% fee of the benefit provided to a client.

The Plaintiff's Steering Committee (hereafter "PSC") and Common Benefit Counsel (hereafter "CBC") were solely responsible for the negotiation of the common fund for attorneys' fees, and Primary Counsel had no involvement in the fee negotiations.  The PSC and CBC failed

to create an adequate common fund to accommodate their request for $114 million in common benefit fees.  The risk of creating an inadequate common benefit fund should be borne by the PSC and the CBC since they were solely responsible for the fee negotiations.  However, due to the PSC and CBC's failure to create an adequate common fund, the PSC and CBC now seek to punish PC by reducing their individual contract fees from an average of 35% to the equivalent of an 11.9% fee.  If the FC's request of $114,581,308.82 of the available $192,981,363.65 is granted, PC will be left with a fund of $78,400,054.53.  Based upon the formula set forth by Judge Fallon in PTO 28(F), ¶5, PC will receive a fee of only 11.9% of the benefit provided to a client.  For example, if a homeowner remediated their home at a total cost of $100,000, PC will receive only $11,900 in fees as opposed to $35,000 under their typical fee agreement.

In an attempt to justify the fee request, the PSC and CBC grossly underestimate the amount of work conducted by PC and grossly inflate the value of the settlement.  In light of PC's work set forth below, the FC's request for common benefit funds in the amount of $114 million is unreasonable.

### B.   Explanation of Representation by Individual Counsel Typical to Each Homeowner.

The PSC recognizes that PC representing the individual homeowners with homes containing Chinese Drywall faced numerous challenges in each case depending on the individual circumstances presented.  (*See* Memorandum of Law in Support of Consolidated Joint Petition of the FC and the Plaintiffs' Steering Committee for Global Award of Attorneys' Fees and Reimbursement of Expenses, filed May 16, 2014 pursuant to PTO 28 at p. 32 (hereafter "Global Fee Petition"))  In fact, the Global Fee Petition sets forth a detailed six (6) page analysis of work performed by PC.  (*See* Global Fee Petition at pp. 92-98).  The FC and PSC now retreat from that position; seeking to discount PC's work for the purpose of the allocation of the common fee

fund.

The FC's current position that the majority of necessary services to complete this litigation were carried out and performed on behalf of all Plaintiffs by the CBC is completely inaccurate. Contrary to the earlier Global Fee Petition, the FC now seeks to discount PC's work by setting forth a number of steps in its Fee Allocation Motion that it asserts are needed to complete a typical personal injury/property case and asserts that CBC performed the great majority of this work. (*See* Memorandum in Support of the FC's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and PC's Fees Pursuant to PTO 28(F) at pp. 58-59 (hereafter "FC's Fee Allocation Motion"). A Chinese Drywall case is far from a typical personal injury and property damage case. The FC's assertion shows a lack of understanding of the individual issues involved in a Chinese Drywall case and the work needed from PC to provide individual homeowners with a positive resolution.[1] In addition, the FC's position that most of the settlement-related services could be performed by non-attorney staff, once again displays the FC's lack of knowledge regarding the work involved in the implementation of the settlement. (*See* FC's Fee Allocation Motion at p. 61.) In dealing with a home suffering damage, a homeowner requires a very high level of individual attention and attorney involvement in all aspects of the litigation and settlement process. (*See* Affidavit of W. Brian Collins attached as Ex. 1). Even work that could be conducted by a non-lawyer is the responsibility of PC to oversee and monitor. (*See* Ex. 1). Each PC determined how to properly represent their clients in a Chinese Drywall case. The FC has no right or basis to retrospectively determine that work performed by PC was work that should have been performed by a non-lawyer.

---

[1] In fact many of the items the PSC takes credit for created a greater burden on the privately retained attorneys such as plaintiff profile forms, work authorizations, claim forms and document gathering.

Unlike other mass litigation, the individual issues addressed by PC in Chinese Drywall cases were unprecedented.  The PSC produced a settlement that required PC to implement and oversee an extensive remediation construction project of each home from the proposal stage to completion of the punch list items.  (*See* Ex.1)  The PSC could have produced a settlement that did not require such a high level of involvement from PC in its implementation, but that was not the case. As a result of the structure of the settlement negotiated by the PSC, PC spent years overseeing construction projects.  (*See* Ex .1)  Further, the responsibility of these issues was left to the PC with little or no involvement by the CBC.  (*See* Ex. 1)  In fact, few, if any, individual clients had any contact with the CBC and would not know CBC purporting to represent them. (*See* Ex. 1.)  All individual client contact outlined herein took place through PC.  (*See* Ex. 1.)

In order to complete the resolution of each Chinese Drywall claim, PC performed most, if not all of the work associated with the following tasks on each file:

- Case generation
  - Determination of location of home with Chinese Drywall
  - Determination of suppliers of Chinese Drywall
  - Research and determination of builders using Chinese Drywall
  - Research and determination of location of home containing Chinese Drywall
  - Correspondence to potential Chinese Drywall homeowners
  - Newspaper interviews
  - Conducted radio talk show interviews
  - Conducted local TV interviews
  - Community/HOA Meetings
  - Research and review of building permits in Alabama during years 2006 and 2007
- Conducted initial client interviews/intakes
- Established criteria for homes which may contain Chinese Drywall
- Set up inspection of home, often times multiple inspections were required in order to locate Chinese Drywall in a home
- Established standards for inspection and evidence needed through inspection
- Research regarding identifying marks of various Chinese Drywall manufacturers
- Research and review of INEX/suppliers invoices
- Attendance at Community/HOA Meetings
- Research and review of builder's licensing information and builder's incorporation information
- Attendance at initial inspection of the property

- Evaluation of home for contaminated Chinese Drywall
- Evaluation of manufacturer of contaminated Chinese Drywall
- Evaluation of potential damages to home, including electrical, plumbing and HVAC damages
- Evaluation of potential number of Chinese Drywall sheets in the home
- Evaluation of client's potential claims and potential defendants
- Evaluation of possible defendants, including builder, supplier, manufacturer, and installer
- Evaluation of possible caveat emptor issues regarding builder
- Review of medical records for the evaluation of possible bodily injury claims and health issues
- Meeting with client to discuss possible legal claims and expectations for relief
- Evaluation of possible repair/remediation scenarios, including protocol to properly repair a Chinese Drywall home
- Discussions with client regarding preservation protocols and option for self-remediation
- Discussions with clients, contractors and inspectors for homes undergoing self-remediation to ensure compliance with preservation protocols
- Preparation of fee agreement for client
- Discussion with client regarding fee agreement and issues regarding damages in property damage cases
- Completion of New Client Questionnaire
- Preparation of list of documentation needed from client
- Review of all documents received from client
- Preparation of information for filing of Omnibus Complaint
- Preparation of and filing of initial indicia information for Omnibus Complaint
- Review of Omnibus Complaint to insure all Claimants were included
- Preparation of Plaintiff Profile Form and documents needed for Plaintiff Profile Form
- Preparation of amended Plaintiff Profile Form
- Evaluation of number of HVAC units contained in each home and number of HVAC coil replacements for each home
- Discussions with client regarding homeowner insurance issues and possible homeowner insurance claims
- Discussions with client regarding protest of tax assessment and preparation of possible tax assessment reduction and appeal with the county authority
- Attendance at appeal hearing regarding tax assessment reduction
- Discussions with client regarding IRS casualty loss issues
- Research and discussions with clients regarding health issues, potential bodily injury issues, and the Center for Disease Control's studies of health issues related to Chinese Drywall
- Discussions with clients and reporting to clients regarding status conferences and progress in the MDL
- Discussions regarding moving out of the home and potential recoupment of damages for moving out
- Attendance at several town hall meetings with clients
- Discussions with clients regarding mortgage forbearance and foreclosure issues
- Negotiations with mortgage companies regarding forbearance and foreclosure issues

- Evaluation of possible builder claim and SOL issues regarding builder claims
- Review of applicable building code and possible building code violations by builder
- Preparation of complaint and filing complaint against builder in Alabama state court
- Review of pleadings generated by defendants in builder cases
- Preparation of discovery requests to builder
- Negotiations with builder attorneys regarding builder's liability
- Attendance at status conferences and motion dockets regarding builder lawsuits
- Preparation of draft case management orders for state court judges regarding various discovery tracks for builder cases
- Receipt and review of Case Management Order for each builder lawsuit
- Receipt and review of discovery from builder attorneys
- Response to builder discovery
- Preparation of response to Knauf's Motion to Stay Alabama state court cases in multiple counties
- Attendance at oral argument regarding Knauf's Motion to Stay Alabama state court cases in multiple counties
- Preparation of Chinese Drywall questionnaires in order to determine common symptoms and/or health problems association with Chinese Drywall
- Reviewing Chinese Drywall questionnaires to determine if any correlation between Chinese drywall and health problems
- Review of all cases regarding possible inclusion in the Knauf Demonstration Remediation Program ("Pilot Program")
- Review of all Pilot Program documentation and information
- Explanation of Pilot Program to clients and the program's possible benefits
- Meetings/Conference Calls with clients to discuss Pilot Program and possible submission of their home to Pilot Program
- Preparation of Pilot Program eligibility packet
- Review of Knauf Settlement Agreement and Amended Knauf Settlement Agreements
- Explanation to clients of Knauf Settlement Agreement
- Evaluation of possible opt-out options of Knauf Settlement Agreement with client
- Meeting with clients to discuss Knauf settlement and choosing of Option 1, 2 or 3
- Discussion with client regarding time line for remediation and next steps towards remediation
- Coordinating inspection of home with Morse Zehnter Associates ("MZA") or Benchmark for initial Knauf inspection
- Attendance at the MZA inspection
- Oversight of MZA's compliance with inspection protocol
- Review of MZA inspection results
- Confirmation from Knauf that home meets threshold requirements for Knauf remediation
- Meeting or correspondence with client regarding results of MZA inspection
- Coordinating Moss walk-through inspection for Xactimate estimate
- Attendance at Moss walk-through inspection for Xactimate estimate
- Discussions with client regarding results of Moss walk-through inspection
- Review of Xactimate estimate for compliance with Exhibit F of Remediation Protocol

- Discussions/meeting with client regarding Xactimate inspection
- Approval by client of Xactimate inspection and ANSI square footage
- Discussions/Correspondence with Moss & Associates re: problems with Xactimate
- Review of Xactimate cost for remediation of home
- Review of Final Cost estimates for remediation of home
- Review of work authorization package and information provided by BrownGreer
- Preparation of work authorization package specific to client
- Correspondence to client with copy of work authorization package and instructions prior to meeting
- Meeting with client regarding explanation of work authorization package and remediation program, including scope of the work, releases, and signing of various work authorization documents
- Return of work authorization to BrownGreer
- Correspondence from BrownGreer regarding additional documents or corrections to work authorization package
- Advice to clients regarding possible move out dates, moving companies, and alternatve living arrangements
- Review of move out notice
- Review of notice regarding kick off meeting
- Review of amount of lump sum payment to determine if it matches ANSI square footage
- Attendance at kick off meeting with client and contractors
- Discussions with contractors regarding Xactimate scope, Exhibit F scope and additions and corrections to the scope of work
- Oversight of compliance with Xactimate scope of work and Exhibit F scope of work during remediation
- Review of appliance binder and oversight of compliance with Exhibit F and Xactimate
- Discussions with client regarding appliance binder and options regarding replacement of appliances
- Approval of appliance binder
- Multiple trips to project during project to monitor progress and compliance with Exhibit F and Xactimate remediation protocol and resolve disputes
- Resolution of construction deficiencies, water damage, termite damage found during remediation
- Oversight of GFA inspection compliance
- Mediation of disputes between homeowner and contractor regarding remediation issues
- Negotiations with contractor regarding delays in project and delay payments owed to client
- Attendance at walk through with client and contractor for development of punchlist items and oversight of compliance with Exhibit F and Xactimate
- Attendance at close out meeting with contractor and client
- Determination of final cost of construction
- Review of close out documents, including GFA certification, GFA inspection, warranty information and contractor's certification
- Preparation of close out package for client, including a copy of the GFA certification, warranty information, GFA inspection report, and contractor's certification

9

- Oversight and monitoring of completion of punchlist items and execution of homeowner release of contractor
- Oversight and monitoring of warranty claims and completion of warranty work
- Advice to clients regarding W9 forms and potential tax consequences
- Discussions with client regarding what disclosures are required for subsequent sales of remediated homes
- Evaluation of possible claims for each client under the Knauf Settlement Agreement and Additional Settlement Agreements
- Preparation of claims forms and information for claims
- Inspection by expert for pre-remediation move out claims
- Approval from Knauf for dismissal of builder suits
- Preparation of dismissals of builder suits
- Preparation of W9 forms for claim eligibility
- Preparation of verification of claims forms for claim eligibility
- Updates to clients regarding status of pending claims
- Receipt and review of notice of claim eligibility
- Discussion with client regarding notice of claims eligibility and acceptance or appeal of the notice
- Preparation of acceptance or appeal form for claims
- Receipt and review of claims funds and releases
- Possible appeals of claims notices
- Filing of the claims appealsFp
- Evaluation of each file regarding potential stipend claim
- Review of "Knauf II" Settlement
- Evaluating claims under "Knauf II" Settlement
- Negotiating claims with attorneys for Knauf under "Knauf II" Settlement
- Negotiating Already Remediated Home claims with attorneys for Knauf
- Scheduling of MZA/Benchmark inspections for "Lower Case Knauf" claims

Although it is impossible to include all thought processes and issues for each individual client, a brief description of the tasks involved in a Chinese Drywall case as listed above should be helpful to the Court. Of course, the above list and the following explanations do not cover the individual nuances and questions of each homeowner. Each homeowner and their particular situation required individual attention by PC. The list above and the following explanation are based upon the undersigned PC's experience and recollection of the litigation. The undersigned PC believes that many, if not most, of these same issues were handled by most individually retained counsel.

10

The first step in the Chinese Drywall litigation was to determine where the Chinese Drywall was present, and the time frame it was installed. (*See* Ex. 1)  This process took hours of research, review of thousands of supplier invoices, review of builder permits, correspondence to potential clients, phone interviews and hundreds of inspections. (*Id.*)  Early in the process, extensive efforts were undertake to inspect homes that did not contain Chinese Drywall in order to determine the typical profile of a home that did contain Chinese Drywall. (*Id.*)  As such, PC spent countless hours and expenses on inspection costs for homes that did not contain Chinese Drywall. (*Id.*)  These expenses cannot be recouped and must be paid from fees paid to PC. (*Id.*)  PC spent time and costs advertising, corresponding with potential Chinese Drywall owners, participating in newspaper interviews, talk radio shows and television interviews to provide awareness to the community regarding the presence of Chinese Drywall and the ramifications of such. (*Id.*)  Once public awareness of Chinese Drywall began to increase, PC addressed with individual homeowners the possibility that their homes might contain Chinese Drywall. (*Id.*)  PC fielded hundreds of phone calls and emails from homeowners concerned that their home may contain Chinese Drywall. (*Id.*)  PC established the criteria to determine the potential of a home to contain Chinese Drywall, including the time frame of the construction, the builder and supplier involved in the construction, and the damage caused by Chinese Drywall. (*Id.*)

If PC determined a home had the potential to contain Chinese Drywall, an inspection was conducted by PC with a trained inspector qualified to determine if the home contained Chinese Drywall. (*Id.*)  PC attended the inspections and hired an independent inspector to verify the presence of Chinese Drywall and document damage to electrical, plumbing and HVAC units typically seen with Chinese Drywall homes. (*Id.*)  At the inspection, PC typically attempted to determine the manufacturer of the drywall, the number of and the percentage of defective sheets

in the home and the level of damage.  (*Id*.)

Following the inspection process, PC made a determination to accept or reject cases. (*Id*.)  This required a legal analysis and evaluation of various factors, including, but not limited to: the possible builders; suppliers; installers; contractors; the Chinese Drywall manufacturer involved; the availability of insurance; and caveat emptor/second homeowner issues.  (*Id*.)

PC would then meet with the homeowner and discuss the possible legal claims, possible repair scenarios, potential outcomes of litigation and the fee agreement.  (*Id*.)  Clients sought advice regarding possible health effects and the ramifications of moving out of their home.  (*Id*.) Clients wanted to know if they should move out because of health issues and if they did, would they be compensated for their expenses.  (*Id*.)

PC would next issue the client a New Client Questionnaire requesting specific information regarding the history of the home and requesting documents, including contracts for construction, deeds, HUD-1 statements, warranties, and appraisals.  (*Id*.)  PC then reviewed this documentation and prepared information for the inclusion of the homeowner on an Omnibus Complaint or prepared a separate complaint for filing.  (*Id*.)  To include a homeowner on an Omnibus Complaint, PC had to provide detailed information regarding the owners of the home and information regarding the property, including an inspection report.  (*Id*.)

Once the Omnibus Complaint was filed, PC was responsible for ensuring all homeowners were included on the proper complaint and all Defendants were properly named.  (*Id*.)  PC was also required to provide a Plaintiff Profile Form containing information and documentation for each home.  (*Id*.)  In many cases, PC had to provide an amended Plaintiff Profile Form to supply additional information.  (*Id*.)  Further, in conjunction with Plaintiff Profile Forms, the PSC requested information regarding the number of HVAC coils replaced in each home.  (*Id*.)  As

such, PC completed a survey of all homeowners regarding the number of HVAC units and the number of HVAC coil replacements.  (*Id.*)

During the course of the litigation process, PC consistently responded to questions and advised homeowners regarding homeowner insurance claims, possible tax assessment protests, and IRS casualty loss issues.  PC drafted tax assessment protests and attended a number of hearings with the tax assessor's office representing homeowners in their appeals of the valuation of their home.  (*Id.*)  Homeowners consistently sought advice regarding the potential health issues associated with Chinese Drywall and whether they should move out of their homes and/or stop paying their mortgages.  (*Id.*)  Homeowners required research and updates on research and results of studies regarding the potential health issues associated with Chinese Drywall.  (*Id.*) This issue proved to be very difficult for PC because so little scientific and medical information was available, but yet clients sought reassurance from PC their health was not in jeopardy.  (*Id.*)

PC participated in and attended various town hall meetings with homeowners.  (*Id.*) Throughout the litigation process, PC provided regular updates to clients regarding the status of the MDL and progress of their case towards resolution.  (*Id.*)

Between the discovery of Chinese Drywall in homes and remediation of the home, PC advised homeowners regarding mortgage forbearance and possible foreclosure issues.  (*Id.*)  On many occasions, PC negotiated directly with mortgage companies regarding forbearance or foreclosure issues.  (*Id.*)

Since the MDL Court lacked personal jurisdiction over Alabama builders that constructed homes in Alabama with Chinese Drywall, PC evaluated the statute of limitations for builders' claims and determined builder liability and availability of insurance for each homeowner.  PC determined the applicable building code for each jurisdiction and determined possible building

code violations.  (*Id*.)  As a result, PC prepared and filed numerous builder lawsuits on behalf of homeowners with Chinese Drywall.  (*Id*.)  As such, PC undertook the usual responsibilities of litigation in the builder filed cases, including generation of pleadings, review of defendant's pleadings and preparation and review of paper discovery.  (*Id*.)  Further, PC undertook settlement negotiations with builder attorneys.  (*Id*.)  PC attended status conferences and motion dockets associated with builder lawsuits and was appointed as liaison counsel for Alabama state court Plaintiffs.  (*Id*.)  As liaison counsel, PC designed and drafted case management orders for various state court judges regarding the various discovery tracks needed for builder cases.  (*Id*.)  Further, PC responded to Motions to Stay filed by Knauf and INEX and represented homeowners at oral argument on this issue.  (*Id*.)

Once the PSC announced the Pilot Program as a possible settlement resolution, PC undertook a review of each file to determine if the home was eligible for the Pilot Program.  (*Id*.)  In addition, PC met with and discussed with clients the possibility of enrolling their home in the Pilot Program and the possible benefits and legal ramifications of the Pilot Program.  (*Id*.)  Once a client agreed to participate, PC prepared an eligibility packet containing certain information required by Knauf to consider a home for the Pilot Program.  (*Id*.)  Once accepted into the Pilot Program, a series of inspections took place to determine the eligibility for homes.  (*Id*.)

As the Pilot Program was proceeding, the Knauf Settlement Agreement was announced.  (*Id*.)  Following the Knauf Settlement Agreement, PC spent numerous hours reviewing the Settlement Agreement, interpreting the Settlement Agreement and explaining it to clients.  (*Id*.)  An evaluation of each file was once again required to determine the possible impact on each homeowner.  (*Id*.)  PC conferred with each client regarding the possibility of opting out of the settlement.  PC met with each client to explain the benefits of the settlement under Option 1, 2 or

14

3, explained the inspection and remediation process, scope of remediation and determined which option was best for each client.  (*Id.*)  After a client chose a particular option, PC reported to Knauf and BrownGreer which clients were choosing which options.  (*Id.*)  Due to the benefits of possible cost increases during construction and the availability of change orders for these cost increases, the vast majority of clients chose Option 1 requiring a remediation construction project. (*Id.*)

Following the choice of an option under the Knauf Settlement Agreement, PC coordinated an inspection of each home by MZA or Benchmark.  (*Id.*)  PC attended and oversaw the numerous inspections for compliance with the inspection protocol.  (*Id.*)  PC often provided the inspectors with vital information regarding the location of the Knauf Chinese Drywall and information regarding damages to the home.  (*Id.*)   In addition, the homeowners often had additional legal questions and concerns regarding the Knauf Settlement Agreement that arose during the inspections and required responses.  (*Id.*)  Following the inspection, PC monitored the results to determine if the home qualified for benefits under the Knauf Settlement Agreement. (*Id.*)

If the home qualified for benefits following the MZA inspection, a second inspection and estimate was performed by Moss or another qualified contractor.  (*Id.*)  PC coordinated and attended the Moss inspection and estimate to ensure compliance with the American National Standards Institute ("ANSI") square footage measurements and compliance with the Exhibit F remediation protocol.  (*Id.*)   Again, during the inspections clients had additional questions regarding the remediation process, scope of the remediation and the legal ramifications of participation in the Knauf Settlement Agreement.  (*Id.*)

Following the inspection by Moss or the qualified contractor, PC received an Xactimate

estimate which provided a scope of work for the home and the ANSI square footage that determined the lump sum payment for each client.  (*Id*.)  The Xacitmate was generally between 70 and 120 pages, which PC reviewed to ensure compliance with the Exhibit F protocol, confirmed that all areas of home were listed in the scope of work and verified the ANSI square footage.  (*Id*.)  PC then conferred with each homeowner to explain the Xactimate scope of work and seek approval of the Xactimate scope and ANSI square footage.  (*Id*.)  Hundreds of mistakes were identified in the Xactimates by homeowners and/or PC and had to be documented by PC and submitted to Moss for correction.  Once the Xactimate scope was approved, PC monitored the Xactimate estimated cost for the home and the Final Cost Estimates to ensure that the costs were in line with the size of the home, the quality of the original construction of the home, and the Xactimate scope of work.  (*Id*.)  PC was also provided notice of the lump sum payment to each client.  PC was required to review the each lump sum notice to ensuresthat payment was consistent with the ANSI square footage.

If the homeowner chose Option 1, after the inspection and estimate process was complete, BrownGreer forwarded a generic work authorization package to be completed by PC and homeowner.  (*Id*.)  PC then prepared a work authorization package specific to the particular homeowner and provided it to the homeowner for review.  (*Id*.)  PC then met with each homeowner to review the work authorization package and discuss the remediation program. (*Id*.)  This meeting included discussions regarding legal implications of executing the work authorization and signing of releases.  (*Id*.)  In addition, the practical aspects of implementing the remediation, moving out, lump sum payments, and other move out and repair issues were discussed.  (*Id*.)

Following the return of the work authorization package, BrownGreer provided a "move

out notice" indicating when the homeowner must be out of the home for the remediation to begin.  (*Id.*)  In addition, BrownGreer and/or Knauf provided a date and time for a "kick off meeting" between the contractors, PC and homeowners.

PC then attended the "kick off meeting" at the home.  (*Id.*)  At this meeting, PC oversaw compliance with the Exhibit F remediation protocol and the Xactimate scope of work.  (*Id.*) Typically, numerous return trips to the project were required during the remediation process to ensure compliance with the remediation protocol and monitor the timing and completion of the construction.  (*Id.*)  During the construction process the homeowner typically raised questions regarding the scope of work as well as the quality of work.  (*Id.*)  For most homes, PC mediated disputes and disagreements regarding the scope of the work and the quality of work.  (*Id.*)  There were often disputes regarding the replacement of materials with "like-for-like" materials as required by the Knauf Settlement Agreement.  (*Id.*)  This process of monitoring the remediations and mediating the disputes resulted in countless hours of time expended by PC.  (*Id.*)  Further, this process of dispute resolution required a firm grasp of the Knauf Settlement Agreement and legal interpretations of the agreement, the work authorizations, and the remediation protocols. (*Id.*)

Once a home was stripped of the Chinese Drywall, sometimes construction deficiencies, water and/or termite damage were discovered.  Also unexpected changes had to be made to comply with updated building codes.  (*Id.*)  At this point, PC were required to determine if the costs associated with such repairs were costs associated with the Knauf remediation or the responsibility of the homeowner.  (*Id.*)  There were often disputes regarding which party was responsible for the payment of such repair costs and required PC to determine a suitable resolution.  (*Id.*)

Following the kick off meeting, Moss provided an appliance binder to PC outlining the appliances to be replaced and setting forth the choices the homeowner.  (*Id*.)  PC had to determine if each appliance binder complied with the Knauf Settlement Agreement, the Exhibit F protocol and the Xactimate scope of work.  (*Id*.)  Often, all appliances were not included in the binder and corrections or adjustments to the binder had to be made.  (*Id*.)  This required intimate knowledge of the Knauf Settlement Agreement and the remediation protocols to determine which appliances were to be replaced.  (*Id*.)  PC then explained the appliance binder and potential choices to the homeowner and reported to Moss the homeowner's decisions. (*Id*.)  In homes greater than 3500 square-feet appliances, were considered salvageable.  On several occasions the appliances in these homes were deemed to be salvageable on the initial inspection, but as remediation progressed, concerns were raised.  Additional inspections had to be negotiated and set up to determine whether a specific appliance was, in fact, salvageable.

As projects neared completion, there were often delays which required negotiations for delay payments owed to the homeowner.  (*Id*.)  PC was responsible for monitoring the deadlines, calculating the delay and negotiating the delay payments for homeowners.  (*Id*.)  Due to the incompetence of contractors, PC had to deal with many irate clients whose homes took significantly longer than planned.  On several occasions, homeowners whose homes were over 3500 square feet, had significant delays in returning to their home.  These delays were caused by the failures of Moss and/or its contractors.  On these occasions owners incurred additional expenses for alternative living and storage.  PC attempted to negotiate delay payments on behalf of these owners, however, Moss refused to provide any relief.  In addition, on at least two occasions PC had to oversee the replacement of prime contractors in the middle of the remediation because of the incompetence of Moss's contractors.  These added steps forced PC to

expend more time on these homes, which was not contemplated by the Knauf Settlement.

After a project obtained a Certificate of Occupancy, the contractor, PC and homeowner met onsite to review the completed work.  (*Id*.)  PC was responsible for determining if the scope of work and quality of work complied with the Knauf Settlement Agreement and the remediation protocols.  (*Id*.)  At this meeting the homeowner and contractor created a punch list of items for the contractor to complete prior to returning the home to the owner.  (*Id*.)  Disputes between the contractor and the owner often arose at this stage and were resolved by PC.  (*Id*.)  This required PC to have a thorough understanding of the Knauf Settlement Agreement, remediation protocols, and interpretations of the Knauf Settlement Agreement.  (*Id*.)

Once the punch list items were complete or the contractor and homeowner reached an agreement regarding the completion dates for the punch list items, a "close out" meeting was held at the home with the contractor, PC, and the homeowner.  (*Id*.)  At this point, the contractor sought to return the home to the owner and have the homeowner sign the release required by the Knauf Settlement Agreement.  (*Id*.)  Serious reservations about signing the release often arose at this stage.  (*Id*.)  In addition, at this meeting, PC provided the homeowner with a close out package, including documents from the remediation such as the Knauf inspection report, the GFA certification, the warranty information, the Certificate of Occupancy, and the contractor's certification.  (*Id*.)

Once the home was released to the homeowner, PC was required to monitor ongoing punch list items and related disputes regarding them.  (*Id*.)  For many homes, it took months to complete the punch list and resolve these issues.  (*Id*.)  It was not unusual for a three (3) month remediation project to take six (6) to nine (9) months for completion of the construction.  (*Id*.)  The homeowners received a one (1) year warranty from the contractor regarding all work

performed on the home and PC monitored and oversaw the warranty requests and their completion. (*Id*.) Disputes often arose involving whether the certain repairs fell within the scope of the warranty. (*Id*.) Due to the one (1) year warranty, each three (3) month project took a minimum of a one (1) year and three (3) months to bring to a final esolution. (*Id*.) On multiples homes, PC has been involved in overseeing punchlist and warranty items after the one year period because contractors failed or refuseed to perform their designated work.

If the homeowner chose Option 2 or 3, a separate set of paperwork was required. PC was required to coordinate the Option 2 or 3 package and meet with the homeowners to execute certain documents and provide legal advice regarding the documentation. (*Id*.) PC had to ensure that components of the settlement package were complete as the settlement administrator had increased scrutiny over these claims. (*Id*.) In addition, PC was required to explain the disadvantages of these options included and was forced to coordinate with personal contractors to ensure proper figures were provided for agreements under Option 2. (*Id*.)

The final step in resolving a homeowner's claim involved the registering, filing and monitoring of claims under the various settlement options, including, but not limited to: bodily injury claims, global builder and supplier claims, foreclosures claims, pre-remediation move out claims, miscellaneous claims, and others. (*Id*.) This process required PC to register all claimants by a set deadline. PC was then required to evaluate all potential claims available under all settlement options and evaluate each client's circumstances to determine if they were eligible for a particular claim. (*Id*.) This involved legal interpretations of the Knauf Settlement Agreement, the multiple settlement agreements, and the various claims materials. (*Id*.) Once the determination was made for each client, PC was responsible for drafting the claim form, gathering the required documentation and timely filing the claims. (*Id*.) Once filed, PC

monitored and updated clients regarding the progress of the claims. (*Id*.)  Eventually, BrownGreer issued a Notice of Claim Eligibility form.  PC discussed the Notice of Claim Eligibility with each client and determined whether to accept or appeal the notice. (*Id*.)  If the claim was accepted, PC was responsible for the execution of the Verification of Claim form, execution of a W9 form, verification of the payment of the claims and execution of releases. (*Id*.)  If the eligibility notice was appealed, PC was responsible for the appeals process to the Special Master or the Court. (*Id*.)

In short, to bring a client's case to a complete resolution, PC invested countless hours and significant expenses not reimbursed by the expense stipend to accomplish tasks that could not be accomplished by Common Benefit Counsel. (*Id*.)  In fact, many of the tasks required of PC to provide a homeowner with a complete resolution were tasks required by the PSC or because the PSC negotiated a settlement that required PC to completely implement the settlement on his/her own. (*Id*.)  The resolution of a homeowner's claims required extensive client contact and involvement which was handled **exclusively** by PC. (*Id*.)  Resolution of a homeowner's claims required consistent work on behalf of the client over a four (4) to six (6) year period of time.  PC contributed the majority of their practice over these time periods to resolve homeowner's Chinese Drywall disputes and without PC involvement, the resolution of these claims would have proved impossible. (*Id*.)

### III. METHOD AND DETERMINATION OF FEE SPLIT BETWEEN PRIMARY COUNSEL AND COMMON BENEFIT COUNSEL

A. **Methodology for Calculation of Common Benefit Counsel Fees**.

The PSC/FC proposes the "blended method" to calculate its appropriate fee for common benefit work. This approach requires the Court to establish the value of of the benefit obtained. Then the Court evaluates and approves a percentage of the fund created for the benefit of the plaintiffs, and finally undertakes a calculation using the lodestar method to "cross-check" the percentage-of-fund fee. This method has been endorsed by the Fifth Circuit, *see Union Asset Mgmt. Holding A.G. v. Del, Inc.*, 669 F. 3d 632, 644 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 317 (2012), and employed by this Court in comparable MDLs. *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657760, 760 F. Supp. 2d 640, 655-661 (E.D. LA 2010) (applying Johnson factors to benchmark percentage then confirming with lodestar cross-check). While PC would generally have no objection to the use of this methodology, the FC has presented this Court with a lodestar calculation based on total hours expended in MDL 2047, not the hours related to the settlements. The FC asks this Court to believe that all hours expended in MDL 2047 have contributed to all settlements. However, other than arbitrary and illusory statements to the effect that *Germano* benefited the overall litigation, the FC has provided no evidence that time expended in the Taishan cases benefited the settlements.[2]

PC takes issue with the FC's application of this method insofar as it fails to distinguish between a common benefit fee and a class action fee award. These fees are not the same, and different considerations apply. *See* William Rubenstein, "On What a 'Common Fee' Is, Is Not, and Should Be, Class Action Fee Digest" (Mar. 2009) at 87 [hereafter, *Common Fee*] ("The one

---

[2] If the PSC, FC or CBC is attempting to include any hours for the matter styled *Cataphora, Inc. v. Parker, et al*, PC contends that these hours should be excluded in the lodestar calculation, as said matter was for the defense of a lawsuit filed against the PSC for failure to honor a contract.

thing a common benefit is not is a class action fee award"). Common benefit fees are a creature of mass torts. Unlike class actions, where attorneys' fees are taken from the benefits available to the class members, in mass torts, the fees payable to CBC are taken from the fees payable to individually retained attorneys who have retainer agreements with the clients, such as PC. The common benefit fee award in mass tort litigation is therefore necessarily smaller than the overall attorney fee award. As Professor Rubenstein explains:

> It is fair to ask why the common benefit fee need be lower than the class action fee… The common benefit attorneys who helped manufacture the benefit might also even have a lodestar that could, with some multiplier, justify [an award of 100 percent of the attorneys' fees]. But here's the hitch – in the mass tort case there are also local counsel who have contingent fee contracts with claimants, and more importantly, who contributed important attorney work to producing the settlement as well. The common benefit lawyers simply did not do 100% of the legal work in the case.

The distinction between class counsel fees and common benefit fees appears to have escaped the FC. From the start, its brief mingles and confuses the two concepts. As a consequence of the muddled analysis, the FC makes the mistake of relying on class actions (and their commensurately higher percentage awards) to justify its overreaching fee request. *See* FC Allocation Motion at 51 (citing class actions which did not award common benefit fees); *see also* Common Fee at 90 (criticizing common benefit lawyers who based their request for an 18% fee on a study of class action attorneys' fees, noting "class action fees are not the same thing as common benefit fees and [are] hence … inapposite.")

> "In class actions the beneficiary of the common benefit work is the
>
> claimant; in MDLs the beneficiary is the primary attorney (the
>
> attorney who has the representation agreement with the claimant).
>
> For this reason, in MDLs, the common benefit fee is extracted

> from the fee of the primary attorney and not the claimant, as is the
> case with class actions.  Thus in MDLs, the claimant does not pay
> the common benefit fee; the primary attorney who is the
> beneficiary of the common benefit work pays it."

Eldon E. Fallon, Common Benefit Fess in Multi-District Litigation, 74 La. L. Rev. 371 (2014),
*See also In re Vioxx Prods. Liab. Litig.,* 760 F. Supp. 2d. 640 (E.D. LA 2010) (common benefit
fee extracted from 32% contingency fee).

The determination of common benefit fees therefore requires careful attention to both the
work performed by PC and a comparison with the fees awarded to common benefit counsel in
other mass torts. The work performed by PC in this case is actually far more extensive than the
work typically performed by the primary attorneys in a pharmaceutical or other mass tort.  (*See*
§II B *supra* outlining representation by PC.)  At the same time, the work done by the PSC in this
case, while impressive, is no more impressive or "Herculean" than the work done by other PSC's
(which often include many of the same lawyers) in pharmaceutical MDLs.  In these roughly
comparable circumstances, the common benefit lawyers have typically been awarded 4-6%, not
the 10.6% requested here.  *See In re Sulzer Hips Prosthesis and Knee Prosthesis Liab. Litig*., 268
F. Supp. 2d 907 (N.D. Ohio 2003) (4.8%) and *In re Diet Drugs Products Liab. Litig*., 553 F.
Supp. 2d 442 (E.D. Pa. 2008) (6.75%) – present an average percentage benchmark of 5.77%,
lending further support to PC's proposed 5% benchmark.  *See also In re Vioxx*, 769 F. Supp.2d
640(6% for common benefit); *In re: Rezulin*, 2002 WL 441342 (6% benchmark in federal cases,
4% benchmark in state cases).

### B.   Attorneys' Fees Funds Available.

The FC asserts the attorneys' fee funds available for allocation between PC and CBC are $192,981,363.35.  However, PC takes issue with the calculation of available funds.  The fee fund should not be used to finance the separate Taishan litigation.  Accordingly, the $10,000,000 "set aside" for Taishan litigation should be made available to pay fees for the Knauf attorneys.  Second, Voluntary Contributions paid by Defendants that settled Chinese Drywall cases outside the MDL equaled $3,332,058.26.  (*See* Ex. 2 to Phil Garret's Affidavit attached as Ex. A to the FC's Fee Allocation Motion.)  The Voluntary Contributions should also be part of the fee fund, as these payments were at all times subject to a future allocation.  As such, the sum of $13,332,058.26 should be added to the fee fund, yielding a total amount available of $206,313,421.50.[3] [4]

### C.   Establishment of the Valuation of the Benefit Obtained.

The FC asserts that the Plaintiffs received a total benefit of $1,120,313,305.90.  (*See* FC's Fee Allocation Motion at p. 49.)  However, this figure is inflated.  In order to determine the allocation of fees to CBC, the Court must establish the actual value of the settlement or the benefit obtained for the Plaintiffs.  The benefit obtained for the Plaintiffs is determined by the actual benefit received by the Plaintiffs.

Under the Knauf Settlement Agreement, a homeowner that qualified for a remediation had the choice of Option 1, using Knauf's contractor; Option 2, using their own contractor; or Option 3, accepting a cash payout.  As such, the benefit obtained for the homeowners is

---

[3] Based on the FC's Allocation Motion it is obvious that there are additional Common Benefit funds still to be paid out that are not included in the Allocation Motion including but not limited to L&W Supply Settlement (Declaration of Russ Herman and Arnold Levin, ¶19), the Knauf Builder Settlement (Footnote 9 to Allocation Motion), and Villa Lago Settlement (Declaration of Russ Herman and Arnold Levin, ¶19).

[4] PC feels that any time and/or expense associated with the action styled *Cataphora, Inc. v. Parker, et al* should not be utilized in determining common benefit, including the $1,335,967.20 payment for an appeal bond and should not be taken from attorney's fees.

determined by the **actual** cost of the remediation under Option 1, by the cost of the **actual** benefits paid to the homeowner and homeowners' contractors under Option 2, and the **actual** amount paid to the homeowners under Option 3.

The actual value of the settlement, or the benefit obtained for the Plaintiffs, is therefore $951,415,935.23, not the $1.1 billion asserted by the FC in their brief. In order to increase its fee, the FC does not use the actual value received by the clients, but instead inflates the value of the settlement by utilizing figures that are not an accurate measure of the settlement value.

The FC asserts that the total value of the settlement is $1,120,313,305.90 and breaks this figure into categories A – F. (*See* FC's Fee Allocation Motion at p. 49.) In categories A & B, the FC asserts a total benefit provided to the Plaintiffs for Option 1, Option 2, Option 3, Already Remediated Homes, GFA payments, and Knauf's "Other Loss" fund payments in the amount of $763,026,343.71[5]. (*See* FC's Fee Allocation Motion at p. 49, combining categories A & B.)

The FC purposefully uses an inflated figure for categories A & B to increase the valuation of the benefit obtained. The FC admits "there is a discernable total paid by Knauf and Moss & Associates for the classwide remediation of the properties conducted by the Knauf contractor under Option 1 of the Settlement Agreement." (*See* FC's Fee Allocation Motion at p. 37.) However, the FC simply ignores this figure. Instead the FC offers a "market place analysis" formula that does not reflect the true cost or the actual scope of work performed pursuant to the Exhibit F protocol for the actual Knauf remediations. FC's "market place analysis" figures are based upon a scope of work that is more extensive than that used in the Knauf remediation program. In addition, the "market place analysis" figures are based upon an $86 per square foot remediation figure which, again, does not reflect the actual cost.

---

[5] Under this analysis the PSC would have negotiated a grossly inadequate settlement for Options 2 and 3, as this reasoning would create a significant shortfall to homeowners who chose either of these options.

The actual cost for categories A & B is $594,128,973.04, some $168,000,000[6] less than asserted by the FC.  The actual cost for categories A & B, including costs for Option 1, Option 2, Option 3, Already Remediated Homes, GFA payments, and Knauf's "Other Loss" fund payments are as follows:

|  |  |
|---|---|
| Option 1 | $345,586,974.09 |
| Option 2 & Option 3 | $201,435,764.28 |
| GFA | $    1,159,406.24 |
| Already Remediated Homes | $  41,714,061.42 |
| Knauf "Other Loss" | $    4,232,227.01 |
|  | $594,128,973.04 |

The actual payment figures of $594,128,973.04 listed above are contained in the "Component's Table" attached as Exhibit B to the FC's Fee Allocation Motion and footnote 2 of the Component's Table attached as Exhibit B to the FC's Fee Allocation Motion.  As such, the FC asserts that categories A & B provide a settlement value of $763,026,347.71, which is inflated by $168,897,370.67.  The actual cost of categories A & B are readily obtainable as outlined above and there is no justification for the use of a "market place analysis" figure or any other figure besides the actual cost.

In addition, the FC improperly includes administrative services and costs associated with the litigation to inflate the value of the settlement.  In category F, the FC asserts that the administration cost of $34,529,905.31[7] should be considered to support the valuation of the benefit to the Plaintiffs.  (*See* FC's Allocation Motion at p. 49.)  Further, the FC asserts that

---

[6]  The Fee Committee chose the $86 square foot from *Germano* rather than the $81 a square foot from *Hernandez*. In addition, the *Hernandez* judgment included line items that were not included in the remediation protocol for the pilot program or Knauf Settlement.

[7]  It should be noted that this figure includes a "total value" of BrownGreer's services of $4,600,000 rather than the fixed contract price of $2,500,000 (See Exhibit 1 to Declaration of Herman and Levin) a difference of $2,100,000.

litigation costs, including held costs of $3,842,737.87 and unreimbursed cash assessments of $2,187,000.00 should be considered to support the value of the benefit.  (*See* Ex. 2 to FC's Allocation Motion.)   The administrative services and costs should not be included in the valuation of the benefit obtained.   Awarding attorney fees based on a percentage of gross recovery has been sharply criticized as resulting in "disproportionately high fees," *In re Immunex Sec. Litig.*, 864 F. Supp. 142, 145 (W.D. Wash. 1994), and essentially allowing counsel to "profit" off of costs.  *Morganstein v. Esber*, 768 F. Supp. 725, 728 (C.D. Cal. 1991).  For this reason, numerous district courts throughout the country have rejected awarding percentage-of-the-recovery attorney fees based on gross settlement amounts, including costs and administration fees, in favor of basing the award on net settlement.  *See, e.g., In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 770-71 (S.D. Ohio 2007) (awarding attorney fees based on percentage of net settlement instead of gross settlement amount); *Montgomery v. Aetna Plywood, Inc.*, 231 F. 3d 399, 408 (7th Cir. 2000) (affirming district court's percentage fee award based on net recovery and noting that the court found no authority indicating that "gross recovery is to be preferred over net recovery as the basis for calculating a fee under the percentage-of-recovery method"); *In re Ikon Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 193 (E.D. Pa. 2000) (basing fee percentage on the net settlement fund because it promotes "cautious expenditure" and "align[s] the interests of the class . . . with those of counsel"); *Lachance v. Harrington*, 965 F. Supp. 630, 647 (E.D. Pa. 1997) ("[A]ttorneys who know that their fee will be based on the net recovery of the class, rather than the gross settlement, will have an incentive to keep costs to a minimum in order to maximize not only the class' return, but also their own attorney fee award."); *Immunex*, 864 F. Supp. at 145 (finding the "better approach" in awarding a reasonable fee is to "award the percentage fee on the net award to the class") (internal quotes omitted)); *Wells v. Dartmouth*

28

*Bancorp, Inc.*, 813 F. Supp. 126, 129 (D.N.H. 1993) (rejecting class counsel's request for 27.5 percent of the gross recovery and awarding 30 percent only after all administrative costs and out-of-pocket expenses have been paid); *Morganstein*, 768 F. Supp. at 727-28 (awarding percentage fee on the net benefit to the class after deduction of costs because it will "prevent the class from being 'double charged' for costs, *i.e.*, paying the costs and also paying 25 percent as attorneys' fees"); *Levit v. Filmways, Inc.*, 620 F. Supp. 421, 426 (D. Del. 1985) (finding fee award of one-third of the difference between the common fund and the litigation expenses appropriate). *See also* 2003 Advisory Committee Notes, Fed. R. Civ. P. 23(h) (explaining that a "fundamental focus" of awarding a reasonable attorney fee is "the result <u>actually achieved</u> for class members") (emphasis added)).

The FC, by including the administration and litigation costs improperly nflates the value of the settlement by an additional $40,559,643.18.

In summary, the FC claims the total value of the settlement is $1,120,313,305.90.  By replacing the "market analysis figure" of $763,026,347.71 for categories A & B in the FC's valuation chart with the actual cost of categories A & B of $594,128,973.04, the total value of the benefit obtained for the Plaintiffs is reduced from $1.1 billion to $951,415,935.23[8].  Further, by subtracting the administrative services and litigation costs of $40,559,643.18 from the valuation of the benefit received by the Plaintiffs, it is further reduced to $910,856,292.05[9].

---

[8] Basing common benefit on this value results in a common benefit fee of 12.5406%
[9] Basing common benefit on this value results in a common benefit fee of 13.0990%

D.   **Establishment of the "Benchmarking" Percentage for the Calculation of Common Benefit Fees.**

The FC contends that the appropriate benchmark to calculate a common benefit fee award is 8 percent. The FC's failure to differentiate between a class action fee award and a common benefit fee leads to the elevated percentage request. When evaluated in the context of common benefit fee awards, it is clear that starting with a benchmark of 8 percent is unprecedented and unreasonable.

The FC relies on the *Manual for Complex Litigation* to support its contention that 25% is a "typical" benchmark for percentage-of-the-fund cases. The *Manual*, however, is referring to class action cases, not mass torts and common fee awards. Indeed, all of the cases cited by the FC at pages 9-10 of their brief are class action cases. The various studies relied upon by the FC, including the "Eisenberg I" and "Eisenberg II" studies offer no meaningful guidance since these studies focused on class action awards, not common benefit awards. For this reason, this Court has previously found that these studies "are of limited usefulness in determining a reasonable benchmark for a common benefit fee award." *Vioxx*, 760 F. Supp. 2d at 652. Like the lawyers in the Kugel Mesh Hernia Patch MDL who tried to justify their fee request by relying on a study of class action attorney fees, the FC "has failed to advise the judge that class action fees are not the same as common benefit fees and hence that the study upon which they relied is inapposite." Common Fee, at 90.

PC submits that 5% of the settlement amount is a reasonable benchmark percentage for a common benefit fee award. This Court in *In re: Vioxx* cited authorities supporting the proposition that most common benefit assessments range from 4% to 6% of the settlement value. *Vioxx*, 760 F. Supp. 2d at 654. This Court settled on a 6% benchmark in *Vioxx*. *Id.* However, the amount of work performed by CBC in VIoxx is far greater than the instant litigation and the

work performed by PC in this case is far in excess of the work performed by primary attorneys in *Vioxx*. (*See* §II *supra*). Based upon the above case law, and the disparity in work load for PC in this case, PC suggests a benchmark of 5%.

The FC's reliance on *Turner v. Murphy Oil*, 472 F. Supp. 2d 830 (E.D. La. 2007), is, once again, misplaced because *Turner* is a class action. The 15% benchmark used in *Turner* and the 25% suggested by the *Manual* are misused by the FC to make their proposed 8% benchmark appear reasonable.

In addition, 9 of the 11 cases cited by the FC on its chart with percentage-of-fund fees submitted in support of the 8% benchmark is largely composed of class fee awards and not common benefit fee awards.[10]  The two (2) remaining cases cited by the FC present an average benchmark of less than 6%, lending further support to PC's proposed 5% benchmark. Other noted MDLs for the Court to take notice of include *In re Vioxx*, (6.5%), *In re Rezulin Prods. Liab. Litig.*, MDL No. 1348, 2002 WL 441342 (6% in federal cases, 4% in state cases).

When compared with studies limited to common benefit fees, which have generally found the typical benchmark to be 4-6%, a benchmark of 8% is not reasonable. The FC tries to compare and contrast the PSC's efforts in this case with the PSC's in *Turner* and *Vioxx* to further justify its enhanced benchmark. While factors such as heightened risk and complexity may weigh in favor of an upward adjustment of the benchmark under *Johnson* (and indeed the FC seeks an upward adjustment of an additional 2.5%), there is no reason to adjust the benchmark in

---

[10] Class actions: *In re Enron Corp. Securities Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008); *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998); *Shaw v Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000); *DeLoach v. Phillip-Morris Cos.*, 2003 U.S. Dist. LEXIS 23240 (M.D.N.C. 2003); *In re Visa Check/Mastermoney*, 297 F, Supp. 2d 503 (E.D.N.Y. 2003), *aff'd Wal-Mart Stores, Inc. v. VISA, U.S.A., Inc.*, 396 F.3d 96 (2nd Cir. 2005); *In re WorlCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 U.S. Dist. LEXIS 77926 (S.D.N.Y. 2006); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006); *In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249 (D.N.H. 2007).

this case. The benchmark is only a starting point reflective of general trends in fee awards and subject to adjustment under the *Johnson* factors, either up or down.

For all of the above reasons, PC submits that 5% of the total benefit is the appropriate benchmark.

### E.   Analysis of the Johnson Factors for Consideration of Adjustment of the Benchmark Percentage.

PC disagree, in part, with the FC's analysis of the *Johnson* factors, and assert that an upward adjustment of 2.65% is not warranted.  Such an adjustment would significantly exceed benchmark adjustments made by courts in other MDLs.  The FC's proposed 8% benchmark with an adjustment to a 10.65% common benefit award would never be appropriate under the circumstances of this case.

### (i)   The Time and Labor Required.

As in *Vioxx*, "[m]embers of the PSC and others who performed common benefit work in the MDL are undoubtedly entitled to compensation" and, again, as in *Vioxx*, the effort was "Herculean."  Compare Joint Fee Petition at 106 (reporting 245,871.19 hours of common benefit time *with Vioxx*, 760 F. Supp. 2d at 655 (560,000 hours of common benefit time). In both cases, the PSC operated under intense pressure for an expedited resolution and necessarily precluded counsel from working on other matters. The Court in *Vioxx* held that the "time and labor" factor warranted a "moderate" upward adjustment of the benchmark percentage.  However the time expended in this matter and the time expended in *Vioxx* have to be given weight.  In *Vioxx* there were 6 bellweather cases that were tried to conclusion.  In the present litigation there was one bellweather case, *Hernandez*[11], tried to conclusion.  In addition, in *Hernandez* Knauf admitted liability and the only evidence presented related to damages.

---

[11] As noted previously, *Germano* was not a trial but a default hearing were evidence was presented to this Court.

PC acknowledges that there have been many hours expended by Common Benefit attorneys.  Many of those hours, however, are for work on a matter that has not yet been settled. The FC asks this Court to adopt the proposition that the hours expended on Taishan claims should have a large impact on the fees.  The time expended on Taishan claims has, however, had little to no impact on the current settlements.  The FC relies heavily on the results of the *Germano* trial, stating that it set a standard for the remediation of homes.  That is not credible, however, given the fact that *Germano* was a default hearing wherein no defense was presented. In addition, at the December 15, 2011 Status Conference announcing the Knauf Settlement, Russ Herman stated in open court "…the Hernandezes who live in St. Tammany Parish in March 2010, because that trial, that judgment, set the basis for what a true remediation would be.  It wasn't the Consumer Product Safety Commission protocol, it wasn't the homebuilders' protocol. It came out of the crucible of trial.  And that enabled another six, seven months of negotiation, to come up with a pilot program as a test."[12]   Further, when the damages were actually litigated in the *Hernandez* trial, the PSC did not fare as well as they had in the *Germano* default, reducing the remediation by $5 a square foot.  Hernandez also included line items in the verdict that were not later included in the pilot program or subsequent Knauf Settlement.

Additionally, the FC points out that although they did not win the INEX/North River trial, it was an impediment/requirement to finalizing the Knauf settlement.  The hours that have been billed for Common Benefit as to the INEX/North River trial should not be included in the Common Benefit time as the Common Benefit attorneys have already reaped $2,500,000 from that trial that goes exclusively to them.

PC believes that the time and labor factor should weigh towards a small upward adjustment.

---

[12] Transcript of December 15, 2011 Status Conference, page, 15, lines 2-8.

### (ii)      The Novelty and Difficulty of the Questions.

The FC contends that the Chinese Drywall litigation presented novel and demanding challenges.  PC admits that service on foreign entities is not an easy task and that there have been considerable legal challenges in this matter. Cases involving novel and difficult questions often warrant an upward adjustment.  *See Vioxx,* 760 F. Supp. 2d at 655 (litigation presented novel and difficult questions weighing in favor of an upward adjustment).  PC believes this factor weighs toward a small upward adjustment.

### (iii)      The Skill Requisite to Perform the Legal Service.

The attorneys who undertook the common benefit work were among the most highly experienced and skilled practitioners in mass torts. However, this factor does not support an upward adjustment of the benchmark percentage. PC and all counsel representing individual climants also applied substantial skill and effort to assist their clients, in scope and depth, performing work far beyond what individual lawyers typically perform in a mass tort case.  (*See* §II *supra*.)  In addition, it would have been of great benefit to this litigation to involve attorneys who were knowledgeable in construction deficiencies having represented thousands of homeowners over the years.  The same set of skills in managing and litigating a mass tort pharmaceutical case is not the same set of skills necessary to litigate a mass tort construction defect case.  PC has extensive knowledge in construction deficiencies cases and was concerned about the time and effort it would take to implement the Knauf settlement.  After working with over 200 homeowners to ensure their remediation was done correctly, it is apparent to PC that the time expended by it was extraordinary, but necessary, to ensure that the Knauf remediation program was successful.  This Court has even acknowledged that during the Pilot Program

34

attorneys present at the remediations were learning about both construction and drywall.[13]  These are hurdles that would not have been necessary if the PSC or Common Benefit Counsel had used the tools at its disposal and incorporated construction deficiency attorneys into the litigation.  PC also contends that it cannot be said that the skill required by the PSC "was so superior to that possessed by PC representing individual clients as to warrant a *Johnson* adjustment which would in effect shift attorneys' fees from one group to another." *Vioxx*, 760 F. Supp. at 656.  Accordingly, PC submits that this factor warrants a substantial downward adjustment.

### (iv)   Preclusion of Other Employment by the Attorney Due to Acceptance of the Case.

The FC also seeks an upward adjustment based on the PSC's need to "devote themselves and their offices to the handling of this matter on a virtually full-time basis."  The FC fails to note that several members of the PSC were assigned to Steering Committees in other unrelated, ongoing litigation.  In addition, several of the members of the PSC tout on their websites their accomplishments in other mass torts and litigation during this time period.  Based on these factors PC contends that this factor should be neutral.

### (v)   Customary Fee.

The FC states that this factor is also neutral since the 10.65% of class recovery requested is especially reasonable considering the 32% of recovery that was negotiated as fee fund in the Global, Banner & InEx settlements, consistent with this Court's ruling in the *Vioxx* litigation. [14]

---

[13] Transcript of February 23, 2011 Status Conference, page 7, lines 5-11, "The thing that's helpful in this particular case, too, is I asked counsel if they could have somebody on the ground, one of the attorneys, at the homes to make sure that these homes were being done according to the protocol.  So we have an attorney at the home. He's learning a lot about construction and a lot about drywall, but at least that's our contact."

[14] By its own admission, the total fee is low. "This hybrid approach – with attorney's fees for the principal class settlement (Knauf Settlement) being paid separately by the settling defendants at no cost to the Plaintiffs, and attorneys' fee form the supplement class settlements (InEx, Banner, Gloval and Virginia) being awarded as a percentage of the common funds created, in order to pay <u>both</u> common benefit counsel <u>and</u> individually retained counsel's contingent fees – **will result in a global fee award that is very low when compared to the range in other mass tort actions.**" (Declaration, ¶ 21)

The FC is gravely mistaken and turns *Vioxx* on its head. The relevant figure from *Vioxx* to compare with the FC's requested 10.65% is not the 32% cap the Court imposed on total available attorneys' fees. The relevant comparable figure is the 6% benchmark the Court selected for the determination of common benefit fees. By this measure, the percentage requested by the FC is grossly excessive.

The FC completely ignores the impact its request would have on the customary fee of PC and the expectations set by the Court in previous orders. Most of the individual attorneys in this matter, including PC, have retainer agreements with their clients that provide for an average of a 35% contingency fee. Consistent with *Vioxx*, PC entered this litigation with the expectation that this Court would likely cap fees at 32%.

The PSC, however, was unable to secure fees amounting to 32% of the settlement benefit. By their own accounting, the amount available to pay all attorneys' fees is to only 17% of the benefit. The FC's request for 10.65% of the benefit, if allowed, would leave PC with a mere 11.9% of the benefit. This low return to PC is unprecedented in mass tort ligation. The primary counsel in *Vioxx*, for example, retained nearly 80% of the total attorney fees, while the PSC received only 20% of the available fees. Stated differently, the primary attorneys retained 25.5% of the total benefits obtained for their clients, while the PSC were paid 6.5%. By contrast, the award sought by this PSC would reverse this allocation, allocating 40% of the fee to the primary attorneys and 60% to the PSC.

In the typical MDL, the PSC retains 4-6 percent of the total recovery and the primary attorneys retain 26% or more. A reduction of contract fees from 35% to 11.9% would discourage lawyers from participating in future MDLs and assisting victims of defective products. Future PSCs will be unable to achieve the results obtained here if the prospect of fees

is grossly below market rates, further discouraging attorneys from representing individual victims and participating in future MDLs.

For these reasons, PC believes this factor weighs heavily against any upward adjustment to the benchmark percentage.

### (vi)     Whether the Fee is Fixed or Contingent.

PC agrees with the FC that this factor is neutral.

### (vii)    Time Limitations Imposed By the Client or the Circumstance.

The FC utilizes the same basic arguments as *Johnson* Factors (i) and (iv).  The FC fails to address the time limitations imposed by the client or the circumstances of the individually retained lawyers.  The FC fails to address that the same time commitment imposed by status conferences and client updates were the same, if not greater, for individually retained attorneys. The periodic reports by counsel filed with the Court were essentially a copy and paste procedure from month to month providing little updated information.  In addition, the settlement negotiated by the PSC put an undue burden on individually retained counsel.  PC has compiled a list of items that were required of individually retained counsel; it is contained within the attached affidavit and included within § II of this pleading.  The FC has admitted that the Knauf settlement placed a significant burden on PC; "For those eligible for the Knauf remediation program, the process was more complicated than a simple settlement." (Declaration, ¶73).  PC submits this factor is neutral.

### (viii)   The Amount Involved and the Results Obtained.

PC agree that the PSC achieved a favorable and meaningful global resolution.  However, because the bulk of the settlement benefits were directed to property remediation, the settlement did not provide claimants with access to substantial amounts of cash.  The decision to accept a

remediation settlement was made solely by the PSC.  PC notes that most construction defect class actions result in cash payment or settlements providing a choice between cash and repair. Consequently, many class members found themselves left with large economic losses despite the settlement.  For homeowners eligible to participate in the remediation program, the payment from the economic loss fund was, often times, not adequate to cover the costs of temporary relocation during the remediation.  Compensation for rent was limited to three months, even though many class members were unable to secure alternate properties for such short terms. Property owners unable to sell their property at full value due to CDW, or lost their property in foreclosure rarely recovered their full losses.

The lack of cash in the settlement also impacts the availability of funds to pay attorneys' fees and costs. In total, the PSC secured $233,078,270.33 from the settling defendants to cover all attorneys' fees and expenses.  Using the FC's calculation of the settlement benefit, this amount represents 21% of the settlement benefit.  This recovery poorly with recoveries by PSCs in other MDLs, which have generally been around 32% or more.  Consequently, there are simply insufficient funds to compensate all the attorneys who worked on this for their time and expenses commensurate with other MDLs.  Exacerbating the problem, the PSC has taken "off the top" nearly $17,435,000 for "reimbursement of advanced costs and assessments, including "held" costs.  (CITE.)  PC was not given the same recovery for expenses.  The Court approved a stipend of $1,000 per property to cover inspections and other costs.  However, this amount did not fully reimburse PC for costs.  The PSC also received a $1,000 stipend for their clients' properties, even though they were also reimbursed their held costs.  This procedure raises the issue of "double-dipping" by the PSC.

PC entrusted the PSC to obtain a settlement that would both fully compensate their clients and provide them with reasonable attorneys' fees and costs. The settlements are fair and reasonable but do not fully achieve these goals.  Having failed to negotiate sufficient cash to provide full and fair compensation to all attorneys in this matter, the PSC has only itself to blame if their fees fall short of expectations.  The PSC was solely responsible for the negotiation of the available attorney fee fund and it should bear responsibility for any inadequacy.  The PSC's failure in this regard is not a reason to depart from decades of precedent and take a disproportionate amount of the available fees away from PC as FC would have this Court do.

As an alternative, PC requests this Court perform an analysis similar to that imposed by Judge Thomas F. Hogan of the United States District Court for the District of Columbia in *In re: Vitamins Antitrust*, 2001 WL 34312839 (D.C. Cir 2001).  Judge Hogan broke down different settlements to determine the appropriateness of the fee. *See Also In re: Genetically Modified Rice*, 2010 WL 716190 (E.D. MO 2010) (breaking down common benefit by different Plaintiff types).  The FC and PSC would like this Court to believe that the hours expended on Taishan play a large role in the settlement of these matters without providing any evidence to support the claim. (*See* footnote 11, *supra*).  A breakdown of each settlement would provide an appropriate measure of fees based on the result of each settlement and not as a whole.

PC believes this factor supports a moderate increase of the percentage benchmark.

(ix)    **The Experience, Reputation and Ability of the Attorneys.**

PC believes that the same arguments as Johnson factor (iii) *supra* "the skill requisite to perform the legal service" apply to this factor.  The attorneys responsible for the negotiation of the settlement, although meaning well, produced a settlement really impossible to control and oversee.  This transferred the huge burden to the PC, which the PSC or CBC did not seek to

alleviate.  If the members of the PSC who negotiated the settlement sought the assistance of counsel more familiar with construction deficiency litigation, PC is confident that the process would have been much smoother and resulted in a more beneficial settlement for the homeowners.  PC believes that this factor is neutral.

(x)      <b>The "Undesirability" of the Case.</b>

The FC admits that the present matter is one that was not considered "undesirable" to undertake and is considered a neutral factor.  PC agrees with the FC's analysis that this factor is neutral.

<b>(xi)      Nature and Length of the Professional Relationship with the Client.</b>

The FC states that this factor is neutral since few (if any) longstanding client relations between common benefit counsel and class members preceded this MDL.  PC agrees.   PC would also like to point out that this factor should weigh in favor of the individually retained lawyers.  PC and other individually retained lawyers maintained, at a minimum, a three year professional relationship with their clients as they had to assist with the initial paperwork for the remediation program and provide guidance to ensure that the remediation was completed in accordance with the Exhibit F and provided a habitable home.  In addition, individually retained counsel acted as mediator between contractors and claimants to reach satisfactory completion of disputed items and continue to do so to this day.  PC believes this factor is neutral.

<b>(xii)    Awards in Similar Cases</b>

PC disagress that 8% is an appropriate percentage benchmark.  The FC's reasoning to support this percentage is flawed because they rely on awards in class action cases and do not limit their survey to awards of common benefit fees.  The use of the 15% benchmark in *Turner* is not appropriate.  *Turner* was a class action, not a mass tort.  Further, there was no differentiation

40

in *Turner* between the members of the PSC and PC.  All plaintiffs' counsel who did common benefit work could share in the fee award but *only* for common benefit work. *Turner*, 472 F. Supp. at 857.

The FC reliance on its prepared chart is similarly does not support its request of an 8% benchmark.  Of the eleven cases listed, nine are class actions and not relevant to this analysis. The remaining two cases– *In re Sulzer Hips Prosthesis and Knee Prosthesis Liab. Litig*., 268 F. Supp. 2d 907 (N.D. Ohio 2003) (4.8%) and *In re Diet Drugs Products Liab. Litig*., 553 F. Supp. 2d 442 (E.D. Pa. 2008) (6.75%) – present an average percentage benchmark of 5.77%, lending further support to PC's proposed 5% benchmark.  *See also In re Vioxx*, 769 F. Supp.2d 640(6% for common benefit); *In re: Rezulin*, 2002 WL 441342 (6% benchmark in federal cases, 4% benchmark in state cases),   PC believes this factor supports a reduction in the benchmark

### (viii)   Adjusted Benchmark Percentage

This analysis identifies three *Johnson* factors supporting an upward adjustment of the benchmark, two factors that support a downward adjustment and the remaining factors are neutral or support no upward movement.  Consequently, PC asserts after the proper benchmark is set, no upward adjustment is warranted.

### F.   The Lodestar Cross-Check.

The lodestar method is not appropriate as a tool to cross-check the value of the settlement when the attorneys' fee fund negotiated by the PSC is inadequate.  As discussed, the PSC negotiated the common fund for the fees available to the CBC and PC.  The PSC failed to provide an adequate fund to support their $119 million lodestar claim.  As such, the lodestar cross-check in this case is irrelevant because of the inadequate fund.  In short, the lodestar cross-check results in a negative multiplier due to the inadequacy of the fund.

If the Court believes that the lodestar cross-check is appropriate, it must consider that the PSC lodestar figures include substantial time associated with the separate Taishan litigation.  The PSC goes into great detail in the Global Fee Petition to support its lodestar figures.  (*See* Global Fee Petition at pp. 38-55.)  It is clear from the Global Fee Petition that the PSC includes in the lodestar figures a substantial amount of time and effort working in the Taishan litigation. (See Global Fee Petition, *See Also* Declaration of Russ M. Herman and Arnold Levin and Supporting Exhibits 6, 9 ,11, 12, 15, 16, 17, 18 and 19).

As the Court is aware, the records to support the lodestar figure are filed under seal and PC cannot review them to determine the actual hours spent by the PSC in the Knauf litigation. PC does not have adequate information to determine the lodestar hours accumulated in the Knauf litigation, versus the Taishan litigation and determine if the hours are proportional to the settlement funds received.  If the Court deems the lodestar figure is relevant to a determination of the fee allocation, PC requests the records supporting the lodestar figure be produced for review by all primary counsel.

In sum, the lodestar cross-check is not appropriate due to the inadequate common fund, but if the Court determines it is appropriate, PC should have the opportunity to review the records supporting the lodestar figures.

## IV. PRIMARY COUNSEL'S FEE ALLOCATION REQUEST AND IMPACT ON PRIMARY COUNSEL AND COMMON BENEFIT COUNSEL

The total value of the benefit obtained for all Plaintiffs in this litigation is $910,856,292.05.   The total funds available for attorneys' fees as discussed herein are $206,313,421.61.  The undersigned PC request this Court to allocate $160,770,607.01 to PC and $45,542,814.60 to Common Benefit Counsel.

This allocation to CBC is based upon a percentage benchmark of 5% with no adjustment

under the *Johnson* factors, equaling a total common benefit fee percentage of 5%.  The common benefit percentage of 5% is applied to the total settlement value of $910,856,292.05.  As such, PC request that $45,542,814.60 be allocated to the CBC and the remaining $160,770,607.01 allocated to the primary attorneys.

This allocation provides PC with 17.6% of the total settlement value and 78% of the total fees available for disbursement.  As a result, based upon PTO 28(F), PC will receive a fee contract percentage of 24% of the benefit provided to each individual client.

This allocation provides CBC with a 5% of the total settlement value and 22% of the total fees available for disbursement.  In *Vioxx*, the CBC received 6.5% of the total benefit obtained which equated to 21% of the total attorneys' fees available.   PC's suggested allocation is reasonable in light of the funds available, work performed, and is consistent with *Vioxx* and the case law provided.

The FC cites to two cases to support its argument that a 59/41 percent split is appropriate in this matter.  The two cases, *In re FEMA Trailer Formaldehyde Prods. Liab. Litig*, MDL No.07-1873 and *In re: Educational Testing Service*, 555 F. Supp.2d 661 (E.D.La 2007) can easily be distinguished from this settlement.  First, in both actions the total recovery and attorney's fees were substantially smaller.   *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, the total attorney's fee award equaled $12,392,319.90, and *In re: Educational Testing Service* the total attorney's fees equaled $3,219,000.00, much smaller pots of money than the present action.  In addition, both of these matters weighed the benefit provided by both the CBC and individual counsel which the FC fails to do.  Additionally, the FC cites to no case wherein the Court awarded more than 50 percent to Common Benefit.

## V.        CONCLUSION

As detailed above, the 10.65% common benefit fee requested by the FC is excessive. The FC's reliance on Class Action settlements to support an 8% initial benchmark is also not proper in light of the circumstances surrounding this case.  Based on awards in similar cases it is PC's position that an initial benchmark of 5% is appropriate.  Additionally, utilizing the analysis of this Court in *In re: Vioxx* and taking into consideration the Johnson factors, PC believes that a only three *Johnson* factors support a small or moderate increase (time, novelty and amount involved),and the additional nine factors weigh  against any increase in the fee, or in favor of a decrease.  Accordingly, PC requests this Court find that an appropriate benchmark be 5% and that based on the Johnson factors no increase is warranted.

Respectfully submitted,

s/David L. Horsley
David L Horsley (ASB-6090-I47H)
Collins & Horsley, P.C.
2021 Morris Avenue
Suite 200
Birmingham, Alabama
205-324-1834 telephone
205-324-1846 facsimile
david@collinshorsley.com

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 28th day of June, 2016.

s/David L. Horsley
David L. Horsley
