## AFFIDAVIT OF W. BRIAN COLLINS

My name is W. Brian Collins and I am over the age of nineteen (19) and have personal knowledge of the facts contained herein.

I graduated from Cumberland School of Law in 1999 and have been a member of the Alabama State Bar since 1999. I am admitted to practice in all state and federal courts in the State of Alabama.

I am a shareholder in the law firm of Collins & Horsley, P.C. I have been involved as Primary Counsel (hereafter "PC") in Chinese Drywall litigation since approximately September 2009. I have been involved in the inspection of several hundred Chinese Drywall properties. In addition, I have been involved in the litigation for approximately 242 Knauf Chinese Drywall cases[1] and approximately 71 Taishan Chinese Drywall cases.

A Chinese Drywall case is far from a typical personal injury and property damage case. In dealing with a home suffering property damage, a homeowner requires a very high level of individual attention and attorney involvement in all aspects of the litigation and settlement process. For most individuals their home is their largest investment, and dealing with damage to that home, a lot of attention must be paid to each individual homeowner. Even work that could be conducted by a non-lawyer is the responsibility of PC to oversee and monitor.

Unlike other mass litigation, the individual issues addressed by PC in Chinese Drywall were unprecedented. The PSC produced a settlement that required PC to implement and oversee a remediation construction project. As a result of the structure of the settlement negotiated by the PSC, PC spent years overseeing construction projects. Further, these issues were left to the responsibility of PC with little or no involvement by the Common Benefit Counsel (hereafter

EXHIBIT 1

"CBC"). All individual client contact outlined herein took place through PC.

The first step in the Chinese Drywall litigation was to determine where the Chinese Drywall was located and the time frame for installation. This process took hours of research, review of thousands of supplier invoices, review of builder permits, correspondence to potential clients, phone interviews and hundreds of inspections. Early in the process, extensive efforts were spent on inspections of homes that did not contain Chinese Drywall in order to determine the typical profile of a home that does contain Chinese Drywall. As such, PC spent countless hours and expenses on inspection costs for homes that did not contain Chinese Drywall. These expenses cannot be recouped and must be paid from fees paid to PC. Based upon my experience, PC spent time and costs advertising, corresponding with potential Chinese Drywall owners, attending community informational meetings, participating in newspaper interviews, talk radio shows and television interviews to provide awareness to the community regarding the presence of Chinese Drywall and the ramifications of such. Once public awareness of Chinese Drywall began to increase, PC addressed with individual homeowners the possibility that their homes might contain Chinese Drywall. PC fielded hundreds of phone calls and emails from homeowners concerned that their home may contain Chinese Drywall. PC established the criteria to determine if a particular home might contain Chinese Drywall, including the time frame of the construction, the builder and supplier involved in the construction, and the symptoms of Chinese Drywall damage. In addition, from the onset it was believed that the replacement of HVAC evaporator coils was a sure sign of Chinese Drywall. After spending thousands of dollars investigating homes, PC learned that it was a potential sign of Chinese drywall however during the same time frame that Chinese Drywall was utilized, many of the

---

[1] 117 cases were filed through the law firm of Whitfield, Bryson & Mason, LLP.

EXHIBIT 1

copper evaporator coils utilized were defective.

If PC determined the home might contain Chinese Drywall, an inspection was conducted by PC with an inspector to determine if the home contained Chinese Drywall. PC attended the inspections and hired an independent inspector to verify the presence of Chinese Drywall and damages to electrical, plumbing and HVAC units typically seen with Chinese Drywall homes. At the inspection, PC typically attempted to determine the manufacturer of the sheet rock, the number of and the percentage of defective sheets in the home and the level of damage.

Following the inspection process, PC made a determination to accept or reject cases. This required a legal analysis and evaluation of various factors, including, but not limited to, the possible builders, suppliers, installers, which Chinese Drywall manufacturer was involved, the availability of insurance and caveat emptor/second homeowner issues.

PC would then meet with the homeowner and discuss the possible legal claims, possible repair scenarios, possible outcomes of litigation and the fee agreement. Clients sought advice regarding possible health effects and the ramifications of moving out of their home. Clients wanted to know if they should move out because of health issues and if they moved out because of health issues, would they be compensated for their expenses.

PC would next issue to the client a New Client Questionnaire requesting specific information regarding the history of the home and documentation regarding the home, including contracts for construction, deeds, HUD-1 statements, warranties, and appraisals. PC reviewed this documentation and prepared information for the inclusion of the homeowner on an Omnibus Complaint or prepared a separate complaint for filing. To include a homeowner on an Omnibus Complaint, IC had to provide detailed information regarding the owners of the home and

EXHIBIT 1

information regarding the property, including an inspection report.

Once the Omnibus Complaint was filed, PC was responsible for insuring all homeowners were included on the proper complaint and all Defendants were properly named. As a requirement by the PSC, IC provided a Plaintiff Profile Form providing information and documentation for each home. In many cases, IC had to provide an amended Plaintiff Profile Form to supply additional information. Further, in conjunction with Plaintiff Profile Forms, the PSC requested information regarding the number of HVAC coils replaced in each home. As such, IC completed a survey of all homeowners regarding the number of HVAC units and the number of HVAC coil replacements.

During the course of the litigation process, PC consistently responded to questions and advised homeowners regarding homeowner insurance claims, possible tax assessment protests, and IRS casualty loss issues. PC drafted tax assessment protests and attended a number of hearings with the tax assessor's office representing homeowners in their appeals of the valuation of their home. Homeowners consistently sought advice regarding the potential health issues associated with Chinese Drywall and if they should move out of their homes and/or stop paying their mortgages. Homeowners required research and updates on research and results of studies regarding the potential health issues associated with Chinese Drywall. This issue proved to be very difficult for PC because so little scientific information was available, but yet clients sought reassurance their health was not in jeopardy. PC also sent out additional questionnaires as the litigation progressed in order to determine if there were any common health problems associated with Chinese Drywall to bolster any health related claims.

PC participated in and attended various town hall meetings with homeowners.

EXHIBIT 1

Throughout the litigation process, PC provided regular updates to clients regarding the status of the MDL and progress of their case towards resolution.

Between the discovery of Chinese Drywall in homes and remediation of the home, PC advised homeowners regarding mortgage forbearance issues and possible foreclosure issues. On many occasions, PC negotiated directly with the mortgage companies regarding forbearance or foreclosure issues spending countless hours on the phone, working with customer service representatives and legal counsel for certain companies in an attempt to work out a solution for homeowners to save their homes.

Since the MDL Court did not have personal jurisdiction over Alabama builders that constructed homes in Alabama with Chinese Drywall, PC evaluated the statute of limitations for builders' claims and determined builder liability and availability of insurance for each homeowner. IPC determined the applicable building code for each jurisdiction and determined possible building code violations. As a result, PC prepared and filed numerous lawsuits against builders and also the supplier Interior/Exterior Building Supply, LP on behalf of homeowners with Chinese Drywall. As such, PC undertook the usual responsibilities of litigation in the state filed cases, including generation of pleadings, review of defendant's pleadings and preparation and review of paper discovery. Further, PC undertook settlement negotiations with builder attorneys. PC attended status conferences and motion dockets associated with builder lawsuits and was appointed as liaison counsel for Alabama state court Plaintiffs. As liaison counsel, PC designed and drafted case management orders for various state court judges regarding the various discovery tracks needed for builder cases. Further, PC responded to Motions to Stay filed by Knauf and INEX and represented homeowners at oral argument on this issue.

EXHIBIT 1

Once the PSC announced the Pilot Program as a possible settlement resolution, PC undertook a review of the protocol involved with the program. PC had 9 homes accepted into the initial 300 home Pilot Program[2] and were informed that detailed inspections of each property needed to be performed to identify the drywall utilized in the home. PC retained a building inspector who performed complete inspections of the home to detail the use of drywall in the homes as well as other issues associated with the construction of the home. PC also reviewed each file to determine if the home was eligible once the Pilot Program was expanded. In addition, PC met with and discussed with clients the possibility of enrolling their home in the Pilot Program and the possible benefits and legal ramifications of the Pilot Program. Once a client agreed to participate, PC prepared an eligibility packet containing certain information required by Knauf to consider a home for the Knauf Pilot Program. Once accepted into the Pilot Program, a series of inspections took place to determine the eligibility for homes.

As the Pilot Program was proceeding, the Knauf Settlement Agreement was announced. Following the Knauf Settlement Agreement, PC spent numerous hours reviewing the Settlement Agreement, interpreting the Settlement Agreement and explaining the Settlement Agreement to clients. An evaluation of each file was once again required to determine the possible impact on each homeowner. PC conferred with each client regarding the possibility of opting out of the settlement. PC met with each client to explain the benefits of the settlement under Option 1, 2 or 3, explained the inspection and remediation process, scope of remediation and determined which option was best for each client. After a client chose a particular option, PC reported to Knauf and BrownGreer which clients were choosing which options. Due to the benefits of possible cost increases during construction and the availability of change orders for these cost increases, the

---

[2] See Exhibit A to Settlement Agreement For The Demonstration Remediation of Homes with KPT Drywall

EXHIBIT 1

vast majority of clients chose Option 1 requiring a remediation construction project.

Following the choice of an option under the Knauf Settlement Agreement, PC coordinated an inspection of each home by MZA. PC attended and oversaw the MZA inspection for compliance with the inspection protocol. Often times PC provided the inspectors with vital information regarding the location of the Knauf Chinese Drywall and information regarding damages to the home. In addition, the homeowners often had additional questions and concerns regarding the Knauf Settlement Agreement and possible legal ramifications of a remediation that arose at the inspections and required responses. Following the MZA inspection, PC monitored the inspection results to determine if the home qualified for benefits under the Knauf Settlement Agreement.

If the home qualified for benefits following the MZA inspection, a second inspection and estimate was performed by Moss or another qualified contractor. PC coordinated and attended the Moss inspection and estimate to ensure compliance with the ANSI square footage measurements and compliance with the Exhibit F remediation protocol. Again, often times at the inspection clients had additional questions regarding the remediation process, scope of the remediation and the legal ramifications of settling under the Knauf Settlement Agreement.

Following the inspection by Moss or the qualified contractor, PC received an Xactimate estimate which provided a scope of work for the home and the ANSI square footage that determined the lump sum payment for each client. PC reviewed the Xactimate estimate to ensure compliance with the Exhibit F protocol, confirmed that all areas of home were listed in the scope of work and verified the ANSI square footage. PC then conferred with each homeowner to explain the Xactimate scope of work and seek approval of the Xactimate scope

EXHIBIT 1

and ANSI square footage. Once the Xactimate scope was approved, PC monitored the Xactimate estimated cost for the home and the Final Cost Estimates to ensure that the costs were in line with the size of the home, the quality of the original construction of the home, and the Xactimate scope of work.

Assuming the homeowner chose Option 1, after the inspection and estimate process was complete, BrownGreer prepared a generic work authorization package to be completed by PC and homeowner. Upon receipt and review of the work authorization, PC became concerned over the language utilized within the authorization. PC had active litigation in state court against builders for Chinese drywall as well as construction deficiencies. Due to the broad nature of the work authorization, PC could not in good conscience allow its homeowners to potentially sign away unrelated claims and damages. PC negotiated direct with Knauf's attorneys to modify the work authorization for its clients in order to ensure that all claims against builders could be pursued. Unfortunately this step created a setback in when remediations began but we has to ensure that we put the best interest of the client in front of ease.

After the modified work authorization was approved, PC then prepared a work authorization package specific to the particular homeowner and provided the package to the homeowner for review. PC then met with each homeowner to review the work authorization package and discuss the remediation program. This meeting included discussions regarding legal implications of executing the work authorization and signing of releases. In addition, the practical aspects of implementing the remediation, moving out, lump sum payments, and other move out and repair issues were discussed.

In Option 1 scenarios, following the return of the work authorization package,

EXHIBIT 1

BrownGreer provided a move out notice indicating when the homeowner must be out of the home for the remediation to begin. In addition, BrownGreer and/or Knauf provided a date and time for a kick off meeting between the contractors, PC and homeowners. Between the time of the receipt of the move out notice and the kick off meeting, PC received the lump sum payment for the homeowner. PC verified the amount of the lump sum payment and disbursed the funds to the clients.

PC then attended the kick off meeting at the home. At this meeting, PC oversaw compliance with the Exhibit F remediation protocol and the Xactimate scope of work. Often times issues regarding the scope of work, including appliance issues and HVAC issues were discussed and corrected onsite. Typically, numerous return trips to the project were required during the remediation process to ensure compliance with the remediation protocol and monitor the timing and completion of the construction. Usually during the construction process the homeowner raised questions regarding the scope of work as well as the quality of work. For most homes, PC mediated disputes and disagreements regarding the scope of the work and the quality of work. There were often disputes regarding the replacement of materials with "like-for-like" materials as required by the Knauf Settlement Agreement. This process of monitoring the remediations and mediating the disputes resulted in countless hours of time expended by PC. Further, this process of dispute resolution required a firm grasp of the Knauf Settlement Agreement and legal interpretations of the agreement, the work authorizations, and the remediation protocols.

Once a home was stripped of the Chinese Drywall, sometimes construction deficiencies or water and termite damage were discovered. At this point, PC were required to determine if

EXHIBIT 1

the costs associated with such repairs were costs associated with the Knauf remediation or the responsibility of the homeowner. There were often disputes regarding which party was responsible for the payment of such repair costs and required PC to determine a suitable resolution.

Following the kick off meeting, Moss provided an appliance binder to PC outlining the appliances to be replaced and setting forth the choices the homeowner had in regards to replacement of the appliances. PC had to determine if the appliance binder complied with the Knauf Settlement Agreement, the Exhibit F protocol and the Xactimate scope of work. Often some appliances were not included in the binder and corrections or adjustments to the binder had to be made. This required intimate knowledge of the Knauf Settlement Agreement and the remediation protocols to determine which appliances were to be replaced. PC then explained the appliance binder and potential choices to the homeowner and reported to Moss the homeowner's decision regarding appliances.

As a project neared completion, there were delays which required negotiations for delay payments owed to the homeowner. PC was responsible for monitoring the deadlines, calculating the delay payments and negotiating the delay payments for homeowners.

After a project obtained a Certificate of Occupancy, the contractor, PC and the owner met onsite to review the completed work. PC was responsible for determining if the scope of work and quality of work complied with the Knauf Settlement Agreement and the remediation protocols. At this meeting the homeowner and contractor created a punch list of items for the contractor to complete prior to returning the home to the owner. Disputes between the contractor and the owner often arose at this stage and were resolved by PC. In order to resolve these issues,

EXHIBIT 1

PC was required to have a thorough understanding of the Knauf Settlement Agreement, remediation protocols, and interpretations of the Knauf Settlement Agreement.

Once the punch list items were complete or the contractor and homeowner reached an agreement regarding the completion dates for the punch list items, a close out meeting was held at the home with the contractor, PC, and the homeowner attending. At this point, the contractor sought to return the home to the owner and have the homeowner sign a release required by the Knauf Settlement Agreement upon substantial completion of the project. Disputes regarding if the release should be signed often arose at this stage. In addition, at this meeting, PC provided the homeowner with a close out package, including documents from the remediation such as the Knauf inspection report, the GFA certification, the warranty information, the Certificate of Occupancy, and the contractor's certification.

Further, once the home was released to the homeowner, PC was required to monitor ongoing punch list items and disputes regarding punch list items. For many homes it took months to complete the punch list and resolve these issues. It was not unusual for a three (3) month remediation project to take six (6) to nine (9) months for a total completion of the construction. In addition, the homeowners received a one (1) year warranty from the contractor regarding all work performed on the home. As such, the homeowners often required warranty work to be performed by the contractor. PC monitored and oversaw the warranty requests and completion of the warranty requests. Disputes often arose involving whether the repairs fell within the scope of the warranty. Due to this one (1) year warranty, each three (3) month project took a minimum of a one (1) year and three (3) months to bring to a complete and total resolution.

EXHIBIT 1

If the homeowner chose Option 2 or 3, a separate set of paperwork was required. PC was required to coordinate the Option 2 or 3 package and meet with the homeowners to execute certain documents and provide legal advice regarding the documentation. PC had to ensure that components of the settlement package was complete as the settlement administrator had increased scrutiny over these claims. In addition, PC was required to explain the detriments that these options included and was forced to coordinate with personal contractors to ensure proper figures were provided for agreements under Option 2.

The final step in resolving a homeowner's claims involved the filing and monitoring of claims under the various settlements, including, but not limited to, bodily injury claims, global builder and supplier claims, foreclosures claims, pre-remediation move out claims, miscellaneous claims, and others. This process required an evaluation of all potential claims available under all settlements and an evaluation of each client's circumstances to determine if a client was eligible for a particular claim. This involved legal interpretations of the Knauf Settlement Agreement, the various other settlement agreements, and the various claims materials. Once the determination was made for each client, PC was responsible for drafting the claim form, gathering the required documentation and timely filing the claims. Once the claims were filed, PC monitored the progress of the claims and updated clients regarding the progress of the claims. Eventually, BrownGreer issued a Notice of Claim Eligibility form. PC discussed the Notice of Claim Eligibility with each client and determined whether to accept or appeal the notice. If the claim was accepted, PC was responsible for the execution of the Verification of Claim form, execution of a W9 form, verification of the payment of the claims and execution of releases. If the eligibility notice was appealed, PC was responsible for the appeals process to the

EXHIBIT 1

Special Master or the Court. Some appeals are still proceeding to date.

In order to bring a client to a complete resolution, PC invested countless hours and significant expenses not reimbursed by the expense stipend to accomplish tasks that could not be accomplished by Common Benefit Counsel. Many of the tasks required of PC to provide a homeowner with a complete resolution were tasks required by the PSC or because the PSC negotiated a settlement that required PC to completely implement the settlement on his own. The resolution of a homeowner's claims required extensive client contact and involvement which was handled exclusively by PC. A resolution of a homeowner's claims required consistent work on behalf of the client over a four (4) to six (6) year period of time. PC contributed the majority of their practice over these time periods to resolve homeowner's Chinese Drywall disputes and without PC involvement the resolution of these claims would have proved impossible.

Collins & Horsley is a firm representing homeowners with Chinese Drywall. Collins & Horsley did not make any claims for common benefit work. Collins & Horsley performed Chinese Drywall-related work that was unique from other PC, but benefited all Chinese Drywall homeowners as a whole.

Collins & Horsley filed numerous lawsuits against builders of homes containing Chinese Drywall in various state courts in Alabama. Since the MDL Court did not have personal jurisdiction over Alabama builders that constructed homes in Alabama with Chinese Drywall, Collins & Horsley evaluated the statute of limitations for builders' claims and determined builder liability for each homeowner. We determined the applicable building code for each jurisdiction and determined possible building code violations. As a result, we prepared and filed numerous builder lawsuits on behalf of homeowners with Chinese Drywall. As such, we undertook the

EXHIBIT 1

usual responsibilities of litigation in the builder filed cases, including generation of pleadings, review of defendant's pleadings and preparation and review of paper discovery. Further, we undertook settlement negotiations with builder attorneys. We attended status conferences and motion dockets associated with builder lawsuits and were appointed as liaison counsel for Alabama state court Plaintiffs. As liaison counsel, we designed and drafted case management orders for various state court judges regarding the various discovery tracks needed for builder cases. Further, we responded to Motions to Stay filed by Knauf and INEX and represented homeowners at the oral argument on this issue. This work was performed without the help of the PSC or Common Benefit Counsel.

Further, Collins & Horsley worked with Moss & Associates and the Lead Contractors to insure that the repair protocol was sufficient. Moss took the position that the Exhibit F was the maximum that they were required to perform. After complaints of several homeowners, Collins & Horsley had to work closely with Moss & Associates to insure proper inspections of appliance, HVAC units and bathrooms. Collins & Horsley worked with homeowners and contractors to insure that the expectations of the clients were met and the homes were habitable when the remediation work was completed. This work was performed without help from the PSC or Common Benefit Counsel.

Collins & Horsley in connection with Eric Hoaglund of McCallum, Hoaglund, Cook and Irby, and Eddie Sexton of Gentle, Turner & Sexton enhanced the Knauf Settlement Agreement by objecting to the original Settlement Agreement and negotiating with Knauf the inclusion of Section 4.9 of the Amended Knauf Settlement Agreement providing Lower-Case Knauf homeowners with relief under the Knauf settlement. Further, the Sexton/Hoaglund firms

EXHIBIT 1

enhanced the Knauf Settlement Agreement by objecting to the original Settlement Agreement and negotiating with Knauf for the inclusion of Section 4.7.3.1 of the Knauf Settlement Agreement providing possible relief to Chinese Drywall homeowners by the inclusion of a claim for miscellaneous expenses not otherwise provided for in the settlement.

_____
W. Brian Collins


STATE OF ALABAMA )
)
JEFFERSON COUNTY )

SWORN TO AND SUBSCRIBED before me the undersigned Notary Public on this the 28th day of June, 2016.

_____
Notary Public
My Commission Expires: 5/19/2019

ASHLEY LEIGH HORSLEY
My Commission Expires
May 19, 2019

EXHIBIT 1