## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION                              MDL 2047

                                        SECTION: L

                                        JUDGE FALLON
                                        MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO:
*ALL CASES*
**************************************************************************

**BARON & BUDD, P.C., ALLISON GRANT, P.A. AND ALTERS LAW FIRM, P.A.'S OBJECTIONS IN OPPOSITION TO FEE COMMITTEE'S MOTION TO DETERMINE THE ALLOCATION OF THE GLOBAL FEE AWARD AS BETWEEN COMMON BENEFIT FEES AND INDIVIDUAL COUNSEL'S FEES PURSUANT TO PTO 28(F)**

Russell W. Budd (TX Bar No. 03312400)
S. Ann Saucer  (TX Bar No. 00797885;
LA Bar No. 21368)
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
rbudd@baronbudd.com
asaucer@baronbudd.com

Jeremy W. Alters (Florida Bar No. 111790)
jeremy@alterslaw.com
Justin D. Grosz (Florida Bar No. 984000)
justin@alterslaw.com
Matthew T. Moore, Of Counsel (Florida Bar
No. 70034)
matthew@alterslaw.com
ALTERS LAW FIRM, P.A.
1855 Griffin Road, Suite C470
Dania Beach, FL 33004
Tel.: (305) 571-8550
Fax: (305) 571-8558

Allison Grant (Florida Bar No. 858330)
Allison Grant, P.A.
14 SE 4th St
Boca Raton, FL 33432-6111
Tel.: 561-994-9646
Fax: 561-431-4627
agrant@allisongrantpa.com

## **TABLE OF AUTHORITIES**

INTRODUCTION ............................................................................................................1

ARGUMENT AND AUTHORITIES..............................................................................5

I.  THE REQUESTED 59.37:40.63 SPLIT IS NOT ONLY MUCH WORSE
    FOR CONTRACTUALLY RETAINED COUNSEL THAN IT APPEARS,
    BUT EVEN WERE IT A FAIR REPRESENTATION OF THE
    ALLOCATION, IT IS UNPRECEDENTED. ...............................................6

    A.  The Disproportionate Fee Demand Is Unprecedented.......................8

        1.  *Vioxx* litigation applied a 6.5-to-25.5 ratio. ...............................8

        2.  In addition to significantly departing from the *Vioxx* 6.5-to-25.5
            ratio, the FC's 59.37-to-40.63 demand is otherwise unprecedented..........10

    B.  The FC Misplaces Reliance on Distinguishable Precedent. ............................11

II.  THE FC'S FUZZY MATH OVERSTATES THE COMMON BENEFIT
     WORK AND UNDERSTATES CONTRACTUALLY RETAINED
     COUNSEL'S WORK. .................................................................................16

    A.  Contractually Retained Counsel Have Earned Reasonable Fees in
        Significant Excess of What the FC and PSC Would Allow. ..........................17

        1.  The FC has already admitted the unique legal work required to
            represent individual clients in these cases. ...............................17

        2.  Because the undersigned Contractually Retained Counsel were
            filing cases before the PSC even existed, the PSC built off of our
            work product. ...........................................................18

        3.  Contractually Retained Counsel worked extensively to establish
            inspection protocol at the beginning of this litigation. ...............................19

        4.  Contractually Retained Counsel had extensive responsibilities even
            after formation of the MDL. .................................................19

        5.  Undersigned Contractually Retained Counsel represented the first
            participants in the Pilot Program...........................................20

        6.  Undersigned Contractually Retained Counsel represented the first
            large scale condominium remediated through the Knauf
            Settlement. ..............................................................21

        7.  Undersigned Contractually Retained Counsel Faced Extensive
            Additional Work Outside of the Pilot Program. .........................................22

    B.  The FC Takes An Overly-Expansive View of What Counts as a
        Benefit That Common Benefit Counsel Uniquely Have Imbued Upon
        the Class.....................................................................24

i

C. The Fee Committee Is Haling Work That Bears No Relationship to the Settlement Funds at Issue.................................................................................27

D. The FC's Demand that the PSC Receive Disproportionate Funds Is All the More Inequitable Considering the Other Sources of Common Benefit Fund Compensation Available to the PSC.........................................29

E. The Undersigned Contractually Retained Counsel Ask for an Award of $21,639,057.39, Which is the Amount Due using a 30:70 Common Benefit: Individually Retained Counsel Split of Available Attorney Fee Funds. ......................................................................................................30

III. THE FC'S REQUEST MISCALCULATES THE AMOUNT AVAILABLE TO COMPENSATE CONTRACTUALLY RETAINED COUNSEL. .......................32

IV. THE FC WANTS TO PAY THE PSC IN FULL PLUS A BONUS WHILE LEAVING CONTRACTUALLY RETAINED COUNSEL HUNDREDS OF THOUSANDS OF DOLLARS IN THE RED ON OUT-OF-POCKET EXPENSES.................................................................................................................34

A. Undersigned Agree with the FC Motion's Theme That Counsel Who Actually Risk Forfeiting Out-of-Pocket Expenses Should Receive More in Fees as Compensation. ......................................................................34

B. The Undersigned Contractually Retained Counsel Risked over $450,000 in Advanced Expenses that Our Clients Agreed to Reimburse That We Will Not Recover. ..........................................................34

C. The FC's Proposal Short-Changes Contractually Retained Counsel by Diverting Settlement Funds for Purposes Unrelated to the Settled Claims. ......................................................................................................36

V. THE FC'S 2016 MOTION IS INCONSISTENT WITH THE PROCEDURAL HISTORY OF THIS CASE. .......................................................................................38

CONCLUSION.......................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Camden I Condo. Ass'n, Inc. v. Dunkle,*
  946 F.2d 768 (11th Cir. 1991) ....................................................................................12, 26

*Deloach v. Philip Morris Co.,*
  No. 1:00CV01235, 2003 WL 23094907 (M.D. N.C. Dec. 19, 2003)....................................16

*Evans v. Tin, Inc.,*
  Nos. 11-2067 *et al*., 2013 WL 4501061 (E.D. La. Aug. 21, 2013) ....................................8, 11

*In re Air Crash Disaster at Florida Everglades Dec. 29, 1972,*
  549 F.2d 1006 (5th Cir. 1977) ........................................................................................10

*In re Clearsky Shipping Co.,*
  No. 96-4047 *et al*., 2003 WL 1563820 (E.D. La. Feb. 26, 2003)....................................12, 35

*In re Diet Drugs Products Liab. Litig*.,
  401 F.3d 143 (3d Cir. 2005)..............................................................................................5

*In re Diet Drugs Products Liab. Litig.,*
  553 F. Supp. 2d 442 (E.D. Pa. 2008) ..............................................................................14

*In re Domestic Air Transp. Antitrust Litig.,*
  148 F.R.D. 297 (N.D. Ga. 1993)......................................................................................12

*In re Dun & Bradstreet Credit Servs. Customer Litig*.,
  130 F.R.D. 366 (S.D. Ohio 1990) ...............................................................................25, 26

*In re Enron Corp. Securities, Derivative & ERISA Litig.,*
  586 F. Supp. 2d 732 (S.D. Tex. 2008) .............................................................................13

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig*.,
  MDL No. 05–1708, 2008 WL 682174 (D. Minn. Mar. 7, 2008), *amended in part*,
  2008 WL 3896006 (D. Minn. Aug. 21, 2008) ..................................................................11

*In re Heartland Payment Systems,*
  851 F. Supp. 2d 1040 (S.D. Tex. 2012) ...........................................................................27

*In re High Sulfur Content Gasoline Prod. Liab. Litig.,*
  517 F.3d 220 (5th Cir. 2008) .............................................................................5, 6, 30, 39

*In re MGM Grand Hotel Fire Litig.,*
  660 F. Supp. 522 (D. Nev. 1987)......................................................................................10

*In re Nasdaq Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D. N.Y. 1998) .................................................................16

*In re OAL Time Warner, Inc. Securities and ERISA Litig.*,
   MDL 1500, 2006 WL 3057232 (S.D. N.Y. 2006) ..................................15

*In re Rezulin Prod. Liab. Litig.*,
   MDL No. 1348, 2002 WL 441342 (S.D. N.Y. March 20, 2002), *amended in part*,
   2003 WL 649116 (S.D. N.Y. Feb. 27, 2003) ...........................................12

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005) ..............................................................27, 36

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
   461 F. Supp. 2d 383 (D. Md. 2006) .................................................15

*In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*,
   268 F. Supp. 2d 907 (N.D. Ohio 2003) ...............................................16

*In re Tyco Int'l, Ltd.*,
   535 F. Supp. 2d 249 (D. N.H. 2007) ..................................................14

*In re Vioxx Prod. Liab. Litig.*,
   574 F. Supp. 2d 606 611 (E.D. La. 2008) .....................................9, 11, 40

*In re Vioxx Prods. Liab. Litig.*,
   650 F. Supp. 2d 549 (E.D. La. 2009) ...................................................9

*In re Vioxx Products Liab. Litig.*,
   760 F. Supp. 2d 640 (E.D. La. 2010) ............................................ *passim*

*In re Visa Check/Mastermoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D. N.Y. 2003), *aff'd*, 396 F.3d 96 (2d Cir. 2005) .............13

*In re WorldCom, Inc., Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D. N.Y. 2005) ..............................................15

*In re Zyprexa Prods. Liab. Litig.*,
   424 F. Supp. 2d 488 (E.D. N.Y. 2006) ..............................................11

*Migis v. Pearle Vision, Inc.*,
   135 F.3d 1041 (5th Cir. 1998) ........................................................12

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
   91 F. Supp. 2d 942 (E.D. Tex. 2000) ................................................16

*Smiley v. Sincoff*,
   958 F.2d 498 (2d Cir. 1992) ...........................................................10

*Sobel v. Hertz Corp.*,
   No. 3:06-CV-00545-LRH-RAM, 2011 WL 2559565 (D. Nev. June 27, 2011).....................27

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ..................................................................................................27

*Strong v. BellSouth Telecomm., Inc.*,
   173 F.R.D. 167 (W.D. La. 1997), *aff'd*, 137 F.3d 844 (5th Cir. 1998)...................................25

*Turner v. Murphy Oil USA, Inc.*,
   472 F. Supp. 2d 830 (E.D. La. 2007) ..............................................................................11, 24

*Wings v. Asarco, Inc.*,
   114 F.3d 986 (9th Cir. 1997) ..................................................................................................26

**Rules**

Fed. R. Civ. P. 23 .........................................................................................................................7

**Other Authorities**

Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. (2014)............6

*Newberg on Class Actions*, § 15:115 (5th ed.).............................................................................31

NOW INTO COURT, Baron & Budd, P.C., Allison Grant, P.A., and Alters Law Firm, P.A. (formerly known as Alters Boldt Brown Rash & Culmo, P.A.) (occ. "Contractually Retained Counsel") respectfully object to the Fee Committee's Motion to determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 23(f) [Doc. 20290] (occ. "FC's Motion" or "FC's 2016 Motion"), in which the Fee Committee (occ. "FC") requests 59.37% of the shared fee fund to pay common benefit fees *in full* while, in stark contrast, leaving counsel whom Plaintiffs actually hired with only pennies on the dollar for fees and expenses:

## **INTRODUCTION**

The undersigned Contractually Retained Counsel represent homeowners and condominium associations who have brought settlement claims related to over 1250[1] homes (approximately 15% of all Plaintiffs in this case), and had filed nearly 100 cases in Florida state courts before the Chinese-Manufactured Drywall MDL existed.[2] The Undersigned respectfully, and forcefully, object to the Fee Committee's proposal that the Plaintiffs' Steering Committee ("PSC") be awarded 10.65% (i.e., $114,581,308.82 out of the purportedly available fund of $192,981,363.35) of what it considers to be the total benefit conferred, plus an additional $5,732,058.26 which the PSC has apparently reserved for itself even though said funds have not been allocated by the Court.  Unlike in *Vioxx,* and many of the cases cited by the FC, there are severely limited attorneys' fees available for distribution in the instant case. Although the amount of fees available for distribution and the calculation of the benefit conferred is disputed, per the FC's calculation, total attorneys' fees in the amount of $192,981,363.35 translates to a

---

[1] 1,075 homes represented collectively by Baron & Budd, P.C., Alters Law Firm, P.A. and Allison Grant, P.A.; and 192 homes represented by Allison Grant, P.A. individually; *See* Exhibits 1, 2.

[2] *See* Exhibit 3.

total fee award (for both common benefit and individually retained attorneys) of 17.54%. Whether expressed as a dollar amount or percentage, clearly the amount available is insufficient to fully compensate two groups of lawyers, and the FC has failed to take this significant factor into account in its request.  Stated differently, were there not a capped and insufficient fund from which both groups of attorneys are to be paid, computing the PSC's fee as a percentage of the benefit they conferred would be appropriate.  However, here, the fund is capped and insufficient to compensate both common benefit counsel and individually retained counsel in full, and it is only fair that both groups share the shortfall equally.  To do otherwise would require the contract attorneys to bear the full burden of the shortfall in available attorneys' fees, and would leave all contract counsel significantly under-compensated while the common benefit lawyers are paid in full, complete with a self-congratulatory upward adjustment.

In the alternative, and to avoid the analysis of whether the total benefit conferred was properly calculated (indeed, it was not), the available fees should be divided equitably and consistently with other similar cases such as *Vioxx*, where the Court awarded approximately 25% of the available fees to the common benefit attorneys and 75% of the fees to the contractually retained attorneys. There is no question that the PSC has done excellent work. But with all due respect, the same is true for the contract attorneys. The salient inquiry here, however, is not whether the attorneys in this case have done a great job, but rather how a limited fund is to be fairly distributed to the two disparate groups. For the reasons set forth in detail below, the undersigned submit that an equitable allocation is a 30% share of available attorneys' fees to compensate common benefit work and a 70% share to compensate individual plaintiffs' counsel.

The Fee Committee comes to a very different conclusion on the proper proportionate allocation of the limited fund. Respectfully, the Fee Committee's analysis and calculations are flawed for a number of independent reasons:

1.      First, pursuant to the settlements that the PSC negotiated, individually retained counsel's fees are capped and limited to a fund that, per the FC's Motion, is inadequate to compensate both common benefit fund work and contractually retained counsel's work. Therefore, the FC Motion's first 54 pages are devoted to evading the real issue here. The real issue is not whether $120,313,367.08 can be justified as reasonable compensation for the highly skilled common benefit representation that the Plaintiffs received. That would have been the issue had the fund been adequate or, alternatively, had the PSC not negotiated settlements that denied retained counsel their contract rights. Here, however, the relevant issue is whether the PSC can effectively cap contractually retained counsel's fees and expenses, and then secure disproportionately favorable terms for its own compensation. Forcing counsel with contract rights to alone suffer the risk of an inadequate limited fund is all the more unjust because the PSC engineered the contract right limitations and now seeks to force *other* lawyers to bare the entire burden of *the PSC'*s own miscalculations. As addressed *infra* at §I, the cases invoked in the FC's Motion addressed distinguishable facts. No authority justifies the FC's attempt to take disproportionate fee and expense compensation away from the lawyers actually hired by the plaintiffs.

2.      Second, the Fee Committee's mathematical calculations are inequitable because its analysis depends on two different benefit numbers (*see* §II *infra*). The FC uses the sum of $1.1 billion as the benefit number to which the PSC's contingent multiplier applies; however, the Settlement Administrator uses $658,713,629.62 as the benefit conferred for the purposes of

calculating contractually retained counsel's fees, which is patently unfair (*see* §II.B *infra*). This is one way in which the Motion overstates the PSC's work relative to contract-right counsel's work. As explained below, undersigned Contractually Retained Counsel were intensely devoted to these clients for seven years and have expended extraordinary legal resources assisting clients devastated by the toxic state of their residences (*see* §II.A *infra*).

3.    Third, the FC Motion's math is wrong for another reason. The Fee Committee requested and received disbursement of funds in the amount of $233,078,720.33 out of settlement proceeds to compensate both the common benefit fund counsel and the Plaintiffs' individually retained counsel [*see* Doc. 20290-5]. The FC has improperly reduced what started out at $233,078,720.33 to only $192,981,363.35 allegedly available for disbursement in attorneys' fees. In reality, that number is $206,313,421.61, as will be explained below.

4.    Fourth, the Fee Committee's motion exclusively addresses the issue of attorneys' fees and ignores the unjust and disproportionate way that it plans to treat the two sets of counsel when it comes to expenses. The PSC will receive full reimbursement for all of its expenses and then is reserving ten million dollars in future expenses for the PSC's pursuit of non-settling defendants. As explained below (*see* §III *infra*), the FC cannot justify this as fair to Contractually Retained Counsel, who are barred from any expense reimbursement beyond an inspection stipend that in many cases will not cover outstanding costs on the case. The Fee Committee is insuring one hundred percent expense reimbursement for the PSC. Irreconcilably, Contractually Retained Counsel will never be compensated for hundreds of thousands of dollars in their out-of-pocket expenses.  In addition to this patent inequity, the approved fund should compensate counsel for work on the cases that settled, yet the FC wants to set aside ten million for something different, i.e., pursuit of future payment from non-settling defendants.

5.      A fifth reason why the disproportionate share of an inadequate limited fund proposal is unjust is because counsel representing individual Plaintiffs under contract were not fairly informed that the settlement agreements' various terms would culminate in the drastic reductions proposed in the FC's 2016 Motion (*see* §V *infra*).

## ARGUMENT AND AUTHORITIES

The undersigned Contractually Retained Counsel do not dispute the propriety of appointing a Fee Committee for recommendations, the propriety of compensating counsel for their common benefit work, or the contribution made by the PSC. Here, however, the Fee Committee's Motion falls short of, and does not seriously address, the fundamental rule applicable to its allocation decisions. Lead counsel responsible for fee allocation must "'apply a ***universally fair*** standard of allocation to all participants, including itself.'" *See In re High Sulfur Content Gasoline Prod. Liab. Litig.,* 517 F.3d 220, 232 (5th Cir. 2008) (case cited in Motion, p. 3) (reversing decision to accept fee allocation determined by a Fee Committee; parenthetically quoting *In re Vitamins Antitrust Litig*., 398 F. Supp. 2d 209, 234 (D. D.C. 2005)) (emphasis added). The contributions of all plaintiffs' attorneys should be compared rather than focusing on the Fee Committee's allocations and contributions. *See High Sulfur*, 517 F.3d at 232 (reversing and criticizing order accepting a fee committee allocation for its failure to make meaningful comparison); *see also id*. at 234 (criticizing the situation in which "five attorneys … declare how an award will cover themselves and seventy-four other attorneys with no meaningful judicial supervision or review"). The Fifth Circuit also explained that:

> [O]ur precedents do not permit courts simply to defer to a fee allocation proposed by a select committee of attorneys, in no small part, because "counsel have inherent conflicts." *In re Diet Drugs Products Liab. Litig*., 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring). As Judge Ambro noted, "They make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?" *Id*.

5

> Here, members of the Fee Committee "had a direct conflict of interest: they were suggesting to the District Court how to proceed on matters near and dear— dividing a limited fund among themselves and other firms. Such a direct conflict of interest strongly suggests that affording substantial deference is inappropriate." *Id*. at 173–74.

*High Sulfur,* 517 F.3d at 234-235. The FC's Motion should be denied because it cannot possibly pass the test of universal fairness.

Two years ago, the FC's Motion described at length the unique pressures, responsibilities, and legal work required by the lawyers responsible for the claims of individuals whose homes were uninhabitable or otherwise severely damaged [Doc. 17687-3, pp. 32-38]. Now, however, the FC's 2016 Motion demands that the Court effectively impair clients' rights to contract by eviscerating contractually retained counsel's compensation to draconian levels in order to ensure common benefit counsel are not only fully compensated but that they also receive a bonus for their efforts. Your Honor has noted that MDL cases account for more than 15% of all civil litigation in this country according to some estimates. Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371, 373 (2014). For the sake of fairness to the individually retained counsel in this case, who have diligently labored for their clients for the past seven years, and for the sake of precedent, the FC should not be allowed to divert attention to the inapposite issue of whether $120,313,367.08 would be a reasonable fee request – which the first 54 pages of the FC's memorandum addresses, ignoring that the requested allocation is patently unjust.

## I.   THE REQUESTED 59.37:40.63 SPLIT IS NOT ONLY MUCH WORSE FOR CONTRACTUALLY RETAINED COUNSEL THAN IT APPEARS, BUT EVEN WERE IT A FAIR REPRESENTATION OF THE ALLOCATION, IT IS UNPRECEDENTED.

The FC believes that common benefit counsel should walk away with the lion's share of the capped fee pot, forcing individual counsel with contingency contracts to lose not only

6

millions in fees that they earned but also hundreds of thousands of dollars in expenses that they expended knowing that they had a contractual right to be reimbursed in full. As explained below (§§ II, III), the FC simply gets the math wrong, skewing its numbers in favor of allocating more money to the PSC. This error is compounded by the FC's unprecedented conclusion that a fair split between counsel without contract rights versus counsel hired by the clients is 59.37-to-40.63. **If the FC's Motion were granted, the undersigned would be receiving in attorneys' fees only 6.8% of the true benefit conferred upon our clients versus the 33⅓% contractually agreed to by our clients in the vast majority of our client contracts** (*see* §II.E *infra; see also* Exhibit 6).  The FC is unable to cite one case – and undersigned is not aware of any – in which a court has so thoroughly ignored the attorney-client relationship between counsel hired by the Plaintiffs in order to award fees to a group of lawyers with which the Plaintiffs did not choose to contract.

Most of the cases cited in the FC's Motion have little bearing on the remedy requested in the motion. The Contractually Retained Counsel are not disputing the common benefit fund doctrine, the Court's authority to order compensation for court-appointed counsel, or the Court's authority to determine class counsel's fees under Rule 23. The issue here is how the limited funds set aside to pay attorneys' fees should be fairly allocated and whether there is *any* legal support for the Fee Committee's proposal to keep most of the money for common benefit work. The latter point can be answered with a resounding no.

The FC crafts its arguments within the format of the blended approach employed by the Court. However, the FC's employment of the blended approach ignores other factors that make its demand unprecedented. The overwhelming majority of the cases upon which the FC misplaces reliance addressed what would be a reasonable fee and not the circumstance of paying

one group of lawyers in full at the expense of leaving other lawyers grossly undercompensated (*see* §I.B *infra*). Further, this Court previously approved a 1 to 3.9 ratio for common benefit-to-contractually retained counsel ratio rather than the 1 to .68 ratio[3] demanded by the FC here (*see* §I.A *infra*). As explained below, the calculations and analysis in the FC's Motion suffer several lapses in law, logic, and math.

### A.  The Disproportionate Fee Demand Is Unprecedented.

#### 1.  *Vioxx* litigation applied a 6.5-to-25.5 ratio.

 In *Vioxx,* Your Honor ultimately decided that **6.5%** of the recovery should be awarded to the common benefit lawyers, **leaving the remaining 25.5%** to privately retained lawyers. *In re Vioxx Products Liab. Litig*., 760 F. Supp. 2d 640, 653 (E.D. La. 2010); *see also Evans v. Tin, Inc.,* Nos. 11-2067 *et al*., 2013 WL 4501061, at \*12 (E.D. La. Aug. 21, 2013) ("The Court ultimately decided that 6.5% of the 4.85 billion dollar recovery should be awarded to the common benefit lawyers, leaving the remaining 25.5% to privately retained lawyers."). Thus, the Court applied a 1 to 3.9 ratio of common benefit fees compared to the fees of counsel with contract rights. Here, in stark contrast, the Fee Committee expects a 1 to .68 ratio of common benefit fees to privately retained counsel' fees. **And**, on top of that disparity, the Fee Committee expects that the common benefit lawyers receive dollar for dollar compensation for their expenses while, at the same time, the counsel with actual contracts are left holding the bag for hundreds of thousands of dollars in unreimbursed expenses.

Nothing in the *Vioxx* analysis remotely supports the conclusion reached in the FC's Motion. In *Vioxx*, this Court acknowledged the validity of contingency fee contracts and did ***not*** find that these contractual rights could be ignored for the sole purpose of paying another group of

---

[3]  Undersigned uses the FC's numbers for the sake of argument here. As explained in §§II, III *infra*, the FC's numbers are not fair.

lawyers in full. In its initial decision capping the fees at 32% plus reasonable costs, the Court reasoned that contingency fee contracts have long been accepted and that "[u]ndercompensating attorneys who handle such litigation would result in too few meritorious private suits being brought and less competent representation." *In re Vioxx Prod. Liab. Litig.,* 574 F. Supp. 2d 606 611 (E.D. La. 2008). The court capped the contingent fee arrangements at 32% plus reasonable costs, and affirmed this position with an alteration that would allow the Court to deviate from the 32% cap in rare circumstances. *In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549 (E.D. La. 2009). Thereafter, the Court allowed the common benefit fund lawyers to be compensated at 6.5%. *In re Vioxx Prod. Liab. Litig.,* 760 F. Supp. 2d 640 (E.D. La. 2010).

In identifying the source of the Court's authority to reduce the contract rights of privately retained lawyers, the Court looked to *inter alia* equitable and inherent supervisory authority. 574 F. Supp. 2d at 611-14. The Court's authority to examine contingent fee contracts was further guided by comparable limitations on contingent fees. *Id.* at 615. The Court reasoned that, "[b]ecause this MDL proceeding is essentially a series of diversity jurisdiction cases, it is appropriate for the Court to consider state statutes" and that "the New Jersey rule is particularly persuasive in this context because New Jersey is one of the primary coordinate jurisdictions in the Vioxx litigation." *Id.* This primary New Jersey character had significant import in the *Vioxx* case because New Jersey strictly limits contingency fee contracts, including capping them at 20% on the high end and providing specific additional protections for mentally incapacitated and minor clients. *Id.* The Court also cited a California law providing a sliding scale for actions against health care providers, a Texas workers' compensation cap of 25%, and Connecticut and Michigan statutes. *Id.* None of those laws apply to the contracts that undersigned counsel have with their clients in the case at bar. At issue are property damage claims, and the cited statutes

aimed at health and Workers' Compensation cases were intended to protect plaintiffs in a different type of litigation. Therefore, the justification for limiting the fees of contractually retained counsel in *Vioxx* are, if anything, weaker here.

### 2. In addition to significantly departing from the *Vioxx* 6.5-to-25.5 ratio, the FC's 59.37-to-40.63 demand is otherwise unprecedented.

The disproportionate dispersal requested by the FC stands at stark odds with the historically understood proportion that non-retained counsel could take from the counsel who actually have attorney-client contracts with plaintiffs in the case. For example, in the early case *In re Air Crash Disaster at Florida Everglades Dec. 29, 1972,* 549 F.2d 1006 (5th Cir. 1977) (cited in FC Motion, Doc. 20290-4, at pp. 4-5), the Fifth Circuit held that the district court could in theory order plaintiffs' counsel to pay, out of their contractually authorized fees, 8% to compensate court-appointed counsel for fees and expenses, but that the district court exercised this power in an erroneous manner. The reversed order stands at stark contrast to what the Fee Committee requests for itself and other common benefit work – first because 8% for both fees and expenses is significantly lower than what the FC's 2016 Motion demands *and* because the retained plaintiffs' counsel in *Air Crash* were not forced to otherwise forfeit their contract rights so as to be compensated ***at significantly lower rates*** than the non-contract counsel.

Another case on point in quantifying the PLC common benefit fees versus retained counsel's fees from a limited fund is *In re MGM Grand Hotel Fire Litig.,* 660 F. Supp. 522 (D. Nev. 1987) (cited in FC Motion, p. 5), where the court allowed 7% for the PLC and a maximum of 26⅓ for the private attorneys. *Contrast also Smiley v. Sincoff,* 958 F.2d 498, 500 (2d Cir. 1992) (cited in FC Motion, Doc. 20290-4 at p. 4) (the fee owed to the plaintiffs' committee "was not to exceed 8% of the gross recovery, and could not exceed one-half of the total attorneys' fees collected for each claim," with several groups exempt from mandatory payments).

The Motion's only other cited cases wherein courts expressly addressed the issue of proportionate payments to common benefit counsel versus contractually retained counsel appear to be two unpublished opinions which divided the fees 50/50. [*See* Doc. 20290-4, at pp. 61-62]. This obviously does not support the FC's disproportionate 59.37/40.63 demand, particularly when considering the totality of the circumstances (*e.g.*, disparate  treatment regarding expenses and asymmetrical limits on fee funding sources).[4]

### B.  The FC Misplaces Reliance on Distinguishable Precedent.

The FC's reliance on *Turner v. Murphy Oil USA, Inc.,* 472 F. Supp. 2d 830 (E.D. La. 2007), as consistent with its fee demand is unavailing. The FC's Motion states in the margin that, "[i]t is important to note that the fee at issue in *Turner* was earmarked for the payment of a class counsel fee only (and not private fees)." [Doc. 20290-4, p. 12 n.8]. This distinction belies the FC's attempt to present *Turner* as reconcilable with its claimed entitlement to keep most of the shared limited fund for the Committee members and other common benefit contributors. The *Turner* fee dispute was between the *Turner* PSC and the defendant, which per settlement had to pay a reasonable fee in the amount set by the Court. The PSC there requested $115,544,100 in

---

[4]  As this Court explained, in the *Zyprexa* litigation, the court conducted a thorough analysis and capped contingent fees at 35%, reserving the right to depart upward to 37.5% or downward to 30% based on the facts of each individual case. *In re Zyprexa Prods. Liab. Litig*., 424 F. Supp. 2d 488, 496 (E.D. N.Y. 2006) (discussed at *Vioxx*, 574 F. Supp. 2d at 616).

In considering the propriety of the cap on contractual fee rights, the Court in *Vioxx* also discussed the  20% cap applied in the *Guidant* litigation. 574 F. Supp. 2d at 616; *see also In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig*., MDL No. 05–1708, 2008 WL 682174, at **17-18 (D. Minn. Mar. 7, 2008), *amended in part*, 2008 WL 3896006 (D. Minn. Aug. 21, 2008).

In *Evans v. Tin, Inc.,* Nos. 11-2067 *et al.*, 2013 WL 4501061 (E.D. La. Aug. 21, 2013), Judge Africk only limited the contingency fee contracts for privately retained lawyers to 20% of the individual claimant's recovery. Furthermore, the special master report recommending the 20% to 24% limitation "was careful to recommend that any attorneys subject to the limitation should have an opportunity to seek a fee review in the event of extraordinary circumstances." *Id.* at *11.

fees and the Court instead awarded $33,746,241.88 plus expenses. 472 F. Supp. 2d at 858, 870-71. The award came out of the defendant's pocket, and the Court did not elevate the common benefit doctrine over counsels' rights to receive compensation from the clients who hired them.

The FC's belabored discussion of the normal fee range is irrelevant here because the cases invoked in the Motion were not setting a reasonable rate for court-appointed counsel *at the expense of* the lawyers that the plaintiffs in the case had actually agreed to pay. *See, e.g., Camden I Condo. Ass'n, Inc. v. Dunkle,* 946 F.2d 768 (11th Cir. 1991) (the discussion of 20-30% as a benchmark was in the context of the settling defendant paying for plaintiffs' class counsel fees); *Migis v. Pearle Vision, Inc.,* 135 F.3d 1041 (5th Cir. 1998) (fee dispute in Title VII case was between plaintiff and defendant).

Further, several opinions cited in the FC's Motion, as support for the general proposition that the common benefit fund doctrine exists, are distinguishable for the dual reasons that none disproportionately take fees from contract counsel in express favor of non-contract counsel, and none granted common benefit fund assessments as high as the FC's request in the first instance. *See, e.g., In re Clearsky Shipping Co.,* No. 96-4047 *et al*., 2003 WL 1563820, at *5 (E.D. La. Feb. 26, 2003) (cited at FC's Motion, p. 5 n.4) (4% common benefit fund); *In re Rezulin Prod. Liab. Litig.,* MDL No. 1348, 2002 WL 441342 (S.D. N.Y. March 20, 2002), *amended in part*, 2003 WL 649116 (S.D. N.Y. Feb. 27, 2003) (cited at FC's Motion, p. 5) (6% common benefit fund, 4% for electives); *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297 (N.D. Ga. 1993) (5.25% fee award).

Scrutiny of the case examples presented in the FC's Table (at pages 51-52) compels the conclusion that the national body of case law – even that cited by the FC – undermines the extraordinary request that common benefit counsel receive 59.37% of a limited fund to pay

themselves in full, with a bonus, for all fees and expenses – while counsel hired by the plaintiffs are stripped of their contract rights and disproportionately, inadequately compensated. These cases adjudicate reasonable fees, but do not address the circumstance where, as here, approving reasonable fees for class counsel or common benefit fund work comes at the expense of retained counsel's contract rights and disproportionately discounts the legal work of counsel actually hired by the plaintiffs.

| Case cited by FC in the Table at FC Motion, Doc. 20290-4, pp. 51-52 | Was % to common benefit counsel lower than FC's request here? | Additional discussion |
|---|---|---|
| *In re Enron Corp. Securities, Derivative & ERISA Litig.,* 586 F. Supp. 2d 732 (S.D. Tex. 2008). | <u>**Yes:**</u> 9.52% | The *Enron* court stressed that the Lead Plaintiff, the Regents of the University of California, had entered into a fee agreement with Lead Counsel that "weigh[ed] heavily in support" of the award. 586 F. Supp. 2d at 766. The Court specifically found "that the fee agreement was negotiated at arm's length between Lead Counsel and General Counsel Office of the Regents of the University of California, a highly sophisticated investor with a substantial stake in the litigation and strong motivation to maximize the recovery for the class." *Id.* at 767. Here, however, the FC's analysis disregards contract rights by disproportionately favoring counsel without any.<br><br>The court did not significantly nullify privately retained counsel's contract rights in order to pay common benefit lawyers most of a limited shared fund. |
| *In re Visa Check/Master money Antitrust Litig.,* 297 F. Supp. 2d 503 (E.D. N.Y. 2003), *aff'd,* 396 F.3d 96 (2d Cir. 2005). | <u>**Yes:**</u> 6.5% | Lead Counsel's fee request was rejected as excessive and "absurd." 297 F. Supp. 2d at 523. The court reasoned that, "Lead Counsel argue that their multiplier of 9.68 is supported by the relevant case law. I disagree." *Id.* at n. 29 (citing and discussing several cases). The court refused to award the fee requested notwithstanding the court's opinion that an extraordinary fee was appropriate because of the magnitude and complexities of the case, that it was "very risky," and the excellence of representation. *Id.* at 523-24.<br><br>Again, the court did not disturb contingency fee contract rights in order to pay common benefit lawyers most of a limited shared fund. |

13

| Case cited by FC in the Table at FC Motion, Doc. 20290-4, pp. 51-52 | Was % to common benefit counsel lower than FC's request here? | Additional discussion |
|---|---|---|
| *In re Diet Drugs Products Liab. Litig.,* 553 F. Supp. 2d 442 (E.D. Pa. 2008). | <u>*Yes:*</u> 6.75% | The court approved class action fees. The court did not state that it was extinguishing the contract rights of retained counsel in order to pay class counsel a disproportionately higher share of a limited fund, but rather analyzed the propriety of the class action fee award. |
| *In re Tyco Int'l, Ltd.,* 535 F. Supp. 2d 249 (D. N.H. 2007). | Unknown The amount was 14.5%, which may be equivalent with proper adjustment of Comm.'s numbers[5] | This was a securities fraud class action in which the settlement and legal fees were approved in the same order. The court looked to a particular set of securities fraud settlements, and found that the document production dwarfed every other major securities class actions. 535 F. Supp. 2d at 268. The court agreed that the few institutional objectors' generalized concerns were legitimate, but found that, "the unusual complexity, great legal uncertainty, high risks, massive but justifiable lodestar, high amount of work done in relation to the recovery for the class, and historic magnitude of the recovery in this case put it in a category of its own." 535 F. Supp. 2d at 272. Further, the fee request had been reduced from the 17.5% described in the notice of proposed settlement down to 14.5% sought and approved. *See id.* at 273. Here, in stark contrast, there was no prior notice that common benefit lawyers were going to claim most of a limited shared fund – in addition to having their expenses paid in full while contractually retained counsel are stripped of their contract rights to recover legal expenses advanced on behalf of the clients who hired them. Also, again, the court did not, as here, face objections from attorneys who were retained by contract and whose contract rights were being usurped in favor of paying other lawyers in full, with a  bonus, out of a limited fund. |

---

[5]   The FC's Motion presents a settlement amount of $1.1 billion by, for example, including payments to independent consultants. *See* Doc. 20290-6 (Exhibit B). As discussed below (§§II, III *infra*), because the FC's Motion relies on improper mathematical figures unfairly skewed in the PSC's favor, the FC is in actuality asking for more than a 10.65% recovery.

| Case cited by FC in the Table at FC Motion, Doc. 20290-4, pp. 51-52 | Was % to common benefit counsel lower than FC's request here? | Additional discussion |
|---|---|---|
| *In re OAL Time Warner, Inc. Securities and ERISA Litig.,* MDL 1500, 2006 WL 3057232 (S.D. N.Y. 2006). | **Yes:** 5.9% | In approving class action fees, the Magistrate Report that was adopted by the district court found that, "[a]n award as high as seven percent … would be excessive here." 2006 WL 3057232, at *21.<br><br>Again, the court did not extinguish contract rights of retained counsel in order to pay class counsel. |
| *In re Royal Ahold N.V. Sec. & ERISA Litig.,* 461 F. Supp. 2d 383 (D. Md. 2006) | Disputed: The amount was 12%, which may be equivalent with proper adjustment of FC's numbers. *See* note 5 *supra*. | This was another securities fraud case in which there was a retainer agreement supporting the fee request. Specifically, the retainer agreement permitted counsel to request 20% of the settlement amount, and this was voluntarily reduced to a 15% request sought. 461 F. Supp. 2d at 386. In approving 12%, the court pointed to exceptional factors. *Id*. at 387.<br><br>Again, none of the objectors were being deprived of the contractual rights established in agreements with their clients in order to pay another group of lawyers in full, with a bonus. |
| *In re WorldCom, Inc., Sec. Litig.,* 388 F. Supp. 2d 319 (S.D. N.Y. 2005). | **Yes:** 5.5% | This was a securities case in which class counsel had "negotiated an arm's-length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation," and that sophisticated client, the second largest public pension fund in the United States, which had been actively involved in overseeing the litigation, endorsed application of the agreement. 388 F. Supp. 2d at 356. In approving the fees, the court emphasize the magnitude and complexity of the litigation, the superior quality of Lead Counsel's efforts, that counsel risked millions of dollars to fund the litigation, and the absence of objections from the class. *Id*. at 357-359.<br><br>Again, the court did not state that it was extinguishing the contract rights of retained counsel in order to pay class counsel, but rather analyzed the propriety of the class action fee award. |

| Case cited by FC in the Table at FC Motion, Doc. 20290-4, pp. 51-52 | Was % to common benefit counsel lower than FC's request here? | Additional discussion |
|---|---|---|
| *Deloach v. Philip Morris Co.,* No. 1:00CV01235, 2003 WL 23094907 (M.D. N.C. Dec. 19, 2003). | <u>*Yes:*</u> 5.9% | A settlement provided that defendants would pay a reasonable fee and the court adjudicated what was reasonable; the court did not pay one group of lawyers in full by abrogating contract rights held by other retained attorneys. <br><br> Class counsel asked for $175,000,000, and the court approved $70,821,329.48. |
| *In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.,* 268 F. Supp. 2d 907 (N.D. Ohio 2003). | <u>*Yes:*</u> 4.8% | The court awarded common benefit fund fees, but did not disturb contingency fee contract rights in order to pay common benefit fund lawyers most of a limited shared fund. |
| *Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F. Supp. 2d 942 (E.D. Tex. 2000) | Disputed: Amount was 15%. *See note 5 supra.* | This order certified a settlement class and approved the terms of the settlement and attorney's fees and costs. As with several other cases that the Fee Committee's Motion misplaces reliance on, this case had not previously proceeded as an MDL, and the court did not disturb contingency fee contract rights in order to pay common benefit fund lawyers a disproportionately greater share of a limited shared fund. |
| *In re Nasdaq Market-Makers Antitrust Litig.,* 187 F.R.D. 465 (S.D. N.Y. 1998). | Disputed: Amount 14%. *See note 5 supra.* | The court noted that the range in "megafund cases" is only 6-10 percent, or even lower. 187 F.R.D. at 487. An exception was made because the litigation was deemed exemplary and was risky from the inception. *Id.* at 487-488. Even so, the court reduced the original request by approximately twenty percent. <br><br> The court did not state that it was extinguishing the contract rights of retained counsel in order to pay class counsel a disproportionately higher share of a limited fund. |

## II.   THE FC'S FUZZY MATH OVERSTATES THE COMMON BENEFIT WORK AND UNDERSTATES CONTRACTUALLY RETAINED COUNSEL'S WORK.

The FC presents a deeply skewed analysis that largely ignores the value of the attorney

client relationship and the seven years of laborious representation the undersigned Contractually

Retained Counsel devoted to their clients (*see* §II.A *infra*). This inequitable treatment is all the more indefensible because the FC is using two very different "benefit" numbers in its fee calculations (*see* §II.B *infra*), is claiming credit for work on matters that have yet to settle (*see* §II.C *infra*), and is omitting the several other sources of compensation potentially available to the PSC (*see* §II.D *infra*). Finally, while unnecessary considering that undersigned counsel are entitled to fees because they were actually hired by the Plaintiffs, Contractually Retained Counsel marshal proof demonstrating that the fee estimated by the Settlement Administrator is grossly inadequate (*see* §II.E *infra*).

**A. Contractually Retained Counsel Have Earned Reasonable Fees in Significant Excess of What the FC and PSC Would Allow.**

The Contractually Retained Counsel's relationships with the clients have necessarily involved considerable work and legal expertise outside of the common benefit work performed by the PSC. During the seven years representing Plaintiffs in this case, the three firms have collectively spent 75,494.21 hours in attorney and staff time. Exhibit 1; Exhibit 2.

The FC's analysis unfairly undervalues the work of the lawyers hired by the Plaintiffs in this case. The judiciary has not decided that mass tort plaintiffs' rights to contract with counsel are so illusory that contractually retained counsel can be deprived of fair treatment. The FC's attempt to create bad precedent on this issue is illogically short-sighted. Without individual counsel identifying the extent of the catastrophe, educating homeowners, contracting with the Plaintiffs, and filing cases on their behalf, the Chinese-Manufactured Drywall MDL would not have existed.

**1. The FC has already admitted the unique legal work required to represent individual clients in these cases.**

Undersigned counsel has for seven years been responsible for client communications and updates regarding the status of the litigation. Representing individual clients has required

significant staff and attorney time to keep what have been understandably distressed clients informed of the pending litigation and to provide them with legal advice outside of the four corners of the complaint. As acknowledged by the Fee Committee and PSC two years ago, the relationship and duty to the individual homeowners in this uniquely complicated and challenging litigation requires legal advice on a wide range of matters, including mortgage forbearances, foreclosure, property tax relief, bankruptcy, homeowner insurance claims, homeowner association dues and liens related to unpaid dues, IRS casualty loss claims, preservation of evidence, self-remediation of the property, condominium rights and responsibilities, disclosures and claim retention in sale of the property, and various other issues, depending on the individual homeowner's circumstances. [Doc. 17687-2, Fee Committee and PSC's Consolidated Joint Petition for Attorney Fees, p. 33]; *see also* Exhibits 1, 2. This responsibility to individual clients has required significant resources that the Fee Committee is now, surprisingly, attempting to shortchange.

> **2. Because the undersigned Contractually Retained Counsel were filing cases before the PSC even existed, the PSC built off of our work product.**

Contractually Retained Counsel have been involved in the Chinese-manufactured drywall litigation from its inception and were among the first firms to identify the problem and file cases related to Chinese drywall. Manufacturers, wholesale suppliers, retail suppliers, builders, and their insurers were identified by Contractually Retained Counsel, and that information was made available for use in the MDL. *See* Exhibits 1, 2. Baron & Budd, Allison Grant, and Alters Law Firm invested significant time and effort to this end. In 2009, Contractually Retained Counsel filed approximately 165 cases in Florida state courts. Exhibit 3. Toward this effort, statutory notice requirements had to be met, complaints had to be drafted and filed, and domestic defendants were served. Further, undersigned counsel negotiated with homebuilders, and in

several instances, builders agreed to remediate our client's homes.  *See* Exhibits 1, 2. These efforts contributed to the momentum quickly gained when the MDL was formed in June of 2009. Although most cases outside of the MDL were eventually stayed, Contractually Retained Counsel conducted some discovery prior to the stay, and also were responsible for updating the Florida courts on the status of the MDL litigation. This required attorney time and firm resources. *See* Exhibits 1, 2.

### 3.   Contractually Retained Counsel worked extensively to establish inspection protocol at the beginning of this litigation.

In the early stages, as the Fee Committee originally admitted [Doc 17687-2, pp. 33-34], determining which homes contained Chinese-manufactured drywall presented a considerable challenge, given that published guidelines and criteria were not available. Exhibits 1, 2. Many homes required multiple initial inspections conducted by both experts and attorneys and air quality testing, the costs of which far exceeded the inspection stipend received by counsel per PTO 30. Exhibit 1. Allison Grant worked extensively with the Florida Department of Health and inspectors to establish a protocol for the inspection of homes with suspected Chinese-manufactured drywall. Exhibit 2.

### 4.   Contractually Retained Counsel had extensive responsibilities even after formation of the MDL.

After creation of the MDL and the Plaintiffs' Steering Committee appointment, significant work continued to be required of individual counsel. *See* Exhibits 1, 2. Because the defect related to the personal residence of most of our clients, significant client contact and counseling took place daily. In addition to the standard case work up and evaluation, inspections confirming the presence of Chinese-manufactured drywall and the manufacturer were

conducted,[6] statutory "Chapter 558" notice letters were sent to defendants on behalf of each Florida homeowner to satisfy Florida construction defect lawsuit requirements, foreclosure defense advice and services were provided, health concerns were discussed with clients, information was provided to local property tax districts to assist with tax assessment reductions, declaratory actions brought by insurance companies against our clients were defended, and a variety of other legal issues were addressed for our clients.  While the PSC was working on omnibus complaint drafts, individual counsel was responsible for identifying the builder, supplier, and installer defendants for each client and in many cases, the insurers of these defendants. Indeed, identifying defendants required considerable time and effort, and these contributions of information to the PSC assisted in the ultimate identification of, and settlement with, many of the defendants who participated in the Global Settlement.

### 5.   Undersigned Contractually Retained Counsel represented the first participants in the Pilot Program.

When the Settlement Agreement for the Demonstration Remediation of Homes with KPT drywall was reached in October of 2010, Contractually Retained Counsel represented the very first homeowner participant in the Pilot Program, and have thereafter ushered over 400 properties through remediation under the Knauf Settlement. Exhibits 1, 2. As is expected with a unique settlement such as this one, there was a tremendous learning curve, with numerous kinks to be refined in the system. Baron & Budd and Allison Grant worked extensively with defense counsel, Moss (contractor), and Benchmark (inspector) on the implementation of the Pilot Program. Initially, Allison Grant was involved in every aspect of the Pilot Program process, including Benchmark's inspection, Moss's walk through, observing and monitoring the progress of construction, and working with Knauf and Moss to modify the remediation protocol as

---

[6] In the beginning these inspections were attended by an attorney. *See* Exhibits 1, 2.

problems were discovered.[7] Even after the Pilot Program was well underway, in nearly every home remediated, many issues needed to be addressed by individual counsel. This included, but was not limited to, counseling each client on settlement paperwork, scheduling inspections with Benchmark, addressing disputes with defense counsel regarding Benchmark inspection results, addressing unexpected pre-existing defects discovered during remediation, addressing disputes between Moss and homeowner clients related to work quality, addressing contractor attempts to deviate from the remediation protocol, and addressing disputes related to the "substantial completion" date and failure to issue delay payments when required. Again, throughout the entire process, we were continually asked by clients to communicate with lenders so that clients would not lose their homes. Exhibits 1, 2. It was necessary for individual counsel to be very hands on throughout this process, as acknowledged by the Court on several occasions [*see* Exhibit 4, October 24, 2013 status conference transcript, p. 10:9-20; Exhibit 5, December 19, 2013 status conference transcript, pp. 8:8 - 9:1].

### 6. Undersigned Contractually Retained Counsel represented the first large scale condominium remediated through the Knauf Settlement.

In addition to the general Pilot Program issues addressed with every home, Contractually Retained Counsel represented the condominium association for the first large scale condominium building in Miami, Florida to be remediated through the Knauf Settlement. Exhibits 1, 2. This condominium building is a ten story, 95 unit enclosed condominium tower building located minutes from downtown Miami. The building includes 90 residential units, and 5 commercial units, one of which is a dialysis center. Remediation took place two floors at a time, with occupants on the other floors continuing to reside in the building during remediation. Because of

---

[7] While some of these efforts may be compensated through common benefit fees, much of this work related to individual cases and will not be compensated by a common benefit award.

the configuration of the building and its location, Moss installed a buck hoist to haul materials in and out of the building, requiring certain residents to vacate their units for the entire twelve months of remediation.  Additionally, parking, fire safety, and access issues had to be addressed to insure the safety of the remaining residents and the dialysis patients. This necessitated a tremendous amount of work and coordination with unit owners, defense counsel, and Moss. This Herculean task required negotiation of a Term Sheet, drafting releases for the condominium association, drafting a release for unit owners, drafting a release for tenants, several in person meetings with Moss to address logistics, fire safety, security, and access to the building, calls and letters to unit owners, countless calls and emails with the condominium association, collecting paperwork for every unit, including bank owned units and abandoned units whose owners could not be located, and addressing every unit owner, tenant, condominium association, and contractor concern as the project was scheduled and progressed.  As with most of the attorney work discussed herein, this condominium remediation was completed separate and apart from the PSC's efforts.  Thereafter, Baron & Budd and Allison Grant did the same for a 107 unit building in Fort Lauderdale, Florida, and several other small condominium communities.

### 7.  Undersigned Contractually Retained Counsel Faced Extensive Additional Work Outside of the Pilot Program.

As this Court is aware, many homeowners who have received benefits under these settlements were not eligible to participate in the Pilot Program. Various challenges were encountered and addressed by individual counsel related to these homes as well. Exhibits 1, 2. For those with Knauf drywall who remediated the home prior to the execution of the Knauf Settlement, extensive negotiations took place between Baron & Budd, Allison Grant, and the Knauf defendants for nearly every client in this category. This included a mediation to resolve claims related to five properties and a hearing before the Special Master on another property.

Exhibit 1. For our clients with Mixed Properties who choose option 3, Baron & Budd and Allison Grant faced a multitude of issues including disputes over Benchmark percentages, Final Cost Estimates, pending foreclosures while we waited for settlement paperwork to be made available, drafting releases, and condominium association claims. Exhibits 1, 2.

The claims process for the Global, Banner, INEX, Virginia Settlements, and Knauf Other Loss Fund claims likewise required extensive attorney and staff work. Exhibits 1, 2. Almost daily telephone and email communications were exchanged between the settlement administrator, Baron & Budd attorney Holly Werkema, and Allison Grant, on issues that continually arose through the process. In addition to determining the appropriate claims for each client and filing each claim, significant documentation was required to support every Other Loss Claim filed, including expert reports for those filing a Short Sale or Foreclosure claim. Clarification on claims and supplemental information was requested and provided over a period of two years. Further, many individual claims needed to be appealed, in some cases requiring a Court appearance. Lastly, the responsibility of sending payment to the claimants fell on the shoulders of individual counsel. Contrary to the PSC's suggestion, most of these services could not have been performed by non-attorney staff. The majority of these tasks could not have been properly delegated to staff, particularly when communication with defense counsel was required.

To put the work involved and amount individual counsel will likely receive for that work in perspective, for many of our clients unable to stave off foreclosure, a recovery of $10,000 is all they can expect from this litigation. If the FC's Motion is granted, the fee the undersigned will be paid on a case such as this may not even cover individual counsel's outstanding costs on the case, and certainly will not compensate the firms for their diligent work during the several years the firms have represented these clients.

**B. The FC Takes An Overly-Expansive View of What Counts as a Benefit That Common Benefit Counsel Uniquely Have Imbued Upon the Class.**

The FC Motion's calculations are based on an overly inflated evaluation of the benefit that common fund counsel allegedly bestowed as opposed to the benefit Contractually Retained Counsel bestowed. Specifically, the FC's unprecedented calculations assume that the common benefit lawyers can claim credit for services provided by *independent*, *outside* sources with whom the common benefit lawyers did *not* contract, appoint, or control. The Fee Committee's 10.65% calculation is fatally flawed, not only because its analysis is inapplicable when the funds available are capped, but also because common benefit/class counsel cannot calculate a reasonable fee request by including benefits not attributable to counsel's efforts. *See Turner v. Murphy Oil USA, Inc.,* 472 F. Supp. 2d 830, 861-62 (E.D. La. 2007) (declining to calculate fees based on $330 million total value of the settlement and instead using lower number, $195 million).

The FC claims that its $120,313,367.08 fee request equates with only a 10.65% recovery by using a benefit quantum of $1.1 billion – which is a much higher number than the $658,713,629.62 figure that the PSC uses to calculate the contractually retained counsel's attorneys' fees. One reason for the disparity is that the Motion includes in that $1.1 billion tens of millions of dollars in services that the common benefit fund lawyers did not provide. [*See* Doc. 20290-6, pp. 3-4 of 69]. The FC credits common benefit counsel for the outside administrators, a curator, an ombudsman, inspectors, remediators, and even the Special Master by including sums paid to these others in the $1.1 billion. *Id.* Many of these individuals were appointed by the Court, and for others Defendants were the contracting parties. *See id.* While it is one thing to pay for these services out of the settlement funds, it is another to treat the work of

24

the Special Master and other independent entities as work for which the common benefit counsel can claim credit to the exclusion of other plaintiffs' counsel.

Using this calculation to justify the evisceration of contract rights is unprecedented. The FC marshals cases in which courts have credited medical monitoring, debt forgiveness, class notice, and certain administrative costs. [Doc. 20290-4, pp. 43-44.] The FC, however, goes further by treating payments to other professionals and services, which are independent of the common benefit fund lawyers, as if they are a benefit provided by the common benefit fund lawyers, and does so for the improper purpose of elevating common benefit counsel's rights over contract rights. The case law does not support a policy of crediting a group of lawyers for work they did not do to give them an advantage over another group of lawyers.

In fact, the decision in *Strong v. BellSouth Telecomm., Inc.,* 173 F.R.D. 167, 170 (W.D. La. 1997), *aff'd,* 137 F.3d 844 (5th Cir. 1998), does not support the FC at all. The FC claims that the *Strong* decision "includ[ed] 'additional intangible economic value of market education.'" [Doc. 20290-4, p. 43 (parenthetically quoting *Strong*, 173 F.R.D. at 170)]. In stark contrast, however, the *Strong* court did ***not*** accept plaintiff's argument regarding intangible education values. Rather, the court found that, "[t]he collective response of the class demonstrates that the intrinsic value of the education provided by this litigation was picayune," and "conclude[d] that the value of the intangible benefit is insubstantial." 173 F.R.D. at 170, 171.

The "non-monetary benefits" discussed in *In re Dun & Bradstreet Credit Servs. Customer Litig*., 130 F.R.D. 366, 373 (S.D. Ohio 1990), further undermine the FC's creative attempt to include services of other independent outside consultants and individuals as if they were a benefit achieved by common benefit counsel, but not other plaintiffs' counsel. The non-monetary benefits in *In re Dun & Bradstreet* were defined as "requiring important changes in the

operating procedures of D & B, that will unquestionably aid and financially benefit all Class Members in their future business dealings with D & B." *Id.* As described, the lawyers claiming credit for these unquestionably financially beneficial provisions were the ones who negotiated for the changes in operating procedures. This logic does not justify inflation of the PSC's share of a limited fund by according the PSC exclusive credit for court-appointed or defendant-retained independent entities.

Undersigned do not dispute the point for which the FC's Motion cites *Wings v. Asarco, Inc.,* 114 F.3d 986, 990 (9th Cir. 1997) (cited at FC Motion, p. 43), which is that medical monitoring is a benefit. Nonetheless, the case lends no support for the FC's stratagem of counting independent court-appointed or defendant-contracted services as a benefit of the PSC, but not individual counsel, for the purpose of claiming a disproportionate share of an inadequate limited fund. Notably, in rejecting the defendant's argument that the settlement value should be lower, the *Wing* court relied on the defendant's own inconsistent prior representations specifically agreeing to the higher value. *Id.* at 990. The case is inapposite in justifying the FC's demand here.

*Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 775 (11th Cir. 1991) (cited at FC Motion, p. 43), simply states that "non-monetary benefits conferred" is a factor under *Eleventh* Circuit law – in addition to the *Johnson* factors, which is *Fifth* Circuit precedent. Even assuming for the sake of argument that an Eleventh Circuit list of factors adding to the Fifth Circuit's list is relevant here, the Eleventh Circuit did not state how "non-monetary benefits" would be calculated and, more to the point, did not intimate that one group of lawyers could take a disproportionate amount of a severely limited shared fund by claiming credit for work performed by outside, independent consultants and service providers.

In *Staton v. Boeing Co.*, 327 F.3d 938, 975 (9th Cir. 2003) (cited at FC Motion, pp. 43-44), the court stated that reasonable and non-excessive costs of notice could be, but were not necessarily required to be, included in the calculation of cost benefiting plaintiffs. *In re Heartland Payment Systems,* 851 F. Supp. 2d 1040, 1078 (S.D. Tex. 2012) (cited at FC Motion, p. 44), stated that costs of notice are often included, but one of the cases it cites clarifies that "*to some extent* the costs of notice and administration" are of value. *Id.* at n. 32 (quoting *Sobel v. Hertz Corp.*, No. 3:06-CV-00545-LRH-RAM, 2011 WL 2559565, at *13 (D. Nev. June 27, 2011) (stating that "the only components with any determinate ... value are the attorneys' fees, incentive payments and to some extent the costs of notice and administration")) (emphasis added). Here, contrary to the muted approval for counting some administrative fees in the jurisprudence, the FC assumes credit for everything, including the Special Master's work and other independent individuals' work. It is one thing to claim credit for administrative tasks actually performed by the common benefit fund lawyers, but quite another to grant them disproportionate credit for someone else's work, and at the expense of the contract rights of other lawyers.

### C. The Fee Committee Is Haling Work That Bears No Relationship to the Settlement Funds at Issue.

A fee analysis that conflates different settlement funds is not reasonable. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302 n.11 (3d Cir. 2005) (district courts cautioned that they should "not conflate [ ] two distinct settlements ...."). The Fee Committee irrelevantly points to efforts that did not contribute to the settlement funds at issue because they relate to pursuit of non-settling defendants.

For example, the FC argues that "[s]eeking recovery from the German and Chinese corporate defendants in these proceedings necessitated the expenditure of considerable attorney

effort and resources, particularly … service of process … and greatly extended the timeline of the litigation." [Doc. 20290-4, p. 16]. While we do not dispute that foreign defendants in this case have presented unique and significant challenges for the PSC, Chinese corporate defendant Taishan did not contribute to the settlement funds at issue, and Taishan appears to be what the FC is referencing here. The FC's argument does not accurately apply to settling defendant Knauf because it agreed to accept service on **November 2, 2009**, just five months after the MDL was created [PTO 17]. To the extent that other Knauf-related defendants did not agree to accept service as of PTO 17, the first settlement with all Knauf defendants was reached in October of 2010. Thus service of process problems did ***not*** "extend[] the timeline of litigation" [Doc. 20290-4, p. 16] for the Knauf settlement at issue here.

In this irrelevant vein, the FC belabors complaints about the difficulty presented by foreign defendants, discussing its difficulty with the Taishan defendants in an attempt to bolster the common benefit fee from the Knauf settlement. The FC alleges that individual counsel were relieved of "costly and challenging foreign service efforts" and points to "translation and service of the complaints on foreign defendants, pursuant to the Hague Convention." [Doc. 20290-4, p. 20]. However, Knauf agreed to accept service. The FC appears to be complaining about Taishan, an inapposite issue.

Further, the FC touts PSC efforts in the North River Trial [Doc. 20209-4, p. 23]. However, the PSC has already secured $2.4 million as compensation for its participation in this trial [Doc. 20290-5, Page 18 of 18]. To the extent that it expects additional credit to justify the instant compensation demand, the PSC is double-dipping for the same trial participation.

**D. The FC's Demand that the PSC Receive Disproportionate Funds Is All the More Inequitable Considering the Other Sources of Common Benefit Fund Compensation Available to the PSC.**

The FC's calculations are all the more problematic considering that it demands a disproportionate share of the limited fund while the FC and the PSC enjoy and/or are pursuing many other ways to collect common benefit fees in this mass tort beyond the $192,981,363.35 discussed in the FC's Motion, as for example:

1.  $3.33 million in "voluntary contributions." [Doc. 8389, 8545; *see also* Doc. 20290-5, Page 18 of 18];

2.  $2.4 million for the North River Trial [Doc. 20290-5, Page 18 of 18];

3.  $10 million in reserve for Taishan expenses [Doc. 20290-5, Page 18 of 18];

4.  Common benefit money the PSC seeks from the Major Homebuilder's Settlement Agreement valued at $100 million, which the Court is addressing separately [*see* Doc. 20290-5, p. 9 n.7; Doc. 17831-1, PSC's Mot. for Additional Common Benefit Assessments; Doc. 10227-6, Major Homebuilder's Settlement Agreement];

5.  Common benefit money the PSC seeks from the Coastal Construction Group of South Florida, Inc. settlement valued at $3,936,000; the Devon International Industries, Inc. settlement valued at $756,000; the Gulf Coast Shelter, Inc. settlement valued at $720,000; the RCR Holdings II, LLC settlement valued at $2,376,000; and the Shoma Homes Splendido, Inc. Settlement valued at $358,000 [*see* Doc ID 15695-2, Amended Global Settlement, Sections 4.2.2, 16.6; Doc. 20257, Court's Order Approving First Amendment to Global Fee Petition, n. 3; Doc ID 17831-1, PSC's Motion for Additional Common Benefit Assessments];

6.      Common benefit money the PSC intends to seek from the "remaining claims of other 3rd parties benefitting from the services and efforts of the PSC, including the Louisiana Attorney General" [Doc ID 17831-1, PSC's Motion for Additional Common Benefit Assessments].

**E. The Undersigned Contractually Retained Counsel Ask for an Award of $21,639,057.39, Which is the Amount Due using a 30:70 Common Benefit: Individually Retained Counsel Split of Available Attorney Fee Funds.**

Perhaps because the FC's Motion ignores how unfairly its proposal would revoke contract rights in order to disproportionately pay counsel without contract rights, the FC fails to estimate the degree to which its proposal impairs the contract rights actually granted by the Plaintiffs that the FC represents. Granting the FC's Motion will leave the undersigned with pennies on the dollar compensation.

As set forth in detail in Exhibit 6, attached hereto, the total dollar amount of the value received by the clients of the undersigned is $172,233,635.91. *See* Exhibit 6. Under the contracts executed by these clients, the undersigned are owed a 1/3 contingent fee[8] or $57,411,154.48. Clearly the undersigned have earned this fee. In fact, it is estimated that, collectively, the three firms have logged approximately 75,494.21 hours in attorney and staff time for these clients. Unfortunately, there simply is not enough money available for Contractually Retained Counsel to be paid the contingent fee they are contractually entitled to in full.

However, the number that the Settlement Administrator currently intends to pay undersigned is so low that it could not possibly pass the universal fairness test of *High Sulfur*, particularly when considering the unreimbursed expenses (discussed below at §IV). Per information provided to the undersigned by the Settlement Administrator pursuant to Pre Trial

---

[8] The clients agreed to pay 33⅓% in contingency fees in the overwhelming number of circumstances (with a handful of contracts being higher (40) or lower (25)). *See* Exhibit 10.

Order 29(F), if the FC's Motion is granted, the Settlement Administrator has estimated the payment to undersigned at $11,747,059.93[9] (Exhibits 7, 8, 9 (filed under seal)), which would compensate Contractually Retained Counsel at only 6.8% of $172,233,635.91. This number pales in comparison to the compensation that the FC proposes for common benefit work.

The undersigned Contractually Retained Counsel recognize the difficulties the Court would face in calculating an appropriate fee for all counsel involved using a percentage of actual benefit bestowed based on each individual contract. As discussed in detail above, at issue is a limited attorney fee fund, which must be allocated fairly and equitably between common benefit counsel and individually retained counsel. Accordingly, as an alternative to the method set forth in Exhibit 6, the undersigned Contractually Retained Counsel request fair division of the available fees, consistent with other similar cases such as *Vioxx*,[10] and based upon the contributions made by all counsel, with 30% of the available fees reserved for common benefit counsel and 70% of the available fees to be divided among individual plaintiffs' counsel.

The undersigned contends that the suggested 30:70 split of available fees is not only fair, but generous to common benefit counsel. Harvard Law Professor William B. Rubenstein conducts a thorough analysis of common benefit assessments in *Newberg on Class Actions*, § 15:115 (5th ed.). He finds that a typical common benefit assessment is 4% to 6% of the client's gross recovery. *See id.* at p. 427 & n. 9 (collecting cases). Granting common benefit counsel 30% of the actual funds available of $206,313,421.61 (actual funds available explained in more detail *infra* at § III) results in a total payment of $61,894,026.48 to common benefit counsel. Even

---

[9] Includes proposed compensation for plaintiffs represented collectively by Baron & Budd, P.C., Alters Law Firm, P.A., and Allison Grant, P.A., and plaintiffs represented by Allison Grant, P.A. individually.

[10] In *Vioxx*, the Court awarded approximately 25% of the available fees to the common benefit attorneys and 75% of the fees to the contractually retained attorneys. See *In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d at 640 (E.D. La. 2010).

using the $1.1 billion dollar figure the FC has calculated as the PSC's total benefit conferred, which we firmly dispute, results in a 5.6% assessment for common benefit fees. This 5.6% is on the high end of the 4-6% typical common benefit assessment (*see Newberg*).

As noted above, the limited fund cannot fully compensate both groups of attorneys, which necessarily requires both groups to receive less than they may have otherwise been entitled. A 30:70 Common Benefit: Individually Retained Counsel split of the $206,313,421.61 we contend are available for distribution (*see* § III below) leaves the undersigned with $21,639,057.39, which is <u>significantly</u> less than the $57,411,154.48 the undersigned are due under client contracts, but certainly more fair and reasonable than the $11,747,059.93 the undersigned would receive if the FC's request is granted. Based on the undersigned's benefit conferred to clients in the amount of $172,233,635.91, as set forth in Exhibit 6, a fee of $21,639,057.39 equates to 12.56% of the benefit conferred, which is still less than half of what the undersigned are entitled under our client contracts. As explained above, this proposed division still leaves common benefit counsel with an award over and above the typical common benefit fee percentage,[11] and thus is undoubtedly fair to common benefit counsel.

## III. THE FC'S REQUEST MISCALCULATES THE AMOUNT AVAILABLE TO COMPENSATE CONTRACTUALLY RETAINED COUNSEL.

The FC Motion presumes entitlement to pay the PSC in full out of a limited fund at the expense of the lawyers retained to represent the Plaintiffs. The inescapable yet unexplained premise upon which the FC's 2016 Motion is based is that the fund the PSC negotiated is grossly inadequate to compensate all Plaintiffs' counsel, and that contractually retained counsel must bear *all* of the downside while, inconsistently, non-contractually retained counsel receive one

---

[11] The percentage to common benefit counsel is actually higher than 5.6% because it is based on the $1.1 billion number, which is disproportionately skewed in the PSC's favor (*see* § II.B *supra*).

hundred percent full compensation *with* a 2.65% upward adjustment. The FC Motion cannot, and does not attempt to, explain why the lawyers with contract rights bear all of the risk of the funds' inadequacy. Moreover, the FC's calculations are wrong because in addition to overstating its comparative bestowed benefit (as noted above), the FC understates the portion of the fee fund that common benefit counsel share with contractually retained counsel.

Specifically, the FC's mathematical calculations depend on its mistaken claim that the only funds remaining, out of $233,078,270.33, that contractually retained counsel could possibly share is $192,981,363.35. [*See* FC's Motion, Doc. 20290-4, p. 56; Doc. 20290-5, Page 18 of 18]. In reality, that number should be at least $206,313,421.61:

- *First*, given that contractually retained counsel are left with hundreds of thousands of dollars in out-of-pocket expenses that they can never recover (*see* §IV *infra*), the FC cannot defend, under the universal fairness rule, taking ten million from the pot to pay the PSC's expense pursuing non-settling defendants.

- *Second*, the FC mistakenly presumes that $3,332,058.26 in voluntary contributions already have been awarded to compensate common benefit work when, in fact, the Order states that this money "may be allocated at a future date." [Doc. 8545]. As of now, the Court has not made that allocation. The FC mistakenly presumes, without any analysis on this point, that the Court already has given that money to the PSC when, in fact, the allocation decision has not been made.

Thus, another inherent defect in the FC's math is that it understates the limited funding that contractually retained counsel are eligible to share.

IV.   **THE FC WANTS TO PAY THE PSC IN FULL PLUS A BONUS WHILE LEAVING CONTRACTUALLY RETAINED COUNSEL HUNDREDS OF THOUSANDS OF DOLLARS IN THE RED ON OUT-OF-POCKET EXPENSES.**

A. **Undersigned Agree with the FC Motion's Theme That Counsel Who <u>Actually</u> Risk Forfeiting Out-of-Pocket Expenses Should Receive More in Fees as Compensation.**

Throughout the FC's Motion, it emphasizes "the litigation risk factors," "the risk of non-recovery," that the PSC advanced sums "for the benefit of the class," that the case proceeded "<u>thanks to the risk undertaken by the PSC to advance these notice costs</u>," that the "<u>substantial expenditure of class-notice costs by a PSC</u>" was unprecedented, that "significant economic risks were accepted by plaintiffs' counsel," and the "added … degree of risk given the renowned difficulty enforcing judgments" in foreign countries [Doc. 20290-4, p. 16, 21, 44, 45, 49, 50 (emph. in original)]. Thus, by the FC's own admission, the degree to which counsel risked advanced expenses is very important in the reasonable fee calculus. This fact compels rejection of the FC's motion. The FC would grant the PSC disproportionately more to compensate them for all fees, a 2.65% bonus, and present and future expenses, while leaving other lawyers in the red for expenses advanced under contract. Given the heavy weight that the FC Motion places upon the need to reward counsel who risked advanced expenses, undersigned Contractually Retained Counsel should receive a greater percent of the shared fund than the PSC.

B. **The Undersigned Contractually Retained Counsel Risked over $450,000 in Advanced Expenses that Our Clients Agreed to Reimburse That We Will Not Recover.**

The undersigned were among the first attorneys in the country to recognize the problem of Chinese drywall and to garner media attention to the issue. The undersigned started filing cases in the beginning of 2009, before the MDL was formed, and before the PSC was even appointed.  We investigated the identity of the defendants, researched the factual and legal basis for the causes of action against the defendants, and filed 165 cases in Florida state courts. We

34

met with clients, held "town hall" meetings in affected communities, and inspected hundreds of homes across the state of Florida, often multiple times, as no protocol or published guidelines related to Chinese drywall were available in early 2009. Ex. 1, 2; *see also* discussion at §II.A *supra*. Our clients contractually agreed to pay our expenses upon successful resolution of the cases. Exhibit 1.  Baron & Budd and Alters Law Firm, P.A., paid $450,322.00 in unreimbursed expenses for filing fees, service of process fees, expert fees, court reporter/transcript charges, mediation costs, foreclosure defense expenses, postage, copies, travel and client communication costs. The PSC negotiated settlements that cap the rights of contractually retained counsel to recover their expenses. [*See* Doc. 17687-3, Con. Jt. Pet. of FC and PSC for a Global Award of Attorney's Fees and Reimbursement of Expenses, Filed Pursuant to PTO No. 28, p. 38, Page 49 of 128.] Therefore, we stand to receive no compensation for these expenses notwithstanding our original contract rights.

One of the cases upon which the FC relies states that where a fund is insufficient, priority must be given to out-of-pocket expenses. *In re Clearsky Shipping Co.,* No. 96-4047 *et al.*, 2003 WL 1563820, at *5 (E.D. La. Feb. 26, 2003) (cited at FC Motion, Doc. 20290-4, p. 5 n.4). In stark contrast, however, the FC assumes the opposite, that the Contractually Retained Counsel will be deprived of adequate fee compensation ***in addition*** to the zeroing of our contractual rights to reimbursement for hundreds of thousands of dollars in expenses.

Standing at great odds with the treatment of Contractually Retained Counsel, the FC intends that the PSC not only be reimbursed one hundred cents on the dollar for its expenses, but further, that the PSC be granted ten million of the settlement funds to pursue litigation against separate defendants. This is improper, as explained below.

35

**C.  The FC's Proposal Short-Changes Contractually Retained Counsel by Diverting Settlement Funds for Purposes Unrelated to the Settled Claims.**

A fee analysis that conflates different settlement funds is not reasonable. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302 n.11 (3d Cir. 2005) (district courts cautioned that they should "not conflate [ ] two distinct settlements ...."). Here, however, the FC and PSC are removing ten million dollars from the settlement funds paid by Knauf and other Defendants and reserving that money to compensate the PSC for its expenses in pursuing a *different* non-settling Defendant. [Doc. 20209-5, Page 18 of 18 ("Set aside for Taishan ... $ (10,000,000.00)]. Clearly, that ten million dollars should remain in the pot of attorneys' fees used to pay counsel for the Knauf and other related settlements, including the undersigned Contractually Retained Counsel.

The Fee Committee cites no authority – and the undersigned is not aware of any – allowing one group of lawyers to receive one hundred cents on the dollar for their out-of-pocket litigation expenses, and to receive a ten million dollar insurance cash advance for future expenses against a non-settling defendant, while another group of lawyers is stripped of their contractual rights to recoup their out-of-pocket expenses incurred in litigating against the settling defendants. The FC's motions advances mistaken arguments on this issue.

The FC argues that "common benefit counsel, by proceeding on a contingent fee basis on behalf of all plaintiffs, undertook a responsibility in the case that entailed a far greater financial risk to their firms than that of an attorney with an individual client." [Doc. 20290-4, p. 34 (emphasis in original)]. The FC finds this to be "especially" true because "target defendants are foreign entities located in Germany and China, countries where legal fora for the enforcement of American judgments are not necessarily available." *Id.* These arguments inflate the purported risk endured by the PSC:

- *First*, the argument that the PSC bore the greater risks is truly ironic – not to mention inaccurate – because the PSC has ensured that it is fully reimbursed for all of its expenses while individually retained counsel is left with hundreds of thousands of dollars in unreimbursed out-of-pocket expenses.

- *Second*, the PSC reached the first settlement with Knauf in October of 2010, a little over a year after the PSC was constituted. This first settlement ameliorated the purported risk, and indeed, a full settlement was reached in December 2011. The time line over which the FC belabors [Doc. 20290-4, pp. 27-31] is factually correct yet overlooks that as of December 9, 2011, when Knauf settled in full and agreed to pay $160 million for attorneys' fees in addition to the settlement benefits bestowed upon homeowners, the PSC was assured of significant compensation for their efforts.

- *Third*, the PSC is now requesting that ten million dollars be set aside to insure it has zero risk up to that sum for pursuing Taishan.

- *Finally*, the lament regarding "American judgments" in foreign countries is an overstatement because once Knauf started settling in October 2010, the PSC knew that it could secure compensation without seeking to enforce judgments in foreign countries.

The FC also overstates the risk of advancing expenses for notice of class action settlements. [*See* Doc. 20290-5, p. 44]. Because the defendants had already agreed to settle the case, unless the PSC for some reason believed that the deal it negotiated for the class should have been rejected by the Court, the PSC expected that the settling defendants' payments would provide a source for reimbursement of the costs advanced.

In sum, the FC overstates the risk to the PSC.

37

V.   **THE FC'S 2016 MOTION IS INCONSISTENT WITH THE PROCEDURAL HISTORY OF THIS CASE.**

The FC's Motion argues that, "individually-retained plaintiffs' counsel … necessarily are aware" that their fees are capped. [FC Motion, Doc. 20290-4, p. 54]. That is akin to observing that passengers boarding the Titanic were at that time "necessarily … aware" that they were going out to sea.

The FC's next pronouncement is that the lawyers actually hired by the plaintiffs in this case should not "be heard to oppose a common benefit fee award on the basis of an inviolable right of contract" because the settlements extinguished those rights. [FC Motion, Doc. 20290-4, p. 55]. The issue here is not whether inviolable rights of contracts can be usurped, but to what degree, and for what end. In order to champion allocating the lion's share of the limited fee fund to compensate common benefit work at the expense of individually retained counsel, the FC abandons its own prior representations on the unique perils and challenges the contractually retained counsel endured in this litigation[12] and the previously noticed 15:17 proportion set in the Global Settlement.[13]

In the Global Settlement, the common benefit fees were capped at no more than 15% of the settlement fund, with a 32% overall cap, providing ***at most*** that the proportionate recovery for common benefit-to-contracted counsel would be 47:53. The FC now surprisingly, and without explanation for the deviation from the terms of the settlement, demands a 59.37:40.63 proportionate recovery, which not only devotes higher compensation to the PSC than 47:53, but which further ignores, in addition to the unfair expense disparity, that there are other settlement

---

[12] Jt. Pet. Of FC and PSC for a Global Award of Attorneys' Fees and Reimbursement of Expenses, Filed Pursuant to PTO No. 28, Doc. 17687-3, pp. 32-38.

[13] *See* Second Amended Allocation Plan for Settlement Involving Builders, Installers, Suppliers and Participating Insurers ("Global Settlement Allocation Plan"), Doc. 16528-1 at p. 2.

funds wherein the common benefit-to-contracted proportion is 100:0 because the PSC will receive all of those millions for itself.

One of the most startling aspects about the Fee Committee's Motion is that it abandons the FC's prior description of the extraordinary burden upon individual counsel arising from the unique tragedies and harrowing uncertainties sustained by clients with no safe place to live and an inadequate safety net. Two years ago, the Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for Global Award of Attorneys' Fees explained at great length why this litigation poses unique burdens and challenges on the counsel chosen by the plaintiffs to represent them. [*See* Doc. ID 17687-3, pp. 32-38]. That petition described the difficulties that attorneys representing individual homeowners have faced throughout seven years of this unique mass property damage litigation. *Id*. Mortgage relief, property tax relief, homeowner insurance claims, homeowner association responsibilities, IRS casualty loss claims, competing remediation solutions, preservation protocols, disclosure for subsequent sales, foreclosure and health concerns, were all listed as unique legal issues that individual counsel were called upon to resolve apart from common benefit work. [Doc. 17687-3, p. 33, Page 44 of 128]. Irreconcilably, however, the FC now presupposes that to the degree that the shared limited fee fund is insufficient to compensate all plaintiffs' counsel, the entirety of the "hair cut" is to be borne by the lawyers hired by the Plaintiffs.

Another reason why undersigned were not on notice of the extent fees to individually retained counsel would be reduced is the law. Lead counsel responsible for fee allocation must "'apply a ***universally fair*** standard of allocation to all participants, including itself.'" *See In re High Sulfur Content Gasoline Prod. Liab. Litig.,* 517 F.3d 220, 232 (5th Cir. 2008) (cit. om.;

emph. supp.). The FC's Motion, by requesting a disproportionately greater share of compensation for common benefit counsel, patently fails the test of universal fairness.

## CONCLUSION

There are two sets of lawyers at issue: lawyers pursuing "common benefit" fees and lawyers with actual contracts with the Plaintiffs. There is no authority for impairing counsel and client's freedom to execute contracts for legal services in order to disproportionately redistribute fees to lawyers the Plaintiffs did not hire, do not know, and with whom Plaintiffs have never communicated. Further, where contingency fee contracts have been nullified by judicial fiat, there has been an actual reason, as for example, *Vioxx* had a primary New Jersey connection and a New Jersey statute strictly caps fees. Here, the facts are different. Here, the PSC decided to cap contractually retained counsel's fees and expenses and declared this as a benefit they secured for Plaintiffs. Contractually Retained Counsel were told that funds created by the settlements would compensate them for attorney fees. Only now, in June 2016, has the other shoe dropped.

From every angle, the FC Motion cannot be squared with the universal fairness test. As set forth in detail above, individually retained counsel have intensely labored alongside the PSC for 7 years, and deserve, along with the PSC, to be fairly compensated for their efforts. To allow common benefit counsel to now take the lion's share of the attorney fees available would be extraordinarily unfair to individually retained counsel and set a terrible precedent, repelling reasonable counsel from the risky investment of time and effort representing individual clients in an MDL.

Among the factors the Court considered in *Vioxx* is "a growing need to protect the public's trust in the judicial process." 574 F. Supp. 2d at 613. Allowing the common benefit lawyers to surprisingly shift one hundred percent of the hardship arising from the shortfalls of a settlement fund they engineered is not in line with protecting public trust in the legal process.

WHEREFORE, the undersigned Contractually Retained Counsel pray that the Court deny the Motion [Doc. 20290-3 and attachments]; that the Court award individually retained counsel 70% of the $206,313,421.61 the undersigned submit are available for distribution; that the Court conduct a full evidentiary hearing in accordance with Fifth Circuit precedent; and, any other relief to which Contractually Retained Counsel may be entitled.

Dated: June 28, 2016                                RESPECTFULLY SUBMITTED:

/s/ S. Ann Saucer
Russell W. Budd (TX Bar No. 03312400)
S. Ann Saucer (TX Bar No. 00797885;
LA Bar No. 21368)
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
rbudd@baronbudd.com
asaucer@baronbudd.com

Allison Grant (Florida Bar No. 858330)
Allison Grant, P.A.
14 SE 4th St
Boca Raton, FL 33432-6111
Tel.: 561-994-9646
Fax: 561-431-4627
agrant@allisongrantpa.com

Jeremy W. Alters (Florida Bar No. 111790)
jeremy@alterslaw.com
Justin D. Grosz (Florida Bar No. 984000)
justin@alterslaw.com
Matthew T. Moore, Of Counsel (Florida Bar No. 70034)
matthew@alterslaw.com
ALTERS LAW FIRM, P.A.
1855 Griffin Road, Suite C470
Dania Beach, FL 33004
Tel.: (305) 571-8550
Fax: (305) 571-8558

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 28th day of June, 2016.

Dated: June 28, 2016

RESPECTFULLY SUBMITTED:

/s/ S. Ann Saucer
S. Ann Saucer (TX Bar No. 00797885;
LA Bar No. 21368)
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
asaucer@baronbudd.com

42