UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | |
| | JUDGE FALLON |
| *ALL CASES* | MAG. JUDGE WILKINSON |

-------------------------------------------------------------------

### MORGAN & MORGAN'S OPPOSITION TO
### FEE COMMITTEE'S ALLOCATION MOTION AND MEMORANDUM

Pursuant to PTO 28(F), Morgan & Morgan opposes the proposal contained in the Fee Committee's Allocation Motion and Memorandum (D.E. 20290-3 and 20290-4):

By its Allocation Motion and Memorandum, the Fee Committee requests a common benefit fee of 59.37% of the available attorney's fee funds, leaving only 40.63% of the total fees for the individual handling attorneys.[1] Considering the formula for calculating individual fees in PTO 28(F) and the amount of benefit conferred on claimants, as reported by Brown Greer, if the Court were to accept the Fee Committee's proposal, individual handling attorneys would receive a fee of 11.9% of the total benefit conferred upon their clients. That percentage, in and of itself, would have little significance and would not be inherently inequitable if not for the unique nature of this mass tort turned into a series of class actions. In this unique case, considering the "partnership" between the PSC and individual lawyers handling cases, an 11.9% allocation to handling lawyers creates an unjust result which fails to adequately and fairly recognize the time, effort, and risk extended by individual handling attorneys.

---

[1] The percentage requested for common benefit by the Fee Committee is actually higher than 59.37%.  It is 61.82% of the total fee.  However, the amount is adjusted due to the Fee Committee's argument that certain funds have been "earmarked" for common benefit fees. This issue is addressed in Section III below.

I.  **Joint And Extensive Collaboration Between Common Benefit Counsel And Individual Handling Attorneys Yielded The Settlements**

By its inherent nature and complexity, the Chinese Drywall Multi-District Litigation ("MDL") required unprecedented and focused coordination among the PSC and attorneys handling individual cases. Under the tireless guidance of Arnold Levin and Russ Herman, the PSC successfully and efficiently undertook the Herculean task of shepherding the claimants and their claims through the courts, assaying and maneuvering through complicated choice of law and jurisdictional hurdles in this case, not to mention peeling back layer upon layer of corporate fiction and structure to identify and engage the hundreds of defendants. This hard work resulted in multiple brilliantly crafted settlements converting this mass tort into a series of class actions. As the PSC's focus was to successfully negotiate and assemble settlements that come as close as possible to making the aggrieved class members whole, Mr. Herman, Mr. Levin, and members of the PSC will, regretfully, never be fully compensated if their work were to be calculated on an hourly basis. A compromise in fee recovery is necessary and unavoidable.

Morgan & Morgan does not dispute the difficulty the Fee Committee faced dealing with these competing and valid interests, nor the unfortunate reality that no lawyer involved in this case will be fully compensated for her or his work. The lawyers---PSC members and individuals who took on these cases---undertook tremendous risk. Clients came first. Clearly a typical contingency fee would undermine the benefit of the settlements because the accomplished goal was to fix homes. The fee to individual attorneys, however, should not be so diminished that these attorneys end up at an economic loss. Most individual attorneys, including the undersigned, took these cases on a 33.33% or 40% contingency. Individual handling attorneys performed necessary, time-consuming and difficult work, albeit work that was not deemed subject to common benefit. Thus, while each attorney should expect a reduced fee recovery, the reductions

2

ought to be balanced and proportional. The Fee Committee certainly acknowledges this concern and no doubt sought an equitable solution. But, in the undersigned's view the effect of the Fee Committee's suggested allocation disproportionately reduces the individual attorneys' fees when compared to the common benefit fees.

The undersigned raises these comments from the perch of serving on the PSC and having one of the largest inventories of cases, representing claimants from 558 unique addresses. Like Louisiana, Southwest Florida, where we live and work, was an "epicenter" of the Chinese Drywall disaster. We, along with many individual attorneys, brought thousands of clients into the MDL. The Fee Committee acknowledges the importance of having and coordinating a "critical mass" of property owners as Plaintiffs in this case. (D.E. 20290-4 at 20). Believing this "critical mass" to lead to the best result for our clients, we did not seek alternative venues and fora for our cases. The Fee Committee further recognizes that individual handling attorneys were vital in aggregating and managing the "critical mass" of homeowners. *Id.* at 57. The individual handling attorneys created the critical mass of claimants, which effectively created the MDL, which, in turn, benefitted thousands of claimants. Lacking the high number of claimants represented by the individual handling attorneys in this case, the total attorney's fees would be significantly diminished or spread out among various cases, venues, and jurisdictions.

No doubt because of Morgan & Morgan's dominance in the local market, when news of the Chinese Drywall epidemic hit the airwaves in late 2008 and early 2009, our firm began receiving inquiries from Chinese Drywall homeowners. From November 2008 to December 2009, Morgan & Morgan received more than 1,000 potential Chinese Drywall client inquiries. The firm organized and hosted town hall meetings, mailed newsletters to gated communities which we had reason to think contained Chinese Drywall, and attended hundreds of Chinese Drywall

inspections. From the moment that the PSC was appointed on July 27, 2009 to the present, we have actively collaborated with the PSC and all common benefit counsel to ensure that the class size increased and that individual homeowners received the relief that they so rightly deserve after suffering through this epidemic. All of these efforts required significant cooperation and coordination with the PSC and common benefit counsel.

## II. This Is Not A Typical Class Case – "There's No Place Like Home"

The Fee Committee is no doubt correct that it is atypical for, "individually retained counsel [to] share in the class fee recovery." (D.E. 20290-4 60 n.19). Yet, as the Fee Committee acknowledges, there have been numerous class settlements where individual handling attorneys were awarded a higher percentage of the overall fees than the Fee Committee's requested allocation in this case. *See, e.g.*, *id.* at 61-62.

This is not a typical class action, nor one with small-dollar damages per class member. Although class treatment in the MDL was the only realistic way to resolve the case, and while the class issues—jurisdiction, venue, causation, and general damages—predominated over the individual issues, the claims were highly individualized within the class structure. The PSC required all handling lawyers to do at least the following at the beginning of most individual cases, at individually-retained counsel's risk and expense:

   a. Obtain an inspection report with adequate Chinese Drywall indicia;

   b. Prepare and submit a Plaintiff Profile Form ("PPF") with extensive data regarding each property, including, potential defendant information (manufacturer, builder, supplier, installer), purchase date, insurance information, square footage, resident information, and other pertinent data;

   c. Submit to the PSC spreadsheets with individual client information regarding each individual client at the time that the Omni Complaints were prepared and filed; and

   d. Advise the PSC to changes in the data if claimants no longer owned their homes or remediated their homes.

Individual lawyers did not simply forward a claim form as would be typical in most consumer class cases.  Instead, these attorneys shepherded their clients through devastating personal crises, including stories of economic ruin, damaged credit, health problems, homelessness, and divorce.  By all means, this was not an ordinary class action.

Our firm advanced hundreds of thousands of dollars in litigation expenses, including inspections and obtaining documents, with no promise of ever getting those amounts back.  We hired additional staff to manage these cases and paid significant overtime wages to allow staff to complete reports and submissions required in this MDL.  Indeed, these class settlements were *designed* to require individual counsel to fund and manage the cases.  These class settlements could not and would not have been possible without the risk, investment and legal efforts of individual counsel.

The vast majority of the claims at issue in this case were filed by homeowners and by individuals who lived in the homes infested with Chinese Drywall.  Most of our clients take great pride in their homes. When they discovered Chinese Drywall in their homes, the homeowners felt abandoned by their builders and insulted by the lack of government intervention.  Understanding we were dealing with our clients' homes—a person's sanctuary—we actively participated in the resolution of each of our clients' claims, as lawyers should be expected to do. As an example, when the Knauf Pilot Program settlement was announced in October 2010, the undersigned personally met with each of our clients and Moss Contractors and Moss's subcontractors in each of our clients' homes, we reviewed and explained the settlements and releases with each client, and we communicated with Moss and Moss's subcontractors to resolve conflicts with our clients.  Each home is unique, each inheres its own nuances. Each homeowner deserved to be treated like

an individual claimant with their own interests within the class structure and to be made whole. Our attorneys actively engaged in this manner from the announcement of the Knauf Pilot Program, to the various other class-wide settlements (Knauf, Global, Banner, and INEX), and through to this day.

The undersigned respectfully takes exception to the Fee Committee's suggestion that non-attorney staff could have (or should have) adequately performed this work. (Memo at 61). First, attorneys had to carefully review, comprehend, and explain the complicated settlements and releases at issue. Second, our presence at inspections, walk-throughs, and meetings with Moss Contractors and subcontractors ensured that our clients received the relief that they agreed to; no cutting corners. Third, our attorneys' involvement in the Knauf settlement process allowed us to discover and report to the PSC proposed changes in the Benchmark inspection protocol and with the identification of mixed board properties. Fourth, with respect to Already Remediated Homes, our attorneys explained to our clients this Court's evidence preservation orders, prepared mediation statements, and actively participated in mediations with Dan Balhoff and Knauf's counsel.

Our attorneys also helped our clients interact with their mortgage lenders, insurance carriers, and county property tax assessors. In many instances, our attorneys educated major lenders and insurance carriers regarding the damaging effects of Chinese Drywall. Our efforts led to a number of clients obtaining forbearances on their mortgages and to insurance carriers continuing to provide homeowner's insurance coverage. Similarly, many of our clients received property tax relief on their homes as a result of our efforts. Several of our clients who received forbearances or other relief from their mortgage lenders received recovery from the class settlements in MDL 2047. Our significant and tangible efforts added value to the settlements. It is

doubtful that the vast majority of class members would have successfully submitted their claims without active counsel. By no means did the settlements in actual practice resemble typical consumer class settlements.

### III. All Monies In The 17% Voluntary Assessment Fund Should Not Apply To Common Benefit

On April 13, 2011, this Court entered the Order establishing the 17% voluntary assessment fund. (D.E. 8545). The Fee Committee argues that all of the $3,326,058.26 in the voluntary assessment fund should go to common benefit fees. (Memo at 55-57). Since such few attorneys apparently contributed to the voluntary assessment fund, it has very little impact on the overall $192 million fund. However, the contributions greatly impacted the few individual handling lawyers who, in good faith, made the voluntary assessment contributions. As loyal members of the PSC, our firm committed to paying the assessment in each and every case it applied to; a fact that cannot be attributed to many, many other firms.

Our firm alone contributed $187,701.42 to the assessment fund. As explained in greater detail in our April 11, 2014 Second Affidavit submitted pursuant to PTO 28, our combined contribution with that of our co-counsel is just under $650,000, which is 19% of the total voluntary assessment fund. If the Court were to accept this redistribution of voluntary contributions when most did not contribute, the inequitable result would be the lesson, "no good deed goes unpunished." Undersigned suggests that the failure of many to contribute to the voluntary assessment fund resulted in it having such little contributions and being so insignificant in the scheme of things that it impacts only those who were forthright (or foolish?) enough to contribute, and that all of the funds should be returned to those who contributed it.

For example, on August 19, 2013, the PSC filed 13 Motions for Rules to Show Cause Why Certain Settled Claims Should Not Be Dismissed. (D.E. 17011 to 17023). The undersigned

carefully reviewed these papers and determined that 26 claims that were part of ongoing settlement negotiations were subject to dismissal. The 26 claimants were clients of four different law firms, including ours. We quickly advised the PSC and appeared for the September 17, 2013 hearing before this Court and successfully carved out the 26 claims from the Rules to Show Cause. Undersigned counsel ultimately settled the 26 claims in separate settlements with two distinct defendants. After the settlements were reached, all four firms paid their voluntary assessments. The total value of those 26 settled claims was $1,089,103 which led to a 17% voluntary assessment contribution of $185,147.51. The 26 claims would have been dismissed but for Morgan & Morgan's action. It is not equitable for all 17% of the voluntary assessment fund to go to common benefit counsel.

WHEREFORE, for the foregoing reasons, undersigned counsel respectfully suggests that the Court consider the extraordinary efforts and risks taken by individual counsel and consider a more balanced approach with respect to the allocation of the common benefit and individual case fees.

Date: June 28, 2016

Respectfully Submitted,

/s/ Scott Wm Weinstein
SCOTT WM WEINSTEIN
Fla. Bar No. 563080
sweinstein@forthepeople.com
PETE V. ALBANIS
Fla. Bar No. 0077354
palbanis@forthepeople.com
Morgan & Morgan, P.A.
12800 University Dr. #600
Fort Myers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing MORGAN & MORGAN'S OPPOSITION TO FEE COMMITTEE'S ALLOCATION MOTION AND MEMORANDUM PRUSUANT TO PTO 28(F) has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail, or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 6, and that the foregoing was filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 28th day of June, 2016.

/s/ Pete V. Albanis