# EXHIBIT 1

# AFFIDAVIT OF HOLLY WERKEMA

**STATE OF TEXAS**
**DALLAS COUNTY**

Before the undersigned, a duly commissioned officer of the laws of Texas, on this 28th day of June, 2016, personally appeared Holly Werkema, who having been first duly sworn, did depose and say:

I have been a member of the Florida bar since 2009, a member of the Texas bar since 2012, and have at all times remained in good standing. I have been employed by the firm of Baron & Budd, P.C. ("Baron & Budd") as an attorney from May 2012 to the present.

From May 2012 to the present, I have been responsible for representation of Baron & Budd's over 900 clients affected by Chinese drywall. As explained in more detail below, this has required extensive attorney and staff efforts by Baron & Budd and its co-counsel, resulting in an estimated 49,245 hours expended by Baron & Budd attorneys and staff (not including common benefit time that has been submitted to Philip Garret pursuant to Pre-Trial Order No. 9) and an estimated 5,374 attorney and staff hours (not including common benefit time) expended by Alters Law Firm, P.A. ("Alters Law Firm"). Baron & Budd's estimated hours spent are based upon records kept in the ordinary course of Baron & Budd's business and relied upon by Baron & Budd. Alters Law Firm's estimated hours spent have been provided to me by Alters Law Firm, and it has been represented to me that the estimated hours are based upon records kept in the ordinary course of Alters Law Firm's business and relied upon by Alters Law Firm.

Based upon my personal knowledge, information set forth in client files, which are kept in the ordinary course of business, and consultation with co-counsel Allison Grant and Alters Law Firm, the undersigned states that representation of Baron & Budd, P.C.'s, Allison Grant,

1

P.A.'s, and Alters Law Firm, P.A.'s (hereinafter "the firms'") Chinese drywall clients has entailed the tasks and duties set forth in detail below.

First and foremost, the firms have been responsible for providing legal advice to clients, protecting the legal rights of clients, and keeping clients informed of the Chinese drywall litigation for the last seven years. The firms also continue to be ethically and professionally responsible for over 400 clients with Taishan manufactured drywall, who still await recovery from their manufacturer. The firms have been asked, and we have provided legal advice and counseling on matters such as mortgage forbearances, foreclosure, property tax relief, bankruptcy, homeowner insurance claims, homeowner association dues and liens related to unpaid dues, IRS casualty loss claims, preservation of evidence, self-remediation of the property, potential health effects of Chinese drywall, condominium rights and responsibilities, disclosures and claim retention in sale of the property, and various other issues, depending on the individual homeowner's circumstances. This responsibility to over 900 total individual clients has required significant resources of the firms, and will continue to require extensive firm resources for approximately 400 clients with Taishan manufactured drywall until the case against Taishan reaches a resolution.

The firms were at the forefront of the Chinese drywall litigation, and were among the first to recognize the problem of Chinese drywall and garner media and political attention to the issue. Co-counsel Jeremy Alters appeared on "Good Morning America" and "Inside Edition" to educate the public on Chinese drywall. Further, he met with former congressman Bruce Braley about the issue and brought the congressman to an affected property to show him first hand the devastation caused by the product.

The firms were also among the first to file suit related to Chinese drywall, and nearly 100 cases were filed in Florida State Court before the MDL was even created. Prior to suit being filed, homes had to be inspected to confirm the presence of Chinese drywall and identify the drywall manufacturers, and the firms collectively inspected hundreds of homes in South Florida. Given that this was before published guidelines and criteria were available, this presented considerable challenges. Initially, all home inspections were attended by an attorney, and often homes were inspected 2 or 3 times, as markings were difficult to locate, and the signs and symptoms to look for to identify Chinese drywall were unclear. Because homes were inspected multiple times and testing that ultimately proved to be somewhat unnecessary was initially conducted (i.e., air quality testing), inspection costs during this initial investigation period were significantly higher than inspection costs in the later years of this litigation. This contributed to the over $450,000 in unreimbursed costs incurred by Baron & Budd and Alters Law Firm. As more and more homes were inspected, and as knowledge regarding the signs of Chinese drywall was gained, the firms worked with the inspectors to establish a protocol for the inspection of homes suspected to contain Chinese drywall.

Further, before suit could be filed, foreign manufacturer defendants, wholesale suppliers, retail suppliers, builders, and in some cases, drywall suppliers were identified. This required an enormous investigative effort on the part of the firms, especially given that the manufacturer defendants are foreign entities, and that most clients would not have any information regarding where the builder of their home would have obtained the drywall used to build their home.

Additionally, before suit could be filed related to a Florida home, the firms were required to send "Chapter 558" notice letters to defendants to satisfy the Florida statutory requirement set forth in §558.001, Fla. Stat., that the homeowner put the builder and other parties against whom

3

the homeowner may have a claim on notice of the construction defect before suit is filed. This also required considerable attorney and staff time.

Once the facts were investigated, defendants were identified, and Chapter 558 letters were served, complaints were drafted and filed, and hundreds of defendants were served. In 2009, the firms filed approximately 165 state court actions. Although these cases were eventually stayed when the MDL was created, some discovery was commenced, and the firms were required to periodically update the courts regarding the status of the litigation until the settlements reached in the MDL received final approval in 2013. On many occasions this required attorney appearances, and this required many status report filings to keep the courts informed.

A simultaneous issue that the firms provided clients assistance with was filing claims against the clients' homeowner insurance companies. Clients understandably had many questions regarding the liability of their insurance company for damages, and needed help completing paperwork related to these claims. Due to the claims some of our clients filed against their homeowners insurance companies, several declaratory actions were filed against our clients, which we then needed to defend.

The firms also provided information regarding Chinese drywall to local property tax offices to assist our clients in obtaining a temporary reduction in their property tax. This provided much need relief to many of our clients, but again, required attorney and staff time counseling clients and communicating with local property tax assessment offices.

In the initial stages of the Chinese drywall litigation and continuing to date, the firms have expended substantial time and resources to help clients fend off foreclosure of their homes. This has included letters to and phone calls with lenders educating them about the lawsuit and

requesting that they not foreclose on the affected properties. Of course, along with this, we have been responsible for providing legal advice related to preservation of evidence and the effect foreclosure may have on our client's claims.

In the early stages of the MDL, and prior to the availability of the Pilot Program to all of our clients, the firms negotiated with major builders such as Lennar, Standard Pacific, GL Homes, Perry Homes, M/I Homes, Ashton Woods, Richard Jones Construction, and others. The firms negotiated and discussed inspection protocols with the builders, and in several instances, the builders agreed to repair clients' homes.

After the MDL was created, significant work continued to be required of individual counsel. Client updates and counseling on a variety of legal, health, and safety issues concerning the Chinese drywall took place daily. The firm's work in identifying the builder, supplier, drywall installer defendants, and the insurers of these defendants continued to require considerable time and effort. Much of the information gained through this work was provided to the PSC. The firms also prepared and submitted Plaintiff Profile Forms, along with the required exhibits for the vast majority of its 900 clients. This again required significant staff and attorney time.

When the Settlement Agreement for the Demonstration Remediation of Homes with KPT drywall was reached in October of 2010, the firms represented the very first homeowner to be remediated through the Pilot Program. Baron & Budd and Allison Grant worked extensively with defense counsel, Moss, and Benchmark on the implementation of the Pilot Program and improving its efficiency. Even after the Pilot Program was well underway, in nearly every home remediated, many issues needed to be addressed by individual counsel throughout the entire process. This included, but was not limited to, counseling each client on settlement paperwork,

scheduling Benchmark inspections, addressing disputes with defense counsel regarding Benchmark inspection results, addressing unexpected pre-existing defects discovered during remediation such as leaks and non-compliance with building codes, addressing disputes between Moss and homeowner clients related to work quality, addressing contractor attempts to deviate from the remediation protocol, and addressing disputes related to the "substantial completion" date and failure to issue delay payments when required.

Another significant undertaking by the firms was the remediation of two large scale condominium buildings in south Florida, namely San Lorenzo in Miami, Florida, and Lauderdale One in Fort Lauderdale Florida. San Lorenzo was the first large scale condominium building to be remediated through the Knauf Settlement. This condominium building is a ten story, 95 unit enclosed condominium tower building located minutes from downtown Miami. The building includes 90 residential units, and 5 commercial units, one of which is a dialysis center. Remediation took place two floors at a time, with occupants on the other floors continuing to reside in the building during remediation. Because of the configuration of the building and its location, Moss installed a buck hoist to haul materials in and out of the building, requiring certain residents to vacate their units for the entire twelve months of remediation. Additionally, parking, fire safety, and access issues had to be addressed to insure the safety of the remaining residents and the dialysis patients. This necessitated a tremendous amount of work and coordination with unit owners, defense counsel, and Moss. Shortly after the San Lorenzo remediation commenced, remediation also began on the Lauderdale One condominiums, which was a 107 unit building wherein occupants of all but one unit needed to vacate for the remediation of their floor.

In addition to the Pilot Program, many of the firms' clients received benefits from the Knauf Settlement through Options 2 and 3, or as an "Already Remediated" homeowner.  For the firms' already remediated homes, extensive negotiations took place between Baron & Budd and Allison Grant for nearly every home in this category.  The undersigned attended a mediation to resolve claims related to five properties and a hearing before the Special Master on another property. For our clients who choose Option 3, particularly those with Mixed Properties who often had no other option available, Baron & Budd and Allison Grant dealt with a multitude of issues including disputes over Benchmark percentages, disputes over Final Cost Estimates, pending foreclosures while we waited for settlement paperwork to be made available, drafting releases, and condominium association claims.

The claims process for the Global, Banner, INEX, Virginia Settlements, and Knauf Other Loss Fund claims likewise required extensive attorney and staff work.  Numerous phone calls and emails were exchanged almost daily between the settlement administrator, Baron & Budd attorney Holly Werkema, and Allison Grant, as issues and concerns came up through the process.  In addition to determining the appropriate claims for each client and filing each claim, significant documentation was required to support every Other Loss Claim filed, including expert reports for those filing a Short Sale or Foreclosure claim.  This required extensive follow up with clients, and clarification on claims and supplemental information was requested and provided over a period of two years related to these claims.  Further, many individual claims needed to be appealed, which required an attorney to prepare and submit the appeal.  Finally, the responsibility of sending payment to the claimants fell on the shoulders of individual counsel, which again required significant time and resources of individual counsel.

The above is a short summary and sample of the work performed by the firms over the past seven years.

*Holly Werkema, Esq.*

SWORN AND SUBSCRIBED BEFORE
ME THIS 28th DAY OF June, 2016.

_____
NOTARY PUBLIC
Print Name: Amelia B Wilson
MY COMMISSION EXPIRES: 8/24/2019

AMELIA B. WILSON
My Notary ID # 126232076
Expires August 24, 2019

8