**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE:  CHINESE-MANUFACTURED          MDL NO. 2047
        DRYWALL PRODUCTS LIABILITY
        LITIGATION                            SECTION: L

        THIS DOCUMENT RELATES TO:             JUDGE FALLON

        ALL *CASES*                           MAG. JUDGE WILKINSON

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PRIMARY COUNSEL'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A
CASE MANAGEMENT ORDER PROVIDING  FOR DISCOVERY, THE UNSEALING
OF RECORDS REGARDING COMMON BENEFIT FEES, AND THE APPOINTMENT
OF A SPECIAL MASTER**

The Court has before it the *Fee Committee's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F),*[3] to which twenty-three firms have objected (hereinafter, "Primary Counsel").  The FC urges the Court to make an unprecedented fee split between Primary Counsel and common benefit counsel based on a blatantly biased presentation of the law and facts, while keeping Primary Counsel in the dark and without the opportunity to fairly challenge the allegedly "inescapable truth that the vast majority of the meaningful, outcome-determinative work" was performed by common benefit counsel.[4]  The FC invites the Court to disregard the limits of its authority to alter private

---

[3] That motion (Doc. 20293) and its supporting memorandum (Doc. 20293-1) are collectively referred to herein as the "Allocation Motion."  Specifically, that motion seeks, on behalf of common benefit counsel, an award of 59.37% ($114,581,308.82) of the entire amount awarded by the Court for attorneys' fees ($192,981,363.35) (the "Global Fee Award"), leaving 40.63% ($78,400.054.53) for allocation among Primary Counsel.

[4] *Omnibus Response to Objections to the Fee Committee's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) ("Omnibus Response")* (Doc. 20384-2), p. 34.

fee agreements[5] and to effectively take judicial notice that common benefit work is far more valuable than the work of Primary Counsel.

In PTO 28(F), this Court promulgated the equation for a pro rata distribution of fee compensation among Primary Counsel, all of whom have clients who contractually agreed to compensate their chosen counsel. Doc. 20282, p. 6. Because the method of distribution among Primary Counsel is settled, there is no need for discovery regarding Primary Counsel's fee.[6] Conversely, the PSC and common benefit counsel, as such,[7] lack a contractual right to compensation.  Accordingly, they were required to file monthly time records.  PTO 9, Doc. 147. These records and the resulting reports of the court-approved CPA, however, have been sealed from Primary Counsel, along with other evidence of the PSC's purported work, including the transcripts of PSC meetings during which the "common benefit" was allegedly formulated.[8] Primary Counsel now seek limited discovery, including unsealing of those records, pertaining to common benefit time and expenses.

---

[5] *See* Eldon E. Fallon, *Common Benefit Fees in Multi-District Litigation,* 74 La. L. Rev. 371, 379 (2014) ("*Common Benefit Fees*"); Charles Silver & Goeffrey P. Miller, *The Quasi-Class Method of Managing Multi-District Litigation: Problems and a Proposal,* 63 Vand. L. Rev. 107, 113 (2010); Aimee Lewis, *Limiting Justice: The Problem of Judicially Imposed Caps on Contingent Fees in Mass Actions,* 31 Rev. Litig. 209, 215 (2012).

[6]  The FC attempts to defend its proposed allocation by raising the issue of which counsel will be paid for common benefit work and in what amounts (*see Omnibus Response*, Doc. 20384-2, pp. 15-16). However, this is a red herring because the Allocation Motion did not ask the Court to make an individual allocation order. The Allocation Motion only raises the issue of how all common benefit fund time compares to all primary counsel's time.

[7] Many firms fall into both categories.  As the FC pointed out, several Objectors have performed Common Benefit Work (Doc. 20384-2, p. 11) and a few are members of the PSC (Doc. 20384-2, fn. 7).

[8] PTO 9 requires counsel to make monthly submissions of common benefit work or expenses to submit to the court-appointed CPA, Philip Garrett.  Doc. 147.  Garrett was then required to compile the submission and provide reports to Plaintiff's Liaison Counsel who would them submit them to the Court.  "Submission of time and expense records to PG and the Court shall be considered as if submitted under seal."  Doc. 147 at ¶ 3. Objectors have requested this information from Mr. Garrett, who has refused to provide the same absent approval by the Court and PSC.  *See* Ex. A, Email String Between Exnicios and Garett regarding *Meeting on Chinese drywall fees and costs*.

The central issue before the Court concerns the division of the limited fee fund as between Primary Counsel and common benefit counsel; in particular, the Court must determine how much of the fee pie to allocate to common benefit counsel under the circumstances.  The legitimacy of individual fee allocations within either group is ***not*** before the Court – a critical point that the FC doggedly disregards, while impugning the motives and efforts of many objectors.  This case is unlike most mass tort fee disputes because the claimants are not implicated and the Court is being asked to alter private contractual fee agreements for the benefit of common benefit counsel.  Compare *In re Vioxx Products Liability Litigation*, 760 F. Supp.2d 640 (E.D. La. 2010) (capping contingency fee agreements for the benefit of claimants before reaching the "taffy pull" among lawyers).  The PSC did not mention its plan to cram-down Primary Counsel when it requested approval of the Global Fee Award.  And no primary attorney could have possibly anticipated that his or her fee agreements would be altered so drastically, let alone for the benefit of paying a premium to common benefit counsel.

The value of fees due to common benefit counsel from the Global Fee Award is a fact intensive inquiry that involves consideration of the type, timing, volume and need for the common benefit work, and it must be measured against the contractual rights of Primary Counsel and the extraordinary work that Primary Counsel performed before, during and after the Global Fee Award was confected.[9]  The procedure followed thus far, however, is hampering the ability of the Court to perform this inquiry because the role of the PSC has changed from a judicially-appointed champion for the common good of claimants to a self-interested litigant in a fee dispute among

---

[9] The Objections make clear that this was no ordinary mass tort proceeding for Primary Counsel.  Nevertheless, Primary Counsel understands that the Court has already determined a formula for allocating fees among Primary Counsel.  The only factor missing is the total allocation to Primary Counsel, which will be the remainder of the pie after the common benefit fee is determined.

lawyers.[10]  Due Process demands that both sides in this "taffy pull" receive equal access to relevant information and an equal opportunity to be heard.

## I.     The Mandates of Due Process Warrant Limited Discovery and the Unsealing of Records.

Due process requires "the opportunity to be heard at a meaningful time and in a meaningful manner" before an individual is deprived of a property interest.  *See Mathews v Elbridge,* 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18 (1976).  While there is no particular standard for what process is due, the Supreme Court in *Mathews* set forth three factors to be balanced in determining whether a process will suffice in a given situation:

> [T]he specific dictates of due process generally require[ ] consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335; *see also Harry v. Colvin*, 819 F.3d 112, 115 (5th Cir. 2016).  The ultimate question is whether "given the nature and circumstances of the case . . . the parties [had] a fair opportunity to present relevant facts and arguments to the court, and to counter the opponents' submissions." *In re Thirteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litigation*, 59 F.3d 295, 302 (1st Cir. 1995) (quoting *Aoude v. Mobil Oil Corporation*, 862 F.2d 890, 894 (1st Cir. 1988); see also  *In re Nineteen Appeals*, 982 F.2d at 611 (citing *Gorman v. University of R.I.*, 837 F.2d 7, 14 (1st Cir. 1988).

Specifically with regard to attorneys' fees, the Fifth Circuit has cautioned that when "a court chooses to hold a 'fee-determination hearing, the hearing format itself ha[s] to be fair.  In

---

[10] The bias of the FC is demonstrated foremost in its refusal to factor the legal rights and work product of Primary Counsel into its proposed methodology for allocating fees.

other words, when a judge constructs a process for setting fees, the process must contain at least the procedural minima' of due process: notice and an opportunity to be heard." *In re High Sulphur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 231 (5th Cir. 20008) (quoting *In re Nineteen Appeals*, 982 F.2d at 614 (1st Cir. 1992); citing *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 584 (3d Cir. 1984)).  *See also Yamada v. Nobel Biocare Holding AG*, No. 14-55263, 2016 WL 3207650, at *7 (9th Cir. Apr. 20, 2016, amended June 9, 2016)) ("the Due Process Clause requires that opposing counsel have access to timesheets relied on to support [a] fee order" and the opportunity to "present whatever objections they might have concerning the fairness and reasonableness of Plaintiffs' fee request").

The First Circuit's decision in *In re Nineteen Appeals* (cited with approval by the Fifth Circuit in *In re High Sulphur*, 517 F.3d at 231) is squarely on point.  In that case, the attorneys for individual plaintiffs appealed the district court's allocation of fees between individual counsel and common benefit counsel in an MDL proceeding.  The circuit court framed the contest as follows:

> One group of lawyers, appellants here, contend that the procedures followed by the district court in awarding attorneys' fees and directing cost reimbursement were fundamentally unfair, ignored the requirements of procedural due process, and constituted an abuse of discretion. Another group of lawyers, appellees here, vehemently deny these charges and seek to uphold the award.

982 F.2d at 605.  After applying the *Mathews* framework, the court found that appellants were denied due process because the fee allocation proceeding was unfairly tilted in favor of the PSC - "as unbalanced as a two-legged stool." *Id.* at 615.  The court was careful to point out that its decision was primarily driven by the district court's use of a process that, itself, was not balanced between the litigants:  "In this instance, we cannot see how the court could fairly adjudicate this dispute unless it afforded [individual counsel] a viable means (comparable to the means afforded

the PSC) of describing their contribution to the litigation, contrasting their contribution with the PSC's contribution, and questioning the PSC members regarding their work." *Id.*

Following remand, the case returned to the First Circuit and the process utilized by the district court on remand was challenged on due process grounds. *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litigation*, 56 F.3d 295 (1st Cir. 1995). On this occasion, however, the appellate court found the process adequate where the district court permitted discovery regarding the PSC and the opportunity for objectors to make a fair rebuttal:

> The Due Process Clause does not require freewheeling adversarial discovery as standard equipment in fee contests. *See Nineteen Appeals,* 982 F.2d at 614. This case exemplifies the wisdom of the rule. The district court did not shut off all discovery, and the procedures that the court employed—especially the compelled exchange of documentation—minimized the need for additional discovery by giving [primary counsel] the raw material that they needed to sift through the particulars of the PSC's fee application. In other words, the court ensured that [primary counsel] had access to all the data reasonably necessary to formulate their objections, including all the PSC members' time-and-expense submissions, summaries thereof, detailed accounts of the procedures used by the PSC to gather, review, and audit time records, and the working papers, correspondence, and documentation generated by the PSC's accountants during the compilation process. With this banquet of information spread before them, appellants then partook of the court's liberality in allowing them to formulate extensive written submissions.

56 F.3d at 303. In sum, the First Circuit reaffirmed that due process requires a level playing field in a mass tort fee dispute.

Application of the *Mathews* factors in the instant matter likewise dictates that Primary Counsel should have the same access as the FC to evidence relating to the allocation of fees and an opportunity to fairly challenge the fee allocation requested by the FC. Stated differently, Primary Counsel should have the same opportunity as the PSC to make a case regarding the extent to which common benefit fees should be carved out of the fee pie. As it stands, the PSC is holding

the evidence and urging the Court to follow its lead, while ridiculing Primary Counsel for being unaware of the true state of affairs and for drawing inferences based on bits and pieces of the evidence.

### A.    *The Private Interest*

It is settled that the right to payment of attorneys' fees is a constitutionally protected property interest that cannot be taken or disposed of without providing due process to interested parties.  *See Fontana v. Barham*, 707 F.2d 221 (5th Cir. 1983).  *See also In re Nineteen Appeals*, 982 F.2d at 613 ("the affected private interest is the monetary share of the funds due each [primary attorney]"); *Rein v. Socialist People's Libyan Arab Jamahiriya,* 568 F.3d 345 354 (2nd Cir. 2009) ("In reallocating contractually negotiated fees among counsel in a case of this nature, a court is disposing of a property interest.").

### B.    *The Risks of an Inadequate Procedure*

Without a fair opportunity to test and challenge the purported factual underpinnings of the FC's proposed allocation through additional discovery and the unsealing of records, Primary Counsel face a very real and tangible risk of losing millions of dollars in fees.  Additionally, and of equal importance, is the risk of offending, in the MDL context, the "traditional judicial standards of transparency, impartiality, procedural fairness and ultimate judicial oversight. . . ."  *In re High Sulfur Content*, 517 F.3d at 227.

The Fifth Circuit has directed fee disputes "to be litigated openly" and for all parties to be furnished information essential to challenge fee allocations.  *Id.* at 230 and 232.  In this case, however, the process followed thus far has been undeniably "unbalanced".  *In re Nineteen Appeals*, 982 F.2d at 615.  In particular, the PSC and FC had the benefit of reviewing all common benefit time and expenses, meeting with common benefit counsel, and reviewing Mr. Garrett's reports.  The same information was not available to Primary Counsel.  The Allocation Motion and response

demonstrate the exact nature of this unleveled playing field and the resulting inequities.  For example, the FC argues that Primary Counsel do not "take into account the untold exertions . . . necessary to administer the challenges presented by the settlements, including ongoing dialogues . . . regular meetings with representatives of Moss and homeowners (and their counsel) over remediation disputes, frequent interfaces with BrownGreer. . . , and related interplay with Mr. Kerry Miller, counsel for Knauf." *Omnibus Response*, Doc. 20384-2, pp. 19-20. Similarly, the FC openly admits that Primary Counsel has been kept in the dark by boasting that Primary Counsel "are likely unaware of the commitment that the PSC made to the Knauf Defendants in connection with the Knauf Settlement to continue to prosecute . . . claims against the Taishan Defendants. . . ." *Id.* at fn. 7.  Primary Counsel have a right to be informed and discover information regarding such "untold exertions" and secret agreements which are being used to bolster the FC's request.

The FC likewise repeatedly diminishes the work of Primary Counsel by claiming that common benefit counsel work was more labor intensive, had a more wide-spread impact and was more complex, challenging and daunting. *Id.* at p.3.  While Primary Counsel can generally deny these statements, any real analysis is impossible based of the information currently available to them.

Absent discovery and the review of documents filed under seal, Primary Counsel run an "intolerably great" risk of being "erroneously deprived of their property."  *In re Nineteen Appeals*, 982 F.2d at 613.  As discussed more fully in the following subsection, there also is a serious risk of impugning the public confidence in the mass tort device, as cautioned by the Fifth Circuit in *In re High Sulphur*, 517 F.3d at 230.

The second *Mathews* factor is clearly satisfied here, as the FC attempts to effectively confiscate millions of dollars from Primary Counsel based on an unprecedented allocation of fees in favor of common benefit counsel.

**C.    Public Interest**

There are two fundamental factors weighing on the public interest in a fee dispute in mass tort litigation.   First, the "substantial governmental interest in conserving scarce judicial resources." *In re Nineteen Appeals*, 982 F.2d at 614. Second, the need to protect the public's confidence in the judicial administration of such proceedings. As Your Honor has written, "the potential harm to the public's perception of the judicial process is especially acute in MDLs because of the large number of claimants involved.  Disproportionate results and inconsistent standards threaten to damage the public's faith in the judicial resolution of mass tort litigation by creating an impression of inherent unfairness." *Common Benefit Fees,* 74 La. L. Rev. at 380.  For this reason, the Fifth Circuit has instructed that allocation procedures should be consistent with "basic judicial standards of transparency and fairness."  *In re High Sulfur*, 517 F.3d at 227. "'[P]ublic confidence [in our judicial system] cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view.' . . . [P]ublicizing the process leading to attorneys' fee allocation may discourage favoritism and unsavory dealings among attorneys even as it enables the court better to conduct oversight of the fees. If the attorneys are inclined to squabble over the generous fee award, they are well positioned to comment – publicly – on each other's relative contribution to the litigation." *Id.* at 230 (internal citations omitted). "Attorneys' fees, after all, are not state secrets that will jeopardize national security if they are released to the public." *Id.*

In this case, the FC seeks an allocation that greatly strains (and arguably exceeds) the Court's authority to alter private fee agreements and that flips the traditional paradigm between primary counsel and common benefit counsel.  Such an unprecedented allocation surely would discourage primary attorneys from pursuing mass tort cases.  "Undercompensating attorneys who handle such litigation would result in too few meritorious private suits being brought and less competent representation in the cases that are brought.  Overcompensating attorneys, however, would also be harmful, as it would encourage frivolous lawsuits and result in unfair recovery for injured litigants." *In re Vioxx*, 574 F.Supp.2d 606, 611 (E.D. La.2008), *on reconsideration in part*, 650 F.Supp.2d 549 (E.D. La. 2009).  Perhaps even worse, such an allocation would create the appearance that the fox is now in charge of the hen house.

Under these circumstances, the public interest favors permitting Primary Counsel to conduct limited discovery and to challenge the FC's requested allocation on equal footing with the PSC.

## II.    Limited Discovery Is Necessary to Answer Targeted Questions Regarding the Fee Committee's Motion.

 As explained above, Due Process requires Primary Counsel to have a fair opportunity to counter the FC's Allocation Motion.  In general, this includes "access to all the data reasonably necessary to formulate their objections, including all the PSC members' time-and-expense submissions, summaries thereof, detailed accounts of the procedures used by the PSC [and FC] to gather, review, and audit time records, and the working papers, correspondence, and documentation generated by [Mr. Garrett] during the compilation process."  *In re Thirteen* Appeals, 56 F.3d at 303; *see also*, *In re High Sulphur*, 517 F.3d at 232 (requiring information such as hours, rates and processes for determining fees to be provided).  Accordingly, Primary Counsel request limited discovery, on the following topics, as necessary to make a presentation to the Court

supporting their objections to the Allocation Motion.   Primary Counsel's proposed *Notice of 30(b)(b) Deposition & Request for Production* is attached hereto as Exhibit B.

### A.   Does the lodestar include work pursuing Taishan?

Primary Counsel have objected that the FC's proposal improperly seeks compensation for the PSC's (to date) unsuccessful efforts to recover from the Taishan Defendants.[11] This legal work was neither reasonable nor necessary for recovery of the limited settlement funds at issue, yet there is every reason to believe that this work is included in the FC's lodestar demand for common benefit compensation:

- Philip A. Garrett's affidavit reporting the number of common benefit hours does not state that work pursuing non-settling Defendants was excised. In fact, Mr. Garrett does identify what *was* eliminated, and time pursuing non-settling defendants is not in the list of omitted time.[12]

---

[11]   *See, e.g.,* Collins & Horsley, P.C.'s Br. in Supp. of Individual Counsel's Request to Allocate the Global Fee Award Between Common Benefit Counsel and Individual Counsel and Obj. to the FC's Mot. to Determine the Allocation of the Global Fee Award as Between Common Benefit Attorneys and Individual Counsel Fees Pursuant to PTO 28(F) (Doc. 20351) ("Collins & Horsley Obj."), pp. 22, 33, 39-42; Baron & Budd, P.C., Allison Grant, P.A. and Alters Law Firm, P.A.'s Obj. in Opp. to FC's Mot. to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) (Doc. 20353-3) ("Baron & Budd Obj."), pp. 27-28; *see generally* Parker Waichman LLP's Opp. to the FC's Mot. to Determine the Allocation of the Global Fee Award as between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F), Request for Discovery, Additional Briefing and a Contradictory Hearing (Doc. 20348-1) ("Parker Waichman Obj."), pp. 18-19.

[12]   *See* Revised and Updated Aff. of Philip A. Garrett, C.P.A., Pursuant to PTO No. 28(F) (Doc. 20290-5) pp. 4-6 ¶¶9-13.

- The Allocation Motion extols the value of the PSC's common benefit work, and in this context, seeks credit for what appears to be work pursuing non-settling Taishan, which has not contributed to the limited settlement funds at issue.[13]

- In its Omnibus Reply, the FC does not deny that it, by virtue of an under-the-table deal with the Knauf entities, is seeking compensation for pursuing non-settling Defendant Taishan, and once again claims credit for doing so.[14]

Therefore, the FC is seeking full compensation on behalf of the PSC for work that did *not* contribute to the limited fund while, at the same time, severely discounting Primary Counsel's work that *did contribute* to the limited fund. Accordingly, Primary Counsel seek discovery quantifying the degree to which the FC's proposal would divert settlement funds from Primary Counsel for the purpose of compensating the PSC and other common benefit counsel for legal work unnecessary to generating the limited settlement funds currently at issue.

### B.    Why does the FC's $1.1 Billion calculation exclusively credit the PSC and common benefit counsel for the work of third parties?

The FC's calculations are riddled with "fuzzy math,"[15] and its Allocation Motion belabors distorted calculations to create the false illusion that its request would result in compensation at

---

[13]  For example, the FC argues that "[s]eeking recovery from the German and Chinese corporate defendants in these proceedings necessitated the expenditure of considerable attorney effort and resources, particularly … service of process … and greatly extended the timeline of the litigation." Doc. 20290-4, p. 16. Taishan appears to be what the FC is referencing here. Knauf agreed to accept service on November 2, 2009, just five months after the MDL was created.  PTO 17. The first settlement with all Knauf defendants was reached in October of 2010. Thus, service of process problems did **not** "extend[] the timeline of litigation" (Doc. 20290-4, p. 16) for the Knauf settlement.

The FC also alleges that Primary Counsel were relieved of "costly and challenging foreign service efforts" and points to "translation and service of the complaints on foreign defendants, pursuant to the Hague Convention." Doc. 20290-4, p. 20. However, Knauf agreed to accept service. Again, the FC is alluding to Taishan.

[14]  Omnibus Response, Doc. 20384-2, p. 16 (arguing that the common benefit counsel "aggressively pursue[d] the unsettled claims against Taishan and its affiliated companies").

[15]  *See, e.g.,* Baron & Budd Obj. (Doc. 20353-3), pp. 16, 24-27.

the rate of 10.65% for common benefit fund work and 11.9% for primary counsel's work. However, compensation for primary counsel would in reality be much lower, possibly in the neighborhood of approximately 7%, were the FC's motion to be granted.[16]

Among the several "fuzzy math" issues is the FC's use of $1.1 billion as the benefit number to which the PSC's contingent multiplier applies; however, the Settlement Administrator uses $658,713,629.62 as the benefit conferred for the purposes of calculating Primary Counsel's fees. The FC's 10.65% request appears much lower and more reasonable than it is in reality because of its use of $1.1 billion as the settlement value as opposed to the actual benefit conferred, $658,713,629.62. To create the $1.1 billion figure, the FC credits Common Benefit counsel for the outside administrators, a curator, an ombudsman, inspectors, remediators, and even the Special Master. Such mathematical machinations are inaccurate and unprecedented. The $1.1 billion figure is grossly overinflated.[17] Discovery is appropriate to identify the factual basis, if any, for treating the work of the Special Master and third parties as a benefit bestowed uniquely by the PSC. Discovery is also appropriate to understand the PSC's valuation of the Knauf (and "interrelated and interdependent")[18] settlement(s) at the time the settlements were reached.

---

[16] As pointed out by Baron & Budd, P.C., that calculation is subject to debate and may be less than 11.9%. *See, e.g.,* Baron & Budd Obj. (Doc. 20353-3), p. 7 ("If the FC's Motion were granted, the undersigned would be receiving in attorneys' fees only 6.8% of the true benefit conferred upon our clients versus . . . ."). *See also*, *id*. at pp. 30-31.

[17] *See* Opp. of Pls. Represented by Milstein Adelman, LLP and Roberts and Durkee, LLP to the Mot. of the PSC FC for Allocation of the Global Fee Award between Common Benefit Fees and Individual Counsel Fees Pursuant to PTO 28(F) (Doc. 20337) ("Milstein Durkee Obj."), pp. 2-5; Collins & Horsley Obj. (Doc. 20351), pp. 25-29; Baron & Budd Obj. (Doc. 20353-3) at pp. 24-27.

[18] Omnibus Response (Doc. 20384-2), p. 1.

### C.    Does the lodestar include duplicative entries?

As noted in the objections, in order to determine whether a fee request is reasonable, the issue of potential duplicative billing must be resolved.[19] Because the time records are sealed from objectors, we cannot now identify the degree of duplication. Discovery on this issue is necessary to understand the degree to which the FC seeks to extinguish Primary Counsel's contract rights in order to pay the PSC for duplicative billing.

### D.    When was the PSC's work performed?

Several objections are based on the FC's surprising and inaccurate failure to acknowledge the yeoman's work performed by primary counsel.[20] For the most part, the PSC did not assist Primary Counsel inspecting clients' homes, ascertaining the manufacturer of the drywall, ascertaining the builder, supplier and installer, providing Knauf with documentation for purposes of qualifying for remediation, negotiating with Knauf for inclusion in the Pilot Program (as well as Options 2, 3 and compensation for Already Remediated Homes), negotiating terms sheets with Knauf with respect to condominiums, disputes arising during the remediation process, administering the claims process for the Global, Banner and INEX settlement, as well as the Other Loss Fund the claims, and thereby foisted an extraordinary amount of work solely upon Primary Counsel. Moreover, Primary Counsel had filed hundreds of cases before the MDL was even instituted, and the work of Primary Counsel in identifying the many defendants was used by the

---

[19]  Parker Waichman Obj. (Doc. 20348-1), pp. 18-19.

[20]  *See, e.g.,* Primary Counsel's Request to Allocate the Global Fee Award between Common Benefit Counsel and Primary Counsel and Obj. to the FC's Mot. to Determine the Allocation of the Global Fee Award as between Common Benefit Attorneys and Individual Counsel Fees Pursuant to PTO 28(F) (Doc. 20336) (Hoaglund Sexton), pp. 4-21; Collins & Horsley Obj. (Doc. 20351), pp. 5-21; Morgan & Morgan's Opp. to FC's Allocation Mot. and Mem. (Doc. 20354), pp. 4-7; Parker Waichman Obj. (Doc. 20348-1), pp. 14-18; Milstein Durkee Obj. (Doc. 20337), pp. 10-13; *see also* Opp. of Whitfield Bryson & Mason LLP, Pendley Baudin & Coffin, Rhine Law Firm, and Luckey & Mullins to FC's Mot. to Determine the Allocation of the Global Fee Award as between Common Benefit Fees and Individual Counsel Fees Pursuant to PTO 28(F) (Doc. 20346) ("Whitfield Bryson Obj."), pp. 4-6.

PSC when the MDL was subsequently created.[21] Thus, Primary Counsel performed the initial attorney work, as well as the bulk of the work after the Knauf and other settlements were finalized and approved.

In their omnibus response, the FC has taken the surprising, contrary position, proclaiming with great inaccuracy that the "cadre of common benefit counsel" allegedly "labor[ed] to administer these settlements," which is allegedly "[u]nlike the objectors."[22] The FC thereby admits that its lodestar includes post- settlement work, which it deems to be substantial.

Discovery therefore is necessary to discern when the common benefit work was performed. Attorney time from the PSC's inception through final approval of the settlement with Knauf and the other settling defendants should be relevant (as to the timeline). However, to the extent that the PSC seeks significant compensation for work performed *after* the settlements were reached (and its arguments indicate that it does), then this fact is discoverable, as it is doubtful that such work was truly necessary in generating the funds at issue.

> ### E.      How are the common benefit expenses being handled?

Primary Counsel have challenged the FC's proposed handling of expenses.[23] The FC would grant the PSC disproportionately more to compensate them for all fees, a 2.65% bonus, and present and future expenses, while leaving Primary Counsel in the red for expenses advanced under contract. Primary Counsel are left without adequate compensation for their expenses, while, in stark contrast, the FC seeks to pay the PSC in advance for the cost of pursuing non-settling Taishan Defendants. This is inappropriate both because of the unfair disparate treatment and because

---

[21]  *See, e.g.,* Baron & Budd Obj. (Doc. 20353-3), pp. 18-19; Parker Waichman Obj. (Doc. 20348-1), pp. 14-15; Collins & Horsley Obj. (Doc. 20351), p. 11.

[22]  Omnibus Response (Doc. 20384-2), p. 1.

[23]  *See, e.g.,* Whitfield Bryson Obj. (Doc. 20346), p. 21; Baron & Budd Obj. (20353-3), pp. 36-37.

Taishan-only costs cannot be paid out of the limited settlement funds. The funds at issue should compensate counsel for their work in generating the settlement – rather than work chasing after a different settlement.

Discovery is necessary on this issue, and the FC itself has suggested why this is so in its Omnibus Response to the objections. Specifically, the FC believes that "several objectors" are "unaware" of the FC's alleged reasons for advancing the PSC ten million dollars to pursue a different, non-settling defendant.[24] That the FC is using the claimed "unaware[ness]" of Primary Counsel highlights that Primary Counsel need discovery to present their objections to the Court.

**F.     How are pro se claims treated?**

It is unclear whether the $658,713,629.92 number, which is the amount that the FC and PSC consider to be the total benefit provided by Primary Counsel, includes funds paid to the pro se claimants, and if so, who is receiving those. Targeted discovery on this discreet issue is appropriate.

**CONCLUSION**

Due process requires Primary Counsel to receive a fair and meaningful opportunity to oppose the FC's proposed fee allocation.  Accordingly, Primary Counsel respectfully request this Court to issue a case management order providing for targeted discovery, the unsealing of records pertaining to common benefit fees and expenses and the appointment of a special master to oversee the process and ultimately make an appropriate recommendation to the Court.

---

[24] Omnibus Response (Doc. 20384-2), p. 10 fn. 7.

Respectfully submitted:

**FAIRCLOTH, MELTON & SOBEL, LLC**

By: ____/s/ *Jimmy R. Faircloth, Jr.*_____
    Jimmy R. Faircloth, Jr. (LA #20645)
    jfaircloth@fairclothlaw.com
    Brook L. Villa (LA #31988)
    bvilla@fairclothlaw.com
    Franklin "Drew" Hoffmann (LA #35824)
    dhoffmann@fairclothlaw.com
    301 Main Street, Suite 920
    Baton Rouge, LA 70801
    Phone: (225) 343-9535
    Fax: (225) 343-9538

    *Attorneys for Parker Waichman LLP*

**LISKA, EXNICIOS & NUNGESSER**

By: ____/s/ *Val Patrick Exnicios*_____
    Val Patrick Exnicios, Esq.
    vpexnicios@exnicioslaw.com
    1515 Poydras Street
    14th Floor, Ste. 1400
    New Orleans, LA. 70112
    Phone: (504) 410-9611
    Fax: (504) 410-9937
    Cell: (504) 495-9666

    *Attorneys for Whitfield Bryson & Mason
    LLP, Pendley Baudin & Coffin, Rhine
    Law Firm, and Luckey & Mullins*

**BARON & BUDD, P.C.**

By: ____/s/ *Russell W. Budd*_____
    Russell W. Budd (TX #03312400)
    rbudd@baronbudd.com
    S. Ann Saucer (TX #00797885;
    LA #21368)
    asaucer@baronbudd.com
    3102 Oak Lawn Avenue, Suite 1100
    Dallas, TX 75219
    Phone: 214-521-3605
    Fax: 214-520-1181

**ALLISON GRANT, P.A.**

By: ____/s/ *Allison Grant*_____
    Allison Grant (FL #858330)
    agrant@allisongrantpa.com
    14 SE 4th St
    Boca Raton, FL 33432-6111
    Phone: 561-994-9646
    Fax: 561-431-4627

**MCCALLUM, HOAGLUND, COOK &
IRBY, LLP**

By: ____/s/ *Eric D. Hoaglund*_____
    Eric D. Hoaglund
    ehoaglund@mhcilaw.com
    905 Montgomery Highway, Suite 201
    Vestavia Hills, Alabama 35216
    Phone: (205) 824-7767
    Fax: (205) 824-7768

**ALTERS LAW FIRM, P.A.**

By: ____/s/ *Jeremy W. Alters*___
    Jeremy W. Alters (FL #111790)
    jeremy@alterslaw.com
    Justin D. Grosz (FL #984000)
    justin@alterslaw.com
    Matthew T. Moore, Of Counsel (FL
    #70034)
    matthew@alterslaw.com
    Design Center of the Americas
    1855 Griffin Road, Suite C470

Dania Beach, FL 33004
Phone: (305) 571-8550
Fax: (305) 571-8558

**GIEGER, LABORDE & LAPEROUSE, LLC**

By: ___/s/ *Victoria E. Emmerling*_____
    Andrew A. Braun (LA #3415)
    abraun@glllaw.com
    Victoria E. Emmerling (LA #33117)
    temmerling@glllaw.com
    701 Poydras Street, Suite 4800
    New Orleans, Louisiana 70139-4800
    Phone: (504) 561-0400
    Fax: (504) 561-1011

    *Attorneys for Morris Bart, L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 15th day of July, 2016.

___/s/ *Jimmy R. Faircloth, Jr.*_____
OF COUNSEL
