UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION       MDL NO. 2047

           SECTION: L

           JUDGE FALLON
           MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO:
*ALL CASES*
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

THE FEE COMMITTEE'S OMNIBUS RESPONSE TO OBJECTIONS
TO THE FEE COMMITTEE'S MOTION TO DETERMINE THE ALLOCATION
OF THE GLOBAL FEE AWARD AS BETWEEN COMMON BENEFIT FEES
AND INDIVIDUAL COUNSEL'S FEES PURSUANT TO PTO 28(F)

Russ M. Herman (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
HERMAN, HERMAN & KATZ, L.L.C.
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
LDavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel MDL 2047*
*Co-Chair/Secretary Fee Committee*

Arnold Levin
Fred S. Longer
Sandra L. Duggan
Matthew C. Gaughan
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street., Suite 500
Philadelphia, PA  19106
Phone:  (215) 592-1500
Fax:  (215) 592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*
*Chair Fee Committee*

Gerald E. Meunier
Gainsburgh, Benjamin, David,
 Meunier & Warshauer, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com
*Co-Counsel for Plaintiffs and PSC Member/Fee Committee*
 *Member*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.    STATEMENT OF FACTS...................................................................................4

    A.  The Interrelatedness of the Settlements Justifies a Unitary
        Analysis of the Funds Available for Distribution ...............................................4

    B.  The Process Leading to the Determination of Funds Available to
        Compensate Common Benefit Counsel and Individually Retained Counsel ......9

    C.  Objectors Seek to Deprive Common Benefit Counsel of Fair
        Compensation for the Benefits They Conferred Upon the Class.........................11

        1.  The Inventory-Driven Common Benefit
            Objectors' Motivations Are Misplaced..........................................................14

        2.  The Free-Rider Contract Attorney Objectors'
            Motivations Are Misplaced.............................................................................17

III.    ARGUMENT ...................................................................................................19

    A.  Neither the Selection nor the Process of the Fee Calculation Methodology
        Proposed by the PSC Fee Committee has been Effectively Challenged
        by Objectors .......................................................................................................19

    B.  The Objectors Fail to Support Their Substitute Values for the Key
        Variables Under the Blended Methodology ........................................................25

    C.  The Resulting Fee Allocation Between Common Benefit/Class Counsel
        and Individual, Private Counsel is Fair and Reasonable.....................................32

IV.    CONCLUSION...................................................................................................34

# TABLE OF CITATIONS

**Page(s)**

*Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991)................................29

*Gascho v. Global Fitness Holdings, LLC*, 2016 WL 2802473
 (6th Cir. 2016)........................................................................................................29

*In re Air Crash Disaster at Florida Everglades on December 29, 1972*,
 549 F.2d 1006 (5th Cir. 1977) .................................................................................3

*In re Cardinal Health Inc. Securities Litigs.*, 528 F.Supp.2d. 752
 (S.D. Ohio 2007)......................................................................................................30

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liab.
 Litig.*, 553 F.Supp.2d 442 (E.D. Pa. 2008), *aff'd*, 582 F.3d 524 (3d Cir. 2009) .................30

*In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D.
 366 (S.D. Ohio 1990)...............................................................................................28

*In re High Sulfur Content Gasoline Products Liab.*, 517 F.3d 220 (5th Cir. 2008) .............24

*In re Vioxx Prod. Liab. Litig.*, 574 F.Supp.2d 606 (E.D. La. 2008). ...................................23

*In re Vioxx Prod. Liab. Litig.*, 760 F.Supp. 640 (E.D. La. 2010) .........................................2, 22

*In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488 (E.D.N.Y.2006) ...............................23

*Lachance v. Harrington*, 965 F.Supp. 630 (E.D. Pa. 1997...................................................31

*Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2015) ........................................................34

*Strong v. BellSouth Telecomm., Inc.*, 173 F.R.D. 167 (W.D. La. 1997), *aff'd*,
 137 F.3d 844 (5th Cir. 1998) ....................................................................................28

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5 Cir.),
 *cert. denied*, 133 S.Ct. 317 (2012)...........................................................................20

*U.S. v. Cook*, 592 F.2d 877 (5th Cir. 1979) ........................................................................13

*Wings v. Asarco Inc.*, 114 F.3d 986 (9th Cir. 1997) ............................................................29

## <u>OTHER AUTHORITIES</u>

28 U.S.C. §1332(d) ..................................................................................21

Fed. R. Civ. P. 23(h) ..............................................................................30

Fed. R. Evid. 404(b) ...............................................................................13

## I.     **INTRODUCTION**

Pursuant to Pretrial Order No. 28(F), the Fee Committee ("FC") submits this response to the various objections to the FC's allocation motion.[1]   The common benefit lawyers whose labors achieved more than $1.1 billion in remediation and other benefits for thousands of class members and the funds available for attorneys' fees pursuant to a series of interrelated and interdependent class settlements are now besieged by objecting counsel complaining that the results were not good enough, and that the objectors should share more greatly in attorneys' fees than the lawyers who actually produced the funds.   Unlike the objectors, there is a dedicated cadre of common benefit counsel who continue to labor to administer these settlements and the Court's docket.   Nonetheless, these objectors, with few exceptions, did little to contribute to the creation of the fund but strenuously object to the obligation to pay for the benefits the common benefit lawyers bestowed upon them.

This is a remarkable case, with 10,000 plaintiffs, and thousands of defendants, including foreign defendants in both Germany and China.   By the Court's own account it is the most

---

[1] Objections to the Motion to Determine the Fee Allocation were filed by the following law firms: 1) Alters Law Firm, P.A. [Rec Doc. 20355]; 2) Baron & Budd, P.C., Allison Grant, P.A. & Alters Law Firm, P.A. [Rec. Doc. 20353]; 3) Cohen, Milstein, Sellers & Toll PLLC and Mrachek, Fitzgerald, Rose, Konopka, Thomas & Weiss, P.A. [Rec.Doc. 20343]; 4) Collins & Horsley, P.C. [Rec.Doc. 20351]; 5) Doyle Law Firm [Rec.Doc. 20350]; 6) Gentle, Turner, Sexton & Harbison, LLC and McCallum, Hoaglund, Cook & Irby, LLP [Rec.Doc. 20336]; 7) Hawkins/Gibson, PLLC [Rec.Doc. 20356]; 8) Paul A. Lea, Jr. [Rec.Doc. 20344]; 9) Milstein, Adelman, Jackson, Fairchild & Wade, LLP and Roberts & Durkee, P.A. [Rec.Doc. 20337]; 10) Morgan & Morgan, P.A. and other individual attorneys [Rec.Doc. 20354]; 11) Parker Waichman, LLP [Rec.Doc. 20348]; 12) Taylor Martino [Rec.Doc. 20338]; 13) Whitfield, Bryson & Mason LLP, Pendley, Baudin & Coffin, Rhine Law Firm and Luckey & Mullins [Rec.Doc. 20346]; 14) Willis & Buckley, APC [Rec.Doc. 20349]; and 15) Yance Law Firm, LLC [Rec.Doc. 20357].   The FC will separately respond to the objections submitted in connection with notice issued by Brown Greer regarding the actual recovery of each claimant pursuant to PTO 28(F), ¶6.

complex of complex litigations.[2]  Despite these complications, the PSC achieved a phenomenal result – $1.1 billion in settlements in which thousands of property owners have had their homes completely remediated.  Few, if any, of the objectors helped create the settlement funds that are the subject of the current allocation motion, but *all* of the objectors want a disproportionate share of the allocation in relation to their contribution.  Thus, the objections present the classic "taffy pull" earlier described by this Court between contract attorneys, who merely face a reduction of their anticipated retainer contract percentage, and common benefit lawyers, who face a reduced return on their sweat equity that created the disputed attorneys' fees in the first instance.[3]

---

[2] *See In re Chinese Manufactured Drywall Prod. Liab. Litig.*, MDL No. 2047, Status Conference at 13:15-22 (E.D. La. May 20, 2015) ("This case is different than a lot of cases . . . In this case not only did we have 20,000 or thereabouts plaintiffs, but we had over 1,000 defendants. We have got 1,400 lawyers in this case as opposed to the cases where you don't have as many lawyers, so that has posed a challenge."); Status Conference at 5:21-6:2 (E.D. La. Jun. 14, 2011) (noting "this case is a little different" and "very difficult"); Status Conference at 20:14-21 (E.D. La. Jan. 20, 2011) ("As you can see, the scope of the litigation is rather daunting. . . . The case presents challenges because I have 1,200 lawyers in this particular case. We have a thousand defendants, 20,000 or so plaintiffs, and 1,200 lawyers. So you can see the challenge that that poses from a logistical standpoint, an organizational standpoint."); Status Conference at 23:3-8; 23:13-15 (E.D. La. Apr. 26, 2012) ("This case is exceptionally challenging because of the numbers that we're dealing with."); Status Conference at 13:2-7 (E.D. La. Nov. 9, 2012) ("You know, oftentimes we're dealing with two or three defendants and a number of plaintiffs, but this one we have got a little unusual situation. We have about a thousand defendants and so it's a difficult thing to coordinate all of that and for you to know it without having heard it."); Status Conference at 6:9-15 (E.D. La. Jan. 23, 2013) (noting that bringing all the parties to the Global Settlement "was a monumental undertaking."); Joint Fairness Hearing at 36:1-6 (E.D. La. May 21, 2013) (noting the MDL "presented some challenges," and that the numbers of parties made the matter "unusual."); Status Conference at 25:15-20 (E.D. La. Aug. 20, 2013) (Noting the MDL "has been made more complicated" by the number of defendant parties); and Status Conference at 10:1-2 (E.D. La. Feb. 20, 2014) ("In this case, we have 1400 lawyers, so without a committee, you couldn't handle it.") [a compendium of the referenced Transcript excerpts is attached hereto as Exhibit "1"].

[3] *See In re Vioxx Prod. Liab. Litig.*, 760 F.Supp.2d 640, 653 (E.D. La. 2010).

The objecting attorneys seek to embellish their *bona fides* with work product that is considered mere routine, the ordinary back-and-forth of client relations, and the mundane costs of doing business.  From their perspective advertising for clients, attending town hall meetings (with an eye towards signing up new clients to their retainer agreements), attending house inspections (to observe their experts actually do the inspection), filling out settlement claim forms, and the like, are as important and labor intensive, or having as wide-spread impact as the PSC's retention of an investigator to conduct "boots on the ground" investigations for the PSC in Germany, Hong Kong, and mainland China; having Lead and Liaison Counsel, and other key PSC members, review documents, prepare for, travel to Germany, China, the United Kingdom, and numerous U.S. Cities to take the key depositions of numerous employees, directors and officers of the manufacturers and importers of Chinese drywall; and prepare and serve Freedom of Information Act requests on key governmental agencies, among other things.

No doubt, the effort to maintain client relations with agitated clients whose homes were literally invaded with defective drywall, was no small feat and could prove extremely challenging. However, these interactions were professionally obligatory.  Without trying to diminish these efforts, they are not on the same level of complexity, or parallel to the effort expended by common benefit counsel who prosecuted this exceptionally challenging, protracted and daunting litigation.  Thus, the Fifth Circuit's mandate to ensure that counsel are adequately compensated for doing the common benefit work of those counsel who benefit from these efforts should apply.[4]

---

[4] *See In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1020 (5th Cir. 1977).

II.   **STATEMENT OF FACTS**

    A.  **The Interrelatedness of the Settlements Justifies a Unitary Analysis of the Funds Available for Distribution**

       Following the resounding success of the contested *Hernandez* trial which resulted in seminal Findings of Fact and Conclusions of Law by the Court regarding the proper scope of any remediation protocol and remediation costs, in October 2010, the PSC and Knauf entered into a Court-approved pilot program for the remediation of homes containing Knauf's drywall.  The Pilot Program remediated over one thousand homes and demonstrated to Knauf, the PSC, and the Court, the potential for a remediation program in which homes could be repaired under Knauf's supervision, and with the contribution of additional funds from other defendants in the chain of supply.

       Building on this model, the PSC and Knauf recognized the benefits of capturing the contribution of funds from the many defendants in the chain-of-commerce (which were sometimes called "low-hanging fruit") on the way to a much broader remediation program. Since liability could be allocated among other responsible parties in the supply chain, thereby limiting the amount of any judgment against any Knauf Defendant to only that percentage of the judgment for which that Knauf Defendant was determined to be at fault, both parties seized on the opportunity to obtain contribution from as many supply chain defendants as possible.  After all, to be fully compensated, Plaintiffs likely would have to rely on recovering from other entities in the supply chain, some of which might be judgment proof.  The Pilot Program was the seed from which sprung the plan for global resolution of the Knauf supply-chain.

       With the guidance of the Court and with the cooperation of Knauf, the PSC engaged in protracted and arm's-length negotiations with hundreds of builders, installers, suppliers, and their insurers, as well as the manufacturer, Knauf.   The PSC reached a series of five separate, but

4

inter-related and inter-dependent class settlements with: (1) supplier Interior Exterior Building Supply, LP ("InEx") and its insurers (the "InEx Settlement"); (2) the Banner entities and their insurers (the "Banner Settlement"); (3) L&W Supply Corporation ("L&W") and USG Corporation (the "L&W Settlement"); (4) the Knauf Defendants (the "Knauf Settlement"); and (5) more than 700 additional Participating Builders, suppliers, Installers, and their Participating Insurers (the "Global Settlement").  Together these inter-related settlements offered a comprehensive resolution of claims asserted by owners and tenants whose homes or businesses contain KPT Chinese Drywall and who filed lawsuits prior to December 9, 2011 with the Knauf Defendants and with numerous other entities in the supply chain.

The history of these settlements is well-described.  In the spring of 2011, Interior Exterior Building Supply ("InEx"), a major supplier of Chinese drywall in the gulf coast, was the first to enter into a class action settlement agreement and the Court preliminarily approved this agreement. This agreement provided for the tendering of all of InEx's primary insurance proceeds in the amount of $8,000,000 and an assignment of claims against InEx's excess carrier, North River Insurance Company, for the benefit of a national class with claims against InEx involving Chinese drywall.

The next notable event occurred in the summer of 2011, when the Banner entities, also major suppliers of Chinese drywall in the gulf coast, entered into a class action settlement agreement and the Court preliminarily approved this agreement. The Banner settlement agreement provided that Banner and its insurers would provide $54,475,558.30 for the benefit of a nationwide class consisting of all persons or entities with claims against Banner arising from or otherwise related to Chinese drywall.

Subsequently, in December 2011, the Knauf entities entered into a class action settlement agreement with plaintiffs. This proposed class settlement agreement was intended to resolve claims made in filed actions which arose out of KPT Chinese drywall installed in properties in the United States. The Court granted preliminary approval of this settlement agreement on January 10, 2012. [Rec. Doc. 12138].  Since neither the L&W Settlement nor the Global Settlement had yet been finalized, however, the Court recognized that in order to properly consider whether to remain as a Class Member in any of the settlements or opt out therefrom, the inter-related settlements must be considered together as a group. Accordingly, the Court extended all opt-out and objection deadlines to September 28, 2012:

> All of the proposed class action settlements are inter-related, and therefore (1) decisions on whether to opt out or object to any particular settlement should be made in light of the existence of all of the proposed settlements; (2) all of the settlements are properly considered together in determining whether they are fair, adequate and reasonable; and (3) there should be a consolidated fairness hearing with respect to all of the proposed class action settlements, and coordinated opt out, objection and briefing deadlines, in order to promote judicial economy.

Order dated June 4, 2012 at 2 [Rec. Doc. 14566].[5]

By extending the opt-out deadlines and granting Class Members the option of opting back into the settlements upon reconsideration of all of the settlements together, this Court recognized the interrelated and inter-dependent nature of these settlements. The opportunity to "opt-back-into" the settlements was important to the success of these global resolution efforts,

_____

[5] *See also* Orders adjourning previous opt-out/objection deadlines for the various class settlements throughout the class settlement period [Rec. Doc. Nos. 10185, 11910, 11911, 12478, 12768, 14566].

because substantial class participation in each of the settlements was a vital component of not only the individual settlements themselves but also the other settlements.

For example, the Settlement Agreements expressly provided that "[t]he Parties agree and acknowledge that any opt-out may be detrimental, so ... each of the [Parties] will have a right to terminate the Settlement on account of the existence of any opt out." *E.g.*, Amended Knauf settlement, Section 8.3.1; accord Amended InEx Settlement, Section 7.3.1; Banner Settlement, Section 6.3.2; L&W Settlement, Section 8.3.1; Amended Global Settlement, Section 8.3.2.   A similar right was granted to Knauf which permitted it to terminate its agreement if the other settling defendants terminated their settlements.   Amended Knauf Settlement, Sections 4.8.5, 13.2.1.  Further evidencing the fact that the settlements were intertwined, it was a condition precedent of the Knauf Settlement that the still unresolved Global Settlement become final and effective.  *Id.* at Section 2.1.  Such express language in the agreements themselves confirmed their interrelatedness.

Following the Knauf Settlement, in March 2012, L&W, a third major Chinese drywall supplier, entered into a class action settlement agreement. The L&W Settlement was a component of the plan for universal resolution of the Knauf/KPT supply chain in this litigation. The Court granted preliminary approval of the L&W settlement agreement on April 26, 2012. [Rec. Doc. 14033].

The final link in this chain of events was the negotiation of the class action settlement agreement involving the Global Settlement. The Global Settlement was entered into by the Plaintiffs' Steering Committee on behalf of claimants, except those with affected properties in

Virginia, and certain Builders, Installers, and Suppliers.[6] This Court granted preliminary approval of the Global Settlement on June 4, 2012. [Rec. Doc. 14562]. The Global Settlement provided for a total payment of $82.7 million (subject to certain credits) for class members regardless of the type or brand of Chinese drywall in their properties and regardless of whether they filed their claims in the MDL or another forum.  [Rec. Doc. 15695-2].

These settlements were all interrelated and interdependent.  They resolved all claims, counterclaims, and third-party claims among the settling parties.  The releases to this effect were all approved by the court in its Order dated February 7, 2013.  [Rec. Doc. 16570] Therein, after reciting the litany of settlements, the Court held: "These settlements are all interrelated and interdependent.  They resolve all claims, counterclaims, and third-party claims among the settling parties." [Rec. Doc. 16570 at 6].

Following the approval of the settlements themselves, the parties entered into Allocation Plans which implemented the terms of the settlements.  Some of these terms effectuated the contribution Knauf demanded in order to accomplish global resolution.  *See, e.g.*, Second Amended Settlement Allocation Plan for Settlement Involving Builders, Installers, Suppliers and Participating Insurers ¶11.  Once again, the interrelated and interdependent nature of the settlements was reinforced.

As if this history was not enough to remove any doubt of the settlements' interrelatedness,  the *de facto* relatedness between all of the settlements is confirmed by this Court's Order of February 1, 2016 [Rec.Doc. 20022].  Therein, the Court ordered all of the Qualified Settlement Funds supporting the Banner, InEx, Global, L&W, Builders Mutual,

---

[6] The interrelated Virginia Settlements involving Builders Mutual, Nationwide, Porter Blaine/Venture Supply, and Tobin Trading were negotiated in parallel to the Global settlement, and modelled after the same, although they came to fruition after the Global Settlement.

Nationwide, Porter Blaine/Venture Supply, and Tobin Trading be transferred to the Knauf

Attorney Fee Settlement Fund, and that the other funds be closed, so that only the singular Knauf

QSF account exists.

### B. The Process Leading to the Determination of Funds Available to Compensate Common Benefit Counsel and Individually Retained Counsel

Beginning with PTO 28, which was filed on January 10, 2014, this Court issued a series

of orders "to allow for the determination of making an award of attorneys' fees and

reimbursement of litigation expenses, and subsequently an allocation from such an award." *See*

Order of May 17, 2016 at 2 [Rec.Doc. 20257].  Pursuant to these directives, on May 16, 2014,

the FC along with the PSC filed their Consolidated Joint Petition for a Global Award of

Attorneys' fees and Reimbursement of Expenses ("Joint Fee Petition") [Rec. Doc. 17700].

Thereafter, consistent with its mandate, the FC engaged in extensive preliminary efforts, which

included interviews of attorneys seeking common benefits, to reach the point where it could

make appropriate allocation recommendations.

In anticipation of the Court ruling on the Global Award, on April 15, 2016, the FC along

with the PSC filed their First Amendment to the Joint Fee Petition [Rec. Doc. 20205].   Therein,

the FC/PSC noted that with the deposit of additional settlement funds in the amount of

$13,592,762.95 by the Knauf Defendants into the Knauf QSF Attorney Fee account, the global

request for Attorney's Fees and costs reimbursement should be adjusted to $192,981,363.35.  No

objection was filed to the First Amendment.

In its Order of May 17, 2016, this Court granted the request and issued its global award

of attorneys' fees and reimbursement of expenses in the amount of $192,981,363.35.  *See* May

17, 2016 Order at 3.  In so ruling, the Court noted its intent to separately address the voluntary

common benefit payments made pursuant to the March 25, 2011 Order [Rec.Doc. 8389], and the

additional fee and cost payment of $2.4 million associated with the North River Stipulation.  *Id.* at 3 n.3.

No objection to the May 17, 2016 Order was filed.

Subsequently, on May 25, 2016, PTO 28(F) issued [Rec.Doc. 20282].  This Order reiterated that "[t]he Court has determined that the total funds available for distribution at this time, for common benefit fees, common benefit costs, and individual counsel's fees, is $192,981,363.35." *Id.* at 2.  It also noted that Mr. Garrett, the Court-appointed CPA, had confirmed the funds available for common benefit fees, and that the allocation for North River funds "will be addressed at a later date in a separate filing."  *Id.* at 2 n.2.  The Order then set a briefing schedule for the Allocation Motion *sub judice*.  There were no objections to the May 25, 2016 Order.

Although this Court has twice ruled that the funds available for distribution at this time are $192,981,363.35, many of the objectors have reinterpreted this Court's Orders and taken contrary positions.  Nevertheless, the FC contends that the numbers are an accurate reflection of the funds available.  Mr. Garrett's analysis confirms that grand total of attorneys' fees received was $233,078,270.33.  *See* Revised and Updated Affidavit of Philip A. Garrett, C.P.A. Pursuant to Pretrial Order No. 28(F), Exb. 2 [Rec.Doc. 20290-5 at 18].  After accounting for appropriate expenses,[7] Mr. Garrett confirmed that the available funds for common benefit and individual retained attorneys is $192,981,363.35.  *Id.*

---

[7] For example, several objectors challenge the $10 million set aside to prosecute the Taishan defendants.  These objectors are likely unaware of the commitment that the PSC made to the Knauf Defendants in connection with the Knauf Settlement to continue to prosecute the class' claims against the Taishan Defendants, which was in addition to our ongoing responsibility to pursue these claims for Taishan claimants.

While subject to dispute (which is discussed *infra*), the FC concluded that aggregate value of the settlements at issue is appropriately $1,120,313,305.90.   Based upon the FC's recommendation to employ the "blended" percentage-of-fund method using the *Johnson* factors, resulting in a factor of 10.65% of the Settlement Fund, this justifies an allocation of $119,313,367.08 for Common Benefit Attorneys.   Taking into account this Court's direction that it would separately address the voluntary payments of $3,332,058.26, and the North River fund for attorneys' fees of $1,400,000.00, the common benefit allocation is reduced to $114,581,308.82.   Deducting this allocation from the funds available for distribution results in an award of $78,400,054.53 for Contract Attorneys.

### C. Objectors Seek to Deprive Common Benefit Counsel of Fair Compensation for the Benefits They Conferred Upon the Class

Many of the current objectors to the FC's Petition for Common Benefit fees are common benefit fee applicants themselves who have done an about-face at the end of a very long and arduous process in order to serve their own interests rather than support fair and adequate compensation for Common Benefit Counsel.[8]   For years, these Common Benefit Objectors submitted time and expenses, on a monthly basis, to Mr. Garrett pursuant to PTO 9.   This

---

[8] *E.g.,*  1) Alters Law Firm, P.A. [Rec Doc. 20355]; 2).Baron & Budd, P.C., Allison Grant, P.A. & Alters Law Firm, P.A. [Rec. Doc. 20353].; 3) Cohen, Milstein, Sellers & Toll PLLC and Mrachek, Fitzgerald, Rose, Konopka, Thomas & Weiss, P.A. [Rec.Doc. 20343]; 4) Milstein, Adelman, Jackson, Fairchild & Wade, LLP and Roberts & Durkee, P.A. [Rec.Doc. 20337]; 5) Morgan & Morgan, P.A. and other individual attorneys [Rec.Doc. 20354]; 6) Parker Waichman, LLP [Rec.Doc. 20348]; 7) Whitfield, Bryson & Mason LLP, Pendley, Baudin & Coffin, Rhine Law Firm and Luckey & Mullins [Rec.Doc. 20346] (referred to hereafter as "Common Benefit Objectors").   The objection of Taylor Martino [Rec.Doc. 20338] is distinct from the other objectors as it presents unique concerns.   Accordingly, the Taylor Martino objection will be addressed separately in connection with its Prichard Housing Authority's and Taylor Martino, P.C.'s Motion for Payment of Attorneys' Fees and Expenses Pursuant to the Stand-Alone Settlement Agreement with Knauf [Rec.Doc. 20341].

required the PSC to incur substantial expense for Mr. Garrett to review those submissions, as well as any resubmissions after disallowance, and prepare reports according to the Court's protocols.  Then, the Common Benefit Objectors prepared common benefit fee affidavits and participated in common benefit fee interviews before the FC in accordance with PTO 28.  The PSC and/or FC members incurred further expense to analyze all of the materials submitted by the Common Benefit Objectors, including their time records and held costs, prepare for and oversee the fee interviews, and compensate the court reporter. This process resulted in many of the Common Benefit Objectors removing substantial amounts of improperly attributed time or expenses--in one instance counsel withdrew 10,402.90 hours, and in another instance counsel withdrew 7,982 hours--that were acknowledged to have been submitted as common benefit time or expense when, in fact, they were actually spent servicing individual clients (*e.g.*, certain counsel had to be told that they could not legitimately expense their costs to attend their Fee Committee interview).   Finally, after purporting to be Common Benefit Counsel and after signing onto the Joint Fee Petition, not only as "Joint Petitioners" but also in some cases as members of the PSC,[9] the Common Benefit Objectors have the audacity to suggest that Common Benefit Counsel are not entitled to fair compensation for years of work that resulted in over $1.1 billion in benefits to Class Members.

Rather than embarrass these Common Benefit Objectors on the public record, the FC is filing under seal memoranda detailing myriad improprieties in their time and expense billing practices throughout this litigation.   These specific examples of overstatements of time and expenses by the objectors establish that until the FC called into question the veracity of their

---

[9]*E.g.* Morgan & Morgan, P.A, Parker Waichman, LLP, Whitfield, Bryson & Mason LLP, and former PSC members including, Mr. Alters and Baron & Budd.

submissions many objectors were content with the value of the attorneys' fee fund until it was apparent that their common benefit submissions would not result in a generous payday.  Copies of these firm-specific documents will be served on each of the Common Benefit Objectors, concurrent with the filing of this Reply.  Should the Court appoint a liaison counsel for the objectors, that counsel will also be provided the under seal documents.

Even amongst themselves, the objectors present an assortment of inconsistent and wildly differing views regarding the appropriate allocation of the global fee award as between common benefit fees and individual counsel's fees based upon their own motivation to maximize their recoveries.[10]  Their views are animated without regard to the extraordinary benefits conferred upon their clients by Class Counsel, and derivatively upon themselves.  Some objectors actually propose that individually retained counsel receive 80% of the funds available for distribution -- diminishing the value of the Common Benefit Counsel's efforts to the point of incredulity.  This boorish behavior could almost be excused for some of the objectors (although we do not excuse it), but it is intolerable coming from PSC members and firms closely associated with them, who have demonstrated no interest or fidelity to the efforts of the PSC and Class Counsel. Such a departure from protocol approaches the level of a breach of fiduciary duty since these objectors, having never objected to the fee awards in any of the seminal class action settlement agreements giving rise to the fees at issue, are singularly focused upon self-aggrandizement from the

---

[10] Evidence of prior acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). As the Advisory Committee Notes to Rule 404 reflect, this admissibility is "fully applicable to both civil and criminal cases." Such evidence is admissible when introduced as to "other activities" relevant to motive or course of conduct. *U.S. v. Cook*, 592 F.2d 877 (5th Cir. 1979).

prosecution of their inventory of individual cases after recognizing that their inflated common benefit recovery would not be countenanced.

The objectors can therefore be compartmentalized into two categories: 1) those previously-committed common benefit counsel that now espouse a parochial self-interested view, and 2) those contract attorneys who never contributed any common benefit effort, but who intend to reap the rewards of the benefit.

**1. The Inventory-Driven Common Benefit Objectors' Motivations Are Misplaced**

The Common Benefit Objectors were at an earlier time committed to developing the general liability themes in the litigation on behalf of the whole array of plaintiffs, albeit while still acting as retained counsel to their personal client base. These common benefit counsel supported the PSC's efforts to globally resolve the KPT litigation in the fashion that was presented to and approved by the Court. Throughout the approval process, the payment of attorneys' fees separate from client recoveries was well-known since the intent of the Knauf settlement was always to insure as much as possible that client properties were fully remediated. At no point did any of these common benefit objectors ever file objections or announce to the Court objections to the totality of the fund

Nevertheless, as these objectors' expectations of common benefit fee and cost recoveries have now diminished, they naturally and predictably turned towards maximizing their fee recoveries through an allocation weighed in favor of their retainer agreements. As set forth in separate appendices filed under seal, the FC describes the motivations underlying the objections of each of these objectors:

1. The Alters Law Firm;[11]
2. Baron & Budd, P.C.[12]
3. Cohen Milstein/Mrachek, Fitzgerald, Rose, Konopka, Thomas & Weiss, P.A.[13]
4. Milstein, Adelman, Jackson, Fairchild & Wade, LLP/Roberts & Durkee, P.A[14]
5. Morgan & Morgan, P.A.[15]
6. Parker Waichman, LLP[16]
7. Whitfield, Bryson & Mason LLP/Pendley Baudin & Coffin/Rhine Law Firm/ and Lucky & Mullins.[17]

Collectively, these objectors have contributed but a small fraction of the overall common benefit time submitted to the FC for review through year-end 2013.  Out of the total number of hours of professional time considered by Mr. Garrett (232,309.35),[18] these counsel submitted only 33,791.52 hours or 14.5%.[19]  In contrast, non-objecting Common Benefit Counsel expended 85.5% of the hours to provide the funds that we are now allocating.  As significant as this vast majority difference is, it does not reflect, nor take into account the untold exertions (many of which are still ongoing and not currently subject to compensation) necessary to administer the challenges presented by the settlements, including ongoing dialogues (thousands of which were

---

[11] *See* Appendix A [filed under seal].

[12] *See* Appendix B [filed under seal].

[13] *See* Appendix C [filed under seal].

[14] *See* Appendix D [filed under seal].

[15] *See* Appendix E [filed under seal].

[16] *See* Appendix F [filed under seal].

[17] *See* Appendix G [filed under seal].

[18] *See* Revised and Updated Garrett Aff., ¶16.

[19] *See* Declaration of Philip A. Garrett, CPA, ¶3 (attached hereto as Exhibit 2).

made by the objectors) with Mr. Louis Velez,[20] the first Ombudsman ever appointed by a federal court to serve in such an unprecedented capacity, regular meetings with representatives of Moss and homeowners (and their counsel) over remediation disputes, frequent interfaces with BrownGreer, the Claims Administrator, and related interplay with Mr. Kerry Miller, counsel for Knauf.

Even more efforts have been devoted to attempt to procure even broader relief, including trying to verdict the coverage issue of InEx's excess insurance against the North River Insurance Company, continuing to aggressively pursue the unsettled claims against Taishan and its affiliated companies, and even the joint presentment of the class fee issues which are now before the Court.  Indeed, the ongoing lodestar for all Common Benefit Counsel for the period January 2014 through April 2016 is also inuring to the benefit of the objectors, who oppose the proposed allocation which fairly accounts for the efforts of both sets of counsel.  It is here that the disparity between Common Benefit Counsel and the objectors is most apparent.  Of the 59,325 hours submitted to Mr. Garrett for the time period January 2014 to April 2016, the objectors have devoted a paltry 883.25 hours to the common benefit, *i.e.,* 1.5%.[21]  These objectors abandoned the litigation after the Knauf funds became available and left it to the remaining Common Benefit Counsel to complete the task of administering the settlement and prosecute ongoing litigation.

---

[20] The objectors took full advantage of the services afforded the class settlements as it related to the provision of Mr. Velez's services.  Ironically, they now dispute the value of these administrative benefits.  A compendium of emails reflecting the usage of Mr. Velez by the objectors is attached hereto as Exhibit "3".

[21] *See* Declaration of Philip A. Garrett, C.P.A., ¶4.

### 2. The Free-Rider Contract Attorney
### <u>Objectors' Motivations Are Misplaced</u>

The second tranche of objectors all share the same characteristic: none has directly participated in any of the MDL proceedings.  In fact, each had the opportunity to pursue their litigation opportunities outside the MDL, either as part of a state court strategy involving available local defendants to destroy diversity jurisdiction or to opt-out their clients from the settlement.  Each intentionally, deliberately and strategically chose to forego the extraordinary costs and risks of such, sat "on the sidelines" and awaited the benefits conferred by the PSC and common benefit lawyers.

Additionally, each had the opportunity to alternatively participate as common benefit counsel.  However, each, again, intentionally, deliberately and strategically decided to provide no common benefit and submitted no common benefit time to the FC.  These objectors admittedly relied entirely on the work-product of the PSC, class counsel, and FC to have their clients' claims prosecuted against their drywall manufacturer and the other entities in the chain of commerce. They readily accepted the efforts of the PSC to file and serve the innovative and premier use of Omni Class Action Complaints on behalf of their clients, which allowed them to avoid the extraordinary cost (hundreds of thousands of dollars) borne by the PSC to perfect service of process under the Hague Convention.  They also willingly received the benefits of the PSC and Class Counsels' work product, including the prosecution of their clients' claims, the conducting of discovery against Knauf (and the PSC's (and related counsel, like Mr. Irpino) ongoing efforts to prosecute the class claims against the recalcitrant and stubborn Taishan

Defendants),[22] the negotiation of the class action settlements, the petitioning of the Court for approval of the settlements, and the subsequent efforts to administer the several interrelated and interdependent settlements.   They also willingly accepted and did not challenge the FC and PSC's Motion for a Global Award of Attorneys' Fees and Reimbursement of Expenses [Rec. Doc. 17687].   Yet, having all of this extraordinary courtroom work performed by common benefit counsel for them, their economic motivations are now laid bare by their unreasonable and legally unsupported positions.   These objectors include:

1. Collins & Horsley, P.C.[23]
2. Doyle Law Firm[24]
3. Gentle, Turner, Sexton & Harbison, LLC[25]
4. Hawkins/Gibson, PLLC
5. Paul A. Lea, Jr.
6. Willis & Buckley, APC
7. Yance Law Firm, LLC

---

[22] The PSC's consistent, ongoing, and significant contributions to the litigation continue uninterrupted. The PSC is solely and vigorously pursuing claims against the Taishan Defendants and their related entities, including their upstream entities – CNBM and BNBM. As part of the PSC's global settlement with the Knauf Defendants, the PSC agreed to continue the labor intensive task of pursuing the Taishan entities so that Knauf would not be at an economic disadvantage in the Chinese marketplace following the settlement. Thus, the PSC will continue to pursue Plaintiffs' claims against these Defendants in an effort to provide compensation for Non-KPT Property Owners. They will continue to prosecute these claims as long as necessary, recognizing the fiduciary obligations owed to these Plaintiffs and the Court continues to diminish remuneration for counsel.

[23] The firm has been the subject of client complaints for being non-communicative. *See* Order dated Nov. 7, 2012 [Rec. Doc. 16139].

[24] The firm is known to the Court having been the subject of client complaints for being non-communicative. *See* Orders dated July 18, 2014, Nov. 18, 2015 [Rec. Doc. Nos. 17870, 17873].

[25] The firm has been the subject of client communications to the Court. *See* Order dated Feb. 11, 2015 [Rec. Doc. 18318].

18

As discussed below, the objections should be overruled as the proposed allocation of the global fee award between common benefit fees and individual counsel's fees at 59.37% to 40.63% is fair, reasonable and fully supported by the fee jurisprudence of the Fifth Circuit.[26]

## III.   ARGUMENT

### A.  Neither the selection nor the process of the fee calculation methodology proposed by the PSC Fee Committee has been effectively challenged by objectors

At the threshold of the Court's common benefit fee allocation is the selection of an appropriate calculation methodology; and, notably, none of the objectors has meaningfully challenged the methodology proposed by the PSC Fee Committee.  This comes as no surprise.  The "blended" method for calculating a common benefit fee (*i.e.*, basing the award on a percentage of the settlement funds/recovery by plaintiffs, cross-checked for reasonableness through a lodestar calculation) is one which has been (a) utilized by this same Court in an MDL context (*Vioxx*), without appeal; (b) utilized by this Court in a Rule 23 class action context

---

[26] Further evidence of the fairness of this allocation is the recently submitted Memorandum of Understanding entered into between Various Homebuilders and the FC, Plaintiffs' Lead Counsel, and Plaintiffs' Liaison Counsel [Rec. Doc. 20381].  The MOU resolves the disputes regarding the entitlement of Various Homebuilders to a return of the remaining portion of the 32% attorneys' fees set aside from the Banner Settlement Agreement and Global Settlement Agreement associated with the Various Homebuilders' homes.  Therein, these Various Homebuilders, who are similarly situated class members in the Banner and Global settlements to those of the objectors' clients, have accepted the proposed allocation of 59.37% to 40.63%.  Movants have sought to treat the Various Homebuilders fairly and even allow counsel for LWH, LLC, Taylor Morrison, Inc., and the Ryland Group, Inc., to receive the same treatment as other Various Homebuilders, even though he intends to seek recognition as an "Active Builder" (which, of course, he was not).

This MOU was the subject of protracted negotiations by movants that were made to protect the class.  Movants' time and effort obtaining the MOU and other administrative matters are barely acknowledged by the objectors even though they are the beneficiaries of such.

(*Murphy Oil*), again without appeal; (c) approved as a method by the Fifth Circuit in *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir.), *cert. denied,* 133 S. Ct. 317 (2012) [endorsing a district court's use of the blended method in calculating the common benefit fee "in common fund cases."]; and (d) characterized by Your Honor in published professional literature as the method now adopted for common benefit fee calculation purposes by a "plethora" of district courts.  *See* PSC FC Brief at 7-9 [Rec. Doc. 20290-4].

The brief filed by a group of objectors collectively referred to as the "Sexton/Hoaglund firms" expressly concedes that these objectors "have no objection to the use of this methodology" [*i.e.*, the above-described "blended" methodology proposed by the PSC Fee Committee] in order to calculate the common benefit fee at issue.  *See* Objector Brief of Sexton/Hoaglund firms at 25 [Rec. Doc. 20336].  Similarly, the brief filed by objectors consisting of the firms of Whitfield Bryson & Mason, LLP, Pendley Baudin & Coffin, Rhine Law Firm, Luckey & Mullins, while insisting that the settlement fees at issue be characterized as resulting from a mass tort and not class action settlement, nonetheless proceeds with a fee calculation utilizing the precise "blended" methodology proposed by the PSC Fee Committee.  *See* Objector Brief of Whitfield Bryson, et al at 11-22 [Rec. Doc. 20346].  The objection brief filed on behalf of the firm Collins & Horsley, P.C. also adheres to the "blended" calculation methodology in setting forth its own proposed calculation of the common benefit fee herein.  *See* Objector Brief of Collins & Horsley at 32-42 [Rec. Doc. 20351].  And the brief filed on behalf of Parker Waichman LLP cites for the proposition that fee awards in common fund cases must be "reasonable under the circumstances," the very Fifth Circuit authority in *Union Asset Mgmt. Holding, supra*, which endorses the use of the blended method of fee calculation proposed by the Fee Committee.  *See* Objector Brief of Parker Waichman at 5 [Rec. Doc. 20348-1].

20

In those few instances where objectors <u>seem</u> to question the use of this widely-accepted methodology, they do so based on the "distinction without a difference" that the settlements at issue are mass tort and not class action settlements, and, more importantly, do so without offering either legal authority or a logical basis for an alternative method to calculate the common benefit fee. For example, the brief filed by Milstein, Adelman LLP and Roberts and Durkee LLP insists, on the one hand, that the mass tort/class action distinction herein, justifies something other than a "traditional common fund fee analysis," but then proceeds to cite cases in which benchmark percentages under the blended/percentage of fund methodology have been lower than the 8% benchmark percentage proposed by the PSC Fee Committee, in order to show that the percentage utilized to calculate the common benefit fee in this case should be lower than that fixed by the Court in the *Vioxx* case. *See* Opp. Mem. of Milstein, Adelman LLP and Roberts and Durkee LLP at 5-6, 14[Rec. Doc. 20337]. In effect, they challenge a starting benchmark percentage as step one in the blended method of calculation, and even allude to a case (*Vioxx*) in which Your Honor utilized the same method in an MDL settlement <u>not</u> implemented under Rule 23, while hinting that, somehow, a different methodology for the common benefit/class counsel fee allocation is in order.[27]

---

[27] The fact is, this case was pled under Fed.R.Civ.P. 23 (the various Omni Complaints, filed with the consent and cooperation of individual plaintiffs' counsel who presented their clients as class representatives, are class action complaints citing Class Action Fairness Act jurisdiction, 28 U.S.C. §1332(d)), and ultimately was settled under Rule 23. To assert that this case is somehow exempt from the blended methodology approved in a common fund/common benefit fee cases because it stands outside of Rule 23, even when it doesn't, is utterly fallacious reasoning both in fact and as a matter of law. This Court has employed the same "blended" methodology of a common benefit fee calculation in both the MDL mass tort settlement context (*Vioxx*) and in a classic Rule 23 settlement context (*Murphy Oil*). It also has recognized the "plethora" of district court matters in which the methodology has been employed. The Court's fee-setting authority, and its discretionary selection of an established fee calculation

The brief filed in objection by the Doyle Law Firm perhaps comes the closest to a frank challenge to the use of the "blended" methodology of calculation in these proceedings. This objector argues that, because the total fee fund at issue was established beforehand as part of the negotiated class settlements, the calculation of the common benefit fee at this juncture should be based on a percentage of that fee fund, as opposed to a percentage of the plaintiff class settlement fund/recovery. The Doyle objectors go so far as to suggest that this "percentage of fee" as opposed to "percentage of recovery" approach to determine the common benefit fee is the "only method that makes sense under the current circumstances." *See* Objector Brief of Doyle Law Firm at 3 [Rec. Doc. 20350]. It then is suggested that this "percentage of fee" calculation result should be cross-checked by either a percentage of recovery or lodestar calculation. *See id.* at 4.

It is an alternative method of calculating a common benefit fee allocation offered without any cited authority or case law support. The reason? There simply is none. Instead, straining for support, the Doyle objectors aver that their proposed "percentage of fee" calculation methodology is the "exact methodology…utilized in this Court's handling of the *Vioxx* litigation…." *See id.* at 4. This statement is remarkable for its lack of accuracy. The Court in *Vioxx* utilized the "blended" methodology to initially calculate the common benefit fee award in that matter, selecting a benchmark percentage of 6% and then making a slight upward adjustment of .5% through a *Johnson* factor analysis. The resulting 6.5% of recovery, as the calculated common benefit fee, was then subjected to a lodestar cross-check. *See In re Vioxx Prod. Liab. Litig.*, 760 F.Supp. 640, 650-662 (E.D. La. 2010). To suggest to this Court of all courts that the

---

methodology, are not dependent on whether the matter at hand is settled as a mass tort or a Rule 23 action, or a combination of the two.

common benefit fee in *Vioxx* was initially calculated as a percentage of the total <u>fee</u> available in that case, is an error as flagrant as one can imagine.  The percent-of-fund (not fee) calculation by Your Honor in *Vioxx* is a matter of unequivocal record.[28]

In any event, even the Doyle objectors ultimately proceed to suggest that the Court reduce the PSC Fee Committee's requested benchmark percentage <u>of recovery</u> (not of total fee) from 8% to 3.5% "to comport with rulings in similar MDL cases."  *See* Obj. Br. of Doyle at 8 [Rec. Doc. 20350-1].  At the end of the day, in other words, Doyle appears to align with the other objectors, acceding to the common benefit fee calculation methodology which is widely-used and approved in common fund cases (class actions or otherwise), but disputing the specific values assigned in the analysis.[29]

---

[28] Moreover, there is no sensible justification to calculate a common benefit fee by primary reference to private fees, notwithstanding the relevant consideration of that issue once the common benefit fee is calculated.  The primary objective in the analysis is discernment of a fair common <u>benefit</u> fee award, and the "benefit" referred to is that of the plaintiff clients, not that of other attorneys.  The policy underpinning of the common benefit fee award is service to those with claims, not to those with fee interests in the resolution of claims.  This is why courts have adopted a calculation methodology for a common benefit fee award which addresses the appropriate percentage of the benefit derived for <u>clients</u> in recovery.  Untethered to any recognized methodology, Mr. Dolye's proposal that common benefit counsel recover approximately only $39 million, after generating a lodestar in excess of $146 million, is insulting.

[29] Mr Doyle's Objection and those of others also border on challenging this Court's authority to police individually retained counsel's retainer agreements.  The authority of a district court to oversee private retainer agreements was indisputably put to rest by this Court in *In re Vioxx Prod. Liab. Litig.*, 574 F.Supp.2d 606 (E.D. La. 2008).  Even in the quasi-class context, this Court recognized that, "[c]ontingent fees may be disallowed as between attorney and client in spite of contingent fee retainer agreements, where the amount becomes large enough to be out of all proportion to the value of the professional services rendered."  *Id.* at 610-611, *quoting Gair v. Peck*, 6 N.Y.2d 97, 188 N.Y.S.2d 491, 160 N.E.2d 43, 48 (N.Y.1959). *See also In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488, 491 (E.D.N.Y.2006) (imposing cap on contingent retainer agreements).

23

Once the common benefit fee calculation is made, it is obvious – and the PSC has never denied – that the resulting division of fee between common benefit and private counsel is a matter of significance and must be considered.  As made clear in its original brief, the PSC Fee Committee in fact acknowledges that this division must be reasonable and fair under the circumstances of the case at hand.  To this extent, there is no dispute with the repeated insistence by objectors that the allocation sought by common benefit/class counsel must comply with a standard of fairness.  The fairness of this allocation, however, ought not be asserted to confuse the threshold question of how a common benefit fee is to be calculated.  The selection of a calculation methodology is required before the common benefit fee can be allocated, and thus, necessarily, before the Court then addresses whether the result in allocation between common benefit and private counsel is reasonable and fair.  That is precisely how the PSC Fee Committee brief has approached the matter at hand, and the Court no doubt will do likewise if precedent is followed.  The objectors offer no meaningful or supportable alternative.[30]

Aside from having failed to meaningfully challenge the fee calculation methodology proposed by the PSC Fee Committee, the objectors do not in any way appear to challenge the

---

[30] Virtually all of the objectors who insist on application of the "fairness" standard in regard to the common benefit/private counsel fee allocation, do so by reliance on the Fifth Circuit decision in *In re High Sulfur Content Gasoline Prod. Liab.*, 517 F.3d 220 (5th Cir. 2008).  In that class action settlement, the total fee award approved by the district court at a fairness hearing was unopposed.  *See id.* at 224.  The issue on appeal was the failure of the district judge to independently assess and determine how this total award should be allocated, a responsibility which the Fifth Circuit confirmed in vacating the fee allocation order.  The original brief of the PSC Fee Committee cites the case for its holding that a district judge must exercise this independent review and assessment authority in allocating a fee award among counsel.  *See* PSC FC Brief at 3 [Rec. Doc. 20290-4].  That the ultimate allocation among counsel should be fair and reasonable in this process virtually goes without saying.  But *High Sulfur* does not stand for the proposition that the required fairness of a common benefit/private fee allocation in any way contradicts, undermines, or supplants the accepted percentage of <u>fund</u> methodology for calculating a common benefit fee.

action steps to be taken by the Court in applying this blended methodology, *to-wit*: selection of a starting or "benchmark" percentage of recovery, followed by the appropriate adjustments upward or downward under the *Johnson* factors, followed by a lodestar cross-check for reasonableness. These, then, are the three steps the Court should proceed to take under the blended fee calculation methodology, and no argument or authority to the contrary has been presented in the objector briefing.

### B. The Objectors Fail to Support Their Substitute Values for the Key Variables Under the Blended Methodology

What the objectors ultimately place in dispute is neither the choice of calculation methodology nor the steps to be taken under same, but rather the specific values they believe the Court should assign to the three variables in the methodology formula:  (1) the benchmark percentage, (2) the *Johnson* factor adjustment, and (3) the valuation of the plaintiff recovery or settlement fund against which the adjusted percentage is to be applied.  The FC respectfully submits that what it has proposed for these three variables, *i.e.* an 8% benchmark, adjusted by a 2.65% *Johnson* factor application resulting in a 10.65% of recovery fee, and a benefit valuation of class recovery in the amount of approximately $1.12 billion, is in each instance well-supported in the factual record and in full accord with published and/or jurisprudential guidelines.  The proposed 10.65%, in particular, is reflective of and consistent with the case developments and contributions of appointed counsel which Your Honor has had the opportunity to observe and evaluate first-hand.  Conversely, the substitute values proposed by objectors simply do not fit the facts and circumstances of this unique MDL, but instead seem driven by discontent with the outcome of a proper and supportable analysis.

Specifically, nothing in what the objectors have presented should cause this Court to diminish the 8% benchmark proposed by the FC.  The FC has set forth both case precedent and

published literature to demonstrate that this percentage is a fair and reasonable starting point, and most critically, is a benchmark which fits the common benefit challenges overcome, efforts required, and outcome achieved in this MDL.  Likewise, the 2.65% *Johnson* factor adjustment proposed by the FC has not been shown by the objectors' arguments to be in any respect unreasonable or unfounded.  The Court in its discretion can surely find that the particular factors cited in the original brief are both applicable and fairly weighed.

Chief among these *Johnson* factors, of course, is the outcome achieved by common benefit counsel, which in turn draws attention to the third and final variable in the fee calculation methodology: the amount and value of the recovery by, and benefit conferred upon, plaintiff class members.

The objectors repeatedly insist on valuating the Knauf class settlement according to what the Court-appointed Settlement Administrator has identified as the amount of actual settlement payments made, including payments to Knauf's remediation contractor, Moss.  But nowhere in any of the objector briefs is there meaningful challenge to George Inglis' valuation of the remediation benefit conferred through the Moss remediation program, as a means to account for the <u>devaluation</u> achieved by Knauf through an economy of scale payment that clearly was never reflective of the value received by each plaintiff.  Put another way, nowhere is there a plausible reason given by objectors to use the figure of what Moss was actually paid to remediate properties, rather than take into account an unequivocal "economy of scale" discount reflected in the Knauf payment to Moss.  If objecting counsel were truly serious about an alternative valuation of these class settlements, they presumably would have presented expert declarations to demonstrate the impropriety or inaccuracy of the "economy of scale" adjustment made by Mr. Inglis.  This they chose not to do.  Instead, they simply argue that the Court should rely on actual

remediation payments to Moss, an argument which flies in the face of market reality.  Mr. Inglis remains uncontradicted and unchallenged.

Mr. Inglis' calculation of $515,643,751 as the most accurate figure to reflect the value of the settlement for those homeowners participating in Option 1 of the Knauf remediation program, is fully supported by his credentials and sworn analysis.  However, under the other programs in the Knauf settlement (besides Option 1 remediation by Moss) the actual payments made to property owners is reflected in the valuation chart and materials attached to the PSC Fee Committee's original brief.  In those cases, the true value of the settlements <u>is</u> reflected by the amounts actually paid to the homeowners, *i.e.,* $201,435,764.25 for non-Option 1 remediation payments, $41,714,601.42 for already remediated homes, and $4,232,227.01 for other loss payments.

Objectors also have failed to show why matters such as the defendant-funded fees and the intangible, not-yet-monetized services to benefit the class, should be excluded from a comprehensive settlement valuation.  The FC, on the other hand, has offered case law support for the proposition that a mass tort or class settlement resulting in the settling defendant's payment of fees which otherwise would be owed and paid out of recovery by plaintiffs, is a rightful and proper amount to be included in the valuation of the settlement, and that intangible, not-monetized benefits also are to be included in a class settlement valuation in the total valuation. Objectors offer no logic or reason to exclude these figures, figures which assign value to benefits clearly conferred on the plaintiffs through settlement.  These amounts remain important components of any true and complete settlement valuation.

That the valuation of the settlements at issue must include not only the tangible funds distributed to plaintiffs but also the non-monetized value realized as a result of the work of

common benefit counsel, is both logical on its face and legally justified; and while objectors are quick to discount the intangible benefits of the settlements, it is notable that they bolster their own contributions and services in the case with assertions of non-monetary, "enhanced benefits" they have delivered to their clients.  More than this, the efforts by the objectors to distinguish cases cited by the FC on this issue, are both misguided and unsupported.

For example, objectors argue that intangible education benefits were not included in the settlement valuation discussed in *Strong v. BellSouth Telecomm., Inc.*, 173 F.R.D. 167 (W.D. La. 1997), *aff'd*, 137 F.3d 844 (5th Cir. 1998). But the *Strong* Court made it clear that such benefits <u>were</u> real insofar as class members were concerned; it simply acknowledged that "[a]lmost all the value of this information…is already accounted for in the credits and cancellations requested by class members," and thus had been monetized and included in the valuation of the settlement. *Id.* at 170. In fact, having so found, the Court went on to consider additional intangible gains which were not reflected in the valuation, and increased the final valuation figure to reflect such benefits. *Id.* at 172.

Another flawed effort at distinction was made by objectors with respect to "significant non-monetary benefits" obtained by class counsel in the case of *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373 (S.D. Ohio 1990). The objectors' purported distinction of that case is flatly erroneous, for the non-monetary benefits found there to "unquestionably aid and financially benefit all Class Members," are clearly analogous to the non-monetary benefits of services attendant to the administration of the settlements providing recovery to plaintiffs herein.

Common benefit counsel in this MDL negotiated class settlements which entail claims administration, inspections to determine eligibility, dispute resolution services, remediation

processes, and other services attendant upon, and necessary to, effectuating these complicated

class settlements. The fact that the individuals and companies performing the services were not

specifically selected by common benefit counsel surely does not negate the fact that the costs of

these services were part and parcel of the benefits achieved for plaintiffs by common benefit

counsel.  Similarly, case law recognizing the value of medical monitoring benefits <u>does</u> support

the inclusion of administration costs and services in the matter at hand.  *See In Wings v. Asarco*

*Inc.*, 114 F.3d 986 (9th Cir. 1997).  The Court in that case acknowledged that the settlement

included a fund for medical monitoring to be replenished by the defendant if needed, and,

notwithstanding that a "complicated formula from which valuable considerations of several

kinds [were] provided to the class members" made it "impossible to determine the 'actual' value

of the recovery for percentage purposes," the Court affirmed the inclusion of the benefit in the

settlement valuation. *Id.* at 990.  The same logic, and conclusion, obtain here with respect to the

class services valued in the FC analysis.

That, as objectors point out, the Eleventh Circuit considers non-monetary benefits in its

*Johnson* analysis, does not preclude this Court from doing so in connection with the settlement

value. The failure to describe the intricacies of such consideration in *Camden I Condo. Ass'n,*

*Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991) was due to that factor not being at issue. Indeed, the

Eleventh Circuit is not the only place where non-monetary benefits are included in valuing

settlements. Because "litigants may agree to cash and noncash settlement components," the

benefit to the class must "give[] appropriate consideration to all components that the parties

found necessary for settlement." *Gascho v. Global Fitness Holdings, LLC*, 2016 WL 2802473,

*10-11 (6th Cir. May 13, 2016) (noting that circuits have treated the issue differently, with "many

maintaining a more case-specific approach and reviewing for abuse of discretion without

29

mandating a particular method").  Likewise, the Third Circuit approved of the valuation of an MDL settlement in terms of "all benefits, tangible and intangible, as a whole." *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 553 F.Supp.2d 442, 468 (E.D. Pa. 2008), *aff'd*, 582 F.3d 524 (3d Cir. 2009).  The non-monetary benefits valued in the settlement included the "extremely important benefit" of "at least obviating the uncertainty regarding the viability of those cases and preclud[ing] … statute of limitations defenses." *Id.* at 471. Because this benefit was attributable to efforts of both common benefit counsel and individual attorneys who subsequently litigated the opt-out cases, the District Court determined that one-half of the value of that benefit would be included in the total settlement value. *Id.* at 471-72. Here, by contrast, the intangible benefits to the class included in the FC's valuation were the result of common benefit counsel's efforts only, not those of individual attorneys.

The cases cited by Objectors in support of basing the award on net settlement amounts, *i.e.* excluding administrative services and costs, are inapposite in these proceedings.  The first and most notably distinct case they cite did calculate the percentage of attorneys' fees based on the net settlement, but did so **pursuant to statutory mandate**.  *See In re Cardinal Health Inc. Securities Litigs.*, 528 F.Supp.2d. 752, 771 (S.D. Ohio 2007) (noting that the Private Securities Litigation Reform Act,  15 U.S.C. § 78u–4(a)(6) [the "PLRSA"], required attorneys' fees and expenses awarded to class counsel to "not exceed a reasonable percentage of the mount of any damages and prejudgment interest *actually paid to the class*.") (emphasis in original). Class counsel sought a percentage awarded before subtracting expenses, which the Court declined, interpreting "actually paid to the class" to mean "the net amount that the class receives after the expert fees, litigation costs, and other expenses have been subtracted." *Id.* at 771. This exact statute is referenced in the Advisory Committee Notes to Fed. Civ. P. 23(h), and is unsuitably

cited by Objectors as requiring the valuation of a settlement to reflect only monies actually paid to class members. In fact, the Advisory Committee Notes indicate a central focus on "the result actually achieved for class members," not the amount actually <u>paid</u> to class members as is required by the PSLRA.  Moreover, the Notes proceed further to state that "in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fees award."

Another notably misguided citation by objectors was made in the case of *Lachance v. Harrington*, 965 F.Supp. 630 (E.D. Pa. 1997), which awarded attorneys' fees out of the net recovery of the class, after acknowledging that "most courts seem to apply the [percentage-of-recovery] methodology **to the gross settlement fund**." *Id.* at 647-648 (emphasis added). In point of fact, the jurisprudence relied upon by Objectors does not mandate that fee award be calculated on a net settlement fund.  These cases generally involve situations where the fees are calculated <u>before</u> removing from the recovery amount certain overhead administrative costs of individual firms.  Self-evidently, common benefit/class counsel in this litigation have never proposed, and do not seek, to include items such as secretarial or office expenses in the class settlement valuation.[31]  The "administrative" costs identified for valuation are those reflecting settlement finalization services performed by outside, qualified vendors under Court authority and oversight, all within the category of non-monetized but valuable benefits conferred on plaintiffs herein.

For common benefit/class counsel to have negotiated, or sought Court approval for, class settlements without the assurance and provision of qualified administration, dispute resolution, eligibility determination, and/or financial facilitation services, would have been imprudent at

---

[31] This is in contradistinction to some objectors, *e.g.*, Baron & Budd, who have included their office staff time to inflate their presentation.

best.  The $34,529,905.31 in administrative services and costs is appropriately included in the valuation of the settlement.

In sum, a total settlement valuation in the amount of $1,120,313,305.90 is supported both legally and as a matter of record in this case.

### C.  The Resulting Fee Allocation Between Common Benefit/Class Counsel and Individual, Private Counsel is Fair and Reasonable

Although the objectors' contention that the settlements and fee fund at issue are to be characterized as MDL mass tort settlements rather than class action settlements (a contention belied by the clear record), this truly represent a "distinction without a difference" in terms of the common benefit fee calculation.  For example, there is one aspect of this distinction which is quite meaningful, specifically with regard to the adequacy of the total fee set-aside.  Objectors have had more than one opportunity to challenge the fairness of the total fees funded by defendants under these class settlements: 1) when the settlements were presented for preliminary or final approval; 2) when the original PSC petition for fee approval was filed approximately 2 years ago; and 3) approximately 7 weeks ago, when the Court issued an Order approving the total fee amount of approximately $193 million.  *See* Order of 5/17/16 [Rec. Doc. 20257].  The process of approving and finalizing a class settlement, including fees to counsel under such a settlement, is specified in Rule 23.  Yet no objector, until now, chose to step forward and assert that an insufficient fee for all counsel to share had been funded by defendants under the class settlements.  For private counsel representing class members to now challenge the fee allocation sought by common benefit/class counsel on the basis that the latter failed to negotiate a higher total fee is both disingenuous, inconsistent with Rule 23, and an affront to the orderly process of this litigation.

That said, the "taffy pull" outcome of the PSC Fee Committee proposal, is what all of the filed objections ultimately are about; and, as stated in its original brief, the PSC Fee Committee submits that this outcome should be evaluated by the Court through a fair, comparative analysis of services, without discounting the work of common benefit counsel, and certainly without disparagement of the work done by private counsel.  To facilitate this analysis, in fact, the PSC Fee Committee has itemized all of the many services an attorney typically performs for a plaintiff in the ordinary course of tort litigation.  *See* PSC FC Brief at 58-59 [Rec. Doc. 20290-4].  Objectors do not appear to take issue with this 37-item "profile" of client services; and it remains available to the Court as one possible tool for the comparative weighing of common benefit and private counsel services to clients in this litigation.

No doubt, there are certain items on the list which were performed by private counsel alone.  They met with clients initially, gathered the information and documents needed to support their claims, filled out profile forms, documented the presence of Chinese-manufactured drywall, kept clients up to date on case developments, and, in the course of settlement remediation, attended to the details of that important activity.  Some of these same services (*e.g.*, documenting drywall and accessing the services to resolve property remediation issues) were performed not by private counsel alone, but in close collaboration with common benefit counsel.   But by comparison with the complex, substantive and challenging services undertaken on behalf of these same clients <u>solely</u> by common benefit/class counsel, it is respectfully submitted that the allocation resulting from the PSC Fee Committee's proposed fee calculation and award, is eminently fair.  It accurately reflects the comparative services of the two groups of counsel, as these related to the ultimate outcome of class settlements and a common fund.  Pleadings and service, experts and science, dispositive motion practice and legal research, discovery, trials, and

interrelated settlements….<u>all</u> of these complex activities in the MDL (and the corresponding items on the "case activity" list) were undertaken and completed by common benefit/class counsel alone.  This is not boasting; it is simple fact.

It thus would appear that those objecting counsel who profess "outrage" at the impact of the proposed fee allocation on their retainer fee agreements, fail to consider (1) their necessary and proper acceptance of a negotiated total fee in a settlement which allowed made-whole relief for their clients, (2) the Court's authority in any matter such as this, class action or otherwise, to appropriately "cap" percentage fees in private attorney fee arrangements (as noted in the PSC FC Brief at 34 n. 13 [Rec. Doc. 20290-4], and, above all, (3) the inescapable truth that the vast majority of the meaningful, outcome-determinative work by counsel on plaintiffs' behalf was performed, in these proceedings, by common benefit/class counsel.  The roughly 59%/41% allocation of fee between common benefit/class counsel and private, individual counsel, is anything but an outrage.  It is an allocation both generated by sound methodology in the calculation of a common benefit fee, and fair in result, particularly when the unique facts and circumstances of this complex MDL are considered.

## IV.   <u>CONCLUSION</u>

As the presiding judge over this seven year old MDL, this Court is well aware of the unique qualities of this extremely complex litigation.  Under Rule 23, this Court is permitted to devise and implement all manner of creative solutions to problems that arise throughout the course of class litigation.  *See, e.g, Pella Corp. v. Saltzman*, 606 F.3d 391, 396 (7th Cir. 2015). This same liberality of discretion applies to considerations of attorneys' fees.  The extraordinary complexity of this case has demanded the utmost from Common Benefit Counsel, who have labored tirelessly to achieve the remarkable results obtained.  To fairly compensate all counsel involved, the proposed recommendation of the FC should be accepted.

The FC's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) should be granted.

Respectfully submitted,

Dated: July 11, 2016

/s/ Russ M. Herman
Russ M. Herman, Esquire (Bar No. 6819) (on the brief)
Leonard A. Davis, Esquire (Bar No. 14190) (on the brief)
Stephen J. Herman, Esquire (Bar No. 23129)
HERMAN, HERMAN & KATZ, L.L.C.
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
LDavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel MDL 2047*

Arnold Levin (on the brief)
Fred S. Longer (on the brief)
Sandra L. Duggan (on the brief)
Matthew C. Gaughan (on the brief)
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone:  (215) 592-1500
Fax:  (215) 592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*

Gerald E. Meunier (LA Bar No. 9471) (on the brief)
Gainsburgh, Benjamin, David,
  Meunier & Warshauer, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com
*Co-Counsel for Plaintiffs and PSC Member*

***ON BEHALF OF THE FEE COMMITTEE***

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 11th day of July, 2016.

/s/ Leonard A. Davis
Leonard A. Davis, Esquire
Herman, Herman & Katz, L.L.C.
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
Plaintiffs' Liaison Counsel MDL 2047
*Co-counsel for Plaintiffs*