# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS                  :      MDL DOCKET NO. 1203
(PHENTERMINE, FENFLURAMINE,        :
DEXFENFLURAMINE) PRODUCTS          :
LIABILITY LITIGATION               :
                                   :
THIS DOCUMENT RELATES TO:          :
_____  :
SHEILA BROWN, et al.               :
                                   :
           v.                      :
                                   :
AMERICAN HOME PRODUCTS             :
CORPORATION                        :      CIVIL ACTION NO. 99-20593

PRETRIAL ORDER NO. 2622

AND NOW, this 3rd day of October, 2002, upon
consideration of the joint petition and individual petitions for
counsel fees and costs and the objections thereto and for the
reasons set forth in the accompanying Memorandum, it is hereby
ORDERED that:

(1)   an interim award of counsel fees in the amount of
$40,000,000 from the Fund A Legal Fee Escrow Account and in the
amount of $40,000,000 from the Fund B Legal Fee Escrow Account is
APPROVED;

(2)   an interim award of counsel fees in the amount of
$80,000,000 from the MDL 1203 Fee and Cost Account is APPROVED;

(3)   an award of costs in the amount of $11,484,152
from the MDL 1203 Fee and Cost Account is APPROVED ($6,465,815
having been previously advanced with court approval);

(4)   a Fee and Cost Allocation Committee is established to develop a plan for allocation and payment of the interim awards of counsel fees and costs among joint petitioners and those petitioners otherwise entitled.   The court appoints as members of the Committee:  Elizabeth Cabraser, Esquire; Michael Fishbein, Esquire; Arnold Levin, Esquire; Diane Nast, Esquire; and Charles Parker, Esquire.  Arnold Levin, Esquire is appointed the chair;

(5)   the Fee and Cost Allocation Committee shall file and serve, if possible, on or before November 18, 2002, said allocation and payment plan;

(6)   any objections to said plan shall be filed and served within 15 days thereafter.  The Committee shall file and serve a response to any objections within 15 days following;

(7)   one-third of the 6% and 9% assessments paid into the MDL 1203 Fee and Cost Account shall be returned without interest to the individual payors;

(8)   the Escrow Agent, Gregory P. Miller, Esquire, shall file and serve, on or before November 18, 2002, a plan for the return of one-third of the 6% and 9% assessments;

(9)   any objections to said plan shall be filed and served within 15 days.  The Escrow Agent shall file and serve a response to any objections within 15 days following;

(10)   Pretrial Order No. 467 is hereby modified so that as of the date of this Order, the assessment paid into the MDL

-2-

1203 Fee and Cost Account is 4% for coordinated state cases and 6% for federal cases; and

(11)  no further petitions for counsel fees or petitions for awards to class representatives shall be filed before October 1, 2003.

BY THE COURT:

_Harvey Bartle_ J.

-3-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS          :     MDL DOCKET NO. 1203
(PHENTERMINE, FENFLURAMINE, :
DEXFENFLURAMINE) PRODUCTS   :
LIABILITY LITIGATION        :
                            :
THIS DOCUMENT RELATES TO:   :
_____ :
SHEILA BROWN, et al.        :
                            :
         v.                 :
                            :
AMERICAN HOME PRODUCTS      :
CORPORATION                 :     CIVIL ACTION NO. 99-20593

MEMORANDUM AND PRETRIAL ORDER NO. 2622

Bartle, J.                                   October 3 , 2002

          Before the court are the petitions for counsel fees and

costs in connection with the multidistrict litigation and the

class action settlement involving the diet drugs known as "fen-

phen."  Included are the joint petition filed by a group of 72

law firms, consisting primarily of the Plaintiffs' Management

Committee and Class Counsel for plaintiffs in the Nationwide

Settlement with American Home Products ("Joint Petitioners"), as

well as several petitions filed by individual law firms and

attorneys who believe they are entitled to compensation for

common benefit work ("Individual Petitioners").  The Joint

Petitioners seek costs and fees from three different sources.

They move for an award from two separate funds established

pursuant to the class settlement, the Fund A Legal Fee Escrow

Account and Fund B Legal Fee Escrow Account.  They also request

fees and reimbursement of costs from the MDL 1203 Fee and Cost
Account for work done in the multidistrict litigation.  Various
Individual Petitioners likewise claim entitlement to fees from
these settlement funds.  Other Individual Petitioners move for
the return of assessments they paid into the MDL 1203 Fee and
Cost Account.

## I.   BACKGROUND

A detailed description of the course of this
litigation, including the factual basis for liability, the
medical circumstances of the Class Members, and the provisions of
the settlement, can be found in this court's Pretrial Order No.
1415, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000), entered by my
predecessor Judge Louis C. Bechtle.  We will only briefly
summarize the relevant background and will then focus on the
aspects of this multidistrict litigation and class settlement
that are most pertinent to fees and costs.

From 1989 through September, 1997, American Home
Products Corporation ("AHP")[1] marketed and sold two prescription
drugs for weight loss in the United States under the brand names
Pondimin (fenfluramine) and Redux (dexfenfluramine) ("diet
drugs").  Beginning in 1992, physicians commonly prescribed
Pondimin in combination with phentermine, another prescription
diet drug.  Phentermine was, and still is, manufactured by
various entities and is distributed and sold under several

---

1.   AHP changed its name to Wyeth on March 11, 2002.  Since the
joint petition was filed prior to that date, we will continue to
use AHP for purposes of this memorandum.

different brand names.  The combination of Pondimin with phentermine was often referred to as "fen-phen."  Sales of both Pondimin and Redux were brisk in the mid-1990's.  From January, 1995 until mid-September, 1997, approximately four million persons in the United States took Pondimin.  Similarly, from June, 1996 through September, 1997, two million people in this country used Redux.

During the period from March to August, 1997 the Mayo Clinic in Rochester, Minnesota observed and reported an association between the use of fenfluramine and/or dexfenfluramine and valvular heart disease ("VHD").  On September 15, 1997, AHP and the Federal Drug Administration ("FDA") announced that there would be no further sales of Pondimin and Redux in the United States.  Since the withdrawal, epidemiological studies have established a causal relationship between fenfluramine and dexfenfluramine and VHD. Epidemiological studies have also established that fenfluramine and dexfenfluramine cause a fatal disease known as primary pulmonary hypertension ("PPH").

A wave of litigation followed the withdrawal of Pondimin and Redux.  Individuals who had ingested diet drugs filed lawsuits and class actions in federal and state courts against AHP and other defendants, including manufacturers, distributors, weight-loss clinics, pharmacies and physicians.  On December 10, 1997, the Judicial Panel on Multidistrict Litigation (the "JPML") designated the United States District Court for the

-3-

Eastern District of Pennsylvania as the transferee court for IN RE: DIET DRUGS (PHENTERMINE/FENFLURAMINE/DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION, MDL 1203 ("MDL 1203").  All cases filed in the federal judicial system were subsequently transferred here for coordinated and consolidated pretrial proceedings.  By November, 1999 approximately 18,000 individual cases and over 130 class actions had been filed.  As of May 9, 2001 approximately 3,000 civil actions involving diet drugs had been transferred by the JPML to this court.  This number will continue to increase as Class Members who elect either an Intermediate or Back-End Opt-Out initiate lawsuits.

Shortly after the transfer of cases to MDL 1203, the court established the Plaintiffs' Management Committee ("PMC") to oversee the coordinated and consolidated pretrial proceedings and to conduct discovery of widespread applicability on behalf of plaintiffs in MDL 1203.[2]  See Pretrial Order No. 6.  As part of its duties and responsibilities, the PMC assisted and continues to assist all plaintiffs in MDL 1203 and state-federal

---

2.  Ultimately, there were eleven PMC members:  Arnold Levin of the Philadelphia law firm, Levin, Fishbein, Sedran & Berman; John J. Cummings, III of the New Orleans firm, Cummings, Cummings & Dudenhefer; Stanley Chesley of the Cincinnati firm, Waite, Schneider, Bayless and Chesley; Michael Hausfeld of the Washington, D.C. firm, Cohen, Milstein, Hausfeld & Toll; Daryl Tschirn of San Diego, California; Elizabeth Cabraser of the San Francisco firm, Lieff, Cabraser, Heimann and Bernstein; Will Kemp of the Las Vegas firm, Harrison, Kemp & Jones; Dianne Nast of the Lancaster, Pennsylvania firm, Roda & Nast; Michael Papantonio from the Pensacola firm, Levin, Middlebrooks, Thomas, Mitchell, Green, Echsner, Proctor & Papantonio; John Restaino from the Newport Beach, California firm, Lopez, Hodes, Restaino, Milman, Skikos & Polos; and Roger Brosnahan of the Minneapolis firm, Brosnahan, Joseph & Suggs.

coordinated proceedings by appearing frequently before this
court, attending regular status conferences held by the Special
Discovery Master,[3] preparing motions and responses regarding
case-wide discovery matters and other pretrial issues, and
maintaining a document depository for all documents produced in
MDL 1203.

The PMC was also charged with establishing a Discovery
Committee, which consisted of PMC members as well as additional
lawyers representing plaintiffs in various state courts.[4]  See
Pretrial Order No. 38.  The PMC Discovery Committee coordinated
and completed numerous depositions of defendants' corporate
representatives, employees and generic experts.  The PMC and the
co-chairs of the PMC Discovery Committee were permitted by the
court to assign work to other "common benefit" attorneys ("PMC

---

3.  On April 14, 1998 the court appointed Gregory P. Miller,
Esquire, as Special Discovery Master and vested him with the
powers enumerated in Rule 53(c) and (d) of the Federal Rules of
Civil Procedure for the purposes of administering a discovery
schedule, mediating discovery disputes and, if necessary,
rendering decisions and recommendations to the court as to any
disputed discovery-related matter.  See Pretrial Order No. 36.

4.  The persons appointed to the Discovery Committee in addition
to the PMC members were Mike Williams from the Portland, Oregon
firm of Williams, Dailey & O'Leary; Michael Slack from the Texas
firm of Slack and Davis; Michelle Parfitt of the Washington, D.C.
based firm, Ashcraft and Gerrell; Alex MacDonald from the large
Boston firm, Robinson & Cole; John Hornbeck from the Santa Monica
firm, Sherman, Salkow, Petoyan & Weber; and Andrew Hutton out of
the Kansas City firm, Hutton & Hutton.  See Pretrial Order No. 38
at ¶ 2.  Mr. Hutton resigned from the Committee on December 1,
1998, and was replaced by John Baker from the Denver firm, Bragg
& Baker.  The persons appointed as co-chairs of the PMC Discovery
Committee were PMC members, Roger Brosnahan and Arnold Levin.
See Pretrial Order No. 38 at ¶ 1.

-5-

common benefit attorneys").[5]  The members of the PMC, the PMC
Discovery Committee, and the PMC common benefit attorneys are all
Joint Petitioners in this matter.

In late April, 1999, AHP and a coalition of plaintiffs'
attorneys consisting of the PMC and counsel for plaintiffs in
certified state class actions pending in Illinois, New Jersey,
New York, Pennsylvania, Texas, Washington, and West Virginia
began negotiations for a global resolution of the diet drug
litigation.[6]  As a result of the negotiations, on November 18,
1999 the parties executed a Nationwide Class Action Settlement
Agreement with AHP (the "Settlement Agreement").  Five days later
the court granted preliminary approval of the settlement.  See
Pretrial Order No. 997.  At that time, the court also established
procedures for providing notice and conducting fairness hearing
discovery.  From May 2, 2000 through May 11, 2000 the court held

---

5.  The following law firms participated in MDL 1203 as PMC
common benefit attorneys:  Alley & Ingram; Climaco, Lefkowitz,
Pecca; Wilcox, & Garofoli, L.P.A.; Gancedo & Nievas; Dennis
Mackin; Norrum & Pearson, P.A.; Robinson, Calcagnie, & Robinson;
Sybil Shainwald; Spangenberg, Shibley & Liber, LLP; Law Office of
Daniel Thistle; and Weisman, Goldberg & Spitzer.

6.  The following persons acted as "Class Counsel" in connection
with the settlement negotiations and were thereafter formally
appointed by the court to serve in that capacity:  Arnold Levin
of Levin, Fishbein, Sedran & Berman; Michael D. Fishbein of
Levin, Fishbein, Sedran & Berman; John J. Cummings, III of
Cummings, Cummings & Dudenhefer; Stanley Chesley of Waite,
Schneider, Bayless & Chesley; Gene Locks of Greitzer & Locks; Sol
Weiss of Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.;
and Christopher Placitella of the firm, Wilentz, Goldman &
Spitzer.  See Pretrial Order No. 997 at ¶ 5.  Ultimately, Mr.
Placitella resigned as Class Counsel and was replaced by Charles
Parker of the firm, Hill & Parker.  See Pretrial Order No. 1062;
see also Pretrial Order No. 1415, 2000 WL 1222042, at *44.

a hearing to consider the fairness, reasonableness and adequacy of the settlement.  Prior to the hearing, the parties executed the First, Second, and Third Amendments, which were considered by the court as part of the Settlement Agreement.  The court received additional testimony at a post-fairness hearing on June 1, 2000.  Thereafter, the parties agreed to the Fourth Amendment, requiring the court to hold a hearing on August 10, 2000 to consider its provisions.  The court approved the Settlement Agreement on August 28, 2000 in Pretrial Order No. 1415.  Appeals of Pretrial Order No. 1415 followed.  The Court of Appeals for the Third Circuit affirmed on October 3, 2001 with respect to the last outstanding appeal, and Final Judicial Approval, as that term is defined in the Settlement Agreement, occurred on January 3, 2002.

Prior to Final Judicial Approval, Class Members had two options for seeking settlement benefits:  the Accelerated Implementation Option ("AIO") or registration.  By electing the AIO, Class Members agreed to waive all of their opt-out rights in exchange for benefits, if eligible, regardless of whether the Settlement Agreement ultimately achieved final approval.  In contrast, eligible Class Members who registered for benefits were not entitled to receive any benefits until after Final Judicial Approval.  Class Members who registered also preserved potential future opt-out rights under the terms of the Settlement Agreement.  As of Final Judicial Approval, the AIO ceased as an option available to Class Members.  See Settlement Agreement at

-7-

§ V.B.  Class Members, however, may still register for various benefits in accordance with the deadlines set forth in the Settlement Agreement and the Official Notice of Final Judicial Approval.

There are two categories of benefits available to all Class Members under the Settlement Agreement.  First, Class Members may apply for medical monitoring and refund benefits. These benefits differ depending on the length of time that a Class Member ingested diet drugs.  Class Members who took drugs for 61 days or more are entitled to:  (1) a free echocardiogram and physician visit as part of a screening program or reimbursement for an echocardiogram received outside of the screening program; (2) additional medical services to monitor their VHD of up to $10,000 in value or $6,000 in cash if they are FDA Positive[7]; and (3) a refund for prescriptions up to a maximum amount of $500 if there are sufficient funds available to pay such benefits after payment of all other expenses and benefits. See Settlement Agreement at § IV.A.1.  Class Members who took diet drugs for 60 days or less are entitled to:  (1) a refund of $30 per month for Pondimin and $60 per month for Redux; (2) reimbursement for out-of-pocket costs for certain privately-obtained echocardiograms if they are FDA Positive; and (3) additional medical services to monitor their VHD of up to $5,000

---

7.  In general, "FDA Positive" means mild or greater regurgitation associated with the aortic valve and/or moderate or greater regurgitation associated with the mitral valve.  See Settlement Agreement at § I.22.

in value or $3,000 in cash if they are FDA Positive.[8]  Id. at
§ IV.A.2.  Additionally, the Settlement Agreement provides for
the establishment of a Medical Research and Education Fund in the
amount of $25 million to finance medical research and education
related to heart disease and for the creation of a medical/legal
registry to track the medical conditions of Class Members.  Id.
at IV.A.3.

Second, Class Members who have serious VHD may apply
for "matrix benefits."[9]  All Class Members diagnosed as FDA
Positive or as having Mild Mitral Regurgitation by the end of the
Screening Period,[10] and their Derivative Claimants,[11] are
qualified to receive matrix benefits.  Id. at §§ IV.B.1.a;
IV.B.1.b; IV.B.1.c.  Furthermore, all Class Members diagnosed as
having endocardial fibrosis by September 30, 2005, and their
Derivative Claimants, are also eligible to receive matrix

---

8.  Class Members could also receive an echocardiogram and
associated interpretive visit for compassionate and humanitarian
reasons.

9.  The matrix benefits available are set forth on four payment
matrices found at section IV.B.2.a of the Settlement Agreement.

10.  Under the Settlement Agreement, the Screening Period is the
twelve-month period following Final Judicial Approval, which may
be extended for six months by the Court for good cause shown.
See Settlement Agreement at § IV.A.1.a.  As previously noted, the
Settlement Agreement achieved Final Judicial Approval on
January 3, 2002.  See Official Notice of Final Judicial Approval
at 2, 5.  Accordingly, absent extension by the court, the
official end date for the Screening Period is January 3, 2003.

11.  Derivative Claimants are members of the settlement class and
may include spouses, parents, children, dependents, other
relatives or "significant others" of Class Members who ingested
diet drugs.  See Settlement Agreement at § II.B.

-9-

benefits.  Id. at §§ IV.B.1.d; IV.B.1.e; IV.B.1.f.  The value of matrix benefits for Class Members ranges from $7,389 to $1,485,000.  Id. at § IV.B.2.a.  A particular Class Member's benefit is calculated based on his or her age at the time of diagnosis of a matrix-level condition and the severity of the condition.  Id. at §§ IV.B.2.a and IV.B.2.b.  Recognizing the progressive nature of VHD, the Settlement Agreement also allows for damage payments to Class Members who develop serious levels of VHD at any time up to December 31, 2015.  Id. at § IV.C.2.

Two separate funds were established under the Settlement Agreement to provide the above benefits to Class Members, and the AHP Settlement Trust ("Trust") was created to administer them.  See Settlement Agreement at §§ III.A.1; III.B; and III.C.  Fund A provides compensation for all non-matrix benefits available under the Settlement Agreement, the associated costs of administering those benefits, and the out-of-pocket and pre-settlement litigation expenses of plaintiffs' counsel approved by the court for reimbursement in relation to Fund A.  Id. at § III.B.2.  AHP has fully funded Fund A with $1 billion.  Id. at § III.B.1.  As of June, 2002, Fund A has paid benefits in the amount of $93,339,673.

Fund B is the source of matrix benefits, the associated costs of administering those benefits, and attorneys' fees and common benefit fees and costs approved by the court in relation to Fund B.  Id. at § III.C.4.c.  AHP pays into Fund B on an on-going basis.  As of June, 2002, $743,627,102 in Fund B matrix

-10-

benefits have been disbursed to Class Members.  Ultimately, AHP
is obligated for a total of $2.55 billion plus accretions in Fund
B benefits, minus Credits to which it is entitled under the
Settlement Agreement.[12]  If the Trustees[13] determine that all Fund
A purposes have been satisfied, the remaining balance of Fund A
is transferred to Fund B.  Any such transfer from Fund A to Fund
B does not reduce the maximum payment obligation of AHP to make
Fund B payments.  Id. at §§ III.B.4 and III.B.5.

## II.  PROVISIONS AND PROCEDURES REGARDING AN AWARD OF FEES AND COSTS

The counsel fees at issue here will be drawn from three
different funds:  the Fund A Legal Fee Escrow Account, the Fund B
Legal Fee Escrow Account, and the MDL 1203 Fee and Cost Account.
We explain each in turn.

### A.  Fund A Legal Fee Escrow Account

After Final Judicial Approval AHP deposited $200
million into the Fund A Legal Fee Escrow Account.  The funds in
this account, including accrued interest, are earmarked for

---

12.  Pursuant to section VII.A of the Settlement Agreement, AHP
is entitled to Credits against its Fund B obligations for
payments made outside of the Settlement Agreement to Class
Members who exercised either an Initial Opt-Out or Back-End Opt-
Out right.  See Settlement Agreement at § VII.A.  The term Full
Credit is defined as the lesser of an amount paid to a Class
Member outside of the Settlement Agreement or the matrix payment
for which such Class Member would have qualified, less the 9%
sequestered for attorneys' fees.  Id. at § VII.A.4.  Initial Opt-
Out Credits are capped at $300 million.  Id. at § VII.A.2.

13.  Seven trustees were appointed by the court in Pretrial Order
No. 1159.

attorneys' fees to Class Counsel, Common Benefit Attorneys[14] and incentive awards to Class Representatives in state and federal court class actions.[15]  See Settlement Agreement at §§ III.B.3; VIII.E.1.a; Pretrial Order No. 2386.  All payments from the Fund A Legal Fee Escrow Account are subject to the Court's approval. See Settlement Agreement at § III.B.3.  AHP cannot take a position with regard to an award of attorneys' fees.  Id.  Any amount in the Fund A Legal Fee Escrow Account not awarded by the court is returned to AHP.  Id.

**B.  Fund B Legal Fee Escrow Account**

Attorneys' fees associated with Fund B are paid out of the Fund B Legal Fee Escrow Account.  In the Settlement Agreement the parties agreed that these fees should not exceed $229 million, or 9% of the $2.55 billion which AHP is mandated to pay into Fund B for the benefit of Class Members.  See Settlement Agreement at § VIII.E.1.  Therefore, 9% of every matrix compensation benefit awarded to a Class Member is set aside in the Fund B Legal Fee Escrow Account.  Id.; Pretrial Order No.

---

14.  Common Benefit Attorneys are defined in the Settlement Agreement as those attorneys who actually contributed to the creation of the settlement funds through work devoted to the "common benefit" of Class Members, including any attorney who actually conferred benefits upon the class through State Court litigation.  See Settlement Agreement at § I.14.  These Common Benefit Attorneys differ from the PMC common benefit attorneys discussed earlier.

15.  These class actions include:  (1) Brown v. AHP, MDL No. 99-20593; (2) Jeffers v. AHP, MDL No. 98-20626; (3) Vadino v. AHP (New Jersey); (4) the New York Diet Drug Litigation; (5) the Pennsylvania Diet Drug Litigation; (6) St. John v. AHP (Washington); (7) Rhyne v. AHP (Illinois); (8) Earthman v. AHP (Texas); and (9) Burch v. AHP (West Virginia).

-12-

2423.   In the event a Class Member is represented by counsel, the 9% assessment is deducted from the individual attorney's fee. Prior to Final Judicial Approval, the Trust placed 9% of any matrix benefit awarded to a Class Member in escrow.  This sum, $59,819,624, was transferred to the Fund B Legal Fee Escrow Account after Final Judicial Approval.  Due to advanced contributions by AHP, this fund now contains $229 million.

The court is to award counsel fees from the Fund B Legal Fee Escrow Account in accordance with applicable principles of law.  See Settlement Agreement at § VIII.E.1.  If the court awards less than the 9% assessments in the Fund B Legal Fee Escrow Account, the monies not awarded will be returned to the Class Members or individual attorneys representing Class Members who contributed the 9% set aside.  Id. at § VIII.E.1.c.

C.  MDL 1203 Fee and Cost Account

The MDL 1203 Fee and Cost Account was established by Pretrial Orders Nos. 467 and 517.  Realizing that there needed to be a method to compensate the PMC and others for costs and attorneys' fees for providing litigation-wide services, the court required the sequestration of 9% of all payments made by defendants to plaintiffs in settlements or in satisfaction of judgments in MDL 1203.  See Pretrial Orders Nos. 467 and 517. These 9% assessments, which are deposited in the MDL 1203 Fee and Cost Account, are deducted from the attorneys' fees payable to an individual plaintiff's counsel and, thus, do not diminish the plaintiff's recovery.  See Pretrial Order No. 467 at ¶ 8.  For

-13-

example, if AHP and an MDL 1203 plaintiff reach a $100,000 settlement, 9% or $9,000, is deducted from the amount that is owed to the plaintiff's attorney under his or her retention agreement.  If the attorney was to receive a 33% contingency fee, he or she would ultimately receive $24,000 ($33,000-$9,000) and the plaintiff would receive $67,000, the same as if there had been no assessment.  See Pretrial Order No. 2152.[16]

Pretrial Order No. 467 also approved a coordination agreement between MDL 1203 and judicial proceedings in California.  Pursuant to this agreement, 6% of all payments made by defendants to plaintiffs with California cases is deposited into the MDL 1203 Fee and Cost Account.  See Pretrial Order No. 467 at ¶¶ 10-11.  Again, this assessment is deducted from the attorney's fee, not the plaintiff's net recovery.  In addition, Pretrial Order No. 467 further directed that any state court action would be eligible for state-federal coordination in the event that a court with jurisdiction over the state court action entered an order requiring, among other things, the sequestration of a 6% assessment.  Id. at ¶¶ 13-16.  Many individual counsel in state cases entered into private coordination agreements with the PMC whereby they agreed to the 6% assessment in exchange for access to the MDL work product and participation in the MDL management structure.

---

16.  This example ignores the effect of litigation expenses for simplification.  For more detailed examples of how the calculations should be performed, see Pretrial Order No. 2152 Ex. A.

-14-

As of June, 2002, approximately $143 million had been deposited into the MDL 1203 Fee and Cost Account. The court is authorized by Pretrial Order No. 467 to award reimbursement of costs and attorneys' fees to the PMC and PMC common benefit attorneys from some or all of the MDL 1203 Fee and Cost Account.[17] After awarding reimbursement of costs and payment of attorneys' fees, the court may refund any remaining amount in the MDL 1203 Fee and Cost Account or may enter an order for the disposition of the funds as appropriate under the law. Id. at ¶ 21.

### D. Procedures

Beginning in Pretrial Order No. 16, the court developed various procedures to govern the recording and reimbursement of time and expenses. All counsel who wished to make an application for fees were required to submit a report of time and expenses, in appropriate form, along with a fee petition to the court-appointed auditor Alan Winikur, C.P.A. on or before June 30, 2001. See Pretrial Orders Nos. 16, 1164, 2224. The auditor was directed to disallow certain time, including time that was not reported in accordance with Pretrial Order No. 16, time that was expended objecting to the Settlement Agreement, time that appeared grossly excessive, and time that was not authorized by the PMC for common benefit work. See Pretrial Order No. 2224 at ¶ 4.

---

17. Pretrial Order No. 467 expressly limits an award of fees to those attorneys who were authorized by the PMC to perform common benefit services. See Pretrial Order No. 467 at ¶ 7.

The auditor received submissions from 106 different law firms.  On December 31, 2001 he filed a report containing the results of the audit.  He reported that 72 firms had submitted 354,152.29 hours of professional time with a current lodestar value of $101,027,494.54 and had documented $15,989,242.31 in reimbursable expenses that were eligible for inclusion in the joint fee petition.  The time submissions of 34 firms, amounting to 47,451.98 hours of time with a lodestar value of $16,725,716.15, were disallowed.

The joint petition for an award of attorneys' fees and reimbursement of expenses, filed February 15, 2002, includes all fee presentations that conformed to the court's orders according to the auditor's determination.  Twelve separate fee petitions were filed by law firms whose time was disallowed by the auditor and not included in the joint petition.  Ultimately, seven of these twelve petitions were withdrawn or resolved and are no longer before the court.  The court also allowed time for the filing of objections to the petitions and responses to the objections.  Eleven objections to the joint petition were filed, one of which was later withdrawn.  Several of these objections came from Individual Petitioners who objected to the joint petition only insofar as it did not include them.  The Joint Petitioners presented objections to all of the individual fee petitions.

The Supreme Court has cautioned that "[a] request for attorney's fees should not result in a second major litigation,"

-16-

Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).  Mindful of this directive but cognizant of the magnitude of the potential fee award at issue, the court permitted limited discovery before the fee hearing.  See In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 338 (3d Cir. 1998).  Any person who wished to take discovery was required, on or before April 5, 2002, to file a motion for leave to do so, along with a detailed explanation of the discovery requested.  See Pretrial Order No. 2387 at ¶¶ 15-19.  The court denied the bulk of requests because they were overbroad, cumulative, or irrelevant but did allow the deposition of Michael D. Fishbein, Esquire.  Mr. Fishbein is knowledgeable about the work performed by the PMC in MDL 1203 and is one of the attorneys appointed as Class Counsel for the settlement class.  Mr. Fishbein was deposed by a group of Objectors and Individual Petitioners for two full days, on May 15 and 16, 2002.

After limited supplemental briefing, a two-day fee hearing was held on June 25 and 26, 2002.

### III.  AWARD OF ATTORNEYS' FEES AND COSTS

The Joint Petitioners request an award of attorneys' fees and costs totaling $567 million.  As a result of the class action settlement, they seek $200 million in attorneys' fees from the Fund A Legal Fee Escrow Account and $229 million from the Fund B Legal Fee Escrow Account for a total of $429 million.  According to the Joint Petitioners, the $429 million represent 11.5% of the $3.75 billion face amount of the settlement or 4.07%

-17-

of the "real value" of the settlement if claims preservation and
health preservation benefits, as estimated by the Joint
Petitioners, are considered.  Due to future work which they
acknowledge they will have to perform in connection with the
administration of the settlement, they recognize that some of the
fee should be withheld at this time.  They suggest that $14
million of the $429 million be reserved for later payment.
Finally, they request an award equal to the full 9% and 6%
assessments from the MDL 1203 Fee and Cost Account.  At the time
the joint petition was filed, there were approximately $138
million in that account.

### A.   Settlement Funds

"[A] thorough judicial review of fee applications is
required in all class action settlements."  In re General Motors
Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768,
819 (3d Cir. 1995).  This oversight function serves not only to
detect abuse but also to deal with potential public
misunderstandings.  Id. at 820.  "[T]he district court must
exercise its inherent authority to assure that the amount and
mode of payment of attorneys' fees are fair and proper.  This
duty of the court exists independently of any objection."  In re
Cendant Corp. PRIDES Litig., 243 F.3d 722, 730 (3d Cir. 2001)
(quoting Zucker v. Occidental Petroleum Corp., 192 F.3d 1323,
1328-29 (9th Cir. 1999)).  There are two methods for calculating
attorneys' fees:  the percentage of recovery method and the
lodestar method.  Id. at 732.  The percentage of recovery method

-18-

is generally used in common fund cases.  In re Prudential Ins.
Co. of Am. Sales Practices Litig., 148 F.3d 283, 333 (3d Cir.
1998).  It "resembles a contingent fee in that it awards counsel
a variable percentage of the amount recovered for the class."  GM
Trucks, 55 F.3d at 819 n.38.  The lodestar method has
traditionally been applied in statutory fee-shifting cases.
Prudential, 148 F.3d at 333.  The lodestar is calculated by
multiplying the hours worked by counsel by a reasonable hourly
fee.  Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d
Cir. 2000).

     In recent years there has been much discussion about
the proper methodology to employ when awarding counsel fees in a
class action settlement.  See, e.g., In re Cendant Corp. Litig.,
264 F.3d 201, 255-56 (3d Cir. 2001); GM Trucks, 55 F.3d at 821-
22; In re Orthopedic Bone Screw Prods. Liab. Litig., 2000 WL
1622741, at *4-5 (E.D. Pa. Oct. 23, 2000); Report of the Third
Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. 237
(1985).  Indeed, the Joint Petitioners spent a significant
portion of their supporting brief detailing the respective pros
and cons of each approach and urging the court to adopt the
percentage of recovery method.  In response, several objectors
argued that the lodestar calculation should be used to avoid an
undeserved windfall for the Joint Petitioners.  We are not
persuaded by the objectors.  The day of the lodestar has passed
in class actions such as this, save for perhaps its use as a
cross-check in some cases.  See Cendant, 264 F.3d at 285.  It is

-19-

now clear that in the Third Circuit the percentage of recovery
method should be utilized in common fund cases.  Id. at 256;
Gunter, 223 F.3d at 195 n.1; Prudential, 148 F.3d at 333-34.

The percentage of recovery method first requires that
the court make an assessment of the value of the settlement.  GM
Trucks, 55 F.3d at 822.  Then, as mentioned above, the court
awards a reasonable percentage of that value as attorneys' fees.
In setting a reasonable percentage award the Third Circuit has
instructed courts to consider the following, nonexclusive list of
factors:

> (1) the size of the fund created and the
> number of persons benefitted; (2) the
> presence or absence of substantial objections
> by members of the class to the settlement
> terms and/or fees requested by counsel; (3)
> the skill and efficiency of the attorneys
> involved; (4) the complexity and duration of
> the litigation; (5) the risk of nonpayment;
> (6) the amount of time devoted to the case by
> plaintiffs' counsel; and (7) the awards in
> similar cases.

Gunter, 223 F.3d at 195 n.1; see Cendant PRIDES, 243 F.3d at 735-
41.

An application of the above factors, or other similar
methodology, has resulted in fee awards in smaller class action
settlements ranging anywhere from 19% to 45%.  See GM Trucks, 55
F.3d at 822; In re Ikon Office Solutions, Inc. Sec. Litig., 194
F.R.D. 166, 194 (E.D. Pa. 2000).  In class actions involving
mega-funds, or those larger than $100 million, the percentage is
generally lower.  For example, in Cendant PRIDES, our Court of
Appeals charted class action settlement fee awards in 18 federal

-20-

mega-fund cases since 1985 and found a range of 2.8 % to 36%.
Cendant PRIDES, 243 F.3d at 737-38.  Of the 18 cases, however,
only three involved settlements of over $1 billion.  In those,
and the additional case we have found dealing with a class
settlement fund greater than $1 billion, the percentages range
from 5% to 14%.  Id.; In re NASDAQ Market-Makers Antitrust
Litig., 187 F.R.D. 465 (S.D.N.Y. 1998).  These cases are
particularly relevant because our Court of Appeals has instructed
that "district courts setting attorneys' fees in cases involving
large settlements must avoid basing their awards on percentages
derived from cases where the settlement amounts were much
smaller."  Cendant PRIDES, 243 F.3d at 736.

### 1.  Joint Petitioners

As detailed above, the Joint Petitioners seek a fee
equal to between 4.07% and 11.5% of the settlement, depending on
how it is evaluated.  However, it is premature to perform a
definitive percentage of recovery analysis at this point.  In the
usual situation the fee is sought at or near the conclusion of
litigation where the only other function remaining is to pay out
the court-approved settlement dollars to the class members.  The
court is then in a good position to review the settlement in
light of the Gunter factors.  In this class action, in contrast,
the settlement is still in many respects in its early stages.
Benefits are available under the Settlement Agreement for certain
medical conditions which occur in the future, up until
December 31, 2015.  Thousands of Class Members have not yet

-21-

received their overdue benefits and may not receive their
benefits for some time to come. There is a significant amount of
work still to be done by the Joint Petitioners in assisting the
administration of the Settlement Agreement. And, contrary to
what was originally thought when the joint petition was
submitted, much of this work so far has not been routine and
commonplace. The administration of this mass tort settlement,
involving a Settlement Agreement of over 140 printed pages, is
turning out to be as complex and demanding as the litigation that
preceded it. Many issues regarding interpretation of the
Settlement Agreement, the operation and funding of the Trust, and
the payment of benefits to Class Members remain to be resolved.
The court is still faced with a continual flow of contested
motions and hearings on a variety of matters which could affect
the value and efficacy of the settlement.

In particular, the processing and determination of
matrix level benefits from Fund B has been much more difficult
and less clear cut than was originally expected. The court
recently held a six-day hearing on a motion by the Trust against
two law firms whom the Trust alleges are submitting matrix claims
on a widespread basis that lack a reasonable medical foundation.
Class Counsel and AHP have joined in the motion. The motion also
makes allegations against certain cardiologists who have
certified Green Forms on behalf of the clients of these law

-22-

firms.[18]  At the heart of the dispute are complicated issues
ranging from the proper interpretation of echocardiograms under
the Settlement Agreement to the correct way to fill out the Green
Form.   Issues such as these will no doubt also be prevalent as
the Screening Period draws to an end and Class Members elect to
exercise the Intermediate Opt-Out right.[19]    Two other motions
filed recently reinforce the court's cautiousness.  Class Counsel
and AHP have filed a joint motion for an emergency stay of
processing matrix claims.  The basis for this motion is the
contention that a significant number of exaggerated or unfounded
claims for matrix benefits are being submitted to the Trust.
Class Counsel and AHP argue that if corrective measures such as
additional audits are not taken a large number of unmeritorious
claims will be paid, with the result that Fund B will be depleted
and Class Members with valid matrix claims will not receive their
benefits.  Class Counsel and AHP have devised proposals for
remedying the perceived problems.  However, these proposals,
including an additional amendment to the Settlement Agreement,
undoubtedly will require hearings and much extra effort on the
part of the court and counsel alike.

------------------------

18.  The Green Form is utilized by Class Members applying for
matrix benefits.  To complete the Green Form a Class Member must
obtain answers to a series of questions from a Board-Certified
Cardiologist or Cardiothoracic Surgeon in Part II of the form.

19.  The Intermediate Opt-Out is available to certain Class
Members who are diagnosed with FDA Positive levels of aortic and
mitral regurgitation after September 30, 1999 but before the end
of the Screening Period.  See Settlement Agreement at § IV.D.3.

Questions regarding the value of the settlement and the benefits conferred on Class Members clearly remain. See Gunter, 223 F.3d at 195 n.1. Under the circumstances, the court finds that it is not possible to undertake a Gunter analysis and make a full fee award from the Fund B Legal Fee Escrow Account at this time.

In addition, the Trust has followed with an emergency motion seeking the suspension of certain Fund A processing deadlines. In it the Trust explains that with its current physical location and staff resources it is unable to meet the Fund A processing deadlines set forth in the Settlement Agreement due to Final Judicial Approval occurring earlier than anticipated and the unexpected high volume of claims it has received. It requests that the court stay all deadlines for the time being to allow it to develop a workable plan for future Fund A processing. Again, with this issue pending, it would be premature to make a final award of counsel fees from the Fund A Legal Fee Escrow Account.

Nonetheless, the Joint Petitioners have engaged in a herculean effort. Without question, they have accomplished a significant amount of necessary and commendable work over a number of years with respect to the class settlement, with no fee recovery on their part to date. To make them wait any longer for at least some fee award would be grossly unfair.

Considering the foregoing, the court finds that it is fair and reasonable to make an interim fee award at this juncture

-24-

in the amount of $80 million - $40 million from the Fund A Legal
Fee Escrow Account and $40 million from the Fund B Legal Fee
Escrow Account.  We believe an interim award of this magnitude
recognizes the remarkable contribution of Class Counsel and
provides them with at least partial compensation at a time when
the court is not really able to analyze fully the _Gunter_ factors
and make a final award.  Making a larger award at this time, in
the court's view, would be inequitable when so many Class Members
are experiencing prolonged delays in the receipt of their
benefits, and Class Counsel have recently filed a motion for a
further delay in the payment of Fund B matrix benefits.

This interim award, of course, is less than one-fifth
of the $429 million requested by Class Counsel.  It amounts to
only about 2% of the $3.75 billion face value of the settlement.
As a percentage, the interim award is less than one-half of the
5% fee found by our Court of Appeals to be at the low end of
awards in mega-fund class action cases.  _See Cendant PRIDES_, 243
F.3d at 737-38.  Under the circumstances, we are confident that
an $80 million interim award would not run afoul of _Gunter_ before
a full analysis can be undertaken.

When the pressing issues delineated above have been
resolved and the entire picture is less clouded, Joint
Petitioners and others ruled herein to be entitled to a fee may
make further application for additional compensation but no
earlier than October 1, 2003.  We hope by that point the court

will be in a better position to make a final fee award to Class
Counsel, after consideration and application of <u>Gunter</u>.

## 2. Individual Petitioners

Certain Individual Petitioners assert that the work
they performed in the diet drug litigation conferred a benefit on
the class and, thus, they should be awarded fees from the
settlement funds.  After reviewing their submissions, the court
finds, with two exceptions, that the Individual Petitioners are
not entitled to any fees.  We briefly address each individual
petition.

### a. The Becnel Attorneys[20]

In their Fee Presentation, the Becnel Attorneys seek an
award of fees and expenses for work relating to the role of
Daniel E. Becnel, Jr. as Co-Chair of the Plaintiffs' State
Liaison Committee in MDL 1203 and an alleged study conducted by
William E. Shell, M.D. (the "Shell Study"), which involved
individuals, including some of the Becnel Attorneys' clients, who
ingested diet drugs.  With regard to the Plaintiffs' State
Liaison Committee, the Becnel Attorneys assert that a portion of
the time submitted relates to Mr. Becnel's review of documents in
furtherance of his role on this committee.  The remaining time
submissions pertain to the Becnel Attorneys' purported assistance

---

20.  Daniel E. Becnel, Jr., Esquire, Robert M. Becnel, Esquire,
Lynn E. Swanson, Esquire, Diane K. Zink, Esquire and the Law
Offices of Daniel E. Becnel, Jr. are referred to collectively as
the "Becnel Attorneys."

in the Shell Study, which they believe benefitted all plaintiffs in MDL 1203 and the settlement class.

It is undisputed that the court created the Plaintiffs' State Liaison Committee and appointed 20 attorneys to serve on this committee in Pretrial Order No. 39. It also is undisputed that Mr. Becnel was appointed to serve as Co-Chair of this committee. The Becnel Attorneys, however, have failed to show that this committee made any substantive efforts to achieve federal-state coordination. In fact, there are very few references that specifically refer to this committee in the Becnel Attorneys' time records. The Becnel Attorneys may have reviewed MDL 1203 documents and initially discussed federal-state issues, but they have not met their burden in establishing that this work conferred an actual benefit on plaintiffs in MDL 1203. Thus, they are not entitled to any fees or expenses associated with this work.

The Becnel Attorneys also have failed to show that they are entitled to fees or expenses for the work they performed relating to the Shell Study. There is no evidence that the Becnel Attorneys commissioned the Shell Study.[21] Dr. Shell has testified that he was retained by the Becnel Attorneys only to evaluate the medical conditions of their clients in furtherance of their individual claims, for which the Becnel Attorneys were compensated from the recoveries of those clients. Furthermore,

---

21. In addition, work relating to the Shell Study was not approved by the PMC as common benefit work.

there is no proof that the Shell Study inured to the benefit of
MDL 1203 plaintiffs or the settlement class.   The Shell Study has
not been published and was not entered into evidence at the
fairness hearing in support of the settlement.   Accordingly, the
Becnel Attorneys are not entitled to any compensation.[22]

### b.   Parker and O'Connell, PLLC

The law firm of Parker & O'Connell, PLLC ("Parker &
O'Connell") requests an award of attorneys' fees and
reimbursement of expenses for prosecuting an uncertified medical
monitoring state class action against AHP in Jefferson County
Circuit Court in Louisville, Kentucky.[23]   The state court
dismissed this class action on the grounds that medical
monitoring claims are not recognized under Kentucky law.   This
dismissal was affirmed by the Kentucky Court of Appeals and, more
recently, by the Kentucky Supreme Court.[24]   Wood v. Wyeth-Ayerst
Labs., 2002 WL 1940664, at *10 (Ky. Aug. 22, 2002).   Parker &
O'Connell argues that, despite the Kentucky Supreme Court's

---

22.   It is unclear whether the Becnel Attorneys were seeking
reimbursement from the MDL 1203 Fee and Cost Account, the
settlement funds or both.   We do not fault the Becnel Attorneys
for this confusion, especially because the Joint Petitioners did
not separate the recoveries they seek between the funds.   In any
event, the court has concluded that the Becnel Attorneys are not
entitled to reimbursement of fees and costs from any of the funds
at issue.

23.   Parker & O'Connell also filed two additional class action
lawsuits in federal court, which were transferred to MDL 1203 and
then voluntarily dismissed without prejudice.

24.   At the time of the filing of Parker & O'Connell's individual
petition, the Supreme Court of Kentucky had not yet ruled on this
matter.

ruling, its medical monitoring class action was a potential liability for AHP and, therefore, AHP was motivated to enter into the Settlement Agreement because of it.  According to Parker & O'Connell, this "motivation" benefitted the settlement class. Parker & O'Connell also argues that its class action is similar to an uncertified class action filed by the Gonzalez Law Office, whose application was included in the joint petition.  Thus, Parker & O'Connell believes that its time and expenses also should have been part of the joint petition.

There is no proof that Parker & O'Connell's state class action influenced AHP in negotiating and entering into the Settlement Agreement.  Thus, the court cannot conclude that this particular class action conferred any benefit on the settlement class.  The fact that the Gonzalez Law Office's Application was included in the joint petition also does not establish Parker & O'Connell's entitlement to fees and expenses.  Although both of the class actions filed by Parker & O'Connell and the Gonzalez Law Office were dismissed, the Gonzalez Law Office was successful in having the dismissal reversed by the appellate court in Florida.  According to the Joint Petitioners, this reversal was a benefit to the settlement class.  For the foregoing reasons, the court denies Parker & O'Connell's request for an award fees and reimbursement of expenses.

### c.  Objectors' Counsel

The following Individual Petitioners seek an award of fees and expenses based on objections they made to the

-29-

settlement:  (1) Pritchard, McCall & Jones; (2) Edward W. Cochran, Esquire; (3) Paul S. Rothstein, Esquire; (4) Cummins & Cronin, LLC; (5) N. Albert Bacharach, Jr., Esquire; (6) R. Steven Griffis, Esquire; (7) Bishop & Associates; (8) George W. Cochran, Esquire; (9) Thompson Hustler, Esquire; and (10) Behrend & Ernsberger, P.C. ("Objectors' Counsel").  Objectors' Counsel argue that they are entitled to fees and expenses because their supplemental objections led to the Fourth Amendment, which addressed issues relating to cash flow in funding matrix benefits and AHP's rights to Credits against its funding obligations for payments to Class Members who opted-out of the settlement.

The objections that purportedly resulted in the Fourth Amendment were set forth in a two-page document that was filed one day prior to the commencement of the fairness hearing.  The court finds that these objections did not "enhance" the settlement for several reasons.  First, the record shows that Class Counsel and AHP began negotiating the terms of the Fourth Amendment before Objectors' Counsel filed their supplemental objections.  Second, Objectors' Counsel unconditionally withdrew the supplemental objections, with prejudice, during the fairness hearing.  Although Objectors' Counsel assert that they withdrew their objections because they were told that the content of their objections would be addressed in the Fourth Amendment, Objectors' Counsel have not submitted any proof that their objections caused

-30-

the parties to negotiate the Fourth Amendment.[25]  Third, due to
the number of Initial Opt-Outs filed prior to the fairness
hearing, it was apparent that AHP's right to Credits might
negatively impact the solvency of Fund B.  Objectors' Counsel
seek $2.75 million in fees and expenses.  The court finds that it
would be inappropriate to award Objectors' Counsel this amount
for pointing out the obvious, especially because Fourth Amendment
negotiations were already in progress at the time the
supplemental objections were made.  Thus, for the foregoing
reasons, the court finds that Objectors' Counsel are not entitled
to an award of fees and expenses because they have failed to show
that their supplemental objections actually conferred a benefit
on the settlement class.

### d.  Non-PMC Refund Counsel[26]

Non-PMC Refund Counsel request an award of fees and
reimbursement of costs relating to their prosecution of non-
certified, nationwide class actions for purchase price refunds.
In support of their request, Non-PMC Refund Counsel argue that:
(1) they conducted substantial factual investigation and legal
research in preparing for the filing of their actions; (2) once
the actions were filed, they preserved and pursued the class

---

25.  It actually appears as if Objectors' Counsel withdrew their
objections because the court was about to consider striking the
objections because Objectors' Counsel had failed to comply with
their discovery obligations.

26.  References to "Non-PMC Refund Counsel" include the following
firms:  (1) Finkelstein, Thompson & Loughran; (2) Krause &
Kalfayan; (3) G. Martin Meyers, P.C.; and (4) Chitwood & Harley.

refund claims by moving for class certification; (3) at the direction of the Special Discovery Master, they participated in the "Non-PMC Coordinating Committee," which involved participation in discovery and coordination of the compilation of contested and uncontested facts relating to the Non-PMC's class certification motions; (4) with the approval of the court, they participated in discovery prior to the fairness hearing; and (5) they filed written comments in support of the Settlement Agreement.  Furthermore, Non-PMC Refund Counsel argue that, unlike the PMC, they pursued nationwide class refund claims, which ultimately became part of the Settlement Agreement with AHP.

According to the Joint Petitioners, Non-PMC Refund Counsel are not entitled to any award because they have failed to establish that their specific services benefitted the settlement class.  The Joint Petitioners also argue that AHP was "indifferent" to the refund claims asserted by Non-PMC Refund Counsel.  In particular, the Joint Petitioners explain that refund claims were included in the Settlement Agreement because at the time the parties were negotiating the Settlement Agreement state class counsel in New Jersey were trying a certified class action in which they were seeking refunds under New Jersey's consumer fraud statute.  Moreover, the Joint Petitioners assert that because Non-PMC Refund Counsel did not actively pursue their medical monitoring claims, it was questionable whether the court had jurisdiction over their refund claims.

-32-

The key issue in determining whether attorneys are entitled to fees and expenses from a common fund is whether the work performed benefitted the settlement class.  Although it appears that the amount of work performed by Non-PMC Refund Counsel in prosecuting their class actions was significant, the record does not support a finding that these actions caused AHP to include refund benefits in the Settlement Agreement.  To the contrary, the record shows that refund claims were included in the Settlement Agreement as a result of the advancement of such claims in the class action trial pending in New Jersey.  Thus, Non-PMC Refund Counsel are not entitled to fees and expenses associated with prosecuting their refund class actions.

Nevertheless, the court recognizes that, at the direction of the Special Discovery Master, Non-PMC Refund Counsel did perform certain duties in connection with the Non-PMC Coordinating Committee.  Although these services were not approved by the PMC and, thus, do not constitute common benefit work under Pretrial Order No. 467, the court finds that a limited award to Non-PMC Refund Counsel for the work performed in this capacity is warranted because these services assisted the court in its consideration of the various class actions pending in MDL 1203.

### e.  Kentucky Applicants

Gallion, Baker & Bray, P.S.C., the Cunningham & Grundy Law Group and the Mills Law Office (the "Kentucky Applicants") have submitted an individual petition for fees and expenses

-33-

relating to a certified state class action in Kentucky.  In May,
1999, the Kentucky Applicants achieved certification for their
class action on behalf of 60,000 potential claimants in Kentucky
who purchased diet drugs from Dr. Rex Duff and Bariatrics, Inc.
Thereafter, in June, 1999, they filed a motion for a trial date
which was not heard until November, 1999.[27]  According to the
Kentucky Applicants, upon AHP's request, they agreed to defer the
trial of their class action.  They maintain that this agreement
protected the Settlement Agreement because to opt-out all of the
individuals covered by their class action would have caused the
nationwide settlement to fail.

        In response, the Joint Petitioners primarily argue that
the Kentucky Applicants are not entitled to an award of fees and
expenses because they failed to abide by the requirements of
Pretrial Order No. 2224, which required, among other things, that
Individual Petitioners submit a sworn Fee Presentation including
a narrative statement about the services performed that
benefitted the class and verified, contemporaneous time records.
They also argue that the Kentucky Applicants have failed to
establish that their class action conferred a benefit on the
settlement class.

        The Joint Petitioners have agreed that multiple
certified state class actions benefitted the settlement class and

_____

27.  Near the end of December, 1999 and after Class Counsel and
AHP made an announcement about the Settlement Agreement, the
Kentucky Applicants expanded their class action to include all
Kentucky residents who ingested diet drugs.

-34-

that the counsel involved in those actions should be compensated.
The court cannot find any reason to treat the Kentucky Applicants
differently than these other counsel.  Thus, the court finds that
the Kentucky Applicants are entitled to an award of reasonable
fees and expenses for the work they performed in connection with
their class action.

The court agrees with the Joint Petitioners, however,
that the Kentucky Applicants' failure to abide by the
requirements of Pretrial Order No. 2224 is problematic.
Specifically, the lack of detail in their time entries and the
fact that these records were not kept contemporaneously makes it
difficult to determine the amount of work, if any, that actually
was performed by the Kentucky Applicants.  Although the court has
determined that a lodestar analysis should not be performed when
considering fee petitions, the court does recognize the
importance of maintaining accurate time records to substantiate
claims that counsel performed significant work for which they
should be compensated.  During the fee hearing, the Kentucky
Applicants conceded that entries in their time records are in
fact unsubstantiated.  The Kentucky Applicants also agreed to
withdraw the unsupported time entries at issue.  Thus, the award
recommended for the Kentucky Applicants should be decreased due
to these deficiencies.

### f.  The Remaining Individual Petitioners

Prior to the fee hearing, the Joint Petitioners agreed
that the following Individual Petitioners should receive an award

-35-

of fees and expenses:  (1) Vermont Counsel; (2) Milberg Weiss

Bershad Hynes & Lerach, LLP; (3) Kenneth B. Moll and Associates,

Ltd.; (4) Law Offices of Charles J. Piven; and (5) Wolf,

Haldenstein, Adler, Freeman & Hers, LLP.  Because the Joint

Petitioners have dropped their objections to these individual

petitions, and have therefore acknowledged that a benefit was

conferred by these Individual Petitioners, the court finds that

these Individual Petitioners are entitled to an award of fees and

expenses.  Additionally, the individual petition filed by the

Campbell Law Firm has been resolved and is no longer before the

court.

### B.  MDL 1203 Fee and Cost Account

It is now commonly accepted in complex multiparty

litigation that a court can and in fact should appoint a

committee such as the PMC to coordinate the litigation and ease

the administrative burden on the court.  Vincent v. Hughes Air

West, Inc., 557 F.2d 759, 773-74 (9th Cir. 1977); In re Air Crash

Disaster at Florida Everglades on December 29, 1972, 549 F.2d

1006, 1014-15 (5th Cir. 1977); Manual for Complex Litigation,

Third (1995) § 20.221 at 27.  As a corollary to this appointment,

the court must be permitted to compensate fairly the attorneys

who serve on such a committee.  As the court explained in Florida

Everglades:  "if lead counsel are to be an effective tool the

court must have means at its disposal to order appropriate

compensation for them.  The court's power is illusory if it is

-36-

dependent upon lead counsel's performing the duties desired of
them for no additional compensation." Id. at 1016.

As discussed above, in Pretrial Order No. 467 the court
established a 9% and a 6% assessment on every federal and
coordinated state case, respectively, to provide this necessary
additional compensation.  These figures were arrived at by
estimating what was perceived to be the value of the services
that would be performed by the PMC.  The assessment on federal
cases was greater to account for the additional management
services provided by the PMC to cases transferred to MDL 1203.
Assessments in other multiparty litigation had ranged from 5% to
13%, so the figures seemed reasonable at the time.  The mere
sequestration of the 9% and 6% did not guarantee that the PMC
would receive the full amount.  Rather, the court made clear that
an award of fees would be made only after a proper showing of
entitlement based upon the contributions made by the PMC common
benefit attorneys.  Pretrial Order No. 467 at ¶ 7.

The Joint Petitioners request that the court award them
the full 9% and 6%, which as of June, 2002 amounted to
approximately $143 million.  While no specific rules exist in
determining how MDL assessments should be awarded, the court's
decision must be fair and reasonable.  Hensley v. Eckerhart, 461
U.S. 424, 433 (1983).  The Gunter factors discussed earlier do
not strictly apply to the MDL because we are not dealing with a
class settlement fund.  Nonetheless, the court believes that the
reasoning and analysis that led to their establishment when the

-37-

percentage of recovery method gained favor in the Third Circuit applies equally well here due to the size of the MDL fund created and the extent of the benefits conferred. See In re Cendant Corp. Litig., 264 F.3d 201, 255-56 (3d Cir. 2001); In re Orthopedic Bone Screw Prods. Liab. Litig., 2000 WL 1622741, at *4-5 (E.D. Pa. Oct. 23, 2000). We will thus consider the following modified version of Gunter factors when determining what is reasonable and fair:  the benefits conferred by the PMC, including the risks faced at the inception of the litigation and the skill of the attorneys involved; the size of the fund created; and assessments in similar cases. The court will also consider the objections that were raised to the 9% and 6% assessments. In general the objectors argue either that the amount of the assessment is too large or that special circumstances exist in their cases that justify an exemption from the assessment.

We start by examining the benefits conferred by the PMC's efforts. In order to carry out effectively their court ordered duties the PMC opened and operated an office in Philadelphia which at the height of the litigation had a staff of 17 attorneys, 7 legal assistants, and 9 clerical employees. The staff's duties included maintaining a database on the status of each MDL 1203 action, sending copies of over 2,500 pretrial orders and over 100 Special Master Decisions and Recommendations to the individual litigants, and explaining applicable practice and procedures to attorneys who were unfamiliar with

-38-

multidistrict litigation or the federal system.   These duties
continue today, as cases are still being transferred to this
court.   Also continuing to this day is the PMC's assistance to
the court and the Special Discovery Master regarding the
administration of the discovery schedule, including the process
of collecting plaintiffs' fact sheets, medical authorizations,
lists of medical providers, and expert disclosures.

In its role as discovery coordinator, the PMC helped
negotiate and draft agreements and pretrial orders that governed
discovery issues such as scheduling, the conduct of depositions,
confidentiality, and privilege.   After its creation, the PMC
Discovery Committee drafted a comprehensive set of
interrogatories and requests for production, then handled
objections to them through negotiation, motion practice, and
participation at hearings.   There were many hard fought battles
between the PMC and AHP over issues such as confidentiality and
privilege.   Ultimately, the PMC Discovery Committee received
approximately 9 million pages of documents from defendants and
third parties.   These were winnowed down to a set of
approximately 5,000 documents that were imaged and entered into a
database which was employed to prepare for depositions.   After
deposition discovery was completed, during which the PMC
Discovery Committee completed nearly 100 depositions of general
fact witnesses, an exhibit list was created and made available to
other plaintiffs' attorneys on CD ROM.   Additionally, the PMC
created a document depository at their office in Philadelphia

which contains the millions of documents produced in MDL 1203.
It is available to plaintiffs' attorneys and to transferor courts
following remand of cases for trial.

In order to manage the generic medical and scientific
issues involved in the diet drug litigation, the PMC Discovery
Committee created a Generic Expert Witness Committee ("GEWC")
composed of attorneys with special talents in the areas of
science and medicine.  The GEWC reviewed and analyzed all
available scientific literature relating to VHD and PPH causation
and then retained 16 experts to present generic expert testimony
on issues of liability, standard of care, causation of injury,
and medical monitoring.  Further, the GEWC analyzed the reports
of the 31 defense experts and deposed 17 of them.

The result of the general fact discovery and generic
expert development done by the PMC Discovery Committee in MDL
1203 was a comprehensive "trial package."  It consisted of a
database of the key documents in the litigation and the documents
themselves, transcripts of all depositions taken, summaries,
annotations, and video excerpts of key depositions, a narrative
factual statement and time line of all relevant events, both with
links to relevant documents, a Medical Science Literature
Database containing over 2,000 relevant items, key MDL 1203
pretrial orders, defendants' answers to interrogatories, and
sample in limine motions, trial briefs, and responses to
defendants' <u>Daubert</u> motions.  The trial package was designed to
enable plaintiffs' attorneys to try diet drug cases.  It was

presented at various seminars throughout the country and
disseminated to other lawyers with cases in MDL 1203.

Liability in the diet drug litigation was not
straightforward or certain.  AHP had raised what is known as the
FDA Defense, resulting from the fact that the Food and Drug
Administration had approved both Pondimin and Redux.  The PMC
faced significant risk at the beginning of the litigation that
the work they did would be unsuccessful and uncompensated.  The
members of the PMC and its committees all brought significant
national experience and expertise in mass tort litigation to
their roles.  They used this experience and expertise to litigate
vigorously all aspects of discovery with AHP and to complete
their administrative duties.  The discovery package created by
the PMC ultimately paved the way for the class settlement and
many individual settlements, to which the large amount of money
in the MDL 1203 Fee and Cost Account bears witness.

Given all of the above, there is no question that the
PMC conferred great benefit on all litigants in the MDL and
state-coordinated litigation.  Moreover, they performed their
duties with admirable skill, diligence, and efficiency.

Nevertheless, the court will not award the full 9% and
6% assessments as requested.  Rather, the court believes that a
fee equal to 6% assessments on federal cases and 4% assessments
on state cases is more reasonable and fairer to the individual
litigants involved, yet still fairly compensates the PMC and
others for their expenses and work in MDL 1203.  The court

-41-

arrives at this determination particularly in light of the size
of the fund created here.  We note again that the 9% and 6%
assessments were simply general estimations made at the beginning
of this litigation when neither the parties nor the court had any
idea how successful plaintiffs would be in their suits against
AHP for diet drug related injuries.  The court now has the
benefit of knowing how much money exists for compensation.  As
noted above, as of June, 2002, the MDL 1203 Fee and Cost Account
had deposits of approximately $143 million.  Out of this amount,
approximately $65 million represent 9% assessments, $74 million
represent 6% assessments, and $2.5 million represent blended
deposits.[28]  In addition, in one instance, the court approved a
$1.5 million assessment based on a special agreement between the
PMC and the Davis & Feder firm.  See Pretrial Order No. 2154.
This represents a blend of 4% and 9% on a settlement of a group
of cases.  The amounts collected represent an enormous sum which
surely surpasses what was anticipated.  Retroactively reducing
the assessments to 6% and 4% still results in a sum of
approximately $94 million from which the court can make an award
of costs and fees.

Moreover, the court finds that 6% and 4% assessments
are more in keeping with those currently being levied in other
MDL's.  For example, in In re Baycol Prods. Liab. Litig., MDL

_____

28.  This sum of $2.5 million consists of deposits where counsel
did not delineate how much were 9% assessments and how much were
6% assessments.  Since one-third of these assessments is being
returned, the exact breakdown between federal and state cases is
not important for present purposes.

1431, the court has established an across the board 6% in both federal and coordinated state cases. Similarly, in In re Phenylpropanolamine (PPA) Prods. Liab. Litig., MDL 1407, an assessment of 4% in federal cases and 3% in state cases is being used. Finally, in In re Propulsid Prods. Liab. Litig., MDL 1355, and In re Rezulin Prods. Liab. Litig., MDL 1348, the same percentages as chosen here, 6% and 4%, are in place.

Turning first to costs, the Joint Petitioners have documented $11,484,152 in reimbursable expenses allocable to the PMC's MDL 1203 costs. No objection was made to this calculation. The court has reviewed the reimbursable costs associated with the PMC's work in MDL 1203 and finds them reasonable. We will award the PMC $11,484,152 in costs from the MDL 1203 Fee and Cost Account. Since $6,465,815 were previously advanced to the PMC out of this Account with court approval, the actual of costs at this time will be $5,018,337.

Some $82.5 million remain for the fee award after subtracting the total costs of $11,484,152 and the one-third of the $143 million in assessments to be returned. The court will award counsel $80 million. This sum fairly compensates the PMC for its time as well as rewards it for excellent work and ultimate success. The remaining $2.5 million will be retained in MDL 1203 Fee and Cost Account for now. This reserve, along with further deposits from settlements or judgments in MDL cases and the interest that has accumulated and will continue to accumulate in the account, will be used in part to pay the Special Master's

-43-

fees associated with the fee proceedings, the costs associated with reimbursement, and other incidental expenses. There may also be future payments to counsel.

The court will ask the Escrow Agent[29] to establish a procedure by which monies can be returned, in accordance with this memorandum, to individual litigants or their counsel who have been subject to the 9% and 6% assessments. Interest will not be paid on these reimbursements. Finally, from this point forward Pretrial Order No. 467 will be modified, and the defendants will be directed to deduct 6% of all payments made to plaintiffs in settlements or satisfaction of judgments in federal cases, and 4% of all payments made to plaintiffs in cases eligible for state-federal coordination, to be deposited and held in the MDL 1203 Fee and Cost Account.

The objectors argue that the settlements reached with AHP in their individual cases were due solely to the work of their own attorneys and not the result of the PMC's efforts.[30]

---

29.  The court appointed Gregory P. Miller, Esquire as the Escrow Agent in Pretrial Order No. 892.

30.  Those who objected to payment of the assessment include: (1) Robins, Kaplan, Miller & Ciresi L.L.P.; (2) Jones, Verras & Freiberg, L.L.C.; (3) Law Offices of Brian S. Riepen; (4) Hersh & Hersh; (5) The Law Offices of Daniel E. Becnel, Jr.; (6) Fleming & Associates. L.L.P.; and (7) Law Offices of Ronald R. Benjamin. The objections made by the foregoing law firms are addressed in this memorandum. Also before the court is a Motion for Exemption from Pretrial Orders Nos. 467 and 517 and for a Refund of Fees ("Motion for Exemption") that was filed by Jonathan B. Andry, Esquire, Glen J. Lerner, Esquire and the Andry Law Firm, L.L.C. (collectively the "Andry Law Firm"), in Abercrombie, et al. v. American Home Products, et al., MDL 1203 Case No. 01-20102. The Andry Law Firm joined 318 plaintiffs in the Abercrombie case,
(continued...)

-44-

They assert that because they did not use or receive the MDL work product, the court should not require them to pay the assessment and doing so would result in unjust enrichment of the PMC.  We find these arguments unavailing for several reasons.

First, as the Fifth Circuit pointed out in <u>Florida Everglades</u>, 549 F.2d at 1012, when dealing with a similar situation, this is not simply a fee contest between private lawyers.  Such an approach "is a nostalgic luxury no longer available in the hard-pressed federal courts.  It overlooks the much larger interests which arise in litigation such as this." <u>Id.</u>  Because of the number of cases and the size of this litigation, there is a "public interest on the part of the court and the world at large" that must also be served.  <u>Id.</u>  The demands on the court in MDL 1203 are and have been extensive throughout the course of the litigation because of both its complexity and size.  It is therefore necessary for the court to "be permitted to bring management power to bear upon [it] to

---

30.(...continued)
which was transferred to MDL 1203.  After filing a motion to remand, but before said motion was decided, 271 plaintiffs in the <u>Abercrombie</u> action settled their claims with AHP and the Andry Law Firm was required to pay a 9% assessment.  In its Motion for Exemption, the Andry Law Firm argues that the court lacked jurisdiction over the entire <u>Abercrombie</u> action and, thus, the assessment should be returned to the Andry Law Firm.  Because these plaintiffs settled their claims before determination on their pending motion to remand, the Andry Law Firm's jurisdiction argument as it pertains to the assessment is moot.  Thus, the Andry Law Firm's Motion for Exemption is denied.  In Pretrial Order No. 2585, the court denied the Andry Law Firm's motion to remand with regard to the 47 plaintiffs who did not settle their claims.  Recently, the Andry Law Firm filed a motion to reconsider the court's decision.  The motion to reconsider is still pending.

prevent it from monopolizing the services of the court to the exclusion of other litigants." Id. In this multidistrict litigation, one of the ways in which the court's managerial power was exercised was the appointment of, and delegation of duties to, the PMC.

Congress created the JPML and vested it with the authority to transfer related cases to a single court for consolidated or coordinated pretrial proceedings. See 28 U.S.C. § 1407. It is important that the transferee court have the power to appoint and compensate a plaintiffs' committee by levying an assessment against all other plaintiffs. We understand how this may seem unfair to some of the individual attorneys involved who did a lot of work on their individual cases.[31] Nonetheless, it is necessary to carry out the will of Congress for the good of the public as a whole.

Second, if the application of an assessment in an MDL such as this depended on an individual analysis of each case to determine exactly how much each plaintiff used the appointed committee's work product, the goals of consolidated proceedings, to promote efficiency and economy would be frustrated. Over 5,000 cases have been subject to either a 9% or 6% assessment. It is unreasonable to suggest that this court should be charged with making "individualized factual determinations as to whether

---

31. We note however, that some of "Plaintiffs' individually retained attorneys' discovery efforts were duplicative, and thus frustrated the goal of efficiently conducting discovery through a plaintiffs' committee for the benefit of all plaintiffs in an MDL." Pretrial Order No. 1492 at 5.

an individual plaintiff actually used any common benefit material
or whether the availability of the material actually influenced
AHP's decision to settle a case." Pretrial Order No. 1492 at 6.
If the court were so charged, it would not be able to function.
Furthermore, it would violate the Supreme Court's admonition that
"[a] request for attorney's fees should not result in a second
major litigation." Hensley v. Eckerhart, 461 U.S. 424, 437
(1983); see Manual for Complex Litigation § 24.21 at 194.

The work done by the PMC in MDL 1203 clearly inured to
the benefit of all individual diet drug litigants.  As we have
previously explained:

> Indeed, AHP most assuredly has been deeply
> involved with the PMC from the outset.  To
> assume that AHP's legal position on most
> questions, including questions regarding
> settlement, has not been influenced by their
> adversarial engagement with the PMC is
> unrealistic.  For example, the PMC's
> voluminous discovery depository was available
> for Plaintiffs to make use of in their case
> if they so wished.  These materials are in
> the possession of numerous plaintiffs'
> attorneys throughout the country.  The court
> can legitimately assume that the availability
> of these materials and the efforts of the PMC
> in developing a case for liability against
> AHP substantially influenced AHP's evaluation
> of every plaintiff's case and its decision to
> settle.

Pretrial Order No. 1492 at 5-6.  Furthermore, we would remind
those who so vigorously object to the MDL assessment that a part
of it is used to reimburse the PMC for the portion of the Special
Master's fees for which it is responsible.  The Special Master,
Gregory P. Miller, Esquire, has been an invaluable resource to
the parties and the court.  It is hard to believe that any party

-47-

who participated in the MDL could argue that he or she derived no benefit whatsoever from the Special Master's extraordinary services.

### C.  Allocation Committee

The allocation of fees among the many Joint Petitioners and the Individual Petitioners also entitled to compensation is not a simple matter.  Recognizing this, the Joint Petitioners urge the court to afford them an opportunity to reach an allocation agreement among themselves.  They suggest that the court charge Arnold Levin, Esquire and Michael Fishbein, Esquire with the task of coordinating and developing an agreed upon allocation.  The court agrees with this suggestion, with some modification.

There is ample authority for a court making an award of attorneys' fees out of a common fund to permit lead counsel to allocate fees among all counsel entitled to share in the award. Bowling v. Pfizer, Inc., 102 F.3d 777, 781 (6th Cir. 1996); Longden v. Sunderman, 979 F.2d 1095, 1101 (5th Cir. 1992); In re Copley Pharm., Inc., 50 F. Supp. 2d 1141, 1148 (D. Wyo. 1999); In re Indigo Sec. Litig., 995 F. Supp. 233, 235 (D. Mass. 1998). Such a procedure makes sense because it relieves the court of the "difficult task of assessing counsels' relative contributions," In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 329 n.96 (3d Cir. 1988).  Moreover, lead/class counsel are generally "better able to decide the weight and merit of each other's contributions."  Copley, 50 F. Supp. 2d at 1148.  As one

-48-

court pointed out when dealing with a situation similar to the one here:

> [I]t is recognized that the allocation among counsel must depend at least in part upon the more subjective factors of the relative contributions of the attorneys to the group effort. In the context of this litigation, which has extended over an eight-year period, it is virtually impossible for the Court to determine as accurately as can the attorneys themselves the internal distribution of work, responsibility and risk.

In re Ampicillin Antitrust Litig., 81 F.R.D. 395, 400 (D.D.C. 1978). Of course, it is never a given that all counsel will agree with lead counsel's allocation. In such a case, the ultimate allocation must be made by the court. See Copley, 50 F. Supp. 2d at 1148; Indigo, 995 F. Supp. at 235.

In this case, compensable work was performed by over 80 law firms during a period spanning over four years. The court finds it is both more efficient and fairer to permit a small committee composed of several Joint Petitioners to make a first attempt at allocating the interim class fee award and the MDL 1203 fee and cost award. After considering the objectives of such a committee, the court appoints the following Joint Petitioners to the Fee and Cost Allocation Committee ("FCAC"):

(1)  Elizabeth Cabraser, Esquire
     Lieff, Cabraser, Heimann and Bernstein

     - PMC Member
     - Counsel for Certified Class in Washington State

(2)  Michael Fishbein, Esquire
     Levin, Fishbein, Sedran & Berman

     - Class Counsel

(3)   Arnold Levin, Esquire
      Levin, Fishbein, Sedran & Berman

- Co-Lead Counsel in MDL 1203
- Liaison Counsel in MDL 1203
- PMC Member
- Class Counsel

(4)   Dianne Nast, Esquire
      Roda & Nast

- PMC Member
- Sub-Class Counsel

(5)   Charles Parker, Esquire
      Hill & Parker

- Counsel for Certified Class in Texas

We name Arnold Levin, Esquire to chair the FCAC.  We hope each of the above individuals will be willing to serve.

Those appointed to the FCAC are respected attorneys who represent varying constituencies included in the joint petition and therefore should be well equipped to develop an acceptable allocation plan.  The FCAC is requested to file and serve such a plan within 45 days for court review and approval.  We expect that during this period members of the FCAC will engage in meaningful discussions in an attempt to develop an allocation that is fair and equitable to all involved.  If approved, the court will order the disbursement of funds.

We strenuously urge the FCAC and all petitioners entitled to an award to reach an agreed upon allocation.  If this turns out to be impossible, any objection shall be filed and served within 15 days after the FCAC plan is filed and served. The FCAC shall file and serve a response within 15 days after the

filing and service of any objections.  The court will then decide
the outstanding issues.