## IN THE CIRCUIT COURT OF BALDWIN COUNTY, ALABAMA

VIT INC.

      **Plaintiff,**                        *

vs.                                 *

**TIM ROGER AMEY, NELLIE**     *  **CV Case No.:**  CV-2012-900537
**AMEY (a/k/a NICKIE AMEY) and**
**FICTITIOUS DEFENDANTS**       *
**A, B, C, and/or D,** whether
singular or plural, being those persons,  *
that also are claiming to have an ownership
interest in or actual ownership of the house  *         CIRCUIT COURT
which is the subject of this action and         BALDWIN COUNTY, AL.
located at 11374 Elysian Circle, Daphne, AL  *           FILED
36526 and/or has filed a lawsuit claiming to
be damaged as the owner of a house located  *      APR 25 2012
at 11374 Elysian Circle, Daphne, AL 36526.
                                      *      JODY W. CAMPBELL
                                        CIRCUIT COURT CLERK

**DEFENDANTS.**

### COMPLAINT FOR DECLARATORY JUDGMENT

      Plaintiff, VIT, INC., comes before this Honorable Court to file its Complaint for

Declaratory Judgment and Relief pursuant to Rule 57 of the *Alabama Rules of Civil Procedure*

and the Code of Alabama 1975 §§ 6-6-220 through 6-6-232. Plaintiff seeks relief in this action

as follows:

### Parties and Jurisdictional Allegations

    **1.**     The Plaintiff, VIT, INC. ("VIT"), is a domestic privately held corporation

organized under, and with its principal business office located in, Mobile County,

Alabama. VIT was in the business of construction and real estate ownership. It is not a

dissolved corporation, but VIT is no longer operating in the construction business.

However, VIT was still in the business of building residential homes for re-sale in 2007.

EXHIBIT 2

In fact, VIT built the home that is the subject of this action and located at 11374 Elysian Circle, Daphne, AL 36526.

2.      DEFENDANTS, TIM ROGER AMEY and NELLIE AMEY (a/k/a Nickie Amey) (collectively as "DEFENDANTS"), are married individuals who reside in Baldwin County, AL.  The DEFENDANTS attempted to purchase through a Vendor's Lien Deed and twelve (12) month Promissory Note the house built by VIT and located at 11374 Elysian Circle, Daphne, AL 36526.  (Vendor's Lien Deed and Promissory Note attached hereto as Exhibits "A" and "B", respectively).  However, DEFENDANTS defaulted on the terms of the Promissory Note and Vendor's Lien Deed, causing VIT to foreclose upon DEFENDANTS and obtain and record a Foreclosure Deed in the Baldwin County Probate Court (Foreclosure Deed attached hereto as Exhibit "C").  VIT then placed DEFENDANTS under a six (6) month lease. (Lease Agreement attached hereto as Exhibit "D").  DEFENDANTS breached the terms of the Lease on several occasions by failing to pay rent at all or in full and failing to pay rent on time.  VIT then attempted to evict DEFENDANTS on several occasions, but they refused to leave until two months after the Lease had expired.  This is true even though they were served with a Notice to Vacate in May of 2012.  (Notice to Vacate attached hereto as Exhibit "E").[1]

3.      The house that is the subject of this lawsuit is located in Baldwin County, AL and has an address of 11374 Elysian Circle, Daphne, AL 36526.  The legal description of the subject house is as follows:

> Lot 41, Unit One, Austin Park, according to the plat thereof recorded on Slide # 2233C and re-recorded on Slide #'s 2236D, 2238B

---

[1] The Eviction Notice attached hereto is unsigned.  However, Defendants were properly served with a signed Eviction Notice as was testified to by the owner of VIT, Inc. in his deposition.  The deposition excerpt containing this testimony is attached as an exhibit to this Declaratory Judgment action.

2

and 2238F in the office of the Judge of Probate, Baldwin County, Alabama.

4.      The Elysian Circle house contains defective Chinese drywall that was discovered by VIT in the fall of 2010. Its presence has since been confirmed by the manufacturer of the defective drywall, Knauf Plasterboard Tianjin Co. Ltd. ("Knauf").[2] (30(b)(6) Deposition of VIT attached hereto as Exhibit "F", p. 62). VIT has a pending federal class action lawsuit in the ongoing Multi-District Litigation against Knauf and Interior Exterior Building Supply ("INEX") as the result of Knauf and INEX manufacturing and supplying the defective drywall. Additionally, VIT has a pending state court action against Andrews Ace Hardware ("Ace") as the result of Ace distributing the defective drywall to VIT. The style of the state court action is *VIT, Inc. v. Andrews Ace Hardware Company, Inc.*, CV-2011-636; In the Circuit Court of Mobile County, Alabama. VIT claims to be the owner of the house in both of its pending lawsuits concerning Chinese drywall.

5.      DEFENDANTS have also filed a lawsuit against Knauf and INEX in the Multi District Litigation class action lawsuits (separate Complaint from VIT) claiming that they are owners of the Elysian Circle house and were damaged as the result of the defective drywall. The style of DEFENDANTS' MDL lawsuit is *Payton v. Knauf GIPS KG*, et al., In the United States District Court for the Eastern District of Louisiana; Class Action Complaint Case cv-2009-07628. (MDL Complaint excerpts attached hereto as Exhibit "G").

6.      However, DEFENDANTS interestingly enough did not add VIT as a Defendant to their MDL lawsuit, nor did DEFENDANTS place VIT on notice of their lawsuit

---

[2] Plaintiff's counsel is in possession of the report from Knauf that confirms the presence of the defective drywall. However, this report is confidential and Knauf has instructed us that it cannot be disclosed to anyone since it was prepared for purposes of settlement.

against Knauf and INEX until the time that Knauf was ready to inspect the house for confirmation of the defective drywall. (Exhibit G and Exhibit F, pp. 96, 99). A Notice to Vacate had already been served upon DEFENDANTS at the time that VIT and DEFENDANTS became aware of the presence of defective drywall in the Elysian Circle house. (Exhibits E and F, pp. 101-102, 106, 108-109).

7.      An actual controversy of a justifiable nature exists between VIT and DEENDANTS involving the rights and liabilities of VIT and DEFENDANTS to claims arising from owning the subject home containing contaminated drywall.

8.      Jurisdiction and venue are proper in this case because the house that is the subject of this Declaratory Judgment action is located in Baldwin County, AL and the DEFENDANTS reside in Baldwin County, AL. This action seeks relief under the Alabama Uniform Declaratory Judgment Act. (Ala.Code §§ 6-6-220 through 6-6-232), as well as the Alabama breach of contract law.

## Factual Allegations

9.      On June 19, 2007, VIT granted to DEFENDANTS by way of a Vendor's Lien Deed equal interests in the Elysian Circle house in exchange for Five Thousand Dollars ($5,000) paid at the closing and DEFENDANTS' promise to pay VIT an additional Three Hundred, Seventy-Five Thousand Dollars ($375,000) over a period of twelve (12) months under the terms of a Promissory Note ("Note"). (Exhibits A and B). VIT was told by DEFENDANTS (and/or its realtor) that the Vendor's Lien Deed was only needed by DEFENDANTS for the purchase of the house for one year because at the end of one year DEFENDANTS would then be able to obtain permanent financing on the house.

(Exhibit F, pp. 15-16, 77-78). However, DEFENDANTS never qualified for permanent financing at the end of the term of the Note.[3] (Exhibit F, pp. 16, 78-79).

10.     One of the terms of the Note and Vendor's Lien Deed was that DEFENDANTS would pay VIT monthly installments of One Thousand, Eight Hundred Dollars ($1,800) for fourteen (14) consecutive days with the first payment due on July 1, 2007, and all additional payments made on the same day of each month thereafter for fourteen (14) consecutive months. (Exhibit A and B). A balloon payment was due on the fifteenth consecutive month in the amount of the remaining balance owed plus unpaid accrued interest. (Id.). On March 1, 2008, DEFENDANTS defaulted under the terms of the Note and Vendor's Lien Deed by failing to pay VIT the installment owed under the Note in the amount of One Thousand, Eight Hundred Dollars ($1,800). DEFENDANTS continued to default under the terms of the Note and Vendor's Lien Deed by continuing to not pay the amounts due VIT as monthly installments under the Note and Deed. (Exhibit F, pp. 67, 78-81, 93). In fact, as of December 1, 2009, DEFENDANTS had failed to pay their monthly installments for an additional fourteen (14) months. Making the total amount owed by DEFENDANTS as of December 1, 2009 totaling Thirty-Three Thousand, Five Hundred Ninety-Three Dollars and Forty-Four Cents ($33,593.44) including interest allowed under the Note and Vendor's Lien Deed for late or non-payment (Id.).

11.     VIT proceeded with foreclosure on the property pursuant to the terms of the Vendor's Lien Deed as the result of DEFENDANTS default under the terms of the Note and Vendor's Lien Deed for non-payment of the monthly installment payment and yearly property taxes. (Exhibits A, B and F, p. 82). At the foreclosure sale, VIT was the highest

---

[3] Defendants had already defaulted under the terms of the Note regardless of them not qualifying for permanent financing.

and best bidder for the property in question by offering a credit to the indebtedness due and owing under the vendor's Lien Deed by DEFENDANTS in the amount of Three Hundred Seventy-Seven Thousand, Five Hundred Sixty-Nine Dollars and Two Cents ($377.569.02). (Exhibit C). Therefore, a Foreclosure Deed was entered in the Probate Court of Baldwin County on December 11, 2009, reflecting VIT as owner of the Elysian Circle property. (Exhibit C). There were no efforts whatsoever made by DEFENDANTS to redeem the subject property after the foreclosure took place.

12.    At or soon after the time of the foreclosure by VIT on the subject property, it was discovered by VIT that DEFENDANTS were also in default of the Vendor's Lien Deed as the result of them not paying the property taxes owed by them for years they resided in the home under the Note and Vendor's Lien Deed for the Elysian Circle house. (Certificate of Redemption by Plymouth Park Investments a/k/a Equivest Financial, LLC attached hereto as Exhibit H). The Vendor's Lien Deed signed by the Defendant in June of 2007 specifically states the "Grantees" of the Vendor's Lien Deed (i.e., DEFENDANTS) are to assume the taxes falling due on the subject house as of the date of them signing the Vendor's Lien Deed. (Exhibit A). An investment company (Equivest Financial, LLC) redeemed the Elysian Circle house on May 27, 2008 as the result of DEFENDANTS failing to pay taxes due on the house. (Exhibits F, pp. 82-87 and H). VIT did not receive notice of the delinquent taxes because he did not reside at the house. (Id.). On January 6, 2010, VIT applied to redeem the subject property from the investment company and on May 17, 2011, VIT was granted redemption of the subject property after having to pay Ten Thousand, Two Hundred Sixteen Dollars and Eighty Cents ($10,216.80) to the Baldwin County Revenue Commissioner. (Id.).

13.     VIT then sought legal counsel to assist with forcing DEFENDANTS to vacate the premises in the fastest way possible since they refused to leave even after service of the Foreclosure Deed. (Exhibit F, p. 82-83, 89-91). With the advice of legal counsel, VIT presented DEFENDANTS with a six (6) month lease which they agreed to sign in order to remain in the house. (Exhibits D and F, pp. 82-83, 89-91). The start date of the lease was April 1, 2010 and its terms required monthly lease payments to VIT for an amount of One Thousand, Five Hundred Dollars ($1,500) due on the first day of each month beginning on the start date of the Lease. (Exhibit D).

14.     DEFENDANTS first became in default of the Lease on May 1, 2010 when they failed to make their monthly payment to VIT owed under the Lease. (Exhibit F, pp. 92-93). DEFENDANTS remained in the Elysian Circle house for nine (9) months even though the term of the lease was only for six (6) months during which time DEFENDANTS continually defaulted on making the monthly lease payments owed to VIT.[4] (Exhibit F, pp. 92-93). Even when DEFENDANTS did pay VIT rent, it was late. VIT is allowed late fees in the amount of One Hundred Eighty Dollars ($180) for all nine (9) months that DEFENDANTS did not pay their rent on time, in full or at all under the terms of the Lease. (Exhibit D). DEFENDANTS only paid a total of Five Thousand, Two Hundred Dollars ($5,200) during their entire time renting the subject house. Therefore, DEFENDANTS owe VIT an amount of Nine Thousand, Nine Hundred Twenty Dollars ($9,920) under the terms of the Lease Agreement. (Exhibit D). DEFENDANTS were served by registered mail on or about May 12, 2012 with a Notice

---

[4] Defendants made payments in full under the Lease in April and June of 2010, but failed to make entire payments owed in July and October of 2010 and did not make any payments in May, August, September, November or December of 2010. Defendants remained in the house even though they were served with a Notice to Vacate on May 12, 2010 and the Lease expired in October of 2010.

to Vacate as the result of their failure to pay rent. (Exhibit E). However, DEFENDANTS did not move out of the house until months after the Lease had expired. (Exhibit F, p. 93).

15.   On December 9, 2009, DEFENDANTS filed a lawsuit in the United States District Court for the Eastern District of Louisiana styled as *Payton v. Knauf GIPS KG*, et al.; Class Action Complaint Case cv-2009-07628. (Exhibit G). The basis of DEFENDANTS' MDL Complaint was that they were the owners of 11374 Elysian Circle, Daphne, Alabama 36526 and they had been damaged as the owners of the house since it contains defective Chinese drywall. (Id.). VIT was not named as a Defendant in DEFENDANTS' suit even though VIT was the builder and owner of the home. (Id.). Additionally, VIT was never placed on notice of the MDL lawsuit by DEFENDANTS. (Exhibit F, pp. 96, 99). Instead, the first time VIT learned of DEFENDANTS' MDL lawsuit was in the fall of 2011 (almost 2 years after said lawsuit was filed). This is when Defendant Tim Amey called the owner of VIT, Ira Turner, to request entry into the subject house in order for Knauf to inspect it to confirm the presence of defective drywall for purposes of DEFENDANTS' MDL case. (Id.). Knauf confirmed the presence of defective drywall during this inspection.[5] (Exhibit F, p.62).

16.   After VIT was made aware of DEFENDANTS' MDL lawsuit and claim as owners of the Elysian Circle house, VIT's counsel was in contact with DEFENDANTS' counsel in the MDL matter to provide them with the appropriate documentation showing that VIT is owner of the house and was at all times relevant to the claims in DEFENDANTS' lawsuit. However, it was the position of DEFENDANTS' attorneys that they would not stipulate to VIT being the owner of the house even after their receipt

---

[5] See, Footnote "2".

of VIT's ownership documentation (all of which is also provided as Exhibits to this pleading) based on their contention that VIT did not properly foreclose on DEFENDANTS. (Email from Knauf's counsel attached hereto as Exhibit "I"). Therefore, Knauf placed a hold on the remediation of the subject house which was scheduled for remediation to start on it under the Knauf Pilot Program in June or July of 2012. (Id.). The basis of Knauf placing a hold on the remediation of the Elysian Circle house is that two parties (VIT and DEFENDANTS) are claiming to be owners of the subject property (Id.).

17.   VIT contends that it is the rightful owner of the subject house and therefore, it is the only party to sue over the presence of defective Chinese drywall in the Elysian Circle house. DEFENDANTS contend that they were not properly foreclosed upon by VIT and therefore, they have ownership rights in the subject house causing them to not stipulate to VIT being the rightful owner of the house and/or dismissing their MDL lawsuit wherein they claim they are the owners of the house. However, VIT, nor its undersigned counsel, have ever been provided any documentation or basis for DEFENDANTS' counsel's contention that the foreclosure was improper. VIT contends that it properly foreclosed upon DEFENDANTS as the result of their non-payment of Note payments and other payments required of them under the Vendor's Lien Deed. VIT contends that it followed the law and the requirements under the Vendor's Lien Deed pertaining to proper foreclosure methods of the Elysian Circle property.

18.   Lastly and regardless of whether the foreclosure was proper, which VIT vehemently denies said foreclosure was improper, DEFENDANTS have never done anything to contest the foreclosure nor have they made any efforts whatsoever to redeem

the property in question. Furthermore, DEFENDANTS time to assert objections to the foreclosure and/or take actions of redemption after the foreclosure have passed since the foreclosure took place in December of 2009. Instead of objecting to the foreclosure, DEFENDANTS agreed to sign a Lease Agreement in order to remain in the house and did not contest to their eviction under the terms of the Lease.

### General Allegations

### Count I: Declaratory Relief of Ownership

A. **DEFENDANTS' OWNERSHIP RIGHTS TO THE HOUSE CEASED UPON THEIR DEFAULT UNDER THE TERMS OF THE VENDOR'S LIEN DEED AND PROMISSORY NOTE AND THEIR FAILURE TO REDEEM THE HOUSE AFTER THE FORECLOSURE**

19.     DEFENDANTS are claiming in their class action MDL lawsuit against Knauf and INEX that they were damaged as the result of the presence of defective Chinese drywall in the house they own located at 11374 Elysian Circle, Daphne, AL 36526. (Exhibit G). They further claim in their lawsuit that they are the rightful persons to bring products liability claims (and other claims) against Kanuf and INEX as the result of the defective drywall. (Id.). However, starting in March of 2008, DEFENDANTS repeatedly failed to pay the Note payments they were required to pay under the Note and Vendor's Lien Deed held by VIT on the subject property that would have allowed Defendants to be the owners of said house. (Exhibits A, B, C and F, pp. 67, 78-81, 82, 93). Additionally, DEFENDANTS failed to pay the property taxes owed on the subject house, which was also another requirement under the terms of the Vendor's Lien Deed. (Exhibits A, F, pp. 82-87 and H).

10

20.     Furthermore, the Vendor's Lien Deed allowed for VIT to foreclose upon the subject house in the event that DEFENDANTS defaulted under any term of the Vendor's Lien Deed. (Exhibit A).  The vendor's Lien Deed states that VIT shall be allowed to foreclose upon the lien "either by sale under the power granted by [the Vendor's Lien Deed] or by court proceedings or shall otherwise be allowed to litigate or employ an attorney for the collection of the owed sums" under [the Note and Vendor's Lien Deed]. (Exhibit A).  VIT chose the foreclosure option.  (Exhibit C).  The foreclosure upon DEFENDANTS was necessary as the result of their failing to pay the Note payments due during fourteen (14) out of the forty (40) months that DEFENDANTS and their family members resided in the house.  (Exhibits C and F, p.82).  On December 11, 2009, a Foreclosure Deed was recorded in the Baldwin County Probate Court wherein VIT became the sole owner of the subject house in exchange for forgiveness of the indebtedness owed by DEFENDANTS to VIT for Defendants default under the Note and Vendor's Lien Deed. (Exhibit C).  The total amount of forgiveness towards the indebtedness owed by DEFENDANTS that was given as consideration in the Foreclosure Deed was Three Hundred Seventy-Seven Thousand, Five Hundred Sixty-Nine Dollars and Two Cents ($377,569.02). (Exhibit C).

21.     DEFENDANTS have never contested the properness of the foreclosure procedure.  In fact, the first time that VIT was ever placed on notice that DEFENDANTS might have a problem with the foreclosure procedure was in the fall of 2011 when DEFENDANTS' MDL counsel stated that as being the reason that they believe DEFENDANTS have an ownership right in the subject property.  Nothing further has ever been provided by DEFENDANTS or their MSL counsel to VIT as to the basis for

this position as to the properness of the foreclosure proceedings or deed. Furthermore, DEFENDANTS did not act on their foreclosure right of redemption within the allotted one year time frame allowed by *Alabama Code of 1975 § 6-5-247*.

22.     VIT contends that DEFENDANTS cannot be the owners of the Elysian Circle house due to their default under the terms of the Note and Vendor's Lien Deed, as well as DEFENDANTS failure to pay the property taxes owed on the house. Furthermore, VIT foreclosed on the subject house and obtained a Foreclosure Deed showing its ownership in the house of which DEFENDANTS did not attempt to contest or otherwise try to redeem said property foreclosed upon. Lastly, it is VIT's contention that it is the only party that has a proper claim against Knauf and INEX for products liability and other related claims that would only arise as the result of VIT being the owner of the property which contains the defective drywall. DEFENDANTS' claim that they are the owners of the subject house and therefore, they are entitled to damages in their MDL lawsuit. However, the documentation entered with the Probate Court of Baldwin County, Alabama does not support DEFENDANTS' contention of ownership of the subject property.


B.     **THE FORECLOSURE WAS PROCEDURALLY PROPER AND THEREFORE, DEFENDANTS HAVE NO CLAIM OF OWNERSHIP**

23.     The Vendor's Lien Deed allowed VIT to conduct a foreclosure sale upon the subject house in the event that DEFENDANTS defaulted on payment of the principal amount due under the Note and Vendor's Lien Deed. (Exhibit A). Furthermore, it gave VIT the right to sell the subject property for cash at a public outcry in front of the Court House in Baldwin County, Alabama to the highest bidder. (Id.). Before the foreclosure

sale could take place, the Vendor's Lien Deed required VIT to notice the sale once a week for three consecutive weeks in a newspaper published in Baldwin County, Alabama stating the time, place and terms of the sale. (Id.). VIT abided by all of these requirements listed in the Vendor's Lien Deed in conducting the foreclosure sale on the Elysian Circle property. (Exhibit C).

24.     The Vendor's Lien Deed also allowed for VIT to bid for and purchase the subject property at the foreclosure sale. (Exhibit A). In the event that VIT was to purchase the subject property at the foreclosure sale of same, the Vendor's Lien Deed also allowed for the auctioneer conducting the foreclosure sale or VIT to execute a deed to VIT in the name of DEFENDANTS. (Id.). VIT further acted as it was allowed under the Vendor's Lien Deed by bidding for and purchasing the Elysian Circle property at the sale in exchange for crediting DEFENDANTS Three Hundred Seventy-Seven Thousand, Five Hundred Sixty-Nine Dollars and Two Cents ($377,569.02) to go towards the indebtedness owed to VIT under the Note and Vendor's Lien Deed. (Id.). The Foreclosure Deed signifying VIT's rightful purchase at the foreclosure sale of the Elysian Circle property was recorded in the Office of Probate Court of Baldwin County, Alabama on December 11, 2009. (Id.). Throughout the entire foreclosure proceedings VIT was advised by legal counsel as to how to properly carry out the foreclosure process. (Exhibit, F, p.82-83, 88-91).

25.     DEFENDANTS have not filed anything with the Court or otherwise placed VIT on notice of any contests to the way in which the foreclosure procedure took place. Instead, DEFENDANTS willingly entered into a Lease Agreement with VIT in order to stay in the subject house. (Exhibits D and F, pp. 82-83, 88-91). After the Notice to

Vacate for Non-Payment of the Lease was served upon DEFENDANTS, they remained in the house an additional eight (8) months until they vacated the property. DEFENDANT never petitioned the court for wrongful eviction proceedings by VIT. (Exhibits E and F, p. 93).

26.    DEFENDANTS further relinquished their rights to 11374 Elysian Circle, Daphne, Alabama 36526 when they did not act on their right of redemption under *Ala. Code* § 6-5-247. DEFENDANTS only had until December 11, 2010 to redeem the Elysian Circle property under the foreclosure laws of Alabama. (*Id.*). Defendants did not do anything towards redeeming their redemption rights as to the foreclosure of the house, but instead became more indebted to VIT under the terms of the Lease by not paying VIT the amounts it was owed in monthly rent. (Exhibit, F, p. 92-93.). While DEFENDANTS have asked VIT's owner, Ira Turner, to move back in the subject house, DEFENDANTS have never made any efforts whatsoever to clear up the debt that it is owed under the Note and Vendor's Lien Deed or the Lease. (Exhibit, F, p. 110.).

27.    DEFENDANTS refuse to withdraw their claims asserted against Knauf and INEX in the MDL litigation. (Exhibit G). This is true even though there counsel has been shown all of the documentation that VIT depends on to prove its ownership of the subject house and which said documentation is attached to this pleading. The Elysian Circle house was going to be remediated in Knauf's Remediation Pilot Program sometime this summer. (Exhibit I). However, as the result of the DEFENDANTS' unwillingness to stipulate that VIT is the rightful owner of the house, and/or dismiss their lawsuit, Knauf has placed the remediation of the Elysian Circle house on hold until such time that ownership of said house is agreed upon or determined otherwise. (*Id.*)

28.    Therefore, and for all of the reasons stated hereinabove, VIT contends that there is a genuine controversy regarding whether the Elysian Circle property was foreclosed upon properly and therefore, VIT is the rightful owner of the subject property.  VIT further contends that a genuine controversy exists because DEFENDANTS' basis for not dismissing their claims against Knauf and INEX in the MDL is they believe they are the owners of the house due to improper foreclosure procedures performed by VIT.  VIT believes that if the Court determines that the subject property was foreclosed upon properly by VIT, and no objections to said foreclosure were properly brought by DEFENDANTS, then VIT must be rendered the only party that can sue Knauf and INEX for property damages incurred as the result of the presence of defective Chinese drywall. The differing contentions of the parties as stated herein make it necessary for VIT to request this Court to determine the rights, obligations and remedies of the parties listed in this matter.

### Count II: Breach of Contract

29.    The total amount to be paid to VIT by DEFENDANTS for rent under the Lease Agreement was Nine Thousand Dollars ($9,000). (Exhibit D). The Lease also called for DEFENDANTS to pay VIT an amount of One Hundred Eighty Dollars ($180) each month that DEFENDANTS did not pay VIT the rent due on time or for the full amount owed each month.  (Exhibit D).  DEFENDANTS only paid VIT Five Thousand, Two Hundred Dollars ($5,200) during the nine (9) months that they resided in the house. DEFENDANTS should have paid VIT a total of Nine Thousand, Nine Hundred Twenty

Dollars for the time that they occupied the house under the Lease. (Exhibit D). This total is inclusive of the late payments that were owed under the Lease.

**30.** VIT properly evicted DEFENDANTS from the Elysian Circle house after DEFENDANTS failed to pay VIT as required under the terms of the Lease. (Exhibits E and G, pp. 89-91). In fact, DEFENDANTS remained in the house eight (8) months after they were served the Notice to Vacate. Furthermore, Defendants remained in the house longer the allotted six (6) months terms of the Lease. (Exhibit E and F, pp.89-91). DEFENDANTS did not file anything with the Court to contest their eviction under the Lease Agreement (Exhibit F, p.93). Therefore, DEFENDANTS have a duty to pay VIT the full amount that it is owed under the Lease.

**31.** DEFENDANTS breached the contract with VIT by not paying VIT an amount of Nine Thousand, Nine Hundred Twenty Dollars ($9,920) owed to VIT for rent and late fees under the terms of the Lease. (Exhibit D). This total amount is owed by DEFENDANTS to VIT as the result of said breach by DEFENDANTS.

WHEREFORE, the premises considered, the Plaintiff demands judgment against the DEFENDANTS, including Fictitious DEFENDANTS A through D, separately and severally, for compensatory damages in the amount of Nine Thousand, Nine Hundred Twenty Dollars ($9,920) and such other or further relief as may be warranted by the evidence and the findings of this Court.

WHEREFORE, Plaintiff prays for a judgment against Tim Roger Amey and Nellie Amey (a/k/a Nickie Amey) for the Plaintiff's claims of Ownership and Breach of Contract and demands the debt owed by DEFENDANTS, specifically the amounts owed under the Lease Agreement

totaling Nine Thousand, Nine Hundred Twenty Dollars ($9,920), plus the applicable interest allowed per annum. Plaintiff also prays for this Court to enter an Order stating that Plaintiff is the rightful owner of the real property located at 11374 Elysian Circle, Daphne, Alabama 36526 and which has a legal description stated hereinabove of:

> Lot 41, Unit One, Austin Park, according to the plat thereof recorded on
>
> Slide # 2233C and re-recorded on Slide #'s 2236D, 2238B and 2238F in
>
> the office of the Judge of Probate, Baldwin County, Alabama.

Plaintiff further prays for a judgment for additional compensatory damages, as well as all attorneys' fees and costs and any other relief this Honorable Court deems proper.

Respectfully submitted,
**ATTORNEYS FOR PLAINTIFF,**

*/s/ K. Amanda Herndon*
GREGORY E. VAUGHAN (VAU 013)
K. AMANDA HERNDON (HER 048)
HOLSTON ◊ VAUGHAN, LLC
Post Office Box 195
Mobile, Alabama 36601
Telephone: (251) 432-8883
Facsimile: (251) 432-8884
GEVlaw@bellsouth.net
KAHlaw@bellsouth.net

**DEFENDANTS TO BE SERVED BY PROCESS SERVER AS FOLLOWS:**

Mr. Tim Amey
10558 Eastern Shore Blvd., Apt. 222
Spanish Fort, AL 36527-5851
DEFENDANT

Mrs. Nellie Amey (a/k/a Nickie Amey)
10558 Eastern Shore Blvd., Apt. 222
Spanish Fort, AL 36527-5851
DEFENDANT


Courtesy Copy sent to the following persons via electronic mail:

Eric Hoaglund, Esq.
McCallum Hoaglund Cook & Irby, LLP
905 Montgomery Highway, Suite 201
Vestavia Hills AL 35216

Eddie Sexton, Esq.
Gentle Turner & Sexton
501 Riverchase Parkway East, Suite 100
Hoover, Alabama 35244

STATE OF ALABAMA:

COUNTY OF BALDWIN:

## VENDOR'S LIEN DEED

KNOW ALL MEN BY THESE PRESENTS, that VIT, INC., a corporation, the GRANTOR, for and in consideration of the sum of THREE HUNDRED EIGHTY THOUSAND AND NO/100THS DOLLARS ($380,000.00), of which FIVE THOUSAND AND NO/100THS DOLLARS ($5,000.00) is hereby acknowledged to have been paid to me by TIM AMEY and NELLIE AMEY, the GRANTEES, do hereby GRANT, BARGAIN, SELL AND CONVEY unto the GRANTEES, as tenants in common with equal interests during the period of their concurrent lives, and upon the death of either of them, the remainder to the survivor of said GRANTEES, the following described real property situated in the said County, State of Alabama, described as follows, to-wit:

Lot 41, UNIT ONE, AUSTIN PARK, according to the plat thereof recorded on Slide # 2233C and re-recorded on Slide #'s 2236D, 2238B and 2238F, in the Office of the Judge of Probate, Baldwin County, Alabama.

THIS CONVEYANCE AND THE WARRANTIES HEREUNDER ARE SUBJECT TO THE FOLLOWING:

1. Any and all reservations, restrictions, easements, right of ways, covenants and/or encumbrances which may appear of record in the Probate Court records.
2. Building setback lines, drainage, utility line easements and access easements, and walking/bridal trail as shown on the recorded plat of subdivision.
3. Right of way easement granted to Baldwin County by instrument recorded in Real Property Book 391, page 1305, and Real Property Book 642, Page 690.
4. Permanent drainage and private access easement conveyed from Austin Brook, L.L.C dated March 23, 2005 and recorded as Instrument No. 878823.
5. Declaration of Covenants, Conditions, & Restrictions of Austin Park Subdivision dated August 3, 2005 and recorded as Instrument No. 916323.
6. Minimum building setback lines and other matters established by the Baldwin County Alabama Zoning Regulations, dated October 17, 2000.
7. Articles of organization of Austin Park, L.L.C, dated December 21, 2004 and recorded as Instrument No. 859662.
8. Articles of Incorporation of Austin Brook and Austin Park Property Owners Association, Inc. dated August 3, 2005 and recorded as Instrument No. 916522.
9. Mortgage by VIT, Inc. to Century Bank dated November 21, 2005 and recorded in Instrument No. 942952.

TOGETHER WITH ALL AND SINGULAR the rights, tenements, hereditaments, members, privileges and appurtenances thereunto belonging, or in anywise appertaining:

TO HAVE AND TO HOLD the said above described property unto said GRANTEES, tenants in common with equal interests for the period of time they both survive, and to the survivor of them at the death of the other and unto the heirs and assigns of said survivor forever.

And, except as to taxes hereafter falling due, which are assumed by GRANTEES, and except as to the matters, exceptions, liens and easements set forth, the said GRANTOR for GRANTOR and for the successors and assigns of GRANTOR, hereby covenants with the GRANTEES, their heirs and assigns, that GRANTOR is seized of an indefeasible estate in fee simple in said property, that said property is free from all encumbrances except as is noted above, and that GRANTOR does hereby WARRANT and will forever DEFEND the title to said property unto the GRANTEES, their heirs and assigns, against the lawful claims of all persons.

Grantor and Grantees acknowledge the prior and first mortgage made by VIT, Inc. to Century Bank dated November 21, 2005 and recorded in Instrument No. 942952 in said Probate Records, which is not assumed by Grantees, but which Grantor agrees to pay in accordance with the terms thereof. Should Grantor default in making payments on said mortgage, Grantees may do so

1



**EXHIBIT**

**A**

and shall be given credit on the indebtedness secured hereby for any payments they may make on the note secured by said prior and first mortgage, but shall have no obligation to do so.

A vendor's lien is hereby specifically retained to secure the payment of the balance of said purchase money, namely, the sum of **THREE HUNDRED SEVENTY FIVE THOUSAND AND NO/100THS DOLLARS ($375,000.00)**, plus interest thereon as next hereinafter set forth, which said unpaid balance is evidenced by that certain promissory note of even date herewith, made by the **GRANTEES**, payable in lawful money of the United States, to the order of the GRANTOR, at _Post Office Box 8334, Mobile, AL 36689_ or such other place as the holder shall from time to time designate in writing, as follows:

In Fifteen (15) consecutive monthly installments, the first Fourteen (14) of which shall be in the amount of One Thousand Eight Hundred and no/100ths Dollars ($1,800.00) each, and the last of which shall be a BALLOON PAYMENT of the remaining principal balance due, together with any unpaid accrued interest, then remaining due. Each installment shall include interest in the amount of One Thousand Three Hundred and no/100ths Dollars ($1,300.00) and Five Hundred ($500.00) of each installment shall go towards the reductions of principal debt. The first installment to be due and payable on _July 1st_ , 2007, and a like installment to become due and payable on the same day of each month thereafter for a total of 14 payments of $1,800.00 and a final BALLOON PAYMENT of the remaining principal plus unpaid accrued interest, due on the 15th month. Installment amounts to be applied first to interest then due and the balance, if any, to be applied on the principal. Should any installment payment be more than 10 days delinquent, the payor agrees to pay a 5% late charge per delinquent installment, not as a penalty but to defray the expenses involved in handling of delinquent installments.

Privilege is given to pay said principal sum in full or to make additional payments on the same at any time, without penalty. The exercise of such privilege shall not relieve the makers of the obligation to make regular payments as provided herein.

By accepting this conveyance the GRANTEES do hereby agree and bind themselves, their heirs and assigns so long as any part of said purchase price, or interest thereon, remains unpaid, as follows:

1. To pay said note and the installments of principal and interest thereon when they respectively fall due.
2. To keep any buildings or other improvements now or which may hereafter be erected upon said property in good repair and insured against fire and lightning and, if required by the GRANTOR, also insured against windstorms, tornadoes and cyclones, by policies issued by good and solvent insurance companies selected by the GRANTOR, which policies shall be deposited with the GRANTOR and shall provide that loss, if any, shall be payable to the GRANTOR as the GRANTOR'S interest may appear, such policies to be in such amounts, not exceeding the insurable value of the said buildings or other improvements, as may be required by the GRANTOR.
3. To pay before the same become delinquent all taxes, assessments, liens, or other charges and encumbrances which may be or become effective against said property, or any portion thereof, together with all penalties, costs and other expenses incurred, or which may accrue, in connection therewith.
4. That if the GRANTOR, upon the happening of any default hereunder, shall foreclose this lien either by sale under the power herein contained or by court proceedings or shall otherwise resort to litigation for the recovery of the sums hereby secured, or employ an attorney to collect said sums, the GRANTEES will pay all reasonable costs of bringing down, from the date of this deed to the date of foreclosure sale hereunder, abstract of title to the property hereinabove described, and said costs, expenses and attorney's fees, and any other sum or sums due the GRANTOR by virtue of any of the special liens herein declared, and may be included in any judgment or decree rendered in connection with said litigation.
5. That if the GRANTEES should fail to perform any of the duties and obligations herein specified to be performed or done by the GRANTEES the GRANTOR may perform the same, but shall not be under any duty to do so, and for any sum expended by the GRANTOR in this behalf, together with interest thereon at the same rate provided in the promissory note secured hereby, GRANTOR shall have an additional lien, secured by these presents, on said property. The GRANTEES agree to pay the GRANTOR any sum or sums so expended by the GRANTOR, with the interest thereon, within ten (10) days after the mailing of written notice from the GRANTOR to the GRANTEES at the GRANTEES' place of residence last known to the GRANTOR of the expenditure of said sum or sums together with demand for payment thereof.

2

6. That upon the happening of a default in the payment of said principal note, or of any installment of principal and interest thereon or upon any default in the performance of any of the obligations herein imposed on the GRANTEES, the whole of said indebtedness secured hereby shall become due and payable, at the discretion of said GRANTOR, and the GRANTOR shall have the right to sell said property for cash, at public outcry in front of the Court House in said County, Alabama, to the highest bidder, after giving notice of the time, place, and terms of sale by advertisement published once a week for three (3) successive weeks in a newspaper published in said County, Alabama, to make proper conveyance to the purchaser; and the proceeds of said sale to apply, FIRST, to the payment of the costs of said sale, including a reasonable attorney's fee; SECOND, to the payment of the amount of said principal note, whether due or not, with the unpaid interest thereon to the date of sale, and any amount that may be due the GRANTOR by virtue of any of the special liens herein declared; THIRD the balance, if any, to be paid over to the said GRANTEES.

7. That at any sale under the powers herein the GRANTOR may bid for and purchase said property like a stranger herein, and in event the GRANTOR should become the purchaser at such sale, either the auctioneer conducting the sale or the GRANTOR may execute a deed to the GRANTOR in the name of the GRANTEES. The auctioneer, or the GRANTOR, making any sale under the powers herein is hereby authorized and directed to make the deed and to acknowledge and deliver the same made under the powers herein, the GRANTEES hereby agree to warrant and defend against the lawful claims of all persons. All recitals made in any deed executed under said powers shall be evidence of the facts therein recited.

8. The holder of this lien exercising the powers herein given is specifically authorized and empowered to use and employ the services of an auctioneer to conduct the foreclosure sale and to make, execute and deliver the conveyance to the purchaser at such sale; and the said auctioneer may exercise all of the other and additional rights and powers reserved in the GRANTOR or otherwise specifically given and granted to said auctioneer.

9. If on the day of sale as fixed by the advertisement of the sale herein provided for, or on any day fixed by any postponement of sale, the holder of this vendor's lien should, for any reason, deem it necessary to postpone or re-postpone said sale, then the GRANTEES authorize and empower the said GRANTOR or the auctioneer making said sale to verbally announce the postponement or re-postponement of said sale to some future date as may be deemed proper, and no further publication of the notice of the time and place of said sale shall be necessary. Any sale made in pursuance of said postponement shall be as valid and binding as if it had been made on the day fixed by the advertisement of said sale.

10. That the word "GRANTOR", wherever herein used, is intended to include the heirs and assigns of the GRANTOR.

11. The GRANTEES shall not, without the GRANTOR'S prior written consent in GRANTOR'S sole and unrestricted discretion, sell transfer, convey, pledge, encumber, grant a security interest in, or otherwise hypothecate or dispose of the property described herein or any interest therein. The GRANTEES shall not cause or permit any junior lien, encumbrance, or mortgage to be placed on the property described herein. If the GRANTEE shall cause any of the above mentioned acts to be committed, without prior written consent of the GRANTOR, the whole of such indebtedness secured hereby shall, at the complete and sole discretion of the GRANTOR, become immediately due and payable.

12. No failure of the GRANTOR to exercise any option herein given to declare the maturity of the debt hereby secured shall be taken or construed as a waiver of the right to exercise such option or to declare such maturity by reason of any past, or present, default on the part of the GRANTEES, and the procurement of insurance, or the payment of such taxes, or other liens, debts, or charges by the GRANTOR shall not be taken or construed as a waiver of the right to declare the maturity of the indebtedness hereby secured by the reason of the failure of the GRANTEES to procure such insurance, or to pay such taxes, debts, liens, or charges; and the lien of this instrument shall remain in full force and effect during any postponement or extension of time of payment of the indebtedness, or any part thereof secured hereby.

13. The GRANTEES shall not cause or permit the presence, use, disposal, storage or release of any hazardous substance on or in the property which may be in violation of any environmental law enacted by any governing authority. GRANTEES shall not do or allow anyone else to do, anything affecting the property that is in violation of any Environmental Law. The GRANTEES shall indemnify and hold harmless the GRANTOR, and GRANTOR'S successors and assigns from and against any loss, damage, cost expense or liability directly or indirectly arising out of or attributable to the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance on, under or about GRANTEES' property, including, but not limited to attorney's fees. This indemnity shall survive repayment of GRANTEES' obligations to the GRANTOR and the release of the lien, if any (whether by payment of the secured indebtedness or foreclosure or action in lieu thereof).

3

All rights, powers and privileges herein secured to the GRANTOR, and all obligations of the GRANTOR, shall inure to the benefit of and be binding upon the assigns of the debt herein secured, should the same be assigned, or transferred, and to the GRANTOR'S successors and assigns; and the promises, covenants, terms, conditions and agreements assumed by or imposed upon the GRANTEES shall, so long as any portion of the debt hereby secured remains unpaid, constitute covenants running with the land enforceable against the within named GRANTEES, their heirs and assigns.

This lien and the note secured are to be construed according to the Laws of Alabama.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals this the 19 day of June, 2007.

GRANTOR:

VYT, INC., a corporation

By: _____

Its: President

GRANTEES:

_____
TIM AMEY

_____
NELLIE AMEY

STATE OF ALABAMA:

COUNTY OF MOBILE:

Before me, the undersigned authority, a Notary Public in and for said State and County, personally appeared _____ as President of VYT, INC., a corporation, whose name is signed to the foregoing instrument, and who is known to me, who after me first being duly sworn on oath did depose and say that being informed of the contents of said instrument, (s)he executed the same voluntarily and with full power and authority to act on behalf of said corporation, on the day the same bears date.

Given under my hand and seal on this 19 day of June, 2007.

_____
NOTARY PUBLIC
My Commission Expires: 11/29/09

STATE OF ALABAMA:

COUNTY OF MOBILE:

I, the undersigned authority, a Notary Public in and for said State and County, hereby certify that TIM AMEY and NELLIE AMEY, whose names are signed to the foregoing instrument, and who are known to me, acknowledged before me on this day that, being informed of the contents of the instrument, they executed the same voluntarily on the same bears date.

Given under my hand and seal on this 19 day of June, 2007.

_____
NOTARY PUBLIC
My Commission Expires: 11/29/09

This instrument prepared by:
Lori Meadows, Esquire
24407 Lauder Place
Orange Beach, Al. 36561
(251) 942-8541

Grantee's address:

1374 Elysian Circle
Daphne, Al. 36526

# PROMISSORY NOTE

$375,000.00

Baldwin County, Alabama

June 19, 2007

FOR VALUE RECEIVED, the undersigned, hereinafter referred to as maker, promises to pay to VIT, INC., or order, the principal sum of THREE HUNDRED SEVENTY FIVE THOUSAND AND NO/100THS DOLLARS ($375,000.00), with interest thereon from the date, as described below. The said principal and interest shall be payable at P.O. Box 8254 Mobile AL 36689, or such other place as the order shall from time to time designate in writing, as follows:

In Fifteen (15) consecutive monthly installments, the first Fourteen (14) of which shall be in the amount of One Thousand Eight Hundred and no/100ths Dollars ($1,800.00) each, and the last of which shall be a BALLOON PAYMENT of the remaining principal balance due, together with any unpaid accrued interest, then remaining due. Each installment shall include interest in the amount of One Thousand Three Hundred and no/100ths Dollars ($1,300.00) and Five Hundred ($500.00) of each installment shall go towards the reductions of principal debt. The first installment to be due and payable on July 1st, 2007, and a like installment to become due and payable on the same day of each month thereafter for a total of 14 payments of $1,800.00 and a final BALLOON PAYMENT of the remaining principal plus unpaid accrued interest, due on the 15th month. Installment amounts to be applied first to interest then due and the balance, if any, to be applied on the principal. Should any installment payment be more than 10 days delinquent, the payor agrees to pay a 5% late charge per delinquent installment, not as a penalty but to defray the expenses involved in handling of delinquent installments.

Privilege is given to pay said principal sum in full or to make additional payments on the same at any time, without penalty. The exercise of such privilege shall not relieve the makers of the obligation to make regular payments as provided herein.

Each maker and endorser waives the right of exemption under the Constitution and laws of Alabama, and each maker and endorser waives demand, protest, and notice of protest, and all requirements necessary to hold them liable as maker and endorsers.

It is further agreed that the undersigned shall pay all costs of collection, including a reasonable attorney's fee on failure to pay any installment of principal and interest of this note on the due hereunder on the date thereof, or in the event of any other default hereunder or under the terms of the instrument securing the payment of the indebtedness represented hereby.

This note is to be construed according to the laws of the State of Alabama, and is secured by a vendor's lien retained in that certain Vendor's Lien Deed from VIT, INC. to TIM AMEY and NELLIE AMEY on even date herewith.

Upon failure to pay any installment of principal and/or interest when due or if any of the conditions and requirements in said vendor's lien be not complied with, the entire principal sum, at the option of the holder, shall become due and payable. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

If all or any of the property secured by said vendor's lien or any interest in it is sold or transferred without prior written consent of order, order may, at its option, require immediate payment in full of all sums stated in this note. If this option is exercised, written notice shall be given to maker according to the vendor's lien executed on the same bears date herewith. This note may be assumed, at the option of the order, if written consent is given by order prior to transfer of said property.

CAUTION: IT IS IMPORTANT YOU THOUROUGHLY READ THIS CONTRACT BEFORE SIGNING.

_____
TIM AMEY

_____
NELLIE AMEY

EXHIBIT

B

BALDWIN COUNTY, ALABAMA
JUDGE ADRIAN T. JOHNS
Recorded: 12/17/2009 9:52 AM
TOTAL        $   29.00
9 Pages

STATE OF ALABAMA )

COUNTY OF BALDWIN )

## FORECLOSURE DEED

    **WHEREAS**, heretofore on to-wit, June 19, 2007, **VIT, INC.**, a corporation, executed a Vendor's Lien Deed on the property hereinafter described to **TIM AMEY** and **NELLIE AMEY**, which said Vendor's Lien Deed is recorded as Instrument No. 1060037 in the office of the Judge of Probate of Baldwin County, Alabama; and

    **WHEREAS**, in and by said Vendor's Lien Deed the Grantor was authorized and empowered in case of default in the payment of the indebtedness thereby secured, according to the terms thereof, to sell said property at public outcry in front of the Court House in Baldwin County, Alabama, to the highest bidder, after giving notice of the time, place and terms of sale by an advertisement published once a week for three (3) successive weeks in a newspaper published in Baldwin County, Alabama, and said Vendor's Lien Deed provided that in case of sale under the power and authority contained in same, the Grantor was authorized to execute title to the purchaser at said sale, and it was further provided in and by said Vendor's Lien Deed that the Grantor may bid at the sale and purchase said property, if the highest bidder therefor; and

    **WHEREAS**, default was made in the payment of the indebtedness secured by said Vendor's Lien Deed, and the said **VIT, INC.** did declare all of the indebtedness secured by said Vendor's Lien Deed due and payable and said Vendor's Lien subject to foreclosure as therein provided, and did give due and proper notice of foreclosure of said Vendor's Lien by publication in THE BULLETIN, a newspaper published in Baldwin County, and of general circulation in Baldwin County, Alabama, in its issues of October 28, 2009, November 4, 2009, and November 11, 2009; and

    **WHEREAS**, on December 4, 2009, the day on which the foreclosure was due to be held under the terms of said notice, between legal hours of sale, said foreclosure was duly and properly conducted, and VIT, INC., as Grantor, did offer for sale and did sell at public outcry in front of the Court House in the County of Baldwin, Alabama, the property hereinafter described; and

    **WHEREAS, ROBERT E. McDONALD, JR.** was the Auctioneer who conducted said foreclosure sale and was the person conducting said sale for the said VIT, INC.; and

1



EXHIBIT

C

WHEREAS, the highest and best bid for the property described in the aforementioned Vendor's Lien Deed was the bid of VIT, INC. in the amount of THREE HUNDRED SEVENTY-SEVEN THOUSAND FIVE HUNDRED SIXTY-NINE AND 02/100THS ($377,569.02) DOLLARS, which sum of money VIT, INC. offered to credit on the indebtedness due and owing under the aforesaid Vendor's Lien Deed, and said real property thereupon was sold to VIT, INC.; NOW, THEREFORE,

KNOW ALL MEN BY THESE PRESENTS, that for and in consideration of the premises, and the credit in the sum of THREE HUNDRED SEVENTY-SEVEN THOUSAND FIVE HUNDRED SIXTY-NINE AND 02/100THS ($377,569.02) DOLLARS to the indebtedness due VIT, INC. from Tim Amey and Nellie Amey under the aforesaid Vendor's Lien Deed, the said VIT, INC. and the said ROBERT E. McDONALD, JR. as auctioneer conducting said sale do hereby GRANT, BARGAIN, SELL and CONVEY unto VIT, INC., a corporation, the following described real property, situated in Baldwin County, Alabama:

Lot 41, UNIT ONE, AUSTIN PARK, according to the plat thereof recorded on Slide #2233C and re-recorded on Slide #'s 2236D, 2238B, and 2238F in the Office of the Judge of Probate, Baldwin County, Alabama.

SUBJECT, HOWEVER, TO THE FOLLOWING:

1.    Any and all reservations, restrictions, easements, rights of way, covenants and/or encumbrances which may appear of record in the Probate Court records.

2.    Building setback lines, drainage, utility line easements and access easements and walking/bridal trail as shown on the recorded plat of subdivision.

3.    Right of way easement granted to Baldwin County by instrument recorded in Real Property Book 391, page 1305 and Real Property Book 642, Page 690 in the records of the Office of the Judge of Probate of Baldwin County, Alabama.

4.    Permanent drainage and private access easement conveyed from Austin Brook, L.L.C. dated March 23, 2005 and recorded as Instrument No. 878823 in the records of the Office of the Judge of Probate of Baldwin County, Alabama.

5.    Declaration of Covenants, Conditions and Restrictions of Austin Park Subdivision dated August 3, 2005 and recorded as

2

Instrument No. 916523 in the records of the Office of the Judge of Probate of Baldwin County, Alabama.

6.     Minimum building setback lines and other matters established by the Baldwin County Alabama Zoning Regulations dated October 17, 2000.

7.     Articles of Organization of Austin Park, L.L.C. dated December 21, 2004 and recorded as Instrument No. 859662 in the records of the Office of the Judge of Probate of Baldwin County, Alabama.

8.     Articles of Incorporation of Austin Brook and Austin Park Property Owners Association, Inc. dated August 3, 2005 and recorded as Instrument No. 916522 in the records of the Office of the Judge of Probate of Baldwin County, Alabama.

9.     Mortgage by VIT, Inc. to Century Bank dated November 21, 2005 and recorded as Instrument No. 942952 in the records of the Office of the Judge of Probate of Baldwin County, Alabama.

10.    Any and all exceptions, agreements, coal, oil, gas and mineral rights, mining and drilling rights, coal, oil, gas and other mineral leases, access rights, and all other matters of record including, but not limited to, those exceptions specifically set forth below.

11.    Encroachments, overlaps, boundary line disputes, overhangs, unrecorded easements, deficiency in quantity of ground, or any matters not of record, which would be disclosed by an accurate survey and inspection of the premises.

12.    An exception from this conveyance and the warranty of this conveyance of the title to all the oil, gas, hydrocarbons and minerals and mineral rights of whatsoever nature or kind, which are located in, on or under, or that may be produced from the above described real property which are owned by parties other than Grantors.

**TO HAVE AND TO HOLD** the above described property unto **VIT, INC.,** its successors and assigns forever; subject, however, to the statutory right of redemption on the part of those entitled to redeem as provided by the laws of the State of Alabama.

**IN WITNESS WHEREOF, VIT, INC.,** Grantor, has caused this instrument to be executed by and through **ROBERT E. McDONALD, JR.** as auctioneer conducting said sale, and as attorney in fact, and **ROBERT E. McDONALD, JR.** as auctioneer conducting said sale has hereunto set his hand and seal this the 4th day of December, 2009.

**VIT, INC.,** Grantor


by: _[signature]_
**ROBERT E. McDONALD, JR.,**
as Auctioneer and Attorney in Fact


_[signature]_
**ROBERT E. McDONALD, JR.,**
as Auctioneer conducting said sale


**STATE OF ALABAMA )**

**COUNTY OF MOBILE )**

I, the undersigned authority, a Notary Public, in and for said State at Large, hereby certify that **ROBERT E. McDONALD, JR.,** whose name as Auctioneer and Attorney in Fact for **VIT, INC.** is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that being informed of the contents of the conveyance, he, in his capacity as such Auctioneer and Attorney in Fact, with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 4th day of December, 2009.


_[signature]_
NOTARY PUBLIC,
STATE OF ALABAMA AT LARGE
My Commission Expires: 04/27/2011

4

STATE OF ALABAMA )

COUNTY OF MOBILE )

I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that **ROBERT E. McDONALD, JR.**, whose name as Auctioneer is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he in his capacity as such auctioneer, and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 4th day of December, 2009.

NOTARY PUBLIC,
STATE OF ALABAMA AT LARGE
My Commission Expires: 4/37/11

This instrument has been prepared by the above attorney based upon information as provided to the said attorney by the Grantee herein with regard to title and legal description of the real property without any independent verification thereof by said attorney.

This instrument was prepared by:

ROBERT E. McDONALD, JR.
Attorney at Law
2671 Government Blvd.
Mobile, Alabama 36606-2601
Phone: 251/478-9741

Grantee's address:

VIT, Inc.
PO Box 8354
Mobile, AL 36689

5

Alabama Residential Lease Agreement

**THIS LEASE AGREEMENT** (hereinafter referred to as the "Agreement") made and entered into this first day of April , 2010, by and between Bay Investments, Inc., (hereinafter referred to as "Landlord") and Tim and Nellie Amey (hereinafter referred to as "Tenant").

**WITNESSETH:**

**WHEREAS,** Landlord is the fee owner of certain real property being, lying and situated in Mobile County, Alabama, such real property having a street address of 11374 Elysian Circle, Daphne, Alabama 36526, (hereinafter referred to as the "Premises").

**WHEREAS,** Landlord desires to lease the Premises to Tenant upon the terms and conditions as contained herein; and

**WHEREAS,** Tenant desires to lease the Premises from Landlord on the terms and conditions as contained herein;

**NOW, THEREFORE,** for and in consideration of the covenants and obligations contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.  **TERM.** Landlord leases to Tenant and Tenant leases from Landlord the above described Premises together with any and all appurtenances thereto, as is, for a term of six (6) months, such term beginning on April 1, 2010, and ending at 11:59 PM on September 30, 2010.

2.  **RENT.** The total rent for the term hereof is the sum of Nine Thousand dollars ($9,000.00) payable on the 1st day of each month of the term, in equal installments of One thousand five hundred dollars ($1500.00), first installment to be paid upon the due execution of this Agreement, the second installment to be paid on May 1, 2010. All such payments shall be made to Landlord at Landlord's address as set forth in the preamble to this Agreement on or before the due date and without demand.

3.  **DAMAGE DEPOSIT.** Upon the due execution of this Agreement, Tenant shall not be required to pay a security deposit .

4.  **USE OF PREMISES.** The Premises shall be used and occupied by Tenant and Tenant's immediate family, consisting of Tim and Nellie, exclusively, as a private single family dwelling, and no part of the Premises shall be used at any time during the term of this Agreement by Tenant for the purpose of carrying on any business, profession, or trade of any kind, or for any purpose other than as a private single family dwelling. Tenant shall not allow any other person, other than Tenant's immediate family or transient relatives and friends who are guests of Tenant, to use or occupy the Premises without first obtaining Landlord's written consent to such use. Tenant shall comply with any and all laws, ordinances, rules and orders of any and all governmental or quasi-governmental authorities affecting the cleanliness, use, occupancy and preservation of the Premises.

5.  **CONDITION OF PREMISES.** Tenant stipulates, represents and warrants that Tenant has examined the Premises, and that they are at the time of this Lease in good order, repair, and in a safe, clean and tenantable condition.

6.  **ASSIGNMENT AND SUB-LETTING.** Tenant shall not assign this Agreement, or sub-let or grant any license to use the Premises or any part thereof without the prior written consent of Landlord. A consent by Landlord to one such assignment, sub-letting or license shall not be deemed to be a consent to any subsequent assignment, sub-letting or license. An assignment, sub-letting or license without the prior written consent of Landlord or an assignment or sub-letting by operation of law shall be absolutely null and void and shall, at Landlord's option, terminate this Agreement.

7.  **ALTERATIONS AND IMPROVEMENTS.** Tenant shall make no alterations to the buildings or improvements on the Premises or construct any building or make any other improvements on the Premises without the prior written consent of Landlord. Any and all alterations, changes, and/or improvements built, constructed or placed on the Premises by Tenant shall, unless otherwise provided by written agreement between Landlord and Tenant, be and become the property of Landlord and remain on the Premises at the expiration or earlier termination of this Agreement.

8.  **NON-DELIVERY OF POSSESSION.** In the event Landlord cannot deliver possession of the Premises to Tenant upon the commencement of the Lease term, through no fault of Landlord or its agents, then Landlord or its agents shall have no liability, but

EXHIBIT

**D**

the rental herein provided shall abate until possession is given. Landlord or its agents shall have thirty (30) days in which to give possession, and if possession is tendered within such time, Tenant agrees to accept the demised Premises and pay the rental herein provided from that date. In the event possession cannot be delivered within such time, through no fault of Landlord or its agents, then this Agreement and all rights hereunder shall terminate.

9. **HAZARDOUS MATERIALS.** Tenant shall not keep on the Premises any item of a dangerous, flammable or explosive character that might unreasonably increase the danger of fire or explosion on the Premises or that might be considered hazardous or extra hazardous by any responsible insurance company.

10. **UTILITIES.** Tenant shall be responsible for arranging for and paying for all utility services required on the Premises.

11. **MAINTENANCE AND REPAIR; RULES.** Tenant will, at its sole expense, keep and maintain the Premises and appurtenances in good and sanitary condition and repair during the term of this Agreement and any renewal thereof. Without limiting the generality of the foregoing, Tenant shall:

    (a) Not obstruct the driveways, sidewalks, courts, entry ways, stairs and/or halls, which shall be used for the purposes of ingress and egress only;

    (b) Keep all windows, glass, window coverings, doors, locks and hardware in good, clean order and repair;

    (c) Not obstruct or cover the windows or doors;

    (d) Not leave windows or doors in an open position during any inclement weather;

    (e) Not hang any laundry, clothing, sheets, etc. from any window, rail, porch or balcony nor air or dry any of same within any yard area or space;

    (f) Not cause or permit any locks or hooks to be placed upon any door or window without the prior written consent of Landlord;

    (g) Keep all air conditioning filters clean and free from dirt;

    (h) Keep all lavatories, sinks, toilets, and all other water and plumbing apparatus in good order and repair and shall use same only for the purposes for which they were constructed. Tenant shall not allow any sweepings, rubbish, sand, rags, ashes or other substances to be thrown or deposited therein. Any damage to any such apparatus and the cost of clearing stopped plumbing resulting from misuse shall be borne by Tenant;

    (i) And Tenant's family and guests shall at all times maintain order in the Premises and at all places on the Premises, and shall not make or permit any loud or improper noises, or otherwise disturb other residents;

    (j) Keep all radios, television sets, stereos, phonographs, etc., turned down to a level of sound that does not annoy or interfere with other residents;

    (k) Deposit all trash, garbage, rubbish or refuse in the locations provided therefor and shall not allow any trash, garbage, rubbish or refuse to be deposited or

permitted to stand on the exterior of any building or within the common elements;

(l) Abide by and be bound by any and all rules and regulations affecting the Premises or the common area appurtenant therein which may be adopted or promulgated by the Condominium or Homeowners' Association having control over them.

12. **DAMAGE TO PREMISES.** In the event the Premises are destroyed or rendered wholly uninhabitable by fire, storm, earthquake, or other casualty not caused by the negligence of Tenant, this Agreement shall terminate from such time except for the purpose of enforcing rights that may have then accrued hereunder. The rental provided for herein shall then be accounted for by and between Landlord and Tenant up to the time of such injury or destruction of the Premises, Tenant paying rentals up to such date and Landlord refunding rentals collected beyond such date. Should a portion of the Premises thereby be rendered uninhabitable, the Landlord shall have the option of either repairing such injured or damaged portion or terminating this Lease. In the event that Landlord exercises its right to repair such uninhabitable portion, the rental shall abate in the proportion that the injured parts bears to the whole Premises, and such part so injured shall be restored by Landlord as speedily as practicable, after which the full rent shall recommence and the Agreement continue according to its terms.

13. **INSPECTION OF PREMISES.** Landlord and Landlord's agents shall have the right at all reasonable times during the term of this Agreement and any renewal thereof to enter the Premises for the purpose of inspecting the Premises and all buildings and improvements thereon. And for the purposes of making any repairs, additions or alterations as may be deemed appropriate by Landlord for the preservation of the Premises or the building. Landlord and its agents shall further have the right to exhibit the Premises and to display the usual "for sale", "for rent" or "vacancy" signs on the Premises at any time within forty-five (45) days before the expiration of this Lease. The right of entry shall likewise exist for the purpose of removing placards, signs, fixtures, alterations or additions, that do not conform to this Agreement or to any restrictions, rules or regulations affecting the Premises.

14. **SUBORDINATION OF LEASE.** This Agreement and Tenant's interest hereunder are and shall be subordinate, junior and inferior to any and all mortgages, liens or encumbrances now or hereafter placed on the Premises by Landlord, all advances made under any such mortgages, liens or encumbrances (including, but not limited to, future advances), the interest payable on such mortgages, liens or encumbrances and any and all renewals, extensions or modifications of such mortgages, liens or encumbrances.

15. **TENANT'S HOLD OVER.** If Tenant remains in possession of the Premises with the consent of Landlord after the natural expiration of this Agreement, a new tenancy from month-to-month shall be created between Landlord and Tenant which shall be subject to all of the terms and conditions hereof except that rent shall then be due and owing at the same rate per month. Landlord has the right to change the rental rate with a thirty day written notice to given tenant. Such tenancy shall be terminable upon thirty (30) days written notice served by either party.

16. **SURRENDER OF PREMISES.** Upon the expiration of the term hereof, Tenant shall surrender the Premises in as good a state and condition as they were at the commencement of this Agreement, reasonable use and wear and tear thereof and damages by the elements excepted.

17. **ANIMALS.** Tenant shall be entitled to keep no more than one (1) domestic dogs, cats or birds; however, at such time as Tenant shall actually keep any such animal on the Premises, Tenant shall pay to Landlord a pet deposit of One hundred DOLLARS ($100.00), DOLLARS shall be non-refundable and shall be used upon the termination or expiration of this Agreement for the purposes of cleaning the carpets of the building.

18. **QUIET ENJOYMENT.** Tenant, upon payment of all of the sums referred to herein as being payable by Tenant and Tenant's performance of all Tenant's agreements contained herein and Tenant's observance of all rules and regulations, shall and may peacefully and quietly have, hold and enjoy said Premises for the term hereof.

19. **CONDITIONS OF NEIGHBORHOOD.** Landlord hereby advises Tenant to satisfy all of Tenant's requirements regarding the area and neighborhood conditions, including but not limited to schools, location and sufficiency of law enforcement, crime rate, proximity of registered offenders or felons, fire service and protection, and other governmental services; availability, sufficiency and cost of any wired or wireless internet connections, or any other telecommunications or technology services; proximity to industrial, commercial, or agricultural activities; existing and proposed construction, development, and transportation that may affect noise, traffic, or view; airport noise, or noise or odor from any source; domestic and wild animals; other nuisances, circumstances, or hazards; cemeteries; condition of any facilities or common areas; conditions and influences of significance to certain cultures and/or religions; and personal needs, preferences, and requirements of Tenant.

20. **DEFAULT.** If Tenant fails to comply with any of the material provisions of this Agreement, other than the covenants to pay rent, or of any present rules and regulations or any that may be hereafter prescribed by Landlord, or materially fails to comply with any duties imposed on Tenant by statute, within seven (7) days after delivery of written notice by Landlord specifying the non-compliance and indicating the intention of Landlord to terminate the Lease by reason thereof, Landlord may terminate this Agreement. If Tenant fails to pay rent when due and the default continues for seven (7) days thereafter, Landlord may, at

Landlord's option, declare the entire balance of rent payable hereunder to be immediately due and payable and may exercise any and all rights and remedies available to Landlord at law or in equity or may immediately terminate this Agreement.

21. **LATE CHARGE.** In the event that any payment required to be paid by Tenant hereunder is not made within three (3) days of when due, Tenant shall pay to Landlord, in addition to such payment or other charges due hereunder, a "late fee" in the amount of One hundred eighty DOLLARS ($180.00).

22. **ABANDONMENT.** If at any time during the term of this Agreement Tenant abandons the Premises or any part thereof, Landlord may, at Landlord's option, obtain possession of the Premises in the manner provided by law, and without becoming liable to Tenant for damages or for any payment of any kind whatsoever. Landlord may, at Landlord's discretion, as agent for Tenant, relet the Premises, or any part thereof, for the whole or any part thereof, for the whole or any part of the then unexpired term, and may receive and collect all rent payable by virtue of such reletting, and, at Landlord's option, hold Tenant liable for any difference between the rent that would have been payable under this Agreement during the balance of the unexpired term, if this Agreement had continued in force, and the net rent for such period realized by Landlord by means of such reletting. If Landlord's right of reentry is exercised following abandonment of the Premises by Tenant, then Landlord shall consider any personal property belonging to Tenant and left on the Premises to also have been abandoned, in which case Landlord may dispose of all such personal property in any manner Landlord shall deem proper and Landlord is hereby relieved of all liability for doing so.

23. **RIGHTS AND REMEDIES.** The rights and remedies under this lease are cumulative, and either party's using any one right or remedy will not preclude or waive that party's right to use any other. These rights and remedies are in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

24. **RECORDING OF AGREEMENT.** Tenant shall not record this Agreement on the Public Records of any public office. In the event that Tenant shall record this Agreement, this Agreement shall, at Landlord's option, terminate immediately and Landlord shall be entitled to all rights and remedies that it has at law or in equity.

25. **GOVERNING LAW.** This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of Alabama.

26. **SEVERABILITY.** If any provision of this Agreement or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

27. **BINDING EFFECT.** The covenants, obligations and conditions herein contained shall be binding on and inure to the benefit of the heirs, legal representatives, and assigns of the parties hereto.

28. **DESCRIPTIVE HEADINGS.** The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations of the Landlord or Tenant.

29. **CONSTRUCTION.** The pronouns used herein shall include, where appropriate, either gender or both, singular and plural.

30. **NON-WAIVER.** No indulgence, waiver, election or non-election by Landlord under this Agreement shall affect Tenant's duties and liabilities hereunder.

31. **MODIFICATION.** The parties hereby agree that this document contains the entire agreement between the parties and this Agreement shall not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto.

32. **NOTICE.** Any notice required or permitted under this Lease or under state law shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested, addressed as follows:

If to Landlord to:    Post Office Box 8384, Mobile, Alabama  28589.

If to Tenant to:    11374 Elysian Circle, Daphne, Alabama  36526.

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

33. **ADDITIONAL PROVISIONS; DISCLOSURES.**

_____
_____
_____
_____
_____

[Landlord should note above any disclosure about the premises that may be required under Federal or Alabama law, such as known lead-based paint hazards in the Premises. The Landlord should also disclose any flood hazards.]

As to Landlord this 1st day of April, 2010.

LANDLORD: Bay Investments, Inc.

Sign: _Isac Turner_ Date: _4/3/10_
    IRA L. TURNER

As to Tenant, this _____ day of _____, 20____.

TENANTS ("Tenant"):  Tim and Nellie Amey

Sign: _Tim Amey_ Date: _4/3/10_
    Tim Amey

Sign: _Nellie Amey_ Date: _4/7/10_
    Nellie Amey

# NOTICE TO VACATE FOR NON-PAYMENT OF RENT

## Tim and Nellie Amey

Date:   May 12, 2010

Notice to you and all others in possession that you are hereby notified to quit and deliver up the premises you hold as our tenant, namely: 11374 Elysian Circle, Daphne, Alabama 36526.

You are to deliver up said premises on or within Seven (7) days of receipt of this notice.

This notice is provided due to non-payment of rent. The present rent arrearage is in the amount of $1680.00 including late charges. You may redeem your tenancy by full payment of said arrears within seven (7) days as provided under the terms of your tenancy or by state law. In the event you fail to bring your rent payments current or vacate the premises, we shall immediately take legal action to evict you and to recover all damages due us for the unlawful detention of said premises.

_____

VICTORIA LOMBARD, BAY INVESTMENTS, INC.

CERTIFIED MAIL, Return Receipt Requested



EXHIBIT
E

1    IN THE CIRCUIT COURT OF BALDWIN COUNTY, ALABAMA

2

3

4

5                                         **ORIGINAL**

     VIT, INC.,

6            Plaintiff,

7

8    Vs.                                  CIVIL ACTION NO:

9                                         CV-2011-636

10   ACE ANDREWS HARDWARE COMPANY,
     INC., and Fictitious Defendants
11   A; B; C; and/or D,

12           Defendants.

13

14

15

16        The testimony of IRA L. TURNER, SR., taken

17   at the law offices of Brady Radcliff & Brown,

18   LLP, 61 St. Joseph Street, Mobile, Alabama, on

19   the 15th day of February 2012, commencing at

20   approximately 1:29 p.m.

21

22

23

*LOIS ROBINSON & ASSOCIATES*
POST OFFICE BOX 66604
MOBILE, ALABAMA  36660




**EXHIBIT**
**F**

2

```
1                A P P E A R A N C E S

2      FOR THE PLAINTIFF:

3                        Holston Vaughan, LLC
                         Post Office Box 195
4                        Mobile, Alabama 36601
                         BY:  K. Amanda Herndon, Esq.
5

6
       FOR THE DEFENDANTS:
7
                         Brady Radcliff & Brown, LLP
8                        61 St. Joseph Street
                         Suite 1600
9                        Mobile, Alabama, 36601
                         BY:  Craig Martin, Esq.
10

11

12

13

14

15                       LYNN ROBINSON-DYKES, CCR
                         COURT REPORTER
16

17

18

19

20

21

22

23
```

1  A.          Yes, ma'am.  It's been tied into

2  another house that's on Elysian Circle, plus a

3  lot that's on Elysian Circle, plus a lot on

4  Bonita Court on Gulf Shores.

5  Q.          And all that is still tied back in,

6  though, still with Century Bank?

7  A.          Right.

8  Q.          What was the purpose -- what was VIT's

9  purpose of constructing the Austin Park home?

10  Was it for your personal residence or was there

11  some -- a contract already on the house?  What

12  was the reason for the construction of this home?

13  A.          Well, it was -- the reason for the

14  construction was for, you know, to sell later.

15  Q.          So at the time it was constructed, in

16  other words, you didn't already have a contract

17  on the house for an owner --

18  A.          No.

19  Q.          -- other than VIT?

20  A.          Right.

21  Q.          Once the construction was complete, did

22  you put the house on the market for sale?

23  A.          Yes, ma'am.

1    Q.        Did somebody buy it?

2    A.        Yes, ma'am.

3    Q.        And who was that or did someone end up

4    buying the home?

5    A.        Yes.

6    Q.        And who was that?

7    A.        We got a guy by the name of Tim Amey.

8              It was not on a permanent con -- it was

9    on a vendor's lien, which was supposed to be for

10   one year, 12 months, it stated, that would be a

11   permanent loan with a -- for him for a 30-year

12   mortgage.  Which I couldn't go no 30-year

13   mortgage and he was supposed to get his permanent

14   mortgage, you know, at the end of the 12 months.

15   Q.        Did he actually ever own the home,

16   though?

17   A.        Not other than a vendor's -- just a

18   vendor's lien for 12 months.

19   Q.        And I'm gonna get back to questions

20   about that.  I know we have some issues to talk

21   about as far as ownership of the home.  I'll get

22   into greater detail later in the deposition

23   because right now I want to focus on the

```
1    Q.        Did you know that you had it in your
2    house as of that day?
3    A.        I didn't know it, no, ma'am.
4    Q.        So the first time that it was ever
5    confirmed that you had defective Chinese drywall
6    in your home was through Mr. Carpenter, John
7    Carpenter?
8    A.        John Carpenter was the first one that
9    indicated that that's what it was.
10   Q.        Now, since then, as you've already
11   testified, did Knauf come to your house and test
12   it and inspect it for defective drywall?
13   A.        Yes, ma'am.
14   Q.        And have they confirmed that, yes, you
15   have defective drywall?
16   A.        I asked one of the install -- guys that
17   was cutting out and he said, yes, it was
18   definitely Chinese Sheetrock, said it was
19   affected by Chinese -- you know, whatever the
20   ingredients was that was in the Sheetrock.
21   Q.        Do you know if VIT, Inc., built any
22   other homes that contained defective Chinese
23   drywall?
```

1   Q.        So you have 12 months from June 13 of

2   2011 until this loan mod is up?

3   A.        Right.  And that -- I don't know what's

4   going to transpire after that.  You know, I don't

5   -- because the house is just sitting, you know,

6   and my financial situation is not going to change

7   and it vacant.  I'm hoping they'll give me an

8   extension, but I don't know.

9   MR. MARTIN:

10            May I see that?

11  MS. HERNDON:

12            Yes.

13  MS. HERNDON:

14  Q.        Now, I know you've already testified

15  Mr. Amey moved out of -- and his family were

16  forced to move out of the house we're talking

17  about here in Austin Park as a result of him

18  and/or his family not paying their bills?

19  A.        Right.

20  Q.        To your -- they were forced to move out

21  by VIT, Inc.?

22  A.        Right.

23  Q.        Once they moved out, was VIT, Inc. --

1   been in the construction business for many years.

2   Is it your understanding that Plaintiff's

3   Exhibit 1, these invoices with Ace, is that your

4   contract with Ace?

5   MR. MARTIN:

6         Objection.

7   THE WITNESS:

8         Yes, ma'am.  That's the bills that they

9   sent that -- when I ordered the Sheetrock.

10   MS. HERNDON:

11   Q.      All right.  Mr. Turner, I want to now

12   turn our attention to Mr. Amey and -- because --

13   and ownership of the home.  So I want to turn to

14   that topic now.

15   A.      Okay.

16   Q.      Tell me how it is that Mr. Amey came

17   about living in the Austin Park home.

18   A.      Well, he -- he came out with a salesman

19   and they looked at the house and Mr. Amey decided

20   he wanted to buy it.  Well, Mr. Amey had problems

21   getting a 30-year loan, so he came out with the

22   -- a mortgage company, which I can't recall, but

23   I can recall -- I know the salesman, and asked me

1   would I sell it to him since they couldn't get a

2   -- said they needed to bring his credit score up

3   some and would I carry it for 12 months until he

4   could get a 30-year loan, and I agreed.

5           And at the end of the 12 months --

6   which they moved in. The end of the 12 months,

7   he was not able to get a permanent loan and he

8   went to many banks and all of them turned him

9   down.

10  Q.      And once he was not able to get a

11  permanent loan, how did he remain in the house or

12  how did VIT, Inc., allow him to remain in the

13  house?

14  A.      Well, he was kind of, more or less,

15  renting it. And I was gone and I called Baldwin

16  County and I asked them was the taxes being paid

17  on it and they indicated that they were and so I

18  didn't ask them who was paying it, but, see, the

19  company that had bought it at the courthouse

20  steps, they had purchased it and paid -- and, in

21  fact, they put up like $10,000 over and above the

22  taxes and -- but -- and then when I come back to

23  Mobile, I went and -- went to Bay Minette, and

1  come to find out, it wasn't Mr. Amey that was

2  paying the taxes, it was a private company.

3  And -- in fact, and within less than a year, I

4  would have lost the whole -- I would have lost

5  the house.

6         I had to go in there and pay 12 percent

7  interest plus the mortgage -- not the mortgage,

8  but the tax -- taxes and everything, interest,

9  and the amount that -- I think $10,700 to get the

10  house put back into VIT.  And plus there was no

11  insurance on the house.  Which they had let their

12  insurance lapse, you know, and I had to put

13  insurance on it and so that's the way he got it.

14  You know, and he just could not purchase a loan,

15  nobody would finance him.

16  Q.         And when he originally moved into the

17  house, since he didn't have permanent financing,

18  what was the financial arrangement between VIT,

19  Inc., and he as to how he was gonna live in the

20  house?

21  A.         Well, he -- it was a vendor's lien for

22  12 months, which the contract states.

23  Q.         And was that -- did he also sign a

1   promissory note?

2   A.        Right.

3   Q.        So there was a promissory note and a

4   vendor's lien in place in order for him to move

5   in the house?

6   A.        Correct.

7             (Plaintiff's Exhibit Number 7 was

8               marked for identification.)

9   MS. HERNDON:

10  Q.        I'm gonna show you what's Plaintiff's

11  Exhibit 7.  And will you identify these documents

12  for me, please?

13  A.        Yes, ma'am.  This is a promissory note

14  here that he -- he'd promised when the 12 months

15  was up, there'd be a balloon and -- with a

16  permanent -- permanent loan, you know.

17  Q.        And he never made it to the balloon

18  note, did he?

19  A.        No, ma'am.

20  Q.        Did he make -- and in that note, how

21  much was Mr. Amey to pay under that note in order

22  to maintain that vendor's lien deed?

23  A.        It was -- he was -- the amount was --

1   it's hard for me to read it.  It's $1800 for the

2   last payment, which would have been the balloon

3   payment, and then 300 and -- I can't hardly read

4   it, but, anyway, the balloon note was due for the

5   full amount after the 12 months was up.

6   Q.        Did Mr. Amey pay you $1800 a month

7   during the length of this note?

8   A.        He -- I can't recall how many notes he

9   missed, but he did not pay -- he was not up to

10  current date, you know.

11  Q.        He defaulted on the terms of the note?

12  A.        Yes, ma'am.

13  Q.        And as we sit here today, do you know

14  to the tune of how much he defaulted on the note?

15  A.        It was -- the rent and all was over --

16  it was 30-something thousand dollars.

17  Q.        But that's including rent?

18  A.        Right.

19  Q.        Which we're gonna get to that.

20  A.        Right.  Right.

21  Q.        Okay.  And in looking at Plaintiff's

22  Exhibit 7, is the vendor's lien deed that would

23  be attached to that note also in there Mr. Amey

1  had on the house when he initially moved in, on

2  page 2 of Plaintiff's Exhibit 7?

3  A.          Yeah.  It was a promissory note of

4  375,000 on June the 19th of '07.

5  Q.          And on page 2 of that exhibit, if

6  you'll turn the page --

7            Mr. Turner?

8  A.          Yeah.

9  Q.          If you'll turn the page of Plaintiff's

10  Exhibit 7.

11  A.          Oh.

12  Q.          Is that the vendor's lien deed that

13  would attach to that note?

14  A.          That's the vendor's lien.  And --

15  Q.          And so once Mr. Amey defaulted on the

16  note, what did VIT, Inc., do?  What was the

17  arrangement then with Mr. Amey in order for him

18  to stay in the house?

19  A.          Well, we -- we foreclosed on him and

20  took it back on paper, you know.  And I couldn't

21  -- I couldn't get him to -- I really couldn't get

22  him to move out, he wouldn't leave, so I --

23  another attorney said probably the cheapest and

```
 1    best way would be to just get him to sign a
 2    six-month lease, and when that six-month lease
 3    was up, then you could get him out.
 4                  (Plaintiff's Exhibit Number 8 was
 5                   marked for identification.)
 6    MS. HERNDON:
 7    Q.       I'm going to show you what's marked as
 8    Plaintiff's Exhibit 8.  Can you identify these
 9    documents?  And take your time and look through
10    all of them, if you would, please.
11    A.       Okay.  This first page indicates where
12    Baldwin County had sold the house for taxes.  And
13    like it states here, it was -- it was $10,216.80.
14    Q.       And was part of the arrangement with
15    Mr. Amey under the note and the vendor's lien
16    that he had to pay the taxes on the house in
17    order to remain in it?
18    A.       Yes, ma'am.
19    Q.       And did he do that?
20    A.       No, ma'am.
21    Q.       Okay.  And in looking at those
22    documents, again, can you identify them?  And
23    please do take your time.
```

1             So the first document reflects what?

2    A.        Well, it reflects that -- that on May

3    the -- May of 2008, that the house was sold for

4    taxes.

5    Q.        To who or what entity?

6    A.        You know, it -- I don't see in here

7    where it states who it was sold to.

8    Q.        Was it VIT, Inc.?

9    A.        Yeah.  It was sold back to VIT, Inc.

10   Q.        On the first page, on the first time

11   that it was foreclosed upon, was it -- who bought

12   it?  Was it VIT, Inc.?

13   A.        No.

14   Q.        It was another company?

15   A.        Another company, that's -- yeah.

16   Q.        Okay.  Page 2 of Plaintiff's Exhibit 8,

17   what do you identify that to be?

18   A.        Well, this page 2 consists of where the

19   tax collector had give me a payoff on what the

20   amount would be to buy the house back, and which

21   it states down here, and it was -- which would

22   have been the 10,000.

23   Q.        And so the second page of Plaintiff's

```
 1   Exhibit 8 is a reflection of the redemption by

 2   VIT, Inc. --

 3   A.          Right.

 4   Q.          -- of the foreclosure of the house?

 5   A.          Where VIT --

 6   Q.          Redeemed it.

 7   A.          -- redeemed the house.

 8   Q.          And the date of the other company, not

 9   -- the first page of Plaintiff's Exhibit 7 --

10   A.          On the first page?

11   Q.          Yes, sir.

12               -- what date was it the other company

13   first foreclosed on the property?

14   A.          The -- it says on the 27th day of 2008,

15   the real estate property described was sold.

16   Q.          27th day of what month?  I'm sorry.

17   A.          Of May.

18   Q.          Okay.  And then when is it that VIT,

19   Inc., redeemed the property in question from that

20   company?

21   A.          Okay.  Looks like that we redeemed it

22   the 9th month, the 10th -- the 30th day of 2011.

23   Q.          Okay.  And then the remaining pages
```

1    after the redemption certificate of VIT, Inc.,

2    the remaining pages of Plaintiff's Exhibit 8, can

3    you identify those for me, please?  You've

4    already identified page 1 and 2.

5    A.        Page 8?

6    Q.        Of Plaintiff's Exhibit 8, which is

7    right before you.

8    A.        Oh, okay.

9    Q.        You have already identified page 1 and

10   page 2 of that exhibit.  If you would, now, turn

11   to page 3, which I think you're gonna find is a

12   repeat of 2, and just confirm that for me.  Does

13   page 3 look to be identical to page 2?

14   A.        Yeah.  It's the same thing.

15   Q.        So if you would, turn to page 4 and the

16   remaining pages of Plaintiff's Exhibit 8 and

17   identify what those documents are.

18   A.        Well, it's -- page 4, it's a cashier's

19   check for $10,200.80 from Regions Bank.

20   Q.        Does that look like to be a payment on

21   behalf of VIT, Inc.?

22   A.        Yes, ma'am.  It was -- what it was, it

23   was for the redemption of the house, is what it

1   was for.

2   Q.        All right.  And then the last page of

3   Plaintiff's Exhibit 8, can you identify that for

4   me, please?

5   A.        Okay.  It's a check for $7,531 payable

6   to Teddy Frost [sic] -- which he's a commissioner

7   over there at Baldwin County, tax assessor --

8   from VIT.

9   Q.        Okay.  Again, is that associated with

10  the redemption of the property by VIT, Inc.?

11  A.        Yes, ma'am.

12  Q.        And after redeeming the property, did

13  VIT, Inc., take the step of having a foreclosure

14  deed on the property towards Mr. Amey?

15  A.        Yes, ma'am.

16  Q.        I'm gonna show you what is marked

17  Plaintiff's Exhibit 9.

18              (Plaintiff's Exhibit Number 9 was

19               marked for identification.)

20  MS. HERNDON:

21  Q.        Can you identify Plaintiff's Exhibit 9

22  for the record, please?

23  A.        Okay.  What this is is a foreclosure

1    deed.

2    Q.        Yes, sir.

3    A.        So for where we foreclosed on the

4    house, this is where it was deeded back to VIT,

5    Incorporated.

6    Q.        And if you would, please, for the

7    record, tell me the date that that foreclosure

8    deed was recorded.

9    A.        Okay.  It was June the 19th, 2007.

10   Q.        That's -- read that sentence.  That's

11   incorrect.  That's when it was the vendor's lien

12   deed, is that correct, was June of '07?

13   A.        Yeah, the foreclosure.

14   Q.        Okay.  What my question is, is can you

15   tell me the date that this foreclosure deed was

16   recorded with the probate court?

17   A.        Oh, okay.

18   Q.        You want me to help?

19   A.        Well, everything --

20   Q.        The recording is gonna be stamped up

21   here on the first page by the probate.  And if

22   you can't read that --

23   A.        I can't see it.

1  Q.        Okay.  Can you tell me from looking at

2  the document, then, when it was this foreclosure

3  deed was signed and notarized?  And that'll be

4  towards the back of the document.

5  A.        Okay.  It was the 4th day of December

6  of 2009.  That's when it was stamped.

7  Q.        And did Mr. Amey get a copy of that

8  foreclosure deed?

9  A.        Yes, ma'am.

10  Q.        So after the foreclosure of the house

11  took place upon Mr. Amey, did he remain in the

12  house?

13  A.        Yes, ma'am.

14  Q.        And how legally did he remain in the

15  house?

16  A.        Well, he just wouldn't move.

17  Q.        Okay.

18  A.        And we -- we sent him a notice, you

19  know, to vacate and he still didn't move.  So

20  that's when Mr. McDonald, which is an attorney --

21  he's the one I spoke of while ago -- he told me

22  the easiest way to get him out was just -- since

23  he wouldn't move, get him to sign a six-month

1   lease, and then after six months, he said you can

2   give him a notice and he's got to go.

3   Q.        And is this the vacate notice -- I'm

4   gonna show you -- I'm sorry.

5              (Plaintiff's Exhibit Number 10 was

6              marked for identification.)

7   MS. HERNDON:

8   Q.        I'm gonna show you what I've marked as

9   Plaintiff's Exhibit 10.  If you would for me,

10  please identify Exhibit 10.

11  A.        Yes, ma'am.  This is -- this was dated

12  May the 12th, 2010, and that's when he was served

13  and he was -- I think it was sent by registered

14  mail, and -- to vacate of Elysian Circle and --

15  Q.        So is that the vacate notice you

16  testified to earlier that was sent to Mr. Amey

17  after the foreclosure took place?

18  A.        Yes, ma'am.

19  Q.        Now, this is -- Plaintiff's Exhibit 10

20  is not signed.  Was Mr. Amey sent a signed copy

21  of this vacate notice?

22  A.        Yeah, he -- we sent him a signed one

23  and, you know --

1    MR. MARTIN:

2           Can I see that?

3    THE WITNESS:

4           -- but that's just a record for us

5    to -- a copy of it.

6    MS. HERNDON:

7    Q.       Now, you testified that Mr. Amey --

8    that then it was VIT, Inc.'s decision, based on

9    legal advice, to have Mr. Amey enter into a lease

10   agreement.

11   A.       Right.

12           (Plaintiff's Exhibit Number 11 was

13            marked for identification.)

14   MS. HERNDON:

15   Q.       Okay.  Can you identify for me

16   Plaintiff's Exhibit 11, please?

17   A.       Well, this is the lease that Mr. Amey

18   signed, six-month lease, I think it was.

19   Q.       Now, in this foreclosure process that

20   VIT, Inc., had to take for the house at Austin

21   Park against Mr. Amey, did it have legal counsel

22   assisting them with this process?

23   A.       The Ameys?

1    Q.       That's correct.  You've already

2    testified, we've seen the documents, of the

3    foreclosure, the redemption.  Was VIT, Inc.,

4    having legal representation to assist VIT with

5    the process of the foreclosure upon Mr. Amey?

6    A.       Yes, ma'am.

7    Q.       Did VIT, Inc., have legal counsel to

8    assist them to prepare this lease agreement that

9    you've identified as Plaintiff's Exhibit 11?

10   A.       I'm -- we got -- you know, we got a lot

11   of lease property and it could be a standard

12   lease, you know, that we use for rental property

13   and -- and -- but it was prepared by an attorney

14   in the beginning.

15   Q.       Did Mr. Amey default on the lease

16   agreement, under the terms of the lease

17   agreement?

18   A.       Well, he didn't -- he defaulted on some

19   of his payments.

20   Q.       So there were months that he did not

21   pay as he was supposed to under --

22   A.       Right.

23   Q.       -- the lease agreement; is that

1  correct?

2  A.        Right.  But I can't -- I can't tell you

3  exactly how many, you know.

4  Q.        You'd agree with me if he missed just

5  one payment under the terms of the lease, he's

6  violated the lease?

7  A.        Right.

8  Q.        And that the -- at the time that the

9  lease was up, is that when Mr. Amey actually

10  moved out?

11  A.        Yeah, he moved out after the lease was

12  up.

13  Q.        The date that Mr. Amey and his family

14  moved out of the Austin Park house, between the

15  deficiencies of the promissory note and the

16  deficiencies of not paying VIT under the lease,

17  do you sit here today and know how much Mr. Amey

18  owes you with a combination of being deficient on

19  both of those?

20  A.        It was in -- it was 30,000 -- it was 30

21  -- it was 30,000 plus.  I don't have the exact

22  amount, but I know it was over 30,000.

23  Q.        Additionally, when Mr. Amey moved out,

1    everything is damaged by the Sheetrock, see.

2    Q.        If there was no defective Sheetrock in

3    the house, would VIT, Inc., have promptly made

4    the repairs to the damage caused by the Ameys?

5    A.        Yes, ma'am.  I'd've went in there and

6    completely re-done it for, you know, rental

7    property or probably sell it.  I really probably

8    would've put it up for sale.

9    Q.        Now, as we sit here, are you -- are you

10   aware of Mr. Amey having a current pending

11   lawsuit related to living in this house and being

12   exposed to Chinese drywall, defective Chinese

13   drywall?

14   A.        Well, I've been told.  Now, I hadn't

15   had any documents sent to me.  But I've been told

16   that he does.  But, you know, for me to have

17   anything concrete, I don't have.

18   Q.        Well, has he called you about that

19   litigation?

20   A.        Yes, he's called me and said, you know,

21   different little -- dropped little hints that he

22   was expecting money out of it.

23   Q.        And did he ever sue you, the builder of

1    A.        He wanted -- yes, he wanted to look in

2    there.

3    Q.        And prior to that, did you have any

4    idea that he was also suing people concerning the

5    Chinese drywall?

6    A.        No, I had no idea.  Nothing indicated

7    that he, you know, was suing anybody.

8    Q.        Is it your understanding that

9    Mr. Amey's basis for the lawsuit is he's claiming

10   he's an owner of that house?

11   A.        That would be the only basis, I think,

12   because he hadn't complained to me about being --

13   any health problems.

14   Q.        Was Mr. Amey, Tim Amey, ever an owner

15   of the house at Austin Park, 11374 Elysian

16   Circle?

17   A.        Nothing above the little promissory

18   note and all he said he would pay off in the 12

19   months and a vendor's lien.  It was a vendor's

20   lien and a promissory note.  It lasted for

21   exactly 12 months.

22   Q.        Of which during that 12 months, he was

23   in default of the note and therefore the vendor's

```
 1   MS. HERNDON:

 2          Okay.

 3                    EXAMINATION

 4   BY MR. MARTIN:

 5   Q.       Mr. Turner, I'm Craig Martin.

 6   A.       Yeah.

 7   Q.       We met just a couple hours ago.

 8   A.       That's right.

 9   Q.       Just a few follow-up questions, sir.

10   A.       Now, I'm deaf in one ear.

11   Q.       Okay.  Well, please -- you know, please

12   let me know if you can't hear me.

13   A.       Yeah.

14   Q.       I'm happy to repeat myself, okay?

15           I think I understand the issues, but I

16   simply want to ask a couple follow-up questions.

17           Now, you're not suggesting or alleging

18   or VIT is not alleging that Mr. Amey's refusal to

19   pay taxes on the home had anything to do with the

20   drywall; is that correct?

21   A.       No.  That happened before any of

22   the drywall --

23   Q.       Right.
```

1    A.        -- come up.

2    Q.        His failure to pay taxes, as you

3    understand, as VIT understands, that's not

4    related to the drywall issue; is that correct?

5    A.        No, sir.  No, sir.

6    Q.        Okay.  And kind of a similar question,

7    then.  VIT's expenses in the redemption and

8    foreclosure process that you just talked about --

9    A.        Yes.

10   Q.        -- you're not contending that that was

11   related to any problems with the drywall; is that

12   correct?

13   A.        No.  That -- that happened prior to the

14   drywall.

15   Q.        Okay.  Yes, sir.

16             And then finally, a similar question.

17   You're not contending or VIT is not contending

18   that Mr. Amey's default under the lease agreement

19   and any associated expenses that it caused VIT --

20   that has nothing to do with the drywall problems,

21   does it?

22   A.        No.  The -- the expenses that --

23   incurred -- that we had to pay, no, that --

```
 1                    EXAMINATION

 2   BY MS. HERNDON:

 3   Q.          At the time that -- Mr. Turner, when

 4   Mr. Amey was -- defaulted -- let's start, one,

 5   with the promissory note -- did VIT, Inc., have

 6   any knowledge of the presence of defective

 7   drywall?

 8   A.          No.

 9   Q.          Did Mr. Amey -- could Mr. Amey have --

10   to your knowledge, did he have any knowledge of

11   defective drywall?

12   A.          There would've been no way he would

13   have known.

14   Q.          Okay.  Did Mr. Amey become aware of

15   defective drywall towards the end of his lease

16   agreement with VIT, Inc.?

17   A.          Yeah.  It was -- it was toward the end

18   of it.

19   Q.          And had Mr. Amey already defaulted on

20   paying under the terms of the lease agreement

21   prior to you disclosing to him the presence of

22   defective drywall?

23   A.          Yeah, he was in default.
```

1    Q.        Okay.

2    A.        It -- you know.

3    MR. MARTIN:

4              Broken light fixtures.

5    THE WITNESS:

6              Yeah.

7    MR. MARTIN:

8              All right.  Well, I let you go there,

9    Mandy, and I think we might be on the same page,

10   but I think I have to ask, then, back, because

11   I'm not sure what his response was.

12                    EXAMINATION

13   BY MR. MARTIN:

14   Q.        So had Mr. Amey told you that his

15   failure to pay the taxes had anything to do with

16   any problems with the drywall?

17   A.        No, sir.  That had -- the taxes not

18   being paid, the insurance not being --

19   Q.        Right.

20   A.        -- being lapsed had nothing to do with

21   the drywall.

22   Q.        Okay.  Did he ever tell you that his

23   failure to pay under the note or the lease

1   agreement had anything to do with any problems he

2   perceived with the drywall?

3   A.        No, sir.

4   Q.        Okay.  All right.  So, then, do I --

5   A.        All this occurred -- him not paying and

6   not paying the taxes, all this occurred before,

7   quite a bit before --

8   Q.        Right.

9   A.        -- anything ever come up about it.

10  Q.        So I think we're on the same page.

11  A.        Yeah.

12  Q.        So it's not -- you're not alleging that

13  any of those problems with the lease agreement,

14  the redemption, the foreclosure, kind of these

15  questions that we're talking about --

16  A.        No, sir.

17  Q.        -- have anything to do with problems

18  related to the drywall?

19  A.        No.  That occurred quite a bit before.

20  Q.        Okay.

21  MS. HERNDON:

22            And off the record.

23            (Off the record.)

1          (Break.)

2                    EXAMINATION

3    BY MS. HERNDON:

4    Q.          Mr. Turner, you testified that Mr. Amey

5    did contact you about his litigation, he's called

6    you about that.  Has Mr. Amey called you and

7    asked to move back in the house since he moved

8    out under the terms of the lease agreement?

9    A.          Yes, ma'am.  About a month ago, I was

10   in Nevada and he called me and asked me would

11   there be any way -- excuse me -- that could they

12   move back in the house and said they was in a

13   little apartment, said it was just like the walls

14   was closing in on them and they really needed to

15   move back in the house.  I said, well, you know,

16   it's impossible to do, I said, because I can't

17   have the power turned on and, you know, there's

18   no way you can move in a house without power, and

19   besides that, it's contaminated and you don't

20   want to move back in a contaminated house.

21              And so, yes, he did call me a month --

22   about a month ago to move back in.

23   Q.          And your understanding, this was while

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SEAN AND BETH PAYTON, individually, and on behalf of all others similarly situated, [ADDITIONAL PLAINTIFFS LISTED ON SCHEDULE OF PLAINTIFFS, ATTACHED HERETO AS EXHIBIT "A"], | CASE NO.: |
| **Plaintiffs,** | |
| v. | JURY TRIAL DEMAND |
| KNAUF GIPS KG; KNAUF PLASTERBOARD (TIANJIN) CO., LTD.; KNAUF PLASTERBOARD (WUHU), CO., LTD.; KNAUF PLASTERBOARD (DONGGUAN) CO., LTD.; [ADDITIONAL DEFENDANTS LISTED ON SCHEDULE OF DEFENDANTS, ATTACHED HERETO AS EXHIBIT "B"], | |
| **Defendants.** | |

CASE NO.:

CLASS ACTION COMPLAINT

_____/

## PLAINTIFFS OMNIBUS CLASS ACTION COMPLAINT (I)

Pursuant to Fed. R. Civ. P. 23, the class representatives in this action bring suit on behalf of themselves and all other similarly situated owners and residents of real property containing defective Chinese manufactured drywall that was designed, manufactured, imported, distributed, delivered, supplied, marketed, inspected, installed, or sold by the Defendants. In order to accomplish an effective class structure, each of the class representatives is pursuing a nationwide class action against the Knauf entities,[1] who are the manufacturers of the drywall located in

---

[1] Knauf consists of Knauf GIPS KG, Knauf Plasterboard (Tianjin) Co., Ltd., Knauf Plasterboard (Wuhu), Co., Ltd., and Knauf Plasterboard (Dongguan) Co., Ltd. (collectively "Knauf").

1



EXHIBIT
G

1506.  Plaintiff, Vickie H. Ames is a resident of Alabama and owns real property located at 3058 Arbor Bend, Birmingham, Alabama 35244.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

1507.  Plaintiffs, Tim and Nickie Amey are residents of Alabama and together own real property located at 11374 Elysian Circle, Daphne, Alabama 36526.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

1508.  Plaintiff, Mohammed Arif is a resident of Alabama and owns real property located at 2352 Arbor Glen, Birmingham, Alabama 35244.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

1509.  Plaintiffs, Richard John Armstrong and Virginia Shelley are residents of Alabama and together own real property located at 32334 Sandpiper Drive, Orange Beach, Alabama 36561.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

1510.  Plaintiffs, Christopher and Kristin Atkinson are residents of Alabama and together own real property located at 1017 Washington Court, Moody, Alabama 35004.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

1511.  Plaintiffs, James Monty and Suzanne Ballard are residents of Alabama and together own real property located at 101 Linden Lane, Birmingham, Alabama 35242.  Plaintiffs

Respectfully submitted,

Dated: December 9, 2009                  By: s/j/ _____

Russ M. Herman
Leonard A. Davis
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhkc.com
*Plaintiffs' Liaison Counsel MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Arnold Levin
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Victor Manuel Diaz
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
vdiaz@podhurst.com

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
  Matthews, Martinez, Gonzales,
  Kalbac & Kane
255 Aragon Avenue, 2nd Floor
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
  Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Bruce William Steckler
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seith Parker
Parker, Waichman, Alonso LLP
27399 Riverview Center Blvd.
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W.
Suite  650
Washington, DC 20006
Phone:  (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Daniel K. Bryson
Lewis & Roberts
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkb@lewis-roberts.com

Jeremy W. Alters
Alters, Boldt, Brown, Rash & Culmo, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Phone: (305) 571-8550
Fax: (305) 571-8559
jeremy@abbrclaw.com

Richard Serpe
Law Offices of Richard J. Serpe
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

## COUNSEL FOR INDIVIDUAL PLAINTIFFS[2]

### Alters, Boldt, Brown, Rash & Culmo,
*Counsel on Behalf of the Following Individual Plaintiffs:*

Abbott, Carl D./Adele
Adams, Kevin
Ambroise, Donald
Anderson, Mark
Anton, Kevin/Joann
Araujo, Marcos
Bongiorno, Salvatore/Arlene
Borkowski, Julie/Stephen
Brown, Dorene
Buckingham, Keith/Fasenda, Jose
Burkman, Ken/Puello, Rosi
Caliguiric, Jacob
Campbell, Ana Marie
Carr, Craig/Windsor, Jill
Carrion, Kathy
Carter-Smith, Jill
Castaneda, Juan Carlos
Catalogna, Michael and Phyllis
Ceglio, Carmine
Clarke, Roger
Coplin, Jose
Cohen, Jan and Michael
Cox, Shawn and Lisa

Cramer, David and Denise
Cummings, Mark
Davis, Matthew and Tricia
Davy, Christopher
DeJesus, leslie
DePirro, Stephen
DeSola, Nick and Heather
Diamond, James and Heidi
DiFillipo, Steven and Kathleen
Dube, Tim and Laura
Edelman, Michael
Fellows, David
Field, Theodore and Leslie
Firmani, Terry Lee
Fleurantain, Toussaint and Bernite
Fodor, Amy and Angelo
Foster, Katherine
Frenz, Ray
Fulks, Bonnie and Richard
Garcia, Gabriela
Garcia, Lorena and Angela
Gardner, Francesca and Brian
Geensburg, Cary

Giggey, Richard and Linda
Gimenez, Adriana
Gomez, Axel and Nicole
Gomez, Gerogina
Gonzalez, Dolores
Grant, Olga and Ross
Green, Colin and Natasha
Gumina, Frank
Hanson, Rene
Insco, John and Ruth
Jackson, Douglas
Jimenez, Camilo
Johnson, Paul
Kampf, Richard and Patricia
Knouff, Johna nd Jacqueline
Koc, Jeffrey and Lori
Kraham, Stuart
Lake, William and Jacqueline
Levin, Ronald and Carol
Macias, Juan Carlos/Hernandez, Adrianna
Martin, Aaron
McAuliffe, Dixie and Matthew

---

[2] Attached hereto as Schedule "D" is the contact information for each plaintiff's counsel and pro se plaintiff.

# CERTIFICATE OF REDEMPTION

## 1975 Code, Title 40-10-127

REDEM

### Certificate Number 17456

#### STATE OF ALABAMA BALDWIN                    COUNTY

Office of the Tax Collector/Revenue Commissioner, BALDWIN               COUNTY

Sales Docket   84 Page 2407              PPIN 273115

WHEREAS, on the 27 day of        May 3008, the real property hereinafter described was sold, in substantial conformity with all the requisitions of the statutes in such cases made and provided, by Teddy J. Faust, Jr. Tax Collector/Revenue Commissioner of said County, to PLYMOUTH PARK**SEE CODE 5 for the taxes, interests, penalties and costs, then due and remaining unpaid on said property; and whereas, VIT INC has made application to redeem said land.

NOW, THEREFORE, I Teddy J. Faust, Jr. Tax Collector/Revenue Commissioner of said County of BALDWIN being satisfied that the said VIT INC                          has an interest in said property, and has a right to redeem the same, do hereby certify that the said VIT INC                          has deposited with me, on this  6 day of   January, 2010     30216.80 Dollars for the redemption of the following real estate:

43-06-23-0-000-030.072

179.4' X 115.8' INR LOT 41 AUSTIN PARK SUB SLIDE 2233-C AMEN DED SLIDES 2236-D 2238-E 2238-F SEC 23-T5S-R2E (WD)

situated in BALDWIN         County, Alabama.  BY:_____
Assessed to VIT INC

| | | | | |
|---|---|---|---|---|
| Amount of Purchase Money........$ | 20977.00 | Interest...$ | 4062.07 |
| 2008 Taxes......................$ | 2528.96 | Interest...$ | 308.46 |
| 2009 Taxes......................$ | 2335.20 | Interest...$ | 4.61 |
| Cost of Redemption Certificate..$ | .50 | | |
| | | | |
| Redemption Total ..............$ | 30216.80 | | |
| Excess Bid.....$ | 20000.00 | | |
| Amount Paid....$ | 10216.80 | | |

Tax Collector/Revenue Commissioner of said County; This  6 Day of   January, 2010

WITNESS  Q. Darnett

Countersigned by:

David K. Bagard

Tax Collector/Revenue Commissioner.

County Treasurer.

EXHIBIT
H

12514328884 Pg 4/4

**REGIONS**

CASHIER'S CHECK
01/05/2010

500 2856353

VIT, INC /
Purchaser / Purchased For

TEN THOUSAND TWO HUNDRED SIXTEEN DOLLARS AND 80 CENTS

PAY TO THE ORDER OF: BALDWIN COUNTY REVENUE COMMISSIONER  $10,216.80

Fee $7.00

NOT NEGOTIABLE
CUSTOMER COPY

Regions Bank

Branch AL01220
CC000250

# APPLICATION FOR REDEMPTION

## STATE OF ALABAMA BALDWIN                    COUNTY

Office of the Tax Collector/Revenue Commissioner, BALDWIN                COUNTY

Sales Docket   87 Page   404                    PPIN 273115

WHEREAS, on the 17 day of      May 2011, the real property hereinafter described was sold, in substantial conformity with all the requisitions of the statutes in such cases made and provided, by Teddy J. Faust, Jr. Tax Collector/Revenue Commissioner of said County, to EQUIVEST FINANCIAL LLC for the taxes, interests, penalties and costs, then due and remaining unpaid on said property: and whereas,  MHY, TIM ETAL AMEY, NELLIE has made application to redeem said land.

43-06-23-0-000-030.072

179.4' X 115.8' IRR LOT 41 AUSTIN PARK SUB SLIDE 2233-C AMEN
DED SLIDES 2236-D 2238-B 2238-F SEC 23-T5S-R2E (VL DEED)_

situated in BALDWIN          County, Alabama.
Assessed to AMEY, TIM ETAL AMEY, NELLIE

Amount of Purchase Money.(2010).$    79176.13   Interest..... $  2707.16
Cost of Redemption Certificate..$       .50

Redemption Total ..............$    81883.79
                 Excess Bid.....$    78000.00
                 Amount to Pay..$     3883.79

Please Sign, Date and Return to this office By: 9/30/2011

Signed X_____  Date _____

Correct Mailing Address:

Print Name

IRA TURNER

251 454 5315
Phone

*** No personal checks accepted for Redemptions ***
Payment must be made by cashiers check, money order or cash. (Cash accepted in Bay Minette office only)

Mailing Address:  Baldwin County Revenue Commissioner
                  Attn: Redemptions
                  PO Box 1549
                  Bay Minette, AL 36507

Physical Address: Baldwin County Revenue Commissioner
                  Attn: Redemptions
                  1705 US Hwy 31 South
                  Bay Minette, AL 36507

**From:** Patricia Chen [mailto:pchen@mossemail.com]
**Sent:** Wednesday, February 22, 2012 12:22 PM
**To:** Arlene J. Ecker; Eddie Sexton; Elizabeth Davis; Eric Hoaglund
**Cc:** Amanda Mkamanga
**Subject:** FW: Ira Turner 11374 Elysian Circle, Daphne, AL 36526

Good afternoon,

Please disregard the work authorization documents for Turner that was mailed yesterday. I'm sorry for any inconveniences this may have caused.

Thanks,
Pat

**From:** Vicari, Angela [mailto:AVicari@kayescholer.com]
**Sent:** Wednesday, February 22, 2012 1:13 PM
**To:** Patricia Chen; Spatz, Mark
**Cc:** Daniel Young; Phil Adams
**Subject:** RE: Ira Turner 11374 Elysian Circle, Daphne, AL 36526

Patricia,

There is a dispute as to who owns this home. Because of this issue, we put the home on hold in October. The hold should remain in place until further notice. Thanks!

Angela Vicari
KAYE SCHOLER LLP
425 Park Avenue | New York, New York 10022
T: +1 212.836.7408 | F: +1 212.836.6495
AVicari@kayescholer.com | www.kayescholer.com

**From:** Patricia Chen [mailto:pchen@mossemail.com]
**Sent:** Wednesday, February 22, 2012 9:57 AM
**To:** Spatz, Mark; Vicari, Angela
**Cc:** Daniel Young; Phil Adams
**Subject:** Ira Turner 11374 Elysian Circle, Daphne, AL 36526

Good morning,

Is this home still on hold or can I send work auth?

Thanks,
Pat

**Patricia Chen**
*Contract Administrator* | **Moss & Associates**
o 954-524-5678 | f 954-563-8681
2101 N. Andrews Ave., Suite 300, Ft. Lauderdale, FL 33311



\* \* \*

IRS CIRCULAR 230 DISCLOSURE:   To ensure compliance with Treasury
Department regulations, we inform you that any U.S. federal tax advice
contained in this correspondence (including any attachments) is not

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev.6/99 | COVER SHEET<br>CIRCUIT COURT – CIVIL CASE<br>(Not For Domestic Relations Cases) | Case Number<br>☐ G ☐ V ☐ ☐ ☐ ☐  ☐ ☐ ☐  ☐ ☐ ☐ - ☐ ☐<br>Date of Filing:                      Judge Code:<br>☐ ☐   ☐ ☐   ☐ ☐ ☐ ☐    ☐ ☐ ☐ ☐<br>Month   Day      Year |
|---|---|---|

## GENERAL INFORMATION

IN THE CIRCUIT COURT OF _____ BALDWIN _____, ALABAMA
*(Name of County)*

VIT, INC.                                  v.   TIM ROGER AMEY, NELLIE AMEY, ET AL
**Plaintiff**                                              **Defendant**

First Plaintiff   ☑ Business      ☐ Individual          First Defendant   ☐ Business      ☑ Individual
                 ☐ Government    ☐ Other                               ☐ Government    ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonness
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☐ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**
☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**
☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**
☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/ Enforcement of Agency Subpoena/Petition to Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP - Contempt of Court
☐ CONT - Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☑ EQND - Equity Non-Damages Actions/Declaratory Judgment/Injunction Election Contest/Quiet Title/Sale For Division
☐ CVUD - Eviction Appeal/Unlawful Detainer
☐ FORJ - Foreign Judgment
☐ FORF - Fruits of Crime Forfeiture
☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB - Protection From Abuse
☐ FELA - Railroad/Seaman (FELA)
☐ RPRO - Real Property
☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP - Workers' Compensation
☐ CVXX - Miscellaneous Circuit Civil Case

CIRCUIT COURT
BALDWIN COUNTY, AL.
FILED
APR 25 2012
JODY W. CAMPBELL
CIRCUIT COURT CLERK

**ORIGIN** *(check one):*   F ☑ INITIAL FILING      A ☐ APPEAL FROM      O ☐ OTHER:
                                            DISTRICT COURT            _____
                           R ☐ REMANDED      T ☐ TRANSFERRED FROM
                                            OTHER CIRCUIT COURT

HAS JURY TRIAL BEEN DEMANDED?   ☐ YES ☑ NO    Note: Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**   ☑ MONETARY AWARD REQUESTED      ☐ NO MONETARY AWARD REQUESTED

ATTORNEY CODE:
| H | E | R | 0 | 4 | 3 |
|---|---|---|---|---|---|

April 24, 2012
Date

_K. Amander Lyndl_
Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:**   ☐ YES   ☐ NO   ☑ UNDECIDED