# COMPOSITE EXHIBIT "A"

# UNITED STATES DISTRICT COURT
## IN AND FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

KRISTIN MORGAN CULLITON,
individually and on behalf of all similarly
situated individuals,

        CASE NO. 09-cv-00589-JDW-TGW

        Plaintiffs,

v.

TAYLOR MORRISON SERVICES, INC., a
Delaware Corporation, Successor to Morrison
Homes, Inc., a Delaware Corporation d/b/a
Morrison Homes, Knauf Gips KG, a German
Corporation, Gebr Knauf Verwaltungsgesellschaft
KG, a German Corporation, Knauf Plasterboard
Tianjin Co. Ltd., a Chinese Limited Corporation,
Rothchilt International Ltd., a Chinese Limited
Corporation, USG Corporation, a Foreign
Corporation, L&W Supply Corporation, d/b/a
Seacoast Supply, a Foreign Corporation, and
Banner Supply Company, a Florida Corporation,

        Defendants.

_____/

## PLAINTIFF'S MOTION FOR PROTECTIVE ORDER
## PURSUANT TO FED. R. CIV. P. 23(d)

Plaintiff Kristin Morgan Culliton (hereinafter "Plaintiff" or "Ms. Culliton"), by and

through undersigned counsel, hereby moves the Court for a protective order protecting the

interests of putative class members in the instant action, pursuant to Rule 23(d) of the Federal

Rules of Civil Procedure for the reasons set forth in the accompanying Memorandum of Law.

This putative class action arises from the installation of defective drywall in numerous

homes throughout Florida.  The drywall contains volatile sulfur compounds and excessive

organic matter.  As the sulfur compounds are released into the air, a sulfurous "rotten egg" smell

occurs, and exposed metallic surfaces in the home tarnish and corrode, causing the failure of air conditioning systems and adversely impacting other elements in the home. In response to numerous complaints about the problem, Defendant Taylor Morrison has implemented a plan to induce affected homeowners and putative class members to completely release and assign their property damage claims arising from the defective drywall against all potential defendants in exchange for Taylor Morrison's promise to repair their homes. *See* Exhibit 1, Repair and Relocation Agreement Package. In addition, Taylor Morrison is unilaterally providing misleading, conflicting, and inaccurate information to putative class members concerning their rights and the steps Taylor Morrison is promising to take to address the Chinese drywall problem. *See* Exhibit 2, Affidavit.

Accordingly, Plaintiff respectfully requests that the Court enter an order: (1) prohibiting Defendant Taylor Morrison from enforcing the "Limited Release" and "Assignment of Claims" provisions contained within its unilaterally-drafted Repair and Relocation Agreements against unrepresented homeowners; (2) declaring as void the "Limited Release" and "Assignment of Claims" provisions contained in any and all Repair and Relocation Agreements executed by unrepresented homeowners subsequent to the initiation of this action; (3) requiring Taylor Morrison to distribute a Court-approved Notice or Information Sheet to all Taylor Morrison homeowners whose homes have been confirmed as containing Chinese drywall, including those who have previously been sent Repair and Relocation Agreements, disclosing the instant class action and the effect that the homeowners' execution of Defendant's Repair and Relocation Agreement may have on their opportunity to participate in this action; and (4) requiring Taylor Morrison to identify any homes that have been confirmed to contain the defective drywall, and

those homeowners to whom Taylor Morrison has provided a Repair and Relocation Agreement and associated documents.

**MEMORANDUM OF LAW**

## I.    BACKGROUND

This class action was brought by Plaintiff Kristin Culliton against Defendant Taylor Morrison and others based on Taylor Morrison's use of defective drywall imported from China (hereinafter "Chinese drywall") in the construction of Ms. Culliton's home located at 15314 Skip Jack Loop, Bradenton, Florida 34202, as well as in the homes of other Florida homeowners whom Ms. Culliton seeks to represent.  Plaintiff's First Amended Complaint and Motion for Class Certification were filed concurrently on January 26, 2009 in the Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida.[1]  Defendant subsequently filed its responsive pleading on February 9, 2009.

Despite having full knowledge of the fact that Plaintiff's action was filed on behalf of a class consisting of all Taylor Morrison homeowners in Florida whose homes were constructed with Chinese drywall, Taylor Morrison has been providing putative class members with misleading and often conflicting information about this action, as well as actively seeking to induce homeowners into a complete surrender of all their potential claims in the action.  For homeowners whose homes contain the Chinese drywall, Taylor Morrison has been providing a package that is attached hereto as Exhibit 1, and contains: a cover letter to the homeowner; a

---

[1] Subsequent to filing the First Amended Complaint, Plaintiff and Defendant stipulated to the transfer of this action to Manatee County and to the filing of Plaintiff's Second Amended Complaint on March 6, 2009.  Defendant L&W Supply Corporation then removed this action to the instant Court on March 30, 2009.  (Doc. Entry 1).

3

Chinese Drywall Fact Sheet; a Master Q & A; a Homeowner Relocation Cover; and a Repair and Relocation Agreement (hereinafter "the Agreement") – all of which were unilaterally drafted by Taylor Morrison.

The Agreement proposes the non-negotiable terms pursuant to which Taylor Morrison will repair homes containing Chinese drywall. In addition to containing unfavorable terms and missing several essential terms, the Agreement completely fails to disclose to homeowners that the instant class action is pending, and that executing Defendant's Agreement could have the effect of opting homeowners out of participating in this action. Plainly, it was Defendant's intent to deny homeowners the opportunity to consult counsel or make an informed and knowing decision concerning whether or not to accept the proposed Agreement, and to take advantage of vulnerable and often desperate homeowners whose homes are uninhabitable and incurring damage from the defective drywall. In other words, Taylor Morrison's goal here is to "pick off" putative class members one-by-one. By failing to reveal the existence and nature of this class action to homeowners and presenting its Agreement in a take-it-or-leave-it manner, Taylor Morrison is seeking to mislead homeowners into believing that acceptance of the Agreement is the only way they can secure any home repairs at Taylor Morrison's expense.

As mentioned above, certain statements and representations in the materials provided to homeowners are misleading, incomplete, and inaccurate, and the proposed Agreement contains terms that are adverse to homeowners and omits some essential terms. For example:

- The Agreement releases or assigns all property damage claims against not only Taylor Morrison, but against every other entity as well, and effectively extinguishes all homeowner property damage claims. ¶¶ 15, 17.

4

- The homeowner must acknowledge that an independent drywall contractor purchased and installed the drywall. Background, Section B.

- The definition of "Residence" leaves it unclear whether Taylor Morrison will repair damage to the landscaping and exterior grounds of the property that occurs during the removal and repair process.

- Taylor Morrison removes and disposes of all the defective drywall. ¶ 2.

- Homeowners are barred from the property unless they give 24-hour notice and are accompanied by a representative of the Builder. ¶ 10.

- Taylor Morrison is under no obligation to begin the process in a timely fashion. The promise to pay relocation expenses is only triggered upon Taylor Morrison providing notice to vacate the home.

- Payment for damage to personal property is limited to $1,500. ¶ 8.

These terms not only threaten to extinguish the rights of affected homeowners; they also could result in the permanent loss of crucial evidence, such as the very drywall that is causing damage to the putative class of affected homeowners.

The other materials Taylor Morrison is providing to homeowners in addition to the Agreement similarly contain inaccurate and conflicting information. The so-called "Fact Sheet" conflicts with the terms of the Agreement in numerous areas, such as the scope of the work to be performed (Fact Sheet: "demolition of the inside of the home down to the studs"); makes incomplete statements regarding the source of the problem with the drywall (Fact Sheet: "naturally occurring sulfur compound," no mention of the levels of excessive organic material); and improperly suggests that the Florida Department of Health has concluded that there is no health risk.

The "Master Q&A" also contains inaccurate and misleading information. Paragraph 11 suggests that homeowners may move out immediately and begin receiving a stipend, but the

5

Agreement only promises a stipend to homeowners who have received a Notice to Vacate. Paragraph 12 again implies that the Florida Department of Health has concluded that there is no health risk, which is not the case.

Finally, the last paragraph of the "Relocation Cover" provided to homeowners induces homeowners to release and assign all of their property damage claims against any and all entities by noting that "homeowners do not have the resources to take legal action against those ultimately responsible for the problem," without any disclosure of this pending action or any of the other related actions against Taylor Morrison, falsely suggesting to homeowners that Taylor Morrison's offer is the only option available to address the problems in their homes caused by the Chinese drywall.

## II.  ARGUMENT

### A.  Defendant Should Be Prohibited from Enforcing the "Limited Release" and "Assignment of Claims" Provisions of the Agreement and the Provisions Should Be Found Void in Any and All Executed Agreements Because Enforcement Would Eliminate Legal Remedies Potentially Available to Putative Class Members of Which They Had No Knowledge.

As recognized by the United States Supreme Court, class actions "serve an important function in our system of civil justice." *Gulf Oil v. Bernard*, 452 U.S. 89, 99 (1981).  Class actions, such as this case against Taylor Morrison, provide a means for a class representative to "vindicat[e] the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost.  *Id.* at 99-100, n. 11 (quoting *Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 328 (1980).  The class action device, because it disposes of numerous common claims in a single lawsuit, also presents

opportunities for abuse as problems for court and counsel in the management of
cases .... Because of the potential for abuse, a district court has both the duty and
the broad authority to exercise control over a class action and to enter appropriate
orders governing the conduct of counsel and the parties.

*Id.* at 100.

Taylor Morrison's requirement under Paragraphs 15 and 17 of the Agreement that

homeowners release, assign, and waive their rights to pursue claims against all other responsible

parties, including, but not limited to, the Defendants named in this lawsuit, infringes on the

Court's duty to protect the interests of potential class members. Rule 23 serves to protect the

interests of class members by requiring that class members receive court-approved notice of the

proceeding and an opportunity to make an informed decision whether to exclude themselves

("opt out") from the class. Rule 23(b)(3), (c)(2) Fed. R. Civ. P.; *Eisen v. Carlisle & Jacquelin*,

417 U.S. 156 (1974). This notice, and the corresponding right to opt out of the class, are

supposed to take place *after* class certification, not *before*, under supervision of the court, and not

as a result of the unilateral communication of incomplete information from a party. *See* H.

Newberg & A. Conte, *Newberg on Class Actions*, §§ 8:2, 8:9 (4th ed. 2002) (emphasis added).

Accordingly, in the event that the Court declines to find the Agreements unenforceable, the Court

should at least declare that any putative class members who executed such Agreements after the

initiation of this class case are not precluded from participating in this class action, should a class

be certified.

Pre-certification contacts with class members that result in class members effectively

opting out of the class before certification – such as is occurring here through Taylor Morrison's

distributing to putative class members Agreements containing releases and assignments of rights

7

– are an abuse which interferes with the Court's authority and ability to effectuate the policies of Rule 23. "Courts are concerned that such communications may prevent class members from making informed decisions about exclusion." *Id.* at § 15-19, pp. 15-52.

Courts have not hesitated to restrain parties from communicating with actual or potential class members when the communications could potentially interfere with the proper conduct of class litigation, especially in cases where a defendant seeks to encourage class members to opt out of a class. The Eleventh Circuit case of *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985) is instructive. In *Kleiner*, the defendant bank, with the goal of diminishing the size of the certified class, engaged in an orchestrated campaign to contact putative class members in order to encourage them to opt out. The court recognized that although it was in the defendant's interests to diminish the size of the class, "Such conduct reduces the effectiveness of the 23(b)(3) class action for no reason except to undermine the purposes of the rule." *Id.* at 1202. The court went on to note that

> A unilateral communications scheme, moreover, is rife with potential for coercion. 'If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive.' This litigation is illustrative. The class consisted of Bank borrowers, many of whom were dependent on the Bank for future financing. Bank customers affected by the litigation included 'those who anticipated seeking a note "rollover," new loans, extensions of lines of credit, or any type of discretionary financial indulgence from their loan officers, and who did not have convenient access to other credit sources.'

*Id.* (citations omitted).

The circumstances before the Court here are very similar. Homeowners who have agreed to Taylor Morrison's Agreement likely did so only because they were unaware that a class action was pending on their behalf, and, accordingly, believed they had no other recourse for correcting

8

the problems in their homes caused by Chinese drywall. Moreover, as discussed above, the average homeowner is likely unaware of the multitude of missing and unfavorable terms in Defendant's proposed Agreement. Not to mention the fact that the package sent by Taylor Morrison to homeowners, including the letter and Agreement, improperly contains opinions and statements of a non-attorney concerning the legal effect of executing the Agreement. Homeowners may not realize that signing Defendant's Agreement not only releases Taylor Morrison from related future claims, but also releases *all* manufacturers and distributors involved in the Chinese drywall supply chain. Further, it goes without saying that homeowners reviewing or executing Defendant's Agreement are unaware that signing the Agreement may opt them out of participating in and benefitting from the instant class action since homeowners have not been given any notice that this case is currently being litigated on their behalf.

Notably, other federal courts have addressed similar scenarios where defendants' pre-certification communications with class members failed to disclose the existence of a related pending class case. *Pollar v. Judson Steel Corp.*, 1984 U.S. Dist. Lexis 19765 (N.D. Cal. Feb. 3, 1984). The *Pollar* court responded by limiting the defendants' communications with class members. "After finding that improper pre-certification communications caused confusion concerning potential class members' rights, the court ... prohibited the defendants from further communication with any class member on issues related to the litigation, ordered the defendants to turn over to class counsel all written communications from potential class members and ordered the defendants to pay for corrective notice... [T]he defendants in *Pollar* caused confusion concerning potential members' rights by running advertisements in newspapers regarding an affirmative action program for women, without disclosing the existence of the class action

9

litigation." *Gerlach v. Wells Fargo & Co.*, No. C 05-0585 CW, 2006 WL 824652, at *6 (N.D.

Cal. March 28, 2006).

Numerous other federal cases are consistent with *Kleiner*. *See, e.g. Erhardt v. Prudential*

*Group, Inc.*, 629 F.2d 843 (2d Cir. 1980) (defendant enjoined from further communication with

class after sending letters to class members warning them that they might be liable for costs if

they remained in class and urging them not to participate); *In re School Asbestos Litig.*, 842 F.2d

671 (3d Cir. 1988) (attempts to influence class member participation characterized as "blatant

misconduct"); *Haffer v. Temple University*, 115 F.R.D. 506 (E.D. Pa. 1987) (order prohibiting

improper communications was required where defendant and its counsel held *ex parte* meetings

with class members and tried to dissuade them from meeting with class counsel).

"The fact that the class has yet to be certified does not prevent the Court from issuing a

protective order limiting communications with putative class members to protect the integrity of

the litigation." *Ojeda-Sanchez v. Bland Farms*, No. 608CV096, 2009 WL 577602, at *7 (S.D.

Ga. March 4, 2009) (citing *Jenifer v. Delaware Solid Waste Authority*, No. Civ. A. 980279

MMS, Civ. A. 980565 MMS, 1999 WL 117762 (D.Del. Feb. 25, 2009)). "The solicitation of

exclusions from a pending class action by a defendant before the court has determined that the

case may proceed as a class action constitutes a serious challenge to the authority of the court to

have some control over communications with class members." *Newberg on Class Actions*, §

15.19, pp. 15-52. The reasons why pre-certification solicitation of opt outs is impermissible were

aptly summed up as follows:

> The defendant's argument that the failure to determine the propriety of
> maintaining this action as a class action makes the notice provisions of rule 23(c)
> inapplicable, is not material to the scope of the court's power under rule 23(d) to

> deal with abuses ... It would be a strange rule, indeed, where a court would be powerless to deal with what it considered abuses because the litigation has not reached a certain stage. To adopt such a rule would be little more than inviting counsel to engage in a race to complete questionable practices before the court acquires the power to prevent such abuses. For the purpose of preventing and correcting abuses, once an action is filed as a class action it should be so presumed even prior to a formal determination that it is a class action.

*Weight Watchers of Philadelphia v. Weight Watchers Int'l*, 53 F.R.D. 647 (E.D.N.Y. 1971);

*modified by Weight Watchers of Philadelphia v. Weight Watchers Int'l*, 55 F.R.D. 50 (E.D.N.Y.

1971). Here, Taylor Morrison is clearly engaging in a "race to complete questionable practices"

in a misguided effort to deprive putative class members of their claims against Taylor Morrison

and every other potentially liable party prior to class certification. In a comparable situation,

where plaintiffs submitted evidence establishing that defendants communicated directly with

class members, the court held that defendants' communications with class members were

inherently coercive, even if the coercion was unintentional. *Ojeda-Sanchez*, 2009 WL 577602, at

*7. "Should these types of communications continue, they would threaten the ability of plaintiffs

and potential plaintiffs to assert their rights through this litigation." *Id.*

Again, other federal courts have similarly ruled when confronted with the issue of pre-

certification contacts. *See, e.g. Hampton Hardware, Inc. v. Cotter, Inc.*, 156 F.R.D. 630, 634

(N.D. Tex. 1994) (where defendant sent letters to potential class members discussing lawsuit and

discouraging participation, potential class members required protection from "making decisions

based upon one-sided information from an interested party..."); *Burrell v. Crown Petroleum, Inc.*,

176 F.R.D. 239, 243 (E.D. Tex. 1993) ("the effect of a defendant attempting to influence

potential [class members] not to join an embryonic class action would be just as damaging to the

purposes of Rule 23 as a defendant that influences members of an already certified class to opt

11

out"); *Impervious Paint Industries, Inc. v. Ashland Oil Co.*, 508 F.Supp. 720, 722-23 (W.D. Ky. 1981) ("During the time between the institution of a class action and the close of the opt out period, ... [i]t is essential that the class members' decision to participate or withdraw be made on the basis of independent analysis of its own self interest. It is the responsibility of the Court as a neutral arbiter ... to insure this type of free and unfettered decision.")

In light of Taylor Morrison's campaign to diminish the class, the Court should take remedial action. Assuming the Court does not declare Defendant's Agreement unenforceable, the Court should enter an order declaring that any putative class members who signed Defendant's Agreement are still permitted to participate in this litigation, since homeowners had no knowledge of this action and, therefore, did not make an informed decision when executing the Agreements.

**B.     Taylor Morrison Should Be Required to Provide Certain Court-Approved Disclosures to Putative Class Members and Identify Those Putative Class Members It Has Communicated With Concerning the Chinese Drywall Issue.**

In all correspondence and communications between Taylor Morrison and homeowners, Taylor Morrison should be required to include meaningful and comprehensive disclosures concerning the instant class action and what effect a homeowner's execution of the Agreement has upon the homeowner's ability to potentially participate in this action. In addition, Taylor Morrison should be required to provide these disclosures to homeowners with whom it has previously communicated and/or already executed Agreements. These disclosures can be distributed in the form of a Court-approved notice or an information sheet. As stated by the *Kleiner* court, "it is critical that the class receive accurate and impartial information regarding the

12

status, purposes, and effects of the class action. *Kleiner*, 751 F.2d at 1202. The disclosures to homeowners should include:

- The nature of the lawsuit and the allegations against Taylor Morrison and other corporate defendants;

- The nature of the equitable and legal relief sought;

- That if a class is certified, the Court will provide Notice to class members informing them of their rights and options; and

- The names, addresses, and phone numbers of Plaintiff's counsel who can be contacted for information about the lawsuit.

Fundamental fairness dictates that a putative class member should have the benefit of full and complete information when faced with the decision whether to waive his or her right to participate in the class action. Further, because Taylor Morrison should be required to identify those homeowners whom it has identified as having the Chinese drywall and those to whom it has provided the Repair and Relocation Agreement and associated documents.

## III.   CONCLUSION

Taylor Morrison is engaging in an improper course of conduct designed to rush vulnerable, unrepresented homeowners into signing away potential rights in exchange for vague and uncertain promises by Taylor Morrison. The release and assignment of claims provisions included in Defendant's Repair and Relocation Agreement are unenforceable and void because, unbeknownst to homeowners, these provisions have the effect of opting them out of the instant class action without even receiving notice of this pending lawsuit or the advice of legal counsel. Defendant should be prohibited from enforcing these provisions of its Agreement against homeowners who executed a "Repair Agreement" subsequent to the initiation of this action,

since homeowners were given no notice of the instant class action pending on their behalf, and therefore, the decision to execute the Agreements was not an informed and knowing decision. Permitting Taylor Morrison to enforce said Agreements would improperly allow Defendant to interfere with this Court's inherent authority under Rule 23, Fed. R. Civ. P.  Further, Defendant should be required to make disclosures concerning the instant action to all Taylor Morrison homeowners, including those who previously executed Agreements.

Respectfully submitted,

_s/ Christopher Casper_____

Christopher Casper
FBN: 048320
Jonathan B. Cohen
FBN: 0027620
JAMES, HOYER, NEWCOMER, SMILJANICH
  & YANCHUNIS, P.A.
4830 W. Kennedy Blvd., Suite 550
Tampa, Florida  33609
Telephone: (813) 286-4100
Facsimile: (813) 286-4174
ccasper@jameshoyer.com

Darren R. Inverso
NORTON, HAMMERSLEY, LOPEZ & SKOKOS, P.A.
1819 Main Street, Suite 610
Sarasota, Florida  34236
Telephone: (941) 954-4691

Tod N. Aronovitz
ARONOVITZ LAW
777 Brickell Ave., Suite 850
Miami, Florida 33131
Telephone: (305) 372- 2772

**Attorneys for Plaintiff Kristin Morgan Culliton**

14

## LOCAL RULE 3.01(g) CERTIFICATE

Plaintiff's counsel has conferred with counsel for Defendant Taylor Morrison Services, Inc., and opposing counsel does not consent to the relief sought in this Motion.

 s/ Christopher Casper
Christopher Casper

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of April, 2009, I electronically caused the foregoing to be filed with the Clerk of the Court using the CM/ECF electronic filing system, which will automatically send copies to all counsel of record in the case.

The foregoing was sent via First Class U.S. Mail, postage prepaid, to the following:

Neal A. Sivyer, Esq.
Stephen Everett Walker, Esq.
Sivyer, Barlow & Watson, P.A.
401 E. Jackson St., Suite 2225
Tampa, Florida 33602

Attorneys for Defendant Taylor Morrison Services, Inc.

Knauf Gips KG
Ridham Dock, Kemsley
Sittingbourne, Kent
ME 9 8SR
UK

Knauf Plasterboard
North Yinhe Bridge, East Jingjin Rd.
Beichen District
Tianjin, China 300400 P.R.C.

15

Rothchilt International Ltd.
N-510 Chiu Hsn Bld.
Annex 96 Chung Shan N. Rd. Sec. 2
Taipei, Taiwan R.O.C.

  s/ Christopher Casper
Christopher Casper

TAYLOR MORRISON
OF FLORIDA, INC.

West Florida Division

501 North Cattlemen Road
Suite 100
Sarasota, FL 34232

p. (941)371-3008
f. (941)379-5248

taylormorrison.com

Jennifer Kahler
15306 Skip Jack Loop
Bradenton, Fl 34202

Dear Jennifer,

Our inspection of your home and subsequent testing has confirmed that apparently
defective Chinese drywall was installed in your home when it was built in 2006. As we
may have told you, we did not know that the manufacturers and subcontractors supplied
and installed the imported drywall when the homes were built. Nevertheless, Taylor
Morrison is taking responsibility for repairing our homes that contain defective Chinese
drywall. We deeply regret any disruption or inconvenience this may cause you and your
family.

We continue to evaluate less intrusive solutions but, at the moment, we believe
replacement of the drywall is the best permanent solution. Taylor Morrison will pay for
the temporary relocation of your family while we make the necessary repairs to replace
the drywall in your home. The repairs will involve demolition of the inside of the home
down to the studs. We will thoroughly clean the home interior, replace all drywall and
damaged items, and essentially rebuild the inside of your home. Once the repairs are
completed, you will be provided with an additional year of warranty for the repaired
items that you received when you first purchased your home.

Taylor Morrison intends to repair homes with drywall problems as soon as possible. We
estimate it will take three to five weeks to work through certain permitting requirements
before we can commence construction. You have the option of remaining in your home
until construction work begins or you may go ahead and move out. We will provide you
with a list of possible relocation options. Taylor Morrison will pay displaced
homeowners a fixed monthly stipend for temporary housing and provide reimbursement
for moving and storage costs. Ultimately you will be free to choose your temporary
housing solution. Construction work will take 30 to 90 days, so we estimate that you
could be in temporary housing between 60 and 160 days.

We would like you to know what to expect in the coming weeks. Once you agree to have
the drywall removed from your home, Taylor Morrison will arrange pre-repair meetings
with you and walkthroughs of your home. A complete room by room inspection of the
home will be made to determine what will be required to return the home to the condition
it was in prior to the repairs. This inspection will have visual documentation, either video

Taylor
Woodrow
Communities



taylor
morrison
Homes Inspired by You

OF FLORIDA, INC.

West Florida Division

501 North Cattlemen Road
Suite 100
Sarasota, FL 34232

p. (941)371-3008
f. (941)379-5248

taylormorrison.com

or photographic, so that there is no confusion about what will be included in the rebuild of the home. Special attention will be given to any homeowner upgrades done since original occupancy of the home. We will use this inspection to determine what materials need to be ordered and will document, in writing, the types of light fixtures, plumbing fixtures, appliances, cabinets, tile, wood flooring, carpet etc. that will be needed to restore the home. If we find that substitutions will have to be made because original materials or items are no longer available, we will ask you to re-select those items.

We at Taylor Morrison have built our reputation over the years by standing by our homeowners and we will continue to do so. In fact, while this issue affects most homebuilders in Florida, to our knowledge Taylor Morrison is one of a very few homebuilders with a dedicated team in place to address the concerns of our homeowners

Again, we deeply regret this situation and are committed to doing the right thing for our affected homeowners. Rick Wilmeth will be contacting you. If you have questions in the meantime, please call him at 941-554-2862.



# CHINESE DRYWALL FACT SHEET
# TAYLOR MORRISON

We have learned that defective drywall manufactured in China was installed in homes constructed by dozens of homebuilders throughout Florida, including a number of homes built by Taylor Morrison[1].

Some of this Chinese drywall emits a naturally occurring sulfur compound that can corrode and ultimately lead to the failure of heating, ventilation and air conditioning (HVAC) coils and other copper elements in the home. It can also produce a sulfur odor in the home similar to a burned match or rotten eggs.

The affected Taylor Morrison homes so far are confined to Lee and Manatee Counties. The number of homes we have identified that were constructed with apparently defective drywall manufactured in China represents a very small percentage of the thousands of homes that Taylor Morrison built in Florida during the past decade.

The defective drywall was installed by subcontractors without our knowledge or direction. Nevertheless, we at Taylor Morrison are doing everything we can to:

- Protect the health and safety of our homeowners,
- Identify any additional homes that may have been built with defective Chinese drywall;
- Repair any homes where it is discovered.

The raw material used to make all drywall is gypsum rock (dihydrous calcium sulfate). Sulfur is a naturally occurring substance contained in every sheet of gypsum drywall. We have been informed that the gypsum contained in the defective drywall comes from a particular mine in China that appeared to have unusually high levels of sulfur.

Taylor Morrison did not manufacture, import or purchase drywall direct from China. Normally a builder such as Taylor Morrison does not directly purchase components such as drywall. Standard practice in the industry is for builders to hire licensed subcontractors to install drywall and those subcontractors typically purchase drywall from local distributors and manufacturers, who are required to meet certain specifications.

The vast majority of homebuilders, including Taylor Morrison, received the defective drywall through a chain of suppliers and installers without any awareness that the product had been manufactured in China.

Like our homeowners, Taylor Morrison is a victim of the manufacturers and suppliers that provided defective drywall from China. We intend to take all necessary actions to hold the manufacturers and suppliers responsible for their defective products.

---

[1] For purposes of this Fact Sheet, the term "Taylor Morrison" shall refer to Morrison Homes, Inc. (n/k/a Taylor Morrison Services, Inc.), Taylor Woodrow, Inc. (n/k/a Taylor Morrison, Inc.) and any subsidiaries thereof.

We recently established a special team of experts to address homeowner concerns and to carry out a comprehensive drywall repair program.

Taylor Morrison retained ENVIRON International Corporation ("ENVIRON"), a leading global environmental firm, to conduct isolated sampling in our homes.

The environmental scientists and toxicologists at ENVIRON have assured us that tests to date confirm that the levels of sulfur compounds inside homes built with defective Chinese drywall is far below even the most stringent government health and safety standards.

The government standards used for evaluating air quality conditions specifically consider long-term (known as chronic) exposures. ENVIRON's investigation evaluated the testing results in comparison to those applicable for daily exposures over a period of years. ENVIRON determined that the levels in the homes, thus far, did not reach standards for chronic exposures, and that there is no indication daily exposure to the recorded levels of sulfur compounds in homes with defective Chinese drywall would result in any adverse health outcomes.

The Florida State Department of Health agrees that available data has not identified levels of corrosive gasses that exceed those recognized as posing a risk to health.

While there have been isolated instances of homeowners complaining about sore throats or itchy eyes, ENVIRON has been unable to connect these symptoms with the affected drywall. These symptoms may be caused by a number of other, unrelated factors.

Government scientists and health experts, working together with ENVIRON, continue to closely study the situation.

In cases where defective Chinese drywall is confirmed, Taylor Morrison will pay for the temporary relocation of affected families while we make the necessary repairs to replace the drywall in the home.

We continue to evaluate less intrusive solutions but, at the moment, we believe replacement of the drywall is the best permanent solution.

The repairs will involve demolition of the inside of the home down to the studs. We will thoroughly clean the home interior, replace all drywall and damaged items, and essentially rebuild the inside of the home. Once the repairs are completed, homeowners will be provided with an additional year of warranty for the repaired items.

Taylor Morrison has identified substandard drywall manufactured by Knauf Plasterboard Tianjin Co. Ltd. of China. There are reports that other home builders have also identified substandard drywall manufactured by Taishan Gypsum Co. LTD.

Dozens of other homebuilders are affected as well. Taylor Morrison, however, is committed to taking care of our homeowners and to our knowledge we are one of the very few builders that are proactively trying to identify affected homes and permanently resolve the problem.

## REPAIR AND RELOCATION AGREEMENT

THIS REPAIR AND RELOCATION AGREEMENT ("Agreement") is made and entered into as of the Effective Date by and between the undersigned Builder and Homeowner(s).

### Background

A.     Homeowner is the owner of a residence sold and/or constructed by Builder located at the address set forth below Homeowner's signature ("Residence");

B.     Subsequent to the original closing on the Residence, the parties discovered that the independent drywall contractors retained by Builder to install drywall in the Residence ("Drywall Contractors") installed defective drywall ("Defective Drywall") obtained from one or more suppliers, distributors, and/or manufacturers, which Defective Drywall has damaged other property within the Residence ("Other Property"); and

C.     Builder has agreed to remove the Defective Drywall and repair damage caused thereby in accordance with the terms and conditions set forth herein.

### Terms

IN CONSIDERATION of the mutual covenants of the parties contained herein, Builder and Homeowner agree as follows:

1.     Scope of Repair.  Builder agrees, at its sole expense, to perform the following repair work (collectively, the "Repair(s)"):
   a) Remove and replace all drywall in the Residence, including the Defective Drywall.
   b) Repair or replace other building materials Builder originally installed in the Residence that are affected by the Defective Drywall, including HVAC systems, plumbing components, and electrical components.
   c) Finish and paint all newly installed drywall.
   d) Repair or replace, as necessary, all materials in the Residence affected by the Repair process, which may include, but is not limited to, flooring, wall coverings, tile, cabinets, countertops, sinks, toilets, bathtubs, shower enclosures, appliances, mirrors, lighting and plumbing fixtures, and wood trim and moldings.
   e) Remove and dispose of all construction debris and clean the interior of the Residence.

2.     Removal of Defective Drywall.  Builder shall be solely responsible for the disposal of all Defective Drywall removed from the Residence, which disposal shall be in accordance with all applicable governmental laws and regulations.

3.     Replacement Selections.  Homeowner understands that some of the original materials, fixtures and equipment installed when the Residence was first constructed must be replaced as part of the Repair process or may be affected by the Repair process and thus need replacement. Accordingly, prior to entering into this Agreement Homeowner met with Builder's

representative and selected replacements for those items that will be replaced, as well as those items that may be affected by the Repairs process and need replacement (collectively, the "Replacement Selections"). A copy of the Homeowner's Replacement Selections is attached hereto and incorporated herein by reference. If the Homeowner's Replacement Selections are discontinued or should materials be affected by the Repair process for which Homeowner has not made Replacement Selections, Builder shall give Homeowner fourteen (14) days to make Replacement Selections from the comparable products and materials Builder has available. If Homeowner fails to make the foregoing Replacement Selections within the fourteen (14) day period, Builder shall have the right to make the Replacement Selections in Builder's sole discretion which shall be final and binding on Homeowner. Homeowner shall not be entitled to any Per Diem (as defined below) for the period of any delay in the completion of the Repairs caused by Homeowner's failure to timely make Replacement Selections.   Homeowner understands that while Builder intends to match replacement materials and equipment as closely as possible with the original items installed with the original construction, some items may be discontinued or have color variations. Given the accelerated schedule for the Repairs, all Replacement Selections are final and may not be changed except with the prior consent of Builder, which consent Builder may withhold or grant in its sole discretion.

    4.   New Warranty for Repairs. Builder will perform the work in a workmanlike manner. Builder warrants for a period of one year following substantial completion of the Repairs that all materials and workmanship related to the Repairs shall be free and clear of defects and deficiencies. For purposes of this Agreement, "substantial completion" shall be defined as closing out of the applicable governmental building permit for the Repairs. If a defect occurs in the Repairs, excluding defects caused by a lack of Homeowner maintenance, Builder, at is option, shall repair, replace, or pay the reasonable cost of repairing or replacing the defective item. Notwithstanding the foregoing, appliances, fixtures and equipment installed in connection with the Repairs shall be governed solely by the manufacturer's warranty for such items which Builder hereby assigns to Homeowner. Except with respect to foregoing warranty with respect to the Repairs, all other terms and conditions of the Homeowner's original warranty in connection with the original sale of the Residence shall remain in full force and affect.

    5.   Per Diem Reimbursement for Relocation Expenses. Homeowner and Builder understand that Homeowner will be required to relocate for the period of time during which Builder makes the Repairs pursuant to this Agreement. Builder will give Homeowner no less than three (3) weeks prior notice ("Vacation Notice") to vacate the Residence before commencing Repairs. Except as otherwise provided in this Agreement, commencing on the later of (i) the day Homeowner vacates and surrenders the Residence to Builder, or (ii) fourteen (14) days following Homeowner's receipt of the Vacation Notice ("Per Diem Commencement Date"), and continuing until five (5) days following substantial completion of the Repairs (the "Repair Period"), Builder agrees to pay Homeowner One Hundred Seventeen Dollars ($117.00) per day (the "Per Diem") in settlement of any and all expenses and damages which Homeowner suffers as a result of having to vacate the Residence. On the Per Diem Commencement Date Builder shall advance to Homeowner sixty (60) days of Per Diem ("Advanced Per Diem"). If the Repairs are not substantially complete prior the expiration of the foregoing sixty (60) day period, Builder will continue to advance the Per Diem in thirty (30) day increments. Builder shall notify Homeowner of the anticipated substantial completion date no less than thirty (30) days prior to substantial completion. In the event Homeowner or its agents interfere, directly or indirectly,

with Builder's performance of the Repairs, Builder shall have be relieved of the obligation to perform any further the Repairs and shall be under no further obligation to pay the Per Diem. Interference shall include, but not be limited to, Homeowner or its agents instructing Builder to cease the Repairs, Homeowner or its agents restricting Builder's access to the Residence, or Homeowner otherwise breaching this Agreement.

6.    Utilities, Taxes, and Maintenance.  Except as otherwise provided below, during the period of the Repairs Homeowner shall remain responsible for paying all ad valorem taxes, community development district assessments, special assessments, utilities, maintenance expenses, and homeowner's and/or condominium association fees in the same manner as though Homeowner occupied the Residence.  Notwithstanding the foregoing, Builder shall reimburse Homeowner for all power, water, wastewater, and trash expenses for the Residence incurred during the Repair Period.  To the extent separately contracted for by Homeowner, Builder shall also reimburse homeowner for any yard or pool maintenance expenses for the Residence incurred during the Repair Period.  Builder shall reimburse Homeowner for the foregoing within thirty (30) days following Builder's receipt of evidence of Homeowner's payment of the same. To the extent not separately contracted for by Homeowner, Builder shall be responsible, at its sole cost and expense, for maintaining the yard and any pool during the Repair Period.

7.    Moving and Storage Expense Reimbursement.  Subject to the reimbursement limits set forth below, Builder shall reimburse Homeowner for documented third-party moving and storage expenses associated with Homeowner moving and storage of Homeowner's furnishings and belongings from and to the Residence during the Repair Period ("Moving and Storage Reimbursement").  If the Residence is one-story, the maximum Moving and Storage Reimbursement is $6,000.  If the Residence is two-stories or located on the second floor or higher, the maximum Moving and Storage Reimbursement is $9,000.  Builder shall pay the Moving and Storage Reimbursement within thirty (30) days following Builder's receipt of evidence of Homeowner's payment of the same.

8.    Personal Property Repair/Replacement Contribution.  In consideration for the terms of this Agreement and the release provided herein, within thirty (30) days following the Effective Date Builder shall pay Homeowner $1,500.00 which Homeowner may use to repair and/or replace any personal property that Homeowner believes may have been affected by the Defective Drywall.

9.    Pre-Drywall and Final Homeowner Orientations.  Prior to installing the replacement drywall, Builder shall provide Homeowner the opportunity to conduct a pre-drywall orientation of the Residence.  Builder shall give the Homeowner no less than five (5) days prior notice of the pre-drywall orientation.  If Homeowner fails to conduct the pre-drywall orientation within the specified time period, Builder may proceed with completing the Repairs.  When the Repairs are substantially complete, Builder shall also give the Homeowner a final orientation of the Residence.

10.    Access.  Once Homeowner vacates the Residence and until the Repairs are complete, Builder shall have sole and exclusive access to the Residence in order to perform the Repairs and shall be in complete control of who shall be entitled to enter and work on the Residence during that time.  Homeowner further understands that for safety, insurance and

3

permitting purposes, it shall enter the Residence only upon at least 24 hour prior notification to Builder and must be accompanied by a Builder representative.

11.   <u>Supervision of Repairs</u>.  Builder shall supervise and direct the Repairs.  Builder shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Repairs.  Builder shall be responsible for the acts and omissions of its employees, subcontractors and their agents' employees in the performance of the Repairs.

12.   <u>Permits, Fees, Licenses and Inspections</u>.  Builder shall secure and pay for any and all required building permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Repairs.  Homeowner shall sign all documents required by the governmental authorities for the issuance of the applicable building permits for the Repairs, including notices of commencement.

13.   <u>Prevention of Further Damage</u>.  To the extent reasonably possible, Builder and its subcontractors will use appropriate precautions to minimize further damage to the Residence during the performance of the Repairs and will indemnify Homeowner against any such damages that are caused.

14.   <u>Subcontractors</u>.  Builder will be responsible to pay any and all subcontractors performing Repairs, and will indemnify Homeowner and bond off any liens that are filed by any said subcontractors.  Builder will use only licensed subcontractors for any and all trades that require subcontracts to be used.

15.   <u>Limited Release of Property Damage Claims and Assignment of Claims</u>.  Except for the indemnities and warranties otherwise provided in this Agreement, Homeowner hereby releases Builder and its parent and subsidiary corporations, employees, agents, officers, directors and shareholders from any and all claims, demands, actions and causes of action relating to or arising from the Defective Drywall and the Repairs being done pursuant to the terms of this Agreement, including claims for damages to Other Property within the Residence, except for personal injury claims which are more specifically excluded in the next paragraph herein.  Except as otherwise set forth herein, this release shall also not release any claims under the original warranty given in connection with the original sale of the Residence, provided, however, that the foregoing shall not be deemed to reinstate any such warranties that have already expired.

16.   <u>No Release of Personal Injury Claims</u>.  Notwithstanding the preceding paragraph, Homeowner is not releasing any and all potential personal injury claims that it may have relative to the Defective Drywall installed by the Drywall Contractors, or the Repairs.  By way of example, in the event that Homeowner somehow becomes ill as a result of the original Defective Drywall installation, it is not releasing its claims to personal injury damages resulting from the installation of such Defective Drywall.

17.   <u>Assignment of Claims</u>.  It is understood by the parties that Builder may seek reimbursement from third parties for the costs of the Repairs and the expenses paid hereunder, including from the Drywall Contractors and the suppliers, distributors, and/or manufacturers of the Defective Drywall (collectively, the "Responsible Parties").  Homeowner desires to assist

4

Builder in the recovery of the foregoing costs and expenses. Accordingly, Homeowner hereby assigns to Builder all of its present and future rights, title, interest, claims and demands against any individual or entity, including, but not limited to, The Responsible Parties, arising from, related to, or connected with property damages in any manner related to the Defective Drywall and Other Property (the "Assigned Claims"). The Assigned Claims shall expressly exclude any personal injury damages or claims arising from the Defective Drywall. Homeowner warrants that it has not previously assigned, settled, compromised or released the Assigned Claims and covenants upon request from Builder to provide Builder with documents, records and other information in Homeowner's possession related to the Assigned Claims and in the meantime shall not destroy or otherwise dispose of the same. Homeowner understands that Builder shall hereafter have the exclusive right to bring any action of claim for property damages related to the Defective Drywall and Other Property. If requested by Builder, Homeowner shall, at Builder's cost, assist Builder in its recovery efforts and shall execute such further documents as may be necessary to evidence the foregoing assignment. Consistent with the foregoing, Homeowner understands that Builder may retain samples of the Defective Drywall removed from the Residence, which shall thereafter be the Builder's sole property.

18.     <u>Confidential Terms</u>.  Homeowner agrees to keep all payment and reimbursement terms provided in this Agreement confidential and shall not discuss or disclose the same to any third parties, other than Homeowner's accountants and lawyer, unless otherwise required by law.

19.     <u>Entire Agreement</u>.  Except as specifically provided herein, this Agreement represents the entire integrated agreement between the parties and supersedes all prior agreements, understandings and representations, oral or written. Homeowner acknowledges that they have read this entire Agreement and fully understand the provisions hereof and are executing the same freely and of their own accord. According, the parties agree that this Agreement shall be construed equally against Builder and Homeowner regardless of who may have originally drafted the same.

20.     <u>Owner</u>.  Homeowner represents and warrants that Homeowner is the sole owner of the Residence and has the authority to enter into this Agreement.

21.     <u>Modification of Agreement</u>.  The terms of this Agreement may only be modified through a written agreement signed by both parties herein.

22.     <u>Attorneys' Fees and Expert Fees</u>.  Each party hereby agrees to be responsible for its own attorneys' fees and expert fees incurred through the Effective Date.

23.     <u>Effective Date</u>.  For purposes of this Agreement, "Effective Date" shall mean the date that this Agreement is last executed by the Builder or Homeowner as indicated by the date below their respective signatures.

SIGNATURES APPEAR ON THE FOLLOWING PAGE

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the Effective Date._____

**BUILDER**

Taylor Woodrow Communities at Vasari, LLC

By:_____
Print name:_____
Title:_____
Date:_____

**HOMEOWNER**

By:_____
Print name:_____
Title:_____
Date:_____

Residence Address:

_____
_____
_____

**ADDITIONAL HOMEOWNER, IF ANY**

By:_____
Print name:_____
Title:_____
Date:_____

ATTACH REPLACEMENT SELECTIONS SHEET

# TAYLOR MORRISON
## HOMEOWNER RELOCATION COVER

As we have told you, in cases such as yours, where defective Chinese drywall is confirmed, Taylor Morrison will pay for the temporary relocation of your family while we make the necessary repairs to replace the drywall in the home. This package contains information regarding the relocation and repair process and what Taylor Morrison will be providing to you.

### Monthly Stipend

Taylor Morrison will pay displaced homeowners a fixed monthly stipend for temporary housing and provide reimbursement for moving and storage costs. We will provide you with two month's temporary housing costs up front after work has been authorized. Ultimately you will be free to choose your temporary housing solution. Construction work will take 30 to 90 days, so we estimate that you could be in temporary housing between 60 and 160 days.

### Temporary Housing Options

Below is a list of possible relocation options.

**Sarasota Residence Inn**
Jennifer Ostrander
941-358-0618
Preferred rate for Taylor Morrison Homeowners

**Ft Myers Residence Inn**
Monica Postigo
859-913-1434
Preferred rate for Taylor Morrison Homeowners

**ATB Furnished Housing**
Ann Moore
1-866-633-3331
www.atbfh.com

**Steve Frey**
**Oasis Corporate Housing**
3225 S. MacDill Ave.
Suite 129
Tampa, Fl. 33629
1-800-578-0256 -- OFFICE
(813) 416-0294 -- CELL
smf@oasiscorporatehousing.com

1

## Moving Companies

We have contacted moving and storage companies and have estimates of from $3,500 to $9,000 for packing, moving out, storage and moving back in. Prices are calculated on weight and will vary from home to home.

We recommend you contact one of these companies to get an estimate for their services. We will pay your moving and storage costs based on these estimates.

### Sarasota Mover Information:

**Spirit Movers**
Tony is the contact
941-748-3969
http://www.spiritmovers.com/

**Sarasota North American Van Lines**
Rick Westervelt
888-642-5007

### Bonita Springs Mover Information

**Peluso Movers**
Ed Turner
800-741-6683

**Greabel Relocation Services**
Karen Toth
800-373-8241 Ext 1120
954-379-1120 - Direct Line

### Fort Myers Mover Information:

**Ray the Mover**
Jeff Smith
239-643-4100
www.raythemover.com

**Alliance Moving Inc.**
Mike Dent
239-455-8276

## Relocation and Repair Schedule

You have the option of remaining in your home until construction work begins or you may go ahead and move out. We estimate it will take three to five weeks to work through certain permitting requirements before we can commence construction. Your Repair Schedule will be provided prior to the commencement of construction.

## Explanation of Repair Agreement

This package includes a waiver for you to sign that will indemnify Taylor Morrison from any further damages, with regards to property damage only. This is a limited release and assignment of claims that will also allow the company to pursue legal damages from the manufacturers and suppliers responsible for their defective products. We realize that homeowners do not have the resources to take legal action against those ultimately responsible for the problem, but we intend to take all necessary actions to hold the manufacturers and suppliers responsible for their defective products. In the meantime, we are committed to making the necessary repairs to your home with no guarantee that we will be able to recover damages from the responsible parties. <u>The agreement does not cover health issues that may arise in the future.</u>

# MASTER Q & A
# TAYLOR MORRISON

## 1. Morrison Homes built my home. Who is Taylor Morrison?
In July of 2007, the parent company of Morrison Homes, Inc., George Wimpey, plc merged with Taylor Woodrow, plc to form Taylor Wimpey, plc, becoming one of the largest homebuilders in the world. Taylor Woodrow, plc was the parent company of Taylor Woodrow, Inc., which constructed homes in the United States through various subsidiary companies. As part of an internal corporate restructuring in January of 2008, Morrison Homes, Inc. changed its name to Taylor Morrison Services, Inc. and Taylor Woodrow, Inc. changed its name to Taylor Morrison, Inc.

## 2. Taylor Woodrow built my home. Who is Taylor Morrison?
In July of 2007, the parent company of Taylor Woodrow, Inc., Taylor Woodrow, plc merged with George Wimpey, plc to form Taylor Wimpey, plc, becoming one of the largest homebuilders in the world. George Wimpey, plc was the parent company of Morrison Homes, Inc., which constructed homes in the United States directly or through various subsidiary companies. Taylor Woodrow, Inc. constructed homes in the United States through various subsidiary companies. As part of an internal corporate restructuring in January of 2008, Taylor Woodrow, Inc. changed its name to Taylor Morrison, Inc.

## 3. How many Taylor Morrison homes were built with Chinese drywall?
So far, Taylor Morrison[*] has identified around a dozen homes that were constructed with defective drywall manufactured in China. This represents a very small percentage of the thousands of homes that Taylor Morrison built in Florida during the past decade. The defective drywall was installed by subcontractors without our knowledge or direction.

Even so, we at Taylor Morrison are doing everything we can to:
- Protect the health and safety of our homeowners;
- Identify any additional homes that may have been built with defective Chinese drywall, and:
- Repair any homes where it is discovered.

## 4. Where are the affected homes located?
The affected Taylor Morrison homes so far are confined to Lee and Manatee Counties.

## 5. When did Taylor Morrison first become aware of the problem?
While Taylor Morrison received less than a handful of odor complaints in 2006 and 2007 that were suspected to be the result of drywall, we were not aware of the related corrosive affects with some Chinese drywall until the recent news reports published this year.

---

1[*] For purposes of this Q&A, the term "Taylor Morrison" shall refer to Morrison Homes, Inc. (n/k/a Taylor Morrison Services, Inc.), Taylor Woodrow, Inc. (n/k/a Taylor Morrison, Inc.) and any subsidiaries thereof.

Investigations determined that, in many cases, the problem was caused by the defective drywall, which emits a naturally occurring sulfur compound that can corrode and cause the failure of HVAC coils and other copper elements in the home.

All drywall contains sulfur, but extensive testing revealed that some sheets of drywall imported from China contained elevated levels of sulfur compounds that can corrode copper elements in the home.

**6. How do I tell if I have defective Chinese Drywall in my home?**
Some affected homes emit a sulfur odor that smells like a burned match or rotten eggs. Other symptoms include blackening and corrosion of air conditioning coils that leads to system failure. Copper pipes under the kitchen sink and copper wiring also show signs of blackening. If your home shows any of these symptoms, or if you simply have a concern, please contact us at 866-477-1272 and we will send a team of experts to conduct an inspection of your home as soon as possible.

**7. How did drywall manufactured in China end up in Florida homes?**
In 2005 and 2006, damage repairs from Hurricanes Katrina and Wilma put additional pressure on top of already high drywall demand for new home construction. As a result of the shortages, suppliers and manufacturers of drywall turned to offshore sources. One such source was China, where it is now suspected that one mine providing the gypsum rock for drywall production had a higher than normal sulfur content.

**8. Did Taylor Morrison purchase the drywall from manufacturers in China?**
No. Taylor Morrison did not manufacture, import or purchase drywall direct from China. Normally a builder such as Taylor Morrison does not directly purchase components such as drywall. Standard practice in the industry is for builders to hire licensed subcontractors to install drywall and those subcontractors typically purchase drywall from local distributors and manufacturers, who are required to meet certain specifications. The vast majority of homebuilders, including Taylor Morrison, received the defective drywall through a chain of suppliers and installers without any awareness that the product had been manufactured in China.

**9. Who manufactured the defective drywall?**
Taylor Morrison has identified substandard drywall manufactured by Knauf Plasterboard Tianjin Co. Ltd. of China. There are reports that other home builders have also identified substandard drywall manufactured by Taishan Gypsum Co. LTD.

**10. What is Taylor Morrison doing to fix the Chinese drywall problem?**
In cases where Chinese drywall and corrosive effects are confirmed, Taylor Morrison will pay for temporary relocation of affected families, while making the necessary repairs to replace defective Chinese drywall. The repairs involve demolition of the inside of the home, quite literally to the studs. We thoroughly clean the home interior, replace the defective drywall and damaged items, and otherwise return the home to its original

condition. Once the repairs are completed, it will be like moving into a brand new home. Homeowners will be provided with an additional year of warranty for the repaired items. We are also working closely with our experts to try to find other, less disruptive ways to resolve the problem.

**11. How long do I need to wait for my home to be repaired?**
Taylor Morrison wants to repair homes with Chinese drywall problems as soon as possible. Before commencing repairs, we estimate that we will need three to five weeks to work through certain requirements under statues and for the permitting process to take place. Construction work will take 30 to 90 days. So, we estimate that homeowners will be in temporary housing between 60 and 160 days. They will have the choice of remaining in their home until construction begins or they may move out immediately if they so wish. Taylor Morrison will pay displaced homeowners a monthly stipend for temporary housing and provide reimbursement for moving and storage costs.

**12. Does the Chinese drywall pose an unusual health hazard of any kind?**
No. We have hired ENVIRON International Corporation, one of the world's leading environmental firms to investigate the drywall issue and to conduct scientific testing. They assure us that only trace amounts of sulfur were emitted by the Chinese drywall and this poses no health or safety risks to our homeowners and their families. The environmental scientists and toxicologists at ENVIRON also assure us that the detected levels of sulfur compounds were far below government health and safety standards for chronic exposure to sensitive people.

ENVIRON scientists met with representatives from the U.S. Center for Disease Control, the EPA, the Florida State Department of Health and county health officials to discuss air sampling results for all sulfur compounds detected in homes believed to have been built with imported drywall.

The Florida State Department of Health agrees that available data has not identified levels of corrosive gasses that exceed those recognized as posing a risk to health. After studying the findings, other government scientists also determined that, to date there is no indication that the levels of sulfur compounds would result in any adverse health outcomes.

**13. Some people living with Chinese drywall say they have physical symptoms such as irritated eyes, sore throats, headaches. If there are no health concerns, why are people having physical reactions to Chinese drywall?**
While there have been isolated instances of homeowners complaining about sore throats or itchy eyes, ENVIRON has been unable to connect these symptoms with the affected drywall. These symptoms may be caused by a number of other, unrelated factors.

Government scientists and health experts, working together with ENVIRON, continue to closely study the situation.

**14. Why does this particular drywall from China affect HVAC coils and other materials?**
The raw material in drywall is gypsum rock (dihydrous calcium sulfate) and sulfur is a naturally occurring substance in every gypsum drywall sheet that is made. We have been told that the gypsum contained in the defective drywall comes from a particular mine in China that apparently had unusually high levels of sulfur.

**15. How it is possible that small amounts of sulfur compounds emitted in the air from defective Chinese drywall can corrode copper substances, but not harm homeowners?**
The interaction of sulfur compounds with copper metals has certain corrosive effects that do not take place when interacting with the human body. Similar chemical reactions of this type that pose no health risks are common. Cars exposed to the salt air at the beach often rust and corrode, but it is perfectly safe for people to visit and live there.

**16. Is the Chinese drywall only a Taylor Morrison problem?**
No. Dozens of other homebuilders are affected as well. Taylor Morrison, however, is committed to taking care of our homeowners and to our knowledge we are one of the very few builders that are proactively trying to identify affected homes and permanently resolve the problem.

4

## AFFIDAVIT

STATE OF FLORIDA
COUNTY OF MANATEE

BEFORE ME, the undersigned authority, personally appeared Jennifer Rzewnicki who, being first duly sworn, deposes and says:

1.      I am a natural person over the age of 18 years and am otherwise competent to testify to the information contained herein.

2.      I am the original owner of the residence located at 15332 Skip Jack Loop, Bradenton, Florida.  By way of background, I have a college degree and am a licensed Professional Engineer (P.E.).

3.      Morrison Homes which is now known as Taylor Morrison or Taylor Morrison Services, Inc. built my house pursuant to a contract signed by me.

4.      On March 31, 2009 an inspection was held at my home by a Taylor Morrison employee named Chris Clark.  The purpose of the inspection was to determine whether or not my home contains defective Chinese drywall.

5.      At the inspection it was confirmed that my home does contain the defective Chinese drywall.  My home has a sulfur, musty-like smell, my electrical wiring, copper plumbing and HVAC coils are corroded and are black.

6.      Subsequent to the inspection on March 31, 2009 Taylor Morrison, through its employees, sent me various documents.  The document packages includes: 1) a Chinese Drywall Fact Sheet; 2) a Repair and Relocation Agreement; 3) a Taylor Morrison Homeowner Relocation Cover; and 4) a Master Q & A sheet.

{8819-1 00383558.DOC:1 4\10\2009}

7.   While reading each of these documents I found them to be confusing, inconsistent, presumptuous and incomplete.   For example, in one instance there is a representation that my home will be demolished down to the wood studs.   However, in the proposed Repair and Relocation Agreement it states that my home's drywall will be replaced and all other components of my home will either be repaired or replaced.   In another instance, one document makes representations that various Government agencies, including the State of Florida, are working with Taylor Morrison's expert, Environ.   This section goes onto state that the State of Florida findings and agencies agree with Environ and its determination that there are no health related risks associated with the defective Chinese Drywall.   Based upon my reading of various reports, this statement is untrue and misleading.

8.   The aforementioned documents are also inconsistent and confusing as they relate to my discussions with Chris Clark at the time of my home inspection.   At that time, Mr. Clark stated that I would receive a daily stipend for relocation expenses from the date that I actually vacated the house.   To the contrary, the Repair and Relocation Agreement states that I will only receive the daily stipend upon Taylor Morrison proving me a notice to vacate.

9.   On April 8, 2009, in an attempt to clarify the documents, I spoke to Rick Wilmeth, Vice President of Construction with Taylor Morrison.   During that conversation Mr. Wilmeth told me that the components inside my air handler would be replaced but the housing of the air handler would not be replaced, the copper from the air handler to the outside would be replaced, and other systems would be replaced or repaired depending on their findings.   Mr. Wilmeth also stated to me that Taylor Morrison had not actually attempted to demolish a home yet, had not removed any systems yet and have not specifically defined a protocol.   Apparently this process is being done at some time in the future using a Taylor Morrison Spec home.   I also

questioned Mr. Wilmeth as to Taylor Morrison's findings regarding what affect, if any; the byproducts of the Chinese drywall have on my nails and straps as they relate to my wood studs and roof trusses. In response, Mr. Wilmeth simply stated that sulfur does not corrode galvanized nails. This statement was confusing to me since I am unaware what type of nails and straps my home has and Taylor Morrison has not performed any destructive testing on my home.

**FURTHER AFFIANT SAYETH NOT.**

Jennifer Rzewnicki

SWORN TO AND SUBSCRIBED before me by Jennifer Rzewnicki, who is personally known to me, this _10th_ day of April, 2009.

My Commission expires:

Nancy E. R. Simmers

Signature of Notary Public

Nancy E. R. Simmers
Commission # DD417466
Expires April 11, 2009
Bonded Troy Fain - Insurance, Inc. 800-385-7019

{8819-1 00383558.DOC;1 4\10\2009}

UNITED STATES DISTRICT COURT
IN AND FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KRISTIN MORGAN CULLITON,

     Plaintiff,

vs.                                                    Case No. 08:09-cv-00589-JDW-TGW
                                                       Division:  C

TAYLOR MORRISON SERVICES, INC.,
A FOREIGN CORPORATION D/B/A
MORRISON HOMES, INC., et al.

     Defendants.

_____/

## DEFENDANT, TAYLOR MORRISON SERVICES, INC.'S, RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

Defendant, Taylor Morrison Services, Inc. ("Taylor Morrison"), by and through undersigned counsel hereby files this, its response in opposition to Plaintiff's Motion for Protective Order, pursuant to Rule 23(d) of the Federal Rules of Civil Procedure.

In late 2008, for the first time, various media outlets began reporting a potential large-scale problem related to corrosion with certain appliances and wiring with certain drywall used in homes.  Homeowners had previously described "rotten egg" and "sulfur" smell in their homes.  Taylor Morrison, a subsidiary of Taylor Morrison Inc., one of the largest homebuilders in the world, immediately began to investigate the potential claims and learned that a small number of the Florida homes they built had some of the reported problems.  At that time, Taylor Morrison was investigating potential claims from homeowners who called the company.  Further investigation by both Taylor Morrison and various governmental agencies revealed that the problem is isolated to certain

1

drywall made in China, from a specific region and time period. Beginning in early 2009, in an effort to alleviate the concerns of their customers, Taylor Morrison notified certain of their homeowners in areas where Chinese drywall was potentially used, and offered to inspect and repair the homes. Moreover, to the extent that the homeowners claim a defect in the drywall or otherwise, the inspection is part of the claims process required by Chapter 558, Florida Statutes before any lawsuit can be filed. In the meantime, by March, 2009 several different groups of law firms began to file putative class action complaints in various jurisdictions in Florida and elsewhere. Only three of these cases include a Taylor Morrison entity as a party. One of those groups of Plaintiffs' lawyers, the lawyers in this case, now seek to preclude Taylor Morrison from continuing to make an effort to repair the homes that contain the defective drywall. Such an effort is clearly not in the best interest of the public or those whose homes are affected by allegedly defective drywall, but rather, appears to be an effort by this group of Plaintiffs' lawyers to improve their chances of recovering attorneys' fees on a large scale basis. Accordingly, Plaintiff Culliton's Motion for Protective Order should be denied.

## I.   BACKGROUND FACTS

This action was brought in the state Court approximately nine months ago on behalf of Kristin Culliton, who simply claimed breach of contract and breach of warranty as to her home. It was not until January 26, 2009, after the aforementioned media reports, that the Plaintiff attempted to amend the Complaint to assert a putative class action claim.

Plaintiff fails to point out that there are at least two (2) other law firms purportedly representing the same putative class members. A putative class action was

filed against a Taylor Morrison subsidiary (Taylor Woodrow Communities at Vasari, LLC) in the Southern District of Florida, styled as KARIN VICKERS, et. al v. Knauf Gips KG, et. al, Case No.:  09-20510-CIV-Gold, and another case was filed against the same Taylor Morrison subsidiary by another homeowner in the Southern District of Florida, styled as LARRY GALVIN and RENE GALVIN v. KNAUF GIPS KG, a German Corporation, TAYLOR WOODROW COMMUNITIES AT VASARI, L.L.C., et. al., Case No.: 09-20847-CIV-Altonaga.   Therefore, it is unclear whether the attorneys filing this motion would even represent the putative class, assuming that a class is ever certified.

Taylor Morrison is currently in the process of inspecting any homes wherein the homeowner has requested an inspection, after receiving notice from Taylor Morrison that their home may be located in a subdivision in which Chinese drywall may have been used.  Some homeowners contacted Taylor Morrison for inspection prior to receiving a notice from Taylor Morrison.  No homeowner is forced to have their home inspected, but rather, the inspection is purely voluntary by the homeowner.

After the inspection, Taylor Morrison has offered to repair any homes with potentially defective drywall.   Said repairs include removal of the drywall and repair of potentially affected "other property" (such as wiring and air conditioning systems). Only homeowners who have asked Taylor Morrison to do the repairs are provided with a Repair and Relocation Agreement, whereby Taylor Morrison offers to make the repairs and to pay for their reasonable relocation expenses. In exchange Taylor Morrison is requesting a release and assignment of claims relative to the repairs and personal property claims.   In its Motion for Protective Order, Plaintiff failed to advise the Court that

3

personal injury claims <u>are expressly excluded</u> from the release. Homeowners have the opportunity to review the proposed agreement and accept or reject it (or even respond with requested modifications).   Any homeowner has the opportunity to request legal advice, if they so choose.  Some homeowners have been represented.  A copy of a Repair and Relocation agreement is attached hereto as Exhibit "A."  Taylor Morrison has not been informed that this group of plaintiffs' lawyers represent any homeowner or putative class member other than Ms. Culliton.

## II.      LEGAL ARGUMENT

### A.      TAYLOR MORRISON MAY COMMUNICATE WITH ITS HOMEOWNERS PRIOR TO CERTIFICATION OF A CLASS

Rule 23 does not preclude Taylor Morrison from contacting any unrepresented putative class members for purposes of offering to repair their home and resolve any claims relating to those repairs. Repairing the homes and resolving claims should be the goal of all parties and their attorneys.

Taylor Morrison is not providing misleading information to its customers.   Any homeowner is free to not request Taylor Morrison to perform an inspection, to not request Taylor Morrison to make repairs, and to request revisions to the proposed agreement offered by Taylor Morrison.    For example, Plaintiff alleges that Taylor Morrison's Fact Sheet is inaccurate since it "suggests that the State of Florida ….has concluded that there is no health risk." See Plaintiff's Motion at p. 4.  In reality, the Fact Sheet states "The Florida State Department of Health agrees that available data has not identified levels of corrosive gasses that exceed those recognized as posing a risk to health."  See Fact Sheet at p. 2. A copy of the Fact Sheet is attached hereto as Exhibit "B."  The FDOH website confirms the statement in the Fact Sheet.  See materials from

4

the FDOH website attached as Exhibit "C." In any event, personal injury claims are excluded from the release, so Plaintiff's argument to the contrary is moot.

It is unclear why counsel for the Plaintiff wishes to have Taylor Morrison advise homeowners of this pending putative class action suit in its inspection and repair materials. There are multiple putative class action suits and Taylor Morrison's goal is simply to repair the homes in question.

Plaintiff's counsel is actively soliciting class members through its website and newspaper articles. Attached hereto as Exhibit "D" are relevant pages from Plaintiff's counsel's website. The website includes a video of an interview with the Plaintiff. The materials in that website indicate that counsel filed a lawsuit dealing with the construction of Florida properties between the years of 2004 and 2006. This is partially false and certainly misleading because the following paragraph indicates that the drywall was imported into the United States between the years of 2005 and 2006. Obviously homes that were built before the Chinese drywall was imported could not possibly have caused a problem. In addition, the website requests that former employees of Taylor Morrison or other companies contact the law firm directly. This could include individuals with knowledge of attorney client privileged information. The website materials of Plaintiff's counsel also indicate that dozens of affected property owners "through Florida" have raised complaints. That is also misleading, as it appears that the complaints are confined to a handful of counties in central and south Florida. Interestingly, the website of the Plaintiff's attorney fails to mention the other pending putative class action cases that were brought by other law firms, which is the very complaint that they are alleging against Taylor Morrison. Finally, in a recent local newspaper article, one of

Plaintiff's attorneys indicates that he has signed up dozens of additional class plaintiffs. (See Exhibit "E1").   However, none of these people have been added as a party.

Page 4 of Plaintiff's Motion alleges that "the Agreement proposes the non-negotiable terms pursuant to which Taylor Morrison will repair homes…"  Plaintiff fails to support this assertion with any facts as there can be no support for the statement because Taylor Morrison has not told a single homeowner that the terms are non-negotiable, and some homeowners have requested changes to the proposed Agreement.

*Gulf Oil v. Bernard* 452 U.S. 89 (1981,) cited by the Plaintiff, involved an action where the representative plaintiff and its counsel (not the defendant) were prohibited by the trial court from contacting class members.  In the case at bar, the Plaintiff's counsel has actively contacted potential class members.  The court in *Gulf Oil v. Bernard* stated as follows: "….an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect weighing of need for a limitation and  potential interference with the rights of the parties; only such a determination can ensure that court is furthering, rather than hindering, policies embodied in the Federal Rules of Civil Procedure…" *Id.* at 98.  The court stated "[W]e conclude that the imposition of the order was an abuse of discretion."  As such the court refused to prohibit contact with class members by any party.

More importantly, there is a distinct difference between Plaintiff's counsel contacting putative class members and Taylor Morrison's contacts with unrepresented homeowners in that Chapter 558, Florida Statutes was intended to facilitate the resolution of claimed construction defects directly between the homeowner and the builder to avoid expenditure of judicial resources.  In a pertinent article concerning the applicable statute,

Larry R. Leiby and Steven B. Lesser, *How to Comply with Chapter 558 Florida Statutes: Current Challenges and Future Changes*, 83 FLA. B.J. 42 (February 2009), states the following:

> "....F.S. Ch. 558 requires an owner (claimant) to give notice and an opportunity to cure with respect to a building defect(s). The statute sets forth its purpose as to create "**an alternative method to resolve construction disputes that would reduce the need for litigation as well as protect the rights of the property owners". In more practical terms, it is intended to allow both claimants and participants to design and construction to resolve alleged defects before both sides run to the courthouse and spend a pile of money on lawyers......**" (Emphasis added)

*Kleiner v. First National Bank of Atlanta*, 751 F. 2d 1193 (11th Cir. 1985), heavily relied upon by the Plaintiff, is not instructive. In *Kleiner* the improper communications were taking place with class members, <u>after</u> a class was certified. In that case, the defendant "secretly solicited exclusion requests from potential members of plaintiff class." This was in direct violation of an existing order of the court. In the case at bar there is no class certified.

In *Weight Watchers of Philadelphia, Inc., v. Weight Watchers International, Inc.*, 455 F. 2d 770 (2nd Cir. 1972) the plaintiff, the holder of the franchise, brought a class action suit alleging that the defendant violated antitrust laws. Shortly after the filing of the suit, the chairman of the defendant's board of directors sent a letter to all franchisees stating, among other things, that such an action would have a detrimental affect on the image of the parent company. The plaintiff moved to restrain the defendant from communicating with any potential member of the class. The plaintiff also attempted to preclude settlement with potential class members. The court stated as follows: "...Indeed, we are unable to perceive any legal theory that would endow a plaintiff who

7

has brought what would have been a "spurious" class action under former Rule 23 with a right to prevent negotiation of settlements between the defendant and other potential member of the class who are of the mind to do this; it is only the settlement of the class action itself without court approval that Fed.R.Civ.P. 23(e) prohibits." *Id.* at 773. The *Weight Watchers* court held that "even if defendant should succeed in settling with so many franchisees that the court will be forced to deny class action status, plaintiff's complaint will remain untouched." *Id* at 776.

Similarly in the case at bar, the Plaintiff, Kristin Culliton's claim would not be effected by any settlements and there are potentially numerous affected homeowners that could form a part of the class if they so desire.

Plaintiff's contention that "Taylor Morrison has been providing putative class members with misleading information" and "is actively seeking to induce homeowners into a complete surrender of all their potential claims in the action" is patently false and itself misleading. First, Plaintiff's contention assumes that the homeowners have and want claims that are a part of any action, let alone the action filed by Plaintiff. Second, in asserting this contention in support of its purported effort to "protect the interests of putative class members," Plaintiff presumptuously seeks to substitute her intentions and desires with regard to the issues presented in this action for those of the other homeowners. In fact, the overwhelming majority of homeowners who have had contact with Taylor Morrison, some of whom are represented by counsel in other pending cases, have taken it upon themselves to contact Taylor Morrison directly, and have expressly indicated a desire to have their homes repaired. Third, Taylor Morrison has offered no misleading information regarding this action. To the extent Taylor Morrison's offer to

repair a home is confusing, Taylor Morrison has and will continue to endeavor to clear up any misconceptions and answer any questions raised by a homeowner.

In offering to repair the allegedly defective drywall, Taylor Morrison is not requiring homeowners to surrender all of their potential claims, should any of the various putative class action lawsuits certify a class. The agreement proposed by Taylor Morrison is not a "take it or leave it" proposition and, as proposed, carves out and preserves any claims for personal injury. Moreover, a new warranty is given for the repair work. Thus if the repair work is insufficient or incorrect, the owner has a remedy for that also.

Likewise, Plaintiff has not set forth the first fact to support her conclusory contention that it is Taylor Morrison's intent to deprive homeowners the opportunity to consult with counsel and to take advantage of vulnerable and often desperate homeowners. Unlike in *Ojeda-Sanchez v. Bland Farms*, 2009 WL 577602 (S.D. Ga. 2009), Taylor Morrison did not make an unannounced visit to any homeowner and demand that anything be signed on the spot. Plaintiff's cite *Ojeda-Sanchez* for the proposition that this Court has the power to limit pre-certification contacts with putative class members. However, the defendant in *Ojeda-Sanchez* sent representatives to Mexico to make unannounced visits to individuals that plaintiff's counsel claimed to represent in an effort to secure written statements that plaintiff's counsel did not represent them. *See Ojeda-Sanchez*, 2009 WL 577602 at 1 – 2. The plaintiffs signed the written statements, but later said that they were coerced by the defendant's representatives, concerned for their families, and intimidated by the power of the defendant who could send people to their homes in Mexico. *See id* at 3 – 4. In response, the *Ojeda-Sanchez* court limited in

9

person and telephone contact with putative class members, but permitted contact in writing. *See id* at 7. It is important to note that the subject communication in *Ojeda-Sanchez* did not involve settlement offers or negotiations.

In the case at bar, Taylor Morrison, in response to the homeowners' requests that Taylor Morrison repair their homes, has delivered or mailed the repair agreement to homeowners and provided them the opportunity to review the agreement and confer with whomever they like, without placing a deadline on acceptance.[1]   Nothing in the documents sent to homeowners by Taylor Morrison or in the actions of Taylor Morrison in inspecting homes suggests that Taylor Morrison is coercive, intimidating, or "seeking to mislead homeowners into believing that acceptance of the Agreement is the only way they can secure any home repairs at Taylor Morrison's expense" as Plaintiff has erroneously conclude without citing facts in support of same.

Presumably, every homeowner recognizes and understands that they have the right to seek legal redress should they be damaged, whether by joining in a class action or by contacting a lawyer and filing their own lawsuit.  Rather, Plaintiff's counsel would have this Court believe that without their guidance the homeowners are incapable of contacting a lawyer, asking questions of or negotiating with Taylor Morrison, or considering the options presented by the presence of allegedly defective drywall in their homes.

**B.    THE CASES PRIMARILY RELIED UPON BY PLAINTIFF INVOLVE POST-CERTIFICATION CONTACT WITH PLAINTIFFS OR PREDATE THE AMENDMENT TO RULE 23.**

---

[1] This is evidenced in Paragraph 6 of the Affidavit of Jennifer Rzewnicki, submitted by Plaintiff in support of the Motion. Ms. Rzewnicki has indicated to Taylor Morrison that she has not retained Plaintiff's counsel.

Taylor Morrison's attempt to repair the alleged defective condition of the subject homes in no way infringes on the Court's duty to protect the interests of class members. No class has been certified in this matter. Plaintiff's argument is misleading and confusing in that Plaintiff suggests that pre-certification settlement of a homeowner's potential claim is the equivalent of the homeowner withdrawing or "opting out" of the class action. The cases cited by Plaintiff are inapposite to the facts of the instant case. *Eisen, Kleiner, Erhardt, Impervious Paint Industries,* and *Haffer,* are all cases which address non-settlement post-certification contact with class members. In addition, it is worth noting the lengths to which Plaintiff has misconstrued and mischaracterized the foregoing cases in an attempt to conjure support for her Motion. For example, Plaintiff cites *Impervious Paint Industries, Inc., et al. v. Ashland Oil, et al.* 508 F.Supp. 720 (W.D. Ky. 1981), as an example of a case dealing with the issue of pre-certification contacts. Quite clearly, the *Impervious Paint Industries* decision was rendered <u>post-certification</u>. *See Impervious Industries* 508 F. Supp at 721. Furthermore, the quote attributed to *Impervious Paint* in Plaintiff's Motion could not be taken further out of context. Plaintiff's cite reads:

> "During the time between the institution of the action and the close of the opt out period,… [i]t is essential that the class members' decision to participate or withdraw be made on the basis of independent analysis of its own self interest. It is the responsibility of the Court as a neutral arbiter… to insure this type of free and unfettered decision."

See Motion, page 12.

Plaintiff's creative use of ellipses may lead this Court to believe that pre-certification settlements of putative class member claims should be made only with the assistance of the Court (and, once again, inaccurately equates "withdraw" with

"settlement"). Yet, a full review of the *Impervious Paint* decision reveals the true nature of the court's ruling. The quoted portion of the *Impervious* decision actually combines two completely separate portions of the decision, separated by an ellipsis, in a misleading attempt to suggest that the *Impervious* court ruled that it has the power to play a role in the approval of pre-certification settlements with putative class members. The first portion of the quotation actually reads "During the time between the institution of a class action and the close of the opt-out period, **the status of *plaintiff's counsel* in relation to the class members cannot be stated with precision.**" *See id* (emphasis added). Then in analyzing the ABA Code of Professional Responsibility in the context of *post-certification* contact by both plaintiff and defense counsel, the court stated:

> "***In this type of case***, both sides are subject to tremendous pressure to step over the thin line between vigorous advocacy and overreaching. It is essential that the class members' decision to participate or to withdraw be made on the basis of independent analysis of its own self-interest."

*See id* (emphasis added).

Further distinguishing these cases from the instant case is the *Impervious* court's reliance upon Rule 23 as it existed prior to the 2003 amendment which clarified when the court can refuse to approve a settlement. It is now clear that court approval is <u>not</u> required for the pre-certification settlement of the claims of a putative class member. Thus, the court has no obligation, under Rule 23, to "protect" putative class members from pre-certification contact and settlement discussions with a defendant absent certain circumstances. Those limited circumstances can be found in the case law cited by Plaintiff, but are notably absent from the Motion.

Of the pre-2003 cases cited by Plaintiff that address pre-certification contact between a defendant and putative class member, only *Slyvester Jenifer, et al. v. Delaware*

*Solid Waste Authority*, No. Civ. A. 980279 MMS, Civ. A. 980565 MMS, 1999 WL 117762 (D. Del. Feb. 25, 2009) and *Weight Watchers of Philadelphia v. Weight Watchers Int'l*, 53 F.R.D. 647 (E.D.N.Y. 1971); *modified by Weight Watchers of Philadelphia v. Weight Watchers Int'l*, 55 F.R.D. 50 (E.D.N.Y. 1971), are cases dealing with pre-certification settlement of the claims of putative class members.

In *Jenifer*, the defendant met with two putative class members in an effort to reach a settlement prior to certification of the class action. *Jenifer* at 1. In response, the plaintiffs moved to enjoin the defendant from such *ex parte* contact with potential class members. *Id.* After referring to several of the cases cited by the Plaintiff in the instant action, the court noted that "before a class action is certified, it will ordinarily not be deemed inappropriate for a defendant to seek to settle individual claims." *Id* at 3. (citations omitted). In finding that the evidence did not establish that putative class members would be threatened or coerced into foregoing any claims, the court stated: "[t]he test for coercion is whether the conduct somehow overpowers the free will or business judgment of the potential class members." *Id* at 5, *citing Mobilificio San Giacomo S.p.A. v. Stoffi*, 1998 WL 125536, at 9 (D. Del. Jan 29, 1998). The court also noted that the communications from the defendant relate to a business proposition, which the potential class members were free to reject if they decide the costs outweigh the benefits, and that the offer was open to all putative plaintiffs on the same terms. *See id.*

In *Payne v. Goodyear Tire & Rubber Co.*, 207 F.R.D. 16 (D Mass. 2002), certain homeowners brought a putative class action case against the manufacturer of hoses utilized in the floor heating system alleging that the hose was defective. The putative class action plaintiff moved for an order to attempt to prevent the manufacturer from

communicating with putative class members and inspecting homes. The court rejected the request and also refused to order Goodyear to modify its website. Among other things, the court stated as follows: "At oral argument, the court learned that plaintiffs' counsel also had a website concerning the Entran II Hose." *Id* at 20. The court further stated "Considering all of the evidence put forth by the plaintiffs, an order barring ex parte communication with absent plaintiffs is not justified by the record currently before the court." *Id* at 21. The court further stated "What remains on Goodyear's website regarding Entran II hose is, in essence, the company's opinion on the hose's functionality.....There is insufficient evidence that the inspections are actually or inherently coercive or misleading."

*Pollar v. Judson Steel Corp.,* 1984 US Dist. Lexis 19765, 1984 WL 161273 (N.D. Cal. Feb. 3, 1984), cited by Plaintiff, is an unpublished interlocutory order that has no persuasive value. It merely held that it was improper to publish in the newspaper a misleading attempt to solicit information from class members who are represented by counsel. This decision, which has no precendential effect, was entered approximately 23 years before Rule 23 made clear that settlement with a putative class member before a class is ever certified is not precluded.

It is not Taylor Morrison's job to advise homeowners of the numerous pending cases. Plaintiff's counsel has done everything that it can to advertise its own putative class action case, without disclosing the existence of other actions where these lawyers are not involved. There is no rule or case law requiring Taylor Morrison to advise homeowners of a class action case where no class has been certified. If such information was required, how would Taylor Morrison decide which class action information should

be advertised, which attorney should be contacted, and how it should summarize the nature of the proceedings? Apparently it is acceptable to the Plaintiff that her own counsel release incomplete information, in an attempt to solicit potential class members, but it is unacceptable to have Taylor Morrison provide information in an attempt to repair the homes and resolve claims with the same homeowners. Merely filing a piece of paper stating that it seeks a "class action" does not give exclusive rights to the Plaintiff's attorney to exclusively communicate with every homeowner that purchased a Taylor Morrison home in the relevant period.

Six weeks ago, Plaintiff's counsel informed the local newspaper that "over 40 homeowners have agreed to join" the pending class action case against Taylor Morrison. (See Composite Exhibit "E2"). These homeowners were likely solicited by Plaintiff's counsel given Plaintiff's counsel's website. Moreover, the statement was clearly made in an attempt to induce others to hire him. This statement appears to be inaccurate, since no additional homeowners have joined the suit.

## C.   TAYLOR MORRISON HAS THE STATUTORY AND CONTRACTUAL RIGHT TO MAKE THE REPAIRS.

Chapter 558 of the Florida Statutes and the warranties between Taylor Morrison and the homeowners give Taylor Morrison the right to make repairs or payment which would result in resolution of the particular claim.

Chapter 558 of the Florida Statues requires the plaintiff to advise a potentially responsible defendant of any construction defect and provides for a bar of any claims upon acceptable repair or payment. The Statute states as follows: 558.004 Notice and opportunity to repair.-

15

(1) " In actions brought alleging a construction defect, the claimant shall, at least 60 days before filing any action, or at least 120 days before filing an action involving an association representing more than 20 parcels, serve written notice of claim on the contractor, subcontractor, supplier, or design professional, as applicable, which notice shall refer to this chapter. If the construction defect claim arises from work performed under a contract, the written notice of claim must be served on the person with whom the claimant contracted. The notice of claim must describe the claim in reasonable detail sufficient to determine the general nature of each alleged construction defect and a description of the damage or loss resulting from the defect, if known. The claimant shall endeavor to serve the notice of claim within 15 days after discovery of an alleged defect, but the failure to serve notice of claim within 15 days does not bar the filing of an action, subject to s. 558.003. This subsection does not preclude a claimant from filing an action sooner than 60 days, or 120 days as applicable, after service of written notice as expressly provided in subsection (6), subsection (7), or subsection (8)....."

............

(5) "Within 45 days after receiving the notice of claim, or within 75 days after receipt of a copy of the notice of claim involving an association representing more than 20 parcels, the person who received notice under subsection (1) must serve a written response to the claimant. The response shall be served to the attention of the person who signed the notice of claim, unless otherwise designated in the notice of claim. The written response must provide:

(a) A written offer to remedy the alleged construction defect at no cost to the claimant, a detailed description of the proposed repairs necessary to remedy the defect, and a timetable for the completion of such repairs;

(b) A written offer to compromise and settle the claim by monetary payment, that will not obligate the person's insurer, and a timetable for making payment;

(c) A written offer to compromise and settle the claim by a combination of repairs and monetary payment, that will not obligate the person's insurer, that includes a detailed description of the proposed repairs and a timetable for the completion of such repairs and making payment;"

..............

(8) "…..<u>If the offeror makes payment or repairs the defect within the agreed time and in the agreed manner, the claimant is barred from proceeding with an action for the claim described in the notice of claim or as otherwise provided in the accepted settlement offer.</u>"
(Emphasis added)

In addition, Taylor Morrison provides a structural warranty (in addition to a separate two year comprehensive warranty) which states as follows:

### D.   WHAT HAPPENS AFTER YOU SUBMIT A CLAIM

1.   "Morrison Homes is entitled to assess claimed defects and decide upon an appropriate repair plan. Morrison Homes is also entitled to choose to repair or replace, or to pay you the fair value of the repair or the replacement of a covered defect."

2.   "…..By accepting the benefits of this Ten-Year Limited Structural Warranty you agree to grant access to Morrison Homes and its contractors to conduct tests and to inspect and repair your home, as Morrison Homes deems appropriate. Failure to grant such access to Morrison Homes shall automatically void this warranty."

   ………….
5.   "As noted, <u>Morrison Homes, in its sole discretion, may choose to perform the required repairs, if any, or to pay its fair value….</u>"

(Emphasis added)

The Plaintiff's attorneys apparently are trying to prevent the putative class members from complying with Chapter 558 of the Florida Statutes, and from complying with the warranty, in the interest of creating a larger class or claim. This action would simply prevent the residents from getting their homes repaired.

There is nothing preventing Taylor Morrison from requesting a release for work that it has done. As previously stated, the release language does not prevent future personal injury claims and contains a warranty for repair work.

17

### III.  CONCLUSION

Taylor Morrison is doing nothing other than fulfilling its obligations under Chapter 558 of the Florida Statutes and its warranty. This Court and the Plaintiff's attorneys should both encourage repair of the homes in question. Every homeowner is free to accept or reject the inspection, the repairs or the proposed release.    Any homeowner is free to retain counsel, if they so choose.

The Plaintiff's attorney itself has solicited the same potential class members, while not advising these potential class members of any other class action case, or the application of Chapter 558 of the Florida Statutes, or the warranty in question. "Putative class members" are not represented by the Plaintiff's counsel simply by the pure filing of the lawsuit and there is no evidence that these putative class members have ever retained these attorneys.  Moreover, it is not even clear which attorney would represent the class given the numerous pending actions.

Plaintiff's Motion for Protective Order should be denied.

Neal A. Sivyer
Florida Bar No. 0373745
Stephen E. Walker
Florida Bar No. 0497851

**SIVYER BARLOW & WATSON, P.A.**
401 East Jackson Street, Suite 2225
Tampa, Florida 33602
Telephone:  (813) 221-4242
Facsimile:  (813) 227-8598
*Attorneys for Defendant*

18

## CERTIFICATE OF SERVICE

I HEREBY certify that on April 22, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

_____
Attorney

Jan Douglas Atlas
Adorno & Yoss, LLP
350 East Las Olas Blvd., Suite 1700
Fort Lauderdale, FL 33301

Darren Robert Inverso
Norton, Hammersley, Lopez & Skokos, P.A.
Suite 610
1819 Main Street
Sarasota, Florida  34236

Christopher Craig Casper, Esquire
James, Hoyer, Newcomer
& Smiljanich, P.A.
One Urban Centre
Suite 550
4830 W. Kennedy Blvd.
Tampa, Florida  33609

Gebr Knauf Vervaltungsgesellschaft KG
Am Bahnhof 7
Iphofen, 2M 97346
Germany

Susan J. Cole, Esquire
Bice Bole Law Firm
999 Ponce De Leon Blvd.
Suite 710
Coral Gables, FL  333134

Knauf Gips KG
Ridham Dock, Kemsley
Sittingbourne, Kent
ME 9 8SR
UK

19

Rothchilt International, Ltd
N-510 Chiu Hsn Bld
Annex 96
Chung Shan N. Rd. Sec. 2
Taipei, Taiwan R.O.C

Knauf Plasterboard
North Yinhe Bridge, East Jingjin Road
Beichen District
Tianjin, China 300400 P.R.C.

Jeffrey A. Backman
Jan Douglas Atlas
350 East Las Olas Boulevard
Suite 1700
Fort Lauderdale, Florida  33301-4217

# REPAIR AND RELOCATION AGREEMENT

THIS REPAIR AND RELOCATION AGREEMENT ("Agreement") is made and entered into as of the Effective Date by and between the undersigned Builder and Homeowner(s).

## Background

A.    Homeowner is the owner of a residence sold and/or constructed by Builder located at the address set forth below Homeowner's signature ("Residence");

B.    Subsequent to the original closing on the Residence, the parties discovered that the independent drywall contractors retained by Builder to install drywall in the Residence ("Drywall Contractors") installed defective drywall ("Defective Drywall") obtained from one or more suppliers, distributors, and/or manufacturers, which Defective Drywall has damaged other property within the Residence ("Other Property"); and

C.    Builder has agreed to remove the Defective Drywall and repair damage caused thereby in accordance with the terms and conditions set forth herein.

## Terms

IN CONSIDERATION of the mutual covenants of the parties contained herein, Builder and Homeowner agree as follows:

1.    Scope of Repair.  Builder agrees, at its sole expense, to perform the following repair work (collectively, the "Repair(s)"):
   a) Remove and replace all drywall in the Residence, including the Defective Drywall.
   b) Repair or replace other building materials Builder originally installed in the Residence that are affected by the Defective Drywall, including HVAC systems, plumbing components, and electrical components.
   c) Finish and paint all newly installed drywall.
   d) Repair or replace, as necessary, all materials in the Residence affected by the Repair process, which may include, but is not limited to, flooring, wall coverings, tile, cabinets, countertops, sinks, toilets, bathtubs, shower enclosures, appliances, mirrors, lighting and plumbing fixtures, and wood trim and moldings.
   e) Remove and dispose of all construction debris and clean the interior of the Residence.

2.    Removal of Defective Drywall.  Builder shall be solely responsible for the disposal of all Defective Drywall removed from the Residence, which disposal shall be in accordance with all applicable governmental laws and regulations.

3.    Replacement Selections.  Homeowner understands that some of the original materials, fixtures and equipment installed when the Residence was first constructed must be replaced as part of the Repair process or may be affected by the Repair process and thus need replacement.  Accordingly, prior to entering into this Agreement Homeowner met with Builder's

**Exhibit "A"**

representative and selected replacements for those items that will be replaced, as well as those items that may be affected by the Repairs process and need replacement (collectively, the "Replacement Selections"). A copy of the Homeowner's Replacement Selections is attached hereto and incorporated herein by reference. If the Homeowner's Replacement Selections are discontinued or should materials be affected by the Repair process for which Homeowner has not made Replacement Selections, Builder shall give Homeowner fourteen (14) days to make Replacement Selections from the comparable products and materials Builder has available. If Homeowner fails to make the foregoing Replacement Selections within the fourteen (14) day period, Builder shall have the right to make the Replacement Selections in Builder's sole discretion which shall be final and binding on Homeowner. Homeowner shall not be entitled to any Per Diem (as defined below) for the period of any delay in the completion of the Repairs caused by Homeowner's failure to timely make Replacement Selections. Homeowner understands that while Builder intends to match replacement materials and equipment as closely as possible with the original items installed with the original construction, some items may be discontinued or have color variations. Given the accelerated schedule for the Repairs, all Replacement Selections are final and may not be changed except with the prior consent of Builder, which consent Builder may withhold or grant in its sole discretion.

4. **New Warranty for Repairs.** Builder will perform the work in a workmanlike manner. Builder warrants for a period of one year following substantial completion of the Repairs that all materials and workmanship related to the Repairs shall be free and clear of defects and deficiencies. For purposes of this Agreement, "substantial completion" shall be defined as closing out of the applicable governmental building permit for the Repairs. If a defect occurs in the Repairs, excluding defects caused by a lack of Homeowner maintenance, Builder, at is option, shall repair, replace, or pay the reasonable cost of repairing or replacing the defective item. Notwithstanding the foregoing, appliances, fixtures and equipment installed in connection with the Repairs shall be governed solely by the manufacturer's warranty for such items which Builder hereby assigns to Homeowner. Except with respect to foregoing warranty with respect to the Repairs, all other terms and conditions of the Homeowner's original warranty in connection with the original sale of the Residence shall remain in full force and affect.

5. **Per Diem Reimbursement for Relocation Expenses.** Homeowner and Builder understand that Homeowner will be required to relocate for the period of time during which Builder makes the Repairs pursuant to this Agreement. Builder will give Homeowner no less than three (3) weeks prior notice ("Vacation Notice") to vacate the Residence before commencing Repairs. Except as otherwise provided in this Agreement, commencing on the later of (i) the day Homeowner vacates and surrenders the Residence to Builder, or (ii) fourteen (14) days following Homeowner's receipt of the Vacation Notice ("Per Diem Commencement Date"), and continuing until five (5) days following substantial completion of the Repairs (the "Repair Period"), Builder agrees to pay Homeowner <u>One Hundred Seventeen</u> Dollars (<u>$117.00</u>) per day (the "Per Diem") in settlement of any and all expenses and damages which Homeowner suffers as a result of having to vacate the Residence. On the Per Diem Commencement Date Builder shall advance to Homeowner sixty (60) days of Per Diem ("Advanced Per Diem"). If the Repairs are not substantially complete prior the expiration of the foregoing sixty (60) day period, Builder will continue to advance the Per Diem in thirty (30) day increments. Builder shall notify Homeowner of the anticipated substantial completion date no less than thirty (30) days prior to substantial completion. In the event Homeowner or its agents interfere, directly or indirectly,

2

with Builder's performance of the Repairs, Builder shall have be relieved of the obligation to perform any further the Repairs and shall be under no further obligation to pay the Per Diem. Interference shall include, but not be limited to, Homeowner or its agents instructing Builder to cease the Repairs, Homeowner or its agents restricting Builder's access to the Residence, or Homeowner otherwise breaching this Agreement.

6.    Utilities, Taxes, and Maintenance.  Except as otherwise provided below, during the period of the Repairs Homeowner shall remain responsible for paying all ad valorem taxes, community development district assessments, special assessments, utilities, maintenance expenses, and homeowner's and/or condominium association fees in the same manner as though Homeowner occupied the Residence.  Notwithstanding the foregoing, Builder shall reimburse Homeowner for all power, water, wastewater, and trash expenses for the Residence incurred during the Repair Period.  To the extent separately contracted for by Homeowner, Builder shall also reimburse homeowner for any yard or pool maintenance expenses for the Residence incurred curing the Repair Period.  Builder shall reimburse Homeowner for the foregoing within thirty (30) days following Builder's receipt of evidence of Homeowner's payment of the same. To the extent not separately contracted for by Homeowner, Builder shall be responsible, at its sole cost and expense, for maintaining the yard and any pool during the Repair Period.

7.    Moving and Storage Expense Reimbursement.  Subject to the reimbursement limits set forth below, Builder shall reimburse Homeowner for documented third-party moving and storage expenses associated with Homeowner moving and storage of Homeowner's furnishings and belongings from and to the Residence during the Repair Period ("Moving and Storage Reimbursement").  If the Residence is one-story, the maximum Moving and Storage Reimbursement is $6,000.  If the Residence is two-stories or located on the second floor or higher, the maximum Moving and Storage Reimbursement is $9,000.  Builder shall pay the Moving and Storage Reimbursement within thirty (30) days following Builder's receipt of evidence of Homeowner's payment of the same.

8.    Personal Property Repair/Replacement Contribution .  In consideration for the terms of this Agreement and the release provided herein, within thirty (30) days following the Effective Date Builder shall pay Homeowner $1,500.00 which Homeowner may use to repair and/or replace any personal property that Homeowner believes may have been affected by the Defective Drywall.

9.    Pre-Drywall and Final Homeowner Orientations.  Prior to installing the replacement drywall, Builder shall provide Homeowner the opportunity to conduct a pre-drywall orientation of the Residence.  Builder shall give the Homeowner no less than five (5) days prior notice of the pre-drywall orientation.  If Homeowner fails to conduct the pre-drywall orientation within the specified time period, Builder may proceed with completing the Repairs.  When the Repairs are substantially complete, Builder shall also give the Homeowner a final orientation of the Residence.

10.    Access.  Once Homeowner vacates the Residence and until the Repairs are complete, Builder shall have sole and exclusive access to the Residence in order to perform the Repairs and shall be in complete control of who shall be entitled to enter and work on the Residence during that time.  Homeowner further understands that for safety, insurance and

3

permitting purposes, it shall enter the Residence only upon at least 24 hour prior notification to Builder and must be accompanied by a Builder representative.

11. <u>Supervision of Repairs</u>. Builder shall supervise and direct the Repairs. Builder shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Repairs. Builder shall be responsible for the acts and omissions of its employees, subcontractors and their agents' employees in the performance of the Repairs.

12. <u>Permits, Fees, Licenses and Inspections</u>. Builder shall secure and pay for any and all required building permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Repairs. Homeowner shall sign all documents required by the governmental authorities for the issuance of the applicable building permits for the Repairs, including notices of commencement.

13. <u>Prevention of Further Damage</u>. To the extent reasonably possible, Builder and its subcontractors will use appropriate precautions to minimize further damage to the Residence during the performance of the Repairs and will indemnify Homeowner against any such damages that are caused.

14. <u>Subcontractors</u>. Builder will be responsible to pay any and all subcontractors performing Repairs, and will indemnify Homeowner and bond off any liens that are filed by any said subcontractors. Builder will use only licensed subcontractors for any and all trades that require subcontracts to be used.

15. <u>Limited Release of Property Damage Claims and Assignment of Claims</u>. Except for the indemnities and warranties otherwise provided in this Agreement, Homeowner hereby releases Builder and its parent and subsidiary corporations, employees, agents, officers, directors and shareholders from any and all claims, demands, actions and causes of action relating to or arising from the Defective Drywall and the Repairs being done pursuant to the terms of this Agreement, including claims for damages to Other Property within the Residence, except for personal injury claims which are more specifically excluded in the next paragraph herein. Except as otherwise set forth herein, this release shall also not release any claims under the original warranty given in connection with the original sale of the Residence, provided, however, that the foregoing shall not be deemed to reinstate any such warranties that have already expired.

16. <u>No Release of Personal Injury Claims</u>. Notwithstanding the preceding paragraph, Homeowner is not releasing any and all potential personal injury claims that it may have relative to the Defective Drywall installed by the Drywall Contractors, or the Repairs. By way of example, in the event that Homeowner somehow becomes ill as a result of the original Defective Drywall installation, it is not releasing its claims to personal injury damages resulting from the installation of such Defective Drywall.

17. <u>Assignment of Claims</u>. It is understood by the parties that Builder may seek reimbursement from third parties for the costs of the Repairs and the expenses paid hereunder, including from the Drywall Contractors and the suppliers, distributors, and/or manufacturers of the Defective Drywall (collectively, the "Responsible Parties"). Homeowner desires to assist

4

Builder in the recovery of the foregoing costs and expenses. Accordingly, Homeowner hereby assigns to Builder all of its present and future rights, title, interest, claims and demands against any individual or entity, including, but not limited to, The Responsible Parties, arising from, related to, or connected with property damages in any manner related to the Defective Drywall and Other Property (the "Assigned Claims"). The Assigned Claims shall expressly exclude any personal injury damages or claims arising from the Defective Drywall. Homeowner warrants that it has not previously assigned, settled, compromised or released the Assigned Claims and covenants upon request from Builder to provide Builder with documents, records and other information in Homeowner's possession related to the Assigned Claims and in the meantime shall not destroy or otherwise dispose of the same. Homeowner understands that Builder shall hereafter have the exclusive right to bring any action of claim for property damages related to the Defective Drywall and Other Property. If requested by Builder, Homeowner shall, at Builder's cost, assist Builder in its recovery efforts and shall execute such further documents as may be necessary to evidence the foregoing assignment. Consistent with the foregoing, Homeowner understands that Builder may retain samples of the Defective Drywall removed from the Residence, which shall thereafter be the Builder's sole property.

18. <u>Confidential Terms</u>.  Homeowner agrees to keep all payment and reimbursement terms provided in this Agreement confidential and shall not discuss or disclose the same to any third parties, other than Homeowner's accountants and lawyer, unless otherwise required by law.

19. <u>Entire Agreement</u>.  Except as specifically provided herein, this Agreement represents the entire integrated agreement between the parties and supersedes all prior agreements, understandings and representations, oral or written.  Homeowner acknowledges that they have read this entire Agreement and fully understand the provisions hereof and are executing the same freely and of their own accord.  According, the parties agree that this Agreement shall be construed equally against Builder and Homeowner regardless of who may have originally drafted the same.

20. <u>Owner</u>.  Homeowner represents and warrants that Homeowner is the sole owner of the Residence and has the authority to enter into this Agreement.

21. <u>Modification of Agreement</u>.  The terms of this Agreement may only be modified through a written agreement signed by both parties herein.

22. <u>Attorneys' Fees and Expert Fees</u>.  Each party hereby agrees to be responsible for its own attorneys' fees and expert fees incurred through the Effective Date.

23. <u>Effective Date</u>.  For purposes of this Agreement, "Effective Date" shall mean the date that this Agreement is last executed by the Builder or Homeowner as indicated by the date below their respective signatures.

SIGNATURES APPEAR ON THE FOLLOWING PAGE

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the Effective Date._____

**BUILDER**

Taylor Woodrow Communities at Vasari, LLC


By:_____
Print name:_____
Title:_____
Date:_____


**HOMEOWNER**

By:_____
Print name:_____
Title:_____
Date:_____

Residence Address:

_____
_____
_____


**ADDITIONAL HOMEOWNER, IF ANY**

By:_____
Print name:_____
Title:_____
Date:_____

ATTACH REPLACEMENT SELECTIONS SHEET

# CHINESE DRYWALL FACT SHEET
## TAYLOR MORRISON

We have learned that defective drywall manufactured in China was installed in homes constructed by dozens of homebuilders throughout Florida, including a number of homes built by Taylor Morrison[1].

Some of this Chinese drywall emits a naturally occurring sulfur compound that can corrode and ultimately lead to the failure of heating, ventilation and air conditioning (HVAC) coils and other copper elements in the home. It can also produce a sulfur odor in the home similar to a burned match or rotten eggs.

The affected Taylor Morrison homes so far are confined to Lee and Manatee Counties. The number of homes we have identified that were constructed with apparently defective drywall manufactured in China represents a very small percentage of the thousands of homes that Taylor Morrison built in Florida during the past decade.

The defective drywall was installed by subcontractors without our knowledge or direction. Nevertheless, we at Taylor Morrison are doing everything we can to:

- Protect the health and safety of our homeowners,
- Identify any additional homes that may have been built with defective Chinese drywall;
- Repair any homes where it is discovered.

The raw material used to make all drywall is gypsum rock (dihydrous calcium sulfate). Sulfur is a naturally occurring substance contained in every sheet of gypsum drywall. We have been informed that the gypsum contained in the defective drywall comes from a particular mine in China that appeared to have unusually high levels of sulfur.

Taylor Morrison did not manufacture, import or purchase drywall direct from China. Normally a builder such as Taylor Morrison does not directly purchase components such as drywall. Standard practice in the industry is for builders to hire licensed subcontractors to install drywall and those subcontractors typically purchase drywall from local distributors and manufacturers, who are required to meet certain specifications.

The vast majority of homebuilders, including Taylor Morrison, received the defective drywall through a chain of suppliers and installers without any awareness that the product had been manufactured in China.

Like our homeowners, Taylor Morrison is a victim of the manufacturers and suppliers that provided defective drywall from China. We intend to take all necessary actions to hold the manufacturers and suppliers responsible for their defective products.

---

[1] For purposes of this Fact Sheet, the term "Taylor Morrison" shall refer to Morrison Homes, Inc. (n/k/a Taylor Morrison Services, Inc.), Taylor Woodrow, Inc. (n/k/a Taylor Morrison, Inc.) and any subsidiaries thereof.

1

Exhibit "B"

We recently established a special team of experts to address homeowner concerns and to carry out a comprehensive drywall repair program.

Taylor Morrison retained ENVIRON International Corporation ("ENVIRON"), a leading global environmental firm, to conduct isolated sampling in our homes.

The environmental scientists and toxicologists at ENVIRON have assured us that tests to date confirm that the levels of sulfur compounds inside homes built with defective Chinese drywall is far below even the most stringent government health and safety standards.

The government standards used for evaluating air quality conditions specifically consider long-term (known as chronic) exposures. ENVIRON's investigation evaluated the testing results in comparison to those applicable for daily exposures over a period of years. ENVIRON determined that the levels in the homes, thus far, did not reach standards for chronic exposures, and that there is no indication daily exposure to the recorded levels of sulfur compounds in homes with defective Chinese drywall would result in any adverse health outcomes.

The Florida State Department of Health agrees that available data has not identified levels of corrosive gasses that exceed those recognized as posing a risk to health.

While there have been isolated instances of homeowners complaining about sore throats or itchy eyes, ENVIRON has been unable to connect these symptoms with the affected drywall. These symptoms may be caused by a number of other, unrelated factors.

Government scientists and health experts, working together with ENVIRON, continue to closely study the situation.

In cases where defective Chinese drywall is confirmed, Taylor Morrison will pay for the temporary relocation of affected families while we make the necessary repairs to replace the drywall in the home.

We continue to evaluate less intrusive solutions but, at the moment, we believe replacement of the drywall is the best permanent solution.

The repairs will involve demolition of the inside of the home down to the studs. We will thoroughly clean the home interior, replace all drywall and damaged items, and essentially rebuild the inside of the home. Once the repairs are completed, homeowners will be provided with an additional year of warranty for the repaired items.

Taylor Morrison has identified substandard drywall manufactured by Knauf Plasterboard Tianjin Co. Ltd. of China. There are reports that other home builders have also identified substandard drywall manufactured by Taishan Gypsum Co. LTD.

Dozens of other homebuilders are affected as well. Taylor Morrison, however, is committed to taking care of our homeowners and to our knowledge we are one of the very few builders that are proactively trying to identify affected homes and permanently resolve the problem.

2



# floridashealth.com

850 245 4250 : Email Us
Read Our Sitemap : Send Feedback

DIVISION OF
**Environmental Health**

EH Home    About Us    **Communities**    Radiation    Medicine    Water    Sewage    Programs    Newsroom

**Bureau Of Community Environmental Health** > **Indoor-Air** > **Drywall Presentation 02/25/09**

## Premature Copper Corrosion in Residences Possibly Associated with the Presence of Imported Drywall from China

Presented by
David Krause, Ph.D., MSPH, CIH, State Toxicologist
Florida Department of Health, Division of Environmental Health
to the
Cape Coral Construction Industry Association and the Lee County Builders Associations
on
February 25th, 2009 at 8 pm
in Fort Myers, Florida

## Introduction

- County Health Department Staff were introduced (James Love, Lee County Health Department, and Robert Kallotte, Sarasota County Health Department)
- Radon and Indoor Air Program (Clark Eldredge and Tim Wallace)
- Division of Environmental Health
- State Toxicologist, Dr. David Krause

## Defining the Role of the Department of Health

- The role of DOH in the assessment of this emerging issue is limited to occupant health.
- By documenting health-related complaints and possible hazards in affected homes, DOH will endeavor to protect public health.
- Diagnosing individual illnesses of occupants in affected homes is beyond the scope and authority of the Florida Department of Health.

## DOH Activities to Date Phase I

- Gathering Information.
- Open dialogue with stakeholders, including builders, consultants, homeowners, and material suppliers.
- Communicating our findings to the public through print, broadcast, and internet media.
- Documenting citizen complaints to…
  - Determine if this phenomenon was localized to a small number of builders and communities, or was this a wide-spread issue effecting disconnected communities state wide?
  - Gather sufficient information to develop a Case Definition.
  - Determine if this phenomenon poses a health hazard to people living in affected homes.
- Preliminary Site Assessment of 12 Homes reported to have experienced copper corrosion associated with the presence of drywall imported from China. This effort was intended to…
  - Identify common trends in homes experiencing copper corrosion leading to the failure of AC coils and

**Exhibit "C"**

other metals.
   o Enable DOH to develop guidance for CHD staff, builders, and homeowners to determine if their homes are experiencing premature copper corrosion.
   o Identify possible health hazards in homes experiencing copper corrosion
- Selected samples of drywall taken during this Preliminary Assessment of 12 Homes are being assessed for sources of corrosive gasses contributing to copper corrosion.
- Depending on initial sample results, further tests using laboratory chambers may be performed to measure corrosive gas emission rates.
- All testing by DOH is being performed in light of prior test results shared by cooperating consultants, builders, and homeowners.

## Shifting DOH Efforts Phase II

- Documenting health-related complaints only
- Forwarding Non-health-related complaints to DOACS, AG's Office, and US CPSC
- Issuing a Case Definition for affected homes
- Proceed with a Hazard Assessment in cooperation with consumer protection agencies and technical experts

## Photo Slides

The following are comments not in the slide presentation. These descriptions were given during the presentation and not "written" on the slide. These photos were used to illustrate what was observed in the homes and the current case definition.

## Photo Slide 1

This is a photo of black corrosion on evaporator coils. This is a documented failure of air conditioner evaporator coil (located inside the air handling unit) that is part of our case definition.



## Photo Slide 2

This is a photo of black corrosion on the Freon "hot-line". Black next to air handler is soot from soldering "hot-line" to replacement coil.



**Photo Slide 3**

This photo shows the markings on the back side of the drywall indicating it was made in China (note that one side of the wall had American manufactured drywall and the other one had imported drywall).



**Photo Slide 4**

This image is a close-up of the type of the printing stating the drywall was made in China



**Photo Slide 5**

Another photo of the markings on the back of the drywall. This piece of drywall has been placed on the floor and we are looking down. The objects on the top of the photo are walls.

**P h o t o   S l i d e   6**

This photo shows ground wire with black copper corrosion.



**P h o t o   S l i d e   7**

This photo shows the corrosion of exposed copper for wires going into an electronic circuit board.



Confirmation by an outside expert or professional for the presence of premature copper corrosion on un-insulated copper wires and/or air conditioner evaporator coils (inside the air handling unit)

**S h i f t i n g   D O H   E f f o r t s   P h a s e   I I   C o n t i n u e d**

- Work with stakeholders in cooperative efforts to determine if any of the following conditions pose a hazard to occupants…
    - Corrosion of copper wires that are part of the home's electrical system, smoke alarms, carbon monoxide alarms, or other electrical appliances.
    - Corrosion of brass and other metal fittings used in Natural Gas furnaces and other appliances.
    - Corrosion of copper, leading to the failure of AC coils, resulting in the leakage of Freon into the home over time.
    - Exposure to corrosive gasses emitted from problematic drywall.
- In cooperation with stakeholders, develop guidance for…
    - Identifying affected homes
    - Identifying hazards that may be unique to certain homes

**T h e   q u e s t i o n   o f   h e a l t h   c o n s e q u e n c e s   d r i v e s   o u r   e f f o r t s .**

- Available data has not identified levels of corrosive gasses that exceed those recognized as posing a risk to

health.

- DOH continues to seek data from all parties regarding occupant exposures to chemicals and secondary hazards resulting from corroded building materials.
- If data arises that identifies health or safety hazards resulting from conditions in homes experiencing this phenomenon, DOH will work with stakeholders to communicate them to the public.

**Thank You**
**David Krause, Ph.D., MSPH, CIH**
**State Toxicologist**
**Florida Department of Health**

The original power point can be <u>downloaded</u> (10.3 MB Zipped Power Point file).

Back To Top

Home : About Us : Community EH : Radiation : Medicine : Water : Sewage : Programs : Newsroom



# JAMES HOYER
NEWCOMER, SMILIANICH & YANCHUNIS, P.A.

What We Do | Attorneys | Investigators & Media Team | Consumer Cases | Whistleblowers | News | Jobs | Contact Us

## Defective Chinese Drywall

### Defective Chinese Drywall Found in Lakewood Ranch



James Hoyer Partner Secures Cy Pres Award



Undercover - How I went from Company Man to FBI Spy



Howard Dean talks with Chris Hoyer



40 Boxes of Ameriquest Documents Found In Dumpster



Brian Ross Investigates Ameriquest on Good Morning America



Ameriquest Mortgage

Chinese Drywall

Countrywide Hurricane Victims

EMC Mortgage: Former Employees CONTACT US HERE

Life Settlements: SENIORS BEWARE

North Shore Agency: Former Employees CONTACT US HERE

Safeco Homeowners Insurance

Sallie Mae Student Loan Discrimination

Waste Management, Inc. Price Increases

Qui Tam Cases: Helping Yours Succeed



James, Hoyer, Newcomer, Smilianich & Yanchunis, P.A. recently filed a class action lawsuit in Florida against **Taylor Morrison Homes, Knauf Plasterboard Tianjin Co. Ltd.**, and **Rothchilt International Ltd.** concerning **defective Chinese drywall** used in the construction of Florida properties built between 2004 and 2006.

If your Florida property was built in or after 2004 and you have noticed a **sulphur or "rotten egg" smell** and/or had recurring problems, such as corrosion, with your air conditioning, appliances, or electrical wiring, your property may have been built using defective drywall manufactured in China by Knauf. This drywall was imported into the United States and used by builders during a shortage of American-made drywall caused by the construction boom in 2005-2006.

Complaints have been raised by dozens of affected property owners throughout Florida concerning this **defective drywall**. As our law firm continues to investigate this matter, we want to hear from people with information about the defective drywall and help those impacted by it.

Please contact us using the form below if you believe that

**Exhibit "D"**

Chinese Drywall - James Hoyer Newcomer & Smiljanich

ABC News Covers
Our Countrywide
Home Loans
Investigation

your Florida property was built with defective Chinese drywall, you have suffered any of the above-described problems caused by the defective drywall, or you are a former employee of a company that bought, supplied, or used defective drywall. One of our attorneys or investigators will respond to your e-mail promptly. Our law firm, headquartered in Tampa, Florida, fights fraud on behalf of consumers across the country.

## James Hoyer Contact Form

**Your Name:** *(required)*

**E-Mail Address:** *(required)*

**Verify E-Mail:** *(required)*

Daytime Phone:

Address Line 1:

Address Line 2:

City:

State:

Zip:

Preferred Contact: By Telephone

Gender: *       Not Specified
Ethnicity: *     Not Specified

* Gender and Ethnicity information are optional. This information is requested to aid in our investigation as it pertains to possible discriminatory practices.

**Enter your message:** *(required)*

E K c J 5 D   **Enter the 6 digit code shown on the left:** *(required)*

Send Message     Clear Form

We will try to get back to you as soon as possible regarding your inquiry. We greatly appreciate any information you are able to provide to us because it will assist us in investigating consumer frauds.



Contact Us

The hiring of a lawyer is an important decision that should not be based solely upon advertisements. Before you decide, ask us to send you free information about our

qualifications and experience. You should be aware that contacting us via e-mail, telephone or other means does not mean you have automatically become our client. Nor does contacting us mean you have automatically become a member of a class-action, whether the class has been certified or not. We greatly appreciate any information you are able to provide to us because it will assist us in investigating consumer frauds.

04/22/2009 ©

- WITH PHOTO
- NO PHOTO
- FACEBOOK
- Yahoo! Buzz
- YAHOO
- NEWSVINE
- DEL.ICIO.US

- FARK
- FURL
- REDDIT
- TECHNORATI

# Lawsuit targets Chinese drywall

By Aaron Kessler

Published: Tuesday, March 3, 2009 at 1:00 a.m.
Last Modified: Tuesday, March 3, 2009 at 9:27 a.m.

A new lawsuit seeking class-action status has been filed by a group of Florida homeowners against a German drywall maker, its Chinese units and several U.S. home builders, claiming that the defective product has corroded metal and sickened some homeowners.

The new federal lawsuit, filed Monday in the Southern District of Florida, joins several other suits seeking class-action status, including one in Sarasota County.

The latest suit claims that legal action could eventually include up to 30,000 Florida homes.

"Our most pressing goal is to make sure the homeowners are taken care of immediately, that their homes are fixed and that they are reimbursed for the expenses of moving and damage to their personal property," said Ervin Gonzalez, the lead attorney bringing the case with the Coral Gables law firm Colson Hicks Eidson.

"We think the developers and builders should get together quickly to do the right thing right now, and then they can pursue the legalities of going after the manufacturers and suppliers to recoup those costs if they wish."

The builders named in the latest suit include Taylor Morrison and Tousa Homes, also known as Engle Homes. More builders could be added as the case progresses, Gonzalez said.

The German-based parent of drywall manufacturer Knauf, along with three of its Chinese subsidiaries in Tianjin, Wuhu and Dongguan, are all cited in Monday's suit as well.

After an extensive analysis of shipping data, the Herald-Tribune reported on Feb. 1 that all three Knauf subsidiaries had shipped sizable quantities of drywall to the United States since 2006.

Third-party exporter Rothchilt International Ltd., which shipped Knauf board from China to the U.S., also was named as a defendant.

South Kendall Construction, which installed some of the drywall, as well as one of the distributors, Banner Supply Co., also were named.

The builders and manufacturers targeted by the suits dispute that the drywall is hazardous.

In a statement sent Monday to the Herald-Tribune, Knauf Plasterboard Tianjin Co. Ltd., also referred to as KPT, said it "continues to investigate the potential causes of HVAC, copper and odor problems in homes and remedies for those problems."

Knauf said it has been singled out because it clearly marked its name on its product, while some other Chinese manufacturers did not. "As a result, KPT has unfairly been the focus of the recent controversy over imported plasterboard."

Monday's lawsuit seeks monetary damages as well as an order by the court to compel the defendants to "remedy, repair and/or replace the drywall in the homes" and "cease and desist from misrepresenting to the class and the general public that there is no defect in, or danger associated with, the drywall."

The suit also demands that a medical monitoring program be set up to track the health of affected homeowners.

The Sarasota County class-action claim, which has now grown to include more than three dozen homeowners, also names Knauf, Rothchilt, Banner and Taylor Morrison. The Sarasota case also names another distributor, L&W Supply, a subsidiary company of USG Corp.

The Florida Attorney General's office is investigating L&W Supply and Knauf for potential violations of state law regulating deceptive marketing practices.

Darren Inverso, who filed the Sarasota suit on behalf of Lakewood Ranch resident Kristin Culliton, said his case will probably be transferred to federal court as well. "I think it's likely we'll wind up there," he said.

With so many complaints seeking class-action status now swirling around, the cases may wind up being consolidated into one massive lawsuit.

While Monday's lawsuit focuses on Florida, other firms across the country are planning to file similar suits in their own states, Gonzalez said.

Exhibit "E" (1)

This story appeared in print on page D1

All rights reserved. This copyrighted material may not be re-published without permission. Links are encouraged.

- -
- -
- -
- Enlarge Text
- Email
- Print
- Comments
- Share

  - Your Name
  - Your Email
  - Recipient's Email
  - Send

  - WITH PHOTO
  - NO PHOTO
  - FACEBOOK
  - Yahoo! Buzz
  - YAHOO
  - NEWSVINE
  - DEL.ICIO.US

**See Today's Mortgage Rates**
Calculate Your New Mortgage Payment. See Rates- No Credit Check Req.
www.LowerMyBills.com

**Cheap Car Insurance**
Drivers Pay $44/mo on Avg for Car Insurance. Are you paying too much?
Auto-Insurance

**Online Degrees**
Get Your AA, BA, Masters or PhD at a Top Online School. Start Now.
Education.Nextag.com

Ads by Yahoo!

**Add a Comment**

Post a comment | View all comments on this topic.

**Featured Business Listings**

- Restaurants
- Cars
- Realtors
- Doctors
- Hotels
- Browse all



**Events Calendar**   More Events   Submit Event

- 22 Wed
- 23 Thu
- 24 Fri
- 25 Sat
- 26 Sun

- Sponsored by:

Enter event type or date | [Search]

- Most Read
- Most Emailed
- Most Recent

- Task force suspects home invader has motives beyond money and drugs
- Toddler drowns in family's backyard pool
- Long-stalled hockey arena reclaimed by landowner
- In home defaults, Sarasota-Bradenton-Venice market just shy of national Top 20
- Lawsuit adds wrinkle to Proscenium project plan
- Tainted drywall found in Punta Gorda condos
- Mix of sun and clouds
- Back to Lakewood Ranch after brush with Somalian pirates
- Myakka River site will be new park
- Vaccine bill has passions flaring

- Recess This: A Cheaper way to Play
- Quadrangle Is Facing Questions Over Pension Funds
- Report Details Broad Scope of Fraud at Satyam
- A Wider Loss at A.M.D. as Chip Sales Slow
- One Town's Rare Ray of Hope: New Auto Plant
- Breast-Feeding Benefits Mothers, Study Finds
- Wider Drug War Threatens Colombian Indians
- Debtholders vs. U.S. Over Chrysler Deal
- I.M.F. Puts Bank Losses From Global Financial Crisis at $4.1 Trillion
- Court Debates Strip Search of Student



**Top Jobs**

DOR, PT, PTA, OT, COTA and ST Select medical rehabilita ...

A/C Lead Installer needed with 7 plus years experie ...

NEW STORE OPENING IN MAY

Inside Sales / Custome ...

SPRAY TECH - with current pesticide license and current ...

Director of Elementary Education: Full time positio ...

Political Science - adjunct position, Master's degree r ...

Taxation - adjunct position, must have Masters degree i ...

Wait Staff - Palm Aire Country Club is looking for Wait ...

ONSITE CONDO SALES ASSOCIATE for Upscale Community, ...





**SITE INDEX**

NEWS | MULTIMEDIA | SPORTS | ENTERTAINMENT | LIVING | REAL ESTATE | CLASSIFIEDS

More sign on to drywall lawsuit - News - Local - Drywall Coverage - Bradenton.com


I Can't Believe You Don't Have Life Insurance!

ACCUQUOTE
10-Yr Level Term Life Insurance
$500,000 Policy (monthly premiums)

| age | male |
|-----|------|
| 35 | $15.75 |
| 40 | $20.56 |
| 45 | $31.06 |
| 50 | $45.06 |

Click Here Get A Free Quote

ACTION Jet Sports   2705 1st Street Bradenton, FL 34208 (941) 745-9521 www.actionjetsports.com

SUBSCRIBE NOW   ADVERTISE WITH US   ARCHIVES   NEWSPAPER ADS   SPECIAL PUBLICATIONS   E-EDITION   CONTACT US

# BRADENTON HERALD.COM

Bradenton, FL
Sunny 78°F
Hi/Low: 79°/61°
Hurricane Radar



LOCAL NEWS   PHOTOS   SPORTS   BUSINESS   ENTERTAINMENT   LIVING   OBITUARIES   CLASSIFIEDS   HOMES   CARS   JOBS   PLACE AN AD

CRIME COURTS   OPINION   LAKEWOOD RANCH   BLOGS   SPECIAL REPORTS   NEIGHBORHOODS   WEATHER   VIDEO   COMMUNITY   POLITICS

Web search powered by YAHOO! SEARCH   [          ]   SEARCH

NEWS - LOCAL - DRYWALL COVERAGE

Wednesday, Feb. 18, 2009
Comments (0) |

## More sign on to drywall lawsuit
### 40-plus homeowners join lawsuit filed in Sarasota County

By JESSICA KLIPA - jklipa@bradenton.com

The number of homeowners who have signed on to civil suits involving tainted drywall across the state continues to mount.

More than 40 homeowners have joined a class action lawsuit filed in Sarasota County, said Darren Inverso, attorney for the law firm, Norton, Hammersley, Lopez & Skokos.

The claim originated with a complaint from homeowner Kristin Culliton, who moved out of her Lakewood Ranch home built by Taylor Morrison because of alleged problems with drywall manufactured in China.

Inverso said h firm is seeking certification for two classes: homeowners who have homes built by Taylor Morrison, and Florida homeowners who have the drywall manufactured by Knauf Tianjin installed in their homes.

The lawsuit, which is open to Florida homes built from 2004 to 2007, alleges product liability on the part of Knauf Tianjin, which sold drywall to suppliers and distributors, including USG, Rothchilt, and L&W Supply.

The lawsuit also alleges breach of contract, breach of implied warranty and negligence against Taylor Morrison. Inverso said that through the contract, Taylor Morrison homeowners should expect to buy a home with materials, fixtures, equipment and appliances of equal value to the materials installed in the model homes.

It's likely that as the class-action lawsuits across the state continue to grow, they will land in federal court and be rolled into one lawsuit, Inverso said.

More than 100 homeowners have contacted another law firm in Bonita Springs, Parker Waichmann Alonso LLP, which has filed a class action suit in the U.S. District Court for the Middle District of Florida, in Fort Myers, on behalf of Florida homeowners.

The lawsuit, filed against manufacturers, distributors and suppliers of the Chinese drywall, alleges product liability and negligence, among other things, said Jordan Chaikin, attorney for Parker Waichmann Alonso LLP. But the list is likely to grow as the firm sorts out the pieces of who may have been involved.

"We are in the process of amending the complaint to include additional defendants who we believe are responsible parties," Chaikin said. "Every day we're getting more information. So because of that we have determined there are other responsible parties out there."

In addition, the firm is handling homeowners' cases regarding homebuilders on an individual basis for breach of contract and negligence.

The class-action suit applies to Florida homeowners whose homes were built using the tainted drywall. Homeowners are also able to opt out of the lawsuit.

The firm is compiling a database of homeowners whose homes exhibit the symptoms of the Chinese drywall. Builders that used the drywall include Lennar, Taylor Morrison, WCI, Meritage Homes, Ryland Homes, Transeastern and Standard Pacific, he said.

Chaikin believes a class-action lawsuit is the appropriate way to handle the situation since the homeowners are all experiencing the same problems, including corrosion and ultimate failure of air-


I Can't Believe You Don't Have Life Insurance!

10-Yr Level Term Life Insurance
$500,000 Policy (monthly premiums)

| age | male | female |
|-----|------|--------|
| 35 | $15.75 | $14.00 |
| 40 | $20.56 | $17.94 |
| 45 | $31.06 | $27.13 |
| 50 | $45.06 | $38.06 |

Click Here Get A Free Quote
ACCUQUOTE

MY YAHOO!
SHARE
SUBSCRIBE
E-Mail
Print
Reprint or license
Text Size:



powered by careerbuilder.com Quick Job Search

Enter Keyword(s):   Enter a City:
[          ]   [          ]

Select a State:   Select a Category:
Florida   All Job Categories

Advanced Job Search | by Category   SEARCH

**Bradenton Herald Top Jobs »**

Medical
MIDTOWNE DENTAL CTR/SARASOTA
US-FL-Bradenton
Employment General
VNU
US-FL-Bradenton
Employment General
WATER CLUB CONDO ASSOC.
US-FL-Bradenton
Medical
HERITAGE PARK CARE & REHAB CTR
US-FL-Bradenton
Medical
PALM GARDEN
US-FL-Bradenton

See More Top Jobs

Composite Exhibit "E"
2

conditioning units, blackening and tarnishing of household items and a foul odor in the home. "I'm a firm believer in class-action," he said. "It not only makes it much more efficient, but it benefits a lot of people in a single action."

**Next Page**

You must be logged in to leave a comment. Login | Register

Submit

**Drywall price**
Compare prices and retailers to get great deals at Yahoo!
shopping.yahoo.com

**Warren Drywall**
Find prescreened drywall contractors in Warren MI in just one contractors

**Drywall**
Browse a huge selection now. Find exactly what you want today.
www.ebay.com

Ads by Yahoo!



Select a Category
View All

**Assistant**
Confidential

**A/C Service Technician**
Aqua Plumbing & Air

**Office Nurse**
Confidential

**Store Manager**

View All Jobs
POWERED BY DIGITAL MEDIA COMMUNICATIONS

MORE NEWS

• Tainted drywall shows up in Katrina homes

• China launches drywall probe

• Obama urged to discuss drywall problems with Chinese president

• State probe into drywall opened

• Drywall problem? Homeowners, take precautions

• Drywall class-action suits mounting

• Expanded probe of drywall problems urged

• State's tainted drywall list grows

• Federal agency joins drywall investigation

• Advocate: Drywall woes may affect several hundred thousand homes

• More sign on to drywall lawsuit

• Immensity of drywall problem still unfolding

• Home builder says it's looking into drywall use

• Drywall problem could lead to new laws

• Study: Tainted drywall not a health risk (with video link)

## SITE MAP

**Homepage**
- Archives
- Subscribe
- Contact Us
- Advertise

**Local News**
- Crime Courts
- Opinion
- Lakewood Ranch
- Blogs
- Special Reports
- Neighborhoods
- Weather
- Video
- Community
- Politics

**Photos**
- Staff Galleries
- Were You Scene
- Community Galleries
- Photo Reprints
- Multimedia

**Sports**
- High School
- MLB/Rays
- NFL/Bucs
- NHL/Lightning
- Golf
- Fantasy
- Fishing/Boating
- Motorsports
- Columnists
- College

**Business**
- Real Estate
- Columnists
- People's Choice
- Names & Faces

**Entertainment**
- Food/Wine
- Society
- Comics/Games
- Restaurants
- Movies
- Music
- Television
- The Arts
- Calendar

**Living**
- Community
- Family
- Health/Fitness
- Occasions
- Faith
- Travel
- Home & Garden
- Living Green
- Columnists
- Pets

**Classifieds**
- Place an Ad
- Jobs
- Cars
- Homes
- Apartments

BradentonHerald.com
Terms of Use   Privacy Policy   Copyright   About the McClatchy Company

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:09-cv-598-T-27TGW

May 12, 2009
Tampa, Florida

KRISTIN MORGAN CULLITON, individually
and on behalf of all similarly situated
individuals,

       Plaintiffs,

vs.

TAYLOR MORRISON SERVICES, INC., et al.,

       Defendants.

_____/

TRANSCRIPT OF DIGITALLY RECORDED HEARING RE:
MOTION FOR PROTECTIVE ORDER (Document 10)
BEFORE THE HONORABLE THOMAS G. WILSON,
UNITED STATES MAGISTRATE JUDGE

Appearances of Counsel:

    For the Plaintiffs:

        Mr. Christopher Craig Casper
        Mr. Darren Robert Inverso
        Mr. John Allen Yanchunis
        Mr. Jonathan Betten Cohen

    For the Defendants:

        Mr. Mark Anthony Romance
        Mr. Neal Allen Sivyer

Transcribed by:    Dennis Miracle, Official Reporter

*Dennis Miracle, Official Reporter (352) 622-7212*

5/18/09

Case 2:09-md-02047-EEF-MBN Document 20508-1 Filed 09/23/16 Page 32 of 122
Case 2:09-md-02047-EEF-MBN Document 2548-1 Filed 09/23/06 Page 39 of 82

2

                    P R O C E E D I N G S

1            THE COURT:  This is a proceeding in Case Number

2    8:09-cv-589-T-27TGW, Kristin Morgan Culliton versus Taylor

3    Morrison.

4            Would counsel identify themselves for the record

5    and indicate who they represent?

6            MR. CASPER:  On behalf of plaintiff, Chris

7    Casper.

8            MR. INVERSO:  On behalf of plaintiff, Darren

9    Inverso.

10           MR. SIVYER:  Your Honor, in behalf of Taylor

11   Morrison Services, Neal Sivyer.

12           MR. ROMANCE:  Good afternoon.  Mark Romance also

13   on behalf of Taylor.

14           THE COURT:  All right.  The plaintiff has filed a

15   motion for protective order, and you may proceed.

16           MR. CASPER:  Thank you, Your Honor.  May it please

17   the Court.  I'm Chris Casper from James, Hoyer, Newcomer

18   Smiljanich & Yanchunis.  Here with me is John Yanchunis and

19   Jonathan Cohen from our firm.

20           Also with me is our co-counsel, Darren Inverso,

21   from the Norton, Hammersley firm in Sarasota.  We're here

22   on our motion for protective order.

23           As the Court, I'm sure, is aware, this case

24   concerns defective drywall that was used in the building of

1  homes throughout the state of Florida.  It mainly appears

2  in the southern half of the state.  We're here today

3  specifically as to one of the defendants in the case,

4  Taylor Morrison.

5       We filed this motion because we learned that

6  Taylor Morrison was contacting homeowners whose homes were

7  built during the time period where the drywall was being

8  used.  The reasons we filed the motion are not because we

9  are trying to prevent Taylor Morrison from inspecting homes

10  when they are contacted -- or when people request an

11  inspection because of their concerns.  We didn't file the

12  motion because we want to stop Taylor Morrison from

13  conducting repairs of homes that are found to have the

14  drywall.  This isn't --

15       THE COURT:  -- (indiscernible) -- how you go about

16  doing that.  They can't contact them.

17       MR. CASPER:  Well, we don't even ask that they not

18  be allowed to contact them.  What we are asking the Court

19  is that, if there are going to be contacts made, that

20  certain disclosures are made, that certain information is

21  provided to homeowners so they can make an informed

22  decision about this agreement.  There's --

23       THE COURT:  So you're not asking that they stop

24  contacting them?

25       MR. CASPER:  That's correct.  We want contacts,

4

1  however, to be governed --

2          THE COURT:  Because that isn't what I got out of

3  the -- out of your motion.

4          MR. CASPER:  Well, in our prayer for relief we

5  don't say they should be prevented from dealing with

6  homeowners, especially homeowners who have concerns about

7  the drywall in their home, and contact them and request an

8  inspection.  We don't ask that they be barred from doing

9  inspections or making repairs either.  The problem

10  arises --

11          THE COURT:  What do you want?

12          MR. CASPER:  What we are asking is if Taylor

13  Morrison is going to be contacting people concerning the

14  specific problem, that certain disclosures are made,

15  specifically that they disclose the fact that there are

16  pending class actions that could potentially involve these

17  homeowners as class members; that class members be informed

18  that they may contact class counsel or their own attorney

19  if they have any concerns --

20          THE COURT:  Which class counsel?

21          MR. CASPER:  We filed a motion, I believe, about a

22  week and a half ago requesting that we be appointed interim

23  class counsel.  We believe that that is related to this,

24  obviously, because if we are successful in being appointed

25  class counsel, we would ask that the disclosure simply

5

1    inform people of that fact and how to contact us.

2          THE COURT:  Well, other class counsel have

3    objected.

4          MR. CASPER:  And they're going to come in --

5          THE COURT:  They don't want you to be class

6    counsel; they want to be class counsel.

7          MR. CASPER:  Well, presumably they can --

8          THE COURT:  So who should the defendants then tell

9    them to contact?

10         MR. CASPER:  Well, I think those issues are going

11   to be heard on that motion.  Two other putative class

12   counsel have moved to intervene for the purposes of being

13   heard on that motion, and presumably those motions will be

14   addressed.  And perhaps a hearing will be held, and the

15   Court can make a decision.  But this is the type of case

16   where there should be interim class counsel for the very

17   reasons set forth not only in this motion but in our

18   interim class counsel motion.

19         If I may approach the Court, I have just a

20   one-page excerpt of some language from the package that

21   they've -- that Taylor Morrison has provided to homeowners.

22         THE COURT:  I've read it.  You can show me what

23   you're talking about.

24         MR. CASPER:  Okay.

25         THE COURT:  I've read all that stuff.  I've read

6

1   all this stuff that's been filed, including their stuff,

2   and I didn't find it misleading.

3        MR. CASPER:  Well, Your Honor, I'll turn your

4   attention to the paragraph quoted at the top of that page

5   that's contained in the cover letter they're providing

6   along with the proposed repair agreement.

7        Now, in that language quoted there at the top of

8   the page, it discusses the release and assignment; and the

9   release and assignment are two of what we see of the

10  biggest problems with this agreement.  The agreement not --

11       THE COURT:  Why do you care about the assignment?

12       MR. CASPER:  Pardon me, Your Honor?

13       THE COURT:  Why do you care about the assignment?

14       MR. CASPER:  Because if -- say a homeowner signs

15  that agreement.  They've not only released their claims

16  against Taylor Morrison; they've assigned claims against

17  any other potentially liable party to Taylor Morrison.

18       THE COURT:  The people who made the drywall.

19       MR. CASPER:  The people who made the drywall?

20       THE COURT:  They want to go -- they're -- I mean,

21  that's so obvious.  They're doing all this work; they want

22  to recover from the people that caused the problem to start

23  with.

24       MR. CASPER:  Well, I believe that the --

25       THE COURT:  So why shouldn't they be permitted to

1  do that?

2  MR. CASPER:  Because it -- what the effect of

3  signing that would potentially do is exclude these putative

4  class members from participation in this action even if

5  there's additional recovery against these other

6  defendants.  They'll be stuck with whatever is in that

7  Taylor Morrison agreement.

8  And as we've set forth in the agreement and as my

9  co-counsel is prepared to address here, there's serious

10  shortcomings with that agreement.

11  THE COURT:  What?  Did you say somebody else is

12  going to talk to me?

13  MR. CASPER:  I wanted my co-counsel to be able to

14  address some of the specific shortcomings in the proposed

15  repair agreement.

16  THE COURT:  Under the Local Rules one guy gets to

17  talk.

18  MR. CASPER:  I'll address those myself then,

19  Your Honor.

20  THE COURT:  Okay.

21  MR. CASPER:  With the -- turning back to that

22  paragraph in the relocation cover, it states that "this is

23  an assignment of claims that will also allow the company to

24  pursue legal damages from the manufacturers and suppliers

25  responsible for the defective products.  We realize that

1 homeowners do not have the resources to take legal action

2 against those ultimately responsible for the problem, but

3 we intend to take all necessary actions to hold the

4 manufacturers and suppliers responsible for the defective

5 products."

6       There's two serious problems with this language.

7 First of all, the description of the assignment, I believe,

8 is misleading to a lay person because it suggests that

9 Taylor Morrison is going to pursue those claims on behalf

10 of the homeowners.  I don't think a lay person reading this

11 is going to understand that this is going to completely

12 extinguish any claims they have against anyone.

13       THE COURT:  It says, "This will allow the company

14 to pursue legal damages."

15       MR. CASPER:  It does, but it doesn't say on whose

16 behalf.

17       THE COURT:  Here's, sort of, the problem:  You're

18 trying to create some ambiguity I didn't see in this stuff.

19       MR. CASPER:  Further, the --

20       THE COURT:  It says -- it says the company will

21 pursue it.

22       MR. CASPER:  Your Honor, it also says that --

23       THE COURT:  "We intend," it says, the company, "to

24 take all necessary actions to hold the manufacturers and

25 suppliers responsible."

1          MR. CASPER:  None of which -- none of which will

2    ultimately benefit the person assigning the claims.

3          THE COURT:  Right.

4          MR. CASPER:  I don't think a lay person

5    understands that.  What's wrong with fuller disclosure so

6    people know that they're signing away everything if they

7    agree to this?

8          THE COURT:  All right.

9          MR. CASPER:  Further, the statement that "we

10   realize homeowners do not have the resources to take legal

11   actions against those ultimately responsible" is

12   discouraging people from even seeking legal representation

13   and is a misleading statement in light of the fact there

14   are pending class actions seeking to assert claims on

15   behalf of these people related to the defective drywall.

16          Right now those cases are pending without

17   requiring these people to pay anything or to commit any of

18   their resources towards the prosecution of these cases.  It

19   suggests that this is their only option, sign the agreement

20   and that's it.  That's simply not accurate.

21          THE COURT:  It says if you want to -- if you want

22   your house fixed, we'll fix it for you, but this is part of

23   the bargain.  That's what it says to me.  If you don't want

24   your house fixed, go see a lawyer.

25          MR. CASPER:  Well, it doesn't say that.  It says

1  you probably can't afford a lawyer, so assign your claims
2  to us.
3           THE COURT:  Whoever gets this is going to know
4  whether they can afford a lawyer or they can't afford a
5  lawyer.
6           MR. CASPER:  They're not going to --
7           THE COURT:  I'm suspecting that this issue -- I
8  don't imagine it's scattered houses, one in this
9  neighborhood and some a number of blocks away.  They are
10  probably all close together.  These people are talking
11  about this problem over and over and over.
12           I mean, that's -- that's -- I had a house in
13  Virginia, and they put in some sewer pipe going to the
14  house.  And it was -- (indiscernible) -- and it sort of --
15  the thing would break, and you would have to have it
16  repaired.  Everybody in the subdivision knew it was coming,
17  and I'm suspecting these people know, hey, this is what the
18  deal is.  Some of them are saying, I'm going to have the
19  company do it; others are saying, I'm going to go see a
20  lawyer.
21           MR. CASPER:  Well --
22           THE COURT:  And others are probably saying they're
23  going to talk to you.
24           MR. CASPER:  Well, there's an important -- that
25  third option, why not disclose it?  Why not give them the

1   full information that --

2         THE COURT: Because the other problem is, you're

3   not the only class counsel.

4         MR. CASPER: We could disclose that there are

5   several pending class actions. They should be disclosed.

6   If -- if the -- if the protective order would require them

7   to disclose that there are several cases and list them -- I

8   believe there's three that Taylor Morrison has been named

9   in in the state of Florida -- that should be disclosed,

10   because that's an important factor that homeowners should

11   know about when they are looking at these agreements.

12         These agreements provide that Taylor Morrison is

13   going to conduct repairs. But as we set forth in our

14   motion, there's serious shortcomings in that. They don't

15   ever promise to fix the problem. They say, We're going to

16   remove affected drywall and any affected elements in the

17   home. Well, that doesn't necessarily cure the problem.

18         The additional problem is --

19         THE COURT: Well, what's left?

20         MR. CASPER: This -- what is happening with the --

21   with the compounds being emitted by the drywall is it

22   causes damage to appliances in the house. It causes damage

23   to A/C units. Televisions have failed, because it causes

24   corrosion of metal components, which could potentially

25   damage all sorts of items in the house.

1       The agreement limits the amount of money for that
2   damage.  It is not specific as to what exactly Taylor
3   Morrison is going to do.
4       The information they provide with the agreement
5   contradicts it in several places.
6       THE COURT:  So you're saying at this point stop
7   doing this stuff until all this is clarified, and the
8   information they have, really, now is much broader so they
9   have more to digest than they do now.
10      MR. CASPER:  Well, what we're saying is --
11      THE COURT:  What I'm gathering also is their
12  houses stink.
13      MR. CASPER:  They do.
14      THE COURT:  If it's a rotten egg smell, that's
15  sort of hard to live with.  And I don't know if you're
16  suggesting, as you may have been, that there's some health
17  problem with that.  If that's the case, then there's even
18  more reason to proceed with these things.
19      MR. CASPER:  We're not asking it to stop.  We're
20  just asking that, if they're going to be doing this, that
21  certain disclosures are made and that people are aware of
22  what they are doing if they sign one of these agreements.
23      That's not the case now.  There's contradictory
24  information within the packet itself.  At one point they
25  say, "We're going to rip the house down to the studs."  The

1  agreement doesn't say they'll do that.

2        At another point they talk about "We'll pay you

3  relocation expenses."

4        THE COURT:  It does mention studs in there.

5        MR. CASPER:  Pardon me?

6        THE COURT:  The disclosures mention the studs --

7        MR. CASPER:  But the agreement --

8        THE COURT:  -- going down to the studs, don't

9  they?  Isn't that what it says?

10       MR. CASPER:  In the agreement itself they do not

11 promise to tear it down to the studs.  They promise to

12 replace affected drywall and other damaged components.

13       That's contradictory to what it says in the

14 materials provided with it that say "We're going to rip it

15 down to the studs."

16       There's other instances where the agreement

17 contradicts other representations made within the same

18 relocation package.  The agreement provides that Taylor

19 Morrison is going to take away all the defective drywall

20 and that the homeowner can't even come to the premises

21 without giving 24 hours' notice.  If a homeowner may have

22 additional claims or even wants to pursue a personal injury

23 claim, which is not released by the Taylor Morrison

24 release, they're going to need that defective drywall.  But

25 if they sign that agreement and Taylor Morrison comes in

1  and rips out all the drywall --

2         THE COURT:  Are you saying Taylor Morrison won't

3  let them take a pile of junk?

4         MR. CASPER:  I think a lot of them may not realize

5  that they should be preserving any of that.  A lawyer would

6  tell them that.  But if they are not represented, they

7  probably wouldn't think of that.

8         The fact that the homes are -- many of them --

9  uninhabitable or at least very unpleasant to inhabit, at a

10  minimum, is that it goes to the coercive nature of this

11  offer.  These people are in a desperate situation.

12  They'll -- if somebody comes in and says "We'll fix the

13  house," a lot of them are going to jump on that without

14  understanding the full ramifications of what exactly

15  they're agreeing to and what they're giving up in exchange

16  for it.

17         These houses are under warranty.  Taylor Morrison

18  is supposed to be fixing these problems anyway, but they

19  are not just doing that; they are going in and saying,

20  "Well, we'll fix it, but you have to give up your legal

21  rights not just against us but against everybody else.  We

22  will warrant the repair work for an additional year."  But

23  it's unclear that, if there's a dispute over whether they

24  have actually fixed the problem, whether the homeowner will

25  have any recourse, because the agreement leaves that

1   largely in Taylor Morrison's discretion.  People who sign

2   these could find themselves in a lot of trouble down the

3   line and unable to find any other recourse as a result of

4   having signed these agreements.

5           THE COURT:  What recourse do they need?

6           MR. CASPER:  Well, recourse against the other

7   defendants.  These -- every one of these class actions

8   names manufacturers and suppliers, and there may

9   ultimately --

10          THE COURT:  If their house is fixed, why do they

11   need recourse against somebody else?

12          MR. CASPER:  Under the agreement there's no

13   assurance that the house is going to be fixed.  There's

14   certainly no assurance that it will be --

15          THE COURT:  But there's still a warranty, then.

16   Then they can go back on the warranty.

17          MR. CASPER:  The warranty -- they will have --

18   they are required to sign a release as part of this.  And

19   the release says -- for some reason it says "We're

20   releasing you for work done," even though they haven't

21   started the repair work yet.  So that Taylor Morrison, I'm

22   sure, would contend down the line releases any other

23   warranty claims that were not made at the time this new

24   agreement was signed.

25          The new agreement only warrants the repair work

1  that is done.  So a homeowner who believes that they

2  haven't complied with the terms of the agreement is

3  potentially stuck with -- Taylor Morrison says, "Well,

4  we're done.  We did what we said we were going to do under

5  the agreement.  You've released your claims based on the

6  original construction.  You've assigned all your claims

7  against other people to us.  You are out of luck."  And

8  that's a situation homeowners could potentially run into.

9       If they are going to do that, they should be given

10  fuller disclosures, as was done in the WeightWatchers case

11  we cited, the Ojeda Sanchez case we cited.  Neither one of

12  those judges said, "You can't contact these people."  They

13  just set certain limits on it and required certain

14  disclosures.

15       In the WeightWatchers case the judge said, "You

16  can negotiate with these franchisee class members and try

17  and settle their claims if they have an attorney

18  present" --

19       THE COURT:  Well, suppose they just add, okay,

20  here's a list of pending class actions, and you may wish to

21  contact them instead of having your house fixed.  Is that

22  okay?

23       MR. CASPER:  I would also think it would be good

24  in there, or "contact your own attorney."  I mean, I'm not

25  just saying they should be pointed only towards us, but

1  they should understand that this document -- they should

2  consult with somebody who can advise them on it before they

3  sign it.

4      Further --

5      THE COURT:  So what should it say?  "You may wish

6  to talk with a lawyer" or "you should see a lawyer"?

7      MR. CASPER:  I think either one would probably be

8  acceptable.  I think "should see" would probably be better.

9      THE COURT:  Well, then if they -- the people will

10  be incurring some expense that they may not need to incur.

11      MR. CASPER:  Well, if they talk to us, they won't

12  be incurring any expense -- if they talk to us.

13      THE COURT:  Yeah, but I can assure you, you're not

14  going to be singled out that everybody should be talking to

15  you guys.

16      MR. CASPER:  I understand.

17      THE COURT:  Because this sort of looks like what's

18  driving this motion, is you want people to come to you.

19      MR. CASPER:  Your Honor, we don't want people who

20  we have a duty at this stage of the case to look out for

21  their best interests to be misled --

22      THE COURT:  At this point you represent one

23  person.

24      MR. CASPER:  We still have duties to the putative

25  class members.  We can't just freeze them out or ignore

1   their concerns.  When you file a class action, you
2   undertake certain duties on behalf of the unnamed class
3   members, and one of those is to see that they're not misled
4   or exploited into waiving all their rights relative to this
5   claim without having been given full disclosure about
6   what's going on and what their options are.  That's the
7   issue and this is -- could be very detrimental to class
8   members who sign on to these agreements.
9            The idea of going out and inspecting and repairing
10  the houses is not necessarily a bad one.  We're not saying
11  they shouldn't be doing that.  But what is the problem with
12  making sure the people make --
13           THE COURT:  It's a good one.  If the house is
14  no -- stinks and it's causing corrosion, the sooner the
15  better.
16           MR. CASPER:  And under the warranty Taylor
17  Morrison should be doing that, but why should they have to
18  require to do warranty work?
19           THE COURT:  What do you say about the Florida
20  statute that they cite, which suggests that, first, anybody
21  who has got a complaint has to send them a complaint and
22  then they have an obligation to fix it?
23           MR. CASPER:  They have -- they have an obligation
24  to make an offer to fix it or a monetary offer.
25           THE COURT:  Or settle it.

1          MR. CASPER:  Right.  Now, when you take that --
2          THE COURT:  It doesn't say anything about they
3    need to contact a lawyer.
4          MR. CASPER:  Well, when there's already a case
5    pending --
6          THE COURT:  The Florida statute -- I mean, that's,
7    sort of, a remarkable thing.  The Florida statute, sort of,
8    directs how to proceed in this case.
9          MR. CASPER:  But that doesn't take into account
10   the fact that there's already a case pending that could
11   potentially resolve the claims of these people.  They
12   should at least be aware of that.
13         THE COURT:  Let me ask this.  I'm just sort of
14   curious.  Is there going to be any contention -- maybe
15   this -- you're the wrong guy to ask -- is there going to be
16   any contention that the class members can only include
17   those people who have complied with that chapter?
18         MR. CASPER:  That's probably going to be an issue
19   that comes up at some point.  Probably at the class
20   certification stage, I would expect, but I certainly expect
21   to hear something about that from them at the appropriate
22   time, yes.
23         THE COURT:  So it, sort of, looks like it almost
24   isn't the standard class situation.  It looks, sort of,
25   like a Fair Labor Standards Act kind of situation where

1  somebody has to do something to be included.

2  　　　　MR. CASPER: Well, that's --

3  　　　　THE COURT: So the people have to make their

4  complaint with some specificity, although at this point I

5  imagine they don't have to be particularly specific. You

6  know, the drywall stinks and it's wrecking our house. But

7  there's -- there's that requirement in the law which, sort

8  of, puts a different twist on this than the typical class

9  action.

10  　　　　MR. CASPER: And, conversely, this puts a twist on

11  the typical construction 558 case because usually that's

12  just a dispute individualized between the homeowner and the

13  builder about the construction.

14  　　　　THE COURT: At this point that's what this is.

15  　　　　MR. CASPER: Well, it -- the fact that there

16  are --

17  　　　　THE COURT: The plaintiff has a claim -- I'm

18  assuming she gave notice.

19  　　　　MR. CASPER: She did, and she purported to give

20  notice on behalf of herself and the putative class.

21  　　　　THE COURT: All right.

22  　　　　MR. CASPER: The cases we've cited, Rule 23, are

23  clear that the Court does have an interest and, in fact,

24  has a duty even to class members before a class is

25  certified, and this is the type of situation where Court

1   intervention is necessary.

2           THE COURT:  Well, they point out most of your

3   cases you cited had to do with post-certification.

4           MR. CASPER:  Ojeda Sanchez is pre-certification.

5   It's actually an FLSA case, as the Court mentioned, and the

6   Court analyzed it --

7           THE COURT:  That's a different -- that's a

8   different situation.  That's not a true class; that's an

9   opt-in situation.

10          MR. CASPER:  That -- and the protections in this

11  situation for unnamed class members are supposed to be even

12  greater, because they are going to be members of that class

13  if it's certified unless they have opted out.

14          In FLSA at least the argument can be made that,

15  hey, these people we're contacting have to make a decision

16  themselves anyway, so why not let us run out and try and

17  tell them not to participate before the judge even allows

18  the notice to go out.

19          In Ojeda Sanchez the Court didn't permit that

20  because the defendant had sent people out to try and get

21  potential FLSA plaintiffs to sign something basically

22  saying they wouldn't participate.

23          The WeightWatchers case we cited involving the

24  franchisees was pre-certification, and the Court put

25  certain limits and disclosures that had to be made to

1  franchisees if the defendant wanted to negotiate settlement

2  agreements with them.  Those are business owners.  They are

3  sophisticated business owners, and the Court said, as long

4  as they have counsel there -- and plaintiffs' counsel was

5  informed ahead of time and is allowed to even attend

6  negotiation sessions to confer with the franchisee seeking

7  to settle his claim, then the Court permitted it.

8         Here, we have individual homeowners in a desperate

9  situation because their homes are largely uninhabitable or

10 certainly unpleasant.  They don't know that there's people

11 out there attempting, at least, to try and assert claims on

12 their behalf.  They are presented with an agreement that

13 purports to provide certain repairs to the house, provide

14 some money for relocation.

15        In the situation they're in, many of them are

16 going to feel pressured to sign that simply because they're

17 desperate.  That's why they should, before making that

18 decision, be given information so they can make an informed

19 decision.

20        As it stands now, we have Taylor Morrison, with an

21 agreement drafted by counsel, including materials

22 suggesting that people don't need a lawyer and it's going

23 to take great legal resources to hire a lawyer, suggesting

24 that assigning your claims --

25        THE COURT:  What's the price range of these

1  houses?

2      MR. CASPER:  They're -- our plaintiff's was bought

3  for, I think, about $370,000.  That was back when prices

4  were higher.  But the homes we've seen largely in

5  subdivisions, I'd say they're in the three fifty, four

6  fifty range, but --

7      THE COURT:  People who have $300,000 homes can't

8  figure out they need to see a lawyer?

9      MR. CASPER:  Why not tell them?  What's the

10  problem with disclosing it?  What's the problem with more

11  information?

12      THE COURT:  Well, because the problem is, who do

13  you tell?  Because you came in here looking like they were

14  to tell about you and nobody else.  That's what the motion

15  indicated -- just tell about you.  Well, that ain't going

16  to happen.

17      MR. CASPER:  We wouldn't object to disclosing

18  the -- the -- I believe it's three pending cases in Florida

19  where Taylor Morrison is the defendant.

20      THE COURT:  All right.

21      MR. SIVYER:  Good afternoon, Your Honor.  Neal

22  Sivyer.

23      There are a couple of statements that Mr. Casper

24  made during argument that I have to take issue with.  The

25  first is the argument that perhaps these folks won't know

1    that they might want to get a lawyer, and this has

2    discouraged getting lawyers.  Your Honor, this is like an

3    ABA convention.  We've got at least six different law firms

4    all purporting to represent the plaintiffs in this case.

5    There's more lawyers in this case than I've ever seen in my

6    life.

7            So if the idea is we're discouraging lawyers,

8    we've done a pretty lousy job of it because, as you say,

9    everybody in these specific subdivisions that are affected

10   knows everything about it, I'm sure talked to all their

11   neighbors, and those who wanted to have gotten lawyers.

12           Interestingly enough --

13           THE COURT:  But what -- do you have any objection

14   to putting in some statement in your -- not necessarily

15   your -- your release but your facts sheet that there are

16   these class actions -- purported putative class actions at

17   this point, right?

18           MR. SIVYER:  Yes, Your Honor.

19           THE COURT:  Is any of them class certified yet?

20           MR. SIVYER:  There are no -- no -- no -- no even

21   hearings, let alone class certified.

22           THE COURT:  Okay.  And that -- or that you might

23   want to contact your own lawyer --

24           MR. SIVYER:  Right.

25           THE COURT:  -- or some other lawyer, do you have

1  any problem doing that?

2        MR. SIVYER:  Yes.  I wouldn't mind having

3  something in there "you may want to contact a lawyer," but

4  naming these specific lawyers -- every week we get another

5  law firm purportedly representing the class.  I don't know

6  who's going to represent the class.  I don't even know what

7  we'd say about it.  Not to mention, what happens if another

8  law firm purports to represent the class a week from now,

9  which could easily happen?  Do we have to amend the notice

10  and add another law firm?  And then what do we say?  Do we

11  say go to this -- how do we list them in order?  What do we

12  say about the case?

13        Your Honor, nobody has had any trouble finding law

14  firms.  And, interestingly enough, Irvin Gonzalez's firm,

15  the Colson and Hicks firm, which is in the lead counsel

16  position in the Southern District where these lawyers want

17  to have the case transferred to, that law firm, as we've

18  said in the affidavit, has asked that we do repairs and

19  inspections right away.  And we filed an affidavit with the

20  list and the letters from that law firm.

21        So if they go to the Southern District and picked

22  up the phone and call that firm first, those lawyers are

23  going to say, presumably, "Let's get these things fixed.

24  Let's sign the agreement."  If they go to this law firm

25  first and pick up the phone, they're going to say, "Don't

1  sign that agreement."

2          I mean, these are $400,000 houses.  These folks

3  are intelligent enough to make an informed decision about

4  whether they want to hire a lawyer; if they do hire a

5  lawyer, who they should hire and what the conditions ought

6  to be.

7          The other statement I want to take issue with with

8  Mr. Casper is --

9          THE COURT:  Let me just --

10          MR. SIVYER:  Yes, Your Honor.

11          THE COURT:  -- pursue that one.  So -- and that --

12  Mr. Gonzalez, I think, has filed an objection to --

13          MR. SIVYER:  He did, Your Honor.

14          THE COURT:  -- the -- actually --

15          MR. SIVYER:  To the motion.

16          THE COURT:  -- it was filed --

17          MR. SIVYER:  Yeah.

18          THE COURT:  It was styled as --

19          MR. SIVYER:  Yeah.  Yeah.

20          THE COURT:  -- an objection to the motion.

21          MR. SIVYER:  Right.

22          THE COURT:  But when you look at it --

23          MR. SIVYER:  Right.

24          THE COURT:  -- I didn't see anything in there

25  arguing against it.

1    MR. SIVYER:  Right.  Well, he says it -- he wants

2  it denied for the time being --

3    THE COURT:  Yeah.

4    MR. SIVYER:  -- anyway, yeah.

5    THE COURT:  Well -- but -- but -- so there's been

6  contact with him -- between your firm --

7    MR. SIVYER:  Yes, Your Honor.

8    THE COURT:  -- and him?

9    MR. SIVYER:  Yes, Your Honor.

10    THE COURT:  And his position is, do repairs?

11    MR. SIVYER:  Sign the release in a slightly

12  modified form, do the repairs, let's go.

13    THE COURT:  What's the modification?

14    MR. SIVYER:  I can't recall all of them.  They are

15  very minor modifications, Your Honor.  I could file it, if

16  I have his permission, but they are very minor

17  modifications to the repair agreement.  And, you know, I

18  would want his permission to file it.

19    THE COURT:  Is there anything in there on the

20  fact -- has the facts sheet been --

21    MR. SIVYER:  It hasn't been modified at all.

22    THE COURT:  Okay.  And so he didn't insist

23  anything about talking to a lawyer?

24    MR. SIVYER:  No.  And, Your Honor, the -- the

25  agreement itself, as the Court pointed out, specifically is

1  fulfilling our obligations under Chapter 558.  Remember,

2  this case shouldn't even be filed until Chapter 558 is

3  satisfied.  So all these other putative class members have

4  to go through the requirements before they can even file

5  suit.  The whole idea --

6          THE COURT:  Well, I was going to get -- you were

7  the one to ask rather than the plaintiff.  So are you going

8  to make some contention -- an objection in class

9  certification that nobody should be a class member if they

10  didn't comply with this chapter?

11          MR. SIVYER:  Absolutely, because we want to fix

12  the houses.

13          THE COURT:  Okay.

14          MR. SIVYER:  That's our goal.  If they have a

15  personal injury claim and there's some horrible health

16  problem, it's excepted.  That's an exception.

17          THE COURT:  And I understand that.

18          MR. SIVYER:  Right.

19          THE COURT:  But in terms of who could be a member

20  of the class, you're going to require every class member --

21  you're going to demand -- and whether it's agreed to or not

22  is something else.

23          MR. SIVYER:  Yes, sir.

24          THE COURT:  -- but you're going to demand that

25  every class member have -- given the notification?

1    MR. SIVYER: Yes, Your Honor. And I think it
2 envisions this type of case, because the statute gives a
3 different time period for 50 or more units. So I think it
4 actually envisions cases just like this when it talks about
5 the repairs.
6    And, you know, the WeightWatchers case, in
7 situations like that -- the Ojeda case involved a situation
8 where somebody sent down to Mexico a representative from
9 the company and solicited a statement under threat that
10 these Mexican workers wouldn't get a job that they didn't
11 want to be part of this case. That's a little different
12 than a $400,000 property owner, many of whom are
13 represented already by lawyers and have a warranty, and the
14 original warranty --
15    THE COURT: Many or some?
16    MR. SIVYER: All of them have a warranty.
17    THE COURT: No. No. The lawyer.
18    MR. SIVYER: Oh.
19    THE COURT: You said many of them have a lawyer.
20 What I got out of that --
21    MR. SIVYER: Right.
22    THE COURT: -- affidavit -- one of the --
23    MR. SIVYER: Right.
24    THE COURT: -- affidavits -- was a few of -- some
25 people have a lawyer.

1    MR. SIVYER:  A number of them have an --
2    (indiscernible) -- I don't have an exact --
3        THE COURT:  All right.
4        MR. SIVYER:  -- number.  I know that Mr. Gonzalez
5    has written to us for probably about eight of them.  We've
6    gotten a handful of other lawyers that have written that
7    are completely unconnected.  Obviously we've gotten the one
8    from Mr. Casper's firm.
9        But the vast majority of the lawyers that have
10   written us 558 notices are not affiliated with Mr. Casper
11   or Mr. Inverso's firm.  And they're doing everything they
12   can, as you can see in our materials, to find these folks
13   themselves.  They have got web sites.  They're talking to
14   the newspaper, trying to sign people up.
15       If they really want clients -- and I'm speaking of
16   plaintiff's counsel -- they're doing everything they can to
17   sign them up themselves.
18       For us to send a notice identifying people to them
19   is not required or even appropriate.  They're doing a very
20   good job themselves of doing anything that's required along
21   those lines, Your Honor.
22       And, importantly, the original warranty isn't
23   being released either.  If you look at Paragraph 15 --
24       THE COURT:  That's what I thought.
25       MR. SIVYER:  Right.

1    THE COURT:  You can go ahead and point it out to
2  me, but that --
3    MR. SIVYER:  Yeah.  Paragraph 15 --
4    THE COURT:  Yeah.
5    MR. SIVYER:  -- has an exception for the original
6  warranty as well as obviously a new warranty be given
7  earlier in the provision.  No personal injury release, no
8  release of the original warranty, and a new warranty
9  given.

10    Is it perfect?  I don't know.  But we're making a
11  good-faith attempt to fix these houses to -- to enter into
12  a fair agreement.  And if folks want representation, fine.
13  We've modified some of the agreements at the request of
14  their lawyers.  And, you know, we're doing the best job we
15  can to get people's homes fixed.  That's really our job and
16  our goal.

17    I'm sorry if that doesn't result in a great big
18  attorneys' fee in this case, but that's really what we're
19  trying to do.  Thank you, Your Honor.

20    THE COURT:  All right.  You want to respond?
21    MR. CASPER:  Your Honor, I would ask just to
22  address some of the attorneys -- (indiscernible) -- we make
23  an exception to the Local Rule and let Mr. Inverso address
24  the Court?

25    THE COURT:  No.  No.  That's what the rule is:

1   One lawyer speaks at a time.

2           Do you have anything to say in response to what he

3   just said?

4           MR. CASPER:  Your Honor, I -- just briefly.  There

5   are a lot of homeowners out there who are not represented.

6   That much is clear.

7           THE COURT:  What's the -- well, maybe, maybe not.

8   Okay.  Guess what?  Just because you're a homeowner --

9   okay.  When my sewer collapsed and I had to get somebody to

10  come and fix it, I didn't go run to a lawyer.  We called

11  the guy who was in the neighborhood who was fixing these

12  things.  They came and fixed it.

13          So everything doesn't have to turn into a

14  lawsuit.  And if they're going to come in and fix the

15  thing, why shouldn't I let this happen without a lawyer

16  intervening?  Lawyers aren't something magical that they

17  can just -- okay, everything goes away and your TV set gets

18  better so --

19          MR. CASPER:  Well, Your Honor, one side has

20  lawyers.  A lot of people on the other side don't.  That's

21  not a fair situation.

22          THE COURT:  Well, why?  Why?  Because they want

23  their house fixed.  If their house gets fixed, then what --

24  why would they need a lawyer?

25          MR. CASPER:  The way the agreements are written,

1    there's no assurance the house is going to be fixed and put
2    in the condition it would have been absent the defective
3    drywall that was installed.  The agreement says they'll put
4    it back --
5           THE COURT:  Well, then you have the warranty, the
6    old one as well as the new one.
7           MR. CASPER:  The release releases any claims
8    related to the defective Chinese drywall, right in
9    Paragraph 15.
10          THE COURT:  Well, of course.  They are taking up
11   that old drywall and putting in new drywall; then you get a
12   year warranty.
13          MR. CASPER:  But if they don't correct the other
14   damage that -- under the agreement it's arguable whether
15   they're even obligated to do, and the homeowner is
16   dissatisfied with the work, they've already released their
17   claims as to the drywall, then the warranty they've gotten
18   in this agreement applies to the repair work.  They've
19   already released their claims related to the problems
20   associated with the defective drywall.
21          THE COURT:  Now, what about the fact that
22   Mr. Gonzalez who -- he wants to represent everybody.  He
23   says, "Go ahead and fix this stuff, and we don't need it.
24   You're -- (indiscernible) -- anything in there about a
25   lawyer."

1    MR. CASPER:  What was filed, I saw --

2    THE COURT:  He's in the same position as you are.

3    MR. CASPER:  What --

4    THE COURT:  And as a matter of fact, he's there

5    objecting to you being interim counsel and the style of the

6    motion was objecting to your motion.

7    MR. CASPER:  The interim class counsel motion,

8    yes.

9    THE COURT:  Well -- but there -- but also the

10   style of it objected to this motion for protective order.

11   But if you look at it, there's nothing in there that talks

12   about it.

13   MR. CASPER:  And nothing --

14   THE COURT:  But he, at least in the style, is

15   objecting to this motion.  And so he's in the same position

16   you are.  He's not saying these people need lawyers.

17   MR. CASPER:  Well, the people he's asking for

18   inspections on behalf of -- and all I've seen that he has

19   asked for is inspections, I've not seen anything where

20   Mr. Gonzalez requested Taylor Morrison to initiate

21   repairs.  That may be the case, but I haven't seen it.

22   I believe all I've seen is where he requested some

23   inspections be done.  He represents those people, is my

24   understanding.  They're not unrepresented.  He represents

25   them.

1     The relief we're asking for wouldn't affect -- he

2 can still go to Taylor Morrison and do whatever he wants.

3     THE COURT:  But he's taking a different position

4 than you are.

5     MR. CASPER:  He can do whatever he wants on behalf

6 of his clients, but he has clients that are represented by

7 him.  It's not his clients we're worried about.

8     THE COURT:  But he would have the same obligation

9 that you feel you have to the putative class, and he isn't

10 asking for some statement in there about lawyers or to stop

11 the repair work or anything like that.

12     MR. CASPER:  He can explain, I presume, if there's

13 a hearing on the interim class counsel motion why he has

14 taken that position.  I can't explain why he would, if he

15 has.  I don't even know that he has, Your Honor.  I've just

16 seen that he's asked for some inspections.  We don't oppose

17 inspections.  We've allowed them to inspect our client's

18 house.

19     The other deficiencies in the agreement I just

20 want to address.  It limits property damage to other

21 property to $1,500.  We're talking about some homes where

22 that number is going to be greatly exceeded because we're

23 talking expensive appliances, TV's, air conditioning

24 units.  Air conditioning units are the first thing to show

25 damage in these houses.  Those are expensive.  You don't

1  replace a unit --

2        THE COURT:  Do you have an objection?

3        MR. SIVYER:  I just wanted to clarify one thing,

4  but I would be glad to wait because I think he's misspoken.

5        THE COURT:  You're going on -- you're not

6  responding to what he said.  You're going on to make a new

7  argument, so I have a problem with that.

8        MR. CASPER:  Okay.  Well, with respect to

9  Mr. Gonzalez, I'll just say I know he's requested

10  inspections.  I don't know anything beyond that.

11        THE COURT:  Okay.

12        MR. CASPER:  With respect to these people having

13  lawyers or not, we don't know how many of them have lawyers

14  or not.  They do.  They don't know the exact number today.

15  We don't know how many people they've contacted, how many

16  people have signed this, how many of those people have

17  lawyers.

18        It's simply -- the whole point of Rule 23 is to

19  allow a great number of people's rights to be protected,

20  people who may not even know they have a claim or be aware

21  that somebody is asserting that claim on their behalf, and

22  avoid a situation like this where one side represented by a

23  lawyer could go in, negotiate settlements with

24  unrepresented persons, settlements which, if enforced, will

25  mean that these people will have been opted out of a

1  putative class action, having no notice that the class
2  exists or that the case is pending, contrary completely to
3  the spirit --
4          THE COURT:  And their house is fixed and they're
5  back in their house and they've moved on with their lives.
6          MR. CASPER:  Well, they haven't gotten
7  compensation for their personal property, and it's doubtful
8  under this agreement that the houses will be fixed as they
9  should be.  And why should they have to sign away all of
10 this to get warranty work done?  Where is that in Chapter
11 558?  When to get somebody to honor a warranty do you have
12 to agree to release all your claims against other people?
13         THE COURT:  Why do you need a lawyer to get a
14 warranty honored?
15         MR. CASPER:  Well, because they're not just
16 honoring the warranty.  They're saying, "Well, we'll honor
17 the warranty if you release your claims against us and
18 assign all your claims against everyone else and take" --
19         THE COURT:  Well -- but he just said -- and that's
20 my recollection.  You don't -- you don't -- they're not
21 releasing any other warranty matters.
22         MR. CASPER:  Well, if there's a completely
23 unrelated problem under the warranty, I agree; that
24 wouldn't be released.  The problem is, the release is going
25 to cover anything related to the defective Chinese drywall.

1  THE COURT:  But there's a new year warranty.

2  MR. CASPER:  On the repair work, not on problems

3  caused by the defective Chinese drywall.  They're going to

4  argue, I'm sure, if it comes up, that only covers -- "that

5  only warrants the stuff we replaced," if a problem arises

6  with that.  It doesn't cover other problems that the

7  drywall caused.  You release those -- "we did what we said

8  we're going to do under the agreement.  If you still think

9  you have problems in your house caused by the drywall, you

10  don't think we fixed it, you don't think we restored your

11  home to the condition it was in, too bad."

12  That's the situation that a lot of people are

13  going to be left in because they were not fully informed;

14  there was not full disclosure.  Many of them were not

15  represented.

16  It's quite a leap to assume, especially after

17  reading the agreement, that everybody is going to be

18  perfectly happy with the house as repaired and it's going

19  to be a fair deal that they've released everything --

20  THE COURT:  There's going to be some people who

21  are going to try to take advantage of it, because some

22  people -- and try to get as much out of it as they can.

23  There are going to be some people who are just happy to get

24  on with their lives.  And there will be some of them that

25  will say, "This was a real aggravation, and I'm glad it's

1  behind us." There's going to be a whole lot of people, and
2  they all will have different reactions.
3      MR. CASPER:  Yeah, let them make that reaction
4  based on complete information.  Some people may look at
5  that and say, "Well, I don't want to wait and see what
6  happens with the class action.  I'm going to take the
7  deal.  I don't think it's a hundred percent but, hey, I'll
8  take it."  Some people are going to do that.  But they
9  should at least make that decision knowingly and with full
10  information.
11      I would urge the Court to review our memo and just
12  compare --
13      THE COURT:  I've already read it.
14      MR. CASPER:  -- the terms of the agreement to the
15  representations in the associated documents.
16      THE COURT:  I've read all this stuff.  I didn't
17  find it particularly misleading.
18      The only thing I find that's -- that has some
19  persuasiveness is some statement to contact a lawyer,
20  period, not you guys, not the other guys, not anybody, but
21  a statement in their facts that there should be some --
22  that you may wish to contact a lawyer before you sign this
23  document.
24      MR. CASPER:  But, Your Honor, why not clearer
25  language on the assignment and release issue as well?  I

1  don't think it's clear to a lot of people in reading this
2  that this means you're done; this is all you're going to
3  get.
4            THE COURT:  No.  That's why you contact a lawyer.
5  I don't think there's anything misleading about that, so
6  I'm not going to say, yeah, you ought to change that.  If
7  I'm reading that, I understand what it means.  If you don't
8  want to do that, okay, then fine.  Then you don't accept
9  their deal.  You get a lawyer; you bring your own
10  lawsuit -- not necessarily yours but their own lawsuit, and
11  they can ask for a class.  So I'm not changing that one
12  because I don't see anything wrong with that one.
13            And I don't see anything wrong with the other
14  stuff.  I didn't find this a misleading statement at all.
15  It may be that some lawyers can find some ambiguities in it
16  to try to create a -- something misleading about it.  But a
17  real honest-to-goodness person that's reading it trying to
18  get the gist of it, they're not going to be misled by
19  this.  They may want to decide, "I don't want to take the
20  deal" for whatever reason after talking with a lawyer.
21  Okay.  Fine.  So that's all I see in this thing.
22            MR. CASPER:  Fair enough, Your Honor.
23            THE COURT:  All right.  So I'm granting the motion
24  only to the extent that the facts sheet -- I'm not sure
25  that's what you call it, but it's something like --

1   MR. CASPER:  It is what -- that's what --

2   THE COURT:  Okay.

3       -- shall include some statement that you -- this

4   is a significant matter, and you may wish to consult a

5   lawyer before deciding to sign this form -- the form.

6   MR. CASPER:  Fair enough.  Fine.  Could we

7   respectfully suggest that the order say it's otherwise

8   denied and that way --

9   THE COURT:  Well, yeah.

10  MR. CASPER:  Okay.  Great.

11  THE COURT:  But what I'm -- what I'm going to do

12  is this:  that you submit something, because the

13  off-the-top-of-my-head language isn't --

14  MR. CASPER:  Right.

15  THE COURT:  -- necessarily what ought to go in

16  there.  So you prepare something along those lines.

17  MR. CASPER:  Yes, Your Honor.

18  THE COURT:  You may wish -- I don't think it ought

19  to -- you should because they may end up spending money

20  they don't need to.  "You may wish to consult" -- "this is

21  a significant matter that involves legal rights, and you

22  may wish to consult a lawyer before signing the form."

23  MR. CASPER:  Fair enough.

24  THE COURT:  And so do this:  You prepare some

25  language along that -- show it to them.  If you don't like

1  it, you can send in your version.  But it isn't going to be

2  much more than that.

3          MR. CASPER:  Fair enough, Your Honor.

4          THE COURT:  So I will grant the motion to that

5  extent, that the fact sheet shall include something along

6  those lines.  And if there's a disagreement, then I'll put

7  in the language myself that I think is right.

8          MR. CASPER:  All right.  Otherwise --

9          THE COURT:  Otherwise, it will be denied.

10          MR. CASPER:  Thank you, Your Honor.

11          THE COURT:  All right.  Court will be in recess.

12          (Thereupon, the proceedings in this case for this

13  date were concluded at this time.)

14

15

16

17

18

19                    C E R T I F I C A T E

20          I, Dennis Miracle, Official Court Reporter, do
    hereby certify that the foregoing proceedings were
21  transcribed by me from a digital record that was produced
    by the United States District Court for the Middle District
22  of Florida, Tampa Division, and is a true and accurate
    record of said proceedings to the best of my ability, **based
23  on the quality of the recording.**

24      s/Dennis Miracle
                                    May 15, 2009
25  _____        _____
        Dennis Miracle                      Date