UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED                MDL NO. 2047
DRYWALL PRODUCTS LIABILITY                 SECTION: L
LITIGATION                                 JUDGE FALLON
                                           MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO:
ALL CASES

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# Special Master's Ruling
## Concerning Objectors' October 7, 2016 Request to Modify
## Special Master Case Management Order No. 1

The Objectors request several modifications to the CMO. An appropriate resolution of this request requires a determination of the appropriate scope of discovery.

## I.      Principles guiding discovery in fee cases

The Court has assigned to the Special Master the task of recommending an appropriate common benefit fee. In their October 7 letter, the Objectors cite authority which fairly outlines the principles which should guide the procedures for accomplishing this task.

**A.      The San Juan Dupont Plaza Hotel Fire Litigation – *Nineteen Appeals*[1] and *Thirteen Appeals*[2]**

On December 31, 1986, a fire killed nearly 100 people at the San Juan Dupont Plaza Hotel. More than 270 lawsuits, involving about 2,300 plaintiffs, ensued.  On May 13, 1987, the Judicial Panel on Multidistrict Litigation consolidated the cases before the Honorable Raymond Acosta. From the fifty-six individually retained plaintiffs' attorneys (IRPAs), Judge Acosta appointed nine (later increased to eleven) to a steering committee (PSC), which served the role of lead and liaison counsel for the plaintiffs.  The litigation eventually settled for approximately $220 million.  Court-appointed accountants determined that the attorneys' fund should be approximately $66 million. Judge Acosta then turned to the issue of how much of the $66 million should be devoted to a common benefit fund aimed at compensating the members of the PSC for their efforts. Judge Acosta held a two-day hearing.  Six of the PSC members proposed a percentage calculation, whereas five proposed a lodestar calculation.

> Despite this adversariness, however, Judge Acosta severely limited the IRPAs' participation throughout the fee-determination process. For instance, the judge's ground rules barred any non-PSC members from testifying at the hearing. Moreover, the IRPAs were told that they had to file their objections to the [lodestar] fee proposal on a one-page form designed by the court. The form . . . allotted only seven lines for substantive comment, i.e., "reason(s) for opposition" to the fee proposal. The court stressed that longer submissions would be ignored.
>
> When the fee-determination hearing began, Judge Acosta flatly refused to permit the IRPAs, either individually or through a

---

[1] *In re Nineteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d. 603 (1st Cir. 1992).

[2] *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir 1995).

> designated representative, to examine the witnesses. The IRPAs were
> not allowed to offer oral argument. After the hearings ended, Judge
> Acosta gave the IRPAs leave to file any written objections which
> were not foreseeable beforehand, but he restricted these filings to the
> same one-page form. The court again admonished the IRPAs that, if
> they deviated from the mandated format, the court would not consider
> their objections.
>
> On the basis of the [lodestar] fee proposal, the testimony at the fee
> hearing, and those objections filed in accordance with the form,
> Judge Acosta awarded some $36,000,000 of the $66,000,000
> attorneys' fee fund to PSC members for their services in that
> capacity. The court asserted that the fee calculation was the
> composite product of the percentage and lodestar methods. . . . The
> court also awarded costs of approximately $10,000,000 to PSC
> members, chargeable against the plaintiffs' fund.[3]

Several attorneys advocating the percentage method appealed. The First Circuit vacated Judge

Acosta's order, finding that, if Judge Acosta decided to hold an evidentiary hearing, it had to be fair.

On remand, Judge Acosta: (1) allowed restricted discovery; (2) refused to allow cross-

examination of the PSC members concerning the hours that they logged and their contribution to the

creation of the settlement fund; and (3) refused to allow an evidentiary hearing. After following this

procedure, Judge Acosta increased the PSC's share of the attorneys' fees to 70% of the total

available amount. On appeal, the First Circuit affirmed the procedure on all counts, although it did

find that Judge Acosta's allocation of the attorneys' fees was too generous to the PSC. The First

Circuit reduced the PSC's share of the attorneys' fees to 50%.

Of particular interest for our purposes is the First Circuit's discussion of Judge Acosta's

restrictions on discovery:

> Apart from the refusal to convene a full-scale hearing, appellants also
> complain that the court demonstrated too great an aversion to

---

[3] *In re Nineteen Appeals, supra*, 982 F.2d at 607-08.

discovery initiatives. But unlimited adversarial discovery is not a necessary—or even a usual—concomitant of fee disputes, *see National Ass'n of Concerned Veterans* [*v. Secretary of Defense*], 675 F.2d [1319,] 1329 [(D.C. Cir. 1982)] (noting that, in general, fee contests should not involve "the type of searching discovery that is typical where issues on the merits are presented"), and, in the circumstances of this case, we think that the court acted well within the province of its discretion in refusing to allow more elaborate discovery.

The Due Process Clause does not require freewheeling adversarial discovery as standard equipment in fee contests. *See Nineteen Appeals*, 982 F.2d at 614. This case exemplifies the wisdom of the rule. The district court did not shut off all discovery, and the procedures that the court employed—especially the compelled exchange of documentation—minimized the need for additional discovery by giving the IRPAs the raw material that they needed to sift through the particulars of the PSC's fee application. In other words, the court ensured that the IRPAs had access to all the data reasonably necessary to formulate their objections, including all the PSC members' time-and-expense submissions, summaries thereof, detailed accounts of the procedures used by the PSC to gather, review, and audit time records, and the working papers, correspondence, and documentation generated by the PSC's accountants during the compilation process. With this banquet of information spread before them, appellants then partook of the court's liberality in allowing them to formulate extensive written submissions.

Furthermore, the court below also had a right to consider the extent to which appellants' request for discovery threatened to multiply the proceedings and turn the fee dispute into a litigation of mammoth proportions. Judge Acosta characterized the IRPAs' discovery foray-which encompassed, inter alia, production of tax returns for employees of all PSC members' firms and details anent fringe benefits (including vacations, maternity leaves, and the provision of training programs)—as "a discovery scheme of needless and unreasonable proportions." It is surpassingly difficult to fault this characterization.

The sweeping nature of appellants' request, coupled with the fact that the focus of the hearings had shifted away from the lodestar and toward a task-oriented assessment of the lawyers' participation in the litigation, give substance to the district court's fears that granting

appellants' supplication would have started the parties on the road to a wasteful and time-consuming "satellite litigation." On this ramified record, appellants can demonstrate neither a high level of need for incremental discovery nor preponderant equities in favor of their request. Hence, we cannot say that the district court's denial of further discovery constituted an abuse of the court's considerable discretion. *See, e.g., National Ass'n of Concerned Veterans*, 675 F.2d at 1329 (holding that district court "retains substantial discretion based on its view of the submissions as a whole" to limit further discovery).[4]

## B.    *In re: High Sulfur Content Gas. Prods. Liab. Litig.  Shell Oil Co.* [5]

The Objectors also cite *In re: High Sulfur Content Gasoline Prods. Liab. Litig. Shell Oil Co.* allegedly produced contaminated gasoline.  Thousands of motorists filed suit, claiming damage to their vehicles.  The claims were consolidated in a federal class action.  The parties settled the matter, setting aside $6.875 million for plaintiffs' attorneys' fees, costs, and expenses.  The district court appointed a five-member Fee Committee, which submitted a proposal whereby the five members of the Fee Committee would receive almost half of the $6.875 million.  The district court adopted the proposal and later denied all motions for reconsideration.  On appeal, the Fifth Circuit reversed, holding that the district court had effectively abdicated its responsibility to the Fee Committee:

> [D]espite the court's statements at the ex parte hearing that it considered the *Johnson* factors, the record offers little substantiation that the court actually reviewed the individual fee awards. The district court set forth no factual findings and reasons to support its awards of individual attorneys' fees. The court's order merely recites without application the twelve *Johnson* factors and a laundry list of other relevant considerations. Moreover, the record is bereft of factual information essential to the conduct of a *Johnson* analysis as

---

[4]*In re Thirteen Appeals, supra*, 56 F.3d at 303-04.

[5]517 F.3d 220 (5th Cir. 2008).

well as appellate review. The record lacks the attorneys time and expense statements, letters, comments, hourly billing rates, and other materials allegedly submitted by the Fee Committee to the district court on or before the ex parte hearing on January 22, 2007. See *Manual for Complex Litigation* § 14.223 (4th ed. 2004) ("In advance of any fee-award hearing, counsel should submit time and expense records, to the extent not previously submitted with the motion and in manageable and comprehensible form ...."). Nor does the record contain a breakdown of the hours and rates claimed by each attorney or their respective lodestars. In other words, the record strongly suggests that at the time of the ex parte hearing the court possessed no documents, other than the Fee Committee's proposed fee allocation, upon which it could base factual findings for awards of individual attorneys' fees.

This circuit . . . does not forbid a district court to rely on fee allocation proposals submitted by attorneys. The proposals must, however, be factually supportable and consistent with the *Johnson* factors. Because the factual basis of the court's fee allocation remains unknown, this court cannot approve it.[6]

## C.     *In re Genetically Modified Rice Litig.*[7]

The Eighth Circuit cited *In re: High Sulfur* (which was a class action) in an MDL fee dispute. In the case of *In re Genetically Modified Rice Litig.*, several thousand rice farmers and others involved in the rice business sued Bayer CropScience alleging that Bayer's genetically modified rice had tainted the domestic rice supply. The Judicial Panel on Multidistrict Litigation consolidated several hundred federal court cases before the Honorable Catherine Perry. Judge Perry appointed Lead Counsel to manage the litigation on behalf of the plaintiffs. The parties eventually reached a $750 million settlement. Lead Counsel requested $51,584,012.54 in fees and $5,468,450.26 in

---

[6]*Id.* at 229-30.

[7]764 F.3d 864 (8th Cir. 2014).

expenses. The Phipps Group (Phipps), who had represented some of the plaintiffs, objected. Judge

Perry appointed a Special Master to consider the fee application and objections. In making his

determination, the Special Master relied upon time summaries instead of source records:

> Although the Special Master initially considered "review[ing] the
> time sheets and records underlying each counsel's fee request," he felt
> it was unnecessary "[a]fter examining all declarations of counsel and
> particularly those of Lead counsel." Instead, the Special Master
> examined the processes used by Lead Counsel in their review of
> attorneys' requests for common benefit fees. The Special Master
> found that Lead Counsel's review, among other benefits, had
> "identified and removed duplicative or excess billing" and "removed
> entries for individual client work."

After completing his review, the Special Master rejected Phipps's objection and recommended

approval of Lead Counsel's request. Judge Perry conducted a de novo review, and adopted the

Special Master's report and recommendation in full. Phipps appealed, and the Eighth Circuit

affirmed. In doing so, the Eighth Circuit rejected Phipp's challenge to the procedures employed by

the lower court:

> Phipps . . . challenges, on procedural and substantive grounds, the
> disbursements made to Lead Counsel and other common benefit
> attorneys in the district court's 2012 Order. . . .   The decision to
> award or deny attorneys, fees rests within the sound discretion of the
> district court. . . .  We give substantial deference to a district court's
> determinations, in light of the district court's superior understanding
> of the litigation. . . .
>
> The district court did not abuse its discretion by denying Phipps's
> request for additional procedures before the Fund monies were
> disbursed. The court was permitted to rely on the summaries and
> affidavits presented to the court by Lead Counsel and other common
> benefit attorneys. "In large cases, especially one of prodigious
> proportions like this, reliance on summaries is certainly within the
> discretion of the district court." *See In re Diet Drugs*, 582 F.3d 524,
> 539 (3d Cir.2009). The court did not merely rely on counsel to
> evaluate their own fee requests, but invited, considered, and
> addressed attorneys' objections to the proposed award.

The district court's review here was substantially more thorough than the procedure disapproved in *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220 (5th Cir.2008). In that case, a district court abused its discretion by determining a fee allocation in an ex parte hearing, accepting lead counsel's proposed order sealing the individual awards, and limiting its own review of objections to the allocation. *Id.* at 223–25. "[N]o affidavits were filed attesting to the accuracy or fairness of the proposed fee allocation," and the court "set forth no factual findings and reasons to support its awards of individual attorneys' fees." *Id.* at 229.

Here, by contrast, the court appointed a Special Master to review the fee request, and the Special Master invited and considered the objections of plaintiffs' attorneys, met with the parties, and reviewed the affidavits submitted by Lead Counsel and other common benefit attorneys. *See In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 384 Fed.Appx. 299, 300–01 (5th Cir.2010) (per curiam) (approving similar procedures). Although the court did not appoint an external auditor or permit discovery, *cf. In re Diet Drugs*, 582 F.3d at 533–34, discovery in connection with fee motions is rarely permitted, *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 338 (3d Cir.1998), and a "request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). We cannot say that the procedures employed by the district court were an abuse of discretion.[8]

## D.   *Yamada v. Nobel Biocare Holding AG.*[9]

The Objectors also cite *Yamada v. Nobel Biocare Holding AG.* In that case, Dr. Jason Yamada filed a class action against NobelDirect, a manufacturer of dental implants. The matter eventually settled, and class counsel moved for attorneys' fees of $4,156,631.85 and expenses of $223,989.06. Nobel requested copies of class counsel's time sheets. The district court then

---

[8]*Id.* at 871-82.

[9]821 F.3d 1058 (9th Cir. 2016).

reviewed the time sheets in camera, but refused to allow production to Nobel. The court entered an

attorneys' fee award, and Nobel appealed. On appeal, the Ninth Circuit reversed, holding that the

time sheets should have been produced to Nobel:

> "[W]hen a judge constructs a process for setting fees, the process
> must contain at least the procedural minima that the Due Process
> Clause requires." *In re Nineteen Appeals Arising Out of San Juan
> Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 614 (1st Cir.1992).
> The Due Process Clause requires that opposing counsel have access
> to the timesheets relied on to support the fee order. The district court
> abused its discretion by denying Defendants such access.
>
> On remand, the district court must allow Defendants access to the
> timesheets, appropriately redacted to remove privileged information,
> so they can inspect them and present whatever objections they might
> have concerning the fairness and reasonableness of Plaintiffs' fee
> request. Plaintiffs must then be allowed to respond to Defendants'
> objections and Defendants must be granted an opportunity to reply.
> The district court will then decide the appropriate fee award. See
> *Hensley v. Eckerhart*, 461 U.S. 424, 433–34, 103 S.Ct. 1933, 76
> L.Ed.2d 40 (1983).[10]

## II.    The procedure adopted by the Court in this case

### A.    Pretrial Order 9

The Court in this case has extensive experience managing MDLs, and has written several

scholarly articles on the subject. In so doing, the Court has set forth its approach to receiving

evidence (at least, in a preliminary fashion) concerning claims for common benefit time:

> [I]t is helpful for the transferee court to fix guidelines at the outset of
> the litigation to establish the type of activities performed and
> expenses incurred by counsel that may entitle them to seek payment
> or reimbursement from the common benefit fund. . . . To create a

---

[10]*Id.* at 1067.

record of the type of work performed as well as the costs expended by the attorneys performing common benefit work, it is also helpful for the transferee court, at an early stage in the litigation, to appoint a CPA to receive and vet records periodically submitted by counsel. Those attorneys who are seeking or plan to seek common benefit fees are expected to contemporaneously report their hours, the nature of the work performed, and the expenses incurred for common benefit work to the court-appointed CPA. These reports are reviewed by the CPA and the court on a regular basis during the course of the litigation for compliance with the court's guidelines for recoverable costs and fees and the reasonableness of the hours reported. The CPA files a monthly or bimonthly report with the court, which is entered into the record under seal for release at the appropriate time. Such records are an important factor in determining the total reasonable hours spent on the case and who actually performed the work that produced the result.[11]

On July 28, 2009, the Court entered Pretrial Order No. 9 (Rec. Doc. 147). PTO 9 closely tracks the methodology outlined above – submission of time (certified for correctness) to a Court-approved CPA, who then compiles and summarizes the submissions, and who then submits the summaries to the Court for monthly review:

These Time and Expense Guidelines are intended for all activities performed and expenses incurred by counsel that relate to matters common to all claimants in MDL 2047.

\* \* \* \* \*

Plaintiffs' Liaison Counsel has retained and the Court approves the retention of Philip Garrett, CPA ("PG"), to assist and provide accounting services to Plaintiffs' Liaison Counsel, the Plaintiff's Steering Committee, and the Court in MDL 2047. PG will be assisting in compiling submissions and will provide reports to Plaintiff's Liaison Counsel who shall submit them with the Court on a monthly basis. These reports will include both time and expenses and will summarize, with back-up detail, the submissions of all firms. Submission of time and expense records to PG and the Court shall be

---

[11]Eldon E. Fallon, Common Benefit Fees in Multi-District Litigation, 74 La. L. Rev. 371, 382-83 (2014).

considered as if submitted under seal.

* * * * *

All submissions shall be certified by a senior partner in each firm attesting to the accuracy and correctness of the submission.

* * * * *

The summary report form shall be certified by a senior partner each month attesting to the accuracy and correctness of the monthly submission.

## B.      Pretrial Order 28

On January 10, 2014, the Court entered Pretrial Order No. 28 (Rec. Doc. 17379). PTO 28 set forth a six-step process for resolving the issues surrounding allocation of the attorneys' fees. The first step of the process, entitled "Review of Time and Expenses", encouraged common benefit claimants to audit their own submissions to the Court-approved CPA to ensure that they were "accurate and correct". The Court later entered several supplemental pretrial orders which clarified the process for resolving attorneys' fee issues.

## C.      Appointment of a Special Master

The Fee Committee filed its motion to determine the allocation of the global fee award (Rec. Doc. 20293). Several attorneys either objected or filed competing motions. On July 19, 2016, the Court appointed the undersigned as Special Master "conduct limited discovery regarding time and expense submissions, procedures, and the relevant work of [the Court-approved CPA], and to make appropriate recommendations regarding these motions and objections." (Rec. Doc. 20410). On

August 30, 2016, the Court entered an order clarifying its appointment of the Special Master. (Rec. Doc. 20478).

### III.   Applying the jurisprudence to the procedures in this matter

A few principles are clear from the jurisprudence, and they can be applied to this matter.

First.  A court cannot simply rubber-stamp a Fee Committee's application. *See, e.g., In re High Sulfur, supra.* The Court must conduct an independent inquiry to determine the fairness of the request. In this case, the Court has adopted a process whereby a Court-approved CPA receives time and expenses and provides monthly summaries to the Court. The Court has also appointed a Special Master to receive and review evidence to make an independent recommendation.

Second.  A court should only allow limited discovery in fee dispute matters, including issues surrounding the appropriate common benefit in an MDL.  *See, e.g., Thirteen Appeals* and *Genetically Modified Rice.* In this case, the Court's initial order appointing the Special Master mandates that only "limited discovery" be conducted.

Third.  A court must be fair to both sides, giving each side equal chances to present the evidence that they have and to make arguments. *See, e.g., Nineteen Appeals.* Fairness, however, does not equate to entitlement to full-blown discovery, cross-examination, and even an evidentiary hearing. *See, e.g., Thirteen Appeals.* In this case, the Court has not entered any orders with respect to how much discovery should be conducted (although the Court has indicated that it should be limited), the extent of cross-examination, or the necessity of an evidentiary hearing. The Special Master is only addressing the first issue (the extent of discovery) at this time (the Special Master does intend to hold a hearing at which he will receive evidence, but the logistics of that hearing will

be decided upon at a later date), and is only addressing that issue partially (i.e., new issues may arise which warrant more discovery than the amount allowed by this ruling).

Fourth.  Those objecting to a fee application may or may not be entitled to discover source time sheets.  *See, e.g., Yamada* (requiring production of source time sheets); and *Genetically Modified Rice* (holding that a court can rely on summaries to determine attorneys' fees).  The Special Master concludes that the necessity of source time sheets should be determined after the deposition of the Court-approved CPA, and possibly after the depositions of the members of the Fee Committee and/or PSC members as discussed below (which will allow the Special Master to determine whether the summaries which have already been produced are enough to satisfy the Court's directive of "limited discovery").

Fifth.  The contributions of the individually retained attorneys (i.e., those not asking for a common benefit award) might have some relevance to the ultimate decision to be made by the Special Master.  In *Thirteen Appeals*, cited by the Objectors, the First Circuit approvingly noted that Judge Acosta had allowed the individually retained attorneys to make submissions which emphasized their own contribution to the case.[12]  Indeed, some attorneys have already made such submissions in this matter.  *See, e.g.*, Affidavit of Eric D. Hoaglund (Rec. Doc. 20336-1).  **Nevertheless, after reviewing the Objection and Request to Modify Special Master Case Management Order No. 1 (Rec. Doc. 20520), the Special Master concludes that this factual issue can be sufficiently developed through the use of affidavits and/or declarations.  If a party wishes to depose an individual who signs such an affidavit or declaration, the party may make a request to the Special Master.  Unless there is an objection by Wednesday, November 2,**

---

[12]56 F.3d at 302 & n.4.

Page 13 of  18

2016, the Special Master will inform the Court that the Objection and Request to Modify Special Master Case Management Order No. 1 (Rec. Doc. 20520) is moot.

Sixth. Although not discussed above, the cited cases also discuss the origin and purposes of the common benefit doctrine. *See, e.g., Nineteen Appeals.* Put simply, a court uses a common benefit fund as an incentive to attorneys to prosecute complex litigation. This includes all aspects of complex litigation. By the time the common benefit fund was created in this case, plaintiffs' attorneys had prosecuted claims against hundreds of defendants, some of whom settled and some of whom did not (Taishan and many others). The Objectors direct the Special Master to no authority which supports the proposition that these efforts, if found to be reasonable and designed to advance the common interest, should not be compensated from the common benefit fund. Furthermore, such an effort to separate time defendant-by-defendant would be all but impossible, since PTO 9 did not require that counsel should specify that any particular time entry was directed at one defendant as opposed to another.

## IV.   The Objectors' requested modifications to CMO No. 1

Considering the above, the Special Master finds as follows with respect to each of the Objectors' requests:

1. Documents:

(a) relied upon by Philip A. Garrett in preparing his Declarations, including but not limited to all submissions of common benefit time and expenses submitted to him pursuant to Pretrial Orders Nos. 9, 9A and 28 including all initial submissions and all revised submissions submitted by any attorney or firm; and

**This requested modification is denied at the present time.  If, after taking the depositions allowed by the CMO as modified, the Objectors demonstrate that source time and expense submissions are necessary to the disposition of this matter, the**

Page 14 of 18

**Special Master will reconsider this determination.**

(b) all ledgers, reconciliations, accountings or lists of common benefit expenses, including all records of whether or not each expense has been reimbursed to date.

**This requested modification is denied at the present time.  If, after taking the depositions allowed by the CMO as modified, the Objectors demonstrate that source time and expense submissions are necessary to the disposition of this matter, the Special Master will reconsider this determination.**

2. All transcripts, agenda and minutes of PSC meetings and FC meetings

**Denied.  The Special Master concludes that this request goes beyond the limited discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.**

3. All emails, written communications and other documents:

a. To the PSC or any member of the PSC requesting authorization to conduct common benefit work pursuant to Pretrial Order No. 9 (Doc. 147); or

**Denied.  The Special Master concludes that this request goes beyond the limited discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.**

b. From the PSC or any member of the PSC authorizing, requesting or denying common benefit work pursuant to Pretrial Order No. 9 (Doc. No. 147).

**Denied.  The Special Master concludes that this request goes beyond the limited discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.**

4. All emails, written communications and other documents to, from or by FC member(s) or PSC member(s) discussing or relating to:

a. Allocation of fees between common benefit counsel and primary counsel;

**Denied.  The Special Master concludes that this request goes beyond the limited discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.**

b. Claims against Taishan and/or other non-settling defendants;

**Denied.  The Special Master concludes that this request goes beyond the limited**

discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.

c. Whether a particular activity or expense was for the common benefit;

**Denied.   The Special Master concludes that this request goes beyond the limited discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.**

d. Allowance or disallowance of common benefit time or expenses;

**Denied.   The Special Master concludes that this request goes beyond the limited discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.**

e. Value of all benefits conferred upon claimants by either common benefit counsel or individually retained counsel.

**Denied.   The Special Master concludes that this request goes beyond the limited discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.**

5. Memoranda, reports, ledgers, spreadsheets, or other documents prepared by or with input from Sandra Duggan regarding, discussing or relating to:

a. Common benefit time and/or expenses,

**Denied.   The Special Master concludes that this request goes beyond the limited discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.**

b. Whether a particular activity or expense was for the common benefit;

**Denied.   The Special Master concludes that this request goes beyond the limited discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.**

c. The allowance or disallowance of common benefit time or expenses; or

**Denied.   The Special Master concludes that this request goes beyond the limited discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.**

d. The value of benefits conferred upon claimants by either common benefit counsel or

individually retained counsel.

**Denied.  The Special Master concludes that this request goes beyond the limited discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.**

6. Depositions of Fee Committee Chair and Co-Chair

**The Objectors may take the depositions of Arnold Levin, Russ Herman, and Sandra Duggan in an order to be determined by the Fee Committee. The Fee Committee no longer has an obligation to produce a designee for deposition as referenced in CMO No. 1. The Objectors must submit a list of topics to the deponent and to the Special Master seven days in advance of any such depositions. The Special Master will review the list of topics to ensure that they are necessary to accomplish the limited discovery requested by the Court and envisioned in the jurisprudence. The depositions must not be duplicative in nature. If the Special Master concludes that the appropriate topics have been sufficiently addressed in either of the first two depositions, the Special Master will have the discretion to modify the requirement for further depositions. Unless further ordered, the procedures for these depositions will be the same as those outlined with respect to the deposition of the Fee Committee designee referenced in CMO No. 1.**

7. Deposition of Sandra Duggan

**See above.**

8. Deposition of Plaintiffs' Steering Committee Designee

**Denied at this time.  If the Special Master determines that the depositions ordered above do not sufficiently address the matters at issue, the Special Master may reconsider this ruling.**

C. Primary Counsel Must be Allowed Access to the Relevant Sealed Documents

**The Special Master adheres to CMO No. 1's treatment of this issue.**

D. Documents Must be Produced in Native Format of the Original

**Denied.**

Baton Rouge, Louisiana, this 28th day of October, 2016

/s/ Daniel J. Balhoff
DANIEL J. BALHOFF
SPECIAL MASTER