**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED | * | |
| DRYWALL PRODUCTS LIABILITY | * | |
| LITIGATION | * | **MDL NO. 2047** |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | * | **SECTION: L** |
| | * | |
| This document relates to:  ALL CASES | * | **JUDGE FALLON** |
| | * | |
| | * | **MAG. JUDGE WILKINSON** |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | | |

**THE FEE COMMITTEE'S RESPONSE IN OPPOSITION TO PRIMARY COUNSEL'S**
**OBJECTION TO SPECIAL MASTER'S RULING CONCERNING OBJECTORS'**
**REQUEST TO MODIFY SPECIAL MASTER CMO NO. 1 AND REQUEST FOR**
**EXPEDITED CONSIDERATION**

The Fee Committee ("FC") submits this response in opposition to Primary Counsel's

Objection to Special Master's Ruling Concerning Objectors' Request to Modify Special Master

CMO No. 1 and Request for Expedited Consideration [Rec. Doc. 20552].

I.     **INTRODUCTION**

"A request for attorney's fees should not result in a second major litigation."  *Hensley v.*

*Eckerhart*, 461 U.S. 424, 437 (1983).  Disregarding the Supreme Court's edict, this Court's Order

appointing the Special Master and limiting discovery, and the Special Master's Ruling Concerning

Objectors' Request, Primary Counsel for Objectors insist on fulminant discovery related to their

ill-conceived and misdirected fee disputes with the FC.  Rather than follow the orderly and efficient

fee award and allocation procedures prescribed by your Honor in PTO 28 as amended, and now

by the Special Master, which include a detailed discovery plan laid out in the Special Master's

Ruling Concerning Objectors' Request to Modify Special Master CMO No. 1, Primary Counsel

demand, without any showing of good cause, yet more fee discovery than what the Special Master

has determined to be necessary.  Their requests are overly broad, if not limitless, and would be unduly burdensome in the extreme to meet.

In their Objection, Primary Counsel persist in demanding production of all transcripts, agendas, and minutes of the PSC and the FC.  Further, Primary Counsel request all emails, written communication, and other documents pertaining to common benefit assignments and tasks in this MDL, which the Plaintiffs' Steering Committee ("PSC") and other common benefit attorneys sent or received throughout a seven-year period (which would likely encompass tens of millions of emails and many thousands of letters, notes, drafts of documents and other pleadings).  Primary Counsel also seek production of all emails, written communications and other documents related to allocation of fees, common benefit expenses and the value of the benefit that all of the common benefit work conferred on the class (which would equally encompass virtually every email generated by the PSC in MDL 2047, not to mention innumerable other documents, pleadings, etc.). In addition, Primary Counsel seek production of all documents and emails related to the pursuit of Taishan and other non-settling Defendants (which relate to confidential, ongoing litigation and which are irrelevant to the current fee disputes).  Finally, despite being granted the right to depose Sandra Duggan, Primary Counsel broadly demand (without limit) all memoranda, reports, ledgers, spreadsheets or other documents she prepared or were prepared with her input.  But the Special Master, after carefully considering the principles guiding discovery in fee cases, determined that the discovery sought by Primary Counsel should not be allowed.  The Special Master employed sound judgment in exercising his discretion.

As Primary Counsel do not even contend that the Special Master abused his discretion, their Objection is unfounded and without merit.

## II.    FACTUAL BACKGROUND

This Court has repeatedly noted the unique qualities of MDL 2047 characterized in part by the innovative procedures confected by the PSC and other common benefit counsel working at their direction to address the complex and often daunting obstacles that regularly presented themselves throughout the course of the litigation.  Without any doubt this case is *sui generis*. Through the unique invention of Omnibus Class Action Complaints based on CAFA jurisdiction, which were first utilized in this case, thousands of named class plaintiffs were able to join together to sue foreign manufacturers and thousands of other supplier, builder, and installer defendants in the federal courts.

Primary Counsel (most of whom are common benefit counsel and some of whom are PSC members) took advantage of this opportunity and agreed to designate their clients as named class plaintiffs in the Omni Complaints.  This allowed the Primary Counsel Objectors to bundle all of their clients in a single complaint, and the PSC then paid the hundreds of thousands of dollars required for translation and service abroad on foreign defendants.  Each participating Primary Counsel attorney affixed his or her name and consented to the Omni class action complaint in which their clients were designated as class representatives, and were thus "of counsel."  As such, they owe a fiduciary duty to the classes they represent.  Further, in the event certification was not obtained, the plaintiffs were assured of standing to pursue their claims by having been named of record on the pleading.  This benefit was invaluable.  In fact, absent the CAFA class device, each plaintiff would have been obliged to bring their own separate lawsuit with the concomitant obligation for each plaintiff to pay their own filing fee and cost for service of process abroad.[1]  It

---

[1] *See In re Xarelto Products Liab. Litig.*, MDL No. 2592, PTO No. 11F (E.D. La. May 20, 2016) (refusing any bundled complaints) [available at http://www.laed.uscourts.gov/sites/default/files/xarelto/Pretrial%20Order%2011F.pdf]; *In re Diet Drugs Products Liab. Litig.*, MDL No. 1203, PTO No. 3370 (E.D. Pa. March 24, 2004) (ordering the severance of all multi-plaintiff actions) [Attached hereto as Exhibit "A"].

is now disingenuous for Primary Counsel to complain of the Rule 23 status of the case, having slept for seven years with no commentary in opposition to the class proceedings they only recently awoke to oppose.[2]

The PSC's preparation of the Omni Complaints relieved all participating counsel, including many Primary Counsel and their clients of costly and challenging foreign service efforts through The Hague Convention.   The PSC's diligent prosecution of these class actions against the defendants in the Knauf chain of distribution in earlier proceedings led to the Threshold Inspection Program, Pilot Program, bellwether trials of *Germano, Hernandez* and *Campbell*, all of which led to the interrelated Rule 23 class action settlements finally approved by the Court on February 7, 2013 (Rec. Doc. 16570).  The significant common funds that these Omni Complaint class actions generated, which are now in dispute, were designed to compensate *both* common benefit counsel and individually retained counsel.  *See* Order of May 17, 2016 (Rec. Doc. 20257).

As mentioned, on February 7, 2013, this Court granted class certification to five settlement classes and final approval of the class settlements involving InEx, Banner, L&W, Global, and Knauf.  Thereafter, on July 9, 2013, the Court issued an Order and Judgment certifying four settlement classes and granting final approval to the Virginia settlements. (Rec. Doc. 16934).[3]  In

---

[2] These class members had every opportunity to object to or opt out of every one of the class actions, class settlements, the establishment of the Qualified Settlement Funds, PTO 28 and PTO 30, but they never did.  By all rights, they should be estopped from presenting their late, new-found arguments.

[3] At the October 20, 2016 Status Conference and hearing on motions, the Court reiterated that the interrelated Knauf and Virginia settlements were *class* proceedings.  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, MDL 2047, Transcript of Motion Hearing at 4 (E.D. La. Oct. 20, 2016) (emphasis added) [attached hereto as Exhibit "B"]. Even more recently, in connection with the fee disputes of Holston Vaughan and Prichard Housing Authority and their counsel, Taylor Martino, P.C., this Court recognized that "once their clients became part of the settlement class," the compensation of their counsel "came fully within the parameters" of the "Class Settlement Agreement's framework for attorneys' fees."  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, MDL 2047, Order and Reasons at 8 (E.D. La. Nov. 18, 2016) [Rec. Doc. 20551].  This same reasoning will apply to the ongoing fee dispute involving Villa Lago.

its Order of February 7, 2013, this Court praised the remediation plan contemplated by the Knauf

Settlement by pointing out:

> The Knauf Settlement further provides for a separate fund for
> attorney fees, thus ensuring that any attorney fees approved by this
> Court will not diminish any plaintiff's recovery or cause a structure
> to receive only partial remediation.

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* MDL No. 2047, 2013 WL 499474, *4

(E.D. La. Feb. 7, 2013).  Ironically, Primary Counsel now complain of this unique benefit to their

clients of having their fees paid separately and not taxing the remedial fund.[4]

Since these were class action settlements, all of the requirements of Rule 23, including

adequacy of class counsel, were satisfied.  Thereafter class notice was provided to class members

and their counsel, including Primary Counsel (with the possible exception of Primary Counsel's

Liaison Counsel, *i.e.,* Messrs. Faircloth and Exnicios).  *See Chinese-Manufactured Drywall,* 2013

WL 499474 at *3 (describing class notice following preliminary class approval).   Following this

notice period, class members were given the right to opt out or object.  *Id.*  Once again, Primary

Counsel never asserted a single objection on behalf of their clients who they represented as named

class representatives in the Omni class action complaints.   In this fee dispute, the Primary Counsel

now deny for the first time after much water has "passed over the dam" that these were always

Rule 23 class proceedings.  *See* Rec. Doc. 20520.

---

[4] The practice of negotiating a separate fund for class action attorneys' fees after the negotiation of the class settlement is not uncommon.  Only recently, such a practice was approved in *In re National Football League Players Concussion Injury Litig.*, 821 F.3d 410, 444 (3d Cir.), *cert. pending*, Nos. 16-283 & 16-413 (U.S. 2016).  And while simultaneous negotiation of the class recovery and attorneys' fees is disfavored, *Prandini v. National Tea Co.,* 557 F.2d 1015, 1021 (3d Cir. 1977), the Supreme Court has determined such practice to be acceptable.  *See Evans v. Jeff D.*, 475 U.S. 717, 734-736 (1986).

Thereafter, through a sequence of again unchallenged orders this Court established guidelines and a series of ongoing procedures (including the appointments of a fee committee and a Special Master) for the application of attorneys' fees with respect to the interrelated Knauf, Banner, InEx, Global, L&W and Virginia class settlements.  *See* Pretrial Order No. 28, as amended in Pretrial Order Nos. 28(A) - 28(F) & PTO 30.[5]  This Court made clear to all interested parties that the "guidelines [in PTO 28] provide direction, but do not create entitlements and do not override the independent judgment and discretion of the FC and the Court."  PTO 28 at 14.  Indeed, the "Court retains all authority and jurisdiction as to the final decisions of awards for common benefit fees, individual attorneys' fees and reimbursement of expenses."  *Id.* at 15.[6]  Most recently, at the November 18, 2016 Status Conference, this Court reiterated that its order here will result in a fee decision that will not be based upon a blank slate, but, rather, a full and transparent record. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* MDL 2047, Nov. 18 2016 Status Conference Hearing Transcript at 3-5 (E.D. La. Nov. 18, 2016) [attached hereto as Exhibit "C"].

Subject to the Court's directives, on May 16, 2014, a Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and

---

[5] None of the Objectors represented by Primary Counsel ever filed an objection to PTO 28.  On the contrary, many of them (Parker Waichman LLP, Whitfield Bryson & Mason, LLP, Pendley, Baudin & Coffin, Rhine Law Firm, Luckey & Mullins, Baron & Budd, PC, McCallum, Hoaglund, Cook & Irby, LLP, Allison Grant, Alters Law Firm, PA, Roberts and Durkee, LLP, and Milstein, Adelman, Jackson, Fairchild & Wade, LLP) participated in the fee award process, submitting fee affidavits and appearing before the FC for interviews.  This, despite the fact that some, *e.g.* Pendley, Baudin & Coffin, breached their fiduciary duties  to their clients by engaging in contradictory and competing class actions in distant fora.  *See, e.g., In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* MDL 2047, Order (E.D. La. Nov. 10, 2010) (Imposing Agreed Stay Order re: *Glen Vereen v. Lowe's Home Centers, Inc.*, Civil Action No. SU 10 CV 2267B, In the Superior Court of Muscogee County, State of Georgia ) [Rec. Doc. 6344].

[6] The Court's multistep processes for awarding attorneys' fees, with ample opportunities for objections to be heard, readily comport with Due Process, which requires only the "opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), *quoting, Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 231 (5th Cir. 2008) ("'when a judge constructs a process for setting fees, the process must contain at least the procedural minima' of due process: notice and an opportunity to be heard."), *quoting In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 614 (1st Cir. 1992).

Reimbursement of Expenses, Filed Pursuant to Pretrial Order No. 28 [Rec.Doc. 17687] was filed. Therein, fee and expense awards were sought from the several interrelated Knauf, Banner, InEx, Global, L&W, and Virginia class action settlement funds.  This Petition was determined by Order of May 17, 2016, which after reciting the history of the interrelated class settlements with Knauf and the Virginia Settlements "determined the global amount of funds available to compensate common benefit counsel and individually retained counsel at this time is $192,981,363.35."  May 17, 2016 Order at 3.  Once again, consistent with their prior inaction, none of the Primary Counsel objected to this Order.  Therein, the Court also recognized that Pursuant to PTO 28, it would "subsequently allocate" "the total common benefit fund" and "the amount of funds for individual counsel for claimants." *Id.*[7]  Again, none of the Primary Counsel objected to any version of PTO 28.

---

[7] Here, it is worth noting the incontrovertible fact that each of the set asides for attorneys' fees in the February 7, 2013 class action settlements were negotiated with a provision that attorneys' fees were to be allocated among common benefit and individually retained counsel.  *See e.g.,* **Third Amended Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047**, §14.1 (Rec.Doc. 16407-3) ("[T]he Knauf Defendants shall pay a singular attorneys' fee (to be allocated among the PSC and common benefit counsel authorized and working at the direction of the PSC, other common benefit counsel, Settlement Class Counsel and individual retained counsel) and reasonable and appropriate costs, including but not limited to Held Costs, Shared Costs and Individual Participating Class Members' Costs limited to reasonable inspection costs."); **Settlement Agreement in MDL No. 2047 Regarding Claims Involving Builders, Installers, Suppliers and Participating Insurers** §16.6 (Rec. Doc. 15695-2) (After the Effective Date, the PSC, Class Counsel, common benefit attorneys, and privately retained attorneys for all Class Members (the "Petitioning Attorneys") shall be entitled to petition the Court for attorneys' fees totaling in the aggregate up to 32% of the Settlement Funds, *with no more than 15% of the Settlement Funds to be allocated to common benefit fees*, and reimbursement of reasonable expenses, excluding the cost of notice. * * * The determination of any attorneys' fee or court cost issue, including the allocation between and amongst the Petitioning Attorneys, shall be determined by the Court and all Parties agree such determination is not appealable and hereby waive all appeals of any such determination."); **Class Action Settlement Agreement Regarding KPT Drywall Claims Against USG and L&W in MDL No. 2047** §15.1 (Rec. Doc. 13375-2) ("L&W shall pay attorneys' fees and reasonable and appropriate expenses (collectively "Attorneys' Fees") (to be allocated among the PSC, common benefit counsel authorized by and working at the direction of the PSC, L&W Class Counsel and individual retained counsel), the calculation and/or amount of which will be determined by a separate agreement between the PSC, the Knauf Defendants and USG and L&W, which will be submitted to the Court for approval. * * * no distribution of Attorneys' Fees will take place without the approval of the Court, and the ruling of the Court regarding Attorneys' Fees shall be non-appealable."); **Amended Stipulation and Agreement of Settlement (regarding Banner)** §14.7 (Rec. Doc. 10064, Exb. A) ("After the Effective Date, the PSC, Class Counsel (but not Co-Class Counsel), common benefit attorneys, and privately retained attorneys for all Class Members (the "Petitioning Attorneys") shall be entitled to petition the Court for attorneys' fees up to 32% of the Settlement Funds and reimbursement of reasonable expenses, including the cost of notice.  The allocation of attorneys' fees between and amongst the Petitioning Attorneys shall be

Promptly thereafter, on June 6, 2016, the Fee Committee filed its Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) [Rec. Doc. 20293].  Therein, the FC detailed the legal authority and policy rationale for awarding common benefit fee and class counsel fees applicable to the global fee award.  As the source for the common fund is derived solely from Rule 23 class settlements, the FC appropriately used a "blended methodology" to calculate common benefit fees, with adjustment based on the application of the *Johnston* factors.  *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir.), *cert. denied*, 133 S. Ct. 317 (2012); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, MDL No. 2179, 2016 WL 6215974, *15 (E.D. La. Oct. 25, 2016); *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 857 (E.D. La. 2007); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974); Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371, 385 and fn. 61 (2014); Russ M. Herman, *Percentage-of-Benefit Fee Awards in Common Fund Cases,* 74 TULANE L. REV. 2033 (2000) (discussing range of percentage fee awards).  Specifically, the FC arrived at a case-appropriate benchmark percentage of 8%, which, after application of the *Johnson* factors, received an upward adjustment of 2.65% to result in a common benefit percentage of 10.65%.[8]

---

determined by the Court...."); **Amended Settlement Agreement Regarding Claims Against Interior-Exterior in MDL No. 2047** §16.7 (Rec.Doc. 12258-3) ("The PSC, Class Counsel ( but not Co-Class Counsel), common benefit attorneys, and privately retained attorneys for all Class Members (the "Petitioning Attorneys") shall be entitled to petition the Court for attorneys' fees up to 32 % of the Settlement Fund and reimbursement of reasonable expenses. The allocation of attorneys' fees and reimbursement of reasonable costs between and amongst the Petitioning Attorneys shall be determined by the Court.").

[8] There is no sound basis for challenging the use of this well-established methodology. *See* FC's Omnibus Response to Objections to the Fee Committee's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) at 19-25 [Rec.Doc. 20384-2].  Yet, Primary Counsel elsewhere maintain (Rec. Doc. 20520) that their contingency fee contracts are the source of all of the funds that are the subject of allocation, and the methodology for disbursing common benefit fees applies.  Their position is nothing but a disingenuous revisionist history that appears for the first time only *after* their clients have recovered class benefits.

Controlling Fifth Circuit precedent requires that "[i]n a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable

This recommendation of the FC became the subject of numerous objections by Primary Counsel which were filed on or about June 28, 2016.[9]  Many of the objectors willingly participated in the Joint Fee Petition (some were PSC members) but completely reversed themselves and opposed the common benefit fee award.[10]  In response to these papers, on July 11, 2016, the FC submitted its Omnibus Response to Objections to the Fee Committee's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) [Rec.Doc. 20417].

Within days of the filing of the FC's Omnibus Response, on July 15, 2016, the personal attorney for Parker Waichman, Jimmy R. Faircloth, Jr., and the personal attorney for Whitfield Bryson & Mason, LLP, Pendley Baudin & Coffin, Rhine Law Firm, and Luckey & Mullins, Val Patrick Exnicios, under the assumed self-designated moniker of "Primary Counsel" filed a Motion

---

and divided up fairly among plaintiffs' counsel." *High Sulfur*, 517 F.3d at 227.  Mindful of *High Sulfur*'s instruction that "the district court must not cursorily approve the attorneys' fee provision of a class settlement or delegate that duty to the parties," this Court established guidelines and a series of ongoing procedures (including the appointments of a fee committee and a Special Master) for the application of attorneys' fees with respect to the interrelated Knauf, Banner, InEx, Global, L&W and Virginia class settlements.  *See* Pretrial Order No. 28, as amended in Pretrial Order Nos. 28(A) - 28(F).

Although Primary Counsel's contention that the settlements and fee fund at issue are to be characterized as MDL mass tort settlements rather than class action settlements (a contention belied by the clear prolix record), this truly represents a "distinction without a difference" in terms of the common benefit fee calculation methodology, and this Court's authority to determine the reasonableness of any individually retained counsel's contingency fee agreement. Objectors have had many chances to challenge the fairness of the total fees funded by defendants under these class settlements: 1) when the settlements were presented for preliminary or final approval; 2) when the Qualified Settlement Funds were established; 3) when the original PSC petition for fee approval was filed over 2 years ago; and 4) when the Court issued its Order of May 17, 2016, approving the total fee amount.  All of these proceedings were performed under the aegis of Rule 23.  Yet Primary Counsel, until now, never chose to step forward to challenge the methodology for calculating fees derived from these funds or to refute this Court's authority to police the contingency fee agreements of all counsel in these proceedings.  Their belated efforts ring hollow, as the alternative world on which they depend does not exist.

[9] For example:  Parker Waichman LLP (Doc. 20348); Baron & Budd, P.C., Allison Grant, P.A., Alters Law Firm, P.A. (Doc. 20353-3); Whitfield Bryson & Mason LLP, Pendley Baudin & Coffin, Rhine Law Firm, Luckey & Mullins (Doc. 20346); McCallum, Hoaglund, Cook & Irby, LLP (Doc. 20336); Alters Law Firm, P.A. (Doc. 20355; Morris Bart, LLC (Doc. 20392-2).

[10] Indeed, in Primary Counsel's Objections and Request to Modify Special Master Case Management Order No. 1 [Rec. Doc. 20520], these counsel made the specious argument that "this matter does not involve a dispute over fees awarded under Rule 23," and that the reasonableness of their contingency fee contracts are not at issue. Objection, ¶¶3-4.

for a Case Management Order Providing for Discovery, the Unsealing of Records Regarding Common Benefit Fees, and the Appointment of a Special Master. [Rec. Doc. 20394]. That motion was procedurally defective. *See* Preliminary Memorandum in Opposition to Primary Counsel's Motion for a Case Management Order Providing for Discovery, the Unsealing of Records Regarding Common Benefit Fees, and the Appointment of a Special Master [Rec. Doc.20411]. Nevertheless, to address the anticipated management issues regarding the objections to the FC's Recommendation, by Order dated July 18, 2016 (entered July 19, 2016 at Rec. Doc. 20410), Mr. Balhoff was appointed as Special Master with regard to the allocation of attorneys' fees.

The Special Master was instructed "to conduct limited discovery regarding time and expense submissions, procedures, and the relevant work of Philip [Garrett], CPA, and to make appropriate recommendations regarding these motions and objections." *Id.* (emphasis added). The Court later clarified its appointment of the Special Master by Order dated August 30, 3016, with more procedural specificity (Rec. Doc. 20478). In particular, the Court described the method by which objections could be taken from Orders of the Special Master. Specifically, the August 30 Order provides: "A party may file objections to, or may file a motion to adopt or modify, any order, report, or recommendations filed by the Special Master no later than 21 days after a copy is served." Order of Aug. 30, 2016 at 2.

After his appointment, the Special Master evaluated the necessary discovery relating to the objections to the Fee Committee's Recommendation, *supra*, by reviewing the relevant papers, including sealed materials, and conferring with the various counsel involved.[11] On July 29, 2016,

---

[11] These materials are provided as a composite exhibit, attached hereto as Exhibit "D".

Mr. Balhoff appointed Val Exnicios and Jimmy Faircloth as co-liaison counsel for the Objectors.[12]
After due consideration of the materials presented to him, on September 25, 2016, the Special
Master issued his Special Master Case Management Order No. 1 (Rec. Doc. 20518-1).  CMO No.
1 addressed immediate discovery requirements including document production by Mr. Garrett and
the FC, and depositions of Mr. Garrett, a designee of the FC and the Objectors.  As to the last
requirement, Objectors (of whom Primary Counsel are a subset) were ordered to present a witness
to testify to 1) "the efforts and work performed by counsel for individual claimants who seek
compensation for handling an individual Chinese drywall claim eligible in any of the various
settlements[;]" and 2) their "Oppositions to the Fee Committee's Motion to Determine the
Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's
Fees Pursuant to PTO 28(F) [Rec. Doc. 20293]."

Rather than abide by these rulings and follow the orderly discovery procedures
contemplated in CMO 1, by letter dated October 7, 2016, Primary Counsel immediately requested
that the Special Master issue an order providing for the additional discovery they had originally
requested in their Motion for a Case Management Order [Rec. Doc. 20394].  The FC responded to
this overly enthusiastic request by letter dated October 13, 2016 [Rec. Doc. 20552-2].  In addition,
on October 13, 2016, Primary Counsel requested that Mr. Balhoff file CMO No. 1 of record so
that they could submit to this Court their Objection to that portion of CMO No. 1 requiring that
they present a designee for deposition.  By Order dated September 19, 2016, CMO No. 1 became
part of the MDL record.  (Rec. Doc. 20518).  This permitted Primary Counsel to file their Objection
on October 21, 2016 (Rec. Doc. 20520).

---

[12]  The compensation of the Objectors' Liaison Counsel is to be decided at a later date. Notably, while Objectors'
Liaison Counsel sought to be compensated from all privately retained counsel, not all privately retained counsel filed
objections, and their obligation to shoulder this expense remains at issue.

Thereafter, on October 28, 2016, the Special Master issued the Special Master's Ruling Concerning Objectors' October 7, 2016 Request to Modify Special Master Case Management Order No. 1.  This Ruling rendered moot Primary Counsel's Objection regarding the requirement that they designate a witness for a deposition.

The October 28, 2016 Special Master Ruling also addressed Primary Counsel's request that CMO No. 1 be modified.  To this end, the Special Master considered Primary Counsel's request for Mr. Garrett's documents used in preparing his Declarations.  The Special Master denied this request without prejudice, thus:

> This requested modification is denied at the present time.  If, after taking the depositions allowed by the CMO as modified, the Objectors demonstrate that source time and expense submissions are necessary to the disposition of this matter, the Special Master will reconsider this determination.

October 28, 2016 Special Master Ruling at 14.

The Special Master also denied all of Primary Counsel's other modified requests for production, addressing the following:

1) all transcripts, agendas, and minutes of the PSC and the FC;

2) all emails, written communications and other documents related to authorizations or denials of common benefit assignments and tasks in this MDL, which the Plaintiffs' Steering Committee ("PSC") and other common benefit attorneys sent or received throughout a seven-year period;

3) all emails, written communications and other documents to, from or by FC or PSC members regarding a) allocation of fees, b) the pursuit of Taishan and other non-settling Defendants, c) common benefit expenses and d) the value of the benefit all of the common benefit work conferred on the class; and

4) all memoranda, reports, ledgers, spreadsheets or other documents Sandra Duggan prepared or were prepared with her input.

As to each request, the Special Master issued the following procedural ruling:

Denied.  The Special Master concludes that this request goes beyond the limited discovery envisioned by the Court, that it would lead to unnecessary satellite litigation, and/or that it would unnecessarily implicate privilege and/or confidentiality issues.

October 28, 2016 Special Master Ruling at 15-17.

Unable to articulate any abuse of discretion in any of these discovery rulings, Primary Counsel nevertheless requested that the Special Master's Ruling be filed of record to permit them the opportunity to file yet another objection.  The Special Master complied. By Order dated November 3, 2016, the Special Master's Ruling was filed of Record [Rec. Doc. 20533].

On Friday, November 11, 2016, the Special Master held a discovery teleconference to discuss the scheduling of depositions of Mr. Garrett, Mr. Herman, Ms. Duggan, Mr. Levin, and other procedural matters, including the advanced production of deposition exhibits and briefing on objections to CMO No. 1.[13]  Thereafter, the Special Master issued CMO No. 2 on Nov. 14, 2016, to address these procedural matters.  [A copy of CMO No. 2 is attached hereto as Exhibit "E"]. Therein, the Special Master required that Primary Counsel file their anticipated objection by November 18, 2016.  *Id.*, ¶10.  Consistent with their insistent demand for always more discovery, on November 18, 2016, Primary Counsel filed the instant Objection to Special Master's Ruling Concerning Objectors' Request to Modify Special Master CMO No.1 and Request for Expedited Consideration.

Pursuant to the direction provided by this Court at the November 19, 2016 Status Conference, this Response is timely submitted to address the unfounded arguments set forth

---

[13] Advanced production of intended deposition exhibits has been approved by numerous courts.  *See In re Celexa and Lexapro Prod. Liab. Litig.*, MDL No. 1736, 2012 WL 6201477, *1 (E.D. Mo. Dec. 12, 2012); *Charleswell v. Chase Manhattan Bank, N.A.*, 277 F.R.D. 277, 284 (D.V.I. 2011); *Stevens V. City of Red Bluff*, 2007 WL 184816, *3 (E.D. Cal. Jan. 19, 2007).

therein.  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* MDL 2047, Nov. 18, 2016 Status Conference Hearing Transcript at 3 (E.D. La. Nov. 18, 2016).

Through their Objection, Primary Counsel seek to obtain extensive discovery in direct opposition to this Court's directive to the Special Master to allow only "limited discovery."  The Special Master, pursuant to this Court's direction, permitted what limited discovery he deemed appropriate.  Nowhere within Primary Counsel's Objection is there any suggestion that the Special Master exceeded his discretion to limit discovery in this fashion.  Under these circumstances, Primary Counsel's Objection should be refused.

## III.   ARGUMENT

### A.  THE SPECIAL MASTER'S RULING IS SUBJECT TO REVIEW UNDER THE ABUSE OF DISCRETION STANDARD

In this Court's Order of August 30, 2016 at 2 (Rec. Doc. 20478), it determined that "all objections to findings of fact or conclusions of law made or recommended by the Special Master" will be decided "*de novo*."  Under Rule 53 of the Federal Rules of Civil Procedure, however, "the court may set aside a master's ruling on a procedural matter only for an abuse of discretion."  Fed. R. Civ. P. 53(f)(5).  Under well-established Fifth Circuit law, in the context of multidistrict litigation, a special master does not abuse his discretion "in making procedural decisions to streamline the process for awarding attorney's fees."  *See In re Vioxx Prod. Liab. Litig.*, 544 Fed. Appx. 255, 259-60 (5th Cir. 2013).  In this same vein, this Court and others have consistently held that a special master's decisions regarding the scope of discovery are procedural matters subject to the abuse of discretion standard. *See In re Vioxx Prod. Liab. Litig.*, MDL 1657, 2012 WL 1448208, *1 (E.D. La. Apr. 25, 2012), *aff'd*, 544 Fed. Appx. 255, 259-60 (5th Cir. 2013).[14]

---

[14] *See also In re Hardieplank Fiber Cement Siding Litig.*, No. 12-md-2359, 2014 WL 5654318, at *1 (D. Minn. Jan. 28, 2014) ("A decision [of a Rule 53 master] regarding the scope of discovery is a procedural matter, reviewed for abuse of discretion."); *Chevron Corp. v. Donzinger*, No. 11 Civ. 0691 LAK, 2013 WL 3270339, at *2 (S.D.N.Y. June

Here, Primary Counsel do not object to any factual findings or conclusions of law issued by the Special Master but instead only to his order with respect to the scope of discovery.  As such, the Special Master's CMO 1 rulings should be reviewed for abuse of discretion.

### B. PRIMARY COUNSEL'S REQUEST FOR EXPANDED DISCOVERY IS NOT RELATED TO ANY NEED TO PROTECT THEIR PROPERTY INTERESTS SINCE THE COURT HAS AUTHORITY TO OVERSEE THE REASONABLENESS OF CONTINGENCY FEE CONTRACTS AND MAKE APPROPRIATE ADJUSTMENTS

Primary Counsel's contention that their rights to the proceeds of their individual attorneys' fee retainer contracts are sacrosanct and constitutionally protected is misdirected.  Even the authority they rely upon, *Fontana v. Barham*, 707 F.2d 221, 226 (5th Cir. 1983), does not support their position.

While recognizing an inchoate property right inherent in that attorney's client retainer contract, the *Fontana* panel affirmed the dismissal of that action because there was no deprivation of the attorney's fee interest by city officials paying the client directly, where counsel still had the ability to recover his fee from his client.  *Id.*  So too here, the FC is not challenging Primary Counsel's inchoate right to recover a fee from their clients.  Instead, what is at issue is this Court's authority to allocate and distribute the available funds awarded by Order dated May 17, 2016, to both common benefit counsel and individually retained attorneys having contingency fee arrangements with Chinese Drywall Plaintiffs.  In deciding how to equitably allocate these fees, the Court unquestionably "possesses equitable authority to examine [all relevant] fee arrangements" and make appropriate adjustments where necessary.  *See In re Vioxx Prods. Liab.*

---

27, 2013) ("Under Fed.R.Civ.P. 53(f)(5), the standard of review by a district court of a special master's ruling on a procedural matter such as [the length and scope of deposition examination] is for abuse of discretion."); *Labrier v. State Farm Fire and Casualty Co.*, No. 15-cv-4093, 2016 WL 4218378, at *3 (W.D. Mo. Aug. 9, 2016) (Special Master's "discovery orders are reviewed by the Court for abuse of discretion").  *Accord Ward v. Santa Fe Independent School District*, 393 F.3d 599, 605 (5th Cir. 2004) (associating "discovery" with "other procedural rulings").

*Litig.*, 650 F. Supp. 2d 549, 553 (E.D. La. 2009).  In fact, "[t]he district courts' supervisory jurisdiction over contingent fee contracts for services rendered in cases before them is well-established."[15]  *Allen v. United States*, 606 F.2d 432, 435 (4th Cir. 1979), *citing Dunn v. H. K. Porter Co.*, 602 F.2d 1105, 1108 (3rd Cir. 1979); *Schlesinger v. Teitelbaum*, 475 F.2d 137, 141 (3rd Cir.), *cert. denied*, 414 U.S. 1111 (1973) ("in its supervisory power over the members of its bar, a court has jurisdiction of certain activities of such members, including the charges of contingent fees").

Because Primary Counsel's inchoate right to recover a fee from their clients is not at issue, their access to discovery regarding the what, why, and how common benefit work was performed is not pertinent to the allocation between common benefit counsel and individually retained counsel.  The Special Master properly employed his discretion to deny such satellite and misdirected discovery.

### C.    THE DENIAL OF EXPANDED DISCOVERY REGARDING PSC AND FC MEETING TRANSCRIPTS, AGENDAS AND MINUTES WAS NOT AN ABUSE OF DISCRETION, AS THE DELIBERATIVE PROCESS IS PRIVILEGED

Primary Counsel baldly contend that the meeting transcripts, agendas, and minutes of the PSC and FC are necessary for them to determine the why and how certain tasks were necessary to complete the common benefit efforts.  Primary Counsel further argue that they are without the ability to confirm the alleged "Herculean effort" of Common Benefit Counsel without these

---

[15] It is equally true that this Court has authority to review Primary Counsel's individual contingency contracts.  There is abundant authority directly supporting this position, whether in the context of a class action or MDL proceeding. *See In re Vioxx,* 650 F. Supp. 2d at 553-54, *citing* Fed. R. Civ. P. 23(g)(1)(C)(iii); Fed. R. Civ. P. 23(h); MCL § 22.927 (2004) & 555; *see also In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2008 WL 682174, at *17-*19 (D. Minn. Mar. 7, 2008) (relying on the quasi-class action nature of an MDL proceeding and the court's equitable authority to implement a reasonable cap on contingent fees); *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (exercising court's inherent power to "impos[e] ... fiduciary standards to ensure fair treatment to all parties and counsel regarding fees and expenses."); *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL No. 926, 1994 WL 114580, at *4 (N.D. Ala.1994).

documents.  This is a silly argument.  Apart from the FC's briefs and supporting affidavits accounting for all of these efforts, the Court's docket objectively substantiates all of this work. With the advent of ECF, the pleadings on the docket are readily available to Primary Counsel.  The Special Master did not abuse his discretion by denying access to these documents, especially to the extent they reflect the FC and PSC's deliberative processes which are privileged.

The minutes of meetings of the Court-appointed PSC and FC memorialize their internal deliberations and analyses conducted prior to reaching recommended fee award allocations in this litigation. Said minutes were intended to be confidential and constitute privileged attorney work product entitled to an order of protection. *See, e.g.*, *In re Adelphia Communications, Corp.*, 348 B.R. 99, 109-10 (S.D.N.Y. Bankr. 2006) (ruling that "care must be taken to protect [court-appointed fee committee's] legitimate rights to the protection of work product, attorney mental impressions, and the attorney-client privilege"). Courts have recognized that "much of the work of any fee committee may have most, if not all, of the trappings of work product," and "courts should be wary of efforts to use discovery from fee committees as a tactical measure, or to go 'tit for tat.'" *Id.* at 110. In analogous situations, courts likewise protect the "discussions, exchanges, and opinions found in the [ ] minutes [of medical peer review committees]" in order to "prohibit[] a party from engaging in a fishing expedition to ascertain what information was considered by the peer review committee...." *See The Medical Protective Co. v. Pang, M.D.*, 2007 WL 433577, *2 (D. Ariz. Feb. 6, 2007) (quotation omitted); *Dieffenbach v. United States*, 715 F. Supp. 2d 587, 592 (D. Del. 2010) (recognizing "qualified privilege for confidential evaluative materials produced by the NIH review process").[16]

---

[16] *See also Bredice v. Doctors Hosp., Inc.*, 50 F.R.D. 249 (D.D.C. 1970) (extending qualified privilege to minutes and reports of hospital review committee); *Mewborn v. Heckler*, 101 F.R.D. 691 (D.D.C. 1984) (denying discovery of peer review materials to plaintiff in FTCA case); *Laws v. Georgetown Univ. Hosp.*, 656 F. Supp. 824 (D.D.C. 1987)

Without protection from disclosure, members of a committee would not be free to express themselves candidly in their deliberations of court-appointed duties. The reasons for granting a qualified privilege to the processes and reasoning of a Labor Board, for example, in reaching its conclusions prior to an official publication, can be summarized as follows:

> The essence of the discussion of a common cause and the judgment ensuing upon that discussion must lie in freedom of expression. If those present during the discussion are aware that their sentiments, either tentative or final, may be revealed by their fellow participants, it is clear that caution or worse would remove all candor from their minds and tongues. The logic this position requires the preservation from questioning of each member of the general body.

*N.L.R.B. v. Botany Worsted Mills*, 106 F.2d 263, 267 (3rd Cir. 1939); *N.L.R.B. v. Sears Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotations omitted) (deliberative process privilege protects from disclosure "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formed."). Accordingly, courts have consistently and broadly protected the deliberations of governmental or quasi-governmental entities from disclosure by litigants. *See*, *e.g.*, *Batton v. Evers*, 598 F.3d 169 (5th Cir. 2010) (exempting from disclosure as part of the deliberative process I.R.S. agent's working papers that contain "revenue agents' development and analysis ... as well as their opinions and recommendations as to the direction of the examination and a possible criminal referral"); *Davis v. Braswell Motor Freight Lines, Inc.*, 363 F.2d 600, 603 (5th Cir. 1966) (quashing subpoena seeking "to examine the processes and reasoning of the [Labor] Board and the General Counsel's office in reaching their conclusions prior to their official publication.");

---

(finding letter written by attending obstetrician to chairman of department at defendant hospital privileged as part of peer review of the attending obstetrician's work); *Doe v. St. Joseph's Hosp. of Fort Wayne*, 113 F.R.D. 677 (N.D. Ind. 1987) (finding Indiana privilege statute applicable to federal civil rights claim brought by plaintiff doctor following peer review and loss of staff privileges); *Weekoty v. United States*, 30 F. Supp. 2d 1343 (D.N.M. 1998) (recognizing "self-critical analysis" privilege for materials related to hospital morbidity and mortality conferences).

*Hinckley v. United States*, 140 F.3d 277, 282-83 (D.C. Cir. 1998) (deliberative process privilege protects internal deliberations of hospital review board charged with recommendation as to conditional release of insanity acquittee); *Ford Motor Co. v. United States*, 94 Fed.Cl. 211 (Fed. Cl. 2010) (denying motion to compel production of documents "reflecting [pre-decisional] advisory opinions, recommendations, and deliberations" of I.R.S.); *ICM Registry, LLC v. Dep't of Commerce*, 538 F. Supp. 2d 130 (D.D.C. 2008) (protecting e-mail discussions regarding how to present agency decision to the public); *United States v. Furrow*, 100 F. Supp. 2d 1170, 1174 (C.D. Calif. 2000) (deliberative and pre-decisional death penalty evaluation form protected where it "is intended primarily to be used as a guideline and work sheet for the internal decision making process" of the death penalty committee); *Ginsberg v. DeHart*, 2011 WL 1100989, *13 (D. N.H. Mar. 11, 2011) (recognizing "there does not appear to be a federal constitutional or common law basis that would afford public access to investigative files and reports used by disciplinary bodies as part of their deliberative process, let alone dictate file retention and indexing obligations").

Primary Counsel never address the privilege associated with the transcripts they request. Their claim of entitlement to the documents was in error. The Special Master's discovery ruling that recognized the privilege and the fact that the information contained in these papers far exceeds the scope of limited discovery authorized by this Court was not an abuse of discretion.

### D.   THE DENIAL OF EXPANDED DISCOVERY REQUESTING *ALL* EMAILS, WRITTEN COMMUNICATIONS AND OTHER DOCUMENTS WAS NOT AN ABUSE OF DISCRETION

Without reference to any controlling authority, Primary Counsel cavalierly assert that under Due Process they "must be allowed access" to various documents simply because they perceive them to be "highly relevant."  Objection at 4 n.6 & 7, 9, 12.  But a fee dispute does not equate with "open season" on discovery: "The Due Process Clause does not require freewheeling

adversarial discovery as standard equipment in fee contests." *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 303 (1st Cir. 1995). This is especially the case where, as here, the district court knows "the case inside and out." *Id.* at 302. As quoted above, the Supreme Court in *Hensley, supra*, directs otherwise, and following this direction your Honor wisely "limited discovery." It was therefore not an abuse of discretion on the Special Master's part to preclude satellite litigation into the wide-ranging and admittedly limitless requests for *all* emails, documents, etc., that were demanded by Primary Counsel.

Primary Counsel base their demand on the fundamental misperception that because this Court implemented policies for its court-appointed Fee Committee to receive information pertinent to making a recommendation to the Court, "they must be allowed a viable means (comparable to [the same information as the FC])." Nothing supports Primary Counsel's demand.

This Court instituted policies and protocols at the outset of the litigation when the PSC was appointed, to ensure that common benefit efforts on their part would be carefully monitored by the Court consistent with Due Process. Pretrial Order No. 9 (Rec. Doc. 147) (and Pretrial Order No. 9A for related state court litigation) requires all attorneys interested in applying for common benefit fees to record their time contemporaneously and submit on a monthly basis their hours and expenses with substantiating receipts to the court-appointed CPA Phil Garrett.[17] This order sets forth in detail the parameters for common benefit consideration, excluding, generally, efforts to

---

[17] *See* Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371, 374 (2014) (recognizing that "[a]ll of this work [by the common benefit attorneys] consumes time and raises costs. While the members of the [Defendants' Steering Committee] are typically compensated by their client on a regular basis, the members of the PSC are not. Because the work that the PSC performs inures to the common benefit of all plaintiffs and their primary counsel (the counsel that they employed), MDL transferee courts usually establish a procedure for creating a common benefit fee to compensate the members of the PSC and the members of any subcommittees who have done common benefit work), *citing Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (recognizing that "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); MANUAL FOR COMPLEX LITIGATION (FOURTH), §§ 14.11, 14.12 (2004).

develop individual cases and requiring detailed explanations of common benefit services performed and a designation of appropriate task codes for each time entry.  *See generally*, Leonard A. Davis and Phillip A. Garrett, *Case Time and Cost Management for Plaintiffs in Multidistrict Litigation*, 74 LA. L. REV. 483 (2014) (describing practices).  The Court has reviewed with Mr. Garrett on a regular basis monthly summaries of all hours and expenses submitted pursuant to PTO 9, and the Court has access to these records.[18]  At this point, over 45 law firms, encompassing more than 500 separate timekeepers, have submitted time and expenses to Mr. Garrett during some or all of the 87 months that have transpired since the MDL was instituted.[19]

Not only is the Court familiar with the efforts of these common benefit counsel by way of their time and expense records, but your Honor is well aware of what has transpired in this matter, having overseen all aspects of the litigation for more than seven years, including: all monthly status conferences; several bellwether trials (*Germano*, *Hernandez*); the *North River* jury trial; numerous evidentiary hearings; many dozens of joint reports by Plaintiffs' and Defendants' Liaison Counsel; entry of 30 Pretrial Orders (many with numerous subparts); entry of hundreds of additional orders and minute entries; adjudication of hundreds of motions; approval hearings and administration for nine interrelated class settlements; and coordination with state court judges assigned to Chinese Drywall cases pending in Virginia and Florida, among other things.  The MDL 2047 docket alone contains in excess of 20,550 entries.

Under these circumstances, it is not necessary or appropriate for Objectors to see each and every time entry ever recorded in the case.  *See In re Whirlpool Corp. Front-Loading Washer*,

---

[18] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* MDL 2047, Nov. 18 2016 Status Conference Hearing Transcript at 4 (E.D. La. Nov. 18, 2016).

[19] Indeed, most of the law firms represented by Primary Counsel have submitted time and expenses to Mr. Garrett pursuant to PTO 9.

2016 WL 5338012, *18 (N.D. Ohio Sept. 23, 2016) (concluding "that objectors have no right to see Class Counsel's fee and expense records," especially where "any such review by objectors would not affect the Court's ultimate conclusion."); *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 281 (6th Cir. 2016) ("[The] key requirement for an award of attorney fees is that the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable *the court* to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation."); *Cassese v. Williams*, 503 Fed. App'x 55, 58 (2nd Cir. 2012) (finding no "error in the district court's failure to order disclosure of class counsel's contemporaneous time records, appended to the fee request and filed under seal," and holding that "[w]hile applications for attorney's fees [must] be supported by contemporaneous [billing] records, we are aware of no authority holding that class counsel must open its books to objectors for inspection by virtue of filing a fee motion. To the contrary, whether to grant objectors access to billing records is a matter within the district court's discretion.").[20]

Plainly, this case does not suffer from the infirmities delineated in *High Sulfur*. There, the district court conducted an *ex parte* hearing with the fee committee that "lasted only twenty minutes," and then the court sealed the transcript from the hearing. *High Sulfur*, 517 F.3d at 226. At that hearing, "[n]o sworn testimony was taken, no depositions were offered, and no affidavits were filed attesting to the accuracy or fairness of the proposed fee allocation." *Id*. at 229. As the

---

[20] Primary Counsel's reliance on *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 542 (9th Cir. June 9, 2016), is misplaced. In that case, the litigation had been finally settled, *i.e.*, there was no ongoing litigation, and the defendant who was responsible for payment of statutory attorneys' fees was challenging "the summary nature of the time records and declarations provided by class counsel." Notably, the district court's fee opinion was not based on the common fund doctrine, as is the case in the matter *sub judice*, and exclusively employed a lodestar analysis after an *in camera* examination of plaintiffs' counsel's billing records. *Id.* Under the circumstances applicable in that case, the court ruled that "normally" the opposing party responsible for payment of the fees in dispute, "has a right to see the timesheets on which a district court relied in issuing a fee award." *Id.* at 539. Since the circumstances applicable to the matter now under consideration are vastly distinct, *Yamada* is not apposite.

Fifth Circuit noted, "because the hearing was ex parte, other plaintiffs' attorneys, including [objectors], were not present to confirm or challenge the Fee Committee's statements about their contributions to the case." *Id*.  Incredibly, later that same day, the district court simply "rubber-stamped" the fee committee's proposal without any modifications.  *Id*.  Problematically, the "[district] court possessed no documents, other than the Fee Committee's proposed fee allocation, upon which it could base factual findings for awards of individual attorneys' fees." *Id*. at 230. Further, it was not until after objections to allocation were filed that the court conducted an *in camera* hearing, and then sealed not only the docket entry for the hearing, but also the transcript and an order permitting supplemental filings. *Id*. at 226.  Two weeks later, the district court sealed the order denying objectors' motion for reconsideration of the court's allocation ruling.  *Id*. According to the Appellate Court, "the [district] court made matters [even] worse when it sealed the exhibit listing the individual fees and the record entries pertaining to fees and placed a gag order on the plaintiffs' attorneys." *Id*. at 229.

In contrast, here, this Court has invited all interested parties to participate in the fee award and allocation process.  The Court's procedures and protocols provide for full transparency, *i.e.*, the "Court will consider any recommendations made by the FC [with regard to allocation] and post the same on its [public] website and invite comments or objections." PTO 28 at 15-16. Importantly, the Court's fee guidelines allow for flexibility, *i.e.*, the Court will "institute any additional procedures it deems necessary, including the appointment of a Special Master to further consider these matters." *Id*.[21]  Finally, it is well established that this Court, like the district court

---

[21] *See Mathews,* 424 U.S. at 334 ("'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to, time, place, and circumstance."), *quoting Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961); *Nineteen Appeals*, 982 F.2d at 611 ("Due process is malleable, calling 'for such procedural protections as the particular situation demands.'"), *quoting Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

judge in *Thirteen Appeals*, has "lived with the litigation from the start and ha[s] an encyclopedic knowledge of it," which will enable the Court to appropriately apply the *Johnson* factors without the need to resort to "a second major litigation" over attorneys' fees. *Thirteen Appeals*, 56 F.3d at 303; *Hensley*, 461 U.S. at 437. In light of these safeguards, the requirements of Due Process and *High Sulfur* are adequately satisfied, and the Special Master was within his authority to deny the wide-ranging discovery sought by Primary Counsel.

This is especially the case where the Special Master has instead granted Primary Counsel the opportunity to depose not only Mr. Garrett, but Mr. Herman, Mr. Levin and Ms. Duggan too. Primary Counsel's ability to ask these witnesses incisive questions based on the plethora of documents already of record is hardly constrained by the Special Master's Ruling denying their requests for every speck of paper that ever passed before the deponent. Thus, the need for every email to or from the PSC or FC about work assignments, allocation of fees, the pursuit of Taishan and other non-settling Defendants, common benefit expenses, the value of the benefit all of the common benefit work conferred on the class and Ms. Duggan's work papers, is ameliorated. This trade-off by the Special Master between incredibly overbroad and burdensome document production and depositions was procedurally proper and not an abuse of discretion.

### E.  PRIMARY COUNSEL'S DISCOVERY REQUESTS ARE OVERBROAD AND ABUSIVE

Primary Counsel's discovery requests should be seen for what they are – an abuse of process.[22]  Completely ignoring the orderly procedures in place, Primary Counsel have asked,

---

[22] Such untethered discovery would consume not only the valuable resources of the Court and the Special Master, the FC, and the PSC, but it would also adversely impact other Objectors not represented by Primary Counsel, as well as non-Objectors to the FC's Fee Allocation Motion. There is a limited pot of attorneys' fees available for allocation, which means all of the time and effort spent on discovery disputes related to fees must be considered in the calculus.

again, for virtually every email, every document, and every receipt, in native format, that has been exchanged between and among all members of the PSC and common benefit counsel in this case for the past 7+ years (which includes more than 500 individuals who have submitted common benefit hours to Phil Garrett pursuant to PTO 9). Primary Counsel are also seeking, in native format, all emails, written communications, and documents, as well as time records and expenses specifically related to the Taishan Defendants. The sheer breadth of these requests is overwhelming, not to mention the significant and burdensome costs, in terms of time and expense, that would be required to sift through what are likely tens of millions of emails, from hundreds of attorneys, paralegals, and support staff, in order to cull out and redact privileged, confidential, and/or irrelevant information.

Primary Counsel demand this additional broad and burdensome discovery because they contend it is highly relevant. However, at this point, they could not possibly know as they have yet to ask Mr. Garrett or any other witness a single question under oath. CMO 1 clearly provides that "[a]fter the Initial Document Production phase is complete, the parties may request the production of additional documents," however, "[a]dditional discovery (written discovery or depositions) will be permitted only upon order of the Special Master for good cause." *See* CMO 1 at 6 & 10 (emphasis added). The process of fee discovery has just begun, so it is entirely premature for anyone to be seeking additional discovery at this juncture. Moreover, Primary Counsel have admitted "that the allocation of common benefit fees is not yet ripe." *Id*. Under these circumstances, their discovery requests cannot be countenanced.

---

In their attempt to maximize their own recoveries, Primary Counsel's clients are diminishing the funds from which they seek redress.

In any event, the scope of discovery to be afforded Primary Counsel must take into account what is "proportional to the needs of the case, considering … whether the burden or expense of the proposed discovery outweighs its likely benefit." *See* FED. R. CIV. P. 26(b)(1). If Primary Counsel's wide-ranging discovery were permitted, cost-shifting measures would be appropriate. It is well known that intentionally overbroad e-discovery requests inevitably drive up the producing party's e-discovery bill. *See* Bruce L. Hay, "Civil Discovery: Its Effects and Optimal Scope," 23 J. LEGAL STUD. 481, 500 (1994). The result is that abusive discovery forces adversaries to settle or continue to pay steep discovery costs regardless of whether they are likely to win or lose on the merits of the actual case. *See* Karel Mazanec, "Capping E-Discovery Costs: A Hybrid Solution To E-Discovery Abuse," 56 WM. & MARY L. REV. 631, 632 (2014) (highlighting the problem with overbroad e-discovery requests: "[p]roducing parties have no choice but to settle or pay exorbitant discovery costs-regardless of whether they are likely to win or lose on the merits of the actual case."); John H. Beisner, "Discovering a Better Way: The Need for Effective Civil Litigation Reform," 60 DUKE L.J. 547, 550-51 (2010); Martin H. Redish & Colleen McNamara, "Back to the Future: Discovery Cost Allocation and Modern Procedural Theory," 79 GEO. WASH. L. REV. 773, 779 (2011) (noting the inequities occurring where a producing party's discovery costs are "determined not by the litigant himself but by the scope and content of the request filed by his opponent" and noting further that these "discovery costs benefit the requesting party and actually impose both a financial and a legal detriment on the producing party").

For these reasons, Courts employ "the limitations of Rule 26(b)(2) with increasing frequency and with an eye toward equity … [which] undeniably, includes cost-shifting in discovery." *United Parcel Service of America, Inc. v. The Net, Inc.*, 222 F.R.D. 69, 71 (E.D. N.Y. 2004); *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318, 322-24 (S.D.N.Y. 2003) (holding

that cost-shifting may be appropriate "when electronic data is relatively inaccessible, such as in backup tapes," and requiring consideration of seven factors: (1) the extent to which the request is specifically tailored to discover relevant information; (2) the availability of such information from other sources; (3) the total cost of production, compared to the amount in controversy; (4) the total cost of production, compared to the resources available to each party; (5) the relative ability of each party to control costs and its incentive to do so; (6) the importance of the issues at stake in the litigation; and (7) the relative benefits to the parties of obtaining the information.).

Taking all these matters into consideration, it can not be said that the Special Master abused his discretion by limiting discovery.[23]

### F. IT WAS NOT AN ABUSE OF DISCRETION TO SEGREGATE THE PSC'S EFFORTS TO PURSUE THE TAISHAN DEFENDANTS FROM ALL OTHER EFFORTS IN THE LITIGATION

Aside from the overbreadth of the discovery requested, Primary Counsel seek information and documents that specifically relate to all efforts spent pursuing claims against the Taishan (and other non-settling) Defendants, as opposed to efforts spent pursuing claims against the settling Defendants, *i.e.*, Knauf, Banner, InEx, L&W, hundreds of Participating Builders, Installers, Suppliers, and Insurers in the Global Settlement, and the Virginia Defendants and their Insurers. However, it is a fiction created by Primary Counsel that "Taishan work" somehow can be disaggregated from "Knauf work," and that a fee request including time related to pursuing non-settling defendants is "wholly inappropriate." Objection at 8.[24] This MDL was established as *In*

---

[23] Since Primary Counsel never raised in their Objection the argument that the Special Master abused his discretion, they should be estopped from raising the argument for the first time in their anticipated Reply.

[24] Primary Counsel base their argument on inapposite securities fraud and antitrust cases where the courts were allocating fees from joint and severally liable defendants, where some of defendants had disproven liability. *See Baughman v. Wilson Freight Forwarding Co.*, 583 F.2d 1208, 1214 (3d Cir. 1978); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302 (3d Cir. 2005).

*re Chinese-Manufactured Drywall Products Liability Litigation*.  It was not set up as a Taishan Drywall MDL or a Knauf Drywall MDL.  In fact, the Plaintiffs began their investigation into the defects of Chinese Drywall generally, without even knowing at the time who the manufacturers were.  The case was comprised of thousands of defendants, with a multitude of attorneys.  More than 5,800 Class Members (having Taishan, Knauf, or a combination of Chinese Drywall in their properties) participated in the interrelated settlements that produced the fund of attorneys' fees available for distribution to common benefit counsel and private attorneys.  It would not be feasible to go back in time and retroactively separate out the hours and expenses uniquely devoted to the pursuit of Taishan and other non-settling Defendants, thus making it impossible to determine, much less quantify, how much time or effort was spent on the pursuit of a particular Defendant or particular claims.

When PTO 9 was entered, the Court neither required nor suggested that counsel code their time and expenses according to the specific Defendant(s) being pursued.  Notwithstanding this, it would have been an untenable method of timekeeping since these claims and issues are interrelated.  For example, many Class Members' properties are "mixed" because they contain drywall made from gypsum originating from the Luneng mine in China, which was manufactured by Knauf (KPT), Taishan, and others.  The Knauf settlement addresses this by setting forth a formula to calculate the "KPT Percentage" in each Participating Class Member's property for purposes of determining the type of relief available and the amount of claim payments, in order to equitably compensate owners of properties where multiple Chinese Drywall products were installed.  Similarly, KPT property owners, Taishan property owners, and mixed property owners alike were entitled to collect settlement payments from the Banner and Global settlements, and both the Banner and Global Allocation Plans tracked the provisions regarding the KPT Percentage.

Therefore, all efforts on the part of common benefit counsel which reasonably led to the achievement of these settlements, benefiting not only pure Knauf property owners, but also mixed property owners, as well as pure Taishan property owners, are intertwined and interrelated, and constitute common benefit work.  It would not be reasonable or fair even to attempt to disentangle the work spent pursuing Taishan, especially when (i) the *Germano* bellwether trial (on behalf of seven families with Taishan Chinese Drywall in their homes) produced positive results for all Plaintiffs in MDL 2047, including the establishment of a proper standard for comprehensive remediation of any and all types of Chinese Drywall from Plaintiffs' properties and the cost of same per square foot, and, going forward, became the avatar for evaluating the cost of remediation of the Knauf properties, (ii) the *Germano* judgment directly led to positive results in the *Hernandez* bellwether trial (on behalf of Plaintiffs with Knauf Chinese Drywall in their homes), and (iii), the *Germano* and *Hernandez* judgments in combination ultimately led to and created the vehicle for the culmination of the KPT Pilot Program, the Knauf settlement, and the "low-hanging fruit" of the InEx settlement, the Banner settlement, the L&W settlement, and the Global settlement, which (except for L&W) lesser settlements included compensation for Taishan products.

Under these circumstances, courts do not require that the work performed by common benefit attorneys be parsed in the manner suggested by Primary Counsel.  In the *Diet Drugs* litigation, for example, the court dismissed an objector's contention "that the District Court abused its discretion in finalizing the [fee] award without requiring Class Counsel to specify how many hours and which expenses were related to each aspect of their common benefit work."  *In re Diet Drugs*, 582 F.3d 524, 539 n.32 (3d Cir. 2009).  In that case, the objector "[s]pecifically … contend[ed] that by permitting Class Counsel to commingle their records, the Court endorsed a fee allocation that violated the Settlement Agreement and the mandates of *Boeing Co. v. Van Gemert,*

444 U.S. 472 , 100 S.Ct. 745, 62 L.Ed.2d 676 (1980)." *Id.* Rejecting that argument, the court held that the objector's "reliance on *Boeing* is … misplaced. That case requires courts awarding attorneys' fees to ensure that 'the benefits of class recovery' are 'traced with some accuracy.'… However, the 'benefit' to which it refers – and which must be 'traced with some accuracy' – is the monetary relief that the plaintiffs recover, not the work that the attorneys do to secure it." *Id.* (internal citations omitted).   The court in *Diet Drugs* further held that "neither law nor logic required the District Court to consider the division of counsel's labor while determining the appropriate percentage of recovery through its analysis of the *Gunter/Prudential*[25] factors." *Id.* at 541 n.35.  *See also id.* at 536 (acknowledging that the "auditor's report did not separate the time spent on the Settlement Agreement from time spent on the MDL," but this did not adversely affect the appropriateness of the multiplier approved by the District Court since a percentage-of-the-fund approach and a rough lodestar cross-check was employed rather than the lodestar method).

It is not uncommon for attorneys' fees to be awarded for the amalgam of tasks performed on behalf of Plaintiffs.  *See In re Woerner*, 783 F.3d 266, 274 (5th Cir. 2015) (en banc) (reversing reduction of debtor attorney's fees under the Bankruptcy Code, which "explicitly contemplates compensation for attorneys whose services were reasonable when rendered but which ultimately may fail to produce an actual, material benefit. Litigation is a gamble, and a failed gamble can often produce a large net loss even if it was a good gamble when it was made.  The statute permits a court to compensate an attorney not only for activities that were 'necessary,' but also for good gambles – that is, services that were objectively reasonable at the time they were made – even when those gambles do not produce an identifiable, tangible, and material benefit. What matters

---

[25] The *Gunter/Prudential* factors governing awards of common benefit fees in the Third Circuit are the equivalent standards employed in the Fifth Circuit under *Johnson, supra.*

is that, prospectively, the choice to pursue a course of action was reasonable") (internal citations and quotations omitted); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008) (awarding common benefit fees based on hours accepted by the court-appointed CPA under procedures that did not require exclusion of hours spent on a non-settling defendant Interneuron … or other non-class recoveries); *see also* Declaration of Brian Fitzpatrick (Professor of Law at Vanderbilt University and author of *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010)), filed in support of Aggregate Common Benefit Fee Petition in the BP Oil Spill litigation, Case 2:10-md-02179-CJB-SS [Rec. Doc. 21024-5] (filed 7/15/16) at ¶ 16 (noting the impossibility "for class counsel to disaggregate the time they have spent on behalf of the [BP Economic and Medical] classes … from the time they have spent on behalf of the other plaintiffs in this MDL"); Declaration of Co-Liaison Counsel, filed in support of the Aggregate Common Benefit Fee Petition in the BP Oil Spill litigation [Rec. Doc. 21024-3] (filed 7/15/16) at ¶ 124 (noting that "[t]he Fee Committee did not attempt to assign or associate particular time entries or expenses with a particular settlement or result[, because] this did not seem practical or feasible, in light of the overlapping work, the overlapping benefits, and the overlapping memberships of the classes.").

IV.   **<u>CONCLUSION</u>**

For the reasons set forth above, Primary Counsel have failed to surmount their heavy burden

of establishing that the Special Master abused his discretion by limiting discovery in the fashion

he did, consistent with this Court's directive and applicable law.

Respectfully submitted,

Dated: November 28, 2016          <u>/s/ Russ M. Herman</u>
                                  Russ M. Herman (Bar No. 6819) (on the brief)
                                  Leonard A. Davis (Bar No. 14190) (on the brief)
                                  Stephen J. Herman, Esquire (Bar No. 23129)
                                  HERMAN, HERMAN & KATZ, L.L.C.
                                  820 O'Keefe Avenue
                                  New Orleans, Louisiana 70113
                                  Phone: (504) 581-4892
                                  Fax: (504) 561-6024
                                  LDavis@hhklawfirm.com
                                  *Plaintiffs' Liaison Counsel MDL 2047*
                                  *Co-Chair/Secretary Fee Committee*

                                  Arnold Levin (on the brief)
                                  Fred S. Longer (on the brief)
                                  Sandra L. Duggan (on the brief)
                                  Levin, Fishbein, Sedran & Berman
                                  510 Walnut Street, Suite 500
                                  Philadelphia, PA 19106
                                  Phone:  (215) 592-1500
                                  Fax:  (215) 592-4663
                                  Alevin@lfsblaw.com
                                  *Plaintiffs' Lead Counsel MDL 2047*
                                  *Chair Fee Committee*


                                  ***ON BEHALF OF THE FEE COMMITTEE***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 28th day of November, 2016.

Respectfully Submitted,

BY: */s/ Leonard A. Davis*
Leonard A. Davis
Herman, Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
ldavis@hhklawfirm.com

*Plaintiffs' Liaison Counsel MDL 2047*