**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  **CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047** |
| | **SECTION: L** |
| **THIS DOCUMENT RELATES TO:** | **JUDGE FALLON** |
| *ALL CASES* | **MAG. JUDGE WILKINSON** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PRIMARY COUNSEL'S REPLY IN SUPPORT OF OBJECTION TO SPECIAL
MASTER'S RULING CONCERNING OBJECTORS' REQUEST TO MODIFY SPECIAL
MASTER CMO NO. 1 AND REQUEST FOR EXPEDITED CONSIDERATION**

NOW COMES Primary Counsel[1] who object to *Special Master's Ruling Concerning Objectors' October 7, 2016 Request to Modify Special Master Case Management Order No. 1* [Doc. 20533], and file this reply brief as further support for Primary Counsel's Objection [Doc. 20552], and in response to *The Fee Committee's Response in Opposition to Primary Counsel's Objection to Special Master's Ruling Concerning Objectors' Request to Modify Special Master CMO No. 1 and Request for Expedited Consideration* [Doc. 20575-2] ("FC Resp. in Opp.").

**INTRODUCTION AND PROCEDURAL HISTORY**

On June 6, 2016, the PSC for the first time quantified the portion of limited funds that it demands for itself. The Fee Committee's ("FC") Allocation Motion[2] asks that common benefit work be compensated in full, plus a bonus for a job well done, plus all past expenses (some of which do not appear to qualify as proper shared or held costs), plus diversion of ten million dollars to pursue a different settlement; the effect of granting the PSC this relief means that only 40% of

---

[1]  Primary Counsel are those firms listed or otherwise designated in the signature block of this pleading.

[2]  *Fee Committee's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F)* [Doc. 20290]. This motion and memorandum in support are collectively referred to herein as the "Allocation Motion."

a limited fund is available to compensate Primary Counsel retained by the Plaintiffs. Thus for the first time, on June 6, Primary Counsel were informed that the PSC intends to leave contractually retained lawyers with only pennies on the dollar compensation – while the PSC receives a bonus and advance.

In response, objectors from coast to coast, twenty-three law firms that collectively represent over a third of the Plaintiffs, made the case for why the FC's proposal was unprecedented and unfair [*see* Docket Entries for 6/28/2016]. Several primary counsel objected that the FC's proposal improperly seeks compensation for the PSC's (to date) unsuccessful efforts to recover from the Taishan Defendants.[3] Indeed, the amounts paid by Knauf for fees and costs pursuant to the settlement agreements were presumably negotiated based on the estimated value of those settlements and were intended to compensate attorneys for properties that contain Knauf drywall. They were not intended to compensate attorneys for matters which had not yet settled and certainly, Primary Counsel would not have agreed to such a preposterous scheme.  Notwithstanding, the FC demands that the PSC be paid in full for work that did *not* contribute to the limited fund while, at the same time, primary counsel's work that *did contribute* to the limited fund go largely uncompensated.

---

[3] *See, e.g.,* Collins & Horsley, P.C.'s Br. in Supp. of Individual Counsel's Request to Allocate the Global Fee Award Between Common Benefit Counsel and Individual Counsel and Obj. to the FC's Mot. to Determine the Allocation of the Global Fee Award as Between Common Benefit Attorneys and Individual Counsel Fees Pursuant to PTO 28(F) [Doc. 20351] ("Collins & Horsley Obj."), pp. 22, 33, 39-42; Baron & Budd, P.C., Allison Grant, P.A. and Alters Law Firm, P.A.'s Obj. in Opp. to FC's Mot. to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) [Doc. 20353-3] ("Baron & Budd Obj."), pp. 27-28; *see generally* Parker Waichman LLP's Opp. to the FC's Mot. to Determine the Allocation of the Global Fee Award as between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F), Request for Discovery, Additional Briefing and a Contradictory Hearing [Doc. 20348-1] ("Parker Waichman Obj."), pp. 18-19.

Objectors also challenged: the FC's assertion of a grossly inflated $1.1 billion in common benefit contrasted to the $658 million reported by BrownGreer,[4] potentially duplicative billing,[5] the FC's about-face abandoning its prior recognition of the yeoman's work performed by Primary Counsel providing individual legal services,[6] and *inter alia* the proposed handling of expenses.[7]

On July 11, 2016, the FC filed its Omnibus Response complaining of the "audacity"[8] of "boorish"[9] objectors "besieg[ing]"[10] the PSC with "self-aggrandizement."[11] Amid the *ad hominem* attacks, the FC explained that **ten million dollars** of the limited fund allegedly is unavailable to compensate Primary Counsel because the Knauf Settlement required that the PSC spend this amount pursuing the non-settling Taishan Defendants and that Primary Counsel were "likely unaware" of this agreement with Knauf.[12] Primary Counsel are certainly unaware that a secret deal

---

[4] *See* Opp. of Pls. Represented by Milstein Adelman, LLP and Roberts and Durkee, LLP to the Mot. of the PSC FC for Allocation of the Global Fee Award between Common Benefit Fees and Individual Counsel Fees Pursuant to PTO 28(F) [Doc. 20337] ("Milstein Durkee Obj."), pp. 2-5; Collins & Horsley Obj. [Doc. 20351], pp. 25-29; Baron & Budd Obj. [Doc. 20353-3] at pp. 24-27.
[5] Parker Waichman Obj. [Doc. 20348-1], pp. 18-19.
[6] *See, e.g.,* Primary Counsel's Request to Allocate the Global Fee Award between Common Benefit Counsel and Primary Counsel and Obj. to the FC's Mot. to Determine the Allocation of the Global Fee Award as between Common Benefit Attorneys and Individual Counsel Fees Pursuant to PTO 28(F) [Doc. 20336] (Hoaglund Sexton), pp. 4-21; Collins & Horsley Obj. [Doc. 20351], pp. 5-21; Morgan & Morgan's Opp. to FC's Allocation Mot. and Mem. [Doc. 20354], pp. 4-7; Parker Waichman Obj. [Doc. 20348-1], pp. 14-18; Milstein Durkee Obj. [Doc. 20337], pp. 10-13; *see also* Opp. of Whitfield Bryson & Mason LLP, Pendley Baudin & Coffin, Rhine Law Firm, and Luckey & Mullins to FC's Mot. to Determine the Allocation of the Global Fee Award as between Common Benefit Fees and Individual Counsel Fees Pursuant to PTO 28(F) [Doc. 20346] ("Whitfield Bryson Obj."), pp. 4-6.
[7] *See, e.g.,* Whitfield Bryson Obj. [Doc. 20346], p. 21; Baron & Budd Obj. [20353-3], pp. 36-37.
[8] Fee Committee's Omnibus Response to Objections to the Fee Committee's Motion to Determine the Allocation of the Global Fee Award as between Common Benefit Fes and Individual Counsel's Fees Pursuant to PTO 28(F) [Doc. 20384-2], p. 12.
[9] *Id.* at p. 13.
[10] *Id.* at p. 1.
[11] *Id.* at p. 13.
[12] *Id.* at 10 & n.7; *see also id.* at 18 n.22 ("As part of the PSC's global settlement with the Knauf Defendants, the PSC agreed to continue the labor intensive task of pursuing the Taishan Defendants ….").

between the PSC and the Knauf Defendants had somehow committed ten million dollars to this end. Primary Counsel have found no evidence of a commitment allegedly removing ten million dollars from the limited fund. This and the several other serious questions prompted by the FC's unprecedented Allocation Motion are the subject of Primary Counsel's discovery attempts.

This Court appointed a Special Master to oversee and make recommendations regarding "all pending attorneys' fee issues.…" [Doc. 20478, at 1]. Primary Counsel maintain their rights to examine the documentation of the common benefit work that the FC asserts as the justification for depriving Primary Counsel of fair compensation for their fees and expenses incurred in representing Plaintiffs. Primary Counsel filed objections to a discovery plan requiring that they proceed with depositions without the underlying documents [Doc. 20552]. Specifically, the Special Master denied Primary Counsel access to common benefit time submissions, transcripts and minutes of PSC/FC meetings, documentation of the PSC's authorization/denial of common benefit work, documents related to the FC's proposed fee allocation, documents memorializing the alleged backroom deal linking the Knauf Settlement with pursuit of the Taishan Defendants, documentation of the apples-to-oranges fuzzy math ($1.1 billion versus $658 million), and the documentary basis for future deponent Sandra Duggan's analysis of common benefit work. Primary Counsel are expected to depose witnesses without access to these documents. The FC, however, has noticed its intention to question Philip Garrett regarding the same documents that Primary Counsel are not allowed to see.[13]

---

[13]  Exhibit 1, FC's Resp. and Obj. to Primary Counsel's Notice to Areas of Inquiry for the Dep. of Philip Garrett, at Topics for Phil Garrett Deposition (last two pages), ¶¶ 2(a), 2(b), 2(e), 2(f), 2(g), 3(a), 5(a), 7(a), 9(e).

The FC's Response in Opposition [Doc. 20575-2] fails to justify why the best evidence of the common benefit work claimed in the Allocation Motion should be barred from Primary Counsel.

## ARGUMENT

Through their objections and the supporting paperwork, Primary Counsel have demonstrated that the FC's proposed allocation would divest Primary Counsel of substantial compensation to which they would be entitled pursuant to the contracts signed by Plaintiffs in this litigation. The Allocation Motion presents several mysteries, including *inter alia* a **$442 million** discrepancy in the benefit calculation and secretive excuses as to why a limited fund should be diverted to pay expenses solely related to **non**-settling Defendants.

Primary Counsel merely seek to examine the underlying documentation of the work for which the Allocation Motion seeks compensation. To distract from the reasonableness of this request, the FC advances irrelevant arguments based on inapposite case law:

- Primary Counsel agree with the objectively reasonable test advanced by the FC (*see* FC's Resp. in Opp., 30 [Doc. 20575-2]). Under that test, the FC cannot spend a limited fund on work and expenses for past and present pursuit of non-settling Defendants, but this is exactly what the Allocation Motion intends (*see* §I *infra*).

- As explained *infra* at §II, the FC wrongly asserts privilege based on plainly inapplicable jurisprudence. Not one of the cases cited in the FC's Response lends remote support to the FC's attempt to block the disclosure of information to the very individuals whom the PSC owed a fiduciary duty and by whom the PSC now seeks to be paid.[14]

- No class was certified, and no class counsel were appointed, under the settlement agreements. Indeed, no certification motions were even filed prior to settlement. Therefore, the FC is incorrect in its assertion that a class settlement is responsible for generating the limited fund (*see* §III *infra*).

---

[14] Irrespective of the invalidity of the claims of privilege, the objection should be overruled because the Court has processes in place to protect the disclosure of privileged information. *See* Rec. Doc. 289, Pretrial Order #15.  The FC should not be allowed to assert a claim a privilege without substantiating those claims as contemplated by PTO 15.

● The FC's persistent suggestion that Primary Counsel waived their objections is baseless and disingenuous (*see* §IV *infra*).

● The standard of review is de novo (*see* §V *infra*).

I. **Primary Counsel Have a Right to Review the Contemporaneously Recorded Documentation of the Common Benefit Work in Order to Assess Work That Was in Furtherance of the Common Benefit and the Degree to Which That Work Was Not Objectively Reasonable in Building a Case Against the Settling Defendants.**

A. **The limited fund cannot be diverted to compensate for fees and expenses pursuing non-settling Defendants.**

The FC opines that it is "silly"[15] for Primary Counsel to seek discovery of the contemporaneous records documenting the common benefit work that is the subject of the Allocation Motion. However, under the legal standard proffered by the FC, the Allocation Motion cannot be granted absent a showing that the legal services "were objectively reasonable." FC Resp. in Opp., 17 [Doc. 20575-2] (parenthetically quoting *In re Woerner,* 783 F.3d 266, 274 (5th Cir. 2015) (en banc)). The PSC's meeting minutes and transcripts ordered by the Court for the good of Primary Counsel's clients, and time submissions revealing whether the work was performed in good faith for the common benefit and to build a case against non-settling Defendants, are directly relevant to whether the Allocation Motion can meet the test of objective reasonability.[16]

Primary Counsel need these documents to fully respond to the Allocation Motion. For one reason, the FC **admits** that it is demanding compensation for work pursuing the **non-**settling Taishan Defendants.[17] Building a case against Defendant A is not objectively reasonable work undertaken to motivate unrelated Defendant B to settle. In fact, the FC's own argument undermines

---

[15]  FC Resp. in Opp., 17 [Doc. 20575-2].

[16]  Notably, Primary Counsel have identified significant expense submissions that were not for the common benefit and, in some cases, were entirely personal and improper.   For this additional reason, it is imperative to review time submissions.

[17]  *See* FC Resp. in Opp., 28 [Doc. 20575-2] (arguing that separating Taishan and other non-settling Defendants time would not be feasible -- hence admitting this was not done).

its attempt to misapply the Knauf Settlement fund to compensate for Taishan work and expenses. Specifically, the FC explains that some of Plaintiffs' homes had both Knauf and Taishan drywall.[18] That is an excellent point, and Primary Counsel embrace this fact as wholly relevant here. Those Plaintiffs' recoveries from the Knauf Settlement were **proportionately reduced** to the degree Taishan versus Knauf drywall was found in their homes.[19] This is precisely how the common benefit compensation should be handled. To the degree that the common benefit work pursued claims against non-settling Defendants, just as the Plaintiffs received proportionally reduced recovery, the common benefit work must be proportionately reduced. Because these Plaintiffs must await recovery from Taishan, the PSC likewise must seek recovery for pursuing Taishan out of a future settlement with Taishan.

No authority supports the FC's insistence that it can be paid for pursuing non-settling Defendants while everyone else, including the Plaintiffs, have to wait. For example, *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) (cited at FC Rep. in Opp., 20 n.17, 29-30), approved of an attorney fee award "requiring every member of the class to share attorney's fees **to the same extent** that he can share the recovery." *Id*. at 480 (emph. supp.). Here, the Plaintiffs were not allowed to share in the recovery from the Knauf Settlement to the extent that they had Taishan drywall, but

---

[18]  *Id.* ("many Class Members' properties are 'mixed'").

[19]  Under the Knauf Settlement an "Inspection Protocol" was implemented wherein the property was inspected to determine the percentage of Knauf (KPT) drywall. *See* Doc. 16407-3, Exhibit C. The property was then assigned a "KPT Drywall Percentage" which would determine the percentage of settlement benefits the claimant would receive under the Knauf Settlement. Knauf Settlement § 1.27 [Doc. 16407-3].  If a property had a 50% KPT Drywall Percentage, the claimant would receive only 50% of the available benefits of a similarly situated property owner with a 100% KPT Drywall Percentage property.

The Builder, Installer, Supplier & Insurer ("Global"), Banner, and InEx Settlements worked with the Knauf Settlement to allow partial compensation to claimants with mixed property for the Non-KPT portion of the drywall and also compensated claimants with 100 % Taishan or Non-KPT drywall.  Docs. 16528-1, ¶ 7; 16527-1, ¶ 8; 16609-2, ¶ 9.

entirely inconsistently, the FC is demanding enhanced compensation and an advance for work pursuing a case against Taishan, primarily from funds reserved for attorneys' fees related to the Knauf Settlement. This is legal error, and Primary Counsel should be granted discovery to make a record on the degree to which this error undermines the FC's Allocation Motion.

In another case cited by the FC (at 1, 20), the Supreme Court explained that in awarding attorney fees "the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).[20] Contrary to the FC's assertion that it was under no duty to separate time pursuing a case against the Knauf Defendants and other settling Defendants from time pursuing a case against the non-settling Defendants, *Hensley* states that counsel applying to the court for a fee award "should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims" and that "at least counsel should identify the general subject matter of his time expenditures." *Id.* at 437 & n.12. As support for this rule, *Hensley* parenthetically quoted a First Circuit decision, for the proposition that, "we would not view with sympathy any claim that a district court abused its discretion in awarding unreasonably low attorney's fees in a suit in which plaintiffs were only partially successful if counsel's records do not provide a proper basis for determining how much time was spent **on particular claims**." 461 U.S. at 437 n.12 (cit. om.; emph. supp.). Thus, the time records supporting the Allocation Motion must provide a basis for determining how much time was spent on claims against the Knauf Defendants and other settling Defendants. *See also Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 325 (5th Cir. 1995) ("LP & L's challenged records do not provide this court with sufficient information to determine

---

[20]  *Abrogated on §1988 grounds by Tex. State Teachers Assoc. v. Garland Indep. Sch. Dist*., 489 U.S. 782 (1983), and *superseded in part by statute*, 42 U.S.C. § 1997e(d)(1).

whether all of the amounts requested were reasonably expended **on this** litigation.") (cit. & note om.; emph. supp.); *In re Vioxx Prod. Liab. Litig.,* 544 F. App'x 255, 259 (5th Cir. 2013) ("The district court did not err in awarding attorney's fees to Tejedor **because** Tejedor's work on behalf of Weeks **culminated in his settlement award.**") (emph. supp.) (case cited at FC Resp. in Opp., 14).

In addition to *Woerner*, the only other authority the FC purports to cite in support of the proposition that it is entitled to compensation for work pursuing non-settling Defendants is a district court opinion in the *Fen-Phen* case and Declarations filed in **a different** case. *See* FC Resp. in Opp., 31 [Doc. 20575-2]. Contrary to the FC's description of *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008), the court did not state that it was awarding common benefit fees based on hours spent on non-settling defendant Interneuron or other non-class recoveries. *Contrast* FC Resp. in Opp., 31 (parenthetical).

In short, ***no legal authority*** supports the FC's presumption that where the Plaintiffs' damages are proportionately reduced to the degree a non-settling Defendant is responsible, one select group of lawyers will be paid in full for pursuing non-settling Defendants. This is an entirely untenable supposition upon which the Allocation Motion admittedly depends.

**B. Work pursuing non-Settling Defendants can be identified.**

Because the FC refuses to separate the Taishan time and expenses, it is necessary that Primary Counsel be granted access to documents to perform this task ourselves. The FC claims that "[i]t would not be feasible" to do so. FC Resp. in Opp., 28 [Doc. 20575-2]. The feasibility of this task is obvious on the face of the PSC's Motion for a Consolidated Fee Award filed in 2014 [Doc. 17687-3]. There, the FC described the tasks it undertook for the common benefit and identified the specific Defendant(s) to which each task related. The 2014 motion consistently

identified what work related to the Knauf Defendants and what work related to the Taishan Defendants.[21] Given access to the same records used by the FC, Primary Counsel will be able to identify which portion of the common benefit work is ineligible for recovery out of the existing limited funds.

## II. The FC Cannot Make Its Case to Pay Itself in Full, with a Bonus and Expense Advance, at the Expense of Primary Counsel, by Hiding the Underlying Documentation from Primary Counsel.

The FC invokes the Court's "familiar[ity]" with the PSC's common benefit work.[22] Specifically, the FC argues that the Court and Mr. Garrett have access to the records documenting attorney time and expenses.[23] The fact that the Court and Mr. Garrett may review these records only underscores that Primary Counsel should be afforded the same opportunity. Under the Special Master's CMO No. 1, Primary Counsel may only review summaries of the common benefit time. Pursuant to Federal Rule of Evidence 1006, however, the FC cannot rely on summaries unless Primary Counsel are allowed to review the original records that are being summarized.[24] Barring

---

[21] For example, the FC named six deponents that were deposed on behalf of the Knauf defendants, which allegedly directly led to the Knauf Settlement. PSC Mot., p. 45 [Doc. 17687-3, Page 56 of 128]. The motion discusses the 30(b)(6) depositions of a specific Taishan Defendant and details the efforts to compel discovery from Taishan. *Id.* Among other work pursuing Taishan, the FC states that a senior partner in a PSC firm worked full-time for more than 5 months opposing Taishan's appeals. *Id.* at 51 [Doc. 17687-3, Page 62 of 128].

[22] FC Resp. in Opp., 21 [Doc. 20575-2].

[23] *See id.*

[24] Federal Rule of Evidence 1006 provides that:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. **The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place.** And the court may order the proponent to produce them in court.

FED. R. EVID. 1006 (emph. supp.).

Primary Counsel's access to these records is a clear violation of the Federal Rules of Evidence that cannot be justified by the FC's erroneous privilege claims.

### A. The privileges claimed by the FC are inapplicable because the FC was working on behalf of Primary Counsel when the documents were created.

The FC does not and cannot claim that the attorney client privilege provides a basis for withholding documents from Primary Counsel.[25] The FC uses the phrase "work product," but omits any explanation as to how that doctrine could possibly apply. The work product doctrine only prevents, in the absence of a showing of substantial need, "a party" from "discover[ing] documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." FED. R. CIV. P. 26(b)(3). The work product privilege "safeguard[es] the fruits of an attorney's trial preparations from the discovery attempts **of an opponent.**" *Shields v. Sturm, Ruger & Co.,* 864 F.2d 379, 382 (5th Cir. 1989) (cit. om.; emph. supp.). At the time that the documents at issue were generated, the PSC was working for the benefit of all plaintiff attorneys in the MDL proceeding. The work product doctrine cannot be used to shield disclosure of documents from the very individuals on whose behalf the work was performed.

None of the cases cited by the FC lend any remote credence to its claimed entitlement to hide time submissions and meeting transcripts from Primary Counsel. The FC collects cases recognizing privileges held by medical peer review committees, a hospital, the National Labor

---

[25] The attorney-client privilege only inures to the benefit and protection of the client. *See Garner v. Wolfinbarger*, 430 F.2d 1093, 1096 n.7 (5th Cir. 1970) (an objection on the grounds of attorney-client privilege is the client's to invoke); *see also, e.g.,* LA. CODE EVID. art. 506(B) (general rule of privilege is that the "client has a privilege"), 506(D) (a lawyer is presumed to have authority to claim privilege "on behalf of the client"). The PSC is not the client and has no standing to assert the attorney-client privilege in service of its own interests antagonistic to counsel actually hired by the clients.

Review Board, and death penalty evaluations. FC's Resp. in Opp., 17-19 [Doc. 20575-2].[26]  None of these cases lend even remote support for the FC's presumption that it can receive full compensation, with a bonus and advance, while hiding the documentation of the common benefit work from the retained lawyers in order to better strip them of their contract rights.  These cases do not apply for multiple, independent reasons:

- The cases addressed the deliberative process privilege, which only protects the decision-making process of agencies empowered to issue orders and rulings (*see* §II.A.1 *infra*);

- The cases addressed privileges exclusive to hospitals and medical peer review committees (*see* §II.A.2 *infra*);

- The cases were decided under a Freedom of Information Act statutory exemption (*see* §II.A.3 *infra*); and/or

- Most of the decisions addressed disclosure to the **public**, which Primary Counsel does not request.[27]

---

[26]  The one exception is the FC's citation to *In re Adelphia Commc'ns Corp.*, 348 B.R. 99 (Bankr. S.D. N.Y. 2006). Contrary to the FC's suggestion, the *Adelphia* court did **not** find that the work product privilege applied. *Contrast* FC's Resp. in Opp., 17 [Doc. 20575-2] *with* 348 B.R. at 110. Rather, the court explained that the committee "did not contend that such matters appropriately could or should be decided on this motion. They are not yet ripe" because the court did "not yet have sufficient factual development" to decide whether exceptions to discovery applied. 348 B.R. at 110. The court also cited no authority in support of the language quoted by the FC.

Moreover, the *Adelphia* court's musing that maybe the work product doctrine might apply is irrelevant here because the *Adelphia* committee's authorization, on the matter of the investigation at issue, was at the onset adversarial vis-à-vis the party attempting discovery. That committee was appointed to help keep professional fees under control in the bankruptcy. *Id*. at 101. The *Adelphia* committee was authorized by the bankruptcy court to investigate the circumstances surrounding the debtor's former special counsel's use of vendors in which family members had an interest; the former special counsel had a fee application before the bankruptcy court, and were trying to seek discovery from the committee. *Id*. Thus, the *Adelphia* bankruptcy Judge's discussion of potential work product protection has no relevance here.

[27]  Because Primary Counsel do not request that the documents it seeks be made public or accessible to defense counsel, many of the cases cited by the FC are inapplicable. Independently, however, there is a strong argument for the public right of access. *See, e.g., Jaufre ex rel. Jaufre v. Taylor*, 351 F. Supp. 2d 514, 516 (E.D. La. 2005) ("the party seeking to overcome the presumption of [public] access bears the burden of showing that the interest in secrecy outweighs the presumption. . . . [A]ny doubt must be construed in favor of disclosure.") (cit. om.).

1.      The deliberative process privilege does not apply.

The FC misplaces heavy reliance on "[t]he deliberative process privilege," which is "a subcategory of the executive privilege" protecting "intra-governmental pre-decisional documents 'reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions are formulated.'" *Ford Motor Co. v. United States*, 94 Fed. Cl. 211, 217 (2010) (quoting *NLRB v. Sears, Roebuck & Co*., 421 U.S. 132, 150 (1975)) (cases cited at FC Resp. in Opp., 18, 19 [Doc. 20575-2]).  There is no support for the proposition that an MDL steering committee enjoys a deliberative process privilege from disclosure to the very firms it was appointed to represent.

In the 1930's decision quoted by the FC (at Resp. in Opp., 18), the court discussed an eighteenth century incident in the British House of Lords in which a bill releasing members of a court martial from their oath of secrecy was defeated on the grounds "that criminal justice could not be administered satisfactorily by any tribunal in the world if there were to be a public disclosure of the reasonings and observations of those who are to pronounce the verdict." *N.L.R.B. v. Botany Worsted Mills*, 106 F.2d 263, 264 (3d Cir. 1939) (cit. om.). The *Botany Worsted* court refused to order "somewhat similar public disclosures from members of the National Labor Relations Board, who have consulted together to pronounce a judgment adverse to the petitioner." *Id.* The court held, apropos to nothing here, that the policy protecting the secrecy of jury deliberations extended to the Labor Board, which the court characterized as "an administrative board." *Id*. at 265. The *Botany Worsted* court reasoned that, "[t]he function of deciding controversies might soon be overwhelmed by the duty of answering questions about them." *Id*. at 267. Thus the secrecy allowed in *Botany Worsted* was directly related to the power of the Board to promulgate an order as the decision-maker, and the FC has quoted the decision out of context. *Contrast also Davis v. Braswell*

*Motor Freight Lines, Inc.*, 363 F.2d 600, 604 (5th Cir. 1966) (discussing "the decisionmaking process of an administrative agency").

Thus, the privilege applicable to government agencies' decision-making has no bearing upon the FC's attempt to use the documentation of its common benefit work as a sword against the same attorneys who are supposed to benefit from the common benefit work, while simultaneously hiding behind the shield of purported privilege.

2. <u>Hospital and medical peer review privileges do not apply.</u>

Also extraordinarily far afield from the discovery issue here, the FC attempts to analogize itself to the St. Elizabeths Hospital in Washington, D.C., when it denied John W. Hinckley, Jr., a conditional release under D.C.Code Ann. § 24–301(k). *See Hinckley v. United States*, 140 F.3d 277 (D.C. Cir. 1998) (case cited at FC Resp. in Opp., 19). Rather than announcing a free-wheeling privilege that applies far beyond the facts of the case, the Circuit opinion "stress[ed] the extraordinary nature of Hinckley's discovery request and the consequently limited scope of our holding." 140 F.3d at 282. The court was concerned with public access to government decision-makers' internal deliberations regarding releasing "an exceptionally dangerous class" of individuals into the public. *Id.* at 285 (cit. & quot. om.). As defined, the privilege would only protect the part of agency give-and-take by which a decision is made, and the agency "must establish what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Id.* at 284 (cit. & quot. om.).[28] The FC cannot possibly make an

---

[28] The Court explained the narrow confines of the privilege it applied:

> The only part of the Hospital's entire process that the district court protected under the deliberative process privilege was the discussion that took place between members of the Hospital Review Board as they reviewed the evidence amongst themselves and came to their final decision. We break no new ground with regard to the scope of the deliberative process privilege in rejecting Hinckley's discovery

14

analogous showing because the PSC was not empowered to make any agency or quasi-agency ruling.

The FC also misplaces reliance on a line of cases protecting hospital and other medical peer review committees from disclosure of certain self-critical analysis documents. *See* FC Resp. in Opp., 17-18 & n.16 [Doc. 20575-2]). Irrelevant here, *Bredice v. Doctors Hosp., Inc.*, 50 F.R.D. 249, 251 (D. D.C 1970), *aff'd*, 479 F.2d 920 (D.C. Cir. 1973), found, citing public policy and the life and death decisions entrusted to doctors, that reviews by doctors acting pursuant to the Joint Commissions on Accreditation of Hospitals are not discoverable without a showing of exceptional necessity. Not only is this finding entirely inapposite, but *Bredice* has since been called into question in numerous published opinions.[29]

3.    Exemptions to F.O.I.A. do not apply.

The FC also misplaces reliance on *Batton v. Evers*, 598 F.3d 169, 183 (5th Cir. 2010), as alleged support for the contention that "deliberations" are "broadly protected" and that an I.R.S. agent's "working papers" were exempt from disclosure.[30] Far from espousing broad protection,

---

request and affirming the district court's holding that the predecisional deliberations of the Hospital Review Board are protected under the deliberative process privilege.

140 F.3d at 282-283.

[29] *See Nilavar v. Mercy Health Sys.-W. Ohio*, 210 F.R.D. 597, 603 (S.D. Ohio 2002) ("*Bredice* was decided prior to the adoption of Rule 501 (which was promulgated in 1975)"); *Spencer Sav. Bank, SLA v. Excell Mortg. Corp.*, 960 F. Supp. 835, 839 (D. N.J. 1997) ("*Bredice* should not be relied on as a basis for recognition of a new federal common law privilege."); *Reichhold Chemicals, Inc. v. Textron, Inc.*, 157 F.R.D. 522, 525 (N.D. Fla. 1994) ("It is important to note that the self-critical analysis privilege has not been universally acknowledged."); *Williams v. Vulcan-Hart Corp.*, 136 F.R.D. 457, 459 (W.D. Ky. 1991) (a number of courts refuse to acknowledge the privilege); *Wei v. Bodner*, 127 F.R.D. 91, 100 (D. N.J. 1989) ("*Bredice* is further undercut by subsequent decisions of the Supreme Court."); *cf. also Lawson v. Fisher-Price, Inc.*, 191 F.R.D. 381, 384 (D. Vt. 1999) ("While there appears to be a limited recognition in the federal courts of the self-critical analysis, it is rarely found to apply, and is circumscribed in several ways.").
[30] *See* FC Resp. in Opp., 18 [Doc. 20575-2].

*Batton* interpreted Exemptions to the disclosure requirements of the Freedom of Information Act. *See* 598 F.3d at 183 (quoting 5 U.S.C. § 552(b)(5)); *contrast also ICM Registry, LLC v. U.S. Dep't of Commerce,* 538 F. Supp. 2d 130 (D. D.C. 2008) (applying 5 U.S.C. § 552(b)(5)). This provision applies only to "inter-agency or intra-agency memorandums or letters" and does not in any event protect "[f]actual material that does not reveal the deliberative process." *See* 598 F.3d at 183 (cit. & quot. om.). Here, the PSC was not "deliberating" any government decision, but allegedly working for the benefit of Primary Counsel's clients.

### B. The FC misplaces reliance on decisions addressing settlement objectors, not the allocation of a limited fund among plaintiffs' counsel.

In arguing that Primary Counsel should be prevented from reading the same sealed time entries upon which the Court will rely in awarding common benefit fees, the FC cites cases that do not address the relevant context of how to allocate a limited fund as between Primary Counsel and counsel lacking contract rights. In *In re: Whirlpool Corp. Front–loading Washer Prod. Liab. Litig*., No. 1:08-WP-65000, 2016 WL 5338012 (N.D. Ohio Sept. 23, 2016) (cited at FC's Resp. in Opp., 21-22 [Doc. 20575-2]), the court found that under the circumstances of the case, objectors could not review time records. That court acknowledged that time logs *could* be reviewed by defense counsel where a fee is hotly contested. 2016 WL 5338012 at *18.

Moreover, in *Cassese v. Williams*, 503 F. App'x 55, 58 (2d Cir. 2012) (cited at FC's Resp. in Opp., 22), "[n]o objector specifie[d] how access to class counsel's billing records would have affected her objections to the fee request." Here, assuming for the sake of argument that Primary Counsel could be equated with objectors, Primary Counsel has advanced sound reasons for why access to the billing records will allow Primary Counsel to defend their contract rights relative to the PSC's claimed right to take most of a limited fund. This is not a fishing expedition. The FC ***admits*** that it seeks compensation for work conducted for the purpose of making a case against

16

**_non-Settling Defendants_**. *Contrast also Gascho v. Glob. Fitness Holdings*, LLC, 822 F.3d 269, 281 (6th Cir. 2016) (cited at FC's Resp. in Opp., 22) (the court did not make a ruling on the discoverability of time sheets or logs, nor did the court address the circumstance in which common benefit counsel are attempting to collect fees at the expense of primary counsel).

### C.  The unprecedented Allocation Motion has created the need for discovery.

The FC complains that the discovery will be costly.[31] The need for discovery is the direct, foreseeable result of the Allocation Motion. The FC's Allocation Motion is unprecedented in its demand that most of a limited fund be paid to counsel not hired by the Plaintiffs at the expense of eviscerating the contract rights of retained Primary Counsel. Absolutely no legal authority supports this level of disregard of client contracts.[32] The FC's Omnibus Response relies upon insults in the place of legal authority or record evidence.[33] Discovery is necessitated by the FC's motion and pleadings.

---

[31]  FC's Resp. in Opp., 25-26 [Doc. 20575-2]. Even were these costs not the result of the FC's unprecedented Allocation Motion, the authorities cited by the FC are inapposite because they address the cost of collecting electronic data from large businesses. Here, it is a small administrative task to make the sealed records available to Primary Counsel, and collecting counsel's emails is not as onerous as searching through a large corporation's database.

[32]  The FC discusses the court's authority to adjust contingency fee contracts. FC Rep. in Opp., 15. The FC cites cases that did not come close to approving the usurpation of Primary Counsel's contract rights demanded in the Allocation Motion. In the Vioxx litigation, the Court allowed the common benefit fund lawyers to be compensated at 6.5%. *In re Vioxx Prod. Liab. Litig.,* 760 F. Supp. 2d 640 (E.D. La. 2010).

   As this Court explained, in the court in the *Zyprexa* litigation conducted a thorough analysis and capped contingent fees at 35%, reserving the right to depart upward to 37.5% or downward to 30% based on the facts of each individual case. *In re Zyprexa Prods. Liab. Litig.,* 424 F. Supp. 2d 488, 496 (E.D. N.Y. 2006) (discussed at *In re Vioxx Prod. Liab. Litig.,* 574 F. Supp. 2d 606, 616 (E.D. La. 2008)).

   In considering the propriety of the cap on contractual fee rights, the Court in *Vioxx* also discussed the 20% cap applied in the *Guidant* litigation. 574 F. Supp. 2d at 616.

[33]  The FC responded that Primary Counsel cannot establish "their *bona fides*" in comparison to the PSC lawyers, whose global jet-setting make their work inherently more important. *See* FC's Omnibus Resp. to Obj. to the FC's Mot. to Determine the Allocation of the Global Fee Award, p.

### III.     The Legal Work Culminating in the Settlements Was <u>Not</u> Performed by Class Counsel on Behalf of a Certified Class.

The FC's Response misstates the history of this litigation by claiming that, "the source for the common fund is derived solely from Rule 23 class settlements."[34] This statement is misleading. From the time that Chinese manufactured drywall was discovered in late 2008 through May 13, 2011, no one was appointed to act as class counsel, and thereafter the only appointments were for "settlement" class counsel.[35] None of the **work** that caused defendants to enter into settlement agreements was conducted by class counsel:

- The PSC did **not** file a motion to certify any class prior to the settlement agreements.

- **No one** was appointed as class action counsel prior to the settlement agreements.

- **No class** was certified prior to the settlement agreements.

Moreover, the FC cannot deny, and has indeed already admitted, that the Knauf settlement required that Primary Counsel perform substantial legal work on behalf of their individual clients. Primary Counsel had to guide their clients through a long and complicated process of home remediation. While settlement class counsel may have intervened in extreme situations, the PSC did not undertake the necessary representation for any individual Plaintiffs (outside of their own

---

3 [Doc. 20384-2]; *see also id.* at pp. 12-13 (calling Primary Counsel names (i.e., "boorish") and lamenting our "audacity").

34   FC's Resp. in Opp., 8 [Doc. 20575-2].

35   For the first time on May 13, 2011, in the order preliminarily approving the Interior Exterior Class Settlement, Russ Herman and Arnold Levin were appointed as "Settlement Class Counsel." Preliminary Approval Order, 7 [Doc. 8818]. That order specifically states that the settlement is a class settlement for a class that has not been certified. *Id.* at 3-4. Additional "Settlement Class Counsel" appointments were made in subsequent orders preliminarily approving the Banner and Knauf settlements. In the order preliminarily approving the Knauf settlement, the Court notes that this is a class settlement for a class that has not yet been certified. Order Preliminarily Approving Knauf Settlement, 14 [Doc. 12138]. The Global Settlement reached in 2012 likewise was preliminarily approved with the explanation that a class had not been certified. [Doc. 14562].

privately retained clients). The FC itself described the burden upon Primary Counsel in its motion filed in 2014:

> For those eligible for the Knauf remediation program, the process was more complicated than a simple settlement. First, every homeowner had to undergo eligibility determinations, requiring the lawyers to coordinate product identification inspections, and in some circumstances, re-inspections. Eligible homeowners had detailed questions about the protocol and their rights under the program, and many homeowners requested the assistance of counsel throughout the process of remediation, including negotiations over such matters as replacement of "like" items and how to resolve damage to the property. As would be expected in any home project of this magnitude, many homeowners ultimately had "punch list" issues that required further assistance of counsel. Some remediation issues expanded to warranty claims requiring additional advocacy to find solutions. Thus, unlike a typical settlement where on a date certain a release is signed, monies are transferred, and the case is over, embarking on the remediation program was simply the next stage of representation.[36]

In short, the PSC did not even try to litigate these cases as class counsel, but rather only sought appointment as settlement class counsel, and even then Primary Counsel remained responsible for individually representing their clients throughout the arduous settlement process. Therefore, "class counsel" did not perform the work creating the limited funds at issue.

## IV.   Primary Counsel's June 2016 Objections Were Timely Filed in Response to the June 2016 Allocation Motion.

For the first time, on June 6, 2016, Primary Counsel learned that the PSC demands full compensation, a bonus, and a ten million dollar advance at the expense of leaving lawyers actually hired by the Plaintiffs significantly under-compensated. Primary Counsel filed their timely objections in June. Nothing prior to the Allocation Motion placed primary counsel on notice that

---

[36]   Mem. of Law in Supp. of Consolidated Jt. Pet. of the FC and PSC for a Global Award of Attorneys' Fees and Reimbursement of Expenses, 36-37 [Doc. 17687-3, Pages 47-48 of 128].

the FC intended to keep most of the money for itself, leaving primary counsel with pennies on the dollar compensation.[37]

Nonetheless, in the absence of legal or factual support for the Allocation Motion, the FC resorts to insinuating waiver. As with its Omnibus Response,[38] the FC's discovery Response repeatedly argues that Primary Counsel slept on their rights and had a duty to object at some unidentified point in time before the Allocation Motion was even filed.[39] The FC's revisionist history is inaccurate.

First, the "you slept" accusation is disingenuous. When Primary Counsel representing Villa Lago moved for an order adjudicating counsel's rights to recover costs in February 2015, the FC represented to the Court that this motion was "premature[]" and that Primary Counsel was improperly attempting to "leap frog" and "jump the gun."[40] Similarly, when other Primary Counsel moved for an award of fees in 2012, the PSC argued that their motion was "grossly premature."[41] Now, in stark contrast, the FC is arguing that timely-filed objections came too late. Clearly, no matter when Primary Counsel acted, the FC's plan was to complain about the timing.

---

[37]   *See* Baron & Budd Objections, 38-40 [Doc. 20353-3]. *See also* Mem. of Law in Supp. of Consolidated Jt. Pet. of the FC and PSC for a Global Award of Attorneys' Fees and Reimbursement of Expenses, 94 [Doc. 17687-3, Page 105 of 128] (admitting fee issue was "left for another day" in the future).

[38]   The FC criticized primary counsel for not previously objecting "to the fee awards in any of the seminal class action settlement agreements giving rise to the fees at issue." FC's Omnibus Resp. [Doc. 20384-2], 13; *see also id.* at 32 (complaining objectors did not step forward "until now").

[39]   FC's Resp. in Opp., 4 (arguing Primary Counsel "slept for seven years" -- during which Primary Counsel were in fact working on behalf of their clients), 6 & n.5 (complaining that Primary Counsel did not object to PTO 28), 7 (alleging "prior inaction"), 9 n.8 (complaining that Primary Counsel allegedly failed to "step forward").

[40]   FC's Resp. to the Villa Lago Pls' Mot. for Payment of Costs Pursuant to Coastal Settlement Agreement, 10-12 [Doc. 18423].

[41]   PSC's Jt. Resp. in Opp. to Eric D. Hoaglund and K. Edward Sexton's Mot. for Award of Att. Fees, 5 [Doc. 16352].

Second, none of the Orders the FC discusses informed Primary Counsel of what was to come. The PSC/FC proposed, and the Court entered, a series of orders to which Primary Counsel did not object because none of the orders stated that Primary Counsel would not be paid for the work they performed on behalf of their clients. Therefore, any objection raised by Primary Counsel would have been rebuffed with the claim that Primary Counsel was "jumping the gun" – the argument the FC in fact made in response to motions filed in 2012 and 2015.

In the Omnibus Response, the FC inadvertently revealed that Primary Counsel in fact had no choice but to go along with the settlements. Specifically, the FC admitted that it was "necessary" that Primary Counsel accept the negotiated settlements.[42] Thus, Primary Counsel did not voluntarily waive their rights by failing to object to a fee reduction proposed for the first time in the June 2016 Allocation Motion.

## V.    This Court Had the Authority to Appoint a Special Master Under a *De Novo* Standard of Review.

This Court's Order promulgated a *de novo* standard of review of the Special Master's findings.[43] Nonetheless, the FC quotes Federal Rule of Civil Procedure 53(f)(5), and collects cases, in support of the proposition that the standard of review is abuse of discretion – rather than *de novo*, as ordered by the Court.[44] Contrary to the FC's argument, Rule 53(f)(5) expressly states that a District Court has the power to promulgate its standard of review over a Special Master's findings. FED. R. CIV. P. 53(f)(5) ("Unless the appointing order establishes a different standard of review, the court may set aside a master's ruling on a procedural matter only for an abuse of

---

[42]  FC's Omnibus Resp., 34 [Doc. 20384-2].
[43]  Order [Doc. 20478], p. 2.
[44]  *See* FC Resp. in Opp., 14 & n. 14.

discretion."). The FC's quotation of the Rule omits this language.[45] Moreover, the scope of the Order providing for discovery is a question of law.

## CONCLUSION

The Allocation Motion seeks to deprive Primary Counsel of their rights to be fairly compensated for the work they performed pursuant to contracts executed by their clients. The FC admits that it seeks to take money from a limited fund to compensate the PSC for its work pursuing **non**-settling Defendants, yet the FC is wholly unable to cite any legal authority that would allow this. The FC has contended that a secret deal, of which Primary Counsel are ignorant, removed ten million dollars from the limited funds available to compensate Primary Counsel. Moreover, there is a $441 million dollar discrepancy between the Allocation Motion's common benefit calculation and the information from BrownGreer ($1.1 billion versus $658 million). These and other issues identified by Primary Counsel justify meaningful discovery – not just depositions, but depositions after the contemporaneous records and transcripts documenting the common benefit work at issue in the Allocation Motion are made available.

Primary Counsel respectfully request that the Court expeditiously consider their Objection [Doc. 20552] and thereafter issue an Order revising the provisions of the Special Master's Rule and expanding discovery accordingly.

Respectfully submitted:

**FAIRCLOTH, MELTON & SOBEL, LLC**          **LISKA, EXNICIOS & NUNGESSER**

By: ___/s/ *Jimmy R. Faircloth, Jr.*___          By: ___/s/ *Val Patrick Exnicios*___
    Jimmy R. Faircloth, Jr. (Objectors' Co-              Val Patrick Exnicios, Esq. (Objectors'
    Liaison Counsel) (LA #20645)              Co-Liaison Counsel)
    jfaircloth@fairclothlaw.com              vpexnicios@exnicioslaw.com
    Brook L. Villa (LA #31988)              1515 Poydras Street

---

[45] *See* FC Resp. in Opp., 14 (quoting Rule 53(f)(5) but omitting the operative phrase, "Unless the appointing order establishes a different standard of review").

bvilla@fairclothlaw.com
Franklin "Drew" Hoffmann (LA #35824)
dhoffmann@fairclothlaw.com
301 Main Street, Suite 920
Baton Rouge, LA 70801
Phone: (225) 343-9535
Fax: (225) 343-9538

*Attorneys for Parker Waichman LLP*

14th Floor, Ste. 1400
New Orleans, LA. 70112
Phone: (504) 410-9611
Fax: (504) 410-9937

*Attorneys for Whitfield Bryson & Mason LLP, Pendley Baudin & Coffin, Rhine Law Firm, and Luckey & Mullins*

**BARON & BUDD, P.C.**

By:  /s/ *Russell W. Budd*
     Russell W. Budd (TX #03312400)
     rbudd@baronbudd.com
     S. Ann Saucer (TX #00797885; LA #21368)
     asaucer@baronbudd.com
     3102 Oak Lawn Avenue, Suite 1100
     Dallas, TX 75219
     Phone: 214-521-3605
     Fax: 214-520-1181

**ALLISON GRANT, P.A.**

By:  /s/ *Allison Grant*
     Allison Grant (FL #858330)
     agrant@allisongrantpa.com
     14 SE 4th St
     Boca Raton, FL 33432-6111
     Phone: 561-994-9646
     Fax: 561-431-4627

**GENTLE, TURNER, SEXTON & HARBISON, LLC**

By:  /s/ *K. Edward Sexton, II*
     K. Edward Sexton, II
     esexton@gentlelaw.com
     501 Riverchase Parkway East, Suite 100
     Hoover, Alabama 35244
     Phone: (205) 716-3000
     Fax: (205) 716-3010

**MCCALLUM, HOAGLUND, COOK & IRBY, LLP**

By:  /s/ *Eric D. Hoaglund*
     Eric D. Hoaglund
     ehoaglund@mhcilaw.com
     905 Montgomery Highway, Suite 201
     Vestavia Hills, Alabama 35216
     Phone: (205) 824-7767
     Fax: (205) 824-7768

**MILSTEIN, ADELMAN, JACKSON, FAIRCHILD & WADE, LLP**

By:  /s/ *Mark Milstein*
     Mark Milstein
     mmilstein@majfw.com
     10250 Constellation Blvd., 14th Floor
     Los Angeles, CA 90067
     Phone: (310) 396-9600
     Fax: (310) 396-9635

**DOYLE LAW FIRM, PC**

By:  /s/ *James V. Doyle, Jr.*
     James V. Doyle, Jr.
     jimmy@doylefirm.com
     2100 Southbridge Pkwy., Suite 650
     Birmingham, AL 35209
     Phone: 205-533-9500
     Fax: 205-414-7528

**ALTERS LAW FIRM, P.A.**

By:    /s/ *Jeremy W. Alters*
    Jeremy W. Alters (FL #111790)
    jeremy@alterslaw.com
    Justin D. Grosz (FL #984000)
    justin@alterslaw.com
    Matthew T. Moore, Of Counsel (FL #70034)
    matthew@alterslaw.com
    1855 Griffin Road, Suite C470
    Dania Beach, FL 33004
    Phone: (305) 571-8550
    Fax: (305) 571-8558

**COLLINS & HORSLEY, P.C.**

By:    /s/ *David L Horsley*
    David L Horsley (AL #6090-I47H)
    david@collinshorsley.com
    2021 Morris Avenue, Suite 200
    Birmingham, Alabama
    Phone: 205-324-1834
    Fax: 205-324-1846

**GIEGER, LABORDE & LAPEROUSE, LLC**

By:    /s/ *Victoria E. Emmerling*
    Andrew A. Braun (LA #3415)
    abraun@glllaw.com
    Victoria E. Emmerling (LA #33117)
    temmerling@glllaw.com
    701 Poydras Street, Suite 4800
    New Orleans, Louisiana 70139-4800
    Phone: (504) 561-0400
    Fax: (504) 561-1011

*Attorneys for Morris Bart, L.L.C.*

## CERTIFICATE OF SERVICE

    I hereby certify that the above and foregoing *Primary Counsel's Reply in Support of Objection to Special Master's Ruling Concerning Objectors' October 7, 2016 Request to Modify Special Master Case Management Order No. 1 and Request for Expedited Consideration* has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 6th day of December, 2016.

               /s/ *Jimmy R. Faircloth, Jr.*
                  OF COUNSEL