## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |

**THIS DOCUMENT RELATES TO:**

*Germano v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.,* **Case No. 09-6687 (E.D. La.);**

*Gross v, Knauf Gips, KG, et al.,* **Case No. 09-6690 (E.D. La.)**

*Wiltz v. Beijing New Building Materials Public Limited Co., et al.,* **Case No. 10-361 (E.D. La.);**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.,* **Case No. 11-1672 (E.D. La.);**

*Amorin Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Case No. 11-1395 (E.D. La.);**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Case No. 11-1673 (E.D. La.); and**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taishe-Dongxin Co., Ltd., et al.,* **Case No. 14-1727 (E.D. La.)**

## BEIJING NEW BUILDING MATERIALS PUBLIC LIMITED COMPANY AND BEIJING NEW BUILDING MATERIAL (GROUP) CO., LTD. RESPONSE TO PLAINTIFFS' STEERING COMMITTEE'S SUPPLEMENT TO OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Defendants Beijing New Building Materials Public Limited Company ("BNBM PLC") and Beijing New Building Material (Group) Co., Ltd. ("BNBM Group" and, collectively, "BNBM") respectfully submit this response to the Plaintiffs' Steering Committee's ("PSC") supplemental filing opposing defendants' motions to dismiss for lack of personal jurisdiction.[1]

### Introduction

In furtherance of its attempt to manufacture an alter ego relationship where none exists, the PSC has submitted a supplemental brief arguing that the recently completed share exchange transaction, whereby BNBM PLC increased its ownership from 65% to 100%, somehow confirms the alter ego claims.  The PSC spends most of its ten page submission on what is little more than a description of the steps of the transaction as it went through the shareholder and regulatory approval process.  It is hard to discern from this historical recitation why the PSC believes that its meritless alter ego claims have new-found support.

All that occurred in the share exchange transaction is that Taishan's minority shareholders have traded their Taishan shares for shares in publically traded BNBM PLC. Nothing else in the relationship between BNBM PLC and Taishan has changed.  The operations remain the same. The management remains the same.  The share exchange transaction was not a merger, asset transfer or acquisition.  No Taishan assets have changed hands.

No one has ever disputed that BNBM PLC is now the 100% owner of Taishan.  But putting aside the PSC's rhetorical flourish that this ownership structure gives BNBM PLC "iron-fisted control" over Taishan, it is law of the case that this structure does not suffice to show an alter ego relationship.  "Complete ownership and appointment of a board of directors are not

---

[1]  Plaintiffs' Steering Committee's Supplement to Omnibus Response in Opposition to Defendants' Motions to Dismiss, Rec. Doc. 20585-2 ("PSC's Supplemental Response," cited as "Supp. Resp.").

enough" to show that a "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created."[2]

The terms and import of this transaction are not news.  The Court reviewed this transaction when it was first announced last fall, after the PSC made an emergency motion for a Rule 16 conference to attack the transaction.  The Court concluded at that time that it need take no action with respect to this matter.  Nothing with respect to any alter ego issue has changed. The essential terms and structure of the finalized transaction are the same as those originally announced and reviewed by the Court last year.[3]  As reflected in BNBM's Feedback Reply to the China Securities Regulatory Commission (the "Feedback Reply"), following the now-consummated transaction the "managements and operations of the Target Company [Taishan]" and BNBM remain "independent in relation to one another."[4]  That same filing also reflects that the transaction was subject to searching regulatory review in China, including by the China Securities Regulatory Commission ("CSRC").[5]  Given the unchanged terms of the share exchange and this Court's unequivocal holdings in the March 10 Opinion as to what does and does not constitute evidence of alter ego, there is no reason for the Court to be concerned about the transaction.

---

[2]   *See* the Court's March 10, 2016 Order and Reasons granting China National Building Material Group's motion to dismiss, 168 F. Supp. 3d 918, 936 (E.D. La. 2106) (referred to herein as "March 10 Opinion").

[3]   *See* "Public Announcement Regarding Completion of Transfer of Underlying Assets of Asset Acquisition by Stock Issue and Related-Party Transaction," Nov. 2, 2016 [BNBMPLC0010439-10444], attached as Exhibit X to the Supp. Resp., (referred to herein as "Ex. X, Nov. 2, 2016 Announcement").

[4]   *See* Feedback Reply of BNBM PLC to the Notice of China Security Regulatory Commission's One-time Comments on Review of Administrative Licensing Project [BNBMPLC0010239-10423], attached as Exhibit T to the Supp. Resp., at page 183 (.   referred to herein as the "Ex. T, Feedback Reply."

[5]   *See also* Ex. X, Nov. 2, 2016 Announcement at § I(1)4, page 4 § (III)1, and § (IV).

## I.      The Facts About the Share-Exchange Transaction

### A.      The Share Exchange Transaction

Last month, following extensive regulatory review and approval, BNBM PLC finalized

the share exchange transaction.  BNBM PLC, which already owned 65% of Taishan, has

acquired the remaining 35% of Taishan's shares from the former minority shareholders.  Ex. X,

Nov. 2, 2016 Public Announcement, at 6.  In exchange, the minority shareholders collectively

received BNBM PLC stock equaling about 21% of the equity in the publically traded parent

company.  *Id.*  The 21% equity interest was fair consideration, as confirmed by an independent

valuation of Taishan and as monitored by the CSRC.[6]

No BNBM PLC shares acquired by the former Taishan minority stockholders through

this transaction can be transferred for 36 months.  Ex. T, Feedback Reply at 93-94.  As part of

the transaction, a portion of those BNBM PLC shares are subject to a contingent risk price

adjustment provision, which allows BNBM PLC to repurchase the shares at a discounted price if

certain contingent risks occur.  As stated in BNBM PLC's Feedback Reply, the "minority

shareholders of Taishan Gypsum agreed to make compensation [to BNBM PLC] for the

contingent risks of the Target Assets[7] and to lock the [shares] obtained by them."  Ex. T,

Feedback Reply at 93.

---

[6]   Morgan Stanley Huaxin Securities, Report on Beijing New Building Materials Public Limited Company's Acquisition of Assets by Issuing Shares and Related-party Transaction, July, 2016 [BNBMPLC0009673-10059]  attached as Exhibit Q to the Supp. Resp. at pages 16-17 ( referred to herein Ex. Q, Morgan Stanley Report").

[7]   Target Asset is a defined term throughout the transaction documents.  It means the shares of the minority shareholders comprising 35% interest in Taishan.  *See, e.g.*, Ex. Q, Morgan Stanley Report at 6.

**B.      Taishan Remains Independent With the Same Management and Operations**

Taishan continues to operate independently of BNBM PLC and remains a strong and profitable company.  As explained in the September, 2016 Feedback Reply, "The managements and operations of the Target Company are independent in relation to one another:"

> Since the acquisition of 65% shares of Taishan Gypsum, BNBMPLC has exercised its shareholder rights according to relevant laws and regulations and exercised the rights at the board of directors of Taishan Gypsum through nominating directors. Taishan Gypsum is an independent legal person. Its operation and management team is responsible for the production and operation of Taishan Gypsum in accordance with the laws and regulations as well as the Articles of Association of Taishan Gypsum.
>
> * * * *
>
> The "Dragon" brand drywall of BNBMPLC and "Taishan" drywall of Taishan Gypsum respectively covered high-end and mid-end market to satisfy the product needs of customers at different levels. The difference in aspects such as brand image and market positioning between the foregoing products has resulted in management difference between BNBMPLC and Taishan Gypsum, such as manufacturing and operation, regional deployment and marketing strategies, etc. Therefore, BNBMPLC and Taishan Gypsum still remain independent in relation to one another in areas of manufacturing and marketing, etc.

Ex.T, Feedback Reply at 183.

The transaction has not changed Taishan's management or its operations.  In fact, as now-significant stockholders of BNBM PLC, Taishan's management remains as financially incented as previously.  As the CNBM PLC announcement of the transaction confirmed, Taishan Gypsum will "continue as a going concern and its current operating mode will be consistently adopted," and the "technical team and the senior management of Taishan Gypsum will remain relatively stable over the years and there will be no issue of substantial loss of professionals." Rec. Doc. 19704-2, Oct. 13, 2015 Announcement, at 10 §§ 1(2), 2(1).

4

**C.    The Share Exchange Transaction Confirms that Taishan Is a Substantial and Well Capitalized Company**

The primary considerations when analyzing alter ego are whether the alleged shell corporation is undercapitalized and whether it serves only to service or shield liability for the parent.   The Court already has found that "Taishan began as a separate and independent manufacturer of drywall;" when "BNBM first purchased shares, Taishan already had revenues of RMB 48.2 million;" [8] "BNBM paid fair value to acquire its interest in Taishan, subject to a third-party audit and asset valuation process;" and a "professional third-party appraisal of the value of Taishan confirmed the adequacy of the purchase price with reference to the net asset value of Taishan."  March 10 Opinion, 168 F. Supp. 3d 918, at 929.  The October 13 Announcement and the offering memorandum corroborate that Taishan continues to be well capitalized, is highly solvent, and has never existed to service BNBM PLC or shield it from liability.  In particular, the valuation performed for the new transaction confirms the continued dynamic growth of Taishan, at a rate ahead of BNBM PLC's.  This independently appraised value reflects a 40-fold increase in Taishan's value since BNBM PLC acquired its ownership interest: a dramatic confirmation of the continuing strength and autonomy of Taishan, and proof positive that Taishan has never operated as a shell company or an instrumentality of its parent corporations, or that Taishan is hiding assets.  After six months of jurisdictional discovery, the PSC has no evidence to suggest otherwise.

This growth reflects the autonomy, ability and judgment of Taishan's management in building its business and utilizing its resources and Taishan management's effective investment

---

[8] BNBM's Memorandum in Support of its Motion to Dismiss (Rec. Doc. 19646-1) contained a typographical error with regards to Taishan's revenue before BNBM's investment in Taishan.  That typographical error was cited by the Court in its March 10 Opinion.  The actual revenue of Taishan before BNBM's investment was RMB 482 million, not RMB 48.2 million.  See, Ex. 8 to BNBM PLC's Memorandum in Support of its Motion to Dismiss (Rec. Doc. 19646-9), Taian Donglian Investment Trade Co., Ltd., Equity Transfer Evaluation Project, Asset Appraisal Report, BNBMPLC0006114-6139, at BNBMPLC0006114, 6122.

and reinvestment of the company's capital.  Taishan's growth proves BNBM PLC has not extracted assets from Taishan or usurped its opportunities.  To the contrary, the purpose of the transaction is to "thicken the earnings per share, increase the shareholder returns level and further enhance the profitability of the Listed Company [BNBM PLC]."  Ex. T, Feedback Reply at 100.

### D.     The Terms of the Transaction Have Not Changed Since It Was Announced Last Year

The PSC's supplemental brief does not actually contend that there is anything new or different in the finalized transaction from what it raised with the Court over a year ago.  The structure of the transaction set forth in the October 13, 2015 Offering Memorandum and summarized in the initial public announcement remained unchanged in the transaction as consummated.  Indeed, BNBM PLC voluntarily and steadily provided the PSC with translations of the corporate announcements and documents related to the transaction as they were released.

Discussing the July, 2016 Morgan Stanley offering memorandum, the best the PSC can offer with respect to "significant revisions" to the transaction in the past year confirms that nothing material to the alter ego question was changed:

> Among the significant revisions, Morgan Stanley pointed out: 1) 2015 profit distribution and the price and quantity of shares issued in the transaction and the number of shares locked up by the counterparties; 2) the total capital and equity structure in BNBM PLC and the shareholder rations of controlling shareholder CNBM PLC and social public shareholders after closing of the acquisition; and 3) an updated audited pro forma earnings per share of BNBM PLC.

Supp. Resp. at 6.  These are not revisions to the structure of the deal, but clarifications of updated financial results.

### E.      The Transaction Was Approved By the CSRC After Extensive Scrutiny

As acknowledged in the PSC's Supplemental Response, the transaction underwent extensive regulatory examination in China.  The CSRC scrutinized the transaction for the better part of the year.  The CRSC posed numerous questions seeking clarification of the transaction and received full and detailed responses.[9]  The CSRC completed its detailed evaluation and gave approval on October 14, 2016.  Ex. X, Nov. 2, 2016 Announcement at § (IV).  The 185 page response to the CSRC's inquiries is a testament to the CSRC's careful review. Ex. T, Feedback Reply.  After the CSRC approved the transaction, BNBM PLC completed the transaction.  Ex. X, Nov. 2, 2016 Announcemen.t

## II.    Argument: The Taishan Share Swap Transaction is Not a Basis For Finding Alter Ego

### A. The 2016 Share Exchange Transaction Is Not Relevant to Whether BNBM PLC and Taishan Were Alter Egos in 2005 or 2006

The share swap transaction is not relevant to the alter ego inquiry because it occurred a decade after the relevant period for the alter ego analysis.  As the Court has observed, "the PSC's claims are based on allegedly defective drywall," and not on events in 2014 or 2015, much less 2016.  Rec. Doc. 19612, Order and Reasons, Oct. 16, 2015, at 3.  An alter ego analysis focuses on the relationship between the parties at the time of the acts complained about.  *Flourine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 861-62 (5th Cir. 2004).  Alter ego allegations require showing that "the corporate entity as to this transaction had *at the time* no separate mind, will or existence of its own."  *San Francisco Estates, S.A. v. Westfeldt Bros., Inc.*, No. CIV. A. 97-1102, 1998 WL 12243, at *5 (E.D. La. Jan. 13, 1998)(emphasis added).  Later interactions are irrelevant:

---

[9]  Ex. T, Feedback Reply..  The PSC claims that the CSRC had "concerns" about the transaction (Supp. Resp. at 5), but no "concerns" are raised in the CSRC's questions, only factual and legal questions.

> Both theories [of alter ego and single business enterprise], therefore, presume that the corporations are unified at the time of the wrongful act. It is illogical, for example, to hold a parent liable for controlling another corporation's debts when it had no control at the time the debts were incurred.

*Flourine,* 380 F.3d at 861-862.  "Under general corporate law principles, the relevant inquiry into the control issue focuses on the relationship between the parent and the subsidiary at the time the acts complained of took place."  *United States v. Wallace*, 961 F. Supp. 969, 979 (N.D. Tex. 1996).[10]  As in *Flourine,* it is "illogical" for the PSC to contend that subsequent matters between BNBM PLC and Taishan are relevant to determining whether the companies were alter egos when the drywall sales at issue in the MDL cases transpired.

    **B.**    **The Contingent Risk Price Adjustment Provision Does Not Affect Taishan, Its Assets or Its Ability to Pay a Judgment or Settlement.**

The share exchange as finalized contains a provision that compels Taishan's minority shareholders to hold onto their new BNBM PLC shares for a three year period, and to have a portion of those shares returned for a nominal price if certain contingent risks occur.  The contingent risks contemplated include a number of risks beyond those associated with this litigation:

> Contingent risks refer to the risks of economic losses that may occur to Taishan Gypsum due to the litigation, arbitration and administrative penalties as well as the future industrial policies and tax policies, economic regulation and industry changes.  According to the Framework

---

[10]  *See also Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 349 (4th Cir. 1998) (disregarding the corporate form requires showing that the parent corporation exercised "complete domination . . . in respect to the transaction attacked so that the corporate entity as to this transaction had ***at the time*** no separate mind, will or existence of its own")(emphasis added); *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 138 (2d Cir. 1991) (plaintiff must show the corporate veil-piercing factors "at the time of the transaction complained of"); *In re Athena Constr., LLC*, No. CIV. A. 06-2004, 2008 WL 3186743, *2-3 (E.D. La. Aug. 4, 2008) (no alter ego relationship based on uncontested facts "at the time of the incident"); *JLC Beechtree, Inc. v. A & E Healthcare of Tenn., LLC,* No. 3:10-CV-523, 2012 WL 1890359, *4 (E.D. Tenn. May 23, 2012) (piercing a subsidiary's corporate veil requires proof that the "parent corporation, at the time of the transaction complained of, exercise[d] complete dominion over its subsidiary").

> Agreement signed by and between BNBMPLC and 10 limited
> partnership enterprises… including Jia Tongchun on October 13, 2015
> and related supplemental agreement, both parties deem after negotiations
> that the number of locked up shares is sufficient to cover the losses
> caused by contingent risks based on the comprehensive evaluation of the
> profitability, synergetic value, contingent risks and other factors relating
> to the Target Assets.  The number of shares the locked-up shares is
> agreed upon negotiation of both parties.

*See* Ex. T, Feedback Reply at 94.  Whether Taishan's minority shareholders personally receive

the lower purchase price established by this provision does not affect Taishan's business

operations or corporate separateness in any way.  The PSC has not articulated an explanation to

the contrary.

Not surprisingly, the PSC cannot articulate an actual reason why the contingency price

adjustment provision should cause alter ego concerns.  Instead of explaining how a share

increase from 65% to 100% (the only change occasioned by the transaction) actually affects the

corporate relationship between BNBM and Taishan, the PSC simply leaps to the conclusion that

the transaction must be nefarious.  But inflammatory pronouncements aside, there is no basis on

which to conclude that the contingency price adjustment – which recognizes that Taishan has a

significant contingent liability – is in any way prejudicial to Plaintiffs.

For example, the PSC claims that "Taishan's history of walking away from these

proceedings is echoed in the Feedback Reply's lock-up provision, which should serve as a

reminder to all involved that Taishan and its parent companies may yet again absent themselves

from the litigation if they are not satisfied with Plaintiffs' reaction to the 3 year limited term they

unilaterally applied to these proceedings."  Supp. Resp. at 8.  But the PSC completely

mischaracterizes the three year contingency period: it is not a deadline imposed on this litigation.

It is an estimate by the parties to the share exchange transaction of when the contingent liability

will have been liquidated.

Moreover, the provisions requires retirement of the shares regardless of whether this litigation is concluded or not.  Far from an indication that Taishan is considering leaving the litigation, the price adjustment provision is a prudent attempt to address the financial impact of Taishan *remaining* in the litigation as well as a number of other contingencies unrelated to the litigation that could affect the transaction.  Indeed, not one word of the share exchange transaction and its accompanying documents suggests that the transaction contemplates a unilateral exit by any party from the litigation, nor does it contemplate any transfer or other disposition of Taishan's assets at any time.  And the Court already has rejected the relevance of Taishan's decisions with respect to this litigation, and parent companies' role in such decisions. "The fact that a parent of a conglomerate corporation supervises, coordinates, or even controls its corporate response to international litigation seeking 'massive' damages against its subsidiaries 'hardly qualifies' as exercising control over routine, daily business."[11]

### C.     The Share Exchange Does Not Evidence An Alter Ego Relationship

Moreover, the share exchange transaction between BNBM PLC and the Taishan minority shareholders provides no evidence that the companies are alter egos.  To pierce the corporate veil the plaintiffs here must show either that Taishan is a mere sham or shell corporation, or fraud.  *Cf. Stuart v. Spademan*, 772 F.2d 1185, 1198 n.12 (5th Cir. 1985).  They must show "total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation."  *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 691 (5th Cir. 1985), *cert. denied*, 106 S. Ct. 1194 (1986).

---

[11] March 10Opinion, F.Supp.3d 918, at 939.

The share exchange transaction did not undermine Taishan, remove any assets, take any business or do anything else to render Taishan a shell, or perpetrate a fraud, or eliminate the separate corporate interests of Taishan.  Taishan was an independent, extremely profitable company making a different brand of product than BNBM PLC before the transaction, and none of these characteristics have changed now.  Indeed, BNBM PLC acquired the shares of the minority stockholders of Taishan in order to increase its ability to support Taishan. Ex. T, Feedback Reply at 100.

The PSC complains that with the share exchange BNBM PLC has "ascend[ed] from 'Controlling Shareholder' of Taishan to outright owner of Taishan, and that this "outright acquisition"  is evidence of "ironfisted control. "  Supp. Resp. at 1, 10.  But it is not unusual for corporations to have wholly-owned subsidiaries, and alter-ego liability does not depend on the extent of the parent corporation's ownership interest.  As this Court held on March 10, "Complete ownership and appointment of a board of directors are not enough" to show that "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created."  March 10 Opinion, 168 F. Supp. 3d at 936.[12]  Just as the term "Controller" or "Actual Controller" reflect "basic ownership structure and shareholding influence, not day-to-day control" (*id.* at 938), so BNBM PLC's complete ownership is not evidence that BNBM PLC controls Taishan's day-to-day operations.[13]  *Id.*  For alter ego purposes there is no difference

---

[12]   For its part, BNBM Group has no direct ownership interest in BNBM PLC or Taishan and does not nominate directors for either.  As the Court held with respect to CNBM Group, "an indirect minority ownership filtered through multiple levels of investment cannot overcome the presumption" of separate status.  March 10 Opinion, 168 F. Supp. 3d at 938.

[13]   In the Supplemental Response the PSC again emphasizes that "CNBMPLC holds 639.06587mn shares in the Company, accounting for 45.20% of the company's total share capital.  So it is the controlling shareholder of the Company." Supp. Resp. at 3.  As the Court held on March 10, this is "simply an indication that CNBM Group's indirect equity interest in BNBM PLC is sufficient to give it influence over the board of directors—a fact that is not in dispute and does not affect the companies' separate status." March 10 Opinion, 168 F. Supp. at 938.

between owning 65% or 100% of the equity in the subsidiary: what matters is not having control, but rather how that control has been exercised.  *See, e.g., Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 219 (5th Cir. 2000) ("We have said . . . that '100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter-ego relationship between two corporations.'"); *Gardemal v. Westin Hotel Co.*, 186 F. 3d 588, 594 (5th Cir. 1999) ("[O]ne-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil.").[14]

    The PSC continues to claim that it has "established the cascading levels of ownership and control between and amongst the parent companies of Taishan Gypsum Co., Ltd."  Supp. Resp. at 1.  Again, this is empty rhetoric.  Taishan was already integrated into the CNBM business group, and to the extent that the share exchange transaction represents some marginal additional integration is not cause for concern.  The fact that "CNBM Group management focused 'on ensuring strong integration across different business's segments by cultivating a unified corporate culture and establishing coordinated purchasing sales, logistics and other operational processes and procedures' does not demonstrate control."  March 10 Opinion, 168 F. Supp.3d at

---

[14]  Similarly, the PSC argues on page 2 of its supplemental brief that CNBM PLC's explanations about why BNBM PLC originally acquired a controlling interest in Taishan reflect admissions of an improper plan to dominate Taishan.  Nothing in the share exchange materials suggest such a plan.  Moreover, the Court's opinion on March 10 already has rejected this argument:  "Thus, the fact that CNBM Group 'guides' subsidiaries in 'establishing . . . a set of unified enterprise values' and issues policies regarding 'risk management,' 'significant personnel appointments,' and 'business decisions,' does not show that it 'so extensively controlled' their day-to-day operations as to 'transform' them into its alter ego."  March 10 Opinion, 168 F. Supp. 3d at 939.  "Plaintiffs' evidence shows that CNBM Group behaves as a responsible shareholder: by issuing guidance to its representatives on the boards of directors of its direct subsidiaries (CNBM Company and BNBM Group) and instructing those directors to consult with CNBM Group for 'significant decisions'—e.g., changes in high-level executive officers, significant investments, and financial guarantees to other entities."  *Id.*  "Ensuring that directors share the sovereign's goals with respect to significant decisions does not support an alter ego relationship."  *Id.*

937 n.17, citing *In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*, 735 F.

Supp. 2d 277, 323 (W.D. Pa. 2010).

While the PSC loves to reiterate the obvious fact that the companies are part of a business

group, much like an American conglomerate, it still has established nothing to show that

ownership and the ability to control have been abused or are being abused now. Certainly

nothing in the share exchange suggests anything of the sort, as can be seen by comparison with

some of the PSC's past claims about alter ego.  The plaintiff's assertion of "ironfisted control"

by BNBM PLC (Supp. Resp. at 10) is contrary to all of the evidence in the case and nothing in

the transaction documents suggest any change.

## Conclusion

For all of the reasons set forth above and in the briefing and argument on the BNBM

companies' motion to dismiss for lack of jurisdiction, BNBM PLC and BNBM Group

respectfully request the Court to dismiss this action against them.

Dated: December 23, 2016

Respectfully submitted,

**DENTONS US LLP**

By: */s/ Michael H. Barr*
Michael H. Barr
New York Bar No. 1744242
Justin N. Kattan
New York Bar No. 3983905
1221 Avenue of the Americas
New York, New York 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
michael.barr@dentons.com
justin.kattan@dentons.com

Richard L. Fenton
Illinois Bar No. 3121699
Leah R. Bruno
Illinois Bar No. 6269469
233 South Wacker Drive
Suite 5900
Chicago, Illinois 60606-6306
Telephone: (312) 876-8000
Facsimile: (312) 876-7934
richard.fenton@dentons.com
leah.bruno@dentons.com


C. Michael Moore
Texas Bar No. 14323600
Matthew T. Nickel
Texas Bar No. 24056042
2000 McKinney Ave., Suite 1900
Dallas, Texas 75201
Telephone: (214) 259-0900
Facsimile: (214) 259-0910
mike.moore@dentons.com
matt.nickel@dentons.com


Kenneth J. Pfaehler
D.C. Bar No. 461718
Drew W. Marrocco
D.C. Bar No. 453205
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 408-6400
Facsimile: (202) 408-6399
kenneth.pfaehler@dentons.com
drew.marrocco@dentons.com

-and-

14

**PHELPS DUNBAR LLP**

Harry Rosenberg
Louisiana Bar No. 11465
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Facsimile: (504) 568-9130
harry.rosenberg@phelps.com

*Attorneys for Defendants Beijing New Building*
*Materials Public Limited Company and Beijing*
*New Building Material (Group) Co., Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Beijing New Building Materials Public Limited Company and Beijing New Building Material (Group) Co., Ltd. Response to Plaintiffs' Steering Committee's Supplement to Omnibus Response in Opposition to Defendants' Motions to Dismiss** has been served on Plaintiffs' Liaison Counsel, Leonard Davis, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with the Pretrial Order No. 6, and that the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 23rd day of December, 2016.

*/s/     Michael H. Barr*

15