UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL No. 2:09-md-2047 |
| | SECTION L |
| **THIS DOCUMENT RELATES TO:** | JUDGE ELDON E. FALLON |
| *Germano v. Taishan Gypsum, 09-cv-6687* | |
| *Gross v. Knauf Gips KG, 09-cv-6690* | MAGISTRATE JUDGE |
| *Wiltz v. BNBM, 10-cv-361* | JOSEPH C. WILKINSON, JR. |
| *Amorin v. Taishan Gypsum, 11-cv-1672* | |
| *Amorin v. Taishan Gypsum, 11-cv-1395* | |
| *Amorin v. Taishan Gypsum, 11-cv-1673* | |

**MEMORANDUM OF LAW IN SUPPORT OF CHINA NATIONAL BUILDING MATERIALS CO., CNBMIT CO. LTD., CNBM USA CORP., AND UNITED SUNTECH CRAFT, INC.'S MOTION TO DECERTIFY CLASS PURSUANT TO RULE 23(c)(1)(C)**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................ 1

II.    FACTUAL AND PROCEDURAL BACKGROUND........................................ 2

       A.    The *Germano* and *Hernandez* Proceedings ........................................ 2

       B.    The Certification Order.......................................................................... 4

       C.    Proceedings on Classwide Damages...................................................... 6

       D.    Plaintiffs' Post-Certification Concessions ............................................ 8

III.   ARGUMENT ............................................................................................. 10

       A.    Plaintiffs Cannot Satisfy the Predominance Requirement Because There
             Are No Issues That Lend Themselves to Classwide Resolution. ....................... 12

             1.    Plaintiffs Did Not Satisfy Their Burden of Proving Predominance. ....... 12

                   a.    Non-Remediation Damages ........................................................ 14

                   b.    Remediation Damages ................................................................ 18

                         (1)    The PSC's proposed methodology fails to account
                                for variations in state law. ................................................ 18

                         (2)    *Germano* and *Hernandez* do not qualify as
                                bellwether trials from which damages may be
                                aggregated. ...................................................................... 24

                                (a)    Bellwether trials are not intended to have
                                       binding effect on other claimants........................ 25

                                (b)    To the extent the findings from bellwether
                                       trials may be applied to other claimants,
                                       none of the requirements for doing so are
                                       present here. ....................................................... 27

             2.    Plaintiffs' Expert Cannot Save the Faulty Formulaic Approach
                   Embraced by the Certification Order. ...................................................... 32

                   a.    Mr. Inglis's methodology is unreliable because it lacks a
                         sample of representative properties. ........................................... 34

                   b.    The certified class contains properties that have already
                         received remediation damages..................................................... 37

                   c.    Mr. Inglis's remediation cost methodology results in
                         windfall damages awards............................................................ 39

             3.    Individual Issues Predominate over Common Ones............................... 40

       B.    Plaintiffs Cannot Satisfy the Superiority or Adequacy Requirements for
             Class Certification................................................................................ 45

- i -

## TABLE OF CONTENTS

**Page**

    1.    Due to the Presence of Numerous Individual Issues, This Litigation Is Not Suited for Classwide Management. ............................................... 45

    2.    The PSC Has Demonstrated That Its Interests Are Not Aligned with Those of the Proposed Class. .......................................................... 47

IV.    CONCLUSION .............................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allison v. Citgo Petroleum Corp.*,
    151 F.3d 402 (5th Cir. 1998) .................................................................13

*Alloway v. General Marine Indus., L.P.*,
    695 A.2d 264 (N.J. 1997) ....................................................................22

*American Fire & Cas. Co. v. Ford Motor Co.*,
    588 N.W.2d 437 (Iowa 1999) ..............................................................22

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013)..................................................................10, 12

*Applewhite v. Reichhold Chemicals, Inc.*,
    67 F.3d 571 (5th Cir. 1995) .................................................................28

*Baldridge v. SBC Commc'ns, Inc.*,
    404 F.3d 930 (5th Cir. 2005) ...............................................................11

*Bell Atlantic Corp. v. AT&T*,
    339 F.3d 294 (5th Cir. 2003) .........................................................13, 24

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*,
    402 U.S. 313 (1971)............................................................................27

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) ...............................................................21

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ........................................................ *passim*

*In re Chevron U.S.A., Inc.*,
    109 F.3d 1016 (5th Cir. 1997) .................................................... *passim*

*In re Chinese Manufactured Drywall Products Liab. Litig.*,
    706 F. Supp. 2d 655 (E.D. La. 2010)...................................2, 3, 17, 28

*In re: Chinese-Manufactured Drywall Products Liability Litigation*,
    Case No. 09-md-02047, Dkt. No. 741 (E.D. La. Jan. 13, 2010)............22

*Chriss v. Manchester Insurance & Indemnity Co.*,
    308 So. 2d 803 (La. App. 1975)...........................................................16

*Cimino v. Raymark Indus., Inc.*,
151 F.3d 297 (5th Cir. 1998) ................................................................... *passim*

*Clevenger and Wright, Co. v. A.O. Smith Harvestore Products, Inc.*,
625 S.W.2d 906 (Mo. App. 1981) ..................................................................22

*Cole v. Gen. Motors Corp.*,
484 F.3d 717 (5th Cir. 2007) ...............................................................19, 24

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ..............................................................................33

*Corley v. Orangefield Indep. Sch. Dist.*,
152 F. App'x 350 (5th Cir. 2005) ................................................................13

*Corp. of Mercer Univ. v. Nat'l Gypsum Co.*,
368 S.E.2d 732 (Ga. 1998) .........................................................................20

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC*,
662 F.3d 913 (7th Cir. 2011) ......................................................................47

*Crooks v. Metro Life. Ins., Co.*,
785 So.2d 810 (La. 2001) ............................................................................23

*Crutchfield v. Sewerage & Water Bd. of New Orleans*,
829 F.3d 370 (5th Cir. 2016) ..........................................................13, 30, 33

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ...................................................................................33

*DeAtley v. Victoria's Secret Catalogue*,
876 So.2d 112 (La. App. 2004) ....................................................................23

*DeBremaecker v. Short*,
433 F.2d 733 (5th Cir. 1970) ......................................................................48

*Ellis v. Great Sw. Corp.*,
646 F.2d 1099 (5th Cir. Unit A June 1981) ...................................................20

*Energy Coal v. CITGO Petroleum Corp.*,
No. 15-30863, 2016 WL 4575569 (5th Cir. Sept. 1, 2016) ...............................21

*Ezell v. Mobile Housing Bd.*,
709 F.2d 1376 (11th Cir. 1983) ...................................................................11

*In re Fibreboard Corp.*,
893 F.2d 706 (5th Cir. 1990) ................................................................32, 43

*In re First T.D. & Inv., Inc.,*
  253 F.3d 520 (9th Cir. 2001) ...................................................................................41

*Fisher Island Holdings, LLC v. Cohen,*
  983 So. 2d 1203 (Fla. App. 3 Dist. 2008) .............................................................16

*Foster Wheeler Enviresponse, Inc. v. Franklin County Convention,*
  678 N.E.2d 519 (Ohio 1997)..................................................................................22

*Frow v. De La Vega,*
  82 U.S. 552 (1872)........................................................................................14, 41, 42

*Gene & Gene, L.L.C. v. BioPay, L.L.C.,*
  624 F.3d 698 (5th Cir. 2010) ..................................................................................11

*Good v. Am. Water Works Co., Inc.,*
  310 F.R.D. 274 (S.D. W.Va. 2015).........................................................................33

*Green v. Champion Ins. Co.,*
  577 So. 2d 249 (La. App. 1 Cir. 1991) ...................................................................21

*Guar. Trust Co. v. York,*
  326 U.S. 99 (1945)...................................................................................................19

*In re Hanford Nuclear Reservation Litig.,*
  534 F.3d 986 (9th Cir. 2008) ..................................................................................25

*Hearndon v. Graham,*
  767 So. 2d 1179 (Fla. 2000)....................................................................................20

*Henson v. Celtic Life Ins. Co.,*
  621 So. 2d 1268 (Ala. 1993)....................................................................................20

*Hicks on Behalf of Feiock v. Feiock,*
  485 U.S. 624 (1988).................................................................................................48

*Hoxworth v. Blinder, Robinson & Co.,*
  980 F.2d 912 (3d Cir. 1992).....................................................................................11

*Huss v. Gayden,*
  571 F.3d 442 (5th Cir. 2009) ..................................................................................19

*Ibe v. Jones,*
  836 F.3d 516 (5th Cir. 2016) ..................................................................................37

*Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.,*
  891 So.2d 532 (Fla. 2004)........................................................................................22

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
    512 U.S. 821 (1994)................................................................................48

*JCW Elecs., Inc. v. Garza*,
    257 S.W.3d 701 (Tex. 2008)..................................................................22

*Jimenez v. Superior Court*,
    58 P.3d 450 (Cal. 2002) .........................................................................22

*Kaltman v. All Am. Pest Control, Inc*.,
    706 S.E.2d 864 (Va. 2011)....................................................................23

*In re Katrina Canal Breaches Consolidated Litigation*,
    258 F.R.D. 128 (E.D. La. 2009)......................................................31, 32

*In re Kave*,
    760 F.2d 343 (1st Cir. 1985).................................................................48

*Kennedy v. Columbia Leather and Mfg. Co., Inc*.,
    384 S.E.2d 730 (S.C. 1989) ..................................................................22

*Keyes Co. v. Shea*,
    372 So. 2d 493 (Fla. App. 4 Dist. 1979) ..............................................23

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)..............................................................................33

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1998)................................................................................49

*Lincoln General Insurance Co. v. Detroit Diesel Corp*.,
    293 S.W.3d 487 (Tenn. 2009)...............................................................22

*Lloyd Word Coal Co. v. Clark Equip. Co.*,
    543 So.2d 671 (Ala. 1989) ....................................................................22

*Marin v. Exxon Mobil Corp.*,
    48 So. 3d 234 (La. 2010) ......................................................................20

*Marlo v. United Parcel Service, Inc.*,
    639 F.3d 942 (9th Cir. 2011) ................................................................11

*McKelvey v. Boeing N. Am., Inc.*,
    86 Cal. Rptr. 2d 645 (Cal. App. 2 Dist. 1999) .....................................20

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)..................................................................44

*Moore v. Coachmen Indus., Inc.*,
   499 S.E.2d 772 (N.C. App. 1998) ...........................................................22

*Mozzetti v. City of Brisbane*,
   67 Cal. App. 3d 565 (Cal. App. 1 Dist. 1977) .......................................23

*Munoz v. Orr*,
   200 F.3d 291 (5th Cir. 2000) ..................................................................37

*Nelson v. AmSouth Bank, N.A.*,
   622 So. 2d 894 (Ala. 1993) .....................................................................42

*Niebarger v. Universal Cooperatives Inc.*,
   486 N.W.2d 612 (Mich. 1992) ................................................................22

*Nishamatsu Const. Co. Ltd. v. Houston Nat. Bank*,
   515 F.2d 1200 (5th Cir. 1976) ................................................................42

*In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*,
   693 F.2d 847 (9th Cir. 1982) ..................................................................21

*Orndorff v. Christiana Community Builders*,
   217 Cal. App. 3d 683 (Cal. App. 4 Dist. 1990) .....................................23

*PPG Architectural Finishes, Inc. v. Lowery*,
   909 So. 2d 47 (Miss. 2005).....................................................................20

*Parklane Hosiery Co. Inc. v. Shore*,
   439 U.S. 322 (1979)................................................................................27

*Perpetual Real Estate Servs., Inc. v. Michaelson Properties, Inc.*,
   974 F.2d 545 (4th Cir. 1992) ..................................................................21

*Petito v. A.H. Robins Co.*,
   750 So. 2d 103 (Fla. App. 3 Dist. 1999) ................................................23

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
   100 F. App'x 296 (5th Cir. 2004) ...........................................................31

*Richardson v. Byrd*,
   709 F.2d 1016 (5th Cir. 1983) ................................................................10

*Ritter v. Custom Chemicides, Inc.*,
   912 S.W.2d 128 (Tenn. 1995).................................................................22

*Robertson v. Monsanto Co.*,
   287 F. App'x 354 (5th Cir. 2008) ...........................................................32

*Robinson v. Texas Auto Dealers Ass'n*,
  387 F.3d 416 (5th Cir. 2004) ..........................................................................13

*Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co.*,
  618 So. 2d 874 (La. 1993) ..............................................................................23

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
  601 F.3d 1159 (11th Cir. 2010) ......................................................................45

*Salt River Project Agr. Improvement & Power Dist. v. Westinghouse Elec. Corp.*,
  694 P.2d 198 (Ariz. 1984)...............................................................................22

*Shaunfield v. Paramount Recovery Sys.*,
  No. 12-cv-4686, 2014 WL 4814827 (N.D. Tex. Sept. 29, 2014) ...........................41

*State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*,
  736 So.2d 384 (Miss. App. 1999) ....................................................................22

*Steering Committee v. Exxon Mobile Corp.*,
  461 F.3d 598 (5th Cir. 2006) ...........................................................12, 18, 43, 46

*M.D. ex rel. Stukenberg v. Perry*,
  675 F.3d 832 (5th Cir. 2012) ...........................................................................43

*Trull v. Plaza Associates*,
  1998 WL 578173 (N.D. Ill. Sept. 3, 1998) .......................................................11

*Turner v. Murphy Oil USA, Inc.*,
  234 F.R.D. 597 (E.D. La. 2006)..................................................................18, 24

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016)................................................................................43, 44

*Unger v. Amedisys Inc.*,
  401 F.3d 316 (5th Cir. 2005) .....................................................................13, 47

*Comptroller of Va. ex rel. Va. Military Institute v. King*,
  232 S.E.2d 895 (Va. 1977)...............................................................................20

*Vulcan Materials Co. v. Drilltech, Inc.*,
  306 S.E.2d 253 (Ga. 1983)...............................................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)................................................................11, 16, 24, 32, 33, 43

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
  208 F.3d 288 (1st Cir. 2000) ...........................................................................21

*Weinberger v. Great N. Nekoosa Corp.*,
    925 F.2d 518 (1st Cir. 1991) ........................................................................48

*WH Smith, PLC v. Benages & Associates, Inc.*,
    51 So. 3d 577 (Fla. App. 3 Dist. 2010) ........................................................21

*Woodard v. Andrus*,
    272 F.R.D. 185 (W.D. La. 2010) ..................................................................45

**Statutes**

28 U.S.C. § 1407 ...............................................................................................49

28 U.S.C. § 2072(b) ..........................................................................................32

Ala. Code § 6-2-38 ...........................................................................................19

Cal. Civ. Code § 3287(a) ..................................................................................42

Cal. Civ. Proc. Code § 338 ...............................................................................19

Fla. Stat. § 95.11(3) ..........................................................................................19

Ga. Code Ann. § 9-3-30 ....................................................................................19

La. Civ. Code Ann. Art. 2315 (1998) ...............................................................23

La. Civ. Code Art. 3492 ....................................................................................19

La. Civ. Code Art. 3493 ....................................................................................20

La. Rev. Stat. Ann. § 9:2800.51 *et seq.* ...........................................................23

M.C.L. § 600.2945(c) .......................................................................................22

Miss. Code Ann. § 11-1-63 ...............................................................................22

Miss. Code Ann. § 15-1-41 ...............................................................................19

N.J.S.A. § 2A-58C-1 .........................................................................................22

O.C.G.A. § 51-1-11 ...........................................................................................22

Va. Code Ann. § 8.01-243(B) ...........................................................................19

**Rules**

Fed. R. Civ. P. 23 ...................................................................................33, 45, 47

Fed. R. Civ. P. 23(a) ................................................................................................................11, 12

Fed. R. Civ. P. 23(b) ......................................................................................................................11

Fed. R. Civ. P. 23(b)(3)............................................................................................................ *passim*

Fed. R. Civ. P. 23(c)(1)(C) ............................................................................................................11

Fed. R. Civ. P. 23(c)(4)............................................................................................................13, 44

Fed. R. Civ. P. 23(g)(1)(B) ...........................................................................................................47

Fed. R. Evid. 702 ...........................................................................................................................33

**Other Authorities**

Black's Law Dictionary 1394 (10th ed. 2009)................................................................................27

Eldon E. Fallon et. al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L.
    Rev. 2323 (2008) ....................................................................................................................25

Joe Lawlor, *A few Chinese drywall homeowners decide to fix it themselves*, Daily
    Press (Dec. 10, 2010) ..............................................................................................................39

27-642 Moore's Federal Practice – Criminal Procedure § 642.03 ...............................................48

## I.       INTRODUCTION

Years ago, the PSC represented to this Court that it could certify a class.  In so claiming, the PSC offered up a grab bag of purportedly common issues, everything from loss of enjoyment to alternative living expenses to the cost of remediating the drywall.  All of it, the PSC proclaimed, could be easily resolved on a collective basis and, therefore, certification of a class of property owners was in order.  Even at the time though, there were cracks in the PSC's class certification foundation.  Its representations were unsupported and ignored critical differences in state law.  And, since that time, the cracks have only widened and multiplied—so much so that today, nearly every issue the PSC previously branded "common" among the proposed class members has vanished.

The PSC has itself acknowledged as much.  Indeed, before the near year-long break in the action in this case, the PSC informed the Court in a September 2015 letter that alternative living expenses, loss of use and enjoyment, short sale and foreclosure claims, personal property damage claims, and lost rent and lost business claims will all require individual resolution.  More recently, the PSC confirmed this recognition in its supplemental briefing on class damages.  The PSC's remarkable retreat from its earlier representations is precisely the sort that warrants revisiting a court's certification order.

Given this departure, one is naturally left to ask: so, what remains?  According to the PSC at least, remediation damages.  But even if that were true (it is not), decertification is required. The presence of a single alleged common issue here—i.e., remediation damages—is wholly inadequate to satisfy the predominance requirement.  Just as importantly though, the proposed formula undergirding the PSC's argument for commonality in remediation damages is predicated

- 1 -

on a faulty data set:  seven Virginia homes.  Those homes and their owners/inhabitants are by no means representative of the putative 3,500-person class.

Among the owners are individuals, corporations and non-profit organizations.  And the properties themselves are equally diverse.  Spread out across 18 states,[1] the buildings range from condominiums to mobile homes, single-family residences to multi-family units, quaint cottages to sprawling mansions, churches to industrial complexes.  And as is obvious from the very nature of the locales, the interiors of those properties also run the gamut.  Thus, they are not susceptible to a formula.  And absent a reliable formula for allocating remediation damages, the sole basis to which the PSC now clings for class purposes is nonexistent.  Accordingly, the Court must revisit its certification order and decertify the class.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

We begin where the PSC claimed to gain traction in its class certification motion: *Germano* and *Hernandez*.

### A.    The *Germano* and *Hernandez* Proceedings

Of the "Taishan Defendants," as defined by this Court,[2] Taishan was the only one named in *Germano*.[3]  *In re Chinese Manufactured Drywall Products Liab. Litig.*, 706 F. Supp. 2d 655,

---

[1] The eighteen states the PSC contends the properties are located in are as follows:  Alabama, Arizona, California, Florida, Georgia, Iowa, Louisiana, Michigan, Missouri, Mississippi, New Jersey, North Carolina, Ohio, South Carolina, Tennessee, Texas, Virginia, and Wisconsin. Ex. 10, Taishan's Response in Opposition to Plaintiffs' Motion for Assessment of Class Damages (Rec. Doc. 18877-8).

[2] This Court defined the "Taishan Defendants" as including Tai'an Taishan Plasterboard Co., Ltd. ("TTP"), BNBM, BNBM Group, CNBM and CNBM Group.  Certification Order ¶ 3 (Rec. Doc. 18028)

[3] Although a number of other defendants were named, none—aside from Taishan itself—was among the "Taishan Defendants."

659 (E.D. La. 2010).  After Taishan, the drywall manufacturer, failed to appear, the Court

entered a preliminary default and proceeded to a default damages hearing without a jury.  *Id.* at

659-60.  In advance of that hearing, though, seven plaintiffs, selected by the PSC, intervened.  *Id.*

And it was those seven Virginia properties—not the original properties—that were the subject of

the hearing.  With no opposition, the intervening plaintiffs were the sole source of evidence

received by this Court.  *Id.* at 660.

Recognizing the unique nature of the properties (as well as their owners), despite the

geographical similarity among them, the Court individually analyzed the specific testimony and

documentary evidence relevant to each—for example, the square footage, the residents of the

house, the residents' employment status, the purchase price, the number of stories, the room

layout, appliance failures, electrical system problems, purchase of fire extinguishers, security

system failures, electronic failures, rental home, bankruptcy filings, and foreclosure proceedings.

*Id.* at 693-712.  Based on those factors, the Court awarded a specific damages amount for each

property.  And, notwithstanding the Court's earlier recognition that its damages determination

would have "a preclusive effect [only] on those properties which are the subject of the hearing,"

Order Dated Dec. 8, 2009 (Rec. Doc. 576)—a finding the PSC featured in a motion *in limine* in

*Germano* as a basis for excluding remediation costs incurred by builders[4]—the Court

subsequently adopted the PSC's uncontested statement that the *Germano* properties constituted a

"representative cross section of Chinese drywall homes" and that bids from two contractors that

---

[4] Specifically, Plaintiffs confirmed their understanding that the *Germano* findings would have no
preclusive effect beyond the properties at issue in that case, stating that "the fear of precedent is
unfounded simply because . . . the Court has already declared that its findings will have no
preclusive effect on Knauf or any other parties, besides those of the intervenor plaintiffs."  Rec.
Doc. 1089-1 at p. 4; *see also id*. at p. 1 ("[T]he Court's findings as a result of the hearing shall
have no preclusive effect save as to the seven Virginia homes at issue").

had inspected the seven *Germano* properties, when averaged, yielded a remediation estimate of $86 per square foot. *Germano* Findings of Fact and Conclusions of Law ("*Germano* FOFCOL") at 57-60, 62-64 (Rec. Doc. 2380). The PSC made this representation without regard for the due process implications of treating properties and findings from a handful of uncontested cases as representative of the thousands of properties at issue in cases where (different) defendants are present.

Unlike *Germano*, *Hernandez* involved a single plaintiff who went to trial against Knauf Plasterboard Tianjin Co., Ltd. ("Knauf"). Findings of Fact and Conclusions of Law ("*Hernandez* FOFCOL") at 4, 7 (Rec. Doc. 2713). As in *Germano*, the evidence adduced during the *Hernandez* trial was highly—indeed, literally—individualized and directed almost entirely at the specific residence at issue. *Id*. at 8–15, 20–44. The *Hernandez* FOFCOL identified the same property and homeowner-specific factors as in *Germano*. Calculating their unique value with respect to that particular property, the Court awarded Plaintiffs approximately $164,000 in damages for remediation, damage to personal property, alternative living expenses and pre- and post-trial repair costs. *Id*. at 47. And, unlike the *Germano* FOFCOL, the *Hernandez* FOFCOL made no mention of a per-square-foot cost of remediating the subject property.[5]

### B.   The Certification Order

Relying heavily on the findings in *Germano* and *Hernandez*, the PSC moved the Court for class certification. *See* Plaintiffs' Omnibus Motion for Class Certification ("Certification Motion") (Rec. Doc. 17883). Having received no countervailing theory, the Court largely

---

[5] The Court did subsequently note in the Certification Order that the award for remediation damages in *Hernandez*, when divided by the square footage of the subject property, would yield a per-square-foot cost of $81. Certification Order at ¶ 74 (Rec. Doc. 18028).

adopted in its Certification Order those theories and arguments advanced by the PSC.

Certification Order at ¶ 74 (Rec. Doc. 18028).  Though the PSC acknowledged that any claim for

personal injury and medical monitoring could not be resolved on a classwide basis and would

require individual adjudication, Plaintiffs' Memorandum of Law in Support of Omnibus Motion

for Class Certification ("Certification Memo.") at 6 n.7 (Rec. Doc. 17883-1), it asserted that

enough commonality existed among the remaining issues to warrant class certification, *id.* at

17-20.

Although this Court was obligated to make an independent determination, it adopted the

PSC's proposed findings.  The Order stated that "[l]iability [has been] conceded by default"

"[b]ecause the only claims at issue here are against default judgment defendants." Certification

Order at ¶ 71 (Rec. Doc. 18028).  It did so even though the Taishan Defendants had not defaulted

in all nine class actions.  *Id*. at ¶ 14.  And, notwithstanding its earlier order that *Germano* would

have no preclusive effect beyond those properties, the Order went on to say that "[u]nder the

doctrine of collateral estoppel, the Court may also rely on the extensive findings already made by

the Court in the *Germano* default judgment proceedings" and that these "extensive findings . . .

are applicable to a cross-section of class members."  *Id*. at ¶¶ 58, 78.  On that basis, the Order

concluded that causation had already been established.  *Id.* at ¶ 71.

Turning to damages, the Order—at the PSC's urging—relied on the findings in *Germano*

and *Hernandez* to determine that Plaintiffs had "demonstrated a methodology to calculate class-

wide damages" and that damages need not be assessed on an individual basis.  *Id*. at ¶ 72.  It

stated, more specifically:

> Damages were previously presented in *Germano* and *Hernandez* and sufficed to
> allow the Court to make per square foot damage calculations for all affected
> plaintiffs.  Such aggregate proof is sufficient to meet Plaintiffs' obligations
> subject to appropriate cost adjustments.

> Given that the Court has already found that the costs of remediation can be
> calculated on a square footage basis and the Court has already determined what
> other property damages are recoverable, class-wide damages can be established in
> an efficient manner without the need for a trial.

*Id*. at ¶¶ 74 and 75 (citations omitted).  The Order drew that conclusion without any explanation

(as the PSC provided none) as to how the damages determination from cases in two states

(Virginia and Louisiana) could be applied under other states' laws or how those differences

might affect a court's ability to resolve the issue of remediation damages, or any other claim or

issue, on a classwide basis.  Nor, in making its certification determination, did the Order factor in

the remaining claims, including, by way of example, claims for medical monitoring, claims for

breach of warranty, and claims under the various states' consumer protection laws.  *See, e.g.*,

*Amorin* Florida Complaint ¶¶ 166–173, 206–210, 211–223.

> Nonetheless, the Order certified the following class:

> All owners of real properties in the United States, who are a named Plaintiff on
> the complaint in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class
> member), asserting claims for remediated damages arising from, or otherwise
> related to Chinese Drywall manufactured, sold, distributed, supplied, marketed,
> inspected, imported, or delivered by the Taishan Defendants.

Certification Order ¶ 79.A. (Rec. Doc. 18028).  That definition, applying only to plaintiffs with

"remediated damages," was later altered, with the Court expanding it to include non-remediated

properties.  Transcript of Hearing on Plaintiffs Motion for Assessment of Class Damages ("Class

Damages Transcript")] at 90:11-91:6.

### C.    Proceedings on Classwide Damages

Having secured its Certification Order, the PSC then moved for more than $1.26 billion

in damages for the class.  Plaintiffs' Memorandum of Law in Support of Motion for Assessment

of Class Damages ("Damages Motion") at 7 (Rec. Doc. 18086-1).  The PSC proposed that

(1) remediation costs would be calculated for each class member on a per-square-foot basis,

(2) alternative living expenses ("ALE") would be calculated for each class member on a per-square-foot basis and (3) each class member would receive an arbitrary $100,000 for loss of use and enjoyment ("LOUE") of their property. *Id*. at 5–7.

The PSC offered George Inglis as an expert in support of this proposal. He began with a $86 per-square-foot average of the contractor bids for the selected properties in *Germano* and then increased that figure to account for inflation, national average of construction costs, and inspection costs, and then adjusted up or down depending on the property's zip code. Declaration of George Inglis, dated May 15, 2015 at ¶ 4 (Rec. Doc. 19091-5); Class Damages Transcript at 119–3:120:1.

During the proceedings that followed, Mr. Inglis acknowledged that he "did [his] analysis based on an *average* quality home," even though there was "variability" in remediation costs across properties; that this variability could turn on "finishes on the interior;" and that "some properties are bigger than others" and "can … have different fit and finishes of kitchen cabinets." *Id*. at 125:19-20; 125:7–8; 160:12 and 162:4–5 (emphasis added). He acknowledged that he did nothing to determine whether the seven selected *Germano* properties—all but two of which (a duplex and a wine cellar) were single-family residences in the Norfolk, Virginia area—were in *any way* representative of the thousands of disparate properties at issue, which are scattered across more than a dozen states. *Id*. at 194:9–21. For instance, he did not inspect any of the PSC's hand-picked properties in formulating his methodology and thus had no insight into the layouts, the floor plans, the types of appliances, or electronics or any other specifics of the properties. *Id*. at 144:16–145:14; 160:13–22. Ultimately, Mr. Inglis was forced to acknowledge that his methodology is not an accurate predictor of an individual Plaintiff's remediation

damages, stating that he would "expect … some people in the class to get more and maybe some people to get less" than their actual remediation costs. *Id*. at 125:3–8.

As it did in pre-hearing briefing, *see* Opposition to Defendants' Motion to Exclude Testimony of George Inglis at 15 (Rec. Doc. 19081), at the damages hearing, the PSC itself had to recognize that Mr. Inglis's methodology[6] would not predict actual remediation costs:

> At the end of the day we'll provide this Court with a reasonable approach based upon the science in this case for determining classwide damages. There ultimately will have to be a claims process and *there will be additional phases where adjustments will be made*. But the claims process, at the end of the day, will be the process by which we *accurately* allocate damages to each individual class member.

Class Damages Transcript at 9:4–10 (emphasis added). This recognition was, of course, in stark contrast with—and, indeed, fundamentally undermined—the PSC's earlier representation that damages could "simply [be] calculated by using a mathematical formula … (i.e., price per square foot to remediate X number of square feet in class members' homes + damages)."[7]  Certification Memo. at 26 (Rec. Doc. 17883-1).

### D.    Plaintiffs' Post-Certification Concessions

Since this Court certified the proposed class and after the damages hearing, the PSC has voluntarily dismissed hundreds of plaintiffs, conceding that many of the certified plaintiffs do

---

[6] The PSC recently submitted a declaration from its original expert Ronald E. Wright who utilized the same methodology relied upon by Inglis.  Declaration of Ronald E. Wright, P.E. (Rec. Doc. 20613-4).  The CNBM Entities object to the procedural impropriety of this expert substitution and will set forth their procedural objections in detail in future briefing.

[7] The PSC also ignores the due process concerns with collecting money from defendants and sorting out liability after the fact, necessarily resulting in overcompensation.

not have standing because the product identifications did not reveal Taishan drywall.[8]  *See, e.g.*, September 8 Letter at 2 (Rec. Doc. 19490-2); *see also infra* at n.28.  And, despite the Plaintiffs' initial representations in their Certification Motion *that all* of their property damages could be resolved on a classwide basis, Certification Memo. at 14 (Rec. Doc. 17883-1), they have since acknowledged that ***all*** of their non-remediation property claims—*as well as* the remediation claims relating to more than 800 properties within the proposed class (*i.e.*, properties no longer owned by class members)—are not susceptible to class treatment and so must ultimately be tried on a case-by-case basis.  Plaintiffs wrote with regard to individualized claims:

> These claims on behalf of current or former owners include:  (a) ALE [i.e., alternative living expenses] claims, (b) loss of use and enjoyment claims, (c) short sale/foreclosure claims, (d) personal property claims, (e) lost rent/business claims, (f) remediation claims not included in Ex. 79[9] such as claims for former owners, and (g) other individualized damages claims not covered by categories (a) – (f) above.

September 8 Letter at 2 (Rec. Doc. 19490-2); *see also* September 17 Response at 3 n.2 (Rec. Doc. 19519-2); Damages Hearing, Plaintiffs' Exhibit 90 at 1 (spreadsheet removing 865 properties no longer owned by class members).  The PSC recently confirmed this recognition in its supplemental briefing on class damages, explaining that ALE, loss or repair of personal properly, HVAC home repairs, mortgage forbearance, in addition to other damages are "too individualized in nature and not necessarily amenable to a formulaic method of calculation."

---

[8] Moreover, the Brown Greer claims administrator testified that the only evidence of Taishan drywall for over ***two-thirds*** of the class was an entry on a Plaintiff Profile Form, which would not be sufficient evidence even for purposes of settlement.  Damages Transcript at 74:10–78:12.

[9] This refers to a spreadsheet submitted by Plaintiffs in connection with the June 9, 2015, hearing ("Damages Hearing") on their motion for assessment of class-wide damages.  The spreadsheet contained a list of properties for which Plaintiffs sought remediation damages.

PSC's Supplemental Brief on Class Damages ("PSC Supp. Class Damages Br.") at 14 (Rec. Doc.

20613-2).  This is a massive, and—to Plaintiffs—fatal concession.

But there is more.  This long list of individualized claims joins a number of additional

claims that must also, again according to Plaintiffs' own admission, be tried on a case-by-case

basis.  These include:

- Taxes, Repair Costs, etc. — Plaintiffs concede that their claims for damages for
  property taxes, insurance, utilities and other property maintenance, as well as
  damages for past and future repair costs and "damages for financial injuries such
  as bankruptcies" are "not capable of calculation on a class basis," i.e., must be
  tried individually.  Damages Motion at 8 (Rec. Doc. 18086-1).

- Setoffs — Plaintiffs acknowledge that Defendants will be entitled to seek setoffs
  from an award of damages to any given Plaintiff and that these setoffs must be
  individually determined.  September 8 Letter at 2 (Rec. Doc. 19490-2); *see also*
  Rec. Doc. 19197 [Plaintiffs' Proposed Findings of and Conclusions of Law
  Related to Remediation Damages Trial ("Plaintiffs' Proposed Damages
  FOFCOL")] at ¶ 15.[10]

- Product Identification — Plaintiffs concede that a given Plaintiff cannot recover
  without first establishing product identification and, moreover, that product
  identification is an issue that must be determined on a case-by-case basis.
  September 8 Letter at 2 (Rec. Doc. 19490-2); September 17 Response at 2 (Rec.
  Doc. 19519-2).

## III.   ARGUMENT

"[C]ertifications are not frozen once made."  *Amgen Inc. v. Conn. Ret. Plans & Trust

Funds*, 133 S. Ct. 1184, 1201 n.9 (2013).  Even after a court enters a certification order, it is

under a continuing duty to "monitor[] its class decisions in light of the evidentiary development

of the case."  *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983).  When "it becomes clear

---

[10] Plaintiffs suggested for the first time in the September 8, 2016, Letter that individual setoff
determinations could be made as part of the claims process procedure.  September 8 Letter at p. 2
(Rec. Doc. 19490-2).  They provided no case support for such an approach, nor explained how a
claims processor could possibly be qualified to adjudge the complex legal and factual issues that
arise in setoff proceedings.

that the district court needs to alter, amend, or even decertify the class," it is obligated to "do so under Rule 23(c)(1)(C)." *Gene & Gene, L.L.C. v. BioPay, L.L.C.*, 624 F.3d 698, 703 (5th Cir. 2010).

Plaintiffs retain the burden at all times to justify certification, even when a defendant has sought decertification. As with the initial certification request, mere assertions by the Plaintiffs will not suffice. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011). It is incumbent upon Plaintiffs to marshal evidence to demonstrate "that the requirements of Rules 23(a) and (b)" remain satisfied. *Marlo v. United Parcel Service, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011) (internal quotation marks and citations omitted); *Ezell v. Mobile Housing Bd.*, 709 F.2d 1376, 1380 (11th Cir. 1983) (affirming a district court's decertification ruling because plaintiffs had "failed to satisfy their burden of proof that class certification was proper"); *cf. Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 932 n.3 (5th Cir. 2005). Such a showing is particularly appropriate where, as here, there have been material changes to the class and those changes occurred at the behest of Plaintiffs' counsel, who later acknowledged their improper characterizations.

And all this is true even when there has been a default. Indeed, responding to a contention that defaulting defendants are precluded from later challenging class certification, the Third Circuit saw "no reason why that should be so." *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 922-23 (3d Cir. 1992). Although parties who experience a default judgment are precluded from raising certain defenses, a class certification challenge "is not the type of potential defense to the merits" that a party can lose through default. *Id.*; *see also Trull v. Plaza Associates*, 1998 WL 578173 at *1 (N.D. Ill. Sept. 3, 1998) (a default—be it preliminary or

final—"does not change the fundamental analysis [a] court must undertake in deciding whether to certify a class"); *see also* Certification Order at ¶ 52 (Rec. Doc. 18028).

Events since this Court entered its Certification Order demand that the Court revisit it. Central to this Court's certification determination were its conclusions that liability had been resolved, that numerous non-remediation damages were susceptible to class-wide resolution, and that a reliable formula exists for calculating remediation damages.  *See* Certification Order (Rec. Doc. 18028).  But since that time, the PSC has acknowledged liability is in flux given that questions remain about product identification while also conceding that all non-remediation damages require individual adjudication.  *See infra* § III.A.1.a.  Moreover, the PSC finally offered up the methodology underlying its formulaic approach—a methodology that has been proven to be wholly unreliable.  Accordingly, as both Taishan (Rec. Doc. 18879) and the BNBM Entities (Rec. Doc. 18883) have requested (in motions that remain pending), this Court should revisit its Certification Order, and decertify the class because (1) the number of issues undisputedly subject to individual adjudication predominate over the single allegedly common claim that remains (remediation), and (2) contrary to the PSC's assertion, the remediation determination itself requires individual adjudication.

### A.   Plaintiffs Cannot Satisfy the Predominance Requirement Because There Are No Issues That Lend Themselves to Classwide Resolution.

#### 1.   Plaintiffs Did Not Satisfy Their Burden of Proving Predominance.

Certification under Rule 23(b)(3) requires the plaintiff to show that "questions of law or fact common to class members predominate over any questions affecting only individual members."  *Amgen*, 133 S. Ct. at 1191.  "[A]lthough similar to the commonality requirement of Rule 23(a)," the predominance requirement "is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Steering*

*Committee v. Exxon Mobile Corp.*, 461 F.3d 598, 601-02 (5th Cir. 2006) (quoting *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005)).

In assessing predominance, the court must consider the *whole* of the plaintiffs' cause of action, *i.e.*, whether questions of law or fact common to class members predominate over any questions affecting only individual members.  *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996) ("[A] cause of action as a whole must satisfy the predominance requirement of (b)(3)."); *Corley v. Orangefield Indep. Sch. Dist.*, 152 F. App'x 350, 355 (5th Cir. 2005) ("Although FED R. CIV. P. 23(c)(4) does permit a district court to certify 'a class action with respect to particular issues,' we have previously held that . . . plaintiffs must first show that the cause of action, taken as a whole, satisfies the predominance requirement.") (quoting Fed. R. Civ. Proc 23(c)(4)); *see also Bell Atlantic Corp. v. AT&T*, 339 F.3d 294, 401 (5th Cir. 2003); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998).

Or, as the Fifth Circuit recently explained, "[a]t bottom, the [predominance] inquiry requires the trial court to weigh common issues against individual ones and determine which category is likely to be the focus of a trial."  *Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 376 (5th Cir. 2016); *Castano*, 84 F.3d at 740 (predominance requires "consideration of how a trial on the merits would be conducted"); *Robinson v. Texas Auto Dealers Ass'n*, 387 F.3d 416, 426 (5th Cir. 2004) (reversing certification order where "the court did not indicate that it [had] seriously considered the administration of the trial [and] [i]nstead . . . appears to have adopted a figure-it-out-as-we-go-along approach that *Castano* criticized and that other Fifth Circuit cases have not endorsed").

a.        **Non-Remediation Damages**

As an initial matter and as we discuss below, *see infra* § III.A.3., issues of liability and

causation must still be resolved by the Court, contrary to the PSC's contention.[11]  That is because

at least one defendant has not defaulted in each of the relevant actions.  Indeed, the PSC has

admitted as much, as evidenced by the very chart it relied upon in its Certification Motion

(where the Xs indicate when a default has been entered):

**CASES IN WHICH THE TAISHAN DEFENDANTS HAVE
BEEN HELD IN DEFAULT**

|  | Taishan | TTP | BNBM | BNBM Group | CNBM Group | CNBM |
|---|---|---|---|---|---|---|
| *Germano* | X |  |  |  |  |  |
| *Wiltz* |  | X |  |  |  |  |
| *Gross* |  |  | X | X | X | X |
| *Amorin* (Virginia) | X | X |  | X | X | X |
| *Amorin* (Louisiana) | X | X |  |  |  | X |
| *Amorin* (Florida) | X | X |  |  |  |  |

Certification Memo. at 10 (Rec. Doc. 17883-1).  Because each non-defaulting defendant is

entitled to defend against claims of liability and challenge arguments concerning causation, *see,*

*e.g., Frow v. De La Vega*, 82 U.S. 552, 554 (1872), those issues, which by their nature are highly

individualized, must be resolved before any damages determination can be made.  And there is

real cause for concern on that front.  The PSC has continually reduced the number of claimant

---

[11] Indeed, as the PSC's periodic dismissals demonstrate, questions of liability remain in flux
with over 1000 claims having been dismissed since this Court issued its certification order.

properties due to lacking product identification, revealing that its earlier, sweeping
characterizations were inaccurate and individual attention is required.  *See infra* § III.A.2.b.  This
demonstrates that liability must be determined on an individual basis.

But, even setting those considerations aside and focusing solely on damages, there is little
dispute concerning the number of issues that will require individual adjudication.  In the
Certification Motion itself, Plaintiffs recognized that any claims for personal injury and medical
monitoring could not be resolved on a classwide basis.  *See* Plaintiff's Omnibus Motion for Class
Certification at 6 n.7 (Rec. Doc. 17883).  Plaintiffs have also acknowledged that damages claims
relating to property taxes, insurance, utilities and other property maintenance, past and future
repair costs, and bankruptcy must be tried individually.  *See* Damages Motion at 8 (Rec. Doc.
18086-1).  Add to that Plaintiffs' September 8, 2015 and December 23, 2016 concessions that
product identification, alternative living expenses, loss of use and enjoyment, short
sale/foreclosure, personal property, and lost rent/business require individual resolution, and the
Court is confronted with a plethora of individual issues requiring individual resolution.  *See* PSC
Supp. Class Damages Br. at 9, 14 (Rec. Doc. 20613-2); September 8 Letter at 2 (Rec. Doc.
19490-2); *see also* September 17 Response at 3 n.2 (Rec. Doc. 19519-2).

Notably, this last concession, involving six separate issues, is directly contrary to what
the PSC initially represented to this Court in its Certification Motion, its proposed FOFCOL, and
its motion for class damages.  *See* Certification Memo. at 20-21 (Rec. Doc. 17883-1); Plaintiffs'
Proposed FOFCOL at 27 (Rec. Doc. 17998); Plaintiffs' Mem. ISO Mot. For Class Damages at
6-7 (Rec. Doc. 18086-1).   The PSC's about-face is understandable, as it had no choice.
Alternative living expenses will inevitably and materially vary from location to location.  The
cost of renting a home or apartment in Baton Rouge is wildly different than the cost of doing so

in Miami.  And state laws account for such geographical cost-of-living disparities, imposing

upon Plaintiffs an obligation, when proving damages, to demonstrate the rental values of homes

in the relevant market.  *See, e.g.*, *Fisher Island Holdings, LLC v. Cohen*, 983 So. 2d 1203, 1204

(Fla. App. 3 Dist. 2008) (calculation of alternative living expenses is based "on the fair market

net rental value of the home"); *Chriss v. Manchester Insurance & Indemnity Co.*, 308 So. 2d

803, 805-06 (La. Ct. App. 1975) ("rental value of similar property").  Yet, Plaintiffs' expert

accounted for none of this geographic disparity in identifying an across-the-board $11.86 per

square foot figure in his original declaration.[12]  Inglis Dec., dated April 27, 2015, at 7 (Rec. Doc.

18877-2).  Eventually, even the PSC had to acknowledge that its representation could not hold

up and "instructed [its expert] to delete the alternative living expenses from [his] damages

calculation."  Inglis Dec., dated April 27, 2015 at 2 (Rec. Doc. 18958-51).

      The same is true of claims for loss of use and enjoyment.  The PSC has argued that "[a]n

award of $100,000 per property" is appropriate.  Plaintiffs' Mem. ISO Mot. For Class Damages

at 7 (Rec. Doc. 18086-1).  It was Plaintiffs' burden to "affirmatively demonstrate" that such an

across the board, undifferentiated figure is appropriate for the thousands of properties at issue.

*Wal-Mart*, 564 U.S. at 350.  Yet, the PSC produced no evidence; instead, it simply pointed to the

Court's findings in *Germano*.  Plaintiffs' Mem. ISO Mot. For Class Damages at 7 (Rec. Doc.

18086-1).  The PSC's failing is not at all surprising given that such inquiries are highly

individualized.  Those affected by a defective product will undoubtedly deal with the issue in

different ways.  A church and a commercial property owner will experience a different type of

loss (e.g., lost revenue or donations) than a residential homeowner.  And even among

---

[12] Nor would he have been competent to do so given that he is an engineer, not a real estate agent or, as in *Germano*, an accountant with receipts from rental payments.

homeowners themselves, the ways in which one loses use and enjoyment of the property will vary from individual to individual:  Some may stay in the house while it is being remediated, others may leave entirely, still others may leave the home but continue to use it for certain purposes, and some may elect to sell or abandon the property.  *See, e.g.*, *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 706 F. Supp. 2d at 694-96 (Morgan family moved out of the home and then permanently abandoned it), 696 (Baldwin family remained in the home), 699 (some members of the Leach family moved out while awaiting remediation, others remained, using portions of the home), 702-03 (Orlando family used only a portion of the home for several months before moving out).  And for many, particularly those in Florida, the properties may be vacation homes that the homeowner uses only infrequently throughout the year.  The PSC's reliance on the *Germano* FOFCOL, without any accompanying evidence, to support a single dollar amount for loss of use and enjoyment is fatal because there is no "legally valid ground on which the … damages suffered by one person may be determined, *without any evidence*, solely on the basis of the average of awards made to other persons in similar cases." *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 321 n.51 (5th Cir. 1998) (emphasis added). Worse still, here, the individual cases are not even similar.

Notwithstanding the PSC's representations to this Court at the time of its certification request, it now acknowledges that all of these non-remediation determinations require individual resolution.  That recognition alone warrants decertification because, even assuming remediation damages are "common to the members of the class" (which they are not), it can scarcely be said that this single issue "predominate[s] over [the numerous] questions affecting only individual members," which include product identification, alternative living expenses, loss of use and enjoyment, short sale/foreclosure, personal property, lost rent/business, personal injury and

medical monitoring, property taxes, insurance, utilities and other property maintenance, past and future repair costs, and bankruptcy. *Steering Comm.*, 461 F.3d at 601. But again, there is more that compels decertification:  the PSC's proposed approach to remediation is itself flawed, leaving truly nothing that reasonably can be decided on a classwide basis.

### b.    Remediation Damages

The sole point of "commonality" to which the PSC now clings is remediation damages. It asserts that such damages can be reduced to a single per-square-foot formula derived from *Germano* and *Hernandez* that can then be applied to each claimant's property wherever it is located and whatever it looks like, but the PSC is wrong.  To begin with, the PSC's contention disregards considerable variations in state law—variations that critically impact the remediation determination depending upon the state in which the property is located.  Beyond this, the *Germano* and *Hernandez* proceedings are improper barometers for measuring class damages because bellwether trials may not be judicially applied to other cases and, even if they could be, the eight properties in *Germano* and *Hernandez* simply and indisputably are not representative of the thousands of properties in the litigation as a whole.

### (1)    The PSC's proposed methodology fails to account for variations in state law.

"When a class action involves multiple jurisdictions," differences in state law bear critically upon the predominance inquiry. *Castano*, 84 F.3d at 741.  Indeed, both this Court "and the Fifth Circuit have refused to certify class actions … where the laws of multiple states are potentially applicable to the plaintiffs' claims, on the grounds that the claims are unmanageable and present too many issues requiring individual resolution." *Turner v. Murphy Oil USA, Inc*., 234 F.R.D. 597, 608 (E.D. La. 2006).  In conformity with this case law, Plaintiffs were required

to "identify the substantive law issues which will control the outcome of the litigation," *Castano*, 84 F.3d at 741, and "extensively analyze . . . [the] variations in state law . . . and the obstacles they present to predominance." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 730 (5th Cir. 2007). Only then could the court ascertain whether "variations in state law … swamp any common issues and defeat predominance." *Castano*, 84 F.3d at 741. But, here, the PSC mentioned no difference in case law among the 18 states at issue.[13] Yet, there are many.

For instance, whether a plaintiff may recover at all will depend on whether he filed his claim within the requisite statute of limitations. *Castano*, 84 F.3d at 744 ("to make a meaningful determination of the certification issues," the district court "must understand the claims, *defenses*, relevant facts, and *applicable substantive law*") (emphases added). Here, that time period varies from state to state and from case to case.[14] In Louisiana, the limitations period for property damage claims is one year, La. Civ. Code. Art. 3492; it is two years in Alabama, Ala. Code § 6-2-38; three years in California, Cal. Civ. Proc. Code § 338; four years in Georgia and Florida, Ga. Code Ann. § 9-3-30; Fla. Stat. § 95.11(3); five years in Virginia, Va. Code Ann. § 8.01-243(B); and up to six in Mississippi, Miss. Code Ann. § 15-1-41. And the trigger date for when those limitations periods begin also varies. In several states, a cause of action does not

---

[13] In its most recent filing, the PSC still does not address the considerable variations in state law. Instead, it simply posits that bellwether trials may be held, which will resolve non-remediation claims for current owners as well as claims for former owners, and, without acknowledging— much less discussing—state law variations, summarily asserts that the damages determinations from these bellwether trials will constitute "the substantial equivalent of the types of intangible damages available" outside Louisiana.   PSC Suppl. Class Damages Br. at 12-15, 26; *see also id.* at 32 (former owner claims in Virginia "will provide important guidance to the resolution of former owner claims in … other states").

[14] "Under the Erie doctrine, federal courts apply the statute of limitations that the forum state would apply." *Huss v. Gayden*, 571 F.3d 442, 450 (5th Cir. 2009) (citing *Guar. Trust Co. v. York*, 326 U.S. 99, 109-10 (1945)).

accrue until the plaintiff knew or reasonably should have known of the defective product. *See, e.g.,* La. Civ. Code art. 3493 ("one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage"); *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 245 (La. 2010); *PPG Architectural Finishes, Inc. v. Lowery*, 909 So. 2d 47, 50 (Miss. 2005); *Hearndon v. Graham*, 767 So. 2d 1179, 1184 (Fla. 2000); *McKelvey v. Boeing N. Am., Inc.*, 86 Cal. Rptr. 2d 645, 651 (Cal. App. 2 Dist. 1999). Other states have rejected this discovery rule in favor of a more stringent standard. *See, e.g., Corp. of Mercer Univ. v. Nat'l Gypsum Co.*, 368 S.E.2d 732, 733 (Ga. 1998) (all actions for negligent damage to property must be brought within four years after the cause of action accrues, even if the negligence was not discovered within that period); *Henson v. Celtic Life Ins. Co.*, 621 So. 2d 1268, 1274 (Ala. 1993); *Comptroller of Va. ex rel. Va. Military Institute v. King*, 232 S.E.2d 895, 900 (Va. 1977) ("the applicable period of limitation begins to run from the moment the cause of action arises rather than from the time of discovery of injury or damage, and we have said that difficulty in ascertaining the existence of a cause of action is irrelevant.").

And the statute of limitations inquiry is even more complex when a property owner brings suit in a state other than the one in which the property is located. In those instances, the federal court is "bound to look to the choice of law rules of the state in which it sits to determine whether the state courts of that state would apply their own state's statute of limitations or the statute of limitations of some other state." *Ellis v. Great Sw. Corp.*, 646 F.2d 1099, 1103 (5th Cir. Unit A June 1981). Consequently, not only will the court have to apply different state statute of limitations but different state choice of law rules for determining which state's statute of limitations apply. Where, as here, "the defendant's 'affirmative defenses (such as ... the statute of limitations) may depend on facts peculiar to each plaintiff's case,' class certification is

erroneous." *Broussard v. Meineke Disc. Muffler Shops*, Inc., 155 F.3d 331, 342 (4th Cir. 1998) (quoting *In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982)); *see also Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("a necessity for individualized statute-of-limitations determinations invariably weighs against class certification").

Under Plaintiffs' own theory, their ability to pursue damages against each named defendant will also vary greatly. To recover against the CNBM Entities (i.e., Moving Defendants), Plaintiffs must establish personal jurisdiction, *see Castano*, 84 F.3d at 744, and Plaintiffs' efforts on that front have been rooted in alter-ego law—an inquiry that Plaintiffs contend is dependent on the law of the forum states.[15] But those laws vary. In Florida, the test is whether the company is a mere instrumentality and the defendant engaged in improper conduct. *WH Smith, PLC v. Benages & Associates, Inc.*, 51 So. 3d 577, 581 (Fla. App. 3 Dist. 2010). In Virginia, courts inquire whether the corporation was used to disguise a legal wrong. *See, e.g., Perpetual Real Estate Servs., Inc. v. Michaelson Properties, Inc.*, 974 F.2d 545, 548 (4th Cir. 1992). And though the CNBM Entities disagree, Plaintiffs claim the test in Louisiana is whether the company was part of a single business enterprise.[16] *See Green v. Champion Ins. Co.*, 577 So. 2d 249 (La. App. 1 Cir. 1991).

---

[15] The CNBM Entities maintain that the law of the place of incorporation applies.

[16] Discussing the single business enterprise recently, the United States Court of Appeals for the Fifth Circuit noted the Louisiana Supreme Court has never adopted it and the state's intermediate appellate courts have taken a narrow view of the theory, requiring a showing similar to veil-piercing. *Energy Coal v. CITGO Petroleum Corp.*, No. 15-30863, 2016 WL 4575569, at *3 (5th Cir. Sept. 1, 2016).

If Plaintiffs clear these hurdles, more lurk:  whether Plaintiffs can recover for certain of their claimed injuries will turn on the extent to which the relevant states have rejected the economic loss doctrine.[17]  That is because the majority of states, which includes—as relevant here—Alabama, Florida, Mississippi, Missouri, New Jersey, North Carolina, Ohio, South Carolina, Tennessee, Texas, and Wisconsin, bar recovery in tort for purely economic damages.[18] In these states, Plaintiffs would be precluded from recovering, under their tort theories, for injury to the product, repair costs, inspection costs, relocation costs, and diminution in value.  Other states, including Arizona, California, Georgia, Iowa, and Michigan, embrace an intermediate view, which allows for tort recovery depending on whether the consumer was "disappointed" or "endangered."[19]  Whether a consumer can recover in tort turns on "the nature of the defect, the type of risk, and the manner in which the injury arose."  *Lincoln General Insurance Co. v.*

---

[17] Though this Court's ruling in the *Knauf* litigation circumvented the issue of state discrepancies on this point, *see In re: Chinese-Manufactured Drywall Products Liability Litigation*, Case No. 09-md-02047, Dkt. No. 741 (E.D. La.), the CNBM Entities respectfully contend that a state-by-state assessment is required.

[18] *See Lloyd Word Coal Co. v. Clark Equip. Co.*, 543 So.2d 671 (Ala. 1989); *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc*., 891 So.2d 532 (Fla. 2004); Miss. Code Ann. § 11-1-63; *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co*., 736 So.2d 384 (Miss. App. 1999); *Clevenger and Wright, Co. v. A.O. Smith Harvestore Products, Inc*., 625 S.W.2d 906 (Mo. App. 1981); N.J.S.A. § 2A-58C-1; *Alloway v. General Marine Indus., L.P*., 695 A.2d 264 (N.J. 1997); *Moore v. Coachmen Indus., Inc*., 499 S.E.2d 772 (N.C. App. 1998); *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention*, 678 N.E.2d 519 (Ohio 1997); *Kennedy v. Columbia Leather and Mfg. Co., Inc*., 384 S.E.2d 730 (S.C. 1989); *Ritter v. Custom Chemicides, Inc*., 912 S.W.2d 128 (Tenn. 1995); *JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701 (Tex. 2008).

[19] *See Salt River Project Agr. Improvement & Power Dist. v. Westinghouse Elec. Corp*., 694 P.2d 198 (Ariz. 1984); *Jimenez v. Superior Court*, 58 P.3d 450 (Cal. 2002); O.C.G.A. § 51-1-11; *Vulcan Materials Co. v. Drilltech, Inc*., 306 S.E.2d 253 (Ga. 1983); *American Fire & Cas. Co. v. Ford Motor Co*., 588 N.W.2d 437 (Iowa 1999); M.C.L. § 600.2945(c); *Niebarger v. Universal Cooperatives Inc.*, 486 N.W.2d 612 (Mich. 1992).

*Detroit Diesel Corp.*, 293 S.W.3d 487, 488 (Tenn. 2009).  A minority of states permit tort recovery for purely economic loss.[20]  These states include Louisiana and Virginia.[21]

State law also differs with respect to the limits that states have placed on recovery. Florida and California, for example, limit recovery to the lesser of the cost of repair or diminution in market value.  *Keyes Co. v. Shea*, 372 So. 2d 493, 496 (Fla. App. 4 Dist. 1979); *Mozzetti v. City of Brisbane*, 67 Cal. App. 3d 565, 576 (Cal. App. 1 Dist. 1977).  But in California, exceptions may provide for repair costs that exceed diminution where there are "personal reasons" to restore the home.  *Orndorff v. Christiana Community Builders*, 217 Cal. App. 3d 683, 687 (Cal. App. 4 Dist. 1990).  Similarly, Louisiana recognizes the "reasons personal" rationale, but as an exception where the cost of repair is disproportionate to the pre-injury value of the house.  *Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co.*, 618 So. 2d 874, 879-80 (La. 1993).  "Other courts, although applying cost to restore as the appropriate measure of damages in all cases of reparable injury to property, use the fair market value of the property before the injury, rather than the diminution in value, as a ceiling on the damage award."  *Id.* at 877.  Such variations in state law will cap recovery in a variety of ways.[22]

---

[20] The PSC makes but passing reference to this in its supplemental brief on class damages, proclaiming, in the most conclusory fashion, that Virginia's economic loss rule should not impact the calculation.  PSC Supp. Class Damages Br. at 29 n.45 (Rec. Doc. 20613-2).

[21] La. Rev. Stat. Ann. § 9:2800.51 *et seq.*; *DeAtley v. Victoria's Secret Catalogue*, 876 So.2d 112 (La. App. 2004); *Kaltman v. All Am. Pest Control, Inc.*, 706 S.E.2d 864 (Va. 2011).

[22] The same goes for non-remediation damages for medical monitoring.  Florida allows such claims even in the absence of discernible injury, while Louisiana does not.  *See Petito v. A.H. Robins Co.*, 750 So. 2d 103, 106–07 (Fla. App. 3 Dist. 1999); La. Civ. Code Ann. art. 2315 (1998); *Crooks v. Metro Life. Ins., Co.*, 785 So.2d 810, 812 (La. 2001).  Recognizing such claims are not susceptible to classwide resolution, Plaintiffs have explicitly stated that "personal injury (or medical monitoring) claims … will be brought on an individual basis."  Certification Memo.

As this Court has explained, these variations make all the difference.  In *Turner v. Murphy Oil USA, Inc.*, the Court began its predominance analysis by stressing the "importan[ce] that the same substantive law will apply to all Plaintiffs' claims in these cases."  234 F.R.D. at 606.  Critically, that case was not one "in which the varying laws of different states create[d] the need for … individual trials."  *Id.*  Rather, "[a]ll of Plaintiffs' claims except one … ar[o]se under Louisiana law."  *Id.*  Here, by contrast, the differences in state law are considerable.  Had the PSC brought them to this Court's attention, the Court would have recognized that such wide variation necessitates considerable individualized attention, and thus militates against class certification.  The issue must be addressed now, because disregard for "how variations in state law affect predominance and superiority  . . . mandates reversal."  *Castano*, 84 F.3d at 740.

### (2)   *Germano* and *Hernandez* do not qualify as bellwether trials from which damages may be aggregated.

At the time Plaintiffs moved for class certification, they claimed that damages could be aggregated to account for almost 4,000 claimants by extrapolating from the seven selected properties in *Germano* and the one in *Hernandez*.  Certification Memo. at 23-27 (Rec. Doc. 17883-1).  But, contrary to what *Wal-Mart* requires, Plaintiffs offered no proof—expert or otherwise—that the formula they sought to embrace was appropriate.  Instead, they pressed their theory upon this court without regard "for the variegated nature" of the class members.  *Bell*, 339 F.3d at 307.  Contrary to Plaintiffs' assertion, *Germano* and *Hernandez* cannot serve as bellwether trials.

---

at 6 n.7 (Rec. Doc. 17883-1).  Considerable variation also exists among the states with regard to negligence, strict liability, affirmative defenses to negligence claims, breach-of-warranty and consumer protection claims, *Castano*, 84 F.3d at 741, 742 n.15, 745 n.20, as well as claims for breach of express and implied warranties, *Cole*, 484 F.3d at 726–30.

(a)     **Bellwether trials are not intended to have binding effect on other claimants.**

Bellwether trials are not intended to have any binding effect beyond the specific claims at issue.  "[T]he purpose of a bellwether trial" is to "clarify[] and streamlin[e] the relevant issues." *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1008 (9th Cir. 2008).  They "assist in the maturation of disputes" by allowing counsel to assess the strengths and weaknesses of their cases.  Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2325 (2008).  As such, "the knowledge and experience gained during the bellwether process can precipitate global settlement negotiations and ensure that such negotiations do not occur in a vacuum, but rather in light of real-world evaluations of the litigation by multiple juries."  *Id*; *see also In re Hanford Nuclear Reservation Litig.*, 534 F.3d at 1007 (observing that "bellwether trial was meant to be a 'learning process'" and to "establish the relative strengths and weaknesses of the parties").

But the PSC seeks to do more than simply use *Germano* and *Hernandez* as a point of reference for negotiations or trial-sharpening tool.  Rather, it seeks to make the findings from those proceedings *binding* as to non-parties.  The Fifth Circuit has affirmatively rejected such an approach.  In *In re Chevron U.S.A., Inc.*, the court prohibited use "of the results obtained from the trial of the thirty (30) selected cases for any purpose affecting issues or claims of, or defenses to, the remaining untried cases." 109 F.3d 1016, 1021 (5th Cir. 1997).  While plaintiffs have argued for a broad reading of *Chevron* as "generally looking with favor on the use of bellwether verdicts when shown to be statistically representative," the Fifth Circuit has explained that any such "language [in *Chevron* was] plainly *dicta*, certainly insofar as it might suggest that representative bellwether verdicts could properly be used to determine individual causation and damages for other plaintiffs."  *Cimino*, 151 F.3d at 318.  *Chevron* "prevent[ed] any preclusive

use of the unitary trial results (whether for general causation or individual causation or otherwise) in cases other than those of the thirty selected plaintiffs." *Id*.   And that was in a case involving the *same* defendant.   The due process concerns are only heightened where, as here, the PSC attempts to use a prior trial against different defendants.

Disregarding this case law, the PSC continues to press this Court to use bellwether trials as a means of resolving untried cases.   Specifically, the PSC asks that the Court authorize two bellwether trials:  one in Louisiana on non-remediation damages and the other in Virginia to address former owner claims.   It then suggests the two may be "conducted to resolve remaining issues of class damages."   PSC Supp. Class Damages Br. at 21; *see also id.* at 14 ("The bellwether hearing would provide substantial guidance for quantifying (*and perhaps resolving*) non-remediation damages of Plaintiff class members") (emphasis added).

It is "for good reason" that "[a]ppellate courts have been skeptical of" precisely these sorts of attempts to treat "the trial of representative claims" as having "a binding effect on the consolidated cases of related claimants."   Fallon, *Bellwether Trials in Multidistrict Litigation*, 82 Tulane L. Rev. at 2331.   As the Fifth Circuit explained in *Cimino*, "personal injury tort actions for monetary damages are 'a prototypical example of an action at law, to which the Seventh Amendment applies.'"   151 F.3d at 311, 319.   Accordingly, consistent with the Seventh Amendment, "the implemented trial plan [must] include a litigated determination … whether, as to each individual plaintiff, [the allegedly offending] product was a cause of his complained-of condition and, if so, the damages that plaintiff suffered as a result."   *Id.* at 314.   To take findings from bellwether proceedings and apply them in a binding fashion is flatly at odds with the requirement of individualized determinations.

Moreover, *Germano* cannot have any preclusive effect against the CNBM Entities because those entities were not parties to the action.  It would work "a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard."[23]  *Parklane Hosiery Co. Inc. v. Shore*, 439 U.S. 322, 327 n.7 (1979) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971)).

> **(b)      To the extent the findings from bellwether trials may be applied to other claimants, none of the requirements for doing so are present here.**

Even if bellwether trials are permissible and even if applying their findings to the CNBM Entities *ex post facto* would not be violative of the Constitution, the PSC's approach here is invalid.[24]  In *Chevron*, the Fifth Circuit detailed the showing that must be made before a bellwether trial may be used "for a purpose that extends beyond the individual cases tried." 109 F.3d at 1020.  Prior to extrapolating, a court must "find that the cases tried are representative of the larger group of cases or claims from which they are selected."  *Id.*  To that end, the representative members must be randomly selected and of sufficient size so as to achieve statistical significance to the desired level of confidence in the result obtained.  *Id.* at 1019.  And the process for selecting the samples must apply the science of inferential statistics—it "must be based on competent, scientific, statistical evidence."  *Id.* at 1020.  Though it was the PSC's

---

[23] "Privy" is defined, in pertinent part, as "a person having a legal interest of privity in any action, matter or property." Black's Law Dictionary 1394 (10th ed. 2009).  None of the CNBM Entities had any interest in the *Germano* hearing, given that they never manufactured drywall and were not named as defendants.  Any contention to the contrary is entirely dependent upon an alter ego theory, which is inapplicable.  *See* Mem. ISO Mot. to Dismiss at 36-45 (Rec. Doc. 19527-2); Reply ISO Mot. to Dismiss at 4-52 (Rec. Doc. 20043-2).

[24] Although the PSC was not entirely clear in its Certification Motion whether it was relying upon both actions or only one, its follow-on expert analysis relied only on *Germano*.

burden to demonstrate this, *see, e.g., Applewhite v. Reichhold Chemicals, Inc.*, 67 F.3d 571, 573 (5th Cir. 1995), its Certification Motion—and the resulting Certification Order—failed to account for, much less satisfy, these requirements.

First, the proposed sample size is exceedingly small.  The *Germano* proceeding consisted of seven selected properties.  *Germano* FOFCOL at 69-102 (Rec. Doc. 2380).  That pales in comparison with even those cases in which courts have *rejected* proposed plans.  In *Cimino*, for instance, the plan involved a full trial on 160 out of 2,128 claims.  *See* 151 F.3d at 309.  The sample size is also not one that would be accepted in the industry.  As Taishan's expert, David Pogorilich, explained, "construction firms do not and would not use a 'sampling' methodology [such as that prompted by Plaintiffs]…, particularly one based on such a small sample, to determine remedial construction pricing for a larger set of 3,739 properties."  Rec. Doc. 18877-3 at 3; *id.* ("construction firms estimating remediation under the circumstances presented in this matter would not rely on a sample of only 7 properties").

Second, Plaintiffs did not select a random sample of properties.  Far from comprising a meaningful cross-section of properties across the eighteen states, the *Germano* proceeding carefully selected homes in a single location: Norfolk, Virginia.  And those properties were not diverse.  They were composed of single family residences, a duplex and a wine cellar.  *In re Chinese Manufactured Drywall Products Liab. Litig.*, 706 F. Supp. 2d at 693-712.  By contrast, the certified class includes mansions, commercial properties, large apartment and condominium complexes, government buildings, and even churches, which are spread out across urban centers and suburban areas.  Thus, "there is no basis in the principles of scientifically valid statistical sampling for supposing that these seven properties are representative of the entire population of class properties."  Marais Decl. ¶ 19 (Rec. Doc. 18877-5).  That is because there is no

"essentially perfect, universally applicable correlation between cost and square footage." *Id.* at ¶ 21.

In each of these respects, this case is even less appropriate for bellwether treatment than *Chevron*.  There, confronted by 3,000 claimants, the district court assembled a trial plan that provided for a bellwether trial involving fifteen claimants selected by the plaintiffs and fifteen selected by the defendants.  *Chevron*, 109 F.3d at 1018-19.  As the Fifth Circuit explained, this did not constitute a bellwether trial.  *Id.*  Instead, the thirty cases simply constituted a "trial of fifteen (15) of the 'best' and fifteen (15) of the 'worst' cases"—there was "no pretense that the thirty (30) cases selected [we]re representative of the" group.  *Id.* at 1019.  And it was "impossible to discern from the district court's order what variables" would "impact on both the property and personal injury claims" at issue in the litigation.  *Id.*  Without any meaningful assurance that the procedure was "reasonably calculated to reflect the results that would be obtained if those claims were actually tried," the Fifth Circuit took the "extraordinary" step of granting a writ of mandamus.  *Id.* at 1020-21.  Ultimately, the court concluded that the district court's plan improperly subjected the defendant "to potential liability to 3,000 plaintiffs by a procedure that [was] completely lacking in the minimal level of reliability necessary" to make the requisite legal determinations.  *Id.*

The PSC's proposed trial plan is even more defective.  Rather than rely on thirty cases, the PSC's proposal involves just seven properties.  And the case selection process is completely asymmetric.  As ill-considered as the Fifth Circuit said the plan was in *Chevron*, the defendants there at least had an opportunity to balance out plaintiffs' selections.  Here, the process was relentlessly one-sided.  The PSC picked seven properties owned by parties in related actions pending in Virginia state and federal courts to intervene and be selected as "representative."

Rec. Doc. 548 at 2.  And it was those hand-selected properties—and those properties alone—that comprised the universe of cases used for the bellwether trials.

Moreover, as in *Chevron*, the PSC ignores many of the property-specific variables that bear on the cost of remediation.  *See* Declaration of David A. Pogorilich (Rec. Doc. 18877-3).  These variables include the qualitative class of construction (e.g., economy, average, custom, luxury), type of residence (e.g., one-story, two-story, three-story, bi-level), occupancy class (e.g., one family, two family), building configuration (e.g., detached, townhome, semi-detached), and number of living areas.  *Id.* at 4-5; *see also* Marais Decl. ¶ 21 (Rec. Doc. 18877-5) (explaining that among the inevitable property variations are the "amount and location of the drywall to be remediated within the home," structure type "reflecting such factors as economies of scale," and "quality of construction to be remediated" (e.g., trim and/or crown molding).

The Fifth Circuit's recent decision in *Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370 (5th Cir. 2016), is instructive  There, the Court affirmed the denial of class certification to property owners claiming damages caused by the construction of the Dwyer Road Intake Canal.  *Id.*  In so holding, the Court rejected the use of a formulaic approach to damages, explaining that it could not "account [for] the variances in age, size, type, construction, condition, … and location of the properties."[25]  *Id.* at 377.  Individual determinations were required—and that was just for properties confined to the Ninth Ward.  *Id.* at 373.  The differences identified by the *Crutchfield* Court are even more pronounced here where the properties are spread out across the country.

---

[25] Also, as in *Crutchfield*, Plaintiffs' damages here were not caused by a single acute event nor were they concentrated in a single defendant.  *Id.* at 378-79.  Rather, the drywall at issue was distributed over a period of time and was distributed by different manufacturers, suppliers and builders.

Judge Duval's decision in *In re Katrina Canal Breaches Consolidated Litigation*, 258 F.R.D. 128 (E.D. La. 2009) is likewise instructive. Addressing damages to community members flowing from an allegedly improperly moored barge during Hurricane Katrina, Judge Duval identified the inherent differences among properties, explaining that "residential structures . . . can vary significantly parcel to parcel, block to block" and "have differing values based upon construction materials, architectural style, neighborhood location, size, age and condition of property."[26] *Id.* at 135.

The PSC disregarded these individual considerations in its Certification Motion and so later was forced to acknowledge that the formula it proposed will not do nearly the work it once represented. Specifically, during the damages hearing before this Court, the PSC explained that even after its proposed formula is applied "adjustments will [have to] be made" in order to "accurately allocate damages to each individual class member." Damages Transcript at 9:4–10. This retreat has consequences: "the necessity of calculating damages on an individual basis, by itself, can be grounds for not certifying a class." *In re Katrina Canal Breaches Consol. Litig.*, 258 F.R.D. at 134 (quoting *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x. 296, 297 (5th Cir. 2004)). The PSC's concession puts to rest any pretense that the

---

[26] In *In re Katrina*, the Plaintiffs' expert acknowledged the numerous variables that would have to be accounted for "in performing the mass appraisal of real estate property" and further acknowledged that there was no way other than individualized assessments to value particularly large and unique properties. *Id.* at 133. Added to that were the personal injury claims, which, as here, plaintiffs admitted would necessitate individual trials. *Id.* at 136. Ultimately, Judge Duval explained that the array of damages (e.g., property damage, personal injury, and personal property) combined with the inability "to supply a model showing that all of these types of damage are subject to a formulaic calculation" militated in favor of the denial of class certification. *Id.* at 136. That determination was only underscored by the outstanding issues of causation that existed there. Here, similarly, questions remain as to whether there was, in fact, Taishan drywall in each home and, if so, what percentage. Those issues must be resolved on an individual basis.

methodology it espoused accounts for property-specific variables. *Germano* cannot be used as a bellwether.

**2.    Plaintiffs' Expert Cannot Save the Faulty Formulaic Approach Embraced by the Certification Order.**

In a long line of cases, the Fifth Circuit has expressed profound skepticism of "statistical measures of representativeness and commonality" and has "remained cautious in their use." *In re Fibreboard Corp.*, 893 F.2d 706, 710 (5th Cir. 1990). Such skepticism is rooted in the understanding that tort damages must be based on "individuals, not groups." *Id.* at 711; *Robertson v. Monsanto Co.*, 287 F. App'x 354, 362 (5th Cir. 2008). The focus on individuality is rooted in the Constitution, which protects a defendant's due process and jury trial rights, and the Rules Enabling Act. *Wal-Mart*, 564 U.S. at 367 (quoting 28 U.S.C. § 2072(b)). These rights are undermined by formulaic approaches that deprive the defendant of his "entitle[ment] to litigate its statutory defenses to individual claims." *Id.*; *see also Cimino*, 151 F.3d at 320-21.[27] The Fifth Circuit's skepticism has particular force in the context of claims for property damage claims because, by their nature, they are highly individualized. As this Court has explained, "injury to landowners varies in substantial ways, depending on the value, character and location of the property over which the easement prevails" and because "geographic variations would render some parcels more valuable than others, thus precluding any mechanical calculations of damages in this case." *In re Katrina Canal Breaches Consol. Litig.*, 258 F.R.D. at 135; *see also*

---

[27] Like Texas law, which was at issue in *Fibreboard* and *Cimino*, the laws of the relevant states here indicate that they require tort damages be proved on a case-by-case basis. *See, e.g.*, Taishan's Proposed Findings of Fact & Conclusions of Law re Plaintiffs' Motion for Class Damages] at ¶ 155 (Rec. Doc. No. 19194) [(discussing Louisiana, Mississippi and Virginia law).

*Crutchfield*, 829 F.3d at 377 (property damages require individualized assessment of "age, size, type, construction, condition, soil composition, and location of the properties").

Thus, if a plaintiff nonetheless seeks to employ a formulaic approach, he must supply "evidentiary proof," *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013), in order to satisfy his burden of "affirmatively demonstrat[ing] … compliance" with Rule 23, *Wal-Mart*, 564 U.S. at 350.  If that proof relies on expert testimony to justify class certification, the expert is subject to the requirements of *Daubert*.  Such testimony is admissible only if it is "the product of reliable principles and methods" and the witness has "applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  Courts must ensure that experts use and apply a reliable methodology that is relevant and helpful to the trier of fact.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). This "gatekeeping obligation" extends to all expert testimony, *Kumho Tire*, 526 U.S. at 147, which must be rigorously analyzed.  *See, e.g., Comcast*, 133 S. Ct. at 1432-33; *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 287-291 (S.D. W.Va. 2015) (excluding expert testimony regarding a classwide method for estimating aggregate damages, and denying a motion to certify a class for damages purpose).

Although the PSC asserted in its Certification Motion that it had consulted an expert who "developed a methodology to estimate" remediation damages, its proposal was not accompanied by any evidence.  Certification Memo. at 26 n.17 (Rec. Doc. 17883-1).  It was only months after that filing that the PSC offered up an expert affidavit laying out a methodology.  This belated disclosure denied this Court the ability to evaluate and incorporate such evidence into its Certification Order.  More important, it rests on faulty data and employs an unreliable formulaic methodology.

The PSC's initial expert evidence was a declaration from Ronald Wright.  *See* Rec. Doc. 18086-1.  Later, the PSC swapped out Wright for his understudy, George Inglis.  On April 27, 2015, Inglis submitted an affidavit, later amended, in which he described his remediation damages formula:  He (1) began with the $86 per-square-foot average of the contractor bids on the seven selected *Germano* homes; (2) then increased that figure to $95.92 per square foot to account for inflation; (3) further increased it to $99.92 per square foot to create a national average (because the small area in Virginia where the seven *Germano* homes are located has construction costs below the national average); (4) increased it again by 6%, to $105.91 per square foot to include the cost of post-remediation inspection by a certified industrial hygienist; and (5) finally adjusted upward or downward to reflect the extent to which construction costs in a given area were more or less than the national average.  Inglis Dec., dated April 27, 2015, at 2 (Rec. Doc. 18958-51).  The PSC has since switched back to Ronald Wright and asserted that the national average cost is $107.83.  Wright Dec., dated Dec. 23, 2016, at 10 ¶8 (Rec. Doc. 20613-4).

Despite this complicated legerdemain, the reasons for the methodology's unreliability are simple: it rests on a non-representative and non-statistically significant sample of remediation cost estimates to create an average remediation cost.  Accordingly, his proposed formula does not supply even a belated basis for salvaging the Certification Order.

### a.     Mr. Inglis's methodology is unreliable because it lacks a sample of representative properties.

Mr. Inglis used the *Germano* proceeding as a bellwether to establish baseline remediation costs.  As discussed above, however, *Chevron* requires a statistically-appropriate and randomly-drawn sample size that is rooted in "competent, scientific, statistical evidence."  109

F.3d at 1020.  Mr. Inglis made no effort to comply with these requirements.  Indeed, his affidavit makes no reference to the statistical significance of the *Germano* bellwether plaintiffs, and he confirmed that he "did not use statistics" to analyze whether the *Germano* properties were representative of the certified class.  Class Damages Transcript at 158:6-10.  Nor could he have done so; as the Court concluded in excluding portions of his testimony, he "has little or no training in statistical analysis."  June 5, 2015 Order at 5 (Rec. Doc. 19092).

Instead, Mr. Inglis argued that the average baseline remediation estimates (obtained from just two bids from local contractors) for the selected *Germano* properties are proxies for average class remediation costs because he "evaluated the seven homes, and . . . visited numerous other homes, projects throughout the United States in various states and found in each case that *the damages that we are seeing, areas that are damaged, are uniform. . . .*  It doesn't matter where the home is, it doesn't matter what type of home it is, the damages are the same."  June 9, 2015 Hearing Tr. 157:12-18 (italics added).

As an initial matter, Plaintiffs' own experts have acknowledged that Mr. Inglis's reliance on just two bids is improper.  In setting out his formulaic methodology, Mr. Inglis relied on the work of Mr. Wright in obtaining bids on the *Germano* properties.  Mr. Wright testified previously that he would normally get *at least three* contractor estimates "on a true bid," but he used just two in *Germano* for no better reason than time constraints in completing his expert report.  Wright Dep. 234:18-235:5 (Feb. 9, 2010).  These estimates are unreliable at best, as Mr. Inglis acknowledged that "two qualified contractors looked at the same seven properties and spent days evaluating, you know, processing their proposals, and yet when they were done, there was considerable variability in their proposals for the same property, the same work under the same conditions."  Class Damages Transcript at 161:11-15.

As to Mr. Inglis's statement that the property damages are uniform, as we explained above, *supra* §§ I, III.A.1.b.(2)(b), the properties themselves (and therefore the remediation costs) are not. Mr. Inglis made no effort to review floor plans of the class properties, familiarize himself with the variety of fits and finishes or quality of appliances in class properties, or become familiar with the specifics of any particular home. Class Damages Transcript at 160:13-22. That contravenes standard industry practice, as "construction firms estimating remediation would not develop a cost without verifying the square footage of the property." Pogorilich Decl. at 3 (Rec. Doc. 18877-3). Absent such measures, the *Germano* remediation estimates were not representative of the certified class.

And, indeed, the qualified statistician who examined the *Germano* properties found them to be unrepresentative. As Dr. Laurentius Marais explained, "Mr. Inglis' far-reaching extrapolation to the entire class of estimated costs from the seven *Germano* properties, an unscientific, improvised sampling of class properties in Virginia, is fundamentally flawed[.]" Marais Decl. at ¶ 10 (Rec. Doc. 18903-5). Mr. Inglis provided no basis for assuming that these properties are representative of the entire class. *Id.* at ¶ 22. They are not. The thousands of properties at issue, Dr. Marais explained, have "varying footprints/configurations (which can impact the quantity of drywall even if the square footage is the same), locales (in differing states as well as within differing municipal jurisdictions), level of fit and finish (from subsidized tract homes to semi-custom, to custom)." Rec. Doc. 18877-3 at 4. Even where the "foot print square footage is similar" in two homes, they "can and often do vary greatly." *Id.* at 6.

That there is considerable variation should come as no surprise given that, by their very nature, the class properties scattered across 18 states differ considerably. *See supra* §§ I, III.A.1.b.(2)(b). Beyond adjusting the average remediation cost on a zip code-by-zip code

basis, Mr. Inglis made no effort to account for any property differences.  And even his zip code adjustment is highly suspect; as any homeowner knows, houses within a given zip code can vary considerably.  Mr. Inglis's failings are particularly glaring given the actual variation in per-square-foot remediation costs that his firm calculated for four units in the same condominium complex.  As Mr. Inglis noted, remediation costs for the four units were estimated at $97.86, $75.27, $76.03, and $68.66.  Inglis Dep. 139:2-23.  This difference in per-square-foot remediation cost exists even where the fit and finish was "essentially the same in the units." *Id*. 141:20-22.  In short, Mr. Inglis's statistical methodology is not a sufficiently reliable basis for embracing his per-square-foot formula.  And "where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate," "class treatment may not be suitable." *Ibe v. Jones*, 836 F.3d 516, 529 (5th Cir. 2016).

### b.     The certified class contains properties that have already received remediation damages.

 "If the basis for an expert's opinion is clearly unreliable, the district court may disregard that opinion." *Munoz v. Orr,* 200 F.3d 291, 301 (5th Cir. 2000) (affirming exclusion of expert testimony in part due to errors in data underlying expert conclusion).  That is the case here because the roster of properties Mr. Inglis relied on in devising his damages methodology is unverified and inaccurate.

An expert's "reli[ance] on the plaintiffs' compilations of data . . . gives rise to a 'common-sense skepticism' regarding the expert's evaluation." *Id.* at 301-02.  Such skepticism is warranted here because Mr. Inglis has relied solely upon the PSC's compilation of property data.  But these data are astonishingly unreliable, as Plaintiffs' own actions reflect.  The PSC has repeatedly been forced to revise and reduce the list of properties that allegedly contain Taishan

or BNBM drywall.  More fundamentally, plaintiffs have been unable to make even a basic

showing of product identification.  September 8 Letter at 2 (Rec. Doc. 19490-2); September 17

Response at 2 (Rec. Doc. 19519-2).  Initially, the PSC urged the Court to award remediation

damages for 3,852 properties.  Rec. Doc. 18086-1 at 6-7.  When Mr. Inglis replaced Mr. Wright,

the PSC reduced the claimant properties to 3,739.  Inglis Decl., dated April 27, 2015 at 2 (Rec.

Doc. 18958-51).  And since that time, the PSC has further reduced the list of properties on no

fewer than five additional occasions.[28]  So, today, the class has been winnowed down to

approximately 1,400 properties—over 2,000 fewer than when the PSC—and Mr. Inglis—started.

  And even after this dramatic, 63% reduction, the list that Mr. Inglis relied upon still

contains inaccuracies.  For example, the PSC seeks remediation damages for more than 100 units

in the Villa Lago at Renaissance Commons development in Boynton Beach.[29]  However, those

properties already were part of multiple prior settlements that provided for remediation of all

units with Chinese drywall.  *E.g.,* Memorandum in Support of Motion for Order Preliminarily

Approving Settlement at 5 (Rec. Doc. 16741-1).  The properties range from 817 square feet to

---

[28] Less than a month after Mr. Inglis replaced Mr. Wright, the PSC further reduced the
population to 2,888.  *Id.* at 7.  By the June 9, 2015 damages hearing, the PSC cut the list further,
to 2,715 properties.  Class Damages Transcript at 53-54.  On September 8, 2015, the PSC
informed the Court that it was authorized to dismiss approximately 50 properties that did not
contain Taishan drywall, and was reviewing a further 900 properties for potential dismissal.
Rec. Doc. 19490-2 at 2.  On September 17, the PSC informed the Court that the certified class
now stood at 1,685 properties with verified product identification.  Rec. Doc. 19519-2 at 2.  And
on March 15, 2016, the PSC dismissed 268 additional properties "for failure to provide sufficient
indicia of product identification."  Rec. Doc. 20180 at 4.  These dismissals continue.  *See, e.g.*,
Annette Brown's Notice of Voluntary Dismissal, Dated April 25, 2016 (Rec. Doc. 20127);
Nancy Fishner's Notice of Voluntary Dismissal, dated May 24, 2016 (Rec. Doc. 20278); Lee and
Mauren Arnold's Notice of Voluntary Dismissal, dated July 18, 2016 (Rec. Doc. 20404).

[29] June 9, 2015 Hearing, Ex. 79 at 10-14.  The PSC has not provided an amended Exhibit 79
identifying the properties for which it no longer seeks remediation damages, nor did the PSC file
a dismissal on behalf of a Villa Lago claimant between September 2015 and March 2016.

1,460 square feet, and would thus receive a double recovery of between $71,549 and $131,434 each under Mr. Inglis's methodology.  June 9, 2015 Hearing on Class Damages, Exhibit 79.  The data provided by the PSC are so plainly inaccurate as to render Mr. Inglis's calculations unreliable, if not literally incredible.

<strong>c.     Mr. Inglis's remediation cost methodology results in windfall<br>damages awards.</strong>

Mr. Inglis would award significant remediation damages far in excess of what homeowners have actually incurred.  For example, media coverage of Chinese drywall in 2010 identified two homeowners in the Hampton Roads area who remediated their homes.  Joe Lawlor, *A few Chinese drywall homeowners decide to fix it themselves*, Daily Press (Dec. 10, 2010) ("Lawlor").[30]  Mr. Inglis would award these properties $207,211 and $302,987.  *See* June 9, 2015 Hearing, Ex. 79 at 94.  However, these property owners incurred substantially lower costs to actually remediate their homes.  The first owner, who did not even suspect the presence of Chinese drywall in his property until he was notified by an attorney, found Chinese drywall in approximately 15 % of his house.  *See Lawlor, supra*.  Although the owner was performing the remediation himself (another variable not accounted for by the PSC's formula), he estimated the cost to complete remediation will reach $15,000.  *Id.*  The second owner, who partially self-remediated, spent $50,000, and estimated (perhaps grandly) that it would cost $150,000 if he had contracted all of the work.  *Id.*  These remediation costs, even including the cost of the hypothetical contractor, are less than half of what Mr. Inglis would award.

---

[30] *Available at* http://articles.dailypress.com/2010-12-30/news/dp-nws-drywall-owner-repair-evg-20101230_1_chinese-made-drywall-chinese-drywall-hydrogen-sulfide.

The same sort of disparity is revealed in the information gathered by BrownGreer, as actual remediation costs are less than the figures produced by Inglis's formula.  Pogorilich Declaration at 12 (Rec. Doc. 18877-3).  Of the three accessible properties analyzed by Taishan's expert, the cost of remediation based on the Inglis formula would come in well over the actual remediation cost.  In one instance, actual remediation costs were $82,232.80—but Mr. Inglis's $86/sq. ft. figure would have awarded damages nearly three times that amount ($223,858), and his $118.89/sq. ft. figure at nearly four times the amount ($309,470.67).  Rec. Doc. 18877-3 at 12.  For the other property, actual remediation costs were $126,241.09, whereas using Mr. Inglis's formula would have awarded a massive windfall—damages between $235,898 and $326,115.27.  *Id.*

Indeed, Mr. Inglis's damages methodology is so broken that it will award some homeowners damages greater than the total value of their property.  For example, Mr. Inglis would award approximately $50,000 to owners of 600-square-foot condominiums in the Sunrise Lakes Phase III development.  *See* June 9, 2015 Hearing, Ex. 79 at 58.  However, even when remediated with new carpet, appliances, doors, paint, water heaters, and upgraded kitchens, these waterfront condominiums are offered for sale for many thousands of dollars less—$37,693.[31] Such an award would contravene state laws that cap damages at diminution in the property value—another point this Court was unaware of because the PSC declined to discuss any variations in state law.  *See supra* § III.A.1.b.(1).

### 3.    Individual Issues Predominate over Common Ones.

To determine whether individual issues predominate over class issues, this Court must

---

[31] *See, e.g.*, https://www.compass.com/listing/8851-sunrise-lakes-boulevard-unit-202-sunrise-fl-33322/fe84191addd8599c378170f3aeabf9340ecf705a/

view the "cause of action as a whole." *Castano*, 84 F.3d at 745 n.21.  Accordingly, the Court

must identify *all* issues in the case, decide if any lend themselves to class resolution, and, if so,

whether they predominate over those that require individual analysis.  When so analyzed, it is

clear that individual issues predominate.

       1.      As we have discussed, *see supra* § III.A.1.a., there are a host of issues that require

individual assessment.  The PSC now effectively agrees.  Notwithstanding its earlier

representations to the Court, the PSC concedes that numerous different types of damages claims

must be evaluated individually—including claims for alternative living expenses, loss of use and

enjoyment, personal injury, personal property, lost rent, lost business, short sale/foreclosure,

medical monitoring, property taxes, insurance, utilities and maintenance, past and future repairs,

and bankruptcy.  *Id.*  These numerous individual issues by themselves are enough to require

decertification.

       2.      In addition, contrary to the PSC's representation in its certification motion,

individual issues of liability and causation must still be resolved for the Taishan Defendants.  In

its certification order, this Court, at the PSC's urging, concluded that liability and causation were

established because the claims are against default judgment defendants and the Court previously

found sufficient facts to establish causation.  Rec. Doc. 18028 at 31.  That is flatly wrong.  As the

Supreme Court has explained, when one defendant in a multi-defendant action defaults, the

proper procedure is to enter default against that defendant alone and permit the other defendants

to proceed on the merits.  *Frow*, 82 U.S. at 554; *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 532

(9th Cir. 2001) (*Frow* is "the leading case on the subject of default judgments in actions

involving multiple defendants"); *see also Shaunfield v. Paramount Recovery Sys.*, No. 12-cv-

4686, 2014 WL 4814827, at *3 (N.D. Tex. Sept. 29, 2014) ("where one of multiple defendants is

in default, as a general rule, a decree of default may be entered, but a judgment is withheld pending a decision on the merits as to the other defendants.) (citation omitted).  Because there is at least one non-defaulted Taishan Defendant in each action,[32] they are entitled under *Frow* to adjudicate issues of liability and causation—the latter being particularly susceptible to individual adjudication as it requires exploration, for example, of the percentage of offending Taishan drywall, if any, in each home.[33]

> 3.       Having now conceded that many of the issues it claimed in its Certification Motion could be assessed in the aggregate actually need to be adjudicated individually, the PSC is now left clinging to a single, supposedly common issue: remediation damages.  But even that question requires individual adjudication because the properties at issue are incredibly varied— and even similar properties yield different remediation results.  *See supra* §§ I, III.A.1.b.(2)(b), III.A.2.a..  Indeed, the PSC acknowledged as much by explaining to this Court that a claims process will be required where adjustments must be made to properly allocate damages.[34]  *See supra* § II.C.  Where it is clear that damages claims "are not subject to any sort of formulaic

---

[32] The class actions covered by the Certification Order also involve defendants having nothing whatsoever to do with the "Taishan Defendants," e.g., Nanhai Silk Imp. & Exp. Corporation. Amorin Florida Complaint ¶ 40.  These defendants, to the extent they are not yet defaulted, are likewise unaffected by a default entered in respect of any other defendant.

[33] The PSC continues to advance this line of reasoning, *see* PSC Supp. Class Damages Br. at 7, citing *Nishamatsu Const. Co. Ltd.  v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1976) for the unremarkable proposition that a defaulting defendant cannot litigate facts admitted as a consequence of its default.  *Nishamatsu* does not address or undermine *Frow*'s recognition that *non-defaulted* defendants are entitled to litigate issues applicable to them.

[34] If adjustments have to be made during claims processing, there can be no claim for prejudgment interest because the claims cannot previously be considered ascertainable or sufficiently defined.  *See, e.g.*, Cal. Civ. Code § 3287(a) (prejudgment interest permitted as of the date "damages certain, or capable of being made certain by calculation"); *Nelson v. AmSouth Bank, N.A.*, 622 So. 2d 894, 895 (Ala. 1993) (tort damages must be "complete at a given time so as to be capable of determination at such time in accordance with known standards of value").

calculation," class certification must be denied.  *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006).  In such instances, once the statistical measure has been set aside, the court must then determine, based on what remains, whether "[t]here are too many disparities among the various plaintiffs for their common concerns to predominate."  *In re Fibreboard*, 893 F.2d at 712.  That is the case here.  Nothing remains and thus even commonality is not satisfied.  *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (commonality requires that "class member's claims depend on a common issue of law or fact whose resolution 'will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke'") (citation omitted).  *A fortiori*, there can be no showing of predominance.

      4.     A recent Supreme Court decision confirms this conclusion. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016).  That case arose out of a dispute with Tyson employees who sought overtime wages under the Fair Labor Standards Act.  *Id.* at 1042.  The employees contended that the time spent getting dressed and undressed, which was a required part of the job, should be accounted for in their weekly hours.  *Id.*  However, having no evidence of exactly how long it took each employee to don and doff, plaintiffs proposed to use a statistical average from a sample set.  *Id.* at 1043.  Tyson Foods defended against certification by claiming that the type of protective gear, and the time it took to don and doff, varied considerably, and that the variations in the sample study demonstrated the need for individual resolution.  *Id.* at 1042-43, 1046.  The Supreme Court reaffirmed *Wal-Mart*, explaining that statistical samples may only be used to establish a class when the evidence could be used in each individual case.  *Id.* at 1048.  Otherwise, the use of such evidence would violate the Rules Enabling Act by giving plaintiffs greater rights than they would have in individual actions.  *Id.*  The Court concluded the donning and doffing average sample at issue there could be used in individual cases because "each

employee worked in the same facility, did similar work, and was paid under the same policy."
*Id.* at 1048.  The Court's approval of the samples in *Tyson Foods* was bolstered by pragmatic
considerations, namely that the employer did not have the requisite paperwork to account for the
variation in donning and doffing time.  *Id.* at 1047.  Here, the opposite is true.  The evidence is
readily obtainable—one can easily discern actual remediation costs.[35]  And the properties at issue
vary in terms of location, interior, and value.

     5.     As the Fifth Circuit has explained, a court "cannot manufacture predominance
through the nimble use of" Rule 23(c)(4) by "sever[ing] issues until the remaining common issue
predominates over the remaining individual issues."  *Castano*, 84 F.3d at 745 n.21.  Yet, that is
precisely what the PSC has endeavored to do here.  It brushes off the individualized assessments,
requesting bellwether trials on non-remediation damages for current owners and damages for
former owners and that the Court funnel product identification adjudications into a claims
process.  PSC Supp. Class Damages Br. at 14-21; *see also* Class Damages Transcript at 9:4–10.
But that is not how class certification works—certainly not in this Circuit.   To approach the
doctrine in the PSC's fashion "would eviscerate the predominance requirement of rule 23(b)(3);
the result would be automatic certification in every case where there is a common issue, a result
that could not have been intended."  *Castano*, 84 F.3d at 745 n.21.  "Roughly estimating the
gross damages to the class as a whole and only subsequently allowing for the processing of
individual claims would inevitably alter defendants' substantive right to pay damages reflective
of their actual liability."  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008)
(subsequent history omitted).  It is one thing if, in the course of settlement, a party agrees to

---

[35] In fact, the PSC endeavors to do precisely that through claims processing.  Class Damages
Transcript at 9:4-6.

forgo his adjudicatory rights and resolve individual issues during a claims process.  It is another entirely to involuntarily subject a defendant to a claims process, which then is devoid of any procedural protections.  As one court in this state explained, it was aware of "no authority … that would permit a private company to perform such an adjudicatory function."  *Woodard v. Andrus*, 272 F.R.D. 185. 197-98 (W.D. La. 2010).

***

This Court should decertify the case for the simple reason that nearly all of the non-remediation issues must be resolved on an individual basis.   But were this Court to go further and try to assess remediation damages, decertification would still be required.  That is because the PSC's formulaic approach does not satisfy the Fifth Circuit's requirements for a statistical analysis.  Individual determinations abound in assessing the appropriate amount of remediation damages for the diverse array of properties at issue here.

For all these reasons, Rule 23's predominance requirement has not been satisfied here.

### B.     Plaintiffs Cannot Satisfy the Superiority or Adequacy Requirements for Class Certification.

#### 1.     Due to the Presence of Numerous Individual Issues, This Litigation Is Not Suited for Classwide Management.

In addition to predominance, Rule 23(b)(3) requires that a plaintiff demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  As the Eleventh Circuit has explained, "the predominance analysis has a 'tremendous impact on the superiority analysis ... for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims.'"  *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1184 (11th Cir. 2010).  Accordingly, this Court

must assess how manageable the litigation would be if class status were conferred. *Castano*, 84 F.3d at 745 n.19.  Where mass injuries have resulted, the case "is ordinarily not appropriate for a class action" given the "likelihood that significant questions, not only of damages but of liability and defenses to liability [will] be present, affecting the individuals in different ways."  Rule 23(b)(3) Advisory Comm. Notes.  In such circumstances, "a class action would degenerate in practice into multiple lawsuits separately tried."  *Id.*

That is precisely the case here.  As explained above, the PSC itself recognizes that there are numerous individual issues, aside from remediation, that must be resolved.  *See supra* § III.A.1.a.  These include thorny choice of law issues and fact-specific inquiries regarding individual plaintiffs and properties.  *Id.*  And even as to remediation, the formulaic approach proposed by the PSC finds no support in Fifth Circuit precedent.  *Id.*  What's more, the PSC acknowledges that even once its formula is applied, individual issues will *still* have to be resolved before dispensing payments (as part of claims processing).  *See supra* § II.C.  In these circumstances, it is clear that the "predominance of [these] individual … issues" detracts from the "superiority of the class action device in resolving these claims," *Steering Committee*, 461 F.3d at 604-05, insofar as "extensive manageability problems" flow from the considerable number of individual issues.  *Castano*, 84 F.3d at 747.

And, as in *Castano*, "[t]he most compelling rationale for finding superiority in a class action—the existence of a negative value suit—is missing in this case."  *Id.* at 748.  This is not, for example, a consumer protection case where the aggregation of claims may be necessary to provide an incentive to litigate.  On the contrary, in its damages motion, the PSC sought on average over $325,000 in damages for remediation, alternative living expenses, and loss of use and enjoyment alone.  Damages Motion at 7 (Rec. Doc. 18086-1).  Given those figures, there is

ample motivation to litigate each case.  On the flip side, the prejudice to defendants of class

certification would be considerable.  As we have explained, numerous issues of liability,

causation, and damages remain.  Plaintiffs therefore have not satisfied Rule 23(b)(3)'s

superiority requirement.

> **2.      The PSC Has Demonstrated That Its Interests Are Not Aligned with
> Those of the Proposed Class.**

Just as Rule 23 guards against conflicts among class members, it requires that class

counsel be capable of "fairly and adequately represent[ing] the interests of the class."  Fed. R.

Civ. P. 23(g)(1)(B); *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) ("[t]o

meet Rule 23['s] [adequacy] requirement[], the court must find that class representatives, their

counsel, and the relationship between the two are adequate to protect the interests of absent class

members").  As one court has explained, "[c]lass counsel owe a fiduciary obligation of particular

significance to their clients when the class members are consumers, who ordinarily lack both the

monetary stake and the sophistication in legal and commercial matters that would motivate and

enable them to monitor the efforts of class counsel on their behalf."  *Creative Montessori*

*Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011) (Posner, J.).

Consequently, "[m]isconduct by class counsel that creates a serious doubt that counsel will

represent the class loyally requires denial of class certification."  *Id* at 918.

Serious concerns exist here whether the PSC can adequately represent the best interests

of the proposed class.  As an initial matter, that is because the PSC does not just represent the

class.  It also represents non-class members, such as those in *Brooke*.  That creates an

irreconcilable tension, as the PSC's efforts to keep the *Brooke* Plaintiffs alive in the litigation or

secure a settlement inclusive of them will hamper resolution for the Class Plaintiffs.

That is not the PSC's only conflict.  It also has placed its own interests above the

Plaintiffs by seeking recovery on contempt, spending Plaintiffs' funds to do so notwithstanding that Plaintiffs cannot recover from that pursuit.  As the contempt order states, the court held Taishan in criminal contempt, *see* Contempt Order at 2 (Rec. Doc. 17869), imposing a fixed fine of 25%-of-profits with no correlation to losses incurred by Plaintiffs.  *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829, 837 (1994).  Because the beneficiaries of criminal contempt are the court and the public rather than the contemnor's adversary, neither the Plaintiffs nor the PSC are entitled to any recovery.  *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 632 (1988) (fine that is criminal or "punitive …is paid to the court"); *In re Kave*, 760 F.2d 343, 352 (1st Cir. 1985) (stating "general rule that a punitive fine is paid into the coffers of a court and a civil fine is paid to the aggrieved party to compensate for its losses"); *see also* 27-642 Moore's Federal Practice – Criminal Procedure § 642.03.  Yet, the PSC is expending Plaintiffs' money— that is, compensation from the common benefit fund—in its pursuit of the contempt action.  That is an irreconcilable conflict.  And, even if the PSC could prevail on contempt recoveries, there would still be a conflict because the PSC's calculations—rising well above a billion dollars—is considerably beyond what Taishan is capable of paying.  *See, e.g.*, *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991) ("the conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery").  Accordingly, the attorneys will be in a race with the proposed class to collect the fixed funds available.[36]

---

[36] The PSC's pursuit of contempt fines also precludes an ascertainability determination.  "It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."  *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970).  Even if the PSC could recover monies for contempt, the class entitled to such recovery is undefined.  The contempt order was entered in *Germano*.  Ostensibly then, it only applies to those plaintiffs.  And even if it applied beyond *Germano*, it is unclear to whom else it

As long as the PSC is focused on recoveries that inure entirely to the attorneys' benefit or not at all to the class, its interests conflict with those of the claimants at issue here. While the PSC may desire to settle quickly to extract large sums before any potentially adverse ruling regarding the scope of the contempt order, many members of the proposed class may prefer to pursue their cases to trial. Or, they may be in disagreement regarding an acceptable settlement figure, as the PSC is content with fees it claims to be entitled to under the contempt ruling. In short, because the PSC's interests are not aligned with those of the proposed class, it cannot adequately represent the proposed class members.

This is not the only misguided tactic embraced by the PSC. Plaintiffs have filed complaints all over the country. And the litigation has proceeded in a largely haphazard fashion with little and, often no, adversarial testing. As a consequence, much of the PSC's maneuvering has gone unchecked. That includes, for example, the PSC's inexplicable filing of redundant complaints as well as its request to certify a peculiarly-defined class. Serious questions thus abound, including whether the PSC's tactics contravene 28 U.S.C. § 1407 and *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), by attempting to evade the requirement that the cases be remanded to the transferor courts at or before the conclusion of pretrial proceedings. While these issues will eventually have to be resolved by this Court and, in turn, the Fifth Circuit, the class certification issue is now before the Court and, with the benefit of meaningful adversarial engagement, it is apparent, even by the PSC's own recognition, that the initial representations upon which the Court made its certification determination were

---

would apply because, for example, the plaintiffs in *Brooke* did not appear until after the contempt had been purged. Moreover, these ascertainability concerns are bolstered by the fact that the identity of the class members is continually changing as plaintiffs are periodically dismissing claimants. *See supra* § III.2.b.

inaccurate.  Individual issues predominate, the case is not well-suited for class resolution, and the PSC's interests are not properly aligned with the Plaintiffs.

## IV.   CONCLUSION

For all these reasons, this Court should revisit its Certification Order and GRANT the CNBM Entities' Motion to Decertify the Class.

Respectfully submitted,

/s/ L. Christopher Vejnoska

L. Christopher Vejnoska (CA Bar No. 96082)
Ian Johnson (CA Bar No. 208713)
Andrew Davidson (CA Bar No. 266506)
Jason Wu (CA Bar No. 279118)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105
Tel.:  415-773-5700
Email:   cvejnoska@orrick.com
          ijohnson@orrick.com
          adavidson@orrick.com
          jmwu@orrick.com

Ewell E. Eagan, Jr. (LA Bar No. 5239)
Donna Phillips Currault (LA Bar No. 19533)
Alex B. Rothenberg (LA Bar No. 34740)
GORDON, ARATA, MCCOLLAM,
DUPLANTIS & EAGAN, LLC
201 St. Charles Avenue, 40th Floor
New Orleans, LA 70170-4000
Tel: (504) 582-1111
Email:   eeagan@gordonarata.com
          dcurrault@gordonarata.com
          arothenberg@gordonarata.com

James L. Stengel (NY Bar No. 1800556)
Xiang Wang (NY Bar No. 4311114)
Kelly Daley (NY Bar No. 4970117)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY, 10019
Tel:  212-506-5000
Email: jstengel@orrick.com
          xiangwang@orrick.com
          kdaley@orrick.com

Eric A. Shumsky (D.C. Bar No. 477926)
ORRICK, HERRINGTON & SUTCLIFFE
LLP
Columbia Center
1152 15th Street NW
Washington, D.C. 20005
Tel: 202-339-8400
Email: eshumsky@orrick.com

Dated: January 3, 2017

*Attorneys for China National Building
Materials Company Limited, CNBMIT Co.,
Ltd., CNBM USA Corp., and United Suntech
Craft, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the above and foregoing **MEMORANDUM OF LAW IN**

**SUPPORT OF CHINA NATIONAL BUILDING MATERIALS CO., CNBMIT CO. LTD.,**

**CNBM USA CORP., AND UNITED SUNTECH CRAFT, INC.'S MOTION TO**

**DECERTIFY CLASS PURSUANT TO RULE 23(c)(1)(C)** has been served on Plaintiffs'

Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. mail

and email and upon all parties by electronically uploading the same to File & Serve in

accordance with Pretrial Order No. 6, and that the foregoing was electronically filed with the

Clerk of Court of the United States District Court for the Eastern District of Louisiana by using

the CM/ECF System, which will send a notice of electronic filing in accordance with the

procedures established in MDL 2047 on this January 3, 2017.

<u>/s/ L. Christopher Vejnoska</u>

L. Christopher Vejnoska (CA Bar No. 96082)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105
Tel:  415-773-5700
Fax: 415-773-5759
Email: cvejnoska@orrick.com
*Counsel for CNBM Group and CNBM Company*