## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L |
| | JUDGE FALLON MAG. JUDGE WILKINSON |

**THIS DOCUMENT RELATES TO:**

*Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, **Case No. 09-6687 (E.D.La.);**

*Gross, et al. v. Knauf Gips, KG, et al.*, **Case No. 09-6690 (E.D.La.);**

*Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, **Case No 10-361 (E.D.La.);**

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, **Civ. Action No. 11-1672 (E.D.La.);**

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, **Civ. Action No. 11-1395 (E.D.La.);**

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, **Civ. Action No. 11-1673 (E.D.La.))**

**PLAINTIFFS' STEERING COMMITTEE'S SUPPLEMENTAL
BRIEF IN SUPPORT OF MOTION FOR CLASS DAMAGES, REPLY TO
TAISHAN'S SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS DAMAGES, AND PROPOSED TRIAL PLAN**

## I.   <u>INTRODUCTION</u>

Pursuant to this Court's Order of November 29, 2016 (Rec. Doc. 20576), the Plaintiffs' Steering Committee ("PSC") submits this supplemental brief in support of their motion for class damages.  Plaintiffs' motion was filed on October 29, 2014.  In the interim, the Court has held an evidentiary hearing and other proceedings.  Through its November 29, 2016 Order, the Court invited additional briefing on the matter.  In this brief, the PSC submits its final evidentiary support for the award of a formulaic methodology for calculating remedial damages, including the Declaration of Ronald E. Wright, P.E., who has been able to return to the litigation after transcending personal family problems and in place of Mr. Inglis.  Mr. Wright opines on updated class damages using the most current remediation valuations.  In addition, Plaintiffs propose a trial plan that describes future phases of class proceedings designed to 1) quantify non-remediation damages in a Louisiana bellwether trial; 2) evaluate damages available to Virginia property owners; 3) establish a claims administration process that can resolve product identification and result in final remediation damage figures; and 4) provide for the remand of Omni XX actions to their transferor fora so that representative cases, which represent accurate case values, may be tried in their originating venues for the parties to evaluate.

## II.   <u>FACTUAL BACKGROUND</u>

Plaintiff class members continue to suffer from damages caused by the Taishan Defendants' defective drywall without proper recompense.  Over the past ~8 years of litigation in these MDL proceedings, the record demonstrates that the Taishan Defendants have strategically decided to ignore their obligations to this Court to the point that default judgments have been entered against them.  Despite proper service of Omni complaints under The Hague Convention, these Defendants chose to sit on the sidelines and be defaulted.  Then, to further delay the

proceedings, they have each challenged jurisdiction over them and even in their corporate filings contend that any judgment entered against them would not be enforceable in China, in any event.

It is now well established that the controlling parents of Taishan Gypsum Co., Ltd. ("TG") and its wholly-owned subsidiary, Tai'an Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan"), put these manufacturers up as stalking horses to contest personal jurisdiction over them, forcing Plaintiffs and our courts to expend considerable resources in terms of time and money to respond to and adjudicate their defense, with no intention of ever satisfying a valid judicial mandate. Taishan and its affiliated entities have demonstrated a pattern of targeting American consumers for purposes of selling millions of dollars of their defective products, but then refusing to submit to the jurisdiction of our courts to pay for their wrongdoing, choosing, instead, to hide behind a wall preventing Plaintiffs from enforcing U.S. judgments in China. At the same time that they evaded attempts to satisfy valid judgments against them by refusing to appear for a judgment debtor examination, the Taishan Defendants used our courts to their advantage to pursue and settle claims for their business disputes, when litigating here was in their best interests, even though such conduct was in violation of the Court's Contempt Order of July 17, 2015.

 Further evidence of the Taishan Defendants' contempt for the federal judiciary's authority is reflected in BNBM's public filings (rendered in Chinese only) with the Chinese regulatory authorities. In connection with its acquisition of Taishan, BNBM provided to the China Securities Regulatory Commission a Notice of Filing of Feedback Reply of Beijing New Building Materials Public Limited Company to the Notice of China Securities Regulatory

Commission's One-time Comments on Review of Administrative Licensing Project.[1]  Therein, BNBM left a marker to all involved in this litigation that unless the case is satisfactorily resolved to its liking in the next 3 years, it may have the Taishan Defendants again absent themselves from the litigation like Taishan did in 2014.  Specifically, BNBM noted that 99,071,875 shares issued for asset purchase were "locked-up" for only 36 months to "make compensation for the contingent risks" this litigation poses to Taishan.  This lock-up provision is reminiscent of the Taishan Defendants' overall contemptuous behavior of defying this Court's authority (along with its parent companies' profiting during the contempt period), challenging this Court's jurisdiction over the Defendants, and otherwise denying any liability or product defect despite allowing adverse findings of same to become entrenched through their defaults.  Taishan's history of walking away from these proceedings is again echoed in the lock-up provision, which suggests that another departure may occur again if matters do not suit the Chinese Defendants.  Given the modus operandi of these defendants in "running the clock," BNBM's lock up provisions are of great concern.

        This intentional litigation strategy of delay has been proven by the Defendants' own records, yet still they resist the demands of justice for all class members.  After such a remarkable length of time, the adage that "justice delayed is justice denied" suitably applies to the thousands of Plaintiffs with Taishan Chinese Drywall in their homes.  Their plight continues to worsen without relief, especially with the Defendants still bent on taking advantage of the Plaintiffs' ever worsening situation, which is the result of the Defendants' intransigence.

---

[1]*See* PSC's Supplement to Omnibus Response in Opposition to Defendants' Motions to Dismiss, Exb. T  (Rec. Doc. 20585).

The most recent case in point is Taishan's Second Supplemental Response to Plaintiffs' Motion for Class Damages (Rec. Doc. 20583), which was filed with leave of Court by Order dated November 29, 2016 (Rec. Doc. 20576).  Therein, Taishan denies that Plaintiffs' methodology for proving aggregated damages is acceptable for the established class members.[2]  Taishan also challenges the current class-claimant count as being uncertain because of the ever changing nature of some class members moving from current owners to no longer residing in their homes or no longer owning their homes.  Here Taishan has clearly used the litigation tactic of years of intentional delay to try to then argue that as result of the passage of time, class members' damages claims have been reduced because they have lost their homes. This diabolical and unjust strategy should not be condoned, and in the interests of equity and under the tort damages laws of the relevant states, these former owners are entitled to be made whole.

Virginia named class representative Michelle Germano suffered catastrophic losses over and above the loss of her home due to Taishan Chinese drywall contamination.  Ms. Germano moved out of her toxic home in April of 2009 due to a series of health problems and concerns.  *See* Declaration of Mary Michelle Germano attached hereto as Exhibit "A."  Although her mortgage bank (Chase) worked with her on a forbearance agreement, she was depleted of funds by her obligation to pay $385 per month in Home Owners Association ("HOA") dues on top of her new rental home.  In 2014, her HOA sued her to collect $26,000 in back dues on her toxic home, which

---

[2]At all relevant times BNBM PLC has had actual control of Taishan.  Now, with its acquisition of the company completed, *see*  PSC's Supplement to Omnibus Response in Opposition to Defendants' Motions to Dismiss (Rec. Doc. 20585), BNBM PLC filed a Notice of Joinder in Taishan's Second Supplemental Response to Plaintiffs' Motion for Class Damages, along with BNBM Group (Rec. Doc. 20584).

she had not lived in since April of 2009. This HOA suit forced her to file for Chapter 13 Bankruptcy relief. Over the next three years, her HOA threatened to bring three additional suits against her, and blocked an offer from Chase to allow Ms. Germano to surrender her "deed in lieu of foreclosure." The HOA refused to foreclose on the property (as they have the right and ability to do under state law) and instead threatened to garnish her wages. Finally, in April of 2016, with the help of Senator Mark Warner, Ms. Germano was able to get a deed in lieu of foreclosure, and the toxic property was no longer in her name. She now lives in a rented home in Norfolk Virginia, waiting for the resolution of her claims against Taishan.

Taishan's defense that Plaintiffs should be denied relief because some Plaintiffs no longer own their homes should not be condoned since the Plaintiffs' condition lays at the unclean hands of these Defendants. Defendants' wrongful conduct justifies the imposition of an estoppel to allow a final accounting of damages once and for all, after all these years. But since Plaintiffs' damages have not yet been compensated, given the passage of time, Plaintiffs submit that updated damages information should be permitted to address 2016 remedial costs.

With the Knauf Settlement now virtually complete, the MDL proceedings are focused on litigation against the Taishan Defendants, including the principal Chinese-based defendant, Taishan, and its parent companies, the BNBM Defendants (Beijing New Building Materials, PLC and Beijing New Building Materials (Group) Co., Ltd.) and the CNBM Defendants (China National Building Materials Group Corp. and China National Building Materials Co., Ltd.).[3]

---

[3]CNBM Group was dismissed from the litigation by Order & Reasons dated March 9, 2016 (entered March 10, 2016) (granting the defendant's motion to dismiss based upon the Foreign Sovereign Immunities Act) [Rec. Doc. 20150].

Following an initial evidentiary hearing in *Germano*, this Court issued judicial findings on the scope of remediation and property damages sustained by the seven *Germano* plaintiff-intervenors as a result of Taishan's defective drywall.[4]  The *Germano* FOFCOL specifically contained findings of fact and conclusions of law as to the causal relationship between defective Chinese Drywall and property damage.[5]

 Also, around the time of the *Germano* trial, the Omnibus class actions by non-absent class members against the Taishan Defendants resulted in a finding of liability and causation as to the Taishan Defendants by way of default judgments.[6]  Taishan unsuccessfully contested the jurisdiction of the Eastern District of Louisiana, resulting in the Court's denying Taishan's motions to vacate the defaults in *Germano* and *Mitchell* and to dismiss the actions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*.[7]  These jurisdictional rulings were affirmed by the Fifth Circuit[8] and not appealed to the United States Supreme Court, thus rendering the findings conclusive.

Upon remand from the Fifth Circuit, the Court certified a class against the Taishan Entities on September 26, 2014, consisting of active litigants in the *Amorin*, *Germano*, *Gross*, and/or *Wiltz*

---

[4]*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* MDL 2047 (E.D.La. April 8, 2010) [Rec. No. 2380] ("*Germano* FOFCOL").

[5]*Germano* FOFCOL at pp. 57-60.

[6]*See* Rec. Nos. 487 and 3013 (Nov. 20, 2009 and May 11, 2010) (*Germano* Plaintiffs and intervenor Plaintiffs default judgments); Rec. Nos. 7302 and 15687 (Feb. 1, 2011 and Aug. 7, 2012) (*Gross* defaults); Rec. No. 7735 (Feb. 24, 2011) (*Wiltz* default); Rec. Nos. 17814 and 17815 (July 1, 2014) (*Amorin* defaults: Louisiana, Florida, and Virginia).

[7]*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F.Supp.2d 819 (E.D. La. 2012).

[8]*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014) (affirming *Germano* jurisdictional ruling); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014) (affirming *Gross*, *Wiltz*, and *Mitchell* jurisdictional rulings).

actions against the Taishan Defendants.[9]  The decision to certify the class was "greatly simplified by the status of the Taishan Defendants as default judgment defendants," in that liability was conceded by default, *i.e.* "conclusively established," leaving only damages to be determined.[10] The Court's ruling was entirely consistent with Fifth Circuit precedent. *See Nishimatsu Const. Co. v. Houston Nat. Bank*, 515 F. 2d. 1200, 1206 (5th Cir. 1975) ("[a]ttempts by a defendant to escape the effects of his default should be strictly circumscribed; he should not be given the opportunity to litigate what has already been considered admitted in law.").  Thereafter, on October 29, 2014, the PSC filed its Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(B) [Rec. Doc. 18086].[11]

To address the class damages motion, on June 9, 2015, this Court conducted a Rule 55(b)(2)(B) hearing to determine the amount of damages owed by TG/TTP to the certified class.[12] For purposes of that hearing, not only was liability and causation deemed admitted by Defendants,

---

[9]*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, MDL 2047, MDL 2047, Class FOFCOL (E.D.La. Sept. 26, 2014) [Rec. No. 18028].

[10]Class FOFCOL at pp. 21-22.  *See also In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, MDL 2047, Sealed Order (E.D.La. June 15, 2016) [Rec. No. 20306].

[11]When Taishan filed its Second Supplemental Response to Plaintiffs' Motion for Class Damages on December 9, 2016 [Rec. Doc. 20583] through the ECF system, it related its Response to Plaintiffs' October 29, 2014 motion.  However, in its Response, Taishan speciously contends that the instant relief is *not* related to any motion.  Defendants' argument that later submissions by the PSC to the Court do not afford Taishan sufficient notice under Due Process is not well founded.  *Cf., United States v. Lambert*, 501 F.2d 943, 947-48 (5th Cir. 1974) (holding in the more stringent criminal context that "[n]ot every variance [of probata with allegata] is fatal," particularly when the defendant has had fair notice to prepare its defense).

[12]By virtue of a longstanding default (in rulings by this Court affirmed on appeal) which have not been set aside, Defendants TG and TTP are deemed by Rule 55 of the Federal Rules of Civil Procedure and the case law thereunder to have conceded all class allegations of liability and causation in these proceedings.  *See* PSC's Memorandum Regarding Effects of Default and Issue Preclusion (Rec. Doc. 18694).

but the doctrine of collateral estoppel/issue preclusion also made it unnecessary in a Rule 55 proceeding to revisit and re-adjudicate questions as to liability or causation.  As noted, this Court had already on two occasions recognized that a formulaic approach to Chinese Drywall remediation damages is reliable.  *See Germano* FOFCOL, at ¶23, 58-61; Class FOFCOL at ¶¶23, 75.  Thus, Taishan's repeated challenges to the reliability of a formulaic remediation damage methodology (Rec. Doc. 20583 at 2-3) are moot; that issue has been conclusively resolved.  At the June 9 Hearing, the Plaintiffs presented evidence regarding only remediation damages for current homeowners on Exhibit 79 (the list of properties with verified square footage that had been created by BrownGreer, which served as the basis for the calculation of remediation damages), and Defendants presented their response to Plaintiffs' calculation. The Court was not presented with evidence relating to remediation damages for former homeowners or any other category of damages, and all such claims have been reserved on the record.  *See* Proposed FOFCOL [Rec. Doc. 19197 at ¶15, 201-202].  It was proposed that later damages hearings (or "phases") would address such matters as: potential off-sets to any damages awards to homeowners; claims for damages other than remediation damages that were established at the June 9, 2015 damages hearing on a class-wide basis (such as alternative living expenses and loss of use); and attorneys' fees.

Although Taishan in its latest Response takes liberties with the fact that the PSC continued to refine its analysis of class members on Exhibit 79 that were subject to the remediation claims process, the truth is <u>the PSC has never wavered from its class definition or its method of calculating aggregate remediation damages</u>.  At the conclusion of the Rule 55(b)(2)(B) hearing, the parties submitted their proposed Findings of Fact and Conclusions of Law.  *See* Rec. Doc. Nos. 19197 (PSC), 19194 (Taishan), 19198 (BNBM).

Thereafter in its September 8, 2015 letter to the Court (Rec. Doc. 19572-1, 19490-2), the PSC reiterated that its verification process of claimants' product identification merely reduced the number of claimants, not the methodology itself. This principle is still true today. Importantly, the PSC noted that the determination of the Class remediation damages identified on Exhibit 79 is a major element of total Class damages, while also recognizing that there will remain individualized damages claims to be addressed and resolved. For example, Class members identified on Exhibit 79 still need to introduce evidence of other damages suffered including, but not limited to: a) alternative living expenses claims, b) loss of use and enjoyment claims, c) short sale/foreclosure claims, d) personal property claims, e) lost rent/business claims, and f) other individualized damage claims not covered by a-e listed above. *Id*. In addition, the remaining Class Members not identified on Exhibit 79 (which includes both current and former property owners) still need to have their remediation and other damages claims tried.

To accomplish these goals, on November 6, 2015, Plaintiffs moved for an Expedited Hearing on Setting Phased Individual Damage Trials Against Taishan [Rec. Doc. 19705]. Therein, Plaintiffs contended that the just and efficient next step in the Class Remediation Damages track was for the Court to exercise its discretion under Rules 55(b)(2) and 23, by entering the proposed FOFCOL which approve the formulaic damages methodology demonstrated at the June 9, 2015 hearing. Specifically, based on the Proposed FOFCOL and subsequent filings, Plaintiffs sought two forms of class-wide relief tailored to the Rule 55(b)(2) status of this matter, and the evidence admitted at and after the hearing:

(1) that the Court find Plaintiffs' formulaic Damages Methodology for Remediation Damages ($107.83/sq. ft. x RS Means location factor x # square feet of residence) to be acceptable,[13] and

(2) that the Court authorize a staged-process to verify important qualifying criteria for each claim (product identification and square footage) in a claims procedure so that a precise sum owed to the class in remediation damages could be calculated and then Plaintiffs can submit that sum certain to the Court and request a final judgment.

Plaintiffs clarified that they did not seek a specific monetary award for final judgment, but will seek such a judgment after the sum certain is calculated at the conclusion of the claims verification process.  *Id.* at 5 & n.2.  These matters laid dormant until this Court's Order of November 29, 2016.

In its current Response, Taishan contends that the additional findings of individual damages necessarily disrupt the entire class proceeding because a specific amount to be quantified is not set.  Taishan Response at 7.  But, as the PSC pointed out last year and maintains to this day, the process is necessary to accommodate the different types of damages, both remediation damages subject to formulaic calculation and individual damages determinations.[14]  Therefore, this Court

---

[13]The figure "$107.83" is the most current cost per square foot and is based upon the Declaration of Ronald E. Wright, P.E. at ¶8 [Attached hereto as Exhibit "B"].

[14]It is important to note that the Supreme Court recognizes that Rule 23 class action procedure readily accommodates such a process.  *See, e.g., Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016) (certification is proper "even though important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.").  Taishan's arguments to the contrary, based upon its counsel's *ipse dixit*, are improper.  *See Torres v. S.G.E. Management, L.L.C.,* 838 F.3d 629, 644 (5th Cir. 2016) (en banc) ("Rather than pointing to evidence, the Defendants rely on speculation alone . . . But such sheer speculation as to the improbable motivations of an undefined, but likely minute number of

should approve the proposed FOFCOL regarding the formulaic methodology to determine class remediation damages (which, as set forth in an updated form  presented in the accompanying Declaration of Ronald E. Wright, P.E. (who is once again able to assist the PSC), reflects current 2016 remedial costs, and allows for the staged process for claims verification (and set-offs, if any) to be followed by further Rule 55(b)(2)(B) damages hearings to resolve non-remediation damages, damages for former owners, and other administrative claims processing.   The result of the amalgam of these proceedings is intended to permit Plaintiffs to provide a sum certain to the Court for seeking a final default judgment quantifying class-wide damages.

Despite all of these past efforts and future plans to achieve justice for the victims of Taishan's Chinese Drywall, with the exception of the seven *Germano* intervenors who were paid by Taishan to cure its contempt of court,[15] the remaining Class Plaintiffs have yet to receive any recovery from this manufacturer[16].  Many Taishan Plaintiffs have been displaced from their homes and, unable to afford the significant costs required to remediate, have undergone foreclosure or been forced to declare bankruptcy.  For those Taishan Plaintiffs remaining in their contaminated properties, their horrendous situation is made even more intolerable, because they have had to witness that many of their neighbors – who happen to have Knauf Chinese Drywall installed in their homes – have suffered a better fate.  In contrast to the actions of the obstinate

---

class members does not cause individual issues of reliance to predominate. Our inquiry looks to how the trial will proceed; trials are grounded in evidence, not extra-record attorney speculation.").

[15] *See* Notice of Payment of Contempt Penalty (Rec. Doc. 18448).

[16] Indeed, Taishan has refused to satisfy the default judgment entered against by Judge Hall in the Virginia drywall consolidated litigation, despite that $3,000,000 judgment (plus attorney's fees and expenses) having been assigned to the Venture Supply class as important consideration for the Virginia class settlement (Rec. Doc. 20466).

Taishan Defendants, the Knauf Defendants stepped up to the plate and established an uncapped settlement fund valued in excess of $1 billion to provide Plaintiffs with complete remediation relief and other benefits to Knauf homeowners. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2013 WL 499474 (E.D. La. Feb. 7, 2013).

As the Taishan Plaintiffs continue to go without relief, they fall prey to bankruptcy, foreclosure, short sales, and other misfortunes. Taishan's contemptuous conduct has dramatically impacted class members, most of whom are Gulf coast residents, who first were victims of Katrina, and now are victims of Taishan's Chinese Drywall and these Defendants' refusal to submit to our judicial proceedings and comply with valid court orders. The time to reach a final judgment has arrived so as to estop the Defendants from asserting that class members' changes in circumstance merit different considerations with regard to damages.

## III.   ARGUMENT

### A. An Appropriate Staged Process Going Forward Should be Implemented.

As a *predicate* to further damages proceedings under Rule 55(b)(2)(B), the PSC submits that it would be most efficient and expeditious to enter the relief regarding the precise *formulaic determination of remediation damages for the class, as presented to the Court at the June 9, 2015 hearing.* The precise relief (as requested at the June 9 Rule 55(b)(2)(B) hearing) related to the formulaic method to calculate remediation damages for class members as set forth below:

> (a) A finding by the Court that Plaintiffs' formulaic damages methodology for Remediation Damages ($107.83/sq. ft. (which includes the cost of post-remediation environment certification) x RS Means location factor  x  # square feet of residence) is acceptable; and
>
> (b) A finding that it is necessary and appropriate to now implement a claims verification process to confirm the qualifying criteria by which each Class Member's remediation claim (*e.g.,* product identification and square footage) may be satisfied in order to

12

arrive at a precise, sum-certain amount of remediation damages
owed by the Defendants to the class.[17]

This requested relief is set forth in the proposed Order filed simultaneously with this

memorandum. Once the Court accepts this particular formulaic method to assess remediation

damages for the certified class, the Administrative Claims Proceeding for class remediation

damages can be implemented. This will clear the way for the remaining damages for the class to

be addressed. *See* Rec. Doc. 18753 (4/24/15) at p. 3, IV(E).

To this end, Class Counsel and the PSC respectfully propose a Trial Plan[18] to deal with *all*

*remaining damages claims in the litigation*. Consistent with the objective that bellwether trial

activity should yield instructive results, the Trial Plan will address two areas of damages

representative of the claims of the class (3512 class members), claims administration for

Remediation Damages, as well as outstanding claims not included in the Plaintiff certified class,

but pled in Omni XX (665 named Plaintiffs). Specifically, the Plan will consist of:

(1) A FRCP 55(b)(2)(B) damages hearing on the full measure of non-remediation
    damages for a current owner class member ("Bellwether Damages Hearing
    #1");

(2) A FRCP 55(b)(2)(B) damages hearing on the full measure of *former owner*
    damages for a class member ("Bellwether Damages Hearing #2");

(3) Approval of a Special Master for claims administration to resolve all product
    ID disputes for class members ("Claims Administration"); and

(4) Severance and remand of Omni XX, with direction to initially conduct a
    consolidated damages trial in Florida as to non-class members located in a
    specific development.

---

[17]*See* June 9, 2015 Tr. at p. 119; Rec. Doc. 19197 (6/23/15) at p. 65; Rec. Doc. 19572 (10/5/15)
at p.3; Rec. Doc. 19705-1 (11/16/15) at p. 5.

[18]The Trial Plan identifies the Proposed bellwether Rule 55 (b)(2)(B) Damages Hearings, and
proposes a schedule for the Hearings and is filed simultaneously herewith as Exhibit "P".

Each of the foregoing is addressed in full detail below.

**(1)** **Full Measure of Non-Remediation Damages**

Particular class-wide damages, other than remediation and post-remediation environmental certification, were not addressed in the June 9, 2015 default class-damages hearing.  It was decided that damages such as class members' alternative living expenses ("ALE") pending remediation, the loss or repair of personal property, multiple HVAC home repairs prior to remediation, mortgage forbearance increased financing costs, as well as other damages were too individualized in nature and not necessarily amenable to a formulaic method of calculation.  Accordingly, Plaintiffs propose that a Rule 55(b)(2)(B) bellwether damages hearing be conducted to determine the full measure of non-remediation damages. Plaintiffs' propose that the bellwether Plaintiff be a Louisiana Plaintiff in an action for redhibition.[19]  This bellwether hearing would provide substantial guidance for quantifying (and perhaps resolving) the non-remediation damages of all Plaintiff class members, and likewise would be instructive as to the claims of all Louisiana class members entitled to recover attorneys' fees from a manufacturer-seller under this State's redhibition law.

**(2)** **Full Measure of Damages For Former Owners**

Class counsel agreed to remove those properties previously but no longer owned by members of the class (a/k/a "former owners") from the claims presented in the June 9, 2015 class damages hearing.  Though not part of that hearing, however, the claims of these former owner class members were expressly reserved so that the Court could address the proper measure of damages recoverable by that particular subset of Plaintiffs.  Included in this group of Plaintiffs are

---

[19]The Court will recall that the previous bellwether trial of *Hernandez* was one in which the defendant manufacturer Knauf stipulated to liability under the Louisiana law of redhibition.

individuals who, because of the defective Chinese drywall in their unremediated homes, were forced to either "sell short," go into foreclosure, or suffer other negative consequences by virtue of their being obliged to sell or otherwise dispose of their contaminated properties.

These former owners represent a substantial part of the class, whose claims are a critically important component in this litigation at the present juncture. Importantly, the number of these claimants has inevitably increased since the commencement of this MDL as the conduct of the Taishan Defendants has protracted this litigation by years – first, with default-proceeding delays, then with extended jurisdictional challenges, and finally (in the case of TG/TTP) going so far as to turn their back on these proceedings in direct contempt of this Court, rather than simply paying judgments entered in favor of certain Plaintiffs.

In a proceeding pursuant to Rule 55, a defendant should not be permitted to diminish the amount of damages owed through contemptuous conduct resulting in tactical delay.  Accordingly, this Trial Plan seeks to address the question of how these former owners can and should be made whole through the recovery of a *full* measure of damages, notwithstanding that Defendants' litigation tactics have forced them to become former owners rather than current owners at the time their damages are to be quantified.  Plaintiffs propose that the bellwether Plaintiff be a former owner in Virginia, e.g. Ms. Germano, since many of the Virginia class members have suffered these damages and the PSC has collected relevant data for these class members to prove up their damages.

Given this Court's broad authority under Rule 55(b)(2)(B), a bellwether damages hearing conducted pursuant to its provisions will provide instructive and important guidance on this critical measure-of-damages question facing a substantial number of class members.

(3)     **Product Identification Disputes**

The related issues of claim verification and product identification ("Product ID") arose during the June 9, 2015 class damages hearing when it became evident that certain information submitted to Brown Greer prior to the hearing required further clarification and confirmation.  As noted, this prompted the PSC to recommend the implementation of an administrative process under Rule 55(b) which would allow an appropriate Court-appointed "neutral" to take the steps necessary to address these claims data issues.  Rec. Doc. 19705-1 (11/18/15) at p.5.  *See also Byrd v. Aaron's Inc.*, 784 F.3d 154, 175 (3d Cir. 2015) ("claims administration is part of every class action.") (Rendell, J., concurring).

This process should begin with the understanding that defendants in default are presumed to have manufactured and sold the defective drywall in each of the class member's respective properties, to the extent their status as the product manufacturer has been alleged in pleadings which they elected not to answer.  Further, there are certain fundamental facts regarding Taishan that are unassailable.

> a.  **Taishan's Records Demonstrate Sales of Chinese Drywall to the U.S. Totaling at least 71,653,240.21 ft$^2$, and the PSC Has Produced Evidence that Taishan's Sales Total 87,609,696 ft$^2$**.

Taishan and TTP sold between 6,656,748.44 and 8,139,139.353 m$^2$ [**71,653,240.21 - 87,609,696 ft$^2$**][20] of Chinese Drywall to the United States from 2005-2008.  These facts are supported by Taishan's own documents:

a.  On May 11, 2009, Taishan issued a report to Chief SONG Zhiping (CNBM's Chairman) and Chief CAO Jianglin (CNBM's President) confirming that from 2005-2008, Taishan exported to the U.S. 822,037.37 m$^2$ [**8,848,410.25 ft$^2$**] under name of TG and 5,834,711.07

---

[20]1 square meter = 10.764 square feet.

m$^2$ [**62,804,829.96 ft$^2$**] under name of TTP through domestic import & export companies.[21] Thus, according to Taishan's admissions, combined total sales of drywall by TG and TTP to the U.S. = **71,653,240.21 square feet**.

b.   On June 27, 2010, Taishan reported that from 2005-2007, Taishan exported 7,292,804.536 m$^2$ [**78,499,748.03 ft$^2$**] of Chinese Drywall to the United States.[22]  In this report, Taishan detailed

(i)      the method of export,

(ii)     the quantity of boards for which TG and/or TTP signed the contracts and issued the invoices,

(iii)    the existence of litigation in the U.S. to resolve disputes involving "3,034,359.405 square meters [32,661,844.64 ft$^2$] of gypsum boards," and

(iv)    the categorization of Taishan's exports by label, which according to Taishan included the following:

> ➢ gypsum boards with the coding of "Shandong Taihe Dongxin Company Limited" in its English name printed on the back (687,247.86 m$^2$ [**7,397,535.97 ft$^2$**]);

> ➢ gypsum boards with the coding of "Tai'an Taishan Plasterboards Company Limited" in its English name printed on the back (117,881.28 m$^2$ [**1,268,874.1 ft$^2$**]);

> ➢ gypsum boards that used the "Taishan" brand of edge band (965,614.38 m$^2$ [**10,393,873.19 ft$^2$**]);

> ➢ gypsum boards that had white unlettered edge band, no coding, and neutral packaging (998,778.91 m$^2$ [**10,750,856.19 ft$^2$**]);

> ➢ gypsum boards that were labeled with the trademark (OEM) of foreign customers according to the customers' requirements (3,502,532.647 m$^2$ [**37,701,261.41 ft$^2$**]); and

> ➢ gypsum boards with "unknown" labeling (1,020,749.452 m$^2$ [**10,987,347.10 ft$^2$**]).

---

[21] *See* Informational Report on the Class Actions (TG-0208428-0208430) [Attached hereto as Exhibit "C"].

[22] *See* Statement on the Data and Statistics of Exports to the U.S. from 2005 to 2007 (TG-0129675-0129676) & Spreadsheet: Statistics of U.S. Gypsum Boards during 2005-2007 (TG-0129677) [collectively attached hereto as Exhibit "D"].

C.  Separate and apart from Taishan's admissions in the Informational Report and the
Statement of Statistics of Exports, the PSC calculated that Taishan exported **87,609,696 ft$^2$**
[1,825,202 sheets sized 4' x 12' (*i.e.*, 48 square feet each)] of Chinese Drywall to the United
States.[23]

This evidence demonstrates at a minimum that Taishan admits to having exported 71.6

million square feet of Chinese Drywall to the United States.  Notwithstanding this admission,

Plaintiffs contend that Taishan manufactured and sold more than 87.6 million square feet of

drywall to American customers.  However, even using Taishan's lower figure, the volume of

Taishan's drywall that was shipped to the U.S. was sufficient to construct more than 9,000

homes,[24] which amply supports the claims of every Plaintiff who has asserted claims against

Taishan for defective drywall.

> **b.  Verification of Taishan Drywall Can Be Administratively
>        Performed by Reviewing Certain Labeling Features Which
>        Taishan, by virtue of its Default, Is Estopped From Challenging**

As evident from (b) (iv) above, Taishan has no idea what markings or labels are on most

of its products since much of the product was knowingly shipped with "white unlettered edge band,

no coding, and neutral packaging" or "unknown" labelling.  Taishan further disclosed that it is

unaware whether any other parties applied their own trademarks to Chinese Drywall manufactured

by Taishan and it has no knowledge of the brand names under which the purchasers of its CDW

may have resold it.[25]  And, even for Taishan's drywall that had edge markings, as to this product

---

[23]*See* Summary Chart of Taishan Gypsum Board Sales to U.S. (supported by invoices & MPFs)
[Rec. Doc. 14843-3, filed 6/20/2012, & Exhibit 1 to 5/8/2012 RMH Affidavit, filed manually
5/8/2012 (Rec. Doc. 14215)] [attached hereto as Exhibit "E"].

[24]Using basic arithmetic and equally basic housing dimensions, the PSC calculated the amount of
homes 71.6 million sq./ft. of drywall can build.  *See* Calculations [attached hereto as Exhibit
"F"].

[25]Tai'an Taishan Plasterboard Co. Ltd. Manufacturer Profile Form, Ex. A, October 14, 2010
[attached hereto as part of the evidentiary support for Taishan products as Exhibit "G"].

counsel for Taishan admitted that, "such trademarks were applied to edge sealing tape, but we understand that was usually removed prior to installation, so it may have limited utility as a means of product verification."[26]  Furthermore, Taishan admitted that the taping was not an identifier at all, but "[t]he tape function is to make sure that the upper side of the gypsum board are not damaged.  And it would be peeled off during usage of the board."[27]

Despite Taishan's purposeful evasion of responsibility for the manufacture of its Chinese Drywall and/or its ineptitude at record keeping, the evidence adduced to date confirms that there are 12 Claimant Product Markings Categories of drywall whose provenance is unquestionably associated with the Taishan Defendants. Using this information, product identification will be administratively feasible during claims processing.  These categories and their evidentiary support are as follows:

> A.  BNBM or Dragon Brand[28]
> B.  C&K Gypsum[29]
> C.  Chinese Manufacturer #2 (purple font)[30]
> D.  Crescent City Gypsum[31]
> E.  DUN[32]

---

[26]*See* March 22, 2011 Letter of Joe Cyr [Rec. Doc. 8310].

[27]*See* Deposition of Che Gang, Taishan's Manager of International Trading - January 12, 2012 [Exhibit 6 to RMH Affidavit, filed manually 5/8/2012, Rec. Doc. 14215]

[28]*See* BNBM or Dragon Brand Evidentiary Support [Attached hereto as Exhibit "H"].

[29]*See* C&K Gypsum Evidentiary Support [Attached hereto as Exhibit "I"].

[30]*See* Chinese Manufacturer #2 (purple font) Evidentiary Support [Attached hereto as Exhibit "J"].

[31]*See* Crescent City Gypsum Evidentiary Support [Attached hereto as Exhibit "K"].

[32]*See* DUN Evidentiary Support [Attached hereto as Exhibit "L"].

    F.  IMT[33]
    G.  ProWall[34]
    H.  Taian Taishan or Taihe Edge Tape[35]
    I.  Made in China[,] Meet[s] or Exceeds ASTM 1396[36]
    J.  Drywall 4feet[x/*]12feet[x/*]1/2inch[37]
    K.  Venture Supply Marking or Invoice[38]
    L.  No Markings[39]

Taishan should be precluded from challenging these product identifications due to its default and principles of estoppel.  The doctrine of equitable estoppel is a central tenet of the common law and "is deeply rooted in the equitable principle that no one should be permitted to profit from his own wrongdoing in a court of justice."[40]  Accordingly, the law generally acts to preclude a litigant from asserting a claim or invoking a defense which is predicated upon his own

---

[33] *See* IMT Evidentiary Support [Attached hereto as Exhibit "M"].

[34] *See* Prowall Evidentiary Support [Attached hereto as Exhibit "N"].

[35] *See* Taian Taishan or Taihe Edge Tape Evidentiary Support [Attached hereto as Exhibit "G"].

[36] *See* Made in China[,] Meet[s] or Exceeds ASTM 1396 Evidentiary Support [Attached hereto as Exhibit "G"].

[37] *See* Drywall 4feet[x/*]12feet[x/*]1/2inch Evidentiary Support [Attached hereto as Exhibit "G"].

[38] *See* Venture Supply Marking or Invoice Evidentiary Support [Attached hereto as Exhibit "O"].

[39] *See* No Markings Evidentiary Support [Attached hereto as Exhibit "G"].

[40] *McGregor v. Louisiana State Univ. Bd. of Sup'rs*, 3 F.3d 850, 865 (5th Cir. 1993).  *See also United States v. Guyton*, 37 F. Supp. 3d 840, 857 (E.D. La. 2014). ("Estoppel is an equitable doctrine invoked to avoid injustice in particular cases, and is recognized as part of the federal common law."); *Nat'l Auto Serv. Centers, Inc. v. F/R 550, LLC*, No. 2D14-3632, 2016 WL 1238265, at *12 (Fla. Dist. Ct. App. Mar. 30, 2016), <u>reh'g denied</u> (May 25, 2016). ("[E]quitable estoppel embraces the notion that a party should not be permitted to profit by asserting rights against another when that party's own inequitable conduct has lulled the other into action or inaction detrimental to its position.").

wrongdoing.[41]  Therefore, the principle of equitable estoppel should be invoked to preclude the defaulted Defendants from taking advantage of any circumstances created by their wrongdoing even in the absence of deceit or misrepresentation.[42]  Because Taishan created the situation in which it is virtually impossible to identify much of its product, Taishan may not profit by asserting a defense of product identification when it was Taishan's own inequitable conduct that created the condition.  The equitable principle of estoppel prohibits such efforts.[43]

Accordingly, the Court should endorse a claims administration process in which Product Identification can be verified using objective measures.

### 4.  Omni XX , Motion for Severance and Suggestion of Remand

If the two Rule 55(b)(2)(B) bellwether damages hearings described above are conducted to resolve remaining issues of class damages, in order to resolve all remaining damages claims in the litigation, the Court may address the question of damages owed by Taishan to Plaintiffs not included in, or bound by, the class proceedings, and, specifically, the 665 plaintiffs named in Omni

---

[41]*See In re S. Motor Co. of Dade Cty.*, 161 B.R. 532, 544 (Bankr. S.D. Fla. 1993) ("The doctrine of equitable estoppel precludes a litigant from asserting a claim or defense that might otherwise be available to him against another party who has detrimentally altered his position in reliance on the former's misrepresentation or failure to disclose some material fact."); *Standard Life & Acc. Ins. Co. v. Pylant*, 424 So. 2d 377, 381-82 (La. Ct. App. 1982) ("[I]t is well settled that our law does not allow one to profit from his own wrongdoing.")

[42]*U.S. For Use & Benefit of Bernard Lumber Co. v. Lanier-Gervais Corp.*, 896 F.2d 162, 168 (5th Cir. 1990) (term equitable estoppel "comprehends that whenever the Chancellor would be led to conclude that in good conscience the result is unjust, unfair or unacceptable, the "magic wand of equity" has the power and duty to ignore, disregard or overrule the obstacle.")  "To establish equitable estoppel . . . , it is not necessary to show actual fraud, but only that the person to be estopped has misled another to his prejudice."  *Nargi v. CaMac Corp.*, 820 F. Supp. 253, 256 (W.D. Va. 1992).

[43]Alternatively, a rebuttable presumption may be employed that would oblige the defendant in default to prove the drywall is *not* theirs, as opposed to a self-serving statement that it "may or may not" be theirs.

XX who are *not* part of the certified class.  The PSC proposes severance and remand, to be followed by home district trials, as the most appropriate method to bring these claims to resolution.  A Motion for Severance and Suggestion of Remand for Omni XX plaintiffs from other districts (such as districts in Florida, Alabama, Virginia, etc.) is filed simultaneously with this supplement to Plaintiffs' Motion to Assess Class Damages.

### B.  Ample Authority Supports the Bellwether Damages Proceedings.

Because the above-detailed bellwether damages hearings will proceed as default judgment damages assessments under Rule 55(b)(2), all issues pertaining to liability and causation have been conclusively determined. As such, the hearings would proceed as bench trials under the authority granted to the Court by Rule 55(b)(2) as well as the authority vested in the Court by virtue of its appointment by the judicial Panel on Multidistrict Litigation ("JPML").

### (1)  Bellwether Damages Hearing #1: Louisiana Redhibition Claims

The principal objective of Damages Hearing #1 is to quantify non-remediation damages in the case(s) of one or more representative class members who already have presented evidence (in the June 9, 2015 class damages hearing) of their damages for property remediation and post-remediation environmental certification.  Such damages would include alternative living expenses (ALE) pending remediation, personal property damage, reimbursement for repair and/or replacement, as well as intangible damages to compensate for inconvenience and mental anguish/emotional distress.  The PSC proposes that the bellwether plaintiff(s) in this initial hearing be a Louisiana property owner pursuing a claim against Taishan in redhibition, since the recoverable damages in such a case are reflective of the intangible, non-pecuniary losses compensable under the laws of other states in which class members preside, and also would include attorney's fees which would provide guidance to the parties on an element of recovery common to all Louisiana class members as well.

In Louisiana, a consumer has a statutory right of action in redhibition against a manufacturer premised on the manufacturer's implied warranty against redhibitory defects. La. Civ. Code art. 2520; *see also Media Production Consultants, Inc. v. Mercedes–Benz of North America, Inc.,* 262 So. 2d 377 (1972).   In these default proceedings, therefore, it has been conceded by the defendant that the defectiveness in its drywall was redhibitory because it rendered the product useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect[…]" *Id.*

The extent of a property owner's recovery for this breach of warranty against redhibitory defects, depends upon whether the seller knew, or did not know of the defect – *i.e.* whether the defendant is a "good faith seller" or a "bad faith seller." La. Civ. Code arts. 2531 and 2545.  A so-called good faith seller is one "who did not know that the thing sold had a defect," and a bad faith seller is one "who knows that the thing he sells has a defect but omits to declare it, or . . . who declares that the thing has a quality that he knows it does not have." La. Civ. Code arts. 2531 and 2545.  However, the "seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing," and as such, is considered a bad faith seller. *Id.*  Taishan as the manufacturer is thus conclusively presumed to have knowledge of defects in the object it produces. *Young,* 595 So. 2d 1123 (La. 1992). Accordingly, it is liable not just for the costs of repair, but "also for damages and reasonable attorney fees." *Live Oak Homes Corp. v. Carrier Sales & Distribution, LLC,* 13-516 (La. App. 5 Cir. 4/23/14), 140 So. 3d 362, 370 (quoting La. Civ. Code art. 2535).

### a.  Nonpecuniary Damages

In certain circumstances, a Louisiana redhibition plaintiff's damages may include nonpecuniary damages for mental anguish, aggravation, and inconvenience. *Blair v. Bad Boy Inc.,* 48,953 (La. App. 2 Cir. 2014), 137 So. 3d 1223, 1228 (citing *Landaiche v. Supreme Chevrolet, Inc.,* 602 So.2d 1127,

23

1132 (La. App. 1 Cir. 1992)).  The Louisiana Supreme Court has held that when the requirements of

Louisiana Civil Code articles 2545 and 1998 are met, purchasers can recover mental anguish damages

caused by the purchase of the defective product even though the product is not unreasonably dangerous

and they have not sustained physical injuries. *Beasley v. Ed's Mobile Homes, Inc.,* 2001-1549 (La. App.

3 Cir. 2002), 824 So. 2d 383, 387, *writ denied,* 2002-1408, 825 So. 2d 1170 (La. 2002); see also *Jones*

*v. Winnebago Indus., Inc.,* 92 So. 3d 1113 (La. App. 2 Cir. 2012) (holding that nonpecuniary damages

are recoverable in redhibition actions if the at least one of the significant interests that the buyer sought

to gratify were nonpecuniary in nature).  Article 1998 provides:

> Damages for nonpecuniary loss may be recovered when the contract, because
> of its nature, is intended to gratify a nonpecuniary interest and, because of the
> circumstances surrounding the formation or the nonperformance of the contract,
> the obligor knew, or should have known, that his failure to perform would cause
> that kind of loss.

> Regardless of the nature of the contract, these damages may be recovered
> also when the obligor intended, through his failure, to aggrieve the feelings
> of the obligee.

La. Civ. Code art. 1998.

The Louisiana Supreme Court in *Young v. Ford Motor Co., Inc*., 595 So. 2d 1123 (La. 1992),

first addressed whether or not a buyer may recover nonpecuniary damages in an action for redhibition.

In doing so, it considered the Roman origins of the redhibitory action and noted that its purpose was to

protect buyers from latent defects undisclosed by corrupt dealers – a concept that was fully incorporated

into Louisiana law (*i.e.* via enactment of the redhibition articles in the Civil Code).  The *Young* Court

reasoned that "[t]he purpose of the redhibition action in Louisiana, as was the case in Roman law, has

been to restore the *status quo.*" *Id.* at 1127 (citing Floyd W. Lewis, Comment, *Warranty of Quality in*

*Louisiana: Extent of Recovery under the Implied–In–Law Warranty,* 23 Tul. L.Rev. 130, 131 (1948);

*Savoie v. Snell,* 35 So. 2d 745, 746 (La. 1948)).  Thus, historically, civilian law has always recognized

and provided a remedy for defective products by restoring the buyer to the same position if not for the defect, which includes both pecuniary and nonpecuniary losses. *Id*. at 1128.

The recovery of nonpecuniary damages requires that the nature of the contract or sale at issue (including the facts and circumstances surrounding its formation) must indicate that the obligee intended to gratify a nonpecuniary interest. *Young*, 595 So. 2d at 1132.  The buyer's nonpecuniary interest, however, must be "significant" inasmuch as it must be more than "an incidental or inferred contemplation of contracting parties." *Id*. (quoting *Meador v. Toyota of Jefferson, Inc.,* 332 So. 2d 433, 437 (La. 1976)) (internal quotations omitted). Importantly, a plaintiff whose intent was to gratify both pecuniary and nonpecuniary interests can recover nonpecuniary damages so long as "at least one of the significant interests" is nonpecuniary in nature.  *Id*. at 1133.

"Nonpecuniary losses" are those damages of a moral nature that do not cause a "material" loss or tangible part of a person's patrimony. *Blair v. Bad Boy Inc.,* 48,953 (La. App. 2 Cir. 4/9/14), 137 So. 3d 1223, 1231 (citing Saul Litvinoff, "Moral Damages," 38 La. L.Rev. 1 (1977)). "The gratification of a nonpecuniary interest means one intended to satisfy an interest of a spiritual order, such as a contract to create a work of art, or a contract to conduct scientific research, or a contract involving matters of sentimental value. In such a case, upon the obligor's failure to perform, the obligee may recover the damages he has sustained of a nonpecuniary—or "moral"— nature." *Id*.

The Court in *Young*, *supra*, concluded that while a contract to purchase a vehicle was primarily pecuniary in nature, there are circumstances in which the purchase of a vehicle may be due to nonpecuniary interests relating to taste, enjoyment, and personal preferences of owning and driving a chosen vehicle. *Young*, 595 So. 2d at 1132. This subtle distinction between pecuniary interests and nonpecuniary interests has been addressed by several Louisiana appellate courts with

respect to a variety of objects. The Louisiana Fourth Circuit Court of Appeal in *Thomas v. Desire Community Housing Corp.*, 773 So. 2d 755 (La. App. 4 Cir. 2000), a case involving the defective construction of a home, ultimately found that the award of nonpecuniary damages was proper. In so holding, the court found the nature of a contract to build the plaintiffs' home was motivated by a significant nonpecuniary interest in that it "was the culmination of a lifelong dream to improve the quality of their lives by rising from the housing projects to ownership." *Thomas*, 773 So. 2d at 764. The court further reasoned that the construction of the plaintiffs' home was "to be the fulfilment of the American Dream for them." *Id.*

Similarly, the Fourth Circuit in *Taylor v. Burton,* 708 So. 2d 531 (La. App. 3 Cir. 1998) found that the plaintiff-homeowners sufficiently proved that the contract to build their house was intended to gratify a significant nonpecuniary interest. The court placed significant emphasis on the testimony of plaintiff-homeowners that this was the first house they had built, the house they previously lived in was cramped and plaintiffs and their children were looking forward to entertaining family and friends in their new house. The plaintiff's excitement transformed into embarrassment, however, and as Mrs. Taylor testified, a family function had to be cancelled the day of out of her fear of possible harm to family members when the garage ceiling started sagging. *Id.* at 533. Ultimately, the court upheld the jury's award of $8,000.00[44] to the plaintiffs for their aggravation and mental distress due to the defects in their house. *Id.* at 536.

Such non-pecuniary damages recoverable under Louisiana's redhibition law, are the substantial equivalent of the types of intangible damages available to non-Louisiana class members as well

---

[44]Given the rate of inflation, $8,000 in 2002 is the equivalent of $10,710.53 in 2016. http://www.usinflationcalculator.com

Hence, the quantification of damages in this first bellwether Rule 55 damages hearing will prove instructive on a classwide basis.

### b. Attorneys' Fees

Under Louisiana law, attorneys' fees ordinarily are not recoverable unless specifically authorized by statute or contract. *See Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So.2d 756, 763 (La. 1985). In an action for redhibition, however, attorney's fees are expressly allowed. *See* La. Civ. Code art. 2545. Article 2545 explicitly provides that a manufacturer of a defective product may be found liable to the buyer of the product in a redhibition action for, *inter alia*, "reasonable attorney fees." *Id.*; *see also Hollybrook Cottonseed Processing, L.L.C. v. Am. Guarantee & Liab. Ins. Co.*, 772 F.3d 1031, 1036 (5th Cir. 2014).

Louisiana courts have consistently held that a buyer's right to recover reasonable attorney's fees from a manufacturer is "nothing more than an element of the buyer's damage." *Hollybrook*, 772 F.2d at 1036 (citing *Borne v. Mike Persia Chevrolet Co.*, 396 So. 2d 326, 330 (La. App. 4th Cir. 1981)). Addressing the constitutionality of the redhibition articles, the Fourth Circuit in *Borne* reasoned that the remedy "is not penal in its operation or intent," but instead, it "simply assigns the cost of contract litigation over actual defects in products" to the responsible party. *Borne*, 396 So. 2d at 330. Stated otherwise, "attorney's fees are nothing more than an element of the buyer's damage from the defective product[,]" one which "is as a practical matter avoidable by the manufacturer through an effective system for repair or replacement." *Id*. Accordingly, the particular reference to a buyer's right to "damages and reasonable attorney's fees" confirm that attorney's fees are explicitly authorized by the legislature, and are recoverable by Louisiana class members.

The determination of the proper amount of attorneys' fees owed, however, is a fact-sensitive inquiry that varies case by case. *Dailey v. The Home Furnishings Store,* 857 So. 2d 1051, 1060 (La.

App. 4 Cir. 2003).  Louisiana courts have awarded attorneys' fees both larger and smaller than the main demand in redhibition claims.  *Hollybrook Cottonseed Processing, LLC v. Carver, Inc.,* No. CIV.A. 09-0750, 2015 WL 5604320, at *5 (W.D. La. Sept. 23, 2015), *amended in part,* No. CV 09-0750, 2015 WL 9304557 (W.D. La. Dec. 21, 2015) (quoting *Dailey,* 857 So. 2d at 1060). The district court in *Hollybrook*, upheld an award of 33% in attorneys' fees on a judgment of $2,296,788.02. *Id*. at *5.  In so holding, the fee was reasonable in light of the complexity of the case and the fact that this case was one that "not all attorneys would have the skill or financial resources to take on a contingency basis." *Id*.  The case also had been ongoing since 2009 and required appearances by counsel in two different Louisiana district courts and in the Fifth Circuit. *Id*.  Regardless of the amount ultimately awarded, however, this will provide key guidance to the parties in all Louisiana cases within the class, through its analysis and quantification of recoverable attorney's fees in a representative, bellwether Rule 55 damages hearing.

### (2)  Bellwether Damages Hearing #2: Virginia Former Owners

Virginia statutory and jurisprudential damages law will govern bellwether Damages Hearing #2.  In the *Germano* FOFCOL, this Court has already identified the available damages recoverable by current owners under Virginia law including the cost of remediation, the loss of personal property, foreclosure and bankruptcy economic damages, and alternative living ("ALE") damages.  *See e.g., Germano* FOFCOL (Rec. Doc. 2380) (4/8/10) at p. 64-74 (damages awarded to Bill Morgan, then current owner.).

Under Virginia law, "[t]he measure of damages in a negligence action is that amount necessary to compensate the injured party for the damages proximately caused by the tortious conduct." *Westlake Properties, Inc. v. Westlake Pointe Prop. Owners Ass'n, Inc.*, 273 Va. 107, 126, 639 S.E.2d 257, 268 (2007).  A variety of damages are available to the plaintiffs under

Virginia law,[45] including damages to plaintiffs' real properties (*i.e.,* their homes).  This applies to the claims of former owners as explained herein.

Damages for "temporary injuries" are recoverable if the real property can be restored to its former condition, in which case, the injured property owner would be entitled to recover the cost of repairs plus applicable depreciation.  If the cost of repair does not exceed the diminution in market value, the owner may recover the cost of repair plus depreciation. *Lee v. Bell*, 237 Va. 626, 379 S.E.2d 464 (1989). Where temporary damages, such as cost of repair, exceed the diminution of market value (which the evidence will show is the case for Virginia CDW class members), damages are limited to the diminution of market value.

> Where evidence of repair and depreciated value after repairs exists, the proper measure of damages is the lower of 1) the difference in the fair market value of the property before and after the accident, or 2) if the property could be restored to its former condition, the cost of repairs, plus applicable depreciation

*7-Eleven, Inc. v. Dep't of Envtl. Quality*, 42 Va. App. 65, 100, 590 S.E.2d 84, 101 (2003) (citing *Averett v. Shircliff*, 218 Va. 202, 237 S.E.2d 92 (1977)); *see also Brooks v. City of Huntington*, 234 W. Va. 607, 768 S.E.2d 97 (2014).

Additionally, the Plaintiffs may also recover damages for injury to their personal property in accordance with Virginia law:

> In the valuation of personal property, which has been damaged but not destroyed, the measure of damages is the difference between the market value of the property immediately before and immediately after the property was damaged, plus necessary and reasonable expenses incurred by the owner in connection with the injury.

---

[45]It should be noted that the plaintiffs' entitlement to damages should not be affected by Virginia's economic loss rule. *In re All Pending Chinese Drywall Cases*, 80 Va. Cir. 69 (2010).

*Averett v. Shircliff*, 218 Va. 202, 206, 237 S.E.2d 92, 95, n.2 (1977).

In general, the determination of the proper amount of damages owed for injury to personal property is made by subtracting the fair market value of the property immediately *following* the loss from the fair market value thereof immediately *before* the injury, the remainder, plus necessary reasonable expenses incurred, being the damages (*i.e.* [fair market value before injury – fair market value after injury] + necessary reasonable expenses).

Other damages proximately caused by the Defendants' conduct and which the Plaintiffs are entitled to recover include, for example, costs incurred for alternative living, costs associated with foreclosures, bankruptcies, and refinances, and costs associated with damaged personal property. *See 7-Eleven, Inc.*, 42 Va. App. at 83 ("Where, as 7-Eleven contends in this case, Hechinger sued for and was entitled to carrying costs, lost profits, and lost investment income proximately caused by 7-Eleven's conduct, those costs are recoverable under Virginia tort law if proved.").

Those Plaintiffs who no longer have title to their properties (former owners) should not, however, be precluded from recovering damages in this MDL, particularly in light of the defendant's own conduct which led to these plaintiffs losing their homes (*i.e.*, by foreclosure or relinquishing title to the lender).

Likewise, the Plaintiffs who no longer own their respective properties rather than the current owners, had and still have the standing to sue and recover damages from Defendants. Despite losing title to their properties, these Plaintiffs retained the absolute right to sue and collect various damages from the Defendants.

> The property owner at the time the damages were inflicted has a personal right of action against the tortfeasor for the disturbance of his real right in the property. When the damage is apparent, the property owner obtains the personal right of action to sue for

> damages to compensate for a loss of value in the property or an interference with the property's use. This personal right exists during his use and enjoyment while he owns the property. This personal right exists even during and after his disposal of the property.

*Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 79 So. 3d 246, 275 (La. 2011).  "The former property owners still have a personal right of action against a tortfeasor for the damage he inflicted on the property while they were the owners, despite the fact that they no longer own the property." *Id.* at 264; *see also Boone v. Conoco Phillips Co.*, 139 So. 3d 1047 (La. App. 3 Cir. 2014) (real property owners did not obtain an assignment of any rights from previous owner that would enable them to sue prior mineral rights lessee for pre-acquisition damages to property).

Of particular importance is the fact that, with respect to these former owner Plaintiffs, was Defendants' actions and/or inactions caused them to lose their homes.  For example, in *Hone v. Advanced Shoring & Underpinning, Inc.*, 291 P.3d 832 (Ut. App. 2012), the homeowner plaintiffs brought an action against the contractor hired to fix the sinking of their house but whose work made the problem even worse.  In affirming an award of comprehensive damages, the court explained:

> The loss of the home was attributable to their having to pay tens-of-thousands of dollars to fix the damage caused to the property by Advanced Shoring [defendant] as well as their inability to pay both the mortgage on their home, which had become uninhabitable, and the rent for another residence . . . The Hones' [plaintiff] contention that the loss was attributable to Advanced Shoring was developed further at trial, where the Hones submitted over a hundred receipts and canceled checks supporting their claims that they invested thousands of dollars in repair work and rent during the time that Advanced Shoring was working on their home.

*Hone*, 291 P.3d at 845.

31

In sum, the proposed Virginia former owner bellwether Rule 55 damages hearing will provide important guidance to the resolution of former owner claims in Virginia and other states; a significant and growing portion of the certified class members have such claims.

**(3) Claims Administration to Resolve Product Identification**

As set forth above, a claims administration process to resolve product identification will be beneficial.  In addition to the equitable principles of estoppel discussed above, by virtue of default, Product identification is deemed admitted, meaning that the corrosive Chinese Drywall Product at issue is presumptively that of the Defendants.  The governing law interpreting and applying Rule 55(b)(2) of the Federal Rules of Civil Procedure recognizes that the well pled allegations of the Complaints are admitted, and as such, create a rebuttable presumption as to the issue of product ID.  *See e.g., Nishimatsu Const. Co.,* 515 F.2d at 1206; *Plumbers & Steamfitters Local 106 Health and Welfare Fund v. Ace Plumbing & Heating, Inc.,* No. 2:09-cv01940, 2011 WL 1831750, at *1 (W.D. La. May 11, 2011).  Furthermore, U.S. Supreme Court jurisprudence, dating from the 19th century to the present, likewise mandates that a defendant who fails to set aside the entry of a default is thereafter barred from contesting any and all facts established by that default.  *Ohio Central Railroad Company v. Central Trust Company of New York,* 133 U.S. 83, 10 S.Ct. 235, 33 L.Ed. 561 (1889).

Plaintiffs therefore propose that this Court establish a claims administration process to accomplish this task.

**(4) Omni XX, Motion for Severance and Suggestion of Remand**

Finally, the PSC proposes a proceeding that is unique among the prior proposals. The PSC files simultaneously herewith a Motion for Severance and Suggestion of Remand for OMNI XX Plaintiffs to their home districts for trial. Plaintiffs rely on the legal authorities cited in that

motion in support of this requested relief.  Therein, as it pertains to Florida claimants subject to remand, the PSC recommends that a consolidated trial all of claims for the 400+ Plaintiffs in the Carlton Arms development be presented before the Florida transferor court.  The limited remand proceedings contemplated in this phase will not be part of the MDL proceedings but the findings from the Florida trial proceedings could be used for bellwether, illustrative, or collateral estoppel purposes.  To that end, jury instruction on damages, like those used in *Seifert,* (attached hereto as Exhibit "Q"), could be used.  In the Knauf context, the rulings from the individual trials of *Robin*s and *Seifert* served a similar useful purpose to the parties in the MDL.

## IV.  **CONCLUSION**

The Taishan Defendants are in default, yet they still present arguments challenging the merits of issues that by all rights they have conceded by virtue of their default.  The Taishan Defendants direct challenges to class proceedings, as well as the formulaic methodology for calculating remediation damages are improper.  Similarly, the Taishan Defendants attempts to leverage the ever-worsening conditions of class member caused by their own delay should be estopped. These defaulted Defendants should not be able to benefits from such shenanigans.

The PSC requests that the Court GRANT its motion for Class Damages and also implement the PSC Trial Plan for Further Damages Proceedings Under Rule 55(b)(2)(B) in order

to facilitate a resolution of all remaining claims against the Taishan entities.

A Proposed Order is filed simultaneously herewith.


                                        Respectfully submitted,

Dated: December 23, 2016                /s/ Russ M. Herman_____
                                        Russ M. Herman, Esquire (Bar No. 6819) (on the
                                        brief)
                                        Leonard A. Davis, Esquire (Bar No. 14190) (on the
                                        brief)
                                        Stephen J. Herman, Esquire (Bar No. 23129)
                                        Madelyn O. Breerwood, Esquire (Bar No. 35538)
                                        HERMAN, HERMAN & KATZ, L.L.C.
                                        820 O'Keefe Avenue
                                        New Orleans, Louisiana 70113
                                        Phone: (504) 581-4892
                                        Fax: (504) 561-6024
                                        LDavis@hhklawfirm.com
                                        *Plaintiffs' Liaison Counsel MDL 2047*


                                        Arnold Levin (on the brief)
                                        Fred S. Longer (on the brief)
                                        Sandra L. Duggan (on the brief)
                                        Matthew C. Gaughan (on the brief)
                                        Nicola Serianni (on the brief)
                                        Levin Sedran & Berman
                                        510 Walnut Street, Suite 500
                                        Philadelphia, PA 19106
                                        215-592-1500 (phone)
                                        215-592-4663 (fax)
                                        Alevin@lfsblaw.com
                                        *Plaintiffs' Lead Counsel MDL 2047*

Gerald E. Meunier (LA Bar No. 9471) (on the brief)
Gainsburgh, Benjamin, David,
  Meunier & Warshauer, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Richard S. Lewis (on the brief)
Kristen Ward Broz (on the brief)
Hausfeld LLP
1700 K Street, NW., Ste. 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
rlewis@hausfeld.com
kward@hausfeld.com

Richard J. Serpe
Law Offices of Richard J. Serpe
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

Dawn M. Barrios
Emma E. Kingsdorf
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

*Co-Counsel for Plaintiffs and PSC Member*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 23rd day of December, 2016.

Respectfully Submitted,

BY:   */s/ Leonard A. Davis*
      Leonard A. Davis
      Herman, Herman & Katz, LLC
      820 O'Keefe Avenue
      New Orleans, LA 70113
      Phone: (504) 581-4892
      Fax: (504) 561-6024
      ldavis@hhklawfirm.com

      *Plaintiffs' Liaison Counsel MDL 2047*