# EXHIBIT B-3

## Kate Robinson

| | |
|---|---|
| **From:** | Regina L. Valenti |
| **Sent:** | Sunday, September 13, 2015 4:16 AM |
| **To:** | eliza_meltzer@laed.uscourts.gov |
| **Cc:** | Russ Herman; alevin@lfsblaw.com; christy.eikhoff@alston.com; cvejnoska@orrick.com; harry.rosenberg@phelps.com; jstengel@orrick.com; michael.barr@dentons.com; mike.moore@dentons.com; richard.fenton@dentons.com; bernard.taylor@alston.com |
| **Subject:** | CDW MDL 2047 |
| **Attachments:** | EXHIBIT A.pdf; EXHIBIT B.pdf; EXHIBIT C.pdf; EXHIBIT D.pdf; EXHIBIT E.pdf |

FROM RUSS M. HERMAN and ARNOLD LEVIN:

Dear Judge Fallon:

Undersigned counsel, on behalf of the Plaintiffs' Steering Committee ("PSC"), respectfully request a status conference at 8:00 a.m. CST/ 9:00 p.m. Hong Kong time on Thursday, September 17, 2015, with regard to an additional critical issue necessitating the Court's intervention.  We became aware of this issue at 7:30 p.m. Hong Kong time on September 12, 2015.

As the Court is aware, we are presently in Hong Kong engaged in preparation for the important deposition of Taishan Gypsum Co., Ltd.'s Chairman, Jia Tongchun.  It now appears that this deposition cannot be complete until the matters explained herein are resolved by motion practice.  We specifically request that the Court consider leaving open the depositions of Jia Tongchun and Taishan Gypsum Co., Ltd. ("Taishan Gypsum").  Counsel will then be able to formally engage in motion practice on these issues, which should be adjudicated prior to the continuance of the depositions.

Transcript pages from the 30(b)(6) depositions of Taishan Gypsum, BNBM PLC and CNBM Group, attached hereto as Exhibits "A," "B," and "C," respectively, are relevant to the following issues, and are the subject matter of this e-mail.

1. In sum, all 30(b)(6) defendants named above denied any knowledge of the whereabouts of Wenlong Peng and his employment status.

2. In addition, Wenlong Peng's e-mails were deleted after defendants above had knowledge of the litigation, and after Taishan Gypsum, BNBM PLC and CNBM Group were served with process, and after the defendants refused service of some of the related complaints filed in MDL 2047.

3. Further, Wenlong Peng, notwithstanding his continued consultancy in the MDL 2047 litigation, was permitted to take his personnel file with him from Taishan Gypsum after making the same privy to defense counsel.

4. Following the recent disclosure and claim by Taishan Gypsum that Wenlong Peng continued as a consultant to Taishan Gypsum in this litigation after he left Taishan Gypsum's employment in March of 2014, and while the "deprivilege" motion was pending before your Honor, an investigator was retained by the PSC at the direction of the undersigned to investigate the whereabouts and current employment of Wenlong Peng.

5. The investigation report (see Exhibit "D" attached hereto) clearly indicates the addresses of Wenlong Peng, his work history, his current employment and an indication that he is still employed and has been employed by an affiliate and/or subsidiary and/or related entity of Taishan Gypsum, namely Taishan Gypsum (Pingshan) Co., Ltd., Dianchang Road, Pingshan Town, Pingshan County.  The investigation report lists Wenlong Peng's home address as Dormitory 302, Taishan Gypsum Apt., Dianchang Rd., Pingshan Town, Pingshan County  (Note:  Taishan Gypsum  owns 70% of Taishan Gypsum (Pingshan) Co., Ltd.).  The PSC has redacted from the investigation report personal information including certain

credit information (values in credit lines and loans), discreet travel records (Wenlong Peng's general passport number), and his PRC ID Number.

6. Wenlong Peng's computer, after his voluntary resignation, was destroyed or reconfigured so as to make it unusable and its information no longer available to the PSC, despite all defendants being privy to its information.

7. Rather than direct a further investigation or interviews with close contacts of Wenlong Peng or Wenlong Peng himself, the undersigned has directed that such interviews not occur because they may potentially violate ethical considerations on the grounds that Wenlong Peng is a proper 30(b)(6) deposition witness of Taishan Gypsum.

8. Wenlong Peng is currently identified as a director and/or officer and in some cases shareholder of three active companies in the PRC, including Taishan Gypsum (Nantong) Co., Ltd. a subsidiary of defendant Taishan Gypsum.

9. Immediately following Wenlong Peng's voluntary resignation from Taishan Gypsum, he became the legal representative and executive director of a company with RMB $20 million.

10. At this time, the PSC has redacted the name of the investigator employed to investigate this matter; however, the PSC will furnish the investigator's name at the request of this Honorable Court.

Undersigned counsel, on behalf of the PSC, following the first day of the deposition of Chairman Song (BNBM(Group), CNBM, CNBM Group) will have a meet and confer with counsel for all parties regarding the issues which the PSC proposes to discuss with the Court on Thursday, September 17, 2015 at 8:00 a.m. CST, regarding the following exemplar issues:

•   Negligent/ intentional misrepresentation.
•   Spoliation of evidence/ violation of PTO 1, ¶14.
•   The cost of three trips for depositions of named defendants in Hong Kong.
•   The resumption of depositions in the United States in the Eastern District of Louisiana of 30(b)(6) depositions of Taishan Gypsum, BNBM PLC, CNBM, BNBM (Group) and CNBM Group and any other witnesses necessary.
•   Potential sanctions that this Court may find just and proper under the circumstances, including, but not limited to: financial penalties, attorneys' fees, entry of default judgment(s), and adverse inferences.
•   New dates for briefing the pending motions filed by CNBM Group and others to dismiss now scheduled for hearing in December, 2015.

In the last week, undersigned counsel have learned (for the first time), despite numerous prior requests, that in November 2010, a Joint Defense Agreement was entered into by the defendants (see Exhibit "E" attached hereto). These defendants were privy to Wenlong Peng's information in accord with their written Joint Defense Agreement. Conversely, the PSC has been precluded from access to Wenlong Peng and his information, and has been prejudiced as a result of same.  Taishan Gypsum should be ordered to produce their consultant (Wenlong Peng) in the United States (Eastern District of Louisiana) for deposition or suffer such sanction that this Court deems just and proper.

While defendants have routinely delayed productions of documents (many documents produced either shortly before or after 30(b)(6) depositions), the defendants were on notice and should have preserved and begun gathering documents at least beginning in November 2010.  The failure of defendants to preserve and begin assembling relevant documents in accordance with the allegations of plaintiffs' complaints in MDL 2047, and as required by PTO 1, ¶ 14 (Rec. Doc. No. 2, 6/16/2009) has adversely impacted the discovery process to the PSC's detriment.

We would be pleased to discuss this matter more fully at the requested conference.

Respectfully,

Russ M. Herman and Arnold Levin

Regina Valenti
Paralegal
Herman, Herman & Katz LLC

This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us immediately at (504) 581-4892 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3    ******************************************************

 4    IN RE:  CHINESE-MANUFACTURED  MDL NO. 2047

      DRYWALL PRODUCTS LIABILITY

 5    LITIGATION                   SECTION:  L

 6    THIS DOCUMENT APPLIES TO     JUDGE FALLON

      ALL CASES

 7                                 MAG. JUDGE WILKINSON

 8    ******************************************************

 9

                   CONFIDENTIAL - SUBJECT TO

10                FURTHER CONFIDENTIALITY REVIEW

11                   Tuesday, June 2, 2015

12                       — — —

13

14              Videotaped 30(b)(6) Deposition of TAISHAN

15    GYPSUM CO., LTD f/k/a SHANDONG TAIHE DONGXIN CO., LTD.

16    through the testimony of GANG CHE, held in the

17    courtroom of the United States District Court, Eastern

18    District of Louisiana, 500 Poydras Street,

19    New Orleans, Louisiana, commencing at 9:00 a.m., on

20    the above date, before Michael E. Miller, Certified

21    Court Reporter (#27009), Registered Diplomate Reporter

22    and Certified Realtime Reporter.

23                       — — —

24              GOLKOW TECHNOLOGIES, INC.

           877.370.3377 ph | 917.591.5672 fax

25                  deps@golkow.com
```

Confidential - Subject to Further Confidentiality Review

1          Mr. Wenlong Peng, pronounced "Peng,"

2     P-E-N-G, was the general manager throughout the

3     entire period.  He's not here.  He left under

4     some sort of circumstances we don't know about,

5     from Taishan's employment.  He was the most

6     knowledgeable person next to Chairman Jia.

7          Chairman Jia was not only the chairman,

8     and, at times, head of the supervisory committee

9     and a director of Taishan throughout the period,

10    and also held positions during the period from

11    2005 through 2014, at least through July.  We

12    don't know, right now, what his position is.

13         Unfortunately, we were advised 71 days

14    ago that he could not be produced in the United

15    States because he had a heart problem.  But, of

16    course, Taishan has had -- unlike the more than

17    3,000 individuals who are still suffering from

18    defective drywall, Taishan has had years of

19    opportunity, as we will show, to prepare

20    witnesses.

21         The gentleman from China who's produced

22    as a 30(b)(6) witness, we appreciate very much.

23    However, Taishan has had lawyers in China now

24    since 2010, has had lawyers in the United States

25    for four or five years before learned counsel

Confidential - Subject to Further Confidentiality Review

```
1       A       Chairman of board of directors, as well as

2    the general manager of Taishan.

3       Q       When did Mr. Peng leave Taishan?

4       A       In March 2014.

5       Q       And in March -- if he left in March 2014,

6    can you explain why his name appears as a Taishan

7    employee in the July 2014 correspondence between the

8    lawyer in China, in Taishan, and the lawyers in the

9    United States, representing Taishan?

10      A       Are you talking about Mr. Peng or Mr. Jia?

11      Q       Mr. Peng --

12      A       You just mentioned two names to me.

13      Q       -- as reflected in the July 7th, 2014,

14   correspondence.

15      A       Even though Mr. Peng had left Taishan, but

16   during the time he worked for Taishan, Taishan treated

17   him well, and he also had a positive sentiment toward

18   Taishan.  So whenever Taishan needed his help, he

19   would help to handle the matters because there is a

20   need of that transitional period before it was taken

21   over.

22              MR. HERMAN:  I want to thank you for

23           being responsive.  It's 10:30, and our practice

24           is to recess for 15 minutes, and so we're going

25           to recess now, at 10:35, and we will begin again
```

Confidential - Subject to Further Confidentiality Review

1      Q      Did anyone restrict you from speaking to any

2  executive at CNBM to prepare you for this deposition?

3                    MR. TAYLOR:  Objection to form.

4      A      No.

5  BY MR. HERMAN:

6      Q      Did anyone -- did anyone restrict you from

7  speaking with CNBM Group executives, or an executive,

8  to prepare you for this deposition?

9                    MR. TAYLOR:  Objection to form.

10      A      No.

11  BY MR. HERMAN:

12      Q      You've testified earlier today that

13  Mr. Peng, the former general manager of Taishan, left

14  the company in March 2014.  Do you recall that?

15                    MR. TAYLOR:  Objection to form.

16      A      I didn't say that.  I've never said there

17  was a Mr. Peng who was the general manager of Taishan.

18  I don't know where did you get that from.

19  BY MR. HERMAN:

20      Q      What was Mr. Peng's position with Taishan

21  when he left the company in March 2014?

22      A      He was the foreign trade department of

23  Taishan's --

24                    THE INTERPRETER:  And the interpreter

25      will start over again.

Confidential - Subject to Further Confidentiality Review

1      A      He was a manager of the foreign trade

2    department of Taishan.

3    BY MR. HERMAN:

4      Q      Did you speak with Mr. Peng about preparing

5    you for this deposition?

6      A      I did call Mr. Peng and confirmed some

7    matters.

8      Q      What matter did you confirm with Mr. Peng?

9      A      I don't have a clear recollection of that.

10   I've been confirming too much -- too many matters

11   recently in preparation of the deposition.

12     Q      And you did that by telephone?

13     A      Correct.

14     Q      What is his phone number?

15     A      133-2527-0000 -- four zeros.

16     Q      Did you have these conversations over the

17   phone while he was at work?

18     A      I don't have a clear recollection on that.

19   Whenever there were matters that needed to be

20   confirmed, I would call him.

21     Q      Where was he working at the time that you

22   made these phone calls?

23     A      I don't know.

24     Q      Where was he living at the time you made

25   these phone calls?

Confidential - Subject to Further Confidentiality Review

1      A      I believe in Taian City.

2      Q      How did you get his phone number?

3      A      He's still using the same phone number he

4   used before.

5      Q      And did he give you any resistance to

6   helping, quote, "prepare you," end quote, to be a

7   Taishan company representative in this deposition?

8              MR. TAYLOR:  Objection to form.

9      A      I don't know what do you mean by "refuse."

10   He cooperated with us.

11   BY MR. HERMAN:

12     Q      Was anyone --

13     A      But he was reluctant on letting us interrupt

14   his new life.

15     Q      What is his new life?

16     A      I don't know.  He's left Taishan.

17     Q      Was he forced out?

18              MR. TAYLOR:  Objection to form.

19     A      He left voluntarily.

20   BY MR. HERMAN:

21     Q      And in preparing yourself for the

22   deposition, did you determine that employees such as

23   yourself and Mr. Peng and Mr. Jia had personnel files?

24              MR. TAYLOR:  Objection to form.

25              THE WITNESS:  Can you repeat your

Confidential - Subject to Further Confidentiality Review

1        question?

2   BY MR. HERMAN:

3        Q       You have a personnel file at Taishan?

4        A       Yes.

5        Q       Does Mr. Peng have a personnel file at

6   Taishan?

7        A       He used to have one.

8        Q       What happened to it?

9        A       It was taken away.

10        Q       Who took it away?

11        A       Whoever resigned would have taken away his

12   own personal file.

13        Q       And did Mr. Jia have a personnel file?

14        A       Yes.

15        Q       Where is your personnel file kept,

16   physically?

17        A       What do you mean by "physically"?

18        Q       Where is it?

19        A       What's "where is it?"

20        Q       This cup is on this table.  Where is your

21   personal file, your personnel file?

22               MR. TAYLOR:  Objection to form.

23        A       I was confirming with you the difference

24   between a physical personal file as a personal file.

25   BY MR. HERMAN:

Confidential - Subject to Further Confidentiality Review

```
 1           question, please?

 2                    MR. HERMAN:  Yeah.

 3    BY MR. HERMAN:

 4      Q      Describe your personal file.

 5      A      My file is placed in a file envelope in the

 6    personnel department of the company.

 7      Q      Give me the address of the personnel

 8    department of Taishan.

 9      A      Taian City, T-A-I-A-N.  Daiyue District,

10    D-A-I-Y-U-E, District.  Dawenkuo, D-A-W-E-N-K-U-O.

11      Q      And is that where Mr. Jia's file is?

12      A      Correct.

13      Q      And isn't there a file there on Mr. Peng?

14      A      They used to have.

15      Q      Well, do you know, today, whether there's a

16    file there for Mr. Peng?

17      A      Not anymore.

18                    MR. HERMAN:  Thank you.  We'll recess.

19                    MR. TAYLOR:  Okay.  Thank you, sir.

20                    THE VIDEOGRAPHER:  This is the end of

21      Tape 3.  We're now off the record at 2:17.

22              (Recess taken, 2:17 p.m. to 2:37 p.m.)

23                    THE VIDEOGRAPHER:  This is the beginning

24      of Tape 4.  We're now back on the record.  The

25      time is 2:37.
```

Confidential - Subject to Further Confidentiality Review

```
1    States.

2    BY MR. HERMAN:

3        Q      Did you, in your many conversations with

4    Mr. Peng in preparation for your testimony under oath,

5    ask him who the affiliates of Taishan Gypsum were

6    in -- within the context of the order?

7              MR. TAYLOR:  Objection to form.

8        A      Mr. Peng no longer communicates with Taishan

9    regarding questions such as this.  For this question,

10   I have communicated with the management, and according

11   to Chinese culture and understanding of Taishan,

12   affiliate companies refer to those that Taishan holds

13   interest in.

14   BY MR. HERMAN:

15       Q      Who told you that?

16             MR. TAYLOR:  Objection to form and

17        assert the attorney-client privilege to any

18        information or advice that was provided to the

19        witness by his attorneys.  Instruct the witness

20        not to answer in that regard.

21             But to the extent he has other

22        information outside of the information provided

23        to him by his attorneys, the witness should

24        answer, and it is appropriate for the witness to

25        answer.
```

Confidential - Subject to Further Confidentiality Review

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3    *********************************************************

4    IN RE:  CHINESE-MANUFACTURED  MDL NO. 2047

     DRYWALL PRODUCTS LIABILITY

5    LITIGATION              SECTION:  L

6    THIS DOCUMENT APPLIES TO     JUDGE FALLON

     ALL CASES

7                       MAG. JUDGE WILKINSON

8    *********************************************************

9

              CONFIDENTIAL - SUBJECT TO FURTHER

10               CONFIDENTIALITY REVIEW

11            Wednesday, June 3, 2015

12               — — —

13

14      Continuing Videotaped 30(b)(6) Deposition of

15    TAISHAN GYPSUM CO., LTD f/k/a SHANDONG TAIHE DONGXIN

16    CO., LTD. through the testimony of GANG CHE, VOLUME 2,

17    held in the courtroom of the United States District

18    Court, Eastern District of Louisiana, 500 Poydras

19    Street, New Orleans, Louisiana, commencing at

20    8:58 a.m., on the above date, before Michael E.

21    Miller, Certified Court Reporter (#27009), Registered

22    Diplomate Reporter, Certified Realtime Reporter.

23                 — — —

24           GOLKOW TECHNOLOGIES, INC.

       877.370.3377 ph | 917.591.5672 fax

25          deps@golkow.com

Confidential - Subject to Further Confidentiality Review

```
 1    discuss with Mr. Jia that this case involved many

 2    high-level officers in the CNBM Group?

 3              MR. HAIRSTON:  Objection.

 4       A    Under the instruction and advice of my

 5    attorney, I confirmed this e-mail with Chairman Jia.

 6    Chairman Jia told me he also did not know why Mr. Dong

 7    Chungang said what he said.

 8    BY MR. HERMAN:

 9       Q    Did you discuss in your telephone calls with

10    Mr. Peng the information -- or any information on this

11    document?

12              MR. TAYLOR:  Objection to form.

13       A    Mr. Peng had left his employment in Taishan,

14    and for any specific questions regarding this case, he

15    personally refused to answer.  Therefore, we are

16    unable to confirm the matter with him.

17              MR. HERMAN:  Do you need to change the

18         tape at this point?

19              THE VIDEOGRAPHER:  This is the end of

20         Tape 6.  We're now off the record at 9:51.

21              (Recess taken, 9:51 a.m. to 10:06 a.m.)

22              THE VIDEOGRAPHER:  This is the beginning

23         of Tape 7.  We're now back on the record, and

24         the time is 10:06.

25    BY MR. HERMAN:
```

Confidential - Subject to Further Confidentiality Review

```
 1          his right, has the Chinese.

 2                  THE WITNESS:  Ask the question again,

 3          please.

 4                  MR. HERMAN:  Yes.

 5   BY MR. HERMAN:

 6      Q     Please read the Chinese version for the

 7   record.

 8      A     "All recipients, we have called Peng to try

 9   to get a detailed written instruction to withdraw from

10   Germano.  Essentially, Peng said the final decision

11   has not been made yet.  Therefore, he was unable to

12   give a detailed written withdrawal from Germano or

13   other cases' instruction.  He was only advised to

14   respond to us to confirm that we have learned the

15   intention of withdrawal from the case.

16                  "We'll continue to push and try to

17   give a response on Monday, your time, but at the same

18   time, I believe we need to proceed according to what

19   Tom had suggested in the other e-mail of his.

20                  "Best regards, Eugene Chen, Partner.

21   Hogan Lovells International LLP, 18th Floor, Park

22   Place, 1601 Nanjing," N-A-N-J-I-N-G, "Road West,

23   Shanghai, 200040.  Telephone:  86 21 6122 3800.

24   Direct:  86 21 6122 3858.  Fax:  86 21 6122 3899."

25      Q     Did you discuss with Peng the contents or
```

Confidential - Subject to Further Confidentiality Review

1   any of the contents of this e-mail of July 11th, 2014?

2        A      No.   Mr. Peng had already refused to answer

3   any specific questions.

4        Q      Did you discuss the contents -- or any

5   contents of this e-mail with Chairman Jia?

6        A      No.

7        Q      Did you ever, in preparation for your

8   deposition as a corporate representative, ever find

9   out who was responsible for, quote, "final decisions,"

10  end quote, regarding "attorneys' withdrawal," end

11  quote?

12                 MR. TAYLOR:   Objection to form.

13       A      Can you be more specific?   Which attorneys'

14  withdrawal?

15  BY MR. HERMAN:

16       Q      Was Hogan Lovells International present as

17  attorneys at your prior deposition?

18       A      Yes.

19       Q      Who were they representing at your prior

20  deposition?

21                 MR. TAYLOR:   Objection to form.

22       A      When I was taking my deposition in 2012,

23  Hogan Lovells was the law firm hired by Taishan.

24  BY MR. HERMAN:

25       Q      Again, as the corporate representative of

Confidential - Subject to Further Confidentiality Review

 1      A      "Subject:  Regarding MDL Status

 2   Conference/Judgment Debtor Exam.  All recipients:  We

 3   have communicated with Peng today regarding affiliate

 4   company" --

 5                  THE INTERPRETER:  This is interpreter

 6           speaking.  The Chinese translation -- the

 7           English translation for the Chinese word, I

 8           spell it here, F-U-S-H-U, can be translated as

 9           "affiliate," "affiliates" or "subsidiary."  So

10           I -- the interpreter will use "affiliates" or

11           "subsidiary" to be the translated version of the

12           Chinese characters fushu, gongsi, F-U-S-H-U,

13           G-O-N-G-S-I.  The interpreter would like to

14           start all over again.

15      A      "To all recipients:  We communicated with

16   Peng on the issue of affiliates company or subsidiary

17   company to ensure that we have provided a proper

18   response.  Please be advised on the Germano order

19   issued on July the 17th, 2014, (Registered Document

20   17869), page 3 mentioned the scope of affiliates or

21   subsidiary company and daughter companies scope,"

22   question mark?

23                  "The specific order is:  It is further

24   ordered that Taishan and any Taishan's affiliates

25   company or subsidiary company or daughter company is

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3    *****************************************************

4    IN RE:  CHINESE-MANUFACTURED   MDL NO. 2047

     DRYWALL PRODUCTS LIABILITY

5    LITIGATION                  SECTION:  L

6    THIS DOCUMENT APPLIES TO       JUDGE FALLON

     ALL CASES

7                               MAG. JUDGE WILKINSON

8    *****************************************************

9

          CONFIDENTIAL - SUBJECT TO FURTHER

10             CONFIDENTIALITY REVIEW

11             Thursday, June 4, 2015

12                  — — —

13

14       Continuing Videotaped 30(b)(6) Deposition of

15   TAISHAN GYPSUM CO., LTD f/k/a SHANDONG TAIHE DONGXIN

16   CO., LTD. through the testimony of GANG CHE, VOLUME 3,

17   held in the courtroom of the United States District

18   Court, Eastern District of Louisiana, 500 Poydras

19   Street, New Orleans, Louisiana, commencing at

20   9:02 a.m., on the above date, before Michael E.

21   Miller, Certified Court Reporter (#27009), Registered

22   Diplomate Reporter, Certified Realtime Reporter.

23                  — — —

24          GOLKOW TECHNOLOGIES, INC.

        877.370.3377 ph | 917.591.5672 fax

25             deps@golkow.com

Confidential - Subject to Further Confidentiality Review

1     you tell me where Taishan Gypsum (Nantong) Company,

2     Limited is located?

3         A     The address of Taishan Gypsum

4     (Nantong) Company, Limited is No. 288 Shenzhen Road,

5     Binjiang Street, Haimen City, Jiangsu Province.

6         Q     Isn't it true that Taishan, the company that

7     you are appearing for today, owns controlling interest

8     in Taishan Gypsum (Nantong) Company, Limited?

9                 THE INTERPRETER:  May the interpreter

10          take a moment to check the word "chronology

11          interest"?

12                 MR. HERMAN:  "Controlling interest."

13                 MR. TAYLOR:  Objection to form.

14        A     I don't know what do you mean when you said

15    "controlling interest."  I only know that Taishan

16    Gypsum is the shareholder of Taishan Gypsum (Nantong).

17    BY MR. HERMAN:

18        Q     Do you know that Taishan owns a hundred

19    percent of Taishan Gypsum (Nantong)?

20        A     I don't have a clear recollection of that,

21    but Taishan company definitely owns the shares of

22    Taishan Gypsum (Nantong).

23        Q     Isn't it --

24        A     I do not recall the specific number.

25        Q     Isn't it true that Peng Wenlong is currently

Confidential - Subject to Further Confidentiality Review

1   employed by Taishan Gypsum (Nantong) Company, Limited?

2        A      No.

3        Q      Isn't it true that the current position of

4   Peng Wenlong is as director and general manager of

5   Taishan Gypsum (Nantong) Company, Limited?

6        A      No.

7        Q      Who is the current director and general

8   manager of Taishan Gypsum (Nantong) Company, Limited?

9        A      I'm sorry, I do not recall.

10        Q      I invite you before you return, should

11   Judge Fallon of this court require you to return, to

12   look at the official Chinese website jsgsj.gov, which

13   lists Peng Wenlong as director and general manager of

14   Taishan subsidiary Taishan Gypsum (Nantong) Company,

15   Limited.

16        A      What website is that?

17        Q      It is the official --

18        A      Is that Taishan --

19        Q      -- Chinese website.

20        A      I'm sorry, I'm not aware of this website.

21        Q      I invite you, during the luncheon recess, to

22   access that website under Taishan Gypsum

23   (Nantong) Company, Limited, so that you can determine

24   who the current directors, general manager of Taishan

25   Gypsum (Nantong) Company, Limited are today, as listed

# EXHIBIT B

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3    *****************************************************

 4    IN RE:  CHINESE-MANUFACTURED  MDL NO. 2047

      DRYWALL PRODUCTS LIABILITY

 5    LITIGATION                    SECTION:  L

 6    THIS DOCUMENT APPLIES TO      JUDGE FALLON

      ALL CASES

 7                                  MAG. JUDGE WILKINSON

 8    *****************************************************

 9

              CONFIDENTIAL - SUBJECT TO FURTHER

10                 CONFIDENTIALITY REVIEW

11                 Thursday, June 18, 2015

12                     — — —

13

14         Continuing Videotaped 30(b)(6) Deposition of

15    CHINA NATIONAL BUILDING MATERIALS GROUP CORPORATION

16    through the testimony of GUOPING ZHOU, VOLUME 3, held

17    at the offices of Gordon, Arata, McCollam, Duplantis &

18    Eagan, LLP, 201 St. Charles Avenue, Suite 4000, New

19    Orleans, Louisiana, commencing at 8:40 a.m., on the

20    above date, before Michael E. Miller, Certified Court

21    Reporter (#27009), Registered Diplomate Reporter,

22    Certified Realtime Reporter.

23                     — — —

24            GOLKOW TECHNOLOGIES, INC.

          877.370.3377 ph | 917.591.5672 fax

25                deps@golkow.com
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. STENGEL:  Consistent with counsel's

 2         direction yesterday, exclude anything your

 3         lawyers may have told you about that subject.

 4              MR. HERMAN:  Excuse me.  That's not my

 5         question.  And counsel's objection, I know, is

 6         inadvertent.

 7    BY MR. HERMAN:

 8         Q     My question is:  Do you understand that in

 9    open court and in conferences with Judge Fallon, that

10    Taishan Gypsum has represented that Wenlong Peng

11    cannot be located?

12              MR. STENGEL:  Objection to form.

13         A     I don't know about that situation.

14    BY MR. HERMAN:

15         Q     Do you understand that Wenlong Peng has been

16    located and is general manager of a Taishan

17    subsidiary?

18              MR. STENGEL:  Objection to form.

19         A     I don't know about that.

20              (CG:6/16/15-6/18/15 Exhibit 37-1

21         marked.)

22              (CG:6/16/15-6/18/15 Exhibit 37-1A

23         marked.)

24              (CG:6/16/15-6/18/15 Exhibit 37-2

25         marked.)
```

# EXHIBIT C

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3    ******************************************************

 4    IN RE:  CHINESE-MANUFACTURED  MDL NO. 2047

      DRYWALL PRODUCTS LIABILITY

 5    LITIGATION                   SECTION:  L

 6    THIS DOCUMENT APPLIES TO     JUDGE FALLON

      ALL CASES

 7                                 MAG. JUDGE WILKINSON

 8    ******************************************************

 9

              CONFIDENTIAL - SUBJECT TO FURTHER

10                 CONFIDENTIALITY REVIEW

11                Wednesday, July 8, 2015

12                    — — —

13

14       Continuing Videotaped 30(b)(6) Deposition of

15    BEIJING NEW BUILDING MATERIALS PUBLIC LIMITED CO.

16    through the testimony of YU CHEN, held at the offices

17    of Phelps Dunbar LLP, 365 Canal Street, Suite 2000,

18    New Orleans, Louisiana, commencing at 9:08 a.m., on

19    the above date, before Michael E. Miller, Certified

20    Court Reporter (#27009), Registered Diplomate

21    Reporter, Certified Realtime Reporter.

22                    — — —

23             GOLKOW TECHNOLOGIES, INC.

           877.370.3377 ph | 917.591.5672 fax

24                 deps@golkow.com

25
```

```
 1          the objection.  You don't have -- it's my

 2          question, and if I don't put the document in

 3          front of him, I live and die with the question I

 4          ask.

 5               MR. BARR:  Yes, you live and die with

 6          the question you ask.

 7               MR. LEVIN:  You know darn well that that

 8          document will be shown to him sometime in the

 9          next three, four days, and that's why it was

10          objectionable, what you said.

11               Now, let's move on.

12               MR. BARR:  I disagree with your

13          statement, Mr. Levin, but I will move on.

14     A     The BNBM annual report did mention the

15   shareholders in the market of Dragon brand product and

16   Taishan brand product, but the specifics can be found

17   in the annual report itself.

18               MR. LEVIN:  Thank you, Mr. Barr.

19               MR. BARR:  Let's skip the comments.

20   BY MR. LEVIN:

21     Q     Did you meet with or attempt to meet with

22   Peng Wenlong prior -- in preparation for the

23   deposition?

24     A     I have met him in the presence of the

25   attorney.
```

Confidential - Subject to Further Confidentiality Review

1      Q      In preparation for this deposition?

2      A      No.

3      Q      Did you meet him prior to the time that you

4  were preparing for the deposition?

5      A      Yes.  A few years ago, I met him.

6      Q      And who is Mr. Peng Wenlong?  Is it a man,

7  you know...

8                     What was his role at Taishan?

9      A      When I met him, he was an employee of

10  Taishan Gypsum.

11      Q      Was he the director of foreign trade of

12  Taishan?

13                THE INTERPRETER:  May the interpreter

14          inquire counsel the meaning of "director" here?

15          The director of board of directors or director

16          of a department, of international trade?

17                MR. LEVIN:  The board.  Strike that.

18          Jiminy Crickets said it was the department.

19                MR. BARR:  She should listen to your...

20      A      I don't remember what exactly was his

21  position, but I remember he did work for that

22  department.  It seems he was the manager of that

23  department.

24  BY MR. LEVIN:

25      Q      Have you seen him lately?

1      A    No.

2      Q    Do you know where he is?

3      A    I have not been in touch with him for a long

4  time.

5                MR. LEVIN:  I'm probably going into

6      annual reports now.

7                MR. BARR:  Okay.

8                MR. LEVIN:  And I think --

9                MR. BARR:  There's no reason for us to

10     go outside.

11               MR. LEVIN:  No, no.  Let's go off the

12     record.

13               MR. BARR:  Sure.

14               THE VIDEOGRAPHER:  The time now is

15     3:32 p.m.  We're off the record.

16               (Discussion off the record.)

17               THE VIDEOGRAPHER:  The time now is

18     3:34 p.m.  We're back on the record.

19               MR. LEVIN:  We are now at a point in the

20     deposition where we will be utilizing, from time

21     to time, documents which are in Chinese, such as

22     annual reports and announcements.

23               The defendant has given us copies -- has

24     given us translations of those reports that were

25     work product for production purposes and would

# EXHIBIT D

PRIVILEGED, CONFIDENTIAL
& WORK PRODUCT PROTECTED
September 9, 2015
VIA FACSIMILE

TO:          Russ Herman, Esq. w/att.
             Lenny Davis, Esq. w/att.
cc:          Arnold Levin, Esq. w/att.


REF:         Update on Peng Wenlong, Taishan Drywall Case

As requested, we put priorities on searching for Peng Wenlong. The following facts have been generated:

1. Home Address:  Dormitory 302, Taishan Gypsum Apt., Dianchang Rd., Pingshan Town, Pingshan County

2. Work Address:  Taishan Gypsum (Pingshan) Co., Ltd., Dianchang Road, Pingshan Town, Pingshan County

3. Telephone Numbers associated with Peng:
   Mobile: 13325270000; Home/Work: 031182935576/031182918626

4. Passport: ███████████  Only travel to UAE in 2005

5. Officer/Director of companies:
   - Shenyang Taishi Rock Wool Co., Ltd. – Executive Director
   - Taishi Rock Wool Co., Ltd. – Manager
   - Taishan Gypsum (Nantong) Co., Ltd.

   Cancelled Association with:
   - Tai'an Jindun Building Material Co., Ltd. Wujin Business Department
   - Tai'an Taihe Advertising Co., Ltd.

Your advice on the field work regarding Peng would be appreciated. For example, close contacts could be interviewed, including Wenlong himself, on a pretext for detailed information.

I hope this material is useful. I would appreciate feedback on our faxes on the proposed plan and contract clarifications.

Regards,

Research

Peng Wenlong



1.  Discreet enquiries revealed registered information relating to Peng as follows:

PRC ID No.:
DOB:                              September 29, 1981
Registered Address:              No.5, Taihe Group, Dawenkou Town, Tai'an City, Shandong
                                 Province
                                 山东省泰安市郊区大汶口镇泰和集团 5 号
Native Place:                    Tai'an City, Shandong Province 山东省泰安市郊区

2.  Discreet enquiries revealed credit information relating to Peng as follows:

Marital Status:                  Married
                                 (Name of spouse not shown)
Mobile:                          13325270000
Home / Work:                     031182935576 / 031182918626
Correspondence Address:          Dianchang Road, Pingshan Town, Pingshan County,
                                 Shijiazhuang City, Hebei Province
                                 河北省石家庄市平山县平山镇电厂路

Residences

Residence 1:                     As at November 21, 2012, dormitory
                                 302, Unit 2, Taishan Gypsum Apartment, Dianchang
                                 Road, Pingshan Town, Pingshan County
                                 平山县平山镇电厂路泰山石膏公寓 2 单元 302

Residence 2:                     As at December 7, 2007
                                 Dormitory of Taihe Group, Dawenkou Town, Daiyue
                                 District, Tai'an City, Shandong
                                 山东省泰安市岱岳区大汶口镇泰和集团宿舍

Residence 3:                     As at June 15, 2007, dormitory
                                 201, Unit 1, No.3 Building, Huayuanzhou Community
                                 One, No.3211, Taishan Street, Tai'an City, Shandong
                                 山东省泰安市泰山大街 3211 号花园洲小区 1 期 3
                                 号楼 2 单元 201

**Employers**

| | |
|---|---|
| Employer 1: | As at November 21, 2012 |
| | Taishan Gypsum (Pingshan) Co., Ltd. |
| | 泰山石膏（平山）有限公司 |
| | Dianchang Road, Pingshan Town, Pingshan County |
| | 平山县平山镇电厂路 |
| Employer 2: | As at December 7, 2007 |
| | Taishan Gypsum Shareholding Co., Ltd. |
| | 泰山石膏股份有限公司 |
| Employer 3: | As at June 15, 2007 |
| | Shandong Tai'an Hedongxi Shareholding Co., Ltd. |
| | 山东泰安和东新股份公司 |
| | No.619, Shenzhen Road, Mengang Industry Area, |
| | Haimen City, Nantong, Jiangsu |
| | 江苏南通海门市门港工贸区深圳路 619 号 |
| Employer 4: | As at January 1, 1990 |
| | Taishi Rock Wool Co., Ltd. |
| | 泰石岩棉有限公司 |

3.  Peng has 7 credit cards on record with no outstanding balance.

| Currency | Credit Line | Last payment | Outstanding |
|---|---|---|---|
| RMB | ███ | July 7, 2013 | 0 |
| RMB | ███ | June 17, 2015 | 0 |
| USD | ███ | September 6, 2012 | 0 |
| USD | ███ | November 21, 2012 | 0 |
| RMB | ███ | Closed July 25, 2007 | |
| USD | ███ | Closed July 25, 2007 | |
| RMB | ███ | Not activated July 22, 2015 | |

4.  Peng has 1 loan on record, which has been repaid.

| Date | Type | Amount | Status |
|---|---|---|---|
| December 7, 2007 | Housing | ███ | Repaid February 9, 2011 |

5.  Discreet travel records revealed Peng Wenlong holds General Passport No. ███. His travel records show he had only travelled abroad in October 2005. No further travel records were found since then.

2005

General Passport No. █████████

| Status | Date & Time | Mode | Destination |
|--------|-------------|------|-------------|
| Entry | 2005-10-24-10:45:19 | Flight CA942 | Not shown |
| Exit | 2005-10-18-14:38:44 | Flight CA941 | United Arab Emirates |

6.   Peng Wenlong was identified as the legal representative, director and/or shareholder of 5
companies in the PRC, of which two are cancelled: -

- Shenyang Taishi Rock Wool Co., Ltd.
  沈阳泰石岩棉有限公司
- Taishi Rock Wool Co., Ltd.
  泰石岩棉有限公司
- Taishan Gypsum (Nantong) Co., Ltd.
  泰山石膏(南通)有限公司

Cancelled

- Tai'an Jindun Building Material Co., Ltd. Wujin Business Department
  泰安市金盾建材有限公司五金经营部
- Tai'an Taihe Advertising Co., Ltd.
  泰安市泰和广告有限公司

**Shenyang Taishi Rock Wool Co., Ltd.**

7.   AIC (Administration for Industry & Commerce) company registration records identified Shenyang Taishi Rock Wool Co., Ltd. was incorporated on March 17, 2014 and is a limited liability company with an issued registered capital of RMB20,000,000. Peng Wenlong 彭文龙 is the legal representative and executive director. Shandong Taishi Energy Conservation Heat Preservation Material Co., Ltd. holds 100% shares.

| | |
|---|---|
| Company Name | Shenyang Taishi Rock Wool Co., Ltd.<br>沈阳泰石岩棉有限公司 |
| Registration No. | 211221004031192 |
| Registered Address | No.1, No.4 Road, Yilu Industrial Area, Tieling County<br>铁岭县工业园区懿路工业园四号路第 1 号 |
| Legal Representative | Peng Wenlong 彭文龙 |
| Registered Capital | RMB20,000,000 |
| Date Incorporated | March 17, 2014 |
| Period of Operation | 2014-03-17 to 2034-03-16 |
| Company Type | Limited liability company (solely-owned by company) |
| Registering Authority | AIC of Tieling County |
| Business Scope | Rock wool, mineral wool, glass wool insulation energy-saving materials and products sales; Cotton production; Hardware accessories sales; Building energy conservation product, external wall insulation system products, rock wool composite panels, insulation decoration integration of product research and development, production, marketing; Import and export business. |
| Status | Active |
| Date of last update | March 17, 2014 |

| Shareholders | Contribution | % |
|---|---|---|
| Shandong Taishi Energy Conservation Heat Preservation Material Co., Ltd.<br>山东泰石节能保温材料有限公司 | RMB20,000,000 | 100 |

| Key Executives | Position |
|---|---|
| Peng Wenlong 彭文龙 | Executive director |
| Li Zhengwen 李正文 | General manager |
| Jia Xinfeng 贾心峰 | Supervisor |

Taishi Rock Wool Co., Ltd.

8.   AIC (Administration for Industry & Commerce) company registration records identified Taishi Rock Wool Co., Ltd. was incorporated on September 30, 2011 and is a limited liability company with an issued registered capital of RMB100,000,000. Liu Huizhen 刘会珍 is the legal representative and shareholder is Shandong Taihe Building Material Co., Ltd. holding 100%.

| | |
|---|---|
| Company Name | Taishi Rock Wool Co., Ltd.<br>泰石岩棉有限公司 |
| Registration No. | 370900200027430 |
| Registered Address | Shangquan Village, Manzhuang Town, Diayue District, Tai'an City<br>泰安市岱岳区满庄镇上泉村 |
| Legal Representative | Liu Huizhen 刘会珍 |
| Registered Capital | RMB100,000,000 |
| Date Incorporated | September 30, 2011 |
| Company Type | Limited liability company (solely-owned by company) |
| Registering Authority | AIC of Tai'an |
| Business Scope | Rock wool, mineral wool, glass wool insulation energy-saving materials and products sales; Cotton production; Hardware accessories sales; Building energy conservation product research and development, production, marketing; Import and export business. |
| Status | Active |
| Date of last update | April 3, 2014 |

| Shareholders | Contribution | % |
|---|---|---|
| Shandong Taihe Building Material Co., Ltd.<br>山东泰和建材有限责任公司 | RMB100,000,000 | 100 |

| Key Executives | Position |
|---|---|
| Peng Wenlong 彭文龙 | Manager |
| Wang Lei 王蕾 | Director |
| Wang Tingxiang 王亭香 | Director |
| Ma Ruoran 马若然 | Director |
| Xu Chunhua 徐春华 | Director |
| Jiao Wenbo 焦文波 | Director |
| Li Zuoyi 李作义 | Supervisor |
| Zhu Jinghua 朱经华 | Supervisor |
| Wang Qinghui 王庆慧 | Supervisor |

| Meng Zhaoyuan 孟兆远 | Supervisor |
| Lv Wenyang 吕文洋 | Director |
| Li Yani 李亚妮 | Director |
| Zheng Meixia 郑梅霞 | Director |
| Shi Meiling 史美玲 | Director |
| Xiao Hong 肖红 | Director |
| Ren Xue 任雪 | Director |
| Liu Huizhen 刘会珍 | Chairman |

**Changes**

| Type | Date | Description |
|------|------|-------------|
| Company Name | 03-04-2014 | Taishi Rock Wool Co., Ltd. 泰石岩棉有限公司 |
| Legal representative | 03-04-2014 | Liu Huizhen 刘会珍 |
| | 30-09-2011 | Lv Wenyang 吕文洋 |

# EXHIBIT E

*PRIVILEGED AND CONFIDENTIAL*

## COMMON INTEREST, JOINT DEFENSE AND CONFIDENTIALITY AGREEMENT

This Joint Defense Agreement ("Agreement") is made by and between Beijing New Building Materials, Public Limited Company ("BNBM PLC") China National Building Materials Co., Ltd. ("CNBM"), China National Building Materials Group Corporation ("CNBM Group"), CNBM (USA) Corporation ("CNBM (USA)"), Taishan Gypsum Co. Ltd. ("TG"), Tai'an Taishan Plasterboard Co. Ltd. ("TTP") and Weifang Aotai Plaster Co. Ltd. ("Weifang") referred to collectively as the "Parties" to this Agreement, in the below described litigation.

WHEREAS, plaintiffs throughout the United States of America ("United States" or "US") have filed numerous legal actions, in both federal and state courts, naming or attempting to name the Parties, and actual or alleged affiliates of those entities, as defendants (collectively, the "Mass Tort Drywall Litigation"); and

WHEREAS, the actions in the Mass Tort Drywall Litigation generally contain allegations that Chinese gypsum drywall products allegedly manufactured, sold, or distributed by the Parties, as well as numerous other companies, are defective and have caused property damage and/or personal injury; and

WHEREAS, the Mass Tort Drywall Litigation includes, among others, numerous federal court actions that have been transferred to and coordinated in a single federal docket, Multidistrict Litigation No. 2047, U.S. Federal District Court for the Eastern District of Louisiana (the "MDL Actions"), as well as many actions filed by homeowners in various state courts throughout the United States and indemnity actions such as *Lennar Homes, LLC et al. v. Knauf GIPS KG et al.*, Miami-Dade County, Florida State Case No. 09-07901-CA-23, filed on January 30, 2009 (the "*Lennar Homes* Action"), all of which raise pressing issues for the Parties; and

WHEREAS, the Parties recognize that the allegations raised by plaintiffs in the Mass Tort Drywall Litigation present certain legal and factual issues that are common to the Parties, and even though the Parties maintain that such allegations are baseless, they warrant joint efforts in analyzing, responding to, and, where appropriate, defending individual actions in the Mass Tort Drywall Litigation; and

WHEREAS, the Parties to this Agreement believe that it will be in their mutual and common interest that they and/or their counsel have the ability to (1) exchange certain of their counsel's legal advice, factual and legal research, documents and other information; (2) share certain of their counsel's work product; (3) and jointly work with one another and their counsel- in connection with responding to and defending the Mass Tort Drywall Litigation and any other actual or potential proceeding involving the same or similar allegations; and they believe that the sharing of information, communications and their counsel's legal advice and work product will reduce the costs of litigation, will promote efficiency, and will be beneficial to their common interests in the joint defense of the Mass Tort Drywall Litigation and any other actual or potential proceeding involving the same or similar allegations; and

EXHIBIT C

WHEREAS, in undertaking and effectuating their joint efforts, it has been and will be advisable and necessary for the Parties and/or their counsel to share with each other information that may be of a privileged, protected, and/or confidential nature; and

WHEREAS, the Parties intend that their joint efforts not constitute or be construed as a waiver of any attorney/client, work product, joint defense, common interest, or self-evaluative privilege, or of any protection afforded to proprietary information or trade secrets, and/or of any other type of privilege or protection, and that such joint efforts have been and shall continue to be undertaken subject to, and without waiving, any such privileges and protections; and

WHEREAS, the Parties intend that their joint efforts shall not constitute joint representation of them by any counsel and shall not itself constitute a basis for disqualification by one Party of the other's lawyers in any litigation or proceeding.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein, the Parties agree as follows:

## AUTHORIZATION AND INCORPORATION OF ABOVE "WHEREAS" CLAUSES

1.      The undersigned represent that they are fully authorized to enter into this Agreement. The above-stated "WHEREAS" clauses are hereby incorporated by reference and made fully a part of this Agreement.

## COMMON INTEREST

2.      In connection with the Parties' efforts in defending against the Mass Tort Drywall Litigation and any other actual or potential proceedings involving the same or similar allegations as those alleged in the Mass Tort Drywall Litigation, the Parties believe and agree they share a mutuality of interest in a common defense. In order to advance the Parties' common interest, they have concluded that facts and information known or discovered by each of them may assist the other Party in the preparation of an individual defense or between the Parties a joint defense. The Parties therefore acknowledge and agree that they share certain common interests and that their interests will be best served if they and/or their counsel can exchange information related to those interests subject to the continued protection of the attorney-client privilege, attorney work product doctrine, joint defense and/or common interest doctrines, and/or any other applicable privileges or protections.

## JOINT DEFENSE INFORMATION

3.      The Parties agree that they may cooperate with each other as each Party may deem appropriate and shall abide by this Agreement in the joint defense of the Parties' common interests to the extent permitted by law pursuant to the joint defense and/or common interest doctrines recognized by the various state and federal courts. To that end, a Party or its counsel (a "Producing Party") may communicate, exchange or share with the other Party or its counsel ("Receiving Party") information protected by the attorney–client privilege, the attorney work product doctrine, or other privileges, and information which constitutes confidential business information, trade secrets, or any other type of privileged or protected confidential

\\\NY - 037476/000001 - 2290422 v1

*PRIVILEGED AND CONFIDENTIAL*

information—both orally and in paper and electronic documents—including but not limited to, documents, facts, strategies, factual analyses, mental impressions, investigations, legal advice and analysis and memoranda and opinions, reports of witness interviews, draft briefs and pleadings, and other information.  All such information that is disclosed pursuant to this Agreement, including information exchanged both orally and in paper and electronic documents, shall be referred to herein as "Joint Defense Information."  All such information communicated between the Parties is intended as confidential shall be covered by a joint defense privilege and shall be treated as confidential Joint Defense Information unless expressly designated otherwise by the Producing Party.

      4.     The Parties hereby confirm to each other that, to the extent they have already been in oral or written communication with one another about matters pertaining to the Mass Tort Drywall Litigation or other actual or potential proceedings involving the same or similar allegations as those alleged in the Mass Tort Drywall Litigation, such communications and work-product have occurred and been created in furtherance of the joint defense, and are subject to this Agreement and the joint defense privilege.

      5.     Nothing in this Agreement is intended to, or shall be deemed to, impose any obligation upon either Party to disclose Joint Defense Information to another Party or its counsel.

## PRESERVATION OF ALL PRIVILEGES AND CONFIDENCES

      6.     The Parties agree and intend that the otherwise privileged or confidential Joint Defense Information will continue to be protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or other applicable privileges or protections, even if such materials are exchanged between themselves or between counsel and other representatives or consultants for the Parties and that disclosure of Joint Defense Information in this manner is not intended to and does not waive any applicable privilege of protection.  Any inadvertent disclosure of Joint Defense Information shall not constitute a waiver of confidentiality or privilege.  Any other disclosure shall not constitute a waiver of confidentiality or privilege by any Party that did not make the disclosure.

## LIMITATIONS ON USE OF JOINT DEFENSE INFORMATION

      7.     The Parties intend and understand that disclosure of Joint Defense Information pursuant to this Agreement shall be done solely to facilitate the preparation and/or presentation of common or coordinated defenses.  To ensure the protection of the mental impressions, conclusions, opinions, legal theories, and other work product of counsel for the Parties, as well as other privileged, protected, or confidential information, each Party agrees that Joint Defense Information shall not be given, shown, made available, or communicated in any way to anyone other than the following:

          (a)     counsel for the Parties and such members of their support staff whose access to such Joint Defense Information is reasonably necessary to such counsel's representation of the Party;

*PRIVILEGED AND CONFIDENTIAL*

(b)     managerial employees and/or in-house counsel for a Party who have responsibilities relevant to the conduct or defense of the Mass Tort Drywall Litigation or other related litigations or proceedings;

(c)     independent consultants and/or non-testifying experts retained, employed, or otherwise consulted by a Party or by the Parties to assist counsel in representing the Party or Parties except that no Joint Defense Information may be disclosed to any such person unless he or she has signed a confidentiality agreement in the form attached as Exhibit A that (a) requires such person to maintain the confidentiality of the Joint Defense Information; (b) limits the use of Joint Defense Information solely for purposes of the Mass Tort Drywall Litigation; and (c) acknowledges that any disclosure of Joint Defense Information is governed exclusively by this Agreement; and

(d)     those individuals or entities to whom disclosure is required by statute, regulation, court or administrative order.

8.     Joint Defense Information that is shared pursuant to this Agreement is to be used solely for the joint defense of the Mass Tort Drywall Litigation or any other actual or potential proceeding involving the same or similar allegations as those alleged in the Mass Tort Drywall Litigation. Joint Defense Information, or information derived therefrom may not be disclosed or used for any other purpose without the consent of both Parties, provided, however, that any Party may use Joint Defense Information for purposes of its own internal factual or legal analysis.

9.     Nothing in this Agreement shall restrict a Party from using its own information or documents, its own legal research and memoranda, or other materials compiled or prepared by its counsel or experts in the Mass Tort Drywall Litigation or any other litigation or proceeding, despite the fact that any of those materials may have been shared with the other Party pursuant to this Agreement.

10.     Provided that no disclosure is made of Joint Defense Information, nothing in this Agreement shall preclude a Party from (a) pursuing independently any subject matter, including subjects reflected in Joint Defense Information, or (b) disclosing to a third party, at its discretion, information which is developed independently of Joint Defense Information.

**DISCOVERY DEMANDS**

11.     If a Party hereto receives a request, subpoena, or demand from any person or entity not a Party to this Agreement for the production of Joint Defense Information other than that Party's own information, by discovery request or otherwise, it shall:  (i) immediately notify counsel for the other Party's client of the demand; (ii) provide the other Parties and their counsel with copies of any writings or documents, including subpoenas, summonses, motions, briefs and transmittals related thereto, that request the Joint Defense Information; (iii) make such objections to the demand as are reasonable and appropriate and assert all available privileges with respect to the requested Joint Defense Information; and (iv) not produce or provide the requested Joint

-4-

*PRIVILEGED AND CONFIDENTIAL*

Defense Information until all such objections are finally resolved by a court, unless the privilege and the protections of this Agreement are waived in writing by the Producing Party. Each Party will take all steps necessary to permit the assertion of all applicable rights and privileges with respect to Joint Defense Information and shall cooperate fully with the other Party in any judicial or administrative proceeding relating to the requested disclosure of Joint Defense Information. The cost of defending or challenging such a request, subpoena, or other demand shall be borne by the Party that originated the Joint Defense Information or, if none, by the Party contesting the disclosure.

If the disclosure of Joint Defense Information is compelled by a court of competent jurisdiction or as part of a judicial, administrative, or alternative dispute resolution ("ADR") procedure, then the Party asked to disclose Joint Defense Information shall give notice of the request or compulsion to the other Party so that the other Party may take appropriate action. The cost of defending or challenging such a disclosure of Joint Defense Information shall be borne by the Party that originated the Joint Defense Information or, if none, by the Party contesting the disclosure.

Each Party agrees that it shall assert all privileges in opposition to any discovery request, subpoena, or other demand propounded by any person or entity not a signatory to this Agreement that seeks information that the Party has received or developed pursuant to this joint defense effort. The terms of this paragraph shall survive the termination of this Agreement.

## DISCLOSURE TO INSURERS

12.     Joint Defense Information received from the other Party shall not be provided to an insurer(s) or other indemnitor unless, in advance of any such disclosure, the Producing Party provides express written consent to the disclosure and the insurer or indemnitor agrees in writing (a) to use the materials only for the joint defense of the Mass Tort Drywall Litigation, and (b) not to disclose the materials to any third parties or employees of the insurer or indemnitor who are not involved in the joint defense of the Mass Tort Drywall Litigation.

## WITHDRAWAL OR TERMINATION

13.     A Party may withdraw from participation in this Agreement at any time pursuant to the procedures set forth herein. In the event a Party elects to withdraw from participation in this Agreement, the withdrawing Party shall immediately provide written notice of its intention to withdraw by e-mail and overnight delivery to the other Party. Within ten (10) business days after providing written notice of its intention to withdraw, the Withdrawing Party shall return all Joint Defense Information received from the other Party pursuant to this Agreement, including all copies thereof, or destroy all such information and certify in writing to the Producing Party that it has done so. The withdrawal shall be deemed effective upon the return or certification of destruction of all Joint Defense Information.

14.     This Agreement shall not be construed in any way as precluding any Party to this Agreement from individually settling with plaintiffs and/or any other person or entity. To preserve the obligations of the Parties under this Agreement, no Party to this Agreement may enter into any settlement of any action in the Mass Tort Drywall Litigation with plaintiffs or their

-5-

*PRIVILEGED AND CONFIDENTIAL*

representatives that includes any agreement by it to voluntarily or affirmatively assist the plaintiffs or their representatives in (1) the prosecution of that action or any other claim, demand or action against the other; (2) the prosecution of any other action in the Mass Tort Drywall Litigation against the other; and/or (3) any activities that would disclose any Joint Defense Information, or strategy, or would otherwise act to waive the attorney-client work product or other privileges pertaining to such Joint Defense Information, or strategy.

15.    If any Party enters into an agreement to resolve one or more individual actions in the Mass Tort Drywall litigation with plaintiffs or their representatives, that Party's counsel must immediately notify counsel for the other Parties that it has reached such a resolution, even if all the terms of the resolution have yet to be finalized in writing, and shall withdraw from this Agreement with respect to the individual action it has resolved. The Party or its counsel's continued participation in this Agreement is permitted only for the purpose of its defense of any remaining actions in the Mass Tort Drywall Litigation. The Parties shall not consult or use Joint Defense Information for any purpose other than its defense of the remaining actions in the Mass Tort Drywall Litigation. A resolving Party shall continue to be bound by this Agreement with regard to any Joint Defense Information provided, disclosed, received, learned, or obtained from the other Party before withdrawal.

16.    The obligations that a Party assumes by becoming a signatory to this Agreement are continuing in nature, and shall survive withdrawal from the Agreement by a Party for any reason and/or termination of the Agreement. The withdrawal by a Party from participation in this Agreement shall be prospective only and shall not constitute a waiver of any privilege, right, or immunity with regard to information shared pursuant to the terms of this Agreement; all such privileges, rights and immunities shall survive withdrawal from the joint defense effort by a Party to this Agreement. A withdrawing Party shall have a continuing obligation pursuant to this Agreement to take reasonable steps and make a good faith effort to preserve all applicable privileges, rights and immunities. A withdrawing Party shall not share Joint Defense Information with any person, firm, corporation or entity not a Party to this Agreement.

17.    Upon either: (1) a written request for return or destruction by a Producing Party; or (2) termination of this Agreement upon consent or at such time as the Parties determine that the Mass Tort Drywall Litigation and other related proceedings have been resolved, any Joint Defense Information shared by any counsel or Party in connection with the joint defense effort, including all copies of such Joint Defense Information, shall be destroyed (and such destruction certified in writing by the destroying party) or returned to the Party that originally furnished such materials, within thirty (30) business days. Notwithstanding the foregoing, outside counsel for each Party to this Agreement may retain archival copies of all Joint Defense Information for record-keeping purposes. This paragraph also shall not be deemed to require the return or destruction by a Party of its own work product or the work product of its counsel that may reflect a knowledge of Joint Defense Information disclosed by the other Party.

18.    This Agreement shall remain in full force and effect unless and until terminated by the written consent of the Parties. This Agreement may be modified or amended only by written consent of both of the Parties.

\\NY - 037476/000001 - 2290422 v1

*PRIVILEGED AND CONFIDENTIAL*

**INDEPENDENT REPRESENTATION/NO WAIVER**

19.     Nothing in this Agreement shall be construed to affect the separate and independent representation of each Party by their respective counsel, or to require counsel to do anything that is not in counsel's client's best interest.  This Agreement does not grant any right to either Party to control, influence, or be consulted with respect to the defenses or claims asserted by the other Party in discussion and/or litigation with plaintiffs, or their manner and timing of assertion, and provides no opportunity to appear on behalf of or to litigate any issues in any case where that Party's client is not a named party in such litigation.  The Parties recognize that each is represented by counsel of its own choice.  Counsel for one company do not represent the other company by virtue of this Agreement; indeed, the mutually-recognized need for independent choice of counsel is one of the bases for this arrangement.  Notwithstanding the obligation of confidentiality created by this Agreement, the Parties recognize that their interests may become directly adverse, that each Party must represent his or her or her own client and no other, and that this Agreement does not create an attorney-client relationship between any lawyer and any client other than the client or clients that the lawyer and his or her firm represents.

20.     The Parties understand and agree that nothing contained herein shall be deemed to create an attorney-client or other agency or fiduciary relationship between any of the undersigned counsel and anyone other than the named client of such counsel as listed below.  No Party shall have authority to waive any applicable confidence, privilege, or doctrine on behalf of the other Party, nor shall any waiver of an applicable privilege or doctrine by the conduct of one Party be construed to affect the rights of the other Party.

21.     The fact that the Parties have agreed to be bound by the terms of this Agreement, or obtained Joint Defense Information pursuant to this Agreement, shall not in any way preclude counsel from taking any position or strategy regardless of whether the other Party agrees with that position or strategy.

22.     The Parties each agree that counsel for the other Party will not be disqualified for any reason arising out of the existence of this Agreement, including that such counsel have been privy to attorney-client communications pursuant to this Agreement.

23.     Each Party agrees that it will not assert that any lawyer or law firm is disqualified from representing its current client(s) in this litigation because that firm has (or any of its lawyers have) received Joint Defense Information, and each Party agrees to waive any such alleged conflict.  Each Party also agrees that it will not assert that any of the other Party's lawyers is disqualified from representing its current client(s) or any third party adverse to the first-mentioned Party's client in any subsequent proceeding because its lawyers have received Joint Defense Information, if that firm represents in writing that no lawyer who is personally representing the current client(s) or third party has actual knowledge of relevant Joint Defense Information.  As to lawyers that have actual knowledge of relevant Joint Defense Information, the Parties will confer in good faith regarding their participation in the subsequent proceeding and will not assert a conflict of interest unless there is a basis to believe that the lawyers' participation will result in actual prejudice to the Party whose Joint Defense Information is in question.

\\\NY - 037476/000001 - 2290422.v1

*PRIVILEGED AND CONFIDENTIAL*

## NO ADMISSION OF LIABILITY

24.    Nothing in this Agreement is intended to be, or shall be deemed to be, an admission of liability on the part of either Party or of the existence of facts upon which liability could be based.

## NO WAIVER OF DEFENSES

25.    Nothing in this Agreement is intended to be, or shall be deemed to be, a waiver of any defenses including, but not limited to, those relating to personal jurisdiction over either Party.

## PRESERVATION OF RIGHTS AND REMEDIES

26.    Nothing in this Agreement shall be construed to waive any rights that one Party may have against the other Party.  Nothing in this Agreement shall be construed to create any enforceable claims or liabilities except to assure compliance with this Agreement.

## NO WAIVER

27.    Any waiver in any particular instance of the rights, obligations or limitations contained in this Agreement shall not be deemed, and is not intended to be, a general waiver of any rights, obligations or limitations under this Agreement and shall not operate as a waiver beyond that particular instance.

## ENFORCEMENT

28.    Disclosure of Joint Defense Information in violation of this Agreement will cause the Parties to suffer irreparable harm for which there is no adequate remedy at law. The Parties agree that injunctive relief is an appropriate means to enforce this Agreement.  A Party that obtains such injunctive relief shall be entitled to recover its reasonable attorneys' fees and costs from the breaching Party.

## SEVERABILITY

29.    In the event that any provision of this Agreement shall be finally determined by a court of competent jurisdiction to be illegal or unenforceable, then such provision shall have no force or effect, but the illegality or unenforceability of such provision shall neither affect nor impair the legality or enforceability of any other provision of this Agreement.

## CONFIDENTIALITY

30.    Neither this Agreement nor its terms may be disclosed to anyone other than the Parties to this Agreement and their client in the Mass Tort Drywall Litigation, except as otherwise provided in this Agreement or agreed to in writing between the Parties or ordered by a court of competent jurisdiction.  If pursuant to due legal process, however, it becomes necessary to disclose the existence of this Agreement (e.g., in response to litigation discovery process

-8-

*PRIVILEGED AND CONFIDENTIAL*

where a log of privileged documents must be submitted), then the mere existence of this Agreement may be disclosed without disclosure of any terms hereof. This Agreement shall not be admissible in any action in the Mass Tort Drywall Litigation or in any related or other litigation except in the case where a Party seeks to have its terms enforced or to prove the continued existence of any protection or privilege.

**SETTLEMENT PROTECTION**

31.     The Parties intend and agree that this Agreement, as well as their discussions and communications among themselves and with other parties relating to the matters covered in this Agreement, are to be afforded the full scope of the protection provided in the Federal Rules of Evidence, including, without limitations, Rule 408, which limits the admissibility of settlement-related evidence. The terms of this paragraph shall survive the termination of this Agreement.

**COUNTERPARTS**

32.     This Agreement may be executed in counterparts, which taken together, shall constitute one and the same instrument.

**BINDING EFFECT**

33.     This Agreement shall be for the benefit of and binding upon the Parties and their respective related or affiliated entities, partners, employees, agents, successors and assigns.

**NOTICE**

34.     Any notice required by this Agreement shall be made in writing to a Party to the representative designed below (or another representative if one is designated by the party in writing). Notice shall be by hand delivery, overnight delivery, telecopy or electronic mail. If notice is sent by telecopy or electronic mail, a copy shall be sent by overnight delivery or First Class U.S. Mail the same day.

If to BNBM PLC:                    L. Christopher Vejnoska, Esq.
                                  Orrick, Herrington & Sutcliff LLP
                                  405 Howard Street
                                  San Francisco, CA 94105-2669
                                  (415) 773-5916
                                  Facsimile No.: (415) 773-5759

*PRIVILEGED AND CONFIDENTIAL*

If to TG:                    Joe Cyr, Esq.
                            Hogan Lovells US LLP
                            875 Third Avenue
                            New York, NY 10022
                            (212) 918-3000
                            Facsimile No.: (212) 918-3100


If to TTP:                   Joe Cyr, Esq.
                            Hogan Lovells US LLP
                            875 Third Avenue
                            New York, NY 10022
                            (212) 918-3000
                            Facsimile No.: (212) 918-3100


If to Weifang:               Joe Cyr, Esq.
                            Hogan Lovells US LLP
                            875 Third Avenue
                            New York, NY 10022
                            (212) 918-3000
                            Facsimile No.: (212) 918-3100


If to CNBM:                  Kyle Schonekas
                            Schonekas, Evans, McGoey & McEachin, L.L.C.
                            650 Poydras Street, Suite 2105
                            New Orleans, Louisiana 70130
                            504.680.6050
                            Facsimile No.: 504.680.6051


If to CNBM Group:            Kyle Schonekas
                            Schonekas, Evans, McGoey & McEachin, L.L.C.
                            650 Poydras Street, Suite 2105
                            New Orleans, Louisiana 70130
                            504.680.6050
                            Facsimile No.: 504.680.605


If to CNBM USA:              [INSERT]

\\NY - 037476/000001 - 2290422 v1

*PRIVILEGED AND CONFIDENTIAL*

**CLIENT AGREEMENT**

35.     By executing this Agreement, each Party certifies its counsel has explained the contents of this Agreement to the Party and it has agreed to enter into the Agreement, and understanding that it can terminate this Agreement at any time by asking its counsel to promptly notify counsel for the other parties of such termination.

**ENTIRE AGREEMENT**

36.     This writing reflects the entire agreement by the Parties with regard to subject matter hereof and supersedes all prior agreements, whether oral or written, among the Parties relating to the subject matter hereof.

**INTERPRETATION**

37.     This Agreement shall be governed by the laws of the State of New York without reference to the principles of choice or conflicts of law.

**COUNTERPARTS**

38.     This Agreement may be executed in counterparts each one of which shall be deemed part of a single agreement.  This Agreement may be modified only in a writing signed by the Parties.  The addition of parties to this Agreement shall be permitted upon notice to and written consent by all Parties to this Agreement

[The remainder of this page is intentionally left blank.]

DATED as of November 29, 2010. _____

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____

Attorneys for Beijing New Building Materials, PLC

HOGAN LOVELLS US LLP

By: _____

Attorneys for Taishan Gypsum Co., Ltd.

\\\NY - 037476/000001 - 2290422 v1

*PRIVILEGED AND CONFIDENTIAL*

HOGAN LOVELLS US LLP

By: _____

Attorneys for Taishan Tai'an
Taishan Plasterboard Co. Ltd.

HOGAN LOVELLS US LLP

By: _____

Attorneys for Weifang Aotai Plaster Co. Ltd.


SCHONEKAS, EVANS, MCGOEY & MCEACHIN, L.L.C.

By: _____

Attorneys for China National Building Materials
Co., Ltd.

SCHONEKAS, EVANS, MCGOEY & MCEACHIN, L.L.C.

By: _____

Attorneys for China National Building Material
Group Corporation

[INSERT FIRM NAME]

By: _____

Attorneys for CNBM (USA) Corporation

*PRIVILEGED AND CONFIDENTIAL*

Exhibit A

**UNDERTAKING CONCERNING JOINT DEFENSE INFORMATION
COVERED BY COMMON INTEREST, JOINT DEFENSE AND CONFIDENTIALITY
AGREEMENT**

I, _____, declare that:

1.   I have received a copy of the Common Interest, Joint Defense and Confidentiality

Agreement in the Mass Tort Drywall Litigation ("the Agreement").

2.   I will comply with all of the provisions of the Agreement.  I will hold in confidence, will

not disclose to anyone other than those persons specifically authorized by the Agreement, and

will not copy or use for purposes other than for the defense or joint defense of a party or parties

to the Agreement,  any Joint Defense Information that I receive.


Date:_____            _____
                                                Signature

\\\NY - 037476/000001 - 2290422 v1