UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL No. 2:09-md-2047 |
| | SECTION L |
| **THIS DOCUMENT RELATES TO:** | JUDGE ELDON E. FALLON |
| ***Germano v. Taishan Gypsum, 09-cv-6687*** | |
| | MAGISTRATE JUDGE JOSEPH C. WILKINSON, JR. |

**OPPOSITION OF THE CNBM ENTITIES[1] TO PLAINTIFFS' MOTION TO ENFORCE
THE COURT'S JULY 17, 2014 CONTEMPT ORDER AND INJUNCTION**

---

[1] China National Building Materials Co. Ltd., China National Building Materials & Equipment Import & Export Corp., CNBMIT Co., Ltd., CNBM Forest Products (Canada), CNBM USA Corp., and United Suntech Craft, Inc.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.    ARGUMENT ........................................................................................................ 4

    A.    This Court Does Not Have Jurisdiction Over The CNBM Entities And Therefore Cannot Sanction Them. ............................................................. 4

    B.    The Court Cannot Impose Criminal Contempt Penalties Without First Adhering To Due Process Requirements. ................................................. 5

        1.    The PSC Has Sought Criminal Contempt Penalties. ................................. 5

        2.    A Court Cannot Impose Criminal Contempt Without Adhering To Rigorous Due Process Protections That Have Not Been Employed Here. ........................................................................................................ 7

    C.    There Is No Basis For Finding That The CNBM Entities Violated The Court's Order Or Acted In Concert With Taishan To Do So. ............................. 12

        1.    The CNBM Entities Have Not Violated The Injunction Because They Are Not Subject To It. ................................................................... 13

            a.    The CNBM Entities Were Not Enjoined Because They Are Not Parties To *Germano*. ................................................................ 13

            b.    The CNBM Entities Did Not Violate The Injunction By Actively Concerting Or Participating With Taishan. ................... 14

                (1)    Taishan Has Not Violated The Injunction. ...................... 14

                (2)    Conduct That Occurred Prior To The Court's Injunction Cannot Supply A Basis For Concluding The CNBM Entities Violated The Injunction. ............... 15

            c.    The CNBM Entities May Not Be Enjoined As Shareholders. .................................................................................. 18

        2.    The Contempt Order Is Unenforceable Because Its Terms Are Impermissibly Vague. ............................................................................ 18

    D.    CNBM Company Did Not Itself Violate The Order. ......................................... 23

III.    CONCLUSION ................................................................................................... 25

-i-

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alemite Mfg. Corp. v. Staff*,
    42 F.2d 832 (2d Cir. 1930)...............................................................................13

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
    968 F.2d 523 (5th Cir. 1992) ..............................................................................6

*Becerra v. Asher*,
    921 F. Supp. 1538 (S.D. Tex. 1996) ................................................................21

*Blockowicz v. Williams*,
    630 F.3d 563 (7th Cir. 2010) .......................................................................14, 16

*In re Bradley*,
    588 F.3d 254 (5th Cir. 2009) ..............................................................................6

*City of N.Y. v. Mickalis Pawn Shop, LLC*,
    645 F.3d 114 (2d Cir. 2011)..............................................................................22

*Coffin v. United States*,
    156 U.S. 432 (1895).........................................................................................12

*Crowe v. Smith*,
    151 F.3d 217 (5th Cir. 1998) ...........................................................................8, 9

*Doctor's Assocs., Inc. v. Reinert & Duree, P.C.*,
    191 F.3d 297 (2d Cir. 1999) .............................................................................13

*Eighth Reg'l War Labor Bd. v. Humble Oil & Ref. Co.*,
    145 F.2d 462 (5th Cir. 1944) ............................................................................14

*ErgoBilt, Inc. v. Neutral Posture Ergonomics, Inc.*,
    No. 397CV2548L, 2004 WL 1041586 (N.D. Tex. 2004).........................................18

*F.T.C. v. Kuykendall*,
    371 F.3d 745 (10th Cir. 2004) ..........................................................................16

*Ford v. Kammerer*,
    450 F.2d 279 (3d Cir. 1971)..............................................................................19

*Frank v. United States*,
    395 U.S. 147 (1969)..........................................................................................7

*Herrlein v. Kanakis*,
    526 F.2d 252 (7th Cir. 1975) ...............................................................................14

*Hicks v. Feiock*,
    485 U.S. 624 (1988)...........................................................................................5, 9

*Matter of Hipp, Inc.*,
    895 F.2d 1503 (5th Cir. 1990) ..........................................................................9, 11

*Hunt v. Hunt (In re Hunt)*,
    754 F.2d 1290 (5th Cir. 1985) ...............................................................................6

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
    512 U.S. 821 (1994)........................................................................................6, 7, 8

*In re Kave*,
    760 F.2d 343 (1st Cir. 1985)...................................................................................9

*Lineback v. Spurlino Materials, LLC*,
    546 F.3d 491 (7th Cir. 2008) ...............................................................................22

*Lamar Fin. Corp. v. Adams*,
    918 F.2d 564 (5th Cir. 1990) ..............................................................................6, 7

*Le Tourneau Co. of Ga. v. N.L.R.B.*,
    150 F.2d 1012, 1012 (5th Cir. 1945) ...................................................................13

*Lee v. Madigan*,
    358 U.S. 228 (1959).............................................................................................12

*In re Leonetti*,
    28 B.R. 1003 (E.D. Pa.) ......................................................................................21

*Lewis v. S. S. Baune*,
    534 F.2d 1115 (5th Cir. 1976) ...............................................................................6

*McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*,
    736 F.3d 375 (5th Cir. 2013) ...............................................................................10

*Morrison v. Amway Corp.*,
    517 F.3d 248 (5th Cir. 2008) ...............................................................................21

*Musidor, B.V. v. Great Amer. Screen*,
    658 F.2d 60 (2d Cir. 1981)....................................................................................7

*N. Atl. Operating Co. v. Evergreen Distributors, LLC*,
    No. 13-CV-4974 ERK VMS, 2013 WL 5603596 (E.D.N.Y. Oct. 11, 2013) .........20

*Paramount Pictures Corp. v. Carol Pub. Grp., Inc.*,
  25 F. Supp. 2d 372 (S.D.N.Y. 1998).................................................................15

*Reebok Int'l Ltd. v. McLaughlin*,
  827 F. Supp. 622 (S.D. Cal. 1993)....................................................................17

*Regal Knitwear Co. v. N.L.R.B.*,
  324 U.S. 9 (1945)...............................................................................................17

*Riberglass, Inc. v. Techni-Glass Indus., Inc.*,
  811 F.2d 565 (11th Cir. 1987) ..........................................................................21

*Russell C. House Transfer & Stor. Co. v. United States*,
  189 F.2d 349 (5th Cir. 1951) .............................................................................20

*S. Ry. Co. v. Lanham*,
  403 F.2d 119 (5th Cir. 1968) ...............................................................................9

*Seven Arts Pictures, Inc. v. Jonesfilm*,
  512 F. App'x 419 (5th Cir. 2013) ......................................................................17

*Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*,
  486 F.2d 114 (5th Cir. 1973) .............................................................................19

*Shillitani v. United States*,
  384 U.S. 364 (1966).............................................................................................6

*Smith v. Sullivan*,
  611 F.2d 1050 (5th Cir. 1980) .............................................................................5

*Span-Eng Associates v. Weidner*,
  771 F.2d 464 (10th Cir. 1985) ..........................................................................22

*Tegal Corp. v. Tokyo Electron Co.*,
  248 F.3d 1376 (Fed. Cir. 2001).........................................................................16

*Torres v. S.G.E. Mgmt., L.L.C.*,
  397 F. App'x 63 (5th Cir. 2010) .......................................................................21

*U.S. Steel Corp. v. United Mine Workers of Am.*,
  519 F.2d 1236 (5th Cir. 1975) ...........................................................................19

*United Pharmacal v. United States*,
  306 F.2d 515 (1st Cir. 1962)........................................................................16, 18

*United States v. Barnett*,
  346 F.2d 99 (5th Cir. 1965) .............................................................................6, 7

*United States v. Martinez*,
    686 F.2d 334 (5th Cir. 1982) ........................................................................7

*United States v. Puente*,
    558 F. App'x 338 (5th Cir. 2013) ................................................................5

*United States v. Voss*,
    82 F.3d 1521 (10th Cir. 1996) ....................................................................17

*In re Van Meter*,
    413 F.2d 536 (8th Cir. 1969) ........................................................................7

*Waffenschmidt v. MacKay*,
    763 F.2d 711 (5th Cir. 1985) ........................................................13, 14, 17

*Wilkerson v. Whitley*,
    28 F.3d 498 (5th Cir. 1994) ........................................................................12

*In re Winship*,
    397 U.S. 358 (1970) ....................................................................................12

*Young v. U.S. ex rel Vuitton et Fils S.A.*,
    481 U.S. 787 (1987) ............................................................................ *passim*

*Zenith Radio Corp. v. Hazeltine Research Inc.*,
    395 U.S. 100 (1969) ......................................................................................4

**Statutes**

Foreign Sovereign Immunities Act ....................................................................2

**Rules**

Fed. R. Civ. P. 65 ......................................................................13, 18, 19

Fed. R. Civ. P. 65(d) ....................................................................13, 18

Fed. R. Civ. P. 65(d)(1) ............................................................................18

Fed. R. Civ. P. 65(d)(1)(C) ......................................................................19

Fed. R. Civ. P. 65(d)(2) ............................................................................13

Fed. R. Civ. P. 65(d)(2)(A) ......................................................................13

Fed. R. Civ. P. 65(d)(2)(B) ......................................................................14

Fed. R. Civ. P. 65(d)(2)(C) ..............................................................14, 16

Fed. R. Crim. P. 42(b) .................................................................................................................5

**Other Authorities**

Black's Law Dictionary ............................................................................................................10

Order, *In re: Chinese-Manufactured Drywall Prods. Liab. Litig.*,
    No. 15-30804 (Nov. 17, 2015) ...........................................................................................19

China National Building Materials Company, Limited, China National Building Materials & Equipment Import & Export Corporation, CNBMIT Company, Limited, CNBM Forest Products (Canada), CNBM USA Corporation, and United Suntech Craft, Incorporated, (together, the "CNBM Entities") respond to the PSC's Substituted Motion to Enforce the Contempt Order (Rec. Doc. 20032).[2]

## I.      INTRODUCTION

On July 17, 2014, this Court issued its Contempt Order.  Rec. Doc. 17869.  In that Order, the Court noted that, following the *Germano* trial, Taishan "refused to appear" for the Judgment Debtor Examination.  *Id.* at 2.  Accordingly, the Court held Taishan in contempt, "both criminally and civilly."  *Id.*  Specifically, it ordered the company to pay $15,000 in attorneys' fees and $40,000 as a penalty for contempt.  *Id.* at 3.  In addition, the Court enjoined "Taishan and any of its affiliates or subsidiaries … from conducting any business in the United States until or unless it participates in the judicial process."  *Id.*  The Court went on, "If Taishan violates the injunction, it must pay a further penalty of 25% of the profits earned by the company or its affiliates who violate the order, for the year of violation."  *Id.*

The Contempt Order long ago served its purpose.  Taishan—whose conduct precipitated the Order, in a case that involved none of the CNBM Entities—returned to litigation *two years ago*—on February 17, 2015.  Taishan paid the penalties imposed by the Order and satisfied the judgments entered in favor of the *Germano* plaintiffs.  Since early 2015, the parties have actively participated in the litigation and expressly contested jurisdiction, discovery, class certification,

_____

[2] The CNBM Entities continue to, and hereby do, preserve all defenses, including lack of jurisdiction, both subject matter and personal, and in no way intend to or do or waive or otherwise limit their ability to raise those defenses, whether by filing this opposition or any other act, filing appearance, or contention, either before or after this opposition, in this or any other litigation. *See, e.g.*, Rec. Doc. 18453, 18655.

and damages.  And along the way, the CNBM Entities have produced numerous deponents and tens of thousands of documents in the process.

Although the contempt has been purged, the PSC continues to doggedly pursue contempt penalties.  It does so for two simple reasons, each of which is invalid.  First, the Order purported to impose a 25% penalty on Taishan and its "affiliates" for doing business in the United States between the time the Order was entered and Taishan returned to the litigation.  On that basis, the PSC asserts that, along with other defendants, the CNBM Entities owe an enormous sum in contempt penalties, which the PSC seeks to use as negotiating leverage, if not to pocket.  But a court cannot sanction a party over which it does not have jurisdiction.  Second, the PSC has used the contempt proceedings as a vehicle to seek costly and burdensome discovery against CNBM Group, a sovereign entity now dismissed from the litigation under the Foreign Sovereign Immunities Act.  Surely, the Court did not intend the Order as a vehicle for treading even further on sovereign interests, and it should put an end to that now.

These concerns no doubt animated the Court's earlier recognition that further contempt proceedings are inappropriate unless and until the Court finds it has jurisdiction over the CNBM Entities.  Rec. Doc. 19392, at 4.  Further, the PSC not only pursued and received abundant contempt-related discovery, it filed its renewed motion well **after** the Court's order on the so-called Peng documents.  All this establishes that no further contempt discovery is necessary.  Rather, what is necessary is, finally, a ruling on the pending jurisdictional motions.  Only then can the Court assess whether contempt even remains a possibility against any defendant.  And that question also is ripe for decision, and dismissal, for two reasons—both of which were laid out in the CNBM Entities' motion to clarify (Rec. Doc. 19271-1), and should be applied now, without further delay.

**First**, the PSC is not entitled to prosecute, and cannot benefit from, any recovery related to contempt. That is because the Contempt Order is explicitly criminal, and the non-compensatory penalties for violating the Order are similarly criminal in nature. As such, stringent due process considerations apply, which bar the PSC from prosecuting contempt violations and require that any penalties be paid to the Court. Most importantly, the PSC has none of the attributes of an independent prosecutor. Far from it; the PSC is intent on finding a pocket somewhere in the United States, and is using the contempt proceedings to do it. And, in so doing, the PSC ignores numerous required protections in a criminal proceeding—including, among others, the proof-beyond-a-reasonable-doubt standard and the right to a jury trial.

**Second**, the motion must be denied because (as the CNBM Entities have explained previously, Rec. Doc. 19271) the CNBM Entities do not fall within the scope of the contempt order, which itself is defective. As an initial matter, they could not have violated the Contempt Order because that Order only applied to *Germano*—but the CNBM Entities were not parties to that action, and they did not aid or abet any party to that action in violating the Court's Order. Moreover, the Order is facially invalid, as it provided inadequate notice of what it forbade and who it applied to. The Court previously postponed decision on these issues on the theory that certain contempt-related issues were factually pregnant and not ready for decision. Rec. Doc. 19392 at 4, Tr. 68:3 (Aug. 7, 2015). While the CNBM Entities believe that the issues raised in the motion to clarify or vacate are entirely questions of law, any potentially relevant facts are now fully developed. Accordingly, this Court should now address them, find that the CNBM Entities are not subject to the Order, or alternatively that the Order cannot validly have applied to them, and deny the PSC's motion to enforce sanctions.

## II.    ARGUMENT

### A.    This Court Does Not Have Jurisdiction Over The CNBM Entities And Therefore Cannot Sanction Them.

As an initial matter, the CNBM Entities cannot be sanctioned because the Court lacks jurisdiction over them.  "A court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant." *Zenith Radio Corp. v. Hazeltine Research Inc*., 395 U.S. 100, 110 (1969).  This Court already has agreed: "The [CNBM] Entities are correct in their assertion that the Court cannot hold them [in] contempt if it lacks jurisdiction over them."  Rec. Doc. 19392, at 4.  For that reason, it concluded that contempt-related proceedings would await a "jurisdictional ruling[,] as the jurisdictional ruling may well affect any contempt proceeding."  *Id.*

This Court has already held that CNBM Group is immune from suit; therefore, there can be no contempt finding—and the motion must be denied—as to CNBM Group.  The Court should clarify this point.  Nor can the Contempt Order apply to the other CNBM Entities because the Court does not have jurisdiction over them.  Rec. Docs. 19527-2, 20043-2.

Not only must the Court address jurisdiction before resolving contempt; there is particular efficiency to doing so here.  As the Court already has recognized, it was *not* the CNBM Entities' conduct "that led to the Contempt Order," Rec. Doc. 19392 at 3—so, as a result, they can only be subject to contempt sanctions if "the CNBM or BNBM entities are alter egos, affiliates, or subsidiaries, [or if] there is a common business enterprise."  *Id.* at 4.  As to CNBM Group, this Court has already made that determination; it properly concluded that there is no such relationship.  Rec. Doc. 20150.  And, as to the other CNBM Entities, that issue has been fully briefed as part of the jurisdictional motions pending before the Court.  There is no basis for further delaying resolution of jurisdiction, which must be decided first.

**B.    The Court Cannot Impose Criminal Contempt Penalties Without First Adhering To Due Process Requirements.**

Plaintiffs' motion to enforce seeks unconditional penalties; *i.e.*, criminal sanctions.  But such punitive sanctions cannot be imposed without adhering to numerous constitutional requirements—which have been all but ignored here.

**1.    The PSC Has Sought Criminal Contempt Penalties.**

The distinction between civil and criminal contempt is of critical importance because "criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings."  *Hicks v. Feiock*, 485 U.S. 624, 632 (1988).  Those protections include "the applicable standard of proof" (proof beyond a reasonable doubt rather than mere "clear and convincing evidence") and "the relevance of intent" (because a "willful, contumacious, or reckless state of mind" is required for criminal contempt).  *Smith v. Sullivan*, 611 F.2d 1050, 1052 (5th Cir. 1980); *see also United States v. Puente*, 558 F. App'x 338, 341 (5th Cir. 2013).  For that reason, the Fifth Circuit has explained that when "reviewing a contempt judgment," its "first duty … is to determine whether the nature of the contempt proceeding was civil or criminal."  *Id.*

Here, the Court characterized the Contempt Order as criminal: "As a consequence of Taishan's refusal to appear at this Judgment Debtor Examination, in direct, willful violation of this Court's June 20, 2014 order, the Court holds Taishan in contempt of court, both *criminally* and civilly."  Rec. Doc. 17869 at 2 (emphasis added).  It also cited Federal Rule of Criminal Procedure 42(b) and criminal contempt cases.  Rec. Doc. 17869 at 3.  The PSC likewise acknowledges the criminal character of the injunction, defining it as punishment invoked "both criminally and civilly."  PSC Sub. Mem. to Enforce Contempt Order ("PSC Sub. Mem.") at 3 (Feb. 10, 2016).  But, faced with these due process concerns some eighteen months ago, the PSC

tried to hedge, arguing simultaneously that the injunction was and was not criminal, PSC Opp. to Mot. to Clarify at 6, 50-51 (July 28, 2015).  On the contrary, and consistent with the labels applied by both the Court and the PSC, the aim of the sanction—which ultimately is conclusive[3]—indicates that the punitive order here was criminal in nature.  "If the purpose of the sanction is to punish the contemnor…, the order is viewed as criminal."  *In re Bradley*, 588 F.3d 254, 263 (5th Cir. 2009).  That is because criminal contempt is designed to vindicate the court's authority, *id.*, and thereby "protect … [its] integrity," *United States v. Barnett*, 346 F.2d 99, 100 (5th Cir. 1965).  Accordingly, if a penalty is "backward-looking and unconditional"—meaning it cannot be purged—"it is criminal."[4]  Here, the Court fashioned a multi-layered decision with both criminal and civil aspects, and that requires it to be treated as criminal.  *See Lamar Fin. Corp. v. Adams*, 918 F.2d 564, 567 (5th Cir. 1990) ("When a Contempt Order contains both a punitive and a coercive dimension, for purposes of appellate review it will be characterized as a criminal contempt order.").

First, the Court ordered Taishan to pay $15,000 in attorney's fees and a $40,000 penalty. Because the latter was unconditional and backward-looking, it was clearly criminal.  Rec. Doc. 17869 at 3.

Second, the Court enjoined Taishan and its affiliates or subsidiaries from doing business in the United States until Taishan participates in the judicial process.  *Id.*  As to Taishan, that penalty is civil, as it is forward-looking and is capable of being purged:  If Taishan re-emerged, the injunction would cease.  As to the CNBM Entities, however, the injunction is criminal

---

[3] *Lewis v. S. S. Baune*, 534 F.2d 1115, 1119 (5th Cir. 1976).

[4] *Bradley*, 588 F.3d at 263 (citing *Shillitani v. United States*, 384 U.S. 364, 366, 368 (1966)); *see also Bagwell*, 512 U.S. at 829; *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 968 F.2d 523, 527, 530-31 (5th Cir. 1992); *Hunt v. Hunt (In re Hunt)*, 754 F.2d 1290, 1293 (5th Cir. 1985).

because they were unable to purge. What mattered is whether *Taishan* re-appeared; the CNBM Entities could not purge the sanction.

That the Contempt Order was intended to be criminal is reinforced by its explanation that "strong sanctions" were necessary to "restore integrity to these proceedings." *Id.*; *see Barnett*, 346 F.2d at 100 ("Criminal contempt is a sui generis proceeding for the protection of the integrity of the Court."). Furthermore, penalties were not "remedial [or] for the benefit of the complainants." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). Rather, having found that Taishan's "disobedience … harms …the decorum of the Court," *Id.* at 2, the Order sought to punish violations of the prohibition against doing business in the United States. And punishing a violation of an injunction is quintessentially a matter of criminal contempt.[5] Thus, as to the CNBM Entities, the Court's order was criminal.

> **2.   A Court Cannot Impose Criminal Contempt Without Adhering To Rigorous Due Process Protections That Have Not Been Employed Here.**

Before a court can impose criminal contempt, it must afford the affected party fundamental procedural protections that are constitutionally required. Those protections vary depending on the type of conduct at issue and the severity of the penalties that the court is contemplating. *Bagwell*, 512 U.S. at 832. At one end of the spectrum are relatively minor violations, which "traditionally have been subject to summary adjudication, to maintain order in

---

[5] *See, e.g.*, *Young v. U.S. ex rel Vuitton et Fils S.A.*, 481 U.S. 787, 800 (1987) (criminal contempt proceedings instituted for violations of permanent injunction); *Frank v. United States,* 395 U.S. 147, 148 (1969) (criminal contempt penalties imposed for violation of injunction against using interstate facilities to conduct business); *United States v. Martinez*, 686 F.2d 334, 336 (5th Cir. 1982) (criminal contempt penalties imposed for strike conducted in violation of restraining orders); *Musidor, B.V. v. Great Amer. Screen*, 658 F.2d 60, 62 (2d Cir. 1981) (criminal contempt penalties imposed for violating preliminary and permanent injunctions); *In re Van Meter,* 413 F.2d 536, 537 (8th Cir. 1969) (criminal contempt penalties imposed for violation of injunction).

the courtroom and the integrity of the trial process in the face of an actual obstruction of justice." *Id.* But when the complained-of conduct occurred outside of court, summary adjudication is prohibited, and more extensive procedural protections are required. *Id.* at 833. And in situations such as this one, the Fifth Circuit has recognized that these protections are at their zenith. Here, not only did the allegedly contumacious conduct—defiance of the court's prohibition on doing business in the U.S.—occur out of court, the sanction is as severe as they come—a massive penalty on doing business in the country. *See, e.g.*, *Crowe v. Smith*, 151 F.3d 217, 228 (5th Cir. 1998) (in the case of "out-of-court disobedience to complex injunctions," criminal protections are clearly "necessary and appropriate to protect the due process rights of parties and prevent the arbitrary exercise of judicial power"). Accordingly, before imposing sanctions, this Court must afford the CNBM Entities the full spectrum of due process protections. Those protections have been entirely lacking here.

First and foremost, the contempt charges must be pursued by a "disinterested" party. *Young v. United States ex rel. Vuitton et Fils S.A*, 481 U.S. 787, 804 (1987). This is a question that requires no factual development, and is properly decided here and now. Often the disinterested party will be an independent prosecutor, but it need not be; what is critical is that any "private attorney appointed to prosecute a criminal contempt … certainly should be as disinterested as a public prosecutor who undertakes such a prosecution." *Id*. at 804.

What happened here was the polar opposite. The PSC is not remotely "independent and impartial," *Crowe*, 151 F.3d at 228—it is counsel for the adverse party, in a case in which it has sought damages in the billions of dollars. And, lest there be any question about just how interested they are, the PSC repeatedly has asserted (wrongly) that they themselves are entitled to

recover any funds awarded via contempt.[6]  And even if the PSC cannot recover any criminal contempt fines, it wins just for trying.  That's because as long as the contempt proceedings continue, the PSC is able to lay claim to attorney's fees from the common benefit fund. Financial incentives like these have prompted the Fifth Circuit to reverse contempt findings.  In *Crowe*, for instance, the trial court erred when it "appointed the attorney for the plaintiffs in the underlying case to investigate and present evidence to the court of the offense."  *Id.* at 221.  The Fifth Circuit reversed, holding that the arrangement was impermissible because counsel "retained substantial possibilities for private recovery against the defendants."  *Id.* at 227; *see also Matter of Hipp, Inc*., 895 F.2d 1503, 1508 (5th Cir. 1990) ("an attorney who represents a party to the underlying litigation, for whose benefit the order allegedly violated was entered, may not represent the United States by prosecuting a criminal contempt for that violation because he likely cannot disinterestedly 'pursue the public interest in vindication of the court's authority'").

Likewise, the Supreme Court has explained, a private prosecutor "may be tempted to bring a tenuously supported prosecution if such a course promises financial or legal rewards for the private client"—and, conversely, such a self-interested prosecutor may be tempted to offer to forgo contempt prosecution in return for a settlement providing benefits to the private client. *Young*, 481 U.S. at 805.  Moreover, "as will generally be the case, the appointment of counsel for an interested party to bring the contempt prosecution . . . at a minimum create[s] *opportunities*

---

[6] Fines for criminal contempt are for the benefit of the public—not of a private party—and thus are payable to the court.  *See Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 632 (1988) (fine that is criminal or "punitive … is paid to the court"); *In re Kave*, 760 F.2d 343, 352 (1st Cir. 1985) (the "general rule" is "that a punitive fine is paid into the coffers of a court and a civil fine is paid to the aggrieved party to compensate for its losses"); *S. Ry. Co. v. Lanham*, 403 F.2d 119, 125 (5th Cir. 1968) (criminal contempt order intended to punish contemnor is payable to the court); *see also Crowe*, 151 F.3d at 227 ("Because the fines in this case were payable to the court," they were criminal and "not compensatory.").

for conflicts to arise, and create[s] at least the *appearance* of impropriety." *Id.* at 806 (italics in original). Such an appearance "diminishes faith in the fairness of the criminal justice system in general." *Id.* at 811. Thus, "counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order." *Id.* at 809.

These concerns are on full display here. Far from engaging in an impartial assessment, the PSC's approach has been adversarial and outcome driven. Rather than inquire whether, as properly defined, any Taishan "affiliates" did business in the United States during the relevant time period, the PSC has started from the conclusion and worked backwards. It has offered up lengthy lists comprising every Chinese entity that did business in the United States and that has any connection to Taishan, no matter how tenuous, and then made aggressive arguments about why those distant companies should be considered Taishan's "affiliates." The aggressively adversarial nature of the PSC's approach is apparent from the PSC's contempt-related discovery requests, which are grotesquely broad and onerous. It has gone after profit-related information concerning what it calls "Entities related to Taishan" (some 46 companies, according to the PSC)—and, indeed, demanded the same information related to Chinese "SOEs" more broadly (some 185 companies in all). Rec. Doc. 18420 at 10-20. These requests bear no relationship to any recognized definition of the term "affiliate." *See, e.g.*, *McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*, 736 F.3d 375, 378 (5th Cir. 2013) ("Black's Law Dictionary defines 'affiliate' as '[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation.'"). To state what should be absolutely apparent—*of course* these 200 companies do not all control Taishan. The PSC's contrary arguments lay bare just how adversarial its approach to this contempt proceeding has been.

Unlike the PSC, an independent prosecutor would have exercised some modicum of discretion—leave aside objectivity—in assessing whether any entity exercises control over Taishan.  Because, by definition, a minority shareholder cannot exercise control, an independent prosecutor would have identified a far smaller pool of candidates.  Nor would an independent prosecutor have used the PSC's extreme discovery tactics.  The PSC has requested documents or communications relating to each of the over 200 entities' profits earned in the United States since January 1, 2001—notwithstanding that the contempt period lasted from July 17, 2014 to February 17, 2015.  An independent prosecutor, with a properly limited focus on whether the properly identified entities did business in the United States during that seven-month period, would have enjoyed no benefit from subjecting the CNBM Entities to reviewing, translating, and producing documents stretching over a 13-year time period.  But, for the PSC, there is every strategic advantage to imposing massive discovery costs.

Allowing the PSC to pursue contempt is an error "so fundamental and pervasive that [it would] require reversal without regard to the facts or circumstances of the particular case." *Young*, 481 U.S at 809-10 (citations omitted); *see also Matter of Hipp, Inc.*, 895 F.2d 1503, 1509 (5th Cir. 1990) ("where, as here, there is a *Young* violation, 'harmless error analysis is inappropriate'").

The absence of an independent prosecutor is not the only due process violation.  Before imposing a penalty like the one that has been suggested, the court would have to recognize the presumption of innocence; require proof beyond a reasonable doubt; recognize the right against self-incrimination; and grant the accused contemnors the right to a jury trial.  *Young*, 481 U.S. at 798–99.  Each of these protections serves as a critical bulwark against unjust convictions.  As the Supreme Court has explained, the proof beyond a reasonable doubt standard "is a prime

instrument for reducing the risk of convictions resting on factual error." *In re Winship*, 397 U.S. 358, 363 (1970). So, too, is the presumption of innocence. It "is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895). And "the right to trial by jury [is] one of the most important safeguards against tyranny which our law has designed." *Lee v. Madigan*, 358 U.S. 228, 234 (1959); *Wilkerson v. Whitley*, 28 F.3d 498, 502 (5th Cir. 1994). Notwithstanding the paramount and foundational importance of these constitutionally enshrined rights, the PSC has ignored them all.

For all of these reasons, if the PSC's motion to enforce the contempt order is granted as to the CNBM Entities, the total failure to adhere to basic constitutional safeguards will necessitate "reversal without regard to the facts" of this case. *Young*, 481 U.S at 810 (citations omitted).

### C.   There Is No Basis For Finding That The CNBM Entities Violated The Court's Order Or Acted In Concert With Taishan To Do So.

The PSC's motion to enforce the injunction also must be denied because it suffers from fundamental legal defects. The Court previously concluded that factual development would be required in order to assess these issues—in particular, to determine whether the CNBM Entities (and other defendants) were Taishan affiliates. Rec. Doc. 19392 at 4. No such factual development is necessary. More to the point here, if indeed the question of who Taishan's affiliates are is "factually pregnant," then the injunctive baby never was delivered: an injunction that is so vague and ill-defined that no one knows if it applies to them is invalid. The motion should be denied, and for the same reasons, the contempt order should be vacated.

12

###### 1. The CNBM Entities Have Not Violated The Injunction Because They Are Not Subject To It.

Like all relief, injunctions principally restrain the conduct of the parties to whom they are directed. Fed. R. Civ. P. 65(d)(2). To the extent injunctions reach the conduct of *non*-parties, it is only under particular, limited circumstances—namely, when the non-party acts on behalf of the party being enjoined, or is in active concert or participation with them. *Id*; *Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir. 1985). Thus, pursuant to Rule 65, the Court's injunction against doing business in the United States (and the penalties flowing therefrom) could bind only: (1) a party to *Germano* (which is only Taishan); (2) Taishan's officers, agents, servants, employees, and attorneys; or (3) other persons who are in active concert or participation with Taishan. The CNBM Entities fall into none of these categories.

###### a. The CNBM Entities Were Not Enjoined Because They Are Not Parties To *Germano.*

The PSC claims that the Order directly enjoined the CNBM Entities themselves from doing business in the United States. Mot. at 16-34. But such an injunction would be beyond the Court's power because "[p]ersons who are not parties . . . cannot be brought within [the scope of the injunction] by naming them in it," and the CNBM Entities are not parties to *Germano. Le Tourneau Co. of Ga. v. N.L.R.B.*, 150 F.2d 1012, 1012 (5th Cir. 1945); *Doctor's Assocs., Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 303 (2d Cir. 1999) ("injunction was not authorized by Rule 65(d) because the injunction bars the nonparty appellants from prosecuting lawsuits that do not aid or abet the federal defendants in violating the injunctions entered against them"); *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (L. Hand, J.) ("[N]o court can . . . lawfully enjoin the world at large, no matter how broadly it words its decree.").

As non-parties, the CNBM Entities cannot have been enjoined pursuant to Rule 65(d)(2)(A).

### b.      The CNBM Entities Did Not Violate The Injunction By Actively Concerting Or Participating With Taishan.

Because the CNBM Entities are not parties to *Germano*, and because Plaintiffs do not allege that the CNBM Entities are acting as Taishan's agents (which they plainly are not, *see* Fed. R. Civ. P. 65(d)(2)(B)), the only possible basis for subjecting them to the injunction is if Taishan violated the Court's Contempt Order, and the CNBM Entities were in active concert with Taishan when Taishan did so.   Fed. R. Civ. P. 65(d)(2)(C).  The "active concert" standard amounts to liability for "aiding and abetting"—the question is whether the non-party assisted the contemnor in violating the contempt order.  *Waffenschmidt*, 763 F.2d at 717 (inquiring whether, pursuant to Rule 65(d)(2)(C), "a court may exercise jurisdiction over a nonparty that knowingly aids and abets a violation of a court's order"); *Blockowicz v. Williams*, 630 F.3d 563, 567 (7th Cir. 2010) ("a person is in 'active concert or participation' with an enjoined party, and thus bound by the injunction, if 'he aids or abets an enjoined party in violating [the] injunction,' or if he is in privity with an enjoined party").  Plaintiffs, who bear the burden of proof beyond a reasonable doubt, have not made this showing.  Instead, Plaintiffs' arguments are solely predicated on the CNBM Entities conducting their own business in the United States—acts of non-parties conducted independently of Taishan.  PSC Sub. Mem. at 38-91.

### (1)      Taishan Has Not Violated The Injunction.

As a threshold matter, there can be no violation because Taishan itself did not violate the injunction.  A necessary predicate to finding that a *non*-party "aided and abetted" is that the *party* itself violated the court's injunction.  *Eighth Reg'l War Labor Bd. v. Humble Oil & Ref. Co*., 145 F.2d 462, 464 (5th Cir. 1944) ("The party defendant to the injunction proceeding must be a principal actor before an injunction may issue against him and others 'in active concert or participation 'with him.'"); *see also Herrlein v. Kanakis*, 526 F.2d 252, 254 (7th Cir. 1975)

("Since neither Kanakis nor Teklad was found in violation of the order, Mogul cannot be held liable as an aider or abettor of the named parties in violating the injunction."); *Paramount Pictures Corp. v. Carol Pub. Grp., Inc.*, 25 F. Supp. 2d 372, 374 (S.D.N.Y. 1998) ("A party in active concert cannot violate an injunction unless the enjoined party is also in contempt."). Plaintiffs have never alleged that Taishan conducted any business in the United States during the injunction period, nor is there any evidence that it did so.  Necessarily, then, the CNBM Entities cannot have aided and abetted Taishan in violating the injunction.  For this reason alone, there can be no finding of contempt.

> **(2)  Conduct That Occurred Prior To The Court's Injunction Cannot Supply A Basis For Concluding The CNBM Entities Violated The Injunction.**

Plaintiffs assert that CNBM Group should be subject to the Court's injunction because CNBM Group participated in Taishan's decision not to appear in the litigation.  PSC Sub. Mem. at 96-99.[7]  The record evidence, however, establishes that Taishan's decision was its own. Regardless, even if CNBM Group played some role in Taishan's decision to withdraw from the litigation (a theory flatly contrary to the record), that could not justify holding CNBM Group in contempt, because someone cannot *violate* an injunction based on conduct that *preceded* the injunction.

---

[7] Plaintiffs' allegation on this score is limited to CNBM Group; they present no argument, much less evidence, that any other CNBM Entity participated in Taishan's decisionmaking.  *See* PSC Sub. Mem. at 3.  Plaintiffs do make various assertions about CNBM Company, but those contentions have nothing to do with whether CNBM Company had a role in Taishan's failure to appear.  At most, Plaintiffs appear to allege that CNBM Company (1) became aware that Taishan's failure to appear would result in sanctions; (2) became aware that the Contempt Order had been issued; and (3) failed to ensure compliance with the injunction after it had issued.  PSC Sub. Mem. at 96-97.  Even if these contentions were true, they are irrelevant to whether CNBM Company participated in Taishan's decision not to appear.

Addressing this very issue, the First Circuit explained that the relevant inquiry is not what the alleged contemnor "had been doing" prior to the injunction, but whether he "aided and abetted [the party] in *violating* the preliminary injunction . . . ." *United Pharmacal v. United States*, 306 F.2d 515, 17 (1st Cir. 1962) (emphasis added). Likewise, the Seventh Circuit has explained, "[a]ctions that aid and abet in violating the injunction must occur *after the injunction is imposed* for the purposes of Rule 65(d)(2)(C), and certainly after the wrongdoing that led to the injunction occurred. . . . Not to mention, permitting [non-parties'] pre-injunction conduct to bind them to the injunction would be inconsistent with the purpose of Rule 65(d)(2)(C), which is to prevent defendants from rendering injunctions void by carrying out prohibited acts through third parties who were not parties to the original proceeding." *Blockowicz*, 630 F.3d at 568 (emphasis added). Here, the CNBM Entities cannot be sanctioned, even under the Plaintiffs' own theory, because they did not assist Taishan in violating the injunction.

The cases cited by Plaintiffs only confirm that this is true. Plaintiffs cite *F.T.C. v. Kuykendall*, 371 F.3d 745 (10th Cir. 2004), for the proposition that entities may be held vicariously in contempt when they engage in a "common enterprise" or could have controlled the activities of the contemnor. But nothing in *Kuykendall* suggests that non-parties could be enjoined based upon actions occurring before the injunction. *Id.* at 758-59. Moreover, the very discussion that Plaintiffs seize upon in *Kuykendall*—concerning "common enterprise" as a theory for contempt—is easily distinguishable because it pertained only to parties to that action. *Id.* at 759.

Plaintiffs' other cases (PSC Sub. Mem. at 99-100) suffer from similar infirmities. In each of them, the conduct that formed the basis for the allegation of contempt occurred *after* the injunction issued. *See Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376 (Fed. Cir. 2001)

(allegations of control were unfounded; relevant conduct must occur following issuance of injunction); *Reebok Int'l Ltd. v. McLaughlin*, 827 F. Supp. 622 (S.D. Cal. 1993), *rev'd on other grounds*, 49 F.3d 1387 (9th Cir. 1995) (analyzing foreign bank's conduct in allegedly aiding defendant following issuance of injunction); *Seven Arts Pictures, Inc. v. Jonesfilm*, 512 F. App'x 419 (5th Cir. 2013) (considering non-party's conduct after court issued injunction); *United States v. Voss*, 82 F.3d 1521 (10th Cir. 1996) (corporate directors held in contempt for refusing to respond to subpoena); *Waffenschmidt*, 763 F.2d at 711 (same; contempt inquiry focused on post-injunction conduct); *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 13 (1945) (same).

Finally, even if pre-injunction conduct could establish the requisite control, the evidence here is quite clear that CNBM Group did not and could not direct Taishan's conduct.  Plaintiffs claim that CNBM Group directed Taishan not to appear at the debtor examination.  PSC Sub. Mem. at 5.  But the document cited by Plaintiffs says precisely the opposite.  Specifically, the board of the CNBM Group simply issued a resolution indicating that they would "respect *Taishan Gypsum's decision* not to attend the Judgement Debtor Hearing."  PSC Sub. Mem. Ex. 5 at 3 (emphases added).  Officials of both CNBM Group and Taishan have testified that this is true.  Song Dep., 92:8-93:7, Sept. 14, 2015; Cao Dep., 112:16-22, Aug. 4, 2015; Che Dep., 266:13-24, June 3, 2015; Che Dep., 366:23-367:6; Jia Dep., 205:21-206:15.  "Respect[ing]" someone *else's* "decision" is the opposite of directing them to do something.  Nor is there any evidence that Taishan officials were required to obtain approval from CNBM Group.  On the contrary, Taishan witnesses testified that Mr. Jia "could … make the decision for Taishan" and Taishan's decisions did not have "to be made by CNBMG directors."  Gang Dep., 46:21-47:1, June 2, 2015; *see also* Jia Dep., 178:15-21, Sep. 18, 2015.

17

### c.    The CNBM Entities May Not Be Enjoined As Shareholders.

Finally, the PSC is left to assert that the injunction is binding on the CNBM Entities because, by virtue of being shareholders of Taishan, they are "affiliates or subsidiaries." PSC Sub. Mem. at 102-106.  This argument is wrong for several reasons.

First, none of the CNBM Entities has a direct shareholding relationship with Taishan. Some are as many as five levels removed from Taishan.[8]  Second, a shareholder relationship between companies does not render them "affiliates" within the meaning of Rule 65(d). *See, e.g.*, *ErgoBilt, Inc. v. Neutral Posture Ergonomics, Inc.*, No. 397CV2548L, 2004 WL 1041586, at *13 (N.D. Tex. 2004) (holding that a company's "dealers and shareholders are outside the scope of Rule 65(d); that these individuals and/or entities should not be bound by the terms of the permanent injunction"); *United Pharmacal*, 306 F.2d at 516-17 (30% shareholder of the enjoined party was not subject to the injunction; as a shareholder, it did not fall within the parameters of Rule 65(d)).  Third, even if minority shareholders of Taishan were "affiliates," the Court still could not enjoin these non-parties absent some showing that they aided or abetted the party, Taishan—which there is no evidence of here.  *See supra*, section § II.C.1.b.  Because Taishan's shareholders do not fall within the scope of Rule 65, they cannot be independently bound by the Court's Order.

### 2.    The Contempt Order Is Unenforceable Because Its Terms Are Impermissibly Vague.

Even if the Court could enjoin the conduct of the CNBM Entities, the Court still cannot grant the PSC's motion because the underlying order providing for an injunction and penalties was impermissibly vague and overbroad.  Rule 65(d)(1) requires that an injunction "state its

---

[8] *See, e.g.*, PSC Sub. Mem. Ex. 63, at PSC00000014; PSC Sub. Mem. at 22-23 (CNBM Forest Products (Canada) and CNBM USA).

terms specifically" and "describe in reasonable detail . . . the act or acts restrained." *Id.*; *see also Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 129 (5th Cir. 1973) ("[A]n injunction must be worded in such specific terms and with such detail as to put the party enjoined on notice of precisely what he is called upon to do or refrain from doing."). An injunction under Rule 65 must be clear on its face; "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *U.S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 n.20 (5th Cir. 1975) (emphasis added). An injunction that is understandable only by reference to other sources does not meet Rule 65's specificity requirement. Fed. R. Civ. P. 65(d)(1)(C) ("Every order granting an injunction … must … describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."). These rules are sufficiently important, and policed with such rigor, that omissions or ambiguities in the injunction must be resolved in favor of any person charged with contempt. *E.g.*, *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971).

The injunction fails to meet these requirements for multiple reasons. First, the injunction does not clearly specify who are "affiliates" of Taishan. There could be no clearer proof of this than the fact that, over a year after issuing the order, the Court itself could not determine who the injunction is meant to bind as affiliates: "What is not yet clear is what entities are affiliates and/or alter egos of Taishan." Rec. Doc. 19392 at 4. Judge Haynes has warned already that it is "puzzling … in the context of contempt" to be "consider[ing] the scope of the injunction as it relates to … identity of the parties covered." *In re: Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. 15-30804, Order at 2 (Nov. 17, 2015) (Haynes, J., concurring). And the inquiry here is especially inappropriate because the PSC's theory is so extreme. They have targeted entities

19

that can only be reached by proceeding upward on the family tree (from Taishan) to a sovereign (that has already been dismissed), out onto various branches of the tree, and then back down through multiple layers of subsidiaries.  The injunction could not possibly have been understood to mean that it applied to the CNBM Entities' business dealings given that those activities have no relationship to the subject matter of the litigation or to Taishan's non-participation.  *Russell C. House Transfer & Stor. Co. v. United States*, 189 F.2d 349, 351 (5th Cir. 1951) ("no decree should be so broad as to place the entire conduct of one's business under the jeopardy of punishment for contempt for violating a general injunction").  Such uncertainty is the very embodiment of a failure to state an injunction's terms with the requisite specificity.

Like the Court, the PSC itself doesn't know who "affiliates" are.  The PSC has continually changed its definition, beginning with just five affiliates,[9] and then repeatedly expanding the list—to 39 supposed affiliates,[10] then 46 affiliates,[11] and later to some 66 different entities.[12]  And if the Court and the PSC did not know who constituted an "affiliate," certainly the CNBM Entities themselves did not.  Plaintiffs' assertions that the non-party CNBM Entities were not provided notice of the injunction only confirms this fact.  PSC Sub. Mem. at 35-38 (explaining that "affected companies" did not receive notice of injunction).  The use of the term "affiliate" has been shown to be particularly problematic and lacking in clarity.  Indeed, one federal court refused to include the word in its preliminary injunction because the term is "too

---

[9] Rec. Doc. 17883 at 2 n.2.

[10] Rec. Doc. 18302-14.

[11] Rec. Doc. 18419.

[12] Rec. Doc. 18645.

vague and broad to give adequate notice to any such parties." *N. Atl. Operating Co. v. Evergreen Distributors, LLC*, No. 13-CV-4974, 2013 WL 5603596, at *2 (E.D.N.Y. Oct. 11, 2013).

The PSC is equally wrong to assert that the Class Certification Findings of Fact and Conclusions of Law (FOFCOL) established that the CNBM Entities were enjoined during the contempt period as "affiliates" or "alter egos." *See, e.g.*, PSC Sub. Mem. at 11, 90, 92, 96, 102-03. First, the FOFCOL were issued *after* the Contempt Order. Rec. Doc. 18028. They cannot be used to retroactively create notice that wasn't contained in the injunction in the first place. The whole point of "notice" is that it puts a party on notice. Retroactive notice isn't notice. *Cf. Morrison v. Amway Corp.*, 517 F.3d 248, 257 (5th Cir. 2008) (notice was inadequate, and an arbitration agreement was deemed illusory, where unilateral amendments to an arbitration program could be retroactively applied to disputes that arose prior to publication); *Torres v. S.G.E. Mgmt., L.L.C.*, 397 F. App'x 63, 68 (5th Cir. 2010) ("lack of a notice window before any elimination of the clause becomes effective and the ability to amend the agreement retroactively so as to avoid any promise to arbitrate are factors indicating that the agreement may be illusory"). Second, the "deemed admissions" contained in the FOFCOL are applicable only to Taishan because the CNBM Entities were not served with the requests for admission. Rec. Doc. 18028 at ¶ 28 n.5. Admissions made by a defendant are not binding against co-defendants, let alone non-parties such as the CNBM Entities. *See, e.g.*, *Becerra v. Asher*, 921 F. Supp. 1538, 1544 (S.D. Tex. 1996), *aff'd*, 105 F.3d 1042 (5th Cir. 1997) ("deemed admissions are binding only on the non-responding party, not on co-parties"); *Riberglass, Inc. v. Techni-Glass Indus., Inc.*, 811 F.2d 565, 566 (11th Cir. 1987) (same); *In re Leonetti*, 28 B.R. 1003, 1009 (E.D. Pa.), *aff'd sub nom. Earl Realty, Inc. v. Leonetti*, 725 F.2d 667 (3d Cir. 1983) (same).

The Contempt Order also lacks the required specificity in describing the enjoined acts. This is clear from Plaintiffs' own arguments about the acts that they say violate the injunction. The Order enjoins conducting "business" in the United States. Rec. Doc. 17869 at 3. But, Plaintiffs think that this covers activities so broad that no one (much less a non-party) could have been on reasonable notice that their activities would be covered. For instance, Plaintiffs argue that continuing to litigate unrelated claims in a pre-existing lawsuit (namely, the Texas lawsuit involving CNBM Co. and BNK Int'l LLC) constitutes conducting "business" within the meaning of the Court's order. PSC Sub. Mem. at 39-40. If they are correct, it only confirms the invalid overbreadth of the injunction. Issuing an injunction against litigating in a different court is "rare" and "extreme." *See Span-Eng Associates v. Weidner*, 771 F.2d 464, 468 (10th Cir. 1985) (reversing order enjoining lawsuit by same plaintiffs in another federal court). An injunction may only restrain conduct that is the subject of the litigation. *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011); *see also Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 504 (7th Cir. 2008) (injunction is overbroad if it results in "likelihood of unwarranted contempt proceedings for acts unlike or unrelated to those originally judged unlawful"). Nonetheless, Plaintiffs would have the Court enjoin non-parties to this litigation from participating in lawsuits that concern completely unrelated legal issues. PSC Sub. Mem. at 39-40, 81-82. This astonishingly broad understanding of the injunction would create a veritable Catch-22 by which a company could be in contempt in *this* Court for *continuing* to litigate, or in contempt in *another* court for *refusing* to litigate.

Plaintiffs also assert that actions *by U.S. investors* constitute a violation of the injunction. PSC Sub. Mem. at 87-90. Their view is that when individual, independent U.S. actors sold or

purchased shares of CNBM Company on the Hong Kong stock exchange, that constituted doing business in the United States in violation of the injunction.  *Id.* at 89-90.

Simply put:  Plaintiffs' view is that by failing to default in other U.S. litigation, and by failing to prevent investors from trading in their stock on an overseas exchange, the CNBM Entities violated an injunction against doing business in the United States.  That such extraordinary contentions could be advanced says all that need be said about the uncertainty and overbreadth of the injunction.  For this reason too, the Plaintiffs' motion to enforce contempt sanctions should be denied.

### D.    CNBM Company Did Not Itself Violate The Order.

Even if the injunction could apply to CNBM Company, there is no evidence it did business in the United States.  That should come as little surprise, given that CNBM Company is a holding company with no commercial activities, in the United States or elsewhere.  Chang Dep. 256:6-9, June 7, 2015.  CNBM Company simply holds investments in other Chinese entities that are engaged in various businesses related to the building industry, including cement, fiberglass, solar energy, lumber, steel, and drywall.  CNBM Company does not manufacture, produce, market, distribute, ship, or sell any building products or construction materials, including drywall.  Chang Decl. ¶ 3 (Rec. Doc. 19527-7).  In fact, CNBM Company does not direct the business operations or business decisions of the entities in which it is invested.  *Id.* ¶ 9.  Those companies are independently organized corporate entities with their own Boards of Directors, Boards of Supervisors, and corporate bylaws.  *Id.*

Plaintiffs' effort to put CNBM Company on the hook for contempt damages consists principally of dumping a massive number of exhibits on the Court.  *See* PSC Contempt Ex. Nos. 1 – 194.  Those materials are impressive for their volume and weight, and they are equally and utterly irrelevant.  There is no showing whatsoever that CNBM Company did business in the United States.  To take just one example, the PSC conflates CNBM Company with CTIEC,

claiming that CNBM Company violated the Order when CTIEC continued a pre-existing

relationships with the New Jersey Institute of Technology (NJIT), among other companies.

*See, e.g.,* PSC Sub. Mem. at 61 ("CNBM carries out its engineering services through CTIEC,

which in turn has several subsidiaries.").  But the very evidence relied upon by the PSC actually

proves that CTIEC is independent:

> Q: Can you give me an organizational structure of CTIEC?
>
> …
>
> A: CTIEC is an independent engineering company.  It has a business department for
> relevant businesses.  At the same time, it also has independently operated subsidiaries.
> That's it.
>
> Q: How many independent subsidiaries does it have?
>
> A: Let me count.  Six to seven perhaps.

Peng S. Dep. 30:12-25 (Sep. 16, 2015).

Plaintiffs similarly conflate CNBM Company with CNBM International Corporation, and

in particular, attributes to the former a global internet retail platform that is operated by the latter.

Specifically, Plaintiffs say that "CNBM has 'commit[ted] itself to offer a brand-new selling

channel for Chinese domestic manufacturers through diverse cooperation forms, and create

convenient, rapid, low-cost purchasing platform for overseas customers."  Mot. at 69.  Yet

Plaintiffs have to acknowledge that "OKorder.com is . . . being operated by CNBM International

Corporation . . . ."  *Id.*  And the evidence they point to consists of documents created by CNBM

International Corporation (PSC Sub. Mem. Ex. 154) or taken from the CNBM Group website

(PSC Sub. Mem. Ex. 155).

Plaintiffs also argue that "CNBM"—they do not specify what company they mean—

maintained an Alibaba.com "'storefront' profile[] to advertise [its] products to potential buyers

in the U.S. and elsewhere."  PSC Sub. Mem. at 83.  This unsupported allegation is deficient on

its face, as the PSC acknowledges that Alibaba "is a Hong Kong company that operates a

24

website linking buyers to the suppliers of various products." *Id.*  Nowhere do Plaintiffs provide a shred of evidence that CNBM Company maintains an Alibaba.com "storefront," much less that any U.S. business was transacted by any entity through Alibaba.com during the contempt period.

Finally, Plaintiffs contend that the injunction was violated when independent, U.S.-based investors traded in shares of CNBM Company. *Id.* at 87-90.  But even that argument acknowledges that CNBM did not itself sell shares in the United States; the PSC simply claims that CNBM Company somehow benefited from U.S. investors selling its shares.  Under any natural reading, that does not constitute "doing business" in the United States.  Certainly the PSC offers no authority to suggest that an injunction like this required CNBM Company to suspend trading of its shares.  To hold otherwise would contravene the constitutionally required notice requirement, *see supra* § II.C.2.

III.    **CONCLUSION**

Contempt proceedings have dragged on for two years, and even now, the PSC wants only half a ruling, proposing to delay an ultimate decision even longer.  They've done so on the basis of the PSC's misplaced belief that it can prosecute and recover contempt penalties.  That belief has stymied settlement efforts, and prolonged the litigation.  The Court should make clear once and for all that the injunction, at least insofar as it pertains to non-parties to *Germano*, like the CNBM Entities, does not apply to prohibit those entities' conduct because of the ambiguity and other basic infirmities in the injunction itself.  The Court should further make clear that any contempt penalty recovered will not be paid to the PSC.  Accordingly, the Court should deny the motion and put an end to the costly contempt proceedings based on an injunction that Taishan has already purged.

Respectfully submitted,

/s/ L. Christopher Vejnoska

| | |
|---|---|
| L. Christopher Vejnoska (CA Bar No. 96082) | Ewell E. Eagan, Jr. (LA Bar No. 5239) |
| Ian Johnson (CA Bar No. 208713) | Donna Phillips Currault (LA Bar No. 19533) |
| Andrew Davidson (CA Bar No. 266506) | Alex B. Rothenberg (LA Bar No. 34740) |
| Jason Wu (CA Bar No. 279118) | GORDON, ARATA, MCCOLLAM, |
| | DUPLANTIS & EAGAN, LLC |
| ORRICK, HERRINGTON & SUTCLIFFE | 201 St. Charles Avenue, 40th Floor |
| LLP | New Orleans, LA 70170-4000 |
| The Orrick Building | Tel: (504) 582-1111 |
| 405 Howard Street | Email: eeagan@gordonarata.com |
| San Francisco, CA  94105 |         dcurrault@gordonarata.com |
| Tel.:  415-773-5700 |         arothenberg@gordonarata.com |
| Email:   cvejnoska@orrick.com | |
|         ijohnson@orrick.com | |
|         adavidson@orrick.com | |
|         jmwu@orrick.com | |

James L. Stengel (NY Bar No. 1800556)
Xiang Wang (NY Bar No. 4311114)
Kelly Daley (NY Bar No. 4970117)
ORRICK, HERRINGTON & SUTCLIFFE
LLP
51 West 52nd Street
New York, NY, 10019
Tel:   212-506-5000
Email: jstengel@orrick.com
        xiangwang@orrick.com
        kdaley@orrick.com

| | |
|---|---|
| Eric A. Shumsky (D.C. Bar No. 477926) | *Counsel for the CNBM Entities* |
| ORRICK, HERRINGTON & SUTCLIFFE | |
| LLP | |
| Columbia Center | |
| 1152 15th Street NW | |
| Washington, D.C. 20005 | |
| Tel: 202-339-8400 | |
| Email: eshumsky@orrick.com | |

Dated: February 13, 2017

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing **CNBM ENTITIES' OPPOSITION TO MOTION TO ENFORCE THE CONTEMPT ORDER** has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. mail and email and upon all parties by electronically uploading the same to File & Serve in accordance with Pretrial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 13th day of February, 2017.

/s/ L. Christopher Vejnoska

L. Christopher Vejnoska (CA Bar No. 96082)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105
Tel:  415-773-5700
Fax: 415-773-5759
Email: cvejnoska@orrick.com
*Counsel for the CNBM Entities*

27