# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: *Germano et al. v. Taishan Gypsum Co. Ltd. et al.*, Case No. 2:09-cv-06687 (E.D. La.) | |

## BEIJING NEW BUILDING MATERIALS PUBLIC LIMITED COMPANY AND BEIJING NEW BUILDING MATERIAL (GROUP) CO., LTD.'S MEMORANDUM OF LAW IN OPPOSITION TO THE SUBSTITUTED MOTION OF THE PLAINTIFF INTERVENORS AND THE PLAINTIFFS' STEERING COMMITTEE TO ENFORCE THE COURT'S JULY 17, 2014 CONTEMPT ORDER AND INJUNCTION

# TABLE OF CONTENTS

Page(s)

TABLE OF CONTENTS ................................................................................................................. i

PRELIMINARY STATEMENT ................................................................................................... 1

PROCEDURAL HISTORY OF THE *GERMANO* CONTEMPT ORDER ................................. 5

ARGUMENT ................................................................................................................................. 9

I.     The Court Did Not Have Jurisdiction to Hold BNBM PLC or BNBM Group in Contempt ......................................................................................................................................... 9

II.    The Contempt Order's Penalties Require Due Process Protections That Have Not Been Afforded ..................................................................................................................... 10

    A.    The Contempt Order Imposed Criminal Penalties ................................................. 10

    B.    BNBM Was Not Afforded Due Process Before Imposition of Criminal Contempt ................................................................................................................... 12

    C.    BNBM Was Not Afforded the Required Protections Prior to Civil Contempt ..... 14

    D.    It is Unlawful for the PSC to Investigate and Prosecute BNBM's Contempt ...... 15

III.   The PSC Did Not Meet Its Burden of Showing That Taishan's Affiliates, Including the BNBM Entities, Controlled Taishan's Decision Not to Appear on July 17, 2014 ........... 16

IV.   The Contempt Order Is Impermissibly Vague and Overbroad ........................................ 20

V.    The BNBM Companies Have Not Violated the Contempt Order ................................... 23

    A.    BNBM PLC Did Not Conduct Business In The United States During the Contempt Period ................................................................................................... 23

    B.    BNBM Group Did Not Conduct Business In The United States During the Contempt Period ................................................................................................... 24

        1.    The Lumber Company Witnesses and Documents Confirm That BNBM Group Did Not "Conduct Business" in the United States During the Contempt Period ................................................................................. 25

            a.    Baillie ........................................................................................ 26

            b.    Hull ............................................................................................ 27

            c.    Western Wood ........................................................................... 29

            d.    WHI ........................................................................................... 30

    C.    Doing Business "*in*" the U.S. Requires More Than Handling the Chinese Aspects of a Cross-Border Transaction ................................................................... 31

    D.    BNBM's Presence on Alibaba Did Not Violate the Contempt Order ................. 32

CONCLUSION ............................................................................................................................ 33

Pursuant to Federal Rule of Civil Procedure 65 and the Court's January 11, 2017 Order (Rec. Doc. 20635), Beijing New Building Materials Public Limited Company ("BNBM PLC") and Beijing New Building Material (Group) Co., Ltd. ("BNBM Group," collectively the "BNBM Entities") respectfully submit this Memorandum of Law in opposition to the Substituted Motion of Plaintiff-Intervenors and the Plaintiffs' Steering Committee to Enforce the Court's July 17, 2014 Contempt Order and Injunction (Rec. Doc. 20032) (the "Substituted Motion").  The Court's July 17, 2014 Order (Rec. Doc. 17869) (the "Contempt Order") was entered in *Germano, et al. v. Taishan Gypsum Co. Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 2:09-cv-6687 ("*Germano*"), an action where neither BNBM PLC nor BNBM Group were parties. In opposition to the Substituted Motion, the BNBM Entities state as follows:

## PRELIMINARY STATEMENT

The Contempt Order entered in the *Germano* litigation does not refer to BNBM PLC or BNBM Group.  And for good reason: the BNBM entities engaged in no contumacious conduct, and neither of them were parties to the *Germano* action.  The only party held in contempt in *Germano* was Taishan Gypsum Ltd., Co. ("Taishan").  Indeed, over a year after issuing the Contempt Order, the Court held that "[w]hat is not *yet* clear is what entities are affiliates and/or alter egos of Taishan."  (Rec. Doc. 19392 at 4).

Controlling Supreme Court and Fifth Circuit jurisprudence precludes the PSC's attempt to retroactively expand the scope of the Contempt Order to impose contempt penalties on the BNBM Entities, who were not before the Court in *Germano* and who were afforded no procedural safeguards in connection with its entry.  A party facing contempt sanctions is entitled to proper notice, and a contempt order, particularly one in the form of an injunction, must be clear on its face as to whom it binds.  The Court cannot *post facto* bind a party to a contempt order years after issuing the order as a means of imposing punishment for an alleged violation.

1

"It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940) (citations omitted).  For this reason, a court cannot enjoin a parent company that is not a named defendant, has not been served with process, and did not formally appear in the case— even if an injunction is issued against its subsidiary company that is properly before the Court. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110-11 (1969).  As this Court has held, the BNBM "Entities are correct in their assertion that the Court cannot hold them in contempt if it lacks jurisdiction over them," and therefore the Court must first decide the jurisdictional motions.  (Rec. Doc. 19392 at 4).

The Court had neither *in personam* nor subject matter jurisdiction over the BNBM Entities in *Germano*.  Neither company was a named defendant in *Germano,* nor was either served, nor did the pleadings in *Germano* seek to bind the BNBM Entities as Taishan's alter egos.  Moreover, *Germano* was originally filed in (and transferred to this Court from) the Eastern District of Virginia.  (Rec. Doc. Nos. 331, 450).  As shown in the BNBM Entities' papers in support of their respective 12(b)(2) motions to dismiss (which we incorporate by reference), neither company had sufficient minimum contacts with Virginia to support the exercise of long-arm jurisdiction consistent with due process.[1]  Not a single MDL claimant from Virginia has asserted that he or she was harmed by BNBM drywall.[2]  And as the 12(b)(2) motion papers also

---

[1]  Rec. Doc. Nos. 18841-1 at 13-17, 19664-1 at 17-22, 20073 at 6-7 (BNBM Group motions); Rec. Doc. Nos. 18849-1 at 18-23, 19646-1 at 70-82, 20079 at 64-76 (BNBM PLC motions).

[2]  *See* Rec. Doc. Nos. 19646-1 at 18-22, 20079 at 65-66.

detail, Taishan's jurisdictional contacts with Virginia cannot be imputed to BNBM PLC or BNBM Group under an alter-ego theory.[3]

The PSC asks the Court to find BNBM PLC and BNBM Group in violation of the Contempt Order and to award the plaintiffs 25% of their profits during the contempt period.  As a matter of law this penalty, which bears no relation whatsoever to the judgment awarded to the *Germano* plaintiffs, is a criminal penalty that cannot be imposed on the BNBM Entities without affording them stringent due process protections—including service of process and notice, the right to be heard, the right to call witnesses and present evidence, and a presumption of innocence until proven guilty beyond a reasonable doubt.  *See Waste Mgmt. of Wash., Inc. v. Kattler*, 776 F.3d 336, 339-40 (5th Cir. 2015) (quoting *In re Oliver*, 333 U.S. 257, 275 (1948)); *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826 (1994) (internal quotes omitted) ("criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings") (collecting cases). None of these protections were provided to the BNBM Entities before the Contempt Order was entered.  Indeed, the BNBM Entities were not even afforded the lesser procedural protections entitled to parties against whom civil contempt sanctions are imposed. *See Bagwell*, 512 U.S. at 827 (civil contempt "may be imposed" after a "civil proceeding upon notice and an opportunity to be heard").

The PSC's attempt to expand the Contempt Order also contravenes the well-settled principle that courts can only hold third parties in contempt for the actions of others where there is proof at the time the order is entered that the third party "exerted control" over the contemnor "in such a way as to be personally connected with the contumacy."  *F.T.C. v. Kuykendall*, 371

---

[3]  Rec. Doc. Nos. 18841-1 at 17-19, 19664-1 at 23-24, 20073 at 2-6 (BNBM Group motions); Rec. Doc. Nos. 18849-1 at 24-31, 19646-1 at 34-68, 20079 at 7-64) (BNBM PLC motions).

F.3d 745, 762-63 (10th Cir. 2004).  No evidence of any kind was presented to the Court before it entered the Contempt Order that either of the BNBM Entities played any role in Taishan's decision not to attend the judgment-debtor examination, much less that either BNBM entity controlled the decision.  In lieu of evidence at the time the Contempt Order was entered (or at any time, for that matter) that BNBM PLC and BNBM Group exerted control over Taishan's decision not to appear, the PSC retroactively seeks to apply the Court's September, 2014 Findings of Fact and Conclusions of Law (Rec. Doc. 18028) (the "FOFCOL") to establish control.  But the FOFCOL made no findings that the BNBM Entities controlled Taishan's decision not to attend the hearing.  Nor could those findings of fact apply to the BNBM Entities given that the FOFCOL's alter-ego findings were based solely on deemed FED. R. CIV. P. 36 admissions made by Taishan, which cannot be applied against the BNBM Entities under *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997).

Even if the Contempt Order could apply to BNBM PLC or BNBM Group, the discovery taken by the PSC demonstrates that neither company violated the Contempt Order by "conducting any business" in the United States between July 17, 2014 and March 2015.  The record shows that BNBM PLC did no business in the United States during this period, and the Substituted Motion identifies no evidence to the contrary.  The PSC contends that BNBM Group violated the order by buying lumber from U.S. exporters for shipment to China.  But the deposition and documentary evidence actually shows that BNBM Group acted solely as a clearing agent *in China* on behalf of *Chinese* clients who imported lumber from the United States to China, and it did not do business in the U.S. during the contempt period:

- BNBM Group sold no products into, and received no payments from, the United States.

- The American lumber companies freely conceded they had "no real business relationship" with BNBM Group, which was not the purchaser of any of the lumber. BNBM Group's role in the transactions was limited to obtaining letters of credit in China (or other means of payment) for its Chinese clients. While BNBM Group's name appeared on invoices and other transaction documents, none of the lumber company witnesses knew what arrangements or contractual relationships their Chinese customers had with BNBM Group.

- BNBM Group had no direct communications with the lumber companies in the United States. Communications, if any, occurred through intermediaries in China.

Simply importing a product from the U.S. does not constitute "doing business" here. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418 (1984); *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 611 (5th Cir. 2008).

The BNBM Entities respectfully request the Court to deny the PSC's Substituted Motion to enforce the Contempt Order.

## PROCEDURAL HISTORY OF THE *GERMANO* CONTEMPT ORDER

On May 11, 2010 a default judgment was entered against Taishan in *Germano*. (Rec. Doc. 3013). *Germano* was originally filed in the United States District Court for the Eastern District of Virginia, and was transferred to this Court by the MDL Panel. (Rec. Doc. Nos. 331, 450). BNBM PLC and BNBM Group were not named as defendants in *Germano*. They were never served with process in the case and no judgments, default or otherwise, were ever entered against them.

Taishan appealed this default judgment to the Fifth Circuit. (Rec. Doc. 3670). On February 19, 2014 the Fifth Circuit issued a judgment and mandate affirming this Court's default judgment against Taishan. (Rec. Doc. 17458).

On June 16, 2014, the *Germano* plaintiffs filed a Motion to Examine Judgment Debtor. (Rec. Doc. 17760, attached as Exhibit 1). The motion sought an order compelling the in-court

examination of Taishan and production of some of Taishan's books and records at the examination. *Id.* at 4-10. The motion did not seek the appearance or testimony of any other party, including BNBM PLC or BNBM Group. The motion did not seek the production of the records of any other party, including BNBM PLC or BNBM Group. The motion did not mention the "affiliates" of Taishan. The motion did not seek relief against any party other than Taishan. The motion did not seek contempt sanctions against Taishan or any other party.

On June 19, 2014, the Court entered a one-paragraph order in response:

> IT IS ORDERED BY THE COURT that **Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. ("Taishan")** appear in open court on the 17th day of July, 2014 at 10:00 o'clock a.m. in Section L of the United States District Court for the Eastern District of Louisiana, to be examined as a judgment debtor pursuant to Fed. R. Civ. P. 69(a) and C.C.P. art. 2451 and that **Taishan** produce at that time the books, papers, and documents described in paragraph XI of the motion.

(Rec. Doc. 17774, attached as Exhibit 2). The order is addressed to Taishan alone. It imposes no requirements on any other entity. And it does not put any other entity on notice that it was bound by the Court's order or that it could be held in contempt.

On July 17, 2014, Taishan did not appear. (Rec. Doc. 17868). The Court entered the Contempt Order in response.[4] The order provides in bold that "**THIS DOCUMENT RELATES TO:** *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.***, case no. 2:09-cv-6687 (E.D. La.).**" The Order holds that "As a consequence of Taishan's refusal to appear at this Judgment Debtor Examination, in direct, willful violation of this Court's June 20, 2014 order, the Court holds *Taishan* in contempt of court, both criminally and civilly." *Id.* at 2 (emphasis added). In addition to $15,000 in attorney fees and a $40,000 "penalty for contempt," the order provided for relief against entities who are not parties to *Germano*:

---

[4] The Contempt Order is attached as Exhibit 3.

6

> **IT IS FURTHER ORDERED** that Taishan, and any of its affiliates or subsidiaries, is hereby **ENJOINED** from conducting any business in the United States until or unless it participates in this judicial process. If Taishan violates this injunction, it must pay a further penalty of 25% of the profits earned by the company or its affiliates who violate the order, for the year of the violation.

*Id.* at 3.  BNBM PLC and BNBM Group were not given prior notice that the foregoing penalty was being considered by the Court or could be entered at or as the result of the July 17, 2014 hearing.

On February 17, 2015, Taishan re-entered the litigation, thereby purging itself of the contempt.  (Rec. Doc. 18352).  On March 9, 2015, Taishan satisfied the $40,000 monetary penalty set forth in the Contempt Order.  (Rec. Doc. Nos. 18448, 18449).  On March 19, 2015, Taishan paid the compensatory attorneys' fees.  By April 1, 2015, Taishan had paid the *Germano* default judgment in full and with interest.  (Rec. Doc. 18508).

After entering appearances in 2015, the CNBM Entities, joined by the BNBM Entities, moved to vacate or clarify that the Contempt Order does not bind them.  (Rec. Doc. Nos. 19271, 19294).  On August 17, 2015, the Court denied the motion, stating "To begin, the Court agrees with the Entities in that it was not their precipitous act that lead to the Contempt Order.  Rather, it was Taishan's action or inaction that led to the Contempt Order."  (Rec. Doc. 19392 at 3, attached as Exhibit 4).  Nonetheless, the Court was unwilling at that time and on the then-existing incomplete record to find that the Contempt Order did not apply to the CNBM and BNBM Entities:

> The Contempt Order is clear; it clearly applies to Taishan's subsidiaries and affiliates.  If any of Taishan's affiliates or subsidiaries did business in the United States during the contempt period, it will have violated the Injunction and will be required to remit 25% of its earnings during that time.  If Taishan did business in the United States during the contempt period, as an alter ego or by means of some common business enterprise, Taishan will be in violation of the Injunction and will be required to remit 25% of its profits.  What is not *yet* clear is what entities are

7

affiliates and/or alter egos of Taishan.  These terms are not vague; rather, they are legal terms, requiring a legal determination.  However, these legal determinations are factually pregnant.  The presence or absence of a subsidiary, affiliate, alter ego, or common business enterprise status or relationship with Taishan is enshrouded in facts.   This justifies the ongoing the discovery and perhaps requires an evidentiary hearing.  Following a period of discovery and, if appropriate, an evidentiary hearing, the Court will make findings of facts and conclusions of law as to whether or not the CNBM or BNBM entities are alter egos, affiliates, or subsidiaries, and/or whether or not there is a common business enterprise.   The Entities are correct in their assertion that the Court cannot hold them [in] contempt if it lacks jurisdiction over them. Consequently, any evidentiary hearing related to the Injunction will be scheduled shortly after the jurisdictional ruling as the jurisdictional ruling may well affect any contempt proceeding.

*Id*. at 4.

The CNBM and BNBM Entities appealed the Court's August 17, 2015 order.  (Rec. Doc. Nos. 19448, 19534).  The PSC moved to dismiss the appeal as premature because the injunction at issue was no longer in effect.  On November 17, 2015, a panel of the Fifth Circuit entered an order granting the dismissal request.  (Rec. Doc. 19779, attached as Exhibit 5).  Circuit Judge Haynes concurred in the order, "but only because the Appellees have conceded that the injunction in question has expired, leaving only consideration of the scope of the injunction as it relates to past conduct and identity of the entities covered (a puzzling inquiry in the context of contempt, but one that is not ripe for review at this point)."  *Id*. at 2.

On January 11, 2017, the Court entered an order setting the PSC's motion to enforce the Contempt Order for oral argument on March 2, 2017, and directed that any responses to the motion be submitted on or before February 13, 2017.  (Rec. Doc. 20635).

**ARGUMENT**

## I.   THE COURT DID NOT HAVE JURISDICTION TO HOLD BNBM PLC OR BNBM GROUP IN CONTEMPT

Neither BNBM PLC nor BNBM Group was held in contempt of court, nor could they have been.  Neither was a party in *Germano* and neither was served with process in that case, which was transferred from the Eastern District of Virginia—a state where neither did business nor had minimum contacts.  The Court simply had no jurisdiction to hold BNBM PLC or BNBM Group in contempt in *Germano*.

A non-party is not personally bound by an injunction when it is not designated as a party to the action, served with process, or given an opportunity to appear and defend.  *Zenith*, 395 U.S. at 110 (1969); *see also, e.g., Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327, n.7 (1979); *Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 328-29 (1971); *Hansberry*, 311 U.S. at 40 (1940); *Tenn. ex. rel. Sizemore v. Surety Bank*, 200 F. 3d 373, 381 (5th Cir. 2000).  This rule reflects our "deep-rooted historic tradition that everyone should have his own day in court." 18 C. WRIGHT, A. MILLER, & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4449, 417 (1981).  In *Zenith*, "the Court made it clear that a non-party is not bound by an injunction pursuant to Rule 65 until a finding is made in a proceeding in which it is a party that the requisites are indeed present."  *In re N.A.A.C.P., Special Contribution Fund*, Nos. 87-3366, 87-3673, 1988 WL 61504, at *3-5 (6th Cir. June 13, 1988) ("As the district court acted without having obtained *in personam* jurisdiction," its preliminary injunction and all subsequent orders were vacated).

BNBM Group and BNBM PLC are not subject to the jurisdiction of this Court, as they demonstrate in their respective motions to dismiss pursuant to FED. R. CIV. P. 12(b)(2) and 12(b)(5) and supporting papers.  With respect to *Germano* and the Contempt Order, neither

BNBM Entity had sufficient minimum contacts with Virginia to permit the exercise of long-arm jurisdiction for purposes of imposing contempt penalties. S*upra* note 1. Not a single profile form from a Virginia resident identifies BNBM drywall in their home. *See supra* note 2. Nor can Taishan's contacts be imputed to BNBM Group or BNBM PLC through an alter-ego theory, particularly given that no such theory was ever pleaded in *Germano*. *Supra* note 3. Because neither BNBM Entity had any contacts with Virginia, much less the requisite contacts needed to exercise long-arm jurisdiction, the Court did not have jurisdiction to sanction them for contempt. *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006).

An "order issued by a court with *jurisdiction over the subject matter and person* must be obeyed by the parties." *See U.S. v. Mine Workers of Am.*, 330 U.S. 258, 293 (1947) (emphasis added); *U.S. Steel Corp. v. United Mine Workers of Am., Dist. 20*, 598 F.2d 363, 368 (5th Cir. 1979) (same). But the "district court has no power to grant an interlocutory or final injunction against a party over whom it has not acquired valid jurisdiction," and an order granting an interlocutory injunction without first determining whether the court has subject matter and personal jurisdiction "is erroneous as a matter of law." *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 470-71 (5th Cir. 1985). The Court did not find such jurisdiction over the BNBM Entities before entering the Contempt Order, and no such jurisdiction exists.

## II. THE CONTEMPT ORDER'S PENALTIES REQUIRE DUE PROCESS PROTECTIONS THAT HAVE NOT BEEN AFFORDED

### A. The Contempt Order Imposed Criminal Penalties

As the Contempt Order expressly states, the penalties imposed against Taishan and its "affiliates" are criminal as well as civil. *See* Contempt Order at 2-3. Despite the language of the order, the PSC contends that the order was not a criminal penalty, but rather a "coercive" civil

penalty.  Substituted Mot. at 93-95.  But even beyond this overt statement, the Contempt Order plainly imposed criminal penalties.  Conclusions "about the civil or criminal nature of a contempt sanction are properly drawn" from "'an examination of the character of the relief itself.'" *Bagwell*, 512 U.S. at 828 (1994) (quoting *Hicks v. Feiock*, 485 U.S. 624, 636 (1988)). The Court entered the Contempt Order because, in its view, Taishan's disobedience of the Court's June 20, 2014 order was an "'affront to the Court's dignity'" that was "'widely observed'" and because there was harm to the parties from Taishan's non-appearance.  Contempt Order at 2-3 (quoting *Pounders v. Watson*, 521 U.S. 982, 988-89 (1997), and citing FED. R. CRIM. P.  42).  "If the purpose of the sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal."  *Lamar Fin. Corp. v. Adams*, 918 F.2d 564, 566 (5th Cir. 1990) (citing *Port v. Heard*, 764 F.2d 423, 426 (5th Cir. 1985), *In re Dinnan*, 625 F.2d 1146, 1149 (5th Cir. 1980), and *U.S. v. Rizzo*, 539 F.2d 458, 462-63 (5th Cir. 1976)).

The PSC relies upon a handful of cases standing for the unsurprising proposition that a judicial sanction in a civil contempt proceeding can be compensatory or coercive.[5]  But a coercive penalty "is civil only if the contemnor is afforded an opportunity to purge."  *Bagwell*, 512 U.S. at 829 (citing *Penfield Co. of Cal. v. Sec. & Exch. Comm'n*, 330 U.S. 585, 590 (1947), and *United States v. Mine Workers*, 330 U.S. 258, 303-04 (1947)).  The BNBM Entities could not purge the contempt themselves; the injunction continued "until or unless" *Taishan* "participates in this judicial process."  Exhibit 3 at 3.  For BNBM PLC and BNBM Group, the fines were "not coercive day fines, or even suspended fines, but are more closely analogous to

---

[5] *See* Substituted Mot. at 94 ("Judicial sanctions in civil contempt proceedings may be employed for *either* or *both* of two purposes: (1) to coerce the defendant into compliance with the court's order, and/or (2) to compensate the complainant for losses sustained.") (citing *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) and *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)).

fixed, determinate, retrospective criminal fines which [they] had no opportunity to purge once imposed." *Bagwell*, 512 U.S. at 837; *see also* 11A FED. PRAC & PROC. § 2960.

Nor can the Contempt Order be considered a compensatory civil contempt fine, which requires that the amount of the penalty compensate the complainant for losses actually sustained from the contemptuous act. *Bagwell*, 512 U.S. at 829. A specific judgment amount was entered in *Germano*. *See* (Rec. Doc. Nos. 3013 (May 10, 2010 default judgment), 18725 (Order & Reasons Awarding Disbursement of the Germano Judgment)). That judgment was ultimately paid in full with interest. (Rec. Doc. 18725 at 2 (indicating that Taishan had already paid the judgment amount to a special trust)). Any adjudicated harm from Taishan's failure to appear on July 17, 2014 has been fully compensated by Taishan's payment of the judgment with interest. The Court made no findings that the 25% penalty amount is related in any way to the judgment amount or any harm to the *Germano* plaintiffs from Taishan's absence at the hearing. No evidence of such harm was proffered in the *Germano* plaintiffs' motion or at the July 17, 2014 hearing.

**B.   BNBM Was Not Afforded Due Process Before Imposition of Criminal Contempt**

Criminal contempt sanctions cannot be imposed unless a defendant is provided with due process protections, including, among other things, service of process and notice, a presumption of innocence, proof beyond a reasonable doubt with respect to its violation of a court order, the right to be heard, the right to counsel, the right to call witnesses and present evidence, and the right to a jury trial. *See* FED. R. CRIM. P. 42(a). Without these protections—none of which were provided to the BNBM Entities—the criminal contempt penalties in the Contempt Order violate due process. *Bagwell*, 512 U.S. at 826 ("Criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal

12

proceedings."); s*ee also id.* at 832-33 (citing *Taylor v. Hayes*, 418 U.S. 488, 498-500 (1974)); *Lamar Fin.*, 918 F.2d at 567.

The Court could not, as the PSC contends, sidestep the requisite due process protections and "summarily" impose sanctions on the BNBM Entities.  Substituted Mot. at 96-98.  FED. R. CIV. P. 42(b) expressly states that courts may only "summarily punish a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies[.]"  The PSC does not, and cannot, argue that the BNBM Entities acted "in open court, in the presence of the judge… where all of the essential elements of the misconduct are under the eye of the court, [and] are actually observed by the court," which are the only circumstances in which a summary contempt order is permissible.  *Pounders v. Watson*, 521 U.S. 982, 988 (1997) (internal citations omitted).  And for all of the reasons discussed above and in the BNBM Entities' pending motions to dismiss, Taishan's failure to appear in Court—the only arguable misconduct that took place "in the presence of the judge"—cannot be imputed to the BNBM Entities.

The PSC's contention that the BNBM Entities knew about the judgment debtor examination, and thus had sufficient notice for due process purposes, is similarly unavailing.  *See* Substituted Mot. at 35-38, 92-96.  The Fifth Circuit rejected this precise argument in *Lamar Financial*, 918 F.2d at 567 (a case cited in the Contempt Order at 3).  The court vacated a "punitive" criminal contempt order where the contemnor was "not given specific notice that the proceeding was a criminal proceeding."  *Id.*  Here, there is no evidence that either BNBM PLC or BNBM Group were specifically made aware of potential criminal sanctions prior to the imposition of the Contempt Order.

Additionally, holding BNBM PLC and BNBM Group in criminal contempt first requires proof of the elements of the contempt beyond a reasonable doubt and a finding that BNBM PLC and BNBM Group acted willfully in contempt of the court.   *See* 18 U.S.C. § 401(3) (providing the statutory requirements for criminal contempt); *see also Griffith v. Oles (In re Hipp, Inc.)*, 895 F.2d 1503, 1509 (5th Cir. 1990).  There were no such findings here, nor could there have been.

## C.   BNBM Was Not Afforded the Required Protections Prior to Civil Contempt

Assuming, for the sake of argument, that the contempt penalty against the affiliates could be considered civil, even the lesser process protections for civil contempt were not provided with respect to the affiliates, including the BNBM Entities.   In general, before a court may impose civil contempt sanctions "one charged with contempt of court" must "be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses." *Waste Mgmt. of Wash., Inc. v. Kattler*,  776 F.3d 336, 339-40 (5th Cir. 2015) (citing *In re Oliver*, 333 U.S. 257, 275 (1948)).   The BNBM Entities were afforded none of these protections. "Adequate notice typically takes the form of a show-cause order and a notice of hearing identifying each litigant who might be held in contempt."   *Waste Mgmt.*, 776 F.3d at 340 (citing *McGuire v. Sigma Coatings*, 48 F.3d 902, 907 (5th Cir. 1995)).   To impose civil contempt penalties on BNBM PLC or BNBM Group, the Court also would have had to find by clear and convincing evidence that they violated "a definite and specific" court order requiring them, not Taishan, "to perform or refrain from performing a particular act," and that they failed to oblige with "knowledge of the court's order."   *Waste Mgmt.*, 776 F.3d at 341 (quoting *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013)).   None of these findings were made; indeed, no evidence was adduced that would have supported any such findings against BNBM PLC or BNBM Group.   Civil contempt sanctions are never appropriate when a

14

contemnor "'has no further opportunity to purge himself of contempt.'" *In re Grand Jury Proceedings*, 744 F.3d 211, 218 (1st Cir. 2014) (quoting *Shillitani v. United States*, 384 U.S. 364, 371 (1966)).  The BNBM Entities had no such opportunity here: only Taishan could purge contempt under the Contempt Order.  Absent sufficient record evidence and factual findings to meet the burden of proof for each element of contempt, a contempt penalty cannot stand.  *See Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961, 965 (5th Cir. 1995).

### D.    It is Unlawful for the PSC to Investigate and Prosecute BNBM's Contempt

Although the harm to the *Germano* plaintiffs caused by Taishan's nonappearance has long since been rectified by Taishan's payment of the judgment with interest, the PSC now is attempting to increase its recovery based on what the Court viewed as an affront to the decorum of the Court.  The PSC may not lawfully do so, because it cannot privately prosecute a contempt order imposing criminal penalties.  It was unlawful for the PSC to deputize itself to investigate violations of the order, and its pending motion to enforce the contempt order is an unlawful attempt by an interested private attorney to seek a finding of criminal contempt.

The PSC's attempt to play private United States Attorney violates FED. R. CRIM. P. 42(a)(2), which provides:

> (2) Appointing a Prosecutor. The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. If the government declines the request, the court must appoint another attorney to prosecute the contempt.

Rule 42(a)(2) was adopted to codify the Supreme Court's instruction in *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798-99 (1987).  *See* FED. R. CRIM. P. 42, Committee Notes on Rules—2002 Amendment.  In *Young* the Supreme Court held that counsel for a party to the underlying case cannot take this role.

Private attorneys appointed to prosecute a criminal contempt action represent the United States, not the party that is the beneficiary of the court order allegedly violated. As we said in *Gompers*, criminal contempt proceedings arising out of civil litigation "are between the public and the defendant, and are not a part of the original cause." 221 U.S., at 445, 31 S.Ct., at 499. The prosecutor is appointed solely to pursue the public interest in vindication of the court's authority. **A private attorney appointed to prosecute a criminal contempt therefore certainly should be as disinterested as a public prosecutor who undertakes such a prosecution.**

*Young*, 481 U.S. at 804 (emphasis added) (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 445 (1911) (reversing contempt convictions when a party's attorney was appointed to prosecute)); *see also Crowe v. Smith*, 151 F.3d 217, 227-29 (5th Cir. 1998) (reversing criminal contempt where court failed to appoint an independent attorney to prosecute criminal contempt charge against insurance company); *Brotherhood of Locomotive Firemen & Enginemen v. U.S.*, 411 F.2d 312, 319-20 (5th Cir. 1969) (if the government declines to prosecute contempt, interested attorneys should not be appointed in its stead).

## III. THE PSC DID NOT MEET ITS BURDEN OF SHOWING THAT TAISHAN'S AFFILIATES, INCLUDING THE BNBM ENTITIES, CONTROLLED TAISHAN'S DECISION NOT TO APPEAR ON JULY 17, 2014

Even if the Court had jurisdiction over the BNBM Entities, the Contempt Order cannot lawfully be interpreted as binding BNBM PLC or BNBM Group.  The Contempt Order is an injunction governed by FED. R. CIV. P. 65.  Rule 65 does not permit an injunction "so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law."  *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 13-14 (1945). Language such as "successors and assigns" cannot be wielded to exceed the limitations of Rule 65.  *Id* at 14; *see also* 11A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2956 (3d ed.). "Persons who are not parties" cannot be brought within the scope of an injunction simply by naming them in the injunction.  *Le Tourneau Co. of Ga. v. N.L.R.B.*, 150 F.2d 1012,

1012 (5th Cir. 1945). An injunction against a subsidiary does not bind a parent corporation when the parent is not a party to the case and has not had its day in court first. Thus in *Zenith*, the Supreme Court held that the parent of a corporation was not bound by an injunction against its wholly owned subsidiary when the parent was not named as a party, was never served, and did not appear prior to entry of the injunction. 395 U.S. at 110-112 (1969).[6]

It is axiomatic that each defendant to a contempt sanction is entitled to "an individualized determination of his interests." *F.T.C. v. Kuykendall*, 371 F.3d 745, 758 (10th Cir. 2004) (quoting *de la Llana-Castellon v. I.N.S.*, 16 F.3d 1093, 1096 (10th Cir. 1994)). A party's contempt only can be imputed to a parent or affiliate upon a finding that the parent or affiliate "exerted control" over the contemnor "in such a way as to be personally connected with the contumacy." *Kuykendall*, 371 F.3d at 762 (declining to hold affiliates in contempt for violating injunction where there was no showing that affiliates controlled the corporation, were part of a common enterprise, or that the corporate structure served only to conceal assets); *Int'l Rectifier Corp. v. Samsung Elec. Co., Ltd.*, 361 F.3d 1355, 1361 (Fed. Cir. 2004) (same).[7]

---

[6] Even a finding that the parent was the subsidiary's alter ego could not have rendered an injunction binding against the parent, because the parent "never had its day in court on the question of whether it and its subsidiary should be considered the same entity for purposes of [the] litigation." *Zenith*, 395 U.S. at 112.

[7] The PSC's reliance on *Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir. 1985) for the proposition that this Court is permitted to "reach out to nonparties who knowingly violate its orders," is similarly unavailing. (Substituted Mot. at 101) (internal quotes omitted). Unlike *Waffenschmidt*, the PSC has offered no evidence that BNBM PLC or BNBM Group "acted in concert" with Taishan to violate the Contempt Order. Moreover, an injunction cannot issue against a foreign nonparty without a finding that it is subject to specific jurisdiction in the United States. *Gucci America vs. Weixing Li*, 768 F.3d 122, 136-38 (2d Cir. 2014). While "other circuits have permitted the exercise of specific jurisdiction over *domestic* nonparties who, with knowledge of an injunction, intentionally aided its violation. . . . we have found no case. . . applying such an analysis in the context of a *foreign* nonparty with only limited contacts in the forum." *Id.* at 137-38 (distinguishing *Waffenschmidt*).

No such evidence was adduced at the July 17, 2014 hearing. No such findings were made before the Contempt Order was entered. Indeed, the order contains no factual findings that could even arguably support a finding that BNBM PLC or BNBM Group made or controlled Taishan's decision not to appear at the hearing "in such a way as to be personally connected with the contumacy." *Kuykendall*, 371 F.3d at 762.

Instead, the PSC relies on the Court's subsequent September 26, 2014 Findings of Fact and Conclusions of Law to support its claim that the BNBM Entities were enjoined during the "Contempt Order [period]" as "affiliates" and that they had notice as part of a "a single business enterprise" with Taishan. Substituted Mot. at 92, 96. However, *post hoc* Findings of Fact and Conclusions of Law cannot be employed to retroactively clarify the scope of the order. A district court cannot "modify a preliminary injunction *nunc pro tunc* retroactively to expand or vitiate rights the parties have already accrued under an injunction." *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010) (citing *Singh v. Mukasey*, 533 F.3d 1103, 1110 (9th Cir. 2008) and *U.S. v. Sumner*, 226 F.3d 1005, 1009-10 (9th Cir. 2000)).

Instead of evidence taken at a full hearing after an order to show cause or other served notice, the relevant findings in the FOFCOL relied exclusively on Taishan's deemed admissions under FED. R. CIV. P. 36, which resulted from Taishan's post-Contempt Order failure to respond to requests directed to and served on Taishan alone. *See, e.g.*, FOFCOL ¶¶ 28-29, 32-47. But Taishan's deemed admissions cannot be used against BNBM PLC or BNBM Group. *Becerra v. Asher*, 921 F. Supp. 1538, 1544 (S.D. Tex. 1996), *aff'd*, 105 F.3d 1042, 1048 (5th Cir. 1997); *see also Riberglass, Inc. v. Techni-Glass Indus., Inc.*, 811 F.2d 565, 566-67 (11th Cir. 1987) (deemed admissions of co-defendants could not bind defendant who had responded to requests);

*In re Leonetti*, 28 B.R. 1003, 1009 (E.D. Pa. 1983), *aff'd sub nom. Earl Realty, Inc. v. Leonetti*, 725 F.2d 667 (3d Cir. 1983) (admission of one defendant not admissible against co-defendant).

In *Becerra*, the plaintiff attempted to use a defendant's unanswered request for admissions as evidence to defeat a co-defendant's motion for summary judgment. 105 F.3d at 1048. The district court ruled that the deemed admissions were not competent evidence, because they "are binding only on the non-responding party, not on co-parties." 921 F. Supp. at 1544. On appeal, the Fifth Circuit affirmed and held that "[d]eemed admissions by a party opponent cannot be used against a co-party." 105 F.3d at 1048. Thus controlling Fifth Circuit precedent prohibits the use of Taishan's admissions to support the exercise of jurisdiction over, or the imposition of sanctions against, BNBM PLC or BNBM Group. *See id.*

Moreover, the FOFCOL found that Taishan and the BNBM Entities are alter egos, not that the BNBM Entities controlled or directed Taishan's decision to attend the hearing. Thus the FOFCOL findings are irrelevant to a finding of contempt against BNBM PLC or BNBM Group.

The PSC has not come forward with evidence that the BNBM Entities made or controlled Taishan's decision not to attend the July 17, 2014 hearing. The Taishan, BNBM, and CNBM witnesses testified that Taishan, and Taishan alone, made the decision to withdraw from the *Germano* action and not attend the hearing. BNBM PLC's Chairman, Wang Bing, testified that Taishan's decision to withdraw from the litigation was not first discussed by the board of directors of BNBM PLC.[8] ████████████████████████.[9] As Taishan's Chairman Jia has explained, ███████████████████████

---

[8] Depo. Tr. of Wang Bing, August 26, 2015 at 306:3-19 (relevant pages attached as Exhibit 6 and cited "Ex. 6, Bing Tr.").

[9] Depo. Tr. of Tongchun Jia, September 17-18, 2015 at 188:22-189:3 (relevant pages attached as Exhibit 7 and cited "Ex. 7, Jia Tr.").

████████████████████████████████████████████████[10]  Gang Che, the 30(b)(6)

witness for Taishan, testified that "████████████████████████████████████████

████████████████"[11]  Finally, the PSC's claim that BNBM PLC's July 18, 2014

public announcement regarding Taishan's decision to withdraw—issued after the Contempt

Order was entered—somehow shows prior notice of the potential that the BNBM Entities could

be held in contempt, is both erroneous and illogical.  Substituted Mot. at 96-97.

There is no evidence that BNBM Group, which does not have an ownership interest in

Taishan, played any role or had any knowledge of Taishan's decision not to attend the debtor

examination.  Given that BNBM Group has no ownership interest in Taishan, it would be

fanciful to suggest otherwise.

## IV.   THE CONTEMPT ORDER IS IMPERMISSIBLY VAGUE AND OVERBROAD

The injunctive portion of the Contempt Order is impermissibly vague.  Federal Rule

65(d)(1) requires that an injunction "state its terms specifically" and "describe in reasonable

detail. . . the act or acts restrained."  An "injunction must be worded in such specific terms and

with such detail as to put the party enjoined on notice of precisely what he is called upon to do or

refrain from doing."  *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 129 (5th Cir.

1973).  A Rule 65 injunction must be clear on its face so "that an ordinary person reading the

court's order should be able to ascertain from the document itself exactly what conduct is

proscribed." *U.S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 n.20 (5th Cir.

1975).  An injunction that is understandable only by reference to other sources does not meet

Rule 65's specificity requirement.  Omissions or ambiguities in the injunction must be resolved

---

[10]   *Id.*

[11]   Depo. Tr. of Gang Che, June 2, 2015 at 266:13-267:1 (relevant pages attached as Exhibit 8
and cited "Ex. 8, Che Tr."); *see also id.* at 193:25-194:9, 194:13-21, 267:7-268:1.

in favor of any person charged with contempt.  *See, e.g., Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971).

The Contempt Order lacks the specificity required by Rule 65.  The order's reference to Taishan's "affiliates" is too vague to have reasonably put BNBM PLC or BNBM Group on notice that either of them was enjoined, and therefore it is unconstitutional.  *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004).  This has led the PSC to purport to propose definitions of the term, ever-shifting, in motions and discovery requests.  But now instead of a definition, the PSC offers an 18-page list of companies whose inclusion is dictated not by a definition of the term, but by whether in the PSC's view they engaged in some sort of activity that could constitute doing business in the U.S.  *See* Substituted Mot. at 16-34.  A contempt order cannot be retroactively redefined on a *post hoc ergo propter hoc* basis.  *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010) (injunction may not be modified *nunc pro tunc* to impair the rights of the parties).  The PSC's recourse to the FOFCOL, dictionaries, as well as bankruptcy, securities, and business laws to clarify the indefinite term "affiliate" is further proof that the Contempt Order is unclear and fails to comply with Rule 65(d)(1) or due process.[12]  And while the PSC devotes much of its Substituted Motion advocating an elastic application of the term "affiliate," it misses the point.  Regardless of whether "affiliate" could be ***interpreted*** to include BNBM PLC or BNBM Group, the Contempt Order's injunction does not identify BNBM PLC or BNBM Group or make clear that they are included.[13]

---

[12] *See* Substituted Mot. at 17-34, 78-90, 102-04.

[13]  The authority offered by the PSC is not apposite.  *Hopkins v. Howard*, 930 So. 2d 999, 1005-06 (La. App. 4 Cir. 2006), does not require this Court to give "affiliate" an expansive definition. The *Hopkins* court construed the term "affiliate" broadly in the specific context of a statute it was analyzing.  *See* 930 So. 2d at 1006 (construing La. R.S. 22:1379(3)(f)).  *Braun v. Ins. Co. of N. Am.*, 488 F.2d 1066, 1067-68 (5th Cir. 1974), also is inapposite.  The Court determined the intent

The Contempt Order also does not specify what "business" Taishan or its "affiliates" are enjoined from "conducting."  Among other things, the PSC claims that sales through a Chinese internet website, continued participation in litigation, pre-existing investments by an American corporate entity, and payments of shareholder dividends somehow all constitute "doing business," and that deposits in American bank accounts violate the Contempt Order.  Substituted Mot. at 78-84, 87-91.  It would not be apparent to an ordinary person, or even an experienced lawyer who knows this case, that such activities could be read into the Contempt Order.  The PSC's expansive interpretation demonstrates that the prohibition against "conducting business" is not "specific in terms" and "described in reasonable detail" as required by Rule 65(d)(1)(B) & (C).  *See, e.g., Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 897-98 (5th Cir. 1978).  As Judge Haynes stated, the Contempt Order leaves open "consideration of the scope of the injunction as it relates to past conduct and identity of the entities covered (a puzzling inquiry in the context of contempt, but one that is not ripe for review at this point)."  Exhibit 5 at 2.

The injunctive portion of the Contempt Order also is impermissibly overbroad.  An injunction may only restrain conduct that is the subject of litigation.  *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011); *see also Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 504 (7th Cir. 2008) (injunction is overbroad if it results in "likelihood of unwarranted contempt proceedings for acts unlike or unrelated to those originally judged unlawful").  Under the PSC's formulation the Contempt Order applies much more broadly than reversing Taishan's failure to appear for a debtor examination.  The PSC contends that the order

---

of the parties to an insurance contract based on the evidence of the parties' intentions and dealings. 488 F.2d at 1068.  The Eastern District of Louisiana has likewise defined "affiliate" in terms of the control one entity exerts upon or over another.  *LMB, Inc. v. Lard Oil Co., Inc.*, No. 97-3817, 1998 WL 777825, at *3 (E.D. La. Oct. 22, 1998).  Common ownership, in contrast, is insufficient to establish affiliate status.  *See Simon v. Int'l Marine, LLC*, No. 07-0427, 2008 WL 4609989, at *8-9 (W.D. La. Oct. 10, 2008).

enjoined dozens of companies, none owned by Taishan and most with no ownership interest in Taishan, from engaging in conduct that has no cognizable relationship to the subject matter of the litigation or to Taishan's prior non-participation.  An injunction cannot apply this broadly. *See, e.g., Russell C. House Transfer & Stor. Co. v. U.S.*, 189 F.2d 349, 351 (5th Cir. 1951) ("no decree should be so broad as to place the entire conduct of one's business under the jeopardy of punishment for contempt for violating a general injunction").  A contempt sanction must be narrowly tailored to remedy the specific action giving rise to it.  *See Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467-69 (5th Cir. 1996) (reversing district court's sanction because it exceeded what was likely necessary to coerce compliance); *see also Shillitani*, 384 U.S. at 371 (a court is obliged to use "the least possible power adequate to the end proposed" in selecting contempt sanctions).

In addition, the Court had the responsibility to assess the facts and calculate actual damages based upon evidence presented at the hearing.  *Kuykendall*, 371 F.3d at 763 (citing *FDIC v. Hamilton*, 122 F.3d 854, 860 (10th Cir. 1997)).  That was not done with respect to the Contempt Order.  Moreover, a contempt order "must set forth clear reasons for its findings" on damages.  *Kuykendall*, 371 F.3d at 763.  The Contempt Order is deficient in this respect as well.

## V.  THE BNBM COMPANIES HAVE NOT VIOLATED THE CONTEMPT ORDER

Even if the Contempt Order could apply to BNBM Group or BNBM PLC, neither company conducted business in the United States during the relevant time period in violation of the Order.

### A.  BNBM PLC Did Not Conduct Business In The United States During the Contempt Period

The PSC does not argue that BNBM PLC did business in the United States during the contempt period, and there is no evidence that BNBM PLC did so.

23

### B.     BNBM Group Did Not Conduct Business In The United States During the Contempt Period

BNBM Group did not do business in the United States during the contempt period.  It sold no products into the U.S.  BNBM Group's only contact with the U.S. during the contempt period was to act as the clearing agent for unrelated Chinese companies that imported lumber to China from American suppliers Baillie Lumber Co. ("Baillie"), Hull Forest Products ("Hull"), Western Wood Lumber Company ("Western Wood"), and WH International, Inc. ("WHI"). BNBM Group's role in each of these transactions was highly circumscribed, as the PSC itself admits:

> In acting as an agent for various *Chinese customers*, BNBM Group would pre-charge a guarantee deposit to its customers, issue a letter of credit to the U.S. companies its customers dealt with,[14] and upon arrival of the goods in China, BNBM Group would facilitate customs clearance. Ultimately the *Chinese customers* of BNBM Group would pay the company for the goods in addition to an agency fee.

Substituted Mot. at 47-48 (emphasis added).

BNBM Group exported no lumber or logs out of the U.S. on its own behalf.  BNBM Group did not solicit the transactions, negotiate the contracts or directly communicate with the

---

[14]   BNBM Group did not issue letters of credit to the American timber companies.  The relevant letters of credit were issued by the paying banks, not to the companies.  *See* Depo. Tr. of Jin Wooh (WHI), May 21, 2015 Ex. Nos. 8-12, Bates WHI 000087-99 (letters of credit issued by Industrial and Commercial Bank of China, Beijing Rural Commercial Bank, or DBS Bank (China) Limited, and received by U.S. Bank) (relevant pages of, and exhibits to, deposition attached as Exhibit 9 and cited "Ex. 9, Woo Tr."); Depo. Tr. of Samuel Hull (Hull Forest Products), May 13, 2015 Ex. 2, Bates Hull0001-3, Hull0019-20 (letters of credit issued by OCBC Bank China and Beijing Rural Commercial Bank Co., and received by CoBank (Colorado)) (relevant pages of, and exhibits to, deposition attached as Exhibit 10 and cited "Ex. 10, Hull Tr."); Depo. Tr. of John Salamanca (Western Wood), May 21 Ex. Nos. 10, 16, 21, beginning at Bates WW 000387, -432, and -465, respectively (letters of credit issued by DBS Bank (China) Limited and received by U.S. Bank) (relevant pages of, and exhibits to, deposition attached as Exhibit 11 and cited "Ex. 11, Salamanca Tr."); Depo. Tr. of Phillip Fenwick (Baillie), May 28, 2015 43:9-10 (letters of credit not used) (relevant pages of, and exhibits to, deposition attached as Exhibit 12 and cited "Ex. 12, Fenwick Tr.").

American lumber companies.[15]  BNBM Group did not control when or how the American lumber companies drew down on the letters of credit.[16]  None of the American lumber companies company paid any money to BNBM Group during the contempt period.[17]  To the extent the timber companies interacted with BNBM Group, they did so through a third-party broker or other intermediary *in China*.[18]  BNBM Group did not come to the U.S. to meet with timber companies.[19]  The lumber company witnesses confirmed that BNBM Group was "not the ultimate customer," and therefore they had "no real business relationship" with it.[20]  The lumber transactions show BNBM Group doing business in China, not in the United States.

> **1.    The Lumber Company Witnesses and Documents Confirm That BNBM Group Did Not "Conduct Business" in the United States During the Contempt Period**

The deposition testimony of each of the timber companies' corporate representatives conclusively establishes that BNBM Group did not "conduct business" with these entities during the contempt period.

---

[15]   As explained in BNBM Group's memorandum supporting its October 30, 2015 motion to dismiss, an "export agent" does not negotiate contracts for sale.  Instead, in exchange for a fee paid by the seller, the export agent completes the customs declarations in its own name, executes the sale contracts on behalf of the seller, and collects payment on behalf of the seller.  (Rec. Doc. 19664-1 at 9-12); *see also* Ex. 9, Wooh Tr. 110:5-9; Ex. 10, Hull Tr. 104:16-105:14; Ex. 11, Salamanca Tr. 218:9-219:25; Ex. 12, Fenwick Tr. 11:7-12:16.

[16]   Ex. 9, Wooh Tr. 111:24-113:5; Ex. 10, Hull Tr. 109:6-110:13; Ex. 11; Salamanca Tr. 215:3-216:12, 218:9-219:25.

[17]   Ex. 9, Wooh Tr. 103:10-13; Ex. 10, Hull Tr. 25:24-26:1; Ex. 11, Salamanca Tr. 190:9-13; Ex. 12, Fenwick Tr. 40:13-18.

[18]   Ex. 9, Wooh Tr. 98:11-100:10, 109:4-23; Ex. 10, Hull Tr. 20:11-16; Ex. 11, Salamanca Tr. 208:5-16; Ex. 12, Fenwick Tr. 17:6-8.

[19]   *See* Ex. 9, Wooh Tr. 98:18-24; Ex. 10, Hull Tr. 22:4-8;  Ex. 11, Salamanca Tr. 209:7-16.

[20]   *See* Ex. 9, Wooh Tr. 109:24-110:4; Ex. 10, Hull Tr. 20:8-10.

### a.    Baillie

Baillie's corporate representative, Phillip Fenwick, could not have been more clear: Baillie does not do business, and never has done business, with BNBM Group.  Rather, four of its customers have used BNBM Group as a "clearing agent."  In that capacity, BNBM Group wires money on behalf of Baillie's Chinese customers to Baillie.  Fenwick testified:

> Q. Thank you. Okay. So Baillie Lumber had business dealings with BNBM, correct?
>
> A. ***I would say we didn't have business dealings with BNBM***.
>
> Q. Okay. With whom do you say you had business dealings?
>
> A. There are four customers that use BNBM as a clearing agent.
>
> Q. What is a clearing agent?
>
> A. Clearing agent is the one that actually sends the money and has an import license, as I understand it.
> . . . .
> I understand that's the reason customers use -- we have many different import agents. ***And I know it looks funny on documentation, because it even looks funny to me seeing, you know, BNBM, because I would not have recognized them as a customer or somebody that we actually do business with***, because our customer on the ground, that we actually -- that I visit, okay? That I visit, like two weeks ago, would tell us last minute, they'd say, okay, use this guy or this guy or this guy to clear our documents.
>
> Q. Okay. And who places -- who makes the payment for the products?
>
> A. So the customer on the ground, that is referenced on the contract, makes the payment, and then the customer that you're showing -- the person that you're showing there as the clearing agent, they wire us the money.[21]

Although BNBM Group, as the clearing agent, is identified on Baillie's contracts and invoices, Mr. Fenwick confirmed that BNBM Group is not the buyer/customer with respect to those transactions.  And Baillie did not undertake any negotiations with BNBM Group in

---

[21]  Ex. 12, Fenwick Tr. 11:7-12:18 (emphasis added).

connection with those transactions.[22]  Baillie has had no communications with anybody from BNBM Group.[23]  Baillie has not made any payments to BNBM Group.  Rather, Mr. Fenwick testified that he has "no idea" how BNBM Group gets paid.[24]

### b.    Hull

Just as Baillie's corporate representative was clear, the co-owner and representative of Hull Forest Products, Samuel Hull, was clear that BNBM Group "is not my final customer. *That's why I have no real business with Beijing New Building Materials* . . . ."[25]

> Q.  Okay. So what would have precipitated the preparation of this letter of credit?
>
> A.  We agreed to a purchase contract with a customer in China, which is, say, Exhibit 5.
> . . . .
> The customer and my representative, Zhuang Kang, produced this, basically the purchase order.
> . . . .
> So after that's produced, we agree to the terms, and then they go to someone to issue a letter of credit for that customer. In this case, it was Beijing New Building Materials.
>
> Q.  Okay. So I don't see an actual -- the ultimate customer listed here, the one that would have been receiving the product.
>
> A.  Correct.
>
> Q.  That's correct?
>
> A.  Yes.
>
> Q.  Okay. Would there be a separate agreement between that customer and Beijing New Building Materials, to your knowledge?
> . . . .

---

[22]  *Id*. 79:5-9; *see also id*. at 35:10-21.

[23]  *Id*.; *see also id*. at 17:6-8.

[24]  *Id*. 40:13-18.

[25]  Ex. 10, Hull Tr. 20:8-10 (emphasis added).

A.  I would assume so, but I don't know.[26]

Confirming that Hull and BNBM Group did no business with one another in the U.S., all of the contracts referenced by the PSC were entered into in China, and were prepared and negotiated by a Hull representative who lives and works in Shanghai full time.[27]  All contracts provide for a Hong Kong forum for dispute resolution.[28]  Hull's Chinese buyers selected BNBM Group to act as the clearing agent, and Hull's Chinese buyers decided if the goods conformed to the contracts.[29]

Further underscoring the PSC's overreach here, the PSC asserts that "[d]uring the Contempt Period, BNBM Group contracted with Hull FP for the purchase of $784,100.00 worth of lumber, in direct violation of this Court's Injunction."  Substituted Mot. at 46.  Yet it is indisputable that four of the five Hull contracts to which the PSC refers *were entered into before the contempt period*,[30] and only one small contract, for $23,200, was entered into shortly following the contempt order, in August, 2014.[31]  Although Hull, during the contempt period,

---

[26]  *Id*. 31:17-32:15.

[27]  *Id.* 15:3-17:8, 112:2-9, 113:5-11, 114:19-22, 118:15-18.

[28]  *Id.* 106:20-107:18 (referencing Ex. 5 to the Hull Tr.), 112:18-113:4 (referencing Ex. 3 to the Hull Tr.), 113:5-114:6 (referencing Ex. 4 to the Hull Tr.), 114:23-25 (referencing Ex. 6 to the Hull Tr.), 118:12-14 (referencing Ex. 7 to the Hull Tr.).

[29]  *Id*. 18:23-19:17, 24:12-14.

[30]  *See* Hull Tr. Ex. Nos. 3, 4, 5, and 6, consecutively Bates stamped BNBM(Group)0002827-2838.

[31]  *See id*. Ex. 7, beginning at Bates No. BNBM(Group)0002847.

drew down on letters of credit that had issued prior to the contempt period, BNBM Group had no control over, and could not prevent such draws.[32]

### c.  Western Wood

The PSC similarly overreaches with respect to Western Wood.  The PSC contends that "from July 14, 2014 through March, 2015, BNBM Group contracted with Western Wood for the purchase of over $1.8 million worth of lumber from the United States to be prepared and exported to China."  Substituted Mot. at 44.  But with one exception, each of the contracts at issue was entered into *before* July 17, 2014.[33]  The relevant irrevocable letters of credit were issued on behalf of BNBM Group before the contempt period.  During the contempt period there were only draws on the irrevocable letters of credit issued before the period (over which, by definition, BNBM Group had no control) and shipments of wood harvested pursuant to contracts made before July 17, 2014.[34]  Western Wood's 30(b)(6) witness had no knowledge of any direct communications between Western Wood and BNBM Group; all communications were with a broker or agent in Asia who dealt with Western Wood on behalf of many unrelated Chinese companies, in addition to BNBM Group.[35]  Western Wood never paid any money to BNBM

---

[32]  *Id*. 104:16-105:14.

[33]  Western Wood contract number CZY0603 was entered into between June 13 and June 20, 2014.  Ex. 11, Salamanca Tr. 214:1-214:3, 216:13-21, 217:16-218:8, and Salamanca Tr. Ex. Nos. 2 (BNBM(Group)0002862) and 16 (WW 000432-434).  Contract CZY0604 was entered into by June 20, 2014.  *Id*. 212:14-213:25, 228:3-10, 229:9-21, and Salamanca Tr. Ex. Nos. 3 (BNBM(Group)0002863), 10 (WW 000387-390), and 55 (WW 000230-232).  Contract CZY 0705 was entered into between July 7 and 14, 2014.  *Id*. 240:10-241:11, and Salamanca Tr. Ex. Nos. 19 (WW 000457) and 4 (BNBM(Group)0002864).

[34]  *Id*. 214:18-215:2, 215:14-216:12, 217:20-218:16, 219:2-25, 220:22-221:12, 224:12-225:14, 229:22-231:6, 231:14-234:5, 241:12-242:2, 243:9-245:10.

[35]  *Id*. 197:13-198:12, 199:9-200:21, 205:8-206:4, 209:7-16, 210:6-212:12, 226:3-24.

Group, nor does it know what compensation BNBM Group received through the transactions cited by the PSC.[36]

### d.      WHI

WHI's corporate representative, Jin Wooh, made clear that his company did not "conduct business" with BNBM Group in the United States, but rather that WHI's Chinese customers, at times, selected BNBM Group to issue letters of credit to facilitate those customers' timber purchases:

> Q.  Is it your understanding, in the timber sales we've been looking at this morning and that you've been asked about, that BNBM was not the ultimate customer for that timber?  Was that your understanding?
>
> A.  Yes.
>
> Q.  Can you describe for me what you understood BNBM's role to be in those transactions?
>
> A.  As far as I'm concerned, BNBM is a letter of credit company that issues the letter of credit for the ultimate buyer, the end user.
>
> Q.  And who chooses BNBM to be involved in any particular transaction?
>
> A.  I don't know.
> . . . .
> Q.  WH International doesn't choose BNBM, does it?
>
> A.  No, we do not.[37]

Draws on the irrevocable letters of credit were made in the U.S., but BNBM Group had no control over such draws once the letters of credit were issued.[38]  WHI issued invoices to BNBM Group solely for the purpose of drawing on the letters of credit.[39]

---

[36]  *Id*. 188:18-23, 190:9-13.

[37]  Ex. 9, Wooh Tr. 109:24-110:19.

[38]  *Id.* 91:6-17, 112:15-113:7.

WHI never communicated directly with anyone at BNBM Group.[40]  WHI provided no compensation to BNBM Group in connection with the transactions the PSC cites, nor does WHI know how BNBM Group was compensated.[41]  All contacts were with WHI's paid consultant or representative in China, who also brought numerous unrelated transactions to WHI.[42]

### C.    Doing Business "*in*" the U.S. Requires More Than Handling the Chinese Aspects of a Cross-Border Transaction

Simply importing material from the U.S. to another country does not constitute "conducting business" in the U.S.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418 (1984); *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 611 (5th Cir. 2008). Indeed, the Fifth Circuit has held that doing business "*in*" the U.S. requires more than merely participating in foreign aspects of a cross-border transaction:

> And while Telmex's [] contacts may be continuous and systematic contacts which constitute doing business *with* Texas, Telmex has virtually no contacts which constitute doing business *in* Texas.  Primarily, Telmex interconnects its Mexican lines with American lines, enabling long distance communication.  The money U.S. companies pay Telmex is for service on the Mexican leg of the call; the money the U.S. carriers receive is for the U.S. leg of the call.  As such, Mexican and U.S. telecommunications companies do business *with* each other in these situations, but neither is doing business *in* the other country for jurisdictional purposes.

*Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999).

BNBM Group cannot be considered to have "conducted business" in the United States.  It interacted exclusively with its Chinese customers in China through Chinese intermediaries; it had no direct communications with or travel to the United States; it received no remuneration from

---

[39]  *Id.* 119:5-10.

[40]  *Id*. 97:22-24, 98:11-99:9, 102:17-19, 108:19-109:7.

[41]  *Id*. 102:13-19, 103:10-13.

[42]  *Id*. 23:8-21, 98:11-24, 98:25-100:10, 109:4-23, 122:25-123:4.

the United States; it shipped or sold nothing to the United States; and not even the relevant American companies believe they had any sort of business relationship with BNBM Group. Given the limited scope of BNBM Group's role, the lumber transactions did not violate the Contempt Order.

###### D.        BNBM's Presence on Alibaba Did Not Violate the Contempt Order

BNBM did not violate the Contempt Order by maintaining a presence on Alibaba.com, a *Chinese* web-based retailer analogous to Amazon.com.  Alibaba allows customers anywhere in the world, including America, to place orders for Chinese goods and services; there is no evidence that BNBM used the site specifically to target U.S. customers, or that they have received any business from U.S. customers.  Therefore, neither defendant can be considered to have "conducted business" in the U.S. through Alibaba.  In *R&B Falcon Drilling (Int'l. & Deepwater), Inc. v. Noble Denton Grp.*, 91 F. App'x 317, 321 (5th Cir. 2004), the Fifth Circuit affirmed the District Court's determination that it could not exercise jurisdiction over a defendant that, although it maintained a website accessible in Texas, "does not directly market sales efforts to Texas-based companies, they only derive a small portion of their revenues from Texas-based companies, and visits by its employees to the U.S. were rare."

The U.S. Supreme Court and courts within the Fifth Circuit have made clear that in order for a nonresident defendant to  have "conducted business" in the U.S., there must be more than the mere possibility that forum residents may purchase products on the nonresident's website.  Instead, there must be evidence of an *actual* "relationship among the defendant, the forum, and the litigation."  *Walden v. Fiore,* --- U.S. ----, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775 (1984)).  In *Monistere v. Losauro,* No. 13–22, 2013 WL 6383886, at *6-8 (E.D. La. Dec. 4, 2013), although defendant's website was "highly interactive" and permitted online transactions, the Court held that "personal jurisdiction

cannot be established by the mere *possibility* that Louisiana residents may purchase products on Defendants' website, without further proof that Defendants have purposefully availed themselves of this forum."  Here, there is no evidence that the BNBM Entities have purposely availed themselves of any U.S. forum through the use of Alibaba.com.  The BNBM entities cannot have "conducted business" in the U.S. based on internet-based exchanges that are possible in theory but have yet to materialize.

## CONCLUSION

For all of the foregoing reasons, and the reasons set forth in the contemporaneous briefing by Taishan and the CNBM entities (which are incorporated by reference herein as if fully restated), BNBM PLC and BNBM Group respectfully request the Court to deny the Plaintiffs' Substituted Motion to Enforce the July 17, 2014 Contempt Order.

Dated:  February 13, 2017


Respectfully submitted,

**DENTONS US LLP**

By: */s/ Michael H. Barr*
Michael H. Barr
New York Bar No. 1744242
Justin N. Kattan
New York Bar No. 3983905
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6700
michael.barr@dentons.com
justin.kattan@dentons.com

- AND -

33

Kenneth J. Pfaehler
D.C. Bar No. 461718
Drew W. Marrocco
D.C. Bar No. 453205
1900 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 496-7500
Facsimile: (202) 496-7756
kenneth.pfaehler@dentons.com
drew.marrocco@dentons.com

- AND -

Richard L. Fenton
Illinois Bar No. 3121699
Leah R. Bruno
Illinois Bar No. 6269469
233 South Wacker Drive
Suite 5900
Chicago, IL  60606-6306
Telephone:  (312) 876-8000
Facsimile:  (312) 876-7934
richard.fenton@dentons.com
leah.bruno@dentons.com

- AND -

C. Michael Moore
Texas Bar No. 14323600
Matthew T. Nickel
Texas Bar No. 24056042
2000 McKinney Ave, Suite 1900
Dallas, TX  75201
Telephone:  (214) 259-0900
Facsimile:  (214) 259-0910
mike.moore@dentons.com
matt.nickel@dentons.com

**- AND -**

**PHELPS DUNBAR LLP**

Harry Rosenberg
Louisiana Bar No. 11465
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone:  (504) 566-1311
Facsimile:  (504) 568-9130
harry.rosenberg@phelps.com

***Attorneys for Beijing New Building
Material (Group) Co., Ltd. and Beijing
New Building Materials Public Limited
Company***

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum of Law of Beijing New Building Materials Public Limited Company and Beijing New Building Material (Group) Co., Ltd. in Opposition to the Plaintiff Steering Committee's Substituted Motion To Enforce the Court's July 17, 2014 Contempt Order and Injunction, by U.S. mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 13th day of February, 2017.

*/s/      Michael H. Barr*