## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO:<br><br>*Germano, et al. v. Taishan Gypsum Co., Ltd.,*<br>*f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,*<br>Case No. 2:09-cv-6687 (E.D.La.) | |

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITIONS TO
PLAINTIFFS' MOTION TO ENFORCE THE COURT'S
JULY 17, 2014 CONTEMPT ORDER AND INJUNCTION**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |

THIS DOCUMENT RELATES TO:
*Germano, et al. v. Taishan Gypsum Co., Ltd.,*
*f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,*
*Case No. 2:09-cv-6687 (E.D. La.)*

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITIONS TO**
**PLAINTIFFS' MOTION TO ENFORCE THE COURT'S**
**JULY 17, 2014 CONTEMPT ORDER AND INJUNCTION**

Russ M. Herman, Esquire (LA Bar No. 6819) (On the Brief)
Leonard A. Davis, Esquire (LA Bar No. 14190) (On the Brief)
Stephen J. Herman, Esquire (LA Bar No. 23129) (On the Brief)
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

Arnold Levin (On the Brief)
Fred S. Longer (On the Brief)
Sandra L. Duggan (On the Brief)
Matthew C. Gaughan (On the Brief)
Keith J. Verrier (On the Brief)
Levin Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

## TABLE OF CONTENTS

I.      **INTRODUCTION**...................................................................................................1

II.    **FACTUAL BACKGROUND**......................................................................................3

        A.    **Taishan's Conduct and Refusal to Appear at the July 17, 2014 Judgment Debtor Exam**............................................................................................4

        B.    **Defendants' Role in and Control over Taishan's Refusal to Appear**...............7

        C.    **Importance of Court's Contempt Order – Causing Taishan to Abide by Orders**.....................................................................................................8

        D.    **Defendants' Failure to Notify Affiliates/Subsidiaries of the Contempt Order**.....................................................................................................9

III.   **LEGAL STANDARD** .............................................................................................11

        A.    **This Court Has the Power to Enforce Compliance Through Contempt Orders** ...................................................................................................12

        B.    **The Court Has Wide Discretion to Hold Both Parties and Non-Parties in Contempt of its Orders**................................................................................14

        C.    **The Court Has Personal Jurisdiction Over Non-Resident Non-Parties in Both the Issuance and Enforcement of Civil Contempt Penalties**............................17

IV.   **LAW AND ARGUMENT**........................................................................................20

        A.    **Jurisdiction Is a Non-Issue, as This Court Had Jurisdiction Over All Parties, and Regardless, the Court Had Authority to Enjoin All Parties**....................21

            1.    **This Court had and continues to have jurisdiction over all Taishan Defendants** ...................................................................................21

            2.    **As a discovery sanction, the Contempt Order's injunction prong properly enjoined Taishan's affiliates and subsidiaries, regardless of jurisdiction**..............................................................................22

B.    **The Court's Civil Contempt Finding Does Not Require Criminal Due Process** ......................................................................................**24**

    1.    **The Contempt Order was also civil in nature** ..................................**24**

    2.    **Civil contempt orders do not afford criminal "Due Process"** ......................

    3.    **Defendants have been afforded the requisite protections for civil contempt** .............................................................................................**30**

    4.    **The PSC's investigation, as ordered by the Court, was warranted and proper** ........................................................................................**31**

C.    **The Contempt Order Is Sufficiently Defined** ......................................**33**

    1.    **Standard for defining contempt orders** .......................................**34**

    2.    **Burden of contemnor to make certain they abide by contempt order** **37**

    3.    **The term "affiliate" is not vague** .................................................**39**

    4.    **The phrase "conducting any business in the United States" is not vague, nor does it require physical presence in the U.S.** ....................**42**

D.    **Taishan, the BNBM Entities, the CNBM Entities and other Taishan affiliates violated the Contempt Order** .........................................................**45**

    1.    **Alter Ego / Single business enterprise** ........................................**46**

    2.    **CNBM Entities - specific violations of the injunction** ..........................**50**

    3.    **BNBM - specific violations of the injunction** .............................**56**

    4.    **BNBM Group - specific violations of the injunction** ...........................**57**

    5.    **TG - specific violations of the injunction** ...................................**60**

IV.    **CONCLUSION** .....................................................................................**60**

iii

## TABLE OF AUTHORITIES

Cases

*Access Telecom, Inc. v. MCI Telecommunications Corp.*,
  197 F.3d 694 (5th Cir. 1999) ................................................................. 36
*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
  228 F.3d 574 (5th Cir. 2000) ................................................... 21, 30, 31
*Baker v. Limber*,
  647 F.2d 912 (9th Cir. 1981) ................................................................. 19
*Bloom v. Illinois*,
  391 U.S. 194, 88 S. Ct. 1477, 20 L. Ed.2d 522 (1968) ......................... 24
*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ............................................................................... 37
*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ................................................................................. 13
*Chilcutt v. United States*,
  4 F.3d 1313 (5th Cir. 1993) ................................................................... 12
*Chinese Drywall*,
  894 F. Supp. ........................................................................................... 52
*Chinese-Manufactured Drywall Prod. Liab. Litig.*,
  894 F. Supp. 819 (E.D. La. 2012) ................................................... 49, 51
*City Cab Co. of Orlando, Inc. v. All City Yellow Cab, Inc.*,
  581 F. Supp. 2d 1197 (M.D. Fla. 2008) ................................................. 15
*ClearOne Commc'n, Inc. v. Bowers*,
  651 F.3d 1200 (10th Cir. 2011) ............................................................. 15
*Cook v. Ochsner Foundation Hosp.*,
  559 F.2d 270 (5th Cir. 1977) ................................................................. 21
*Cooke v. United States*,
  267 U.S. 517, 45 S. Ct. 390, 69 L. Ed. 767 (1925) .............................. 24
*Ex parte Robinson*,
  86 U.S. 505 (1873) ................................................................................. 12
*F.T.C. v. Kuykendall*,
  371 F.3d 745 (10th Cir. 2004) ............................................................... 19
*Gompers v. Bucks Stove & Range Co.*,
  221 U.S. 418, 31 S. Ct. 492, 55 L. Ed. 797 (1911) .............................. 24
*Goya Foods, Inc. v. Wallack Mgmt. Co.*,
  290 F.3d 63 (1st Cir. 2002) ............................................................. 13, 14
*Green v. Champion Ins. Co.*,
  577 So. 2d 249 (La. Ct. App.) ............................................................... 39

*Harris v. Fairwether,*
   2011 WL 4538436 (S.D.N.Y. Sept. 29, 2011) ........................................................ 35

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
   466 U.S. 408 (1984) ....................................................................................................... 36

*Hicks v. Feiock,*
   485 U.S. 624, 108 S. Ct. 1423, 99 L. Ed.2d 721 (1988) ........................................ 24

*Hopkins v. Howard,*
   930 So. 2d 999 (La. Ct. App.) ..................................................................................... 33

*In re Bradley,*
   318 U.S. 50, 63 S. Ct. 470, 87 L. Ed. 608 (1943) ................................................... 24

*In re Bradley,*
   588 F.3d 254 (5th Cir. 2009) ....................................................................................... 12

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
   753 F.3d 521 (5th Cir. 2014) ....................................................................................... 39

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.,*
   706 F. Supp. 2d 655 (E.D. La. 2010) ..................................................................... 4, 7

*In re Grand Jury Proceedings,*
   875 F.2d 927 (1st Cir. 1989) ....................................................................................... 27

*In re Rodriguez,*
   2007 WL 593582 (W.D. Tex. Feb. 20, 2007) ......................................................... 23

*In re Rumaker,*
   646 F.2d 870 (5th Cir. 1980) ....................................................................................... 21

*In re Sequoia Auto Brokers LTD., Inc.,*
   827 F.2d 1281 (9th Cir. 1987) ..................................................................................... 23

*In re Stewart,*
   571 F.2d 958 (5th Cir. 1978) ....................................................................................... 26

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y,*
   774 F.3d 935 (9th Cir. 2014) ................................................................................ 14, 15

*International Union, United Mine Workers of America v. Bagwell,*
   512 U.S. 821 (1994) ......................................................................................... 22, 24, 25

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n,*
   389 U.S. 64 (1967) ......................................................................................... 14, 29, 30

*Irwin v. Mascott,*
   370 F.3d 924 (9th Cir. 2004) ....................................................................................... 14

*Johnston v. Multidata Sys. Int'l Corp.,*
   523 F.3d 602 (5th Cir. 2008) ....................................................................................... 36

*Lelsz v. Kavanagh,*
   673 F. Supp. 828 (N.D. Tex. 1987) ........................................................................... 31

*Mandel v. Associated Collection Serv. Inc.,*
   2015 WL 1508842 (D. Ariz. Mar. 31, 2015) ......................................................... 33

*Martin v. Trinity Indus., Inc.*,
  959 F.2d 45 (5th Cir.1992) ................................................................ 25

*Martinez v. City of Avond*ale,
  2013 WL 5705291 (D. Ariz. Oct. 18, 2013) ...................................... 23

*Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.*,
  195 F.3d 765 (5th Cir. 1999)............................................................. 30

*McComb v. Jacksonville Paper Co.*,
  336 U.S. 187 (1949) .......................................................................... 31

*Meyer v. Brown & Root Const. Co.*,
  661 F.2d 369 (5th Cir. 1981).............................................................. 29

*Michaelson v. United States*,
  266 U.S. 42 (1924) ............................................................................ 12

*Molex, Inc. v. Nolen*,
  759 F.2d 474 (5th Cir. 1985).......................................................... 30, 33

*Monistere v. Losauro*,
  2013 WL 6383886 (E.D. La. Dec. 4, 2013) ...................................... 37

*Naranjo v. Thompson*,
  809 F.3d 793 (5th Cir. 2015)............................................................. 12

*Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
  2 F.3d 1397 (5th Cir, 1993)............................................................... 11

*Nat'l Labor Relations Bd. v. Lawley*,
  182 F.2d 798 (5th Cir. 1950).............................................................. 31

*NLRB v. Laborers' Int'l Union of N. Am., AFL-CIO*,
  882 F.2d 949 (5th Cir.1989).............................................................. 15

*Norman Bridge Drug Co. v. Banner*,
  529 F.2d 822 (5th Cir. 1976).............................................................. 22

*Nye v. United States*,
  313 U.S. 33 (1941) ............................................................................ 22

*Penfield Co. of Calif. v. SEC*,
  330 U.S. 585 (1947) .......................................................................... 22

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*,
  646 F.2d 800 (2d Cir. 1981)............................................................... 32

*Peterson v. Highland Music, Inc.*,
  140 F.3d 1313 (9th Cir. 1998)............................................................ 14

*Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*,
  177 F.3d 380 (5th Cir.1999)............................................................... 25

*Polo Fashions, Inc. v. Stock Buyers Intern., Inc.*,
  760 F.2d 698 (6th Cir. 1985).............................................................. 27

*Prof'l Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cty. Cmty. Coll. Dist.*,
  730 F.2d 258 (5th Cir.)...................................................................... 30

vi

*Quinter v. Volkswagen of Am.*,
  676 F.2d 969 (3d Cir. 1982) ........................................................................... 14

*R & B Falcon Drilling (Int'l & Deepwater), Inc. v. Noble Denton Grp.*,
  91 Fed. Appx. 317 (5th Cir. 2004) ................................................................... 37

*Reebok Intern. Ltd. v. McLaughlin*,
  827 F. Supp. 622 (S.D. Cal. 1993) .................................................................. 19

*Rousseau v. 3 Eagles Aviation, Inc.*,
  130 Fed. Appx. 687 (5th Cir. 2005) ................................................................. 12

*S.E.C. v. Homa*,
  514 F.3d 661 (7th Cir. 2008) ........................................................................... 14

*S.P.M. Flow Control, Inc. v. Special Piping Materials Limited*,
  2013 WL 12140497 (S.D. Tex. Jun. 20, 2013) ................................................ 26

*Seven Arts Pictures, Inc. v. Jonesfilm*,
  512 Fed. Appx. 419 (5th Cir. 2013) ................................................................. 14

*Shillitani v. United States*,
  384 U.S. 364 (1966) ................................................................................... 12, 25

*Stiller v. Hardman*,
  324 F.2d 626 (2d Cir. 1963) ............................................................................ 15

*Taddeo v. American Invsco Corp.*,
  2015 WL 751072 (D. Nev. Feb. 20, 2015) ...................................................... 19

*Taylor v. Hayes*,
  418 U.S. 488, 94 S. Ct. 2697, 41 L. Ed.2d 897 (1974) .............................. 24, 25

*Tegal Corp. v. Tokyo Electron Co.*,
  248 F.3d 1376 (Fed. Cir. 2001) ....................................................................... 19

*TMX Funding, Inc. v. Impero Technologies, Inc.*,
  2010 WL 2077011 (N.D. Cal. May 21, 2010) .................................................. 36

*United States v. Brown*,
  561 F.3d 420 (5th Cir. 2009) ........................................................................... 30

*United States v. Greyhound Corp.*,
  508 F.2d 529 (7th Cir. 1974) ........................................................................... 30

*United States v. Hall*,
  472 F.2d 261 (5th Cir. 1972) ........................................................................... 20

*United States v. Laurins*,
  857 F.2d 529 (9th Cir. 1988) ........................................................................... 19

*United States v. United Mine Workers of Am.*,
  330 U.S. 258 (1947) ........................................................................................ 21

*United States v. Voss*,
  82 F.3d 1521 (10th Cir. 1996) ......................................................................... 19

*Waffenschmidt v. MacKay*,
  763 F.2d 711 (5th Cir. 1985) ..................................................................... passim

*Walden v. Fiore*,
  134 S. Ct. 1115 (2014) ................................................................................................ 37
*Whitcraft v. Brown*,
  570 F.3d 268 (5th Cir. 2009) .................................................................................... 13
*Wirtz v. Ocala Gas Co.*,
  336 F.2d 236 (5th Cir. 1964) .................................................................................... 23
*Wiwa v. Royal Dutch Petroleum Co.*,
  226 F.3d 88 (2d Cir. 2000) ........................................................................................ 37
*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
  481 U.S. 787 (1987) .................................................................................................. 26

Rules

FED. R. CIV. P. 37(b)(2)(A)(vii) ............................................................................... 13, 20
FED. R. CIV. P. 37(d)(1)(A)(i) ........................................................................................ 13
FED. R. CIV. P. 65 ............................................................................................. 22, 23, 24
FED. R. CIV. P. 65(d)(2) ................................................................................................. 24
FRE 1006 ........................................................................................................................ 58
Rule 37 of the Federal Rules of Civil Procedure ................................................... 13, 24
Rule 71 of the Federal Rules of Civil Procedure ............................................. 14, 15, 17

viii

# INDEX OF EXHIBITS

Fifth Circuit Order dismissing appeals (Rec. Doc. No. 19779) .................................................  Exhibit 195

1/23/2011 & 11/30/3011 letters from J. Cyr – prior counsel for Taishan (collectively).............  Exhibit 196

Deposition of Peng Shiliang dated 1/11/2012............................................................................. Exhibit 197

8/31/2015 Sworn declaration of Jia Tongchun .......................................................................... Exhibit 198

9/16/2015 Sworn declaration of Jia Tongchun for Clarification and Supplementation............... Exhibit 199

BNBM Web Page, http://english.bnbm.com.cn/about/CompanyProfile.asp .............................. Exhibit 200

"Notice of the State Administration of Taxation on Issuing the Measures for the
   Implementation of Special Tax Adjustments (for Trial Implementation)"
   (No. 2 [2009] of the State Administration of Taxation) .................................................. Exhibit 201

Deposition of CNBM Group (Zhou Guoping) dated 6/16-17/2015 ........................................... Exhibit 202

Deposition of BNBM PLC (Chen Yu) dated 7/8-11/2015........................................................... Exhibit 203

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITIONS TO
PLAINTIFFS' MOTION TO ENFORCE THE COURT'S
<u>JULY 17, 2014 CONTEMPT ORDER AND INJUNCTION</u>**

Taishan,[1] the BNBM Entities,[2] and the CNBM Entities[3] (collectively referred to as the "Taishan Defendants") have filed oppositions to the Plaintiffs' Motion to Enforce the Court's July 17, 2014 Contempt Order and Injunction ("Contempt Order").[4]  Plaintiffs hereby respond as set forth below.

**I.      <u>INTRODUCTION</u>**

The Taishan Defendants' oppositions to enforcement of the injunction prong of the Court's Contempt Order, which continue to disavow this Court's jurisdiction, are largely based on the incorrect premise that the Contempt Order is criminal rather than civil in nature.  Defendants ignore the fact that this Court held Taishan in contempt of court, "both criminally and civilly."  Moreover, Defendants overlook the fact that the injunction component of the Contempt Order was civil in nature – to "coerce compliance" – which was necessary because "if [the Court] merely held

---

[1] Taishan includes:  Taishan Gypsum Co., Ltd. ("TG") and its wholly-owned subsidiary and alter ego Taian Taishan Plasterboard Co., Ltd. ("TTP").

[2] The BNBM Entities include:  Beijing New Building Materials Public Limited Company ("BNBM PLC" or "BNBM") and Beijing New Building Material (Group) Co., Ltd. ("BNBM Group").

[3] The CNBM Entities include: China National Building Materials Co. Ltd. ("CNBM"), China National Building Materials & Equipment Import & Export Corp. ("CNBM Import & Export"), CNBMIT Co., Ltd. ("CNBMIT"), CNBM Forest Products (Canada) Co., Ltd. ("CNBM Forest (Canada)"), CNBM USA Corp. ("CNBM USA"), United Suntech Craft, Inc. ("United Suntech").  On March 10, 2016, the Court dismissed China National Building Material Group Corporation ("CNBM Group") for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act (Rec. Doc. No. 20150).

[4] *See* July 17, 2014 Contempt Order (Rec. Doc. No. 17869).

Taishan in contempt and required Taishan to pay damages, the Contempt Order alone would not stop Taishan from continuing to disregard the orders of the Court," since Taishan had fired its counsel and fled the jurisdiction.[5]

Aside from the jurisdictional and "civil versus criminal contempt" arguments, Defendants continue to improperly assert that the Contempt Order is vague, in spite of this Court's prior ruling that the Contempt Order is <u>not</u> vague.  In denying Defendants' July, 2015 motions to clarify and/or vacate the Contempt Order – filed a year *after* the Contempt Order issued – this Court specifically held that "[t]he Contempt Order is clear; it clearly applies to Taishan's subsidiaries and affiliates ... [t]hese terms are not vague; rather, they are legal terms, requiring a legal determination."[6] Thereafter, Defendants appealed this Court's denial of their motions to clarify, and on November 17, 2015, the Fifth Circuit dismissed the appeals for lack of jurisdiction.[7]  Accordingly, the Court need not consider Defendants' attempts to re-litigate this previously addressed vagueness argument.

Defendants' oppositions either ignore or attempt to mischaracterize the extent and nature of their varied and numerous violations of the Court's injunction barring them from doing <u>any</u> business in the United States "until or unless [Taishan] participate[d] in this judicial process."  The period of contempt ("Contempt Period") began on July 17, 2014 (when Taishan refused to appear for its Judgment Debtor Examination ("JDE")) and ended in March, 2015 (when Taishan re-

---

[5] *See* Contempt Order at p. 3.  *See also* Rec. Doc. No. 19392.

[6] 8/17/2015 Order denying Defendants' motions to clarify and/or vacate Contempt Order (Rec. Doc. No. 19392) at p. 4 (emphasis added).

[7] *See* Fifth Circuit Order dismissing appeals (Rec. Doc. No. 19779) [CONTEMPT Ex. 195 attached hereto].

entered the litigation and paid the *Germano* judgment, plus interest, costs, attorneys' fees, and penalties).   As an initial matter, Defendants do not properly address the fact that, at all pertinent times, Taishan and the BNBM/CNBM Entities operated as a single-business enterprise and were the alter egos of one another.   Further, the BNBM Entities misrepresent as meaningless their extensive Contempt Period U.S. business dealings (which include entering into and fulfilling contracts with various U.S. companies for U.S. products and using our judicial system to seek redress for themselves on breached contracts).   Finally, the CNBM Entities utterly fail to substantively deal with the vast majority of continuous and numerous Contempt Order violations by Taishan/CNBM subsidiaries and/or affiliates such as CNBM Forest (Canada), CNBM Forest Products Co., Ltd. ("CNBM Forest"), CNBM Import & Export, CNBM Investment, Jushi USA Fiberglass Co., Inc. ("Jushi USA"), and United Suntech.

## II.   <u>FACTUAL BACKGROUND</u>

Defendants' oppositions attempt to erase and/or gloss over the most critical facts (necessary for a proper contextual analysis) relative to the Contempt Order.   Defendants fail to properly address issues such as: a) Taishan's conduct and refusal to appear at the July 17, 2014 JDE; b) Defendants' role in and control over Taishan's refusal to appear; c) the importance and need for the Court's Contempt Order; and d) Defendants' failure to provide notice of the Contempt Order to affiliates and subsidiaries – all but guaranteeing a myriad of Contempt Order violations. Accordingly, Plaintiffs will "fill in the blanks" from Defendants' oppositions, by setting forth some of the more relevant facts surrounding these matters.

3

A.   **Taishan's Conduct and Refusal to Appear at the July 17, 2014 Judgment Debtor Exam**

From the very outset and continuing through the end of the most recent round of discovery, Taishan's conduct in this litigation has been obstructive, contemptuous and deceitful. Taishan has used our judicial system to avoid paying money judgments to homeowners as compensation for Taishan's defective products sold in the U.S., and then walking away from the Court – "tak[ing] their ball and go[ing] home, so to speak" – "because they didn't get their way."[8] Moreover, Taishan has consistently employed a litigation strategy which has included: purposefully ignoring this suit and the orders (and even the authority) of this Court, feigning a lack of understanding of the U.S. legal process, engaging and/or complying in the litigation only as a matter of last resort, and deceiving the parties and the Court throughout the litigation. By way of example, separate from its conduct relative to the Contempt Order, just some of Taishan's dilatory and obstructive actions have included:

-   TG purposefully ignored this suit and sat on the sidelines for over a year, until a default judgment was entered against it.[9]

-   On June 10, 2010, the last day to timely do so, TG filed a Notice of Appeal of the Default Judgment in *Germano*, arguing – for the first time – that this Court lacked personal jurisdiction over it.[10]

---

[8] Transcript of MDL Status Conference, 1/22/2015 (Rec. Doc. No. 18276) [CONTEMPT Ex. 1] at 20.

[9] *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 706 F. Supp. 2d 655, 659-60 (E.D. La. 2010). *See also* Proof of Service on TG in *Germano* (Rec. Doc. No. 1-7, Case No. 09-6687), 5/11/2010 Default Judgment (Rec. Doc. No. 3013).

[10] Rec. Doc. No. 3670. *See also* Contempt Order at p. 2.

4

- Once in the litigation, TG and TTP consistently responded to discovery in an evasive and incomplete manner.[11]

- Taishan caused an entire round of Rule 30(b)(6) depositions (of TG and TTP) to degenerate into "chaos and old night" – rendering the discovery "ineffective" – due at least in part to lack of knowledge and/or responsiveness of the deponents.[12]

- Taishan threatened to withdraw from the litigation in November of 2011, and had to deliberate on whether to produce witnesses for Rule 30(b)(6) depositions – eventually producing some witnesses (under threat of Court sanctions) and eventually "decid[ing] to continue to participate in the litigation."[13]

- Taishan's obstructive conduct resulted in the Court having to personally attend a second round of Rule 30(b)(6) depositions (of TG and TTP) in Hong Kong.[14]

- Taishan's representatives were evasive and/or deceitful in depositions, to the point where the Court found it necessary to instruct and warn one of the Taishan deponents.[15]

- Taishan committed multiple discovery abuses relative to the whereabouts of Peng Wenlong and his documents/computers, necessitating an evidentiary hearing, and

---

[11] *See*, *e.g.*, 1/12/2011 PSC's motion to compel Taishan (Rec. Doc. No. 6964), 2/9/2011 PSC's motion to compel Taishan (Rec. Doc. No. 7364), 5/3/2011 PSC's motion to compel Taishan (Rec. Doc. No. 8685), various other parties' motions to compel Taishan (Rec. Doc. Nos. 8695, 8755, 8758, 8768, 8792, 8805). *See also* 9/9/2011 Order and Reasons regarding motions to compel (Rec. Doc. No. 10269).

[12] *See* 9/9/2011 Order and Reasons (Rec. Doc. No. 10269) at p. 5. *See also* 5/26/2011 Order (Rec. Doc. No. 9107).

[13] *See* 11/23/2011 & 11/30/3011 letters from J. Cyr – prior counsel for Taishan [collectively, COMTEMPT Ex. 196 attached hereto].

[14] 1/8/2016 FOFCOL from the 11/17/2015 hearing (Rec. Doc. No. 19959) at p. 4, ¶¶ 8-9.

[15] The Court stated to the deponent: "I am the Judge who will decide the issues in this case. One thing I do when I make that decision, I listen to the testimony and I evaluate the credibility of the truthfulness of the witnesses. I listen closely to what people say, and it's important for you to listen to the question and to answer the question, if you can. . . . Because if I get the impression that you are not answering the question intentionally, I will discount your testimony and not believe it." *See* Deposition of Peng Shiliang dated 1/11/2012 at 44:8-45:8 [CONTEMPT Ex. 197 attached hereto].

resulting in various findings, including that Taishan engaged in "discovery abuses warranting sanctions."[16]

- Taishan's Chairman, Jia Tongchun, filed a false and/or misleading sworn declaration, to the point where it had to be "clarified" by a subsequent sworn declaration.[17]

Taishan's conduct leading up to and surrounding the Contempt Order was consistent with its continuous and repeated pattern of being obstructive, contemptuous and deceitful.  In June of 2014, just after the U.S. Fifth Circuit Court of Appeals affirmed the Court's exercise of personal jurisdiction over TG and TTP, and just after the *Germano* judgment in favor of seven bellwether Plaintiffs became final, TG and TTP fired their counsel "immediately" and internally discussed "how to withdraw from the litigation...."[18]  Moreover, true to their modus operandi in this litigation, when this Court ordered Taishan to appear in open court for a JDE on July 17, 2014,[19] Taishan *refused* to appear.[20]

---

[16] 1/8/2016 FOFCOL from the 11/17/2015 hearing (Rec. Doc. No. 19959) at pp. 15-18, ¶¶46, 54, 60 & 66.

[17] *See* 8/31/2015 Sworn declaration of Jia Tongchun, stating in pertinent part at ¶ 3 that: "Mr. Peng voluntarily left the employment of TG in March 2014, to pursue another career at a company unrelated to TG, TTP, and to my knowledge … any BNBM or CNBM entity.  Mr. Peng has never told me the name of the company where he currently works …" [CONTEMPT Ex. 198 attached hereto].  *See also* 9/16/2015 Sworn declaration of Jia Tongchun for Clarification and Supplementation [of August 31, 2015 declaration], stating in pertinent part that: "I know that Peng Wenlong ('Mr. Peng') is currently employed at Shenyang Taishi Rock Wool Co., Ltd. ('Shenyang') [which is owned by a company he has ownership in and which is a shareholder of TG] …" and Jia goes on to state that his prior 8/31/15 declaration gave a "misimpression" [CONTEMPT Ex. 199 attached hereto].

[18] Rec. Doc. No. 18196 at 7 (citing Privilege Log Item 143).

[19] Rec. Doc. No. 17774.

[20] *See* Contempt Order at p. 2 (emphasis in original); *see also* Rec. Doc. No. 17846.

Case 2:09-md-02047-EEF-MBN   Document 20688-1   Filed 02/23/17   Page 17 of 67

Taishan's refusal to appear effectively declared its intention to no longer participate in these proceedings. This prompted the Court to enter the Contempt Order and Injunction "to protect the sanctity of its decrees and the legal process."[21] Thereafter, Taishan ignored this Court, ignored this Court's orders, and only "returned" to this litigation in February of 2015.[22]

**B.** **Defendants' Role in and Control over Taishan's Refusal to Appear**

Throughout this litigation, the BNBM Entities, the CNBM Entities, and Taishan have shared the same law firms.[23] Moreover, from the outset, the BNBM/CNBM Entities controlled Taishan's participation (or lack thereof) in this case, as well as how they handled and/or responded to case-related matters.[24] In fact, in July, 2014 (after the U.S. Fifth Circuit Court of Appeals affirmed this Court's findings of personal jurisdiction as to TG and TTP), CNBM Group handed down orders to all of its subsidiaries to ensure their assets and funds were out of this Court's reach.[25] Thus, immediately prior to the Contempt Order, CNBM Group (knowing full well that it would not allow Taishan to pay the *Germano* judgment), was advising its subsidiaries not to put money in any New York banks and not to use company email accounts but, rather, only their personal emails when communicating overseas for business purposes.[26]

---

[21] *Id.* at p. 3.

[22] Rec. Doc. No. 19959, at p. 5, ¶13.

[23] *See* PSC's Omnibus Response (Rec. Doc. No. 19995), at pp. 107-110.

[24] *Id.* at pp. 99-107.

[25] *See* 7/11/2014 CNBM Group Resolution No. 17 of the Third Session of the Board of Directors of CNBM Group ("CNBM Group Resolution No. 17") [CONTEMPT Ex. 5].

[26] *Id.*

Not surprisingly, the BNBM and CNBM Entities controlled Taishan's refusal to appear at the July 17, 2014 JDE.[27]  Indeed, the decision for Taishan "not to continue to participate in any of the gypsum board litigation brought against Taishan Gypsum in the US courts" was made and approved (*via* 11-0 vote) by CNBM Group's board of directors in a July 11, 2014 meeting.[28]  As a result, Taishan was a "no show" at the July 17, 2014 JDE before this Honorable Court.

### C.   Importance of Court's Contempt Order – Causing Taishan to Abide by Orders

The Contempt Order and Injunction was necessary to compel Taishan's compliance with an existing order from this Court – the June 20, 2014 order for Taishan to appear for the July 17, 2014 JDE[29] – relative to the final *Germano* judgment amounting to $2,609,099.99 plus interest and costs.[30]  This was particularly necessary considering Taishan's history of obstruction and/or unwillingness to participate in the litigation.[31]  Accordingly, this Court's Contempt Order mandated, in pertinent part, as follows:

> **As a consequence of Taishan's refusal to appear at this Judgment Debtor Examination, in direct, willful violation of this Court's June 20, 2014 order, the Court holds Taishan in contempt of court, both criminally and civilly**. This refusal to appear is a direct contemptuous act occurring in open court after actual notice of the proceedings. Such disobedience of the Court's order harms both the many other parties in this case and the decorum of the Court… In this massive suit, **the harm from Taishan's**

---

[27] *See* PSC Omnibus Response (Rec. Doc. No. 19995), at pp. 111-115.

[28] *See* Statement on Implementation of the Requirements from the Group Corporation's Meeting of the International Business Risk Prevention [CONTEMPT Ex. 2].

[29] Rec. Doc. No. 17774.

[30] Rec. Doc. Nos. 3013, 17825, 18034.

[31] *See* Section II.A., *supra*.

> **noncompliance is high and requires strong sanctions <u>to coerce compliance</u> and restore integrity to these proceedings. . . .**[32]

In addition to the monetary fines imposed ($15,000 in attorneys' fees and $40,000 as a contempt penalty), the Court enjoined Taishan and any of its affiliates or subsidiaries from conducting any business in the U.S. "until or unless it participate[d] in this judicial process."[33]  If Taishan violated the injunction, it would be required to pay a penalty of 25% of the profits earned by the company "or its affiliates who violate[d] the order, for the year of the violation."[34]

In all reality, if not for this Court's entry of the Contempt Order <u>and Injunction</u>, Taishan would not have re-entered these proceedings, Taishan would not have paid the *Germano* judgment, and Taishan would not presently be participating in this litigation.[35]  Indeed, "if [the Court] merely held Taishan in contempt and required Taishan to pay damages, the Contempt Order alone would not stop Taishan from continuing to disregard the orders of the Court."[36]  It is thus imperative that the resulting sanctions for what the Court found to be Taishan's "direct contemptuous act" in this MDL, as well as an "affront to the Court's dignity,"[37] and the penalties for violations of the Court's injunction be made fully and effectively enforceable by further Order of this Court.

### D.    Defendants' Failure to Notify Affiliates/Subsidiaries of the Contempt Order

---

[32] Contempt Order at pp. 2-3 (emphasis added).

[33] *Id.* at p. 3.

[34] *Id.*

[35] *See* Contempt Order at p. 3.  *See also* Rec. Doc. No. 19392.  Additionally, but for the Contempt Order and Injunction, Taishan's parent companies (the BNBM and CNBM Entities) would never have entered the litigation in the first place, leaving thousands of Taishan homeowners without redress.

[36] Contempt Order at p. 3.  *See also* Rec. Doc. No. 19392.

[37] Rec. Doc. No. 17869 at pp. 2-3.

Defendants defied the Contempt Order and Injunction issued by this Court in a calculated manner. Although Taishan and the CNBM and BNBM Entities were well aware of the Contempt Order and Injunction, they took no affirmative steps to ensure compliance with the Court's directives. In fact, the Defendants proceeded to do business as if the Contempt Order had no effect.

Except for Taishan's Chairman Jia Tongchun instructing his deputy general manager to "pass down the information," Taishan made no effort to ensure compliance with this Court's Order.[38] While Taishan might contend that Chairman Jia's instructions to notify the company's subsidiaries of the Injunction sufficed, such instruction was meaningless and ineffective as it took place more than seven months *after* this Court issued the Contempt Order.[39]

As for the BNBM and CNBM Entities, their respective leaders all failed to instruct their subsidiaries and affiliates about the injunction prong of the Contempt Order, and failed to ensure that their subsidiaries and affiliates abided by same. Cao Jianglin (the Chairman of both BNBM and BNBM Group's Supervisory Committees), Wang Bing (Chairman and a Director of BNBM, Vice President of CNBM, and Director of Taishan), and Song Zhiping (Chairman of CNBM, BNBM Group and CNBM Group), all testified that they never provided any notice to or monitored the activities of their companies' affiliates, subsidiaries and/or related companies affected by the order, despite their knowledge as to the risks associated with violating the injunction.[40] It is telling

---

[38] Deposition of Jia Tongchun dated 9/17-18/2015 ("JIA Dep.") [CONTEMPT Ex. 10], at 227:24-228:13.

[39] JIA Dep. at 231:1-11.

[40] *See* Deposition of Cao Jianglin dated 8/4-5/2015 ("CAO Dep.") [CONTEMPT Ex. 77], at 44:3-11 and 111:15-2; 44:12-47:9 (no notification given to CNBM Investments a/k/a BND Company, China Jushi, CNBM, CNBM Group, BNBM Group, BNBM PLC, related companies of CNBM, related companies of CNBM Group, related companies of BNBM PLC), 49:2-24 (no notice sent to any companies in which CNBM held stock), and 51:7-10 (no notification given to any companies in which CNBM Group held stock). *See also* deposition of Wang Bing, dated 8/25-27/2015 ("WANG Dep.") [CONTEMPT Ex. 78] at 59:13-

that Zhao Yanming (Deputy General Manager of BNBM Group) only learned of the Contempt Order in July, 2015, as he was preparing to testify in these proceedings as the corporate witness for the company.[41]

Ultimately, the Defendants did not inform the affected companies of their obligations and restraints on business activities in the U.S. under the Contempt Order. The consequential limited awareness of the Contempt Order further stifled any potential for compliance with the Injunction against doing business in the United States during the Contempt Period. The numerous violations of the Contempt Order discussed below (and outlined more fully in Plaintiffs' 2/10/2016 substituted memorandum) are hardly surprising given the Defendants' *calculated* disobedience of the Court's order and *refusal* to notify affected companies and ensure compliance with the Injunction.

## III.   <u>LEGAL STANDARD</u>

If the lawful orders issued by judges presiding over legal disputes can simply be ignored by a litigant, the authority of the judicial system necessarily is called into question. The Fifth Circuit has noted that the very existence of the judiciary requires that a judge have real-world power to not only enter, but enforce, orders rendered in the course of litigation. *See Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1407 (5th Cir, 1993), *cert. denied*, 510 U.S. 1073 (1994). Here, the Court had the jurisdiction and inherent authority to hold a litigant as

---

15, 253:7-22, 419:20-420:13; Deposition of Song Zhiping, dated 9/14-15/2015 ("SONG Dep.") [CONTEMPT Ex. 32], at 32:3-5; 32:15-33:11.

[41] Deposition of BNBM Group (Zhao Yanming) dated 7/15-17/2015 ("ZHAO Dep.") [CONTEMPT Ex. 28], at 208:10-16.

well as non-litigants in contempt for failure to comply with its orders.  The further authority to enforce such a contempt order is rooted in the necessity of preserving the United States judicial system.

### A.   This Court Has the Power to Enforce Compliance Through Contempt Orders.

The Supreme Court has held that "[t]here can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966).  *See also In re Bradley*, 588 F.3d 254, 265 (5th Cir. 2009).  The Fifth Circuit similarly has recognized that "[s]imply by virtue of having been created, federal courts are vested with inherent power to take action 'essential to the administration of justice.'" *Naranjo v. Thompson*, 809 F.3d 793, 802 (5th Cir. 2015) (quoting *Michaelson v. United States*, 266 U.S. 42, 65-66 (1924)).  Indeed, this Circuit has further recognized that the contempt and sanctions authority of federal courts dates back to the very origins of our country:

> So important and deeply rooted is the federal courts' authority to enforce their orders and punish willful infractions thereupon that the seventeenth section of the Judiciary Act of 1789 provided that all federal courts "shall have power ... to punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same."

*Chilcutt v. United States*, 4 F.3d 1313, 1327 n.38 (5th Cir. 1993), *cert. denied*, 513 U.S. 979 (1994) (citing *Ex parte Robinson*, 86 U.S. 505 (1873)).  An essential corollary of this principal authority is that a litigant is bound to obey court orders even when a challenge to the same is contemplated. "[I]f a court issues an erroneous order, a party must obey the order until it is reversed through an orderly proceeding" because "[t]he remedy for an erroneous order is appeal, not noncompliance." *Rousseau v. 3 Eagles Aviation, Inc.*, 130 Fed. Appx. 687, 690 (5th Cir. 2005).

Rule 37 of the Federal Rules of Civil Procedure vests the district court with authority to "treat[] as contempt of court the failure to obey an order." *See* FED. R. CIV. P. 37(b)(2)(A)(vii). Further, Rule 37 empowers a district judge to impose sanctions upon a "party or party's officer, director, or managing agent – or person designated by Rule 30(b)(6)" who "fails, after being served with proper notice to appear." FED. R. CIV. P. 37(d)(1)(A)(i).  But even this codification of the Court's contempt and sanction authority does not express the full extent of that authority, which remains an inherent power derived from the very existence of the judicial system.  "[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power.  But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Chambers v. NASCO, Inc*., 501 U.S. 32, 50 (1991).

## B.   The Court Has Wide Discretion to Hold Both Parties and Non-Parties in Contempt of its Orders.

A district court's order may be enforced against parties and non-parties alike.  *See*, *e.g.*, *Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir. 1985), *cert. denied*, 474 U.S. 1056 (1986) ("An injunction binds not only the parties subject thereto, but also nonparties who act with the enjoined party."); *Goya Foods, Inc. v. Wallack Mgmt. Co*., 290 F.3d 63, 75 (1st Cir. 2002), *cert. denied*, 537 U.S. 974 (2002) ("Nonparties may be liable for civil contempt notwithstanding their nonparty status.").  As Rule 71 of the Federal Rules of Civil Procedure indicates, a court's orders "may be enforced against a nonparty" and the "procedure for enforcing the order is the same." FED. R. CIV. P. 71.  In the context of injunctions, for example, "[a] court order binds not only the parties subject thereto, but also non-parties who act with the enjoined party." *Whitcraft v. Brown*, 570 F.3d 268, 272 (5th Cir. 2009).  As long as the non-party has notice of the order, Rule 71 allows

a district court to use the same process for enforcing obedience of an order addressed to a non-party as it could with a party, including holding the non-party in contempt for violating it. *Irwin v. Mascott,* 370 F.3d 924, 931 (9th Cir. 2004). In the Fifth Circuit specifically, it is clear that a court's order can bind non-parties and fall within the scope of Rule 65(d) irrespective of how it is titled, provided it is an "equitable decree compelling obedience under the threat of contempt." *Seven Arts Pictures, Inc. v. Jonesfilm*, 512 Fed. Appx. 419, 426 (5th Cir. 2013) (citing *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 75 (1967)).

In light of this rationale, courts generally engage in a two-pronged analysis to determine whether a non-party may be held in contempt of an order: (1) whether the non-party had actual notice of the order; and (2) whether the non-party has aided or abetted a party in violating the court's order, or is legally identified with a party subject to the order. *Waffenschmidt*, 763 F.2d at 718-19; *Goya Foods*, 290 F.3d at 75 ("it has long been recognized that a nonparty may be held in civil contempt if, and to the extent that, he knowingly aids or abets an enjoined party in transgressing a court order."); *Quinter v. Volkswagen of Am.*, 676 F.2d 969, 972 (3d Cir. 1982) ("A person who is not a party to a proceeding may be held in contempt if he or she has actual knowledge of a court's order and either abets the defendant or is legally identified with him."); *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014), *cert. denied,* 135 S. Ct. 2816 (2015) ("It has long been settled law that a person with notice of an injunction may be held in contempt for aiding and abetting a party in violating it."); *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998), *cert. denied*, 525 U.S. 983 (1998) (same); *S.E.C. v. Homa*, 514 F.3d 661, 674 (7th Cir. 2008) (same).

Conversely, a court may even hold a party in contempt for a non-party's violation of the court's order. "[A] party may be held in contempt for giving a non-party the means to violate an

14

injunction, if the party knows it is highly likely the non-party will use those means to violate the injunction." *Inst. of Cetacean Research*, 774 F.3d at 950. *See NLRB v. Laborers' Int'l Union of N. Am., AFL-CIO*, 882 F.2d 949, 954 (5th Cir.1989) ("[A]ny party who knowingly aids, abets, or conspires with another to evade an injunction or order of a court is also in contempt of that court.").

### C.   The Court Has Personal Jurisdiction Over Non-Resident Non-Parties in Both the Issuance and Enforcement of Civil Contempt Penalties.

Courts have recognized that, "[t]he Federal Rules of Civil Procedure themselves indicate that personal jurisdiction over a nonparty contemnor is a given." *City Cab Co. of Orlando, Inc. v. All City Yellow Cab, Inc.,* 581 F. Supp. 2d 1197, 1200 (M.D. Fla. 2008) (relying on Rule 71 to find that court had jurisdiction over non-party in a civil contempt proceeding). More importantly, courts have consistently held that they "may assert jurisdiction of a person who acts outside the forum, but causes effects within it." *Waffenschmidt*, 763 F.2d at 722. *See also ClearOne Commc'n, Inc. v. Bowers*, 651 F.3d 1200, 1215-16 (10th Cir. 2011) ("[A] district court may properly exercise personal jurisdiction over a nonparty for purposes of entering contempt orders, when the nonparty, with actual notice of an injunctive order issued by the district court, and in active concert or participation with a party, violates that order.").

In *Waffenschmidt*, the Fifth Circuit held that a district court can exercise personal jurisdiction over non-party and non-resident banks "who, with knowledge of the court's orders, actively aid and abet an enjoined party." *Waffenschmidt*, 763 F.2d at 718-19 (citing *Stiller v. Hardman*, 324 F.2d 626, 628 (2d Cir. 1963)) ("Violation of an injunctive order is cognizable in the court which issued the injunction, regardless of where the violation occurred."). In that case, following an injunction hearing in which the lower court directed a defendant to turn over certain stock proceeds, the district judge issued an order further directing non-party banks to turn over any

15

stock proceeds they had received.  *Id.* at 714.  It was undisputed that these non-party banks had no contacts with the forum state and that all were beyond the territorial limits for service of process; but the district court found that the non-party banks were included under "all persons acting in concert" with the defendant listed in the original temporary restraining order.  *Id.* at 714-15. Acknowledging the lack of minimum contacts with the forum state, the district court nonetheless found that the non-parties had notice of the injunction order, had acted in active concert with the defendant, and thus could be found in contempt.  *Id.* at 715.

On appeal, the Fifth Circuit affirmed the district court's contempt order.  *Id.* at 719.  The Appellate Court noted the inherent authority of courts to enforce their own injunctive decrees, and found that the mandate of an injunction runs nationwide and "carries with it the concomitant power of the court to reach out to nonparties who knowingly violate its orders."  *Id.* at 716-17.  As to the non-parties' lack of minimum contacts with the forum state, the Fifth Circuit agreed with the district court's jurisdictional finding that "[b]y actively aiding and abetting" a party named in a court's order, non-parties "place themselves within the personal jurisdiction of the district court." *Id.* at 718.  Thus, a showing of active participation or actions in concert with an enjoined party is sufficient for jurisdiction in contempt proceedings; and such active participation by the Taishan Defendants is, without question, present in this case.

IV.   **LAW AND ARGUMENT**

The Taishan Defendants' briefs in opposition to enforcement of the Contempt Order and Injunction ignore this Court's jurisdiction.  Said jurisdiction arguments are misplaced for either of two independent reasons: 1) although the matter is currently under consideration by this Court, Plaintiffs respectfully submit that jurisdiction has been established through prior briefing, and 2) jurisdiction is not necessary in the context of implementing and enforcing the Court's injunction, which was issued as a discovery sanction and is governed by Rule 37(b)(2)(A)(vii).

After the jurisdiction issue, Defendants' arguments are primarily based on the incorrect premise that the Contempt Order and its enforcement was criminal (rather than civil) in nature, precluding the Plaintiffs' enforcement motion.  Defendants' "criminal contempt" arguments ignore the fact that the Contempt Order and Injunction was necessary to "coerce compliance" and/or "to compensate the complainant for losses sustained."  However, the Contempt Order and Injunction was civil in nature.  Consequently, it did not entitle the Taishan Defendants to the Due Process protections associated with a criminal contempt order, and it did allow the Court to order the PSC to investigate any potential violations of same.

Additionally, Defendants continue to improperly assert that the Contempt Order is vague, in spite of the fact that this "vagueness" argument has been previously rejected by the Court.[42] Further, when Defendants appealed this very ruling to the Fifth Circuit, the Appellate Court

---

[42] "The Contempt Order is clear; it clearly applies to Taishan's subsidiaries and affiliates ... [t]hese terms are not vague; rather, they are legal terms, requiring a legal determination."  *See* 8/17/2015 Order denying Defendants' motions to clarify and/or vacate Contempt Order (Rec. Doc. No. 19392) at p. 4.

dismissed the appeals for lack of jurisdiction.[43]  As such, this "vagueness" claim has been resolved and should again be rejected by the Court.

Finally, with respect to alleged Contempt Order violations at issue, Defendants' oppositions either ignore or mischaracterize the extent and nature of their varied and numerous violations of the injunction prong of the Contempt Order.  Defendants do not properly address the fact that, at all pertinent times, Taishan and the BNBM/CNBM Entities operated (and continue to operate) as a single-business enterprise and are the alter egos of one another.  Moreover, the BNBM Entities misrepresent their extensive Contempt Period U.S. business dealings as meaningless, and the CNBM Entities utterly fail to substantively deal with the vast majority of continuous and numerous Contempt Order violations by relevant affiliates and/or subsidiaries.

A.   **Jurisdiction Is a Non-Issue, as This Court Had Jurisdiction Over All Parties, and Regardless, the Court Had Authority to Enjoin All Parties.**

1.   **This Court had and continues to have jurisdiction over all Taishan Defendants.**

The issue of this Court's jurisdiction over the BNBM and CNBM Entities has been extensively briefed by the parties.  The PSC respectfully submits that jurisdiction over these entities has been proven.  Rather than repeat all prior facts and arguments, the PSC outlines some of the more pertinent alter/ego and single business enterprise matters in Section IV.D.1., *infra*, and the PSC hereby adopts and incorporates by reference its prior briefing on this matter.[44]

---

[43] *See* Fifth Circuit Order dismissing appeals [CONTEMPT Ex. 195].

[44] *See*, *e.g.*, 10/29/2015 PSC response to CNBM Group's Motion to Dismiss on Grounds of the Foreign Sovereign Immunities Act (with affidavit of Russ M. Herman and all exhibits) (filed under seal with Rec. Doc. No. 19658-2); PSC's Omnibus Response.

18

2.   **As a discovery sanction, the Contempt Order's injunction prong properly enjoined Taishan's affiliates and subsidiaries, regardless of jurisdiction.**

The CNBM and BNBM Entities deny the Court's authority to enjoin them from violating its orders based upon the misguided contention that they are not parties in the *Germano* proceedings.  These Defendants premise their argument on FED. R. CIV. P. 65.  However, this Court's Contempt Order issued (at least in part) pursuant to Taishan's refusal to present discovery at the Judgment Debtor hearing.  Thus, Rule 37(b)(2)(A)(vii) is the animating authority of the Order.

It is well-recognized that a judgment debtor's failure to comply with a post-judgment discovery order may be grounds for a contempt sanction.[45]  It is equally well-recognized that such a contempt order may reach non-parties involved in the decision to violate the court's order.[46]  Moreover, it is well-established that affiliates and related parties may be held liable where they exercise control over a contemnor.[47]

---

[45] *See Baker v. Limber*, 647 F.2d 912, 919 (9th Cir. 1981).

[46] *See Taddeo v. American Invsco Corp.*, 2015 WL 751072, *4 (D. Nev. Feb. 20, 2015) (upholding Rule 37 sanction against non-party because "[a]n order to a corporation binds those who are legally responsible for the conduct of its affairs.") (citing *United States v. Laurins*, 857 F.2d 529, 535 (9th Cir. 1988)).

[47] *See F.T.C. v. Kuykendall*, 371 F.3d 745, 759 (10th Cir. 2004) (affiliates and related corporate entities may be held vicariously in contempt where they engage in a "common enterprise" and/or could have controlled the activities of the contemnor); *Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1379 (Fed. Cir. 2001) ("courts have held parties in contempt based on the conduct of others, but in that circumstance they have required proof that the party subject to contempt sanctions had control over those who engaged in the conduct proscribed by the injunction.").  *See also Reebok Intern. Ltd. v. McLaughlin*, 827 F. Supp. 622 (S.D. Cal. 1993), *rev'd on other grounds*, 49 F.3d 1387 (9th Cir.), *cert. denied*, 516 U.S. 908 (1995) (holding that a non-party may be bound by injunction where it is proved that the non-party participated in the contumacious act of the party); *United States v. Voss*, 82 F.3d 1521, 1527 (10th Cir. 1996) (individual that controlled organization that had access to requested records was properly convicted of criminal contempt where that individual was aware of court orders requiring organizations to respond to grand jury subpoenas the organizations failed to comply with the orders).

As defaulted parties, the CNBM and BNBM Entities are deemed to have admitted that they controlled the affairs of Taishan and were responsible for its contemptuous acts. Moreover, an extensive record replete with evidence has been developed, both before and after the Contempt Order, proving that the CNBM and BNBM Entities controlled the affairs of Taishan, and that these Defendants are a single business enterprise, agents, and alter egos of one another.[48]

Taishan's contemptuous violation of this Court's June 20, 2014 JDE Order[49] was effectively monitored and approved by the parent affiliates of Taishan.[50] It likewise is true that any violations of the injunction prong of the Contempt Order were caused by these parent affiliates of Taishan failing to notify or instruct their subsidiaries and Taishan's affiliates relative to the Contempt Order.[51] Indeed, even under the jurisprudence of Rule 65, an injunction against a party has force and effect to reach the parties' officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation.[52]

This Court, therefore, is vested with the clear sanctioned authority under FED. R. CIV. P. 37 to enjoin the activities of the affiliates of Taishan, including the BNBM and CNBM Entities, as

---

[48] *See*, *e.g.*, 10/29/2015 PSC response to CNBM Group's Motion to Dismiss on Grounds of the Foreign Sovereign Immunities Act (with affidavit of Russ M. Herman and all exhibits) (filed under seal with Rec. Doc. No. 19658-2); PSC's Omnibus Response.

[49] Rec. Doc. No. 17774.

[50] *See* Section II.B, *supra*.

[51] *See* Section II.D, *supra*.

[52] *See* FED. R. CIV. P. 65(d)(2). *See also United States v. Hall*, 472 F.2d 261, 267 (5th Cir. 1972) ("In examining this contention we start with the proposition that Rule 65 was intended to embody the common law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in privity with them, represented by them or subject to their control.") (internal quotations omitted); *Waffenschmidt*, 763 F.2d at 717 (same).

businesses which continue to exercise control over Taishan, which constitute a single business enterprise, and which were in privity with Taishan with respect to the activities giving rise to Taishan's contemptuous actions in this litigation.

**B.      The Court's Civil Contempt Finding Does Not Require Criminal Due Process.**

**1.      The Contempt Order was also civil in nature.**

The Taishan Defendants erroneously contend that the Court's injunction and 25% penalty provision constitute criminal contempt sanctions and, therefore, afford them heightened Due Process protections.  This argument fundamentally misapprehends the purpose of the Court's injunction and penalty provisions.  The purpose of this provision was clearly aimed at forcing Taishan's re-entry into the litigation following its contemptuous withdrawal and refusal to appear at the JDE.  This argument also fails to account for the compensatory nature of the penalty provision and the fact that the contempt itself is purgeable.  In addition, all of the Taishan Affiliates easily could have avoided the penalty for violations of the injunction by simply refraining from doing business in the United States during the Contempt Period.

Civil contempt is remedial in nature, not punitive.  *See, e.g.*, *In re Rumaker*, 646 F.2d 870, 871 (5th Cir. 1980) (explaining the difference between civil and criminal contempt).  Judicial sanctions in civil contempt proceedings may be employed for either or both of two purposes: (1) "to coerce the defendant into compliance with a court's order," and/or (2) "to compensate the complainant for losses sustained."  *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947); *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000), *cert. denied*, 531 U.S. 1191 (2001); *Cook v. Ochsner Foundation Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977) (civil contempt can serve as a coercive "sanction to enforce compliance with an order of the

court or to compensate for losses or damages sustained by reason of noncompliance."); *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976). Indeed, the United States Supreme Court observed in *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 827 (1994), that:

> **[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard.**

(emphasis added). *See also Nye v. United States*, 313 U.S. 33, 41-43 (1941) (noting that while it is not always easy to distinguish between civil and criminal contempt, some characteristics of civil contempt are when "the punishment is wholly remedial, serves only the purpose of the complainant, and is not intended as a deterrent to offenses against the public," whereas criminal contempt may be marked by a fine or payment to the government rather than to a private party).

The aim of the Court's injunction and penalty provisions was clearly designed to meet the twin purposes of civil contempt penalties by: (1) compelling compliance with the Court's Contempt Order by forcing Taishan to re-enter the litigation, and (2) attempting to compensate Chinese Drywall homeowners for their losses and delay in receiving justice by virtue of Taishan's refusal to participate in these proceedings. Thus, the coercive aspects of the Court's Contempt Order and Injunction, as well as its compensatory purpose, clearly demonstrate that it is a civil contempt sanction. However, even assuming that the Taishan Defendants are correct in their argument that the penalty provision is not compensatory, which is specifically denied, it still constitutes a civil contempt sanction since it is purgeable. *Bagwell*, 512 U.S. at 829 ("Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge.") (citing *Penfield Co. of Calif. v. SEC*, 330 U.S. 585, 590 (1947)).

Both the BNBM and CNBM Entities concede that the injunction and penalty provisions are purgeable and, thus, civil as to Taishan. *See* BNBM Opp. at 15 ("Taishan could purge contempt under the Contempt Order."); CNBM Opp. at 6 ("the Court enjoined Taishan and its affiliates from doing business in the United States … [a]s to Taishan, that penalty is civil, as it is forward-looking and is capable of being purged: If Taishan re-emerged, the injunction would cease."). Ignoring their control over Taishan and their ability to dictate the actions of Taishan, these Defendants take the bizzare position that while this provision is civil as to Taishan, it is criminal as to them since they have no way of purging the contempt. First, this argument is misleading since the BNBM and CNBM Entities had the ability to purge the contempt by merely instructing their controlled subsidiary, Taishan, to re-enter the litigation, which they seemingly did in March of 2015. *See Wirtz v. Ocala Gas Co.*, 336 F.2d 236, 241-43 (5th Cir. 1964) (determining that newly formed subsidiary was subject to court's earlier decree against another subsidiary and that president of all corporations and parent corporation (which controlled the companies) were answerable for contempt if a violation of the decree could be proven). Second, the BNBM and CNBM Entities easily could have avoided the penalty provision by simply abiding by the injunction and refraining from doing business in the U.S. until Taishan re-entered the litigation. Thus, the injunction and penalty provisions are purgeable (or avoidable) as to all of the Taishan Defendants. Accordingly, these provisions constitute civil contempt penalties.[53]

---

[53] The only portion of the Court's contempt order that constitutes a criminal contempt penalty is the requirement that Taishan pay $40,000 as a penalty for contempt. "Criminal contempt is punitive, and may include fines payable to the district court instead of compensating a moving party and jail time." *Martinez v. City of Avond*ale, 2013 WL 5705291, at *3 (D. Ariz. Oct. 18, 2013) (*citing In re Sequoia Auto Brokers LTD., Inc.*, 827 F.2d 1281, 1283 n.1 (9th Cir. 1987)). *See also In re Rodriguez*, 2007 WL 593582, at *11 (W.D. Tex. Feb. 20, 2007) ("The Court concludes that the $15,000 fine payment constituted criminal contempt because it was a punitive fine payable to the Court for a past act of disobedience."). This portion of the Contempt Order clearly imposes a fixed penalty that was designed to punish Taishan criminally and

## 2. **Civil contempt orders do not afford criminal "Due Process."**

Flowing from their erroneous argument that the injunction and penalty provisions constitute a criminal contempt sanction, the Taishan Defendants contend that they were afforded insufficient Due Process protections. This argument is incorrect because the Taishan Defendants were afforded appropriate Due Process protections in light of the fact that the injunction and penalty provisions fall under the rubric of civil contempt. In *Bagwell*, 512 U.S. at 826-27, the United States Supreme Court explained the differences between criminal contempt and civil contempt:

> "Criminal contempt is a crime in the ordinary sense," *Bloom v. Illinois*, 391 U.S. 194, 201, 88 S. Ct. 1477, 1481, 20 L. Ed.2d 522 (1968), and "criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings," *Hicks v. Feiock*, 485 U.S. 624, 632, 108 S. Ct. 1423, 1429-1430, 99 L. Ed.2d 721 (1988). *See In re Bradley*, 318 U.S. 50, 63 S. Ct. 470, 87 L. Ed. 608 (1943) (double jeopardy); *Cooke v. United States*, 267 U.S. 517, 537, 45 S. Ct. 390, 395, 69 L. Ed. 767 (1925) (rights to notice of charges, assistance of counsel, summary process, and to present a defense); *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 444, 31 S. Ct. 492, 499, 55 L. Ed. 797 (1911) (privilege against self-incrimination, right to proof beyond a reasonable doubt). For "serious" criminal contempts involving imprisonment of more than six months, these protections include the right to jury trial. *Bloom*, 391 U.S., at 199, 88 S. Ct., at 1481, *see also Taylor v. Hayes*, 418 U.S. 488, 495, 94 S. Ct. 2697, 2701-2702, 41 L. Ed.2d 897 (1974). **In contrast, civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required.**

---

to protect the decorum of the Court. None of the Taishan Defendants contest the propriety of this criminal contempt sanction, as it was imposed following Taishan's contemptuous refusal to appear at the judgment debtor proceedings that occurred in open court.

*Id.* (emphasis added).

Unlike a criminal contempt proceeding, which imposes heightened Due Process requirements, the instant proceedings involving the Taishan Defendants' violations of the Contempt Order and Injunction merely require notice and an opportunity to be heard. These protections have been provided as set forth below. The Taishan Defendants are simply not entitled to a jury trial or the proof beyond a reasonable doubt standard as they contend.[54]

### 3. Defendants have been afforded the requisite protections for civil contempt.

The Taishan Defendants have received all of the constitutional protections to which they are entitled. They have been provided with notice and an opportunity to be heard. *Bagwell*, 512 U.S. at 826-27. The adequacy of notice is clearly demonstrated by the fact that the websites for the BNBM and CNBM Entities reported to the world the issuance of the Court's Contempt Order and Injunction.[55] The fact that the Taishan Defendants have been provided with a full opportunity to be heard is demonstrated by their participation in the discovery efforts regarding violations of the Court's injunction as well as their participation in briefing and argument concerning their challenges to the Contempt Order. Additionally, the Taishan Defendants are being heard in the

---

[54] Even where a civil contempt involves the risk of a conditional sentence of imprisonment, the law is clear that an indictment and jury trial are not constitutionally required. *Shillitani v. United States*, 384 U.S. 364, 365 (1966). "A movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir.1992); *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, 383 (5th Cir.1999) (citation omitted). The evidence must be "'so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts' of the case." *Piggly Wiggly*, 177 F.3d at 383 (citation omitted).

[55] *See* 7/18/2014 CNBM Announcement [CONTEMPT Ex. 3] at p. 1. *See also* 7/18/2014 BNBM Announcement [CONTEMPT Ex. 4] at p. 1.

instant briefing regarding the propriety of the Court's Contempt Order as well the underlying evidence of violations.

Further, the Taishan Defendants will participate in oral argument scheduled for March 2, 2017, regarding the contempt violations, and they will be entitled to participate in a hearing, should it be deemed necessary by the Court, to determine the penalty owed by Taishan and/or any of the Taishan Affiliates and Subsidiaries.  Accordingly, the Taishan Defendants have been provided sufficient Due Process protections.

### 4. The PSC's investigation, as ordered by the Court, was warranted and proper.

The Taishan Defendants challenge the PSC's participation in the contempt discovery as improper since, they contend, a federal prosecutor must be appointed to ensure impartiality.  This argument should be rejected because it is well-established that private litigants may spearhead civil contempt proceedings.  *In re Stewart*, 571 F.2d 958, 963 (5th Cir. 1978) ("Civil contempt may be brought by a party as a facet of a principal suit."); *S.P.M. Flow Control, Inc. v. Special Piping Materials Limited*, 2013 WL 12140497, at *1 (S.D. Tex. Jun. 20, 2013) (same).

The Taishan Defendants seek to challenge the PSC's participation in the contempt proceedings by again repeating their erroneous argument that the injunction and penalty provisions are criminal in nature.  As set forth in detail above, this argument is incorrect.  Thus, because these provisions of the Contempt Order are civil in nature, it was entirely appropriate for the PSC to conduct discovery regarding the Taishan Defendants' violations of the Contempt Order and Injunction.[56]

---

[56] Even assuming the Taishan Defendants are correct in arguing that the injunction and penalty provisions are criminal in nature, other courts have stated that private attorneys representing a party to a litigation may assist the United States Attorney in criminal contempt proceeding.  *See Young v. U.S. ex rel. Vuitton et Fils*

The Taishan Defendants' contention that the PSC's discovery efforts were somehow improper is equally without merit.  This Court specifically directed the PSC to conduct discovery involving potential violations of this Court's Contempt Order, and the PSC merely fulfilled its obligation as imposed by the Court.  While the Taishan Defendants object to the PSC's decision to seek discovery involving entities that they claim are too far removed from Taishan, the PSC respectfully submits that it had a duty to develop the factual record consistent with its understanding that the Taishan Defendants operate as a single business enterprise through a complex web of subsidiaries and other interrelated entities.  Therefore, the PSC's decision to direct discovery towards multiple entities linked to Taishan was entirely appropriate.  The same is true with respect to the scope of the activities investigated by the PSC.  While the Taishan Defendants take the position that ongoing litigation efforts and fundraising activities do not constitute "conducting business," the PSC disagrees for the reasons set forth below.  Simply stated, the PSC believes it had an affirmative responsibility to investigate all potential violations of the Court's Contempt Order.  While it may turn out that the Court ultimately concludes that certain activities investigated by the PSC do not fall within the scope of the Court's injunction, such a determination

*S.A.*, 481 U.S. 787, 806 n.17 (1987) ("The potential for misconduct that is created by the appointment of an interested prosecutor is not outweighed by the fact that counsel for the beneficiary of the court order may often be most familiar with the allegedly contumacious conduct. That familiarity may be put to use in assisting a disinterested prosecutor in pursuing the contempt action, but cannot justify permitting counsel for the private party to be in control of the prosecution."); *Polo Fashions, Inc. v. Stock Buyers Intern., Inc.*, 760 F.2d 698, 705 (6th Cir. 1985) ("The practicality of having an attorney who is familiar with the facts of the underlying litigation involved in a criminal contempt prosecution is obvious … Where counsel for an interested party is appointed pursuant to Rule 42(b) he or she cannot conduct the criminal contempt proceedings, but may assist the United States Attorney or the assistant United States Attorney assigned to the prosecution.").  The PSC is ready, willing, and able to assist the United States Attorney should the Court determine the penalties are criminal in nature.  However, given the state of the record that has been developed regarding the Taishan Defendants' violation of the Court's injunction, the Court may very well dispense with the need for appointing a prosecutor and instead elect to fill that role itself.  *In re Grand Jury Proceedings*, 875 F.2d 927, 934 (1st Cir. 1989) (upholding court's decision to proceed without a prosecutor in an out-of-court criminal contempt proceeding).

27

does not mean the PSC was overreaching in its discovery efforts.  Rather, the PSC had an obligation to investigate all potential violations so that the record before the Court would be complete.

### C.      The Contempt Order Is Sufficiently Defined.

Defendants' arguments relative to alleged vagueness of the Contempt Order are an improper attempt to re-litigate a previously decided issue.  In its denial of Defendants' prior motions to clarify and/or vacate the July 17, 2014 Contempt Order (which they filed one year *after* the Contempt Order issued),[57] this Court has already clearly held, with respect to this Contempt Order, as follows:

> **The Contempt Order is clear; it clearly applies to Taishan's subsidiaries and affiliates**. If any of Taishan's affiliates or subsidiaries did business in the United States during the contempt period, it will have violated the Injunction and will be required to remit 25% of its earnings during that time. ... What is not yet clear is what entities are affiliates and/or alter egos of Taishan. **These terms are not vague; rather, they are legal terms, requiring a legal determination**.[58]

Thereafter, Defendants appealed this Court's denial of their motions to clarify, and on November 17, 2015, the Fifth Circuit dismissed the appeals for lack of jurisdiction.[59]  Accordingly, Plaintiffs

---

[57] *See* 7/9/2015 CNBM Entities' Motion to Clarify the July 17, 2014 Contempt Order, or in the Alternative to Vacate the Order to the Extent it Purports to Apply to [CNBM Entities] (Rec. Doc. No. 19271).  *See also* 7/13/2015 BNBM and BNBM Group's Joinder of the CNBM Entities' Motion to Clarify or Vacate (Rec. Doc. No. 19294).

[58] *See* 8/17/2015 Order denying Defendants' motions to clarify and/or vacate Contempt Order (Rec. Doc. No. 19392) at p. 4 (emphasis added).  Defendants' appeal of this ruling to the Fifth Circuit was dismissed as a non-final order.

[59] *See* Fifth Circuit Order dismissing appeals (Rec. Doc. No. 19779) [CONTEMPT Ex. 195].

respectfully submit that this issue is (and has been) fully resolved.  Nonetheless, Plaintiffs hereby respond to these re-alleged "vagueness" arguments of Defendants.

### 1.   Standard for defining contempt orders

The Taishan Defendants challenge the Contempt Order as lacking "the specificity required by Rule 65."[60]  Specifically, they challenge references to Taishan's "affiliates" as too vague to put them on notice that they were enjoined, and they further argue that the terms "business" and "conducting" are not specific enough.[61]

The Court's Contempt Order includes an injunction pursuant to Rule 65, which contains the terms that the Taishan Defendants challenge as lacking specificity under that Rule.  Under Rule 65, "[e]very order granting an injunction shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained ...."  As the Fifth Circuit has held, "[t]he specificity requirement [of Rule 65] is not unwieldy, however.  An injunction must simply be framed so that those enjoined will know what conduct the court has prohibited."  *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 373 (5th Cir. 1981) (citing *Int'l Longshoremen's*, 389 U.S. at 76 (holding that "a federal court [must] frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.")).[62]  This specificity requirement "is not absolute,"

---

[60] Rec. Doc. No. 20656-2 at 21; Rec. Doc. No. 20659 at 18-19.

[61] Rec. Doc. No. 20656-2 at 21-22; Rec. Doc. No. 20659 at 19-22.

[62] In stark contrast to the specificity of the Order requiring Taishan to appear for a JDE and the instant Contempt Order and Injunction by Judge Fallon, a decree in effect granting an injunction against a union in *Int'l Longshoremen's*, and a finding of contempt for failure to comply with the decree, which the union did not understand, was held by the Supreme Court to lack clarity, and, therefore, "was too vague to be sustained as a valid exercise of federal judicial authority."  *See Int'l Longshoremen's*, 389 U.S. at 73-74.  In that case, the district court held the union in contempt for failure to comply with a decree that required specific enforcement of a prior arbitrator's award, which arguably was no longer applicable to the circumstances.  At a hearing regarding the issuance of the decree, Counsel for Local 1291, Abraham E.

and "'[t]he mere fact that … interpretation is necessary does not render the injunction so vague and ambiguous that a party cannot know what is expected of him.'" *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999) (quoting *United States v. Greyhound Corp.*, 508 F.2d 529, 536 (7th Cir. 1974)); *see also United States v. Brown*, 561 F.3d 420, 438 (5th Cir. 2009) ("The mere fact that ... interpretation is necessary does not render the injunction so vague and ambiguous that a party cannot know what is expected....").

When issuing an injunction, "[t]he district court need not anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated." *Am. Airlines, Inc.*, 228 F.3d at 578 (declining to overturn finding that the enjoined defendant did not take "all reasonable steps" as mandated by TRO).  "No definition [is] necessary" where the defendant "knows full well" what the challenged phrase means.  *Molex, Inc. v. Nolen*, 759 F.2d 474, 476 (5th Cir. 1985).  Put another way, where, as here, a challenged phrase within the injunction "will be understood by both parties in the context of the many procedural skirmishes in the life of this case," the requisite specificity should be found.  *Martin's Herend Imports*, 195 F.3d at 771-72; *see also Prof'l Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cty. Cmty. Coll. Dist.*, 730 F.2d 258, 273 (5th Cir.), *cert. denied*, 469 U.S. 881 (1984) ("It is difficult to understand how the defendants could have legitimate difficulty understanding what they are forbidden to do, or to imagine how the injunction could be more specific without attempting to catalog every conceivable means by which an employer might retaliate or discriminate against an employee.").

---

Freedman, repeatedly asked the district judge for instructions and clarification on the effect and breadth of the decree, but the court refused: "That you will have to determine, what it means."  *Id.* at 70 (noting, "[t]hus, despite counsel's repeated requests, the District Judge steadfastly refused to explain the meaning of the order.").

As described below, there is no ambiguity in the terms "affiliate" or "conducting any business in the United States...."[63]

### 2.   Burden of contemnor to make certain they abide by contempt order

As an initial matter, regardless of whether the terms in question were actually vague, the fact that Defendants may have innocently believed they were not bound by the terms of the Contempt Order (despite their actions and statements to the contrary) due to some perceived vagueness or ambiguity is irrelevant to determining whether they were in violation of the Contempt Order.  As the Fifth Circuit has held, *"*[t]he contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc.*, 228 F.3d at 581; *see also Nat'l Labor Relations Bd. v. Lawley*, 182 F.2d 798, 800 (5th Cir. 1950) ("This being a proceeding in civil contempt, the question for decision is not one of intent, but simply whether respondents have complied with the court's order.")

And even if the Taishan Defendants truly believed that the terms in questions were vague or ambiguous, the proper mechanism for dealing with that issue would have been to seek clarification, rather than openly flouting the Contempt Order.  *See Lelsz v. Kavanagh*, 673 F. Supp. 828, 840 (N.D. Tex. 1987) ("[T]he proper remedy for vagueness is a motion for modification, clarification, or construction, and vagueness may not be argued successfully as a defense to contempt without prior efforts to obtain clarification.") (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949) ("Respondents could have petitioned the District Court for a modification, clarification or construction of the order. … But respondents did not take that course

---

[63] *See* Contempt Order at 3.

either. They undertook to make their own determination of what the decree meant. They knew they acted at their peril.")); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 808 (2d Cir. 1981), *appeal after remand*, 673 F.2d 53 (1982), *cert. denied*, 459 U.S. 832 (1982) ("[A] party to an action is not permitted to maintain a studied ignorance of the terms of a decree in order to postpone compliance and preclude a finding of contempt. The party and his counsel have a duty to monitor the progress of the litigation and to ascertain the terms of any order entered against the party.").

The Taishan Defendants, having failed to seek preemptive relief from the Contempt Order that they knew was in effect and that they knew (or should have known) was likely to apply to them,[64] simply ignored the order in the hopes of maintaining plausible deniability as they continued to conduct business in the U.S.  The case law is clear that their intent to defy the Contempt Order is irrelevant; the only relevant factor is what they actually did.  The Taishan Defendants violated the Contempt Order "at their peril" and should pay damages accordingly.

### 3.    The term "affiliate" is not vague.

The term "affiliate" has a uniform, unambiguous meaning, whether in English or Chinese. *See* Substituted Mot. to Enforce Contempt Order at 102-04 (filed under seal, with Rec. Doc. No. 20032).  It is defined as "[a] corporation that is related to another corporation by shareholdings or other means of control; a *subsidiary*, a *parent* or a *sibling corporation*."  Black's Law Dictionary (9th ed. 2009) (emphasis added).  CNBM actually cites this "recognized definition" to support their claim that the PSC's discovery requests were too broad and included entities that are not

---

[64] Defendants' July 2015 Motions to Clarify were hardly preemptive since they were filed nearly a full year (360 days) *after* the Contempt Order was entered.  *See* 7/9/2015 CNBM Entities' motion to clarify and/or vacate the July 17, 2014 Contempt Order (Rec. Doc. No. 19271).

Taishan affiliates.  *See* CNBM Opp. at 10.  In a decision controlling here, the Fifth Circuit specifically rejected the argument that the term "affiliate or subsidiary" was too vague to be enforceable.  *See Molex*, 759 F.2d at 477.  In *Molex*, the enjoined defendant appealed, as impermissibly vague, the trial court's injunction (forbidding the defendant from dealing with "Tandy Corporation or any affiliate or subsidiary of Tandy corporation….").  *Id.*  The Fifth Circuit rejected the argument that "affiliate or subsidiary" was too vague to be enforceable, noting only that it should be reformed in a "minor respect" to included affiliates or subsidiaries as of the date of the judgment.  *Id.*

BNBM challenges the authority of the cases cited in the Substituted Motion to Enforce Contempt Order by distinguishing them on the facts.  *See* BNBM Opp. at 21-22 n.13.  However, the variety of factual circumstances in which the courts use the same definition for "affiliate" proves that the term has a definite legal meaning.  Whether the Court is interpreting a contract or a statute, it identifies the same meaning as "common and approved usage" of "affiliate."  *Hopkins v. Howard*, 930 So. 2d 999, 1005 (La. Ct. App.), *writ denied,* 930 So. 2d 984 (2006); *see also Mandel v. Associated Collection Serv. Inc.*, 2015 WL 1508842, at *4 (D. Ariz. Mar. 31, 2015) (explaining that in "common usage" the term means "a company effectively controlled by another or associated with others under common ownership or control").

In fact, the Taishan Defendants have used the term "affiliate" repeatedly to illustrate their organizational structure in public documents and websites.  CNBM's Global Prospectus uses the uses it throughout.  In one instance, it provides:

> Parties are considered to be related if one party has the ability, directly or indirectly, to control the other party or exercise significant influence over the other party in making financial and operating decisions. Parties are also considered to be related if they are subject to common control.

33

>    The Group is controlled by Parent and has significant transactions
>    and relationships with the Parent and its *affiliates*.

*See* CNBM 2006 Global Offering Prospectus [CONTEMPT Ex. 16] at I-67 (emphasis added).

Although the connection is not express, it is clear that the term "affiliates" refers to "related parties"

defined in a preceding paragraph using the Black's Law Dictionary definition.  Similarly, BNBM's

website (since at least 2015) proudly touts that, "CNBM has a total assets of 20 billion RMB yuan;

a  staff  of  30  thousands;  ***200  affiliated  companies***"  BNBM  Web  Page,

http://english.bnbm.com.cn/about/CompanyProfile.asp (last visited on Feb. 18, 2017) (emphasis

added) [CONTEMPT Ex. 200 attached hereto].  Moreover, in responding to the June, 2008 Beijing

Securities Regulatory Bureau audit, BNBM stated, "[o]n the issue that Mr. Jianjun Jia holds

concurrent positions as the director of subsidiaries and *affiliates*, we will raise a proposal to change

the director when the subsidiaries and *affiliates* hold their annual general meetings."  *See* 7/7/2008

BNBM "Report on the Improvement and Solution of Relevant Issues Raised in the [June 2008]

Site Inspection of Beijing Securities Regulatory Bureau" [MTD Ex. 134].[65]

    The term "affiliation" is even defined in Chinese Rules on Taxation that are applicable to

the Affiliate Defendants.[66]  The Rules' definition makes clear that the ownership relationship

among Taishan, the CNBM Entities, and the BNBM Entities is one of affiliates.

---

[65] MTD Ex. [__] refers to the Exhibits attached to the PSC's Omnibus Response in Opposition to
Defendants' Motions to Dismiss ("PSC Omnibus Response"), filed under seal 1/22/2016 [*see* Rec. Doc.
No. 19995].

[66] *See* "Notice of the State Administration of Taxation on Issuing the Measures for the Implementation of
Special Tax Adjustments (for Trial Implementation)" (No. 2 [2009] of the State Administration of Taxation)
[CONTEMPT Ex. 201 attached hereto (7/25/2015 Declaration of Yan Gao & translation)], which defines
"affiliation" for tax purposes in China as "relationships between an enterprise and other enterprises,
organizations or individuals":
      1.  One party directly or indirectly holds at least 25% of the total shares of the other party, or 25% of
          the shares of both parties are directly or indirectly held by a same third party. If one party indirectly

Defendants' various arguments are mere sophistry – they clearly know, and always knew, that "affiliates" are the companies identified by the PSC as violating, along with Taishan, the Court's clear injunction.

### 4.  The phrase "conducting any business in the United States" is not vague, nor does it require physical presence in the U.S.

The CNBM Entities make a weak argument that the Contempt Order "lacks the required specificity in describing the enjoined acts."  CNBM Opp. at 22.  Plaintiffs have addressed this previously – the term "conducting business in" is not vague and is routinely employed by courts when issuing injunctions.  *See* PSC Opp. to Defendants' Motion to Clarify (filed under seal with Rec. Doc. No. 19354), at 47 (citing to *Harris v. Fairwether*, 2011 WL 4538436, *2 (S.D.N.Y. Sept.

---

holds the shares of the other party through an intermediate party, as long as it holds at least 25% of the shares of the intermediate party, the proportion of the other party's shares held by it shall be computed on the basis of the other party's shares held by the intermediate party;

2. The loans received by one party from the other party (excluding an independent financial institution) account for at least 50% of one party's paid-in capital, or at least 10% of the total loans received by one party are guaranteed by the other party (excluding an independent financial institution);

3. At least half of one party's senior management (including members of the board of directors and managers) are or at least 1 senior member of the board of directors who has the controlling power over the board of directors is appointed by the other party, or at least half of both parties' senior management (including members of the board of directors and managers) are or at least 1 senior member of the board of directors who has the controlling power over the board of directors is appointed by a same third party;

4. At least half of one party's senior management (including members of the board of directors and managers) are also senior management of the other party (including members of the board of directors and managers), or at least 1 senior member of the board of directors of one party who has the controlling power over the board of directors is also a senior member of the board of directors of the other party;

5. The normal production and business operations of one party must depend on the industrial property, know-how or any other franchise provided by the other party;

6. One party's purchase or sale activities are largely controlled by the other party;

7. The services that one party receives or provides are largely controlled by the other party; or

8. One party exercises a substantive control over the other party's production, business operations or transactions, or the two parties have any other affiliation of interest, such as a relationship that one party and the main shareholder of the other party enjoy basically the same economic interests though the shareholding percentage described in subparagraph 1 hereof is not reached, a clanship or a kinship.

29, 2011) (granting in part plaintiff's motion to clarify the scope of a preliminary injunction by enjoining defendant from "doing business" in plaintiff's name); *TMX Funding, Inc. v. Impero Technologies, Inc.*, 2010 WL 2077011, *2 (N.D. Cal. May 21, 2010) (enjoining defendants and its affiliates from "doing business or continuing to do business with customers or third party vendors").

The BNBM Entities take a different approach, arguing that they did not conduct business "in" the U.S. because they were not physically here.   However, the cases they cite for this proposition are irrelevant because each involved the issue of whether the court had ***general personal jurisdiction*** over a foreign party – not whether a foreign party's conduct qualifies as business.   *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418 (1984) ("hold[ing] that *mere* purchases . . . are not enough to warrant . . . *in personam jurisdiction* over a nonresident corporation in a cause of action *not related* to those purchase[s]") (emphasis added); *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 618 (5th Cir. 2008) (finding defendant's contacts with the state insufficient "to justify the exertion of *general jurisdiction*") (emphasis added); *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 718 (5th Cir. 1999), *reh'g denied*, 210 F.3d 365 (5th Cir. 2000), *cert. denied*, 531 U.S. 917 (2000) (holding that a foreign corporation's contact with a state was such that "*general jurisdiction* cannot be shown") (emphasis added).   In *Johnston*, the court emphasized that the "continuous and systematic contacts test" required for *general personal jurisdiction* "is a difficult one to meet, requiring extensive contacts between a defendant and a forum."   *Johnson*, 523 F.3d at 609 (5th Cir. 2008).   The court even went so far as to "review past cases to illustrate just how difficult it is to establish general jurisdiction."   *Id.* at 610.   This high burden is necessitated by constitutional consideration not present here.

36

Notably, even for personal jurisdiction purposes, doing business "in" the U.S. does not require a party's physical presence in the country. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) ("[W]e have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."); *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000), *cert. denied,* 532 U.S. 941 (2001) (finding general jurisdiction based on activities performed for a foreign corporation by an agent).

The cases BNBM cites for the proposition that its presence on the Alibaba website did not constitute conducting business "in" the U.S. are similarly unavailing. Each involved a question of personal jurisdiction. *See R & B Falcon Drilling (Int'l & Deepwater), Inc. v. Noble Denton Grp.*, 91 Fed. Appx. 317, 321 (5th Cir. 2004) (finding that "maintenance of a *passive* website for advertising purposes" does not "give rise to *general jurisdiction*") (emphasis added); *Walden v. Fiore*, 134 S. Ct. 1115, 1119 (2014) (finding party's contact with the state was insufficient to "exercise *personal jurisdiction*") (emphasis added); *Monistere v. Losauro*, 2013 WL 6383886, at *8 (E.D. La. Dec. 4, 2013) ("Court has neither general nor specific *personal jurisdiction* over Defendants.") (emphasis added).

### D.   Taishan, the BNBM Entities, the CNBM Entities and other Taishan affiliates violated the Contempt Order.

As set forth in the PSC's Motion to Enforce the Contempt Order, the Taishan Defendants blatantly continued to do business in the United States during the period of time that Taishan was held in contempt of court for its failure to appear for a JDE scheduled for July 17, 2014. The CNBM Entities, the BNBM Entities, and Taishan received notice of the Court's order and injunction and understood its meaning. Nevertheless, they failed to instruct their subsidiaries not to do business in the U.S., and they continued to do business in this country as usual, except for

37

one important development.  CNBM Group (<u>immediately prior</u> to the Contempt Order) instructed the CNBM Entities and the BNBM Entities that when doing business in the U.S., they should not put any money in New York banks and they should not use company email accounts but rather only their personal emails when communicating overseas for business purposes.[67]  The Taishan Defendants' deliberate violations of this Court's order and their attempt to conceal their activities should not be countenanced.

### 1. <u>Alter Ego / Single business enterprise</u>

The factual record in this case is replete with examples of Taishan, the BNBM Entities, and the CNBM Entities operating as alter egos of one another and as a single business enterprise. Notably the Fifth Circuit, in affirming this Court's earlier finding that TG and its wholly-owned subsidiary TTP are alter egos, identified a non-exhaustive list of factors to consider in determining whether corporate entities may be considered alter egos or part of a single business enterprise:

1. corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control;

2. common directors or officers;

3. unified administrative control of corporations whose business functions are similar or supplementary;

4. directors and officers of one corporation act independently in the interest of that corporation;

5. corporation financing another corporation;

6. inadequate capitalization ("thin incorporation");

---

[67] *See* 7/11/2014 CNBM Group Resolution No. 17 of the Third Session of the Board of Directors of CNBM Group ("CNBM Group Resolution No. 17") [CONTEMPT Ex. 5].

7.  corporation causing the incorporation of another affiliated corporation;

8.  corporation paying the salaries and other expenses or losses of another corporation;

9.  receiving no business other than that given to it by its affiliated corporations;

10. corporation using the property of another corporation as its own;

11. noncompliance with corporate formalities;

12. common employees;

13. services rendered by the employees of one corporation on behalf of another corporation;

14. common offices;

15. centralized accounting;

16. undocumented transfers of funds between corporations;

17. unclear allocation of profits and losses between corporations; and

18. excessive fragmentation of a single enterprise into separate corporations.

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521, 546 (5th Cir. 2014) (quoting

*Green v. Champion Ins. Co.*, 577 So. 2d 249, 257-58 (La. Ct. App.), *writ denied*, 580 So. 2d 668

(1991)).

Applying those factors here, there is sufficient evidence to demonstrate that the Taishan

Defendants operate as a single business enterprise.  This evidence is set forth in detail in the PSC's

Omnibus Response to the Defendants' Motions to Dismiss (filed under seal 1/22/2016), as well as

the supporting Affidavit of Russ M. Herman dated January 21, 2016 (filed under seal) (both of

39

which are incorporated herein by reference).[68]  The most pertinent factors supporting a finding that the Taishan Defendants are a single business enterprise are the following:

- The Taishan Defendants share ownership structures and controlling shareholder arrangements whereby upstream entities have the authority to appoint and, in fact, do appoint and control the board of directors and executives of downstream entities [*see, e.g.*, MTD Exs. 5, 10, 13, 15-34, 32, 33, 35, 37-43, 47-52, 57, 75-76, 91, 126, 272- 274];

- The CNBM Entities set policies and procedures for the BNBM Entities and Taishan, and the BNBM Entities set policies and procedures for Taishan [*see, e.g.*, MTD Exs. 49, 52-56, 58-67, 69, 70-71, 73-74, 161];

- The upstream entities have oversight of strategy management, decision-making management, resource management, and culture management of the downstream entities [*see, e.g.*, MTD Ex. 91];

- The upstream entities have oversight over the downstream entities' operations and human resources departments [*see, e.g.*, MTD Exs. 66, 249];

- The upstream entities have the capacity and authority to exercise control, and, in fact, do exercise control over strategic business decisions and daily operations of the downstream entities [*see, e.g.*, MTD Exs. 13, 49, 62, 68, 74-77];

- The upstream entities control the downstream entities' land holdings and lease land use [*see, e.g.*, MTD Exs. 157-159];

- The upstream entities impose requirements on the downstream entities that approvals be obtained for capital investments, financing, certain contracts, as well as of bonuses and salaries [*see, e.g.*, MTD Exs. 49, 57, 62, 65, 77-78, 86-92];

- The upstream entities have the capacity to oversee and audit, and, in fact, do audit the downstream entities [*see, e.g.*, MTD Exs. 49, 52-54, 73, 98, 260];

- The upstream entities send leadership groups to the downstream entities in order to oversee their operations [*see, e.g.*, MTD Ex. 55];

---

[68] Rec. Doc. No. 19995.

- The upstream entities impose requirements that the downstream entities must produce reports for the upstream entities on strategy and risk management [*see*, *e.g.*, MTD Exs. 49, 62];

- Numerous transactions between and among the Taishan Defendants were completed where assets and ownership interests changed hands for nil consideration; [*see*, *e.g.*, MTD Exs. 19, 32];

- The Taishan Defendants share numerous common and overlapping officers and directors [*see*, *e.g.*, MTD Exs. 1, 34, 53, 72, 78-85];

- The Taishan Defendants share common office space [*see*, *e.g.*, MTD Exs. 5, 15-20, 22-34, 39, 46, 96, 100-103, 106, 266-270];

- The Taishan Defendants jointly hold property and businesses [*see*, *e.g.*, MTD Exs. 14, 16, 23, 48, 73, 129, 144, 171];

- The Taishan Defendants use common logos, have common corporate identities, and common website advertisements [*see*, *e.g.*, MTD Exs. 5, 81, 108-116];

- The Taishan Defendants fail to observe corporate formalities [*see*, *e.g.*, MTD Exs. 19, 21, 23, 26, 104-105, 121-125, 134, 144, 166];

- The Taishan Defendants fail to follow corporate procedures for establishing subsidiaries and in constructing factories [*see*, *e.g.*, MTD Ex. 73];

- The Taishan Defendants commingle funds [*see*, *e.g.*, MTD Exs. 124, 130];

- The Taishan Defendants improperly treat dividends from subsidiary entities [*see*, *e.g.*, MTD Exs. 167, 170];

- The upstream entities guarantee loans for the downstream entities [*see*, *e.g.*, MTD Exs. 49, 62, 77-78, 86-92];

- The Taishan Defendants use the same accountants and auditors [*see*, *e.g.*, MTD Exs. 19, 31, 39, 46, 93, 96-99, 267, 271];

- The downstream entities hold themselves out to the public as being the upstream entities themselves [*see*, *e.g.*, MTD Exs. 11, 111-112, 117, 119, 120]; and

- Customers are often confused as to which entity they are doing business [*see*, *e.g.*, MTD Exs. 111-116].

*See* PSC's Omnibus Response, at pp. 6-98.

41

Based on the foregoing, there is sufficient evidence to find that the Taishan Defendants constitute a single business enterprise.  Accordingly, the Taishan Defendants, as well as their subsidiaries and related entities, are subject to the 25% penalty provision of the injunction prong of the Court's Contempt Order for their violations thereof.  As set forth below, the Taishan Defendants engaged in repeated violations of this order and as such must forfeit a portion of their profits earned during the Contempt Period.

### 2. CNBM Entities - specific violations of the injunction

Remarkably, CNBM's defense to the PSC's Motion to Enforce consists of the argument that CNBM itself did not violate the Court's injunction since it is only "a holding company with no commercial activities, in the United States or elsewhere."  CNBM Opp. at 23.  This argument ignores CNBM's control over its subsidiaries and affiliates and the fact that they operate as a single business enterprise.  The CNBM Entities fail to mention that they received notice of the Contempt Order but made no effort to comply by refraining from doing business in the U.S. until Taishan participated in the proceedings and paid the *Germano* judgment.[69]  The CNBM Entities also fail

---

[69] *See*, *e.g*., Deposition of CNBM Group (Zhou Guoping) dated 6/16-17/2015 ("GUOPING Dep.") [CONTEMPT Ex. 202 attached hereto], at 253:10-21 (CNBM did not notify its subsidiaries of the contempt order); Deposition of CNBM (Chang Zhangli) dated 6/5-7/2015 ("CHANG Dep.") [CONTEMPT Ex. 31], at 271:25-273:10 (CNBM was aware of the contempt order); Deposition of BNBM PLC (Chen Yu) dated 7/8-11/2015 ("CHEN Dep.") [CONTEMPT Ex. 203 attached hereto], at 44:9-21 (BNBM PLC was aware of the contempt order); Deposition of CNBM Forest (Deng Jianjun) dated 10/28/2015 ("DENG Dep.") [CONTEMPT Ex. 38], at 88:2-6, 95:18-100:15 (CNBM Forest was not aware of the contempt order prior to January 2015.  After becoming aware of the Contempt Order in January 2015, CNBM Forest had concerns about whether it should be doing business in the United States but nevertheless did so.); Deposition of Song Zhiping dated 9/14-15/2015 ("SONG Dep.") [CONTEMPT Ex. 32], at 129:2-9 (Mr. Song, Chairman of the Board of Directors and Executive Director of CNBM, Chairman of the Board of Directors of CNBM Group, and Chairman of Board of Directors of BNBM Group, failed to instruct Taishan affiliates that they should not be doing business in the United States following the issuance of the Contempt Order and Injunction.); Deposition of Cao Jianglin dated 8/4-5/2015 ("CAO Dep.") [CONTEMPT Ex. 77], at 44:3-11 (CNBM learned of the Contempt Order and Injunction in either July or August 2014); CAO Dep. at 44:12-49:24 (CNBM did not advise its subsidiaries of the contempt order and injunction).

to mention in their brief the repeated and consistent violations of the injunctive provision of this Court's Contempt Order by numerous CNBM entities, including CNBM Import & Export, CNBM Forest Products, CNBM Forest (Canada), CNBM (USA), CNBM Investment, CNBMI, United Suntech, China Jushi, Jushi USA, and CNBM International Engineering Co., Ltd.  These violations are set forth in detail in the February 10, 2016 Substituted Memorandum of Law in Support of Motion of Plaintiff-Intervenors and the Plaintiffs' Steering Committee to Enforce the Court's July 17, 2014 Contempt Order and Injunction (filed under seal) (incorporated herein by reference).[70] By way of a sample listing, the CNBM Entities violated the Court's injunction in the following ways:

- **CNBM Import & Export** participated in and settled ongoing litigation during the Contempt Period in federal court in Oregon, and as part of the settlement 15.4 million board feet of logs were shipped to China for CNBM and a payment of $2.55 million was made to the CNBM entities (p. 39) [*see* CONTEMPT Exs. 81-89];

- **CNBM Forest (Canada)** participated in and settled ongoing litigation during the Contempt Period in federal court in Oregon, and as part of the settlement 15.4 million board feet of logs were shipped to China for CNBM and a payment of $2.55 million was made to the CNBM entities (p. 39) [*see* CONTEMPT Exs. 81-89];

- **CNBM Forest Products** purchased lumber from Hampton Affiliates in the United States during the Contempt Period to be prepared and exported to China (p.49) (*see* CONTEMPT Exs. 104-109];

- **CNBM Forest (Canada)** purchased lumber from Western Wood in the United States during the Contempt Period to be prepared and exported to China (p. 50) [*see* CONTEMPT Exs. 38, 96, 109-111];

- **CNBM Forest (Canada)** purchased lumber from Millwood Timber, Inc. in the United States during the Contempt Period to be prepared and exported to China (pp. 51-52) [*see* CONTEMPT Exs. 38, 112-113];

---

[70] Rec. Doc. No. 20032.

- **CNBM Forest (Canada)** purchased lumber from Simpson Lumber Co. in the United States during the Contempt Period to be prepared and exported to China (p.53) [*see* CONTEMPT Exs. 101, 103];

- **CNBM Forest Products** conducted business in the State of Louisiana during the Contempt Period, involving the Southern Yellow Pine ("SYP") Project for the transfer of logs from the Port of Natchez to the Port of New Orleans for the eventual export of the timber.  CNBM Forest Products used SFP as the log container operator and log exporter for this project (pp. 53-54) [*see* CONTEMPT Exs. 114-115];

- **CNBM Forest (Canada)** conducted business in the State of Louisiana during the Contempt Period, involving the SYP Project for the transfer of logs from the Port of Natchez to the Port of New Orleans for the eventual export of the timber. CNBM Forest (Canada) used SFP as the log container operator and log exporter for this project and visited the Port of Savannah Georgia in early 2014 while researching logistics for the SYP project (pp. 53-54) [*see* CONTEMPT 114-115];

- **CNBM Forest Products** conducted business with SFP in Chalmette, Louisiana during the Contempt Period, including entering into several agreements to purchase a substantial amount of lumber during the Contempt Period (p. 54) [*see* CONTEMPT Exs. 38, 115-118];

- **CNBM Forest (Canada)** conducted business with SFP in Chalmette, Louisiana during the Contempt Period, including entering into several agreements to purchase a substantial amount of lumber during the Contempt Period (p. 54) [*see* CONTEMPT Exs. 38, 115-118];

- **CNBM Forest (Canada)** conducted business with Plum Creek, a Seattle, Washington company, to obtain logs from Oregon and Washington for sale to China during the Contempt Period (p. 57) [*see* CONTEMPT Exs. 103, 115, 119-122];

- **CNBM Import & Export** purchased and imported from the United States $43,453,100.00 worth of petroleum coke and U.S. thermal coal via letters of credit. Invoices and contracts produced during discovery have revealed that CNBM Import & Export did $18,687,268.46 in business in the U.S. in clear violation of this Court's Contempt Order (p. 57) [*see* CONTEMPT Exs. 101, 122];

- **CNBM Import & Export** contracted with Liberty Pultrusions, a Pennsylvania company, for the sale of fiberglass products supplied by Jushi USA during the Contempt Period (p. 58) [*see* CONTEMPT Ex. 122];

- **CNBM Import & Export** contracted with Orenco Systems, a Pennsylvania company, for the sale of insulation during the contempt period (p. 58) [*see* CONTEMPT Ex. 122];

- **CNBM International** funded **United Suntech,** a California corporation and a CNBM subsidiary and affiliate, and its business operations during the Contempt Period (pp. 59-60) [*see* CONTEMPT Exs. 16, 30, 56, 58, 70, 73, 79, 122-127];

- **CNBM Investment** conducted business with **United Suntech,** a California corporation and a CNBM subsidiary and affiliate, during the Contempt Period (p. 60) [*see* CONTEMPT Exs. 73, 126-127];

- **CTIEC**, CNBM's engineering entity, conducted business in the United States during the Contempt Period in an on-going partnership with the New Jersey Institute of Technology to develop photovoltaic technology that would be used in the development of projects in the United States, in violation of this Court's Contempt Order (pp. 62-65) [*see* CONTEMPT Exs. 66, 128-141];

- **CTIEC**, CNBM's engineering entity, paid tuition, room, and board to send its executives to NJIT during the Contempt Period to learn about the photovoltaic technology (p. 65) [*see* CONTEMPT Ex. 140];

- **CTIEC**, CNBM's engineering entity, conducted business in the United States during the Contempt Period by doing business with the Toledo Engineering Company in violation of this Court's Contempt Order. (pp. 62-65) [*see* CONTEMPT Exs. 131-135];

- **CTIEC**, CNBM's engineering entity, conducted business in the United States during the Contempt Period with Sunpin, an Illinois company, by entering into an Engineering, Procurement and Construction ("EPC") Framework Agreement for various solar photovoltaic projects located in the United States (p. 65) [*see* CONTEMPT Exs. 143-148];

- **CTIEC**, CNBM's engineering entity, conducted business in the United States during the Contempt Period with Sunpin, an Illinois company, by signing an agreement for constructing solar panels in Walmart supermarkets in the United States (p. 67) [*see* CONTEMPT Exs. 149-150];

- **CTIEC**, CNBM's engineering entity, had a joint-venture with Toledo Engineering Co., Inc. located in Toledo, Ohio to market and sell its services in the U.S. during the Contempt Period (p. 68) [*see* CONTEMPT Exs. 151-152];

- **CNBM International** actively maintained OKorder.com, an e-commerce site that marketed and derived a significant amount of business and income from the United States during the Contempt Period. (pp. 69-71) [*see* CONTEMPT Exs. 154-161];

- **CNBM International,** using OKorder.com, sold GPS devices to a company in Indiana during the Contempt Period as well as other products (pp. 71-72) [*see* CONTEMPT Exs. 160-161];

45

- **CNBM International,** using OKorder.com, entered into a purchase agreement with Comet, a U.S. company, for $2.58 million worth of aluminum foil for food packaging during the Contempt Period (pp. 72-73) [*see* CONTEMPT Ex. 162];

- **CNBM International,** through OKorder.com, worked with IBM and entered into agreements with them to start an across the border e-commerce cloud project during the Contempt Period (pp. 73-74) [*see* CONTEMPT Exs. 34, 159, 164-165, 167];

- **CNBM International** acted in violation of this Court's Contempt Order by operating a website using an IP address assigned to an American Corporation (p. 75) [*see* CONTEMPT Exs. 31, 167];

- **CNBM International** did $340,355.46 in sales during the Contempt Period in direct violation of the contempt order (p. 76) [*see* CONTEMPT Ex. 169];

- **CNBM International** sold stainless steel to Architectural Iron Products in Portland, Oregon during the Contempt Period (p. 77) [*see* CONTEMPT Ex. 174];

- **CNBM International** sold bricks to Refractories, Inc. in Houston Texas during the Contempt Period (p. 77) [*see* CONTEMPT Ex. 173];

- **CNBM International** sold aluminum coils to Global TDR, LLC, a Florida company, during the Contempt Period (p. 77) [*see* CONTEMPT Ex. 172];

- **CNBM International** met with a shelf system company Engineered Products in Seattle Washington during the Contempt Period, and during the visit, technical details of the sale (projected at $420,000) were discussed and finalized (p. 78) [*see* CONTEMPT Ex. 175];

- **CNBM International** purchased clay from Active Minerals Int'l LLC in the United States during the Contempt Period (p. 78) [*see* CONTEMPT Ex. 176];

- **CNBMI** (a wholly-owned subsidiary of CNBM and an affiliate of Taishan) filed a civil lawsuit in the United States District Court for the Western District of Texas (Austin Division), *China National Building Material Investment Co., Ltd. v. BNK International, LLC and Jeffrey Chang*, No. 14-701 (W.D. Tex.). CNBMI's complaint alleges, among other things that: (i) Defendant BNK Int'l – a Texas company – was CNBMI's agent for sales of CNBMI's products in the U.S. from 2004-2008; (ii) BNK owes CNBMI over $7.6 million in connection with their agency relationship and U.S. sales; (iii) through BNK Int'l, CNBMI sold more than $20 million worth of product (to Lumber Liquidators) in the U.S.; and (iv) BNK Int'l is personally liable to CNBMI pursuant to theories of "alter ego" and "piercing the corporate veil". (p. 81) [*see* CONTEMPT Exs. 177-179]. On June 17, 2015 the presiding Judge issued an order staying and abating the case, and directing the parties to seek an instruction from this Court regarding the

46

impact of the Contempt Order and Injunction on the Texas proceedings [see Rec. Doc. No. 19166];

- **CNBM** conducted business throughout the U.S. *via* its subsidiary, Jushi USA. Jushi USA conceded that it continued to do business (*i.e.* selling fiberglass) in the United States during the Contempt Period in clear violation of this Court's prohibition on such business (pp. 84-87) [*see* CONTEMPT Ex. 64, 186, 189];

- **Jushi USA**, a CNBM subsidiary, operated distribution centers in South Carolina, Indiana, and California, from which substantial revenue was derived. during the Contempt Period, and in direct violation of the Contempt Order (p. 85) [*see* CONTEMPT Ex. 64];

- **China Jushi,** another CNBM subsidiary, established another corporate entity in the U.S., Jushi USA South Carolina Fiberglass Company, during the Contempt Period (pp. 84-85) [*see* CONTEMPT Ex. 64];

- **CNBM Forest (Canada)** maintained and used accounts in United States banks in connection with their business conducted during the period of contempt (pp. 90-91) [*see* CONTEMPT Ex. 191];

- **CNBM International** maintained and used accounts in United States banks in connection with their business conducted during the period of contempt (pp. 90-91) [*see* CONTEMPT Ex. 193];

- **CNBM USA** maintained and used accounts in United States banks in connection with their business conducted during the period of contempt (pp. 90-91) [*see* CONTEMPT Ex. 192];

- **Jushi USA** maintained and used accounts in United States banks in connection with their business conducted during the period of contempt (pp. 90-91) [*see* CONTEMPT Ex. 64];

- **CNBM Import & Export** maintained a store-front" on Alibaba.com, an online English-language marketplace for global trade (p. 82) [*see* CONTEMPT Ex. 182];

- **CNBM International** maintained a store-front" on Alibaba.com, an online English-language marketplace for global trade (p. 82) [*see* CONTEMPT Ex. 183];

- **CNBM International Engineering Co., Ltd.** maintained a store-front" on Alibaba.com, an online English-language marketplace for global trade (p. 82) [*see* CONTEMPT Ex. 184];

47

- The following Morgan Stanley entities incorporated in the U.S. held shares in CNBM during the Contempt Period: (1) Morgan Stanley Tower, LLC; (2) Morgan Stanley Commercial Services, (3) MS Beta Holdings, (4) MS Alpha Holdings, (5) Morgan Stanley JV Holdings, (6) Morgan Stanley JV Holdings, LLC, (7) MS Gamma Holdings, and (8) Morgan Stanley Smith Barney Holdings (pp. 88-90) [*see* CONTEMPT Exs. 54, 190];

- Likewise, JP Morgan, Citigroup, Inc., T. Rowe Price and BlackRock each held H shares in CNBM during the Contempt Period. Though the number of shares each of the foregoing entities held during the period of Taishan's contempt vary, each either purchased, sold, or maintained the number of shares it held, ultimately inuring to the benefit of CNBM in one way or another (pp. 89-90) [*see* CONTEMPT Exs. 54, 190].

The CNBM Entities have completely failed in their opposition to specifically address the vast majority of the above-listed violations of the Contempt Order and Injunction. In fact, the CNBM Entities merely argue that the PSC "conflates" two of the CNBM Entities (CTIEC and CNBM International) with CNBM. *See* CNBM Entities' Opp. at pp. 23-24. This "conflating" argument does not address many of the CNBM Entities, or their conduct. Moreover, such an argument ignores the duty of the CNBM Entities to abide by the Contempt Order and Injunction, and it misses the fundamental points that: a) all of the CNBM Entities are affiliates of Taishan; b) the CNBM Entities are responsible for their violations of the Contempt Order; and c) all of these entities, along with Taishan, the BNBM Entities, and the other CNBM Entities, operate as a single business enterprise - making the Taishan Defendants (including CNBM) responsible for these various CNBM Entities' violations of the Contempt Order.

### 3.     BNBM - specific violations of the injunction

With respect to BNBM PLC specifically, the BNBM Entities' opposition provides a single (and incorrect) statement that: "[t]he PSC does not argue that BNBM PLC did business in the

United States during the Contempt Period, and there is no evidence that BNBM PLC did so."[71] This statement represents the entirety of BNBM PLC's argument that it did not violate the Contempt Order, in spite of the fact that the PSC's 2/10/2016 Substituted Memorandum of Law (at pp. 82-84) set forth the following contempt violations by BMBM PLC (in even greater detail):

- **BNBM** maintained a "store-front" on Alibaba.com, an online English-language marketplace for global trade, including with customers from the United States (pp. 82-84) [*see* CONTEMPT Ex. 180 – BNBM PLC's Alibaba "storefront" page]. As previously demonstrated in this case, customers from the U.S. were introduced to Taishan through the Alibaba website and, in fact, purchased Chinese Drywall from Taishan in this manner. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 819, 850 (E.D. La. 2012), *aff'd*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014) ("Additionally, TG published and advertised its products on a third-party website, Alibaba.com. Alibaba.com is an Asian website comparable to Ebay or Craigslist in the United States, which allows for the sale of products via the internet on a global basis. Some customers in the United States have purchased drywall from TG utilizing the Alibaba.com website.).

In fact, the corporate representative of BNBM PLC (Yu CHEN) admitted that the Alibaba site was used by BNBM PLC to promote its products for customers "from any place" to see.[72]

### 4.    <u>BNBM Group - specific violations of the injunction</u>

BNBM Group repeatedly and systematically violated the Court's injunction during the Contempt Period by entering into numerous contracts for the purchase of lumbar from American companies, which was then exported to China. The fact that BNBM Group may have acted as an export agent or other type of agent for other Chinese companies does not alter the fact that BNBM Group participated in and earned money for its role in these commercial activities – worth millions

---

[71] *See* BNBM Entities' 2/13/2017 Opposition to Plaintiffs Motion to Enforce the Contempt Order (Rec. Doc. No. 20656-2) at p. 23.

[72] *See* CHEN Dep. [CONTEMPT Ex. 203], at 582:11-585:19.

of dollars, as set forth in greater detail in the PSC's Substituted Memorandum of Law, and as summarized below as follows:

- **BNBM Group** conducted business with **Western Wood**, a lumber wholesaler located in Buckley, Washington to purchase and export $1.8 million worth of wood to China over during the Contempt Period (p. 44) [*see* CONTEMPT Ex. 90 – FRE 1006 Summary Chart of transactions between BNBM Group and Western Wood with supporting documents, and CONTEMPT Exs. 95-96];

- **BNBM Group** contracted with **WH Int'l** and utilized banks in the United States for the purchase and export over $1 million worth of lumber from the United States to China during the Contempt Period (p. 45) [*see* CONTEMPT Ex. 92 – FRE 1006 Summary Chart of transactions between BNBM Group and WH Int'l with supporting documents, and CONTEMPT Exs. 91 & 97];

- **BNBM Group** conducted business with **Hull FP** for the purchase of over $800,000 worth of lumber to be exported to China during the Contempt Period (p. 46) [*see* CONTEMPT Ex. 93 – FRE 1006 Summary Chart of transactions between BNBM Group and Hull FP with supporting documents].

- **BNBM Group** contracted with **Baillie Lumber**, a United States corporation, as the "clearing agent" for four (4) Chinese companies, for the purchase and export of over $840,000 worth of hardwood lumber from the U.S. to China during the Contempt Period (pp. 46-48) [*see* CONTEMPT Ex. 94 – FRE 1006 Summary Chart of transactions between BNBM Group and Baillie Lumber with supporting documents, and CONTEMPT Exs. 28 & 98-100].

In spite of these clear and numerous violations of the Contempt Order, the BNBM Entities argue that the corporate representative witnesses for these lumber companies somehow excuse this conduct by themselves not characterizing the above business dealings as "doing business."[73] However, this argument fails for several independent reasons. First, it is wholly irrelevant how the lumber company witnesses define "doing business," since it is this Court (and not an executive at a lumber company) who determines whether these extensive business dealings violated the

---

[73] *See* BNBM Entities' 2/13/2017 Opposition to Plaintiffs' Motion to Enforce the Contempt Order (Rec. Doc. No. 20656-2) at pp. 25-31.

Contempt Order.  Second, the BNBM Entities mischaracterize the testimony at issue.  Statements such as "BNBM is not my final customer," "I would not have recognized them [BNBM] as a customer," and "BNBM was not the ultimate customer," do not stand for the proposition that the above-listed business dealings did not occur.[74]  In fact, these very same witness confirmed these above-listed business dealings, which violated the Court's Contempt Order and Injunction.  Third, one of these same lumber company witnesses (Philip Fenwick – Baillie Lumber), which the BNBM Entities cite to for the proposition that they did not violate the Contempt Order, actually testified that once his company was served with the PSC's discovery and was made aware of the Contempt Order, it requested that its customers cease using BNBM [Group] as a "clearing agent."[75]

As a concluding point relative to BNBM Group's violations of the Contempt Order, the PSC must challenge the BNBM Entities' over-arching argument that acting as a "clearing agent" is somehow not doing business.  If that were true, then is there no such thing as a "clearing agent" business.  Was this work performed by BNBM Group altruistic?  Were the underlying contracts which BNBM Group entered into with these U.S. companies just pretend or otherwise invalid?  Did BNBM Group receive no money for being a "clearing agent"?  The answers to all of these questions is "no" - as confirmed by the corporate representative of BNBM Group (Yanming ZHAO), who testified that BNBM Group received an "agency fee" for this work.[76]

### 5.      TG - specific violations of the injunction

---

[74] *Id.*

[75] *See* Deposition of Baillie Lumber (Philip Fenwick) dated 5/28/2015 [CONTEMPT Ex. 99] at 75:1-2.

[76] *See* ZHAO Dep. [CONTEMPT Ex. 28], at 356:19-357:25.

Similar to BNBM PLC, and not coincidentally (as Taishan does what its controlling parents instruct), Taishan engaged in the below violation of the Court's injunction during the Contempt Period:

- **Taishan** maintained a store-front" on Alibaba.com, an online English-language marketplace for global trade, including with American customers (p. 82) [*see* CONTEMPT Ex. 181]; *see also Chinese Drywall*, 894 F. Supp. at 850.

## IV.   **CONCLUSION**

The severe conduct of Defendants which gave rise to and which surrounded this Court's July 17, 2014 Contempt Order "harm[ed] both the many other parties in this case and the decorum of the Court," and "requires strong sanctions." If not for this Court's entry of the Contempt Order and Injunction, Taishan might never have re-entered these proceedings, and Taishan's parent companies – including the BNBM Entities and CNBM Entities - might never have entered the litigation in the first place.  Indeed, "if [the Court] merely held Taishan in contempt and required Taishan to pay damages, the Contempt Order alone would not stop Taishan from continuing to disregard the orders of the Court."

Moreover, the Defendants continued to conduct business here throughout the pendency of the Contempt Period.  As demonstrated above and as outlined more fully in Plaintiffs' Substituted Memorandum of Law in Support of Motion of Plaintiff-Intervenors and the Plaintiffs' Steering Committee to Enforce the Court's July 17, 2014 Contempt Order and Injunction, these Defendants and their affiliates have contemptuously violated this Court's Contempt Order and Injunction.

Accordingly, for the foregoing reasons, Plaintiff-Intervenors and the PSC respectfully submit that the Court enforce the July 17, 2014 Contempt Order and enter an order: (1) identifying the "affiliates" and "subsidiaries" of Taishan subject to the Court's July 17, 2014 Injunction

prohibiting them from conducting any business in the United States for the period of Taishan's contempt (collectively, the "Taishan Affiliates and Subsidiaries"); (2) finding that the Taishan Affiliates and Subsidiaries (previously identified and identified herein) violated the Court's July 17, 2014 Injunction; (3) setting a hearing to determine the penalty owed by Taishan and/or any of the Taishan Affiliates and Subsidiaries; and (4) to determine an appropriate award of attorneys' fees and costs associated with PSC's efforts undertaken in pursuit of enforcing the Contempt Order and Injunction.

Respectfully submitted,

Dated: February 22, 2017

/s/ Russ M. Herman
Russ M. Herman, Esquire (LA Bar No. 6819) (On the Brief)
Leonard A. Davis, Esquire (LA Bar No. 14190) (On the Brief)
Stephen J. Herman, Esquire (LA Bar No. 23129) (On the Brief)
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

Arnold Levin (On the Brief)
Fred S. Longer (On the Brief)
Sandra L. Duggan (On the Brief)
Matthew C. Gaughan (On the Brief)
Keith J. Verrier (On the Brief)
Levin Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)

53

Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm, LLC
425 W. Airline Highway, Suite B
Laplace, LA 70068
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Peter Prieto
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com

Bruce William Steckler (On the Brief)
Kirstine Rogers (On the Brief)
Steckler, LLP
12720 Hillcrest Road, Ste. 1045
Dallas, TX 75230
Phone: (972) 387-4040
Fax: (972) 387-4041
bruce@stecklerlaw.com

Ervin A. Gonzalez
Colson, Hicks, Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
The Lambert Firm
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@thelambertfirm.com

Gerald E. Meunier (On the Brief)
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
Parker Waichman, LLP
27300 Riverview Center Blvd.
Suite 103
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves
Reeves & Mestayer, PLLC
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@attorneys4people.com

Christopher Seeger
Scott Allan George (On the Brief)
Kseniya Lezhnev (On the Brief)
Seeger Weiss, LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
Whitfield, Bryson & Mason, LLP
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5002
dan@wbmllp.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

Victor M. Diaz, Jr., Esquire
V.M. Diaz and Partners, LLC
119 Washington Ave, Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Anthony D. Irpino (On the Brief)
IRPINO AVIN HAWKINS LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

Richard S. Lewis (On the Brief)
Swathi Bojedla (On the Brief)
HAUSFELD LLP
1700 K Street, N.W. Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail <u>or</u> by hand delivery and e-mail <u>and</u> upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, which will serve a notice of the uploading in accordance with the procedures established in MDL 2047, on this 22nd day of February, 2017.

<u>/s/ Leonard A. Davis</u>
Leonard A. Davis
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
Plaintiffs' Liaison Counsel
MDL 2047

*Co-Counsel for Plaintiffs*
