```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2     ***********************************************************

 3     IN RE:  CHINESE-MANUFACTURED          Docket No. 09-MD-2047
       DRYWALL PRODUCTS LIABILITY            Section "L"
 4                                           New Orleans, Louisiana
                                             Thursday, July 17, 2014
 5
       ***********************************************************
 6

 7          TRANSCRIPT OF STATUS CONFERENCE AND MOTION PROCEEDINGS
                HEARD BEFORE THE HONORABLE ELDON E. FALLON
 8                    UNITED STATES DISTRICT JUDGE

 9

10     APPEARANCES:

11     FOR THE PLAINTIFF:              HERMAN, HERMAN, KATZ & COTLAR
                                       BY:  LEONARD DAVIS, ESQ.
12                                     820 O'Keefe Avenue
                                       New Orleans, LA 70130
13

14                                     LEVIN, FISHBEIN, SEDRAN & BERMAN
                                       BY:  ARNOLD LEVIN, ESQ.
15                                     510 Walnut Street, Suite 500
                                       Philadelphia, PA 19106
16

17                                     BARRIOS, KINGSDORF & CASTEIX
                                       BY:  DAWN M. BARRIOS, ESQ.
18                                     701 Poydras Street, Suite 3650
                                       One Shell Square
19                                     New Orleans, LA 70139

20

21     FOR THE DEFENDANT:             FRILOT L.L.C.
                                       BY:  KYLE A. SPAULDING, ESQ.
22                                     Energy Centre - Suite 3700
                                       1100 Poydras Street
23                                     New Orleans, LA 70163-3700

24

25
```

CONTEMPT
Exhibit 6

```
 1   SETTLEMENT ADMINISTRATOR:        BROWNGREER
                                      BY:  JACOB WOODY
 2                                    250 Rocketts Way
                                      Richmond, VA 23231
 3

 4   FOR TAISHAN GYPSUM CO. LTD:      STANLEY, REUTER, ROSS,
                                      THORNTON & ALFORD
 5                                    BY:  THOMAS P. OWEN, JR., ESQ.
                                      LL&E Tower
 6                                    909 Poydras St., Suite 2500
                                      New Orleans, LA 70112
 7

 8   FOR THE STATE OF LOUISIANA:      PERKINS COIE
                                      BY:  CRAIG M.J. ALLELY, ESQ.
 9                                    1900 Sixteenth St., Suite 1400
                                      Denver, CO 80202-5255
10

11   ALSO PRESENT:                    PETER S. THRIFFILEY, pro se
                                      JEANNETTE N. THRIFFILEY, pro se
12

13
     Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR
14                                    500 Poydras Street, Room HB-406
                                      New Orleans, Louisiana 70130
15                                    (504) 589-7776

16

17        Proceedings recorded by mechanical stenography, transcript
     produced by computer.
18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

(THURSDAY, JULY 17, 2014)

(STATUS CONFERENCE AND MOTION PROCEEDINGS)


(OPEN COURT.)

THE COURT:  Be seated, please.  Good morning, ladies and gentlemen.  Call the case, please.

THE DEPUTY CLERK:  MDL-2047, *in re:  Chinese Manufactured Drywall Products Liability Litigation*.

THE COURT:  Lead counsel make their appearance.

MR. LEVIN:  Arnold Levin for the Plaintiff Steering Committee, sir.

MR. SPAULDING:  Good morning, your Honor, Kyle Spaulding on behalf of the Defense Steering Committee and the Knauf defendants.

THE COURT:  We're here today for our monthly status conference.  Please use the microphones because we have several hundred people on the phone who are monitoring it.

I met with lead and liaison counsel a moment ago to discuss with them the proposed agenda.  I'll take it in the order that it's presented.

Anything on Pretrial Orders?

MR. LEVIN:  Yes.  Pre-Trial Order 28(D), your Honor appointed Leonard Davis as assistant secretary to the Fee Committee.

THE COURT:  And any State Court Trial Settings?

09:02:27  1          MS. BARRIOS:  Good morning, Dawn Barrios.  No, your Honor,
09:02:31  2  none changed from what was in the joint report.
09:02:34  3          THE COURT:  Okay.  Anything on State/Federal Coordination?
09:02:39  4          MR. LEVIN:  No, sir.
09:02:41  5          THE COURT:  Omnibus Class Action Complaints?
09:02:43  6          MR. LEVIN:  No, sir.
09:02:46  7          THE COURT:  The motion, Plaintiffs' Litigation Expense
09:02:50  8  Fund.
09:02:51  9          MR. LEVIN:  Well, we're in that period of due diligence
09:02:56  10  where moneys is being deposited with the clerk of the court, sir.
09:03:03  11          THE COURT:  We have in this particular case the unique
09:03:07  12  situation where the individuals who have had their property damaged
09:03:16  13  are getting 100 percent remediation plus attorney's fees, that is to
09:03:21  14  say the claimants themselves are not having to pay attorney's fees.
09:03:26  15  The attorney's fees have been paid by or will be paid by the
09:03:33  16  defendant Knauf, which is already in an account.
09:03:40  17          The issue now is how to allocate those attorney's fees
09:03:47  18  between those individuals who have private clients and the common
09:03:51  19  benefit claims, plaintiff attorney claims, and that involves an
09:03:59  20  interview process and some documentation, much of which I have
09:04:05  21  gotten over the years from the CPA, court appointed CPA, which you
09:04:11  22  know I meet every month to go over the hours that everybody has
09:04:17  23  spent, the type of work that they've done during those hours, the
09:04:21  24  amount invested and the reason for the investment, and now he is
09:04:27  25  pulling together for me a summary of all of those reports and I'll

09:04:30  1    have that plus the benefit of the interviews, and I'll go from

09:04:36  2    there.

09:04:38  3            Anything on the Remediation Program?

09:04:41  4            MR. SPAULDING:  Your Honor, very briefly.  The remediation

09:04:48  5    program seems to be running well.  As of Tuesday, there are 2,243

09:04:54  6    completed units, that's homes and condominiums, with another

09:04:58  7    207 units currently under construction, and another 68 set to begin

09:05:02  8    remediation soon.  So like I say, everything seems to be running

09:05:06  9    well.

09:05:06 10            And as always, Phil Adams from Moss is here, and he can

09:05:11 11    answer any questions about specific remediations if anybody has any

09:05:16 12    questions after the conference.

09:05:17 13            THE COURT:  I've always asked the Moss representative to

09:05:21 14    be present at these meetings so that if anybody, any lawyer has any

09:05:24 15    issue or any claimant has any issue they can meet with the person

09:05:29 16    who is handling all of these.  He's been very helpful at this

09:05:34 17    matter.

09:05:35 18            Just a word.  I've said it before, but it's worth

09:05:39 19    repeating.  The case proceeded by way of, first, after discovery, a

09:05:45 20    couple of trials to establish a potential protocol for remedying

09:05:50 21    these problems.  The protocol was fashioned but when you come up

09:05:55 22    with a protocol based on evidence, often times it's a little

09:06:01 23    theoretical and not practical.  So we tried to put the protocol into

09:06:05 24    action by having a small number of homes selected and the protocol

09:06:12 25    was applied to them.

09:06:13  1        It had to be tweaked a bit, but it looked like that it

09:06:17  2   worked.  And so Knauf, to their credit, has extended the small

09:06:20  3   amount to anybody who is interested in remediating their homes while

09:06:24  4   the settlement program was being devised, while the litigation was

09:06:30  5   continuing.  So now we're up to at least 2,000 homes that have been

09:06:36  6   remediated 100 percent and people are back in their homes.  We've

09:06:41  7   got more going on, but in the meantime we're now proceeding at least

09:06:46  8   with the settlement program of the Knauf entities.

09:06:49  9        And we have some issues that are still outstanding, legal

09:06:54 10   and otherwise, with the Taishan entities, but we'll get to that

09:06:59 11   later on.

09:07:01 12        Anything on INEX, Banner?

09:07:05 13        MR. LEVIN:  Mr. Davis will respond to the CAP 8 issue.

09:07:08 14        THE COURT:  Okay.

09:07:08 15        MR. DAVIS:  Your Honor, BrownGreer is here to give their

09:07:12 16   report with respect to the settlements.

09:07:14 17        But within the last few weeks CAP 8 was issued, it's

09:07:19 18   referenced in the joint report.  And the only other item under this

09:07:23 19   is the Knauf motion to appoint a guardian where there's still some

09:07:27 20   outstanding time and that's pending.

09:07:29 21        THE COURT:  Right.

09:07:37 22        MR. WOODY:  Good morning, your Honor.  My name is Jake

09:07:50 23   Woody from BrownGreer, I'm here to give the monthly status report

09:07:53 24   for the settlement program.

09:07:54 25        As always, we start with the number of total claims filed,

1   we have 22,386 claims filed.  By far the largest is Global, Banner,

2   INEX Repair and Relocation Damages, there's 12,599 of those.

3        And then we turn to miscellaneous, there's 3,996 of those.

4   Miscellaneous claims are a variety of issues, mainly property damage

5   are the allegations in those.

6        We have 1,830 lost rent claims, 1,369 Knauf remediation

7   claims, 911 foreclosure and short sale claims, 870 bodily injury

8   claims, 754 alternative living expenses claims, and just 57 tenant

9   loss claims.

10        We have reviewed 80 percent of all of the claims

11   submitted.  Just under 18,000 reviews are complete.  We've completed

12   reviews of the Global, Banner, INEX claims, the bodily injury

13   claims, the Knauf remediation claims, alternative living expenses

14   and tenant loss claims, we've finished all of the initial reviews

15   for those claim types.  We've started but not yet completed the lost

16   rent claims, foreclosure claims, and miscellaneous claims.

17        We have 838 foreclosure claims to review.  We actually

18   just started those recently, so that number will drop in the next

19   few weeks.

20        By far the largest we have left to review is

21   miscellaneous.  We saved that to the end given the wide variety of

22   claims we were seeing there, we thought it was best to take care of

23   the more established claim types first.

24        We have 242 unreviewed lost rent, we'll finish that in

25   short order.

09:09:43  1          This slide shows the status of the Global, Banner, INEX

09:09:51  2    claims after review:  6,502 are eligible, 1,425 are denied, and just

09:09:58  3    11 are incomplete.  The important number from this slide is not

09:10:02  4    necessarily the number of claims but the number of open claims.

09:10:04  5    Because the Global, Banner, INEX settlement is a pro rata

09:10:07  6    settlement, as long as there are open claims we can't make the final

09:10:10  7    calculations.  We have 108 open claims at this time, at the last

09:10:14  8    status conference we had 500, so those numbers are dropping quickly.

09:10:17  9          And I've included the deadlines for those open claims to

09:10:21 10    close.  As you can see from this, 97 will close within 20 days.  And

09:10:27 11    I have a chart that shows our timeline.  On July 25th we should have

09:10:32 12    85 open claims, on August 4th we should drop down to 11 open claims,

09:10:37 13    and we should have 0 open claims by August 14th.  This is dependent

09:10:41 14    on the claims that are currently open staying in their current

09:10:44 15    status.  We expect that they will, but if one flips from denied to

09:10:49 16    eligible it could change this timeline slightly.  But at this point

09:10:52 17    we think most will stay as they are.

09:10:55 18          Because we're so close to closing all of the claims and

09:10:58 19    making the final calculation, we should be able to do that by the

09:11:01 20    next status conference and start the process of making payments for

09:11:05 21    Global, Banner, INEX claims.  We expect to make one payment instead

09:11:09 22    of breaking it out over several distributions.  We will at the next

09:11:14 23    status conference address that and report on what the numbers look

09:11:16 24    like and the process and time line for doing all of that.

09:11:20 25          THE COURT:  Okay.

09:11:21  1           MR. WOODY:  We did have 888 Global, Banner, INEX appeals.

09:11:26  2   This chart shows what happened to those claims on appeal.  The

09:11:29  3   appeal process works by, we look at the claim first to see if we can

09:11:33  4   resolve the issue; if we can, we send a notice out saying the new

09:11:38  5   result.  If we cannot, we send it to the special master to review.

09:11:42  6   We were able to resolve 87 percent of the appeals on the first pass.

09:11:47  7   We sent just over 100 to the special master, 57 of those came in as

09:11:52  8   denied and remained denied after the special master completed her

09:11:56  9   review.  45 came in as eligible and stayed eligible after review.

09:12:02 10   And just four, one percent, became incomplete on the appeal review.

09:12:07 11           This slide is a version of one I've shown in the past,

09:12:12 12   I've changed it slightly to include the dollar amounts available for

09:12:17 13   each settlement pool and the total eligible and open under air

09:12:23 14   square footage.  The total eligible and open under air square

09:12:28 15   footage includes, obviously, the eligible claims and the claims that

09:12:30 16   are still open whether they're eligible or denied.  It's a small

09:12:30 17   number of square footage.

09:12:33 18           And it also includes for the first time the square

09:12:36 19   footage for claims submitted by Knauf.  As Lenny mentioned a minute

09:12:40 20   ago, CAP 8 has been approved.  CAP 8 addresses how we will handle

09:12:44 21   claims submitted by Knauf.  Knauf has claims against the Global,

09:12:47 22   Banner, INEX settlements because when they remediate a home, a

09:12:52 23   homeowner signs a release and assigns them those claims.  So the

09:12:56 24   CAP 8 addresses how we'll handle the claims submission by Knauf

09:13:00 25   because there are so many of those claims.  And because it's been

09:13:03  1   entered, I have a good idea of how the square footage will shake

09:13:07  2   out.

09:13:07  3          The square footage numbers will change slightly, it will

09:13:10  4   go up and down.  I don't think it'll change by an amount that

09:13:15  5   will -- because there's so much square footage, I don't think --

09:13:18  6   small changes in square footage don't really affect the

09:13:22  7   calculations.

09:13:23  8          As you can see, the Global Settlement is divided into

09:13:26  9   three separate pools and that's spelled out in the allocation

09:13:30 10   agreement for the Global settlement.  There's one amount for the

09:13:35 11   Global settlement and then the allocation plan has a percentage for

09:13:40 12   whether, you know, the builders have a certain percent, the

09:13:44 13   installers have a certain percent, and the suppliers a certain

09:13:46 14   percent.  So homeowners can collect from at least -- at most three

09:13:51 15   pools, some will collect from all three, some will collect from one.

09:13:55 16   But the calculations are different for each, so we'll issue checks,

09:14:00 17   sometimes multiple checks for claimants depending on how their

09:14:03 18   claims came out.

09:14:04 19          THE COURT:  Would you go over them so that the people on

09:14:07 20   the phone can get them.

09:14:09 21          MR. WOODY:  Yes.  There are $32,407,975 available for

09:14:15 22   Banner.  The total eligible under open air square footage is

09:14:22 23   10,664,162.

09:14:23 24          INEX there's $2,068,286 available and there's

09:14:32 25   5,669,133 square feet.

09:14:34  1          Global Builder is $18,779,229 available, and the total
09:14:41  2    square footage for that is 8,993,019 square feet.
09:14:48  3          The Global Supplier, there's $13,980,092 available and
09:14:55  4    3,883,142 square feet.
09:14:59  5          And finally, the Global Installer, there's $8,972,298
09:15:06  6    available and 7,085,840 square feet.
09:15:12  7          We'll post the status report on our web site so people
09:15:15  8    can access the slide in case they didn't catch any of that, and I
09:15:18  9    believe the court posts it as well.
09:15:21 10          THE COURT:  All right.
09:15:22 11          MR. WOODY:  Finally, I'll go through the other loss claims
09:15:26 12    results very quickly.
09:15:27 13          Bodily injury, as I mentioned, is complete and has been
09:15:31 14    complete for a long time.  And what's been happening is that claims
09:15:34 15    are moving from incomplete to denied or incomplete to eligible.  You
09:15:38 16    can see that there's 148 eligible claims, since the last status
09:15:44 17    conference we added 17 to that total, so people moved from
09:15:48 18    incomplete because they didn't have required documents, they gave it
09:15:51 19    to us and became eligible.
09:15:53 20          There are 86 currently incomplete claims, those will
09:15:57 21    either move to incomplete or they will be denied for
09:15:59 22    incompleteness -- I'm sorry, they'll either move to eligible or be
09:16:02 23    denied for incompleteness within the next few weeks.  598 have been
09:16:07 24    denied.  All of them have been denied for incompleteness, there's no
09:16:11 25    other reason that we deny these claims.  And 38 claimants have

09:16:15  1    withdrawn their claims.

09:16:17  2            Reporting on the Knauf remediation review results, I

09:16:21  3    haven't reported on this in awhile and I wanted to give the court an

09:16:24  4    idea of what's been happening with that.

09:16:28  5            Knauf remediation claims are claims for remediation from

09:16:31  6    Knauf.  Most of these claims, there's 1,369, almost all of them have

09:16:38  7    been denied for a variety of reasons, including incompleteness, but

09:16:42  8    also because they submitted Knauf remediation claims when the home

09:16:46  9    had already been remediated.

09:16:49  10           1,132 have been denied.  The remaining claims submitted

09:16:53  11   enough indicia to be, that they appear to be class members.  If they

09:16:57  12   hadn't had an inspection, we requested an inspection for them from

09:17:01  13   the program inspector which is Benchmark.  That inspection will

09:17:08  14   establish the percentage of drywall and whether it truly exists.

09:17:10  15           As you can see, there's 78 claims in that category now.

09:17:14  16   Since we last reported it, that number has dropped down by 56 so

09:17:17  17   that means 56 inspections have taken place since we last reported.

09:17:21  18           The next step would be a Moss estimate where they do a

09:17:24  19   walk through and figure out how much the estimate will cost; that

09:17:28  20   number is 48 at this time and that's down from 65 since I last

09:17:32  21   reported.  So claims are moving from inspection needed to Moss

09:17:35  22   estimate pretty regularly.

09:17:37  23           And the final step is for people to return their work

09:17:40  24   authorizations after Moss does their inspection.  There are 32 in

09:17:44  25   that category and that's down from 50.  So people are moving through

09:17:48   1    this process pretty smoothly, pretty regularly, and I wanted to

09:17:51   2    apprise your Honor of how that's been going.

09:17:54   3          I do have a number of other smaller statuses for these:

09:17:59   4    12 are currently incomplete, 54 have lower case KPT, which is

09:18:04   5    provided for by a separate procedure in the Knauf settlement

09:18:08   6    agreement, and 13 claimants withdrew their claims.

09:18:12   7          The next claim is Pre-Remediation Alternative Living

09:18:16   8    Expenses.  Like bodily injury, this is pretty far along in terms of

09:18:20   9    processing.  There are 754 total, 459 are eligible, just 14 are

09:18:29  10    currently incomplete.  Those will, just like bodily injury, resolve

09:18:31  11    themselves in the next few weeks.  241 are denied.  We deny these

09:18:36  12    claims because they're incomplete or in some cases because they

09:18:41  13    assign their claim to someone else.  27 require a little bit of

09:18:48  14    additional review and we'll handle that quickly.  And 13 have been

09:18:51  15    withdrawn.

09:18:52  16          Lost Rent, Use and Sales claims is what we've really been

09:18:57  17    working on for the last month or so.  This process is not as far

09:19:02  18    long as bodily injury and pre-remediation but it's moving quickly.

09:19:06  19    We're almost finished with all of the reviews.

09:19:09  20          THE COURT:  What does this involve, somebody who had a

09:19:12  21    commercial?

09:19:12  22          MR. WOODY:  These are strictly commercial owners filing

09:19:16  23    claims either because a tenant had to move out because they run a

09:19:20  24    business out of the property and couldn't use it and had to find an

09:19:23  25    alternative location, or because they were unable to sell the

09:19:26   1   property because of the presence of Chinese Drywall.

09:19:30   2          761 are potentially eligible, which is a higher

09:19:34   3   percentage than most of the other claims we've seen so far.  369 are

09:19:38   4   incomplete.  131 have been denied.  Again, that's because of an

09:19:44   5   assignment at this point.  The denied numbers will increase as will

09:19:47   6   the eligible and the incomplete will drop by the time of the next

09:19:51   7   status conference as claims resolve themselves and are either

09:19:55   8   incomplete or eligible.

09:19:57   9          Finally, we have started Foreclosure and Short Sale

09:20:01  10   claims review, we started this in the last week or so.  We've only

09:20:05  11   completed 73, but we're working on this, this is our primary work

09:20:09  12   right now, so the numbers will increase quickly.  All 73 are

09:20:13  13   incomplete.  That's not terribly surprising given the document

09:20:18  14   requirements to prove a foreclosure claim or short sale claim.

09:20:22  15   They're somewhat difficult.  We expect that we will get eligible

09:20:26  16   claims in this category, but that many people will have

09:20:28  17   incompleteness and will resolve it by submitting additional

09:20:32  18   documents.

09:20:33  19          That's all I have for this month, your Honor.  Our

09:20:36  20   contact information remains the same.  The best place to contact us

09:20:40  21   is by e-mail at cdwquestions@browngear.com, our toll free number is

09:20:49  22   (866) 866-1729, and our web portal where you can file claims and

09:20:52  23   access claims and see statuses and upload documents is

09:20:57  24   www3.browngreer.com/drywall.

09:21:00  25          THE COURT:  Okay.  Thank you very much.

09:21:02  1           The next item, Shared Costs.

09:21:09  2           MR. LEVIN:  Nothing new, sir.

09:21:10  3           THE COURT:  Anything on Taishan Defendants?

09:21:12  4           MR. LEVIN:  Yes, sir.  This week we received from counsel

09:21:18  5  for Taishan in the *Germano* case a withdrawal of appearance

09:21:25  6  indicating they were discharged by their client.  Shortly

09:21:29  7  thereafter, we received a withdrawal with regard to all of the other

09:21:33  8  Taishan Omni complaints.

09:21:38  9           We have last night filed our response.  That will no doubt

09:21:43 10  be scheduled probably for the next hearing.

09:21:46 11           In the interim, the PSC intends to make several filings.

09:21:54 12  Today there is the Judgment Debtor Rule, there's a Rule to Show

09:22:01 13  Cause.  We anticipate, according to our discussions with counsel,

09:22:03 14  although we may be surprised, that nobody will be here from China.

09:22:08 15  We will be filing a contempt motion and a sanction motion, and then

09:22:12 16  we intend to pursue a lot of discovery by serving on the

09:22:18 17  discharged -- serving on counsel who apparently wants to be

09:22:24 18  discharged but still is a matter of record here in this court, and

09:22:27 19  that will unfold over the next couple of weeks, sir.

09:22:31 20           THE COURT:  All right.  We will take the Judgment Debtor

09:22:35 21  Rule right after this meeting, so those on the phone who want to

09:22:39 22  continue to monitor this aspect of today's proceeding, please remain

09:22:47 23  on the line.

09:22:53 24           Anything for Venture Supply and Porter Blaine?

09:22:58 25           MS. BARRIOS:  Good morning again, your Honor.  Dawn

09:23:00  1   Barrios, I'm giving the report for Garretson Resolution Group today.

09:23:04  2          We filed the report, it's of record.  We want to say, let

09:23:07  3   the court know that everything is going very well.  The real

09:23:11  4   property claims are all done.  Notices have been issued.  There's an

09:23:17  5   issue with Fannie Mae, but Fannie Mae has contacted Mr. Serpe and

09:23:21  6   they're going to attempt to work that out.

09:23:23  7          As far as the other loss claims go, they are being

09:23:27  8   reviewed at the present time.  And Mr. Garretson is going to get

09:23:31  9   together with BrownGreer to make sure that the administration of the

09:23:37  10  loss claims are consistent between the two settlements.

09:23:40  11         THE COURT:  Okay.

09:23:41  12         MS. BARRIOS:  And for the record, any communication with

09:23:43  13  Garretson Resolution Group should be sent via e-mail to

09:23:50  14  chinesedrywall@garretsongroup.com.  Thank you, your Honor.

09:23:53  15         THE COURT:  All right.  Thank you very much.

09:23:56  16         Nothing on the Plaintiff Profile Forms?

09:23:59  17         MR. LEVIN:  No, sir.

09:24:01  18         THE COURT:  Anything on Pro Se Claimants?

09:24:10  19         MR. JOHNSTON:  Good morning, your Honor.  Bob Johnston,

09:24:20  20  curator for pro se plaintiffs.

09:24:24  21         I have, as occurs in connection with each of the monthly

09:24:28  22  status conferences, I have filed in the record the Curator's Status

09:24:34  23  Report No. 29.  So we've been doing this a long time.

09:24:39  24         THE COURT:  Yes.

09:24:41  25         MR. JOHNSTON:  I will be very, very brief.  In chambers we

09:24:45  1    had a short discussion, but I can relay to the court that there has

09:24:52  2    been a substantial amount of communication with my office from pro

09:24:58  3    ses, large numbers of whom have what we refer to as late Knauf

09:25:03  4    claims.  And because a pro se plaintiff has filed the first motion

09:25:11  5    relating to that, I also last week filed a brief motion simply to

09:25:17  6    provide the court with the 25 particular individuals.  In the

09:25:25  7    in-chambers discussion, it is my appreciation that this will be

09:25:28  8    addressed after this status conference, and I think that that's

09:25:33  9    appropriate that we just deal with it at that point.

09:25:39  10            And status quo continues though.

09:25:40  11            THE COURT:  Okay.

09:25:41  12            MR. JOHNSTON:  Thank you.

09:25:42  13            THE COURT:  These are claims filed after the October date,

09:25:45  14   the issue is what to do with them.  As I understand it, counsel for

09:25:52  15   all sides, I am going to continue these motions so that they have an

09:25:55  16   opportunity to fully discuss that between and among themselves and

09:26:00  17   see whether or not we can get some resolution out of these matters.

09:26:04  18            The original settlement document put a deadline of

09:26:10  19   December, that deadline was moved once, maybe twice, and the last

09:26:18  20   was very stated by counsel for the defendant that it would be

09:26:25  21   October 25th and they indicated that they would not entertain any

09:26:30  22   new claims thereafter.  So we're dealing with claims filed after

09:26:42  23   October 25th that we're trying to focus on at this time, and the

09:26:44  24   parties will get together and see whether or not they can come up

09:26:47  25   with some creative solution to resolve those claims.

09:26:49  1          MR. JOHNSTON:  Correct.  For the record, the 25 all have

09:26:53  2  essentially the same fact situation, which is discovery of the

09:26:58  3  presence of Knauf after the deadline.

09:27:00  4          But having said that, we will have discussions and I will

09:27:06  5  informally continue participation with that.

09:27:09  6          THE COURT:  Okay.

09:27:09  7          MR. JOHNSTON:  Thank you, your Honor.

09:27:11  8          THE COURT:  Thank very much.  Thanks for your help on

09:27:13  9  these matters.

09:27:15 10          Anything on Physical Evidence?  I think we had something

09:27:17 11  last time.

09:27:18 12          MR. LEVIN:  I believe that's all been resolved, your

09:27:20 13  Honor, at least as to the plaintiffs.

09:27:23 14          THE COURT:  How about from the Attorney General, the State

09:27:26 15  of Louisiana, any report on the Attorney General?

09:27:34 16          MR. ALLELY:  Thank you, your Honor.  Craig Allely on

09:27:35 17  behalf of the state.

09:27:36 18          We have recently filed our amended petition, your Honor,

09:27:39 19  and I believe earlier this week an amended notice of removal was

09:27:44 20  filed; and we intend to go ahead and complete, file our response to

09:27:49 21  that according to the schedule that you entered in May I believe on

09:27:52 22  August 11th.  So that's going on just as you foresaw.

09:27:57 23          In addition, the only other issue to report to the court

09:28:03 24  and people on the phone, is that we have been working with Knauf and

09:28:06 25  just yesterday received some information about the drywall that's in

09:28:12  1   storage in Florida at the warehouse there.  And we are determined to

09:28:14  2   work with Knauf to see what information we can get from that in the

09:28:18  3   most cost-efficient way and also within the preservation order that

09:28:23  4   Judge Butchko has for the case that she's got in Miami.

09:28:27  5           And I think that's all we have to report, your Honor.

09:28:29  6           THE COURT:  All right.  Okay.  Anything from Knauf on

09:28:31  7   that?

09:28:36  8           Anything other than what I have just discussed?

09:28:41  9           MR. LEVIN:  With regard to the entire report, sir?

09:28:43 10           THE COURT:  Yes.  I've got some motions, I'll take just a

09:28:48 11   three-minute break and come back and deal with the motions, and then

09:28:50 12   we'll also deal with the Judgment Debtor Rule at that time.

09:28:55 13           MR. LEVIN:  With regard to the preliminary defaults as

09:28:59 14   against all of the Chinese companies.  Now, we have preliminary

09:29:03 15   defaults and they include the parents on Taishan on several of the

09:29:07 16   Omni complaints, particularly the Amorin complaint, and we intend to

09:29:13 17   file for a national class, your Honor; and if certified, seek to

09:29:18 18   assess damages on a class-wide basis against all of the Taishan and

09:29:24 19   upstream defendants, sir.

09:29:26 20           THE COURT:  Okay.  As everyone knows, the circuit has now

09:29:31 21   answered both of those cases that they had on appeal, they affirmed

09:29:36 22   the court on the question of jurisdiction.  So one of those cases,

09:29:43 23   *Germano*, the time for any writs to the Supreme Court is long past.

09:29:49 24   What's the situation with the other one?

09:29:51 25           MR. LEVIN:  Well, I think the last appeals are mid August,

09:29:57 1    second or third week in August for a petition for cert, assuming

09:30:03 2    other counsel come in because they can't move pro se, they're a

09:30:08 3    corporation.

09:30:09 4              Also, your Honor, one last thing.  You've in chambers

09:30:13 5    told us when the September conference will be.

09:30:16 6              THE COURT:  The next conference is August 13th, the

09:30:19 7    September conference is September the 10th.

09:30:24 8              Okay.  We'll just take a short three-minute recess at this

09:30:28 9    time.  Those on the phone please remain if you're interested in

09:30:32 10   hearing the Judgment Debtor Rule.  The court will stand in recess

09:30:35 11   for three minutes.

09:30:36 12             THE DEPUTY CLERK:  All rise.

09:30:37 13        (WHEREUPON, A RECESS WAS TAKEN.)

09:36:40 14        (OPEN COURT.)

09:36:42 15             THE COURT:  Be seated, please.  I have a couple of motions

09:36:45 16   first before me.  First, I noticed that I had a pro se couple, the

09:36:50 17   Thriffileys, that were in the courtroom.  Are they still with us?

09:36:54 18   Mr. and Mrs. Thriffiley.  They filed a pro se claim, they were one

09:36:58 19   of the late filed claims.  I wanted to at least give them an

09:37:02 20   opportunity to present any information if they felt they needed to.

09:37:12 21   Anything from Mr. Thriffiley?

09:37:14 22             MR. JOHNSTON:  He is right here, your Honor.

09:37:17 23             THE COURT:  Mr. Thriffiley, I'm calling your case.  As I

09:37:20 24   mentioned, you're one of several late filed claims.  I understand

09:37:27 25   the issue.  What I was hoping is that I wouldn't rule on this

09:37:32  1   particular motion or the motions involving the late filed claims at

09:37:37  2   this time.  I felt that it would be helpful to the late filed claims

09:37:41  3   if you met with Knauf and discussed with them some potential for

09:37:50  4   handling this issue.  But I appreciate you coming today and I wanted

09:37:58  5   to afford you an opportunity to speak, if you have anything to say,

09:38:01  6   sir.

09:38:03  7          MR. PETER THRIFFILEY:  That's fine, your Honor.  I'll

09:38:05  8   leave that up to your Honor.

09:38:05  9          THE COURT:  Okay.  I received your documents, it was well

09:38:07 10   stated, I understand it.  It's one of those situations that it's not

09:38:12 11   new to us, it's a question of how to handle that particular problem.

09:38:17 12   When the cases were originally settled there was a time limit for

09:38:22 13   the settled claims, and then several claims came up after that and

09:38:33 14   there was some movement of those dates, but there was some

09:38:38 15   discussion as to the feeling of the parties that they had to put

09:38:44 16   some date that was a drop-dead date.  That doesn't mean that those

09:38:50 17   claims don't have merit, it's just that whether they come into this

09:38:55 18   settlement or they can be resolved in some other fashion, and that's

09:39:00 19   one of those things that we're struggling to deal with now.  But I

09:39:05 20   do recognize that your claim has merit, you just discovered it

09:39:09 21   lately --

09:39:10 22          MR. PETER THRIFFILEY:  Yes, your Honor.

09:39:11 23          THE COURT:  -- and felt that you should bring it to the

09:39:13 24   court.  So I appreciate your interest and coming today.

09:39:16 25          MR. PETER THRIFFILEY:  Thank you for your time, your

09:39:18  1    Honor.

09:39:18  2            THE COURT:  Okay.  Thank you.

09:39:20  3            As I mentioned, the other late claim, the other late

09:39:24  4    filed claim issues, the parties indicated that they would like to

09:39:27  5    discuss them and see whether or not we can deal with those in some

09:39:32  6    fashion.  Anything from you, Bob?

09:39:33  7            MR. JOHNSTON:  That's right.  And we will report to the

09:39:36  8    court at the conclusion of that.

09:39:37  9            THE COURT:  Good.  Okay.

09:39:41 10            Does that do it for the motions?

09:39:43 11            There's a motion for a default, I haven't received any

09:39:49 12    response to it, so I'll grant that motion as being final.

09:39:55 13            The next item on the agenda is the Judgment Debtor Rule.

09:40:03 14    Let me say a word or two just to put that in perspective so that

09:40:07 15    we're all at least on the same page.

09:40:12 16            By way of background, as we all know because we've lived

09:40:17 17    through it now, from 2005 to 2008, a housing boom coincided with the

09:40:24 18    destruction caused by Hurricanes Katrina and Rita and sharply

09:40:31 19    increased the demand for construction materials, particularly

09:40:35 20    drywall, in the Gulf states as well as the eastern seaboard.

09:40:40 21            In response to this, several Chinese companies

09:40:44 22    manufactured considerable amount of the gypsum drywall because the

09:40:51 23    United States in effect ran out.  We're a big drywall producer in

09:40:55 24    this country, we use it a lot in our construction, but because of

09:40:59 25    this boom and because of the destruction of the hurricanes, by in

large the drywall manufactured by the United States in effect ran

out.  Some Chinese companies, both subsidiary of European entities

as well as Chinese created companies, got into the mix, and they

felt that this was an opportunity for them, not only to sell drywall

but to also help the people who needed drywall.

In any event, several Chinese companies manufactured

considerable quantities of gypsum wallboard, which became known as

Chinese Drywall, and it was shipped to this country.  Homeowners

bought them, thousands of millions of sheets of this Chinese

manufactured drywall, put into the homes, new construction as well

as repaired construction resulting from the hurricanes.

The homeowners installed that and they began to have

problems with it.  They had problems with the odor, they also had

problems with damages for the structural, mechanical, and plumbing

systems of the home, and also appliances.  Apparently this drywall

contained an excess amount of sulphur.  And the two metals that

predominate, probably in all worldwide construction, but certainly

in the United States, is metal and copper.  Copper, as we know, is

used for ground wires, it's also used for refrigerants and air

conditioning, things of that sort.  The other metal that

predominates is silver.  Silver is used as contact points for all

switches, both manufactured for lights, for burglar alarms, for

smoke alarms, for fire alarms, computers, and what have you.  These

two metals predominate because they don't rust and so they're able

to withstand the use put upon them in the construction.

09:43:33 1      The unfortunate thing is that the problem with both of

09:43:41 2 them, the Krypton as we would say and those who live with Superman

09:43:46 3 years ago, the Achilles heel of those two metals is sulphur.  When

09:43:53 4 they're exposed to sulphur, they corrode and they cease to function,

09:44:02 5 and so the ground wires don't work, you're concerned about heating

09:44:08 6 and you're concerned about fires.  If a fire occurs the smoke alarms

09:44:11 7 don't go off because they don't work either, refrigerants start to

09:44:15 8 break down and create problems.

09:44:19 9      So as a result of these issues, cases were filed, claims

09:44:26 10 were filed, and the claims multiplied as you see several thousand,

09:44:33 11 20, 30, 40,000 claims were filed in about 26 states and a

09:44:41 12 multi-district judicial panel for multidistrict litigation dubbed

09:44:47 13 this a multi-district case and transferred it to the Eastern

09:44:55 14 District of Louisiana.

09:44:57 15      After a period of discovery, it became clear that there

09:45:02 16 were two groups of manufacturers involved in most of these

09:45:08 17 instances, one group was the Knauf entities.  Knauf was able to

09:45:15 18 purchase inside of China a manufacturing or several manufacturing

09:45:20 19 facilities.  They created a wholly owned subsidiary, Chinese

09:45:26 20 subsidiary to own those facilities, and they produced a substantial

09:45:31 21 amount of drywall.

09:45:32 22      Also the other entities were Chinese-based entities,

09:45:37 23 Taishan and Tianjin, gypsum and plaster board companies, they also

09:45:48 24 produced, they were Chinese-based companies.

09:45:51 25      Knauf recognized their responsibility and waived service

09:46:00 1    and fielded a group of attorneys who were very conscientious and

09:46:04 2    hard working and they started working on the case.  They took

09:46:11 3    discovery and also we proceeded to trial and dealt with a protocol.

09:46:18 4    And as I mentioned earlier on, this developed into a pilot program

09:46:23 5    and then a remediation program, and then the parties, the Knauf

09:46:30 6    entity agreed to monetize that program, and as a result the cases

09:46:37 7    involving Knauf drywall were settled for a billion dollars or

09:46:43 8    thereabouts, upwards or downwards for the Knauf based drywall.

09:46:51 9          Taishan Gypsum and the other companies affiliated with

09:46:56 10   them took a different approach.  They felt that this court had no

09:47:02 11   jurisdiction over them, they did not wish to accept service.  As a

09:47:09 12   result, the litigants had to involve the international service, the

09:47:19 13   Haig, and serve them under the Haig.  The unfortunate thing is that

09:47:26 14   service under the Haig in a case like this, service of one pleading

09:47:32 15   is six figures generally, it's 100, $125,000 just to serve the

09:47:39 16   individuals.  This presented some problems, but the attorneys for

09:47:44 17   the litigants bit the bullet, so to speak, and served those

09:47:50 18   individuals.

09:47:54 19         They were properly served, they were properly sued, they

09:47:58 20   had notice of the suit, they didn't respond.  I gave them a

09:48:05 21   considerable amount of time, trying to encourage them to respond.

09:48:10 22   They refused to respond.  I then directed the plaintiff attorneys

09:48:16 23   representing the litigants to take a default.  They took a

09:48:20 24   preliminary default.

09:48:22 25         Again, I notified the Taishan entities and invited them

09:48:26  1   to respond.  They did not respond.  I ordered the plaintiffs to take
09:48:32  2   a default.  The default consumed about a week of this court's time
09:48:39  3   and expense of about $1 million just to take a default in this case
09:48:47  4   with the various experts involved.  A default was taken and I issued
09:48:53  5   a judgment against the defendants.
09:49:00  6        On the last day, the 30th day, Taishan decided to enter
09:49:04  7   the proceeding.  They entered the proceeding at that point and
09:49:08  8   presented themselves to the Fifth Circuit questioning jurisdiction.
09:49:12  9   The Fifth Circuit looked at the record and indicated that that
09:49:16 10   wasn't raised before, so they remanded the case back to this court
09:49:21 11   for the purpose of dealing with the jurisdictional aspects of the
09:49:25 12   case.  The jurisdiction involved whether or not Taishan and its
09:49:33 13   entities were present, and if so, what was the scope and the breadth
09:49:38 14   of their presence.
09:49:41 15        I felt that that required some discovery.  I directed the
09:49:45 16   parties to proceed with discovery.  And the long and short of it,
09:49:53 17   the first attempt at discovery presented some logistical problems,
09:49:59 18   we had too many translators involved, and I found page after page of
09:50:07 19   interesting discussion but mostly by the translators arguing as to
09:50:13 20   what the word was and what the word wasn't.  So we had to take the
09:50:18 21   discovery again, and I saw no alternative but for this court to go
09:50:23 22   over to China to participate in the discovery.  We spent five days
09:50:30 23   in a dungeon, the basement of a building, and the discovery
09:50:39 24   proceeded eight, nine hours a day.  The discovery went reasonably
09:50:44 25   well, objections were made, I ruled on them, and competent counsel

```
09:50:49  1   for both sides proceeded and the discovery was finalized and
09:50:55  2   completed.
09:50:56  3        I looked over the discovery and the record, and I wrote
09:51:01  4   an opinion feeling that I had jurisdiction and I expressed myself as
09:51:07  5   to the reasons.  Taishan appealed those judgments.  At that point I
09:51:17  6   had four cases that were before me that I ruled on and I felt that I
09:51:22  7   had jurisdiction.  They appealed them and did a good job on the
09:51:25  8   appeal, they wrote, Taishan, excellent briefs because they were
09:51:30  9   represented by excellent counsel and they presented a good argument
09:51:36 10   to the circuit.  So did the plaintiff attorneys.
09:51:43 11        The circuit in two opinions, two different panels of
09:51:48 12   judges expressed themselves and affirmed this court's judgment.  The
09:51:56 13   cases then were finalized, time for writs to the United States
09:52:05 14   Supreme Court, at least in the *Germano* case, is now expired and the
09:52:09 15   plaintiffs felt that it was necessary for them to take action to
09:52:14 16   execute on the judgment.  As is done in matters of this sort, they
09:52:20 17   filed for a Judgment Debtor Rule requiring the defendant Taishan and
09:52:29 18   its affiliates to be present and the court ordered them to be
09:52:36 19   present and the Judgment Debtor Rule was set for today.
09:52:40 20        So I'll turn to that rule at this time.
09:52:47 21        MR. LEVIN:  Good morning again, your Honor.  Mr. Meunier
09:52:52 22   will present our position, but I just want to state for the record
09:52:59 23   and counsel for Taishan is here, that Taishan is aware of these
09:53:03 24   procedures and was made aware of these proceedings by its counsel.
09:53:09 25   It's seven minutes to ten and since the original notice said
```

09:53:14  1    10 o'clock, at some point in time I would like to have the court ask

09:53:20  2    whether anybody representing Taishan, other than Mr. Owen, is

09:53:24  3    present in the courtroom or any of their principles are present in

09:53:27  4    the courtroom.

09:53:27  5            THE COURT:  Sure, I'll do that now.  Anybody from Taishan

09:53:31  6    defendants?

09:53:32  7            Let me ask counsel for Taishan at this point.  I received

09:53:40  8    a notice or a pleading from Taishan's counsel indicating the

09:53:47  9    following:  Said counsel has notified Taishan of the outcome of the

09:53:52 10    appeal.  Counsel has also notified Taishan of the court's directive

09:53:58 11    to appear at court on July 17th, 2014, for a judgment debtor

09:54:07 12    examination, as well as notified Taishan of the bill of costs filed

09:54:12 13    by the PSC on July 2nd and the appropriate deadlines associated with

09:54:20 14    objecting to the bill of costs.  I'm quoting from counsel's memo.

09:54:27 15            Taishan has notified counsel that it does not intend to

09:54:31 16    participate in the judgment debtor exam or any decision on the bill

09:54:35 17    of costs.  I received that from counsel, Mr. Thomas Owen who is

09:54:44 18    representing Taishan, along with Joe Cyr and Frank Spano.

09:54:53 19            MR. OWEN:  Tom Owen, counsel of record for Taishan Gypsum.

09:54:57 20    Those statements, we did file in our motion to withdraw that was

09:55:02 21    filed on Monday which related to the *Germano* case, and those are

09:55:07 22    correct statements.  National counsel, which is Hogan Lovells, in

09:55:11 23    this matter notified Taishan Gypsum of the motion for a judgment

09:55:16 24    debtor exam, as well as the court's order setting it for today,

09:55:21 25    July 17th, 2014, at 10:00 A.M.

09:55:25   1          National counsel received communications from Taishan

09:55:30   2    Gypsum that it would not attend or participate in the judgment

09:55:34   3    debtor examination.  To my knowledge, no representative of Taishan

09:55:44   4    Gypsum is planning to appear today.  And I have not been provided

09:55:48   5    with any records to provide to the PSC to satisfy anything that was

09:55:53   6    requested pursuant to that judgment debtor exam.

09:55:57   7          Also, as the court has said, we received a letter on

09:56:01   8    July 13th from Taishan Gypsum informing us that national counsel

09:56:07   9    Hogan Lovells, as well as my firm Stanley Reuter, has been

09:56:11  10    discharged as its counsel with regard to not only the *Germano*

09:56:15  11    proceedings but with respect to all of the proceedings, both in

09:56:21  12    federal and state court, which led to the motion to withdraw that

09:56:26  13    you quoted from earlier today.

09:56:28  14          THE COURT:  I just received the motion a day or two ago

09:56:31  15    and I just received the response from the motion, I haven't had an

09:56:37  16    opportunity to invite a response to the plaintiffs' position.  I'll

09:56:42  17    move this motion, I'll move it to another time and give you both an

09:56:48  18    opportunity to respond to the motion and also present oral argument

09:56:54  19    on it.  The motion presents some issues as to when you were

09:56:59  20    discharged, why you were discharged, who discharged you, whether

09:57:04  21    somebody else is going to be representing them now, and if so, who

09:57:13  22    and what.  But I'll deal with that.

09:57:18  23          Presently you're attorney of record and I appreciate you

09:57:21  24    being here.  And as I mentioned before, both your firm as well as

09:57:24  25    the national firm has represented this entity vigorously,

09:57:30  1   competently and professionally, and from that standpoint you have

09:57:35  2   the thanks and appreciation of the court.  It's unfortunate that

09:57:42  3   your client feels that they can't abide by court orders.  I take

09:57:50  4   that as an offense and I have to act on it.  But I do so not in any

09:57:59  5   disrespect to you or your counsel because you've done everything

09:58:05  6   possible competently and you've competently represented them.  And

09:58:08  7   if they don't appreciate it, you need to know the court appreciates

09:58:11  8   it.

09:58:12  9          MR. OWEN:  Thank you and I appreciate that, your Honor.

09:58:14  10         THE COURT:  I note that they not only failed to appear but

09:58:18  11  that they refused to appear.  I think that that is contemptuous, I

09:58:25  12  feel that they're in contempt of court, and they are in contempt of

09:58:28  13  court criminally as well as civilly.  And so for failure and refusal

09:58:36  14  to participate in these proceedings, the court holds these

09:58:41  15  defendants, Taishan and the Taishan entities, in contempt both

09:58:49  16  civilly and criminally.  As a penalty for this contempt, the

09:58:57  17  defendants are condemned to pay $15,000 attorney's fees to

09:59:02  18  plaintiffs' counsel and $40,000 penalties.

09:59:08  19         In addition, the court hereby enjoins these defendants and

09:59:13  20  any of their affiliates and subsidiaries from doing any business in

09:59:17  21  the United States until or unless they participate in this process.

09:59:24  22  And if they violate this injunction, they will owe 25 percent of the

09:59:29  23  profits earned by the company or its affiliates who violate it for

09:59:35  24  the year of the violation.

09:59:38  25         I'm also going to send this document to the Secretary of

09:59:41 1  Commerce and the Chair of the Senate Committee on Commerce, as well

09:59:48 2  as the United States Attorney General so that they can be aware of

09:59:52 3  the seriousness of this situation.

09:59:55 4          A company, a foreign company who comes into our country

09:59:58 5  and does business in our country and then takes the opportunity to

10:00:03 6  appeal the opinion of the court, participate in the argument,

10:00:08 7  participate in the briefs and because they lose the appeal decide

10:00:13 8  that they're going to thumb their nose at the court and not follow

10:00:16 9  the court's orders, I think that that's clearly contempt and

10:00:23 10 contempt in the presence of the court.  So I will issue an order to

10:00:26 11 that effect.

10:00:27 12          Thank you very much.  Anything further from anyone?

10:00:29 13          MR. LEVIN:  No, sir.

10:00:31 14          THE COURT:  The court will stand in recess.

10:00:33 15          THE DEPUTY CLERK:  All rise.

10:00:34 16      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

17

18                              *  *  *  *  *  *

19                          REPORTER'S CERTIFICATE

20

21      I, Karen A. Ibos, CCR, Official Court Reporter, United
   States District Court, Eastern District of Louisiana, do hereby
   certify that the foregoing is a true and correct transcript, to the
22 best of my ability and understanding, from the record of the
   proceedings in the above-entitled and numbered matter.

23

24      _____
                            Karen A. Ibos, CCR, RPR, CRR, RMR
25                          Official Court Reporter