Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3    ************************************************

 4    IN RE:  CHINESE-MANUFACTURED  MDL NO. 2047
      DRYWALL PRODUCTS LIABILITY
 5    LITIGATION                    SECTION:  L

 6    THIS DOCUMENT APPLIES TO      JUDGE FALLON
      ALL CASES
 7                                  MAG. JUDGE
                                    WILKINSON
 8
      ************************************************
 9

10            CONFIDENTIAL - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW
11              Tuesday, August 25, 2015

12                    — — —

13

14        Videotaped Deposition of Bing Wang, held at

15    the offices of Phelps Dunbar LLP, 365 Canal

16    Street, Suite 2000, New Orleans, Louisiana,

17    commencing at 9:17 a.m., on the above date, before

18    Maureen O. Pollard, Certified Court Reporter

19    (#2011025), Registered Merit Reporter, Realtime

20    Systems Administrator.

21

22

23                    — — —

24            GOLKOW TECHNOLOGIES, INC.
         877.370.3377 ph | 917.591.5672 fax
25              deps@golkow.com
```

CONTEMPT
Exhibit 78

Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S :
 2   COUNSEL FOR THE PLAINTIFF CLASS:
 3   HERMAN HERMAN & KATZ LLC
     BY:  MADELYN M. O'BRIEN, ESQUIRE
 4        mobrien@hhklawfirm.com
               820 O'Keefe Avenue
 5             New Orleans, Louisiana 70113
               (504) 581-4892
 6
 7   LEVIN FISHBEIN SEDRAN & BERMAN
     BY:  ARNOLD LEVIN, ESQUIRE
 8        alevin@lfsblaw.com
               510 Walnut Street
 9             Suite 500
               Philadelphia, Pennsylvania 19106
10             (215) 592-1500
11
     IRPINO LAW FIRM
12   BY:  PEARL A. ROBERTSON, ESQUIRE
          probertson@irpinolaw.com
13        ANTHONY IRPINO, ESQUIRE
          airpino@irpinolaw.com
14             2216 Magazine Street
               New Orleans, Louisiana 70130
15             (504) 525-1500
16
     GAINSBURGH BENJAMIN DAVID MEUNIER &
17   WARSHAUER LLC
     BY:  RACHEL A. STERNLIEB, ESQUIRE
18        rsternlieb@gainsben.com
               2800 Energy Centre
19             1100 Poydras Street
               New Orleans, Louisiana 70163-2800
20             (504) 522-2304
21
     COUNSEL FOR TAISHAN GYPSUM COMPANY:
22   ALSTON & BIRD LLP (Via Phone)
     BY:  BERNARD TAYLOR, SR., ESQUIRE
23        bernard.taylor@alston.com
               One Atlantic Center
24             1201 West Peachtree Street
               Atlanta, Georgia 30309-3424
25             (404) 881-7000
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):
 2
      COUNSEL FOR BNBM DEFENDANTS:
 3
      DENTONS US LLP
 4    BY:  C. MICHAEL MOORE, ESQUIRE
              mike.moore@dentons.com
 5            MATTHEW T. NICKEL, ESQUIRE
              matt.nickel@dentons.com
 6                2000 McKinney Avenue
                  Suite 1900
 7                Dallas, Texas 75201
                  (214) 259-0900
 8
 9
      DENTONS US LLP
10    BY:  MICHAEL H. BARR, ESQUIRE
              michael.barr@dentons.com
11                1221 Avenue of the Americas
                  New York, New York 10020
12                (212) 768-6700
13
14    PHELPS DUNBAR LLP
      BY:  HARRY ROSENBERG, ESQUIRE, ESQUIRE
15            harry.rosenberg@phelps.com
                  365 Canal Street, Suite 2000
16                New Orleans, Louisiana 70130-6535
                  (504) 566-1311
17
18    DENTONS HK LLP
      BY:  TODD LIAO, ESQUIRE
19            todd.liao@dentons.com
              ANNIE QIU, ESQUIRE
20            annie.qiu@dentons.com
                  5th Floor The Center
21                989 Changle Road
                  Shanghai, 200031 China
22                +86 21 2315 6000
23
24
25
```

```
 1    APPEARANCES (CONTINUED):

 2    COUNSEL FOR CNBM DEFENDANTS:

 3    ORRICK HERRINGTON & SUTCLIFFE LLP

      BY:  KELLY M. DALEY, ESQUIRE

 4         kdaley@orrick.com

                51 West 52nd Street

 5              New York, New York 10019-6142

                (212) 506-3775

 6

 7


      GORDON ARATA McCOLLAM DUPLANTIS & EAGAN LLP

 8    BY:  EWELL (TIM) E. EAGAN, JR., ESQUIRE

                eeagan@gordonarata.com

 9              201 St. Charles Avenue

                40th Floor

10              New Orleans, Louisiana 70170-4000

                (504) 582-1111

11

12    COUNSEL FOR THE STATE OF LOUISIANA:

13    PERKINS COIE LLP

      BY:  DAVID L. BLACK, ESQUIRE

14         dblack@perkinscoie.com

                1900 Sixteenth Street

15              Suite 1400

                Denver, Colorado 80202

16              (303) 291-2400

17

18    ALSO PRESENT:

19         SUNNY WANG, MANDARIN INTERPRETER

20         DENNIS ZHAO, HERMAN HERMAN & KATZ, LLC

21         RICHARD RIENSTRA, VIDEOGRAPHER

22         JOSHUA TARR

23                    —— —— ——

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                         INDEX

 2     EXAMINATION                           PAGE

 3     BING WANG

 4      BY MR. LEVIN                            7

 5      BY MS. ROBERTSON                      153

 6      BY MR. LEVIN                          156

 7

 8

 9           E X H I B I T S

10     NO.         DESCRIPTION               PAGE

11    308     Request for Instructions on
              Establishing a Wholly-Owned
12            Subsidiary in Xiangyang by Taishan
              Gypsum, Bates BNBMPLC-E-0100080
13            through 0100086.....................121

14    313-R   Notice on Asking for Opinions and
              Suggestions on the Democratic Life
15            Meeting of the Leadership Team of
              BNBM PLC for the Year 2014, Bates
16            BNBMPLC-E-0109215 through 109216.....116

17    314-R   4/2006 document, Bates
              BNBMPLC-E-0005409 through 5421.......152
18
      321     3/10/06 USA Market Development
19            Plan for BNBM Homes Prepared by
              JPS Group, Inc., Bates
20            BNBM(Group)-E-0008592 through 8606...107

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1              P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  We are now on the

 4    record.  My name is Richard Rienstra,

 5    videographer here for Golkow Technologies.

 6              Today's date is August 25, 2015, and

 7    the time is 9:17 a.m..

 8              This videotaped deposition is being

 9    held in New Orleans, Louisiana in reference to

10    the Chinese-Manufactured Drywall Products

11    Liability Litigation.

12              The deponent today is Mr. Wang Bing.

13              The court reporter is Maureen Pollard.

14              Counsel will be noted on the

15    stenographic record.

16              Will the court reporter please swear

17    in the interpreter.

18              (Sonny Wang, Mandarin Interpreter,

19    sworn.)

20              THE VIDEOGRAPHER:  Please swear in the

21    witness.

22

23              BING WANG,

24    having been first duly sworn, was examined and

25    testified as follows through the interpreter:
```

1                    EXAMINATION

2   BY MR. LEVIN:

3        Q.    Good morning, Mr. Wang.  My name is

4   Arnold Levin.  If you don't understand my

5   accent, Mr. Barr will translate for you.  Is

6   that understood?

7        A.    Thank you.

8              MR. BARR:  That was the first in a

9   series of very bad jokes that will happen.

10             MR. LEVIN:  That's easy for you to

11  say.

12  BY MR. LEVIN:

13       Q.    Sir, when did you come to New Orleans

14  in anticipation of this deposition?

15       A.    I came here yesterday.

16       Q.    And had you been to New Orleans, or

17  the United States, or any city in the United

18  States before for preparation of the deposition?

19       A.    I have never been to New Orleans, but

20  before coming here I went to New York first.

21       Q.    Okay.  And did you come to New Orleans

22  directly from New York?

23       A.    Yes.

24       Q.    And did you meet with Mr. Barr in New

25  York?

Confidential - Subject to Further Confidentiality Review

1      A.    We did meet.

2      Q.    When did you come to New York?

3      A.    I went to New York for a couple of

4  days.

5      Q.    Okay.  And did you meet in Mr. Barr's

6  office those couple days in preparing for this

7  deposition?

8      A.    We met in Barr's -- Mr. Barr's office.

9      Q.    And who was present when you met with

10  Mr. Barr, do you recall?

11     A.    My memory was Attorney Liao, L-I-A-O,

12  as well as this attorney.

13           MR. LEVIN:  And Mr. Barr can tell us

14  his name?

15           MR. BARR:  Matt Nickel and Annie Qiu.

16  BY MR. LEVIN:

17     Q.    That's fine.

18           How long did you meet with Mr. Barr

19  and his group of attorneys?

20     A.    A few times, approximately, in these

21  couple of days.

22     Q.    How many hours, would you say?

23     A.    Approximately a day and a half.

24     Q.    An eight hour day?

25     A.    Pretty much.

Confidential - Subject to Further Confidentiality Review

1      Q.    Did you meet with Mr. Barr or any of

2  his attorneys in either China or Hong Kong?  I

3  realize Hong Kong is part of China now, so I

4  apologize.

5      A.    I met with Mr. Barr in Beijing.

6      Q.    And when was that, sir?

7           MR. BARR:  Are you asking him in

8  connection with preparation for his deposition,

9  or ever?

10          MR. LEVIN:  Forever, and then in

11  preparation for the deposition.

12          MR. BARR:  Okay.

13     A.    I believe I met with Mr. Barr in

14  Beijing after we had hired Mr. Michael Barr's

15  company once, and another time it was before I

16  came to the United States.

17  BY MR. LEVIN:

18     Q.    And when was that, sir?

19     A.    Approximately a month ago, but I do

20  not have a clear recollection on that.

21     Q.    You hired Mr. Barr -- maybe I didn't

22  understand you.

23          MR. BARR:  I don't think your question

24  -- your question is when did he meet me as

25  opposed to when were we retained.

1           MR. LEVIN:  Okay.  Thank you.

2   BY MR. LEVIN:

3       Q.    When did you retain Mr. Barr's law

4   firm?

5       A.    I believe it was approximately two or

6   three months ago it was announced publicly, it

7   was in charge of by our legal department.  I do

8   not remember the details.

9       Q.    Did you meet with members of

10  Mr. Barr's law firm prior to retention?

11      A.    No.

12      Q.    And I would imagine your retention in

13  this a couple months ago with regard to

14  Mr. Barr's law firm was for purposes of the

15  litigation that we're here for today?

16      A.    Yes.

17      Q.    Did any other lawyers, American

18  lawyers, US lawyers, represent you prior to your

19  retention of Mr. Barr's firm?

20      A.    We had hired a legal consultant before

21  in America, but I do not know the details, but

22  I've heard there was a legal consultant such as

23  this.

24          MR. BARR:  Just before you pose your

25  next question, let me know that you're asking

Confidential - Subject to Further Confidentiality Review

1   about, when you say "you," you're referring to

2   BNBM PLC?

3           MR. LEVIN:  Yes, I am, the collective

4   you.

5           MR. BARR:  That's the "you" you're

6   referring to?  I just want to be clear.

7           MR. LEVIN:  Yes.

8   BY MR. LEVIN:

9       Q.    Was that an American law firm that was

10  the consultant?

11      A.    It is an American law firm.

12      Q.    And when were they hired as a

13  consultant?

14      A.    I do not know the specifics because

15  this is a daily matter, and was in charge of by

16  the legal department.

17      Q.    Perhaps this would refresh your

18  recollection.  Was it in 2010?

19      A.    I do not remember the accurate time,

20  but we have a public announcement, you can check

21  the public announcement for the specifics.

22      Q.    The public announcement relates who

23  the law firm was that was acting as a

24  consultant?

25      A.    I remember it does have that

1    information.  The public announcement did not

2    specify the name.

3        Q.    Maybe I can help you.

4              Was that the Orrick law firm?

5        A.    Correct.  Correct.  Yes.

6        Q.    And who recommended the Orrick law

7    firm to you?  Was it a Chinese lawyer

8    representing -- strike that.

9              Did a Chinese lawyer, Chinese

10   National, recommend the Orrick firm to you?

11       A.    I don't know.  It was hired by the

12   legal department.

13       Q.    Would that be Dong Chungang?

14             MR. BARR:  Objection.

15             Pose the question first.

16             THE INTERPRETER:  Dong --

17             MR. LEVIN:  C-H-U-N-G-A-N-G.  I have

18   my cheat sheet here.

19             MR. BARR:  Objection to the form of

20   the question, lack of foundation.

21             The witness already answered he

22   doesn't know.

23       A.    I don't know how it was hired, because

24   it was responsibility of the legal department to

25   hire a law firm.

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. LEVIN:

 2       Q.    Do you know Mr. Dong?

 3       A.    I've heard of this person.

 4       Q.    And under what circumstances did you

 5   hear of him?

 6       A.    I believe he was a lawyer in China,

 7   because besides hiring Orrick as a law firm we

 8   had also hired a Chinese law firm, he is a

 9   lawyer at that law firm.

10       Q.    And that was BNBM that hired him?

11       A.    Correct.

12       Q.    And you also have a representative

13   capacity with another Chinese company, Taishan,

14   do you not?

15             MR. BARR:  Objection.

16       A.    You mean us?

17             MR. BARR:  Objection to the form of

18   the question.

19   BY MR. LEVIN:

20       Q.    BNBM?

21       A.    Are you talking about the relationship

22   between the lawyer and BNBM?

23       Q.    You're anticipating my next question.

24   Right now I'm talking about the relationship

25   between you and Taishan.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. BARR:  Objection to the form of
 2    the question.
 3              THE INTERPRETER:  This is the
 4    interpreter speaking.
 5              When counsel said "you," did counsel
 6    mean BNBM?
 7              MR. LEVIN:  I mean BNBM, yes.
 8              MR. BARR:  Now I'm truly thoroughly
 9    confused.
10              MR. LEVIN:  Strike everything.
11              MR. BARR:  Is your question simply
12    does he have any position at Taishan?  I'm just
13    asking is that where you wanted to start?
14    BY MR. LEVIN:
15       Q.   Could you answer your counsel's
16    question?
17       A.   I listen to the instruction of my
18    counsel.
19       Q.   Okay.  Do you also have, you
20    personally, have a position at Taishan?
21       A.   I am a director of the board of
22    directors in Taishan company.
23       Q.   Okay.  In connection with your role at
24    Taishan, did you ever have occasion to meet
25    Mr. Dong?
```

1          MR. BARR:  And you may answer that

2    question yes or no.

3      A.    No.

4    BY MR. LEVIN:

5      Q.    Do you know whether Taishan engaged

6    the services of Mr. Dong at any time in

7    connection with this litigation?

8          MR. BARR:  Again, you may answer that

9    question yes or no.

10     A.    No.

11   BY MR. LEVIN:

12     Q.    Do you know whether CNBM or CNBM Group

13   engaged the services of Mr. Dong at any time in

14   connection with this litigation?

15         MR. BARR:  And again, you may answer

16   that question yes or no.

17     A.    I don't know.

18   BY MR. LEVIN:

19     Q.    Does Mr. Dong still act as a

20   consultant for BNBM, either PLC or the Group?

21         MR. BARR:  Why don't you break it

22   down.

23         MR. LEVIN:  Really?

24         MR. BARR:  Yes, really.  They're

25   completely different companies.

1           MR. LEVIN:  I don't know that.  You

2    say that.  Strike that.

3    BY MR. LEVIN:

4        Q.    Does BNBM Group have -- does Mr. Dong

5    still -- strike that.

6           Is Mr. Dong presently a consultant for

7    BNBM Group?

8           MR. BARR:  Objection to the form of

9    the question.

10       A.    I don't know.

11    BY MR. LEVIN:

12       Q.    Is Mr. Dong currently a consultant for

13    BNBM PLC?

14           MR. BARR:  And you may answer that yes

15    or no.

16       A.    I don't know.

17    BY MR. LEVIN:

18       Q.    Have you personally ever been in a

19    meeting where Mr. Dong was present and members

20    of the Orrick firm were present?

21           MR. BARR:  Again, you may answer that

22    question yes or no.

23       A.    I don't remember.

24    BY MR. LEVIN:

25       Q.    Have you ever been in a meeting where

Confidential - Subject to Further Confidentiality Review

1    Mr. Dong and members of the Denton firm were

2    present?

3            MR. BARR:  Again, you may answer that

4    question yes or no.

5        A.    I don't remember.

6    BY MR. LEVIN:

7        Q.    Are you familiar with an American firm

8    White & Case?

9        A.    I don't have an impression of that.

10       Q.    Does that mean you don't remember, or

11   does it mean something else?  I'm having

12   difficulty with your word "impression."

13       A.    I don't believe I have ever heard of

14   this name.

15       Q.    Prior to -- strike that.

16           In preparing for this deposition, did

17   you have occasion to speak with anybody else

18   either at -- at BNBM?

19       A.    No.

20       Q.    Did you speak to Chairman Jia in

21   preparation for this deposition?

22       A.    No.

23       Q.    Did you -- do you know a Mr. Cheg

24   Gang?

25       A.    I do not know.  I have never heard of

1    him.

2         Q.    Okay.  What are your duties in your

3    present position for Taishan?

4         A.    As a director of Taishan Gypsum's

5    board of directors, I participate in the board

6    of directors meetings.

7         Q.    And do you review the financials of

8    Taishan in connection with your role?

9              MR. BARR:  Objection to the form.

10   Vague.

11        A.    Usually there is a board of directors

12   meeting in Taishan Gypsum once a year, only in

13   that board of directors meeting the management

14   of Taishan Gypsum would report on their

15   financial status.

16   BY MR. LEVIN:

17        Q.    In that capacity, are you interested

18   in their sales and their sales volume, what

19   they're selling, and where they're selling it

20   to?

21             MR. BARR:  Objection to the form of

22   the question.  Compound.

23             But you may answer.

24        A.    All these issues are not the

25   responsibilities of a director, but rather the

1    responsibilities of the management.

2    BY MR. LEVIN:

3        Q.    If I wanted to find out the most

4    information that I could find out about Taishan,

5    could you give me the name of somebody at

6    Taishan that I can contact and ask those

7    questions of?

8              MR. BARR:  Objection to the form of

9    the question.  Vague.

10             But you can answer.

11       A.    I'm only a director of the company,

12   and only participate in the directors meeting.

13   I do not know the details.

14             MR. BARR:  I think the question was

15   who would you speak to at Taishan to get the

16   details.

17             Is that what you're asking?

18             MR. LEVIN:  Yes.  I like the other

19   answer, though.

20       A.    We might speak with management of

21   Taishan such as the Chairman of the Board, and

22   the general manager.

23   BY MR. LEVIN:

24       Q.    And who would that be, sir?

25       A.    Mr. Jia.

1    Q.    Now, are you a director of BNBM?

2          MR. BARR:  And are you asking BNBM

3    PLC?

4          MR. LEVIN:  I mean BNBM PLC.

5    A.    Yes, I am a director of BNBM PLC.

6    BY MR. LEVIN:

7    Q.    And did you at some point in time also

8    attend board meetings with Chairman Jia for BNBM

9    PLC?

10   A.    He is a director of Taishan Gypsum.

11   He does not attend the board of directors

12   meetings of BNBM PLC.

13   Q.    Has he ever attended the board of

14   directors meetings of PLC?

15   A.    I don't have the impression that he

16   had ever attended BNBM PLC's board of directors

17   meeting.

18   Q.    Have you -- do you know a Mr. Peng

19   Nenlong?  Excuse me, I believe it's pronounced

20   Peng.

21   A.    I don't know.

22   Q.    Never heard of him?

23   A.    I have never heard of him.

24   Q.    In preparing for this deposition, did

25   you want to know everything that you could find

1    out concerning the subject matter of the

2    deposition?

3           MR. BARR:  Object to the form of the

4    question.

5           Mr. Wang is not a 30(b)(6) witness, he

6    is here in his individual capacity to testify as

7    such.

8           MR. LEVIN:  I agree.  But people --

9    never mind.  I won't answer you.  You can

10   object.  You're not directing him, that's fine.

11   I'm not asking him as a 30(b)(6).

12          MR. BARR:  I'm not directing him not

13   to answer, but I wanted that objection clear on

14   the record.

15      A.    No.  My attorney told me that --

16          MR. BARR:  No, object and --

17   BY MR. LEVIN:

18      Q.    Let me say it.  Don't -- when I ask a

19   question, listen to your attorney.  If he says

20   yes or no, that's as far as I can go, and don't

21   tell us what he said to you or what you said to

22   him.

23          MR. BARR:  Let me caution the witness

24   that to the extent your answer would require you

25   to disclose communications with your counsel,

Confidential - Subject to Further Confidentiality Review

```
 1    I'm specifically directing you not to answer.

 2    Mr. Levin is only entitled to ask you what you

 3    know of your own personal knowledge, what you

 4    may have learned based upon communications with

 5    counsel.

 6              MR. LEVIN:  I don't necessarily agree

 7    with your statement and the form in which you

 8    said it.

 9              MR. BARR:  Let her pose the question.

10              MR. LEVIN:  Okay.

11    BY MR. LEVIN:

12        Q.    I don't necessarily agree with what

13    Mr. Barr said, but I don't think it's important

14    now to engage in any discourse with regard to

15    it.

16              Did you -- do you know what a

17    deposition -- well, strike that.

18              Did you, in preparation for this

19    deposition, did you have occasion to review any

20    prior testimony of any witnesses that have

21    testified in these proceedings?

22        A.    No.

23        Q.    Did you want to see what Mr. Jia,

24    Chairman Jia, had to say in connection with this

25    litigation?
```

Confidential - Subject to Further Confidentiality Review

1     A.    No.

2     Q.    Did you want to see what Mr. Chen, Lu

3   Chen, had to say by deposition in connection

4   with this litigation?

5     A.    No.

6           THE INTERPRETER:  Attorney, clarify

7   the deponent.  Upon clarifying with the

8   deponent, I believe by answering "no," the

9   deponent meant the deponent did not look or see

10  those testimonies.

11  BY MR. LEVIN:

12    Q.    Did you want to see those testimonies?

13    A.    I did not.

14    Q.    Did you think it was important in your

15  position to know what your colleagues had said

16  about the very subject matter that I'm

17  questioning you on?

18          MR. BARR:  Again, I want to caution

19  the witness to the extent your answer would be

20  based upon communications with your counsel, I'm

21  directing you not to answer.  But otherwise, you

22  may respond.

23    A.    My responsibility is to answer a

24  question according to what I know.  I don't know

25  anything else.

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LEVIN:
 2        Q.    So I take it that you did nothing in
 3    preparation for this deposition to refresh your
 4    memory as to events that occurred over the last
 5    ten years dealing with the subject matter of
 6    this litigation?
 7              MS. EAGAN:  Objection.  Argumentative.
 8              MR. BARR:  Objection.
 9    Mischaracterizes the witness's testimony in
10    response to prior questions.  And objection,
11    argumentative.
12    BY MR. LEVIN:
13        Q.    You may answer the question.
14        A.    As a witness for the preparation of
15    the deposition, I have reviewed the company law,
16    including BNBM's charter, as well as browsed
17    through BNBM's annual reports.
18        Q.    Did you review any other documents?
19        A.    No.
20        Q.    But so that I'm certain, you didn't
21    review any of the testimony that has been given
22    in this litigation in the last couple months, am
23    I correct?
24        A.    I did not.
25        Q.    When you said you reviewed the company
```

Confidential - Subject to Further Confidentiality Review

1   law, are you referring to BNBM's company law, or

2   China's company law?

3       A.   When I said I reviewed it, I actually

4   just browsed through the document. As for the

5   duties as the chairman of the board of

6   directors, I have browsed through the company

7   law, as well as the company charter, because my

8   major was not law, therefore I only browsed

9   through those documents.

10      Q.   How long did you meet with your

11   American attorneys from Denton in China or Hong

12   Kong or Mainland in preparation for this

13   deposition?

14      A.   I have just answered. I met them in

15   Beijing.

16      Q.   And how much time did you spend with

17   them in Beijing?

18      A.   Approximately a day, or a little bit

19   over a day.

20      Q.   So you spent approximately three or

21   four days with them both in the United States

22   and in China, and the only documents that you

23   reviewed were the two documents that you just

24   told us about, is that correct?

25      A.   Also the attorneys of Denton --

Confidential - Subject to Further Confidentiality Review

```
 1              MR. BARR:  I'm going to --
 2       A.     -- informed me.
 3              MR. BARR:  I'm concerned as to
 4   attorney/client privilege.
 5              MR. LEVIN:  Well, then, straighten it
 6   out now.  Let's go off the record.
 7              MR. BARR:  Let's go off the record.
 8              THE VIDEOGRAPHER:  We're off the
 9   record at 9:56 a.m..
10              (Whereupon, a recess was taken.)
11              THE VIDEOGRAPHER:  We're back on the
12   record at 9:58 a.m..
13              MR. LEVIN:  In an off the record
14   discussion which I agreed to, it was determined
15   that if counsel showed him a document -- why
16   don't you say it so you say it exactly the way
17   it is, rather than me paraphrase what you said.
18              MR. BARR:  Sure.  I think that the
19   witness understood, Mr. Wang understood from my
20   directions about not divulging communications
21   with counsel that if he saw documents as part of
22   his preparation that he should not disclose that
23   he saw those documents.  Off the record we
24   advised Mr. Wang that while he should not
25   divulge the discussions he had with counsel
```

1  concerning any documents, to the extent he saw

2  documents in preparation, that is appropriate

3  for questioning.

4       A.    What was your question?

5            MR. BARR:  Your turn.

6  BY MR. LEVIN:

7       Q.    In preparation for the deposition, did

8  you see any documents, other than the two that

9  you've testified to, even if you saw them in the

10  presence of counsel?

11            MR. BARR:  You may answer Mr. Levin's

12  question in that regard.

13       A.    I remember the attorney showed me some

14  documents, some contracts, some printed out

15  documents.  It seems that an impression that I

16  have was also the documents regarding some

17  American customers coming to China, and some

18  documents related to BNBM, some contracts and

19  some documents.

20  BY MR. LEVIN:

21       Q.    Can you be more specific than that?

22  Do you remember who the American companies were?

23       A.    I don't have a clear recollection on

24  the names.  I read the English contracts.

25       Q.    Do you speak English?

1      A.    I do not.

2      Q.    Well, looking at the English

3   contracts, what was your impression of what you

4   read or saw?

5      A.    In the very beginning I almost forgot

6   the existence of the contract, but when I was

7   presented to the contract I remember there was

8   such a contract.

9      Q.    And who was the contract with?

10          MR. BARR:  Objection.  Asked and

11   answered.

12      A.    This is a product selling contract

13   signed between this American customer and BNBM

14   PLC when this customer came to China.

15   BY MR. LEVIN:

16      Q.    Do you remember when he came to China?

17      A.    I do not have a clear recollection on

18   that, because it was a sales department that was

19   in charge of receiving the customer.

20      Q.    Aside from these contracts, what else

21   did you see that you could tell me about?

22          MR. BARR:  In preparation for his

23   deposition?

24          MR. LEVIN:  In preparation for his

25   deposition.

```
1        A.    The attorney showed us some documents

2    that we have never seen before, and some

3    documents that we have seen before, such as BNBM

4    PLC's meeting minutes.

5    BY MR. LEVIN:

6        Q.    And anything else?

7        A.    I don't have a clear recollection.

8        Q.    Is it a fact, sir, that when you saw

9    this information in the last couple months, it

10   refreshed your recollection as to what had

11   occurred several years ago?

12            MR. BARR:  Objection.  Overbroad and

13   vague.

14            But you may answer if you can.

15       A.    Because the incident happened over ten

16   years ago, and I have held position of the

17   Chairman of the Board for six years, I'm not

18   very familiar with daily operation of the

19   company.  But in order to prepare for the

20   deposition, the attorneys have shown me some

21   documents which allowed me to have more

22   recollections on the issue.  However, I do not

23   remember the details in such a long period of

24   time.

25   BY MR. LEVIN:
```

Confidential - Subject to Further Confidentiality Review

1    Q.    Let me try to understand.  Let's do it

2  by the numbers.

3         You don't remember the details of what

4  happened over a period of ten years, is that

5  correct, sir?

6    A.    There are two issues here.  First of

7  all, I was not the person that was personally in

8  charge of the matter, and it had been such a

9  long time, when you ask whether I was able to

10  recall more details in preparation of the

11  deposition, I really could not give you a

12  definite answer in that regard.

13         MR. LEVIN:  Well, are we done, Sunny?

14    A.    That's it.

15  BY MR. LEVIN:

16    Q.    Did the documents help you remember

17  things that happened in the past?

18         MR. BARR:  Objection.  Asked and

19  answered.

20    A.    The attorney has shown us some

21  documents regarding to product sales as well as

22  the company which allowed me to have more

23  recollections on what had happened --

24  BY MR. LEVIN:

25    Q.    And since --

Confidential - Subject to Further Confidentiality Review

1      A.     -- in the past ten years.

2      Q.     Since your review of those documents

3   with your attorneys, have you forgotten anything

4   between then and now, within the last two

5   months?

6             MR. BARR:  Arnold, I'm going to

7   object.  That's vague beyond vague.

8             MR. LEVIN:  There was --

9             MR. BARR:  What's the relevance?

10            MR. LEVIN:  Let me go.  Let me go.

11            MR. BARR:  I want an objection that

12  that is one of the single vaguest questions I

13  have ever heard in a deposition.

14            But you may answer if you can.

15            MR. LEVIN:  I've given you a first.

16            MR. BARR:  Many firsts.

17     A.     Because I was not personally in charge

18  of the product sales, therefore when the

19  attorneys had shown me some of those documents,

20  I could only remember what I could remember, and

21  could only answer your question truthfully in

22  that regard.

23  BY MR. LEVIN:

24     Q.     Do you remember the product that was

25  involved in these contracts?

Confidential - Subject to Further Confidentiality Review

1      A.     I remember.

2      Q.     What were they?

3      A.     Gypsum board.

4      Q.     Whose; BNBM's, Taishan's, or anybody

5  else's?

6      A.     BNBM PLC gypsum board.

7      Q.     Several minutes ago you mentioned that

8  you reviewed the Chinese company -- you reviewed

9  the company law.  Was that BNBM's company law,

10  or the government of China's company law?

11      A.     I flipped through China's company law,

12  as well as BNBM PLC's company charter.

13      Q.     Okay.  When you were being prepared

14  for these depositions in China, other than

15  members of the Denton firm, were anybody else

16  other than yourself present during the sessions,

17  the deposition session -- the preparation

18  sessions?

19      A.     No.

20      Q.     Was anybody else present in the United

21  States during these preparation sessions, other

22  than members of the Denton firm?

23      A.     No.

24      Q.     Now, I'm not speaking to you about the

25  preparation sessions for this deposition, but in

```
 1    your roles either at Taishan, or BNBM PLC, or

 2    any other BNBM, CNBM, or Taishan-type company,

 3    have you ever met with American lawyers in

 4    connection with this litigation from the time --

 5    that's from the time you first found out about

 6    the litigation until the deposition preparation

 7    sessions.

 8            MR. BARR:  You may answer that

 9    question -- I'm sorry.

10            (Translating.)

11            MR. BARR:  Objection.  Compound.

12            But you may answer question or no.

13       A.    No.

14    BY MR. LEVIN:

15       Q.    Were you ever present with Mr. Yu Chen

16    when American lawyers were spoken to in China?

17            MR. BARR:  You may answer the question

18    yes or no.

19       A.    It happened once.  When Chen Yu was

20    being prepped for his deposition as the

21    company's witness, Chen Yu and Dentons attorney

22    came to me and asked me the information that I

23    know.

24            MR. BARR:  I want to caution the

25    witness not to disclose any of the details of
```

Confidential - Subject to Further Confidentiality Review

1    those communications.

2    BY MR. LEVIN:

3        Q.    What did you tell Yu Chen?

4            MR. BARR:  Objection.  To the extent

5    that whatever you communicated to Yu Chen was at

6    a meeting in which Dentons was also there, I'm

7    directing you not to answer.  To the extent that

8    you had conversations with Yu Chen when counsel

9    were not present, you may answer.

10       A.    When Chen Yu approached me to get

11   information that I know of from me, it was

12   through Denton.  It was together with the

13   attorneys of Denton.

14   BY MR. LEVIN:

15       Q.    I don't want to know what Denton told

16   you, or what you told Denton.  I want to know

17   what you told Yu Chen.

18           MR. BARR:  To the extent whatever you

19   communicated to Mr. Chen was at a meeting at

20   which Dentons was also present, I'm directing

21   you not to answer the question.

22       A.    I would follow the instruction of my

23   attorney, because my meeting was in the presence

24   of Dentons attorneys, therefore I would follow

25   the instruction of my attorney not to answer his

1    question.

2    BY MR. LEVIN:

3        Q.    How long was this meeting?

4            MR. BARR:  You may answer that

5    question.

6        A.    I believe it was less than a day.

7    BY MR. LEVIN:

8        Q.    He was present for the entire prep

9    session?

10            MR. BARR:  Objection.

11    Mischaracterizes the witness's testimony.

12    BY MR. LEVIN:

13        Q.    How many hours was it?

14        A.    I have met him in the morning for a

15    while, and in the afternoon for a while, but

16    they were not continuous, because I also took

17    care of other matters in-between.

18        Q.    Now, I want to see whether Mr. Barr

19    will let you answer this question.  This is what

20    I don't want you to tell me.  I don't want you

21    to tell me what Mr. Barr told you.  I don't want

22    you to tell me what you told Mr. Barr.  What I

23    would like for you to tell, so that we're very

24    clear when we talk to the judge about this, is

25    what you of your own personal knowledge told Yu

Confidential - Subject to Further Confidentiality Review

1    Chen.

2              MR. BARR:  And if that meeting,

3    Mr. Wang, was in the presence of counsel and for

4    purposes of this litigation, I'm directing you

5    not to answer the question.

6              MR. LEVIN:  I'd like to call the judge

7    with this question.

8              MR. BARR:  Call the judge.

9              MR. LEVIN:  Could you mark this,

10   especially my last question, so we can relate it

11   to the judge?

12             THE VIDEOGRAPHER:  We're off the

13   record at 10:21 a.m..

14             (Off the record discussion.)

15             THE VIDEOGRAPHER:  We're back on the

16   record at 10:22 a.m..

17   BY MR. LEVIN:

18     Q.    Did you review the global offering,

19   the global public offering in preparation for

20   this deposition?

21             MR. BARR:  Objection to the form.

22             Could you please say what global

23   offering you're referring to?

24             MR. LEVIN:  The 2006 CNBM.

25     A.    I don't remember which time, but I do

Confidential - Subject to Further Confidentiality Review

1    remember I had participated in the road show of

2    CNBM, because I'm the Chairman of the Board of

3    BNBM, which also is a shareholder of CNBM.  I

4    participated as a member of the delegation.

5             MR. BARR:  His question was simply

6    have you ever reviewed the 2006 global offering

7    materials.

8             MR. LEVIN:  In preparation for this

9    deposition.

10       A.    No.

11   BY MR. LEVIN:

12       Q.    Are you aware that the United States

13   District Court for the Eastern District of

14   Louisiana, Judge Eldon Fallon, issued a contempt

15   order in this litigation against Taishan?

16       A.    I've heard of it.

17            MR. LEVIN:  Can you read the

18   question --

19            MR. BARR:  You asked about the

20   contempt order, and he said he heard of it.

21   BY MR. LEVIN:

22       Q.    What is your present understanding of

23   that contempt order?

24            MR. BARR:  If your understanding of

25   the contempt order is based on what you were

Confidential - Subject to Further Confidentiality Review

1    told by your counsel, I direct you not to

2    answer.  But if you have an independent

3    understanding, you may respond.

4        A.    I myself is not in the law field, I do

5    not understand American law, I do not quite

6    understand the contempt order.

7    BY MR. LEVIN:

8        Q.    Well, what is your understanding of

9    the contempt order?

10            MR. BARR:  Again, to the extent your

11   understanding is based upon communications with

12   your counsel, I'm directing you not to answer.

13   If you have an independent understanding based

14   upon your own review of the documents or

15   otherwise, you may respond.

16       A.    I personally do not understand the

17   contempt order.  I've only saw the order given

18   by the Court through the legal department of

19   Taishan Gypsum.

20   BY MR. LEVIN:

21       Q.    Were you aware, sir, that I would most

22   probably ask you questions about the contempt

23   order before you came to this deposition?

24            MR. BARR:  Objection.

25            Direct you not to answer.

```
 1              MR. LEVIN:  How come?

 2              MR. BARR:  Come on, it's a ridiculous

 3      question.

 4              MR. LEVIN:  You're ridiculous.  It's a

 5      ridiculous answer.

 6              MR. BARR:  He didn't give an answer.

 7      I said it's a ridiculous question, I direct him

 8      not to answer.

 9              MR. LEVIN:  I don't want to pursue

10      this.  You can't block everything that a person

11      knows because he may have originally got

12      something from an attorney, especially when it's

13      the subject matter of the litigation.  I'll

14      leave it alone.

15              MR. BARR:  No, I'm not going to leave

16      the comment alone, because at the end of the day

17      when you're asking him questions about what are

18      purely legal matters based on the meaning of

19      Court orders, it is hardly surprising that a

20      witness's knowledge would be based upon

21      communications with counsel, and that is not

22      appropriate inquiry.  That's why we have an

23      attorney/client privilege in this country.

24              MR. LEVIN:  I'm not asking him for his

25      legal opinion.  I'm asking him what his -- what
```

Confidential - Subject to Further Confidentiality Review

```
 1   he believes the contempt order to be, what is

 2   his impression of the contempt order.  This man

 3   is not a fool.  I'm sure you don't want him to

 4   come across as a fool on this record.

 5            MR. BARR:  Mr. Levin, I really hope we

 6   don't go down that road in terms of

 7   characterizing the witness.  The witness is here

 8   to answer questions.

 9            MR. LEVIN:  I didn't characterize the

10   witness.  I characterized something else.

11            MR. BARR:  No, I think you did.

12            You can characterize me all you'd

13   like, but that would be unfortunate as well.

14            But the witness, to the extent you are

15   asking about the meaning of legal documents, and

16   his understanding is based upon communications

17   he's had with his counsel, as you well know, and

18   there indeed have been motions in front of the

19   Court as recently as the last few weeks

20   concerning the meaning and scope of that order,

21   that that is not an appropriate inquiry to make

22   of this witness.  You can ask him what conduct

23   the company did, whether they did something that

24   in some fashion you believe may violate the

25   order.  But asking him the impression of a legal
```

```
 1    document, and he says that his knowledge is

 2    based upon communications with counsel, that

 3    ends the inquiry.

 4              MR. LEVIN:  Did you -- Sunny, are we

 5    ready yet?

 6              THE INTERPRETER:  Yes.

 7    BY MR. LEVIN:

 8       Q.    Did you read the Chinese version of

 9    the contempt order at any time?

10       A.    I did not read that, but a member of

11    the legal department had mentioned that to me.

12       Q.    And what did the member of the legal

13    department say to you?

14              MR. BARR:  You may answer that

15    question to the extent that a member of the

16    legal department told you what the order said.

17              THE INTERPRETER:  Interpreter needs to

18    inquire of the witness gender of the person he

19    was referring to in his answer.

20       A.    She only told me that Taishan Gypsum

21    had given notification that there was such an

22    order in connection to the lawsuit that needed

23    to be publicly announced.

24    BY MR. LEVIN:

25       Q.    And when was that?
```

1        A.    It seems to be last year, but I do not

2    remember the specifics.

3              MR. LEVIN:  Okay.  Let's take a break.

4              THE VIDEOGRAPHER:  We're off the

5    record at 10:31 a.m..  This concludes tape one.

6              (Whereupon, a recess was taken.)

7               (Off video record.)

8              (Judge Fallon present by phone.)

9              MR. LEVIN:  Good morning, your Honor.

10    It's Arnold Levin, and we appreciate your

11    calling.

12              Mr. Barr is here, Michael Barr.

13              MR. BARR:  Your Honor, Michael Barr

14    here on behalf of the witness and BNBM PLC.

15              JUDGE FALLON:  Okay.

16              MR. LEVIN:  We have a question that I

17    asked that requires your intervention one way or

18    the other.

19              We have a witness here, Wang Bing, who

20    is not a 30(b)(6) witness.  We -- I took the

21    30(b)(6) witness, Yu Chen, several weeks ago,

22    and this question was asked of the witness by

23    me, that is Mr. Wang, and I'm going to have the

24    court reporter read that question to you, sir.

25              JUDGE FALLON:  Okay.  This is the new

Confidential - Subject to Further Confidentiality Review

```
1    witness, or the 30(b)(6) witness?

2              MR. LEVIN:  No, the new witness.

3              JUDGE FALLON:  All right.

4              (Whereupon, the reporter read back the

5    following question:

6       "Q:  Now, I want to see whether Mr. Barr

7    will let you answer this question.  This is what

8    I don't want you to tell me.  I don't want you

9    to tell me what Mr. Barr told you.  I don't want

10   you to tell me what you told Mr. Barr.  What I

11   would like for you to tell, so that we're very

12   clear when we talk to the judge about this, is

13   what you of your own personal knowledge told Yu

14   Chen."

15             MR. LEVIN:  Mr. Yu Chen was present

16   with Mr. Barr and the witness in preparation for

17   the 30(b)(6) deposition, and the witness said

18   something to Mr. Yu Chen, and I've eliminated, I

19   thought, everything that would be

20   attorney/client privilege, because Yu Chen was

21   gathering information from this witness for the

22   30(b)(6) deposition.

23             MR. BARR:  Your Honor --

24             JUDGE FALLON:  What's the objection?

25             MR. BARR:  Your Honor, the objection
```

1   is attorney/client communications.  This was a

2   meeting that was held with two representatives

3   of my client, they were communications in

4   furtherance of our preparation for this

5   litigation.  It's classical attorney/client and

6   attorney work product material, the discussions

7   that I have and the information that I gather

8   from my clients in preparation for my defense of

9   them in this litigation.

10          When Mr. Chen previously testified at

11  his deposition, I permitted open questioning in

12  terms of the knowledge and information that he

13  had, and he testified at that time for four days

14  to the best of his ability concerning what he

15  knew.  But here we're talking about a specific

16  communication that took place with counsel, you

17  know, in my defense of my clients, and,

18  respectfully, that's protected as both

19  attorney/client and attorney work product

20  material.

21          JUDGE FALLON:  The other side takes

22  the position that he's not asking what you told

23  the witness, he's asking what the witness told

24  the other witness.

25          MR. BARR:  Your Honor, information

1    that is gathered with attorneys there preparing

2    witnesses for depositions is, respectfully,

3    exactly the kind of material that is privileged.

4    The fact that you have a three-way conversation

5    when we are developing factual information for

6    our defense of the case does not eliminate the

7    privilege.

8              MR. LEVIN:  May I?

9              JUDGE FALLON:  Go ahead.

10             MR. LEVIN:  Well, Yu Chen then goes

11   into the deposition and testifies as a 30(b)(6)

12   witness as to corporate knowledge, and the

13   corporate knowledge that he's obtained he's

14   obtained by a high-up corporate official.

15             Now, certainly that's a factual

16   question, it's not coming from Mr. Barr, he's

17   not speaking to Mr. Barr.  Mr. Yu Chen is

18   speaking to Mr. Wang and preparing Mr. Wang for

19   the deposition.

20             MR. BARR:  Your Honor, I had

21   specifically -- and this goes with both the

22   deposition today as well as the deposition of

23   Mr. Chen, I instructed both witnesses to the

24   extent they had communications concerning --

25   about factual matters outside the presence of

1    counsel that they were free to answer.  This,

2    respectfully, is different.  This is a meeting

3    with counsel preparing a witness for his

4    deposition.  I could have 50 employees of the

5    client in the room at the same time gathering

6    information in preparation for that defense and,

7    respectfully, that would not initiate the

8    privilege.

9            JUDGE FALLON:  No, it doesn't.  The

10   thing that troubles me is -- I hope we're on --

11   I hope the court reporter is taking all this

12   down, is that right?

13           MR. LEVIN:  Yes, sir.

14           JUDGE FALLON:  The thing that troubles

15   me is that I don't think that the witness ought

16   to say anything that you told the witness.  But

17   with the 30(b)(6) deposition, the 30(b)(6)

18   testifies what he knows or what he was able to

19   gather from other people, because he's speaking

20   not as a witness, but as a 30(b)(6), which means

21   he's speaking for the company.  And so any

22   information that he's given not from the

23   attorney and not from any meeting that the

24   attorney gave him, but if this witness is giving

25   him additional information which that 30(b)(6)

1     deposition witness is utilizing to testify on

2     behalf of the company, I see a distinction

3     there.  I don't see an attorney/client privilege

4     simply because the witness was in on a meeting

5     with you or others, and he's not being asked as

6     to what happened during that meeting.  He may

7     have given information to the 30(b)(6) witness,

8     that that 30(b)(6) witness in speaking for the

9     company was appropriately given information on.

10     I don't think that the 30(b)(6) witness -- if

11     the present witness was giving information to

12     the 30(b)(6) witness that you told him, then I

13     think the privilege is safe.

14           MR. BARR:  Your Honor, this is not --

15     I'm sorry, your Honor, I certainly didn't mean

16     to interrupt the Court.

17           This is not a situation where an

18     attorney is just a bystander to a conversation,

19     and then two other people are talking, and the

20     fact that the attorney there is meaningless.

21     This is the preparation for the deposition.

22     This is not a circumstance where it is someone

23     simply gathering information, this is part of a

24     communication, a conversation with counsel as

25     part of that preparation.

```
 1            So again, I don't think, respectfully,
 2    that this is a circumstance where you simply say
 3    this is a pure information-gathering exercise,
 4    what a 30(b)(6) witness would do when they would
 5    be at the company and gather information.  The
 6    witness did testify at great length -- Mr. Chen
 7    did at great length about that kind of
 8    information, that's fair game.
 9            But, your Honor, I don't think that
10    you can effectively characterize the way
11    Mr. Levin is doing here that, in effect, the
12    lawyer is nothing more than a bystander and not
13    part of an overall communication in gathering of
14    facts for purposes of the defense.
15            JUDGE FALLON:  I understand that
16    position.
17            But the fact that you're simply there
18    while, in fact, a 30(b)(6) witness is gathering
19    facts, which that 30(b)(6) witness is then going
20    to disgorge during the deposition doesn't mean
21    that everything that was said during that
22    conversation, simply because you were there,
23    makes it all privileged.  I think that if you
24    were there and communicating with the witnesses,
25    and you told the witness something or discussed
```

1   the -- gave information or gave some kind of

2   instruction to the witness, that would be

3   privileged.  But the fact that you're there

4   while this witness is -- while the 30(b)(6)

5   witness is collecting information doesn't make

6   everything that that 30(b)(6) witness collected

7   privileged simply because you were present

8   there.  You may be a bystander in some

9   situations, and you may be a participant in

10   others.  I don't think the witness is -- should

11   give any information when you were there as a

12   participant.  But the simple fact that you were

13   there while that witness was gathering

14   information -- while the 30(b)(6) witness was

15   gathering information from all of the witnesses

16   makes everything that he gathered during that

17   time privileged simply because you were there.

18            MR. BARR:  Your Honor, that's reaching

19   a result --

20            JUDGE FALLON:  That would make it

21   impossible to ask any questions for a 30(b)(6)

22   deposition, everything makes it privileged.

23            MR. BARR:  Your Honor, but that's

24   characterizing the conversation as that the

25   purpose of the meeting was simply for the

Confidential - Subject to Further Confidentiality Review

1    gathering of information for a 30(b)(6)

2    deposition.  Respectfully, that is not what the

3    purpose of the meeting was.  That was a meeting

4    with counsel for preparation for a deposition,

5    no question.  But to say that, oh, this is

6    simply one witness gathering information from

7    another, as opposed to counsel meeting with

8    multiple witnesses, a client, we certainly knew

9    Mr. Wang was going to be a witness as well, that

10   that vitiates the privilege, respectfully, your

11   Honor, we disagree.

12             JUDGE FALLON:  I understand.

13             What I feel is it's almost like an

14   e-mail situation where you send an e-mail,

15   string of e-mail around to all of the

16   departments, and one of the departments happens

17   to be the in-house counsel, and everybody is

18   communicating back and forth, and then the

19   in-house counsel is getting those e-mails.  Now,

20   until the in-house counsel communicates, I don't

21   see the fact that it's all privileged simply

22   because he was on the list of e-mail.

23             Now, I don't think that the witness

24   ought to be asked to give information as to what

25   you said, what you told him, what instructions

Confidential - Subject to Further Confidentiality Review

1   you gave him, what communications you gave him.

2          But if a 30(b)(6) deposition is

3   preparing himself to give a 30(b)(6) deposition,

4   which he's obligated to do, he can't come to the

5   deposition and say "I don't know anything, I

6   didn't look at any document, I didn't talk to

7   any of my people," then he's not -- he's not

8   following the requirements of the 30(b)(6).

9   He's got to not only say what he knows, he's

10  speaking for the company, so he's got to gather

11  information from all sources on all of the

12  topics that he's notified on in a deposition.

13         Now that he's gathering those

14  informations, if you tag along with him, simply

15  watching what he's gathering for your

16  information, that doesn't convert everything

17  that he's gathered into a privilege.

18         Now, during that time you say, now,

19  Mr. Chen, just a moment, let me give you

20  instruction on that, that is that part of the

21  privilege, but the rest isn't just because

22  you're there.  You can be both an instructor and

23  a bystander in a company's 30(b)(6) preparation.

24         MR. BARR:  Your Honor, this was me

25  personally meeting with -- or, I'm sorry, my

1   partners meeting with two of our witnesses, both

2   of whom have been noticed for deposition.  An

3   important part of the attorney/client privilege

4   and attorney work product is the gathering of

5   facts from witnesses.  And, respectfully, what

6   you're suggesting, what potentially you're

7   ruling, your Honor, it vitiates that privilege.

8           JUDGE FALLON:  It doesn't.  It's not

9   as if you just sit there while he's gathering

10  information.  If you convert everything that a

11  30(b)(6) deposition witness on his way to

12  gathering information in preparation for his

13  30(b)(6), if simply your presence makes it

14  privileged, then there's no way you can do a

15  30(b)(6) deposition.

16          MR. BARR:  But, your Honor --

17          JUDGE FALLON:  You're limiting that

18  witness to testify what he knows.

19          (Multiple speakers.)

20          JUDGE FALLON:  Wait, let me finish.

21          The deposition is not only what he

22  knows, but what the company knows, so he's got

23  to go outside and look at those documents and

24  look at the areas that he's asked to investigate

25  to speak for the company.

1          Now, if he's doing that in your

2     presence, that doesn't convert that to a

3     privilege.  It converts it to a privilege when

4     you start speaking.

5          MR. BARR:  Your Honor, the witness

6     here today is not the 30(b)(6).

7          JUDGE FALLON:  I understand that.

8          MR. BARR:  Okay.  And again --

9          JUDGE FALLON:  The 30(b)(6)

10    deposition, though, talked to him in preparation

11    for giving a 30(b)(6) deposition.  Now, if the

12    30(b)(6) deponent-to-be is gathering information

13    so that he can give a 30(b)(6) deposition, and

14    one of the people that he talks to is somebody

15    that he gets information from, if you're not

16    there, then why would that be privileged?  And

17    if you are there, why would it convert it into a

18    privilege if you don't say anything, and this

19    person who is going to be a 30(b)(6) deposition

20    is purposely talking to somebody who knows

21    information about one of the topics that the

22    30(b)(6) deponent is about to testify to?

23          MR. BARR:  Your Honor, I think that

24    the way you're characterizing the witness's role

25    is in a far less participatory fashion than is

1    the reality here, and that is my concern.  I

2    agree that a fly on the wall does not convert

3    something into a different kind of

4    communication, but, respectfully, that's not

5    what we're talking about here.

6           JUDGE FALLON:  Well, that's my ruling.

7    What you can do is package this and hold it, and

8    put it under seal.  But my ruling is that I

9    don't want this witness to testify anything that

10   you said to him, told him, discussed with him.

11   That's attorney/client privilege.  But if a

12   30(b)(6) deposition is being -- is going to be

13   taken, and the person is given the categories

14   that that 30(b)(6) deponent is going to testify

15   to, and that 30(b)(6) deponent says, well, I

16   personally know about this, I personally know

17   about this, I personally know about this, but I

18   don't have the foggiest idea about this and

19   this, but Jim Smith does, or Mr. Chen does so

20   I'll talk to Mr. Chen because I'm going to be

21   speaking for the company and Mr. Chen knows this

22   information and I can talk to him and then speak

23   for the company, and if he talks to that

24   individual and that individual gives him the

25   information on that topic, it seems to me that

1    that's fair game.

2         Now, if during that period of time you

3    happen to be there and you say, now, Mr. Chen,

4    this is the -- this is what I want you to do, or

5    this is my instruction, or this is what you

6    should know about the law, or this is the big

7    picture, or something of that sort, then that's

8    excluded.

9         But if you simply sit there while this

10   witness is gathering information, as his duty

11   and responsibility for 30(b)(6) deposition, and

12   you say nothing, and if that would be admissible

13   and not privileged without your presence, the

14   fact that you're present at that time doesn't

15   convert it into a privilege.

16        So that's my ruling.  And if you're

17   concerned about it, package that, seal it, and

18   you can -- it won't go into the deposition until

19   you have an opportunity to analyze it and maybe

20   re-urge it, or take me up on it.

21        MR. BARR:  Fair enough.  Your Honor,

22   thank you for your time.

23        MR. LEVIN:  Thank you, your Honor.

24        JUDGE FALLON:  Thank you very much.

25        I'm at the airport.  Unfortunately the

Confidential - Subject to Further Confidentiality Review

1    MDL, it's exhausting, I've got a seminar and

2    they asked me to come and speak.  But I've got

3    to get back to New Orleans because I've got a

4    lot on.

5              MR. LEVIN:  You should know, your

6    Honor, that your chambers is calling it a

7    vacation.

8              JUDGE FALLON:  Well, that's the only

9    vacation they get, when I'm to a seminar.  All

10   right.  One of these days I'll get to go like

11   you folks.  Thank you.

12             MR. LEVIN:  Thank you, your Honor.

13             JUDGE FALLON:  If you need me, my

14   flight has been a little bit delayed, but

15   hopefully I'll get home.

16             MR. LEVIN:  Thank you, sir.

17             (Off the record discussion.)

18             (Back on video record.)

19             THE VIDEOGRAPHER:  Okay.  We're back

20   on the record at 11:16 a.m..  This is the

21   beginning of tape two.

22   BY MR. LEVIN:

23     Q.    Before we get to the question of the

24   day, you mentioned in the legal department that

25   you spoke to a woman.  What was her name?  You

1    used the word "she."

2              MR. TAYLOR:  This is Bernard.  I want

3    to be clear which legal department we're talking

4    about, Taishan or BNBM?

5              MR. LEVIN:  The guy wears many hats,

6    Bernard, he can tell us.

7              MR. TAYLOR:  I may have an objection,

8    that's why I raise it.

9              Object.  Compound.

10        A.    I meant that the person in charge of

11   the BNBM PLC's legal department has spoken to me

12   in that regard.

13   BY MR. LEVIN:

14        Q.    And her name?

15        A.    She Keping.

16        Q.    Is she a lawyer?

17        A.    No.

18        Q.    What is her rank?  I mean, what is her

19   job classification?

20        A.    She is in charge of the legal works of

21   the company.

22        Q.    And what is her title, do you know?

23        A.    Secretary of the board of directors.

24        Q.    And what did she tell you?

25        A.    She told me that they have received a

Confidential - Subject to Further Confidentiality Review

1   notification from Taishan Gypsum's legal

2   department regarding the update of this lawsuit.

3       Q.    And when did this occur?

4       A.    It was after the order -- some order

5   was issued by the Court, she told me that she

6   had received notification from Taishan Gypsum

7   regarding the order issued by the Court.

8       Q.    And did she tell you why Taishan

9   Gypsum notified BNBM PLC?

10      A.    I don't know.  She did not tell me

11  that.

12      Q.    Did you ask her to explain the order

13  to you, since you're not a lawyer and did not

14  understand it?

15      A.    Neither my job nor her job was in

16  charge of this lawsuit.  We were simply

17  contacting information disclosure according to

18  the requirements of public listing companies.

19      Q.    And what were the requirements of a

20  public listing company that you were charged to

21  inquire about?

22            MR. BARR:  Objection to the form of

23  the question.  Vague, mischaracterizes the

24  witness's testimony.

25            But you can answer.

Confidential - Subject to Further Confidentiality Review

1    A.    I did not inquire her.  It was her

2    that told me that the issue needed to be

3    publicly announced, and I said according to the

4    requirements it is okay.

5    BY MR. LEVIN:

6    Q.    You mean it was okay to publicly

7    announce it?

8    A.    It was that she notified me the

9    situation, and then I said I'm aware of that.  I

10   did not need to approve the public announcement,

11   it was only a procedure according to the

12   requirements.

13   Q.    Did you have anything to do with

14   formulating the public announcement?

15   A.    I did not.

16   Q.    Who did at BNBM?

17   A.    The secretary of the board of

18   directors.

19   Q.    Is she still secretary of the board of

20   directors?

21   A.    Yes.

22   Q.    Now, I want to go back to Dong

23   Chungang.

24         And I asked you whether you had had

25   any meetings with him, and you answered my

1    question.

2         What I want to now know is, did you

3    ever converse with him, other than in an

4    in-person meeting, concerning the subject matter

5    of this litigation?

6         MR. BARR:  You may answer that

7    question yes or no.

8         A.    I do not have an impression of that.

9    BY MR. LEVIN:

10        Q.    Ever have a phone call with him

11   concerning this litigation?

12        A.    No, I don't have such an impression.

13   I don't remember that I have called him.

14        Q.    Have you ever seen a document that

15   indicates that you had a conversation with Dong

16   Chungang?

17        A.    I don't have that impression.

18        Q.    That means -- when you say you don't

19   have that impression, so I understand you, does

20   that mean you don't remember?

21        A.    Because I am not in charge of the

22   lawsuit, I only know that he is a lawyer of a

23   law firm that BNBM PLC had hired.  Because I'm

24   not in charge of this lawsuit specifically,

25   therefore I do not remember whether I have had

1    communications with him or not.

2           MR. BARR:  Can we go off the record

3    for one second?

4           THE VIDEOGRAPHER:  We're off the

5    record at 11:26 a.m..

6           (Off the record discussion.)

7           THE VIDEOGRAPHER:  We're back on the

8    record at 11:28 a.m..

9           MR. BARR:  I raised with the various

10   Chinese speakers around the table when we were

11   off the record whether the appropriate

12   translation of the word that has been translated

13   as "impression" might be "recollection," at

14   least I understand it could go in either

15   direction.  I think we have stipulated that,

16   going forward, we will for these purposes

17   utilize the word "recollection."

18          MR. LEVIN:  Unless you or somebody

19   else finds that in the context of that

20   particular communication/answer it should be

21   something else.

22          MR. BARR:  Understood and agree.

23   BY MR. LEVIN:

24      Q.    It's my understanding that this past

25   Saturday you also met with Orrick's counsel, did

```
 1   you not?  Not Orrick's -- strike that.

 2            You also meet with CNBM and CNBM

 3   Group's counsel, counsel being Orrick, is that

 4   correct, sir?

 5            MR. BARR:  You may answer that

 6   question yes or no.

 7        A.   Yes.

 8   BY MR. LEVIN:

 9        Q.   Yes?

10        A.   Yes.

11        Q.   Who was present for Orrick at that

12   time?

13        A.   I don't remember.  I don't know the

14   accurate name.  That lady (indicating).

15        Q.   And that lady is?

16            MS. DALEY:  Kelly Daley.

17            And I apologize, I lost my live feed

18   just as we were talking.

19        A.   I'm sorry, I don't remember your name.

20   BY MR. LEVIN:

21        Q.   And we now have the name.

22            Was Taishan's counsel present, Alston

23   & Bird?

24        A.   No, only Dong.

25        Q.   Was the subject matter of that meeting
```

Confidential - Subject to Further Confidentiality Review

```
 1   in connection with preparation for this

 2   deposition?

 3            MR. BARR:  You may answer that

 4   question yes or no.

 5       A.    I don't know.  Because I'm the vice

 6   president of CNBM, therefore they met with me

 7   and asked me some questions.

 8   BY MR. LEVIN:

 9       Q.    How long did that meeting occur?  What

10   was the length of that meeting?

11       A.    It seems to be two or three hours.

12       Q.    Were you there as a CNBM operative, or

13   a BNBM operative, or an operative of both?

14            MR. BARR:  Object to the form of the

15   question.

16       A.    I was there as the vice-president of

17   CNBM Company, Limited.

18   BY MR. LEVIN:

19       Q.    Who was your counsel at that meeting?

20       A.    It was that lady over there.

21       Q.    Okay.  Never mind.

22            MR. IRPINO:  Kelly Daley.

23   BY MR. LEVIN:

24       Q.    Was Mr. Barr present?

25       A.    I remember Attorney Matt was there, as
```

1    well as Attorney Liao, L-I-A-O.

2           MR. BARR:  There were attorneys for

3    Dentons present at that meeting as well, Matt

4    Nickel, my partner, and Mr. Liao, my partner as

5    well.

6    BY MR. LEVIN:

7       Q.    Were they representing you at that

8    meeting?

9       A.    No.  I don't know.

10          MR. BARR:  I'm going to object to the

11   question in terms of Mr. Wang is not a --

12   obviously not a lawyer, but further, not

13   familiar with the American legal system.  And we

14   were there as his counsel on behalf of BNBM.

15   CNBM's counsel can speak for themselves in that

16   respect.

17          MR. LEVIN:  Would that lady like to

18   speak for herself?

19          MS. DALEY:  I reconfirm with the

20   witness that we were there in our capacity as

21   counsel for CNBM company, the witness is

22   vice-president.

23          MR. LEVIN:  Okay.

24   BY MR. LEVIN:

25      Q.    Now, do you still remember the

Confidential - Subject to Further Confidentiality Review

1   question that I asked you before we spoke with

2   the Court, the Judge?

3       A.    I believe it was a question regarding

4   to Mr. Chen Yu's deposition as the company's

5   witness.

6           MR. BARR:  I just want to make a

7   statement for the record at this point.

8           Number one, we're going to ask that

9   this portion of the record be sealed.

10          Number two, as should be clear from

11  the discussion that we had with the Court, that,

12  respectfully, we disagree with the Court's

13  ruling and are preserving our position.

14  However, the Court did rule, and we may indeed

15  with the Court re-urge that or take it up on

16  appeal.

17          For that reason, we will be careful in

18  terms of the scope of what we permit the

19  questioning concerning.  But we do understand

20  the Court to have ruled that information that

21  Mr. Chen requested of Mr. Wang for purposes of

22  his 30(b)(6) deposition, at least as per the

23  Court's ruling, is not protected, and we'll

24  proceed on that basis.

25  BY MR. LEVIN:

Confidential - Subject to Further Confidentiality Review

1    Q.    At that meeting, we have the length of

2    that meeting in the record, what did you tell

3    Mr. Chen?

4             MR. BARR:  Again, I just want my same

5    objection to be noted.

6             MR. LEVIN:  You have a continuing

7    objection, as far as I'm concerned, to this

8    entire line of questioning.

9    A.    What was his question?  Did he say his

10   question?  Did you interpret his question?  You

11   interpreted for me, I believe.  What was your

12   question?

13   BY MR. LEVIN:

14   Q.    Okay.  My question was -- he's getting

15   more concise -- what did you tell Mr. Chen at

16   that meeting that he needed to know as a

17   corporate witness, a 30(b)(6) witness as we call

18   it, for your corporation?

19             MR. BARR:  Objection on

20   attorney/client work product grounds.  Subject

21   to those objections, you may respond.

22   A.    I remember the time Mr. Chen and

23   Dentons attorney came to me and said that he, as

24   the witness of the company, needed to collect

25   some information regarding to the sales of the

1   gypsum board.  At the time I told him that I do

2   remember there --

3           THE INTERPRETER:  Interpreter needs to

4   clarify with deponent whether the word "company"

5   he mentioned in his answer was in plural or

6   singular form.

7           Upon clarification here is deponent's

8   answer.

9      A.    I told him that I do remember there

10  was an American company that came to China to

11  purchase gypsum board, and at the time we were

12  not selling the gypsum board to America, we did

13  not make the sale before that, nor did we make

14  the sale after that.  I told him that at the

15  time we had gone through quality tests for the

16  gypsum board, and I believe the gypsum board of

17  BNBM did not have quality issues.

18          I remember I also told him that I did

19  not receive any information in extent that any

20  American testing and examination institutions

21  had any proof to verify that there had been any

22  quality problems of BNBM's gypsum board, thus

23  caused the quality problem that was -- that were

24  claimed in this lawsuit.

25          I remember I told him that even though

1   I am the general manager of the company, but I'm

2   not in charge of the specific sales work,

3   therefore I suggested him that I did not know

4   the details of the product sales.  If he needed

5   that information, he could look for the person

6   in charge of the sales department at the time to

7   get to know that information.  That's it.

8        Q.    Did you discuss any other topics with

9   Mr. Chen?

10       A.    No.

11       Q.    Did he ask you about any other topics

12  that you indicated to him that he didn't have

13  knowledge of, other than the issue with regard

14  to the sales department that you just testified

15  to?

16       A.    At the time he only asked me whether

17  the products had gone through quality

18  examinations, whether they were up to the

19  quality standard.  I told him the products had

20  gone through quality examinations both before

21  and after.

22       Q.    Go ahead.  I didn't mean to interrupt

23  you.

24            Who did the quality examinations?

25       A.    Chinese government has a specific

Confidential - Subject to Further Confidentiality Review

1    quality supervision and examination department.

2         Q.    And do they issue reports?

3         A.    Yes.

4         Q.    And have you seen the reports?

5         A.    I have not.

6         Q.    Do you know where those reports are

7    kept?

8         A.    I have heard from the person in charge

9    of the relevant department that all products had

10   passed the quality examination.

11        Q.    Who was this person that told you

12   this?

13        A.    The deputy general manager in charge

14   of the quality production department.

15        Q.    And what is his name, or her name?

16        A.    It's a gentleman by the name of Zhou

17   Huan.

18        Q.    And when did he tell you that?

19        A.    After the lawsuit.  After we have

20   learned of the lawsuit.

21        Q.    And when was that?

22        A.    I don't have a clear recollection.  In

23   fact, the product of BNBM had always been going

24   through the quality examination according to the

25   requirements of Chinese law, and this is

Confidential - Subject to Further Confidentiality Review

1    something I know, it has always been up to the

2    standard of the quality examination.

3         Q.    Now, BNBM ships their product in

4    foreign commerce, do they not?

5              MR. BARR:  Objection.  Objection to

6    the form of the question, but the answer can

7    stand.

8         A.    We have never sold our products to

9    foreign countries.  However, because BNBM's

10   products have very good quality, sometimes

11   customers from foreign countries would come to

12   China to make purchases, which we also did not

13   reject.

14   BY MR. LEVIN:

15        Q.    And when they came, whatever these

16   foreign countries are, did you create the

17   product to meet the specifications that were

18   necessary for that particular country?

19        A.    BNBM's products has always -- have

20   always been in conformity with Chinese laws and

21   requirements, and in accordance with the quality

22   requirements, it has always been the same.

23        Q.    Do you create your product when

24   selling in foreign commerce to meet the

25   requirements of the foreign buyer?

1          MR. BARR:  Objection to the form of

2   the question.

3          You can answer.

4      A.    Not according to my recollection.

5   BY MR. LEVIN:

6      Q.    In preparation for this deposition,

7   have you ever seen a film of BNBM's products in

8   a Florida warehouse?

9      A.    No.

10     Q.    Have you ever heard of such a film?

11     A.    No.

12     Q.    You mentioned before, and this was

13  your testimony, that the BNBM product met the

14  American standards, the US standards, is that

15  correct?

16         MR. BARR:  Objection.

17  Mischaracterizes the witness's testimony.

18     A.    Chinese standard.  Chinese standard.

19  BY MR. LEVIN:

20     Q.    So you were not referring to a U.S.

21  agency, the Consumer Product Safety Commission,

22  at any time in the last two hours when you

23  answered any of my questions, were you?

24         MR. BARR:  Objection.  Vague,

25  ambiguous, form.

Confidential - Subject to Further Confidentiality Review

1    A.    Correct.  I do not remember we have

2  mentioned that topic, and I don't know what you

3  meant by that.

4  BY MR. LEVIN:

5    Q.    Did you come to know about the quality

6  or lack of quality of the Taishan drywall

7  product?

8    A.    I am a director of Taishan Gypsum, I'm

9  not in charge of Taishan Gypsum's production or

10  operation, so I do not know the specifics of

11  this issue.

12    Q.    So that was never discussed at a

13  directors meeting at Taishan where you were

14  present, is that correct?

15        MR. TAYLOR:  Objection to form.

16        MR. BARR:  Objection to the form as

17  well.

18    A.    Correct.  No.

19        MR. BARR:  I think we should take a

20  break now.

21        MR. LEVIN:  We can take five minutes

22  now.

23        MR. BARR:  Why don't we take five

24  minutes now, and come back and do lunch.

25        THE VIDEOGRAPHER:  We're off the

Confidential - Subject to Further Confidentiality Review

```
 1    record at 11:52 a.m..

 2              (Whereupon, a recess was taken.)

 3              THE VIDEOGRAPHER:  We're back on the

 4    record at 12:07 p.m..

 5    BY MR. LEVIN:

 6       Q.    I just want to find out a little bit

 7    about your filing of papers in your employ.

 8              Do you have a personal file?

 9              MR. LEVIN:  Sunny, that was a

10    question.

11       A.    Yes.

12    BY MR. LEVIN:

13       Q.    And where is it kept?

14       A.    CNBM Company, Limited.

15       Q.    And does that file have papers that

16    are created or received in your capacity in

17    connection with your duties at both Taishan as

18    well as CNBM and CNBM Group?

19              THE INTERPRETER:  This is the

20    interpreter speaking.

21              Counsel, when you said "personal

22    file," did you mean a file that belongs to him,

23    or a personnel file?

24              MR. BARR:  I heard it as personnel

25    file.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. LEVIN:  I mean a personal file,
 2   his own files.
 3              MR. BARR:  I also heard it as
 4   personnel, and I believe that's how it was
 5   translated.
 6   BY MR. LEVIN:
 7       Q.    Okay.  Let's start over again.
 8              Do you have a personal file, something
 9   where you keep your papers that are related to
10   your business activities?
11       A.    No.
12       Q.    So then if you receive a letter or
13   communication or an e-mail, you do not
14   particularly house those papers in your own
15   personal file, they are placed somewhere else,
16   is that correct?
17              MR. BARR:  Objection to the form.
18              You can answer.
19       A.    I'm the Chairman of the Board of BNBM.
20   My main job is to listen to reports, and to
21   participate in the board of directors meeting.
22   I do not keep those documents in my personal
23   file.  I do not have such a personal file.  But
24   person who is specifically in charge of certain
25   issue will show me such documents and keep the
```

Confidential - Subject to Further Confidentiality Review

```
 1   documents.

 2   BY MR. LEVIN:

 3       Q.    Well, if I wanted to write to you, and

 4   I wrote a letter to Mr. Wang Bing, and I said

 5   "are you going to be in a certain city with

 6   regard to the road show," I signed it Arnold

 7   Levin, "please let me know," where would that

 8   letter be put?

 9           MR. BARR:  Objection to the form.

10           You may answer.

11       A.    Usually a letter like that will be

12   opened by the office, and they would tell me

13   there is such a letter.  They are the ones that

14   are in charge of that.  I don't know whether the

15   letter will be kept and where would it be kept.

16   BY MR. LEVIN:

17       Q.    So all your mail and all your

18   communications go to the office first, and they

19   open them, even though they're addressed to you,

20   and then they call you and tell you that they

21   received it, if they choose to do that, you read

22   it and you give it back to them, and then you

23   don't know where they put it, is that correct?

24       A.    The circumstances vary.  Sometimes the

25   letters would be given to me directly, but
```

1   sometimes because I was on a business trip and I

2   would have them read the letter for me and let

3   me know about the letter.  Because I'm not

4   specifically in charge of the daily operation of

5   the company, therefore rarely I would receive

6   letters that directed to me.

7           My job is mainly to decide important

8   issues in the board of directors meetings, and

9   to listen to the reports in the meetings.

10  Therefore, there weren't many letters that were

11  forwarded directly to me, and I do not keep

12  those letters as well.

13      Q.    Well, putting aside how many there

14  are, or how little there are, other than when

15  you're travelling and a letter comes to you,

16  does it get delivered to your office for you to

17  read and respond to, if necessary?

18      A.    Usually in China executives like us,

19  such as the Chairman of the board of directors,

20  would simply make phone calls.  I do not recall

21  that anything like what you have just mentioned

22  ever happened.

23      Q.    Vast experience at BNBM, you don't

24  recall what I just described as ever happening,

25  is that correct?

```
 1              MR. BARR:  Objection to the form.
 2       A.    It rarely happens, but I do not
 3   remember any specific letter.  However, there
 4   are circumstances when advertisement agencies
 5   sending an invitation letter to the company, the
 6   office would tell me that "since you're not
 7   here, there is this advertisement agency that
 8   has sent you invitation letter," that's
 9   possible, and then I would say "okay, I'm aware
10   of that."
11   BY MR. LEVIN:
12       Q.    I'm not interested in advertisements.
13             I'm interested in communications that
14   deal with what you get paid for doing on a daily
15   basis.
16             Do you get letters in connection with
17   your employment at BNBM?
18       A.    I don't have that recollection.  My
19   recollection is that's if any BNBM employee or
20   personnel that's needed to see me, they would
21   make an appointment to come see me and report to
22   me.
23       Q.    What if somebody other than an
24   employee of BNBM wanted to communicate with you,
25   me, could they do it by letter?
```

1      A.    Yes.

2      Q.    And you have an address that they can

3  send it to?

4      A.    Yes.

5      Q.    And what is it?

6      A.    I do not have a clear recollection of

7  the specifics, but the company does have an

8  address.  It is in the public announcement.

9      Q.    And where would that letter end up

10  after you saw it?  It would end up in a file

11  someplace, I would assume.  And could you tell

12  me where that file is located?

13          MR. BARR:  Objection to the form.

14      A.    It is my experience of being the

15  Chairman of the Board of BNBM for six years, I

16  do not remember any letters were written to me,

17  because as a Chairman of the board of directors

18  of a Chinese company, we're not used to writing

19  letters.  I do not have the habit of writing

20  letters, therefore nobody writes me letters.  I

21  do not know.  I do not remember.

22  BY MR. LEVIN:

23      Q.    I would imagine that at BNBM there are

24  people below the Chairman that do receive

25  letters.  Do you agree with me?

1      A.    I don't know.  But as far as I know,

2    according to the news in China, because of the

3    popularity of communicating via telephone,

4    people rarely communicate through letters

5    anymore.  Who writes letters nowadays?

6      Q.    Do people write e-mails nowadays?

7      A.    For ordinary employees, that's

8    possible, but it's rarely there will be a high

9    level executive would be sitting in front of

10   computer and typing.  I'm talking about Chinese

11   companies.

12     Q.    So you're a high level executive at

13   BNBM, are you not?

14     A.    Yes.

15     Q.    And you don't do e-mails, do you?

16     A.    There are e-mails in the company, I do

17   have e-mail address, but I rarely use it.

18     Q.    What is your e-mail address?

19     A.    Because my job is mainly the board of

20   directors meeting, and issues in the meetings.

21          MR. BARR:  Do you want to repose the

22   question?

23     A.    Is the spelling of my name.

24   BY MR. LEVIN:

25     Q.    And the company?

```
1        A.    Correct.  Correct.

2        Q.    Let me hear you say it.  Say it so I

3    can hear it.

4        A.    It's WB@, and after that is

5    BNBM.com.cm.

6        Q.    Does your secretary receive your

7    e-mails or anybody in the employ of BNBM receive

8    your e-mails for you?

9        A.    No.

10       Q.    Do you dictate responses to e-mails if

11   by chance you happen to get one?

12       A.    Rarely.  Sometimes, because I'm not in

13   charge of the specific day-to-day works.  My

14   main work responsibility is to deal with the

15   issues related to the board of directors

16   meeting, and sometimes you do some research.  We

17   mainly communicate through face-to-face.  And

18   sometimes, if necessary, when I am in other

19   places, there would be a response, but it was

20   only occasionally, it was only sometimes.  I do

21   not have a clear recollection on that.

22       Q.    You have no clear recollection of ever

23   responding to an e-mail, is that correct?

24       A.    Maybe, but very few.  In my

25   recollection, very few.
```

1      Q.    In the last six years, how many

2  e-mails have you responded to?

3           MR. BARR:  Objection.  Vague.

4      A.    I do not have a clear recollection on

5  that, but I rarely use e-mails.

6  BY MR. LEVIN:

7      Q.    You've said that.

8      A.    My main job is to participate in the

9  board of directors meeting.

10     Q.    On these rare occasions, do you type

11  the e-mail, or do you have somebody do it for

12  you, your response?

13     A.    I would type it myself, because I'm

14  not very good in typing.  Therefore, I rarely

15  use it.

16     Q.    Well, do you have somebody type it for

17  you?  I know somebody that does that.

18     A.    No.  Because I am the Chairman of the

19  board of directors, whatever I participate in is

20  confidential.

21           THE INTERPRETER:  Interpreter wants to

22  clarify with deponent.

23     A.    What I have participated in are all

24  important and confidential issues.  I would

25  rarely ask other people to assist me in that.

Confidential - Subject to Further Confidentiality Review

1    I'd rather communicate face-to-face.  Only if

2    necessary I will write e-mails myself.

3    BY MR. LEVIN:

4        Q.    And where are these e-mails only if

5    necessary that you've written yourself?  Do you

6    have copies of them?

7        A.    Because I rarely use my e-mail box,

8    therefore I do not have a habit of keeping them.

9        Q.    Do you have --

10       A.    I rarely use it.

11           MR. LEVIN:  Are you ready for me,

12   Sunny?

13           THE INTERPRETER:  Yes.

14   BY MR. LEVIN:

15       Q.    Do you have a computer that you use to

16   receive on rare occasions -- respond on rare

17   occasions with e-mails?

18       A.    There is a computer in the company's

19   office.

20       Q.    Do you have a personal computer you

21   use, or do you go to the company office and use

22   their computer for your e-mails?

23       A.    I do not have a personal computer.

24       Q.    So where do you go when you have to --

25   on these very rare occasions, on only when

1    necessary situations and you have to respond to

2    an e-mail?

3         A.    There was no such occasions.  I do not

4    have a recollection of such an occasion, because

5    I'm not in charge of the daily operation of the

6    companies, rarely there would be e-mails sending

7    to me.  My main job is to participate in

8    meetings, and face-to-face would be a proper way

9    to communicate with other people.

10        Q.    If I understand what's happening here,

11   you have on occasion responded to e-mails.  And

12   what I want to know is what particular gadget,

13   whether it be an iPhone, a computer, a PC, or

14   whatever one has, did you use to respond to one

15   of those e-mails?

16             MR. BARR:  Objection to the form of

17   the question.

18             You can answer.

19        A.    I recall I used company's computer.

20   BY MR. LEVIN:

21        Q.    Where is that located at BNBM?

22        A.    Office.

23        Q.    Whose office?

24        A.    My office.

25        Q.    When you say your office, you mean a

Confidential - Subject to Further Confidentiality Review

1    BNBM office, or your personal office?

2              MR. BARR:  Personal office at BNBM.

3              MR. LEVIN:  You can help me.

4              MR. BARR:  I'm just wondering when she

5    has said company computer, again I don't know

6    the answer to this, whether he was referring to

7    a company-owned computer that happens to be

8    either in his physical office or someplace in

9    the office.  I don't know the answer to that.

10   But I think there's some confusion on the record

11   because of that.

12             MR. LEVIN:  I think there's a lot of

13   confusion.

14             MR. BARR:  I don't think there's a

15   lot.  I think on that issue there's a lot.

16             MR. LEVIN:  I think there's a lot of

17   studied confusion here.

18             MR. BARR:  Arnold, would you please.

19             MR. LEVIN:  I can't help myself.

20             MR. BARR:  Please help yourself.

21             MR. LEVIN:  Patently upsetting.

22        A.    In my office in BNBM's -- of BNBM

23   company.

24   BY MR. LEVIN:

25        Q.    Do you have your own personal office

1    in BNBM company?

2        A.    My personal office, yes.

3        Q.    And that's where the computer is that

4    you use when necessary to respond to e-mails, is

5    that correct?

6        A.    Yes.

7        Q.    And did you turn that computer over to

8    Mr. Barr and his group in connection with the

9    document production in this litigation?

10       A.    I did.

11       Q.    Now, do you schedule meetings by

12   e-mail, or by some written communication?

13       A.    I do not schedule meetings.  The

14   office would schedule meetings.  All I have to

15   do is to participate in the meetings.

16       Q.    Who schedules the meetings?

17       A.    The employees of the company's board

18   of directors.

19       Q.    And how do they communicate the dates

20   and times of those meetings to you?

21       A.    Through telephone calls, or report to

22   me face-to-face.

23       Q.    Do they ever send you a memorandum as

24   to when meetings are to occur?

25       A.    Because they knew that I basically do

1    not use computer, I do not know how to use

2    computer.

3         Q.    Do you have -- I'm sorry.

4         A.    The most important thing is that I, as

5    many executives in Chinese companies, are used

6    to face-to-face communications, to listen to the

7    reports, it is not necessary --

8              THE INTERPRETER:  Interpreter needs to

9    clarify.

10        A.    Only if necessary they would report to

11   me face-to-face.  They would not require me to

12   sit in front of the computer to read the

13   e-mails.  This is the fact.

14   BY MR. LEVIN:

15        Q.    Did they ever send you a memorandum,

16   not in e-mail, just a written memorandum giving

17   you any information with regard to meetings or

18   anything else dealing with BNBM?

19              MR. BARR:  Object to the form.

20        A.    What kind of memorandum are you

21   talking about?  Are you referring to a written

22   notification of meeting?

23   BY MR. LEVIN:

24        Q.    Referring to anything that has to do

25   with the functioning of this large corporation

1    that we have learned is BNBM PLC.

2        A.    That's possible.  For example, there

3    are a lot of items in the agenda of a meeting.

4    In that circumstance they were printed out and

5    asked me if the agenda is okay.  In that

6    circumstance, I will read that.

7        Q.    What do you do with that memo when

8    you're finished reading it?  Do you give it to

9    somebody to file?

10       A.    This is not a memo.  It's something

11   like an agenda, a draft, they would ask for my

12   opinion, and then they would ask if I would

13   instruct them to keep it.  Usually they would

14   not need to be kept.  In my recollection,

15   usually in Chinese companies, only the contracts

16   or agreements were kept.  I do not have a

17   recollection of the keeping of the memos in

18   file.

19       Q.    Who are the employees of the board?

20   Can you tell me the names that notify you of

21   these meetings?

22       A.    The secretary of the board of

23   directors.

24       Q.    Do you have a secretary, a personal

25   secretary that sends things out for you,

Confidential - Subject to Further Confidentiality Review

1    receives information when you're travelling

2    abroad, calls you from time to time, types

3    documents for you, etcetera, etcetera, etcetera?

4            MR. BARR:  I'd like to make an

5    etcetera, etcetera, etcetera objection to the

6    form, compound, vague.

7            If you understand the question, you

8    may answer.

9        A.    I do not have a secretary to do what

10   you have just mentioned for me.

11   BY MR. LEVIN:

12       Q.    Now, we're going to go to lunch now,

13   but I'm going to give you a homework assignment.

14   I'm going to ask the same questions with regard

15   to your work at Taishan and what you do for CNBM

16   when we come back from lunch, so you can think

17   about it, and maybe it will be faster.

18            Thank you.

19            MR. BARR:  Thank you.

20            THE VIDEOGRAPHER:  Okay.  We're off

21   the record at 12 --

22       A.    Okay.  Thank you.

23            THE VIDEOGRAPHER:  Okay.  We're off

24   the record at 12:43 p.m..  This concludes tape

25   two.

Confidential - Subject to Further Confidentiality Review

```
 1              (Whereupon, a luncheon recess was

 2         taken.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                      AFTERNOON SESSION

 2

 3            THE VIDEOGRAPHER:  We're back on the

 4    report at 1:41 p.m..  This is the beginning of

 5    tape three.

 6            MR. BARR:  I advised Mr. Levin in an

 7    off the record conversation that we just had

 8    that I had discussions with Mr. Wang during the

 9    lunch break, and determined that his

10    understanding when Mr. Levin asked him questions

11    about did he get any memoranda, he understood

12    that to mean any memoranda of understanding in a

13    corporate transaction, and answered on that

14    basis.

15            So to the extent you want to

16    re-inquire with respect to paper documents, you

17    know, you may and he may be able to elaborate on

18    his prior answers.  All of his -- he indicated

19    all of his answers with respect to electronic

20    files are exactly as he testified before.

21            MR. LEVIN:  Okay.

22            Have you told him what Mr. Barr said,

23    Sunny?

24            THE INTERPRETER:  I did, Mr. Levin.

25            MR. LEVIN:  Good.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LEVIN:

 2       Q.    When I'm speaking of memorandum, now

 3    I'm speaking strictly of paper materials that

 4    you would get in the ordinary course of business

 5    at BNBM.

 6            And did you get those materials from

 7    time to time?

 8       A.    Yes.

 9       Q.    And could you describe the type of

10    materials that you would get in the ordinary

11    course of business at BNBM?

12       A.    Yes.  For example, before some of the

13    board of directors meeting there would be

14    proposals submitted for review in the meeting

15    before the meeting started, and relevant

16    department will bring materials for me to read.

17    And during the board of directors meeting,

18    besides what I just mentioned to you regarding

19    the agenda, I was also shown some of the

20    proposals for the meeting which are written.

21       Q.    Did you also get written materials

22    dealing with guaranties, dealing with Taishan

23    and Taishan subsidiaries?

24       A.    Sometimes BNBM would provide guaranty

25    for Taishan Gypsum's bank loans.  I would be
```

1    shown and my signature required for documents

2    such as that.

3        Q.    And would there be times when you

4    would get directives from CNBM or CNBM Group?

5            MR. BARR:  Objection to the form.

6    Vague and ambiguous.

7        A.    Sometimes as the vice-president of

8    CNBM Company, Limited I would receive documents

9    and materials and notifications from them.

10   BY MR. LEVIN:

11       Q.    Well, did you ever see any CNBM

12   directives or requests or information either

13   from CNBM or CNBM Group that was directed to

14   BNBM PLC?

15           MR. BARR:  Objection to the form.

16       A.    No.  I don't recall this ever

17   happened.

18   BY MR. LEVIN:

19       Q.    This -- all these written materials,

20   such as we just discussed, when you were

21   finished reading them, what did you do with

22   them?

23           THE INTERPRETER:  Interpreter needs to

24   clarify with witness.

25       A.    Usually the materials will be returned

Confidential - Subject to Further Confidentiality Review

1    back to those who submitted them, and for those

2    materials for the board of directors meeting

3    after the meeting, they will be returned to the

4    secretary of the board of directors meeting.

5        Q.    Is it fair to say that the standard

6    operating procedure at BNBM in a board of

7    directors meeting was to collect all materials

8    at the end of the board of directors meeting,

9    and give them back to where they came from?

10            MR. BARR:  Are you asking whether his

11   particular practice, or for all the directors?

12            MR. LEVIN:  For all the directors.

13       A.    There is no standard requirements for

14   that, but usually they would be returned to the

15   secretary of the board of directors.  But for

16   those who -- but for those documents that are

17   not confidential, if any director would ask to

18   keep a copy of them, that could also be

19   possible.

20   BY MR. LEVIN:

21       Q.    Would the director have to ask

22   somebody for permission to keep a copy of them?

23       A.    Not according to my recollection.  And

24   nobody had ever come to me for that request.

25       Q.    You did not keep any of this material,

1    you gave it all back, am I correct?

2        A.    Yes.

3        Q.    Now, did you ever get a written

4    document or memorandum for somebody that you had

5    to respond to in writing?

6            THE INTERPRETER:  This is the

7    interpreter speaking.  Mr. Levin, what do you

8    want the interpreter to translate as for the

9    word "memorandum"?  Do you want the interpreter

10   to translate as notes or materials or memo?

11           MR. LEVIN:  Notes and materials.

12       A.    There was no occasion that called for

13   a written response.  But there were occasions,

14   for example, if there is an issue related to

15   investment, and I would suggest them to forward

16   it to specific departments for further research,

17   and to ask for their opinions such as sales

18   department.  There were materials that were

19   forwarded to those departments asking for

20   opinions.

21   BY MR. LEVIN:

22       Q.    Does BNBM have a document retention

23   policy?

24       A.    No.

25       Q.    Do you keep them forever, or do you --

1    or is it up to an individual who receives these

2    documents as to whether or not they keep them or

3    trash them?

4           MR. BARR:  Object to the form.

5    A.    I do not know how any specific person

6    would handle the material, because this is

7    something related to daily operation which I'm

8    not in charge of.  I'm in charge of the board of

9    directors meeting, the documents of the board of

10   directors meeting.

11   BY MR. LEVIN:

12   Q.    Now, I want to turn your attention to

13   Taishan.  You're a director of Taishan, are you

14   not?

15   A.    Yes.

16   Q.    And you were appointed to be a

17   director of this corporation, Taishan, by BNBM

18   where you also were a director, and you moved on

19   to a bigger and better job classification?

20          MR. BARR:  Objection to the form.

21   Compound.

22   A.    After BNBM became the shareholder of

23   Taishan Gypsum Company, according to Chinese

24   law, I was nominated by BNBM Company, Limited as

25   the director of Taishan Gypsum, and upon the

Confidential - Subject to Further Confidentiality Review

1   election of the board of directors meeting of

2   Taishan Gypsum Company, Limited I was elected as

3   director.  I was elected as the director of

4   Taishan Gypsum Company through the election of

5   the company's board of directors meeting.

6            MR. LEVIN:  Do you want to go off the

7   record?

8            MR. ROSENBERG:  Please.

9            THE VIDEOGRAPHER:  Off the record.

10  Off the record.  We're off the record at

11  1:56 p.m..

12            (Pause.)

13            THE VIDEOGRAPHER:  We're back on the

14  record at 18:58 p.m..

15            THE INTERPRETER:  This is interpreter

16  speaking.  The interpreter would like to make a

17  correction of her prior interpretation.

18            Mr. Wang said that he was actually

19  elected as a director of Taishan through Taishan

20  Gypsum Company's shareholders meeting rather

21  than a board of directors meeting.

22  BY MR. LEVIN:

23     Q.    Okay.  While you have been a director

24  of Taishan, have you received any mail in

25  connection with your position at Taishan?

1        THE INTERPRETER:  This is interpreter

2    speaking.

3        Counsel, when you said "mail," did you

4    also include e-mail, e-mail and letters?

5        MR. LEVIN:  We can.  It won't compound

6    when you say it, though.

7    A.    I'm a director of Taishan Gypsum.

8    According to the law, some of the decisions that

9    are made are required to be made in the board of

10   directors meeting of Taishan Gypsum.  For

11   documents related to those decisions, sometimes

12   they would let me read that.

13   BY MR. LEVIN:

14   Q.    Would you keep them?

15       MR. BARR:  They would.

16       MR. LEVIN:  Let me read that.

17       THE INTERPRETER:  Interpreter clarify

18   with deponent.

19   A.    There's no change on the interpreter's

20   prior interpretation.  Go ahead, Counsel.

21   BY MR. LEVIN:

22   Q.    Is that mail, written documents, and

23   e-mail that you would receive?

24   A.    Usually they would print them out and

25   gave to me.  They knew that I don't really use

1    e-mail that much, but since they know I do have

2    e-mail it is possible that they would send me an

3    e-mail.

4        Q.    If they did send you an e-mail, would

5    they send it to your e-mail address at BNBM?

6        A.    Yes.

7        Q.    And these materials that you receive

8    at the end of the directors meeting at Taishan,

9    I think I know something about you now, you'd

10   give them back; you wouldn't keep them, would

11   you?

12       A.    Yes.  Usually they would be given to

13   the secretary of the board of directors after

14   the meetings were held.

15       Q.    So the board of directors collects all

16   the materials back, is that correct?

17       A.    Usually that's the case.  But there is

18   no such mandatory requirements that all

19   directors must submit all the materials.

20   Usually that's the case.  Most of the time

21   that's the case.

22       Q.    With regard to BNBM, did you partake

23   in the production of documents in this

24   litigation?

25            MR. BARR:  Objection to the form.

```
 1            What do you mean by "partake"?

 2   BY MR. LEVIN:

 3       Q.    Did you help or assist those that were

 4   gathering the documents?

 5       A.    Gathering the documents, I don't quite

 6   understand who gathered documents.

 7       Q.    Memorandum, but not memorandum of

 8   understanding.

 9            MR. BARR:  Can you rephrase the

10   question?

11       A.    Provided to who?

12   BY MR. LEVIN:

13       Q.    How about if I use the word notes or

14   written materials?

15            MR. BARR:  You're asking what role did

16   he play with respect to the notes and materials

17   that were produced by BNBM in this case?

18            MR. LEVIN:  That were to be produced

19   by BNBM in this case.

20       A.    The legal department is in charge of

21   that.  I am not in charge of that.

22   BY MR. LEVIN:

23       Q.    Well, do members of the board of

24   directors either in Taishan or BNBM have their

25   private files, other than you?
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. TAYLOR:  Object to form.

 2              MR. BARR:  Objection to the form.

 3   Calls for speculation.

 4      A.   I don't know.  I don't know this.  I

 5   don't know the circumstance.

 6   BY MR. LEVIN:

 7      Q.   Did anybody from the legal department

 8   come to you either in your capacity at BNBM,

 9   Taishan, or CNBM, CNBM Group, or BNBM Group, and

10   ask you for materials and/or e-mails and/or

11   other written indicia of the business of those

12   particular corporations for production in this

13   litigation?

14              MR. BARR:  Objection to the form.

15   Compound, and asked and answered.

16      A.   The legal department notifies me that

17   a professional entity would come and make copies

18   of e-mails.  I did not participate in anything

19   else.

20   BY MR. LEVIN:

21      Q.   When was that, sir?

22      A.   I don't have a clear recollection.

23      Q.   So where did they find the e-mails

24   that they were to make copies of?

25      A.   They made copy over the computer that
```

Confidential - Subject to Further Confidentiality Review

```
 1    is located in my office in the company.

 2         Q.    Was that in 2014 or 2015, or some

 3    other year?

 4         A.    2015.

 5         Q.    Were you ever given a directive by

 6    anyone at BNBM or CNBM as to preserve all your

 7    documents and not destroy any documents and not

 8    discard any documents, even though in the normal

 9    course of business ordinarily you would do that?

10         A.    Because I was not involved in the work

11    of documents, it was only that the legal

12    department told me that there was going to be a

13    copy of documents, I did not receive this

14    information therefore, I did not participate in

15    this.

16         Q.    Were you given the directive not to --

17    to preserve all your documents at any point in

18    time?

19         A.    Only during the time of collecting of

20    documents -- collecting of evidence, the legal

21    department told me that the evidence will be

22    collected, you can no longer touch the computer.

23              THE INTERPRETER:  The interpreter

24    would like to clarify with deponent.

25              The interpreter asked the deponent
```

Confidential - Subject to Further Confidentiality Review

1    what did he mean when he said they could no

2    longer touch the computer.  The deponent said

3    that the computer would be taken away for

4    collecting of the evidence.

5         Q.    That was in 2015, wasn't it?

6         A.    Yes.

7         Q.    Were you ever told before 2015 by your

8    legal department or anybody else what to do with

9    the documents that you had personal control

10   over?

11        A.    No, because I also did not have much

12   documents.

13        Q.    Did you have an office at Taishan?

14        A.    No.

15        Q.    Did you have an office at CNBM?

16        A.    No.

17        Q.    Did you have your own computer at

18   CNBM?

19        A.    No.

20        Q.    If you received materials at CNBM

21   while serving as vice-president of CNBM, what,

22   if anything, did you do with those materials?

23   Where did you keep them?

24        A.    As the vice-president of CNBM, I did

25   not have an office, nor did I have a computer.

1   I was not involved in the daily operation of the

2   company, I was only in charge of BNBM's

3   investment.  I was not involved in the daily

4   work of CNBM.

5       Q.    Did you ever receive materials

6   directed to you in your official capacity of

7   CNBM?

8       A.    As the vice-president of CNBM,

9   sometimes I would receive notices from CNBM, but

10  very few.

11      Q.    What would you do with them?  Where

12  would you put them when you were finished

13  reading them?

14      A.    Sometimes I would keep them in hand.

15  Sometimes I would shred them using the shredding

16  machine.  I did not have the responsibility of

17  keeping documents.

18      Q.    And up until 2015 when the document

19  production was made here, you would have

20  shredded some of the documents, is that correct?

21      A.    No.  Ever since I was clearly asked to

22  provide evidence, I did not handle the

23  documents.

24      Q.    And when was that, in 2015 that you

25  were asked to provide evidence?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Now, has CNBM Group from time to time

 3   issued directives to its subsidiaries and BNBM?

 4              MR. TAYLOR:  Objection to form.

 5              MR. BARR:  Objection to form.

 6              MS. DALEY:  Objection to form.

 7        A.    There was no directives.

 8   BY MR. LEVIN:

 9        Q.    Now, you're the Chairman of BNBM

10   Homes, are you not?

11        A.    Yes.

12        Q.    And what is the business of BNBM

13   Homes?

14        A.    It is a type of assembled homes.  It

15   was achieved by assembling of homes.

16        Q.    Who were the shareholders of BNBM

17   Homes?

18        A.    BNBM Company, Limited.

19        Q.    Are they 100 percent owner?

20        A.    Yes.

21        Q.    And where is BNBM Homes located?

22        A.    Its headquarters is in Beijing.

23        Q.    And did they -- have they or -- strike

24   that.

25              Do they market in the United States?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    I have not heard of that.

 2        Q.    Have you ever heard of a company

 3   called JPS Group, Inc. in Monterey Park,

 4   California?

 5        A.    I have not heard of it.

 6        Q.    Has BNBM Homes done business in the

 7   United States?

 8        A.    I have not heard that it had done

 9   businesses.

10        Q.    Did you have any connection with BNBM

11   Homes prior to 2008?

12              MR. BARR:  Are you asking about him

13   personally?

14              MR. LEVIN:  Him personally.

15        A.    I don't have a clear recollection on

16   that.  I might have been a director.

17   BY MR. LEVIN:

18        Q.    Were you a director in 2006?

19        A.    I don't have a clear recollection as

20   of when I became a director.  It's quite a while

21   ago.

22        Q.    If I wanted to find out what BNBM

23   Homes was doing in the year 2006 or 2005 or

24   2007, who at BNBM Homes should I talk to?

25        A.    After I became the director of BNBM
```

Confidential - Subject to Further Confidentiality Review

1    Homes, I was aware of its major decisions.  But

2    for its operation, the general manager and the

3    management would be the ones to know.

4        Q.    Did you ever hear of the Hurricane

5    Katrina that struck New Orleans and some of the

6    southern cities of the United States?

7              THE INTERPRETER:  Interpreter needs to

8    clarify with witness.

9        A.    I've heard that southern America --

10             THE INTERPRETER:  Interpreter would

11   like to start over.

12       A.    I've heard that in south of the United

13   States there had been a disaster of hurricane.

14       Q.    Were you aware, sir, as a director

15   that BNBM Homes in 2006 discussed the marketing

16   of their product in the Katrina-devastated areas

17   of the United States?

18       A.    No.

19       Q.    Were you aware -- sir, you're smiling?

20             MR. BARR:  He's smiling because I'm

21   smiling looking at Pearl going 3, 2, 1.

22   BY MR. LEVIN:

23       Q.    I'm not smiling, because I have 4,000

24   homeowners that are living like dogs right now,

25   so I don't find it that funny, sir.

```
 1          MR. BARR:  Well, your own associate

 2   working with you was smiling relating to

 3   something related to documents, so let's please

 4   not, you know, try showmanship here on the

 5   record, sir.  Let's move on and get the

 6   questions for the witness.

 7          MR. LEVIN:  I've got plenty of

 8   questions.

 9          MR. BARR:  Okay.  So just ask the

10   questions.

11          MS. ROBERTSON:  This is a document

12   produced by BNBM in this litigation.  For the

13   record, Plaintiffs identify this document as

14   Wang Exhibit 321, Bates BNBM(Group)-E-0008592

15   through Bates BNBM(Group)-E-0008606.  The last

16   page of this exhibit is blank as produced.

17          (Whereupon, Exhibit Number 321,

18          3/10/06 USA Market Development Plan

19          for BNBM Homes Prepared by JPS Group,

20          Inc., Bates BNBM(Group)-E-0008592

21          through 8606, was marked for

22          identification.)

23          MR. BARR:  I just want to note for the

24   record that the suffix -- excuse me, the Bates

25   number at the bottom indicates that this was a
```

1    document produced by BNBM Group, not by BNBM

2    PLC.

3    BY MR. LEVIN:

4        Q.    Sir, I show you Exhibit 321 and ask

5    you to just familiarize yourself with it.

6              (Witness reviewing document.)

7    BY MR. LEVIN:

8        Q.    Sir, have you ever seen that document

9    before?

10       A.    I've never seen it.

11       Q.    Are you familiar with the subject

12   matter of that document?

13       A.    I'm not familiar.

14       Q.    What is the business of BNBM Homes?

15             MR. BARR:  Objection.  Asked and

16   answered.

17       A.    Its main business is to construct some

18   simple assembled homes in Chinese rural market.

19   BY MR. LEVIN:

20       Q.    Would you characterize that as

21   prefabricated homes?

22             THE INTERPRETER:  Would the

23   interpreter inquire the definition of

24   "prefabricated"?

25             MR. LEVIN:  Forget it.

```
 1              THE INTERPRETER:  Counsel, is it the
 2    homes that have been constructed pending
 3    assembling?
 4              MR. LEVIN:  Yes.  Thank you.
 5       A.    It's not.  I'd like to make a
 6    supplement comment since this is a professional
 7    question, and there might be some
 8    mistranslation.
 9              BNBM's main business is that in the
10    Chinese rural areas.  Instead of using
11    traditional way of building homes with bricks,
12    it has teams of construction to build homes.
13              MR. LEVIN:  Sunny?
14              THE INTERPRETER:  That's fine.
15    BY MR. LEVIN:
16       Q.    Did BNBM Homes ever sell their product
17    in the United States?
18       A.    No.
19       Q.    No, or I don't know?
20       A.    I have not heard of that.  I don't
21    believe so.
22       Q.    Did you ever hear that they attempted
23    to sell their homes in the United States?
24       A.    I have not heard of that.
25       Q.    Have you -- do you know the meaning of
```

1    an exclusive agent?

2         A.    I'm not sure.

3         Q.    Well, have you ever heard that JPS

4    Group of Monterey, California prepared a

5    document and a presentation to be an exclusive

6    agent of BNBM Homes for sale of the homes in

7    both North and South America?

8              MR. BARR:  Wait.  I'm going to object

9    to the characterization of the document which,

10   of course, speaks for itself.  It specifically

11   says in the first line "JPS has secured the

12   exclusive marketing rights," but makes no

13   reference to the word "agent."  If you can point

14   to someplace else in the document for the

15   witness to look at where that term is used,

16   please do so.  But in all events the document

17   speaks for itself as to what it says.  It's a

18   document he's already identified he's not seen.

19             MR. LEVIN:  Okay.

20        A.    I'd like to make an additional

21   comment.  Besides the document was not provided

22   by BNBM PLC, I have seen that line about the

23   right of sales that was mentioned.  Because none

24   of the product of BNBM was sold in the United

25   States, and Homes -- the Homes business is a

1  more complex business, it would need a -- it

2  would need construction teams and general

3  contracting.  Currently BNBM Homes only builds

4  homes in Chinese rural market, each year it has

5  a volume of tens of millions of RMB.

6        MR. BARR:  Just answer his question.

7  There's no question pending.

8     A.    I don't know where this document come

9  from, and I've also not heard of their plan in

10  America.

11        MR. BARR:  Please, Sunny, I would ask

12  you to translate that please ask the witness to

13  simply answer the questions that are posed by

14  Mr. Levin.

15        (Translating.)

16        THE INTERPRETER:  Sunny, tell the

17  witness that I'm very comfortable with him

18  answering the questions as he's been answering

19  them.  If he wants to elaborate, I'll tell him

20  when to stop.

21        (Translating.)

22        MR. BARR:  Time to actually pose a

23  question.  Let's go on.

24  BY MR. LEVIN:

25     Q.    Sir, this document was produced to us

1   by BNBM Group.  Do you have any knowledge

2   whatsoever what BNBM Group's involvement was

3   with regard to JPS group of Monterey Park,

4   California?

5        A.    I do not know.

6        Q.    But BNBM PLC owns 100 percent of BNBM

7   Homes, do they not?

8        A.    Correct.

9        Q.    So, sir, is it a fact that BNBM Group

10  was acting on behalf of BNBM PLC when this

11  document was generated by JPS Group, Inc.?

12            MR. BARR:  Objection to the form.

13  Objection, lack of foundation.  Objection,

14  assumes facts not in evidence.

15  BY MR. LEVIN:

16       Q.    You may answer.

17       A.    Correct, I have also not heard of

18  that.

19       Q.    Do you know how the document came to

20  be in BNBM Group's files?

21       A.    I do not know.

22            THE INTERPRETER:  May the interpreter

23  inquire?

24            Upon clarifying with deponent, I would

25  suggest Madame Court Reporter to put a comma

1    following Mr. Wang's answer of correct, instead

2    of a period.

3    BY MR. LEVIN:

4        Q.    Could you turn to Bates number

5    0008599.  I call your attention to 2.1, which is

6    in Chinese and in English.  In English it's

7    "Organizational Structure."

8            Do you see the first line where it

9    says "JPS will be the exclusive distributor of

10   BNBM"?

11       A.    I see that's what the document said.

12       Q.    I note that you, sir, at BNBM PLC are

13   Secretary to the Party Committee from July 20,

14   '14, at least until present, is that correct?

15       A.    Yes.

16       Q.    I'm really not aware of the Party

17   Committee or the party or anything.  Could you

18   explain to me what the role of the Party

19   Committee is in this business organization

20   called BNBM that sells products and makes

21   profits?  What role does the Party have in all

22   this?

23       A.    Because some of the employees of BNBM

24   PLC are also Party members, according to

25   requirements, those Party members can form a

Confidential - Subject to Further Confidentiality Review

1    Party Committee.  The Party Committee is a

2    political organization which does not involve in

3    the operation of the company.

4        Q.    Who appointed you as Secretary to the

5    Party?

6            MR. BARR:  I'm going to object to this

7    line of questioning at this juncture.  This

8    would be no different than asking an American

9    witness whether they were a member of the

10   Democratic Party, the Republican Party, or some

11   other.  The witness has testified this had

12   nothing to do with the business of BNBM, so that

13   unless you're able to establish some

14   relationship between the business of BNBM and

15   the Party Committee, I'm going to respectfully

16   ask you to move on to another subject area.

17           MR. LEVIN:  I mean no disrespect.

18           MR. BARR:  So I'm going to allow the

19   witness to answer the question just posed, but

20   if you persist in this questioning I'll direct

21   the witness not to answer.

22           MR. LEVIN:  I understood.  I don't

23   agree with you, but I heard what you said.

24       A.    According to requirement of the Party,

25   the Party Secretary was elected by the Party

1    members.  I'd like to repeat, this is a

2    political organization.

3    BY MR. LEVIN:

4         Q.    Is it authorized by BNBM PLC to be

5    part of the BNBM PLC's physical location?

6              MR. BARR:  I'm going to object and

7    instruct the witness not to answer.  This would

8    be like asking whether a religious group would

9    be allowed to meet, to form, and be allowed to

10   meet on company's grounds.  The witness has

11   testified this has nothing to do with the

12   business.

13             If you'd like to call the judge,

14   please do so.  I think this is an inappropriate

15   invasion of -- with respect to the witness's

16   political involvement in the country, and not

17   appropriate subject matter for this deposition,

18   given his testimony.

19             MR. LEVIN:  Let's take five.

20             MR. BARR:  Okay.

21             THE VIDEOGRAPHER:  We're off the

22   record at 2:48 p.m..

23             (Whereupon, a recess was taken.)

24             THE VIDEOGRAPHER:  We're back on the

25   record at 3:05 p.m..

Confidential - Subject to Further Confidentiality Review

1            MS. ROBERTSON:  At this time

2    Plaintiffs offer Wang Exhibit 313-R.  It can be

3    identified as Bates BNBMPLC-E-0109215

4    through 109216.  This document was furnished to

5    Defendants in advance of the deposition in the

6    interest of saving time, and red-lining the

7    PSC's translation.  The exhibit is assembled

8    with the accepted red lines of Defendants, BNBM

9    PLC, followed by the PSC's original translation,

10   followed by the produced machine translation,

11   and finally the original Chinese document as

12   produced.  I now hand a copy to the witness and

13   a copy to the court reporter.

14            (Whereupon, Exhibit Number 313-R,

15            Notice on Asking for Opinions and

16            Suggestions on the Democratic Life

17            Meeting of the Leadership Team of BNBM

18            PLC for the Year 2014, Bates

19            BNBMPLC-E-0109215 through 109216, was

20            marked for identification.)

21   BY MR. LEVIN:

22      Q.    Sir, have you seen this document

23   before?

24            MR. BARR:  I want to note my

25   continuing objection to this line of questions.

Confidential - Subject to Further Confidentiality Review

1           You may answer that question yes or

2     no.

3       A.     No, I don't recall.  I don't remember

4     seeing this document.

5     BY MR. LEVIN:

6       Q.     Do you know, could you explain to me,

7     the Notice on Asking for Opinions and

8     Suggestions on the Democratic Life Meeting of

9     the Leadership Team of BNBM PLC for the Year

10    2014, what is the Democratic Life Meeting?

11          MR. BARR:  You may answer that

12    question with my continuing objection.

13          But again, Mr. Levin, I'm going to be

14    very clear here, I'm shortly going to cut off

15    this line of questions given the witness's prior

16    answer.

17          But you may answer that question.

18          MR. LEVIN:  Wait until you hear the

19    questions.

20      A.     The Democratic Life Meeting is also a

21    political activity of the Party.  Its content

22    has nothing to do with the production and the

23    operation.

24    BY MR. LEVIN:

25      Q.     And does the Party Committee include

Confidential - Subject to Further Confidentiality Review

1    as a unit the Taishan Gypsum Company, Limited

2    and the Party branches of BNBM PLC?

3              MR. BARR:  Direct the witness not to

4    answer based upon the prior objection made.

5    BY MR. LEVIN:

6        Q.    Is this particular note -- I'm sorry.

7              (Translating.)

8              MR. BARR:  I direct you not to answer.

9        A.    I follow my attorney's instruction.

10   BY MR. LEVIN:

11       Q.    Is this notice given to all the

12   employees in the company?

13             MR. BARR:  Again, direct the witness

14   not to answer.

15   BY MR. LEVIN:

16       Q.    Is this notice only given to Party

17   members?

18             MR. BARR:  Again, direct the witness

19   not to answer.

20   BY MR. LEVIN:

21       Q.    Does CNBM and/or CNBM Group have a

22   like Party Committee?

23             MR. BARR:  You may answer that

24   question yes or no.

25             And I object to the form of the

Confidential - Subject to Further Confidentiality Review

1   question as to the meaning "a like."

2          MR. LEVIN:  Similar.

3       A.    Wherever the number of the Party

4   members had reached to a certain degree, they

5   can form a Party Committee, and each one of the

6   Party Committee is independent from the others.

7   BY MR. LEVIN:

8       Q.    Does CNBM have such a Party Committee?

9          MR. BARR:  Again, now I'm directing

10  the witness not to answer the question given his

11  prior answer.

12  BY MR. LEVIN:

13      Q.    Does CNBM Group have such a Party

14  Committee?

15         MR. BARR:  Same objection.  And same

16  instruction.

17  BY MR. LEVIN:

18      Q.    Who is Yuemei Ma?  It's on the bottom.

19         MR. BARR:  You may answer that

20  question.

21      A.    I don't know.

22  BY MR. LEVIN:

23      Q.    Are there any BNBM members of the

24  board of directors who are not members of the

25  Party?

1          MR. BARR:  Objection.  Direct the

2     witness not to answer.

3     BY MR. LEVIN:

4        Q.    Same question with regard to Taishan.

5          MR. BARR:  Same objection.  Same

6     instruction.

7          MR. TAYLOR:  Join in the objection.

8          MS. ROBERTSON:  For the record,

9     Plaintiffs do offer Wang Exhibit 313-R.

10          MR. BARR:  For the record, we

11     strenuously object to that document for any

12     purpose in this litigation, given the witness's

13     testimony.

14          MS. ROBERTSON:  Plaintiffs offer,

15     file, and introduce, Wang Exhibit 308.  Wang

16     Exhibit 308 is BNBNPLC-E-0100080 through 10086,

17     and is the PSC translation followed by the

18     produced machine translation, followed by the

19     original Chinese document.  The document is

20     titled "The Request for Instructions on

21     Establishing a Wholly-Owned Subsidiary in

22     Xiangyang by Taishan Gypsum."

23          I hand a copy to the witness and a

24     copy to the court reporter.  Counsel opposite

25     has been also provided a copy.

1          MR. BARR:  Let me just understand, is

2    this a document we are seeing your translation

3    for the first time and have not had a chance to

4    do red-line on it?

5          MS. ROBERTSON:  Yes, sir.

6          (Whereupon, Exhibit Number 308, The

7          Request for Instructions on

8          Establishing a Wholly-Owned Subsidiary

9          in Xiangyang by Taishan Gypsum, Bates

10         BNBMPLC-E-0100080 through 0100086, was

11         marked for identification.)

12         MR. BARR:  I assume we will follow our

13   typical protocols with respect to the English

14   translation of this document.  And further,

15   that, as we did at the deposition of Mr. Chen,

16   that questions will be asked with respect to the

17   substance rather than in effect quoting lengthy

18   portions in English which we have not yet

19   agreed.

20         MS. ROBERTSON:  Yes, sir.

21         MR. BARR:  Okay.

22   BY MR. LEVIN:

23     Q.    Have you seen this document before?

24     A.    I don't have a recollection.  Perhaps

25   I have seen it.

Confidential - Subject to Further Confidentiality Review

1      Q.    Well, take a minute and review it.  It

2  says it was issued by Bing Wang.

3      A.    I see that.

4      Q.    And in what capacity did you issue

5  this?

6            MR. BARR:  Object to the form of the

7  question.

8            You may answer.

9      A.    Because I am the Chairman of the board

10  of directors of BNBM PLC, therefore I would

11  issue important documents.

12            THE INTERPRETER:  Interpreter would

13  like to correct her interpretation.

14      A.    Therefore, I would issue documents

15  regarding to important decisions in investment.

16  BY MR. LEVIN:

17      Q.    And was this such an important

18  decision that BNBM was faced with?

19      A.    Because BNBM PLC is public listing

20  company, according to the requirement of public

21  listing company, any investment -- any external

22  investment more than 30 million yuan would need

23  to be decided by BNBM's shareholders meeting and

24  board of directors meeting.

25            And according to the practice of

Confidential - Subject to Further Confidentiality Review

1  accounting principle, Taishan Gypsum Company

2  would need to consolidate its financial

3  statement with BNBM PLC's financial statement.

4  And according to the practice of the accounting

5  principle, the consolidated financial report

6  also need the approval of the shareholders

7  meeting and a board of directors meeting of

8  BNBM.

9      Q.    Does BNBM and Taishan have the same

10  accountant?

11      A.    BNBM and Taishan Gypsum each has its

12  own financial statement and standard accounting

13  practice.

14      Q.    Who are the accountants for Taishan?

15      A.    Are you talking about CPA, or auditor?

16      Q.    CPA first.

17      A.    BNBM and Taishan Gypsum each has its

18  own independent CPA.

19      Q.    Who is the CPA for Taishan Gypsum?

20      A.    It's a Madame Mi Weimin.

21      Q.    And who is the CPA for BNBM PLC?

22      A.    The person responsible for BNBM's

23  financial department is a Madame Yang Yanjun.

24      Q.    Now, are these employees of Taishan

25  and employees of BNBM, or are they outside CPAs?

Confidential - Subject to Further Confidentiality Review

```
 1              MR. TAYLOR:  Object to the form.

 2      A.      The CPA for BNBM is an employee of

 3  BNBM.  And the CPA for Taishan Gypsum is the

 4  employee of Taishan Gypsum.

 5  BY MR. LEVIN:

 6      Q.      Does Taishan have an outside certified

 7  public accountant?

 8      A.      It has an auditor.

 9      Q.      Does BNBM have an outside certified

10  public accountant?

11      A.      According to Chinese law, entities do

12  not necessarily need to have an external CPA,

13  but auditor.  The entities would need a CPA firm

14  to perform audit work, external, independent.

15      Q.      Who were the outside auditors who were

16  also CPAs for Taishan?

17      A.      The name is -- I cannot recall the

18  name at this instant, but it is in all of -- it

19  is in all of our public announcements.

20      Q.      Who is the outside auditor/CPA for

21  BNBM PLC?

22      A.      It's also included in our public

23  information disclosure material, as well as in

24  our public announcement.

25      Q.      Are those auditors affiliated in any
```

 1    way?

 2              MR. BARR:  Objection to the form.

 3        A.    I don't understand your question.

 4    BY MR. LEVIN:

 5        Q.    Are the auditors the same for both

 6    BNBM and Taishan?

 7        A.    According to the requirements of

 8    public listing companies, according to the laws

 9    requirement, the auditor for the consolidated

10    financial report has to be the same.

11        Q.    So Taishan and BNBM have the same

12    auditor for their consolidated financial

13    statement?

14        A.    It's the same company.  It's the same

15    CPA firm, but not the same person.

16        Q.    Just different individuals within the

17    same firm perform the functions for BNBM and

18    Taishan, correct?

19        A.    Yes, I think so.

20        Q.    Do you know the auditor that CNBM, the

21    company, uses?

22              MR. BARR:  CNBM PLC you're asking?

23              MR. LEVIN:  CNBM PLC.

24        A.    I don't know.  I'm not in charge of

25    that.

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. LEVIN:

 2       Q.    Do you know the auditor that the CNBM

 3   Group uses?

 4       A.    I don't know.  I'm not in charge of

 5   that.

 6       Q.    What is your educational background?

 7       A.    Electric engineer.

 8       Q.    Is that an undergraduate, a bachelor's

 9   degree that you have in electrical engineering?

10       A.    College, bachelor's degree.

11       Q.    In what year did you achieve that?

12       A.    1994.

13       Q.    And have you continued your education

14   after 1994 in any formal educational

15   institution?

16       A.    Yes.

17       Q.    And where was that?

18       A.    I received an in occupation MBA degree

19   in 2005, and I have also received doctorate of

20   business administration degree in occupation in

21   2012.

22       Q.    What educational entity did you

23   receive your electrical engineering degree in?

24       A.    Wuhan Science and Technology

25   University.
```

1    Q.    And what institution did you receive

2    your MBA in?

3    A.    From an institute called CEIBS.

4    Q.    And you have a doctorate business

5    degree.  Is that a Ph.D., or the equivalent of

6    what we in the United States call a Ph.D.?

7    A.    It's different.  It's business

8    management institution.  I've heard this is

9    different.  I'm not sure.

10    Q.    Am I allowed to call you doctor?

11    A.    No.  Maybe not.  Nobody had ever

12    called me that.  You can call me Bing Wang.

13    Q.    Let this be the first, Doctor.

14    A.    Thank you.

15    Q.    This Document 308, BNBM is making

16    inquiry of China National Building Material

17    Company, Limited, is it not?

18         MR. BARR:  Objection.  The document

19    speaks for itself, but you may answer.  Also

20    object to the form.

21    A.    It is a document that's shareholder

22    asking opinions.  It is a form of communication

23    and notification.

24    BY MR. LEVIN:

25    Q.    Who are you asking the opinion of, the

```
1    China National Building Material Company,

2    Limited?

3        A.    From the biggest shareholder of BNBM,

4    China National Building Material Company,

5    Limited.

6        Q.    This particular document says "Issued

7    By," it says Bing Wang.

8              Before the document production in this

9    case, if I wanted to find this document, where

10   would it physically be at BNBM?

11       A.    It should have been kept in the

12   investment department.  The meaning "issued by"

13   here, I'm not sure whether it has the same

14   understanding in America, but in Chinese company

15   the meaning "issued by" is to show importance of

16   the document by the document's been issued from

17   a high level executive of a company.  It does

18   not carry any legal significance.

19       Q.    Was this document prepared in the

20   ordinary course of business?

21             MR. BARR:  Object to the form of the

22   question, which is utilizing legal terminology

23   in the US.

24             But you may answer.

25       A.    I'm not sure about its meaning in the
```

1    normal course of business, but I was told that

2    it is a document related to shareholders.

3    Usually documents in connection with investment

4    would have been issued by me.

5    BY MR. LEVIN:

6        Q.    You're familiar with this document,

7    are you not?

8        A.    I just said that I'm not familiar with

9    the specific content of the document.  The word

10   "issued by," it's a term of courtesy, it does

11   not carry any meaning.  I'm aware of this

12   matter, however the specifics is to be

13   researched by specific departments.

14       Q.    Who drafted this document?

15       A.    I don't know that either.

16       Q.    Is there anything in this document

17   that you can tell us today is incorrect?

18            MR. BARR:  Take as much time as you

19   need to review the document to answer that

20   question.

21       A.    I only know that Taishan Gypsum would

22   invest in a place called Xiangyang, a new

23   production line.  That's all I know.

24       Q.    But BNBM PLC sought the advices of

25   CNBM, Limited in connection with that particular

Confidential - Subject to Further Confidentiality Review

1    aspect of Taishan's business, did they not?

2             MR. BARR:  Objection to the form.

3    Objection to the form.  And further objection,

4    mischaracterizes the witness's prior testimony

5    in response to a similar question.

6        A.    Like I just said, investment matters

7    such as this would need an approval of BNBM's

8    shareholders meeting.  As CNBM as the biggest

9    shareholder of BNBM, there should be a

10   communication on the update of the matter.  Its

11   purpose is to make BNBM shareholder's meeting

12   when it is indeed held to be more effective.

13   BY MR. LEVIN:

14       Q.    Now, sir, the relationships that exist

15   in this document between Taishan, BNBM, and CNBM

16   PLC are consistent with the tenets of the global

17   offering, are they not?

18            MR. BARR:  I'm going to object to the

19   form of the question.

20            The witness testified previously he

21   had not seen the global offering.  I don't know

22   how he can testify in response to that question.

23       A.    They are totally unrelated, and I

24   don't know what you're saying.

25   BY MR. LEVIN:

Confidential - Subject to Further Confidentiality Review

1      Q.    Are you familiar with the CNBM global

2    offering?

3              MR. BARR:  From what year?

4              MR. LEVIN:  2006.

5      A.    I'm aware of there has been a global

6    offering of CNBM, but I'm not involved in CNBM's

7    global offering, because at the time I was a

8    general manager of BNBM I was not holding any

9    position in CNBM.

10   BY MR. LEVIN:

11     Q.    Well, since 2006, you've held

12   positions in Taishan, you've held positions in

13   BNBM, you've held positions in CNBM companies,

14   and in all of those positions and in all of that

15   time, are you telling us that you never became

16   familiar with CNBM's global offering?

17             MS. EAGAN:  Objection.  Argumentative.

18             MR. BARR:  Object to the form of the

19   question.  Objection, argumentative.  Objection,

20   mischaracterizes the witness's testimony.

21     A.    I am aware of that CNBM's global

22   offering matter, but I'm not in charge of it,

23   I'm not familiar with its details.

24   BY MR. LEVIN:

25     Q.    Have you ever heard it said in your

1    employment and your responsibilities with regard

2    to Taishan, BNBM PLC, CNBM PLC, that the global

3    offering is a, in words or substance, is a very,

4    very important document?

5              MR. BARR:  Objection to the form.

6    Objection, argumentative.  Objection.

7              MR. TAYLOR:  Join in the objection.

8              MR. BARR:  Vague.

9    A.    I have just answered you.  I am aware

10   of the matter, but because I'm not in charge of

11   the matter, therefore I'm not familiar with the

12   matter.

13   BY MR. LEVIN:

14   Q.    Are you familiar that the global

15   offering has a non-competition agreement between

16   CNBM Group and BNBM?  Are you aware of that?

17             MR. BARR:  Objection.  Lack of

18   foundation.

19             You may answer.

20   A.    This is according to the requirement

21   of Chinese public listing company, since BNBM is

22   a public listing company, CNBM as BNBM's

23   shareholder, regardless whether it has share

24   offering or not, it nevertheless cannot compete

25   with BNBM, even if it is not a public listing

1    company.

2    BY MR. LEVIN:

3        Q.    So it's a requirement of Chinese law

4    that there be no competition between CNBM Group

5    and BNBM, is that what you're telling us?

6             MR. BARR:  Objection to the form of

7    the question.  And objection to the lack of

8    foundation.  I'll leave it at that.

9        A.    Yes.

10   BY MR. LEVIN:

11       Q.    Now, does BNBM compete with Taishan?

12       A.    That's okay.  Yes.

13            MR. TAYLOR:  Objection to the form.

14   BY MR. LEVIN:

15       Q.    It's all right?  It's okay?

16       A.    Yes.  Because Taishan is not a public

17   listing company.

18       Q.    Who is Jainli Liu?

19       A.    I don't know.

20       Q.    She's not your secretary, never has

21   been?

22       A.    No, I don't have a secretary.

23       Q.    Is she secretary to the board?

24       A.    No.

25       Q.    Who is -- please look at Page 100081.

Confidential - Subject to Further Confidentiality Review

1    And the statement on the last line of the page

2    in the left-hand corner, starting with that

3    character, what does it say?

4        A.    It says "Recorded by," which means the

5    person who typed it, that's the name of that

6    person.

7        Q.    Do you know who it is?

8        A.    I don't know.

9        Q.    Do you know who the next name is right

10   next to it, looking at it to the right of it?

11       A.    It says "Checked by."  I believe it is

12   a person who proofread the text, but I do not

13   know this person.

14       Q.    What's the name of this person?

15       A.    It says here Lu Xiaoyong.

16       Q.    Now, this Document 308, which was

17   issued by you, you have no idea who typed it, am

18   I correct?

19            MR. BARR:  Objection to the form of

20   the question.  Mischaracterizes the witness's

21   testimony as to what "issued by" means.

22       A.    The person in charge of the investment

23   had me sign on the document.  I was not the one

24   who arranged a typist for the document,

25   therefore I do not know who was the typist.

```
 1   BY MR. LEVIN:

 2       Q.    Who drafted this document?

 3             MR. BARR:  Objection.  Asked and

 4   answered.

 5       A.    I don't know.  I believe they arranged

 6   it.  I did not arrange it.

 7   BY MR. LEVIN:

 8       Q.    Who is "they"?

 9       A.    For investment project such as this,

10   it should be the investment department who make

11   the arrangement.

12       Q.    Who at the investment department, a

13   name, drafted this document?

14       A.    I don't know who drafted it.  And

15   this, I don't know who drafted it.

16       Q.    And is it a fact that whoever drafted

17   that document, their name is not on the

18   document?

19       A.    I can't be sure of that.

20       Q.    Well, take a look at the document.

21       A.    Maybe those two people directly

22   drafted it, maybe not.

23       Q.    The typist?

24       A.    I don't know.  I did not arrange that.

25       Q.    Does the document anywhere on the face
```

Confidential - Subject to Further Confidentiality Review

1  of the document show who drafted the document?

2         MR. BARR:  Objection.  Asked and

3  answered.

4         MR. LEVIN:  No, it hasn't.

5         MR. BARR:  Yes, it has.

6         MR. LEVIN:  I haven't gotten an

7  answer.

8         MR. BARR:  You don't like the answer,

9  because the answer has been given three times.

10         MR. LEVIN:  I don't like non-answers.

11         MR. BARR:  That's your

12  characterization, sir.  That's disparaging what

13  the witness said, and I would appreciate if you

14  would stop.

15         MR. LEVIN:  He doesn't speak English,

16  so I didn't disparage him.

17         Could you repeat the question, please?

18         (Whereupon, the reporter read back the

19  pending question.)

20         MR. BARR:  Same objection.

21     A.    The document does not indicate the

22  name of the person who drafted it.  Usually

23  Chinese document does not indicate who drafted

24  the document, only the person who recorded the

25  document and the person who checked the document

Confidential - Subject to Further Confidentiality Review

1   would have their name appear on the document.

2   BY MR. LEVIN:

3       Q.    And besides the typist, the "checked

4   by" person, the only other name that appears on

5   this document is your name with "issued by" next

6   to your name, is that correct?

7            MR. BARR:  Objection.  The document

8   speaks for itself.

9       A.    That's what the document says.

10  BY MR. LEVIN:

11      Q.    Did you sign off on this document as

12  to its voracity?

13           MR. BARR:  Objection to the form of

14  the question.

15      A.    I believe I issued this document.

16  BY MR. LEVIN:

17      Q.    Have you seen Chairman Jia lately?

18      A.    How long did you mean when you said

19  "recently"?  Usually when there were issues that

20  are to be discussed in the board of directors

21  meeting, I would meet him for that.

22      Q.    Within the last six months?

23      A.    I have met him.

24      Q.    How many times have you seen Chairman

25  Jia in the last six months?

Confidential - Subject to Further Confidentiality Review

1    A.    Not much, but we have met

2  discussing --

3    Q.    Did he ever complain to you --

4    A.    -- matters of Taishan regarding to the

5  investment of Taishan.

6        MR. LEVIN:  We're going off the record

7  now.

8        THE VIDEOGRAPHER:  We're off the

9  record at 3:57 p.m..

10        This concludes tape number three.

11        (Whereupon, a recess was taken.)

12        THE VIDEOGRAPHER:  We're back on the

13  record at 4:16 p.m..  This is the beginning of

14  tape four.

15  BY MR. LEVIN:

16    Q.    When you've seen Chairman Jia

17  recently, at least as a lay person, has he

18  appeared to be in good health?

19        MR. TAYLOR:  Objection to the form.

20    A.    I'm not a medical expert.

21  BY MR. LEVIN:

22    Q.    Obviously, although you're a doctor?

23    A.    I don't know his health condition, but

24  he did mention to me that he is not doing very

25  well physically.

Confidential - Subject to Further Confidentiality Review

1    Q.    And what is Chairman Jia's reputation

2  for truth and voracity?

3          MR. BARR:  Objection to the form of

4  the question.

5          MR. TAYLOR:  Object to the form.

6          MR. BARR:  I'm sorry, Bernard, did you

7  just object to form, or something else?

8          MR. TAYLOR:  I objected to form.

9          MR. BARR:  Okay.

10    A.    He is the Chairman of the board of

11  directors of a company that BNBM holds shares

12  in.  We as shareholder of this company is very

13  satisfied.

14  BY MR. LEVIN:

15    Q.    Could you turn to Page 100082 of

16  Exhibit 308?  And can you tell me what the

17  caption of that particular page of this

18  particular document is?

19    A.    This is Mr. Jia's resume.

20    Q.    And who completed this resume;

21  Mr. Jia, Chairman Jia?

22          MR. BARR:  Objection to the form.

23  Lack of foundation.

24    A.    I don't know.

25  BY MR. LEVIN:

Confidential - Subject to Further Confidentiality Review

```
1       Q.    Well, have you ever completed a like

2    resume?  You don't like the word "like."

3             Have you ever completed a similar

4    resume?

5       A.    Sometimes I completed that.

6       Q.    On a form similar to this form?

7       A.    The form is ourself created, not

8    necessarily the same.

9       Q.    Do you see where it says "Health

10   Condition" on that form of Chairman Jia?

11      A.    Yes, I see that.

12      Q.    And what does it say the health

13   condition of the Chairman is?

14      A.    It says "Healthy" here.

15      Q.    Why was this chart attached to 308,

16   the Document 308?

17            MR. BARR:  Object to the form.

18      A.    I don't know why.  Perhaps --

19            MR. BARR:  Objection.

20      A.    -- because of his position as the

21   director of the invested company.

22            MR. BARR:  Objection.  I just want to

23   caution the witness that he's asking you to

24   testify to the best of your knowledge, and you

25   should not speculate.
```

Confidential - Subject to Further Confidentiality Review

1    BY MR. LEVIN:

2        Q.    Now, Mr. Barr said with regard to the

3    Communist Party, just like social organization

4    within the BNBM and Taishan, could you tell me

5    what this document says with regard to the

6    Chinese Communist Party as to the membership of

7    Chairman Jia, and why that becomes important

8    enough to be on this document?

9            MS. EAGAN:  Objection.  Argumentative.

10            MR. BARR:  Object to the form of the

11    question.  I object to Mr. Levin's

12    characterization that it was my testimony, as

13    opposed to the witness testified quite clearly

14    on the record as to the role of the Party,

15    non-role with respect to business.

16            You can answer the question if you

17    can.

18        A.    It's the Chinese customary that when

19    writing somebody's resume not only the person's

20    work-related occupations are listed, but also

21    the person's social occupations, it is quite

22    possible.

23    BY MR. LEVIN:

24        Q.    Do you know of any info on this page

25    to be inaccurate?

Confidential - Subject to Further Confidentiality Review

 1      A.    I don't know.

 2      Q.    You don't know whether you know or

 3   not?

 4            MR. BARR:  Object to the form.

 5      A.    I don't know what are accurate or

 6   inaccurate in the information.

 7   BY MR. LEVIN:

 8      Q.    Now, let's go back to CNBM where I

 9   left off several hours ago.

10            MR. BARR:  You don't want me to

11   comment on that.

12            MR. LEVIN:  You can.  I have a very

13   thick skin.  My resume doesn't say Communist

14   Party, it says Chabad, as is custom.

15   BY MR. LEVIN:

16      Q.    In your capacity of Chairman of BNBM,

17   did you from time to time receive directives

18   from CNBM Group?

19            MR. BARR:  Objection.  Asked and

20   answered.

21            THE INTERPRETER:  Interpreter corrects

22   her interpretation.

23            No.

24   BY MR. LEVIN:

25      Q.    Okay.  And if directives were sent by

1    CNBM Group to BNBM, as Chairman of BNBM you

2    would have known of such, would you not?

3              MS. DALEY:  Objection.

4              MR. BARR:  Objection.  Calls for

5    speculation.  Object to the form.

6        A.    As BNBM's Chairman of the Board, I

7    serve BNBM and represent the interest of BNBM by

8    the definition of law.

9    BY MR. LEVIN:

10       Q.    But if CNBM Group or CNBM send a

11   directive to BNBM, as the Chairman of BNBM you

12   would want to know about that, wouldn't you?

13       A.    I don't know they have -- I don't know

14   such circumstance ever was presented.

15       Q.    Now I want to do a day in the life of

16   Wang Bing.

17             MR. BARR:  I thought that's exactly

18   what we've been doing today.

19             MR. LEVIN:  It was a day in the life

20   of Arnold Levin.

21             MR. BARR:  That's more accurate.

22             MR. LEVIN:  It is more accurate.

23   Please, you know, don't --

24             MR. BARR:  Don't steal your thunder?

25             MR. LEVIN:  Don't disparage me.

Confidential - Subject to Further Confidentiality Review

1    BY MR. LEVIN:

2        Q.    On a normal workday at BNBM when

3    you're not travelling on road show in other

4    countries, what do you do?  What is a normal

5    business day for you?

6        A.    I would as the Chairman of the company

7    try to understand the strategy, the economic

8    situation, the industry situation.  And also,

9    for example, I would try to know the situation

10   of the industry peers, and if the management has

11   any investment proposals, any important items

12   for discussion, they would make appointment to

13   communicate with me.

14       Q.    And would these appointments be made

15   in advance of the day, of the workday?

16       A.    Not necessarily.  They will call me,

17   and if I'm available I would meet them.  If I'm

18   not, we would change to another time.

19       Q.    Well, when they called and you were

20   not available, let's say you had a very busy

21   day, would you then give that individual an

22   appointment to see you on another day?

23       A.    Usually I would not be that busy.  But

24   if I happen to be unavailable, I would schedule

25   another time.

1      Q.    And I would imagine that individuals

2    that were not working in the vicinity, the same

3    city or same section of the city, would call and

4    make appointments to see you at your office, am

5    I correct?

6      A.    Yes.

7      Q.    And who would schedule these

8    appointments?

9      A.    That would be according to my

10   availability.  Like I said, even though I'm the

11   Chairman of the Board, but because I'm not in

12   charge of daily operation, I was usually not

13   that busy given that I'm not on a business trip.

14   Usually I would be available.

15     Q.    I'm sure from time to time you had to

16   schedule appointments; it wasn't like fast food

17   place where you just walk in and get a hamburger

18   when you want one, you would have to make an

19   appointment with the Chairman to see the

20   Chairman, wouldn't you?

21     A.    By telephone call is fine.  When I'm

22   available I would meet, when I'm not I would not

23   meet.  It is nothing strict.  I'm not an

24   official.

25     Q.    Well, when you weren't available,

1   let's say you were sick, once in a while you

2   were sick and somebody called for an

3   appointment, who would schedule the appointment

4   if you were unavailable?

5        A.    It was myself.

6        Q.    And would you keep a calendar of those

7   appointments?

8        A.    Not necessarily.  The appointment

9   would not be made for some time much longer into

10  the future.  If I do not have time today, then

11  tomorrow; if not tomorrow, then the day after

12  tomorrow.  No appointments was for sometime

13  beyond a long period of time, therefore it is

14  not necessary to keep such a calendar.

15       Q.    Well, from time to time did you visit

16  the offices of Taishan?

17       A.    Usually I would not go unless there is

18  a meeting, unless there is a board of directors

19  meeting held.

20       Q.    Would Taishan's board of directors

21  meeting occur at Taishan's facilities?

22       A.    Not necessarily.  It can be held

23  there, or not held there.

24       Q.    Okay.  If it was held there, would you

25  put in your calendar the date and time that the

Confidential - Subject to Further Confidentiality Review

```
 1    meeting would occur, if indeed you have a
 2    calendar?  I don't know that we've established
 3    that you have a calendar.  We've established you
 4    have a memory.
 5              MR. BARR:  Why don't you ask if he has
 6    a calendar.
 7              THE INTERPRETER:  Interpreter
 8    speaking.
 9              Clarification, when you say
10    "calendar," did you mean physical calendar, or a
11    scheduler, or schedule?  In Chinese there are
12    different --
13              MR. LEVIN:  A scheduler.
14       A.    I would stick a Post It on my desk so
15    that I would not forget.
16    BY MR. LEVIN:
17       Q.    You never had a calendar like this for
18    the month, the dates on it, you wrote in when
19    people were going to see you, when you were
20    going to see people?
21       A.    It's very complicated.  Our work is
22    not that professional, nor that complicated.
23       Q.    Were the board meetings of Taishan
24    sometimes held at BNBM for your convenience?
25       A.    That's possible.
```

Confidential - Subject to Further Confidentiality Review

1       Q.    Was it more likely that the board

2   meeting of Taishan would be at BNBM than at

3   Taishan's office?

4       A.    It was most of the time held in

5   Taishan.

6       Q.    Okay.  Did your work-related

7   activities take you to visit the offices of

8   CNBM?

9       A.    Usually there is no such need.

10      Q.    Do you ever have reason to go to the

11  offices of CNBM Group?

12      A.    My usual work does not have the need,

13  unless for courtesy visit to visit an

14  acquaintance.

15      Q.    That would just be a personal thing?

16      A.    Yes.

17      Q.    Do you ever go to a Taishan building,

18  a factory or an office, other than for a board

19  of directors meeting?

20      A.    Rarely.  But I used to go there to get

21  myself familiarized with the situation of

22  Taishan.  After all, BNBM is the biggest

23  shareholder of Taishan, and I am its director.

24      Q.    Well, do you ever visit Chairman Song

25  to talk about business with him, one Chairman to

Confidential - Subject to Further Confidentiality Review

1  another?

2      A.    It's not necessary.

3      Q.    So you don't see Chairman Song from

4  time to time in the ordinary course of your

5  business activities?

6      A.    It's not necessary.

7      Q.    I don't know whether it's necessary or

8  not, because you could visit him and it could be

9  completely unnecessary.

10          But do you ever go to see Chairman

11  Song for business matters?

12      A.    I did not go see him because of the

13  normal production operation of BNBM.

14      Q.    Is it -- do I understand it that you

15  don't go to see Chairman Song for business

16  activities, and that you haven't gone to see

17  Chairman Song for business activities?  Is that

18  correct?

19          MR. BARR:  Objection to the form.

20      A.    No.  Because Chairman Song is the big

21  shareholder of BNBM, and he is also the Chairman

22  of the Board of CNBM.  When there are important

23  investment matters of CNBM, he would be

24  consulted for his opinion on that, because he is

25  the Chairman of BNBM's biggest shareholder,

Confidential - Subject to Further Confidentiality Review

 1   therefore it is unnecessary for me to avoid him.

 2   BY MR. LEVIN:

 3       Q.     So you do from time to time visit

 4   Chairman Song at his office, is that correct?

 5       A.     Sometimes, not often.

 6       Q.     Not often.

 7              Well, do you speak with him on the

 8   telephone from time to time more often than you

 9   visit him in person?

10       A.     I would call when there is a need.

11       Q.     Does Chairman Song ever come to BNBM

12   to visit with you and your colleagues?

13       A.     He's been here, but rarely.  He came

14   here to visit because BNBM is CNBM's subsidiary.

15       Q.     But when he comes to see you, does he

16   just drop in, or does he call and make an

17   appointment, tell you when he's coming?

18       A.     When he comes to BNBM, he may call or

19   he may not call, because he is the biggest

20   shareholder of BNBM.

21       Q.     When he does call to make an

22   appointment, do you put it in your calendar,

23   your schedule?

24       A.     He would not make appointment for

25   sometime far off.  He would say "I would come

1  today or tomorrow, are you available?"  I would

2  come to understand -- to get some information.

3      Q.    How close to your office is his

4  office?

5      A.    Not far.

6      Q.    A mile, two miles?

7      A.    Before, for a long period of time ago,

8  we needed to drive for about 40 minutes.

9      Q.    And now?

10     A.    Recently we're in the same building,

11  because BNBM is under remodelling, therefore we

12  temporarily rent a place.  And next year we

13  would move back.  At that time we would be even

14  farther away from each other.  The driving

15  distance would be about an hour.

16     Q.    How far are you from Taishan's office,

17  Chairman Jia's place of business?

18     A.    They're very far away, a few hundreds

19  kilometers.

20     Q.    More specifically, what type of issues

21  do you call Mr. Song to discuss?

22     A.    Nothing specific.  For example,

23  sometimes for issues that needed to be decided

24  by BNBM's shareholders meeting, I would ask for

25  his opinions and listen to his suggestions

1    beforehand.  On the other hand, he, after all,

2    is the Chairman of the biggest shareholder of

3    BNBM, but frequently I would call him to set my

4    greetings just for the purpose of showing

5    respect.

6        Q.    Would you from time to time have to

7    discuss with Chairman Song the guaranties that

8    you were providing for Taishan and Taishan

9    subsidiaries?

10       A.    These are very small matters.  It is

11   not necessary to discuss with him in that

12   regard.  We, BNBM, can make that decision.

13       Q.    Have you ever, ever seen a document

14   where CNBM or CNBM Group approved guaranties

15   that were being made by BNBM to Taishan or

16   Taishan's subsidiaries?

17       A.    I don't have such recollection.

18            MS. ROBERTSON:  Plaintiffs offer,

19   file, and introduce Wang Exhibit 314-R.  This

20   exhibit was previously identified and offered to

21   Defendant BNBM PLC for the purpose of red-lining

22   the PSC's partial translation of the document.

23            (Whereupon, Exhibit Number 314-R,

24            4/2006 document, Bates

25            BNBMPLC-E-0005409 through 5421, was

 1              marked for identification.)

 2          MS. ROBERTSON:  The PSC has accepted

 3   the changes made by BNBM PLC, as a result the

 4   exhibit is 314-R, followed by the PSC's

 5   translation, followed by the machine translation

 6   as produced, and finally followed by the

 7   original Chinese.  The Bates range of the entire

 8   document is BNBM PLC-E-0005409 through 5421.

 9          Because this is a partial translation,

10   the PSC has, as best as possible, identified the

11   specific Bates where the partial translation was

12   made, and now offer all pieces to the witness,

13   and all pieces to the court reporter.  Counsel

14   has received copies.

15          MR. BARR:  I have.

16          MS. ROBERTSON:  Mr. Wang, at the end

17   of the documents, it's rather long in Chinese,

18   but it begins on BNBMPLC-E-0005409, highlighted

19   in Chinese is the cover.  This is a document

20   produced by BNBM in the litigation.

21   BY MS. ROBERTSON:

22       Q.   Can you identify this document, sir?

23       A.   I haven't seen this document.

24       Q.   Is your name on this document?

25       A.   I see that.

Confidential - Subject to Further Confidentiality Review

1       Q.    And what's the date of this document?

2       A.    April, 2006.

3       Q.    This document appears to be a work

4    report of BNBM PLC, would you agree?

5          MR. BARR:  Objection.  The document

6    speaks for itself.

7       A.    No, I disagree, because I haven't seen

8    this document, and it says here "Draft."

9    BY MS. ROBERTSON:

10      Q.    Would you agree that this document is

11   created by BNBM in the ordinary scope of BNBM's

12   document?  A draft is a typical document you

13   would have in your records?

14      A.    I disagree.

15          MR. BARR:  Okay.  I object to the

16   characterization of the document.  Further, the

17   witness already testified that he hadn't seen it

18   before.  You're asking him to agree to something

19   on a document that he's never seen before.

20   BY MS. ROBERTSON:

21      Q.    Mr. Wang, are work reports created by

22   BNBM PLC in their ordinary course of business?

23          MR. BARR:  And I object to the form of

24   the question, and to the use of the legal use of

25   "ordinary course of the business" in the form

1    which you're asking the question.

2           You may answer to the best of your

3    ability, though, sir.

4      A.    I see on the document, it says "staff

5    representative meeting."  We do not have any

6    formal agenda for meetings such as this.

7    BY MS. ROBERTSON:

8      Q.    After a staff representative meeting,

9    are work reports created?

10     A.    No.

11     Q.    Are work reports created prior to

12   staff representative meetings?

13     A.    Neither that.

14     Q.    Are work reports ever created by BNBM

15   PLC?

16           MR. BARR:  Objection.  Vague.

17     A.    What report are you referring to?

18   Because staff representative meeting is a staff

19   social organization.  It is not a company's

20   meeting.

21   BY MS. ROBERTSON:

22     Q.    Is this document not a document of

23   BNBM PLC?

24           MR. BARR:  I object to the form of

25   that question.  I don't even know what that

Confidential - Subject to Further Confidentiality Review

```
 1    question means.  He acknowledged that it came
 2    from BNBM PLC's files.  Beyond that, what are
 3    you asking him?
 4             MS. ROBERTSON:  The witness testified
 5    that it's not a company's meeting.  I'm just
 6    trying to get why this meeting, then, would be
 7    part of a BNBM document.
 8             MR. BARR:  No, it comes from BNBM
 9    PLC's files.  But beyond that, you know, you
10    need to lay some foundation here.
11             MR. LEVIN:  Okay.
12             MR. BARR:  Do you have a question you
13    want to pose?
14    BY MR. LEVIN:
15       Q.   Yes.  Let's talk.
16             Let's go to the English version.  I'll
17    give you the Chinese of 0005412.  And it's Roman
18    Numeral II, sir.
19             In English, it starts with
20    "Accelerated Structural Adjustment."  I'd like
21    you to read the first three paragraphs to
22    yourself.  Do you have it?  It's Page 5412 in
23    Chinese.
24       A.   I see that.  I see that.
25             MR. BARR:  Please take your time to
```

Confidential - Subject to Further Confidentiality Review

1   read the paragraphs on that page, as Mr. Levin

2   requested.

3           (Witness reviewing document.)

4   A.      Do I only read the highlighted part?

5           MR. BARR:  Why don't you take your

6   time and read the page.

7           MR. LEVIN:  That's better.

8           (Witness reviewing document.)

9   A.      I've read it.

10          MR. BARR:  He said he's done reading

11  it.

12  BY MR. LEVIN:

13  Q.      Do you note in the first paragraph

14  that it says "In 2005, under the direct guidance

15  of CNBM Co., Limited, and with the assistance of

16  IBM Globals Business Consulting Department, BNBM

17  PLC reorganized the company's development

18  strategy, adjusted the company's organizational

19  structure, established five big business

20  departments, and set up the strategic

21  positioning to develop gypsum boards, mineral

22  rock wool, and exterior wall boards into the

23  largest and most competitive industries in

24  Asia"?

25          Do you, sitting here today, agree that

Confidential - Subject to Further Confidentiality Review

1    this was done under the direct guidance of CNBM

2    Co., Inc. with the assistance of IBM global

3    business consulting department.

4              MS. DALEY:  Objection.  Form.

5        A.    First of all, I did not write this

6    document.  To my recollection, at the time, BNBM

7    had set up some development strategies.  This is

8    the right of BNBM.  Of course, we hired IBM's

9    Chinese consulting development -- Chinese

10   Consulting Department to help us in our

11   efficiency of management by providing us with

12   management opinions and suggestions.

13   BY MR. LEVIN:

14       Q.    But this was done under the direct

15   guidance of CNBM Co., Limited, was it not?

16             MS. DALEY:  Object to the form.

17       A.    CNBM is the biggest shareholder of

18   BNBM.  CNBM is a large company.  And BNBM in

19   order to increase its management level and

20   efficiency, besides consulting outside

21   organizations, it would also consult CNBM and

22   learn from its management experience.

23   BY MR. LEVIN:

24       Q.    Sir --

25             MR. BARR:  One second.  BNBM consult

Confidential - Subject to Further Confidentiality Review

1   CNBM?  I'm just looking at the last part of his

2   answer.  Did he say BNBM, or did he say CNBM?

3   Can you just check with the witness, please?

4           MR. LEVIN:  He said BNBM.

5           MR. BARR:  How do you know?  You can't

6   understand Chinese.

7           MR. LEVIN:  I speak Chinese.

8           THE INTERPRETER:  This interpreter

9   believe the witness said CNBM, according to the

10  interpreter's recollection.

11          The witness just confirmed the

12  interpreter's statement.

13          MR. LEVIN:  BNBM and CNBM becomes

14  confusing at times because they're similar, am I

15  correct?

16          MR. BARR:  Oh, come on.  It's 5:05,

17  you can't be making those kind of statements at

18  this point.  Do you have a question?

19          MR. LEVIN:  That's a question.

20          MR. BARR:  That's not a question.

21          MR. LEVIN:  Are you directing him not

22  to answer?

23          MR. BARR:  Yes, I am.

24  BY MR. LEVIN:

25      Q.    Okay.  Do you have some problem, sir,

Confidential - Subject to Further Confidentiality Review

1  using the words that appear in this document

2  that say "direct guidance of CNBM Co., Limited"?

3  And I'll advise you that as to the translation

4  of this document, your attorneys have approved

5  that language.

6          MS. DALEY:  Object to form.

7          MR. BARR:  Object to the form of the

8  question.

9          Yes, we have agreed as to the accuracy

10  of the translation, but the witness has already

11  testified this is not his document.

12          He can answer.

13          MR. LEVIN:  That's right, he can

14  answer the question.  That's why it was

15  unnecessary for you to make a statement.

16          MR. BARR:  I made an objection.

17          MR. LEVIN:  You made a speaking

18  objection, and the witness understands at least

19  a little bit of English, it's obvious because of

20  his shaking his head.

21          MR. BARR:  I'm not going to comment on

22  what someone who is a Chinese National can and

23  can't understand, because I don't think that's

24  relevant because, of course, the translator will

25  be translating to him whatever I said.

Confidential - Subject to Further Confidentiality Review

1          But if you can answer the question,

2   you can.

3          My objection stands.

4      A.     I did not author this document,

5   neither have I seen this document.  And I did

6   not make the statement in the paragraph.  If you

7   need further discussion I can explain to you the

8   relationship of Chinese company and their

9   shareholders, if you're concerned about it.  In

10  Chinese culture, Chinese company respects its

11  shareholder.

12         But according to Chinese law, besides

13  those items that have to be decided by the

14  shareholders meeting, each company is entitled

15  to make its own decision on the items related to

16  production and operation of the company.

17     Q.     Respect is important to you, is it

18  not?

19     A.     Respect is part of Chinese culture.

20     Q.     Do you have any respect -- I'm sorry.

21     A.     In China, it's a country with rich

22  cultures and respect.

23     Q.     In a country that has rich cultures

24  and is very respectful of others, do you have

25  any respect for the drafter of this particular

1    document who used the words "Direct guidance of

2    CNBM Co., Limited"?  Do you believe he meant

3    what he said?

4           MR. BARR:  Objection.  Object to the

5    form of the question.  Objection, calls for

6    speculation.

7           MS. DALEY:  Same objections.

8      A.    I browsed through the document and

9    found that in the beginning of this document it

10   says it is a document that I supposedly have

11   reported in.  I can explain to you that this is

12   a meeting of a staff social organization.

13   Sometimes Chinese companies management would

14   participate in meetings such as this, and to

15   communicate with the staff, including to

16   motivate the staff.  But this is not an official

17   meeting.  The management would simply

18   communicate with people without having to read

19   off a report.  It is not that formal.  It is not

20   legal procedure, nor it is a document -- legal,

21   nor it is a legal binding document.  But I can

22   tell you in this paragraph that the internal

23   adjustment of BNBM regarding to its production

24   and management, it is a daily operational matter

25   within BNBM.

Confidential - Subject to Further Confidentiality Review

```
 1              MR. BARR:  It's 5:15.

 2              MR. LEVIN:  I've got a couple more

 3    questions, that's all.

 4         A.    This is decided by BNBM itself, and

 5    not -- and it is not necessary -- it is not

 6    necessary to be decided by the shareholders

 7    meeting.

 8    BY MR. LEVIN:

 9         Q.    Let's go down to the bottom of the

10    document at Page 5412 in Chinese, the last

11    sentence.  What does -- does this say "Currently

12    the three year development plan of BNBM PLC and

13    ShangDong Taihe has been reviewed and approved

14    by CNBM Co., Limited's hearing"?

15              MS. DALEY:  Objection to form.

16              MR. BARR:  Objection.  The document

17    speaks for itself.

18         A.    That's what the document says, and I

19    see it.

20    BY MR. LEVIN:

21         Q.    Do you remember that being said at

22    this meeting?

23         A.    I don't remember it having being said.

24         Q.    Did you say it at that meeting?

25         A.    I have just said, the staff
```

Confidential - Subject to Further Confidentiality Review

1    representative meeting is a staff social

2    organization's meeting.  The company's

3    management may have participated in meetings

4    such as this.  At the time I was a general

5    manager of BNBM, I might have or might not have

6    attended this meeting.

7         Q.    Who represented the leadership team

8    for BNBM PLC in this document?

9         A.    In this document?

10        Q.    The first page.

11        A.    I don't know what you're referring to.

12        Q.    Look at 5410.  Take a look at the

13   highlighted version.

14        A.    I see that.

15        Q.    Do you see where it says "Now I

16   represent the leadership team of BNBM PLC to

17   report to you"?  Who is saying that?  What

18   person?

19        A.    I repeat, first of all I have not seen

20   this document, neither have I authored the

21   document.

22             Number two, from the face of the

23   document, since you asked that question it

24   should have said that I supposed to be the

25   author of the document, and I supposed to have

1    spoken that.

2        Q.    So that the I --

3             MR. BARR:  Off the record, please.  We

4    have a translation issue.

5             THE VIDEOGRAPHER:  Off the record?

6    We're off the record at 5:19 p.m..

7             (Off the record discussion.)

8             THE VIDEOGRAPHER:  We're back on the

9    record at 5:20 p.m..

10            MR. BARR:  Therefore, at 5:20 I'd ask

11   you to wrap up, please.

12   BY MR. LEVIN:

13       Q.    This document, that paragraph, "now I

14   represent the leadership team," the "I" in that

15   statement is Bing Wang, is it not?

16            MR. BARR:  Object to the form of the

17   question.  Mischaracterizes the witness's

18   testimony.

19       A.    I did not author this document,

20   neither have I seen this document, therefore I

21   do not know what the specific meaning of it.

22            MR. LEVIN:  Okay.  We'll pick up on

23   "I" tomorrow.

24            THE VIDEOGRAPHER:  Okay.  Off the

25   record.  We're off the record at 5:22 p.m..

1    This concludes tape number four.

2              (Whereupon, the deposition was

3              adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

```
 1              REPORTER'S CERTIFICATE

 2

 3        This transcript is valid only for a

 4   transcript accompanied by my original signature

 5   and original required seal on this page.

 6        I, MAUREEN O'CONNOR POLLARD, Certified

 7   Court Reporter (LA Certificate #2011025), in and

 8   for the State of Louisiana, as the officer

 9   before whom this testimony was taken, do hereby

10   certify that Bing Wang, after having been duly

11   sworn by me upon authority of R.S. 37:2554, did

12   testify as hereinbefore set forth in the

13   foregoing pages; that this testimony was

14   reported by me in the stenotype reporting

15   method, was prepared and transcribed by me or

16   under my personal direction and supervision, and

17   is a true and correct transcript to the best of

18   my ability and understanding; that the

19   transcript has been prepared in compliance with

20   transcript format guidelines required by the

21   statute or by rules of the board, that I have

22   acted in compliance with the prohibition on

23   contractual relationships, as defined by

24   Louisiana Code of Civil Procedure Article 1434

25   and in rules and advisory opinions of the board.
```

Confidential - Subject to Further Confidentiality Review

1        That I am not related to counsel or to the

2    parties herein, nor am I otherwise interested in

3    the outcome of this matter.

4

5        Signed this the 25th day of August, 2015.

6

7

8

9    _____

10   MAUREEN O'CONNOR POLLARD, CCR, RMR, CLR

11   Realtime Systems Administrator

12   LA Certificate #2011025

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the appropriate

 6   space on the errata sheet for any corrections

 7   that are made.

 8              After doing so, please sign the

 9   errata sheet and date it.  It will be attached

10   to your deposition.

11              It is imperative that you return

12   the original errata sheet to the deposing

13   attorney within thirty (30) days of receipt of

14   the deposition transcript by you.  If you fail

15   to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1              - - - - - -

            E R R A T A

 2              - - - - - -

 3    PAGE  LINE  CHANGE

 4    _____ _____ _____

 5      REASON: _____

 6    ____  _____ _____

 7      REASON: _____

 8    _____ _____ _____

 9      REASON: _____

10    _____ _____ _____

11      REASON: _____

12    _____ _____ _____

13      REASON: _____

14    _____ _____ _____

15      REASON: _____

16    _____ _____ _____

17      REASON: _____

18    _____ _____ _____

19      REASON: _____

20    _____ _____ _____

21      REASON: _____

22    _____ _____ _____

23      REASON: _____

24    _____ _____ _____

25
```

Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3           I, _____, do
     Hereby certify that I have read the foregoing
 4   pages, and that the same is a correct
     transcription of the answers given by me to the
 5   questions therein propounded, except for the
     corrections or changes in form or substance, if
 6   any, noted in the attached Errata Sheet.

 7

 8   _____
     BING WANG                    DATE

 9

10

11

12

13

14

15   Subscribed and sworn
     To before me this
16   _____ day of _____, 20____.
17   My commission expires: _____
18

     _____
19   Notary Public

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

1                    LAWYER'S NOTES

2    PAGE  LINE

3    _____ _____    _____

4    _____ _____    _____

5    _____ _____    _____

6    _____ _____    _____

7    _____ _____    _____

8    _____ _____    _____

9    _____ _____    _____

10   _____ _____    _____

11   _____ _____    _____

12   _____ _____    _____

13   _____ _____    _____

14   _____ _____    _____

15   _____ _____    _____

16   _____ _____    _____

17   _____ _____    _____

18   _____ _____    _____

19   _____ _____    _____

20   _____ _____    _____

21   _____ _____    _____

22   _____ _____    _____

23   _____ _____    _____

24   _____ _____    _____

25

Confidential - Subject to Further Confidentiality Review

```
1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3   **************************************************

4   IN RE:  CHINESE-MANUFACTURED  MDL NO. 2047
    DRYWALL PRODUCTS LIABILITY
5   LITIGATION                     SECTION:  L

6   THIS DOCUMENT APPLIES TO       JUDGE FALLON
    ALL CASES
7                                  MAG. JUDGE
                                   WILKINSON
8
    **************************************************
9
10          CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW
11             Wednesday, August 26, 2015

12                   — — —

13

14      Continued Videotaped Deposition of Bing

15   Wang, held at the offices of Phelps Dunbar LLP,

16   365 Canal Street, Suite 2000, New Orleans,

17   Louisiana, commencing at 8:11, on the above

18   date, before Maureen O. Pollard, Certified Court

19   Reporter (#2011025), Registered Merit Reporter,

20   Realtime Systems Administrator.

21

22                   — — —

23          GOLKOW TECHNOLOGIES, INC.
       877.370.3377 ph | 917.591.5672 fax
24             deps@golkow.com

25
```

Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S :
 2   COUNSEL FOR THE PLAINTIFF CLASS:
 3   HERMAN HERMAN & KATZ LLC
     BY:  MADELYN M. O'BRIEN, ESQUIRE
 4       mobrien@hhklawfirm.com
             820 O'Keefe Avenue
 5           New Orleans, Louisiana 70113
             (504) 581-4892
 6
 7   LEVIN FISHBEIN SEDRAN & BERMAN
     BY:  ARNOLD LEVIN, ESQUIRE
 8       alevin@lfsblaw.com
             510 Walnut Street
 9           Suite 500
             Philadelphia, Pennsylvania 19106
10           (215) 592-1500
11
     IRPINO LAW FIRM
12   BY:  PEARL A. ROBERTSON, ESQUIRE
         probertson@irpinolaw.com
13       ANTHONY IRPINO, ESQUIRE
         airpino@irpinolaw.com
14           2216 Magazine Street
             New Orleans, Louisiana 70130
15           (504) 525-1500
16
     GAINSBURGH BENJAMIN DAVID MEUNIER &
17   WARSHAUER LLC
     BY:  RACHEL A. STERNLIEB, ESQUIRE
18       rsternlieb@gainsben.com
             2800 Energy Centre
19           1100 Poydras Street
             New Orleans, Louisiana 70163-2800
20           (504) 522-2304
21
     COUNSEL FOR TAISHAN GYPSUM COMPANY:
22   ALSTON & BIRD LLP (Via Phone)
     BY:  JOSHUA BECKER, ESQUIRE
23       joshua.becker@alston.com
             One Atlantic Center
24           1201 West Peachtree Street
             Atlanta, Georgia 30309-3424
25           (404) 881-7000
```

Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (CONTINUED):
 2
     COUNSEL FOR BNBM DEFENDANTS:
 3
 4   DENTONS US LLP
     BY:  MICHAEL H. BARR, ESQUIRE
 5        michael.barr@dentons.com
              1221 Avenue of the Americas
 6            New York, New York 10020
              (212) 768-6700
 7
 8   PHELPS DUNBAR LLP
     BY:  HARRY ROSENBERG, ESQUIRE, ESQUIRE
 9        harry.rosenberg@phelps.com
              365 Canal Street, Suite 2000
10            New Orleans, Louisiana 70130-6535
              (504) 566-1311
11
12   DENTONS HK LLP
     BY:  TODD LIAO, ESQUIRE
13        todd.liao@dentons.com
          ANNIE QIU, ESQUIRE
14        annie.qiu@dentons.com
              5th Floor The Center
15            989 Changle Road
              Shanghai, 200031 China
16            +86 21 2315 6000
17
     COUNSEL FOR CNBM DEFENDANTS:
18
     ORRICK HERRINGTON & SUTCLIFFE LLP
19   BY:  KELLY M. DALEY, ESQUIRE
          kdaley@orrick.com
20            51 West 52nd Street
              New York, New York 10019-6142
21            (212) 506-3775
22   GORDON ARATA McCOLLAM DUPLANTIS & EAGAN LLP
     BY:  EWELL (TIM) E. EAGAN, JR., ESQUIRE
23        eeagan@gordonarata.com
              201 St. Charles Avenue
24            40th Floor
              New Orleans, Louisiana 70170-4000
25            (504) 582-1111
```

```
 1    APPEARANCES (Continued):
 2    COUNSEL FOR THE STATE OF LOUISIANA:
 3
      PERKINS COIE LLP
 4    BY:  DAVID L. BLACK, ESQUIRE
              dblack@perkinscoie.com
 5                1900 Sixteenth Street
                  Suite 1400
 6                Denver, Colorado 80202
                  (303) 291-2400
 7
 8    OFFICE OF THE ATTORNEY GENERAL STATE OF
      LOUISIANA
 9    BY:  L. CHRISTOPHER STYRON, ESQUIRE
              styron@ag.state.la.us
10                1885 North Third Street
                  Baton Rouge, Louisiana 70802
11                (225) 326-6079
12
      ALSO PRESENT:
13
          SUNNY WANG, MANDARIN INTERPRETER
14
          TONI XU, HERMAN HERMAN & KATZ, LLC
15
          RICHARD RIENSTRA, VIDEOGRAPHER
16
          JOSHUA TARR
17
                        —— —— ——
18
19
20
21
22
23
24
25
```

```
 1                         INDEX
 2   EXAMINATION                          PAGE
 3   BING WANG
 4    BY MR. LEVIN                        180
 5
 6
 7              E X H I B I T S
 8   NO.          DESCRIPTION             PAGE
 9   307          9/28/2014 e-mail from Chen Hayoa
                  to Shi Keping re: Name lists of
10                the third, fourth and fifth
                  sessions of the compensation and
11                assessment committee.............. 262
12                ...................................
13   315-R        Partial Translation of
                  BNBMPLC-E-0004827-0004847 -
14                3/23/2007 GM Wang Bing's Work
                  Report at the 3rd meeting of the
15                5th session of BNBM Staff
                  representative meeting;
16                "Strengthen Operation,
                  Accelerate Construction, Develop
17                Harmoniously, Work Together to
                  Create Success" (Redlined)........ 205
18
     316          Partial Translation of
19                BNBMPLC-E-0005889-5892 - Wang
                  Bing's Welcome Speech on the
20                2008 BNBM Annual Marketing
                  Meeting........................... 215
21
     316-R        Partial Translation of
22                BNBMPLC-E-0005889-5892 - Wang
                  Bing's Welcome Speech on the
23                2008 BNBM Annual Marketing
                  Meeting (Redlined)................ 270
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1              PREVIOUSLY MARKED EXHIBITS
 2
     133       Partial Translation of
 3             CNBMGRP0009807-9838 -
               (CNBMGRP0009832-9833): Problems
 4             Discovered during Auditing
               Review - CNBM Co. Ltd re "BNBM
 5             and Taishan Gypsum separately
               received services of summons" of
 6             "Lawsuit on American Drywall" and
               Audit of BNBM outlining Jia's
 7             resignation from BNBM's Board of
               Directors                          274
 8
 9   134-R     Translation of BNBMPLC-E-0010163 -
               SASAC Audit of Economic
10             Responsibility - BNBM should
               improve relevant management
11             regulations (Redlined)             275
12   61        Knauf e-mail and letters to Song
               Zhiping and Wang Bing, with
13             Attachments                        293
14
15
16
17
18
19
20
21
22
23
24
25
```

1          P R O C E E D I N G S

2

3          THE VIDEOGRAPHER:  We are back on the

4     record, August 26, 2015 at 8:11 a.m..  This is

5     the continuation of the deposition of Mr. Wang

6     Bing.  This starts day two, tape number one.

7          The witness and interpreter are

8     previously sworn from yesterday.

9          Counsel will be noted on the

10    stenographic record.

11         You may begin.

12         MS. ROBERTSON:  Good morning,

13    Mr. Wang.

14         THE WITNESS:  Good morning.

15         MS. ROBERTSON:  And Counsel.

16         This morning, to begin, Plaintiffs

17    offer, file, introduce Exhibit 315.  It's

18    identified with Bates numbers BNBNPLC-E-0004827

19    through 4847.

20         The PSC previously provided this

21    exhibit to defense counsel for purposes of

22    redlining the exhibit.  The PSC and BNBM's

23    counsel have agreed to all redlines except for

24    one word found at BNBMPLC-E-0004836.

25         In an off the record conversation, the

1  PSC has agreed to not use that portion of this

2  document at this time, and we will further agree

3  to discuss the discrepancy between the word with

4  defense counsel with our translators.

5          MR. BARR:  All I would add to that is

6  that the word, just so it's clear on the record,

7  is that the PSC says the word should be

8  "subsidiaries," and BNBM believes the word

9  should be "subordinate enterprises."

10          And beyond that, I agree with what you

11  said.

12

13          BING WANG,

14  having been first duly sworn, was examined and

15  testified as follows through the interpreter:

16                  EXAMINATION

17  CONTINUED BY MR. LEVIN:

18      Q.   Mr. Wang, good morning.

19      A.   Good morning.

20      Q.   Could you make yourself familiar with

21  this document if you haven't reviewed it

22  recently?

23          (Witness reviewing document.)

24  BY MR. LEVIN:

25      Q.   Just let me know when you're ready,

1   sir.  It's a rather lengthy document, so if you

2   want to stop at any time to read something, just

3   raise your hand like you need a hall pass and

4   I'll let you read it.

5        A.   All right.

6        Q.   Now, this document indicates that it's

7   a work report.  I can't use the words ordinary

8   course of business because your counsel would

9   object.  Is this the type of thing that you do

10  in your employment from time to time, and it's

11  part of your employment at BNBM?

12       A.   I was the general manager of BNBM as

13  reflected in a document in the year 2007.  As a

14  mechanism of general manager for

15  decision-making, we hold monthly meetings.

16  Staff representative meeting is a social

17  organization organized by staff voluntarily,

18  therefore it does not carry the legal meaning of

19  work report.

20            I see the document bears my name on

21  it, but I did not write this document.  In my

22  recollection during the preparation of

23  deposition, the attorney might have shown me

24  this document, but I do not have a recollection

25  on the content written in the document.

 1      Q.   I wasn't there.  Could you help me and

 2   tell me who did write this document?

 3      A.   I don't know who wrote it.  I also

 4   don't know where you obtained it from.  But I

 5   did not write it.

 6      Q.   Well, the document bears a Bates

 7   number on it which indicates to all of us at

 8   this table that it came from the files of BNBM

 9   PLC.  Do you know how it got into those files?

10      A.   I don't know about this.

11      Q.   Do you know where work order

12   documents -- work order -- work reports are kept

13   at BNBM?

14      A.   Like I just said, staff

15   representatives meeting is a social organization

16   voluntarily organized by staff.  During my post

17   as the general manager, to my recollection I

18   have attended staff representative meetings such

19   as this.  I would also need to communicate with

20   the staff as well as giving speeches, but I do

21   not need to read off the script.

22      Q.   What were your duties as general

23   manager?

24      A.   As the general manager of the company,

25   I was in charge of the company's normal

Confidential - Subject to Further Confidentiality Review

1  production and management.

2      Q.   In your duties as general manager

3  attending these meetings evidenced by the work

4  report in Exhibit 315, did you find these

5  meetings useful so as to adequately perform your

6  functions as general manager?

7           MR. BARR:  Objection to the form.

8      A.   Whether attend or not attend, the

9  staff social organization such as this does not

10 interfere with my duties as general manager and

11 its performance.

12 BY MR. LEVIN:

13     Q.   I didn't ask you whether it interfered

14 with your duties.  I said do you feel it helpful

15 to have these meetings and listen to what was

16 said at these meetings?

17     A.   Because staff representative meeting

18 is a staff social organization, it sometimes

19 invites the management team of the company to

20 attend.  I remember I have attended.  The

21 purpose of that is to show concern and to

22 consolidate the staff, to communicate with the

23 staff, and to motivate the staff.

24          THE INTERPRETER:  The interpreter

25 needs a moment to check the dictionary.

 1              MR. BARR:  Off the record just for a

 2      second.

 3              THE VIDEOGRAPHER:  We're off the

 4      record at 8:26 a.m..

 5              (Off the record discussion.)

 6              THE VIDEOGRAPHER:  We're back on the

 7      record at 8:28 a.m..

 8              THE INTERPRETER:  This is interpreter

 9      speaking.  Instead of the word "consolidate"

10      used in the interpreter's prior interpretation

11      of Mr. Wang's testimony, I would like to replace

12      that word with to show -- I would like to delete

13      the word, if the defense agrees.

14              MR. BARR:  That's fine.

15              MR. LEVIN:  Okay.  That's fine.

16              MR. BARR:  That's fine with me, too.

17              You can proceed, sir.

18      BY MR. LEVIN:

19          Q.  This document clearly indicates that

20      "General Manager Bing Wang's" -- and it's

21      apostrophe S -- "work report at the 3rd meeting

22      of 5th session of BNBM staff representative

23      meeting."  I don't know Chinese, but in English

24      that means that the work report belongs to Bing

25      Wang, it's possessive.

Confidential - Subject to Further Confidentiality Review

1          Do you agree with that?

2          MR. BARR:  Object to the form.

3          MS. EAGAN:  Object to the form,

4    argumentative, repetitive.

5          A.   I have not seen this document besides

6    when I was shown the document by the attorney

7    during the preparation of the deposition.  I

8    definitely did not write this.  I might have

9    attended, but this report does not represent

10   what I have said, even though this written

11   document has my name on it, but it does not

12   represent the fact.  Because I did not write it,

13   many of the language in there are not accurate.

14   BY MR. LEVIN:

15         Q.   Well, this was not your first social

16   event that you went to that you characterized as

17   a work -- that led to work reports, was it?

18         MR. BARR:  Object to the form.

19         A.   What social event you're referring to?

20   Are you referring to the staff representative

21   meeting?

22   BY MR. LEVIN:

23         Q.   Yes.  I was trying to use your words,

24   the social event, how you characterize this

25   document.  They're certainly not my words.  This

Confidential - Subject to Further Confidentiality Review

1   is not your first -- this is not your first

2   social event.

3       A.   The staff representative meeting had

4   invited me to attend, but I'm not sure whether I

5   had attended this specific meeting.

6       Q.   Do you know who decided to make this

7   your document and use your name in the document?

8            MR. BARR:  Objection to the form.

9            THE INTERPRETER:  The interpreter

10  needs to clarify the tense in the answer of

11  witness.

12      A.   When I was the general manager of the

13  company, according to the custom in China,

14  sometimes when management attend an event a

15  script would be prepared for him.  That is

16  possible.  I don't know who wrote this script,

17  but I did not write it.

18  BY MR. LEVIN:

19      Q.   Is it a fact, sir, that you've

20  attended other meetings of this nature in your

21  capacity of general -- as general manager?

22      A.   What do you mean about meetings of

23  other nature?

24      Q.   Well, as you characterize it, the

25  social events.

Confidential - Subject to Further Confidentiality Review

1      A.    It's possible.

2      Q.    And is it a fact that at these staff

3    representative meetings, the written indicia of

4    the meeting when you attended as general manager

5    begins with the statement "General Manager Bing

6    Wang's work report"?

7           MR. BARR:  Objection to the form.

8    Objection, lacks foundation.  Objection,

9    mischaracterizes the witness's testimony.

10           You may answer.

11      A.    Usually as the management of a

12    company, as a general manager of a company, it

13    is possible for me to attend meetings such as

14    this staff representative meeting.  It is

15    possible that a communication with the staff had

16    happened and speeches were given.  I remember I

17    have attended meetings like this and have given

18    speeches, but I do not have such a recollection

19    that I have received such a draft, and read from

20    the draft.  I don't have that recollection.

21    BY MR. LEVIN:

22      Q.    Just to be clear, you have no

23    recollection that your name appears as general

24    manager on similar staff meeting reports, is

25    that correct?

```
 1              MR. BARR:  Objection to the form.

 2      A.   I don't have a recollection that I

 3  have ever written the statement in this

 4  document.  I did not write it.

 5  BY MR. LEVIN:

 6      Q.   I'm not speaking of this document.  I

 7  was speaking, sir, not of this document, but of

 8  similar staff meeting reports.  Do you have any

 9  recollection of them?

10              MR. BARR:  Objection to the form.

11  Objection, lacks foundation.  Objection,

12  mischaracterizes the witness's testimony.

13      A.   I don't have a recollection.

14  BY MR. LEVIN:

15      Q.   Sir --

16      A.   I have not been the general manager

17  for over six years.

18      Q.   How long were you general manager?

19      A.   I believe four to five years, perhaps.

20      Q.   Now, would you agree that this

21  document indicates statements that were made by

22  others who attended this particular staff

23  meeting?

24              MR. BARR:  Objection to the form of

25  the question.  Objection, the document speaks
```

Confidential - Subject to Further Confidentiality Review

1    for itself.

2        A.   I don't know.

3    BY MR. LEVIN:

4        Q.   Do you recall March 23, 2007, and the

5    meeting that occurred on that date?  My

6    birthday.

7            MR. BARR:  Did you attend?  Strike

8    that, that was just --

9            MR. LEVIN:  I am sure --

10            MR. BARR:  That was gratuitous.  Let's

11    go back to the question.

12            MR. LEVIN:  I'd like to take you up on

13    that.

14            MR. BARR:  Read the question back to

15    the witness, if you could.  My apologies.

16            MR. LEVIN:  The answer is I can't

17    recall because I haven't looked at my calendar

18    recently from 2007.

19            MR. BARR:  All right.  I gave you a

20    softball.

21            Please read the question back.

22            (Whereupon, the reporter read back the

23    pending question.)

24        A.   Happy birthday.

25    BY MR. LEVIN:

1        Q.    Thank you, Doctor.

2        A.    Because this date was a long time ago,

3    and to me it's just an ordinary day, therefore I

4    do not remember any specific event happened on

5    that day.

6        Q.    How are these -- what's the process by

7    which these work reports come into existence?

8             MR. BARR:  Objection to the form.

9        A.    I don't recall that I would have them

10   prepare a work report such as this when I

11   attended the staff representative meeting.

12   BY MR. LEVIN:

13       Q.    Sir, since your name is the only name

14   on this document, is it fair to say that you

15   received a copy of this document shortly after

16   March 23rd, 2007?

17            MR. BARR:  Objection.  Lacks

18   foundation.

19       A.    I only recall that I might have the

20   possibility of attending a staff representative

21   meeting such as this.  But I do not have the

22   recollection that I have received a report like

23   this.

24   BY MR. LEVIN:

25       Q.    Have you received similar reports from

Confidential - Subject to Further Confidentiality Review

1    other staff meetings?

2        A.   I don't have a recollection.

3        Q.   Who are the leaders and

4    representatives that are present at this

5    particular gathering?

6        A.   Like I've said, I do not remember

7    whether I have attended this meeting or not, but

8    usually it is possible that a staff

9    representative meeting invites the attending of

10   management.

11       Q.   So the leaders and representatives in

12   attendance at this meeting were management-type

13   personnel?

14           MR. BARR:  Objection to the form of

15   the question.  Mischaracterizes the witness's

16   testimony.

17       A.   The purpose of the staff

18   representative meeting is mainly to uphold the

19   rights of the staff, and it is a social

20   organization for the staff.  It's possible that

21   the meeting invites one or two management

22   personnel to attend.  It is also possible that

23   it invites external guests to attend, because

24   it's a social organization.

25   BY MR. LEVIN:

1    Q.    And who would these external guests

2    be?

3    A.    There are many possibilities.  There

4    is a possibility that the guests are the

5    representatives of five shareholders, and the

6    guests could also be government official.  It

7    could also be the person in charge of other

8    staff social organizations.  These are all

9    possible.

10    Q.    Well, in any event, at this particular

11    gathering and like gatherings, you discuss the

12    business of BNBM, do you not?

13    A.    No.  This meeting does not discuss and

14    does not make a decision upon the company's

15    daily operation and management.

16    Q.    At this particular meeting, present as

17    leaders were representatives of CNBM Group and

18    CNBM PLC, were they not?

19    A.    Whether I attended this meeting or

20    not, I'm not sure.  And I'm also not sure

21    whether the shareholders' representatives had

22    attended the meeting.  Like I just said, it's

23    possible, but I do not recall.

24    Q.    Well, the document says they were

25    there, does it not?

Confidential - Subject to Further Confidentiality Review

1          MR. BARR:  Objection.  The document

2   speaks for itself.

3      A.   Because I did not write this document,

4   neither do I recall that I received this

5   document.

6   BY MR. LEVIN:

7      Q.   Do you keep a list of who is in

8   attendance at these meetings, or is it a secret?

9          MR. BARR:  Objection to the form of

10  the question, and the use of the word "secret."

11     A.   I remember that I have attended

12  meetings such as this, but I do not recall

13  keeping a name list.

14  BY MR. LEVIN:

15     Q.   If I wanted to attend this meeting,

16  this social event, could I get in, or would I be

17  barred at the door?

18     A.   The meeting was organized by the

19  company's staff representatives, not I.

20     Q.   Could I get into one of those

21  meetings?  Is it open to the public?

22     A.   If you're invited, of course you can

23  attend.

24     Q.   Okay.  But you have to be invited?

25     A.   I think so.

Confidential - Subject to Further Confidentiality Review

1      Q.   Is there a list of invitees kept?

2      A.   I don't know.  I don't think so,

3   because it is not a company's management

4   meeting.

5      Q.   I'm a bit confused.  What is the

6   process by which a work report gets finalized,

7   such as this particular work report?

8           MR. BARR:  Objection to the form.

9   Objection, lack of foundation, asked and

10   answered, mischaracterizes the witness's

11   testimony.

12           You may answer if you can yet again.

13      A.   If I, as the company's general

14   manager, was invited to a meeting such as this,

15   maybe I would just communicate and talk with the

16   people.  A direct communication would be just

17   fine.  I could also possibly give introduction

18   on the company's status and gave thanks to the

19   hard work of the staff.  There is no such a

20   process to review a certain report, and to have

21   me read the report.

22   BY MR. LEVIN:

23      Q.   Well, somebody took notes at this

24   meeting, because page after page evidences what

25   occurred at this meeting.  And your testimony is

Confidential - Subject to Further Confidentiality Review

1    you don't know who did it, you don't know why it

2    was done, and you don't know where this document

3    came from, is that correct?

4            MR. BARR:  Objection to the form of

5    the question.  And objection, mischaracterizes

6    the witness's testimony.  Objection,

7    mischaracterizes the document which speaks for

8    itself.

9            You're making supposition after

10   supposition in terms of what this is.  If you

11   have a question for the witness, please ask it.

12   BY MR. LEVIN:

13       Q.   You may answer the question, sir.

14       A.   I have read the document you have just

15   introduced to me, but from the document and as a

16   general manager I do not see it is a note of the

17   meeting, and neither have I written this

18   document.  I don't recall that I have ever

19   arranged anybody to take a note of my talk.  And

20   when I just browsed through the document, I

21   found many errors.

22       Q.   When you found many errors, is that

23   many errors substantively, or many errors as to

24   what was said at that meeting?

25       A.   It definitely does not look like

1    something I would have written, nor does it look

2    like something that I would have said.  There

3    are many major and principal mistakes on the

4    numbers reflected here.

5         Q.   You have no recollection of being at

6    the meeting, you so stated, is that correct?

7         A.   Maybe I have attended, but I do not

8    have a clear recollection on that.

9         Q.   So you have no recollection of what

10   was said at the meeting, do you?

11        A.   I have attended so many meetings, it

12   is impossible for me to remember what I have

13   said on each one of the meetings.  Seven or

14   eight years later, if you were to ask me who was

15   -- who were present in today's meeting and what

16   had been said in today's meeting, I would

17   probably not remember.

18        Q.   But we could give you notes of today's

19   meeting, Maureen can give you, and that would

20   refresh your recollection, would it not?

21        A.   The thing is that this meeting has

22   pre-arranged a record taken, therefore I can

23   recall.  However, a staff representative

24   meeting, a social event such as this did not

25   have a note-taking arranged.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   I've got one more question about your
 2   memory at this time.
 3             So that we're absolutely clear, do you
 4   recall anything that was said at this meeting
 5   occurring on March 23rd, 2007?
 6        A.   I do not recall.
 7        Q.   Now, I want to call your attention to
 8   the paragraph that begins with "Ni hao."  Do you
 9   see that, sir?
10        A.   I see "Hello everyone."
11        Q.   Do you recall saying that, sir?
12        A.   If I were to attend meetings, the
13   beginning of my speech had many possibilities.
14        Q.   Well, would one of the possibilities
15   be "First, I, on behalf of all of the BNBM
16   staff, would like to extend a warm welcome to
17   all of the leaders"?  Would that be something
18   that you would say at a staff meeting?  Could
19   you possibly be the "I" here whose name appears
20   four lines up as General Manager Bing Wang?
21             MS. EAGAN:  Object to form.
22             MR. BARR:  Object to form as well.
23   Object to the form.  Objection, compound.
24        A.   If I did attend a meeting such as
25   this, and present in the meeting were
```

```
 1   shareholders' representatives, I would most

 2   definitely not start with this opening.  For

 3   example, I know all of the shareholders'

 4   representatives.  Supposedly if Mr. Barr is one

 5   of our shareholders' representatives, because I

 6   know Mr. Barr, I would say "hello, Mr. Barr."

 7   Or, for example, I would say "hello, Mr. Liao,"

 8   "hello, Attorney Liao," or "hello, Leader Liao."

 9   That's why I'm saying this material is not

10   definite meeting note.

11   BY MR. LEVIN:

12       Q.   So you would identify the leader of

13   CNBM or CNBM Group by name because you knew

14   them?

15       A.   According to Chinese culture we would

16   not address them directly by their names, but

17   rather a respective form as, for example, I

18   would call Mr. Liao Leader Liao or Chairman

19   Liao.

20       Q.   And if there were multiple people at

21   -- what you characterized at this social event,

22   you would go by the numbers and welcome each one

23   individually by their title in accordance with

24   Chinese custom?

25       A.   I would extend my welcome to all
```

1    important guests, leaders, including major

2    shareholders by the respective form.

3         Q.   Whoever the "I" was, if indeed it

4    wasn't you, wouldn't be abiding by Chinese

5    custom in this welcoming by statement "hello"?

6              MR. BARR:  Objection to the form.

7    Vague.

8         A.   Therefore, I did not write this,

9    neither did I say this.

10   BY MR. LEVIN:

11        Q.   Now, the topic that -- of this social

12   event was, as I read it in English, and as your

13   counsel has agreed it's a proper translation, is

14   to "Strengthen Operation, Accelerate

15   Construction, Develop Harmoniously, Work

16   Together to Create Success."

17             Do you see that?  Very top of the

18   page, 4827.

19        A.   I see the language in this document.

20        Q.   Do you agree that that's the type of

21   items that are discussed at what you

22   characterize to be a social event?

23        A.   I don't understand.  What do you mean?

24   I don't understand your question.

25        Q.   Well, at these staff meetings, do you

1    engage in conversation concerning strengthening

2    the operation, accelerating construction, and

3    development of harmonious, work together to

4    create success for BNBM Company in which at this

5    time you were general manager?

6         A.    I don't remember what I said when I

7    attended this type of meetings, but I can give

8    you some supplement comments on the definition

9    of staff representative meeting.

10        Q.    You've answered the question.

11        A.    Okay.

12        Q.    Now, at the bottom of the page --

13   strike that.

14             Why were members of CNBM Group and

15   CNBM present at this so-called social event?

16             MS. DALEY:  Objection to form.

17        A.    Because CNBM Company, Limited is the

18   biggest shareholder of BNBM, and China is a

19   Socialist country.  Staff representative meeting

20   is not a decision-making organization deciding

21   on the company's production and management, but

22   having the management personnels, sometimes even

23   shareholders to attend staff representative

24   meetings such as this is in conformity with

25   Chinese culture.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Why was representatives of CNBM Group
 2   present at this meeting?
 3        A.   Because according to Chinese company
 4   law, CNBM Group is the actual controller of
 5   BNBM.  It is the shareholders' shareholder.
 6        Q.   Now, at the bottom of the Page 4832.
 7             MR. BARR:  4832?
 8             MR. LEVIN:  4828, sorry.  Bates number
 9   appears at the top of the paragraphs.
10   BY MR. LEVIN:
11        Q.   I'll read you what the translation of
12   the Chinese document says, "at the same time" --
13   as agreed to by the redlined version.
14             "At the same time, in the aspect of
15   international business, we devoted great efforts
16   to develop international distribution network,
17   insisted on the export of our own brands,
18   especially did a large export scale of 'BNBM'
19   brand to the American market for the first time,
20   competed with worldwide big brands on the same
21   platform, and laid a good foundation for BNBM to
22   build an internationally famous brand at a good
23   time."
24             Sir, having said that, do you have a
25   recollection today that that was part of the
```

Confidential - Subject to Further Confidentiality Review

1    business interest of BNBM at the time,

2    particularly March 23rd, 2007?

3              MS. EAGAN:  Object to form.

4              MR. BARR:  Object to form.

5         A.   I see the statement that you have just

6    mentioned in the document, but I did not write

7    it.  I also do not remember how I said it, but I

8    see some of the language expression are not

9    accurate.  There are two points of facts.

10             MR. BARR:  You --

11             MR. LEVIN:  Wait.  I didn't ask him

12   whether it was accurate or not.  I'll ask him

13   that question, or you can ask him that question,

14   but I don't want it.

15             MR. BARR:  Excuse me.

16             MR. LEVIN:  I said do you agree.

17             MR. BARR:  Excuse me.  You asked a far

18   broader question than that.

19             MR. LEVIN:  You're right.

20             MR. BARR:  Object.  Excuse me.

21             MR. LEVIN:  I withdraw what I said.

22   Go ahead.

23             MR. BARR:  You withdraw the question?

24             MR. LEVIN:  Let him go.

25             MR. BARR:  You may continue.

Confidential - Subject to Further Confidentiality Review

1      A.    You're going to talk, or I talk?

2            MR. BARR:  Your turn.

3      A.    From the document, it is true that

4   when some of the foreign customers come to BNBM

5   for purchasing products, BNBM had always

6   insisted in selling products of its own brand,

7   therefore it is very easy to identify what are

8   the customers that had purchased products of

9   BNBM's.

10           THE INTERPRETER:  Interpreter needs to

11   clarify whether the word "customer" the witness

12   used in his response is plural or singular form.

13     A.    There was indeed an American customer

14   who came to China to purchase BNBM's products,

15   but BNBM had never sent people to go to America

16   or other foreign countries to establish

17   so-called sales network or to promote its

18   market.

19   BY MR. LEVIN:

20     Q.    So you as the general manager of Bing

21   Wang -- strike that.

22           You, the general manager whose name

23   appears on this work report have just

24   characterized what you believe -- strike that.

25           You have disagreed either in whole or

Confidential - Subject to Further Confidentiality Review

1    in part with this paragraph that I just read to

2    you, is that correct, on 4828?

3         A.   Correct.

4         Q.   And as far as I know, and as far as

5    you said, you have no recollection of being

6    there and having heard this, do you?

7         A.   Correct.

8         Q.   And this document was produced by your

9    company and was in your company's files at least

10   since sometime on or about March 23rd, 2007, is

11   that correct?

12             MR. BARR:  Objection.  Lacks

13   foundation.

14        A.   I don't know.

15             MR. LEVIN:  Let's take five.

16             THE VIDEOGRAPHER:  We're off the

17   record at 9:19 a.m..  This concludes tape number

18   one.

19             (Whereupon, a recess was taken.)

20             THE VIDEOGRAPHER:  We're back on the

21   record at 9:40 a.m..  This is the beginning of

22   tape two.

23             MR. LEVIN:  We had a discussion with

24   regard to the use of the word "subsidiary" in

25   this particular document, and the use of the

```
 1    word --

 2              MS. ROBERTSON:  Subordinate

 3    enterprises.

 4              MR. LEVIN:  We will agree that for

 5    purposes of this document, the translation

 6    should read "subordinate enterprises."

 7              MR. BARR:  Okay.

 8              MS. ROBERTSON:  And for the record,

 9    that's in Wang Exhibit 315-R at

10    BNBNPLC-E-0004836.

11              (Whereupon, Exhibit Number 315-R,

12              Partial Translation of

13              BNBMPLC-E-0004827-0004847 - 3/23/2007

14              GM Wang Bing's Work Report at the 3rd

15              meeting of the 5th session of BNBM

16              Staff representative meeting;

17              "Strengthen Operation, Accelerate

18              Construction, Develop Harmoniously,

19              Work Together to Create Success"

20              (Redlined), was marked for

21              identification.)

22    BY MR. LEVIN:

23        Q.  Before we go back to the text of the

24    document, sir, who other than you would give

25    speeches at BNBM staff representative meetings
```

Confidential - Subject to Further Confidentiality Review

1    while you were general manager?

2         A.   There are many possibilities.  Other

3    management personnels as well as staff

4    representatives all make speeches.

5         Q.   Can you tell us their names and their

6    job classifications?

7         A.   I don't recall.  Even an ordinary

8    staff representative can make a speech when

9    raising hand.

10        Q.   Can you help me and tell me the name

11   of one ordinary staff representative and what

12   their job -- his or her job classification was?

13        A.   For example, our --

14             THE INTERPRETER:  Interpreter needs to

15   clarify with witness for the gender of the

16   person in his answer.

17        A.   For example, the Chairman of the union

18   may make a speech.

19   BY MR. LEVIN:

20        Q.   Can you tell me during your time as

21   general manager who the Chairman of the union

22   was?

23        A.   Zhang Laili.

24        Q.   How often did BNBM have staff

25   representative meetings while you were general

1   manager?

2       A.   It varies.  Usually the meeting is

3   held once a year.

4       Q.   And where is it held?

5       A.   Maybe in hotel, or rent a conference

6   room.  They're all possible.

7       Q.   What hotel would you use?

8       A.   It is the responsibility of the union

9   and of the staff representative meeting.  It is

10  not something that I'm in charge of.

11      Q.   Looking at this document, 315, and

12  being the general manager, with all the

13  experience that you have at BNBM, could you tell

14  us from the document itself where this meeting

15  occurred?

16      A.   I don't know.

17      Q.   At these so-called social events, do

18  you serve a meal?

19      A.   We do not serve meals.

20      Q.   Do you serve liquor?

21      A.   No.  Water.

22      Q.   Water and talk?

23      A.   I think so.

24      Q.   Turn --

25      A.   I'd like to make a supplement comment.

Confidential - Subject to Further Confidentiality Review

1      Q.   Wait, wait, wait.  About the question
2  I just asked you, or about something else?
3      A.   Your question.
4      Q.   Fine.
5      A.   I did not serve meals, neither did we
6  serve meals.  It is organized by the union, the
7  staff representative meeting.
8      Q.   Did they serve meals?
9      A.   I've never eaten meals.  I have never
10 heard of meals.  Usually it is over in half a
11 day.  There would be no meal served.
12     Q.   So it usually takes a half a day at
13 this social event, as you characterized it, to
14 discuss issues similar to the issues that are
15 reflected in Exhibit 315, is that correct?
16     A.   This issue was not been discussed.
17     Q.   You answered "this issue was not been
18 discussed."  Where was it not discussed?
19     A.   When I participated as management in
20 staff representative meetings such as this, I
21 would make an introduction, and the items
22 discussed were mainly staff welfare and
23 activities of staff representatives small group.
24     Q.   What is the staff representatives
25 small group?

Confidential - Subject to Further Confidentiality Review

1      A.   For example, different representatives

2    of staff in different departments would form a

3    union small group.  For example, they would

4    communicate such as one small group, would say

5    we have organized a mountain hiking event this

6    weekend, and another group would say we have

7    organized a badminton event this weekend.

8      Q.   In any event, in Exhibit 315 there is

9    nothing there about mountain hiking, bicycling,

10   swimming, drinking beer, eating popcorn, or

11   anything else that are at happy social events,

12   is there?

13         MR. BARR:  Objection.  The document

14   speaks for itself.  Also mischaracterizing the

15   witness's testimony.

16   BY MR. LEVIN:

17     Q.   Am I right that that doesn't appear in

18   the document?

19         Now let's --

20         MR. BARR:  Can we wait for the

21   translation, please?

22         MR. LEVIN:  It's not important.

23         MR. BARR:  Don't ask the question if

24   it's not important.

25     A.   We don't have these activities

1   written.  However, there are many various of

2   activities.

3   BY MR. LEVIN:

4       Q.    Okay.  Let's move on with this

5   document that bears your name that you have no

6   recollection of.

7           4832.  Perhaps you could have the

8   Chinese version in front of you, and read along,

9   follow my reading.

10          Does this document produced by BNBM in

11  this litigation state as follows, After all

12  newly-built production lines had put into normal

13  production successively and the logistics had

14  become more convenient, Shandong Taihe realized

15  a slight increase in the stable sale prices of

16  its product, gave full play to the value

17  increase of brand technology and quality brought

18  about by BNBM, as the controlling shareholder

19  brought into play the driving effect and

20  synergistic effect of BNBM, improved the

21  profitability of Taihe, and it's also brought

22  good investment returns to BNBM.  Yes or no.

23          MR. BARR:  We'll stick with that's

24  what the document says.  It speaks for itself

25  here.  Is there a document you want to ask about

Confidential - Subject to Further Confidentiality Review

1    it?

2              MR. LEVIN:  I want to witness to -- I

3    just want him to say yes or no.  I want the

4    witness's testimony on this, not your

5    stipulation.  It's more effective in front of a

6    jury.

7         A.   I did not write this.

8    BY MR. LEVIN:

9         Q.   I didn't ask you whether you wrote it.

10   I asked you whether it says what I said it says.

11   Yes or no.

12        A.   Not completely.  Not accurately.  It

13   says the profitability of Shandong Taihe had

14   been improved because of the new product line

15   had been put in.  BNBM as its shareholder

16   together with other shareholders of Shandong

17   Taihe had received good return proportionately,

18   and have shared its profits.

19        Q.   Sir, are you saying the document says

20   what you just said it was, or is that what you

21   want the document to have said?

22             MR. BARR:  Objection to the form of

23   the question.  Objection, argumentative.

24             You can answer.

25        A.   You asked me about a statement.  I'm

 1   only confirming with you the fact that I know

 2   of.

 3   BY MR. LEVIN:

 4        Q.   Well, sir, I'm not asking you what the

 5   facts are.  I've asked you whether I read the

 6   document correctly.  Yes or no.

 7        A.   It's hard, I can't answer you by yes

 8   or no directly.  I cannot answer accurately by

 9   yes or no.

10             MR. BARR:  Please let him finish his

11   answer.

12             MR. LEVIN:  I understand.

13             MR. BARR:  Let's go off the record for

14   a minute.  I want to step outside.

15             Is there a question pending?

16             MR. LEVIN:  No.

17             THE VIDEOGRAPHER:  We're off the

18   record at 9:58 a.m..

19             (Whereupon, a recess was taken.)

20             THE VIDEOGRAPHER:  We're back on the

21   record at 10:06 a.m..

22   BY MR. LEVIN:

23        Q.   Now, what number is the Chinese

24   version?

25             MR. BARR:  It's all part of 315.

```
 1              MR. LEVIN:  For purposes of the next

 2    question, the translator need not translate the

 3    English version that we have stipulated to by

 4    and between counsel for BNBM and the PSC.

 5              MR. BARR:  Just before you pose that

 6    question, and based upon a discussion we had,

 7    you know, off the record, the difficulty the

 8    witness was having is that you had read the

 9    document in English, the translator was then

10    translating from that English into Chinese,

11    which may have had certain --

12              MR. LEVIN:  Certain nuances.

13              MR. BARR:  What was in the document

14    itself.  As I stated clearly, we'll stipulate we

15    agree fully that the stipulation in English he

16    read in is accurate.

17              MR. LEVIN:  Okay.

18    BY MR. LEVIN:

19       Q.  Sir, this document that bears your

20    name as general manager dated March 23, 2007 at

21    4836, Roman Number IV, I want to call your

22    attention to.  Does it state the following:

23    Roman Number IV. "Adjusted the industrial

24    development structure, and expanded the main

25    business development scale.
```

```
 1                "For the strategic needs of further

 2     integrating Shandong Taihe gypsum boards,

 3     strengthening the controlling power over

 4     Shandong Taihe, reinforcing and developing the

 5     Company's leading position in gypsum board

 6     industry, and sharing the good profits of

 7     Shandong Taihe to a larger extent, in

 8     August 2006, under the strong support of CNBM

 9     and under the direct direction of Chief Song and

10     Chief Cao, BNBM further purchased 23 percent of

11     equity of Shandong Taihe, which made the

12     company's equity share in Shandong Taihe

13     increase up to 65 percent in total, and the

14     Company thus obtained the substantial equity

15     control over Shandong Taihe; the Company

16     purchased 30 percent equity in Jiangyin Tiashan

17     Company, which were jointly held by two foreign

18     shareholders Full Most Co., Limited and Hong

19     Kong Rich Well, so far, Taihe and its

20     subordinate enterprises have finished the

21     shareholder clear-up, and only keep the

22     shareholders of local government, providers of

23     raw materials and land like electricity plant

24     and chemical fertilizer plant, which increased

25     BNBM's controlling power and equity share, and
```

1    simplified the Company's governance structure."

2          Did I read that correctly, sir?  Yes

3    or no.

4       A.   I don't understand English, but I see

5    the Chinese version in a paragraph.

6          MR. BARR:  We will so stipulate as to

7    the accuracy of the translation.

8          MS. ROBERTSON:  Next Plaintiffs offer,

9    file and introduce Wang Exhibit 316, which is a

10   partial translation by the PSC of

11   BNBMPLC-E-0005889 through 5892, is the full

12   range.  I do not believe this was provided in

13   advance of the deposition, as a result we do not

14   have agreement as to the accuracy of the English

15   translation at this time.

16          (Whereupon, Exhibit Number 316,

17          Partial Translation of

18          BNBMPLC-E-0005889-5892 - Wang Bing's

19          Welcome Speech on the 2008 BNBM Annual

20          Marketing Meeting, was marked for

21          identification.)

22          MS. ROBERTSON:  The exhibit is one

23   page, translated by the PSC, followed by the

24   machine translation, followed by four pages of

25   the Chinese original document.  I now hand one

 1   to the witness and one to the court reporter,

 2   and copies have been distributed to counsel.

 3           MR. BARR:  Are you going to ask

 4   questions other than on the highlighted portion

 5   of this?  See if we can expedite his review.

 6           MS. ROBERTSON:  We will only be asking

 7   questions on the highlighted portion found on

 8   the Chinese version at BNBMPLC-E-0005889.

 9   BY MR. LEVIN:

10      Q.   Sir, do you recall the 2008 BNBM

11   Annual Marketing Meeting?

12      A.   I do remember an annual meeting was

13   held.

14      Q.   And did you deliver the welcoming

15   speech?

16      A.   My recollection is that I believe I

17   have attended the annual sales meeting, but I do

18   not recall whether I have given a speech or not.

19      Q.   Well, does the document indicate

20   "Welcome Speech on the 2008 BNBM Annual

21   Marketing Meeting"?

22      A.   Yes.

23      Q.   And were you present at this annual

24   meeting?

25      A.   I believe I was present.  It was many

Confidential - Subject to Further Confidentiality Review

1    years ago, but I believe I was present.

2        Q.   And was Chairman Song present?

3        A.   I do not have an accurate recollection

4    on that, but he may be present because some of

5    those meetings we would have invited Chairman

6    Song to attend.

7        Q.   Well, what company was Chairman Song

8    Chairman of?

9        A.   He is the Chairman of the Board of

10   CNBM Group, and the president of the board of

11   directors of CNBM Company, Limited.

12           MR. BARR:  Was the question --

13           MR. LEVIN:  In 2008.

14           MR. BARR:  I just want to make sure

15   his answer is accurate.

16       A.   I believe so.

17   BY MR. LEVIN:

18       Q.   And who is, I'll spell, J-I-A-B-A-O

19   space X-I-A-O?

20       A.   He's the president of a media, a

21   magazine.

22       Q.   What magazine was it?

23       A.   He's the president of a magazine in

24   the construction industry.

25       Q.   What's the name of the magazine?

Confidential - Subject to Further Confidentiality Review

```
1         A.    Perhaps China Construction Newspaper.

2         Q.    That's the name of the magazine, China

3   Construction Newspaper?

4         A.    It's not a magazine, it's a newspaper.

5   I have not said it accurately.

6         Q.    Okay.  How often is the newspaper

7   published?

8         A.    I'm not sure.  It could be daily or

9   weekly.

10        Q.    Who subscribes -- not names, but what

11  type of individuals subscribe to this

12  publication?

13        A.    All types of construction companies,

14  all types of decoration, remodelling companies.

15        Q.    Are this group of entities customers

16  of BNBMPLC?

17        A.    They are our direct or indirect

18  customers.

19        Q.    What do you mean by an indirect

20  customer?

21        A.    For example, we do business with them

22  through our distributors.

23        Q.    And they would then sell to some other

24  third party, is that correct, the distributor?

25        A.    Correct.
```

1      Q.   And was it important for BNBM to

2  invite newspaper reporters and executives to

3  your board meeting so that you can make a

4  positive impression on them and they can report

5  things properly, and you can increase the sales

6  of your product at the annual meeting?  I'm

7  sorry.

8      A.   It's not the company's meeting, but

9  sales meeting.  It's a meeting, consists of

10  mostly customers and distributors.  It is a

11  promotional work meeting.

12      Q.   And I stand corrected, it's the annual

13  marketing meeting, is it not?

14          THE INTERPRETER:  This is the

15  interpreter speaking.

16          The word marketing was -- the English

17  translation of the Chinese characters, sales.

18          MR. LEVIN:  That's fine.

19          THE INTERPRETER:  May the interpreter

20  use same translation?

21          MR. LEVIN:  I will accept sales.

22  BY MR. LEVIN:

23      Q.   Who is Director, and I'll spell,

24  Z-H-E-N-J-I-A-N-G space X-I-E?

25      A.   He is the president of China

1    Construction Material Newspaper.

2        Q.   And how often is that published?

3        A.   It could be either daily or weekly

4    newspaper.  I don't have a clear recollection on

5    that.

6        Q.   Do you have a present recollection of

7    this meeting?

8        A.   I do not have a clear recollection.

9    However, there have been marketing meetings

10   held, and guests invited.

11       Q.   Has the Chinese document in front of

12   you refreshed your recollection of what occurred

13   at that meeting?

14       A.   What occurred?  I don't understand

15   what you mean.

16       Q.   What took place?

17            MR. BARR:  What happened at the

18   meeting.

19   BY MR. LEVIN:

20       Q.   What happened?

21            MR. BARR:  He's asking does this

22   document help you remember what happened at the

23   meeting.

24            MR. LEVIN:  Thank you.

25       A.   I do not have a clear recollection on

Confidential - Subject to Further Confidentiality Review

1    this document.  However, I can recall usually

2    what happens in a marketing work meeting.

3    BY MR. LEVIN:

4        Q.   Do you recall what happened at this

5    marketing work meeting?

6        A.   I don't have a clear -- I don't have

7    an accurate recollection.

8            MR. BARR:  Please just note my

9    objection to the form of the question.  You said

10   "marketing work meeting," and this was just

11   annual sales meeting.

12           MR. LEVIN:  Oh, I'm sorry.  I stand

13   corrected.

14   BY MR. LEVIN:

15       Q.   Would there be a list of attendees

16   kept for meetings such as this?

17           THE INTERPRETER:  This is interpreter

18   speaking.

19           I thought the counsels stipulated on

20   the translation of the document, we translate

21   the Chinese marketing meeting to be sales

22   meeting.

23           MR. BARR:  We agreed it would be sales

24   meeting.

25           THE INTERPRETER:  But the English

Confidential - Subject to Further Confidentiality Review

```
 1    translation says marketing meeting.

 2              MR. BARR:  This is their translation.

 3    Your translation is sales.

 4              MR. LEVIN:  I so stipulate.

 5              THE INTERPRETER:  Stipulate on my

 6    translation or the --

 7              MR. LEVIN:  Your translation.

 8              THE INTERPRETER:  The deponent just

 9    said it should be marketing.  Marketing.

10         A.   Because we don't do business in

11    meetings like this.  It's promotional.  It's

12    propaganda.

13              MR. BARR:  We all stand corrected.

14              Go ahead.

15    BY MR. LEVIN:

16         Q.   Who were the --

17              THE INTERPRETER:  This is interpreter

18    speaking.

19              So the interpreter would translate the

20    sales as it reflects in Chinese character or --

21              MR. LEVIN:  At this point I don't

22    know.

23              MR. IRPINO:  Whatever he says.

24              MR. LEVIN:  Whatever he says.

25              THE INTERPRETER:  I understand.
```

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. LEVIN:

 2       Q.   Who were in attendance -- I have a

 3   question outstanding.

 4            MR. BARR:  I don't think so.  You

 5   started to say "who attended."

 6   BY MR. LEVIN:

 7       Q.   Who were in attendance -- strike all

 8   that.

 9            Is there a list of attendees at this

10   meeting?

11       A.   No, I don't think so.

12       Q.   Is there a list of invitees at this

13   meeting?

14       A.   I don't know.

15       Q.   Could anybody attend, or is it only by

16   invitation to hear the propaganda?

17       A.   To my recollection, whoever that is

18   interested in our business is welcome to attend.

19       Q.   So it's open to the public?

20       A.   Not to the public, but to our

21   industry.

22       Q.   Well, could anybody attend that's a

23   member of your industry that did not receive an

24   invitation?

25       A.   I don't remember there is such a thing
```

1    as invitation letters.  Usually a meeting like

2    this would have the meeting inform -- would have

3    our industry informed as well as our customers

4    informed, and to have others who are not our

5    customers, but in industry to be informed, and

6    to inform some medias, whoever is willing to

7    attend can attend.  This is not a meeting with

8    strict registration policy.

9         Q.   Do you inform your customers and the

10   media of who will attend this meeting before,

11   such as "Respectable Board Chairman Zhiping Song

12   will be at this meeting"?

13        A.   No, because every time we would invite

14   different guests, we could invite guests or not

15   inviting guests.  We could invite this guest or

16   that guest.

17        Q.   Chairman Song was at this meeting.

18   Did he speak at this meeting?

19        A.   I do not recall whether he had

20   attended this meeting, but we have indeed

21   invited him to attend promotional meetings of

22   this type, and he had attended those meetings.

23        Q.   And in the past, has he spoken at

24   these meetings that he's attended?

25        A.   Sometimes he would speak, sometimes he

1   would not.

2       Q.   Have you spoken at these meetings?

3       A.   Sometimes I spoke, sometimes I did

4   not.

5       Q.   In the meetings that Chairman Song has

6   spoken, do you recall anything that he said?

7       A.   Because Chairman Song is a famous

8   entrepreneur, when he's invited usually he would

9   talk about management, economy, and to share his

10  experience.

11      Q.   Would he speak about the marketing

12  efforts of BNBM?

13      A.   No.

14      Q.   Well, these reports were obviously

15  kept, or I wouldn't have it.  Do you know who is

16  the keeper of these reports, where are they

17  housed, where are they stored at BNBM?

18      A.   The company does not have a policy,

19  nor have arranged keeping marketing promotional

20  materials such as this.

21      Q.   With all that you know about BNBM, and

22  all the roles that you've heard of BNBM, do you

23  know how this document came to be produced by

24  your counsel to the Plaintiffs' Steering

25  Committee in this litigation?

1      A.   I don't know, but I only know that

2   when a large enterprise's management personnel

3   in China attend a meeting like this, it is

4   possible that a certain department would want to

5   prepare a speech, a draft, for the leader.  But

6   I have never used it.

7      Q.   Would you characterize this particular

8   meeting as a social event like we did earlier

9   today?

10      A.   This is not.  This is a marketing

11   promotional event of the sales department.

12      Q.   Where was this meeting held?

13      A.   I don't have a clear recollection.

14      Q.   Where were these meetings usually

15   held?

16      A.   Usually these type of meetings would

17   have been held in a place with beautiful

18   scenery, and at the same the guests are being

19   treated for a nice tourist experience.

20      Q.   So in promoting your company, you take

21   them to nice places and entertain them, is that

22   correct?

23      A.   We set the promotional meetings in a

24   nice -- in a place with beautiful sceneries to

25   attract more customers to attend.  Customers can

1    arrange their own tours in addition to that.

2        Q.   And correct me if I'm wrong, it's

3    important that those that speak on behalf of

4    BNBM or CNBM or Taishan at these meetings be

5    truthful in their presentations to their

6    customers and to the media, am I correct?

7            MR. BARR:  Object to the form of the

8    question.

9            MS. DALEY:  Object to the form.

10           THE INTERPRETER:  I already

11   interpreted.

12           MR. BARR:  It was object to the form

13   of the question.  Lack of foundation.

14       A.   This type of meeting is mainly

15   marketing promotional meetings.  It is also

16   possible that the guests would communicate with

17   people.  It is neither a press conference of the

18   company, nor the company's production and

19   management meeting.

20   BY MR. LEVIN:

21       Q.   Is it important to be truthful in your

22   presentations to your customers and to the

23   media?

24       A.   Yes.

25       Q.   In China, do you, as a matter of

Confidential - Subject to Further Confidentiality Review

1   custom, exaggerate?

2          MR. BARR:  Object to the form of the

3   question.

4       A.   I don't know what you mean by that.

5   BY MR. LEVIN:

6       Q.   Do you puff and not tell totally the

7   truth when you're stating things to your

8   customers and to your media?

9          MR. BARR:  Objection.  Vague.

10      A.   We definitely conduct our sales

11  promotion, marketing promotion, according to the

12  truth.

13  BY MR. LEVIN:

14      Q.   And it would be wrong not to tell the

15  truth, would it not?

16      A.   Anyone should tell the truth.

17      Q.   Did you attend all of the sales

18  meetings when you were general manager of BNBM?

19      A.   No.

20      Q.   What was your responsibility at the

21  meetings that you did attend?

22      A.   It is the responsibility of the sales

23  department to hold the marketing promotional

24  meetings.  The purpose of inviting me to attend

25  is to show respect to customers and

Confidential - Subject to Further Confidentiality Review

1    distributors.

2        Q.   So in order to show respect to the

3    customers, distributors, you as the general

4    manager was present, and Mr. Song as a Chairman

5    of CNBM Group was present, is that correct?

6        A.   Sometimes.

7        Q.   Were representatives of Taishan at

8    these meetings?

9            MS. EAGAN:  Object to form.

10       A.   No.  We have completely independent

11   sales, completely independent marketing

12   promotional works.

13   BY MR. LEVIN:

14       Q.   So that representatives of Taishan

15   were never in attendance at these meetings?

16       A.   No.

17       Q.   Was Chairman Jia ever at these

18   meetings?

19       A.   Never.

20       Q.   Does this document which has been

21   produced by BNBM in this litigation state as

22   follows.

23           MR. BARR:  We do not have a

24   stipulation.

25           MR. LEVIN:  We want to give you this

Confidential - Subject to Further Confidentiality Review

```
 1    document.  Can you accommodate us at lunch?

 2              MR. BARR:  We can try.

 3              MR. LEVIN:  Thanks.

 4    BY MR. LEVIN:

 5         Q.   Sir, do you serve on the auditing

 6    committee?

 7              MR. BARR:  Of?

 8              MR. LEVIN:  BNBM.

 9              MR. BARR:  I'm sorry, now?

10              MR. LEVIN:  Yes, now.

11         A.   In the auditing committee of the board

12    of directors meeting.

13    BY MR. LEVIN:

14         Q.   Are there -- let's go by the numbers.

15              Are one of the committees of BNBM the

16    auditing committee?

17         A.   Yes.  The board of directors auditing

18    committee.

19         Q.   And have you served on that committee?

20         A.   I used to, but I don't believe I am

21    right now, according to my recollection.

22         Q.   What years were you on the auditing

23    committee?

24         A.   I don't have a clear recollection.

25         Q.   What are the functions of the auditing
```

1    committee?

2        A.   The audit committee perform the

3    responsibility of supervising the company's

4    accounting statements according to the company

5    charter and the company law.

6        Q.   And do you partake in any note-taking

7    -- strike that.

8            Did you partake in any note-taking

9    when you were on the auditing committee?

10       A.   No.

11       Q.   Is it fair to say, sir, that in your

12   job, work, responsibilities, as a matter of

13   course you do not take notes?

14           THE INTERPRETER:  This is the

15   interpreter speaking.

16           Counsel, when you said "a matter of

17   course," did you mean definitely, naturally?

18           MR. LEVIN:  Naturally.

19           MR. BARR:  Typically.

20           MR. LEVIN:  Typically.

21       A.   Correct, most of the meetings that I

22   have attended is just like today where we just

23   communicate.

24   BY MR. LEVIN:

25       Q.   And do your colleagues, as you

Confidential - Subject to Further Confidentiality Review

1    observed, also not take notes?

2              MR. BARR:  Colleagues where;

3    colleagues on the board, colleagues anyplace?

4              MR. LEVIN:  Colleagues at BNBM.

5    Pretty broad.

6        A.   Everybody has his own habit.  I do not

7    arrange them to do that, and I don't know what

8    they do.

9    BY MR. LEVIN:

10       Q.   But your observation in all the time

11   that you've been at BNBM, have you observed that

12   your colleagues do not take notes?

13             MR. BARR:  Objection.  Overbroad.

14       A.   I did not pay attention.

15   BY MR. LEVIN:

16       Q.   Have you ever seen your colleagues

17   taking notes at a meeting?

18       A.    I would focus on discussing about work

19   during meetings.  I did not pay attention to

20   this.  Many years later if you were to ask me

21   that in this meeting if anybody had taken notes,

22   I would not have been able to give an answer.

23   But since you have just reminded me that, I have

24   noticed that some ladies and gentlemen here

25   today have brought their notebooks and pens.

1      Q.   Is it part of the Chinese culture not

2  to take notes?  This is simply an observation

3  that I've made.  Am I correct?

4           MR. BARR:  Objection.  Vague and

5  overbroad.

6      A.   I see there are Chinese and Americans

7  here today, some Chinese took notes, some

8  Chinese did not, some Americans took notes, some

9  Americans did not.  I believe it's a habit of

10  each individual.

11  BY MR. LEVIN:

12      Q.   Have you served on the nomination

13  committee of the board of directors?

14      A.   Yes.

15      Q.   And what years did you serve on that

16  committee?

17      A.   I don't have a clear recollection, but

18  I believe for quite a while.

19      Q.   And what is the function of the

20  nominating committee?

21      A.   The function is mainly to discuss and

22  nominate BNBM's high level management

23  personnels, to submit it to the board of

24  directors meeting.

25      Q.   And what would you be nominating them

1   for?

2      A.   BNBM's high level management

3   personnels, such as deputy general manager,

4   etcetera.

5      Q.   And would there be minutes kept of the

6   nominating committee?

7      A.   No.  There are only three people.  I'm

8   only a committee member, and not the person in

9   charge.

10      Q.   What years were you a member of the

11   nominating committee?

12      A.   I don't have a clear recollection on

13   that, but for quite a few years.

14      Q.   In the beginning --

15      A.   I wasn't.

16      Q.   In the beginning -- that's not a

17   question, it's a start.

18           In the beginning, who was on the

19   nominating committee with you?

20      A.   According to Chinese law requirement,

21   the nominating committee will be consist of

22   independent directors as members, which also

23   include another independent director and a

24   company's management personnel.

25      Q.   When you first attended a nominating

1    committee, can you tell -- meeting, can you tell

2    me who was in attendance other than yourself?

3            MR. BARR:  Do you have a document you

4    can put in front of him to expedite this?

5            MR. LEVIN:  I don't have it.  I'm told

6    we do, though, it's just going to be very

7    general.  I'm not going through it.

8            MR. BARR:  This one would be something

9    of record.

10           MR. LEVIN:  I'm told we have those

11   documents.

12       A.   I don't have a clear recollection on

13   this nominating committee, but you can check our

14   public announcement.  Usually before the board

15   of directors would hire a company's high level

16   management personnel, it would be that an

17   independent director initiate and the nominating

18   committee discuss about the nominee before the

19   hiring.

20   BY MR. LEVIN:

21       Q.   I'm just trying to see how it

22   functions.

23           You say there are three members of the

24   nominating committee?

25       A.   They are in charge of nominating the

Confidential - Subject to Further Confidentiality Review

1    company's high level management personnels

2    before hiring.

3        Q.    And two of them are independent?

4        A.    Yes.

5        Q.    And one is management?

6        A.    Yes.

7        Q.    And when you were on the -- when you

8    are on the nominating committee, you function as

9    the designated member for management, or of

10   management?

11       A.    No.  You're inaccurate.  I'm

12   inaccurate.  The Chairman of the Board is a

13   member of the nominating committee.

14       Q.    Am I correct that you were not a

15   member of the nominating committee?

16       A.    I am, but the Chairman of the Board is

17   the member of nominating committee, and I am the

18   Chairman of the Board.

19       Q.    Okay.  And how are the independent

20   members chosen?

21       A.    Chinese government has a supervision

22   department setting standard to choose

23   independent directors for those public listing

24   companies.  Those who are willing to become

25   independent directors of public listing company

Confidential - Subject to Further Confidentiality Review

1   would have to pass an examination.  After this

2   person had passed the examination, this person

3   would obtain a certificate.  All shareholders of

4   a public listing company can nominate

5   independent directors.  All nominees will be

6   submitted to the shareholders meeting of the

7   public listing company for voting, according to

8   the requirement of Chinese public listing

9   company.  The number of independent directors

10  cannot be less than one-third of the members of

11  the board of directors.  Independent directors

12  that are voted and decided by the shareholders

13  meeting would be -- will be having their name

14  submitted to Chinese government's supervising

15  authority to confirm that they do not have any

16  affiliation relationship, nor do they have any

17  conflict of interest, they're, in fact,

18  independent.

19       Q.   Who administers the exam that you

20  mentioned?

21       A.   Chinese supervision department for

22  public listing companies, the Security

23  Supervision Department.

24            MR. LEVIN:  I think this may be a good

25  time to take five minutes.

```
 1              THE VIDEOGRAPHER:  Off the record at

 2   11:02 a.m..  This concludes tape number two.

 3              (Whereupon, a recess was taken.)

 4              THE VIDEOGRAPHER:  We're back on the

 5   record at 11:25 a.m..  This is the beginning of

 6   tape three.

 7   BY MR. LEVIN:

 8       Q.   I also noticed, sir, another committee

 9   called a remuneration committee.  Are you a

10   member of that committee?

11       A.   Yes, I am a committee member.

12       Q.   During what years have you been a

13   member of that committee?

14       A.   I don't have a clear recollection.

15   It's been many years.

16       Q.   Are you presently a member?

17       A.   Yes.

18       Q.   What is the function of that

19   committee?

20              THE INTERPRETER:  Interpreter clarify

21   with witness.

22       A.   Its function is to decide the

23   compensation of BNBM's management level

24   personnels.

25   BY MR. LEVIN:
```

1    Q.   How often does the committee meet?

2    A.   Annually.

3    Q.   How many members are there of that

4  committee?

5    A.   Three.

6    Q.   And presently who are the three

7  members of that committee?

8    A.   I am one of them, the other two are

9  independent directors.

10    Q.   And who are the independent directors?

11    A.   I don't have a clear recollection on

12  that, but the chairperson of the remuneration

13  committee is an independent director.

14    Q.   And who -- in whose employ is he or

15  she?

16        THE INTERPRETER:  Interpreter needs to

17  clarify gender with deponent.

18    A.   It is an organization of the board of

19  directors.  There are three independent

20  directors; two gentlemen, one lady.  I do not

21  recall whether this chairman of the committee,

22  the independent director, is a lady or

23  gentleman.

24  BY MR. LEVIN:

25    Q.   In whose employ is this individual?

Confidential - Subject to Further Confidentiality Review

1      A.   This person is voted and selected by

2  the shareholders meeting.  This person is

3  accountable to BNBM Company, but this person is

4  not an employee of BNBM.

5      Q.   Whose employ is he in?

6      A.   The board of directors meeting, board

7  of directors meeting.

8           MR. BARR:  Who does he work for?

9      A.   This person is voted and selected by

10  the shareholders meeting.  This person is

11  accountable to BNBM Company, but not an employee

12  of BNBM Company.

13  BY MR. LEVIN:

14      Q.   Who is he --

15      A.   This is a very special organization.

16      Q.   Where does he work when he's not in

17  the remuneration committee?

18      A.   The independent directors can be an

19  expert in the field of strategy or in the field

20  of management, and the independent director can

21  also be a teacher, a scholar.  They have their

22  own employers.

23      Q.   We're talking about the three of you

24  today.

25           Now, what we've established, because

1   we've gotten to know you, that you're one of the

2   members of the remuneration committee.  Now I'm

3   interested in the other two.  Who are they

4   employed by on a regular basis when they're not

5   counting money for BNBM?

6       A.   One works at a CPA firm, another works

7   at a law firm, and another works at university.

8   Three of them.

9       Q.   So there are four members of the

10   remuneration committee, you and three others?

11       A.   I said that we are three.  But what I

12   said was that the independent directors are from

13   these three places, because I don't recall what

14   are -- who are the two independent directors

15   that also served in the remuneration committee.

16   Therefore when you were asking me the question

17   of their employers, I give you the employers of

18   all three.

19       Q.   Okay.  Who was the -- who is the CPA?

20       A.   I don't recall the name.  You'll find

21   them in our public announcement.  We have public

22   announcements for all.

23       Q.   When was the last time this

24   remuneration committee met?

25       A.   Last year.

1      Q.   And you don't recall the name of the

2   CPA that was there?

3      A.   I don't have a clear recollection of

4   that.

5      Q.   What was the name of the firm of the

6   CPA?

7      A.   I don't have a clear recollection.

8      Q.   Does the CPA -- is the CPA the CPA

9   firm for BNBMPLC?

10     A.   No.

11     Q.   Is he a CPA firm for either of the

12  CNBM entities?

13     A.   No.

14          MS. DALEY:  Objection to the form.

15  BY MR. LEVIN:

16     Q.   Does he perform CPA work, to your

17  knowledge, for Tiashan?

18          MR. BECKER:  Object to form.

19     A.   No.

20  BY MR. LEVIN:

21     Q.   The other member that you met with

22  last year, do you recall his name, or her name?

23     A.   We discuss issues in the meetings, but

24  I do not remember the names.

25     Q.   Do you remember who that individual --

Confidential - Subject to Further Confidentiality Review

```
 1              MR. LEVIN:  I'm sorry, Sunny.
 2   BY MR. LEVIN:
 3         Q.   Do you remember who that individual
 4   was employed by?
 5         A.   Which individual?
 6         Q.   The member of the committee, the
 7   independent member of the committee other than
 8   the CPA.
 9         A.   I said I do not remember their names
10   at this moment.
11         Q.   Do you remember who he's employed --
12   he or she were employed by?
13         A.   I do not remember at this moment.
14   It's easy to find out.
15         Q.   I'm asking you your recollection.
16         A.   I don't recall at this moment.
17         Q.   The third member, do you remember that
18   member's name that you met with at least one
19   year ago?
20         A.   Like I said, I cannot recall the name
21   at this moment.
22         Q.   Do you --
23              MR. BARR:  Just want to note for the
24   record before another question is posed that
25   documents have been produced, I'm not sure
```

1    whether it's the meeting, the board of directors

2    meeting minutes or the resolution, but the names

3    are all there.

4            MR. LEVIN:  I'm not interested in

5    getting the names from the document.  I'm

6    interested in getting names from the witness.

7            MR. BARR:  Those documents were

8    produced to you.  To facilitate this, if you

9    would put those documents in front of the

10   witness.  If you choose not to, this is slowing

11   down the process.

12           MR. LEVIN:  Because this is a de bene

13   esse deposition, I prefer to take it the way I

14   take it.

15           MR. BARR:  It all depends -- well,

16   never mind.

17           MR. LEVIN:  Going witness, he's gone.

18   It will be a jury trial, and they'll look at

19   him, they'll hear what he said and how he said

20   it.

21           MR. BARR:  They'll also hear there

22   were documents available and you chose not to

23   put them in front of him.

24           MR. LEVIN:  Exactly.

25           MR. BARR:  Fine.

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LEVIN:
 2        Q.   Whose employ was the third witness --
 3    strike that.
 4             In whose employ was the third
 5    independent member?
 6        A.   I don't know who is the third person
 7    you said.
 8        Q.   Were any of the independent members
 9    lawyers?
10        A.   One is a lawyer.
11        Q.   Which law firm was he employed by?
12        A.   I don't recall the name of the law
13    firm at this moment.
14        Q.   Does the law firm represent BNBM?
15        A.   No.
16        Q.   Does it represent CNBM?
17        A.   No.
18        Q.   Does it represent CNBM Group?
19        A.   No.
20        Q.   Does it represent Taishan?
21        A.   No.
22        Q.   Now, how do you go about establishing
23    remuneration for executives of BNBM?  What are
24    the criteria?  What's the protocol?
25        A.   It is decided according to the
```

1    performance of the company, and in reference to

2    the remuneration of other public listing

3    companies.

4        Q.   What do you mean by "the remuneration

5    of other public listing companies"?

6        A.   Because the remuneration of other

7    public listing companies are public, which we

8    can all see.

9        Q.   You compare it with other corporate

10   entities, is that what you're saying?

11       A.   We would reasonably decide the

12   remuneration of executives of BNBM in reference

13   to other public listing companies' remuneration,

14   and in accordance to the performance of BNBM

15   Company.

16       Q.   Do you decide salary and bonuses?

17       A.   Yes.

18       Q.   And do you decide remuneration for the

19   members of the board of directors of BNBM?

20       A.   No.

21       Q.   What -- how are the directors

22   compensated in BNBM?

23       A.   Directors do not receive compensation.

24   They only have an allowance.

25       Q.   Allowances for expenses?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Who determines the allowance?

 3        A.    The board of directors meeting.

 4        Q.    So they determine their own allowance?

 5        A.    According to Chinese public listing

 6   companies' custom, very little.

 7        Q.    Does BNBM -- strike that.

 8              Does the remuneration committee

 9   determine any compensation for any executives of

10   Taishan?

11        A.    It does not.

12        Q.    Did the remuneration committee ever

13   determine any compensation for Chairman Jia?

14        A.    No.

15        Q.    Did you ever determine a bonus for the

16   Chairman Jia?

17        A.    No.

18        Q.    Are you aware whether or not Chairman

19   Jia ever received a bonus from BNBM?

20              MR. BECKER:  Object to form.

21        A.    There has always been -- there has

22   only been --

23              THE INTERPRETER:  Interpreter corrects

24   herself.

25        A.    One exception, which is a special
```

Confidential - Subject to Further Confidentiality Review

1   bonus from shareholders.

2   BY MR. LEVIN:

3       Q.   And when was -- did Chairman Jia

4   receive an allowance when he sat on the board of

5   directors and was also Chairman of Taishan?

6       A.   What board?

7            MR. BARR:  Your question didn't

8   indicate which board you're referring to.

9   BY MR. LEVIN:

10      Q.   The BNBM board.

11      A.   All directors of BNBM's board receive

12  allowance, even though it is a small number of

13  allowance.

14      Q.   When you say "all," did that include

15  Chairman Jia?

16      A.   Chairman Jia is only the Chairman of

17  board of directors of Taishan Gypsum.  I don't

18  know what you mean.

19      Q.   Was he ever on the board of BNBM?

20      A.   For a period of time.

21      Q.   Any period of time?

22           MR. BARR:  Can you repose the

23  question?  Otherwise we're going to get lost

24  here.

25  BY MR. LEVIN:

Confidential - Subject to Further Confidentiality Review

1          Q.    I misunderstood.

2                What period of time?  What years?

3          A.    According to the requirement of

4     Chinese law to the public listing companies, all

5     directors during their -- during the time they

6     hold that position can receive a very low number

7     of allowance from the public listing company.

8     If you were asking about Mr. Jia TongChun during

9     his time as the director of BNBM, he also had

10    received an allowance, even though it's very

11    little.

12         Q.    What is very little?

13         A.    Only tens of thousands dollars per

14    year RMB in my recollection, only a few thousand

15    RMB per month, to my recollection.

16         Q.    A few thousand per month, there's

17    12 months in a year, so that could be 24,000?

18         A.    Perhaps.  I do not have a clear

19    recollection.

20         Q.    That you've characterized as a small

21    amount of money for serving on the board of

22    directors, correct?

23         A.    This is a basic number according to

24    Chinese company law, and according to Chinese

25    law for public listing companies.  It is not a

Confidential - Subject to Further Confidentiality Review

1    remuneration.

2         Q.    How many times a year does the board

3    of directors of BNBM meet?

4         A.    It varies.  Whenever there are issues

5    to be discussed by the board of directors

6    meetings, the meetings would be held.

7         Q.    How many times did it meet in the year

8    2014?

9         A.    I don't have a clear recollection.  We

10   have public announcements for it all.  Some of

11   the meetings are not publicly announced.

12        Q.    This was last year, sir.  Do you

13   remember how many times the board of directors

14   met last year?

15        A.    According to the requirements, the

16   board of directors meetings are supposed to be

17   held at least once a quarter, therefore four

18   times a year.  There would also be meetings held

19   for major investment issues.  So according to my

20   recollection, a few meetings in that respect

21   were held in 2014.

22        Q.    So you met four times in 2014, plus

23   two additional meetings, four quarterly meetings

24   and two additional, is that your recollection?

25              MR. BARR:  Object to the form of the

Confidential - Subject to Further Confidentiality Review

1    question.  Mischaracterizes the witness's

2    testimony.

3         A.   Who did they meet?  At the time

4    Mr. Jia was no longer the director.

5              MR. BARR:  He's asking simply how many

6    times did they meet in 2014.  He did not ask

7    about Mr. Jia.  Just listen to the question that

8    he's asking.

9              THE INTERPRETER:  This is interpreting

10   speaking.

11             The word "meet" in Chinese can be

12   interpreted as meet face-to-face, or meeting, an

13   official meeting.  So the way counsel formed his

14   question, the interpreter interpret it to meet

15   face-to-face instead of a formal meeting.

16             MR. BARR:  Then I would ask if

17   counsel --

18             THE INTERPRETER:  Can counsel for both

19   parties agree with that?

20   BY MR. LEVIN:

21        Q.   I'm referring to formal board

22   meetings.

23             MR. BARR:  Face-to-face?

24             MR. LEVIN:  Face-to-face.

25             THE INTERPRETER:  The interpreter will

Confidential - Subject to Further Confidentiality Review

```
 1    relay that to the witness.

 2         A.   You're correct.

 3    BY MR. LEVIN:

 4         Q.   Six?

 5         A.   I didn't say six.

 6              MR. BARR:  You need to listen to his

 7    question, because his question said six.

 8         A.   I did not hear the interpreter

 9    interpreting six.

10    BY MR. LEVIN:

11         Q.   Okay.  Let me tell you where the six

12    came from.

13              You said you had quarterly meetings,

14    that's four, and then I believe you said in 2014

15    you had two other meetings.

16              MR. BARR:  In the transcript is they

17    had a few other meetings.

18              MR. LEVIN:  "A few" became two with

19    me.

20    BY MR. LEVIN:

21         Q.   So it was at least six meetings?

22         A.   I said the quarterly meetings can be

23    held face-to-face or not face-to-face.

24         Q.   I see.

25              In 2014, how many face-to-face
```

1   meetings were held by the board of directors?

2       A.   I don't have a clear recollection on

3   the accurate number.  Because I'm a witness, I'm

4   not just chatting with you, I can't just

5   randomly give you a number.

6       Q.   Good.

7            At any of these, did you have any

8   special board of directors meetings dealing with

9   the contempt order in this case?

10           MR. BARR:  You need to specify

11  "company."

12           MR. LEVIN:  BNBM Company.

13      A.   No.

14  BY MR. LEVIN:

15      Q.   Did you have any meetings of the board

16  of directors ever dealing with the litigation

17  that's at issue in this deposition?

18           MR. BARR:  Solely with the litigation

19  or --

20           MR. LEVIN:  No.  Dealing in whole or

21  in part with the litigation.

22      A.   No.

23  BY MR. LEVIN:

24      Q.   Now, the years that -- I don't think I

25  got an answer for how many years Chairman Jia

Confidential - Subject to Further Confidentiality Review

```
 1    was on the board of directors of BNBM, the

 2    company.

 3            MR. BECKER:  Object to form.  Calls

 4    for speculation.

 5        A.   I don't have a clear recollection.

 6    BY MR. LEVIN:

 7        Q.   Excuse me?  You don't know.

 8        A.   I don't have a clear recollection.

 9        Q.   When Chairman Jia was on the board of

10    directors of BNBM, and you were on the board of

11    directors of BNBM, did you know that he owned 5

12    percent of the shares of Taishan?

13            MR. BECKER:  Object to form.

14        A.   I know that.

15    BY MR. LEVIN:

16        Q.   Did you know it then?

17        A.   When are you referring to?

18        Q.   When you were on the board of

19    directors of Taishan -- of BNBM, and Chairman

20    Jia was on the board of directors of BNBM, were

21    you aware that the Chairman owned 5 percent of

22    the shares of Taishan?

23        A.   I know Mr. TongChun Jia owns 5 percent

24    of the shares of Taishan Gypsum.

25        Q.   Did you know it at the time that you
```

Confidential - Subject to Further Confidentiality Review

1   were on the board of directors of BNBM and

2   Chairman Jia was also on the board of directors

3   of BNBM?

4        A.   Did I know Mr. TongChun Jia owns 5

5   percent of the shares of Taishan Gypsum?

6        Q.   We're having great difficulty here?

7             MR. BARR:  There's apparently, at

8   least from what I understand, issues in Chinese

9   language with tenses, so it is difficult, but I

10  think this is a translation language issue, with

11  no fault of anyone.

12            MR. LEVIN:  I'll accept that.

13            THE INTERPRETER:  This is interpreter

14  speaking.

15            The interpreter specifically used "did

16  you know at that time," which is Chinese way of

17  the tense, past tense.

18            MR. LEVIN:  I know this, Watergate.

19  BY MR. LEVIN:

20       Q.   At that point in time when you were on

21  the board of directors of BNBM and Chairman Jia

22  was also on the board of directors at that point

23  in time, did you know at that point in time that

24  Chairman Jia owned 5 percent of the shares of

25  Taishan?

1      A.   I knew.

2      Q.   Okay.  Did you report it to anybody,

3  any security agency or governmental authority,

4  that Chairman Jia was sitting on the board of

5  directors of BNBM and owned 5 percent of

6  Taishan?

7      A.   Taishan Gypsum's equity structure,

8  because Taishan Gypsum is the subsidiary of

9  BNBM, therefore it is public.  Mr. TongChun Jia

10 was elected as the director of BNBM by BNBM's

11 shareholders meeting.  All directors' records

12 are to be reported to supervision authority.

13     Q.   What is the supervision -- I'm sorry.

14     A.   So I don't need to report on that.

15 Everybody knows about it.

16     Q.   What is the supervision authority?

17          THE INTERPRETER:  The interpreter

18 needs a minute to correct translation of

19 supervision authority the witness had just said.

20     A.   China Securities Regulatory

21 Commission.

22          MR. BARR:  I was simply saying that we

23 should take a lunch break soon, given we started

24 so early.

25          MR. LEVIN:  Because we started

1    earlier.

2    BY MR. LEVIN:

3         Q.   What is the supervisory committee?

4              MR. BARR:  Objection to the form of

5    the question.  Mischaracterizes the witness's

6    testimony.

7              MR. LEVIN:  This is a new question.

8    I'm not basing it on anything the witness has

9    said.

10             MR. BARR:  Supervisory committee of

11   what?

12             MR. LEVIN:  Of BNBM.

13        A.   It is a legal entity based on the

14   requirements of Chinese company law.

15   BY MR. LEVIN:

16        Q.   And who -- are you a member of that

17   committee?

18        A.   No.

19        Q.   Have you ever been a member of that

20   committee?

21        A.   No.

22        Q.   What is the function of that

23   committee?

24        A.   Chinese law has distinct definitions

25   for its function.  For example, it supervises

Confidential - Subject to Further Confidentiality Review

1    the operation of companies to see whether it is

2    in compliance with the company charter and the

3    company law.

4         Q.   Who are the present members of that

5    committee?

6         A.   The members are -- one of them is

7    C-A-O space J-I-A-N-G-L-I-N, and another one

8    being H-U space J-I-N-Y-U, and another one is a

9    staff supervisor, which name I do not recall at

10   this moment.

11        Q.   How are they chosen?

12        A.   By BNBM's shareholders meeting.

13        Q.   Who was this individual named C-A-U --

14   C-A-O employed by?

15        A.   CNBM Company, Limited.

16        Q.   And who was the individual named Hu,

17   H-U, employed by?

18        A.   CNBM Company, Limited.

19        Q.   And who was the independent employed

20   by?

21        A.   It's a staff supervisor, not an

22   independent supervisor.  This person is an

23   employee of BNBM.

24             MR. LEVIN:  We can take lunch now.

25             MR. BARR:  Okay.

Confidential - Subject to Further Confidentiality Review

1                THE VIDEOGRAPHER:  We're off the

2    record at 12:09 p.m..

3                (Whereupon, a recess was taken.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              AFTERNOON SESSION

2

3              THE VIDEOGRAPHER:  We're back on the

4    record at 1:18 p.m..

5    BY MR. LEVIN:

6        Q.   Sir, what is the salary inspection

7    committee?

8        A.   Salary inspection committee, I have

9    not heard of this committee.

10             THE INTERPRETER:  Counsel, this is

11   interpreter speaking.

12             I have to correct translation of

13   salary inspection committee.  In Chinese,

14   sometimes the Chinese, the translation does not

15   correspond directly to the English.

16       Q.   How about the compensation and

17   assessment committee.  Let me -- he doesn't know

18   it, so let's go back on the record.

19             MR. BARR:  We're on the record.

20       A.   The committee, what organization?

21   BY MR. LEVIN:

22       Q.   BNBM.

23       A.   Is that organization under the board

24   of directors meeting, or at the management

25   level?
```

Confidential - Subject to Further Confidentiality Review

1       Q.   Under the board of directors meeting.

2       A.   I have not heard of this committee.

3            THE INTERPRETER:  Interpreter start

4    over again.

5       A.   I have not heard of this organization

6    in the board of directors meeting.

7       Q.   Have you -- how about the same

8    question under the management level committee?

9            THE INTERPRETER:  This is interpreter

10   speaking.

11           Maybe it will help if I have the

12   correct Chinese translation of the committee.

13   Sometimes the translation and the English

14   original do not correspond.

15           MR. BARR:  We don't have an objection

16   to translation of 307, if you want to put that

17   in front of him that will probably speed things

18   up.

19           MS. ROBERTSON:  Plaintiffs file,

20   offer, and introduce Exhibit 307.  It's a

21   translation of BNBMPLC-E-0105574.  This is an

22   exhibit that includes the PSC's translation, a

23   machine translation, and then the original

24   Chinese document.

25

1              (Whereupon, Exhibit Number 307,

2              9/28/2014 e-mail from Chen Hayoa to

3              Shi Keping re: Name lists of the

4              third, fourth and fifth sessions of

5              the compensation and assessment

6              committee, was marked for

7              identification.)

8              MR. BARR:  We have reviewed the PSC's

9    translation, and we do not have any changes to

10   it.

11             MS. ROBERTSON:  I hand one to the

12   witness and one to the court reporter, and we

13   will distribute to all counsel.

14             MR. BARR:  Give the witness just a

15   minute to review the document.

16   BY MR. LEVIN:

17        Q.   Go ahead.

18             (Witness reviewing document.)

19             MR. BARR:  Okay.

20   BY MR. LEVIN:

21        Q.   Sir, this document mentions the

22   compensation and assessment committee.  Could

23   you tell us what that committee is?

24        A.   It doesn't reflect here what company

25   it is.  BNBM's board of directors meeting has a

1    compensation and assessment committee.

2        Q.   And what does that committee do?

3        A.   This is what we have talked about in

4    the morning when we called it remuneration

5    committee.  It is the same committee.

6        Q.   That's the same committee as the

7    remuneration committee.  Got it.

8             What is the job classification of

9    H-A-O-Y-A space C-H-E-N?

10            THE INTERPRETER:  Interpreter is

11   clarifying gender.

12       A.   She is BNBM's audit department's

13   manager.

14   BY MR. LEVIN:

15       Q.   And what does she do as an audit

16   department manager, other than managing the

17   audit department?

18       A.   She is the general manager of the

19   auditing department, and the general manager's

20   assistant for BNBM.

21            THE INTERPRETER:  Interpreter would

22   like to start over again.

23       A.   She is the general manager of the

24   auditing department and the assistant to BNBM's

25   general manager.

1        Q.   How does she function?  As the manager

2    of the audit department, what does that

3    individual do?

4        A.   She is in charge of the company's

5    internal audit.

6        Q.   And what is the company's internal

7    audit?

8        A.   It is to audit the company's

9    production and management procedure to see if

10   any aspect of that would comply with Chinese

11   law, the Chinese company law and the company

12   charter.

13       Q.   And in that job classification, if she

14   finds an irregularity, does she write a report?

15            MR. BARR:  Objection to the form.

16       A.   Her job is to work according to the

17   company law, the country law, and the company's

18   charter.

19   BY MR. LEVIN:

20       Q.   And if she finds an irregularity, does

21   she write a report concerning the same?

22       A.   I don't know.  She does not report her

23   work to me.

24       Q.   What exchange, securities exchange is

25   BNBMPLC on?

1      A.   In Schenzhen Security Exchange.

2      Q.   Does this individual that we were

3  speaking of make reports to that Securities

4  Exchange?

5      A.   No.  Well, I don't know, but I don't

6  think so.

7      Q.   Did she ever determine that there was

8  an irregularity with regard to corporate

9  formality with regard to any payments to

10  Chairman Jia?

11          MR. BARR:  Object to the form.

12      A.   I don't know.

13  BY MR. LEVIN:

14      Q.   Have you ever become aware of an audit

15  of BNBM by CNBM concerning Chairman Jia's

16  resignation from the BNBM board?

17          MR. BECKER:  Object to form.

18      A.   I'm not part of it.

19  BY MR. LEVIN:

20      Q.   Did there come a time when Chairman

21  Jia left the board of BNBM?

22      A.   Yes.

23      Q.   And did you ever speak with Chairman

24  Jia as to the reason he left the board?

25      A.   The reason Mr. Jia Tongchun no longer

Confidential - Subject to Further Confidentiality Review

1   was in the board of BNBM is because there had

2   been the implementation of a new policy from

3   Chinese government.

4        Q.   When was this new policy promulgated?

5        A.   I believe in around 2012.

6        Q.   What was this new policy?

7        A.   If an individual holds equity of a

8   company, he cannot hold the position of a

9   director or the position of an executive in the

10  company's shareholding company.

11       Q.   And have you seen this new regulation

12  or law?

13       A.   Yes.

14       Q.   And was it dated 2012?

15       A.   I don't have a clear recollection, but

16  I'm aware of the regulation, and I believe it

17  was the date.  The regulation is also public.

18       Q.   Was the regulation promulgated prior

19  to 2012?

20       A.   I remember it was in 2012.  I do not

21  remember the accurate time, but it was a year

22  when Mr. Jia Tongchun no longer holds a

23  position.  To my knowledge, he resigned from the

24  position because of the reason.

25       Q.   Was it a SASAC regulation?

Confidential - Subject to Further Confidentiality Review

1         A.   I do not have a clear recollection.

2    Perhaps it is a regulation of security

3    regulatory authority.  It might be a unified

4    regulation of a few authorities perhaps.

5         Q.   Would SASAC be one of the entities

6    that you defined as a few of our authorities?

7         A.   I don't have a clear recollection.

8    Maybe.

9         Q.   Did CNBM conduct an audit of BNBM

10   prior to Chairman Jia's resignation that dealt

11   with Chairman Jia's position at BNBM?

12        A.   I have not heard of that.

13        Q.   Did there come a time when Chairman

14   Jia received a bonus from BNBM for the work that

15   he did at Taishan?

16        MR. BECKER:  Object to form.  Vague.

17        A.   I remember in one year, because

18   Taishan Gypsum's business performance had

19   exceeded the expectation and below the budget,

20   therefore beside receiving Taishan Gypsum's own

21   bonus Chairman Jia was also given a special

22   bonus from BNBM as Taishan Gypsum's shareholder.

23   BY MR. LEVIN:

24        Q.   As a shareholder, did BNBM give

25   anybody else a bonus?

Confidential - Subject to Further Confidentiality Review

1       A.   Are you referring to other people in

2    Taishan Gypsum?

3       Q.   I'm referring to other people in the

4    world.

5       A.   We had once given BNBM Housing's

6    general manager a bonus for the reason that its

7    business performance was extremely good, and it

8    was below the budget.

9       Q.   So at least in that year, did you get

10   -- did BNBM get dividends from Taishan?

11           MR. BARR:  Object to the form.

12      A.   I remember Taishan Gypsum has very

13   good dividends every year.

14   BY MR. LEVIN:

15      Q.   So if I'm not mistaken, at least in

16   this year you got dividends from Taishan, and

17   you gave back a bonus to Jia from BNBM's funds,

18   is that correct?

19           MR. BARR:  You don't mean this year,

20   which is what you --

21           MR. LEVIN:  The year of the bonus.

22      A.   The fact BNBM as the shareholder had

23   given the Chairman and general manager of

24   Taishan Gypsum a special bonus had nothing to do

25   with the dividends, because Taishan Gypsum's

Confidential - Subject to Further Confidentiality Review

```
 1    dividends is decided by Taishan Gypsum's board

 2    of directors and shareholders meeting.  It is

 3    not decided by BNBM.

 4    BY MR. LEVIN:

 5         Q.   How many board members of Taishan

 6    Gypsum were appointed by BNBM that year?

 7         A.   There were three that were nominated

 8    by BNBM, and voted and selected by the

 9    shareholders meeting of Taishan Gypsum and

10    serving Taishan Gypsum.

11         Q.   And how many board members were there

12    that year of Taishan Gypsum, the year in which

13    three of them were BNBM types?

14              MR. BECKER:  Object to form.

15              MR. BARR:  Object to form.

16         A.   Total, five.

17    BY MR. LEVIN:

18         Q.   How much was the payment to Chairman

19    Jia that came from BNBM funds?

20         A.   I do not have an accurate

21    recollection.  It was many years ago.  It

22    perhaps was 500,000, but it wasn't accurate.

23              MR. BARR:  Was that 500,000 RMB, or

24    $500,000.

25         A.   RMB.
```

```
 1   BY MR. LEVIN:

 2       Q.   Was there a second payment made to Jia

 3   ever?

 4            MR. BARR:  Object to the form.

 5       A.   No.

 6            MR. BARR:  It gets me depressed every

 7   time I see you go backwards in your notebook.

 8            MR. LEVIN:  Sometimes I refer back to

 9   my pre-13 upbringing.

10            MR. BARR:  Okay.  I'll accept that.

11   BY MR. LEVIN:

12       Q.   Let's go to Exhibit 316.  We do have a

13   translation now?

14            (Whereupon, Exhibit Number 316-R,

15            Partial Translation of

16            BNBMPLC-E-0005889-5892 - Wang Bing's

17            Welcome Speech on the 2008 BNBM Annual

18            Marketing Meeting (Redlined), was

19            marked for identification.)

20            MS. ROBERTSON:  Previously the PSC

21   offered and introduced Wang Exhibit 316 which

22   was a partial translation of BNBMPLC-E-0005889

23   through 5892.  But again, that was just a

24   partial.

25            Over the lunch break Defendants and
```

1  the PSC came to an agreement that the PSC's

2  partial translation was redlined by the

3  Defendants, and we have agreed to the redlines

4  provided by the Defendants, and we now offer

5  Exhibit 316-R as supplement to the original 316,

6  which included the machine translation and the

7  Chinese original document.  The PSC's

8  translation refers specifically in the Chinese

9  document to Bates BNBMPLC-E-0005889, and is

10  highlighted to reflect the portion that the PSC

11  translated.

12  BY MR. LEVIN:

13      Q.   Sir, does this document which has been

14  produced by BNBM in this litigation state as

15  follows:  "In 2007, under the correct leadership

16  and strong support of CNBM and the correct

17  decision-making of the BNBM board of directors,

18  BNBM, according to the requirements of CNBM

19  Group's 'unified, modelized, streamlined,

20  systemized, and digitized' management model,

21  fully implemented KPI management, and

22  satisfactorily accomplished the three missions

23  given by the Group."

24          Is that what it says?

25      A.   I think that's what the document says.

```
 1        Q.   Let's go forward.

 2             Is BNBM bound by SASAC regulations?

 3             MR. BARR:  Objection to the form.

 4   Calls for a legal conclusion.

 5        A.   The SASAC regulation -- well, BNBM

 6   Company, Limited does not have a direct

 7   relationship with SASAC.

 8   BY MR. LEVIN:

 9        Q.   Do you abide by directives of SASAC in

10   connection with your commercial activities?

11        A.   BNBM's operation is in accordance with

12   the company law as well as the regulations for

13   public listing companies.  No directives from

14   SASAC had been received.

15        Q.   So SASAC does not give you -- strike

16   that.

17             You receive no directives from SASAC

18   in connection with your commercial activities at

19   BNBM, is that correct?

20        A.   Correct.

21        Q.   What is SASAC?

22        A.   SASAC is a Chinese government

23   department.

24        Q.   And what do they do?  What is their

25   task?
```

1        A.   I'm not sure about that.  Chinese

2   government website has the introduction.

3        Q.   I'm not asking you to tell me where I

4   might find the answer.  I'm interested in what

5   you know concerning -- and your ability to

6   answer the questions that I ask you.

7             So my question is, what does SASAC do?

8   What function do they serve?

9             MR. BARR:  Objection, vague.

10   Objection, form.  Objection, lack of foundation.

11             You may answer.

12        A.   I'm not a SASAC staff, and my daily

13   work does not deal with SASAC as well.  If I

14   were to learn about SASAC, I would also just get

15   information from Chinese government's website.

16   BY MR. LEVIN:

17        Q.   Let's move on to Exhibit 133.

18             MS. ROBERTSON:  In this deposition,

19   Plaintiffs offer, file, and introduce

20   Exhibit 133.  But to make the record clear,

21   Exhibit 133 was previously introduced in these

22   rounds of depositions, and this was first seen

23   in the deposition of Mr. Chen Yu, the 30(b)(6)

24   deponent for BNBMPLC, as a result, it is marked

25   as B:7/8/15-7/11/15 Exhibit 133.

```
 1                  (Whereupon, Exhibit Number 133,

 2                  Previously marked Partial Translation

 3                  of CNBMGRP0009807-9838 -

 4                  (CNBMGRP0009832-9833): Problems

 5                  Discovered during Auditing

 6                  Review - CNBM Co. Ltd re "BNBM

 7                  and Taishan Gypsum separately

 8                  received services of summons" of

 9                  "Lawsuit on American Drywall" and

10                  Audit of BNBM outlining Jia's

11                  resignation from BNBM's Board of

12                  Directors.)

13             MS. ROBERTSON:  It's a partial

14    translation of CNBMGRP00009807-9838.  This is a

15    PSC translation followed by the full range of

16    machine translations followed by the Chinese

17    original.  Defendants did subsequently redline

18    this exhibit.  At this time there is not an

19    agreement between Defendants' redlines and the

20    PSC's red lines of this exhibit.

21             MR. BARR:  Can you also please just

22    indicate for the record where this document came

23    from?

24             MS. ROBERTSON:  CNBMGRP000098070

25    through 9838.  It was from the CNBM Group
```

1   production.

2           MR. BARR:  Okay.

3           MR. LEVIN:  For now let's go to the

4   next one so we can proceed.  Let's go to

5   Exhibit 134, Pearl.

6           (Whereupon, Exhibit Number 134-R,

7           Translation of BNBMPLC-E-0010163 -

8           SASAC Audit of Economic

9           Responsibility - BNBM should

10          improve relevant management

11          regulations (Redlined),

12          was marked for identification.)

13          MS. ROBERTSON:  Exhibit 134-R was also

14   introduced at Chen Yu's deposition, bears the

15   Exhibit Number B:7/8/15 through 7/11/15.

16   Exhibit 134.  This is a translation of

17   BNBMPLC-E-0010163, and BNBM document.  It has

18   the PSC's translation followed by the machine

19   translation, followed by the Chinese original

20   document.

21   BY MR. LEVIN:

22       Q.  Sir, take a look at that document.

23   After you reviewed it tell me whether you've

24   seen it before.

25       A.  I have not seen this document before.

Confidential - Subject to Further Confidentiality Review

1      Q.   Are you familiar with the subject

2   matter of this document?

3      A.   I don't think this Audit of Economic

4   Responsibility is to us.  I believe it is to the

5   state-owned SASAC enterprises.

6           MR. LEVIN:  Time.  Off the record.

7           THE VIDEOGRAPHER:  We're off the

8   record at 1:59 p.m..

9           (Off the record discussion.)

10          THE VIDEOGRAPHER:  We are back on the

11  record at 2:01 p.m..

12  BY MR. LEVIN:

13     Q.   Sir, are you familiar with the subject

14  matter of this document?

15     A.   I see here entitled "SASAC Audit of

16  Economic Responsibility."  I believe it is to

17  audit the state-owned SASAC enterprises.

18     Q.   Sir, does this appear to be an audit

19  of SASAC of BNBM and make certain findings as a

20  result of that audit?

21     A.   On the second paragraph I see it says

22  municipal entity, Taishan Gypsum.

23          THE INTERPRETER:  Interpreter needs to

24  correct herself.

25          Instead of the municipal, the word

1   municipal, it should have been interpreted as a

2   fourth-tier enterprise.

3        Q.   Sir, your counsel has agreed to the

4   translation that I'm using, so for purposes of

5   my questioning please accept this translation.

6   Now I'll ask you a question.

7             Does this appear to be a statement of

8   an audit by the state-owned asset supervision

9   and administration commission of BNBM?

10       A.   No.

11            MR. BARR:  Objection.  The document

12  speaks for itself, please note for the record.

13  BY MR. LEVIN:

14       Q.   Sir, this document states as

15  translated and agreed to by your attorneys, "1.

16  Issue of Investment Management."

17            (1) Audit Opinion:  Issues on some

18  subsidiaries' responsible personnel violating

19  regulations on shareholding and dividend

20  distribution.  BNBM should improve relevant

21  management regulations, earnestly clean up and

22  make rectification according to the relevant

23  requirements of the State-owned Asset

24  Supervision and Administration Commission.

25            Do you see that in the first

Confidential - Subject to Further Confidentiality Review

1    paragraph?

2           THE INTERPRETER:  This is interpreter

3    speaking.

4           Does counsel want the interpreter to

5    read off the Chinese version?

6           MR. LEVIN:  No.

7           MR. BARR:  If you could point out the

8    paragraph that was just read so he could read it

9    for himself.  Sunny, could you do that?

10          THE INTERPRETER:  Yes.  Interpreter

11   found in the Chinese version it did not have the

12   word "BNBM," but the interpreter would be happy

13   to direct the witness of what had been read by

14   counsel.

15       A.   I see the Chinese paragraph.

16   BY MR. LEVIN:

17       Q.   Well, your counsel has agreed to an

18   interpretation that includes BNBM in it.

19       A.   I do not see the word BNBM or Beijing

20   New Building Material.

21       Q.   And, sir, this document was produced

22   in this litigation by BNBMPLC.  Are you aware of

23   that?

24       A.   I do not know that.

25       Q.   And, sir, isn't it important for BNBM

1    to maintain corporate formalities?

2           THE INTERPRETER:  May interpreter have

3    the definition of "formalities"?  Rules?

4           MR. LEVIN:  Corporate practices.

5       A.   I'm sorry.  I did not hear your

6    question clearly.

7    BY MR. LEVIN:

8       Q.   Sir, isn't it important for BNBM to

9    maintain corporate formalities?  You indicated

10   to me you didn't know the meaning of the word

11   formalities, and I said how about utilizing and

12   instead corporate practices?

13          MR. BARR:  It was the interpreter that

14   had asked for the definition of formalities.

15   Why don't you just repose your question and

16   let's see if he can answer.  If he can't, it's

17   an interpreter issue, not the witness.

18          MR. LEVIN:  I was not aware of that.

19   I apologize.

20   BY MR. LEVIN:

21      Q.   Do you know, the witness know, the

22   meaning of formalities?

23          THE INTERPRETER:  The interpreter

24   would use the definition counsel just gave

25   interpreter for formalities, which is rule or

Confidential - Subject to Further Confidentiality Review

1    practice.

2                MR. LEVIN:  Okay.

3         A.   I believe so.

4                MR. LEVIN:  Let's take five minutes.

5                THE VIDEOGRAPHER:  We're off the

6    record at 2:09 p.m..  This concludes tape number

7    three.

8                (Whereupon, a recess was taken.)

9                THE VIDEOGRAPHER:  We are back on the

10   record at 2:44 p.m..  This is the beginning of

11   tape four.

12   BY MR. LEVIN:

13        Q.   I'm going to ask you some very easy

14   questions now.

15               You're a director of BNBM and you're a

16   director of Taishan, am I correct?

17        A.   Correct.

18        Q.   And what do you do at Taishan as a

19   director of Taishan, and also a director of

20   BNBM?

21               MR. BARR:  I'd appreciate it if you

22   would break down the two questions.

23   BY MR. LEVIN:

24        Q.   What do you do at Taishan as a

25   director of Taishan?

Confidential - Subject to Further Confidentiality Review

1        A.    According to the law, to attend

2    Taishan Gypsum's board of directors meetings.

3        Q.    What law?

4        A.    Company law, and relevant Taishan

5    Gypsum's company charter.

6        Q.    What type of matters do you handle at

7    a normal Taishan board of directors meeting?

8            MR. BARR:  Object to the form.

9        A.    Mainly issues according to the law and

10   company law; for example investment, for example

11   the nomination of Taishan Gypsum's management

12   personnels.

13       Q.    And do you ever consider in the

14   Taishan board of directors issues that have to

15   do with BNBM?

16           MR. BECKER:  Object to form.  Vague.

17           MR. BARR:  Join the objection.

18       A.    According to the regulation of Chinese

19   law as well as company law, companies' directors

20   all serve the company itself, therefore when I

21   attend Taishan Gypsum board of directors meeting

22   as Taishan Gypsum's director, I'm only Taishan

23   Gypsum's director, not somebody who holds any

24   position in BNBM.

25   BY MR. LEVIN:

1          Q.   I'll ask the question again.  Please

2     answer this question, not the one that you want

3     me to ask.

4               When you sit in the board of directors

5     at Taishan, do you have occasion to discuss

6     Taishan's relationship with BNBM?

7               MR. BARR:  Translate, and then I have

8     an objection.

9               MR. BECKER:  Object to form.  Vague.

10              MR. BARR:  I object to the

11    mischaracterization of the witness's prior

12    testimony which was directly responsive to the

13    prior question.

14              But you may answer the new question

15    that was just posed.

16         A.   No.

17    BY MR. LEVIN:

18         Q.   When you sit on the board of directors

19    of BNBM, do you ever discuss the relationship

20    that BNBM has with Taishan?

21         A.   No.

22         Q.   But three of the directors of Taishan

23    were appointed by BNBM, am I correct in that?

24              MR. BARR:  Objection.  Argumentative.

25         A.   Correct.

Confidential - Subject to Further Confidentiality Review

1    BY MR. LEVIN:

2        Q.   Did you ever join a judgment in your

3    own mind as to why BNBM was interested in having

4    three of five directors of Taishan appointed by

5    themselves?

6            MR. BARR:  Objection.  Form, vague.

7            MR. BECKER:  Also mischaracterizes the

8    witness's testimony.

9        A.   According to the regulation of the

10   Chinese law, all shareholders can nominate

11   directors.  Currently there are three Taishan

12   Gypsum's directors that were nominated by BNBM,

13   and voted and selected by Taishan Gypsum's

14   shareholders meeting.

15   BY MR. LEVIN:

16       Q.   How many -- I'm sorry.

17           MR. BARR:  Were you done with your

18   answer?

19       A.   No.

20           When these three directors were

21   elected as Taishan's directors, according to the

22   law they were responsible.

23           THE INTERPRETER:  Interpreter would

24   like to start over again.

25       A.   According to the law, they were

1  accountable to Taishan Gypsum.  According to the

2  law, if the issue -- if the issues in the board

3  of directors of Taishan Gypsum had anything to

4  do with its transaction with BNBM, these three

5  directors who were nominated by BNBM and elected

6  by Taishan Gypsum's shareholders meeting would

7  recuse themselves from voting.

8  BY MR. LEVIN:

9      Q.   Are you finished?

10     A.   Yes.

11     Q.   Did I ever today or yesterday ask you

12 to opine on the law of China when I asked you a

13 question?  Did I?

14          MR. BARR:  Objection.  Objection to

15 the form of the question.  Objection, vague.

16 And objection, misstates probably 99 percent of

17 the deposition so far.

18          But you may answer.

19     A.   Many questions were asked, and you

20 have asked about the requirements, relevant

21 requirements.

22 BY MR. LEVIN:

23     Q.   I'm going to ask you, sir, without

24 going back and asking you about everything,

25 because the record is the record, but if I ask

Confidential - Subject to Further Confidentiality Review

1    you a question that deals with facts, you don't

2    have to say each and every time "according to

3    the laws of China I did this."

4             Do you understand what I'm telling

5    you?  That's not a question, that's an

6    admonition.

7             MR. BARR:  You're not entitled to give

8    admonitions or instructions to the witness.

9    You're entitled to ask questions, and the

10   witness will respond to questions.

11   BY MR. LEVIN:

12       Q.   As director of BNBM, do you ever vote

13   on matters related to Taishan?

14       A.   As the director of BNBM, to vote in

15   the board of directors meeting of BNBM, or board

16   of directors in Taishan?

17       Q.   Board of directors meeting of BNBM.

18       A.   There would have many issues related

19   to Taishan Gypsum in the board of directors

20   meeting of BNBM.  I have voted all.

21       Q.   And you've never recused yourself from

22   such a vote because you're also on the board of

23   Taishan, have you?

24       A.   Taishan Gypsum is not the shareholder

25   of BNBM.  I had become the director of Taishan

1  Gypsum without the nomination of BNBM, therefore

2  I do not need to recuse myself for Taishan

3  Gypsum's issues.

4      Q.   Now, the board of the directors of

5  Taishan were approved by the shareholders of

6  Taishan, is that correct?

7      A.   They were elected by Taishan Gypsum's

8  shareholders meeting.

9      Q.   Right.

10         And at the shareholders meeting, only

11  the shareholders of Taishan have a vote, is that

12  correct?

13      A.   All Taishan Gypsum's shareholders can

14  vote.

15      Q.   And is it a fact -- well, what

16  percentage of the shares are owned by BNBM?

17         MR. BECKER:  At what time are we

18  talking about?

19      A.   BNBM directly owns 42 percent of

20  Taishan Gypsum's shares, and through a

21  subsidiary company it owns 23 percent of the

22  shares.

23  BY MR. LEVIN:

24      Q.   And what is the subsidiary company?

25      A.   It's called D-O-N-G-L-I-A-N Investment

1    Company, Limited.

2         Q.   And who owns that company?

3         A.   BNBM owns 100 percent of this

4    company's equity.

5         Q.   Now, there's another shareholder,

6    Taian State-owned Asset Management Company.  Do

7    they own shares of Taishan?

8         A.   Yes.

9         Q.   And who owns Taian State-owned Asset

10   Management Company?

11        A.   Taian Municipal Government.

12        Q.   And there's another shareholder,

13   Shandong Taihe Building Material Company,

14   Limited.  Could you tell me something about that

15   company?  What does that company do for

16   business?

17             MR. BARR:  What is the timing?

18             MR. LEVIN:  Let's say currently.

19        A.   To my knowledge, this company is owned

20   by some individual investors.  Beside it own

21   some of Taishan Gypsum's equities, it also does

22   other businesses.

23   BY MR. LEVIN:

24        Q.   Who are some of the -- who are the

25   individual investors in Shandong?

Confidential - Subject to Further Confidentiality Review

```
1        A.    What company?

2        Q.    Shandong Taihe Building Materials

3   Company.

4        A.    Perhaps some of them are in the

5   management, or some others which I'm not sure.

6   The staff.

7        Q.    Are any of the owners, any of the

8   investors, executives of BNBM?

9        A.    No.

10            MR. BARR:  He said no.

11  BY MR. LEVIN:

12       Q.    Does Chairman Jia own 5 percent of

13  Taishan?

14       A.    Yes.

15       Q.    Has Chairman Jia at any time owned any

16  shares of Shandong Taihe Building Materials

17  Company, Limited?

18       A.    I don't know.

19       Q.    Did BNBM ever make a loan to Taian

20  State-owned Management Asset -- Taian

21  State-owned Asset Management Company, Limited?

22            MR. BARR:  Let's make sure --

23            THE INTERPRETER:  I did say Taian.

24            MR. BARR:  Okay.

25       A.    It happened, I believe, according to
```

1    my recollection, once many years ago.

2         THE INTERPRETER:  Interpreter needs

3    clarifying.

4         A.   It happened.

5    BY MR. LEVIN:

6         Q.   It happened.

7         THE INTERPRETER:  The interpreter

8    would like to withdraw her interpretation for

9    the word "once," upon clarifying the deponent.

10        A.   I do not have a clear recollection on

11   the details.

12        Q.   Is it a fact, sir, that the money

13   loaned by BNBM to that entity was used by that

14   entity to purchase Taishan stock?

15        MR. BECKER:  Object to form.

16        MR. BARR:  Object to form.

17        A.   I don't know.

18   BY MR. LEVIN:

19        Q.   After that money was lent to Taian

20   State-owned Asset Management Company, did the

21   stock of Taishan -- was it pledged as security

22   for purposes of that loan?

23        A.   Yes.

24        Q.   Now, sitting on both boards, did you

25   ever find yourself conflicted by an issue that

```
 1   was before either board?

 2           THE INTERPRETER:  Interpreter needs

 3   clarification from counsel.  When you said "if

 4   ever find yourself conflicted," did you mean

 5   conflict of interest, or conflicted of the

 6   issues?

 7           MR. LEVIN:  I mean --

 8           THE INTERPRETER:  He's conflicted by

 9   the issues?

10   BY MR. LEVIN:

11       Q.   Conflict of interest, sir.

12       A.   Did you mean when I was the directors

13   of both boards, had I ever encountered a

14   conflict of interest?

15       Q.   Yes.

16       A.   I don't recall that ever happened.  If

17   there were, according to the regulation of the

18   law I should have had recused myself from

19   voting.

20       Q.   So that when you vote as a director of

21   Taishan, you're in no way impinging on any of

22   the rights or obligations of BNBM, is that

23   correct?

24           MR. BARR:  Object to the form.

25           THE INTERPRETER:  May interpreter have
```

Confidential - Subject to Further Confidentiality Review

1    the definition of "impinging" here?

2            MR. LEVIN:  Strike the question.

3    BY MR. LEVIN:

4        Q.   When you vote as a director of

5    Taishan, often it's not only for the benefit of

6    Taishan, but it's for the benefit of BNBM as

7    well, is it not?

8            MR. BECKER:  Object to form.

9        A.   No.  When I vote as a director of

10   Taishan Gypsum, according to the law I am

11   accountable to the interest of Taishan Gypsum.

12   I would only vote representing Taishan Gypsum.

13   BY MR. LEVIN:

14       Q.   And if you had to vote at Taishan

15   Gypsum and you were accountable only to the

16   board of Taishan Gypsum, and the vote was

17   adverse to BNBM, would you recuse yourself?

18       A.    When I vote as a director of Taishan

19   Gypsum, I only represent Taishan Gypsum.  I do

20   not have the position or interest of BNBM.

21       Q.   If it was adverse, that was my

22   question, to the interest of BNBM, would you

23   recuse yourself?

24       A.    I have never encountered a situation

25   such as this.

1      Q.   When you vote as a director of BNBM

2   concerning matters of Taishan, have you ever

3   found yourself in a position where your vote at

4   BN would adversely affect the operation of

5   Taishan?

6      A.   We have never assessed if any issue

7   would adversely affect Taishan Gypsum, because

8   issues that are dealt with in BNBM's board of

9   directors meeting all represent the interest of

10   BNBM.  We would not consider other companies.

11      Q.   Even though they represent the

12   interests of BNBM, they do at times affect the

13   interests of Taishan, do they not?

14      A.   I don't understand.  What do you mean

15   by that?

16      Q.   Let me give you an example.

17           Are you ready?

18      A.   All right.

19      Q.   There are guaranties that BNBM makes

20   on behalf of Taishan, am I correct?

21      A.   Correct.

22      Q.   And certainly when you vote in BNBM to

23   make a guaranty for Taishan, it's beneficial to

24   BNBM, and it's also beneficial to Taishan, is it

25   not?

Confidential - Subject to Further Confidentiality Review

1      A.   When we vote for the guaranty in the

2  board of directors of BNBM, we would only

3  consider whether it is beneficial to BNBM.

4      Q.   But it would also be beneficial to

5  Taishan, would it -- wouldn't it?

6      A.   This is your speculation.

7      Q.   Well, do you ever discuss --

8          MR. BARR:  Before you -- let's take a

9  break for just one moment.

10          MR. LEVIN:  Do you have to go to the

11  bathroom?

12          MR. BARR:  No, I want to take a break

13  for a moment.

14          THE VIDEOGRAPHER:  Off the record?

15  We're off the record at 3:15 p.m..

16          (Whereupon, a recess was taken.)

17          THE VIDEOGRAPHER:  We're back on the

18  record at 3:21 p.m..

19          MS. ROBERTSON:  Plaintiffs now offer

20  and introduce Exhibit 61 to this deposition.

21          (Whereupon, Exhibit Number 61, Knauf

22          e-mail and letters to Song

23          Zhiping and Wang Bing, with

24          Attachments, previously was marked for

25          identification.)

Confidential - Subject to Further Confidentiality Review

```
1              MS. ROBERTSON:  Exhibit 61 was
2    previously marked as C:6/5/15-6/7/15, and
3    provided to the Defendants.
4              For the record, Exhibit 61 is preceded
5    by an e-mail cover page at KNAUFGIPS,
6    KNAUFGIPS0160544.  Following the e-mail are two
7    letters with their attachments ranging from
8    Bates KNAUFGIPS0160545 through 0160888.
9              For the convenience of Defendants and
10   the interest of time, the PSC has excerpted the
11   portions from this previously provided exhibit
12   to Defendants today so we can all follow along.
13             MR. BARR:  Can you explain for the
14   witness's benefit, because he's not familiar
15   with Bates numbering and the like, from whose
16   files this document came?
17             MR. LEVIN:  Yes.
18             MS. ROBERTSON:  These documents were
19   produced in this litigation, but not necessarily
20   for your deposition, and certainly not from your
21   lawyers, but from the lawyers for Knauf.
22             MR. BARR:  That's fine.
23   BY MR. LEVIN:
24        Q.   Sir -- are we -- of course.
25             MR. BARR:  Otherwise Pearl would have
```

Confidential - Subject to Further Confidentiality Review

1    wasted a lot of breath.

2    BY MR. LEVIN:

3        Q.   Are you familiar with the German

4    company Knauf?

5        A.   I've heard of it.  It's also in the

6    same industry as us.

7        Q.   And does this company have ownership

8    of companies in China that compete with your

9    companies?

10       A.   Yes.

11       Q.   And are they manufacturers of

12   plasterboard?

13       A.   I think so.

14       Q.   And just so we can have a discussion,

15   what are the properties of plasterboard?  What

16   are the ingredients?  What materials are used to

17   create wallboard or plasterboard?

18       A.   It is a type of paper and plaster,

19   gypsum.

20       Q.   Where does gypsum come from -- I'm

21   sorry.

22       A.   Desulphurized plaster.

23       Q.   Where does gypsum come from?

24       A.   I am not in charge of the procurement

25   of the gypsum, but I've heard they're mainly

 1    from power stations.

 2         Q.   Does any of the ingredients of the

 3    plasterboard come from mines?

 4         A.   As far as I know, all the ingredients

 5    of gypsum of BNBM are from power stations.

 6         Q.   How about the ingredients of Taishan's

 7    wallboard?

 8         A.   I don't know.

 9         Q.   What was your job classification in

10    2009?

11         A.   I was BNBM's Chairman of the Board.

12         Q.   Did you have a relationship with

13    Taishan at that time?

14              MR. BARR:   Object to the form.

15         A.   I was a director of Taishan Gypsum.

16    BY MR. LEVIN:

17         Q.   When was the first time that you

18    learned that there was an issue with the

19    plasterboard in the Gulf states of the United

20    States?

21         A.   I don't have a clear recollection.   I

22    remember the legal department reported to me

23    that there had been some complaints in the

24    United States which led to some lawsuits.

25         Q.   And did the legal department tell you

Confidential - Subject to Further Confidentiality Review

1    that they came in possession of those lawsuits?

2              MS. EAGAN:  Object to form.

3              MR. BARR:  Object to form.

4              Can you rephrase that?

5              MR. LEVIN:  No.

6              MR. BARR:  Possession of lawsuits, is

7    that what --

8              MR. LEVIN:  Lawsuit paper.

9              MS. EAGAN:  Object to form.

10             MR. LEVIN:  Michael, you're right.

11   Strike that question.

12   BY MR. LEVIN:

13        Q.   Did the legal department tell you that

14   they had been come in possession of complaints

15   and petitions that had been filed in US courts

16   in connection with those lawsuits?

17        A.   They did not tell me that.  I have not

18   heard of that.

19        Q.   Did you ever see any of the papers

20   that were filed in US courts concerning these

21   lawsuits?

22        A.   No.

23        Q.   Did you ever hear of the Luneng mine?

24        A.   No.

25        Q.   Did you ever learn where Knauf got its

Confidential - Subject to Further Confidentiality Review

```
 1   product to manufacture its plasterboard in

 2   China?

 3        A.   I don't know.

 4        Q.   Sorry.

 5             As a director of Taishan, did you ever

 6   discuss these lawsuits at a board of directors

 7   meeting?

 8        A.   Once the management personnel of

 9   Taishan Gypsum reported the situation of the

10   lawsuits in Taishan's board of directors

11   meeting.

12        Q.   And who was the one that made this

13   report?

14        A.   A few management personnels of Taishan

15   Gypsum.

16        Q.   What were their names?

17        A.   I do not have a clear recollection,

18   but I remember Chairman Jai had also made the

19   report.

20        Q.   When was this board of directors

21   meeting?

22        A.   I don't have a clear recollection.

23        Q.   Well, was it -- let's go through the

24   years.

25             Was it 2009?
```

Confidential - Subject to Further Confidentiality Review

1          A.   Not that far back.  It should be more

2     recent.

3          Q.   2010?

4          A.   I do not remember the exact time, but

5     it should be in 2010 or after.

6          Q.   Did you attend every board meeting of

7     Taishan from 2009 to present, or did you miss

8     some?

9          A.   I believe I have attended all.  I do

10    not recall that I have ever missed.

11         Q.   How many a year do they have, Taishan?

12         A.   Usually once a year the meeting was

13    held.

14         Q.   Are there board meetings by telephone

15    other than the formal board meetings within a

16    year?

17         A.   Besides face-to-face meetings,

18    sometimes telephonic meetings or meetings in

19    written form were held.

20              THE INTERPRETER:  Interpreter clarify

21    with witness.

22              Upon clarification, the deponent also

23    said sometimes in the form of signing off of

24    board of directors meeting resolution.

25         Q.   They would just be sent to you for

Confidential - Subject to Further Confidentiality Review

1    signature?

2        A.   No.  For example, an agreement was

3    reached through telephonic discussion

4    beforehand.

5        Q.   And then the formal document was sent

6    to you for signature, is that correct?

7        A.   Correct.

8        Q.   Where were the board meetings held?

9        A.   Usually they were held in Taishan

10   Gypsum Company.

11       Q.   And in 2009, where was that located?

12       A.   I don't recall.

13       Q.   You don't recall where you went to a

14   board meeting in 2009, what the physical

15   location was?

16       A.   Correct, I do not have a clear

17   recollection on that.

18       Q.   Where did you attend board meetings in

19   2010?

20            THE INTERPRETER:  Interpreter needs

21   clarification from witness.

22       A.   I do not have a clear recollection.

23   It could be in Taian City, it could be in

24   Taishan Gypsum Company.

25       Q.   Are they in close proximity to each

1    other?

2        A.    Taishan Gypsum Company is located in

3    Taian City.

4        Q.    And are your board meetings today

5    still in those locations?

6        A.    All possible.  Sometimes it would be

7    held in Taishan Gypsum Company, sometimes in

8    Taian City's certain hotel, sometimes just in a

9    hotel.

10       Q.    Now, these meetings which were not

11   formal meetings where you appeared in person

12   with your fellow directors at Taishan facilities

13   or hotels, when they occurred by telephone or

14   other means, was the lawsuit ever discussed?

15            MR. BECKER:  Object to the form.

16   Vague.

17       A.    I have said just now lawsuits is an

18   issue related to Taishan Gypsum's daily

19   production and management.  It is something to

20   be taken care of by Taishan Gypsum itself.  Of

21   course, in one of Taishan's board meetings,

22   Taishan Gypsum's management reported issues

23   related to the lawsuit.

24   BY MR. LEVIN:

25       Q.    My question was, was the lawsuit ever

Confidential - Subject to Further Confidentiality Review

1    discussed by the board of directors in non-board

2    meetings, but via telephone or other means?

3                MS. EAGAN:  Object to form.

4                MR. BARR:  Object to the form.

5    Objection, mischaracterizes the witness's

6    testimony.

7        A.   I don't have a recollection on that.

8    BY MR. LEVIN:

9        Q.   Were certain directors designated,

10   certain Taishan directors designated to perform

11   services with regard to the defense of the

12   lawsuit?

13       A.   No.

14       Q.   Do you know whether Taishan allowed

15   BNBM in 2009, 2010, in that area, to act on

16   their behalf with regard to this lawsuit?

17               MR. BECKER:  Object to form.

18               MR. BARR:  Object to the form.

19       A.   I don't understand your question.

20   BY MR. LEVIN:

21       Q.   Well --

22       A.   Please repeat.

23       Q.   Did the board of directors of Taishan

24   at any time take any action to deal with the

25   lawsuit, deal a little bit with the lawsuit by

1    reading it, by discussing it, by hiring counsel?

2    Compound.

3              Go.

4              MS. EAGAN:  Object to form.

5              MR. BARR:  Object to form, but he may

6    answer.

7         A.   According to the lawsuit, it was

8    Taishan Gypsum itself responsible for it, such

9    as hiring attorneys, etcetera.  I have also said

10   earlier in one of the board meetings of Taishan,

11   management reported the updated situation and

12   strategy of the lawsuit.

13        Q.   What did they tell you --

14        A.   Taishan's board of directors respected

15   and agreed upon their decisions.

16        Q.   What did they tell you that the board

17   of directors agreed upon?

18        A.   I remember the Taishan managements

19   reported on the progress of the lawsuit, the

20   issues regarding to the jurisdictions, the

21   appeal was not dismissed by the Court.

22        Q.   And was that told to you at that one

23   meeting?

24        A.   Yes.

25        Q.   So that you never discussed the hiring

Confidential - Subject to Further Confidentiality Review

1   of attorneys at a board of directors meeting

2   prior to that particular meeting?

3           MR. BARR:  Object to the form.

4   Mischaracterizes the witness's testimony, lack

5   of foundation.

6       A.   Regarding the lawsuit, it is the

7   responsibility of Taishan itself, because it is

8   a company's daily operation, it is not something

9   to be discussed and decided by either the board

10  of directors meeting or the shareholders

11  meeting.  Therefore, Taishan Gypsum itself is

12  responsible for issues related to the lawsuit,

13  such as hiring attorneys.

14      Q.   So that to be clear, that was never

15  discussed with the board of directors?

16      A.   Are you referring to hiring of

17  attorneys?

18      Q.   Yes.

19      A.   No.

20          MR. BARR:  I knew I should have

21  objected, but he handled the gap.

22          MR. LEVIN:  He handled the gap?  I

23  think he fell into a canyon.

24          MR. BARR:  Too late to start this.  Go

25  ahead.

1    BY MR. LEVIN:

2        Q.   Now, at the same time you were a

3    director of Taishan, you were also director of

4    BNBM.

5             Putting on your BNBM hat, when was the

6    first time you heard that BNBM was a party to a

7    lawsuit, was a defendant in the lawsuit filed in

8    the United States of America?

9        A.   When legal department reported and

10   BNBM received the notification of Taishan Gypsum

11   that they are participating in a lawsuit, and a

12   public announcement is needed.  At the same time

13   Taishan Gypsum also informed us that in some of

14   the lawsuits BNBM was also listed as defendant.

15       Q.   What year was that, sir?

16            MR. LEVIN:  I'm sorry, Sunny.

17       A.   I don't have a clear recollection on

18   that, but the year that BNBM first made a public

19   announcement regarding the lawsuit.

20   BY MR. LEVIN:

21       Q.   What year was that?

22       A.   I don't have a clear recollection.

23   Maybe it was 2009.

24       Q.   Was it after the board of directors

25   meeting where Taishan reported to you the status

Confidential - Subject to Further Confidentiality Review

1    of the lawsuit, or before that?

2         A.   Before that.

3         Q.   As a member of the board of directors

4    of BNBM, did you ever attend the board of

5    directors meeting where the lawsuit against

6    Taishan was discussed?

7         A.   BNBM's board meeting had never had any

8    issues or topics regarding the lawsuit,

9    including topics regarding the lawsuits against

10   Taishan Gypsum.  But according to the law, BNBM

11   itself was also listed as a defendant, and the

12   situation of the lawsuit against Taishan Gypsum

13   all requires regular information and public

14   announcements, and they all need to be disclosed

15   in BNBM's annual report as public announcements.

16        Q.   Was this lawsuit or any portion of the

17   lawsuit discussed at a BNBM board of directors

18   meeting?

19        A.   No.

20        Q.   In your other capacities, other than

21   as a director at BNBM, did you have occasion to

22   deal with the lawsuit?

23             MR. BARR:  Object to the form.  Lack

24   of foundation.

25        A.   No.

1    BY MR. LEVIN:

2        Q.    Did you deal with lawyers that

3    represented you with regard to the lawsuit,

4    other than in preparation for this deposition?

5                MR. BECKER:  Object to form.

6                MR. BARR:  And other than as he

7    testified yesterday, because he testified about

8    meetings with our firm beyond just deposition

9    preparation.

10               MR. LEVIN:  During the period of time

11   that he testified yesterday.

12               MR. BARR:  It is testimony yesterday.

13               MR. LEVIN:  It would have to be.

14               MR. BARR:  He testified on that,

15   correct.

16               And you may answer that question yes

17   or no.

18       A.    As a board of -- as the Chairman of

19   the Board of BNBM after BNBM answered to the

20   lawsuit and attorneys were hired, I had -- I

21   have had met the attorneys.

22   BY MR. LEVIN:

23       Q.    And that would be in 2014 and 2015, am

24   I correct?

25               MR. BARR:  Objection.  Lack of

```
 1   foundation.

 2        A.   I believe so.

 3   BY MR. LEVIN:

 4        Q.   Strike that.

 5             That would be in 2015 when you

 6   authorized the lawyers to enter their appearance

 7   for you, is that correct?

 8        A.   I believe so.

 9             MR. BARR:  We also covered this

10   yesterday.

11             Can we go off the record for maybe

12   three minutes?  I just want to know how long

13   we're going to go today.

14             MR. LEVIN:  I said 4:00 o'clock.

15             MR. BARR:  Okay.  Fine.

16             MR. LEVIN:  We said 8 to 4.

17             MR. BARR:  Okay.  I wanted to make

18   sure we're all consistent with the time we

19   discussed.

20   BY MR. LEVIN:

21        Q.   At the board of directors meeting of

22   Taishan, did any director ever say to anyone in

23   words or substance, "Taishan's been sued in the

24   United States, we should get some information on

25   this"?
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. BECKER:  Objection.  Form.

 2              MR. BARR:  Objection.  Form.

 3       A.   I don't have that recollection.

 4  BY MR. LEVIN:

 5       Q.   At BNBM directors meeting, have any

 6  directors of BNBM ever said in words or

 7  substance "gee, we've been sued in the United

 8  States, in the United States Federal Court, we

 9  should get some information on this, we have

10  obligations as directors to know what's going on

11  with this company that we are directors in"?

12              MR. BARR:  Objection to the form of

13  the question.  Argumentative.

14       A.   Lawsuit is an item categorized as

15  daily production and management item, it is not

16  something to be discussed or decided by the

17  board of directors meeting.  Regarding to all

18  the information of this lawsuit, BNBM had made

19  timely public announcements, and also was

20  disclosed in all types of annual reports that

21  were reviewed by the company's board of

22  directors meeting, therefore there had been

23  sufficient disclosure of lawsuits information.

24  BY MR. LEVIN:

25       Q.   Well, that disclosure, sir, would have
```

1  been to the public.  Did you as a member of the

2  board of directors seek anything for your own

3  knowledge beyond the disclosures that you made

4  to the public?

5      A.   The work of the lawsuit belongs to the

6  work of the management in charge of daily

7  operation and production.  All the information

8  had been disclosed to directors and public.

9      Q.   And as a director of Taishan, as a

10  director of BNBM, and in various other roles

11  that you served as executive positions at BNBM,

12  you felt you had no need to know anything other

13  than what the public announcements were, is that

14  correct?

15          MR. BARR:  Objection, form.

16  Objection, argumentative.  Objection,

17  mischaracterizes the witness's testimony over

18  the two days.

19      A.   As the Chairman of the Board of BNBM,

20  I'm not responsible in managing the lawsuits of

21  BNBM.  As a director for Taishan Gypsum, I also

22  do not need to participate in Taishan Gypsum's

23  lawsuits, but at the same time the management of

24  Taishan Gypsum made a report in Taishan Gypsum's

25  board meeting.

1  BY MR. LEVIN:

2      Q.   And that's the extent of the knowledge

3  that you had and the extent of the knowledge

4  that you wanted to have?

5      A.   As a director of BNBM and as a

6  director of Taishan Gypsum, our responsibility

7  corresponds with our job duties.  Besides that,

8  as a director of Taishan Gypsum, I have also

9  attended a Taishan Gypsum's board of directors

10 meeting where Taishan Gypsum's management made

11 an introduction of the situation and reported on

12 their decisions.

13     Q.   You've told us today all you knew and

14 how you obtained your knowledge, did you not?

15          MR. BARR:  At what point in time?

16 BY MR. LEVIN:

17     Q.   Up until the time you met Mr. Barr,

18 and his colleagues.

19     A.   What was your question?  I forgot.

20 I'm sorry.

21     Q.   You've told us today all you knew and

22 how you obtained your knowledge, did you not,

23 regarding the lawsuit --

24          MR. BARR:  And up until the time --

25 BY MR. LEVIN:

Confidential - Subject to Further Confidentiality Review

1          Q.    -- up until the time you met Mr. Barr?

2                MR. BARR:  Thank you.

3                MR. LEVIN:  And his colleagues,

4    minions.

5          A.    You can say that.

6                MR. LEVIN:  Have a pleasant evening.

7    8:00 o'clock tomorrow.

8                MR. BARR:  8:00 o'clock tomorrow.

9                MR. LEVIN:  I'll get you out so you

10   can get your 6:30.

11               THE VIDEOGRAPHER:  We're off the

12   record at 4:06 p.m..  This concludes tape number

13   four.

14               (Whereupon, the deposition was

15               suspended.)

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

```
 1              REPORTER'S CERTIFICATE

 2

 3        This transcript is valid only for a

 4    transcript accompanied by my original signature

 5    and original required seal on this page.

 6        I, MAUREEN O'CONNOR POLLARD, Certified

 7    Court Reporter (LA Certificate #2011025), in and

 8    for the State of Louisiana, as the officer

 9    before whom this testimony was taken, do hereby

10    certify that WANG BING, after having been duly

11    sworn by me upon authority of R.S. 37:2554, did

12    testify as hereinbefore set forth in the

13    foregoing pages; that this testimony was

14    reported by me in the stenotype reporting

15    method, was prepared and transcribed by me or

16    under my personal direction and supervision, and

17    is a true and correct transcript to the best of

18    my ability and understanding; that the

19    transcript has been prepared in compliance with

20    transcript format guidelines required by the

21    statute or by rules of the board, that I have

22    acted in compliance with the prohibition on

23    contractual relationships, as defined by

24    Louisiana Code of Civil Procedure Article 1434

25    and in rules and advisory opinions of the board.
```

Confidential - Subject to Further Confidentiality Review

1       That I am not related to counsel or to the

2   parties herein, nor am I otherwise interested in

3   the outcome of this matter.

4

5       Signed this the 26th day of August, 2015.

6

7

8

9   _____

10  MAUREEN O'CONNOR POLLARD, CCR, RMR, CLR

11  Realtime Systems Administrator

12  LA Certificate #2011025

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3               Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the appropriate

 6    space on the errata sheet for any corrections

 7    that are made.

 8               After doing so, please sign the

 9    errata sheet and date it.  It will be attached

10    to your deposition.

11               It is imperative that you return

12    the original errata sheet to the deposing

13    attorney within thirty (30) days of receipt of

14    the deposition transcript by you.  If you fail

15    to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

```
 1                   - - - - - -

                   E R R A T A

 2                   - - - - - -

 3    PAGE  LINE  CHANGE

 4    _____ _____  _____

 5        REASON: _____

 6    ____  _____  _____

 7        REASON: _____

 8    _____ _____  _____

 9        REASON: _____

10    _____ _____  _____

11        REASON: _____

12    _____ _____  _____

13        REASON: _____

14    _____ _____  _____

15        REASON: _____

16    _____ _____  _____

17        REASON: _____

18    _____ _____  _____

19        REASON: _____

20    _____ _____  _____

21        REASON: _____

22    _____ _____  _____

23        REASON: _____

24    _____ _____  _____

25
```

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3              I, _____, do

    Hereby certify that I have read the foregoing

 4  pages, and that the same is a correct

    transcription of the answers given by me to the

 5  questions therein propounded, except for the

    corrections or changes in form or substance, if

 6  any, noted in the attached Errata Sheet.

 7

 8  _____

    BING WANG                    DATE

 9

10

11

12

13

14

15  Subscribed and sworn

    To before me this

16  _____ day of _____, 20_____.

17  My commission expires: _____

18

    _____

19  Notary Public

20

21

22

23

24

25
```

1                    LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____   _____

4      _____  _____   _____

5      _____  _____   _____

6      _____  _____   _____

7      _____  _____   _____

8      _____  _____   _____

9      _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____

25

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3    ************************************************

 4    IN RE:  CHINESE-MANUFACTURED  MDL NO. 2047

      DRYWALL PRODUCTS LIABILITY

 5    LITIGATION                   SECTION:  L

 6    THIS DOCUMENT APPLIES TO     JUDGE FALLON

      ALL CASES

 7                                 MAG. JUDGE

                                   WILKINSON

 8

      ************************************************

 9

10         CONFIDENTIAL - SUBJECT TO FURTHER

              CONFIDENTIALITY REVIEW

11          Thursday, August 27th, 2015

12                   — — —

13

14      Continued Videotaped Deposition of Bing

15   Wang, held at the offices of Phelps Dunbar LLP,

16   365 Canal Street, Suite 2000, New Orleans,

17   Louisiana, commencing at 8:14 a.m., on the above

18   date, before Maureen O. Pollard, Certified Court

19   Reporter (#2011025), Registered Merit Reporter,

20   Realtime Systems Administrator.

21

22                   — — —

23         GOLKOW TECHNOLOGIES, INC.

         877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com

25
```

Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S:
 2   COUNSEL FOR THE PLAINTIFF CLASS:
 3   HERMAN HERMAN & KATZ LLC
     BY:  MADELYN M. O'BRIEN, ESQUIRE
 4        mobrien@hhklawfirm.com
              820 O'Keefe Avenue
 5            New Orleans, Louisiana 70113
              (504) 581-4892
 6
 7   LEVIN FISHBEIN SEDRAN & BERMAN
     BY:  ARNOLD LEVIN, ESQUIRE
 8        alevin@lfsblaw.com
              510 Walnut Street
 9            Suite 500
              Philadelphia, Pennsylvania 19106
10            (215) 592-1500
11
     IRPINO LAW FIRM
12   BY:  PEARL A. ROBERTSON, ESQUIRE
          probertson@irpinolaw.com
13        ANTHONY IRPINO, ESQUIRE
          airpino@irpinolaw.com
14            2216 Magazine Street
              New Orleans, Louisiana 70130
15            (504) 525-1500
16
     GAINSBURGH BENJAMIN DAVID MEUNIER &
17   WARSHAUER LLC
     BY:  RACHEL A. STERNLIEB, ESQUIRE
18        rsternlieb@gainsben.com
              2800 Energy Centre
19            1100 Poydras Street
              New Orleans, Louisiana 70163-2800
20            (504) 522-2304
21
     COUNSEL FOR TAISHAN GYPSUM COMPANY:
22   ALSTON & BIRD LLP (Via Phone)
     BY:  JOSHUA L. BECKER, ESQUIRE
23        josh.becker@alston.com
              One Atlantic Center
24            1201 West Peachtree Street
              Atlanta, Georgia 30309-3424
25            (404) 881-7000
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):
 2
      COUNSEL FOR BNBM DEFENDANTS:
 3
      DENTONS US LLP
 4    BY:  MATTHEW T. NICKEL, ESQUIRE
           matt.nickel@dentons.com
 5              2000 McKinney Avenue
                Suite 1900
 6              Dallas, Texas 75201
                (214) 259-0900
 7
 8
      DENTONS US LLP
 9    BY:  MICHAEL H. BARR, ESQUIRE
           michael.barr@dentons.com
10              1221 Avenue of the Americas
                New York, New York 10020
11              (212) 768-6700
12
13    PHELPS DUNBAR LLP
      BY:  HARRY ROSENBERG, ESQUIRE, ESQUIRE
14         harry.rosenberg@phelps.com
                365 Canal Street
15              New Orleans, Louisiana 70130-6535
                (504) 566-1311
16
17    DENTONS HK LLP
      BY:  TODD LIAO, ESQUIRE
18         todd.liao@dentons.com
           ANNIE QIU, ESQUIRE
19         annie.qiu@dentons.com
                5th Floor The Center
20              989 Changle Road
                Shanghai, 200031 China
21              +86 21 2315 6000
22
23
24
25
```

```
 1   APPEARANCES (CONTINUED):

 2   COUNSEL FOR CNBM DEFENDANTS:

 3   ORRICK HERRINGTON & SUTCLIFFE LLP

     BY:  KELLY M. DALEY, ESQUIRE

 4       kdaley@orrick.com

             51 West 52nd Street

 5           New York, New York 10019-6142

             (212) 506-3775

 6

 7

     GORDON ARATA McCOLLAM DUPLANTIS & EAGAN LLP

 8   BY:  EWELL (TIM) E. EAGAN, JR., ESQUIRE

         eeagan@gordonarata.com

 9           201 St. Charles Avenue

             40th Floor

10           New Orleans, Louisiana 70170-4000

             (504) 582-1111

11

12   COUNSEL FOR THE STATE OF LOUISIANA:

13   PERKINS COIE LLP

     BY:  DAVID L. BLACK, ESQUIRE

14       dblack@perkinscoie.com

             1900 Sixteenth Street

15           Suite 1400

             Denver, Colorado 80202

16           (303) 291-2400

17

18   ALSO PRESENT:

19       SUNNY WANG, MANDARIN INTERPRETER

20       TONI XU, HERMAN HERMAN & KATZ, LLC

21       DENNIS ZHOU, HERMAN HERMAN & KATZ, LLC

22       RICHARD RIENSTRA, VIDEOGRAPHER

23       JOSHUA TARR

24                   ___ ___ ___

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                        INDEX

 2    EXAMINATION                            PAGE

 3    BING WANG

 4      BY MR. LEVIN                         327

 5      BY MS. ROBERTSON                     384

 6      BY MR. LEVIN                         387

 7      BY MS. ROBERTSON                     397

 8      BY MR. LEVIN                         401

 9      BY MS. ROBERTSON                     406

10      BY MR. LEVIN                         409

11      BY MS. ROBERTSON                     412

12      BY MR. LEVIN                         413

13      BY MS. ROBERTSON                     422

14      BY MR. LEVIN                         423

15      BY MS. ROBERTSON                     450

16

17

18             E X H I B I T S

19    NO.         DESCRIPTION                PAGE

20   305-R    Partial Translation of
              BNBMPLC-E-0011157-0011166 - BNBM PLC
21            Annual General Meeting Document:
              Resolution of the 2013 Annual
22            General Meeting re: approval of
              Guaranties to Taishan Gypsum
23            (Redlined)........................... 396
      306     Translation of BNBMPLC-E-0130705
24            1/06/2015 e-mail from Shi Keping to
              Chen Yu attaching draft of the
25            12/12/2014 Meeting Minutes........... 439
```

Confidential - Subject to Further Confidentiality Review

```
 1

    306-1      Clawed back as attorney-client
 2             privileged material.................   440
 3  309        Translation of BNBMPLC-E-0029655 -
               Report on hiring foreign law firms
 4             for American gypsum board litigation
               matters..............................   356
 5
    310        Common Interest Joint Defendants and
 6             Confidentiality Agreement............   445
 7  311-R      Partial Translation of
               BNBMPLC-E-0005169-5150 - Letter of
 8             Communication and Confirmation about
               the Audit Schedule for the 2009
 9             Annual Financial Statements
               (Redlined)...........................   434
10
    312-R      Translation of
11             BNBMPLC-E-0004777-4780 - Proposal on
               the Company's [BNBM PLC's] 2007
12             Annual Investment Plan (Redefined)....   406
13  317        Partial Translation of
               BNBMPLC-E-0006061-6063 - 2008
14             Regulator Opinion on BNBM PLC.........   421
15  317-R      Partial Translation of
               BNBMPLC-E-0006061-6063 - 2008
16             Regulator Opinion on BNBM PLC
               (Redlined)...........................   422
17
    318-R      Partial Translation of
18             BNBMPLC-E-000606406066, Beijing New
               Building Material Public Limited
19             Company, Report on the Improvement
               and Solution of Relevant Issues
20             Raised in the Site Inspection of
               Beijing Securities Regulatory Bureau
21             (Redlined)...........................   433
22  322-R      Partial Translation of
               BNBMPLC-E0222095-112112 - BNBM PLC
23             Public Announcement of the External
               Guaranties for the year 2015
24             (Redlined)...........................   383
25
```

Confidential - Subject to Further Confidentiality Review

```
 1
    324-R    Partial Translation of
 2             BNBMPLC-E-0002177-0002179 - BNBM:
              The resolution of the 15th interim
 3            meeting of the 4th session of the
              Board of Directors (Redlined)........  412
 4
    325-R    Partial Translation of
 5            BNBMPLC-E-0005724-5725,
              Communications and Confirmation
 6            Letter on the Auditing Schedule of
              the 2008 Annual Financial Report
 7            (Redlined)..........................  437
 8  326-R    Partial Translation of
              BNBMPLC-E-0011442 - Rectification
 9            Status on the Inversion of Procedure
              in the Fixed Investment Projects of
10            the Stock Company - Weekly Report
              (Redlined)..........................  450
11
    328      Partial Translation of
12            BNBMPLC-E-0006086-6100 - Information
              on Work Performance of the General
13            Manger in 2006......................  453
14  329      Partial Translation of
              BNBMPLC-E-0005884-5888 - reply to
15            the Inquiry on Evaluating the 2007
              Annual Report.......................  451
16
    330      Partial Translation of
17            BNBMPLC-E-0058974-58995 - BNBM PLC
              Investment Document No. 62 (2013).....  454
18
19
20
21
22
23
24
25
```

```
 1              P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  We are back on the

 4     record, August 27, 2015, at 8:14 a.m..  This is

 5     the continuation of the deposition of Mr. Wang

 6     Bing.  This begins day number three, tape number

 7     one.

 8              The witness and the interpreter are

 9     previously sworn from yesterday, and counsel

10     will be noted on the stenographic record.

11              You may begin.

12              MR. BARR:  Before you ask your first

13     question, Mr. Levin, I want to make a comment.

14              Yesterday you asked a series of

15     questions relating to what information he

16     learned about the litigation from the board of

17     directors.  He understood those questions to

18     relate to just in the capacity of the board of

19     directors.

20              He did obtain certain other

21     information about the litigation over the course

22     of time.  You're welcome to inquire further

23     about that.  I didn't want to raise it after you

24     were done with all of your questions today

25     through mine, raise it at the outset here.  So
```

Confidential - Subject to Further Confidentiality Review

```
 1    you're free to inquire further about that, if

 2    you so desire.

 3             MR. LEVIN:  Okay.  May I examine you?

 4             MR. BARR:  You can ask any questions

 5    to the witness you want.

 6                      EXAMINATION

 7    CONTINUED BY MR. LEVIN:

 8        Q.    Good morning, Chairman Wang.

 9        A.    Mr. Levin.

10        Q.    You have a very fancy shirt on today,

11    and I hope the camera picks it up.  It will be

12    well-received by an Eastern District of

13    Louisiana jury.  In fact, I saw the governor

14    wear a shirt that looked just like that.

15             Have you looked at Exhibit 61, sir?

16    That is the letters that were produced by Knauf

17    and which were sent to BNBM, and Chairman Song.

18        A.    I have not seen it.

19        Q.    Have you ever seen those letters

20    before?

21        A.    No, I don't remember I have ever seen

22    this letter.  It was not addressed to me.

23        Q.    Did anybody ever tell you about those

24    letters?

25        A.    Nobody had told me that this letter
```

```
1      was being received.
2           Q.   You said it was not addressed to you
3      because it was addressed to Chairman Song?
4           A.   I don't know to whom the letter was
5      written to, but it was not written to me.
6               MR. BARR:  Why doesn't the witness
7      take a moment to read through all pages of the
8      document, of the exhibit.
9               (Witness reviewing document.)
10              MR. LEVIN:  Let the record show you're
11     directing him.
12              MR. BARR:  It's no great secret.
13              MR. LEVIN:  Would you like to direct
14     him to the page, Mr. Barr?
15              MR. BARR:  Why don't you look at --
16     just to see if we can expedite this.
17          A.   I see my name on the material
18     following that, but the company name, the
19     address, and the ZIP code do not belong to BNBM
20     where I work.
21     BY MR. LEVIN:
22          Q.   Do you recognize the address, as who
23     belongs to that address?
24          A.   I don't know, but by looking at it I
25     believe it is the address of BNBM Group, but I'm
```

1    not sure.  I don't know.

2         Q.   Was BNBM Group and BNBM, did they ever

3    share the same address?

4         A.   We're not the same company.  We do not

5    work in the same location.

6         Q.   Let me tell you something.  I'm going

7    to today repeat every question that I ask until

8    I get an answer to my question rather than a

9    speech.  Mr. Barr is going to object to what I'm

10   saying.

11            MR. BARR:  I am going to object most

12   strenuously, sir.

13            MR. LEVIN:  I accept your strenuous

14   objection.

15            MR. BARR:  The witness has been here

16   for two days answering your questions, many of

17   which are in objectionable form, a number of

18   which are not clear, to the best of his ability,

19   despite the fact of the added difficulty of

20   having translations in two directions with

21   respect to that.  I would appreciate it if you

22   would not insult the witness in this matter, but

23   rather simply ask your questions, and I will

24   object as appropriate.

25   BY MR. LEVIN:

Confidential - Subject to Further Confidentiality Review

1        Q.   I will ask -- I'll start again.

2             Did BNBM and BNBM Group ever share the

3   same address?

4        A.   At least we do not work together in

5   the same location in the past five to

6   eight years, but perhaps before that it was.

7        Q.   Well, May 15, 2009, what was the

8   address of BNBM Group?

9        A.   I'm not sure about the specific and

10  accurate address in May, 2009.  Perhaps it is

11  what is written in the document.  But what I can

12  be sure of is that BNBM and BNBM Group do not

13  work in the same place.

14       Q.   What was the address of BNBM PLC on

15  May 15, 2009?

16       A.   To my recollection, I believe it is in

17  a place in Beijing, Beichengdong Road in

18  Chaoyang district, or in Xisanquidong Road.

19  Because at the time we were moving, therefore I

20  do not remember the accurate address in that

21  year, but I'm sure that BNBM Company, Limited

22  had never worked in the address shown here.

23       Q.   What was the registered address for

24  BNBM PLC in May of 2009?

25       A.   Its registered address is in Jia,

1    Number 11 Sanlihe Road.

2         Q.   Was BNBM and BNBM Group ever in the

3    same building?

4              MR. BARR:  Objection.  Asked and

5    answered.

6         A.   In the very beginning when BNBM had

7    first became public listing company, they used

8    to work in the same building.  I believe it was

9    ten years ago.

10   BY MR. LEVIN:

11        Q.   Did BNBM and BNBM Group ever share the

12   same registered address?

13        A.   I don't believe so.  Not according to

14   my recollection.

15        Q.   If BNBM received a letter addressed to

16   BNBM Group, would you as an executive at BNBM

17   PLC make sure that letter was rerouted to BNBM

18   Group?

19        A.   I have not received letters such as

20   this.

21        Q.   Have you in your official capacities,

22   either as a general manager or Chairman, that's

23   pretty high, ever directed your mailroom to

24   reroute letters that were misaddressed to other

25   BNBM or CNBM organizations?

Confidential - Subject to Further Confidentiality Review

```
 1              MS. EAGAN:  Object to form.

 2         A.   No.

 3    BY MR. LEVIN:

 4         Q.   I believe you told us that you were

 5    aware of the Knauf companies, were you not?

 6         A.   I've heard of it.

 7         Q.   The last 10, 15 years prior to 2009,

 8    did you have occasion to ever deal with Knauf

 9    representatives in matters that you shared the

10    same interest in?

11              MR. BARR:  Objection to the form.

12         A.   Because we belong to the same

13    industry, we might have met in the industry

14    meetings or communications.

15    BY MR. LEVIN:

16         Q.   And where would these industry

17    meetings take place?

18         A.   There are many possibilities.

19         Q.   Did you ever meet Mr. Mark Norris, an

20    employee and executive of Knauf, at any of these

21    meetings?

22         A.   I don't recall.

23         Q.   He's an Australian fellow with an

24    Australian accent.  Would that refresh your

25    recollection as to whether or not you've ever
```

Confidential - Subject to Further Confidentiality Review

1    met him?

2           A.   I don't have a recollection on that.

3           Q.   Were you ever aware of a certain

4    Mr. Grundke coming to China from Germany, an

5    executive of Knauf, to discuss with you -- when

6    I say "you" I mean your company -- and members,

7    executives of your company, the lawsuits

8    involving the Chinese drywall situation in

9    Louisiana, Florida, Virginia, and other Gulfport

10   states?

11          MR. BARR:  Objection to the form.

12          A.   I don't recall.

13   BY MR. LEVIN:

14          Q.   Did you ever -- do you recall whether

15   Mr. Bancroft Knauf ever came to China and spoke

16   with either -- with BNBM representatives

17   concerning the lawsuits in the United States?

18          A.   I don't recall.

19          Q.   Do you recall whether or not

20   Mr. Bancroft Knauf came to China and spoke with

21   members of CNBM Group concerning the lawsuit?

22          MR. BARR:  Objection.  Lack of

23   foundation.

24          A.   I don't know.

25   BY MR. LEVIN:

Confidential - Subject to Further Confidentiality Review

1          Q.   Do you know whether Mr. Bancroft Knauf

2     spoke with Chairman Song concerning this lawsuit

3     in a location in China?

4          A.   I don't know.

5          Q.   Now, yesterday I asked you several

6     questions concerning what was discussed or not

7     discussed concerning the lawsuits at either the

8     board of directors meetings of Taishan and BNBM.

9               Do you recall that?

10         A.   I remember.

11         Q.   And you indicated that you may have

12    had knowledge of the lawsuit from other sources

13    in other venues other than the board of

14    directors meetings of either of those

15    corporations, is that correct?

16              THE INTERPRETER:  This is interpreter

17    speaking.

18              Did counsel say he indicated?

19              MR. BARR:  He said you, it's just a

20    mistake on the screen.

21         A.   We learned about the lawsuit was

22    because Taishan Gypsum informed the BNBM's legal

23    department about that, and the legal department

24    informed me -- informed us, and we confirmed it.

25    We have heard about it prior to that from media.

Confidential - Subject to Further Confidentiality Review

1    However, we were -- we could not confirm whether

2    it was related to Taishan Gypsum or BNBM.

3    BY MR. LEVIN:

4        Q.   Did there come a time when you

5    confirmed that both Taishan and BNBM were both

6    sued in the same complaint, a legal instrument?

7        A.   Taishan Gypsum informed BNBM that they

8    have received such an item of lawsuit, and also

9    decided to answer to the lawsuit.  And at the

10   same time they told the legal department, and

11   our legal department the same time reported to

12   me that BNBM was listed as a defendant in part

13   of the lawsuit.

14       Q.   And the first time you heard about the

15   lawsuit is when Chairman Jia told you that he

16   was going to defend the lawsuit, or answer the

17   lawsuit, as you stated?

18           MR. BARR:  You're asking individually

19   Jia?  That wasn't what his prior answer said.

20   I'm just -- I'm trying to understand whether

21   you're using that colloquially Jia to stand for

22   Taishan altogether, or whether you're asking

23   specific questions just about Jia.

24           MR. LEVIN:  Just about Jia.

25           MR. BARR:  Objection to the form, lack

Confidential - Subject to Further Confidentiality Review

1    of foundation.

2              You may answer.

3         A.   I've learned it from the legal

4    department of BNBM.

5    BY MR. LEVIN:

6         Q.   Which was at the same time that

7    Taishan decided to answer the lawsuit, is that

8    correct?

9         A.   BNBM legal department informed me of

10   this information because BNBM's legal department

11   had received a notification from the legal

12   department of Taishan Gypsum stating that they

13   would answer to the lawsuit.

14        Q.   And did they answer the lawsuit

15   shortly after that, to your knowledge?

16        A.   Perhaps.  I heard they did.

17        Q.   And did you hear that from your legal

18   department?

19        A.   Yes.

20        Q.   Now, did Mr. Yu Chen have any role in

21   defense of the lawsuit on behalf of BNBM?

22             MR. BARR:  At any point in time?

23             MR. LEVIN:  At any point in time.

24        A.   I don't know.

25   BY MR. LEVIN:

Confidential - Subject to Further Confidentiality Review

1          Q.   Were you ever in the company of Yu

2     Chen and others when the lawsuit was discussed?

3               MR. BARR:   I want to caution the

4     witness that to the extent the lawsuit was

5     discussed with Mr. Chen and counsel present, you

6     may simply answer that, you know, yes or no,

7     that you were.

8          A.   I'm sorry, I don't understand your

9     question.   Can you repeat?

10              MR. BARR:   Apparently there was -- a

11    "company" got translated as "corporation," so

12    it's just --

13              MR. LEVIN:   Okay.

14    BY MR. LEVIN:

15         Q.   Were you ever in the presence of Yu

16    Chen and others when the lawsuit was discussed

17    at any point in time?

18              MR. BARR:   And you may answer that

19    question yes or no.

20         A.   Yes.

21    BY MR. LEVIN:

22         Q.   Were you ever on telephone conferences

23    with Yu Chen and others when the lawsuit was

24    discussed?

25              MR. BARR:   Again, you may answer that

Confidential - Subject to Further Confidentiality Review

```
1     yes or no.

2     BY MR. LEVIN:

3          Q.   And that's other than in preparation

4     for the deposition.

5          A.   Yes.

6          Q.   As Chairman -- well, first of all, as

7     Chairman of BNBM PLC, were you the highest

8     ranking executive at BNBM PLC?

9          A.   I am the Chairman of the Board of

10    BNBM, and Yu Chen is the highest ranking

11    executive in the management.

12         Q.   Well, who has more authority in

13    running the operation, BNBM, you as Chairman, or

14    Yu Chen in his capacity?

15         A.   It was Yu Chen that is in total charge

16    of the company's day-to-day operation.  I'm in

17    charge of the relevant works of the board of

18    directors meetings.

19              MR. BARR:  The relevant words, is that

20    the translation?

21    BY MR. LEVIN:

22         Q.   I guess work.  Are we okay?

23              MR. BARR:  Yes, she cleared it up.

24    That's fine.

25    BY MR. LEVIN:
```

Confidential - Subject to Further Confidentiality Review

1      Q.   Who appointed Yu Chen to his position?

2      A.   He was appointed by BNBM's board of

3   directors meeting.

4      Q.   And that's the outfit that you're

5   Chairman of?

6           MR. BARR:  Object to the form.

7      A.   Yes.

8   BY MR. LEVIN:

9      Q.   At the time that you spoke with Yu

10   Chen concerning the lawsuit via the telephone,

11   were representatives of CNBM Group also on the

12   line?

13          MR. BARR:  You may answer that yes or

14   no.

15     A.   No.

16   BY MR. LEVIN:

17     Q.   And these telephone conversations were

18   all prior to March 15, 2015, were they not?

19     A.   I don't have a clear recollection on

20   that.

21     Q.   Were there joint conferences with CNBM

22   Group concerning the lawsuits prior to the joint

23   defense agreement of March 15, 2015?

24     A.   I don't remember.

25     Q.   Who or what group has the ability and

Confidential - Subject to Further Confidentiality Review

```
1    the authority to fire Yu Chen?

2         A.   According to Chinese law, BNBM's board

3    has the right.

4         Q.   And that's the group that you're

5    Chairman of?

6         A.   The BNBM board where I am the Chairman

7    of.

8         Q.   Who does Yu Chen report to with regard

9    to his work?

10        A.   He reports to BNBM's board.

11        Q.   And that's the Group that you're

12   Chairman of?

13        A.   Currently I am the Chairman of BNBM.

14        Q.   Have you ever spoken to Mark Norris?

15        A.   I don't have a recollection of this

16   person.

17        Q.   Were you aware, sir, other than --

18   well, were you -- strike that.

19             Are you aware that a similar letter

20   that was addressed to you was also sent to

21   Chairman Song at CNBM Group also on May 15,

22   2009, and signed by David Gregory, Chairman of

23   the Board of Knauf Plasterboard (Tianjin)

24   Company, KTP as it's known in this litigation?

25        A.   I don't know.
```

Confidential - Subject to Further Confidentiality Review

```
1              MS. DALEY:  Objection to form.

2    BY MR. LEVIN:

3         Q.   Look at that exhibit, 61, and confirm

4    for me whether that was the address of CNBM

5    Group at that time.

6              MR. BARR:  Do you want to direct him

7    to a particular page?

8              MR. LEVIN:  For the record, it's

9    KNAUFGIPS-0160545.

10             MR. BARR:  0545.

11        A.   I don't know.

12   BY MR. LEVIN:

13        Q.   You don't know, or you don't remember?

14        A.   I don't know.

15        Q.   Was there ever a time that you knew?

16        A.   I have not written a letter to CNBM

17   Group, therefore I do not know its address.

18   Also, I do not work there.

19        Q.   Do you know whether CNBM Group has

20   moved since May 15, 2009?

21        A.   I don't know, the detailed time, where

22   they worked at this point in time.

23             MR. BARR:  Are we done with this

24   exhibit?

25             MR. LEVIN:  Not yet.  We're done with
```

1    Gregory.  We're not done with Norris.

2    BY MR. LEVIN:

3        Q.    Assume you would receive the letter

4    from Norris in your capacity then as general

5    manager, to whose attention would you have

6    brought that letter?

7            MR. BARR:  Objection.  Calls for

8    speculation.

9        A.    I have not received the letter from

10   Knauf, the letter from this individual.

11   BY MR. LEVIN:

12       Q.    Well, what I'm trying to find out is

13   how this major company operates.  So my question

14   is that if you as a general manager received a

15   letter such as this, would you bring it to

16   somebody else's attention at your organization?

17           MR. BARR:  Objection.  Calls for

18   speculation.

19           You may answer.

20       A.    I don't remember that I have ever

21   received letters from a competitor, especially

22   for a company like Knauf.  To my recollection,

23   we rarely have had communication with each

24   other.

25   BY MR. LEVIN:

```
 1          Q.   Sir, if you had received a letter
 2     concerning a lawsuit in which you were -- your
 3     company was named as a defendant, would you
 4     bring it, turn it over, make somebody else at
 5     your company aware of it?
 6          A.   I have not received materials,
 7     documents, letters related to this lawsuit.
 8          Q.   My question is, if you had received
 9     this, would you turn it over to your legal
10     department?
11               MS. EAGAN:  Object to form.
12               MR. BARR:  Objection, calls for
13     speculation.
14               But you may answer.
15          A.   My work in BNBM is not to receive and
16     send letters, therefore I cannot speculate in
17     that regard.  That's not my work.
18     BY MR. LEVIN:
19          Q.   Sir, listen to me very carefully,
20     okay?
21               If you as a general manager at BNBM
22     PLC received a letter, e-mail, a memorandum from
23     some third party, somebody other than BNBM,
24     concerning a lawsuit in which BNBM was sued,
25     would you turn that material over in the normal
```

Confidential - Subject to Further Confidentiality Review

1     course of your business operations to your legal

2     department?

3            MS. EAGAN:  Objection.  Repetitive.

4       A.   I just said it earlier, that I have

5     not received letters such as this, and I

6     wouldn't know what -- how would I handle it if I

7     did.

8     BY MR. LEVIN:

9       Q.   Does your legal department deal with

10    lawsuits that are filed against BNBM?

11      A.   Ever since BNBM answered this lawsuit

12    last year, it was the responsibility of the

13    legal department to answer the lawsuit.

14           MR. BARR:  Just one moment.  The

15    question he asked you -- just, please, listen to

16    the question -- was as your general practice,

17    does your legal department deal with lawsuits

18    that are filed against BNBM.  Just respond to

19    his question.

20      A.   Yes.

21    BY MR. LEVIN:

22      Q.   And who does the legal department

23    report to at BNBM?

24      A.   Report to the general manager.

25      Q.   And you were general manager at the

Confidential - Subject to Further Confidentiality Review

1    time this Knauf letter was sent to you on

2    May 15, 2009?

3              MR. BARR:  Objection.  Lack of

4    foundation.

5        A.   Like I said, I have not seen this

6    letter.

7    BY MR. LEVIN:

8        Q.   That was not my question, sir.

9              My question was, were you general

10   manager on May 15, 2009?  We're going to answer

11   my question, sir.

12             MR. BARR:  Excuse me.  Your question

13   was were you general manager when Knauf sent

14   this letter.  There's nothing in this record

15   indicating he received this.  It was responsive.

16             MR. LEVIN:  It's in front of him right

17   now.

18             MR. BARR:  You asked specifically as

19   of May 15, 2009 were you general manager.

20   That's a fair question.

21             MR. LEVIN:  Answer the fair question.

22       A.   First of all, I was only pausing when

23   I answered your question just now for the

24   respect of the interpreter.

25             MR. BARR:  Mr. Levin and I both

Confidential - Subject to Further Confidentiality Review

1    apologize for cutting you off in the middle of

2    your answer, sir.

3         A.   Therefore, I did not elaborate on my

4    answer.

5              THE INTERPRETER:  The interpreter said

6    therefore, I did not elaborate on my answer.

7         A.   So the second half of my answer to

8    your earlier question is in May, 2009, I was the

9    general manager of BNBM.

10   BY MR. LEVIN:

11        Q.   And who was in charge of the legal

12   department at that time?

13        A.   Let me think about it.  There have

14   been a lot of changes recently in the person --

15   on the person in charge of the legal department

16   of BNBM, therefore I do not recall at this

17   moment who was in charge of the legal department

18   in 2009.

19        Q.   In and about 2009, as Chairman of BNBM

20   PLC, did you get reports from the legal

21   department on anything in the world?

22        A.   I have answered your question earlier.

23   I have learned from BNBM's legal department that

24   Taishan Gypsum notified them that it was

25   involved in the lawsuit and it had answered to

Confidential - Subject to Further Confidentiality Review

1      the lawsuit.

2          Q.   Who was in charge of the legal

3      department in 2014?

4          A.   It should be the secretary of the

5      board of BNBM Shi Keping.

6          Q.   The secretary of the board of BNBM is

7      in charge of the legal department?

8          A.   She is in charge of that

9      simultaneously.  She also reports to the general

10     manager.  Mr. Chen Yu is in charge of this

11     matter directly.

12         Q.   Would that be in 2014?

13         A.   Yes.

14         Q.   And who is in charge of the legal

15     department in 2015?

16         A.   Specifically it is also Shi Keping,

17     but Chen Yu is in charge directly.

18         Q.   Is Chen Yu a member of the legal

19     department?

20         A.   No.

21         Q.   Who appointed Chen Yu to be in charge

22     of the lawsuit?

23         A.   Chen Yu, I mentioned himself, he is

24     the general manager, he is in charge of making

25     arrangements, that's what I heard.

Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Did you appoint him to do that?

 2            A.    No.

 3            Q.    Was that part -- I'm sorry.

 4            A.    The Chairman of the Board.

 5                  THE INTERPRETER:  Interpreter needs

 6      clarification.

 7            Q.    That's his job that you're telling me,

 8      as general manager, to be in charge of the

 9      lawsuit?

10            A.    Because regarding to the lawsuit, it

11      is part of the daily operation, and the general

12      manager is in charge of the daily operation, so

13      I heard that he is in charge of this matter.

14            Q.    In May of 2009, you were general

15      manager, were you not?

16            A.    Yes.

17            Q.    And as part of your job, you would

18      have been in charge of the lawsuit, wouldn't

19      you?

20            A.    No.

21            Q.    Was somebody on your staff in charge

22      of the lawsuit that worked with you as general

23      manager?

24            A.    Yes, because every general manager

25      arranges his work according to his preference.
```

Confidential - Subject to Further Confidentiality Review

1       Q.   And in arranging the work according to

2   your preference as general manager, who did you

3   appoint to be in charge of the lawsuit?

4       A.   I remember the time I have appointed

5   the secretary of the board to be in charge of

6   the legal matter.

7       Q.   But the secretary of the board was not

8   in the general manager's group at the company,

9   was she?

10          MR. BARR:  Objection to the form,

11  vague, lacks foundation.

12      A.   That's not so.  According to Chinese

13  law, the secretary of the board is an executive

14  of the company, is in the management team.

15  BY MR. LEVIN:

16      Q.   And at this time who was the secretary

17  of the board?

18      A.   Currently it is Shi Keping.

19      Q.   In May of 2009, who was secretary of

20  the board?

21      A.   I don't recall at this moment.  You

22  can find the information --

23      Q.   Is --

24          MR. LEVIN:  I'm sorry, I didn't know.

25  I apologize to you, the witness, and to

Confidential - Subject to Further Confidentiality Review

```
1      everybody at this table.

2              MR. BARR:  Just apology to the

3      witness.

4              MR. LEVIN:  I did something wrong

5      today.

6          A.   It is public information.

7  BY MR. LEVIN:

8          Q.   I'm not here to obtain public

9      information, sir.  I'm here to obtain testimony

10     from you and your recollection.

11             Was Chen Yu ever secretary of the

12     board of BNBM?

13         A.   He was in that position simultaneously

14     for a period of time.

15         Q.   And as secretary of the board, I

16     gather from your testimony he would have been in

17     charge of the lawsuit at the time that he was

18     secretary of the board?

19             MR. BARR:  Objection, mischaracterizes

20     the witness's testimony, lack of foundation.

21         A.   When Chen Yu was the secretary of the

22     board of BNBM, he was also the general manager

23     of BNBM, he was the one making arrangements for

24     the legal department.

25  BY MR. LEVIN:
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.   And that would include the hiring of
 2    counsel, would it not?
 3          A.   Correct.
 4               MR. BARR:  He answered "correct."
 5    BY MR. LEVIN:
 6          Q.   Now, when Chen Yu acted in his
 7    capacity as general manager and as secretary to
 8    the board with regard to the lawsuit, did he
 9    have to get approval of the board of directors
10    for the decisions that he made?
11          A.   It's not necessary.
12          Q.   Under what circumstances, if any,
13    would he need board approval?
14          A.   Matters revolve lawsuits belong to the
15    company's daily operation, it's not necessary to
16    have that approved by the board of directors.
17          Q.   Is there anything dealing with this
18    lawsuit that needs the approval of the board of
19    directors?
20          A.   Not necessary.
21          Q.   Does that mean nothing requires the
22    approval of the board of directors with regard
23    to this lawsuit?
24          A.   Regarding this lawsuit, the law does
25    not require the board of directors to approve
```

1    it, neither the board of directors approved it,

2    in fact.

3        Q.   So it's clear to me, it's crystal

4    clear to me, that the board of directors does

5    not have to approve anything with regard to this

6    lawsuit, is that correct?

7        A.   Regarding the complaint of the

8    lawsuit, it is not necessary to be approved by

9    BNBM's board of directors.  Regarding the

10   information of the lawsuit, all had been

11   disclosed by BNBM either in the board of

12   directors meeting, or in the annual report, or

13   in any other ways.  It is information disclosure

14   rather than approval.

15       Q.   Would any other BNBM executive, not a

16   director, need to approve matters related to

17   this lawsuit?

18           MR. BARR:  Other than who?  I'm sorry,

19   could I ask the question be rephrased just

20   because it's not clear?  Any other BNBM

21   executive other than who?

22           MR. LEVIN:  A director, other than a

23   director.  Let me rephrase it.

24           MR. BARR:  Please.

25   BY MR. LEVIN:

```
 1            Q.   Would any BNBM executive, other than a

 2    director, need to approve matters related to

 3    this lawsuit?

 4            A.   No.

 5            Q.   Did the BNBM directors have to approve

 6    matters related to Taishan's defense of this

 7    lawsuit?

 8            A.   No.

 9            Q.   Did CNBM's directors have to approve

10    matters related to this lawsuit with regard to

11    BNBM and/or Taishan?

12            MS. DALEY:  Object to the form.

13            A.   No.

14    BY MR. LEVIN:

15            Q.   Did CNBM Group have to -- excuse me?

16            Does CNBM Group directors have to

17    approve matters related to this lawsuit by

18    either BNBM and/or Taishan?

19            MS. DALEY:  Object to the form.

20            A.   I don't know.

21    BY MR. LEVIN:

22            Q.   Has BNBM ever approved matters related

23    to this lawsuit -- strike that.

24            Has BNBM board of directors ever

25    approved in the past matters of Taishan related
```

Confidential - Subject to Further Confidentiality Review

1    to this lawsuit?

2         MR. BECKER:  Object to the form.

3      A.   No.

4    BY MR. LEVIN:

5      Q.   Has CNBM's directors in the past ever

6    approved matters related to this lawsuit as it

7    applied to BNBM?

8         MS. DALEY:  Object to the form.

9      A.   Not to my knowledge.

10   BY MR. LEVIN:

11     Q.   Has CNBM Group in the past ever

12   approved matters related to this lawsuit with

13   regard to BNBM?

14        MS. DALEY:  Objection to form.

15     A.   I don't know, but as far as I know it

16   will be no.

17        MR. LEVIN:  Let's take five.

18        THE VIDEOGRAPHER:  We're off the

19   record at 9:23 a.m..  This concludes tape one.

20        (Whereupon, a recess was taken.)

21        THE VIDEOGRAPHER:  We're back on

22   record at 9:41 a.m..  This is the beginning of

23   tape two.

24   BY MR. LEVIN:

25     Q.   As a director of Taishan, are you

Confidential - Subject to Further Confidentiality Review

```
 1    aware of whether any employees or

 2    representatives of Taishan were ever

 3    reprimanded, fired, or asked to resign as a

 4    result of this lawsuit?

 5              MR. BECKER:  Object to form.

 6         A.   I don't know.

 7    BY MR. LEVIN:

 8         Q.   Do you use a smartphone?

 9         A.   I have a cell phone.

10         Q.   And do you text with it?

11         A.   Sometimes I would.

12         Q.   And do you receive texts?

13         A.   Sometimes I would.

14         Q.   How long have you had a smartphone?

15         A.   About a month.  Very short.

16         Q.   When I asked you questions about

17    whether Mr. Knauf came to China to visit with

18    you, I called him Bancroft Knauf.  Would your

19    testimony be any different if I told you his

20    name was Baldwin Knauf?

21         A.   There wouldn't be any change.

22         Q.   That's the reason I call everybody

23    "sir."

24         A.   Thank you.

25         Q.   Let's go to this document.
```

```
 1              MS. ROBERTSON:  At this time

 2    Plaintiffs offer, file, and introduce Wang

 3    Exhibit 309.  Wang Exhibit 309 was produced by

 4    BNBM PLC in this litigation.

 5              (Whereupon, Exhibit Number 309,

 6              Translation of BNBMPLC-E-0029655 -

 7              Report on hiring foreign law firms for

 8              American gypsum board litigation

 9              matters, was marked for

10              identification.)

11              MS. ROBERTSON:  Wang Exhibit 309 is

12    identified as the PSC's translation of the

13    BNBMPLC-E-0029655, followed by the machine

14    translation as produced, and that is then

15    followed by the Chinese version of the original

16    document.

17              This was not provided in advance to

18    BNBM's counsel, therefore there is no agreement

19    as to the translation of this document.

20              MR. BARR:  Just hold on.

21              MR. LEVIN:  Take some time to

22    familiarize yourself with it.

23              (Reviewing document.)

24              MR. BARR:  All right.  We can go back

25    on the record.  I'm going to make a statement,
```

```
 1      though, before you ask a question.  We were

 2      never off the record?  I didn't realize we had

 3      this long pause here, a little dead space on the

 4      record.

 5              We've just been provided with Wang

 6      Exhibit 309, which we had not seen before.  The

 7      document on its face relates to the retention of

 8      foreign law firms for American gypsum board

 9      litigation matters.  I'm not going to object on

10      this time to questions with respect to this

11      document on privilege grounds, provided that you

12      will agree that our permitting you to ask

13      questions does not constitute a broader waiver

14      of the attorney/client privilege with respect to

15      either the attachments which are referenced

16      below or on any other matters.

17              MR. LEVIN:  That's fine, as long as

18      it's related solely to this document and the

19      attachments to this document.

20              MR. BARR:  Well, no.  You have to

21      acknowledge that our allowing you to question on

22      any privileged document does not constitute a

23      broader waiver of the attorney/client privilege,

24      or else I can't let you ask any questions.

25              MR. LEVIN:  Allowing you -- allowing
```

Confidential - Subject to Further Confidentiality Review

```
 1     me to question the witness as this document does

 2     not waive the privilege as to any other

 3     documents that you've produced, is that what --

 4            MR. BARR:  Correct.  Well, no,

 5     documents we may not have produced.  It's not a

 6     wholesale waiver of the privilege.

 7            MR. LEVIN:  It's not a wholesale

 8     waiver of the privilege, yes.

 9            MR. BARR:  That is what I --

10            MR. LEVIN:  It's a one-off.

11            MR. BARR:  It's a one-off with respect

12     to this document, this sheet of paper.

13            MR. LEVIN:  That's correct.

14            MR. BARR:  Okay.

15     BY MR. LEVIN:

16        Q.   Have you reviewed the document, sir?

17        A.   I see this document.

18        Q.   Have you seen this document before?

19        A.   No.

20        Q.   Are you familiar with the subject

21     matter of the document?

22        A.   I see the document, right, that it is

23     material of a certain company hiring law firms.

24        Q.   Have you seen -- are you familiar with

25     the subject matter of this document?
```

```
 1              MR. BARR:  Objection.  Vague.

 2         A.   I'm not familiar.

 3    BY MR. LEVIN:

 4         Q.   Are you aware of the facts that are

 5    stated in this document?

 6         A.   I don't know which company it is, nor

 7    the legal department of which company.

 8         Q.   Can you see that the document was

 9    provided by BNBM PLC?

10         A.   I don't know who provided it.

11         Q.   Do you know that this document came

12    from the files of BNBM PLC?

13         A.   I don't know.

14         Q.   Was BNBM involved in the engagement of

15    counsel for Taishan?

16              MR. BECKER:  Object to the form.

17         A.   To my knowledge, it is each company's

18    management's responsibility to hire counsel.

19    BY MR. LEVIN:

20         Q.   Did Hogan Lovells ever represent BNBM?

21         A.   I'm not sure.

22         Q.   Did Hogan Lovells ever represent

23    Taishan?

24         A.   I've heard of it.

25         Q.   You've heard of Hogan Lovells, or
```

1      you've heard of them representing Taishan?

2          A.   I've heard that Hogan Lovells has

3      represented Taishan for the lawsuit.

4          Q.   If this document -- strike that.

5              This document came from BNBM's files.

6      You're Chairman of the Board of BNBM, you've

7      been general manager of BNBM, you're

8      vice-president of CNBM.  Could you help me and

9      tell me a name of somebody who would be

10     knowledgeable as to the contents of this

11     document?

12         A.   I see the date in the document is

13     October, 2009 in which time I was no longer the

14     general manager of BNBM.

15         Q.   What were you?

16         A.   The director of the board of BNBM.

17         Q.   Did you hold any other positions at

18     BNBM?

19         A.   No.

20         Q.   Well, my question was, who would know

21     at BNBM about the contents of this particular

22     document?

23         A.   At the time I was the director, the

24     Chairman of the director of the board of BNBM, I

25     was not in charge of the legal matters of this

```
 1      lawsuit, therefore I do not know.  I would say

 2      perhaps it was the person in charge of the legal

 3      department.

 4          Q.   Sir, you said at this time you were

 5      only a director of BNBM PLC.  You were only a

 6      director, but you were Chairman at this time,

 7      weren't you?

 8              MR. BARR:  So testified in the prior

 9      answer.

10              MR. LEVIN:  He didn't -- it's the

11      prior -- at a prior time he so testified, but

12      not the prior answer.

13              MR. BARR:  Yes, he did.  "At the time

14      I was the director, the Chairman of the director

15      of the board of BNBM."  It's a little horrible

16      in terms of the translation, but he did say.

17              MR. LEVIN:  Not what I heard.  Let me

18      read it.

19              MR. BARR:  35, 21.

20              MR. LEVIN:  Okay.  The one above he

21      didn't say, he did say it afterwards.

22              MR. BARR:  Agreed.

23      BY MR. LEVIN:

24          Q.   This document which has been produced

25      by BNBM and is dated October 12, 2009 and
```

1    appears to come from the legal department of

2    BNBM states at Paragraph 3, which hasn't been --

3         MR. BARR:  His testimony clearly

4    stated he did not know whose legal department

5    this was.

6         MR. LEVIN:  I understand.

7    BY MR. LEVIN:

8      Q.   In this document, could you tell me

9    who the company is that's referred to in

10   Paragraph 3?

11        MR. BARR:  Objection.  Asked and

12   answered.

13     A.   From the document, I cannot tell what

14   company is it, and which company's legal

15   department is it.  It could be BNBM, it could be

16   Taishan Gypsum, it could be any other company.

17        MR. LEVIN:  Mr. Barr, will you agree

18   that the document was produced by BNBM?

19        MR. BARR:  Yes.

20   BY MR. LEVIN:

21     Q.   Okay.  Let's go to guaranties.

22        Did there come a time in the events of

23   BNBM where BNBM would make guaranties to Taishan

24   and Taishan's wholly-owned subsidiaries?

25     A.   Yes.

```
 1            Q.   And what was the purpose for making

 2     those guaranties?

 3            A.   According to the custom of Chinese

 4     bank and the rules of Chinese bank, when a

 5     company goes to a bank for a loan, a guaranty is

 6     needed.  Usually the guaranty would be provided

 7     by the shareholder, the biggest controlling

 8     shareholder of that company, perhaps is for the

 9     purpose of Taishan's bank loan.

10            Q.   Did this -- did Taishan need these

11     guaranties to operate their company effectively?

12                 MR. BECKER:  Object to form.

13                 MR. BARR:  Join the objection.

14            A.   Not necessarily.  Like I said,

15     sometimes Taishan Gypsum would use its own

16     assets as guaranty.  I also know that for some

17     of the loans it can obtain without providing a

18     guaranty, and sometimes it would need as big a

19     shareholder, BNBM, to provide guaranty, in that

20     case we would submit that to the board of

21     directors meeting and the shareholders meeting

22     for discussion.

23     BY MR. LEVIN:

24            Q.   Has BNBM's shareholders -- strike

25     that.
```

```
 1              Has BNBM's board of directors ever

 2    turned down a guaranties request from Taishan?

 3        A.    I don't remember it has ever been

 4    refused.

 5        Q.    And is it a fact that Taishan could

 6    not grow its business without the guaranties

 7    provided by BNBM?

 8              MR. BECKER:  Object to form.

 9              MR. BARR:  Objection to the form.

10    Lack of foundation.

11        A.    I disagree with your opinion.  In

12    China when an enterprise trying to get funding,

13    it is a very common practice for the company's

14    biggest shareholder to provide guaranty for the

15    bank loan.

16    BY MR. LEVIN:

17        Q.    What is the process by which Taishan

18    solicits a guaranty from BNBM?  Do they have to

19    have a board of directors meeting of their own?

20    Do they then send something to BNBM?  Does BNBM

21    have a board of directors meeting?  Do they

22    approve it?  Tell me about it.

23              MR. BARR:  Object to the form.

24              You may answer.

25        A.    Usually, as far as I know, when
```

```
 1     Taishan Gypsum needed a bank loan, it will,

 2     according to its need, sometimes negotiate with

 3     a bank regarding the loan, and sometimes the

 4     guaranty will be waived, sometimes it will use

 5     its own assets for the guaranty, and sometimes,

 6     according to the condition Taishan negotiates

 7     with the bank, and the bank would request to see

 8     whether its biggest shareholder can provide the

 9     guaranty.  In that case, Taishan Gypsum would

10     submit a request to BNBM.  BNBM will hold a

11     shareholders meeting and a board of directors

12     meeting for discussion.  If the board of

13     directors meeting or the shareholders meeting

14     decided that by having the biggest shareholder

15     of Taishan Gypsum, BNBM, supporting Taishan

16     Gypsum providing the guaranty for the loans

17     would be beneficial to the development of

18     Taishan Gypsum, because the development of

19     Taishan Gypsum would result in more profit, and

20     the biggest shareholder of Taishan Gypsum will

21     also share the profit, in that case the board of

22     directors meeting and shareholders meeting of

23     BNBM will possibly approve such a guaranty.  To

24     my knowledge, it is a common practice for

25     Chinese enterprises, as well as those Chinese
```

```
 1     enterprises invested by foreign companies.

 2          Q.   Okay.  Let's go to Taishan now.

 3               Does the Taishan board of directors

 4     vote as to whether or not they are going to go

 5     to BNBM for a guaranty?

 6          A.   It's not necessary.

 7          Q.   Have they voted from time to time with

 8     regard to whether or not they were going to go

 9     to BNBM for a guaranty?

10          A.   It's not necessary.

11          Q.   Have they ever voted with regard to a

12     guaranty that they requested from BNBM?

13          A.   No.

14          Q.   Who makes the decision at Taishan as

15     to making the determination to request a

16     guaranty from BNBM?

17          A.   Taishan Gypsum itself, its management

18     team.

19          Q.   Chairman Jia?

20          A.   Not him individually.  It is a

21     decision of the company.

22          Q.   Well, does he act for the company when

23     he makes that request?

24               MR. BECKER:  Object to form.

25          A.   He did not make the request
```

```
 1      individually.  It is that Taishan Gypsum as a

 2      company makes the question to BNBM.

 3      BY MR. LEVIN:

 4          Q.   And they do not seek the approval of

 5      the board of directors before making that

 6      request?

 7          A.   Not for the request of guaranty.

 8               THE INTERPRETER:  Interpreter would

 9      like to start over again.

10          A.   The approval is not needed for

11      requesting the guarantee.

12               THE INTERPRETER:  The interpreter

13      would like to start over again.

14          A.   The approval of the board of directors

15      meeting is not needed for requesting the

16      guaranty.

17      BY MR. LEVIN:

18          Q.   But are the subject matter of

19      guaranties ever brought before the board of

20      directors meetings of Taishan?

21          A.   No.

22               I'd like you to clarify.  Did you ask

23      the matter of guaranty, or the related matter of

24      guaranty?

25          Q.   What is the related matter of
```

Confidential - Subject to Further Confidentiality Review

1    guaranty?

2        A.    For the need of a loan itself, if up

3    to a certain number it would need the approval

4    of the board of directors meeting of Taishan

5    Gypsum.  But for the matter of whether it would

6    need the guaranty from BNBM, it is not necessary

7    that the matter to be discussed and decided by

8    Taishan Gypsum's board of directors meeting.

9        Q.    Thank you for clearing that up.

10            When Taishan is desirous of making a

11   loan from a bank, do they seek the approval of

12   the board of directors?

13       A.    When it's up to a certain amount and

14   to a certain proportion.

15       Q.    And what amount would that be, and

16   what proportion would that be?

17       A.    I don't have a clear recollection.

18   There are some regulations of the law and of the

19   bank.

20       Q.    Have you ever been to a board of

21   directors meeting of Taishan where the subject

22   matter of whether a loan should be incurred was

23   discussed.

24       A.    Yes.

25       Q.    And did you vote as a director of

1    Taishan?

2         A.   Yes.

3         Q.   And then a decision was made to obtain

4    the loan, is that correct?

5         A.   The board of directors meeting would

6    approve the proposal from the management

7    requesting the loan.

8         Q.   And then I take it in the ordinary

9    course of the business operations of Taishan,

10   you would seek a guaranty from BNBM, if needed?

11        MR. BECKER:  Object to form.

12        A.   As a director of Taishan Gypsum, I

13   know that the board of directors of Taishan

14   would only make approval based on the

15   requirements of the law and of the bank in

16   regard to the request of loan submitted by the

17   management.  But it is decided by Taishan

18   Gypsum's management through its negotiation with

19   the bank whether the loan needs a guaranty, and

20   a guaranty is made through its assets, through

21   other ways, or even through third party

22   providing such a guaranty.

23   BY MR. LEVIN:

24        Q.   Would BNBM provide such guaranties?

25        A.   Sometimes Taishan Gypsum would submit

1    a request to BNBM to provide it with the

2    guaranty of the loans.

3        Q.   Now, when you mentioned third party,

4    were you referring to BNBM?

5        A.   No.  It is up to the management team

6    of Taishan Gypsum and up to the negotiation of

7    Taishan Gypsum's management team and the bank if

8    Taishan Gypsum were to find another company,

9    such as you yourself if you're willing to

10   guaranty for them.

11       Q.   Well, my question to you -- and I'll

12   get to whether I'm willing or not.  My question

13   to you is, sir, when you referred to a third

14   party, did you include BNBM as a third party in

15   that statement?

16           MR. BARR:  Objection.  Asked and

17   answered.

18       A.   It is the general practice in China

19   when we talk about the third party, well,

20   usually it is the biggest shareholder of a

21   certain company that would provide guaranty for

22   that company, but sometimes the company can also

23   find a professional guaranty company to provide

24   guaranty for it.

25   BY MR. LEVIN:

1     Q.   When you sat on the board of directors

2    of Taishan, are you aware of any guaranties that

3    were made by a professional guarantor, that is

4    somebody other than BNBM?

5     A.   I'm not sure about that, but Taishan

6    Gypsum used to provide guaranty to another

7    company, in exchange another company would

8    provide guaranty for Taishan Gypsum.

9     Q.   When was that, and who was that

10   company?

11    A.   I don't recall.

12    Q.   Was that company related to BNBM?

13    A.   No.

14    Q.   Was it related to CNBM?

15    A.   No.

16    Q.   How many times did that occur while

17   you were on the board of directors of Taishan?

18    A.   I don't recall whether it happened,

19   and I don't recall how many times it happened,

20   because providing a guaranty is not an issue to

21   be discussed in the board of directors meeting.

22    Q.   Would you expect Chairman Jia to know

23   that?

24        MR. BECKER:  Object to the form.

25   Calls for speculation.

Confidential - Subject to Further Confidentiality Review

```
1          A.   I don't know whether he is in charge

2     of the matter or not.

3     BY MR. LEVIN:

4          Q.   Now, if not Chairman Jia, who would be

5     knowledgeable of that fact?

6          A.   I don't know.

7          Q.   Now, there were times when you as a

8     director voted with regard to the need for a

9     loan from a bank for Taishan, as a director of

10    Taishan, am I correct?

11         A.   Yes.

12         Q.   And on some of these loans, at least,

13    if not many, they would also seek guaranties

14    from BNBM, would they not?

15         A.   As far as I know, Taishan Gypsum had

16    submitted requests to guaranty some of the loans

17    to BNBM, that is correct.

18         Q.   And as a member of the board of

19    directors of BNBM, you would vote with regard to

20    the guaranty with regard to these loans?

21         A.   Yes.

22         Q.   So you as an individual, as a director

23    of Taishan, and as a director of BNBM would vote

24    as to the loan, and then put on another hat and

25    vote as to the guaranty?
```

Confidential - Subject to Further Confidentiality Review

```
1              MR. BARR:  Objection to form.
2         A.   No.  When I am the director of Taishan
3    Gypsum on the board, I represent Taishan Gypsum.
4    When I'm the director of the board of BNBM, I
5    represent BNBM.  It's not only a matter of
6    wearing different hats.
7    BY MR. LEVIN:
8         Q.   But you would vote on the loan as a
9    director of Taishan Gypsum, and then you would
10   vote on the guaranty that was related to the
11   loan as a director of BNBM, is that correct?
12        A.   Correct.
13        Q.   Has BNBM gotten any guaranties from
14   either CNBM or CNBM Group?
15        A.   BNBM had obtained guaranty from CNBM
16   Company, Limited.
17        Q.   Have they obtained guaranties from
18   CNBM Group?
19        A.   No.
20        Q.   Have they obtained guaranties from
21   BNBM Group?
22        A.   No.
23        Q.   Have they ever obtained a guaranty
24   from --
25              MR. BARR:  Arnold, can we just agree,
```

1       the question starts "CNBM" and then "BM Group."

2               MR. LEVIN:  It's BN Group.  Strike it.

3       BY MR. LEVIN:

4          Q.   Have they obtained -- that is, has

5       BNBM obtained any guaranties from any other CN

6       related company, in other words another company

7       that had the four letters CNBM in front of it?

8       You know, all those companies.

9               MS. EAGAN:  Object to form.

10              MR. BARR:  I object to form as well.

11         A.   No.

12      BY MR. LEVIN:

13         Q.   Under what circumstances did BNBM

14      receive guaranties from CNBM?

15         A.   Just like the situation I just

16      described to you, when BNBM needs loan from the

17      bank, we would negotiate with the bank.

18      Sometimes we do not need a guaranty, we can

19      guaranty by our own assets.  And sometimes it is

20      possible that we would need our biggest

21      shareholder, CNBM, to provide the guaranty for

22      us.  All is done according to the normal

23      business rules and regulations of law.

24              MR. BARR:  We just fix the transcript,

25      "all is done," not "all is gone."

```
 1    BY MR. LEVIN:

 2         Q.   How many times has that occurred since

 3    you've been a director of BNBM?

 4              MR. BARR:  How many times has what

 5    occurred?

 6              MR. LEVIN:  Where CNBM guarantied a

 7    BNBM loan.

 8         A.   I did not pay attention to that, and I

 9    do not remember the numbers of times it had

10    happened.  Because a company seeking the

11    guaranty from its biggest shareholder is a very

12    normal and ordinary practice, therefore I did

13    not spend time trying to pay attention to that.

14    BY MR. LEVIN:

15         Q.   And it was a normal and ordinary

16    practice for BNBM to seek a guaranty from CNBM?

17         A.   Yes, it happened.

18         Q.   At these times that BNBM sought

19    guaranties from CNBM, you were vice-president of

20    CNBM, were you not?

21         A.   When BNBM seeks guaranty from CNBM,

22    the request of guaranty would have been

23    submitted to the board of directors of CNBM for

24    approval.  However, I am not a member of the

25    board of directors of CNBM, I'm only the
```

```
 1    vice-president.

 2         Q.   But you were vice-president during

 3    this period of time, were you not?

 4              MS. DALEY:  Object to the form.

 5              MR. BARR:  Join the objection.

 6         A.   I have been the vice-president in

 7    recent years, not before.

 8    BY MR. LEVIN:

 9         Q.   Now, as vice-president of CNBM, you're

10    interested in the general operations of CNBM

11    because you have a fiduciary duty to CNBM to

12    carry out your duties as vice-president, and in

13    order to perform your fiduciary duty you make

14    yourself aware of things that are happening at

15    CNBM, do you not?

16              MR. BARR:  Objection to the form.

17              MS. EAGAN:  Object to form.

18              MR. BARR:  Objection to calls for --

19    excuse me.

20              Objection to lack of foundation.

21    Objection to multi compound.  You can answer if

22    you can.  And objection to the use of legal

23    terms in the question as well.

24              But you may answer, if you can.

25         A.   As the vice-president of CNBM, my duty
```

Confidential - Subject to Further Confidentiality Review

```
 1      is to be in charge of BNBM's investment and

 2      return.  I do not have an office in CNBM, nor do

 3      I work in CNBM.  I do not in charge of any other

 4      works in CNBM, and I'm not in charge of CNBM's

 5      daily operation.

 6              The matter of BNBM seeking guaranty

 7      from CNBM is an issue of BNBM's board of

 8      directors meeting, it is not -- it is not a

 9      matter of daily operation, therefore I'm not

10      involved, and I do not know.

11      BY MR. LEVIN:

12          Q.   How many times did CNBM guaranty a

13      loan for BNBM when you were general manager of

14      BNBM?

15          A.   I don't have a clear recollection on

16      that, but there have been --

17              THE INTERPRETER:  Interpreter needs to

18      clarify.

19          A.   There have been guaranties, and all

20      have been publicly announced.

21          Q.   As vice-president of CNBM, are you

22      aware of whether CNBM Group ever made any

23      guaranties of CNBM?

24          A.   As the vice-president of CNBM, I'm not

25      in charge of the daily operation of CNBM,
```

Confidential - Subject to Further Confidentiality Review

1       therefore whether they have sought guaranties or

2       loans from -- whether they have sought loans or

3       guaranties from CNBM Group, I do not know.

4           Q.   Now, you indicated before that as

5       vice-president of CNBM, you were in charge of

6       the investment in BNBM, is that correct?  Do I

7       remember that correctly?

8           A.   Accurately speaking, I'm in charge of

9       managing CNBM's equity in BNBM.

10          Q.   Okay.  And is that your sole function

11      at CNBM as a vice-president of CNBM?

12          A.   Correct.

13          Q.   So get this straight.

14              Your sole function in your capacity at

15      CNBM is with regard to CNBM's investment in

16      BNBM, correct?

17              MR. BARR:  Objection.  Asked and

18      answered.

19              MR. LEVIN:  I know that.

20              MR. BARR:  Objection.  Argumentative.

21              MR. LEVIN:  No, it's not.

22          A.   Yes.

23      BY MR. LEVIN:

24          Q.   And then you're Chairman of BNBM, is

25      that correct?

1          MR. BARR:  Asked and answered a

2    thousand times.

3          MR. LEVIN:  I want the jury to hear.

4     A.   Yes.

5    BY MR. LEVIN:

6     Q.   And you then perform your task at BNBM

7    to ensure that BNBM operates successfully and

8    creates dividends for CNBM, where you're

9    vice-president, is that correct?

10    A.   My function as the Chairman of BNBM is

11   that I'm only accountable to BNBM.  I'm

12   accountable to all the shareholders of BNBM.

13    Q.   And that's to operate successfully and

14   make money for the shareholders?

15    A.   The duty of a Chairman of the Board

16   is, of course, to be in charge of the board of

17   directors meetings, and to guaranty that the

18   company will operate more successfully.

19    Q.   And then going further down, you are a

20   director of Taishan, is that correct?

21    A.   Yes.

22    Q.   And your job in Taishan is, as a

23   director, is to see to it that Taishan operates

24   successfully so that it makes money for the

25   shareholders of Taishan, which are in large part

 1     the shareholders of BNBM, and that BNBM then

 2     makes money, which in large part for the

 3     shareholders of CNBM, so the dividends flow from

 4     Taishan to BNBM to CNBM, and you have a role in

 5     all three companies?

 6             MS. EAGAN:  Object to form.

 7             MR. BARR:  Objection to form.

 8             MR. BECKER:  Object to form.

 9             MR. BARR:  Objection to the

10     speechifying which is more in the nature of

11     summation than it is appropriate for a

12     deposition.  Objection, compound.

13             But if you can answer, sir, for the

14     thousandth time with respect to all of those

15     elements of that compound question, you may.

16             MR. LEVIN:  That's quite a speaking

17     objection.

18             MR. BARR:  That was quite a speech you

19     made.

20        A.   This is indeed a very complex and

21     lengthy, lengthy question.  I don't quite

22     understand the concept of that question.

23             But since it took me 12 hours to fly

24     from Beijing to New York, and another three to

25     fly from New York to New Orleans, just to answer

```
 1     your question.  So for the matters that concern

 2     you, I would like to make a supplement comment.

 3              For example, I became the director of

 4     Taishan Gypsum through unanimous voting of all

 5     the shareholders in the shareholders meeting of

 6     Taishan Gypsum.  According to Chinese law and

 7     the company charter of Taishan Gypsum, as the

 8     director of Taishan Gypsum I take legal

 9     responsibilities and obligations to Taishan

10     Gypsum.  As a director of Taishan Gypsum, I am

11     accountable to Taishan Gypsum's board of

12     directors meeting.  The equity of all

13     shareholders is protected by the law and is

14     equal.  According to Chinese law, one -- the

15     owner of one share is protected equally as the

16     owner of a thousand shares.  As the director of

17     the company that was voted and selected, he has

18     to be accountable to the owner that owns 1,000

19     shares as well as the owner that owns one share.

20     According to the rule of equity, of course the

21     shareholders would share profits of the company

22     according to the proportion of the shares they

23     hold.

24              I apologize that I have made a lengthy

25     supplement comment, because I believe you were
```

```
 1      interested in the issue.

 2                MR. BARR:  Let's take a break.

 3                MR. LEVIN:  Do you want to take a

 4      break now?

 5                MR. BARR:  Yes.  He's been going over

 6      an hour.

 7                MR. LEVIN:  The next -- we want to

 8      move on.  The next document is 322.

 9                MR. BARR:  Do we have that?

10                MS. ROBERTSON:  Yes.

11                MR. LEVIN:  I have a few questions

12      before that document, maybe five minutes, if you

13      want me to do them now I'll do them now, if not

14      I'll do them first thing when we come back.

15                MR. BARR:  First thing when we come

16      back.

17                MR. LEVIN:  That's fine.

18                THE VIDEOGRAPHER:  We're off the

19      record at 10:48 a.m..  This concludes tape

20      number two.

21                (Whereupon, a recess was taken.)

22                THE VIDEOGRAPHER:  We're back on the

23      record at 11:03 a.m..  This is the beginning of

24      tape three.

25                MS. ROBERTSON:  At this time
```

1    Plaintiffs offer, file, and introduce Wang

2    Exhibit 322-R.  This exhibit was redlined by the

3    Defendants BNBM PLC, and the PSC has agreed with

4    the redline changes.

5              For identification, this is a range of

6    documents beginning with BNBMPLC-E-0112095

7    through 0112112.

8              (Whereupon, Exhibit Number 322-R,

9              Partial Translation of

10             BNBMPLC-E0222095-112112 - BNBM PLC

11             Public Announcement of the External

12             Guaranties for the year 2015

13             (Redlined), was marked for

14             identification.)

15             MS. ROBERTSON:  This document was

16   produced by BNBM PLC in this litigation.  This

17   exhibit is a redlined version.  The Plaintiffs'

18   English translation prior to the redline, the

19   produced machine translation, and finally the

20   original Chinese document.

21             Because this is a partial translation,

22   the translation was highlighted -- the Chinese

23   was highlighted in yellow, that corresponds with

24   English portions that were translated.

25   BY MR. LEVIN:

1          Q.   Sir, could you familiarize yourself

2     with that document?

3          A.   All right.  Thank you.

4               MR. BARR:  Do you want him to just

5     focus on the highlighted portions?

6               MR. LEVIN:  I'd like him to focus on

7     the whole document.

8     BY MR. LEVIN:

9          Q.   As Jiminy Cricket said, it's the

10    highlighted portions on the Chinese is what I

11    have here, so he could focus only on that.

12              MR. BARR:  So he said you can focus on

13    the highlighted portions, that that's what he's

14    going to ask questions on?

15              THE INTERPRETER:  It's been

16    translated.

17              MR. BARR:  Okay.

18              (Witness reviewing document.)

19    BY MS. ROBERTSON:

20         Q.   This is a document produced by BNBM in

21    this litigation.  Can you identify what the

22    document is?

23         A.   From the face of the document, it

24    appears to be a public announcement of BNBM's

25    guaranty.  But I also see there are a lot of

1    blank spaces, therefore I believe it is a draft.

2        Q.   Do you know who at BNBM PLC creates

3    this type of document?

4        A.   Usually the secretary of the board of

5    the company would draft a public announcement

6    for the guaranties.

7        Q.   And what is the date of this document?

8        A.   I don't know, but it says here March

9    the 18th, 2015.

10       Q.   Sir, would you agree that this

11   document identifies that you hosted the meeting

12   of the board of directors related to the

13   announcement in this document?

14       A.   I usually host BNBM's board of

15   directors meeting.

16       Q.   Do you recall hosting the meeting that

17   discussed the external guaranties for the year

18   2015?

19       A.   I don't have a clear recollection, but

20   it's possible.

21       Q.   Following the board of directors

22   meetings, is it ordinary or typical for BNBM PLC

23   to publish an announcement such as this?

24       A.   Yes.

25       Q.   After the BNBM announcements are

Confidential - Subject to Further Confidentiality Review

1    published, do you know whether there are ever

2    changes or edits made to a BNBM PLC

3    announcement?

4         A.   Upon publishing of BNBM's public

5    announcements, it cannot be changed or edited.

6         Q.   Before an announcement is made public,

7    can the announcement be changed or edited?

8         A.   Before the public announcement is

9    made, the secretary of the board of directors

10   would draft it, and the board of directors would

11   discuss it, and the public announcement could be

12   changed according to the opinion of the board of

13   directors meeting.

14        Q.   So did you receive -- or do you

15   receive drafts of public announcements as the

16   Chairman of the board of directors prior to a

17   BNBM PLC announcement being published?

18        A.   Usually for matters such as the public

19   announcement, the secretary of the board of

20   directors would draft an announcement and report

21   it to the board of directors meeting, as well as

22   read it in the board of directors meeting.  All

23   directors, including myself, can provide an

24   opinion of changes to the draft.  The secretary

25   of the board of directors would make changes and

Confidential - Subject to Further Confidentiality Review

1    publish the public announcement based on the

2    unanimous agreement reached by the board of

3    directors meeting.

4    BY MR. LEVIN:

5        Q.   Okay.  Are you familiar with the facts

6    contained in this document which has been marked

7    for identification as 322-R?

8        A.   I know it.

9        Q.   Is anything in this document not true?

10       A.   Because the document contains much

11   details and it is a draft, I do not remember

12   every detail, but the public announcement that

13   was published was the final resolution, that is

14   for sure.  If you were to ask -- if you were to

15   ask every sentence and every paragraph of the

16   draft, I do not have a clear recollection.

17   However, I can confirm with you the facts.  In

18   this board of directors meeting, it approved

19   BNBM's guaranty for some of Taishan Gypsum's

20   loans, and approved Taishan Gypsum Company to

21   provide guaranties for Taishan Gypsum's

22   subsidiary companies, and the board of directors

23   meeting had agreed to have Taishan Gypsum's

24   shareholders to provide reverse guaranty.

25            The reason I said that was BNBM only

1    holds 65 percent of Taishan Gypsum.  There are

2    also other shareholders.  For the guaranty that

3    BNBM provides to Taishan Gypsum, BNBM would

4    require other shareholders of Taishan Gypsum to

5    provide guaranty to BNBM.  The responsibility of

6    the guaranty is in proportion with the

7    percentage that the shareholder holds in Taishan

8    Gypsum.

9              For the guaranty made by BNBM to

10   Taishan Gypsum when the guaranty has been

11   implemented, Taishan Gypsum would need to

12   guaranty BNBM by Taishan Gypsum's assets.

13       Q.   The document -- are you finished?

14   Thank you.

15             The document indicates that it was

16   sent out on March 6, 2015 via e-mail.  I'm

17   sorry, strike that.  That's the notification of

18   the meeting.

19             Do you agree with the statement made

20   at 112109, the opinion of the board of

21   directors, and I'll read it, "The board of

22   directors of the company holds the opinion" --

23   when we're speaking of the board of directors

24   we're speaking of the board of directors of

25   BNBM, correct?

```
 1              MR. BARR:  What page are you on?

 2              MR. LEVIN:  The last page.

 3    BY MR. LEVIN:

 4         Q.   It's easier if I didn't ask my

 5    questions that way because of the translation.

 6    Strike what I said.

 7              We are here -- the board of directors

 8    of the company that is making the statement in

 9    the opinion of the board of the directors is the

10    board of directors of BNBM, is that correct?

11    That you can answer when she translates it.

12         A.   That's what is written here.  It

13    should be the case.  I believe so.

14         Q.   Okay.  Now, I will read Roman Number

15    IV., the paragraph at 0112109.  "Opinion of the

16    Board of Directors.  The Board of Directors of

17    the Company holds the opinion that Taishan

18    Gypsum is the controlled subsidiary of the

19    company.  Its operating status and credit status

20    are good.  It has relatively strong capability

21    to repay its debts.  To provide guaranties for

22    it will not negatively impact the company.  In

23    order to meet the normal production and

24    operational needs of Taishan Gypsum, the board

25    of directors of the company agrees to provide
```

1    guaranties for its bank credit loan business."

2              And you were at the meeting?

3              MR. BARR:  Drop the word credit, it's

4    not there, for the record.  It says "bank loan

5    business."  Delete the word "credit," please,

6    Maureen.

7    BY MR. LEVIN:

8        Q.   You hosted --

9              MR. LEVIN:  Are you telling me

10   "credit" should be in there?

11             MR. BARR:  You're absolutely right.

12   Why don't you re-read your thing into the record

13   and forget what I said.  That's the only time

14   I'm going to say that.

15             MR. LEVIN:  When was the last time you

16   made a mistake?

17             MR. BARR:  Just now, not for a very

18   long time before that.

19   BY MR. LEVIN:

20       Q.   Sir, I'll read to you a statement that

21   occurred in this document which you hosted as

22   the Chairman of the Board of directors of BNBM.

23   "Opinions of the Board of Directors.  The Board

24   of Directors of the Company holds the opinion

25   that Taishan Gypsum is the controlled subsidiary

1    of the company.  Its operating status and credit

2    status are good.  It has relatively strong

3    capability to repay its debts.  To provide

4    guaranties for it will not negatively impact the

5    company.  In order to meet the normal production

6    and operational needs of Taishan Gypsum, the

7    board of directors of the company agrees to

8    provide guaranties for its bank credit loan

9    business."

10           Do you, sir, agree with that

11   statement?

12        A.   This is a draft.  I don't know the

13   final version of the public announcement is the

14   same.  But the basic truth is there.

15        Q.   Do you know what bank was involved

16   here?

17        A.   I don't know.  It should be many

18   banks.  They're listed in the front, many banks.

19        Q.   And do you know whether these

20   guaranties were accepted by any of the many

21   banks?

22        A.   Only upon the approval of BNBM's board

23   of directors can Taishan Gypsum proceed with the

24   guaranty with the bank.

25        Q.   Was there a final resolution of this

1    particular document at some point, an

2    announcement made?

3         A.   Yes.

4         Q.   And could you tell me whether any of

5    the banks accepted the guaranty?

6         A.   As far as I know, the guaranty went

7    successfully --

8         Q.   To all the banks?

9         A.   -- usually.

10        Q.   Strike that.  I mean -- let Sunny

11   finish.

12             THE INTERPRETER:  Sunny finished.

13        A.   I don't know if each of the guaranty

14   requests or each of the resolution was

15   implemented, but the board of directors meeting

16   of BNBM had approved of this.

17        Q.   Do you know whether any bank rejected,

18   or did not accept, the guaranty of BNBM?

19        A.   Because it was Taishan Gypsum that

20   dealt with the specific process of the loan and

21   guaranty, I did not hear from them whether all

22   of them were completed, or if any of them were

23   not accepted.

24        Q.   If a guaranty of BNBM's for a Taishan

25   loan had not been accepted by a bank, would you

Confidential - Subject to Further Confidentiality Review

1    as a director of Taishan know that?

2         A.   It is a matter of operation of Taishan

3    Gypsum.  It is not necessary to be reported to

4    the board of directors.

5         Q.   Of Taishan?

6         A.   Correct.

7         Q.   But it was a BNBM guaranty.  Would it

8    be necessary to report to the board of BNBM, the

9    board of directors of BNBM, that one of their

10   guaranties was not accepted by a bank?

11        A.   The BNBM board of directors only

12   approve whether they would provide guaranty for

13   these loans.  But whether it is, in fact, been

14   implemented or not, it is not necessary to

15   report back to the BNBM's board of directors.

16        Q.   Well, I'm not concerned about whether

17   Taishan presented it to a bank.  I'm concerned,

18   sir, whether Taishan presented it to a bank, a

19   BNBM guaranty, and the bank rejected your

20   guaranty.

21             MR. BARR:  Do you have a question?

22   Because there's no question.

23             MR. LEVIN:  That's true.

24   BY MR. LEVIN:

25        Q.   To your knowledge, did any bank that

Confidential - Subject to Further Confidentiality Review

```
 1      Taishan sought a loan from, together with a BNBM

 2      guaranty, reject the BNBM guaranty?

 3          A.   I've not heard of information like

 4      that.  Usually, to my understanding, when an

 5      enterprise submit a request to a bank for the

 6      loan or the guaranty, if the bank does not

 7      approve the loan or the guaranty, the business

 8      cannot go forward, the loan will be cancelled.

 9      The board of directors only approves and agrees

10      if there's a loan it would provide guaranty for

11      the loan, but the board of directors would not

12      force that because it would provide a guaranty

13      for the loan, the loan must go forward.  If, as

14      you said, a bank disapprove of a certain

15      guaranty of a loan, the loan would not even go

16      forward, therefore it does not need to be

17      reported to the board of directors.

18          Q.   To your knowledge, were any loans not

19      granted by the bank where Taishan sought the

20      loan based on Taishan's financial situation?

21          A.   Obtaining a loan from the bank is an

22      issue of Taishan's operation and management.  I

23      am not involved in it, and neither do I know

24      about it.

25          Q.   Who signs off on the guaranty for
```

```
 1    BNBM?

 2         A.   You mean sign off the report?

 3         Q.   Yes.  Who signs off on the guaranty

 4    for Taishan?

 5              MR. BARR:  Based on what he just

 6    asked, are you asking him physically someone who

 7    signs something?

 8              MR. LEVIN:  Yes, proof, or words to

 9    that effect.

10         A.   As long as that person is authorized

11    by BNBM's board of directors, it will be fine.

12    But it's not any individual, it is upon the

13    approval of the resolution of the board of

14    directors, anyone authorized by the company's

15    board of directors can sign off.

16    BY MR. LEVIN:

17         Q.   Who signs off on the loan that Taishan

18    seeks?

19         A.   I don't know about that.  I believe it

20    is the management team of Taishan.

21         Q.   Next document.

22              MS. ROBERTSON:  Plaintiffs now offer,

23    file, and introduce Wang Exhibit 305.

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                (Whereupon, Exhibit Number 305-R,

 2                Partial Translation of

 3                BNBMPLC-E-0011157-0011166 - BNBM PLC

 4                Annual General Meeting Document:

 5                Resolution of the 2013 Annual General

 6                Meeting re: approval of Guaranties to

 7                Taishan Gypsum (Redlined), was marked

 8                for identification.)

 9           MS. ROBERTSON:  This exhibit is found

10      at BNBMPLC-E-0011157 through 0011166.  We

11      introduce this exhibit as Wang Exhibit 305-R.

12      It was provided to the Defendants prior to the

13      deposition.  The Defendants have redlined, the

14      PSC has accepted the redlines.  As a result, we

15      have the redlined version of the English, the

16      PSC original English translation, the produced

17      machine translation, and finally the Chinese

18      document.

19                This is, again, a partial translation,

20      so the Chinese document is highlighted in

21      yellow, and the highlights in yellow correspond

22      with the English translation.

23           MS. DALEY:  If we could note again for

24      the record, when you say "the defendants have

25      reviewed," you mean BNBM has reviewed?  Because
```

```
 1      the CNBM has not reviewed these translations,

 2      and reserve the right to object.

 3             MS. ROBERTSON:  My apologies.  When I

 4      say "defendants" I do mean the defendants as in

 5      the attorneys for Mr. Wang Bing, the deponent

 6      here today.  This is a document produced by BNBM

 7      PLC.

 8      BY MS. ROBERTSON:

 9          Q.   Have you had an opportunity to glance

10      at the document, Mr. Wang?

11          A.   I just read the document.

12          Q.   Can you identify what this document

13      is?

14          A.   It should be a resolution of BNBM's

15      board of directors meeting.

16             MR. BARR:  Board of directors?

17          A.   I'm sorry.  Shareholders meeting.

18             THE INTERPRETER:  This is interpreter

19      speaking.

20             It might be a misinterpretation.  The

21      witness might have said shareholders meeting.

22      Interpreter stand corrected.

23      BY MS. ROBERTSON:

24          Q.   For clarity, Mr. Wang, you would agree

25      that this is a document from BNBM's shareholders
```

Confidential - Subject to Further Confidentiality Review

1    meeting?

2         A.    Yes.

3         Q.    Do you know who at BNBM PLC creates

4    this type of document?

5         A.    Usually the secretary of the board of

6    directors would be responsible for documents of

7    shareholders such as this, because the

8    shareholders meeting is convened by the board of

9    directors.

10        Q.    Do you recall attending the meeting

11   that created this document as a board of

12   director for BNBM PLC?

13        A.    From the document I see that I did not

14   attend the meeting, which is possible, because

15   sometimes when I'm on business trip, I may be --

16   not be able to attend.

17        Q.    Do you usually attend shareholder

18   meetings as a director of BNBM PLC -- BNBM

19   shareholder meetings as a director of BNBM PLC?

20             THE INTERPRETER:  Interpreter needs to

21   clarify with the witness.

22        A.    According to Chinese law, the

23   directors of a public listing company would

24   usually observe the shareholders meeting, but

25   for this meeting, I might have been on a

1    business trip because I don't see my name on it.

2         Q.   Is it typical or usual for BNBM PLC to

3    publish resolutions of BNBM PLC's shareholders

4    meetings?

5         A.   Yes.

6         Q.   Is there a place at BNBM PLC, like a

7    file, where the final version of the

8    announcements for shareholder meetings are kept?

9         A.   The resolution of BNBM's shareholders

10   meetings has always been publicly announced, and

11   it is -- and they are all on the internet.

12        Q.   Does BNBM ever keep the physical copy,

13   the paper copy of the announcements?

14        A.   I don't know about that.

15        Q.   Prior to publication of shareholder

16   meeting resolutions or announcements, do you see

17   a draft?

18        A.   Because I am the director of BNBM,

19   when BNBM hosts its shareholders meeting,

20   according to the law I can be an observer to be

21   present.  So during the meeting I would be given

22   a draft to read.

23        Q.   During the board of directors meeting,

24   or during the shareholders meeting?

25        A.   Shareholders meeting.

Confidential - Subject to Further Confidentiality Review

1     Q.   So you receive a draft of the

2     announcement during the shareholders meeting?

3     A.   I would see it, yes.

4     Q.   Who were the shareholders of BNBM PLC?

5     A.   It includes CNBM Company, Limited, as

6     well as many entities' investors.

7          THE INTERPRETER:  Interpreter needs to

8     clarify with deponent for the word "entity."

9     The interpreter asked the witness the definition

10    of entity in his answer.

11         The deponent said the entity would

12    include all kinds of investors or other

13    companies, all kinds of other companies.

14    Q.   Can we agree this document is dated

15    2014?

16         MR. BARR:  The document speaks for

17    itself.

18    A.   Because I did not attend the meeting,

19    from the face of it, therefore I'm not sure what

20    its date, but that's what the document says.

21    BY MS. ROBERTSON:

22    Q.   In 2013, do you know out of

23    100 percent how much percentage of stock in BNBM

24    PLC was owned by CNBM Company, Limited?

25    A.   In the year 2013, I believe it was

    1    52.4 percent.

    2         Q.   In Exhibit 305-R at BNBMPLC-E-0011157,

    3    can you please identify for us the total

    4    percentage of shareholders in attendance at the

    5    annual shareholders meeting for 2013?

    6         A.   I see the document says 54.9 percent.

    7    BY MR. LEVIN:

    8         Q.   Reading the statement at 11160, and

    9    ask you whether you agree with the statement

   10    which has been approved with regard to the

   11    translation by your counsel.  "Taishan Gypsum

   12    Company, Limited (Taishan Gypsum) is BNBM's

   13    controlled subsidiary and has good operation and

   14    credit standing.  To satisfy Taishan Gypsum's

   15    needs of normal production and operation, it is

   16    approved that BNBM will provide guaranty for

   17    Taishan Gypsum's comprehensive credit line and

   18    working capital borrowings not exceeding a total

   19    of RMB 1 billion.  During the related period,

   20    from the day when this proposal is approved at

   21    this meeting, to the day of holding the 2014

   22    annual general meeting of shareholders, see the

   23    following details."

   24              So far do you agree with what I've

   25    said as being factually correct?

1              MR. BARR:  If you just direct him to

2       that section and the question, that would be

3       fine to us.

4           A.   Because I did not attend this meeting,

5       and I do not know if this document corresponds

6       with the final resolution of this meeting, but

7       it is possible that BNBM's shareholders meeting

8       had reviewed and voted and agreed for BNBM to

9       provide guaranty for Taishan Gypsum.  Even

10      though from the document I see there are some

11      against votes, not all shareholders had agreed,

12      but according to Chinese law the guaranty had

13      been approved as the result of the voting.

14      BY MR. LEVIN:

15          Q.   CNBM agreed, though, didn't they?

16          A.   I don't know.

17          Q.   Do you agree that these guaranties

18      were made, as stated in this document, to

19      satisfy Taishan Gypsum's needs of normal

20      production and operation?

21          A.   When Taishan Gypsum is in need of

22      loans, it is possible that it will submit a

23      guaranty request to BNBM.  If BNBM's

24      shareholders meeting believes that providing a

25      guaranty for Taishan Gypsum is in accordance

Confidential - Subject to Further Confidentiality Review

1    with the interest of BNBM, and under the

2    condition that majority of shareholders voted to

3    agree, then the guaranty request will be

4    approved.

5         Q.   CNBM is the majority shareholder, are

6    they not?

7              MR. LEVIN:  Can we go off the record?

8              MR. BARR:  I think --

9              MR. LEVIN:  Mike --

10             MR. BARR:  Are we off the record?

11             THE VIDEOGRAPHER:  Offer the record at

12    11:57 a.m..

13             (Off the record discussion.)

14             THE VIDEOGRAPHER:  Okay.  We're back

15    on the record at 11:58 a.m..

16        A.   If BNBM's shareholders meeting had

17    approved through voting to provide guaranty for

18    Taishan Gypsum, then BNBM will provide guaranty

19    for Taishan Gypsum.

20    BY MR. LEVIN:

21        Q.   The question is, sir --

22             MR. BARR:  Let's take a one minute

23    break.

24             MR. LEVIN:  That's fine.

25             THE VIDEOGRAPHER:  We're off the

Confidential - Subject to Further Confidentiality Review

```
1     record at 11:58 a.m..

2              (Whereupon, a recess was taken.)

3              THE VIDEOGRAPHER:  We're back on the

4     record at 12:04 p.m..

5     BY MR. LEVIN:

6         Q.   Do you, sir, agree that these

7     guaranties were made, as stated in this

8     document, to satisfy Taishan Gypsum's needs of

9     normal production and operation?  Yes or no.

10        A.   I don't completely agree with your

11    expression, to be accurate.  It should be that

12    BNBM's shareholders meeting believes that

13    according to the request and need of Taishan

14    Gypsum, so the votes of the shareholders, when

15    more than half or two-third of the shareholders

16    agree, then the proposal will be approved.

17        Q.   And CNBM, you would concede, is the

18    majority shareholder of BNBM?

19             MR. BARR:  At this point in time?

20             MR. LEVIN:  At this point in time.

21        A.   CNBM is the biggest shareholder of

22    BNBM.

23    BY MR. LEVIN:

24        Q.   And the majority shareholder?

25             MR. BARR:  At that point in time.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. LEVIN:  At that point in time.

 2         A.   Correct.

 3    BY MR. LEVIN:

 4         Q.   Now, looking at this document, can you

 5    confirm that the guaranty set forth in the

 6    document in the amounts that they're set forth,

 7    and with the financial institution that they're

 8    set forth, are true and correct?

 9         A.   Financial institution?

10              MR. BARR:  The banks.

11         A.   Because I did not attend the meeting,

12    therefore I don't remember, I don't know the

13    specific amount.

14    BY MR. LEVIN:

15         Q.   Do you have any reason to disagree

16    with what that document says?

17         A.   Both the guaranty and the amount of

18    guaranty are logical.  I don't think there's a

19    problem with it.

20         Q.   All right.  Let's go on to another

21    document.

22              MS. ROBERTSON:  At this time

23    Plaintiffs file, offer, and introduce Wang

24    Exhibit 312.

25
```

Confidential - Subject to Further Confidentiality Review

```
1                    (Whereupon, Exhibit Number 312-R,

2                    Translation of BNBMPLC-E-0004777-4780

3                    - Proposal on the Company's [BNBM

4                    PLC's] 2007 Annual Investment Plan

5                    (Redefined), was marked for

6                    identification.)

7                    MS. ROBERTSON:  Wang Exhibit 312 is

8       identified as BNBMPLC-E-0004777 to 4780, it was

9       produced by BNBM PLC in this litigation.

10                   Wang Exhibit 312 was provided to

11      counsel for BNBM PLC, and the PSC and BNBM's

12      counsel have agreed to redlines of this

13      document.  Wang Exhibit 312-R identifies a

14      partial translation.  It's my understanding that

15      BNBM's counsel has made this a full translation

16      of BNBMPLC-E-004777 through 4780.

17                   MR. BARR:  That is my understanding.

18      BY MS. ROBERTSON:

19           Q.   Sir, have you had the opportunity to

20      look at this document?

21           A.   I just saw the document.

22           Q.   Can you tell us what this document is?

23           A.   The document seems to be a proposal in

24      regarding to BNBM and Taishan Gypsum's

25      investment project.
```

Confidential - Subject to Further Confidentiality Review

```
1          Q.   What is the date of this document?

2          A.   It says here April the 9th, 2007.

3               MS. ROBERTSON:  Counsel, can I get a

4      stipulation that the Chinese version of

5      BNBMPLC-E-0004777 through 4780 is a business

6      record of BNBM PLC's?

7               MR. BARR:  I don't know that I can do

8      that.  I may be able to after reviewing further,

9      but --

10     BY MS. ROBERTSON:

11         Q.   Mr. Wang, who is this document

12     addressed to?

13         A.   It seems that the document was

14     submitted to BNBM board of directors.

15         Q.   Does it identify who the document was

16     submitted by, or who submitted the document to

17     the board of directors?

18         A.   Usually the secretary of the board of

19     directors would prepare the proposal submitted

20     to the board of directors.

21         Q.   Does BNBM PLC have annual proposals

22     related to BNBM PLC's investment plan for that

23     year, or each year?

24         A.   There is no set rules about that.  It

25     is possible that the board of directors meeting
```

1    would discuss the investment on certain projects

2    that have already been contemplated for that

3    year.  It can also be that the board of

4    directors meeting discusses about a specific

5    investment project.

6         Q.   Do you have any reason to believe that

7    this document is not the product of a discussion

8    had at the board of directors meeting in 2007?

9         A.   It seems to be a topic discussed in

10   the board of directors meeting.

11        Q.   Would you agree that this document is

12   the type of document that BNBM PLC's board of

13   directors use in the ordinary scope of BNBM

14   PLC's board of directors meetings?

15        A.   Like I said earlier, as for whether

16   each year has an investment plan, it is not a

17   regular event.  It may has -- some years --

18             THE INTERPRETER:  Interpreter is

19   clarifying.

20        A.   It's possible that maybe there is such

21   an annual plan, maybe there is no such annual

22   plan.  But according to Chinese law, from the

23   face of document the BNBM board of directors

24   would review and discuss about the investment

25   project of BNBM, and the investment projects of

Confidential - Subject to Further Confidentiality Review

```
 1    Taishan Gypsum.

 2              MR. LEVIN:  Are you done?

 3    BY MR. LEVIN:

 4         Q.   Is it a fact, sir, that BNBM's

 5    fully-initiated national gypsum board industrial

 6    base layout for three to five years was approved

 7    by the China National Building Material Company,

 8    Limited?

 9              THE INTERPRETER:  This is the

10    interpreter speaking.

11              Where are you reading from, Counsel?

12    Are you reading from the document?

13              MR. LEVIN:  0004477.

14              MS. DALEY:  Objection to form.

15              THE INTERPRETER:  This is interpreter.

16              Where is it?  Where is it on that

17    page, on that paragraph?

18              MR. LEVIN:  Could you show it to him,

19    Mike?

20         A.   Like I said earlier, the board of

21    directors meeting would review and approve

22    certain investment project, but BNBM's

23    management team may make a longer plan based on

24    market forecast, because the investment plan can

25    also -- can only be effective upon the approval
```

Confidential - Subject to Further Confidentiality Review

1    of the company's board of directors meetings and

2    the shareholders meeting.  So when I see the

3    question you just asked, it is possible that for

4    the reason of making the board of directors

5    meeting more -- the shareholders meeting more

6    effective, BNBM would communicate with CNBM, the

7    shareholder of BNBM, beforehand.  That is

8    possible.

9    BY MR. LEVIN:

10        Q.   Sir, I don't mean to be pejorative,

11   but when is your flight back to China?

12             MR. BARR:  Let's just go on with the

13   questions.

14   BY MR. LEVIN:

15        Q.   I am trying to accommodate you on

16   that, and I intend to accommodate you on that,

17   but will you listen carefully to my questions

18   and answer them with some brevity?  I'm not

19   telling you how to answer them, but try to be as

20   brief as you can in getting what you want

21   answered so that I understand it.

22             MR. BARR:  Okay.  Let's proceed.

23        A.   Thank you.  I apologize.

24   BY MR. LEVIN:

25        Q.   You don't have to apologize.  I

 1    understand that you want to do certain things at

 2    this deposition.

 3              In any event, the initiated national

 4    gypsum board industrial base layout was approved

 5    by China National Building Materials Company,

 6    Limited, correct?

 7              MS. DALEY:  Object to form.

 8              MR. BARR:  Objection, asked and

 9    answered.  Objection to form.

10              You may respond.

11         A.   It is only an opinion of shareholders.

12    It does not need an approval.

13    BY MR. LEVIN:

14         Q.   Whether it needs an approval or

15    doesn't need an approval, they approved it,

16    didn't they?

17              MS. DALEY:  Object to the form.

18         A.   What it approved is its own

19    shareholders' opinion.  But BNBM's project would

20    require the approval of BNBM's board of

21    directors meeting and shareholders meeting.

22    BY MR. LEVIN:

23         Q.   Let's go on.  Next document.

24              MS. ROBERTSON:  Plaintiffs now offer,

25    file and introduce --

```
 1                    MR. LEVIN:  It's not a business
 2      record.  He wants to consider it.
 3                    MR. IRPINO:  Let us know.
 4                    MR. BARR:  Go ahead.
 5                    MS. ROBERTSON:  Plaintiffs now offer,
 6      file, and introduce Wang Exhibit 324-R.
 7                    (Whereupon, Exhibit Number 324-R,
 8                    Partial Translation of
 9                    BNBMPLC-E-0002177-0002179 - BNBM:  The
10                    resolution of the 15th interim meeting
11                    of the 4th session of the Board of
12                    Directors (Redlined), was marked for
13                    identification.)
14                    MS. ROBERTSON:  The full Bates number
15      of the Chinese document is
16      BNBMPLC-E-0002177-2179.  This is a partial
17      translation which was redlined by Defendants'
18      counsel, BNBM PLC's counsel.  The redline is
19      followed by the PSC's English translation, which
20      is followed by the machine translation as
21      produced, which is finally followed by the
22      Chinese original.  This is a document produced
23      by BNBM PLC in this litigation.
24      BY MS. ROBERTSON:
25            Q.   Mr. Wang, can you identify this
```

```
 1    document?

 2         A.   It appears to be a document of BNBM's

 3    board of directors meeting.

 4              MR. BARR:  We will stipulate this is a

 5    business record.

 6              Let's see if we can expedite things

 7    here.

 8              MS. ROBERTSON:  Thank you, Counsel.

 9    BY MR. LEVIN:

10         Q.   Sir, this document indicates that the

11    board of directors of BNBM "Deliberated and

12    passed the Proposal for the Company's Controlled

13    Subsidiary Company Taishan Gypsum, Limited to

14    Invest in and Construct a Plasterboard

15    Production Line Project with an Annual

16    Production Capacity of 50 Million Square Meters

17    in Liaocheng City, Shandong Province that

18    Comprehensively Utilizes Thermal Power and

19    desulphurization."

20              Is that correct?

21         A.   Yes.

22         Q.   If you turn the page, sir.

23              MR. BARR:  He has to go to the last

24    page.

25    BY MR. LEVIN:
```

Confidential - Subject to Further Confidentiality Review

1        Q.   Last page, 2979.

2             And you signed off on this document,

3     did you not?

4        A.   From the document it seems that -- I

5     believe I have attended the meeting, and I have

6     signed.

7        Q.   And Chairman Jia signed off on this

8     document, did he not?

9        A.   I'm not sure, and I do not recall

10    whether Mr. Jia Tongchun was still a director of

11    BNBM at this time.

12       Q.   Both name appears on the same page as

13    your name as signature of the board of

14    directors, does it not?

15       A.   I see that.  If at this point in time

16    Mr. Jia Tongchun was still the director of the

17    board of directors of BNBM and he did attend

18    this meeting, then I believe he signed.

19       Q.   And when he signed --

20       A.   But I'm not sure.

21       Q.   When he signed it as a director of

22    BNBM, he was also Chairman of Taishan, was he

23    not?

24       A.   No.  As a director of BNBM, he was

25    voted and selected by BNBM's shareholders

1        meeting, and is accountable to BNBM.

2            Q.    That was not my question, sir.

3                At the time when he signed off here,

4        he also held the title at Taishan as Chairman,

5        did he not?

6            A.    I really don't know.  I don't remember

7        whether he had attended the meeting and whether

8        he had signed.  But at the same time Mr. Jia

9        Tongchun was the Chairman of the Board of BNBM,

10       he was also the Chairman of the Board of Taishan

11       Gypsum.

12               MR. BARR:  He wasn't Chairman of the

13       Board of -- did you say Chairman of the Board

14       of --

15               MR. LEVIN:  He said that --

16               MR. BARR:  Did he say Jia was Chairman

17       of the Board?  It was the translator.

18           A.    The director of BNBM.

19               THE INTERPRETER:  This is the

20       interpreter speaking.

21               I believe the witness did say the

22       Chairman of the board of directors BNBM, but

23       then the witness just said the director of BNBM.

24       BY MR. LEVIN:

25           Q.    And the project that's described in

1    Exhibit 324 is a Taishan project, is it not?

2         A.   According to the regulation, a public

3    listing company, all Taishan Gypsum's investment

4    project would require the approval of BNBM's

5    board of directors meeting.

6         Q.   Okay.  Sir, aside from you, who else

7    on the BNBM board also served as a director of

8    Taishan?

9              MR. BARR:  At what point in time?

10             MR. LEVIN:  Ever.

11        A.   All BNBM's directors were elected by

12   BNBM's shareholders meetings.  For a very short

13   period of time, Mr. Jia Tongchun was a director

14   of the board of BNBM, but he is not currently,

15   ever since 2012.

16   BY MR. LEVIN:

17        Q.   Who else from BNBM has served on the

18   Taishan board?

19             MR. BARR:  Can you give a point in

20   time?

21             MR. LEVIN:  Ever.

22        A.   Nobody in BNBM is in Taishan's board.

23   BNBM can nominate -- nominated three directors

24   through the election of Taishan shareholders

25   meeting, and became the director of Taishan

```
 1    Gypsum.  I am one of them.

 2    BY MR. LEVIN:

 3        Q.   Who else?  I just want some names.  I

 4    want to talk to them.

 5        A.   Chen Yu, and Yang Yangun.

 6        Q.   During the time that you were on

 7    Taishan's board, who has been the secretary of

 8    the board of directors?  Just give me the names.

 9             MR. BARR:  Of Taishan?

10             MR. LEVIN:  Of Taishan, yes.

11        A.   Zhang Jianchun, I believe.

12             MR. LEVIN:  At this point can we take

13    our lunch, and only take a half hour to

14    accommodate those that have flight plans?

15             MR. BARR:  Thank you.  It is

16    appreciated.

17             THE VIDEOGRAPHER:  We're off the

18    record at 12:34 p.m..  This ends tape three.

19             (Whereupon, a luncheon recess was

20             taken.)

21

22

23

24

25
```

```
1                    AFTERNOON SESSION

2

3                    THE VIDEOGRAPHER:  We're back on the

4       record at 1:13 p.m..  This is the beginning of

5       tape four.

6       BY MR. LEVIN:

7            Q.   Sir, did BNBM pay any of the counsel

8       fees of Taishan?

9            A.   No.

10           Q.   Money being fungible, is it

11      conceivable that your guaranties enabled them to

12      pay counsel fees?

13                    MR. BARR:  Objection.  Calls for

14      speculation.

15                    MR. BECKER:  Object to form.

16                    MR. BARR:  And object to form.

17                    MR. LEVIN:  Are you having a problem

18      with "fungible"?

19                    THE INTERPRETER:  Replaceable?

20                    MR. LEVIN:  Money being like water.

21                    MR. BARR:  Colloquial stuff,

22      seriously.

23                    MR. LEVIN:  I understand that.  I

24      didn't think fungible was colloquial.

25                    MR. LIAO:  It's hard to find an exact
```

Confidential - Subject to Further Confidentiality Review

1    corresponding.  Interchangeable.

2    BY MR. LEVIN:

3         Q.   Let me try, since money is

4    interchangeable -- that's very good.

5              Is it conceivable that money that was

6    generated by your guaranties were used for

7    paying counsel fees for Taishan?

8              MR. BARR:  Objection, calls for

9    speculation.  Objection to form.

10        A.   I don't think so.

11   BY MR. LEVIN:

12        Q.   Did BNBM contribute to Taishan's

13   payment of the Germano judgment, the attorney's

14   fees awarded by the Court, and any other monies

15   as a result -- that were paid as a result of the

16   contempt citation?

17        A.   No.

18        Q.   Did, as Chairman of BNBM, did you in

19   any way -- strike that.

20             As Chairman of BNBM, did you

21   facilitate in any way notice to your affiliates,

22   subsidiaries, and related companies of Judge

23   Fallon's concept citation?

24             MS. EAGAN:  Object to form.

25             MR. BARR:  Objection to form.

```
1          A.   To me it is an order against Taishan

2     Gypsum, not BNBM, therefore it is not my job.

3     BY MR. LEVIN:

4          Q.   Did you in any way police the

5     activities of your affiliates, subsidiaries, and

6     related companies as to the business that they

7     transacted in the United States during the

8     contempt period?

9               MS. EAGAN:  Object to form.

10              MR. BARR:  Object to form.  Objection,

11    lack of foundation.  Objection, vague.

12         A.   As far as I know, the contempt order

13    is against Taishan Gypsum, not BNBM.

14    BY MR. LEVIN:

15         Q.   Are you -- do you consider yourself to

16    be an affiliate of Taishan, BNBM?  Do you

17    consider BNBM to be an affiliate of Taishan?

18              MS. EAGAN:  Object to form.

19              MR. BARR:  Object to the form of the

20    question.  Object to calling for a legal

21    conclusion.

22         A.   The word "affiliate" has many

23    definitions.  It has definitions in law,

24    definitions in accounting, different definitions

25    carry different meanings, some of the
```

1    expressions and wordings are completely

2    different.

3    BY MR. LEVIN:

4         Q.   Did you understand that Judge Fallon

5    used the word "affiliate" in his contempt order?

6         A.   I have not read the Judge's order

7    because it is against Taishan Gypsum, not BNBM.

8         Q.   Was it ever shown to you as Chairman

9    of the Board of BNBM?

10        A.   No.

11             MR. LEVIN:  317.

12             MS. ROBERTSON:  Wang Exhibit 317 is a

13   PSC partial translation of BNBM produced

14   document, BNBMPLC-E-0006061 through 6063, is the

15   PSC translation, followed by the machine

16   produced translation, followed by the Chinese

17   original.  This document has not been redlined

18   by BNBM PLC's counsel.

19

20

21

22             (Whereupon, Exhibit Number 317,

23             Partial Translation of

24             BNBMPLC-E-0006061-6063 - 2008

25             Regulator Opinion on BNBM PLC, and

 1                    Exhibit Number 317-R, Partial

 2                    Translation of BNBMPLC-E-0006061-6063

 3                    - 2008 Regulator Opinion on BNBM PLC

 4                    (Redlined), were marked for

 5                    identification.)

 6                    MS. ROBERTSON:  Again, the portions

 7          translated in English are highlighted in yellow

 8          in the Chinese version to best direct the

 9          witness to the content of questioning.

10          BY MR. LEVIN:

11               Q.   Look at it, sir, tell me when you're

12          ready for me to fire.

13                    (Witness reviewing document.)

14               A.   I'm ready.

15          BY MR. LEVIN:

16               Q.   Sir, have you ever seen that document

17          -- go ahead, do you want to identify it?

18          BY MS. ROBERTSON:

19               Q.   Mr. Wang, can you identify this

20          document?

21               A.   It appears to be a regulatory opinion

22          to BNBM by a regulatory authority.

23               Q.   Are these regulatory opinions

24          published publicly?

25               A.   Not this one.  This should be sent by

1    the government's regulatory authority to the

2    company.

3        Q.   This is not the type of regulatory

4    opinion that's published, am I correct?

5        A.   No.

6        Q.   Are you familiar with the contents of

7    this document?

8        A.   I don't have a recollection on the

9    document.

10   BY MR. LEVIN:

11       Q.   Are you familiar with the subject

12   matter of the document?

13       A.   Because BNBM is a public listing

14   company, it sets regulatory authorities

15   monitoring, and those regulatory authorities

16   have the right to monitor the public listing

17   company according to accounting standards and

18   rules regarding the way that the company had

19   handled certain matters.

20           MR. BARR:  I just want to note for the

21   record, before you pose the next question, this

22   is one where there was in our exhibit an

23   agreement with respect to translation.  It is

24   317-R with the sole, you know, disagreement to

25   this point relating just to one word that

1    appears on -- I guess it's 6062 where there was

2    a disagreement as to whether the word should be

3    "affiliated" or "related party."

4           MR. LEVIN:  Thank you.  Because we

5    don't have it.  That doesn't mean you didn't --

6           MS. ROBERTSON:  I never saw it.

7           MR. LEVIN:  We didn't get it.  When I

8    say "we," we didn't get it.

9    BY MR. LEVIN:

10        Q.   Does this document, sir, evidence the

11   fact that there were flaws with the company's

12   financial management and accounting?

13        A.   This is a government document.  It's

14   not BNBM's company document.

15        Q.   Sir, we want to get out of here, and

16   I'm sorry that I'm raising my voice because at

17   this point I'm not working for me, I'm working

18   for people in the other end of the table, you

19   and your counsel.  So please listen to my

20   questions, or people are going to miss planes,

21   and that's unfortunate, and I don't want that to

22   happen.

23          MR. BARR:  Go ahead and pose a

24   question.

25   BY MR. LEVIN:

Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Now there's a question.  Does this

 2     document evidence flaws by BNBM's financial

 3     management and accounting?  It's number 3.

 4          A.   The document says that BNBM has some

 5     imperfections, very small problems regarding the

 6     way they handle some accounting issues.

 7          Q.   Does the document say "very small

 8     problems," or is that you characterizing the

 9     document as small problems?

10          A.   The document uses the word

11     "imperfection."

12               THE INTERPRETER:  This is the

13     interpreter speaking.

14               The interpreter used her own

15     interpretation.  The interpreter will use the

16     word flaws as agreed by both counsel.

17               So the answer of -- the answer of the

18     witness should be "the document uses the word

19     flaws."

20          Q.   And does the document indicate that

21     certain corporate formalities were not observed

22     by BNBM?

23               MR. BARR:  Objection.  The document

24     speaks for itself.

25               MS. DALEY:  Same objection.
```

Confidential - Subject to Further Confidentiality Review

```
1          A.   The document said it very clearly, the
2     company's handling of some accounting issues
3     does not comply with some of the accounting
4     rules.  It is small flaw, it's very clear.
5     BY MR. LEVIN:
6          Q.   Does the document use the word "small
7     flaw," or are they your words?
8          A.   I have just said, the original
9     documents used the word "flaws."
10         Q.   You don't see "small" in there, do
11    you?
12              MR. BARR:  Objection.  The document
13    speaks for itself.
14         A.   The definition of the Chinese word
15    "xiaci" means small problems.  You can refer to
16    the Chinese dictionary for this definition.
17              THE INTERPRETER:  The interpreter
18    would like to correct her spelling, X-I-A-C-I
19    instead.
20         A.   The translation between Chinese and
21    English can be very different.  Sometimes a
22    Chinese word would contain two characters, while
23    an English expression contains three words.
24         Q.   This document came from Beijing
25    Securities Company, issue number -- this
```

Confidential - Subject to Further Confidentiality Review

1    document came from the Beijing Security Company

2    Regulatory Commission, did it not?  Strike that.

3         This document came from the China

4    Securities Regulatory Committee Beijing

5    Supervisory Bureau, did it not?

6         A.   I see that this is a document from

7    Chinese government, not a document from BNBM.

8    It should be kept confidential.

9         Q.   Yes.

10        And several times, many times, not a

11   small number of times when you answered a

12   question for me, you always said "according to

13   Chinese government law."  This document was

14   issued by the Chinese government.  Would you

15   concede that it was in accordance with Chinese

16   government law?

17        MR. BARR:  Objection, form.

18   Objection, argumentative.

19        MS. DALEY:  Same objection.

20   BY MR. LEVIN:

21        Q.   You can answer the question.

22        A.   When I answered your prior questions,

23   when mentioning Chinese law and Chinese

24   document, the Chinese government document, I was

25   referring to the public laws of China and the

1    public documents.

2        Q.   But this is in accordance with the

3    laws of China, is it not?

4        A.   This is definitely in accordance with

5    the law.

6        Q.   Okay.  So the laws of China through --

7    are you finished?

8        A.   Okay.

9        Q.   In accordance with the laws of China,

10   through this regulatory opinion which has been

11   published, they found that some subsidiaries'

12   financial management is not standardized enough,

13   for example, the incubator company, and not

14   truthfully record -- and did not truthfully

15   record the bank deposit income and expenses, and

16   the amount in large -- was very large.  It

17   doesn't say small, it says large, is that

18   correct?

19            MR. BARR:  It doesn't say "very

20   large."  Excuse me.

21            MR. LEVIN:  "Was relatively large,"

22   I'm sorry.

23   BY MR. LEVIN:

24       Q.   Does it say that, sir?  Yes or no.

25       A.   I see that.

Confidential - Subject to Further Confidentiality Review

1          Q.   Does it also say, "The phenomena that

2    an item was not entered into the account timely,

3    the bank account statements were patched on and

4    it was not rigorous"?

5               MR. BARR:  Objection.  The document

6    speaks for itself.

7          A.   I see that.

8    BY MR. LEVIN:

9          Q.   Does it say that there were flaws in

10   the company's annual report and disclosure of

11   financial report?

12              MR. BARR:  Objection to the form.  The

13   document speaks for itself.

14         A.   I see that.

15   BY MR. LEVIN:

16         Q.   Does it also state there were flaws

17   with the company's annual report and its

18   disclosure of financial report?  Paragraph 1,

19   "For the affiliated transaction" --

20              MR. BARR:  No, that is contested, and

21   we do not agree.

22              MR. LEVIN:  That's what you disagree.

23   I didn't have your redline.  I see, you didn't

24   agree with "affiliate."  Okay.  That's not

25   unusual.

```
 1              MR. BARR:  Come on, Arnold.

 2              MR. LEVIN:  Oh, come on, Arnold.

 3              MR. BARR:  You agree with me, that's

 4     perfect.

 5              MR. LEVIN:  You sound like my wife.

 6              MR. BARR:  I like her already.

 7              MR. LEVIN:  Take my wife, please.

 8     BY MR. LEVIN:

 9         Q.   I want you to look at this document,

10     and I'm going to hand you the redlined version.

11     Oh, gosh, it's in English.

12              Does it also say on the last page, 4,

13     Paragraph 4, Number 4, "The company should

14     further improve the quality and disclosure of

15     regular reports.  Additionally, your company's

16     former subsidiary, CNBM Investment Company,

17     Limited, has been sold to the majority

18     shareholder"?

19              MR. BARR:  Again, that's different

20     language.

21              MR. LEVIN:  Is it different?  I'm

22     sorry, we just got the redlined version.

23     BY MR. LEVIN:

24         Q.   "Additionally, your company's former

25     controlled subsidiary, CNBM Investment Company,
```

Confidential - Subject to Further Confidentiality Review

```
 1      Limited, has been sold to the controlling
 2      shareholder, but the public limited company
 3      still provides loan guaranties for it.  During
 4      the course of inspection, your company has
 5      promised to discontinue guaranty after the term
 6      expires.  You should" not adopt measures -- "you
 7      should adopt measures to ensure the performance
 8      of this promise."
 9              Do you see that?
10      A.   Yes.
11      Q.   Do you see below that "Your company
12      should focus on the above regulatory opinions
13      carefully, study them, and make timely
14      rectifications, submit a written rectification
15      report within 10 working days after receiving
16      this opinion.  The company rectification report
17      should be reviewed and signed by the board of
18      directors for confirmation."
19              Do you see that?
20      A.   I see that.  It's very normal.
21      Q.   Do you recall signing that?
22              MR. BARR:  Recall signing that?
23              MR. LEVIN:  Signing the rectification
24      report.
25      A.   I do not remember this document, and
```

1    neither do I recall the rectification report.

2         But what I do remember is as a public

3    listing company, the company should, in

4    accordance with the regulations of the public

5    listing company, to be responsible for things

6    such as information disclosure and financial

7    arrangements.  This kind of regulatory opinion

8    in China is very, very common as a public

9    listing company.  It is a regular monitoring

10   action.  And it says here they're all --

11       Q.   Wait.

12            MR. BARR:  Excuse me.

13            MR. LEVIN:  This is totally

14   unresponsive, Michael.  I have no guarantee to

15   get you out on time, and I'm trying to.

16            MR. BARR:  The witness complete his

17   answer, please.

18       A.   They're all very -- and it says here

19   they are all flaws, very small issues.

20   BY MR. LEVIN:

21       Q.   Do you recall signing the

22   rectification document?

23            MR. BARR:  You already asked that.

24       A.   I don't recall.

25            MR. LEVIN:  318.

Confidential - Subject to Further Confidentiality Review

```
 1                MS. ROBERTSON:  Wang Exhibit 318-R.

 2                (Whereupon, Exhibit Number 318-R,

 3                Partial Translation of

 4                BNBMPLC-E-000606406066, Beijing New

 5                Building Material Public Limited

 6                Company, Report on the Improvement and

 7                Solution of Relevant Issues Raised in

 8                the Site Inspection of Beijing

 9                Securities Regulatory Bureau

10                (Redlined), was marked for

11                identification.)

12                MS. ROBERTSON:  This is a partial

13      translation of Bates range BNBMPLC-E-0006064

14      through 6066.  It was produced by BNBM PLC in

15      this litigation, and was provided to Defendants

16      for BNBM PLC.

17                Prior to its introduction at this time

18      is the redlined agreement between BNBM PLC's

19      counsel and the PSC, the PSC's original English

20      translation, the machine translation, and

21      finally the original Chinese document.

22      BY MR. LEVIN:

23           Q.   Do you recall that document, sir?

24           A.   I don't have a clear recollection of

25      this document, but it appears to be a document
```

1      given from the company to the government.

2          Q.   And what company gave the document;

3      BNBM?

4          A.   BNBM.

5               MR. LEVIN:  Can we agree this is a

6      business record?

7               MR. BARR:  Yes, I'll stipulate this is

8      a business record.

9               MR. LEVIN:  It's authentic?

10              MR. BARR:  Yes, the Chinese version is

11     authentic, and that we have stipulated as to the

12     translation of what is contained in the Chinese

13     document.  The same with respect to being a BNBM

14     business record.  The stipulation is with

15     respect to the Chinese version, again we agree

16     to the accuracy of the translation.

17              MR. LEVIN:  311.

18              MS. ROBERTSON:  Plaintiffs now offer,

19     file, and introduce Wang Exhibit 311-R.

20              (Whereupon, Exhibit Number 311-R,

21              Partial Translation of

22              BNBMPLC-E-0005169-5150 - Letter of

23              Communication and Confirmation about

24              the Audit Schedule for the 2009 Annual

25              Financial Statements (Redlined), was

Confidential - Subject to Further Confidentiality Review

```
 1                    marked for identification.)

 2               MS. ROBERTSON:  The full Bates range

 3      of this exhibit is BNBMPLC-E-0005169

 4      through 5170.  This was produced by BNBM PLC in

 5      this litigation.  It is -- the top document is

 6      the -- BNBM PLC's counsel and the PSC's counsel

 7      agreed to redlines, followed by the PSC's

 8      English translation prior to redline, followed

 9      by the machine translation, and finally the full

10      Chinese document as produced by BNBM PLC.

11               Because this is a partial translation,

12      the Chinese is highlighted as to which portions

13      were translated into English.

14      BY MR. LEVIN:

15          Q.   Do you recognize this document, sir?

16          A.   I do not have a clear -- I do not have

17      a recollection of this, but from the document it

18      is a communication regarding to audit report.

19          Q.   Did you endorse this communication,

20      sir?

21          A.   What do you mean by "endorse"?

22          Q.   Did you sign it?

23          A.   I do not recall the content in the

24      document, but as for -- because this is

25      financial statement, financial statement audit,
```

Confidential - Subject to Further Confidentiality Review

1    as a member of the audit commission, I might

2    have sign it.

3              MR. BARR:  We will stipulate that this

4    is a business record, and the translation is

5    accurate.

6              MR. LEVIN:  It's authentic?

7              MR. BARR:  It's authentic.

8              MR. LEVIN:  And that Bing Wang's name

9    appears on it?

10             MR. BARR:  His name appears on it.

11   It's obviously not -- it's an electronic

12   version, it's not a hand-signed one, so we

13   obviously can't say he signed it.  We'll

14   stipulate it is a business record.

15   BY MR. LEVIN:

16        Q.   What does this document reflect, sir?

17   Is it an internal control investigation of

18   Taishan by BNBM?

19             MR. BARR:  The document speaks for

20   itself.

21        A.   Because BNBM is a shareholder of

22   Taishan, therefore BNBM's financial statement

23   also includes Taishan's consolidated financial

24   statement.  Therefore, according to the

25   regulation of Chinese regulatory authority, for

```
 1      the Chinese public listing company, the audit

 2      firm would need to audit the financial statement

 3      of Taishan and BNBM.

 4           Q.    Then, in other words, financially BNBM

 5      and Taishan are married?

 6                 MR. BARR:  Arnold, I'm going to direct

 7      him not to answer.

 8                 MR. BECKER:  Object to form.

 9                 MR. BARR:  I'm directing him not to

10      answer the question.

11                 MR. LEVIN:  What did I do wrong?

12                 MR. BARR:  Next question, please.

13                 MR. LEVIN:  Next document, 325.

14                 MS. ROBERTSON:  Plaintiffs offer,

15      file, and introduce Wang Exhibit 325-R.

16                 (Whereupon, Exhibit Number 325-R,

17                 Partial Translation of

18                 BNBMPLC-E-0005724-5725, Communications

19                 and Confirmation Letter on the

20                 Auditing Schedule of the 2008 Annual

21                 Financial Report (Redlined), I was

22                 marked for identification.)

23           A.    This document was produced by BNBM PLC

24      in this litigation, and is identified with Bates

25      Number BNBM-PLC-E-0005724 through 5725.
```

```
 1              Defendants for BNBM PLC and the PSC

 2      have agreed to redlines of the PSC's initial

 3      English translation.  As a result, this exhibit

 4      has the redlined version of English, the PSC's

 5      version of English, the machine translation in

 6      English, and finally the Chinese document as

 7      produced by counsel for BNBM PLC.

 8              MR. BARR:  Just a question.  What is

 9      at the back of this document?  Is that a

10      different document starting on 5982, at least in

11      the copy I have?  That's not on yours, Pearl?

12      It may be two documents inadvertently got put

13      together, or more.

14              MR. LEVIN:  The last Bates number I

15      have is 5984.

16              MR. BARR:  Do me a favor, reintroduce

17      the exhibit as to what Bates range it includes,

18      just so we are clear on the record.

19              MS. ROBERTSON:  The Bates range

20      document for Wang Exhibit 325-R is

21      BNBMPLC-E-0005724 to 5725, should be two pages

22      in Chinese, all English, the redline is one

23      page, PSC's initial English is one page, and the

24      Chinese is two pages.

25              MR. LEVIN:  Can we stipulate to this
```

Confidential - Subject to Further Confidentiality Review

```
1    document?

2              MR. BARR:  Yes.

3              MR. LEVIN:  Stipulate to the

4    authenticity?

5              MR. BARR:  And it is a business

6    record, obviously, with respect to the Chinese

7    language document attached, and as to the

8    accuracy of the translation.

9              MR. LEVIN:  Very well.

10             Next document, Pearl?

11             MS. ROBERTSON:  PSC offers, files, and

12   introduces Wang Exhibit 306.

13             Wang Exhibit 306 is a translation of

14   BNBMPLC-E-0130705.

15             (Whereupon, Exhibit Number 306,

16             Translation of BNBMPLC-E-0130705

17             1/06/2015 e-mail from Shi Keping to

18             Chen Yu attaching draft of the

19             12/12/2014 Meeting Minutes, was marked

20             for identification.)

21             MS. ROBERTSON:  It was produced by

22   BNBM PLC in this litigation, however was not

23   previously provided to BNBM PLC in advance for

24   purposes of redlining.  As a result, this

25   exhibit is the PSC's English translation, the
```

Confidential - Subject to Further Confidentiality Review

```
1     machine translation, and finally the original

2     Chinese document.

3              MR. BARR:  But the original Chinese

4     document here is just the cover e-mail, not the

5     attachment, the meeting minutes referenced in

6     the attachment, correct?

7              MS. ROBERTSON:  Correct.

8              In connection with Wang 306,

9     Plaintiffs also offer, introduce, and file Wang

10    Exhibit 306-1, which is the translation of BNBM

11    produced document BNBMPLC-E-0130706

12    through 0130707.

13              (Whereupon, Exhibit Number 306-1,

14              Clawed back as attorney-client

15              privileged material, was marked for

16              identification.)

17              MS. ROBERTSON:  Again, this was not

18    provided to counsel for BNBM in advance, as a

19    result this is a translation done by the PSC,

20    followed by the machine translation, and finally

21    followed by the original Chinese document.

22              (Witness reviewing document.)

23              MR. LEVIN:  Would you agree, sir --

24    sir I called you, Michael.  Strike that.

25              Would you agree that this is a
```

```
 1     business record?  Would you consider agreeing

 2     that this is a business record, the minutes?

 3              MR. BARR:  Having just seen it, I'm

 4     going to need to go back and look at this.  It

 5     may not be an issue, but I don't know that I

 6     could agree, having seen this for the first

 7     time.

 8              MR. LEVIN:  How much time do you need?

 9              MR. BARR:  I don't know.  I don't know

10     I'd be able to do it today.

11              Why don't you ask questions that you

12     want to ask with respect to it.  We can't

13     stipulate.

14              MR. LEVIN:  So there's no stipulation?

15              MR. BARR:  Not at the moment, no.

16     There may be subsequently, but --

17     BY MR. LEVIN:

18         Q.   Look at this document, sir.  Do you

19     see who attended the meeting, CNBM Group, Jian

20     Zhang, Qiming Shi, CNBM Group people were there?

21         A.   That's what the document says.

22         Q.   You see that, right?

23         A.   Yes.

24         Q.   Who is Zhang?

25         A.   As far as I know, he is a person in
```

1    charge of legal affairs in CNBM Group.

2        Q.    And who is Shi, S-H-I?

3        A.    It seems that he is also someone that

4    is in charge of the legal affairs.

5        Q.    Do you know what the purpose of CNBM

6    Group's legal-type individuals were present at

7    this meeting?

8        A.    I just took a look that the e-mail was

9    not written to me, but to Chen Yu.  I have not

10   seen this document.  I took a look, and maybe it

11   is BNBM's legal department.  I saw my name.

12   Maybe it is a communication of a situation

13   update between the legal department and the

14   legal department of the shareholder.

15           MR. BARR:  On the basis of

16   understanding who the individuals that have been

17   identified by as being members of the legal

18   department at both CNBM and BNBM, we

19   respectfully withdraw the document on privilege

20   grounds, subject to a joint defense privilege.

21           MR. LEVIN:  Let me just --

22           MR. BARR:  Go ahead.

23   BY MR. LEVIN:

24       Q.    I'm just going to -- are the people

25   from the legal department at CNBM Group lawyers

1    that are stated there?

2        A.    I said the e-mail was not sent to me,

3    neither have I seen this document.  And also I

4    see it says "draft" on it, therefore I do not

5    know who attended the meeting, but definitely

6    people from the legal department.

7            MR. BARR:  He's simply asking with

8    respect to the people shown on the line for

9    CNBM, are they lawyers, to your knowledge.

10       A.    These people are the people in charge

11   of the legal department, but the names of the

12   attorneys are not listed here.

13   BY MR. LEVIN:

14       Q.    So they're not attorneys that are on

15   here?

16           MR. BARR:  We have been advised by --

17       A.    Correct.

18           MR. BARR:  -- by counsel to CNBM that

19   Qiming Shi is an attorney, as is Yang Fu.  On

20   behalf of BNBM, on both attorney/client and work

21   product and joint defense group, we are

22   withdrawing the document.

23           MR. LEVIN:  The date of this document

24   is December 12, 2014.  Are you taking the

25   position that a document from December, 2014 is

```
 1    part of the joint defense agreement?

 2            MR. BARR:  Yes.  The joint defense

 3    privilege does not require the execution of a

 4    written joint defense to establish the

 5    privilege, as you well know.

 6            MR. LEVIN:  It's any time you want it.

 7    BY MR. LEVIN:

 8        Q.    Is your name on this document, sir?

 9        A.    I see my name on it.

10        Q.    Exactly.

11        A.    Yesterday when you asked me questions

12    I said sometimes I would attend certain

13    meetings, such as the meetings of the legal

14    department for situation updates.  This is one

15    of those meetings.  Usually attorneys are

16    present in this type of meetings.

17            MR. BARR:  I'm going to direct the

18    witness not to answer further questions with

19    respect to that.

20            MR. LEVIN:  One document -- one more

21    question.

22    BY MR. LEVIN:

23        Q.    Does this document deal with the

24    litigation that we're involved in here?

25        A.    Like I said, this document was not
```

Confidential - Subject to Further Confidentiality Review

```
 1    written to me.  And also it says "draft" here,

 2    therefore I don't know what document.

 3              MR. BARR:  It also refers to the

 4    gypsum matter.  Arnold, please move on.  We've

 5    asserted the privilege here.

 6    BY MR. LEVIN:

 7         Q.  Just bear with me.

 8              I show you Exhibit 310, which is the

 9    common interest joint defense and

10    confidentiality agreement.

11              (Whereupon, Exhibit Number 310, Common

12              Interest Joint Defendants and

13              Confidentiality Agreement, was marked

14              for identification.)

15    BY MR. LEVIN:

16         Q.  You don't need to read it.  I just

17    need to have you go to the last page and have

18    you identify those that signed.

19              (Witness reviewing document.)

20              MS. ROBERTSON:  For the record,

21    Plaintiffs offer, file, and introduce Wang

22    Exhibit 310, which was produced by BNBM PLC in

23    this litigation and bears Bates numbers

24    BNBMPLC-0007605 through 7625.

25    BY MR. LEVIN:
```

1          Q.   Sir, have you ever seen that document

2     before?

3          A.   I have not read this document before.

4          Q.   Did you meet with anyone in connection

5     with the execution of this document?

6               MR. BARR:  Objection to the form.

7          A.   I'm the Chairman of the Board of BNBM,

8     I'm not in charge of lawsuits, therefore I have

9     not seen this document.

10    BY MR. LEVIN:

11         Q.   Okay.  Could you turn to Page 18, the

12    last page?  And what I need your help on is to

13    tell me who signed it.

14              MR. BARR:  As opposed to just reading

15    who signed it on the document?

16              MR. LEVIN:  It's in Chinese.  I want

17    to know who it is.

18              MR. BARR:  Actually the names are in

19    English and quite easy to read.  It's all

20    American law firms.

21              And again, the document speaks for

22    itself as plainly as can be.

23              MR. LEVIN:  You're right.

24    BY MR. LEVIN:

25         Q.   Do you know who White & Case

Confidential - Subject to Further Confidentiality Review

```
 1    represents in this case?

 2        A.   I don't know.  I'm not in charge of

 3    lawsuits.

 4        Q.   There's a lot you're not in charge of.

 5             Okay.  You know, remember in jest when

 6    we were talking about guaranties, you said to me

 7    that as a third party I could even guaranty the

 8    loans of Taishan?  Do you remember that?

 9        A.   I was just joking.

10        Q.   You were just joking?  I'm glad you

11    were just joking.

12             Is BNBM stock still trading on the

13    exchange?

14        A.   Yes.

15        Q.   There has not been a stop on trading

16    on the exchange in China where BNBM stock is

17    traded?

18        A.   It has stopped right now.

19        Q.   What do you mean?  You can't trade

20    right now?

21        A.   Correct.  During the period of stop,

22    you cannot trade.  But after it resumes trading,

23    that's when you can.

24        Q.   Has it resumed trading?

25        A.   There has been a major fluctuation in
```

Confidential - Subject to Further Confidentiality Review

1    Chinese stock market, just like in American

2    stock market.

3        Q.   When did the regulatory commission

4    stop trading in BNBM stock?

5        A.   It is not that it stopped the trading.

6    It is that BNBM itself applied for the stop.

7        Q.   When was that?

8        A.   Quite a few months ago.

9        Q.   Could you be more -- and have you

10   continued to extend and ask for an extension

11   with regard to the stoppage of trading in your

12   stock?

13       A.   Yes, we have public announced it.

14       Q.   And what was the reason why you

15   stopped trading in your stock?

16       A.   This is confidential.  According to

17   the regulations of public listing company, has

18   to be confidential.

19           MR. BARR:  Then I direct you not to

20   answer.

21   BY MR. LEVIN:

22       Q.   So as an investor in your stock,

23   nobody could find out why you stopped trading?

24   It's a secret?

25           MR. BARR:  Objection to the form of

Confidential - Subject to Further Confidentiality Review

1    the question.

2        A.    Correct.

3    BY MR. LEVIN:

4        Q.    Stopping trading in a stock is a

5    pretty significant thing when a company does

6    something like that, isn't it?

7        A.    This is the right of public trading

8    companies.

9        Q.    What occurred at BNBM to cause you to

10   stop trading in your stock?

11       A.    It is a very common thing that Chinese

12   public listing company would stop trading, and

13   the Chinese public listing company would apply

14   for such estoppel according to its needs.  It is

15   a very common thing.

16       Q.    I'm not interested in what is common

17   and what is not common.  I'm interested in why

18   your company stopped trading.

19       A.    I have just told you, according to

20   relevant regulations it has to be kept

21   confidential.

22           MR. BARR:  Then I direct you not to

23   answer.

24           MR. LEVIN:  Hit it, Pearl.  Remember

25   that from Saturday Night Live?

```
 1              MS. ROBERTSON:  At this time PSC

 2       offers, files, and introduces Wang

 3       Exhibit 326-R.

 4              (Whereupon, Exhibit Number 326-R,

 5              Partial Translation of

 6              BNBMPLC-E-0011442 - Rectification

 7              Status on the Inversion of Procedure

 8              in the Fixed Investment Projects of

 9              the Stock Company - Weekly Report

10              (Redlined), was marked for

11              identification.)

12              MS. ROBERTSON:  This is a partial

13       translation of BNBMPLC-E 0011442.  This was

14       provided to counsel for BNBM PLC last evening,

15       and a redline agreement was reached by BNBM PLC

16       and the PSC.  As a result, this is the redlined

17       document, followed by the PSC's initial English

18       translation, followed by the machine

19       translation, and finally the originally-produced

20       Chinese document.  This document is a

21       spreadsheet produced by BNBM PLC in this

22       litigation.

23       BY MS. ROBERTSON:

24           Q.   Mr. Wang, can you identify this

25       document for us?
```

```
 1              A.   This should be a document regarding

 2        the matters of procedures of some of BNBM and

 3        Taishan Gypsum's invested projects.

 4                   MS. ROBERTSON:  Counsel, can we get a

 5        stipulation this is a business record of BNBM

 6        PLC?

 7                   MR. BARR:  With respect to the Chinese

 8        version, yes.  And we agree as to the accuracy

 9        of the translation.

10                   MS. ROBERTSON:  We would agree that

11        the Chinese version is authentic as well?

12                   MR. BARR:  To say it's a business

13        record it's acknowledged, but okay.

14                   MS. ROBERTSON:  At this time

15        Plaintiffs offer, file, and introduce Wang

16        Exhibit 329.  Wang Exhibit 329 was produced by

17        BNBM in this litigation.

18                   (Whereupon, Exhibit Number 329,

19                   Partial Translation of

20                   BNBMPLC-E-0005884-5888 - reply to the

21                   Inquiry on Evaluating the 2007 Annual

22                   Report, was marked for

23                   identification.)

24                   MS. ROBERTSON:  The full Chinese

25        document is BNBMPLC-E-005884 to 5888.  This
```

Confidential - Subject to Further Confidentiality Review

1    document was not provided to counsel for BNBM

2    PLC in advance of this deposition.  As a result,

3    the exhibit is the PSC's partial English

4    translation, followed by the full machine

5    translation, followed by the full Chinese

6    document which is highlighted in yellow for

7    those parts that were translated by the PSC.

8             MR. BARR:  To facilitate matters, we

9    will stipulate that this is a business record,

10   the Chinese version.  But obviously we -- post

11   this deposition to review your translation and

12   see whether we can agree.

13             Next.

14             MS. ROBERTSON:  PSC now offers, files,

15   and introduces Wang Exhibit 328.  The full

16   Chinese document can be found add

17   BNBMPLC-E-0006086 through 6100.  This Bates

18   range was not provided to counsel for BNBM PLC

19   prior to this deposition.  As a result, the

20   exhibit is the PSC's initial English

21   translation, followed by the machine

22   translation, and finally followed by the Chinese

23   document as produced by BNBM PLC.

24

25

```
 1                  (Whereupon, Exhibit Number 328,

 2                  Partial Translation of

 3                  BNBMPLC-E-0006086-6100 - Information

 4                  on Work Performance of the General

 5                  Manger in 2006, was marked for

 6                  identification.)

 7                  MR. BARR:  Can we go off the record

 8        for one minute?  Maybe we can do the same thing

 9        with this.  I need to confer with the witness.

10                  THE VIDEOGRAPHER:  We're off the

11        record at 2:19 p.m..

12                  (Whereupon, a recess was taken.)

13                  THE VIDEOGRAPHER:  We're back on the

14        record at 2:33 p.m..

15                  MR. BARR:  Pearl, why don't you

16        identify both documents, and then I can respond

17        with respect to them.

18                  MS. ROBERTSON:  Sure.

19                  Prior to the break, the PSC provided

20        for counsel BNBM PLC two exhibits.  The first is

21        identified as Wang Exhibit 328, it can be found

22        at BNBMPLC-E-0005884 through 5888.  It was not

23        provided to BNBM PLC's counsel for purposes of

24        redlining.  As a result, it is the PSC's initial

25        English translation, followed by the machine
```

1    translation, and finally followed by the Chinese

2    document, which has corresponding highlights to

3    the partial translation of the PSC.

4              In additional to Exhibit 329, the PSC

5    also furnished Wang Exhibit 330 to BNBM PLC's

6    counsel.  Wang Exhibit 330 is a Bates range

7    BNBMPLC-E-0058974 through 58995.

8              (Whereupon, Exhibit Number 330,

9              Partial Translation of

10             BNBMPLC-E-0058974-58995 - BNBM PLC

11             Investment Document No. 62 (2013), was

12             marked for identification.)

13             MS. ROBERTSON:  Again, this was not

14   given to BNBM PLC counsel in advance for

15   purposes of redlining.  As a result, the exhibit

16   is the PSC's initial English translation, which

17   is partial, followed by the full machine

18   translation, followed by the full Chinese

19   version which is highlighted to correspond with

20   the partial translation in English.

21             MR. BARR:  With respect to both Wang

22   Exhibit 328 and Exhibit 330, BNBM will stipulate

23   that the Chinese portion of those documents are

24   business records, and that we need to address

25   your English language translation following the

```
 1    deposition.

 2            MR. LEVIN:  And the Chinese portion is

 3    authentic?

 4            MR. BARR:  Yes.

 5            MS. ROBERTSON:  I think I have to

 6    correct the record on myself.

 7            I said 329 was given to you before the

 8    break, and you're correct, it's 328, Wang

 9    Exhibit 328, BNBMPLC-E-0006086 through 6100.

10            MR. BARR:  Back to you.

11            MR. LEVIN:  Your witness.

12            MR. BARR:  I have no questions for the

13    witness, so the deposition is completed.

14            MR. LEVIN:  I leave the deposition

15    open for the following reasons.

16            There's a document that you clawed

17    back.  And we have been put at a terrible

18    disadvantage with the production of documents,

19    and I'm only speaking in terms of the

20    production, not any motive for production, and

21    why we're getting -- we got documents and

22    privilege logs in foreign languages on the eve

23    of depositions, and it's impossible to keep up

24    with them.  For that reason, I'm keeping it

25    open.
```

Confidential - Subject to Further Confidentiality Review

1           And I move for admission of all the

2      documents that have been identified in this

3      deposition.

4           MR. BARR:  With respect to the

5      admission of documents, that's for a Court to

6      decide at the appropriate time, and we will

7      state our appropriate objections at that time.

8           And we disagree with you with respect

9      to the continuation of this deposition, but I

10     guess we will address that if it becomes an

11     issue.

12           MR. LEVIN:  Exactly.

13           MR. BARR:  The deposition is

14     concluded.

15           THE VIDEOGRAPHER:  We're off the

16     record at 2:37 p.m..  Concluding tape number

17     four.

18           (Whereupon, the deposition was

19           adjourned.)

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

```
1              REPORTER'S CERTIFICATE

2

3         This transcript is valid only for a

4    transcript accompanied by my original signature

5    and original required seal on this page.

6         I, MAUREEN O'CONNOR POLLARD, Certified

7    Court Reporter (LA Certificate #2011025), in and

8    for the State of Louisiana, as the officer

9    before whom this testimony was taken, do hereby

10   certify that WANG BING, after having been duly

11   sworn by me upon authority of R.S. 37:2554, did

12   testify as hereinbefore set forth in the

13   foregoing pages; that this testimony was

14   reported by me in the stenotype reporting

15   method, was prepared and transcribed by me or

16   under my personal direction and supervision, and

17   is a true and correct transcript to the best of

18   my ability and understanding; that the

19   transcript has been prepared in compliance with

20   transcript format guidelines required by the

21   statute or by rules of the board, that I have

22   acted in compliance with the prohibition on

23   contractual relationships, as defined by

24   Louisiana Code of Civil Procedure Article 1434

25   and in rules and advisory opinions of the board.
```

1          That I am not related to counsel or to the

2     parties herein, nor am I otherwise interested in

3     the outcome of this matter.

4

5          Signed this the 27th day of August, 2015.

6

7

8

9     _____

10     MAUREEN O'CONNOR POLLARD, CCR, RMR, CLR

11     Realtime Systems Administrator

12     LA Certificate #2011025

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4     carefully and make any necessary corrections.

 5     You should state the reason in the appropriate

 6     space on the errata sheet for any corrections

 7     that are made.

 8              After doing so, please sign the

 9     errata sheet and date it.  It will be attached

10     to your deposition.

11              It is imperative that you return

12     the original errata sheet to the deposing

13     attorney within thirty (30) days of receipt of

14     the deposition transcript by you.  If you fail

15     to do so, the deposition transcript may be

16     deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
  1                  - - - - - -

                  E R R A T A

  2                  - - - - - -

  3     PAGE   LINE   CHANGE

  4     ____   ____   _____

  5        REASON: _____

  6     ____   ____   _____

  7        REASON: _____

  8     ____   ____   _____

  9        REASON: _____

 10     ____   ____   _____

 11        REASON: _____

 12     ____   ____   _____

 13        REASON: _____

 14     ____   ____   _____

 15        REASON: _____

 16     ____   ____   _____

 17        REASON: _____

 18     ____   ____   _____

 19        REASON: _____

 20     ____   ____   _____

 21        REASON: _____

 22     ____   ____   _____

 23        REASON: _____

 24     ____   ____   _____

 25
```

Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3              I, _____, do

        Hereby certify that I have read the foregoing

 4      pages, and that the same is a correct

        transcription of the answers given by me to the

 5      questions therein propounded, except for the

        corrections or changes in form or substance, if

 6      any, noted in the attached Errata Sheet.

 7

 8      _____

        BING WANG                     DATE

 9

10

11

12

13

14

15      Subscribed and sworn

        To before me this

16      _____ day of _____, 20_____.

17      My commission expires: _____

18

        _____

19      Notary Public

20

21

22

23

24

25
```

1                    LAWYER'S NOTES

2        PAGE   LINE

3        _____  _____   _____

4        _____  _____   _____

5        _____  _____   _____

6        _____  _____   _____

7        _____  _____   _____

8        _____  _____   _____

9        _____  _____   _____

10       _____  _____   _____

11       _____  _____   _____

12       _____  _____   _____

13       _____  _____   _____

14       _____  _____   _____

15       _____  _____   _____

16       _____  _____   _____

17       _____  _____   _____

18       _____  _____   _____

19       _____  _____   _____

20       _____  _____   _____

21       _____  _____   _____

22       _____  _____   _____

23       _____  _____   _____

24       _____  _____   _____

25

- - - - - - -

**ERRATA**

**DEPOSITION OF BING WANG**

勘误表

王兵庭外录证

- - - - - - -

| **PAGE**<br>页 | **LINE(S)**<br>行 | **CHANGE**<br>更正 |
|---|---|---|
| 10 | 20-21 | Change "We had hired a legal consultant before in America" to "We had hired an American legal consultant". |
| REASON:<br>理由 | | 证人供称：“我们请过一个美国的法律顾问”。<br>Interpretation issue.<br>翻译错误。 |
| 37 | 3 | Change "which also is a shareholder of CNBM" to "which also is a subsidiary of CNBM " |
| REASON:<br>理由 | | 证人供称：“也是中国建材一个持股的公司”。<br>Interpretation issue.<br>翻译错误。 |
| 58 | 17 | Change "contacting information disclosure" to "conducting information disclosure". |
| REASON:<br>理由 | | 证人供称：“进行信息披露”。<br>Typo.<br>笔误。 |
| 62 | 24 | Change "only Dong" to "only them". |
| REASON:<br>理由 | | 证人供称：“只有他们”。<br>Typo.<br>笔误。 |
| 68 | 1-2 | Change "I am the general manager of the company, but I'm not in charge of the specific sales work" to "I was the general manager of the company, but I was not in charge of the specific sales work". |
| REASON:<br>理由 | | 证人供称：“我虽然是公司总经理，但我不负责这些具体的销售工作”。<br>Interpretation issue.<br>翻译错误。 |
| 69 | 14 | Change "quality production department" to "production quality department". |
| REASON:<br>理由 | | 证人供称：“生产质量部门”。<br>Interpretation issue.<br>翻译错误。 |

| 80 | 5 | Change "BNBM.com.cm" to "BNBM.com.cn". |
| | | 证人供称：　"BNBM.com.cn"　。 |
| REASON: | | Typo. |
| 理由 | | 笔误。 |

| 80 | 16 | Change "and sometimes you do some research" to "including doing some research". |
| | | 证人供称：　"包括做一些调研"　。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 81 | 13-15 | Change "I would type it myself, because I'm not very good in typing. Therefore, I rarely use it" to "I would type it myself. Because I'm not very good in typing, therefore, I rarely use it". |
| | | 证人供称：　"我自己打。就是因为不擅长打字才很少用"　。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 84 | 4 | Change "she" to "he". |
| | | 证人律师称：　"他"　。 |
| REASON: | | Typo. |
| 理由 | | 笔误。 |

| 85 | 17 | Change "employees" to "working staff". |
| | | 证人供称：　"工作人员"　。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 91 | 12-15 | Change "before some of the board of directors meeting there would be proposals submitted for review in the meeting before the meeting started" to "before some of the board of directors meeting there would be important proposals, important proposals regarding investment which need to be reviewed and discussed by the board of directors". |
| | | 证人供称：　"开董事会之前，一些重要的议案，董事会需要审议的关于投资的重要议案"　。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 96 | 1 | Change "board of directors meeting" to "shareholders meeting". |
| | | 证人供称：　"股东会"　。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 96 | 5 | Change "board of directors meeting" to "shareholders meeting". |
| | | 证人供称：　"股东会"　。 |
| REASON: | | Interpretation issue. |

| 理由 | | 翻译错误。 |
|---|---|---|
| 96 | 14 | Change "18:58" to "1:58".<br>录像师称："1:58"。 |
| REASON:<br>理由 | | Typo.<br>笔误。 |
| 97 | 19 | Delete "A.".<br>删除"A."。 |
| REASON:<br>理由 | | Typo.<br>笔误。 |
| 103 | 2-3 | Change "I was only in charge of BNBM's investment" to "I was only in charge of investment in BNBM".<br>证人供称："我只是负责北新建材的投资"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 104 | 14 | Change "assembled homes" to "prefabricated homes".<br>证人供称："装配式房屋"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 109 | 9 | Change "BNBM's" to "BNBM Home's".<br>证人供称："北新房屋的"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 123 | 5 | Change "financial report" to "accounting statement".<br>证人供称："会计报表"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 127 | 21-22 | Change "shareholder asking opinions" to "asking opinion from shareholders".<br>证人供称："向股东征求意见"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 130 | 12 | Change "effective" to "efficient".<br>证人供称："有效率"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 133 | 1 | Add "This is decided by the status of BNBM" after "company.".<br>证人供称："这是由北新建材决定的"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 142 | 23 | Add "A." before "No".<br>在句首增加"A."。 |

| | | |
|---|---|---|
| REASON:<br>理由 | | Typo.<br>笔误。 |
| 149 | 20-22 | Change "Because Chairman Song is the big shareholder of BNBM, and he is also the Chairman of the Board of CNBM" to "Because Mr. Song is the Chairman of the board of directors of CNBM, the biggest shareholder of BNBM".<br>证人供称："因为宋先生是北新建材的大股东中国建材的董事会主席"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 149 | 23 | Change "CNBM" to "BNBM".<br>证人供称："北新建材"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 164 | 24-25 | Change "I supposed to be the author of the document" to "I supposed to be the representative".<br>证人供称："由我来代表"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 183 | 22 | Change "consolidate" to "comfort".<br>证人供称："慰问"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 192 | 5 | Change "five" to "certain".<br>证人供称："某个"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 206 | 3-4 | Change "staff representatives all make speeches" to "staff representatives may all make speeches".<br>证人供称："职工代表都有可能讲话"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 206 | 23 | Change "Zhang Laili" to "Zhang Nailing".<br>证人供称："张乃龄"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 211 | 14 | Change "product line" to "production line".<br>证人供称："生产线"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 226 | 18 | Change "at the same" to "at the same time".<br>证人供称："顺便"。 |
| REASON: | | Typo. |

| 理由 | | 笔误。 |
|---|---|---|
| 234 | 21-22 | Change "the nominating committee will be consist of independent directors as members" to "the nominating committee will have an independent director serving as the chairperson of committee". |
| | | 证人供称："提名委员会是由独立董事担任主任委员"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 237 | 16 | Change "affiliation relationship" to "associated relationship". |
| | | 证人供称："关联关系"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 249 | 13-14 | Change "Only tens of thousand dollars per year RMB" to "Only tens of thousand RMB per year". |
| | | 证人供称："每年只有几万块的人民币"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 257 | 13 | Change "legal entity" to "statutory organization". |
| | | 证人供称："法定机构"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 267 | 18-19 | Change "Taishan Gypsum's business performance had exceeded the expectation and below the budget" to "Taishan Gypsum's business performance was far beyond the initial expectation and budget". |
| | | 证人供称："泰山石膏的业绩表现远远超出一开始的预计和预算"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 268 | 5 | Change "BNBM Housing's" to "BNBM Home's". |
| | | 证人供称："北新房屋的"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 268 | 7-8 | Change "it was below the budget" to "it was beyond the expectation and budget". |
| | | 证人供称："超出了预期和预算"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |
| 285 | 25 | Change "I had become the director of Taishan" to "I had become the director of BNBM". |
| | | 证人供称："我成为北新建材董事"。 |
| REASON:<br>理由 | | Interpretation issue.<br>翻译错误。 |

| 286 | 1 | Change "Gypsum without the nomination of BNBM" to "without the nomination of Taishan Gypsum". |
| | | 证人供称：　"不是泰山石膏提名的"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 306 | 13-14 | Change "regular information and public announcements" to "regular public announcements of information". |
| | | 证人供称：　"定期的信息公告"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 307 | 20-21 | Change "and attorneys were hired, I had -- I have had met the attorneys" to "I have had met the attorneys hired by BNBM". |
| | | 证人供称：　"跟北新建材聘请的律师有过见面"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 311 | 7 | Change "our job duties" to "what we know". |
| | | 证人供称：　"我们的信息"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 330 | 16-17 | Change "To my recollection, I believe it is in a place in Beijing" to " To my recollection, I believe it was in a place in Beijing". |
| | | 证人供称：　"印象中应该是在北京"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 346 | 14 | Change "recently" to "in recent years". |
| | | 证人供称：　"最近几年"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 347 | 17 | Change "but Chen Yu is in charge directly" to "and Chen Yu is also assigned to oversee it directly". |
| | | 证人供称：　"当时也是陈雨直接分管负责的"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 347 | 23 | Change "I mentioned himself" to "He arranged himself". |
| | | 证人供称：　"他自己安排"。 |
| REASON: | | Typo. |
| 理由 | | 笔误。 |

| 351 | 14 | Change "revolve" to "relating to". |
| | | 证人供称：　"关于"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 352 | 1 | Change "approved" to "discussed". |
| | | 证人供称："讨论"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 352 | 7-8 | Change "Regarding the complaint of the lawsuit" to "Regarding this lawsuit". |
| | | 证人供称："关于这起诉讼"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 352 | 11-12 | Change "the board of directors meeting" to "the report of board of directors". |
| | | 证人供称："董事会报告"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 367 | 2 | Change "makes the question" to "makes the request". |
| | | 证人供称："申请"。 |
| REASON: | | Typo. |
| 理由 | | 笔误。 |

| 377 | 1-2 | Change "BNBM's investment and return" to "investment in and return from BNBM". |
| | | 证人供称："北新建材的投资和效益"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 377 | 7 | Change "BNBM's" to "CNBM's". |
| | | 证人供称："中国建材的"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 378 | 2-3 | Change "sought loans or guaranties from CNBM Group" to "sought guaranties from CNBM Group". |
| | | 证人供称："寻求中建材集团的担保"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 387 | 24 | Change "reverse guaranty" to "counter guaranty". |
| | | 证人供称："反担保"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 392 | 15-16 | Change "but the board of directors meeting of BNBM had approved of this" to "but BNBM had approved this ". |
| | | 证人供称："但北新建材同意了这个事"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

| 400 | 6 | Change "entities' investors" to "institutional securities investors". |

|  |  | 证人供称："机构证券投资者"。 |
|---|---|---|
| REASON:<br>理由 |  | Interpretation issue.<br>翻译错误。 |
| 408 | 9 | Change "a topic discussed" to "a topic to be discussed".<br>证人供称："要讨论的议题"。 |
| REASON:<br>理由 |  | Interpretation issue.<br>翻译错误。 |
| 416 | 2-3 | Change "According to the regulation, a public listing company," to "According to the regulation on public listing companies".<br>证人供称："按照上市公司的规定"。 |
| REASON:<br>理由 |  | Interpretation issue.<br>翻译错误。 |
| 417 | 5 | Change "Yang Yangun" to "Yang Yanjun".<br>证人供称："杨艳军"。 |
| REASON:<br>理由 |  | Typo.<br>笔误。 |
| 420 | 22 | Change "affiliate" to "related".<br>证人供称："关联"。 |
| REASON:<br>理由 |  | Interpretation issue.<br>翻译错误。 |
| 423 | 14-19 | Change "it sets regulatory authorities monitoring, and those regulatory authorities have the right to monitor the public listing company according to accounting standards and rules regarding the way that the company had handled certain matters" to "it would be supervised from many aspects, supervised under accounting principles and certain rules, therefore the securities regulatory authorities have the right to opine on the public listing company regarding the way that the company had handled certain matters".<br>证人供称："它要接受很多的监管，会计准则和一些规则的监管，所以证券的监管部门有权利对于上市公司在有些事项方面的处理办法提出自己的意见"。 |
| REASON:<br>理由 |  | Interpretation issue.<br>翻译错误。 |
| 437 | 23 | Delete "A."<br>删除"A."。 |
| REASON:<br>理由 |  | Typo.<br>笔误。 |
| 445 | 2 | Change "I don't know what document" to "I have not seen this document and I don't know what this document said".<br>证人供称："我没看过这个文件，我不知道它说了什么内容"。 |
| REASON:<br>理由 |  | Interpretation issue.<br>翻译错误。 |

| 449 | 13-14 | Change "apply for such estoppel" to "apply to the stock exchange for suspension in trading" |
| | | 证人供称："向交易所申请停牌"。 |
| REASON: | | Interpretation issue. |
| 理由 | | 翻译错误。 |

证人确认书

　　本人，王兵，特此确认，本人已经阅读之前第 1 页至第 462 页各页内容，确认其是对本人对其中所提各项问题所作回答的正确记录，但附件勘误表中列出的对形式或内容进行更正或修改（如有）的除外。

2015. 10. 14

_____ 　　　　　_____
王兵 　　　　　　　　　　　　　　日期

## ACKNOWLEDGMENT OF DEPONENT

I, BING WANG, do hereby certify that I have read the foregoing pages,1 through 462 and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.


_____          2015 , 10 , 14
BING WANG                                 DATE



| | |
|---|---|
| **C. Michael Moore**<br>Partner | c.michael.moore@dentons.com<br>D  +1 214 259 0902 |

Salans FMC SNR Denton
dentons.com

Dentons US LLP
2000 McKinney Avenue
Suite 1900
Dallas, TX 75201-1858 USA

T  +1 214 259 0900
F  +1 214 259 0910

September 8, 2015


**BY E-MAIL**


Kristie Martello
Supervisor of Case Management
Golkow Technologies Inc.
production@golkow.com


Re:    Deposition of Bing Wang, August 25 to August 27, 2015 -- Confidentiality Designations

Dear Ms. Martello:

As counsel for Beijing New Building Material (Group) Co., Ltd. ("BNBM Group") and Beijing New Building Materials Public Limited Company ("BNBM PLC") collectively ("BNBM Entities"), I write to you regarding the deposition of Mr. Bing Wang in the Chinese Drywall MDL (2:09-md-2047) in the Eastern District of Louisiana, which was conducted from August 25 through August 27, 2015 in New Orleans.

Pursuant to the Court's pre-trial order on confidentiality (PTO 16), BNBM Entities submit the following confidentiality designations for the Deposition Transcript of Bing Wang ("Wang Deposition").

The following sections of the Wang Deposition are marked as **"Confidential Information"** and are to be redacted, as they discuss matters that are subject to an Order from the Court designating them as such:

- Wang Deposition 107:11 through 111:10

- Wang Deposition 111:25 through 115:2

- Wang Deposition 116:1 through 120:9

- Wang Deposition 120:14 through 120:22

- Wang Deposition 121:6 through 121:11

- Wang Deposition  121:23 through 126:5

- Wang Deposition  127:15 through 130:1

- Wang Deposition 130:6 through 130:17

- Wang Deposition 130:23 through 130:24

- Wang Deposition 133:25 through 134:18

September 8, 2015
Page 2

- Wang Deposition 134:22 through 136:1

- Wang Deposition 136:21 through 137:6

- Wang Deposition 137:9 through 15

- Wang Deposition 140:15 through 21

- Wang Deposition 141:2 through 8

- Wang Deposition 141:18 through 142:3

- Wang Deposition 142:5 through 6

- Wang Deposition 152:18 through 154:18

- Wang Deposition 154:7 through 14

- Wang Deposition 154:21 through 22

- Wang Deposition 155:4 through 15

- Wang Deposition 156:16 through 24

- Wang Deposition 157:16 through 160:5

- Wang Deposition 161:4 through 162:3

- Wang Deposition 162:8 through 25

- Wang Deposition 163:4 through 163:14

- Wang Deposition 163:18 through 165:1

- Wang Deposition 165:13 through 15

- Wang Deposition 165:19 through 21

- Wang Deposition 179:16 through 180:11

- Wang Deposition 181:6 through 183:6

- Wang Deposition 183:8 through 23

- Wang Deposition 184:19 through 185:1

- Wang Deposition 185:5 through 185:17

- Wang Deposition 189:19 through 186:7

- Wang Deposition 186:12 through 188:9

- Wang Deposition 188:13 through 188:23

September 8, 2015
Page 3

- Wang Deposition 190:6 through 202:9

- Wang Deposition 203:3 through 204:14

- Wang Deposition 205:2 through 209:12

- Wang Deposition 209:25 through 210:22

- Wang Deposition 211:9 through 212:9

- Wang Deposition 213:19 through 215:1

- Wang Deposition 215:16 through 226:19

- Wang Deposition 270:12 through 273:15

- Wang Deposition 273:17 through 276:5

- Wang Deposition 276:13 through 278:1

- Wang Deposition 278:10 through 279:12

- Wang Deposition 293:19 through 293:21

- Wang Deposition 327:15 through 329:5

- Wang Deposition 330:7 through 331:20

- Wang Deposition 341:3 through 342:24

- Wang Deposition 344:25 through 345:6

- Wang Deposition 356:1 through 357:16

- Wang Deposition 358:16 through 359:18

- Wang Deposition 360:5 through 361:3

- Wang Deposition 361:24 through 364:15

- Wang Deposition 382:25 through 384:3

- Wang Deposition 384:20 through 395:20

- Wang Deposition 396:1 through 403:4

- Wang Deposition 405:4 through19

- Wang Deposition 405:22 through 410:8

- Wang Deposition 412:7 through 413:3

- Wang Deposition 413:10 through 416:5

September 8, 2015
Page 4

- Wang Deposition 421:12 through 429:19

- Wang Deposition 430:9 through 432:24

- Wang Deposition 433:1 through 434:4

- Wang Deposition 434:18 through 437:5

- Wang Deposition 437:14 through 438:24

- Wang Deposition 439:13 through 440:12

- Wang Deposition 441:18 through 444:16

- Wang Deposition 441:23 through 445:2

- Wang Deposition 445:20 through 449:21

- Wang Deposition 450:1 through 451:3

- Wang Deposition 451:14 through 453:6

- BW 8/25/15-8/27/15 Exhibit 61

- BW 8/25/15-8/27/15 Exhibit 133

- BW 8/25/15-8/27/15 Exhibit 134-R

- BW 8/25/15-8/27/15 Exhibit 305

- BW 8/25/15-8/27/15 Exhibit 305-R

- BW 8/25/15-8/27/15 Exhibit 306

- BW 8/25/15-8/27/15 Exhibit 308

- BW 8/25/15-8/27/15 Exhibit 309

- BW 8/25/15-8/27/15 Exhibit 310

- BW 8/25/15-8/27/15 Exhibit 311-R

- BW 8/25/15-8/27/15 Exhibit 312-R

- BW 8/25/15-8/27/15 Exhibit 313-R

- BW 8/25/15-8/27/15 Exhibit 314-R

- BW 8/25/15-8/27/15 Exhibit 315

- BW 8/25/15-8/27/15 Exhibit 315-R

- BW 8/25/15-8/27/15 Exhibit 316

September 8, 2015
Page 5

- BW 8/25/15-8/27/15 Exhibit 316-R

- BW 8/25/15-8/27/15 Exhibit 317

- BW 8/25/15-8/27/15 Exhibit 318

- BW 8/25/15-8/27/15 Exhibit 318-R

- BW 8/25/15-8/27/15 Exhibit 321

- BW 8/25/15-8/27/15 Exhibit 322-R

- BW 8/25/15-8/27/15 Exhibit 324-R

- BW 8/25/15-8/27/15 Exhibit 325-R

- BW 8/25/15-8/27/15 Exhibit 326-R

- BW 8/25/15-8/27/15 Exhibit 328

- BW 8/25/15-8/27/15 Exhibit 329

- BW 8/25/15-8/27/15 Exhibit 330

Sincerely,

C. Michael Moore
Partner

cc:    Russ Herman, Esq.
       Arnold Levin, Esq.