Confidential - Subject to Further Confidentiality Review

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3    ****************************************************

4    IN RE:  CHINESE-MANUFACTURED   MDL NO. 2047

     DRYWALL PRODUCTS LIABILITY

5    LITIGATION                    SECTION:  L

6    THIS DOCUMENT APPLIES TO      JUDGE FALLON

     ALL CASES

7                                  MAG. JUDGE WILKINSON

8    ****************************************************

9

              CONFIDENTIAL - SUBJECT TO FURTHER

10                 CONFIDENTIALITY REVIEW

11              Wednesday, September 16, 2015

12                     — — —

13

14         Videotaped Deposition of PENG SHOU, VOLUME

15   1, held at Orrick, Herrington & Sutcliffe, LLP, 15

16   Queen's Road Central, 43rd Floor, Hong Kong,

17   commencing at 9:05 a.m., on the above date, before

18   Micheal A. Johnson, Certified Court Reporter (#29025),

19   Registered Merit Reporter and Certified Realtime

20   Reporter.

21

22                     — — —

23

24         GOLKOW TECHNOLOGIES, INC.

          877.370.3377 ph │ 917.591.5672 fax

25              deps@golkow.com

**CONTEMPT**
**Exhibit 79**

Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S:
 2   COUNSEL FOR THE PLAINTIFF CLASS:
 3        LEVIN FISHBEIN SEDRAN & BERMAN
          BY:  SANDRA L. DUGGAN, ESQUIRE
 4             sduggan@lfsblaw.com.
               ARNOLD LEVIN, ESQUIRE
 5             alevin@lfsblaw.com
          510 Walnut Street, Suite 500
 6        Philadelphia, Pennsylvania 19106
          (215) 592-1500
 7
 8        IRPINO LAW FIRM
          BY:  ANTHONY D. IRPINO, ESQUIRE
 9             airpino@irpinolaw.com
               PEARL A. ROBERTSON, ESQUIRE
10             probertson@irpinolaw.com
          2216 Magazine Street
11        New Orleans, Louisiana 70130
          (504) 525-1500
12
13   COUNSEL FOR TAISHAN GYPSUM COMPANY:
14        ALSTON & BIRD LLP
          BY:  CHRISTINA HULL EIKHOFF, ESQUIRE
15             christy.eikhoff@alston.com
          1201 West Peachtree Street
16        Atlanta, Georgia 30309-3424
          (404) 881-4496
17
18   COUNSEL FOR BNBM DEFENDANTS:
19        DENTONS US LLP
          BY:  C. MICHAEL MOORE, ESQUIRE
20             mike.moore@dentons.com
          2000 McKinney Avenue, Suite 1900
21        Dallas, Texas 75201-1858
          (214) 259-0902
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S:

 2   COUNSEL FOR BNBM DEFENDANTS:

 3        DENTONS LLP

          BY:  TODD LIAO, ESQUIRE

 4             todd.liao@dentons.com

          5th Floor The Center 989 Changle Road

 5        Shanghai, China 200031

          +86 21 2315 6028

 6

 7   COUNSEL FOR CNBM DEFENDANTS:

 8        ORRICK HERRINGTON & SUTCLIFFE LLP

          BY:  L. CHRISTOPHER VEJNOSKA, ESQUIRE

 9             cvejnoska@orrick.com

               JASON M. WU, ESQUIRE

10             jmwu@orrick.com.

               Jason Cabot

11             jcabot@orrick.com

          405 Howard Street

12        San Francisco, California 94105-2669

          (415) 773-5916

13

14        ORRICK HERRINGTON & SUTCLIFFE LLP

          BY:  CHRISTOPHER CRUZ, ESQUIRE

15             ccruz@orrick.com

          2050 Main Street, Suite 1100

16        Irvine, California 92614-8255

          (949) 852-7717

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S:
 2   COUNSEL FOR CNBM DEFENDANTS:
 3       ORRICK HERRINGTON & SUTCLIFFE LLP
         BY:  YALI HU, ESQUIRE
 4           yhu@orrick.com
             SHELLEY ZHANG, ESQUIRE
 5           szhang@orrick.com
         5701 China World Tower
 6       No. 1 Jianguomenwai Avenue
         Beijing 100004
 7       People's Republic of China
         +86 10 8595 5668
 8
 9   COUNSEL FOR THE STATE OF LOUISIANA:
10       PERKINS COIE LLP
         BY:  DAVID L. BLACK, ESQUIRE
11           dblack@perkinscoie.com
         1900 Sixteenth Street, Suite 1400
12       Denver, Colorado 80202-5255
         (303) 291-2309
13
14       OFFICE OF THE ATTORNEY GENERAL STATE OF
         LOUISIANA
15       BY:  L. Christopher Styron
             styron@ag.state.la.us
16       1885 North Third Street
         Baton Rouge Louisiana 70802
17       (225) 326-6079
18
19   ALSO PRESENT:
20       TONI XU
21       REGINA VALENTI
22       MELISSA BARDWELL, VIDEOGRAPHER.
23       SUNNY WANG, MANDARIN INTERPRETER
24                   — — —
25
```

Confidential - Subject to Further Confidentiality Review

```
 1                        INDEX

                       PENG SHOU

 2                 September 16, 2015

 3

 4       PROCEEDINGS                              10

 5

 6   EXAMINATION OF PENG SHOU:

 7            BY MR. IRPINO                10

 8

 9       REPORTER'S CERTIFICATE               125

10

11

12       INFORMATION REQUESTED BY COUNSEL FOR CNBM

13                    Page 22, Line 25

                      Page 46, Line 12

14                    Page 50, Line 15

                      Page 59, Line 17

15                    Page 81, Line 15

                      Page 84, Line 7

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION EXHIBITS
                          PENG SHOU
 2                     September 16, 2015
 3
 4   NUMBER                DESCRIPTION              MARKED
 5   Exhibit 360    EPC framework Agreement by        107
                    and between Sunpin Solar
 6                  Development, LLC and China
                    Triumph International
 7                  Engineering Co., Ltd.
 8   Exhibit 361    BOS Agreement for the            108
                    Maryland Church Hill 7.344 MW
 9                  Solar Power Project by and
                    between Sunpin Construction
10                  Management, LLC and China
                    Triumph International
11                  Engineering Co., Ltd.
12   Exhibit 362    EPC Short-Form Agreement by      114
                    and between Sunpin Walmart
13                  Avon-North Oxford, LLC and
                    China Triumph International
14                  Engineering Co., Ltd.
15   Exhibit 364    EPC Agreement for the            110
                    Maryland Church Hill 7.344 MW
16                  Solar Power Project by and
                    between Church Hill Solar
17                  Farm, LLC and China Triumph
                    International Engineering
18                  Co., Ltd.
19   Exhibit 366    Agreement for Joint Venture       67
20   Exhibit 367    Close Corporation Agreement       68
21   Exhibit 368    March 12, 2013, E-mail,           74
                    Slater to Gries with Letter
22                  of Payment Instruction
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1                        DEPOSITION EXHIBITS
                              PENG SHOU
 2                        September 16, 2015
 3
 4    NUMBER                  DESCRIPTION               MARKED
 5    Exhibit 369    Partial Translation of              118
                     CNBMGRP00116380-116410
 6                   The Economic Responsibility
                     and Financial Audit Report
 7                   for the Term of Office of
                     Comrade Shou Peng, the
 8                   General Manager of China
                     Triumph International
 9                   Engineering Company Limited
10    Exhibit 371    PV Materials Technology              92
                     Development Agreement
11
      Exhibit 374    September 25, 2014, E-mail,          79
12                   Slater to Teng
13    Exhibit 375    February 5, 2015, E-mail,            80
                     Gries to Traynor/Paulsen
14
      Exhibit 376    Quarterly Report, CdTe PV           99
15                   Materials R&D Project
16    Exhibit 377    Quarterly Report, CdTe PV           99
                     Materials R&D Project
17
      Exhibit 378    PV Materials Technology             98
18                   Development Agreement
19    Exhibit 379    Collaborative Graduate             90
                     Certificate Program Agreement
20                   Between New Jersey Institute
                     of Technology and China
21                   Triumph International
                     Engineering Co., Ltd.
22
      Exhibit 380    Collaborative Graduate            102
23                   Certificate Program Agreement
                     Between New Jersey Institute
24                   of Technology and China
                     Triumph International
25                   Engineering Co., Ltd
```

Confidential - Subject to Further Confidentiality Review

```
 1                        DEPOSITION EXHIBITS
                              PENG SHOU
 2                        September 16, 2015

 3

 4     NUMBER                  DESCRIPTION              MARKED

 5     Exhibit 381    November 22, 2013, E-mail,          86
                      Sebastian to Williams
 6
       Exhibit 386    3/26/15 E-mail, Cao to Peng        123
 7
       Exhibit 399    12/1/2014 Wire Transfer            113
 8                    Receipt
 9     Exhibit 400    1/22/2015 Wire Transfer            113
                      Receipt
10
       Exhibit 401    3/16/2015 Wire Transfer            117
11                    Receipt
12     Exhibit 402    3/16/2015 Wire Transfer            117
                      Receipt
13
       Exhibit 406    Progress Report on the             119
14                    Preliminary Work of the
                      United States Cement
15                    Investment Project
16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

1                   PREVIOUSLY MARKED EXHIBITS

2

   NUMBER                    DESCRIPTION              REFERENCED

3

   Exhibit 5        ...........................        47

4

   Exhibit 5-A      ...........................        47

5

   Exhibit 13       ...........................        38

6

   Exhibit 13-A     ...........................        38

7

   Exhibit 82       ...........................       115

8

   Exhibit 82-1     ...........................       111

9

   Exhibit 150      ...........................        60

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

```
 1                    PROCEEDINGS

 2              THE VIDEOGRAPHER:  We are now going on

 3       the record.  My name is Melissa Bardwell,

 4       videographer here for Golkow Technologies.

 5       Today is September 16th, 2015.  Time now is

 6       approximately 9:05 a.m.

 7              This videotaped deposition is being held

 8       in Hong Kong in reference to the Chinese

 9       Manufactured Drywall Products Liability

10       Litigation.  The deponent today is Peng Shou.

11              Counsel will be noted for the

12       stenographic record.  The court reporter today

13       is Micheal Johnson and he will now swear in the

14       interpreter and the witness.

15                 (Interpreter sworn.)

16                 (Oath administered to the witness.)

17                    PENG SHOU

18          having been first duly sworn,

19             testified as follows:

20                    EXAMINATION

21   BY MR. IRPINO:

22       Q     Good morning.

23       A     Good morning.

24       Q     Sir, have you ever given a deposition

25   before?
```

```
 1      A      No.

 2      Q      There are a few rules I want to go over with

 3   you.  This is a question and answer session where I

 4   ask questions and you do the best to give answers.  Do

 5   you understand?

 6      A      I understand.

 7      Q      Do you understand that you are under oath

 8   just as if you were in a court of law?

 9      A      I understand.

10      Q      We're going to need you to verbalize all of

11   your answers.  We cannot have you just shaking your

12   head yes or no.

13      A      I understand.

14      Q      Are you currently on any medication?

15      A      I am not on any medication, not on any

16   medication, but I have taken a little bit of

17   medication on lowering my blood lipid.

18      Q      Would it be fair to state that whatever

19   little medication you have taken would not in any way

20   prevent you from providing full and honest answers at

21   this deposition today?

22      A      Correct.

23      Q      Now, we're going to be talking today about a

24   number of different companies and I am going to use a

25   number of different acronyms.  I'm going to go over
```

1    some of those with you now so that there's no

2    confusion later.  Okay?

3        A     Okay.

4        Q     When I say "CNBM" or "CNBM Company," I'm

5    referring to China National Building Material Company,

6    Limited.  Okay?

7              When I say "CNBM Group" or "CNBMG,"

8    I'm referring to China National Building Material

9    Group Corporation.  Do you understand?

10       A     I understand.

11       Q     When I say "BNBM" or "BNBM PLC," I'm

12   referring to Beijing New Building Materials, Public

13   Limited Company.  Do you understand?

14       A     Now I understand.

15       Q     When I say "BNBM Group" or "BNBMG," I'm

16   referring to Beijing New Building Material Group

17   Company, Limited.  Do you understand?

18       A     I understand.

19       Q     When I refer to "Taishan" or "TG," I'm

20   referring to Taishan Gypsum Company, Limited.  When I

21   refer to "CTIEC," C-T-I-E-C, or "China Triumph," I'm

22   referring to China Triumph International Engineering,

23   Limited.  You understand?

24       A     I understand this very well.

25       Q     When I refer to "TECO," T-E-C-O, I'm

1    referring to Toledo Engineering Company, Incorporated.

2    You understand?

3        A     I understand.

4        Q     When I refer to CTIEC-TECO, I'm referring to

5    the joint venture company established and owned by

6    CTIEC and TECO.  That is also known as CTIEC-TECO

7    American Technology LLC.  When I refer to "NJIT," I'm

8    referring to the New Jersey Institute of Technology.

9    Do you understand?

10       A     I understand.

11       Q     And if I refer solely to Sunpin, that will

12   mean Sunpin Solar Development, LLC.  Understand?

13       A     I'm aware of that.

14       Q     Can you please state your full, complete

15   name for the record.

16       A     My name is Peng Shou.

17       Q     Would you like me to refer to you as

18   Mr. Shou or Mr. Peng?

19       A     Whatever according to your custom.

20       Q     No, sir.  Your custom.

21       A     Mr. Peng.

22       Q     Mr. Peng.  All right.  What is your current

23   office address?

24       A     Which office address you referring to?

25       Q     Whatever you consider to be your office

Confidential - Subject to Further Confidentiality Review

 1    address.

 2              MR. VEJNOSKA:  Objection, vague and

 3         ambiguous.

 4    A     My office address is No. 2000 Zhong Qi

 5    Building, Zhongshan North Road, Shanghai.

 6    BY MR. IRPINO:

 7    Q     What entity has its offices in that building

 8    that you work for?

 9              MR. VEJNOSKA:  Objection, vague and

10         ambiguous, overbroad.

11    A     He is asking the building.  I don't quite

12    understand that question.  Please repeat.

13    BY MR. IRPINO:

14    Q     Sure.  What company do you work for when you

15    do work at that office?

16    A     I work for China Triumph International

17    Engineering Company.

18    Q     Does CTIEC have its offices in that same

19    building?

20              MR. VEJNOSKA:  Objection, foundation,

21         misstates testimony.

22    A     CTIEC is in the office building.

23    BY MR. IRPINO:

24    Q     Are any other CNBM Group entities in that

25    building?

Confidential - Subject to Further Confidentiality Review

```
 1      A     No.

 2             MR. VEJNOSKA:  Objection, vague and

 3         ambiguous.

 4   BY MR. IRPINO:

 5      Q     Now, you had mentioned, I think, that you

 6   had other offices.  What other offices do you

 7   maintain?

 8             MR. VEJNOSKA:  Objection, foundation.

 9      A     I have an office in Bengbu.

10   BY MR. IRPINO:

11      Q     What is the full name of the entity for

12   which you work relative to that office?

13      A     Bengbu Glass Research Institute.

14      Q     I'm going to refer to that company as

15   Bengbu.  Is that okay?

16      A     Yes.

17      Q     Can you please state the name of each CNBM

18   Group company other than CTIEC and Bengbu that you

19   have a current position with.

20             MR. VEJNOSKA:  Objection, vague and

21         ambiguous.

22      A     Please have him repeat.

23   BY MR. IRPINO:

24      Q     Please state the name of each CNBM Group

25   company or entity with which you currently hold any
```

Confidential - Subject to Further Confidentiality Review

1    position.

2              MR. VEJNOSKA:  Objection, vague and

3         ambiguous, foundation.

4    A    Where I currently hold positions?

5    BY MR. IRPINO:

6    Q    Yes.

7              MR. VEJNOSKA:  Same objections.

8              THE INTERPRETER:  The interpreter needs

9         to correct her prior interpretation.  The

10        deponent said where I hold positions instead of

11        where I currently hold positions.

12   A    I have already answered him earlier.  I hope

13   that he will ask me the question again.

14   BY MR. IRPINO:

15   Q    I want to know what CNBM Group companies or

16   entities that you currently hold a position with other

17   than CTIEC and Bengbu.

18             MR. VEJNOSKA:  Same objections.

19   A    I do not hold position in CNBM Group.

20   BY MR. IRPINO:

21   Q    CNBM Group entities was what I asked,

22   entities or companies.  And I'll define it further.

23   Any entity that falls under the umbrella of CNBM

24   Group.  Do you understand?

25             MR. VEJNOSKA:  Same objections.

Confidential - Subject to Further Confidentiality Review

```
 1      A      Under the umbrella I also hold the position

 2   of vice president of CNBM Company, Limited.

 3   BY MR. IRPINO:

 4      Q      Is that all, all the companies?

 5      A      Yes.

 6      Q      Did you meet with any attorneys to prepare

 7   for your deposition today?

 8              MR. VEJNOSKA:  You may answer that

 9       question yes or no, Mr. Peng.

10      A      Yes.  Prior to this the attorney had done

11   some preparation work.

12   BY MR. IRPINO:

13      Q      How many times did you meet with attorneys

14   to prepare for your deposition today?

15      A      How many times did I meet?  What does that

16   mean?

17      Q      Was it one day, over two days, over a period

18   of separate days?

19      A      Two days.

20      Q      Which days?

21      A      Yesterday and the day before yesterday.

22      Q      How long was the meeting yesterday?

23      A      Four or five hours.

24      Q      Which attorneys did you meet with yesterday?

25      A      I don't remember their English names.  It's
```

Confidential - Subject to Further Confidentiality Review

1    really hard to remember the English names.

2        Q     Are any of them in this room?

3        A     Younger.  Two younger.

4              MR. IRPINO:  For the record, I don't

5        know y'all's names.  What are your names?

6              MR. VEJNOSKA:  He met with Orrick

7        attorneys.  Do you need their names?

8              MR. IRPINO:  No, I think that's fine.

9    BY MR. IRPINO:

10       Q     The day before yesterday, how long was your

11   meeting?

12       A     Also for four or five hours.

13       Q     Was it with the same attorneys?

14       A     Yes.

15       Q     Was anyone present other than those

16   attorneys?

17       A     Others present.  There was also this person.

18   She is the interpreter.

19       Q     Understood.

20             MR. VEJNOSKA:  And a lawyer with Orrick.

21   BY MR. IRPINO:

22       Q     Separate from the meetings in person, did

23   you have any other communications with lawyers to

24   prepare for your deposition?

25       A     No.

1      Q     Did you have any communications, meetings,

2   phone calls, Skype sessions, with any nonattorneys

3   while attorneys were not present?

4            MR. VEJNOSKA:  Objection, vague and

5         ambiguous and overbroad.  Mr. Irpino, to try to

6         be helpful here, I think if you look at your

7         question, you basically have asked him if he's

8         ever had any conversations in his life with

9         nonattorneys.

10           MR. IRPINO:  Let's be fair.  This is all

11        along the line of questioning about preparation

12        for the deposition.  If we're going to get

13        picky, this will be a long day.

14           MR. VEJNOSKA:  I'm just trying to help

15        you, Mr. Irpino.

16   BY MR. IRPINO:

17     Q     Since your lawyer has an objection that I

18   guess is vague or overbroad, I will repeat.  In order

19   to prepare for your deposition did you have any

20   communications, meetings, phone calls, Skype sessions

21   with any nonattorneys while attorneys were not

22   present?

23     A     Because what had been said is not clear,

24   please have him to repeat it.

25     Q     Sure.  In order to prepare for your

Confidential - Subject to Further Confidentiality Review

1    deposition, separate from any meetings you had with

2    attorneys, separate from any communications you had

3    with attorneys, did you have any communications with

4    any nonattorneys to prepare for your deposition?

5         A    No.

6         Q    Did you review any documents to prepare for

7    your deposition?

8         A    I have reviewed documents.

9         Q    What documents have you reviewed?

10        A    I reviewed a document provided by our

11   group's legal department, which is the annual report.

12        Q    What years' annual report and what

13   companies' annual report?

14        A    I did not go through them in detail.  I do

15   not have a clear recollection on that as for which

16   years.  It should be the annual reports in the recent

17   couple of years.

18        Q    And for which companies?

19        A    The annual reports of CNBM Company, Limited.

20        Q    Did you review any other documents to

21   prepare for your deposition?

22        A    No.

23        Q    Now, let's talk a little bit in detail about

24   your role at CNBM.  I think based on what I have read

25   you have been an executive director at CNBM since June

Confidential - Subject to Further Confidentiality Review

1   of 2006; is that correct?

2       A      Yes.

3       Q      You have also been a vice president at CNBM

4   since approximately March of 2005; is that correct?

5       A      I'm the vice president of CNBM Company,

6   Limited.

7       Q      And is that since approximately March of

8   2005?

9       A      I don't have a clear recollection on that.

10  It supposed to be 2005, the period of 2005.

11      Q      Since approximately 2005 had you held any

12  other positions at CNBM in addition to vice president

13  or executive director?

14      A      I am the chairman of the board of directors

15  and the general manager of China Triumph International

16  Engineering Company.

17      Q      Right now I just want to discuss the precise

18  roles or positions that you have held at CNBM.  And is

19  there anything else other than what you have

20  testified?

21      A      No.

22      Q      How did you get the position of executive

23  director at CNBM?

24              MR. VEJNOSKA:  Objection, vague and

25          ambiguous.

```
 1      A      As for the executive director, it was the

 2  board of directors that elected me as the executive

 3  director.

 4  BY MR. IRPINO:

 5      Q      And how about your position as vice

 6  president at CNBM?

 7      A      I was hired by the board of directors'

 8  meeting.

 9      Q      Was it the board of directors of CNBM as a

10  whole, as a unit, that hired you or was it one person

11  who was on the board of directors?

12              MR. VEJNOSKA:  Objection, compound.

13      A      It was the board of directors.

14  BY MR. IRPINO:

15      Q      Currently what are your responsibilities at

16  CNBM as a vice president?

17              MR. VEJNOSKA:  Objection, vague and

18        ambiguous, overbroad.

19      A      My sole responsibility as the vice president

20  of CNBM is to be responsible for China Triumph

21  International Engineering Company.

22  BY MR. IRPINO:

23      Q      What are your responsibilities as an

24  executive director at CNBM?

25              MR. VEJNOSKA:  Would you mark that,
```

Confidential - Subject to Further Confidentiality Review

1          please.

2     A     As the executive director my responsibility

3   is to independently vote and involved in

4   decision-making based on the authority given in

5   accordance with the company law in the board of

6   directors.

7   BY MR. IRPINO:

8     Q     Has that responsibility changed at all from

9   2006 to the present date?

10    A     No.

11    Q     Have your responsibilities as vice president

12  changed at all from approximately 2005 until the

13  present date?

14    A     No.

15    Q     For as long as you have been a vice

16  president at CNBM, your responsibilities have solely

17  been related to your role at CTIEC.  True?

18          MR. VEJNOSKA:  Objection, asked and

19      answered.

20    A     I have just answered that question, which is

21  I am specifically in charge of the business of China

22  Triumph International Engineering Company.

23  BY MR. IRPINO:

24    Q     How does your work for CNBM divide out

25  between your duties as vice president and your duties

Confidential - Subject to Further Confidentiality Review

1    as executive director?  And let me add to it, I'm

2    talking about time, amount of time.

3              MR. VEJNOSKA:  Objection, vague and

4         ambiguous.

5         A    The time division is as the vice president

6    I'm in charge of the work of China Triumph

7    International Engineering Company full time.  As the

8    executive director I participate in the board of

9    directors' meetings according to requirements.

10   BY MR. IRPINO:

11        Q    How much time a week does that take to

12   participate as the executive director with those

13   responsibilities?

14             MR. VEJNOSKA:  Objection, foundation.

15        A    I just said, I would exercise my right of

16   director whenever there are board of directors'

17   meetings.  I do not handle the matters on a weekly

18   basis because it is not my day-to-day work.

19   BY MR. IRPINO:

20        Q    Can you estimate for us how much time in a

21   year you have to spend working in your role as an

22   executive director at CNBM?

23        A    I only participate in the meetings.  In the

24   meetings required by the board of directors I do not

25   participate in anything else.

1     Q      And are there approximately ten or so such

2    board meetings a year?

3     A      I do not have a clear recollection on the

4    details, but I remember board of directors' meetings

5    are held during the period of annual reports and

6    interim reports.

7     Q      Let's just talk about board meetings.

8    Approximately how long do they last, CNBM board

9    meetings that you attend?

10             MR. VEJNOSKA:  Objection, vague and

11        ambiguous, compound, overbroad.

12     A      I would like to ask him, did he mean how

13    long does it last for each of the CNBM Company,

14    Limited board of directors' meeting?

15    BY MR. IRPINO:

16     Q      Yes.  Approximately.  Understanding I would

17    imagine that some may last more than others, I'm just

18    trying to get a general sense of how long they take.

19             MR. VEJNOSKA:  Same objections.

20     A      According to what you said in the general

21    sense usually it is half a day, from 9:00 to 11:00 or

22    11:30.

23    BY MR. IRPINO:

24     Q      Other than actually attending the meeting,

25    do you have to do any preparation work for the meeting

```
 1    such as reviewing any documents?

 2              MR. VEJNOSKA:  Same objections.

 3      A     I neither prepare nor review documents for

 4    the meetings.  I would just participate in the

 5    meetings and they would talk in the meetings.

 6    BY MR. IRPINO:

 7      Q     Do you ever talk in the meetings?

 8              MR. VEJNOSKA:  Same objections.

 9      A     No.

10    BY MR. IRPINO:

11      Q     In connection with your work as the chairman

12    of CTIEC, do you use a computer?

13      A     As the chairman of the board of CTIEC I

14    basically do not use a computer.

15      Q     Do you send e-mails in connection with

16    either your role as chairman of CTIEC or as executive

17    director at CNBM?

18      A     I do not send e-mails.

19              MR. IRPINO:  Why don't we take a break.

20              THE VIDEOGRAPHER:  Time now is 9:54 a.m.

21        We are off the record.

22              (Recess Taken From 9:54 a.m. To

23              10:10 a.m.)

24              THE VIDEOGRAPHER:  This begins disk 2 of

25        today's deposition.  Time now is 10:10 a.m.  We
```

Confidential - Subject to Further Confidentiality Review

1        are back on the record.

2   BY MR. IRPINO:

3        Q    Do you have a secretary or an assistant that

4   handles either sending or receiving e-mails for you?

5        A    Yes.

6        Q    What is his or her name?

7        A    I would like to explain that whenever I need

8   them to handle my e-mails, I would tell them.  I

9   myself do not handle the e-mails.  A specific

10  secretary handles the e-mails of the international

11  association.  I have never read them.

12       Q    And who is that secretary's name?

13       A    The secretary handling the e-mails of

14  international glass association is Wang Kun.

15       Q    Do you have a secretary or assistant that

16  assists with e-mails relative to your work at CTIEC?

17       A    I don't have a regular one.

18       Q    How do you communicate in your capacity as

19  chairman of CTIEC?

20            MR. VEJNOSKA:  Objection, vague and

21       ambiguous, overbroad.

22       A    As the chairman of the board, I would often

23  give oral instructions to them for relevant works.

24  BY MR. IRPINO:

25       Q    Do you have an e-mail address?

Confidential - Subject to Further Confidentiality Review

```
 1      A     Yes.

 2      Q     What is it?

 3      A     Cgc001@ctiec.net.

 4      Q     And what do you do with e-mails that you

 5   receive at that e-mail address?

 6      A     I would review the e-mails received in a

 7   certain period of time.  If I find anything related to

 8   me, I will instruct my staff to handle it.  If it is

 9   unrelated to me, I don't even read them.

10      Q     When you instruct your staff to handle

11   e-mails that do relate to you, would they respond for

12   you from your e-mail address?

13            MR. VEJNOSKA:  Objection, calls for

14         speculation, vague and ambiguous.

15      A     This is hard.  I would instruct them on

16   that.  Usually it is not necessary for me to handle

17   them.  I would instruct them on what e-mail address to

18   use in response.  If it is a foreigner, they will

19   respond in English.  If it is Chinese, they may

20   respond in Chinese.  And sometimes they would respond

21   by making telephone calls.

22   BY MR. IRPINO:

23      Q     And when you say you would instruct them on

24   what e-mail address to use in response, what are the

25   different e-mail addresses that you choose from?
```

Confidential - Subject to Further Confidentiality Review

1    A    I think you misunderstood me.  Perhaps it

2  was an error in the interpretation.  I said I do not

3  know in what way they would respond as long as they

4  respond.  There is no fixed e-mail for respond.  I do

5  not instruct them on that.

6    Q    What are their names and what are their

7  e-mail addresses?

8    A    There has been no regular personnel.

9  Therefore, I do not have a clear recollection.

10            THE INTERPRETER:  The interpreter needs

11        to clarify with the witness.

12            Upon clarifying with the witness, there

13        is no change on the interpreter's prior

14        interpretation.

15  BY MR. IRPINO:

16    Q    My appreciation is that you have been the

17  chairman and president of CTIEC for at least the last

18  ten years.  True?

19    A    Yes.

20    Q    Can you give me a brief description about

21  the business that CTIEC is in?

22    A    Yes.  The main businesses of China Triumph

23  International Engineering Company, Limited is to

24  provide project services.  Its businesses include

25  glass, cement, new energy resources.

 1      Q      What are the different departments or

 2   divisions of CTIEC?

 3                MR. VEJNOSKA:  Objection, foundation.

 4      A      What is a decision.

 5                MR. VEJNOSKA:  Vague and ambiguous.

 6                THE INTERPRETER:  This is the

 7        interpreter speaking.  Chinese department and

 8        division has exactly same translation.

 9        Therefore, the interpreter interpreted division

10        literally.

11   BY MR. IRPINO:

12      Q      Why don't we do it this way.  Can you give

13   me an organizational structure of CTIEC?

14                MR. VEJNOSKA:  Objection, vague and

15        ambiguous, overbroad.

16      A      CTIEC's organizational structure is supposed

17   to be public information, but I will explain in brief.

18   CTIEC is an independent engineering company.  It has a

19   business department for relevant businesses.  At the

20   same time, it also has independently operated

21   subsidiaries.  That's it.

22   BY MR. IRPINO:

23      Q      How many independent subsidiaries does it

24   have?

25      A      Let me count.  Six to seven perhaps.

1      Q     Is Bengbu a subsidiary?

2      A     No.

3      Q     What are the names of the different

4   subsidiaries of CTIEC?

5      A     I believe you will find all of them in our

6   public information, but I will say a few in brief.  We

7   have Bengbu Kaisheng, Nanjing Kaisheng, Beijing

8   Kaisheng, Zhongyi Kaisheng.  It is a joint venture

9   with Italy.  There is also a Yancheng Environmental

10  Protection Research Institute, et cetera.

11     Q     Just so we're clear, when you say "our

12  public information," to what are you referring?

13     A     These company names are listed in our

14  company's annual reports.

15     Q     Does CTIEC have an annual report?

16     A     CTIEC does not have an annual report.

17     Q     What annual reports are you referring?

18     A     The annual report that I said is referring

19  to CNBM's annual report when it publishes its

20  performance report annually in Hong Kong.

21     Q     Now, as chairman and president of CTIEC who

22  directly reports to you?

23     A     As -- please have him repeat his question.

24     Q     Yes.  As the president and chairman of CTIEC

25  who directly reports to you?

1           MR. VEJNOSKA:  Objection, vague and

2       ambiguous.

3       A       As the chairman and president of China

4   Triumph International Engineering Company, the other

5   deputy managers in the management team report to me.

6   They are responsible fully to the works that are

7   assigned to them.

8   BY MR. IRPINO:

9       Q       Now, your role at Bengbu, what is your

10  position at Bengbu currently?

11      A       I am the director of the research center,

12  also known as research institute in Bengbu.

13      Q       And how much of your time is spent in that

14  job?

15      A       On this job I mainly would contribute my

16  brain power.  I would come up with ideas of research

17  and development and they will implement them.

18      Q       And how much time do you spend doing that in

19  a given year?

20      A       In a given year I do not have statistics.  I

21  believe I've used my spare times.  I do not have

22  statistics.  I also do not recall.

23      Q       Who owns Bengbu?

24      A       The owner of Bengbu is CNBMG.

25      Q       And does CNBMG own 100 percent of Bengbu?

Confidential - Subject to Further Confidentiality Review

```
 1      A      Yes.

 2      Q      Who do you report to as the director of the

 3   Research Center At Bengbu or Bengbu Glass?

 4             MR. VEJNOSKA:  Objection to foundation.

 5      A      As the director of the research center I

 6   report to myself.

 7   BY MR. IRPINO:

 8      Q      Does Bengbu have a board of directors?

 9      A      Bengbu does not have a board of directors.

10      Q      So who controls Bengbu Glass?

11             MR. VEJNOSKA:  Objection, vague and

12         ambiguous, calls for legal conclusion.

13      A      I just said CNBMG owns 100 percent of shares

14   of Bengbu Institute, also known as Bengbu.

15   BY MR. IRPINO:

16      Q      So if CNBM Group owns 100 percent and you

17   don't have to report to anybody, then do you run the

18   show there?

19             MR. VEJNOSKA:  Objection, vague and

20         ambiguous, argumentative.

21      A      Bengbu is an independent company, a research

22   organization mainly doing research.  It comes up with

23   ideas and researches the same according to the entire

24   market and its future development.

25   BY MR. IRPINO:
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q      Well, then can you share with me the

 2   organizational structure of Bengbu?

 3               MR. VEJNOSKA:  Objection, vague and

 4          ambiguous.

 5        A      The organizational structure of Bengbu is

 6   that it is simply a research institute.  The research

 7   institute, like I just said, conduct independent

 8   researches based on the development direction of the

 9   industry, the country, and the world.

10   BY MR. IRPINO:

11        Q      And as -- I'm trying to figure out who is

12   the head of it.  Who is the head of Bengbu Glass?

13        A      Me.

14        Q      Then who is the organizational structure

15   underneath you?  Do you have, for example, deputy

16   managers that report to you?

17               MR. VEJNOSKA:  Objection, compound.

18        A      I do.  I have every research center which

19   led by scientists to report to me.

20   BY MR. IRPINO:

21        Q      And how many different research centers does

22   Bengbu have?

23        A      Research center is established based --

24   based on different research subjects.

25        Q      How many different?
```

Confidential - Subject to Further Confidentiality Review

1      A      It's changing.  Currently I believe around

2    three to four.

3      Q      And what are those different subjects?

4      A      For example, in connection with new

5    materials, with glass.  Mainly in connection with

6    these areas.

7              THE INTERPRETER:  Interpreter needs to

8        clarify with witness.

9      A      Because glass itself is big in scope and

10   substantial in content which including flat glass,

11   display glass, special glass such as the Low-E glass

12   for the windows.

13   BY MR. IRPINO:

14     Q      Now, with respect to the research that is

15   done at Bengbu, do patents come out of it?

16     A      Patents do come out of the research at

17   Bengbu.

18     Q      And who owns the patents that come out of

19   the research from Bengbu?

20     A      They're owned by Bengbu Institute itself.

21     Q      Does Bengbu license or earn any money off of

22   the patents that it holds?

23     A      The patents that come out of Bengbu are

24   approved by the country.

25     Q      And does Bengbu make any money off of the

1    patents?

2        A    Bengbu does not make any money off of its

3    patents.

4        Q    Does Bengbu license or assign its patents to

5    anyone?

6                MR. VEJNOSKA:  Objection, asked and

7          answered.

8        A    I have already answered this question

9    earlier.

10   BY MR. IRPINO:

11       Q    Well, then I don't understand your answer.

12   When you say that the patents come out of Bengbu are

13   approved by the country, I don't understand that.  Can

14   you please explain that to me better?

15               MR. VEJNOSKA:  Objection, vague and

16         ambiguous.

17               MR. MOORE:  Sidebar.

18               MR. VEJNOSKA:  Move to strike.  You may

19         answer.

20               THE INTERPRETER: This is the interpreter

21         speaking.  Is sidebar an objection or you

22         request a sidebar?

23               MR. MOORE:  It's an objection.

24               MR. VEJNOSKA:  You may answer.

25       A    The patents that come off of the Research

1    Institute of Bengbu would be reported to China patent

2    bureau pending approval.  It is also a protection of

3    our own intellectual properties.

4    BY MR. IRPINO:

5        Q     What role or position do you hold with

6    CTIEC-TECO?

7        A     I play no roles in CTIEC-TECO.

8        Q     What role do you play with NJIT or the New

9    Jersey Institute of Technology?

10       A     I also hold no positions.

11       Q     Is that you have no positions with NJIT or

12   with CTIEC-TECO?

13              MR. VEJNOSKA:  Objection, asked and

14        answered, compound.

15       A     No.

16   BY MR. IRPINO:

17       Q     So does Bengbu pay you a salary?

18       A     No.

19       Q     Does Bengbu pay you any compensation at all?

20       A     No.

21       Q     Does CTIEC pay you any compensation?

22       A     Yes.

23       Q     And does CNBM pay you any compensation?

24       A     No.

25       Q     Does your compensation for your work at

Confidential - Subject to Further Confidentiality Review

1    CTIEC come from CNBM?

2                MR. VEJNOSKA:  Objection --

3                THE INTERPRETER:  The interpreter would

4        like to reinterpret.

5                MR. VEJNOSKA:  Objection, asked and

6        answered.

7        A     Do I still need to answer?

8    BY MR. IRPINO:

9        Q     Yes.

10               MR. VEJNOSKA:  Yes, you may answer.

11       A     My compensation comes from the performance

12   assessment of China Triumph International Engineering

13   Company.

14   BY MR. IRPINO:

15       Q     Well, let's take a look at the most -- you

16   said you reviewed some recent CNBM annual reports?

17       A     I browsed through them, but not in detail.

18       Q     Well, let's take a look at some excerpts

19   from the 2014 CNBM annual report, which has been

20   previously marked as Exhibits 13 and 13-A.  We'll

21   provide copies to your counsel, copy for you as well.

22   We have copies for everybody.

23               Now, I will ask you to turn to

24   page 161, which is also Bates number AL-RMHCNBM3824.

25   In Chinese the Bates number is AL-RMHCNBM4046.  Both

Confidential - Subject to Further Confidentiality Review

 1    are page 161 of CNBM's 2014 annual report.

 2                    Have you ever seen this before,

 3    Mr. Peng?

 4        A     I have not seen this before.

 5        Q     Well, this is what CNBM reports to the world

 6    about its company, and this specific section is what

 7    CNBM reports to the world about the earnings of its

 8    directors, supervisors and employees.  Do you see the

 9    section titled 9(a), Directors' and Supervisors'

10    Emoluments?

11                    MR. VEJNOSKA:  I'm going to move to

12          strike the prefatory statement as argumentative.

13                    You may answer the question.

14        A     I see that.

15    BY MR. IRPINO:

16        Q     As an executive director at CNBM, do you

17    understand that this document is published by CNBM to

18    the public?

19        A     What I see is what CNBM published to the

20    public.

21        Q     And as an executive director, do you in fact

22    vote on CNBM publishing its annual report to the

23    public?

24                    THE INTERPRETER:  The interpreter needs

25          to clarify with witness.

Confidential - Subject to Further Confidentiality Review

```
 1               MR. VEJNOSKA:  I'm going to object to

 2        the --

 3        A     Vote is to be given.

 4   BY MR. IRPINO:

 5        Q     Have you --

 6               MR. VEJNOSKA:  Sorry.  I'm going to

 7          object to the question as vague and ambiguous,

 8          foundation.  Thank you.

 9               MR. IRPINO:  Sure.

10   BY MR. IRPINO:

11        Q     Have you in fact voted on CNBM annual

12   reports being approved for publication?

13        A     I did vote.

14        Q     And did you in fact vote on CNBM's 2014

15   annual report being approved for publication?

16        A     I did vote.

17        Q     And did you vote to approve the publication

18   of CNBM's 2014 annual report?

19        A     Yes.

20        Q     And if we go back to page 161 of CNBM's 2014

21   annual report, how much does it state that you earned

22   as an executive director of CNBM for the year 2014?

23               MR. VEJNOSKA:  Objection, foundation.

24        A     This is the first time I'm reading this

25   today.
```

Confidential - Subject to Further Confidentiality Review

 1    BY MR. IRPINO:

 2         Q    Okay.  Well, we'll go slowly.  First, do you

 3    see your name on the page?

 4         A    Yes, I see that.

 5         Q    And the first column which states fees that

 6    you earned in 2014 is blank.  True?

 7         A    Fees?  Yes.

 8         Q    If we go to the second column which states

 9    salaries, allowance and benefits in kind --

10                   THE INTERPRETER:  This is the

11              interpreter speaking.  Would counsel like the

12              interpreter to read off the Chinese version?

13                   MR. IRPINO:  Sure.

14    BY MR. IRPINO:

15         Q    -- it states that in 2014 you made from CNBM

16    418,000 RMB.  True?

17         A    I do not remember the specific amount

18    because I'm not in charge of money.

19         Q    Okay.  Fair enough.  Well, then, let's just

20    go based on what CNBM reported to the public.  Okay?

21    What does CNBM state -- actually, strike that.

22                   It is true that CNBM states to the

23    public that for 2014 your salary, allowance and

24    benefits in kind earned was 418,000 RMB.  True?

25         A    That's what is written here.

```
 1      Q     And if we go over to the next column in
 2  terms of money earned from CNBM and what CNBM has
 3  reported to the public in its 2014 annual report, the
 4  very next column states discretionary bonuses.  Do you
 5  see that?
 6      A     I see that.
 7      Q     And it states that the amount of
 8  discretionary bonus that you earned from CNBM for 2014
 9  is 504,000 [sic] RMB.  True?
10                THE INTERPRETER:  This is the
11            interpreter speaking.  Did counsel say 504,000
12            RMB?
13                MR. IRPINO:  No, 540,000 RMB.  I'm sorry
14            if it came up 504.
15      A     That is what is written here.  That's what
16  is written here.
17  BY MR. IRPINO:
18      Q     And then we go over to the next column and
19  that states retirement plan contributions.  Do you see
20  that?
21      A     I see that.
22      Q     And what CNBM states to the public that in
23  2014 you made from CNBM in retirement plan
24  contributions is 25,000 RMB.  True?
25      A     That's what is written here.
```

Confidential - Subject to Further Confidentiality Review

1      Q     And then CNBM totals up the amounts paid to

2  you in 2014 in the furthest right-hand column.  True?

3      A     I see that is written there.

4      Q     And the total amount that CNBM paid you in

5  2014 was 983,000 RMB.  True?

6      A     That's what is written here.

7      Q     Based on this document you would agree that

8  out of all of the executive and nonexecutive

9  directors, all of the independent nonexecutive

10  directors, all of the supervisors and all of the

11  independent supervisors at CNBM for the year 2014,

12  nobody made more money than you.  True?

13            MR. VEJNOSKA:  Objection, foundation,

14       vague and ambiguous, argumentative.

15      A     That's what is stated on it.  I am not in

16  charge of my salary.

17  BY MR. IRPINO:

18      Q     Who at CNBM is in charge of your salary?

19      A     CNBM has a board of directors and it has a

20  remuneration committee.  Like I just said, my salary

21  is decided based on my business performances in China

22  Triumph International Engineering Company.

23      Q     Who is on the CNBM remuneration committee?

24      A     I don't recall, because I'm not supposed to

25  care who are the people in charge of my salary.

```
 1        Q     Can you turn the page to page 162.  This

 2   provides the salary that -- the salary and emoluments

 3   that CNBM paid to you in 2013.  Do you see that?

 4        A     I see that.

 5        Q     And do you see that the total amount that

 6   CNBM paid to you for salaries and emoluments in 2013

 7   was 981,000 RMB?

 8        A     That's what is written here.

 9        Q     And did CNBM's remuneration committee give

10   anybody -- or decide to give anybody more money than

11   you in 2013?

12             MR. VEJNOSKA:  Objection, foundation,

13        vague and ambiguous.

14        A     I don't know.

15   BY MR. IRPINO:

16        Q     Do you see anybody who's listed on this

17   page 162, which provides the executive directors,

18   nonexecutive directors, independent nonexecutive

19   directors, supervisors and independent supervisors of

20   CNBM during the 2013 year, do you see anybody who made

21   more money than you listed on this sheet?

22        A     That's what is written here.

23        Q     Meaning nobody other than -- nobody more

24   than you.  True?

25             MR. VEJNOSKA:  Same objections,
```

Confidential - Subject to Further Confidentiality Review

```
1            argumentative.

2      A      I don't know.  I don't know.

3  BY MR. IRPINO:

4      Q      Well, let's talk just a little bit about --

5             MR. VEJNOSKA:  Mr. Irpino, sorry, when

6         you have a chance, maybe we could take a brief

7         break.  We've been going a little over an hour.

8             MR. IRPINO:  Okay.  Let me get through

9         this next --

10            MR. VEJNOSKA:  Fine.

11  BY MR. IRPINO:

12     Q      But I always want to accommodate you if a

13  break is necessary.  Please turn to page 20 of the

14  2014 CNBM annual report.  Are you there?

15     A      I'm here.

16     Q      You would agree that CNBM has different

17  business segments.  True?

18     A      Yes.

19     Q      One of the business segments for CNBM is

20  cement, one is lightweight building materials, one is

21  glass, fiber and composite materials, and one is

22  engineering services.  True?

23     A      Yes.

24     Q      And is it accurate that CTIEC falls under

25  the engineering services segment of the CNBM
```

Confidential - Subject to Further Confidentiality Review

```
 1   enterprise?

 2       A     Yes.

 3       Q     Is it true that BNBM falls under the

 4   lightweight building materials segment of the CNBM

 5   enterprise?

 6             MR. VEJNOSKA:  Objection, foundation.

 7       A     That's what is written here.

 8   BY MR. IRPINO:

 9       Q     Okay.  Are CTIEC's financials consolidated

10   with CNBM's financials?

11       A     They are consolidated.

12             MR. VEJNOSKA:  Please mark that.

13             MR. IRPINO:  We can take a break now if

14        you request.

15             MR. VEJNOSKA:  That's great.  Since

16        we've got lunch coming in right at noon again,

17        why don't we keep it short, maybe five or six

18        minutes so we can stretch our legs.

19             MR. IRPINO:  Sure.

20             THE VIDEOGRAPHER:  Time now is

21        11:20 a.m.  We are off the record.

22             (Recess Taken From 11:20 a.m. To

23             11:32 a.m.)

24             THE VIDEOGRAPHER:  This begins disk 3 of

25        today's deposition.  Time now is 11:32 a.m.  We
```

```
 1              are back on the record.

 2                     MR. VEJNOSKA:  Mr. Irpino, first thank

 3              you for the break.  And the witness would like

 4              to make a correction to how some of his

 5              testimony, either what he said or how it was

 6              transcribed with your permission.

 7                     MR. LEVIN:  What he said or how it was

 8              transcribed?

 9                     MR. VEJNOSKA:  Honestly I'm not speaking

10              Chinese.  I cannot tell where it came from.

11                     MR. IRPINO:  Let's go off the record for

12              a second.

13                     THE VIDEOGRAPHER:  Time now is

14              11:33 a.m.  We are off the record.

15                     (Recess Taken From 11:33 a.m. To

16                     11:33 a.m.)

17                     THE VIDEOGRAPHER:  Time now is

18              11:33 a.m.  We're back on the record.

19      BY MR. IRPINO:

20         Q    Sir, I would like to show you what has

21      previously been marked as Exhibit 5 and Exhibit 5-A,

22      which are copies of the CNBM 2006 annual reports.  The

23      2006 annual report was done in English and Chinese.

24      The English version is Exhibit 5, the Chinese version

25      is Exhibit 5-A.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. VEJNOSKA:  Mr. Irpino, just to be
 2         very clear, I have asked that the witness be
 3         allowed to make a correction.  I realize that
 4         what I said to you about what he wanted to
 5         correct is not -- was not the right way to put
 6         it.  He is not going to correct his testimony
 7         about CNBM Company paying him.  He wanted to
 8         correct his testimony about whether or not CTIEC
 9         pays him.  And he stands by his testimony on the
10         basis of his compensation.  If you don't want to
11         allow that, then you'll live with the record.
12              MR. IRPINO:  What I've said is, and I'll
13         say it on the record now, I welcome counsel for
14         defense to ask those questions when I'm finished
15         asking mine.
16    BY MR. IRPINO:
17    Q    Can you turn to page 17 of the document
18    which is Bates numbered in the Chinese version 5-A
19    AL-RMHCNBM662.  For the record, in the English version
20    the Bates number is AL-RMHCNBM4124.
21    A    What page?
22    Q    Page 17.  It's a page titled Management
23    Discussion and Analysis and it's -- it discusses the
24    same as it did in the 2014 annual report.  Apparently
25    Mr. Cao doesn't age very much because these two photos
```

1    seem to be identical.

2              Now, we see here back in 2006 that

3    CNBM had the same business segments as it does in

4    2014.  True?

5              MR. VEJNOSKA:  Object to and move to

6         strike the prefatory statements as

7         argumentative.

8    A    That's what is written here.

9    BY MR. IRPINO:

10    Q    And in 2006 CTIEC also fell under the

11    engineering services segment of CNBM enterprise.

12    True?

13    A    Yes.

14    Q    And back in 2006 CNBM owned 91 percent of

15    CTIEC.  True?

16    A    That's what is written here.

17    Q    And if we look at -- if we go back to

18    page 20 of Exhibit 13 and Exhibit 13-A, CNBM in 2014

19    still owned 91 percent of CTIEC.  True?

20    A    That is what is written there, correct.

21    Q    As the chairman and president of CTIEC,

22    does -- can you tell us if CNBM still owns 91 percent

23    of CTIEC today?

24    A    It still owns 91 percent today.

25    Q    Has CNBM consistently owned 91 percent of

Confidential - Subject to Further Confidentiality Review

1    CTIEC from 2006 through the present date?

2        A       Yes.

3        Q       Now, do you recall previously that we

4    discussed how CTIEC's financials are incorporated into

5    CNBM's annual report?  Do you recall that?

6                MR. VEJNOSKA:  Objection, foundation,

7          argumentative.

8        A       Because this is something professionally

9    done by the financial personnels.

10   BY MR. IRPINO:

11       Q       And as an executive director of CNBM and the

12   chairman and president of CTIEC, do you know the basis

13   for CNBM's ability to consolidate CTIEC's financials

14   into its own?

15                MR. VEJNOSKA:  Please mark the

16          translation.

17                Objection, calls for speculation, calls

18          for legal conclusion or other expert opinion,

19          foundation.

20       A       Because this is what the director of the

21   financial department, the financial personnel's doing,

22   I will not speculate.

23   BY MR. IRPINO:

24       Q       Well, as an executive director at CNBM, you

25   realize that in addition to CTIEC's financials being

Confidential - Subject to Further Confidentiality Review

1    consolidated into CNBM's, that BNBM's financials are

2    consolidated into CNBM's.  True?

3              MR. VEJNOSKA:  Same objections.

4    A     I'm not aware of that.

5    BY MR. IRPINO:

6    Q     Are you aware as an executive director of

7    CNBM that Taishan Gypsum's financials are consolidated

8    into CNBM's financials?

9              MR. VEJNOSKA:  Same objections,

10      foundation.

11   A     I also don't know that.

12   BY MR. IRPINO:

13   Q     Let's discuss just for a moment some

14   specifics back to the CNBM board of directors'

15   meetings.  How do you receive notice of CNBM board of

16   director meetings?

17   A     The secretary office of the board of

18   directors of CNBM Company, Limited would inform me to

19   participate in the board of directors' meeting.

20   Q     Do you receive written notification of the

21   meetings?

22   A     Usually written notices are given for the

23   meetings.

24   Q     How are the written notices sent to you?

25   A     CTIEC office is informed of such a meeting

Confidential - Subject to Further Confidentiality Review

1    and they will inform me of that.

2        Q    Okay.  And are you ever provided with any

3    written materials in advance of CNBM board meetings?

4        A    These are only my office.  Well, I usually

5    would only read the materials at the meetings.  I

6    don't know and I don't care whether they're provided

7    or not.

8        Q    Whatever materials are provided in advance,

9    is it my understanding that to the extent you would

10   review them you would do so at the actual board

11   meeting?

12            MR. VEJNOSKA:  Objection, vague and

13       ambiguous.

14       A    At the board of directors' meeting I would

15   take a look at the materials that are relevant to me

16   and I will not care for the materials that are not

17   relevant to me.  Every time there are materials this

18   thick (indicates).

19   BY MR. IRPINO:

20       Q    And when you say you are only concerned with

21   the materials that are relevant to you, how are you

22   defining materials that are relevant to you?

23       A    Relevant to the engineering company, to

24   China Triumph International Engineering Company.

25       Q    Understood.  How are the agendas set for the

Confidential - Subject to Further Confidentiality Review

```
 1   CNBM board meetings?

 2              MR. VEJNOSKA:  Objection, calls for

 3        speculation.

 4       A     I'm not aware of this matter.

 5   BY MR. IRPINO:

 6       Q     Do you know whose responsibility it is to

 7   set the agenda for the CNBM board meetings?

 8              MR. VEJNOSKA:  Objection, foundation.

 9       A     I also don't know about that.

10   BY MR. IRPINO:

11       Q     Do you know how items are selected to be

12   voted upon at CNBM board meetings?

13       A     I also do not know how the items are

14   selected to be voted.

15       Q     Where do CNBM board meetings occur?

16       A     Generally most of them are held in Beijing.

17       Q     Are they held in Beijing at CNBM's offices?

18              MR. VEJNOSKA:  Objection, vague and

19        ambiguous, compound.

20       A     They're held at the Beijing office of CNBM

21   Company, Limited.

22   BY MR. IRPINO:

23       Q     Have you ever had a CNBM board meeting at

24   CNBM Group offices?

25              MR. VEJNOSKA:  Objection, vague and
```

Confidential - Subject to Further Confidentiality Review

1          ambiguous.

2     A     CNBM Company, Limited has its own office.

3  BY MR. IRPINO:

4     Q     Sure.  That's not my question.  Has CNBM

5  ever held board of director meetings at CNBM Group

6  offices?

7               MR. VEJNOSKA:  Same objection,

8       argumentative.

9     A     I really don't recall.  I only participate

10  in the meetings.  I'm not sure about that.

11  BY MR. IRPINO:

12     Q     Do you receive any materials throughout the

13  year in connection with your work as a CNBM board

14  member?

15               MR. VEJNOSKA:  Objection, vague and

16       ambiguous, asked and answered.

17     A     I have already answered this question

18  before.  The materials are given to the office via

19  multiple channels.

20  BY MR. IRPINO:

21     Q     And I understand and I don't mean to ask you

22  the same question again.  My understanding was that

23  your office may receive for you some materials for the

24  board meetings.  And I'm asking separate from that,

25  separate from any of these materials are there any

1   other materials that you may receive during the year

2   that relate to your work as an executive director of

3   CNBM?

4       A     No.

5       Q     Now, as a director of CNBM, have you ever

6   voted on any matters related to BNBM?

7       A     No.

8             MR. VEJNOSKA:  Interpose a vague and

9       ambiguous objection.

10  BY MR. IRPINO:

11      Q     As a director of CNBM, have you ever voted

12  on any matters related to Taishan Gypsum?

13            MR. VEJNOSKA:  Objection, vague and

14      ambiguous.

15      A     Not to my recollection.

16  BY MR. IRPINO:

17      Q     As the director of CNBM, have you ever voted

18  on any matters related to this lawsuit?

19            MR. VEJNOSKA:  Objection, vague and

20      ambiguous.

21      A     No.

22            THE VIDEOGRAPHER:  Time now is

23      11:57 a.m.  We are off the record.

24            (Recess Taken From 11:57 a.m. To

25            1:05 p.m.)

Confidential - Subject to Further Confidentiality Review

1              THE VIDEOGRAPHER:  This begins disk 4 of

2         today's deposition.  Time now is 1:05 p.m.  We

3         are back on the record.

4    BY MR. IRPINO:

5         Q    Mr. Peng, when did you first learn about

6    this lawsuit?

7         A    I don't have a clear recollection on that,

8    but it was not too long ago when I learned that I were

9    to be the witness.  That's when I heard about it.

10        Q    Are you saying sometime within the last six

11   months was the first time that you heard of this

12   litigation?

13        A    I don't have a clear recollection.  It

14   was -- it was -- let me think about it.  Let me try to

15   recall.  In about a few months.

16        Q    What was it that you heard about this

17   lawsuit when you first learned of its existence?

18             MR. VEJNOSKA:  And I just want to

19        instruct the witness that if what he heard was

20        from his legal department or his counsel, he is

21        not to disclose the contents of that

22        communication.

23             MR. LEVIN:  Can we go off the record

24        now?

25             THE VIDEOGRAPHER:  Time now is 1:07 p.m.

Confidential - Subject to Further Confidentiality Review

1          We are off the record.

2                    (Recess Taken From 1:07 p.m. To

3                    1:11 p.m.)

4                    THE VIDEOGRAPHER:   Time now is 1:11 p.m.

5          We are back on the record.

6     BY MR. IRPINO:

7          Q     Mr. Peng, we left and the question that was

8     being asked was what did you hear about the lawsuit

9     when you first learned of its existence?  And I am

10    going to qualify that by if you heard it from your

11    lawyers first, then let's leave out what they told

12    you.  Did you hear it from somebody who's not a

13    lawyer?

14                    And I'm going to strike the question.

15    We'll try to get around this easier.

16                    How did you first learn about the

17    lawsuit?

18         A     I was notified by the legal department.

19         Q     Who with the legal department notified you?

20         A     I do not have a clear recollection on when

21    the legal department had notified me of that.  I was

22    told that there has been a lawsuit and it is possible

23    that I might be preparing for becoming a witness.

24         Q     Was it the legal department with CNBM that

25    notified you or CTIEC?

```
1        A     I don't have a clear recollection.

2        Q     You don't know if it -- which legal

3   department notified you about the existence of the

4   lawsuit, but you do know that it was somebody with a

5   legal department.  True?

6              MR. VEJNOSKA:  Objection, asked and

7        answered.

8        A     I don't have a clear recollection.

9   BY MR. IRPINO:

10       Q     And you don't recall an individual -- you

11  don't recall who notified you of the existence of this

12  lawsuit?

13             MR. VEJNOSKA:  Objection, asked and

14       answered.

15       A     I don't have a clear recollection on who had

16  said that.  Allow me to try to recollect.  What was

17  the last name?  It was a female.  It was a young

18  female.  I really don't have a clear recollection on

19  the last name.

20  BY MR. IRPINO:

21       Q     Other than the two meetings you had to --

22  with lawyers to prepare for your deposition, have you

23  ever had any other meetings with anybody for any

24  matter related to this litigation?

25             MR. VEJNOSKA:  Objection, vague and
```

```
 1          ambiguous.

 2     A     No.

 3 BY MR. IRPINO:

 4     Q     I just am not entirely clear about your

 5 answer regarding when you first learned of this

 6 lawsuit.  And I know that you're not certain of the

 7 time frame, but can you narrow it down for us?  Was it

 8 in 2015 the first time that you learned of the

 9 existence of this lawsuit?

10     A     No.

11     Q     Was it in 2014 that you first learned of the

12 existence of this lawsuit?

13     A     No.

14     Q     Was it sometime before 2014 that you fist

15 heard of the existence of this lawsuit?

16     A     No.

17          MR. VEJNOSKA:  Could you mark the prior

18     question.

19          I can --

20          MR. IRPINO:  We'll try.

21          MR. VEJNOSKA:  Will you take a

22     suggestion?

23          MR. IRPINO:  Yeah, sure.

24          MR. VEJNOSKA:  Ask him about 2015 again

25     based on the translation.
```

Confidential - Subject to Further Confidentiality Review

1           MR. IRPINO:  Okay.

2   BY MR. IRPINO:

3       Q     Did you -- you first learned of this

4   lawsuit, of the existence of this lawsuit, at some

5   point in this year of 2015.  True?

6       A     2015, which is this year.  What year is this

7   year?  I'm confused.  2015.  2015.  I just simply have

8   too many things.

9       Q     Understood.  So this year, 2015, it's your

10  testimony that this year, 2015, is when you first

11  learned of the existence of this lawsuit.  True?

12      A     Yes.

13      Q     Now, we're going to show you --

14            MR. VEJNOSKA:  Go off the record just a

15        second.

16            THE VIDEOGRAPHER:  Time now is 1:22 p.m.

17        and we are off the record.

18            (Recess Taken From 1:22 p.m. To

19            1:24 p.m.)

20            THE VIDEOGRAPHER:  Time now is 1:24 p.m.

21        We are back on the record.

22            MR. IRPINO:  Show the witness and

23        counsel a document that's been previously marked

24        as Exhibit 150.  It's a copy of the July 17th,

25        2014, contempt order issued by Judge Fallon.

Confidential - Subject to Further Confidentiality Review

```
1              MR. VEJNOSKA:  So the record is clear,

2        Mr. Irpino, this is the English version of it

3        and there is not a translated version for the

4        witness, correct?

5              MR. IRPINO:  That's right.  And we

6        provided the rec doc, which is rec doc 17869,

7        just so that we're all clear on what it is.

8              MR. VEJNOSKA:  Exactly.

9   BY MR. IRPINO:

10     Q     Mr. Peng, when was the first time that you

11  learned about the existence of the --

12     A     I don't understand this.

13     Q     I understand.  Mr. Peng, when was the first

14  time that you learned of the existence of the

15  July 17th, 2014, contempt order issued by Judge Fallon

16  in this litigation?

17     A     I have not heard about it.  I am not aware

18  of the orders whatsoever.

19     Q     Is today the first time that you have ever

20  learned about the existence of the July 17th, 2014,

21  contempt order issued by Judge Fallon?

22     A     The lawyer mentioned it to me a couple of

23  days ago when I was prepped for the deposition.  I

24  have not read it.  Today is the first time I'm looking

25  at it.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q     Okay.  And a couple days ago was the first

 2   time you had ever heard about it.  True?

 3                MR. VEJNOSKA:  Objection, vague and

 4        ambiguous.

 5      A     This is my first time seeing this document.

 6   BY MR. IRPINO:

 7      Q     And when was the first time that you learned

 8   that there was such an order that occurred?

 9                MR. VEJNOSKA:  Objection, vague --

10      A     I do not recall.  I do not have a clear

11   recollection in this recent month.

12                MR. VEJNOSKA:  Objection, asked and

13        answered.

14   BY MR. IRPINO:

15      Q     Have you ever seen a translated into Chinese

16   version of the Exhibit 150, the July 17, 2014,

17   contempt order issued by Judge Fallon?

18      A     No.

19      Q     I know it was recent and that you're not

20   sure exactly when, I think you said sometime maybe

21   within the last month, is the first time that you

22   learned of the existence of this July 17th, 2014,

23   contempt order.  However, whenever it was that you

24   learned of it, did you take any action in response to

25   learning about the existence of the contempt order?
```

Confidential - Subject to Further Confidentiality Review

1               MR. VEJNOSKA:  Objection and move to

2        strike the prefatory statement as argumentative.

3     A     I'm not in charge of this area.  Therefore,

4   I have not conducted investigations.

5   BY MR. IRPINO:

6     Q     What, if anything, did you do after learning

7   about the existence of this July 17, 2014, contempt

8   order?

9               MR. VEJNOSKA:  Objection, vague and

10        ambiguous, calls for speculation.

11    A     I have only learned about it recently.  I

12   haven't even read the content in detail.

13   BY MR. IRPINO:

14    Q     And would it be fair to state that you have

15   made -- you have taken no steps in response to this

16   July 17th, 2014, content order?

17              MR. VEJNOSKA:  Objection, argumentative,

18        foundation.

19    A     I'm not assigned to be in charge of this

20   area of the work.  I also do not know this matter.

21   BY MR. IRPINO:

22    Q     So, then, is it fair to state that you have

23   not done anything in response to learning about the

24   existence of this July 17th, 2014, contempt order?

25              MR. VEJNOSKA:  Objection, asked and

Confidential - Subject to Further Confidentiality Review

```
 1          answered, foundation, argumentative.

 2     A      I did not learn about it.

 3              MR. VEJNOSKA:  Sorry, can we go off the

 4          record.  Sorry, Micheal, they're connected and

 5          we are not.  We cannot even connect.

 6              THE VIDEOGRAPHER:  Time is 1:34 p.m.

 7              (Recess Taken From 1:34 p.m. To

 8              1:40 p.m.)

 9              THE VIDEOGRAPHER:  Time now is 1:40 p.m.

10          We are back on the record.

11     BY MR. IRPINO:

12     Q      Mr. Peng, does CTIEC have a board of

13     directors?

14     A      Yes.

15     Q      How many people are on the board of

16     directors?

17     A      Five.

18     Q      Who are they?

19     A      Me, Mr. Cao, Chang Zhangli, also a staff

20     representative and another one is Sun JianAn.

21     Q      And Mr. Cao is also on the board of CNBM.

22     True?

23     A      He is a director.

24     Q      So you -- and you are also on the board of

25     CNBM.  True?
```

Confidential - Subject to Further Confidentiality Review

1      A      What question is he asking?  Can you ask him

2  to repeat his question?

3      Q      Sure.  We have you are also on the board of

4  CNBM.  True?

5      A      I'm a director of CNBM Company, Limited.

6      Q      And is Chang, second name Zhangli, also on

7  the board of CNBM?

8      A      Yes.

9      Q      Three of the five board members of CTIEC are

10  also on the board of CNBM.  True?

11      A      I have already answered him earlier.  Yes.

12      Q      How long of a period of time has that been

13  the case where three of the board members -- three of

14  the five CTIEC board members were also board members

15  at CNBM?  How long?

16      A      There have been changes on the members on

17  the board of directors of CNBM, but I do not remember

18  the specific time.

19      Q      Do you know if CTIEC's company charter

20  requires that three of the five board members come

21  from CNBM?

22              MR. VEJNOSKA:  Objection, foundation.

23      A      I have not specifically read the charter.

24  BY MR. IRPINO:

25      Q      Does CNBM -- is CNBM the party that has the

1    right -- strike that.

2              Does CNBM have the right to nominate

3    three of the five board members of CTIEC's board?

4       A    Whether it has or has no right, I'm not

5    sure, but it is an investor.

6       Q    Let's talk about CTIEC-TECO.  But first can

7    you tell me what type of a company is TECO?

8              THE INTERPRETER:  Interpreter needs to

9         clarify with witness.

10             MR. VEJNOSKA:  Objection, vague and

11        ambiguous.

12      A    TECO is an American company designing

13   melting furnaces.

14   BY MR. IRPINO:

15      Q    When did CTIEC first conduct business with

16   TECO?

17      A    I don't recall.

18      Q    Do you recall when CTIEC entered into the

19   joint venture agreement with TECO?

20             THE INTERPRETER:  This is interpreter

21        speaking.  Can the question be repeated?

22             MR. IRPINO:  Sure.

23   BY MR. IRPINO:

24      Q    Do you recall when CTIEC entered into the

25   joint venture agreement with TECO?

Confidential - Subject to Further Confidentiality Review

```
 1      A      Let me think about it.  2005, approximately.

 2  It's been too long ago.

 3              (Deposition Exhibit 366 marked.)

 4  BY MR. IRPINO:

 5      Q      I'm going to present you with what has

 6  previously been marked as Peng Shou Exhibit 366, Bates

 7  number CTIEC-TECO 3225 through 3239.  It's a document

 8  titled agreement for joint venture.

 9              MR. VEJNOSKA:  Again, Mr. Irpino, just

10         for clarity of the record it is a document in

11         English, correct?

12              MR. IRPINO:  Yes, for clarity of the

13         record.

14              MR. VEJNOSKA:  Thank you, sir.

15  BY MR. IRPINO:

16      Q      Mr. Peng, have you ever seen this document

17  before?

18      A      At the time I participated in the signing of

19  this document, but as for when I do not have a clear

20  recollection.  But the joint venture is a fact and I

21  signed on it.  I don't remember when did I see the

22  document.

23      Q      If you go to the last page of the document,

24  page 15, Bates number 3239 on Peng Shou Exhibit 366,

25  the signature on this joint venture agreement for
```

Confidential - Subject to Further Confidentiality Review

1    CTIEC is your signature.  True?

2              MR. VEJNOSKA:  Objection, foundation.

3       A     It is my writing on it.

4    BY MR. IRPINO:

5       Q     Now, you said -- testified earlier that the

6    joint venture with TECO is a fact; is that correct?

7       A     It is a fact to have established this joint

8    venture with TECO.

9       Q     And is it a fact that the name of the joint

10   venture is CTIEC-TECO, American Technology, Inc.?

11             MR. VEJNOSKA:  Objection, misstates the

12        document.

13      A     The name is CTIEC-TECO American Technology

14   Company, Limited perhaps.  I don't have a clear

15   recollection on that.

16   BY MR. IRPINO:

17      Q     I will show you and your counsel a document

18   that is marked Peng Shou Exhibit 367.  It is Bates

19   numbered CTIEC-TECO 3294 to 3302.  This is an

20   October 14th, 2005, document titled Close Corporation

21   Agreement.

22             (Deposition Exhibit 367 marked.)

23             MR. VEJNOSKA:  And again, for the

24        record, the document that the witness is looking

25        at is an English language document.

Confidential - Subject to Further Confidentiality Review

```
 1                MR. IRPINO:  Correct.

 2   BY MR. IRPINO:

 3       Q     Mr. Peng, if you go to the last page of the

 4   document, which is page 9, whose signature is that for

 5   China Triumph International Engineering Company,

 6   Limited?

 7       A     It's mine.  It is written as my name.

 8       Q     You signed this close corporation agreement

 9   on behalf of CTIEC.  True?

10       A     Yes.

11       Q     Now, going back to Peng Shou Exhibit 366, at

12   the top of the page 2, Bates number 3226, it states

13   that the name of the joint venture company is

14   CTIEC-TECO, American Technology, LLC?

15                MR. VEJNOSKA:  Objection, calls for

16        speculation.

17       A     That's what is written.

18   BY MR. IRPINO:

19       Q     Now, if we go back to Exhibit 367 at the top

20   of the page 1, this agreement that you signed on

21   October 14th, 2005, on behalf of CTIEC states that the

22   agreement is by and among, and the first party listed

23   is CTIEC-TECO American Technology, Inc.  True?

24                MR. VEJNOSKA:  Same objection.

25       A     These are all in English.  I don't
```

Confidential - Subject to Further Confidentiality Review

1  understand.

2  BY MR. IRPINO:

3      Q      Okay.  Now, getting back to Peng Shou

4  Exhibit 366, did you receive a copy of this agreement

5  in Chinese?

6      A      I don't have a clear recollection because I

7  did not -- I don't have a clear recollection.

8      Q      When you signed this document, Exhibit 366,

9  on behalf of CTIEC, did you understand that you were

10  entering into a joint venture agreement with TECO, an

11  American company?

12     A      This was handled by relevant personnels of

13  legal department.

14     Q      Sure.  My question is, you as the person who

15  signed on behalf of CTIEC, what did you understand

16  this agreement to be?

17             MR. VEJNOSKA:  Objection, asked and

18         answered, vague and ambiguous, calls for

19         speculation.

20     A      My understanding is that to establish a

21  cooperation relationship with TECO it was also what

22  had been discussed with TECO at the time.

23  BY MR. IRPINO:

24     Q      Now, moving on in Exhibit 366 at the top of

25  page 2, Bates number 3226, it states that the legal

1    address of the joint venture company is 3400 Executive

2    Parkway, Toledo, Ohio 43606 USA.  Is that where you

3    understand the legal address of your joint venture

4    company to be located?

5              MR. VEJNOSKA:  Objection, calls for

6         legal conclusion.

7    A    This is what has been written on it.

8    BY MR. IRPINO:

9    Q    And do you have any information that that --

10   that that address is incorrect?

11             MR. VEJNOSKA:  Same objection.

12             THE INTERPRETER:  This is the

13        interpreter speaking.  Did counsel say written

14        information or information?

15             MR. IRPINO:  No, any information.

16             THE INTERPRETER:  Thank you.  There is

17        no change on the interpretation.

18   A    I did not confirm it.

19   BY MR. IRPINO:

20   Q    No, my question is different.  Do you have

21   any information that this address is not correct?

22             MR. VEJNOSKA:  Same objection.

23   A    This is what is written here.

24   BY MR. IRPINO:

25   Q    Now, under Article 3 it states that "All of

Confidential - Subject to Further Confidentiality Review

1    the joint venture's activities shall be governed by

2    Ohio's laws, decrees, and other pertinent rules and

3    regulations."

4              Did you understand that all the

5    activities of the joint venture would be governed by

6    Ohio's laws?

7    A     This is legal language.  I do not

8    understand, neither do I speculate.

9    Q     Under Article 7 on page 3226 it states that

10   "The initial amount of investment of the joint venture

11   company is 500,000 US dollars," and moving on to the

12   next page, "that the initial capital of the joint

13   venture shall be contributed as follows:  TECO to pay

14   $250,000 into the joint venture and CTIEC to pay

15   $250,000 into the joint venture for each party having

16   a 50 percent interest in the joint venture."

17             Did that occur?

18             MR. VEJNOSKA:  Objection, compound.

19   A     It did occur to my recollection.

20   BY MR. IRPINO:

21   Q     Now, if we go back to Article 5 on page 2,

22   it states that, "The purpose of the joint venture

23   company is to market, sell and develop the technology

24   and services of the joint venture partners."  And it

25   goes on to say, "On the principal of equality and

Confidential - Subject to Further Confidentiality Review

 1   mutual benefits and to reach a higher level of

 2   production technique and technology for obtaining

 3   satisfactory economic benefits for the owners to the

 4   joint venture company."

 5               Is that consistent with your

 6   understanding of at least a purpose of the joint

 7   venture?

 8       A    My understanding is that as initially

 9   discussed with TECO through the establishment of the

10   joint venture company to establish strategic

11   cooperation relationship between the two companies to

12   help it to acquire projects in the ways of cooperation

13   in relevant countries.

14       Q    This joint venture agreement is still in

15   effect today.  True?

16       A    Currently it is still valid.

17       Q    This joint venture agreement was valid from

18   July 18th, 2014, until December 31st, 2014.  True?

19               MR. VEJNOSKA:  Objection, vague and

20         ambiguous.

21       A    What I said was that the strategic

22   cooperation partnership relationship between us and

23   TECO is valid.

24               THE WITNESS:  I would like to go to the

25         rest room.

Confidential - Subject to Further Confidentiality Review

1           MR. VEJNOSKA:  Can we take a break.

2           THE VIDEOGRAPHER:  Time now is 2:16 p.m.

3      We are off the record.

4           (Recess Taken From 2:16 p.m. To

5           2:29 p.m.)

6           THE VIDEOGRAPHER:  This begins disk 5 of

7      today's deposition.  Time now is 2:29 p.m.  We

8      are back on the record.

9  BY MR. IRPINO:

10     Q    Mr. Peng, I'm going to show you what's been

11  marked as Peng Shou Exhibit 368.  It will be passed

12  out to you, your counsel and all counsel present.

13          (Deposition Exhibit 368 marked.)

14  BY MR. IRPINO:

15     Q    It is, I will tell you now, a March 12,

16  2013, e-mail chain with attachments including a letter

17  of payment instruction from CTIEC and you as the

18  chairman and CEO of CTIEC.  I'm going to ask you to

19  take a look at that exhibit which is a total of three

20  pages.

21          MR. VEJNOSKA:  Once again, for the

22      record, this is an English language only

23      document.

24          MR. IRPINO:  Yes.

25          MR. VEJNOSKA:  Thank you.

 1   BY MR. IRPINO:

 2       Q     And for the record, page 3 of the document

 3   was a letter of payment instruction written in English

 4   from CTIEC to CTIEC-TECO.  True.

 5       A     This is in English.  I don't understand.

 6   BY MR. IRPINO:

 7       Q     Well, then I don't understand.  Because this

 8   e-mail states from Teng -- by the way, who is Teng,

 9   T-e-n-g?

10               MS. EIKHOFF:  Objection.

11               MR. VEJNOSKA:  Objection, calls for

12         speculation.  Object to the argumentative

13         portion.  You're now asking about the e-mail on

14         page 1, correct, not the letter on page --

15               MR. IRPINO:  No, the letter is signed by

16         him.  I know who he is.  We're on page 1.  And

17         it's written from zjteng@hotmail.com.  It's

18         signed Teng, T-e-n-g, and it includes Fred

19         Paulsen, Scott Slater and at least to my

20         recollection based on the testimony earlier

21         today, Mr. Peng's e-mail address.

22               MR. VEJNOSKA:  So I'm sorry, is there a

23         question?

24               MR. IRPINO:  Yeah.  It's the same as

25         before.

```
 1   BY MR. IRPINO:

 2       Q     With that background, who is Teng, T-e-n-g?

 3       A     Teng is Teng Zujian who is a deputy director

 4   of the business department of CNBM.

 5       Q     And for the record, it's Z-u-j-i-a-n.  Is

 6   that spelled correctly?

 7       A     Teng Zujian.

 8   BY MR. IRPINO:

 9       Q     I'm sorry, and what was Mr. Teng's title?

10       A     He's a deputy manager of the glass business

11   department.

12       Q     Okay.  Now, he is -- well, just reading the

13   e-mail Mr. Teng states that, "We need your help for

14   the payment to New Jersey Institute of Technology for

15   the merge of their PV lab.  I am sending you the

16   scanned copy of Mr. Peng's letter and payment

17   instruction.  Please try to make payment tomorrow."

18             His e-mail states that in part.  Do

19   you recall -- and page 3 is a copy of the letter of

20   payment instruction that is referenced in the page 1

21   e-mail from Mr. Teng.  This is of exhibit -- Peng Shou

22   Exhibit 368.  Do you recall --

23             MR. IRPINO:  I'm sorry, Sunny, go ahead.

24   BY MR. IRPINO:

25       Q     Do you recall signing this letter of payment
```

Confidential - Subject to Further Confidentiality Review

1    instruction on page 3 of exhibit Peng Shou 368?

2    A    This is my signature, but I do not

3    understand the content in English.

4    Q    Whatever the content is, the signature and

5    the stamp on page 3 of Exhibit 368 is yours?

6    A    The signature and the stamp, that's correct.

7    Q    Then I will try and help you with what is

8    outlined in the letter and you tell me if this is

9    consistent with your memory of what occurred.  It says

10   that "We," meaning CTIEC, "have reached an agreement

11   with the New Jersey Institute of Technology to merge

12   their PV lab."

13            Do you recall that as being accurate?

14   A    Please repeat.

15   Q    Sure.  "Recently we," meaning CTIEC, "have

16   reached an agreement with New Jersey Institute of

17   Technology to merge their PV lab."

18            I'll represent to you that's what the

19   document says.  My question to you is, is that

20   consistent with what you recall to be the case back in

21   or around March of 2013?

22   A    It is not very accurate of what's being

23   written, but I can tell you what is my recollection.

24   Q    Please do.

25   A    At the time we and New Jersey co-established

1    a research lab.

2            THE INTERPRETER:  Interpreter needs to

3        clarify with deponent.  No change on the

4        interpretation.

5    A     To co-establish a research lab.

6            THE INTERPRETER:  Interpreter needs to

7        clarify with witness.  No change on the

8        interpretation.

9    BY MR. IRPINO:

10   Q     The letter goes on to state, "Under our

11   management, we have a payment commitment to them

12   soonest.  As we have long procedure to make foreign

13   currency in China, we hereby request your assistance

14   to make a payment of $250,000 from CTIEC TECO to this

15   institution," meaning New Jersey Institute of

16   Technology, "with payment details enclosed."

17           My question is, did CTIEC-TECO in fact

18   pay the $250,000 to the New Jersey Institute of

19   Technology on behalf of CTIEC?

20   A     I'm not sure whether it was TECO or

21   CTIEC-TECO that had made the payment.

22   Q     One of those two.  True?

23   A     Yes.

24   Q     I'm going to show you what has -- what we

25   have marked as Peng Shou Exhibit 374, which has

Confidential - Subject to Further Confidentiality Review

1    previously been Bates stamped CTIEC-TECO 2999 through

2    3005.

3                    (Deposition Exhibit 374 marked.)

4    BY MR. IRPINO:

5       Q     And the top e-mail on page 1 of Peng Shou

6    Exhibit 374 is a September 25th, 2014, e-mail from

7    Scott Slater at TECO to Mr. Teng at CTIEC.  And I

8    will --

9                    MR. VEJNOSKA:  Sorry.  Objection,

10          foundation, misstates the document.  Thank you,

11          Mr. Irpino.

12   BY MR. IRPINO:

13      Q     On page 1 of the document I'll represent to

14   you that it is being written that there is an

15   outstanding balance due from CTIEC to TECO in an

16   amount of $28,717.51.  And, again, the date of this is

17   September 25th, 2014.

18                    Do you recall communications to or

19   from TECO regarding a balance that they claimed to be

20   owed to them from CTIEC as of September of 2014?

21                    MR. VEJNOSKA:  Objection, foundation.

22      A     First of all, it's in English, which I do

23   not understand.  Second of all, I do not recall

24   clearly.

25   BY MR. IRPINO:

Confidential - Subject to Further Confidentiality Review

1      Q      Do you recall generally ongoing issues in

2   September of 2014 regarding amounts claimed to be owed

3   from CTIEC to TECO?  Do you generally recall that?

4                MR. VEJNOSKA:  Objection, foundation,

5         calls for speculation.

6      A      I don't have a clear recollection on that.

7                (Deposition Exhibit 375 marked.)

8   BY MR. IRPINO:

9      Q      Mr. Peng, I'm going to show you what we've

10   marked as Peng Shou Exhibit 375.  It is a four-page

11   document.  Page 1 consists of a February 5th, 2015,

12   e-mail from Bob Gries which attaches to it the 2014

13   unaudited financial statements for the CTIEC-TECO

14   joint venture.  Pages 2, 3 and 4 of Exhibit 375 are

15   the unaudited financial statements of the CTIEC-TECO

16   joint venture for the 2014 year.

17                Have you ever seen these unaudited

18   financials for the CTIEC-TECO joint venture before?

19      A      I have not seen it.

20      Q      Okay.

21                MR. VEJNOSKA:  And again, to be clear,

22         this is an English language document.

23                MR. IRPINO:  Yes.

24                MR. VEJNOSKA:  Thank you.

25      A      It is in English, that's correct.  In

Confidential - Subject to Further Confidentiality Review

1    addition to that, this company is a nonoperative

2    company managed by TECO.  Therefore, I do not know

3    about it, neither it is necessary for me to read it.

4    BY MR. IRPINO:

5        Q      You understand that CTIEC still has a 50

6    percent ownership in this company.  True?

7        A      Yes.

8        Q      You understand that since July 18th, 2014,

9    continuously through today's date that CTIEC has had

10   over a quarter of a million dollars in assets in this

11   joint venture in Ohio of the United States of America.

12   True?

13              MR. VEJNOSKA:  Objection, foundation,

14        argumentative.

15              Would you please mark the translation.

16       A      I'm not sure exactly how much.

17   BY MR. IRPINO:

18       Q      You realize that for the year of 2014

19   CTIEC-TECO earned interest income from American banks

20   in the amount of $4,218.22; isn't that correct?

21              MR. VEJNOSKA:  Sorry, can you state the

22        amount again?

23              MR. IRPINO:  Yes.

24              MR. VEJNOSKA:  Seems my realtime is out.

25              MR. IRPINO:  No problem.  $4,218.22.

1            MR. VEJNOSKA:  Thank you.

2            MR. IRPINO:  That's for the year of

3        2014.

4      A    I don't know because it is financial matter

5    which is managed by TECO.  I do not know.

6    BY MR. IRPINO:

7      Q    By the way, who is the chairman of the board

8    of CTIEC-TECO?

9            MR. VEJNOSKA:  Objection, foundation.

10     A    For the chairman of the board -- well, there

11   had been no board of directors' meeting held.  Like I

12   said earlier, it is a strategic committee in which I

13   am the president.

14   BY MR. IRPINO:

15     Q    Is anyone above you in authority at

16   CTIEC-TECO?

17     A    Above my authority.  Which company you

18   referring to?

19     Q    CTIEC-TECO.

20     A    TECO it's our strategic partner.  I do not

21   have authority over it.  When situation arises we

22   would discuss all together because it is 50/50.

23     Q    My question is just a little bit different.

24   Is there anybody with higher authority than you in the

25   joint venture CTIEC-TECO?

Confidential - Subject to Further Confidentiality Review

1         MR. VEJNOSKA:  Objection, foundation,

2     asked and answered, misstates his testimony.

3     A     Like I just said, in this joint venture

4  company with TECO, even though I am the chairman,

5  however, I have equal authority with them.  If I were

6  to say anybody had higher authority than I, I would

7  say TECO has a higher authority than I because I do

8  not manage that company.

9  BY MR. IRPINO:

10    Q     Did CTIEC attempt to work in the United

11 States in 2014 on a project for China Fiberglass

12 group?

13        MR. VEJNOSKA:  Objection, vague and

14    ambiguous.

15    A     The matter is that because I'm not in charge

16 of the specific business, therefore, I don't know.

17 BY MR. IRPINO:

18    Q     You would defer to whatever was testified to

19 under oath by the people at TECO relative to the

20 CTIEC-TECO joint venture agreement; is that correct?

21        MR. VEJNOSKA:  Objection, vague and

22    ambiguous, argumentative, overbroad, calls for

23    speculation.

24    A     I'm confused with what you said regarding to

25 testimony under oath or people of TECO or CTIEC-TECO.

Confidential - Subject to Further Confidentiality Review

 1   BY MR. IRPINO:

 2       Q    Well, it sounds like you're saying you don't

 3   know as much about CTIEC-TECO as the people at TECO;

 4   is that true?

 5              MR. VEJNOSKA:  Objection, argumentative,

 6         vague and ambiguous, misstates testimony.

 7              Would you please mark the translation of

 8         the question.

 9       A    You're correct -- he is correct.  I'm very

10   familiar with TECO because we have the strategic

11   partnership relationship.  They respect me very much

12   and I respect them very much.

13   BY MR. IRPINO:

14       Q    How long have you had the strategic partner

15   relationship with TECO?

16       A    The agreement was signed in 2005, but it did

17   project in China prior to that and I knew them then.

18       Q    What attempts, if any, did CTIEC make to

19   work for Fuyao Glass America, Inc., F-u-y-a-o Glass

20   America, Inc., on any project in the United States in

21   2014?

22              MR. VEJNOSKA:  Objection, foundation,

23         vague and ambiguous.

24       A    I can recollect and explain to you in brief.

25   BY MR. IRPINO:

1      Q      Please do.

2      A      At the time Fuyao was planning to go to

3   America to establish a glass factory.  TECO approached

4   me to ask whether I could help them.  To particular in

5   this project.  I told Fuyao that TECO and us are

6   cooperation partners.  It would be the best if you can

7   find an American company to do your project.

8   Afterwards I made an introduction of TECO.  After that

9   I've heard that either for the reason of pricing or

10  other reasons TECO had chosen another local American

11  company to do the project.  I'm not sure about the

12  reason.  That's about it.

13     Q      Did CTIEC wind up doing any work or

14  submitting any bids for the project?

15             MR. VEJNOSKA:  Objection, vague and

16        ambiguous.

17     A      I don't know about that.  I only made

18  introduction.  As how they did it specifically, it was

19  them who did it.

20  BY MR. IRPINO:

21     Q      Who at CTIEC would know if CTIEC submitted

22  any bids or did any work on the project?

23             MR. VEJNOSKA:  Objection, calls for

24        speculation.

25     A      CTIEC is an empty company.  Definitely

Confidential - Subject to Further Confidentiality Review

1    nobody would have done this.  If anybody would had

2    done it, it would be the people from TECO.

3    BY MR. IRPINO:

4      Q    Let's talk about the New Jersey Institute of

5    Technology.  How did you first come to partner up with

6    the New Jersey Institute of Technology?

7                THE INTERPRETER:  Interpreter needs to

8         clarify with the witness as for the correct

9         translation of New Jersey Institute of

10        Technology.

11     A    I do not remember the specific time.  I

12   believe it was three years ago.  Three years ago.

13   Tell him.  Three years ago.

14                (Deposition Exhibit 381 marked.)

15   BY MR. IRPINO:

16     Q    Got it.  We're going to show you a document

17   that is marked Peng Shou Exhibit 381.  The top e-mail

18   is a November 22nd, 2013, e-mail from a Donald

19   Sebastian with New Jersey Institute of Technology.

20   The e-mail chain itself is on pages NJIT 3299 through

21   NJIT 3301.  The rest of Peng Shou Exhibit 381 contains

22   the attachments to that e-mail chain.

23                MR. VEJNOSKA:  And again, this is an

24        English language document, correct?

25                MR. IRPINO:  Yes.  There are some

Confidential - Subject to Further Confidentiality Review

```
1            sections that have some Chinese.

2                MR. VEJNOSKA:  It looks like the

3            heading -- the company name is in Chinese

4            characters at the top of each page.

5                And, Mr. Irpino, looking at it I see

6            what look like copies of passports, so I think

7            we may need to figure out a way to mark this as

8            confidential or highly confidential or whatever

9            we need to do later, but it does not need to

10           delay us now.  We'll deal with you about that

11           later if that's all right.

12   BY MR. IRPINO:

13       Q    Mr. Peng, part of the e-mail states that

14   CTIEC prepared all of the documents for trainees and

15   need to ask for an account number and wire the

16   tuition.  And then it attaches documents for trainees.

17   And on the documents are information for different

18   individuals who are "the nominated CTIEC employees for

19   the CTIEC/New Jersey Institute of Technology

20   Collaborative Graduation Certificate Program."

21               Do you recall this program?

22               THE INTERPRETER:  The interpreter

23           inquires a definition of denominated.

24               MR. IRPINO:  Of nominated?

25               THE INTERPRETER:  Nominated.  Thank you.
```

1      A      First of all, it's in English which I do not

2    understand.  But what I want to say is that I'm aware

3    of the matter of the training.  But I'm not sure about

4    what program.

5    BY MR. IRPINO:

6      Q      If you turn to Bates number page NJIT 3305,

7    one of the CTIEC employees nominated for the

8    CTIEC/NJIT Collaborative Graduate Certificate Program

9    was Dongliang Zhang?

10                THE INTERPRETER:  Just one moment.  This

11          is the interpreter speaking.  This is the

12          interpreter speaking.  Can counsel spell out the

13          names?

14                MR. IRPINO:  Yes.  D-o-n-g-l-i-a-n-g,

15          second name Z-h-a-n-g.

16      A      Dongliang Zhang.

17    BY MR. IRPINO:

18      Q      Who is that?

19                THE INTERPRETER:  The interpreter needs

20          to inquire the gender of the person with the

21          witness.

22      A      He's an engineer.

23    BY MR. IRPINO:

24      Q      Does he still work for CTIEC?

25      A      He currently works for CTIEC.

```
 1      Q      Did he in fact go through the CTIEC/NJIT
 2   Collaborative Graduation Certificate Program?
 3      A      Well, because I sent a lot of people to
 4   study, I do not understand -- I do not remember what
 5   are those people.  I believe he had participated in
 6   the program as well.
 7               Before you ask the next question, may
 8   I give you an introduction of the background of our
 9   cooperation with New Jersey?
10      Q      Yes, you may.
11      A      Thank you.  New Jersey Institute of
12   Technology is an outstanding university in the area of
13   management in the United States.  Ever since I got to
14   know them, they mentioned whether or not we can
15   co-train some professionals.  I believe it's
16   consistent with the need of the company's future
17   development.  Therefore, we had discussed and decided
18   to send around six people per year to participate in
19   the study of their official courses.  Those people
20   must have the capability of foreign language who are
21   to attend the classes, take the examinations and write
22   thesis together with the students they have recruited.
23   For that reason I've sent them to study there for
24   about four months.  I would like to give myself a
25   praise that this activity was praised by the
```

1    technology industry people of both in China and

2    America.  That's it.

3        Q     Well, I will praise you too.

4        A     Thank you.

5        Q     And we always appreciate when people send

6    people to study in America.  That's a big business for

7    us.

8        A     It's for communication, the studying.

9               (Deposition Exhibit 379 marked.)

10   BY MR. IRPINO:

11       Q     I will show you what we have marked as Peng

12   Shou Exhibit 379.  And we'll get a copy to your

13   counsel as well.  Exhibit Peng Shou 379 is Bates

14   marked NJIT 5797 through 5809.  The document is titled

15   Collaborative Graduate Certificate Program Agreement

16   Between New Jersey Institute of Technology and China

17   Triumph International Engineering Company Limited.

18               Is this the first contract between

19   CTIEC and NJIT regarding the Collaborative Graduate

20   Certificate Program that you just patted yourself on

21   the back for?

22               MR. VEJNOSKA:  I'll object to the last

23          comment as argumentative and just note that the

24          document again is entirely in English.

25       A     The document is in English which I do not

1    understand.

2    BY MR. IRPINO:

3        Q      Did you sign this document?

4        A      The signature in the back of the document is

5    mine.  The Chinese signature is mine, but the English

6    beneath it was not written by me.

7        Q      When you signed this contract, were you

8    signing it on behalf of China Triumph?

9        A      I signed this contract on behalf of China

10   Triumph International Engineering Company.  But I

11   don't know the English content of this document, this

12   one.

13       Q      And whatever the English content is, you

14   have routinely sent people over from CTIEC to the New

15   Jersey Institute of Technology to learn pursuant to

16   agreement between CTIEC and the New Jersey Institute

17   of Technology.  True?

18               MR. VEJNOSKA:  Objection, vague and

19           ambiguous, overbroad.

20       A      Correct.  It is a fact that I've sent people

21   to go study.

22   BY MR. IRPINO:

23       Q      And you sent people to study in 2014.  True?

24       A      Let me think about it.  I have sent people

25   for two years.

Confidential - Subject to Further Confidentiality Review

```
 1              THE INTERPRETER:  Interpreter needs to
 2        clarify gender with witness.
 3     A     Originally it hopes that I could send people
 4  next year as well.
 5  BY MR. IRPINO:
 6     Q     Did you -- and did people go this year,
 7  2015?
 8     A     2015, let me think about it.  Well, the
 9  first year -- well, 2015, which is this year, 2015 I
10  believe so.  I believe it had already ended.
11     Q     And if the agreement that you had started --
12  I will give you a date the agreement started;
13  December 9th of 2013.  And would that be about the
14  time you started sending people to New Jersey
15  Institute of Technology?
16     A     I don't know about that.  After signing of
17  the agreement a test was given.  And just like I said
18  a moment ago, they have to be people that are
19  qualified in foreign language and there is a standard.
20  Also they have to acquire study visa which took a long
21  time.
22              (Deposition Exhibit 371 marked.)
23  BY MR. IRPINO:
24     Q     I'm going to show you what's been marked as
25  Peng Shou Exhibit 371.  It is Bates numbered NJIT 2654
```

1    through 2668.  It is titled "PV Materials Technology

2    Development Agreement."  The document is written in

3    both English and Chinese with the English coming first

4    and the Chinese following that throughout the

5    document.

6                    Mr. Peng, this is a PV materials

7    technology development agreement that was entered into

8    as of December 31st, 2013, between China Triumph and

9    New Jersey Institute of Technology.  Have you had a

10   chance to look at the document?

11      A    I'm aware of this matter.  But I have not

12   read this document.

13      Q    I understand.  When you say you're aware of

14   this matter, you're aware of the fact that there has

15   been a PV materials technology development agreement

16   entered into between CTIEC and NJIT?

17      A    I'm aware of that we have signed an

18   agreement with New Jersey Institute of Technology to

19   co-establish a research center for new energy

20   materials.

21      Q    And who signed this agreement on behalf of

22   China Triumph?

23      A    From the name on the document Sun JianAn,

24   the deputy general manager of China Triumph

25   International Engineering Company signed.

Confidential - Subject to Further Confidentiality Review

```
 1              MR. VEJNOSKA:  I'll interpose an

 2       objection of foundation and speculation.

 3   BY MR. IRPINO:

 4       Q     Does the individual who signed report to you

 5   as the chairman and president of China Triumph?

 6       A     I'm aware of this matter and I proved his

 7   signature.

 8       Q     If you turn to page 2 of the document, which

 9   is Bates number 2655 -- by the way, is this

10   document -- this agreement is still in effect today,

11   correct?

12              THE INTERPRETER:  Interpreter needs to

13       clarify with witness.

14       A     I have not conducted a detailed research on

15   this agreement, but currently we are handling it on a

16   case-by-case matter.

17              THE INTERPRETER:  The interpreter just

18       asked the witness to clarify the Chinese

19       language for case by case.  Here's what the

20       witness said.

21       A     A case by case means that if we're to

22   continue this year, we'll have to talk about it.  If

23   we are to continue next year, we'll have to discuss

24   about it.  If we no longer provide them with the

25   supporting fundings, the center will close its door.
```

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. IRPINO:

 2       Q     What is the name of the center?

 3       A     At the time we named it China Building

 4   Material PV Material Research Center.  Originally it

 5   was called New Energy Research Center, but then I said

 6   just put this down.  Because the research center is

 7   only a name.  They had neither registered nor

 8   established a company.  It can be changed any time.

 9       Q     Okay.

10            MR. VEJNOSKA:  Mr. Irpino, I know you

11         want to finish this document and this line of

12         questioning, but when you reach a break time, it

13         would be great if we could take our last

14         afternoon break.

15            MR. IRPINO:  Last afternoon break.

16         Okay.

17   BY MR. IRPINO:

18       Q     If you turn to page 8, which is NJIT 2661,

19   and this is Peng Shou Exhibit 371, and under

20   paragraph 6.2 it states, "Exploitation by CTIEC."  Do

21   you see that?

22            THE INTERPRETER:  This is the

23         interpreter speaking.  Should the interpreter

24         read from the Chinese translation on the

25         document?
```

Confidential - Subject to Further Confidentiality Review

1            MR. IRPINO:  Sure.

2            THE INTERPRETER:  Thank you.

3      A    6.2 regarding to CTIEC, I see that.

4   BY MR. IRPINO:

5      Q    The document states that CTIEC is entitled

6   to license the intellectual property rights to any

7   affiliate.  Do you see that?

8            THE INTERPRETER:  This is the

9        interpreter speaking.  The Chinese translation

10       on the document does not correspond with its

11       English originals.  Should the interpreter read

12       off the Chinese translation on the document?

13            MR. IRPINO:  Sure.

14            THE INTERPRETER:  This is the

15       interpreter speaking again.  The Chinese

16       translation left out the language the

17       intellectual property rights.  Should the

18       interpreter read from the Chinese translation on

19       the document?

20            MR. IRPINO:  Sure.  So the -- so to be

21       clear for the record, the Chinese version says

22       CTIEC is entitled to license to any affiliate?

23            THE INTERPRETER:  That's correct.

24      A    I see the Chinese wordings.

25   BY MR. IRPINO:

Confidential - Subject to Further Confidentiality Review

1     Q     And then does the second sentence state that

2    CTIEC may grant licenses to third parties excluding

3    affiliates only upon written consent of NJIT?

4     A     That's what the Chinese says.

5     Q     And if we go back to page 2 of the document,

6    which is Bates number 2655, under paragraph No. 1

7    titled definitions it defines "affiliate."  This

8    contract signed between CTIEC and NJIT from

9    December 31st, 2013, defines "affiliate" stating:

10    "Affiliate means, in respect of a Party, a company or

11    other entity controlling, controlled by or under

12    common control, directly or indirectly, with such

13    Party, but only during the time that such control

14    exists."

15                Does he see that?

16                THE INTERPRETER:  This is the

17         interpreter speaking.  The Chinese translated

18         affiliate into subsidiary.  Should the

19         interpreter read off of the Chinese translation

20         on the document?

21                MR. IRPINO:  The what?

22                THE INTERPRETER:  The Chinese

23         translation of the word affiliate to the

24         interpreter's understanding has been translated

25         as subsidiary.  Should the interpreter read off

1           from the document?

2                   MR. IRPINO:  Sure.

3       A     That's what the Chinese says here.

4                   (Deposition Exhibit 378 marked.)

5    BY MR. IRPINO:

6       Q     Now, there is another document I want you to

7    take a look at, which is exhibit Peng Shou

8    Exhibit 378.

9                   MR. IRPINO:  Chris, did you want to take

10          your last break?

11                  MR. VEJNOSKA:  Whenever you would like.

12          I'm just thinking we've got till 5 and we've

13          been going about an hour and 45 minutes.

14          Whenever is convenient for you.  I don't want

15          to --

16                  MR. IRPINO:  Let's just make it quick,

17          whatever it is.

18                  THE VIDEOGRAPHER:  Time now is 3:49 p.m.

19          We are off the record.

20                  (Recess Taken From 3:49 p.m. To

21          3:59 p.m.)

22                  THE VIDEOGRAPHER:  This begins disk 6 of

23          today's deposition.  Time now is 3:59 p.m.  We

24          are back on the record.

25    BY MR. IRPINO:

Confidential - Subject to Further Confidentiality Review

1      Q      Do you see exhibit Peng Shou 378?

2             MR. IRPINO:  Which, for the record, is

3         in Chinese and English, with English first and

4         then Chinese immediately following.

5   BY MR. IRPINO:

6      Q      Mr. Peng, do you know the current status of

7   this agreement -- or proposed agreement?

8      A      I'm not sure about the recent status, but

9   they're still working.  New Jersey is still working.

10     Q      They have not shut the -- they have not shut

11   the center down.  True?

12     A      I don't know about that right now.  I have

13   heard they say that if no fundings are received,

14   perhaps the school will shut down.  As for consensus

15   reached in regarding to the research center it is to

16   be discussed in certain time in the future.

17     Q      Have you heard that the school is shut down,

18   that the center is shut down?

19     A      I have not heard of it.

20     Q      Let's look at a couple of quarterly reports

21   related to the CdTe PV materials R&D project.  We're

22   going to give you what's been marked as Peng Shou

23   Exhibit 376 and Peng Shou Exhibit 377.

24             (Deposition Exhibit 376 marked.)

25             (Deposition Exhibit 377 marked.)

```
 1                MR. IRPINO:  Exhibit 376 is --

 2                THE INTERPRETER:  The interpreter needs

 3           to interpret what counsel just said.  Did

 4           counsel say the quarterly report of CdTe PV R&D?

 5           Can counsel repeat that?  The interpreter didn't

 6           get that.

 7                MR. IRPINO:  Sure.  No problem.  CdTe PV

 8           materials R&D project.

 9                THE INTERPRETER:  What was the question?

10                MR. IRPINO:  I was just stating what the

11           title of the exhibits are.

12                Third quarterly report is Peng Shou

13           Exhibit 376 and as stated on page 2 of that

14           document, which is Bates number 2998 this

15           document is to report the R&D performed from

16           July 1 to September 30th, 2014.

17                MS. EIKHOFF:  Counsel, I note on the

18           record I observed there's a stamp on this

19           exhibit that's on another page that says

20           confidential for attorneys' eyes only.  Are you

21           familiar with that confidentiality designation?

22           Was that made by the third party that produced

23           it?

24                MR. IRPINO:  Yes.

25                MS. EIKHOFF:  So I just want to -- I
```

Confidential - Subject to Further Confidentiality Review

1        suppose to make sure that as an exhibit to this

2        deposition --

3                MR. IRPINO:  It's confidential.

4                MS. EIKHOFF:  -- it has the proper

5        confidentiality demarcation.

6                MR. IRPINO:  It's confidential.  All you

7        need is the word confidential on it and it's

8        treated as confidential in this case.

9                MR. LEVIN:  Nobody is going to jail.

10               MS. EIKHOFF:  Since it said for

11       attorneys' eyes only, it appeared to me to have

12       a higher demarcation of confidentiality than

13       other documents we have seen.

14               MR. IRPINO:  Okay.  Thank you.

15               MR. VEJNOSKA:  I have seen that.  I

16       suggest that we deal with that after we close

17       the record and figure out what we need to do to

18       protect it.

19               MR. LEVIN:  Nobody's going to jail.

20               MR. VEJNOSKA:  Thank you, Ms. Eikhoff.

21               MR. LEVIN:  Especially in Chicago or New

22       Jersey.

23   BY MR. IRPINO:

24       Q    Have you seen this document?

25               MR. VEJNOSKA:  Which one, Mr. Irpino?

```
 1          You gave him --

 2               MR. IRPINO:  We're now on 376.

 3               MR. VEJNOSKA:  376.  Thank you.

 4     A     I have not read this document.  It was their

 5   working report to me.  Just like what it says here, it

 6   is highly confidential, it is R&D of a high

 7   technology.

 8   BY MR. IRPINO:

 9     Q     And was this -- this was work, to be clear,

10   that was being done pursuant to the PV agreement that

11   we showed you earlier.  True?

12     A     Yes.

13     Q     And the same is true for Exhibit 377, but

14   this was work that was done between October 1, 2014,

15   and December 31, 2014.  True?

16     A     I'm not sure about that.  The purpose of

17   this writing is to express what work they have done,

18   but as for what time the work done, I don't care and I

19   have not read it.  It is a work report to show that

20   they are working on the money that I have given them.

21               (Deposition Exhibit 380 marked.)

22   BY MR. IRPINO:

23     Q     Now we're going to show you what's been

24   marked as Peng Shou Exhibit 380.  And if you go to

25   the -- let me mark for the record, this is Peng Shou
```

 1    Exhibit 380 and the Bates numbers are NJIT 3508 to

 2    3519.  And the title of the document is "Collaborative

 3    Graduate Certificate Program agreement Between New

 4    Jersey Institute of Technology and China Triumph

 5    International Engineering Company, Inc."

 6              Did you sign this document?

 7    A     No.  No.

 8    Q     Who did on behalf of China Triumph?

 9    A     They have placed my handwritten stamp on it.

10    It is my stamp, not my signature.

11    Q     And who are "they" when you say "they"

12    placed your stamp on the document?

13    A     At the time -- well, I don't remember

14    clearly.  Whoever was negotiating with them told me as

15    they were conducting trainings with each other.  While

16    I have not read it, I do not know its content.

17    Therefore, I can't give an opinion on it.

18    Q     Sure.  Did the person who made the stamp for

19    you have your permission to do that?

20              MR. VEJNOSKA:  Objection, calls for

21         speculation, foundation.

22    A     If I were to be told the gist of this

23    document, I could try to remember whether I'm aware of

24    this matter or not.

25    BY MR. IRPINO:

Confidential - Subject to Further Confidentiality Review

1      Q      Well, quickly, it's a January 2015 contract

2    between China Triumph and New Jersey Institute of

3    Technology.

4              MR. IRPINO:  Sunny, if you can read him

5       that -- tell him.

6      A      What contract?

7    BY MR. IRPINO:

8      Q      Which is in a second -- which appears to be

9    a second Collaborative Graduate Certificate Program

10   Agreement.

11             MR. VEJNOSKA:  Would you mark the

12       translation of the question and -- sorry.

13             Argumentative, foundation.  Thank you.

14             Sorry, Madam Translator.

15     A      I have reached an agreement with New Jersey

16   before and they hope that I could send people to be

17   trained every year.  If this is indeed the training

18   agreement, then I have approved it, but I don't know

19   the detailed content of it.

20   BY MR. IRPINO:

21     Q      I will represent to you that it is the

22   training agreement.

23     A      Thank you.

24             MR. VEJNOSKA:  Same objections.

25   BY MR. IRPINO:

Confidential - Subject to Further Confidentiality Review

1      Q     One of the provisions in Exhibit 380

2  mentions that for tuition payment CTIEC shall pay the

3  New Jersey Institute of Technology tuition in the

4  amount of $20,400 for each student.

5              THE INTERPRETER:  This is the

6         interpreter speaking.  Counsel, point at where

7         counsel is reading off from.

8              MR. IRPINO:  Page 4 of the document,

9         Bates number 3511.  It's part Roman numeral VI,

10        number -- paragraph No. 1, Tuition Payment.

11  BY MR. IRPINO:

12     Q     One of the terms under this agreement, Peng

13  Shou Exhibit 380, is that for the training CTIEC shall

14  be responsible for paying New Jersey Institute of

15  Technology tuition of $20,400 for each student.

16     A     I'm able to -- I am able to read the

17  numbers, but not the rest of them.

18     Q     No problem.

19     A     Everybody is to be paid -- is to pay, but I

20  don't know how much is the payment.

21     Q     No problem.  Let's talk about Sunpin.  Can

22  you give us a brief background on CTIEC's business

23  dealings with Sunpin.

24              THE INTERPRETER:  Interpreter ask the

25        counsel how to spell Sunpin and what is Sunpin?

```
 1                    MR. IRPINO:  Pearl has it.

 2                    THE INTERPRETER:  Is that a person or a

 3          company?

 4                    MR. IRPINO:  It's a company.  It's

 5          Sunpin Solar --

 6                    THE INTERPRETER:  Can the question be

 7          repeated, Counsel, please.

 8                    MR. VEJNOSKA:  I don't think it was a

 9          question.  I think it was an introduction.

10                    MR. IRPINO:  No, it was a question.

11                    MR. VEJNOSKA:  I think you said let's

12          talk about Sunpin.

13     BY MR. IRPINO:

14          Q    Can you give a brief background on the

15     business relationship between Sunpin and CTIEC.

16                    MR. VEJNOSKA:  Objection, vague and

17          ambiguous, overbroad, compound.

18          A    Yes.  But because I'm not in charge of the

19     specific businesses, but I can give you an

20     introduction based on my recollection.

21     BY MR. IRPINO:

22          Q    Thank you.  Please do.

23          A    Sunpin company is a company investing in

24     solar power stations in the United States.  It wishes

25     to establish a cooperation relationship with our
```

Confidential - Subject to Further Confidentiality Review

 1    engineering company to have us be their project

 2    contractor's EPC.  That's pretty much it.

 3        Q     Where is Sunpin located?

 4        A     I have never been there, but I've heard that

 5    they say perhaps it is in Chicago.

 6              MR. VEJNOSKA:  Move to strike based on

 7        speculation.

 8        A     This is my recollection.  I have not been

 9    there.

10    BY MR. IRPINO:

11        Q     Understood.  I'm going to show you a

12    document that we have marked Peng Shou Exhibit 360.

13    It is a November 3rd, 2014, EPC Framework Agreement

14    between Sunpin Solar Development, LLC and China

15    Triumph.

16              (Deposition Exhibit 360 marked.)

17    BY MR. IRPINO:

18        Q     This November 3rd, 2014, contract is signed

19    by China Triumph on page 000017 in the upper left-hand

20    corner of the document, which is the second-to-last

21    page of the document.  Do you see the name Dongliang,

22    second name Zhang who signed on behalf of China

23    Triumph?

24        A     I see that.

25        Q     And it says that he is the vice director of

Confidential - Subject to Further Confidentiality Review

1    the new energy department at China Triumph.

2        A    Deputy manager.

3        Q    Okay.  And did this person have the

4    authority to sign the contract on behalf of China

5    Triumph?

6                MR. VEJNOSKA:  Objection, calls for

7           legal conclusion, foundation.

8        A    This is a specific business.  Each

9    department, each business department independently

10   operates it.  His signature is a matter of the

11   business of his department.

12               MR. VEJNOSKA:  And while we're looking

13          at this document, I just want the record to

14          reflect it is an all-English document.

15       A    Plus it is an English document which I do

16   not understand, so I have no comment.

17               (Deposition Exhibit 361 marked.)

18   BY MR. IRPINO:

19       Q    Okay.  Well, maybe I can help you out with

20   the next document, which is Exhibit 361.  It's a

21   November 26th, 2014, BOS Agreement for the Maryland

22   Church Hill Solar Power Project between Sunpin

23   Construction Management, LLC, and China Triumph

24   International Engineering Company, Limited.  And

25   again, this is Peng Shou Exhibit 361.  Bates numbers

Confidential - Subject to Further Confidentiality Review

```
 1    are in the upper left-hand corner of the document.

 2    They go from 000036 through 00065.  Ask that the

 3    witness --

 4              MR. VEJNOSKA:  And, again, it is an

 5         all-English document.

 6              And I'm not sure since I tried to

 7         interject, I just wanted the record to be clear

 8         again it's an all-English document.

 9    BY MR. IRPINO:

10         Q    Mr. Peng, if you turn to page 15 of the

11    document, do you see your signature there?

12         A    I see that.

13         Q    And if you --

14         A    I would like to reiterate that I have signed

15    my Chinese name, not the English name.

16         Q    Understood.  And did you also sign your

17    Chinese name, if you flip right there, which is two

18    more pages --

19         A    The Chinese name on this page is my

20    signature.

21         Q    Okay.  And when you signed this agreement,

22    were you signing in your capacity as president and

23    chairman of China Triumph?

24         A    At the time I signed on it, I signed as the

25    president and chairman --
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE INTERPRETER:  Interpreter needs
 2         to correct -- the interpreter reinterpret the
 3         interpretation.
 4     A     At the time I signed on this agreement, I
 5  signed as the general manager and chairman of China
 6  Triumph International Engineering Company.  Excuse me.
 7  I'm only responsible for this page because the entire
 8  document is in English which I do not understand.
 9              (Deposition Exhibit 364 marked.)
10  BY MR. IRPINO:
11     Q     Now we will show you what's been marked as
12  Peng Shou Exhibit 364, which is another November 26,
13  2014, agreement.  This one is an EPC Agreement for the
14  Maryland Church Hill solar power project by and
15  between Church Hill Solar Farm, LLC, and China Triumph
16  International Engineering Company, Limited.
17              MR. VEJNOSKA:  And I'll note again an
18         all-English document.
19  BY MR. IRPINO:
20     Q     If you turn to the last page of the
21  document, Mr. Peng, is that your signature in Chinese
22  on the document?
23     A     It is my signature on the signature page.
24     Q     And did you sign this contract, Peng Shou
25  Exhibit 364, in your capacity as the president and
```

Confidential - Subject to Further Confidentiality Review

```
1    chairman of China Triumph?

2        A     Yes.

3        Q     The contract that we just discussed on

4    Church Hill solar power project, that project

5    physically was occurring in Maryland, United States.

6    True?

7                  MR. VEJNOSKA:  Objection, vague and

8           ambiguous, foundation.

9        A     Because I'm not in charge of managing

10   specific projects, they're implemented by other

11   people.  Therefore, I do not know where is it located

12   and what state it is.  I'm not in charge of that.

13   BY MR. IRPINO:

14       Q     Did you come to America to sign this

15   agreement?

16       A     I don't remember.

17       Q     Maybe we could look to website for help.

18   I'm going to show you what we have marked as

19   Exhibit 82-1.  It is a December 2nd, 2014, section

20   from China National Building Materials Group

21   Corporation website.  The title of this news release

22   from China National Building Materials Group

23   Corporation's website is "CTIEC Signed a 100 MW

24   Photovoltaic Power Plant Project in the US."  The

25   document 82 -- Exhibit 28-1 is two pages.  The first
```

Confidential - Subject to Further Confidentiality Review

```
 1    page is in English, the second page is in Chinese.

 2                   Do you recall going to New York to

 3    sign this agreement?

 4        A    Yes.  It was in the meeting room of New

 5    Jersey Institute of Technology.

 6        Q    And do you see on the photo on page 2, is

 7    that you in the photo signing this agreement?

 8        A    That is me.

 9        Q    I think you look good.

10                   THE INTERPRETER:  The witness is

11           directing his comment on what --

12                   MR. LEVIN:  I have that type of a face.

13                   THE INTERPRETER:  Saying that you're the

14           age of his father so he looks like your son

15           perhaps.

16                   MR. VEJNOSKA:  I want to -- would you

17           mark the translation.  I'm pretty sure that he

18           said grandfather.

19                   MR. LEVIN:  Do I remind you of your

20           father?

21                   MR. VEJNOSKA:  When you don't finish, I

22           want you to know who --

23                   MR. IRPINO:  Right.

24    BY MR. IRPINO:

25        Q    But the Church Hill project has at least --
```

Confidential - Subject to Further Confidentiality Review

1    work has begun on that project.  True?

2        A    I believe this project has started according

3    to my recollection, but I'm not very clear about it.

4        Q    And this may help.  We have some wire

5    transfer payments regarding the project.  I will show

6    you what's been marked as Peng Shou Exhibit 399 and

7    Peng Shou Exhibit 400, with copies to your counsel and

8    other counsel.

9                (Deposition Exhibit 399 marked.)

10               (Deposition Exhibit 400 marked.)

11               MR. VEJNOSKA:  Object to prefatory

12          remarks; it's argumentative, move to strike.

13   BY MR. IRPINO:

14       Q    Peng Shou Exhibit 399 is a copy of a

15   document -- copy of a wire transfer receipt produced

16   by Sunpin, specifically relating to a $200,000 wire

17   transfer from Sunpin to CTIEC on December 1st, 2014.

18   Are you aware of such a payment having been made?

19       A    I don't have a clear recollection because

20   I'm not in charge of the matters in finance nor the

21   matters in projects.

22       Q    Peng Shou Exhibit 400 is a similar document

23   but the wire transfer here on the Church Hill project

24   is for $1.2 million from Sunpin to CTIEC dated

25   January 22nd, 2015.  Does that help you remember that

Confidential - Subject to Further Confidentiality Review

1    business transaction?

2              MR. VEJNOSKA:  Objection, calls for

3         speculation.

4    A     Like I said earlier, I'm not in charge of

5    specific businesses nor money received.  Therefore, I

6    don't know about this matter.

7    BY MR. IRPINO:

8    Q     Okay.  We'll move to the next document,

9    which is -- which we've marked as Peng Shou

10   Exhibit 362.  Again, Peng Shou Exhibit 362.

11             (Deposition Exhibit 362 marked.)

12             MR. IRPINO:  And this is an EPC

13        Short-Form Agreement dated February 25, 2015,

14        between Sunpin Walmart Avon-North Oxford, LLC

15        and China Triumph International Engineering

16        Company, Ltd., with copy to your attorney, copy

17        to all counsel present and a copy to you.  I

18        will state for the record that this document is

19        in English.

20   BY MR. IRPINO:

21   Q     Mr. Peng, can you turn to page 5 of

22   Exhibit 362.  Is that your signature in Chinese on

23   this EPC Short-Form Agreement?

24   A     Yes.  The signature on this page is mine.

25   Q     Yes.  And did you sign this contract on

1    behalf of China Triumph as the president and chairman

2    of China Triumph?

3        A    By putting the signature here, I am the

4    representative, that's correct.

5        Q    And to be clear, this is a contract for, at

6    least in part, a Walmart deal for two Walmart stores

7    in Massachusetts.  True?

8                MR. VEJNOSKA:  Objection, foundation,

9        calls for speculation.

10               MS. EIKHOFF:  Objection, vague.

11       A    I would like to make a comment.  No. 1, this

12   is in English which I do not understand.  It is -- the

13   entire contract is in English.  No. 2, I can give you

14   a gist of it according to my recollection.

15   BY MR. IRPINO:

16       Q    Please do.

17       A    Sunpin told me that they can do US

18   project -- a project such as Walmart roofs or power

19   stations in such and such places because Walmart had

20   approached them.  They claimed they could do a few

21   projects.  And afterwards I supported it to do that.

22   That's it.

23       Q    Okay.  I will show you what we have marked

24   as Exhibit 82.  It is a two-page document.  The first

25   page is in English, the second page is in Chinese.

1    And this comes from the CNBM Group website.  It is a

2    March 2nd, 2015, news release by CNBM on behalf of

3    CTIEC that is titled "CTIEC signs Wal-Mart roof power

4    plant project."

5                Do you see on page 2 the Chinese

6    version?

7        A     I see that.

8        Q     And did you in fact fly back to New York to

9    sign this contract involving the Walmart deal, that

10   contract being Peng Shou Exhibit 362?

11       A     I'm not sure which agreement that was signed

12   depicted in this picture.  I do not remember, but I

13   indeed signed.  It is also -- it was also signed in

14   the principal's office of New Jersey Institute of

15   Technology.

16       Q     You say the principal's office and that

17   always makes people here nervous.  But it was one of

18   the Walmart contracts that you signed in New York?

19       A     I don't remember, but it was said that they

20   are going to be a lot of projects with Walmart, but

21   I'm not sure whether they can indeed work on how many

22   projects.  Like I just said, I gave my support to it

23   for sure.  It has to start with one project.  I'm not

24   in charge of specific projects.

25       Q     And we also have for you what have been

Confidential - Subject to Further Confidentiality Review

1    marked as Peng Shou Exhibits 401 and 402.  We will

2    hand copies to your counsel and to other counsel,

3    copies for you.

4              (Deposition Exhibit 401 marked.)

5              (Deposition Exhibit 402 marked.)

6    BY MR. IRPINO:

7        Q    Peng Shou Exhibit 401 is a March 16th, 2015,

8    wire transfer from CTIEC to Sunpin for the Church Hill

9    project.

10             Peng Shou Exhibit 402 is also a

11   March 16th, 2015, wire transfer from CTIEC to Sunpin

12   as the first payment on an administrative provision

13   agreement to cover the cost for housing for CTIEC's

14   employees overseeing the Church Hill project.  Please

15   take a look --

16             THE INTERPRETER:  Just one moment,

17        please.

18             The interpreter had finished her

19        interpretation onto the introduction of

20        Exhibit 402, the wire transfer from CTIEC to

21        Sunpin.  Will counsel continue or repeat his

22        question after that?

23   BY MR. IRPINO:

24       Q    Do you recall making -- CTIEC making wire

25   transfers to Sunpin relative to payments on the Church

Confidential - Subject to Further Confidentiality Review

1    Hill project in March of this year, 2015?

2        A    I do not operate on matters such as this and

3    I do not know.

4        Q    Do you have any information that CTIEC did

5    not make any payments to Sunpin in connection with the

6    Church Hill project?

7                MR. VEJNOSKA:  Objection, calls for

8        speculation, foundation, argumentative.

9        A    Because I'm not in charge of the detailed

10   matters, therefore, I do not have a clear recollection

11   and I do not know.

12               (Deposition Exhibit 369 marked.)

13   BY MR. IRPINO:

14       Q    Okay.  We'll show you what has been marked

15   as Peng Shou Exhibit 369.

16               MR. VEJNOSKA:  Mr. Irpino, while we're

17       doing this, I see it is 4:59.  If you told me

18       that you can finish if I give you an extra five

19       minutes, I'm willing to do that.

20               MR. IRPINO:  What a man.

21               (Discussion Off The Record.)

22   BY MR. IRPINO:

23       Q    This document is -- Peng Shou Exhibit 369 is

24   titled "Economic Responsibility and Financial Audit

25   Report for the Term of Office of Shou Peng, the

Confidential - Subject to Further Confidentiality Review

1   General Manager of China Triumph International

2   Engineering Company Limited."  The document is dated

3   June 8th, 2009.

4                    Have you seen this document before?

5       A     No. 1, this is in English; No. 2, I have not

6   seen this before, but there is a Chinese version

7   following that.

8       Q     And, I'm sorry, I meant have you seen the

9   Chinese version before?

10      A     I have not seen it.

11      Q     Okay.  Do you in fact get audited in

12  connection with your job as chairman and president of

13  China Triumph?

14                   MR. VEJNOSKA:  Objection, vague and

15          ambiguous.

16      A     I don't have a clear recollection on that.

17                   (Deposition Exhibit 406 marked.)

18  BY MR. IRPINO:

19      Q     Okay.  We're going to show you an exhibit

20  that's been marked Peng Shou 406.

21                   MR. IRPINO:  Chris, after that, we've

22          got one more.  That's it.

23  BY MR. IRPINO:

24      Q     Mr. Peng, I ask you to look --

25                   MR. VEJNOSKA:  Could I just ask you to

 1          move quickly because Mr. Peng did tell me coming

 2          in today that he needed to be out right at 5 for

 3          an appointment.  Let's just go quickly.

 4                    MR. IRPINO:  Okay.

 5     BY MR. IRPINO:

 6      Q     Mr. Peng, this is -- Peng Shou Exhibit 406

 7     is titled progress report on the preliminary work on

 8     the cement investment project in the United States.

 9     The document is provided in Chinese and English.  And

10     it states that -- on page 1 of the document under

11     paragraph numbered No. 1 it states, "To have an

12     accurate investment estimate and to confirm the

13     conditions for building the factory" -- this is the

14     factory in the United States -- "we entrusted Beijing

15     Triumph to conduct the detailed analysis and to

16     compare the feasibility report after asking chairman

17     Shou Peng for instructions and we formed a work

18     leadership group and a technology analysis group for

19     this project with Beijing Triumph's general manager

20     Mingliang Ma, chief engineer Guishan Tong,

21     G-u-i-s-h-a-n, second name T-o-n-g, and other leaders

22     and technology personnel.

23                    MR. VEJNOSKA:  And with this document

24          and the prior one, I'm going to repeat my

25          objections from the last two days about the

Confidential - Subject to Further Confidentiality Review

```
 1          authenticity, reliability of the translations by

 2          third parties and reserve our rights and

 3          objections to same.

 4   BY MR. IRPINO:

 5      Q    Can you tell me about this cement investment

 6   project in the United States, what you know about it.

 7               MR. VEJNOSKA:  Objection, vague and

 8          ambiguous, calls for a narrative.

 9      A    Regarding to the investment project in

10   America, Ma Mingliang told me that there is a project.

11   Since he's in charge of the cement project, then I

12   said, go ahead, but I do not know about this at all,

13   the entire course I do not know.

14   BY MR. IRPINO:

15      Q    Would it be fair to say that Mingliang Ma

16   knows more about it than you?

17      A    I don't know about that.

18               MR. VEJNOSKA:  Objection, calls for

19          speculation.

20      A    Because I only said -- well, I don't even

21   have a recollection on this.  I am not even aware of

22   this document.  This is my first time seeing the

23   document.

24   BY MR. IRPINO:

25      Q    And to be clear, I'm not -- I'm talking
```

Confidential - Subject to Further Confidentiality Review

1    about the project.  Who knows the most about this

2    project?

3              MR. VEJNOSKA:  Objection, calls for

4         speculation, foundation.

5    A    I don't know about this project because it

6    is -- the project's preliminary work and nobody's in

7    charge of the specific project right now.

8    BY MR. IRPINO:

9    Q    Is the project ongoing?

10             MR. VEJNOSKA:  Objection, asked and

11        answered.

12   A    I don't know.

13   BY MR. IRPINO:

14   Q    Who does Mingliang Ma work for?

15   A    Mingliang Ma has his own company and he

16   works there.

17   Q    And who is --

18             MR. VEJNOSKA:  Mr. Irpino, we're

19        stopping at 5:10, so I hope you're using your

20        time wisely.

21   BY MR. IRPINO:

22   Q    Who does Feng Wei work for?

23   A    What?

24   Q    Feng Wei.

25   A    Wei Feng, perhaps he works at international

Confidential - Subject to Further Confidentiality Review

```
1    business.  I'm not sure.  I don't know.

2              MR. VEJNOSKA:  Move to strike based on

3        speculation.

4    BY MR. IRPINO:

5        Q     The final exhibit is exhibit Peng Shou

6    Exhibit 386, copy to your lawyer, copy for you, sir.

7              (Deposition Exhibit 386 marked.)

8              MR. IRPINO:  For the record, Peng Shou

9        Exhibit 386 is total of four pages.  The first

10       two pages are the machine translation provided

11       by CNBM, the last two pages are the original

12       e-mails themselves in Chinese and in English.

13   BY MR. IRPINO:

14       Q     Mr. Peng, on page 3 of Exhibit 386, which is

15   Bates numbered CNBMCO46670, the March 26, 2015, e-mail

16   from Clarence Cao to cgc001@ctiec.net, is that your

17   e-mail address?

18       A     Cgc001 is my e-mail address, that's correct.

19       Q     Can you read what is written in Chinese in

20   that e-mail out loud.

21             MR. IRPINO:  Chris, to try and speed

22       it --

23   BY MR. IRPINO:

24       Q     Does this say at least in part, as you know

25   on February 27th -- well, let's just go even further
```

Confidential - Subject to Further Confidentiality Review

1    down.  It says, "Today, CTIEC-TECO received a copy of

2    a revised notice of deposition expanding the scope of

3    topics of deposition and document production.  A copy

4    of that notice is also attached."  It goes on to say,

5    "Under an order entered by the Court last week, we are

6    required to provide" -- "we are required to respond to

7    this subpoena within ten days of today."

8                    THE INTERPRETER:  Should the interpreter

9         read off the Chinese original e-mail?

10                   MR. IRPINO:  Sure.

11       A     That's what the Chinese says.

12                   MR. IRPINO:  Thank you.

13                   MR. VEJNOSKA:  Deposition is concluded.

14       Thank you.

15                   THE VIDEOGRAPHER:  Time now is 5:12 p.m.

16       Today's deposition consisting of six disks is

17       now concluded.

18                   (Deposition Concluded At 5:12 p.m.)

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

```
 1                    REPORTER'S CERTIFICATE

 2

 3         This transcript is valid only for a transcript

 4    accompanied by my original signature and original

 5    required seal on this page.

 6         I, Micheal A. Johnson, Certified Court Reporter

 7    (LA Certificate #29025) in and for the State of

 8    Louisiana, as the officer before whom this testimony

 9    was taken, do hereby certify that PENG SHOU, after

10    having been duly sworn by me upon authority of

11    R.S. 37:2554, did testify as herein before set forth

12    in the foregoing 128 pages; that this testimony was

13    reported by me in the stenotype reporting method, was

14    prepared and transcribed by me or under my personal

15    direction and supervision, and is a true and correct

16    transcript to the best of my ability and

17    understanding; that the transcript has been prepared

18    in compliance with transcript format guidelines

19    required by statute or by rules of the board, and that

20    I am informed about the complete arrangement,

21    financial or otherwise, with the person or entity

22    making arrangements for deposition services; that I

23    have acted in compliance with the prohibition on

24    contractual relationships, as defined by Louisiana

25    Code of Civil Procedure Article 1434
```

Confidential - Subject to Further Confidentiality Review

1   and in rules and advisory opinions of the board;

2   that I have no actual knowledge of any prohibited

3   employment or contractual relationship, direct or

4   indirect, between a court reporting firm and any party

5   litigant in this matter nor is there any such

6   relationship between myself and a party litigant in

7   this matter.  I am not related to counsel or to the

8   parties herein, nor am I otherwise interested in the

9   outcome of this matter.

10

11          Signed this ___ day of _____, 2015.

12

13

14

15          _____

16          MICHEAL A. JOHNSON, RMR, CRR

17          Certified Court Reporter

18          LA Certified Court Reporter #29025

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

1                    ACKNOWLEDGMENT OF DEPONENT

2

3           I,_____, do hereby

4    certify that I have read the foregoing pages and

5    that the same is a correct transcription of the

6    answers given by me to the questions therein

7    propounded, except for the corrections or changes in

8    form or substance, if any, noted in the attached

9    Errata Sheet.

10

11           _____

12           PENG SHOU                    DATE

13

14    Subscribed and sworn to before me this

15    _____ day of _____, 20 _____.

16    My commission expires: _____

17

18    Notary Public

19

20

21

22

23

24

25

1                    _ _ _ _ _ _

2                      ERRATA

                     _ _ _ _ _ _

3

4    PAGE   LINE    CHANGE

5    _____  _____  _____

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____

25   _____  _____  _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE MANUFACTURED DRY WALL | : MDL No. 2047 |
| PRODUCTS LIABILITY LITIGATION | : Section L |
| | : |
| This Document Relates to | : JUDGE FALLON |
| ALL CASES | : MAG. JUDGE WILKINSON |

PEOPLE'S REPUBLIC OF CHINA

CITY OF _____Beijing_____

DECLARATION OF 杨颖（Ying YANG）

This is a declaration being made in accordance with and pursuant to 28 U.S.C. § 1746.

I, 杨颖（Ying YANG）, declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct:

1. I am over eighteen (18) years of age, am competent to testify to the matters contained herein, and have personal knowledge of these facts.

2. I am director of translation division with Beijing Golden Olive Translation Center, and work in the office in Beijing, China.

3. I am fluent in the languages of Chinese and English.

4. I hereby certify that I prepared the English translation of the "ERRATA TO THE DEPOSITION OF PENG SHOU" ("ERRATA") in Chinese which was signed by Mr. PENG Shou, and when I translated the page/line numbers in the ERRATA, I reviewed the Transcript in English (see Attachment A) and the Chinese translation of the Transcript (see Attachment B) and confirmed that the contents in the Chinese translation of the Transcript as referred to by the page/line numbers indicated in the ERRATA in Chinese are corresponding to the contents in the Transcript in English as referred to by the page/line numbers indicated in the English translation of the ERRATA. I further certify that these copies of the ERRATA are true and accurate translations of one another.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 15, 2015



_____
Signature

_____
杨颖

Printed Name

路易斯安那州东区美国联邦地区法院

多地区合并诉讼案号：2:09-md-2047
关于：中国制造的石膏墙产品责任诉讼

彭寿的 2015 年 9 月 16 日庭外采证勘误表

| 页/行 | 翻译 | 更正 | 原因 |
|---|---|---|---|
| 20:5 | 我审阅过由我们集团的法务部提供的一份文件，是年报。 | 我审阅过由中国建材股份的法务部提供的一份文件，是年报。 | 澄清。 |
| 22:4 | 我是由董事会会议聘请的。 | 我是由董事会任命的。 | 翻译错误。 |
| 37:17 | 是的 | 不支付 | 在庭外采证时提供了澄清意见，但未被对方律师采纳 |
| 37:19 | 不支付 | 是的 | 在庭外采证时提供了澄清意见，但未被对方律师采纳 |
| 59:5 | 2015 | 2014 | 翻译错误。 |
| 62:7 | 我记不起来了，我最近一个月记性不太好。 | 那是最近，我记不太清楚了，那应该是最近这个月的什么时候。 | 翻译错误。 |
| 66:2 | 投资方。 | 股东。 | 澄清。 |
| 85:5 | TECO | 福耀 | 澄清。 |
| 85:14 | 中国建材国际工程是空壳公司 | CTIEC-TECO是空壳公司 | 澄清。 |
| 109:13 | 总裁兼董事长 | 总经理 | 翻译错误。 |

庭外采证证人的确认书

本人，彭寿，在此证明我已阅读前述各页的内容，且前述的内容为我对其中提出的问题所做出的回答的正确记录，但对形式或实质内容的更正或改变除外。对形式或实质内容的更正或改变，如果有的话，在所附勘误表上进行备注。

_____     _____
        彭寿                        日期

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MDL No. 2:09-md-2047

IN RE:  CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION

ERRATA TO THE DEPOSITION OF PENG SHOU
TAKEN SEPTEMBER 16, 2015

| Page/Line | Transcript | Change | Reason |
|---|---|---|---|
| 20:10-11 | I reviewed a document provided by our group's legal department, which is the annual report. | I reviewed a document provided by CNBM Company's legal department, which is the annual report. | Clarification. |
| 22:7-8 | I was hired by the board of directors' meeting. | I was appointed by the board of directors. | Interpretation error. |
| 37:22 | Yes | No | Clarification that was offered to but not accepted by opposing counsel at deposition. |
| 37:24 | No | Yes | Clarification that was offered to but not accepted by opposing counsel at deposition. |
| 59:8 | 2015 | 2014 | Interpretation error. |
| 62:10-11 | I do not recall.  I do not have a clear recollection in this recent month. | It's recent, I can't quite remember, it should be sometime this recent month. | Interpretation error. |
| 66:5 | investor. | shareholder. | Clarification. |
| 85:10 | TECO | Fuyao | Clarification. |
| 85:25 | CTIEC is an empty company. | CTIEC-TECO is an empty company. | Clarification. |
| 109:25 | president and chairman | general manager | Interpretation error. |

**Acknowledgement of Deponent**

    I, Peng Shou, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

**Peng Shou**                     **Date**



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
THE ORRICK BUILDING
405 HOWARD STREET
SAN FRANCISCO, CALIFORNIA 94105-2669

*tel* +1-415-773-5700
*fax* +1-415-773-5759
WWW.ORRICK.COM

September 28, 2015

Jason Cabot
(415) 773-5605
jcabot@orrick.com

*VIA E-MAIL*

Kristie Martello
Supervisor of Case Management
Golkow Technologies Inc.
production @golkow.com

Re:     Depositions of Song Zhiping (September 14-15, 2015) and Peng Shou (September 16, 2015)
        Confidentiality Designations

Dear Ms. Martello:

As counsel for the China National Building Materials Entities, I write to you regarding the deposition of Song Zhiping, held on September 14-15, 2015, and the deposition of Peng Shou, on September 16, 2015.

The following excerpts from the deposition transcript of Song Zhiping should be designated Confidential:

- 50:14 - 54:16

- 63:24 – 69:18

- 70:6 – 102:3

- 105:9 – 108:4

- 129:11 – 130:16

- 141:21 – 144:22

- 177:6 – 187:19

- 196:10 – 213:6

- 220:8 – 223:10



ORRICK

Kristie Martello
September 28, 2015
Page 2

The following excerpts from the deposition transcript of Peng Shou should be designated
Confidential:

- 67:5 – 73:23

- 80:9 – 86:13

- 90:11 – 99:19

- 102:23 – 111:16

- 114:8 – 115:22

- 118:14 – 124:11

The following excerpts of the deposition transcript of Peng Shou should be designated Highly
Confidential:

- 74:10 – 80:6

- 86:16 – 90:8

- 99:20 – 100:16

- 101:24 – 102:20

- 113:4 – 114:6

- 116:25 – 118:11

Exhibits 368, 376, 377, 381, 399, 400, 401, and 402 to the Peng Shou deposition should be
designated Highly Confidential.

Thank you for your attention to this matter and for your ongoing service on this case.  Please let me
know if you have any questions.



ORRICK

Kristie Martello
September 28, 2015
Page 3

Sincerely,

*/s/ Jason Cabot*

Jason Cabot

cc:    Alan Weinberger - aweinberger@hanrylaw.com
       Harry Rosenberg - harry.rosenberg@phelps.com
       C. Michael Moore - mike.moore@dentons.com
       Gene R. Besen - gene.besen@dentons.com
       Richard L. Fenton - richard.fenton@dentons.com
       Leah R. Bruno - leah.bruno@dentons.com
       Michael H. Barr - michael.barr@dentons.com
       Justin N. Kattan - justin.kattan@dentons.com
       Bernard Taylor - bernard.taylor@alston.com
       Christina H. Eikhoff - christy.eikhoff@alston.com
       David Venderbush - david.venderbush@alston.com
       Michael P. Kenny - mike.kenny@alston.com
       Russ M. Herman - rherman@hhkc.com
       Sandra L. Duggan - sduggan@lfsblaw.com
       Frederick S. Longer - flonger@lfsblaw.com
       Arnold Levin - alevin@lfsblaw.com
       Leonard A. Davis - ldavis@hhklawfirm.com