```
 1        IN THE UNITED STATES DISTRICT COURT

 2          EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE:  CHINESE-MANUFACTURED     MDL No. 2047

 5   DRYWALL PRODUCTS LIABILITY        SECTION: L

 6   LITIGATION                        JUDGE FALLON

 7                                     MAG. JUDGE WILKINSON

 8

 9

10        CONFIDENTIAL - SUBJECT TO FURTHER

11            CONFIDENTIALITY REVIEW

12       VIDEOTAPED DEPOSITION OF STEVEN ZIKA

13                 May 18, 2015

14        Taken on behalf of the Plaintiffs

15

16                  *   *   *

17

18

19

20

21

22        GOLKOW TECHNOLOGIES, INC.

23     877.370.3377 ph | 917.591.5672 fax

24            deps@golkow.com

25
```

<div style="border:1px solid black; padding:4px;">

**CONTEMPT**
**Exhibit 104**

</div>

Confidential - Subject to Further Confidentiality Review

```
1              BE IT REMEMBERED THAT, pursuant to Federal

2     Rules of Civil Procedure, the deposition of STEVEN

3     ZIKA was taken before Julie A. Walter, CSR No.

4     90-0173, on May 18, 2015, commencing at the hour

5     of 9:02 a.m., the proceedings being reported in

6     the law offices of Stoel Rives, 900 SW Fifth

7     Avenue, Suite 2600, Portland, Oregon.

8                        *   *   *

9                     APPEARANCES

10

11    TONKON TORP

12       Daniel H. Skerritt, Esquire

13       888 SW Fifth Avenue

14       Portland, Oregon 97204

15       Counsel for the Plaintiff

16

17    ORRICK, HERRINGTON & SUTCLIFFE

18       Christopher Cruz, Esquire

19       2050 Main Street, Suite 1100

20       Irvine, California  92614

21       Counsel for Defendant China National

22       Building Materials

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1    DENTONS US

 2      Kate Rumsey, Esquire (via telephone)

 3      2000 McKinney Avenue, Suite 1900

 4      Dallas, Texas 95201

 5      Counsel for Defendant Beijing New Building

 6      Material (Group) Co. Ltd., and Beijing New

 7      Building Materials Public Limited Co.

 8

 9    STOEL RIVES

10      Jeffery Courser, Esquire

11      900 SW Fifth Avenue, Suite 2600

12      Portland, Oregon 97204

13      Counsel for the Deponent

14

15    Also Present:  Ian Heitz, videographer

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1              INDEX

 2  Videotaped Deposition of:  STEVEN ZIKA      Page

 3

 4  Examination by:  Mr. Skerritt                  9

 5  Examination by:  Mr. Cruz                     58

 6

 7            EXHIBIT INDEX

 8  Number              Item                     Page

 9  1      Corporate Overview                     14

10         HAMPTON 020413-020418

11  2      11/8/11 Remarks by Steve Zika          15

12         HAMPTON 020419-020422

13  3      Hampton Meets Largest Customer         17

14         in China

15         HAMPTON 020425

16  4      Memorandum of Understanding            19

17         HAMPTON 020423-020424

18  5      12/13/04 letter to Ken Kao             20

19         from Steven Zika

20         HAMPTON 020426

21  6      Photograph                             22

22         HAMPTON 020427

23  7      7/31/14 email to Jim Tyrer from        27

24         Devin Huang

25         HAMPTON 014691-014694
```

| 1  | 8   | 11/13/14 email to Mark Porter      | 28 |
| 2  |     | from Devin Huang                   |    |
| 3  |     | HAMPTON 003319                     |    |
| 4  | 8A  | 11/13/14 email to Jim Tyrer from   | 28 |
| 5  |     | Devin Huang                        |    |
| 6  |     | HAMPTON 003321                     |    |
| 7  | 8B  | 11/16/14 email to Jim Tyrer        | 28 |
| 8  |     | from Devin Huang                   |    |
| 9  |     | HAMPTON 003351-003353              |    |
| 10 | 9   | 1/28/15 email to Dan Zhu from      | 30 |
| 11 |     | Jim Tyrer                          |    |
| 12 |     | HAMPTON 002850-002880              |    |
| 13 | 10  | Commercial Invoice 7/24/14         | 32 |
| 14 |     | HAMPTON 020436-020441              |    |
| 15 | 11  | Sales Order Acknowledgment 7/31/14 | 33 |
| 16 |     | HAMPTON 014296                     |    |
| 17 | 12  | 8/4/14 email to Jim Tyrer from     | 35 |
| 18 |     | Devin Huang                        |    |
| 19 |     | HAMPTON 014689-014690              |    |
| 20 | 13  | 8/5/14 email to Devin Huang from   | 37 |
| 21 |     | Jim Tyrer                          |    |
| 22 |     | HAMPTON 014705                     |    |
| 23 | 14  | Commercial Invoice 8/7/14          | 37 |
| 24 |     | HAMPTON 013943-013949              |    |
| 25 |     |                                    |    |

Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | 15 | Commercial Invoice 8/7/14 | 39 |
| 2 | | HAMPTON 014847-014853 | |
| 3 | 16 | 8/8/14 email to Dan Deng from | 41 |
| 4 | | Jim Tyrer | |
| 5 | | HAMPTON 014912-014914 | |
| 6 | 17 | Sales Order XB 513 | 42 |
| 7 | | HAMPTON 020428-020431 | |
| 8 | 18 | 8/13/14 email to Jim Tyrer | 44 |
| 9 | | from Devin Huang | |
| 10 | | HAMPTON 013174-013176 | |
| 11 | 19 | Commercial Invoice 8/15/14 | 45 |
| 12 | | HAMPTON 013935-013942 | |
| 13 | 20 | Commercial Invoice 8/15/14 | 45 |
| 14 | | HAMPTON 013950-013956 | |
| 15 | 21 | 8/14/14 email to Daniel Deng | 46 |
| 16 | | from Jim Tyrer | |
| 17 | | HAMPTON 013204-013209 | |
| 18 | 22 | Certificate of Origin | 47 |
| 19 | | HAMPTON 020171-020172 | |
| 20 | 23 | 8/15/14 email to Daniel Deng from | 47 |
| 21 | | Jim Tyrer | |
| 22 | | HAMPTON 013430-013440 | |
| 23 | 24 | 8/21/14 email to Lisa Ma from | 48 |
| 24 | | Jennifer Fidler | |
| 25 | | HAMPTON 014040-014049 | |

```
 1    25    8/22/14 email to Susana Vong          49

 2          from Daniel Deng

 3          HAMPTON 014248-014256

 4    26    8/26/14 email to Troy Epps from       49

 5          Monica Philpott

 6          HAMPTON 010083-010144

 7

 8    27    8/27/14 email to Daniel Deng from     51

 9          Jim Tyrer

10          HAMPTON 014487-014498

11    28    8/28/14 email to Jennifer Fidler      52

12          from Lisa Ma

13          HAMPTON 014590

14    29    Spreadsheet                           53

15          (No Bates Numbers)

16    30    Spreadsheet                           56

17          (No Bates Numbers)

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1            P R O C E E D I N G S

 2

 3        VIDEOGRAPHER:  We are now going on the

 4   record.  My name is Ian Heitz.  Today's date is

 5   May 18th, 2015, and the time is 9:02 a.m.

 6        This is -- the video deposition is being held

 7   at Stoel Rives, 900 Southwest Fifth Avenue,

 8   Suite 2600, Portland, Oregon, in the matter of In

 9   Re: Chinese Manufactured Drywall Products Liability

10   Litigation, filed in the United States District

11   Court, Eastern District of Louisiana.  The deponent

12   is Steven Zika.

13        Will the court reporter please swear in the

14   witness.

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                      STEVEN ZIKA,

 2          having first been sworn, testified under oath as

 3          follows:

 4

 5                      EXAMINATION

 6     BY MR. SKERRITT:

 7     Q.   Mr. Zika, my name is Dan Skerritt.  I'm with the

 8          Tonkon Torp firm here in Portland, and I'm taking

 9          the deposition on behalf of the plaintiffs group in

10          this case.

11               And as you probably know, this case arises out

12          of some disputes with some people who exported into

13          the United States some drywall that had some

14          problems with it and it led to a lawsuit, and there

15          was later some issues related to the activity of

16          some of the affiliates of the company from China

17          called Taishan.  And one of those affiliated

18          companies is China National Building Material Group

19          Corporation.

20               You're familiar with that company, aren't you?

21     A.   I am.

22     Q.   And just for --

23     A.   CNBM.

24     Q.   We will use "CNBM" to refer to them today just to

25          make it a little bit easier for everybody.
```

Confidential - Subject to Further Confidentiality Review

```
 1              First off, very briefly, would you describe for

 2         us your position?

 3    A.   Yeah.  I'm the CEO of the Hampton Companies.  There

 4         is a variety of companies where we go by Hampton

 5         Affiliates as kind of a d/b/a, but there's probably

 6         15 legal entities.  The company has been around

 7         about 70 years, so they have been set up for

 8         various reasons based on products we have or tax

 9         reasons, that type of thing, but I'm the CEO of --

10         of all the operating companies.

11    Q.   And what -- where is your home office located?

12    A.   Here in Portland, Oregon, USA.

13    Q.   And describe very briefly the business that Hampton

14         Affiliates is in.

15    A.   Yeah.  There are three main parts of our business.

16         We own some timberland here in Oregon and

17         Washington.  We have sawmills in Oregon,

18         Washington, and British Columbia, and then we also

19         have a wholesale distribution arm that sells our

20         products, plus we wholesale other people's products

21         as well, primarily in building products.

22    Q.   Do you do any drywall or any products like -- like

23         that?

24    A.   No.

25    Q.   So just pretty much exclusively in the forest
```

Confidential - Subject to Further Confidentiality Review

1       products realm?

2   A.  Yes.

3   Q.  Can you tell me when you first became acquainted

4       with CNBM?

5           MR. CRUZ:  Objection, vague and ambiguous to

6       the extent that CNBM could have different meanings.

7   Q.  BY MR. SKERRITT:  Well, when we defined that, we

8       were referring to the company we first identified.

9       That's what we mean when referring to CNBM, but if

10      you have any confusion about it, let me know.

11  A.  After the recession started here in the United

12      States in the housing market, a lot of companies in

13      North America started looking overseas to Asia to

14      develop export opportunities.  And so I would say

15      that somewhere in -- the Canadian government and

16      industry were really ahead of the United States in

17      doing that.

18          And I would say probably in 2009 or so I

19      became familiar with the opportunity to export

20      lumber to China.  We previously had been exporting

21      to Japan for a number of years.  And one of the

22      companies that was probably the biggest in terms of

23      trying to develop that market over there was CNBM

24      in China.  So I became familiar with the name

25      because people talked about it in the industry.

Confidential - Subject to Further Confidentiality Review

```
 1          They were very visible there in trying to generate

 2          a lot of market share, and so they were buying

 3          lumber from a lot of different companies in North

 4          America.

 5    Q.    Did you at some point personally meet

 6          representatives of CNBM?

 7    A.    Yes.  Let me see.  I can't remember whether I met

 8          them first over here in Portland or over in China.

 9          Every year I would go over with -- the Canadian

10          government and industry had a joint trip where they

11          would go over once a year to meet with various

12          Chinese officials and customers.  There were some

13          demonstration products, how to use the lumber,

14          that type of thing, and so I may have met

15          somebody from CNBM during one of those visits.

16              Eventually, we started selling some -- some

17          product to them, lumber, and, you know, either

18          visiting China during the time with some of our

19          salespeople or them coming over here.  They would

20          come over here several times a year, and so I would

21          say probably in that 2010 time frame that I

22          probably first met somebody from CNBM.

23    Q.    When you're saying "coming over here," are you

24          referring to the Portland office?

25    A.    Yes.  They would come over to Canada as well, but
```

```
 1          they would come to our Portland, Oregon, office

 2          because, again, we were starting to sell some

 3          products to them.  And as typical in sales

 4          arrangements, you like to meet the customer.

 5          They like to look at the quality of the product,

 6          because it was a new market, and we were developing

 7          a program to sell some metric product out of our

 8          Tillamook facility, and so they came to the United

 9          States and actually went down to Tillamook to see

10          what the product looked like.

11   Q.     Did you accompany any of the individuals from CNBM

12          on the mill tours?

13   A.     I did not.  I met with them in the Portland office.

14          Typically, they -- like I said, they would come

15          about twice a year and you would sit down and talk

16          about the market in China and what we were selling

17          them, and then typically there was a dinner, so,

18          you know, half -- half a day at the most, probably.

19   Q.     We asked for some documents to be produced, and,

20          boy, did you give me documents.  I won't let you

21          guess how I spent my weekend, but, anyway, I found

22          some documents I think that relate to one of the

23          trips sponsored by the Canadian government that

24          were produced that you're probably familiar with,

25          but I would like to have you get these on the
```

Confidential - Subject to Further Confidentiality Review

```
 1         record.
 2              The first one is -- I'm going to hand you is
 3         Exhibit 1 with the title page that says "Corporate
 4         Overview" on it.
 5                   (Exhibit No. 1 marked)
 6    Q.   BY MR. SKERRITT:  I think on the -- after the cover
 7         page, there is a picture of you and the BC forest
 8         -- forestry minister on the second page of this
 9         document.  Is that correct?
10    A.   Yes.
11    Q.   And there is other pictures related to some
12         building projects that you were at, and then it
13         looks like a signing of a Memorandum of
14         Understanding and some log decks in Shanghai.
15              Are you familiar with this document?
16    A.   Yes, yes.
17    Q.   Do you know if you -- did you testify earlier that
18         you had taken a number of different trips with the
19         Canadian government?
20    A.   Yes.  Probably one a year for the last four years,
21         something like that, maybe five years.
22    Q.   I think the documents that were produced to us, if
23         I'm -- if my records are straight, only included
24         the 2011 trip.
25              Do you know if there were other similar
```

Confidential - Subject to Further Confidentiality Review

1           documents related to the trips that were made after

2           2011?

3      A.   I don't believe there was any documents.  You know,

4           if you check the Ministry of Forests' records, you

5           know, they take pictures and stuff, like you see

6           here, and they may have some of the individuals

7           accompanying.  I don't think I had anything or we

8           kept anything.

9      Q.   It appears that at the 2011 trip that you made some

10          formal remarks?

11     A.   Yes.

12     Q.   At least they were printed up.

13               (Exhibit No. 2 marked)

14     Q.   BY MR. SKERRITT:  I will hand you Exhibit 2 and ask

15          you if you can identify Exhibit 2 as a copy of your

16          formal remarks?

17     A.   Yes.

18     Q.   In the second paragraph, you identify some of the

19          individuals from Hampton who attended along with

20          you.

21          Could you go over those names and tell me the

22          positions of those people, please?

23     A.   Sure.  Mark Porter is our sales manager here in the

24          US.  He was at the time a sales manager.  He is a

25          VP now.  So he primarily handled domestic sales for

Confidential - Subject to Further Confidentiality Review

```
 1          our mill -- out of our mills, and so to the extent

 2          we were going to export something out of one of our

 3          mills, he would be the coordinator, even though,

 4          typically, one of our export people that I will

 5          mention here later probably did the sale.  But he

 6          was kind of the gatekeeper from our US mills.  So

 7          he was there.

 8              Steve Kimery was the sales manager, our export

 9          sales manager at the time.  Back when I gave these

10          remarks in 2011, Trans-Pacific was a separate

11          company, and so they were effectively our -- kind

12          of our agent.  But Steve Kimery was selling

13          directly to China and mostly to Japan out of our

14          Portland office.  So he's our export salesman out

15          of Portland.

16              Today we would refer from a branding standpoint

17          to them as Trapa USA.  We brand all of our export

18          products as Trapa.  This is our one sales manager

19          that's here in Portland that does 100 percent

20          export.

21              And, then, as I mentioned, our associates, Jim

22          Tyrer is the president and Trent Gustafson is the

23          vice president of Trans-Pacific, who at the time

24          were -- were the contact, the official contact with

25          CNBM, and we would sell to CNBM, and they would
```

Confidential - Subject to Further Confidentiality Review

```
 1          sell to -- or to Trans-Pacific, and they would sell

 2          to CNBM.

 3              Later in 2012, we actually merged with

 4          Trans-Pacific.  So there is kind of a timeline

 5          going on.

 6              And then Mike Phillips, who was the president

 7          of our sales team, wasn't there for that meeting.

 8      Q.  Did you have two different companies, one

 9          Trans-Pacific Canada and another Trans-Pacific US,

10          or was it one single entity?

11      A.  Well, once we merged, there are two different

12          entities that are branded.  So one is a US company,

13          which is Trapa USA, and then there is the Canadian

14          company, which is Trapa Canada.

15      Q.  I've seen Jim Tyrer's name on a number of

16          documents.  Is he located in Vancouver?

17      A.  Yes.

18      Q.  Vancouver, BC, I should say, since --

19      A.  Yes.

20      Q.  -- confusingly, there's a similar town next to us

21          in Portland.

22                    (Exhibit No. 3 marked)

23      Q.  BY MR. SKERRITT:  I'm going to hand you document 3,

24          which appears to be -- Exhibit 3, I should say.  It

25          appears to be in the form of a press release.
```

Confidential - Subject to Further Confidentiality Review

```
 1              Are you familiar with Exhibit 3?
 2   A.   I don't remember exactly what context it was used
 3        in.  Most likely it was on our intranet.  We have
 4        a company intranet.  We share information with
 5        employees and that type of thing, so that's
 6        probably where it was or maybe in my blog or
 7        something like that where I kind of talk about
 8        what's going on.
 9   Q.   This one does not have a year date on it, so
10        it's -- do you -- but it came with a batch of
11        documents relating to the 2011 trip.
12   A.   Yes.  This would have referred to the same trip.
13   Q.   Okay.  In the first sentence of Exhibit 3, it
14        refers to Hampton's largest Chinese company, China
15        National Building Material Group Corporation, CNBM?
16   A.   Largest Chinese customer, you mean?
17   Q.   Yes.  I'm sorry.
18   A.   Yeah.
19   Q.   Was that already the case in 2011, that CNBM was
20        Hampton's largest Chinese customer?
21   A.   Yes.
22   Q.   Was that true for exports from American mills or
23        ports?
24   A.   That's what it would have referred to because,
25        again, Trapa Canada, which wasn't part of our
```

```
 1           organization then, was selling out of Canada.  We

 2           were a relatively small amount, but we were getting

 3           into the exporting business, and that's why we

 4           ended up merging with Trapa.

 5               Strategically, we were trying to grow our --

 6           our export business, and so aligning or buying

 7           somebody that was already in that business with

 8           more contacts, customers, the logistics, is really

 9           what we were trying to accomplish.

10    Q.    When did Hampton acquire Trapa or merge with it?

11    A.    2012, I believe.

12    Q.    So in -- when you're referring to export partners,

13          Jim Tyrer and Trent Gustafson, they were with the

14          Trans-Pacific Limited, which was a Canadian entity

15          at that time?

16    A.    Yeah, and so we just pay them commission basically

17          or -- or sell them products, which they would then

18          turn around and sell.

19               (Exhibit No. 4 marked)

20    Q.    BY MR. SKERRITT:  I'm going to hand you Exhibit 4,

21          which is a Memorandum of Understanding.  It's a

22          little bit hard to read because it looks like maybe

23          there were an American page -- excuse me -- an

24          English page and a Chinese page, and they look

25          like they got smudged a little bit on each other.
```

Confidential - Subject to Further Confidentiality Review

```
 1   A.   I think so, yeah.  This was the best copy that we
 2        could find.
 3   Q.   Yeah.  And this is not dated, but is it your belief
 4        that this Memorandum of Understanding, which I have
 5        marked as Exhibit 4, was executed at the time of
 6        the 2011 trip?
 7   A.   Yes.
 8   Q.   Do you know whether you have any other MOUs with
 9        CNBM subsequent to this one?
10   A.   We have no more.
11              (Exhibit No. 5 marked)
12   Q.   BY MR. SKERRITT:  I'm going to hand you a letter
13        which is from you to Mr. Ken Kao, who is a managing
14        director of CNBM, that's marked as Exhibit 5.
15        The date on it is December 13, 2004, but I have
16        a question about the accuracy of the date because
17        the body of the letter seems to suggest that it's
18        looking forward to 2000- --
19   A.   Right.
20   Q.   -- 14.
21        First of all, is this a letter that you wrote?
22   A.   Yes.
23   Q.   And do you know what the actual date that it was
24        written?
25   A.   Well, it was sent out on December 13, 2013.
```

Confidential - Subject to Further Confidentiality Review

```
1   Q.   So it's just a --
2   A.   I confirmed it with my -- my assistant.  That's
3        when she created the document, and, like you said,
4        when you get down to the body, you can see hoping
5        they will visit in early 2014.
6   Q.   And this -- this letter is bringing to the
7        attention of Mr. Kao that you have learned that
8        CNBM has started purchasing logs for export from
9        the Pacific Northwest or particularly Oregon, that
10       you were frustrated with because of the shortage of
11       logs for the mills in the area.  Is that correct?
12  A.   Correct.
13       MR. CRUZ:  Objection to the form of the
14       question.
15  Q.   BY MR. SKERRITT:  And you said that you -- that
16       Mr. Tyrer had informed you about this because he
17       was at a dinner with Westerlund managers, and they
18       were talking about the business they were doing in
19       exporting logs.  Is that correct?
20  A.   It wasn't through Jim Tyrer. I was talking -- I was
21       at an industry dinner, and I was talking with some
22       folks from Forest City who had mentioned that they
23       had seen the Westerlund folks with Ken Kao.  When
24       I say "competitor," I was referring to Forest City.
25  Q.   The statement says that "One of the competitors was
```

```
 1            sitting at dinner with one of the Westerlund

 2            managers who after a few drinks bragged about his

 3            growing business in China and was showing everyone

 4            a picture of him over in China with you."

 5                      (Exhibit No. 6 marked)

 6    Q.    BY MR. SKERRITT:  I want to hand you Exhibit 6.  I

 7            don't know if this is related at all, but it came

 8            in, I think, the order -- next in order of the

 9            document.

10            Is that picture related at all to the

11            Westerlund --

12    A.    No.

13    Q.    Okay.

14    A.    This is from earlier when we signed the MOU.

15    Q.    Now that I see you in person, I recognize that you

16            are in that and not someone from Westerlund.  So we

17            don't need to pay much attention to that document

18            then.  Did you get a response from Mr. Kao?

19    A.    Yes.  He sent an email, I believe, saying he was

20            sorry for the misunderstanding, and, again, I don't

21            have the email anymore because it was sent, you

22            know, back in 2013, but something along the lines

23            that he would be visiting the Pacific Northwest and

24            we would sit down and talk about it.

25    Q.    Did such a visit take place?
```

```
 1    A.    Yes.

 2    Q.    Do you recall approximately when?

 3    A.    I believe it was January of 2014.

 4    Q.    Where was the meeting?

 5    A.    In our office in Portland.

 6    Q.    Can you give us your best recollection of what the

 7          two of you discussed?

 8    A.    He apologized for not sharing that they were doing

 9          that business.  As you can see from my letter, you

10          know, we felt like with an MOU, even though it was

11          a nonbinding MOU, we were going to communicate and

12          work together to develop our -- our business

13          over -- over in China, and I just felt that, you

14          know, them not telling us that they were buying raw

15          materials in our -- in our market area was how

16          two people who were working together shouldn't

17          operate.

18              So he acknowledged that.  He didn't necessarily

19          say they were going to stop exporting logs.  He

20          just admitted they were doing it.  He said that's a

21          part of their business to export logs and that they

22          would be more open and transparent in future

23          negotiations.

24              He said he didn't know what was going to happen

25          in Astoria, where they were exporting logs.  He
```

Confidential - Subject to Further Confidentiality Review

```
1           said they were having some difficulty with the

2           operator, Westerlund, there, but he wouldn't tell

3           me one way or another whether they were going to

4           continue to export logs or not.

5    Q.     During this time frame, which is the early part of

6           2014, do you have a recollection of the volume of

7           business that Hampton was doing with CNBM?

8    A.     You know, as I mentioned, when -- when we got

9           started with them in 2011, they had a goal of being

10          a very big player in terms of importing products

11          from Canada and the US, not only from us, from a

12          lot of people.

13              That business strategy didn't work out

14          particularly well, and so their -- their volume of

15          business had shrunk down because I think from what

16          they told me, they weren't making any money doing

17          the business, and so they had reorganized the

18          office and kind of shrunk down.

19              So the reason I give you that background is the

20          volume of business that we were doing with them was

21          shrinking.  I can't speak for other people and what

22          they were selling.  So our business had been

23          dropping.

24              At one time, we were selling 100 percent of our

25          product out of the Tillamook facility to CNBM, but
```

Confidential - Subject to Further Confidentiality Review

```
 1          by the time we got to 2014, the US market had

 2          started to get better.  The Chinese market had

 3          started to slow down.  So the volumes had dropped

 4          significantly.

 5              I would say in 2014, early, Tillamook was

 6          probably selling only 25 percent of their product

 7          to CNBM and China, and so the overall level -- our

 8          company sales, about 2010, 2011, we had gotten to

 9          about 20 percent of our total sales as a company to

10          export, not to CNBM, but to various export

11          customers.

12              By early 2014, that had dropped to about 12 to

13          15 percent, and so I would say our volume with CNBM

14          in early 2014 was pretty similar to the level of

15          activity you saw in what we disclosed during this

16          period, July to today, maybe a little bit more,

17          but, for our company, relatively small.

18   Q.     Was most of the sales that were made from Hampton

19          out of the US through the Tillamook mill?

20   A.     Through the US, by the time we got to 2014,

21          especially during the relevant period you're

22          talking about, it would be a little bit out of the

23          Hampton US mills, a little bit that we would have

24          sold CNBM from other wholesale mills, and then I

25          believe during the -- the relevant period, there
```

Confidential - Subject to Further Confidentiality Review

```
 1              were some logs, we sold them out of the US south
 2              that have nothing to do with Hampton Mills or
 3              anything like that, but it was kind of a one-time
 4              effort.
 5                   That was kind of the level of activity, but the
 6              Hampton mills per sale were selling very, very
 7              small, less than a couple percent probably by the
 8              time we got to the end of 2014 to CNBM.
 9      Q.     The period that we're most interested in this case
10              follows a particular court order that you were
11              given a copy of as part of the notice, which is in
12              July of 2014.
13                   So starting from July 2014, do you have a sense
14              of how much business Hampton has done out of the
15              United States with CNBM?
16      A.     Well, you would have seen -- there's copies of all
17              the invoices.  I didn't add them up to see what the
18              total dollars are, but that's -- that's the extent
19              of it, which, again, is a very, very small part of
20              our business.
21      Q.     And was Trans-Pacific making sales out of Canadian
22              mills or of Canadian logs to CNBM during this --
23              the last half of 2014?
24      A.     Yes.  We also produced those as well, but like I
25              said, it's much smaller than we would have done
```

```
 1              several years before then.
 2     Q.   I'm going to go through some of these sales-related
 3              documents, and I don't know whether I picked them
 4              all up because I had quite a large volume to go
 5              through, but I'm going to try to make this go as
 6              quickly as I can.
 7     A.   Okay.
 8     Q.   Because we got kind of a frightening number of
 9              documents to go through, but I think we can do it
10              pretty quickly.
11                 (Exhibit No. 7 marked)
12     Q.   BY MR. SKERRITT:  The first one I'm going to show
13              you is Exhibit 7.
14                 Exhibit 7 is an email exchange.  I think it's
15              dated in July 31 of 2014, and the subject has to do
16              with Tillamook.  I'm assuming that would be the
17              Tillamook mill.
18     A.   Yes.
19     Q.   If you could go to the third page of this document,
20              there are some references to some -- some product
21              in paragraphs 4, 5, and 6.  There is a 48 by 98
22              econo.
23                 Can you tell me what an econo is?
24     A.   That's economy lumber.  So you have high grades of
25              lumber, and economy is the lowest grade of lumber.
```

Confidential - Subject to Further Confidentiality Review

```
 1   Q.   And towards the bottom of that same page, there
 2        is -- Mr. Tyrer is sending an email to some
 3        individuals, including Devin Huang, and he asks
 4        about news on Tillamook inventory.
 5             Is he referring to Tillamook inventory which
 6        has already been delivered to China that they are
 7        trying to resell or inventory at Tillamook that
 8        Hampton is trying to sell?
 9   A.   The latter.  Basically, as we -- we started
10        decreasing the product we were selling out of
11        Tillamook, there was some -- I think this refers to
12        some of the old inventory that was generated, you
13        know, three months before this, that was still
14        there, and it was the lower grade, and so the
15        pressure Jim talks about is the pressure somebody
16        like me would say, you know, we got this old
17        inventory, let's get it moving, and so we were
18        trying to make offers to see if they would take
19        that product.
20                  (Exhibit Nos. 8, 8A, 8B marked)
21   Q.   BY MR. SKERRITT:  I'm bouncing around a little bit
22        in the order of things here.  I apologize for that.
23             But I'm going to hand you some documents that
24        relate to what appears to be some planning for a
25        trip to Portland by representatives of CNBM in late
```

Confidential - Subject to Further Confidentiality Review

```
 1            2014.  And the documents I'm going to hand you are

 2            Exhibits 8, 8A, and 8B.  I apologize for the weird

 3            numbering.  That's because I was doing it myself

 4            over the weekend.

 5                 You can take a moment to go through these

 6            emails, but it basically refers to setting up the

 7            logistics for a trip for representatives of CNBM to

 8            come to Portland for a visit.

 9                 The email is going to Mark Porter, and I think

10            you identified him before.

11      A.    Right.

12      Q.    And did you say that he has a different position by

13            this time?

14      A.    He is a vice president now, but he is basically in

15            the same position, in charge of mill sales.

16      Q.    Do you know whether there was a visit from CNBM

17            representatives in November of 2014?

18      A.    I believe they did come, yes.  I wasn't -- I wasn't

19            at the office at the time, so I didn't meet with

20            them.

21      Q.    Okay.

22      A.    And I don't know if they went out to a mill or not

23            or whether -- I think they just met in the Portland

24            office is what I remember.

25      Q.    Was it fairly common to take pictures of different
```

```
 1            inventory which was going to be loaded onto ships

 2            or sold and transmit those pictures to CNBM?

 3    A.      Yeah, it's fairly common in export business,

 4            especially when you are dealing with a -- you know,

 5            in the US, you have standard products, two by four,

 6            number 2, stuff like that.  Over in China, you have

 7            products that are going to be used for different

 8            things.  Sometimes you are experimenting, trying

 9            something, and they don't quite understand the US

10            grades very well, so they want to see what it looks

11            like.  Plus we want to know what the quality looks

12            like when it was shipped, so in case there is ever

13            a claim where they say, "Well, wait a minute, you

14            shipped us something else," there is just proof on

15            both sides in terms of -- it's just a good thing to

16            do.  It doesn't happen on every sale, I don't

17            believe, but it happens on a lot of them.

18                      (Exhibit No. 9 marked)

19    Q.      BY MR. SKERRITT:  I'm going to hand you Exhibit 9,

20            which is from Jim Tyrer.  And it -- there are some

21            attachments that are referred to, and I have one

22            confusion I would like to see if you can clear up

23            for me on this.  This makes reference to -- it says

24            there are some photos of Babine's 2 by 6J.  I

25            thought that Babine was a Vancouver BC mill. Is it?
```

Confidential - Subject to Further Confidentiality Review

```
 1    A.    It is a -- one of our joint venture mills in Burns

 2          Lake, Canada, yes.  So there's two mills up there.

 3          There is Babine and Decker Lake.  They are both

 4          together, Babine Forest Products, which is our

 5          joint venture up there.

 6              So what he is referring to is J grade, which is

 7          a Japanese very high premium product that typically

 8          goes to the Japanese, although the Chinese buy it

 9          sometimes.

10    Q.    It references that the grade -- the photos that are

11          attached are Hampton Lumber, Portland, Oregon.  So

12          is this Hampton's US mills manufacturing that --

13          the same grade that was used at Babine?

14    A.    No.  I think it just has -- I don't know where the

15          Portland, Oregon, you are talking about.  Are you

16          talking about in the paper wrap itself?

17    Q.    Yes, yes.

18    A.    I think that's just kind of standard paper wrap.

19          You can see it has the Canadian flag and the US

20          flag.  I think we put "Hampton Lumber" because, you

21          know, it's the parent company location or

22          something.  I'm not sure.  We use a variety of

23          paper wraps at different operations.  So up in

24          Canada you will see Babine Premium, Hampton.

25          Typically, it's not going to say "Trans-Pacific."
```

Confidential - Subject to Further Confidentiality Review

```
1              You are putting a mill paper wrap on it.

2     Q.    So the fact that this has paper wrap referring to

3           Portland, Oregon, doesn't mean that it --

4     A.    No.

5     Q.    -- wasn't coming from the Babine mill?

6     A.    No.  We don't make it.  It's a spruce product, and

7           there is no spruce down here that we manufacture.

8     Q.    Okay.  Thank you for clearing that up.

9                 (Exhibit No. 10 marked)

10    Q.    BY MR. SKERRITT:  I'm going to hand you now

11          Exhibit 10.  Exhibit 10 is a commercial invoice.

12          This is from Trans-Pacific Trading US dated

13          July 24, 2014.

14             Should I -- am I safe in assuming that this was

15          for a US sale since it says "Trans-Pacific US"?

16    A.    Yes.  It's Douglas fir KD Lumber utility, which is

17          just above economy, and hem fir utility, which

18          typically is going to come out of the Pacific

19          Northwest, not Canada.

20    Q.    And the invoice amount there on page 1 of Exhibit

21          10 is $110,000 and some addition; correct?

22    A.    Um-hum (affirmative response).

23    Q.    The invoice date is July 24, 2014.  Can you explain

24          for me in the process when an invoice would be

25          issued as to when -- as comparison to when the
```

Confidential - Subject to Further Confidentiality Review

```
 1            lumber was loaded or shipped?

 2   A.   Yeah.  Typically, the invoice -- you would have

 3            to have everything loaded on the ship already, so

 4            the -- you know, we still own the inventory until

 5            it gets on the ship, and then I think at the

 6            time everything is loaded, you have got all the

 7            documents together, which in an export sale

 8            there is quite a bit of packing lists and

 9            phytosanitary certificates and things like

10            that.

11               Once that was all completed, the ship was

12            loaded, then we would send an invoice and try and

13            collect on the letter of credit.

14   Q.   I would agree that there is a lot of paperwork

15            generated for this.

16   A.   The domestic invoices don't look like this, but

17            when you deal in the export world, there is a lot

18            of invoices or a lot of materials.

19   Q.   If you look at the second page of Exhibit 10, it

20            shows shipped date of July 17, 2014.  Is that

21            correct?

22   A.   Yes.

23                    (Exhibit No. 11 marked)

24   Q.   BY MR. SKERRITT:  I'm going to hand you now a

25            document which I have marked as Exhibit 11.  This
```

```
 1              is a sales order acknowledgment.

 2                   Can you describe for me the process that the

 3              company goes through in -- that results in the

 4              generation of a document that's referred to as a

 5              Sales Order Acknowledgment?

 6     A.       Yes.  So typically what happens is there's emails

 7              going back and forth saying, hey, we have got this

 8              product available, or the customer would say, hey,

 9              we're looking for this product, and you will see

10              back and forth going on.

11                   Email is pretty prevalent in the export world

12              just because of the time difference and the

13              language issues and stuff, so you see a lot of

14              email traffic back and forth typically on these

15              orders.

16                   Once they have agreed, you want to acknowledge

17              the terms so that the sales order would be sent by

18              us to the customer just to make sure that they

19              agree with what the deal is or the transaction is

20              going to be.

21     Q.       Okay.  Now, in Exhibit 11, it's dated July 31,

22              2014, and it comes from Trans-Pacific Trading US;

23              correct?

24     A.       Yes.

25     Q.       And looking at the type of lumber that's involved,
```

Confidential - Subject to Further Confidentiality Review

```
 1              are we safe in assuming that this is an agreement

 2              to ship from a US mill?

 3     A.       Correct.

 4     Q.       And the contract period is stated as August;

 5              correct?

 6     A.       I don't know where you're referring to.

 7     Q.       Well, it's under --

 8     A.       Oh, contract period, August.  I see, yes.

 9     Q.       And that would be August 2014?

10     A.       Right.

11     Q.       The next documents are going to show you --

12              probably relate to some of the type of email

13              traffic back and forth on quotes, but I wanted to

14              have you identify them, please.

15                        (Exhibit No. 12 marked)

16     Q.       BY MR. SKERRITT:  This is Exhibit 12, and it's

17              dated August 4, 2014, and it's from Devin to Jim

18              Tyrer.

19     A.       Um-hum (affirmative response).

20     Q.       In the first page there or looking at this email,

21              it's just basically the exchange of quotes of what

22              the Tillamook mill was willing to sell the economy

23              lumber for?

24     A.       Yeah, I don't -- does it say "Tillamook"?  I'm not

25              sure.
```

Confidential - Subject to Further Confidentiality Review

```
 1    Q.   Well, the heading says -- attachment says

 2         "Tillamook."

 3    A.   Okay.  So this would be the typical, like you

 4         described, kind of back and forth trying to figure

 5         out the volumes and the tallies and that type of

 6         thing.

 7    Q.   This is sort of an aside, but I'm just curious.

 8         Since the Chinese are very good at negotiating,

 9         does it usually take a number of back and forths

10         before you get to a deal or is this more of a

11         commodity, take it or leave it sale?

12    A.   It's a negotiating thing because, again, everybody

13         knows what a 2 by 4 number 2 is in the US,

14         especially when you are dealing with these lower

15         grade items.  Depends on what you are going to do

16         with them.  There is a lot of products they make,

17         they rip them, they remanufacture.  So depending on

18         their use, a lot of this low grade also goes into

19         concrete forms, things like that.  So that's why

20         they are taking kind of US products and trying

21         to -- whatever their use is.

22              So, yes, it's typically back and forth, and,

23         you know, the market is relatively young, you know,

24         ten years, and it really picked up in about four or

25         five years ago.  So the Chinese are still learning
```

Confidential - Subject to Further Confidentiality Review

```
1          what to do with these products, where to buy them

2          from, what grades and yields they get out of

3          different products, and so it's a bit of a learning

4          experience for both sides.

5    Q.    This next document -- I was marking some documents,

6          and it looks like a response to a prior email,

7          Exhibit 13.

8                   (Exhibit No. 13 marked)

9    Q.    BY MR. SKERRITT:  I decided just to go ahead and

10         introduce it rather than have a gap, but it doesn't

11         add very much to it, but the -- Jim Tyrer who has

12         sent the message at the top on August 5, 2014, to

13         Devin is the same Jim Tyrer we have been talking

14         about earlier; correct?

15   A.    Yes.

16                  (Exhibit No. 14 marked)

17   Q.    BY MR. SKERRITT:  I'm going to hand you now

18         Exhibit 14, which is a commercial invoice.  And

19         it's for invoice number 674352 dated August 7,

20         2014, from Trans-Pacific US.

21             Is this an invoice for the sale of -- out of

22         the Tillamook mill?

23   A.    I can't be sure.  Again, that's the likely

24         situation, but I don't know because they did buy,

25         like I said, from Georgia-Pacific, who makes some
```

Confidential - Subject to Further Confidentiality Review

```
 1           hemlock at their Philomath mill.

 2    Q.     If you go to the second page of Exhibit 14, this is

 3           a -- I guess from the Costco container lines.  It

 4           lists the point of origin as Oregon, USA.

 5              Do you see that?

 6    A.     Um-hum (affirmative response).

 7    Q.     And if you go back to the first page, this

 8           August 7, 2014, invoice is for $29,222.69; correct?

 9    A.     Yes.

10    Q.     Now, the commercial invoice is a little bit

11           different than the -- I think the earlier sales

12           order acknowledgment.

13              Can you tell me in the process or the chain

14           of how a transaction evolves, when do you issue an

15           invoice to a customer?

16    A.     Well, again, the invoice is when everything is

17           finally -- you know exactly what's shipped.  The

18           sales order acknowledgment is -- is trying to make

19           sure you -- both sides agree on the terms of what's

20           actually going out.

21              This is a -- this commercial invoice is a

22           different product than what was in the sales order

23           acknowledgment.  You can see we got 38 by 89.

24    Q.     Right.

25    A.     Here.
```

Confidential - Subject to Further Confidentiality Review

```
 1   Q.   A different amount of money, so I'm not trying to
 2        suggest it's the same transaction.
 3   A.   Right, yeah.
 4   Q.   I notice here that the customer is Shanghai Jianpu
 5        Import and Export Company.  Would that be the
 6        company or the consignors through whoever CNBM had
 7        resold the product to?
 8   A.   I think in this --
 9            MR. CRUZ:  Objection.
10            THE WITNESS:  I think in this particular case
11        this is an affiliate of CNBM, some kind of -- they
12        arrange like letters of credits and things --
13   Q.   Okay.
14   A.   -- is my best understanding.
15   Q.   But as far as the party that Hampton was
16        contracting with and processing an order, you were
17        dealing at least through CNBM.  Is that correct?
18   A.   Correct.
19   Q.   We have another commercial invoice that's the same
20        day but has a different number and a different
21        dollar amount.
22                (Exhibit No. 15 marked)
23   Q.   BY MR. SKERRITT:  This is Exhibit 15.  Exhibit 15
24        is invoice number 674668, again dated August 7,
25        2014, and from Trans-Pacific US; correct?
```

```
 1    A.   Um-hum (affirmative response).

 2    Q.   And it shows it's for $18,767.34.  Is that correct?

 3    A.   Yes.

 4    Q.   Then if you go to the document that has the Bates

 5         stamp number at the bottom, the little numbers at

 6         the bottom, it's Hampton 14851?

 7    A.   Um-hum (affirmative response).

 8    Q.   It shows a Certificate of Origin, and that's -- can

 9         you tell me what -- who the Certificate of Origin

10         is issued by?

11    A.   I guess I don't know who officially issues it.  You

12         typically see it as people want to know where --

13         where these things are sourced from.  It's a

14         requirement in a lot of business we do.

15    Q.   Is it filled out by someone from Hampton?  There is

16         -- it's signed by -- it looks like a Kiffani

17         Iverson.  Is that -- do you know whether that's

18         someone who is one of your employees?

19    A.   I don't recognize that name, no.

20    Q.   Okay.

21    A.   It could either be from the forged company or

22         it could be one of our clerks, and I just don't

23         know.

24    Q.   There is a forwarding agent called All Ports

25         Forwarding, Inc. that's listed on this document as
```

Confidential - Subject to Further Confidentiality Review

```
 1        well?

 2   A.   Yeah.

 3   Q.   So it could have been that?

 4   A.   A lot of times there is another middleman arranging

 5        a lot of this documentation.

 6   Q.   But, again, just so the record is clear on this

 7        August 7, 2014, invoice, which is Exhibit 15, so

 8        far as Hampton is concerned, it's dealing with or

 9        through CNBM; correct?

10   A.   Yes.

11             (Exhibit No. 16 marked)

12   Q.   BY MR. SKERRITT:  I'm handing you now a document

13        that I have marked as Exhibit 16.  I should put on

14        the record -- I don't think I did before, before we

15        got started -- that your counsel indicated that you

16        were the individual who was responding on behalf of

17        the Rule 30(b)(6) notice in addition to your own

18        personal notice for a deposition.

19   A.   Can you explain that again to me?

20   Q.   You're the one who's testifying with knowledge of

21        the events that we have asked --

22   A.   Yes.

23   Q.   -- that we're asking questions about?

24   A.   Yes.

25   Q.   And Rule 30(b)(6) is just a rule of the Federal
```

Confidential - Subject to Further Confidentiality Review

```
 1          Rules of Civil Procedure that in our lawyer

 2          parlance, we just refer them to -- this is a

 3          category of deposition where it's a company

 4          representative instead of identifying an individual

 5          who is coming to testify.

 6    A.    Right.

 7    Q.    So you're in a dual capacity today in response to

 8          your individual subpoena but also appearing as a

 9          company representative?

10    A.    Yes.

11    Q.    Okay.  I should have done that at the very

12          beginning, so I apologize for disrupting it now.

13              If you look at Exhibit 16, it's dated August 8,

14          2014.  It's an exchange of some emails.  But if you

15          go to the second page, there's a sales order

16          acknowledgment.  It looks like that's just an email

17          which attaches the sales order acknowledgment,

18          which is the same as Exhibit 11, so I'm not going

19          to ask you any more questions about that.  I

20          apologize for the duplication.

21                    (Exhibit No. 17 marked)

22    Q.    BY MR. SKERRITT:  I'm going to hand you now

23          Exhibit 17.  Exhibit 17 is a sales order, It's XB

24          513.  Do you know what the "XB" stands for?

25    A.    I don't, no.
```

Confidential - Subject to Further Confidentiality Review

```
 1   Q.   Okay.  And it's sold to CNBM as the customer.

 2             If you go to the second page of Exhibit 17, it

 3        says "FOB Mobile ports."  Does that refer to

 4        Mobile, Alabama?

 5   A.   Yes.

 6   Q.   And I think you mentioned that you had sold some

 7        logs out of the southern area or southeastern part

 8        of the United States.  Is this the transaction that

 9        you were referring to?

10   A.   Yes.  I believe this is the only transaction of

11        southern yellow pine logs that we sold to CNBM

12        during this period or at any time.

13   Q.   And so I have the dates down here, let me find a

14        date here.  The shipping period is August 2014;

15        correct?

16   A.   It says loaded on board September 14 -- or

17        September 18, I think.

18   Q.   Okay.

19   A.   So that may have been the intention.  Maybe it was

20        late.

21   Q.   Okay.  And the -- it looks like this invoice is for

22        $89,100; correct?

23   A.   Yes.

24   Q.   And then the pages that are attached have it looks

25        like the incremental parts of the sales that lead
```

Confidential - Subject to Further Confidentiality Review

```
1          up to the total amount of the sale.  Is that
2          correct?
3    A.    Yes.
4    Q.    And I apologize.  I think maybe when I was going
5          through all the documents, there is attached some
6          documents at 20433 that includes some Canadian logs
7          of Canadian origin that are not related to the same
8          sale.  I think I just...
9    A.    Right, I understand.
10   Q.    That's a mistake on my part.  So the only parts of
11         the exhibit that are relevant to our -- to the case
12         here are Bates numbers Hampton 020428 through
13         Hampton 020431.
14   A.    Yes.
15   Q.    Maybe we can all just take the rest of it off of
16         the exhibit just to avoid confusion for the future,
17         because God knows we got enough paper already here.
18         I have done that with my exhibit, and if you could
19         do that with the original, I would appreciate
20         that, too.
21                   (Exhibit No. 18 marked)
22   Q.    BY MR. SKERRITT:  I will hand you now Exhibit 18.
23         It's an August 13, 2014, email exchange from Devin
24         to Jim Tyrer, and in this instance Devin is asking
25         for some photos from Tillamook.  Is that correct?
```

Confidential - Subject to Further Confidentiality Review

```
 1   A.   Looks like it, yes.

 2                (Exhibit No. 19 marked)

 3   Q.   BY MR. SKERRITT:  I'm going to hand you Exhibit 19.

 4            Exhibit 19 is a commercial invoice from the

 5        Trans-Pacific US arm, invoice number 674351, dated

 6        August 15, 2014.  This is for hem fir.  That would

 7        be hemlock fir.

 8   A.   Yes.

 9   Q.   And knowing what type of lumber it is, would you

10        assume that's out of the Tillamook mill?

11   A.   Most likely, yes.

12   Q.   And the amount of this invoice is for $48,704.49;

13        correct?

14   A.   Um-hum (affirmative response).

15   Q.   You have to say "yes."  I'm sorry.  "Yes" or "no."

16   A.   Yes, sorry.

17   Q.   And on the second page, the Certificate of Origin

18        shows Oregon, USA, as the country of origin?

19   A.   Yes.

20                (Exhibit No. 20 marked)

21   Q.   BY MR. SKERRITT:  I'm going to hand you now

22        Exhibit 20.

23                (Pause in proceedings)

24   Q.   BY MR. SKERRITT:  Exhibit 20 is an invoice.  It's

25        also August 15, 2014, but the number is different
```

```
 1            from Exhibit 19.  This one is 674352B, and the

 2            dollar amount of the invoice issued by the US --

 3            Trans-Pacific US is for $29,222.69.

 4                 Do you see that?

 5    A.     Yes.

 6    Q.     Again, on the second page shows the Certificate of

 7            Origin being Oregon, USA; correct?

 8    A.     Correct.

 9                 (Exhibit No. 21 marked)

10    Q.     BY MR. SKERRITT:  I'll hand you Exhibit 21.  This

11            is an email exchange between Mr. Tyrer and Daniel

12            Deng, August 14, 2014, with some photos.

13                 The last page has a Hampton Lumber Mills on it,

14            but I want to find out whether I have the --

15            whether I'm confusing the -- just the fact that it

16            had a Hampton wrap on it, whether this is properly

17            identified as relating to a US versus a Canadian

18            transaction.

19    A.     This would be -- this would be a Canadian shipment.

20    Q.     Okay.

21    A.     You can see it's the -- it says "SPF KD" under the

22            picture number 3.  This looks like a colored tag

23            that we would use in Canada.

24    Q.     Okay.

25    A.     So I'm pretty confident it's not US.
```

Confidential - Subject to Further Confidentiality Review

```
1                    (Exhibit No. 22 marked)

2    Q.   BY MR. SKERRITT:  I'm going to hand you now

3         Exhibit 22.  Oops, I gave you two copies of it, I

4         think.

5              Exhibit 22 is A Certificate of Origin.  It's

6         dated August 30, 2014, and this is from North

7         Carolina with the USDA phytosanitary certificate.

8              As far as you know, does this relate to the

9         sale of yellow pine that was shipped out of Mobile?

10   A.   Yes, it should be one and the same.  You can see

11        port of loading, Mobile, Alabama, on there.

12   Q.   Right.  And the date issued of the certificate by

13        the USDA was September 29, 2014; correct?  It's at

14        the very bottom of the second page.  It says "Date

15        issued."

16   A.   Okay, yeah.

17                   (Exhibit No. 23 marked)

18   Q.   BY MR. SKERRITT:  I'm going to hand you now

19        Exhibit 23.

20             Exhibit 23 is an email from Jim Tyrer to Daniel

21        Deng.  It's dated August 15, 2014, and it attaches

22        some pictures.  This time it does look as if the

23        pictures relate to something that happened in

24        Portland, Oregon, because the cover letter says

25        "See attached photos that Steve took at the
```

```
 1            Portland container reload as you requested."
 2              Do you see that?
 3    A.   Right.  So "Steve" would be referring to Steve
 4         Kimery, who is our export salesman in the US, and
 5         this would either have been taken at the Morgan
 6         container terminal or the Port of Portland
 7         container facility.
 8    Q.   And this relates to some pictures of product that
 9         was being shipped in or put on containers sometime
10         in the time period around August -- mid-August of
11         2014?
12    A.   Looks like it, yep, or they were -- they could have
13         potentially been negotiating again.  They wanted to
14         see what it looked like.  But it was around that
15         time period, obviously, when he wanted those
16         pictures.
17    Q.   Thank you.
18              (Exhibit No. 24 marked)
19    Q.   BY MR. SKERRITT:  I'm going to give you Exhibit 24.
20         That's one I scribbled on.  Sorry.
21              Exhibit 24 is August 21 email from Jennifer
22         Fidler of Trapa Canada to someone named Lisa at
23         CNBM.
24    A.   Um-hum (affirmative response).
25    Q.   And it attaches a USDA phytosanitary certificate
```

Confidential - Subject to Further Confidentiality Review

```
 1          which starts on Hampton 014046 with a place of

 2          issue, Portland, Oregon, and a date of August 21,

 3          2014.

 4               Do you see that?

 5   A.   Yep.

 6                    (Exhibit No. 25 marked)

 7   Q.   BY MR. SKERRITT:  Let me hand you Exhibit 25.

 8        Exhibit 25, the first page is an exchange of email

 9        from Daniel at CBMIE to Susana Vong at Trapa

10        Canada?

11             Do you see that?

12   A.   Yep, yes.

13   Q.   And if you go to the page which is Hampton 014252,

14        there is a question that's asked about the shipping

15        rates from Mobile to Shanghai.  I'm assuming that's

16        Mobile, Alabama, and we're talking again about the

17        shipment of the logs.

18   A.   Yes.

19   Q.   And I don't recall whether I put the date of this

20        Exhibit 25 email exchange.  It's August 22, 2014;

21        correct?

22   A.   Yes.

23                    (Exhibit No. 26 marked)

24   Q.   BY MR. SKERRITT:  I'm going to hand you now

25        Exhibit 26.  This is an email exchange with a
```

Confidential - Subject to Further Confidentiality Review

```
1              number of attachments from Monica Philpott to Troy

2              Epps at TMX Ship and a number of different people.

3              Also includes Graeme Lusk.

4                  Can you identify who Graeme Lusk is?

5      A.      Graeme Lusk is the person whose responsible for log

6              sales out of Trapa in Vancouver, Canada.

7      Q.      The cover of this talks about getting the USDA

8              phyto cert, but is it -- in looking at this, would

9              you assume that this relates to the different

10             manner of keeping inventory of the logs that were

11             sold as part of the Mobile sale?

12                 I'm not sure there is anything else on here

13             that would identify this.

14     A.      It's a "USDA."  We don't export logs out of the

15             Pacific Northwest, so I would -- again, I don't

16             know, but I'm assuming it probably is because

17             that's the only exporting of logs we have done out

18             of the United States is the -- the southern logs,

19             and, otherwise, I don't know where they would

20             ever -- if this is referring to the logs, I mean,

21             it looks like it has log handlers and that type of

22             thing.  That would really be the only reason you

23             would have a USDA --

24     Q.      Right --

25     A.      -- phyto cert.
```

```
 1   Q.   And when you say "phyto cert," that's the
 2        phytosanitary certificate?
 3   A.   Certificate, yes.
 4   Q.   What's the purpose of that?
 5   A.   You have to certify that it's been heat treated or
 6        fumigated to make sure there is no bugs that are
 7        going overseas.
 8   Q.   This is another instance of some photographs that
 9        you can help me with.  I wondered if, when I saw
10        the Hampton references, that it was an American
11        transaction, but I'm going to hand you Exhibit 27
12        and see if you can identify for me whether this
13        is an American or a Canadian transaction that's
14        referenced to August 27, 2014.
15              (Exhibit No. 27 marked)
16   Q.   BY MR. SKERRITT:  And I apologize for -- if you go
17        back to the very first page, it looks like this
18        material is all at the stuffing terminal in
19        Portland waiting to be loaded in containers.  So
20        that would --
21   A.   This is all US material.  You see the Hampton paper
22        wrap.  You will see the American flag but not the
23        Canadian flag.
24   Q.   Okay.
25   A.   So that's your first kind of clue, and basically
```

```
 1          it's that same product.  I can tell by the heat

 2          treat and the WWPA stamp, it looks like.

 3   Q.     Thank you.

 4               (Exhibit No. 28 marked)

 5   Q.     BY MR. SKERRITT:  I'm going to hand you Exhibit 28,

 6          which is an email exchange between Lisa at CBMIE

 7          and Jennifer at Trapa, Canada.  It talks about --

 8          it gives a contract number.  And when the supplier

 9          is listed there as Trapa USA, that would refer to

10          export out of the US?

11   A.     Yes.  Sometimes the clerks, we have clerks in

12          Portland, and we have clerks -- most of the clerks

13          in Vancouver, and so sometimes they share

14          responsibilities back and forth, just doing the --

15          the bookkeeping.

16               So sometimes it's hard to tell, and I don't

17          know the individual clerks good enough to know, you

18          know, during all these periods where they were or

19          who they are, but, yes, this was Trapa US business.

20   Q.     Okay.  I have a document which did not have Bates

21          stamps on it, but there is a little tag that

22          someone put on there for me that says it was

23          Hampton 00382.  And it's a type of spreadsheet that

24          I would like to ask you about.  And if we can kind

25          of have you walk through with me very briefly --
```

```
 1              it's a pretty lengthy document -- how this document
 2              is used internally at Hampton.  This is Exhibit 29.
 3                   (Exhibit No. 29 marked)
 4   Q.  BY MR. SKERRITT:  I also wasn't able to see a date
 5              on this.  I had a few different copies of these,
 6              and I couldn't really tell when they were issued,
 7              but I decided to spare everyone and just use one
 8              copy.
 9                   First of all, do you know who generates this --
10              these spreadsheets?
11   A.  I don't know the name of the person.
12   Q.  Do you know which office would likely do it?
13   A.  Typically, this would be up at Trapa, our Vancouver
14              office.
15   Q.  Okay.  Is there any way, looking at this document,
16              to identify which of the transactions are --
17              originate for US exports as opposed to Canadian
18              exports?
19   A.  Not perfectly, but you can pretty much -- when you
20              look at -- like all the SPF comes out of Canada.
21              You have got hem fir, Doug fir.
22   Q.  When you are talking about -- is that in the column
23              "Description of Goods"?
24   A.  Yes, yes.
25   Q.  Okay.
```

Confidential - Subject to Further Confidentiality Review

```
 1    A.    And, you know, so this is a spreadsheet tracking

 2          all the -- all the business.  I don't, again, know

 3          if this is all CNBM business or not or whether

 4          it's -- it's -- there's other customers involved.

 5          It doesn't say.  But it's somebody's spreadsheet to

 6          track a bunch of export activity.  You can see all

 7          the different dates and sizes and products, and so

 8          it would be used as just kind of a tracking

 9          facility, how are we doing on certain things, when

10          are they coming.

11    Q.    You mentioned that the SPF would be Canadian, and

12          that's -- is that spruce?

13    A.    Spruce, pine and fir is what SPF, so, yes, that

14          would be Canadian.

15    Q.    And then HF, would that refer to hemlock?

16    A.    Yeah, hem fir, Doug fir is typically going to be

17          US, hem fir, US.  Ponderosa pine, the P pine, that

18          probably is -- that could be Ponderosa pine here in

19          the -- in the Northwest, or that could be -- I

20          mean, guessing that's -- that's Northwest.  I mean,

21          there is southern yellow pine in the South, so --

22          Pacific Albus is typically a US type of a -- of a

23          product.

24              You can see the pine logs again.  That's

25          probably referring to the southern yellow pine that
```

Confidential - Subject to Further Confidentiality Review

```
 1          we talked about before.

 2   Q.     That's from the second page?

 3   A.     Yes.  As I said, the Chinese were going through a

 4          lot of different products trying to figure -- and

 5          grades trying to figure out what fit the market

 6          over in China, so they bought a lot of different

 7          types of things, but the primary product is

 8          southern -- I mean SPF in Canada.  China buys huge

 9          volumes from -- from Canada and very little volumes

10          from the US, just because the SPF tends to be a lot

11          cheaper.  The lumber and logs up there are cheaper

12          than -- than US.  They tend to be looking for the

13          cheapest product.

14   Q.     If you go on to the attachments, there's a

15          spreadsheet which -- which tracks the phyto

16          certificate.

17   A.     It's the same group?

18   Q.     Yeah.  On the shorter pages.

19   A.     Um-hum (affirmative response).

20   Q.     Is there any way, looking at that page, that you

21          can identify -- those pages -- that you can

22          identify which certificates are issued by the US as

23          opposed to the Canadian government?

24   A.     Not from this spreadsheet, no.

25                    (Exhibit No. 30 marked)
```

```
 1    Q.    BY MR. SKERRITT:  I'm going to hand you a document

 2          that has been marked as Exhibit 30.  This, again,

 3          does not have Bates stamps on it, but it was

 4          generated, I guess, as a single label document,

 5          Hampton 000303.

 6              Did I write -- does one of them have -- I will

 7          trade you.  Sorry.

 8              Looking at Exhibit 30, can you tell me what

 9          this was used for, this particular document?

10    A.    It's just another spreadsheet where somebody is

11          kind of tracking activity.

12    Q.    One of the things you testified about Exhibit 29,

13          that you weren't sure whether this listed sales to

14          customers other than CNBM.  If you look at about

15          the fourth, fifth page in, it looks like there is

16          an email showing that a copy is going to two

17          individuals from CBMIE.

18              Do you see that?

19    A.    No, I don't.  One, two --

20    Q.    It's the fifth page in.  There is a --

21    A.    Oh, I got you.

22    Q.    So do you know whether there was a regular

23          reporting protocol where copies of the reports or

24          spreadsheets like this were sent to CNBM by either

25          Hampton or Trapa?
```

```
 1   A.   I don't.

 2   Q.   When we sent the notice of your deposition, we

 3        attached a copy of the order of the judge that --

 4        of Judge Fallon that had some restrictions on

 5        business that affiliates of Taishan could do in the

 6        United States until a contempt matter was resolved.

 7             Were you ever made aware of that contempt order

 8        by anyone from CNBM?

 9   A.   No.

10   Q.   Do you know whether anyone else in your

11        organization, either Canadian or American, was made

12        aware of that?

13   A.   No.

14   Q.   So is it fair to say that you had no knowledge of

15        it until you got involved in our request for the

16        deposition?

17   A.   Correct.

18   Q.   Is the US arm of Hampton Affiliates, any of the

19        companies in Hampton Affiliates continuing to do

20        business with CNBM today?

21   A.   Yes.

22   Q.   Can you give me some indication of the volume of

23        the business that you are doing?

24   A.   I would say it's -- it's much less than what you

25        are seeing here for the period -- the relevant
```

Confidential - Subject to Further Confidentiality Review

```
 1          period, as you have defined it.  It's probably 25

 2          percent of that level, maybe even lower.  We aren't

 3          shipping any southern yellow pine logs.  So out of

 4          the US, it would be an occasional, you know,

 5          economy -- I mean, like I said, the Chinese market

 6          is very slow, and so it's not a particularly

 7          lucrative type of business, so we use it to

 8          sometimes get rid of some low grade and that type

 9          of thing out of our US mills, but I would say it's

10          very, very small.

11     Q.   And do you recall when the most recent visit to the

12          United States was from any representatives of CNBM,

13          where they visited Hampton?

14     A.   I believe it was the one you referred to -- was it

15          in November 2014? -- which I wasn't at.

16          MR. SKERRITT:  Thank you.  That's all I have.

17                         EXAMINATION

18     BY MR. CRUZ:

19     Q.   Mr. Zika, I just have a few questions.

20          Mr. Skerritt at the beginning of the deposition

21          referred to "CNBM," and he defined it as China

22          National Building Materials Group Company.

23          And I just want to clarify and make certain

24          that when he has referred to "CNBM" throughout the

25          course of this deposition, that China National
```

```
 1             Building Materials Group Company is the entity that

 2             you understood him to be referring to.  Is that

 3             correct?

 4     A.    Yes.

 5     Q.    Okay.  And there were a couple of other entities

 6             that have been mentioned throughout the deposition

 7             or that are identified in some of the documents;

 8             the most recently was attached to -- I believe it

 9             was Exhibit 30.  There is a reference to "CBMIE."

10                  Without speculating, do you have any

11             understanding of the relationship between CNBM as

12             we've defined it and CBMIE?

13     A.    I don't.

14     Q.    Okay.  One of the other references was Exhibit 17.

15             It states on the front "sold to CNBM Forest

16             Products Canada, Limited."

17                  Again, without speculating, do you have any

18             understanding of the relationship between CNBM

19             Forest Products Canada, Limited and CNBM, as we

20             have defined it here today?

21     A.    Can you show me which exhibit you're talking about?

22     Q.    Of course.  It's Exhibit number 17 that

23             Mr. Skerritt marked.  It's a sales order XB 513.

24     A.    You're referring to CNBM Forest Products Canada,

25             Limited?
```

```
 1   Q.   Correct.

 2   A.   I know that's a CNBM entity.  I don't know the

 3        relationship between CNBM, this entity, and the

 4        CNBM in China.  My understanding is this was the

 5        office that they opened up for a short period of

 6        time in Vancouver, but I don't know the legal, you

 7        know, how the companies connect with it or are

 8        affiliated or a parent or sub or anything like

 9        that.

10   Q.   Right.  And you wouldn't know who makes business

11        decisions on behalf of the CNBM Forest Products

12        Canada, Limited versus CNBM?

13   A.   I don't personally.

14   Q.   Okay.  And then one further entity that's on

15        Exhibit number 15 listed as commercial invoice on

16        the top, and it references Shanghai Jianpu Import

17        and Export Company, Limited?

18   A.   Yes.

19   Q.   And, again, the same question, without speculating,

20        do you have any personal knowledge of the

21        relationship between Shanghai Jianpu Import and

22        Export Company, Limited and CNBM, as we have

23        defined it here today?

24   A.   My only knowledge is that this is some related

25        entity to CNBM, whether a sister or affiliate or
```

```
 1        whatever, that handles a lot of the letters of

 2        credit for CNBM.

 3   Q.   And you don't have any personal knowledge as to the

 4        operation or control of either of the two entities.

 5        Is that correct?

 6   A.   Correct.

 7   Q.   All right.  Thank you very much for your time.

 8             MR. COURSER:  I have no questions.

 9             MR. SKERRITT:  Kate, are you still there?  Do

10        you have any questions?

11             MS. RUMSEY:  I am still here.  No questions on

12        our end.

13             MR. SKERRITT:  Thank you.

14             MS. RUMSEY:  Thank you.

15             (DEPOSITION ADJOURNED at 10:23 a.m.)

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
1              C E R T I F I C A T E

2

3          I, Julie A. Walter, CSR No. 90-0173, do

4     hereby certify that STEVEN ZIKA personally appeared

5     before me at the time and place mentioned in the

6     caption herein; that the witness was by me first

7     duly sworn on oath, and examined upon oral

8     interrogatories propounded by counsel; that said

9     examination, together with the testimony of said

10    witness, was taken down by me in stenotype and

11    thereafter reduced to typewriting; and that the

12    foregoing transcript, Page 1 to 61, both inclusive,

13    constitutes a full, true and accurate record of

14    said examination of and testimony by said witness,

15    and of all other oral proceedings had during the

16    taking of said deposition, and of the whole

17    thereof, to the best of my ability.

18          Witness my hand as Certified Shorthand

19    Reporter at Portland, Oregon, this 19th day of May,

20    2015.

21

22    _____

23                Julie A. Walter

24                CSR No. 90-0173

25
```

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8              After doing so, please sign

 9    the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                  -   -   -   -   -   -

 2                    E  R  R  A  T  A

 3                  -   -   -   -   -   -

 4

 5     PAGE   LINE   CHANGE

 6     _____  _____  _____

 7        REASON:   _____

 8     _____  _____  _____

 9        REASON:   _____

10     _____  _____  _____

11        REASON:   _____

12     _____  _____  _____

13        REASON:   _____

14     _____  _____  _____

15        REASON:   _____

16     _____  _____  _____

17        REASON:   _____

18     _____  _____  _____

19        REASON:   _____

20     _____  _____  _____

21        REASON:   _____

22     _____  _____  _____

23        REASON:   _____

24     _____  _____  _____

25        REASON:   _____
```

Confidential - Subject to Further Confidentiality Review

```
 1            ACKNOWLEDGMENT OF DEPONENT

 2

 3            I,_____, do

 4    hereby certify that I have read the

 5    foregoing pages, and that the same is

 6    a correct transcription of the answers

 7    given by me to the questions therein

 8    propounded, except for the corrections or

 9    changes in form or substance, if any,

10    noted in the attached Errata Sheet.

11

12

13    _____

14     STEVEN ZIKA                       DATE

15

16

17    Subscribed and sworn

18    to before me this

19    _____ day of _____, 20____.

20    My commission expires:_____

21

22    _____

23    Notary Public

24

25
```

1                    LAWYER'S NOTES

2        PAGE   LINE

3        _____  _____   _____

4        _____  _____   _____

5        _____  _____   _____

6        _____  _____   _____

7        _____  _____   _____

8        _____  _____   _____

9        _____  _____   _____

10       _____  _____   _____

11       _____  _____   _____

12       _____  _____   _____

13       _____  _____   _____

14       _____  _____   _____

15       _____  _____   _____

16       _____  _____   _____

17       _____  _____   _____

18       _____  _____   _____

19       _____  _____   _____

20       _____  _____   _____

21       _____  _____   _____

22       _____  _____   _____

23       _____  _____   _____

24       _____  _____   _____

25       _____  _____   _____

Confidential - Subject to Further Confidentiality Review

Page 64

1                    -   -   -   -   -   -

2                       E   R   R   A   T   A

3                    -   -   -   -   -   -

4

5     PAGE   LINE   CHANGE

6     ____   ____   _____

7          REASON:   _____

8     ____   ____   _____

9          REASON:   _____

10    ____   ____   _____

11         REASON:   _____

12    ____   ____   _____

13         REASON:   _____

14    ____   ____   _____

15         REASON:   _____

16    ____   ____   _____

17         REASON:   _____

18    ____   ____   _____

19         REASON:   _____

20    ____   ____   _____

21         REASON:   _____

22    ____   ____   _____

23         REASON:   _____

24    ____   ____   _____

25         REASON:   _____

Confidential - Subject to Further Confidentiality Review

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3                I,  Steven J. Zika      , do

 4      hereby certify that I have read the

 5      foregoing pages, and that the same is

 6      a correct transcription of the answers

 7      given by me to the questions therein

 8      propounded, except for the corrections or

 9      changes in form or substance, if any,

10      noted in the attached Errata Sheet.

11

12

13      _____      5/27/15

14      STEVEN ZIKA                      DATE

15

16

17      Subscribed and sworn

18      to before me this

19      29  day of  May       , 20 15 .

20      My commission expires:    10/21/17

21

22      _____

23      Notary Public
```

OFFICIAL STAMP
NIKKI COMMERFORD
NOTARY PUBLIC-OREGON
COMMISSION NO. 920794
MY COMMISSION EXPIRES OCTOBER 21, 2017

```
24

25
```