Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

                   EASTERN DISTRICT OF LOUISIANA

 2

 3

                                    )

 4                                  )

      IN RE: CHINESE-MANUFACTURED   ) MDL NO. 2047

 5    DRYWALL PRODUCTS LIABILITY     )

      LITIGATION                     ) SECTION: L

 6                                  )

                                    ) JUDGE FALLON

 7    THIS DOCUMENT APPLIES TO ALL CASES )

                                    ) MAG. JUDGE WILKINSON

 8                                  )

 9                                  )

10

11

12

13            CONFIDENTIAL - SUBJECT TO FURTHER

14                 CONFIDENTIALITY REVIEW

15

16

17

18      VIDEOTAPED DEPOSITION OF ROSEMARY DASZKIEWICZ

19

20

21

22                     April 16, 2015

23                   Seattle, Washington

24

25
```

**CONTEMPT**
**Exhibit 121**

```
 1                  APPEARANCES
 2   For the Plaintiffs:
 3              Daniel H. Skerritt, Esq.
               Tonkon Torp LLP
 4              888 SW Fifth Avenue
               Pioneer Tower, Suite 1600
 5              Portland, OR  97204
               503.221.1440
 6              dan.skerritt@tonkon.com
 7
     For CNBM Group:
 8
               Jonathan "J.R." Riddell, Esq.
 9              Orrick Herrington & Sutcliffe LLP
               400 Capitol Mall
10              Suite 3000
               Sacramento, CA  95814-4497
11              916.447.9200
               jriddell@orrick.com
12
13   For Taishan Gypsum:
14              Mackenzie "Mack" Kahnke, Esq.
               Alston & Bird LLP
15              1201 West Peachtree Street
               Atlanta, GA  30309-3424
16              404.881.7000
               mackenzie.kahnke@alston.com
17
18
     For BNBM PLC and BNBM Group Co., LTD.:
19
               Adam Pierson, Esq.
20              Dentons US LLP
               2000 McKinney Avenue
21              Suite 1900
               Dallas, TX  75201-1858
22              214.259.0900
               adam.pierson@dentons.com
23
24
     Also present:  Ed Burke, Videographer
25
```

Confidential - Subject to Further Confidentiality Review

```
 1                    EXAMINATION INDEX

 2     EXAMINATION BY:                         PAGE NO.

 3   MR. SKERRITT                                  5

 4

 5                     EXHIBIT INDEX

 6     EXHIBIT NO.    DESCRIPTION               PAGE NO.

 7

 8   Exhibit No. 1    35-page notice of oral and    10

                      videotaped deposition.

 9

     Exhibit No. 2    2-page memorandum of          11

10                    understanding in English.

11   Exhibit No. 3    2-page memorandum of          11

                      understanding in a foreign

12                    language.

13   Exhibit No. 4    3 pages of web material with  12

                      screen shots, "CBMIE signed

14                    strategic agreement with

                      Sumitomo Forestry Co., Ltd. and

15                    Plum Creek Timber Inc."

16   Exhibit No. 5    3-page transaction document   23

                      from Plum Creek to Sumitomo

17                    Forestry Seattle Inc.

18   Exhibit No. 6    4-page log sale agreement.    24

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                    BE IT REMEMBERED that on Thursday,

 2      April 16, 2015, at 1201 Third Avenue, Suite 3200,

 3      Seattle, Washington, at 9:35 a.m., before Terilynn

 4      Pritchard, Certified Court Reporter, CCR, RMR, CRR, CLR,

 5      appeared ROSEMARY DASZKIEWICZ, the witness herein;

 6                    WHEREUPON, the following proceedings

 7      were had, to wit:

 8

 9                         <<<<<< >>>>>>

10

11                    VIDEOGRAPHER:  We are now on the

12      record.  My name is Ed Burke.  I am a videographer for

13      Golkow Technologies.

14          Today is April 16th, 2015, and the time is 9:35 a.m.

15          This is the video deposition that is being taken in

16      Seattle, Washington in the matter of In Re

17      Chinese-Manufactured Drywall Products Liability

18      Litigation for the U.S. District Court, Eastern District

19      of Louisiana.

20          The deponent is Rosemary Daszkiewicz, and if Counsel

21      could please identify yourselves, and we'll start on my

22      right.

23                    MR. RIDDELL:  J.R. Riddell on behalf

24      of CNBM Group.

25                    MS. KAHNKE:  I am Mack Kahnke on
```

Confidential - Subject to Further Confidentiality Review

```
 1       behalf of Taishan.

 2                     MR. SKERRITT:  Dan Skerritt for the

 3       plaintiffs.

 4                     VIDEOGRAPHER:  And the court reporter,

 5       Teri Pritchard, will now swear in the witness.

 6

 7       ROSEMARY DASZKIEWICZ,   having been first duly affirmed

 8                         by the Certified Court Reporter,

 9                         testified as follows:

10

11                         EXAMINATION

12       BY MR. SKERRITT:

13   Q   Ms. Daszkiewicz, could you spell your last name for the

14       record, please?

15   A   D-A-S-Z-K-I-E-W-I-C-Z.

16   Q   Thank you.

17           And I understand that you are the witness under Rule

18       30(b)(6) for Plum Creek in this deposition?

19   A   Correct.

20   Q   Can you tell us what your position is with Plum Creek?

21   A   My title is senior director, comma, law.

22   Q   Okay.  Can you just give us a very brief description of

23       what all your job responsibilities are?

24   A   Sure.

25           I report to our general counsel.  I serve as the
```

Confidential - Subject to Further Confidentiality Review

```
 1        primary legal resource for our manufacturing operations

 2        in Montana, for our HR group.

 3            I handle privacy compliance, Internet security, and

 4        I oversee the company's litigation, other than a

 5        colleague of mine out of Atlanta oversees litigation in

 6        the southern states.

 7            There are other things, but that's kind of the bulk

 8        of my responsibilities.

 9            Oh, relevant here, I'm also in charge of records.

10   Q    Do you also have responsibility in contract

11        administration?

12   A    Not administration so much.

13            We expect our business groups to administer their

14        own contracts.

15            We certainly-- we have form contracts, and we help

16        them negotiate when terms are challenged, or if it's a

17        contract that just-- you can't use a form contract for,

18        we will get involved and help our business units

19        negotiate.

20   Q    Do you have a system in place to keep track of the

21        various contracts, especially for timber sales, lumber

22        sales, or log sales that the company has?

23   A    We have a records retention schedule that has a records

24        category that would cover timber sale contracts, and we

25        expect that our operations folks recognize that and
```

Confidential - Subject to Further Confidentiality Review

```
 1      follow it, and it is a ten-year bucket.

 2   Q  Plum Creek is quite a large company.

 3         Can you tell me what systems are in place to make

 4      sure that central records keeping gets copies of all

 5      relevant contracts?

 6   A  We don't get-- there is no central records keeping that

 7      gets copies of all relevant contracts.

 8         Right now, although we are moving to SharePoint, we

 9      are primarily a paper-based records retention system, and

10      so we expect our operational units to retain their

11      contracts for the necessary period of time.

12   Q  Can you describe for us what steps were taken within the

13      company to respond to the notice of the subpoena,

14      including the documents that were requested to be

15      produced for the deposition today?

16   A  Sure.

17         I don't remember when I got that, but within a week

18      after getting it, I-- from my company's perspective, it

19      is an incredibly broad subpoena, and so I asked our

20      accounts payable, accounts receivable folks to go through

21      the list of entities and identify any entities that we

22      had done business with, and I-- at least in the more

23      recent years.

24         I believe that the subpoena wanted us to go back to

25      2001, which was, from my perspective, too broad.
```

```
 1              I had that conversation, and my colleague, in

 2         accounts receivable, Donna Bolender, provided me the

 3         documents that I provided to you with respect to Sumitomo

 4         that she happened to have, for an unrelated reason.

 5              After that, I had a conversation with Jerry Meunier,

 6         and Jerry told me that he-- that folks were really

 7         focusing on events since, I believe, July of 2014, when a

 8         stay of-- that I don't know the details of, happened, and

 9         so he said that-- he and I had a discussion about the

10         depth of the document request, and he said that really

11         what he was focusing on and wanted me to focus on was

12         interactions that happened since 2014, July of 2014 or

13         June, and he brought to my attention a website-- a

14         picture on a website.

15              He asked me to look into that as well.

16    Q    When did this conversation with Mr. Meunier take place?

17    A    Sometime between the day I received the subpoena and

18         today.

19    Q    And how far back in time did your search with your

20         records person, Donna, that you mentioned--

21    A    I will look at my notes and tell you the answer of what I

22         asked her to do.

23              Actually, I asked her to look at whether we've done

24         business with the laundry list of entities between 2001

25         and the present.
```

Confidential - Subject to Further Confidentiality Review

```
 1           Now, that said, I don't remember when we switched

 2      accounting systems, and it might have been 2004, so as a

 3      practical matter, she might have only looked to 2003,

 4      2004.

 5   Q  So as far as you know, the document search did go that

 6      far back in 2004 and wasn't limited to mid 2014 going

 7      forward?

 8   A  So I didn't ever actually do a document search.

 9           I got the information from Donna, and then based on

10      my follow-up conversation with Jerry, I didn't do a-- I

11      didn't make any attempt to figure out whether any of our

12      resources units had any contracts from the dawn of time

13      or from 2001 until-- forward.

14   Q  But is it your assumption that if there had been

15      responsive contracts from 2004 on, that Donna would have

16      brought them to your attention?

17   A  No, but it is my assumption that if there had been

18      payments to or from any of the entities, from 2004 to the

19      present, she would have brought that to my attention.

20   Q  So the way you-- the methodology you used to develop the

21      response was to look to see what consideration had been

22      paid to or from somebody?

23   A  Right.

24           I figured that was the way to be most efficient and

25      that would allow me to hone down, if I needed to do any
```

Confidential - Subject to Further Confidentiality Review

 1       follow-up, where I would need to do any follow-up.

 2  Q   I am going to have marked as Exhibit No. 1 the notice of

 3       deposition.

 4                              (Exhibit No. 1 marked for

 5                               identification.)

 6

 7  Q   (By Mr. Skerritt)  In the notice of deposition, if you go

 8       past the notice, there's a schedule of definitions and

 9       instructions, which is Schedule A.

10           On Page 10 of 35, and you can see up at the top

11       right-hand corner, it begins a list of entities related

12       to Taishan.

13           Is that the laundry list of companies that you are

14       referring to when you gave this information to Donna to

15       check for payables or receipts?

16  A   In part.

17           I also asked her to check the SOEs that begin on

18       Page 12 and go to Page-- whatever it goes to-- 20.

19  Q   Thank you very much.

20           Then on Page 24 of 25 there's a list of documents to

21       be produced.

22           Did you give her a copy of that as well?

23  A   I did indeed forward to her an electronic copy of the

24       entire packet, Exhibit No. 1, but I did not ask her to

25       produce any documents.

Confidential - Subject to Further Confidentiality Review

1  Q  And when you-- you had some documents, which you-- let me

2     back up.

3        Did you forward some documents to Mr. Meunier prior

4     to today's deposition?

5  A  Yes.

6  Q  And can you tell me what those documents were?

7  A  Yes.

8        They are copies of a document that my CEO signed,

9     one in English and one in another language that I don't

10    recognize.

11 Q  And I am going to mark, as Exhibits No. 2 and 3, to be an

12    English language version of a document that's referred to

13    as a memorandum of understanding, and then a second

14    document, which is in-- it looks like either perhaps

15    Chinese or Japanese, and after the court reporter has

16    marked them, I would like to have you identify whether

17    those are the documents you sent to Mr. Meunier.

18                        (Exhibit No. 2 & 3 marked

19                           for identification.)

20

21                THE WITNESS:  Yes, these are the

22    documents I e-mailed to Mr. Meunier.

23                MR. RIDDELL:  I'm sorry, before we

24    move forward, can we make sure-- I know I had a copy of

25    one of the documents, but do you have copies of the

Confidential - Subject to Further Confidentiality Review

```
 1        documents that were marked?

 2                    MR. SKERRITT:  This is an English

 3        version of it.

 4        Exhibit No. 2, the English version of the memorandum

 5        of understanding.

 6        Then Exhibit No. 3 is the-- Exhibit No. 3 is the one

 7        that's in the Chinese or other Asian language version.

 8   Q    (By Mr. Skerritt)  Is that correct?

 9   A    Yes.

10   Q    You also mentioned that Mr. Meunier had located a web

11        page, which he asked you to look into.

12        I am going to mark as Exhibit No. 4 a document,

13        which I believe is the web page that you were referring

14        to with screenshots of something taken off of the

15        Internet.

16                    (Exhibit No. 4 marked for

17                    identification.)

18

19   Q    (By Mr. Skerritt)  Can you tell us whether Exhibit No. 4

20        is the web page material that Mr. Meunier brought to your

21        attention?

22   A    Yes, it is.

23   Q    And he said that he asked you to look into it.

24        Can you tell us what you did in response to that

25        request, after you received a copy of Exhibit No. 4?
```

Confidential - Subject to Further Confidentiality Review

```
1   A   Well, I contacted folks beneath my CEO to ask if they had
        any information about this trip.
2
3           I looked on our own website to see if this-- any
4       events had been-- this event had been mentioned on our
5       own website or we had done some sort of a press release.
6           I talked to our communications folks to see if there
7       had been something on the website that had somehow come
8       down.
9           Then when all of that proved fruitless, I reached
10      out to my CEO to ask him for his recollection.
11  Q   And did you do that?
12  A   I did it.
13  Q   And what did you learn from him?
14  A   I am going to grab my notes so I don't miss anything.
15          Rick Holley, my CEO, told me that he went to China,
16      he was hosted by Sumitomo Forestry, and Sumitomo Forestry
17      introduced us-- him to the China company.
18          He met with Kao (phonetic) who at that point-- Ken
19      Kao, I believe was his name--
20  Q   Can you spell the last name?
21  A   No.
22           I guessed it as K-A-O, but I don't know that for
23      sure.
24          Mr. Kao was a senior-level person in Sumitomo who we
25      had had some dealings with or Mr. Holley had had some
```

Confidential - Subject to Further Confidentiality Review

```
 1        dealings with, and other senior people there as well.

 2            He recalled, although he wasn't certain, that they

 3        had meetings in Shanghai and also Beijing, and then near

 4        the end of the trip they had this ceremonial thing where

 5        they signed what was titled a memorandum of

 6        understanding.

 7   Q    That's Exhibit No. 2?

 8                        MR. RIDDELL:  Can we-- I'm sorry, I

 9        just got an e-mail indicating Dentons is trying to dial

10        into the deposition.

11                        COURT REPORTER:  Can we go off?

12                        VIDEOGRAPHER:  We are going off

13        record.  The time is 9:49 a.m.

14                            (Recess 9:49 to 9:56 a.m.)

15

16                        VIDEOGRAPHER:  We are back on record.

17        The time is 9:56.

18                        MR. SKERRITT:  We have had another

19        counsel join us by telephone.

20            Could you identify yourself and say your name and

21        the party you're representing for the record, please?

22                        MR. PIERSON:  This is Adam Pierson

23        from Dentons U.S. LLP representing Beijing New Building

24        Material Public Limited Company and Beijing New Building

25        Material Group Company Limited.
```

1                          MR. SKERRITT:  Thank you.

2    Q   (By Mr. Skerritt)  Ms. Daszkiewicz, you were--

3                          MR. RIDDELL:  Sorry, one-- Adam, just

4        to be clear-- this is J.R. Riddell.

5            You said you're representing BNBM Public Limited

6        Company and BNBM Group Company Limited; is that correct?

7                          MR. PIERSON:  That's correct.

8                          MR. RIDDELL:  All right.  Thank you.

9                          MR. SKERRITT:  Thank you.

10   Q   (By Mr. Skerritt)  Ms. Daszkiewicz, before we took the

11       last break, you were describing to us the information

12       that was provided to you by Plum Creek's CEO regarding

13       the background of the meeting that led to the memorandum

14       of understanding that we had marked as Exhibits 2 and 3.

15           Could you-- do you have additional information to

16       provide in response to the background of that meeting,

17       what you were told by your CEO?

18   A   Yes.

19   Q   Please go ahead.

20   A   I believe I was at the point where Rick conveyed, at the

21       end of the meetings that they had, there was a ceremonial

22       signing of the documents that are identified as Exhibit

23       No. 2 or 3, which Rick's recollection was, was a

24       commitment to work on a strategic alliance regarding the

25       North American log business.

Confidential - Subject to Further Confidentiality Review

 1       Rick then followed up-- Rick then told me that

 2    nothing had come of the agreement, that he had-- nothing

 3    had come of the agreement, and that while there may have

 4    been some conversation, nothing had occurred.

 5       I then specifically asked him if he had any meetings

 6    on this matter in the last two years, and he said, "No."

 7                    MR. RIDDELL:  I am going to object on

 8    the-- as hearsay and move to strike hearsay statements.

 9                    MR. SKERRITT:  Your objection is

10    noted.  Thank you.

11  Q  (By Mr. Skerritt)  Did you have any further conversation

12    with him?

13  A  Yes.

14       After I spoke to Mr. Meunier, and he asked if we had

15    copies of the documents, and I said that I didn't know, I

16    reached out to Rick again and asked if he had any copies

17    and if I could do anything to help facilitate locating

18    them.

19       He was on the road at that point of time and had

20    been for a couple of weeks.

21       He said he didn't know if he did, but he would be

22    the only one to find them in his office, and so when he

23    returned to the office on that Monday or Tuesday of the

24    last days of March, I came into my office one day to find

25    the Naugahyde binders with Exhibit No. 2 and 3 on my desk

Confidential - Subject to Further Confidentiality Review

1    with a little note that said, "From Rick."

2  Q  The binders did not include any information.  They just

3     were housing the documents?

4  A  Right.

5        They were ceremonial binders, was my guess, but that

6     was just a guess on my part.

7  Q  Right.  And you brought the original with you today, and

8     we actually copied one of the documents from that?

9  A  Yes, you did.

10 Q  When you-- let me ask you, in your capacity as the Rule

11    30(b)(6) representative of the company, have you been

12    able to make any determination whether there was any

13    business activity within the company with any of the

14    entities that were listed, aside from your discussion

15    with the CEO?

16                    MR. RIDDELL:  Object to the form of

17    the question.

18                    THE WITNESS:  Yes, I did.

19 Q  (By Mr. Skerritt)  Okay.  And what did you learn?

20 A  I learned that over the years, and I believe most

21    recently in 2011, we have, from time to time, sold logs

22    for export to a Sumitomo entity.

23       I learned that we have-- that Devon Energy has been

24    a lease customer of our energy and natural resources

25    business.

Confidential - Subject to Further Confidentiality Review

1   Q   Is Devon one of the listed companies?

2   A   I discovered this morning that indeed it is.

3           It is-- they're not sorted alphabetically, but as I

4       recall, it's on-- I'm sorry, I can't remember now if they

5       are-- which of the two lists they're on.

6           They're on Page 18 of 35, three from the bottom, of

7       Exhibit No. 1.

8   Q   Okay.  And what type of commerce was Plum Creek doing

9       with Devon?

10  A   They would have had a lease to exploit an energy resource

11      on our land.

12  Q   During what period?

13  A   Because I just discovered that this morning, the best

14      that I could do was determine that the last payment that

15      we received from Devon Energy was January 15th of 2014,

16      and Ben Dow, our accountant, for our E&R group, recalls

17      that another entity, Cross Timbers Energy, has taken over

18      the lease, so we no longer have a lessee relationship

19      with Devon.

20  Q   Did you bring copies of the lease with you or have you

21      had them produced for the deposition today?

22  A   No.

23  Q   I would request that when you return to your office, if

24      you would, that you provide us with a copy of that lease.

25  A   As I told to Jerry Meunier, I have concerns about the

Confidential - Subject to Further Confidentiality Review

1      breadth of the subpoena and the time frames, and he, in

2      turn, told me that we could focus on the period of time

3      from July to the present, July of 2014.

4          As a third-party entity, I have concerns about being

5      asked to try to respond to a subpoena of this breadth

6      comprehensively and would need, in all likelihood, to ask

7      our outside counsel to file a protective order--

8   Q  Well, I am still making the request and ask that you do

9      it.

10         I believe that it's within the scope of the

11     subpoena.

12         I understand that we have a short time frame, but

13     one specific entity here is not-- doesn't seem to be that

14     broad, asking for one lease with the responsive company.

15         The request is made, and we can-- if necessary, the

16     parties can take that up with the judge.

17         Do you know-- when you say that you now have-- that

18     the lease was taken over by-- was it Cross Timbers

19     Energy?  Is that what you said?

20  A  Yes, Cross Timbers Energy.

21  Q  Do you know when that transfer took place, as far as the

22     lessee's interest?

23  A  No.  That, I do not know.

24  Q  Do you know what type of an energy project this was that

25     Devon Energy was developing?

Confidential - Subject to Further Confidentiality Review

```
 1   A   I do not know that.

 2   Q   You don't know whether it was thermal or any other type?

 3   A   I don't believe we have any thermal energy resources in

 4       our company.

 5   Q   Do you know when the lease was entered into?

 6           I think you gave me the date of the last payment you

 7       were aware of, which was January 15th, 2014, but have

 8       you-- are you aware of the inception date for the lease

 9       between Plum Creek and Devon Energy Corp.?

10   A   I am not.

11   Q   Do you know the amount of the lease payment that was made

12       on January 15, 2014?

13   A   $1,854.27.

14   Q   And do you know what time period that covered, whether it

15       was a month or some other quarterly or what timespan that

16       lease payment was for?

17   A   I don't.

18   Q   You've been referring to some notes in response to the

19       request.

20           I would like to have your notes and the e-mails that

21       you have referred to marked as exhibits for the

22       deposition.

23   A   And I am here as a 30(b)(6) deponent, and my view is that

24       my job is to convey to you the information that I

25       collected from my company, and that the process of
```

Confidential - Subject to Further Confidentiality Review

```
 1       collecting that information is protected by the

 2       attorney-client or work product privilege, so I will not

 3       allow you to see my notes or my e-mails with my

 4       colleagues.

 5                       MR. SKERRITT:  Okay.  Just for the

 6       record, my position is that when a witness refers to

 7       documents for refreshing their recollection during a

 8       deposition, that they then lose their privilege and we

 9       are entitled to have them, but I understand that you are

10       not going to produce them today, based on an

11       off-the-record conversation that we had, but I have made

12       the request, and that's likely something that we can take

13       up.

14                       THE WITNESS:  Yeah.

15   Q   (By Mr. Skerritt)  I want to make sure that you've

16       completed your response because you talked about the

17       meeting that the CEO had with the representatives of

18       Sumitomo and China National, and then you found out that

19       there was an additional amount of money that was paid to

20       the company by Devon Energy Corp.

21           Have you learned anything else about additional

22       business that was done by Plum Creek with any of the

23       entities described as affiliates of Taishan or the

24       state-owned entities?

25   A   Other than the Sumitomo Forestry, no.
```

```
 1   Q   Right.

 2           By the way, when you were talking with the CEO, did

 3       he describe for you the relationship between Sumitomo and

 4       Plum Creek and China National that led to the memorandum

 5       of understanding?

 6   A   As he explained to me, the-- Sumitomo, which we had done

 7       business with for some time, had arranged this

 8       introduction, this meeting.

 9           We believed, obviously, it would be in Plum Creek's

10       best interests were we able to export southern yellow

11       pine, which is a particular type of tree grown in the

12       south, to China, and that would have been beneficial to

13       us, and I presume also to Sumitomo, as an exporter.

14   Q   I was going to ask, under the memorandum of understanding

15       were Sumitomo and Plum Creek both in the business of

16       exporting or was it anticipated that Plum Creek would do

17       business with China National through Sumitomo?

18                       MR. RIDDELL:  Object to the form.

19                       THE WITNESS:  I don't know the answer

20       to that.

21           I do know that we tend to export through U.S. based

22       entities.

23   Q   (By Mr. Skerritt)  So the practice that Plum Creek has,

24       if you export logs, for example, you would normally not

25       sell directly to the foreign buyer, but instead would
```

Confidential - Subject to Further Confidentiality Review

```
 1        sell to a domestic entity, and that entity would be the

 2        exporter?

 3   A    Yes, as a general rule.  Yes.

 4   Q    And Sumitomo, although I think it's probably related to a

 5        Japanese trading company, in fact the entity that's

 6        involved in the memorandum of understanding, is that a

 7        domestic arm of Sumitomo?

 8   A    I don't know who Sumitomo Forestry Company LTD is, but

 9        the LTD-- Limited, suggests to me that they are not

10        United States based.

11   Q    But there's also a Sumitomo Forestry Seattle Inc.?

12   A    Correct.

13   Q    To your knowledge is that a domestic U.S. corporation?

14   A    I believe so.

15   Q    In response to the notice, you located and brought with

16        you a document indicating a transaction with Sumitomo

17        Forestry Seattle Inc., and I would like to have that

18        marked as Exhibit No. 5, please.

19                              (Exhibit No. 5 marked for

20                               identification.)

21

22   Q    (By Mr. Skerritt)  Also, at the same time, there is a log

23        sale agreement that goes along with the same transaction.

24        Let's mark that as Exhibit No. 6.

25        They are related documents.
```

Confidential - Subject to Further Confidentiality Review

```
 1                              (Exhibit No. 6 marked for

 2                               identification.)

 3

 4    Q   (By Mr. Skerritt)  Ms. Daszkiewicz, could you verify for

 5        us that Exhibit No. 5 and 6 are the documents I just

 6        described that relate to a transaction between Plum Creek

 7        and Sumitomo Forestry Seattle Inc.?

 8    A   Correct, yes, they are.

 9    Q   And Exhibit No. 5 is a-- can you tell me what Exhibit

10        No. 5 is?

11    A   Exhibit No. 5 is an internal document that we generate

12        that obtains-- it allows our accounts receivable group

13        to-- it's credit approval, is the short of it.

14    Q   Okay.  And Exhibit No. 6, can you identify what that is?

15    A   Exhibit No. 6 is a log sale agreement between Plum Creek

16        Marketing Inc. and Sumitomo Forestry Seattle Inc.

17    Q   And this identifies that company as a Washington

18        corporation; is that correct?

19    A   Yes, it does.

20    Q   Do you know whether Sumitomo was, in turn, exporting the

21        products that were sold under this log sale agreement

22        overseas?

23    A   We believe they were.

24            That was our understanding.

25    Q   And do you know who they were doing business with on the
```

Confidential - Subject to Further Confidentiality Review

1      other end?

2  A   No.

3                    MR. RIDDELL:  Lacks foundation, calls

4      for speculation.

5                    THE WITNESS:  Sorry.

6        No.

7  Q   (By Mr. Skerritt)  You don't know whether or not it may

8      have been anyone related to the China National or

9      Taishan-affiliated companies?

10 A   I don't know-- we don't know.

11 Q   Is this the only Sumitomo Forestry Seattle Inc. business

12     transaction that you were able to discover in your

13     efforts to pull together the documents in response to the

14     deposition notice?

15 A   Yes, but I did not go back further in time, and my

16     understanding is that in the era of the spotted owl,

17     which would have been the mid '90s, and maybe even early

18     2000s, there was more export than there is today, and it

19     may well have included Sumitomo Forestry.

20 Q   Is it your understanding that you have all of the

21     Sumitomo transactions that post date the date in

22     September of 2011 when the memorandum of understanding,

23     that's Exhibit No. 2, was signed?

24 A   Yes, I do.

25 Q   And so this-- there are no more, other than this one, as

```
 1        far as you are aware?

 2   A    Correct.

 3   Q    Are you aware of any other business transactions with any

 4        of the entities that were listed as Taishan affiliates or

 5        state-owned entities, in addition to the ones that you

 6        have already testified about, which included the Devon

 7        Energy Corp.?

 8   A    I can't remember how you asked the question, but my

 9        answer is that these are the only two that I'm aware of.

10   Q    If you could turn to-- on Exhibit No. 1, which is the

11        notice, there's a list of deposition topics.

12            It begins on 26 of 35, and I would like to go

13        through these to see if you have information on any of

14        these topics.

15            I apologize if this might be a little bit tedious,

16        but I want to walk through it.

17            First of all, the first deposition topic that is

18        listed is "Any entities which Plum Creek Timber is

19        affiliated or has a financial interest in that was

20        involved in the design, development, manufacture,

21        promotion, export, import, brokerage, distribution,

22        shipment, storage, sale, purchase, and/or installation of

23        Chinese Drywall during the relevant time period."

24            To your knowledge, did Plum Creek have any business

25        transactions that would fit within the description that's
```

1       in Paragraph No. 1 here?

2    A  We did not.

3    Q  Okay.  Paragraph No. 2 is a follow-on question that

4       relates to any transactions involving Chinese drywall, so

5       I'm assuming the answer would be the same, that you did

6       not have any business related to drywall?

7    A  We did not-- I'm sorry, we did not.

8    Q  Exhibit-- No. 3 is "The nature of every transaction

9       between Plum Creek and Taishan and any of the entities

10      that were related to Taishan, or the SOEs," state-owned

11      entities-- and basically it's asking for any documents

12      that record communications between Plum Creek and any of

13      those entities, so do you have any information, or the

14      nature of any transactions between Plum Creek and those

15      entities, other than what you've already testified

16      about?

17   A  Nothing beyond what we've already discussed.

18   Q  Okay.  And the fourth request or topic for the deposition

19      is "Any commercial interactions or commercial

20      relationships that Plum Creek has with Taishan entities,

21      entities related to Taishan, or the state-owned entities

22      and all intermediaries between the relevant time period."

23          Do you have any information of any interactions or

24      commercial relationships that would fit within this

25      description, other than the ones you have already

```
 1        testified about?

 2   A    No.

 3   Q    The next question relates to all the documents that were

 4        produced in response to the subpoena, and the documents

 5        have been marked as exhibits and include within them all

 6        of the documents that you were able to locate?

 7   A    Correct.

 8   Q    The next subject relates to any loans or investments by

 9        Taishan and any entities related to them during the time

10        period.

11            Do you have any information or knowledge about any

12        loans or investments by Taishan and Plum Creek entities?

13   A    I actually confirmed with our treasurer and folks that

14        report to her, that we do not.

15   Q    Thank you.

16            The next topic relates to a contempt order that was

17        entered by Judge Fallon in the multidistrict litigation

18        on July 17, 2014.

19            Do you have any knowledge or information about that

20        contempt order?

21   A    Only what was provided to me in the packet that has been

22        marked as Exhibit A, Exhibit No. 1, and I must be on the

23        distribution list for this case now, unfortunately,

24        because I got another packet that we received in the last

25        two weeks.
```

1        I haven't really looked at it, but I don't know if

2        it contains anything related to the order.

3    Q   I will mention that to the class action plaintiffs group

4        and make sure-- because I think they have about 50

5        depositions going on, so--

6    A   Right, and I-- yes, I-- yes, I assumed it was something

7        like that.

8    Q   I will try to see if we can get that corrected, so I will

9        mention that to them.

10       The next item that is listed is your knowledge of

11       whether Taishan or any of the affiliated entities or

12       state-owned entities have conducted business in the

13       United States during the time period, and so the question

14       is:

15       Aside from what Plum Creek did, do you have any

16       knowledge of any business done by those entities in the

17       United States?

18   A   We do not.

19   Q   The final topic here that's listed is any agreements that

20       you have between the Taishan or the state-owned entities

21       and their affiliates and Sumitomo.

22       Do you have any agreements, other than the one that

23       you produced with Sumitomo, that are responsive to

24       Paragraph No. 9 of this request?

25   A   I will quibble with your use of the word "agreement."

Confidential - Subject to Further Confidentiality Review

```
 1          I think it's a memorandum of understanding, but with

 2      that quibble aside, no, nothing else.

 3   Q  And you-- just to kind of make sure that I am not missing

 4      anything, to-- your understanding, in your representation

 5      as a Rule 30(b)(6) witness, is that nothing ever came to

 6      fruition as a result of the memorandum of understanding

 7      that was entered into in September of 2011?

 8   A  Correct.

 9          I believe that China continues to ban southern

10      yellow pine.

11   Q  And there were no other log sales that were made by Plum

12      Creek of other species to China National or any of the

13      Taishan entities?

14   A  No.

15          The only one relevant to this is the Sumitomo one

16      that we have already discussed.

17   Q  And to your knowledge there are no other domestic

18      entities that Plum Creek sold to that were, in turn,

19      exporting other species of logs to any of the Taishan or

20      state-owned entities or their affiliates?

21   A  I am not aware of any.

22                      MR. SKERRITT:  Thank you.  That's all

23      I have.

24                      MR. RIDDELL:  I don't have any further

25      questions.
```

```
 1                    MS. KAHNKE:  That will do it.

 2                    MR. RIDDELL:  Adam?

 3                     MR. PIERSON:  Yes.

 4                    MR. RIDDELL:  Do you have any

 5        questions or follow-up or would you like to talk off line

 6        briefly about anything?

 7                     MR. PIERSON:  I do not have any

 8        questions for the record, but I would be happy to talk

 9        off line after this.

10                    MR. RIDDELL:  Well, I mean, before we

11        actually conclude the deposition did you want to talk

12        about anything, hop on a call or anything like that?

13                     MR. PIERSON:  No.

14                    MR. SKERRITT:  Just one thing before I

15        close:

16           I would, Ms. Daszkiewicz, ask that you maintain the

17        documents that you were using as your notes that you

18        referred to that I indicated I wanted to have marked and

19        produced where you claimed privilege, so that in the

20        event there is a subsequent ruling by the Court that you

21        are required to turn them over, that they will still be

22        available.

23                     THE WITNESS:  I will.

24                    VIDEOGRAPHER:  We are going off

25        record.  The time is 10:22.  This is the end of Disc
```

Confidential - Subject to Further Confidentiality Review

```
1       No. 1.

2                       (Deposition concluded at 10:22 a.m.)

3                       (Signature reserved.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1      STATE OF WASHINGTON )    I, Terilynn Pritchard, RMR, CRR,
                            ) ss CLR, a certified court reporter
 2      County of Pierce    )    in the State of Washington, do
                                 hereby certify:
 3

 4
                 That the foregoing deposition of ROSEMARY
 5      DASZKIEWICZ was taken before me and completed on
        April 16, 2015, and thereafter was transcribed under my
 6      direction; that the deposition is a full, true and complete
        transcript of the testimony of said witness, including all
 7      questions, answers, objections, motions and exceptions;

 8               That the witness, before examination, was by me
        duly sworn to testify the truth, the whole truth, and
 9      nothing but the truth, and that the witness reserved the
        right of signature;

10

                 That I am not a relative, employee, attorney or
11      counsel of any party to this action or relative or employee
        of any such attorney or counsel and that I am not
12      financially interested in the said action or the outcome
        thereof;

13

                 That I am herewith securely sealing the said
14      deposition and promptly delivering the same to
        Attorney Daniel H. Skerritt.

15

                 IN WITNESS WHEREOF, I have hereunto set my
16      signature on the 22nd day of April, 2015.

17

18

19

20

21

22                        _____

                          Terilynn Pritchard, CCR, RMR, CRR, CLR
23                        Certified Court Reporter No. 2047.

24

25
```