## THIS CIRCULAR IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION

**If you are in any doubt** as to any aspect of this circular or as to the action to be taken, you should consult your licensed securities dealer, registered institution in securities, bank, bank manager, solicitor, professional accountant or other professional adviser.

**If you have sold or transferred** all your shares in China National Building Material Company Limited, you should hand this circular to the purchaser or transferee or the bank, licensed securities dealer, registered institution in securities or other agent through whom the sale or transfer was effected for transmission to the purchaser or transferee.

The Stock Exchange of Hong Kong Limited takes no responsibility for the contents of this circular, makes no representation as to its accuracy or completeness and expressly disclaims any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this circular.



## CNBM
# China National Building Material Company Limited*
# 中 國 建 材 股 份 有 限 公 司

*(A joint stock limited company incorporated in the People's Republic of China with limited liability)*

(Stock Code: 3323)

### DISCLOSEABLE AND CONNECTED TRANSACTION

### ACQUISITION OF THE ENTIRE EQUITY INTEREST IN
### CNBM INVESTMENT COMPANY LIMITED FROM
### BEIJING NEW BUILDING MATERIAL COMPANY LIMITED AND
### CHINA FIBERGLASS COMPANY LIMITED

### CONNECTED TRANSACTION

### SUBSCRIPTION OF A SHARES IN CHINA FIBERGLASS COMPANY LIMITED
### AND
### DISPOSAL OF AN 11.5% EQUITY INTEREST IN JUSHI GROUP CO., LTD. TO
### CHINA FIBERGLASS COMPANY LIMITED

Advised by

Independent financial adviser to the Independent Board Committee and
the shareholders of the Company

28 December, 2007

*\* For identification only*

<div style="border:1px solid black">

## CONTEMPT
## Exhibit 125

</div>

SUNTECH:  Exhibit 447

CNBMCO00106238

CONTENTS

*Page*

**Definitions** ................................................................................................................................ ii

**Letter from the Board** ................................................................................................................ 1

**Letter from the Independent Board Committee** ........................................................................ 15

**Letters from GF Capital** ............................................................................................................ 17

**Appendix — General Information** .............................................................................................. 39

CNBMCO00106239

# DEFINITIONS

*In this circular, the following words have the following meanings unless the context requires otherwise:*

| | |
|---|---|
| "A shares" | ordinary shares denominated in RMB of companies listed on a stock exchange in the PRC |
| "BNBM" | 北新集團建材股份有限公司(Beijing New Building Material Company Limited*), a joint stock limited company incorporated under the laws of the PRC and a 52.4% owned subsidiary of the Company. Its A shares are listed on the Shenzhen Stock Exchange |
| "BNBM Equity Transfer Agreement" | an equity transfer agreement dated 7 December, 2007 between the Company and BNBM in respect of the acquisition of an equity interest of 80% in CNBM Investment by the Company from BNBM |
| "BNBMG" | 北新建材（集團）有限公司(Beijing New Building Material (Group) Company Limited*), a limited liability company incorporated under the laws of the PRC and a wholly-owned subsidiary of Parent |
| "China Fiberglass" | 中國玻纖股份有限公司 (China Fiberglass Company Limited*), a joint stock limited company incorporated under the laws of the PRC and an associated company of the Company, in which the Company directly holds a 36.15% equity interest. It includes, except where the context otherwise requires, all of its subsidiaries. Its A shares are listed on the Shanghai Stock Exchange |
| "China Fiberglass Equity Transfer Agreement" | an equity transfer agreement dated 7 December, 2007 between the Company and China Fiberglass in respect of the acquisition of an equity interest of 20% in CNBM Investment by the Company from China Fiberglass |
| "China Fiberglass Subscription" | the subscription of 177,004,000 A shares of China Fiberglass by the Company and the Other Parties, pursuant to the terms and conditions of the Share Exchange and Merger Agreement |
| "Cinda" | 中國信達資產管理公司 (China Cinda Asset Management Corporation*), an asset management company established under the laws of the PRC |
| "Company" | 中國建材股份有限公司(China National Building Material Company Limited*), a joint stock limited company incorporated under the laws of the PRC, whose H shares are listed on The Stock Exchange of Hong Kong Limited |

CNBMCO00106240

"CNBM Investment"

中建材投資有限公司(CNBM Investment Company Limited*), formerly known as 北新物流有限公司(BND Co., Limited*), a limited liability company incorporated under the laws of the PRC and a subsidiary of the Company

"CNBM Trading"

中建材集團進出口公司 (China National Building Material Import and Export Company*), a state-owned enterprise established under the laws of the PRC and a wholly-owned subsidiary of Parent

"Equity Transfer Agreements"

collectively, the BNBM Equity Transfer Agreement and the China Fiberglass Transfer Agreement

"GF Capital"

GF Capital (Hong Kong) Limited, a corporation licensed to carry out type 6 (advising on corporate finance) regulated activity under the SFO and the independent financial adviser to the Independent Board Committee and the shareholders of the Company regarding the Equity Transfer Agreements and the Share Exchange and Merger Agreement

"Group"

the Company and its subsidiaries from time to time

"HK$"

Hong Kong dollars, the lawful currency of Hong Kong

"Hong Kong"

the Hong Kong Special Administrative Region of the PRC

"Jushi"

巨石集團有限公司 (Jushi Group Co., Ltd.*), a limited liability company incorporated in the PRC

"Jushi Disposal"

the disposal of an 11.5% and 37.5% equity interests in Jushi by the Company and the Other Parties, respectively, to China Fiberglass, pursuant to the terms and conditions of the Share Exchange and Merger Agreement

"Independent Board Committee"

the independent committee of the Board comprising Mr. Zhang Renwei, Mr. Zhou Daojiong, Mr. Chi Haibin and Mr. Lau Ko Yuen, Tom, all of them being independent non-executive directors of the Company

"Latest Practicable Date"

21 December, 2007, being the latest practicable date prior to the printing of this circular for ascertaining certain information for inclusion in this circular

"Listing Rules"

the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited

"Other Parties"

the equity holders of Jushi (other than the Company and China Fiberglass), namely Pearl Success, Zhenshi and Surest Finance, which, respectively, hold 18.5%, 11% and 8% in Jushi immediately prior to the date of the

CNBMCO00106241

Share Exchange and Merger Agreement

| | |
|---|---|
| "Parent" | 中國建築材料集團公司 (China National Building Material Group Corporation*), a state-owned enterprise established under the laws of the PRC and a controlling shareholder of the Company |
| "Pearl Success" | 珍成國際有限公司 (Pearl Success International Limited), a limited partnership incorporated in the British Virgin Islands |
| "PRC" | the People's Republic of China. Geographical reference in this circular to the PRC excludes Hong Kong, the Macau Special Administrative Region of the PRC and Taiwan |
| "RMB" | Renminbi, the lawful currency of the PRC |
| "Share Exchange and Merger Agreement" | the conditional agreement dated 7 December, 2007 entered into between China Fiberglass, Jushi, the Company and the Other Parties regarding to the China Fiberglass Subscription and the Jushi Disposal |
| "SFO" | Securities and Futures Ordinance (Chapter 571 of the Laws of Hong Kong) |
| "Stock Exchange" | The Stock Exchange of Hong Kong Limited |
| "Surest Finance" | Surest Finance Limited, a limited liability company incorporated in the British Virgin Islands |
| "Transition Date" | the later of (i) the date when the Company and the Other Parties become the registered shareholders of the A shares of China Fiberglass following the China Fiberglass Subscription or (ii) the date of deregistration of Jushi's legal capacity |
| "US$" | United Stated dollars, the lawful currency of the United States of America |
| "Zhenshi" | 振石集團股份有限公司 (Zhenshi Group Company Limited*) a joint stock company incorporated in the PRC |

*  For identification only

CNBMCO00106242

LETTER FROM THE BOARD



**CNBM**

# China National Building Material Company Limited*

中 國 建 材 股 份 有 限 公 司

*(A joint stock limited company incorporated in the People's Republic of China with limited liability)*

(Stock Code: 3323)

*Executive directors:*
Mr. Song Zhiping (Chairman)
Mr. Cao Jianglin (President)
Mr. Li Yimin (Vice President)
Mr. Peng Shou (Vice President)

*Non-executive directors:*
Ms. Cui Lijun
Mr. Huang Anzhong
Mr. Zuo Fenggao

*Independent non-executive directors:*
Mr. Zhang Renwei
Mr. Zhou Daojiong
Mr. Chi Haibin
Mr. Lau Ko Yuen, Tom

*Registered office:*
No. A-11 Sanlihe Road
Haidian District
Beijing 100037
PRC

*Place of Business in Hong Kong:*
Level 28
Three Pacific Place
1 Queen's Road East
Hong Kong

28 December, 2007

*To the shareholders*

Dear Sirs,

## DISCLOSEABLE AND CONNECTED TRANSACTION

## ACQUISITION OF THE ENTIRE EQUITY INTEREST IN CNBM INVESTMENT COMPANY LIMITED FROM BEIJING NEW BUILDING MATERIAL COMPANY LIMITED AND CHINA FIBERGLASS COMPANY LIMITED

## CONNECTED TRANSACTION

## SUBSCRIPTION OF A SHARES IN CHINA FIBERGLASS COMPANY LIMITED

CNBMCO00106243

**AND**

**DISPOSAL OF AN 11.5% EQUITY INTEREST IN JUSHI GROUP CO., LTD. TO CHINA FIBERGLASS COMPANY LIMITED**

*\* For identification only*

## INTRODUCTION

Reference is made to the announcements of the Company dated 7 and 11 December, 2007.

On 7 December, 2007 after trading hours, the Company entered into the Equity Transfer Agreements for a total consideration of RMB520,000,000. Upon completion of the Equity Transfer Agreements, CNBM Investment will become a wholly owned subsidiary of the Company.

On 7 December, 2007 after trading hours, the Company, China Fiberglass, Jushi and the Other Parties (being a group of equity holders of Jushi holding an aggregate of 37.5% equity interest in Jushi) entered into the Share Exchange and Merger Agreement to subscribe 177,004,000 A shares of China Fiberglass, an associated company of the Company, and in consideration, the Company and the Other Parties will dispose of 11.5% and 37.5% equity interests in Jushi to China Fiberglass, respectively.

The purpose of this circular is to provide you with (i) details of the Equity Transfer Agreements; (ii) the letters from the independent board committee and independent financial adviser regarding the Equity Transfer Agreements; (iii) details of the Share Exchange and Merger Agreement; and (iv) the letters from the independent board committee and independent financial adviser regarding the Share Exchange and Merger Agreement.

## THE BNBM EQUITY TRANSFER AGREEMENT

**Date**

7 December, 2007

**Parties**

BNBM, as the vendor

The Company, as the buyer

**Interest to be acquired**

All equity interests held by BNBM in CNBM Investment, representing an equity interest of 80% of the entire issued equity capital in CNBM Investment.

**Consideration**

RMB416,000,000 comprising (i) cash consideration of RMB261,120,000; (ii) retained earnings of CNBM Investment of

CNBMCO00106244

RMB102,880,000 as of 31 July, 2007 to be distributed to BNBM; and (iii) a maximum audited consolidated profits of RMB52,000,000 for the period between 31 July, 2007 and 31 December, 2007 to be distributed to BNBM in accordance with the terms of the BNBM Equity Transfer Agreement.

**Terms of payment**

The cash consideration of RMB261,120,000 is payable by the Company to BNBM according to the following timetable:

(i)     50% of RMB261,120,000 is payable by the Company to BNBM within 20 business days from the effective date of the BNBM Equity Transfer Agreement;

(ii)    30% of RMB261,120,000 is payable by the Company to BNBM within 10 business days from date of completion of the legal, business and other necessary registration procedures in respect of the change of the shareholder of CNBM Investment from BNBM to the Company; and

(iii)   20% of RMB261,120,000 is payable by the Company to BNBM within three months from the date of completion of the legal, business and other necessary registration procedures in respect of the change of the shareholder of CNBM Investment from BNBM to the Company.

## THE CHINA FIBERGLASS EQUITY TRANSFER AGREEMENT

**Date**

7 December, 2007

**Parties**

China Fiberglass, as the vendor

The Company, as the buyer

**Interest to be acquired**

All equity interests held by China Fiberglass in CNBM Investment, representing an equity interest of 20% of the entire issued equity capital in CNBM Investment.

**Consideration**

RMB104,000,000 comprising (i) cash consideration of RMB65,280,000; (ii) retained earnings of CNBM Investment of RMB25,720,000 as of 31 July, 2007 to be distributed to China Fiberglass; and (iii) a maximum audited consolidated profits of RMB13,000,000 for the period between 31 July, 2007 and 31 December, 2007 to be distributed to China Fiberglass in accordance with the terms of the China Fiberglass Equity Transfer Agreement.

**Terms of payment**

CNBMCO00106245

The cash consideration of RMB65,280,000 is payable by the Company to China Fiberglass according to the following timetable:

(i)     50% of RMB65,280,000 is payable by the Company to China Fiberglass within 20 business days from the effective date of the China Fiberglass Equity Transfer Agreement;

(ii)    30% of RMB65,280,000 is payable by the Company to China Fiberglass within 10 business days from date of completion of the legal, business and other necessary registration procedures in respect of the change of the shareholder of CNBM Investment from China Fiberglass to the Company; and

(iii)   20% of RMB65,280,000 is payable by the Company to China Fiberglass within three months from the date of completion of the legal, business and other necessary registration procedures in respect of the change of the shareholder of CNBM Investment from China Fiberglass to the Company.

## OTHER MAJOR TERMS OF THE EQUITY TRANSFER AGREEMENTS

Both of the Equity Transfer Agreements have the following terms:

**Distribution of all retained earnings of CNBM Investment to BNBM and China Fiberglass**

Pursuant to the Equity Transfer Agreements, each of BNBM and China Fiberglass has agreed, respectively, to procure CNBM Investment to pass a shareholders' resolution approving the distribution of all of CNBM Investment's retained earnings of approximately RMB128,600,000 as of 31 July, 2007 to the existing shareholders of CNBM Investment, BNBM and China Fiberglass, in proportion to their respective shareholdings in CNBM Investment, no later than 31 December, 2007.

**Distribution of profit**

During the period between 31 July, 2007 and 31 December, 2007 (both days not included), if the audited consolidated profits of CNBM Investment does not exceed RMB65,000,000, each of BNBM and China Fiberglass is entitled to receive a distribution of such profits in proportion to the percentage of equity interests held by it in CNBM Investment. If the audited consolidated profits of CNBM Investment exceeds RMB65,000,000, each of BNBM and China Fiberglass is entitled to receive a distribution of a maximum amount of RMB52,000,000 and RMB13,000,000 respectively. Any amount of CNBM Investment's consolidated profits in excess of RMB65,000,000 will be distributed to the Company.

The directors of the Company are of the view that CNBM Investment has sufficient financial resources to make a profit distribution to both BNBM and China Fiberglass.

**Effective date**

Each of the Equity Transfer Agreements will be effective upon completion of the following conditions:

(1)     the legal representative or the respective authorised representative of the relevant parties to the Equity Transfer

Agreement signing and sealing the Equity Transfer Agreement; and

(2)    the relevant authorisations and consents (including the board of directors and the shareholders, if necessary) obtained in respect of the parties to the Equity Transfer Agreement to approve the equity transfer stipulated in the Equity Transfer Agreement in accordance with the articles of associations of the parties to each Equity Transfer Agreement and the applicable listing requirements set out by the relevant stock exchange(s).

**Completion date**

The parties to the Equity Transfer Agreements agree to procure that the necessary registration procedures for the equity transfer to be completed on or before 31 December, 2007. As at the Latest Practicable Date, the Equity Transfer Agreements have not been completed. The completion date of the each of Equity Transfer Agreements shall be the earlier of (i) the date on which CNBM Investment completes the legal, business and other necessary registration for the transfer of the equity interests in CNBM Investment from BNBM and China Fiberglass to the Company; and (ii) 31 December, 2007.

## BASIS OF DETERMINATION OF CONSIDERATION UNDER THE EQUITY TRANSFER AGREEMENTS

The total consideration of RMB520,000,000 under the Equity Transfer Agreements was determined after negotiations between the Company, BNBM and China Fiberglass by reference to (i) the appraised net asset value of CNBM Investment of approximately RMB463,000,000 as at 31 July, 2007, which has been determined by an independent valuer, Zhong Shang Assets Appraisal Company Limited* (中商資產評估有限責任公司), on a replacement cost basis, an approach commonly used in the market; (ii) the satisfactory business results of CNBM Investment and (iii) the internal estimates of the earnings capacity of CNBM Investment. On this basis, the board of directors (including independent non-executive directors) of the Company considers the basis of determination of the consideration to be fair and reasonable.

The total cash consideration of RMB326,400,000 under the Equity Transfer Agreements shall be payable by the Company by cash. The cash consideration will be financed as to 40% from internal resources and 60% from external borrowings of the Company.

## REASONS FOR, AND BENEFITS OF, THE ACQUISITION OF ENTIRE EQUITY INTEREST IN CNBM INVESTMENT

CNBM Investment is currently developing its investment business. The acquisition of the entire equity interests in CNBM Investment will allow the Company to establish an investment arm as part of the long term development strategy of the Group. In light of the satisfactory business performance of CNBM Investment pursuant to the latest management account of CNBM Investment as at 30 November, 2007, the acquisition is also believed to have a positive impact on the consolidated results of the Group. As the investment business of CNBM Investment is not in line with the core businesses of BNBM and China Fiberglass, the disposal of their respective equity interests in CNBM Investment will enable BNBM and China Fiberglass, both of which are listed in the PRC, to streamline their business activities and enhance their transparency.

CNBMCO00106247

The directors of the Company are also of the view that the Equity Transfer Agreements have been entered into on normal commercial terms in the ordinary and usual course of business of the Company and the terms of the Equity Transfer Agreements are fair and reasonable and in the interests of the shareholders of the Company as a whole.

## IMPLICATIONS OF THE EQUITY TRANSFER AGREEMENTS UNDER THE LISTING RULES

As the relevant percentage ratios defined under the Listing Rules exceed 5% but below 25%, the acquisition of the entire equity interests in CNBM Investment contemplated under the Equity Transfer Agreements mentioned above constitutes a discloseable transaction of the Company under Chapter 14 of the Listing Rules and is subject to the disclosure requirements under Chapter 14 of the Listing Rules.

China Fiberglass is a substantial shareholder of CNBM Investment, which is currently an indirect non-wholly owned subsidiary of the Company, and therefore a connected person of the Company within the meaning of the Listing Rules and the acquisition of the entire equity interests in CNBM Investment hence also constitutes a connected transaction of the Company under Chapter 14A of the Listing Rules and is subject to the reporting, announcement and independent shareholders' approval requirements under the Listing Rules.

The earnings, assets and liabilities of CNBM Investment will continue to be consolidated into the accounts of the Group after completion of the Equity Transfer Agreements.

The acquisition will have a minimal impact on the consolidated net profit of the Group. However, as the Company's effective interest in CNBM Investment will increase from 49.15% to 100% upon completion of the acquisition, the Company can enjoy a higher proportion of the profit of CNBM Investment.

The acquisition of CNBM Investment will have a minimal impact on the financial performance and liquidity of the Group as the debt-to-asset ratio of the enlarged Group will slightly increase to 48.4% from 47.7% as at 30 June, 2007.

The Company has applied to the Stock Exchange for a waiver under Rule 14A.43 of the Listing Rules from the requirement to hold a shareholders' meeting to consider and approve the Equity Transfer Agreements. The waiver was sought on the basis that (i) no shareholder of the Company is required to abstain from voting if the Company were to convene a general meeting to approve the Equity Transfer Agreements because no shareholder of the Company has an interest that is different from that of other shareholders in relation to the Equity Transfer Agreements; and (ii) written approval has been obtained from Parent and its three wholly owned subsidiaries, namely Beijing New Building Material (Group) Company Limited, China National Building Material Import and Export Company and China Building Materials Academy, which as at the Latest Practicable Date collectively hold approximately 56.02% of the issued shares in the Company, giving them the right to attend and vote at the general meeting of the Company to approve the Equity Transfer Agreements.

The Stock Exchange has granted the waiver under Rule 14A.43, no shareholders' meeting will be held to consider and approve the Equity Transfer Agreements.

## THE SHARE EXCHANGE AND MERGER AGREEMENT

**Date**

7 December, 2007

**Parties**

Company

China Fiberglass

Jushi

Other Parties

**The China Fiberglass Subscription and the Jushi Disposal**

Under the Share Exchange and Merger Agreement, the Company and the Other Parties agreed to subscribe 177,004,000 A shares of China Fiberglass, an associated company of the Company, and in consideration, the Company and the Other Parties will dispose of 11.5% and 37.5% equity interests in Jushi to China Fiberglass, respectively.

**Terms of the China Fiberglass Subscription and the Jushi Disposal**

*Price and number of subscription shares*

The subscription price of approximately RMB17.97 per A share was determined based on the average of the closing prices of the A shares of China Fiberglass as quoted on the Shanghai Stock Exchange for the last 20 trading days immediately before 28 August, 2007. The subscription price is subject to adjustments to reflect any payment of dividends, bonus issues and capitalisation of capital reserves funds etc., which events occur prior to the Transition Date. 28 August, 2007 was the reference date for the purpose of obtaining the relevant approvals from the board of directors, shareholders and the relevant governmental and regulatory authorities in the PRC by China Fiberglass, one of the conditions precedents of the Share Exchange and Merger Agreement. The closing price of the A shares of China Fiberglass on 7 December, 2007 was RMB26.99.

The number of shares of China Fiberglass (i.e. 177,004,000 A shares) to be subscribed by the Company and the Other Parties was determined with reference to the 49% (the proportion of equity interest in Jushi to be disposed by the Company and the Other Parties) of the appraised net asset value of Jushi of approximately RMB6,491,351,000 as at 30 June, 2007. The valuation report has been prepared by an independent qualified asset valuer in the PRC, Beijing Zhongzheng Appraisal Company Limited* (北京中証資産評估有限公司), based on the discounted income approach, and filed with the relevant institutions in the PRC.

The total consideration to the Company and the Other Parties represented by the China Fiberglass Subscription is approximately RMB3,180,762,000, which is equivalent to the net asset value of Jushi as at 30 June, 2007 attributable to the aggregate 49% equity interests in Jushi sold by the Company and the Other Parties to China Fiberglass (i.e. RMB6,491,351,000 * 49%). There is no material gain or loss to the Group as a result of the China Fiberglass

CNBMCO00106249

Subscription and the Jushi Disposal.

The number of China Fiberglass' A shares to be subscribed by the Company and the Other Parties is, respectively, 41,541,755 and 135,462,245 (of which Zhenshi, Surest Finance and Pearl Success will subscribe for 39,735,592, 28,898,612 and 66,828,041 A shares respectively).

As at the Latest Practicable Date, China Fiberglass, the Company and the Other Parties hold 51%, 11.5% and 37.5% equity interests in Jushi respectively. The Company owns 36.15% equity interest in China Fiberglass. Upon completion of the China Fiberglass Subscription and the Jushi Disposal, the Company will not have any direct equity interest in Jushi but will own approximately 32.43% of the A shares in the enlarged capital of China Fiberglass which in turn will fully control Jushi. Jushi will become a branch of China Fiberglass and its legal capacity will be deregistered.

*Lock up period of the subscription shares*

The 177,004,000 A shares in China Fiberglass are subject to a thirty-six-month lock up period from the date the Company and the Other Parties become the registered shareholders of such shares.

*Distribution of China Fiberglass' retained earnings*

The shareholders of China Fiberglass (including the Company and the Other Parties) are entitled to share the retained earnings of China Fiberglass as at the Transition Date in proportion to the respective equity interests in China Fiberglass held by them after completion of the Share Exchange and Merger Agreement.

*Share of Jushi's losses*

Each of the Company and the Other Parties will compensate China Fiberglass in cash for any losses incurred by Jushi during the period between 30 June, 2007 and the Transition Date (or if the Transition Date falls in the middle of a month, the last day of such month) in proportion to their respective equity interests in Jushi.

*Profit guarantee*

The Company and the Other Parties agreed to provide a several profit guarantee in favour of Jushi to the effect that save for the occurrence of certain force majeure events, if the net profits of Jushi for the two years ending 31 December, 2007 and 2008 fall below RMB452,660,000 and RMB550,000,000 respectively, the Company and the Other Parties will have to (i) compensate Jushi in cash or (ii) distribute the A shares of China Fiberglass held by the Company and, or the Other Parties to the holders of the tradable and listed A shares of China Fiberglass correlating to the amount of the shortfall for the relevant year pro-rata to their respective proportions of equity holdings in Jushi prior to the Jushi Disposal. The projected net profits of Jushi of RMB452,660,000 and RMB550,000,000 for the two years ending 31 December, 2007 and 2008, respectively, are determined on the basis of the internal profit projections of Jushi.

**Conditions precedents**

The completion of the Share Exchange and Merger Agreement is conditional on, amongst other things, (i) compliance with the relevant laws and regulations in the PRC as well as the articles of associations of the relevant parties; and (ii) the

CNBMCO00106250

approvals of the shareholders of China Fiberglass and the relevant regulatory authorities in the PRC.

## DIAGRAMMATIC REPRESENTATION OF THE SHAREHOLDING STRUCTURE OF JUSHI IMMEDIATELY BEFORE AND AFTER COMPLETION OF THE CHINA FIBERGLASS SUBSCRIPTION AND THE JUSHI DISPOSAL

**Immediately before completion of the China Fiberglass Subscription and the Jushi Disposal**

(diagram)

**Immediately after completion of China Fiberglass Subscription and the Jushi Disposal**

(diagram)

## REASONS FOR, AND BENEFITS, OF THE PROPOSED SUBSCRIPTION

As disclosed in the announcement of the Company dated 27 August, 2007, the China Fiberglass Subscription allows the Company to continue its investment in Jushi indirectly via the Company's investment in China Fiberglass. At the same time, China Fiberglass, an associated company of the Company, will fully control Jushi and is expected to benefit economically from the enlarged asset base of Jushi and the anticipated profit growth of Jushi in the future.

The anticipated improvement in the profits of Jushi is expected to benefit the Company indirectly as the effective equity interest of the Company in Jushi will increase from approximately 29.94% to approximately 32.43% (after taking into account the dilutive effect on the Company's equity interest in China Fiberglass as a result of the China Fiberglass Subscription).

The directors of the Company are of the view that the Share Exchange and Merger Agreement has been entered into on normal commercial terms in the ordinary and usual course of business of the Company and the terms of the Share Exchange and Merger Agreement are fair and reasonable and in the interests of the Company and its shareholders as a whole.

## IMPLICATIONS OF THE SHARE EXCHANGE AND MERGER AGREEMENT UNDER THE LISTING RULES

China Fiberglass is a substantial shareholder of CNBM Investment Company Limited* (中建材投資有限公司), which is an indirect non-wholly owned subsidiary of the Company as at the Latest Practicable Date, and therefore a connected person of the Company within the meaning of the Listing Rules and the Share Exchange and Merger Agreement hence constitutes a connected transaction of the Company under Chapter 14A of the Listing Rules and is subject to the reporting, announcement and independent shareholders' approval requirements under the Listing Rules.

The Company has applied to the Stock Exchange for a waiver under Rule 14A.43 of the Listing Rules from the requirement to hold a shareholders' meeting to consider and approve the Share Exchange and Merger Agreement. The waiver was sought on the basis that (i) no shareholder of the Company is required to abstain from voting if the Company

were to convene a general meeting to approve the Share Exchange and Merger Agreement because no shareholder of the Company has an interest that is different from that of other shareholders in relation to the Share Exchange and Merger Agreement; and (ii) written approval has been obtained from Parent and its three wholly owned subsidiaries, namely Beijing New Building Material (Group) Company Limited, China National Building Material Import and Export Company and China Building Materials Academy, which as at the Latest Practicable Date collectively hold approximately 56.02% of the issued shares in the Company, giving them the right to attend and vote at the general meeting of the Company to approve the Share Exchange and Merger Agreement.

The Stock Exchange has granted the waiver under Rule 14A.43, no shareholders' meeting will be held to consider and approve the Share Exchange and Merger Agreement.

The Company, China Fiberglass, Jushi and the Other Parties entered into certain agreements dated 5 January, 2007 in relation to the subscription and transfer of equity interests in Jushi, details of which are disclosed in the announcement of the Company dated 5 January, 2007 and the circular of the Company dated 25 January, 2007. Save as disclosed, no prior transactions with between the Company, China Fiberglass, Jushi and the Other Parties require aggregation under the Listing Rules.

## INFORMATION RELATING TO THE COMPANY

The Company is a leading building materials company in PRC with significant operations in the cement, lightweight building materials, glass fiber and fiberglass reinforced plastics products, and engineering services business segments.

## INFORMATION RELATING TO CNBM INVESTMENT

CNBM Investment, formerly known as BND Co., Limited, is a limited liability company incorporated in the PRC and a non-wholly owned subsidiary of the Company. It is principally engaged in the merchandise trading, commercial real estate leasing, retail distribution, and contract decoration services.

Based on the generally accepted accounting principles in the PRC, as at 31 July, 2007, CNBM Investment had audited net asset value of approximately RMB356,490,923. Its audited profit before tax for the two years ended 31 December, 2005 and 2006 and the seven months ended 31 July, 2007 was approximately RMB43,563,077, RMB34,859,016 and RMB7,892,181 respectively. Its audited profit after tax for the two years ended 31 December, 2005 and 2006 and the seven months ended 31 July, 2007 was approximately RMB38,192,013 and RMB 28,853,997 and RMB7,106,515 respectively.

The original purchase cost of the respective equity interests in CNBM Investment held by BNBM and China Fiberglass was approximately RMB171,978,600 and RMB95,680,800 respectively.

## INFORMATION RELATING TO BNBM

BNBM is a joint stock limited company incorporated in the PRC and a 52.4% owned subsidiary of the Company. It is principally engaged in the production and sale of gypsum board. Its A shares have been listed on the Shenzhen Stock Exchange since 1997.

CNBMCO00106252

**INFORMATION RELATING TO CHINA FIBERGLASS**

China Fiberglass is a joint stock limited company incorporated under PRC law and an associated company of the Company. It is principally engaged in the production and sale of glass fiber products. Its A shares have been listed on the Shanghai Stock Exchange since 1999.

Based on the generally accepted accounting principles in the PRC, the audited net asset value of China Fiberglass as at 30 June, 2007 was approximately RMB910,227,000. Its audited profit before tax and minority interest for the two years ended 31 December, 2005 and 2006 was approximately RMB324,260,000 and RMB245,774,000 respectively. Its audited profit after tax and minority interest for the two years ended 31 December, 2005 and 2006 was approximately RMB136,050,000 and RMB123,476,000 respectively.

China Fiberglass is and will continue to be equity accounted for as an associated company of the Company before and after completion of the China Fiberglass Subscription and the Jushi Disposal.

**INFORMATION RELATING TO JUSHI**

Jushi manufactures and sells glass fiber and related products in China. It has a registered capital of US$151,200,000. Its annual production capacity is about 500,000 tonnes. Jushi will cease to be a separate legal entity after completion of the Jushi Disposal.

The Company purchased the 11.5% equity interest in Jushi for a consideration of US$46,428,448 on 5 January, 2007. Based on the generally accepted accounting principles in the PRC, the audited profit of Jushi before tax and minority interest for the two years ended 31 December, 2005 and 2006 was approximately RMB354,605,000 and RMB233,369,000 respectively. Its audited profit after tax and minority interest for the two years ended 31 December, 2005 and 2006 was approximately RMB253,062,000 and RMB185,558,000 respectively.

Jushi is equity accounted for as an associated company of the Company before completion of the China Fiberglass Subscription and the Jushi Disposal and its results will no longer be accounted for by the Company after that.

**GENERAL**

The Board (including the independent non-executive directors of the Company) has considered the letters from GF Capital and is of the view that the terms and conditions of the Equity Transfer Agreements and the Share Exchange and Merger Agreement to be fair and reasonable, on normal commercial terms and are in the interests of the Company and its shareholders as a whole.

Your attention is drawn to:

(a)     the letter from the Independent Board Committee set out on pages 15 to 16 of this circular, which contains its recommendation concerning the Equity Transfer Agreements and the Share Exchange and Merger Agreement;

(b)     the letters from GF Capital, set out on pages 17 to 38 of this circular, which contain its advice to the Independent Board Committee and shareholders of the Company; and

(c)     the additional information set out in the Appendix to this circular.

<div align="center">

Yours faithfully,

For and on behalf of the board of directors of

**China National Building Material Company Limited**

**Song Zhiping**

*Chairman*

</div>

CNBMCO00106254

LETTER FROM THE INDEPENDENT BOARD COMMITTEE



**CNBM**

# China National Building Material Company Limited*

# 中 國 建 材 股 份 有 限 公 司

*(A joint stock limited company incorporated in the People's Republic of China with limited liability)*

(Stock Code: 3323)

28 December, 2007

*To the shareholders of the Company*

Dear Sir or Madam,

**DISCLOSEABLE AND CONNECTED TRANSACTION**

**ACQUISITION OF THE ENTIRE EQUITY INTEREST IN
CNBM INVESTMENT COMPANY LIMITED FROM
BEIJING NEW BUILDING MATERIAL COMPANY LIMITED AND
CHINA FIBERGLASS COMPANY LIMITED**

**CONNECTED TRANSACTION**

**SUBSCRIPTION OF A SHARES IN CHINA FIBERGLASS COMPANY LIMITED
AND
DISPOSAL OF AN 11.5% EQUITY INTEREST IN JUSHI GROUP CO., LTD. TO
CHINA FIBERGLASS COMPANY LIMITED**

We refer to the circular dated 28 December 2007 (the "Circular") issued by the Company to the shareholders of the Company of which this letter forms part. Unless the context otherwise requires, terms used in this letter shall have the same meanings given to them in the Circular.

As we have no interest in the Equity Transfer Agreements and the Share Exchange and Merger Agreement, we have been appointed by the Board as the Independent Board Committee to consider the terms of the Equity Transfer Agreements and the Share Exchange and Merger Agreement.

\*   *For identification only*

The Independent Board Committee has been formed to advise the shareholders of the Company as to whether the terms of the Equity Transfer Agreements and the Share Exchange and Merger Agreement are fair and reasonable so far as the shareholders of the Company are concerned. GF Capital has been appointed as the independent financial adviser to advise the Independent Board Committee and the shareholders of the Company.

We wish to draw your attention to the "Letters from GF Capital" as set out on pages 17 to 38 of the Circular. We have considered the terms and conditions of the Equity Transfer Agreements and the Share Exchange and Merger Agreement, the advice of GF Capital and the other factors contained in the "Letter from the Board" as set out on pages 1 to 14 of the Circular.

Having taken into account the advice of GF Capital, we consider that the terms of the Equity Transfer Agreements and the Share Exchange and Merger Agreement are fair and reasonable, on normal commercial terms and in the interests of the Company and its shareholders as a whole.

Accordingly, we recommend the shareholders of the Company to vote in favour of the resolutions approving the Equity Transfer Agreements and the Share Exchange and Merger Agreement.

However, the Stock Exchange has granted a waiver under Rule 14A.43 of the Listing Rules, it is not necessary for the shareholders of the Company to vote on the Equity Transfer Agreements and the Share Exchange and Merger Agreement.

<div align="center">

Yours faithfully,
Independent Board Committee of
**China National Building Material Company Limited**
**Zhang Renwei, Zhou Daojiong, Chi Haibin, Lau Ko Yuen, Tom**
*Independent Non-executive Directors*

</div>

CNBMCO00106256

# LETTERS FROM GF CAPITAL

*The following is the text of a letter of advice from GF Capital, which has been prepared for the purpose of incorporation into this circular, setting out its opinion to the Independent Board Committee and the shareholders of the Company in connection with the Equity Transfer Agreements.*

GF Capital (Hong Kong) Limited

Suites 2301-3 & 2313, COSCO Tower
183 Queen's Road Central
Hong Kong

*To the Independent Board Committee*
*and the shareholders of the Company*                                                          28 December, 2007

Dear Sirs,

## DISCLOSEABLE AND CONNECTED TRANSACTION

## ACQUISITION OF THE ENTIRE EQUITY INTEREST IN CNBM INVESTMENT COMPANY LIMITED FROM BEIJING NEW BUILDING MATERIAL COMPANY LIMITED AND CHINA FIBERGLASS COMPANY LIMITED

## INTRODUCTION

We refer to our appointment as the independent financial adviser to the Independent Board Committee and the shareholders of the Company (the "**Shareholders**") in respect of the connected transaction in relation to the Equity Transfer Agreements, particulars of which are set out in the "Letter from the Board" (the "**Letter**") contained in the circular of the Company dated 28 December, 2007 (the "**Circular**"), of which this letter forms part. Capitalised terms used in this letter shall have the same meanings ascribed to them in the Circular unless the context otherwise requires.

As disclosed in the announcement of the Company dated 7 December, 2007, the Company entered into the BNBM Equity Transfer Agreement with BNBM and the China Fiberglass Equity Transfer Agreement with China Fiberglass respectively to acquire the entire equity interests in CNBM Investment. As the relevant percentage ratios defined under the Listing Rules exceed 5% but below 25%, the acquisition of the entire equity interests in CNBM Investment contemplated under the Equity Transfer Agreements constitutes a discloseable transaction of the Company under Chapter 14 of the Listing Rules and is subject to the disclosure requirements under Chapter 14 of the Listing Rules. In addition, China Fiberglass is a substantial shareholder of CNBM Investment, which is currently an indirect non-wholly owned subsidiary of the Company, and therefore a connected person of the Company within the meaning of the Listing Rules and the acquisition of the entire equity interests in CNBM Investment hence also constitutes a connected transaction of the Company under Chapter 14A of the Listing Rules and is subject to the reporting, announcement and independent shareholders' approval requirements under the Listing Rules.

The Company had applied to the Stock Exchange for a waiver under Rule 14A.43 of the Listing Rules from the requirement to hold a shareholders' meeting to consider and approve the Equity Transfer Agreements. The waiver would be sought on the basis that (i) no shareholder of the Company is required to abstain from voting if the Company were to convene a general meeting to approve the Equity Transfer Agreements because no shareholder of the Company has an interest that is different from that of other shareholders in relation to the Equity Transfer Agreements; and (ii) written approval has been obtained from Parent and its three wholly owned subsidiaries, namely Beijing New Building Material (Group) Company Limited, China National Building Material Import and Export Company and China Building Materials Academy, which as at the Latest Practicable Date, collectively hold approximately 56.02% of the issued shares in the Company, giving them the right to attend and vote at the general meeting of the Company to approve the Equity Transfer Agreements. On 18 December, 2007, the Stock Exchange granted the waiver under Rule 14A.43 and no shareholders' meeting will be held to consider and approve the Equity Transfer Agreements.

## INDEPENDENT BOARD COMMITTEE

The Independent Board Committee, comprising all the independent non-executive directors of the Company, namely Mr. Zhang Renwei, Mr. Zhou Daojiong, Mr. Chi Haibin and Mr. Lau Ko Yuen, Tom, has been established to give advice to the Shareholders in relation to the Equity Transfer Agreements.

We have been appointed under Rule 13.39(6)(b) of the Listing Rules to advise the Independent Board Committee and the Shareholders as to whether the terms of the Equity Transfer Agreements are fair and reasonable so far as the Shareholders are concerned and are on normal commercial terms and whether the entering into of the Equity Transfer Agreements is in the ordinary and usual course of business of the Company and in the interests of the Company and the Shareholders as a whole.

## BASIS OF OUR OPINION

In formulating our opinion, we have relied on the information, statements, opinions and representations provided to us by the Company, its representatives and the directors of the Company for which they are solely and wholly responsible and we have assumed that all such information, statements, opinions and representations contained or referred to in the Circular were true, accurate and complete at the time they were made and continue to be true, accurate and complete at the date of the Circular. We have assumed that all statements of belief, opinion and intention made by the Company, its representative and the directors of the Company as set out in the Circular were reasonably made after due and careful enquiry. We have also sought and obtained confirmation from the Company that no material facts have been omitted from the information provided and referred to in the Circular. The directors of the Company confirmed that they have provided us with all currently available information and documents which are available under present circumstances to enable us to reach an informed view and we have relied on the accuracy of such information and the information contained in the Circular to provide a reasonable basis of our opinions.

Our review and analyses were based upon the information provided by the Company which include, among others, (i) the Equity Transfer Agreements; (ii) the annual reports of the Company for two years ended 31 December, 2006; (iii) the interim report of the Company for the six months ended 30 June, 2007; (iv) the announcement of the Company dated 7 December, 2007 in relation to the acquisition of CNBM Investment; (v) the valuation report dated 26 November, 2007 (the "Valuation Report") of CNBM Investment (formerly known as BND Co., Limited) issued by Zhong Shang Assets Appraisal Company Limited (中商資產評估有限責任公司) (the "Valuer"); and (vi) the unaudited management

accounts of CNBM Investment for the eleven months ended 30 November, 2007. We consider that we have reviewed sufficient information which enables us to reach an informed view and to provide us with a reasonable basis for our opinion. We have no reason to suspect that any material facts or information which is known to the Company, its representatives and the directors of the Company have been omitted or withheld from the information supplied or opinions expressed in the Circular nor to doubt the truth, accuracy and completeness of the information, facts, and representation provided, or the reasonableness of the opinions and representation expressed by the Company, its representatives and the directors of the Company. We have not, however, carried out any independent verification on the information provided to us by the Company, its representatives and the directors of the Company, nor have we conducted an independent in-depth investigation into the business affairs, assets and liabilities, and the prospects of the Company and CNBM Investment.

Our opinion is necessarily based upon the financial, economic, market, regulatory and other conditions as they exist on, and the facts, information, representations and opinions made available to us as of, the Latest Practicable Date. We disclaim any undertaking or obligation to advise any person of any change in any fact or matter affecting the opinion expressed herein, which may come or be brought to our attention after the Latest Practicable Date.

## PRINCIPAL FACTORS AND REASONS CONSIDERED

In arriving at our opinion to the Independent Board Committee and the Shareholders, we have considered the following principal factors and reasons:

**1.     Information on the Group**

The Group is a leading building materials group in the PRC with significant operations in the cement, lightweight building materials, glass fiber and fiberglass reinforced plastics products, and engineering services business segments.

*Review of financial performance of the Group*

Based on the information set out in the annual reports for 2005 and 2006 and the interim report for 2007 of the Company, the financial results of the Company are summarized as follows:

|  | For the year ended 31 December, | | | Six months ended 30 June, | |
|---|---|---|---|---|---|
|  | **2004** | **2005** | **2006** | **2006** | **2007** |
|  | (Audited) | (Audited) | (Audited) | (Unaudited) | (Unaudited) |
|  | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
| Revenue | 2,898,072 | 4,726,544 | 6,451,830 | 2,703,484 | 3,643,541 |
| Gross profit | 554,757 | 874,141 | 1,297,228 | 500,053 | 724,964 |
| Gross profit margin | 19.14% | 18.49% | 20.11% | 18.50% | 19.90% |
| Profit/(Loss) attributable to equity holders of the Company | 193,138 | 351,105 | 298,146 | (2,277) | 256,416 |
| Net profit margin | 6.66% | 7.43% | 4.62% | Not applicable | 7.04% |

CNBMCO00106259

The Company's consolidated revenue for the year ended 31 December, 2005 amounted to 4,726.5 million, representing an increase of 63.1% from RMB2,898.1 million in 2004, primarily due to an increase of RMB844.4 million in revenue from the Group's lightweight building materials segment. Accordingly, the profit attributable to equity holders of the Company increased by 81.8% from RMB193.1 million in 2004 to RMB351.1 million in 2005 and the net profit margin improved to 7.43% from 6.66%.

For the year ended 31 December, 2006, the Company's consolidated revenue amounted to RMB6,451.8 million, representing an increase of 36.5% from RMB4,726.5 million in 2005, primarily due to an increase of RMB942.9 million in revenue from the Group's cement segment. The profit attributable to equity holders of the Company decreased by 15.1% from RMB351.1 million in 2005 to RMB298.1 million in 2006, which included the loss from consideration paid for the share conversions of certain subsidiary and associated companies of the Company. Excluding such loss from share conversions, profit attributable to equity holders of the Company would increase by 56.9% to RMB550.9 million.

For the six months ended 30 June 2007, the Company's unaudited consolidated revenue grew by 34.8% to RMB3,643.5 million from RMB2,703.5 million for the six months ended 30 June, 2006 which was primarily attributable to an increase of RMB586.4 million in revenue from the cement segment. The unaudited profit attributable to equity holders of the Company increased to RMB256.4 million for the six months ended 30 June, 2007 from a loss of RMB2.3 million for the six months ended 30 June, 2006. However, the latter had taken into account the loss of share conversion of certain subsidiary and associated companies of the Company. Excluding such losses, the profit attributable to equity holders of the company for the six months ended 30 June, 2006 would be RMB193.0 million.

**2.      Background of the Equity Transfer Agreements**

As disclosed in the announcement of the Company dated 7 December, 2007, the Company entered into (i) the BNBM Equity Transfer Agreement with BNBM in relation to the acquisition of 80% equity interests in CNBM Investment at a maximum consideration of RMB416,000,000; and (ii) the China Fiberglass Equity Transfer Agreement with China Fiberglass in relation to the acquisition of 20% equity interests in CNBM Investment at a maximum consideration of RMB104,000,000. Upon completion of both acquisitions, CNBM will become a wholly-owned subsidiary of the Company.

**3.      Information on CNBM Investment**

CNBM Investment is principally engaged in the merchandise trading, commercial real estate leasing, retail distribution, and contract decoration services. As at the Latest Practicable Date, CNBM Investment is a non-wholly owned subsidiary of the Company and its results have been consolidated with the results of the Company. The results of CNBM Investment will continue to be consolidated into the accounts of the Group after completion of the Equity Transfer Agreements.

Based on the generally accepted accounting principles in the PRC, as at 31 July, 2007, CNBM Investment had audited net asset value of approximately RMB356,490,923. Its audited profit before tax for the two years ended 31 December, 2005 and 2006 and the seven months ended 31 July, 2007 was approximately RMB43,563,077,

CNBMCO00106260

RMB34,859,016 and RMB7,892,181 respectively. Its audited profit after tax for the two years ended 31 December, 2005 and 2006 and the seven months ended 31 July, 2007 was approximately RMB38,192,013 and RMB 28,853,997 and RMB7,106,515 respectively. According to the management of the Company, the decrease in net profit in 2006 was primarily due to the disposal of E-HOME stores in August 2005 which reduced the revenue and profit for the year ended 31 December, 2006. According to the latest management account of CNBM Investment as at 30 November, 2007, CNBM Investment had net asset value of approximately RMB356,490,923. Its profit before and after tax for the eleven months ended 30 November, 2007 was approximately RMB58,238,995 and RMB41,227,539 respectively. The increase in profit in this period was primarily due to the increase in fair value of the investment of CNBM Investment.

4.   **Major terms of the Equity Transfer Agreements**

Pursuant to the Equity Transfer Agreements, the maximum aggregate consideration payable by the Company to BNBM and China Fiberglass for the entire equity interests in CNBM Investment is RMB520,000,000 comprising (i) cash consideration of RMB326,400,000; (ii) retained earnings of CNBM Investment of RMB128,600,000 as of 31 July, 2007 to be distributed to BNBM and China Fiberglass; and (iii) a maximum audited consolidated profits of RMB65,000,000 for the period between 31 July, 2007 and 31 December, 2007 to be distributed to BNBM and China Fiberglass in accordance with the terms of the Equity Transfer Agreements.

Pursuant to the Equity Transfer Agreements, each of BNBM and China Fiberglass has agreed, respectively, to procure CNBM Investment to pass a shareholders' resolution approving the distribution of all of CNBM Investment's retained earnings of approximately RMB128,600,000 as of 31 July, 2007 to the existing shareholders of CNBM Investment, BNBM and China Fiberglass, in proportion to their respective shareholdings in CNBM Investment, no later than 31 December, 2007.

During the period between 31 July, 2007 and 31 December, 2007 (both days not included), if the audited consolidated profits of CNBM Investment does not exceed RMB65,000,000, each of BNBM and China Fiberglass is entitled to receive a distribution of such profits in proportion to the percentage of equity interests held by it in CNBM Investment. If the audited consolidated profits of CNBM Investment exceeds RMB65,000,000, each of BNBM and China Fiberglass is entitled to receive a distribution of a maximum amount of RMB52,000,000 and RMB13,000,000 respectively. Any amount of CNBM Investment's consolidated profits in excess of RMB65,000,000 will be distributed to the Company.

The directors of the Company are of the view that CNBM Investment has sufficient financial resources to make a profit distribution to both BNBM and China Fiberglass. We have reviewed the audited account of CNBM Investment as at 31 July, 2007 and the latest management account of CNBM Investment as at 30 November, 2007. We concur with the view of the directors of the Company that CNBM Investment has sufficient financial resources to make the said profit distribution to both BNBM and China Fiberglass.

Taking into consideration of the aforesaid arrangements in respect of the retained earnings and the profits distribution, the total cash consideration of RMB326,400,000 under the Equity Transfer Agreements shall by payable by the Company by cash. We are of the view that the payment terms of the Equity Transfer Agreements is in the interests of the Company and the Shareholders as a whole.

CNBMCO00106261

5.     **Basis of the Consideration**

As stated in the Letter, the total consideration of RMB520,000,000 under the Equity Transfer Agreements was determined after negotiations between the Company, BNBM and China Fiberglass by reference to (i) the appraised net asset value of CNBM Investment of approximately RMB463,000,000 as at 31 July, 2007, which has been determined by an independent valuer, Zhong Shang Assets Appraisal Company Limited* (中商資產評估有限責任公司), on a replacement cost basis, an approach commonly used in the market; (ii) the satisfactory business results of CNBM Investment and (iii) the internal estimates of the earnings capacity of CNBM Investment.

In accessing the fairness and reasonableness of the consideration, we have also, to the best of our knowledge and based on the information available from the website of the Stock Exchange, reviewed and compared the price-to-book ratio of CNBM Investment and those of companies listed on the Stock Exchange which are principally engaged in the merchandise trading, commercial real estate leasing, retail distribution, and contract decoration services. However, we noted that there is no company which is engaged in the same business and have comparable market capitalization with CNBM Investment; therefore, it may not be relevant to have such comparison.

Out of the total consideration of RMB520,000,000 under the Equity Transfer Agreements, RMB65,000,000 is to be satisfied by a maximum audited consolidated profits of RMB65,000,000 for the period between 31 July, 2007 and 31 December, 2007 to be distributed to BNBM and China Fiberglass in accordance with the terms of the Equity Transfer Agreements. Accordingly, the total consideration adjusted by the said profits distribution is about RMB455,000,000 and it represented a discount of about 1.73% to the appraised net asset value of about RMB463,000,000 as at 31 July, 2007.

Having considered the basis of the consideration and the slightly discount to the appraised net asset value, we consider that the terms of the Equity Transfer Agreements are fair and reasonable to and are in the interests of the Company and the Shareholders as a whole.

6.     **Reasons for the acquisition of CNBM Investment**

As stated in the Letter, the directors of the Company believe that the acquisition of the entire equity interests in CNBM Investment will allow the Company to establish an investment arm as part of the long term development strategy of the Group. In light of the satisfactory business performance of CNBM Investment pursuant to the latest management account of CNBM Investment as at 30 November, 2007, the acquisition is also believed to have a positive impact on the consolidated results of the Group. The directors of the Company also believe that, as the investment business of CNBM Investment is not in line with the core businesses of BNBM and China Fiberglass, the disposal of their respective equity interests in CNBM Investment will enable BNBM and China Fiberglass, both of which are listed in the PRC, to streamline their business activities and enhance their transparency. The directors of the Company are also of the view that that the Equity Transfer Agreements have been entered into on normal commercial terms in the ordinary and usual course of business of the Company and the terms of the Equity Transfer Agreements are fair and reasonable and in the interests of the Shareholders as a whole.

As stated in the interim report 2007 of the Company, the Group would actively expedite the acquisition, merger

CNBMCO00106262

and restructuring projects to ensure further low-cost expansion and to boost industry consolidation, restructuring and integration of regional markets and resources. Regarding its business segments, the Group expected to speed up its projects under construction in order to expand the principal operation scale, expand its market share in domestic and overseas markets, and secure a leading position in the relevant sectors.

As stated in the Letter, CNBM Investment is engaged in the merchandise trading, commercial real estate leasing, retail distribution, and contract decoration services. On the other hand, BNBM is principally engaged in the production and sale of gypsum board and China Fiberglass is principally engaged in the production and sale of glass fiber products.

We would like to draw the attention of Shareholders that BNBM and China Fiberglass is owned as to 52.4% and 36.15% by the Company respectively as at the date of this letter and we are of the view that the acquisition of CNBM Investment by the Company from BNBM and China Fiberglass is a restructuring of the existing businesses which aligns with the overall business strategy of the Group and as a result BNBM and China Fiberglass can focus on their existing principal businesses. In addition, changing CNBM Investment to a wholly owned subsidiary of the Group enables the Company to have a full control over CNBM Investment and thus enhances the efficiency in developing the investment strategy of the Group.

We concur with the view of the directors of the Company that the Equity Transfer Agreements have been entered into on normal commercial terms in the ordinary and usual course of business of the Company and the terms of the Equity Transfer Agreements are fair and reasonable and in the interests of the Company and the Shareholders as a whole.

**7.   Financial effects of the acquisition of CNBM Investment**

The financial effects of the acquisition on the Group are summarized as the following:

*Earnings*

As at the Latest Practicable Date, CNBM Investment is a non-wholly owned subsidiary of the Company and its results have been consolidated with the results of the Company. After completion of the Equity Transfer Agreements, CNBM Investment will become a wholly owned subsidiary of the Company and the results of CNBM Investment will continue to be consolidated into the accounts of the Group.

As the results of CNBM Investment have already been and will continue to be consolidated into the accounts of the Group, it appears that the acquisition will have a minimal impact on the consolidated net profit of the Group. However, as the Company's effective interest in CNBM Investment will increase from 49.15% to 100% upon completion of the acquisition, the Company can enjoy a higher proportion of the profit of CNBM Investment.

*Liquidity and financial resources*

According to the Equity Transfer Agreements, part of the aggregate consideration which amounts to RMB326,400,000 will be payable in cash. The Company expected that the cash consideration will be financed as to 40% from internal resources and 60% from additional external borrowings of the Company. Based on the

CNBMCO00106263

interim report 2007 of the Company, the Group had cash and bank balances of approximately RMB1,316.8 million as at 30 June, 2007 and thus the cash consideration payable by the Group would not cause immediate material adverse impact to the Group's financial resources.

However, as at 31 December, 2006 and 30 June, 2007, the Group had net current liabilities of approximately RMB846.1 million and RMB986.6 million which demonstrated the relatively tight liquidity position of the Group. Due to increasing bank credit of the Group and the new issue of corporate bonds amounting to RMB1,000,000,000 during the period to meet the growing need for working capital and to finance the enlarged business (including capital investment and acquisition), debt-to-asset ratio, calculated by dividing the consolidated borrowings by the total consolidated assets, increased from 43.2% as at 31 December, 2006 to 47.7% as at 30 June, 2007. Taking into account 60% of consideration of RMB326,400,000 payable by the Group for the acquisition will be financed by external borrowings, the debt-to-asset ratio of the enlarged Group will become 48.4%. We are of the view that the acquisition of CNBM Investment will only slightly increase the gearing level of the Group.

Based on the above analysis, it appears that the acquisition of CNBM Investment will have a minimal impact on the financial performance and liquidity of the Group as the debt-to-asset ratio of the enlarged Group will slightly increase to 48.4% from 47.7% as at 30 June, 2007. Having considered that (i) the Company can obtain full control over CNBM Investment; and (ii) the strategy of the Company is to restructure the Group's business, in particular, streamlining BNBM and China Fiberglass's business activities and enhancing their transparency, we consider that the financial impact on the Group is acceptable.

## CONCLUSIONS

Having considered the above principal factors and reasons, we are of the view that the Equity Transfer Agreements have been entered into on normal commercial terms and in the ordinary and usual course of business of the Company and the terms of the Equity Transfer Agreements are fair and reasonable and in the interests of the Company and the Shareholders as a whole. Accordingly, we recommend the Independent Board Committee to advise the Shareholders to vote in favour of the resolution approving the acquisition of CNBM Investment if a meeting of Shareholders has to be convened.

<div align="center">

For and on behalf of
**GF Capital (Hong Kong) Limited**
**Dino Ng**
*Director and Co-Head of Corporate Finance*

</div>

CNBMCO00106264

## LETTERS FROM GF CAPITAL

*The following is the text of a letter of advice from GF Capital, which has been prepared for the purpose of incorporation into this circular, setting out its opinion to the Independent Board Committee and the shareholders of the Company in connection with the Share Exchange and Merger Agreement.*

GF Capital (Hong Kong) Limited

Suites 2301-3 & 2313, COSCO Tower
183 Queen's Road Central
Hong Kong

*To the Independent Board Committee
  and the shareholders of the Company*                                    28 December, 2007

Dear Sirs,

## CONNECTED TRANSACTION

## SUBSCRIPTION OF A SHARES IN CHINA FIBERGLASS COMPANY LIMITED
## AND
## DISPOSAL OF AN 11.5% EQUITY INTEREST IN JUSHI GROUP CO., LTD. TO
## CHINA FIBERGLASS COMPANY LIMITED

## INTRODUCTION

We refer to our appointment as the independent financial adviser to the Independent Board Committee and the shareholders of the Company (the "**Shareholders**") in respect of the connected transaction in relation to the Share Exchange and Merger Agreement, particulars of which are set out in the "Letter from the Board" (the "**Letter**") contained in the circular of the Company dated 28 December, 2007 (the "**Circular**"), of which this letter forms part. Capitalised terms used in this letter shall have the same meanings ascribed to them in the Circular unless the context otherwise requires.

As disclosed in the announcement of the Company dated 11 December, 2007, the Company entered into the Share Exchange and Merger Agreement with China Fiberglass, Jushi and the Other Parties on 7 December, 2007. As China Fiberglass is a substantial shareholder of CNBM Investment Company Limited (中建材投資有限公司), and therefore a connected person of the Company within the meaning of the Listing Rules and the Share Exchange and Merger Agreement hence constitutes a connected transaction of the Company under Chapter 14A of the Listing Rules and is subject to the reporting, announcement and independent shareholders' approval requirements under the Listing Rules.

The Company had applied to the Stock Exchange for a waiver under Rule 14A.43 of the Listing Rules from the requirement to hold a shareholders' meeting to consider and approve the Share Exchange and Merger Agreement. The waiver would be sought on the basis that (i) no shareholder of the Company is required to abstain from voting if the

Company were to convene a general meeting to approve the Share Exchange and Merger Agreement because no shareholder of the Company has an interest that is different from that of other shareholders in relation to the Share Exchange and Merger Agreement; and (ii) written approval has been obtained from Parent and its three wholly owned subsidiaries, namely Beijing New Building Material (Group) Company Limited, China National Building Material Import and Export Company and China Building Materials Academy, which as at the Latest Practicable Date, collectively hold approximately 56.02% of the issued shares in the Company, giving them the right to attend and vote at the general meeting of the Company to approve the Share Exchange and Merger Agreement. On 18 December, 2007, the Stock Exchange granted the waiver under Rule 14A.43 and no shareholders' meeting will be held to consider and approve the Share Exchange and Merger Agreement.

## INDEPENDENT BOARD COMMITTEE

The Independent Board Committee, comprising all the independent non-executive directors of the Company, namely Mr. Zhang Renwei, Mr. Zhou Daojiong, Mr. Chi Haibin and Mr. Lau Ko Yuen, Tom, has been established to give advice to the Shareholders in relation to the Share Exchange and Merger Agreement.

We have been appointed to advise the Independent Board Committee and the Shareholders as to whether the terms of the Share Exchange and Merger Agreement are fair and reasonable so far as the Shareholders are concerned and are on normal commercial terms and whether the entering into of the Share Exchange and Merger Agreement is in the ordinary and usual course of business of the Company and in the interests of the Company and the Shareholders as a whole.

## BASIS OF OUR OPINION

In formulating our opinion, we have relied on the information, statements, opinions and representations provided to us by the Company, its representatives and the directors of the Company for which they are solely and wholly responsible and we have assumed that all such information, statements, opinions and representations contained or referred to in the Circular were true, accurate and complete at the time they were made and continue to be true, accurate and complete at the date of the Circular. We have assumed that all statements of belief, opinion and intention made by the Company, its representative and the directors of the Company as set out in the Circular were reasonably made after due and careful enquiry. We have also sought and obtained confirmation from the Company that no material facts have been omitted from the information provided and referred to in the Circular. The directors of the Company confirmed that they have provided us with all currently available information and documents which are available under present circumstances to enable us to reach an informed view and we have relied on the accuracy of such information and the information contained in the Circular to provide a reasonable basis of our opinions.

Our review and analyses were based upon the information provided by the Company which include, among others, (i) the Share Exchange and Merger Agreement; (ii) the annual reports of the Company for two years ended 31 December, 2006; (iii) the interim report of the Company for the six months ended 30 June, 2007; (iv) the announcements of the Company dated 27 August, 2007 and 11 December, 2007 in relation to the China Fiberglass Subscription and the Jushi Disposal; and (v) the annual reports of China Fiberglass for two years ended 31 December, 2006 and the third quarter report of China Fiberglass for the nine months ended 30 September, 2007. We consider that we have reviewed sufficient information which enables us to reach an informed view and to provide us with a reasonable basis for our opinion. We have no reason to suspect that any material facts or information which is known to the Company, its representatives and the directors of the Company have been omitted or withheld from the information supplied or opinions expressed in the

CNBMCO00106266

Circular nor to doubt the truth, accuracy and completeness of the information, facts, and representation provided, or the reasonableness of the opinions and representation expressed by the Company, its representatives and the directors of the Company. We have not, however, carried out any independent verification on the information provided to us by the Company, its representatives and the directors of the Company, nor have we conducted an independent in-depth investigation into the business affairs, assets and liabilities, and the prospects of the Company, China Fiberglass and Jushi.

Our opinion is necessarily based upon the financial, economic, market, regulatory and other conditions as they exist on, and the facts, information, representations and opinions made available to us as of, the Latest Practicable Date. We disclaim any undertaking or obligation to advise any person of any change in any fact or matter affecting the opinion expressed herein, which may come or be brought to our attention after the Latest Practicable Date.

## PRINCIPAL FACTORS AND REASONS CONSIDERED

In arriving at our opinion to the Independent Board Committee and the Shareholders, we have considered the following principal factors and reasons:

1.  **Information on the Group**

    The Group is a leading building materials group in the PRC with significant operations in the cement, lightweight building materials, glass fiber and fiberglass reinforced plastics products, and engineering services business segments.

    *Review of financial performance of the Group*

    Based on the information set out in the annual reports for 2005 and 2006 and the interim report for 2007 of the Company, the financial results of the Company are summarized as follows:

    |  | For the year ended 31 December, | | | Six months ended 30 June, | |
    |---|---|---|---|---|---|
    |  | **2004** | **2005** | **2006** | **2006** | **2007** |
    |  | (Audited) | (Audited) | (Audited) | (Unaudited) | (Unaudited) |
    |  | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
    | Revenue | 2,898,072 | 4,726,544 | 6,451,830 | 2,703,484 | 3,643,541 |
    | Gross profit | 554,757 | 874,141 | 1,297,228 | 500,053 | 724,964 |
    | Gross profit margin | 19.14% | 18.49% | 20.11% | 18.50% | 19.90% |
    | Profit/(Loss) attributable to equity holders of the Company | 193,138 | 351,105 | 298,146 | (2,277) | 256,416 |
    | Net profit margin | 6.66% | 7.43% | 4.62% | Not applicable | 7.04% |

    The Company's consolidated revenue for the year ended 31 December, 2005 amounted to 4,726.5 million, representing an increase of 63.1% from RMB2,898.1 million in 2004, primarily due to an increase of RMB844.4 million in revenue from the Group's lightweight building materials segment. Accordingly, the profit attributable

CNBMCO00106267

to equity holders of the Company increased by 81.8% from RMB193.1 million in 2004 to RMB351.1 million in 2005 and the net profit margin improved to 7.43% from 6.66%.

For the year ended 31 December, 2006, the Company's consolidated revenue amounted to RMB6,451.8 million, representing an increase of 36.5% from RMB4,726.5 million in 2005, primarily due to an increase of RMB942.9 million in revenue from the Group's cement segment. The profit attributable to equity holders of the Company decreased by 15.1% from RMB351.1 million in 2005 to RMB298.1 million in 2006, which included the loss from consideration paid for the share conversions of certain subsidiary and associated companies of the Company. Excluding such loss from share conversions, profit attributable to equity holders of the Company would increase by 56.9% to RMB550.9 million.

For the six months ended 30 June, 2007, the Company's unaudited consolidated revenue grew by 34.8% to RMB3,643.5 million from RMB2,703.5 million for the six months ended 30 June, 2006 which was primarily attributable to an increase of RMB586.4 million in revenue from the cement segment. The unaudited profit attributable to equity holders of the Company increased to RMB256.4 million for the six months ended 30 June, 2007 from a loss of RMB2.3 million for the six months ended 30 June, 2006. However, the latter had taken into account the loss of share conversion of certain subsidiary and associated companies of the Company. Excluding such losses, the profit attributable to equity holders of the company for the six months ended 30 June, 2006 would be RMB193.0 million.

2.    **Overview of the fiberglass industry in the PRC and the Group's competitive position**

As both China Fiberglass and Jushi are engaged in production and sales of glass fiber products, we have reviewed the fiberglass industry in the PRC. The PRC's economy has been experiencing continuous growth in previous years. According to the National Bureau of Statistics of China, from 2000 to 2005, the PRC's nominal gross domestic product ("GDP") grew from RMB9,921 billion to RMB18,308 billion, representing a compound annual growth rate of 13.0%. In 2006, the PRC's nominal GDP reached RMB20,941 billion, which increased by RMB2,633 billion, or 14.4%, from that in 2005. According to the Economist Intelligence Unit, the PRC's economy is expected to continue growing rapidly in the coming years. The strong growth was contributed by, among others, rapid growth in fixed assets investments such as properties.

Benefiting from the rapid growth in fixed assets investment in the PRC, the PRC's glass fiber industry recorded a steady growth in output and profitability in 2006. As stated in the 2006 annual report of the Company, according to China Fiber Glass Industry Association, the accumulative output of glass fiber in the PRC increased year-on-year by approximately 22.18% to approximately 1.1607 million tonnes. Profit for the whole industry increased by approximately 39.65% in 2006.

Pursuant to the 2007 interim report of the Company, in the first half of 2007, coupled with the fully-loaded production across the industry, surging sales and under-supplying with certain products, the output of glass fiber of the PRC increased year-on-year by approximately 27.3% to approximately 820,000 tonnes, while sales-output ratio increased year-on-year by approximately 0.6% to approximately 99.5%. The total output of the major three domestic glass fiber manufacturers as led by China Fiberglass, an associate company of the Company, accounted for approximately half of the total industry output.

CNBMCO00106268

The fiberglass business of the Company is mainly conducted in its associate China Fiberglass. Based on the information set out in the annual reports for 2005 and 2006 and the third quarter report for 2006 and 2007 of China Fiberglass, the financial data of China Fiberglass is set out below:

| | For the year ended 31 December, | | | For the nine months ended 30 September, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | *RMB'000* | | |
| Revenue | 1,145,654 | 1,464,189 | 2,016,801 | 1,432,668 | 2,253,130 |
| Net profit | 91,846 | 123,476 | 136,050 | 177,705 | 343,127 |
| Total assets | 2,754,892 | 3,798,081 | 5,489,943 | 5,683,623 | 7,817,094 |
| Total liabilities | 1,796,278 | 2,562,393 | 3,981,027 | 4,326,099 | 5,357,733 |
| Net assets | 958,614 | 1,235,688 | 1,508,916 | 1,357,524 | 2,459,361 |

We note that the results and asset bases of China Fiberglass are on an upside trend which is consistent with the growth of glass fiber market in the PRC.

3.   **Background of the Share Exchange and Merger Agreement**

As disclosed in the Company's announcement dated 27 August, 2007, the Company and the Other Parties proposed to subscribe for not more than 250 million A shares of China Fiberglass, and in consideration, the Company and the Other Parties would transfer to China Fiberglass of 11.5% and 37.5% equity interests in Jushi, respectively. On the same date, two announcements are also made by China Fiberglass and published in the PRC in relation to, respectively, (i) the proposed transfer to China Fiberglass of an 11.5% and 37.5% equity interests in Jushi by the Company and the Other parties, respectively; and (ii) China Fiberglass' board resolutions dated 27 August, 2007 approving, amongst other things, the proposed subscription of not more than 250 million A shares of China Fiberglass by the Company and the Other Parties.

On 7 December, 2007 after trading hours, the Company, China Fiberglass, Jushi and the Other Parties (being a group of equity holders of Jushi holding an aggregate of 37.5% equity interest in Jushi) entered into the Share Exchange and Merger Agreement which is a formal agreement to subscribe for 177,004,000 A shares of China Fiberglass and in consideration, the Company and the Other Parties will dispose of 11.5% and 37.5% equity interests in Jushi to China Fiberglass, respectively.

4.   **Information on China Fiberglass**

China Fiberglass is a joint stock limited company incorporated under PRC law and an associated company of the Company. It is principally engaged in the production and sale of glass fiber products. Its A shares have been listed on the Shanghai Stock Exchange since 1999.

Based on the generally accepted accounting principles in the PRC, the audited net asset value of China Fiberglass as at 30 June, 2007 was approximately RMB910,227,000. Its audited profit before tax and minority interest for the two years ended 31 December, 2005 and 2006 was approximately RMB324,260,000 and RMB245,774,000

CNBMCO00106269

respectively. Its audited profit after tax and minority interest for the two years ended 31 December, 2005 and 2006 was approximately RMB136,050,000 and RMB123,476,000 respectively. China Fiberglass is and will continue to be equity accounted for as an associated company of the Company before and after completion of the China Fiberglass Subscription and the Jushi Disposal.

**5.   Information on Jushi**

Jushi manufactures and sells glass fiber and related products in China. It has a registered capital of US$151,200,000. Its annual production capacity is about 500,000 tonnes. Jushi will cease to be a separate legal entity after completion of the Jushi Disposal.

The Company purchased the 11.5% equity interest in Jushi for a consideration of US$46,428,448 on 5 January, 2007.

Based on the generally accepted accounting principles in the PRC, the audited profit of Jushi before tax and minority interest for the two years ended 31 December, 2005 and 2006 was approximately RMB354,605,000 and RMB233,369,000 respectively. Its audited profit after tax and minority interest for the two years ended 31 December, 2005 and 2006 was approximately RMB253,062,000 and RMB185,558,000 respectively. Jushi is equity accounted for as an associated company of the Company before completion of the China Fiberglass Subscription and the Jushi Disposal and its results will no longer be accounted for by the Company after that.

**6.   Major terms of Share Exchange and Merger Agreement**

Under the Share Exchange and Merger Agreement, the Company and the Other Parties agreed to subscribe 177,004,000 A shares of China Fiberglass, of which 41,541,755 A shares of China Fiberglass will be subscribed by the Company at the subscription price of approximately RMB17.97 per A share ("Subscription Price") and in consideration of this, the Company and the Other Parties will dispose of 11.5% and 37.5% equity interests in Jushi to China Fiberglass.

The 177,004,000 A shares in China Fiberglass are subject to a thirty-six-month lock up period from the date the Company and the Other Parties become the registered shareholders of such shares.

The shareholders of China Fiberglass (including the Company and the Other Parties) are entitled to share the retained earnings of China Fiberglass as at the Transition Date in proportion to the respective equity interests in China Fiberglass held by them after completion of the Share Exchange and Merger Agreement.

Each of the Company and the Other Parties will compensate China Fiberglass in cash for any losses incurred by Jushi during the period between 30 June, 2007 and the Transition Date (or if the Transition Date falls in the middle of a month, the last day of such month) in proportion to their respective equity interests in Jushi.

The Company and the Other Parties agreed to provide several profit guarantee in favour of Jushi to the effect that save for the occurrence of certain force majeure events, if the net profits of Jushi for the two years ending 31 December, 2007 and 2008 fall below RMB452,660,000 and RMB550,000,000 respectively, the Company and the Other Parties will have to (i) compensate Jushi in cash or (ii) distribute the A shares of China Fiberglass held by

CNBMCO00106270

the Company and, or the Other Parties to the holders of the tradable and listed A shares of China Fiberglass correlating to the amount of the shortfall for the relevant year pro-rata to their respective proportions of equity holdings in Jushi prior to the Jushi Disposal. The projected net profits of Jushi of RMB452,660,000 and RMB550,000,000 for the two years ending 31 December, 2007 and 2008, respectively, are determined on the basis of the internal profit projections of Jushi.

We are of the view that the major terms of the Share Exchange and Merger Agreement has been entered into on normal commercial terms in the ordinary and usual course of business of the Company and the terms of the Share Exchange and Merger Agreement are fair and reasonable and in the interests of the Company and its shareholders as a whole.

7.  **Original investment costs in Jushi and the market value of the China Fiberglass A Shares**

The subscription price is subject to adjustments to reflect any payment of dividends, bonus issues and capitalisation of capital reserves funds etc., which events occur prior to the Transition Date. 28 August, 2007 was the reference date for the purpose of obtaining the relevant approvals from the board of directors, shareholders and the relevant governmental and regulatory authorities in the PRC by China Fiberglass, one of the conditions precedents of the Share Exchange and Merger Agreement. The closing price of the A shares of China Fiberglass on 7 December, 2007 was RMB26.99.

The Subscription Price of RMB17.97 represents:

(a)  a discount of approximately 33.4% to the closing price of RMB26.99 per A shares of China Fiberglass as quoted on the Shanghai Stock Exchange on 7 December, 2007, being the date of the Share Exchange and Merger Agreement;

(b)  a discount of approximately 27.5% to the average closing price of RMB24.79 per A shares of China Fiberglass as quoted on the Shanghai Stock Exchange for the last five consecutive trading days up to and including 7 December, 2007; and

(c)  a discount of approximately 24.6% to the average closing price of RMB23.8 per A shares of China Fiberglass as quoted on the Shanghai Stock Exchange for the last ten consecutive trading days up to and including 7 December, 2007; and

(d)  a discount of approximately 36.6% to the closing price of RMB28.34 per A shares of China Fiberglass as quoted on the Shanghai Stock Exchange on the Latest Practicable Date.

Given that the Subscription Price represents a substantial discount to the prevailing market price of the A shares of China Fiberglass, we consider that the Subscription Price is fair and reasonable and is in the interests of the Company and the Shareholders as a whole.

We would like to draw Shareholders' attention that (i) the Company purchased the 11.5% equity interest in Jushi for a consideration of US$46,428,448 (or about RMB338 million) on 5 January, 2007; and (ii) the consolidated audited net asset value of Jushi was approximately RMB2,567,892,006 as at 30 June, 2007 based on the generally

accepted accounting principle in the PRC and the Company's 11.5% equity interests attributed net asset value was about RMB295,307,580. However, the market value of 41,541,755 A shares of China Fiberglass to be issued to the Company is about RMB1,121,211,967 based on the closing price of RMB26.99 per A shares of China Fiberglass as quoted on the Shanghai Stock Exchange on 7 December, 2007, being the date of the Share Exchange and Merger Agreement.

In addition, based on 41,541,755 A shares of China Fiberglass to be issued to the Company upon completion of the Share Exchange and Merger Agreement and the Company's original costs of US$46,428,448 (or about RMB338 million) for the 11.5% equity interest in Jushi which is used to exchange for those A shares of China Fiberglass, the Company's original cost per A Shares of China Fiberglass is about RMB8.1 each and it represented a substantial discount of about 54.9% and 70.0% to subscription price of RMB17.97 and the closing price of RMB26.99 per A shares of China Fiberglass as quoted on the Shanghai Stock Exchange on 7 December, 2007, being the date of the Share Exchange and Merger Agreement.

We are of the view that the terms of the Share Exchange and Merger Agreement are fair and reasonable and in the interests of the Company and its Shareholders as a whole.

**8.    Reasons for the Share Exchange and Merger Agreement**

As disclosed in the Letter, the directors of the Company believe that the Share Exchange and Merger Agreement allows the Company to continue its investment in Jushi indirectly via the Company's investment in China Fiberglass. At the same time, China Fiberglass, an associated company of the Company, will fully control Jushi and is expected to benefit economically from the enlarged asset base of Jushi and the anticipated profit growth of Jushi in the future. The anticipated improvement in the profits of Jushi is expected to benefit the Company indirectly as the effective equity interest of the Company in Jushi will increase from approximately 29.94% to approximately 32.43% (after taking into account the dilutive effect on the Company's equity interest in China Fiberglass as a result of the China Fiberglass Subscription).

As stated in the interim report 2007 of the Company, the Group will actively expedite the acquisition, merger and restructuring projects to ensure further low-cost expansion and to boost industry consolidation, restructuring and integration of regional markets and resources. In particular for the glass fiber business, the Group will continue investing in research and development and innovation to enhance product quality, improve production efficiency and further reduce costs.

As set out in the sections headed "Information on China Fiberglass" and "Information on Jushi" in this letter, both China Fiberglass and Jushi are principally engaged in the production and sale of glass fiber products. We are of the view that the China Fiberglass Subscription and the Jushi Disposal are restructuring of the existing businesses and thus align with the overall business strategy of the Group. Upon completion of the China Fiberglass Subscription and the Jushi Disposal, China Fiberglass will fully control Jushi and Jushi will become a branch of China Fiberglass and its legal capacity will be deregistered. The Company thus can regroup its fiber glass business under a flagship company, China Fiberglass, which is a leading fiber glass products manufacturer in PRC. By consolidating with China Fiberglass, it is expected that original assets of Jushi can provide a higher return due to the benefits from economies of scale, including higher production efficiencies and lower production costs.

Not Confidential

As the effective equity interest of the Company in Jushi will increase from approximately 29.94% to approximately 32.43% upon completion, the Company will enjoy such benefit of Jushi. Therefore we concur with the view of the directors of the Company that the Share Exchange and Merger Agreement has been entered into on normal commercial terms in the ordinary and usual course of business of the Company and the terms of the Share Exchange and Merger Agreement are fair and reasonable and in the interests of the Company and the Shareholders as a whole.

9.    **Financial effects of the Share Exchange and Merger Agreement**

The financial effects of the Share Exchange and Merger Agreement on the Group are summarized as the following:

*Earnings*

Before completion of the Share Exchange and Merger Agreement, both China Fiberglass and Jushi are equity accounted for as an associated company of the Company. After completion, Jushi's results will no longer be accounted for by the Company while China Fiberglass will continue to be equity accounted for as an associated company of the Company. As none of the results of Jushi and China Fiberglass will be consolidated to the account of the Company, the immediate effect on the consolidated profit of the Company should be minimal. We note from the annual report of China Fiberglass that large proportion of consolidated assets and results of China Fiberglass are accredited to Jushi, which is a subsidiary of China Fiberglass and its accounts are consolidated into the accounts of China Fiberglass. Therefore, although upon completion of the Share Exchange and Merger Agreement the Company's interest in China Fiberglass's other assets (other than interest in Jushi) will be diluted from 36.15% to 32.43%, the increase in the Company's effective interest in Jushi's asset from 29.9% to 32.4% will enable the Company to enjoy a higher profit from China Fiberglass's enlarged asset base.

*Liquidity and financial resources*

As the considerations for the Share Exchange and Merger Agreement will be fully settled against each other and no cash consideration is involved, there should not be any effect on the Group's liquidity and financial resources.

Based on the above analysis, it appears that the China Fiberglass Subscription and the Jushi Disposal will have a minimal impact on the financial performance and liquidity of the Company. Having considered (i) the strategy of the Company is to restructure the Group's business; and (ii) the expected higher return the assets of Jushi due to the benefits from economies of scale, which has been discussed in the paragraph headed "Reasons for the Share Exchange and Merger Agreement" in this letter, we consider that it is possible for the Share Exchange and Merger Agreement to be beneficial to the Company in long run.

**CONCLUSIONS**

Having considered the above principal factors and reasons, we are of the view that the Share Exchange and Merger Agreement has been entered into on normal commercial terms and in the ordinary and usual course of business of the Company and the terms of the Share Exchange and Merger Agreement are fair and reasonable and in the interests of the Company and the Shareholders as a whole. Accordingly, we recommend the Independent Board Committee to advise the

Shareholders to vote in favour of the resolution approving the Share Exchange and Merger Agreement if a meeting of Shareholders has to be convened.

<div align="center">

For and on behalf of

**GF Capital (Hong Kong) Limited**

**Dino Ng**

*Director and Co-Head of Corporate Finance*

</div>

CNBMCO00106274

APPENDIX                                          GENERAL INFORMATION

## 1.    RESPONSIBILITY STATEMENT

This circular includes particulars given in compliance with the Listing Rules for the purpose of giving information with regard to the Company. The directors of the Company collectively and individually accept full responsibility for the accuracy of the information contained in this circular concerning the Company and confirm, having made all reasonable enquiries, that to the best of their knowledge and belief, there are no other facts not contained in this circular the omission of which would make any statement herein misleading.

## 2.    DISCLOSURE OF DIRECTORS' INTEREST

As at the Latest Practicable Date, as far as the Company is aware, none of the directors and supervisors of the Company had any interests or short positions in the shares, underlying shares or debentures of the Company or any of its associated corporations (as defined in the SFO) which were required to be recorded in the register required to be kept under Section 352 of the SFO, or otherwise required to be notified by the directors or supervisors to the Company and the Stock Exchange pursuant to Divisions 7 and 8 of Part XV of the SFO (including interest and short position which he is taken or deemed to have under such provisions of the SFO) or the Model Code for Securities Transactions by Directors of Listed Issuers set out in Appendix 10 to the Listing Rules nor have they been granted the right to acquire any interests in the shares or debentures of the Company or any of its associated corporations.

## 3.    SUBSTANTIAL SHAREHOLDERS

So far as was known to any director or supervisor of the Company, as at the Latest Practicable Date, the persons (other than the directors and supervisors of the Company) who had interests or short positions in the shares or underlying shares of the Company which were required to be disclosed to the Company and the Stock Exchange under the provisions of Divisions 2 and 3 of Part XV of the SFO, or which were recorded in the register required to be kept by the Company under Section 336 of the SFO or had otherwise notified to the Company were as follows:

| Name | Class of shares | Number of shares held | Approximate percentage in the relevant class of share capital $_{2,5}$ (%) | Approximate Percentage in total share capital $_{2,5}$ (%) |
|---|---|---|---|---|
| Parent$_1$ | Domestic | 1,237,188,659$_3$ | 94.70 | 56.02 |
| BNBMG$_1$ | Domestic | 771,776,923$_3$ | 59.08 | 34.95 |
| CNBM Trading$_1$ | Domestic | 118,304,112$_3$ | 9.06 | 5.36 |
| Cinda | Domestic | 69,216,154$_3$ | 5.30 | 3.13 |
| JPMorgan Chase & Co. | H Shares | 250,824,156$_3$ | 27.80 | 11.36 |

| | | | | |
|---|---|---|---|---|
| | H Shares | 110,124,156[4] | 12.21 | 4.99 |
| Atlantis Investment Management Ltd | H Shares | 68,950,000[3] | 7.64 | 3.12 |
| Halbis Capital Management (Hong Kong) Limited | H Shares | 61,946,000[3] | 6.87 | 2.80 |
| Baring Asset Management Limited | H Shares | 46,094,000[3] | 5.11 | 2.09 |
| Northern Trust Fiduciary Services (Ireland) Limited | H Shares | 45,998,000[3] | 5.10 | 2.08 |
| T. Rowe Price Associates, Inc. And Its Affiliates | H Shares | 45,204,000[3] | 5.01 | 2.05 |

*Notes:*

1.    Of these 1,237,188,659 shares, 346,498,205 shares are directly held by Parent, the remaining 890,690,454 shares are deemed corporate interest indirectly held through BNBMG, CNBM Trading and China Building Materials Academy. CNBM Trading and China Building Materials Academy are wholly owned subsidiaries of Parent. BNBMG is a subsidiary of Parent which directly and indirectly holds 100% equity interest in BNBMG, of which 75% is directly held and 25% is indirectly held through CNBM Trading. Under the SFO, Parent is deemed to own the shares directly held by BNBMG (771,776,923 shares), CNBM Trading (118,304,112 shares) and China Building Materials Academy (609,419 shares).

2.    As at the Latest Practicable Date, the Company's total issued share capital comprises 2,208,488,000 shares, including 1,306,404,813 domestic shares and 902,083,187 H shares.

3.    Long position.

4.    Lending pool.

5.    All the above percentages are calculated by rounding to two decimal places.

Save as disclosed above, as at the Latest Practicable Date, the Company has not been notified by any persons who have interests or short positions in the shares or underlying shares of the Company which would fall to be disclosed to the Company under the provisions of Divisions 2 and 3 of Part XV of the SFO, or which were recorded in the register required to be kept by the Company under Section 336 of the SFO.

## 4.    SERVICE CONTRACTS

As at the Latest Practicable Date, none of the directors of the Company had a service contract with any member of the Group nor was there any proposed service contract which was not determinable within one year without payment of compensation (other than statutory compensation).

## 5.    INTERESTS IN ASSETS, CONTRACTS AND OTHER INTERESTS

As at the Latest Practicable Date, none of the directors and supervisors of the Company had any direct or indirect interest in any assets which have been acquired, disposed of or leased to, or which are proposed to be acquired, disposed of or leased to, the Company or any of its subsidiaries since 31 December, 2006, the date to which the

CNBMCO00106276

latest published audited accounts of the Group were made up.

As at the Latest Practicable Date, there is no contract or arrangement subsisting in which any director or supervisor of the Company is materially interested and which is significant in relation to the business of the Group.

As at the Latest Practicable Date, none of the directors and their associates had interests in any business which competes or is likely to compete, either directly or indirectly, with the business of the Group.

## 6.   MATERIAL ADVERSE CHANGE

The Board is not aware of any material adverse change in the financial or trading position of the Company since 31 December, 2006, being the date of the latest published audited accounts of the Company.

## 7.   EXPERT

GF Capital is a corporation licensed to carry out type 6 (advising on corporate finance) regulated activities under the SFO and the independent financial adviser to the Independent Board Committee and the shareholders of the Company regarding the Equity Transfer Agreements and the Share Exchange and Merger Agreement.

GF Capital has given and has not withdrawn its written consent to the issue of this circular with the inclusion of its letters and reference to its name in the form and context in which they appear.

As at the Latest Practicable Date, GF Capital was not beneficially interested in the share capital of any member of the Group nor did it has any right (whether legally enforceable or not) to subscribe for or to nominate persons to subscribe for securities in any member of the Group nor did it have any interest, either direct or indirect, in any assets which have been, since 31 December, 2006, being the date to which the latest published audited account of the Company, were made up, acquired, disposed of by or leased to or are proposed to be acquired or disposed of by or leased to any member of the Group.

## 8.   PROCEDURES FOR DEMANDING A POLL BY SHAREHOLDERS

At any general meeting of the Company, a resolution shall be decided on a show of hands unless a poll is (before or after any vote by show of hands) demanded:

(1)     by the chairman of the meeting;

(2)     by at least two shareholders entitled to vote present in person or by proxy; or

(3)     by one or more shareholders present in person or by proxy and representing 10% or more of all shares carrying the right to vote at the meeting.

Unless a poll be so demanded, a declaration by the chairman that a resolution has on a show of hands been carried unanimously, or carried by a particular majority, or lost, and an entry to that effect in the minutes of the meeting

CNBMCO00106277

shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against such resolution. The demand for a poll may be withdrawn by the person who makes such demand.

A poll demanded on the election of the chairman of the meeting, or on a question of adjournment of the meeting, shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs, and any business other than that upon which a poll has been demanded may be proceeded with, pending the taking of the poll. The result of the poll shall be deemed to be a resolution of the meeting at which the poll was demanded. On a poll taken at a meeting, a shareholder (including proxy) entitled to two or more votes need not cast all his votes in the same way.

In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded shall be entitled to one additional vote.

## 9.   LITIGATION

None of the members of the Group was engaged in any litigation or arbitration or claims of material importance which is known to the directors of the Company to be pending or threatened by or against either the Company or any of its subsidiaries as at the Latest Practicable Date.

## 10.   GENERAL

(a)   The joint company secretaries of the Company are Mr. Chang Zhangli and Ms. Lo Yee Har, Susan. Ms. Lo is a fellow member of both the Institute of Chartered Secretaries and Administrators and the Hong Kong Institute of Chartered Secretaries.

(b)   The qualified accountant of the Company is Ms. Pei Hongyan, a member of the Association of Chartered Certified Accountants.

(c)   The H share registrar and transfer office of the Company in Hong Kong is Tricor Investor Services Limited at 26th Floor, Tesbury Centre, 28 Queen's Road East, Wanchai, Hong Kong.

(d)   The Company's registered office in PRC is at No. A-11 Sanlihe Road, Haidian District, Beijing, PRC.

(e)   The Company's place of business in Hong Kong is at Level 28, Three Pacific Place, 1 Queen's Road East, Hong Kong.

(f)   The English text of this circular prevails over the Chinese text.

## 11.   DOCUMENTS AVAILABLE FOR INSPECTION

Copies of the following documents will be available for inspection at the office of the Company in Hong Kong at Level 28, Three Pacific Place, 1 Queen's Road East, Hong Kong during normal business hours on any weekday (except public holidays) from the date of this circular up to and including 11 January, 2008:

CNBMCO00106278

(a)    memorandum and articles of association of the Company;

(b)    the letters from GF Capital to the Independent Board Committee and the shareholders of the Company, the text of which are set out on pages 17 to 38 of this circular;

(c)    the consent letter issued by GF Capital as referred to in the paragraph headed "Expert" in this appendix;

(d)    BNBM Equity Transfer Agreement;

(e)    China Fiberglass Equity Transfer Agreement; and

(f)    Share Exchange and Merger Agreement.

CNBMCO00106279