Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF LOUISIANA
 3                      -   -   -
 4

        IN RE:                :  MDL NO. 2047
 5      CHINESE-MANUFACTURED  :
        DRYWALL PRODUCTS       :  SECTION:  L
 6      LIABILITY LITIGATION   :
                              :  JUDGE FALLON
 7      THIS DOCUMENT APPLIES  :
        TO ALL CASES          :  MAG. JUDGE WILKINSON
 8                            :
                      -   -   -
 9              April 22, 2015
10                      -   -   -
11      CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
12
13              30(b)(6) Videotaped deposition
        of New Jersey Institute of Technology through
14      its Designee, DONALD H. SEBASTIAN, Ph.D.,
        taken pursuant to notice, was held at the
15      law offices of Potters & Della Pietra, LLP,
        100 Passaic Avenue, Fairfield, New Jersey,
16      beginning at 10:41 a.m., on the above date,
        before Michelle L. Gray, a Registered
17      Professional Reporter, Certified Shorthand
        Reporter and Notary Public.
18
                      -   -   -
19
20
21
22          GOLKOW TECHNOLOGIES, INC.
23       877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com
```

CONTEMPT
Exhibit 138

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2

 3       SEEGER WEISS, LLP
         BY:  SCOTT ALAN GEORGE, ESQUIRE
 4       1515 Market Street, Suite 1380
         Philadelphia, Pennsylvania 19102
 5       (215) 553-7982
         Sgeorge@seegerweiss.com
 6       Representing the Plaintiffs

 7

         LEVIN, FISHBEIN, SEDRAN & BERMAN
 8       BY:  MATTHEW C. GAUGHAN, ESQUIRE
         510 Walnut Street, Suite 500
 9       Philadelphia, Pennsylvania 19106
         (215) 592-1500
10       mgaughan@lfsblaw.com
         Representing the Plaintiffs

11

12       POTTERS & DELLA PIETRA, LLP
         BY:  GARY POTTERS, ESQUIRE
13       100 Passaic Avenue
         Fairfield, New Jersey 07004
14       (973) 575-5240
         gpotters@pdplawfirm.com
15       Representing NJIT and the Witness

16

         ORRICK, HERRINGTON & SUTCLIFFE, LLP
17       BY:  KELLY M. DALEY, ESQUIRE
         BY:  HANNAH JUNKERMAN, ESQUIRE
18       51 West 52nd Street
         New York, New York 10019
19       (212) 506-5397
         kdaley@orrick.com
20       Representing the Defendant, CNBM
         entities

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1      TELEPHONIC APPEARANCES:  (Cont'd.)
 2

        ALSTON & BIRD, LLP
 3      BY:  MACKENZIE (MACK) KAHNKE, ESQUIRE
        1201 West Peachtree Street
 4      Atlanta, Georgia 30309
        (404) 881-4828
 5      mackenzie@kahnke@alston.com
        Representing Taishan Gypsum Co.
 6
 7      DENTONS U.S., LLP
        BY:  KATE RUMSEY, ESQUIRE
 8      2000 McKinney Avenue, Suite 1900
        Dallas, Texas 75201
 9      (214) 259-1878
        kate.rumsey@dentons.com
10      Representing the BNBM entities
11
12      VIDEOTAPE TECHNICIAN:
           Henry Marte
13
14      ALSO PRESENT:
15         Brian E. Tierney.
           (NJIT - Deputy General Counsel)
16
17
18                 -   -   -
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                     -  -  -
 2                 I N D E X
 3                   -  -  -
 4
    Testimony of:
 5
                DONALD H. SEBASTIAN, Ph.D.
 6
          By Mr. George          14, 266
 7
          By Ms. Daley           238
 8
 9
10                   -  -  -
11             E X H I B I T S
12                   -  -  -
13
14  NO.            DESCRIPTION            PAGE
15  NJIT-1         Amended Notice of      22
                   Expedited Deposition
16
    NJIT-2         Press Release          40
17                 NJIT Celebrates Growth
                   Of Solar Technology
18
    NJIT-3         Press Release          63
19                 Chinese Partnership
                   Fuels NJIT's Solar
20                 Cell Research
21  NJIT-4         Press Release          74
                   Center Research
22
    NJIT-5         Press Release          75
23                 CNBM New Energy
                   Materials Research
24                 Center
```

Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5    NO.            DESCRIPTION            PAGE
 6    NJIT-6         Non-stoichiometric    82
                     Composition Shift in
 7                   Physical Vapor Deposition
                     Of CdTe Thin Films
 8
      NJIT-7         NJIT PowerPoint       88
 9                   CNBM New Energy
                     Materials Research Center
10                   CdTe Solar Energy
                     Devices R&D Industry
11
      NJIT-8         Copy of Color         92
12                   Photograph
13    NJIT-9         Copy of Color         104
                     Photograph
14
      NJIT-10        Press Release         107
15                   Chinese Delegates to
                     Visit NJIT to Learn of
16                   Sustainability, Solar Energy
17    NJIT-11        Letter, 4/2/13        110
                     From Garber to Wang
18                   NJIT 216
19    NJIT-12        PV Materials          117
                     Technology Agreement
20                   NJIT 2553-610
21    NJIT-13        PV Materials          134
                     Technology Agreement
22                   NJIT 2654-69
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -
 2              E X H I B I T S  (Cont'd.)
 3                      -  -  -
 4
 5   NO.              DESCRIPTION              PAGE
 6   NJIT-14          E-mail Thread           135
                      3/12/13
 7                    Subject, Progress?
                      NJIT 1729-31
 8
     NJIT-15          Initial Proposal        143
 9                    For CNBM - NJIT Apollo
                      CdTe R&D Collaboration
10                    NJIT 2921-24
11   NJIT-16          Proposal, Cooperative   148
                      R&D of CNBM and China
12                    To Shou
                      NJIT 2103-12
13
     NJIT-17          Proposal, Cooperative   154
14                    R&D of Apollo Center
                      To Shou
15                    NJIT 2048-102
16   NJIT-18          Amendment 1 to          156
                      PV Materials Between
17                    China Triumph & NJIT
                      NJIT 2857-60
18
     NJIT-19          NJIT Request to Add     166
19                    Money Cost Center
                      NJIT 1075-101
20
     NJIT-20          Quarterly Report        168
21                    1/1/14 - 3/31/14
                      NJIT 2670-734
22
     NJIT-21          Quarterly Report        171
23                    4/1/14 - 6/30/14
                      NJIT 2775-815
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -
 2             E X H I B I T S  (Cont'd.)
 3                      -  -  -
 4
 5   NO.             DESCRIPTION            PAGE
 6   NJIT-22         Quarterly Report       171
                     4/1/2014 - 7/1/14
 7                   NJIT 2997-23
 8   NJIT-23         Final Report to        172
                     Peng Shou
 9                   NJIT 2861-88
10   NJIT-24         US Patent No.          172
                     8,883,549 B2
11                   NJIT 2909-20
12   NJIT-25         PV Materials           174
                     Technology Development
13                   Agreement
                     NJIT 1661-996
14
     NJIT-26         E-mail Thread          176
15                   3/19/15
                     Subject, Final Billing
16                   NJIT 1345-48
17   NJIT-27         E-mail Thread          186
                     3/16/15
18                   Subject, Delivery
                     Of Complete Set of
19                   Reports
                     NJIT 1861-67
20
     NJIT-28         Collaborative          197
21                   Graduate Certificate
                     Program Agreement
22                   Between NJIT &
                     China Triumph
23                   NJIT 5797-809
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -
 2           E X H I B I T S  (Cont'd.)
 3                      -  -  -
 4
 5   NO.           DESCRIPTION           PAGE
 6   NJIT-29       Developing Chinese    200
                   Corporation Employee's
 7                 Talent Continuing
                   Professional Education
 8                 NJIT 3385-86
 9   NJIT-30       Collaborative         201
                   Graduate Certificate
10                 Program Agreement
                   Between NJIT &
11                 China Triumph
                   NJIT 3508-519
12
     NJIT-31       E-mail Thread         203
13                 11/22/13
                   Subject, Untitled
14                 Attachment
                   NJIT 3299-316
15
     NJIT-32       E-mail Thread         207
16                 12/10/13
                   Subject, Information (1)
17                 NJIT 5784-93
18   NJIT-33       E-mail, 12/15/14      210
                   Subject, CTIEC Fee
19                 NJIT 3561
20   NJIT-34       E-mail, 3/19/15       212
                   Subject, CTIEC Wires
21                 NJIT 3570
22   NJIT-35       E-mail Thread         218
                   & Attachment
23                 3/13/14
                   Subject, Revised Contract
24                 NJIT 1803-39
```

Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -
 2             E X H I B I T S  (Cont'd.)
 3                      -  -  -
 4
 5   NO.            DESCRIPTION            PAGE
 6   NJIT-36        E-mail Thread          219
                    5/12/14
 7                  Subject, Payment
                    Back to TECO
 8                  NJIT 715-720
 9   NJIT-37        File Copy of Check     223
                    Direct Expense Form
10                  # 133950
                    NJIT 209-10
11
     NJIT-38        E-mail Thread          224
12                  5/26/14
                    Subject, Revised Contract
13                  NJIT 592-93
14   NJIT-39        E-mail Thread          225
                    5/26/14
15                  Subject, Revised Contract
                    NJIT 621-650
16
     NJIT-40        Cash Receipts &        226
17                  E-mail Thread
                    8/27/14
18                  NJIT 1169-79
19   NJIT-41        Invoice F14CN0210      234
                    3/13/15
20                  NJIT 1705-07
21   NJIT-42        E-mail Thread          236
                    1/7/14
22                  Subject, Contract
                    Closer to the Final
23                  Version
                    NJIT 01788-98
24
```

1                        -   -   -

2              DEPOSITION SUPPORT INDEX

3                        -   -   -

4

5    Direction to Witness Not to Answer

6    PAGE    LINE
     None.

7

8    Request for Production of Documents

9    PAGE    LINE
     182     11

10

11   Stipulations

12   PAGE    LINE
     None.

13

     Questions Marked

14

     PAGE    LINE

15   None.

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
1                      -  -  -

2               THE VIDEOGRAPHER:  We are

3       now on the record.  My name is

4       Henry Marte.  I'm a videographer

5       for Golkow Technologies.

6               Today's date is April 22nd,

7       2015.  And the time is 10:41 a.m.

8               This videotaped deposition

9       is being held at 100 Passaic

10      Avenue, Fairfield, New Jersey, in

11      the matter of In Re:

12      Chinese-Manufactured Drywall

13      Products Liability Litigation in

14      the United States District Court,

15      Eastern District of Louisiana.

16              The deponent is the 30(b)(6)

17      of Dr. Donald Sebastian.

18              Counsel will be noted on the

19      stenographic record.

20              The court reporter is

21      Michelle Gray, and will now swear

22      in the witness.

23                      -  -  -

24      ... DONALD H. SEBASTIAN, Ph.D.,
```

```
1    having been first duly sworn, was

2    examined and testified as follows:

3                       -   -   -

4    BY MR. GEORGE:

5         Q.    Good morning, Dr. Sebastian.

6         A.    Good morning.

7         Q.    Before we start talking, I

8    think counsel should introduce themselves

9    around the table for the record so we're

10   clear.

11             MR. GEORGE:  Scott Alan

12        George from Seeger Weiss, for the

13        PSC.

14             MR. GAUGHAN:  Matthew

15        Gaughan from Levin Fishbein for

16        the PSC as well.

17             MS. DALEY:  All right.

18        Kelly Daley and Hannah Junkerman

19        of Orrick, Herrington & Sutcliffe

20        for defendants --

21             MS. KAHNKE  This is Mack

22        Kahnke on behalf of Alston & Bird,

23        and Taishan Gypsum Co.

24             MR. GEORGE:  You didn't
```

Confidential - Subject to Further Confidentiality Review

```
 1            raise your hand.

 2                 MS. DALEY:  We are on behalf

 3            of the CNBM Company.

 4                 MR. GEORGE:  I missed your

 5            colleague's name.  I'm sorry.  I

 6            missed your colleague's name.

 7                 MS. DALEY:  Hannah

 8            Junkerman.

 9                 MR. GEORGE:  Hannah?

10                 MS. DALEY:  Yes.

11                 MR. TIERNEY:  I'm Brian

12            Tierney from the New Jersey

13            Institute of Technology.  I'm the

14            deputy general counsel.

15                 MR. POTTERS:  Gary Potters,

16            Potters & Della Pietra, on behalf

17            of Dr. Sebastian and NJIT.

18                 MR. GEORGE:  And from

19            Dentons, who was that again?

20                 MS. RUMSEY:  Kate Rumsey

21            Dentons and we are here on behalf

22            of the BNBM entities.

23                 MR. GEORGE:  Okay.  Thank

24            you.
```

Confidential - Subject to Further Confidentiality Review

1           Also, for the defendants who

2      are here, I think we had an

3      agreement last time which worked

4      well where an objection by one

5      defendant would go for all

6      defendants to save time and also

7      the need to have each person say

8      "me too," "me too."

9           Does that make sense to you,

10     on the phone?

11          MS. RUMSEY:  Yes.

12          MR. GEORGE:  Okay.  Thank

13     you.

14          MS. KAHNKE:  That makes

15     sense.

16          MR. GEORGE:  Thank you.

17               -  -  -

18            EXAMINATION

19               -  -  -

20   BY MR. GEORGE:

21        Q.    Good morning, Dr. Sebastian.

22        A.    Good morning.

23        Q.    Could you please tell me

24   what your professional role and title

Confidential - Subject to Further Confidentiality Review

1    are, please?

2         A.    So I am currently the senior

3    vice president for technology in business

4    development at New Jersey Institute of

5    Technology.

6              I have an additional role

7    which is as the president and CEO of the

8    New Jersey Innovation Institute, which is

9    a 501(c)3 research, technology,

10   development organization that we've

11   launched out of the university in July,

12   essentially July 1st of 2014.

13             I'm also a professor of

14   chemical, biological, and pharmaceutical

15   engineering.

16        Q.    That's quite a span.

17        A.    Well, university folks have

18   to have tri-fold business cards.

19        Q.    And you seem to have more

20   than that, even.

21        A.    Well, I think -- I think you

22   can use any one of those.  But I think in

23   the context of today's proceedings, it's

24   probably the first that is the germane.

1      Q.     Senior vice president?

2      A.     Yes.

3      Q.     You mentioned the New Jersey

4   Innovation Institute?

5      A.     Correct.

6      Q.     Which, I believe, actually

7   appears in the headings of one of the

8   contracts that we're going to look at

9   later.

10      A.     Yes.

11      Q.     Tell me a little bit about

12   that institute, please.

13      A.     So we formed NJII at the

14   direction of the president, to create a

15   home for the economic development mission

16   element of the university's overall

17   charter.  We've maintained this since the

18   1980s.  We've invested and perfected many

19   things that are not traditional academic

20   research; extension programs, incubators,

21   outreach programs.  And increasingly

22   focused on developing a capacity to do

23   industrial contract, research and

24   development, much of which is not

1  designed to go into academic publication,

2  but to solve problems.

3            We recognize the growing

4  need and it's not new.  This is something

5  I've watched professionally since the

6  '80s.  With the decline of corporate

7  research and development, there's nothing

8  to fill the void that works on solving

9  the problems that come to us from the

10  industry and industrial sectors.

11            And with the shrinking

12  resources of these companies, we no

13  longer have individual entities, like Ma

14  Bell, that were not just the U.S.

15  telecommunications enterprise, but mostly

16  the global telecommunications enterprise

17  that could afford a Bell Laboratories,

18  how are we going to solve that problem?

19            We see that in many foreign

20  nations.  There are different

21  public/private constructs that pull

22  together industrial sectors, define

23  problems, and go about using academic and

24  nonacademic resources to solve those

Confidential - Subject to Further Confidentiality Review

1    problems.  And that's our mission.

2              There really is not a direct

3    analogue in the United States.  Probably

4    closest to the Fraunhofer Institutes of

5    Germany in terms of model and approach.

6         Q.    Okay.  Now, with the -- the

7    institution that you're the senior VP

8    for, what was that again?

9         A.    Yes.  New Jersey Institute

10   of Technology.

11        Q.    Okay.

12        A.    That is the public research

13   university, they -- the state's

14   polytechnic university.  There are three

15   designated research and development

16   universities in the construct of higher

17   ed, Rutgers -- Rutgers University, which

18   includes now the medical school and the

19   biological health sciences division, and

20   Rowan University, and NJIT.

21        Q.    And these are all State

22   institutions?

23        A.    State institutions, yes,

24   sir.

1    Q.    And you said you're a

2  professor.  What do you -- do you lecture

3  at all?

4    A.    No.  Since attaining the

5  university lead roles, I've not -- I've

6  not been actually active in the

7  classroom.

8    Q.    A little busy?

9    A.    Well, yes.

10   Q.    Okay.  I'm going to ask you,

11  do you understand that today you are

12  testifying on behalf of NJIT, correct?

13   A.    I do understand that, yes.

14   Q.    Okay.  So you can speak with

15  your personal knowledge, but you may need

16  to have talked to several other people to

17  round out your understanding of certain

18  topics?

19   A.    Correct.

20   Q.    Do you understand that?

21   A.    I do understand that.

22   Q.    Are there any areas that

23  you've spoke with other people to prepare

24  yourself to testify today as NJIT?

Confidential - Subject to Further Confidentiality Review

1      A.    I've reviewed the

2  submissions from the other folks who have

3  been involved.  One never knows where the

4  conversation will go, but my

5  understanding of the engagements that

6  we've had with CTIE, in particular, most

7  of them have come from the -- either in

8  the research and development contract

9  work that I'm sure we'll talk about, or

10  in initiating the student trainee

11  opportunity that is documented through

12  Gale Spak's office as our head of

13  continuing professional education.

14      Q.    Okay.  When you say

15  "reviewed submissions," do you mean

16  documents that you believe were produced

17  in this litigation?

18      A.    Correct.  Yes, sir.

19      Q.    Okay.  In reviewing those

20  documents, were those documents produced

21  in the course of NJIT's operations?

22      A.    Yes, sir.

23      Q.    Okay.  And then there's --

24      A.    To the best of my knowledge,

Confidential - Subject to Further Confidentiality Review

1    yes.

2         Q.    Okay.  Well, certainly the

3    ones that you -- e-mails that you wrote

4    and so forth and so on, were all made as

5    part of your responsibilities to the

6    institution, correct?

7         A.    Absolutely.

8         Q.    And they were kept and

9    maintained in the appropriate files or

10   servers by the university?

11        A.    Indeed they have.  You are

12   fortunate that I probably haven't deleted

13   an e-mail in the last ten years.

14        Q.    It was surprising.

15              And that's true for the

16   other documents that you saw as well?

17        A.    Yes, sir.

18        Q.    Did you speak -- aside from

19   reviewing the documents, did you speak

20   with other persons to -- to gain factual

21   knowledge?

22        A.    I did not.

23        Q.    Okay.  Did you do anything

24   else to prepare for today's deposition?

Confidential - Subject to Further Confidentiality Review

```
 1          A.   I -- I -- as I said, I
 2   reviewed the subpoena, and I reviewed the
 3   materials that I prepared.  And the
 4   general outline of the other -- the
 5   sources of the other materials that were
 6   produced.
 7          MR. GEORGE:  All right.
 8          Could you please mark this as
 9          NJIT-1, please.
10          Do you all want to share
11          one?  I have plenty, but I don't
12          want to dump too much on you
13          either.
14          MR. POTTERS:  Yeah, no,
15          that's fine.
16          MS. DALEY:  Thank you.
17          (Document marked for
18          identification as Exhibit
19          NJIT-1.)
20   BY MR. GEORGE:
21          Q.   Okay.  What's been placed
22   before you as NJIT-1 is a titled --
23   document entitled "Amended Notice of
24   Expedited Oral and Videotaped Deposition
```

1    Pursuant to the Court's Directive During

2    the March 17, 2015, Special Hearing and

3    Minute Entry and Order."

4              Have you seen this document

5    before?

6         A.    It appears identical to one

7    that I've seen before --

8         Q.    Okay.  Looking --

9         A.    I've not scanned all of 30

10   pages.

11        Q.    And there are a couple --

12   yeah, I'm not asking you to authenticate

13   this at all.  I'm going to ask particular

14   questions.

15             But initially, as the

16   videographer recited, this is in

17   litigation called In Re:

18   Chinese-Manufactured Drywall Products

19   Liability Litigation.

20             And I'm wondering before

21   getting -- seeing this document, were you

22   aware of this litigation?

23        A.    I was not.

24        Q.    Okay.  And before seeing

1    this document -- well, after seeing this

2    document, are you aware of the fact that

3    there is a contempt order currently

4    pending?

5          A.    My entire knowledge of this

6    case, as well as of the company Taishan,

7    is what I've learned from the -- this

8    document and the attachments.

9          Q.    Okay.  And you mentioned

10   earlier an entity called CTIE?

11         A.    Correct.

12         Q.    Can you tell me what that

13   stands for, please?

14         A.    China Triumph International

15   Engineering.

16         Q.    Okay.  Is it sometimes

17   referred to in the documents that you

18   reviewed as CTIEC?

19         A.    Yes.

20         Q.    They're the same thing?

21         A.    Same thing.  The same thing.

22         Q.    Okay.  So -- and did you --

23   did they -- did CTI or any other agents

24   ever talk to you about this litigation?

1        A.    No, no.  I -- I repeat what

2   I said before.  I had not heard of the

3   litigation or of Taishan until several

4   weeks ago when we received this.

5        Q.    Okay.  Did you speak to any

6   attorneys before today's deposition about

7   today's deposition?

8        A.    Yes.  I -- I met with our

9   university counsel and with our counsel

10  here today.

11       Q.    Okay.  Mr. Potters?

12       A.    Yes, Mr. Potters.

13       Q.    Okay.  Anybody else?

14       A.    That's it.

15       Q.    Okay.  Did Mr. Peng or any

16  other persons with CTIE, talk to you

17  about today's deposition?

18       A.    No, they have not, nor have

19  I communicated with them.

20       Q.    So no e-mails, no phone

21  calls?

22       A.    No.

23       Q.    Okay.  How do you usually

24  communicate with Mr. Peng when you do?

1          A.    Either directly by e-mail or

2    through his direct reports or through,

3    very often, one of our alums, Mr. --

4    Dr. Jingong Pan, who is the CEO of

5    Apollo, which is the beginning of our

6    story of how we became engaged in doing

7    work in cadmium telluride.

8          Q.    I thought that might be the

9    foothold for that, but we'll get there.

10   Could you spell Dr. Jingong Pan's --

11         A.    Last name Pan, P-A-N.  First

12   name J-I-N-G-O-N-G.

13         Q.    O-N-G.  And you said CEO for

14   Apollo?

15         A.    Yes.

16         Q.    Is Apollo still independent

17   or has it been purchased by CTIEC or

18   affiliated with CTIEC?

19         A.    To the best of my

20   understanding, Apollo is still

21   independent and there is a joint venture

22   partnership between Apollo and CTIE, for

23   the purpose of developing thin-film

24   photovoltaic solar cells and solar panels

Confidential - Subject to Further Confidentiality Review

1   incorporating that technology.

2        Q.    And Apollo and Dr. Pan were

3   the original sponsors of a research

4   institution at NJIT, correct?

5        A.    I want to be sure I

6   understood.  Peng or Pan?

7        Q.    P-A-N-G?  Dr. --

8        A.    Jingong Pan, P-A-N, right?

9        Q.    P-A-N.

10        A.    Only because there's Peng

11   Shou, P-E-N-G --

12        Q.    Yeah.  P-A-N, Pan.

13        A.    So Dr. Pan -- originally

14   Mr. Ho was the CEO of Apollo at the time

15   that we formed the relationship.  Our

16   graduate Ph.D. alum, Dr. Pan, formed a

17   relationship and was doing business

18   development work for Mr. Ho, and that's

19   where we initiated, then, the research

20   and development relationship.

21        Q.    Okay.  And did that

22   relationship take any sort of particular

23   form, institutional form, named form,

24   anything like that?

1    A.    It didn't -- it was not a

2    named form.  We signed a three-year R&D

3    contract with Apollo in 2010.  I'd say it

4    was about this time in 2010, March or

5    April of 2010.

6         And I'm sure there is a web

7    page with the exact date and my smiling

8    face shaking Mr. Ho's hand.  That will

9    give you the precise date on that.

10        And then the work really

11   began more in earnest beginning with the

12   summer session, with the end of classes

13   in the summer session of 2010.

14   Q.    And this was focused on

15   developing certain photovoltaic

16   technologies?

17   A.    Yes.  So Apollo is a minor

18   refiner of what are called rare earth

19   metals.  They have the luxury of a unique

20   source of tellurium.  Tellurium ore which

21   is something which is typically a trace

22   contaminant found with other materials,

23   which means it's very difficult to

24   extract useful amounts of the material.

Confidential - Subject to Further Confidentiality Review

1              But they must have been

2    where the comet struck, or whatever.

3    They are a good fortune and they are

4    sitting on sources of tellurium ore.  It

5    was their intent to go from being the

6    creator of raw materials that could go

7    into these next-generation-type solar

8    cells to actually producing their own.

9              And that was where they

10   thought they needed research and

11   development to better understand the

12   things that would influence the

13   manufacturing process by which the raw

14   materials would then be turned into

15   active solar cells and integrated into

16   solar panels.

17         Q.    Okay.  And so this

18   relationship, you said, three-year

19   contract signed somewhere in the spring

20   of 2010?

21         A.    Correct.

22         Q.    Did the full three-year

23   contract play out with Apollo?

24         A.    It did not.

Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2      A.    So after we received the

3  first year's worth of payment, by the

4  second year of the program, apparently

5  Apollo was in a difficult financial

6  position.  But whether they were

7  technically bankrupt or not, I don't

8  understand their system well enough, nor

9  their finances.

10          But the short answer is they

11  were unable to pay.  So we ended up with

12  a year of expenses that were not

13  reimbursed, and obviously, an inability

14  then to proceed with the third year of

15  the program under their funding.

16      Q.    Okay.  Is that when CTIE

17  comes into your life?

18      A.    With one intervention.  We

19  began discussions with another privately

20  held Chinese company that was interested

21  in perhaps taking on the technology.  And

22  that's when Apollo raised the prospect of

23  having CTI step in and essentially

24  underwrite the expenses that hadn't been

```
 1    covered and pick up the new contract.

 2              So it would have been

 3    roughly 2012 time frame where we began

 4    those discussions with CTIE.  And I'm

 5    going to say October-ish, second week of

 6    October after their national -- their

 7    Fourth of July, I think, is October 1st.

 8    It's a week-long celebration.

 9              The president and I and the

10    head of development took a trip to China,

11    a combination of things, to visit alumni,

12    but also to make business contacts.

13              I think we were in seven

14    cities in five days, one of which was a

15    meeting with Mr. Peng in Shanghai, at

16    which time he committed to cover the

17    expenses that were defaulted by Apollo

18    and asked to develop a new relationship

19    with NJIT to continue the work for the

20    development of cadmium telluride solar

21    technology, and perhaps, other things as

22    we went forward.

23         Q.    Okay.  And is it during the

24    same time that you mentioned a joint
```

1    venture within Apollo and CTIEC, is that

2    when that joint venture --

3         A.    I have no idea.  That may

4    actually have been in place from the very

5    beginning with Apollo.

6         Q.    Okay.

7         A.    I mean, we went over in 2010

8    to visit.  They already had a pilot

9    facility, Apollo did, that was beginning

10   to implement machine technology from, at

11   that point, a third-party vendor, CTF, an

12   East German firm.  I think that they were

13   subsequently acquired by CTIE.  They're

14   part of the -- part of the enterprise

15   now.  But their pilot facility was

16   already in place when we went over in

17   2010.

18        Q.    And this private equity firm

19   that you mentioned that you were also

20   talking with briefly, after Apollo -- no

21   one could fund you.  You said were

22   speaking to a private investor?

23        A.    A private -- not -- well,

24   yes, it was a --

Confidential - Subject to Further Confidentiality Review

1          MR. POTTERS:  Just note my

2     objection.

3          MR. GEORGE:  I corrected my

4     error, I believe.

5          MR. POTTERS:  Thank you.

6          THE WITNESS:  It was a

7     competitor.  It was a company that

8     was also in the business of

9     producing energy-efficient

10    building materials and supplies.

11 BY MR. GEORGE:

12        Q.   What was the name?

13        A.   You know, I'd have to go

14 back and check now.  I've erased them

15 from my memory.

16        Q.   Okay.  Where would you look

17 if you had to go?

18        A.   I would go back to my

19 e-mails from that era.  And we actually

20 had, I think, a prototype contract that,

21 in the end, he never honored.  And so we

22 terminated that when we went over in that

23 October 2012.

24        Q.   All right.  If you could

1    turn -- there are a number of pages here,

2    if you look at the top at the header, it

3    says Pages 16 of 33.

4         A.    16.

5         Q.    This is Exhibit 1.  If you

6    could just review these documents to be

7    produced topics.  And let me know if

8    there's any areas here that you do not

9    believe documents were gathered in

10   relation to.

11        A.    I have reviewed this list

12   already, if it hasn't changed.  I believe

13   we produced all relevant documents.

14             There may be categories

15   where there are no relevant documents.

16   But certainly nothing has been withheld.

17        Q.    Okay.  And turning then to

18   Page 19 of 33.  Those topics, in

19   reviewing these, do you believe that you

20   are prepared to testify substantively

21   about each of these topics?

22        A.    I do.

23        Q.    And if you can turn to

24   Page 10 of 33.

1          A.     I'm there.

2          Q.     Thank you.  Under little

3     (n), there's a list of company names, the

4     next couple of pages.  I wonder if you

5     can tell me, as you read through that,

6     companies that you were aware of prior to

7     the deposition preparations that you

8     undertook.

9          A.     Yes, I reviewed this, and I

10    believe there were only two.

11         Q.     Which two were they?

12         A.     Which was Roman ii, China

13    National Buildings Materials Group.

14         Q.     Okay.

15         A.     And where we find CTIE.

16    25 --

17         Q.     Little 12?

18         A.     22, is it?

19         Q.     22, yeah.

20         A.     China Triumph International

21    Engineering Company.  That's where the

22    CTIEC comes from.

23         Q.     Okay.  And the other

24    companies, never have been aware of them?

1    A.    I am not aware of them.

2    Q.    Okay.  And how is it that

3  you're familiar with CNBM Group?

4    A.    Excuse me.  So I was first

5  introduced to them in my first trip to

6  China in 2010 by Apollo.  They asked me

7  to spend a week touring the company and

8  essentially publicizing our relationship,

9  helping to validate it, to show that they

10  had formed a relationship with a strong

11  U.S. research and development university.

12         And in that process when I

13  was in Beijing, I spent the morning with

14  the CNBM Group.  They showed me their

15  model homes, their energy off-the-grid

16  concepts for modular residential housing.

17         And I talked a little bit

18  about the university and what we do and

19  what we had hoped to accomplish in the

20  relationship.

21    Q.    Okay.  When you were

22  publicizing the relationship, you were

23  suggesting the relationship that was now

24  entered into between CTIEC and --

Confidential - Subject to Further Confidentiality Review

1          A.     No.  This is two years

2     before that.  This is 2010.

3          Q.     Okay.  So what relationship

4     is this that we're talking about then?

5          A.     This was the original

6     contract with Apollo that I described at

7     the front end, to work with them on the

8     research and development aspects of

9     cadmium telluride deposition, if you

10    will.  A different type of deposition.

11         Q.     Yeah.

12         A.     A fabrication of the

13    photovoltaic cells using these materials.

14         Q.     Okay.  So you're publicizing

15    the relationship that you had with

16    Apollo?

17         A.     Correct.

18         Q.     And when you were touring

19    with CNBM, were you making any efforts to

20    make any connection with CNBM people?

21         A.     At that point, no.

22         Q.     Okay.  Did you meet any --

23    remember any people you met at that point

24    in time?

1            A.    I -- I could pull out my

2    business card rolodex.  I had quite a few

3    that I -- but I'm -- but I don't recall

4    the names now because we have not

5    maintained direct contact since then.

6            Q.    Okay.  Have you ever gone

7    back and toured the facilities of CNBM

8    group?

9            A.    I have not.

10           Q.    Okay.  When you went over

11   and -- you said, I think, in 2012, 2013,

12   you went to Shanghai?

13           A.    Yes.

14           Q.    And that was to meet with?

15           A.    Mr. Peng.

16           Q.    Mr. Peng?

17           A.    Yes.

18                 But he had -- who, by the

19   way, I understand also has a position in

20   CNBM.  So he is the chairman of CTIE.  I

21   believe he is the executive director of

22   the Bengbu Glass Industry Research

23   Institute, which was the first stop that

24   I made on my first trip.  That's where I

Confidential - Subject to Further Confidentiality Review

1    came to know him.

2            And I believe he is a vice

3    president in CNBM.  I think he may even

4    hold a position in the parliament, or

5    whatever they call the equivalent.

6            Q.   And, in fact, I have some

7    questions about that as well.

8            A.   I don't know too much.

9    That's all I know.  So you can ask me

10   more, but I've told you all that I know.

11           Q.   And I think there are

12   additional titles he holds in other

13   companies as well.

14           A.   That may very well be.

15           Q.   We'll get there.  Okay.

16           So aside from those two

17   trips to China, the one to CNBM Group to

18   publicize your relationship with

19   Apollo --

20           A.   Mm-hmm.

21           Q.   -- and then the one to

22   Shanghai to meet with CTIEC about your

23   relationship going forward, any other

24   trips you've made to China?

1          A.     That's it.

2          Q.     Are you -- are you familiar

3     with the offerings on the New Jersey

4     Institute of Technology website as it

5     relates to the CNBM research center?

6          A.     We have a complex website,

7     some of which is created by our faculty

8     members.  So I -- I can't say for sure

9     that I know what you're looking at and

10    whether or not it's officially blessed by

11    the university.

12         Q.     Okay.

13         MR. GEORGE:  Let's mark as

14         NJIT-2, please.

15         (Document marked for

16         identification as Exhibit

17         NJIT-2.)

18    BY MR. GEORGE:

19         Q.     Okay.  What's been marked as

20    NJIT-2 is a screenshot from the NJIT

21    webpage.  The news item is "NJIT

22    Celebrates Growth of Solar Technology."

23    The press date is Newark, February 26,

24    2013.

Confidential - Subject to Further Confidentiality Review

1    Are you familiar with this

2  press release?

3    A.    I -- I recognize it.  And I

4  recognize my face in the photo.

5    Q.    Okay.  One thing I should

6  do -- tell you, of course, I tend to --

7  I'll go all day.  If you want to take a

8  break at any time, let me know.  I'll

9  just ask that any questions that are

10  pending...

11    A.    Thanks.

12    Q.    Okay.

13    A.    I appreciate that.

14    Q.    Yeah, no problem.

15    A.    If I have another cup of

16  coffee, I'll appreciate it even more.

17    Q.    We can take a break in a few

18  minutes, and we can get a cup of coffee.

19    A.    I'm good now, thank you.

20    Q.    Sure.

21    It says here discusses the

22  rededication of a research center as the

23  China National Building Materials

24  Photovoltaic Materials Research Center.

1    And is that the changing of it from being

2    funded by Apollo to being --

3           A.    Correct.

4           Q.    -- CNBM-sponsored?

5           A.    Correct.  So, again, I don't

6    understand exactly how this flows, but I

7    believe that CTIE, you know, receives

8    government funding to do research and

9    development activities.  And they wished

10   to acknowledge that relationship as part

11   of the source of how all this could

12   happen, not just investment in us but I

13   presume in other activities.

14               And it was their request,

15   then, that we -- we name it in that

16   fashion, yes.

17          Q.    When was the last time you

18   spoke with Mr. Peng?

19          A.    I'd have to go back to my

20   calendar.  He visited the United States,

21   I believe it was in January.  It's been

22   within the last several months, and that

23   was the last time that I spoke to him.

24          Q.    Okay.  And when you're not

1    dealing with him directly, who's the next

2    person down from him that you deal with?

3         A.    So typically, it's -- it's

4    Dr. Pan.

5         Q.    Dr. Pan?

6         A.    Who serves as intermediary.

7    There are other people who are part of

8    the -- his bureaucracy over there.  And

9    so on contractual issues there was a Wong

10   Wei that was involved.

11              Congxiao Wang is another

12   individual who has been involved in

13   discussions.  And he's actually in

14   residence on the campus now as part of

15   the program, I'm sure you'll get to later

16   on when we discuss that.

17        Q.    Okay.  And when was the last

18   time you spoke with Mr. Pan?

19        A.    I would -- I would guess,

20   again, when -- when he came, he -- he

21   accompanied Peng Shou at their most

22   recent visit.  That's the last time that

23   I spoke with him.  We exchanged e-mails

24   because he was looking to arrange a

1    university alumni event.  We -- in my

2    first visit, we created a Chinese alumni

3    organization as our first experiment in

4    developing international programs.

5              And Dr. Pan and one of our

6    illustrious graduates, Ying Wu, who was

7    the developer of the first cell phone

8    company in China, co-hosted an event in

9    Beijing.  They've had their third dinner.

10   It was -- it was about two weeks ago.

11   And so I was in touch with Dr. Pan about

12   securing arrangements for the president

13   to visit that group.  It was the Monday

14   after Easter, whatever date that ends up

15   on the calendar, April.

16        Q.    And when you say --

17   actually, when you said "the president,"

18   you mean the president of NJIT, correct?

19        A.    Correct.  Dr. Bloom.

20        Q.    Okay.  Dr. Bloom?

21        A.    Bloom, B-L-O-O-M.  Joel

22   Bloom.

23        Q.    Thank you.

24              And when is the last time

Confidential - Subject to Further Confidentiality Review

1    you spoke with somebody about the

2    relationship between CTIEC and CNBM?

3         A.    I don't think I've ever

4    spoken to anyone about that relationship.

5         Q.    Okay.  And we're going to

6    be -- naming a couple of people down the

7    pike.

8               Ken Chin, do you know who he

9    is?

10        A.    Dr. Chin.  Chin is a

11   professor in our department of physics.

12   And he is the principal investigator on

13   all the work that is described in the --

14   in the documentation about our contract.

15        Q.    Okay.  And he holds a

16   doctorate?

17        A.    He does.

18        Q.    Okay.  What's that in, do

19   you know?

20        A.    I believe it's in physics.

21   I think it's from Stanford.

22        Q.    Okay.  And is it Dr. Alan

23   Delahoy?

24        A.    Yes.

1          Q.    Is he still with NJIT?

2          A.    Yes.  Alan Delahoy is a

3    research associate in the center.  I

4    believe he was previously a CTO for a

5    solar panel manufacturer that used a

6    different thin-film technology.  But

7    is -- is knowledgeable and conversant in

8    the field of manufacturing operations

9    that we were supposed to be helping to

10   improve.

11         Q.    Okay.  What's his doctorate

12   in?

13         A.    I honestly don't know.

14         Q.    But something to do with

15   solar panel technologies?

16         A.    I would assume it's with --

17   with physics or material science.  But

18   sometimes life takes you on strange

19   paths.  I'm a chemical engineer.  I've

20   had to do many things since then, so...

21         Q.    Sure.  And you hold a

22   doctorate, though, correct?

23         A.    I do.

24         Q.    Where did you get your

Confidential - Subject to Further Confidentiality Review

1    degree from?

2         A.    Stevens Institute of

3    Technology.

4         Q.    I went there for a year.

5         A.    Did you?  When?

6         Q.    1985.

7         A.    So I was there from '70 to

8    '95, so we overlapped.  What were you

9    studying?

10        Q.    I was studying engineering,

11   electrical engineering.

12        A.    Electrical engineering.

13        Q.    Yeah.

14        A.    Unless you were an

15   undergraduate, I couldn't have had the

16   chance to abuse as a faculty member.

17   I hope you enjoyed the experience.

18        Q.    I did.  I did.

19              Anyway, down further, it

20   says, "CNBM is also a sponsor of Nexus

21   House, NJIT's entry to the first China

22   Solar Decathlon competition."

23        A.    Yes, sir.

24        Q.    Tell me about Nexus House.

Confidential - Subject to Further Confidentiality Review

1          A.     Would you like to know about

2    the Solar Decathlon --

3          Q.     Yes.

4          A.     -- so you know what the

5    Nexus House is?

6          Q.     Yeah, yeah.

7          A.     Okay.  So the U.S.

8    Department of Energy has for -- I'm going

9    to say, 12 years or so, don't quote me,

10   but on more than a decade, I believe,

11   staged a biannual event called the Solar

12   Decathlon.  It is a competition for

13   universities to create an off-the-grid

14   house concept, and to then actually build

15   it -- up until recently, on the mall in

16   Washington, for a two-week competition in

17   which there are ten events, hence the

18   name decathlon.

19          And much like in the

20   athletic decathlon, you earn points

21   against standards, and the one that comes

22   out with the most points is the winner.

23   The competitions involve ways of testing

24   or stressing the house's electrical

Confidential - Subject to Further Confidentiality Review

1    efficiency in its performance as a living

2    environment.

3              So there is a competition,

4    for example, to see if you can have a hot

5    shower after doing two tubbings of

6    washing.  To see how you can stand up to

7    a dinner party for 16 participants.

8              Then there's other

9    competitions that are on your signage,

10   and your -- and there's one that's a

11   user's choice.  So the attendees to the

12   event, because it's open to the public

13   for about two weeks, get to vote on the

14   house that's their favorite.

15             And so you stack all these

16   things up and you total up the points and

17   you determine a winner.

18             We participated in the U.S.

19   event in -- I think it was 2010.  I'd

20   have to go back and check to make sure.

21   I'm pretty sure that was.  Whatever this

22   is, if you go back two years.  That was

23   our -- our first attempt.

24             We were pleased to be

1    selected to compete.  Not everyone who

2    puts in a design gets to go in.  We

3    designed a -- an all concrete home.  Sort

4    of a Frank Lloyd Wright-inspired home.

5              Our partner university, who,

6    for the sake of this deposition, will

7    remain nameless so that they're not

8    besmirched, didn't do their good job in

9    engineering, in the electrical

10   engineering work, and so that house was

11   beautiful and it didn't perform up to

12   standards and it didn't -- it didn't

13   place very well.

14             But at that event, so I

15   don't digress too far, they announced the

16   intent to partner with the Chinese

17   analogue to the Department of Energy and

18   host the first ever China Solar

19   Decathlon.  There was already precedent

20   of a European iteration that had begun a

21   few years ago, maybe -- maybe two cycles

22   back, four years prior to that.

23             And our -- our architect,

24   Richard Garber, who had been the

1   principal designer of the concrete homes,

2   said, "I'd really like to go compete

3   there."

4                And he developed a design

5   that was inspired by one of our faculty

6   members who was born in China and raised

7   in the farm -- rural farming area.  Had

8   recognized that government attempts to

9   build sort of concrete subdivisions to

10  move the farmers out of their shacks and

11  into more modern living had failed.  And

12  that they were, in pictures that I saw,

13  in trees and weeds growing out the

14  windows of what might have been very

15  elegant subdivisions here in Levittown,

16  Long Island.  But no takers.

17               And so that inspired them to

18  develop a design that was inspired by the

19  traditional Chinese farmhouse.  And we

20  partnered with a Chinese university,

21  Harbin Institute of Technology.  They are

22  deemed to be the MIT of China.

23               They brought to our group,

24  really, the construction engineering side

1    that we had lacked in our teaming with a

2    partner university in the first

3    iteration.

4                So we had the architectural

5    design component and they had the

6    execution component.  And we sought help

7    from Mr. Peng to see if we could get

8    donations, it's an expensive operation,

9    of photovoltaics, of building HVAC

10   systems, and I think even a contribution

11   of some money to be able to support the

12   construction expenses at the competition

13   site.

14               It ended up that we won the

15   user's choice, so we were very proud.  It

16   was a -- it was a beautiful design.  I

17   think out of some 25 competitors, there,

18   their score ended up somewhere six or

19   seven, but they -- they actually won the

20   category of -- of appeal to the Chinese

21   attendees.  And that's -- if I were an

22   architect, I'd be --

23       Q.    Good victory.

24       A.    -- very proud of that

1    accomplishment.

2          Q.    Well, what is -- from a

3    business point of view, from a national

4    point of view, what's the purpose of this

5    decathlon?

6          A.    So it's really -- it's to

7    stimulate attention and interest in

8    energy efficient housing and building

9    materials.

10         Q.    And it's applying

11   technologies as well, correct?  It's

12   applying the technologies?

13         A.    I'm not sure what you mean

14   by that.

15         Q.    You're putting these

16   technologies into use in

17   commercialization?

18         A.    Well, that's the hope,

19   right?  Is that it would inspire, then,

20   commercialization of concepts and for

21   people to adopt off-the-grid concepts

22   into what would later become commercial

23   housing.

24         Q.    And where was this China

Confidential - Subject to Further Confidentiality Review

1    Solar Decathlon taking place?

2        A.    So this was a year ago in

3    the summer.

4        Q.    2014?

5        A.    No, it must go back another

6    year.

7        Q.    Okay.

8        A.    2013.  Time flies whether

9    you're having fun or not.  It feels like

10   it was last summer, but I -- I think it

11   may -- it may have been the one before.

12       Q.    And did NJIT already have a

13   relationship established with CNBM?

14       A.    Well, so again, our

15   relationship was never directly with

16   CNBM.  We formed a relationship with

17   Harbin as a partner because, again, the

18   name will keep cropping up, Dr. Pan, his

19   undergraduate degree was at Harbin.

20            And I asked if we were going

21   to compete there.  I thought it was

22   important that we have a partner

23   university, particularly because you have

24   to do pre-construction work on the

Confidential - Subject to Further Confidentiality Review

1    ground.  Part of the recipe of this

2    competition is to build and demonstrate

3    the house on your own campus first, and

4    then deconstruct and ship it to the

5    competition site and reconstruct.

6              So that would have been

7    rather awkward to try to do at the last

8    minute in Newark, as we did with the

9    concrete home.  And it took 12 -- no, 25

10   tractor-trailers and special authority of

11   the lieutenant governor, who cleared the

12   roadways for me from the New Jersey

13   Turnpike through Delaware and Maryland

14   down to D.C.

15             To do that would have been

16   impossible to compete in China.  So we

17   formed that partnership through Dr. Pan.

18             And then as we identified

19   that we needed the mechanicals, is the

20   terminology, right -- the HVAC systems

21   and PV -- we turned to Mr. Peng to see

22   what he could do to supply that for us.

23        Q.    Okay.  And did he?

24        A.    Yes, he did.

Confidential - Subject to Further Confidentiality Review

1       Q.    What was the value of the

2    stuff that CNBM or CTIEC provided to you?

3       A.    I have -- I really don't

4    know.  There may be things in

5    Richard's -- Richard's correspondence

6    that indicates that.  But I really don't

7    know.

8       Q.    Okay.

9       A.    And I don't know that -- I

10   just leave it at that.  I don't know that

11   one had to have an accounting of the

12   value of such things in the competition.

13   I suspect you did, because there was a

14   construction cost target that was one of

15   the competition items.

16      Q.    Have other solar decathlons

17   taken place since that one in China?

18      A.    I don't know if there's been

19   a China one.  I believe that this last

20   summer was the -- the next iteration of

21   the U.S. competition, and I think they

22   held it out in California, not in the

23   Mall as they had had it in prior years.

24      Q.    And did NJIT participate?

1    A.    No, we didn't.  Too

2  expensive, frankly.

3    Q.    Okay.  At the very end of

4  this press release from February of 2013,

5  it says, "Recognizing Shou Peng's deep

6  experience in the science and engineering

7  of advanced building materials, NJIT

8  welcomed him as an affiliate faculty

9  member at the ceremonies in Newark on

10  February 15th."

11         What degree does Shou Peng

12  hold?

13    A.    I don't know that for sure.

14    Q.    Does he hold a doctorate?

15    A.    I think that he does, but

16  I'm not positive.  But the degree of

17  affiliated faculty, or the title of

18  affiliated faculty is essentially an

19  honorific that we confer to allow

20  partners who are not NJIT employees that

21  will be working -- potentially could be

22  working with us.  Very often they come in

23  as curricular advisors, but sometimes as

24  research partners, to have a recognition

1   as part of the family, so to speak.

2          Q.     Okay.  Is he a curricular

3   advisor?

4          A.     No, he's not a curricular

5   advisor.

6          Q.     Is he a research partner?

7          A.     In this case, he's working

8   with Dr. Peng.

9          Q.     Dr. Pan?

10         A.     I'm sorry.  Dr. Chin.  I'm

11  sure with Dr. Pan as well, but Dr. Chin

12  is what I meant to say.

13         Q.     So he's a research partner

14  with Dr. Chin?

15         A.     Yes.

16         Q.     What does he bring to the

17  table as a partner?

18         A.     He has the whole context of

19  the industrial issues that are coming to

20  him from the commercialization company

21  CTF, the German company.  He also has the

22  expertise in the glass industry.

23                For example, one of the

24  problems that Ken's research has

1    identified is that you need high

2    temperatures in order to achieve superior

3    results in these materials, high

4    processing temperatures, sufficiently

5    high that the normal glass substrates,

6    the backing glass for solar panels, reach

7    a softening point.

8              We can go into details if

9    you wish, but it causes many processing

10   problems, that Mr. Peng then recognized,

11   could be solved by changing the

12   formulation of the glass.  And so they

13   could create a new special glass that

14   would withstand the processing

15   temperatures that could lead to higher

16   efficiencies.

17        Q.    Was this research done

18   through NJIT?

19        A.    Yes.

20        Q.    Okay.  Done through the CNBM

21   New Energy Materials Center?

22        A.    Yes.

23        Q.    Was this part of any formal

24   PV agreement between NJIT and CTIEC?

1          A.     What do you mean by "PV

2     agreement"?

3          Q.     There are two iterations of

4     agreements.  There was a PV agreement,

5     cooperation between CTIEC, and there was

6     four-phased reporting and funding

7     structure.  Are you familiar with those

8     agreements?

9          A.     Mm-hmm.

10          Q.     One in 2013-2014, and one in

11     2015?

12          A.     Right.

13          Q.     Is it part of that --

14          A.     2015 is yet to be approved.

15     So, yes, this was the -- well, Ken's

16     work -- again, Ken's work goes back to

17     the original relationship with Apollo.

18     And we continued that work really

19     without -- I don't want to say without

20     interruption.  Without -- certainly with

21     disruption, but without interruption from

22     2010 until the present.

23          Q.     Okay.  And so this glass

24     research that you're talking about that

Confidential - Subject to Further Confidentiality Review

1    started before Mr. Peng came into the

2    picture was done as part of the

3    agreement?

4         A.    Well, let me clarify.  We

5    did not do the glass research.

6         Q.    Okay.  Who did?

7         A.    Ken's work, that's -- that's

8    whatever they've done over in China or

9    with their partner.

10        Q.    Okay.

11        A.    The motivation for that work

12   came from Ken's findings that suggested

13   that one needed much higher temperatures.

14   There were -- there is the approach that

15   the -- now the German subsidiary, now

16   subsidiary, uses.

17              If I could, a graphic.  If

18   you can imagine this being a sheet of

19   glass, two foot by three foot, supported

20   on the sides, if you are deposing and you

21   are only supporting on the sides, what

22   happens?

23              And because they are

24   deposing from the bottom, if they put

1    support structure in the way, then you

2    block off the area in order to keep the

3    glass plainer.

4             So one approach is to do top

5    down, which I believe is covered by a

6    competitors' patents.  And so they solved

7    the problem not by switching the

8    technology, but by maintaining a bottom

9    up and finding a way to stiffen the

10   glass.

11            So the motivation for doing

12   that came out of Ken's scientific

13   findings about the optimal processing

14   conditions for creating photovoltaic

15   efficiency in cadmium telluride

16   materials.  But we didn't engage at all

17   in any of the glass-related research.

18       Q.    So Dr. Chin reported that to

19   Mr. Peng?

20       A.    Correct.

21       Q.    Okay.  And this arose out of

22   the CNBM New Materials Center operations?

23       A.    Yes.

24       Q.    Okay.  Who has control over

1    that information, that know-how?  Is it

2    NJIT or CTIEC or both?

3         A.    Both.

4         Q.    Both.  And can either use it

5    without the other person's permission?

6         A.    So I believe the terms of

7    our contract now has given them the

8    option for exclusive use of that.  But

9    Ken has published the scientific findings

10   in the open scientific literature.

11        Q.    Okay.  And the same holds

12   true for any patents or intellectual

13   property, correct?

14        A.    Yes, sir.

15             MR. GEORGE:  NJIT-3, please.

16             (Document marked for

17        identification as Exhibit

18        NJIT-3.)

19   BY MR. GEORGE:

20        Q.    What's been marked as NJIT-3

21   is another press release, this one dated

22   February 21, 2014, entitled "Chinese

23   Partnership Fuels NJIT's Solar Cell

24   Research?"

Confidential - Subject to Further Confidentiality Review

```
 1                    Okay.  So have you seen this
 2   press release before?
 3         A.    I recognize it is in the
 4   NJIT format.
 5         Q.    Did you review it?
 6         A.    Just now, yes.
 7         Q.    Okay.  Let me know when
 8   you're finished, and then we'll chat.
 9   Anything wrong in this press release,
10   incorrect?
11         A.    Not at first glance.  I
12   think it reflects what I just described
13   to you as the nature of the research and
14   the findings.
15         Q.    Agreed.  It begins -- the
16   article begins, "Earlier this month, NJIT
17   formalized an agreement with Chinese
18   partners that would advance the
19   university's research," blah, blah, blah,
20   which is what the 2013 press release
21   announced.
22                    What happened in between
23   that year that it's being re-announced?
24         A.    It took a long time to get
```

1    the statement approved and the contract

2    in place.  This happened to coincide with

3    a visit, I believe, of Mr. Peng, in which

4    we were able to finalize those details.

5         Q.    Okay.  So over the year,

6    you, NJIT, and Mr. Peng, wearing his

7    hats, were negotiating this agreement?

8         A.    So about the time frame of

9    the first press release, which is when we

10   had an understanding that they actually

11   would continue to find a way to work with

12   us, Dr. Chin prepared a technical

13   proposal and a statement of work.  The

14   original intent was to begin that work in

15   July 1st of 2013.

16              And the first iteration of

17   the contract specified that as a start

18   date and still sits as a start date.  But

19   it was not until the October time frame,

20   roughly, that we actually had an

21   agreement on all the terms.  And enough

22   said.

23              So we -- he had been doing

24   work.  But it ended up causing delays in

Confidential - Subject to Further Confidentiality Review

1    the acquisition of some of the capital

2    equipment that was necessary to conduct

3    the work, which then led to delays and

4    delivering on the contract and stretched

5    the program for another six months.

6            Q.    Okay.  And were the

7    benchmarks for accomplishments pushed

8    back as well?

9            A.    Yes.

10           Q.    And payment was pushed back?

11           A.    Yes.

12           Q.    Okay.  So if I have you read

13   the article, "The CNBM center has already

14   developed important insights into the

15   physics of the photoelectric behavior of

16   these materials, which suggest that new

17   manufacturing conditions could produce

18   much higher cell efficiencies."

19           Is that discussing the glass

20   manufacturing process we spoke about?

21           A.    It's part -- not the glass

22   manufacturing process, the processing

23   conditions.

24           Q.    Okay.  Conditions.

1        A.    So we're very clear, because

2    the -- there are other solar cell

3    manufacturing processes for which that

4    glass modification might not be

5    necessary.

6        Q.    Okay.  And what other --

7    what other important insights did the

8    CNBM center already have access to?

9        A.    You're outside of

10    my technical world here.  I mean, this

11    is -- the principal focus of Ken's

12    research, with Alan's help, is to

13    understand the physics by which cadmium

14    telluride materials produce electricity

15    when exposed to sunlight.

16            In the scientific American

17    terminology, their finding is that,

18    unlike silicon-based photovoltaics, the

19    ones that you see on most roofs now, in

20    which silicon is dolch, they diffuse

21    contaminant, if you will, into the

22    silicon material that gives it electronic

23    properties.  And so you have a gradation

24    from the top, where you are diffusing it

Confidential - Subject to Further Confidentiality Review

1  in, to the bottom where, perhaps, there

2  may be none of the contaminant.

3            The -- the electrical

4  activity of cadmium telluride is inherent

5  in the nature of the material and in the

6  impurities that come along with it, come

7  along for the ride.

8            And so now the properties

9  are distributed evenly throughout the

10  material and that gives rise, then, to

11  different physics of how it produces and

12  a different understanding, perhaps, of

13  how you would structure the final device.

14       Q.    Okay.  And this is the kind

15  of intellectual property --

16       A.    And that's the best I can do

17  on insights.

18       Q.    Okay.  And this is kind of

19  insights?

20       A.    Yes.  Right.

21       Q.    Okay.  And then --

22       A.    Knowing that, how do you --

23  or how would you modify process

24  conditions to maximize the good things

1    and minimize the bad things.

2          Q.    Which would make any product

3    more competitive at the end of the day?

4          A.    Yes, that's the intent.

5          Q.    Okay.  And once Mr. Peng,

6    wearing his many hats, came in and

7    reached an agreement with NJIT, he and

8    NJIT were sharing all that know-how,

9    correct?

10         A.    Correct.

11         Q.    Like we spoke before, where

12   one could use the other ones without the

13   permission of the other person?

14         A.    Mm-hmm.  I'm sorry.  I

15   forgot, a head shake doesn't -- doesn't

16   translate.

17         Q.    And in one of the closing

18   thoughts, it says here, "CNBM is eager to

19   speed development of an inexpensive power

20   production that can be seamlessly

21   incorporated into a range of building

22   materials?"

23              That's true, right?

24         A.    I believe that to be true.

Confidential - Subject to Further Confidentiality Review

1          Q.    I believe -- why else would

2    you ever do it?

3          A.    One of their -- one of their

4    applications is to develop their own

5    solar forms, so...

6          Q.    Yes.

7          A.    Yeah.

8          Q.    Yeah, thank you.

9          A.    They have a lot of space.

10          Q.    And a lot of people.

11          A.    And a lot of people.

12          Q.    But they're not just looking

13    at the Chinese market, correct, they're

14    also looking at developing the American

15    European market, right?

16              MR. POTTERS:  Just note my

17          objection with regard to what his

18          knowledge is of what CNBM is

19          doing.

20    BY MR. GEORGE:

21          Q.    To the extent you know.

22          A.    Well, and that's exactly how

23    I would have said it.  I have no idea

24    what their business plan is.

1           In my discussions with

2   Jingong, it's all primarily focused on

3   domestic market.

4       Q.     But you mentioned earlier,

5   there's a certification program that NJIT

6   set up for some of CTIEC's employees,

7   correct?

8       A.     Certification is probably,

9   maybe not --

10       Q.     That's what it's called.

11       A.     -- a certificate program,

12   all right, which is a -- a subset of a

13   master's degree program that -- we have a

14   whole catalogue of these, we'll call them

15   mini-graduate certificates.  It's

16   typically a three- or four-course

17   sequence that is graduate level and

18   certified courses.  So that if you were

19   to go for a master's degree, they would

20   transfer over and they would be accepted

21   towards the full 30, or even 60 credit

22   count, depending on what your degree is.

23           We put together a custom

24   certificate program for him that's in --

1    essentially derived from our engineering

2    management certificate program.

3              And he is -- he is in the

4    second cycle of sending, say, seven to

5    nine employees over to spend a semester.

6    They live in the dorms with an American

7    student/partner.  They eat in our

8    cafeteria, they go to classes with all

9    the regular students.  And they, at the

10   end, achieve, essentially, a 9- to

11   12-credit graduate certificate in

12   engineering management, which he has

13   found makes them, then, much more

14   valuable employees when they return home.

15        Q.    Okay.  Did Mr. Peng's son

16   ever attend NJIT?

17        A.    Let me think.  I've met his

18   son.  I can't remember.  Because there

19   were a couple.  I think -- I -- I'm not

20   positive if he went to our school of

21   management or if we simply advised him

22   and spoke to him.  I think he did go and

23   get a full master's degree.

24        Q.    From NJIT?

Confidential - Subject to Further Confidentiality Review

```
 1           A.    In management.  That's my --

 2    my recollection, but I could be wrong.

 3    Because, again, I've been through that

 4    discussion with several of the people

 5    that I met in the various trips out

 6    there.  And in some cases, it was

 7    simply to help advise their children how

 8    to better prepare themselves to go to

 9    American schools.

10           Let me leave it at that.  I

11    don't know.

12           Q.    Okay.

13           A.    I really don't know.

14           Q.    But you believe he might

15    have gotten a master's from NJIT?

16           A.    He might have, but I may be

17    confusing him with the -- I think I

18    might.  I am confusing with the son of

19    former mayor of Ninguo, so...

20           Q.    Okay.

21           MR. POTTERS:  Scott,

22      whenever is a good time to take a

23      break.

24           MR. GEORGE:  Now is good.
```

Confidential - Subject to Further Confidentiality Review

1          Thanks.

2              THE VIDEOGRAPHER:   The time

3      is -- the time is 11:29 a.m.  We

4      are going off the record.

5          (Short break.)

6              THE VIDEOGRAPHER:  The time

7      is 11:39 a.m.  We are back on the

8      record.

9          (Document marked for

10      identification as Exhibit

11      NJIT-4.)

12  BY MR. GEORGE:

13      Q.   Okay.  I presented to you

14  what's been marked as NJIT Exhibit 4,

15  which is another screen shot from the

16  NJIT CNBM research -- center research web

17  page.  If you can review that quickly.

18  Anything that looks incorrect from this?

19      A.   Okay.  Seems --

20      Q.   Seems correct?

21      A.   -- correct.

22      Q.   Okay.  Are you familiar with

23  the CNBM New Energy Materials Research

24  Center website area?

1           A.    I can't say that I am.

2                 (Document marked for

3           identification as Exhibit

4           NJIT-5.)

5    BY MR. GEORGE:

6           Q.    Okay.  What's been marked as

7    NJIT-5 is a screenshot from the NJIT

8    website from the CNBM New Energy

9    Materials Research Center site.

10                MR. POTTERS:  Do you have

11          dates for these printouts that is

12          NJIT-4 and 5?

13                MR. GEORGE:  I made these --

14          the dates are -- I made these

15          three weeks ago.

16                MR. POTTERS:  Thank you.

17          The only reason why I ask, the

18          others had dates on them.  But

19          these don't.

20                THE WITNESS:  Yeah, they

21          were press releases.

22                MR. GEORGE:  No, they were

23          press -- exactly.  They were press

24          releases.  They were also

Confidential - Subject to Further Confidentiality Review

1           published on the website where

2           this is a screenshot.  They used

3           one of those fancy-schmancy print

4           the website things, but I didn't

5           know it didn't print the date.

6                THE WITNESS:  Well, it also

7           doesn't print the date in which

8           the materials were created.

9                And so you -- I'm not -- I'm

10          not denying or commenting on the

11          veracity of the material, but just

12          that these things could have been

13          created five years ago and still

14          be on the website.

15     BY MR. GEORGE:

16          Q.   Well, that's why I'm talking

17     with you.

18          A.   Okay.  Just to clarify.  The

19     date in which you printed it, is not

20     equivalent to the date in which it was

21     conceived, unlike the press releases

22     where those were the dates in which they

23     were actually entered on the website.

24          Q.   I am glad you mentioned

1    that.

2          A.    Just a clarification.

3          Q.    With you here, I'm going to

4    be talking about certain attachments, if

5    you will, to this web page.

6          A.    Okay.

7          Q.    And I will be confirming

8    their vintage.

9          A.    Well, I'll do the best that

10   I can.

11         Q.    Thank you.

12         A.    Okay.

13         Q.    Okay.  Thank you.  First

14   off, I want your help untangling what

15   seems to have been a proofreading error

16   in the opening statement about the

17   mission of the center.  Where it just

18   says, "CNBM New Energy Materials Research

19   Center, a public U.S. corporation and

20   sole owner of the world's only

21   independently formed tellurium mine in

22   China, recently awarded NJIT a

23   three-year, $1.5 million grant to

24   establish," blah, blah, blah.

1          I would like to -- I believe

2    that, CNBM is inaccurate here.  The

3    research center is inaccurate here.  And

4    this Apollo is inaccurate here.

5          I want you to tell me.  Who

6    owns the tellurium?  Who is awarding what

7    a grant?  And how much is it?

8          A.    All right.  I would almost

9    hazard to guess that since this was

10    composed by Dr. Chin and -- that he

11    didn't read what he wrote.  Because I

12    believe the "public U.S. corporation" is

13    terminology used to describe Apollo

14    someplace else.

15          Q.    Yes.

16          A.    So I -- I'm not -- you

17    know --

18          Q.    So is Apollo --

19          A.    Not to use your word --

20          Q.    Well, there is a -- as you

21    mentioned earlier, there is a mine being

22    owned by somebody?

23          A.    Yeah, somebody -- it's my

24    understanding --

1      Q.    There is somebody owning

2  that and then there is somebody giving

3  you guys money.  So owning -- in this

4  sentence, there are -- assumes a fact.

5  There is a mine owned, and there's a

6  $1.5 million grant.

7      A.    So I'll do the best I can to

8  inscribe it --

9      Q.    Who's doing --

10          MR. POTTERS:  Hold on.  Just

11          note my objection to the phrase

12          "there is somebody giving you guys

13          money."  Because that's fairly

14          loose language.  I understand the

15          import, but that could mean many

16          things.

17              So subject to that, you can

18          answer the question.

19          THE WITNESS:  First of all,

20          Apollo is a complex structure in

21          and of itself.  I believe it is

22          also, or was at the time we began

23          this relationship in 2010, a

24          multicompany structure and that

1          the mining operations were not

2          necessarily the same company as

3          the refining operation.

4               The relationship that we had

5          was, then, with the entity that

6          was doing the refining that wanted

7          to get into the manufacture of

8          solar cells, which I believe, has

9          now become a joint venture

10         partnership with CTIE under the

11         name Apollo Solar Technologies, if

12         I'm correct in where it sits now.

13              The original grant from

14         2010, was meant to be

15         $1.5 million, three-year program.

16         $500,000 a year.

17              The -- when that collapsed

18         and CTIE stepped in, the contract

19         that we negotiated -- you've got

20         the exact figure in there, but it

21         essentially awarded us $500,000 to

22         cover the money that we had

23         expended, actually expended as

24         opposed to contracted for, in the

Confidential - Subject to Further Confidentiality Review

1              two years after Apollo defaulted,

2              and roughly $680,000 in new

3              expenses that were meant to begin

4              on July 1st, 2013, and end on

5              June 30, 2014, but in reality,

6              protracted until the end of

7              December 2014.

8                  And there's even some debate

9              as to whether or not the

10             deliverables have been achieved

11             enough to reimburse us at this

12             date.

13    BY MR. GEORGE:

14             Q.   Okay.  And so payments

15    continued until December 2014?

16             A.   So we are just beginning to

17    receive payment now for the invoices that

18    we submitted in December for the third

19    phase of the project.  And have not yet

20    been honored for the invoices that

21    pertain to the fourth phase of that first

22    contract.

23             Q.   Okay.

24             A.   I'm not sure if that

1    answered your question.

2           Q.    It did.  And I appreciate

3    it.

4                 Okay.  Under current

5    research R&D projects -- I'll let you

6    know that when you click on the CdTe PVD

7    crystal growth 2015, the one that we're

8    going to mark as Exhibit 6 comes up.  The

9    research paper by Dr. Chin and

10   Dr. Delahoy.

11                (Document marked for

12          identification as Exhibit

13          NJIT-6.)

14   BY MR. GEORGE:

15          Q.    I will not be quizzing you

16   on any of the substantive issues covered

17   there in.

18          A.    Thank you, because I could

19   not answer you.

20          Q.    I have a question on the

21   first page and last page, and I'll let it

22   speak for itself.

23                NJIT Exhibit 6 is an article

24   from the Journal of Crystal Growth

1    entitled "Non-sto --

2         A.    -- "-stoichiometric."  That,

3    I could explain.

4         Q.    "Nonstoichiometric

5    composition shift in physical vapor

6    deposition of CdTe thin films."

7         A.    So -- just so I can play

8    professor.  Stoichiometric essentially

9    means in the proportions in which the

10   chemical construct would naturally occur.

11   Water is H2O, so a stoichiometric mixture

12   of hydrogen and oxygen for water would

13   have two hydrogens for every oxygen.

14        Q.    Okay.

15        A.    So did I get it right?

16        Q.    The impurity issue that we

17   are talking about.

18        A.    You nodded like I got it

19   right.

20        Q.    I couldn't even Google that.

21             MR. POTTERS:  You are asking

22        lawyers?

23             THE WITNESS:  You never

24        know.  I mean, he went for a

1          double E degree, you know.

2  BY MR. GEORGE:

3          Q.    Am I correct that Dr. Chin

4  and Dr. Delahoy, this was work by them in

5  the CNBM energy research center, correct?

6          A.    Correct.

7          Q.    And it was published on

8  February 14, 2015?

9          A.    If that's what it says, then

10  that's when it was.

11          Q.    And this know-how in this

12  article is owned jointly by NJIT and

13  CTIEC, correct?

14          A.    Correct.

15          Q.    At the very end under

16  "Acknowledgment," it says, "The authors

17  acknowledge the China Triumph

18  International Engineering Company, CTIEC,

19  Shanghai, China, which offers generous

20  financial report for this work."

21          Are they referring to the

22  funding of the center's research under

23  the agreement that we are discussing?

24          A.    Precisely.

Confidential - Subject to Further Confidentiality Review

1           MR. DALEY:  Can you tell me

2      what you are reading from again?

3           MR. GEORGE:

4      Acknowledgements, last page.

5           THE WITNESS:  Before the

6      references in blue.

7  BY MR. GEORGE:

8      Q.    Were there any other, as far

9  as you know, any other scholarly

10  articles, peer-reviewed articles that

11  were published in the course NJIT's work

12  under the agreement with CTIEC?

13      A.    I believe there were a

14  number of other ones which were part of

15  the deliverables, and are probably

16  enumerated in the reports back to CTIE

17  throughout the course of the project.

18      Q.    And all of those would be

19  owned jointly under the agreement by

20  NJIT --

21      A.    Well, a scientific article

22  is not really owned.

23      Q.    The intellectual, the

24  know-how.

1          A.     Yes.

2          Q.     Correct?

3          A.     Right.

4          Q.     And how many patents were

5    applied for and how many were ultimately

6    actually received?

7          A.     Well, I -- I don't know if

8    any have issued.  I'd have to look at the

9    records.

10         Q.     Okay.

11         A.     Because, you know, it takes

12   three years to go through the patent

13   process.

14         Q.     Correct.

15         A.     So if any have issued, they

16   would have been based on work that were

17   done originally under the Apollo funding.

18         Q.     Which CTIEC owns as well,

19   correct?

20         A.     Yeah.  So that was our

21   understanding, that if they made us whole

22   on our expenses for the blackout period

23   where there was default from Apollo, that

24   we would essentially transfer the intent

Confidential - Subject to Further Confidentiality Review

1   to commercialize that was in accord with

2   Apollo over to CTIEC.

3          Q.    And CTIEC did their due

4   diligence and they saw what was being

5   done -- what they were buying, basically,

6   correct?

7          A.    I would assume --

8               MR. POTTERS:  Just note my

9       objection.  Okay?

10              THE WITNESS:  Okay.

11              MR. POTTERS:  We don't want

12      you to assume.

13  BY MR. GEORGE:

14         Q.    And they negotiated a price

15  for that intellectual property, correct?

16         A.    How they arrived, I don't

17  know.  I know how I arrived.  I know what

18  we spent as the direct expenses to keep

19  the work going, and I asked to be

20  reimbursed for the expense on students'

21  salary and equipment that we did for two

22  years of the first -- the first of those

23  two under the expectation that we would

24  be reimbursed under Apollo, and the

1  second under the expectation that CTIEC

2  was, in fact, going to develop a contract

3  and support us.

4      Q.    Okay.  And so you put a

5  price on that and made a demand.  Did

6  CTIEC accept that demand or was there

7  negotiation after that?

8      A.    No, they accepted the

9  number.

10      Q.    And the CNBM showcase, the

11  four slides, the five slides, there is

12  one PowerPoint presentation that I

13  downloaded as well, Number 6.

14      A.    That came from --

15      Q.    Oh, 7, yeah, thank you?

16      A.    The journal article is 6,

17  the -- the PowerPoint is 7.  Okay.

18              (Document marked for

19          identification as Exhibit

20          NJIT-7.)

21  BY MR. GEORGE:

22      Q.    This is what one gets when

23  one clicks on slide one, which is the

24  first series of the deck.

Confidential - Subject to Further Confidentiality Review

1        A.     Mm-hmm.

2        Q.     Have you seen this

3    PowerPoint presentation before?

4        A.     No, it doesn't look familiar

5    to me.

6        Q.     Okay.

7        A.     That's all right.

8        Q.     No, no, that's fine, then I

9    won't bother you with any questions.  We

10   will really create delay and

11   consternation.

12              Going further down, there's

13   other news -- it says, "May 17, 2014, CEO

14   of CTIEC and CNBM, Mr. Peng Shou.  And CO

15   of Chengdu, CNBM Optoelectronic Materials

16   Company and Sichuan Apollo, Dr. Jingong

17   Pan?"

18       A.     Dr. Pan.

19       Q.     Dr. Pan, he's our

20   connection, right?

21       A.     Dr. Pan is, yes.

22       Q.     And now he's a CEO of a CNBM

23   company, correct?

24       A.     Well, I saw this, this -- I

1    do not understand that designation.

2         Q.    What do you mean?  "That

3    designation," what do you mean?

4         A.    The -- the CNBM

5    Optoelectronic Materials Company.  I

6    don't know what that is.

7         Q.    Okay.

8         A.    Sichuan Apollo, that's the

9    company to which we've referred on a

10   number of occasions.

11             And the joint venture

12   between Apollo and CTIE, I thought was

13   called Apollo Solar Technologies.

14        Q.    Okay.

15        A.    If -- if it's morphed, I

16   wouldn't know.  I mean, my contract is

17   not with them.

18        Q.    Okay.  But your -- you deal

19   with Mr. -- Dr. Pan?

20        A.    I do.  And, again, I know

21   him as a CEO of Apollo.

22        Q.    Okay.  So you don't know

23   whether or not he's also the CEO of this

24   CNBM company?

1        A.    Exact --  I've never heard

2   that term before, and I don't know if Ken

3   was getting creative or if that's what

4   it's become.

5        Q.    Okay.  All right.

6        A.    So it could be both.

7        Q.    Well, you don't deal, at

8   all, with that company.

9        A.    Correct.

10       Q.    Just the one hat that

11  Mr. Pan wears, which is the Apollo hat?

12       A.    Right.

13       Q.    Okay.  Okay.  And then

14  there's photo 1, which we're going to

15  see.  In photo 2, there is a gathering

16  for a dedication of a plaque.

17       A.    Mm-hmm.

18       Q.    Did you attend that, those

19  functions?

20       A.    I did.  If I'm not in the

21  picture, I probably took it.

22       Q.    That was my question.

23            MR. GEORGE:  Okay.  I think

24       we're up to, whatever it is,

1        please tell me.

2               MR. POTTERS:  8.

3               MR. GEORGE:  8, thank you.

4               (Document marked for

5        identification as Exhibit

6        NJIT-8.)

7   BY MR. GEORGE:

8        Q.    Okay.  So this is what's

9   been marked as 8, is a photo -- a photo

10  of about 10, 12 people.

11       A.    Mm-hmm.

12       Q.    And this is, I guess, the

13  plaque that goes in the main door, going

14  into the center now, correct?

15       A.    Correct.

16       Q.    And that's the CNBM logo

17  there on the door, isn't it?

18       A.    That's correct.

19       Q.    When was this dedication, on

20  May 17th of 2014?

21       A.    I -- I can't say for sure.

22  I would have thought earlier.  I would

23  have thought it was coincident with one

24  of those press releases.  Perhaps within

1   February 2014.

2          Q.    Okay.  2014, early 2014?

3          A.    That would be my guess,

4   yeah.

5          Q.    Okay.  On this picture,

6   could you draw an arrow and write "Peng"

7   to -- to Mr. Peng.

8          A.    That, I can do.

9          Q.    Thank you.

10          A.    And I can do Pan, if you

11   would --

12          Q.    I would, I would very much

13   like to see that, please.

14          A.    I hate to anticipate the

15   next question.

16              MR. POTTERS:  Well, that's

17          all he's asked you to do for now.

18              THE WITNESS:  Okay.

19   BY MR. GEORGE:

20          Q.    Okay.  And I guess that's --

21   is that President Bloom in the blue tie?

22          A.    No, I don't believe

23   President Bloom is in the picture.

24          Q.    Oh, that's Delahoy?

Confidential - Subject to Further Confidentiality Review

```
1            A.    Well, if you're talking
2     about this gentleman here --
3            Q.    With the white hair?
4            A.    Delahoy.
5            Q.    Delahoy.  Okay.
6                  Would you like that labeled?
7            A.    No.
8            Q.    Okay.  Starting from the
9     left, the woman in the orange jacket.
10           A.    I'm not sure.  I'm not sure.
11           Q.    Okay.  How about next to
12    her, the guy in the orange tie?
13           A.    Again, I'm -- I'm not sure.
14           Q.    Could he be a student?
15           A.    Probably not.
16           Q.    Why?
17           A.    I'm going to guess that the
18    next one is a student, but it's a guess.
19           Q.    Okay.  But you don't know
20    who he is either?
21           A.    No.
22           Q.    In the plaid shirt?
23           A.    I don't know them by --
24    by name.
```

1        Q.    Okay.  The guy kneeling in

2    front of Dr. Delahoy?

3        A.    I, again, don't recognize.

4    I -- I couldn't name any of them in the

5    front row, other than Dr. Pan.

6        Q.    Okay.  And the gentleman to

7    the left of Dr. Delahoy?

8        A.    That's Ken Chin, our

9    physicist.

10        Q.    Ken Chin.  Okay.

11              And then across the valley

12    created by the sign, CNBM sign, that's

13    Mr. -- Mr. Peng?

14        A.    Mr. Peng, yeah.  I so noted

15    him on the -- on the chart.

16        Q.    Okay.  To his -- to his

17    left?

18        A.    I can't -- I can't tell you

19    the names of the others.

20        Q.    Okay.

21        A.    I -- again, I'm -- I believe

22    that this is a -- that a number of them

23    are the first group of students who

24    attended our certificate course.  So they

1    joined Mr. Peng for this dedication.

2    They are not people with whom I had any

3    other contact in the context of the R&D

4    activity.

5         Q.    Okay.  That makes sense.

6         A.    So there's a combination of

7    Dr. Chin's students, who I -- I'm -- I --

8    I do believe, without knowing their

9    names, the two kneeling in the middle are

10   his graduate students involved in the

11   program, or at least one of them.

12        Q.    Okay.  So they actually work

13   in the center?

14        A.    Correct.

15        Q.    They're not part of the

16   certificate program we discussed earlier?

17        A.    Correct.

18        Q.    Okay.  Now, at the bottom,

19   there is reference to discussion about

20   the celebration of the Chinese New Year

21   of the horse, and honoring CTIEC/CNBM CEO

22   Professor Peng Shou and Mrs. Peng.

23        A.    Mm-hmm, mm-hmm.

24        Q.    CEO Apollo -- COE Apollo,

1   CEO Dr. Pan, and Mrs. Pan.

2          A.    Mm-hmm, mm-hmm.

3          Q.    And then CTIEC training --

4   trainees studying at NJIT.

5          A.    Yes.

6          Q.    And this is at Mr. and Mrs.

7   -- sorry, Professor and Mrs. Chin's

8   house, correct?

9          A.    Correct.

10         Q.    Were you at that function?

11         A.    I was.

12         Q.    And behind the camera again,

13  I assume.

14         A.    Probably.

15         Q.    Okay.  So Mr. -- Mr. Peng

16  was here for this dedication, we saw

17  earlier.

18         A.    Mm-hmm.

19         Q.    And when was this Chinese

20  New Year's celebration?  The same period?

21         A.    That was -- was definitely

22  in the February time frame.

23         Q.    Because of New Year's Day?

24         A.    Because that's when the New

Confidential - Subject to Further Confidentiality Review

1    Year is, yes.

2          Q.    Okay.  Was it the same trip

3    or had you visited twice?

4          A.    That's the same trip, as far

5    as I recall.

6          Q.    Okay.  How many times has

7    Mr. Peng visited NJIT?

8          A.    I don't have the exact

9    count.  But it -- I would say at least

10   twice a year we've met.

11         Q.    Since what time?

12         A.    Since the 2012 time frame.

13         Q.    Okay.  And when you guys

14   were -- when you and Mr. Peng were

15   negotiating the -- the center agreement,

16   about funding the center --

17         A.    Mm-hmm.

18         Q.    -- were those -- were those

19   negotiations taking place, were they

20   taking place in person or was it through

21   other means?

22         A.    Both.

23         Q.    Okay.

24         A.    We -- we would try to come

Confidential - Subject to Further Confidentiality Review

1    to agreement when we met face to face.

2    And because we both have a great deal of

3    respect for Dr. Pan and he is on --

4    onsite, so to speak, and also much more

5    conversant in English, he's very often

6    been the go-between to try to iron out if

7    there are any differences of opinion or

8    direction.

9         Q.    Okay.  And that's also true

10   with the 2015 PV agreement that's still

11   being negotiated?

12        A.    Correct.  Yes.

13        Q.    Some negotiations are in

14   person?

15        A.    So that becomes a little

16   more complex because CTF, the German

17   company that's actually now designing the

18   pilot production facility and ultimate

19   commercial production facility, I

20   believe, has been given the overarching

21   responsibility for our coherent research

22   and development plan.

23              So there are negotiations

24   with them.  Sebastian, I believe, is

Confidential - Subject to Further Confidentiality Review

1   their -- is their principal scientist.

2   And they ultimately present the package

3   to CTIE for approval of the overall

4   program.  To my understanding, that's

5   been done and it now rests with Mr. Peng

6   to approve the overall program.

7          Q.    Okay.  But you participated

8   in those negotiations, correct?

9          A.    Mm-hmm.

10         Q.    And those negotiations took

11  place, in part, when Mr. Peng was

12  visiting here in the United States?

13         A.    Yes.

14         Q.    And this would be in the

15  2014 time period?

16         A.    This -- this most recent,

17  actually, would extend into probably

18  January of this year.

19         Q.    Okay.  2015?

20         A.    Mm-hmm.  I have to check my

21  calendar, plus or minus 30.

22         Q.    Anybody -- any other high

23  ranking officers from CTIEC who you've

24  hosted here in the United States, besides

Confidential - Subject to Further Confidentiality Review

1    Mr. Peng?

2        A.    Not that I recall.

3        Q.    Did he travel with any sort

4    of assistant or entourage?

5        A.    He always -- yes, he usually

6    does.

7        Q.    An entourage?

8        A.    Yes.  Well, because he's

9    here for other purposes.  He has,

10   typically, a couple of other officers of

11   the company and sometimes his wife and

12   sometimes not his wife.

13       Q.    Okay.  Which -- in his

14   entourage, which people in his entourage

15   would you engage with?

16            MR. POTTERS:  Just --

17            I didn't before, but I am now, I

18            have an issue with the word

19            "entourage."  So I'm just going to

20            object.  It's a group, if you

21            will.

22            MR. GEORGE:  Okay.  All

23            right.

24            THE WITNESS:  My -- my

1          discussions have been principally

2          with Mr. Peng and Mr. -- Dr. Pan

3          as my translator and go-between.

4     BY MR. GEORGE:

5          Q.    Okay.  So anybody else in

6     his group that you dealt with?

7          A.    Not in terms of discussions

8     of the business terms.  I think

9     occasionally Congxiao Wang -- I'll spell

10    that out for you, C-O-N-G, X-I-A-O -- has

11    been involved in more contractual

12    details, payment schedules, and so on.

13          He's now one of the students

14    in the current crop.  So he's here in the

15    United States.  And we have met, I would

16    say, in the last month to try to see what

17    it would take to finalize agreement on

18    the deliverables from the prior contract

19    and be able to move forward in the new

20    contract.

21          Q.    Congxiao, what was his title

22    when he was --

23          A.    I don't know his title

24    offhand.  I'm sure I have his business

1    card in my office, but I don't know

2    offhand.

3         Q.    In the Rolodex?

4         A.    And I'm not sure even I

5    would understand it if I could read it to

6    you.  Meaning, I don't know how those

7    titles correspond to levels of

8    responsibility and what their

9    organizational hierarchy is in CTIE.

10        Q.    Okay.  And if, as we go

11   through some of the documents, you note

12   his name, and you see a title affiliated

13   with it or you recollect what it was,

14   please let me know.

15        A.    Okay.

16        Q.    Conversely, if something at

17   today's deposition that you think is

18   incorrect, feel free to correct it later

19   on when you've realized it.

20        A.    Thank you.

21        Q.    We're assuming that you

22   answered the questions put to you in this

23   process.  Do you understand?

24        A.    Yes.  Thank you.

1            MR. GEORGE:  NJIT-9.

2            (Document marked for

3       identification as Exhibit

4       NJIT-9.)

5  BY MR. GEORGE:

6       Q.    What's been marked as

7  NJIT-9, this is the photo that you see

8  when you click on the first link of the

9  photo under the Chinese New Year of the

10 horse celebration discussion that we just

11 had.  It looks like a lot of fun.  This

12 is Dr. Chin's house, correct?

13      A.    Correct.  I believe it's

14 Dr. Chin's house.

15      Q.    Could you tell me -- draw

16 arrows to each of the person's that you

17 know and write their name above their

18 heads, please.

19      A.    Can I do it from below since

20 you have a sticker on top?

21      Q.    Yeah.  Yeah, exactly put a

22 little arrow.  You don't have to go the

23 face, just underneath each person, since

24 they're lined up nicely.

Confidential - Subject to Further Confidentiality Review

1        A.    So you have Jingong Pan,

2   Dr. Pan; Dr. Pan's wife; Ken Chin; Peng

3   Shou or Shou Peng; and I believe that is

4   Mrs. Peng; and I believe that is

5   Mrs. Chin.

6        Q.    Thank you.  You were there

7   at the celebration?

8        A.    Mm-hmm.

9             MR. POTTERS:  You have to

10        say "yes."

11             THE WITNESS:  Yes.  I'm

12        sorry, yes.

13             All right.  Let me -- yes.

14        This is the 2014; is that correct?

15   BY MR. GEORGE:

16        Q.    Yes.  This year is not the

17   horse.

18        A.    Because they did one in 2015

19   I did not attend.

20        Q.    Okay.  Correct.  Okay.  And

21   did Mr. Peng and his wife come to the

22   celebration this year?

23        A.    I believe -- I don't know.

24   I mean, I believe they were invited.  But

1   I couldn't attend it, so I don't know who

2   was there and who was not there.  But it

3   was a -- again, these were receptions

4   that were really intended for the student

5   cohort, and Mr. Peng was in the area for

6   business at the time and was -- went out

7   of his way to become part of the

8   welcoming crew so his people would feel

9   comfortable in the new environment.

10                This is typically about a

11  week or so after they've arrived here in

12  the U.S.

13           Q.    The students?

14           A.    Yes.

15           Q.    That makes sense.

16           A.    Our semester starts -- maybe

17  it's two or three weeks, but our semester

18  starts typically the day after Martin

19  Luther King holiday, whenever that falls.

20  So that's middle, late January.  I think

21  it was a bit later this year.  They often

22  don't arrive until just when things are

23  starting.

24           Q.    That is a big holiday for

Confidential - Subject to Further Confidentiality Review

1   these folks.

2         A.    For them?

3         Q.    For Chinese, yeah.

4         A.    MLK?

5         Q.    No, no, the Chinese New

6   Year.

7         A.    Oh, yes.  I'm sorry.  That's

8   why you had me.

9         Q.    Baby steps first.

10              (Document marked for

11              identification as Exhibit

12              NJIT-10.)

13  BY MR. GEORGE:

14        Q.    What's marked as NJIT-10 is

15  another shot from the website, CNBM New

16  Energy Materials Research Center.  It's a

17  news item.  It's November 27th, 2010,

18  "Chinese delegates to visit NJIT to learn

19  of sustainability, solar energy."  I

20  believe there's a picture of you in this

21  one, Doctor.

22        A.    That would be a younger me.

23        Q.    That's you to -- in the left

24  of the photograph, signing?

1      A.    Correct.

2      Q.    Okay.  And what were you

3  guys signing in 2010?

4      A.    So as I mentioned, I went to

5  China at Apollo's invitation in the

6  summer of 2010.  They took me to a number

7  of locations, one of which was Ninguo

8  City, and the intent at that time was the

9  mayor wanted to be China's first

10 all-solar city.  And they were going to

11 procure the cadmium telluride-based solar

12 panels that Apollo had intended to

13 produce, and that would be their grid.

14          And they were hoping then

15 that some of the other business entities

16 in that community might also then start

17 to partake in a relationship with the

18 university to infuse them with R&D that

19 would make them more competitive in the

20 areas of energy efficient building

21 concepts and building materials.

22          So that was a relationship.

23 Nothing ever came of the signing, I'm

24 sorry to say.  The mayor has moved on to

1    a higher level provincial position.

2            I think in my subsequent

3    visit two years later, I met with the new

4    mayor, and they're still interested.

5    But, you know, it didn't turn into any

6    material relationship.

7        Q.    Okay.  And the second

8    time -- you said you were in China twice,

9    once for this trip and, and the second

10   time to see Mr. Peng?

11       A.    Well, the original -- the

12   purpose of the second trip was, first and

13   foremost, to attend an NJIT Chinese

14   alumni association, second gathering of

15   the group.

16            The first one was hosted on

17   my first visit.  And so this was another

18   alum who offered his garden property

19   outside of Beijing as a meeting ground.

20   And I think we had at least a dozen alums

21   who attended that event, to meet then our

22   new president.  Joel Bloom was our new

23   president.

24            And then from there we

1    visited a number of locations, also

2    anchored by alum in most instances.  But

3    it ended up in a visit in Shanghai with

4    Mr. Peng.

5        Q.    Are there any alumni working

6    in CTIEC?

7        A.    I can't say that for sure.

8    There are -- none of the individuals with

9    whom we are engaged, that I'm aware of,

10   are university alums.  Other than the --

11   you would not call them alums.  Those

12   that are taking the --

13       Q.    Certificate?

14       A.    -- certificate programs now.

15   But --

16       Q.    Yeah.  Okay.

17       A.    So Dr. Pan, as I repeated

18   often, he is our electrical engineering

19   Ph.D. alum.  I believe he graduated in

20   2008.

21       Q.    Good for him.

22           (Document marked for

23           identification as Exhibit

24           NJIT-11.)

Confidential - Subject to Further Confidentiality Review

```
 1              MR. POTTERS:  How do you
 2         want to handle that part of the
 3         dep transcript where we're going
 4         to be addressing NJIT documents
 5         with the designation that we've
 6         made?  Ordinarily, we would --
 7              MR. GEORGE:  I think the
 8         protective order contemplates that
 9         the entire thing is considered to
10         be under seal.
11              MR. POTTERS:  So stipulated
12         and agreed.
13              MR. GEORGE:  And if not, so
14         stipulated.
15              MR. POTTERS:  Thank you.
16              MR. GEORGE:  And then to the
17         extent that you and I can work
18         out -- this is a public letter.
19         I'm sure if we talked about it,
20         you'd say -- I just had to save
21         time, so I sent everything.
22              MR. POTTERS:  Per our
23         discussion, it would be very
24         reasonable.  It's just under the
```

1           very contracted time frame, we

2           didn't want any of these work

3           proposals and things along those

4           lines --

5                   MR. GEORGE:  Understood.

6                   MR. POTTERS:  But there will

7           be no issue in securing our

8           cooperation.

9                   MR. GEORGE:  Keep in the

10          back of your mind as we go through

11          these, I think what I've

12          designated are all things that are

13          properly a part of the public

14          record.  Maybe you and I can talk,

15          catch our breath next week, and

16          then confirm that.

17                  MR. POTTERS:  Fair enough.

18                  MR. GEORGE:  And that will

19          make it easier for everybody

20          involved, especially for us for

21          filing and so forth.

22    BY MR. GEORGE:

23          Q.   What's been marked as

24    NJIT-11 is a letter dated 2 April, 2013,

1    from Richard Garber AIA to Mr. Wang

2    Congxiao.  Did I get that right?

3         A.    Congxiao.  Your Chinese and

4    mine are probably no better.

5         Q.    I'm learning from you.  All

6    right.

7              So earlier we talked about

8    the Chinese Solar Decathlons.  This

9    letter relates to it?

10        A.    Correct.

11        Q.    And what was Richard --

12   Richard Garber's role in that process?

13        A.    Richard Garber is a

14   professor in our school of architecture,

15   in our college of architecture and

16   design.  He was the principal --

17   essentially the principal architect and

18   project lead in both of our Solar

19   Decathlon competitions in the U.S. and

20   then later the Chinese competition.

21        Q.    Okay.  So this is basically

22   done by him in his responsibilities to

23   NJIT to Mr. Wang Congxiao?

24        A.    Since you asked me to

Confidential - Subject to Further Confidentiality Review

1    clarify on any past potential errors or

2    omissions, looking at the date on this,

3    2013, that would suggest that the Chinese

4    Solar Decathlon was in July of 2013, not

5    2014.  Time flies.

6           Q.    It does.  And this is

7    seeking the material assistance that

8    CNBM, in fact, ultimately produced and

9    provided, correct?

10          A.    As I understand it, yes.

11          Q.    And does this jog your

12   memory as to what Mr. Congxiao's role or

13   title was in CTIEC?

14          A.    No, it doesn't.

15          Q.    Doesn't say?

16          A.    He was a go-to guy for

17   Mr. Peng.  But he could very well be a

18   senior vice president in the

19   organization.

20          Q.    Do you still have dealings

21   with him?

22          A.    He is on campus.

23          Q.    He's studying right now?

24   Right, you mentioned that?

Confidential - Subject to Further Confidentiality Review

1          A.    I mentioned earlier.  He is

2    one of the group that is on campus.

3          Q.    Okay.  How old is he?

4          A.    I have no idea.  I have no

5    idea how old any of them are.

6          Q.    He might hold a title of

7    senior VP, so he's older than 28.

8          A.    Oh, yeah.

9          Q.    Is he our age?

10         A.    Well, I may be a little

11   older --

12         Q.    You look 45 to me.

13         A.    Thank you.  I'm 62 and a

14   half.  Going on 63.  So that's the point.

15   I don't know.  I don't know.  He's not a

16   kid.  Yes, he's not a kid.

17               But Dr. Pan also looks very

18   young, and I think he's in his mid 40s.

19         Q.    Okay.  All right.  So the

20   certificate program isn't just for people

21   who are continuing undergraduate work to

22   get a graduate certificate; these are

23   professionals who've been working for

24   CTIEC for some time?

Confidential - Subject to Further Confidentiality Review

1           A.     To be absolutely clear, it

2      is the latter.

3                  This is a program that

4      Mr. Peng put together for mid-career

5      managers.  This is not for fresh outs to

6      continue their education.  This is an

7      opportunity to give some of his star

8      performers a U.S. residential experience,

9      an international living experience to

10     make them potentially wiser and better

11     leaders for this company in the future.

12          Q.     So these are his top

13     managers, basically?

14          A.     Well, that's what I

15     understand it to be.

16          Q.     Okay.  And who -- who pays

17     for, I assume there's a tuition charge,

18     correct?

19          A.     Yes.

20          Q.     And there's room and board?

21          A.     Correct.

22          Q.     And materials, supplies,

23     entertainment, who pays for all that?

24          A.     So they -- they pay, they

1    pay, and I don't know, I don't remember

2    the exact number, it's something like

3    $19,000 per student for the one semester.

4          Q.    For tuition costs?

5          A.    It's -- it includes the

6    tuition for the courses they're

7    attending, they're room and board.  The

8    expenses associated with the travel

9    experiences that we give them as part of

10   the -- part of the one-semester duration

11   they have on campus.

12         Q.    And that's paid by CTIEC?

13         A.    Correct.

14               MR. GEORGE:  Here you go.

15               (Document marked for

16         identification as Exhibit

17         NJIT-12.)

18   BY MR. GEORGE:

19         Q.    What's been marked as

20   Exhibit 12 is a document Bates-stamped

21   NJIT 02553, last page is 02610, and it's

22   entitled, "PV Materials Technology

23   Development Agreement."

24               Now, this is -- the

Confidential - Subject to Further Confidentiality Review

1    agreement itself, then -- then the

2    agreement refers to, in its body, an

3    application form.  And this is the only

4    iteration of this agreement application

5    form that was sequential, meaning that

6    the pages followed sequentially.

7              But I noted -- I note that

8    you are the only person who signed this

9    version.

10         A.    Yeah.

11         Q.    And then a final version

12   later that didn't have the form after it,

13   but it is, in fact, signed by both you

14   and the vice president, Sun Jian'an.

15         A.    Mm-hmm.

16         Q.    So, and I compared them, and

17   I'll represent to you that the language

18   in both is the same.

19         A.    Yeah.  I'm not sure that I

20   have a fully executed copy in my records.

21   I -- this looks like the one I provided,

22   but...

23         Q.    Yeah, it does.  And someone

24   has this with both your signatures.

Confidential - Subject to Further Confidentiality Review

1        A.    They should.

2        Q.    Is that your signature?

3        A.    That's my contract office.

4   Yes, that is my signature.

5        Q.    Okay.  On 2567, that's your

6   signature?

7        A.    Absolutely, yes.

8        Q.    So this document is the

9   document that we've been talking about,

10  the agreement between NJIT and CTIEC?

11       A.    The original.

12       Q.    The original?

13       A.    The original.  The -- or the

14  first.

15       Q.    Okay.

16       A.    Maybe that's a better way to

17  phrase it.

18       Q.    With the effective date of

19  July 1st, initially, 2013?

20       A.    Correct.

21       Q.    Okay.  And that -- that

22  effective date, was it changed eventually

23  to, what, January 2014?

24       A.    No, it was never changed.

Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  When was the start

2    date, then?

3          A.    Start date was July 1st,

4    2013.

5          Q.    Okay.

6          A.    And work -- we -- the work

7    began then and we incurred expenses from

8    that time forward.

9          Q.    Okay.

10         A.    There were delays in the

11   program as described in the application.

12   Because there was -- there was not a

13   contract in place and not approval to

14   incur some of those expenses.  I think

15   that it was, in fact, not until

16   Mr. Peng's visit in January of 2014, that

17   we got approval for the major equipment

18   expenses, which then were a necessary

19   requirement for some of the experimental

20   work and, therefore, no equipment, no

21   results, no results, no bill.

22         Q.    Okay.  And that's -- that's

23   when the delay happened?

24         A.    Yes.

1      Q.    Okay.

2      A.    It was a custom piece of

3  equipment, to be clear.  This was a piece

4  of an apparatus that Alan was building.

5  And there was some debate as to whether

6  or not we should be free to choose any

7  vendor sources or whether it should be

8  fabricated over in China.  Alan was

9  uncomfortable with not being able to be

10  hands-on in the -- in the assembly of his

11  apparatus.

12      Q.    Okay.  In what language

13  was -- I assume that this wasn't the

14  final version of the agreement, there was

15  some negotiated terms, correct?

16      A.    Are you assuming this is not

17  the final version?

18      Q.    This is the final version.

19  It wasn't the first.

20      A.    I --

21      Q.    There was some negotiation?

22      A.    I -- I don't know that there

23  were changes.  I mean, there

24  were -- I --

Confidential - Subject to Further Confidentiality Review

1          Q.    Who initiated -- who drafted

2     this document?

3          A.    This began, the application,

4     the second portion, is really all Ken

5     Chin's work.

6          Q.    Okay.

7          A.    The contract, I think we

8     did -- Brian, I don't know if you were

9     involved.  I think Paul Mottrey might

10    have been involved.

11         Q.    Was it written in Chinese

12    and English or just Chinese at first or

13    English at first?

14         A.    I don't know.  When I

15    received it, it was bilingual.

16         Q.    You received it in

17    bilingual?

18         A.    Yes.

19         Q.    Okay.

20         A.    And I believe the

21    translation was done by Dr. Chin and his

22    students, that's my understanding.

23         Q.    The translation into

24    English?

Confidential - Subject to Further Confidentiality Review

1          A.     No, no, into Chinese.

2          Q.     Into Chinese.

3                 But when you received it, it

4   was already bilingual?

5          A.     As you see it.

6          Q.     Okay.  Who on NJIT's end was

7   the person responsible for negotiating

8   this, this agreement, not the -- not the

9   form attached, but the agreement itself?

10         A.     I -- that would have been my

11  responsibility as a university officer.

12         Q.     And did you negotiate

13  anything?

14         A.     Yeah.

15         Q.     Okay.  The definition

16  "affiliate," did you negotiate anything

17  with that or did you accept what CTIEC

18  offered?

19         A.     I don't recall any

20  modification or changes.  Where are you

21  referring to there?

22         Q.     On Page 2, under

23  "Definitions."

24         A.     Okay.

Confidential - Subject to Further Confidentiality Review

1          Q.    It was, the first item is

2    "affiliate."

3          A.    Mm-hmm.

4          Q.    Did NJIT care about this

5    term at all?

6          A.    I -- I don't recall any

7    negotiated changes in language.  So let's

8    presume that this was fine as written.

9          Q.    Okay.  So that was CTIEC?

10          A.    I -- CTI- -- were they the

11    originator of this?

12          Q.    Yeah.

13          A.    I don't know that they would

14    have.

15          Q.    Well, you weren't, were you?

16          A.    I -- I was not personally.

17          Q.    Okay.  And you were

18    negotiating the contract for NJIT,

19    correct?

20          A.    Yeah.

21          Q.    Okay.  Do you know why this

22    term is in here?

23          A.    No, I do not.

24          Q.    Is it for NJIT's purposes?

Confidential - Subject to Further Confidentiality Review

1  Do you have any affiliates at NJIT?

2       A.    I have no affiliates.  At

3  this -- at this time, we had no

4  affiliates, no.

5       Q.    Right.

6             And it was based on this

7  agreement that the Apollo Center's name

8  was changed to CNBM New Materials

9  Research Center?

10      A.    Mm-hmm.

11      Q.    Correct?

12      A.    Mm-hmm. I'm sorry, yes.

13  "Mm-hmm" doesn't translate very well,

14  does it.

15      Q.    Okay.  And "Background

16  Information."

17      A.    Yes, sir.

18      Q.    And did -- did you negotiate

19  any part of that?

20      A.    Well, we created the

21  language in background information to

22  describe the work that Dr. Chin had done,

23  as I've explained earlier, since 2010.

24  It was being rolled in as something that

Confidential - Subject to Further Confidentiality Review

1    was contained in this agreement for which

2    we would be reimbursed for that work.

3           Q.    Okay.  Good.

4                 And then "Foreground

5    Results" is all the work going forward

6    with, under the new sponsorship, correct?

7           A.    Correct.

8           Q.    And that includes any

9    know-how, whether or not it's patentable,

10   correct?

11          A.    Correct.

12          Q.    Okay.  On Page 4, there is a

13   term "know-how."  Do you know who

14   introduced that into the contract?  Was

15   it from NJIT or was it from CTIEC?

16          A.    I don't know.  And I -- I

17   would imagine that much of this was in

18   the language in the original Apollo

19   agreement.

20          Q.    Okay.  So if I compared this

21   to the Apollo agreement, if it's new,

22   who -- who invented it?

23          A.    I couldn't tell you.

24          Q.    Did you -- did you draft the

1    know-how language?

2         A.    I did not draft that

3    language.

4         Q.    Did you -- did you review it

5    before it went to CTIEC?

6         A.    Sure.  And this was reviewed

7    by our counsel before it was sent to

8    CTIEC.

9         Q.    Well, did you receive it

10   from CTIEC?  Who took the first draft of

11   this?

12        A.    Well, I -- I received this

13   from -- from our side.

14        Q.    Okay.  In both those

15   languages, Chinese and English?

16        A.    As I said, Ken Chin and his

17   group did the translation into Chinese.

18        Q.    And -- and who -- who

19   originally wrote the English?

20        A.    I don't know where that

21   language came from.

22        Q.    Okay.  On Page 5, under

23   Section 2.2, it says, "During the period

24   of development works," which is not a

1    defined term.  And I wonder if you know

2    what "development works" means?

3             A.    I would interpret it to mean

4    the period under which where this

5    contract applies.

6             Q.    Okay.

7                   MR. POTTERS:  Actually, it

8             is defined on Page 3.  "Science

9             and Development Work."

10                  MR. GEORGE:  Okay.  All

11            right.  I didn't know that it was

12            separate -- that you referred to

13            it in a shorthand definition, like

14            a nickname.

15                  THE WITNESS:  Thank you.

16   BY MR. GEORGE:

17            Q.    Okay.  Okay.  So this is

18   what -- what was done.  All right.

19                  Did NJI- -- and were they

20   obliged to get five invention patents,

21   three papers and one paper unpublished?

22            A.    That's what the PIs agreed

23   to do.

24            Q.    Okay.  And how many of those

Confidential - Subject to Further Confidentiality Review

1    things, how many of those deliverables

2    did NJIT deliver?

3           A.    I believe they've satisfied

4    all of the deliverables.  I -- I know the

5    publications are there.

6           Q.    Okay.

7           A.    The patents, including the

8    provisional filings, I believed reached

9    the head count.

10          Q.    Okay.  Does CTIEC agree that

11   you reached the head count?

12          A.    Well, we're still -- we're

13   still waiting for them to agree, that

14   they agree.

15          Q.    Okay.  And is the -- is the

16   dispute over how many patents?

17                MR. POTTERS:  Just

18          objection.

19                MS. DALEY:  Objection as

20          well.

21   BY MR. GEORGE:

22          Q.    Or -- okay.

23                Is it over how many patents?

24          A.    I -- I don't know.  I've not

1    been told.  All I know is they are still

2    reviewing the final reports from Ken and

3    his group and has not yet paid the

4    invoices.

5         Q.    Okay.  Now, under

6    "Reimbursement of Costs," which is under

7    3.1, it says, "CTIEC shall bear all

8    reasonable costs."

9              And then on 3.2, there's a

10   lump sum payment.

11        A.    Mm-hmm.

12        Q.    Was CTIEC responsible for

13   reasonable costs separate from the lump

14   sum payment or does lump sum payment

15   including all costs?

16              Was -- was CTIEC on the hook

17   under this agreement for the lump sum

18   payment of $920,000, plus reasonable

19   costs?

20        A.    No, that's the -- this is

21   the totality.

22        Q.    Okay.  So 920 is the price

23   tag?

24        A.    Correct.

1        Q.     All in?

2        A.     If those numbers add up

3    correctly.

4        Q.     Okay.  So there are -- there

5    are no reasonable costs separate from the

6    $920,000?

7        A.     So this was the version from

8    July of 2013.  So this is another 250,000

9    that was added to this, you know,

10   subsequent negotiation.

11       Q.     An amendment to this?

12       A.     An amendment, which was in

13   January of 2013.  This was -- 2014.

14   Right?  2014.

15       Q.     Yeah.  Yeah.  January 1st.

16       A.     Because there was a

17   misunderstanding about the -- the

18   $500,000 for the background rights

19   payment.

20       Q.     Right.  Okay.

21              But looking at this

22   agreement alone, I'm wondering if CTIEC's

23   obligation to bear all reasonable costs

24   is in addition to the lump sum payment or

1    subsumed by?

2         A.    I'll repeat.  The 920 --

3         Q.    Is all in?

4         A.    -- is all in.  It turned out

5    there was another 250 that had to be

6    accounted for, but nothing else besides

7    that.

8         Q.    Okay.  Under exploitation by

9    NJIT, 6.1.2.  It says, "NJIT shall not be

10   free to use, develop, commercially

11   exploit and/or license foreground results

12   without accounting to CTIEC."

13            And I'm wondering what the

14   term "accounting" means there to NJIT?

15   Do you have to account -- I mean, like,

16   provide an evaluation of the transfer or

17   payments or is it -- what does it mean?

18            My first question, actually,

19   is has that ever come --

20        A.    No.

21        Q.    -- become an issue?

22        A.    It has not.

23        Q.    Okay.  When accounting is

24   used there, what was that referring to?

1    Because that stands in contrast to CTIEC,

2    under 6.2.1, where CTIEC is entitled to

3    license intellectual property rights to

4    any affiliate.  "CTIEC may grant licenses

5    to third parties, (excluding affiliates),

6    only upon written consent of NJIT."

7              So CTIEC has to get your

8    consent, but you have to account to

9    CTIEC.

10        A.   So that we would have to

11   report to CTIEC, should we choose to

12   exercise our license rights.

13        Q.   So actually accounting to?

14        A.   Accounting is reporting to.

15        Q.   Okay.  But CTIEC needn't

16   account to NJIT, correct?

17        A.   They had a undivided right

18   to commercialize intellectual property.

19        Q.   And that's true for both the

20   background and the foreground?

21        A.   That's my understanding.

22        Q.   Okay.

23             MR. GEORGE:  13, please.

24             (Document marked for

1              identification as Exhibit

2              NJIT-13.)

3       BY MR. GEORGE:

4              Q.    What's been marked as

5       NJIT-13 is a multi-page document.  First

6       page is Bates-stamped NJIT 02654.  Last

7       page is 02669.  Title is "PV Materials

8       Technology Development Agreement," which

9       I'll represent to you, Doctor, is

10      identical to what we just saw, not the

11      appendix, except for the fact that Sun

12      Jian'An on behalf of CTIEC signs this

13      one.

14             A.    Okay.

15             Q.    Okay.  And I'm wondering if

16      you can tell me who -- we have not heard

17      about him before -- Sun Jian'An is, and

18      why Mr. Peng wasn't signing this?

19             A.    I don't know that, nor would

20      I necessarily worry about who was the

21      signatory for CTIEC.

22             Q.    There is no doubt this is

23      not an agreement between you and CTIEC

24      correct?  You, NJIT?  This is authentic,

Confidential - Subject to Further Confidentiality Review

1    correct?

2          A.    This is authentic, yeah.

3    What I'm saying is just as our university

4    president is not the signatory here, I

5    would not have been surprised or amazed

6    that the CEO of CTIEC was not the

7    signatory.

8          Q.    No, no, true.

9                (Document marked for

10               identification as Exhibit

11               NJIT-14.)

12   BY MR. GEORGE:

13         Q.    What's been marked as

14   NJIT-14, a three-page document.  First

15   page is Bates-stamped NJIT 01729.  Last

16   page is 01731.

17               And it's series of e-mails

18   between Mr. Pan and Dr. Sebastian --

19   between Dr. Pan and Dr. Sebastian around

20   March 12, 2013.

21               Okay.  My first question,

22   the cast of characters is important at a

23   play sometimes, and this is one of those

24   situations.

Confidential - Subject to Further Confidentiality Review

1          The initial -- the last

2    e-mail on the last page of this document,

3    which is an e-mail from Ken Chin to a

4    number of people, but he addresses Peng

5    Zong.  Who is Peng Zong?  Do you know?

6          A.    I have no idea.  That is not

7    Mr. -- that is not the Mr. Peng.  That is

8    not Mr. Peng that we're talking about,

9    Peng Shou.

10          Q.    Right, yeah.  Right.  And

11    then there's reference in here that he's

12    having discussions in relation to the

13    CNBM center with Sun Zong, Z-O-N-G.  Do

14    you know him?

15          A.    I don't know.  I know there

16    was a group reporting to Mr. Peng who

17    were responsible for new energy

18    materials.  And Ken made trips to China

19    to negotiate the substance of what we

20    were going to do.  I never met any of

21    those people.

22          Q.    Who paid for that trip?

23          A.    Nor would I necessarily do

24    that.

Confidential - Subject to Further Confidentiality Review

1      Q.    Who paid for that trip?

2      A.    Well, ultimately it was

3    billed to the grant.  But at the time, we

4    were carrying the expenses, the

5    university was.

6      Q.    So Wang Zong, Z-O-N-G,

7    Dr. Xu --

8      A.    Dr. Xu, I don't know.

9      Q.    How about Mr. Wang Congxiao?

10     A.    I've mentioned him several

11   times before.  So he is an executive in

12   the division that was responsible for

13   this work.

14     Q.    Okay.  So this may relate to

15   Dr. Chin's efforts to negotiate the final

16   terms of the agreement?

17     A.    Right.  This was -- this was

18   the period where we were trying to

19   approve statement of work, yes, what is

20   it that he would do that they would pay

21   for.

22     Q.    Okay.

23     A.    In those terms.

24     Q.    And that's the appendix to

Confidential - Subject to Further Confidentiality Review

1   the agreement that we looked at before?

2       A.    Correct.  I think it was

3   called the application.

4       Q.    The application, correct.

5   Form Number 1, it says.  Okay.

6           And these e-mails are

7   e-mails that you sent and received in the

8   course of your responsibilities at NJIT?

9       A.    Correct.

10      Q.    And they were retrieved from

11  your files or from your server?

12      A.    I believe that these are

13  ones that I manually cut and pasted

14  together for you, yes.  Or printed.

15      Q.    Yes.  That was -- that was

16  interesting.  Sometimes -- did you

17  physically -- did you cut out e-mails and

18  put them together?

19      A.    Well, let me explain what I

20  did, because I wanted you to preserve the

21  from/to header and so on.  And if I

22  simply cut and pasted e-mails, that would

23  be lost.

24          So I printed them to a text

1    file.  And then I selected them and I

2    pasted them back into a continuous thread

3    in chronological order.

4              What got lost and why you

5    see question marks, are those in which

6    there were Chinese characters.  They came

7    out as unprintable when it got translated

8    to straight text.  No deception.

9         Q.    Are you stating on the

10   record that you copied and then pasted

11   identically what was in the e-mail to

12   here?

13        A.    Correct.

14        Q.    And you made no edits or

15   deletions or omissions?

16        A.    I made no edits.  In some

17   cases if it was a thread in which the

18   same thing was repeated five times over,

19   I might have just taken the last of the

20   thread, or I may have eliminated the

21   portions that were just repeats of

22   something that might have been there

23   three or four times over.

24        Q.    Okay.  Were all these

1    e-mails in any common folders that you

2    keep on your e-mail server or Outlook?

3    What do you use?

4         A.    I use Outlook.  So they were

5    in my backlog of e-mails.

6         Q.    So you just keep one inbox?

7         A.    I have some stuff in special

8    folders, but in this case it's just the

9    backlog in my inbox in the search for

10   things that had CTIE or other keywords

11   that I might have recognized.

12        Q.    Okay.  I'm just going to

13   request that you make sure you don't

14   delete, if you haven't already done so,

15   delete any of these e-mails.  So in

16   case --

17        A.    I think we understood that

18   from the start.

19        Q.    Yeah, but if I don't say it,

20   you can say, "Shame on you."

21        A.    Okay.  I wouldn't want to do

22   that.

23        Q.    No, I wouldn't want to have

24   that said to me.

1          A.     Likewise.

2          Q.     Okay.  Here you say -- no,

3     Dr. Pan says to you that he, Mr. Peng,

4     correct is in the China National Congress

5     meeting in Beijing.  Do you know -- does

6     he hold a -- is he a delegate or

7     something.  Do you know what his title

8     is?

9          A.     I don't know his title.  I

10    don't understand the system.  But Jingong

11    has told me that he has a position

12    loosely equivalent to a senator or a

13    congressman.  And I don't know if they

14    have two houses or not.  But that tells

15    us he's not in the executive branch.

16         Q.     Okay.  He is not a bush

17    league guy?

18         A.     Is that the family or --

19         Q.     That's pretty funny.

20                Okay.  And here you're

21    already raising some concerns about the

22    delay in implementation, correct, of an

23    agreement?

24         A.     Well, yes.  And this is

Confidential - Subject to Further Confidentiality Review

1    actually -- yes, yes.

2         Q.    Dr. Chin here, he

3    attaches -- see, this is why I was

4    frustrated from what I learned you did

5    with the copying and pasting.

6              This is an e-mail from

7    Dr. Chin including you, and there's an

8    attachment, 130423ProposalChin.PDF.  And

9    I really wanted to see that document.

10   I've identified a couple that I think may

11   be it.  I'm hoping that you may be able

12   to help me understand what he was sending

13   around.

14        A.    I'm not sure there's any

15   other process by which that stuff would

16   have stayed intact for you.

17        Q.    You can save it as an

18   Outlook file into a folder and then

19   produce it to counsel, and then he would

20   have sent it off to me.

21        A.    It would save me two days.

22   I wish somebody had told me that.  This

23   was a very tedious process.

24        Q.    And that you did it

Confidential - Subject to Further Confidentiality Review

1   personally, I appreciate it.  And I

2   apologize for the burdens.

3                  (Document marked for

4          identification as Exhibit

5          NJIT-15.)

6   BY MR. GEORGE:

7          Q.    What's been marked as

8   NJIT-15 is a four-page document.  First

9   page is NJIT 02921.  Last page is 02924.

10  It's entitled "Initial Proposal for

11  CNBM-NJIT Apollo CdTe R&D Collaboration."

12  Could this be the attachment?

13         A.    Possibly.  Was I copied on

14  the original?

15         Q.    Yeah.  If you look at the

16  very end there.

17         A.    Because if I'm brought into

18  an e-mail thread afterwards, very often

19  the attachments don't exist, right.

20         Q.    It just gets forwarded?

21         A.    You get a note like this

22  that says the file name, but it's not in

23  there.

24         Q.    Yeah.  That's why I think

Confidential - Subject to Further Confidentiality Review

1    you would have it.  At the top here --

2    well, anyway --

3          A.    All right.

4          Q.    So this document, NJIT-15,

5    this was a business record from NJIT,

6    correct, sent and received in the course

7    of your business?  Take a look at it.

8          A.    I -- I can't attest yes or

9    no, if I didn't -- I'm not the author and

10   I didn't send it.  It looks like a sort

11   of correspondence that Ken would have had

12   with the CTIEC people to try to develop

13   an understanding of what work they would

14   fund for him to do.

15         Q.    Correct.  I will remind you

16   that you're not just here testifying as

17   Dr. Sebastian, but as NJIT.

18         A.    I understood.

19         Q.    But as far as you

20   understand --

21         A.    As far as I can tell.

22         Q.    -- this document came from

23   NJIT's records?

24         A.    Yes.

Confidential - Subject to Further Confidentiality Review

1          Q.    And it was produced in the

2    course of NJIT doing its business with

3    CTIEC, correct?

4          A.    Correct.

5          Q.    And by looking at this,

6    any -- any sense you have of where in the

7    negotiations, course of negotiations this

8    document would have been produced?

9          A.    It would have been probably

10   early on.

11         Q.    Why do you say that?

12         A.    Well, and because there's

13   not much depth to it.

14         Q.    Okay.  More of an outline?

15         A.    Yes.

16         Q.    And let's look at -- and so

17   looking at the transmittal date from

18   Dr. Chin to yourself and others --

19         A.    Mm-hmm.

20         Q.    -- of April 23rd, 2013,

21   would this -- would April 13th be later

22   than this would have been produced in the

23   process of the negotiations?

24         A.    This would not have been

Confidential - Subject to Further Confidentiality Review

1   later than that.

2          Q.     Okay.  It might have been

3   earlier?

4          A.     It could have been earlier.

5   But it's -- it's probably about the right

6   time frame where we begin.

7          Q.     Okay.

8          A.     I think we met with, as I

9   said earlier, with Mr. Peng in a trip

10  that was in mid October of the previous

11  year.  And then it took some time for his

12  commitment to fund some work to turn into

13  action.  And I'm going to, again, guess,

14  he typically comes to visit us in the

15  early part of the calendar year.  And

16  that would have been turned into,

17  perhaps, directives at home to start

18  getting serious about developing an

19  agreed upon statement of work.

20                So if it were not -- what

21  was the date on Ken's transmission?

22         Q.     April.

23         A.     April 13th.  So it might

24  have been March if it weren't April.  But

Confidential - Subject to Further Confidentiality Review

1    it's certainly within that time frame.

2         Q.    Okay.

3         A.    And if it's critical, we'll

4    certainly be able to track down and give

5    you the -- the authentic date of

6    creation.

7         Q.    Yeah, that's why I'm asking

8    if you still had them.  I don't think

9    it's going to be critical.

10        A.    I -- I know that I dumped

11   all the attachments from my e-mails into

12   a disc files, which I did provide.

13        Q.    Yes, so -- so that's why I'm

14   trying to get the pieces --

15        A.    Yeah.

16        Q.    -- and then bring them

17   together.

18             MR. GEORGE:  Here is another

19   proposal.  It's a little thicker than the

20   last one, but not quite as thick as the

21   ones coming up to this.

22             THE WITNESS:  Mm-hmm.

23             MR. GEORGE:  I guess we're

24   up to 16.  I think everybody has the same

Confidential - Subject to Further Confidentiality Review

1    thing.

2              (Document marked for

3         identification as Exhibit

4         NJIT-16.)

5              THE WITNESS:  Actually, I'm

6         recalling Mr. Peng visited us in

7         March of that year.

8    BY MR. GEORGE:

9         Q.    Of 2013?

10        A.    Yes.  And that's where he

11   tacitly agreed that he would go forward

12   and not only fund the future work and

13   make up for the shortfall on the Apollo

14   funding, so this, in -- this, in all

15   likelihood, would have been the

16   attachment that you're seeking in April,

17   would have been about that time frame for

18   Ken to have prepared that.

19        Q.    Okay.  Good.  Good.  And

20   thank you for that.

21              What's been marked as

22   NJIT-16 is a multipage document.  First

23   page is NJIT 02103, and the last page is

24   NJIT 02112.

Confidential - Subject to Further Confidentiality Review

1          A.     Mm-hmm.

2          Q.     And the title is, "Proposal

3   for Cooperative R&D," et cetera, et

4   cetera, submitted to Mr. Peng Shou.  And

5   then there is a list of titles.  One,

6   two, three, four, five, six, seven, eight

7   titles that he has in that many different

8   -- CNBM and other companies.  These are

9   all his titles that he carries around

10  with him?

11         A.     I have no idea.

12         Q.     Have you seen this before,

13  this list?

14         A.     I don't -- I don't recognize

15  that.  I'm quite certain that Ken Chin

16  would have prepared this.  And I'm sure

17  he was trying to collect everything that

18  he knew.

19         Q.     Okay.

20         A.     Whether they are the correct

21  titles or not, I don't know.

22         Q.     Okay.

23         A.     From the ones that I do

24  know --

Confidential - Subject to Further Confidentiality Review

1      Q.    Yes.  Thank you.

2      A.    -- is from the bottom up,

3  the president of the Bengbu Design &

4  Research Institute for Glass Industry.

5      Q.    Okay.

6      A.    As I -- as I think I

7  mentioned earlier, that was my first

8  meeting, my first trip to China.  My

9  first visit was to that institute.  And

10  that's where I met him.

11      Q.    Okay.

12      A.    And the executive director

13  vice president, China National Building

14  Materials, as a board chairman and

15  president of CTIEC.  Again, that's my

16  understanding.

17      Q.    Okay.

18      A.    And the -- the CNBM, I -- I

19  have known him to be a vice president for

20  CNBM.  I don't know about the executive

21  director.

22           And beyond that, I don't

23  know what any of those others -- those

24  other positions.

Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  So from all these

2    nametags, you know him to wear the name

3    tag of the CNBM direct -- vice president,

4    president and board chairman of CTIEC and

5    the president of Bengbu Design & Research

6    Institute, correct?

7        A.    Correct.

8        Q.    And the other nametags,

9    you're not sure about?

10        A.    Correct.

11        Q.    Okay.  And is -- is this

12    sort of a later iteration of NJIT-15, in

13    terms of getting a proposal fleshed out?

14        A.    Yes.

15        Q.    Okay.  And is a proposal

16    like this, we have the first draft from

17    Mr. Chin, probably, NJIT-15.

18        A.    Mm-hmm.

19        Q.    Is it iterative, meaning

20    does it go back and forth between

21    Mr. Chin and somebody at CTIEC?

22        A.    That would be my -- my

23    understanding.

24        Q.    Okay.

1          A.    He proposed a number of

2    topics that he thought they would be

3    interested in -- in sponsoring.  And he

4    probably got feedback as to where they

5    thought the important areas were and

6    where his focus should be.  And then this

7    would be another iteration that would

8    pick those topics and then provide a

9    little more detail as to what they'd do.

10   And I see there's a budget included.  So

11   there was a cost estimate of what it

12   would take to do the work that was

13   proposed.

14          Q.    Okay.  And so this would

15   have then reflected input and review by

16   CTIEC?

17          A.    Correct.

18          Q.    Okay.  And this was created

19   in the course, then, of

20   Dr. Chin's responsibilities to NJIT?

21          A.    Correct.

22          Q.    And it came from NJIT's

23   records?  Yes?

24          A.    Yes.  That's my

Confidential - Subject to Further Confidentiality Review

1    understanding.

2           Q.    Okay.  Thank you.

3           A.    Yes, I'm sorry.  Head

4    shaking.

5                 MR. GEORGE:  What time is

6         it?

7                 THE VIDEOGRAPHER:  It is

8         12:40.

9                 MR. GEORGE:  Okay.  You seem

10        to be getting tired, so let's take

11        a break.

12                THE WITNESS:  Your call.

13                THE VIDEOGRAPHER:  This

14        marks the end of Videotape Number

15        1.  And the time is 12:43 p.m.

16        Going off the record.

17                      -  -  -

18                (Lunch break.)

19                      -  -  -

20                THE VIDEOGRAPHER:   This is

21        Videotape Number 2.  The time is

22        1:25 p.m.

23                We are back on the record.

24   BY MR. GEORGE:

Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Thank you, Doctor,

2     for returning after lunch.

3               (Document marked for

4          identification as Exhibit

5          NJIT-17.)

6     BY MR. GEORGE:

7          Q.    What I've marked as

8     exhibit -- NJIT Exhibit 17 is a

9     multi-page document, the first page is

10    NJIT 020408, the last page is 02102.  And

11    it looks to be another iteration of the

12    proposal regarding the agreement we

13    looked at earlier.

14         A.    Correct.

15         Q.    Can you tell me, is this

16    like third in a sequence of these prior

17    two or does it fall somewhere between the

18    two, can you tell me?

19         A.    This, I believe, would come

20    after the previous two.

21         Q.    Okay.

22         A.    But it's certainly far short

23    of what became the final.  Because I see

24    major elements of the program that they

Confidential - Subject to Further Confidentiality Review

1    declined to fund.

2         Q.    Okay.  Yeah, the price tag

3    was higher too.

4         A.    There was a whole aspect

5    here where Dr. Chin was looking to create

6    an actual pilot production facility.  And

7    they believed that was the appropriate

8    province of CTIF -- CTF, the partner

9    should be doing that work.

10        Q.    The one in Germany?

11        A.    And we should focus on the

12   science, yes.

13        Q.    Okay.  And this is a

14   document as well, it's going back and

15   forth between Dr. Chin and CTIEC,

16   correct?

17        A.    Correct.

18        Q.    So any changes would have

19   been reviewed and approved by CTIEC as

20   this iterative process continued?

21        A.     If -- if there -- if

22   "approval" is the right word, yeah.

23        Q.    Okay.  Okay.  Earlier, you

24   had mentioned that there was an amendment

Confidential - Subject to Further Confidentiality Review

1    entered into regarding that first

2    agreement, correct?

3          A.    Correct.

4                MR. GEORGE:  This is

5          NJIT-19?

6                MR. POTTERS: 18.

7                MR. GEORGE:  18.  Thank you.

8          I want to discuss that a little

9          bit.

10               (Document marked for

11         identification as Exhibit

12         NJIT-18.)

13   BY MR. GEORGE:

14         Q.    What we've marked as NJIT-18

15   is a document Bates-stamped NJIT 02857

16   through 2860 entitled, "Amendment 1 to PV

17   Materials Technology Development

18   Agreement."

19               Is this the amendment we

20   discussed?

21         A.    Yes, sir.

22         Q.    Okay.  And that's your

23   signature at the end there, on Page 2860?

24         A.    Correct.  It is.

1          Q.    Okay.  And why was this

2    amendment necessary?

3          A.    Excuse me.  Could I ask for

4    a bottle of water?  It's not urgent.  But

5    just I know I'm going to need it.

6    I can continue on.

7                So all right.  We reel back

8    in time to the meeting with Mr. Peng in

9    China in October 2012, at which point we

10   had entered into an agreement with

11   another company.  And now I recall the

12   name was Tung Tai, a privately held

13   company that wanted to get into the

14   production of solar panels.

15               By that point, their having

16   declared their desire to work with us in

17   July, they still had not come across with

18   money or approval, final approval on the

19   contract.

20               Mr. Peng at that point said,

21   You should work with us.  We're the big

22   boys, and we will make good on the

23   expenses that you've incurred by virtue

24   of Apollo's default on the original

Confidential - Subject to Further Confidentiality Review

1    contract.

2              That amount was 500,000, by

3    our estimation -- not just estimation, by

4    our accounting.

5              And so then, I think I

6    mentioned earlier Mr. Peng came to visit

7    us, say it was March of 2013.  And he

8    again confirmed his desire to cover those

9    expenses and said he would find a way to

10   get us that money expeditiously.

11             Not long thereafter we

12   received a wire transfer for $250,000.

13   Glad to have it as partial payment

14   towards that obligation.

15             And so when we drafted the

16   budget that you referred to earlier and

17   we talked about a $500,000 expense

18   associated with background intellectual

19   property rights, put in an additional

20   $250,000 under the impression that the

21   first 250 had been paid in full.

22             In discussions which you see

23   documented in the e-mail trails that

24   we've given you, apparently the first was

Confidential - Subject to Further Confidentiality Review

1  not a payment so much as a loan, from

2  whom to whom we can go through, because

3  that was a twisted tale in itself.

4            And they expected that we

5  would bill the full $500,000 into the

6  contract, the full expense -- they didn't

7  know what it was -- and that the original

8  payment would be reimbursed to what I now

9  understand is the American subsidiary,

10  TECO, T-E-C-O.

11            So when we finally got a

12  clear understanding of what was owed and

13  why, we came up with this amendment,

14  which includes then the additional

15  250,000 plus interest that TECO expected

16  to be repaid for having provided the

17  money to CTIE the previous March.

18            I mean, that's the truth.

19  The question is, is that clear?  It was

20  never clear as we went through.

21      Q.    You know, honestly, it's one

22  of the more turgid stories I've

23  encountered as a lawyer.  And you made it

24  as clear, I think, as can be.

1          A.     Okay.  Thank you.

2          Q.     We'll come back to it later

3     when we talk about that --

4          A.     Very good.

5          Q.     -- that loan from TECO?

6          A.     And that's why there was an

7     amendment because we needed to include in

8     the contract the full $500,000 expense

9     that was part of the agreement to cover

10    the background intellectual property

11    rights for the work that was conducted in

12    the three years prior to the signing of

13    this contract.

14         Q.     Okay.  And so this contract

15    increases the lump sum payment we saw

16    earlier?

17         A.     Yes.

18         Q.     And that lump sum payment

19    then is recognition of that earlier wire

20    transfer from TECO to NJIT plus the

21    interest that accrued in the interim?

22         A.     Correct.  And as before,

23    that's the full extent of the

24    compensation.  There are no other --

1    there are no sidebars, no others.  You

2    were asking before, the condition --

3    terms and conditions remained the same.

4    This is the payment in full for the work

5    to be done.

6         Q.    And the new lump sum was

7    $1,126,000?

8         A.    100 -- like it says there,

9    yes, as written on the NJIT 02859.

10        Q.    Okay.  Now, looking on that

11   same page -- well, actually that prior

12   page, there are four payments to be made?

13        A.    Correct.

14        Q.    Did -- was the October 1st

15   payment made on time?

16        A.    No.

17        Q.    When was that made?  Do you

18   remember?

19        A.    We submitted the invoices in

20   the end of December.

21        Q.    Okay.  And when was it --

22   when was -- what was the lag between the

23   submission of the invoices and the actual

24   payment?

Confidential - Subject to Further Confidentiality Review

1      A.     I don't recall.  But it --

2   I'm fairly certain that those were

3   actually processed in pretty close to

4   real time.

5      Q.     Okay.  So around January,

6   February 2014?

7      A.     Yes, yes.  Because there was

8   a subsequent set of invoices that took a

9   bit longer to be processed.

10      Q.     Okay.  And turning the page

11   to 2859, the lump sum amount down there.

12   The January 1st Phase I second payment,

13   when was that made?

14      A.     So again, the target dates

15   were all predicated on the original

16   expectation that the work started in

17   July 1st, 2013, and was continuing on

18   pace, which it did not.

19            And so the payments,

20   although we put them on a one-year

21   calendar, were really payments against

22   milestones.  Those milestones were not

23   attained until later in the year.  You

24   know, you've got my invoices.  I'm going

1    to say it was some time in the -- it

2    might have been February-March time frame

3    when we invoiced for the second phase

4    worth of work.

5         Q.    Okay.  And how soon after

6    the invoicing was that made?

7         A.    Again, I don't have those

8    records at hand.  But you must have those

9    records at hand to indicate when those

10   wire transfers ultimately took place.

11        Q.    Was it shortly after that

12   time period?

13        A.    I recollect that one as

14   being paid reasonably promptly.

15        Q.    Okay.  And target-based

16   two-thirds payment --

17        A.    So it was --

18        Q.    Let me finish my question,

19   please.

20        A.    I'm sorry.

21        Q.    April 1st of 2014, when were

22   those invoices submitted?

23        A.    December of this year.

24        Q.    Of --

1          A.      2014, I'm sorry.

2          Q.      2014.

3          A.      Yes.

4          Q.      Okay.  And has that

5   payment -- have those payments been

6   received, that payment?

7          A.      My accounting people told me

8   yesterday that the first invoice, the

9   first payment, the first block was wire

10  transferred this week.  So it is in

11  progress.

12         Q.      Okay.

13         A.      They usually do them one --

14  one per week.  It's about the time it

15  takes to process.

16         Q.      And I notice that was

17  usually in like $50,000 or $40,000

18  increments.  Do you know what that first

19  wire was of, sumwise?

20         A.      Are you asking the one that

21  just happened this last week?

22         Q.      Correct.

23         A.      It was $45,000, is my

24  understanding.

Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Would it surprise you

2     if the target Phase I second payment,

3     which was invoiced in March or February

4     of 2014, was paid as late as August of

5     2014?

6          A.    It wouldn't surprise me if

7     it took that long.

8          Q.    Okay.  And so in terms of

9     the target Phase III fourth payment,

10    that's not even invoiced yet?

11         A.    It's been invoiced.

12         Q.    Okay.

13         A.    And again, there is

14    discussion as to whether or not the

15    research team met all of the contracted

16    deliverables.

17         Q.    Okay.

18         A.    And whether or not their

19    accomplishments are satisfactory to do

20    that.  You've already alluded to some of

21    the targets like 14-1/2 percent cell

22    efficiency, and is 14 good enough or is

23    it not.

24         Q.    Yeah.

Confidential - Subject to Further Confidentiality Review

1          (Document marked for

2          identification as Exhibit

3          NJIT-19.)

4    BY MR. GEORGE:

5          Q.    What's been marked as

6    NJIT-19 is a multi-page document.  First

7    page is Bates-stamped NJIT 01075.  Last

8    page is 01101.

9               This is the kind of thing I

10   want you to authenticate.  Is NJIT-19

11   like some sort of a folder from an

12   accounting department or something at

13   NJIT?

14         A.    Are you asking me?

15         Q.    Yeah.

16         A.    This looks like -- yes, this

17   is an NJIT document.

18         Q.    Okay.  And is it like a

19   packet that would be maintained by NJIT?

20   I notice the contract in discussing the

21   agreement, the transmittal e-mail talking

22   about it being finalized and some

23   accounting-type documents at the end.

24         A.    Well, it is standard

1    practice to have a physical file of all

2    the documents pertinent to a particular

3    research contract, and so it would be

4    consistent that this would be an

5    accumulation of both, what we call

6    pre-award sponsored research office

7    documents and the post-award, the grant

8    and contract office documents.

9           Q.    Okay.  And which is this?

10          A.    Well, the cover is from

11   grant and contract.  But typically the

12   next page -- in my prior life as the vice

13   president for research and development,

14   it would have been out of my group, the

15   sponsored research office.

16                Not to make it everything

17   complicated, but we reorganized on

18   July 1st, the formation of my new

19   company.  And those are now sponsored

20   research, and the grants and accounting

21   office have been put together in a common

22   framework under a vice provost.

23                Our research, they used to

24   report separately in the organization.

Confidential - Subject to Further Confidentiality Review

1    The grants and contracts to essentially

2    the CFO, senior vice president for

3    finance administration, Henry Mauermeyer.

4    You have a collection of documents from

5    him, so just to put a name on the title.

6             Sponsored research reported

7    to the then senior vice president of

8    research and development, which would be

9    me, or was me.

10            Q.    Okay.  So getting back to --

11            A.    So there's a collection here

12   of things that are sort of from both

13   sides of the shop.  It looks like the

14   office file on the project.

15            Q.    Okay.  Thank you.

16            A.    Finito?

17            Q.    Finito.

18            (Document marked for

19            identification as Exhibit

20            NJIT-20.)

21   BY MR. GEORGE:

22            Q.    What's been marked as NJIT

23   Exhibit 20 is a multi-page document.

24   First page is NJIT 02670.  Last page

Confidential - Subject to Further Confidentiality Review

1   02734.  Entitled "Quarterly Report

2   Submitted to Mr. Peng Shou."

3              Is this the first quarterly

4   report to report on the first milestones,

5   if you will, for the agreement?

6          A.    By the date --

7          Q.    Yes.

8          A.    -- I might think not.  I

9   might think it this second.  But you have

10  all of the reports, so it is possible.

11         Q.    Because January 1st, 2014,

12  is when the amendment went into place and

13  a new effective date, I believe, in terms

14  of the effectuation of the agreement,

15  correct?

16         A.    I don't -- I don't believe

17  we changed the dates.  The period of

18  performance had always remained from

19  July 1, 2013 to June.  This was a point

20  of confusion to Ken, who, in spite of the

21  fact that he did the English language to

22  the Chinese translations of the contract

23  all along, seemed confused as to when the

24  real start date was.

Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Well, be that as it

2     may, this was a quarterly report from a

3     quarter?

4          A.    Absolutely.  It is

5     absolutely a university document,

6     quarterly report.

7          Q.    Okay.

8          A.    And -- and I -- you're

9     probably correct, there are no other

10    prior...

11         Q.    Okay.  And on Page 2 of

12    the -- on the report --

13         A.    Mm-hmm.

14         Q.    -- the first -- end of the

15    first English section there, it discusses

16    the delay in reaching mutually acceptable

17    contract terms and receiving

18    authorization from blah, blah, blah.

19         A.    Mm-hmm.

20         Q.    That's that delay we were

21    discussing earlier, correct?

22         A.    Yes, it makes specific

23    reference to the piece of equipment that

24    Alan Delahoy needed to build to do his

Confidential - Subject to Further Confidentiality Review

```
1    job and -- and was not ultimately

2    approved until Peng Shou's January visit.

3           Q.    Okay.  So this was the first

4    report, at least after that?

5           A.    Correct.

6           Q.    Okay.

7                 (Document marked for

8                 identification as Exhibit

9                 NJIT-21.)

10                (Document marked for

11                identification as Exhibit

12                NJIT-22.)

13   BY MR. GEORGE:

14          Q.    What's been marked as

15   NJIT-21 is a multi-page document, NJIT

16   02775 through to 02815, quarterly report

17   submitted to Peng, Mr. Peng Shou.  And

18   this one reporting for Phase II of the

19   project, correct, Doctor?

20          A.    Correct.

21          Q.    And, again, this is the

22   official report provided by NJIT to

23   Mr. Shou?

24          A.    Yes.  And you'll see here
```

1   the -- the three titles to which I

2   referred to before.

3          Q.    Yes.

4          A.    The ones that I know.

5          Q.    And the prior one as well.

6   It all sorted itself out.

7                And one of them is, in fact,

8   his role as executive director and vice

9   president of CNBM, correct?

10         A.    That's listed, yes.

11         Q.    Okay.

12               MR. GEORGE:  Why don't we

13         get these done in one swoop.  It's

14         the same sort of thing.  23.  And

15         then the next in order.

16               (Document marked for

17         identification as Exhibit

18         NJIT-23.)

19               (Document marked for

20         identification as Exhibit

21         NJIT-24.)

22   BY MR. GEORGE:

23         Q.    Okay.  And, again, can you

24   just authenticate that these are the

Confidential - Subject to Further Confidentiality Review

1   final reports -- the third and final

2   reports to Peng Shou from NJIT?

3           A.     Correct.

4           Q.     Under the agreement,

5   correct?  Okay.

6                  MR. TIERNEY:  Is the third

7   NJIT-22?

8                  MR. GEORGE:  Yes.

9   BY MR. GEORGE:

10          Q.     And under the agreement, any

11  of the intellectual property, articles,

12  know-how contained in these articles is

13  the joint property of NJIT and CTIEC,

14  correct?

15          A.     Correct, sir.

16          Q.     And their affiliates, too,

17  correct?  Yes?

18          A.     Yes.

19          Q.     Okay.

20                 MR. POTTERS:  Whose

21          affiliates?

22                 MR. GEORGE:  Any of the

23          parties'.  CTIEC's affiliates,

24          NJIT's affiliates, to the extent

1          they exist.

2               MR. POTTERS:  Fair.  Fair

3          enough.

4               MR. GEORGE:  24.

5               (Document marked for

6          identification as Exhibit

7          NJIT-24.)

8     BY MR. GEORGE:

9          Q.    What's been marked as

10    NJIT-24 is a multi-page document, United

11    States patent.  Patent number 8,883,549

12    B2, first page is NJIT 02909.

13               Doctor, is NJIT-24 one of

14    the patents that was -- it's actually a

15    patent, right?  It's been approved by the

16    patent department?

17         A.    This is issued in 2014, yes.

18         Q.    Okay.  And this was part of

19    the intellectual property that was

20    basically owned now by CTIEC in

21    conjunction with NJIT, correct?

22         A.    That is my understanding,

23    correct.

24         Q.    Okay.  Has there ever been

```
 1    any valuation, that you know of, made as

 2    to the value of this patent?

 3         A.    No.

 4         Q.    Do you know if it's been

 5    applied, at all, by CTIEC or anybody

 6    else?

 7         A.    I don't know that it has.  I

 8    -- I am fairly certain that CTIEC has yet

 9    to develop a commercial solar cell

10    production facility.

11         Q.    Do you know where their

12    intention to -- is that facility in --

13    under -- in construction or in

14    preparation right now?  Do you know?

15         A.    I don't know the state.

16    I -- it is much like our work, something

17    for which the deadlines had continuous

18    slip.

19              It was originally when we

20    began our work with Apollo in 2010.  A

21    pilot facility that was expected to be

22    rapidly scaled into production work back

23    in that time frame.  For a variety of

24    reasons, including some of the technology
```

Confidential - Subject to Further Confidentiality Review

1  shortcomings that we described earlier,

2  it -- it hasn't happened.

3         Q.    Okay.  And where is that

4  facility planned to be?

5         A.    I -- my -- my understanding

6  was it was meant to be in Chengdu, where

7  Dr. Pan's company is located.

8         Q.    Okay.  And in terms of the

9  wider know-how reflected in the quarterly

10  reports, has that found any -- been

11  valued, that you know of, or been

12  purchased, sold or put into production or

13  application by CTIEC?

14         A.    It has not, to my knowledge.

15              MR. GEORGE:  25?

16              (Document marked for

17         identification as Exhibit

18         NJIT-25.)

19              THE WITNESS:  Thank you.

20              MR. GEORGE:  You're welcome.

21  BY MR. GEORGE:

22         Q.    All right.  What's been

23  marked as NJIT-25, is a multi-page

24  document, it's actually two documents.

1    And this is one of the situations where I

2    found the agreement and I found what I

3    think is the application form.

4         A.    Mm-hmm.

5         Q.    But they never were

6    together.  So the first range of

7    documents related to the PV materials

8    Technology and Development Agreement

9    starts 01661 and ends 01674 with your

10   signature.  Okay?

11             And then the -- the form,

12   the appendix to that agreement, setting

13   forth what's to be done, begins NJIT

14   02940 and ends 02996, and includes the

15   signatures of both, I believe -- are

16   those Dr. Chin's and Dr. Delahoy's

17   signatures on the last, the very last

18   page of the document?

19        A.    Correct.

20        Q.    Okay.  So does that suggest

21   this is the final proposal?

22        A.    Yes.  And they -- they

23   probably never appeared together in a

24   single document.  I think I mentioned

1 earlier, the CTF was assembling the

2 technology proposals and putting them

3 together to forward to Mr. Peng.  So we

4 gave him the pieces.  We gave him the

5 technical scope of work, what's called

6 the application first, to be sure that we

7 were all simpatico on what we were going

8 to do.

9     And then the contractual

10 details, I gave them separately.  And it

11 was for them to merge them together.  And

12 whatever was their larger document

13 included their own requests.

14    Q. Okay.  Very good.

15    And --

16    A. Now, that's just to explain

17 why they're in separate files.  They were

18 never consolidated into one -- one

19 composite.

20    Q. Oh, interesting.  Okay.  But

21 I've got them, I got it right here.

22    A. Yes.  You have the pieces.

23 Correct.  I'm just explaining why they

24 didn't appear as a single file.

Confidential - Subject to Further Confidentiality Review

1    Q.    That's good.  Thank you.

2          Now, I notice here, and

3    you -- early on, we spoke about your

4    various titles.

5    A.    Mm-hmm.

6    Q.    And you mentioned the New

7    Jersey Innovation Institute.

8    A.    Correct.

9    Q.    I notice that that is the

10   party to this agreement, not NJIT as it

11   was in the prior agreement, correct?

12   A.    Mm-hmm, correct.

13   Q.    But NJIT is still basically

14   a beneficiary of the agreement, correct?

15   A.    Correct.

16   Q.    And NJII is basically just

17   doing this on behalf of NJIT?

18   A.    Yes, you've captured it.

19   It's part of our function to be the

20   manager of industrial contract

21   relationships.  That's why we created the

22   institute, as a better home for those

23   sorts of relationships than in a

24   traditional academic structure

1   environment.  But much of what we expect

2   to do would be done, ultimately, with

3   students and faculty, not only at our

4   university, but at other State

5   universities.  So we've become a

6   front-end, if you will, for coordinating

7   the resources of the academic sector and

8   the State companies.

9          Q.    Yeah, that's a good

10  adaptation to the market.

11               And the CNBM new

12  materials -- new materials center, will

13  be the body through which this funding

14  and these tasks are completed, correct?

15         A.    Correct.

16         Q.    Okay.

17         A.    Which is a -- it is a

18  structure that has no legal formality.

19  It's just a name.  It's a name of a

20  program.

21               And it's a -- there -- there

22  are two laboratories and a couple of

23  offices with a plate on the wall in our

24  oldest academic building --

1        Q.    But that, and that plate

2   says what?

3        A.    That's the plate that you

4   saw in the picture that says CNBM.

5        Q.    CNBM?

6        A.    Yeah.

7        Q.    In fact, on the top left

8   here, I notice the NJII reference, in the

9   top right.  Top left is CNBM, the --

10  below the logo, below the Chinese

11  characters is CNBM New Energy Materials

12  Research Center NJIT, correct?

13       A.    Yes.  Yes, that's Dr. Chin's

14  adornment.

15       Q.    And if you turn to Page 6 of

16  the agreement.

17       A.    Mm-hmm.

18       Q.    And that's the similar thing

19  we saw before, it's three, three

20  milestones and three payments made,

21  correct?

22       A.    Correct.

23       Q.    And the -- the lump sum

24  would be $740,000?

1          A.     That is what was asked.

2     It's yet to be approved.

3          Q.     You're right, you're waiting

4     for Mr. Peng to okay it?

5          A.     Mm-hmm.

6          Q.     So the lack of his signature

7     on this means it hasn't been signed yet

8     by CTIEC?

9          A.     That's correct.

10         Q.     Okay.  If I could request if

11    and when you do receive that, please

12    provide it to your counsel so we can see

13    that as part of an ongoing part of the

14    discovery here.

15         A.     Absolutely.

16         Q.     And that's your signature on

17    Page 14?

18         A.     Yes, that's my signature.

19         Q.     And so there have been no

20    payments received for this agreement?

21         A.     Correct.

22         Q.     Although there was a

23    $250,000 payment received in advance of

24    the initial agreement being signed and

Confidential - Subject to Further Confidentiality Review

1  finalized, correct?

2       A.    Different set of

3  circumstances.  The $250,000 was part of

4  what was supposed to have been a $500,000

5  payment that would make us whole on

6  expenses already incurred to get to the

7  point where, in July of 2013, we would

8  have been in a position to execute on the

9  next series worth of deliverables.

10           That having been done, this

11 is now solely about new work going

12 forward.

13      Q.    Right.  No.  I understood.

14 Right.  But just to be clear, my question

15 is much smaller.

16      A.    Yeah.

17      Q.    There was -- this -- this

18 agreement had no payment before the

19 agreement was finalized?

20      A.    Yeah, correct.

21      Q.    That initial agreement had a

22 small wire from TECO before the initial

23 agreement was finalized, correct?

24      A.    Yes, correct.

Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  And that's where the

2     confusion happened, correct?

3          A.    That's a polite way of

4     saying it.  Correct.  Confusion is a

5     polite way of saying that.

6          Q.    I wasn't in the trenches on

7     that one.  I just saw years later.

8               (Document marked for

9               identification as Exhibit

10              NJIT-26.)

11    BY MR. GEORGE:

12         Q.    What's been marked as

13    NJIT-26 is a multi-page document.  First

14    page is NJIT 01345, and the last page is

15    01348.

16              Okay.  My interest here in

17    this e-mail is on Page 2 of the e-mail,

18    1346 at the top.  There's a nice

19    reference chart about the various phases,

20    amounts owing, and the amount -- well,

21    received or open.

22         A.    Correct.

23         Q.    Am I correct to assume that

24    received means that it had been paid on

1    or before the date of this e-mail, which

2    is March 13th, 2015?

3            A.    Yeah, correct.

4            Q.    Okay.

5            A.    It was a much cleaner table

6    in the electronic format.

7            Q.    Yeah, you're killing me

8    there.

9            A.    Well, that's the trouble

10   with tabs.

11           Q.    And so 3 --

12           A.    It's not too bad.  It's not

13   too bad.  Things are aligned pretty well.

14   It's just the receives wrap around.  That

15   causes a little distortion.  Otherwise,

16   the columns are --

17           Q.    Yeah, the ED drops down.

18               So for Phase III is $130,000

19   owing, and you said that has been paid

20   since this e-mail, correct?

21           A.    We've gotten our first

22   installment against that one, $45,000 --

23           Q.    Okay.

24           A.    -- which I acquired about

1    two days ago and was told that it just --

2    that first payment had arrived.

3         Q.    Okay.  All right.  That's

4    all for that.

5              And the Phase IV, it's still

6    being negotiated?

7         A.    Correct.

8         Q.    In the course of your

9    business dealings with Mr. Peng and

10   Dr. Pan, did they ever suggest that there

11   is a Chinese secrecy law that prevented

12   them from sharing any certain information

13   with you or NJIT?

14        A.    I've never heard of that.

15        Q.    You didn't have -- didn't

16   have to sign any special documents or

17   waivers to get information?

18        A.    No.  You've seen everything

19   that I've -- to the best of my knowledge,

20   you have all of my communications with

21   them.

22             (Document marked for

23        identification as Exhibit

24        NJIT-27.)

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. GEORGE:
 2         Q.    What's been marked as
 3    NJIT-27 is a multi-page collection of
 4    e-mails.  First page is 01861.  Last page
 5    is 01867.
 6              From my perspective, I just
 7    need you to authenticate that these are
 8    e-mails that you had sent and assembled
 9    for production in this -- in this case.
10         A.    That would be correct.
11         Q.    And these are e-mails that
12    you sent in the course of your business
13    at NJIT?
14         A.    Correct, sir.
15         Q.    And they were from your
16    Outlook that you use at work?
17         A.    Correct.
18         Q.    Okay.
19         A.    And again, the question
20    marks are placeholders for Chinese
21    characters.
22         Q.    Yes, yes.  And to the extent
23    that there -- these came from -- these
24    did come from native e-mail files, and
```

1    those are still on your server and in

2    your Outlook?

3        A.    Absolutely.

4        Q.    Do you know if -- if your

5    counsel or general counsel had any

6    conversations with lawyers for any of the

7    defendants in this case, in particular

8    CNBM, Taishan Gypsum, or BNBM?

9            MR. POTTERS:  Objection.

10           Perhaps we should discuss your

11           question off the record.

12           MR. GEORGE:  Okay.  Off the

13           record.

14           THE VIDEOGRAPHER:  All

15           right.  Stand by.  The time is

16           1:56 p.m.  We are going off the

17           record.

18           (Whereupon, a discussion was

19           held off the record.)

20           (Witness exits the

21           conference room.)

22           MR. POTTERS:  We've had a

23           discussion.  I've asked the

24           witness to leave the room so as to

1    not have any inference or

2    accusation of coaching the

3    witness.

4         I don't know what the

5    Louisiana federal law is on that.

6    But in New Jersey, as I said,

7    we're particularly sensitive to

8    that.

9         So I wanted to have this

10   discussion outside of the presence

11   of the witness.

12        It seems to me that your

13   question invades the

14   attorney/client privilege, and

15   whether the witness is produced in

16   his individual capacity or as he

17   is here today as a corporate

18   designee, the question -- again,

19   respectfully -- I do not believe

20   is proper.

21        NJIT had no knowledge of

22   your litigation.  Had no knowledge

23   of the injunction, had no

24   knowledge of the contempt order

1        prior to receiving the subpoena.

2              MR. GEORGE:  And he's

3        testified to that effect.

4              MR. POTTERS:  Exactly.

5              MR. GEORGE:  Correct.

6              MR. POTTERS:  So when we,

7        that is NJIT, receives the

8        subpoena, I spoke with you because

9        the time frame is rather

10       circumscribed, I think is a polite

11       way of putting it.

12             And what NJIT may or may not

13       have done to familiarize

14       themselves -- if you want to

15       ask -- in my opinion, if it's done

16       through counsel, communicating

17       with counsel is not, again,

18       respectfully, a proper inquiry.

19             If you want to ask the

20       witness did he learn any facts

21       from any such conversations,

22       that's a proper inquiry.  And I

23       can represent to you the answer is

24       no.

1              MR. GEORGE:  Don't confuse

2         the fact of a conversation with

3         the facts discussed about a

4         conversation.

5              So my initial question is

6         simply does he know, have such

7         conversations taken place.  That

8         is fully discoverable.  The length

9         of time, perhaps, we can quibble

10        when we get -- cross over from

11        there was a communication versus

12        what was communicated.

13             But my initial question is

14        unobjectionable.  I think it

15        raises some interesting law school

16        type of questions about can a

17        corporate designee know things

18        like that.

19             I don't think this is the

20        forum for playing out that

21        dialogue.

22             MR. POTTERS:  I don't

23        believe the witness knows the

24        answer to your question.

Confidential - Subject to Further Confidentiality Review

```
1                I'll let him answer.  But if

2           the witness says yes, for example,

3           and then you ask what was

4           discussed, then I am going to

5           instruct him not to answer.

6                MR. GEORGE:  Were there

7           conversations --

8                MR. POTTERS:  To the extent

9           any such conversations even

10          occurred that he knows about.

11               Again, I don't believe he

12          knows the answer to that.  But

13          that's why I wanted to have the

14          discussion with you outside of his

15          presence, because obviously if I

16          said that in front of him --

17               MR. GEORGE:  And he knew

18          something, he'd go, "Maybe I

19          should dummy up or lawyer up."

20               MR. POTTERS:  He would say

21          well -- he's -- he's been, I

22          think, very direct, which is the

23          engineer way.

24               So he will -- he will
```

Confidential - Subject to Further Confidentiality Review

1           continue to be so.  But again,

2           that's why I wanted the

3           conversation outside of his

4           presence.  I'll bring him back.

5               MR. GEORGE:  And I'll repose

6           my question.  And I think we agree

7           it's not objectionable.  And if I

8           get involved in understanding what

9           was communicated, to the extent he

10          knows anything, that's when you

11          will interpose the objection you

12          think is appropriate in this

13          situation.

14              MR. POTTERS:  I don't agree

15          that it's not objectionable.  But

16          I'm going to let him answer it.

17              MR. GEORGE:  What objection

18          do you have to that?

19              MR. POTTERS:  I think

20          conversations that, for example,

21          if the defense lawyer was asking

22          the witness on cross-examination,

23          "Are you aware of any

24          conversations that your counsel

```
1        had with plaintiff's counsel?"  I

2        think similarly, that is an

3        objectionable question.

4             What a desig- -- and I don't

5        think it makes a difference

6        whether the witness is produced in

7        his individual capacity or as a

8        corporate designee.  I think

9        that's a distinction without a

10       difference.

11            What this witness knows in

12       terms of what counsel may have

13       done on behalf of his client to

14       educate themselves about a

15       nine-year litigation where the

16       docket sheet, I think, is over

17       6,000 pages long, I think that's

18       correct.

19            MR. GEORGE:  That's going to

20       be one subject of conversation.

21       There are many others as well.

22       And I'm --

23            MR. POTTERS:  Yeah --

24            MR. GEORGE:  In the first
```

Confidential - Subject to Further Confidentiality Review

1           for instance, the line of

2           questioning used in the first

3           instance is to find out whether

4           the witness can testify about

5           something.  Does he know about any

6           conversations?

7                If he says no, then you're

8           off the hook.  If he says yes,

9           then you and I can mix it up and

10          see what happens.

11               MR. POTTERS:  That's why I

12          said I'll permit him to answer the

13          question.  Because I think the

14          answer is going to be no.

15               MR. GEORGE:  Okay.  Thank

16          you.

17               (Witness re-enters the

18          room.)

19               THE VIDEOGRAPHER:  The time

20          is 2:05 p.m.

21               We are back on the record.

22     BY MR. GEORGE:

23          Q.    Okay.  So the question,

24     again, Doctor is:  Are you aware of any

Confidential - Subject to Further Confidentiality Review

1   conversations New Jersey Tech has had

2   with counsel for CNBM, BNBM or Taishan

3   Gypsum about the subpoenas?

4           MR. POTTERS:  Objection.

5           You may answer the question.

6           THE WITNESS: I am not aware

7       of any.

8           MR. GEORGE:  Okay.

9           THE WITNESS:  I have spoken

10      only to Holly Stern and Brian

11      Tierney and they were

12      fundamentally about the process of

13      collection.

14          MR. POTTERS:  Don't -- no,

15      no, no, no, don't disclose what

16      you spoke with your inhouse

17      lawyers.

18  BY MR. GEORGE:

19      Q.    That was a yes or no.  And I

20  appreciate your --

21      A.    Okay.

22          MR. POTTERS:  Okay.

23          THE WITNESS:  No coaching

24      the witness.

1          Q.    We're moving on now to the

2    certificate program.

3          A.    Okay.

4          Q.    We're putting behind the

5    schlag we just went through.

6          A.    Good.

7          Q.    And it's a much smaller

8    little hike.

9          A.    Yes, it is.  Hopefully much

10   more straightforward.  But one never

11   knows.

12         Q.    It couldn't be less

13   straightforward.

14         A.    It all depends on the lens

15   you're wearing.

16              MR. GEORGE:  27.  Oh, yes.

17         I just read 27.  I guess we're on

18         28.

19              (Document marked for

20         identification as Exhibit

21         NJIT-28.)

22   BY MR. GEORGE:

23         Q.    Okay.  So what's been marked

24   as NJIT-28 is a multi-page document,

Confidential - Subject to Further Confidentiality Review

1    first page NJIT 05797, last page 05809,

2    entitled, "Collaborative Graduate

3    Certificate Program Agreement Between

4    NJIT and CTIEC."

5         A.    Very good.

6         Q.    And this is the agreement

7    reached between your two entities,

8    establishing the certificate program,

9    correct?

10         A.    Correct.

11         Q.    And that's Peng Shou's

12    signature on Page 7?

13         A.    I would -- I would believe

14    so.

15         Q.    Okay.  And do you know who

16    would have signed on behalf of NJIT?  I

17    couldn't find a fully executed agreement.

18         A.    It might have been executed

19    by Gale Spak, as -- as the head of

20    continued professional ed.  It could have

21    been authorized by the provost, Fadi

22    Deek, or even the president.  And that's

23    the reporting line.

24         Q.    Okay.  And so Fadi Deek was

1    the provost at the time?

2          A.    Correct.  Gale reports to

3    Fadi.  That would have been the

4    appropriate signatory.

5          Q.    Who selected the candidates

6    who would be for this program, would

7    CTIEC select them?

8          A.    Yes.

9          Q.    Did NJIT have any say in

10   that?

11         A.    No.

12         Q.    Okay.

13         A.    Not to my knowledge.

14         Q.    So this is the first of the

15   agreements, which I believe you said

16   would have been for the January 2014

17   semester?

18         A.    A year ago, yes.

19         Q.    Okay.

20         A.    Our spring semester, a year

21   ago.

22         Q.    Okay.

23         A.    2014.

24         Q.    And on Page 4, under

1   "Financial Arrangements and Tuition," was

2   set at that $19,000 for each head,

3   correct?

4          A.    Correct.

5          Q.    And there were seven heads

6   in -- in that time?

7          A.    I believe that's correct.

8          Q.    Okay.  And it says, "Books

9   and Materials."  It says, "CTIEC and/or

10  the students are responsible for paying

11  required books and materials."  Do you

12  know who ended up paying for those, CTIEC

13  or the students?

14         A.    I don't.  That's typically

15  the arrangement of the university.

16         Q.    Okay.  It is what it is.

17         A.    It is.

18               MR. GEORGE:  Is this 29?

19               (Document marked for

20        identification as Exhibit

21        NJIT-29.)

22  BY MR. GEORGE:

23         Q.    What's been marked as

24  NJIT-29 is a press release.  First page

Confidential - Subject to Further Confidentiality Review

1   is NJIT 03385, last page is 03386,

2   entitled, "Developing Chinese Corporation

3   Employee's Talent," which was reprinted

4   from the alumni association of the NJIT

5   newsletter.  Are you familiar with this

6   document?

7          A.    I'm not.  But I wouldn't

8   contest its authenticity.

9          Q.    Okay.  Do you know when the

10  winter/spring 2014 edition of the alumni

11  association newsletter comes out?

12         A.    Not specifically, I -- I

13  would guess about this time frame, I

14  think we just got one for 2015 within the

15  last few weeks.

16         Q.    Okay.  So this time last

17  year?

18         A.    Yeah.

19         Q.    Okay.  Thank you.

20               MR. GEORGE:  Number 30.

21               (Document marked for

22          identification as Exhibit

23          NJIT-30.)

24  BY MR. GEORGE:

1     Q.    What's been marked as

2   NJIT-30 is a multi-page document, first

3   page is NJIT 03508, last page is 3519.

4   Same title as 28.  "Collaborative

5   Graduate Certificate Program Agreement

6   Between NJIT and CTIEC."

7           And if I can call your

8   attention to Page 7, Doctor, and, again,

9   that's -- is that Peng Shou's signature,

10  as far as you recognize?

11    A.    As far as I recognize.

12    Q.    And -- and that's Fadi Deek,

13  the provost signing there?

14    A.    Yes, Fadi Deek, D-E-E-K.

15    Q.    I'm sorry, yes.

16    A.    Full title would be the

17  senior executive vice president for

18  academic affairs and provost.

19    Q.    Okay.  Thank you.

20          And this is for the current

21  semester, correct?

22    A.    Correct.

23    Q.    And on Page 4, "Tuition

24  Payment."  The tuition is now $20,400 per

1    head, correct?

2           A.    Correct.

3           Q.    How many people

4    participating this term?

5           A.    I -- I believe it's six.

6           Q.    Okay.  And I assume payment

7    is made before the semester commences?

8           A.    I believe.  Let's put it

9    this way, it's my understanding that this

10   has been paid because in -- in earlier

11   correspondence that we discussed, there

12   was confusion as to whether that payment

13   was meant for Ken Chin's center activity

14   for this program.

15          Q.    Okay.  That was an earlier

16   e-mail that we looked at?

17          A.    Yes.

18          Q.    Okay.

19          A.    The one with the table.

20          Q.    Very good.  Thank you.

21                MR. GEORGE:  31.

22                (Document marked for

23          identification as Exhibit

24          NJIT-31.)

1    BY MR. GEORGE:

2         Q.    What's been marked as

3    NJIT-31 is a multi-page e-mail, with

4    attachment, first page is NJIT 03299,

5    ending 3316.

6              And this is -- includes a

7    communication between Jingong.  He is

8    referred to as Dr. Pan sometimes,

9    correct?

10        A.    Yes.

11        Q.    And to yourself.  And it's

12   attaching on CTIEC letterhead a number of

13   pages.  Can you explain what those pages

14   are?

15        A.    I -- I believe these are the

16   credentials of the students so that we

17   could arrange for the student visas.

18        Q.    Okay.  And then if you can

19   help me just confirm my understanding.

20   For example, on Page 3303, there is the

21   person's name, and then preferred course

22   rank by course name.

23              This is the students'

24   preference for the course offerings under

1    the program, correct?

2         A.    Correct.  At that point, we

3    were still trying to shape this like a

4    snowball to understand which of the

5    courses that we had available would suit

6    the needs and interest of the certificate

7    students so we could get them registered

8    in the courses that were about ready to

9    go right after Christmas.

10            MR. POTTERS:  Can we take a

11        break just for a second for a

12        technical issue?

13            MR. GEORGE:  Yeah, sure.

14            MR. POTTERS:  Let's go off

15        the record.

16            THE VIDEOGRAPHER:  The time

17        is 2:14 p.m.  We are going off the

18        record.

19            (Short break.)

20            THE VIDEOGRAPHER:  The time

21        is 2:20 p.m.  We are back on the

22        record.

23    BY MR. GEORGE:

24            Q.    Doctor, if you could turn to

1    the Bates-stamped Number 3305.

2         A.    Okay.

3         Q.    And this is for Dongliang

4    Zhang, position in company, title vice

5    director of new energy department.  Did I

6    read that correctly?

7               And under brief description

8    of responsibilities, it says, "To take

9    charge of the PV EPC market development

10   in American market."

11              I wonder if you can tell me

12   what PV means and what EPC means, please.

13        A.    I can tell you what PV

14   means, photovoltaic.  That's the

15   scientific terminology for things that

16   produce electricity when exposed to

17   light, which is solar cells.  EPC --

18        Q.    Do you know that?

19        A.    I'm not sure.

20        Q.    Any -- if you had to make

21   an --

22        A.    Couldn't even guess.

23        Q.    -- educated guess?

24        A.    You know, energy production

1    canumba.

2           Q.    Okay.

3           A.    Technical term.

4           Q.    It's sort of an application

5    under things.  It's not a theorist here.

6    It's somebody is trying to make something

7    for the market, correct?

8           A.    Correct.  The people in this

9    course were not involved in the work at

10   Ken's lab, if that helps clarify.

11          Q.    Yeah, it does, because

12   they're business people trying to sell a

13   product.

14          A.    Exactly.

15          Q.    Okay.

16          A.    Or whatever it is that

17   business people do.  I'm just an

18   academic.  I wouldn't know.

19               (Document marked for

20               identification as Exhibit

21               NJIT-32.)

22   BY MR. GEORGE:

23          Q.    What's been marked as

24   Exhibit 32 is an e-mail and attachments.

Confidential - Subject to Further Confidentiality Review

1    First Bate stamp number is NJIT 05784;

2    last one is 5793.

3              This e-mail is discussing

4    the payment of additional expenses of

5    $1,500 in addition to the tuition; is

6    that correct?

7         A.    Yes.

8         Q.    Okay.  Do you know what

9    those expenses were related to?

10        A.    I don't.  I can do a quick

11   scan and see if there's any detail back

12   here.

13             My belief is it's to cover

14   some of the field trips and entertainment

15   that was provided.  I know that they --

16   they took them skiing.  I think they took

17   them to Washington D.C. to visit the

18   national monuments and so on.  So that

19   would be my guess.

20        Q.    Okay.  Do you know what

21   other states they might have visited on

22   these outings?

23        A.    I believe most of the travel

24   was within New Jersey.  If they went to

Confidential - Subject to Further Confidentiality Review

1  Delaware or Pennsylvania, it was all

2  within driving distance.  New York, New

3  York City.

4         Q.    So no flights?

5         A.    To the best of my knowledge,

6  there were no flights, no.  $1,500, that

7  wouldn't even cover round trip to

8  Philadelphia.

9         Q.    I'm sure of that.  Okay.

10  Thank you.

11              And I'm sorry.  And then

12  there was -- attached to that e-mail,

13  there's -- each of the -- am I reading

14  correctly that this is a memorandum -- a

15  certification basically from CTIEC that

16  such payments be made for each individual

17  here.  So for example, we spoke about

18  Mr. Zhang Dongliang.

19         A.    Yes.

20         Q.    He's discussed in this

21  individual certification from CTIEC on

22  5788, correct?

23         A.    Your eyes are better than

24  mine.  Yes, that would be my

Confidential - Subject to Further Confidentiality Review

1   understanding.  Each one of these

2   pertains to each student.

3          Q.    Do you know if similar

4   arrangements are being made for the

5   current batch?

6          A.    I don't know how it's being

7   handled, but I believe that the current

8   program is meant to mirror the original

9   one that was deemed to be a success.

10          Q.    Okay.

11              (Document marked for

12          identification as Exhibit

13          NJIT-33.)

14   BY MR. GEORGE:

15          Q.    What's been marked as

16   NJIT-33 is a single-page e-mail, NJIT

17   03561.

18              MS. DALEY:  Do we have any

19          record of who this e-mail is to?

20              MR. GEORGE:  I wish I knew.

21   BY MR. GEORGE:

22          Q.    Who is Joanne --

23          A.    That's what happens when you

24   don't do it the way I do it.  You may get

1    the special characters, but you don't get

2    the full header.

3          Q.    Joanne Branin, is she the

4    executive director of continuing

5    professional education at the time?

6          A.    Correct.

7          Q.    This was created as part of

8    her responsibilities, correct?

9          A.    Joanne would report to Gale

10   Spak, who we cited several times before

11   as the head of the continuing

12   professional ed division.

13         Q.    Okay.  And then at the top

14   here is Base, which I -- looked like --

15   these is things covered by the tuition

16   paid, the $20,400 for this year, correct?

17         A.    Correct.

18         Q.    And there's a projected

19   bunch of extras below that, correct?

20         A.    Correct.

21         Q.    And does CTIEC pay both the

22   base and the extras?

23         A.    To the best of my knowledge,

24   yes.

Confidential - Subject to Further Confidentiality Review

1        (Document marked for

2        identification as Exhibit

3        NJIT-34.)

4   BY MR. GEORGE:

5        Q.    What we're going to mark as

6   NJIT-34 is a single-page, e-mail NJIT

7   03570.  Another e-mail from Joanne

8   Branin.

9            Am I correct in assuming

10  this reflects the payments, I assume, for

11  this term of the collaboration

12  certificate program?

13       A.    Correct.

14       Q.    Okay.  All right.  And am I

15  correct to understand that at the end of

16  each line, first payment, second payment

17  and third payment, there's a date,

18  January 30th for the first, February 5th

19  for the second, and February 12th for the

20  third?

21       A.    I would interpret that the

22  same as well.

23       Q.    Okay.  Thank you.

24       A.    As I think I said earlier,

Confidential - Subject to Further Confidentiality Review

1   when we checked on the payment for Ken's

2   center, this total amount had been

3   received.

4          Q.    Okay.  So you got a wire

5   from a company in Toledo, right, in 2013?

6          A.    Wire transfer, yes.

7          Q.    For a quarter million

8   dollars, right?

9          A.    Mm-hmm.

10         Q.    Was there any paperwork

11  related to that?

12         A.    No.

13         Q.    Okay.  How did NJIT know

14  that it was part of the CNBM new

15  material -- energy materials center?

16         A.    Because Mr. Peng Shou said

17  that he would be wiring us the money to

18  make good on the $500,000 of expenditures

19  we'd already incurred.  And we were led

20  to believe that TECO was a U.S.

21  subsidiary of CTIEC and that was the

22  nature by which you would transfer funds,

23  American funds, to U.S. dollars in the

24  U.S.

Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  So it was a wire

2   transfer from TECO?

3    A.    Mm-hmm.

4    Q.    And it was sent to -- the

5   account to which it was wired, was it one

6   unique to the center or was it to NJIT?

7    A.    No, to NJIT.  All those wire

8   transfers that you see documented, even

9   for the subsequent invoices, to CTI,

10   throughout the balance of the program are

11   the university's lock box.

12    Q.    Okay.  And so, then, you

13   told -- what department is in charge of

14   receiving wires and making sure that they

15   get delegated properly?

16    A.    It would be our accounts

17   receivable department.

18    Q.    Okay.  And so you told them

19   to watch out for a wire from TECO?

20    A.    Mm-hmm.

21    Q.    Okay.

22    MR. POTTERS:  You have to

23   say yes.

24    THE WITNESS:  I'm sorry.

1               Yes.

2    BY MR. GEORGE:

3          Q.    Okay.  Did the lack of

4    paperwork on the front end cause any

5    headaches for you on the back end when --

6          A.    Well, I think the lack of

7    understanding that it was a loan as

8    opposed to full payment or a partial

9    payment towards the full expense caused

10   considerable confusion, even perhaps to

11   our friends in Toledo.

12         Q.    Okay.

13         A.    I think you're flying out

14   there to find out.

15         Q.    Yeah, and you think you had

16   a headache.

17               Who was it a loan to?

18         A.    We didn't know that it was a

19   loan.

20         Q.    You found out later it was a

21   loan?

22         A.    Our -- our understanding,

23   you know, with 20/20 hindsight was

24   apparently it was a loan from TECO to

1    CTIEC.

2          Q.    Okay.  So it was not a loan

3    to NJIT?

4          A.    Or you can tell from the

5    correspondence we were led to believe for

6    some period of time that that was perhaps

7    the case.

8          Q.    Okay.  And so --

9          A.    Led to believe is -- is an

10   improper way of stating it.  There was

11   considerable confusion about who loaned

12   what to whom and to whom payments were

13   owed for what.

14         Q.    And your understanding is

15   that the loan -- the payments were made

16   to NJIT, but the loan was made to whom?

17         A.    The loan was made, my

18   understanding, after the dust had

19   settled, was from TECO to the parent

20   company to allow the parent company,

21   CTIEC, to expedite payment to NJIT for

22   the $500,000 of expenses that had been

23   incurred from the period of default of

24   the Apollo program up until the period

1  where we would be getting contracted

2  work.

3         Q.    Okay.  And that would have

4  been, your understanding, half a payment

5  for that amount?

6         A.    Correct.

7         Q.    And that's why the initial

8  agreement we saw only had $250,000 under

9  Section 5.1 as opposed to --

10         A.    You understand my thinking

11  better than they do.

12         Q.    Is that correct?

13         A.    I put it in the contract.

14  Then the 250, because it was my belief

15  that that first 250 was a payment, not a

16  loan to be reimbursed.  They did not

17  understand that.  And they believed that

18  that 250 was really then to repay the

19  original loan.

20         Q.    Okay.  But, again, not a

21  loan to you, a loan to CTIEC?

22         A.    Yeah.  I'm not even sure if

23  "loan" is the proper word.  Because

24  you -- you must tell when we're -- when

1    we're dealing with English as a second

2    language, sometimes terms don't have the

3    same precision as when we're speaking to

4    ourselves.

5         Q.    Yes, that is true.  Okay.

6              And I do want to simply get

7    a few e-mail threads that discuss what

8    we've spoke about in that transaction

9    authenticated.  But I really have no

10   further questions for you on that one.

11        A.    Fair enough.

12             MR. GEORGE:  35.

13             (Document marked for

14        identification as Exhibit

15        NJIT-35.)

16   BY MR. GEORGE:

17        Q.    What's been marked as

18   NJIT-35, is a collection of e-mails from

19   Dr. Sebastian.  First page is NJIT 01803,

20   last page is 1809.

21             And these are all e-mails

22   that you sent and/or received in the

23   course of your responsibilities at NJIT,

24   Doctor?

1          A.     Correct, sir.

2          Q.     And these came from your

3    Outlook?

4          A.     They did indeed.  I

5    recognize the mysterious question marks.

6          Q.     Okay.

7                 (Document marked for

8                 identification as Exhibit

9                 NJIT-36.)

10   BY MR. GEORGE:

11         Q.     What's been marked as NJIT

12   Exhibit 36 is a multi-page e-mail, the

13   first page is NJIT 00715, the last page

14   is 720.  Can you tell me, Doctor, who

15   Henry Mauermeyer?

16         A.     Yes, Henry Mauermeyer is our

17   senior vice president for finance

18   administration, corporate title is he

19   would be our CFO.

20         Q.     Okay.  And He Wen, do you

21   know that name?

22         A.     I -- I guess recognize that

23   name.  I think I might even have met him

24   once.

1        Q.    Okay.  And who is He Wen?

2        A.    I -- He -- I think I saw

3   his -- his title on a previous e-mail,

4   that he was an assistant to the

5   president.  I think he might have been

6   one of the students.  Probably should

7   double-check.  And he might also have

8   been in the crop of first-year students.

9        Q.    For the certificate program?

10       A.    Yeah.

11       Q.    Okay.  You can look at the

12  roster.

13       A.    That's why I think I met

14  him.  Because I think he was on campus

15  last year as we were trying to resolve

16  things.  And he came to my office to try

17  to see what -- what up, as we say in

18  Jersey.

19       Q.    Okay.  And I'm sure he

20  learned that phrase, at least.

21            And had you -- prior to

22  this, had NJIT had any dealings with TECO

23  before?

24       A.    No, never heard of it.  And

1    didn't know what they do -- what they do.

2    I still don't know what they do.

3         Q.    Okay.  Here, you -- is it

4    you saying this, yes?

5         A.    Which one?

6         Q.    Here at the bottom here,

7    right above Don.  And it says, "We were

8    told" -- "I spoke to Mr. Paulson this

9    morning."  He's the guy from TECO, right?

10        A.    Yes.

11        Q.    "He is correct that we were

12   solving the wrong problem.  We were told

13   that TECO wanted repayment of a loan to

14   NJIT."

15        A.    Correct.

16        Q.    "In fact, it is a loan to

17   CTIE and we are asking to be fiscal agent

18   to move the funds internationally without

19   a tax liability to TECO."  Is that

20   correct?

21        A.    So to back that up.  What I

22   assert there is correct.  We thought that

23   we were loaned the money from TECO.  We

24   were looking for a vehicle by which we

Confidential - Subject to Further Confidentiality Review

1    could then pay them.  You can't just send

2    them a check for no reason.  And our

3    sponsored programs office was trying

4    diligently to execute a subcontract to

5    TECO.  And TECO resisted saying, well,

6    no, we didn't do a piece of work.  If you

7    issue us a subcontract, then we will have

8    a tax liability to pay on income and

9    there was never any -- any service

10   provided.

11             We are -- are expecting, you

12   know, you to be the agent to repay the --

13   the money that was advanced by us by

14   virtue of CTIEC now embracing that in the

15   master contract.

16        Q.    Okay.  So this understanding

17   about -- came from conversations with

18   TECO?

19        A.    Yes.

20        Q.    Or a conversation with

21   CTIEC?

22        A.    This was -- this was what --

23   what finally became clear when we spoke

24   to the folks at TECO.

1          Q.     Okay.

2          A.     Mr. Paulson, who I referred

3    in the -- in the letter.

4          Q.     Did you ever confirm this

5    with CTIEC?

6          A.     Did I confirm that that was

7    their intent?

8          Q.     Yeah.

9          A.     That's -- I think through

10   the fractured English, I think we finally

11   came to arrive as an understanding, that

12   was the intent, yes.

13         Q.     Okay.

14              MR. GEORGE:  And the last

15         one is NJIT Exhibit 37.

16              (Document marked for

17         identification as Exhibit

18         NJIT-37.)

19   BY MR. GEORGE:

20         Q.     What's been marked

21   Exhibit 37, two-page document, NJIT 00209

22   first, 210 second.  The first page is a

23   copy of a check.

24         A.     Mm-hmm.

Confidential - Subject to Further Confidentiality Review

1       Q.    And the second page is the

2    form, this expense form.

3          Is this the file copy of the

4    check paid to TECO related to the loan

5    and made to CTIEC?

6       A.    I would believe that to be

7    correct.

8       Q.    Okay.  And do you recognize

9    any of the signatures on the second page?

10       A.    I do.  Nancy Eng, who is the

11    director of the grants and contract

12    accounting office.

13       Q.    Okay.

14       A.    And William Garcia is the

15    controller.

16       Q.    Very good.  Thank you very

17    much.

18          (Document marked for

19          identification as Exhibit

20          NJIT-38.)

21    BY MR. GEORGE:

22       Q.    Okay.  What's been marked as

23    NJIT-38 is an e-mail.  First page is

24    Bates-stamped NJIT 00592.  This is an

1    e-mail between you and Mr. Wang Wei.  Who

2    is Mr. Wang Wei?

3         A.    He's a staff administrator

4    at CTIE who at the time was handling the

5    contract management for the Ken Chin

6    program.

7         Q.    Okay.  Oh, Ken Chin.  Okay.

8         A.    Mm-hmm, the R&D program.

9         Q.    Yeah.  And this is -- these

10   were e-mails sent and received in the

11   course of your responsibilities?

12        A.    Yes, sir.

13        Q.    And they were obtained

14   from -- okay.  That's all I need.  Thank

15   you.

16             (Document marked for

17             identification as Exhibit

18             NJIT-39.)

19   BY MR. GEORGE:

20        Q.    NJIT Exhibit 39 is a

21   multi-page e-mail thread, first page NJIT

22   00621.  Who's -- oh, you talked about him

23   already.  These also -- these were

24   e-mails that you sent and received in the

Confidential - Subject to Further Confidentiality Review

1    course of your responsibilities at NJIT?

2         A.    Yes.  And chronologically,

3    prior to those other two documents, which

4    is the whole thread about trying to

5    understand the nature of what was owed to

6    whom.  And those others are the back end

7    of it.

8              So these were even before we

9    spoke to folks at TECO.

10        Q.    Yes.  Okay.  Thank you.

11             (Document marked for

12             identification as Exhibit

13             NJIT-40.)

14   BY MR. GEORGE:

15        Q.    NJIT-40 is a multi-page

16   document.  First page is NJIT 01169.  The

17   last page is 1179.

18             And this is where I really

19   need your help.  And I'm looking at

20   the -- if you start on Page 1176.  I

21   understand --

22        A.    1176.

23        Q.    Yeah.  We're going to work

24   towards the front.

1          A.     Okay.

2          Q.     And you'll see these are a

3   series of e-mails relating to wire

4   transfers, correct?

5          A.     Mm-hmm, yes, sir.

6          Q.     And if you notice, there's

7   like a Number 1 for the one at the

8   bottom.  And you go up, Number 2, Number

9   3.

10         A.     I'm sorry.  I'm -- oh, okay.

11         Q.     The subject "China

12  trans-international wire 5/13/14 equals

13  50,000 (Number 1)."

14                You go up to the next e-mail

15  closer to the top of that page, 1176, it

16  says two wires, 5/30/14 equals $50,000,

17  (Number 2), and $50,000 (Number 3).  And

18  so on up it continues.

19         A.     To Number 6 on 1172.

20         Q.     To Number 6, and then it

21  says on 1172, it says Number 6 for

22  $6,875, and it says total $256,875.  That

23  relates to the NJIT being reimbursed from

24  CTIEC for the TECO loan, correct,

Confidential - Subject to Further Confidentiality Review

```
 1    payment?

 2           A.    This first round of payments

 3    were the payments against the first

 4    invoice or series of invoices that I

 5    filed.  I think it was literally

 6    December 31st, 2013.  So that includes a

 7    mixture of reimbursement for the direct

 8    expenses of the project, retroactive to

 9    July 1st, and it includes what at that

10    time we still believed to be the $250,000

11    in addition to complete the background

12    IP, $500,000 charge.

13           Q.    Okay.

14           A.    So at this point, we were

15    still in a fog about repayment and those

16    other issues.  Let me just verify the

17    dates.  No, no, no, wait a minute.  Where

18    are we right now?  Now we're in August.

19    This is in August.

20           Q.    No, no.

21           A.    I'm sorry.

22           Q.    Yeah, if you go on Page

23    1172.

24           A.    Okay.
```

Confidential - Subject to Further Confidentiality Review

1              Q.    There's a jump to August.

2    You're right.  But the last payment has

3    the total handwritten, 256,875 on

4    June 12th.

5              A.    Okay.  I apologize.  I was

6    looking at this first line, 460 because

7    that was the genesis.

8              Q.    Yeah, yeah, yeah.

9              A.    These span --

10             Q.    These ones are going

11   throughout June.

12             A.    So these -- so these would

13   then include the $250,000 plus -- the

14   amount that's specified in the contract

15   addendum.  So this -- if it adds up to

16   256 and change, that's what that

17   corresponds to.

18                   The extra amount in the

19   addendum that we discussed earlier in

20   January of 2014.

21             Q.    Okay.  The amendment?

22             A.    The amendment, yes.  Sorry.

23             Q.    Okay.  And in going forward

24   from this -- that's okay.  And then going

Confidential - Subject to Further Confidentiality Review

1    forward from this from June 12th, the

2    next wire I see here is from August 13th

3    of last year for $50,000, correct?

4           A.     Yes.

5           Q.     Do you know what that is in

6    relation to?

7           A.     So, again, these all add up.

8    These are all in little pieces.

9           Q.     Okay.  I can actually --

10   then maybe we can stop this baby stepping

11   stuff and get where we can take adult

12   steps.  Starting in August, NJIT receives

13   payments.  How much, starting in August,

14   did NJIT receive from CTIEC?

15          A.     I have June, so where is

16   Number 1?  What page?  We're at -- we're

17   at 1176, right?  That's in May.  So

18   this -- these transactions Numbered 1, in

19   reverse order, to 6, span the period from

20   May 16th until June 12, 2014.

21          Q.     Right.  And those are

22   payments to that background?

23          A.     And those payments should

24   equal the addition that was specified in

1  the amendment, right, 250.  And that's

2  the 6,875.

3          That was the amount having

4  already then been paid for the $500,000

5  background IP that had to be reimbursed

6  to TECO for providing that money on the

7  front end.

8      Q.    Correct.

9      A.    Yes.  I think that that's

10  self-consistent.

11      Q.    Okay.  And then stepping

12  forward from this chronologically.

13          MR. POTTERS:  This way,

14      going forward.

15  BY MR. GEORGE:

16      Q.    The next page, there's one

17  in August for 50.  And then turn the page

18  again, there's a number more in August,

19  each for 50.  For a total of $200,000.

20  I'm wondering what that is in relation

21  to.

22      A.    So those would -- those

23  should be additional payments against the

24  invoices for Dr. Chin's work under the

1    contract that we discussed earlier.

2          Q.    Okay.  And those would be

3    for Phase I second payment or Phase II?

4          A.    I'm going to -- I'm going to

5    say Phase II --

6          Q.    Okay.

7          A.    -- because I believe the

8    Phase Is were paid in the March time

9    frame.  So all in the summer, these would

10   have been the Phase II.  And I know there

11   wouldn't have been III or IV because we

12   just put in those invoices.  We didn't

13   meet the deliverables in a timely

14   fashion.

15         Q.    Okay.  Did NJIT receive any

16   additional payments after July 2014

17   besides those reflected here that you're

18   aware of, related to the center?

19         A.    Related to the center?  I

20   think I've already said that we had just

21   this week received $45,000 payment

22   towards, I think, $130,000 in total

23   invoices.

24         Q.    Okay.  And no other payments

1    since July 2014?

2         A.    Correct.

3         Q.    Okay.  Aside from the center

4    payments and the certificate course, are

5    you aware of any other payments that NJIT

6    has received from CTIEC since July of

7    2014?

8         A.    I'm not aware of any other

9    relationship that would demand payments,

10   for which there would be payments.

11        Q.    Would there be someone else

12   besides yourself who might know about

13   this?

14        A.    Would there?

15        Q.    Yeah.  Would there?

16        A.    You know...

17        Q.    No?  Did you say no?

18        A.    I don't know that there

19   would be.

20        Q.    Okay.  Well, who could --

21   who could besides you?

22        A.    The CFO.

23        Q.    Mr. -- what was his name?

24        A.    Mr. Mauermeyer.

Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Mauermeyer.

2         (Document marked for

3    identification as Exhibit

4    NJIT-41.)

5  BY MR. GEORGE:

6    Q.    What's been marked as

7  Exhibit 41 is three pages.

8    A.    Yes.

9    Q.    Invoices.  1705 through

10  1707.  Are these invoices that you

11  mentioned being sent out in March?

12    A.    Correct.

13    Q.    And one of these has been

14  paid last week?

15    A.    Correct.

16    Q.    Okay.  And I notice this is

17  Milestone 4A, 4B and 4C.  Does that make

18  you understand that these relate to the

19  fourth phase of the initial agreement?

20    A.    Yes.

21    Q.    Okay.  So does that change

22  your understanding --

23    A.    It's not Milestone A, B, or

24  C, just to be clear.  It's Payments A, B,

Confidential - Subject to Further Confidentiality Review

1    and C --

2            Q.    Correct?

3            A.    -- against Milestone 4, or

4    the last phase of the project.

5            Q.    So we were looking earlier

6    at the wires in August.  And you were

7    saying it may have been related to

8    Milestone 2.

9            A.    Correct.

10           Q.    But when was Milestone 3

11   paid?

12           A.    These are unpaid.

13           Q.    Yes.  These are Milestone 3?

14   Is this Phase IV or Phase III?

15           A.    This is IV.

16           Q.    And the wires here are for

17   Phase II?

18           A.    II, and as I told you, we've

19   just begun to receive payments for

20   three --

21           Q.    Okay.

22           A.    -- which were submitted in

23   December 2014, and I just was notified

24   that the first -- and I think it was

1    F14CN0208 was the invoice they said had

2    been on it.

3         Q.    That you know that is

4    frightening.

5         A.    Well, only because I made

6    these.  And I made up these numbers.

7         Q.    So none of these three --

8         A.    It's fiscal year '14, China.

9         Q.    None of these -- none of

10   these three pages then have been paid at

11   all yet?

12        A.    Correct.

13        Q.    I have one last thing for

14   you to authenticate, and pending any

15   questions from counsel across the table,

16   we will be finished.

17              (Document marked for

18              identification as Exhibit

19              NJIT-42.)

20   BY MR. GEORGE:

21        Q.    All right.  Thank you.

22   Actually, I have to retract that.  My

23   co-counsel reminded me of one other thing

24   I wanted to ask you.

1          So NJIT-42 is a number of

2   e-mails.  NJIT-01788, the first page, and

3   1798, the last page.  And these were your

4   e-mails, correct, Doctor?

5          A.    Yes, they are.

6          Q.    And they were sent and

7   received in the course of your employment

8   at NJIT?

9          A.    They are.

10          Q.    And these were the ones that

11   you collected for production in this

12   case?

13          A.    They are.

14          Q.    Okay.  I'll ask you nothing

15   about that.

16          The company Sunpin.  Do you

17   know the company Sunpin?

18          A.    Never heard of it.

19          Q.    Out of New York?

20          A.    No.

21          Q.    Oh, I'm sorry.  Chicago.

22          A.    It could be out of -- I

23   still don't know about them.

24          Q.    Okay.  Are there any

Confidential - Subject to Further Confidentiality Review

1   for-profit corporations in the United

2   States who were involved in solar

3   technology with whom the center deals

4   with?

5         A.    No.  Not that I'm aware of.

6   Ken's only funding has been from the

7   contracts first with Apollo and then

8   CTIE.

9             MR. GEORGE:  Okay.  Thank

10        you.

11            -  -  -

12            EXAMINATION

13            -  -  -

14   BY MS. DALEY:

15        Q.    Just a few follow-up

16   questions.  Thank you, Dr. Sebastian.  I

17   will try to be brief.  I know it's been a

18   long day.

19            Just by way of reminder, I'm

20   Kelly Daley, I represent CNBM Company in

21   this Chinese Wall litigation.

22            I have questions that relate

23   to the testimony you've given today in

24   order of the testimony that you gave.

1    And so if I hop around between subjects,

2    it's because I'm following my notes.  I

3    apologize in advance for that.

4              Also, just for a frame of

5    reference, I might refer to some of your

6    prior testimony.  If you feel that I've

7    mischaracterized what you previously

8    said, please, you know, let me know.

9    Feel free to restate it.  I trust

10   plaintiff's counsel will keep me on that

11   as well.

12             Okay.  My first question,

13   you mentioned before that CTIC -- CTIEC,

14   pardon me, wanted you -- wanted NJIT to

15   rename the CNBM center accordingly to --

16   I think you said to reflect their

17   government funding.

18             Do you recall that

19   testimony?

20        A.   Well, my understanding is

21   that some of the funding for the research

22   and development activities is the normal

23   course of business that government grants

24   through CNBM come to the operating

1    companies like CTIE.  That's -- that's

2    the full extent of my understanding of

3    how that flow may occur.

4         Q.    So the request to re-name

5    the building and the center the CNBM --

6         A.    Hold on a second.  No

7    building.  There's no building named

8    here.  Let's be very clear.

9              We are talking about two

10   laboratories in a -- in a -- in the

11   microelectronics center in Tiernan Hall.

12   Two of our, sad to say, our oldest

13   buildings on campus.  But this is not a

14   building naming.

15        Q.    Thank you.

16        A.    There is no acquisition.

17   It's an honorific.

18        Q.    Thank you for the

19   clarification.  But the research center

20   and the laboratories that bear the name

21   CNBM --

22        A.    Yes.

23        Q.    -- that request to do that

24   renaming came from CTIEC; is that

1    correct?

2         A.    It's my understanding it

3    came out of conversations with Ken,

4    Jingong, and I presume, the CNBM and

5    CTIEC folks.

6         Q.    CTIEC?

7         A.    Yes.

8         Q.    So did you ever have a

9    conversation with anybody at CNBM

10   regarding --

11        A.    I had no -- no hand in this,

12   other than to print the signs the day we

13   took the pictures.

14        Q.    But here on behalf of NJIT,

15   are you aware of anybody at NJIT having

16   conversations directly with CNBM, not

17   CTIEC, but CNBM --

18        A.    No.

19        Q.    -- about the renaming?

20        A.    No, I have no knowledge of

21   that, and I don't believe -- I have no

22   knowledge of that.

23        Q.    In one of the photos that we

24   looked at earlier, the -- you identified

Confidential - Subject to Further Confidentiality Review

1    the CNBM logo --

2         A.    Yes.

3         Q.    -- on the door to the

4    laboratory.  Do you know whether NJIT has

5    a license agreement to use that logo on

6    the laboratory?

7         A.    I don't know that we do.

8         Q.    Are you aware of any

9    discussions regarding the use of that

10   logo?

11        A.    No.

12        Q.    Do you know whose decision

13   it was to put that logo on the

14   laboratory?

15        A.    I don't.  Again, I believe

16   that came out of conversations with Ken

17   and the sponsor and that was a hope.  It

18   could come down as quickly as it went up.

19        Q.    I have no position on that.

20   I was just asking the question.

21             MR. GEORGE:  You might want

22        to plead the Fifth on this one.

23   BY MS. DALEY:

24        Q.    Civil cases, can't do it.

1          Okay.  So, you have spoken a

2   bit today about Mr. Peng.  And I believe

3   that's Mr. -- is it Peng Shou is his full

4   name?

5          A.    Yes.

6          Q.    And you described him before

7   as affiliated faculty with the New Jersey

8   Institute of Technology?

9          A.    It was an honorary title

10  that they afforded him when we signed the

11  agreement, yes.

12         Q.    And you described him as a

13  nonemployee?

14         A.    Absolutely.

15         Q.    That means he is not

16  compensated by --

17         A.    He is not compensated in any

18  way by the university.

19         Q.    I want to go through a

20  couple of the exhibits, and I'll take

21  them in order.  So hopefully it should be

22  easy to dig through the pile.

23              But we'll start --

24         A.    You're going to do that for

Confidential - Subject to Further Confidentiality Review

1    me?  Thank you.

2          Q.    Let's take a quick look, if

3    we could, at Exhibit 3.  So let me start

4    with some background questions about the

5    NJIT website.

6              Who drafts the content on

7    the NJIT website?

8              MR. POTTERS:  So, I -- I

9          didn't do this before.  But I

10         think I need to do it now.  While

11         the witness is produced in his

12         capacity as a corporate designee,

13         the NJIT website is a vast --

14             THE WITNESS:  A separate --

15             MR. POTTERS:  Contains a

16         separate quantity of information.

17             Given the extremely limited

18         time that NJIT was afforded

19         pursuant to the court order,

20         the -- you'll note in our

21         production we do not have website

22         documents.

23             So I understand the manner

24         in which the witness is produced.

Confidential - Subject to Further Confidentiality Review

1           I'm not going to instruct him to

2           not answer; however, I do need to

3           object on questions related to

4           documents that he very likely did

5           not author, very likely did not

6           review.

7               Certainly he can answer to

8           the best of his ability.  But I'll

9           have that standing objection to

10          any questions that do not bear an

11          NJIT Bate stamp.

12              MS. DALEY:  I appreciate

13          that objection, Counsel.  And

14          certainly because the witness has

15          already testified about the

16          contents of these documents, I --

17          my questions really go to the

18          basis for that testimony.

19     BY MS. DALEY:

20          Q.   And if the answer is, as

21     your counsel indicated, that you don't

22     know or you don't have a basis for that

23     testimony, then that's certainly an

24     appropriate answer, and that's really

Confidential - Subject to Further Confidentiality Review

1   what I'm trying to figure out here.

2            So do you know who has

3   control over the content of the NJIT

4   website?

5        A.    So we have a marketing and

6   communications division that reports to

7   the vice president for advancement,

8   Mr. Chuck Dees.  The leadership has

9   changed several times.  So at the time

10  this was done, I'm not sure -- I'm not

11  exactly sure who was the individual that

12  had that responsibility.

13           And this particular article

14  looks to have been drafted by one of the

15  staff reporters who covered the signing

16  or the post events after the signing of

17  the contract, and as our newsroom website

18  is filled with, is trying to create

19  visibility and promote the good works the

20  university does.

21       Q.    And do you know whether the

22  university has a process in place for

23  fact checking the information that's put

24  on the NJIT website?

1    A.    I don't.  I know that in

2    some cases it does not.  As the counselor

3    suggested, it is an amalgamation of

4    things which are university information

5    and departmental college level,

6    departmental level, and even individual

7    level information.

8    Q.    And counsel for the

9    plaintiffs asked you before in reviewing

10   these various website pages whether the

11   information was correct.

12         Do you have a basis for

13   determining that this information is

14   correct?

15   A.    My personal involvement with

16   the project to the extent that it

17   reflects my understanding of what

18   happened, that's the basis of my comment.

19   Q.    And in preparing for this

20   deposition, you did not do any research

21   or fact gathering as to the background of

22   this website information?

23   A.    No.  This was just presented

24   today.

Confidential - Subject to Further Confidentiality Review

1        Q.    So looking, then, at -- at

2   Exhibit 3, turning to the second

3   paragraph.  It says, "With more than

4   $650,000 from the Shanghai-based China

5   National Building Materials Company," and

6   then goes on to describe the company and

7   the contribution.

8             Do you believe it to be

9   correct that the $650,000 came from China

10  National Building Materials Company?

11       A.    No.  Our contract is with

12  CTIEC.

13       Q.    That is not correct?

14       A.    I would agree that is an

15  incorrect extrapolation.

16       Q.    And looking at Exhibit 4,

17  which is another snapshot of the NJIT

18  website.  Please look to the second

19  paragraph.

20             Again, second sentence, it

21  says, "CNBM, China National Building

22  Materials group, a state-owned

23  enterprise, with a subsidiary CTIEC, is

24  vigorously implementing the strategy of

Confidential - Subject to Further Confidentiality Review

1  integration, industrialization,

2  engineering," et cetera, et cetera.

3          Do you have any

4  understanding of what the basis is for

5  including CNBM group in that

6  characterization?

7      A.    Since Ken and I both were on

8  those trips in 2010, and were exposed to

9  what I perceived to be a very coherent

10 strategy for developing energy efficient

11 buildings and housing, even to the point

12 of modular homes and design for different

13 international tastes, I think we were

14 exposed to a thought process at CNBM to

15 tackle these issues, the technological

16 issues that stand between that vision and

17 the current reality.

18          So I -- I wouldn't find an

19 objection to the second half of the

20 paragraph.

21          I don't know if the

22 corporate relations as expressed here on

23 the front half are correct or not.

24      Q.    Did CNBM group have any

1    contact with NJIT regarding the CNBM

2    center?

3         A.    To my knowledge, no.  Other

4    than we've, I think, established that

5    Mr. Peng has a position within CNBM and

6    so whenever they are referenced together,

7    I think it's an acknowledgment to that

8    joint dual hattedness or whatever that

9    means in their corporate structure.

10        Q.    Let's dig into that dual

11   hattedness that you just mentioned.  When

12   Mr. Peng was negotiating these agreements

13   with NJIT, did he ever represent to NJIT

14   that he was there as a representative of

15   CNBM group?

16        A.    Not specifically.

17        Q.    Did he ever consent to

18   making CNBM group a party to the

19   agreement with NJIT?

20        A.    Not that I know of.  Again,

21   I don't understand -- to be very blunt, I

22   don't understand that relationship

23   between CNBM and the other companies that

24   share a logo to some extent.  And his --

Confidential - Subject to Further Confidentiality Review

1    his multiple roles, it's not a U.S.

2    business model, so I don't profess to

3    understand.  I think Ken was trying to

4    respect that there seems to be a

5    connection there.

6         Q.    But Mr. Peng, when he was

7    negotiating with you, held him out --

8    himself out as a representative of CTIEC,

9    the party to the agreement with NJIT; is

10   that right?

11        A.    I believe all of the

12   contractual documentation demonstrates

13   that our discussions were between NJIT

14   and CTIE.

15        Q.    If you could look at

16   Exhibit 11, please.  This is a letter

17   from a faculty leader at NJIT to Mr. Wang

18   Congxiao of CTIEC, correct?

19        A.    Correct.  Richard Garber,

20   professor of the school of architecture.

21        Q.    And in the, I guess, third

22   paragraph, second full textual paragraph

23   of the letter.  He says, "We would like

24   to speak with you and Mr. Peng

Confidential - Subject to Further Confidentiality Review

1    specifically about the level of CNBM

2    support for our work."  It goes on to

3    say, "We need CNBM to identify domestic

4    sources."

5                Why is Mr. Garber referring

6    there to CNBM?

7                MR. POTTERS:  Note my

8         objection.

9                You can answer.

10               THE WITNESS:  I could guess.

11        My -- my --

12               MR. POTTERS:  We don't want

13        you to guess.

14               THE WITNESS:  Well, then I

15        won't guess.

16   BY MS. DALEY:

17        Q.   Do you have any

18   understanding of why he would refer to

19   CNBM in a letter to CTIEC about a joint

20   venture between NJIT and CTIEC?

21        A.    In the earliest discussions

22   of this project, it was conceived that

23   CNBM -- that this house and this

24   partnership would be the CNBM sort of

1    showcase entry, and that they would not

2    be sponsoring other entries in the

3    competition.  Whether that became the

4    truth or not, I don't know.  To be

5    honest, I don't care.  But you might.

6           Q.    I do, in fact.

7           A.    Well, then you have some

8    homework to check and see.

9           Q.    When you say "it was

10   conceived," the lawyer in me doesn't like

11   the passive voice.  Who is conceiving of

12   it in that sentence?

13          A.    So when Richard decided that

14   he would prefer to make his next entry in

15   the China solar decathlon as opposed to a

16   repeat entry in the U.S., and we began --

17   we, Don as an example, tried to find out

18   how can we form partnerships.  I talked

19   to Jingong, Dr. Pan, about finding a

20   university partner in China, which, I

21   made that request knowing full well that

22   he was an alum of Harbin.  And it would

23   be very prestigious for us if we could

24   make a connection to their MIT.

1          Then the question comes as

2     it would if it were a U.S. competition

3     entry.  Where can we find corporate

4     sponsorship?  Where can we find people

5     who will donate materials?

6          And although you cannot

7     brand those, per se, in the competition,

8     it's not a naming opportunity in the

9     competition, still it is something that

10    those who do such contributions, I

11    believe, after the fact can point back to

12    say, "It was our air conditioner in the

13    winning entry."

14          It was in that sense that we

15    then, again through Jingong, our

16    intermediary, said to Mr. Peng, "what

17    might we -- how might we bring in this to

18    be a CNBM co-sponsored entry, and how

19    might you help us access domestic

20    sources, Chinese domestic sources of

21    materials that we could showcase?"  And

22    it, frankly, would make it a lot easier

23    than shipping -- you know, buying and

24    shipping overseas to assemble over there.

1      Q.    So just to clarify then, it

2   was NJIT that was hoping that CNBM would

3   become a sponsor for this project?

4      A.    That would be correct.

5      Q.    Okay.  If we could look

6   quickly at Exhibit 16.  This is one of

7   the iterations and proposals for the CNBM

8   research center cooperative; is that

9   right?

10      A.    Yes.  I think we -- we

11   believed it was one of the middle ones.

12   Not the first and certainly not the last.

13      Q.    And this was drafted by

14   Dr. Chin?

15      A.    That would be correct also.

16      Q.    And, again, noting here

17   that -- let's turn to 02112.

18      A.    02 -- last page?  Yes.

19      Q.    It's the second -- oh, it is

20   the last page.  I'm sorry.  Last page.

21           You've got a variety of

22   proposed payments there that are capped

23   off by the line total CNBM funding

24   $6,250,000.  Just to clarify, again, that

Confidential - Subject to Further Confidentiality Review

1    money was never coming from CNBM,

2    correct, that was from CTIEC?

3          A.    Well, since this never

4    happened.

5          Q.    Your hypothetical money.

6          A.    So, you know, we can agree

7    that when it got to the point of a

8    contractual discussion, it was all from

9    CTIE.

10            For this to be a 6 or

11   $7 million project, I don't know if it

12   would have required funding from a higher

13   level or alternate source.  But it never

14   -- became ten percent of this.

15         Q.    And there was never any

16   discussion of CNBM directly making these

17   payments?

18         A.    I never had any discussion

19   with CNBM.

20         Q.    And the reference to CNBM in

21   these documents was put in there by

22   Dr. Chin?

23         A.    Correct.

24         Q.    And not by anyone from

1    CTIEC?

2          A.    Correct.

3          Q.    Exhibit 17.  Another

4    proposal, a thicker one this time?

5          A.    Well, it still has the

6    process line in it.  So it is another one

7    that was a fantasy.

8          Q.    Okay.  So, here this is

9    titled "Proposal for Cooperative R&D of

10   Apollo Center, NJIT, USA and CNBMG

11   Banggou, China."  And it looks below that

12   like maybe they are defining CNBMG as

13   China National Building Materials Group.

14   Do you agree with me?

15         A.    I would agree that I would

16   interpret it that way.

17         Q.    Okay.  This is, again,

18   drafted by Dr. Chin?

19         A.    Correct.

20         Q.    And this was a proposal that

21   was never signed, never finalized in this

22   form?

23         A.    Yes, that's correct.

24         Q.    And, again, it was Mr. --

Confidential - Subject to Further Confidentiality Review

1    Dr. Chin, pardon me, and not CTIEC that

2    included CNBM group as sort of a proposed

3    party to this proposal?

4         A.    You are correct.

5         Q.    If we could look at

6    Exhibit 13.  Sorry to go slightly out of

7    order.  I was promising not to.

8              So Exhibit 13 is the fully

9    executed initial agreement between NJIT

10   and CTIEC; is that correct?

11        A.    That's correct.

12        Q.    Okay.  And there's no other

13   parties to this agreement besides NJIT

14   and CTIEC?

15        A.    That's correct.

16        Q.    Okay.  So let's look quickly

17   at Section 5.2 of this agreement.  The

18   foreground results.

19              I don't know if you recall

20   earlier, plaintiff's counsel asked you if

21   the intellectual property resulting from

22   the collaboration was the -- was the

23   shared property of NJIT and CTIEC, and

24   you said yes.  And then he said "and

1   affiliates?"  And you said yes.

2             Do you recall that?

3        A.    Yes.

4        Q.    So I'd like to look at

5   Paragraph 5.2 of this agreement.  And

6   that agreement reads, "All foreground

7   results and all intellectual property

8   rights in and to foreground results from

9   application one shall be jointly owned by

10  NJIT and CTIEC."

11            Do you see anywhere in that

12  agreement a reference to CTIEC's

13  affiliates?

14       A.    I do not.

15       Q.    And then if we can just turn

16  the page and look at Section 6.1.  Sorry,

17  6.2.1.  We see it says, "CTIEC is

18  entitled to license the intellectual

19  property rights to any affiliate."

20            Did I read that correctly?

21       A.    Mm-hmm.  Yes, you did.

22       Q.    Based on those two

23  paragraphs, is it still your

24  understanding that this contract confers

1    the intellectual property rights on the

2    affiliate, or does it merely permit CTIEC

3    to license to affiliates?

4        A.    The latter interpretation

5    would be more precise.  Affiliate, to my

6    understanding, was the joint venture with

7    Apollo.

8        Q.    Thank you.  Looking quickly

9    at Exhibit 18.

10       A.    You may look quickly.  But

11   I'm not so quick.  My helper fell asleep.

12       Q.    It's the amendment -- I'm

13   getting through this as fast as I can.  I

14   promise.

15       A.    Okay.

16       Q.    It's the amendment to the

17   agreement.

18            Can you just confirm for me

19   that Exhibit 13 and Exhibit 18 in

20   conjunction with each other represent the

21   complete and fully incorporated contract

22   between --

23       A.    Yes, I can affirm that this

24   amendment to the prior document is the

Confidential - Subject to Further Confidentiality Review

1   complete contract for the first year of

2   funding, now became year and-a-half.

3           Q.    And that represents the

4   totality of the agreement between NJIT

5   and CTIEC with regard to this project?

6           A.    Correct.

7           Q.    There are no other

8   agreements?  And there are no --

9           A.    There are no other

10  agreements I'm aware of.  As he shakes

11  his head.

12              You can write that, "shakes

13  head no."

14          Q.    And there are no other

15  parties to these agreements other than

16  the parties reflected in these documents?

17          A.    That is correct.

18          Q.    Okay.  Almost done.

19  Exhibit 28.

20          A.    This is the educational

21  program agreement.

22              MR. POTTERS:  Yes.

23              THE WITNESS:  Yes.

24  BY MS. DALEY:

Confidential - Subject to Further Confidentiality Review

1          Q.     Now, am I correct that the

2    certificate program was an agreement

3    exclusively with CTIEC?

4          A.     Correct.

5          Q.     There was no discussion with

6    CNBM regarding CNBM sending people for

7    the certificate program?

8          A.     None whatsoever.

9          Q.     Looking at part two,

10   paragraph one, on the first page of this

11   agreement.

12         A.     Part two -- okay.  Yes, yes.

13         Q.     You see that it describes

14   CTI -- this is a bad photocopy.  But I

15   think that says "CTIEC described as,

16   quote, the engineering technical platform

17   of China National Building Material

18   Company, Limited."

19                Did I read that correctly?

20         A.     That's my interpretation as

21   well.

22         Q.     Who drafted this agreement?

23         A.     I don't know.  I would

24   imagine this was --

1          MR. POTTERS:  Don't -- if

2      you don't know, you don't know.

3          THE WITNESS:  I don't know.

4          MR. GEORGE:  I join in that

5      objection.

6  BY MS. DALEY:

7      Q.    Okay.  Well, if you don't

8  know, then I won't ask you any follow-up

9  questions on that.

10      A.    Okay.  Sorry.

11      Q.    That's totally fine.

12          MR. POTTERS:  You don't have

13      to be sorry.

14          THE WITNESS:  I was enjoying

15      the conversation.

16  BY MS. DALEY:

17      Q.    You've just figured out how

18  to shorten your deposition.

19          MR. GEORGE:  "I don't know"

20      is the best answer.

21  BY MS. DALEY:

22      Q.    Exhibit 29, the next

23  exhibit.  Do you know who drafted this

24  document?

1          A.    I do not know.  If it

2    appeared in the alumni magazine, it would

3    have been written by one of the staff

4    writers in the marketing communications

5    division to whom we alluded earlier.

6          Q.    And are you familiar with

7    any process by which those documents, or

8    those publications are vetted for factual

9    accuracy?

10          A.    No.

11               MR. GEORGE:  May I ask a

12          clarification?

13               No, you are not aware of any

14          or, no, there are none?

15               THE WITNESS:  I'm not aware

16          of any.

17    BY MS. DALEY:

18          Q.    And, finally, looking at

19    Exhibit 40, which is the series of wire

20    transfers.  Just to confirm, all of these

21    wire transfers to NJIT came from CTIEC,

22    correct?

23          A.    That's my understanding.

24    And to the extent that I could interpret

1    the audit trail here, that's what it

2    documents.

3         Q.    And to your knowledge, NJIT

4    has never received a payment from CNBM

5    group?

6         A.    I am not aware of any such

7    transactions and all of my invoices to

8    which these are payments were sent to

9    CTIE.

10        Q.    In your business dealings

11   with CTIEC, did you ever understand that

12   CTIEC was controlled in its business

13   decisions by some other entity like CNBM

14   group?

15        A.    I think I've said earlier, I

16   really don't understand the relationship,

17   other than that there is a relationship.

18        Q.    But you never had any reason

19   to think that your relationship with

20   CTIEC was really a relationship with

21   CNBM?

22        A.    No.

23             MS. DALEY:  No further

24        questions.

Confidential - Subject to Further Confidentiality Review

1              MR. GEORGE:  Two lines of

2          questions to follow-up real quick.

3                     -  -  -

4              FURTHER EXAMINATION

5                     -  -  -

6    BY MR. GEORGE:

7          Q.    If CTIEC were to share

8    intellectual property with CNBM that came

9    out of the lab, the CNBM center, would

10   NJIT consider that a breach of the

11   agreement?

12             MR. POTTERS:  Note my

13         objection.

14   BY MR. GEORGE:

15         Q.    Without NJIT's written

16   consent?

17             MR. POTTERS:  You can

18         answer.

19             THE WITNESS:  I don't think

20         we would consider that a breach.

21   BY MR. GEORGE:

22         Q.    Is that because it's from an

23   affiliate with whom it can be shared

24   without a consent?

 1          A.     Yes.

 2          Q.     Includes a company or other

 3   entity controlling or controlled by or

 4   under common control directly or

 5   indirectly with such a party?

 6          A.     Well, certainly, it is a

 7   hypothetical.  So CNBM is -- as I

 8   understand it, it would ultimately be a

 9   subsidiary that would actually be

10   executing the activities.  And so I think

11   that that is sort of the -- will be the

12   expected relationship.

13               As I said, all of this is

14   really crafted specifically to support an

15   activity that was with an affiliate with

16   the Apollo joint venture.  Variations on

17   that theme.

18               MR. GEORGE:  That's it.

19               MS. RUMSEY:  I have no

20          questions.

21               MS. KAHNKE:  No questions

22          either.

23               THE VIDEOGRAPHER:  This

24          marks the end of today's

1          deposition.  The time is 3:21 p.m.

2          We are going off the record.

3                    (The witness was excused.)

4                    (Deposition concluded at

5          approximately 3:21 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1

 2                    CERTIFICATE

 3

 4

 5         I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
 6   deposition is a true record of the
     testimony given by the witness.

 7

         It was requested before
 8   completion of the deposition that the
     witness, DONALD H. SEBASTIAN, Ph.D., have
 9   the opportunity to read and sign the
     deposition transcript.

10

11

12         _____
           MICHELLE L. GRAY,
13         A Registered Professional
           Reporter, Certified Shorthand
14         Reporter and Notary Public
           Dated:  April 23, 2015
15

16

17         (The foregoing certification
18   of this transcript does not apply to any
19   reproduction of the same by any means,
20   unless under the direct control and/or
21   supervision of the certifying reporter.)
22

23

24
```

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8              After doing so, please sign

 9    the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

1                - - - - - -

E R R A T A

2                - - - - - -

3

4    PAGE   LINE   CHANGE

5    _____  _____  _____

6         REASON: _____

7    _____  _____  _____

8         REASON: _____

9    _____  _____  _____

10        REASON: _____

11   _____  _____  _____

12        REASON: _____

13   _____  _____  _____

14        REASON: _____

15   _____  _____  _____

16        REASON: _____

17   _____  _____  _____

18        REASON: _____

19   _____  _____  _____

20        REASON: _____

21   _____  _____  _____

22        REASON: _____

23   _____  _____  _____

24        REASON: _____

Confidential - Subject to Further Confidentiality Review

```
 1

 2              ACKNOWLEDGMENT OF DEPONENT

 3

 4              I,_____, do

 5   hereby certify that I have read the

 6   foregoing pages, 1 - 273, and that the

 7   same is a correct transcription of the

 8   answers given by me to the questions

 9   therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    DONALD H. SEBASTIAN, Ph.D.        DATE

17

18

19   Subscribed and sworn

     to before me this

20   _____ day of _____, 20____.

21   My commission expires:_____

22

     _____

23   Notary Public

24
```

Confidential - Subject to Further Confidentiality Review

1                    LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____   _____

4      _____  _____   _____

5      _____  _____   _____

6      _____  _____   _____

7      _____  _____   _____

8      _____  _____   _____

9      _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____

# POTTERS & DELLA PIETRA LLP

### COUNSELORS AT LAW

GARY POTTERS *
CHRISTOPHER V. DELLA PIETRA ▲

LAUREN H. BLAIR ▲
JODI S. BRODSKY ▲
MICHELE L. DELUCA ♦
DREW D. KRAUSE ◼

* MEMBER OF NJ BAR
▲ MEMBER OF NY AND NJ BARS
♦ MEMBER OF NJ AND TN BARS
◼ MEMBER OF NJ AND PA BARS

100 PASSAIC AVENUE • FAIRFIELD, NJ 07004
TEL (973) 575-5240 • FAX (973) 575-4468
www.pdplawfirm.com

MAILING ADDRESS:
P.O. BOX 657
WEST CALDWELL, NJ 07007-0657

NEW YORK OFFICE:
546 FIFTH AVENUE
NEW YORK, NY 10036
(212) 355-8555

May 11, 2015

By Regular Mail

Herman, Herman & Katz, LLC
c/o Chinese Drywall Depository
820 O'Keefe Road
New Orleans, LA 70113

By Email

Golkow Global Litigation Services
1650 Market Street, Suite 5150
Philadelphia, PA 19103
production@golkow.com

Re:   Deposition of Donald H. Sebastian, Ph.D. (New Jersey Institute of Technology)
      April 22, 2015
      In Re: Chinese-Manufactured Drywall Products Liability Litigation
      MDL No. 2047
      PDP File No. 80321.50596

Dear Madam/Sir:

Enclosed is the Acknowledgment of Deponent Donald Sebastian together with the errata sheet.

Thank you.

Very truly yours,

POTTERS & DELLA PIETRA LLP

Gary Potters

GP:af
Enclosures
c:   Scott Alan George, Esq. (by email w/encl.)

Confidential - Subject to Further Confidentiality Review

1

2            ACKNOWLEDGMENT OF DEPONENT

3

4          I, _Donald Sebastian_ , do

5 hereby certify that I have read the

6 foregoing pages, 1 - 273, and that the

7 same is a correct transcription of the

8 answers given by me to the questions

9 therein propounded, except for the

10 corrections or changes in form or

11 substance, if any, noted in the attached

12 Errata Sheet.

13

14

15                                5/11/2015

16 DONALD H. SEBASTIAN, Ph.D.      DATE

17

18

19 Subscribed and sworn

    to before me this

20 _11_ᵀᴴ day of _MAY_ , 20_15_ .

21 My commission expires:_____

22

    _Holly C. Stern_

23 Notary Public HOLLY C STERN
                An Attorney at Law of
                the State of New Jersey

24

Page 15 Line 3 – Change "In" to "and"

Page 28 Line 17 - Change "minor" to "miner"

Page 30 Line 23 - Change "CTI" to "CTIE"

Page 33 Line 12 - The Company Name in question is: "Tungtay (Kunshan) Vacuum Coating Engineering Inc., located at 99 South Yuehe Road, Kunshan, Jiangsu Province, China"

Page 36 Line 7 – Change "company" to "country"

Page 62 Line 3 – Change "plainer" to "planar"

Page 67 Line 20 – Change "dolch" to "doped"

Page 70 Line 5 – Change "forms" to "farms"

Page 93 Line 6-7 – I am not part of the Q&A but appears as my answer to attorney's question

Page 103 Line 3 – Congxiao Wang's business card title was President Assistant; New Energy Engineering Dept. / Director (For CTIE)

Page 107 Line 23 – Change "to" to "too"

Page 117 Line 7 – Change "they're" to "their"

Page 122 Line 9 – Change "Mottrey" to "Matri"

Page 157 Line 12 – Change "Tung Tai" to "Tungtay"

Page 169 Line 19 – Change "June" to "June 30, 2014"

Page 203 Line 14 – Change "for" to "or"

Page 214 Line 9– Change "CTI" to "CTIE"

Page 220 Line 2 – He Wen is President Assistant; HR & Admin Dept./Director