Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3    _____§

 4                                § MDL NO. 2047

 5    IN RE:                      §

 6    CHINESE-MANUFACTURED        § SECTION: L

 7    DRYWALL PRODUCTS            §

 8    LIABILITY LITIGATION        § JUDGE FALLON

 9                                §

      This Document Applies

10    to All Cases                § MAGISTRATE JUDGE WILKINSON

11    _____ §

12              CONFIDENTIAL - SUBJECT TO

13           FURTHER CONFIDENTIALITY REVIEW

14           The confidential - subject to further

15    confidentiality review deposition of STEVE KIM, called

16    for examination, taken pursuant to the Federal Rules

17    of Civil Procedure of the United States District

18    Courts pertaining to the taking of depositions, taken

19    before JULIANA F. ZAJICEK, CSR No. 84-2604, a

20    Certified Shorthand Reporter of said State of

21    Illinois, at the offices of Freed, Kanner, London &

22    Millen LLC, Suite 130, 2201 Waukegan Road,

23    Bannockburn, Illinois, on April 17, 2015, at 10:15

24    a.m.
```

CONTEMPT
Exhibit 143

Confidential - Subject to Further Confidentiality Review

```
 1   PRESENT:
 2   ON BEHALF OF THE PLAINTIFFS' STEERING COMMITTEE:
 3        LEVIN, FISHBEIN, SEDRAN & BERMAN
          510 Walnut Street, Suite 500
 4        Philadelphia, Pennsylvania 19106-3697
          215-592-1500
 5        BY:  MATTHEW C. GAUGHAN, ESQUIRE
               mgaughan@lfsblaw.com
 6
               -and-
 7
          SEEGER WEISS LLP
 8        1515 Market Street, Suite 1380
          Philadelphia, Pennsylvania 19102
 9        215-553-7982
          BY:  SCOTT ALAN GEORGE, ESQUIRE
10             sgeorge@seegerweiss.com
11   ON BEHALF OF CNBM COMPANY:
12        ORRICK, HERRINGTON & SUTCLIFFE LLP
          51 West 52nd Street
13        New York, New York 10019-6142
          212-506-5397
14        BY:  KELLY M. DALEY, ESQUIRE
               kdaley@orrick.com
15
     ON BEHALF OF TAISHAN GYPSUM:
16
          ALSTON & BIRD LLP
17        One Atlantic Center
          1201 West Peachtree Street
18        Atlanta, Georgia 30309-3424
          404-881-7000
19        BY:  MATTHEW D. LAWSON, ESQUIRE
               matt.lawson@alston.com
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    PRESENT: (Continued)

 2    ON BEHALF OF THE BNBM ENTITIES:
      (Via Telephone)

 3
           DENTONS US LLP

 4         2000 McKinney Avenue, Suite 1900
           Dallas, Texas 75201-1858

 5         214 259 0900
           BY:  KATE RUMSEY, ESQUIRE

 6              kate.rumsey@dentons.com

 7    ON BEHALF OF SUNPIN SOLAR AND THE WITNESS:

 8         RKJ LEGAL
           1 North LaSalle Street, Suite 1515

 9         Chicago, Illinois 60602
           312-368-8700

10         BY:  MICHAEL JIMENEZ, ESQUIRE
                mcj@rkjlegal.com

11

12

13    THE VIDEOGRAPHER:

14         MR. SLAWDMIR KOJRO,
           MR. RICK LENSER,

15              Golkow Technologies.

16

17

18

19

20

21    REPORTED BY:  JULIANA F. ZAJICEK, C.S.R.
                    CERTIFICATE NO. 84-2604.

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    I N D E X

 2   WITNESS:                              PAGE:

 3    STEVE KIM

 4          EXAM BY MR. GAUGHAN.................    7

 5          EXAM BY MS. DALEY...................  141

 6

 7                    *****

 8

 9                  E X H I B I T S

10   KIM EXHIBIT                     MARKED FOR ID

11   No. 1.......................................   7

          Amended Notice of Expedited Oral and

12        Videotaped Deposition

13   No. 2.......................................  30

          EPC Framework Agreement 000010 - 018

14

          No. 3.......................................  58

15        Security Agreement 000019 - 035

16   No. 4.......................................  58

          BOS Agreement 000036 - 065

17

          No. 5.......................................  58

18        EPC Short-Form Agreement 000001 - 009

19   No. 6....................................... 58

          Mortgage 000085 - 093

20

          No. 7....................................... 58

21        Pledge and Security Agreement

          000094-98

22

          No. 8.......................................  90

23        EPC Agreement 000066-84

24
```

Confidential - Subject to Further Confidentiality Review

```
 1            E X H I B I T S (Continued)
 2   KIM EXHIBIT                    MARKED FOR ID
 3
     No. 9.......................................102
 4       Solar Power & Services Agreement between
         Sunpin Walmart Avon-North Oxford, LLC and
 5       Wal-Mart Stores, Inc.;
         WM2015-005399C000001 - 097
 6
     No. 10...................................... 105
 7       Administration Provision Agreement On
         the Contraction of Maryland Church Hill
 8       Solar Power Project; 000099 - 106
 9   No. 11...................................... 105
         Wire Transfer, 12/1/14
10
     No. 12...................................... 105
11       Wire Transfer, 1/22/15
12   No. 13...................................... 105
         Wire Transfer, 1/22/15
13
     No. 14...................................... 105
14       Wire Transfer, 3/16/15
15   No. 15...................................... 106
         Wire Transfer, 3/16/15
16
     No. 16...................................... 122
17       Solar Power & Services Agreement between
         Sunpin Walmart Avon-North Oxford, LLC
18       and Wal-Mart Stores, Inc., dated as of
         August 1, 2014; WM2015-005399C000098 - 192
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1            THE VIDEOGRAPHER:  We are on the video record.

 2    My name is Slawdmir Kojro.  I am a videographer for

 3    Golkow Technologies.  Today's date is April 17th,

 4    2015, the time is 10:15 a.m.

 5            This deposition is being held in

 6    Bannockburn, Illinois, in the matter of Chinese

 7    Manufactured Drywall Products Litigation in the

 8    United States District Court, Eastern District of

 9    Illinois.  The deponent is Steve Kim.

10            Will counsel please identify themselves

11    for the record.

12        MR. GAUGHAN:  Hi.  Good morning.  Matthew

13    Gaughan from Levin Fishbein on behalf of the Plaintiff

14    Steering Committee.

15        MR. GEORGE:  Scott George, Seeger Weiss, PSC.

16        MR. JIMENEZ:  Michael Jimenez on behalf of

17    Sunpin Solar from RKJ Legal.

18        MS. DALEY:  Kelly Daley of Orrick, Herrington &

19    Sutcliffe on behalf of CNBM Company.

20        MR. LAWSON:  Matt Lawson from Alston & Bird LLP

21    on behalf of Taishan Gypsum.

22        THE VIDEOGRAPHER:  The court reporter is Juliana

23    Zajicek.

24            Please swear in the witness.
```

Confidential - Subject to Further Confidentiality Review

```
 1                  (WHEREUPON, the witness was duly

 2                   sworn.)

 3                        STEVE KIM,

 4    called as a witness herein, having been first duly

 5    sworn, was examined and testified as follows:

 6                        EXAMINATION

 7    BY MR. GAUGHAN:

 8        Q.    Good morning, Mr. Kim.

 9        A.    Good morning.

10        Q.    We met briefly on the way into the

11    deposition.  My name is Matthew Gaughan.  I'm here on

12    behalf of the Plaintiff Steering Committee and the In

13    Re: Chinese Drywall Litigation, okay.

14                  And I understand you're appearing today

15    pursuant to a deposition notice that was served.  I'm

16    going to mark that deposition notice.

17                  (WHEREUPON, a certain document was

18                   marked Kim Deposition Exhibit No. 1,

19                   for identification, as of

20                   04/17/2015.)

21        THE VIDEOGRAPHER:  Excuse me.  We need to go off

22    the record for a moment.  The time is 10:16.

23                  (WHEREUPON, a recess was had

24                   from 10:16 to 10:18 a.m.)
```

```
 1        THE VIDEOGRAPHER:  We are on the record, 10:18.

 2   BY MR. GAUGHAN:

 3        Q.    And I just provided to you, Mr. Kim,

 4   what's been marked as Exhibit 1.  And we -- we served

 5   a subpoena on Sunpin back on March 23rd, 2015, with a

 6   copy of an earlier version of this same notice.  Is it

 7   your understanding you are here today to testify

 8   against -- based on the service of that subpoena and

 9   this discovery request?

10        A.    Yes.

11        Q.    Before we get too involved in the

12   deposition, I do want to give you a few instructions.

13   We are trying to make a record here, so a couple of

14   things that are very important is I'll ask you the

15   question.  If you just let me complete the question,

16   I'd appreciate it, because what ends up happening is

17   the court reporter sometimes if two of us are speaking

18   at the same time, it can be very difficult for the

19   court reporter and also it just makes kind of a sloppy

20   record, okay?

21        A.    Okay.

22        Q.    And the other thing is you want to be sure

23   to answer verbally.  If you nod your head, it doesn't

24   necessarily register as a yes or no or an answer to
```

1   a question, okay?

2        A.    Okay.

3        Q.    So also, if you don't understand my

4   question, please let me know.  Sometimes I talk fast

5   and I might be confusing.  If that's the case, let me

6   know and I will do my best to rephrase the question so

7   you can understand it.

8              Is that fair?

9        A.    Yes.

10       Q.    Okay.  Also, from time to time your

11   counsel may object to my questions and some of

12   the other lawyers in the room might object.  Unless

13   you hear an instruction not to answer a question from

14   your counsel, you should go ahead and answer the

15   question, okay?

16       A.    Yes.

17       Q.    If you need to take a break, let me know.

18   You know, what usually happens if there is a question

19   pending, I ask that you answer the question -- answer

20   the question, excuse me, and then we'll take a break.

21             Is that okay?

22       A.    Yes.

23       Q.    Okay.  And I want to direct your attention

24   back to this deposition notice, if you could.  And if

Confidential - Subject to Further Confidentiality Review

 1   you could flip to -- do you see at the top where there

 2   are some numbers, it says page -- I want you to go to

 3   page 11 out of 28, okay.

 4       A.   Okay.  I've got it.

 5       Q.   There is a section there under the heading

 6   "Taishan Affiliates and Subsidiaries" and after that

 7   there is a list of various entities.  And I'd just

 8   like you to read through that and let me know each one

 9   that you recognize?

10       A.   You want me to --

11       Q.   Yes.

12       A.   -- read each one and see which one I

13   recognize --

14       Q.   Read to me --

15       A.   -- or just tell you which one I recognize?

16       Q.   I want you to read through the whole list

17   and then just tell me the ones that you actually

18   recognize.

19       A.   Okay.  "State-owned" --

20       Q.   I'm sorry.  Not out loud, just read

21   through it.

22       A.   Oh, okay.  Yeah, that's what I thought.

23       Q.   I'm sorry if that was unclear.

24       A.   All right.  I recognize --

1        MS. DALEY:  Wait a second.  I'd just like to

2    object on behalf of CNBM Company to the form of the

3    question.  And also, just for convenience, if it's

4    okay with you, we would like to say that objections

5    for one of us are for both of us so we don't have to

6    both object to everything and make this longer than

7    necessary, if that's okay.

8        MR. GAUGHAN:  That's fine with me.  But what's

9    the nature of the objection, to the form of the

10   question, is that --

11       MS. DALEY:  That "recognize" is an unclear term.

12   BY MR. GAUGHAN:

13       Q.    Okay.  Do you understand the term

14   "recognize," sir?

15       A.    I do.

16       Q.    Okay.  And you can kindly read through

17   that list and let me know which entities you

18   recognize?

19       A.    China National Building Materials Group, I

20   recognize.  That's it on that page.

21       Q.    Okay.  And if you can continue to the next

22   page.

23       A.    China Triumph International Engineering

24   Company, Limited, I recognize.

Confidential - Subject to Further Confidentiality Review

```
1        Q.    And then there is one more page, if you

2   can just look at that.

3        A.    Well, I guess this case is by Taishan, so

4   I recognize Taishan Gypsum.

5        Q.    Okay.  And so we've -- you've identified

6   three entities, is that correct, sir?

7        A.    Yes.

8        Q.    Okay.  In terms of -- you mentioned CNBM

9   Group?

10       A.    Yes.

11       Q.    Where do you recognize that entity from?

12       A.    From a website.  It's a -- it's a website

13  that I -- I looked at due to, you know, the work

14  Sunpin is doing.

15       Q.    Okay.  And by that you mean the work with

16  China Triumph for -- is that what you are talking

17  about, sir?

18       A.    China -- is that CTIEC, yeah.

19       Q.    Yes.

20       A.    Yeah.

21       Q.    Okay.  So you recognize CNBM from going to

22  a website for CTIEC, I guess it is?

23       A.    Correct, when we were doing work, yes.

24       Q.    Okay.  Have you had any communication with
```

```
 1    anyone from CNBM Group?

 2         A.    I don't really quite understand that

 3    question because, I mean, I think we all recognize

 4    CNBM is kind of the holding company, so anyone

 5    working -- are you saying anyone working underneath

 6    that holding company?

 7         Q.    Yes.  Well, I mean --

 8         A.    Well --

 9         Q.    Let me strike that.

10               What I'm asking is, have you ever had any

11    dealings with anyone from CNBM Group that you knew was

12    an employee of CNBM Group?

13         A.    From the headquarters office?

14         Q.    Yes.

15         A.    Headquarters.  I still don't quite

16    understand that question, though.

17         Q.    All right.

18         A.    Someone that works in the headquarters

19    office directly that has a CNBM business card, is

20    that -- is that what you are saying?

21         Q.    That would be one way of quantifying who

22    works for BNBM Group, if you understood them to be

23    an employee of BNBM Group?

24               MS. DALEY:  Objection.  You were talking about
```

```
 1    CNBM.

 2    BY MR. GAUGHAN:

 3         Q.    I'm sorry.  CNBM Group.

 4         A.    No, I don't think so.

 5         Q.    Okay.

 6         A.    Not someone directly from there, no.

 7         Q.    Okay.  How about CNBM, have you heard of a

 8    company called CNBM, and this is, you know, distinct

 9    from CNBM Group?

10         A.    Oh, I -- I didn't know there was a

11    difference.  I don't know.

12         Q.    Okay.  Have you ever had, you know, to

13    your knowledge any sort of interaction with anyone

14    that was an employee of CNBM?

15         A.    Again, I would like to preface this --

16         MR. JIMENEZ:  I think he answered that so I

17    would object to the question.

18    BY THE WITNESS:

19         A.    Yeah, I'm not -- right.

20    BY MR. GAUGHAN:

21         Q.    Is it the same answer that you gave

22    previously to my question about whether you had any

23    interactions with anyone from CNBM Group?

24         A.    Yes, I don't -- I don't think I've dealt
```

Confidential - Subject to Further Confidentiality Review

1   with anyone directly from CNBM headquarters which is I

2   believe in Beijing.

3        Q.    Okay.  And then you mentioned Taishan

4   Gypsum.

5        A.    Um-hum.

6        Q.    Have you ever had any communications with

7   anyone from Taishan Gypsum?

8        A.    No, I have not.

9        Q.    Okay.  And you mentioned you recognized

10  their name from the litigation, is that correct?

11       A.    Yes.  That's the first time I've ever

12  seen.

13       Q.    Okay.  I understand.

14             And you can -- you can put that document

15  aside.

16       A.    Okay.

17       Q.    How long have you been working for Sunpin?

18       A.    Well, ever since it's kind of founding.

19       Q.    And when was that?

20       A.    When was that, 2000 and -- what are we,

21  '14 now.  Gosh.

22       Q.    '15.

23       A.    '15, wow.  2012, I think.

24       MR. JIMENEZ:  That's correct.

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. GAUGHAN:

 2       Q.    And what was -- what is your position now

 3   at Sunpin?

 4       A.    Well, actually, I'm an attorney with RKJ

 5   Legal.

 6       Q.    Okay.  This is going to be interesting.

 7       A.    Okay.  And when Sunpin was originally

 8   founded with the head of Sunpin, who is a Chinese

 9   national that I knew, so I worked as counsel, and but

10   through that role I worked closely with the -- with

11   the chairman of the company and developed the company.

12   So I guess I don't have an official title except I'm

13   with RKJ Legal as counsel.

14       MR. JIMENEZ:  Well, for the record, listed as

15   manager.

16   BY THE WITNESS:

17       A.    Correct, at that time because it was

18   just -- just starting out.

19   BY MR. GAUGHAN:

20       Q.    Do you receive a paycheck from Sunpin?

21       A.    I do not.

22       Q.    Okay.  And you work for RK legal, is that

23   correct?

24       MR. JIMENEZ:  RKJ Legal.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. GAUGHAN:

 2         Q.    I'm sorry.

 3         A.    RKJ Legal.  I'm one of the partners there.

 4         Q.    Okay.  So do you have any involvement in

 5    the day-to-day operations of Sunpin?

 6         A.    Yes, I do.

 7         Q.    Okay.  Do you have a -- is there an office

 8    location where Sunpin, you know, works out of or

 9    operates out of?

10         A.    Yes, they do.

11         Q.    Okay.  Where is that?

12         A.    It's 1 North LaSalle in Chicago.

13         Q.    Okay.  Is that your address, is

14    that where you actually have your office or do you

15    have an office elsewhere?

16         A.    That's the same office that I work out of

17    and that RKJ Legal is based out of also.

18         Q.    And just to kind of move things along, is

19    your firm more or less an in-house counsel group for

20    Sunpin?

21         A.    Correct.

22         Q.    Okay.  And so you don't have any other

23    clients beyond Sunpin?

24         A.    Oh, we have other clients.
```

Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  But you handle all of the legal

2   matters for Sunpin?

3      A.    We handle legal matters, strategic

4   matters.  As I said, it's as a startup from -- from a

5   foreign country, there is more involved than just

6   legal matters and, you know, we help with a lot of the

7   day-to-day activities.

8      Q.    Okay.  Did you have any involvement in

9   Sunpin's negotiations or anything like that with

10  China Triumph, I guess we'll call it?

11     A.    Yes.

12     Q.    Okay.  Did you -- were you involved in the

13  communications with people that worked for China

14  Triumph?

15     A.    Yes.

16     Q.    Okay.  Can you explain to me exactly what

17  Sunpin does as a business?

18     A.    Sunpin is an investor and a developer of

19  solar projects throughout the United States.

20     Q.    Okay.  And I understand that Sunpin has a

21  number of affiliated companies, is that correct?

22     A.    Correct.

23     Q.    One of which was Sunpin Construction

24  Management, is that correct?

Confidential - Subject to Further Confidentiality Review

1      A.      Correct.

2      Q.      Okay.  And does that particular affiliate

3   actually do, you know, install work, I guess, or

4   project work?

5      A.      Yes.

6      Q.      Okay.  When did you first hear of China

7   Triumph International Engineering Group?

8      A.      It's hard to say what date it was.  I

9   believe it was around September of last year, 2014.  I

10  can't say an exact date though.  That's just an

11  approximate time period.

12     Q.      How is it that you came to first hear of

13  CTIEC, I guess is what I'll call it, if that's okay

14  with you?

15     A.      I heard about it from the chairman of

16  the -- of Sunpin.

17     Q.      Okay.  And what were you told at that

18  time?

19     A.      Just out of many companies that we are

20  dealing with, a potential company that we can work

21  with.

22     Q.      Okay.  And who at Sunpin is, I guess,

23  primarily responsible for communicating with CTIEC?

24     A.      I don't think there is one primary person.

1    I think a lot of us speak with CTIEC or several of us.

2         Q.    Okay.  And if you don't mind, can you tell

3    us who the individuals are at Sunpin that would

4    actually be communicating with CTIEC?

5         A.    Ever?  I don't know, really.  I mean --

6         MR. JIMENEZ:  I'd like to object to that

7    question.  I don't see relevance in who is

8    communicating.  Mr. Kim is here on behalf of Sunpin

9    and he communicates with them.

10   BY THE WITNESS:

11        A.    Right, I really don't -- I mean, I'm being

12   very honest.  I don't know who in Sunpin is

13   communicating with who at CTIEC on a daily basis.  I

14   just don't know that.

15   BY MR. GAUGHAN:

16        Q.    You mentioned the chairman of the company

17   initially told you that there was a company called

18   CTIEC that there was a potential business opportunity,

19   is that correct?

20        A.    Correct.

21        Q.    And who is the chairman?

22        A.    Tian Li, T-i-a-n.

23        Q.    All right.  Now, would Mr. Li be one of

24   the individuals who would be communicating with CTIEC?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes, I believe so.

 2        Q.    Okay.  Are you aware of anyone else at

 3   Sunpin who is communicating with CTIEC?

 4        A.    Yes.

 5        Q.    Who else?

 6        A.    Tom Rosenberg, my law partner.

 7        Q.    Is that it?

 8        A.    That I -- that I am aware of would be Hahn

 9   Mutlu.

10        Q.    How do you spell that?

11        A.    M-u-t-l-u.

12              Xjay Chen.  I would think that that would

13   be the primary people.  I just don't know if anyone

14   else has communication with them, but I do know that

15   they do.

16        Q.    Okay.  And I understand we had requested

17   production of e-mails and other correspondences and it

18   is my understanding that there are no such e-mails or

19   letters, anything like that from Sunpin to CTIEC.  Is

20   that your understanding as well?

21        A.    There are -- of course there are e-mails,

22   but those e-mails I don't think have anything

23   significant that's not in the documents that we've

24   already provided.
```

```
 1       MR. GAUGHAN:  Okay.  We did request those,

 2   obviously, and we would like those to be produced.

 3       MR. JIMENEZ:  I would object to the production

 4   of the e-mails.  I believe the e-mails were simply

 5   framework for the agreements which I produced and the

 6   agreements have been produced.  I don't see any reason

 7   for e-mails to be produced that simply, you know, set

 8   framework for the agreements themselves.  And for the

 9   record, I have not seen any e-mails.  I have not

10   been given any e-mails.

11       MR. GAUGHAN:  I mean, personally I totally

12   disagree.  I think we have requested those and I think

13   we are entitled to them.  You know, we can take it

14   up at another time, obviously, and we'll continue

15   along with the deposition.

16   BY MR. GAUGHAN:

17       Q.   So you mentioned there were some e-mails

18   that you are aware of.  What other means of

19   communication would you have with CTIEC?

20       A.   Phone.

21       Q.   Okay.

22       A.   And face-to-face meetings.  Are there any

23   other forms that people do things?

24       Q.   Instant message.  Do you do instant
```

Confidential - Subject to Further Confidentiality Review

1    message?

2         A.    You are asking for me personally, right?

3         Q.    Well, I'm also asking -- you are a

4    30(b)(6) witness.  So if you have knowledge of any

5    other people at Sunpin who are using those form of

6    communication, I'd like to know about it.

7         A.    No, I don't know.  That I have no idea.

8         Q.    And at the time that you first became

9    involved in communicating with CTIEC, did it come to

10   your attention that CTIEC was a subsidiary of a

11   company called CNBM?

12        A.    When I originally talked to them, no.  I

13   did not know that.  I personally did not know that.

14        Q.    Did it come to your attention at some

15   point in time that they were affiliated with CNBM?

16        A.    Yes, at a later point, correct.

17        Q.    When was -- do you know when that was?

18        A.    For me personally, I don't -- I can't

19   really recall the exact time, but, you know, through

20   our discussions, you know, I went and did some due

21   diligence on CTIEC, so, yes, I found out that they are

22   part of -- they work with CNBM.

23        Q.    Did you ever discuss that relationship

24   with anyone at CTIEC?

```
 1        A.    I personally, no, no.

 2        Q.    Okay.

 3        A.    I did not.  I mean, there was no reason

 4   for me to.

 5        Q.    And you keep saying you personally, but

 6   you are a 30(b)(6) witness, so --

 7        A.    Okay.

 8        Q.    -- in your preparation for today's

 9   deposition, did it come to your knowledge that someone

10   at Suntech had had --

11        MR. JIMENEZ:  Sunpin.

12   BY MR. GAUGHAN:

13        Q.    Sunpin, I'm sorry.  There is another

14   company called Suntech, so strike that.  I'll start

15   again.

16             So during your investigation as a 30(b)(6)

17   witness, did it come to your attention at any point

18   that anyone at Sunpin had previously been informed of

19   the relationship between CTIEC and CNBM?

20        MS. DALEY:  Objection.  We can just be careful

21   with using CNBM without anything after it because

22   there is CNBM Group and CNBM Co. and the distinction

23   is important.

24   BY MR. GAUGHAN:
```

1      Q.   Okay.  All right.  I will strike that

2   question.

3           When I say CNBM, sir, can we understand

4   that to mean China National Building Materials

5   Group -- excuse me -- China National Building

6   Materials Public, Limited?

7      A.   Okay.

8      Q.   Is that the correct name for the entity?

9      MS. DALEY:  Are you referring -- that's what you

10  are using to refer to Company?

11     MR. GAUGHAN:  Yes.

12     MS. DALEY:  Okay.  I mean, I --

13     MR. GAUGHAN:  Can we just have a stipulation

14  that when I say CNBM, I mean CNBM and when I say CNBM

15  Group, I mean CNBM Group, and is that -- can we do

16  that?

17     MS. DALEY:  Yeah, but let's clear up the

18  stipulation because you just said that CNBM means CNBM

19  which is a meaningless stipulation.  CNBM means CNBM

20  Co., is that what you are saying?

21     MR. GAUGHAN:  Yes.

22     MS. DALEY:  Okay.  That's fine.  I just want to

23  refer back to the witness' prior testimony that he

24  never heard of CNBM Co., so if that renders your

Confidential - Subject to Further Confidentiality Review

1    question meaningless, that's not my problem, but I

2    just want to point out that issue, so proceed.

3         MR. GAUGHAN:  Well, I'm still going do ask the

4    question, but can we just have that stipulation when I

5    say CNBM, I mean CNBM Company and when I say CNBM

6    Group, I mean CNBM Group, okay?

7         MS. DALEY:  Absolutely, as long as the witness

8    understands and answers accordingly.

9         MR. JIMENEZ:  And for the record, the witness

10   has already stated that he doesn't know what the

11   difference is between the two.

12   BY THE WITNESS:

13        A.    Yeah, I have no idea what the difference

14   is.

15   BY MR. GAUGHAN:

16        Q.    Okay.  And we'll -- that's fine.

17             But if you could maybe look back to the

18   notice, and on page 11 we see under paragraph (n)ii

19   there is a company called CNBM -- or I guess China

20   National Building Materials Group, Company, Inc.

21   Limited and that's who I'm referring to as CNBM Group?

22        A.    Okay.

23        Q.    And then if you go down to paragraph ix,

24   there is a company called China National Building

Confidential - Subject to Further Confidentiality Review

```
 1    Material Company, Limited.

 2              Do you see that?

 3       A.    Yes.

 4       Q.    And that's who I'm referring to as CNBM,

 5    okay.  Is that fair, sir?

 6       A.    Yes, but I'm just saying, you know, maybe

 7    it's -- maybe we have it clearer in our framework

 8    agreement.  I just don't know personally that, the

 9    difference between those two companies.  So I don't

10    know if -- I don't think we've dealt with both of

11    them, right?  I think we only dealt with one of them,

12    so I don't know what's -- what it says in the

13    agreement or anything, but I just don't know.

14              We don't deal with CNBM, nothing at all.

15    So CNBM for us is just -- for me and our group I

16    believe is just a company we heard of, we -- you know,

17    we understand is out there.  So when you're asking me

18    this is -- you know, I don't know the difference

19    between (n)ii and (n)ix.

20       Q.    Okay.

21       A.    That they are separate companies, I have

22    no idea of that.

23       Q.    And so getting back to my original

24    question, in your preparation for today, did it come
```

1    to your attention that anyone other than yourself had

2    some level of awareness of the relationship between I

3    guess it is CTIEC and CNBM or CNBM Group?

4         A.    Yes, I believe so.

5         Q.    Okay.  And what did you learn about when

6    and -- when Suntech first learned of this

7    relationship?

8         MR. JIMENEZ:  Sunpin.

9    BY MR. GAUGHAN:

10        Q.    Sunpin.  I'm sorry.

11        A.    When did we first learn.

12              Probably during our negotiations with

13   CTIEC, later in 2014.  I don't know.  When was that

14   form -- that Framework Agreement signed?  It would be

15   probably during that time.

16        MR. JIMENEZ:  November 2014.

17   BY MR. GAUGHAN:

18        Q.    Okay.  So you think it was around

19   November?

20        A.    Yeah, I believe so, when we had more

21   understanding of CTIEC and its structure.

22        Q.    Okay.  When did Sunpin first, I guess, get

23   involved in a formal business relationship with C --

24   CTIEC?

Confidential - Subject to Further Confidentiality Review

1     A.    That would be that date.

2     Q.    But there is some --

3     A.    That agreement date.

4     Q.    Okay.  So there was no prior business

5  between the, you know, CTIEC and Sunpin, is that

6  correct?

7     A.    Not that I'm aware of.

8     Q.    No other projects that went on before?

9     A.    No.

10    Q.    Okay.  And I think you mentioned before

11 you believe that you first learned of, I guess, CTIEC

12 in around September of 2014, is that correct?

13    A.    I can't be sure, but I believed around

14 that period.

15    Q.    And how did you first become aware of this

16 company, CTIEC?

17    A.    I think I already answered that.  From

18 the -- from Mr. Tian Li, the chairman of the Sunpin.

19    Q.    And what did he tell you?

20    A.    I think I said that, which is, you know, I

21 have potential business opportunity with CTIEC.

22    Q.    Okay.  And what did he tell you about that

23 business opportunity?

24    A.    That, you know, CTIEC can come in and

Confidential - Subject to Further Confidentiality Review

1    possibly be a partner in certain projects that we both

2    feel can benefit Sunpin.

3         Q.    And what do you mean by partnership?  Is

4    that like an eq- -- I understand you set up some

5    entities.  Would CTIEC have an equity interest in any

6    of these entities that were set up under your business

7    practice?

8         A.    Equity, I don't believe so.

9         MR. JIMENEZ:  I would object to the question.

10   BY THE WITNESS:

11        A.    Equity?  You know, I don't believe so.

12   However, really, if you looked at the agreements that

13   we have, that's our business relationship with them.

14   BY MR. GAUGHAN:

15        Q.    Okay.  Why don't we start by marking the

16   Framework Agreement.

17                  (WHEREUPON, a certain document was

18                   marked Kim Deposition Exhibit No. 2,

19                   for identification, as of

20                   04/17/2015.)

21   BY MR. GAUGHAN:

22        Q.    And I'm showing you what's been marked as

23   Exhibit 2 to the deposition.

24        A.    Yep, I have it.

Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Have you seen this document before

2   today?

3      A.    Yes, I have.

4      Q.    And you mentioned the chairman of Sunpin?

5      A.    Yes.

6      Q.    Tian Li, is that correct?

7      A.    Yes.

8      Q.    And if you go to the second-to-last page.

9      A.    Okay.

10      Q.    And I'm assuming Tian is a man.  Is

11   that incorrect?

12      A.    Yes, he is a man.

13      Q.    Okay.  Is that his signature?

14      A.    I believe so.

15      Q.    Okay.

16      A.    I didn't see him sign it, so I believe so.

17      Q.    You didn't see him sign it, but you have

18   no reason to believe that's not his signature?

19      A.    Yeah, yeah, I don't have any reason to

20   believe that.

21      Q.    And you've seen this document before, you

22   mentioned?

23      A.    I have.

24      Q.    Okay.  Is this a document either yourself

```
1    or someone else from, was it RK --

2         A.    RKJ.

3         Q.    -- would have prepared?

4         A.    Yes.

5         Q.    Okay.  And would that be something that

6    would be prepared in the normal course of business for

7    Sunpin, is that correct?

8         A.    What -- can you reiterate that question a

9    little bit?

10        Q.    All right.  Well, what I'm trying to

11   establish here is this something that would be

12   customary for -- to be prepared, a contract or this

13   type of document, would that be something that was

14   customarily prepared for Sunpin when these sort

15   of business arrangements?

16        A.    By RKJ?

17        Q.    Yes.

18        A.    Yes.

19        Q.    And this would be something that RKJ or

20   Sunpin would retain a copy of as part of that same

21   business practice?

22        A.    Yes.

23        Q.    Okay.  And you can turn to the second

24   page of this document.
```

```
 1        A.    Okay.

 2              Okay.

 3        Q.    And if you just want to read that first

 4   paragraph for me?

 5        A.    Out loud or --

 6        Q.    Yes, let's do it out loud this time.

 7        A.    The whole first paragraph?

 8        Q.    Yes.

 9        MR. JIMENEZ:  I mean, it speaks -- it speaks for

10   itself.

11        MR. GAUGHAN:  I just want to put it on the

12   record.

13        MS. DALEY:  It is an exhibit.  It is on the

14   record.

15   BY THE WITNESS:

16        A.    I mean, it is an exhibit.

17   BY MR. GAUGHAN:

18        Q.    Why am I getting so much pushback.  Can

19   you please just read it into the record, sir?

20        MS. DALEY:  It is a beautiful day, we want to

21   get outside.

22        MR. JIMENEZ:  It is hot in this room, for the

23   record.

24   BY THE WITNESS:
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    All right.  I'll read it.

 2              "This agreement ('Framework Agreement') is

 3   by and between Sunpin Solar Development, LLC

 4   ('Sunpin') with office located at 1 North LaSalle

 5   Street, Suite 1515, Chicago, Illinois 60602, and China

 6   Triumph International Engineering Company, Limited

 7   ('CTIEC') with office located at Zhongqi Building,

 8   Floor 27, 2000," I'm going to murder these names,

 9   "Zhongshanbei Road, Shanghai, China 20063.  This

10   agreement summarizes the recent discussions of

11   commercial terms regarding a framework agreement for

12   the development, engineering, procurement, financing

13   and construction of various photovoltaic projects

14   located in the US (the 'Projects').  This Framework

15   Agreement is intended to serve as the basis for the

16   affiliation between the parties, in which Sunpin will

17   develop and invest in Projects, and CTIEC will provide

18   EPC and financing services for such Projects.

19   Pursuant to this affiliation, Sunpin and CTIEC

20   (hereinafter each called a 'Party' or collectively

21   'Parties') will work in good faith to execute an

22   engineering, procurement, financing and construction

23   agreement ('EPC Agreement') for each Project, and do

24   so within a commercially reasonable timeframe."
```

Confidential - Subject to Further Confidentiality Review

1     Q.    Thank you, sir.

2     MR. JIMENEZ:  Good job.

3  BY MR. GAUGHAN:

4     Q.    So, as I appreciate it, this agreement is

5  basically establishing an ongoing business

6  relationship between Sunpin and CTIEC?

7     A.    Potentially, yes.

8     Q.    Okay.  And there was an actual -- there

9  were actual what's referred to here as EPC agreements

10  that came about later, correct?

11     A.    Correct.

12     Q.    And is it basically -- it is basically my

13  understanding -- there are a lot of agreements here, I

14  read through a bunch of them, but my understanding is

15  CTIEC would provide equipment, I guess materials, and

16  some financing, and Sunpin would actually locate

17  opportunities and through its other entity, which was

18  Sunpin, you know, the general contracting entity, I'm

19  forgetting the name of it right now, would do the

20  actual projects if they were actually materialized, is

21  that correct?

22     MR. JIMENEZ:  I would object to the question.

23  The document speaks for itself.

24  BY MR. GAUGHAN:

Confidential - Subject to Further Confidentiality Review

1      Q.     Is that a yes?  And I guess you can

2  answer.

3      A.     Yeah, that's what it says in this

4  agreement, correct.

5      Q.     Okay.  So you agree with my

6  characterization of...?

7      A.     In general terms, yes.

8      Q.     Okay.  Well, how would you describe the

9  relationship between CTIEC and Sunpin?

10     A.     I describe it more as per project basis.

11 It's a very new relationship.  And per project basis,

12 if there is an opportunity to work together, you know,

13 we would.  What you laid out is generally these may

14 be -- these are terms that -- or activities that may

15 be involved but they are not -- this is a framework,

16 so project by project can be varied and can be

17 different.

18     Q.     Okay.  And if you look to paragraph 1.a,

19 it reversed -- it refers to special purpose vehicles.

20            Do you see that?

21     A.     Correct.

22     Q.     Okay.  And it's my appreciation, tell me

23 if you disagree, that under this agreement Sunpin and

24 CTIEC would set up, you know, specific entities per

```
 1    project or that was at least the framework.

 2              Is that -- is that also your

 3    understanding?

 4         A.    We may, we may.

 5         Q.    What's your --

 6         A.    As I said, this is a framework agreement,

 7    so what we -- what we have here are potential

 8    activities that -- that we can do together.  Forming

 9    SPVs is, you know, very common in the United States

10    and business practices when you are doing separate

11    projects.

12         Q.    That's part of the framework?

13         A.    Yeah, that's part of the framework.

14         Q.    Okay.  And if you turn to the next page.

15    MR. JIMENEZ:  What page is this?

16    MR. GAUGHAN:  It would be -- if you look at the

17    top at the Bates numbers, it would be 12.

18    BY THE WITNESS:

19         A.    Okay.

20    BY MR. GAUGHAN:

21         Q.    And this refers to -- the top of the

22    page refers to Sunpin locating certain opportunities.

23              Is that a fair reading of that first

24    paragraph there?
```

Confidential - Subject to Further Confidentiality Review

```
1        A.    Well, more than locating.  Sunpin would

2   have to develop these projects.  They would have to be

3   shovel ready projects, so it is a lot more than

4   locating.

5        Q.    And what is -- I guess what's the

6   distinction?  So --

7        A.    Well, locating -- go ahead.  I'm sorry.

8        Q.    Just tell me the differences, the

9   distinction in your mind?

10       A.    Well, locating is just going out there and

11  there is a piece of land, you can do it, but that's

12  not what we do.  We -- we develop.  We get all of the

13  legal, the permitting process, lease/purchase the

14  land, everything that allows the construction to

15  occur.

16       Q.    Okay.  So when would these potential

17  projects be shared with CTIEC?

18       A.    When Sunpin deemed it was a project that

19  we felt we can work with with CTIEC.  It was really an

20  internal decision on our part.

21       Q.    Okay.  So would Sunpin locate a potential

22  project, do all of the due diligence and then once

23  that was completed communicate that opportunity to

24  CTIEC?
```

Confidential - Subject to Further Confidentiality Review

1      A.    Not at all times.  We may just have a

2   separate partner, we may build it ourselves.  If it --

3   you know, it was an internal decision if we want to

4   move forward with CTIEC or not.

5      MR. JIMENEZ:  And, again, I object because the

6   document speaks for itself.  There is no more that he

7   can say that isn't said in here.

8      MR. GAUGHAN:  Well, I'm asking him questions

9   about it, so I think that's a fair question.  This is

10  what was produced to me.  I don't have any e-mails or

11  anything else like that to ask about, so I'll stand on

12  my questioning.

13  BY MR. GAUGHAN:

14     Q.    And then if you look at the bottom of that

15  page under CTIEC Responsibilities, it says, "CTIEC

16  shall be responsible for performing all activities

17  necessary to effectuate the completion of each

18  approved Project as an operating, interconnected and

19  commissioned solar photovoltaic" -- I think that's how

20  you said that?

21     A.    Voltaic.

22     Q.    -- "electric power plant."

23        Did I read that correctly?

24     A.    Correct.

Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  And at the bottom of that page it

2   refers to, "CTIEC shall provide to Sunpin a lump sum,

3   'Turn Key' proposal for the engineering, procurement,

4   financing and construction of each approved project."

5         Did I read that correctly?

6      A.    Correct.

7      Q.    And I just want to ask you a question.

8         At the bottom of this page beginning with

9   the word "in" and then carrying over to the next page,

10   it says, "In addition, CTIEC shall be responsible for

11   the selection, bidding and negotiation of all general

12   and subcontractor services and agreements for the

13   Project, including labor, materials, equipment and

14   services, and shall advise and coordinate with Sunpin

15   throughout such process."

16         Did I read that correctly?

17      A.    Yes, you did.

18      Q.    Have you ever actually worked on a project

19   with CTIEC where they actually were involved in the

20   bidding, negotiation and general and subcontracting

21   services?

22      A.    In some forms, yes, but not all that you

23   have read.

24      Q.    Can you clarify that, please?

Confidential - Subject to Further Confidentiality Review

1      A.    As I said before, this is a framework

2    agreement and there may be some things in here that

3    would be CTIEC's role, Sunpin's role, but as a small

4    startup, as a starting kind of relationship, we are

5    very flexible in our business dealings.

6      Q.    But that's not quite what I asked you.  I

7    was asking you if you were familiar with any of the

8    projects you've worked on where CTIEC actually was

9    involved in selection, bidding, negotiation or general

10   and subcontracting services?

11     A.    Selection, bidding -- not selection, not

12   bidding, not negotiating.  Certain subcontractor

13   services, yes.

14     Q.    Okay.  What subcontractor services are you

15   referring to?

16     MR. JIMENEZ:  Could you specify a project for

17   this or is this just a hypothetical or what's your

18   question?

19     MR. GAUGHAN:  That's not hypothetical.  I asked

20   him if he was aware of CTIEC ever performing any of

21   those roles and he said he was aware of CTIEC being

22   involved in some subcontracting, and what I'm asking

23   is what subcontracting was that that he is aware of.

24   BY THE WITNESS:

1          A.      What I am aware of.  Well, I guess we do

2     all of the subcontracts, so Sunpin Construction does

3     that.  I mean, should we just get to the point and

4     say, yes, I mean, we have a project that we are

5     working with them on.  But, you know, you are

6     saying -- you are talking about these specific things

7     and I don't know.  I mean, I'm not quite sure if that

8     definition is in the project that we are working on

9     with.

10    BY MR. GAUGHAN:

11         Q.      All right.  So let me ask you it this way.

12    All right.  If you look on the next page under

13    paragraph h, this is 4.h, it says, "Except for

14    procuring modules and inverters, CTIEC shall

15    subcontract all the remaining scopes of work set forth

16    in EPC Contract, as a minor scope contract, to Sunpin

17    Construction Management LLC."

18         MS. DALEY:  I think that says "mirror".

19    BY THE WITNESS:

20         A.      It's "mirror scope."

21    BY MR. GAUGHAN:

22         Q.      I'm sorry.  "Mirror scope."  So that was

23    going to be my question.

24              Is CTIEC effectively bringing on Sunpin

Confidential - Subject to Further Confidentiality Review

1    Construction Management LLC to perform the actual

2    projects as a contractor?

3        A.    Yes, Sunpin Construction Management is

4    responsible for -- for the EPC.

5        Q.    Okay.  And underneath that there is a

6    fairly complicated paragraph about pricing.  And it

7    says, "The price paid by Sunpin to CTIEC for each

8    project shall be determined on a project-by-project

9    basis and agreed upon by the parties in the EPC

10   Agreement for each Project, and shall be based on a

11   unit price per MWp of installed peak power

12   (hereinafter 'EPC Price')."

13           Did I read that correctly?

14       A.    Yes.

15       Q.    And I'm not going to bother to read the

16   rest of the paragraph, but -- so basically is it fair

17   to say that in at least this Framework Agreement the

18   idea was that CTIEC would be compensated on a project

19   based on peak power installed on that particular

20   project?

21       MR. JIMENEZ:  I would object.  The document

22   speaks for itself.

23   BY THE WITNESS:

24       A.    EP -- CTIEC would be compensated?

 1   BY MR. GAUGHAN:

 2        Q.    Yes.

 3        A.    I mean, if that's what it reads, that's

 4   what it reads.  I -- I don't know.

 5        Q.    Okay.  Let me ask you this.

 6              So you've actually executed a few

 7   agreements with CTIEC.  How is it that they are to be

 8   compensated under those agreements?

 9        A.    Only one agreement we have executed.

10        Q.    Okay.  Which agreement is that?

11        A.    Church Hill Solar Farm.

12        Q.    How about Wal-Mart?

13        A.    Wal-Mart is still in negotiations.

14        Q.    Okay.  Why don't we pick up that.

15   What's the status of the negotiation there?

16        A.    With Wal-Mart?

17        Q.    Yes.

18        A.    We are still negotiating with the builder,

19   the construction group.  So we haven't started the

20   project yet.

21        Q.    How about with Wal-Mart, do you have an

22   actual agreement with Wal-Mart?

23        A.    Sunpin has an agreement with Wal-Mart.

24        Q.    Okay.  What is the -- what is the

1   agreement?

2       MR. JIMENEZ:  I object.  There is -- to

3   relevance.  Sunpin is not a party to the lawsuit, any

4   litigation.  Their contract is independent with

5   Wal-Mart.  It has nothing to do with any of the people

6   named in the lawsuit.

7   BY MR. GAUGHAN:

8       Q.   You can answer the question.

9       A.   It's a power purchase agreement that we

10  have with Wal-Mart.  And just to reiterate what

11  counsel said, it has nothing whatsoever to do with

12  CTIEC.

13      Q.   What is the actual agreement itself?

14      A.   It's a -- as I said, it's a power purchase

15  agreement.

16      Q.   For what?  What's the scope of it?  Is it

17  for a number of locations or is it -- can you tell me

18  more about it?

19      A.   Two locations, very small projects, two --

20  two rooftop projects, small, in Massachusetts where

21  Sunpin has an agreement with Wal-Mart to build solar

22  panels on top of their roof and Wal-Mart pays a

23  certain power price to Sunpin.

24      Q.   So it is just two -- for now, two stores?

```
 1        A.    Correct.

 2        Q.    Is there negotiations to expand to other

 3   stores?

 4        A.    No.

 5        Q.    So it's just limited to the two stores?

 6        A.    Yes.

 7        Q.    Okay.  And has that ever been discussed,

 8   the possibility of expanding the project to additional

 9   stores?

10        A.    With Wal-Mart?

11        Q.    Yes.

12        A.    No.

13        Q.    Okay.

14        MR. GAUGHAN:  I guess we'll take a quick break

15   if that's okay with everyone.

16        THE WITNESS:  Okay.

17        THE VIDEOGRAPHER:  Off the record 11:01.

18               (WHEREUPON, a recess was had

19                from 11:01 to 11:11 a.m.)

20        THE VIDEOGRAPHER:  On the record 11:11.

21   BY MR. GAUGHAN:

22        Q.    Okay.  I guess we are still looking at the

23   same exhibit, which is Exhibit 2.

24               If you go to the second-to-the-last --
```

Confidential - Subject to Further Confidentiality Review

```
 1    second-to-the-last page there, the signature page.

 2         A.    Okay.  I have that.

 3         Q.    It looks like on behalf of China Triumph

 4    International Engineering, there is a signature by an

 5    individual by the name of Dongliang Zhang.

 6               Do you see that?

 7         A.    Yes.

 8         Q.    Have you had any communications with that

 9    individual?

10         A.    Yes, I have.

11         Q.    Okay.  What -- first of all, is that a

12    man?

13         A.    It's a man.

14         Q.    Okay.  And when were those conversations

15    or interactions?

16         A.    He was the initial person that we spoke to

17    regarding our relationship with China Triumph.

18         Q.    And when you say spoke with, was that in

19    person or over the phone?

20         A.    Over the phone.

21         Q.    Okay.  Do you know when those

22    conversations on the phone took place?

23         A.    September/October period.

24         Q.    Okay.  Do you know how many conversations,
```

```
 1    approximately, there might have been?

 2         A.    He was in China, so just that one

 3    conversation at that time.

 4         Q.    Okay.  Did you ever meet with Mr. Zhang, I

 5    guess, in person?

 6         A.    Yes.

 7         Q.    In person?

 8         A.    Yes, I have.

 9         Q.    Okay.  When was that?

10         A.    I think the first time was in November.

11         Q.    Okay.  Was that in the United States?

12         A.    Yes.

13         Q.    Okay.  Was that in Chicago?

14         A.    Yes.

15         Q.    Okay.  At your offices in Chicago?

16         A.    Yes.

17         Q.    Okay.  Was that the only time you met with

18    him?

19         A.    No.

20         Q.    Okay.  When else did you meet with him?

21         A.    Chicago several times and in New York.

22         Q.    Okay.  How many times -- you said several

23    times in Chicago, is that correct?

24         A.    Yes.
```

```
1        Q.    Okay.  Do you know whether Mr. Zhang had

2   any problems obtaining a Visa to come to the

3   United States?

4        MR. JIMENEZ:  I object to relevance.

5   BY THE WITNESS:

6        A.    I don't know.

7   BY MR. GAUGHAN:

8        Q.    Okay.

9        A.    I had nothing to do with that.

10        Q.    All right.  Have you -- anyone you've

11   dealt with at CTIEC, are you ever aware of someone

12   having an issue getting a Visa to travel to the

13   United States?

14        A.    No, I have not.  I do not know that.

15        Q.    Okay.  Now, you mentioned there were a

16   couple of meetings in Chicago?

17        A.    Yes.

18        Q.    Okay.  Was that over, you know, a week

19   period or some period of time or was it he came,

20   traveled here multiple different times?

21        A.    As I recall, he came maybe three times.

22        Q.    Three times, okay.

23        A.    Separate occasions.

24        Q.    And you said it was
```

Confidential - Subject to Further Confidentiality Review

```
1    September/October timeframe, was that right?

2        A.    No.  November -- after the agreement was

3    signed.

4        Q.    Okay.  So --

5        A.    Before and right after.

6        Q.    Okay.  And you also mentioned you met with

7    him in was it New York or Newark?

8        A.    Both location, Newark, New York.  We

9    had -- we met in Newark, we had dinner in New York.

10       Q.    Okay.

11       A.    Same time about that.

12       Q.    That was probably a good decision.

13             When was it -- was that -- when was

14   that meeting in -- in that area?  Was it more than

15   once -- let me strike that.

16             Was there more than one meeting in that

17   area?

18       A.    No.  Just one.

19       Q.    Just one.

20             When was that?

21       A.    Boy, I know it was nasty weather.  I guess

22   that was the whole winter.  Gosh, February, January,

23   February, around that time.  I just can't remember.

24       Q.    So after this agreement was executed?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    Okay.  Do you know why Mr. Zhang was in

 3    that area?

 4          A.    In New York?

 5          Q.    Yes.

 6          A.    Newark?  I.

 7                Don't -- I don't know why he was there,

 8    no.

 9          Q.    Okay.  Do you know if he was there on some

10    other business or anything like that?

11          A.    That I do not know.

12          Q.    Okay.  I'm just wondering why it was that

13    he didn't come directly to Chicago, if you have any

14    information on that?

15          A.    Why he didn't -- I don't -- I don't know.

16          Q.    Okay.  So he never said anything to you or

17    anyone else at Sunpin about why, you know, it was

18    necessary to travel to New York?

19          A.    Specifically why to New York?

20          Q.    Or Newark, New York, whatever you want to

21    call it.

22          A.    Why he happened -- I don't -- I don't --

23    why he is -- why he wanted us to go to New York or

24    what?
```

1     Q.     Why he was in that location and he wasn't

2     coming to Chicago?

3     A.     Well, I think he had some other colleagues

4     there, so.

5     Q.     Do you know who those colleagues were?

6     A.     The -- I don't know all of them, but the

7     president of CTIEC, Mr. Peng, and Mr. Wang, the vice

8     president of CTIEC.

9     Q.     Okay.  Were they there on some other

10    business matter, to your knowledge?

11    A.     I believe Mr. Peng said that his son is in

12    school there and it was spring break, so wanted to see

13    his son.

14    Q.     Was he -- do you know if it was at the

15    New Jersey Institute of Technology, by chance?

16    A.     Yes, it was.

17    Q.     Okay.  Mr. Peng's son is studying there?

18    A.     I don't believe so.  I don't -- I don't

19    know.

20    Q.     He was studying there?

21    A.     I don't know where he studies.  All I know

22    is that Mr. Peng was saying that his son is in the

23    New York area.

24    MR. JIMENEZ:  For the record, they didn't meet

 1   at his son's school.

 2        THE WITNESS:  We did?

 3        MR. JIMENEZ:  You did not, correct?

 4   BY THE WITNESS:

 5        A.   I don't know where his son goes to school.

 6        MR. JIMENEZ:  Right.

 7   BY MR. GAUGHAN:

 8        Q.   Well, you ment- -- when I mentioned

 9   New Jersey Institute of Technology, you sounded

10   familiar with that --

11        A.   Yes.

12        Q.   -- institution?

13        A.   Yes.

14        Q.   Why is that?

15        A.   Because that's where we -- we met.

16        Q.   Okay.

17        A.   We met at the university.

18        Q.   How many times did you meet there?

19        A.   Once.

20        Q.   Okay.  Are you aware that CTIEC has had

21   some involvement with that university?

22        A.   Vaguely aware.

23        Q.   Okay.  What do you know about that?

24        A.   As I said, very, very -- there is -- they

Confidential - Subject to Further Confidentiality Review

```
 1   are there, there is some relationship.  I don't know

 2   the extent of it.

 3        Q.    Were you ever informed that there were

 4   actually students studying there from these, I

 5   guess, CNBM?

 6        A.    From CNBM?

 7        Q.    Yeah.

 8        A.    No.

 9        Q.    Okay.  How about from CTIEC?

10        A.    Yes.

11        Q.    What is your knowledge of that, like how

12   many students, do you have any information on that?

13        MR. JIMENEZ:  I object to relevance.

14   BY THE WITNESS:

15        A.    I saw a few of them.  I don't know.

16   That's really none of Sunpin's business, this -- what

17   they are doing there is really not anything to do with

18   Sunpin and CTIEC.

19   BY MR. GAUGHAN:

20        Q.    Did you meet any of these students?

21        A.    I have.

22        Q.    How many?

23        A.    It was at a dinner.  I don't -- a couple

24   of them.  I don't know.
```

Confidential - Subject to Further Confidentiality Review

1        Q.      Do you know any of their names?

2        A.      No.

3        Q.      Was one of them Mr. Peng's -- was it Peng,

4     the --

5        A.      Mr. Peng is the --

6        Q.      Peng.

7        A.      -- president.

8        Q.      Did his son have dinner with you guys?

9        A.      I don't believe so.

10       Q.      Okay.  Is there anything else you know

11    about the relationship between CTIEC and New Jersey

12    Institute of Technology?

13       A.      Not more that what I've told you.

14       Q.      I do want to have you flip to the -- you

15    know, turn to the next page, I should say, on that.

16       A.      Okay, um-hum.

17       Q.      And there is a Contract Structure, which

18    is Exhibit A.

19               Do you see that?

20       A.      Yes, I do.

21       Q.      And on top it has -- under Owner it says

22    unpin/other company.

23       A.      Okay.

24       Q.      And underneath that we spoke about SPVs

1    before.  Do you remember that?

2        A.    Yes.

3        Q.    And so underneath the owner it lists

4    SPV-1, 2, 3 and then I guess N, so.

5            Do you see that?

6        A.    Yes.

7        Q.    And then underneath that on the left-hand

8    side under SPV-1, we see CTIEC.  And underneath CTIEC

9    it says, Modules and Inverters.

10           Do you see that?

11       A.    Yes.

12       Q.    And so was that what general -- you know,

13   generally the framework was that CTIEC would provide

14   the modules and inverters for future projects?

15       A.    Yes.

16       Q.    Okay.

17       A.    Generally.

18       Q.    Generally, I'm sorry?

19       A.    Yeah, generally, yes.

20       Q.    Okay.  That was what was contemplated

21   anyway?

22       A.    Right.  Sunpin still had a say in

23   everything, so.

24       Q.    And then a line from CTIEC goes to BOS

Confidential - Subject to Further Confidentiality Review

1    (U.S.).

2            Do you see that?

3    A.    Yep.

4    Q.    And that's a contract that you would

5    execute -- or CTIEC would execute with Sunpin,

6    correct?  And we'll look at one in a little bit.

7            MR. JIMENEZ:  To clarify that with Sunpin, you

8    know, there is Sunpin and Sunpin Construction, so

9    there is a distinction, I believe.

10   BY MR. GAUGHAN:

11   Q.    Sunpin and its affiliates and

12   subsidiaries?

13   A.    Correct.

14   Q.    Okay.  And underneath that we see Sunpin

15   Construction Management LLC, correct?

16   A.    Yes.

17   Q.    And that's the entity we referred to

18   earlier that would perform some of the general

19   contracting services?

20   A.    Correct.

21   Q.    On project -- I guess on projects,

22   correct?

23   A.    On project, yes.

24   Q.    And underneath that we see Local

1   Subcontractors, correct?

2       A.    Yes.

3       Q.    So Sunpin would -- if there was an actual

4   project that went forth -- forward under this

5   framework, the idea was that Sunpin Construction

6   Management LLC would do the general contracting and

7   would bring in local subcontractors, correct?

8       A.    Correct.

9       MR. GAUGHAN:  Okay.  I think I'm just going to

10  mark a few exhibits.  It probably makes sense to do it

11  that way.

12                  (WHEREUPON, discussion was had off the

13                   record.)

14                  (WHEREUPON, a certain document was

15                   marked Kim Deposition Exhibit No. 3,

16                   for identification, as of

17                   04/17/2015.)

18      MR. GAUGHAN:  I'm just going to mark a couple of

19  these because I think they all involve the same

20  project.

21                  (WHEREUPON, certain documents were

22                   marked Kim Deposition Exhibit No. 4,

23                   No. 5, No. 6 and No. 7, for

24                   identification, as of 04/17/2015.)

```
 1   BY MR. GAUGHAN:

 2        Q.    And I'm showing you what's been marked as

 3   Exhibits 3 to 7.

 4        A.    Yes.

 5        Q.    If you just want to take a quick look at

 6   those and just let me know if you are familiar with

 7   them.

 8        A.    I know they exist, but...

 9        Q.    Do you know they exist?

10        A.    Yes.

11        Q.    Do you know they were produced by your

12   counsel in this case?

13        A.    Yes.

14        Q.    What do you understand --

15        A.    Well, no, no, that's not true.  I believe

16   one of these was produced by CTIEC's counsel, am I

17   correct, the Mortgage?

18        MR. JIMENEZ:  No.

19        THE WITNESS:  No, no, okay.  That's not Frank

20   Ryan.

21        MR. JIMENEZ:  That's not their Bates stamp

22   there.

23        THE WITNESS:  Oh, oh, okay.

24   BY MR. GAUGHAN:
```

Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  What do you mean by produced -- you

2    indicated that you thought one of those was produced

3    by CTIEC's counsel.

4            What do you mean by that?

5      A.    Well, I -- I'm sorry.  I just saw their

6    name here, so that's --

7      Q.    Okay.  So you don't have any information

8    that they provided that to you or created it or

9    anything like that?

10     A.    No, no, I don't know.

11     Q.    Okay.

12     A.    This is getting down to the little weeds,

13   so I wasn't very directly involved in this part.

14     Q.    Well, you understand you are a 30(b)(6)

15   witness, correct?

16     A.    Yes.

17     Q.    Did you review these materials prior to

18   today in preparation for the deposition?

19     A.    No, I'm sorry, I -- I knew that they are

20   out there, but I did not read every single agreement

21   before I came here.

22     Q.    Okay.  Let's look at Exhibit 3, if you

23   could, and go to page I guess at the top Bates 23, so

24   if you see that.

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Okay.

 2        Q.    And this is signed by Tian Li?

 3        A.    Yes.

 4        Q.    Is that his signature?

 5        A.    Yes.

 6        Q.    Okay.  And it's on behalf of Church Hill

 7   Solar Farm LLC, correct?

 8        A.    Yes.

 9        Q.    And is this one of the SPV entities that

10   we spoke of before, an example, I guess?

11        A.    I don't think so.  I don't think so.

12        Q.    All right.  Why don't you tell me about

13   this entity, this -- let me get to it again.

14              What do you know about Church Hill Solar

15   Farm LLC?

16        A.    I may be wrong here.  I may be completely

17   wrong here, but I believe it is the company that

18   Sunpin purchased to develop this project.

19        Q.    Who are they -- who would have

20   Sunpin -- who sold this entity to Sunpin, to your

21   knowledge?

22        A.    A group called Abacus.

23        Q.    Okay.  And we don't need to get too into

24   that, but your understanding is that Church Hill Solar
```

1    Farm LLC is a subsidiary of Sunpin?

2         A.    You know, I don't know.  I don't really

3    know that, what that legal structure of Church Hill

4    Solar Farm is in relations to Sunpin.  I don't want to

5    speak off the record.  I just 100 percent don't know.

6         Q.    If you look at the Pledge and Security

7    Agreement which is Exhibit 7 --

8         A.    Um-hum.

9         Q.    -- paragraph A defines Church Hill Solar

10   Farm LLC as CHSF.

11               Do you see that?

12        A.    Yes.

13        Q.    And it states that -- states that CH --

14   CHSF is a wholly-owned subsidiary of Sunpin?

15        A.    Well, okay.  Then you know the answer.

16   Sorry.  I didn't --

17        Q.    I was hoping you might know the answer as

18   a 30(b)(6) witness.

19        A.    We have many projects.  You know, we do a

20   lot of things, so I probably know as much as -- more

21   than anyone else though.

22        Q.    So you don't dispute that Church

23   Hill Sun -- Solar Farms, LLC is a subsidiary of

24   Sunpin?

 1       A.    If that's what it says, then, yes, I guess

 2  it is.

 3       Q.    All right.  Continuing on Exhibit 3, if

 4  you look at Exhibit A, which is on Bates 26.

 5       A.    Okay.

 6       Q.    And this talks about the scope of work on

 7  the Church Hill Solar Farm project?

 8       A.    Yes.

 9       Q.    What's your understanding of what this --

10  what that project is actually about and what's going

11  on, who is doing what?

12       A.    Okay.  Church Hill, we are constructing

13  7.3 megawatts worth of solar panels on a piece of

14  land.  That's what we are doing.  That's very simple

15  on solar.  We are putting up 7.3 megawatts of solar

16  panels on a piece of land in Church Hill.

17       Q.    Okay.  And that would be owned by this

18  entity that we talked about before that's a subsidiary

19  of Sunpin?

20       MR. JIMENEZ:  For the record, the land or the

21  proper -- or the project, what are you asking is

22  owned by Church Hill?

23       MR. GAUGHAN:  The project.

24  BY MR. GAUGHAN:

Confidential - Subject to Further Confidentiality Review

1      Q.    Is that correct?

2      A.    Yes, the project.

3      Q.    All right.  And can you tell me -- I guess

4   you -- maybe you don't know, but do you know whether

5   CTIEC has any interest in Church Hill Solar Farms,

6   LLC, any ownership interest?

7      A.    No, I don't believe they do.

8      Q.    Okay.  And I don't want to get too much

9   into what this project is about, but is it -- is

10  Sunpin developing this project for resale or are they

11  going to sell energy to people, is there -- you know,

12  I don't want to get too involved?

13     A.    We haven't made the decision on what we

14  are going to do with the project yet.

15     Q.    Okay.  So you might sell it, you might --

16     A.    We might keep it, we might refinance it,

17  we don't know yet.

18     Q.    Okay.  All right.  And in terms of the

19  project, you guys are going to be developing it?

20     A.    We've already developed it.  Now we are

21  just constructing it.

22     Q.    Okay.  What was the extent of CTIEC's

23  involvement in this project?

24     A.    They provide 80 percent of the EPC

Confidential - Subject to Further Confidentiality Review

1    financing.

2         Q.    Okay.  And maybe the thing to do is to

3    turn to Exhibit C.

4         MS. DALEY:  Bates 31?

5         MR. GAUGHAN:  Yes, Bates 31.

6    BY THE WITNESS:

7         A.    Okay.

8    BY MR. GAUGHAN:

9         Q.    And this is the part where I get a little

10   confused, but it talks about a fixed turnkey, you

11   know, a fixed price for the turnkey installation and

12   it lists $4,358,518.07?

13        A.    Yes.

14        Q.    Who is actually being paid that amount?

15        A.    That money is paid to the construction

16   group, the panel provider, the inverters, the

17   equipment.  It is to build the project.  So that money

18   goes to building the project.

19        Q.    So we talked about Sunpin Construction

20   earlier?

21        A.    Yes.

22        Q.    That's who's going to be paid that amount?

23        A.    I believe 80 percent of that amount

24   because Sunpin has to put in 20 percent.

Confidential - Subject to Further Confidentiality Review

1      Q.    So Sunpin puts in 20 percent and then

2   receives 80 percent of this $4 million number we just

3   looked at?

4      A.    I believe so.

5      Q.    Do you know who would actually be making

6   that payment?

7      A.    Who is paying Sunpin?

8      Q.    Yes.

9      A.    CTIEC.

10     Q.    Okay.  And how is CTIEC getting paid on

11  this -- in this project, do you know?

12     A.    How are they -- they -- it's in the

13  agreement.

14     MR. JIMENEZ:  I object.  It is in the agreement.

15  BY THE WITNESS:

16     A.    Yeah, I mean --

17     MR. JIMENEZ:  The document speaks for itself.

18  BY THE WITNESS:

19     A.    It really does.  You know, I'm not going

20  to say anything that's different from what the

21  document says.  What do they get, 8.5 percent,

22  something like that.  I mean, that's -- generally

23  that's what they get.

24     MR. JIMENEZ:  Not generally.

```
1    BY THE WITNESS:

2         A.    Isn't that what it says, right?  If they

3    got 8.5, then they get 8.5 percent.

4    BY MR. GAUGHAN:

5         Q.    Well, if you look at Exhibit 4 --

6         A.    Okay.

7         Q.    -- and if you go to Exhibit C of this

8    document which is on Bates 60?

9         A.    60?

10        Q.    Yep.

11        A.    Okay.

12        Q.    This is talking about the same project,

13   but it says, "Fixed price (Turnkey Installation) of

14   project:  $11,103,584."

15              Did I read that correctly?

16        A.    Yes.

17        Q.    And I guess my question is, is that what

18   CTIEC would be receiving under this project?

19        A.    I mean, okay.  Where was that 4 million

20   number?  Is that 4 million number the number --

21        Q.    I guess it doesn't speak for itself.

22        A.    It does.

23        Q.    Well, explain it to me.

24        A.    It does.
```

Confidential - Subject to Further Confidentiality Review

1        Q.     Please explain it to me.

2        A.     Okay.  But I haven't gone through -- I

3    mean, if you guys read this, then you would know

4    exactly what it is.  Okay.

5        Q.     I did read it.

6        A.     All right.  So then -- here, I don't know

7    what all of these numbers are, okay, but here is

8    basically the deal, okay.  We'll just cut to the chase

9    here.  I'm wasting too much time here.

10            7.3 megawatts and the -- what's -- what's

11    the EPC price, a dollar -- what did we say?  So I

12    believe the $11 million is the total price for -- or

13    is it.  I'm sorry.  Where is that 11 million?

14        Q.     It is on Bates 60.

15        MR. GEORGE:  The top left.

16    BY THE WITNESS:

17        A.     No.  Where is that $4 million number?

18        MR. JIMENEZ:  That's on the Security Agreement.

19        MS. DALEY:  It is also in paragraph 2 of Exhibit

20    4.

21    BY MR. GAUGHAN:

22        Q.     It is Bates 31.

23        MS. DALEY:  It is also on Bates 37.

24    BY THE WITNESS:

Confidential - Subject to Further Confidentiality Review

```
1        A.    Okay.  Okay.  All right.  So I think the

2   more accurate number that we have to look at is in the

3   BOS agreement.

4   BY MR. GAUGHAN:

5        Q.    Well, do a calculation, because I want to

6   know how much they are getting under this project.  I

7   think the purpose of Exhibit C is to show me the

8   compensation that is contemplated for CTIEC under

9   this contract?

10        A.    No, not whatsoever, no.

11        Q.    What's is this number then?

12        A.    That number is what it costs to build this

13   project and that's the -- that's the number that

14   the -- yeah, that's the number that it's going to cost

15   to build the 7 megawatt, 7.3 megawatt Church Hill

16   project.

17        Q.    But so if we took -- so there is this $4

18   million number that we looked at in Exhibit C to

19   the Security Agreement we talked about earlier, it

20   gets $4 million to -- $4,358,518.07, that would be

21   what should be paid to the Sunpin Construction entity

22   we talked about earlier, correct?

23        A.    No.  I believe it's -- it should be -- now

24   I'm a little bit confused here, so.
```

Confidential - Subject to Further Confidentiality Review

1            Oh, okay.  Yeah.  Right.  So 11 million --

2    so the $4 million is the -- the construction costs.

3    That's the construction portion of it.  So that's the

4    general contractor's agreement.  So the construction

5    of it will cost $4 million out of that, out of this 11

6    million.

7        Q.    So if I subtract that $4 million from the

8    11, would the rest of that be going to CTIEC?

9        A.    No.  That goes to equipment, right.  A

10   schedule of values, where does it go to, you know.

11   All right.  So it goes to equipment, all of the other

12   things to build this project.  You have construction,

13   guys that build it, so you've got to pay them, and you

14   have got to buy the materials.  You've got to buy

15   things.

16       Q.    But isn't that -- you mentioned guys who

17   build it, equipment, isn't that underneath the 4

18   million we just talked about?  Is this the cost --

19       A.    Right, 4 million is the -- is just the

20   labor, let's simplify it.  4 million I believe is the

21   labor portion.  And the rest would go to buying the

22   panels, inverters, all of the equipment.

23       Q.    Who pays that, for the panels and

24   inverters?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    CTIEC.

 2        Q.    And who pays the labor?

 3        A.    CTIEC.  80 percent of the total price.

 4        Q.    Did they pay the labor on this project?

 5        A.    I -- well, they -- they pay it to a

 6   Sunpin, Sunpin pays the labor.  Not all of it.  I

 7   think we made an initial installment, right.  The

 8   project just got started.

 9        Q.    Okay.  Is this project currently underway?

10        A.    Yes, it is.

11        Q.    All right.  And this one is in Maryland,

12   is that --

13        A.    Yes.

14        Q.    Okay.  So you can't tell me what the level

15   of compensation would be under this contract with

16   CTIEC?

17        A.    8.5 percent, right.  It is in the

18   agreement.  We don't know how much money we are going

19   to make from this deal.  We can lose money, right.  We

20   have no idea.

21        Q.    But does CTIEC get paid based on the

22   amount of I guess energy that's provided in the

23   contract?

24        A.    No, no.  They get -- they get paid on the
```

Confidential - Subject to Further Confidentiality Review

1    profits.

2         Q.    Can you explain that to me?

3         A.    Okay.  If --

4         Q.    Well, for instance, this project we

5    mentioned before that you might sell it, you might

6    retain it, so how would C -- so if you retained it,

7    for instance, how would CTIEC be compensated?

8         A.    They would get, is it -- it is 8.5 percent

9    of the profits.  So it doesn't matter if we retain it

10   or whatever, they get their money back plus

11   8.5 percent.

12        Q.    So theoretically you might be paying them

13   profits at this venture if you were to sell energy to

14   people and keep this SPV in operation?

15        A.    Correct.  We would refinance it or -- you

16   know, and, yeah, we would have to pay them back plus

17   their 8.5 percent.

18        Q.    Okay.  I should ask you while I have all

19   of these exhibits in front of us, I guess Exhibits

20   4 -- 3 -- 3 through 7, would these be the type of

21   records that Sunpin would retain as part of its --

22   these type of activities, these sort of contracts?

23        A.    Yes, they would be in our office.

24        Q.    And these would be the normal documents

1    that you guys would prepare, you know, for any sort of

2    project like this?

3         A.    Correct, RKJ would.

4         MR. JIMENEZ:  I was going to say, could you

5    clarify who are you asking prepares?

6    BY THE WITNESS:

7         A.    Just to make it clear, I didn't write

8    these.

9    BY MR. GAUGHAN:

10        Q.    Okay.  Do you know who wrote them?

11        A.    Tom Rosenberg and Ron Hayden from our

12   office.

13        Q.    And that would be something that

14   Mr. Rosenberg would prepare these type of contracts at

15   the direction of Sunpin if there was a project?

16        A.    Correct.

17        Q.    Okay.  And that would be something that

18   would normally happen, this isn't like an unusual

19   thing?

20        A.    Yes, that would be normal.

21        Q.    And Sunpin would have entered these type

22   of contracts as part of its normal business

23   operations?

24        A.    Yes.

```
1        Q.    Okay.  And it would be standard practice

2    for Sunpin to retain copies of these, these type of

3    contracts?

4        A.    Yes.

5        MR. JIMENEZ:  Yes.

6    BY MR. GAUGHAN:

7        Q.    Do you know if anyone from CTIEC traveled

8    to the United States to participate in this project,

9    you know, either on site or, you know, before it even

10   started to review it?

11       A.    Yes.

12       Q.    Okay.  Who would that be?

13       A.    I don't know.  I don't know their names,

14   but I do know some came.

15       Q.    How many people, do you know how many

16   people?

17       A.    Two.

18       Q.    Two.

19             Okay.  What's the extent of their

20   involvement with this project?

21       A.    I think they are just kind of the eyes and

22   ears of CTIEC.

23       Q.    Okay.  Are they on site during the whole

24   project, do you know?
```

1      A.    I believe so.

2      Q.    Okay.  Do you know if there has been any

3  payments either to CTIEC or Sunpin on this project yet

4  by anyone?

5      A.    Yes.

6      Q.    Okay.  Can you tell me what the payments

7  were, when and where?

8      A.    I don't know.  Didn't we give that to you?

9      Q.    I -- okay.  So you don't know off the top

10  of your head, I'm just curious if you have an

11  understanding?  And we will go over them.

12      A.    I believe Sunpin gave the 20 percent and

13  the CTIEC gave the first installment and the

14  administrative fee.

15      Q.    Okay.  And we're talking about this

16  same project, the --

17      A.    Yes.

18      Q.    Okay.  That we've been talking about, the

19  one in Maryland, correct?

20      A.    It is the only project that we have had

21  any transactions on with them.

22      Q.    And if we turn to, I guess, Bates 51, the

23  same Exhibit 4 that we were looking at earlier?

24      A.    Yes.

Confidential - Subject to Further Confidentiality Review

```
1        Q.    You mentioned Mr. Peng before.  Is that

2   his signature for CTIEC, to your knowledge?

3        A.    Yes, it should be.

4        Q.    And if you turn to the very next page,

5   there is a collateral assess -- assignment of lease.

6              Do you see that?

7        A.    Yes.

8        Q.    And this is something that Sunpin

9   provided to CTIEC as part of I guess security on the

10  agreement?

11       A.    Yes.

12       Q.    Okay.  Is that standard practice, you

13  provide a sort of security for your projects?

14       A.    Project-by-project basis, no.  It depends.

15       Q.    Do you know why this was required in this

16  particular case?

17       A.    They are giving 80 percent of the money,

18  so.

19       Q.    So you provided them with a security

20  interest because they were -- that was something

21  they asked for?

22       A.    Yes.

23       Q.    Does CTIEC ever provide any security on

24  projects to you?
```

Confidential - Subject to Further Confidentiality Review

1       A.      This is our only project, so no.

2       Q.      They have not?

3       MR. JIMENEZ:  I think he answered the question.

4    BY MR. GAUGHAN:

5       Q.      Do you know why they haven't provided any

6    security?

7       A.      I don't know.

8       Q.      Was that something --

9       MR. JIMENEZ:  Would you define security?

10   BY THE WITNESS:

11      A.      What does that mean, security?

12   BY MR. GAUGHAN:

13      Q.      Well, we just looked at --

14      A.      Do you see any agreement that says?  I

15   don't know.  Is there an agreement that has that?  We

16   gave you all of the agreements, so if there was, if

17   there is an agreement that says that then --

18      MR. JIMENEZ:  Do you mean security like guards,

19   or what do you mean security?

20   BY MR. GAUGHAN:

21      Q.      Well, we just saw, we went over an

22   assignment of a lease, correct?

23      A.      Yes.

24      Q.      And that's something that, you know, in

Confidential - Subject to Further Confidentiality Review

1    this sense, security if there was a failure to provide

2    a -- you know, to live up to a financial obligation,

3    that would be deemed security for the agreement,

4    correct?

5         A.    Yes.

6         Q.    All right.  So that's the type of security

7    I'm talking about.

8              Has CTIEC ever provided that type of

9    security?

10        A.    As I said is -- I mean, we gave you all of

11   the documents, so if it's not in there, then no.

12        Q.    Okay.  But as a -- you are not aware of it

13   is what I'm trying to ask you?

14        A.    I'm not aware of it.

15        Q.    Okay.  Thank you.

16        A.    I'd just like to state that we gave you

17   everything.

18        Q.    And we've gone over everything, so that's

19   what we are doing.

20        A.    Well, you have it.  If you read it, then

21   you understand it.  There isn't anything going on

22   that's on the side or anything like that.  So

23   everything that you have, you have -- we have, you

24   have right now --

Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Move to strike.

2      A.    -- as an agreement.

3      Q.    If you look at Exhibit 6, which is a

4  Mortgage, and Exhibit 7, which is a Pledge and

5  Security Agreement.

6      A.    Okay.

7      Q.    Is this the type of security that Sunpin

8  or in this case Church Hill Solar Farms, LLC would

9  normally provide for this type of project?

10     MR. JIMENEZ:  I think he answered prior

11  project-by-project basis.

12  BY THE WITNESS:

13     A.    I don't -- this is -- everything is

14  by-project-by-project basis.

15     MR. GAUGHAN:  I'm going to object to the

16  speaking objection.

17  BY THE WITNESS:

18     A.    Yes, this is by project by project and in

19  this case there is one.  We've only done one project

20  with CTIEC, so we have no idea what will happen in --

21  if there is another project.

22  BY MR. GAUGHAN:

23     Q.    Well, Sunpin has done other projects.  Do

24  they normally do a mortgage like this?

Confidential - Subject to Further Confidentiality Review

 1      A.    Other projects Sunpin has done on its own,

 2  so, no.

 3      Q.    Okay.  So are you aware of other projects

 4  where they have done a mortgage?  You don't have to

 5  tell me which ones.  I just want to know if you are

 6  aware of other ones where Sunpin has actually done a

 7  mortgage?

 8      A.    Tom Rosenberg would probably know more

 9  than I, but I don't believe so.  I don't know.  I

10  don't think so.

11      Q.    You are not aware of it?

12      A.    Yeah, I'm not.

13      Q.    And if you look to the Exhibit 7 we talked

14  about earlier which was the Pledge and Security

15  Agreement, and this -- and this agreement looks like

16  Sunpin Solar Chicago, LLC and Sunpin Solar Development

17  LLC are providing a pledge and security agreement for

18  this same project we talked about earlier, is that

19  correct?

20      A.    Yes.

21      Q.    Okay.  Would that be something that Sunpin

22  would normally do on a project?

23      A.    I'm going to answer the same way.

24  Project-by-project basis.

1        Q.    Are you aware of -- are you aware of

2    Sunpin providing this type of pledge and security

3    agreement with other projects --

4        A.    Yes.

5        Q.    -- not involving CTIEC?

6        A.    Yes.

7        Q.    Okay.  And if you look at paragraph C, it

8    indicates that "Sunpin is obligated on a promissory

9    note ('Note'), which was entered into for the purpose

10   of financing Sunpin's acquisition of the CHSF

11   membership units, in the amount of $250,000 ('Note

12   Balance')."

13            Did I read that correctly?

14       A.    Yes.

15       Q.    Okay.  So, is it your understanding that

16   CTIEC actually provided financing to enable the

17   purchase of this Church Hill Solar Farms, LLC in this

18   particular project?

19       MR. JIMENEZ:  I object that the document speaks

20   for itself.

21   BY MR. GAUGHAN:

22       Q.    You can answer.

23       A.    I don't know.  The document speaks for

24   itself.  I -- I wasn't involved in the direct signing

1    of this.

2        Q.    You mentioned the document speaks for

3    itself, so if I read -- would you read this to say

4    that that's what happened, that CTIEC actually

5    provided financing for the acquisition of Church Hill

6    Solar Farms -- Solar Farms, excuse me, LLC?

7        MR. JIMENEZ:  I believe it states that

8    Sunpin is obligated on a promissory note.

9        MR. GAUGHAN:  Counsel, let him answer the

10   question.

11   BY THE WITNESS:

12       A.    As far as I know, CHSF -- no.  As far as I

13   know -- yeah, maybe it's just a prom -- promise --

14   it's a promissory note, so, no, I don't believe that

15   there has been financing by CTIEC for the acquisition

16   of the project.

17   BY MR. GAUGHAN:

18       Q.    And have you seen this promissory note

19   that's being referenced in this document?

20       A.    There is a promissory -- yes, there is a

21   promissory note between Sunpin and CHSF.  I've seen

22   that.

23       Q.    Is it the same one that's being referenced

24   in this paragraph here that we just talked about?

Confidential - Subject to Further Confidentiality Review

1        A.    I -- I don't know.  I mean, when we bought

2    the Church Hill project, we bought it in phases and,

3    you know, we gave a promissory note to the owner.

4        Q.    All right.  So, you just mentioned there

5    was some sort of promissory note between Church Hill

6    Farms, LLC and CTIEC, is that correct?

7        MS. DALEY:  No.  He said between Sunpin and

8    Church Hill Farms.

9    BY MR. GAUGHAN:

10       Q.    Is that -- I'm sorry.  Did I misstate your

11   testimony?

12       A.    No, I'm sorry.  I meant actually Sunpin

13   and the previous owner of the project.

14       Q.    Okay.  So you're not aware of any

15   promissory note that involved CTIEC and any other

16   entity with respect to this project?

17       A.    You know, I just -- I don't know enough

18   about this agreement to tell you the truth to really

19   expound upon it.

20       Q.    So you're not aware, though, as you sit

21   here today?

22       A.    Yeah, I -- as I said, I wasn't involved in

23   this, so I may be -- because I'm --

24       MR. JIMENEZ:  Could you clarify that?  Could you

Confidential - Subject to Further Confidentiality Review

1    reask the question for the record?

2    BY MR. GAUGHAN:

3        Q.    Okay.  I just want to know if he is aware

4    of any promissory note involving CTIEC and this

5    project that we've been talking about for the last 20

6    minutes?

7        A.    I personally am not --

8        Q.    As a 30(b)(6) witness.

9        A.    I haven't asked people, so I personally --

10   all I can say is I personally have -- don't know.

11   There may be, there may not be.  I don't know.  I

12   don't know.  That's --

13       Q.    And just for the record, you didn't -- you

14   didn't review any of these documents that we've been

15   talking about, 3 through 7, prior to today's

16   deposition?

17       A.     No, I have not.

18       MS. DALEY:  I'd just like to object on the

19   record to the --

20       MR. GAUGHAN:  Well, counsel, I don't know why

21   you making a speaking objection.  Is the objection to

22   form or --

23       MS. DALEY:  I am objecting on the record to the

24   shaming of the witness on 30(b)(6) topics.  Deposition

```
1    topics, there are two topics noticed.  First, "your

2    knowledge regarding the contract for the Wal-Mart roof

3    power plant project."  Clearly not at issue here.

4    Topic 2, "your knowledge regarding the conduct of any

5    business in the United States by Taishan or the

6    Taishan affiliates."  That doesn't mean --

7         MR. GAUGHAN:  Which is defined rather broadly.

8         MR. JIMENEZ:  He already stated that he didn't

9    know who Taishan was until --

10        MR. GAUGHAN:  Well, CTIEC is under our

11   definition a Taishan affiliate, so I don't understand

12   what the objection is.

13        MS. DALEY:  The objection is that the conduct of

14   any business in the United States does not require the

15   intimate review of every agreement that relates to any

16   business transaction.

17        MR. GAUGHAN:  I don't understand why you are

18   objecting on this basis.

19        MS. DALEY:  Because you are badgering the

20   witness about his failure to review documents that

21   aren't within the scope of the deposition topics.

22        MR. GAUGHAN:  I'm trying to establish that maybe

23   he is inadequate for the topics he has been designated

24   for, counsel.
```

 1       MS. DALEY:  And, again, I'm objecting to the

 2    grounds that -- on the grounds that these questions

 3    are outside of the scope of the deposition topics and

 4    he is perfectly well informed.

 5       MR. GAUGHAN:  How is that outside the scope?  We

 6    just talked about doing business by a Taishan

 7    affiliate.  We talked about CTIEC.

 8       MS. DALEY:  He is perfectly well informed on the

 9    subject of --

10       MR. GAUGHAN:  But how is it outside the --

11    listen --

12       MR. JIMENEZ:  For the record, he is the most

13    knowledgeable to be here to give this deposition.

14    We've already stated that.

15       MR. GAUGHAN:  Let's just move forward on this.

16    I mean, I -- you know I --

17       MS. DALEY:  I understand that we disagree on

18    this point, but it is important that I lay this

19    objection because if you guys say that they didn't

20    have a prepared witness and that you have to do

21    another 30(b)(6) deposition, we are going to disagree

22    with you because these questions are outside of the

23    scope of the deposition topics.

24       MR. GAUGHAN:  How so?  I mean, listen, should we

1   go off the record and talk about this?  I don't

2   understand why you are saying --

3        MR. GEORGE:  We'll get there when we get there.

4        MS. DALEY:  We disagree.

5        MR. GAUGHAN:  I'm asking the questions that I

6   think are appropriate.

7        MS. DALEY:  I'm not asking to stop you.  I'm

8   just laying the record for our issue if you try to lay

9   a -- to get another 30(b)(6) witness.

10        MR. GAUGHAN:  Your objection is on the record.

11   Can we just go forward?

12        MS. DALEY:  Absolutely.

13        MR. GAUGHAN:  What was the last question?

14        MR. JIMENEZ:  It was about a promissory note

15   between Sunpin and --

16        MR. GAUGHAN:  Why don't you just read back what

17   he said.

18                    (Indicating.)

19        MR. GAUGHAN:  Okay.  I think I have an answer to

20   that particular question.

21   BY MR. GAUGHAN:

22        Q.   And I guess maybe the thing to do is we'll

23   look at Exhibit 5, which is the one exhibit we haven't

24   looked at yet on this same deal.  If you'd just take a

Confidential - Subject to Further Confidentiality Review

1    quick look at that.

2          We talked before about I believe what was

3    the entities --

4        MR. JIMENEZ:  It is the EPC Short Form.

5    BY MR. GAUGHAN:

6        Q.    Okay, strike that.

7          What's your understanding of the nature of

8    an ECF agreement?

9        MR. JIMENEZ:  There is no such --

10   BY MR. GAUGHAN:

11       Q.    EPC, I'm sorry.

12       A.    It's an engineering, procurement,

13   construction agreement.

14       Q.    And I don't think we have to belabor this,

15   but this -- the purpose of this agreement here, is it

16   fair to say is -- it's appointing Sunpin Construction,

17   the entity we talked about before, as the general

18   contractor on the project?

19       A.    Sunpin is the general contractor, yes,

20   general developer/contractor, yes.  Responsible party,

21   I would say that.

22       Q.    And if you look at this particular

23   document at the top where it defines -- where it

24   mentions China Triumph International Engineering Co.,

```
1    Limited, it's design -- it is designated as the EPC

2    contractor, correct, that's the term that's used to

3    refer to --

4         A.    Um-hum, yes.

5         Q.    -- CTIEC, correct?

6         A.    Yes.

7         Q.    And if you turn to Bates 68, we see under

8    the heading "Project Cost/Payment Schedule.  Fixed

9    price, all inclusive Contract."

10        A.    Where are you?  I'm sorry.

11        Q.    It is at the very top of Bates 68.

12        A.    68?

13        MR. JIMENEZ:  I don't have 68.

14        MR. GAUGHAN:  It is Exhibit 5.

15        MR. JIMENEZ:  Yeah, Exhibit 5 goes -- starts at

16   001.

17        MS. DALEY:  We don't have a 68.

18        MR. JIMENEZ:  It is 001 to 009.

19        MS. DALEY:  Ours stops at 55.

20        MR. GAUGHAN:  Oh, maybe I have a wrong number.

21   That should be -- I don't think I marked that one yet.

22   I can fix it.

23        MR. JIMENEZ:  To be -- on the record, we are

24   looking at the EPC short-form agreement.
```

1      MR. GAUGHAN:  Let's go off the record just for a

2  minute.  I have to figure out what I did with these

3  exhibits.

4      THE VIDEOGRAPHER:  Off the record, 12 noon.

5              (WHEREUPON, a recess was had

6               from 12:00 to 12:04 p.m.)

7              (WHEREUPON, a certain document was

8               marked Kim Deposition Exhibit No. 8,

9               for identification, as of

10              04/17/2015.)

11      THE VIDEOGRAPHER:  On the record 12:04.

12  BY MR. GAUGHAN:

13      Q.    And my apologies.  Apparently before my

14  Exhibit 5 I put in by accident was a different

15  document.  So what's -- what's being marked as Exhibit

16  8 --

17      A.    Okay.

18      Q.    -- was, you know, the document that I was

19  intending to refer to, and we'll come back to 5 in a

20  little bit.

21          But just -- and maybe the thing to do now

22  is just take a look at 5 and 8.

23      A.    Um-hum.

24      MS. DALEY:  I'm sorry.  We are leaving the

1    previously marked 5 as 5?

2         MR. GAUGHAN:  Yes.

3         MS. DALEY:  And marking a different exhibit?

4         MR. GAUGHAN:  Yes, because there is testimony on

5    5, I'm sorry, by accident.

6    BY THE WITNESS:

7         A.    Oh, I think I gave you back 5 or

8    something.  Okay.  Here, I've got it.

9    BY MR. GAUGHAN:

10        Q.    Okay.  And I guess I'll start by asking

11   you, if you'll just take a look at those documents and

12   tell me, are these the type of documents that Sunpin

13   or counsel for Sunpin would have prepared at or near

14   the time these contracts were entered into?

15        A.    Yes.

16        Q.    Okay.  And these would be contracts that

17   would be executed as part of Sunpin's normal business

18   practices?

19        A.    Yes.

20        Q.    And they would be retained also as part of

21   Sunpin's normal business practices, correct?

22        A.    Yes.

23        Q.    Okay.  And you can put 5 aside for now.

24        A.    Okay.

```
1        Q.    And we'll take a look at 8, which I
2   thought I was asking about before, but, you know,
3   we'll clarify that.
4             And this is an EPC agreement between
5   Church Hill Solar Farm, LLC and China Triumph
6   International Engineering Co., Limited, dated
7   November 26, 2014, correct?
8        A.    Yes.
9        Q.    And, you know, we started -- we started
10  talking about this before, but this would have been
11  the agreement for the general contracting services for
12  the project?
13       A.    The EPC part, yes.
14       Q.    Okay.  Can you clarify that, EPC?
15       A.    Engineering, procurement and construction.
16       Q.    Okay.  And under this document, China
17  Triumph International Engineering Co., Limited is
18  defined as the EPC contractor, correct?
19       A.    Under this document, correct.
20       Q.    Okay.  And if you turn to page Bates 68
21  under paragraph 2, Project Costs/Payment Schedule.
22  Fixed price, all inclusive contract.  It says, "CHSF
23  agrees to pay EPC Contractor the EPC Contractor's
24  Fixed Price as defined herein.  The budgeted total
```

1    contract amount of US$1.512/watt, comparing a total

2    fixed price" -- "comprising a total fixed price of" 11

3    million 100 -- 300,584 dollars?

4        MS. DALEY:  103,000.

5    BY MR. GAUGHAN:

6        Q.    Let me read the amount again.

7    "$11,103,584."

8            Did I read that correctly?

9        MR. JIMENEZ:  You did.

10   BY THE WITNESS:

11       A.    Yes.

12   BY MR. GAUGHAN:

13       Q.    I did?

14       A.    Yes.

15       Q.    Okay.  And we talked a bit before when we

16   looked at different documents about this $11 million

17   figure, correct?

18       A.    Yes.

19       Q.    And so this is the price of the contract

20   to compensate CTIEC, correct?

21       MR. JIMENEZ:  Objection; that was asked and

22   answered already.

23       MR. GAUGHAN:  Well, this is a different

24   document, counsel, and I'm going to object to the

1    speaking objection.

2    BY THE WITNESS:

3         A.    Okay.  What this is is the price that

4    includes their profit, so this would be the price

5    that, you know, at the end of the day we would pay it

6    back to the EPC contractor.

7    BY MR. GAUGHAN:

8         Q.    Okay.  And that in this case is CTIEC,

9    correct?

10        A.    Yes.

11        Q.    You can put that document aside.

12              Now we'll move back to 5.

13        A.    Okay.

14        Q.    And this is an EPC Short-Form Agreement

15   between Sunpin Walmart Avon-North Oxford, LLC, under

16   that -- underneath that we see Sunpin and China

17   Triumph International Engineering Co., Limited.

18              Is that correct?

19        A.    Yes.

20        Q.    And this is dated February 25, 2015, if

21   you turn to Bates 2, the second page of the document,

22   correct?

23        A.    Yes.

24        Q.    Okay.  And we talked about this a little

 1    bit before, this is the project involving Wal-Mart,

 2    correct?

 3         A.    Yes, yes.

 4         Q.    Okay.  And I guess so you have executed a

 5    contract with CTIEC with respect to this project,

 6    correct?

 7         A.    A short-form agreement, what you see in

 8    place here.

 9         Q.    Okay.  What's the distinction between

10    a contract and a short-form agreement?

11         A.    This is just a placeholder for the

12    long-term agreement.

13         Q.    What's the -- is that long-term agreement

14    what we looked at before?

15         A.    There isn't one for this project.

16         MR. JIMENEZ:  I want to clarify, long form.

17    BY THE WITNESS:

18         A.    Long form, I'm sorry.  I'm sorry.  Long

19    form.  This is just a I would say more closely in line

20    for like an MOU, you know, like more of a placeholder.

21    BY MR. GAUGHAN:

22         Q.    Okay.  But has this project actually been

23    commenced, I guess, yet?

24         A.    No.

1       Q.    When is it set to commence?

2       A.    Still negotiating.  We've been negotiating

3    for a little while, so.

4       Q.    With Wal-Mart?

5       A.    No.  Our construction team.

6       Q.    Okay.  And do you have any sense of when

7    the project will actually begin at this time?

8       A.    Hopefully the next couple of months.

9       Q.    Okay.  But you have -- has there been any

10   payments under this contract?

11      A.    No.

12      Q.    Okay.  And by that I mean to anyone, to

13   Sunpin or to CTIEC?

14      A.    No.

15      Q.    But when this contract -- I guess you did

16   sign an agreement with CTIEC that you would use their,

17   I guess, equipment and services when this -- when this

18   contract does actually come to fruition?

19      A.    Whatever is in the short-form agreement is

20   what we agreed to.

21      Q.    Okay.  What's the nature of this project,

22   to your understanding?

23      A.    As I said before --

24      MR. JIMENEZ:  I believe he already answered

1    that.  So objection; asked and answered.

2    BY THE WITNESS:

3        A.    As I said before, two Wal-Mart stores and

4    we are going to build panels on top of it.

5    BY MR. GAUGHAN:

6        Q.    Okay.  And that's up in Massachusetts?

7        A.    Correct.

8        Q.    And CTIEC would supply the actual

9    panels, is that correct?

10        A.    In conjunction with working with us, yes.

11        Q.    Okay.  And this entity that was set up or

12    is to be set up, the Sunpin Walmart Avon-North Oxford,

13    LLC, is that an existing corporate entity, it has

14    been incorporated?

15        A.    Wal-Mart -- yes.

16        Q.    Okay.  And is that -- to your knowledge,

17    is that an entity that is owned by Sunpin?

18        A.    Yes.

19        Q.    Okay.  Do you know if CTIEC has any stake

20    or ownership interest in that entity?

21        A.    No.

22        Q.    Are they going to -- do you know if there

23    has been any discussion of them requiring you to

24    execute any sort of pledge or, you know, lease,

1    assignment, mortgage, anything like that?

2        A.    We have not gone into any discussions on

3    that with CTIEC.

4        Q.    If you look at paragraph 5 which is on

5    Bates 3.

6        A.    Okay.

7        Q.    This indicates a -- that "The price paid

8    by Sunpin to CTIEC shall be" $2.50 "per MW of

9    installed peak power."

10            Did I read that correctly?

11        MR. JIMENEZ:  No.  2.55.

12    BY MR. GAUGHAN:

13        Q.    Okay.  Let me read that again.

14            Under Pricing it says, "The price paid by

15    Sunpin to CTIEC shall be $2.55 per M" -- "MW of

16    installed peak power."

17            Did I read that correctly?

18        A.    Yes.

19        Q.    And if you turn to page -- I guess Bates

20    5.

21        A.    Okay.

22        Q.    This is signed by Sunpin Walmart

23    Avon-North Oxford, LLC, it is signed buy Tian Li, is

24    that correct?

Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    And for China Triumph International

3   Engineering Company, Limited, by Shou Peng, is that

4   correct?

5        A.    Yes.

6        Q.    Do you know where this was executed?

7        A.    Yes.

8        Q.    Where?

9        A.    In Newark.

10       Q.    And this was the -- what we talked about

11  before where you guys went up to Newark and then you

12  met for dinner?

13       A.    Yes.

14       Q.    You met at -- initially you guys were at

15  New Jersey Institute of Technology?

16       A.    Yes.

17       Q.    Okay.  And if you look on Exhibit C to

18  this document, which is on Bates No. 8, it indicates a

19  Fixed Price (Turnkey Installation) of Project of Two

20  Million Five Hundred Ninety Four and Forty-Five

21  Thousand One Hundred Fifty Three and 25/100 dollars,

22  is that correct?

23       A.    Yes.

24       Q.    And do you know who would receive that

Confidential - Subject to Further Confidentiality Review

1    payment under this contract?  Would this be to Sunpin

2    or, you know, would it be to --

3         A.    Yeah --

4         Q.    -- CTIEC?

5         A.    -- I might have confused a few things, but

6    I believe -- it is just the way it's worded.

7              Is there a calculator?  I mean, if it's

8    2.55 times -- I can be more precise if I had a

9    calculator.

10                  (WHEREUPON, a calculator was

11                  tendered to the witness.)

12   BY THE WITNESS:

13        A.    Okay.  Yes.  So what that is is at the end

14   of the project that Sunpin Walmart Avon-North Oxford

15   would pay to China Triumph International Engineering

16   Company, I guess at a time period after, that includes

17   their construction costs plus 1.5 percent for

18   personnel, administrative costs and advanced capital

19   costs for the project, plus a profit margin of 7

20   percent of the advanced capital costs of the project.

21        Q.    Okay.

22        A.    But that would have been the same with the

23   Church Hill project and I might of confused it at that

24   time as just simply the construction EPC costs.  It

Confidential - Subject to Further Confidentiality Review

1    was the EPC costs plus the profit.

2        Q.    Either way, it would contemplate a payment

3    of, you know, 2.5 million, approximately, in this case

4    from Sunpin to CTIEC, correct?

5        A.    It is a price -- yes, but --

6        Q.    Yes, right?

7        A.    But -- yes, but 92 percent of that is the

8    construction cost.

9        Q.    But I'm just trying to --

10       A.    You are getting to the profit, right, so

11   just take 7 -- 8.5 percent of that and that's the

12   profit.

13       Q.    Well, I understand, but I just want to

14   establish there would be an actual -- the

15   contemplation of this agreement is there would be an

16   actual payment for 2.5 million, and I understand the

17   profit is 8.5 percent of that?

18       A.    Right.

19       Q.    There is actually contemplated there is

20   going to be a payment of 2.5 million under this

21   agreement?

22       A.    I disagree with the term "payment".

23       Q.    What would you -- how would you

24   characterize it?

Confidential - Subject to Further Confidentiality Review

```
 1        A.     Returning the construction cost plus

 2   the -- plus their profit.

 3        Q.     How about if we call it a wire transfer?

 4        A.     I -- I don't know.  I don't know if it

 5   will be a wire transfer.  I have no idea.

 6        Q.     Transfer of funds, whether it's via wire

 7   or check or whatever?

 8        A.     I don't know because what if we don't make

 9   any profit.  There is -- there is -- this is something

10   that we are perceiving.

11        Q.     That's what's contemplated under the

12   agreement?

13        A.     Right, that's what's contemplated.

14        Q.     That's what I want the answer to, so the

15   contemplation of this agreement is we would -- you

16   would or Sunpin would send funds, whether they are by

17   wire or check or Pony Express, and send them to CTIEC

18   in the amount of 2.5 million, correct?

19        A.     In the scenario where everything works

20   perfectly well, yes.

21        Q.     Okay.  That's fine.  Thank you.  And I

22   guess I'm up to my next exhibit.

23                    (WHEREUPON, a certain document was

24                     marked Kim Deposition Exhibit No. 9,
```

Confidential - Subject to Further Confidentiality Review

```
 1                    for identification, as of

 2                    04/17/2015.)

 3        MS. DALEY:  This is 9?

 4        MR. GAUGHAN:  This is, yes, 9.

 5   BY MR. GAUGHAN:

 6        Q.    Have you seen this document before?

 7        A.    Yes, I have.

 8        Q.    When did you see it?

 9        A.    Initially?

10        Q.    Yes.  In development are you going to tell

11   me, when it was being drafted?

12        A.    Yeah, when it was being drafted.

13        Q.    Okay.  How about in its final form?

14        A.    Final form, last I saw it, when we signed

15   it, I guess.  When was that?

16        Q.    It's a -- I think you are probably looking

17   for -- where are the Bates numbers on this thing --

18        A.    September 26th, 2014.

19        Q.    2014.

20              And this is again signed by Li, Tian, is

21   that correct?

22        A.    Correct.

23        Q.    Okay.  And this would be the contract

24   between Sunpin Walmart Avon-North Oxford, LLC and
```

Confidential - Subject to Further Confidentiality Review

```
1   Wal-Mart, correct?

2       A.    Correct.

3       Q.    And according to the cover, it was

4   August 1, 2014, correct?

5       A.    Correct.

6       Q.    And this involves one of the two stores.

7   This is the one in Avon, Massachusetts?

8       A.    No, it should be both stores.

9       Q.    Look at the first page, look at the cover,

10  the bottom, Store No. 2122-Avon?

11      A.    Oh, yeah.  They are identical.

12      Q.    Okay.  And is it your -- just to kind of

13  speed things along, is it your understanding that this

14  agreement contemplates that Sunpin would install these

15  roof panels and operate them for Wal-Mart?

16      A.    Yes.

17      Q.    And then you would -- you would receive

18  profit based on their usage of energy supplied through

19  these solar panels?

20      A.    No, not profit.  It would be a payment --

21      Q.    Compensation?

22      A.    -- that we -- yeah, compensation.

23      Q.    And, again, would this be a document that

24  I guess your legal department would prepare, you know,
```

1   with respect to this sort of project?

2        A.    Actually, this was prepared by Wal-Mart.

3        Q.    Okay.  And but this was -- this would be a

4   document that your legal department would normally

5   retain after execution of this type of agreement?

6        A.    RKJ would, yes, review this document.

7        Q.    And this is the type of contract that

8   Sunpin would normally enter with respect to its, you

9   know, business of providing power services?

10       A.    Yes.

11       Q.    And after reviewing this document, this --

12   is it your understanding this is the actual contract

13   that was executed with Wal-Mart?

14       A.    Yes.

15       Q.    Okay.

16       MR. GAUGHAN:  Okay.  Why don't we just go off

17   the record.

18       THE VIDEOGRAPHER:  End of Tape 1, deposition of

19   Steve Kim.  Off the record.

20                   (WHEREUPON, a recess was had

21                    from 12:23 to 12:36 p.m.)

22                   (WHEREUPON, a certain document was

23                    marked Kim Deposition Exhibit No. 10,

24                    No. 11, No. 12, No. 13, No. 14 and

Confidential - Subject to Further Confidentiality Review

1           No. 15, for identification, as of

2           04/17/2015.)

3       THE VIDEOGRAPHER:  This is Tape 2, deposition of

4    Steve Kim.  The time is 12:36.  On the record.

5       MR. GAUGHAN:  We are back on?

6       THE VIDEOGRAPHER:  Yes.

7    BY MR. GAUGHAN:

8       Q.   I'm showing you what's been marked as

9    Exhibit 10.

10          Have you seen that document before?

11      MS. DALEY:  I don't think we --

12      MR. GAUGHAN:  It is right there.  I'm sorry.

13   BY THE WITNESS:

14      A.   Yes, I have.

15   BY MR. GAUGHAN:

16      Q.   Okay.  Can you tell me what the nature of

17   this document is?

18      A.   It's an Administration Provision Agreement

19   between China Triumph International Engineering and

20   Sunpin Solar Chicago.

21      Q.   Okay.  And we talked about CTIEC was going

22   to send some people over to the United States earlier,

23   correct?

24      A.   Correct.

Confidential - Subject to Further Confidentiality Review

1        Q.    This talks about two individuals.  If you

2   look on page 101, it talks about Contractor's Staff.

3              Do you see that?

4        A.    Yes.

5        Q.    And it says, "The Contractor desires to

6   dispatch at least" -- "dispatch at least two

7   people" -- "two of its employees to the Project

8   Construction site through the entire Project

9   Construction period for the purpose of supervision and

10  management of the Project Construction."

11             Did I read that correctly?

12       A.    Yes.

13       Q.    Okay.  And so this was an agreement that

14  Sunpin executed with CTIEC with respect to bringing

15  CTIEC personnel over to the United States for this

16  project in Maryland we talked about earlier, correct?

17       A.    Yes.

18       Q.    Okay.  And to your knowledge, people have

19  actually come over to that site from CTIEC, is that

20  correct?

21       A.    Yes.

22       Q.    And you don't know who those people are?

23       A.    Not by names.

24       Q.    Do you know how long they have been in the

1   United States?

2        A.     Not exactly.

3        Q.     Do you know approximately when they came

4   over?

5        A.     Maybe a few weeks.

6        Q.     A few weeks?

7        A.     Three weeks maybe.

8        Q.     Okay.  When did the project begin?

9        A.     Oh, it's hard to say because there is

10  different portions of a project, you know,

11  construction, there is the engineering portion, design

12  portion, so.

13       Q.     Well, do you have an understanding of why

14  CTIEC was sending people here?  Was it for the

15  construction phase or was it other?

16       A.     I believe it's for the construction phase.

17       Q.     Do you know when the construction phase

18  began?

19       A.     It hasn't actually begun quite yet.

20       Q.     But you believe they do have two

21  individuals -- at least two individuals in the

22  United States for this project?

23       A.     Yes.

24       Q.     Okay.

```
 1          THE VIDEOGRAPHER:  It looks like we lost the

 2     stream for a second.  Can you give me one second?

 3          MR. GAUGHAN:  Okay.

 4               (WHEREUPON, discussion was had off the

 5                stenographic record.)

 6     BY MR. GAUGHAN:

 7          Q.    So just getting back to your earlier

 8     test -- earlier testimony, you indicated you believe

 9     these individuals had been in the United States for

10     approximately three weeks?

11          A.    I believe so, yes.

12          Q.    Okay.  And we'll just move on from that,

13     but this -- so this contract, essentially, just to

14     recap, is, you know, basically providing the

15     groundwork for those employees to come to the

16     United States and observe the project we talked about

17     in Maryland?

18          A.    Yes.  Well, specifically I think more that

19     this contract is just -- they are just reimbursing us

20     because, you know, we are nice people and we are

21     just -- they don't know want to -- they don't know

22     anywhere, so we are just providing some lodging and

23     helping them get around, yeah.

24          Q.    Okay.  You are helping them with lodging.
```

1      A.    Helping them, you know, pay their rent and

2   stuff.

3      Q.    And then if you go to Part 2 which is on

4   Bates 102, there is a contract price listed of

5   $99,000?

6      A.    Um-hum.

7      Q.    Okay.  Is that -- that would be for -- is

8   it a one-year time period that this is contemplated

9   for?

10     A.    I believe it's for the entirety of the

11  project --

12     Q.    Okay.

13     A.    -- yeah, but not last a year.

14     Q.    I mean, I guess that's my point.  That's

15  kind of a large number, so do you anticipate that

16  they are going to be here for some period of time

17  or that it is going to require $99,000.

18     A.    Well, I mean, it may be more, less.

19  It's -- you know, they need cars, they need lodging,

20  you know, they may have other people coming.  So --

21     MR. JIMENEZ:  For the record, I think there is

22  an annex which is --

23  BY THE WITNESS:

24     A.    Oh, yeah, the temporary office, that's

1    going to be costly.

2    BY MR. GAUGHAN:

3        Q.    Okay.  So there is other -- there is

4    additional costs as well?

5        A.    Yeah, um-hum.

6        Q.    Okay.  Do you have an anticipated timeline

7    for this project, the construction phase of it?

8        A.    Four months.

9        Q.    Four months, okay.  And you can put that

10   aside.

11           I think what I might do is I marked a

12   couple of exhibits here, so I'm just going to give you

13   all three of -- all five of them to look at at once.

14   There is 11.  11 for you guys.  12, 13.  Oops.

15       MR. JIMENEZ:  I think 12 and 13 are the same.

16       MR. GAUGHAN:  Yeah, I was going to ask that.

17   BY THE WITNESS:

18       A.    Yeah, they are the same.

19   BY MR. GAUGHAN:

20       Q.    So this is 14 and here is 15.

21           Okay.  So I'm showing you what's been

22   marked as Exhibits 11 through 15 to your deposition.

23           Have you seen these documents before?

24       A.    Yes.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  What's your understanding of what

 2   these documents are?

 3        A.    These are wire transfers to and from CTIEC

 4   and Sunpin.

 5        Q.    Okay.  So the first exhibit is 11.  We see

 6   an outgoing wire transfer to the Bank of China Limited

 7   and it looks like Beijing, China by China -- or To

 8   China Triumph International, is that correct?

 9        A.    Yes.

10        Q.    And what -- do you know what this payment

11   was for?

12        A.    It was a portion of our 20 percent.

13        Q.    Okay.  So this didn't represent any sort

14   of profits or --

15        A.    No.

16        Q.    -- anything like that?

17        A.    No.

18        Q.    And it wasn't for costs, or was it for

19   costs?

20        A.    No.  It's for -- according to our

21   agreement, Sunpin is required to put in 20 percent of

22   the project costs and this was one payment of it.

23        Q.    Okay.  And you can put that aside.

24        MR. JIMENEZ:  And for which project?
```

Confidential - Subject to Further Confidentiality Review

```
 1        THE WITNESS:  Sorry.  The Maryland Church Hill

 2   solar project.

 3   BY MR. GAUGHAN:

 4        Q.    Okay.  And then flipping to 12 and 13, and

 5   I'm just going to ask generally, these -- I mean, they

 6   are attached to an e-mail from your counsel.

 7        MR. JIMENEZ:  Yes, I duplicated.  I'm sorry.  I

 8   attached the same one twice.

 9   BY MR. GAUGHAN:

10        Q.    Okay.  So they are the same -- they are

11   the same transaction?

12        MR. JIMENEZ:  Yes, they are.

13   BY THE WITNESS:

14        A.    Yes.

15   BY MR. GAUGHAN:

16        Q.    So I'll ask you only about 12 then.

17              And this is another outgoing wire transfer

18   from Bank of -- or excuse me.  I guess it's to Bank of

19   China Limited, head office in Beijing, specifically To

20   China Triumph International?

21        A.    Yes.

22        Q.    Is that correct?

23        A.    Correct.

24        Q.    And this is from January 22nd, 2015?
```

```
 1        A.    Yes.

 2        Q.    Do you know what this payment was for?

 3        A.    It was another payment to go to the

 4   20 percent required --

 5        Q.    Okay.

 6        A.    -- from Sunpin.

 7        Q.    This didn't represent profits or costs or

 8   anything like that?

 9        A.    No, it did not.

10        Q.    And just flipping back to Exhibit 11 real

11   quick, I just wanted to confirm the date of that

12   transfer is -- that we spoke about of 200,000 was

13   December 1st of 2014?

14        A.    Yes.

15        Q.    And then if we go to Exhibit 14, we see an

16   incoming wire transfer from -- on March 16th, 2015,

17   correct?

18        A.    Correct.

19        Q.    And this is from Bank of China New

20   York branch and it is for Sunpin Construction

21   Management LLC, correct?

22        A.    Correct.

23        Q.    And what's the nature of this transfer, to

24   your knowledge?
```

Confidential - Subject to Further Confidentiality Review

1        A.     This is the first installment to Sunpin

2   Construction Management from CTIEC.

3        Q.     Does this represent a 20 percent payment?

4        A.     No.  It is part of their 80 percent

5   payment.

6        Q.     Okay.  So was there a separate 20 percent

7   payment at some point?

8        A.     Well, the 20 percent payment is -- is

9   our -- is Sunpin's portion to pay for the project.

10       Q.     I understand.

11       A.     So we initially paid the 20 percent.

12       Q.     So this would represent payment of the

13   initial 80 -- I guess the 80 percent, correct?

14       A.     Right, but they are not going to pay all

15   at once.  It is an installment.

16       Q.     Okay.  Do you have an appreciation of

17   whether I guess CTIEC has a bank account in New York?

18       A.     I guess I just saw it now.  I did not know

19   that.

20       Q.     Okay.  You did not know anything about

21   that previously?

22       A.     No, I did not.

23       Q.     Okay.  Now moving to Exhibit 15, we see

24   another incoming wire transfer on 3/16/2015 for

1    $29,997, is that correct?

2         A.    Yes.

3         Q.    Again, this is from Bank of China New York

4    to Sunpin Holdings LLC Chicago?

5         A.    Yes.

6         Q.    Correct?

7         A.    Yes.

8         Q.    And do you know what this payment was for?

9         A.    Yes.  It's the first payment for the

10   administrative fee.

11        Q.    I'm sorry.  For the administrative

12   payment?

13        A.    Yes.

14        Q.    Is that what we just talked about, that

15   last contract we looked at of the employees coming

16   over?

17        A.    Yes.

18        Q.    Were there any issues with CTIEC getting

19   the wire out to you, any of the wires we just

20   discussed to Sunpin?

21        A.    Not that -- not that I'm personally aware

22   of.

23        Q.    And they were timely?

24        A.    Yes, correct, yes.

Confidential - Subject to Further Confidentiality Review

```
1        Q.    Are these the only wires that you are

2   aware of between CTIEC and Sunpin?

3        A.    No.  There is another wire that we don't

4   have a copy of here.

5        Q.    And what is that wire?

6        A.    It's for I believe our final 20 percent

7   which -- part of the 20 percent which is around

8   800-some-thousand dollars.

9        Q.    When did that payment transpire?

10       A.    It was a fairly recent payment, I think.

11       Q.    Okay.  Within the month of April?

12       A.    Maybe March.

13       Q.    Do you -- I guess we can get a more

14  definite timeframe on that?

15       A.    Yeah, and we can give you a copy.

16       MR. JIMENEZ:  And I can get you that document.

17  We just couldn't locate it before today.

18  BY MR. GAUGHAN:

19       Q.    Okay.  So your understanding is there is

20  another payment for $800,000, you believe it was at

21  the end of March, is that correct?

22       A.    I can't -- I mean, it is around March.  I

23  just don't remember.

24       Q.    March or April, one of the two?
```

Confidential - Subject to Further Confidentiality Review

1    A.    Yeah.

2    Q.    And, again, that was an incoming payment

3    from CTIEC, is that correct?

4    A.    No.

5    Q.    Oh, it was an outgoing payment?

6    A.    From Sunpin to CTIEC to finalize our

7    20 percent.

8    Q.    Okay.  That was the remaining payment on

9    the 20 percent we talked about earlier?

10   A.    Yes.

11   Q.    Okay.  And that's it, no other payments

12   that you are aware of?

13   A.    Yes.  I don't -- I'm not aware of any

14   others.

15   Q.    I do want to direct you back to the Notice

16   of Deposition that we talked about.  That is

17   Exhibit 1.

18   A.    Wait.  I'm sorry.  Did I -- how much did I

19   say that was our final payment?

20   Q.    You said 800,000, I believe.

21   A.    Yeah, yeah, 750,000, I think it was 750.

22   Q.    750, okay, I understand.

23   A.    The total amount was 2.2 million, so.

24   Q.    Okay.  And if you want to just take a look

Confidential - Subject to Further Confidentiality Review

1    at -- if you don't mind, if you could go to I guess at

2    the top where it says page 20 -- it should say 25 of

3    28.

4         A.    Go to page 25?

5         Q.    Yes, 25 of 28.

6         A.    Okay.

7         Q.    Have you seen this document before?  It

8    was attached to the deposition notice.

9         A.    The first time I saw it was with this

10   deposition.

11        Q.    Okay.  And this was a -- appeared on

12   CNBM's website, one of the entities we spoke of

13   before, correct?

14        A.    Yes.

15        Q.    Okay.  And this is talking about the

16   Sunpin's and I guess CI -- CTIEC and, you know, deal

17   with Wal-Mart, correct?

18        A.    Yeah, well, yes.

19        Q.    Well, that's what I wanted to ask you

20   about.

21             The second paragraph there says -- it

22   talks about a cooperative agreement.  Do you see that,

23   in the second paragraph?

24        A.    Yes.

Confidential - Subject to Further Confidentiality Review

1      Q.    And it says, "Under the cooperative

2   agreement, CTIEC will work with Sunpin to contract" --

3   "construct," excuse me, "roof solar power plants for

4   Wal-Mart's some 1,000 supermarkets in North America,

5   with a total installed capacity of some 500MW."

6           Did I read that correctly?

7      A.    Yes.

8      Q.    And then it says, "Located in

9   Massachusetts, the first two power plants involved in

10  the project will commence in April 2015."

11          Did I read that correctly?

12     A.    Yes.

13     Q.    Do you have any reason to dispute there is

14  a cooperative agreement for the construction of roof

15  panels involving 1,000 supermarkets?

16     A.    Yes.  I don't know where that came from.

17     Q.    So you don't believe this is accurate?

18     A.    I -- for what I know of, if they -- I

19  don't know if they have some other agreement with

20  Wal-Mart, but I think this is a little bit some kind

21  of more marketing, I would say.

22     Q.    So you don't -- so from your perspective,

23  Sunpin doesn't have an agreement with Wal-Mart to --

24  or hasn't explored any possibility of doing additional

Confidential - Subject to Further Confidentiality Review

1    work for other stores other than the two we talked

2    about in Massachusetts?

3        A.    No.  The agreement that I showed you that

4    you have are --

5        Q.    Okay.

6        A.    -- is the extent of our agreement.

7        Q.    I just wanted to confirm, there has been

8    no discussion by anyone at Sunpin with Wal-Mart or

9    anyone else that, you know, Sunpin was going to do

10   work for these other Wal-Mart stores referenced in

11   this blurb.

12       A.    We would like to eventually, but -- but

13   there are -- we have to do these projects, so, no.

14       Q.    Okay.  So there has been no discussion?

15       A.    No.

16       Q.    Okay.  And you can put that aside.

17       MR. JIMENEZ:  Can you imagine the delta?

18       THE WITNESS:  I know, that would be great.

19       MR. JIMENEZ:  We'd have to hire more staff.

20       THE WITNESS:  I wish the press release was true.

21       MR. GEORGE:  We have some space you can use.

22       MR. JIMENEZ:  I wouldn't want to drive out here

23   every day.

24       MR. GAUGHAN:  Let's mark this, just one more.

```
 1   BY MR. GAUGHAN:

 2        Q.    I just want you to authenticate this next

 3   exhibit.

 4        A.    Okay.

 5              (WHEREUPON, a certain document was

 6               marked Kim Deposition Exhibit No. 16,

 7               for identification, as of

 8               04/17/2015.)

 9   BY MR. GAUGHAN:

10        Q.    Okay.  Take a look at Exhibit 16.

11              This is -- we talked about -- or we looked

12   at the earlier contract with Wal-Mart for the first

13   of -- or I guess the two stores.  This is the other

14   store.

15              Can you just confirm that you've seen this

16   document before?

17        A.    Yes, I have.

18        Q.    And is that a true and accurate copy of

19   your contract with Wal-Mart for the second store?

20        MS. DALEY:  Counsel, do you have any more

21   copies?

22        MR. GAUGHAN:  I don't, but you are welcome to

23   look at if you want.

24        MR. JIMENEZ:  This is not the Avon?
```

Confidential - Subject to Further Confidentiality Review

1        MR. GAUGHAN:  This is the other location.

2    BY THE WITNESS:

3        A.    This is the North Oxford.

4              Yes, I believe so.  I see the signature

5    page.  I believe so.

6    BY MR. GAUGHAN:

7        Q.    So it is an accurate copy?

8        A.    I believe so.

9        Q.    Okay.  And you can provide it to anyone

10   who wants to look at it.

11       MR. GAUGHAN:  Can I ask questions or do you

12   guys --

13       MS. DALEY:  Oh, yes, that's fine, please.  Go

14   ahead.

15   BY MR. GAUGHAN:

16       Q.    And, again, same questions I asked you

17   about the other Wal-Mart contract.  I understand that

18   was prepared by Wal-Mart's counsel?

19       A.    Yes.

20       Q.    But that would be something that would

21   have been common, you know, for you to execute that

22   sort of contract when you are entering that sort of

23   deal with a party, correct, for Sunpin?

24       A.    Yes.

Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.   And that's something that Sunpin

2    would retain in its records, correct?

3      A.    Yes.

4      Q.    Okay.   And you can put that one aside.

5           We tried to notice the deposition of Tommy

6    Li, and not the -- not the drummer, but we had

7    attempted to notice that, but I -- it is now occurring

8    to me that we probably meant Tian Li?

9      A.    Yeah.

10      Q.    Okay.

11      A.    I don't know.

12      MR. JIMENEZ:  I can only assume.

13    BY MR. GAUGHAN:

14      Q.    Well, the notice -- I just want to confirm

15    that no such individual exists?

16      A.    Tommy Li, no, there is no Tommy Li.

17      MR. JIMENEZ:  Tian Li, T-i-a-n.

18      MR. GAUGHAN:  Tian Li.

19    BY MR. GAUGHAN:

20      Q.    And just for the record, that document

21    that we looked at that was attached to the notice

22    refers to a Tom Li, so there was apparently an

23    inaccuracy on what was on the CNBM website.

24      MR. JIMENEZ:  A couple.

Confidential - Subject to Further Confidentiality Review

```
1         MR. GAUGHAN:  A couple, well, I don't know -- I

2    don't know if I agree with that part, but...

3    BY MR. GAUGHAN:

4         Q.    I just have a few other questions.

5              In terms of the individuals that you spoke

6    to at CTIEC, what language would those conversations

7    be in?

8         A.    English.

9         Q.    Okay.  They are all in English?

10        A.    Well, that -- with my communications, yes.

11        Q.    Okay.  Were the individuals you spoke with

12   fluent in English?

13        A.    They were good English.

14        Q.    Okay.

15        A.    They were fine.

16        Q.    They are not native speakers, but they

17   could communicate?

18        A.    They are not native speakers, but we can

19   have a business conversation.

20        Q.    Does anyone at Sunpin ever -- has anyone

21   ever gone to China from Sunpin with respect to the

22   CTIEC deal -- dealings we've seen?

23        A.    Yes.

24        Q.    Okay.  Who has gone to China?
```

Confidential - Subject to Further Confidentiality Review

```
1        A.     Tian Li and Tom Rosenberg.

2        Q.     And was it just one time or was it more

3    than once?

4        A.     One time, but I -- just to clarify, they

5    went to China for other things and they just -- you

6    know, I think they met with -- they had a meal with

7    them.

8        Q.     Do you know when that was?

9        A.     May -- no, no, no.  February, January.

10       MR. JIMENEZ:  I could look on the calendar and

11   tell you.

12   BY MR. GAUGHAN:

13       Q.     Well, do you have a -- I mean, do you have

14   a sense of when it was?

15       A.     Gosh, I want to -- January, was it around

16   there.

17       Q.     January?

18       A.     In Chinese New Year, so.

19       MR. JIMENEZ:  Yeah, it was Chinese New Year,

20   February.

21   BY THE WITNESS:

22       A.     So, February, yeah, yeah.

23       MR. JIMENEZ:  February.

24   BY THE WITNESS:
```

Confidential - Subject to Further Confidentiality Review

```
1        A.    So the purpose of the trip was actually

2    for Chinese New Year, but...

3    BY MR. GAUGHAN:

4        Q.    Okay.  Was that to -- do you know what

5    city that was to, Beijing, Shanghai or Hong Kong or

6    elsewhere?

7        A.    Tian Li's hometown is Chang Xhou, so

8    that's where he went.

9        Q.    Where is that exactly?

10       A.    Close to Shanghai, about an hour and a

11   half from Shanghai by drive.

12       Q.    Have you had any -- I'm sorry.  Go ahead.

13             Have you had any dealings with a company

14   called Toledo Engineering Co., Inc.?

15       A.    I have heard of them.

16       Q.    Okay.  In what context?

17       A.    I think just a casual conversation that

18   someone from CTIEC was -- was saying.

19       Q.    Okay.  So they -- they mentioned that

20   entity?

21       A.    Yes.

22       Q.    Has anyone from Sunpin been in contact

23   with Toledo Engineering?

24       A.    No, I don't believe so.
```

1       Q.      Okay.  Was it contemplated that they might

2    do some of the work on the projects that you've been

3    involved with?

4       A.      No.

5       Q.      So what was the nature, what did you learn

6    about C -- you know, I guess Toledo Engineering?

7       A.      Oh, it was very, very casual, that they --

8    they know -- you know, they have a relationship with

9    this company, that's -- that's it.

10      Q.      Okay.

11      A.      It really has nothing to do with Sunpin,

12   so we never talked about it.

13      Q.      How about CTIEC/Teco American Technology,

14   Inc., have you ever heard of that company?

15      A.      I've never heard of that company.

16      Q.      Okay.  And you mentioned New Jersey

17   Institute of Technology.

18      A.      Um-hum.

19      Q.      Apart from having a meeting on that

20   campus, have you had any official conversations with

21   anyone from the university?

22      A.      No.

23      Q.      Okay.  So there is -- they are not

24   contemplated as a future business partner or anything

1    like that?

2         A.    No, they are -- they are a college.

3         Q.    Okay.  Well, we'll let -- we'll let it go

4    at that one.

5              Now, during the time that you were having

6    discussions with -- and Sunpin was having discussions

7    with CTIEC, did you ever hear anyone from CTIEC say

8    anything that or indicate anything that Chinese

9    secrecy laws somehow prevented them from sharing

10   information with a -- with Sunpin?

11        A.    No.

12        Q.    Okay.

13        A.    That's not -- yeah, no, we would never

14   have discussed that.

15        Q.    So in your dealings with CTIEC, it's

16   never come up that, you know, Chinese secrecy

17   laws somehow prohibit them or limit what they can

18   share -- information they can share with you, with

19   Sunpin?

20        A.    As far as I know, no.  They've been very

21   open.

22        Q.    Okay.  Have you had anyone -- discussions

23   with anyone from CTIEC regarding the deposition or the

24   litigation involving Chinese drywall?

1      A.    Yes.

2      Q.    Okay.  What was the nature of the

3    conversation?

4      A.    Oh, when we got your deposition -- when we

5    got the deposition, we didn't know what it was, so we

6    reached out to them.

7      Q.    And you personally reached out to someone

8    over there?

9      A.    I did.

10      Q.    Okay.  Who did you speak with?

11      A.    I spoke with -- at CTIEC I spoke with

12    Mr. Zhang --

13      Q.    Okay.

14      A.    -- and Mr. Wang.

15      Q.    And what did -- was it one conversation

16    with both of them or were there separate

17    conversations?

18      A.    Separate conversations.

19      Q.    Okay.  And was it just two conversations

20    total or was there more than that?

21      A.    It was two real -- two -- just two.

22      Q.    Okay.  What was the nature of your

23    conversation with Mr. Zhang?

24      A.    "What the heck is this?"  He said, "I

Confidential - Subject to Further Confidentiality Review

1    don't know.  I'll find out."

2         Q.    Okay.  Were they at all concerned that

3    this deposition was going forward?

4         A.    No, no.

5         Q.    How about Mr. -- was it -- who was the

6    other individual?  I'm sorry.

7         A.    Mr. Wang.

8         Q.    What did Mr. Wang tell you about this

9    notice and I guess the litigation?

10        A.    That this was kind of news to them also.

11        Q.    Okay.  Now, did they in any way try to

12   tell you to -- things that you should say and should

13   not say?

14        A.    No.

15        Q.    And we mentioned some of the other

16   entities before, you know, CNBM and CNBM Group.

17             Did you have any conversations with anyone

18   at any of those companies regarding this deposition or

19   the litigation?

20        A.    No.

21        Q.    No?

22        A.    Not -- not -- not -- so, all I'm just

23   thinking who -- who I've talked to, but no one -- no

24   one from the organization.

```
1        Q.    How about Taishan, did you speak to anyone

2   from Taishan?

3        A.    No.

4        Q.    All right.  Who did you talk to about the

5   litigation again?

6        A.    Well, not really per se the litigation,

7   but, you know, we didn't know what was going on when

8   we saw this, so we talked to -- you know, we needed to

9   find out what it was, so we reached out to Mr. Zhang

10  and then also I talked to Mr. Wang.  That's

11  Mr. Zhang's superior.

12       Q.    Okay.  And that was it?  Was there anyone

13  else?

14       A.    From CTIEC?

15       MR. GEORGE:  Anyone.

16  BY THE WITNESS:

17       A.    Anyone at all on this?  I talked to

18  attorneys.

19  BY MR. GAUGHAN:

20       Q.    Anyone aside from attorneys?  Well, I

21  guess who are the attorneys, let's start with that?

22       A.    The -- when this was beginning, we had

23  a -- we had a brief conversation with I believe the

24  CNBM's attorney, or was it CTIEC.  I'm not quite sure.
```

Confidential - Subject to Further Confidentiality Review

```
1        Q.    What was the nature of that conversation?

2        A.    We didn't know what was going on and, you

3    know, I think that conversation is privileged though.

4        Q.    How is it privileged?

5        A.    Because that was attorney/attorney.  That

6    was when I had the attorney's hat on, so I believe

7    that's --

8        Q.    But you are talking to a third party?

9    There is no client involved.  Who is the client?

10       A.    There is a client.

11       Q.    Who?

12       A.    Our client of Sunpin.

13       Q.    Were you -- was Sunpin involved in the

14   conversation?

15       A.    Yes.  The deposition was to Sunpin.

16       Q.    Who was at the meeting?

17       A.    It wasn't a phys -- it wasn't a physical

18   meeting.  It was a phone meeting.

19       Q.    Okay.  So you're refusing to divulge --

20   who was on the call?

21       MR. JIMENEZ:  It wasn't -- I'm sorry.  You

22   weren't on the call?

23       THE WITNESS:  I was on the call.

24       MR. JIMENEZ:  Oh, okay.  I wasn't.
```

```
 1          THE WITNESS:  I was on the call.

 2   BY MR. GAUGHAN:

 3          Q.    Okay.  So who was on the call?

 4          A.    Myself, Tom Rosenberg, an attorney from

 5   Shanghai, and Mr. Zhang, and an attorney from Orrick.

 6          Q.    Okay.  Do you know who the attorney from

 7   Shanghai was?

 8          A.    I can't recall his name.  It was just one.

 9          Q.    And do you know the name of the attorney

10   from Orrick?

11          A.    I can't recall his name right it now.  It

12   was just one brief conversation.

13          Q.    And how long was the call?

14          A.    10, 15 minutes.

15          Q.    When?

16          A.    I think shortly after we got this notice.

17          Q.    Okay.  Who asked questions?

18          A.    We did.

19          Q.    Okay.  Who was answering the questions?

20          A.    Everyone else that was on the call.

21          Q.    Was there a specific -- well, okay.

22   Everyone answered questions?

23          A.    You know, I can -- I can just simply state

24   that it was -- the call had nothing to do with legal
```

```
 1    strategy or anything like that.  It was just

 2    background information.

 3         Q.    Okay.  So there was no legal advice

 4    offered during the call?

 5         A.    No.

 6         Q.    Okay.  Was any future business discussed

 7    during the call?

 8         A.    Future business?

 9         Q.    Yeah.

10         A.    What does that mean.

11         Q.    Any future projects involving CTIEC or

12    CNBM?

13         A.    No.  As I said it was simply -- we just

14    wanted background information.

15         Q.    What information did you want?

16         A.    That I'm not going to divulge.

17         MR. JIMENEZ:  I'm going to object.  I think it

18    is obvious that when a small company like Sunpin gets

19    served with a deposition for a federal lawsuit that

20    they know nothing about --

21         MR. GAUGHAN:  I'm going to object to the

22    speaking objection.

23         MR. JIMENEZ:  -- they are going to be concerned,

24    as any company would be.
```

Confidential - Subject to Further Confidentiality Review

1        MR. GAUGHAN:  Well, counsel, I don't know why

2   you are testifying.

3        MR. JIMENEZ:  I'm just making a point here.  You

4   are badgering him on that question.

5   BY MR. GAUGHAN:

6        Q.    What questions did you have?

7        A.    Just background.

8        Q.    Like what?  Elaborate.

9        A.    That's privileged.

10       Q.    Okay.  So you are refusing to answer on

11   privilege grounds?

12       A.    As -- yes, I think we've had -- I'm more

13   than happy to talk about the business aspects of it.

14       Q.    What did you learn from the call?

15       A.    Not much.  Just the background of the

16   case.

17       Q.    What background?

18       A.    I'm not going to divulge --

19       MR. JIMENEZ:  I'm going to object to the form.

20   BY THE WITNESS:

21       A.    -- any specifics.

22   BY MR. GAUGHAN:

23       Q.    So, again, you are refusing to testify on

24   attorney/client privilege grounds?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Right.

 2        MR. GAUGHAN:  All right.  Okay.  And obviously

 3   we are -- we don't agree with the assertion of

 4   privilege --

 5        MR. JIMENEZ:  Okay.

 6        MR. GAUGHAN:  -- and we can take it up at a

 7   different time.

 8        MR. JIMENEZ:  However you want to do it.

 9   BY MR. GAUGHAN:

10        Q.    Anyone else you talked to about this

11   subpoena deposition notice?

12        A.    Internal staff.  That's it.

13        Q.    Internal staff at Sunpin?

14        A.    Internal legal staff.

15        Q.    Okay.  And what did you discuss with

16   that -- with the staff?

17        A.    That's attorney/client privilege.

18        Q.    Okay.  So you are asserting the

19   attorney/client privilege?

20        A.    Um-hum.

21        Q.    Turning back to I guess something we

22   talked about earlier, you indicated that when you were

23   involved in the early stages of this business -- the

24   business dealings with CTIEC, you did some research on
```

```
1    CNBM, is that correct?

2         A.    On CTIEC.

3         Q.    Okay.  And then did you come across

4    information at some point regarding CNBM?

5         A.    Yes.

6         Q.    And CNBM Group?

7         A.    Yes.

8         Q.    Was it one or both entities?

9         A.    I don't know.  It was a quick web --

10        MR. JIMENEZ:  I believe he already testified.

11   BY THE WITNESS:

12        A.    It was a quick website look.  I think I

13   just clicked onto --

14        MR. JIMENEZ:  I just want to object.

15        MR. GAUGHAN:  Counsel.

16        MR. JIMENEZ:  I believe he testified that he

17   didn't know the difference between the two parties --

18        MR. GAUGHAN:  Counsel --

19        MR. JIMENEZ:  -- when he first heard.

20        MR. GAUGHAN:  -- listen, listen, I don't really

21   appreciate the speaking objection this time.  I just

22   want to --

23        MR. JIMENEZ:  I object; asked and answered.

24        MR. GAUGHAN:  Well, I'm going to ask some
```

Confidential - Subject to Further Confidentiality Review

```
 1    different questions, so I'm trying to fill the

 2    background before I launch into a question, if that's

 3    okay with you.

 4    BY MR. GAUGHAN:

 5         Q.    So you're saying -- just to clarify, you

 6    were doing some research on the Internet, is that

 7    correct?

 8         A.    Very, very casual, yes.

 9         Q.    Did you talk to anyone about CNBM or CNBM

10    Group?

11         A.    No.

12         Q.    You didn't -- did you talk to anyone at

13    CTIEC about CNBM or CNBM Group?

14         A.    They mentioned CNBM.

15         Q.    What did they say about CNBM?

16         A.    That they are, you know, a subsidiary of

17    CNBM.

18         Q.    Okay.  And what -- did they tell you

19    anything about CNBM, what CNBM was?

20         A.    It's a maj- -- basic.  It's a major large

21    Chinese company.

22         Q.    And they are state owned?

23         A.    Yes, I know that.

24         Q.    Okay.  And that they are  publicly traded,
```

Confidential - Subject to Further Confidentiality Review

1    that sort of thing?

2         A.    Yeah, it's very, very casual, general

3    information.

4         Q.    And was it your appreciation based on that

5    conversation that, you know, your -- that CTIEC was,

6    you know, I guess controlled by CNBM?

7         A.    I wouldn't say controlled, no.  I felt

8    CTIEC and their folks had independent powers that can

9    make deals on their own.

10        Q.    But at least that they were a subsidiary

11   of a major Chinese state-owned entity, that was

12   your appreciation?

13        A.    Yeah, that there was a link to a major --

14   major company.

15        Q.    Okay.  How much of a link?

16        A.    CNBM was not brought up.  Maybe just once,

17   just when they did an overview of the -- of CTIEC.

18        Q.    When was this overview?

19        A.    When we met, I don't know, November or I

20   guess before we signed that.

21        Q.    Was it one of the face-to-face meetings or

22   was it over the phone?

23        A.    Face-to-face.

24        Q.    Okay.  Was this in New Jersey?

Confidential - Subject to Further Confidentiality Review

```
1          A.    No.  I believe this was Chicago.

2          Q.    Chicago.

3          MR. GAUGHAN:  We are going to go off the record.

4     I think we are done, but I want to confer.

5          THE WITNESS:  Okay.

6          THE VIDEOGRAPHER:  Off the record, 1:12 p.m.

7                    (WHEREUPON, a recess was had

8                     from 1:12 to 1:14 p.m.)

9          THE VIDEOGRAPHER:  On the record, 1:14 p.m.

10         MR. GAUGHAN:  Okay.  I have no further questions

11    if anyone has anything.

12         MS. DALEY:  I have a very brief follow-up.  I

13    will come up to the table.

14                         EXAMINATION

15    BY MS. DALEY:

16         Q.    Good afternoon, Mr. Kim.  I am Kelly Daley

17    from Orrick, Herrington & Sutcliffe.  I represent CNBM

18    Company.

19              I just want to clear up one point you

20    mentioned earlier when we were discussing the

21    contracts with CTIEC.

22              Do you recall mentioning an 8.5 percent

23    profit payment that would go to CTIEC?

24         A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

1          Q.     So if you could look, I know you have a

2   big pile of exhibits, if you could find Exhibits 5 and

3   8.  We can start with 5.

4          A.     I have 5.  I'm looking for 8.  Okay.  I've

5   got them.

6          Q.     Both of them?

7          A.     Yes.

8          Q.     Okay.  So turning to Bates numbered

9   page 3.

10         A.     Is this on Exhibit 5?

11         Q.     On Exhibit 5, yes, please.

12                And looking at paragraph 5 which is titled

13  Pricing.

14         A.     Yes.

15         Q.     So looking at the payments, in the last

16  three lines it says that, "CTIEC will be paid plus

17  1.5 percent for personnel, administrative cost and

18  advanced capital cost for the project."

19                Do you understand that to be compensation

20  for CTIEC's out-of-pocket costs on that project?

21         MR. GAUGHAN:  Object to form.

22  BY THE WITNESS:

23         A.     Yes, you're -- you're -- you are correct.

24  BY MS. DALEY:

Confidential - Subject to Further Confidentiality Review

```
1          Q.    And the next line that says, "Plus a

2    profit margin of 7 percent of advanced capital costs,"

3    that is CTIEC's, in fact, profit on the project?

4          A.    Yes.  I apologize.  I -- yes, you're --

5    you're correct.  I was mistaken.  The profit is 7

6    percent.

7          Q.    Okay.  And then if we can look at

8    Exhibit 8, paragraph 2 and Bates numbered page 68.

9          A.    Okay.

10         Q.    So at the bottom of that paragraph, the

11   last three lines again, it says, "The fixed price

12   includes the project administrative costs, 1.5 percent

13   of project construction costs, and profit margin of 7

14   percent of project construction costs."

15              Do you understand that to be consistent

16   with the last paragraph we looked at which is that

17   1.5 percent relates to costs?

18         A.    Yes.

19         Q.    And, again, the profit margin on that

20   project is 7 percent?

21         A.    7 percent, yes.

22         Q.    And just so we clarify for the record,

23   Exhibit 8 refers to the Church Hill Solar Farm

24   project, correct?
```

Confidential - Subject to Further Confidentiality Review

```
1        A.    Correct.

2        Q.    And Exhibit 5 refers to the potential

3   Wal-Mart project?

4        A.    Correct.

5        Q.    So on both the Church Hill Farms project

6   and the Wal-Mart project, CTIEC's expected profit is 7

7   percent?

8        A.    Yes, you are correct.

9        MS. DALEY:  Okay.  Great.  We have no further

10  questions.

11       MR. GAUGHAN:  Okay.  We are done.

12       MR. GEORGE:  Anything for you?

13       MR. LAWSON:  No.

14       MR. GAUGHAN:  Does anyone have the phone have

15  anything?

16       MR. LAWSON:  He got bored, he or she.

17       MS. DALEY:  Was there ever anybody on the phone?

18       THE VIDEOGRAPHER:  One moment.

19            This concludes the deposition of Steve

20  Kim.  The time is 1:18.  End of tape.  Off the record.

21                 (Time Noted:  1:18 p.m.)

22                 FURTHER DEPONENT SAITH NOT.

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                      REPORTER'S CERTIFICATE

 2              I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 3      a Certified Shorthand Reporter, do hereby certify:

 4              That previous to the commencement of the

 5      examination of the witness herein, the witness was

 6      duly sworn to testify the whole truth concerning the

 7      matters herein;

 8              That the foregoing deposition transcript

 9      was reported stenographically by me, was thereafter

10      reduced to typewriting under my personal direction and

11      constitutes a true record of the testimony given and

12      the proceedings had;

13              That the said deposition was taken before

14      me at the time and place specified;

15              That I am not a relative or employee or

16      attorney or counsel, nor a relative or employee of

17      such attorney or counsel for any of the parties

18      hereto, nor interested directly or indirectly in the

19      outcome of this action.

20              IN WITNESS WHEREOF, I do hereunto set my

21      hand on this 18th day of April, 2015.

22

23      _____

24      JULIANA F. ZAJICEK, Certified Reporter
```