000036

# BOS AGREEMENT

for the Maryland Church Hill 7.344 MW Solar Power Project

by and between

Sunpin Construction Management, LLC



and

China Triumph International Engineering Co., Ltd



CTIEC

CONTEMPT
Exhibit 145

November 26th, 2014

EXHIBIT ___
WIT: ___
DATE: ___
Juliana Zajicek CSR

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000037

# GENERAL CONTRACTOR AGREEMENT
## (Church Hill Solar Farm Project)

This General Contractor Agreement (the "**Agreement**") is by and between Sunpin Construction Management, LLC ("Sunpin") with offices located at 1 North LaSalle Street, Suite 1515, Chicago, Illinois 60602 and China Triumph International Engineering Co., Ltd ("**CTIEC**") with an address of 2000 Zhongshanbeilu Road, Shanghai, China. Each of Sunpin and CTIEC shall be known as a "**Party**" and collectively as the "**Parties**."

## RECITALS

A. Sunpin is in the business of designing and installing energy systems.

B. CTIEC has entered into an engineering, procurement and construction contract ("**EPC Contract**") with Churchill Solar Farm, LLC ("**CHSF**") for the purpose of designing and installing a 7.344 MW DC (6.0 MW AC) Photovoltaic System entitled the Church Hill Solar Farm (the "**Project**") at the property commonly known as located 602 Cedar Lane, Church Hill, Maryland 21623 (the "**Property**"). CTIEC desires to obtain the services of Sunpin to procure equipment and perform design services, construction, and commissioning for the Project.

C. Sunpin is interested in providing the foregoing services to CTIEC for the Project.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

1. Scope of Work. Sunpin, its employees, consultants and subcontractors shall perform the design, procurement and engineering work, construction and installation work for the Project set forth in the Project Scope of Work attached as Exhibit A, including providing specified labor, equipment and materials. The Parties intend that the Project Scope of Work include all of CTIEC responsibilities under the EPC Contract except (a) the procurement of inverters and (b) the procurement of PV modules. Sunpin and CTIEC shall each appoint authorized representatives to act on their behalf in all communications with respect to the Project.

2. Project Cost/Payment Schedule. Fixed Price, all inclusive Contract. CTIEC agrees to pay Sunpin the Fixed Price as defined herein. The budgeted total contract Fixed Price is **FOUR MILLION, THREE HUNDRED FIFTY THOUSAND, FIVE HUNDRED EIGHTEEN AND 07/100 dollars** ($4,358,518.07) (the "**Fixed Price**"). The allocation of the Fixed Price is set forth in Exhibit C. The Fixed Price includes applicable sales taxes, permit fees and testing fees for the Project and shall be inclusive of all costs for engineering, procurement, financing and construction for the Project, but does not include the costs for procurement of the CTIEC Contributed Materials (further defined in Schedule D and consisting of panels and inverter packages) for the Project, which shall remain the responsibility of CTIEC. The Parties agree that this Contract shall result in Sunpin completing all activities necessary to effectuate the completion of the Project as an operating, interconnected and commissioned solar photovoltaic electric power plant (excluding land acquisition rights, the processing of permits for the projects

1

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

and other preliminary development activities as delineated below), and with a design life of 25 years. Payments from CTIEC to Sunpin shall be made in accordance with the requirements of Section 8. Sunpin is responsible for any and all federal, state, and local taxes payable relating to or arising from the Project.

3. Description of Equipment. Equipment to be supplied by Sunpin shall be approved by CTIEC and set forth in Exhibit D.

4. Compliance With Applicable Law. Sunpin shall design and engineer the Project in accordance with all federal, state and local laws, rules, regulations, ordinances, policies and procedures materially applicable to the Project and in existence at the date of execution of this Agreement.

5. Permits Process. Sunpin shall prepare for CTIEC all applications and other submissions required to obtain all permits required for the Project. Sunpin, on behalf of CTIEC, shall promptly submit and be responsible to pay for any and all such required permit applications to the appropriate government agency(ies) having jurisdiction over the Project. After Sunpin has submitted the required permit applications, Sunpin shall actively manage and support all permit processes supplying additional information as required, and secure permits when approvals are completed. CTIEC shall support Sunpin by providing documents, personnel, or other support as needed to aid Sunpin in obtaining permits, *provided that* any material cost of such support is not part of the Fixed Price and shall be at Sunpin's expense.

6. Final Design and Engineering Phase. Sunpin and its subcontractors shall provide design and engineering services by competent personnel to complete the design and engineering work for the Project, including the preparation of (a) final design, engineering and construction documents, (b) all required permit applications, and (c) an updated implementation schedule for the Project.

6.1 Final Design Documents. Within 30 days of the effective date of this Agreement, Sunpin shall deliver Final Design Documents to CTIEC. Final Design Documents shall include the following: (a) drawings and specifications sufficient to establish the size, quality and character of the entire Project, its structural, mechanical, heating and electrical systems and the materials needed and construction steps necessary, to complete the Project; (b) design and engineering drawings and specifications for laying and connecting required wiring/piping and switch gear, placement of the PV modules, and other components reasonably necessary for the installation, testing and commissioning of the Project as an operational system; (c) equipment and material specifications; (d) drawings and/or documentation that will demonstrate that the Project when operational will not have a material adverse impact on the Property's aesthetics or cause unacceptable noise levels, vibrations or exhaust fumes that will adversely affect tenants at the Property, and (e) any other drawings or design documents necessary to obtain all permit and/or governmental approvals for the Project in accord with the Schedule. A 90% design review will be held prior to submission of Final Design Documents.

6.2 Project Schedule. A Preliminary Project Schedule will be developed with CTIEC and will be considered Exhibit B of this Agreement. At the end of the final design and engineering phase, Sunpin shall update and submit to CTIEC for review and approval a project schedule

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

("**Project Schedule**") providing phasing of construction and commissioning, including dates for building shut downs, times of commencement and completion required for each phase or category of the Project, ordering and delivery of system components requiring lead time, adequate periods of time for CTIEC's review and approval of the Final Design Documents and government agency(ies) review of applications and submissions prepared by Sunpin and/or CTIEC for any and all permits required for the Project, and working around any critical timing requirements of CTIEC. Sunpin shall achieve substantial completion of the Project not later than as provided for in the approved Project Schedule and currently stated as April 30, 2015, subject to adjustments as provided for in this Agreement for events of Force Majeure and/or changes in the schedule approved by CTIEC. Sunpin shall update and reissue the Project Schedule in the event of such adjustments.

6.3 CTIEC Review and Approval of Final Design Documents, Materials, Contractors, Consultants and Project Schedule. CTIEC shall have the right to approve and request modifications to the following: Final Design Documents; all materials to be used on the Project (including the solar modules and inverters, and including racking and balance of system materials/equipment ("**BOS**"); contractors; design and general consultants; and the Project Schedule. Sunpin shall provide CTIEC with revisions of drawings as CTIEC may reasonably require.

7. Construction Phase. During construction, Sunpin shall carry out the Project in accordance with the latest approved Project Schedule and the terms and conditions of this Agreement. Sunpin shall also (a) schedule and conduct weekly meetings or conference calls with CTIEC to discuss procedures, progress and scheduling of the Project; (b) schedule and coordinate the sequence of construction and assignment of space at the Property in accordance with the Project Schedule, the Final Design Documents, this Agreement and all building rules and regulations; (c) record the progress of the Project and submit weekly written progress reports to CTIEC showing percentages of the Project completed; (d) supply a plan of action to CTIEC regarding courses of action to correct any situations where the Project is not meeting the requirements of the Final Design Documents or Project Schedule; (e) make recommendations to CTIEC with respect to requests for change in the Project and prepare proposed Change Orders (as defined herein) which incorporate any modification to the Project; and (f) maintain at the Project site, one record copy of the Final Design Documents, the Agreement, relevant addenda, Change Orders or other modifications thereto and make all such records available to CTIEC upon request and deliver them to CTIEC upon completion of the Project. CTIEC shall cooperate with Sunpin in the foregoing duties and responsibilities and shall arrange for necessary access to the Property for Sunpin and its subcontractors to carry out the Project, subject to the security procedures of the Property.

7.1 Sunpin shall supervise and direct the construction and installation work (the "**Work**"), using Sunpin's best skill and attention. CTIEC will not have control over or charge of and will not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since Sunpin shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Agreement.

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000040

7.2. Unless otherwise provided in this Agreement, Sunpin shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, transportation, and other facilities and services necessary for the proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work, but excluding the procurement and cost of the panels and inverters to be used in the Project, which shall remain the sole responsibility of CTIEC.

7.3  Sunpin shall enforce strict discipline and good order among Sunpin's employees and other persons carrying out the Work.  Sunpin shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

7.4 All workmanship, materials and equipment furnished under the Agreement shall be of good quality and new.  The Work shall be free from defects in materials, workmanship and design and otherwise conform with the requirements of the Agreement.  Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective.  If required by CTIEC, Sunpin shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

7.5  Sunpin shall comply with and give notices required by laws, ordinances, rules, regulations, and lawful orders of public authorities bearing on performance of the Work.  Sunpin shall promptly notify CTIEC if any drawings or specifications are observed by Sunpin to be at variance therewith.

7.6  Sunpin shall be responsible to CTIEC for the acts and omissions of Sunpin's employees, subcontractors and their agents and employees, and other persons performing portions of the Work under a contract with Sunpin and Sunpin's subcontractors.

7.7  Sunpin shall make reasonable efforts to keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Agreement.  At completion of the Work, Sunpin shall remove from and about the Project waste materials, rubbish, Sunpin's tools, construction equipment, machinery and surplus materials.

7.8  Sunpin shall pay all royalties and license fees, if any; shall defend suits or claims for infringement of patent rights and shall hold CTIEC harmless from loss on account thereof.

7.9 Sunpin warrants that title to all Work, materials and equipment will pass to CTIEC upon incorporation into the Project and, upon payment therefor, shall be free and clear of all liens, claims, security interests or encumbrances and that no Work, materials or equipment will have been acquired by Sunpin, or by any person performing Work at the site or furnishing materials and equipment for the Project, subject to an agreement under which an interest therein or an encumbrance thereon is retained by Sunpin or otherwise imposed by Sunpin or such other person.

7.10  Sunpin shall not cause or permit any Hazardous Substances or Hazardous Materials (as defined below) to be used, stored, generated or disposed of, on or in the Property or any other portion thereof, without compliance with applicable federal, state and local laws, ordinances, regulations and statutes now in force or which are hereafter enacted, relating to, governing or

4

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000041

regulating Hazardous Substances or Hazardous Materials ("Environmental Laws"). Sunpin will abide by all applicable Environmental Laws in performing its duties hereunder, including without limitation all Environmental Laws, pertaining to documentation and record-keeping and will make such records available to CTIEC upon request. If Sunpin encounters any Hazardous Substance on the Property, Sunpin shall immediately advise CTIEC and, if prudent or required pursuant to Environmental Laws, cease work on the affected area of the Property until the Hazardous Substance is handled in a manner acceptable to CTIEC. Sunpin shall indemnify and hold CTIEC harmless from loss on account of any breach of its obligations under this Section 7.10. "**Hazardous Substances**" or "**Hazardous Materials**" shall mean any toxic or hazardous material, waste, pollutant or substance defined as a Hazardous Substance or Hazardous Material under applicable Environmental Laws.

8. Payments. Subject to the requirements of Sections 8.1 through 8.6, CTIEC shall make payments on account of the Fixed Price to Sunpin in the manner set forth below.

8.1 CTIEC shall pay an initial deposit of twenty (20%) percent of the Fixed Price value, in the amount of \$\$871,703.60, upon within 30 days of execution of this contract by CTIEC. CTIEC shall pay Sunpin the balance of 80 percent of the Fixed Price upon the submission of requests for payment. Not more than twice per month, Sunpin shall submit to CTIEC a request for payment in form the usual AIA form or such other form as the parties may agree upon, certified by the authorized representative of Sunpin as to the items of the SCHEDULE OF VALUES which have been completed in the period with respect to which the request is made and the amount due and payable with respect to such items. Sunpin shall certify as to what portions of each item have been completed since the last request for payment and the corresponding amount due with respect to such items. Portions which lie between the values listed in the SCHEDULE OF VALUES shall be determined by interpolation between the values listed.

8.2 Sunpin shall make progress payments to approved contractors and other payees participating in the Project, and all such progress payments paid to such 3rd parties shall be based on Applications For Payment setting forth the percentage completion of each item on the Schedule of Values allocating the Fixed Price as provided in Exhibit C. Except as otherwise provided in this Agreement, the period covered by each Application For Payment shall be one calendar month ending on the last day of the month.

8.3 With each progress Payment and financing draw-down (including final payment) made on the Project, Sunpin shall furnish to CTIEC, Sunpin's partial (or final) waiver of lien for the amount requested to be paid in such Application for Payment and a waiver of lien from each of its subcontractor and their subcontractors who have performed work or provided equipment or materials to the Project. Such lien waivers may be made conditional upon payment of the amount requested by Sunpin and each subcontractor, *provided that*, no current payment shall be made to Sunpin or any subcontractors unless unconditional lien waivers are given for all prior payments which were made upon the presentation of conditional lien waivers. The forgoing lien waiver requirements shall not apply to subcontractors to whom the total amount of payments with respect to the Project are expected to be less than \$25,000. All lien waivers and releases shall be in accordance with the lien laws of the state in which the property is located. Sunpin shall obtain partial waivers of lien from all subcontractors, materialmen, suppliers and lien-

5

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000042

eligible independent contractors for each payment made to such persons or entities, and final waivers of lien for all such persons or entities upon final payments. Sunpin shall deliver such lien waivers to CTIEC, together with Sunpin's own lien waivers and Contractor's Sworn Statement (accounting for the applicable progress payment or draw-down made to Sunpin, and listing all such person's and/or entities performing work or materials on the Project) relating to each progress payment made by CTIEC to SUNPIN hereunder.

8.4   Omitted.

8.5   Final payment shall be earned by Sunpin and payable to Sunpin as provided below, only after the Work has been completed, the Equipment has been accepted by CTIEC (as evidenced by CTIEC executing the Project Completion Certificate as provided in Section 11), the system is fully operational and this Agreement fully performed.

9. Commissioning Phase. After the system is operational and in compliance with the requirements of Exhibit A, Sunpin shall test and commission the Project as a fully operational system as directed by CTIEC. Sunpin shall comply with the Commissioning Checklist to be proposed by Sunpin and approved by CTIEC. Sunpin shall give notice to CTIEC and demonstrate that the Project is fully operational, is capable of supplying electricity for CTIEC as provided in the Scope of Work (Exhibit A), and has satisfied all requirements of this Agreement. Sunpin shall provide CTIEC with reasonable documentation thereof, including the execution and delivery to CTIEC of a Commissioning Certificate in substantially the form to be proposed by Sunpin and approve by CTIEC and a mutually agreed upon punch list (the **"Punch List"**). Sunpin will make commercially reasonable efforts to address any remaining items on the Punch List in a timely fashion. The Warranty Period (as described in Section 19) will commence upon the first to occur of the execution of the Commissioning Certificate, or operation of the system in a non-test mode.

10. Substantial Completion. Upon completion of the Commissioning Phase and CTIEC approval of Commissioning documents, Sunpin will submit a date to perform the Capacity Test. Successful completion of the Capacity Test will constitute "**Substantial Completion**."

11. Documentation Phase. Sunpin and its subcontractors shall provide all relevant documentation of the Project to CTIEC. Documentation shall include a system level Plant Operations & Maintenance Manual comprised of the following: (a) a binder of relevant literature for installed equipment such as O&M manuals, wiring diagrams, installation diagrams, piping details, cut sheets, and specification sheets; (b) a binder of test results for equipment and systems; (c) written confirmation of completed punch list items (if any); and (d) as- built drawings including detailed drawings of systems requiring registered professional services, such as structural, architectural, mechanical, electrical, plumbing and fire protection. Timing of delivery of this documentation will be indicated in the Project Schedule.

12. Project Completion. CTIEC shall immediately execute the Project Completion Certificate substantially in the form provided by CTIEC upon completion of all Punch List items, delivery by Sunpin of documentation specified in the Documentation Phase and final acceptance of a fully operational system by CTIEC.

6

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

13. <u>Bill of Sale.</u>  After CTIEC's execution of the Commissioning Certificate, Sunpin will issue a Bill of Sale of the Project and all Equipment to CTIEC.

14. <u>CTIEC's Response to Information Requests.</u>  CTIEC shall respond to reasonable requests of Sunpin regarding CTIEC's requirements for the Project in a reasonable time period, including CTIEC's objectives, schedule, constraints and criteria for the Project. CTIEC shall designate a representative to act on its behalf in communicating with Sunpin with respect to the Project.

15. <u>Site Information and Acceptance of Site.</u>  Execution of this Agreement by Sunpin is a representation by Sunpin that (i) Sunpin has extensive experience in the type of engineering, procurement and construction required hereunder and with the construction industry standards for the means and methods required to satisfactorily complete the Project, (ii) Sunpin has visited the site, become familiar with the local conditions under which the work is to be performed, including roof and subsurface conditions as applicable, and accepts the site as satisfactory to complete the Project, (iii) Sunpin has received and accepted all available documents it needs to complete the Project, and (iv) Sunpin is prepared to provide to CTIEC a completely operational system as described in this Agreement and on the Project Schedule.  CTIEC shall cooperate with Sunpin to arrange access to the Property for Sunpin and subcontractors as necessary to complete the Project, subject to reasonable security procedures as determined by the owner and managing agent of the Property.

16. <u>Use of CTIEC's Name.</u>  Sunpin shall not in the course of performance of this Agreement or thereafter use or permit the use of CTIEC's name nor the name of any affiliate or subsidiary of CTIEC, in any advertising, promotional or other materials prepared by or on behalf of Sunpin, nor disclose or transmit the same to any other party, without the prior written consent of CTIEC.

17. <u>Risk of Loss.</u>  Sunpin shall bear risk of loss of Equipment prior to its acceptance by CTIEC and delivery to CTIEC of the Bill of Sale described above.  CTIEC bears risk of loss of Equipment after its acceptance of the Equipment and receipt of the Bill of Sale of the Project.

18. <u>Insurance.</u>  Sunpin shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located insurance for protection from claims under workmen's compensation acts and other employee benefit acts which are applicable, claims for damages because of bodily injury, including death, and from claims for damages, other than to the Work itself, to property which may arise out of or result from Sunpin's operations under this Agreement, whether such operations be by Sunpin or by a subcontractor or anyone directly or indirectly employed by any of them. This insurance shall be written for not less than limits of liability specified in this Agreement or required by law, whichever coverage is greater, and shall include contractual liability insurance applicable to Sunpin's obligations under Section 23. Certificates of such insurance shall be provided to CTIEC prior to the commencement of the Work, and prior to the start of work on the Project by any subcontractor, a certificate of insurance shall be obtained from the subcontractor naming CTIEC and the owner of the Property, and their respective agents, as additional insureds on the subcontractor's policies.  As Sunpin will not be performing the installation of the actual systems

7

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000044

themselves, Sunpin will ensure that all subcontracted entities will maintain said insurances naming CTIEC and Sunpin as additional insureds.

18.1 The insurance required by Section 18 shall be written for not less than the following, or greater if required by law:

Workers' Compensation:
(a) State:......................................................Statutory
(b) Applicable Federal:.................................Statutory
(c) Employer's Liability:...........................$1,000,000

Comprehensive General Liability (including but not limited to comprehensive form, premises operations, explosion and collapse hazard and underground hazard, products and completed operations hazard, contractual liability, broad form property damage (including completed operations), independent contractors' protective, personal injury, automobile liability comprehensive form for owned, hired and non-owned vehicles):

(a) Combined single limits for bodily injury and property damages:
$5,000,000 .....................................Each Occurrence
$10,000,000 .................................Annual Aggregate

(b) Products and Completed Operations to be maintained for 3 years after final payment. Owner responsible for requesting yearly certificates.

(c) Property Damage Liability Insurance shall provide X, C and U coverage if Sunpin's operations involve any exposure to explosion, collapse or underground damage.

(d) Errors and omissions or professional liability insurance respecting any insurable professional services hereunder in the amount of at least $5,000,000.

18.2 The certificates of insurance shall contain the following provisions:

Name: CTIEC, the owner of the Property and their respective agents, beneficiaries, assigns and mortgagees, as additional insureds (excluding workers' compensation):

In the event of any change in the limits of liability, decrease in coverage or other material change in coverage, or the cancellation of insurance in its entirety, the insurer must give CTIEC and the owner of the Property, written notice at least thirty (30) days prior to the effective date of such change or cancellation, and insurance coverage shall remain in force during said thirty (30) day period; and

Waiver of any right of subrogation of the insurers against CTIEC, the owner of the Property and their respective agents, beneficiaries and mortgagees.

8

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000045

18.3  If Sunpin fails to carry or provide evidence of insurance provided for herein, CTIEC may, but shall not be obligated to, procure the same and charge the cost thereof to Sunpin.

19. Maintenance.  See Manufacturer's Warranty.

20. Subcontractors.  Sunpin, as soon as practicable after completion of the Preliminary Design and Engineering Phase of the Project, shall furnish in writing to CTIEC the names of persons or entities proposed as subcontractors for each principal portion of the Project. CTIEC will promptly reply to Sunpin in writing stating whether or not CTIEC has reasonable objection to any such proposed person or entity. Failure of CTIEC to reply promptly shall constitute notice of no reasonable objection. By an appropriate agreement, written where legally required for validity, Sunpin shall require each subcontractor, to the extent of the portion of the Project to be performed by such contractor, to be bound to Sunpin by the terms of this Agreement, and to assume toward Sunpin all the obligations and responsibilities which Sunpin assumes toward CTIEC.  Notwithstanding the foregoing, Sunpin's subcontracting of any of the Work hereunder shall not relieve Sunpin of any of its obligations under this Agreement.

21. Warranty.  Sunpin warrants that all materials, equipment and supplies furnished under the Agreement shall be free of defects in design, materials and workmanship for twelve (12) months (the "**Warranty Period**") from the first to occur of the date of execution of the Commissioning Certificate, or operation of the system in a non-test mode. This warranty does not cover repairs due to CTIEC's failure to properly operate and maintain the Project in accordance with official manufacturers' operating manuals and maintenance schedules that are delivered to CTIEC by Sunpin prior to the effective date of this warranty.

23. Relationship Between Parties.  The Parties are independent contractors with respect to each other.  Except as is expressly provided to the contrary in this Agreement, nothing in this Agreement shall be construed to create any relationship of partnership, joint venture, trust, association, employer/employee, or principal/agent between the parties.

24. Indemnity.  Except to the extent caused by the negligence or willful misconduct of the Indemnitees (as defined below), Sunpin shall defend, indemnify and hold harmless CTIEC and the owner of the Property, and their respective agents, representatives, employees, contractors, subcontractors, shareholders, directors, officers, and attorneys (collectively "**Indemnitees**") from and against any and all liabilities, damages, claims, losses, injuries, deaths, penalties, actions, proceedings, arbitrations, costs, fees, interest, awards, judgments or damages (collectively "**Liabilities**") which any of the Indemnitees may incur in, on, about or with respect to the Project, that in any way arise out of, result from, are based upon or are connected with any act, error, omission or conduct of Sunpin and/or its agents, representatives, employees, contractors, or subcontractors during the course of performance of this Agreement.  In claims against any person or entity indemnified under this Section 22 by an employee of Sunpin, a subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under this Section 24 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for Sunpin or a

9

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000046

subcontractor under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts.

Except to the extent caused by the negligence or willful misconduct of the Indemnitees (as defined below), CTIEC shall defend, indemnify and hold harmless Sunpin and its respective agents, representatives, employees, contractors, subcontractors, shareholders, directors, officers, and attorneys (collectively also "**Indemnitees**") from and against any and all liabilities, damages, claims, losses, injuries, deaths, penalties, actions, proceedings, arbitrations, costs, fees, interest, awards, judgments or damages (collectively "**Liabilities**") which any of the Indemnitees may incur in, on, about or with respect to the Project, that in any way arise out of, result from, are based upon or are connected with any act, error, omission or conduct of CTIEC and/or its agents, representatives, employees, contractors, or subcontractors during the course of performance of this Agreement. In claims against any person or entity indemnified under this Section 23 by an employee of CTIEC, a subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under this Section 23 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for CTIEC or a subcontractor under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts.

25. <u>Force Majeure.</u> If either party is rendered wholly or partially unable to perform its obligations under this Agreement because of an event of Force Majeure (as defined below), that party shall be excused from whatever performance is affected by the event of Force Majeure to the extent, and for the time period, so affected and shall not be considered to be in default in respect of any obligation under this Agreement to the extent that failure of performance shall be due directly to an event of Force Majeure. Within five (5) days after becoming aware of an event of Force Majeure, the affected party shall give written notice to the other party stating the nature of the event, its anticipated duration and effect upon the performance of such party's obligations. If an event of Force Majeure occurs that affects either party's performance, the Project Schedule affected by such delay shall be adjusted and extended by a period equal to the amount of time (including a period for mobilization and demobilization) necessary to make up for such delay. The term "**Force Majeure**" as used in this Agreement, means any cause beyond the control and not due to the negligence of the party affected, as a result of which the party affected is delayed in the performance of, or unable to perform, its obligations under this Agreement, including, but not limited to, natural disasters, flood, extreme weather conditions, earthquake, fire, lightning, epidemic, war (whether declared or undeclared), acts of God, terrorism, riots, explosions, civil disturbance, sabotage, strikes, or lockouts.

26. <u>Changes in the Project.</u> Changes in the Project may be accomplished after execution of this Agreement, and without invalidating such Agreement, only by a written change order ("**Change Order**") subject to the limitations stated in this Section 25 and elsewhere in this Agreement. A Change Order shall be based upon agreement between CTIEC and Sunpin. Any Change Order executed by anyone other than CTIEC's representative, or his/her written designee shall be of no force and effect or binding on CTIEC in any way. Unless otherwise provided in the Change Order, Sunpin and CTIEC shall proceed promptly to carry out all such changes. Additional services to be provided by Sunpin in connection with an approved Change Order shall be compensable provided CTIEC and Sunpin enter into a prior written agreement relating to the additional work. Work performed by subcontractors and approved in writing by CTIEC in

10

000047

connection with an approved Changed Order shall be at Sunpin's actual cost plus a five percent mark-up for Sunpin's technical support and supervision.  Sunpin and Client shall agree on a reasonable budget for such services before commencement of such work.

27. Events of Defaults and Remedies. The following events shall be deemed to be events of default by a party to this Agreement: (i) failure to comply with any provision of this Agreement and such failure shall continue for a period of ten (10) business days after written notice of such failure is delivered to the defaulting party, provided, however, if such condition cannot reasonably be cured within such ten (10) business day period, it instead shall be an event of default if the defaulting party shall fail to commence to cure such condition within such ten (10) business day period and/or shall thereafter fail to prosecute such action diligently and continuously to completion within a reasonable time period following non-defaulting party's notice of default; (ii) a party shall become insolvent or unable to pay its debts as they become due, or a party notifies the other party that it anticipates either condition; (iii) a party takes any action to, or notifies the other party that it intends to file a petition under any section or chapter of the United States Bankruptcy Code, as amended from time to time, or under any similar law or statute of the United States or any State thereof, or a petition shall be filed against a party under any such statute which shall not be dismissed within thirty (30) days) or (iv) a receiver or trustee shall be appointed for all or a substantial part of the assets of a party.  Upon the occurrence of any event or events of default by a party, the non-defaulting party shall have the option to terminate this Agreement, without prejudice to any other remedies available to it under this Agreement, at law or in equity.

28. Ownership of Documents and Other Materials.  All originals, disks, duplicates and negatives of all plans, drawings, reports, photographs, charts, programs, models, specimens, specifications, and other documents or materials required to be furnished by Sunpin hereunder, including drafts and reproduction copies thereof, shall be and remain the exclusive property of CTIEC, and CTIEC shall have the unlimited right to publish and use all or any part of the same without payment of any additional royalty, charge, or other compensation to Sunpin.  Upon the completion of the Project, or as requested during any stage of the Work, Sunpin shall promptly deliver all such materials to CTIEC. Sunpin shall not publish, transfer, license or, except in connection with carrying out obligations under this Agreement, use or reuse all or any part of such reports and other documents, including working papers, without the prior written approval of CTIEC, provided, however, that Sunpin may retain copies of the same for Sunpin's own general reference.  Any reuse by CTIEC is at its sole risk unless approved in writing by Sunpin

29. No Personal Liability. No general or limited partner, officer, director, principal, employee, agent, affiliate or shareholder of CTIEC or Sunpin shall be personally liable for the performance of that party's obligations under this Agreement.

30. Spare Parts.  Prior to completion of installation of the Equipment, SUNPIN shall provide CTIEC with a list of spare parts.  The prices for such spare parts shall remain firm and valid for orders issued by CTIEC for such spare parts up to one year from the date of delivery of the list. Payment for such Spare Parts shall be net thirty (30) days after delivery, FOB final destination, and after receipt of a complete and accurate invoice. The provisions of Section 21 (warranty) shall also apply to orders issued by CTIEC for spare parts.

11

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000048

31. Maintenance Agreement. If CTIEC requests, Sunpin shall propose a binding and assignable maintenance agreement for the system (inverters and modules) with the supplier thereof, with such terms and conditions as are approved by and acceptable to CTIEC. This cost will be paid by CTIEC directly to the supplier.

32. Recitals and Exhibits. This Agreement shall be construed in light of its Recitals and Exhibits, which are incorporated by reference as contractual terms and conditions.

33. Parties Bound and Benefited. The covenants, terms and conditions contained in this Agreement shall be binding upon and inure to the benefit of the heirs, devisees, administrators, executors, representatives, assigns, successors and successors-in-interest of the respective parties hereto. No other third parties are intended to be benefited by this Agreement, except for (a) potential Indemnitees, loss payees, and additional insureds under this Agreement and (b) any other parties (if any) expressly referred to in this Agreement as beneficiaries of this Agreement. No such excepted third parties are bound by this Agreement.

34. Assignment; Financing Assistance.

34.1    Assignment. Except as provided in this Section 34.3, neither party may assign its rights under this Agreement. Neither party shall have the right to assign the whole or any part of any obligations under this Agreement, without the express written consent of the other party. Such consent must be reasonably given.

34.2    Cooperation with Financing Parties. Sunpin shall reasonably cooperate with CTIEC and any debt, equity or lease financing parties for the Project or any parties seeking to acquire the Project (collectively, "**Financing Parties**") in connection with the financing or acquisition of the Project, including without limitation, by (i) furnishing such information as may be reasonably requested by CTIEC or the Financing Parties, (ii) delivering one or more estoppel certificates as may be reasonably requested by CTIEC or the Financing Parties, and (iii) delivering one or more consents as may be reasonably requested by CTIEC or the Financing Parties (including any consent to assignment of this Agreement).

34.3    Security Interests in Project. Sunpin acknowledges that CTIEC may be financing the development, acquisition, installation, operation and/or maintenance of the Project with financing accommodations from one or more Financing Parties and that CTIEC's obligations will be secured by, among other collateral, a pledge or collateral assignment of this Agreement and a first security right in the Project.

35. Amendment. No amendment to this Agreement shall be effective unless it is in a writing executed by all of the parties to this Agreement.

36. Marginal Titles and Headings. The marginal titles, subtitles, headings an subheadings of the paragraphs, subparagraphs, sections and subsections herein are intended to be for reference and for the sake of convenience only and shall not be construed to nation or broaden the scope of or affect whatever interpretation or construction would otherwise be given to the plain and ordinary meanings of the words herein.

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

37. Entire Agreement. This written Agreement is fully integrated, constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all other prior and contemporaneous agreements, contracts, representations, promises, acknowledgments, warranties and covenants, oral or written, by and between the parties with respect to such subject matter which are not expressly included herein.

38. Waivers. The failure by any party to object to a default or exercise any rights or remedies under this Agreement shall not constitute a waiver of the right to do so in the future, unless such failure is accompanied by an express written waiver by such party.

39. Interpretation. The language in all parts of this Agreement shall be construed (a) according to its fair meaning and common usage and (b) not strictly for or against any party to this Agreement.

40. Counterparts. This Agreement may be executed in counterparts, so long as each of the parties to this Agreement executes at least one counterpart;. All such executed counterparts shall collectively constitute one and the same original document.

41. Warranties of Authority. In addition to the warranties set forth in Section 21 (warranty), each party acknowledges, warrants and represents for the benefit of the other party(ies) to this Agreement: (a) the person executing this Agreement is duly authorized and empowered to execute this Agreement on behalf of such entity; (b) that, if a corporation, limited liability company, joint venture, trust, partnership, limited liability company or other entity (i) such entity has been duly formed and organized and is in good standing and (ii) all necessary and appropriate resolutions and actions by such entity's board of directors, general partner(s), manager(s), members or other policy-making authority authorizing such entity to enter into, execute and perform this Agreement and the transactions contemplated by this Agreement have been obtained; and (c) that all steps have been taken and acts performed that are conditions precedent to making this Agreement valid, enforceable and binding against such entity in accordance with its terms and conditions.

42. Independent Counsel. Each party to this Agreement acknowledges that it has enjoyed the advice and representation of competent independent legal, business, tax and financial counsel in negotiating, entering into and executing this Agreement or knowingly, voluntarily and unconditionally waived its right to do so. The fact that this Agreement may have been drafted in whole or in part by one such party's counsel shall not cause any part of this Agreement to be construed against such party.

43. Severability. If any non-material provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. If a material provision is determined to be unenforceable and the Party which would have been benefited by the provision does not waive its unenforceability, then the Parties shall negotiate in good faith to amend the Agreement to restore to the Party that was the beneficiary of such unenforceable provision the benefits of such provision. If the Parties are unable to agree upon an amendment that restores the Parties' benefits, then the Party that was the beneficiary of such unenforceable provision may terminate this agreement upon written notice of termination.

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000050

44. <u>Notices.</u> Each notice required under this Agreement or by law shall: (a) be in writing; (b) contain a clear statement setting forth the subject and substance thereof and the reasons therefore; and (c) be personally delivered, facsimile transmitted ("FAX"), transmitted as a pdf file via email, or duly mailed by certified mail, return receipt requested, to each party to this Agreement at its following address or number or to such other address or number as that party may have most recently given notice of to all of the other parties:

Sunpin:      Sunpin Construction Management LLC
               c/o Sunpin Solar LLC
               1 North LaSalle Street
               Suite 1515
               Chicago, Illinois 60602
               Attn: Tom Li

          With a copy to:

               Thomas Rosenberg, Esq.
               RKJ Legal, Ltd.
               1 N. LaSalle Street
               Suite 1515
               Chicago, IL 60602
               tdr@rkjlegal.com

CTIEC:      China Triumph International Engineering Co., LTD.
               Attn.: Dongliang Zhang
               27th Floor, 2000 Zhong Shan Bei Road
               Shanghai, China. 2000063

               zdllldz@hotmail.com

With a copy to:

               Jill D. Winans
               F. Frank Lyman
               McCauley Lyman, LLC
               10 Speen Street
               Framingham, MA 01701

               JillWinans@McCauleyLyman.com
               FrankLyman@McCauleyLyman.com

45. <u>Survival.</u> All of the representations and warranties of the parties shall survive the termination of this Agreement for any reason.

14

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000051

46. Attorneys' Fees and Legal Costs. All of the attorney's fees and legal costs incurred by the respective parties in negotiating and forming this Agreement shall be borne by the respective parties. All legal costs and attorneys' fees actually incurred by any party to this Agreement to enforce any obligations of any other party under this Agreement or any instruments executed in connection herewith shall be paid to the prevailing party by the other party and shall bear interest at the legal rate.

47. Governing Law; Disputes and Remedies. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

48. Arbitration. Notwithstanding any other provision of this Agreement, any controversy or claim arising out of this Agreement, or the breach thereof, shall be settled by binding Arbitration, if it cannot be resolved directly by the parties in reasonable time. The matter will be heard in the Chicago location of and pursuant to the Commercial Arbitration Rules of the American Arbitration Association, and the substantive rules of the State of Illinois. Any judgment or award rendered by the Arbitrator(s) shall be non-appealable, and may be entered in any court of competent jurisdiction. This section shall not prevent either party from obtaining an injunction in any court of competent jurisdiction.

49. Time is of the Essence. Time is of the essence for the performance of each covenant and term of this Agreement.

In Witness Whereof, the parties hereto have executed this Agreement the day and year first written above.

SUNPIN CONSTRUCTION MANAGEMENT, LLC

By: _Lee chan_

Name: _Tim Li_

Title: _Chairman_

CHINA TRIUMPH INTERNATIONAL ENGINEERING CO., LTD

By: _____

Name: _Shu Peng_

Title: _President and Chairman_

15

000052

# COLLATERAL ASSIGNMENT OF LEASE

THIS COLLATERAL ASSIGNMENT OF LEASE (this "*Assignment*"), dated as of November 25, 2014, is made by CHURCH HILL SOLAR FARM, LLC, a Maryland limited liability company ("*CHSF*"), to and for the benefit of CHINA TRIUMPH INTERNATIONAL ENGINEERING CO., LTD., a People's Republic of China company ("*CTIEC*"), pursuant to that certain ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT (Church Hill Solar Farm Project) of the same date by and between CHSF and CTIEC (as amended, restated, modified, or supplemented from time to time, the "*EPC Agreement*"). Capitalized terms used but not defined in this Agreement have the meanings given them in the EPC Agreement.

     **1.**    **ASSIGNMENT.** CHSF hereby transfers, assigns, conveys and grants to CTIEC, subject to the terms and conditions herein contained, as further security for the payment and the satisfaction of all of its obligations under the EPC Agreement (the "*Obligations*"), all of CHSF's right, title and interest in the CHURCH HILL SOLAR FARM Solar Site Lease Agreement dated April 26, 2013, as amended, by and between Church Hill Solar Farm and The Sally Ann Patchett Revocable Trust dated June 20, 2002, as Amended and Restated, The Dorsey D. Patchett Revocable Trust dated June 20, 2002, as Amended and Restated, R. Brett Patchett and Dorsey D. Patchett, Jr., (the "*Lease*"). CHSF represents that there are no amounts currently owing under the Lease.

     **2.**    **ATTORNEY-IN-FACT.** CHSF irrevocably appoints CTIEC as its attorney-in-fact, and CTIEC shall have the right at any time (but shall have no obligation) upon the occurrence and during the continuance of an event of default under the EPC Agreement (an "*Event of Default*") to exercise in its own name or in the name of CHSF, any or all of CHSF's rights arising under or in respect of the Lease (collectively, the "*Rights*") in such manner as CTIEC shall deem necessary or appropriate to protect or preserve its interests. CTIEC shall incur no liability on account of any action taken by it or on its behalf pursuant to this Assignment whether or not the same shall prove to be improper, inadequate or invalid, in whole or in part, and CHSF agrees to indemnify and hold CTIEC harmless from and against any and all loss, cost, liability or expense, including but not limited to reasonable attorneys' fees and expenses, except for those resulting from CTIEC's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. Neither this Assignment nor any action or actions on the part of CTIEC shall constitute an assumption of any of the obligations of CHSF by CTIEC under the Lease, and shall continue to be liable for all such obligations.

     **3.**    **RIGHTS AND OBLIGATIONS OF THE PARTIES.** So long as no Event of Default has occurred and is continuing, subject to the terms of the EPC Agreement, CHSF may continue to receive and exercise, except as herein restricted or provided otherwise, all of its rights, benefits and privileges in and to the Lease. CHSF shall at all times diligently enforce the Rights in all material respects unless otherwise directed or consented to by CTIEC in writing and shall, at CHSF's sole cost and expense, appear in and defend CTIEC in any action or proceeding in any way connected with the Lease and shall pay all reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and expenses, which CTIEC may incur in

000053

connection with CTIEC's appearance, voluntarily or otherwise, in any such action or proceeding as and to the extent set forth in the EPC Agreement.

4.    **TERMINATION**.  Upon the satisfaction in full of all Obligations and the termination of all CTIEC's obligations under the EPC Agreement, this Assignment shall become null and void.

5.    **GENERAL**.

(a)    **Assignment**.  This Assignment shall be binding upon CHSF and its successors and assigns, and shall inure to the benefit of CTIEC and its successors and assigns. CTIEC may assign all or any portion of its interest in the Rights or the Lease and, in such event, CHSF at its sole expense, shall promptly execute, acknowledge and deliver such additional documents, instruments and Lease as may be required by CTIEC in connection with any such assignment.

(b)    **Amendments; Waivers**.  This Assignment may not be amended, modified or changed, nor shall any waiver of any provision hereof be effective, except by an instrument in writing and signed by the party against whom enforcement of the waiver, amendment, change, modification or discharge is sought.  Any waiver or consent relating to any provision of this Assignment shall be effective only in the specific instance and for the specific purpose for which given.  No notice to or demand on CHSF in any case shall entitle CHSF to any other or further notice or demand in similar or other circumstances.

(c)    **Severability**.  If any provision of this Assignment shall be invalid, illegal or unenforceable, it shall not affect or impair the validity, legality and enforceability of any other provision of this Assignment or of any documents related thereto.

(d)    **Notices**.  All notices and other communications under this Assignment shall be in writing and shall be personally delivered, sent by overnight, registered or certified mail (postage prepaid), sent by facsimile, or sent by electronic mail and shall be deemed to be given when received by the intended recipient thereof.  Unless otherwise specified in a notice given in accordance with this provision, notices and other communications shall be given to the parties hereto at their respective addresses (or to their respective fax numbers and email addresses) indicated on the signature page.

(e)    **Cumulative Remedies; Failure or Delay**.  The rights and remedies provided in this Assignment are cumulative and are not in lieu of, but are in addition to, any other rights or remedies which CTIEC may have under the EPC Agreement or any other IGL Document, at law, in equity or otherwise.  No failure or delay on the part of CTIEC in the exercise of any power, right or remedy under this Assignment shall impair such power, right or remedy or shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude other or further exercise thereof or of any other power, right or remedy.

(f)    **Governing Law**.  This Assignment shall be governed by and construed in accordance with the laws of the State of Illinois.

2

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000054

(g)     **Waiver of Trial by Jury**. CHSF WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION UNDER THIS ASSIGNMENT OR ANY OTHER ACTION ARISING OUT OF THE TRANSACTIONS CONTEMPLATED HEREBY, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION OR ACTIONS.

(h)     **Execution in Counterparts**. This Assignment may be executed in any number of counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same agreement. This Assignment shall become effective upon the execution of a counterpart hereof by each of the parties hereto. Delivery of a copy of this Assignment bearing an original signature by facsimile transmission, by electronic mail in "*portable document format*," or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

(i)     **Complete Agreement**. This Assignment, together with the EPC Agreement and documents related to the Church Hill Solar Farm project, is intended by the parties as a final expression of their agreement regarding the subject matter hereof and is intended as a complete statement of the terms and conditions of such agreement. In the event of any conflict between this Assignment (or any portion thereof) and the EPC Agreement, the terms of the EPC Agreement shall prevail.

IN WITNESS WHEREOF, CHSF and CTIEC have executed this Collateral Assignment of Lease as of the date first written above.


**CHURCH HILL SOLAR FARM, LLC**

By: _Cushan_

Name: _Tian Li_

Title: _Chairman_


**CHINA TRIUMPH INTERNATIONAL ENGINEERING CO., LTD**

By: _____

Name: _Shou Peng_

Title: _President and Chairman_

3

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

# Exhibit A:

## Scope of Work Requirements

<u>**Scope of Work**</u>

Church Hill Solar Farm – 7,344,000 Watts DC

EPC Contractor, its employees, consultants and contractors shall perform the design and engineering, procurement, construction, installation and interconnection work for the Project. The Project shall consist of the "turnkey" installation of a 7.344 megawatt photovoltaic power system, including all labor, materials, equipment and engineering required therefore, and in accord with the approved and permits, plans and specifications for the Project.

EPC Contractor will include, but not be limited to, the installation of a ground mounted structural racking system per Manufacturer's structural drawings, installation specifications; the installation of solar modules per manufacturer's installation specification or equivalent; the receipt, handling and proper installation of eight (8ea) SG750MX PV Skid Inverter Packages (per Exhibit D) or equivalent; the installation of Balance of System ("BOS") labor and materials, and commissioning of the Project.

1. <u>**General**</u>

1.1. If applicable, the EPC Contractor will account for any prevailing and or union wage requirements.

1.2. EPC Contractor is responsible for the necessary upgrades to the existing Host facility electrical system.

1.3. EPC Contractor shall be responsible for the following engineering, procurement, and constructions services, which shall be further delineated below, in accord with the terms hereof. Such scope shall include, but not be limited to:

     a.     EPC Contractor shall procure all necessary materials necessary for the complete construction of the Project, which shall include, but not be limited to, fittings, handholds, piping, wiring, supports, conduit, all required solar panels, racking system & hardware and surveying, inverters with factory on site commissioning, transformers, combiner boxes, re-combiners, civil site work and improvements, tree removal, stumping and grubbing, fencing, security systems, permit fees, civil designs, wetland consultants, and electrical engineering.

     b.     EPC Contractor shall provide basic labor for all facets of construction, including site and civil work, racking installation, electrical work, general labor and interconnection work.

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000056

     c.     EPC Contractor shall provide EPC, project management and general contracting services which are to include, but not limited to, supervision of all contractors, materialmen and services, any and all required usage of heavy equipment and equipment operation to be used for, but not limited to, loading, offloading, and moving of materials and equipment as well as general on-site heavy lifting requirements. Additionally, it shall provide technical design work and engineering.

     d.     EPC Contractor shall provide all required direct project overhead, which is to include, but not limited to, site trailers, temporary electric service, housing, onsite and offsite materials and equipment storage and transport, equipment, etc. or other such items as often referred to as "Direct Job Costs" and "Equipment Costs".

     e.     EPC Contractor shall provide commissioning support services, in addition to the required third party commissioning services, which are to include, but not limited to, any required services attributable to the final commissioning of the Project.

     f.     The project schedule for each project shall be agreed upon by the parties and set forth below. The EPC Agreement provides that time is of the essence relating to project schedule dates.

     g.     CHSF shall provide support to EPC Contractor in engaging with governmental, local authorities and utility agencies to help ensure efficient construction, interconnection and commissioning.

## 2.  Design/Engineering

2.1. EPC Contractor will provide engineering documentation in accordance with **Section 3.**

2.2. EPC Contractor will design the system in accordance with **Section 4.**

## 3.  Permitting & Utility Interconnection

3.1. EPC Contractor is responsible for securing all applicable permits or other approvals required by the applicable authority, paying permit fees and obtaining final city and other permitting agency sign-offs. This is to include, but not limited to municipal building, planning, or architectural or design review, landlord or other CC&R approvals, nighttime operations, or any other specialty permits.

3.2. The EPC Contractor will fulfill any and all City and/or Fire department requirements for project permitting and project approval (i.e.: Paleontology and Archaeology studies, ground mount aisle way requirements for Fire Trucks, etc).

3.3. EPC Contractor is responsible for filing the utility interconnection application as soon as the system design has been approved by CHSF and is also responsible for receiving utility interconnection approval.

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000057

3.4. Costs to have the utility shutdown the Host's facility for a system interconnection in will be covered by the EPC Contractor.

4.  **Procurement**

4.1. EPC Contractor will procure all necessary materials, including but not limited to, photovoltaic modules, AC and DC wiring, DC junction boxes, AC and DC disconnects, inverter(s) and applicable shade structure(s), combiner boxes, conduit, electrical switchgear as needed, transformers as needed, data acquisition system and meteorological station(s), revenue grade meter(s), security components including fencing, cameras and perimeter monitoring as required, module mounting system and all other components, parts, products and materials to complete the construction of the Project in accordance with all applicable specifications in **Section 4.**

5.  **Construction Management**

5.1. EPC Contractor will have a designated Project Manager.
5.2. EPC Contractor will have a designated General Superintendent/Safety Activity Coordinator.
5.3. EPC Contractor will have a General Superintendent on site at all times when work is being performed by its employees or its sub-contractors.

6.  **Construction**

6.1. EPC Contractor will prepare the site in accordance with engineer(s) of record's guidelines.
6.2. EPC Contractor will construct the system in accordance with the engineer(s) of record's guidelines.
6.3. EPC Contractor will adhere to the applicable regulatory body air quality standards during construction.
6.4. EPC Contractor will assemble, construct and install with its own labor resources and/or Subcontractors, the following hardware and materials to include, but not limited to photovoltaic modules, AC and DC wiring, DC junction boxes, AC and DC disconnects, inverter(s) and applicable shade structure(s), combiner boxes, conduit, electrical switchgear as needed, transformers as needed, data acquisition system and meteorological station(s), revenue grade meter(s), security components including fencing, cameras and perimeter monitoring as required, module mounting system and all other components, parts, products and materials to complete the construction of the Project.
6.5. EPC Contractor shall perform the Work, in accordance with practices generally accepted in the industry, all Applicable Laws, Governmental Approvals and permitting requirements, and quality control and inspections so that the Solar Energy Facility (i) meets or exceeds all requirements of Applicable Laws, Governmental Approvals and licenses and the Project is installed in accordance with manufacturer's specifications or by methods otherwise approved by the manufacturer(s); (ii) complies with all requirements of the Utility Interconnection Agreement; (iii) meets or exceeds the manufacturers warranties and guarantees; (iv) are safe and adequate for their intended purpose and conditions; (v) are free from defects; (vi) is comprised of equipment

HIGHLY CONFIDENTIAL RESTRICTED SUBJECT TO PROTECTIVE ORDER

000058

which is new and of good quality when installed, designed and manufactured and of a grade in accordance with generally accepted national standards for the design, manufacture and quality of such equipment; and (viii) meets or exceeds all requirements for any applicable federal, state or other rebates and incentives.

6.6.  EPC Contractor is responsible for providing construction power as needed.

6.7.  EPC Contractor is responsible for providing drinking water and sanitation facilities for all workers on the Site.

7. **Completion**

7.1.  EPC Contractor will commission the system in accordance with municipality's commissioning requirements.

7.2.  EPC Contractor will provide an  operations and maintenance manual ("O&M") with maintenance protocols based on manufacturers' recommendations to ensure Manufacturers' Warranties remain intact.

7.3.  EPC Contractor will train CHSF's designee in the system operation and emergency procedures as well as standard inverter shut down and restart procedures, each of which shall be documented in writing with copies for CHSF.

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000059

# Exhibit B:

# Project Schedule

Mobilization Date November 20, 2014

April 30, 2015 Substantial Completion

May 31, 2015 Commercial Operation Date

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000060

# Exhibit C:

## Schedule of Values

Fixed Price (Turnkey Installation) of Project: ELEVEN MILLION ONE HUNDRED THREE THOUSAND FIVE HUNDRED EIGHTY FOUR dollars (US$11,103,584.00)

Schedule of Values:

Prices as indicated are subject to change within 30 days from the delivery of final engineering and/or permit documentation.

(Itemized Schedule of Values attached hereto and incorporated herein)

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

**7.3 MW DC Solar Farm - Church Hill, Maryland**

| | | |
|---|---|---|
| 800 Watt Modules (watts) | 24,480 | 7,344,000 |
| Total (watts) | | 7,344,000 |

| Construction Budget | $/watt | $ | November | % | December | % | January | % | February | % | March | % | April | % | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Engineering** | | | | | | | | | | | | | | | |
| Upgrade - Review Engineering Design | 0.020 | 146,880.00 | 73,440.00 | 50% | 73,440.00 | 50% | - | | - | | - | | - | | 100% |
| Permitting | 0.004 | 29,673.47 | 29,673.47 | 100% | - | | - | | - | | - | | - | | 100% |
| As-Built Documentation | 0.001 | 5,994.19 | - | | - | | - | | - | | - | | 5,994.19 | 100% | 100% |
| **Subtotal** | 0.025 | 182,547.66 | 103,113.47 | | 73,440.00 | | - | | - | | - | | 5,994.19 | | |
| **Major Equipment** | | | | | | | | | | | | | | | |
| Modules | 0.760 | 5,581,440.00 | - | | 1,116,288.00 | 20% | 1,674,432.00 | 30% | - | | - | | 2,790,720.00 | 50% | 100% |
| Inverters & transformer | 0.158 | 1,163,626.03 | 349,087.81 | 30% | - | | - | | - | | - | | 814,538.22 | 70% | 100% |
| Racking | 0.145 | 1,064,880.00 | 212,976.00 | 20% | 212,976.00 | 20% | 425,952.00 | 40% | 212,976.00 | 20% | - | | - | | 100% |
| DC Combiners | 0.005 | 38,362.81 | - | | - | | 7,672.56 | 20% | - | | - | | 30,690.25 | 80% | 100% |
| Monitoring System | 0.010 | 73,440.00 | - | | - | | - | | - | | 73,440.00 | #### | - | | 100% |
| Spare Parts | 0.003 | 24,975.84 | - | | - | | - | | - | | - | | 24,975.84 | 100% | 100% |
| **Subtotal** | 1.082 | 7,946,724.68 | 562,063.81 | | 1,329,264.00 | | 2,108,056.56 | | 212,976.00 | | 73,440.00 | | 3,660,924.31 | | |
| **Balance of Systems Components** | | | | | | | | | | | | | | | |
| DC Cabling | 0.024 | 174,681.21 | - | | - | | 34,936.24 | 20% | 52,404.36 | 30% | 87,340.61 | 50% | - | | 100% |
| DC Grounding | 0.009 | 67,479.35 | - | | - | | 13,495.87 | 20% | 20,243.81 | 30% | 33,739.68 | 50% | - | | 100% |
| AC Cabling | 0.016 | 116,454.14 | - | | - | | 23,290.83 | 20% | 34,936.24 | 30% | 58,227.07 | 50% | - | | 100% |
| AC Grounding | 0.002 | 11,645.41 | - | | - | | 2,329.08 | 20% | 3,493.62 | 30% | 5,822.71 | 50% | - | | 100% |
| Conduit | 0.005 | 34,936.24 | - | | - | | 6,987.25 | 20% | 10,480.87 | 30% | 17,468.12 | 50% | - | | 100% |
| Misc | 0.008 | 58,227.07 | - | | - | | 29,113.54 | 50% | - | | - | | 29,113.54 | 50% | 100% |
| **Subtotal** | 0.063 | 463,423.42 | - | | - | | 110,152.81 | | 121,558.91 | | 202,598.18 | | 29,113.54 | | |
| **Subcontractors** | | | | | | | | | | | | | | | |
| Medium Voltage Interconnection (Electrician) | 0.071 | 524,043.64 | 52,404.36 | 10% | 157,213.09 | 30% | 157,213.09 | 30% | 104,808.73 | 20% | - | | 52,404.36 | 10% | 100% |
| Racking Buildout | 0.050 | 367,200.00 | - | | - | | 183,600.00 | 50% | 146,880.00 | 40% | - | | 36,720.00 | 10% | 100% |
| Construction / Gravel Road | 0.009 | 64,937.04 | 12,987.41 | 20% | 45,455.93 | 70% | 6,493.70 | 10% | - | | - | | - | | 100% |
| Construction Entrance | 0.001 | 7,992.26 | 3,996.13 | 50% | 3,996.13 | 50% | - | | - | | - | | - | | 100% |
| Drainage | 0.002 | 17,468.12 | - | | 17,468.12 | 100% | - | | - | | - | | - | | 100% |
| Private Locating | 0.001 | 6,987.25 | 6,987.25 | 100% | - | | - | | - | | - | | - | | 100% |
| Construction Road Recondition | 0.001 | 4,995.16 | - | | - | | - | | - | | - | | 4,995.16 | 100% | 100% |
| Verizon Work | 0.008 | 60,000.00 | - | | 60,000.00 | 100% | - | | - | | - | | - | | 100% |
| **Subtotal** | 0.143 | 1,053,623.46 | 76,375.15 | | 284,133.27 | | 347,306.80 | | 251,688.73 | | - | | 94,119.52 | | |
| **Site Conditions** | | | | | | | | | | | | | | | |
| Landscape Buffer | 0.018 | 130,429.84 | 65,214.92 | 50% | 65,214.92 | 50% | - | | - | | - | | - | | 100% |
| Seeding | 0.005 | 34,936.24 | - | | - | | - | | - | | 34,936.24 | #### | - | | 100% |
| Portable Toilet | 0.000 | 2,000.00 | - | | 375.00 | 25% | 375.00 | 25% | 375.00 | 25% | 375.00 | 25% | - | | 100% |
| Permanent Material Shed | 0.000 | 2,000.00 | - | | - | | - | | - | | 2,000.00 | #### | - | | 100% |
| Permanent Security Fence | 0.009 | 64,000.00 | 19,200.00 | 30% | 44,800.00 | 70% | - | | - | | - | | - | | 100% |
| Construction Trailer / Generator | 0.000 | 1,500.00 | - | | 375.00 | 25% | 375.00 | 25% | 375.00 | 25% | 375.00 | 25% | - | | 100% |
| Silt Fencing | 0.000 | 1,500.00 | 1,500.00 | 100% | - | | - | | - | | - | | - | | 100% |
| Code Compliance Labeling | 0.000 | 3,000.00 | - | | - | | - | | - | | 3,000.00 | #### | - | | 100% |
| Debris Removal | 0.001 | 10,000.00 | - | | - | | 3,300.00 | 33% | 3,300.00 | 33% | 3,400.00 | 34% | - | | 100% |
| Cold Weather Condition / Snow Removal | 0.007 | 50,000.00 | - | | - | | - | | 25,000.00 | 50% | 25,000.00 | 50% | - | | 100% |
| **Subtotal** | 0.041 | 298,864.88 | 85,914.92 | | 110,764.32 | | 4,050.00 | | 29,050.00 | | 69,086.24 | | - | | |
| **Labor** | | | | | | | | | | | | | | | |
| Security Guard / Patrol | 0.004 | 27,000.00 | - | | 6,750.00 | 25% | 6,750.00 | 25% | 6,750.00 | 25% | 6,750.00 | 25% | - | | 100% |
| Project Superintendent | 0.011 | 80,000.00 | - | | 20,000.00 | 25% | 20,000.00 | 25% | 20,000.00 | 25% | 20,000.00 | 25% | - | | 100% |
| Laborer / Installers | 0.027 | 209,000.00 | - | | 50,000.00 | 25% | 50,000.00 | 25% | 50,000.00 | 25% | 50,000.00 | 25% | - | | 100% |
| Technician | 0.011 | 80,000.00 | - | | 20,000.00 | 25% | 20,000.00 | 25% | 20,000.00 | 25% | 20,000.00 | 25% | - | | 100% |
| Surveyor | 0.003 | 20,000.00 | 10,000.00 | 50% | 10,000.00 | 50% | - | | - | | - | | - | | 100% |
| **Subtotal** | 0.055 | 407,000.00 | 10,000.00 | | 106,750.00 | | 96,750.00 | | 96,750.00 | | 96,750.00 | | - | | |
| **Equipment Rental** | | | | | | | | | | | | | | | |
| Crane Rental | 0.001 | 8,000.00 | - | | - | | - | | 8,000.00 | #### | - | | - | | 100% |
| Rough Terrain Forklift | 0.002 | 12,000.00 | - | | 3,960.00 | 33% | 3,960.00 | 33% | 4,080.00 | 34% | - | | - | | 100% |
| Wire Puller | 0.000 | 1,600.00 | - | | - | | 800.00 | 50% | 800.00 | 50% | - | | - | | 100% |
| Trencher | 0.000 | 3,000.00 | - | | - | | 1,500.00 | 50% | 1,500.00 | 50% | - | | - | | 100% |
| Shopvac | 0.000 | 300.00 | - | | - | | 150.00 | 50% | 150.00 | 50% | - | | - | | 100% |
| Cable Stands | 0.000 | 2,000.00 | - | | - | | 1,000.00 | 50% | 1,000.00 | 50% | - | | - | | 100% |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Generators | $ | 0.000 | $ | 2,000.00 | $ | - | $ | 660.00 | 33% | $ | 660.00 | 33% | $ | 880.00 | 34% | $ | - | $ | - | - | 100% |
| Trailer | $ | 0.000 | $ | 1,500.00 | $ | - | $ | 495.00 | 33% | $ | 495.00 | 33% | $ | 510.00 | 34% | $ | - | $ | - | - | 100% |
| Pickup Truck | $ | 0.000 | $ | 3,000.00 | $ | - | $ | 3,000.00 | 100% | $ | - | $ | - | $ | - | $ | - | 100% |
| General Tools | $ | 0.001 | $ | 10,000.00 | $ | - | $ | 3,300.00 | 33% | $ | 3,300.00 | 33% | $ | 3,400.00 | 34% | $ | - | $ | - | - | 100% |
| **Subtotal** | $ | 0.006 | $ | 43,400.00 | $ | - | $ | 11,415.00 | | $ | 11,865.00 | | $ | 20,120.00 | | $ | - | $ | - | | |
| **Administration** | | | | | | | | | | | | | | | | | | | | | |
| Project Accounting | $ | 0.001 | $ | 10,000.00 | $ | - | $ | - | | $ | - | | $ | - | | $ | - | $ | 10,000.00 | 100% | 100% |
| Project Legal | $ | 0.008 | $ | 60,000.00 | $ | 15,000.00 | 25% | $ | 15,000.00 | 25% | $ | - | $ | - | $ | 15,000.00 | 25% | $ | 15,000.00 | 25% | 100% |
| Safe Harbor Audit / LMA / Compliance MGMT | $ | 0.001 | $ | 10,000.00 | $ | - | $ | - | $ | - | $ | 4,000.00 | #### | $ | - | | 100% |
| NETZ Cable Testing | $ | 0.001 | $ | 4,000.00 | $ | - | $ | - | $ | - | $ | 4,000.00 | #### | $ | - | | 100% |
| Recloser Witness Testing | $ | 0.000 | $ | 2,000.00 | $ | - | $ | - | $ | - | $ | 2,000.00 | #### | $ | - | | 100% |
| **Subtotal** | $ | 0.012 | $ | 86,000.00 | $ | 15,000.00 | | $ | 15,000.00 | | $ | - | | $ | 6,000.00 | | $ | 25,000.00 | $ | 25,000.00 | |
| **Logistics** | | | | | | | | | | | | | | | | | | | | | |
| Material Shipping | $ | 0.003 | $ | 20,000.00 | $ | 4,000.00 | 20% | $ | 4,000.00 | 20% | $ | 4,000.00 | 20% | $ | 4,000.00 | 20% | $ | 4,000.00 | 20% | $ | - | - | 100% |
| Travel | $ | 0.002 | $ | 12,000.00 | $ | 2,400.00 | 20% | $ | 2,400.00 | 20% | $ | 2,400.00 | 20% | $ | 2,400.00 | 20% | $ | 2,400.00 | 20% | $ | - | - | 100% |
| Accmmodation | $ | 0.003 | $ | 20,000.00 | $ | 4,000.00 | 20% | $ | 4,000.00 | 20% | $ | 4,000.00 | 20% | $ | 4,000.00 | 20% | $ | 4,000.00 | 20% | $ | - | - | 100% |
| **Subtotal** | $ | 0.007 | $ | 52,000.00 | $ | 10,400.00 | | $ | 10,400.00 | | $ | 10,400.00 | | $ | 10,400.00 | | $ | 10,400.00 | | $ | - | |
| **Insurance** | | | | | | | | | | | | | | | | | | | | | |
| Insurance | $ | 0.003 | $ | 20,000.00 | $ | - | $ | 20,000.00 | 100% | $ | - | $ | - | $ | - | $ | - | | 100% |
| Miscellaneous | $ | 0.014 | $ | 100,000.00 | $ | 20,000.00 | 20% | $ | 20,000.00 | 20% | $ | 20,000.00 | 20% | $ | 20,000.00 | 20% | $ | 20,000.00 | 20% | $ | - | - | 100% |
| **Project Management/ OH** | | | | | | | | | | | | | | | | | | | | | |
| Project Management/ Supervision | $ | 0.061 | $ | 450,000.00 | $ | 100,000.00 | 22% | $ | 70,000.00 | 16% | $ | 70,000.00 | 16% | $ | 70,000.00 | 16% | $ | 70,000.00 | 16% | $ | 70,000.00 | 16% | 100% |
| **Subtotal Payment Amount** | | | | | $ | 982,866.75 | | $ | 2,051,166.59 | | $ | 2,778,581.16 | | $ | 838,543.63 | | $ | 567,274.42 | | $ | 3,885,151.55 | |
| **Total Hard Construction Cost** | $ | 1.512 | $ | 11,103,584.10 | | | | | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000063

# Exhibit D

## Schedule of Equipment

The EPC Contractor shall procure and install within its scope of work for the project, including but not limited to, the following equipment and/or materials (or equivalent):

Modules:    High quality Solar PV Modules sufficient to complete the 7.344MW DC Project and qualified as UL 1000V, 300watt panels, of the following type: _____ or equivalent modules of other types.

Inverters:    Eight (8ea) SG750MX inverter systems with Three Phase Pad-Mount Transformers (1.5MVA Medium Voltage), or equivalent, and Schoals Technology Group Power House Plug & Play Inverter Stations, or equivalent.

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000064

# Exhibit E:

## Warranties

EPC Contractor shall provide CHSF the following EPC Contractor and equipment manufacturer warrantees for the Project:

1. Modules shall be warranted for workmanship for ten (10) years. Modules power output shall be warranted to be not less than 90% of the minimum peak power at STC for a minimum of ten (10) years.
2. Modules power output shall be warranted to be not less than 80% of the minimum peak power at STC for a minimum of twenty-five (25) years.
3. Inverters shall carry a structured warranty of five (5) years from the warranty start date/commercial operations.
4. The project power plant shall be warranted for a maximum of one year from COD.

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER

000065

EXHIBIT F

Security Agreement

HIGHLY CONFIDENTIAL-RESTRICTED-SUBJECT TO PROTECTIVE ORDER