

Transcript of the Testimony of:   **Shiliang Peng**

01/11/2012

Chinese Drywall

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA

2

    _____
3                              § MDL NO. 2047
    IN RE:                     §
4   CHINESE-                   § SECTION: L
    MANUFACTURED               §
5   DRYWALL PRODUCTS           § JUDGE FALLON
    LIABILITY                  §
6   LITIGATION                 § MAGISTRATE
    _____       § JUDGE WILKINSON

7
                    -   -   -
8
      CROSS NOTICED IN VARIOUS OTHER ACTIONS
9
                    -   -   -
10
                 January 11, 2012
11
                    -   -   -
12
        CONFIDENTIAL - SUBJECT TO FURTHER
13           CONFIDENTIALITY REVIEW
14                  -   -   -
15          Videotaped deposition of
    SHILIANG PENG, held at the Executive
16  Centre, Level 3, Three Pacific Place, One
    Queen's Road East, Hong Kong, China,
17  commencing at 8:30 a.m., on the above
    date, before Linda L. Golkow, Certified
18  Court Reporter, Registered Diplomate
    Reporter, Certified Realtime Reporter and
19  Notary Public.
                    -   -   -
20
21
22          GOLKOW TECHNOLOGIES, INC.
       877.370.3377 ph | 917.591.5672 fax
23              deps@golkow.com
24

Confidential - Subject to Further Confidentiality Review

```
 1   BEFORE:
 2        HONORABLE ELDON E. FALLON
          UNITED STATES FEDERAL COURT -
 3        EASTERN DISTRICT OF LOUISIANA
 4
 5   APPEARANCES:
 6
     GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 7   & WARSHAUER, L.L.C.
     BY:  GERALD E. MEUNIER, ESQUIRE
 8   2800 Energy Centre
     1100 Poydras Street
 9   New Orleans, Louisiana 70163
     (504) 522-2304
10   gmeunier@gainsben.com
     Representing the Plaintiffs'
11   Steering Committee
12
     HERMAN HERMAN KATZ & COTLAR, LLP
13   BY:  LEONARD A. DAVIS, ESQUIRE
     820 O'Keefe Avenue
14   New Orleans, Louisiana 70113
     (504) 581-4892
15   Ldavis@hhkc.com
     Representing the Plaintiffs'
16   Steering Committee
17
     COLSON HICKS EIDSON
18   BY:  ERVIN GONZALEZ, ESQUIRE
     BY:  PATRICK S. MONTOYA, ESQUIRE
19   255 Alhambra Circle
     Penthouse
20   Coral Gables, Florida 33134
     (305) 476-7400
21   Ervin@colson.com
     Patrick@colson.com
22   Representing Plaintiffs' Steering
     Committee in the Federal and State
23   Coordinated Actions
24
```

```
 1   APPEARANCES (CONTINUED):
 2
         LEVIN, FISHBEIN, SEDRAN & BERMAN
 3       BY:  ARNOLD LEVIN, ESQUIRE
         510 Walnut Street - Suite 500
 4       Philadelphia, Pennsylvania 19106
         (215) 592-1500
 5       Alevin@lfsblaw.com
         Representing the Plaintiffs'
 6       Steering Committee
 7
         SEEGER WEISS LLP
 8       BY:  SCOTT A. GEORGE, ESQUIRE
         One William Street
 9       New York, New York 10004
         (212) 584-0700
10       Sgeorge@seegerweiss.com
         Representing the Plaintiffs'
11       Steering Committee
12
         HOGAN LOVELLS US LLP
13       BY:  JOE CYR, ESQUIRE
         875 Third Avenue
14       New York, New York 10022
         (212) 918-3000
15       Joe.cyr@hoganlovells.com
         Representing Taishan Gypsum Co.
16       Ltd. and Taian Taishan
         Plasterboard Company Ltd. and the
17       Witness, Shiliang Peng
18
         HOGAN LOVELLS INTERNATIONAL LLP
19       BY:  EUGENE CHEN, ESQUIRE
         18th Floor, Park Place
20       1601 Nanjing Road West
         Shanghai, China 200040
21       (86 21) 6122 3800
         eugene.chen@hoganlovells.com
22       Representing Taishan Gypsum Co.
         Ltd. and Taian Taishan Plasterboard
23       Company Ltd. and the Witness,
         Shiliang Peng
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):
 2
      GREENBERG TRAURIG, LLP
 3    BY:  HILARIE BASS, ESQUIRE
      1221 Brickell Avenue
 4    Miami, Florida 33131
      (305) 579-0745
 5    bassh@gtlaw.com
      Representing the Home Builders
 6    Steering Committee
 7
      PERKINS COIE LLP
 8    BY:  DAVID L. BLACK, ESQUIRE
      1899 Wynkoop Street
 9    Suite 700
      Denver, Colorado 80202
10    (303) 291-2300
      DBlack@perkinscoie.com
11    Representing the State of Louisiana
12
      THOMPSON COE COUSINS & IRONS, L.L.P.
13    BY:  KEVIN F. RISLEY, ESQUIRE
      One Riverway
14    Suite 1600
      Houston, Texas 77056
15    (713) 403-8210
      krisley@thompsoncoe.com
16    Representing The North River
      Insurance Company
17
18    BRENNER, EVANS & MILLMAN, P.C.
      BY:  THEODORE I. BRENNER, ESQUIRE
19    411 East Franklin Street
      Suite 200
20    Richmond, Virginia 23218
      Tbrenner@beylaw.com
21    (804) 644-1300
      Representing Tobin Trading Company
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (CONTINUED):
 2
          McKENRY, DANCIGERS, DAWSON &
 3        LAKE, P.C.
          BY:  J. BRIAN SLAUGHTER, ESQUIRE
 4        192 Ballard Court
          Suite 400
 5        Virginia Beach, Virginia 23462
          (757) 461-2500
 6        Jbslaughter@va-law.org
          Representing Atlantic Homes LLC and
 7        Multiple Other Virginia-Based
          Defendants
 8
 9        QUINN EMANUEL URQUHART & SULLIVAN,LLP
          BY:  JANE M. BYRNE, ESQUIRE
10        BY:  JULIA BESKIN, ESQUIRE
          51 Madison Avenue
11        22nd Floor
          New York, New York 10010
12        (212) 849-7000
          Janeburne@quinnemanuel.com
13        Juliabeskin@Quinnemanuel.Com
          Representing Chartis Select Insurance
14        Company and Related Chartis Insurers
15
16        WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
          BY:  MICHAEL SEXTON, ESQUIRE
17        3344 Peachtree Road, NE
          Suite 2400
18        Atlanta, Georgia 30326
          (404) 876-2700
19        msexton@wwhgd.com
          Representing Various Banner
20        Defendants
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1        APPEARANCES (CONTINUED):

 2

          SINNOTT, NUCKOLS & LOGAN, PC

 3        BY:  KENNETH F. HARDT, ESQUIRE

          13811 Village Mill Drive

 4        Midlothian, Virginia 23114

          (804) 378-7600

 5        khardt@snllaw.com

          Representing Venture Supply, Inc. and

 6        Porter-Blaine Corp.

 7

    ALSO PRESENT:

 8

          SUNNY WANG, INTERPRETER

 9

10

11                      -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    APPEARANCES VIA TELEPHONE:

 2

 3       GALLOWAY JOHNSON TOMPKINS BURR and SMITH
         BY:  CARLINA C. EISELEN, ESQUIRE
 4       One Shell Square
         701 Poydras Street, 40th Floor
 5       New Orleans, Louisiana 70139
         (504) 525-6802
 6       ceiselen@gjtbs.com
         Representing Interior/Exterior
 7       Building Supply

 8

         HUNTON & WILLIAMS LLP
 9       BY:  A. TODD BROWN, ESQUIRE
         Bank of America Plaza
10       101 South Tryon Street
         Suite 3500
11       Charlotte, North Carolina  28280
         (704) 378-4700
12       Representing Stock Building Supply, LLC

13

14       JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE LLP
15       BY:  MEGAN E. DONOHUE, ESQUIRE
         600 Jefferson Street, Suite 1600
16       Lafayette, Louisiana 70501
         (337) 262-9062
17       mdonohue@joneswalker.com
         Representing Fireman's Fund Insurance
18       Company

19

         FULMER LEROY ALBEE BAUMANN
20       BY:  MICHAEL P. McCAHILL, ESQUIRE
         2866 East Oakland Park Boulevard
21       Ft. Lauderdale, Florida 33306
         (954) 707-4430
22       mosscandace@fulmerleroy.com
         mmccahill@fulmerleroy.com
23       Representing Independent Builders
         Supply Association (IBSA)

24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE (CONTINUED):

 2

 3        WRIGHT, FULFORD, MOORHEAD & BROWN, P.A.
          BY:  DORYK B. GRAF, JR., ESQUIRE
 4        145 N. Magnolia Ave.
          Orlando, Florida 32801
 5        (407) 425-0234
          dgraf@wfmblaw.com
 6        Representing West Construction, Inc.

 7

 8        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY: CLINTON DOCKERY, ESQUIRE
 9        51 Madison Avenue, 22nd Floor
          New York, New York 10010
10        (212) 849-7000
          clintondockery@quinnemanuel.com
11        Representing Chartis Select Insurance
          Company and Related Chartis Insurers

12

13        RUMBERGER, KIRK & CALDWELL, P.A.
          BY:  MONICA C. SEGURA, ESQUIRE
14        Brickell Bayview Centre, Suite 3000
          80 Southwest 8th Street
15        Miami, Florida 33130
          (305) 358-5577
16        Representing several defendants and
          Defendants' Liaison Counsel for
17        Installers

18
          BUCHANAN INGERSOLL & ROONEY
19        BY:  C. ROBERT ZAPPALA, ESQUIRE
          One Oxford Centre
20        301 Grant Street, 20th Floor
          Pittsburgh, Pennsylvania 15219
21        (412) 392-2135
          bobby.zappala@bipc.com
22        Representing 84 Lumber

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES VIA STREAM:
 2
     BECNEL LAW FIRM, L.L.C.
 3   BY:  ROBERT BECNEL, ESQUIRE
     106 W. 7th Street
 4   Reserve, Louisiana 70084
     (985) 536-1186
 5   robbecnel@aol.com
     Representing the Plaintiffs'
 6   Steering Committee
 7
     PARKER WAICHMAN ALONSO LLP
 8   BY:  JORDAN L. CHAIKIN, ESQUIRE
     3301 Bonita Beach Road
 9   Bonita Springs, Florida 34134
     (239) 390-1000
10   Jchaikin@yourlaywer.com
     Representing Plaintiffs' Steering
11   Committee
12
     MORGAN & MORGAN
13   BY:  PETE V. ALBANIS, ESQUIRE
     12800 University Drive
14   Suite 600
     Fort Myers, Florida 33907
15   (877) 667-4265
     Representing the Plaintiffs
16
17   IRPINO LAW FIRM
     BY:  ANTHONY IRPINO, ESQUIRE
18   2216 Magazine Street
     New Orleans, Louisiana 70130
19   Airpino@irpinolaw.com
     (504) 525-1500
20   Representing the Plaintiffs
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):
 2
 3       GALLOWAY JOHNSON TOMPKINS BURR and SMITH
         BY:  CARLINA C. EISELEN, ESQUIRE
 4       One Shell Square
         701 Poydras Street, 40th Floor
 5       New Orleans, Louisiana 70139
         (504) 525-6802
 6       ceiselen@gjtbs.com
         Representing Interior/Exterior
 7       Building Supply
 8
         HEARD & MEDACK, P.C.
 9       BY:  JAMES DAVIS, ESQUIRE
         9494 Southwest Freeway, Suite 700
10       Houston, Texas 77074
         (713) 772-6400
11       jdavis@heardmedackpc.com
         Representing CastleRock Communities, L.P.
12
13
         HUNTON & WILLIAMS LLP
14       BY:  A. TODD BROWN, ESQUIRE
         Bank of America Plaza
15       101 South Tryon Street
         Suite 3500
16       Charlotte, North Carolina  28280
         (704) 378-4700
17       tbrown@hunton.com
         Representing Stock Building Supply, LLC
18
19
         SHER GARNER CAHILL RICHTER KLEIN &
20       HILBERT, L.L.C.
         BY:  MATTHEW C. CLARK, ESQUIRE
21       909 Poydras Street
         Suite 2800
22       New Orleans, Louisiana 70112
         (504) 299-2100
23       mclark@shergarner.com
         Representing the Southern Home
24       Defendants
```

Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES VIA STREAM (CONTINUED):
 2
 3      QUINN EMANUEL URQUHART & SULLIVAN, LLP
         BY: CLINTON DOCKERY, ESQUIRE
 4       51 Madison Avenue, 22nd Floor
         New York, New York 10010
 5       (212) 849-7000
         clintondockery@quinnemanuel.com
 6       Representing Chartis Select Insurance
         Company and Related Chartis Insurers
 7
 8      JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE LLP
 9       BY:  MEGAN E. DONOHUE, ESQUIRE
         600 Jefferson Street, Suite 1600
10       Lafayette, Louisiana 70501
         (337) 262-9062
11       mdonohue@joneswalker.com
         Representing Fireman's Fund Insurance
12       Company
13
         DEUTSCH, KERRIGAN & STILES
14       BY:  MELISSA M. SWABACKER, ESQUIRE
         755 Magazine St.
15       New Orleans, Louisiana  70130
         (504) 581-5141
16       mswabacker@dkslaw.com
         Representing Landmark American
17       Insurance Company
18       PUGH, ACCARDO, HAAS, RADECKER, CAREY
         & HYMEL, LLC
19       BY:  DONNA M. YOUNG, ESQUIRE
         1100 Poydras Street
20       Suite 3200
         New Orleans, Louisiana 70163
21       Dyoung@pugh-law.com
         (504) 799-4500
22       Representing Stock Building Supply
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA STREAM (CONTINUED):

 2

 3        WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
          BY:  SHUBHRA MASHELKAR, ESQUIRE
 4        3344 Peachtree Road, NE
          Suite 2400
 5        Atlanta, Georgia 30326
          (404) 876-2700
 6        Smashelkar@wwhgd.com
          Representing Various Banner
 7        Defendants

 8
                        -   -   -
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -
 2                  I N D E X
 3   WITNESS                      PAGE NO.
 4   SHILIANG PENG
 5    By Mr. Meunier                 19
 6    By Ms. Bass                    112
 7    By Mr. Cyr                     116
 8    By Mr. Meunier                 124
 9
10
11                      -  -  -
12                E X H I B I T S
13
     NO.           DESCRIPTION      PAGE NO.
14
15    Peng S.-1    E-mail chain, top   51
                   e-mail in English
16                 dated August 03,
                   2006, Bates stamped
17                 TG 0019798 through
                   TG 0019800
18
     Peng S.-2     E-mail chain, top   56
19                 one dated
                   12/12/2005, Bates
20                 stamped TG 0019840
                   and TG 0019841
21
     Peng S.-3     E-mail chain, top   59
22                 one dated
                   10/15/2005, Bates
23                 stamped TG 0019813
                   and TG 0019814
24
```

Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Peng S.-4 | Invoice dated July | 80 |
| | | 03, 2006, Bates | |
| 2 | | stamped TG 0020090 | |
| 3 | Peng S.-5 | Taian Taishan | 83 |
| | | Plasterboard Co., | |
| 4 | | Ltd., Packing List | |
| | | dated July 03, | |
| 5 | | 2006, Bates stamped | |
| | | TG 0019366 | |
| 6 | | | |
| | Peng S.-6 | Taian Taishan | 88 |
| 7 | | Plasterboard Co., | |
| | | Ltd., Invoice dated | |
| 8 | | July 20, 2006, | |
| | | Bates stamped TG | |
| 9 | | 00120091 | |
| 10 | Peng S.-7 | Taian Taishan | 88 |
| | | Plasterboard Co., | |
| 11 | | Ltd., Invoice dated | |
| | | July 20, 2006, | |
| 12 | | Bates stamped TG | |
| | | 00120092 | |
| 13 | | | |
| | Peng S.-8 | Taian Shandong | 91 |
| 14 | | Province Special | |
| | | Invoice for Export, | |
| 15 | | Bates number TG | |
| | | 0001657, TG | |
| 16 | | 0001658, TG | |
| | | 0001661, TG 0001663 | |
| 17 | | through TG 0001670, | |
| | | and TG 0001680 | |
| 18 | | through TG 0001682 | |
| 19 | Peng S.-9 | Settlement and | 100 |
| | | Release Agreement, | |
| 20 | | Bates stamped TG | |
| | | 0020118 through TG | |
| 21 | | 0020122 | |
| 22 | Peng S.-10 | Contract, Bates | 112 |
| | | stamped TG 0001704 | |
| 23 | | through TG 0001706 | |
| 24 | | | |

```
 1   Jia              Document in Chinese, 122
     Defendant's 45  Bates stamped TG
 2                    0026004 through TG
                      0026006
 3
     Jia              2006 Financial    122
 4   Defendant's 45A Statement of Taian
                      Taishan Plasterboard
 5                    Co., Ltd., Bates
                      stamped TG 0026004
 6                    through TG 0026006667
 7   Jia              Document in Chinese, 123
     Defendant's 46  Bates stamped TG
 8                    0026007 through TG
                      0026009
 9
     Jia              Balance Sheet, Bates 123
10   Defendant's 46A stamped TG 0026007
                      through TG 0026009
11
     Jia              Document in Chinese, 123
12   Defendant's 47  Bates stamped TG
                      0026010 through TG
13                    0026012
14   Jia              2008 Financial    123
     Defendant's 47A Statement of Taian
15                    Taishan Plasterboard
                      Co., Ltd. Balance
16                    Sheet, Bates stamped TG
                      0026010 through TG
17                    0026012
18
19
20
21
22
23
24
```

```
 1                 -  -  -

 2            THE VIDEOTAPE TECHNICIAN:

 3       We are now on the record.  My name

 4       is Dan Lawlor.  I'm a videographer

 5       for Golkow Technologies.  Today's

 6       date is January 11, 2012 and the

 7       time is 8:30 a.m.

 8            This video deposition is

 9       being held in Hong Kong, China in

10       the matter of Chinese Drywall

11       Litigation for the United States

12       District Court, Eastern District

13       of Louisiana, MDL Number 2047 and

14       cross-noticed in various other

15       actions.

16            The deponent today is

17       Shiliang Peng.  Will Your Honor

18       and all those present please state

19       your presence for the record.

20            THE COURT:  Judge Eldon

21       Fallon, Eastern District of

22       Louisiana.

23            MR. MEUNIER:  Gerry Meunier

24       appearing for the Plaintiffs'
```

```
 1              Steering Committee in the MDL.
 2                   MR. DAVIS:  Leonard Davis on
 3              behalf of the Plaintiffs' Steering
 4              Committee and Plaintiffs' Liaison
 5              Counsel.
 6                   MS. BASS:  Hilarie Bass on
 7              behalf of Home Builders Steering
 8              Committee.
 9                   MR. GONZALEZ:  Good morning.
10              Ervin Gonzalez and Patrick Montoya
11              on behalf of the PSC and the MDL
12              liaison states.
13                   MR. HARDT:  Good morning,
14              Ken Hardt on behalf of Venture
15              Supply in the Germano action and
16              the Alexander state court action.
17                   MR. BRENNER:  Theodore
18              Brenner on behalf of Tobin Trading
19              in the Germano action.
20                   MR. SLAUGHTER:  Brian
21              Slaughter.  I'm here on behalf of
22              Atlantic Homes, LLC both in the
23              Commonwealth of Virginia and in
24              the MDL matters.
```

```
 1              MR. SEXTON:  Mike Sexton on

 2         behalf of certain Banner Supply

 3         entities.

 4              MR. BLACK:  David Black on

 5         behalf of the State of Louisiana

 6         reserving the positions set forth

 7         in our pending remand motion.

 8              MR. LEVIN:  Arnold Levin,

 9         lead counsel, Plaintiffs' Steering

10         Committee.

11              MR. GEORGE:  Scott Alan

12         George, Seeger Weiss, PSC.

13              MS. BESKIN:  Julia Beskin

14         from Quinn, Emanuel Urquhart &

15         Sullivan for the Chartis insurance

16         group.

17              MR. RISLEY:  Kevin Risley on

18         behalf of North River Insurance

19         Company.

20              MR. CYR:  Eugene Chen and

21         Joe Cyr of Hogan Lovells on behalf

22         of Defendants Taishan Gypsum and

23         TTP.

24              THE COURT:  Would you rise,
```

Confidential - Subject to Further Confidentiality Review

```
 1          please, sir.

 2                    -  -  -

 3          SHILIANG PENG, after having

 4          been duly sworn, was examined and

 5          testified as follows:

 6                    -  -  -

 7          THE COURT:  Have a seat,

 8          please.

 9          You may begin, Counsel.

10                    -  -  -

11          EXAMINATION

12                    -  -  -

13  BY MR. MEUNIER:

14          Q.    Good morning.

15          A.    Hello.

16          Q.    Would you please state your

17  name and business address.

18          A.    My name is Peng Shiliang,

19  last name, P-E-N-G, first name,

20  S-H-I-L-I-A-N-G.

21               I don't quite understand

22  what you mean by business address.

23          Q.    What address or addresses do

24  you use in order to conduct your
```

 1    business?

 2            A.    When I do my business?

 3            Q.    Do you have an office?

 4            A.    What period of time?

 5            Q.    Today.

 6            A.    Today I don't have an

 7    office.

 8            Q.    By whom are you employed?

 9            A.    I don't have an office right

10    now.

11            Q.    By whom are you employed?

12            A.    I don't understand from the

13    beginning.  What do you mean by business

14    address?

15            Q.    I'm asking a different

16    question now.  Who do you work for?

17            A.    Currently I work for TG.

18            Q.    In your work for TG, do you

19    work in an office?

20            A.    I work in the manufacture.

21            Q.    You work at a manufacturing

22    plant?

23            A.    Correct.  I work in a

24    manufacture plant.

Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Please give us the address
 2    of that plant.
 3                  INTERPRETER:  Interpreter
 4            clarification.
 5                  In Lucheng city,
 6            L-U-C-H-E-N-G, Shanxi province,
 7            S-H-A-N-X-I.
 8    BY MR. MEUNIER:
 9            Q.    Does the plant manufacture
10    drywall?
11            A.    There is a plant that
12    manufacture drywall.
13            Q.    Is the plant where you work
14    owned by TG?
15            A.    Yes.
16            Q.    What is your job position?
17            A.    I'm the manager of this
18    plant.
19            Q.    What are the duties and
20    responsibilities of the manager of the
21    plant?
22            A.    My duties are to be in
23    charge of the daily operation of the
24    plant to ensure its normal operation.
```

1        Q.    Who is the boss that you

2    report to?

3        A.    I report to the executives

4    of TG.

5        Q.    And who are they?

6        A.    Mr. Jia Tongchun.

7        Q.    Anyone else?

8        A.    And also Mr. Ren Xulian,

9    R-E-N, last name, first name,

10   X-U-L-I-A-N.

11       Q.    What is the job position of

12   Mr. Ren Xulian?

13       A.    Deputy general manager of

14   TG.

15       Q.    Which employees at the plant

16   report to you as their boss?

17       A.    Deputy production general

18   manager and the people in charge in

19   financial department and supply

20   department.

21       Q.    Please give me the names of

22   those people.

23       A.    Production manager, Mr. Chen

24   Zhongjian, last name, C-H-E-N, first

Confidential - Subject to Further Confidentiality Review

1   name, Z-H-O-N-G-J-I-A-N.

2          Q.    Who in the financial

3   department reports to you?

4          A.    Dai Zhiming, D-A-I, last

5   name, first name, Z-H-I-M-I-N-G.

6          Q.    Who in the support

7   department reports to you?  I'm sorry.

8   Who in the supply department reports to

9   you?

10         A.    Sun Qingli, last name,

11  S-U-N, first name, Q-I-N-G-L-I.

12         Q.    Are you in your current job

13  involved in the marketing or sale of

14  gypsum board?

15         A.    I have not participated in

16  marketing and sales activities.

17         Q.    How long have you held your

18  current position?

19         A.    Since April 2009 until

20  today.

21         Q.    What was your position with

22  TG before April of 2009?

23              MR. CYR:  Objection.

24              THE COURT:  What's the

Confidential - Subject to Further Confidentiality Review

1          objection for?

2               MR. CYR:  The question

3          assumes that he worked for TG

4          prior to April of 2009.

5               THE COURT:  Let's clarify

6          that, please.

7     BY MR. MEUNIER:

8          Q.   Did you work for TG before

9     2009, Mr. Peng?

10         A.   I did not work for TG before

11    that.

12         Q.   Who did you work for before

13    that?

14         A.   Before that, I worked for

15    TTP.

16         Q.   Is it true you started

17    working for TTP when that company was

18    created in February 2006?

19         A.   Yes, absolutely correct.

20         Q.   Tell me the job positions

21    you held with TTP between April 2006 and

22    April 2009.

23               MR. CYR:  That would be

24          February 2006.

Confidential - Subject to Further Confidentiality Review

```
 1              MR. MEUNIER:  I'm sorry,

 2         February 2006 and April 2009.

 3              THE WITNESS:  My position in

 4         TTP while I worked there were

 5         Chairman of the Board of Directors

 6         and general manager.

 7   BY MR. MEUNIER:

 8         Q.    In that position, were you

 9   in charge of the daily operations of TTP?

10         A.    In that position, I was in

11   charge of the daily operation of TTP.

12         Q.    TTP was owned 100 percent by

13   TG; is that correct?

14         A.    Can you repeat that?

15         Q.    TTP was owned 100 percent by

16   TG; is that correct?

17         A.    TG is the only shareholder

18   of TTP.

19         Q.    When you were the manager of

20   TTP, did you report to any of the

21   executives of TG?

22         A.    As the manager of TTP, I

23   worked independently.  I did not report

24   to the executives of TG.
```

1          Q.    Who reported to you as boss

2    during the time you were manager of TTP?

3          A.    TTP's production manager and

4    other relevant department managers in TTP

5    reported to me.

6          Q.    Please give me their names

7    and job positions.

8          A.    Song Qinghai, Mr. Song

9    Qinghai, last name, S-U-N-G, first name,

10   Q-I-N-G-H-A-I.

11              MR. CHEN:  Pardon me, just

12         for clarification, the Pinyin is

13         S-O-N-G, not S-U.

14   BY MR. MEUNIER:

15         Q.    Was he the production

16   manager at TTP?

17         A.    Correct.  He was the

18   production manager of TTP.

19         Q.    Who were the other relevant

20   employees who reported to you at TTP?

21         A.    Mr. Peng Wenlong at sales

22   department.

23         Q.    Was he in charge of the

24   sales department at TTP?

Confidential - Subject to Further Confidentiality Review

1         A.    He was in charge of the

2    sales department in TTP.

3         Q.    Who else reported to you?

4         A.    Zhang Min in financial

5    department.  Last name, Z-H-A-N-G, first

6    name, M-I-N.

7         Q.    Who worked under Mr. Peng

8    Wenlong in the sales department of TTP?

9         A.    There about seven or

10   eight employees under him and worked for

11   him.

12        Q.    Can you give me the names of

13   those you remember?

14        A.    Mr. Che Gang, Mr. Yang

15   Jiapo.  I can't remember the rest of the

16   names.

17        Q.    Are you a member of the

18   board of directors of TG?

19        A.    I am a member of TG's board

20   of directors.

21        Q.    For how long have you been a

22   member?

23        A.    Since its establishment in

24   February 2006 until today.

1        Q.    I was asking about you being

2    a member of the board of directors of TG

3    not TTP?

4        A.    I am not a member of the

5    board of directors in TG.

6        Q.    Have you ever been a member

7    of the board of directors of either

8    Shandong Taihe Dongxin or Taishan Gypsum?

9        A.    Neither.

10        Q.    Who did you work for before

11    TTP was created in February 2006?

12        A.    Before the establishment of

13    TTP in the year 2006, I worked at a

14    workshop in -- manufacturer workshop in

15    TG.

16        Q.    Were you employed by TG when

17    the name of the company was Shandong

18    Taihe Dongxin?

19        A.    Can you repeat the question?

20        Q.    Were you employed by a

21    company named Shandong Taihe Dongxin?

22        A.    Yes, correct.

23        Q.    When did you start working

24    for that company?

```
 1           A.     In 1991.

 2           Q.     Did you continue to work for

 3      that company after it changed its name to

 4      Taishan Gypsum?

 5           A.     Can you repeat it?

 6           Q.     When did Shandong Taihe

 7      Dongxin change its name to Taishan

 8      Gypsum?

 9           A.     I don't recall that.

10           Q.     Did you work for Shandong

11      Taihe Dongxin until February 2006?

12           A.     Yes.

13           Q.     And then after TTP --

14                  After you left TTP in April

15      of 2009, you went back to work for the

16      company which at that time was called

17      Taishan Gypsum; is that true?

18           A.     Correct.  At the time, it

19      was already Taishan Gypsum Company.

20           Q.     Tell me all the positions

21      you held at Shandong Taihe Dongxin

22      between 1991 and February 2006?

23           A.     I did not have a position in

24      TG.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    No.  I was asking about

 2   Shandong Taihe Dongxin.  When you --

 3   shall I ask it again?

 4          A.    I was only an ordinary

 5   employee at TG.

 6          Q.    What job positions did you

 7   have at Shandong Taihe Dongxin from 1991,

 8   when you started, until February of 2006,

 9   when you went to work for TTP?

10          A.    I was only a director of one

11   of TG's production manufacturer workshop.

12          Q.    Were you the director of

13   that production workshop from 1991 until

14   February 2006?

15          A.    Yes.

16          Q.    Which production facility

17   did you direct?

18          A.    It is just one of TG's

19   gypsum board workshop.

20               MR. MEUNIER:  Madam

21          Interpreter, I'm not clear about

22          the meaning of the word

23          "workshop."  Maybe you can help.

24               THE COURT:  Well, ask the
```

```
 1              witness.

 2     BY MR. MEUNIER:

 3              Q.     Is a workshop a

 4     manufacturing facility?

 5              A.     Workshop is a manufacturer

 6     facility.

 7              Q.     Did you direct the same

 8     manufacturing facility from 1991 until

 9     February 2006?

10              A.     Yes, I directed that one

11     workshop.

12              Q.     Please give me the location

13     of that facility.

14              A.     It's located in Dawenkou

15     Town, Taian.

16              Q.     What product or products

17     does the facility manufacture?

18              A.     Those workshops produce and

19     only produce paper-faced gypsum board.

20              Q.     Who reported to you as boss

21     when you directed that facility from 1991

22     to February 2006?

23              A.     The deputy director of the

24     workshop reported to me.
```

1        Q.    Who was the deputy director?

2        A.    The deputy director was Hou

3    Yanyun, last name, H-O-U, first name,

4    Y-A-N-Y-U-N.

5        Q.    Who did you report to as

6    your boss when you were the director of

7    that facility?

8        A.    I reported to, at the time I

9    reported to Mr. Duan Zhentao, D-U-A-N,

10   first name, Z-H-E-N-T-A-O.

11       Q.    What was his position?

12       A.    Production manager.

13       Q.    Who were the sales employees

14   involved in the sale of gypsum board

15   manufactured at that facility between

16   1991 and February 2006?

17       A.    I was only in charge of the

18   production in the workshop.  I'm not sure

19   about the detailed sales employees.

20       Q.    Who was in charge of the

21   sales employees for the gypsum board

22   manufactured by that facility when you

23   were the director?

24       A.    Like I said, I was only in

Confidential - Subject to Further Confidentiality Review

```
 1    charge of the production of the workshop.

 2    I'm not sure who was in charge of the

 3    sales.

 4          Q.    You don't know who

 5    supervised the sales personnel for the

 6    gypsum board made at that facility when

 7    you were the director?

 8          A.    I was not in charge of the

 9    sales.  I was only in charge of the

10    production of the workshop.

11          Q.    I understand you were not in

12    charge.  My question is, do you know who

13    was in charge of the sales personnel?

14          A.    TG was in charge of the

15    sales.

16          Q.    Who at TG?

17          A.    I had minimal contact with

18    the sales part.  As of now, I really

19    can't remember who was the person in

20    charge of sales.

21          Q.    How often did the board of

22    directors of TTP meet when you were chair

23    of the board from February 2006 to April

24    2009?
```

1    A.    The board of directors

2  meeting in TTP was held irregularly,

3  usually once a year.

4    Q.    Were reports made at the

5  board of directors meetings concerning

6  the marketing or sale of gypsum board?

7    A.    Sometimes at a board of

8  directors meeting, these words were

9  discussed.

10    Q.    Who made the report at the

11  board of directors meetings on marketing

12  and sales at TTP?

13    A.    Can you repeat the question?

14    Q.    Who made the report on

15  drywall marketing and sales at the board

16  of directors meetings for TTP?

17    A.    Usually I would make the

18  report for the board of directors.

19    Q.    How did you gather

20  information on the marketing and sale of

21  gypsum board in order to make that

22  report?

23    A.    The report was only a simple

24  summary of our productions and sales.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.     How did you get the summary

 2   on sales?

 3        A.     I requested the balancing

 4   between the production and sales lower

 5   the product payments risk to provide good

 6   service for the customers.

 7        Q.     How did you learn the total

 8   volume of drywall sales as director of

 9   TTP?

10        A.     TTP's financial department

11   would have the statistics.

12        Q.     Were the reports on the

13   volume of drywall sales from the

14   financial department made in writing?

15        A.     It was in written form.

16        Q.     What was the name of the

17   written form?

18        A.     It was only a very simple

19   production and sales statistic report.

20        Q.     Is that the name of the

21   report, sales and statistic report?

22        A.     There wasn't a detailed name

23   for that report.  It's only reflected as

24   a form of form.
```

Confidential - Subject to Further Confidentiality Review

1    Q.    Did the report contain

2    information on foreign sales?

3                MR. CYR:  Objection.

4                THE COURT:  Can you ask him

5          for the time frame.

6    BY MR. MEUNIER:

7          Q.    During the time these

8    reports were made between February 2006

9    and April 2009 at TTP, did the reports

10   contain information on sales to foreign

11   customers?

12         A.    Like I just said, it was

13   only a very simple statistic form.

14   Because our company, TTP, did not do

15   direct exporting, therefore, the form was

16   not reflected on that.

17         Q.    What do you mean "The

18   company did not do direct exporting," Mr.

19   Peng?

20         A.    Hasn't Mr. Attorney asked me

21   the question regarding exporting to other

22   countries?

23         Q.    Did TTP sell drywall to

24   foreign customers?

Confidential - Subject to Further Confidentiality Review

```
 1                INTERPRETER:  Interpreter

 2        clarification.

 3                THE WITNESS:  To sell the

 4        drywall to who?

 5   BY MR. MEUNIER:

 6        Q.    Did the purchasers of TTP

 7   drywall between February 2006 and April

 8   2009 include businesses outside of China?

 9        A.    All the paper-faced drywall

10   that TTP produced had transactions within

11   China.

12        Q.    Is it your testimony that no

13   foreign customers purchased drywall

14   manufactured by TTP between February 2006

15   and April 2009?

16        A.    Like I said, all the

17   transactions regarding our products were

18   within China.

19        Q.    Do you deny that Peng

20   Wenlong, Che Gang and Yang Jiapo all

21   dealt and did business with foreign

22   customers when they were sales personnel

23   of TTP?

24        A.    You said deny?
```

```
 1          Q.    Is it true that the sales

 2   personnel, Peng Wenlong, Che Gang and

 3   Yang Jiapo, did business with foreign

 4   customers when they were sales employees

 5   of TTP?

 6          A.    I would like to repeat.

 7   Number one, all our transactions were

 8   within China.  Number two, some of our

 9   sales employees did sign some contracts

10   with the trading companies in China.

11             MR. MEUNIER:  Your Honor, I

12          would like to move on, but I don't

13          think I'm getting a response to

14          the question.  I'll try one more

15          time.

16             MR. CYR:  I agree, Counsel.

17   BY MR. MEUNIER:

18          Q.    Did Peng Wenlong, Che Gang

19   and Yang Jiapo, as sales employees of

20   TTP, between February 2006 and April

21   2009, do business with foreign purchasers

22   of drywall, by that I mean, purchasers

23   who were not in China?

24          A.    I don't have an impression
```

```
 1    of that.

 2                    May I use the restroom?

 3                    THE COURT:  Yes.

 4                    THE VIDEOTAPE TECHNICIAN:

 5            Going off the record.  The time is

 6            9:20.

 7                    THE COURT:  Let's take a

 8            10-minute break at this time.

 9                         -   -   -

10                    (Whereupon, a recess was

11            taken from 9:20 a.m. until 9:34

12            a.m.)

13                         -   -   -

14                    THE VIDEOTAPE TECHNICIAN:

15            Going back on the record,

16            beginning of Tape Number 2.  The

17            time is 9:34.

18    BY MR. MEUNIER:

19            Q.   Mr. Peng, what documents did

20    you review in order to prepare for this

21    deposition?

22            A.    In order to prepare for

23    today's deposition, I have, together with

24    my attorney, reviewed relevant
```

1    information about TTP.

2           Q.    What relevant information

3    did you review?

4           A.    Most of the information are

5    about the article of incorporation of TTP

6    and the resolution of the meeting of

7    board of directors.

8           Q.    What did the resolution deal

9    with?

10          A.    One is at the establishment

11   of TTP, the purchasing of TTP from TG of

12   the two production lines.  And another

13   resolution was about TTP decided to sell

14   the two production lines to TG.

15          Q.    Does that refer to the sale

16   of TTP assets to TG when TTP stopped

17   doing business in April 2009?

18          A.    Correct.

19          Q.    What other documents, if

20   any, did you review?

21          A.    That's all I can name for

22   now.

23          Q.    How many meetings have you

24   had with your attorney in order to

Confidential - Subject to Further Confidentiality Review

1    prepare for this deposition?

2         A.    I didn't really pay

3    attention, so, I can't really tell.

4         Q.    What do you mean you didn't

5    pay attention?

6         A.    I didn't really pay

7    attention how many times we met.

8              INTERPRETER:  Correction.

9              THE WITNESS:  I met with my

10        attorney.

11             MR. CHEN:  I'm sorry.  I

12        don't think the word "cuee" is

13        being translated.

14             MR. DAVIS:  Excuse me, Your

15        Honor.  We have a translator.

16             THE COURT: That's all right.

17        But do you understand?

18             MR. CHEN:  This is just a

19        recommendation for the interpreter

20        to accept or reject.

21             THE COURT:   Go ahead.

22        What's the problem?

23             MR. CHEN:  I think he's

24        saying I didn't specifically pay

1          attention to that matter, and

2          that's just my suggestion to you

3          whether to accept it.

4               THE COURT:  Let's get a

5          clarification.  What do you mean?

6          Ask him the question again, what

7          do you mean by that.

8     BY MR. MEUNIER:

9          Q.    When you said you didn't pay

10    attention, what do you mean by that?

11         A.    Which is that I did not

12    remember how many times I met with my

13    attorney.

14         Q.    Did you meet with anyone

15    else besides your attorney in order to

16    prepare for this deposition?

17         A.    Beside my attorney, I've

18    also met with Mr. Jia Tongchun and Mr.

19    Peng Wenlong.  Jia Tongchun spelling is

20    J-I-A, first name, T-O-N-G-C-H-U-N.

21         Q.    Were any attorneys present

22    when you met with Mr. Jia and Mr. Peng

23    Wenlong?

24         A.    No.

1          Q.    What did you discuss with

2     them?  First Mr. Jia, tell me everything

3     you remember discussing with Mr. Jia.

4          A.    It's hard for me to remember

5     and to say what exactly we have said at

6     the time.  I don't remember clearly.

7          Q.    When did you meet with Mr.

8     Jia?

9          A.    I'm not sure about the time.

10         Q.    Was it yesterday?

11         A.    Not yesterday.

12         Q.    Was it within the last week?

13         A.    We came together.  Of course

14    we met within the week.

15         Q.    Did Mr. Jia talk to you

16    about this case?

17         A.    In this process, we did not

18    talk about the case.

19         Q.    Did he give you advice how

20    to answer questions today?

21         A.    Like I said, in this

22    process, we did not talk about this

23    issue, so, we did not communicate about

24    this.

```
 1          Q.    You told me you met with him
 2    to get ready for the deposition.  What
 3    did you mean by that?
 4          A.    We came together by car.  If
 5    I had come by myself, I wouldn't be
 6    familiar with the route and the agenda.
 7    It would be safer that way.
 8               THE COURT:  Let me interrupt
 9          and say something.
10               Sir, I am the Judge who will
11          decide the issues in this case.
12          One thing I do when I make that
13          decision, I listen to the
14          testimony and I evaluate the
15          credibility of the truthfulness of
16          the witnesses.  I listen closely
17          to what people say, and it's
18          important for you to listen to the
19          question and to answer the
20          question, if you can.  Do you
21          understand that?
22               THE WITNESS:  I understand.
23               THE COURT:  Because if I get
24          the impression that you are not
```

1           answering the question

2           intentionally, I will discount

3           your testimony and not believe it.

4                   Do you understand that?

5                   THE WITNESS:  I understand.

6                   THE COURT:  Now let's

7           continue with the deposition, and

8           keep that in mind, please.

9    BY MR. MEUNIER:

10          Q.    Mr. Peng, when you met with

11   Mr. Jia to get ready for this deposition,

12   what did you and Mr. Jia discuss?

13                  MR. CYR:  Objection, asked

14          and answered.

15                  THE COURT:  The reason that

16          I'm going to allow it is because I

17          think it was asked, but I'm not

18          sure it was answered.  So I'll

19          overrule the objection.

20                  THE WITNESS:  Can you repeat

21          your question?

22   BY MR. MEUNIER:

23          Q.    When you met with Mr. Jia to

24   get ready for this deposition, what did

1    you and Mr. Jia talk about?

2          A.    Mr. Jia and I checked on

3    some information of TTP.

4          Q.    What information?

5          A.    Like I just mentioned, such

6    as TTP's Article of Incorporation and

7    resolution of the board of directors

8    meeting.

9          Q.    Anything else besides that?

10          A.    Nothing else.

11          Q.    You did not talk about sales

12    to foreign customers?

13          A.    We did not talk about the

14    sales.  We did not sell to foreign

15    customers.  Our transaction has always

16    been within China, so, we cannot talk

17    about that.

18          Q.    Did Mr. Jia advise you to

19    say that today?

20          A.    No, no.

21          Q.    When you and Mr. Peng

22    Wenlong met in order for you to prepare

23    for this deposition, what did you and he

24    discuss?

```
 1          A.    We talked about, as I said,

 2   the Article of Incorporation and the

 3   resolution of TG.  We also talked about

 4   the aspects of sales.

 5          Q.    Explain what you mean by

 6   that, "aspects of sales."

 7          A.    Because Mr. Peng Wenlong was

 8   in charge of the sales in TTP.

 9   Therefore, I asked him for information

10   regarding TTP's sales.

11          Q.    What information did you ask

12   him for, and what information did he give

13   you?

14          A.    He told me how the sales of

15   our gypsum board went about.

16          Q.    What exactly did he tell

17   you?

18          A.    Him and I only simply tried

19   to remember the sales work at TTP and how

20   we dealt with customers.

21          Q.    And what did you and he

22   remember about that?

23          A.    One is how much have we

24   produced and how much have we sold.
```

Confidential - Subject to Further Confidentiality Review

```
 1            Q.    And how much was produced
 2    and sold?
 3            A.    From the establishment of
 4    the company in 2006 until we stopped
 5    doing business, we had all together
 6    produced over 60 million square meter of
 7    the product.
 8            Q.    And how much was sold?
 9            A.    We've sold them all.
10    There's a balance between production and
11    sales.
12            Q.    How much was sold to
13    customers outside of China?
14            MR. CYR:  Objection.
15            THE COURT:  Ask him first
16        whether or not any was.
17    BY MR. MEUNIER:
18            Q.    Were any of the 60 square
19    meters -- I'm sorry -- 6 --
20            INTERPRETER:  Million.
21    BY MR. MEUNIER:
22            Q.    -- 6 million square meters
23    sold to customers outside of China?
24            A.    All the transactions of our
```

```
 1    productions were taking place in China.

 2    Perhaps some trading companies sold them

 3    to outside of China.

 4         Q.    How many of the purchasers

 5    were outside of China?

 6         A.    I was not in charge of the

 7    detailed sales work, and it has been too

 8    long.  I could not say exactly how much.

 9         Q.    What is your best estimate

10    of how much?

11         A.    I could not give such an

12    estimation because all our products were

13    delivered in China.  As of how much had

14    the trading companies sold to us out of

15    China, I could not possibly know.

16         Q.    Why did TTP sales personnel

17    provide price and shipping cost

18    information for TTP gypsum board to

19    customers in the United States?

20         A.    I was not in charge of the

21    specific sales work.  For that question,

22    you should ask Mr. Peng Wenlong.

23         Q.    Do you believe sales

24    personnel for TTP provided price and
```

1    shipping cost information for gypsum

2    board to customers in the United States?

3          A.    I don't know about that.

4          Q.    Did they do that?

5          A.    Like I said, I really don't

6    know.

7          Q.    Did they have authority to

8    do that?

9          A.    They will decide themselves

10   how will they sell, in what way did they

11   make the sales.

12         Q.    Did they have authority to

13   provide this information even for a

14   specific construction project located in

15   the United States of America?

16         A.    Because TTP had established

17   for a short period of time, I don't think

18   in that respect they had much experience

19   to do such job.

20         Q.    Did they have the authority

21   to do this?

22         A.    Whether they could do it or

23   not, I'm not sure.

24                MR. MEUNIER:  Let me show

Confidential - Subject to Further Confidentiality Review

```
 1          you documents that have been

 2          marked TG 19798 through 19800, and

 3          I'll mark that as Peng Exhibit 1.

 4                  -   -   -

 5          (Whereupon, Deposition

 6          Exhibit Peng S.-1, E-mail chain,

 7          top e-mail in English dated August

 8          03, 2006, Bates stamped TG 0019798

 9          through TG 0019800, was marked for

10          identification.)

11                  -   -   -

12   BY MR. MEUNIER:

13          Q.    Mr. Peng, at the bottom of

14   Page 19798, continuing to the top of

15   19799, is an e-mail of August 1, 2006

16   from Josephine Wang to Yang Jiapo in

17   which Josephine Wang tells Mr. Yang she

18   is interested in learning more about his

19   product and doing business with him and

20   advises him that her company is currently

21   building in Philadelphia a project called

22   South Bridge.  She then asks Mr. Yang to

23   forward information about how he sells

24   abroad.
```

Confidential - Subject to Further Confidentiality Review

1                    Please listen as the

2    translator reads the reply from Mr. Yang

3    to Ms. Wang by e-mail dated August 3rd,

4    2006 at 3:11 a.m.  It is in the middle of

5    Page 19798.

6                    MR. MEUNIER:  (Addressing

7    the interpreter.)  Would you please read

8    it in English for us?

9                    INTERPRETER:  I'm sorry.

10            You mean the one in the middle?

11                    MR. MEUNIER:  Yes.

12                    INTERPRETER:  Ms. Wang,

13            hello.  I'm glad to have received

14            your e-mail and now I'm sending

15            you all the information.  Please

16            take a look.  Normal gypsum board

17            4 by 12 by half, FOB Qingdao USD

18            4.15/PCS 660 PCS/40 FCL 26.5

19            tons/40 FCL.

20                    A new line.  4 by 8 by 1 and

21            a half -- I'm sorry.  Let me try

22            again.

23                    4 by 8 by half USD

24            2.77/PCS 960 PCS/40 FCL.

Confidential - Subject to Further Confidentiality Review

1              Skip a line.  A new line.  4

2         by 12 by half FOB LIANYUNGANG USD

3         4.2/PCS 76 PCS/tray.

4              A new line.  4 by 8 by

5         half USD 2.8/PCS 76 PCS/tray.

6              A new line.  Our company is

7         the biggest gypsum board

8         production facility.  Please take

9         heart for the product quality and

10        volume.

11             Skip line.  Best wishes!

12             Skip three or four lines.

13        Yang Jiapo, 2006.8.2.

14   BY MR. MEUNIER:

15        Q.    Did Mr. Yang in this e-mail

16   provide to this person accurate and

17   truthful information concerning TTP

18   prices and shipping information?

19        A.    The detailed sales employees

20   would be in charge of the detailed

21   handling of specific sales in the process

22   of sales.  As Chairman of the Board of

23   Directors and general manager of the

24   company, I did not participate in that.

```
 1    Therefore, I have never seen this -- the

 2    content of this document.

 3        Q.    Mr. Peng, as long as TTP got

 4    paid, was it okay with you as director

 5    that the company sold its gypsum board to

 6    be used in a construction project in

 7    Philadelphia, Pennsylvania?

 8        A.    The sales principle of our

 9    company is to ensure production and sales

10    balancing and also to decrease the risk

11    that comes with the payment.  Therefore,

12    it doesn't matter who we sell the

13    products to, the collection of payment

14    has to be ensured.

15        Q.    Is it true that export

16    sales, when you were an employee of

17    Shandong, increased in the second half of

18    2005?

19        A.    Can you repeat it?

20        Q.    Is it true that export

21    sales, when you were employed at

22    Shandong, increased in the second half of

23    2005?

24        A.    Shandong?
```

Confidential - Subject to Further Confidentiality Review

1          Q.    Yes.

2          A.    Employee of Shandong?

3          Q.    No, sir.  I'm referring to

4    when you worked for Shandong in the

5    second half of 2005.

6                Shandong Taihe Dongxin, when

7    you worked for that company in the second

8    half of 2005, is it true that export

9    sales of gypsum board increased?

10         A.    Like I said, in the year

11   2005, I was only a director of a

12   production workshop in TG.  I was not in

13   charge of the sales work.  Therefore, I

14   would not specifically collect

15   informations about this.  Therefore, I do

16   not know whether the exporting sales

17   increased.

18         Q.    Before they went to work for

19   TTP, Peng Wenlong, Che Gang and Yang

20   Jiapo were all sales employees of

21   Shandong Taihe Dongxin, true?

22         A.    That's true.  They were all

23   salespeople in TG.

24         Q.    In the second half of 2005,

1   as sales employees of Shandong Taihe

2   Dongxin, is it true they provided price

3   and shipping costs information to

4   customers in the United States of

5   America?

6          A.    I insist on my prior

7   statement.  I was only a director of a

8   production workshop.  I was not aware of

9   the detailed sales work.

10         Q.    Let me show you an example

11   of what I mean.

12              MR. MEUNIER:  I show you a

13         document which is Bates numbered

14         TG 19840 and 19841, and I will

15         mark that as Peng Number 2.

16                   -  -  -

17              (Whereupon, Deposition

18         Exhibit Peng S.-2, E-mail chain,

19         top one dated 12/12/2005, Bates

20         stamped TG 0019840 and TG 0019841,

21         was marked for identification.)

22                   -  -  -

23   BY MR. MEUNIER:

24         Q.    Mr. Peng, at the bottom of

```
 1    19840, continuing to the top of 19841, is

 2    an e-mail of December 12, 2005 to Mr.

 3    Yang Jiapo from Leon Liu, L-I-U, in which

 4    Mr. Liu asked for pricing information on

 5    32,000 boards for delivery in the Port of

 6    New York/New Jersey and pricing

 7    information on an additional 32,000

 8    boards for delivery to the Port of

 9    Savannah, Georgia.  In his e-mail to Mr.

10    Liu of December 11, 2005, which is in the

11    middle of 19840, please read Mr. Yang's

12    response.  And I'll ask the interpreter

13    to please read it in English for the

14    record.

15              INTERPRETER:  Here

16         (indicating)?

17              THE WITNESS:  (Reading in

18         Chinese.)

19              Mr. Liu, hello.  Regarding

20         to the port pricing, in this

21         e-mail, we have not received the

22         pricing of the port.  We can only

23         give you a pricing -- FOB pricing

24         for the customer's reference.
```

Confidential - Subject to Further Confidentiality Review

1           A new line.  4 by 12 by half

2        ordinary gypsum board: FOB USD

3        3.68/PCS.

4           A new line.  Response can be

5        provided for other requirements as

6        well.

7           A new line.  For the matter

8        of samples, our company currently

9        has a rule that our company will

10       not bear any cost for samples over

11       200 RMB because right now there

12       are too many American customers

13       that ask for samples, we do not

14       want to get a special approval.

15       We apologize.  I'm sorry.

16           A new line.  Thank you.

17           A new line.  Jiapo.

18           A new line.  2005.12.12.

19  BY MR. MEUNIER:

20       Q.   Mr. Peng, as the director of

21  Shandong Taihe Dongxin gypsum board

22  manufacturing facility in December of

23  2005, was it okay with you if the drywall

24  produced there was sold for delivery to

1    ports in the United States of America as

2    long as the company got paid?

3         A.    I insist on my prior

4    statement that I was only a director of

5    the production workshop.  As of the

6    requirements for the salespeople, I

7    really did not know.  I'm very sorry.

8         Q.    Let me show you one other

9    example, and then we'll move to a

10   different subject.  This is a document

11   Bates numbered TG 19813 and 19814 which I

12   will mark as Peng Number 3.

13                    -   -   -

14              (Whereupon, Deposition

15         Exhibit Peng S.-3, E-mail chain,

16         top one dated 10/15/2005, Bates

17         stamped TG 0019813 and TG 0019814,

18         was marked for identification.)

19                    -   -   -

20   BY MR. MEUNIER:

21         Q.    Mr. Peng, in this document,

22   there is an e-mail at the bottom of 19813

23   addressed to Mr. Yang Jiapo from Wenny

24   Yin, Y-I-N, dated October 15, 2005.  And

Confidential - Subject to Further Confidentiality Review

1   in this e-mail, Ms. Yin requests

2   information on certain pieces of gypsum

3   board to be sent to the Port of

4   Jacksonville, Florida, 100,000 pieces,

5   and an additional 100,000 pieces to the

6   Port of New Orleans, Louisiana.  Will you

7   please read quietly to yourself Mr.

8   Yang's e-mail reply of October 15, 2005

9   at the top of 19813, and I will ask the

10  court reporter to read it in English for

11  the record.

12              THE COURT:  You mean the

13          interpreter?

14              MR. MEUNIER:  I'm sorry, the

15          interpreter.

16              THE WITNESS:  You mean

17          quietly reading it, meaning do not

18          read it out loud?

19              MR. MEUNIER:  Correct.  But

20          I would ask the interpreter to

21          please read it out loud in English

22          for the record.

23              INTERPRETER:  Dear Wenny

24          Yin, hello.  I have been following

Confidential - Subject to Further Confidentiality Review

```
 1          up on the cargo ship for

 2          individual cargos, and I have not

 3          received a response.  Finally, I

 4          have received information

 5          regarding the ship, therefore, I

 6          will give you the price.  Please

 7          take a look.  Ordinary gypsum

 8          board 3660 by 1220 by 12.7

 9          mm CNFNEW ORLEANS PORT USD

10          7.22/PCS.

11               A new line.  Package, gypsum

12          board tray, 60 pieces/tray,

13          plastic inner membrane untie

14          humidity.

15               INTERPRETER:  Interpreter

16          needs clarification.

17               (Discussion of interpreter

18          and Mr. Chen in Chinese.)

19               MR. CHEN:  I think either is

20          fine.

21               INTERPRETER:  Waterproof

22          exterior gypsum board protection,

23          horizontal and vertical steel

24          belts packaging.
```

Confidential - Subject to Further Confidentiality Review

```
 1              A new line.  Term of

 2         payment, LC, instant payment, L/C.

 3              A new line.  In addition,

 4         there is no ship to Jacksonville

 5         port.

 6              Skip a few lines.  Thank

 7         you.  Please reply if you have any

 8         questions.

 9              Skip a few lines.  Jiapo.

10              A new line.  2005.10.15.

11   BY MR. MEUNIER:

12         Q.    Mr. Peng, when Mr. Yang and

13   other employees became sales personnel

14   for TTP, did they provide this same type

15   of detailed information about cargo and

16   shipping to the United States when they

17   dealt with customers?

18         A.    Salespeople were in charge

19   of detailed sales process in respect to

20   different circumstances.  Therefore, I

21   don't know whether they would do that or

22   not.

23         Q.    So, as the manager of TTP,

24   you left that up to the sales personnel?
```

Confidential - Subject to Further Confidentiality Review

1    Is that true?

2           A.    Correct.

3           Q.    One more question, Mr. Peng,

4    about this e-mail.  You'll notice that

5    information is requested on October 15,

6    2005 for 100,000 pieces of gypsum board

7    to go to the New Orleans port.  Were you

8    aware that only six weeks before that, a

9    major storm had destroyed property in the

10   New Orleans area, creating a great need

11   for rebuilding?

12          A.    Orleans, you mean Orleans?

13   Is that how should I put it?

14          Q.    New Orleans is good.

15          A.    New Orleans.  I have read

16   the news about the storm in New Orleans.

17   What was your question again?

18          Q.    Were you aware that this

19   storm in New Orleans, which was six weeks

20   before the e-mail we just read, created a

21   need for significant rebuilding in the

22   New Orleans area?

23          A.    Like I said, I have read the

24   news about the old New Orleans storm from

Confidential - Subject to Further Confidentiality Review

1    media, and I know about it, but I don't

2    know how they rebuilt the houses.

3              MR. MEUNIER:  Your Honor, I

4         have about an hour left, but this

5         might be a good breaking point for

6         me.

7              THE COURT:  All right.

8         Let's take a 15-minute break at

9         this time.

10             THE VIDEOTAPE TECHNICIAN:

11        Going off the record.  This is the

12        end of Tape Number 2.  The time is

13        10:33.

14                   -  -  -

15             (Whereupon, a recess was

16        taken from 10:33 a.m. until 10:50

17        a.m.)

18                   -  -  -

19             THE COURT:  Sir, you are

20        still under oath.

21             THE VIDEOTAPE TECHNICIAN:

22        Going back on the video record,

23        the time is 10:50.  This is the

24        beginning of Tape Number 3.

1    BY MR. MEUNIER:

2         Q.    Mr. Peng, when you were

3    manager of TTP, did you prepare a general

4    manager's annual report of the company's

5    work?

6         A.    Our TTP's annual report has

7    always been issued by our accounting

8    firm.

9         Q.    Did you approve and sign the

10   annual report?

11        A.    The annual report was

12   completed by the third party independent

13   accounting firm.

14        Q.    Let me refer you to exhibits

15   Jia 26 and 27, Defendant Jia Exhibits 26

16   and 27, which are the general manager

17   reports of TG for the years 2006 and

18   2007.  Have you seen those documents

19   before?

20        A.    I've heard in the general

21   manager's meeting for annual report, but

22   let me take a look.

23              (Reviewing documents.)

24              I have not seen these two

Confidential - Subject to Further Confidentiality Review

1    reports.  I have not.

2           Q.    Did TTP prepare annual

3    reports that were similar to those

4    reports?

5           A.    TTP have not prepared

6    reports that are similar to these.

7           Q.    You said you have not seen

8    those reports, but that you heard reports

9    at certain meetings.  Is that correct?

10          A.    I can't recall now.  I'm

11   very sorry.

12          Q.    Well, what meetings were you

13   talking about?

14          A.    These two reports, I do not

15   remember that I have seen these two

16   reports.

17          Q.    Do I understand, Mr. Peng,

18   that you have never been a member of the

19   board of directors of either Shandong

20   Taihe Dongxin or Taishan Gypsum?

21          A.    Correct.  I'm not a member

22   of TG's board of directors.

23          Q.    And you never have been?

24          A.    I have never been a member

1    of TG's board of directors.

2         Q.    And you have never been a

3    member of the board of directors of

4    Shandong Taihe Dongxin?

5         A.    No, I have not been a member

6    of the board of directors of Shandong

7    Taihe Dongxin.

8         Q.    Is it true that TTP was

9    created for reasons related to value

10   added taxes?

11        A.    The purpose of TTP's

12   establishment was to be able to provide

13   value added tax invoices to the customers

14   who had such requests.

15        Q.    Was there any difference in

16   the nature of the drywall business

17   conducted by TG and TTP?

18             MR. CYR:  Objection, vague.

19             MR. MEUNIER:  I wanted to be

20         general, but...

21             THE COURT:  I think that's a

22         valid objection.  I sustain it.

23   BY MR. MEUNIER:

24        Q.    Can you tell us if there are

Confidential - Subject to Further Confidentiality Review

1    any differences, Mr. Peng, between the

2    drywall manufacturing process used by TG

3    or Shandong and the process used by TTP?

4            A.    The manufacturing process

5    for manufacturing paper-faced drywall are

6    pretty much the same.

7            Q.    And TG, even when it was

8    called Shandong Taihe Dongxin,

9    manufactured certain brand names of

10   drywall such as Five Star and Dun; is

11   that true?

12           A.    I don't recall clearly as of

13   what brand of product the TG manufactured

14   at the time.

15           Q.    Did TG and TTP manufacture

16   drywall under the same brand names?

17           A.    TG authorized TTP to use the

18   brand Taishan and Taishan Wang.

19           Q.    Did TTP manufacture under

20   the brand names Five Star and Dun?

21           A.    We did not produce these two

22   brand's products.  The authorized

23   products -- the authorized brands were

24   Taishan and Taishan Wang, and also we

1    manufactured according to the

2    requirements of the customers.

3         Q.    Do you know of any

4    differences between TG and TTP in how

5    they marketed and sold their drywall?

6         A.    Well, I have not analyzed

7    the differences between the two.  The

8    sales principle of TTP were to keep the

9    balance between production and sales, to

10   lower the risk of payment collection, to

11   make sure to provide good services for

12   our customers.

13              INTERPRETER:  Interpreter

14         clarification.

15              THE WITNESS:  To have a

16         better control of the pricing.

17   BY MR. MEUNIER:

18         Q.    And those are the same

19   principles that applied to Shandong Taihe

20   Dongxin and TG, true?

21         A.    These are the principles

22   applied to TTP.  As of TG's sales

23   principles, they must have had their own.

24   I'm not sure whether the principles are

Confidential - Subject to Further Confidentiality Review

1    the same as TTP's.

2         Q.    As far as you know, when

3    sales employees of Shandong Taihe Dongxin

4    became sales employees of TTP, were they

5    given any new or different rules or

6    guidelines for how they conducted sales?

7         A.    I don't understand your

8    question.

9         Q.    As far as you know, were the

10   sales employees of TTP given any rules or

11   guidelines that were different from the

12   rules and guidelines they had as sales

13   employees of Shandong Taihe Dongxin?

14        A.    They would summarize on the

15   experiences in TG.  But as for TG's

16   special circumstances, they should base

17   their principles on TG's circumstances.

18        Q.    But as far as you know, the

19   rules they followed were the same, true?

20        A.    The same as to who?

21        Q.    Shandong Taihe Dongxin.

22             INTERPRETER:  Interpreter

23        clarification.

24             THE WITNESS:  TTP's sales

```
 1              employees only follow the rules

 2              and principles of sales of TTP's.

 3    BY MR. MEUNIER:

 4         Q.    Can you tell me how those

 5    rules and principles were different from

 6    the rules and principles for sales

 7    employees of Shandong Taihe Dongxin?

 8         A.    TTP had its own sales

 9    principle, while TG had its own

10    principle.  Whether the two principles

11    were the same, I'm not sure.

12         Q.    TTP stopped operating in

13    what year?

14         A.    TTP stopped operating in

15    January 2008.

16         Q.    Why?

17         A.    Through the two years

18    operation of TTP, the customers who

19    requested value added invoices were not

20    that much -- not that many.  However, TTP

21    had two paper-faced gypsum production

22    lines of 2 by 20 million.

23              According to the regulation

24    of our country, for those enterprises
```

1    that had reached the production volume of

2    20 million paper-faced gypsum board would

3    be able to enjoy half of the value added

4    tax benefit.  So TTP's board of directors

5    and its shareholders had decided to stop

6    the operation of TTP.  That's the reason

7    behind TTP's stop of operating.

8          Q.    But you remained an employee

9    of TTP until April of 2009?

10         A.    You mean TTP's employee or I

11   myself?

12         Q.    You told us earlier that you

13   worked for TTP until April 2009, true?

14         A.    Correct, yes.

15         Q.    If TTP stopped operations in

16   January of 2008, please explain what you

17   did as its employee between January 2008

18   and April 2009?

19         A.    Even though during this

20   period of time, TTP had stopped its

21   operation, but there were still some

22   relevant assets and accountings that

23   needed to be handled.

24         Q.    Did the company earn any

 1    revenue or income between January 2008

 2    and April 2009?

 3         A.    There were a little bit of

 4    profit in that period of time, which were

 5    the gypsum board that were left and also

 6    some raw materials that were left.

 7         Q.    Who paid your salary between

 8    January 2008 and April 2009?

 9         A.    During that period of time,

10    I still got paid from TTP.

11         Q.    Were you paid the same

12    salary as before January 2008?

13         A.    I'm very sorry.  That's my

14    privacy.  Can I not answer that question?

15         Q.    I'm not asking you for the

16    dollar amount.  I'm just asking if the

17    salary stayed the same?

18              MR. CYR:  I think the Judge

19         wants to rule.

20              MR. MEUNIER:  I want to make

21         sure he understands that I don't

22         want his dollar amount.

23              THE COURT:  I don't want you

24         to say how much.  The question is

Confidential - Subject to Further Confidentiality Review

```
 1            whether it's the same.

 2                 THE WITNESS:  Not the same.

 3   BY MR. MEUNIER:

 4            Q.    How different?

 5                 THE COURT:  More or less?

 6                 THE WITNESS:  Because TTP

 7            had stopped its operations at the

 8            time, the salary that I received

 9            was less than when it was operated

10            normally.

11   BY MR. MEUNIER:

12            Q.    Is it true you have kept an

13   office at TTP?

14            A.    You mean right now?

15            Q.    As of April 6, 2011, is it

16   true you still kept an office at TTP?

17            A.    Right now, the people

18   left -- I'm sorry.

19                 Right now, the people that

20   remained in TTP still is working there.

21            Q.    But you are no longer

22   employed by TTP; is that true?

23            A.    According to TTP's company

24   law, the election is to be held every
```

1    three years.  But there was no election

2    after three years, but I am still the

3    legal person of TTP.

4           Q.    You are today an employee of

5    Taishan Gypsum, true?

6           A.    Yes, I am right now an

7    employee of Taishan Gypsum.

8           Q.    And your entire salary is

9    paid by Taishan Gypsum, true?

10          A.    My current salary is paid by

11   the company located in Shanxi, Lucheng.

12          Q.    Which company is that, sir?

13          A.    That's a subsidiary of TG

14   located in Shandong, Liaocheng to produce

15   paper-faced gypsum board.

16          Q.    That is a different

17   subsidiary than TTP, true?

18          A.    Correct.  This is only a

19   branch company.

20          Q.    What is the name of that

21   company?

22          A.    Shanxi Lucheng Taishan

23   Gypsum.  Shanxi Lucheng Taishan Gypsum,

24   Lucheng branch office.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    But even though you are an
 2   employee of Taishan Gypsum and your
 3   salary is paid by a different subsidiary
 4   of Taishan Gypsum, it is true that you
 5   still keep an office at TTP?  Is that
 6   true?
 7          A.    Where is it?
 8          Q.    Do you still keep an office
 9   at a TTP location, sir?
10          A.    TTP has office.
11          Q.    And you still have an office
12   at that location, don't you?
13          A.    Which location?
14          Q.    At the location of TTP.  At
15   any location of TTP, is it true that you
16   have an office?
17          A.    I have my own office in TTP.
18          Q.    So, you have an office at
19   TTP, and you also have an office at the
20   Taishan Gypsum factory in Lucheng,
21   correct?
22          A.    Correct.
23          Q.    Tell me the percentages of
24   time you spend at those two offices.  How
```

Confidential - Subject to Further Confidentiality Review

```
 1    much at one office versus the other?

 2           A.    Because TTP had stopped its

 3    production and business and it does not

 4    have much business right now, and also

 5    there were remaining personnels working

 6    at TTP.  Therefore, my time is basically

 7    being spent at the office in Shanxi,

 8    Lucheng branch office.

 9           Q.    But you do spend some time

10    at the TTP office, don't you?

11           A.    I basically do not stay at

12    TTP.

13           Q.    But you keep an office there

14    and do go there sometimes, don't you, Mr.

15    Peng?

16           A.    Because there are still

17    remaining people work at the office right

18    now, if there is any issue, we

19    communicate through telephone.  My main

20    job right now is at Lucheng's branch

21    office.

22           Q.    But you still hold the title

23    of director or manager of TTP, don't you?

24                 MR. CYR:  Objection.
```

Confidential - Subject to Further Confidentiality Review

```
1              THE COURT:  What's the basis

2         of the objection?  Asked and

3         answered?

4              MR. CYR:  And I recommend

5         that the interpreter not interpret

6         my statement.

7              THE COURT:  Right.

8              MR. CYR:  I believe that

9         he's testified that he terminated

10         his position at TTP in April of

11         2009.  The record is clear about

12         that.  What the record is not

13         clear about, in my opinion, is

14         that he continues to hold the

15         position of, quote, legal

16         representative, closed quote, of

17         TTP today, and that has been the

18         misunderstanding during your

19         dialogue during the last five

20         minutes.

21              MR. MEUNIER:  Well, I'll

22         change my question based on

23         counsel's direction, Judge.

24    BY MR. MEUNIER:
```

```
 1           Q.    Do you still hold a title
 2    with TTP today, namely, legal
 3    representative, is that true?
 4           A.    I am a legal person of TTP
 5    right now.
 6           Q.    That is why from time to
 7    time you have to talk on the phone or
 8    work with the people who remain at TTP?
 9    Is that true?
10           A.    Correct.
11           Q.    But your entire salary for
12    all work activity, including that, is
13    today paid by a different subsidiary of
14    Taishan Gypsum; isn't that true?
15           A.    Correct.
16           Q.    Do you sometimes refer to
17    this group of customers as the Taishan
18    Group?  Group of companies, rather, as
19    the Taishan Group?
20           A.    No.
21           Q.    Is it true, Mr. Peng, that
22    in July of 2006, TTP sold more than
23    11,000 pieces of gypsum board to a
24    company called Advanced Products or APIC
```

Confidential - Subject to Further Confidentiality Review

1    for shipment to New Orleans, Louisiana in

2    the United States of America?

3         A.    I'm not sure about the

4    English name of that company you just

5    said.

6         Q.    Have you ever heard of

7    American -- I'm sorry -- Advanced

8    Products or APIC Building Materials?

9         A.    I don't recall the name of

10   these two companies.

11        MR. MEUNIER:  I show you a

12        document which has been stamped TG

13        20090, and I'll mark that as Peng

14        Number 4.  And the title of it is

15        "Taian Taishan Plasterboard

16        Company, Limited invoice."

17              -  -  -

18        (Whereupon, Deposition

19        Exhibit Peng S.-4, Invoice dated

20        July 03, 2006, Bates stamped TG

21        0020090, was marked for

22        identification.)

23              -  -  -

24   BY MR. MEUNIER:

1          Q.    Are you familiar with this

2     invoice form?

3          A.    I'm not familiar with this

4     invoice form.

5          Q.    Are you familiar with the

6     company Triax Trading & Logistics, LLC?

7          A.    I'm not familiar with this

8     name.

9               MR. MEUNIER: I show you

10              another document which I'll mark

11              as Peng Number 5, which is Bates

12              numbered 19366 entitled Taian

13              Taishan Plasterboard Company,

14              Limited "Packing List."

15                    -  -  -

16              (Whereupon, Deposition

17              Exhibit Peng S-5, Taian Taishan

18              Plasterboard Co., Ltd., Packing

19              List dated July 03, 2006, Bates

20              stamped TG 0019366, was marked for

21              identification.)

22                    -  -  -

23     BY MR. MEUNIER:

24          Q.    Are you familiar with this

Confidential - Subject to Further Confidentiality Review

```
 1   form?

 2              MR. CHEN:  I'm sorry,

 3        Counsel.  I have in my binder it

 4        goes from 19364 to 374.  You said

 5        366?

 6              MR. MEUNIER:  366.  Let me

 7        state for the record for The Court

 8        and for counsel that there does

 9        appear to be duplicate stamping on

10        these documents.  For example, the

11        invoice I refer to of July 3, '06

12        is Bates Number 20090.  It's also

13        Bates numbered 19365.  They appear

14        to be the same documents.

15              MR. CYR:  Can I just see it?

16              MR. MEUNIER:  (Handing over

17        document.)

18              What I have marked as Fu --

19        I'm sorry, Peng Number 4 is

20        actually two Bates Numbers.  19365

21        and 20090.

22              And what I have marked as

23        Peng Number 5 is Bates numbered

24        19366, and I submit that it's
```

Confidential - Subject to Further Confidentiality Review

1            clear they deal with the same

2            transaction, which is what I

3            intended to clarify.

4    BY MR. MEUNIER:

5            Q.    Mr. Peng, my question now

6    is, are you familiar with the packing

7    list form, which is Peng Number 5?

8            A.    I'm not familiar with this

9    document.

10           Q.    If both of the documents I'm

11   showing you, Peng 4 and 5, have the same

12   invoice number, which is SDTH0622, and

13   the same date of July 3, 2006, is it fair

14   to say they both deal with the same

15   transaction?

16           A.    I'm not clear about that.  I

17   can't be sure of that.

18           Q.    The invoice refers to a

19   quantity of 5,676 pieces of gypsum board

20   at a cost in US dollars of $4.25 each for

21   a total amount of $24,123 being shipped

22   from Qingdao to New Orleans, Louisiana.

23   Did TTP sell this gypsum board on July

24   3rd, 2006 as indicated on the invoice and

Confidential - Subject to Further Confidentiality Review

1    packing list?

2        A.    I'm sure the gypsum board

3    was sold, but I really am not sure about

4    the process.

5        Q.    Would you, though, as

6    director, approve the sale of TTP gypsum

7    board at that price to be shipped to New

8    Orleans, Louisiana in July of 2006?

9        A.    The price of gypsum board

10   was specifically discussed and determined

11   by the sales department.

12       Q.    And if the price was right,

13   it was okay that the board was being

14   shipped to New Orleans, Louisiana in the

15   United States, true?

16       A.    After the price was

17   determined, I am not sure where exactly

18   the gypsum board was shipped to.

19       Q.    But TTP authorized the

20   shipment of board purchased at this price

21   to New Orleans, Louisiana in the United

22   States, true?

23       A.    Our gypsum board, which is

24   the gypsum board that produced by TTP,

1    has always been delivered in China.

2    Whether it would be shipped to that

3    location or how was it shipped to that

4    location, I am not sure about the

5    process.

6            Q.    But from TTP's own sales

7    documents, including these invoices and

8    packing lists, TTP knew that the gypsum

9    board was being delivered to New Orleans,

10   Louisiana, correct?

11           MR. CYR:  Objection.

12           THE COURT:  Ask him about

13       the invoices.

14   BY MR. MEUNIER:

15           Q.    Do you agree the invoice and

16   packing list of your company, TTP at that

17   time, indicated that this gypsum board

18   being sold by TTP was being delivered to

19   New Orleans, Louisiana?

20           A.    Please repeat your question.

21           THE COURT:  Why don't you

22       read it back to him.

23   BY MR. MEUNIER:

24           Q.    You agree that the invoice

Confidential - Subject to Further Confidentiality Review

1    and packing list I'm showing you, which

2    are your company's invoice and packing

3    list, show that this gypsum board that

4    you sold was shipped to New Orleans,

5    Louisiana, true?

6         A.    Because TTP produced the

7    gypsum board.

8              THE COURT:  Let me see the

9         invoice.

10             THE WITNESS:  (Handing over

11        document.)

12             THE COURT:  The invoice

13        which is marked Exhibit Number 4,

14        which is invoice SDTH0622,

15        indicates that the material will

16        be delivered from -- is that O or

17        Q?

18             MR. MEUNIER:  Q.

19             THE COURT:  Q-I-N-G-D-A-O to

20        New Orleans, Louisiana.  It's

21        dated July 3rd, 2006.  Isn't that

22        correct, sir?

23             THE WITNESS:  The location

24        that is written on this invoice

```
 1              was marked by us according to the

 2              requirement of the customers.

 3    BY MR. MEUNIER:

 4         Q.    Did the company wish to make

 5    money from that sale?

 6              THE COURT:  Which company?

 7              MR. MEUNIER:  TTP.

 8              THE WITNESS:  As a

 9              manufacturing company, making

10              money is, of course, its main

11              purpose.

12    BY MR. MEUNIER:

13         Q.    And so TTP intended to make

14    money and did make money from the sale of

15    the gypsum board reflected on those

16    documents in front of you; is that true?

17         A.    To sell our paper-faced

18    gypsum board, we, of course, need to

19    concern about the cost and, of course,

20    the profit.

21              THE COURT:  I will take that

22              as an indication that the answer

23              is yes?

24              Now, I tell you again, sir,
```

```
 1          you took an oath today to tell the

 2          truth.  If I find that you did not

 3          tell the truth intentionally, that

 4          will be very bad for your company

 5          as well as you.  Do you understand

 6          that, sir?

 7               THE WITNESS:  I understand.

 8               THE COURT:  Any further

 9          questions?

10               MR. MEUNIER:  Additional

11          documents, Your Honor.

12                    -  -  -

13               (Whereupon, Deposition

14          Exhibit Peng S-6, Taian Taishan

15          Plasterboard Co., Ltd., Invoice

16          dated July 20, 2006, Bates stamped

17          TG 00120091, and Deposition

18          Exhibit Peng S-7, Taian Taishan

19          Plasterboard Co., Ltd., Invoice

20          dated July 20, 2006, Bates stamped

21          TG 00120092, were marked for

22          identification.)

23                    -  -  -

24    BY MR. MEUNIER:
```

1          Q.     Mr. Peng, I show you an

2     invoice which is Bates numbered TG 20091,

3     which I'll mark as Peng-6, and an invoice

4     Bates numbered 20092, which I'll mark as

5     Peng-7.  And I will ask you to confirm

6     that these invoices both refer to the

7     sale of 5,760 pieces of drywall at the

8     cost of $4.34 in US dollars on July 20,

9     2006 with shipment from Qingdao, China to

10    New Orleans, Louisiana.

11         A.     I don't understand English.

12    I don't understand.

13         Q.     If the documents I put in

14    front of you reflect the sale of over

15    5,000 pieces of drywall priced in US

16    dollars and being shipped to New Orleans,

17    Louisiana, do you have any reason, as you

18    sit here today, to deny that the

19    documents are accurate in reflecting that

20    information?

21         A.     I do not deny.

22         Q.     The prices of the gypsum

23    board per sheet or per piece are

24    different in the July 3rd and July 20

```
 1    sales transactions reflected by these

 2    invoices.  Can you explain why?

 3              THE COURT:  Do you have much

 4         more?

 5              MR. MEUNIER:  Your Honor,

 6         I'm afraid I do.  I probably have

 7         another 45 minutes.  I'm sorry.

 8         It's going a little slower than I

 9         thought.

10              MR. CYR:  You're showing him

11         documents he's never seen before.

12              MR. MEUNIER:  He's the

13         director of the company.

14              MR. CYR:  It's you and the

15         Judge are in charge.

16              THE COURT:  Folks, no.  He's

17         not in charge.  I'm in charge.

18              MR. MEUNIER:  I have another

19         maybe 30 to 45 minutes.

20              THE COURT:  We'll take a

21         break in ten minutes, and then

22         we'll come back.

23    BY MR. MEUNIER:

24         Q.   Why were the prices
```

```
 1    different in those invoices?

 2          A.    The price of the gypsum

 3    board sold is affected by volume, cost

 4    and shipping distance.  Therefore, it has

 5    some certain ups and downs in pricing.

 6    The specific salespeople are in charge of

 7    this operation.

 8          Q.    Mr. Peng, I want to show you

 9    a series of documents which are entitled

10    "Taian Shandong Province Special Invoice

11    for Export," which I'll mark as Peng-8 in

12    globo, Bates number TG 1657, 1658, 1661,

13    1663, 1664, 1665, 1666, 1667, 1668, 1669,

14    1670, 1680, 1681 and 1682.

15                     -  -  -

16              (Whereupon, Deposition

17          Exhibit Peng S.-8, Taian Shandong

18          Province Special Invoice for

19          Export, Bates number TG 0001657,

20          TG 0001658, TG 0001661, TG 0001663

21          through TG 0001670, and TG 0001680

22          through TG 0001682, was marked for

23          identification.)

24                     -  -  -
```

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. MEUNIER:

 2        Q.    Are you familiar with this

 3   form?

 4        A.    I have not seen these forms

 5   because I'm not a detailed financial

 6   personnel nor the detailed sales

 7   personnel.

 8        Q.    Do you deny that the forms

 9   all indicate that the exporter is Taian

10   Taishan Plasterboard Company, Limited?

11             MR. CYR:  Objection.

12             THE COURT:  Now, wait a

13        minute.  I sustain the objection.

14        They are what they are.  If he has

15        not seen them, how is he going to

16        testify about them?  They are what

17        they are.  This witness said he

18        hasn't seen them.

19   BY MR. MEUNIER:

20        Q.    Mr. Peng, were special forms

21   required by the local Shandong province

22   government for the export sale of gypsum

23   board by TTP?

24        A.    I'm not familiar in this
```

Confidential - Subject to Further Confidentiality Review

```
 1    part, because I'm not the person detailly

 2    operating the sales.

 3                  THE COURT REPORTER:

 4         Detailed?

 5                  INTERPRETER:  Detailly

 6         operating the sales.

 7    BY MR. MEUNIER:

 8         Q.    Although you're not familiar

 9    with the details, Mr. Peng, you do know,

10    don't you, that the government required

11    special invoice for the export of gypsum

12    board by TTP?

13         A.    I don't know whether special

14    invoices were used, but I know it had to

15    be approved and recorded by the foreign

16    trading department.

17         Q.    And you do not deny, do you,

18    that between 2006 and 2007, TTP made

19    export sales of gypsum board for delivery

20    to the United States, to New Orleans,

21    Louisiana, to Miami, Florida, and to New

22    York, New York?  You don't deny that, do

23    you?

24                  MR. CYR:  Objection.
```

Confidential - Subject to Further Confidentiality Review

1             THE COURT:  What's the

2        basis, Joe?

3             MR. CYR:  (Addressing the

4        interpreter.)  Please don't

5        interpret.

6             It just seems to me that

7        it's going to be difficult in the

8        translation to distinguish between

9        not denying and actually knowing.

10       If you want to know if he knew

11       that, I think the better question

12       is whether or not he knew that.

13       I'm just afraid that you're going

14       to get a "yes" on don't deny.  I'm

15       not quite sure what it means.

16            THE COURT:  Ask him about

17       knowing.  I think that's a

18       legitimate observation.  If this

19       witness knows, he knows.  If he

20       doesn't know, he doesn't.

21    BY MR. MEUNIER:

22       Q.   Mr. Peng, do you know that

23    in 2006 and 2007, TTP, as reflected by

24    these invoices, sold gypsum board that

1   was delivered to New Orleans, Louisiana,

2   the USA, Miami, Florida, Miami/USA and

3   New York?

4        A.   All our gypsum boards were

5   delivered in China.  Whether some other

6   trading company had actually shipped them

7   over there or how were they shipped over

8   there, I'm not sure about that.

9        Q.   But you don't deny that

10  forms that TTP may have filled out for

11  export purposes indicate the shipping

12  destinations in the United States that I

13  have mentioned?  You do not dispute that,

14  do you?

15       A.   Let me put it this way.

16  Reflected in this document, the exporting

17  enterprise name is TTP.  This is in

18  accordance with the fixed form of the

19  special invoice for export.  Customers

20  will tell us where did they want us to

21  ship the products to according to the

22  invoice, then we would write down the

23  destination on the invoice.  As of

24  whether it had indeed shipped to that

Confidential - Subject to Further Confidentiality Review

 1   place, I am not sure.  Because this

 2   belongs to customer's business secret,

 3   therefore, we would neither ask nor

 4   speculate.

 5        Q.   Who filled out the

 6   information on these forms?

 7        A.   I'm not sure whether the

 8   information on the form was filled out by

 9   the financial department or the taxation

10   department.

11        Q.   But you would agree, all the

12   information on the forms was verified by

13   your company?

14        A.   This invoice does belong to

15   our company.

16             MR. MEUNIER:  Thank you,

17        sir.  I'll mark that as Peng

18        Number 8 in globo.

19             Your Honor, I have one final

20        area of questioning for this

21        witness which I think will take

22        about 30 minutes.  If The Court

23        would like me to do so after a

24        break, I will.

```
 1              THE COURT:  What's your

 2        situation, Joe?  Do you want to go

 3        on or you want to take a break.

 4              MR. CYR:  I'm going to need

 5        20 minutes if Your Honor allows

 6        it.  So, I guess it's just a

 7        question of whether you decide

 8        that we have an early lunch now or

 9        break for lunch at 1.  If you only

10        go a half hour, I can finish

11        before 1:00.

12              THE COURT:  I don't have any

13        problem.  You have to get out of

14        here.  That's why --

15              MR. CYR:  No, no, no.  I

16        don't have to get out of here this

17        afternoon, Judge.  It is tomorrow

18        morning.

19              MR. MEUNIER:  But if we

20        delay lunch, the witness could be

21        free.

22              MR. CYR:  Yeah, yeah.  That

23        would be great.

24              MR. MEUNIER:  I don't know
```

```
 1          who else has questions, though.

 2                MR. CYR:  So, if it's all

 3          right with the Judge, we can --

 4                THE COURT:  You want to

 5          continue?  I don't have any

 6          problem.

 7                MR. CYR:  Continue until

 8          1:00.

 9                THE COURT:  Okay.  That's

10          fine.

11                THE VIDEOTAPE TECHNICIAN:  I

12          do need to change tape though.

13                THE COURT:  Let's change

14          tapes.

15                THE VIDEOTAPE TECHNICIAN:

16          Going off the record.  This is the

17          end of Tape Number 3.  The time is

18          12:05.

19                      -  -  -

20                (Whereupon, a recess was

21          taken from 12:05 p.m. until 12:20

22          p.m.)

23                      -  -  -

24                THE VIDEOTAPE TECHNICIAN:
```

 1          This is the beginning of Tape

 2          Number 4.  Going on the record at

 3          12:20.

 4    BY MR. MEUNIER:

 5          Q.    Mr. Peng, Mr. Jia has given

 6    testimony in this case this past April

 7    that you personally were involved in the

 8    settlement of a dispute with a company

 9    called Guardian Building Products

10    Distribution, Inc.  Is that true?

11          A.    The English name that you

12    just mentioned, do you have a Chinese

13    name for it?

14          Q.    Is the name Guardian

15    Building Products Asia, Inc. familiar?

16          A.    Is that an English name?

17                MR. CYR:  May I?  Off the

18          record, not to be interpreted.

19                     -  -  -

20                (Whereupon, an

21          off-the-record discussion was

22          held.)

23                     -  -  -

24    BY MR. MEUNIER:

```
 1        Q.    Mr. Peng, I show you a

 2   document that's been Bates numbered

 3   200 -- I'm sorry -- 20118 through 20122

 4   which I'll mark as Peng Number 9.  I ask

 5   you if you are familiar with that

 6   document?

 7                    -  -  -

 8              (Whereupon, Deposition

 9         Exhibit Peng S-9, Settlement and

10         Release Agreement, Bates stamped

11         TG 0020118 through TG 0020122, was

12         marked for identification.)

13                    -  -  -

14              (Witness reviewing

15         document.)

16              THE WITNESS:  I'm aware of

17         this.

18   BY MR. MEUNIER:

19        Q.    The document is in both

20   English and Chinese, true?

21        A.    Correct.

22        Q.    And it is a settlement and

23   release agreement of 2008 between TTP and

24   Guardian Building Products Distribution,
```

 1    Inc., correct?

 2              INTERPRETER:  May the

 3         interpreter use the translation

 4         stated on the document as a

 5         correct translation in Chinese for

 6         the deponent?

 7              MR. MEUNIER:  Yes.

 8    BY MR. MEUNIER:

 9         Q.   So, you agree this is a

10    written settlement and release agreement

11    of 2008 between those two companies?

12         A.   Yes.

13         Q.   Were you involved in making

14    this agreement, Mr. Peng?

15         A.   Mr. Peng Wenlong was the

16    detail handler of this agreement.  And

17    also our attorney, Mr. Liang Guangbin.

18         Q.   But you also were involved

19    as the director and manager of TTP, true?

20         A.   After this had happened, Mr.

21    Peng report it to me.

22         Q.   And you know that this

23    agreement resolved a dispute about the

24    quality of drywall manufactured and sold

```
 1    by TTP to Guardian Building Products,

 2    true?

 3         A.    Our product was sold to a

 4    Taigao Trading Company in Taian, and that

 5    company distributed our products to

 6    Guardian Building Products Distribution,

 7    Inc.

 8              INTERPRETER:  Interpreter

 9         needs clarification on the

10         spelling of Taigao.

11              MR. CHEN:  I don't know if

12         they have a designated English

13         name, so if you use the Pinyin,

14         that would be fine, I think, for

15         the record.

16              INTERPRETER:  Sometimes they

17         use different names.

18    BY MR. MEUNIER:

19         Q.    But Taishan is the company

20    that agreed to pay Guardian the total

21    amount of $380,000 US dollars to settle

22    this dispute, true?

23         A.    Yes, that's the company.

24         Q.    And Guardian, to whom
```

```
 1    Taishan agreed to pay this money, is a
 2    company organized under the laws of the
 3    State of Georgia, United States of
 4    America, with its principal place of
 5    business in South Carolina, USA; is that
 6    true?
 7          A.    I only know that there is an
 8    amount of $380,000 to be paid for the
 9    settlement, but I'm not sure about the
10    process of such payment because it is a
11    financial department who was specifically
12    in charge of this.
13          Q.    The financial department of
14    TTP?
15          A.    Correct.  TTP's financial
16    department.
17          Q.    And the money in the amount
18    of $380,000 US dollars was paid by the
19    financial department of TTP to the
20    company that is identified in Paragraph 2
21    on the first page, Bates Number 20118; is
22    that true?
23          A.    The first page?
24          Q.    Yes, sir.
```

Confidential - Subject to Further Confidentiality Review

```
 1           A.    You said the payment was

 2    given to this one?

 3           Q.    The payment was --

 4           A.    To be paid to Guardian.

 5           Q.    Guardian Building Products

 6    Division, Inc., the company described in

 7    Paragraph 2 on the first page of the

 8    document.

 9           A.    Yes.

10           Q.    What was the nature of the

11    dispute about the quality of this

12    drywall?

13                 INTERPRETER:  Interpreter

14           needs to consult expert on this.

15                 MR. CHEN:  Maybe you might

16           check the dictionary.  It is a

17           technical term.  I understand it

18           to mean weight bearing ability,

19           but I'm not sure.  You should

20           double-check that.

21                 (Discussion of interpreter

22           and witness in Chinese.)

23                 THE WITNESS:  The opposing

24           party raised their claim regarding
```

1          the nail puncturing power of our

2          product, which was weak.

3     BY MR. MEUNIER:

4          Q.     So, it was a complaint about

5     the quality of gypsum board manufactured

6     by TTP; is that true?

7          A.     Yes.  That was a complaint

8     regarding the quality of the gypsum

9     board.

10         Q.     But the board was sold to

11    Guardian Building Products by Taian

12    Taigao Trading Corporation; is that true?

13         A.     Yes.

14         Q.     Why did TTP agree to pay the

15    money if the sales contract was between

16    that company and Guardian?

17         A.     Because we manufactured and

18    produced such gypsum board.

19         Q.     If you'd turn to the second

20    page, which is Bates Number 20119.

21    Please refer to Paragraph 2.  In this

22    paragraph, Guardian agrees to waive and

23    release "all claims against Taishan, its

24    parents, subsidiaries, and affiliated

```
 1    corporations...whether such claim arose

 2    in the United States or in the People's

 3    Republic of China."  Is that true?

 4         A.    Correct.

 5         Q.    Why was it important for TTP

 6    to pay this money in order to get a

 7    release of claims which would arise under

 8    the law of the United States America?

 9         A.    Even though the claim was

10    about the nail puncturing power, however,

11    in each of the stages, transportation,

12    storage, loading and usage, if there was

13    improper handling, there would also be

14    quality problem arise from it.

15              The opposing party also

16    suggested us to undertake an

17    investigation on their using sites of the

18    products, but because of the distance,

19    which is rather great, and it's required

20    great cost and personnel arrangements.

21              And also based on the

22    friendly cooperation relationship between

23    TTP and Taigao Trading Company, and also

24    in consideration of our capability of
```

Confidential - Subject to Further Confidentiality Review

```
 1    bearing such cost, it has to be within

 2    the limits of what we can bear.  Even

 3    though we were sure that we had no such

 4    quality problems, however, based on the

 5    above points that I just mentioned,

 6    because TTP had already stopped its

 7    operation, we did not have sufficient

 8    energy nor financial capability to carry

 9    on, so that we reached such a settlement

10    agreement.

11            Q.    It was important for TTP in

12    this case to stand behind the quality of

13    its product, true?

14            A.    Yes, we believe in our

15    quality.  The opposing party had visited

16    our production process during the period

17    of production, and they had performed an

18    on-site inspection before shipment.  They

19    had not raised any dispute on the quality

20    of our product.  From the time we shipped

21    our product to the time we received such

22    feedback, there was half a year in

23    between.  The time period was long.  Like

24    I said, if there were problems during the
```

Confidential - Subject to Further Confidentiality Review

1    process of transportation and storage,

2    the problem would still be there.

3         Q.    Do you believe Guardian

4    exaggerated the problems with the

5    drywall?

6         A.    We believe all our gypsum

7    board products are qualified products

8    because all went through inspections.

9         Q.    But you believe it was

10   important to pay money to resolve this

11   dispute, true?

12        A.    In order to benefit the

13   customer, we felt a little sacrifice is

14   okay.

15        Q.    And that included resolving

16   all claims whether they arose under US or

17   Chinese law, true?

18        A.    This depends on the

19   circumstances of both parties.

20        Q.    But it was a benefit to TTP

21   to resolve all claims under both US and

22   China law through this agreement, true?

23        A.    To be able to resolve the

24   disputes of both parties, it is the

```
 1    purpose of our both parties.

 2          Q.    In Paragraph 3 on the page

 3    Bates numbered 20119, in paying this

 4    money, Taishan and its affiliates and

 5    subsidiaries, including but not Limited

 6    to Shandong Taihe Dongxin Stock Co.,

 7    Limited and Taian Taishan Gypsum

 8    Corporation, Limited, waived and released

 9    all of their claims against Guardian,

10    whether those claims arose in the United

11    States or in the People's Republic of

12    China.  Is that true?

13          A.    Yes.

14          Q.    Please look at the signature

15    page, which is Bates numbered 20121, and

16    tell us who signed this release agreement

17    on behalf of Taian Taishan Plasterboard

18    Company, Limited?

19          A.    The representatives on

20    behalf of the company signed the

21    agreement for attorney Liang Guangbin and

22    Mr. Peng Wenlong of our company.

23          Q.    Both of those gentlemen

24    signed?
```

 1          A.     Yes, that's their

 2     signatures.

 3          Q.     And their signatures are

 4     dated October 28, 2008?

 5          A.     Yes, October 28, 2008.

 6          Q.     And whose seal or stamp

 7     appears over the name of the company TTP?

 8          A.     The seal is the seal of

 9     Taian Taishan Plasterboard Company,

10     Limited.

11          Q.     The agreement is signed by

12     both a representative of Guardian

13     Building Products Distribution, Inc. and

14     Guardian Building Products Asia, Inc.  Do

15     you know the relationship between those

16     two companies?

17          A.     I'm not sure about the

18     detailed differences between the two

19     companies.

20          Q.     And the final signature is

21     on behalf of Beijing Swift Investment

22     Consultants Company, Limited.  Why is

23     that company appearing on this document?

24          A.     Because there is a

```
 1    connection between this company and

 2    Guardian.

 3         Q.    Finally, the final page of

 4    this exhibit is TG 20122.  It's entitled

 5    "Exhibit A, Wire Transfer Instructions."

 6    Does this document reflect that the

 7    Taishan payment in the total amount of

 8    $380,000 US dollars was wired to the Bank

 9    of America, an account held by Guardian

10    Building Products Distribution?

11         A.    Yes.

12         Q.    And does it reflect that the

13    wiring was sent to that bank in the City

14    of New York, New York?

15         A.    I'm not sure about that.

16              THE COURT:  Any further

17         questions?

18              MR. MEUNIER:  I don't think

19         I do.  If I could just tender the

20         witness.

21              THE COURT:  Anybody else

22         from the --

23              MS. BASS:  I'm just going to

24         ask him to mark one document,
```

Confidential - Subject to Further Confidentiality Review

```
 1          please.

 2                    -  -  -

 3                 EXAMINATION

 4                    -  -  -

 5  BY MS. BASS:

 6          Q.    Good afternoon.  My name is

 7  Hilarie Bass, and I just have one quick

 8  set of questions for you.

 9               MS. BASS:  I would like to

10          have marked as the next exhibit

11          for this deposition, which I

12          believe is 10, a document with

13          Bates Number TG 1704.

14                    -  -  -

15               (Whereupon, Deposition

16          Exhibit Peng S-10, Contract, Bates

17          stamped TG 0001704 through TG

18          0001706, was marked for

19          identification.)

20                    -  -  -

21  BY MS. BASS:

22          Q.    The Bates Number of this

23  document is TG 1704 through 1706.  Please

24  take a moment and review the document.
```

1    My question is whether or not you can

2    recall having seen that document before?

3         A.    I haven't seen this

4    document.  I don't understand English

5    anyways.

6         Q.    Could you look at the third

7    page of the document, please, and

8    identify for us who on behalf of Taian

9    Taishan Plasterboard Company, Limited

10   signed this agreement?

11        A.    You mean the three

12   characters here?

13        Q.    Yes.

14        A.    Yang Jiapo.

15        Q.    And that individual was a

16   salesperson at TTP in June of 2006,

17   correct?

18        A.    He was a salesperson of TTP.

19        Q.    Were you aware of a

20   transaction in which TTP sold gypsum

21   board to Wood Nation, Inc. for delivery

22   in Tampa, Florida?

23        A.    I have only heard it from

24   Peng, Yang Jiapo, from TTP.  Can you

1    repeat your question?

2         Q.    Yes.

3               Were you aware of an

4    agreement by which TTP agreed to sell its

5    gypsum board to a company entitled Wood

6    Nation, Inc. based in Tampa, Florida?

7         A.    I've only heard that some of

8    our gypsum boards was sold in America.

9    But I'm not sure whether there was such a

10   transaction.

11        Q.    Would your approval have

12   been sought for a transaction which

13   contemplated 20 to 30 containers of

14   gypsum to be sold each week between June

15   2006 through December 2006 for delivery

16   at the port of Tampa, Florida?

17        A.    My sales principle is the

18   balancing of production and sales, which

19   is you should sell whatever volume that

20   we produce.  As of in what period of time

21   and to where were they sold to, they did

22   not need to report to me.

23        Q.    My last question is, can you

24   identify for us the seal of TTP on this

1    agreement?  It is spread over the three

2    pages?

3           A.    It says Taian City, Taishan

4    plaster stone.  Correction, Plasterboard

5    Company, Limited.

6           Q.    Can you identify that as the

7    seal of TTP?

8           A.    The seal of TTP was the seal

9    that I just read to you which says Taian

10   Taishan Plasterboard Company, Limited.

11          Q.    So, the answer to my

12   question is yes, this is the seal of TTP?

13                INTERPRETER:  Interpreter

14          clarification.  I think he meant

15          the one before.

16                MS. BASS:  That's why I'm

17          asking again.

18                THE WITNESS:  The seal is

19          different from the one before.  It

20          has English on it, but the other

21          seal does not have English on it.

22   BY MS. BASS:

23          Q.    Do you recognize having seen

24   this seal with both Chinese and English

```
 1    writing that states Taian Taishan

 2    Plasterboard Company?  It will be easier

 3    to read like this.

 4              (Handing over document.)

 5         A.   Yes, yes.  That's it.

 6              MS. BASS:  Thank you very

 7         much.

 8              THE COURT:  Anyone else?

 9              (No response.)

10              THE COURT:  Let's take a

11         break then at this time.  We'll

12         come back at 2:00, please.

13              MR. CYR:  If you want,

14         Judge, I can probably get through

15         it in 10, 15 minutes.

16              THE COURT:  Let's do that.

17         That's fine.

18              MR. CYR:  May I begin, Your

19         Honor?

20              THE COURT:  Yes, please.

21                   -  -  -

22                   EXAMINATION

23                   -  -  -

24    BY MR. CYR:
```

1          Q.    Mr. Peng, during the time

2    TTP was operating, did Peng Wenlong ever

3    tell you that some of TTP's customers

4    said they intended to ship the drywall to

5    the U.S.?

6          A.    Yes.

7          Q.    Did you have any knowledge

8    at that time where the drywall was

9    actually shipped?

10         A.    I didn't know where exactly

11   where the drywall is to be shipped to,

12   but according to Mr. Peng Wenlong, who

13   said that some of the customers might

14   ship the gypsum boards to the United

15   States.

16         Q.    Did you have any knowledge

17   where the drywall was actually used?

18         A.    We don't know exactly where

19   were they used at.

20         Q.    When the other lawyer was

21   asking you questions about your meeting

22   with Mr. -- discussions with Mr. Jia

23   about preparing for the deposition, you

24   indicated that you talked with Mr. Jia

```
 1    about a few of the TTP documents.  Do you

 2    remember that testimony?

 3          A.    I remember that.

 4          Q.    In your discussions with Mr.

 5    Jia, did you discuss anything else

 6    besides that?

 7          A.    Nothing else.

 8          Q.    Have I ever asked you that

 9    question before?

10          A.    No.

11          Q.    How many employees did TTP

12    have?

13          A.    TTP, while it was in

14    production or in normal operation, it had

15    about 260 employees.

16          Q.    Did TTP ever share any of

17    its employees with TG?

18          A.    TTP's employees were its own

19    employees.  It did not share employees

20    with TG.

21          Q.    Did TTP have its own

22    production facility?

23          A.    TTP had its own facility,

24    its own office, and its own employees.
```

```
 1            Q.    Did TTP share its production

 2   facility with TG?

 3            A.    TTP had its own production

 4   facility.  It did not use the facility of

 5   production of TG's.

 6            Q.    Did TTP purchase its own

 7   supplies for the gypsum board?

 8            A.    TTP had its own production

 9   and purchased its own raw material that

10   was needed for the production.

11            Q.    Did TTP have its own bank

12   accounts?

13            A.    TTP had an independent

14   financial department.  Of course it had

15   its own bank account.

16            Q.    Did TTP pay its own

17   employees?

18            A.    TTP's employees worked at

19   TTP.  Of course TTP would be the company

20   that paid them.

21            Q.    Was TTP ever inspected by a

22   government agency with respect to whether

23   or not it operated independently?

24            A.    Yes.  We had to register,
```

Confidential - Subject to Further Confidentiality Review

1  put in record and receive approval from

2  relevant institutions of the government.

3       Q.    What government agency

4  inspected TTP with respect to whether it

5  operated independently?

6       A.    The department of business

7  licensing, the department of taxation,

8  and other inspection institutions.

9       Q.    I would like to direct your

10  attention to Defendant's Exhibit 37.

11  Take a look at that and tell the Judge

12  and plaintiff's counsel what that

13  document is.

14            MR. HARDT:  Can you give us

15       the Bates Number?

16            MR. CYR:  Yes.  It's Bates

17       TG 20850, 20851.

18            THE COURT:  What's the

19       question?

20            MR. CYR:  Can we proceed?

21            THE COURT:  Yes, please do.

22  BY MR. CYR:

23       Q.    Could you tell the Judge and

24  plaintiffs' counsel what that document

Confidential - Subject to Further Confidentiality Review

1    is?

2          A.    It is a capital verification

3    description issued by a third-party

4    accounting firm to Shandong Taihe Dongxin

5    Plasterboard Company, Limited.

6          Q.    Was it prepared at the

7    request of TTP?

8          A.    Yes.  It was requested by

9    TTP because Shandong TG Company was going

10   to add registered capital, therefore,

11   capital verification was needed.

12         Q.    Please look at Defendant's

13   Exhibit 45, 46 and 47.  While Mr. Jia is

14   looking at those documents, I'll quickly

15   cite the TG numbers.

16               45 is TG 26004 through TG

17   26006.

18               Defendant's Exhibit 46 is TG

19   26007 through TG 26009.

20               And Defendant's 47 is TG

21       26010 through TG 26012.

22               MS. BASS:  Are they being

23       separately marked in this?

24               MR. CYR:  They have already

Confidential - Subject to Further Confidentiality Review

```
1        been marked as Defendant's 45, 46

2        and 47.

3              MS. BASS:  So they are not

4        being separately marked in this

5        deposition?

6              MR. CYR:  I believe that Ms.

7        Bass correctly points out that

8        although they were premarked, it

9        hasn't been reflected in the

10       transcript of this deposition.

11       Thank you.

12                   -   -   -

13             (Whereupon, Deposition

14       Exhibit Jia Defendant's-45,

15       Document in Chinese, Bates stamped

16       TG 0026004 through TG 0026006;

17       Deposition Exhibit Jia

18       Defendant's-45A, 2006 Financial

19       Statement of Taian Taishan

20       Plasterboard Co., Ltd., Bates

21       stamped TG 0026004 through TG

22       0026006.

23                   -   -   -

24             (Whereupon, Deposition
```

Confidential - Subject to Further Confidentiality Review

```
1              Exhibit Jia Defendant's-46,

2              Document in Chinese, Bates stamped

3              TG 0026007 through TG 0026009;

4              Deposition Exhibit Jia

5              Defendant's-46A, Balance Sheet,

6              Bates stamped TG 0026007 through

7              TG 0026009.

8                      -  -  -

9              (Whereupon, Deposition

10             Exhibit Jia Defendant's-47,

11             Document in Chinese, Bates stamped

12             TG 0026010 through TG 0026012, and

13             Deposition Exhibit Jia

14             Defendant's-47A, 2008 Financial

15             Statement of Taian Taishan

16             Plasterboard Co., Ltd. Balance

17             Sheet, Bates stamped TG 0026010

18             through TG 0026012, were marked

19             for identification.)

20                     -  -  -

21  BY MR. CYR:

22         Q.   Mr. Peng, could you tell The

23  Court and plaintiffs' counsel what these

24  documents are?
```

Confidential - Subject to Further Confidentiality Review

```
1          A.    These are the accounting

2  report provided by a third-party

3  accounting firm regarding TTP's

4  accounting report in the years of 2006,

5  2007 and 2008.

6          Q.    Did TTP provide information

7  to the independent accounting firm for

8  the purposes of their preparation of

9  those three reports?

10         A.    All the information provided

11 was through the independent financial

12 department of TTP.

13              MR. CYR:  Thank you, Your

14         Honor.  I have no further

15         questions.

16              THE COURT:  Any redirect?

17              MR. MEUNIER:  Briefly, Your

18         Honor.

19                   -  -  -

20                EXAMINATION

21                   -  -  -

22 BY MR. MEUNIER:

23         Q.    Mr. Peng, in response to

24 your attorney's questions, you say that
```

Confidential - Subject to Further Confidentiality Review

```
 1    Peng Wenlong did tell you that some TTP

 2    drywall was being sold and shipped to

 3    different locations in the USA; is that

 4    true?

 5              MR. CYR:  Objection.

 6         Misstates the record.

 7              THE COURT:  Sustain the

 8         objection.  Restate it.

 9    BY MR. MEUNIER:

10         Q.   Is it true that you knew

11    from Peng Wenlong that TTP drywall was

12    being shipped to the US?

13         A.   I've only heard it from Mr.

14    Peng Wenlong.  He said that some of the

15    trading customers might have shipped some

16    of the gypsum boards to the United

17    States.

18         Q.   Were the sales employees of

19    TTP allowed to enter into sales

20    agreements for TTP drywall which they

21    knew was being shipped to the United

22    States?

23         A.   They may sign such

24    agreements, but as far as I know, all
```

```
 1    these products that was mentioned in the

 2    agreements were transactioned through the

 3    trading companies in China.

 4         Q.    Did it matter to you where

 5    TTP board was being shipped to and used

 6    in the United States as long as TTP made

 7    a profit on those sales?

 8              MR. CYR:  Objection, vague.

 9              THE COURT:  I don't see that

10         being vague.  I overrule the

11         objection.

12              MR. CYR:  Answer the

13         question, Mr. Peng.

14              THE WITNESS:  Can you repeat

15         the question?

16    BY MR. MEUNIER:

17         Q.    Did it matter to you where

18    the TTP board was being shipped to and

19    used in the United States as long as TTP

20    made a profit on those sales?

21         A.    We're not sure exactly where

22    would be our gypsum board be shipped to.

23         Q.    It was okay if it was

24    shipped to the US and used in the U.S. as
```

Confidential - Subject to Further Confidentiality Review

```
 1    long as you made a profit; is that true?

 2         A.    After entering into

 3    agreements with our customers, I'm sure

 4    our customers had their own benefits in

 5    mind.  We would not take into

 6    consideration where they would use the

 7    product at.

 8         Q.    So, it was okay if you made

 9    sales agreements for the sale of drywall

10    that was shipped and used in the U.S.,

11    right?

12         A.    Our trading customers may

13    ship our gypsum board to the United

14    States, but as of where did they use the

15    gypsum board in, we don't have the right

16    to ask.

17              MR. MEUNIER:  I have no

18         further questions.

19              THE COURT:  We'll come back

20         at 2:30.

21              THE VIDEOTAPE TECHNICIAN:

22         That concludes today's deposition.

23         Going off the record at 1:24.

24                      -  -  -
```

Confidential - Subject to Further Confidentiality Review

```
1                    (Whereupon, the deposition

2           concluded at 1:24 p.m.)

3                      -   -   -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E
 2
 3
                I, LINDA L. GOLKOW, a
 4    Registered Diplomate Reporter, Certified
      Court Reporter and Notary Public, do
 5    hereby certify that, pursuant to notice,
      the deposition of SHILIANG PENG was duly
 6    taken on January 11, 2012 at 8:30 a.m.
      before me.
 7
 8              The said SHILIANG PENG was
      duly sworn by The Court according to law
 9    to tell the truth, the whole truth and
      nothing but the truth and thereupon did
10    testify as set forth in the above
      transcript of testimony.  The testimony
11    was taken down stenographically by me.
12
                I do further certify that
13    the above deposition is full, complete
      and a true record of all the testimony
14    given by the said witness.
15
16
            Linda L. Golkow
17          Registered Diplomate Reporter
            Certified Realtime Reporter
18
19
20              (The foregoing certification
      of this transcript does not apply to any
21    reproduction of the same by any means,
      unless under the direct control and/or
22    supervision of the certifying reporter.)
23
24
```

```
 1              INSTRUCTIONS TO WITNESS

 2

 3

 4              Please read your deposition

 5   over carefully and make any necessary

 6   corrections.  You should state the reason

 7   in the appropriate space on the errata

 8   sheet for any corrections that are made.

 9

10              After doing so, please sign

11   the errata sheet and date it.  It will be

12   attached to your deposition.

13

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

```
 1                 - - - - - -

              E R R A T A

 2                 - - - - - -

 3    PAGE   LINE   CHANGE

 4    _____  _____  _____

 5      REASON:  ____ _____

 6    _____  _____  _____

 7      REASON:  _____ _____

 8    _____  _____  _____

 9      REASON:  _____ _____

10    _____  _____  _____

11      REASON:  _____ _____

12    _____  _____  _____

13      REASON:  _____ _____

14    _____  _____  _____

15      REASON:  _____ _____

16    _____  _____  _____

17      REASON:  _____ _____

18    _____  _____  _____

19      REASON:  _____ _____

20    _____  _____  _____

21      REASON:  _____ _____

22    _____  _____  _____

23      REASON:  _____ _____

24
```

Confidential - Subject to Further Confidentiality Review

```
 1
 2            ACKNOWLEDGMENT OF DEPONENT
 3
                 I,_____, do
 4    hereby certify that I have read the
      foregoing pages, 1-132, and that the same
 5    is a correct transcription of the answers
      given by me to the questions therein
 6    propounded, except for the corrections or
      changes in form or substance, if any,
 7    noted in the attached Errata Sheet.
 8

      _____
 9     SHILIANG PENG                    DATE
10
11
12
13
14
15
      Subscribed and sworn
16    to before me this
      _____ day of _____, 20_____.
17
      My commission expires:_____
18
19    _____
      Notary Public
20
21
22
23
24
```

```
 1                    LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____
```