UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED          MDL NO. 2047
DRYWALL PRODUCTS LIABILITY           SECTION: L
LITIGATION                           JUDGE FALLON
                                     MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO:
ALL CASES

# Special Master's Recommendations
# Regarding Motion of Taylor Morrison, Inc.,
# the Ryland Group, Inc., and LWH, LLC
# for Determination of Active Builders Status (Rec. Doc. 20503)

Taylor Morrison, Inc., The Ryland Group, Inc. n/k/a CalAtlantic Group, Inc., and LWH, LLC (collectively, "the Movants") filed a motion asking that they be deemed "Active Builders," thereby entitling them to a greater amount of attorneys' fees than if they are deemed to be "non-Active Builders." For the reasons stated below, the Special Master concludes that the Movants are non-Active Builders.

Resolution of this motion requires an understanding of the litigation and settlement history of this matter.

> The present litigation arises from alleged property damage and personal injuries caused by the presence of Chinese drywall in homes and other buildings. Hurricanes Katrina and Rita devastated the Gulf Coast in 2005. These disasters, coinciding as they did with a boom in new housing construction, helped precipitate a shortage of drywall for the construction and reconstruction of homes in the United States. As a result, from approximately 2005 to 2008, Chinese drywall entered the United States market, changing hands in the chain of commerce, and ultimately finding its way into thousands of homes and buildings in the United States, primarily in Florida, Louisiana, Alabama, Mississippi, Texas, and Virginia. Sometime after the installation of Chinese drywall in these properties, homeowners, residents, and occupants began to notice and complain of odd odors, corrosion of metal components, failure of electronics and appliances, and in some cases, physical ailments, such as nose bleeds, skin

irritation, and respiratory problems.

* * *

The present litigation commenced with the filing of law suits in 2009 in both federal and state courts by property owners and occupants damaged by the Chinese drywall installed in their residences and businesses, in addition to suits filed by some homebuilders who repaired these properties. Defendants and declaratory judgment plaintiffs include homebuilders, developers, installers, retailers, realtors, brokers, suppliers, importers, exporters, and distributors, as well as their insurers and the insurers of homeowners, who were involved with the Chinese drywall in the affected properties. . . . On June 15, 2009, the Panel transferred all federal actions alleging damages from Chinese drywall to this Court, the U.S. District for the Eastern District of Louisiana, for coordinated and consolidated proceedings. See (R. Doc. 1).

Since the inception of MDL 2047, approximately three years ago [as of February 7, 2013], numerous cases have been consolidated, containing thousands of claims; the Court has appointed steering committees and liaison counsel for plaintiffs, homebuilders, insurers, installers, and manufacturers; it has presided over monthly status conferences, hearings, and several bellwether trials; it has issued numerous opinions, pretrial orders, and minute entries; the Court has facilitated several mediations; and over 16,000 record documents have been filed.[1]

The presence of Chinese drywall in a home might implicate several parties. Any homeowner (with appropriate proof of identification) might sue any entity in the stream of commerce from the installer to the manufacturer, along with their insurers. Similarly, any defendant might have an incidental claim against another defendant further upstream (e.g., a supplier of drywall might have a claim against the manufacturer that provided the drywall).

Recognizing the tangled relationships among the hundreds of parties, the Court encouraged

---

[1] R. Doc. 16570 (Order and Judgment: (1) Certifying the InEx, Banner, Knauf, L&W, and Global Settlement Classes; and (2) Granting Final Approval to the InEx, Banner, Knauf, L&W, and Global Settlements, pp.2-4).

settlement discussions on all fronts:

> The first notable breakthrough towards resolving the MDL litigation claims against Knauf came in October 2010, when the PSC and the Knauf entities entered into a Court approved pilot program for remediation of homes containing drywall manufactured by Knauf. In addition to the Knauf entities, a number of defendants in the chain-of-commerce contributed funds to the program. The pilot program has since been implemented, with homes being added to and completed on a regular basis since early spring 2011. To date, contractors have completed remediation of over one thousand homes through this program.
>
> The second notable breakthrough occurred in the spring of 2011, when Interior Exterior Building Supply ("InEx"), a major supplier of Chinese drywall in the gulf coast, entered into a class action settlement agreement and the Court preliminarily approved this agreement. This agreement provides for the tendering of all of InEx's primary insurance proceeds, in the amount of $8,000,000, for the benefit of a national class with claims against InEx involving Chinese drywall.
>
> The third notable breakthrough occurred in the summer of 2011, when the Banner entities, also major suppliers of Chinese drywall in the gulf coast, entered into a class action settlement agreement and the Court preliminarily approved this agreement. The Banner settlement agreement provides that Banner and its insurers will provide $54,475,558.30 for the benefit of a nationwide class consisting of all persons or entities with claims against Banner arising from or otherwise related to Chinese drywall.
>
> The fourth, and most notable breakthrough, occurred in December 2011, when the Knauf entities entered into a class action settlement agreement with plaintiffs. This proposed global, class settlement agreement is intended to resolve claims made in filed actions which arose out of KPT Chinese drywall installed in properties in the United States. The Court granted preliminary approval of this settlement agreement on January 10, 2012. (R. Doc. 12138).
>
> The fifth breakthrough in the litigation came in March 2012 when L&W, a third major Chinese drywall supplier, entered into a class action settlement agreement. The L&W Settlement is a component of the plan for global resolution of the Knauf/KPT supply chain in

this litigation. The Court granted preliminary approval of the L&W settlement agreement on April 26, 2012. (R. Doc. 14033).

The sixth and final breakthrough in this litigation involved various builders, suppliers, and installers, and these parties' insurers, who have entered into a class action settlement agreement (the "Global Settlement") with the plaintiffs. The Global Settlement was entered into by the Plaintiffs' Steering Committee on behalf of claimants, except those with affected properties in Virginia, and certain Builders, Installers, and Suppliers. This Court granted preliminary approval of the Global Settlement on June 4, 2012. (R. Doc. 14562). The Global Settlement provides for a total payment of $70,570,000.00 for class members regardless of the type or brand of Chinese drywall in their properties and regardless of whether they filed their claims in the MDL or another forum.

These settlements are all interrelated and interdependent. They resolve all claims, counterclaims, and third-party claims among the settling parties.[2]

As is typical in complex litigation, the settlements have given rise to claims for attorneys' fees, including both common benefit fees and individual counsel fees. Common benefit fees are "for legal services beneficial to persons other than a particular client."[3] An attorney typically is not entitled to a common benefit fee for time spent prosecuting his or her own client's claim (unless, for instance, the case has been selected as a bellwether).

The Court in this matter issued a series of pretrial orders, including PTO 28, setting forth the procedure for awarding attorneys' fees:

> [T]he Court shall set the amount of the award of attorneys' fees and expenses to be compensated and reimbursed and at the appropriate time. . . . After the amount of the award is determined, the Court

---

[2]R. Doc. 16570 (Order and Judgment: (1) Certifying the InEx, Banner, Knauf, L&W, and Global Settlement Classes; and (2) Granting Final Approval to the InEx, Banner, Knauf, L&W, and Global Settlements, pp.5-6).

[3]*In re Vioxx Prods. Liab. Litig.*, 760 F.Supp.2d 640, 647 (E.D. La. 2010).

shall establish the allocation between the common benefit fee and individual counsels' fee.[4]

On May 17, 2016, the Court entered an order setting the total amount of attorneys' fees and expenses at $192,981,363.35.[5]

The Court subsequently appointed the undersigned as Special Master with the task of

making recommendations (including findings of fact and conclusions of law) concerning all pending attorneys' fee issues, including but not limited to those described in Pre-Trial Order 28 (R. Doc. 17379), Pre-Trial Order 28(A) (R.. Doc. 17402), Pre-Trial Order 28(B) (R. Doc. 17567), Pre-Trial Order 28© (R. Doc. 17639), Pre-Trial Order 28(D) (R. Doc. 17832), Pre-Trial Order 28(E) (R. Doc. 18037), and Pre-Trial Order 28(F) (R. Doc. 20282).[6]

The undersigned is in the process of making a recommendation to the Court of the appropriate "allocation between the common benefit fee and individual counsels' fee." Once this process is complete, the Court (and possibly the undersigned) will confront the appropriate allocation of the common benefit fee among various attorneys who contributed to the common benefit effort.

Of course, many attorneys will ultimately receive fees from both the common benefit pot and the individual counsels' fee pot. A typical example of such an attorney in an MDL would be a member of the PSC who, in addition to representing individual claimants, also helps to try bellwether cases for claimants that other attorneys represent.[7]

---

[4] R. Doc. 17379 (Pre-Trial Order No. 28, pp.8-9).

[5] R. Doc. 20257 (Order).

[6] R. Doc. 20478 (Order, p.1).

[7] For the purposes of the matter before the Special Master today, there is no reason to exhaustively list what activities might or might not qualify as being for the benefit of the common benefit.

Page 5 of 8

This case presents an unusual twist concerning which attorneys contributed to the common benefit effort. As was stated above, the homeowners had claims against upstream entities, and so did many of the defendants. For instance, a homebuilder might have a claim against suppliers and manufacturers that contributed Chinese drywall to the homebuilder which it later incorporated into affected homes. The attorney for such a homebuilder might confine his or her efforts to defending the claim by the homeowner and prosecuting the incidental claims against the pertinent upstream entities, in which case the attorney would be limited to recovering an individual counsel's fee. Conversely, if the attorney also contributes "legal services beneficial to persons other than [his or her] particular client," the attorney (theoretically, at least) might be entitled to share in the common benefit fee.

In crafting the Banner and Global Settlements, the parties divided homebuilders between "Active Builders" (defined as "builders that have actively pursued this litigation") and "non-Active Builders." The settlements gave Active Builders a higher percentage of fees than non-Active Builders, with the better treatment coming at the expense of the common benefit fee pot. Eventually, the parties entered into an Amended Memorandum of Understanding,[8] wherein they agreed that Active Builders would receive 22% of the 32% overall fee award, whereas non-Active Builders would receive 13% of the 32% overall fee award. Thus, Active Builders receive 9% more of the attorneys' fee pot than do non-Active Builders.

The Movants have now filed a motion contending that they are Active Builders (and therefore are entitled to 22% of the overall fee award with respect to their Affected Properties). the Fee Committee disagrees.

---

[8] R. Doc. 20467-1.

Again, a finding of Active Builder status essentially triggers a transfer of a 9% fee from the common benefit pot to the builder. There is only one logical explanation for this. *An Active Builder receives what otherwise would have been common benefit fee because its attorney performed significant[9] common benefit work.*[10]

The issue, then, is whether the Movants' attorneys performed a significant amount of common benefit work. In addition to their memoranda, the Movants submitted several exhibits, including time records from their attorneys (Sivyer, Barlow & Watson, P.A.). The Movants contend that their activities benefitted other claimants, especially other builders, but this benefit appears to have been incidental to the attorneys' appropriate representation of the Movants. The undersigned concludes that the Movants have not sufficiently supported a conclusion that they are Active Builders.

## Conclusion

For the foregoing reasons, the Special Master recommends that the Court enter an order:

- Finding that the Movants are "non-Active Builders" for purposes of the Amended Memorandum of Understanding (R. Doc. 20467-1); and

- Denying the Motion of Taylor Morrison, Inc., the Ryland Group, Inc., and LWH, LLC for Determination of Active Builders Status (R. Doc. 20503).

---

[9] The common benefit work must be significant because the agreement presents a binary choice – the builder is either an Active Builder or non-Active Builder; there is no middle status. *De minimus* or incidental work which benefits claimants' other than one's own client does not warrant participation in a common benefit fee.

[10] The Movants contend that they are not requesting common benefit fees. This may be technically true, but (as discussed above) they are requesting the reassignment of fees that otherwise would have been assigned to the common benefit attorneys.

Baton Rouge, Louisiana, this 20th day of March, 2017

/s/ Daniel J. Balhoff
DANIEL J. BALHOFF
SPECIAL MASTER