# LEVIN, FISHBEIN, SEDRAN & BERMAN
*Counsellors at Law and Proctors in Admiralty*

ARNOLD LEVIN
MICHAEL D. FISHBEIN
HOWARD J. SEDRAN
LAURENCE S. BERMAN
FRED S. LONGER *
DANIEL C. LEVIN
CHARLES E. SCHAFFER
AUSTIN B. COHEN *
MICHAEL M. WEINKOWITZ * †
MATTHEW C. GAUGHAN * †
KEITH J. VERRIER *
LUKE T. PEPPER
NICOLA F. SERIANNI *

510 WALNUT STREET
SUITE 500
PHILADELPHIA, PA 19106-3697
www.lfsblaw.com

TELEPHONE (215) 592-1500
FACSIMILE (215) 592-4663

OF COUNSEL:
SANDRA L. DUGGAN

* also admitted in New Jersey
† also admitted in New York

October 13, 2016

**VIA EMAIL**

Daniel J. Balhoff, Esquire
Perry, Balhoff, Mengis & Burns, L.L.C.
2141 Quail Run Drive
Baton Rouge, LA 70808

  Re: **Fee Committee's Response to October 7, 2016 Letter from Primary Counsel**
     ***In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL 2047 (E.D. La.)**

Dear Mr. Balhoff:

  The Supreme Court held more than 30 years ago that "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Ignoring the High Court's admonition, Primary Counsel for Objectors are continuing to insist on a full-bore litigation of their fee disputes with the Fee Committee ("FC"). Rather than follow the orderly and efficient fee award and allocation procedures prescribed by the District Court, which include a detailed discovery plan laid out by the Special Master just two weeks ago, Primary Counsel have jumped the gun by prematurely seeking additional fee discovery that is extremely broad and unduly burdensome. They have done so without even bothering to review and digest the voluminous fee-related materials and reports produced to them by Mr. Garrett and the FC on October 5, 2016.

  In their most recent letter to the Special Master, dated October 7, 2016, Primary Counsel have renewed their requests for production of every email, written communication, and other document pertaining to common benefit assignments and tasks in this MDL, which the Plaintiffs' Steering Committee ("PSC") and other common benefit attorneys sent or received throughout a seven year period (which would likely encompass tens of millions of emails and many thousands

**LEVIN, FISHBEIN, SEDRAN & BERMAN**

Daniel J. Balhoff, Esquire
October 13, 2016
Page 2

---

of letters, notes, drafts of documents and other pleadings). Objectors also seek production of all materials and communications specifically related to the pursuit of Taishan and other non-settling Defendants (which would encompass innumerable emails, documents, pleadings, etc.) that relate to confidential, ongoing litigation and which are irrelevant to the current fee disputes. Further, Primary Counsel have asked for all transcripts, agendas, and minutes of the PSC and the FC, as well as all submissions and resubmissions of time and expense, with supporting documentation and receipts, to the court-appointed CPA Phil Garrett by dozens of law firms and hundreds of individual timekeepers, from inception of the MDL in June, 2009 through the current date. In addition to this plethora of written materials requested, Primary Counsel are insisting, again, on the depositions of the FC Chair and Co-Chair, Sandra Duggan, and a designee of the PSC, despite the fact that CMO 1 grants them an opportunity to examine Mr. Garrett and an FC designee under oath, and an opportunity to request additional discovery thereafter, upon good cause shown.

Primary Counsel's actions demonstrate that they are not proceeding in good faith. Instead of awaiting the outcome of the fee discovery plan, which was crafted with input from all interested parties, following numerous submissions of letters, briefs, and proposed CMOs with discovery proposals from both sides to the Special Master, Primary Counsel refiled their original Proposed Case Management Order and discovery requests, just 12 days after CMO 1 was entered on September 25, 2016, and just 2 days after the initial production of documents was made. In so doing, their true intentions to abuse the process and inappropriately create an *in terrorem* effect on the FC[1] have become transparent. Primary Counsel admit "that the allocation of common benefit fees is not yet ripe," Faircloth Letter (10/7/2016) at 1, and yet, here they go again requesting documents and depositions that pertain to common benefit fee allocation. As a result, the FC and the Court (through the Special Master) are forced to expend precious resources to respond to and address another set (actually the same set) of discovery requests from Primary Counsel. At some point, their obstreperous conduct and multiple requests for discovery, and for

---

[1] *See David v. Signal Int'l, LLC*, 257 F.R.D. 114, 126-127 (E.D. La. 2009) (granting motion for protective order, in FSLA suit seeking unpaid wages and overtime, with respect to discovery of putative class members' current immigration status, address and/or post-employment history, designed to have a "chilling" or "*in terrorem*" effect that would intimidate plaintiffs from coming forward), *objections overruled*, 2009 WL 2030382 (E.D. La. Jun. 2, 2009); *Flores v. Albertson's Inc.*, 2004 WL 3639290, *3-4 (C.D. Cal. Apr. 9, 2004) (denying motion to compel production of unredacted payroll documents of plaintiffs, which would have revealed their social security numbers and created an *in terrorem* effect on them), *reconsideration denied*, 2004 WL 3639291 (C.D. Cal. Jun. 4, 2004); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975) (noting the "social cost" resulting from discovery that would permit a party "with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence.").

LEVIN, FISHBEIN, SEDRAN & BERMAN
Daniel J. Balhoff, Esquire
October 13, 2016
Page 3

---

reconsideration of rulings related to discovery, must stop. The renewed, premature, and regurgitated requests of Primary Counsel should be denied without prejudice to seek additional discovery at a later date, <u>for good cause shown</u>.

I. **The District Court's Multistep Fee Award and Allocation Procedures Comport with Due Process and *High Sulfur*.**

It is undisputed that the district court has wide discretion to determine awards of attorneys' fees,[2] and "[i]n a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008). Mindful of *High Sulfur*'s instruction that "the district court must not cursorily approve the attorneys' fee provision of a class settlement or delegate that duty to the parties," Judge Fallon established guidelines and a series of ongoing procedures (including the appointments of a fee committee and a Special Master) for the application of attorneys' fees with respect to the interrelated Knauf, Banner, InEx, Global, L&W and Virginia class settlements. *See* Pretrial Order No. 28, as amended in Pretrial Order Nos. 28(A) - 28(F).[3] The district court made clear to all interested parties that the "guidelines [in PTO 28] provide direction, but do not create entitlements and do not override the independent judgment and discretion of the FC and the Court." PTO 28 at 14. Indeed, the "Court retains all authority and jurisdiction as to the final decisions of awards for common benefit fees, individual attorneys' fees and reimbursement of expenses." *Id.* at 15. The Court's multistep processes for awarding attorneys' fees, with ample opportunities for objections to be heard, readily comport with Due Process, which requires only the "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), *quoting, Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *High Sulfur*, 517 F.3d at 231 ("'when a judge constructs a process for setting fees, the process must contain at least the procedural minima' of due process: notice and an opportunity to be heard."), *quoting In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 614 (1st Cir. 1992).

---

[2] *See Hensley*, 461 U.S. at 436-37; *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974); *Husain v. Springer*, 622 Fed. Appx. 13, 14 (2nd Cir. 2015) (Summary Order), *pet. for cert. filed* (U.S. Aug. 11, 2016); *D'Orazio v. Washington Tp.*, 501 Fed. Appx. 185, 188 (3d Cir. 2012); *Bobbitt v. Paramount Cap Mfg. Co.*, 942 F.2d 512, 514 (8th Cir. 1991).

[3] None of the Objectors represented by Primary Counsel ever filed an objection to PTO 28. On the contrary, many of them (Parker Waichman LLP, Whitfield Bryson & Mason, LLP, Pendley, Baudin & Coffin, Rhine Law Firm, Luckey & Mullins, Baron & Budd, PC, McCallum, Hoaglund, Cook & Irby, LLP, Allison Grant, Alters Law Firm, PA, Roberts and Durkee, LLP, and Milstein, Adelman, Jackson, Fairchild & Wade, LLP) participated in the fee award process, submitting fee affidavits and appearing before the FC for interviews.

LEVIN, FISHBEIN, SEDRAN & BERMAN

Daniel J. Balhoff, Esquire
October 13, 2016
Page 4

---

Ultimately, the Court's order here will result in a fee decision that will not be based upon a blank slate, but, rather, a full and transparent record.

Far from engaging in a "cursory" exercise with respect to the approval of a global fee award and any allocation of that award among fee applicants, Judge Fallon instituted policies and protocols at the outset of the litigation when the PSC was appointed, to ensure that common benefit efforts on their part would be carefully monitored by the Court. Pretrial Order No. 9 (Rec. Doc. 147) (and Pretrial Order No. 9A for related state court litigation) requires all attorneys interested in applying for common benefit fees to record their time contemporaneously and submit on a monthly basis their hours and expenses with substantiating receipts to the court-appointed CPA Phil Garrett.[4] This order sets forth in detail the parameters for common benefit consideration, excluding, generally, efforts to develop individual cases and requiring detailed explanations of common benefit services performed and a designation of appropriate task codes for each time entry. The Court has reviewed with Mr. Garrett on a regular basis monthly summaries of all hours and expenses submitted pursuant to PTO 9, and the Court has access to these records. At this point, over 45 law firms, encompassing more than 500 separate timekeepers, have submitted time and expenses to Mr. Garrett during some or all of the 87 months that have transpired since the MDL was instituted.[5]

Not only is the Court familiar with the efforts of these common benefit counsel by way of their time and expense records, but Judge Fallon is well aware of what has transpired in this matter, having overseen all aspects of the litigation for more than seven years, including: all monthly status conferences; several bellwether trials (*Germano, Hernandez*); the *North River* jury trial; numerous evidentiary hearings; many dozens of joint reports by Plaintiffs' and Defendants' Liaison Counsel; entry of 30 Pretrial Orders (many with numerous subparts); entry of hundreds of additional orders and minute entries; adjudication of hundreds of motions; approval hearings and administration for nine interrelated class settlements; and coordination

---

[4] *See* Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371, 374 (2014) (recognizing that "[a]ll of this work [by the common benefit attorneys] consumes time and raises costs. While the members of the [Defendants' Steering Committee] are typically compensated by their client on a regular basis, the members of the PSC are not. Because the work that the PSC performs inures to the common benefit of all plaintiffs and their primary counsel (the counsel that they employed), MDL transferee courts usually establish a procedure for creating a common benefit fee to compensate the members of the PSC and the members of any subcommittees who have done common benefit work), *citing Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (recognizing that "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); MANUAL FOR COMPLEX LITIGATION (FOURTH), §§ 14.11, 14.12 (2004).

[5] Indeed, most of the law firms represented by Primary Counsel have submitted time and expenses to Mr. Garrett pursuant to PTO 9.

LEVIN, FISHBEIN, SEDRAN & BERMAN
    Daniel J. Balhoff, Esquire
    October 13, 2016
    Page 5

---

with state court judges assigned to Chinese Drywall cases pending in Virginia and Florida, among other things. The MDL 2047 docket alone contains in excess of 20,500 entries.

Under these circumstances, it is not necessary or appropriate for Objectors to see each and every time entry ever recorded in the case. *See In re Whirlpool Corp. Front-Loading Washer*, 2016 WL 5338012, *18 (N.D. Ohio Sept. 23, 2016) (concluding "that objectors have no right to see Class Counsel's fee and expense records," especially where "any such review by objectors would not affect the Court's ultimate conclusion."); *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 281 (6th Cir. 2016) ("[The] key requirement for an award of attorney fees is that the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable *the court* to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation."); *Cassese v. Williams*, 503 Fed. App'x 55, 58 (2nd Cir. 2012) (finding no "error in the district court's failure to order disclosure of class counsel's contemporaneous time records, appended to the fee request and filed under seal," and holding that "[w]hile applications for attorney's fees [must] be supported by contemporaneous [billing] records, we are aware of no authority holding that class counsel must open its books to objectors for inspection by virtue of filing a fee motion. To the contrary, whether to grant objectors access to billing records is a matter within the district court's discretion.").[6]

Plainly, this case does not suffer from the infirmities delineated in *High Sulfur*. There, the district court conducted an *ex parte* hearing with the fee committee that "lasted only twenty minutes," and then the court sealed the transcript from the hearing. *High Sulfur*, 517 F.3d at 226. At that hearing, "[n]o sworn testimony was taken, no depositions were offered, and no affidavits were filed attesting to the accuracy or fairness of the proposed fee allocation." *Id.* at 229. As the Fifth Circuit noted, "because the hearing was ex parte, other plaintiffs' attorneys, including

---

[6] Primary Counsel's reliance on *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 542 (9th Cir. June 9, 2016), is misplaced. In that case, the litigation had been finally settled, *i.e.*, there was no ongoing litigation, and the defendant who was responsible for payment of statutory attorneys' fees was challenging "the summary nature of the time records and declarations provided by class counsel." Notably, the district court's fee opinion was not based on the common fund doctrine, as is the case in the matter *sub judice*, and exclusively employed a lodestar analysis after an *in camera* examination of plaintiffs' counsel's billing records. *Id.* Under the circumstances applicable in that case, the court ruled that "normally" the opposing party responsible for payment of the fees in dispute, "has a right to see the timesheets on which a district court relied in issuing a fee award." *Id.* at 539. Since the circumstances applicable to the matter now under consideration are vastly distinct, *Yamada* is not apposite.

Moreover, the Special Master has already ruled on the scope of discovery with respect to hours and expenses. In the event each and every hour and expense receipt must be produced, that cost should be borne by Primary Counsel's clients alone.

LEVIN, FISHBEIN, SEDRAN & BERMAN
Daniel J. Balhoff, Esquire
October 13, 2016
Page 6

---

[objectors], were not present to confirm or challenge the Fee Committee's statements about their contributions to the case." *Id.* Incredibly, later that same day, the district court simply "rubber-stamped" the fee committee's proposal without any modifications. *Id.* Problematically, the "[district] court possessed no documents, other than the Fee Committee's proposed fee allocation, upon which it could base factual findings for awards of individual attorneys' fees." *Id.* at 230. Further, it was not until after objections to allocation were filed that the court conducted an *in camera* hearing, and then sealed not only the docket entry for the hearing, but also the transcript and an order permitting supplemental filings. *Id.* at 226. Two weeks later, the district court sealed the order denying objectors' motion for reconsideration of the court's allocation ruling. *Id.* According to the Appellate Court, "the [district] court made matters [even] worse when it sealed the exhibit listing the individual fees and the record entries pertaining to fees and placed a gag order on the plaintiffs' attorneys." *Id.* at 229.

In contrast, here, the Court has invited all interested parties to participate in the fee award and allocation process. The Court's procedures and protocols provide for full transparency, *i.e.*, the "Court will consider any recommendations made by the FC [with regard to allocation] and post the same on its [public] website and invite comments or objections." PTO 28 at 15-16. Importantly, the Court's fee guidelines allow for flexibility, *i.e.*, the Court will "institute any additional procedures it deems necessary, including the appointment of a Special Master to further consider these matters." *Id.*[7] Finally, it is well established that Judge Fallon, like the district court judge in *Thirteen Appeals*, has "lived with the litigation from the start and ha[s] an encyclopedic knowledge of it," which will enable the Court to appropriately apply the *Johnson* factors without the need to resort to "a second major litigation" over attorneys' fees. *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 303 (1st Cir. 1995); *Hensley*, 461 U.S. at 437. In light of these safeguards, the requirements of Due Process and *High Sulfur* are adequately satisfied.[8]

II. **Primary Counsel's Untethered and Unduly Burdensome Discovery Requests Are Unnecessary, Unwarranted, and a Waste of Valuable Resources.**

As Primary Counsel have acknowledged, the fee proceedings have not yet arrived at a point where allocation of common benefit fees has occurred. The parties and the Court are still

---

[7] *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) ("'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to, time, place, and circumstance."), *quoting Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961); *Nineteen Appeals*, 982 F.2d at 611 ("Due process is malleable, calling 'for such procedural protections as the particular situation demands.'"), *quoting Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

[8] Indeed, "[t]he Due Process Clause does not require freewheeling adversarial discovery as standard equipment in fee contests." *Thirteen Appeals*, 56 F.3d at 303. This is especially the case where the district court knows "the case inside and out." *Id.* at 302.

LEVIN, FISHBEIN, SEDRAN & BERMAN
>Daniel J. Balhoff, Esquire
>October 13, 2016
>Page 7

---

in the process of developing a full record. It would be unfair and premature for anyone even to suggest that the Court will fail to exercise its sound judgment and discretion in rendering at the appropriate time its fee-related decisions in this matter. By allowing Objectors "limited" fee discovery and access to summaries of the hours and expenses vetted by the court-appointed CPA,[9] as well as the fee and cost reconciliation statements and the Initial Fee Affidavits, and by appointing a Special Master to hear these fee disputes, the Court has recognized the balance that must be met between Due Process, transparency with respect to fee awards, and the need to conserve valuable resources. *See Thirteen Appeals*, 56 F.3d at 301 (commending the district court for "keeping tight controls on the fee dispute" in light of the large number of lawyers involved, the lengthy duration of the case, and the interest in not generating satellite litigation) & at 303 (acknowledging that the district court "had a right to consider the extent to which appellants' request for discovery threatened to multiply the proceedings and turn the fee dispute into a litigation of mammoth proportions.").

Primary Counsel's discovery requests should be seen for what they are – an abuse of process.[10] Completely ignoring the orderly procedures in place, Primary Counsel have asked, again, for virtually every email, every document, and every receipt, in native format, that has been exchanged between and among all members of the PSC and common benefit counsel in this case for the past 7+ years (which includes more than 500 individuals who have submitted common benefit hours to Phil Garrett pursuant to PTO 9). Primary Counsel are also seeking, in native format, all emails, written communications, and documents, as well as time records and expenses specifically related to the Taishan Defendants. The sheer breadth of these requests is overwhelming, not to mention the significant and burdensome costs, in terms of time and

---

[9] Primary Counsel's argument that the fee and cost summaries are inadequate and in violation of Federal Rule of Evidence 1006 is misplaced. The purpose of FRE 1006 is to aid the trier of fact in its examination of evidence already admitted, by allowing the use of summaries when the volume of documents being summarized is so large as to make their use impracticable or impossible. *See United States v. Johnson*, 594 F.2d 1253, 1255 (9th Cir.1979); *United States v. Winn*, 948 F.2d 145, 158 (5th Cir. 1991) ("considering that the average jury cannot be rationally expected to compile on its own such charts and summaries which would piece together evidence previously admitted…, summary/testimony charts may be admitted."). With regard to the fee objections at issue here, FRE 1006 is inapplicable. Moreover, as set forth above, production of the raw data comprising all common benefit hours and expenses submitted in this litigation is neither required nor warranted since the issue currently before the Court entails only the percentage allocation between common benefit counsel and individually retained counsel.

[10] Such untethered discovery would consume not only the valuable resources of the Court and the Special Master, the FC, and the PSC, but it would also adversely impact other Objectors not represented by Primary Counsel, as well as non-Objectors to the FC's Fee Allocation Motion. There is a limited pot of attorneys' fees available for allocation, which means all of the time and effort spent on discovery disputes related to fees must be considered in the calculus. <u>In their attempt to maximize their own recoveries, Primary Counsel's clients are diminishing the funds from which they seek redress.</u>

LEVIN, FISHBEIN, SEDRAN & BERMAN

Daniel J. Balhoff, Esquire
October 13, 2016
Page 8

---

expense, that would be required to sift through what are likely tens of millions of emails, from hundreds of attorneys, paralegals, and support staff, in order to cull out and redact privileged, confidential, and/or irrelevant information.

Primary Counsel argue that they immediately need this additional broad and burdensome discovery "for the purpose of challenging the size of the *total* recommended common benefit fee." Faircloth Letter (10/7/2016) at 1. However, at this point, they could not possibly know – must less demonstrate – what "more" is needed since they have not even attempted to peruse the documents and reports produced to them by Mr. Garrett and the FC on October 5, 2016, and they have yet to ask Mr. Garrett or the FC designee a single question under oath. CMO 1 clearly provides that "[a]fter the Initial Document Production phase is complete, the parties may request the production of additional documents," however, "[a]dditional discovery (written discovery or depositions) will be permitted only upon order of the Special Master for good cause." *See* CMO 1 at 6 & 10. The process of fee discovery has just begun, so it is entirely premature for anyone to be seeking additional discovery at this juncture. Moreover, Primary Counsel have admitted "that the allocation of common benefit fees is not yet ripe." *Id.* Under these circumstances, their discovery requests cannot be countenanced.

In any event, the scope of discovery to be afforded Primary Counsel must take into account what is "proportional to the needs of the case, considering ... whether the burden or expense of the proposed discovery outweighs its likely benefit." *See* FED. R. CIV. P. 26(b)(1). If Primary Counsel's wide-ranging discovery were permitted, cost-shifting measures would be appropriate. It is well known that intentionally overbroad e-discovery requests inevitably drive up the producing party's e-discovery bill. *See* Bruce L. Hay, "Civil Discovery: Its Effects and Optimal Scope," 23 J. LEGAL STUD. 481, 500 (1994). The result is that abusive discovery forces adversaries to settle or continue to pay steep discovery costs regardless of whether they are likely to win or lose on the merits of the actual case. *See* Karel Mazanec, "Capping E-Discovery Costs: A Hybrid Solution To E-Discovery Abuse," 56 WM. & MARY L. REV. 631, 632 (2014) (highlighting the problem with overbroad e-discovery requests: "[p]roducing parties have no choice but to settle or pay exorbitant discovery costs-regardless of whether they are likely to win or lose on the merits of the actual case."); John H. Beisner, "Discovering a Better Way: The Need for Effective Civil Litigation Reform," 60 DUKE L.J. 547, 550-51 (2010); Martin H. Redish & Colleen McNamara, "Back to the Future: Discovery Cost Allocation and Modern Procedural Theory," 79 GEO. WASH. L. REV. 773, 779 (2011) (noting the inequities occurring where a producing party's discovery costs are "determined not by the litigant himself but by the scope and content of the request filed by his opponent" and noting further that these "discovery costs benefit the requesting party and actually impose both a financial and a legal detriment on the producing party").

LEVIN, FISHBEIN, SEDRAN & BERMAN
Daniel J. Balhoff, Esquire
October 13, 2016
Page 9

---

For these reasons, judges are employing "the limitations of Rule 26(b)(2) with increasing frequency and with an eye toward equity ... [which] undeniably, includes cost-shifting in discovery." *United Parcel Service of America, Inc. v. The Net, Inc.*, 222 F.R.D. 69, 71 (E.D. N.Y. 2004); *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318, 322-24 (S.D.N.Y. 2003) (holding that cost-shifting may be appropriate "when electronic data is relatively inaccessible, such as in backup tapes," and requiring consideration of seven factors: (1) the extent to which the request is specifically tailored to discover relevant information; (2) the availability of such information from other sources; (3) the total cost of production, compared to the amount in controversy; (4) the total cost of production, compared to the resources available to each party; (5) the relative ability of each party to control costs and its incentive to do so; (6) the importance of the issues at stake in the litigation; and (7) the relative benefits to the parties of obtaining the information.).

### III. The District Court Has Clear Authority to Adjust Individual Counsel's Contingency Fee Agreements.

Primary Counsel's argument that their clients are being deprived of a constitutionally protected property interest is a red herring. There is no indication in the record that Objectors will be deprived of attorneys' fees. On the contrary, the Court's orders provide that the available funds for attorneys' fees will be allocated and distributed to both common benefit counsel and individually retained attorneys having contingency fee arrangements with Chinese Drywall Plaintiffs.[11] In deciding how to equitably allocate these fees, the Court unquestionably "possesses equitable authority to examine [all relevant] fee arrangements" and make appropriate adjustments where necessary. *See In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549, 553 (E.D. La. 2009). In fact, "[t]he district courts' supervisory jurisdiction over contingent fee contracts for services rendered in cases before them is well-established." *Allen v. United States*, 606 F.2d 432, 435 (4th Cir. 1979), citing *Dunn v. H. K. Porter Co.*, 602 F.2d 1105, 1108 (3rd Cir. 1979); *Schlesinger v. Teitelbaum*, 475 F.2d 137, 141 (3rd Cir.), *cert. denied*, 414 U.S. 1111 (1973) ("in its supervisory power over the members of its bar, a court has jurisdiction of certain activities of such members, including the charges of contingent fees"). Because they involve the relationship between attorney and client, contingent fee agreements "are of special concern to the courts and are not to be enforced on the same basis as are ordinary commercial contracts." *Dunn*, 602 F.2d at 1108; *McKenzie Construction, Inc. v. Maynard*, 758 F.2d 97, 101 (3rd Cir. 1985) (same); *Green v. Nevers*, 111 F.3d 1295, 1302 (6th Cir.), *cert. denied*, 522 U.S. 996 (1997) ("a contract for contingent fees 'should always be subject to the supervision of a court, as to its reasonableness'"); *In re A. H. Robins Co., Inc.*, 86 F.3d 364, 373 (4th Cir.), *cert. denied*, 519

---

[11] In each of the class settlements that produced these funds, the agreements made clear that the available fees would be allocated equitably among the PSC, other common benefit counsel, and individually retained attorneys. *See* Settlement Agreements posted on the Court's MDL website at http://www.laed.uscourts.gov/case-information/mdl-mass-class-action/drywall; *see also* PTO 28.

LEVIN, FISHBEIN, SEDRAN & BERMAN
Daniel J. Balhoff, Esquire
October 13, 2016
Page 10

---

U.S. 993 (1996) (it "has long been clear that federal district courts have inherent power and an obligation to limit attorneys' fees to a reasonable amount").

In the context of a class action, "[t]he Federal Rules of Civil Procedure expressly grant this power to district courts." *Vioxx*, 650 F. Supp. 2d at 553-54, *citing* FED. R. CIV. P. 23(g)(1)(C)(iii); FED. R. CIV. P. 23(h); MCL § 22.927 (2004); *see also In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008) (relying on the quasi-class action nature of an MDL proceeding and the court's equitable authority to implement a reasonable cap on contingent fees); *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (exercising court's inherent power to "impos[e] ... fiduciary standards to ensure fair treatment to all parties and counsel regarding fees and expenses.").

In an MDL it is not uncommon for limits to be imposed on contingency fee agreements, especially when there is a global settlement involved. *See Vioxx*, 650 F. Supp.2d at 555 (holding courts have the power to "set a reasonable limit on the amount that individual attorneys may charge claimants enrolled in the global settlements, regardless of whether their cases were filed in state or federal court."); *Guidant*, 2008 WL 682174, at *17-19; *Zyprexa*, 424 F. Supp. 2d at 496; *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL No. 926, 1994 WL 114580, at *4 (N.D. Ala.1994).

### IV. Segregating the PSC's Efforts to Pursue the Taishan Defendants from All Other Efforts in the Litigation Would Constitute an Impossible Task, and Is Unwarranted in any Event.

Aside from the overbreadth of the discovery requested, Primary Counsel seek information and documents that specifically relate to all efforts spent pursuing claims against the Taishan (and other non-settling) Defendants, as opposed to efforts spent pursuing claims against the settling Defendants, *i.e.*, Knauf, Banner, InEx, L&W, hundreds of Participating Builders, Installers, Suppliers, and Insurers in the Global Settlement, and the Virginia Defendants and their Insurers. However, it is a fiction created by Primary Counsel that "Taishan work" somehow can be disaggregated from "Knauf work." This MDL was established as *In re Chinese-Manufactured Drywall Products Liability Litigation*. It was not set up as a Taishan Drywall MDL or a Knauf Drywall MDL. In fact, the Plaintiffs began their investigation into the defects of Chinese Drywall generally, without even knowing at the time who the manufacturers were. More than 5,800 Class Members (having Taishan, Knauf, or a combination of Chinese Drywall in their properties) participated in the interrelated settlements that produced the fund of attorneys' fees available for distribution to common benefit counsel and private attorneys. It would not be feasible to go back in time and retroactively separate out the hours and expenses uniquely devoted to the pursuit of Taishan and other non-settling Defendants, thus making it impossible to determine, much less quantify, how much time or effort was spent on the pursuit of a particular Defendant or particular claims.

**LEVIN, FISHBEIN, SEDRAN & BERMAN**
Daniel J. Balhoff, Esquire
October 13, 2016
Page 11

---

When PTO 9 was entered, the Court neither required nor suggested that counsel code their time and expenses according to the specific Defendant(s) being pursued. Notwithstanding this, it would have been an untenable method of timekeeping since these claims and issues are interrelated. For example, many Class Members' properties are "mixed" because they contain drywall made from gypsum originating from the Luneng mine in China, which was manufactured by Knauf (KPT), Taishan, and others. The Knauf settlement addresses this by setting forth a formula to calculate the "KPT Percentage" in each Participating Class Member's property for purposes of determining the type of relief available and the amount of claim payments, in order to equitably compensate owners of properties where multiple Chinese Drywall products were installed. Similarly, KPT property owners, Taishan property owners, and mixed property owners alike were entitled to collect settlement payments from the Banner and Global settlements, and both the Banner and Global Allocation Plans tracked the provisions regarding the KPT Percentage.

Therefore, all efforts on the part of common benefit counsel which reasonably led to the achievement of these settlements, benefiting not only pure Knauf property owners, but also mixed property owners, as well as pure Taishan property owners, are intertwined and interrelated, and constitute common benefit work. It would not be reasonable or fair even to attempt to disentangle the work spent pursuing Taishan, especially when (i) the *Germano* bellwether trial (on behalf of seven families with Taishan Chinese Drywall in their homes) produced positive results for all Plaintiffs in MDL 2047, including the establishment of a proper standard for comprehensive remediation of any and all types of Chinese Drywall from Plaintiffs' properties and the cost of same per square foot, (ii) the *Germano* judgment directly led to positive results in the *Hernandez* bellwether trial (on behalf of Plaintiffs with Knauf Chinese Drywall in their homes), and (iii), the *Germano* and *Hernandez* judgments in combination ultimately led to and created the vehicle for the InEx settlement, the culmination of the KPT Pilot Program, the Banner settlement, the Knauf settlement, the L&W settlement, and the Global settlement.

Under these circumstances, courts do not require that the work performed by common benefit attorneys be parsed in the manner suggested by Primary Counsel. In the *Diet Drugs* litigation, for example, the court dismissed an objector's contention "that the District Court abused its discretion in finalizing the [fee] award without requiring Class Counsel to specify how many hours and which expenses were related to each aspect of their common benefit work." *In re Diet Drugs*, 582 F.3d 524, 539 n.32 (3d Cir. 2009). In that case, the objector "[s]pecifically … contend[ed] that by permitting Class Counsel to commingle their records, the Court endorsed a fee allocation that violated the Settlement Agreement and the mandates of *Boeing Co. v. Van Gemert,* 444 U.S. 472 , 100 S.Ct. 745, 62 L.Ed.2d 676 (1980)." *Id.* Rejecting that argument, the court held that the objector's "reliance on *Boeing* is … misplaced. That case requires courts awarding attorneys' fees to ensure that 'the benefits of class recovery' are 'traced with some accuracy.'… However, the 'benefit' to which it refers – and which must be 'traced with some

**LEVIN, FISHBEIN, SEDRAN & BERMAN**

Daniel J. Balhoff, Esquire
October 13, 2016
Page 12

---

accuracy' – is the monetary relief that the plaintiffs recover, not the work that the attorneys do to secure it." *Id.* (internal citations omitted). The court in *Diet Drugs* further held that "neither law nor logic required the District Court to consider the division of counsel's labor while determining the appropriate percentage of recovery through its analysis of the *Gunter/Prudential*[12] factors." *Id.* at 541 n.35. *See also id.* at 536 (acknowledging that the "auditor's report did not separate the time spent on the Settlement Agreement from time spent on the MDL," but this did not adversely affect the appropriateness of the multiplier approved by the District Court since a percentage-of-the-fund approach and a rough lodestar cross-check was employed rather than the lodestar method).

Similarly, in the *Vioxx* litigation, all hours devoted to a variety of claims (*e.g.*, personal injury, third-party payor, Attorney General) pending in different venues were submitted in support of the application for common benefit attorneys' fees in the *Vioxx* MDL pending before Judge Fallon. In a third-party payor state court *Vioxx* case, *Local 68*, a motion for class certification was lost by the Plaintiffs in New Jersey. Subsequently, the hours spent prosecuting that case were included in the application for fees to be awarded in connection with the settlement of related personal injury claims in the MDL. Then, after a global settlement of third-party claims was eventually reached, the Court awarded attorneys' fees to counsel who pursued the claims in the *Local 68* action, but without duplicating any compensation previously awarded for the prosecution of the personal injury claims. Thus, these counsel were awarded common benefit attorneys' fees for all efforts spent in *Vioxx*. *See In re Vioxx Prods. Liab. Litig.*, 2014 WL 31645, *11 (E.D. La. Jan. 3, 2014) (awarding Levin, Fishbein, Sedran & Berman ("LFSB") fees for time spent developing *Local 68* action in New Jersey litigation); *see also* Supplemental Vioxx Third Party Payor Common Benefit Application of LFSB (noting that all of LFSB's time engaged in the representation of Local 68 was previously submitted in the firm's common benefit fee submission of Plaintiffs' Liaison Counsel's Motion for and Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses), Case 2:05-md-01657-EEF-DEK [Rec. Doc. 63569].

It is not uncommon for attorneys' fees to be awarded for the amalgam of tasks performed on behalf of Plaintiffs. *See In re Woerner*, 783 F.3d 266, 274 (5th Cir. 2015) (en banc) (reversing reduction of debtor attorney's fees under the Bankruptcy Code, which "explicitly contemplates compensation for attorneys whose services were reasonable when rendered but which ultimately may fail to produce an actual, material benefit. Litigation is a gamble, and a failed gamble can often produce a large net loss even if it was a good gamble when it was made. The statute permits a court to compensate an attorney not only for activities that were 'necessary,' but also for good gambles – that is, services that were objectively reasonable at the time they were made – even when those gambles do not produce an identifiable, tangible, and

---

[12] The *Gunter/Prudential* factors governing awards of common benefit fees in the Third Circuit are the equivalent standards employed in the Fifth Circuit under *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974).

LEVIN, FISHBEIN, SEDRAN & BERMAN

    Daniel J. Balhoff, Esquire
    October 13, 2016
    Page 13

---

material benefit. What matters is that, prospectively, the choice to pursue a course of action was reasonable") (internal citations and quotations omitted); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008) (awarding common benefit fees based on hours accepted by the court-appointed CPA under procedures that did not require exclusion of hours spent on a non-settling defendant Interneuron … or other non-class recoveries); *see also* Declaration of Brian Fitzpatrick (Professor of Law at Vanderbilt University and author of *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010)), filed in support of Aggregate Common Benefit Fee Petition in the BP Oil Spill litigation, Case 2:10-md-02179-CJB-SS [Rec. Doc. 21024-5] (filed 7/15/16) at ¶ 16 (noting the impossibility "for class counsel to disaggregate the time they have spent on behalf of the [BP Economic and Medical] classes … from the time they have spent on behalf of the other plaintiffs in this MDL"); Declaration of Co-Liaison Counsel, filed in support of the Aggregate Common Benefit Fee Petition in the BP Oil Spill litigation [Rec. Doc. 21024-3] (filed 7/15/16) at ¶ 124 (noting that "[t]he Fee Committee did not attempt to assign or associate particular time entries or expenses with a particular settlement or result[, because] this did not seem practical or feasible, in light of the overlapping work, the overlapping benefits, and the overlapping memberships of the classes.").

### V.    <u>Conclusion</u>

       As set forth above and as stated previously in the FC's letter dated July 25, 2016, the FC submits that Primary Counsel's renewed requests for additional broad and untethered discovery should be denied, without prejudice to the Objectors to seek additional discovery at the appropriate time, for good cause shown.

                                              Respectfully,

                                              Arnold Levin
                                              *Plaintiffs' Lead Counsel*

                                              Russ Herman
                                              *Plaintiffs' Liaison Counsel*

cc:  Jeremy W. Alters, Esquire (via email)
      Russell W. Budd, Esquire (via email)
      Allison Grant, Esquire (via email)
      Theodore J. Leopold, Esquire (via email)
      Gregory S. Weiss, Esquire (via email)

**LEVIN, FISHBEIN, SEDRAN & BERMAN**

Daniel J. Balhoff, Esquire
October 13, 2016
Page 14

---

      James V. Doyle, Jr., Esquire (via email)
      David Horsley, Esquire (via email)
      K. Edward Sexton, II, Esquire (via email)
      Eric D. Hoaglund, Esquire (via email)
      John Hawkins, Esquire (via email)
      Paul A. Lea, Jr., Esquire (via email)
      Mark Milstein, Esquire (via email)
      C. David Durkee, Esquire (via email)
      Scott Wm. Weinstein, Esquire (via email)
      Victoria E. Emmerling, Esquire (via email)
      Andrew A. Braun, Esquire (via email)
      Jimmy R. Faircloth, Jr., Esquire (via email)
      Brook L. Villa, Esquire (via email)
      Franklin "Drew" Hoffmann, Esquire (via email)
      Richard H. Taylor, Esquire (via email)
      Val Patrick Exnicios, Esquire (via email)
      William P. Buckley, Esquire (via email)
      R. Tucker Yance, Esquire (via email)