| | |
|---|---|
| **IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **CIVIL ACTION** |
| | **NO. 09-02047** |
| | **SECTION "L" (5)** |
| **THIS DOCUMENT RELATES TO: ALL CASES** | |

## ORDER & REASONS

Before this Court are four motions pursuant to Rule 12(b) of the Federal Rules of Civil Procedure seeking an order dismissing complaints against the Defendants for lack of personal jurisdiction and for insufficient process and service of process. Specifically, these motions are as follows: (1) Motion to Dismiss by China New Building Materials Group ("CNBM Group"), China New Building Materials Co. ("CNBM"), CNBMIT Co. Ltd. ("CNBMIT"), CNBM USA Corp. ("CNBM USA"), and United Suntech Craft, Inc. ("United Suntech") (collectively, the "CNBM Entities") (R. Doc. 19527); (2) Motion to Dismiss by Beijing New Building Materials Public Limited Company ("BNBM") (R. Doc. 19646); (3) Motion to Dismiss by Beijing New Building Material Group ("BNBMG") (R. Doc. 19664); and (4) Motion to Dismiss the State of Louisiana's Second Amended and Restated Petition by BNBM and BNBM Group (collectively, the "BNBM Entities") (R. Doc. 19663). Having read the parties' briefs, evaluated the relevant jurisdictional discovery, reviewed the applicable law, and heard the parties on oral argument, the Court now issues this Order and Reasons.

# Table of Contents

I. BACKGROUND ........................................................................................................ 3

II. PROCEDURAL BACKGROUND ...................................................................... 4

III. FACTUAL BACKGROUND .............................................................................. 12

   A.   The Corporate Structure of the CNBM Business Group ................... 12

      1.   CNBM Group's Role as Parent of the CNBM Business Group ..................... 12

      2.   BNBM Group is a Minority Shareholder in CNBM ....................................... 13

      3.   CNBM Group is a Shareholder in CNBM ....................................................... 15

      4.   CNBMIT, CNBM USA, and United Suntech are companies within the CNBM Corporate Family. ................................................................................. 16

      5.   CNBM is a Majority Shareholder in BNBM ................................................... 17

      6.   BNBM's Relationship with its Subsidiary Taishan ........................................ 19

   B.   BNBM PLC's Contacts with Florida ................................................. 27

   C.   Defendant Entities' Response to the Instant Litigation .................... 32

IV. IMPUTING TAISHAN'S FORUM CONTACTS TO PARENT CORPORATIONS FOR PURPOSES OF PERSONAL JURISDICTION ................................................. 36

   A.   Standard of Review ........................................................................... 37

   B.   Legal Standards Governing Alter Ego Relationships ....................... 38

      1.   Choice of Law ................................................................................................. 40

      2.   Chinese Company Law ................................................................................... 41

      3.   Forum State Law ............................................................................................ 42

   C.   Legal Standard Governing Agency Relationships ........................... 46

   D.   Imputation Analysis ......................................................................... 49

      1.   Chinese Cultural and Economic Context ....................................................... 50

      2.   Analysis Under Florida Law .......................................................................... 54

      3.   Analysis Under Virginia Law ........................................................................ 64

      4.   Analysis Under Louisiana Law ...................................................................... 69

V. PERSONAL JURISDICTION OVER BNBM BY VIRTUE OF ITS CONTACTS IN FLORIDA ................................................................................................................. 80

   A.   Personal Jurisdiction Over a Foreign Defendant .............................. 80

   B.   Florida's Long-Arm Statute .............................................................. 80

      1.   BNBM's Business in the state ........................................................................ 81

2. Tortious Acts within the State ........................................................................ 84

3. Causing Injury in the State .......................................................................... 86

C. Due Process Clause .......................................................................... 86

D. Minimum Contacts .......................................................................... 87

1. Specific Jurisdiction ...................................................................... 88

E. Cause of Action Arises from Minimum Contacts ................................................ 91

F. Fair Play and Substantial Justice ........................................................... 92

VI. SERVICE OF PROCESS ........................................................................... 95

VII. CONCLUSION ................................................................................. 98

## I. BACKGROUND

The present MDL litigation arises from alleged property damage and personal injuries sustained as a result of the presence of Chinese-manufactured drywall in homes and other buildings in a number of states. In the instant motions, Defendants are contesting personal jurisdiction and service of process. Defendants move to dismiss on the grounds that they do not have sufficient minimum contacts with the forum states to meet the long arm statutes or satisfy due process. Defendants contend they are not alter egos of Taishan and, thus, imputing jurisdiction is not justified. Against these contentions, Plaintiffs assert that there is substantial evidence that these foreign corporate entities acted as alter egos, agents, or within a single business enterprise, in unison with Taishan to sell defective drywall to American customers. It is the law of the case that personal jurisdiction has been established over Taishan. *Chinese Drywall*, 742 F.3d 576 & 753 F.3d 521. Therefore, the critical issue before this Court is whether the CNBM and BNBM Entities are alter egos or agents of Taishan or in a single business enterprise such that Taishan's contacts with the forum states, which were sufficient to establish personal jurisdiction, may be imputed to the CNBM and BNBM Entities.

Given the substantially similar nature of the arguments in the four pending motions, this Order & Reasons will analyze the four pending motions in the following manner. First, it will briefly summarize the procedural background of this litigation. Second, it will describe the factual background relevant to the personal jurisdiction arguments. Third, it will address the critical issue of whether Taishan's contacts with the forum states should be imputed to the CNBM and BNBM Entities. Fourth, it will address whether the BNBM Entities' contacts in Florida are sufficient to establish this Court's personal jurisdiction over the BNBM Entities. Finally, it will address the Defendants' insufficient service and service of process arguments.

## II. PROCEDURAL BACKGROUND

From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 829 (E.D. La. 2012), *aff'd*, 742 F. 3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall. Accordingly, these homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as multidistrict litigation. Pursuant to a

Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 2047 in the U.S. District Court, Eastern District of Louisiana.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities, and (2) the Taishan Entities. The litigation has focused upon these two entities and their downstream associates, and has proceeded on strikingly different tracks for the claims against each group as described below:

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts. The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009. *See* (R. Doc. 18). Thereafter, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall. *See* (R. Doc. 2713). The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed Findings of Fact and Conclusions of Law and entered a Judgment in the amount of $164,049.64, including remediation damages in the amount of $136,940.46, which represented a cost of $81.13 per square foot based on the footprint square footage of the house. *See* (R. Doc. 3012).

Subsequently, the Knauf Entities entered into a pilot remediation program with the Plaintiffs' Steering Committee ("PSC") in the MDL. This program was largely based upon the remediation protocol formulated by the Court from the evidence in *Hernandez*. The Knauf pilot remediation program is ongoing and has, at present, remediated more than 2,200 homes containing KPT Chinese drywall using the same general protocol. At the Court's urging, the

parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which is designed to resolve all Knauf-related, Chinese drywall claims. *See* (R. Doc. 12061-5). In addition to the Knauf Settlement Agreement, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. Although the Court occasionally must deal with settlement administration and enforcement issues, the Knauf portion of this litigation is largely resolved.

The litigation against the Chinese entities has taken a different course. The Chinese Defendants in the litigation include the principal Chinese-based Defendant Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include the CNBM and BNBM Entities.

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687; (2) *The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115; (3) *Gross v. Knauf Gips KG*, Case No. 09-6690; and (4) *Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361. The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. *See* (R. Doc. 52); (R. Doc. 1-7) (Case No. 09-6687). Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both of these cases. *See* (R. Docs. 277, 487).

Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the Preliminary Default in *Germano* on the Plaintiffs' claimed damages. *See* (R. Doc. 502, 1223, 1258, 2380). At this hearing, the Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases. Following this hearing, which occurred on February 19 and 20, 2010, the Court issued detailed Findings of Fact & Conclusions of Law. *See* (R. Doc. 2380). On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano*, in favor of the Plaintiffs. (R. Doc. 3031). On the last day to timely do so, June 10, 2010, Taishan filed a Notice of Appeal of the Default Judgment in *Germano* and entered its appearance in *Germano* and *Mitchell*. (R. Docs. 3668, 3670).

After TG entered its appearance in the MDL, it quickly sought to have the Final Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction, as well as on procedural grounds. *See* (R. Docs. 5436, 5583). However, because of the pending appeal, this Court was without jurisdiction to address any motions filed by TG. *See* (R. Doc. 5504). Accordingly, TG sought and was granted by the Fifth Circuit, a stay of its appeal to allow this Court to provide an indicative ruling on TG's motions to vacate the preliminary default and default judgments. *See* (R. Doc. 5649). In response, this Court issued an order pursuant to Federal Rule of Civil Procedure 62.1 to allow it to consider TG's motions. *See* (R. Doc. 6101). In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve TG's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. *See, e.g.*, (R. Docs. 5839, 5840). Discovery has included the production of both written and electronic

documents, as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery has often been contentious, requiring close supervision by the Court. The Court has presided over regularly-scheduled status conferences to keep the parties on track, and conducted hearings and issued rulings to resolve numerous discovery-related disputes. *See, e.g.*, (R. Docs. 7136, 7511).

The first Taishan depositions were held in Hong Kong on April 4-8, 2011. *See* (R. Docs. 8296, 8297). Thirteen attorneys traveled to Hong Kong and deposed the following three Taishan witnesses: (1) Jia Tongchun, General Manager, Director of Board of Directors, and five-percent owner of TG; (2) Peng Wenglong (a.k.a. Frank Clem), Manager of Foreign Trade Department of TG in 2005, salesperson at TTP from 2006-07, and current Manager of Foreign Trade Department at TG; and (3) Zhang Jianchun, Secretary of TG and TTP. *See id.*

Upon return to the United States, several motions were filed seeking to schedule a second round of Taishan depositions as a result of problems during the depositions and seeking discovery sanctions against Taishan. *See* (R. Docs. 8685, 8695, 8755, 8758, 8768, 8792, 8805). Taishan opposed these motions. *See* (R. Docs. 8841, 8842). The Court, after reviewing the transcripts from the depositions, concluded that the "depositions were ineffective because of disagreement between interpreters, counsel, and witnesses, translation difficulties, speaking objections, colloquy among counsel and interpreters, and in general ensuing chaos." *See* (R. Doc. 9107). Accordingly, the Court ordered the parties to move forward with further written discovery and to schedule a second-round of Taishan depositions, but this time with knowledgeable and prepared witnesses, a single translator, and Court supervision. *See id.* The parties complied with the Court's orders and met regularly with the Court to resolve their further

discovery disputes. *See* (R. Docs. 9524, 10092, 9649, 9944, 10007, 10216, 10269, 10799, 11175, 10804, 11138, 11192, 11326).

The Court scheduled the second round of Taishan depositions for the week of January 9, 2012, in Hong Kong. *See* (R. Docs. 10804, 11138, 11192). The Court appointed a Federal Rule of Evidence 706 expert to operate as the sole interpreter at the depositions. *See* (R. Doc. 11533). Counsel for the interested parties and Judge Fallon traveled to Hong Kong for these depositions. The following witnesses were deposed or re-deposed: (1) Peng Wenglong (a.k.a. Frank Clem); (2) Jia Tongchun; (3) Che Gang (a.k.a. Bill Cher), Manager of International Trading for Taishan, salesperson at TG from 2001-06 and 2009-12, and salesperson at TTP from 2006-07; (4) Peng Shiliang, General Manager and Chairman of Board of Directors of TTP from 2006-09, employee of TTP, and Plant Manager of TG from 2009-12; and (5) Fu Tinghuan, Supervisor at TG, Deputy General Manager at TG, and Director of TTP. Because the Court was present at the depositions, objections were ruled upon immediately and the majority of problems which plagued the first round of depositions were absent. Also, the Court was able to observe the comments, intonation, and body language of the deponents. Upon return from Hong Kong, the parties informed the Court that minimal further discovery was necessary before briefing could be submitted on Taishan's personal jurisdiction challenges.

In April 2012, Taishan filed various motions, including its motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with Judge Joseph Farina of the 11th Judicial Circuit Court of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss, and held that it maintained personal jurisdiction over Taishan. *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG. The Court certified an interlocutory appeal and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan and TTP. *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 753 F.3d 521 (5th Cir. 2014); *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 742 F.3d 576 (5th Cir. 2014). The time for writs of certiorari passed and the issue of personal jurisdiction over Taishan became firmly settled.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. (R. Doc. 17774). Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination and the Court held Taishan in contempt and ordered that Taishan pay $15,000.00 in attorney's fees to Plaintiffs' counsel; that Taishan pay $40,000.00 as a penalty for contempt; that Taishan, and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process, and if Taishan violates the injunction, it must pay a further penalty of 25% of the profits earned by the Company or its affiliate who violate the Order for the year of the violation. (R. Doc. 17869).

On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). (R. Doc. 17883). Taishan did not appear and, on September 26, 2014, this Court certified a class of "[a]ll owners of real properties in the United States, who are named

Plaintiffs [in the various MDL complaints] asserting claims for remediated damages arising from, or otherwise related to, Taishan drywall." *See* (R. Doc. 18028 at 34-35).

Taishan entered an appearance with the Court in February 2015 and, to satisfy the contempt, Taishan paid both the sum of $15,000 in attorney's fees to Plaintiffs' counsel and the contempt penalty of $40,000 in March 2015. (R. Doc. 18764). On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists." (R. Doc. 17869). The instant motions are directly concerned with this relationship.

Most recently, in March 2016, this Court granted CNBM Group's Motion to Dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act and therefore outside the jurisdiction of this Court. 28 U.S.C. § 1603(b). The Court determined that the tortious activity exception did not apply, because the alleged tortious conduct did not occur within the United States. 28 U.S.C. § 1605(a)(5). Further, the Court found that the commercial activity exception did not apply in this case, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because Plaintiffs failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the Motion and dismissed CNBM Group from the present litigation. *See* (R. Doc. 20150).

## III.    FACTUAL BACKGROUND

### A. The Corporate Structure of the CNBM Business Group

#### 1.    CNBM Group's Role as Parent of the CNBM Business Group

At the top of the CNBM Corporate family tree is CNBM Group, a state-owned entity organized under the laws of the People's Republic of China.  CNBM Group is—and was, at the time this suit was filed—directly and wholly owned by the state.  *See* Cao Decl. ¶¶ 3-6.  CNBM Group conducts no business in the United States, and does not itself manufacture, produce, market, distribute, ship or sell any building products or construction materials, including drywall. *Id.* ¶ 9.  Since 2005, CNBM Group has been a controlling shareholder of BNBM Group by directly and/or indirectly holding 100% of BNBM Group's shares.  *See* Zhao Dep. at 385:4-24 [MTD Ex. 5].  Beginning in 2005, CNBM Group was the sole shareholder of BNBM Group, directly holding 100% of BNBM Group's stock.  *See* 2005 CNBM Annual Report at 8.  On December 31, 2005, CNBM Group transferred 25% of its equity holding in BNBM Group to CNBM Import and Export, another wholly-owned subsidiary of CNBM Group.  *See* 2005 BNBM Group Auditor's Report at 6 [MTD Ex. 17].  Thereafter, CNBM Group continued to maintain total ownership of BNBM Group's stock, although the percentages of CNBM Group's direct holdings of BNBM Group's shares, and the corresponding percentages of its indirect holdings, have shifted over the years.  No entity in which CNBM Group is *directly* invested, including BNBM Group, is directly engaged in any aspect of the drywall business.

As the ultimate parent, CNBM Group acts as the strategic center for the business conglomerate in four primary aspects: (1) strategy management – CNBM Group "guides all subsidiaries to strictly adhere to the Group Corporation's determined strategy on business activities, to ensure the realization of the Group Corporation's strategic goals"; (2) decision

making management – "exercises the decision making power as the fund contributor on major issues such as its subsidiaries' investment and financing, restructuring, etc."; (3) resource management – "coordinates and integrates various domestic and overseas resources…"; and (4) culture management – "guides subsidiaries…[in] forming a set of unified enterprise culture values within [CNBM Group]." *See* [MTD Ex. 57].

CNBM Group issues technical safety codes to its gypsum plasterboard enterprises, and assigns BNBM with specific responsibility "for drafting of the code." *See* [MTD Ex. 68]. CNBM Group's policies control the "safety technology of gypsum plasterboard enterprises," and are mandatory in nature. *Id.* CNBM also requires that its subsidiaries complete annual Comprehensive Risk Management Reports "stating what are the risks for [the particular] year, what are the things that need to be done and how to prevent." *See* Taishan's 2011 Risk Management Report.

CNBM Group provides training to the middle- and senior-level leaders of BNBM Group, CNBM, BNBM, and Taishan. In 2011, CNBM Group held a three-day course for "people in charge of a functional department in the headquarters of the Group Corporation and the people of a higher level, and the personnel who come from a subsidiary (group) company or a research institute but are managed by the Group Corporation or are subject to the pre-placement archival management." *See* [MTD Ex. 74]. Taishan's Chairman Jia Tongchun was directed by BNBM to attend this course. *Id.*

## 2. BNBM Group is a Minority Shareholder in CNBM

In 1996, with the investment of CNBM Group, BNBM Group became a wholly state-owned limited liability company. In 1997, seeking to raise public capital for its drywall manufacturing business, BNBM Group formed BNBM PLC ("BNBM"), a public company listed

on the Shenzen stock exchange. After BNBM was formed, BNBM Group stopped manufacturing drywall and BNBM became the sole manufacturer of Dragon Brand drywall. BNBM Group continued to operate in other sectors of the building materials market.

As part of the 2004 corporate restructuring in preparation for CNBM's public offering (discussed in more detail below), BNBM Group transferred its 60.33% equity interest in BNBM to CNBM. In consideration, BNBM Group acquired a minority interest in CNBM. *See* 2005 BNBM PLC Annual Report. Thus, BNBM Group no longer had any direct ownership in BNBM at the time BNBM acquired its ownership interest in Taishan. At present, BNBM Group owns approximately 27.5% of CNBM. *See* 2014 CNBM Annual Report.

The CNBM Articles of Association limit BNBM Group's power as a stockholder. Many important business decisions must be decided by a "special resolution," which requires "more than two-thirds of the voting rights represented by the shareholders." *See* Articles of Association of CNBM, January 17, 2014, at 32, Art. 8.16. Such decisions include increasing or decreasing capital, issuing stock, warrants, or similar securities, issuing bonds, engaging in mergers, undergoing dissolution or liquidation, amending the articles of association, or taking other actions "likely to have a material impact" on the company. *Id.* at 34, Art. 8.23. BNBM Group is also precluded from assuming management of CNBM. "Unless prior approval is obtained at a general meeting" of the shareholders, "the Company shall not enter into any contract with any persons other than Directors, supervisors, general managers and other senior management members pursuant to which such person shall be responsible for managing the whole or any part of the Company's business." *Id.* at 27, Art. 8.3. As a 30% stockholder of CNBM, BNBM Group may not exercise its voting rights "in a manner prejudicial to the interests of all or some of the shareholders of the Company." *Id.* at 25, Art. 7.5.

### 3. CNBM Group is a Shareholder in CNBM

Like its parent (CNBM Group), CNBM is not directly engaged in the manufacture or sale of building materials.  It is a holding company with investments in other Chinese entities engaged in various businesses related to the building industry, including cement, fiberglass, solar energy, lumber, steel, and drywall.  CNBM does not manufacture, produce, market, distribute, ship or sell any drywall.  *See* Chang Decl. ¶ 3.  On March 28, 2005, CNBM was converted into a publicly traded joint stock limited company on the Hong Kong Stock Exchange ("HKSE"), with CNBM Group and several wholly-owned CNBM Group subsidiaries possessing approximately 95% of the share capital of CNBM immediately prior to the Global Offering.  *See* Global Offering at 153 [MTD Ex. 38].  To accomplish this Public Offering, CNBM Group executed a reorganization of its subsidiaries aimed to "position the Company [CNBM], then a wholly-owned subsidiary of [CNBM Group] as the holding company" of its building materials products and engineering services businesses.  *Id.* at 89.

The conversion of CNBM into a publicly listed company on the HKSE shifted CNBM Group's ownership of share capital in CNBM.  CNBM Group "is deemed to own the shares directly held by BNBM Group, CNBM Import & Export, and Building Materials Academy." *See* 2006 CNBM Annual Report at 45 n.1.  Thus, by virtue of its shareholdings, after completion of the Global Offering, CNBM Group directly and indirectly held 60.34% of CNBM's total share capital, making CNBM Group the "controlling shareholder" of CNBM.[1]  *Id.* at 43-45.  Following the Global Offering, CNBM Group's direct and indirect ownership in CNBM's shares has

---

[1] Controlling Shareholder is defined as "any shareholder…entitled to exercise, or control the exercise of 30%...or more of the voting power at general meetings of a new applicant or who is in a position to control the composition of a majority of the board of directors of the new applicant." HKSE Rules, Sec. 19A.14

declined slightly.[2]  However, it continued to control the highest percentage of CNBM's total shares, and consequently, has been and remains the "Controlling Entity" of CNBM.[3]  That said, over half the shares of CNBM are owned by public investors.  *See* 2014 CNBM Annual Report.

CNBM Group and CNBM share common employees.  Since 2005, Song Zhiping has been the Chairman of CNBM Group and the Chairman and Executive Director of CNBM.[4]  *See* [MTD Ex. 1]. Zhou Guoping is the Chief Economist for CNBM Group and, since 2005, a Supervisor for CNBM.  *Id.*  Additionally, Chang Zhangli is the Vice President and Executive Director of CNBM and has been a Secretary to the Board for CNBM since 2005.[5]  *Id.*

### 4. CNBMIT, CNBM USA, and United Suntech are companies within the CNBM Corporate Family.

CNBMIT is a Chinese entity that acts as an import and export agent for Chinese companies.  *See* Chaun Decl. ¶ 6.  CNBMIT has never manufactured, produced, marketed, distributed, shipped or sold drywall in either China or the United States.  However, it does conduct some of its import and export business in the United States.  CNBMIT has an office in the United States from which it "promotes Chinese building material and machinery and establishes a distribution network in North America.  With a localized professional sales team and matured sales channels, [CNBMIT] has become an important supplier of building materials and machinery in the USA and North American markets."  *See* CNBMIT webpage, "CNBMI

---

[2] CNBM Group's direct ownership in CNBM ranged from 16.9% in 2005 to 13.67% in 2009; its direct/indirect ownership ranged from 60.34% in 2005 following the Global Offering to 44.10% in 2010.

[3] "Controlling Entity" is defined as a person who, either alone or with any of his associates is entitled to exercise or control the exercise of not less than 20%, has the right to nominate any of the directors of the corporation; or has an interest in shares carrying the right to veto any resolution; or amend, modify, limit or add conditions to any resolution, at general meetings of the corporation. *See* Chapter 571 (Securities and Futures Ordinance of the Hong Kong Special Administrative Region of the PRC).

[4] He is also the Chairman of BNBM Group.

[5] He is also a Director of BNBM.

USA" Tab, available at http://www.cnbmit.com/en/overseas/Detail.aspx?MenuID=050602 (last visited 2/22/2016).

CNBM USA and United Suntech were registered business entities located in California from 2005 to 2009. CNBM USA was established in 2006 as the United States branch of CNBM Group, and tasked with the mission to distribute CNBM products throughout the United States. To develop business in the United States, CNBM USA emphasized the fact that the "CNBM has become the largest building supplier in China…[and] will improve our market share and become one of the largest building supply companies known throughout the world." *See* CNBM USA "Building a Mutually Rewarding Partnership" Powerpoint dated 4/2/2007 [MTD Ex. 163]. In 2011, immediate ownership of CNBM USA was transferred to an intermediary entity, CNBM International. *Id.*

CNBMIT and United Suntech are subsidiaries of CNBM Investment.[6] CNBM Investment (f/k/a BND) was majority-owned by BNBM until December 2007, when BNBM's Board of Directors announced a resolution on transferring its 80% share ownership in BND to CNBM. *See* 12/7/2007 BNBM Announcement of Final Resolution of the 30th Interim Meeting of the 3rd Session of Board of Directors [MTD Ex. 262]. In addition to the 80% share acquisition, CNBM acquired the remaining 20% of equity shares from China Fiberglass, making CNBM Investment a wholly-owned subsidiary of CNBM by 2008. *See* 2008 CNBM Annual Report at 59.

**5.** **CNBM is a Majority Shareholder in BNBM**

BNBM is a subsidiary of CNBM, which, as discussed above, is itself a subsidiary of CNBM Group via direct and indirect equity interest. In each of BNBM's annual reports from

---

[6] By 2008, CNBM Investment acquired full ownership of United Suntech.

2005 to 2014, CNBM is defined as BNBM's "Controlling Shareholder" and CNBM Group is defined as its "Actual Controller."[7]  In June 2006, CNBM Group paid for a "share conversion of BNBM stock in order to transfer 45,630,000 of CNBM's non-tradeable BNBM shares into tradable shares.  *See* 2006 CNBM Annual Report at 101 n. (a).  As a result of this share conversion, CNBM directly held 52.40% equity interest in BNBM, which it retained through 2013.  *See* 2007 CNBM Annual Report at 10, 17 & 113; 2013 BNBM Annual Report at 53. From 2005 to 2010, CNBM held between 60.33% and 52.40% direct ownership interest in BNBM's shares; and, CNBM Group, by virtue of its direct and indirect ownership in CNBM, held between 41.16% and 23.11% indirect ownership interest in BNBM.  Additionally, from 2005 through 2015, among the top ten shareholders of BNBM, CNBM has been the only shareholder with a 5% or higher stake in BNBM.  *See* 2005-2014 BNBM Annual Reports.

Because its stock is listed on the Hong Kong Stock Exchange, CNBM is subject to the rules and regulations of the Exchange.  Under HKSE rules, CNBM Group is a "Close Associate" of CNBM, which in turn is a "Close Associate" of BNBM, which is a "Close Associate" of Taishan, meaning that each company is able to "exercise or control the exercise of 30% . . . or more of the voting power at general meetings, or to control the composition of a majority of the board of directors and any subsidiary of this other company."  *See* Keyes Dep. at 39:2-21 [MTD Ex. 40]; HKSE Rules, Chapter 1 [MTD Ex. 42].  Further, under HKSE Rules, CNBM Group is

---

[7] Under the stock listing rifes of the Shenzen Stock Exchange ("SZSE"), where BNBM's stock is listed, "Controlling Shareholder" is defined as the "shareholder whose equity shares account for more than 50% of the Company's total stock; or the shareholder who holds less than 50% of equity shares, but still has major influence on the resolutions made by the general meeting of shareholders because of the voting rights entitled to the equity shares thereof." Partial Translation of SZSE Stock Listing Rules (2014 Revision) No. 378, Chapter XVIII, 18.1(5). "Actual Controller" is defined as "any natural person, legal person or other organization that is capable of dominating and actually dominating the conducts of the Company by virtue of investment relationship, agreement or any other arrangement." *Id.* at Chapter XVIII, 18.1 (6).

the "Controlling Shareholder"[8] of CNBM; CNBM is a "Substantial Shareholder"[9] of BNBM and

BNBM is a "Substantial Shareholder" of Taishan.  *See* Keyes Dep. at 48:16-19; 74:13-79:20.

Additionally, CNBM, BNBM, and BNBM Group have shared the same accounting firm.  CNBM

has used the accounting firm of Baker Tilley Hong Kong Ltd. since 2010; BNBM Group has

used the same firm since 2012 and BNBM has used Baker Tilley since 2013.

### 6.      BNBM's Relationship with its Subsidiary Taishan

BNBM manufactures building materials, including drywall, in China.  BNBM is a public

company traded on the Shenzhen Stock Exchange, with over 21,000 shareholders.  It is a

majority shareholder in Taishan.  *See* 2014 BNBM PLC Annual Report.  BNBM neither created

nor incorporated Taishan.  Taishan began as a separate and independent manufacturer of drywall.

When BNBM first purchased shares, Taishan already had revenues of RMB 48.2 million.  *See*

2005 Asset Appraisal Report [BNBM Ex. 8].  BNBM acquired its equity stake in Taishan in two

separate actions.  BNBM paid fair value to acquire its interest in Taishan, subject to a third-party

audit and asset valuation process.  *See* Yang Decl. ¶ 8.  In March and April 2005, BNBM entered

into a Share Subscription Agreement to purchase 65,362,500 shares of Taishan, representing

42% of the registered capital of the company.  *See* March 19, 2005 Share Subscription

Agreement [MTD Ex. 126].  The subscription price paid by BNBM was approximately RMB

117.65 million.  *Id.*  A professional third-party appraisal of the value of Taishan confirmed the

adequacy of the purchase price with reference to the net asset value of Taishan.  *See* 2005 Asset

---

[8] Controlling Shareholder is defined as "any shareholder…entitled to exercise, or control the exercise of 30%...or more of the voting power at general meetings of a new applicant or who is in a position to control the composition of a majority of the board of directors of the new applicant." HKSE Rules, Sec. 19A.14

[9] Substantial Shareholder is defined as "a person…who is entitled to exercise, or control the exercise of, 10% or more of the voting power at any general meeting of the company…"

Appraisal Report [BNBM Ex. 8]. Taishan's shareholders and BNBM's Board of Directors voted on and approved the acquisition in compliance with each company's articles of association.

CNBM's August 2008 Announcement regarding BNBM's acquisition of a controlling interest in Taishan states the following as the reason for the purchase:

> Following BNBM's acquisition of the 42% equity interest of Taihe, the Company [CNBM] has become the largest producer of gypsum boards in the PRC. The acquisition has also enhanced the Company's ability to serve a broader base of customers. The directors of the Company believe that the Acquisition will enable *CNBM Group* to further enhance its competitiveness and consolidate the leading position in the PRC gypsum board market *as it will participate more actively in the daily operations and management of Taihe* with a view to improving its profitability.

*See* CNBM Announcement: "Connected Transaction Acquisition" [MTD Ex. 13].

Taishan's articles of incorporation were amended as part of the transaction. *See* Articles of Incorporation [BNBM Ex. 10]. In addition to providing minority stockholder protections, the articles were amended to provide for a seven person Board of Directors (four nominated by BNBM). *Id.* at Art. 67. The Taishan Board was later downsized to five directors, with three BNBM designees.

In 2006, BNBM acquired an additional, indirect 23% equity interest in Taishan through the purchase of one of Taishan's shareholders, Taian Donglian Investment Trade Co., Ltd. ("Donglian"). *See* Song Dep. at 51:20-52:2 [MTD Ex. 36].[10] The acquisition left BNBM with 65% equity interest in Taishan. *See* Yang Decl. ¶ 8 [BNBM Ex. 3]. Taishan's Chairman and General Manager Jia Tongchun (who was also Deputy General Manager and Director of BNBM from 2005-2012) personally retained 5% equity ownership in Taishan, and was the majority

---

[10] CNBM published BNBM's increased equity acquisition of Taishan as a "Connected Transaction" on the HKSE, stating that the acquisition was made to "enable CNBM Group to further enhance its competiveness and consolidate its leading position in the PRC gypsum board market." *See* 8/26/2006 Connected Transaction Announcement.

shareholder and legal representative of an investment company, which owned 14% of Taishan's equity shares. *See* 8/28/2006 Connected Transaction Announcement at Q000011-12 [MTD Ex. 127].

Under Chinese law, BNBM is the "controlling shareholder" of Taishan.[11] As such, it exercises a certain degree of authority over Taishan. On October 16, 2007, BNBM issued an inter-company special inspection report on the management and control of its branches and subsidiaries. *See* BNBM's Report on Management and Control of its Branches and Subsidiaries, 10/16/07 [MTD Ex. 75]. The report specified Taishan as a "controlled subsidiary," and stated that BNBM (1) "strictly followed the relevant regulations to conduct management and control of the daily operation and important activities of the branches and subsidiaries" and (2) "emphasized and strengthened the control of its controlled subsidiaries' related party transactions, outside guarantees, usage of financing funds, major investments, information disclosure and other activities." *Id.*

BNBM unifies auditing and financial control and administration of Taishan and its other subsidiaries. BNBM's audit committee, which serves under BNBM's Board of Directors, also conducts annual financial audits of Taishan. *See* 11/28/2009 "Letter of Communication and Confirmation about the Audit Schedule for the 2009 Financial Statements." BNBM and Taishan shared the same external auditing firm between 2006 and 2010. Also, Taishan must submit monthly, quarterly, and yearly budget plans and financial reports to BNBM. Notably, however, Chinese accounting and exchange rules require BNBM to consolidate its financial reporting with Taishan, because it holds a majority of Taishan's stock. *See* Accounting Standards No. 33 at Art.

---

[11] Controlling Shareholder is defined as "any shareholder…entitled to exercise, or control the exercise of 30%...or more of the voting power at general meetings of a new applicant or who is in a position to control the composition of a majority of the board of directors of the new applicant." HKSE Rules, Sec. 19A.14

47 [BNBM Ex. 47].[12]  Additionally, BNBM and Taishan prepare separate audited financial statements, maintain separate books and records, file separate tax returns, and maintain separate bank accounts.  *See* Chen Tr. at 596:3-11; 600:3-8 [BNBM Ex. 2].

BNBM guarantees loans that Taishan receives from third-party banks and Taishan is prohibited from requesting guarantees from any companies other than BNBM.  *See* Chen Dep. at 363:18-23 [MTD Ex. 77].  At the beginning of 2006, BNBM's Board approved guarantees for Taishan with eight banks.  *See* BNBM Announcement of Final Decision of the 15th Meeting of the 3rd Session of the Board of Directors, 1/23/06 [MTD Ex. 146].  In June of 2007, BNBM provided a guarantee for a capital expenditure proposed by Taishan to finance the "technological transformation of the original gypsum board production line" of Taishan.  *See* BNBM Announcement of the Resolution of the Final Resolution of the 25th Interim Meeting of the 3rd Session of the Board of Directors, 6/15/2007 [MTD Ex. 138].  BNBM's General Manager Chen Yu confirmed that "from 2005 through 2014, there are . . . substantial guarantees, provided to Taishan each and every year in order for Taishan to maintain its profitability and business interest."  *See* Chen Dep. at 363:18-23.  Additionally, BNBM approves all of Taishan's loan increases.  However, BNBM does not finance Taishan's operations by providing non-repayable funds; it has never paid for Taishan's debts, losses, or expenses and it has not made any direct loans to Taishan.

BNBM exercises a high degree of control over Taishan's operational management.  After Taishan's Board of Directors passes certain resolutions that require significant capital expenditures, Taishan must seek approval from BNBM—its controlling shareholder—regarding those resolutions.  *See* Shandong Taihe Dongxin 3rd Meeting of the 3rd Board of Directors,

---

[12] American accounting rules provide the same standard.

4/15/2006 [MTD Ex. 132]. BNBM requires that its subsidiaries report their board resolutions, shareholder meeting resolutions, and other important documents and financial statements to the relevant departments within BNBM. With regard to the resolutions, BNBM's relevant departments will "conduct analyses and researches (sic), raise questions and give suggestions, and protected [BNBM's] interest to the maximum." *See* 10/16/2007 Special Inspection Report. With regard to Taishan's financial statements, BNBM's relevant departments will "conduct analyses and researches (sic), so as to timely grasp the production and operation situation and financial situation and to raise relevant disposal opinions at proper timing, to ensure profit realization and risk control of the equity investments." *Id.*

For example, Taishan's Board of Directors needed to get the approval of BNBM before it could build additional factories. *See* Chen Dep. at 345-46, 349. BNBM invested in the construction of drywall factories, plants, and gypsum board production lines by offering guarantees to Taishan. BNBM tracked its investments made in Taishan's production lines through weekly reports. *See* "Rectification Status on the Inversion of Procedure in the Fixed Investment Projects of the Stock Company" [MTD Ex. 137]. Taishan also had to seek approval from BNBM regarding the design, quality, technology, and processes of drywall production. *See* 4/15/2006 Taishan Board of Directors Resolutions (requiring shareholder [BNBM] approval of gypsum board factory construction projects with specifications for production).

In 2005, the Taishan shareholder meeting resolved that: (1) if any Taishan subsidiary must have more than two shareholders, BNBM will purchase 5% of equity shares; and (2) for any Taishan subsidiary to be established in the future, if the subsidiary must have more than two shareholders, BNBM will hold 20% interest of equity shares. *See* 6/26/2005 Resolution of the 4th Extraordinary General Meeting of Shareholders [MTD Ex. 129]. Notably, this resolution was

implemented to accommodate the Chinese Company Law requirement that limited liability subsidiaries have more than one shareholder. *See* Jia Tr. 758:21-760:16. Following the adoption of this resolution, BNBM became a co-owner in three different Taishan drywall manufacturing subsidiaries. In 2007, BNBM acquired a 30% equity interest in a fourth Taishan subsidiary; the reason for the acquisition was for "CNBM Group to benefit from the synergy between BNBM and Taishan, increase its competitiveness and consolidate its leading position in the gypsum board market . . . " *See* 4/13/2007 CNBM Announcement at 2, 7. Additionally, in 2008, to "ensur[e] the on-going and stable supply of raw materials to Taishan Gypsum for production of paperbacked plasterboards," BNBM added ownership in a fifth Taishan subsidiary when it and Taishan jointly established Taihe Decoration. 6/30/2008 BNBM Announcement of the 3rd Session; BNBM Annual Report at 42.

In October, 2015, CNBM made a public announcement that as a result of an agreement between BNBM and Taishan's minority shareholders, "BNBM will directly and indirectly hold 100% equity interest in Taishan Gypsum. . . . Both BNBM and Taishan will remain as subsidiaries." *See* 10/13/2015 CNBM Announcement: Acquisition of Equity Interest in Taishan Gypsum Through Share Issuance of BNBM.

Since 2005, BNBM Directors and Officers have maintained voting control over Taishan's Board of Directors. *See, e.g.*, 4/23/07 BNBM Reply on Inquiry Letter about 2006 Annual Report Verification. Seven BNBM directors/officers have served in concurrent positions at Taishan. *See* Summary Chary of Overlapping Executives and Officers [MTD Ex. 1]. However, Chairman Jia, who was Taishan's General Manager before BNBM acquired an interest in the company, was the only BNBM director who also served as a Taishan executive. *Id.* From 2005 to 2009, Wang Bing was the General Manager and a Director of BNBM while contemporaneously a

Director of Taishan (a position he still holds today).[13]  *Id.*  That said, Mr. Wang testified that if an issue arose with BNBM and Taishan, he recused himself from voting on Taishan's Board of Directors.  *See* Wang Tr. at 281:18-24, 284:2-7, 291:4-12 [BNBM Ex. 38].  Similarly, from 2005 to 2009, Cao Jianglin was the Chairman of BNBM & Secretary to the Party Committee of BNBM, while contemporaneously serving as Chairman of the Supervisory Committed of Taishan.[14]  As with Mr. Wang, Mr. Cao did not serve in any executive role during his time as Chairman of BNBM and he recused himself from voting on Taishan's board of directors on any issue involving BNBM.  *Id.*

Notwithstanding the foregoing, Taishan is a successful and autonomous company.  Prior to BNBM first investing in 2005, Taishan had a 58.4% share of the Chinese low-cost drywall market, was the largest producer of gypsum board in China in terms of production capacity, and made RMB 58,000 in net profits.  *See* Deal Decl., Table 18 [BNBM Ex. 11].  Taishan's revenues have continued to grow since 2005.  In each year since BNBM invested in Taishan, Taishan's annual net revenues and profit margins have exceeded BNBM's.  *See* Gordon Decl. ¶ 55-59 [BNBM Ex. 12].  In 2014, Taishan's revenue was over 5.5 billion yuan.  *Id.*  Figure 1.  By contrast, BNBM's revenue was approximately 2.789 billion.  Taishan is not undercapitalized.  At least since BNBM's acquisition of its interest in Taishan, Taishan has complied with Chinese corporate legal requirements, such as holding shareholder and board of director meetings and obtaining corporate authorizations for major transactions.  *See* Chen Decl. ¶ 11 [BNBM Ex. 67].  Taishan conducts periodic meetings of the board of directors and stockholders, and obtains required corporate authorizations for major transactions.

---

[13] Since 2009, Mr. Wang has also served as a Vice President of CNBM.
[14] Since 2005, Mr. Cao has also been a director of CNBM Group and President and Executive Director of CNBM.

BNBM also complies with corporate governance requirements. Taishan's finances and accounting functions operate independently of BNBM. *See* Yang Decl. ¶¶ 11-16; Chen Tr. 596:3-11. Each company is responsible for its own debts, liabilities and losses. *See* Chen Tr. 600:3-8. BNBM and Taishan manage and use their assets separately. They have never had joint bank accounts. *See* Yang Decl. ¶ 11. Neither can access the other's bank accounts. *Id.* ¶ 14,15. They have never had common accounting books. *Id.* ¶ 12.[15] While BNBM guaranties working capital lines for Taishan, BNBM has never had to perform on these guarantees. *See* "Draft Public Announcement on the External Guarantees for the Year 2015" [BNBM Ex. 56].[16] The headquarters and plants for BNBM are in a different province than Taishan's offices and operations, roughly 330 hundred miles apart. *See* Wang Tr. 151:16-19.

Nevertheless, as mentioned above, from 2005 to 2012, Jia Tongchun held concurrent positions at Taishan and BNBM while also owning 5% of Taishan. He was appointed Chairman of Taishan's Board of Directors and General Manager of Taishan in 2002; and, from 2005-2012, he served as Deputy General Manager of BNBM; and, from 2006 to 2012, he served as a Director on BNBM's Board of Directors. *See* 2011 BNBM Annual Report at 12; 2012 BNBM Annual Report at 52; *see also* Jia Dep. at 745:18-746:9 [MTD Ex. 105]. Holding these dual roles while owning 5% stock in Taishan was flagged as an issue in a 2012 SASAC-sponsored audit of BNBM. *See* [MTD Ex. 123]. However, Mr. Jia resigned his position as Deputy General Manager at BNBM in September 2012 to ensure no conflict existed with his Taishan share

---

[15] While Plaintiffs attempt to claim that CNBM, BNBM and Taishan comingled and improperly transferred funds between and among each other, the only evidence for this claim is a 2008 audit report that found two payment vouchers to be inaccurate. *See* Communications about the Problems of BNBM [MTD Ex. 124]. Thus, this evidence merely demonstrates that corporate group audit controls were in place to ensure that proper accounting practices were being followed and funds were not being comingled. *Id.*

[16] It is standard practice for a bank to require loan guarantees, and they are typically provided by the biggest shareholder. *See* Wang Tr. 363:1-9. 364:17-366:1. It is also routine practice in the United States. Major American companies such as Federal Express and the Walt Disney Company guarantee the loans of their subsidiaries. *See* Gordon Decl. ¶¶ 67, 70, 76 [BNBM Ex. 12].

ownership. Relatedly, in its annual reports, BNBM stated that "Mr. Jia Tongchun received no remuneration from the Company [BNBM] as he also held a position in the proprietary subsidiary Taishan Gypsum Co., Ltd." *See, e.g.*, 2006 BNBM Annual Report at 16. However, like all BNBM board members, he did receive a fee of 25,000 RMB. *See* Jia Tr. at 880:17-23, 935:8-936:3. That said, he did not receive any payment from BNBM for his position as a Deputy General Manager because that position was purely honorary. Additionally, in 2012, he received an award for Taishan's "outstanding performance" in raising its operating revenue and net profits. *See* Award for Significant Business Contributors from Taishan Gypsum and BNBM Homes [MTD Ex. 122].

## B. BNBM PLC's Contacts with Florida

In 2000, the BNBM Entities established BNBM of America in Florida. The leadership of BNBM of America included Song Zhiping as Chairman and Cao Jianglin as Director. "BNBM Group also assigned special people to the U.S. to take charge of sales work . . ." for BNBM of America. *See* BNBM Group's "Explanation on accounts receivable of BNBM of America [MTD Ex. 214]. From approximately 2001 through 2004, BNBM of America had approximately 8 permanent employees, paid U.S. taxes, sold over $1 million of BNBM drywall in the U.S., and purchased and rented heavy equipment. *See* Hannam Dep. at 33:23-37:7 [MTD Ex. 213]. Although BNBM of America was winding-down its business in 2004, in 2005, and into 2006, it still maintained its mailing address and principal place of business in Tampa, Florida as well as its status as a Florida corporation. BNBM of America shut down its drywall sales "somewhere in between 2002 and 2003," and ceased its corporate existence in 2006. *Id.* at 75:8-14.

In 2005, BNBM hosted representatives from two Florida drywall distributor companies— Davis Construction Supply, LLC ("Davis Construction") and EAC & Sons Corporation

("EAC")—at its facilities in China. *See* Chaparro Dep. at 28:22-30:4 [MTD Ex. 216]; Davis Dep. [MTD Ex. 217]. BNBM assisted with obtaining business visas for Stefan Davis of Davis Construction and Edgar Chaparro of EAC by sending them "invitation letters" as such letters are necessary to obtain a Chinese travel visa. *See* Chaparro Dep. at 24:7-21, 29:3-30:4; Davis Dep. at 29:16-30:1. Davis and Chaparro's initial visit to China was in 2005. During that visit, Davis and Chaparro met with Cai Kai, Manager of BNBM's Drywall Division, and were taken on a tour of BNBM's factory. *See* Chaparro Dep. at 28:22-30:4. Later on in their dealings with BNBM, Davis and Chaparro met with BNBM General Manager Wang Bing—who expressed a clear interest in doing business with the United States. *See* Davis Dep. at 36:2-22 (stating that BNBM was "very interested" in doing business in the United States and had already started the process of getting additional UL certification). Throughout the course of EAC's dealings with BNBM, Chaparro visited China to meet with BNBM approximately 10-20 times. *See* Chaparro Dep. 29:3-21.

BNBM acquired U.S. authorization for its drywall and manufactured its drywall to meet U.S. standards. BNBM knew that its drywall had to meet proper U.S. codes and regulations in order for its U.S. sales efforts to be successful. Accordingly, in October of 2005, BNBM acquired authorization to use U.S.-based Underwriters Laboratories ("UL") certifications on its 5/8" Type X drywall. *See* 10/10/2005 UL Authorization [MTD Ex. 219]; Davis Dep. at 52:1-7. Additionally, BNBM manufactured its drywall to meet American Society for Testing and Materials ("ASTM") standards and to conform to U.S. drywall size specifications. *See* Chaparro Dep. at 93:19-23; Davis Dep. at 42:23-43:11. The fact that BNBM obtained the UL certificate and met ASTM standards specifically attracted EAC and Davis Construction to conduct business with BNBM in 2005. While researching potential drywall sources online, EAC and Davis

Construction chose to purchase from BNBM because it was the only available manufacturer with a UL certification. *See* Chaparro Dep. at 24:22-25, 25:1-11. BNBM's product was listed on UL's website as having a UL certification. *Id.* at 25:12-25, 26:1-18. Notably, however, BNBM manufactures fire resistant drywall, and a UL certification is necessary to be fire rated. Hamman Dep. at 38:24-39:9. Further, UL certification requires that drywall meet ASTM standards. Chaparro Dep. at 50:19-21. The ASTM and UL specifications are international standards used around the world, including in China. *See, e.g.*, http://www.astm.org/ABOUT/faqs.html#used; http://china.ul.com. In fact, both ASTM and UL have offices in China. http://ul.com/aboutul/locations; http://www.atsm.org/ABOUTfactsheet.html.

BNBM also provided Davis Construction (via its agent EAC), with a Material Safety Data Sheet ("MSDS") pursuant to standards prescribed by the U.S. Occupational Safety and Health Administration ("OSHA"); EAC required a MSDS as a condition of accepting shipment. *Id.* at 153:22-154:8. BNBM's MSDS for its drywall detailed compliance with various U.S. standards and regulations, including UL, American National Standards Institute, U.S. Department of Transportation, OSHA, and numerous U.S. Environmental Protection Agency regulations. *See* 2006 BNBM Drywall MSDS [MTD Ex. 222].

For Davis Construction, BNBM agreed to add Davis Construction's label to its drywall. Specifically, the contract provided that "BNBM PLC will sell the products under its brand. On the end tapes of all products will be printed: 'Produced by BNBM PLCE and distributed by Davis in USA.' " *See* Chaparrp Dep. at 84:21-86:1 (quoting Section 2.42 of Davis Purchase Agreement). This customized labeling was used for one shipment to the United States. *Id.* at 85:10-86:1.

BNBM labeled its drywall with certifications that it met American standards, including a UL certification.  *See* Davis Dep. at 42:23-43:11.  BNBM's contracts with Davis Construction and EAC included requirements that: a) "All gypsum board products shall be designed and manufactured in full compliance and in strict accordance with ASTM 1396-04, ASTM 1264-05 and UL Standards" and b) "All products shall be stamped with the appropriate UL certification and the correct board designation (i.e., 5/8" Type X gypsum board…)".  *See* 3/12/06 Exclusive Purchase & Supply Agreement [MTD Ex. 223].

BNBM and BNBM Group arranged shipping of BNBM drywall to Florida ports.  On November 18, 2005, BNBM entered into an initial agreement with EAC for the sale of 200,000 boards of BNBM drywall to be shipped CIF to the Port of Tampa in Florida.  *See* 11/18/05 Sales Contract [MTD Ex. 224].  BNBM drafted the initial agreement.  Chaparro Dep. 67:9-23.  The contract price for this drywall was $2,350,000.  *See* [MTD Ex. 224 at 2].  According to EAC, BNBM made all the shipping arrangements for the board to be shipped to the Port of Tampa in Florida.  Chaparro Dep. at 43:22-46:19 (testifying that, pursuant to this November 18, 2005 CIF contract for drywall, "BNBM [did] all the shipping transaction[s] and the deliver[y] and everything to the point that [EAC] take[s] the material from the ship once it's inside the port.").  Similarly, on November 16, 2005, BNBM agreed to sell and ship (CFR) 240,000 boards of BNBM drywall to Wood Nation in Port Manatee, Florida.  *See* 1/6/06 BNBM Invoice to Wood Nation at 2 [MTD Ex. 225].  The contract price for this drywall was $2,040,541.00.  *Id.*  BNBM made all the shipping arrangements for this shipment as well.  *See* Wood Nation Dep. at 63:1-25 (testifying that "BNBM lined up the ship and the transportation for this drywall shipment to Port Manatee, Florida.").  Additionally, on June 5, 2006, BNBM shipped almost 300,000 sheets of

drywall (at a price of $1,778,013.60) to the Everglades port in Florida for Triorent Trading. *See* BNBM "Statistical Spreadsheet of Gypsum Boards" [MTD Ex. 143].

On March 12, 2006, BNBM entered into an agreement with Davis Corporation, a Florida drywall distributor company, to sell BNBM drywall in the United States. *See* 3/12/2006 Exclusive Purchase & Supply Agreement at 5 [MTD Ex. 223]. The discussions between BNBM and Davis Construction specifically identified drywall sales to include the entire Southeast and Eastern seaboard of the U.S. BNBM "certainly knew that [Davis Construction] was based out of Florida." Davis Dep. at 37:19-38:6. In fact, Davis "absolutely" spoke with BNBM about the drywall distribution plan involving Florida and other states. *Id.* at 38:7-18. The effective dates of the agreement were March 12, 2006 through December 31, 2006. [MTD Ex. 223]. Two BNBM drywall shipments were made under the agreement. The first shipment from BNBM to Davis Construction consisted of more than 250,000 sheets of drywall, and the second shipment consisted of more than 100,000 sheets. *See* 6/3/09 Letter from Stefan Davis [MTD Ex. 226]. The agreement contained an exclusivity provision. However, the exclusivity agreement never took effect because Davis failed to pay BNBM the prerequisite $1 million needed to trigger the provision. [MTD Ex. 223].

As of June 15, 2015, over 200,000 sheets of BNBM's drywall were being stored in a Davis Construction warehouse in Ocala, Florida. 6/15/15 Sworn Statement of Stephan Davis at 4:16-5:23 [MTD Ex. 229]. The inventory includes 139,000 sheets of 5/8" Type X drywall 4 x 12, and 87,000 sheets of 1/2" drywall 4 x 12, totaling 226,000 sheets. This drywall has been in the Ocala warehouse for eight years. *Id.*

BNBM manufactured and sold over 68 million square feet—more than $10,000,000—of its drywall to United States customers. [MTD Ex. 143]. In 2006, BNBM sold and exported at

least eight shipments of drywall to U.S. customers consisting of 1,435,238 sheets of drywall. *Id.* Of these BNBM drywall sales, six of the shipments (constituting over 1,300,000 sheets if drywall and amounting to more than $9,000,000.00) were exported to ports in Florida.[17] *Id.*

### C. Defendant Entities' Response to the Instant Litigation

On April 21, 2009, the Chairman of Knauf wrote to CNBM Group's Chairman, SONG Zhiping, regarding the U.S. Chinese Drywall lawsuits. *See* 5/15/2009 Knauf Letters [MTD Ex. 187]. On May 8, 2009, Taishan was served with process under the Hague Convention in the first of hundreds of lawsuits complaining of defects with Taishan's Chinese-manufactured drywall. Three days later, Taishan compiled for its leaders at CNBM Group an "Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan Gypsum Company Limited." *See* [MTD Ex. 3]. Taishan prepared this report for CNBM Group "so that the leaders can understand the facts of the case and give relevant instructions." *Id.* Despite acknowledging that more than 70 million square feet of its drywall were sent to the U.S. and were the subject of complaints from customers, Taishan reported that "[it] is not inclined to respond to the lawsuit" and asked Chiefs Song and Cao for instructions and approval as to whether such inaction was appropriate. *Id.* Taishan further proposed that "when necessary, it will provide documents that are beneficial to Taishan Company to the court that accepted the case." *Id.*

On May 15, 2009, Knauf again wrote to request "that CNBM and BNBM . . . take effective measures to respond to the U.S. consumer lawsuits and media coverage as soon as possible;" Knauf express its "willing[ness] to, under the leadership of CNBM, safeguard the international reputation of Chinese-made building materials . . ." *See* Knauf Letter [MTD Ex. 187]. Shortly after Knauf's second entreaty to CNBM Group, Peng Wenlong of Taishan, at the

---

[17] The other two shipments were exported to California.

"arrangements of the Company's leaders," corresponded with China Buildings Materials

Academy, a wholly-owned subsidiary of CNBM Group that took the lead in researching and

analyzing the issues related to American reports of defective gypsum board. *See* 7/9/2010

CNBM Group Corporation Meeting Minutes of the 5th Work Meeting of Managers of CNBM

Group [MTD Ex. 192].[18]

On June 3, 2010, less than a month after the *Germano* judgment was entered, CNBM

Group hosted two telephonic conferences. First, the Manager of CNBM Group's Business

Administration Department had a telephonic meeting with Wang Bing of BNBM, Jia Tongchun

of Taishan, and two attorneys to discuss the strategy for responding to the litigation. *See* Course

of Events on Hiring Foreign Law Firms [MTD Ex. 186]. A memorandum produced by BNBM

in this litigation provides a summary of the meeting:

> Mr. Knauf visited Zhiping Song, chairman of the board of directors,
> and hoped that CNBM Group could offer a helping hand to them in
> responding to the United States drywall event.
> …
> Chairman Song agreed that CNBM Group should organize the
> response to the litigation, but the purposes of the response are: 1. for
> the images of Chinese products and Chinese enterprises; 2. for the
> friendship with Mr. Knauf of more than years. Reluctant to see the
> Knauf Company fighting alone; 3. insisting on the position that our
> products do not have any problems. We should consider the situations
> as we deal with the litigation. The Company may ask the Knauf
> Company to help recommend attorneys for us and delay the
> effectiveness of judgment.

*Id.*.[19] A second teleconference also took place on June 3, 2010, which included Chiefs Cao and

Zhang Jian of CNBM Group, Chang Zanghli of CNBM, Yu Chen of BNBM, Jia Tongchun of

---

[18] In this correspondence, Peng Wenlong offered a report on Taishan's drywall manufacturing and attached a questionnaire that included answers to questions imposed upon Taishan about the quality of its drywall, shipping and loading information for the boards exported to the U.S., and whether the packages were sealed. *See* [MTD Ex. 191, 193].

[19] Song did not have a clear recollection as to most of the facts set forth in the memorandum of this meeting. *See* Song Dep. at 107-108. He did, however, recall that he was not in any way involved in a plan to delay the effectiveness of the judgment against Taishan. *Id*. at 108:2-4. ("as a shareholder, I encouraged Taishan to

Taishan, and attorney Dong Chungang. *Id.* The topic of the call was "the strategy for responding to the United States gypsum board litigation." *Id.* The discussion addressed the strengths and weaknesses of hiring the Hogan Lovells law firm. *Id.* The summary memorandum memorializing these teleconferences indicates that (1) the owner of Taishan's competitor invited Song Zhiping and CNBM Group to consider a collaborative effort in responding to the lawsuit; (2) Chairman Song would organize the response to the litigation; (3) CNBM Group's Board of Directors would decide the direction of the litigation; and (4) Taishan should retain Hogan Lovells. *Id.*

Also on June 3, 2010, Zhang Jian of CNBM Group circulated via email to Wang Bing (BNBM Chairman, CNBM VP, and Taishan Director), BNBM's General Manager and Director, and Jia Tongchun (Taishan Chairman and BNBM Director) an "Opinion Soliciting Draft" from CNBM Groups' Board of Directors titled, "Informational Report on Seriously and Proactively Doing a Good Job in Responding to the Incident of 'Problematic Gypsum Boards Shipped to the United States.'" *See* [MTD Ex. 195]. The report, which describes the timeline of the lawsuit in great detail, states that "[d]uring the entire development process of the incident, CNBM Group has required and arranged BNBM PLC and Taishan Gypsum to actively cooperate with quality examinations, various kinds of investigations, surveys, and field inspections organized by the government departments based on the attitude of being responsible for the consumers." *Id.*

On June 27, 2010, Taishan's Foreign Sales Manager, Peng Wenlong, wrote to Chief Zhang of CNBM Group in an effort to comply with a request from CNBM Group to report the relevant statistics to CNBM Group. *See* [MTD Ex. 196]. The email included a detailed analysis of the lawsuits, the origin of the gypsum used in Taishan's boards, and a spreadsheet showing

---

actively respond to the litigation. That I remember."). The PSC contends, however, that the weight of the evidence refutes Song's testimony on this point.

Taishan's U.S. exports for the years 2005-2007. *Id.* The Chairman and Secretary of Taishan were copied on the email. *Id.*

Throughout the litigation, the Defendants have shared attorneys and law firms. On November 29, 2010, all of the parties—CNBM Group, CNBM, CNBM (USA), BNBM, Taishan, TTP, and Weifang—signed a Common Interest, Joint Defense and Confidentiality Agreement ("2010 JDA"). *See* [MTD Ex. 199]. Chris Vejnoska (who is the current counsel of record for the CNBM Entities) then represented BNBM. Joe Cyr of Hogan Lovells represented Taishan, TTP, and Weifang, and his firm had been retained previously by BNBM. *See* Chen Dep. at 509. Since the beginning of the litigation, attorney Dong Chungang has appeared at numerous meetings of all of the CNBM/BNBM and Taishan Defendants. None of the Defendants claim Dong as their legal counsel, but he is a signatory to the more-recent Joint Defense Agreement. *See* [MTD Ex. 202].

CNBM Group approved Taishan's decision not to appear at the Court-ordered Judgment Debtor Examination on July 17, 2014. On July 7, 2014, CNBM Group issued a notice summoning Taishan's Chairman Jia to appear at its Board of Directors meeting scheduled for July 11, 2014. *See* Notice of 17th Meeting. The third item on the agenda was "[d]eliberating on the proposal on strategies of coping with the event of gypsum board transported to the U.S." *Id.* At the July 11, 2014 CNBM Group Board of Directors meeting, CNBM Group deliberated on and signed a unanimous resolution (11-0) authorizing Taishan's decision "not to attend the judgment debtor hearing on July 17, 2014." *See* CNBM Group Resolution No. 17. CNBM Group's Chairman Song stated that the Board of Directors unanimously resolved to "respect" the decision for Taishan not to appear before this Court, but he disclaimed any "support" for the decision.

However, also on July 7, 2014—with awareness of the Plaintiffs' effort to collect on the *Germano* judgment and in anticipation of the repercussions of Taishan's contempt of court— CNBM Group directed its subsidiaries to cease depositing any funds in New York banks and to have personnel use their own personal email accounts, rather than company emails, when doing business internationally. *See* Requirements for International Business Risk Prevention. Also on July 7, 2014, attorney Dong Chungang informed Hogan Lovells via email that "It's not Mr. Jia who can make the decision. This case involves many high-level officers at CNBM Group now." *See* [MTD Ex. 209].

Following entry of the Contempt Order in this case, CNBM Group continued to monitor the litigation. During CNBM Group's Board of Directors meeting on August 15, 2014, Zhang Jian indicated that the CNBM Group need not be concerned about an American judgment: "Regardless of the ruling in the United States, the domestic assets will not be subject to enforcement." *See* 18th Meeting. At the same meeting, Cao (General Manager of CNBM Group) stated that "There is one thing we need preliminary decision on: Beijing New Building Materials is not going to respond to the lawsuit." *Id.* Similarly, CNBM Group's Chairman Song stated that SASAC "wrote a letter to have us engage in litigation. Engage in limited response to the lawsuit, dealing with an order of over 2 million [presumably referring to *Germano*]. Now we really can't engage." *Id.*

## IV. IMPUTING TAISHAN'S FORUM CONTACTS TO PARENT CORPORATIONS FOR PURPOSES OF PERSONAL JURISDICTION

In the current motions, Defendants CNBM Group, CNBM, CNBMIT, CNBM USA, United Suntech, BNBM, and BNBM Group have filed motions to dismiss for lack of personal jurisdiction. As mentioned, it is the law of the case that this Court has jurisdiction over Taishan. Thus, if any entity exerts substantial control and dominance over Taishan, sufficient to allow the

two corporations to be treated as a single entity under a theory of alter ego and/or agency, that entity (or entities) would also be subject to the jurisdiction of this Court. The question is whether this control occurred. The Court will review the law and facts to seek an answer.

## A. Standard of Review

Federal Rule of Civil Procedure 12(b)(2) permits a defendant to seek a dismissal of a complaint based on lack of personal jurisdiction. "When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident. The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Stuart v. Spademan,* 772 F.2d 1185, 1192 (5th Cir. 1985) (citing *Thompson v. Chrysler Motors Corp.,* 755 F.2d 1162, 1165 (5th Cir. 1985)).

When a court hears a Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff need only present a *prima facie* case of personal jurisdiction. *See Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.,* 517 F.3d 235 (5th Cir. 2008). Alternatively, when there is an evidentiary hearing, the plaintiff is held to the higher standard of preponderance of the evidence. *See id.* (citing *Brown v. Slenker,* 220 F.3d 411, 419 (5th Cir. 2000)). The Fifth Circuit "has never explicitly laid out the criteria necessary to constitute a 'full evidentiary hearing,' " *Kwik–Kopy Corp. v. Byers,* 37 Fed. Appx. 90, at *4 (5th Cir. May 9, 2002), but has concluded for purposes of an evidentiary hearing, "both parties must be allowed to submit affidavits and to employ all forms of discovery, subject to the district court's discretion and as long as the discovery pertains to the personal-jurisdiction issue." *Walk Haydel & Assocs., Inc.,* 517 F.3d at 242. The distinguishing factor between a mere hearing and an "evidentiary hearing" is the presentation of evidence "beyond the written materials." *See Kwik–Kopy Corp.,* 37 Fed. Appx.

at *4 (quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.,* 557 F.2d 1280 (9th Cir. 1977)).  The

Court finds that the hearing on the present Motions constitutes an evidentiary hearing, because

the Court is relying on evidence representing the full extent of personal jurisdiction discovery

and depositions.  This conclusion requires plaintiffs to establish personal jurisdiction by a

preponderance of the evidence, rather than the more lenient standard of a prima facie showing.

### B.  Legal Standards Governing Alter Ego Relationships

As the MDL transferee court, this Court is required to apply the substantive state law of

the transferor court, and the federal law of its own circuit.  *See In re Chinese Manufactured*

*Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 837 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th

Cir. 2014), and *aff'd sub nom. In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d

521 (5th Cir. 2014) (citing cases).  Thus, the Court will analyze the jurisdictional question

according to Fifth Circuit federal procedural law and the substantive law of the transferor states.

It is axiomatic under Fifth Circuit law that a federal district court sitting in diversity may

exercise personal jurisdiction over a foreign defendant if: (1) the long arm statute of the forum

state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction

is consistent with the Due Process Clause of the United States Constitution.  *Clemens v.*

*McNamee,* 615 F.3d 374, 377 (5th Cir. 2010) (citing *Latshaw v. Johnston,* 167 F.3d 208, 211

(5th Cir. 1999)); *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266, 270 (5th Cir. 2006).

Further, the Fifth Circuit acknowledges that in some cases, the relationship between affiliated

corporations requires the forum contacts of one entity to be imputed to another for the purpose of

personal jurisdiction.  *See, e.g., Freudensprung v. Offshore Technical Servs., Inc.,* 379 F.3d 327,

345 (5th Cir. 2004); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983); *In re*

*Chinese Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 867–68 (E.D. La. 2012),

*aff'd,* 742 F.3d 576 (5th Cir. 2014), and *aff'd sub nom. In re Chinese-Manufactured Drywall*

*Prod. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014). The theory behind this principle is that the

relationship between the parent and subsidiary is so intertwined "that they do not in reality

constitute separate and distinct corporate entities but are one and the same corporation for

purposes of jurisdiction." 2 J. Moore & Lucas, *supra,* at 4–273; *see* 4 C. Wright & A. Miller,

*Federal Practice and Procedure* § 1069, at 255–57 (1969).

A subsidiary's contacts may be attributed or imputed to the parent for personal

jurisdiction purposes where the subsidiary is the parent's alter ego or general agent. *See Chinese*

*Drywall*, 753 F.3d at 546; *see also Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 586 (5th

Cir. 2010); *Minnesota Min. & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1265 (Fed. Cir. 1985).

Additionally, Courts are not limited to imputing the jurisdictional contacts of subsidiaries to

direct parent companies only, but may impute the contacts of any related entity if warranted by

the facts. *See, e.g.*, *Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.,* 210 F.3d 18,

29 (1st Cir. 2000) ("While alter ego liability may be most common in an ordinary parent-

subsidiary context, 'the equitable doctrine of piercing the corporate veil is not limited to the

parent-subsidiary relationship.'") (quoting *C M Corp. v. Oberer Dev. Co.,* 631 F.2d 536, 539 (7th

Cir. 1980)).

As this Court has previously explained, "[p]iercing the corporate veil is not necessary for

imputing contacts of one affiliated corporation to another for purposes of *personal jurisdiction,*

but rather is the test generally conducted for imposing *liability* as between related corporations."

*In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 867 (E.D. La.

2012), *aff'd,* 742 F.3d 576 (5th Cir. 2014), and *aff'd sub nom. In re Chinese-Manufactured*

*Drywall Prod. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014). Thus, the Court will address the

parties' arguments regarding corporate veil piercing for the purposes of liability if and when such a determination becomes necessary. At present, the Court will discuss the applicable law for imputing forum contacts between companies for purposes of personal jurisdiction and apply this law to the facts of the present case. If the facts demonstrate by a preponderance of the evidence that a Defendant entity is so intertwined with Taishan "that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction," that Defendant would also be subject to the jurisdiction of this Court. 2 J. Moore & Lucas, *supra,* at 4–273; s*ee also* 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1069, at 255–57 (1969).

1.  **Choice of Law**

"In MDL cases where a federal court applies state law, such as this one, the transferee court is generally bound to apply the law the transferor court would follow." *In re Mastercard Int'l, Inc. Internet Gambling Litig.*, No. 00-cv-0661, 2004 WL 287344, at * 2 (E.D. La. Feb. 12, 2004) (citation omitted). Moreover, applying "the law of the transferor forum [in a MDL] . . . include[es] the transferor forum's choice-of-law rules." *In re Vioxx Prod. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007); *Varnado v. Danek Med., Inc.*, No. 95-1802, 1998 WL 524896, at *3 n.1 (E.D. La. Aug. 19, 1998) ("A transferee forum applies the choice of law rules of the transferor court.") (citation omitted). The forum states in this instance are Louisiana, Virginia, and Florida. The forum states' choice of law rules mandate applying Chinese law i.e., the law of the state of incorporation, to determine alter ego status.

Under Louisiana law, "the law of the state of incorporation governs the determination when to pierce a corporate veil." *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 647 (5th Cir. 2002) (analyzing alter ego status and applying that conclusion to personal jurisdiction).

The same is true under Virginia law; "the law of the state of incorporation determines whether the corporate veil may be pierced." *Brainware, Inc. v. Scan-Optics, Ltd.*, No. 11-cv-755, 2012 WL 1999549, at *5 (E.D. Va. May 9, 2012) (analyzing personal jurisdiction). Similarly, Florida law provides that the internal affairs of a corporation are governed by the laws of the state of incorporation. *See Mukamal v. Bakes*, 378 F.App'x 890, 897 (11th Cir. 2010); *see also In re Hillsborough Holdings Corp.*, 123 B.R. 1004, 1014 (Bankr. M.D. Fla. 1990) ("the veil piercing issue must be resolved with reference to the laws of the state where the corporation is incorporated"). The CNBM and BNBM Entities were incorporated in China. Accordingly, under each of the forum state's choice of law rules, Chinese law applies.

### 2. Chinese Company Law

Companies formed under the laws of China are subject to the country's Company Law. The pertinent provision in the 2005 Company Law states that

> Where shareholders of a corporation abuse the corporate independent status or the limited liability of shareholders for the purpose of escaping debts, and seriously injures the interests of the creditors of the corporation, such shareholders shall be jointly and severally liable for the debts of the corporation.[20]

To pierce the corporate veil in China, Plaintiffs must demonstrate that the shareholder has "abuse[d] the independent status of the company as a legal person or the limited liability of shareholders" in order to "evade[] debts," and thereby "seriously damage[] the interests of the creditors of the company." Clarke Decl. ¶ 21; Clarke Supp. Decl. ¶ 16. Regulations interpreting China's veil-piercing Company Law look to corporate separateness, considering factors such as the comingling of shareholder and company income, funds, and business and whether the

---

[20] At present, Company Law Art 20(3) similarly states: "Where the shareholder of a company abuses the independent status of the company as a legal person or the limited liability of shareholders, evades debts and thus seriously damages the interests of the creditors of the company, he shall assume joint and several liability for the debts of the company. (R. Doc. 19179-9).

company's business transactions are under complete control of its shareholders. Clarke Decl.¶ 24; Clarke Supp. Decl. ¶ 17. "Chinese law generally respects the legal separateness provided by the corporate form, and requires a strong showing of comingling in order to negate it." Clarke Decl.¶ 59; Clarke Supp. Decl. ¶ 17.

### 3. Forum State Law

The substantive state law of Louisiana, Virginia, and Florida regarding alter ego status is similar to Chinese law. This Court has noted that "the alter ego test for attribution of contacts, *i.e.,* personal jurisdiction, is less stringent than that for liability." *In re Chinese-Manufactured Drywall Products Liab. Litig.,* 753 F.3d 521, 546 (5th Cir. 2014) (quoting *Stuart v. Spademan,* 772 F.2d 1185, 1198 n.2 (5th Cir. 1985). However, the case on which this Court relied in making that distinction i.e., *Stuart v. Spademan,* applied only Texas law, and not the forum states' law that Plaintiffs assert govern this litigation.[21] Notably, *assuming arguendo* that a distinction is proper and the alter ego test for personal jurisdiction is less stringent than that for liability, the test for jurisdiction is still difficult to satisfy.

While Texas law may apply a different alter ego standard to impute jurisdiction than impose liability, relevant jurisprudence suggests that the forum states—Florida, Virginia, and Louisiana—apply the same alter ego analysis in the jurisdictional context as they do in the liability context. Each requires proof of wrongdoing, fraud, or abuse. Under Florida law, to pierce the corporate veil under an alter ego theory, the plaintiff must establish "*both* that the corporation is a 'mere instrumentality' or alter ego of the defendant, *and* that the defendant engaged in 'improper conduct' in the formation or use of the corporation." *WH Smith, PLC v.*

---

[21] In *Stuart,* the Fifth Circuit noted that under Texas law, "for jurisdiction to exist, there need not be both the existence of a mere shell corporation and fraud. Rather, either factor, a shell corporation or fraud is sufficient by itself to justify jurisdiction." 772 F.2d at 1198 n.12 (citation and quotation omitted).

*Benages & Associates, Inc.*, 51 So. 3d 577, 581 (Fla. Dist. Ct. App. 2010) (emphasis in original).

When plaintiffs fail to "meet their burden of proving that an alter ego relationship was

maintained for an improper purpose," they cannot obtain personal jurisdiction over a defendant

on the theory of alter ego. *McFadden Ford, Inc. v. Mancuso ex rel. Mancuso*, 766 So. 2d 241,

243 (Fla. Dist. Ct. App. 2000); *Hobbs v. Don Mealey Chevrolet,* 642 So. 2d 1149, 1156 (Fla.

Dist. Ct. App. 1994) ("Without evidence that AFSLIC was formed or used for some illegal,

fraudulent, or other unjust purpose, the mere fact of American Way Group's and Warmus's

ownership and control of AFSLIC was insufficient to justify piercing AFSLIC's corporate

veil.").

Likewise, under Virginia law, if a subsidiary corporation is an alter ego of their parent,

the actions of the subsidiary are imputed to the parent for purposes of jurisdiction. *PBM

Products v. Mead Johnson Nutrition Co.,* No. 3:09-CV-269, 2009 WL 3175665, at*3-4 (E.D. Va.

Sept. 29, 2009) (*citing* Va. Code Ann. § 8.01–328.1(A)); *Schmitt-Doss v. Am. Regent, Inc.*, No.

6:12-CV-00040, 2012 WL 6474038, at *7 (W.D. Va. Dec. 13, 2012). "Alter ego liability may

attach where there is such unity between a corporation and an individual that the separateness of

the corporation has ceased." *William v. AES Corp.*, 28 F. Supp. 3d 553, 562 (E.D. Va. 2014)

(quotation omitted). "The alter ego doctrine states that, when the corporation is deemed an

instrumentality or business conduit of another corporation or person, the corporate form may be

disregarded." *Wu v. Tseng*, No. 06-346, 2007 WL 201087, at *7 (E.D. Va. Jan. 24, 2007). In

making an alter ego determination, "courts look at factors such as whether the corporations

maintain the necessary formalities, have separate books, have separate officers, directors, and

employees, separately manage their own day to day affairs, and the degree of control exercised

by the parent over the subsidiary." *Long v. Chevron Corp.*, No. 4:11CV47, 2011 WL 3903066, at *7 (E.D. Va. Sept. 2, 2011).

Like Florida and Virginia, Louisiana law allows jurisdictional imputation based on alter ego status. "Under Louisiana law, the factors to be considered to determine whether one entity is an alter ego of another or whether two entities are a 'single business enterprise' are similar." *Jackson*, 615 F.3d at 587 (citing *Green v. Champion Ins. Co.*, 577 So. 2d 249, 257-58 (La. Ct. App. 1991)). In *Hargrave v. Fibreboard Corp.,* the Fifth Circuit explained that when evaluating whether an alter ego relationship exists for the purposes of jurisdiction, the court should consider the following factors: (1) the amount of common stock owned by the corporate entities, (2) whether the entities share corporate headquarters, (3) whether the entities share common officers and directors, (4) whether the entities observe corporate formalities, (5) whether the entities share bank accounts, accounting and payroll systems, insurance contracts, budgets, financial records, and tax returns, (6) whether the parent has authority over general policy decisions of the subsidiary, and (7) whether the parent has authority over the subsidiary's day-to-day business and operations decisions. 710 F.2d 1154 (5th Cir. 1983); *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 346 (5th Cir. 2004); *see also Adm'rs of Tulane Educ. Fund,* 687 F. Supp. 2d 620, 625 (E.D. La. 2009). "When the corporate entity is invoked to frustrate the ends of justice, it will be disregarded by the courts, leaving the shareholders personally chargeable with the acts and obligations of the purported corporation." § 9:170. Liability of majority shareholders— Piercing the corporate veil, 1 La. Prac. Corp. § 9:170 (2016-2017 ed.) (citing *Brown v. Benton Creosoting Co.*, 147 So. 2d 89 (La. Ct. App. 2d Cir. 1962)).

Additionally, Louisiana courts recognize that liability may be imputed to related corporations in a 'single business enterprise.' In *Brown v. ANA Insurance Group*, the Louisiana

Supreme Court explained that the single business enterprise doctrine is "a theory for imposing liability where two or more business entities act as one. Generally under the doctrine, when corporations integrate their resources in operations to achieve a common business purpose, each business may be held liable for wrongful acts done in pursuit of that purpose." *Brown v. ANA Ins. Grp.*, 2007-2116 (La. 10/14/08), 994 So. 2d 1265, 1267 n.2. To determine whether multiple corporate entities are a single business enterprise, the Court should consider the following factors: (1) common ownership, (2) common directors and officers, (3) common employees, (4) common offices (5) unified administrative control, (6) similar or supplementary business functions, (7) one corporation financing the other, (8) inadequate capitalization, (9) one corporation's creation of the other, (10) one corporation paying the salaries, expenses, or losses of the other corporation, (11) one corporation receiving no business other than that given to it by the affiliated corporation, (12) shared property, (13) noncompliance with corporate formalities, (14) services rendered by the employees of one corporation on behalf of another corporation, (15) centralized accounting, (16) undocumented transfer of funds between corporations, (17) unclear allocation of profits and losses between corporations, and (18) excessive fragmentation of a single enterprise into separate corporations. *See Green,* 577 So. 2d at 257-58; *accord Jackson*, 615 F.3d at 587. "This list is illustrative and is not intended as an exhausted list of relevant factors. No one factor is dispositive . . . ." *Green,* 577 So. 2d at 258*; accord Jackson*, 615 F.3d at 587. As this Court has previous reasoned, the single business enterprise theory is a valid concept under Louisiana law. *See Chinese Drywall*, 2014 WL 4809520, at *8 (Class Cert FOFCOL); *see also Southern Capitol Enterprises, Inc.*, 476 F. Supp. 2d 589, 595 (M.D. La. 2007).

### C.    Legal Standard Governing Agency Relationships

In addition to recognizing jurisdiction based on an alter ego status, each of the forum states recognizes that jurisdiction can exist based on an agency relationship between a corporate parent and subsidiary.  Florida's long-arm statute recognizes that an agent's contacts with Florida can be imputed to its principal for jurisdictional purposes: "A person, whether or not a citizen or resident of this state, who personally *or through an agent* does any of the acts enumerated in this subsection thereby submits . . . to the jurisdiction of the courts of this state."  Fla. Stat. Ann. § 48.193(1)(a) (emphasis added); *see also Dev. Corp. of Palm Beach v. WBC Constr., LLC,* 925 So. 2d 1156, 1161 (Fla. Dist. Ct. App. 2006) ("While a parent corporation is not subject to jurisdiction in Florida solely because its subsidiary does business here, the control of a parent over a subsidiary may permit the conclusion that the subsidiary is acting as the agent of the parent, thus subjecting the parent to jurisdiction under section 48.193(1) and supporting 'minimum contacts.'") (internal citations omitted).

Under Florida law, "[t]he issue of control is critical to the determination of agency." *State v. Am. Tobacco Co.,* 707 So. 2d 851, 854 (Fla. Dist. Ct. App. 1998).  "Generally, proof of control by the parent over the internal business operations and affairs of the subsidiary is required to fuse the two for jurisdictional purposes, and the degree of control exercised by the parent must be greater than that normally associated with ownership and directorship." *Brownsberger v. Gexa Energy, LP,* 2011 WL 197464, at *3 (S.D. Fla. Jan. 20, 2011).  The parent's control "must be high and very significant." *Enic, PLC v. F.F. S. & Co., Inc.,* 870 So. 2d 888, 891 (Fla. Dist. Ct. App. 2004).  The crux of any Florida agency analysis is control. *Chinese Drywall*, 894 F. Supp. 2d at 868 ("[P]roof of control by the parent over the internal

business operations and affairs of the subsidiary is required to fuse the two for jurisdictional purposes.") (citations omitted).

Like Florida, Virginia law also recognizes that if a subsidiary corporation is an agent of the parent, the two entities are treated as one for jurisdictional purposes. *PBM Products v. Mead Johnson Nutrition Co.,* No. 3:09-CV-269, 2009 WL 3175665, at*3-4 (E.D. Va. Sept. 29, 2009) (*citing* Va. Code Ann. § 8.01–328.1(A)); *Schmitt-Doss v. Am. Regent, Inc.*, No. 6:12-CV-00040, 2012 WL 6474038, at *7 (W.D. Va. Dec. 13, 2012). Under Virginia law, "the determining factor when evaluating whether an agency relationship exists is the principal's power of control." *First Am. Title Ins. Co. v. First All. Title, Inc.*, 718 F. Supp. 2d 669, 678–79 (E.D. Va. 2010), *aff'd on other grounds sub nom. First Am. Title Ins. Co. v. W. Sur. Co.*, 491 F. App'x 371 (4th Cir. 2012) (citing *Va. Employment Comm'n v. A.I.M. Corp.,* 302 S.E. 2d 534 (1983)). In making this determination, a court need not find actual control – "it is the right to control which is determinative." *Whitfield v. Whittaker Mem'l Hosp.*, 169 S.E. 2d 563 (1969); *see also Butterworth v. Integrated Resources Equity Corp.,* 680 F.Supp. 784, 789 (E.D.Va.1988) ("The question is not whether the party exercises control over the agent, but whether he has it."). Thus, like Florida, the crucial factor for determining whether an agency relationship exists under Virginia law is control.

Louisiana law also recognizes that personal jurisdiction may be imputed to a foreign defendant based upon the forum-related contacts of its agent. *See* La. Rev. Stat. § 13:3201(A); *Gillespie v. Bynum*, 508 So. 2d 628, 630 (La. App. 2 Cir. 1978). Under Louisiana law, agency is termed as "mandate" and defined as "a contract by which a person, the principal, confers authority on another person, the mandatory, to transact one or more affairs for the principal." La. Civ. Code art. 2989. A mandate relationship can be express or implied. *See Admin. of Tulane,*

450 F. App'x at 333; *E. Smith Plumbing, Inc. v. Manuel*, 2011-1277, p.7 (La. App. 3 Cir. 3/28/12); 88 So. 3d 1209, 1215. "'[A]n agency relationship cannot be presumed, it must be clearly established.'" *Id.* (quoting *Roberson Adver. Serv., Inc. v. Winnfield Life Ins., Co.*, 453 So. 2d 662, 665 (La. App. 5 Cir. 1984)). For an implied agency, "'the principal has the right to control the conduct of the agent and the agent has the authority to bind the principal.'" *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, 2000 WL 726880, at *4 (E.D. La. June 2, 2000) (quoting *Urbeso v. Bryan*, 583 So. 2d 114, 117 (La. App. 4 Cir. 1991)). Implied agency "is established 'by the words and conduct of the parties and the circumstances of the case.'" *Id.* (quoting *Self v. Walker Oldsmobile Co., Inc.*, 614 So. 2d 1371, 1375 (La. App. 3 Cir. 1993)).

Notably, each of the Defendants acknowledges that, whether the Court applies Chinese or forum-state law, there is no meaningful difference in outcome. *See* BNBM Group's Brf. at 23 ("The result is the same if the law of Florida, Louisiana, or Virginia is applied."); BNBM's Brf. at 60 ("Even if this Court were to apply the law of the forum states, there is still no basis to impute Taishan's forum contacts to BNBM PLC as an alter ego."); CNBM Entities Brf. at 43 n.37 & n.44 ("Nor, based on the factual record, would an alter ego relationship exist under the forum states' laws" & "Under both Chinese and U.S. law, exercising controlling shareholder rights fall far short of demonstrating that a subsidiary is so totally subsumed by a shareholder that they should be treated as a single entity."). Additionally, when Art. 20 of the Chinese Company law has been interpreted, legal scholars have concluded that it effectively states the U.S. common law doctrine of piercing the corporate veil. *See* Chao Xi, *Piercing the Corporate Veil in China: How Did We Get There?*, 5 J. Bus. L. 413, 424 (2011).

Finally, this very same result was acknowledged previously in these proceedings. Taishan conceded in its jurisdictional challenge that no difference in outcome derives from the application of Chinese or U.S. forum law, in regard to the jurisdictional imputation of contacts. On this basis, the Fifth Circuit declined to find an actual conflict of law and therefore applied the forum law in addressing Taishan's jurisdictional challenge:

> TG faults the district court for applying the forum state's law (Florida law) instead of Chinese law to the question of whether to impute TTP's Florida contacts to TG. TG concedes, however, that "Chinese law is not materially different on this issue from Florida law, and the outcome should be the same under either law." Accordingly, we need not choose because "if the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 839 n.20, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Therefore, we apply Florida law.

*Chinese Drywall*, 753 F.3d 521, 529 (5th Cir. 2014). In other words, the Fifth Circuit held that because Chinese law is not materially different than the forum state's law on the question of imputing contacts for personal jurisdiction, there is no real conflict between them and the forum state's law can be applied. *Id.* Thus, considering the foregoing in conjunction with (1) the lack of authoritative interpretation of the applicable Chinese law, (2) the influence of Chinese culture and politics on the applicable Chinese law, and (3) Defendants' acknowledgement that no real conflict exists, this Court is inclined to apply the laws of the forum states which govern the claims at issue.[22]

### D. Imputation Analysis

Before applying the law to the facts of this case, it is necessary to consider the weight the Court must give to the parties' evidence. Both Plaintiffs and Defendants have presented myriad

---

[22] Furthermore, China's Company Law is not nearly as detailed as the veil-piercing law of the forum states. *See* Mark Wu, *Piercing China's Corporate Veil: Open Questions from the New Company Law*, 117 Yale L.J. 329, 330 (2007) (discussing the ambiguities and uncertainties regarding veil-piercing in China's Company Law).

facts regarding the relationships between these various entities. However, the parties characterize these facts in different ways. In evaluating whether these facts support the existence of a single business enterprise, alter ego, or agency relationship, the Court must "give Plaintiff the benefit of any 'favorable inferences' supported by the record." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 62 (4th Cir. 1993); *see also Schmitt-Doss v. Am. Regent, Inc.*, No. 12-0040, 2012 WL 6474038, at *2 (W.D. Va. Dec. 13, 2012) ("When the court addresses the question of personal jurisdiction on the basis of motion papers, legal memoranda, allegations in the complaint, and jurisdictional discovery, the facts are viewed in the light most favorable to the plaintiff.").

Furthermore, the Court notes that this analysis must consider real as well as formal relationships, including a pragmatic approach to the nebulous power structure of modern corporations; particularly in the context of large Chinese corporate groups, where the parent company is owned by the Chinese Government. *See Bulova Watch Co. v. K. Hattori & Co.*, 508 F. Supp. 1322, 1340 (E.D.N.Y. 1981) ("It would be helpful were the law to provide some grand jurisdictional ledger sheets upon which formal points such as these could be assigned weights and totted up. That is not possible in our real world where so much depends on nuances, on a sense of interrelationships and on a realistic appraisal of subtle economic and power connections."). In embarking on such an analysis, it is important to consider the unique cultural tradition which influences the business and personal relationships within these corporate entities.

### 1.     Chinese Cultural and Economic Context

In evaluating the relationships between these entities, it is essential to understand that the doctrines of corporate separateness and veil-piercing are decidedly Western legal concepts. Their development and application have been shaped by Western culture and economic

theories—namely democracy and capitalism.  The jurisprudence applying these doctrines in Eastern cultures is far less formal.  Scholars are in agreement that Chinese corporate law, and indeed Chinese corporations themselves, embody China's "unique socio-economic environment."  Shuangge Wen, *The Ideals and Reality of A Legal Transplant-the Veil-Piercing Doctrine in China*, 50 Stan. J. Int'l L. 319, 322 (2014) ("China's legal system, while heavily influenced by Western legal norms, is embedded in a complex economic, political, and ideological system that is unique and distinct from its Western counterparts.); *see also* Donald C. Clarke, *What's Law Got to Do with It? Legal Institutions and Economic Reform in China*, 10 UCLA Pac. Basin L.J. 1, 3 (1991-92).  One salient feature of this unique economic environment is the state's pervasive dominance in the Chinese economy.  State entities control natural resources, utilities, and infrastructure.  The state maintains control over even public corporations through concentrated ownership.  Through this state ownership, "government representatives generally dominate the boards of these corporations."  Wen, *supra*, at 335; *see* Qiao Liu, *Corporate Governance in China: Current Practices, Economic Effects, and Institutional Determinants*, 52 CESifo Econ. Stud. 415, 429 (2006).

China's Confucian tradition has also made a significant and indelible impact on Chinese corporate culture even in privately owned corporations.  The "historical heritage of Confucianism demands collectivism and hierarchical obedience."  Wen, *supra*, at 337. One scholar has argued these cultural values "dominate the structure, organisation and behaviour of eastern enterprises [and] impose near-irresistible codes of conduct" on Chinese corporations. Clyde D. Stoltenberg, *Globalization, "Asian Values," and Economic Reform: The Impact of Tradition and Change on Ethical Values in Chinese Business*, 33 Cornell Int'l L.J. 711, 719 (2000); *see* Richard D. Lewis, *When Cultures Collide: Managing Successfully Across Cultures*

81 (1996).  This Confucian influence encourages "paternalistic attitudes to employees and their dependents, top-down obligations, bottom-up loyalty, obedience and blind faith."  Lewis, *supra*, at 81.  These concepts and values pervade the management structure of Chinese corporations and their related entities, resulting in strict hierarchal internal control, where the parent corporation dominates and controls even the minor activities of its subsidiaries through concepts of "respect" rather than a controlling economic interest.  Jingyuan Ma, Mel Marquis, *Business Culture in East Asia and Implications for Competition Law*, 51 Tex. Int'l L.J. 1, 18–19 (2016) (discussing the influence of Confucian culture in East Asian business).  Because of the emphasis on respect, deference to authority, and unwavering loyalty within the corporate hierarchy, this control often exists without the formal, externally visible mechanisms used to control Western corporations.

As a result, a parent corporation that may only have a minority share in its subsidiary, or a minority of the seats on its Board of Directors has the potential to exert far more control over its subsidiary than a similarly-situated parent in a Western, capitalistic market.  In some cases, even a single seat on the Board may guarantee control over the entire corporation, as other Board members are bound to vote in accordance with the parent corporation's judgment.  *See* Ma, & Marquis, *supra* at 18–19; Lewis, *supra*, at 81.  Thus, in applying the concept of corporate separateness to economic systems outside of the tradition of Western capitalism, the Court faces the challenge of fitting a square peg in a round hole.  "In this as in so many other areas of the law, stuffing new and complex factual patterns into absolutely rigid legal cubbyholes often results in distortion of the facts.  Some give in the categories is desirable lest the law lose touch with the real world."  *Bulova Watch Co. v. K. Hattori & Co.*, 508 F. Supp. 1322, 1327 (E.D.N.Y. 1981).  It is with this background in mind that the Court begins its analysis.

As noted above, there is scant authority interpreting Chinese Company Law. Furthermore, this Court has already established that Chinese law is not materially different than the law of the forum states on the question of imputing contacts for personal jurisdiction. Thus, the bulk of the Court's analysis will focus on the alter ego and agency law of the forum states as it applies to the contextual facts of the present case.

Nevertheless, the Court cannot ignore the external influence of social and cultural factors in its analysis. In evaluating whether to impute the jurisdictional contacts of a subsidiary corporation to its parent, Chinese law considers whether the subsidiary's business transactions were under the complete control of its shareholders. In the United States, this would be determined by ascertaining who had the most shares. As discussed above, in China, the answer is revealed by an analysis of the evidence of control—including both formal and informal relationships, explicit corporate power structure, as well as more subtle means of influence. The evidence in this case demonstrates BNBM controlled Taishan. It determined how Taishan would grow, controlled its capital expenditures, and dictated how Taishan would manufacture drywall. The two entities shared directors and officers. BNBM has admitted it controlled the daily operation and important activities of Taishan. *See* 10/16/2007 BNBM Special Inspection Report on the "Management and Control of its Branches and Subsidiaries." Government representatives employed by CNBM Group were able to manage and control BNBM and its subsidiary Taishan. *See generally*, Wen, *supra*, at 335. As the outcome of the analysis for imputing jurisdictional contacts under Chinese law is not different than that of the forum states, the Court will use the law of Florida, Virginia, and Louisiana to determine whether the Court's personal jurisdiction over Taishan should be imputed to other entities within the CNBM Group corporate family. *See Chinese Drywall*, 742 F.3d 576, 753 F.3d 521.

### 2.     Analysis Under Florida Law

Unlike Texas, where either fraud or the existence of a shell corporation is sufficient to pierce the corporate veil, Florida law requires Plaintiff to demonstrate "*both* that the corporation is a 'mere instrumentality' or alter ego of the defendant, *and* that the defendant engaged in 'improper conduct' in the formation or use of the corporation."  *Compare Stuart v. Spademan,* 772 F.2d 1185, 1198 n.2 (5th Cir. 1985), *with WH Smith, PLC v. Benages & Associates, Inc.*, 51 So. 3d 577, 581 (Fla. Dist. Ct. App. 2010).

Here, Plaintiffs have not demonstrated that Taishan's separate existence was maintained for an illegal or improper purpose.  *See McFadden Ford, Inc. v. Mancuso ex rel. Mancuso*, 766 So. 2d 241, 243 (Fla. Dist. Ct. App. 2000).  Without proof of fraud or abuse, Florida law does not support a finding of alter ego liability.  *Id.*  Therefore, the Court finds that the evidence in this case does not demonstrate Taishan was the alter ego of any of the BNBM or CNBM entities under Florida law.

However, as this Court has previously noted, an agent's contacts with Florida can be imputed to its principal for jurisdictional purposes.  *Chinese Drywall*, 894 F. Supp. 2d at 868.  To determine if Taishan was an agent of any or all of its parent companies such that jurisdiction can be imputed to the BNBM or CNBM entities, the Court must determine if parent corporations controlled Taishan's internal business operations and affairs.  *See Brownsberger v. Gexa Energy, LP,* 2011 WL 197464, at *3 (S.D. Fla. Jan. 20, 2011).

As discussed in detail below, the Court finds that BNBM exercised a degree of control over Taishan such that Taishan was in fact an agent of BNBM.  Therefore, Taishan's contacts with the forum state can be imputed to BNBM for jurisdictional purposes.  Plaintiffs argue that BNBM Group and CNBM should also be treated as agents of Taishan for the purposes of

determining jurisdiction. However, CNBM and BNBM Group did not have the same relationship with Taishan as BNBM. CNBM and BNBM Group did not have the "high and very significant" level of control necessary to create an agency relationship. *See Enic, PLC v. F.F. S. & Co., Inc.,* 870 So. 2d 888, 891 (Fla. Dist. Ct. App. 2004).

For example, Taishan was not required to seek approval from CNBM or BNBM Group before making capital investments. Neither CNBM nor BNBM Group had the right to appoint directors to the Taishan Board. Neither entity shared property with Taishan, or dictated how Taishan manufactured drywall. While these entities had the ability to influence and exert some level of control over Taishan by virtue of their ownership in BNBM, the evidence does not demonstrate either CNBM or BNBM Group controlled Taishan's "internal business operations and affairs." *See Brownsberger v. Gexa Energy, LP,* No. 10-81021, 2011 WL 197464, at *3 (S.D. Fla. Jan. 20, 2011). Therefore, Taishan's jurisdictional contacts cannot be imputed to CNBM or BNBM Group under Florida law.

However, based on the extensive jurisdictional discovery in this case, the Court finds that BNBM exerted such dominion and control over Taishan that Taishan's contacts with Florida can be imputed to BNBM for jurisdictional purposes. The following facts are conclusive of an agency relationship between Taishan and BNBM:

### i.  Taishan and BNBM share Directors, Officers, and Executives

As Song Zhiping, the Chairman of CNBM Group explained, "Although a limited company, Taishan is not independent." *See* 2/26/2014 Meeting Minutes of the Seminar on Deepening Reform, CNBM Group Board of Directors [MTD Ex. 10]. Taishan and other subsidiaries within the CNBM Corporate family are controlled by Board Members who are not only appointed, but also controlled by CNBM Group. When BNBM acquired Taishan—at

CNBM Group's direction—BNBM was guaranteed the right to appoint a majority of Taishan's Board Members, giving it direct control over Taishan's corporate strategy. *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors [MTD Ex. 52]. CNBM Group, through BNBM, also protected its ability to control Taishan's financial and strategic decisions.

For example, BNBM board members must comply with directives from the CNBM Group on such matters as how to report to the parent corporation, how to seek approval from CNBM Group, and how to vote at Taishan's Board Meetings. *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors [MTD Ex. 52]. Through this hierarchy, CNBM Group can ensure BNBM is "[c]arefully implementing and executing the Group Corporation's development strategy, scheme, and plan, giv[ing] an expression of the Group Corporation's minds and requirements, faithfully protecting the lawful rights and interests of the Group Corporation." *Id.* By appointing and controlling Board Members of BNBM and Taishan, CNBM Group is able to control BNBM, who in turn controls Taishan.[23]

Furthermore, directors and officers frequently sit on the boards of multiple entities within the CNBM Group conglomerate. For example, Wang Bing has served as the Chairman of BNBM and the Vice President of CNBM since 2009, and a Director at Taishan from 2005 to the present. Cao Jianglin has been the Director of CNBM Group, Chairman of BNBM Group's Supervisory Committee, and the President and Executive Director of CNBM since 2005, the Chairman of BNBM's Supervisory Committee since 2009, and from 2005-2011, was the

---

[23] As this Court previously held, CNBM Group is an agent or instrumentality of a foreign state, and was therefore dismissed from this litigation pursuant to the Foreign Sovereign Immunities Act. 28 U.S.C. § 1603(b). Nonetheless, evaluating CNBM Group's role in the overall corporate group provides valuable context for this analysis.

Supervisor and Chairman of the Supervisory Committee of Taishan. Jia Tongchun has been the

Chairman and General Manager of Taishan since 2002, while also employed as the Deputy

General Manager of BNBM from 2005-2012, and a Director of BNBM from 2008-2012. *See*

Summary Chart of Overlapping Executives and Officers at p. 3 & Ex. 10. While Defendants

argue this is nothing more than the typical oversight a parent would exercise over its subsidiary

corporation, the Court finds this system of overlapping board membership provides a mechanism

of control which exceeds the typical parent subsidiary relationship.

Defendants acknowledge the control they obtained as a result of their Board positions.

BNBM has indicated its ability to appoint Taishan's directors enables BNBM to "influence

[Taishan's] production and operation decision-making." *See* 4/23/2007 BNBM Reply on the

Inquiry Letter about 2006 Annual Report Verification. CNBM Group has also explained the

ability to appoint BNBM Board Members allows it to "regulat[e] the corporate governance

structure and manag[e] the representatives" of its subsidiaries, including Taishan. *See* China

National Building Material Group Corporation Administrative Measures for Appointing

Representatives of Capital Contributors. BNBM has a majority on Taishan's Board of Directors,

but it also exerts more informal control as Taishan's corporate parent. The culture of deference

to corporate hierarchy makes it implausible that Taishan would act independently of BNBM's

instructions. BNBM acquired Taishan in order to "maintain control" of the corporation's long-

term, strategic decisions and day to day operations. Thus, the Court finds that by controlling

Taishan's Board of Directors, BNBM was able to exert the "high and very significant" level of

control required to fuse Taishan and BNBM for jurisdictional purposes. *Enic, PLC v. F.F. S. &

Co., Inc.*, 870 So. 2d 888, 891 (Fla. Dist. Ct. App. 2004).

ii. **BNBM controls Taishan's financial and strategic business decisions**

In addition to the control and oversight BNBM exerts over Taishan vis-à-vis subsidiary Board Members, BNBM also controls Taishan's long-term strategic decisions. For example, Taishan can only obtain loans that are guaranteed by BNBM, and BNBM must approve any substantial capital expenditures. *See* 4/15/2006 Taishan Board of Director Resolution (requiring BNBM to approve drywall production specifications). Such approval is required for specific elements of the manufacturing process, such as the capacity of new factories, the type of drywall Taishan wishes to manufacture, and where the product will be marketed and sold. If BNBM does not approve it, Taishan cannot manufacture, sell, or distribute it. This provides BNBM a high level of control and oversight over Taishan's business strategy that goes beyond the standard parent subsidiary relationship. *Enic, PLC,* 870 So. 2d at 891. However, BNBM does not act alone in this supervision. Before BNBM can provide a guarantee to Taishan, CNBM Group must approve the decision. This allows CNBM Group to control Taishan's finances through BNBM. CNBM Group also must approve Taishan's decisions to:

> "change[] its general manager, chief financial officer, or chief accountant . . . any decisions on significant investments and directions of operation . . . investment increase plan, profit (income) distribution plan, or bond issuance . . . provide[] guarantees to any other entities . . . Any other matters that may affect the capital contributor's rights and interests."

*See* 4/15/2006 Taishan Board of Director Resolutions. By requiring approval on major decisions regarding its subsidiaries' financing, investment, and strategic growth, CNBM Group is able to ensure "all subsidiaries [] strictly adhere to the Group Corporation's determined strategy on business activities, to ensure the realization of the Group Corporation's strategic goals." *See* China National Building Material Group Corporation Sample Document. Thus, BNBM has both direct and indirect control over Taishan's business decisions—often as directed by CNBM Group.

### iii.   BNBM exerts control over Taishan's day to day operations

From the time BNBM acquired a majority interest in Taishan, BNBM and CNBM Group have acknowledged that the acquisition was completed in order to better control the "daily operation and important activities of the branches and subsidiaries" in the CNBM Group.  *See* 10/16/2007 BNBM Special Inspection Report on the "Management and Control of its Branches and Subsidiaries."  For example, BNBM directs Taishan's production requirements.  BNBM issues mandatory safety codes for gypsum production within CNBM Group.  *See* Technical Code for Safety of Gypsum Plasterboard Enterprises: Instructions for Preparation.  BNBM is then able to monitor Taishan's compliance by virtue of the Board Members it is entitled to appoint to Taishan's Board of Directors.  BNBM has explained that these directors "are the majority . . . and can influence [Taishan's] production and operation decision-making."  *See* 4/23/2007 BNBM Reply on the Inquiry Letter about 2006 Annual Report Verification.

Furthermore, BNBM had the power through the directors it appointed to Taishan's Board and mandatory approval of Taishan's financial investments to control the capacity of Taishan drywall factories, the manufacturing process, the type of gypsum manufactured, and where Taishan would market and sell its gypsum.  *See* 4/15/2006 Taishan Board of Director Resolutions – requiring shareholder [BNBM] approval of gypsum board factory construction projects.  As part of this process, Taishan was required to submit its annual production and operation plans to BNBM for approval.  This level of control and oversight demonstrates that BNBM was involved in Taishan's day to day operations—and, importantly, the decisions regarding drywall production, manufacturing, sales, and distribution, which are directly germane to this lawsuit.

Additionally, BNBM had authority to assign and manage Taishan's directors, supervisors, and management personnel. *See* 10/16/2007 BNBM Special Inspection Report. This oversight allowed CNBM Group, through BNBM, to "ensure effective control of its branches and subsidiaries," including Taishan. *See* 10/16/2007 BNBM Special Inspection Report. CNBM Group and BNBM also controlled Taishan's human resources and were responsible for hiring and conpensation, including "selecting, appointing (recommending), adjusting, evaluating, giving rewards and penalties to the representatives of capital contributors." *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors. This included employee training and performance evaluations. *See* 5/28/2014 Beijing New Building Materials (Group) Company Limited Internal Control System Construction Work Summary; s*ee* 6/29/2011 Email and attachment to JIA Tongchun re: Notice on Matters Relevant to CNBM Group's Training Class in 2011 for Leaders at Middle and Senior Levels.

These facts describe a corporate culture by which Taishan's strategic and daily business decisions were monitored and approved by BNBM. If Taishan failed to comply with the directives of its parent corporation, CNBM Group would outline the necessary corrective action and BNBM would use its control of Taishan's Board of Directors to ensure compliance. Many of Taishan's top executives were also employed by BNBM or CNBM Group. Taishan employees were hired, managed, trained, and reviewed by CNBM Group. The parent corporations set standards for drywall safety and production. Further, CNBM Group is a state-owned entity organized under the law of the People's Republic of China. It is directly and wholly owned by the state. As scholars have noted, despite China's recent shift toward a market-

based economy, Chinese corporate law is still influence by its socio-economic tradition.[24]  State-appointed representatives dominated BNBM and Taishan's Boards of Directors.  Not only did BNBM have the formal power and relationships to control Taishan, but the cultural atmosphere also indicates BNBM could have exerted this influence even without these formal structures.

One notable example of this informal control occurred shortly before Taishan failed to appear for the Judgment Debtor Examination in this Court.  After receiving an update on the status of this litigation, CNBM Group instructed its subsidiaries "to avoid depositing funds in banks that have branches in the State of New York, United States," and ordered its overseas employees to "carry out business activities only in the name of their own legal person unit," use "special email accounts" to communicate regarding overseas projects, and that "business personnel use their own [personal] emails."  *See* 7/11/2014 Statement on Implementing the Requirements from the Group Corporation's Meeting of International Business Risk Prevention.  These instructions were not the result of a formal Board resolution, nor were they issued after consulting with the leadership of each individual corporation.  Instead, they were a top-down initiative, and it was assumed all subsidiaries would immediately comply.  Instructions of this detail—including what email accounts employees must use to conduct business—reveal that parent corporations within the CNBM family had the power to control even the minute details of a subsidiary's daily operations even without owning a majority of its shares.

### iv.   BNBM occasionally held themselves out as the same entity as Taishan

Publicly, entities within the CNBM Group advertised the interrelatedness of their corporate group, and sought to benefit from one another's reputations.  When BNBM increased

---

[24] The "historical heritage of Confucianism demands collectivism and hierarchical obedience," which can result in paternalistic attitudes and authoritarian control within Chinese corporations. Ma & Marquis, *supra* at 18–19; Wen, *supra*, at 337. *See* Section IV.D.1.

its formal ownership in Taishan, BNBM explained the acquisition would "enable CNBM Group to further enhance its competitiveness and consolidate its leading position in the PRC gypsum board market." *See* 8/28/2006 Connected Transaction Announcement; *see also* 3/23/2007 "General Manager Bing Wang's work report at the 3rd meeting of the 5th session of BNBM staff representative meeting." In marketing materials to potential customers, BNBM combined its drywall production data with Taishan's to demonstrate the global strength of their drywall brand. *See* 2008 BNBM Annual Report at 30. Similarly, CNBM Group publicly boasted of its position as the "Largest gypsum board producer in the world." *See* 2014 CNBM Group's Social Responsibility Report at 6. This advertising was based on the combined production of BNBM and Taishan.

Further, the CNBM, BNBM and Taishan entities all share a common logo and many of the entities refer to one another in their names. *See* ZHOU Dep. at 291:16-292:5, *see* 11/2/2010 Email and attachment from PENG Wenlong to Manager XU (revising Taishan Gypsum's logo to read, "China National Building Material Group Taishan Gypsum Company."). Finally, during various periods since 2005, these entities have shared office space, and used each other's offices for shareholder meetings. *See* 2005 BNBM Group Auditor's Report at 6; *see also* 2005 CNBM Annual Report at 4; 2005 BNBM Annual Report at 3; 6/12/2010 Taishan Gypsum Co., Ltd., Resolution of the Fifth Extraordinary General Meeting in 2010; 8/11/2011 Taishan Gypsum Co., Ltd., Resolutions of the 2010 General Meeting of Shareholders.

### v. Commingling and Shared Property

Finally, there is some evidence which suggests at least occasional commingling occurred between the companies. In 2008, CNBM Group transferred 40,000,000 RMB from CNBM Group to Taishan, and from Taishan to BNBM. This transaction was not explicitly accounted

for. *See* 7/7/2008 BNBM "Report on the Improvement and Solution of Relevant Issues Raised in the [June 2008] Site Inspection of Beijing Securities Regulatory Bureau [MTD Ex. 134]. Defendants argue this only demonstrates they made a mathematical mistake, while Plaintiffs contend it is evidence of an alter ego relationship. While this factor alone may not lead to a conclusion that these companies were alter egos, it is evidence that, at the very least, BNBM had the ability to abuse the corporate form with respect to internal transfers of funds between BNBM and Taishan. In another example, during Taishan's Fourth Interim Meeting of the Shareholders' general committee, which took place in BNBM's conference room, BNBM approved Taishan's decision to investment in its gypsum production line. This was a 10 million Yuan project, 80% of which was paid by Taishan, and 20% paid by BNBM. *See* 6/26/2005 Fourth Interim Meeting of the Shareholders' [MTD Ex. 68]. In this transaction, BNBM's investment was not limited to guaranteeing Taishan's loans, but directly providing capital for its new business venture, which included joint ownership of property.

Based on the foregoing, the Court finds that BNBM had a degree of control over Taishan such that Taishan was an agent of BNBM under Florida law. *See State v. Am. Tobacco Co.,* 707 So. 2d 851, 854 (Fla. Dist. Ct. App. 1998). As discussed above, the touchstone of an agency relationship under Florida law is control. BNBM controlled Taishan's long-term strategic business decisions, and decisions regarding Taishan's financial investment and growth. This control extended to Taishan's day to day operations, as BNBM had the ability to control the Taishan Board of Directors, appoint executives, and train and evaluate employees. *See Brownsberger v. Gexa Energy, LP,* No. 10-81021, 2011 WL 197464, at *3 (S.D. Fla. Jan. 20, 2011). Importantly, BNBM controlled Taishan's production, by specifying the capacity of its factories, the processes for manufacturing gypsum, and even dictating where drywall could be

sold. *See Ugalde v. Dyncorp, Inc.,* No. 98 Civ. 5459, 2000 WL 217502, at *3 (S.D.N.Y. Feb. 23, 2000) (finding subsidiaries were mere departments of parent when parent imposed standard operating procedures on subsidiaries). These external indicators, in light of the hierarchal obedience prevalent in Chinese corporations, demonstrate that BNBM had a "high and very significant" level of control over Taishan. *Enic, PLC v. F.F. S. & Co., Inc.,* 870 So. 2d 888, 891 (Fla. Dist. Ct. App. 2004); *see* Stoltenberg, *supra*, at 719.

It is true that BNBM did not act alone. Instead, BNBM's control over Taishan was dictated by CNBM Group, which used its ability to appoint directors and officers to control BNBM's decisions. But unlike BNBM, CNBM Group is wholly-owned by the Republic of China. A strict analysis of the Foreign Sovereign Immunities Act ("FSIA") required their dismissal. BNBM, however, is publicly owned and not entitled to claim immunity under FSIA. Based on the overwhelming evidence of the actual control of all significant aspects of Taishan's operations by BNBM, afforded to it by both formal and informal means, the Court concludes that the Plaintiffs have demonstrated that Taishan was an agent of BNBM such that the Court's jurisdiction over Taishan is imputed to BNBM.

### 3.     Analysis Under Virginia Law

Like Florida, Virginia law requires a finding that the corporation was used "to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage" to support an alter ego relationship. *C.F. Trust, Inc. v. First Flight L.P.*, 580 S.E. 2d 806, 809–10 (2003). As discussed in Section IV.D.3, the evidence does not demonstrate Taishan was created or used for a fraudulent purpose. Without proof of such fraud or abuse, Virginia law does not support a finding of alter ego liability. *Id.*; *see also Greenberg v. Com. ex rel. Atty. Gen. of Virginia*, 499 S.E. 2d 266, 272 (1998) (explaining that piercing the corporate veil

through the an alter ego theory is only justified in rare circumstances, where the "separateness would work an injustice."). However, Virginia law treats two corporations as one for jurisdictional purposes when the subsidiary corporation is an agent of the parent. *PBM Products v. Mead Johnson Nutrition Co.*, No. 3:09-CV-269, 2009 WL 3175665, at *3-4 (E.D. Va. Sept. 29, 2009).

Under Virginia law, "the determining factor when evaluating whether an agency relationship exists is the principal's **power** of control." *First Am. Title Ins. Co. v. First All. Title, Inc.*, 718 F. Supp. 2d 669, 678–79 (E.D. Va. 2010), *aff'd on other grounds sub nom. First Am. Title Ins. Co. v. W. Sur. Co.*, 491 F. App'x 371 (4th Cir. 2012) (emphasis added). Nevertheless, the Court need not find actual control, as "it is the right to control which is determinative" under Virginia Law. *Whitfield v. Whittaker Mem'l Hosp.,* 169 S.E. 2d 563 (1969); *see also Butterworth v. Integrated Resources Equity Corp.,* 680 F.Supp. 784, 789 (E.D. Va. 1988) ("The question is not whether the party exercises control over the agent, but whether he has it."). The facts demonstrate that BNBM had control over Taishan and exercised this control such that Taishan was an agent of BNBM under Virginia law.

However, the Court finds that CNBM and BNBM Group did not have sufficient control over Taishan to support an agency relationship between Taishan and either of these entities. *See Whitfield v. Whittaker Mem'l Hosp.*, 169 S.E. 2d 563 (1969); *see also Butterworth v. Integrated Resources Equity Corp.*, 680 F.Supp. 784, 789 (E.D.Va.1988) ("The question is not whether the party exercises control over the agent, but whether he has it."). The Court's findings on the relationship between Taishan and BNBM Group and CNBM are equally applicable under Virginia law. *See* section IV.D.3. Therefore, Taishan's jurisdictional contacts cannot be imputed to either BNBM Group or CNBM under Virginia law.

However, based on the extensive jurisdictional discovery in this case, the Court finds that BNBM exerted such dominion and control over Taishan that Taishan's contacts with Virginia can be imputed to BNBM for jurisdictional purposes. The following facts are conclusive of an agency relationship between Taishan and BNBM under Virginia law:

First, BNBM exerts control over Taishan's Board of Directors. BNBM's appoints a majority of Taishan's Board Members. *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors [MTD Ex. 52]. As a result, three of the five seats on the Taishan Board are directly controlled by BNBM. Viewing these facts in the overall context of the relationships between these entities, the remaining two Board Members are not entirely independent. As discussed previously, Chinese corporations operate according to principles of extreme deference to authority and respect for their parent corporations. Based on the control BNBM had over so many facets of Taishan's business, it is improbable any Taishan director would have voted contrary to the positions of the BNBM-appointed Directors—particularly when CNBM Group was directing the votes of the BNBM-appointees.[25]

BNBM also exercised control over Taishan's executive team, as multiple Taishan directors were also employed by BNBM. For example, Jia Tongchun has been the Chairman and General Manager of Taishan since 2002, while also employed as the Deputy General Manager of BNBM from 2005-2012, and a Director of BNBM from 2008-2012. *See* Summary Chart of

---

[25] CNBM Group did not just appoint the board members of its subsidiaries. It dictated how subsidiaries should report matters to the parent corporation, how to seek CNBM Group's approval on important decisions, and even how to vote at Board Meetings—including Board meetings where BNBM was approving Taishan's decisions. See China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors [MTD Ex. 52]. In turn, BNBM had authority, with CNBM Group's oversight, to appoint three of the five directors on the Taishan Board. With the power to control Board Member's votes, CNBM Group had control over Taishan's important business and financial decisions. See Butterworth v. Integrated Resources Equity Corp., 680 F.Supp. 784, 789 (E.D. Va. 1988).

Overlapping Executives and Officers at p. 3 & Ex. 10.  With overlapping directors and employees BNBM had the ability to control Taishan's strategic financial and business decisions, which satisfies the requirements for an agency relationship under Virginia law.  *Whitfield v. Whittaker Mem'l Hosp.,* 169 S.E. 2d 563 (1969).  Additionally, as discussed above, Taishan executive employees were hired, trained, and evaluated by BNBM and CNBM Group.  *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors.  In light of the Chinese cultural heritage which influenced these business relationships, it is improbable that employees who were hired and trained by Taishan's corporate parents would act counter to the parents' recommendations.  *See* Lewis, *supra*, at 81 (arguing China's cultural traditions manifests in corporations by way of "top-down obligations, bottom-up loyalty, obedience and blind faith.").

Beyond board members and executives, BNBM had the formal power to approve or deny Taishan's business decisions and financial investments.  For example, only BNBM was allowed to guarantee Taishan's loans.[26]  *See* 4/15/2006 Taishan Board of Director Resolution (requiring BNBM to approve drywall production specifications).  Before Taishan could build a factory, it needed approval from both BNBM and CNBM Group.  *See* 4/15/2006 Taishan Board of Director Resolutions.  These limitations effectively prevented Taishan from making independent decisions regarding how to grow and expand its international drywall business, demonstrating BNBM's control.  *Copiers Typewriters Calculators, Inc. v. Toshiba Corp.*, 576 F. Supp. 312 (D. Md. 1983) (asserting that jurisdiction over a foreign parent is appropriate where the parent must approve significant decisions of the domestic subsidiary).

---

[26] These guarantees were subject to CNBM Group approval.

To further regulate Taishan's drywall business, BNBM specified the manufacturing capacity and processes Taishan would use in new factories and determined where the product could be marketed and sold. This level of regulation and oversight goes beyond a typical parent-subsidiary relationship, and demonstrates that BNBM had the ability to exert a high level of control over Taishan, such that Taishan was an agent of BNBM. *See, e.g., Dorfman v. Marriott Int'l Hotels, Inc.*, No. 99 CIV 10496 (CSH), 2002 WL 14363, at *7 (S.D.N.Y. Jan. 3, 2002) (finding an agency relationship when "[t]he evidence construed in the light most favorable to plaintiff shows that Otis Elevator supervises the activities of Otis Felvonó not as a stockholder watching over its investment but as the headquarters of a worldwide business making sure that its products and services meet uniform company standards."); *In re Polyester Staple Antitrust Litigation*, 2008 WL 906331 (W.D.N.C. 2008) (nature of decisions made by subsidiary provide evidence of symbiotic relationship between subsidiary and parent company sufficient to find personal jurisdiction over nonresident parent company).

Finally, these entities publicized these individual corporations as one corporate group. CNBM Group, BNBM and Taishan used similar logos, and BNBM combined its production capability with Taishan's in marketing materials. *See* 2014 CNBM Group's Social Responsibility Report at 6. By presenting themselves as one, multi-national corporation, they sought to benefit from the size and resources of this conglomerate. Despite taking full advantage of these benefits, BNBM now seeks to separate itself from Taishan to protect its assets—assets which are due in part to Taishan's profits. Such a separation is not supported in fact or law. *See Pepsi-Cola Bottling Co. of Ft. Lauderdale-Palm Beach v. Buffalo Rock Co.*, 593 F. Supp. 1559, 1565 (N.D. Ala. 1984) ("Nor can a foreign corporation escape the jurisdiction of a state simply because the business activities conducted there, though clearly contemplated by the corporate

defendant and redounding to its financial benefit, were conducted through "intermediaries" of one kind or another.").

Under Virginia law, when a parent corporation exerts high levels of control over its subsidiaries such that an agency relationship exists, the personal jurisdiction of the agent is imputed to the parent. Here, Plaintiffs have demonstrated by a preponderance of the evidence that BNBM controlled Taishan, creating an agency relationship. As such, the Court has jurisdiction over BNBM under Virginia law. *First Am. Title Ins. Co. v. First All. Title, Inc.*, 718 F. Supp. 2d 669, 678–79 (E.D. Va. 2010), *aff'd on other grounds sub nom. First Am. Title Ins. Co. v. W. Sur. Co.*, 491 F. App'x 371 (4th Cir. 2012) (citing *Va. Employment Comm'n v. A.I.M. Corp.,* 302 S.E. 2d 534 (1983)).

### 4.     Analysis Under Louisiana Law

Unlike Florida and Virginia, Louisiana utilizes the theory of "single business enterprise" when evaluating whether corporate entities are the same for purposes of jurisdiction. While the tests for alter ego liability and single-business enterprise vary slightly, the two theories are somewhat related. *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010) ("Under Louisiana law, the factors to be considered to determine whether one entity is an alter ego of another or whether two entities are a "single business enterprise" are similar.").

In *Hargrave v. Fibreboard Corp.,* the Fifth Circuit explained that when evaluating whether an alter ego relationship exists for the purposes of jurisdiction, the court should consider the following factors: (1) the amount of common stock owned by the corporate entities, (2) whether the entities share corporate headquarters, (3) whether the entities share common officers and directors, (4) whether the entities observe corporate formalities, (5) whether the entities share bank accounts, accounting and payroll systems, insurance contracts, budgets, financial

records, and tax returns, (6) whether the parent has authority over general policy decisions of the subsidiary, and (7) whether the parent has authority over the subsidiary's day-to-day business and operations decisions. 710 F.2d 1154 (5th Cir. 1983). Accordingly, to determine whether Taishan is an alter ego of any of its parent corporations, the Court will discuss each factor in turn, realizing that this concept is a legal theory created and nurtured by Western legal regimes. These facts may have to be informed by the evidence of the actual control exerted by the involved entities.

i.   *Amount of common stock*

Given the layered ownership interest in Taishan, it is necessary to analyze the shared ownership interest that exists between many of the entities within the CNBM Group. Since 2005, CNBM Group has been a controlling shareholder of BNBM Group by directly and/or indirectly holding 100% of BNBM Group's shares. *See* Zhao Dep. at 385:4-24 [MTD Ex. 5]. Until 2014, BNBM Group had a 27.5% ownership interest in CNBM. CNBM Group also owns a majority of CNBM, as after completion of the Global Offering in 2005, CNBM Group directly and indirectly held 60.34% of CNBM's total share capital, making CNBM Group the "controlling shareholder" of CNBM. From 2005 to 2010, CNBM held between 60.33% and 52.40% direct ownership interest in BNBM's shares; and, CNBM Group, by virtue of its direct and indirect ownership in CNBM, held between 41.16% and 23.11% indirect ownership interest in BNBM. Additionally, from 2005 through 2015, among the top ten shareholders of BNBM, CNBM has been the sole shareholder with a 5% or higher stake in BNBM. *See* 2005-2014 BNBM Annual Reports. From 2006 to 2016, BNBM owned a 65% equity interest in Taishan. *See* Yang Decl. ¶ 8 [BNBM Ex. 3]. In 2016, BNBM acquired complete ownership of Taishan. *See* Announcement of Beijing New Building Materials Public Limited Company Regarding

Approval for the Company's Issuance of Shares to Purchase Assets by The Review Committee on Merger, Acquisition and Restructuring of China Securities Regulatory Commission and Resumption of Trading of Company's Shares.

Unlike the entities in *Hargrave* who owned 100% of their subsidiary during the relevant time period, the parent companies here did not *all* own 100% of their subsidiaries. However, CNBM Group did own 100% of BNBM Group. Further, CNBM Group had a majority interest in CNBM, which in turn had a majority interest in BNBM during the relevant time period. BNBM owned a majority of Taishan, until it acquired 100% ownership in 2016. In *Hargrave*, the Court looked to stock ownership because it was indicative of who controlled the company's operations. In the United States, stock ownership typically equates with voting power. However, the evidence and context of this case demonstrates that stock ownership alone does not equate to independent voting power—particularly if that vote is controlled by another parent entity. *See, supra*, Section IV.C.

For example, CNBM Group does not own 100% of BNBM, but, according to the Stock Listing Rules of the Shenzhen Stock Exchange ("SZSE"), CNBM Group is BNBM's Actual Controller, which is defined as "any natural person, legal person or other organization that is **capable of dominating and actually dominating** the conducts of the Company by virtue of investment relationship, agreement or any other arrangement." *Id*. at Chapter XVIII, 18.1(6) (emphasis added). Based on this definition, CNBM Group controls BNBM. Similarly, CNBM Group is the "controlling shareholder" of CNBM, and after the Global Offering directly and indirectly owned 60.34% of CNBM. Thus, this factor also leans in favor of finding an alter ego relationship between CNBM and CNBM Group. Next, from 2005 to 2010, CNBM held between 60.33% and 52.40% direct ownership interest in BNBM's shares, giving it a majority share in the

company.  Finally, at the time of the relevant conduct, BNBM owned 65% of Tiashan's shares.

Thus, evaluating the entities stock ownership in light of the rules of the SZSE, this factor weighs

in favor of finding Taishan is an alter ego of BNBM, CNBM, and CNBM Group.

### ii.  Shared corporate headquarters

BNBM's headquarters and plants are in a different province than Taishan's.  *See* Wang

Tr. 151:16-19.  However, during various periods since 2005, these entities occasionally shared

office space, and have used each other's offices to conduct shareholder meetings.  *See* 2005

BNBM Group Auditor's Report at 6; *see also* 2005 CNBM Annual Report at 4; 2005 BNBM

Annual Report at 3; 6/12/2010 Taishan Gypsum Co., Ltd., Resolution of the Fifth Extraordinary

General Meeting in 2010; 8/11/2011 Taishan Gypsum Co., Ltd., Resolutions of the 2010 General

Meeting of Shareholders.  Furthermore, at least one CNBM officer, Wang Bing, who

simultaneously served as the Chairman of BNBM and the Vice President of CNBM, testified that

while he was employed at CNBM, his sole job duty was to ensure the profitability of BNBM—

and that he did not have an office at CNBM in connection with his employment there.  It appears

that the various entities may have occasionally shared office space by virtue of employees who

had dual roles at multiple corporate entities.  However, the facts do not demonstrate that these

entities always shared corporate headquarters.  Therefore, the factor is neutral in the court's

analysis.

### iii.  Common officers and directors

As discussed in full above, many directors and officers within the CNBM Group

simultaneously hold leadership and executive positions at multiple entities, including BNBM and

Taishan, within this larger corporate group.  *See infra* IV.2.i.  This factor strongly weighs in

favor of finding that Taishan is an alter ego of BNBM.

## iv. Corporate formalities

Taishan and its parent corporations maintain many of the formalities required to preserve the separate corporate form. When BNBM acquired Taishan, a professional third-party appraised Taishan and confirmed the purchase price, which demonstrates at least portions of the acquisition were conducted as an arm's length transaction. *See* 2005 Asset Appraisal Report [BNBM Ex. 8]. Taishan's shareholders and BNBM's Board of Directors voted on and approved the acquisition in compliance with each company's articles of association. Each entity within the CNBM Corporate family, with the exception of United Suntech, has regular board meetings. *See* LIU Dep. at 49:7-50:3 (The corporate designee is not aware of either a United Suntech shareholder meeting or board of director meeting since June 2010). The entities are not undercapitalized. They do not share bank accounts and there is not substantial evidence they have comingled funds. Thus, this factor weighs against a finding of alter ego identity.

## v. Common bank accounts, accounting, payroll, budgets, tax returns

There is no evidence to suggest these entities have common bank accounts, payroll, or tax records. BNBM's audit committee, which serves under BNBM's Board of Directors, conducts annual financial audits of Taishan, but the evidence indicates these audits are still conducted separately. *See* 11/28/2009 "Letter of Communication and Confirmation about the Audit Schedule for the 2009 Financial Statements." BNBM and Taishan shared the same external auditing firm between 2006 and 2010. However, BNBM and Taishan prepare separate audited financial statements, maintain separate books and records, file separate tax returns, and maintain separate bank accounts. *See* Chen Tr. at 596:3-11; 600:3-8 [BNBM Ex. 2]. Thus, this factor weighs against a finding of alter ego identity.

## vi. Parental authority over general policy decisions of subsidiary

As discussed above, CNBM Group exercises high-levels of control and authority over its subsidiaries. This authority is applied in a cascading manner, such that Taishan is controlled by BNBM, who is controlled by CNBM Group. This authority includes the power to control the financial decisions, capital expenditures, human resources, marketing, and manufacturing processes of the subsidiaries. *See infra* IV.C.2.ii-iii. This factor weighs in favor of finding an alter ego relationship between BNBM and Taishan.

*vii. Parental authority over daily business and operations decisions*

BNBM acknowledges that it acquired Taishan in order to manage and control the "daily operation and important activities of the branches and subsidiaries" within the CNBM Group corporate family. *See* 10/16/2007 BNBM Special Inspection Report on the "Management and Control of its Branches and Subsidiaries." In order to control Taishan's daily operations, BNBM dictates the protocols and standards for Taishan's drywall manufacturing process. *See infra* IV.C.2.ii-iii. BNBM has the capability to "influence [Taishan's] production and operation decision-making." *See* 4/23/2007 BNBM Reply on the Inquiry Letter about 2006 Annual Report Verification. CNBM Group controls the daily operations of its subsidiaries—including CNBM, BNBM, and Taishan—by hiring, training, and evaluating employees, including providing performance evaluations. *See* 5/28/2014 Beijing New Building Materials (Group) Company Limited Internal Control System Construction Work Summary; *see* 6/29/2011 Email and attachment to JIA Tongchun re: Notice on Matters Relevant to CNBM Group's Training Class in 2011 for Leaders at Middle and Senior Levels.

As previously discussed, at one point CNBM Group instructed its subsidiaries conducting business in the United States to refrain from depositing funds in United States banks, only use their personal names in international business, and use personal emails when conducting

business overseas.  *See* 7/11/2014 Statement on Implementing the Requirements from the Group

Corporation's Meeting of International Business Risk Prevention.  The Court does not

necessarily view these instructions as proof of the parent corporation's authority over daily

business and operations, but considers them an example of the standard operating procedure for

companies within the CNBM Group corporate family.  A parent corporation without control over

its subsidiaries' business decisions would not be able to issue a directive dictating which email

addresses and even the *names* its employees were to use when conducting business, unless it

already exerted significant control and influence over the day-to-day operations of the

subsidiary.  Thus, the evidence demonstrates that CNBM Group and BNBM had direct and

indirect control over Taishan's daily business and operations decisions.  This factor weighs in

favor of a finding of alter ego identity.

Applying the *Hargrave* factors to this case, only the first factor supports a finding that

Taishan is an alter ego of CNBM.  However, factors one, three, six and seven support a finding

that Taishan is an alter ego of BNBM.  Factors four and five weigh in favor of maintaining the

corporate separateness between these entities.  Factor two is neutral.  Thus, viewing "[a]ll the

relevant facts and circumstances surrounding the operations of the[se] parent[s] and

subsidiary[ies]" in the light more favorable to Plaintiffs, the Court concludes that Taishan is an

alter ego of BNBM under Louisiana law.  *Hargrave*, 710 F.2d at 1160.

Furthermore, Louisiana courts also recognize that liability may be imputed to related

entities within a "single business enterprise."  The test for a single-business enterprise, while

similar to the test for alter ego, provides additional factors the Court should consider in its

analysis.  To determine whether multiple corporate entities are a single business enterprise, the

Court should consider the following factors: (1) common ownership, (2) common directors and

officers, (3) common employees, (4) common offices (5) unified administrative control, (6) similar or supplementary business functions, (7) one corporation financing the other, (8) inadequate capitalization, (9) one corporation's creation of the other, (10) one corporation paying the salaries, expenses, or losses of the other corporation, (11) one corporation receiving no business other than that given to it by the affiliated corporation, (12) shared property, (13) noncompliance with corporate formalities, (14) services rendered by the employees of one corporation on behalf of another corporation, (15) centralized accounting, (16) undocumented transfer of funds between corporations, (17) unclear allocation of profits and losses between corporations, and (18) excessive fragmentation of a single enterprise into separate corporations. *See Green,* 577 So. 2d at 257-58; *accord Jackson*, 615 F.3d at 587.

As discussed above, the corporate entities within the CNBM Group had common ownership, directors, officers, and employees; factors one, two, and three strongly support a finding of a single business enterprise. Similarly, the Court has already addressed that while the entities do not share permanent offices, at least some officers use the office space of one corporation in their work for a related entity, and shareholders of one entity have used other entities' offices for their shareholder meetings; this factor is neutral.

The evidence demonstrates that these entities were all controlled—directly and indirectly—by CNBM Group. As the ultimate authority, or actual shareholder, over all the subsidiaries, CNBM Group appointed directors and officers, approved loan guarantees, directed its subsidiaries on how to vote, audited and gave recommendations for corrective action to its subsidiaries, and even specified the safety regulations and production standards for Taishan's drywall. *See* 4/15/2006 Taishan Board of Director Resolution. While CNBM Group is no

longer a party to this case, its control and dominance is still considered when evaluating whether it and its downstream publicly-owned corporate entities constitute a single-business enterprise.

Additionally, at least some of the entities within this corporate family shared property. For example, in 2005, Taishan and BNBM agreed, without negotiations, that Taishan will own 80% and BNBM will own 20% of the two new plasterboard factories and gypsum powder plant Taishan was building. *See* 6/26/2005 Resolution of the 4th Extraordinary General Meeting of Shareholders for the Year of 2005 of Shandong Taihe Dongxin Co., Ltd. (now Taishan Gypsum) [MTD Ex. 129] at 1-2. This factor favors the existence of a single business enterprise.

Many of the entities within the CNBM Group serve similar or supplementary business functions. CNBMIT is an import export company, which supplies building materials to the North American market. *See* CNBMIT webpage, "CNBMI USA" Tab, available at http://www.cnbmit.com/en/overseas/Detail.aspx?MenuID=050602 (last visited 2/22/2016). CNBM USA was established in 2006 in order to distribute CNBM products in the United States. *See* Papers Relating to Incorporation from the State of California, Secretary of State [MTD Ex. 168]; CNBM Group "Contact Us," USA Tab. Not only did it receive exclusive business from CNBM, but it rendered services on behalf of CNBM. Finally, there is some evidence that employees of one corporation render services on behalf of other corporations. *See infra* IV.C.2.i. While employed as a vice-president at CNBM, Wang Bing, the Chairman of BNBM explained that his sole job duty was to ensure the profitability of BNBM. Many other officers and directors served in such dual capacities, thereby performing services for a corporation other than the entity with which they were currently employed. *See infra* IV.C.2.i.

As to whether one corporation financed, or created the other corporation, factors seven and nine, there are some instances where this has occurred, but those instances seem to be the

exception rather than the rule. When BNBM acquired Taishan, it was an existing corporation, and the largest producer of gypsum board in China. *See* Deal Decl., Table 18 [BNBM Ex. 11]. However, BNBM has made annual guarantees on Taishan's behalf in order to ensure Taishan's continued financial success. While BNBM did not create Taishan, BNBM was formed by BNBM Group in 1997, in order to raise capital for its drywall business. After creating BNBM, BNBM Group stopped manufacturing drywall, and instead relied on the drywall manufactured by BNBM. These facts are insufficient to demonstrate these entities consistently financed one another and therefore these factors are neutral in the Court's analysis.

On the other hand, there are some factors which do not support the finding of a single business enterprise. Taishan and other entities within the CNBM Group conglomerate are apparently adequately capitalized. There is no evidence that one corporation pays the salaries or losses of the other corporations. Most of the entities comply with corporate formalities such as Board and shareholder meetings, even if many of the board members and shareholders have positions with multiple corporate entities. *See* Chen Decl. ¶ 11 [BNBM Ex. 67]. Taishan, CNBM Group, CNBM, BNBM Group, and BNBM use the same accounting firms and auditors, but these firms prepare separate reports for each entity. There is only evidence of one undocumented transfer of funds between the corporations. Finally, there is a clear allocation of profits and losses between corporations.

Applying the factors for a single-business enterprise to the facts of this case, the Court finds the evidence supports the existence of a single business enterprise under Louisiana law. These entities were led and controlled by CNBM Group, who ensured each of the entities under it were working to maximize the profits of CNBM Group. "When a corporation integrates their resources . . . to achieve a common business purpose, each business may be held liable for the

wrongful acts done in pursuit of that purpose." *Brown*, 996 So. 2d at 1267 n.2. Here, the entities within the CNBM Group corporate umbrella have integrated their resources to ensure their success as an international building materials company. Thus, each business within the larger corporate family—including BNBM, BNBM Group, and CNBM—may be held liable for the wrongful acts done in pursuit of that purpose. *Id.*

To borrow a metaphor from Judge Weinstein of the Eastern District of New York, CNBM Group and its subsidiaries "do maintain some independence about as much as the egg and vegetables in a western omelette. Just as, from a culinary point of view, we focus on the ultimate omelette and not its ingredients, so, too, from a jurisdictional standpoint, it is the integrated international operation of [CNBM Group] affecting activities in [the forum states] that is the primary focus of our concern." *Bulova Watch Co. v. K. Hattori & Co.*, 508 F. Supp. 1322, 1341 (E.D.N.Y. 1981); *see also* Blumberg, The Law of Corporate Groups, supra note 3, at § 3.06.1 (explaining that more courts are focusing on the "mutual dependence" between components of a corporate group in determining whether the actions of a subsidiary can be imputed to the parent for the purpose of jurisdiction).

CNBM Group controlled, directed, and monitored the activities of its subsidiaries. It provided approval for financing to build drywall factories, established manufacturing guidelines, and set production limits. CNBM Group, along with its subsidiaries clearly contemplated that Taishan drywall would end up in the forum states; and received the financial benefit from these sales. Under the Louisiana single-enterprise doctrine, the Court finds that Taishan, BNBM, BNBM Group, and CNBM constitute a single business enterprise. This single business enterprise is therefore considered one entity for the purposes of imputing personal jurisdiction under Louisiana law.

## V.  PERSONAL JURISDICTION OVER BNBM BY VIRTUE OF ITS CONTACTS IN FLORIDA

Assuming, arguendo, that BNBM and Taishan do not have an agency relationship,

(which the overwhelming evidence supports existed) the Court may still have jurisdiction over

BNBM by virtue of the business it conducted in Florida.

### A.  Personal Jurisdiction Over a Foreign Defendant

It is axiomatic under Fifth Circuit law that a federal district court sitting in diversity may

exercise personal jurisdiction over a foreign defendant if: (1) the long-arm statute of the forum

state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction

is consistent with the Due Process Clause of the United States Constitution.  *Clemens v.*

*McNamee,* 615 F.3d 374, 377 (5th Cir. 2010) (citing *Latshaw v. Johnston,* 167 F.3d 208, 211

(5th Cir. 1999)); *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266, 270 (5th Cir. 2006)

(citing *Mink v. AAAA Dev. LLC,* 190 F.3d 333, 335 (5th Cir. 1999)); *Paz v. Brush Engineered*

*Materials, Inc.,* 445 F.3d 809, 812 (5th Cir. 2006) (quoting *Allred v. Moore & Peterson,* 117

F.3d 278 (5th Cir. 1997)); *Ouazzani–Chahdi v. Greensboro News & Record, Inc.,* 200 Fed.

Appx. 289, 291 (5th Cir. 2006) (citing *Revell v. Lidov,* 317 F.3d 467, 469 (5th Cir. 2002));

*Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 418 (5th Cir. 1993).  The Court

now addresses each of these requirements in turn.

### B.  Florida's Long-Arm Statute

The Florida long-arm statute provides in relevant part:

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent[10] does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing or any of the following acts:
(a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
(b) Committing a tortious act within this state.

—

(f) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at the time of the injury, either:

1. The defendant was engaged in solicitation or service activities within this state; or

2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

Fla. Stat. Ann. § 48.193. " 'Courts are required to strictly construe the long-arm statute.' " *Caiazzo v. Am. Royal Arts Corp.,* 73 So. 3d 245, 256 (Fla. 4 Dist. App. Ct. 2011) (quoting *Seabra v. Int'l Specialty Imps., Inc.,* 869 So. 2d 732, 733 (Fla. 4 Dist. App. Ct. 2004)). "As used in [subsection (1) of] the long arm statute, 'the term 'arising from' is broad; it does not mean 'proximately caused by,' but only requires a direct affiliation, nexus, or substantial connection to exist between the basis for the cause of action and the business activity.' " *Golant v. German Shepherd Dog Club of Am., Inc.,* 26 So. 3d 60, 62 (Fla. 4 Dist. Ct. App. 2010) (quoting *Citicorp Ins. Brokers (Marine), Ltd. v. Charman,* 635 So. 2d 79, 82 (Fla. 1 Dist. Ct. App. 1994)). The Court will now discuss the three provisions under the Florida Long–Arm Statute which are at issue in this litigation: subsections (a), (b), and (f).

### 1.        BNBM's Business in the state

Beginning in 1999, BNBM Group worked as BNBM's export agent to sell BNBM drywall to the United States. *See* ZHAO Dep. at 183:15-184:18. In 2000, the BNBM Entities registered BNBM of America, Inc. ("BNBM of America") in Florida, and bought equipment and leased warehouse space in relation to its business in the state. *See* Wood Nation Dep. at 20:22-21:2; 2000-2005 BNBM of America, Inc. Business Reports to Florida Secretary of State. From approximately 2001 through 2004, BNBM of America had approximately eight permanent employees, paid U.S. taxes, and sold over $1 million of BNBM drywall to United States customers. *See* Hannam Dep. at 33:23-37:7 [MTD Ex. 213]. Although BNBM of America was

winding-down its business in 2004, in 2005, and into 2006, it still maintained its mailing address and principal place of business in Tampa, Florida as well as its status as a Florida corporation. BNBM of America shut down its drywall sales "somewhere in between 2002 and 2003," and ceased its corporate existence in 2006. *Id.* at 75:8-14.

During this period, BNBM hosted representatives from two Florida drywall distributors, Davis Construction and EAC & Sons Corporation, at its manufacturing facilities in China. *See* Chaparro Dep. at 28:22-30:4 [MTD Ex. 216]; Davis Dep. [MTD Ex. 217]. To assist in arranging this trip, BNBM sent "invitation letters" to Stefan Davis of Davis Construction and Edgar Chaparro of EAC to ensure they were able to obtain travel visas. *See* Chaparro Dep. at 24:7-21, 29:3-30:4; Davis Dep. at 29:16-30:1. BNBM gave Davis and Chaparro tours of their factories, arranged meetings with Cai Kai, Manager of BNBM's Drywall Division, and Wang Bing, BNBM's General Manager—who expressed a clear interest in doing business in the United States. *See* Davis Dep. at 36:2-22. Chaparro visited China to meet with BNBM approximately 10-20 times. *See* Chaparro Dep. 29:3-21.

In order to establish its presence in the U.S. drywall market, BNBM manufactured its drywall to meet American Society for Testing and Materials ("ASTM") standards and to conform to U.S. drywall size specifications. *See* Chaparro Dep. at 93:19-23; Davis Dep. at 42:23-43:11. BNBM gave Davis and EAC a Material Safety Data Sheet ("MSDS") pursuant to standards prescribed by the U.S. Occupational Safety and Health Administration ("OSHA"). It received authorization that its drywall met U.S. standards—which in turn, led Davis and EAC to conduct business with BNBM in 2005. *See* Chaparro Dep. at 24:22-25, 25:1-11.

BNBM arranged to have its drywall shipped to Florida. On November 18, 2005, BNBM entered into an initial agreement with EAC for the sale of 200,000 boards of BNBM drywall to

be shipped CIF to the Port of Tampa in Florida.  *See* 11/18/05 Sales Contract [MTD Ex. 224].

The contract price for this drywall was $2,350,000.  *See* [MTD Ex. 224 at 2].  Similarly, on

November 16, 2005, BNBM agreed to sell and ship (CFR) 240,000 boards of BNBM drywall to

Wood Nation in Port Manatee, Florida.  *See* 1/6/06 BNBM Invoice to Wood Nation at 2 [MTD

Ex. 225].  The contract price for this drywall was $2,040,541.00.  *Id.*  Additionally, on June 5,

2006, BNBM shipped almost 300,000 sheets of drywall (at a price of $1,778,013.60) to the

Everglades port in Florida for Triorent Trading.  *See* BNBM "Statistical Spreadsheet of Gypsum

Boards" [MTD Ex. 143].

     Based on the foregoing, the Court finds that BNBM's business activities in Florida were

sufficient to satisfy subsection (a) of the Florida long-arm statute.  BNBM manufactured and

sold over 68 million square feet—more than $10,000,000—of its drywall to United States

customers.  [MTD Ex. 143].  In 2006, BNBM sold and exported at least eight shipments of

drywall to U.S. customers consisting of 1,435,238 sheets of drywall.  *Id.*  Of these BNBM

drywall sales, six of the shipments (constituting over 1,300,000 sheets of drywall and amounting

to more than $9,000,000.00) were exported to ports in Florida.[27]  *Id.*  BNBM established an

American subsidiary, BNBM America in Florida to help develop these sales.  BNBM solicited

representatives from Florida corporations, arranged for them to visit BNBM facilities in China,

and negotiated sales contracts.  BNBM ensured its drywall met U.S. standards, arranged for its

product to be shipped to Florida.  It undoubtedly knew its drywall would end up in Florida.

These contacts satisfy subsection (a) of the Florida long-arm statute.  *See Robert D. Harley Co.*

*v. Global Force (H.K.) Ltd.*, 2007 WL 196854, at *4 (S.D. Fla. Jan. 23, 2007) (finding personal

jurisdiction under subsection (a) of the Florida long-arm statute where defendant executed

---

[27] The other two shipments were exported to California.

agreement which contemplated business with a Florida subsidiary, this business resulted in $5–6 million per year for three years, defendant shipped its goods directly to Florida, and it attended a meeting in Florida.); *Sierra v. A Betterway Rent–A–Car, Inc.*, 863 So. 2d 358, 360 (Fla. 3 Dist. Ct. App. 2003) (finding personal jurisdiction over defendant who knew its products were used in Florida, did not discourage or prohibit the use of its products in Florida, advertised globally, and three accidents involving its products occurred in Florida.); *Gillins v. Trotwood Corp.*, 682 So. 2d 693, 693–94 (Fla. 5 Dist. Ct. App. 1996) (finding personal jurisdiction over foreign defendant in Florida who although was not authorized to do business or solicited business in the state and had no office, agent, or property in the State, specially-manufactured a machine outside of the state which it knew was destined to be used in Florida.); *McHugh v. Kenyon*, 547 So. 2d 318, 319 (Fla. 4 Dist. Ct. App. 1989) (finding personal jurisdiction over defendant who conducted no business in Florida, had no salesperson or distributors in the State, and no other ties to Florida, on the basis that the defendant produced hundreds of thousands of product units which were distributed over five years in the United States, with 6,000 marketed in Florida.); *compare Promex, LLC v. Perez Distrib. Fresno, Inc.*, 2010 WL 3452341, at *3–4 (S.D. Fla. Sept. 1, 2010) (finding no personal jurisdiction over defendant who sold products to two Florida customers, because no evidence that defendant sold its products on more occasions or of a series of acts involving these transactions, the latter of which may have conferred jurisdiction).

### 2.     Tortious Acts within the State

Pursuant to subsection (b) of the Florida long arm statute, "[a] court has specific jurisdiction over a defendant where [it] 'commits a tortious act within this state.' " *Reiss v. Ocean World, S.A.*, 11 So. 3d 404, 406 (Fla. 4 Dist. Ct. App. 2009).  "In order to commit a tortious act within this state, a defendant's physical presence in Florida is not required," *id.*

(citing *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002)), as subsection (b) also applies to "defendants committing tortious acts outside the state that cause injury in Florida." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1217 (11th Cir. 1999). "While a defendant's physical presence in the state is not required, it is not, however, enough that the actions of a defendant committed outside of Florida ultimately have consequences in Florida. Instead, [defendant's] actions must directly cause injury or damage within the state." *Blumberg v. Steve Weiss & Co., Inc.*, 922 So. 2d 361, 364 (Fla. 3 Dist. Ct. App. 2006) (citing *Korman v. Kent*, 821 So. 2d 408, 411 (Fla. 4 Dist. Ct. App. 2002)). "[T]he plaintiff must demonstrate that the non-resident defendant 'committed a substantial aspect of the alleged tort in Florida' . . . . such a showing is properly made by establishing that the activities in Florida 'were essential to the success of the tort.' " *Williams Elec. Co., Inc. v. Honeywell, Inc.*, 854 F.2d 389, 394 (11th Cir. 1988) (quoting *Watts v. Haun*, 393 So. 2d 54, 56 (Fla. Dist. Ct. App.1981)).

According to Stephan Davis, as of June 15, 2015, over 200,000 sheets of BNBM's defective drywall were being stored in a Davis Construction warehouse in Ocala, Florida. Sworn Statement of Stefan Davis dated 6/15/2015 ("Davis Sworn Statement") [MTD Ex. 229] at 4:16-5:23. BNBM argues that there is no evidence this drywall is defective, as Plaintiffs have not put forth any evidence that this particular drywall was tested. However, if the drywall was safe, it is unlikely that Davis would have continued to store it for more than a decade. Thus, the Court finds that this contradictory evidence, viewed in the light most favorable to the Plaintiff, is sufficient to satisfy subsection (b) of the Florida long arm statute. *See Schmitt-Doss v. Am. Regent, Inc.*, No. 12-0040, 2012 WL 6474038, at *2 (W.D. Va. Dec. 13, 2012) ("When the court addresses the question of personal jurisdiction on the basis of motion papers, legal memoranda,

allegations in the complaint, and jurisdictional discovery, the facts are viewed in the light most favorable to the plaintiff.").

### 3.     Causing Injury in the State

Pursuant to subsection (f) of Florida's long arm statute, an entity is subject to personal jurisdiction when it is:

> Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at the time of the injury, either: 1. The defendant was engaged in solicitation or service activities within this state; or 2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

Fla. Stat. Ann. § 48.193(f).  As this Court has previously held, economic injury is sufficient to satisfy section (f) of the Florida long-arm statute.  Further, Defendant admits that 69 claims identified "BNBM," "Dragon," or "Beijing," as the manufacturer of drywall found in their homes.  *See* R. Doc. 19646 at 22.  While Defendants are correct that this is only a small portion of the claims in Florida, it does indicate that BNBM drywall caused injury in the state.  Thus, at this stage in the proceeding, Plaintiffs have satisfied subsection (f) of Florida's long arm statute.

### C.     Due Process Clause

"The Due Process Clause 'operates to limit the power of a State to assert in personam jurisdiction over a nonresident defendant.' " *Ouazzani–Chahdi,* 200 Fed. Appx. at 291 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14 (1984)); *Asahi Metal Indus. Co., Ltd. v. Superior Court of Ca.,* 480 U.S. 102, 109 (1987); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980) (citing *Kulko v. Ca. Superior Court.,* 436 U.S. 84, 91 (1978)).  A court's exercise of personal jurisdiction over a foreign defendant is consistent with due process only when: (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state; and (2) the

exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945); *Paz,* 445 F.3d at 813 (quoting *Panda Brandywine Corp. v. Potomac Elec. Power Corp.,* 253 F.3d 865, 867 (5th Cir. 2001)); *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir. 2010) (citing *Revell v. Lidov,* 317 F.3d 467, 470 (5th Cir. 2002)); *Ouazzani–Chahdi,* 200 Fed. Appx. at 291 (quoting *Revell,* 317 F.3d at 470); *Ruston Gas Turbines, Inc.,* 9 F.3d at 418 (citing *Int'l Shoe Co.,* 326 U.S. at 316, 366). The limits of the Due Process Clause "have been substantially relaxed over the years . . . . largely attributable to a fundamental transformation in the American economy." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292–93 (1980) (internal citations omitted). The Court will now address the due process requirements in turn, beginning with minimum contacts.

### D.    Minimum Contacts

"The 'constitutional touchstone' of the inquiry to determine if personal jurisdiction can be exercised is whether the defendant 'purposefully established minimum contacts in the forum state.' " *Seiferth,* 472 F.3d at 271 (quoting *Asahi Metal Ind. Co. v. Super. Ct.,* 480 U.S. 102, 108–09 (1987)); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985) (citing *Int'l Shoe,* 326 U.S. at 316). There exist two types of minimum contacts: those that give rise to specific personal jurisdiction and those which give rise to general jurisdiction. *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir. 2010) (citing *Wilson v. Belin,* 20 F.3d 644, 647 (5th Cir. 1994)); *Seiferth,* 472 F.3d at 271; *Revell v. Lidov,* 317 F.3d 467, 470 (5th Cir. 2002); *Ruston Gas Turbines, Inc.,* 9 F.3d at 418. Only specific personal jurisdiction is alleged by plaintiffs. *See* (R. Doc. 14209, p. 7). Specific jurisdiction exists when " 'the defendant has "purposefully directed" his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities.' " *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir. 2010) (quoting *Burger*

*King v. Rudzewicz,* 471 U.S. 462, 472 (1985)); *Seiferth,* 472 F.3d at 271 (quoting *Nuovo*

*Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir. 2002)).  The Court now

addresses the applicable law for specific personal jurisdiction.

### 1.　　　Specific Jurisdiction

For specific personal jurisdiction to attach, "[t]he non-resident's purposefully directed

activities in the forum must be such that he could reasonably anticipate being haled into court in

the forum state." *Id.*  (quoting *Burger King,* 471 U.S. at 474).  Specific personal jurisdiction

requires a sufficient nexus between the non-resident's contacts with the forum and the cause of

action.  *Id.* at 378–79 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408,

414 n.8 (1984)).  A defendant who purposefully avails himself of the privilege of conducting

activities in the forum state invokes the benefits and protections of the forum's laws.  *Id.* at 379

(citing *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)).  "The 'purposeful availment' requirement

ensures that a defendant will not be hauled into a jurisdiction solely as a result of random,

fortuitous, or attenuated contacts."  *Id.*  (citing *Burger King,* 471 U.S. at 472).  The activities of a

defendant are not measured by quantity, but rather quality as "[a] single act by the defendant

directed at the forum state . . . can be enough to confer personal jurisdiction if that act gives rise

to the claim being asserted."  *Ruston Gas Turbines, Inc.,* 9 F.3d at 419.

Where a nonresident's contact with the forum state "stems from a product, sold or

manufactured by the foreign defendant, which has caused harm in the forum state, the court has

specific jurisdiction if it finds that the defendant delivered the product into the stream of

commerce with the expectation that it would be purchased or used by consumers in the forum

state." *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 380 (5th Cir. 2002). Under

this 'relatively expansive' theory, only 'mere foreseeability' that a defendant might be haled into

court because it purposely availed itself of the benefits of the forum state is required. *Id*. A defendant need not have 'purposely directed' its activities to the forum. *Jackson v. Tanfoglio Giuseppe, S.R.L.,* 615 F.3d 579, 585 (5th Cir. 2010). It is the law of the case that "the Court must reject the "stream-of-commerce-plus" approach to specific personal jurisdiction in favor of the less stringent "stream-of-commerce" approach." *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 849 (E.D. La. 2012), *aff'd,* 742 F.3d 576 (5th Cir. 2014), and *aff'd sub nom. In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014).

First, the Court will review BNBM PLC's ("BNBM's") contacts with Florida. In order to begin selling drywall in the U.S. market, BNBM established BNBM America in Florida, and registered that entity with the secretary of state. However, as BNBM America was winding down, BNBM began to negotiate directly with two Florida companies to arrange for future sales. Beginning in 2005, BNBM developed a relationship with two corporate representatives—Stefan Davis of Davis Construction and Edgar Chaparro of EAC & Sons Construction—in order to sell drywall to the U.S. This demonstrates that the parties had an extensive relationship, with the explicit goal of selling drywall to the forum states. *See Burger King*, 471 U.S. at 478–79 (considering parties' course of dealings in minimum contacts analysis). BNBM helped to arrange Davis and Chaparro's visit to China, arranged meetings with high level BNBM and CNBM executives, and gave them a tour of the BNBM factory. This also indicates the parties had the requisite contacts to satisfy specific jurisdiction. *See Asahi*, 480 U.S. at 103 (considering marketing tactics in minimum contacts analysis).

In October of 2005, BNBM obtained certification that its drywall met U.S. manufacturing standards, and included this certification on its marketing materials. BNBM modified the labels

on its drywall in order to reach a sales contract with these Florida companies. Such targeted marketing demonstrates BNBM purposely availed itself of the forum state. *See J. McIntyre*, 131 S.Ct. at 2792 (Breyer, J. concurring); *Asahi*, 480 U.S. at 112, (O'Connor, J. plurality) (reasoning special state-related marketing or advertising is a factor to be considered in favor of exercising personal jurisdiction in that state.). After reaching the sales agreement, BNBM drafted the contract, and arranged for its drywall to be shipped **to Florida.** *See* 11/18/2005 Sales Contract for 200,000 boards of BNBM PLC drywall to EAC [MTD Ex. 224]; Chaparro Dep. at 43:22-46:19. This process was repeated a second time, when on November 16, 2005, BNBM agreed to sell and ship 240,000 boards of its drywall to Port Manatee, Florida. *See* 1/6/2006 BNBM Invoice to Wood Nation for 240,000 sheets of drywall [MTD Ex. 225] at 21; s*ee also* BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006" at 2.

After these initial sales, BNBM entered an agreement with Davis Construction, where Davis agreed to distribute BNBM drywall throughout the southeastern United States—including Florida. *See* 3/12/2006 Exclusive Purchase & Supply Agreement at 5. In accordance with this agreement, BNBM sent two additional shipments of its drywall to Florida. After it arrived, the parties continued to communicate regarding how the drywall was being distributed throughout the United States, and Mr. Davis wrote in April, 2006 that "BNBM material is now being distributed throughout the Southeastern United States and we expect future shipments to be distributed along the Eastern Seaboard of the United States."

Based on these facts there can be no doubt that BNBM delivered its drywall into the stream of commerce with the expectation that it would be purchased or used by consumers in Florida. *See Jackson,* 615 F.3d at 585. BNBM marketed its drywall to Florida companies, entered into sales contracts to sell its drywall in Florida, and repeatedly shipped its drywall to the

state.  These contacts demonstrate a "regular and anticipated flow of products from manufacture to distribution to retail sale" as required for minimum contacts.  *See Asahi*, 480 U.S. at 116–17 (Brennan, J. concurring).

### E.   Cause of Action Arises from Minimum Contacts

As noted, "specific personal jurisdiction exists when 'the defendant has "purposefully directed" his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities.' "  *Clemens v. McNamee*, 615 F.3d 374, 377 (5th Cir. 2010) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *Seiferth*, 472 F.3d at 271 (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)).  BNBM argues that as its "limited contracts with Florida companies were made and performed in China, plaintiffs cannot demonstrate the requisite nexus between their claims and BNBM conduct directed at those states."  R. Doc. 19646 (citing *Prejean*, 652 F.2d at 1270 n.21.).  However, as this Court has previously explained, these plaintiffs have filed tort claims seeking damages caused by defective drywall, and therefore their claims do not solely relate to the sales contracts BNBM entered in China, but the actions BNBM took as a result of that contract.  The class definition in *Amorin* includes:

> All owners of real properties in the United States, who are a named Plaintiff on the complaint in *Amorin*, *Germano*, *Gross*, and *Wiltz* (*i.e.*, not an absent class member), asserting claims arising from, or otherwise related to Chinese Drywall **manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered** by the Taishan Defendants.[28]

---

[28] The "Taishan Defendants" are comprised of the following entities: Taishan Gypsum Co. Ltd. (hereafter "Taishan"); Beijing New Building Materials Limited Co. (hereafter "BNBM"); Beijing New Building Materials Group Co., Ltd. (hereafter "BNBM Group"); China National Building Materials Co., Ltd. (hereafter "CNBM"); China National Building Materials Group Corporation (hereafter "CNBM Group"); and Tai'an Taishan Plasterboard Co., Ltd (hereafter "TTP").

*See* R. Doc. 17883 (emphasis added).  Thus, BNBM's contacts with Florida include its marketing, advertising, design, manufacturing, sale, and shipment of its drywall.  As this Court has explained,

> The Court does not read the "arise from" or "relate to" requirements as narrowly as [defendant] suggests; nor does it find any jurisprudence supporting this narrow interpretation. The Supreme Court has not yet addressed "what sort of tie between a cause of action and a defendant's contacts with a forum" is required for specific personal jurisdiction. *See Helicopteros,* 466 U.S. at 416 n.10, 104 S.Ct. 1868. The plain language of this requirement alone indicates a broader interpretation of the nexus between minimum contacts and the allegations against the foreign defendant.

*In re Chinese Manufactured Drywall Prod. Liab. Litig.,* 894 F. Supp. 2d at 857.  BNBM targeted its marketing and manufacturing in order to enter into sales contracts with Florida customers.  It was aware its drywall would be delivered, sold, and used in Florida.  Accordingly, the Court finds that the claims against BNBM in *Amorin* "relate to" and "arise from" BNBM's minimum contacts with Florida.

### F.       Fair Play and Substantial Justice

Under the final prong of the due process inquiry, "[e]ven if minimum contacts exist, the exercise of personal jurisdiction over a non-resident defendant will fail to satisfy due process requirements if the assertion of personal jurisdiction offends 'traditional notions of fair play and substantial justice.' "  *Ruston Gas Turbines, Inc.,* 9 F.3d at 421 (quoting *Int'l Shoe,* 326 U.S. at 316).  Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show the assertion of personal jurisdiction in the forum would be unfair or unreasonable. *Seiferth,* 472 F.3d at 271 (citing *Nuovo Pignone,* 310 F.3d at 382); *Wien Air Alaska v. Brandt,* 195 F.3d 208, 215 (5th Cir.1999) (citing *Akro Corp. v. Luker,* 45 F.3d 1541, 1547 (Fed. Cir. 1995)).  "It is rare to say the assertion is unfair after minimum contacts have been shown."  *Id.* (citing *Akro Corp.,* 45 F.3d at 1549).  A court is to consider the following factors in making the

fairness determination: (1) the defendant's burden, (2) the forum state's interest, (3) the plaintiff's interest in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the state's shared interest in furthering fundamental social policies. *Paz,* 445 F.3d at 814; *Ruston Gas Turbines, Inc.,* 9 F.3d at 421.

First, the Court will address the potential burden on Defendants. The Court recognizes that BNBM will incur costs as a result of defending these claims. BNBM argues it will need to translate thousands of documents, travel to and from Louisiana for depositions, and endure "surmounting logistical difficulties in litigating a matter half way around the globe." R. Doc. 19646 at 83. However, as the Supreme Court recognizes, "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *World–Wide Volkswagen,* 444 U.S. at 294. Further, the larger and more sophisticated the defendant, the less burdensome it is to defend in a foreign country. *See, e.g.*, *Bean Dredging Corp. v. Dredge Tech. Corp.,* 744 F.2d 1081, 1085 (5th Cir. 1984) ("Given the magnitude of [defendant's] operations, the court is compelled to hold that it is not unreasonably inconvenient for [defendant] to defend the suit in [the forum]."). As evidence of its ability to defend, the Court notes that not only was BNBM able to overcome these challenges in marketing its drywall within the United States, but it has also managed to retain excellent counsel who have emphatically and capably represented the Defendant.

The second factor is the interest of the forum state. BNBM argues the interests of the forum states are not served by exercising jurisdiction, as BNBM does not have property or employees in the forum states. The Court finds that Florida has a great interest in its citizens seeking compensation against BNBM for the alleged damages caused to their properties,

especially after years of suffering in homes contaminated with Chinese drywall and the vast delays that have plagued this litigation, preventing a resolution of this matter.

The third factor is the Plaintiffs' interest. BNBM again argues the Plaintiffs' interest will not be best served by requiring BNBM to defend this litigation here. The Court disagrees. As this Court has previously noted, it would be immensely burdensome for the Plaintiffs to litigate their claims against BNBM in China. Thus, the Plaintiffs' interest is strong.

The fourth factor is the judicial system's interest. BNBM argues that this factor does not favor the exercise of personal jurisdiction because of the previously mentioned difficulties regarding travel, translation, and discovery. Again, the Court disagrees and finds that the judicial system has a great interest in exercising personal jurisdiction over BNBM. The MDL Panel authorized this Court to conduct proceedings in all Chinese drywall-related cases, but the Court's progress has been repeatedly stymied. First by Taishan's failure to appear in the litigation, and later by the massive discovery required to resolve the present personal jurisdiction challenge. The judicial system has an interest in this Court effectively and efficiently resolving the Chinese drywall-related claims, and it can best satisfy this interest by having BNBM, a major manufacturer defendant, before the Court while the litigation remains consolidated.

Finally, the fifth factor requires that the Court consider the state's shared interest in furthering fundamental social policies. While the Court recognizes the inherent conflict in determining the rights of foreign entities in United States Courts, this conflict is overshadowed by the importance—and necessity—of holding manufacturers of defective products liable for the damages caused by their product. In a "flat world" in which we now live, markets are world-wide and it is in everyone's interest to discourage the manufacture and distribution of defective products. *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 860

(E.D. La. 2012), *aff'd,* 742 F.3d 576 (5th Cir. 2014), and *aff'd sub nom. In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014).

When considered *in toto*, even in light of the burden placed on BNBM to litigate in this forum, the Court finds that the exercise of personal jurisdiction over BNBM in this forum does not offend traditional notions of fair play and substantial justice.  At least four out of five of the factors favor the exercise of personal jurisdiction over BNBM.  As the Supreme Court has stated "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."  *Asahi,* 480 U.S. at 114.

**VI.     SERVICE OF PROCESS**

Finally, Both the BNBM and CNBM Entities argue these complaints should be dismissed for failure to effect service of process in accordance with Federal Rule of Civil Procedure 12(b)(4) and 12(b)(5).  First, CNBM argues that CNBMIT was never properly served as they were not named in the summons—instead the summons named "CNBMI."  Plaintiffs aver this is a typo that should not render service ineffective, particularly in light of the fact CNBMIT was on notice of the suit.  Second, the CNBM Entities argue that the complaints in *Abner*, *Morris*, and *Posey* should be dismissed, as these complaints were either not served at all, or service was not completed by the required deadline.  Plaintiffs aver that the complaint in *Abner* was eventually served on Defendants, and any delay was the result of the challenges inherent in effecting service in China, and should not disqualify the complaint.  In regards to *Morris* and *Posey*, Plaintiffs aver these complaints are included in the PSC's other omnibus complaints such that separate service should not be required.  Third, BNBM PLC argues it was never served in *Gross*, *Wiltz*, or *Amorin*.  Plaintiffs respond that a translation "understandably" led to confusion in *Wiltz*, but in

every complaint, the record demonstrates that complete service was effectuated on BNBM PLC in relation to these complaints. Finally, BNBM Group argues that is was not properly served in *Gross* or *Amorin*, as the service arrived at the incorrect address. Plaintiffs argue that this was the correct address according to the publicly available documents at the time, and the fact that service occurred at BNBM PLC's address, rather than BNBM Group's is immaterial, as these entities are alter egos of one another.

In sum, Defendants' issues with service are summarized as follows: service as to CNBMIT contained a typographical error; the *Abner*, *Morris*, and *Posey* complaints against the CNBM Entities were not served timely; BNBM PLC was never served in *Gross*, *Wiltz*, or *Amorin*, and BNBM Group was incorrectly served at BNBM PLC's address in the *Gross* or *Amorin* Complaints.

"To acquire jurisdiction over the person, a court must serve on the person a document, such as a summons, notice, writ, or order." *McGuire v. Sigma Coatings*, 48 F.3d 902, 907 (5th Cir. 1995) (citing *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (5th Cir. 1988) (per curiam)). Other circuits have reasoned that "service of process is not legally defective simply because the complaint misnames the defendant in some insignificant way." *Morrel v. Nationwide Mut. Fire Ins. Co.*, 188 F.3d 218, 224 (4th Cir. 1999). The Fifth Circuit has applied this reasoning in the context of arbitration awards reasoning that a "technical defect" did not render the district court's decision erroneous and "certainly does not require reversal." *Cigna Ins. Co. v. Huddleston*, 986 F.2d 1418 (5th Cir. 1993). Here, like the parties in *Huddleston*, "everyone involved in the action . . . knew of and could identify the entity being sued[,] and that the misnomer . . . 'injured no one.' " *Huddleston*, 986 F.2d at 1418 (quoting *United States v. A.H. Fischer Lumber Co.*, 162 F.2d 872, 874 (4th Cir. 1947).

As this Court has previously explained:

> Motions for service of process are procedural, not substantive motions. Furthermore, the purpose of requiring satisfactory service of process is to assure that the potential litigant receives full, valid and accurate notice of complaints or lawsuits brought against them. Its purpose is not to compel the expenditure of excessive costs, or cause undue delay or encourage evasive action. This lawsuit has been going on for over five years. Numerous depositions have been taken in this country and in China. Dozens of motions have been filed, briefed, and argued. All of the parties have been enthusiastically and competently represented. It is time to focus on substantive issues and not continue to conjure up and construct procedural roadblocks to impede the progress of this litigation.

*See* Order of November 9, 2015 (R. Doc. 19713). "[T]he core function of service is to supply notice of the pendency of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections." *Henderson v. United States*, 517 U.S. 654, 672 (1996). The Hague Convention exists in order to facilitate service of process abroad and assure foreign defendants adequate notice. *Volkswagenwerk*, 486 U.S. at 704-05; *see also Burda Media, Inc. v. Viertel*, 417 F.3d 292, 300 (2d Cir. 2005) ("The Hague Convention of 1965 was intended to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time.") (internal quotation omitted). Thus, the Court must determine whether service of the Chinese Defendants provides the Entities with adequate notice of this litigation.

Based on the extensive procedural history of this case, the Court is convinced service on these entities has satisfied due process. Even without considering the agency and alter-ego relationships that exist between many of these related corporations, the evidence demonstrates the entities received adequate notice of this action and sufficient time to present their defenses. Additionally, these entities have refused to accept service at various points in this history of this litigation. To now argue these minor technical deficiencies should warrant dismissal is

disingenuous.  Thus, the Defendants' motion is denied in regards to their arguments that these claims should be dismissed for lack of proper service of process.

## VII.    CONCLUSION

In sum, the Court finds it has jurisdiction over BNBM in relation to Plaintiffs' claims in Louisiana, Florida, and Virginia. Under both Florida and Virginia law, the evidence demonstrates Taishan was BNBM's agent, such that Taishan's jurisdictional contacts in Florida and Virginia are imputed to BNBM. Applying Louisiana law, BNBM and Taishan were members of a single business enterprise, such that the two entities are treated as one for purposes of determining jurisdiction.

Furthermore, the Court finds it has jurisdiction over CNBM and BNBM Group in relation to Plaintiffs' claims in Louisiana. Under Louisiana law, Taishan, BNBM, BNBM Group, and CNBM were members of a single business enterprise, such that Taishan's contacts in Louisiana are imputed to the other entities in the enterprise. However, the Court finds it does not have jurisdiction over CNBM or BNBM Group in relation to Plaintiffs' claims in Florida or Virginia. Under Florida and Virginia law, Taishan was neither an agent nor an alter ego of CNBM or BNBM Group, and therefore Taishan's activities in Florida and Virginia cannot be imputed to CNBM or BNBM Group.

Additionally, the Court also finds that it has jurisdiction over BNBM by virtue of BNBM's contacts in Florida. This jurisdiction is consistent with Florida's long arm statute and the Due Process Clause. Therefore, for the foregoing reasons:

**IT IS ORDERED** that the CNBM Entities' Motion to Dismiss, (R. Doc. 19527) is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** with respect to CNBMIT Co. Ltd., CNBM USA Corp., and United Suntech Craft, Inc., as the evidence does not support

jurisdiction over these entities. It is also **GRANTED** with respect to Plaintiffs' claims against CNBM in Florida and Virginia, as CNBM does not have an agency or alter ego relationship with Taishan under Florida or Virginia law. However, the motion is **DENIED** with respect to Plaintiffs' claims against CNBM under Louisiana law, as the Court finds the evidence demonstrates CNBM was part of a single business enterprise with Taishan. Therefore, Taishan's contacts in Louisiana are imputed to CNBM, such that the Court has jurisdiction over CNBM in relation to Plaintiffs' claims based on Louisiana law.

      **IT IS FURTHER ORDERED** that BNBM Group's Motion to Dismiss (R. Doc. 19664) is **GRANTED** with respect to Plaintiffs' claims against BNBM Group under Florida and Virginia law, as BNBM Group does not have an agency or alter ego relationship with Taishan under the laws of those states. However, it is **DENIED** with respect to Plaintiffs' claims against BNBM Group under Louisiana law, as the Court finds the evidence demonstrates BNBM Group was part of a single business enterprise with Taishan under Louisiana law. As such, Taishan's contacts in Louisiana are imputed to BNBM Group.

      **IT IS FURTHER ORDERED** that BNBM's Motion to Dismiss Complaints Pursuant to Rules 12(b)(2) and 12(b)(5) (R. Doc. 19646) is **DENIED**. The Court finds Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to BNBM. Further, the evidence demonstrates BNBM and Taishan were members of a single business enterprise, such that Taishan's contacts in Louisiana are imputed to BNBM under Louisiana law.

      **IT IS FURTHER ORDERED** that the BNBM Entities' Motion to Dismiss the State of Louisiana's Second Amended and Restated Petition Pursuant to Rule 12(b)(2), Rule 12(b)(5) and Rule 12(b)(6) (R. Doc. 19663) is **DENIED**. As stated above, BNBM, BNBM Group, and

Taishan were members of a single business enterprise; therefore these entities are treated as one for the purposes of jurisdiction under Louisiana law.

**IT IS FURTHER ORDERED** that CNBM USA Corp.'s Motion to Dismiss (R. Doc. 2346), is **DISMISSED AS MOOT**.

New Orleans, Louisiana this 21st day of April, 2017.

UNITED STATES DISTRICT JUDGE