```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2   ********************************************************************

 3
     IN RE:  CHINESE-MANUFACTURED        Docket No. 09-MD-2047
 4   DRYWALL PRODUCTS LIABILITY       New Orleans, Louisiana
                                      Tuesday, June 9, 2015
 5

 6   ********************************************************************

 7
                    TRANSCRIPT OF HEARING ON DAMAGES PROCEEDINGS
 8            HEARD BEFORE THE HONORABLE ELDON E. FALLON
                      UNITED STATES DISTRICT JUDGE
 9


10
     APPEARANCES:
11
     FOR THE PLAINTIFFS:            SEEGER WEISS, LLP
12                                  BY:  CHRISTOPHER SEEGER, ESQ.
                                    77 Water Street
13                                  New York, NY 10005

14
                                    GAINSBURGH, BENJAMIN, DAVID,
15                                  MEUNIER & WARSHAUER
                                    BY:  GERALD E. MEUNIER, ESQ.
16                                  2800 Energy Centre
                                    1100 Poydras Street
17                                  New Orleans, LA 70163-2800

18

19   FOR THE DEFENDANT:            ALSTON & BIRD
                                   BY:  MICHAEL P. KENNY, ESQ.
20                                      CHRISTINA H. EIKHOFF, ESQ.
                                   One Atlantic Center
21                                 1201 W. Peachtree St.
                                   Atlanta, GA 30309-3424
22
                                   DENTONS
23                                 BY:  RICHARD L. FENTON, ESQ.
                                   7800 Sears Tower
24                                 233 South Wacker Drive
                                   Chicago, IL 60606
25
```

1

Official Court Reporter:          Karen A. Ibos, CCR, RPR, CRR
2                                  500 Poydras Street, Room HB-406
                                   New Orleans, Louisiana 70130
3                                  (504) 589-7776

4

5
     Proceedings recorded by mechanical stenography, transcript
6   produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3    WITNESSES FOR THE PLAINTIFFS:              PAGE/LINE:

4    JACOB WOODY

5      Direct Examination by Mr. Meunier        17/7
       Cross-Examination by Mr. Fenton          65/7
6      Redirect Examination by Mr. Meunier      97/13

7    GEORGE J. INGLIS

8      Voir Dire Examination by Mr. Seeger      103/19
       Direct Examination by Mr. Seeger         107/16
9      Cross-Examination by Mr. Kenny           129/6
       Redirect Examination by Mr. Seeger       168/21

10

11

12   WITNESSES FOR THE DEFENDANTS:

     DAVID POGORILICH

13
       Voir Dire Examination by Mr. Kenny       172/17
14     Direct Examination by Mr. Kenny          179/4
       Cross-Examination by Mr. Seeger          205/12
15     Redirect Examination by Mr. Kenny        225/18

16   LAURENTIS MARAIS

17     Voir Dire Examination by Mr. Fenton      229/16
       Direct Examination by Mr. Fenton         231/23
18     Cross-Examination by Mr. Meunier         257/7
       Redirect Examination by Mr. Fenton       291/19

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(TUESDAY, JUNE 9, 2015)

(DAMAGES HEARING PROCEEDINGS)

08:50:21   (OPEN COURT.)

08:50:22        THE COURT:  Be seated, please.  Good morning, ladies and

08:50:22   gentlemen.  Counsel make their appearance for the record, please.

08:50:24        MR. SEEGER:  Your Honor, Chris Seeger for the plaintiff

08:50:26   class.

08:50:27        MR. MEUNIER:  Jerry Meunier for the plaintiffs, your

08:50:30   Honor.

08:50:30        MR. KENNY:  Michael Kenny on behalf of two Taishan

08:50:34   defendants, your Honor.

08:50:35        MR. FENTON:  Rick Fenton on behalf of BNBM, PLC and BNBM

08:50:38   Group.

08:50:38        THE COURT:  This is in connection with the case, Dean call

08:50:41   it.

08:50:41        THE DEPUTY CLERK:  MDL No. 2047, *in re:  Chinese*

08:50:46   *Manufactured Drywall Products Liability Litigation.*

08:50:48        THE COURT:  Folks, we are here today to deal with the

08:50:51   second phase of the class action in MDL-2047 entitled *In Re:*

08:50:56   *Chinese Manufactured Drywall Products Liability Litigation.*  You'll

08:51:01   recall that in September of 2014 I conducted a certification and

08:51:08   liability phase of this case -- of this class action.  And on

08:51:11   September the 26th, I found defendants liable and certified the

08:51:16   1   class as including the following:  All owners of real property in

08:51:20   2   the United States who are named plaintiffs on complaints in *Amorin*,

08:51:29   3   *Germano*, *Gross*, and *Wiltz*, asserting claims for remediated damages

08:51:34   4   arising from or otherwise related to Chinese drywall manufactured,

08:51:41   5   sold, distributed, supplied, marketed, inspected, imported, or

08:51:47   6   delivered by the Taishan defendants.

08:51:51   7          Specifically, the plaintiffs are those named in *Germano*

08:51:58   8   *v. Taishan,* Case No. 09-6687; *Gross v. Knauf*, Case No. 09-6690;

08:52:13   9   *Wiltz v. BNBM Materials Public, Ltd., et al*, Civil Action No.

08:52:24  10   10-361; *Able, et al, v. Taishan Gypsum, et al*, Action No. 11-080;

08:52:34  11   *Haya v. Taishan Gypsum Corporation, et al*, Civil Action 11-1077;

08:52:43  12   *Almeroth v. Taishan Gypsum, et al*, Civil Action 12-0498; *Amorin, et*

08:52:52  13   *al v. Taishan Gypsum, et al,* Civil Action 11-1672; and *Amorin v.*

08:53:01  14   *Taishan Gypsum, et al*, Civil Action 11-1395; and *Amorin v. Taishan*

08:53:13  15   *Gypsum, formerly known as Shandong Taihe Dongxin, Co.*, Civil Action

08:53:20  16   11-1673.

08:53:23  17          The Taishan defendants in that particular case are

08:53:27  18   comprised of the following entities:  Taishan Gypsum Company, BNBM,

08:53:34  19   Ltd., BNBM Materials Group Company, China National Building

08:53:42  20   Materials Company, China National Building Material Group, Tainin

08:53:52  21   Taishan Plasterboard.  Taishan affiliates were comprised of the

08:53:57  22   following BNBM, BNBM Group, CNBM, CNBM Group, and TTP.

08:54:06  23          And as I mentioned today, we're here to deal with the

08:54:12  24   testimony, as well as other evidence, regarding the damages aspect

08:54:19  25   of this class action.  I've asked the parties to give me a brief

08:54:23  1    opening statement.  I'll hear from the plaintiffs at this time.

08:54:29  2             MR. SEEGER:  Thank you, your Honor.  For the record again,

08:54:31  3    it's Chris Seeger.

08:54:34  4             Your Honor, all of the people in this class have been

08:54:37  5    living in a toxic corrosive environment for years.  And during these

08:54:41  6    years, these defendants, Taishan and their alter ego defendants,

08:54:45  7    have not elected to make this right.

08:54:48  8             Today's Rule 55(b) proceeding is straightforward.  The

08:54:51  9    question is how much does Taishan and the alter ego defendants owe

08:54:56 10    this class for damages caused to their homes.  This is not a hearing

08:54:59 11    to decertify the class or an attempt to relitigate issues because

08:55:03 12    all issues other than damages are precluded.

08:55:06 13             Your Honor, while you hear the evidence, we would ask you

08:55:08 14    to be mindful of the following:  Our approach to class-wide damages

08:55:12 15    is simple and formulaic.  George Inglis, who you will hear from this

08:55:16 16    morning, has extensive experience with remediating Chinese drywall

08:55:21 17    homes.  As the Court well knows from his work and testimony in

08:55:23 18    *Germano*, much of which the Court has accepted, if not all.

08:55:26 19    Mr. Inglis's experience includes the analysis of contractor bids

08:55:30 20    cross-checked by RSMeans, a standard guide to people in the industry

08:55:34 21    for pricing, to arrive at a national average adjusted from 2010

08:55:39 22    dollars up to 2015 dollars.  He, then, further refines that national

08:55:42 23    average by using local zip codes to adjust for local cost factors.

08:55:47 24    So the concept is labor and material in some parts of Virginia might

08:55:53 25    not be as expensive as in some parts of New Orleans, New Jersey, or

08:55:56  1    New York.

08:55:57  2          He then takes a spreadsheet compiled by BrownGreer, an

08:56:00  3    independent court appointed claims administrator, an administrator

08:56:03  4    who has been appointed by courts across the country to do this kind

08:56:06  5    of work in this kind of work and personal injury work, and the

08:56:11  6    information on the spreadsheet, which is derived from plaintiffs'

08:56:14  7    fact sheets or other information readily available to the

08:56:17  8    independent claims administrator.  Mr. Inglis then simply takes that

08:56:21  9    spreadsheet and does simple math.  He goes line by line and

08:56:25  10   multiplies the reported square footage of each class members home

08:56:28  11   and multiplies it by a square footage amount.

08:56:31  12         Mr. Inglis has 40 years of experience as an engineer and a

08:56:36  13   construction specialist.  He's been involved in formulating the

08:56:39  14   scope of remediation, which is law of this case, and he's been

08:56:42  15   involved in formulating the scope of remediation and estimating

08:56:45  16   those remediation costs in homes with Chinese drywall throughout the

08:56:49  17   country.  The scope of work he starts with, that he works off of is

08:56:53  18   from this Court's findings of fact and conclusions of law in

08:56:57  19   *Germano*, and the basic idea is that all of these homes, their

08:57:00  20   interiors, get stripped to the studs.

08:57:03  21         The key to any estimate is the judgment and the

08:57:05  22   experience of the estimator.  In some respects, it's more art than

08:57:10  23   science.  It's a straight mathematical approach based upon judgment

08:57:14  24   and experience, not statistics or extrapolation.  Whether the

08:57:18  25   approach to a construction project is contractor bids, RSMeans,

08:57:24  1   Xactimate, anything you want to refer to, there's a certain amount

08:57:27  2   of variability to any pricing or estimating scheme.  No one approach

08:57:32  3   is perfect.  But our approach is supported by the science of this

08:57:36  4   case.  In fact, it's driven by the science of this case.

08:57:39  5           The Court's rulings put together with Mr. Inglis's

08:57:43  6   extensive experience with Chinese drywall homes and his 40 years of

08:57:47  7   construction and engineering experience come together here.

08:57:52  8           Coincidental to all of this is that Taishan's expert,

08:57:55  9   Mr. Pogorilich, who you'll hear from this afternoon, readily admits

08:57:59 10   several things:  He admitted that each and everyone of the class

08:58:03 11   members need to have the corrosive environment corrected.  They need

08:58:06 12   to have the Chinese drywall removed from their homes.  He will tell

08:58:09 13   you that himself.  Yet he was not asked to provide a methodology for

08:58:14 14   doing this, and in that respect, I think they've missed a tremendous

08:58:18 15   opportunity here, your Honor.

08:58:19 16           Instead, he attempts, Mr. Pogorilich attempts to pit

08:58:23 17   Mr. Inglis, his damages analysis against the Knauf settlement.  And

08:58:28 18   the problem that they have is just that, that Knauf is a settlement.

08:58:31 19   The starting place is your findings of fact, but the Knauf

08:58:35 20   settlement varies from that.  It's a different scope of work than

08:58:39 21   what governs and binds this defendant.

08:58:42 22           Moreover, he totally, Mr. Pogorilich, ignores the

08:58:45 23   economies of scale that Knauf obtained by using one contractor to

08:58:50 24   remediate thousands of homes, your Honor, instead of hundreds and

08:58:54 25   maybe even thousands of contractors to individually remediate homes.

08:58:59 1  Those economies of scale that were obtained in the Knauf settlement

08:59:02 2  cannot be ignored.  And this was their opportunity to offer a

08:59:08 3  positive methodology to right this wrong and they passed.

08:59:12 4      At end of the day we'll provide this Court with a

08:59:14 5  reasonable approach based upon the science in this case for

08:59:17 6  determining class-wide damages.  There ultimately will have to be a

08:59:21 7  claims process and there will be additional phases where adjustments

08:59:24 8  will be made.  But the claims process, at end of the day, will be

08:59:27 9  the process by which we accurately allocate damages to each

08:59:31 10  individual class member.

08:59:32 11      Thank you, your Honor.

08:59:34 12      THE COURT:  Thank you.  Let me hear from the defendants.

08:59:38 13      MR. KENNY:  Good morning, your Honor.  May it please the

08:59:40 14  Court, Michael Kenny on behalf of two Taishan defendants.

08:59:43 15      We're here this morning, your Honor, because last October

08:59:45 16  the plaintiffs made a motion on behalf of 3,852 property owners for

08:59:51 17  class damages in the amount of $1.26 billion.  This class of 3,852

09:00:00 18  property owners asked for three categories of class damages:  They

09:00:04 19  asked for $783 million in remediation costs; they asked for

09:00:11 20  $385 million in loss of use and enjoyment; and they asked for

09:00:16 21  $95 million in class damages for alternative living expenses.  The

09:00:21 22  evidence shows that this class claim was an extreme overreach.

09:00:26 23      Based on the evidence, the class motions that the

09:00:29 24  plaintiffs filed last fall, which still has not actually been

09:00:33 25  amended, is a shell of its former self.  The class itself has been

09:00:39  1    reduced by 30 percent; 1,137 of the original class members are out

09:00:46  2    of the class.  The class claim for $385 million in loss of use of

09:00:53  3    enjoyment is out of the class.  The class claim for $95 million in

09:00:58  4    alternative living expenses is out of the class.  The class claim

09:01:02  5    for remediation costs is shrinking by the day.  In just the past

09:01:08  6    five days, your Honor, it has shrunk by $105 million, including the

09:01:15  7    very latest admitted mistake last night of $78 million.

09:01:22  8            So today, the plaintiffs are not seeking $1.26 billion in

09:01:27  9    class damages.  They are seeking $502,000,000, a staggering

09:01:33 10    60 percent reduction from what they requested last fall.  In

09:01:40 11    absolute dollars, a $758 million drop from what they requested.

09:01:45 12            So it's natural to ask, what happened?  Why?

09:01:48 13            The reason, your Honor, is because Taishan came back into

09:01:52 14    this case.  Chastened, we came into the case.  We paid the penalties

09:01:58 15    that you imposed.  We paid the *Germano* plaintiffs full up, and we

09:02:03 16    have been actively participating in this quest, in this case

09:02:08 17    intimated by two straightforward questions that align our interests,

09:02:11 18    and their interests, and your interests, your Honor:  How much does

09:02:15 19    Taishan owe and who do they owe that money to?

09:02:19 20            Now, trying to answer these two questions, Taishan,

09:02:24 21    through evidence, has exposed mistake after mistake after mistake

09:02:29 22    after mistake in the means and methods of how the plaintiffs are

09:02:34 23    calculating class damages.  These are serious mistakes, and they've

09:02:39 24    all been acknowledged by the plaintiffs.

09:02:42 25            What do these mistakes include?  They include there was no

09:02:45 1   evidence of a class claim for $385 million in loss of use of

09:02:50 2   enjoyment.  They had a flawed methodology to try to prove

09:02:54 3   alternative living expenses of $95 million as a class claim.  They

09:02:59 4   misidentified class members numbering in the thousands, including

09:03:04 5   class representatives.  They have claimants who have dismissed their

09:03:10 6   claims.  They have claimants who have no Taishan drywall in their

09:03:14 7   homes.  And just last night, as I said, they admitted a $78 million

09:03:21 8   mistake that has reduced their damages because their expert botched

09:03:26 9   how you use RSMeans.  That was pointed out by Taishan.

09:03:31 10         Now, their expert signed an affidavit in late April

09:03:35 11   saying the class remediation costs are $879 million.  He's changed

09:03:41 12   that number three times since, including last night.  And based on a

09:03:48 13   cascade of errors and mistakes exposed by Taishan through evidence,

09:03:52 14   the expert now says that class remediation costs are $502,000,000.

09:03:59 15   That's a drop, your Honor, in six weeks of $377 million, a

09:04:05 16   43 percent reduction in six weeks based on calculations that each

09:04:10 17   time they were made supposedly were made reliably.  $377 million.

09:04:16 18         And the evidence shows that there are still big problems

09:04:21 19   in the Cornerstone data that the plaintiff expert is relying on to

09:04:25 20   do his calculations.  These evidentiary problems that will be

09:04:29 21   exposed today include no admissible evidence of the square footage

09:04:32 22   for many of the remaining class members.  Considerable doubt whether

09:04:37 23   more than half of the 2,015 class members who are left even have any

09:04:43 24   Taishan drywall or ever had Taishan drywall in their homes.  And the

09:04:47 25   Cornerstone class list continues to be riddled with mistakes and

09:04:52  1    errors such as duplicate entries and wrong addresses.

09:04:56  2         In plain terms, the plaintiff expert relies on riddled --

09:05:00  3    on data riddled with hearsay.  And a problem is just this, it's not

09:05:06  4    trustworthy.

09:05:07  5         Now, the evidence will also show that the plaintiffs'

09:05:09  6    expert has willingly turned a blind eye to the data problems and has

09:05:13  7    simply processed bad information that has been fed to him.  And in a

09:05:19  8    construction business that relies on property specific estimates to

09:05:23  9    estimate remediation costs, plaintiffs' expert has not inspected a

09:05:27  10   single one of the 2,015 homes or properties that were left in the

09:05:32  11   case.  Instead, he relies on a homemade methodology that applies a

09:05:37  12   single benchmark price derived from a double averaging technique

09:05:42  13   from seven properties in southeastern Virginia, five years ago, to

09:05:47  14   each one of the 2,715 properties in at least 15 states.  To say that

09:05:55  15   this approach of estimating remediation costs is unconventional

09:06:00  16   would be an understatement of the first order, your Honor.

09:06:02  17        But more to the point, it simply fails to provide a

09:06:06  18   reasonable estimate of remediation costs.  It is not a talismanic

09:06:12  19   substitute for property specific inspections and estimates.  It

09:06:16  20   simply doesn't work and we'll prove it.

09:06:18  21        Now, your Honor, the evidence will show that the

09:06:20  22   plaintiffs have failed to carry their burden of proof.  Their

09:06:24  23   decision to dispense with individual proof and pursue class damages

09:06:28  24   fails to prove both of Taishan's questions that it has asked since

09:06:33  25   it came back into the case, your Honor:  Who do we owe and how much

09:06:36  1   do we owe people with proper claims?  They have failed to prove

09:06:40  2   remediation cost damages for the class or for any of the individual

09:06:44  3   members of the class.

09:06:46  4          These mistakes, your Honor, are not refinements.  They

09:06:51  5   are colossal errors.  Major problems still remain.  For these

09:06:54  6   reasons and for the reasons -- the legal reasons stated in our

09:06:58  7   briefs, we would ask your Honor to deny their motion for class

09:07:01  8   damages.  Thank you.

09:07:04  9          MR. FENTON:  Good morning, your Honor.  Rick Fenton on

09:07:10 10   behalf of the BNBM parties.  I'll try not to repeat anything that

09:07:13 11   Mr. Kenny covered.

09:07:15 12          The Fifth Circuit has set forth very specific standards

09:07:19 13   for the calculation of damages; whereas, here the plaintiffs are

09:07:23 14   seeking damages calculation based on a bellwether trial.  In those

09:07:30 15   exceptional circumstances where such a methodology is determined to

09:07:34 16   be appropriate, the Fifth Circuit has explained that the trial court

09:07:38 17   must find that any extrapolation of a bellwether verdict, "must be

09:07:46 18   based on competent scientific statistical evidence that identifies

09:07:51 19   the variables involved and that provides a sample of sufficient

09:07:56 20   size."

09:07:57 21          Here there is no such scientific or statistical evidence.

09:08:02 22   Mr. Inglis may be qualified to estimate costs on a single home, but

09:08:08 23   to take that and try to apply it to a class of several thousand is

09:08:13 24   not an exercise in cost estimation.  It is unquestionably an

09:08:19 25   extrapolation that clearly implicates the science of statistics.

09:08:26   1   Mr. Inglis has conceded that he made no attempt to conduct any

09:08:30   2   statistical analysis to determine whether the *Germano* damages are

09:08:36   3   representative of the damages for the members of the class.  Indeed,

09:08:41   4   he is entirely unschooled in statistical science and would be

09:08:45   5   incapable of generating the type of statistical evidence that would

09:08:50   6   pass muster in this circuit.  And plaintiffs proffer no one else.

09:08:55   7        In addition, this Court will hear from our expert

09:09:01   8   Dr. Marais.  Dr. Marais is a highly regarded and well-respected

09:09:08   9   statistician.  Dr. Marais will testify that Mr. Inglis's model is

09:09:14  10   without question an extrapolation and that it has no statistical

09:09:17  11   validity whatsoever.  This is due in large part to the fact that

09:09:21  12   Mr. Inglis undertook no efforts to derive a random sampling of the

09:09:28  13   class, but instead took -- simply took what was convenient, the

09:09:33  14   seven *Germano* properties and assumed that those were representative

09:09:38  15   without any proof.

09:09:40  16        And Dr. Marais's opinions, your Honor, are not just

09:09:44  17   theoretical.  He will provide empirical evidence that demonstrates

09:09:50  18   how unreliable Mr. Inglis's formula actually is both as to

09:09:56  19   individual properties and in the aggregate.  In the course of

09:10:00  20   discovery, we received information about the actual costs of

09:10:04  21   remediation from the Knauf settlement.  Comparing those actual

09:10:09  22   numbers to the values that Mr. Inglis's model would generate,

09:10:16  23   Dr. Marais found that Mr. Inglis overstated damages between 31 and

09:10:22  24   51 percent.  Now, my numbers are a little old, your Honor, because

09:10:25  25   of this change that we received last night, but I believe that

09:10:29  1   Dr. Marais will testify that even with that change, there is still a

09:10:34  2   substantial overstatement in the Inglis results.

09:10:39  3        The Court will hear no evidence and no opinions from any

09:10:42  4   qualified expert refuting anything that Dr. Marais has to say.  And

09:10:47  5   on Dr. Marais's unrefuted and imminently qualified testimony, the

09:10:52  6   Chevron tests that applies in this circuit has not been met and

09:10:57  7   plaintiffs' proof fail as a consequence.

09:11:00  8        I think the other thing the proofs will show, and this

09:11:03  9   should be of substantial concern to the Court, is the lack of any

09:11:07 10   adequate product identification here.  In order to prove that one

09:11:12 11   was damaged by the defective product, plaintiffs first have to prove

09:11:18 12   that they received it.  Mr. Woody from BrownGreer will testify that

09:11:24 13   BrownGreer was only able to confirm the presence of Chinese drywall

09:11:29 14   from any of these defendants in about a third of the class.  And at

09:11:33 15   this point, he can't even tell us which plaintiffs those were.  For

09:11:37 16   the rest of the class, the most, and I mean the very most, that

09:11:42 17   plaintiffs have is a bald indication on a plaintiff profile form or

09:11:48 18   a supplement which may have been done online claiming that there was

09:11:53 19   Chinese drywall.  Not only is that rank hearsay, but the proofs are

09:11:59 20   going to show that that has also been demonstrated to be wholly

09:12:03 21   unreliable.

09:12:04 22        Indeed, just last week the PSC dropped 127 class members

09:12:11 23   who claimed that they had drywall from these defendants, but who, in

09:12:16 24   fact, had KPT drywall.  We don't know and can't know how many other

09:12:23 25   class members still in the class fall into that category or who had

09:12:27  1   no Chinese drywall at all.  All we have, at this point, is the PSC's

09:12:32  2   say so and that is not evidence.

09:12:35  3          Your Honor, we recognize the long and, at times, very

09:12:40  4   frustrating path that this litigation has taken, and we can't

09:12:43  5   rewrite the past.  But dealing with the present, the proofs that the

09:12:49  6   plaintiffs will put before the Court are simply inadequate under the

09:12:53  7   established law of this circuit to support an award of class

09:12:57  8   damages, and we respectfully submit that plaintiffs' motion for

09:13:01  9   assessment of class damages should be denied.

09:13:03  10         THE COURT:  Thank you very much.  Let's proceed with the

09:13:06  11  proof.

09:13:06  12         MR. MEUNIER:  May it please the Court, your Honor, we will

09:13:10  13  call our first witness Jake Woody.  As Mr. Woody comes forward, I

09:13:15  14  think for the purposes of the record and as class counsel under Rule

09:13:19  15  23, I have to say that I know Mr. Kenny did not intend to suggest

09:13:22  16  that the PSC has removed members of the class.  We've removed no

09:13:27  17  individuals from the class.  Knauf plaintiffs were taken off of the

09:13:32  18  list because they weren't in the class to begin with, and we have

09:13:34  19  specified the types of claims which should be subject to formulaic

09:13:39  20  calculation for class-wide damages in this first phase of a

09:13:42  21  multi-phase trial.  We've removed no one from the class and I wanted

09:13:45  22  to make that record clear on that.

09:13:50  23         So our first witness is Mr. Woody.

09:13:50  24         THE COURT:  Let's swear him in, please.

09:13:57  25         THE DEPUTY CLERK:  Raise your right hand.

09:13:57   1          (WHEREUPON, JACOB WOODY, WAS SWORN IN AND TESTIFIED AS

09:13:58   2      FOLLOWS:)

09:13:58   3              THE DEPUTY CLERK:  Please have a seat.  State and spell

09:14:00   4   your name for the record, sir.

09:14:01   5              THE WITNESS:  My name is Jacob Woody, J-A-C-O-B W-O-O-D-Y.

09:14:08   6                      DIRECT EXAMINATION

09:14:09   7   BY MR. MEUNIER:

09:14:09   8   Q.  Good morning.

09:14:18   9   A.  Hello.

09:14:19  10   Q.  Would you give your name and address for the record, please.

09:14:22  11   A.  My name is Jacob Woody.  My address is 250 Rockets Way,

09:14:26  12   Richmond, Virginia 23231.

09:14:29  13   Q.  What is your occupation?

09:14:30  14   A.  I am an attorney with BrownGreer.

09:14:31  15   Q.  And how long have you been with BrownGreer?

09:14:34  16   A.  I have been with BrownGreer for about three years.

09:14:38  17   Q.  What's your formal education, Mr. Woody?

09:14:42  18   A.  I have a JD from the University of Virginia and a BA from

09:14:46  19   George Mason University.

09:14:48  20   Q.  Did you go to BrownGreer immediately upon graduating from law

09:14:51  21   school?

09:14:52  22   A.  No.  I worked for a law firm in Charlottesville, Virginia, for

09:14:58  23   about four years.

09:14:59  24   Q.  And then, after that, you went to BrownGreer?

09:15:01  25   A.  Yes.

09:15:01  1   Q.  Over the time you've been with BrownGreer, what kind of legal

09:15:07  2   services has that firm provided, particularly in multidistrict

09:15:11  3   litigation?

09:15:11  4   A.  We provide claims administration services, run claims programs.

09:15:16  5   We also provide data management, data collection services for large

09:15:25  6   scale mass torts, MDL's, and regular class actions.

09:15:28  7   Q.  Has the firm or members of the firm been court appointed as

09:15:32  8   special masters in MDL cases?

09:15:35  9   A.  Yes.

09:15:35  10  Q.  Court appointed as claims administrators?

09:15:37  11  A.  Yes.

09:15:37  12  Q.  Court appointed as settlement administrators?

09:15:40  13  A.  Yes.

09:15:41  14  Q.  What, in providing services as a claims settlement

09:15:46  15  administrator, can you describe the kind of staff and technical

09:15:49  16  resources that BrownGreer offers?

09:15:51  17  A.  We employ many attorneys, like myself; we also employ claims

09:15:57  18  reviewers, who review claims; and we have a large IT/programming

09:16:04  19  department that we use to build and maintain online web portals.

09:16:09  20  Q.  And does BrownGreer have a quality assurance or QA protocol for

09:16:14  21  the work it does as a claims or settlement administrator?

09:16:18  22  A.  Yes.  They vary by claims program, but, yes.

09:16:21  23  Q.  Can you generally describe the QA protocols that you have?

09:16:25  24  A.  Certainly.  After a claim is reviewed, we undertake a second

09:16:33  25  review, in some cases a third review, to make sure that the review

09:16:36  1    is correct.   The way we determine whether a claim needs to be

09:16:40  2    reviewed again varies by program.   In some cases, certain answers

09:16:46  3    are answered in a certain way or characteristics of the claim

09:16:50  4    indicate that it should be looked at again.

09:16:52  5    Q.   Now, when you say, "a claim being reviewed," Jake, are you

09:16:56  6    talking about claims that are being placed in line for an actual

09:16:58  7    payment, an actual allocation payment?

09:17:00  8    A.   Yes.   Although we do QA processes on claims that we believe are

09:17:06  9    ineligible as well to make sure that that review is correct.

09:17:09  10   Q.   Does BrownGreer as part of its procedures allow its claims data

09:17:14  11   system to be audited?

09:17:15  12   A.   Yes.

09:17:15  13   Q.   Does the firm agree to such audits if they're requested by a

09:17:18  14   party in a case?

09:17:19  15   A.   Yes.

09:17:20  16   Q.   Had Taishan Gypsum been in here over the life of this case,

09:17:26  17   would it have been able to make a request for an audit of your

09:17:29  18   system?

09:17:30  19           MR. KENNY:   Objection, your Honor.

09:17:31  20           THE WITNESS:   Yes.

09:17:32  21           THE COURT:   What's the objection?

09:17:33  22           MR. KENNY:   Hypothetical question.

09:17:39  23           THE COURT:   I'll overrule the objection.   He is an expert.

09:17:43  24   BY MR. MEUNIER:

09:17:44  25   Q.   Based, again, on your years with the firm and, again, generally

09:17:47   1    speaking, Mr. Woody, do BrownGreer's services in MDL's include

09:17:52   2    regular reporting on claims data to the presiding judge?

09:17:55   3    A.  Yes.

09:17:55   4    Q.  Is this most commonly done at status conferences?

09:17:57   5    A.  Yes.

09:17:58   6    Q.  Is the firm also set up to make reports on request to the Court

09:18:02   7    between status conferences?

09:18:03   8    A.  To the Court and to parties.

09:18:05   9    Q.  And what is the protocol at BrownGreer when a party requests

09:18:10  10    certain information or clarification about the claims data in your

09:18:13  11    system?

09:18:13  12    A.  It depends on the claims program.  It's all different.  The

09:18:18  13    parties can agree on whatever they want, but, generally, if a party

09:18:21  14    to a litigation or a court requests data about the claims program

09:18:25  15    and the claims characteristics, we provide it.

09:18:28  16    Q.  And, again, had Taishan Gypsum been in here since the beginning

09:18:33  17    of that case, those kinds of requests could have been made and

09:18:35  18    received by BrownGreer?

09:18:36  19    A.  Yes.

09:18:37  20    Q.  In your experience, and specifically in this case, has

09:18:41  21    BrownGreer -- in the drywall case -- has BrownGreer responded to

09:18:45  22    requests by parties for claims data?

09:18:47  23    A.  Yes.

09:18:48  24    Q.  Can you give us some examples?

09:18:50  25    A.  We respond to requests from Knauf, often standing requests that

09:18:57  1   we provide information on a regular basis about the remediation

09:19:01  2   program.  We provide information to the PSC about various issues

09:19:07  3   with claims, and we have provided information to Taishan about

09:19:12  4   claims characteristics and statistics.

09:19:15  5   Q.  Taishan through counsel asked you for information about the

09:19:18  6   Knauf remediation program, for example?

09:19:20  7   A.  Yes.

09:19:20  8   Q.  And you provided that data?

09:19:21  9   A.  I did.

09:19:22 10   Q.  Now, as a general rule, when BrownGreer is serving as a claims

09:19:30 11   administrator and it's asked by a party in the case to provide

09:19:35 12   clarification or information about claims, does the firm feel

09:19:39 13   obliged to seek clearance or authority from the Court?

09:19:42 14   A.  Not unless required to by agreement by the parties.  In the

09:19:46 15   absence of that, if a party requests information, we provide it.

09:19:50 16   Q.  Based on your experience, does the firm see responding to a

09:19:55 17   party's request as being inconsistent with your court appointment as

09:19:59 18   a claims administrator?

09:20:00 19   A.  No.  Oftentimes I feel it's a required part of our job.

09:20:04 20   Q.  When the firm provides claims information at the request of one

09:20:09 21   of the parties in an MDL, does it see this as taking sides or

09:20:13 22   compromising its neutrality as a court appointed administrator?

09:20:16 23   A.  No.

09:20:17 24   Q.  Now, let's discuss BrownGreer's involvement in this particular

09:20:22 25   case.  How and when did the firm first become involved in the

09:20:26  1   Chinese drywall case?

09:20:27  2   A.  We became involved, I believe, in 2011 when Lynn Greer was

09:20:31  3   appointed special master for purposes of collecting indicia.  This

09:20:35  4   was before any settlement or resolution.  And we collected a number

09:20:41  5   of materials related to properties with -- affected properties in

09:20:48  6   Chinese drywall.

09:20:50  7   Q.  Is it true that before BrownGreer's first entry into the case,

09:20:56  8   claim forms had been established in the case, profile forms?

09:20:59  9   A.  Yes, plaintiff profile forms.

09:21:01  10  Q.  And did you familiarize yourself, after you became involved in

09:21:04  11  the case, with those forms?

09:21:05  12  A.  Yes.

09:21:05  13  Q.  And I am showing you, Mr. Woody, Pre-Trial Order No. 11.  It

09:21:11  14  was entered on August 17, 2009, in this case filed as Record

09:21:18  15  Document 168-1.  Do you see that this was the Court's order that

09:21:24  16  certain profile forms, both plaintiff and defendant profile forms,

09:21:28  17  be forwarded to respective liaison counsel?

09:21:30  18  A.  Yes.

09:21:31  19  Q.  And attached to the order is the -- one of the things attached

09:21:34  20  is the plaintiff profile form.  Let me just -- it's a little bit

09:21:39  21  small type, but let me just ask you.  Looking at this first page of

09:21:44  22  the plaintiff profile form, does it state that this form is to be

09:21:47  23  filled out under oath?

09:21:49  24  A.  Yes.

09:21:49  25  Q.  Does it provide for the supplementation of responses as new

09:21:56  1    information is made available?

09:21:57  2    A.  Yes.

09:21:58  3    Q.  Does it provide for the attachment of photographs where

09:22:04  4    necessary?

09:22:04  5    A.  Yes.

09:22:06  6    Q.  On the following page, does it provide for inspection

09:22:12  7    information if available?

09:22:13  8    A.  Yes.

09:22:14  9    Q.  Does it provide for identity of the drywall manufacturer in the

09:22:17 10    home?

09:22:17 11    A.  Yes.

09:22:18 12    Q.  Square footage in the home?

09:22:20 13    A.  Yes.

09:22:20 14    Q.  Does it provide for the attachment of floor plans?

09:22:24 15    A.  Yes.

09:22:24 16    Q.  And in the final -- on the final page, page 27 of 27 in the

09:22:31 17    document, does it state over the signature page that the signature

09:22:35 18    is here made under penalty of perjury?

09:22:38 19    A.  Yes.

09:22:39 20    Q.  Before your entry into the case, had the Court also established

09:22:49 21    what was known as the TIP program, or the Threshold Inspection

09:22:53 22    Program?

09:22:54 23    A.  Yes.

09:22:55 24    Q.  And I am referring you now to Pre-Trial Order No. 10, entered

09:22:59 25    on August 21st, 2009, it's Record Document 171.  Does this order

09:23:05  1    provide for the utilization of a photographic catalog?

09:23:10  2    A.  Yes.

09:23:11  3    Q.  And what was that catalog to be used for?

09:23:14  4    A.  To identify the types of drywall in the property.

09:23:18  5    Q.  And I am showing you the attached index to that order, which

09:23:26  6    includes a listing of certain types of drywall according to markings

09:23:32  7    and photographs, correct?

09:23:33  8    A.  Correct.

09:23:33  9    Q.  How was this utilized in the case?

09:23:35  10   A.  We used this to identify drywall, to look at the pictures

09:23:41  11   attached to this document, and we used those pictures and others

09:23:45  12   like it during the course of our reviews to establish what kind of

09:23:49  13   drywall was in the property.

09:23:50  14   Q.  Was this Court approved index photographic catalog ever

09:23:55  15   modified?

09:23:56  16   A.  Not that I know of.

09:23:57  17   Q.  Did Taishan ever file an objection or seek to revise this

09:24:02  18   index?

09:24:03  19   A.  Not that I know of.

09:24:04  20   Q.  Or the attached markings?

09:24:06  21   A.  No.

09:24:06  22   Q.  Do you see that the order or the index does provide for

09:24:12  23   revisions and was last revised as of January 2012.  Do you see that?

09:24:18  24   A.  No.  I am not sure I...

09:24:25  25   Q.  It's small print.

09:24:26  1    A.  Yes, I see that, yes.

09:24:28  2    Q.  So parties had the opportunity, including defendant

09:24:31  3    manufacturers, to offer revisions?

09:24:33  4    A.  I assume so, yes.

09:24:34  5    Q.  Now, Lynn Greer was appointed as special master in the case,

09:24:42  6    Lynn Greer with BrownGreer by court order, or stipulation rather, of

09:24:46  7    December 27, 2010.  It's Record Document 6732, correct?

09:24:50  8    A.  Correct.

09:24:51  9    Q.  And her appointment was very specific as special master,

09:24:54 10    correct?

09:24:55 11    A.  Yes.

09:24:55 12    Q.  She was appointed according to this for the purpose of

09:24:58 13    collecting indicia from plaintiffs that the homes contained KPT,

09:25:04 14    Wuhu or Dongguan drywall?

09:25:08 15    A.  Yes.

09:25:11 16    Q.  And then, subsequently, there was a supplement to that order

09:25:14 17    which is dated January 12, 2011, it's Record Document 6967.

09:25:23 18    Correct?

09:25:23 19    A.  Correct.

09:25:24 20    Q.  Which spelled out Lynn Greer special master duties, again, for

09:25:28 21    that specific purpose?

09:25:29 22    A.  Yes.

09:25:30 23    Q.  Now, Jake, in February of 2013, did Judge Fallon approve

09:25:36 24    certain class settlements in this case?

09:25:38 25    A.  Yes.

09:25:38  1   Q.  Which settlements were approved?

09:25:41  2   A.  The Banner settlement, the InEx settlement, and what we call

09:25:45  3   the Global settlement which is also called the builders, suppliers,

09:25:48  4   installers, and insurers settlement.

09:25:50  5   Q.  Those settlements were collectively referred to as GBI, Global,

09:25:57  6   Banner, InEx?

09:25:57  7   A.  Yes.

09:25:57  8   Q.  Was there a Knauf settlement as well that was approved by the

09:26:00  9   Court?

09:26:01  10  A.  Yes.

09:26:01  11  Q.  Was BrownGreer at that time called upon to serve as the claims

09:26:05  12  or settlement administrator for all of those settlements?

09:26:08  13  A.  Yes.

09:26:08  14  Q.  So this was a distinct service from the special master

09:26:12  15  appointment of Lynn Greer, a new role for BrownGreer in the case,

09:26:16  16  correct?

09:26:17  17  A.  Yes.

09:26:17  18  Q.  Can you just briefly explain to the Court the differences in

09:26:23  19  the Knauf settlement on the one hand and the GBI settlement on the

09:26:28  20  other; particularly, how those differences affected the activities

09:26:31  21  and role of BrownGreer?

09:26:32  22  A.  Yes.  The Knauf settlement is a remediation settlement.

09:26:37  23  Homeowners with Knauf drywall are eligible to have their properties

09:26:41  24  remediated by a contractor of their choosing or by a contractor

09:26:46  25  appointed by the court.  There is no real claims process for the

09:26:51 1   remediation program.  Properties are inspected as they are

09:26:56 2   identified.  They're inspected by Benchmark or MZA, which are court

09:27:01 3   appointed inspectors.  Those inspection companies determined the

09:27:06 4   nature and quantity of the drywall in the property.  If they

09:27:11 5   determined that a property has the right kind of drywall, KPT

09:27:15 6   drywall, the property proceeds through the remediation course.

09:27:19 7           Our job is to collect documents from Moss, Knauf, and

09:27:26 8   homeowners, and to issue payments to homeowners and to Moss.  There

09:27:33 9   is no real claim determination that we make in that program.

09:27:36 10  Q.  What documents exactly are you collecting that you referred to?

09:27:40 11  A.  Many documents:  Inspection reports, photographs, estimates,

09:27:48 12  requests for payment, change orders, all of the things that go along

09:27:53 13  with a construction project.

09:27:54 14  Q.  Now, what about the GBI settlement, what were your services

09:27:59 15  there?

09:27:59 16  A.  The GBI settlements do not provide for remediation.  They

09:28:03 17  provide for payment based on the square footage in a property.  We

09:28:10 18  were charged with accepting claims for GBI payments, reviewing them

09:28:16 19  to determine eligibility, and, if eligible, the size of the property

09:28:22 20  in under air square feet, which is the heated and cooled areas of

09:28:26 21  the home suitable for year round living.  Aggregate all of the

09:28:31 22  square footage of all of the eligible properties to determine a pro

09:28:35 23  rata square foot amount.  And then issue payment based on that pro

09:28:39 24  rata square footage amount.

09:28:41 25  Q.  Did you make periodic reports to the court and to the parties

09:28:47 1  on the claims administration for settlement purposes in both the

09:28:50 2  Knauf and GBI settlements?

09:28:52 3  A.  Yes.

09:28:52 4  Q.  How many status conferences did you attend where you personally

09:28:56 5  made those reports?

09:28:57 6  A.  I believe the last status conference was No. 22.

09:29:01 7  Q.  And you've been attending all of those status conferences?

09:29:05 8  A.  Yes, I've attended all of those, and a few more before I

09:29:09 9  started making regular reports.

09:29:10 10  Q.  Are your reports disseminated to the parties in the case?

09:29:14 11  A.  Yes.

09:29:16 12  Q.  Are they also posted on the court's web site?

09:29:18 13  A.  Yes.

09:29:19 14  Q.  Now, let me make sure we're talking about two specific

09:29:26 15  categories of information, Mr. Woody:  Property square footage and

09:29:32 16  product ID.  For the Knauf remediation program, how was property

09:29:41 17  square footage collected by BrownGreer?

09:29:43 18  A.  We received that information from Moss, who would do an

09:29:49 19  estimate and provide the square footage.  And we received product ID

09:29:55 20  from the Benchmark and MZA inspection reports.

09:29:58 21  Q.  So do I understand that both categories of information for the

09:30:02 22  Knauf remediation program, that is square footage product ID, came

09:30:07 23  to BrownGreer through Knauf's own inspection activity?

09:30:10 24  A.  Correct.

09:30:11 25  Q.  Did the square footage collected for the Knauf settlement refer

09:30:16  1  to the total square footage as opposed to under air living space?

09:30:21  2  A.  It referred to what we call remediation square footage, which

09:30:24  3  is the parts of the home that need to be remediated, which

09:30:28  4  oftentimes include parts that would not be included in under air

09:30:34  5  square footage.

09:30:34  6  Q.  So when you say or refer to "under air square footage," what

09:30:37  7  are you referring to?

09:30:39  8  A.  Generally, it's easier to say what is not included in that, and

09:30:43  9  that would be garages, unfinished basements, attics, carports,

09:30:49  10 places where you would not live.

09:30:52  11 Q.  But the square footage totals you have for the Knauf

09:30:54  12 remediation are total and not limited to under air or living space;

09:30:58  13 is that true?

09:30:59  14 A.  Correct.

09:30:59  15 Q.  And it was the responsibility of BrownGreer to keep an accurate

09:31:07  16 record of the payments made to the contractors to remediate homes in

09:31:11  17 that program?

09:31:12  18 A.  Yes.

09:31:13  19 Q.  Did you also record payments of move in, move out expenses?

09:31:18  20 A.  Yes.

09:31:19  21 Q.  That was part of what the plaintiffs received in the Knauf

09:31:21  22 settlement?

09:31:22  23 A.  Yes.

09:31:22  24 Q.  Other than recording the payments for the actual remediation of

09:31:28  25 property and recording payments for move in, move out costs, did

09:31:32  1   BrownGreer record any other payments which might have been made for

09:31:35  2   purposes of carrying out the Knauf settlement?

09:31:37  3   A.  The only other payment would be bank fees and IRS tax

09:31:46  4   preparation fees.

09:31:46  5   Q.  Now, you mentioned this, but how was the product identification

09:31:51  6   phase of the Knauf remediation program carried out?  Is that, again,

09:31:55  7   based on inspection?

09:31:56  8   A.  Yes.  The Benchmark and MZA inspections where they would

09:32:02  9   determine whether a property had KPT drywall, and if so, the

09:32:06 10   percentage of the home that contained KPT drywall.

09:32:09 11   Q.  Let's talk about that.  If a home contained both KPT and

09:32:14 12   domestic drywall, was it eligible for remediation?

09:32:16 13   A.  Yes.

09:32:16 14   Q.  If a home contained KPT and other reactive Chinese drywall, how

09:32:22 15   did that work in the program?

09:32:23 16   A.  That would be what we call a mixed home, and they are eligible

09:32:27 17   for what we call Option 2 or Option 3 remediation.  Option 2 allows

09:32:34 18   a homeowner to hire their own contractor and Knauf will pay the

09:32:40 19   percentage of the remediation costs that is attributable to KPT

09:32:45 20   drywall.  So, for instance, if a home has 50 percent KPT drywall and

09:32:50 21   it costs $100,000 to remediate, Knauf will pay $50,000.  And the

09:32:54 22   homeowner has to provide the remaining $50,000.

09:32:58 23   Q.  So in that case of a mixed home, BrownGreer is only recording

09:33:02 24   the Knauf percentage payment?

09:33:04 25   A.  We would record the entire payment.

09:33:07 1    Q.  But you would break it out between what Knauf paid and what was

09:33:11 2    paid otherwise?

09:33:11 3    A.  Yes.

09:33:12 4    Q.  Let's talk about the GBI settlements, particularly with respect

09:33:17 5    to square footage and product ID.  Were there separate categories of

09:33:23 6    funding in the GBI settlement?

09:33:25 7    A.  Yes.

09:33:25 8    Q.  And how did that break down?

09:33:27 9    A.  Well, there are three settlements; each has its own QSF, it's

09:33:34 10   own account.  We make payments from separate accounts.  Obviously,

09:33:38 11   the Banner and InEx are one -- or two of the three.  And the third,

09:33:43 12   what we call the Global funding, was received into a QSF from

09:33:49 13   approximately 800 defendants.  And we issued payments from the

09:33:55 14   Global QSF in what I'll call three different buckets:  The Global

09:34:00 15   builder, the Global installer, and the Global supplier.  Each have

09:34:03 16   their own separate pro rata breakdown.

09:34:08 17   Q.  Did the Global, Banner, InEx settlements require BrownGreer as

09:34:12 18   claims administrator to collect square footage data?

09:34:14 19   A.  Yes.

09:34:15 20   Q.  Why is that?

09:34:15 21   A.  Because the payments made to homeowners is based on the square

09:34:21 22   footage of the property, and the pro rata calculations are based on

09:34:26 23   the total aggregate square footage of eligible claims submitted

09:34:33 24   against each of the three settlements.

09:34:34 25   Q.  Did the court approve a certain allocation process whereby

09:34:40 1  there was a specific requirement to submit square footage?

09:34:42 2  A.  Yes.

09:34:43 3  Q.  And I am showing you what has been entered in the record on

09:34:50 4  January 22nd, 2013, as Record Document 16528-1.  Do you recognize

09:34:56 5  this as the allocation plan for the builders and suppliers and

09:35:02 6  insurers or Global aspect of that settlement?

09:35:06 7  A.  Yes.

09:35:06 8  Q.  And does this protocol on page 3 of 7 mandate that for

09:35:13 9  allocation purposes square footage be -- under air square footage be

09:35:19 10  collected?

09:35:20 11  A.  Yes.

09:35:20 12  Q.  We've already discussed this.  Under air square footage is

09:35:24 13  defined to be living space square footage?

09:35:26 14  A.  Correct.

09:35:27 15  Q.  So if pursuant to this allocation requirement there was a

09:35:31 16  submitted floor plan that included garage or non-living space, what

09:35:36 17  did BrownGreer do to record only the under air square footage?

09:35:41 18  A.  We would look at the floor plan and add up the parts of the

09:35:46 19  property that were under air and exclude the parts that were not

09:35:49 20  under air.

09:35:52 21  Q.  I am next showing you the proposed allocation plan that was

09:35:56 22  court approved for the Banner portion of the GBI settlement.  And

09:36:00 23  does it, likewise, at page 3 of 6 require that affected properties

09:36:05 24  submit under air square footage information to BrownGreer?

09:36:08 25  A.  Yes.

09:36:08 1    Q.  And that's Record Document 1657-1 filed on January 22nd, 2013.

09:36:18 2         And finally, Mr. Woody, I am showing you the proposed

09:36:22 3    allocation for the InEx settlement, and it's Document 16609-2 filed

09:36:29 4    on March 13, 2013, at page 3 of that document.  Does it also require

09:36:35 5    that BrownGreer receive under air square footage in order for

09:36:39 6    allocation to be made?

09:36:46 7    A.  Yes.

09:36:47 8    Q.  The BrownGreer reviewers who entered this information, and I am

09:36:55 9    talking about now specifically, the square footage information that

09:36:59 10   was required for allocation purposes in the GBI settlement, were

09:37:03 11   those reviewers trained to review and enter that information?

09:37:08 12   A.  Yes.

09:37:09 13   Q.  Was there a deficiency process in place to handle submissions

09:37:16 14   that were problematic?

09:37:17 15   A.  Yes, yes.

09:37:18 16   Q.  Can you describe that process?

09:37:19 17   A.  We would review a claim, and if we determined that it was

09:37:23 18   missing one or more required elements of proof, we would issue what

09:37:29 19   we call an incompleteness notice that we would send to the claimant

09:37:33 20   or the claimant's attorney explaining exactly what was missing and

09:37:36 21   what they needed to do to remedy that situation.  They had 25 days

09:37:41 22   to respond to that notice.

09:37:42 23        If we did not receive a response or if we received a

09:37:45 24   response that was still insufficient, we would issue what we call a

09:37:49 25   follow-up incompleteness notice, and they would have five days to

09:37:52  1   respond to that.

09:37:53  2          If, again, it was still insufficient for either not

09:37:56  3   submitting anything or submitting insufficient documents, we would

09:37:59  4   issue what we call an incompleteness denial notice.  Essentially,

09:38:03  5   denying the claim but allowing a claimant to still, again, submit

09:38:07  6   the documents that were missing within 30 days.

09:38:11  7   Q.  And again, as I appreciate it, all of that was a predicate and

09:38:14  8   prerequisite for a claimant to actually receive an allocated share

09:38:18  9   of the settlement, correct?

09:38:19 10   A.  Yes.

09:38:20 11   Q.  And BrownGreer could have that same exact system in place, for

09:38:24 12   example, to allocate any aggregated fund in this case should the

09:38:28 13   Court approve the damages model suggested by the plaintiffs?

09:38:31 14   A.  Yes.

09:38:31 15   Q.  Now, we have talked about the photographic catalog that was

09:38:45 16   established with PTO 10 in the summer of 2009.  But at the time of

09:38:53 17   the GBI settlement, Mr. Woody, was there also a Court approved

09:38:58 18   drywall indicia guide?

09:39:00 19   A.  Yes, it was an exhibit to the Knauf settlement agreement.

09:39:02 20   Q.  And I am showing you now Pre-Trial Order No. 27, which is dated

09:39:09 21   September 10th, 2013.  It's Record Document 17060.  Pursuant to this

09:39:19 22   pretrial order, did the Court give discretionary authority to

09:39:25 23   BrownGreer with respect to the implementation of the settlement?

09:39:29 24   A.  Yes.

09:39:29 25   Q.  What was that discretionary authority?

09:39:32 1   A.  We instituted a system of what we call a claims administration

09:39:37 2   procedures that allowed us to consult with the parties, plaintiffs

09:39:42 3   and defendants, on issues or policies that we needed -- that we felt

09:39:46 4   needed to be resolved to clarify certain elements of the settlement

09:39:50 5   agreements.  And once we had the agreement of all of the parties, or

09:39:54 6   if we -- even without that, we could issue what we call claims

09:39:58 7   administrator procedures.  We filed them with the Court and made

09:40:01 8   them available on our website, and they explained various policy

09:40:05 9   decisions.

09:40:06 10  Q.  Let me, then, refer you to one of the attached claims

09:40:10 11  administrative procedures, or CAP's.  Do you recognize this one?

09:40:14 12  A.  Yes.

09:40:15 13  Q.  And the purpose here is to require -- it's to set forth what

09:40:23 14  the proof requirements were for submitting documentary evidence in

09:40:27 15  connection with the settlements, correct?

09:40:29 16  A.  Correct.

09:40:30 17  Q.  Paragraph 3A of this document, this CAP says that inspection

09:40:40 18  reports by certain approved inspectors are conclusive proof of

09:40:43 19  Chinese drywall; is that true?

09:40:45 20  A.  Yes.

09:40:46 21  Q.  But then a plaintiff could also submit a written agreement for

09:40:50 22  repair.  That could be proof of Chinese drywall?

09:40:52 23  A.  Yes.

09:40:53 24  Q.  And a plaintiff could also submit affidavits?

09:40:56 25  A.  Correct.

09:40:56  1    Q.  Explain to the Court how the affidavit component of proof is

09:41:00  2    handled by BrownGreer.

09:41:02  3    A.  Claimants can submit affidavits to prove any part of the claim

09:41:07  4    that they are incomplete for or need to prove with the caveat that,

09:41:14  5    in order for us to accept an affidavit, the claimant had to provide

09:41:17  6    a basis for the assertion that they're making.  So they couldn't

09:41:21  7    just, for instance, list a supplier.  They couldn't just say,

09:41:26  8    "Banner supplied my drywall."  They needed to say something more

09:41:30  9    about why they believe that to be true.  The best example is Banner

09:41:35 10    supplied all of the properties in my neighborhood was a fairly

09:41:42 11    common basis asserted in an affidavit.

09:41:45 12    Q.  And BrownGreer was given by the Court authority to make those

09:41:49 13    calls on the sufficiency of affidavits?

09:41:51 14    A.  Yes.

09:41:51 15    Q.  And that same protocol would be in place, for example, for

09:41:54 16    allocation purposes in any settlement the Court approved or

09:41:58 17    quantified through this hearing?

09:41:59 18    A.  Yes.

09:42:01 19            MR. FENTON:  Objection, your Honor.  Calls for a legal

09:42:04 20    conclusion.  That's your Honor's determination.

09:42:06 21            THE COURT:  Okay.

09:42:07 22            MR. MEUNIER:  I asked that the system would be in place,

09:42:09 23    your Honor.

09:42:12 24            THE COURT:  I'll let him answer it.

09:42:16 25    BY MR. MEUNIER:

09:42:17  1   Q.  Were there, in this CAP procedure that's outlined here,

09:42:21  2   challenges made by homeowners to BrownGreer determinations?

09:42:25  3   A.  Yes.

09:42:25  4   Q.  Can you give the Court any idea of the number of those that

09:42:30  5   took place?

09:42:30  6   A.  There were various appeals made.  I would think the total

09:42:34  7   number of appeals was about 800 in the course of the entire program.

09:42:40  8   And that would include claims other than GBI claims as well.

09:42:45  9   Q.  Were all of those deficiencies or challenges resolved without

09:42:48  10  Judge Fallon having to be involved?

09:42:50  11  A.  No.  Several have made their way to Judge Fallon, mainly

09:42:54  12  through appeals of decisions made by Dan Belhoff, who is the special

09:42:59  13  master appointed to resolve those types of disputes.

09:43:06  14          MR. MEUNIER:  Your Honor, I will offer as Exhibit 76,

09:43:09  15  which is the number given to it on the master list, the BrownGreer

09:43:14  16  claims administration procedure, which has been referred to and

09:43:19  17  entered on September 10, 2013.

09:43:26  18          MR. FENTON:  No objection.

09:43:27  19          THE COURT:  Let it be admitted.

09:43:31  20  BY MR. MEUNIER:

09:43:31  21  Q.  Now, Mr. Woody, have you provided to both counsel for the

09:43:35  22  defendants, the Taishan defendants and to the PSC, an internal

09:43:41  23  BrownGreer document entitled "Chinese Drywall Settlement Program

09:43:46  24  Global, Banner, InEx, Document Review Protocol Questions"?

09:43:50  25  A.  Yes.

09:43:50  1    Q.  And you recognize this as that document?

09:43:52  2    A.  I do.

09:43:52  3    Q.  Tell us what this document is and how it was used by BrownGreer

09:43:57  4    as a settlement administrator.

09:43:58  5    A.  In the course of performing Global, Banner, InEx reviews, our

09:44:04  6    reviewers encountered a number of documents that they weren't quite

09:44:08  7    sure how to handle.  They had questions about them.  The documents

09:44:15  8    ranged from square footage documents, to indicia documents, to

09:44:18  9    ownership documents.  We compiled the questions and provided example

09:44:25 10    documents and submitted these to the parties with our recommendation

09:44:30 11    of how they should be handled.  And then met with the parties in

09:44:35 12    October of 2013, reviewed all of the materials, and with their

09:44:41 13    guidance, issued a final decision as to how those documents would be

09:44:46 14    handled, which we promulgated to our reviewers to use during the

09:44:50 15    course of their reviews.

09:44:52 16    Q.  And this BrownGreer system remains in effect at this time?

09:44:55 17    A.  Yes.

09:44:55 18    Q.  And the checklist you have here, the 12-item checklist, the

09:45:00 19    BrownGreer reviewers trained on that checklist?

09:45:02 20    A.  Yes.

09:45:04 21           MR. MEUNIER:  Your Honor, I will offer as Exhibit 77 the

09:45:09 22    protocol questions of BrownGreer dated October 23rd, 2013.

09:45:14 23           MR. FENTON:  Your Honor, the only objection I have, and

09:45:17 24    I'm sure this was inadvertent, but I believe there are three or four

09:45:21 25    more pages to that protocol checklist that are not in this Exhibit,

09:45:27   1    and I would just ask that they be added.

09:45:30   2            MR. MEUNIER:  We have the entire thing in the

09:45:33   3    exhibit book.

09:45:33   4            MR. FENTON:  Oh, okay.

09:45:35   5            MR. MEUNIER:  That's what I'm offering.

09:45:37   6            MR. FENTON:  My copy just had one page.

09:45:39   7            MR. MEUNIER:  Well, you're just seeing the PowerPoint, but

09:45:41   8    we have the entire document offered, your Honor.

09:45:43   9            MR. FENTON:  Okay.  Thank you.

09:45:44  10            THE COURT:  No objection.  I'll allow it.

09:45:44  11    BY MR. MEUNIER:

09:45:49  12    Q.  Now, Mr. Woody, last fall were you asked by the PSC to provide

09:45:58  13    certain information from the BrownGreer database; specifically,

09:46:04  14    information which had been created and maintained by BrownGreer in

09:46:07  15    the course of its work in this MDL?

09:46:10  16    A.  Yes.

09:46:10  17    Q.  What information were you asked to provide last fall?

09:46:13  18    A.  Initially we were asked to provide updated mailing addresses

09:46:19  19    for a number of properties on the spreadsheet we received from the

09:46:25  20    PSC.  We did that.  And then we were asked to provide square footage

09:46:31  21    information that we had collected during the course of our Global,

09:46:35  22    Banner, InEx reviews.

09:46:36  23    Q.  In making this initial square footage request, did the PSC,

09:46:40  24    through the office of lead counsel Arnold Levin, provide you with a

09:46:45  25    list of properties and property owners?

09:46:47 1   A.  Yes.

09:46:47 2   Q.  What did you understand that list to represent?

09:46:49 3   A.  I understood it to represent the members of the Taishan class.

09:46:54 4   Q.  So to be clear, neither you nor anyone at BrownGreer took part

09:46:59 5   in creating that Taishan class list?

09:47:01 6   A.  No.

09:47:02 7   Q.  Do you know that list to have been revised and modified over

09:47:06 8   the last several months?

09:47:08 9   A.  Yes.

09:47:08 10  Q.  Do you know it to now be reflected in what is marked as the

09:47:13 11  Inglis Exhibit 10 spreadsheet?

09:47:14 12  A.  Yes.

09:47:15 13  Q.  Now, have you and BrownGreer been compensated as claims

09:47:21 14  administrator for the Knauf and Global, Banner settlements under the

09:47:25 15  terms of those settlements?

09:47:27 16  A.  Yes.

09:47:28 17  Q.  Did the Plaintiff Steering Committee request for square footage

09:47:35 18  information call on you and others at BrownGreer to spend time that

09:47:38 19  was not subject to that compensation agreement?

09:47:41 20  A.  Yes.

09:47:41 21  Q.  And was an agreement, therefore, reached between BrownGreer and

09:47:45 22  the PSC that you and BrownGreer would be compensated for the time

09:47:50 23  spent complying with this information request?

09:47:53 24  A.  Yes.

09:47:54 25  Q.  Is the PSC to be billed at the same rate which applies to your

09:47:57  1    services as a claims administrator?

09:47:59  2    A.  Yes.

09:47:59  3    Q.  Have you or BrownGreer yet billed the PSC?

09:48:03  4    A.  No.

09:48:03  5    Q.  Do you intend to?

09:48:04  6    A.  Yes.

09:48:05  7    Q.  Do you need Arnold Levin's credit card information?

09:48:09  8    A.  Yes, I do.

09:48:11  9              MR. LEVIN:  Which one?

09:48:13  10             MR. KENNY:  We ask that that be stated in open court.

09:48:16  11   BY MR. MEUNIER:

09:48:17  12   Q.  Please tell Judge Fallon, then, what you or the BrownGreer

09:48:21  13   staff did, initially, to comply with the request from the PSC for

09:48:26  14   square footage information last fall.

09:48:29  15   A.  We reviewed the list we received from the PSC.  The list had

09:48:35  16   property owner name and street address.  We reconciled that list

09:48:42  17   with our list of properties and square footage, and where there was

09:48:47  18   a match to a property on our list and we had square footage compiled

09:48:53  19   through our reviews, we would insert the square footage number on

09:48:57  20   the PSC list.

09:48:58  21   Q.  And you were drawing specifically on your GBI settlement data?

09:49:02  22   A.  Yes.

09:49:03  23   Q.  So this was under air or living space square footage?

09:49:07  24   A.  Correct.

09:49:07  25   Q.  And it had been verified through all of the protocols and

09:49:11  1  documents that we've already reviewed?

09:49:14  2  A.  Yes.

09:49:14  3  Q.  Were you able, Mr. Woody, at that time, to supply square

09:49:20  4  footage information for all of the properties which had been placed

09:49:24  5  on that list by the PSC?

09:49:26  6  A.  No.

09:49:26  7  Q.  In the spring of this year, did the PSC then ask you to take

09:49:33  8  further steps to supply square footage information for properties on

09:49:37  9  the list?

09:49:37 10  A.  Yes.

09:49:38 11  Q.  Specifically, those properties which remained blank as of that

09:49:42 12  time?

09:49:42 13  A.  Correct.

09:49:43 14  Q.  Did the PSC more specifically, at that time, ask that you rely

09:49:47 15  on the content of plaintiff profile forms in cases where other

09:49:52 16  information on square footage was not available?

09:49:54 17  A.  Yes.

09:49:55 18  Q.  Did you do as you were requested to do in that respect?

09:49:59 19  A.  I did.

09:49:59 20  Q.  And did the PSC then ask you to write a memo reflecting what

09:50:06 21  you had done at that point, both with respect to the initial request

09:50:09 22  in the fall of 2014 and the follow-up request this spring?

09:50:13 23  A.  Yes.

09:50:14 24  Q.  And I am referring you now, Mr. Woody, to a file memo from you.

09:50:56 25  The file memo from you to the file which is dated May 5th, 2015.  Do

09:51:00  1    you recognize this?

09:51:01  2    A.  Yes.

09:51:01  3    Q.  And there were certain attachments to that as well, which we

09:51:06  4    will discuss, correct?

09:51:06  5    A.  Correct.

09:51:07  6    Q.  Now, let's be clear about one thing, Jake.  Before you

09:51:11  7    finalized this requested file memo, did you provide drafts of the

09:51:16  8    memo to the PSC?

09:51:17  9    A.  Yes.

09:51:18  10   Q.  Did you agree to certain language edits suggested by the PSC?

09:51:22  11   A.  Yes.

09:51:23  12   Q.  Did you accept all of the edits suggested by the PSC?

09:51:26  13   A.  No.

09:51:26  14   Q.  Were all of the edits that you agreed to of a nature that in

09:51:32  15   any way changed the substantive meaning of your initial draft?

09:51:35  16   A.  No.

09:51:36  17   Q.  Have all of those drafts of the memo as well as all of the

09:51:39  18   e-mails that went back and forth with the drafts been provided to

09:51:42  19   counsel for the Taishan defendants?

09:51:45  20   A.  Yes.

09:51:45  21   Q.  We are looking here, are we not, at the final version of your

09:51:49  22   file memo of May 5th?

09:51:51  23   A.  Yes.

09:51:51  24   Q.  With attachments?  There's an attachment, correct?

09:51:55  25   A.  Yes, there are two attachments to this memo.

09:51:58  1          MR. MEUNIER:  And I will offer the memo with attachments,

09:52:00  2   your Honor, as Exhibit 17 in globo.  It's in the bench book.

09:52:06  3          THE COURT:  Any objection?

09:52:09  4          MR. KENNY:  What's the number?

09:52:10  5          MR. MEUNIER:  Exhibit 17.

09:52:12  6          MR. KENNY:  Thank you.

09:52:13  7          THE COURT:  I'll admit it.

09:52:15  8   BY MR. MEUNIER:

09:52:16  9   Q.  So in the first part of this memo, you refer to the properties

09:52:25 10   that were on the PSC list and the complaints that those properties

09:52:29 11   were involved with.  And then, in the second paragraph, you talk

09:52:35 12   about the list itself containing at that point 3,709 properties,

09:52:40 13   correct?

09:52:40 14   A.  Correct.

09:52:41 15   Q.  And you discuss here how you then cross-referenced that list

09:52:46 16   with the verified square footage and the GBI settlement data?

09:52:51 17   A.  Yes.

09:52:51 18   Q.  And again, by "verified," what did you mean?

09:52:53 19   A.  The number that we collected during the course of our review by

09:53:00 20   looking at the documents submitted and using the protocols we've

09:53:04 21   discussed earlier today.

09:53:05 22   Q.  And how many properties on the list in the fall of 2014 were

09:53:11 23   you able to verify square footage for using that method?

09:53:15 24   A.  2,343.

09:53:19 25   Q.  In the paragraph that follows then, did you, then, specify the

09:53:26  1   methods and the sources of information for the verification of the

09:53:30  2   square footage for those 2,343 properties?

09:53:33  3   A.  Yes.

09:53:34  4   Q.  Now, at the bottom of page 1, the first page of this memo,

09:53:39  5   beginning with "Since October 2014," are you now beginning to

09:53:43  6   describe what was done in response to the follow-up request that the

09:53:47  7   PSC made in the spring of this year?

09:53:49  8   A.  Yes.

09:53:49  9   Q.  And you say that you added square footage at that point for an

09:53:54  10  additional 899 properties on the class list, correct?

09:53:58  11  A.  Yes.

09:53:59  12  Q.  And the three subparagraphs, do these specify the three

09:54:07  13  different bases you used to identify square footages in those cases?

09:54:12  14  A.  Yes.

09:54:12  15  Q.  In the first case you say you referred on the GBI review

09:54:18  16  process?

09:54:19  17  A.  Yes.

09:54:19  18  Q.  What exactly were you referring to there?

09:54:22  19  A.  Again, the data that we collected during the course of our

09:54:25  20  reviews.  We initially did this work in the fall of 2014, and when

09:54:32  21  we received the follow-up in the spring of 2015, there were

09:54:36  22  properties who did not have square footage available when we first

09:54:40  23  did it, but in the months between had submitted documents that

09:54:44  24  allowed us to calculate the square footage.  And I added those to

09:54:48  25  the list.

09:54:48   1    Q.  And according to Subparagraph 2 at the bottom of page 1 of this

09:54:53   2    memo, you also looked at websites?

09:54:55   3    A.  Yes.

09:54:56   4    Q.  Describe that activity for the Court.

09:54:58   5    A.  The PSC asked us if we could, first of all, collect what were

09:55:05   6    essentially supplemental plaintiff profile forms, they're also

09:55:09   7    called, in some cases, the Taishan evidence form, where people would

09:55:13   8    list the square footage of their property.  And the PSC asked us to

09:55:17   9    first collect those, and if we did not already have a square footage

09:55:21  10    for those properties, to attempt to verify it through third-party

09:55:26  11    sources, just as we had done during the course of our Global,

09:55:32  12    Banner, InEx reviews.  Those sources generally included tax

09:55:34  13    appraisal websites, property ownership websites, official government

09:55:39  14    websites, things of that nature.

09:55:41  15    Q.  And then, finally, you mention at the bottom of page 1 of the

09:55:45  16    memo you relied on plaintiff profile forms in some cases?

09:55:49  17    A.  Where there was no square footage available through Method 1 or

09:55:53  18    Method 2, the PSC asked us to insert the square footage listed on

09:55:58  19    the PPF and we did that.

09:55:59  20    Q.  Now, it was at that point in time in the early spring of this

09:56:03  21    year, correct?

09:56:03  22    A.  Correct.

09:56:04  23    Q.  Let me be sure.  When you say "profile forms" in this context,

09:56:08  24    you're talking about the earlier reviewed Court approved PPF's which

09:56:14  25    have the statements about perjury, under oath, et cetera?

09:56:16  1    A.  Yes.

09:56:17  2    Q.  At the top of page 2 of the memo, you, then, mention that the

09:56:29  3    total number of claims or properties on the list had been revised,

09:56:32  4    is that true?

09:56:33  5    A.  True.

09:56:34  6    Q.  Because in the cross-referencing with addresses they were

09:56:37  7    duplicates and that sort of thing?

09:56:39  8    A.  Yes.

09:56:39  9    Q.  So the total size of the list then shrunk somewhat or changed

09:56:44  10   somewhat?

09:56:45  11   A.  Yes.

09:56:45  12   Q.  Now, in addition to square footage, the PSC was also at that

09:56:51  13   point asking you for assistance on property or drywall

09:56:57  14   identification or product ID, correct?

09:56:58  15   A.  Yes.

09:56:59  16   Q.  And in the balance of this memo, do you discuss what you did in

09:57:03  17   that regard?

09:57:04  18   A.  Yes.

09:57:05  19   Q.  In the paragraph then, first full paragraph -- second full

09:57:11  20   paragraph on page 2, you talk about verifying the presence of

09:57:14  21   Taishan drywall, correct?

09:57:16  22   A.  Correct.

09:57:17  23   Q.  Now, when we talk about Taishan defendants or Taishan drywall,

09:57:22  24   be more specific with us.  Who do you understand that to include?

09:57:25  25   A.  Obviously Taishan, we use the indicia guy we talked about

09:57:31 1    earlier which lists the manufacturer and then has a photograph of

09:57:34 2    the markings for that manufacturer.  Taishan has its own entry.  We

09:57:39 3    used that of course.  What's called Taihe drywall, which is Item 3

09:57:45 4    on the indicia guide; Venture Supply drywall, which is Item 5; and

09:57:51 5    then Beijing New Building Materials, BNBM, which is Item 6 on the

09:57:57 6    indicia guide.

09:58:00 7    Q.  I want to find reference to that indicia guide, but, again, I

09:58:05 8    am challenged a bit to do that.  You refer to the indicia guide in

09:58:16 9    subparagraph 1 on page 2, correct?

09:58:19 10   A.  Yes.

09:58:20 11   Q.  Let's put this on the ELMO just so the judge can see.  This is

09:58:23 12   a 44-page document, and the entire document we will offer into

09:58:26 13   evidence with the memo, but is this the first page of that document?

09:58:29 14   A.  Yes.

09:58:30 15   Q.  And it has Document No. 12061-10, filed December 20th, 2011.

09:58:38 16   And does the second page, then, Jake, give us the index for what's

09:58:47 17   actually in the indicia guide?

09:58:49 18   A.  Yes.

09:58:49 19   Q.  And on the listing under non-KPT Chinese drywall, we have, for

09:58:53 20   example, Taihe, correct?

09:58:55 21   A.  Yes.

09:58:55 22   Q.  Taishan?

09:58:57 23   A.  Yes.

09:58:57 24   Q.  Venture Supply, BNBM?

09:58:59 25   A.  Yes.

09:59:00  1    Q.   DRAGONBOARD?

09:59:01  2    A.   Yes.

09:59:02  3    Q.   And in the indicia guide itself, we have photographs and

09:59:05  4    markings that correspond to all of those types of drywall?

09:59:08  5    A.   Yes.

09:59:09  6    Q.   And so this is the document, and its attached to your file memo

09:59:16  7    that we're looking at, your May 5th file memo, that you referred to

09:59:22  8    in order to identify whether properties on the list that the PSC had

09:59:28  9    given you had Taishan drywall?

09:59:30  10   A.   Yes.

09:59:32  11   Q.   And you also say in your memo on page 2 going back to your file

09:59:49  12   memo of May 5th, you also say that you refer to drywall with

09:59:53  13   markings consistent with those identified in a defendant profile

09:59:57  14   form.   Which profile form were you referring to there?

10:00:01  15   A.   Taishan submitted a defendant profile form some years ago that

10:00:07  16   contained photographs of drywall with markings.   These photographs

10:00:14  17   were duplicative of the photographs in the indicia guide, but it was

10:00:19  18   something we looked at to verify that we were looking for the right

10:00:22  19   thing.

10:00:24  20   Q.   And then you go on to say in your memo that the Taishan

10:00:28  21   defendants include Taishan Gypsum, BNBM, and China New Building

10:00:34  22   Materials or CNBM, correct?

10:00:36  23   A.   Yes.

10:00:36  24   Q.   And so at the end of that process that you described here by

10:00:42  25   looking at the indicia guide and the Taishan profile form, how many

10:00:47  1   properties on the PSC list were you able to verify as being

10:00:51  2   associated with Taishan drywall?

10:00:53  3   A.  1,285.

10:01:00  4   Q.  And you say that to make this determination you did review data

10:01:03  5   regarding the manufacturer collected during the GBI reviews?

10:01:07  6   A.  Correct.

10:01:07  7   Q.  Were you referring to the same information we've talked about,

10:01:10  8   the indicia guide?

10:01:11  9   A.  Yes.

10:01:12  10  Q.  And the photographic catalog?

10:01:15  11  A.  Yes.

10:01:15  12  Q.  Now, you then go on in the memo of May 5th to say you reviewed

10:01:25  13  profile forms with respect to 2,449 properties and identified them

10:01:32  14  on that basis as having Taishan drywall?

10:01:35  15  A.  Correct.

10:01:35  16  Q.  So had the PSC, again, in the spring of this year, at that

10:01:46  17  point, asked you to use profile forms where necessary as a means to

10:01:51  18  identify Taishan drywall where it was not otherwise apparent for the

10:01:58  19  GBI and indicia guide?

10:02:00  20  A.  Yes.

10:02:00  21  Q.  And again, when you relied on the plaintiff profile form for

10:02:08  22  those 2,449 properties referenced in this memo, you were relying on

10:02:12  23  the same profile form we've earlier looked at that was under oath

10:02:16  24  and under perjury?

10:02:17  25  A.  Yes.

10:02:17  1   Q.  And that's the same form that provides for information about

10:02:25  2   inspection, that provide for the attachment of photographs, et

10:02:30  3   cetera?

10:02:30  4   A.  Yes.

10:02:30  5   Q.  Let me be clear about something, Jake.  When you said these

10:02:40  6   2,449 properties had Taishan drywall based on a PPF, did you take --

10:02:45  7   undertake the effort of looking for what was submitted as

10:02:49  8   attachments to the PPF's?

10:02:51  9   A.  No.

10:02:52  10  Q.  Could you do that?

10:02:55  11  A.  Yes.

10:02:56  12  Q.  In fact, do you recall in your memo Taishan Gypsum's counsel,

10:03:03  13  Mr. Campbell, asked if you could do that?

10:03:05  14  A.  Yes.

10:03:06  15  Q.  You have not done it yet?

10:03:07  16  A.  No.

10:03:08  17  Q.  Would you, based on your experience, expect that at this stage

10:03:12  18  in the litigation the PPF's would have attachments and documents

10:03:17  19  with respect to product identification?

10:03:19  20  A.  Yes, some of them, yes.

10:03:21  21  Q.  Do you have any idea how many?

10:03:23  22  A.  No.

10:03:24  23  Q.  In an allocation process, were it to occur, could BrownGreer

10:03:39  24  through its existing systems do what was necessary to verify

10:03:44  25  plaintiff profile form statements on product ID?

10:03:47  1          MR. KENNY:  Objection, your Honor, relevance.

10:03:50  2          THE COURT:  I'll overrule that.

10:03:51  3          THE WITNESS:  Yes.

10:03:53  4  BY MR. MEUNIER:

10:04:02  5  Q.  Now, in your deposition given on May 26th, did counsel for

10:04:10  6  Taishan Gypsum point out that certain properties on the Taishan

10:04:14  7  class list from the PSC contained Knauf remediation products?

10:04:19  8  A.  Yes.

10:04:20  9  Q.  And again, since BrownGreer did not create that list, you don't

10:04:26  10  know how or why that mistake was made?

10:04:28  11  A.  No.

10:04:29  12  Q.  So were you asked at your deposition by both counsel for the

10:04:32  13  defendants and by the PSC to cross-reference the then existing

10:04:39  14  Taishan class list against properties identified in the BrownGreer

10:04:44  15  database as Knauf remediated properties?

10:04:47  16  A.  Yes.

10:04:48  17  Q.  Did you do so?

10:04:49  18  A.  Yes.

10:04:49  19  Q.  And following your deposition, did you also receive updated

10:04:55  20  information, updated through supplemental claim forms from the PSC?

10:04:59  21  A.  I received additional documents, yes.

10:05:02  22  Q.  Did those additional documents deal with square footage

10:05:06  23  information and documentation?

10:05:07  24  A.  Yes.

10:05:08  25  Q.  Did you review and verify this updated information from the PSC

10:05:13  1    using the same BrownGreer protocol that has been in place for

10:05:17  2    verification from the beginning?

10:05:18  3    A.  We did.

10:05:19  4    Q.  And did you, then, provide both the PSC and defendants with

10:05:23  5    updated information and the results of both the cross-reference with

10:05:29  6    the Knauf remediation and the updated square footage?

10:05:32  7    A.  Yes.

10:05:32  8    Q.  And did the PSC, again, ask you to create a file memo

10:05:36  9    reflecting that activity?

10:05:37 10    A.  Yes.

10:05:38 11    Q.  And I am now referring you to your file memo of June 4, 2015.

10:05:46 12    Do you recognize this?

10:05:47 13    A.  Yes.

10:05:49 14          MR. MEUNIER:  And, your Honor, I would offer this file

10:05:51 15    memo as Exhibit 78.

10:05:55 16          THE COURT:  Hearing no objections, admitted.

10:05:58 17    BY MR. MEUNIER:

10:06:03 18    Q.  Let's briefly review the information set forth here, Mr. Woody.

10:06:06 19    You first say that -- again, you're looking at a revised Exhibit 10.

10:06:10 20    To be clear, that's the Taishan class list which now appears as

10:06:15 21    Exhibit 10 to the Inglis expert report?

10:06:17 22    A.  Yes.

10:06:18 23    Q.  It's a spreadsheet?

10:06:20 24    A.  It is.

10:06:20 25    Q.  And you say with respect to that list, you removed 127

10:06:25  1   properties that were 100 percent KPT drywall.

10:06:31  2   A.  Yes.

10:06:31  3   Q.  So you did that removal of 127 properties by referring to the

10:06:37  4   database you had on the Knauf remediation program?

10:06:39  5   A.  Yes.

10:06:39  6   Q.  You then say you removed 46 properties because of information

10:06:45  7   from the PSC that those claims had been dismissed?

10:06:49  8   A.  Yes.

10:06:49  9   Q.  Or they contain -- or that they contained Knauf drywall?

10:06:54  10  A.  Correct.

10:06:54  11  Q.  Or that the property owners were not pursuing claims against

10:06:58  12  Taishan?

10:06:59  13  A.  Yes.

10:06:59  14  Q.  And then you say you verified square footage for 55 properties

10:07:05  15  previously unverified.  And tell us on what basis you did that?

10:07:09  16  A.  Based on the square footage documents that I received from the

10:07:13  17  PSC using the same protocols we used to do our Global, Banner, InEx

10:07:19  18  reviews.

10:07:19  19  Q.  And what was the result of the verification -- well, strike

10:07:27  20  that.

10:07:28  21          Was the total number of properties on the list at that

10:07:32  22  time also changed to 2,715?

10:07:36  23  A.  Yes.

10:07:36  24  Q.  Did you understand, for example, that the PSC was removing not

10:07:39  25  from the class but from today's hearing for purposes of aggregating

10:07:43  1    damages for owners?

10:07:45  2    A.  Yes.

10:07:45  3    Q.  And as we were removing claims for ALE as well, right?

10:07:51  4    A.  I am not sure.

10:07:52  5    Q.  Alternative living?

10:07:54  6    A.  I am not sure.

10:07:54  7    Q.  But the total class list, this is on the last version of

10:07:59  8    Exhibit 10 of the class list that you looked at, had 2,715 names?

10:08:03  9    A.  Yes.

10:08:04  10   Q.  And then you state at the end of this June 4 memo that the

10:08:09  11   total number of properties with unverified square footage changed

10:08:13  12   from 131 at that point to 28 because you had verified the additional

10:08:19  13   55 and removed 48 unverified, right?

10:08:22  14   A.  Correct.

10:08:24  15   Q.  I want to be clear about this, Jake.  As of the last time you

10:08:27  16   worked with this class list, Exhibit 10, and as of the date of this

10:08:34  17   memo June 4, all of the properties on the class list have square

10:08:42  18   footage amounts verified by BrownGreer under its existing Court

10:08:48  19   approved protocols, except for 28 properties; is that true?

10:08:53  20   A.  Correct.

10:08:53  21   Q.  And you're sure about that?

10:08:55  22   A.  Yes.

10:08:55  23   Q.  And as to square footage, again, on this last version of

10:09:08  24   Exhibit 10, you can attest to the Court today that 1,285 have

10:09:18  25   product identification of Taishan drywall based on Court approved

10:09:22  1    protocol and the GBI settlement, et cetera?

10:09:26  2    A.  Yes.

10:09:27  3    Q.  And that the balance are product identified by you based on

10:09:33  4    reference to the profile forms, right?

10:09:35  5    A.  Correct.

10:09:36  6    Q.  Without having yet looked at attachments to profile forms?

10:09:40  7    A.  That's correct.

10:09:40  8    Q.  But you could do the review of attachments to profile forms if

10:09:45  9    asked?

10:09:46 10    A.  Yes.

10:09:46 11    Q.  So the final subject I do want to cover with you in my

10:09:54 12    questioning, Mr. Woody, is the Knauf remediation information.

10:10:00 13    Again, Taishan's counsel, at some point, asked you as a party or

10:10:08 14    asked you as the claims administrator to provide information from

10:10:11 15    the database on the Knauf remediation, correct?

10:10:14 16    A.  Yes.

10:10:14 17    Q.  And you did so?

10:10:17 18    A.  I did.

10:10:17 19    Q.  And did counsel -- did we ask you on behalf of the PSC to

10:10:27 20    provide a file memo setting forth the information or explaining the

10:10:31 21    information that you provided with respect to the Knauf remediation?

10:10:34 22    A.  Yes.

10:10:35 23    Q.  You provided that information on April 29th of 2015; is that

10:10:38 24    right?

10:10:39 25    A.  That's correct.

10:10:39  1   Q.  So I'm referring you now to the file memo you made -- you

10:10:52  2   created on May 22nd of 2015.  Do you recognize this?

10:10:56  3   A.  I do.

10:10:57  4   Q.  And in the first section of the file memo -- and again, you're

10:11:03  5   referring to the spreadsheet on Knauf remediation information that

10:11:06  6   you furnished on April 29th, the first section on mixed properties,

10:11:12  7   just in summary, tell the Court what your referring to here.

10:11:16  8   A.  Well, we provided a list to the parties of data related to the

10:11:23  9   Knauf program.  That list was at the request of Taishan defendants.

10:11:29 10   And we broke down remediation costs on a number of factors,

10:11:35 11   including a summary of the total costs and then a summary by zip

10:11:39 12   code.  The initial list that we provided on April 29th contained

10:11:44 13   every property that had been through the Knauf remediation program

10:11:47 14   where remediation was complete, including mixed properties.

10:11:52 15   Q.  And why did you identify the six properties reflected in the

10:11:57 16   chart at the bottom of page 1?

10:11:59 17   A.  Because those are mixed properties where the homeowner was

10:12:06 18   able, through Option 2 where they hired their own contractor, to

10:12:10 19   complete the remediation for less than the final cost estimate,

10:12:15 20   which is the amount that Knauf would have paid Moss to do this work.

10:12:20 21   So because the homeowner actually was able to achieve remediation

10:12:25 22   for less than the final cost estimate, these six properties don't

10:12:30 23   reflect the full remediation cost that would have been owed had it

10:12:38 24   gone through the regular program.

10:12:39 25   Q.  But there are only six cases like that?

10:12:41 1    A.  Correct.

10:12:42 2    Q.  At the top of page 2 under the heading of "Knauf Program

10:12:46 3    Summaries," you set forth a chart.  Explain to the Court what you

10:12:51 4    were explaining here.

10:12:51 5    A.  The initial chart that I produced just had a summary total

10:12:57 6    without reference to the year of the remediation, and this chart

10:13:04 7    breaks down remediations by year and gives the cost for each year.

10:13:14 8    Q.  And the average cost per square foot increases yearly as

10:13:19 9    indicated on the far right-hand column?

10:13:21 10   A.  Yes.

10:13:21 11   Q.  And then, in the final section of this memo, which is entitled

10:13:28 12   "April 29 Report," are you explaining to us what the Knauf

10:13:34 13   remediation amounts in the database include and also what they don't

10:13:38 14   include?

10:13:39 15   A.  Yes.

10:13:39 16   Q.  Insofar as what they include, you state they include two

10:13:44 17   things, at this point, in the material, the payments for actual

10:13:50 18   remediation, correct?

10:13:51 19   A.  Correct.

10:13:52 20   Q.  And then move in/move out payments, which were part of the

10:13:56 21   Knauf settlement?

10:13:57 22   A.  Yes.

10:13:58 23   Q.  And what is that, 8.50 a square foot for a home under

10:14:01 24   3,500 square feet and $10 a square foot for homes larger?

10:14:05 25   A.  Yes.

10:14:06  1   Q.  So those numbers at this moment are in this chart that you've

10:14:11  2   got?

10:14:11  3   A.  Yes.

10:14:11  4   Q.  And then, in the final part of the memo, you tell us what

10:14:16  5   numbers don't include.

10:14:17  6   A.  Correct.

10:14:18  7   Q.  And you say they don't include payments from a source other

10:14:23  8   than the remediation program.  What do you mean by that?

10:14:27  9   A.  The payments made to home owners either through the already

10:14:39 10   remediated programs or made by Moss because of a delay or other

10:14:43 11   problem with the remediation.

10:14:46 12   Q.  You say, "They also don't include payments for properties not

10:14:49 13   yet closed."  And by that you mean this program is still continuing?

10:14:54 14   A.  Yes.

10:14:55 15   Q.  So there are a number of properties, and you talk about it in

10:15:02 16   the previous section of your memo, that are in the process of being

10:15:05 17   remediated and payments are still being made?

10:15:08 18   A.  Yes.

10:15:08 19   Q.  And as of the time of this memo, there were 655 properties

10:15:13 20   still open?

10:15:14 21   A.  Yes.

10:15:14 22   Q.  How many properties are still open today?  Do you know?

10:15:20 23   A.  Probably a very similar amount.  Maybe a handful more than

10:15:24 24   that.

10:15:25 25   Q.  So the total remediation payments made in the Knauf settlement

10:15:28  1   is going to increase above these numbers?

10:15:30  2   A.  Yes.

10:15:31  3   Q.  And the third thing you say in your memo that's not included in

10:15:36  4   these numbers are payments for remediation related insurance,

10:15:42  5   correct?

10:15:42  6   A.  Yes, correct.

10:15:43  7   Q.  Insurance for subcontractors, for example?

10:15:45  8   A.  Yes.

10:15:46  9   Q.  Insurance for the removal of toxic drywall debris, for example?

10:15:51 10   A.  Yes.

10:15:51 11   Q.  Those payments, which were necessarily made as part of the

10:15:55 12   remediation activity, are not in your payment data, correct?

10:15:59 13   A.  Correct.

10:15:59 14   Q.  The next thing you say you don't include are payments made

10:16:04 15   for -- let's lump them together -- pre-remediation and post

10:16:10 16   remediation inspections?

10:16:12 17   A.  Correct.

10:16:12 18   Q.  Right.  Give us an idea of what you refer to there.

10:16:16 19   A.  Pre-remediation inspections would be the Benchmark/MZA

10:16:21 20   inspections that Knauf paid for outside of our QSF.  Post

10:16:26 21   remediation inspections would be environmental inspections to make

10:16:31 22   sure that the bad drywall had been properly removed.

10:16:36 23   Q.  Now, when you say, "environmental," you're referring to CIH

10:16:40 24   payments or certified industrial hygienist payments?

10:16:44 25   A.  Yes.

10:16:44  1   Q.  And your experience with this, every time a drywall home is

10:16:48  2   remediated in the Knauf program, a certified industrial hygienist

10:16:55  3   goes in and makes sure that the property is safe to inhabit?

10:16:58  4   A.  I believe so, yes.

10:16:59  5   Q.  And Knauf has actually hired, what, one contractor to do all of

10:17:07  6   that environmental clearance work?

10:17:08  7   A.  I think so, yes.

10:17:09  8   Q.  So there are certain economies of scale in that because of only

10:17:14  9   one being involved?

10:17:15 10   A.  I assume so.

10:17:15 11   Q.  You don't know the amounts that have been paid for the CIH all

10:17:20 12   clear fees, do you?

10:17:21 13   A.  No.

10:17:22 14   Q.  And then you say you don't include in these numbers payments

10:17:26 15   related to the administration of the settlement.

10:17:28 16   A.  Correct.

10:17:29 17   Q.  Meaning what?

10:17:29 18   A.  Payments made to BrownGreer, payments made to banks that house

10:17:35 19   the QSF's, tax preparation payments, payments made to the special

10:17:40 20   master, payments made to the ombudsman, things of that nature.

10:17:46 21   Q.  And finally, you don't include payments to Moss for services

10:17:52 22   related to overseeing the remediation?

10:17:54 23   A.  Correct.

10:17:54 24   Q.  Moss serves as a general contractor?

10:17:57 25   A.  Yes.

| | | |
|---|---|---|
| 10:17:58 | 1 | Q.  And charges a certain fee for oversight and management? |
| 10:18:01 | 2 | A.  I believe so. |
| 10:18:02 | 3 | Q.  And Knauf's payment for that service is not in your numbers, |
| 10:18:07 | 4 | not in the Knauf remediation payments that BrownGreer records? |
| 10:18:10 | 5 | A.  We don't make the payments, so I didn't include it in the |
| 10:18:13 | 6 | numbers. |
| 10:18:15 | 7 | MR. MEUNIER:  Thank you very much, Jake.  That's all of |
| 10:18:17 | 8 | the questions I have at this time. |
| 10:18:18 | 9 | THE COURT:  Let's take a ten-minute break at this time. |
| 10:18:20 | 10 | The Court will stand in recess. |
| 10:18:22 | 11 | THE DEPUTY CLERK:  All rise. |
| 10:18:23 | 12 | (WHEREUPON, A RECESS WAS TAKEN.) |
| 10:31:56 | 13 | (OPEN COURT.) |
| 10:31:57 | 14 | THE COURT:  Any further questions? |
| 10:31:58 | 15 | MR. MEUNIER:  Your Honor, I did have one follow-up, or two |
| 10:32:01 | 16 | perhaps, with Mr. Woody. |
| 10:32:02 | 17 | First, I failed to offer into evidence the Woody memo of |
| 10:32:06 | 18 | May 22, 2015, which is Exhibit 18 on the list. |
| 10:32:13 | 19 | THE COURT:  Let it be admitted. |
| 10:32:15 | 20 | MR. MEUNIER:  And I do want to show Mr. Woody one final |
| 10:32:18 | 21 | document. |
| 10:32:20 | 22 | BY MR. MEUNIER: |
| 10:32:24 | 23 | Q.  And it's been marked as Plaintiffs' Exhibit 80.  Jake, do you |
| 10:32:29 | 24 | recognize that document? |
| 10:32:30 | 25 | A.  Yes. |

10:32:31  1    Q.  Tell the Court, please, what it is.

10:32:33  2    A.  This is Exhibit 10, the list of properties and square footage.

10:32:39  3    Q.  What information does it reflect?

10:32:41  4    A.  Name, address, city, state, square footage, things of that

10:32:48  5    nature.

10:32:49  6    Q.  Let me just put it on the ELMO for a moment.

10:33:03  7          MR. KENNY:  Just for the record, we have various versions

10:33:06  8    of this.  Can you just tell us --

10:33:26  9    BY MR. MEUNIER:

10:33:26  10   Q.  Let me ask you, you referred to this as Exhibit 10.  Is this

10:33:30  11   the removal list?

10:33:34  12          THE COURT:  The what list?

10:33:36  13          MR. MEUNIER:  Removal list.

10:33:36  14   BY MR. MEUNIER:

10:33:37  15   Q.  Do you want to see it again?

10:33:39  16   A.  Yes.

10:33:40  17   Q.  Ask if you can identify this as what's been referred to as the

10:33:44  18   removal list, namely with your assistance has been taken off of the

10:33:50  19   Taishan class list?

10:33:51  20   A.  Yes, yes, it is.  And the summary table at the top gives the

10:33:56  21   reasons for removal, which is then in the category column.

10:33:59  22   Q.  So let me put it back on the ELMO.  In general, this document,

10:34:15  23   Plaintiff's Exhibit 80, shows the basis for removing certain

10:34:21  24   properties from the Taishan class list, is that true?

10:34:25  25   A.  Yes.

10:34:25  1    Q.  And as you indicated, there are certain categories identified

10:34:30  2    at the top left-hand corner of the first page?

10:34:33  3    A.  Yes.

10:34:34  4    Q.  And just what do those categories consist of?

10:34:37  5    A.  *Germano* intervenors already compensated, claimants who no

10:34:45  6    longer own the property, duplicate entries, opt outs, claimants who

10:34:49  7    filed a motion to dismiss, properties that are in the Knauf pilot

10:34:53  8    program, properties where there is no evidence of Taishan drywall,

10:34:58  9    properties that are 100 percent KPT drywall, and an additional group

10:35:04 10    that is not KPT as well.

10:35:08 11    Q.  And then in the far right-hand column for each and every

10:35:11 12    property removed you fit it into one of those categories for

10:35:15 13    removal, correct?

10:35:16 14    A.  Yes.

10:35:17 15            THE COURT:  So it's your position that these are not

10:35:19 16    included in the class?

10:35:20 17            MR. MEUNIER:  This is not included.  This shows exactly

10:35:24 18    why each one was removed from the class list, your Honor, which is

10:35:27 19    Exhibit 10 to the Inglis report, the Taishan class list.

10:35:38 20            When I say they're not in the class, they are not being

10:35:40 21    presented for the aggregate damages presented here today.

10:35:43 22            THE COURT:  I understand.  Do you have a list of those

10:35:46 23    that are being presented?

10:35:48 24            MR. MEUNIER:  That's going to be Exhibit 10, your Honor,

10:35:50 25    which is going to be part of the Inglis presentation.  And I'll

10:35:54  1    offer Plaintiff's Exhibit 80, the removal list.

10:35:56  2              THE COURT:  Let it be admitted.

10:36:05  3              MR. MEUNIER:  I have no further questions at this time.

10:36:14  4              THE COURT:  You may proceed.  Cross-examination.

10:36:17  5              MR. FENTON:  Yes, your Honor.

10:36:28  6                          CROSS-EXAMINATION

10:36:28  7    BY MR. FENTON:

10:36:29  8    Q.  Good morning, Mr. Woody.

10:36:30  9    A.  Hello.

10:36:30  10   Q.  I am Rick Fenton.  I represent the BNBM companies, and I have

10:36:34  11   some questions for you here this morning.

10:36:36  12   A.  Okay.

10:36:36  13   Q.  Mr. Woody, if you can go back and put up on the screen your

10:36:41  14   May 5th memo.

10:36:48  15             THE COURT:  Can you put the May 5th memo up?

10:36:57  16   BY MR. FENTON:

10:36:57  17   Q.  And this is Defendant's Exhibit 16.  And Mr. Marais had some

10:37:02  18   questions about this document for you.  I believe you said you

10:37:05  19   prepared this memo at the request of the Plaintiffs Steering

10:37:10  20   Committee?

10:37:10  21   A.  Yes.

10:37:10  22   Q.  And you prepared it in May of 2015, but what the memo did was

10:37:17  23   give an account of the work that you had done for the Plaintiffs

10:37:22  24   Steering Committee with respect to what you called the square

10:37:25  25   footage project that had been going on since October of the previous

10:37:28  1    year, correct?

10:37:29  2    A.  Yes.

10:37:30  3    Q.  And you tried to be true and accurate in what you presented

10:37:33  4    there?

10:37:33  5    A.  Yes.

10:37:34  6    Q.  And you submitted it to the PSC for comment and review before

10:37:39  7    you finalized it?

10:37:40  8    A.  Yes.

10:37:41  9    Q.  And I believe you testified you got some comment, some you

10:37:44 10    took, some you didn't?

10:37:45 11    A.  Yes.

10:37:46 12    Q.  And you didn't submit it to us for review beforehand, did you?

10:37:50 13    A.  No.

10:37:51 14    Q.  That's because you were doing work for the PSC and they were

10:37:54 15    paying for this project, right?

10:37:55 16    A.  They asked me to answer questions in the form of a memo, so I

10:37:59 17    did that.

10:37:59 18    Q.  And that's what you did.  Okay.  That's fine.

10:38:02 19            Now, at this time according to your memo, there were

10:38:09 20    3,709 properties in the claimed class, correct?

10:38:13 21    A.  I believe there were initially, yes.

10:38:21 22    Q.  And that was on a list that you had gotten from the PSC,

10:38:25 23    correct?

10:38:26 24    A.  Yes.

10:38:26 25    Q.  And you did not produce to us, correct?

10:38:29   1   A.  No.

10:38:30   2   Q.  No, it's not correct or, no, you did not produce it?

10:38:33   3   A.  I did not produce it.

10:38:34   4   Q.  And the number of class properties now is, I believe, 2,715; is

10:38:43   5   that correct?

10:38:44   6   A.  The last version I saw had that number on it.

10:38:47   7   Q.  I know it changes a lot, but the last one you saw was 2,715?

10:38:50   8   A.  Yes.

10:38:51   9   Q.  And so the class now is significantly smaller than when you

10:38:55  10   prepared -- well, when you received the initial class list from the

10:38:59  11   PSC, correct?

10:39:00  12   A.  The list is smaller, yeah.  I don't know who is in the class or

10:39:05  13   not.

10:39:05  14   Q.  Well, neither do I, so we're even.

10:39:10  15          MR. SEEGER:  Objection, your Honor.

10:39:11  16          THE COURT:  Let's just stay with the question rather than

10:39:16  17   comments.

10:39:18  18          MR. FENTON:  All right, your Honor.

10:39:18  19   BY MR. FENTON:

10:39:18  20   Q.  You said in here that you confirmed square footage in one of

10:39:21  21   three ways, correct?

10:39:23  22   A.  I said I did it three separate ways.

10:39:27  23   Q.  Well, three separate ways, but the first way you did it was you

10:39:31  24   looked at the under air square footage data collected during your

10:39:37  25   GBI review process?

10:39:38  1    A.  Yes.

10:39:38  2    Q.  And in Mr. Meunier's examination you told us a little bit about

10:39:46  3    that process and how you had acquired the data, correct?

10:39:48  4    A.  Yes.

10:39:49  5    Q.  And if you were unable to verify the square footage based on

10:39:57  6    the GBI data, you then went to No. 2, right?

10:40:00  7    A.  Yes.

10:40:01  8    Q.  Which was checking property appraisal websites on the Internet,

10:40:07  9    correct?

10:40:07 10    A.  Yes.

10:40:08 11    Q.  Now, how many class properties were you able to confirm square

10:40:12 12    footage for under Method No. 1?

10:40:16 13    A.  I believe the number was 2,342.  It's elsewhere in this memo.

10:40:24 14    Q.  2,342 and that was roughly about two-thirds of the class?

10:40:33 15    A.  Again, it's 2,342.  That's the number.

10:40:36 16    Q.  But for the remaining class members, which was over 1,000, you

10:40:41 17    had to go to Methods 2 or 3 in order to confirm square footage,

10:40:45 18    correct?

10:40:45 19    A.  Yes.

10:40:46 20    Q.  Now, if you were to look at the class list today, would you be

10:40:50 21    able to tell me which class members were confirmed under Method 1,

10:40:54 22    which were confirmed under Method 2, or which were confirmed under

10:40:58 23    Method 3?

10:40:59 24    A.  Yes.

10:40:59 25    Q.  You have that information?

10:41:00 1    A.  Yes.

10:41:01 2    Q.  What about if I limited it to just two and three, would you be

10:41:05 3    able to tell us who was confirmed based on the local property

10:41:08 4    website and who was confirmed just based on the profile forms?

10:41:13 5    A.  Yes.

10:41:13 6    Q.  Have you produced that information to us?

10:41:15 7    A.  Yes.

10:41:15 8    Q.  Then I must have missed it.  Let me go back to this.  For

10:41:21 9    approximately one-third of the class you confirmed either through

10:41:25 10   the local property appraisal websites or based on the plaintiff

10:41:30 11   profile forms, right?

10:41:31 12   A.  Can you say that again?

10:41:32 13   Q.  Yes.  For about one-third of the class you had to go either to

10:41:35 14   the property appraisal websites or the square footage data on

10:41:39 15   plaintiff profile forms in order to get the square footage?

10:41:42 16   A.  I did that for the people who weren't part of the 2,342.

10:41:45 17   Q.  Right, who didn't have information of Method No. 1?

10:41:49 18   A.  Yes.

10:41:50 19   Q.  And when you went to your local property appraisal websites,

10:41:54 20   you didn't keep a record or a printout of the websites that you

10:41:58 21   consulted, did you?

10:41:59 22   A.  No.

10:42:00 23   Q.  And so you didn't produce it to us because you didn't keep it

10:42:08 24   any record of the supporting information that you used to fill in

10:42:12 25   the missing square footage data based on the websites that you

10:42:16  1    consulted, correct?

10:42:17  2    A.  No, they're publicly available websites.

10:42:20  3    Q.  I understand that, but sometimes there's more than one that may

10:42:23  4    have the information, correct?

10:42:24  5    A.  Yes.

10:42:25  6    Q.  And if we wanted to see the one that you used, you wouldn't be

10:42:29  7    able to tell us that, right?

10:42:30  8    A.  No.

10:42:30  9    Q.  And then, square footage data from plaintiff profile forms

10:42:38 10    submitted for properties on the Taishan class list, that was the

10:42:43 11    third method you used if you couldn't verify square footage under

10:42:46 12    either one or two, correct?

10:42:47 13    A.  Yes.

10:42:48 14    Q.  And now, you told us a little bit about the Knauf settlement

10:42:55 15    and the administration of that settlement.  And in order to assess a

10:43:06 16    property for remediation, Knauf actually conducted a physical

10:43:11 17    inspection of the property, correct?

10:43:12 18    A.  Yes.

10:43:13 19    Q.  They didn't just rely on some square footage representation in

10:43:19 20    a profile form, did they?

10:43:20 21    A.  No.

10:43:20 22    Q.  And you ran into instances in connection with the Knauf

10:43:24 23    settlement and with the GBI settlements where the information that

10:43:29 24    was available on inspection differed from what was on the profile

10:43:32 25    forms, didn't you?

10:43:32 1    A.  Yes.

10:43:33 2    Q.  And that was one of the reasons they wanted to do inspections

10:43:36 3    to confirm that they had the correct information, right?

10:43:38 4    A.  I don't know.

10:43:39 5    Q.  Okay.  In any event, you do know that plaintiff profile forms

10:43:45 6    were not always correct with respect to square footage information?

10:43:48 7    A.  Yes.

10:43:49 8    Q.  And that was true with respect also to the GBI settlements

10:43:54 9    which were based on a payment that was key to square footage,

10:43:58 10   correct?

10:43:58 11   A.  Yes.

10:43:58 12   Q.  Now, the Knauf settlement -- just so we're clear, the Knauf

10:44:08 13   settlement involved actual remediations of the properties, correct?

10:44:11 14   A.  Yes.

10:44:12 15   Q.  And that was for a full remediation of the drywall; take it

10:44:16 16   down to the studs, put up new, repair the property?

10:44:20 17   A.  There's a scope of work attached to the settlement agreement.

10:44:23 18   Q.  But you understand it's for full remediation.  They are not

10:44:27 19   leaving anything behind, no defective property, correct?

10:44:29 20   A.  That's my understanding.

10:44:30 21           MR. MEUNIER:  Objection, your Honor, lack of foundation.

10:44:32 22           THE COURT:  Overrule the objection.

10:44:35 23   BY MR. FENTON:

10:44:43 24   Q.  So in connection with either the Knauf or the GBI settlement,

10:44:49 25   you would never have relied just on No. 3, square footage data from

10:44:55 1    plaintiff profile forms, correct?

10:44:56 2    A.  No, it wasn't my job to determine the square footage.

10:44:58 3    Q.  Okay.  But in connection with the Knauf and the GBI

10:45:00 4    settlements --

10:45:02 5    A.  Oh, yes.

10:45:02 6    Q.  -- you wouldn't have relied just on the square footage of the

10:45:05 7    profile forms, you would have looked at the actual inspections of

10:45:08 8    the property?

10:45:08 9    A.  Correct.

10:45:09 10   Q.  You talked a little bit on direct examination, Mr. Woody, about

10:45:20 11   the plaintiff profile forms, and I believe Mr. Meunier showed you

10:45:25 12   Pre-trial Order No. 11.  If we could get that on the screen.  We

10:46:01 13   have that up on the screen now, Mr. Woody.  You see it's Pre-Trial

10:46:05 14   Order No. 11, and I believe you testified that it approved the

10:46:09 15   original plaintiff profile form in this case?

10:46:11 16   A.  Yes.

10:46:12 17   Q.  Now, you also testified that in the spring of this year the PSC

10:46:19 18   sent out requests for supplemental profile forms, correct?

10:46:22 19   A.  Yes.

10:46:22 20   Q.  And that you had collected that data?

10:46:24 21   A.  Yes.

10:46:25 22   Q.  Are you aware of any Court order approving the form of the

10:46:29 23   supplemental profile forms?

10:46:30 24   A.  No.

10:46:31 25   Q.  And at the request of the PSC, you actually set up a website so

10:46:36  1  that people could go online and fill in the information, correct?

10:46:40  2  A.  We made the form available on our settlement portal that we had

10:46:44  3  been using for years.

10:46:46  4  Q.  So it was available on the settlement portal and people would

10:46:50  5  submit the form electronically; fill it out online and submit it

10:46:53  6  electronically?

10:46:54  7  A.  Yes.

10:46:54  8  Q.  And you didn't have Court approval for that either, correct?

10:46:57  9  A.  No.

10:46:58  10  Q.  Either as to the content or the form, right?

10:47:01  11  A.  No.

10:47:01  12  Q.  And in any event, at the time you were doing the square footage

10:47:14  13  analysis, be it simply the original profile forms or the

10:47:20  14  supplemental profile forms, you didn't believe that a mere statement

10:47:24  15  on a profile form was sufficient evidence to square footage, did

10:47:28  16  you?

10:47:28  17  A.  Not for the GBI reviews.

10:47:29  18  Q.  Or for the Knauf reviews, or for any settlement you were

10:47:34  19  administering, right?

10:47:34  20  A.  No.

10:47:35  21  Q.  Can you answer this question for me, Mr. Woody.  Of the 2,714

10:47:51  22  properties that are on the current class list, do you know how many

10:47:56  23  had no proof of square footage other than what was on the profile

10:48:00  24  form?

10:48:01  25  A.  I think 28.

10:48:02  1    Q.  I thought you testified 28 were unverified square footage?

10:48:07  2    A.  Yes.

10:48:08  3    Q.  So other than that 28, you have verified the square footage

10:48:13  4    either through the GBI data or through the websites?

10:48:16  5    A.  Yes.

10:48:17  6    Q.  And you didn't have any participation in how the other 28 were

10:48:27  7    determined in terms of square footage for purposes of Mr. Inglis's

10:48:33  8    analysis, did you?

10:48:34  9    A.  No.

10:48:34  10   Q.  I would like to talk to you a little bit about product

10:48:38  11   identification.  And again, let's go back to your May 5 memorandum,

10:48:47  12   which is Plaintiff 17 I believe.  And if we could go to page 2 of

10:48:57  13   the memo.  And if we could pull out that second-to-the-last

10:49:07  14   paragraph.  You say there, Mr. Woody, that you were able to verify

10:49:18  15   that 1,285 of the properties on the Taishan class list had submitted

10:49:26  16   proof that the property contained drywall related to a Taishan

10:49:31  17   defendant.  And at that time, the class list contained, I think we

10:49:35  18   said, about 3,700 some properties?

10:49:41  19   A.  Yes.

10:49:41  20   Q.  So this was approximately a third of the class at that time?

10:49:45  21   A.  Yes.

10:49:47  22   Q.  And so for a third of the class you were able to verify that

10:49:54  23   the properties had submitted proof.  And by "proof" you meant either

10:49:59  24   photographic evidence or an inspection report confirming the

10:50:04  25   presence of Chinese drywall, correct?

10:50:06  1   A.  Yes.  The presence of Taishan Chinese Drywall.

10:50:13  2   Q.  Taishan Chinese Drywall.  And did you make any differentiation,

10:50:17  3   for purposes of this memo, as to whether the manufacturer was

10:50:20  4   Taishan as opposed to the one of the BNBM companies or one of the

10:50:24  5   CNBM companies?

10:50:25  6   A.  No.

10:50:25  7   Q.  You lumped that altogether in Taishan?

10:50:28  8   A.  Yes.

10:50:29  9   Q.  And so you can't tell me, as you sit here today, how many were

10:50:33 10   confirmed to have had BNBM drywall as opposed to Taishan drywall,

10:50:38 11   could you?

10:50:39 12   A.  Not as I sit here today, but it would be a simple exercise to

10:50:41 13   figure that out.

10:50:41 14   Q.  That would be something you could pull together for us if you

10:50:45 15   wanted to?

10:50:45 16   A.  Sure.

10:50:46 17   Q.  Now, again, Mr. Woody, with product identification, in none of

10:50:55 18   the settlements that you administered, would a mere entry on a

10:51:02 19   plaintiff profile form be sufficient proof of product

10:51:07 20   identification; isn't that correct?

10:51:08 21   A.  Not without some objective basis to support that assertion.

10:51:14 22   Q.  Some supporting photographic evidence, or inspection, or some

10:51:18 23   kind of evidence confirming the mere representation, correct?

10:51:22 24   A.  Yeah.  Or as I talked about earlier, we had the claims

10:51:26 25   administrator Procedure 2 allowed us to accept affidavits for

10:51:30  1    certain information with a basis for that assertion.

10:51:34  2    Q.  Right.  So the affidavits had to have a specific basis for the

10:51:38  3    assertion of the product being present, right?

10:51:41  4    A.  Yes.

10:51:41  5    Q.  Well, I believe you said that after you verified the 1,285

10:51:50  6    properties having proof of Taishan drywall, there were 2,449

10:51:58  7    properties that fell outside of that category, correct?

10:52:00  8    A.  Yes.

10:52:01  9    Q.  Well, when there were 2,449 properties where there wasn't

10:52:08  10   independent proof of Taishan drywall, were those removed from the

10:52:13  11   class list?

10:52:13  12   A.  Some of them were.  I don't think all of them were though.

10:52:17  13   Q.  Well, recently you removed about 127 that had KPT drywall,

10:52:21  14   right?

10:52:22  15   A.  Yes.

10:52:22  16   Q.  But at that time, did the PSC ask you to remove the 2,700 some

10:52:30  17   odd properties that didn't have indicia of Taishan drywall, at least

10:52:35  18   that you had seen?

10:52:35  19   A.  I think it was 2,449 and the answer is no.

10:52:38  20   Q.  So the PSC kept those properties on the list even though, for

10:52:45  21   purposes of the settlements you're administering, that would not in

10:52:49  22   itself have been sufficient proof of product identification,

10:52:53  23   correct?

10:52:53  24   A.  They didn't ask me to remove them.

10:52:54  25   Q.  Right.  And you didn't do it because they didn't ask you,

10:52:58  1    right?

10:52:58  2    A.  Yes.

10:52:59  3    Q.  So as you sit here now, for roughly two-thirds of the class, at

10:53:07  4    least as it stood at that time, you're not aware of anything to

10:53:10  5    prove that Taishan or Chinese drywall was used in the homes other

10:53:14  6    than the statement on the profile form; is that correct?

10:53:16  7    A.  I know that many of the --

10:53:19  8              MR. MEUNIER:  I think it misstates his testimony.  I

10:53:21  9    object to the question.

10:53:23 10              THE COURT:  What's the objection?

10:53:25 11              MR. MEUNIER:  The objection is that nothing supports

10:53:29 12    except the statement in the profile form.

10:53:31 13              THE COURT:  Restate the question.

10:53:33 14    BY MR. FENTON:

10:53:35 15    Q.  All right.  Mr. Woody, as you sit here right now, not having

10:53:39 16    reviewed what backup might or might not have been submitted with

10:53:42 17    individual profile forms, as far as you know for approximately

10:53:47 18    two-thirds of the class there's no independent confirmation of the

10:53:52 19    presence of Chinese drywall; is that correct?

10:53:53 20              MR. MEUNIER:  Same objection, your Honor.

10:53:55 21              THE COURT:  I'll overrule the objection.  He is under

10:53:57 22    cross.

10:53:57 23              THE WITNESS:  I know that there are supporting documents

10:53:59 24    attached to profile forms and that some of the 2,449 do have

10:54:03 25    supporting documentation, but I can't tell you what that

10:54:05  1   documentation says or how many there are.

10:54:08  2   BY MR. FENTON:

10:54:09  3   Q.  And you haven't done a review as to whether you would regard

10:54:12  4   that documentation as sufficient, correct?

10:54:14  5   A.  No.

10:54:14  6   Q.  And you can't tell me how many properties that affects, right?

10:54:17  7   A.  No.

10:54:18  8   Q.  Do you know whether it's more than 50?

10:54:20  9   A.  I don't know.

10:54:21  10  Q.  More than 20?

10:54:24  11          MR. MEUNIER:  Your Honor.

10:54:25  12          THE WITNESS:  I don't know.

10:54:28  13  BY MR. FENTON:

10:54:29  14  Q.  All right.  Now, on June 4, Mr. Woody, that is to say just five

10:54:45  15  days ago, you provided a new memo, and I believe we can get it up

10:54:50  16  there, it's Plaintiff's 78, with some updates to your square footage

10:54:56  17  project.

10:54:58  18  A.  Yes.

10:54:59  19  Q.  And this was done, again, at the request of the PSC?

10:55:06  20  A.  Yes.

10:55:06  21  Q.  The biggest change from where things stood on May 5 and where

10:55:21  22  things stood on June 4 is that there were over 1,000 properties that

10:55:28  23  had been removed during that period from the class list; is that

10:55:31  24  correct?

10:55:31  25  A.  Yes.

10:55:31  1   Q.  How did those properties get on the class list in the first

10:55:39  2   place?

10:55:39  3   A.  I don't know.

10:55:39  4   Q.  You don't know because the PSC gave you the list, right?

10:55:42  5   A.  It's not my list.

10:55:44  6   Q.  Right, it's not something you independently derived?

10:55:46  7   A.  No.

10:55:46  8   Q.  On this June 4 memo, I believe there was the spreadsheet

10:55:57  9   attached to it that Mr. Meunier -- well, let me go through it right

10:56:02 10   here.  127 properties were determined to have 100 percent KPT

10:56:08 11   drywall.  That's Knauf drywall, correct?

10:56:11 12   A.  It is.

10:56:12 13   Q.  And did you make that determination based on checking your

10:56:15 14   Knauf database?

10:56:16 15   A.  Yes.

10:56:16 16   Q.  And so that was your determination?

10:56:20 17   A.  That they had 100 percent, yes.

10:56:22 18   Q.  Did the PSC ask you to check the Knauf database?

10:56:25 19   A.  Yes.

10:56:26 20   Q.  And you did so and you reported back to them?

10:56:30 21   A.  Yes.

10:56:30 22   Q.  And then they asked you to remove those 127 properties?

10:56:34 23   A.  Yes.

10:56:34 24   Q.  There may be properties that had been remediated and paid for

10:56:39 25   by another source that you wouldn't have data on; isn't that

10:56:43  1    correct?

10:56:43  2    A.  I guess that's correct.

10:56:46  3    Q.  Sure.  I mean, if an insurance company paid or some settlement

10:56:49  4    with a builder that you don't know about it, wouldn't be in your

10:56:53  5    database, right?

10:56:53  6    A.  No.

10:56:54  7    Q.  And you didn't check the class list for that, did you?

10:56:57  8    A.  There would be no way for me to check for that.

10:56:59  9    Q.  And then you said you removed 46 properties because the PSC

10:57:03  10   informed us that the cases related to those properties had been

10:57:07  11   dismissed, that the properties contained Knauf drywall, and/or that

10:57:10  12   the property owners would not pursue claims against Taishan.  So

10:57:15  13   that was the PSC request?

10:57:17  14   A.  Yes.

10:57:17  15   Q.  And you don't know if there's any cases that remain on the

10:57:21  16   class list that would fall into that category; that is to say,

10:57:26  17   whether cases had been dismissed, or properties contained Knauf

10:57:30  18   drywall, or the owners were not pursuing claims?

10:57:32  19   A.  No, I think that would be something that we would look for in

10:57:36  20   any sort of review process.

10:57:37  21   Q.  That would not be something you would look for?

10:57:39  22   A.  It would be, yes.

10:57:40  23   Q.  And would you have a database that could tell you whether

10:57:43  24   owners were pursuing claims or not?

10:57:46  25   A.  We would leave it up to them to submit a claim.

10:57:49 1  Q.  Okay.  And that would be as part of the claims process down the

10:57:52 2  road?

10:57:52 3  A.  Yes.

10:57:52 4  Q.  And then it says you verified square footage for 55 properties

10:58:00 5  that were previously unverified and you did that through the Global,

10:58:08 6  Banner, InEx, and I think we've covered that, haven't we?

10:58:09 7  A.  The review protocol, yes.

10:58:11 8  Q.  Okay.  So the class list is now down to 2,715 instead of I

10:58:24 9  believe it was the 3,709 that we had started with back in May of the

10:58:28 10 previous year?

10:58:30 11 A.  The list, yes, the current Exhibit 10 list, yes.

10:58:34 12 Q.  Mr. Woody, if we can look at the spreadsheet that accompanied

10:58:53 13 this.  This is the removed properties spreadsheet.  I believe it's

10:58:59 14 Plaintiff's 80.  There we go.  And if we could just blow up that box

10:59:05 15 at the top.  This is a summary of that spreadsheet, correct?

10:59:12 16 A.  Yes.

10:59:14 17 Q.  And did you prepare this spreadsheet or was it prepared by the

10:59:17 18 PSC?

10:59:18 19 A.  This was a tab on the Exhibit 10 spreadsheet that we moved

10:59:27 20 properties to as we removed them from the list.  So we created it in

10:59:34 21 the sense that we cut and paste from another spreadsheet -- from

10:59:37 22 another part of the spreadsheet.

10:59:39 23 Q.  And the Exhibit 10 spreadsheet that you're referring to, that's

10:59:44 24 Inglis 10 which is the damage calculation that Mr. Inglis did based

10:59:48 25 on the class list?

10:59:49  1    A.  Yes.

10:59:49  2    Q.  So you would move properties from that spreadsheet, put them

10:59:52  3    into here, and then this became a standalone spreadsheet?

10:59:56  4    A.  Yes.

10:59:57  5    Q.  And then you created this summary?

10:59:58  6    A.  Yes.

11:00:01  7    Q.  And it shows that the *Germano* intervenors were already

11:00:08  8    compensated, so they came out.  865 properties came out because the

11:00:17  9    claimant no longer owned the property?

11:00:19 10    A.  Yes.

11:00:19 11    Q.  And the PSC asked you to remove those?

11:00:22 12    A.  Yes.

11:00:23 13    Q.  But you haven't gone back and verified that the remaining class

11:00:27 14    members still own their property, have you?

11:00:31 15    A.  No.  Again, that would be something we would do through some

11:00:34 16    claims process.

11:00:35 17    Q.  And so that's something you would leave for another day,

11:00:40 18    basically?

11:00:40 19    A.  Yeah.

11:00:43 20    Q.  And if I were to give you a list of properties where we have

11:00:52 21    found evidence that there had been a transfer, that's something you

11:00:57 22    would want to consider, wouldn't it?

11:00:58 23    A.  Sure.

11:00:58 24    Q.  You say you could do that as part of a claims process after

11:01:03 25    these proceedings are completed?

11:01:05  1  A.  If necessary, yes, I can do that.

11:01:07  2  Q.  And then you removed 30 duplicate properties?

11:01:12  3  A.  Yes.

11:01:18  4  Q.  Do you know whether there are any duplicate properties

11:01:22  5  remaining on Inglis 10?

11:01:25  6  A.  I don't think so.  It's sometimes hard to tell because of the

11:01:29  7  way the properties have been entered.  For instance, one might say

11:01:34  8  "Road" spelled out.  Another might say, "RD period," but I believe

11:01:38  9  we found most of those, although there may be a few left.

11:01:41 10  Q.  You tried your best?

11:01:43 11  A.  We did.

11:01:43 12  Q.  Let me show you one that I think you may have missed.  If we

11:01:48 13  could go to the Inglis 10 exhibit.  Plaintiff 79.  And if we could

11:01:57 14  go to the Bay St. Louis -- there's a whole set of properties here,

11:02:22 15  Mr. Woody, that are owned by MS Investors d/b/a Manor House, that

11:02:29 16  apparently is a developer of some kind?

11:02:31 17  A.  I am not sure.

11:02:32 18  Q.  But in any event, you see that -- I'm sorry, this is a

11:02:41 19  different point, but let me make it.

11:02:43 20       You see listed on here that there are 35, I think if we

11:02:55 21  count down the list, apartments that are listed here owned by MS

11:03:06 22  Investors on Demontluzin Avenue on Bay St. Louis.  Do you see that?

11:03:11 23  A.  Yes.

11:03:12 24  Q.  And now, you also said the PSC removed from the list properties

11:03:44 25  where there had been found to be KPT drywall?

11:03:47 1   A.  Yes.

11:03:48 2   Q.  Correct, okay.  And so we see on the current list of Exhibit 10

11:03:53 3   we've got 35 of 71 apartments on Bay St. Louis.  If we could go to

11:04:00 4   Defendant's 14.  And if we could go to page 29.  And if we could

11:04:18 5   blow that up a little bit.  I wonder if you recognize this

11:04:21 6   spreadsheet, Mr. Woody.  Mr. Meunier, when he was questioning you,

11:04:29 7   mentioned that you had provided us with some information that we had

11:04:32 8   requested from time to time?

11:04:32 9   A.  Yes.

11:04:33 10   Q.  And do you recall preparing this spreadsheet in response to our

11:04:36 11   request for information?

11:04:37 12   A.  Yes.

11:04:38 13   Q.  And if we could, on Exhibit 14 take a look at Line 3736.  I

11:04:56 14   think we have a demonstrative on that.  This is a pull out from the

11:05:00 15   document you prepared.  Do you see you have the MS Investors - Manor

11:05:07 16   House Apartments as the claimant name?

11:05:08 17   A.  Yes.

11:05:09 18   Q.  That's what we saw on the current version of the class list?

11:05:14 19   A.  Yes.

11:05:15 20   Q.  And that's on Demontluzin -- I'm sure I botched that -- Avenue

11:05:27 21   in Bay St. Louis?

11:05:28 22   A.  Yes.

11:05:28 23   Q.  And then there's a column on this for percentage of KPT

11:05:31 24   drywall, correct?

11:05:32 25   A.  There is.

11:05:32  1   Q.  And KPT drywall is not Taishan drywall?

11:05:34  2   A.  No.

11:05:35  3   Q.  KPT is the subject of the Knauf settlement program?

11:05:38  4   A.  Yes.

11:05:39  5   Q.  And it says it's according to the spreadsheet that you

11:05:42  6   prepared, that there is 100 percent KPT drywall for these 71

11:05:48  7   apartments, correct?

11:05:48  8   A.  Yes.

11:05:49  9   Q.  Yet we have 35 of those apartments still on the class list,

11:05:52 10   right?

11:05:52 11   A.  Right.  And I think that what's happening here is that this is

11:05:55 12   a multiple unit condo or apartment where some of the units may have

11:06:01 13   KPT and others may have something else, may have Taishan.

11:06:05 14   Q.  Do you know that for a fact or are you speculating?

11:06:08 15   A.  I don't know that for a fact without reviewing the particular

11:06:10 16   properties in-depth.

11:06:11 17   Q.  What we do know for a fact is when you prepared this

11:06:15 18   spreadsheet and gave it to us pursuant to our request you said it

11:06:19 19   was 100 percent KPT drywall, correct?

11:06:21 20   A.  I said there's -- yes, I did say that.  And I think -- I did.

11:06:25 21   Q.  So that's something you would want to go back and check?

11:06:28 22   A.  It is, yeah.

11:06:29 23   Q.  And then, just not to belabor the point, Mr. Woody, but you had

11:06:35 24   testified that you had removed duplicates from the class list.  And

11:06:40 25   if we could go back to Inglis 10 and cover the Peace Harbor.  This

11:06:49 1    is the exhibit Defendant 79.  If we could go to the Peace Harbor

11:06:56 2    condominiums.  And we'll blow that -- do as best we can because it

11:07:15 3    covers multiple pages.

11:07:17 4            But if you take a look at that, Mr. Woody, you can see

11:07:20 5    that at least about half a dozen or so of those properties are

11:07:25 6    duplicated on the list.  You have two listings for, I believe, 1201,

11:07:31 7    two for 1203, two for 1202, two for 1302.  Do you see that?

11:07:38 8    A.  Yes.

11:07:39 9    Q.  So despite your best effort, you may have missed some

11:07:42 10   duplicates the list, too?

11:07:43 11   A.  Yes.

11:07:43 12   Q.  And that's something that you would want to go back and check?

11:07:46 13   A.  Yes.

11:07:46 14   Q.  So you agree with me that this list probably still needs a

11:07:49 15   little work, right?

11:07:50 16   A.  I agree with you that there are some duplicates on it, yes.

11:07:59 17           MR. SEEGER:  Your Honor, before we go off 79 since both

11:08:02 18   sides are using it, can we just move it into evidence now?  Would

11:08:07 19   that be okay?

11:08:08 20           MR. FENTON:  Exhibit 79, the class list?

11:08:12 21           MR. SEEGER:  Yes.

11:08:13 22           MR. FENTON:  Your Honor, I have a partial objection to 79.

11:08:17 23   Obviously, it is the class list that Mr. Inglis used to calculate

11:08:21 24   damages, and for that purpose, showing what he did and the basis on

11:08:25 25   which he did it, I have no objection at all.

11:08:27   1          I do, however, have an objection to 79 going into

11:08:31   2   evidence as proof of Taishan drywall, because, obviously, this

11:08:34   3   witness has not confirmed that the properties on that list

11:08:37   4   necessarily have it, other than for most of them on a hearsay basis.

11:08:44   5          THE COURT:  But that's argument as to the validity of the

11:08:47   6   accuracy of the list.  It is what it is.  If there's enough

11:08:53   7   testimony on it, I'll admit it.

11:08:56   8          MR. FENTON:  All right.  Thank you, your Honor.  Let me

11:09:10   9   see if I can shorten this up a little bit, Mr. Woody.

11:09:14  10          THE WITNESS:  Okay.

11:09:16  11          MR. FENTON:  I'm sure you won't mind.

11:09:19  12          THE WITNESS:  I don't.

11:09:23  13          MR. KENNY:  I'm sorry, your Honor.

11:09:29  14   BY MR. FENTON:

11:09:30  15   Q.  Let me ask you.  This is Plaintiff 79.

11:09:36  16          MR. FENTON:  So if I may ask counsel, your Honor, has this

11:09:39  17   updated with the latest information that we got last night?

11:09:42  18          MR. SEEGER:  Yes.

11:09:43  19          MR. FENTON:  Just so we can confirm that.

11:09:48  20   BY MR. FENTON:

11:09:54  21   Q.  Now, I would like to go, if we could, to Plaintiff's 30.  If we

11:10:13  22   could get that up on the screen.  And Plaintiff's 30, Mr. Woody, is

11:10:35  23   the compilation, I believe, you testified to of the supplemental

11:10:40  24   plaintiff profile form.  No, that's not it.

11:10:58  25          THE COURT:  What's the number?  What does he need?

11:11:01 1          MR. SEEGER:  He referenced 30, but what he described isn't

11:11:05 2     30.

11:11:06 3          MR. FENTON:  I'm sorry.  It's Defendant's Exhibit 12.  I

11:11:09 4     know there's a corresponding plaintiffs' number.  It's the

11:11:13 5     supplemental profile form spreadsheet.

11:11:17 6          MR. SEEGER:  Okay.

11:11:25 7     BY MR. FENTON:

11:11:25 8     Q.  And, Mr. Woody, I believe you testified on your direct

11:11:30 9     examination that you had prepared this form to collect the data that

11:11:35 10    was on the supplemental profile forms that were collected?

11:11:40 11    A.  This is a report of the data we collected.

11:11:42 12    Q.  Okay.  And I believe you also testified that the supplemental

11:11:48 13    profile forms you had made a website available, people filled them

11:11:53 14    out?

11:11:53 15    A.  Yes.

11:11:53 16    Q.  Did all of the plaintiffs provide supplemental profiles?

11:11:57 17    A.  No.

11:11:57 18    Q.  And in many cases, in fact, it wasn't actually the plaintiffs

11:12:02 19    who were filling them out, but counsel for the various plaintiffs,

11:12:05 20    right?

11:12:05 21    A.  Yes.

11:12:06 22    Q.  And so you prepared this as part of your work in collecting the

11:12:16 23    data at the request of the PSC for purposes of this project you

11:12:23 24    testified about?

11:12:24 25    A.  I prepared this.  This is simply a report of all of the

11:12:28  1  information entered by people on to that page, and I prepared this

11:12:33  2  to produce to you.

11:12:34  3  Q.  And it's a compilation of the information that you got in the

11:12:37  4  supplemental profile forms, correct?

11:12:39  5  A.  Yes.

11:12:40  6        MR. FENTON:  And I would like to move Defendant's

11:12:42  7  Exhibit 12 into evidence, your Honor.

11:12:44  8        MR. SEEGER:  No objection.

11:12:45  9        THE COURT:  Admitted.

11:12:47 10  BY MR. FENTON:

11:12:47 11  Q.  If we could go to a column, it's about halfway through the

11:12:54 12  page.  You see there's a column there already remediated --

11:13:00 13  A.  Yes.

11:13:00 14  Q.  -- Mr. Woody.  And the plaintiff -- the supplemental profile

11:13:04 15  asks various claimants if their properties had been remediated or

11:13:09 16  not, correct?

11:13:10 17  A.  Yes.

11:13:10 18  Q.  And quite a few of the plaintiffs answered yes?

11:13:14 19  A.  Yes.

11:13:15 20  Q.  And I think that was over 700 or so?

11:13:19 21  A.  I would have to look.  I don't know.

11:13:21 22  Q.  Does that number sound about right?

11:13:25 23  A.  Okay.  It sounds fine.  I don't know.

11:13:28 24  Q.  And then a number of people answered no, had not been

11:13:32 25  remediated, right?

11:13:33  1    A.   Yes.

11:13:34  2    Q.   And then a number of people left it blank, right?

11:13:37  3    A.   Yes.

11:13:38  4    Q.   So we don't know whether the property has been remediated or

11:13:42  5    not?

11:13:43  6    A.   Not based on this form, no.

11:13:44  7    Q.   And you didn't do any independent work other than, I suppose,

11:13:49  8    consulting the Knauf database to see whether properties on the class

11:13:54  9    list had been remediated or not, right?

11:13:56 10    A.   No.

11:13:57 11    Q.   I wonder if we could put up the class definition.  I believe

11:14:05 12    Judge Fallon read this earlier today.  What we've pulled out of the

11:14:14 13    Court's decision, findings of fact and conclusions of law certifying

11:14:20 14    the class is the class definition that the Court utilized.  And what

11:14:26 15    it says there is the certified class is defined as follows:  All

11:14:31 16    owners of real properties in the United States, who are named

11:14:35 17    plaintiffs on the complaints in *Amorin*, *Germano*, *Gross* and/or *Wiltz*,

11:14:41 18    (i.e. not an absent class member), asserting claims for remediated

11:14:48 19    damages arising from, or otherwise related to Chinese drywall

11:14:53 20    manufactured, sold, distributed, supplied, marketed, inspected,

11:14:58 21    imported, or delivered, by the Taishan defendants.  But those were

11:15:04 22    for remediated damages, correct?

11:15:07 23            MR. MEUNIER:  Your Honor, I do object to counsel asking

11:15:08 24    this witness questions about a definition of a class, aside from the

11:15:12 25    fact that the word "remediated" probably means remediation.  It's a

11:15:17 1   typo.

11:15:18 2                MR. FENTON:  I object to the argument, your Honor.

11:15:19 3                THE COURT:  It is argument.  I am the one that put it

11:15:24 4   there, so I meant both remediated and remediation.  All of the

11:15:28 5   damages resulting from the need to remediate or the fact that it's

11:15:33 6   remediated.  That's what I meant, Mr. Woody.

11:15:35 7   BY MR. FENTON:

11:15:36 8   Q.  All right.  With that classification, Mr. Woody, so you

11:15:39 9   included on this list both remediated and unremediated properties?

11:15:44 10               MR. MEUNIER:  Your Honor, he didn't include anything.  He

11:15:46 11  is just reporting what came in the form.

11:15:48 12               MR. FENTON:  I'll accept that correction.

11:15:51 13               THE COURT:  I'll overrule that objection and let him

11:15:52 14  answer.

11:15:53 15  BY MR. FENTON:

11:15:53 16  Q.  On Exhibit 10, Exhibit 10 includes properties where people

11:15:57 17  said, "Yes, I had my property remediated," and, "No, I haven't,"

11:16:01 18  correct?

11:16:01 19  A.  I don't know.

11:16:01 20  Q.  You don't know because you haven't looked at the latest

11:16:05 21  Exhibit 10, correct?

11:16:06 22  A.  No.

11:16:06 23  Q.  But on the last class list you looked at you had both

11:16:10 24  categories of properties, correct?

11:16:11 25  A.  I am not sure.

11:16:12 1   Q.  That's not something that you can answer?

11:16:13 2   A.  No.

11:16:14 3   Q.  Just a few more questions, Mr. Woody, on the Knauf remediation

11:16:21 4   program.  I think we established or Mr. Meunier established that

11:16:31 5   BrownGreer keeps full and accurate records of its expenditures in

11:16:39 6   connection with the Knauf remediation program in the ordinary course

11:16:40 7   of its business.

11:16:41 8   A.  What do you mean by "expenditures"?

11:16:44 9   Q.  In other words, when properties are remediated, you keep a

11:16:47 10  record of what is paid to contractors for remediation?

11:16:50 11  A.  Yes.

11:16:51 12  Q.  And you used that to prepare the list of now remediation data

11:16:59 13  that was presented to us earlier in the case, and that I think has

11:17:04 14  been identified as Plaintiff's 30, if we can get that up on the

11:17:07 15  screen.  And actually, I believe, Mr. Woody, we may have seen an

11:17:26 16  earlier version of this, the one that was done before your

11:17:31 17  deposition on Mr. Meunier's questioning.  But in any event, this was

11:17:37 18  a list that you put together at our request to show the Knauf

11:17:40 19  remediation expenses, correct?

11:17:42 20  A.  Yes.

11:17:43 21  Q.  I believe you said on direct examination that payments made to

11:17:54 22  Moss for the services of overseeing the remediation program were not

11:18:00 23  included in the amounts that are shown on this spreadsheet?

11:18:04 24  A.  Yes.

11:18:05 25  Q.  But that's not -- if Moss actually did the construction work to

11:18:10  1   remediate the properties, that was included on this list, correct?

11:18:14  2   A.  Yes.

11:18:14  3   Q.  You're not saying you didn't include any payments to Moss on

11:18:17  4   this, right?

11:18:18  5   A.  No, no.

11:18:18  6   Q.  This was for the work that they were doing in connection with

11:18:21  7   the settlement oversight, correct?

11:18:25  8   A.  The amounts listed on here are the costs of remediation.

11:18:28  9   Q.  Right.  So if Knauf was remediating a property and they were

11:18:32 10   the contractor on the job, those costs would be included, correct?

11:18:35 11   A.  Moss, yes.

11:18:38 12   Q.  Yes, all right.  Now, the earlier version that we looked at --

11:18:47 13   and if we could go to Plaintiff's 19 -- no, that's not it.  This is

11:19:08 14   your May 22nd memo, Mr. Woody.  I think maybe it's Plaintiff 18.

11:19:15 15   That's it.  If we could blow that up.  This is the memo that

11:19:24 16   Mr. Meunier showed you during your direct examination, correct?

11:19:30 17   A.  Yes.

11:19:30 18   Q.  And he took you through the list of what payments it included

11:19:40 19   and what payments the spreadsheet didn't include, correct?

11:19:42 20   A.  Yes.

11:19:43 21   Q.  And I believe you said that at the time you did this memo, the

11:19:49 22   Knauf remediation spreadsheet that you had done included both

11:19:53 23   payments for mixed properties; that is to say, where Knauf only paid

11:19:57 24   a portion of the settlement, correct?

11:19:58 25   A.  Yes.

11:19:59 1   Q.  And it also, at that time, included move in/move out costs,

11:20:06 2   which was akin to alternative living expenses for the various

11:20:10 3   claimants, correct?

11:20:11 4   A.  I don't know how I would characterize it.  They're move in/move

11:20:16 5   out costs.

11:20:17 6   Q.  But in any event, when we took your deposition, Mr. Woody, we

11:20:21 7   asked you if you could back those numbers out; that is to say, the

11:20:25 8   mixed settlements and the move in/move out costs, correct?

11:20:28 9   A.  Yes.

11:20:30 10  Q.  And the mixed settlement, as it turned out, there were maybe

11:20:33 11  about 20 property on the list that were mixed settlements?

11:20:37 12  A.  That sounds right, yes.

11:20:39 13  Q.  In terms of the data that you have provided, the Knauf

11:20:42 14  settlement data includes close to 4,000 properties, correct?

11:20:47 15  A.  I think it's 3,000.

11:20:50 16  Q.  3,000, okay.  Well, we'll look at the list and see.  So now, if

11:20:56 17  we could go to the Knauf remediation spreadsheet -- one thing before

11:21:04 18  we leave this, if we could go to page 2.  You see the Knauf

11:21:10 19  remediation summary?

11:21:13 20  A.  Yes.

11:21:13 21  Q.  And you prepared it at that time?  Did you prepare that summary

11:21:21 22  at that time?

11:21:22 23  A.  Yes.

11:21:22 24  Q.  And that was to show the average cost of square foot for the

11:21:26 25  Knauf settlement remediation program?

11:21:29  1   A.  Per year, yes.

11:21:30  2   Q.  And that was construction costs plus the move in/move out,

11:21:35  3   right?

11:21:35  4   A.  Yes.

11:21:36  5   Q.  At that time.  And it showed at that time that the average cost

11:21:41  6   per square foot for the Knauf remediation was approximately $73 a

11:21:46  7   square foot, correct?

11:21:47  8   A.  Yes.

11:21:48  9   Q.  And then after you backed out the move out/move in costs and

11:21:53  10  after you removed the mixed properties, that number went down,

11:21:57  11  didn't it?

11:21:58  12  A.  Yes.

11:21:58  13  Q.  To about $65 a square foot, correct?

11:22:01  14  A.  I think so.

11:22:02  15  Q.  Could we put, now, Plaintiff's 30.  And so this is the

11:22:14  16  remediation -- the Knauf remediation spreadsheet as of May 28th.  So

11:22:20  17  this is the current version, correct?

11:22:21  18  A.  Yes.

11:22:22  19  Q.  And we see in your summary on the first page that the overall

11:22:28  20  cost of remediation per square foot is down to $65.15, correct?

11:22:34  21  A.  Yes.

11:22:35  22  Q.  And if we can go to the next sheet, the zip.  And I just want

11:22:42  23  the Court to understand what you did here.  You organized the

11:22:45  24  spreadsheet by zip code, correct?

11:22:47  25  A.  That's how you asked for it, so that's how I did it.

11:22:51  1    Q.  So you placed -- for example, if you look at line 3, there were

11:22:54  2    16 properties in that zip code?

11:22:56  3    A.  Yes.

11:22:57  4    Q.  And you gave us the average remediation costs, the median

11:23:00  5    remediation costs, and the highest and lowest remediation costs?

11:23:04  6    A.  Yes.

11:23:05  7    Q.  And you can see from this data, even to the untrained eye,

11:23:18  8    there is a tremendous variation in the costs between the different

11:23:25  9    zip codes, correct?

11:23:26  10   A.  Yeah, they vary.

11:23:28  11   Q.  And even within zip codes there is significant variations.  For

11:23:38  12   example, if you look at line 6 and carry that over, the highest

11:23:43  13   remediation cost per square foot for -- well, those were two

11:23:48  14   properties, 82.67 and the lowest remediation cost is 67.13?

11:23:55  15   A.  Yes.

11:23:55  16   Q.  And if you look at line 7 where there's 35 properties.  The

11:24:00  17   highest remediation cost is $78.34 per square foot and the lowest

11:24:06  18   remediation cost is $57.93 per square foot, correct?

11:24:13  19   A.  Yes.

11:24:14  20   Q.  And then if you go down to line 14 where there is only one

11:24:18  21   property, there your average cost of remediation for the one

11:24:23  22   property, so I guess it's not an average, is over $108 a square

11:24:28  23   foot, correct?

11:24:28  24   A.  Yes.

11:24:29  25   Q.  And compared with line 1 where there's only one property where

11:24:32 1    the average remediation cost was $47 per square foot, correct?

11:24:37 2    A.  Yes.

11:24:38 3    Q.  So these numbers are sort of all over the place, aren't they,

11:24:41 4    sir?

11:24:41 5    A.  They differ, yes.

11:24:43 6    Q.  They do indeed.

11:24:45 7          MR. FENTON:  Okay.  Mr. Woody, give me one moment.  Your

11:24:50 8    Honor, I would like to admit Defendant's 14 into evidence and also

11:24:54 9    Plaintiff's 30.

11:24:55 10         THE COURT:  Okay.  Let it be admitted.  Any redirect?

11:25:02 11         MR. MEUNIER:  Yes.

11:25:15 12                        REDIRECT EXAMINATION

11:25:16 13   BY MR. MEUNIER:

11:25:16 14   Q.  Mr. Woody, you don't know the reason for any of those the

11:25:18 15   differences in square footage on the Knauf data, do you?

11:25:20 16   A.  No.

11:25:21 17   Q.  You don't know whether some of those owners decided to move

11:25:23 18   back in sooner or later because they wanted to get back in their

11:25:26 19   house?

11:25:26 20   A.  No.

11:25:26 21   Q.  You were asked on redirect about the $65 a square foot average

11:25:31 22   for the Knauf remediation once you take out move in/move out,

11:25:35 23   correct?

11:25:35 24   A.  Yes.

11:25:36 25   Q.  There are costs, are there not, associated with actual

11:25:40 1  remediation which are not included in that number?  You know that,

11:25:44 2  don't you?

11:25:44 3  A.  Yes, yes.

11:25:46 4  Q.  Counsel asked you about Moss.  It's not Moss overseeing

11:25:49 5  settlement, the charges for Moss as a general contractor to oversee

11:25:55 6  remediation work are not included in the 65.15, correct?

11:26:00 7  A.  Correct.

11:26:02 8  Q.  The cost for the CIH inspection, not in the 65.15, correct?

11:26:06 9  A.  Correct.

11:26:06 10  Q.  The cost for insurance, not in the 65.15?

11:26:09 11  A.  Correct.

11:26:10 12  Q.  For the 1,285 properties for which you verified the needed

11:26:28 13  existence of reactive Chinese drywall in order to receive funds in

11:26:33 14  the GBI settlement, you did review many of the PPF's, did you not?

11:26:37 15  A.  Yes.

11:26:38 16  Q.  And they did have documentation to support the Chinese drywall,

11:26:42 17  didn't they?

11:26:42 18  A.  Yes, some do.

11:26:43 19  Q.  Not just ten or 20, you reviewed them in that case to establish

11:26:48 20  the 1,285, didn't you?

11:26:50 21          MR. FENTON:  Leading.

11:26:52 22          THE COURT:  Please don't lead.

11:26:54 23  BY MR. MEUNIER:

11:26:55 24  Q.  Did you review PPF's for establishing the 1,285?

11:26:58 25  A.  Yes, where we didn't have other evidence submitted by

11:27:02  1   claimants.  We would look at the PPF's.

11:27:03  2   Q.  And look for supporting documents?

11:27:06  3   A.  Yes.

11:27:06  4   Q.  And you found it?

11:27:07  5          MR. FENTON:  Objection, your Honor.

11:27:09  6          THE COURT:  Leading, sustained.

11:27:11  7   BY MR. MEUNIER:

11:27:12  8   Q.  And the square footage given for the Knauf remediation was

11:27:18  9   based on Knauf inspection?

11:27:21 10   A.  Yes.

11:27:22 11   Q.  But the square footage given for the GBI was not, right?  It

11:27:26 12   was based on other materials?

11:27:29 13          MR. FENTON:  Objection, your Honor.

11:27:30 14          THE COURT:  Please don't lead.  He is going to keep

11:27:35 15   objecting.  Ask him questions not leading.

11:27:38 16   BY MR. MEUNIER:

11:27:39 17   Q.  Mr. Woody, for the Knauf and GBI settlement programs, was the

11:27:45 18   level of verification that BrownGreer used for both square footage

11:27:51 19   and product ID part of an effort to actually allocate funds to

11:28:00 20   individual people to either remediate or be paid under a settlement?

11:28:05 21          MR. FENTON:  Same objection, your Honor.

11:28:06 22          THE COURT:  What was the purpose of it, that's what he

11:28:09 23   wants to know.

11:28:10 24   BY MR. MEUNIER:

11:28:10 25   Q.  What was the purpose of the verification of square footage and

11:28:13  1   product ID --

11:28:13  2            THE COURT:  Wait.  He understands.  What's the purpose,

11:28:15  3   tell us.

11:28:15  4            THE WITNESS:  To determine how much people were entitled

11:28:17  5   to and to pay them.

11:28:18  6   BY MR. MEUNIER:

11:28:19  7   Q.  Individual people?

11:28:19  8   A.  Yes.

11:28:20  9   Q.  You understand that this is an aggregation, not an allocation

11:28:23 10   hearing?

11:28:24 11            MR. FENTON:  Objection, your Honor.  That is yet to be

11:28:27 12   determined.

11:28:27 13   BY MR. MEUNIER:

11:28:28 14   Q.  Referring to the last list that you looked at, which had 2,715

11:28:34 15   properties on the list, you are certain that 1,285 had Taishan

11:28:43 16   drywall which was verified under your protocol?

11:28:46 17   A.  Yes.

11:28:46 18   Q.  And the balance are supported by the under perjury statement in

11:28:53 19   the PPF, correct?

11:28:55 20            THE COURT:  Objecting to leading.

11:28:57 21            MR. FENTON:  Leading all over.

11:28:59 22   BY MR. MEUNIER:

11:28:59 23   Q.  How are the balance on the lists supported other than the

11:29:04 24   1,285?

11:29:04 25   A.  If we didn't have information on product ID through our GBI

11:29:09   1   review, we used the plaintiff profile form statements.

11:29:17   2           MR. KENNY:  Your Honor, I will object on the grounds --

11:29:19   3   I'm sure you didn't intend this, but he said that the other list was

11:29:23   4   2,449, not the remainder on the class list of 2,715.  I'm sure you

11:29:30   5   didn't --

11:29:30   6           THE COURT:  Just restate it.  Let's get the right number.

11:29:36   7   BY MR. MEUNIER:

11:29:36   8   Q.  For the last list you have product ID for 1,285 based on using

11:29:43   9   the Court approved protocol for verification?

11:29:46  10   A.  Yes.

11:29:46  11   Q.  Product ID we're talking about.  And the balance on the list,

11:29:51  12   not that 1,285 would be supported --

11:29:53  13           THE COURT:  He is objecting.  What's the balance?

11:29:57  14   BY MR. MEUNIER:

11:29:57  15   Q.  What would the balance be supported with?

11:30:01  16   A.  Assertions on a plaintiff profile form.

11:30:04  17   Q.  And you have not looked at the supporting documentation --

11:30:05  18           THE COURT:  The question is:  Have you looked at the

11:30:07  19   supporting documents?

11:30:08  20           MR. MEUNIER:  I am trying to be expeditious.  I apologize.

11:30:11  21   BY MR. MEUNIER:

11:30:12  22   Q.  Have you looked at the supporting documents with the PPF's in

11:30:15  23   this case?

11:30:15  24   A.  No.

11:30:15  25   Q.  And with respect to square footage on the last list, the one

11:30:21  1    with the 2,715, do you have verification of square footage --

11:30:27  2    A.  Yes.

11:30:27  3    Q.  -- using the Court approved protocol?

11:30:31  4    A.  Yes.

11:30:32  5    Q.  In how many cases do you not?

11:30:35  6    A.  The last version I saw had 28 where we had not verified square

11:30:40  7    footage.

11:30:42  8    Q.  Mr. Woody, at all times in replying to the requests for

11:30:45  9    information from counsel for both the plaintiffs and the defendants,

11:30:49  10   have you been mindful of your Court appointed position in this case?

11:30:52  11   A.  Yes.

11:30:52  12   Q.  Have you at any time adopted any interest in which side

11:30:58  13   prevails in this hearing?

11:31:00  14   A.  No.

11:31:00  15   Q.  Have you at all times endeavored to provide the parties and the

11:31:03  16   Court with the best information available?

11:31:06  17   A.  Yes.

11:31:07  18          MR. FENTON:  Your Honor, this is beyond the scope.

11:31:09  19          MR. MEUNIER:  Thank you.  I have no further questions.

11:31:11  20          THE COURT:  Let me see counsel on logistics, please.

11:31:46  21      (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD.)

11:32:11  22      (OPEN COURT.)

11:32:11  23          THE COURT:  We'll stop here and come back at 12:30.  The

11:32:15  24   Court will stand in recess.

11:32:16  25          THE DEPUTY CLERK:  All rise.

11:32:18  1        (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

11:32:18  2

11:32:18  3                    P R O C E E D I N G S

12:39:59  4                    (AFTERNOON SESSION)

12:39:59  5        (OPEN COURT.)

12:39:59  6            THE COURT:  Be seated, please.  Call your next witness.

12:40:03  7            MR. SEEGER:  Judge, we are going to continue with

12:40:06  8   Mr. George Inglis.  Judge, just for counsel's benefit, he has up

12:40:08  9   there a binder up.  That's just his declaration and his exhibits.

12:40:15 10            THE COURT:  Okay.  All right.  Swear him in, please.

12:40:18 11            THE DEPUTY CLERK:  Please stand and raise your right hand.

12:40:19 12        (WHEREUPON, GEORGE J. INGLIS, WAS SWORN IN AND TESTIFIED AS

12:40:20 13        FOLLOWS:)

12:40:20 14            THE DEPUTY CLERK:  Please have a seat, state and spell

12:40:22 15   your name for the record, sir.

12:40:25 16            THE WITNESS:  My name is George J. Inglis, G-E-O-R-G-E,

12:40:33 17   Inglis, I-N-G-L-I-S.

12:40:47 18                    VOIR DIRE EXAMINATION

12:40:48 19   BY MR. SEEGER:

12:40:49 20   Q.  Mr. Inglis, why don't you tell his honor what you do for a

12:40:52 21   living?

12:40:52 22   A.  I'm a registered professional engineer in the state of Ohio and

12:40:55 23   Illinois.

12:40:56 24   Q.  And what kind of work do you do as an engineer?

12:40:59 25   A.  Work I'm involved with is with buildings, building

12:41:05  1   construction, building modification, renovation; particularly, in

12:41:09  2   diagnosing problems related to a building where there's an issue

12:41:16  3   that's causing damages.  And I perform inspections and develop

12:41:22  4   remediation plans, determine the cause of the problem.  And in some

12:41:29  5   cases just causation analysis, in other cases it also includes

12:41:35  6   involvement of cost estimate.

12:41:37  7   Q.  And just prior to your time getting involved with Chinese

12:41:40  8   drywall, tell us what kind of jobs you've had.  Where are you

12:41:43  9   currently?

12:41:44 10   A.  I have 30 years with U.S. Steel.  I was an engineer for most of

12:41:50 11   that time.  I was also in corporate capital procurement for about

12:41:56 12   three or four years, but the majority of my time was in engineering

12:42:01 13   within U.S. Steel.

12:42:04 14          In engineering I was involved with implementing projects

12:42:09 15   of various types, cost project, capital projects where I would be

12:42:14 16   responsible for developing the scope, the cost, schedule, and was

12:42:19 17   responsible for procurement, largely, particularly, near the end of

12:42:25 18   my career.

12:42:28 19   Q.  Were these big projects at U.S. Steel?  Let's just focus on

12:42:32 20   that.

12:42:32 21   A.  My last project I had, value of the project itself was 95

12:42:36 22   million for the one project.  So I've been involved with large

12:42:41 23   projects implementation, developing costs for them.  And I also

12:42:47 24   worked in the capital purchasing where I was responsible -- it was a

12:42:52 25   small group of us, about four, who performed all of the procurement

12:42:56  1   on capital and large cost projects for U.S. Steel; across steel

12:43:00  2   mills, iron ore mines, coal mines.  At the time when the corporation

12:43:07  3   was spending, like, 350 to $400 million a year.

12:43:11  4   Q.  Now, in capital procurement, did you deal with contractor

12:43:15  5   bidding?

12:43:16  6   A.  Dealt extensively with contractor bidding, establishing bid

12:43:21  7   lists to develop competitive bid environments, and we did try to

12:43:29  8   competitively bid projects when we could.

12:43:32  9   Q.  Where are you employed today?

12:43:34 10   A.  I am employed with Berman & Wright.

12:43:38 11   Q.  How long have you been there?

12:43:39 12   A.  Been with Berman & Wright 12-and-a-half years.

12:43:42 13   Q.  And you got involved -- just to move through this piece

12:43:47 14   quickly, you got involved as a testifying expert for us here because

12:43:52 15   Ron Wright couldn't continue, is that fair enough?

12:43:54 16   A.  That is correct.

12:43:55 17   Q.  And in your time -- in your experience, again predating Chinese

12:44:02 18   drywall, did you work on multi-state remediations, work multi-state

12:44:06 19   projects?

12:44:07 20   A.  I've done extensive traveling with Berman & Wright.  In the mid

12:44:18 21   2000s I was down in -- I was in New Orleans numerous times for

12:44:23 22   assessing damage for Hurricane Katrina, damages assessing the mode

12:44:29 23   of building failure, type of loss, flood, wind, vandalism, whatever.

12:44:40 24   That extended through the Gulf Coast regions, including Florida and

12:44:44 25   also Texas with Hurricane Wilma.

12:44:49  1        And with another category of work that we've been
12:44:53  2  extensively involved with that also included EFIS, which is a
12:44:58  3  synthetic stucco.  I traveled particularly New Jersey, South
12:45:02  4  Carolina, North Carolina, on synthetic stucco damages.  I'm based
12:45:10  5  out of Ohio, but I do a lot of traveling.  And do a lot of water
12:45:16  6  remediation-type assessments on cladding systems like stucco, brick,
12:45:22  7  HardiePlank, vinyl, various type cladding systems.
12:45:25  8  Q.  Let me ask you this:  Tell us a little bit about how you got
12:45:29  9  involved in Chinese drywall and your experience working with Chinese
12:45:33 10  drywall.  Start from the beginning.
12:45:35 11  A.  Okay.  It goes back to about the middle of 2009.  We were
12:45:42 12  approached about a problem type of drywall material that emitted a
12:45:52 13  corrosive fume.  And at that time, it was pretty much the ground
12:45:57 14  floor on assessing what the damages were and the scope of work,
12:46:01 15  understanding what the problem was.  So in 2009, Ron Wright and I
12:46:09 16  were extensively involved with first understanding what was the
12:46:16 17  available science in terms of what was happening to materials inside
12:46:21 18  of a residence that was exposed to this environment.  And there was
12:46:25 19  literature published by science.  There were also people we
12:46:29 20  contacted in the way of experts in the field that we evaluated.  We
12:46:37 21  did assessments of building codes as it relates to corrosive
12:46:42 22  drywall.
12:46:42 23  Q.  Let me ask you this just to pause right there.  Did you consult
12:46:45 24  with scientists from other fields, other experts?
12:46:48 25  A.  In particular, we consulted with Lori Streit for the drywall

12:46:52 1  and also, damage to copper; there was Don Galler who was a

12:46:56 2  specialist in electronic devices, plating of plumbing fixtures,

12:47:03 3  smoke detectors, light switches.  And then there was I think it was

12:47:07 4  Brad Krantz who was also involved heavily with electrical outlets,

12:47:12 5  corrosion on copper.  We conversed extensively with them.

12:47:21 6       MR. SEEGER:  Your Honor, at this time we will tender

12:47:24 7  Mr. Inglis as an expert in the areas of building engineering,

12:47:28 8  diagnostics and forensics, and estimation of building repairs.

12:47:34 9       MR. KENNY:  Your Honor, just for the record, we would like

12:47:35 10 to renew our Daubert motion.

12:47:38 11      THE COURT:  All right.  I've ruled on the Daubert motion.

12:47:42 12 I denied it.  I granted it in part and denied it in part, and I

12:47:45 13 stand by that ruling.  I'll allow him to testify as an expert.

12:47:50 14      MR. SEEGER:  Thank you, your Honor.

12:47:51 15                    DIRECT EXAMINATION

12:47:53 16 BY MR. SEEGER:

12:47:54 17 Q.  I want to talk now specifically about your drywall experience

12:47:58 18 in the *Germano* litigation.  What were you asked to do there?

12:48:02 19 A.  In *Germano* we were asked to first develop an understanding of

12:48:11 20 what was happening within the building, what materials were being

12:48:15 21 damaged, and then -- that was the science part of it.  And then, it

12:48:20 22 dealt -- our work dealt with assessing from a constructability point

12:48:24 23 of view what would be the scope of work to remediate a building that

12:48:30 24 was exposed to this type of corrosive drywall.  And particularly

12:48:36 25 things like copper wiring, devices that had silver contacts; to the

12:48:44  1    extent it would be plumbing that had copper, fixtures -- plumbing

12:48:51  2    fixtures.  Understand what materials were getting damaged.

12:48:56  3           And then, I think the science was pretty clear you had to

12:49:00  4    remove the hazard in the form of getting rid of the corrosive

12:49:04  5    drywall that was emitting the gas, and take out the drywall, remove

12:49:11  6    the hazard; but then there was questions about, you know, how do you

12:49:14  7    go about doing that?  And that had to do with constructability

12:49:17  8    questions, like, you know, how do you get the cabinets out of there

12:49:23  9    to get access to the wiring behind the cabinets?  Questions like do

12:49:27  10   you save doors, trim?  Do wood floors have to go?  Do they stay?

12:49:34  11   How about tile floors?  Reuse of electric wiring, is that an

12:49:39  12   appropriate step to do.

12:49:41  13          So we first handled the science part of it to determine

12:49:47  14   what needed to come out.  Then we worked with the scope of work,

12:49:51  15   which was the constructability.  And to do that we worked with two

12:49:55  16   contractors, particularly for *Germano*, and was seven homes in the

12:50:02  17   Norfolk, Virginia area; two contractors, that was VB Homes and

12:50:08  18   VIRTEXCO.  Had extensive discussions with them about our tentative

12:50:14  19   remediation plan of what we believed needed to come out.  And then

12:50:18  20   we had discussions about constructability challenges to make that

12:50:23  21   happen.

12:50:26  22          We also supplemented that with discussions with Beazer

12:50:31  23   Homes in Florida.  We visited a couple of days.  Two of us went to

12:50:35  24   Florida, visited homes where Beazer was remediating homes of

12:50:41  25   corrosive Chinese drywall.  And we had discussions with them about

12:50:48  1   some of the tentative plans that we had developed, and based on

12:50:55  2   that, Beazer had some very specific recommendations as to things

12:51:00  3   that we should think seriously about adding to our scope of work;

12:51:04  4   things such as CIH, certified industrial hygienist, who would be

12:51:09  5   there to track the residence from pre-remediation, take samples

12:51:14  6   during remediation, and prior to build back of the residence, and

12:51:20  7   post remediation.  Also, things like practicality of maintaining

12:51:27  8   wood floors through this process or just removing them.  The same

12:51:32  9   with kitchen cabinets.

12:51:33 10   Q.  Let me interrupt you there just to save a little time.  So the

12:51:37 11   work you did with regard to scope of remediation, what you're

12:51:40 12   describing now, was that work ultimately adopted by this Court in

12:51:44 13   the *Germano* case?

12:51:45 14   A.  Yes, it was, in the finding of fact.

12:51:49 15   Q.  You reviewed the findings of fact --

12:51:51 16   A.  I did.

12:51:51 17   Q.  -- issued by his Honor?  And did you see your work in that body

12:51:55 18   of that document?

12:51:56 19   A.  Yes, it was.  In terms of the scope that we had recommended,

12:52:01 20   which was to essentially go into a building that's been exposed to

12:52:05 21   this environment and strip it down to the studs, remove all of the

12:52:11 22   drywall that's in the building.  With some exceptions, there's a

12:52:18 23   fire code, there might be some other things.  But essentially go

12:52:21 24   into the building, strip it down to the studs, remove all of the

12:52:24 25   dust, vacuum up any residue or residual drywall residue that's in

12:52:33  1   the building, vacuum it, HEPA vacuum it, wipe down the studs, wet

12:52:40  2   wipe the studs, air out the building.  And as part of that would be

12:52:44  3   to remove electric wiring, remove damaged items.

12:52:48  4   Q.  Let me ask you this:  When you were coming up with the scope of

12:52:50  5   work that you were going to recommend to the Court, what was the

12:52:53  6   goal of that scope of work?  What were you trying to accomplish with

12:52:55  7   regard to a Chinese drywall home?

12:52:57  8   A.  First remove the cause of the corrosive damage, and then bring

12:53:05  9   the home back to a condition as it was intended to be initially

12:53:11 10   constructed for with replacement of materials.

12:53:15 11   Q.  Now, in connection with your work with *Germano*, did you do work

12:53:18 12   regarding pricing the costs of remediation?

12:53:21 13   A.  Yes, we did.

12:53:23 14   Q.  Tell us what you did.  Just briefly tell us what you did to

12:53:27 15   generate a cost of remediation with regard to the *Germano* homes.

12:53:32 16   A.  With *Germano* we met with the two contractors.  The two

12:53:39 17   contractors visited the homes.  Ron Wright from our firm visited the

12:53:46 18   homes.  The contractors made takeoffs.  They had subs also with them

12:53:54 19   visit the homes.  And each of these two contractors developed

12:53:58 20   proposals to remediate each one of these residences.  Based on those

12:54:08 21   bids, we had pricing for each home and this is where, when we

12:54:17 22   average the numbers, we got -- developed that $86 a square foot

12:54:23 23   number; which at that time we did not have in our scope, the CIH.

12:54:28 24   But as a result of our visit to Florida with Beazer, we understood

12:54:34 25   better the necessity of having a CIH involved through the process,

12:54:38  1   so we added the CIH as part of our scope of work.  And also, based

12:54:44  2   on Beazer's experience and practicality of taking out kitchen

12:54:51  3   cabinets and counters without damaging them, we revised our scope to

12:54:55  4   include replacement of the cabinets and wood flooring.  And that was

12:55:00  5   our scope.  We had the pricing from the two contractors, which they

12:55:06  6   had proposed.

12:55:08  7           And then as a separate check, we implemented -- we

12:55:12  8   developed an RSMeans price, which was a combination of unit prices,

12:55:23  9   dollar per square foot prices.  And because of the specialized

12:55:27 10   nature of the work actually for the tear out, clean up, to get the

12:55:31 11   house down to the bare studs and clean it, we actually used the

12:55:35 12   costs from the contractors for that because of the specialized

12:55:40 13   nature.

12:55:40 14   Q.  Let me ask you this.  If you had two contractor bids, why did

12:55:43 15   you also use RSMeans?

12:55:44 16   A.  We wanted to perform a cross-check on the number from the

12:55:50 17   contractors.  And we did this like in a hypothetical.  In *Germano*,

12:55:57 18   the average homes were 2,414 square feet.  That area, though,

12:56:03 19   included the garages.  So we wanted to perform a cross-check on that

12:56:11 20   to make sure that those numbers, you know, were reasonable.  So we

12:56:17 21   did a separate RSMeans cross-check, which is kind of a hybrid

12:56:21 22   because we used some units, some square foot.  And next we used for

12:56:27 23   the demo and clean up we used actually the pricing from the

12:56:31 24   contractors.

12:56:31 25   Q.  And through that method is that how you arrived at the $86?

12:56:35  1   A.  That was how we initially developed the $86 pricing for

12:56:40  2   remediation of homes.  It started with the work in *Germano*, but that

12:56:50  3   was 2010.  Subsequent to that --

12:56:52  4   Q.  Actually, hold off, I'm going to ask you a question that's

12:56:57  5   going to lead right into that.  Let me put the question out there.

12:56:58  6        Tell us about the work that you've done since *Germano.*

12:57:01  7   Have you been involved in other Chinese drywall scope and

12:57:03  8   remediation projects?

12:57:05  9   A.  Yes, we have.  Numerous projects.  And when I say "projects,"

12:57:13  10  some cases are homes, some cases are duplexes, could be a multi-unit

12:57:18  11  condominium of various types, even commercial work.

12:57:24  12       In 2010, we had numerous projects that we've been involved

12:57:28  13  with -- in 2010 -- particularly 2010, '11, '12 and then by 2013 the

12:57:37  14  work actually started to taper off somewhat in terms of the number

12:57:41  15  of projects.

12:57:42  16       But this work was not just in Virginia.  It was in

12:57:46  17  Louisiana.  It was in Florida.  It was in North Carolina.  It was in

12:57:53  18  New Jersey.  Maybe I mentioned Virginia.  Alabama.  We visited

12:57:59  19  multi-states.  And what we observed was that it didn't matter if it

12:58:07  20  was a northern state or a southern state, if there was corrosive

12:58:11  21  drywall in there, the damages were also there.  It didn't matter

12:58:16  22  where the location was.

12:58:19  23       And we felt very confident based on our work that we had

12:58:23  24  done and our observations on these various properties that we

12:58:29  25  observed that in all cases the remedy was the same:  The corrosive

12:58:33 1   drywall had to be removed and the damaged items had to be replaced,

12:58:39 2   such as copper wiring.

12:58:40 3   Q.  Let me follow-up on that.  So with regard to the scope of

12:58:43 4   remediation, has that changed from property to property or has that

12:58:48 5   been consistent in your experience since 2009 to the present?

12:58:51 6   A.  It's been our experience that it has been consistent.  We found

12:58:57 7   that the damages have been consistent, regardless of where the home

12:59:02 8   or the building was located.  And our scope of work was -- has

12:59:08 9   remained consistent to basically strip it down to the studs and do

12:59:13 10  the clean out and then rebuild the interior.

12:59:16 11          Now, just the interior.  We are not doing anything with

12:59:20 12  exterior siding or trim or anything of that.  Just the interior

12:59:23 13  finishes of the house.  Take it down to the studs, reconstruct.

12:59:27 14  Q.  And with regard to the Chinese drywall, have you had occasion

12:59:30 15  in your experience to develop a scope of remediation and to do an

12:59:36 16  estimate to remediate these properties without actually physically

12:59:40 17  visiting and seeing the properties yourself?  Is that part of your

12:59:45 18  experience?

12:59:46 19  A.  Yes, we have.

12:59:46 20  Q.  Can you tell us if you can identify the property you were

12:59:51 21  involved with, and just briefly, what your experience was with that?

12:59:54 22  A.  Can you repeat the question again?

13:00:00 23  Q.  Yes.  Have you had occasion in your experience to develop a

13:00:04 24  scope of remediation and pricing for remediation on a property or

13:00:07 25  properties where you actually haven't visited them yourself?

13:00:10 1    A.  That is actually what we've done here for this class action.

13:00:17 2    What we found was the scope has always been consistent with all of

13:00:21 3    the projects that we visited.  There hasn't been a change in that.

13:00:26 4    And what we have found is that for our scope of work, which is

13:00:30 5    really very narrowly focused, again, it's only on the interior demo

13:00:35 6    and build out, that the pricing has remained consistent, you know,

13:00:42 7    once you make adjustments for the location and the timing.

13:00:49 8            And what we've done on subsequent projects, we've actually

13:00:53 9    performed detailed RSMeans unit price estimates that we've applied

13:00:59 10   to various properties in various states.  And every time we've made

13:01:04 11   a unit price estimate, we've always taken it back to the dollar per

13:01:09 12   square foot to see if we were still in a, you know, had a good

13:01:14 13   comparison with the $86.

13:01:17 14   Q.  What have you found?

13:01:19 15   A.  We felt that we were actually tracking well to that $86 figure.

13:01:25 16   Q.  Now, are you familiar with the property by the name of Villa

13:01:30 17   Lago?

13:01:30 18   A.  Yes, I am.

13:01:31 19   Q.  Tell us what your experience in Villa Lago was.  Did you need

13:01:34 20   to look at each and everyone of the remediated properties to do

13:01:39 21   estimating?

13:01:39 22   A.  Villa Lago is a development in Boynton Beach, Florida.  It

13:01:46 23   consists of 328 condominium units.  Myself and another gentleman

13:01:53 24   visited that site and we actually entered into and made takeoffs on

13:02:02 25   four different units in that building.  Out of the 328, we visited

13:02:08  1    four.  Made takeoffs.  And our assignment there was to develop a

13:02:14  2    comprehensive damages estimate for that development.  It wasn't like

13:02:22  3    a unit-by-unit, but it was for the entire development.

13:02:27  4            So we, based on our experience with visiting the four,

13:02:31  5    looking at some of the direct costs for each of the units, we

13:02:37  6    applied those damages to the remaining 324.  And then on top of that

13:02:44  7    we added in for general conditions, contingency overhead, profit of

13:02:50  8    the project.

13:02:50  9    Q.  Did you visit all 324 units?

13:02:52  10   A.  No, we did not.  We visited four -- visited and entered four

13:02:57  11   specific units.

13:02:59  12   Q.  Now, we talked a little bit in your past experience on a

13:03:02  13   project you were involved with regarding stucco.  Do you recall

13:03:05  14   that?  Just yes or no on this one.

13:03:07  15   A.  Yes, yes.

13:03:08  16   Q.  In that matter that you were involved with, did you have

13:03:14  17   experience developing a scope of remediation and pricing for

13:03:18  18   remediation without actually visiting -- physically visiting the

13:03:22  19   properties?  If so, tell us about it.

13:03:25  20   A.  In the 1990s there was a cladding system known as EFIS, it's

13:03:33  21   synthetic stucco.  There's been extensive damages related to EFIS,

13:03:39  22   barrier reefs.  And our firm, I believe we investigated something,

13:03:45  23   approximately 1,500 or more homes that were -- and they would be

13:03:50  24   different developments, not just homes -- that had sustained

13:03:53  25   damages; particularly, water damage as a result of EFIS.  And we

13:03:58   1   performed numerous RSMeans estimates to estimate the cost for

13:04:05   2   remediating EFIS homes.

13:04:08   3          And what we had done -- this is back in the '90s -- we

13:04:11   4   developed a cost.  Again, it was a very specialized narrow scope,

13:04:16   5   but it was to remediate an EFIS building on a dollar per square foot

13:04:22   6   of wall area.

13:04:24   7   Q.  How many buildings?

13:04:25   8   A.  I am not sure how many times we used that.  I think we've done

13:04:32   9   something in the area of 500 estimates for EFIS damage, and I am not

13:04:39  10   sure how many of those that we did under that.  That was actually in

13:04:43  11   the '90s, that was before I was employed.  Since that time, the

13:04:50  12   installation of barrier reefs on the residences in the United

13:04:53  13   States -- I mean, they're really not around very often anymore.

13:04:56  14   Q.  Let me ask you this and focus you now back on this case.  Were

13:04:59  15   you able to make cost of repair estimates in this case for the

13:05:03  16   thousands of homes that span the class?

13:05:06  17   A.  I'm sorry.  Say it again, please.

13:05:07  18   Q.  Were you able to make cost of repair estimates in this case for

13:05:11  19   all of the homes in the class in this case?

13:05:14  20   A.  Yes.

13:05:14  21   Q.  Tell us how you did that.  Where did you start and tell us what

13:05:19  22   your methodology is.

13:05:19  23   A.  Again, going back to 2009 with *Germano* and developing that

13:05:27  24   price initially of the 86 and consistent investigations and

13:05:31  25   maintaining that specific scope of work for the next five years, we

13:05:42  1   believe, we feel very comfortable with the scope of work that we

13:05:47  2   have.  And the cost, we believe we've confirmed that throughout the

13:05:52  3   years also.  And what we did for these properties, this class of

13:05:58  4   properties here is we basically for the 2,686 buildings, we made a

13:06:09  5   separate estimate for each building.  And by doing that, what we did

13:06:12  6   is we took the list, the previous gentleman --

13:06:15  7   Q.  Let me identify it.  You're talking about what's been entered

13:06:18  8   into evidence as Exhibit 79, is that this one?

13:06:23  9   A.  I believe that's --

13:06:29  10  Q.  Does that look familiar?

13:06:30  11  A.  That's an exhibit that we prepared.  The initial basis of the

13:06:38  12  information is information we had received from --

13:06:40  13  Q.  Let me just ask you some questions because we have this on.

13:06:44  14  This is Exhibit 79, your Honor.  This cover page here, Mr. Inglis,

13:06:48  15  what is that number right there (INDICATING)?

13:06:51  16  A.  This represents for 2,686 buildings, and at the top it says

13:06:59  17  these are only properties with verified square footage.  So there's

13:07:03  18  no buildings here that are unverified.  This says for these homes

13:07:09  19  they all have verified square footage across 16 states.

13:07:18  20         What we did for each one of these homes in each state by

13:07:22  21  zip code we established a local cost factor for each one of these --

13:07:28  22  each one of these residences.  We had information provided to us

13:07:37  23  by --

13:07:37  24  Q.  Let me just take you through this so everyone can see what you

13:07:41  25  did.  Take the top line.

13:07:44  1    A.   John Guinn.

13:07:50  2    Q.   This house right here.  You took this zip code you're saying,

13:07:52  3    right?

13:07:53  4    A.   Yes.

13:07:53  5    Q.   Now, talk us through what you did.  Why is that zip code

13:07:56  6    relevant?

13:07:57  7    A.   The zip code is relevant because through means we established

13:08:02  8    what a local cost factor was.  And what we had to do prior to the

13:08:09  9    local cost factor we established -- taking the $86, bringing it to

13:08:18 10    today, 2015, including also a CIH, we took the Norfolk, Virginia,

13:08:28 11    which was a localized area, and we developed a national cost as if

13:08:37 12    it was a location of the United States with a cost factor of one.

13:08:41 13    We developed a national cost factor, a cost for dollars per square

13:08:47 14    foot, and then we took that and used -- applied a localized factor

13:08:52 15    for that zip code that would multiply times that national cost,

13:08:56 16    which I believe is like $105.91, to bring it to a local cost for

13:09:02 17    that building in that area.  And we multiplied that by the square

13:09:07 18    footage of that building.

13:09:08 19    Q.   We prepared a demonstrative.  Would this help you explain this

13:09:13 20    concept a little bit better?

13:09:14 21    A.   Sure.

13:09:15 22    Q.   Can you see this?

13:09:24 23    A.   Yes.

13:09:24 24    Q.   Take us through one more time.  You can do this briefly

13:09:28 25    starting with your first point.  Tell us what you did to come up

13:09:31 1   with the numbers that you used to apply to the spreadsheet that's

13:09:35 2   Exhibit 79 we were just talking about.

13:09:39 3   A.   Item 1, Step 1 was starting with the $86, which was --

13:09:45 4   Q.   That comes from what, the $86?

13:09:47 5   A.   Well, it was initially developed in *Germano*, but it's been

13:09:52 6   reinforced.  But it initially came in 2010 from Norfolk, Virginia.

13:09:57 7   Q.   Okay.  Then what?

13:09:59 8   A.   Then we adjusted that to reflect material and labor costs in

13:10:05 9   2015 for Norfolk which was 95.92.  We took that number and went up

13:10:14 10  to Step 2 which was to develop a national cost using RSMeans cost

13:10:19 11  data, which was the 99.92.

13:10:25 12  Q.   Okay.  And then what?

13:10:26 13  A.   And then to that we added -- for CIH we added six percent.

13:10:32 14  Q.   That's a certified industrial hygienist?

13:10:35 15  A.   Right.

13:10:35 16  Q.   You added six percent.  And that brings you to this number?

13:10:40 17  A.   That brings us to the 105.91 for 2015.

13:10:44 18  Q.   And then what?

13:10:45 19  A.   However, there are only very, very few properties that would be

13:10:48 20  like at a national average cost, so what we did was apply a local

13:10:53 21  cost factor which is approximately .84, 84 percent of that.  Most of

13:10:59 22  the properties are in the southeastern United States, Gulf states

13:11:03 23  areas, so we multiplied this national figure of 105.91 times the

13:11:09 24  local cost factor, and we applied that to the square footage for

13:11:14 25  each property.

13:11:15  1            So, in essence, what we did, we did this process --

13:11:20  2  methodology for every property.  We did it 2,686 times and we

13:11:26  3  developed a separate estimate for each one.

13:11:28  4  Q.  So you went line by line on the spreadsheet in Exhibit 79 and

13:11:33  5  you did the math.  What is the math that you did?

13:11:35  6  A.  The math is once you develop the localized cost number, do

13:11:42  7  these steps, you multiply that times the square footage of the

13:11:47  8  residence to develop a cost to remediate.

13:11:50  9  Q.  In most instances when you apply the local cost factor, does

13:11:54 10  the number -- does the national number go up or does it go down?

13:11:59 11  A.  It almost always goes down.  And I think the average here was

13:12:06 12  approximately 84 percent.  So it would be 84 percent on average of

13:12:12 13  the 105.

13:12:14 14  Q.  Let's clarify one thing.  While you were being questioned by

13:12:18 15  the defendants in your deposition an issue came up about the local

13:12:21 16  cost factor you were using.  Do you recall that?

13:12:23 17  A.  Yes, I do.

13:12:24 18  Q.  Can you tell his Honor what happened with that?  We got that

13:12:27 19  wrong, right?  But why?

13:12:28 20  A.  I'm sorry.  What?

13:12:29 21  Q.  We got that wrong, but why?

13:12:31 22  A.  Let me explain what happened.  When we did the cost factor

13:12:41 23  analysis, we used a tool from RSMeans known as CostWorks.  We do

13:12:49 24  it -- we perform the evaluation online using their online data

13:12:54 25  source.  And they would say it should be more accurate because the

13:12:57  1   cost data is actually upgraded at least quarterly where they update

13:13:02  2   the costs.

13:13:04  3         When you go into CostWorks, the first thing you do is when

13:13:07  4   you log in you identify the type of work you're doing, which we said

13:13:13  5   residential as the title; next step is to identify where is the work

13:13:21  6   being done.  Is it a national average --

13:13:23  7   Q.  Would this help us follow along with you?

13:13:27  8   A.  Yes.

13:13:27  9   Q.  Tell us exactly what this is, Mr. Inglis.

13:13:30 10   A.  Can you maybe blow it up a little more?  That's going to be

13:13:34 11   kind of hard to see.

13:13:35 12   Q.  Is that a screen shot?

13:13:36 13   A.  It is a screen shot.

13:13:38 14   Q.  I'll zoom in, but let's start with what it is.

13:13:42 15   A.  It is a screen shot that was actually taken from my computer

13:13:47 16   where I was logged in to CostWorks.  In the upper left corner there

13:13:52 17   is a red circle.  You might want to just put a check there.

13:13:56 18   Q.  The upper left corner or the upper right corner?

13:13:56 19   A.  Upper left.

13:13:59 20   Q.  It identifies that that's CostWorks, 2015, residential.  So

13:14:11 21   pause there.  If you go online to use this program, that's what

13:14:14 22   you're going to pull up, CostWorks, 2015, residential?

13:14:17 23   A.  Correct.

13:14:17 24   Q.  Because that applies to this case, these are residential

13:14:21 25   buildings, right?

13:14:21   1   A.  Right.

13:14:22   2   Q.  Go ahead.

13:14:23   3   A.  This is an example.  What I did -- there's another screen shot.

13:14:28   4   What I did here is I logged in.  I said 2015, cost for Norfolk,

13:14:33   5   Virginia.  That's the circle there just to the right and a little

13:14:40   6   bit lower.  It says, "Norfolk, Virginia, 234."

13:14:40   7   Q.  Right over here (INDICATING)?

13:14:46   8   A.  Correct.  It's 2015 costs for Norfolk.

13:14:49   9        Norfolk has three sets of cost codes based on the zip

13:14:54  10   codes, but the weighted average is the same.  The online version

13:15:01  11   reads out .864.

13:15:05  12        When you do that, you type in Norfolk, all of the cost

13:15:08  13   numbers that appear on your screen are adjusted from the national

13:15:12  14   average by that cost factor of .864.

13:15:16  15   Q.  Wait.  Let's get there.  So that's the cost factor that you

13:15:20  16   were provided by this program you're saying?

13:15:23  17   A.  Yes.  This is what the program gives you.  For Norfolk,

13:15:26  18   Virginia, weighted advantage .864.

13:15:29  19   Q.  And that number is wrong, right?

13:15:32  20   A.  That number is wrong.

13:15:33  21   Q.  How do you know that number is wrong now?

13:15:37  22   A.  Here is what I did.  I looked at this and there is another

13:15:42  23   screen shot I did where I said Norfolk, Virginia, I said, okay.  Do

13:15:47  24   the national average which shows this house.  Can you slide it over

13:15:52  25   just to the right a little bit?  You'll see where the circles are,

13:15:55 1    they're for 2000.  This is an average quality two story,

13:16:01 2    2,000 square feet.  The first number there -- now, you see, this is

13:16:04 3    to construct an entire home.  There's no basement, no air

13:16:07 4    conditioning, but 2,000 square feet is $90.68.

13:16:13 5            If you take one of the other screens that shows the same

13:16:16 6    thing except for the 2015, it's not Norfolk, it's the national

13:16:20 7    average, that number becomes 104.95.  So 104.95 is the national

13:16:28 8    average.  This is 90.68.  If you do the math of 90 over 104, it's

13:16:33 9    .864.  So this program is actually applying that cost factor to

13:16:38 10   every cost that's on this page.

13:16:40 11   Q.  Let me ask you this:  Has this issue now been corrected?

13:16:44 12   A.  It is not corrected --

13:16:47 13   Q.  No.  In your analysis?

13:16:49 14   A.  In our analysis it's been corrected.

13:16:53 15   Q.  So are you still applying the .864 --

13:16:57 16   A.  No.

13:16:57 17   Q.  -- or do you have a new number?

13:17:00 18   A.  In fact, let me -- if I can just clarify because in my

13:17:05 19   deposition I said I would investigate this.  First, I did this to

13:17:11 20   confirm I was doing it right.  I called CostWorks and I reviewed

13:17:15 21   actually these screens with a person from CostWorks.  And their

13:17:20 22   first response is, "Well, there will be differences because

13:17:24 23   CostWorks periodically is updated," so there will be differences.  I

13:17:29 24   said, well, I think these might be more profound than just some

13:17:32 25   little tweaking of the data.

13:17:34  1        So I actually reviewed these screens.  The person from

13:17:38  2   CostWorks actually logged on and was looking at the same screens,

13:17:41  3   doing the same analysis.  And I said, "So all of these factors are

13:17:45  4   adjusted by 864?"

13:17:47  5        And I was told, "Yes."

13:17:48  6        So I said, "I am doing it right?"

13:17:50  7        And the answer was, "Yes, you're doing it exactly right.

13:17:54  8   Everything is adjusted."

13:17:56  9        I said, "Okay.  Why is there, then, the difference between

13:17:59 10   those numbers in the 864 and if you go to the residential book it's

13:18:06 11   .96?"

13:18:06 12        And the response was, "I don't know.  I'll get you an

13:18:11 13   answer."  And that was, I think, May 29th.  "We will get you an

13:18:17 14   answer on Monday."  I didn't get an answer on Monday.  I called

13:18:21 15   Tuesday --

13:18:21 16   A.  Okay.  We can move through this.

13:18:22 17        MR. KENNY:  Your Honor, objection for all of the hearsay

13:18:24 18   testimony.

13:18:26 19        THE COURT:  Let's try to move forward.

13:18:28 20   BY MR. SEEGER:

13:18:29 21   Q.  You've corrected your formula to include the correct local cost

13:18:32 22   factor, right?

13:18:33 23   A.  Okay.

13:18:34 24   Q.  Have you?

13:18:35 25   A.  Yes.  I was advised by CostWorks on Monday --

13:18:39  1    Q.  Just yes?

13:18:39  2    A.  Okay.  Yes, it's corrected.

13:18:41  3    Q.  Mr. Inglis, let me ask you this:  If your starting point is an

13:18:53  4    average square foot price, would you expect, then, for some people

13:18:55  5    in the class to get more and maybe some people to get less?  Would

13:18:59  6    that be something that you would expect?

13:19:01  7    A.  There could be some variability based on the finishes on the

13:19:12  8    interior and the size.  I'll point out, though, that the average

13:19:19  9    size of the *Germano* home, which without the garage was approximately

13:19:25 10    2,000 square feet, is very close to what the average is in this

13:19:29 11    class of properties.  It's a little over 2,000 square feet.  These

13:19:32 12    properties don't include square footage for garages.  So size-wise

13:19:39 13    of the properties, they're pretty much equivalent.

13:19:45 14            The finish of the homes, it's been our experience through

13:19:48 15    having visited numerous Chinese drywall homes, but also other homes

13:19:53 16    not just Chinese drywall, that the majority of the homes are more

13:19:57 17    around the middle.  You don't generally see Sub-Zero or Wolf

13:20:02 18    refrigerator in the kitchens.  They're more towards the means.

13:20:09 19            We basically did our analysis based on an average quality

13:20:16 20    home, average, around the 2,000 square feet.  We felt that this was

13:20:21 21    similar to what we observed in *Germano* and we felt comfortable with

13:20:27 22    the data.

13:20:28 23            MR. KENNY:  Your Honor, I am going to move to strike, the

13:20:30 24    answer is clearly not responsive to his own counsel's question.

13:20:34 25            MR. SEEGER:  I thought it was.  It was the question I

13:20:36 1   asked.

13:20:37 2           THE COURT:  I'll deny the motion to strike.  Let's pick up

13:20:43 3   the pace, please.

13:20:44 4   BY MR. SEEGER:

13:20:45 5   Q.  Mr. Inglis, let me ask you this:  When you get bids from

13:20:50 6   contractors, is there a certain amount of variability in the bids

13:20:53 7   that you get?  Is that accepted in your field?

13:20:56 8   A.  There could be extreme variability.  When I was at U.S. Steel

13:21:01 9   it was -- I mean, it was amazing how different contractors look at

13:21:06 10  the same project and come up with really variable pricing on the

13:21:11 11  bids.  And even in *Germano* we saw that with two contractors looking

13:21:17 12  at same property.  They look at the project a little bit

13:21:21 13  differently.  They come up with different number.

13:21:24 14  Q.  Let me ask you this:  Is this the text that you use in your

13:21:28 15  field called *Standard Estimating Practices*?

13:21:31 16  A.  That is a text, yes.

13:21:32 17  Q.  Something that you relied upon?

13:21:34 18  A.  Yes.

13:21:34 19  Q.  Would it help you in your testimony if we refer to some

13:21:39 20  language in this book?

13:21:40 21  A.  Sure.

13:21:45 22          MR. KENNY:  Is that an exhibit?

13:21:46 23          MR. SEEGER:  Yes, it's one of your exhibits, actually.

13:21:52 24  It's our 26, sorry.  It's *Standard Estimating Practices*.

13:22:01 25  BY MR. SEEGER:

13:22:02  1    Q.  Mr. Inglis, I just want to read you language here and you tell

13:22:06  2    me if it supports the concept that you just gave the court?

13:22:09  3                MR. KENNY:  I'm sorry, can we identify the page?

13:22:12  4                MR. SEEGER:  It's page 77.  See it right there?  I want to

13:22:20  5    be able to read it, so I have to blow it up.

13:22:20  6    BY MR. SEEGER:

13:22:22  7    Q.  Page 77 of the book that we just identified says, "Thinking

13:22:27  8    about the spread on bids from contractors, even on hard bid projects

13:22:30  9    with completed plans and specifications, I went through the bid

13:22:34 10    tabulations for 25 competitively general contract projects.  Each

13:22:39 11    project had a minimum of four bidders and some had as many as ten.

13:22:45 12    On some projects, the differences between the low and the high bids

13:22:48 13    was as little as one-half percent and on others as much as

13:22:53 14    30 percent.  The average differences for all projects was

13:22:57 15    17 percent."

13:22:57 16                Is that consistent with what you just said about the

13:23:00 17    variability in contractor bidding?

13:23:02 18    A.  Yes, it is.

13:23:16 19    Q.  In your experience as an engineer for 40 years, Mr. Inglis, are

13:23:20 20    the methods that you used for estimating class damages here accepted

13:23:24 21    in the construction industry?

13:23:25 22    A.  Yes, they are.  Because our methodology included the

13:23:33 23    competitive bidding, unit prices, dollar per square foot, and

13:23:44 24    consistent -- developing historical information where we kept the

13:23:48 25    same scope of work and developed historical costs where we could

13:23:58  1    apply this methodology to make sure that our numbers were valid.

13:24:04  2    Q.  How about square footage pricing?  Is that something that's

13:24:07  3    accepted?

13:24:07  4    A.  Square footage pricing is well established and often is used on

13:24:13  5    buildings that aren't even constructed yet.

13:24:15  6    Q.  There's another book I just want to identify for the record,

13:24:22  7    Defendant 5, which for your purposes is *Estimating Building Costs*

13:24:26  8    for RSMeans.  Is this a reference book that you use?

13:24:30  9    A.  Yes.

13:24:31  10   Q.  I just want refer you to some language in this book, page 494,

13:25:06  11   counsel, in this book.  I want to refer you to the language right

13:25:14  12   under where it says, "square foot estimate."  It says, "Another

13:25:17  13   method of conceptual estimating uses the gross square foot area of

13:25:22  14   the structure as the reporting parameter.  This is likewise meant as

13:25:26  15   a planning tool.  Square foot estimates also rely heavily on

13:25:29  16   historical costs from projects of similar nature, size, and type."

13:25:34  17           Is that consistent with what you've done here as far as

13:25:38  18   using square footage pricing?

13:25:41  19   A.  Yes, it is.  Only I just want to emphasize that what we did,

13:25:46  20   again, was also for the same scope and was also supplemented by --

13:25:51  21   reinforced by bids and unit pricing in addition to the square foot.

13:25:55  22   Q.  And, Mr. Inglis, all of the opinions that you've expressed here

13:26:00  23   today, do you hold them to a reasonable degree of certainty as an

13:26:04  24   expert in your field?

13:26:04  25   A.  Yes, I do.

13:26:04 1          MR. SEEGER:  Your turn.

13:26:17 2          THE COURT:  You may cross.

13:26:17 3          MR. KENNY:  Your Honor, may I approach the witness?

13:26:19 4          THE COURT:  Yes.

13:26:19 5                        CROSS-EXAMINATION

13:26:20 6  BY MR. KENNY:

13:26:20 7  Q.  By the way, I'm Mike Kenny.  Nice to meet you.  We have not met

13:26:25 8  yet.  This is the book that has your deposition in it, your

13:26:28 9  declarations, Mr. Inglis's declaration and a few other documents.

13:26:33 10 A.  Okay.

13:26:46 11         MR. KENNY:  Chris, as a housekeeping matter, do you have

13:26:49 12 any objection if we move your demonstrative that you used into

13:26:53 13 evidence?

13:26:53 14         MR. SEEGER:  No.

13:26:57 15         MR. KENNY:  Your Honor, we would like to move the

13:26:59 16 demonstrative that Mr. Seeger used with Mr. Inglis into evidence as

13:27:04 17 Defendant's 33.

13:27:05 18         THE COURT:  Okay.  Let it be admitted.

13:27:08 19         MR. KENNY:  The one with the map that explains his

13:27:11 20 formula.

13:27:12 21         MR. SEEGER:  No problem.

13:27:19 22 BY MR. KENNY:

13:27:19 23 Q.  Mr. Inglis, you just finished your testimony and maybe I didn't

13:27:24 24 hear it, but you did not offer any damages opinion when you were on

13:27:28 25 direct, did you?  Did you tell the Court what the class damages are?

13:27:37  1   Did you give any testimony about the class damages in this case?

13:27:41  2   A.  You mean the dollar amount?

13:27:42  3   Q.  Yes.

13:27:43  4   A.  I believe there was that Exhibit 2 which had the $497 million

13:27:47  5   at the bottom right.

13:27:49  6   Q.  Is that your testimony that the class damages are four hundred

13:27:52  7   and how much?

13:27:53  8   A.  497,180,467.

13:27:59  9   Q.  Is that your testimony about the class damages?

13:28:00 10   A.  Yes, it is.

13:28:01 11   Q.  Now, some of the lawyers for the plaintiffs in this case asked

13:28:04 12   you to serve as a testifying expert in mid April of this year,

13:28:08 13   correct?

13:28:08 14   A.  I'm sorry.  Could you repeat that?

13:28:10 15   Q.  Some of the lawyers in this case asked you to be a testifying

13:28:13 16   expert in this case in mid April, correct?

13:28:17 17   A.  That's correct.

13:28:17 18   Q.  And you agreed to do that?

13:28:19 19   A.  Yes, I did.

13:28:20 20   Q.  Prior to your retention, your boss, Mr. Wright, was serving as

13:28:23 21   the plaintiffs' damages experts, correct?

13:28:26 22   A.  Yes, he was.

13:28:26 23   Q.  And you reviewed the short affidavit Mr. Wright prepared on or

13:28:31 24   about October 22 of 2004, in support of plaintiffs' class damages

13:28:35 25   motion, haven't you?

13:28:36  1    A.  Have I what?  Have I seen it?

13:28:39  2    Q.  Have you reviewed it?

13:28:40  3    A.  I have reviewed it.

13:28:41  4    Q.  And after agreeing to serving as the substitute testifying

13:28:45  5    expert for your boss, you've prepared two sworn statements laying

13:28:49  6    out some damages calculations, correct?

13:28:51  7    A.  Correct.

13:28:52  8    Q.  Both of them about seven to eight pages with some exhibits?

13:28:56  9    A.  Correct.

13:28:56  10   Q.  Your first sworn statement was your affidavit dated April 27,

13:29:01  11   2015.  Do you remember that?

13:29:02  12   A.  Yes.

13:29:03  13   Q.  And that was signed shortly after you agreed to substitute for

13:29:06  14   Mr. Wright, correct?

13:29:07  15   A.  I believe so.

13:29:08  16   Q.  You signed that affidavit under oath, correct?

13:29:10  17   A.  It was within two weeks.  But I want to emphasize, I've worked

13:29:16  18   with Mr. Wright from 2009.  So it wasn't like -- when you say, "the

13:29:21  19   middle of April," it wasn't like I just was immersed in Chinese

13:29:26  20   drywall at that time.

13:29:26  21   Q.  My question is simple, sir.  I just asked if you agreed to

13:29:29  22   serve as a testifying expert as a substitute for Mr. Wright in mid

13:29:32  23   April?

13:29:33  24   A.  Correct.

13:29:33  25   Q.  And you submitted your first affidavit on April 27 of this

13:29:37  1    year, correct?

13:29:38  2    A.   Correct.

13:29:38  3    Q.   And that was signed under oath, correct?

13:29:41  4    A.   Correct.

13:29:41  5    Q.   And when you signed your affidavit under oath you believed that

13:29:45  6    your damages calculations were reliable, didn't you?

13:29:48  7    A.   Correct.

13:29:48  8    Q.   And you represented that they reasonably estimated damages for

13:29:52  9    the class certified by Judge Fallon, correct?

13:29:55  10   A.   Correct.

13:29:56  11   Q.   But there were mistakes in that April 27 affidavit, weren't

13:30:00  12   there?

13:30:00  13   A.   Let me say this:  I relied on the list of properties of class

13:30:10  14   properties and I applied my damages calculation to that listing of

13:30:16  15   properties.  So to the extent that that list of properties has

13:30:19  16   changed, I changed my damages calculation.

13:30:23  17   Q.   There were mistakes in your April 27 affidavit, weren't there?

13:30:26  18   A.   There were adjustments made to the data, so I made changes to

13:30:33  19   my damages calculation.

13:30:34  20   Q.   And those adjustments caused you to submit a declaration dated

13:30:38  21   May 15th, correct?

13:30:39  22   A.   Correct.

13:30:40  23   Q.   You signed that declaration under oath, too, didn't you, sir?

13:30:44  24   A.   I did sign it, yeah.

13:30:47  25   Q.   And when you signed your May 15 declaration, you believed that

13:30:50  1    the class damages calculations were reliable at that point in time,

13:30:54  2    didn't you?

13:30:55  3    A.  Yes.

13:30:55  4    Q.  You represented they reasonably estimated damages for the

13:30:59  5    class, didn't you?

13:31:00  6    A.  Yes.

13:31:00  7    Q.  Now, your May 15 declaration was signed and sworn to shortly

13:31:04  8    after my client Taishan submitted some papers with the Court

13:31:07  9    challenging some of your calculations in your April 27 affidavit.

13:31:11  10   Do you remember that?

13:31:12  11   A.  Yeah, I do.

13:31:16  12   Q.  And, for example, in your April 27 affidavit you made some

13:31:20  13   calculations for alternative living expenses, didn't you?

13:31:23  14   A.  Yes.

13:31:24  15   Q.  In the approximate amount of $95 million?

13:31:27  16   A.  I don't recall exactly.  I don't recall what the total number

13:31:32  17   was.  If you have the document.

13:31:34  18   Q.  Your declaration is in that notebook if you would like to take

13:31:37  19   a look at it to refresh your recollection.

13:31:40  20   A.  Oh, okay.  I think --

13:31:50  21   Q.  I think it's under Tab 2.

13:31:52  22   A.  I'm sorry.  It's Tab 2?

13:31:54  23   Q.  Tab 2.  Tab 3, excuse me.  It's Tab 2, sorry.

13:32:27  24          THE COURT:  You can put it on the overhead if you want.

13:32:32  25   Why don't you put it on the overhead so we can see it.

13:32:32  1   BY MR. KENNY:

13:32:32  2   Q.  Do you have it?  I think he has it now.

13:32:35  3   A.  I do have it, yeah.  The total -- I have the total, but I am

13:32:41  4   not sure that I had it broke out by -- I am not sure if I had it

13:32:47  5   broken out by alternative living as a total.

13:32:51  6   Q.  Do you have any reason to doubt that your calculation for

13:32:53  7   alternative living expenses was the approximate amount of

13:32:57  8   $95 million, sir?

13:32:58  9   A.  I don't recall what the number was.

13:33:00  10  Q.  But the lawyers told you to take your calculation for

13:33:05  11  alternative living expenses out for purposes of your May 15

13:33:08  12  declaration, correct?

13:33:09  13  A.  They did tell me to remove alternative living.

13:33:13  14  Q.  And you did as you were instructed, correct?

13:33:15  15  A.  I removed it.

13:33:16  16  Q.  And in your April 27 affidavit you attempted to calculate

13:33:20  17  damages for a class of approximately 3,713 buildings, correct?

13:33:25  18  A.  Let's see.

13:33:53  19  Q.  If you look at paragraph 2.

13:33:55  20  A.  Actually, I was looking --

13:33:57  21  Q.  Paragraph 2 of your declaration says it.

13:34:01  22  A.  Exhibit 2 has total number of properties 3,739.

13:34:06  23  Q.  But after Taishan also challenged those calculations, the

13:34:09  24  plaintiffs lawyers told you to delete 851 buildings from the class,

13:34:13  25  correct?

13:34:14  1   A.  Subsequent to this, as I received an updated list of buildings,

13:34:22  2   I modified my estimate based on that information.

13:34:26  3   Q.  Modified it by subtracting out 851, correct?

13:34:29  4   A.  I took the list of buildings and I applied my methodology to

13:34:35  5   that list of remaining buildings.

13:34:37  6   Q.  And you took these buildings out because the lawyers instructed

13:34:41  7   you to do that, correct?

13:34:42  8   A.  I took the buildings out because the list was -- I received

13:34:46  9   it -- it was modified.

13:34:48 10   Q.  Right.  You didn't modify that?

13:34:50 11   A.  No, I didn't modify the list of buildings, no.

13:34:53 12   Q.  You didn't create the list?

13:34:54 13   A.  I'm sorry?

13:34:55 14   Q.  You did not create the list?

13:34:57 15   A.  I did not create the list of buildings, no.

13:34:59 16   Q.  And you didn't create the lists that contained the addresses

13:35:03 17   with the buildings, correct?

13:35:04 18   A.  That's correct.

13:35:04 19   Q.  That was given to you by somebody else?

13:35:06 20   A.  Correct.

13:35:07 21   Q.  And you just relied on that document, correct?

13:35:09 22   A.  I relied on that document.

13:35:10 23   Q.  Now, your assignment in this case was to prepare damages

13:35:14 24   calculation on behalf of a class, correct?

13:35:15 25   A.  Correct.

13:35:16 1   Q.  And in April your affidavit included 3,739 properties in the

13:35:21 2   class, correct?

13:35:22 3   A.  Correct.

13:35:23 4   Q.  Then in your May declaration you included 2,888 properties,

13:35:29 5   correct?

13:35:29 6   A.  Yes, I believe that is correct.

13:35:32 7   Q.  And then you modified, once again, the number of properties in

13:35:37 8   the class calculation last Thursday and you reduced it to 2,715

13:35:43 9   properties, correct?

13:35:44 10  A.  I think it's actually 2,714, I believe.

13:35:52 11  Q.  And included in those 2,714 or 15 properties, you refer to some

13:36:00 12  properties with unverified square footage, correct?

13:36:04 13  A.  There were -- of those, there was 28 that were unverified.

13:36:08 14  Q.  Now, as an engineer you would agree with me, sir, that it is

13:36:12 15  important to have accurate data when you do calculations based on

13:36:15 16  that data, wouldn't you?

13:36:16 17  A.  Accurate data is important.

13:36:19 18  Q.  And you would also agree with me, sir, that as a testifying

13:36:23 19  expert you should exercise your independent judgment in performing

13:36:26 20  your assignment, correct?

13:36:27 21  A.  As an engineer it's not unusual to rely on information by

13:36:35 22  others; in particular, on a project foundations you get reports and

13:36:42 23  analysis of soils for foundations.  It's not unusual to rely on data

13:36:47 24  from others, and I relied on the data that I had received.

13:36:50 25  Q.  We'll get to that, but my question is a little different, sir.

13:36:53  1    You would agree with me that as a testifying expert you should

13:36:57  2    exercise your independent judgment in performing your assignment,

13:37:01  3    correct?

13:37:02  4    A.  I did not see a need to perform the same work that BrownGreer

13:37:07  5    was performing.

13:37:09  6    Q.  Did you exercise any independent judgment in calculating class

13:37:12  7    damages?

13:37:13  8    A.  As it relates to -- as it relates to verifying whether or not

13:37:23  9    these homes -- what the square footage was, if they had been

13:37:27 10    remediated or not, I did not do that.

13:37:29 11    Q.  Did you otherwise exercise any independent judgment in your

13:37:32 12    assignment to calculate class damages, sir?

13:37:35 13    A.  I applied my methodology, which was independent, to determine

13:37:44 14    what the class damages were to that class of buildings.

13:37:48 15    Q.  For the properties for which you have done calculations, it's

13:37:51 16    important that each owner be a current owner of the property; you

13:37:55 17    understand that, don't you?

13:37:56 18    A.  Yeah, that was not my assignment to confirm ownership of

13:38:02 19    properties.

13:38:02 20    Q.  But you understand that current owners of the property are the

13:38:07 21    people who should be in the class and not former owners; you

13:38:10 22    understand that, correct?

13:38:11 23           MR. SEEGER:  Objection, your Honor, calls for a legal

13:38:13 24    conclusion.

13:38:15 25           THE COURT:  I can't hear you if you sit down.  What is

13:38:17  1    your objection?

13:38:18  2            MR. SEEGER:  He is asking him what he understands who was

13:38:20  3    in the class, the definition excludes some.  It calls for a legal

13:38:22  4    conclusion.

13:38:22  5            THE COURT:  That may be so, but he is not asking who is

13:38:26  6    included, he is asking his impression of it.

13:38:28  7    BY MR. KENNY:

13:38:29  8    Q.  Do you have an understanding of who you're actually supposed to

13:38:32  9    calculate damages for, sir?

13:38:34  10   A.  My assignment was to calculate the damages and establish what

13:38:44  11   the cost would be to remediate each one of these buildings, and

13:38:48  12   that's what I did.  I did not try to determine who the owner was of

13:38:54  13   the building or if it was even a current owner or past owner.

13:38:58  14   Q.  So you don't know who you're supposed to calculate damages for

13:39:00  15   for the class?

13:39:01  16   A.  Each one of the properties has a name and an address.

13:39:06  17   Q.  So as long as any name is on the list supplied to you by

13:39:11  18   somebody else, you'll calculate damages for them; is that your

13:39:14  19   testimony, sir?

13:39:15  20   A.  I took the name that was on the list and that was the property.

13:39:22  21   I did not independently verify the owner of a property.

13:39:27  22   Q.  Now, you deleted 851 properties from your April 27 affidavit in

13:39:35  23   your May 15 declaration.  You recall that, correct?

13:39:37  24   A.  The updated list that I received from BrownGreer had fewer

13:39:47  25   properties.  My understanding is that it was more refined, and I

13:39:52   1   used that data to develop an updated damages estimate.

13:40:00   2   Q.  Your May 15 declaration had 25 percent fewer properties in it

13:40:06   3   than your April 27 declaration, correct?

13:40:08   4   A.  I didn't do the math, but there was definitely fewer

13:40:13   5   properties.

13:40:13   6   Q.  Did you ask anybody why you were deleting those properties?

13:40:17   7   A.  There was a memo that I had received.  It was authored by Jake

13:40:23   8   Woody where he went through his methodology of what had changed and

13:40:28   9   he came up with -- developed a revised list that had fewer

13:40:33  10   properties.  But I did not independently verify the work that he was

13:40:37  11   doing.

13:40:38  12   Q.  When Mr. Seeger was asking you some questions, you referred to

13:40:42  13   that "previous gentleman who testified."  Have you ever met Jake

13:40:46  14   Woody?

13:40:46  15   A.  I have not.

13:40:47  16   Q.  Have you ever spoken to Jake Woody?

13:40:49  17   A.  I have not.

13:40:50  18   Q.  Ever e-mailed with Jake Woody?

13:40:52  19   A.  I have not -- I have not personally corresponded with Jake

13:40:59  20   Woody.

13:40:59  21   Q.  Did you rely on Jake Woody to supply you data to perform your

13:41:03  22   calculations?

13:41:04  23   A.  I relied on BrownGreer, Jake Woody for the data that he

13:41:10  24   provided.

13:41:11  25   Q.  But you never met the man or spoke to the man at any point in

13:41:16  1   the course of your assignment?

13:41:17  2   A.  No, I just actually met him during one of the breaks.

13:41:21  3   Q.  Now, with regard to the 2,715 properties, or 14 properties -- I

13:41:26  4   thought it was 2,715, but you might be right as 2,714.  I'll cut

13:41:34  5   every one I can.  Do you know if those people for whom you've now

13:41:37  6   calculated class damages as late as last night, do you know if

13:41:41  7   they're current owners of the property?

13:41:49  8   A.  I am not sure.

13:41:49  9   Q.  Did you do anything to try to figure that out, to check it out,

13:41:55 10   to make sure that the damages that you're calculating, in fact, are

13:41:59 11   reasonably reliable?

13:42:00 12   A.  I believe the damages are reliable.  I think your question was

13:42:05 13   did I do anything to verify who the owner was of the property or the

13:42:09 14   current owner?

13:42:10 15   Q.  You're calculating damages of almost $500 million, correct?

13:42:14 16   A.  Correct.

13:42:14 17   Q.  On behalf of 2,714 or 2,715 people, correct?

13:42:21 18   A.  Correct.

13:42:22 19   Q.  Have you done anything to verify that, in fact, all of those

13:42:25 20   people are current owners?

13:42:27 21   A.  I did not independently check the listing of properties.

13:42:32 22   Q.  So for all you know, as you're sitting here testifying today,

13:42:35 23   there could be a bunch of properties on that list that you've

13:42:38 24   calculated where people aren't current owners, correct?

13:42:41 25   A.  I didn't independently check it.  My understanding was not only

13:42:45 1   did BrownGreer check it, I believe there's a methodology in place

13:42:55 2   that, when it comes time to remediate homes there will be some

13:42:59 3   additional steps taken to ensure that there was a safeguard in case

13:43:03 4   you're suggesting maybe some issues with who is actually receiving

13:43:07 5   compensation.

13:43:08 6   Q.  When did you come to this understanding?

13:43:10 7   A.  That's my understanding from speaking with legal counsel.

13:43:14 8   Q.  When?

13:43:15 9   A.  Through the course of this assignment.

13:43:24 10   Q.  This list, did you design it?

13:43:29 11   A.  No.

13:43:30 12   Q.  Did anybody working under your direction or control prepare

13:43:35 13   that list?

13:43:37 14   A.  The listing of properties was prepared by BrownGreer.  We

13:43:43 15   modified it by adding additional columns that would take into

13:43:48 16   account additional data that included the cost and location factors.

13:43:54 17   Q.  Now, the square footage of the property is a critical variable

13:43:59 18   in your damages, isn't it, sir?

13:44:01 19   A.  It's important, yes.

13:44:01 20   Q.  Not only important, according to you it's the primary driver of

13:44:05 21   remediation costs, right?

13:44:07 22   A.  Location, square footage, both very important.

13:44:09 23   Q.  And the data on square footage for the class properties was

13:44:13 24   supplied to you by a law firm, correct?

13:44:14 25   A.  Yes.

13:44:15  1   Q.  And that data was not collected based on any protocol you

13:44:18  2   designed, was it?

13:44:19  3   A.  I was not involved with the collection of the data or

13:44:24  4   verification of the data.

13:44:26  5   Q.  You didn't supervise the project, did you?

13:44:26  6   A.  Of?

13:44:31  7   Q.  Collecting the data that goes into your calculations.

13:44:34  8   A.  As to the ownership of the home, the size of the home, the

13:44:38  9   location of the home, no.

13:44:39 10   Q.  Square footage of the home?

13:44:40 11   A.  No.

13:44:41 12   Q.  In fact, you received a list that purported to contain square

13:44:45 13   footage property for class members and you accepted it on faith,

13:44:48 14   didn't you, sir?

13:44:49 15   A.  I accepted it as being accurately prepared.

13:44:54 16   Q.  You asked no questions, you took it completely on faith,

13:44:59 17   accepted it 100 percent, correct?

13:45:00 18   A.  If there was an issue with it -- there were some, at times we

13:45:16 19   and I would look and I'd see an anomaly, maybe in a zip code, or the

13:45:21 20   size of a property that seemed like it was abnormally large, and

13:45:26 21   there were some cases where we did question the data to see, you

13:45:32 22   know, is this really a home of this size or is this maybe a series

13:45:37 23   of homes?  We did ask some questions, but it was not the norm that

13:45:44 24   we did that.  We did not screen the data.

13:45:47 25   Q.  Not the norm, did this a few times?

13:45:49  1   A.  Yeah.

13:45:53  2   Q.  You've testified that it was not your assignment to worry about

13:45:57  3   the data that you were given, correct?

13:45:58  4   A.  I testified I think I didn't say not to worry.  It was to

13:46:06  5   accept it as -- accept it and rely on it.

13:46:11  6   Q.  And it was not your assignment to confirm, or check, or verify

13:46:14  7   the information that was given to you, was it, sir?

13:46:17  8   A.  No, it was not.

13:46:18  9   Q.  You just processed the information, correct?

13:46:20 10   A.  We established a damages calculation based on that list of

13:46:26 11   properties.

13:46:27 12   Q.  You just took it, accepted it on faith, and then did your

13:46:33 13   calculations?

13:46:33 14   A.  We did our calculations based on those properties.

13:46:36 15   Q.  Now, by the way, all of the class properties for which you've

13:46:40 16   calculated damages have addresses, don't they?

13:46:43 17   A.  I'm sorry?

13:46:43 18   Q.  All of the properties for which you've calculated damages,

13:46:49 19   first more than 3,700 in your April 27 affidavit and now we're down

13:46:54 20   to somewhere around 2,714 or 15, they all have addresses, right?

13:46:59 21   A.  Yes, they do.

13:47:00 22   Q.  So you know where all of the properties are located, right?

13:47:02 23   A.  Yes.

13:47:03 24   Q.  And you did not inspect a single one, did you?

13:47:05 25   A.  That's not correct.  There are properties that are on the list

13:47:13  1    that also are properties that were properties that we had through

13:47:20  2    our experience gone from 2010 to 2013 that we actually did do an

13:47:28  3    investigation of that were on this list.

13:47:31  4    Q.  Is that the Duke residence?  Do you remember the Duke

13:47:36  5    residence?

13:47:36  6    A.  The Duke residence was a property that we did not become

13:47:44  7    involved with until after it was remediated by other parties.  We

13:47:49  8    became involved after that was already remediated.

13:47:53  9    Q.  Was it the Carbone residence?

13:47:54 10    A.  It was similar to the Duke.  Our involvement -- we were

13:47:59 11    involved with that, but it came -- that involvement was after the

13:48:03 12    property was remediated by others.

13:48:06 13    Q.  As of today, you're trying to calculate damages, class damages

13:48:12 14    for 2,714 or 15 people, correct?

13:48:16 15    A.  Yes.

13:48:16 16    Q.  In the course of preparing those calculations, did you do an

13:48:20 17    inspection, go on site and look at any one of those properties for

13:48:25 18    purposes of calculating your damages?

13:48:27 19    A.  Yes, we did.

13:48:28 20    Q.  Which ones?

13:48:30 21    A.  The Gail residence is one that we reviewed in Virginia.

13:48:36 22    Q.  When did you go visit that residence?

13:48:38 23    A.  It was, I believe, 2013.

13:48:41 24    Q.  2013.  You didn't become a testifying expert until mid April of

13:48:45 25    this year, correct?

13:48:46 1    A.  Correct.

13:48:47 2    Q.  You didn't attempt to try to estimate damages for that property

13:48:51 3    until, at least, mid April of this year, correct?

13:48:55 4    A.  We prepared a unit price estimate in 2013 for that property.

13:49:02 5    Q.  And are you using that unit price estimate to calculate the

13:49:05 6    damages for this property as you sit here today?

13:49:07 7    A.  No.  Today what we did use the same methodology and apply that

13:49:15 8    methodology to the damages calculation.

13:49:20 9    Q.  Well, when you prepared the estimate for that property back in

13:49:25 10   2013, had that property already been remediated?

13:49:30 11   A.  I don't know.

13:49:31 12   Q.  Does it matter to you?  Would it inform your judgment at all if

13:49:35 13   you knew that that property had been remediated in 2013?

13:49:41 14   A.  It was my assignment to calculate the damages to these

13:49:47 15   properties, and if they've already been remediated, I certainly

13:49:54 16   would not recommend that they be remediated again.  I wouldn't say

13:49:59 17   that.  That's not at all the case.

13:50:01 18   Q.  That wouldn't make any sense, would it?

13:50:04 19   A.  No, it would not make sense.

13:50:06 20   Q.  Last Thursday Jake Woody prepared a memorandum, Plaintiff's or

13:50:11 21   No. 78.  Have you ever seen this document before, sir?

13:50:21 22   A.  I believe I have.

13:50:28 23   Q.  When is the first time you saw it?

13:50:30 24   A.  Let's see.  June 4th, that was last Thursday?  I believe I saw

13:50:41 25   it --

13:50:41  1    Q.  A lot happened on last Thursday.

13:50:43  2    A.  I'm sorry?

13:50:44  3    Q.  A lot happened on last Thursday.  Do you recall that day?

13:50:47  4    A.  I think this was -- I believe I received this on that same

13:50:51  5    date, June 4th.

13:50:52  6    Q.  On June 4th you submitted yet another damages calculation for

13:50:58  7    the class, correct?

13:51:06  8    A.  I believe I did.

13:51:08  9    Q.  Now, you recall from your May 15, 2015, declaration you

13:51:13  10   calculated class damages in the amount of $607 million?

13:51:17  11   A.  I don't recall the number.

13:51:20  12   Q.  Do you have any reason to dispute that?

13:51:22  13   A.  I am not disputing it.  I just don't remember.

13:51:26  14   Q.  And on June 4 you revised those calculations downward, correct?

13:51:30  15   A.  Each time we modified them downwards.

13:51:34  16   Q.  And in part, you modified them downwards, as you say, is

13:51:39  17   because 127 properties were removed from the class list that you

13:51:43  18   worked with because those people did not have Taishan drywall.  You

13:51:48  19   understand that, right?

13:51:49  20   A.  According to this, yes, 127 had 100 percent Knauf drywall.

13:51:56  21   Q.  Did it excite your curiosity in the least that perhaps maybe

13:52:01  22   more than 127 people on your class list do not have Taishan drywall

13:52:08  23   in their homes?

13:52:14  24   A.  I keep saying we did not do an independent confirmation of

13:52:19  25   which homes had Taishan drywall and the actual square footage of the

13:52:26  1  property or the ownership, that was not something -- that was not

13:52:29  2  work that we performed.

13:52:29  3  Q.  Were you intellectually curious at all?

13:52:32  4  A.  I'm sorry?

13:52:33  5  Q.  Were you intellectually curious at all as to whether all of the

13:52:37  6  remaining properties after you withdrew 127 because they didn't have

13:52:41  7  Taishan drywall, that there might be some more on the list that

13:52:44  8  don't have Taishan drywall?

13:52:47  9         MR. SEEGER:  Objection, argumentative.

13:52:49 10         MR. KENNY:  I hope so.

13:52:49 11         THE COURT:  He's under cross.  I'll allow it.

13:52:52 12         THE WITNESS:  I wasn't about to undertake the task of

13:53:06 13  investigating 2,700 properties to determine the ownership, whether

13:53:14 14  it had been remediated, what the source of the drywall.  That would

13:53:20 15  be a task that would be such that it would be a major undertaking

13:53:27 16  and that wasn't our assignment, we did not do that.

13:53:31 17  BY MR. KENNY:

13:53:32 18  Q.  Pretty important undertaking though, wouldn't you agree with

13:53:35 19  me, sir?

13:53:35 20  A.  It's an important undertaking.

13:53:39 21  Q.  I mean, you want to get your damages calculation right,

13:53:42 22  correct?

13:53:43 23  A.  If there's an issue with the list of properties, I will revise

13:53:48 24  the damages estimate.  If there's an issue there, I'll revise it and

13:53:53 25  that's what I've consistently done.

13:53:57  1  Q.  How are you going to know?  How do you know whether it should

13:54:00  2  be revised?  Just because a lawyer tells you?

13:54:02  3          THE COURT:  Come on, Counsel, let's move on.  I understand

13:54:06  4  this line of questioning.  I got the point.

13:54:09  5          MR. KENNY:  All right, your Honor.

13:54:11  6  BY MR. KENNY:

13:54:12  7  Q.  Now, let's show you Jake Woody's May 5 memo.  No. 17.  Have you

13:54:28  8  seen this memorandum before?

13:54:30  9  A.  Can you blow it up a little bit?  It's kind of blurry here.

13:54:46 10  Q.  I have a question for you on the second page, but I want you to

13:54:49 11  have an opportunity to review it.

13:54:51 12  A.  I believe I've seen this memorandum.

13:54:54 13  Q.  When do you think you saw it before?

13:54:56 14  A.  If it's dated May 5th, I probably saw it May 5th, May 6th.

13:55:04 15  Q.  Now, were you in the courtroom when Mr. Woody testified this

13:55:07 16  morning in response to some of Mr. Meunier's questions?

13:55:12 17  A.  Not 100 percent of the time.  Most of the time I was present.

13:55:17 18  Q.  Did you hear Mr. Woody when he testified that the plaintiffs'

13:55:24 19  lawyers edited or suggested some edits to the memo when it was in

13:55:29 20  draft form and Mr. Woody accepted some and didn't accept others.

13:55:33 21  Did you hear that testimony?

13:55:34 22  A.  I think I missed that portion of it.

13:55:37 23  Q.  Were you asked to review the memo when it was in draft form?

13:55:43 24  A.  This memo here?

13:55:44 25  Q.  Yes.

13:55:44  1   A.  No.

13:55:45  2   Q.  No?

13:55:45  3   A.  No.

13:55:46  4   Q.  Let me direct your attention to the second page, this

13:55:56  5   paragraph, second-to-the-last paragraph.  Do you see that paragraph?

13:56:00  6   A.  That's much better, yes, thank you.

13:56:04  7   Q.  And it reads, "We were able to verify that 1,285 of the

13:56:09  8   properties on the Taishan class list had submitted proof that the

13:56:12  9   property contained drywall related to a Taishan defendant."  Now, in

13:56:21 10   your judgment as a damages expert in this case, if only 1,285 people

13:56:28 11   can prove they have Taishan drywall in the class, do you agree the

13:56:33 12   class should be limited to those people?

13:56:36 13   A.  I think you're asking me a legal opinion, a legal conclusion.

13:56:43 14   I am certainly not qualified to offer an opinion like that.

13:56:46 15   Q.  Let me ask you this question.  May I use the board?  Just

13:56:57 16   assume for me that the number of properties is 2,715.  It helps the

13:57:03 17   math.  You're an engineer, you get the math better.

13:57:08 18   A.  Okay.

13:57:09 19   Q.  If it turns out that out of the 2,715 people who are currently

13:57:20 20   in this class, that only 1,285 of them have Taishan drywall, that

13:57:27 21   would mean that 1,430 do not have Taishan drywall?

13:57:32 22           MR. SEEGER:  Objection.  You're asking as a hypothetical,

13:57:34 23   right?  Because the next paragraph contradicts that.

13:57:37 24           MR. KENNY:  I can ask my questions any way I want.

13:57:40 25           THE COURT:  What is the point?  He will agree that that's

13:57:41 1    the math.

13:57:42 2    BY MR. KENNY:

13:57:43 3    Q.  Right?

13:57:43 4    A.  That's the math, yes.

13:57:45 5    Q.  And assume for me that 1,430 people, in fact, do not have

13:57:51 6    Taishan drywall in their properties.  Okay?  Make that assumption.

13:57:56 7    A.  Okay.

13:57:57 8    Q.  If that's true, would you agree with me that your class damages

13:58:02 9    calculation is inflated by more than 100 percent?

13:58:06 10        MR. SEEGER:  So that's also an assumption?

13:58:11 11        MR. KENNY:  It started with an assumption, yes.

13:58:13 12        THE COURT:  Do you understand the question?  Can you

13:58:15 13   answer that?

13:58:17 14        THE WITNESS:  If I understand the question right, he is --

13:58:19 15   the gentleman is saying 1,285 properties contain Taishan drywall,

13:58:29 16   1,430 do not contain Taishan drywall.

13:58:32 17        THE COURT:  He is asking you to assume that.

13:58:33 18        THE WITNESS:  Okay.  And then your question is based on

13:58:37 19   that assumption should these people be compensated or --

13:58:42 20   BY MR. KENNY:

13:58:42 21   Q.  Let me help you.  1,430 is more than half, correct?  You can do

13:58:47 22   that math.

13:58:49 23   A.  That's good.

13:58:50 24   Q.  If 1,430 people out of the 2,715 do not have Taishan drywall in

13:58:57 25   their homes --

13:58:57  1    A.  Right.

13:58:58  2    Q.  -- you would agree with me, wouldn't you, sir, that your $500

13:59:02  3    million class damage amount is inflated by more than 100 percent?

13:59:06  4    A.  It would depend on the location, the size of the properties,

13:59:14  5    but that would be a possibility.

13:59:17  6    Q.  And so just using some rough math, we'll fine tune it.  If, in

13:59:24  7    fact, your class damage estimate is approximately $500 million --

13:59:29  8    A.  Okay.

13:59:29  9    Q.  -- if it turns out that 1,430 people do not have Taishan

13:59:33 10    drywall, then your class damages should reduce to something closer

13:59:37 11    to 250 million, correct?

13:59:39 12    A.  If the list of properties I am given, if that changes, it is

13:59:44 13    modified, I will modify my damages estimate.

13:59:49 14    Q.  Now, based on your calculations for the 2,715 people, you can't

13:59:57 15    tell us which one of those people have Taishan drywall and which do

14:00:04 16    not, can you?

14:00:04 17    A.  I hope I made that clear.  I did no independent verification of

14:00:13 18    these property owners and what type of drywall they have in their

14:00:17 19    homes.  I have not performed that type of evaluation.

14:00:21 20    Q.  Right.  But you have prepared a list where you have a line item

14:00:26 21    for every single one of these properties, 2,715, where you have put

14:00:32 22    a damages number next to every single one of those addresses,

14:00:35 23    correct?

14:00:35 24    A.  That is correct.

14:00:36 25    Q.  And your testimony is you can't tell on that list which of the

14:00:41 1   people have Taishan drywall and which do not, correct?

14:00:46 2   A.  That's correct.

14:00:52 3   Q.  Now, let's go back to your April 27 affidavit where you

14:00:56 4   calculated the remediation costs for 3,713 -- 39 properties, right?

14:01:03 5   Do you remember that?

14:01:04 6   A.  Was that Exhibit 2?

14:01:06 7   Q.  Yes.

14:01:08 8   A.  Okay.  What is your question on that one?

14:01:10 9   Q.  You calculated class damages for 3,739 property owners,

14:01:17 10  correct?

14:01:17 11  A.  3,739, yes.

14:01:22 12  Q.  And the dollar figure for those people was $879 million,

14:01:27 13  correct?

14:01:27 14  A.  Correct.

14:01:28 15  Q.  And then you changed your calculations on May 15, correct?

14:01:32 16  A.  Correct.

14:01:33 17  Q.  And you reduced the properties to 2,888, correct?

14:01:38 18  A.  Correct.

14:01:39 19  Q.  A reduction of 851 properties, correct?

14:01:45 20  A.  I didn't confirm your math, but I am willing to accept it.

14:01:49 21  Q.  I've done it three or four times, if you're willing to accept

14:01:52 22  it.

14:01:53 23  A.  It sounds reasonable.

14:01:54 24  Q.  I figured you would get me on that one.  Your total class

14:01:57 25  remediation estimate fell to approximately $607 million, correct?

14:02:01   1   A.  I don't have that one handy, but, again, if that's my document,

14:02:11   2   that's what it is, that's what it is.

14:02:12   3   Q.  And so from April 27 to May 15, your class damages calculation

14:02:18   4   dropped $272,000,000, correct?

14:02:22   5   A.  Again, I am not checking your math as you go, but it went down.

14:02:27   6   Q.  And then just a few days ago, last Thursday after you pulled

14:02:31   7   out 127 properties because they didn't have Taishan drywall and some

14:02:35   8   other properties were pulled out, your damages reduced, your damages

14:02:40   9   calculation reduced to $579 million, correct?

14:02:43   10   A.  I don't recall the specific numbers, but -- I mean, they are --

14:02:52   11   they are what they are.  I don't recall exactly the numbers.

14:02:53   12   Q.  And then last night you reduced your damages once again, based

14:02:57   13   on the mistake, down to $502,000,000 for all 2,715 people, correct?

14:03:07   14   A.  I don't agree with your characterization when you say

14:03:11   15   "mistake," but it was -- we made a modification to our calculations,

14:03:17   16   yes.

14:03:17   17   Q.  Did you hear your lawyer ask you a question and said, "We made

14:03:21   18   a mistake."  You made a mistake on RSMeans," right?

14:03:26   19           MR. SEEGER:  Objection, your Honor, I didn't say that.

14:03:28   20           THE COURT:  If you're going to object, stand up so I can

14:03:31   21   hear you.

14:03:31   22           MR. SEEGER:  Your Honor, objection, he is misstating.  For

14:03:33   23   the record, I didn't acknowledge that.

14:03:35   24           THE COURT:  And that's argument anyway.  Let's move on.

14:03:35   25   BY MR. KENNY:

14:03:39 1   Q.  In any event, you changed your damages calculation for the

14:03:42 2   fourth time last night, correct?

14:03:44 3   A.  I changed it last night, yes.

14:03:49 4   Q.  And, in fact, based on your data from last night, you've -- you

14:03:54 5   say that there are 2,686 people who have what you called verified

14:03:59 6   square footage, correct?

14:04:00 7   A.  Correct.

14:04:01 8   Q.  Not verified by you, right?

14:04:03 9   A.  Not verified by me.

14:04:04 10  Q.  And the total class remediation costs in your opinion today is

14:04:09 11  $502,000,000?

14:04:10 12  A.  I believe it's 497.

14:04:15 13  Q.  497 because you're not including the 28 folks who have

14:04:20 14  so-called unverified square footage, correct?

14:04:22 15  A.  I believe that's correct, yes.

14:04:25 16  Q.  Now, if we assume that fewer than half, based on this

14:04:29 17  assumption I've asked you to make, of the 2,715 properties have

14:04:34 18  provable drywall, then the total class remediation costs could be as

14:04:38 19  low as $250 million, correct?

14:04:41 20  A.  If I get that information, I'll definitely adjust it and it

14:04:45 21  will definitely be adjusted downward.

14:04:48 22  Q.  Let me show you a visual, sir, that shows the evolution of your

14:04:53 23  damages calculation.  So Inglis 1, that's April 27.

14:05:04 24  A.  Okay.

14:05:05 25  Q.  That's the total number of class members and the total dollars.

14:05:09  1   Correct?

14:05:09  2   A.  Okay.

14:05:10  3   Q.  Inglis 2, that's May 15 of this year.  Class members go down,

14:05:17  4   dollars go down.  Inglis 3, class members go down, dollars go down.

14:05:25  5   Inglis 4, class members stay the same, dollars go down.  And the

14:05:32  6   last entry is if, in fact, only 1,285 property owners have Taishan

14:05:39  7   drywall, the damages could be as low as 251, correct?

14:05:43  8   A.  They would be less.

14:05:43  9          THE COURT:  If you take it further and there's no drywall,

14:05:46 10   then the damages would be nothing.

14:05:49 11          MR. KENNY:  And we're hoping that that's going to be the

14:05:52 12   case, your Honor.  That's one of the reasons we've asked for an

14:05:56 13   extension.

14:05:59 14   BY MR. KENNY:

14:06:00 15   Q.  Let's change subjects for a minute.

14:06:02 16          THE COURT:  Well, from the standpoint of the extension,

14:06:06 17   you had about five years to come into this case and you came in in

14:06:09 18   the eleventh hour.  All of the problems that you have complained of

14:06:14 19   are your own doing.  But let's continue.

14:06:17 20          MR. KENNY:  My apologies.

14:06:18 21          THE COURT:  That's all right.

14:06:19 22          MR. KENNY:  I am not complaining, your Honor.

14:06:21 23          THE COURT:  It sounded like it, that's why I was

14:06:25 24   explaining.

14:06:25 25          MR. KENNY:  I'm sorry.

14:06:26   1            MR. SEEGER:   Sounded like it to me, too.

14:06:28   2   BY MR. KENNY:

14:06:28   3   Q.  You're not an expert in statistics, correct?

14:06:31   4   A.  That is correct.

14:06:31   5   Q.  And you know that the defendants have retained Dr. Marais as a

14:06:35   6   rebuttal expert to your opinions, correct?

14:06:37   7   A.  I am aware of that.

14:06:39   8   Q.  You don't dispute that Dr. Marais is an expert in statistics,

14:06:45   9   do you?

14:06:45  10   A.  I know that he's written one or two papers -- opinions on this

14:06:52  11   project, but I do not hold myself out as a statistics expert and I

14:07:00  12   am really not in a position to offer an opinion on his work as it

14:07:04  13   relates to being a statistician.

14:07:07  14   Q.  Your remediation cost calculations do use statistical

14:07:12  15   techniques, don't they?

14:07:12  16   A.  No, they do not.

14:07:13  17   Q.  You used the statistical technique of averaging to determine

14:07:16  18   your $86 benchmark, correct?

14:07:19  19   A.  As an engineer, I am familiar -- I mean, that's pretty basic to

14:07:27  20   use averaging.  You may take that as being a form of statistics, but

14:07:34  21   as an engineer, evaluating anomalies in data, outliers, averages,

14:07:43  22   that's not something that is unusual for an engineer to perform on a

14:07:48  23   daily basis.  But that doesn't mean that I am a statistician.  I

14:07:53  24   don't hold myself out as a statistician just because I would

14:07:59  25   calculate averages.

14:08:00  1   Q.  I appreciate that, sir, but my question is just a little

14:08:02  2   different.  And that is, averaging is a statistical technique and

14:08:05  3   you've actually used averaging to calculate your $86 benchmark,

14:08:10  4   correct?

14:08:10  5   A.  I've used averaging, but I really didn't -- I didn't regard

14:08:22  6   averaging as being statistics.  I don't know if I agree with that

14:08:27  7   premise that's statistics.

14:08:30  8   Q.  Just so it's clear, you did not do any statistical analysis to

14:08:33  9   figure out if the seven *Germano* properties are representative of the

14:08:36 10   2,715 properties for which you purport to calculate your remediation

14:08:42 11   costs, correct?

14:08:43 12   A.  What we did is we evaluated the seven homes, and subsequent to

14:08:49 13   that in 2010 through 2013, '14, we visited numerous other homes,

14:08:57 14   projects throughout the United States in various states and found in

14:09:03 15   each case that the damages that we are seeing, areas that are

14:09:09 16   damaged, are uniform.  They're consistent.  It doesn't matter where

14:09:13 17   the home is, it doesn't matter what type of home it is, the damages

14:09:17 18   are the same.

14:09:18 19   Q.  But my question is a little different.  And that is, you did

14:09:22 20   not do any statistical analysis to figure out that the seven *Germano*

14:09:26 21   properties are representative of the 2,715 buildings for which

14:09:30 22   you're calculating remediation costs, correct?

14:09:33 23   A.  My experience -- our experience that for every home that we

14:09:40 24   visited or building that we visited the damages are the same.

14:09:44 25   They're the same in *Germano* as they were in any of the other

14:09:47 1    properties we visited regardless of state.  We did not do that based

14:09:55 2    on a statistic.  It was a forensic investigation visiting property

14:09:59 3    where we viewed what was the damage resulting from the corrosive

14:10:04 4    drywall.  And in each case, we found that we had the similar damage

14:10:09 5    regardless of location.

14:10:10 6    Q.  So then you would agree with me that you did not do a

14:10:13 7    statistical analysis to figure out if the seven *Germano* properties

14:10:17 8    are representative of the class properties that you're testifying

14:10:20 9    here today?

14:10:21 10   A.  We did not use statistics.  We used forensic evaluation of the

14:10:27 11   buildings, and I don't consider that statistics.

14:10:33 12   Q.  The seven *Germano* properties are all in and around Norfolk,

14:10:38 13   Virginia, correct?

14:10:39 14   A.  Correct.

14:10:39 15   Q.  They included six residential homes and a wine cellar, correct?

14:10:43 16   A.  Correct.

14:10:44 17   Q.  No commercial properties, correct?

14:10:45 18   A.  Correct.

14:10:45 19   Q.  No apartment complexes, correct?

14:10:47 20   A.  Correct.

14:10:48 21   Q.  No condominium complexes, correct?

14:10:51 22   A.  Correct.

14:10:51 23   Q.  No government buildings, correct?

14:10:53 24   A.  Correct.

14:10:54 25   Q.  Now, your list of class properties in this case includes

14:10:59  1   commercial properties, correct?

14:11:01  2   A.  I believe so.

14:11:01  3   Q.  It includes apartment complexes?

14:11:03  4   A.  Yes.

14:11:04  5   Q.  It includes condominium complexes?

14:11:07  6   A.  Yes.

14:11:07  7   Q.  It includes government buildings?

14:11:10  8   A.  I couldn't confirm that if it was a government building or not.

14:11:16  9   It may, but I don't know.

14:11:17 10   Q.  It includes properties outside of Norfolk, Virginia, correct?

14:11:21 11   A.  Correct.

14:11:21 12   Q.  Outside of Virginia?

14:11:23 13   A.  Correct.

14:11:24 14   Q.  Includes properties in at least 15 other states than Virginia,

14:11:29 15   correct?

14:11:29 16   A.  Correct.

14:11:29 17   Q.  Includes a mix of property types in urban areas, correct?

14:11:34 18   A.  Yeah, I believe it would be a mix of properties.

14:11:36 19   Q.  It includes a mix of property types in rural areas, correct?

14:11:40 20   A.  I didn't try to make a determination if they were rural areas

14:11:45 21   or not.  But what I said earlier, we saw the same damages.  We went

14:11:50 22   to Villa Lago.  It was 328-unit condominium in Florida.  And it

14:11:56 23   didn't make any difference in terms of the type of damages that we

14:12:00 24   observed.  We observed the same damages regardless of whether it was

14:12:04 25   a commercial building, multi-family, single family, the damages were

14:12:07 1   the same.  It didn't matter if it was commercial.

14:12:11 2   Q.  I appreciate that's your testimony.  That's candidly, sir, not

14:12:15 3   my question.  I just asked you if there was a mix of properties in

14:12:19 4   rural areas?

14:12:19 5   A.  In rural areas?

14:12:21 6   Q.  Yeah.  On your list.

14:12:22 7   A.  I didn't do a determination to locate a property to see if it

14:12:32 8   was a rural or urban area, I didn't do that.

14:12:35 9   Q.  Includes mansions?

14:12:37 10  A.  I'm sorry?

14:12:39 11  Q.  Some of the properties on your list include mansions?

14:12:42 12  A.  Some properties are bigger than others, yes.

14:12:45 13  Q.  Includes homes with a wide variety of interior layouts?

14:12:50 14  A.  I am not familiar with the layouts of the residences.

14:12:53 15  Q.  Is that because it's not important to you?

14:12:55 16  A.  I didn't review floor plans of the class properties.

14:13:03 17  Q.  Includes homes with a wide variety of fit and finishes, do you

14:13:07 18  know that?

14:13:07 19  A.  I am not familiar with the specifics on individual residences.

14:13:12 20  Q.  So you don't know if it includes homes with a wide variety of

14:13:17 21  appliances and electronics?

14:13:19 22  A.  I don't know the specifics on a particular home.

14:13:25 23  Q.  Now, you say that you think there is wide variety, in your

14:13:38 24  experience you've seen wide variety when contractors make estimates.

14:13:42 25  Did you testify to that effect?

14:13:44  1   A.  I've received thousands of competitive bids; particularly, when

14:13:52  2   I was with U.S. Steel.  And it's amazing the variability of

14:13:58  3   competitive bids that you receive from multiple contractors looking

14:14:04  4   at the same project at the same time under the same conditions.

14:14:08  5   Q.  And yet you think that you have discovered a formula where

14:14:15  6   there is no variability except for a geographic localization factor.

14:14:23  7   You've got a single $86 benchmark that could reasonably estimate --

14:14:29  8   A.  I didn't say there was no variability.

14:14:33  9   Q.  -- to estimate damages for 2,715?

14:14:36 10   A.  What I am saying is that in -- take *Germano*, for example.

14:14:40 11   There was an instance where two qualified contractors looked at the

14:14:47 12   same seven properties and spent days evaluating, you know,

14:14:53 13   processing their proposals, and yet when they were done, there was

14:15:00 14   considerable variability in their proposals for the same property,

14:15:05 15   the same work under the same conditions.  Based on getting

14:15:10 16   quotations.

14:15:10 17   Q.  And it's your testimony that your formula, which has no

14:15:15 18   variability on the benchmark number, will reasonably estimate repair

14:15:21 19   costs for all of these properties across all of these states, no

14:15:26 20   matter the interior layout, no matter the type of building.  That's

14:15:31 21   your testimony, sir?

14:15:32 22   A.  I believe the number that we have provides a good estimate of

14:15:39 23   what that cost is when adjusted for location.  And there was another

14:15:52 24   comment I was going to make.

14:15:55 25            Remember, this is a very specific scope.  We are not

14:15:58  1   building a house.  We're renovating the interior, so we're taking it

14:16:02  2   down to the studs and reconstructing it.  And much of that work is

14:16:10  3   related to the demolition of the drywall of which it would be very

14:16:16  4   repetitive, similar type work.  So can you have different fit and

14:16:21  5   finishes of kitchen cabinets, yes, you can.  But in terms of the

14:16:25  6   overall amount of money for the remediation, it's -- I believe the

14:16:32  7   variability is within the variability that you would receive if you

14:16:40  8   had contractors submitting the bids, particularly based on our

14:16:43  9   experience with *Germano*.

14:16:44 10   Q.  With all respect, sir, that's just pure speculation, isn't it?

14:16:49 11   A.  In *Germano*?

14:16:50 12   Q.  No.  Your -- to sit here and testify that you can apply your

14:16:55 13   single formula, which by the way, as of last Thursday, the

14:17:01 14   remediation costs constant was $118.89, correct?

14:17:08 15   A.  As you're aware, we made an adjustment based on the --

14:17:14 16   Q.  As of last Thursday it was 118.89, right?

14:17:18 17   A.  Yes, it was.

14:17:19 18   Q.  And now, today it's $105, is that what it is?

14:17:23 19   A.  It's 105, yeah, based on the -- that's based on the 2015

14:17:29 20   national average.

14:17:30 21   Q.  And you didn't -- you had the opportunity -- actually, your

14:17:35 22   formula is really nothing more than a hypothesis, correct?

14:17:39 23   A.  No, that's not correct.

14:17:40 24   Q.  You had an opportunity to take that formula and actually try to

14:17:44 25   test it against at least some of these properties, but you never did

14:17:49  1   that, correct?

14:17:50  2   A.  We did that with the Gail residence.

14:17:53  3   Q.  Well, actually you didn't, sir.  You did that in 2013, whatever

14:17:58  4   you did in 2013.  But in performing your job, your assignment as a

14:18:04  5   testifying expert in this case, you came up with a formula and you

14:18:07  6   had the opportunity to actually test whether, in fact, your formula

14:18:12  7   could reasonably predict what the remediation costs would be for

14:18:17  8   some of these properties and you didn't test it against a single

14:18:21  9   property, did you?

14:18:22 10   A.  Well, subsequent to 2010 we viewed multiple properties --

14:18:29 11   Q.  But, sir, my question --

14:18:32 12          MR. SEEGER:  Objection, your Honor, he needs to be able to

14:18:34 13   finish.

14:18:34 14          THE COURT:  I understand.

14:18:35 15   BY MR. KENNY:

14:18:36 16   Q.  -- you didn't get to test it against these properties, correct?

14:18:38 17   That's a yes or no, sir?

14:18:39 18   A.  Against those properties.  I said there are properties on this

14:18:45 19   list for which we did actually perform a site investigation.  The

14:18:51 20   Gail residence is one that sticks in my mind.  We did do a separate

14:18:56 21   unit price.

14:18:57 22          But we've used this methodology on other projects and we

14:19:01 23   used it on Villa Lago and to support the methodology of the adjusted

14:19:09 24   $86 a square foot.  So we have done that.

14:19:12 25   Q.  Let me try one more time, sir.  I think my question is

14:19:15 1   straightforward.  Since you became a testifying expert in mid April

14:19:19 2   of this year --

14:19:20 3   A.  Okay.

14:19:20 4   Q.  -- you came -- until last night, your formula had a universal

14:19:25 5   constant of 118.89, correct?

14:19:29 6   A.  Yes.  On national average.

14:19:31 7   Q.  But you had one number, right, using your $86 benchmark

14:19:36 8   adjusted for inflation, correct?

14:19:39 9   A.  It was adjusted for inflation and it was also adjusted for

14:19:44 10  location.  So each property had a different dollar per square foot.

14:19:50 11  Q.  And until last night, when you revised that number to basically

14:19:56 12  $105, you never took that number, your formula, and tested to see

14:20:02 13  whether it could reasonably predict what the remediation costs would

14:20:06 14  be for any of these properties, you haven't done that in the last

14:20:10 15  six weeks, have you?

14:20:13 16          THE COURT:  He is asking a question, since 2013 have you

14:20:16 17  done it?

14:20:18 18          THE WITNESS:  I mean, have I visited -- other than the

14:20:36 19  Gail residence, have I visited one of these properties and performed

14:20:40 20  a -- is that what your question is?

14:20:43 21  BY MR. KENNY:

14:20:43 22  Q.  Let me try again.  On April 27 of this year you signed an

14:20:47 23  affidavit, correct?

14:20:48 24  A.  Yes.

14:20:49 25  Q.  As a damages expert in this case, correct?

14:20:51  1   A.  Yes.

14:20:53  2   Q.  That was about two weeks after you were retained as a

14:20:56  3   testifying expert, correct?

14:20:56  4   A.  Yes.

14:20:57  5   Q.  And in that affidavit it was your opinion that you could use

14:21:04  6   $118.89 to reasonably anticipate remediation costs for, at that

14:21:09  7   time, about 3,700 properties across 19 states, correct?

14:21:14  8   A.  Yes.  When adjusting for location.

14:21:18  9   Q.  Yes.

14:21:18 10   A.  And size of property.

14:21:19 11   Q.  Fair enough.  And my simple question is:  In reaching that

14:21:23 12   conclusion, you never tested whether, in fact -- you never tried to

14:21:27 13   do any test to figure whether that formula would actually reasonably

14:21:33 14   anticipate remediation costs for any of the class properties at that

14:21:37 15   time, correct?

14:21:39 16   A.  What I did do is I took the original *Germano* properties, and I

14:21:53 17   took the actual finding of fact, conclusions of law, I took those

14:21:58 18   awards for damages and I applied this methodology to the *Germano*

14:22:11 19   homes.  I did a similar calculation to Villa Lago.  It was --

14:22:24 20   Q.  That was a couple of years ago?

14:22:26 21   A.  No, no, that was subsequent to this.

14:22:28 22   Q.  My question is:  Did you test it against any of these

14:22:31 23   properties over the last six weeks?  Is this hard?

14:22:34 24   A.  Not those particular properties.  But would I have tested it

14:22:41 25   with respect to going back to *Germano* and Villa Lago?  I've tested

14:22:47  1    that.

14:22:47  2    Q.  Well, sir, you didn't take $118 --

14:22:51  3             THE COURT:  We have to move on, Counsel.

14:22:53  4    BY MR. KENNY:

14:22:53  5    Q.  Let me ask you this:  You gave some testimony in answer to

14:22:57  6    Mr. Seeger's questions about after you came up with the *Germano*

14:23:00  7    formula.  Are you with me?

14:23:02  8    A.  Yes.

14:23:02  9    Q.  The $86 benchmark.  And you gave some testimony that you said

14:23:08 10    based on some other work on Chinese drywall cases in 2011, 2012, and

14:23:14 11    started to taper off, I think you said in 2013, you had examples

14:23:21 12    where your formula was coming in close to contractor estimates.  Is

14:23:25 13    that what your testimony was?

14:23:26 14    A.  No.

14:23:27 15    Q.  What did you say?

14:23:28 16    A.  What I said was we developed a unit price estimates on various

14:23:36 17    properties.  When we did a detailed unit price, which was based on

14:23:44 18    an inspection of a residence, we would take off of the residences.

14:23:50 19    And each time we did one of those, the unit price estimates, we

14:23:56 20    always converted that back to a dollar per square foot so that we

14:24:01 21    could see what the dollar per square foot was for that project, at

14:24:06 22    that time, in that area.  And we then were able to compare that cost

14:24:11 23    to see how we were looking with respect to the initial $86.

14:24:20 24    Q.  You submitted two sworn statements in this case, correct?

14:24:23 25    A.  Yes.

14:24:24  1  Q.  About seven or eight pages.  They each had exhibits.  And in

14:24:28  2  those statements you never provided us with any examples where you

14:24:33  3  used this $86 benchmark method and showed us and gave us any reason

14:24:40  4  to believe that that accurately estimated remediation costs back in

14:24:47  5  2011, 2012, or 2013, did you, sir?

14:24:50  6  A.  You have copies of all of the unit price estimates that we

14:24:54  7  performed.  You have those.  And I believe each and every one that

14:24:58  8  you have do convert it to a dollar per square foot.  And subsequent

14:25:03  9  to that, I believe we produced a document that shows where I did

14:25:07  10  make a comparison of the initial *Germano* properties and took the

14:25:17  11  Court -- the judge's award for just damages and applied the same

14:25:24  12  methodology as applied in this analysis, applied it to the

14:25:31  13  initial -- to the award on *Germano* and applied the same methodology

14:25:37  14  to that award.  And I believe you have a copy of that.

14:25:41  15  Q.  With all respect, I don't think we do.  It's not in any of your

14:25:45  16  declarations, any of your sworn statements, it's not in any of your

14:25:48  17  exhibits, and you didn't bring any of that information to the Court

14:25:52  18  today, did you?

14:25:53  19       MR. SEEGER:  Objection, your Honor, it's in his reliance

14:25:56  20  material.  He told him where to look.

14:25:58  21       THE COURT:  I sustain the objection.

14:26:00  22       MR. SEEGER:  It's not fair.

14:26:02  23       MR. KENNY:  I have no further questions, your Honor.

14:26:03  24       MR. SEEGER:  Just a couple of quick follow-up.

14:26:06  25       MR. FENTON:  I have a few.

14:26:07  1          MR. SEEGER:  Oh, double teaming.

14:26:09  2          MR. MEUNIER:  Just for the record, this is a 55(b)(2) in

14:26:14  3    which alter ego is established, and we object to separating counsel

14:26:17  4    when it comes to the presentation of evidence.

14:26:19  5          THE COURT:  I allowed counsel to put on witnesses, but I

14:26:26  6    think it's double teaming to do cross-examination.  I think we're

14:26:32  7    just going to --

14:26:32  8          MR. FENTON:  Your Honor, it won't be lengthy, and I intend

14:26:34  9    to cover a little different subject than what's been covered.

14:26:39 10          THE COURT:  Having to do with BNBM?

14:26:40 11          MR. FENTON:  It has to do with BNBM and it also has to do

14:26:43 12    with the remediation costs which is part and parcel of some of the

14:26:48 13    things that Dr. Marais is going to address, and it's my

14:26:50 14    responsibility --

14:26:50 15          MR. MEUNIER:  Your Honor --

14:26:51 16          THE COURT:  I sustain the objection.  We're going to have

14:26:53 17    to go on with it.  One person on cross-examination each time.  Let's

14:26:59 18    redirect.

14:27:01 19          MR. SEEGER:  I'll be quick, your Honor.

14:27:05 20                    REDIRECT EXAMINATION

14:27:06 21    BY MR. SEEGER:

14:27:09 22    Q.  Mr. Inglis, I think you were trying to answer counsel's

14:27:12 23    question, the last series.  Just tell -- we don't spend more than a

14:27:19 24    minute, please.  What is this?

14:27:20 25    A.  To confirm my methodology, I went back to these initial seven

14:27:35 1   homes that were *Germano*.  I took the 2010 findings of fact and

14:27:40 2   conclusions of law.  I took the actual amounts that were listed in

14:27:45 3   the award, which were actually the numbers that we had developed at

14:27:52 4   that time, Berman & Wright did develop, and it includes just the

14:27:53 5   remediation and CIH costs only, no other costs are included.  There

14:27:58 6   were other costs, but I just took those costs, I adjusted to 2015,

14:28:03 7   and then I said, okay.  If we use the methods, let's compare that to

14:28:11 8   the comp Exhibit 10 damages.  Let's see what those numbers would be

14:28:16 9   under my evaluation as I put in comp Exhibit 10.  And you can see

14:28:23 10  the right column, I believe the Morgan residence, comp Exhibit 10

14:28:31 11  was higher than the adjusted 215.

14:28:35 12  Q.  This column, this last column, Mr. Inglis?  I just want to be

14:28:38 13  clear for the record.

14:28:39 14  A.  Okay.  The last column is taking based on the square footage of

14:28:48 15  the properties, forgetting independent of the first two columns,

14:28:52 16  just take the comp Exhibit 10.  That's taking the square footage of

14:28:56 17  the property and applying it to this adjusted dollar per square foot

14:29:04 18  cost --

14:29:05 19  Q.  Let me help.  Let me ask this question.  The last column here,

14:29:09 20  that's applying the methodology that you're proposing to his Honor

14:29:13 21  in this case to the *Germano* homes, correct?

14:29:15 22  A.  Yes, that's Exhibit 10 that's in the book.  The same

14:29:19 23  methodology to see what result would come out of that.

14:29:23 24          MR. SEEGER:  Your Honor, this is Exhibit 11 in our book.

14:29:26 25  Any objection into entering this into evidence?

14:29:29  1              MR. KENNY:  No, not at all.

14:29:30  2              THE COURT:  Put it back up.  What's the last column?

14:29:35  3              THE WITNESS:  The last column is that if I was given this

14:29:39  4      list with these locations with these square footages, these are the

14:29:43  5      damages that I would have calculated using the comp Exhibit 10,

14:29:48  6      using my methodology --

14:29:48  7      BY MR. SEEGER:

14:29:49  8      Q.  Nobody knows what comp Exhibit 10 is, let me help.  Is this

14:29:52  9      applying your methodology that you are proposing for determining

14:29:55  10     class wide damages --

14:29:56  11     A.  Yes.

14:29:56  12     Q.  In that column?

14:29:56  13     A.  Yes.

14:29:56  14     Q.  So it's taking the *Germano* homes and applying the methodology

14:29:59  15     you proposed here, adjusting to 2015 dollars with local cost

14:30:03  16     factors?

14:30:04  17     A.  Correct.  And doing that, the damage calculation under this

14:30:10  18     methodology was actually less, with the exception of Morgan, the

14:30:15  19     Morgan residence, it was higher.  But on average it was 13 percent

14:30:21  20     less using this methodology.

14:30:23  21     Q.  Mr. Inglis, let me ask you a different question now.  You were

14:30:26  22     also asked questions about different types of homes, where they were

14:30:30  23     located.  I think you were asked if a home was rural, if a home was

14:30:34  24     in an urban area.  Would that be factored into the adjustments you

14:30:38  25     do using the zip codes?

14:30:39  1    A.  In terms of the costs of material and labor, it would have a

14:30:45  2    cost effect based on where the home was located.

14:30:50  3    Q.  I just have one more question.  In the textbook that we looked

14:30:57  4    at earlier, RSMeans, and we looked at a section about square footage

14:31:02  5    pricing, on page 494 for counsel's reference.  There's a sentence

14:31:20  6    here that we didn't read with regard to square footage pricing, but

14:31:24  7    I would like to read now.  It says, "They are based on the premise

14:31:32  8    that all building types can be distilled to a cost per square foot

14:31:36  9    of gross floor space."  Did I read that correctly?

14:31:40 10    A.  Yes, you did.

14:31:40 11    Q.  Do you agree with that statement?

14:31:42 12    A.  I'm sorry?

14:31:42 13    Q.  Do you agree with that?

14:31:44 14    A.  Yes, I do.

14:31:45 15            MR. SEEGER:  Your Honor, that's all I have.

14:31:47 16            THE COURT:  All right.  You're excused, sir.

14:31:48 17            Any further witnesses from the plaintiff?

14:31:50 18            MR. SEEGER:  No more for us.

14:31:52 19            THE COURT:  Anything from defendants?

14:31:54 20            MR. KENNY:  Yes, your Honor, we have two witnesses.

14:31:57 21            THE COURT:  Okay.  Let's take a ten-minute break at this

14:31:59 22    time.  The Court will stand in recess.

14:32:01 23            THE DEPUTY CLERK:  All rise.

14:32:02 24        (WHEREUPON, A RECESS WAS TAKEN.)

14:42:32 25        (OPEN COURT.)

14:42:32  1          THE COURT:  Be seated, please.  Call your next witness.

14:42:35  2          MR. KENNY:  Your Honor, the defense calls Mr. David

14:42:42  3  Pogorilich.

14:42:42  4          Good afternoon, Mr. Pogorilich.

14:42:43  5          THE WITNESS:  Good afternoon.

14:42:43  6          THE DEPUTY CLERK:  Excuse me, I have to swear him in.

14:42:43  7          MR. KENNY:  Oh, I'm sorry, got so excited.

14:42:43  8          THE DEPUTY CLERK:  Could you stand and raise your right

14:42:46  9  hand.

14:42:46  10      (WHEREUPON, DAVID POGORILICH, WAS SWORN IN AND TESTIFIED AS

14:42:51  11      FOLLOWS:)

14:42:51  12          THE DEPUTY CLERK:  Please have a seat.  State and spell

14:42:52  13  your name for the record, sir.

14:42:54  14          THE WITNESS:  My name is David Pogorilich, D-A-V-I-D, last

14:42:57  15  name P-O-G-O-R-I-L-I-C-H.

14:43:03  16                  VOIR DIRE EXAMINATION

14:43:03  17  BY MR. KENNY:

14:43:04  18  Q.  Where do you live?

14:43:04  19  A.  I live in Temple Terrace, Florida.

14:43:07  20  Q.  Where do you work?

14:43:08  21  A.  I work at Navigant Consulting.

14:43:10  22  Q.  What's your position at Navigant?

14:43:12  23  A.  I'm a director.

14:43:13  24  Q.  How long have you worked at Navigant?

14:43:15  25  A.  Just under eight years since 2007.

14:43:18 1  Q.  What is the business of Navigant?

14:43:20 2  A.  Navigant is an independent consulting firm that has several

14:43:24 3  divisions including health care, construction, government services,

14:43:28 4  economics.

14:43:29 5  Q.  Does that include consulting on construction projects?

14:43:33 6  A.  Yes, it does.

14:43:33 7  Q.  Include estimating construction projects?

14:43:35 8  A.  Yes, it does.

14:43:36 9  Q.  What's your role at Navigant?

14:43:39 10  A.  My role at Navigant is to perform owners rep services,

14:43:44 11  construction management services, estimating, standard of care

14:43:49 12  cases, analysis of standard of care and remediation cases, as well

14:43:54 13  as general consulting and litigation support.

14:43:56 14  Q.  Now, do you personally provide expert consulting services

14:43:59 15  related to estimating construction projects?

14:44:02 16  A.  Yes.

14:44:02 17  Q.  Including remediation estimation services?

14:44:05 18  A.  Yes.

14:44:06 19  Q.  Are these regular expert consulting services you provide, sir?

14:44:10 20  A.  Yes.

14:44:11 21  Q.  Do you have a college degree?

14:44:12 22  A.  Yes, I do.

14:44:12 23  Q.  Where did you go to college?

14:44:14 24  A.  Got my undergrad at Drexel University.

14:44:16 25  Q.  What in?

14:44:18  1   A.  BS in construction management.

14:44:19  2   Q.  Do you have an M.B.A.?

14:44:22  3   A.  I do.

14:44:22  4   Q.  Do you have any further advanced training or education?

14:44:24  5   A.  Yes, I am a licensed general contractor in the State of

14:44:27  6   Florida.

14:44:27  7   Q.  What's it mean to be a certified general contractor in the

14:44:30  8   State of Florida?

14:44:31  9   A.  It means that the construction industry licensing board of

14:44:34 10   Florida has given me a license to build everything from a home

14:44:40 11   through multi-rise condo to a power plant to this courthouse.

14:44:46 12   Q.  Describe for the Court what general contracting services are

14:44:50 13   and what you perform.

14:44:51 14   A.  General contracting service is the means and methods of

14:44:54 15   building a project from the ground up, from foundations through

14:44:57 16   finishes, and that includes the planning, estimating, coordination

14:45:02 17   of subcontractors, being -- making sure that the project is done on

14:45:08 18   time and on budget, again, from foundations all the way through

14:45:11 19   finishes.

14:45:12 20   Q.  Do general contractors prepare construction cost estimates?

14:45:15 21   A.  Yes, they do.

14:45:16 22   Q.  Have you performed construction cost estimates?

14:45:18 23   A.  I have.

14:45:18 24   Q.  And how long have you been performing construction cost

14:45:21 25   estimates?

14:45:22   1   A.   Probably since I was about ten years old when I started working

14:45:26   2   with my dad in his construction business.

14:45:28   3   Q.   Have you performed construction cost estimates for commercial

14:45:31   4   projects?

14:45:31   5   A.   Yes, I have.

14:45:32   6   Q.   For residential projects?

14:45:34   7   A.   Yes.

14:45:34   8   Q.   Have you performed construction cost estimates for remediation

14:45:39   9   projects?

14:45:40   10   A.   Yes.

14:45:40   11   Q.   Have those remediation projects been for both residential and

14:45:44   12   commercial properties?

14:45:45   13   A.   Yes.

14:45:46   14   Q.   Now, please describe for the Court your experience with

14:45:47   15   preparing construction cost estimates.

14:45:50   16   A.   Again, from the time I was about ten I worked with my dad in

14:45:55   17   doing everything from developing estimates.  At first I was just

14:45:59   18   pulling the dummy end of the tape.  And then actually doing the

14:46:03   19   work, and then helping him with estimates as I got older.

14:46:07   20   Q.   And how long did you work for your dad?

14:46:09   21   A.   Till I was about a sophomore in college.

14:46:11   22   Q.   And after you got out of college, did you join any construction

14:46:15   23   companies?

14:46:16   24   A.   Well, while I was in college, I went to school at night, I went

14:46:19   25   to work for O'Brien Kreitzberg; who was a boutique consulting firm,

14:46:25  1    very similar to Navigant.

14:46:26  2    Q.   Worked your way through college?

14:46:27  3    A.   Yes, sir.

14:46:28  4    Q.   Doing construction projects during the day and school by night?

14:46:31  5    A.   Yes.

14:46:32  6    Q.   What's the business of O'Brien Kreitzberg?

14:46:34  7    A.   Again, O'Brien Kreitzberg is a boutique consulting firm that

14:46:39  8    does many of the same things that Navigant Consulting does.

14:46:42  9    Q.   Did you perform construction cost estimates at O'Brien

14:46:45  10   Kreitzberg?

14:46:45  11   A.   Yeah, we performed construction cost estimates that as well as

14:46:48  12   value engineering and critical path method scheduling.

14:46:50  13   Q.   How long did you work for O'Brien Kreitzberg?

14:46:53  14   A.   Until approximately 1981.

14:46:55  15   Q.   After O'Brien Kreitzberg did you stay in the construction cost

14:46:59  16   estimating business?

14:46:59  17   A.   Yes, I did.

14:47:01  18   Q.   For how long?

14:47:01  19   A.   Until now.

14:47:02  20   Q.   And between O'Brien Kreitzberg and when you joined Navigant in

14:47:10  21   2007 and 2008, did you work for companies that provided construction

14:47:12  22   cost estimating services?

14:47:14  23   A.   Yes, sir.

14:47:15  24   Q.   Just tell the Court names of some of those companies.

14:47:17  25   A.   A number of them.  After O'Brien Kreitzberg, I went to work for

14:47:19  1  Wagner Hohns and Inglis, and then left there to go work for Kearney

14:47:26  2  Development, and then Chitester Management Systems, then Brower,

14:47:34  3  Kritz and Stynchcomb, then FTI, and now Navigant.

14:47:37  4  Q.  Did you perform construction cost estimating at those

14:47:40  5  companies?

14:47:40  6  A.  Yes.

14:47:40  7  Q.  Did those professional services include estimating remediation

14:47:44  8  projects?

14:47:44  9  A.  Yes.

14:47:44  10  Q.  And I think you said you started working at Navigant in 2008?

14:47:49  11  A.  2007.

14:47:50  12  Q.  Over your 30-year career, sir, in the construction business,

14:47:53  13  how many construction cost estimates have you prepared?

14:47:57  14  A.  I don't know the exact number, but it's certainly in the

14:47:59  15  hundreds.

14:47:59  16  Q.  In the hundreds?

14:48:00  17  A.  Yes, sir.

14:48:01  18  Q.  Based on your professional experience over the last 30 years,

14:48:05  19  are there generally accepted methods used to perform remediation

14:48:09  20  cost estimating?

14:48:09  21  A.  Yes.

14:48:10  22  Q.  And based on your experience, what generally accepted method

14:48:13  23  would you use to prepare a construction cost estimate?

14:48:15  24  A.  The first thing you had to do is you had to visit the site and

14:48:18  25  what you're going to remediate.  Once you get into that site, you

14:48:23  1    had to start looking at the layout of the structure, of the

14:48:26  2    building, the height of the ceilings, the amount of drywall to be

14:48:29  3    removed, the number of outlets, the number of switch plates; what's

14:48:35  4    on the wall, is it just drywall, is it painted with some special

14:48:39  5    paint, is it knock down plaster, does it have wallpaper, are there

14:48:43  6    ceiling fans?

14:48:43  7             Then as you start looking at the fit and finish items,

14:48:46  8    what's going on in the various locations.  Like, if you go into the

14:48:50  9    kitchen, what are the types of appliances in there, are they builder

14:48:54 10    grade, are they more custom, how many appliances, is there a trash

14:48:57 11    compacter or not a trash compacter, dishwasher or not a dishwasher.

14:49:02 12             Then you get into the other fit and finish items such as

14:49:05 13    vanities, and sinks, and mirrors, and faucets.  All of that has to

14:49:11 14    be taken into account to come up with a reasonable estimate.

14:49:15 15             THE COURT:  Before you go into it, are you going to tender

14:49:17 16    him as an expert?

14:49:19 17             MR. KENNY:  Yes, sir.

14:49:21 18             THE COURT:  Do you want to do it now?

14:49:22 19             MR. KENNY:  Sure.  We'll tender.

14:49:26 20             THE COURT:  Any questions?

14:49:27 21             MR. SEEGER:  I'll save it for cross, your Honor.

14:49:29 22             THE COURT:  Okay.  I'll accept him as an expert in the

14:49:31 23    field of -- what are you tendering him in?

14:49:34 24             MR. KENNY:  In construction cost estimating and project

14:49:36 25    management for construction sites.

14:49:38  1          THE COURT:  Okay.  I'll accept him in as an expert in that

14:49:41  2  field.

14:49:42  3                    DIRECT EXAMINATION

14:49:42  4  BY MR. KENNY:

14:49:42  5  Q.  Now, in your 30 years of performing construction cost

14:49:45  6  estimates, have you identified any substitute for property specific

14:49:48  7  analysis?

14:49:48  8  A.  No.

14:49:49  9  Q.  You understand this case involves what has been referred to as

14:49:53 10  Chinese drywall?

14:49:53 11  A.  Yes, sir.

14:49:54 12  Q.  Is there anything unique about Chinese drywall remediation that

14:49:57 13  you believe justifies deviating from the generally accepted

14:50:02 14  methodology that you've already described?

14:50:04 15  A.  No, sir.

14:50:04 16  Q.  Why not?

14:50:05 17  A.  Because you're still taking a scope of work and putting

14:50:09 18  together the tasks that go into reasonably accommodating that scope

14:50:13 19  of work, and then pricing up those individual tasks to come up with

14:50:17 20  a total price.

14:50:18 21  Q.  More specifically, is there anything unique about Chinese

14:50:21 22  drywall that would enable you to accurately estimate remediation

14:50:25 23  costs for some properties based on inspections and estimates of

14:50:28 24  other properties?

14:50:29 25          MR. SEEGER:  Objection, your Honor.  Maybe he could break

14:50:31  1  those questions up and not lead him through it so much.

14:50:34  2          THE COURT:  Break up your questions.

14:50:36  3  BY MR. KENNY:

14:50:36  4  Q.  Anything unique about Chinese drywall that would enable

14:50:39  5  estimating from one property to another property?

14:50:41  6  A.  No.

14:50:42  7  Q.  Why not?

14:50:43  8  A.  Because each individual, in this case, residence is going to be

14:50:49  9  unique.  It's going to differ in layout, it's going to differ in the

14:50:52 10  quality of the construction, it's going to differ in the fit and

14:50:55 11  finish items that you have from one house to the next.

14:50:57 12  Q.  How long would it take you to conduct a construction cost

14:51:00 13  estimate on an average residential property?

14:51:02 14  A.  On a property, about a day.

14:51:04 15  Q.  How much would it cost?

14:51:05 16  A.  If I wanted the job, it wouldn't cost anything.

14:51:08 17  Q.  Now, are you aware of other types of remediation work that are

14:51:11 18  similar to Chinese drywall?

14:51:13 19  A.  Yes.  Mold and water intrusion projects are very similar.

14:51:17 20  Q.  How is mold remediation similar to Chinese drywall?

14:51:22 21  A.  It impacts the same elements of construction that the Chinese

14:51:25 22  drywall.  You still have to replace the drywall, you're looking at

14:51:30 23  replacing possibly studs depending on what the studs are made out

14:51:32 24  of, and how long the water intrusion has been there, how long the

14:51:35 25  mold has been there.  You're also remediating insulation; and,

14:51:39  1   again, depending on the amount of damage, there could be some fit

14:51:43  2   and finish items that get impacted as well.

14:51:45  3   Q.  How is that water infiltration remediation similar to Chinese

14:51:50  4   drywall?

14:51:50  5   A.  Again, the water infiltration problem impacts many of the same

14:51:56  6   task items and has a very similar scope of work.

14:51:59  7   Q.  Have you recently performed construction cost estimating for

14:52:03  8   residential remediation projects dealing with mold or water

14:52:06  9   intrusion?

14:52:06 10   A.  Yes, I have.

14:52:06 11   Q.  Please describe for the Court some of the projects you've

14:52:09 12   worked on recently.

14:52:10 13   A.  I recently had a project in Sarasota, Florida, that was a

14:52:13 14   residence that had both mold and water intrusion problems.  And we

14:52:17 15   visited that home.  We measured areas that were impacted by the mold

14:52:22 16   and water intrusion.  We developed remediation estimates for repair

14:52:25 17   of those areas, and looked at the fit and finish items in the

14:52:29 18   kitchen and throughout the home to determine an overall price for

14:52:33 19   remediation.

14:52:34 20   Q.  How did you estimate the remediation costs for the Sarasota

14:52:38 21   project?

14:52:38 22   A.  We went there a couple of times, took a lot of pictures,

14:52:42 23   measured the quantity and ceiling heights of what was going to be

14:52:45 24   removed and replaced; looked at the types of windows, for instance,

14:52:50 25   that were going to have to be replaced; looked at the quality of

14:52:54  1    those windows; looked at wall treatments; looked at the ceiling;

14:52:59  2    molding; looked at the kitchen items that were going to have to be

14:53:03  3    replaced because of water damage; and cataloged all of that so that

14:53:07  4    we could come up with a reasonable price for replacement.

14:53:09  5    Q.  Is this the same generally accepted method for estimating

14:53:12  6    construction costs that you described for the Court earlier?

14:53:15  7    A.  Yes.

14:53:15  8    Q.  Are there any other examples of recent construction cost

14:53:18  9    estimating that you recently performed for residential properties

14:53:20  10   using this generally accepted method?

14:53:22  11   A.  Yes.  I have two projects in Tampa that I worked on; one was a

14:53:25  12   condominium and one is an apartment.  And in both cases, we went to

14:53:30  13   the building, we measured balconies and walkways and breezeways,

14:53:35  14   went into the impacted condo units and apartment units, took

14:53:40  15   pictures, took measurements, looked at fit and finish items to,

14:53:43  16   again, come up with a reasonable repair cost.

14:53:45  17   Q.  Now, sir, to prepare an accurate remediation estimate, why do

14:53:49  18   you inspect the particular property?

14:53:51  19   A.  Because no two properties are alike.  Every property is going

14:53:56  20   to have its own layout, it's going to have its own fit and finish

14:54:01  21   items, its going to have its own quantity of materials and its own

14:54:04  22   quality issues.

14:54:04  23   Q.  Now, prior to this case, did you have any experience with

14:54:07  24   Chinese drywall remediation?

14:54:09  25   A.  Yes.

14:54:10   1    Q.   Please explain your prior experience with Chinese drywall

14:54:13   2    remediation?

14:54:13   3    A.   Back in 2012 I was involved in five homes that were being

14:54:19   4    remediated, a couple in the Ocala area and the rest in the Winter

14:54:23   5    Haven/Orlando area.

14:54:25   6    Q.   And what did you do?

14:54:27   7    A.   Again, for those five homes, we first visited the testing

14:54:32   8    facility to talk to the people that did the tests, to walk through

14:54:36   9    their protocol for taking samples, for maintaining samples, what

14:54:41  10    their chain of command was on the samples, to actually look at the

14:54:44  11    samples to see that we actually did have Chinese drywall.  To look

14:54:48  12    at the results of some of the things that they gathered as samples;

14:54:52  13    for instance, wiring and fixtures, mirrors.  We looked at the coils

14:54:58  14    from refrigeration units as well as air conditioning units.  And

14:55:03  15    then, following that, we went out to each home and we took pictures

14:55:07  16    and measurements to look to see what kind of quantity was being

14:55:13  17    remediated, and then compared that to the actual costs that we were

14:55:16  18    getting on each residence to determine the reasonableness of the

14:55:20  19    costs.

14:55:20  20    Q.   Now, were any of the five houses that you worked on back in

14:55:24  21    2012 on the plaintiffs' list of the class properties in this case?

14:55:27  22    A.   Yes, two.

14:55:28  23    Q.   Which ones?

14:55:29  24    A.   The Carbone residence and the Duke residence.

14:55:32  25    Q.   And you actually went on site and inspected those houses?

14:55:35 1   A.  Yes, both of them.

14:55:36 2   Q.  And were both of those houses remediated back in 2012?

14:55:40 3   A.  Yes.

14:55:40 4   Q.  Do you recall the remediation cost per square foot of the

14:55:44 5   Carbone property?

14:55:44 6   A.  As I recall, the Carbone property was 60, $61 a square foot.

14:55:49 7   Q.  Do you recall the remediation costs per square foot of the Duke

14:55:54 8   property?

14:55:54 9   A.  It was like fifty or $52 a square foot.

14:55:57 10   Q.  How do you recall those amounts?

14:55:59 11   A.  Well, (a) I was there; and (b) I saw those same amounts on the

14:56:03 12   Wright documentation -- well, the Berman & Wright documentation.

14:56:07 13   Q.  The Berman & Wright?

14:56:08 14   A.  Yes.

14:56:09 15   Q.  The place where Mr. Inglis works?

14:56:10 16   A.  Yes, sir.

14:56:10 17   Q.  Now, has your prior experience with Chinese drywall informed

14:56:14 18   your opinions in this case?

14:56:14 19   A.  Yes.

14:56:15 20   Q.  How?

14:56:16 21   A.  Well, it gave me an opportunity to see up close and personal

14:56:20 22   what the impacts of Chinese drywall -- defective Chinese drywall are

14:56:24 23   on a residence.  It allowed me the opportunity to see what the scope

14:56:28 24   of work would be like, and also the actual line items that would

14:56:34 25   satisfy that scope of work.

14:56:35 1    Q.  Did it change your professional judgment with respect to how to

14:56:38 2    properly estimate remediation costs for Chinese drywall?

14:56:40 3    A.  No.

14:56:41 4    Q.  Why not?

14:56:42 5    A.  Because even though it's a different entity, it's still a

14:56:48 6    different remediation type.  The scope of work and what I'm used to

14:56:51 7    seeing is very similar.  And you still had to go through the same

14:56:55 8    procedure, still had to be able to see what you're remediating, take

14:56:59 9    a look at layout, quantify the quantities of remediation on the

14:57:03 10   inside of the house, look at your qualitative issues such as fit and

14:57:08 11   finish and see what types of appliances, what's on the walls.  All

14:57:11 12   of those things go into producing a reasonable estimate.

14:57:15 13   Q.  What was your assignment in this case?

14:57:17 14   A.  My assignment in this case was to review first Mr. Wright's

14:57:23 15   declaration, I think, is what they called it, and then, following

14:57:26 16   Mr. Inglis's two declarations, to opine on the methodology used to

14:57:33 17   determine the damages.

14:57:34 18   Q.  Did you review materials related to the various remediation

14:57:38 19   cost estimates for the properties at issue in this case?

14:57:40 20   A.  Yes.

14:57:41 21   Q.  Did you review any other materials?

14:57:43 22   A.  Yes.  I reviewed depositions in this case, in *Germano*, in

14:57:47 23   Hernandez; I reviewed the reports by Mr. Wright and Mr. Inglis; I

14:57:53 24   reviewed RSMeans documentation; I reviewed city, parish, and county

14:58:00 25   websites; I reviewed the Zillow website; I reviewed some Court

14:58:04 1   documents; I reviewed a government report on Chinese drywall, and

14:58:09 2   there was another report on Chinese drywall that I reviewed as well.

14:58:12 3   Q.  Did you have access to the materials of your choice?

14:58:14 4   A.  Yes.

14:58:15 5   Q.  Now, were you assisted by any of your professional colleagues

14:58:18 6   at Navigant?

14:58:18 7   A.  Yes, I was.

14:58:19 8   Q.  In what ways?

14:58:21 9   A.  In that when we first got the -- Mr. Wright's report, there was

14:58:26 10  an exhibit attached to it that listed all of the properties.  My

14:58:31 11  assistant, as well as others, then went about the task of trying to,

14:58:35 12  (a) quantify to see if we got the same square footage that they

14:58:39 13  showed on their spreadsheet, and also to see if we could quantify

14:58:44 14  the addresses where they showed an unverified square footage.

14:58:48 15  Q.  What did you find?

14:58:50 16  A.  Found two things:  One, there was variability in what we were

14:58:53 17  finding as square footage from what was listed; and secondly, we

14:58:58 18  were able to verify what they determined to be unverified.

14:59:00 19  Q.  What do you mean by "unverified"?

14:59:02 20  A.  Well, I'm not sure what they meant, but on their sheet they had

14:59:07 21  an unverified column, and it showed that that particular address did

14:59:11 22  not have square footage assigned to it.  So we went in and took that

14:59:15 23  address and looked at public available websites, county websites,

14:59:21 24  parish websites, as well as Zillow to see if we could determine

14:59:24 25  square footage.

14:59:25 1    Q.   What is Zillow?

14:59:26 2    A.   Zillow is an online website that is basically a real estate

14:59:30 3    database, and it has a lot of project specific or address specific

14:59:34 4    data.

14:59:34 5    Q.   Now, based on your 30 years of professional experience and work

14:59:39 6    on this case, have you formed opinions in this case?

14:59:42 7    A.   Yes.

14:59:42 8    Q.   Are you being compensated in this case?

14:59:45 9    A.   I am.

14:59:45 10    Q.   How much?

14:59:46 11    A.   $380 per hour.

14:59:48 12    Q.   Has your compensation in any way affected your opinions in this

14:59:50 13    case?

14:59:50 14    A.   No.

14:59:51 15    Q.   And once again, in your 30 years of experience, how many

14:59:54 16    construction cost estimates have you personally prepared?

14:59:56 17    A.   Hundreds.

14:59:57 18    Q.   Now, let's go to the two overarching opinions that you have in

15:00:03 19    this case.  Can we pull up the visual.  The first one reads,

15:00:10 20    "Estimating requires property specific analysis."

15:00:14 21    A.   Yes.

15:00:14 22    Q.   My first question, though, you heard Mr. Inglis testify --

15:00:16 23    A.   I did.

15:00:17 24    Q.   -- in this case.  What is your understanding of how Mr. Inglis

15:00:20 25    estimated remediation costs for the Taishan class in this case?

15:00:23  1    A.  My understanding of what Mr. Inglis did was to take two bids

15:00:28  2    for each of seven properties in the *Germano* case, average those bids

15:00:33  3    on a property-by-property basis, then take the seven averages and

15:00:37  4    average those seven averages to get a base number.  They then took

15:00:41  5    that base number and inflated it using means 2015, and then

15:00:46  6    readjusted it using means based on zip codes.

15:00:49  7    Q.  Now, you heard Mr. Inglis testify.  Do you have any

15:00:53  8    understanding as to whether in 2015, after he was retained as a

15:00:56  9    testifying expert, whether he performed any property specific

15:01:00 10    analysis with regard to the class?

15:01:02 11    A.  It's my understanding he has not.

15:01:04 12    Q.  Now, does a property specific analysis require an estimator to

15:01:09 13    consider more than footprint, square footage, and zip code?

15:01:12 14    A.  Yes.

15:01:13 15    Q.  Why do you say that?

15:01:14 16    A.  Again, because you could have two houses right next to each

15:01:17 17    other that are both the same footprint, the same box, but as you

15:01:21 18    enter the house, the layout of the home is different, the quantity

15:01:25 19    and quality of the elements are different, the fit and finish is

15:01:29 20    different.

15:01:31 21    Q.  And why does that matter?

15:01:32 22    A.  Because that's what you're remediating, the inside of the

15:01:36 23    house; because all of those -- the layout, the amount of drywall,

15:01:40 24    the ceiling heights, all of that is going to have a material impact

15:01:43 25    on the price of the remediation.

15:01:44  1    Q.  And you've offered some opinions that are critical of

15:01:47  2    Mr. Inglis's methodology and his formula?

15:01:49  3    A.  Yes.

15:01:51  4    Q.  Why?  What's the basis for those?

15:01:54  5    A.  The basis is that Mr. Inglis's formula is an average of an

15:01:58  6    average, and it's just -- it doesn't work.  It doesn't reflect the

15:02:01  7    reasonable price to do work on a house-by-house basis.

15:02:04  8    Q.  In your opinion, what should he have done?

15:02:07  9    A.  He should have done -- what he should have done is inspected

15:02:11  10   each home and develop a project specific estimate -- project

15:02:16  11   specific location estimate.

15:02:17  12   Q.  And why do you say he should have done that to prepare

15:02:19  13   remediation estimates in this way?

15:02:21  14   A.  Because the only way to prepare a reasonable estimate for a

15:02:24  15   particular house is to visit the house, look at the layout, look at

15:02:29  16   the qualitative and quantitative issues, look at the fit and finish

15:02:34  17   in order to develop a reasonable price for a particular location or

15:02:37  18   a project specific location.

15:02:39  19   Q.  Now, have you prepared a visual that compares the standard

15:02:43  20   construction cost estimating methodology that you think Mr. Inglis

15:02:47  21   should have utilized?

15:02:48  22   A.  Yes.

15:02:48  23   Q.  Let's take a look.  Now, over on the left where it says,

15:02:53  24   "Standard method," that's the method you think he should have used?

15:02:57  25   A.  Yes, sir.

15:02:58  1   Q.  And over on the right seems self-explanatory, Inglis's formula.

15:03:03  2   And that's your understanding of the formula that he used to

15:03:06  3   calculate class damages?

15:03:07  4   A.  Yes.

15:03:08  5   Q.  Under standard Method 1, it says, "Conduct on-site inspection."

15:03:13  6   Please explain what you mean by that.

15:03:15  7   A.  Again, in order to determine what the variability between

15:03:20  8   multiple properties is going to be, the only way to do that is to

15:03:24  9   conduct an on-site inspection where you go in, you look at the

15:03:27 10   layout of the building, you look at the number of partitions, the

15:03:33 11   ceiling height, the number of outlets, the number of switches, the

15:03:38 12   number of Cat 5 cable outlet, the number of ceiling fans; you look

15:03:43 13   at what's on the walls, is it just paint, is it knock down plaster,

15:03:48 14   is it wallpaper, are there fixtures that have been impacted, how

15:03:52 15   many fixtures, where are they; mirrors, have mirrors been impacted?

15:03:56 16            And then look at the appliances and electronics, have they

15:03:59 17   been impacted.  If they have, are they state-of-the-art or just run

15:04:05 18   of the mill?  Again, looking at the appliances, are they builder

15:04:08 19   grade appliances or are they more custom appliances?

15:04:12 20            Just simple things.  Like, one house may have a -- have

15:04:15 21   one air conditioner for the entire house.  Another house may have --

15:04:19 22   be on two zones with two air conditioners.  All of that is going to

15:04:22 23   have a material impact on the price.

15:04:24 24   Q.  Is this the method you've used for 30 years?

15:04:26 25   A.  Yes.

15:04:27  1   Q.  Let's go to the second item.  It says, "Estimate actual costs

15:04:31  2   for material and labor."  Explain that for the Court.

15:04:33  3   A.  Once you've done your on-site inspection, you come away from

15:04:37  4   that with a list of tasks, if you will, and the quantity of those

15:04:41  5   tasks, square footage of this, linear feet of something else.  And

15:04:45  6   to that you assign a cost to that for material and labor.  And then

15:04:49  7   you add up all of those different tasks that you've now assigned a

15:04:54  8   cost to, to come up with a base price for that particular location.

15:04:57  9   Q.  Is this the method you've used for 30 years of your

15:05:00 10   professional life?

15:05:01 11   A.  Yes.

15:05:01 12   Q.  Finally, it says, "Determine overhead and profit."  Why do you

15:05:05 13   do that?

15:05:05 14   A.  Well, as a contractor that's how you stay in business.  Once

15:05:09 15   you have your base costs, you have to determine what your overhead,

15:05:14 16   which is normally fixed, and then your profit, which can change on a

15:05:19 17   case-by-case basis depending on how bad you want the work, what your

15:05:23 18   competition is, how many homes you're going to be able to do on a

15:05:27 19   block, for instance; a lot of things go into determining the

15:05:30 20   ultimate profit.

15:05:31 21   Q.  Now, Mr. Inglis's formula.  What's your understanding of the

15:05:36 22   $86 figure?

15:05:38 23   A.  Again, the $86 is an average of an average for seven homes in

15:05:44 24   *Germano*.

15:05:44 25   Q.  Is it your understanding that the $86 number Mr. Inglis uses is

15:05:48 1    a substitute for the site specific analysis and cost estimating that

15:05:52 2    you described earlier?

15:05:53 3    A.  My understanding is Mr. Inglis's formula in whole is a

15:05:58 4    substitute for doing what I did.

15:05:59 5    Q.  Third variable under the Inglis formula, SF, the square

15:06:07 6    footage?

15:06:07 7    A.  Yes.

15:06:07 8    Q.  What's your understanding of the square footage that Mr. Inglis

15:06:10 9    uses?

15:06:11 10   A.  My understanding is it's basically what I call the footprint,

15:06:14 11   the under air square footage.

15:06:16 12   Q.  Do you agree that a contractor should focus on footprint square

15:06:20 13   footage to estimate remediation costs for Chinese drywall?

15:06:24 14   A.  No.

15:06:26 15   Q.  Why?

15:06:26 16   A.  Again, because of everything I discussed earlier, the layout

15:06:28 17   from one house to the next, even though the square footage may be

15:06:31 18   the same, can be and will be different.  The qualitative and

15:06:36 19   quantitative issues, the fit and finish issues are going to be

15:06:40 20   different.  So even though you have similar square footage, the cost

15:06:44 21   to remediate one house to another can vary drastically.

15:06:49 22   Q.  Let's go to zip code variable.  Do you agree with how

15:06:53 23   Mr. Inglis used his zip code variable?

15:06:54 24   A.  No.

15:06:55 25   Q.  Why not?

15:06:55 1    A.  He is applying that zip code variable from means to the average

15:06:59 2    of an average.

15:07:05 3    Q.  And is Mr. Inglis universal cost-per-square-foot number based

15:07:09 4    on any cost estimates of any of the 2,715 properties?

15:07:13 5    A.  No.

15:07:13 6    Q.  Not even one?

15:07:14 7    A.  Not one.

15:07:15 8    Q.  Now, based on your 30 years of experience, have you ever seen a

15:07:26 9    professional in the industry use a universal constant price per

15:07:30 10   square foot to prepare remediation estimates for thousands of

15:07:33 11   properties?

15:07:34 12   A.  No.

15:07:34 13   Q.  Do you have any opinion as to why not?

15:07:36 14   A.  Well, why not is because it's going to be wrong; and if you're

15:07:43 15   wrong enough times, you're not in business anymore.

15:07:47 16   Q.  Please explain what you mean.

15:07:48 17   A.  Well, you're applying an average of an average.  The only time

15:07:51 18   that the average is going to be right is if the next project meets

15:07:56 19   all of the exact criteria of whatever made up the average.  And that

15:08:00 20   average in and of itself is a dilution of the variabilities from one

15:08:05 21   property to the next.  So you just know that you're going to be

15:08:08 22   wrong.  And if you're wrong on the low side, you're going to be

15:08:12 23   losing money on every project, and you will be out of business in a

15:08:16 24   short amount of time.

15:08:17 25   Q.  Now, here the allegation is that 2,715 properties have the same

15:08:23  1   product defect and require the same scope of work.  Does that change

15:08:26  2   your opinion?

15:08:26  3   A.  No.

15:08:26  4   Q.  Why not?

15:08:27  5   A.  Again, because in order to satisfy that scope of work, you have

15:08:33  6   to go in and look at the line items, the tasks, the quantities that

15:08:38  7   will satisfy that general scope of work, and that's going to change

15:08:42  8   from house, to house, to house, to house.

15:08:44  9   Q.  Now, based on your data review, do you believe the seven

15:08:48 10   *Germano* properties are representative of the class of 2,715

15:08:52 11   properties?

15:08:52 12   A.  No.

15:08:53 13   Q.  Why not?

15:08:54 14   A.  Well, (a) they're all in one place; (b) they are all homes and

15:09:00 15   the class properties contained commercial properties.  I think there

15:09:06 16   was also a church in there.  At least there was, I don't know if

15:09:09 17   it's still there or not.  But it contains condos and apartments and

15:09:12 18   *Germano* properties are all homes.  Also, they're all -- all of the

15:09:16 19   *Germano* properties are in Virginia; the class properties are spread

15:09:21 20   out through 15 states at least.  And the square footage of the

15:09:28 21   houses are different.

15:09:29 22   Q.  Based on your review of the data, does it appear that any of

15:09:32 23   these properties in the list of 2,715 have been remediated?

15:09:37 24   A.  Yes, based on -- we have seen some houses that have been

15:09:42 25   remediated.

15:09:43  1   Q.  Does that have any impact on your professional judgment in this

15:09:47  2   case?

15:09:47  3   A.  Yes.

15:09:47  4   Q.  How so?

15:09:48  5   A.  If you have a house that's been remediated, you should have

15:09:52  6   actual costs for that house.  Having actual costs would give you the

15:09:55  7   opportunity to compare your formula, per se, to whatever the actual

15:09:59  8   costs were to test that formula.

15:10:00  9   Q.  Now, on a couple of occasions you've testified about the

15:10:04 10   importance of interior layout.  Do you recall that testimony?

15:10:06 11   A.  Yes.

15:10:07 12   Q.  Have you prepared any visuals to demonstrate how differences in

15:10:10 13   interior layouts can affect remediation costs between two

15:10:13 14   properties?

15:10:13 15   A.  I have.

15:10:14 16   Q.  Let's see it.  Would you like to come off the stand to explain

15:10:20 17   it?

15:10:20 18           MR. KENNY:  Would that be okay, your Honor?

15:10:22 19           THE COURT:  Yes, that's all right.

15:10:22 20           THE WITNESS:  Is that fine?

15:10:24 21           THE COURT:  Sure.

15:10:34 22           THE WITNESS:  So in this example on this particular

15:10:37 23   demonstrative, we have two homes.  Both homes are 70 feet by

15:10:42 24   30 feet.  They have the exact same footprint.  On the Layout A or

15:10:46 25   Home A -- we'll call it Home A -- as you walk through the front

15:10:50  1   door, you start to see that there's not a lot of partitions as

15:10:54  2   compared to walking through the front door of House B.

15:10:58  3          Other differences are if you look at House A we have

15:11:01  4   standard eight-foot ceilings, we have builder grade cabinetry and

15:11:06  5   appliances; whereas, if we go to House B we have 12-foot ceilings,

15:11:10  6   we have cathedral ceilings, we have solid wood cabinetry, we have

15:11:15  7   crown molding throughout the house, we have copper plumbing in this

15:11:19  8   house, and in this house we have PVC plumbing.  Those are the types

15:11:24  9   of differences that are going to have a material impact on the

15:11:27  10  price.

15:11:27  11         In addition to that, what we don't show here is we don't

15:11:30  12  know, you know, with all of these extra partitions and then you put

15:11:34  13  some specialized wall covering on these partitions, that, too, is

15:11:38  14  going to have a material impact on the price.

15:11:40  15         So you can see even though the footprint is exactly the

15:11:43  16  same in both homes, the number of partitions, the square footage of

15:12:20  17  drywall to be remediated, the height is going to impact the price as

15:12:20  18  well as the number of partitions and the overall square footage will

15:12:20  19  obviously change.

15:12:20  20  BY MR. KENNY:

15:12:20  21  Q.  When you say the footprint is the same in Layout A and Layout

15:12:20  22  B, do you ment they have identical -- a footprint square footage?

15:12:20  23  A.  Each one of these is 70 feet long and 30 feet wide, so they

15:12:20  24  have basically 2,100 square feet in each house.  So each house, if

15:12:20  25  it were on the list, the spreadsheet, would be listed as 2,100

15:12:20 1    square feet.  But, obviously, the amount of drywall to be remediated

15:12:23 2    in House B would be a lot more than in House A.

15:12:26 3    Q.  And in your judgment that would have a material impact on the

15:12:30 4    cost of remediation?

15:12:31 5    A.  Yes, it would.

15:12:33 6    Q.  And in your judgment, then, the cost of remediation for these

15:12:37 7    two properties would materially differ?

15:12:38 8    A.  Yes.

15:12:39 9    Q.  Is it your judgment that that's still true even if they're

15:12:46 10   within the same zip code?

15:12:52 11   A.  It would be true if they were right next door to each other.

15:12:55 12   Q.  Now, would your opinion change -- what would cause your opinion

15:13:02 13   to change?  Based on anything in your professional judgment with

15:13:05 14   respect to these two houses, is there anything that would cause your

15:13:07 15   opinion to change?

15:13:08 16   A.  No.

15:13:10 17           THE COURT:  Why would it be different?  I mean, why would

15:13:13 18   it be different?  Why would A be different from B?  You're talking

15:13:19 19   about the total?

15:13:20 20           THE WITNESS:  I'm talking about the --

15:13:21 21           THE COURT:  Wouldn't you have more square footage in B?

15:13:23 22           THE WITNESS:  Well, you don't have more square footage of

15:13:26 23   footprint.  The pricing by Mr. Inglis is based on 2,100 square feet.

15:13:33 24           THE COURT:  I see.

15:13:34 25           THE WITNESS:  If you look at the house on the Layout A,

15:13:38  1   the actual cost of remediation inside that house is going to be a

15:13:42  2   lot less than the actual cost of remediation inside of House B

15:13:47  3   because you're remediating much more drywall in House A, you're

15:13:52  4   replacing the copper piping in House A, you have more expensive

15:13:57  5   crown molding, more expensive appliances, and you've got solid wood

15:14:02  6   cabinetry versus just builder grade cabinetries in House A.

15:14:02  7              THE COURT:  I see.

15:14:06  8              THE WITNESS:  Then you have higher ceilings in House B,

15:14:08  9   even though the footprint is the same.  So again, the square footage

15:14:11 10   of drywall that you have to remediate in House A is going to be

15:14:15 11   materially different than the square footage of drywall in House A.

15:14:19 12              All of that has an impact on the cost, so you would expect

15:14:22 13   that the House B would be more money to remediate than House A, even

15:14:29 14   though the square footage of the footprint is exactly the same.

15:14:34 15              THE COURT:  I see.  The interior, though, square footage

15:14:36 16   would be greater in B than in A?

15:14:40 17              THE WITNESS:  The square footage of drywall to be

15:14:42 18   remediated would be different.

15:14:44 19              THE COURT:  Right.

15:14:45 20   BY MR. KENNY:

15:14:46 21   Q.  Based on those answers to the judge's questions, do you think a

15:14:49 22   contractor should focus on footprint square footage to estimate

15:14:53 23   remediation costs for Chinese drywall?

15:14:55 24   A.  No.

15:14:55 25   Q.  Why not?

15:14:56  1    A.  Because of that example.  If all you price your bids on is

15:15:01  2    square footage, your actual cost is going to be wrong.

15:15:06  3    Q.  So in your opinion, estimating requires property specific

15:15:11  4    analysis?

15:15:11  5    A.  Yes.

15:15:11  6    Q.  And it requires property specific analysis in this case?

15:15:14  7    A.  Yes.

15:15:15  8    Q.  Let's go back to the visual on your opinions.  The second

15:15:24  9    opinion is Mr. Inglis's formula does not work.  What do you mean?

15:15:29 10    A.  I mean that using an average of an average is not going to give

15:15:33 11    you the right number.

15:15:34 12    Q.  Now, did you test Mr. Inglis's formula against the *Germano*

15:15:38 13    properties?

15:15:38 14    A.  Yes, I did.

15:15:39 15    Q.  Now, were you in the courtroom when on redirect Mr. Inglis was

15:15:43 16    asked to explain a certain document of the *Germano* properties?

15:15:48 17    A.  Yes, I was.

15:15:48 18    Q.  Did you understand that Mr. Inglis himself compared the formula

15:15:52 19    to the *Germano* properties?

15:15:53 20    A.  Yes.

15:15:53 21    Q.  Now, when you compared Mr. Inglis's cost-per-square-foot

15:15:57 22    formula to the actual cost of *Germano* properties, what did you find?

15:16:01 23    A.  We found wide variability.

15:16:03 24    Q.  And did you prepare a visual?

15:16:05 25    A.  Yes, I did.

15:16:06  1   Q.  Do you want to come down off the stand?  Would it be easier?

15:16:12  2         THE WITNESS:  Is that okay?

15:16:13  3         THE COURT:  You may do so.

15:16:21  4   BY MR. KENNY:

15:16:22  5   Q.  For the Court, just start with the names and go across the

15:16:27  6   columns and explain to the Court what you're doing.

15:16:30  7   A.  These three columns are all columns that were developed by

15:16:33  8   Mr. Inglis.  First column are the names of the plaintiffs; the

15:16:37  9   second column is the awarded damages adjusted to 2015; the third

15:16:45  10  column is Mr. Inglis's formula applied to the square footage of the

15:16:49  11  plaintiffs' home to get an adjustment for location for each

15:16:55  12  individual home.

15:16:56  13  Q.  And then, did you further carry out the analysis that one can

15:17:01  14  do based on the work of Mr. Inglis?

15:17:04  15  A.  Yes.  In these two columns I simply did a mathematical

15:17:08  16  extraction, and here we just did some division to look at

15:17:11  17  differences on a property specific basis.

15:17:13  18  Q.  Just explain what is represented in the two columns that you

15:17:19  19  prepared.

15:17:19  20  A.  The two columns that I prepared you would see that on every --

15:17:24  21  generally speaking, first of all, every -- no house hit the mark.

15:17:29  22  On the first home, the Morgan home, the exhibit Mr. Inglis's damage

15:17:34  23  calculation would have overpaid the mortgage by $31,315.  On the

15:17:42  24  Baldwin --

15:17:43  25  Q.  I'm sorry.  And what percentage difference was that?

15:17:44  1   A.  That's about a 15 percent difference.

15:17:46  2   Q.  Now, is a 15 percent difference significant in your business?

15:17:51  3   A.  It certainly is.

15:17:52  4   Q.  Why?

15:17:53  5   A.  Because if I am overpaying 15 percent on a home, my bid is

15:18:01  6   somehow overpaying somebody for the work that I have to do, I am

15:18:05  7   making money, a lot of money.  Still only going to cost $277,000.

15:18:11  8   If I am under by 15 percent, and I do that more than a couple of

15:18:15  9   times, I am going to be out of business.

15:18:19 10   Q.  Go down to the last two properties.  What do they show?

15:18:24 11   A.  On the McKellar property, it shows that Mr. Inglis's formula

15:18:28 12   would underpay the McKellars by $59,454; and on the Heischober, it

15:18:36 13   would underpay that particular plaintiff by $113,155.  And each of

15:18:42 14   those two, for the McKellar it would have been 25 percent difference

15:18:48 15   and on the Heischober it would have been 30 percent.

15:18:51 16   Q.  Now, Mr. Inglis's analysis, as reviewed on redirect on

15:18:55 17   plaintiffs' example 11 doesn't reflect these percentage differences,

15:18:59 18   does it?

15:19:00 19   A.  Not on the individual plaintiff basis, no.

15:19:03 20   Q.  Did you draw any conclusions from this empirical analysis and

15:19:07 21   testimony that you've done?

15:19:14 22   A.  Yes.  We've drawn a few conclusions.  First of all, that

15:19:19 23   Mr. Inglis's formula never gets it right, even on the *Germano*

15:19:25 24   properties.  Secondly, there's wide variation between Mr. Inglis's

15:19:29 25   formula damages and the damages that each plaintiff received.

15:19:33  1   Q.  So based on your analysis of the seven *Germano* properties and

15:19:37  2   the application of Mr. Inglis's formula to those properties, do you

15:19:41  3   have any opinions about his formula?

15:19:43  4   A.  It doesn't work.

15:19:44  5   Q.  Do you have an opinion as to why his formula does not

15:19:50  6   approximate the remediation costs from *Germano*?

15:19:54  7   A.  Well, because when you take an average of an average and apply

15:19:57  8   it to a footprint, you don't take into account the real work that

15:20:02  9   has to be done to remediate that particular property.

15:20:05  10  Q.  Have you conducted any other empirical test of Mr. Inglis's

15:20:11  11  form?

15:20:11  12  A.  We also tested it against the Knauf properties.

15:20:14  13  Q.  What is Knauf?

15:20:14  14  A.  Knauf is another drywall manufacturer.

15:20:17  15  Q.  Are you aware of whether Knauf has remediated any properties?

15:20:20  16  A.  I believe they have.

15:20:21  17  Q.  And have you had an opportunity to review the Knauf remediation

15:20:25  18  scope of work?

15:20:26  19  A.  I have.

15:20:26  20  Q.  Please explain to the Court your understanding of what the

15:20:29  21  Knauf remediation scope entails.

15:20:31  22  A.  My understanding of the Knauf remediation is full remediation

15:20:35  23  of each property with some flexibility given to the contractor as to

15:20:40  24  the methodology, how to do that.

15:20:43  25  Q.  Now, why did you review the Knauf data?

15:20:46  1    A.  Because it's kind of apples-to-apples comparison.

15:20:49  2    Q.  What do you mean it's kind of apples to apples comparison?

15:20:52  3    A.  Well, it's similar properties and similar locations, as this

15:20:56  4    case, similar square footages, and similar scope of work.

15:21:01  5    Q.  Do you know if Mr. Inglis considered the Knauf data?

15:21:06  6    A.  I don't believe he has.

15:21:07  7    Q.  Now, is this the kind of information contractors rely on in the

15:21:11  8    real world?

15:21:11  9    A.  Yes.

15:21:12 10    Q.  And what was Knauf's overall average square foot remediation

15:21:17 11    cost?

15:21:17 12    A.  I believe it was about $65 a square foot.

15:21:19 13    Q.  For how many properties?

15:21:21 14    A.  2,000.

15:21:22 15    Q.  You said you compared his formula to the Knauf data.  Please

15:21:26 16    describe what you actually did.

15:21:27 17    A.  Well, what we did was we looked at three locations that were

15:21:32 18    the largest locations in this particular case.  We looked at

15:21:36 19    Louisiana, we looked at Florida, and we looked at Alabama.  And on

15:21:42 20    the Knauf spreadsheets there is a high and low column and there is

15:21:45 21    an average column by zip code.  So we took four zip codes from each

15:21:49 22    of those locations and compared the average cost for those locations

15:21:53 23    against the high and low for each zip code.

15:21:55 24    Q.  Did you prepare a visual for the Court?

15:21:58 25    A.  I did.

15:21:58  1    Q.  Let's take a look at it.  Just explain what we're looking at?

15:22:04  2    A.  Again, this is Louisiana, which, again, is one of the larger

15:22:09  3    areas in this particular case, and along the bottom are the zip

15:22:13  4    codes we looked at:  70433, 70125, 70810, and 70126.  And based on

15:22:22  5    the Knauf data, they showed for a particular zip code, for instance,

15:22:26  6    70433, that the high was $135.80 per square foot, the low was $40.37

15:22:36  7    per square foot, and the average was $64.18 per square foot.

15:22:40  8    Q.  Did you draw any conclusions from those empirical facts?

15:22:43  9    A.  Well, a couple.  One is that there's great variability between

15:22:46  10   the high and low, and there's great variability between either the

15:22:50  11   high or the low and the average.

15:22:53  12   Q.  Now, what's your opinion as to why we see that variability?

15:22:56  13   A.  Again, because it's an average.  I mean, an average is never

15:23:01  14   going to be exact on either a high or a low.

15:23:05  15   Q.  Do you have an opinion when an average might hit the mark?

15:23:09  16   A.  If you have -- if the next property you're looking at is exact

15:23:18  17   in every way to the house that you took or the homes you took the

15:23:23  18   average on, then it would probably hit the mark.

15:23:25  19   Q.  Now, this empirical analysis of Louisiana, did you do it for

15:23:29  20   any other states?

15:23:30  21   A.  Yes, we did it for two other states.

15:23:32  22   Q.  Which ones?

15:23:33  23   A.  Florida and Alabama.

15:23:35  24   Q.  Similar results?

15:23:37  25   A.  Very similar results.

15:23:38  1   Q.  Based on these empirical data, did you draw any conclusion

15:23:42  2   regarding Mr. Inglis use of a single per square foot cost for every

15:23:47  3   property in the zip code?

15:23:48  4   A.  It will not work.

15:23:49  5   Q.  Why?

15:23:49  6   A.  Because, again, it's an average of an average.  And even as you

15:23:53  7   see here within the zip code, there's wide variability between the

15:23:57  8   price of one home versus the next.

15:24:00  9          MR. KENNY:  Thank you.  No further question, your Honor.

15:24:02 10          THE COURT:  Any cross?

15:24:04 11                    CROSS-EXAMINATION

15:24:05 12   BY MR. SEEGER:

15:24:15 13   Q.  Mr. Pogorilich, how are you?

15:24:19 14   A.  I'm great.  How are you?

15:24:20 15   Q.  Good.  So you've actually testified and you've been deposed

15:24:24 16   many times, right, as an expert witness; is that fair?

15:24:28 17   A.  I've been deposed a few times, yes.

15:24:31 18   Q.  But never until now for Chinese drywall, right?

15:24:33 19   A.  That's correct.

15:24:34 20   Q.  And last year you spent 80 percent of your time, 80 percent of

15:24:38 21   your work time as a professional litigation expert, correct?

15:24:40 22   A.  Correct.

15:24:41 23   Q.  The other 20 percent you spent as, I believe you described

15:24:45 24   yourself as an owner rep?

15:24:47 25   A.  That's correct.

15:24:48  1    Q.  That's where you're checking schedules and other people have

15:24:52  2    estimated the job, but you're kind of coming in to make sure it's

15:24:55  3    all moving on schedule and proceeding?

15:24:56  4    A.  And we're also looking at the estimating for potential change

15:25:01  5    orders as well.

15:25:02  6    Q.  Right.  And you've published articles before, but you've never

15:25:06  7    published an article on estimating, fair enough?

15:25:09  8    A.  Yes.

15:25:10  9    Q.  And you don't -- you haven't published anything on Chinese

15:25:13 10    drywall, right?

15:25:13 11    A.  Correct.

15:25:14 12    Q.  And you've taught courses regarding construction, but the last

15:25:18 13    time you taught a course on estimating was about 20 years ago; fair

15:25:22 14    enough?

15:25:22 15    A.  Fair enough.

15:25:23 16    Q.  And, you know, I deposed you and I asked you these questions

15:25:29 17    during the deposition, so none of this will come as a surprise.  But

15:25:32 18    if I want to go on Navigant's website and find out who you are, you

15:25:36 19    have your CV up there, right?

15:25:38 20    A.  Yes.

15:25:38 21    Q.  Do you remember I asked you these questions?

15:25:40 22    A.  Yes, I do.

15:25:41 23    Q.  And on your CV on your website -- that's you, right?

15:25:48 24    A.  That's me.

15:25:49 25    Q.  And by the way, I'll represent to you I just checked this

15:25:52  1   20 minutes ago.  That's still up there, right?

15:25:55  2   A.  If you checked it 20 minutes ago and it's still up there, I'll

15:25:59  3   take your word on it.

15:26:00  4   Q.  Thank you.  It says -- big picture of you.  And let's just look

15:26:05  5   at the first sentence of your CV.  Says, "David Pogorilich has over

15:26:10  6   20 years of experience in claims analysis and resolution on projects

15:26:13  7   in the United States and abroad."  Right?

15:26:15  8   A.  Yes, sir.

15:26:15  9   Q.  Then it says, "His background also includes estimating."

15:26:20 10   That's the second thing you mention in the second sentence, right?

15:26:22 11   A.  Yes.

15:26:23 12   Q.  But for this case you have a CV that you prepared and attached

15:26:26 13   to your report that the judge has, correct?

15:26:28 14   A.  Yes.

15:26:28 15   Q.  You changed it, right?

15:26:29 16   A.  Yes.

15:26:29 17   Q.  You made your estimating experience a little bit more important

15:26:33 18   than it is up on your website, isn't it?

15:26:35 19   A.  Yes.

15:26:36 20   Q.  Now, you have -- according to this new CV you have, you have

15:26:42 21   over 25 years of experience in all aspects of construction, from

15:26:46 22   inspections, which happens to be one of the things we're talking

15:26:48 23   about here, right?

15:26:49 24   A.  Yes.

15:26:49 25   Q.  And estimating, correct?  And we're also talking about

15:26:52  1    estimating here?

15:26:53  2    A.  Yes.

15:26:54  3    Q.  And this is the -- just for convenience sake, this is the CV

15:26:59  4    you want to go by for today's purposes (INDICATING)?

15:27:01  5    A.  Sure.

15:27:02  6    Q.  And you've been pretty heavily compensated for the work you've

15:27:09  7    done.  When was your company first retained by Taishan?

15:27:12  8    A.  I don't recall the exact date.

15:27:15  9    Q.  Last couple of months, though, pretty much?

15:27:17  10   A.  Last three or four months, yeah.

15:27:19  11   Q.  What are you run up-to-date, your bill?  Somewhere around

15:27:23  12   $500,000 by now?

15:27:24  13   A.  I think it's probably closer to, like, 350 or four.

15:27:27  14   Q.  Because when I deposed you a few weeks ago, you were over

15:27:32  15   $300,000, but since then you've prepared a supplemental report,

15:27:35  16   you've been spending time with the lawyers, and preparing

15:27:37  17   demonstratives, and you think you've only gone up that little?

15:27:40  18   A.  Well, the only person involved in that since my deposition has

15:27:43  19   been me.

15:27:43  20   Q.  So you're comfortable with a number of about $400,000 in fees

15:27:47  21   in the last two months?

15:27:49  22   A.  Yes.

15:27:54  23   Q.  I want to talk a little bit about your Chinese drywall

15:27:58  24   experience.  By the way, for all of that compensation you've

15:27:59  25   received and produced a report and a supplemental report, you have

15:28:02  1   not yet really told us what your methodology would be for coming up

15:28:06  2   with class-wide damages, right?

15:28:07  3   A.   That is not true.

15:28:09  4   Q.   Your approach is you have to visit every single house, measure

15:28:13  5   every single house, and get bids on every single house, fair?

15:28:17  6   A.   That's fair.

15:28:18  7   Q.   And how much do you make an hour?

15:28:19  8   A.   I don't know.

15:28:20  9   Q.   What's your billing rate?

15:28:21 10   A.   My billing rate is $380 an hour.

15:28:24 11   Q.   Let's say we wanted you to do that, so we would have to pay

15:28:27 12   you -- you say it takes one day to visit a house, measure it, and

15:28:31 13   estimate it, right?

15:28:32 14   A.   Approximately one day, yes.

15:28:32 15   Q.   So we would have to pay you, if it you were doing it, assuming

15:28:36 16   you're not going to get the job because this is not a job you would

15:28:39 17   handle, right?

15:28:40 18   A.   Excuse me?

15:28:41 19   Q.   You wouldn't do the -- you would not personally do the

15:28:44 20   remediation work on 2,600 homes, right?

15:28:46 21   A.   No.

15:28:46 22   Q.   So let's assume you wanted somebody to do that and we hired an

15:28:50 23   expert like you, that would be $380 an hour, times eight hours for

15:28:55 24   the day, times 2,600 homes.  That would be a pretty hefty bill just

15:29:01 25   to come up with a method under your methodology for class-wide

15:29:05  1    damages?

15:29:06  2    A.  If I were the one that was hired to do the inspections, I would

15:29:08  3    find someone else, other than me, to assist with those inspections

15:29:11  4    that would obviously be a lower bill rate.

15:29:13  5    Q.  Lower billing, but we would have to pay somebody.  Unless we're

15:29:17  6    giving them the job, we're going to have to pay somebody for the

15:29:19  7    work; is that fair?  I just want to be clear on what you're telling

15:29:22  8    me.

15:29:22  9    A.  If you're going to hire me to do it, then you would have to pay

15:29:24 10    me or somebody or my assistant to do the work, yes.

15:29:28 11    Q.  We'll take that under advisement.  Your experience in Chinese

15:29:35 12    drywall is five homes, right?

15:29:36 13    A.  Yes.

15:29:37 14    Q.  All in Florida?

15:29:38 15    A.  Yes.

15:29:39 16    Q.  And you worked for an insurance company?

15:29:41 17    A.  I worked for -- the counsel that represented the insurance

15:29:45 18    company that was -- had a Manchester firm as a client, yes.

15:29:49 19    Q.  You were hired by a lawyer who worked for an insurance company,

15:29:52 20    fair enough?

15:29:52 21    A.  Yes.

15:29:52 22    Q.  And if your job in the Chinese drywall homes is you played no

15:29:58 23    role at all in determining the scope of remediation in any of those

15:30:01 24    five homes; is that fair?

15:30:02 25    A.  That's correct.

15:30:02  1    Q.   And, in fact, nobody even asked your opinion on the scope of

15:30:05  2    remediation in those five homes, fair?

15:30:07  3    A.   That's correct.

15:30:08  4    Q.   And you did not personally harvest any samples in that case,

15:30:13  5    right?

15:30:13  6    A.   That's correct.

15:30:14  7    Q.   And you don't even know what those things were tested for?

15:30:16  8    A.   I know they were tested for defective Chinese drywall.

15:30:18  9    Q.   You have no idea what tests were run on any of those samples

15:30:21 10    that were harvested?

15:30:22 11    A.   The specific test?

15:30:24 12    Q.   Yes.

15:30:24 13    A.   I do not know the specific tests.

15:30:26 14    Q.   And you never personally confirmed there was defective drywall

15:30:31 15    in the case, you relied on somebody else to tell you that the

15:30:34 16    drywall was defective; is that fair?

15:30:35 17    A.   That's not correct.

15:30:37 18    Q.   Okay.  Tell me what you did to confirm the defective drywall.

15:30:39 19    A.   The first thing I did was visit the testing facility who had

15:30:43 20    garnered samples from each home, and I could see for myself from the

15:30:48 21    samples the effects of the Chinese drywall.

15:30:50 22    Q.   But you don't remember who the manufacturer of the Chinese

15:30:53 23    drywall was, you just know it said, "Made In China" on the back?

15:30:56 24    A.   Some of it had manufacturer stamps on them, some of them said

15:31:01 25    "Made In China."

15:31:01 1   Q.  Do you remember who the manufacturer of the drywall was?

15:31:05 2   A.  I do not.

15:31:05 3   Q.  Was it the defendant's drywall?

15:31:08 4   A.  I don't know.

15:31:08 5   Q.  And your involvement in all of these homes only occurred after

15:31:11 6   the remediation had already commenced.  You came in maybe before it

15:31:15 7   was completed in some cases, but it was already started?

15:31:17 8   A.  In every case it was already started, that's correct.

15:31:20 9   Q.  And the other thing I want to ask you is, do you know how when

15:31:29 10  you were referencing before Berman & Wright, you know that there

15:31:32 11  were documents there showing that Berman & Wright did work on the

15:31:36 12  Carbone house, the Dukes house, and other residences, you saw that

15:31:39 13  stuff, right?  They gave it to you?

15:31:40 14  A.  Yes.

15:31:40 15  Q.  You didn't produce one scrap of paper showing us that you did

15:31:45 16  any work on any Chinese drywall home with your name on it, did you?

15:31:48 17  A.  No.

15:31:49 18  Q.  We don't have your bills, do we, from Dukes and Carbone?

15:31:53 19  A.  I don't know if you do or not.  I produced everything I had.

15:31:56 20  Q.  Did you give them bills showing that you billed that attorney

15:32:00 21  for the work you did in Dukes and Carbone?

15:32:02 22  A.  No.

15:32:03 23  Q.  No, you didn't.  And you said you had handwritten notes, but we

15:32:07 24  don't have your handwritten notes, do we?

15:32:10 25  A.  No, you don't.

15:32:10  1   Q.  And you generated reports, but we do not have your reports?

15:32:10  2   A.  I did not generate any reports.  If I had, I would have given

15:32:14  3   them to you.

15:32:14  4   Q.  Right.  So other than your testimony, which is all I have to go

15:32:16  5   on, I have no other documentary proof that you did any work at all

15:32:20  6   on five Chinese drywall houses?

15:32:21  7   A.  We did produce a lot of paper on the --

15:32:24  8   Q.  None of it produced by you though?

15:32:26  9   A.  None of it produced by me.

15:32:27 10   Q.  So you were not -- on the five homes you worked on, you were

15:32:44 11   not asked your opinions about what, scientifically what tests to do,

15:32:47 12   correct?

15:32:48 13   A.  Correct.

15:32:48 14   Q.  And you didn't recommend any changes to the scope of work.  You

15:32:53 15   didn't look at it and say, "This doesn't make sense.  We have to do

15:32:56 16   something else."  Right?

15:32:58 17   A.  I made recommendations on what the actual scope of work was

15:33:03 18   because sometimes the actual scope of work went well beyond

15:33:07 19   remediation of drywall.

15:33:08 20   Q.  I understand you wanted to make sure that homeowners didn't get

15:33:11 21   upgrades, like, new kitchens and new irrigation systems, somebody

15:33:15 22   got a new TV they tried to pass off on the insurance company.  You

15:33:19 23   made sure you caught all of that stuff, right?

15:33:21 24   A.  Correct.

15:33:27 25   Q.  Now, you know -- or maybe you didn't.  Let me ask you this.

15:33:35  1   When you were doing the work on those homes, those five Chinese

15:33:38  2   drywall homes, were you aware that there was a big litigation in

15:33:41  3   federal court here in New Orleans regarding Chinese drywall?

15:33:43  4   A.  I was.

15:33:44  5   Q.  Did you also know that there was litigation going on in Miami

15:33:47  6   in Florida regarding hundreds of homes that needed to be remediated

15:33:51  7   in Florida?

15:33:51  8   A.  I don't know if I was aware of that or not.

15:33:53  9   Q.  And you understand because you spent so much of your time

15:33:57 10   testifying that the courtroom is the place where experts come and

15:34:00 11   ideas get thrown out, and Courts and juries look at that and decide

15:34:03 12   what to accept.  You understand that's what happens, right?

15:34:06 13   A.  Generally speaking, yes.

15:34:07 14   Q.  Did you consult any of the scientists that testified in this

15:34:11 15   case regarding the *Germano* litigation or any of the trials that were

15:34:14 16   held in this Court?

15:34:15 17   A.  No.

15:34:15 18   Q.  So when you were involved in the remediation of five Chinese

15:34:21 19   drywall homes, let's be clear, when it came to the drywall you were

15:34:22 20   selectively remediating drywall, you didn't rip it down to the

15:34:28 21   studs; some drywall came out and some stayed, right?

15:34:28 22   A.  The drywall that came out was ripped down to the studs.

15:34:31 23   Q.  You didn't tear the whole house down to the studs?

15:34:34 24   A.  Some of them the entire house was torn down to the studs.

15:34:37 25   Q.  And some not?

15:34:38  1    A.  And some not.

15:34:39  2    Q.  So in some homes you selectively remediated the drywall; is

15:34:46  3    that fair?

15:34:47  4    A.  In some homes, yes.

15:34:49  5    Q.  How long of an air out period did you have in the five homes

15:34:53  6    that you were involved with?

15:34:55  7    A.  You know, I believe it was -- I don't recall the exact number,

15:35:02  8    but I believe it was like a week or two.

15:35:04  9    Q.  That's what you told me during your deposition, that you

15:35:06 10    couldn't remember how long they aired out for, right?

15:35:08 11    A.  Yeah, yeah.

15:35:09 12    Q.  Do you know how long this Court has ordered that homes need to

15:35:12 13    air out after they've been ripped to the studs?

15:35:15 14    A.  I have no idea.

15:35:16 15    Q.  The scope of remediation, that's important when it comes to

15:35:20 16    estimating a price, right?

15:35:21 17    A.  Yes.

15:35:21 18    Q.  You have to know exactly what you're bidding on?

15:35:23 19    A.  Yes.

15:35:24 20    Q.  And do you know what a certified industrial hygienist does?

15:35:29 21    A.  Yes.

15:35:32 22    Q.  But you have no opinion on what tests or what things a

15:35:36 23    certified industrial hygienist should do to a Chinese drywall home,

15:35:40 24    right?

15:35:40 25    A.  I have a general understanding of what they do, but I don't

15:35:44  1    know the exact test.

15:35:44  2    Q.  But you have no opinion -- I asked you in your deposition, I

15:35:47  3    said, "Hey, do you have an opinion on what a certified industrial

15:35:52  4    hygienist should do?"  And you said you have no opinion on that.

15:35:56  5    A.  That's correct.

15:35:56  6    Q.  Now, when you selected -- when you agreed that the protocol was

15:36:04  7    right to selectively remove drywall in these homes, did you consult

15:36:07  8    any science literature on the possibility of cross-contamination

15:36:12  9    between Chinese drywall and non-Chinese drywall?  Did you do that?

15:36:16 10    A.  No.

15:36:16 11    Q.  No, okay.  What about appliances?  Did you leave the appliances

15:36:22 12    in those homes that you were involved with?

15:36:24 13    A.  Some were removed and some weren't.

15:36:26 14    Q.  Did you do any -- did you do any literature searchs or consult

15:36:30 15    any scientists on corrosion?

15:36:32 16    A.  No.

15:36:32 17    Q.  Do you understand the problem in Chinese drywall homes is

15:36:38 18    corrosion, right?

15:36:39 19    A.  Yes.

15:36:39 20    Q.  Now, you agree -- in your testimony you would be comfortable

15:36:49 21    with me saying is that you agree that people who have Chinese

15:36:53 22    drywall in their homes need to get it out, correct?

15:36:55 23    A.  I would agree it needs to be remediated, yes.

15:36:58 24    Q.  Now, you yourself use RSMeans, right?

15:37:03 25    A.  Yes, sir.

15:37:03 1  Q.  And, in fact, in the five Chinese drywall homes that you were

15:37:06 2  involved with, what you did was you took the estimate -- contractors

15:37:12 3  bid those jobs, right?

15:37:13 4  A.  Yes.

15:37:13 5  Q.  You had prices?

15:37:14 6  A.  I had prices, I had PO's, I had invoices.

15:37:17 7  Q.  And you came in and you took RSMeans and you cross-checked the

15:37:21 8  contractor's prices, didn't you?

15:37:23 9  A.  Yes.

15:37:24 10  Q.  And you agree that RSMeans is tool that is to be used together

15:37:38 11  with the estimator's knowledge and experience; you don't dispute

15:37:40 12  that, do you?

15:37:41 13  A.  I would dispute that -- well, let me say it this way.  The

15:37:49 14  knowledge and experience of an estimator does come into play when

15:37:53 15  you're using RSMeans.  But there are still -- still have to do kind

15:37:59 16  of a standard methodology to determine a price.

15:38:03 17  Q.  But judgment is an important thing.  I mean, in estimating it's

15:38:06 18  not just mechanical; the judgment, the experience, the expertise of

15:38:11 19  the estimator is important; is that fair?

15:38:13 20  A.  Well, if the estimator is using his judgment based on his

15:38:17 21  historical costs, yes.

15:38:19 22  Q.  Based on his historical costs.  You've got a lot of comfort

15:38:25 23  with RSMeans; is that fair?

15:38:27 24  A.  Yes.

15:38:28 25  Q.  I just want to ask you if you agree with one thing.  I'll just

15:38:41  1   use my copy.  It's not important.  I have a whole bunch -- I even

15:38:45  2   have an arrow showing what I want to read to you.

15:38:48  3          So you acknowledge RSMeans as an authoritative source for

15:38:52  4   you, correct?

15:38:52  5   A.  Yes.

15:38:52  6   Q.  You see that bold sentence at the very bottom?  This section is

15:38:58  7   called "How the Book is Built:  An Overview."  Instructing people

15:39:02  8   who use it, what they think is important, fair enough?

15:39:04  9   A.  Fair enough.

15:39:06 10   Q.  See what it says right there, "With reasonable exercise of

15:39:10 11   judgment, the figures can be used for any building work."  Meaning

15:39:14 12   the figures in RSMeans, correct?

15:39:17 13   A.  As using -- as long as you're using the right line items and

15:39:20 14   the right figures, yes.

15:39:22 15   Q.  You also agree that there is a tremendous amount of variability

15:39:33 16   with contractors bids, right?

15:39:35 17   A.  There is some variability.

15:39:36 18   Q.  I mean, I deposed -- I can show you the testimony, but just to

15:39:39 19   cut through it, you agree it could be as much as 20 to 30 percent?

15:39:43 20   A.  Yes, but you didn't ask me why.

15:39:45 21   Q.  I did ask you why.  But you agree that variability is there,

15:39:47 22   right?

15:39:48 23   A.  The variability would be there for a number of different

15:39:50 24   reasons including a contractor made a mistake, the contractor

15:39:53 25   doesn't really need the work, they want -- they would low ball it to

15:40:00  1   continue to keep their crews working.  There's a number of different

15:40:03  2   reasons why you can have great variability.

15:40:05  3   Q.  But you're aware that variability is something that's taken as

15:40:08  4   a given, I mean, in -- you were in the courtroom when I was

15:40:11  5   deposing -- I'm sorry, questioning our witness Mr. Inglis, right?

15:40:15  6   A.  Yes.

15:40:15  7   Q.  And you saw the language I put up from RSMeans.  It was an

15:40:19  8   article in that book by Larry Cochran (PHONETIC) which talks about a

15:40:23  9   variability anywhere from a half a percent up to 30 percent in

15:40:27 10   contractor bids.  You don't dispute that, do you?

15:40:30 11   A.  I would say that that's -- that's what it says, but if there's

15:40:34 12   30 percent disparity amongst bids, then there's a problem with the

15:40:38 13   bid.  Or problem with the scope.

15:40:40 14   Q.  I want to talk to you a little bit about the Knauf settlement.

15:40:45 15   You were testifying earlier.  You fully understand that the

15:40:49 16   settlement, that the Knauf settlement is, in fact, a settlement,

15:40:52 17   right?

15:40:53 18   A.  Yes, sir.

15:40:53 19   Q.  And you know, because you've been around a long time around

15:40:56 20   litigation and other things, that a settlement is a compromise,

15:40:59 21   right?

15:41:00 22   A.  Yes.

15:41:00 23   Q.  Both sides give; there's give and take, right?

15:41:03 24   A.  Yes.

15:41:03 25   Q.  So if Judge Fallon's findings of fact and conclusions of law,

15:41:09  1    which you've read, are the starting place, you would be comfortable

15:41:12  2    with me saying then that Knauf is a compromise from that starting

15:41:15  3    place, correct?

15:41:17  4    A.  Without knowing the details, I don't know that I can agree with

15:41:20  5    you or not.

15:41:20  6    Q.  You don't know the Knauf details?

15:41:22  7    A.  I don't know how the negotiations went.

15:41:24  8    Q.  No, I am just asking you -- you said you read the Court's

15:41:27  9    findings of fact and conclusions of law, you know what the scope of

15:41:30  10   remediation is in that?

15:41:33  11   A.  Yes.

15:41:33  12   Q.  Rip it to the studs, fair enough?

15:41:34  13   A.  Fair enough.

15:41:35  14   Q.  You understand the Knauf scope of remediation is a settlement

15:41:39  15   that compromises, in many respects, what's in the findings of fact,

15:41:44  16   you understand that?

15:41:45  17   A.  I don't know that it compromises it, it gives full remediation

15:41:48  18   with some flexibility on how exactly it gets done.

15:41:51  19   Q.  I mean, how do you know it gives full remediation?  What do you

15:41:56  20   know about the Knauf remediation?

15:41:57  21   A.  I know that people have been given money through a settlement,

15:42:00  22   and I am not personally aware of anybody that has tried to overturn

15:42:06  23   that settlement or complain about that settlement or that have, you

15:42:10  24   know, since come back and said that they have health issues because

15:42:14  25   of that settlement.

15:42:15  1   Q.  Well, that's -- okay.  I understand what you're saying.  I'm

15:42:18  2   saying something else.

15:42:19  3          You understand that the scope of remediation is different

15:42:22  4   from the findings of fact, fair enough?

15:42:24  5   A.  Yes.

15:42:25  6   Q.  And you also understand that there is one contractor, Moss.

15:42:30  7   You've heard of Moss, right?

15:42:31  8   A.  Yes.

15:42:31  9   Q.  It's a big builder.  They are doing all of the remediation

15:42:35 10   work, so you would expect some efficiencies or economies of scale

15:42:38 11   using one contractor, wouldn't you?

15:42:39 12   A.  You could get those same efficiencies by using multiple

15:42:42 13   contractors if you're doing multiple projects.

15:42:45 14   Q.  You can get the same efficiencies, let's say, by using hundreds

15:42:47 15   of contractors versus one contractor like Moss?

15:42:51 16   A.  Yes.

15:42:51 17   Q.  Let me ask you this.  Do you know what Knauf makes:  Do you

15:42:55 18   understand they make drywall?

15:42:56 19   A.  Yes.

15:42:58 20   Q.  Sitting here right now, do you know if Knauf has provided that

15:43:02 21   drywall free of charge to its builder to install?

15:43:04 22   A.  I do not.

15:43:05 23   Q.  Maybe that's factored into price.  Do you know that one way or

15:43:07 24   another?

15:43:08 25   A.  I wouldn't know.

15:43:08  1   Q.  How about -- you provide a table in your report.  Do you have

15:43:12  2   your report in front of you?

15:43:14  3   A.  I do not.

15:43:15  4   Q.  A copy of your report.  Let me just show you.  You created

15:43:35  5   Table 15 in this report that you provided to the defense counsel,

15:43:40  6   right, sir?

15:43:41  7   A.  Table 5.

15:43:43  8   Q.  Did I say, "15"?  I am going to put it up.  I'm sorry.  I

15:43:47  9   thought you knew what I meant.  That's Table 5.  And your point of

15:43:52 10   this is to show this great variation in price between Knauf and what

15:43:57 11   Mr. Inglis did, right?

15:43:58 12   A.  Yes.

15:43:59 13   Q.  And one of the points you make is right here.  You went line by

15:44:04 14   line through the Knauf remediation program and you picked out a

15:44:07 15   couple of things by a couple of homes by zip code; is that fair?

15:44:10 16   A.  Yes.

15:44:11 17   Q.  One of the homes you picked is the row 16, that's one house,

15:44:15 18   right?

15:44:15 19   A.  Yes.

15:44:16 20   Q.  And you show it's 2,600 feet and show remediation price of

15:44:23 21   $31.59, correct?

15:44:23 22   A.  Correct.

15:44:24 23   Q.  And that's way off what George Inglis is saying the square

15:44:28 24   footage price should be; is that fair?

15:44:29 25   A.  That's fair.

15:44:30  1  Q.  That's way off what you understand the average square footage

15:44:32  2  price to be for the entire Knauf remediation program; is that fair?

15:44:34  3  A.  Yes.

15:44:35  4  Q.  Do you know why that number is as low as it is?

15:44:37  5  A.  I do not.

15:44:38  6  Q.  Have you heard of the concept of mixed homes in the Knauf

15:44:41  7  settlement?  Do you know what that is, a mixed home?

15:44:44  8  A.  Yes.

15:44:44  9  Q.  What is a mixed home?

15:44:45 10  A.  A mixed home is a house that has two different types of

15:44:49 11  drywall.

15:44:49 12  Q.  And what if I told you that the house that you selected in 16

15:44:53 13  was partially remediated by the Knauf settlement program and that's

15:44:56 14  why that square footage number is so low.  Does that make sense?

15:45:00 15          MR. KENNY:  Objection, no foundation.

15:45:06 16          THE COURT:  He is asking him to assume that.

15:45:06 17          THE WITNESS:  Even if you were to assume that, you

15:45:08 18  wouldn't know that unless you were there.

15:45:10 19  BY MR. SEEGER:

15:45:11 20  Q.  So why did you use it as an example?  You don't know about it,

15:45:13 21  that's my point.

15:45:13 22  A.  Well, that's my point.

15:45:14 23  Q.  That's your example.  Why did you pick that?

15:45:15 24  A.  The point is that you have wide variability in the numbers, and

15:45:20 25  unless you go to the specific property, you don't know why you had

15:45:23  1   the variability.  But you're going to have variability.

15:45:26  2   Q.  But the fact that Knauf might have remediated half of the house

15:45:30  3   and only reported the half they remediated, that would not be

15:45:33  4   comparing apples to apples as people say, right?  That's different

15:45:36  5   from what George Inglis is proposing?

15:45:38  6   A.  But, again, you don't know that unless you go there.

15:45:41  7   Q.  That's my point.  And the same thing with line 324.  You have

15:45:45  8   no idea why that number is as low as $46, do you?

15:45:49  9   A.  No.

15:45:49  10  Q.  You just picked it because it was different and lower, right?

15:45:52  11  A.  I picked it to show variability in the numbers.

15:45:55  12  Q.  Let's stick with your report for a few minutes.  Do you see

15:46:13  13  this sentence right here (INDICATING).  You wrote that, right?

15:46:15  14  A.  Yes.

15:46:16  15  Q.  Just want to be clear.  It says, "Most recently, I have been

15:46:19  16  involved as an expert and have inspected multiple single family

15:46:22  17  residences containing Chinese drywall in the Florida market with

15:46:27  18  tasks performed germane to the Taishan matter summarily including,"

15:46:32  19  and then you list the points.  Did I read that correctly?

15:46:34  20  A.  Yes.

15:46:35  21  Q.  And let's be clear, that experience that you're talking about,

15:46:37  22  that's the five homes that we talked about earlier where you worked

15:46:40  23  for the insurance company, right?

15:46:42  24  A.  Yes.

15:46:42  25  Q.  The tasks that you list -- just to be really clear because we

15:46:49 1  wouldn't want anybody to misunderstand your experience with Chinese

15:46:54 2  drywall -- is physical inspection of the actual residences; that

15:46:57 3  included going there, looking at scope that was created by somebody

15:47:00 4  else, confirming that the work was done, right?

15:47:02 5  A.  Yes.

15:47:03 6  Q.  And with regard to review of the repair protocols, that was

15:47:09 7  somebody else prepared those repair protocols, not you, right?

15:47:13 8  A.  That's correct.

15:47:14 9  Q.  And the review of the evidence chain of command and the storage

15:47:16 10  of the same defective materials, you didn't do the harvesting,

15:47:20 11  somebody else harvested and somebody else tested it, correct?

15:47:23 12  A.  That's correct.

15:47:34 13         MR. SEEGER:  Let me just see if I have anything else for

15:47:36 14  you.

15:47:48 15         That's all I have, Judge.

15:47:50 16         THE COURT:  Any redirect?

15:47:51 17                    REDIRECT EXAMINATION

15:47:52 18  BY MR. KENNY:

15:47:53 19  Q.  Mr. Pogorilich, have you been asked to offer any expert

15:47:59 20  opinions in this case about the science of corrosion in Chinese

15:48:03 21  drywall?

15:48:03 22  A.  No, I have not.

15:48:04 23  Q.  Have you been asked to render any opinions about scope of work

15:48:07 24  in this case?

15:48:07 25  A.  No.

15:48:08  1   Q.  What was your assignment?

15:48:09  2   A.  My assignment was to review Mr. Wright's and Mr. Inglis's

15:48:14  3   methodology for determining damages in this case.

15:48:17  4   Q.  And was it related to damages?

15:48:19  5   A.  Yes.

15:48:19  6   Q.  Your opinion related to damages?

15:48:21  7   A.  Yes.

15:48:22  8   Q.  Based on what Mr. Inglis has done by way of calculating class

15:48:27  9   damages, did he prepare contractor bids?

15:48:31  10  A.  No.

15:48:32  11  Q.  Did he do any contractor bids to prepare his damages?

15:48:37  12  A.  No.

15:48:37  13  Q.  Did he use RSMeans unit pricing to prepare his damages

15:48:42  14  calculations in this case?

15:48:43  15  A.  No.

15:48:44  16  Q.  Why do you say that?

15:48:45  17  A.  Because his pricing is the average of an average.  On two bids

15:48:51  18  he got for seven homes in Virginia, he took the average of those

15:48:55  19  seven bids, and so he took an average of an average and then

15:49:00  20  adjusted it using means for 2015, and then readjusted it for zip

15:49:09  21  code using means.

15:49:09  22  Q.  What about dollars-per-square-foot pricing, did he do that?

15:49:12  23  A.  I did not see any dollars-per-square-foot pricing.

15:49:16  24  Q.  Are you familiar with the book *RSMeans:  How to Estimate With*

15:49:19  25  *RSMeans Data*?

15:49:21  1    A.  Yes.

15:49:21  2    Q.  Does that relate to dollars-per-square-foot pricing?

15:49:24  3    A.  Yes.

15:49:25  4    Q.  Let me ask you to take a look at page 28 of that book.  Can you

15:49:40  5    blow it up?  "Approximate estimates."  Where it starts with,

15:49:46  6    "Approximate estimates".

15:49:47  7    A.  Would you like me to read that?

15:49:48  8    Q.  Yes.

15:49:49  9    A.  "Approximate estimates are usually prepared in a very short

15:49:52  10   time by multiplying the area (or number of functional units) in the

15:49:56  11   proposed project by a predetermined unit price and then applying

15:50:00  12   needed adjustments.  This predetermined unit price may have been

15:50:04  13   obtained from one's own previous experience in similar projects or

15:50:08  14   third-party information such as the RSMeans data books."

15:50:13  15            Do you want me to continue?

15:50:14  16   Q.  Yes.

15:50:15  17   A.  "Comparatively detailed estimates require quantity takeoffs of

15:50:19  18   all work items in the proposed project and their specifications.

15:50:22  19   This process cannot occur without the availability of the detailed

15:50:26  20   design, and it takes a high level of effort."

15:50:33  21   Q.  Go ahead.  Now, here, do you agree with this statement here

15:50:38  22   about approximate estimates?  Read that.

15:50:40  23   A.  "Approximate estimates usually have an accuracy range of about

15:50:43  24   minus 30 percent to plus 50 percent (i.e. 30 percent underbid to

15:50:49  25   50 percent overbid).  Sometimes approximate estimates are called

15:50:53  1  order of magnitude, preliminary, back of the envelope, or summary

15:50:58  2  estimates.  Conceptual estimates are also a type of approximate

15:51:01  3  estimates.  Approximate estimates are used to do the following:

15:51:04  4  Conduct feasibility studies.  An owner may do an approximate

15:51:07  5  estimate to know the ball-park figure of the project's cost."

15:51:10  6  Q.  In your professional judgment, would you use this type of

15:51:14  7  methodology to try to reasonably estimate damages for remediation

15:51:19  8  costs?

15:51:19  9  A.  No.

15:51:20  10  Q.  And even if you did, would that dispense with an on site

15:51:23  11  property inspection?

15:51:25  12  A.  In order to get a reasonable estimate, you have to do an

15:51:28  13  on-site inspection.

15:51:30  14          MR. KENNY:  No further questions, your Honor.

15:51:31  15          THE COURT:  Okay.  You're excused.  Thank you, sir.

15:51:34  16          THE WITNESS:  Thank you.

15:51:34  17          THE COURT:  Let me just see counsel on logistics.

15:51:40  18     (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD.)

15:52:42  19     (OPEN COURT.)

15:52:42  20          THE DEPUTY CLERK:  All rise.

15:52:43  21          THE COURT:  We're in recess for ten minutes.

15:52:45  22     (WHEREUPON, A RECESS WAS TAKEN.)

16:05:45  23     (OPEN COURT.)

16:05:45  24          THE COURT:  Be seated, please.  Call your next witness.

16:05:49  25          MR. FENTON:  Your Honor, before we call Dr. Marais, your

16:05:52  1   Honor, we want to move into evidence Defendant Exhibit 28.  I've

16:05:55  2   spoken with counsel, there's no objection.  It's a summary exhibit.

16:05:58  3           MR. MEUNIER:  No objection.

16:06:00  4           THE COURT:  Okay.  Admitted.

16:06:06  5           MR. FENTON:  Thank you, your Honor.  The defense calls

16:06:07  6   Dr. Laurentius Marais.

16:06:11  7           THE DEPUTY CLERK:  Would you please stand and raise your

16:06:13  8   right hand.

16:06:13  9       (WHEREUPON, LAURENTIUS MARAIS, WAS SWORN IN AND TESTIFIED AS

16:06:17  10      FOLLOWS:)

16:06:17  11          THE DEPUTY CLERK:  Please have a seat.  State and spell

16:06:20  12  your name for the record, sir.

16:06:22  13          THE WITNESS:  My name is Laurentius Marais, Laurentius is

16:06:24  14  L-A-U-R-E-N-T-I-U-S, Marais is M-A-R-A-I-S.

16:06:36  15                  VOIR DIRE EXAMINATION

16:06:36  16  BY MR. FENTON:

16:06:37  17  Q.  Good afternoon, Dr. Marais.

16:06:39  18  A.  Good afternoon, Mr. Fenton.

16:06:40  19  Q.  Dr. Marais, can you share with the Court -- well, first of all,

16:06:45  20  what is your profession?

16:06:46  21  A.  I am a professional consulting statistician.

16:06:49  22  Q.  And can you share with the Court your educational and

16:06:53  23  professional background?

16:06:54  24  A.  Certainly.  It ends with a Ph.D. from Stanford University from

16:07:00  25  the graduate school of business with a minor in mathematics, which

16:07:04  1   is, was my major field for many years.  I have masters degrees also

16:07:09  2   from Stanford University; one degree in mathematics, another degree

16:07:13  3   in statistics.  I have a bachelor degree with a triple major in

16:07:17  4   applied mathematics, pure mathematics, and computer science.

16:07:22  5   Q.  And have you held any faculty or research positions with any

16:07:29  6   major educational institutions?

16:07:31  7   A.  Yes, I have.

16:07:32  8   Q.  And share those with us.

16:07:36  9   A.  I have -- I was on the faculty of the graduate school of

16:07:39  10  business at the University of Chicago for approximately ten years.

16:07:44  11  I have also taught occasionally as an adjunct faculty member or a

16:07:49  12  consulting professor, actually, at Stanford University.

16:07:52  13  Q.  Dr. Marais, do you hold membership in any professional

16:07:58  14  organizations?

16:07:59  15  A.  Several.

16:08:00  16  Q.  Can you tell us what those are?

16:08:02  17  A.  The American Statistical Association, the Royal Statistical

16:08:05  18  Society, the Society For Industrial and Applied Mathematics, the

16:08:09  19  American Mathematical Association, the American Accounting

16:08:12  20  Association, and there may be -- the American Economics Association,

16:08:17  21  and there may be others that don't come to mind right now.

16:08:21  22  Q.  Dr. Marais, do you have experience as an expert witness?

16:08:25  23  A.  I do.

16:08:25  24  Q.  And approximately how many cases over the past ten years?

16:08:29  25  A.  I have testified at trial in, perhaps, 40 or 50 cases over the

16:08:38   1   past ten -- I think you said ten.  Maybe 30 or 40 in ten years.

16:08:43   2   Q.  And does that include any construction defect cases?

16:08:46   3   A.  Yes.

16:08:46   4   Q.  Can you tell us a little bit about your experience as an expert

16:08:52   5   in construction defect cases?

16:08:53   6   A.  Certainly.  Construction defect allegations that -- claims

16:09:00   7   disputes that I have come across have typically involved sampling

16:09:04   8   issues in large complexes where there are alleged problems with

16:09:11   9   plumbing fittings, or with windows, or with other elements of the

16:09:16  10   construction.  And the question that I have encountered is typically

16:09:22  11   the extent to which one can generalize from a sample of inspected

16:09:30  12   units or fittings to the entire population of the same kind of units

16:09:36  13   or fittings in the entire relevant population of units.

16:09:44  14          MR. FENTON:  And at this point, your Honor, we would

16:09:47  15   tender Dr. Marais as an expert in statistics and statistical

16:09:51  16   sampling.

16:09:52  17          THE COURT:  Any questions on those areas?

16:09:54  18          MR. MEUNIER:  No questions at this time.

16:09:55  19          THE COURT:  Okay.  The Court will accept him in the field,

16:09:58  20   chosen field as an expert.

16:10:00  21          MR. FENTON:  Thank you, your Honor.

16:10:01  22                    DIRECT EXAMINATION

16:10:01  23   BY MR. FENTON:

16:10:01  24   Q.  Dr. Marais, you've prepared several reports in this case.

16:10:04  25   Would it assist you in your testimony to have your supplemental

16:10:07  1   report in front of you?

16:10:08  2   A.  Yes.

16:10:08  3   Q.  And that's been marked as Defendant's 26.  And let me give you

16:10:14  4   a copy of that.  Dr. Marais, can you explain to the Court what an

16:10:33  5   extrapolation is?

16:10:34  6   A.  Yes.

16:10:36  7   Q.  And what is that?

16:10:37  8   A.  An extrapolation is a kind of statistical calculation in which

16:10:46  9   one attempts to extend from some portion of universe of a relevant

16:10:55 10   population, something that you have measured in that portion of the

16:10:59 11   population and you are attempting to extend it to the entire

16:11:05 12   population.  That would be an example of an extrapolation.

16:11:10 13   Q.  So it's where you have a subset of a larger universe.  You know

16:11:14 14   something about the subset and you're trying to expand that to the

16:11:18 15   larger universe?

16:11:19 16   A.  Yes.

16:11:22 17   Q.  And there's been some discussion, Dr. Marais, about whether

16:11:26 18   Mr. Inglis's analysis is an extrapolation.  Based on your

16:11:31 19   professional opinion and the work that you've done in this case, is

16:11:34 20   Mr. Inglis's analysis here an extrapolation?

16:11:38 21   A.  Mr. Inglis's analysis, specifically his calculation of

16:11:45 22   aggregate damages, is a quintessential example of an extrapolation

16:11:51 23   from a small sampling to an entire population.

16:11:56 24   Q.  And is the process of extrapolation an area of statistical

16:12:02 25   science in which you have knowledge, experience, and training?

16:12:05  1    A.   It is.   It is both an area of statistical science.   It is one

16:12:10  2    of the principle focuses, areas of focus of statistical science, and

16:12:16  3    it is an area in which I have both knowledge and experience.

16:12:20  4    Q.   Based on your knowledge, experience, and training, Dr. Marais,

16:12:26  5    do you have an opinion as to the validity of Mr. Inglis's damage

16:12:32  6    extrapolation?

16:12:33  7    A.   Yes.

16:12:34  8    Q.   And is that opinion stated in your report?

16:12:37  9    A.   Yes.

16:12:38  10   Q.   And I am going to put a portion of that on the board.   Exhibit

16:12:45  11   200, please.   Can you tell the Court what your opinion is with

16:12:49  12   respect to Mr. Inglis's extrapolation?

16:12:51  13   A.   A good way to do it is to simply read aloud the portion of my

16:12:55  14   report that is on the screen.   "Mr. Inglis's purported calculations

16:12:59  15   of class-wide remediation costs do not comport with well established

16:13:04  16   principles for obtaining statistically and scientifically valid

16:13:08  17   extrapolations from samples, and, therefore, cannot be relied upon

16:13:14  18   to estimate class-wide damages, or damages for individual class

16:13:17  19   members."

16:13:18  20   Q.   And can you explain to the Court, Dr. Marais the basis for your

16:13:24  21   opinion that Mr. Inglis's model cannot be relied upon to estimate

16:13:28  22   either class-wide or individual damages?

16:13:30  23   A.   Certainly.   The basis of my opinion goes to how -- the nature

16:13:41  24   of the sample from which Mr. Inglis is making his extrapolation.

16:13:50  25   Not every sample is a valid basis for an extrapolation.   Indeed,

16:13:59  1    there are specific criteria and qualifications that are well

16:14:03  2    established in the science of statistics for the kind of sample that

16:14:09  3    permits a valid extrapolation to an entire population.  The sample

16:14:15  4    has to be, in plain English, it has to be representative.  And so

16:14:19  5    the question is:  What is the auditable, the verifiable, the

16:14:26  6    scientific credential of a sample as a representative sample?

16:14:32  7          Much of statistical science having to do with sampling

16:14:36  8    and extrapolations goes to the question of how to obtain a

16:14:42  9    representative sample.  And although there are variations and

16:14:47 10    methods that give rise to many yards of textbook shelving on how one

16:14:54 11    goes about doing this, there is essentially one idea that underlies

16:14:59 12    all of those various methods in statistics and that idea is some

16:15:04 13    form of what we call in technical language probability sampling, but

16:15:11 14    what is known more informally as random sampling.  The randomness of

16:15:16 15    how a sample was obtained, that process of sampling is fundamental

16:15:23 16    to the validity of extrapolations from the sample.

16:15:27 17    Q.  And what is it about Mr. Inglis's selection of the seven

16:15:33 18    *Germano* properties here that was not random?

16:15:37 19    A.  Random sampling is a technical term for a process that has the

16:15:48 20    following ingredients -- the following elements in it:  Essentially,

16:15:53 21    to obtain a random sample, you begin with a list of all of the units

16:16:01 22    in the target population; that is, the population to which you

16:16:06 23    ultimately intend to make some extrapolation.  And you choose

16:16:14 24    elements, entries on that list to be included in the sample by a

16:16:21 25    probabilistic process that has several properties.  Among those

16:16:25  1   properties are that every entry on the list must have a -- must be

16:16:34  2   eligible and must have a non-zero chance of making it into the

16:16:38  3   ultimate sample.  And it is important that the actual selection be

16:16:45  4   guided by known objective probabilities that can subsequently be

16:16:52  5   used in the extrapolation calculations.

16:16:55  6          So a probabilistic selection with known probabilities in

16:17:01  7   which every element in the ultimate universe has a non-zero chance

16:17:07  8   of being in the sample, that is the bulk of the definition of a

16:17:14  9   random sample.  There are a few more details that I am leaving out.

16:17:18  10          I understand that the seven *Germano* properties were

16:17:23  11  selected by what I understand is the Plaintiff's Steering Committee

16:17:30  12  in this matter.  I am aware of no evidence that they -- that in

16:17:36  13  selecting the *Germano* properties they followed the kind of process

16:17:42  14  that I've just described.

16:17:44  15          Now, what that means is that the *Germano* properties, the

16:17:49  16  seven *Germano* properties have no credential.  They have no

16:17:53  17  qualification from a statistical perspective as being a

16:18:00  18  representative random sample from the class in this case.

16:18:06  19  Q.  And let me just see if I can break that down a little bit.  I

16:18:12  20  believe you said that to obtain a random sample you would have to

16:18:16  21  begin with a list of the target population?

16:18:18  22  A.  Yes.

16:18:18  23  Q.  Would that be, in this case, the class list, the class members

16:18:23  24  for whom you were trying to make the extrapolation?

16:18:26  25  A.  Yes.

16:18:26 1   Q.  And so in order to do a statistical random sampling, all of

16:18:32 2   those class members would need to be, I believe you said, eligible

16:18:36 3   for selection?

16:18:36 4   A.  Yes.

16:18:37 5   Q.  And each one would have to have a non-zero chance of being

16:18:42 6   selected?

16:18:42 7   A.  Yes.

16:18:44 8   Q.  So it would be picked from the entirety of the population, not

16:18:48 9   just seven cases that happened to be convenient?

16:18:52 10  A.  Certainly.

16:18:53 11  Q.  Now, can you describe how one would go about picking a random

16:19:04 12  sample in this case?

16:19:05 13  A.  Certainly.  You would begin -- you would begin with a list of

16:19:12 14  the class properties in this case.  It could -- you could, in fact,

16:19:17 15  begin with a list that is somewhat greater than the class

16:19:20 16  properties, but it is important that the list contain all of the

16:19:23 17  class properties in the case.

16:19:29 18          Then you would select -- you would, first of all, make a

16:19:33 19  decision about the sample size that you intended to draw.  That

16:19:39 20  would -- that decision would itself be based on calculations about

16:19:43 21  the precision of the extrapolations that you hope to make from the

16:19:48 22  sample, and you would then proceed to draw a sample from that class

16:19:54 23  list using a random selection mechanism.  Typically, when we are

16:20:00 24  doing this in practice, we use computer generated random numbers to

16:20:06 25  determine which elements of the list -- of the class list are

16:20:12   1   included in the sample and which are left -- which are left out.

16:20:17   2   Q.  Now, you mentioned sample size, and I wonder if you can expand

16:20:21   3   on that a little bit.  What is the significance of sample size?

16:20:24   4   A.  The significance of sample size is it's critically important.

16:20:31   5   But even so, it is secondary to the randomness of the sample

16:20:36   6   selection procedure.  However, assuming that we are following a

16:20:41   7   probability sampling protocol and drawing a random sample, what the

16:20:46   8   sample size does is to determine the precision of the

16:20:52   9   extrapolations.  In other words, in a familiar example, when one

16:20:57  10   sees political opinion polls reported, they often say that

16:21:04  11   40 percent of eligible voters hold a certain opinion, plus or minus

16:21:09  12   a margin of error of, say, four percent.

16:21:12  13       The fact that that margin of error that we often see in

16:21:16  14   political polls is four percent is a consequence of the sample size

16:21:26  15   that was used in order to elicit opinions.  Typically, a sample size

16:21:31  16   of about 1,000 voters would get you -- would buy you a margin of

16:21:36  17   error of plus or minus four percent is an approximate rule of thumb.

16:21:42  18   Q.  And would a sample size of seven to extrapolate to 2,715

16:21:50  19   properties in this case be adequate to get you within a reasonable

16:21:54  20   margin of error?

16:21:55  21   A.  That would be the subject of a calculation that I have not seen

16:22:01  22   done in this case.  But as a general matter, a sample size of seven

16:22:07  23   is too small, in my experience, to achieve any reasonable margin of

16:22:14  24   error.  Certainly, nothing like the plus or minus four percent based

16:22:17  25   on the sample size of 1,000 that I mentioned in my example a minute

16:22:22  1    ago.

16:22:22  2    Q.  Now, is it possible to calculate the margin of error in

16:22:28  3    Mr. Inglis's analysis?

16:22:29  4    A.  No.

16:22:31  5    Q.  And why not?

16:22:32  6    A.  That is so for the reason that I stated in a previous answer a

16:22:39  7    minute or two ago, and that is that the mathematical apparatus of

16:22:46  8    formulas, things you can look up in a treatise or a textbook for

16:22:51  9    calculating a margin of error rests quite fundamentally on the

16:22:56  10   assumption that the sample was drawn as a probabilistic random

16:23:01  11   sample in the first place.  There is no known method -- no one on

16:23:06  12   the planet knows a method for calculating a margin of error for a --

16:23:16  13   what we call a convenience sample, which is, essentially, what I

16:23:21  14   understand the *Germano* properties to be.

16:23:22  15   Q.  Now, while we're on the subject of the *Germano* properties, have

16:23:29  16   you calculated the likelihood that a random sample selection from

16:23:35  17   this class would have wound up with seven properties all located in

16:23:40  18   the State of Virginia?

16:23:42  19   A.  I have, yes.

16:23:43  20   Q.  And what's the likelihood of that?

16:23:45  21   A.  The chances of that are approximately -- so the question here,

16:23:53  22   as I understand it, is if you were to draw seven properties at

16:23:56  23   random from the entire class, what are the chances, given the

16:24:02  24   composition of the class, that they all would happen to be in

16:24:05  25   Virginia?  The answer is the chances are about one in 100 million.

16:24:13 1          MR. MEUNIER:  Your Honor, if I may just interpose an

16:24:16 2   objection.  Since the plaintiffs have never in this case suggested

16:24:19 3   that the seven *Germano* properties are randomly selected as a

16:24:23 4   statistical sample, this is a very interesting dissertation, but it

16:24:26 5   really is not germane at all to the plaintiffs' position in the

16:24:29 6   case.  So I want to just make an objection on the record to continue

16:24:33 7   to talk about things that are not even argued on the plaintiffs'

16:24:37 8   side.

16:24:38 9          THE COURT:  Okay.  I understand.  You may go on, but let's

16:24:41 10  see if you can shorten it.

16:24:41 11  BY MR. FENTON:

16:24:54 12  Q.  In some of the papers in this case, Dr. Marais, the plaintiffs

16:24:58 13  have suggested that you're saying that Mr. Inglis should have used

16:25:01 14  statistical sampling to do his analysis.  Is that a fair

16:25:06 15  characterization of your testimony?

16:25:07 16  A.  No, sir.

16:25:08 17  Q.  And how would you correct that characterization?

16:25:11 18  A.  I would correct it in the following way:  There is no question

16:25:15 19  that Mr. Inglis in this case is claiming to make an extrapolation

16:25:21 20  from the seven *Germano* properties to an amount of class damage for

16:25:27 21  the entire class.  So there is an extrapolation at the root of

16:25:34 22  Mr. Inglis's work in this case, and it is an extrapolation from the

16:25:38 23  *Germano* properties to the entire class.

16:25:40 24          So I am not -- I am not advancing the idea that there

16:25:44 25  should be an extrapolation.  Mr. Inglis is making an extrapolation.

16:25:50  1          My opinion in this case goes to the validity of the

16:25:54  2   extrapolation that Mr. Inglis is making, and I am pointing out that

16:26:00  3   lacking the credential of representativeness that probabilistic

16:26:06  4   random selection would have given the sample on which he relies,

16:26:10  5   there is no scientifically statistically valid principle for

16:26:17  6   supporting the extrapolation that he makes.

16:26:19  7   Q.  Now, you heard Mr. Inglis testify earlier today, and I know you

16:26:23  8   read his reports and he testifies about this $86 a square foot

16:26:28  9   number.

16:26:30  10          In statistical terms, is he drawing a correlation between

16:26:33  11  that number and square footage?

16:26:36  12  A.  I would put it this way, that he is assuming a correlation

16:26:44  13  between the total cost of remediation and the total square footage

16:26:49  14  of the property, so that's the correlation that I perceive in

16:26:53  15  Mr. Inglis's assumptions.

16:26:55  16  Q.  And is he assuming a perfect correlation between those two

16:27:00  17  factors?

16:27:01  18  A.  It may not be perfect, but he is assuming that there is a

16:27:04  19  strong and meaningful correlation, and, essentially, uniform

16:27:09  20  relationship.

16:27:09  21  Q.  Now, do you agree that there is that kind of strong correlation

16:27:14  22  based on what you've seen in this case?

16:27:16  23          MR. MEUNIER:  Objection, your Honor.  Your Daubert ruling

16:27:18  24  specifically prohibits this witness from addressing the accuracy of

16:27:22  25  the square footage cost data, and this is an indirect way to get him

16:27:26   1   to comment on correlation of data that he has no qualifications or

16:27:29   2   credentials on.

16:27:31   3              THE COURT:  With the Daubert I limited him to testifying

16:27:34   4   to statistics and mathematics.  The validity of the construction or

16:27:39   5   whether what's needed and how much the construction costs, I don't

16:27:44   6   think this witness is able to add anything to it.  He can talk about

16:27:49   7   statistics, he can talk about mathematics, he is imminently

16:27:53   8   qualified to do that.  But from the standpoint of what's needed,

16:27:57   9   whether it's representative, whether it's valid costs for what's

16:28:01  10   needed, I didn't see him having any experience in construction and

16:28:10  11   installing drywall.

16:28:12  12              Have you ever installed drywall before?

16:28:14  13              THE WITNESS:  No, sir.

16:28:20  14              THE COURT:  Let's stay away from that.

16:28:23  15              MR. FENTON:  May I lay a foundation, your Honor?

16:28:23  16   BY MR. FENTON:

16:28:25  17   Q.  Could you explain to the Court, is correlation something that

16:28:28  18   statisticians evaluate?

16:28:31  19   A.  It's one of the key terms of art in the field of statistics

16:28:35  20   since well over 100 years ago, yes.

16:28:37  21   Q.  And as a statistician, Dr. Marais, do you routinely work with

16:28:44  22   different kinds of populations in different industries to evaluate

16:28:47  23   whether there are correlations between one thing and another?

16:28:52  24   A.  That's a fair characterization of much of what I do, yes.

16:28:56  25   Q.  And have you done that in construction defect cases?

16:29:00 1    A.  I have.

16:29:00 2    Q.  And based on that, Dr. Marais, do you have an opinion as to

16:29:07 3    whether this correlation that Mr. Inglis is assuming is a valid

16:29:12 4    correlation?

16:29:13 5         MR. MEUNIER:  Your Honor, I object again.  The Daubert

16:29:15 6    ruling prohibits him from talking about the accuracy of square

16:29:20 7    footage data or cost data, and we are now into the validity of a

16:29:24 8    correlation in the cost data.  I don't think this witness is

16:29:26 9    permitted by your ruling to discuss it.

16:29:30 10        MR. FENTON:  Your Honor, with all due respect, I don't

16:29:32 11   believe your ruling meant that the witness had to testify in a

16:29:34 12   vacuum.

16:29:35 13        THE COURT:  No, I didn't.  But the problem I am having is

16:29:39 14   that I don't know how he can talk about correlation without knowing

16:29:44 15   how much it's going to cost and whether that cost is accurate or

16:29:49 16   inaccurate or valid or invalid.  I understand the seven.  It's easy

16:29:58 17   for me to follow that, the seven, but 2,715 is not enough,

16:30:03 18   particularly if they're all in Virginia, to make a sample from a

16:30:08 19   statistical standpoint.  But whether or not the amount that the

16:30:14 20   construction man is allowed.

16:30:17 21        MR. FENTON:  Your Honor, I don't intend to ask this

16:30:19 22   witness any opinions about what it will cost, either on any given

16:30:23 23   property or in the aggregate.  What I do want --

16:30:26 24        THE COURT:  Let's do it theoretically then.  Proceed.

16:30:31 25   I'll deal with it.

16:30:33  1    BY MR. FENTON:

16:30:33  2    Q.  And my question, Dr. Marais, is based on what you have seen in

16:30:41  3    this case, including the testimony you've heard in Court today, is

16:30:46  4    there the kind of correlation that Mr. Inglis assumes based on your

16:30:53  5    opinion as a professional statistician?

16:30:55  6    A.  Based on the statistical data that I have examined in this

16:31:02  7    case, I am aware of no basis for that implicit assumption that I

16:31:08  8    described earlier; and, indeed, I am aware of evidence that tends to

16:31:13  9    run counter to it.

16:31:15 10    Q.  And can you share with us some of the evidence that runs

16:31:18 11    counter?

16:31:19 12    A.  I was provided with a set of data which I understand describes

16:31:29 13    the Knauf settlement in this case, to which I applied as a test of

16:31:37 14    Mr. -- of the implicit correlation assumption in Mr. Inglis's

16:31:44 15    method.  I applied Mr. Inglis's method to the square footage data

16:31:49 16    included in that data set provided to me.  And I compared the

16:31:54 17    predictions from Mr. Inglis's method to the recorded remediation

16:32:03 18    costs data, again, in the data set.

16:32:07 19            So looking at it as a comparison of a prediction formula

16:32:11 20    or an extrapolation formula based on the seven *Germano* properties to

16:32:18 21    recorded remediation cost numbers in a body of data provided to me

16:32:22 22    for analysis, I have tested the correlation assumption by comparing

16:32:28 23    the results -- the predicted costs from the extrapolation formula to

16:32:37 24    the data -- the remediation cost data recorded in the Knauf data

16:32:43 25    set.

16:32:43 1   Q.  And we are going to drill down on that in a few minutes,

16:32:47 2   Dr. Marais, but in general, what conclusions did you draw from that

16:32:50 3   comparison?

16:32:54 4   A.  That the endless extrapolation formula, which assumes this

16:32:59 5   correlation, does not predict accurately the numbers in the Knauf

16:33:07 6   remediation cost data set.  It is neither consistently high nor

16:33:12 7   consistently low, but on many observations predicts high,

16:33:16 8   unambiguously high; on many other observations predicts

16:33:20 9   unambiguously low.

16:33:22 10  Q.  You know what, Dr. Marais?  I think we're going to skip ahead

16:33:26 11  to that Knauf data.  And I wonder if we can identify --

16:33:32 12  Plaintiff's 30 I believe has been admitted; is that correct?

16:33:47 13           This is Plaintiffs' Exhibit 30, Dr. Marais, and if we

16:33:55 14  could go to the second sheet, the zip.  Mr. Woody testified this

16:33:59 15  morning that this was a sheet that he had prepared with the Knauf

16:34:03 16  data.  Are you familiar with this document?

16:34:06 17  A.  I am.  This is the statistical data provided to me for review

16:34:13 18  and analysis.

16:34:14 19  Q.  And that's the data you just testified about?

16:34:16 20  A.  It is.

16:34:17 21  Q.  And have you performed some calculations based on this data?

16:34:21 22  A.  I did.

16:34:21 23  Q.  And I wonder if we can put up Defendant's Exhibit 21.  And let

16:34:40 24  me give you a copy for your own reference, if I might, Dr. Marais.

16:34:45 25  The print is a little small, so it might be better off looking at

16:34:50  1   the screen.

16:34:51  2   A.  Thank you.

16:34:52  3   Q.  If you could, Dr. Marais, share with us what this document

16:35:05  4   represents.

16:35:06  5   A.  This document represents my comparison of the results of

16:35:18  6   applying the Inglis formula, the Inglis extrapolation formula to the

16:35:28  7   remediation cost numbers recorded in the spreadsheet that you had up

16:35:34  8   on the screen a minute ago.

16:35:36  9        It's important that I add that I have made two adjustments

16:35:43 10   to the Inglis method as Mr. Inglis actually applied it in this case,

16:35:50 11   and I've made both of those changes for cause to promote a better

16:35:56 12   comparability -- closer comparability of the Inglis formula numbers

16:36:03 13   to the numbers -- the cost numbers as recorded in the spreadsheet.

16:36:07 14   Q.  And what are those adjustments that you made?

16:36:10 15   A.  One of the two is that the -- Mr. Inglis's formula includes a

16:36:20 16   six percent allowance for clearance testing or inspection, for some

16:36:26 17   kind of inspection to be performed.  I believe Mr. Inglis testified

16:36:30 18   about that in this courtroom earlier today.

16:36:34 19        It is my understanding that no such cost element was

16:36:40 20   included in the cost numbers reported in the spreadsheet of

16:36:45 21   statistical data provided to me.  And for that reason, I removed the

16:36:50 22   six percent allowance from the Inglis extrapolation formula.

16:36:55 23        Secondly, Mr. Inglis's extrapolation formula is stated in

16:37:01 24   terms of dollars of 2015.  In other words, it incorporates a full

16:37:08 25   five years of inflation adjustment, of inflation escalation between

16:37:15  1    the *Germano* property numbers dated approximately 2010 and the

16:37:20  2    present day.

16:37:21  3            Now, I do not know the exact timing of the entries in the

16:37:29  4    Knauf spreadsheet.  There is no column that indicates that timing.

16:37:32  5    But it is my understanding that the remediation project reflected in

16:37:39  6    that spreadsheet took place very largely, if not entirely, during

16:37:45  7    the period between 2010 and the present day.

16:37:50  8            For that reason, I used, in addition to the Inglis method

16:37:55  9    for calendar year 2015, I also modified for one column in this chart

16:38:01 10    the Inglis method to remove Mr. Inglis's inflation escalation since

16:38:08 11    2010.  So the right-hand two columns are headed in part Inglis

16:38:14 12    method low and Inglis method high.  And the low and the high there

16:38:20 13    refer in a shorthand manner to the cost levels of 2010 or

16:38:28 14    alternatively the cost levels of 2015.  But in both cases, the six

16:38:33 15    percent allowance for testing is -- I have excluded from the

16:38:37 16    extrapolation formula.

16:38:39 17    Q.  And if I understand what you were saying, Dr. Marais, by

16:38:44 18    providing the Inglis method low estimate, which is not adjusted for

16:38:50 19    inflation, 2009 dollars, and the Inglis method high calculation,

16:38:58 20    which is adjusted to 2015 dollars, you actually created a range of

16:39:05 21    Mr. Inglis's values?

16:39:07 22    A.  Correct.

16:39:08 23    Q.  And if we could just go -- flip to the next page.

16:39:18 24            THE COURT:  So do I understand you that you feel that the

16:39:21 25    damages is between 300 million and 500 million?

16:39:25   1          THE WITNESS:  No, sir.  I could explain that if you want,

16:39:31   2   your Honor.

16:39:32   3          THE COURT:  I just understood -- what's the point of it?

16:39:37   4          THE WITNESS:  This projection is entirely for the

16:39:42   5   properties built on the properties in the Knauf remediation program.

16:39:46   6   So it's not about the properties that I understand to be at issue in

16:39:49   7   the present proceeding.  So this is a test of the Inglis method by

16:39:54   8   applying it to the Knauf remediation data.

16:39:57   9          THE COURT:  I see.

16:39:59  10   BY MR. FENTON:

16:39:59  11   Q.  We haven't asked you to do a calculation of damages here, have

16:40:03  12   we, Dr. Marais?

16:40:04  13   A.  That's correct.

16:40:04  14   Q.  There is some gray bars there and there's some blue bars up at

16:40:09  15   the top.  And if you could just tell us what the gray bars are and

16:40:13  16   what the blue bars are.

16:40:14  17   A.  If we can see them blown up.  The gray bars, the heading shaded

16:40:23  18   in gray simply signal that those are a portion of the original -- of

16:40:28  19   the data as provided to me.  In other words, those are the work

16:40:32  20   product of BrownGreer and Mr. Woody.  Those are not my work product.

16:40:37  21   Q.  Right.  Those came from that Exhibit 30 we looked at just a

16:40:40  22   couple of minutes ago, correct?

16:40:42  23   A.  Yes.

16:40:42  24   Q.  And then the blue bars?

16:40:43  25   A.  Those are calculations that I have based on the data in the

16:40:50 1   gray bars.

16:40:52 2   Q.  And so these are the calculations that you have provided.  How

16:40:58 3   did you arrive at the average square footage for a particular zip

16:41:03 4   code?

16:41:03 5   A.  The gray bars, if we could go back to the gray headings for a

16:41:08 6   moment.  The gray bars do not report the average square footage for

16:41:19 7   the properties on each row, but they do report the average

16:41:23 8   remediation cost and the average per square foot remediation cost,

16:41:29 9   and a simple calculation based on those two elements allows me to

16:41:33 10  back out what must have been the average square footage.

16:41:39 11          On some rows in the spreadsheet there is only one

16:41:42 12  property on that row anyway, so the average square footage simply

16:41:46 13  mean the square footage of that property.  But most of the rows in

16:41:50 14  this spreadsheet, given the way it was constructed by zip code, most

16:41:53 15  of the rows actually contain multiple properties, so the concept of

16:41:57 16  an average square footage becomes important.

16:41:59 17  Q.  Let's just take a look at the rows, if we can.  Can you pull

16:42:06 18  out a few of those all the way across?  So the rows -- so in the

16:42:15 19  second column it says, "Zip code," so that represents the zip code

16:42:21 20  the various properties come from?

16:42:22 21  A.  That's correct.

16:42:23 22  Q.  And then BrownGreer reported the remediation costs of the

16:42:27 23  properties within that zip code?

16:42:29 24  A.  Yes.

16:42:31 25  Q.  And the high, the low, and the average for all of the

16:42:38  1   properties in the zip code?

16:42:40  2   A.   Correct.

16:42:40  3   Q.   So, for example, in zip codes where there was only one

16:42:44  4   property, the high, the low, and the average would all be the same?

16:42:47  5   A.   Exactly.

16:42:48  6   Q.   Dr. Marais, based on -- and in your blue numbers did you

16:42:57  7   actually calculate the number that Mr. Inglis's method would have

16:43:03  8   arrived at as an estimate?

16:43:05  9   A.   Yes.

16:43:05  10  Q.   And did you compare that to the actual cost of remediation as

16:43:10  11  reported by BrownGreer?

16:43:12  12  A.   I did.

16:43:13  13  Q.   And if we could go back to the first page of this exhibit.  Did

16:43:25  14  you draw any conclusions, Dr. Marais, as to the reliability of

16:43:31  15  Mr. Inglis's method as a predictor with respect to the actual costs

16:43:37  16  of remediation for the Knauf program, either in the aggregate or in

16:43:45  17  an individual zip code-by-zip code area?

16:43:47  18  A.   I drew my conclusions.  They certainly apply to many of the

16:43:54  19  individual rows, but -- and what I have displayed in this summary

16:44:00  20  table includes both summaries for certain selected zip codes and

16:44:04  21  also for the entire body of data.

16:44:06  22  Q.   And with respect to the entire body of data, what were your

16:44:12  23  conclusions about the predicted value of Mr. Inglis's method?

16:44:16  24  A.   Mr. Inglis -- for me to answer that without creating confusion,

16:44:25  25  I need to explain the distinctions that I've drawn in the summary

16:44:30  1    table.

16:44:31  2    Q.  Feel free.

16:44:32  3    A.  I have a range of values for the Inglis method as I have

16:44:37  4    already explained.  That range is from what I called the Inglis

16:44:40  5    method low to the Inglis method high.  And in the case of -- if I

16:44:49  6    have a single -- an individual property in a single zip code, so

16:44:57  7    thinking back to the structure of the data in the previous slide,

16:45:01  8    each row of the original data is a zip code and that row may contain

16:45:06  9    one or multiple properties.

16:45:09 10         If I have just one property on that row, then there is no

16:45:13 11    question about what is the average costs per square foot of

16:45:18 12    remediation in that property.  And I can, then, determine whether

16:45:22 13    the Inglis range falls entirely above that value, or brackets that

16:45:28 14    value, or falls entirely below it.  And that accounts for the three

16:45:33 15    rows of information that I show here.

16:45:36 16         Things get a little more complicated for zip codes with

16:45:40 17    multiple properties, but there again, I can ask, "Does the Inglis

16:45:45 18    interval fall entirely above the range of high to low, or does it

16:45:50 19    overlap that range, or does it fall entirely below that range?"  So

16:45:55 20    the first and the third of those options are unambiguous, entirely

16:46:01 21    above or entirely below.  Again, those are the three alternatives

16:46:04 22    that I report here.

16:46:05 23         This chart shows that in -- out of the 395 zip codes in

16:46:14 24    the BrownGreer data, in 316 of 395 cases the Inglis method range

16:46:25 25    from low to high falls entirely above the range, all of the specific

16:46:34  1    point value that I get as recorded in the Knauf remediation data

16:46:38  2    spreadsheet.  It is important, again, to understand to avoid

16:46:45  3    confusion, that the chart that is displayed right now dates from

16:46:49  4    before Mr. Inglis's change to his method that was provided to me

16:46:55  5    last night.

16:46:56  6    Q.  So this is not -- this is not updated for the data that we

16:47:00  7    received yesterday evening?

16:47:02  8    A.  That's correct.

16:47:03  9    Q.  But based on the data we had up until, at least, 5:45

16:47:11 10    yesterday, if I understand what you're saying, for the 316 out of

16:47:18 11    395 zip codes that Mr. Inglis's analysis overstated --

16:47:26 12    A.  Yes.

16:47:27 13    Q.  -- the cost of remediation as compared with the actual cost of

16:47:32 14    the Knauf data?

16:47:33 15    A.  Yes.

16:47:33 16    Q.  And then can you explain what the second row is?

16:47:37 17    A.  The second row is the indeterminate cases where Mr. Inglis's --

16:47:42 18    the range from -- of Inglis values from Inglis low to Inglis high,

16:47:48 19    as I have explained those concepts, overlaps the remediation cost as

16:47:55 20    recorded in the Knauf spreadsheet.

16:47:58 21    Q.  And then, how many properties were in that?

16:48:01 22    A.  There were 72 of those, as I've called them, indeterminate

16:48:05 23    cases where there is a correspondence -- a degree of correspondence

16:48:10 24    between Inglis method and reality as recorded.

16:48:14 25    Q.  And then the third line.

16:48:18  1    A.   There was seven zip codes where the Inglis range fell entirely

16:48:25  2    below the data recorded in the Knauf spreadsheet.

16:48:31  3    Q.   And I wonder if we could look at this in, perhaps, a little

16:48:36  4    different way, Dr. Marais.  Can we get Exhibit 115 up?  Do you

16:48:45  5    recognize this demonstrative, Dr. Marais?

16:48:48  6    A.   I do.

16:48:49  7    Q.   Now, the first question I have is:  Has this demonstrative been

16:48:55  8    updated with the data that you received yesterday?

16:48:57  9    A.   Yes.

16:48:57 10    Q.   So these are the numbers that the PSC is currently using?

16:49:02 11    A.   As I understand it, yes.

16:49:05 12    Q.   And can you tell us what the dots -- the data points are on

16:49:12 13    this demonstrative?

16:49:13 14    A.   Those simply show the average per square foot cost of

16:49:19 15    remediation by individual zip code as reported in the Knauf

16:49:27 16    remediation data provided to me for my review and analysis.

16:49:34 17    Q.   So each of those data points is one of the Knauf zip codes that

16:49:38 18    was recorded?

16:49:38 19    A.   It's a single Knauf zip code and its height above the

16:49:43 20    horizontal axis.  If you read off the height on the vertical axis at

16:49:49 21    the left-hand edge of that chart, that tells you the number in that

16:49:52 22    zip code for the per square foot cost of -- the average per square

16:49:57 23    foot cost of remediation.

16:49:58 24    Q.   And then there's two horizontal bars; one in gold and one in

16:50:03 25    red.  Can you tell us what those are?

16:50:05   1   A.  Those are the average values of the Inglis high method applied

16:50:15   2   to these zip codes, including the location factors for the zip codes

16:50:22   3   as Mr. Inglis testified about earlier today.  And the gold line is

16:50:27   4   the Inglis low line.

16:50:29   5   Q.  And again, those have been adjusted for the data we received

16:50:33   6   last night?

16:50:35   7   A.  Yes.

16:50:35   8   Q.  Mr. Inglis talked about an $86 per square foot number.  The

16:50:40   9   Inglis low is 74 and the high is 83.  Can you explain why that is?

16:50:44  10   A.  Yes.  Mr. Inglis's method proceeds from $86, which is itself

16:50:52  11   based on the seven *Germano* properties.  So this is where the

16:50:56  12   extrapolation is occurring.  We begin with seven *Germano* properties.

16:51:01  13   As Mr. Inglis testified here today, he draws from that an average

16:51:05  14   value of $86 per square foot for 2010.

16:51:10  15           The next step of his process is, then, to adjust that

16:51:16  16   number upward because the cost levels in the Norfolk, Virginia area

16:51:22  17   are lower than the national average according to RSMeans --

16:51:27  18   according to the statistical tables in the RSMeans publication.

16:51:31  19   That adjustment takes the form of dividing 86 by the number .96

16:51:37  20   which gets you up to a national average for 2010 of approximately

16:51:43  21   $90.  So that's for 2010.

16:51:47  22           Mr. Inglis also applies an inflation escalation to that

16:51:53  23   $90 number for 2010 in order to bring that -- to restate that number

16:51:59  24   in the cost levels of 2015.  So after that inflation escalation, the

16:52:07  25   national average is about 100 by Mr. Inglis's method.

16:52:12  1          So, now, we have two numbers, and I recall Mr. Inglis

16:52:17  2    spoke of $105.91.  The difference between the $100 number that I've

16:52:24  3    just spoken and the $105.91 that Mr. Inglis spoke is essentially the

16:52:30  4    six percent clearance adjustment, which I have excluded.

16:52:33  5          So we begin with 90 and $100.  Those are the national

16:52:40  6    averages, and then, within each zip code, the Inglis method applies

16:52:44  7    the so-called location factor from the RSMeans statistical

16:52:49  8    tabulations for that zip code.  Those, as Mr. Inglis testified

16:52:54  9    earlier today, those average $84 or .84 as a location factor, or

16:53:03 10    84 percent I think he said.  So this was essentially his testimony

16:53:07 11    earlier today, and I agree with that average.

16:53:09 12          So if you multiply $84, which is the average value of the

16:53:14 13    location factors, by a starting point of $100, 84 percent that is by

16:53:20 14    a starting value of $100, that gets you approximately $84.  I've

16:53:26 15    just given you a hand waving version of the Inglis calculation and

16:53:31 16    the calculation applied here.  But that accounts for the value of

16:53:35 17    $83.33.

16:53:37 18    Q.  So that's the -- what happens, the Inglis high and Inglis low

16:53:42 19    number, when you see how the location factor is applied over the

16:53:46 20    population?

16:53:47 21    A.  Yes.

16:53:48 22    Q.  And, Dr. Marais, if Mr. Inglis's calculation was an accurate

16:53:58 23    predictor of actual remediation costs, where would you expect those

16:54:04 24    data points to fall?

16:54:05 25    A.  I would expect the data points to span the two horizontal lines

16:54:12  1   to be spread around them.  The data points, as I've already

16:54:16  2   explained, have various timings associated with them that are not

16:54:20  3   recorded in the data, and so I would expect the bulk of these data

16:54:24  4   points to bracket the two horizontal lines shown in this chart.

16:54:29  5   Q.  And is that to say that most of the lines would fall between

16:54:33  6   the gold bar and the red bar?

16:54:35  7   A.  They would fall -- certainly, the center of the cloud of dots

16:54:41  8   would fall between the red and gold bar, and it would be unclear --

16:54:47  9   because of the things that are left out of the Inglis method, not

16:54:50  10  accounted for, it would not be clear how much of a spread to expect

16:54:57  11  around the red and gold bars because of the other factors that are

16:55:00  12  not included in the Inglis extrapolation method.

16:55:05  13  Q.  And looking at this graph, most of the data points, I think, to

16:55:09  14  any observer seem to fall below, and in most cases, well below that

16:55:14  15  gold bar.  What does that tell you?

16:55:17  16  A.  That very -- that indicates that the gold bar is itself an

16:55:22  17  overestimate of the average cost of remediation, as reflected in the

16:55:34  18  red data points in this chart.

16:55:35  19  Q.  So if I understand what you're saying, you're saying that

16:55:40  20  Mr. Inglis's 2009 values, even if you don't adjust for inflation,

16:55:48  21  would overstate the cost of remediation when measured against the

16:55:52  22  Knauf data?

16:55:53  23  A.  Yes.  Which is entirely consistent with the summary, the three

16:55:58  24  line summary chart that I testified to a minute ago; or even a

16:56:03  25  version of that summary chart updated to include the latest change

16:56:06   1   in Mr. Inglis's method.

16:56:08   2            THE COURT:  Let's see if you can get to an end.

16:56:11   3            MR. FENTON:  I'll try, Judge.  A couple more.

16:56:15   4   BY MR. FENTON:

16:56:15   5   Q.  Now, Professor Marais, you heard Mr. Inglis testify today about

16:56:20   6   how he believed that he tested his method based on other estimates

16:56:27   7   that he had done.  Do you have any conclusions about that?

16:56:30   8   A.  Yes.

16:56:30   9            MR. MEUNIER:  Your Honor, this is clearly beyond his

16:56:33  10   expertise.

16:56:33  11            THE COURT:  Sustain the objection.  I think we've heard

16:56:37  12   enough from the standpoint of the statistics and the mathematics.  I

16:56:42  13   understand his position.

16:56:43  14            MR. FENTON:  Well, I am at a good stopping point, Judge,

16:56:46  15   because I am just about finished.

16:56:47  16            So, Dr. Marais, thank you very much.  And I would at this

16:56:50  17   point, your Honor, move in the exhibits which are 21 and 26.

16:56:57  18            THE COURT:  How about the demonstratives, too, are you

16:57:00  19   going to put those in?

16:57:00  20            MR. FENTON:  And the demonstratives as well.  That was

16:57:04  21   115.

16:57:06  22            THE COURT:  I think you had two of them, two or three.

16:57:11  23            MR. FENTON:  200.

16:57:13  24            THE COURT:  Okay.  Let that be admitted.

16:57:15  25            MR. MEUNIER:  No objection.

16:57:18  1           MR. SEEGER:  While we're doing some housekeeping, can we

16:57:21  2   just move in a couple?  You guys don't object to this.  We are going

16:57:26  3   to move in Exhibits 1, 46 and 52, no objections.

16:57:30  4           THE COURT:  Okay.  Do you have that, Dean?

16:57:32  5           MR. SEEGER:  Thank you, Judge.  Thank you.

16:57:51  6                    CROSS-EXAMINATION

16:57:52  7   BY MR. MEUNIER:

16:57:53  8   Q.  Dr. Marais, you would describe yourself as a professional

16:57:56  9   consultant in the areas of applied statistics and math, correct?

16:58:00 10   A.  Yes.

16:58:01 11   Q.  In fact, you would describe yourself as a principle consultant

16:58:05 12   for William Wecker and Associates?

16:58:07 13   A.  That is my -- one of my job titles, yes.

16:58:10 14   Q.  And you spend about two-thirds of your total professional time

16:58:14 15   working as a retained consultant or expert witness in legal cases,

16:58:18 16   correct?

16:58:18 17   A.  That's a fair ball-park estimate, I think.

16:58:23 18   Q.  In fact, you've been a hired expert in the total of between 100

16:58:28 19   and 150 legal cases spanning about 25 years, true?

16:58:32 20   A.  That, again, seems to me to be a fair ball-park estimate.

16:58:37 21   Q.  And isn't it true, Dr. Marais, that not a single time, not once

16:58:45 22   in all of those years and in all of those cases have you ever been

16:58:54 23   retained on behalf of individuals seeking to recover damages against

16:58:58 24   a corporation?  In fact, you've never even been asked; isn't that

16:59:01 25   true?

16:59:01  1   A.  I've never been asked and, therefore, have never done it, yes,

16:59:05  2   sir.

16:59:05  3   Q.  I want to refer you to a list of the cases that you've provided

16:59:13  4   with your expert report.  I think it's Exhibit 66.  Do you recognize

16:59:30  5   this list of cases that you've testified in in the last four

16:59:35  6   years --

16:59:35  7   A.  I do.

16:59:37  8   Q.  -- that you provided with your expert report?

16:59:39  9   A.  I do.  It looks familiar.

16:59:41  10  Q.  And, in fact, you really only went up to January of 2015,

16:59:45  11  correct?

16:59:45  12  A.  This list only goes up to January 2015, yes.

16:59:49  13  Q.  And do you remember we agreed that in every single one of these

16:59:54  14  cases, with the exception of five, which I'll mention, you were the

16:59:59  15  expert for the named defendant entity, true?

17:00:03  16  A.  I have no reason to disagree with that.  As I testified at the

17:00:11  17  time, that's just not a count that I carry around in my head, and I,

17:00:16  18  frankly, don't recall exactly where we ended up in trying to make

17:00:20  19  such a count at my deposition.

17:00:22  20  Q.  Well, let's just enumerate the ones on this list that you were

17:00:26  21  not testifying for the defendant so it's clear.  In the third case

17:00:31  22  which is *In Re:  Budeprion*.  It's a marketing MDL case.  Do you see

17:00:39  23  that?  Can you blow that up?  *In re:  Budeprion*.  Do you see that

17:00:48  24  third case?

17:00:49  25  A.  I see it.

17:00:50  1    Q.  In that one you were the expert for a generic drug

17:00:55  2    manufacturer, correct?

17:00:55  3    A.  Yes.

17:00:56  4    Q.  And in Item 5, which is *AIG v. Altus Finance* you were the

17:01:02  5    expert for AIG, correct?

17:01:07  6    A.  I believe that's true.  As I testified at the time, I often

17:01:11  7    don't recall, and in this case, I am not certain, but to the best of

17:01:18  8    my recollection.

17:01:18  9    Q.  That's what you told me in your deposition, correct.  And on

17:01:22 10    Case 10 which is *Wells Fargo v. American General Life*, you were the

17:01:28 11    expert for Wells Fargo, correct?

17:01:30 12    A.  That's as I recall it, yes.

17:01:32 13    Q.  And Item 12, which is *State of Indiana v. IBM*, and also *IBM v.*

17:01:38 14    *State of Indiana*.  Hard to say plaintiff or defendant, but no doubt

17:01:42 15    that you were the IBM expert?

17:01:43 16    A.  I was retained by IBM in that case, yes.

17:01:46 17    Q.  And then finally, in Case 20, which is *Cincinnatus Partners v.*

17:01:50 18    *Farm Bureau*, you were the hired expert for Cincinnatus Partners?

17:01:54 19    A.  They retained me, yes.

17:01:56 20    Q.  And all of the other cases on this list you were the testifying

17:01:59 21    expert for the named defendant, correct?

17:02:04 22    A.  If that's where we ended up at deposition, I have no reason to

17:02:09 23    contest it today, but I would have to go through the list again

17:02:12 24    today to confirm it.

17:02:13 25    Q.  The website of William Wecker chooses to list and identify some

17:02:18  1   of the law firms which have hired the company over the years,

17:02:21  2   correct?

17:02:22  3   A.  It does.

17:02:23  4   Q.  And do you recognize this as the list of firms?  Can we blow

17:02:27  5   that up, please, a little bit.  Do you recognize this as a list of

17:02:33  6   the firms that the company puts on its website as having hired it

17:02:38  7   over the years?

17:02:39  8   A.  It looks familiar to me.  Obviously, I don't have a

17:02:42  9   line-by-line recall of it, but I have no reason to doubt that that

17:02:46 10   is what this is.

17:02:46 11   Q.  You would not be surprised if these are firms known to

17:02:49 12   represent the interests of large corporations in litigation, would

17:02:53 13   you?

17:02:53 14   A.  I would not be surprised to learn that they represented the --

17:02:59 15   sometimes the opposing parties to large corporations.  That simply,

17:03:05 16   sir, has nothing to do with my work and it's not something that I

17:03:11 17   track or review or keep track of.

17:03:14 18              MR. MEUNIER:  Your Honor, we would like to offer into

17:03:16 19   evidence as Exhibit 66 the list of cases with Dr. Marais'

17:03:22 20   supplemental declaration where he's previously testified, and as

17:03:26 21   Exhibit 63 the list of law firms posted on his firm's website.

17:03:30 22              MR. FENTON:  No objection, your Honor.

17:03:31 23              THE COURT:  Let it be admitted.

17:03:32 24   BY MR. MEUNIER:

17:03:33 25   Q.  Your company, William Wecker Associates, also chooses to

17:03:37  1  advertise on its website a number of clients for which it has

17:03:41  2  offered consulting and expert witness services, correct?

17:03:44  3  A.  Yes.

17:03:45  4  Q.  And can we look at that list, please.  Do you recognize this as

17:03:51  5  a list of clients posted on your website?

17:03:53  6  A.  Certainly has that appearance.  I have no reason to doubt that

17:03:57  7  that is what it is.

17:03:57  8  Q.  And it includes entities such as BP Oil, correct?

17:04:03  9  A.  Yes.

17:04:04  10  Q.  DuPont?

17:04:05  11  A.  Yes.

17:04:05  12  Q.  ExxonMobil?

17:04:07  13  A.  Yes.

17:04:08  14  Q.  Dow Chemical?

17:04:09  15  A.  Yes.

17:04:10  16  Q.  JP Morgan Chase?

17:04:12  17  A.  Yes.

17:04:12  18  Q.  And several tobacco companies, true?

17:04:16  19  A.  I see one, and it would not surprise me if there were others.

17:04:23  20  Q.  There are three.  Altria?

17:04:25  21  A.  That's the one I recognized.

17:04:26  22  Q.  How about Philip Morris?

17:04:30  23  A.  Philip Morris has retained my company.  I don't see it on here,

17:04:36  24  but --

17:04:37  25  Q.  I am pointing to it with the laser.

17:04:40  1   A.  I don't recognize that as the Philip Morris logo, but I have no

17:04:44  2   reason to question that it is.

17:04:46  3   Q.  It actually says, "Philip Morris."  And then also RJ Reynolds?

17:04:50  4   A.  Again, I don't see it --

17:04:52  5   Q.  Here it is, right (INDICATING).

17:04:55  6   A.  -- but RJ Reynolds has, indeed, retained Wecker Associates.

17:05:01  7           MR. MEUNIER:  Judge, I'll offer the client posting on the

17:05:03  8   website as Exhibit 62.

17:05:05  9           MR. FENTON:  No objection.

17:05:07  10          THE COURT:  Let it be admitted.

17:05:08  11  BY MR. MEUNIER:

17:05:08  12  Q.  The fact is William Wecker Associates has a long history

17:05:12  13  serving the interest of the tobacco industry in litigation, doesn't

17:05:16  14  it?

17:05:16  15  A.  If you mean by that, sir, that William Wecker has been retained

17:05:21  16  on multiple occasions to provide statistical analysis and related

17:05:27  17  testimony by clients in the tobacco industry, yes.

17:05:31  18  Q.  Statistical analysis in cases where plaintiffs were

17:05:34  19  demonstrating a link between diseases such as cancer and smoking?

17:05:37  20  A.  That was certainly an element of those cases, yes.

17:05:40  21  Q.  And your firm and you have appeared on the side of tobacco in

17:05:45  22  those cases?

17:05:46  23  A.  I have appeared on that side, not always on that issue, but I

17:05:52  24  have been retained by tobacco firms in the past.

17:05:55  25  Q.  Your company founder, William Wecker, has served as an expert

17:05:59  1   in legal cases on behalf of the tobacco industry, hasn't he?

17:06:05  2   A.  Yes.

17:06:06  3   Q.  You told me in your deposition that you could recall three

17:06:08  4   occasions on which you personally served as an expert in litigation

17:06:12  5   on behalf of the tobacco industry.  Do you recall that?

17:06:15  6   A.  Generally, not specifically.  I wouldn't know the number if I

17:06:18  7   sit here -- if you asked me today without trying to think of the

17:06:22  8   occasions.

17:06:23  9   Q.  Well, no, sir, I am referring to what you said under oath when

17:06:26 10   I took your deposition.

17:06:27 11   A.  I don't recall what I said.

17:06:29 12         MR. MEUNIER:  May I approach the witness?

17:06:29 13   BY MR. MEUNIER:

17:06:36 14   Q.  I am handing you a transcript of the deposition that you gave

17:06:40 15   in this case on May 21st of 2015.

17:06:48 16         MR. FENTON:  Pardon me, your Honor.  Can we get the page

17:06:51 17   number?

17:06:51 18   BY MR. MEUNIER:

17:06:52 19   Q.  And I am referring you now to page 46.

17:07:02 20   A.  I am there.

17:07:11 21   Q.  It's actually -- can I see the ELMO, please.  I want to refer

17:07:20 22   you, actually, to page 46, line 24; and page 47 where your answer

17:07:29 23   continues to line 3.

17:07:31 24         "QUESTION:  Let me make sure I understand your answer.  So

17:07:33 25   your testimony today is that, to the best of your estimation today,

17:07:37  1    you've testified a total of three times on behalf of tobacco

17:07:42  2    companies in legal cases?"

17:07:44  3           There was an objection and then your answer, "On the

17:07:47  4    understanding the testimony includes deposition testimony, yes, I

17:07:51  5    can remember three occasions."

17:07:54  6           Is that your testimony under oath on May 21st, 2005?

17:08:01  7    A.  It does appear to be.

17:08:04  8    Q.  You had a chance to do an errata sheet and correct your

17:08:09  9    testimony just recently and you didn't correct that, did you?

17:08:11 10    A.  Correct.

17:08:12 11    Q.  The truth is that you, Laurentius Marais, have been named as an

17:08:17 12    expert witness by tobacco companies in approximately ten to

17:08:23 13    15 cases, different cases, and have been a consultant for the

17:08:27 14    tobacco industry in approximately five other cases; isn't that true?

17:08:36 15    A.  I don't have a tally of those occasions which necessarily would

17:08:41 16    include non-testimony occasions; so, in other words, not what you're

17:08:45 17    asking me about here and what I was answering about here.  I have no

17:08:49 18    reason, as I sit here today, to change the answer I gave you at

17:08:53 19    deposition, and I have -- I have no reason to query or to challenge

17:09:01 20    the numbers you've just stated.  But I simply don't carry -- they

17:09:07 21    could be right for occasions on which I have not testified.

17:09:10 22    Q.  So do you admit, Dr. Marais, that you have been involved as

17:09:15 23    either a named expert or consulting expert on behalf of tobacco

17:09:20 24    companies in a total of approximately 15 to 20 cases?  Do you admit

17:09:25 25    that?

17:09:25   1   A.  Twenty sounds high.  So I can't -- I simply cannot admit that.

17:09:32   2   And truthfully.  But some number between ten and 20 and perhaps 15

17:09:39   3   is certainly possible.

17:09:40   4   Q.  Well, sir, I need to make sure I understand your answer before

17:09:44   5   I refer you to the next exhibit.  Do you admit or not that to the

17:09:50   6   best of your recollection you have been named as an expert or

17:09:54   7   consulted with tobacco companies in a total of 15 to 20 cases?

17:10:01   8           MR. FENTON:  Objection, your Honor.  It's been asked and

17:10:03   9   answered.

17:10:03  10           MR. MEUNIER:  I don't think I got a straight answer the

17:10:05  11   last time.

17:10:06  12           THE COURT:  Also, let's try to get through this.  I don't

17:10:11  13   know the relevance of tobacco or not, but I got it.

17:10:14  14           THE WITNESS:  I'm sorry.  Would you restate the question

17:10:17  15   and then I will try and answer it?

17:10:20  16   BY MR. MEUNIER:

17:10:21  17   Q.  Do you admit that you have been named as an expert or hired as

17:10:27  18   a consultant by tobacco companies in a total of approximately 15 to

17:10:33  19   20 cases?

17:10:33  20   A.  I admit that quite readily that I have been retained by tobacco

17:10:42  21   companies on a number of occasions outside of the three occasions

17:10:47  22   involving testimony about which I -- you asked me and I answered at

17:10:52  23   my deposition.  I don't know the number.  It would not surprise me

17:10:55  24   if I went back and somehow unearthed that history.  It would not

17:11:01  25   surprise me if it were as many as 15 in total, including the three

17:11:07 1   occasions on which I gave testimony.  Twenty sounds too high, so I

17:11:14 2   can't admit to that number without --

17:11:18 3           MR. MEUNIER:  Your Honor --

17:11:19 4           THE COURT:  That's his answer 15.

17:11:21 5           MR. MEUNIER:  I know there is 15 and 20 may not be

17:11:24 6   important, but I would like to refer him to some testimony, if I

17:11:27 7   could, your Honor.  I understand you want to move it along.

17:11:27 8   BY MR. MEUNIER:

17:11:30 9   Q.  Do you remember testifying in the case of *Bullock v. Philip*

17:11:34 10  *Morris*?

17:11:36 11  A.  I remember such a case ten or 15 years ago, yes.

17:11:40 12  Q.  So ten or 15 years ago?

17:11:42 13  A.  Seems to me it's in that time frame.

17:11:46 14  Q.  And do you remember being asked in that case -- here is the

17:11:58 15  heading of it -- here is the caption, *Bullock v. Philip Morris* in

17:12:03 16  state court in Los Angeles.  Do you remember being asked in that

17:12:05 17  case, Dr. Marais, how many cases you had been named as an expert

17:12:10 18  witness, and do you remember testifying that you had been named in

17:12:17 19  ten to 15 cases, named as an expert?

17:12:21 20  A.  No, sir.  The cover page you're showing me dates this case in

17:12:24 21  May of 2002.  I have no recollection as I sit here today of -- no

17:12:29 22  specific recollection of any of the questions asked me on that day

17:12:33 23  13 years ago and what answer I may have given 13 years ago.

17:12:37 24          THE COURT:  Wait one moment.

17:12:38 25          MR. FENTON:  Your Honor, I have three objections.  One,

17:12:40  1  it's getting a little excessive; No. 2, it's irrelevant; and three,

17:12:44  2  it's collateral.

17:12:45  3          THE COURT:  Let's see if we can truncate this.  I know you

17:12:49  4  have a right to impeach a witness, but we're getting very far afield

17:12:53  5  at this point.

17:12:54  6          MR. MEUNIER:  With a different answer I could have, your

17:12:57  7  Honor.

17:12:57  8  BY MR. MEUNIER:

17:12:58  9  Q.  But I want you to look at your testimony in the *Bullock* case

17:13:01 10  here, Dr. Marais, and I'll refer you specifically to the question

17:13:08 11  that begins at line 8 on page 10.  "How many cases," do you see

17:13:14 12  that?

17:13:16 13  A.  Line?

17:13:17 14  Q.  Line 8, page 10 -- line 8, page 11, I'm sorry.  "How many cases

17:13:33 15  total do you think that you've been involved in for tobacco" --

17:13:38 16  A.  Excuse me, sir, but I think you were referring me to line 8?

17:13:43 17  Q.  If you follow on the screen, do you see this question

17:13:46 18  (INDICATING)?

17:13:48 19          THE COURT:  Line 16, is that right?

17:13:53 20          MR. MEUNIER:  Line 8, "How many cases."  Are you with me.

17:13:56 21          THE WITNESS:  I see the spot you're pointing to on the

17:13:59 22  screen.

17:13:59 23  BY MR. MEUNIER:

17:14:00 24  Q.  "How many cases, total, do you think that you've been involved

17:14:03 25  in for tobacco?"

17:14:05  1          "ANSWER:  I've been named, I would think -- and again, I

17:14:09  2   don't have -- I don't carry a catalog in my mind, but I think the

17:14:12  3   range of ten to 15 cases would be a reasonable estimate.

17:14:16  4          "QUESTION:  Where you've been named as an expert?"

17:14:19  5          "Yes."

17:14:19  6          And then it continues on the next page.

17:14:20  7          "How many cases are there where you were hired as a

17:14:22  8   consultant but not named?"

17:14:23  9          "Another handful.  Perhaps five."

17:14:26 10          "QUESTION:  So we're talking a total, thus far, of 15 to

17:14:31 11   20 cases?

17:14:32 12          "ANSWER:  Understanding that that is a rough estimate and

17:14:34 13   not, obviously, a precise number, yes, that's a fair range."

17:14:38 14          MR. FENTON:  Your Honor, this is improper impeachment.

17:14:40 15   This is perfectly consistent with the answer the witness has been

17:14:43 16   giving and, again, it's on a collateral issue.

17:14:46 17          THE COURT:  I think it's consistent with what the witness

17:14:48 18   said frankly.

17:14:49 19          MR. MEUNIER:  Okay.  Thank you, Judge.

17:14:51 20   BY MR. MEUNIER:

17:14:52 21   Q.  That was your answer in that case?

17:14:54 22   A.  You're showing me a transcript which I have no verbatim

17:14:58 23   recollection of.  If this is a true transcript, then that was my

17:15:02 24   answer.

17:15:04 25          THE COURT:  That's what he said before.

BY MR. MEUNIER:

Q.  Now, in those cases where you have used -- do you remember the cases you've appeared in on behalf of tobacco where you've used your statistical expertise to challenge the validity of studies showing a link between diseases such as cancer and smoking?

A.  I can't recall any instance -- well, it depends on what you mean by "link," I guess.  There's no question of a link between smoking and smoking related diseases.  So I've never challenged that such a link exists.

        On some occasions there are studies that attempt to quantify exactly how many cases -- how many excess cases of a given disease that is admittedly caused by smoking or the result of smoking as opposed to background cases.  And sometimes there are flaws or problems in such quantifications.  That has typically been the subject of my testimony.  I don't recall ever challenging the existence of a link.

Q.  Let's move on, Doctor.  In your deposition about 18 days ago, do you recall I asked you if your expert opinions in legal matters had ever been excluded or limited by a court based on a Daubert challenge?

A.  I do recall that question.

Q.  And your answer was that you were not aware of any such occasions, correct?

A.  Yes.

Q.  In fact, you said, as you sat there at that time under oath in

17:16:46  1    that deposition, you could, in your words, "certainly testify

17:16:50  2    forthrightly," that you were unaware of any such occasion; is that

17:16:55  3    your testimony?

17:16:56  4    A.  It was my testimony.

17:16:57  5    Q.  And the truth is that your expert opinion testimony has been

17:17:01  6    limited by a judge not once, but on at least several occasions,

17:17:07  7    including for reasons under Daubert, true?

17:17:13  8    A.  As I testified at my deposition, my testimony has been limited

17:17:17  9    in the past for reasons that did not, to my knowledge, involve a

17:17:23  10   Daubert challenge.  I believe I testified about that at deposition,

17:17:27  11   and I am quite prepared to testify about that again today.

17:17:31  12           As I sit here today, I still don't know of any Daubert

17:17:34  13   challenge that resulted in exclusion of my testimony.

17:17:40  14   Q.  Then, after your deposition testimony to that effect, you

17:17:43  15   signed an errata sheet, and I am showing it here on the screen for

17:17:49  16   your deposition, in which you stated -- can we blow this up, please.

17:18:04  17   You stated, "I am aware that my testimony was excluded in the *Walden

17:18:08  18   v. Chrysler* matter.  I do not know if this was due to Daubert

17:18:12  19   challenge."  Correct?

17:18:13  20   A.  Correct.

17:18:13  21   Q.  So that case occurred to you after your testimony on

17:18:17  22   March 21st?

17:18:18  23   A.  No, I was aware of that case on March 21st, as I write in on

17:18:24  24   the errata sheet here.  Right up to today, I don't know that that

17:18:28  25   was a Daubert challenge.  I simply don't associate it with the word

17:18:33  1   "Daubert."

17:18:33  2   Q.  Well, the case resulted in $150 million judgment on April 2nd,

17:18:39  3   2015, to a family of a four-year old boy killed in a rear-end

17:18:43  4   collision in a Jeep Cherokee, right?

17:18:45  5   A.  I have read that result in the news.

17:18:49  6        MR. FENTON:  Again, your Honor, this is prejudicial and so

17:18:52  7   far afield he is yet to be asked a single question about his opinion

17:18:56  8   in this case.

17:18:57  9        THE COURT:  Let's move on to this.  Whatever you've done,

17:19:00 10   you're doing it.  Let's move on.  You made the question of

17:19:05 11   impeachment.  I understand the issue.  We've got to move on, folks,

17:19:10 12   we really do.

17:19:11 13        MR. MEUNIER:  We do, Judge.

17:19:12 14        THE COURT:  This has nothing to do with the facts here,

17:19:15 15   other than impeachment.  It has nothing to do with it.  It's

17:19:19 16   tobacco, this is a different deal.

17:19:22 17        MR. MEUNIER:  Your Honor, I agree with

17:19:24 18   you wholeheartedly --

17:19:25 19        THE COURT:  Every lawyer in this courtroom has represented

17:19:28 20   people that they wouldn't want to marry or bring home for dinner or

17:19:33 21   something of that sort.  That doesn't mean they're bad or good.

17:19:36 22        MR. MEUNIER:  I am not suggesting that, your Honor.  But

17:19:39 23   if I could, at least, mention -- I won't take time with him, but

17:19:44 24   there were several other cases where his testimony has been excluded

17:19:46 25   under Daubert and he hasn't told us about it.  And I think for the

17:19:49  1    record we ought to know that fact.

17:19:52  2            THE COURT:  Just file those in the record, and I'll take

17:19:55  3    that.  I understand it.

17:19:57  4            MR. MEUNIER:  If we could just put them in the record that

17:20:00  5    way, your Honor, then I'll forego any further questioning.

17:20:02  6            THE COURT:  Let's do that.

17:20:09  7    BY MR. MEUNIER:

17:20:09  8    Q.  Now, in this case, Dr. Marais, you were hired about three

17:20:12  9    months ago, mid March of this year?

17:20:15 10    A.  Certainly, no earlier than that.  It may even be sometime in

17:20:21 11    April.

17:20:21 12    Q.  And you were hired by the Denton firm as counsel for the BNBM

17:20:26 13    defendants, correct?

17:20:27 14    A.  I believe the first phone call that came to me was from the

17:20:34 15    Denton firm, and I knew that there was a Chinese drywall defendant

17:20:39 16    in the case.  I am not sure I knew the name.  And I am still a

17:20:44 17    little vague on the names of the parties.

17:20:46 18    Q.  And to your understanding, it's entirely possible that you, in

17:20:49 19    fact, have been retained as an expert by more than one of the

17:20:53 20    Chinese manufacturers in this case?

17:20:54 21    A.  Yes.

17:20:55 22    Q.  And on your website for William Wecker and Associates, we won't

17:21:01 23    take the time to look at it, your company has shaded in the entire

17:21:04 24    People's Republic of China?

17:21:06 25    A.  As one of the countries of domicile of our clients, yes.

17:21:11  1   Q.  But the shading of the entire People's Republic of China, you

17:21:14  2   told me in your deposition is based entirely on you being hired in

17:21:18  3   this case about three months ago?

17:21:20  4   A.  As far as I know.

17:21:21  5   Q.  That's true?

17:21:21  6   A.  As far as I know, yes.

17:21:29  7          MR. MEUNIER:  Your Honor, for the record we will offer the

17:21:31  8   William Wecker website shading in the People's Republic of China as

17:21:40  9   Exhibit 64.

17:21:42  10          MR. FENTON:  No objection, your Honor.

17:21:43  11          THE COURT:  Admitted.

17:21:44  12   BY MR. MEUNIER:

17:21:44  13   Q.  Now, you understand that in this case Judge Fallon is

17:21:47  14   addressing the amount of class-wide damages for Chinese drywall

17:21:50  15   remediation?

17:21:51  16   A.  I do.

17:21:53  17   Q.  And you have challenged the statistical -- on a statistical

17:21:59  18   basis the methodology used to calculate those damages?

17:22:02  19   A.  Yes.

17:22:03  20   Q.  But aside from challenging that methodology, you have not

17:22:07  21   offered your own analysis for the calculation of class-wide damages,

17:22:11  22   have you?

17:22:11  23   A.  Correct.  I haven't been asked and haven't done it.

17:22:16  24   Q.  And that's been true in other cases you've appeared in, for

17:22:22  25   example, *Gore v. Harris* where you appeared on behalf of the

17:22:25  1    Bush/Cheney campaign, right?

17:22:26  2    A.  I did.  I was retained in that case by the Bush/Cheney campaign

17:22:31  3    and I did testify, yes.

17:22:32  4    Q.  And you testified in answer to the judge's questions that you

17:22:36  5    had not done your own statistical analysis of what a recount would

17:22:40  6    be, you just challenged what the plaintiff said; correct?

17:22:43  7    A.  As in the bullet matter, sir, that's a long time ago, and I

17:22:49  8    don't recall exactly what I was asked.  I don't recall the context,

17:22:52  9    and I don't recall exactly what my answer was.

17:22:55  10   Q.  Now, if we could look at your -- well, we don't have to look at

17:23:02  11   it.  Your CV and list of publications, we reviewed them in your

17:23:06  12   deposition.  Let me make sure the record is clear.  You have no

17:23:09  13   formal education whatsoever in the field of professional

17:23:12  14   engineering, never taken a course in it, correct?

17:23:14  15   A.  It would be misleading to simply say yes, and the reason why

17:23:21  16   it's misleading is it appears extensively in my deposition

17:23:25  17   testimony.

17:23:25  18   Q.  You've never taken a course which was specifically about

17:23:31  19   building construction or building materials, true?

17:23:34  20   A.  That is true.

17:23:34  21   Q.  In all of the formal education, you've never taken a course

17:23:39  22   whose subject matter dealt with principles solely within the field

17:23:41  23   of professional engineering, true?

17:23:43  24   A.  That's fair.

17:23:43  25   Q.  You never taught a course solely on the principles of

17:23:48  1   professional engineering, true?

17:23:49  2   A.  That's fair.

17:23:50  3   Q.  You've never taught a course dealing with the calculation or

17:23:52  4   assessment of property damage remediation, correct?

17:23:56  5   A.  I'm sorry.  What was your question again?  Have I taught a

17:24:00  6   course solely having to do with that?

17:24:03  7   Q.  No, sir.  You've never taught a course dealing with the

17:24:05  8   calculation or assessment of property damage remediation, correct?

17:24:09  9   A.  That is correct.

17:24:11 10   Q.  You sit on no boards of organizations which deal with the

17:24:16 11   principles of professional engineering, correct?

17:24:18 12   A.  That's correct.

17:24:18 13   Q.  Referring to your list of publications, none addresses,

17:24:22 14   principles solely within the scope of professional engineering,

17:24:25 15   correct?

17:24:26 16   A.  That's fair.

17:24:27 17   Q.  You've not edited any articles dealing with building

17:24:30 18   construction or property damage remediation, correct?

17:24:34 19   A.  It's fair.

17:24:35 20   Q.  You've authored not a single article on the topic of property

17:24:39 21   damage remediation, correct?

17:24:41 22   A.  That's fair.

17:24:42 23   Q.  And finally, you've never taught a course, attended a course,

17:24:45 24   or published anything dealing specifically with RSMeans or

17:24:50 25   Xactimate, right?

17:24:51  1   A.  That, again, is correct.

17:24:52  2   Q.  You've never inspected a property with Chinese drywall?

17:24:56  3   A.  That's fair, I have not.

17:24:57  4   Q.  You've never even witnessed any phase of Chinese drywall

17:25:02  5   remediation, correct?

17:25:05  6   A.  Except possibly by sheer accident as I was driving by, but

17:25:10  7   never intentionally and never consciously.

17:25:13  8   Q.  And, in fact, although this is a case about property damage

17:25:16  9   remediation, as of the time of your deposition, you had not

17:25:20 10   conferred with a single property damage remediation expert,

17:25:24 11   including the defendant's expert Mr. Pogorilich, true?

17:25:28 12   A.  Correct.

17:25:29 13   Q.  Now, with both your May 7 and May 28 declarations, you provided

17:25:38 14   lists of the materials that you have relied on or reviewed in

17:25:42 15   forming your opinions in this case.  Correct?

17:25:45 16   A.  Yes.

17:25:45 17   Q.  I've put on the screen a list of those reliance materials.

17:25:53 18   There are two lists; one with your original declaration that's on

17:25:56 19   the left, and one with your supplemental declaration on the right.

17:25:59 20   Correct?

17:25:59 21   A.  That does appear to be correct, yes.

17:26:06 22   Q.  And the first 12 items are the same, the second list adds six

17:26:10 23   things that you reviewed or relied on for your supplemental report;

17:26:14 24   is that true?

17:26:15 25   A.  Correct.

17:26:16  1    Q.  And in many cases, you simply reviewed but did not rely on this

17:26:21  2    material; is that true?

17:26:22  3    A.  Correct again.

17:26:23  4    Q.  For example, Items 2 and 3, the plaintiffs' motion for

17:26:26  5    assessment of damages and memo, would be in the category of what you

17:26:30  6    may have reviewed, but certainly you didn't rely on?

17:26:33  7    A.  As I sit here today, I can't think of any element of that

17:26:37  8    document that I rely on.

17:26:41  9    Q.  And as we discussed, you know that today's hearing is to

17:26:45 10    address class-wide damages against defendants who have been placed

17:26:49 11    in default?

17:26:51 12    A.  That's a legal term, as I hear it, and I simply -- I don't know

17:26:58 13    how to interpret it.  I've read language to that effect, but it's

17:27:04 14    well outside my area of expertise.

17:27:05 15    Q.  Are you aware of any of the allegations of fact made against

17:27:09 16    these defendants in the class action complaints where they have been

17:27:12 17    placed in default?

17:27:14 18    A.  I am certainly aware, generally, of the allegation that the

17:27:20 19    material they provided was defective; but beyond that very general

17:27:26 20    knowledge, I have no specific knowledge of allegations against them.

17:27:30 21    Q.  And you neither relied on or even reviewed the class action

17:27:34 22    allegations against these defendants in default, have you?

17:27:37 23    A.  If the documents are listed here, I have at least reviewed upon

17:27:42 24    them.  As I sit here today, there's no element of those documents

17:27:46 25    that I rely on or need to rely on for the opinions I've expressed in

17:27:52  1    this case.

17:27:52  2    Q.  Well, none of the class action complaints are listed on either

17:27:55  3    document.

17:27:55  4    A.  Then I have not reviewed them.

17:27:57  5    Q.  Now, with respect to Item 6, the *Germano* findings of fact and

17:28:02  6    conclusions of law.  Those were entered on April the 8th, 2010, it's

17:28:08  7    Record Document 2380, and I am showing you the table of contents.  I

17:28:14  8    wanted to be clear for the record, Dr. Marais, that in conducting

17:28:17  9    your statistical analysis and in forming your opinions as a

17:28:22 10    professional consultant in that field, you relied in no way on any

17:28:28 11    of Judge Fallon's findings or conclusions in *Germano* in any of the

17:28:33 12    subject headings shown in this table; is that true?

17:28:37 13    A.  I cannot think, as I sit here today, of any element of the

17:28:42 14    Court's findings in this document that I've relied on.  I have

17:28:46 15    certainly reviewed the document, but I can't think of anything that

17:28:48 16    I relied on in this document.

17:28:50 17    Q.  In fact, you admit that in forming your opinions in this case,

17:28:54 18    you have no familiarity with any of the specific findings made or

17:28:58 19    conclusions reached by Judge Fallon regarding the *Germano* plaintiffs

17:29:03 20    or their properties, correct?

17:29:05 21    A.  I can think of nothing that I am relying on.  By now, there are

17:29:15 22    many things that I am aware of in this case that I don't know where

17:29:19 23    I first came across each of those facts of which I am aware.  But I

17:29:25 24    cannot think of -- there's no line in the document that you're

17:29:29 25    displaying that I can think of to point out as one that I'm relying

17:29:35  1    on.

17:29:35  2    Q.  No, sir, my question was not just relying.  You have no

17:29:39  3    specific familiarity with any of Judge Fallon's findings or

17:29:42  4    conclusions regarding the seven *Germano* properties, correct?

17:29:45  5    A.  I certainly have no specific familiarity in the sense that I

17:29:49  6    could recite to you any of the Court's findings, as I sit here

17:29:53  7    today, regarding the *Germano* properties.

17:29:57  8    Q.  And it's true you have no understanding of the legal weight or

17:30:00  9    effect of those findings in this default case, right?

17:30:03  10   A.  I have no -- that's an entirely legal cluster of concepts that

17:30:09  11   you've just raised on which I have no opinion --

17:30:14  12   Q.  Or understanding?

17:30:15  13   A.  -- or understanding.

17:30:15  14   Q.  And it's also true, isn't it, Dr. Marais, as you stated more

17:30:20  15   than once in your deposition, it's not your intention to suggest in

17:30:23  16   this hearing that Judge Fallon was in error in making any of the

17:30:27  17   findings made or in reaching any of the conclusions reached by the

17:30:31  18   Court in the *Germano* trial; is that true?

17:30:33  19            MR. FENTON:  Objection.  This is calling for legal

17:30:36  20   analysis of the Court's opinion and tremendously unfair.

17:30:39  21            THE COURT:  Well, the only thing if he testified to it.

17:30:43  22   BY MR. MEUNIER:

17:30:43  23   Q.  Is that true?

17:30:45  24   A.  Could I hear the question again?

17:30:47  25   Q.  Isn't it true that it is not your intention to suggest in this

17:30:50   1   default hearing that Judge Fallon was in error in making any of the

17:30:53   2   findings made or reaching any of the conclusions reached by the

17:30:57   3   Court in the *Germano* trial; isn't that true?

17:31:02   4   A.  That's fair.  I have no intention, as I sit here, to suggest

17:31:05   5   that the Court was in error.

17:31:06   6   Q.  And it's true you have not even reviewed, much less relied on,

17:31:12   7   the *Hernandez* findings of fact and conclusions of law?  It's not on

17:31:13   8   your list.

17:31:13   9   A.  I believe that is true.  If it's -- certainly, it's true if

17:31:16   10  it's not on my list.

17:31:18   11  Q.  And it's also true, not on your list, for either being reviewed

17:31:22   12  or relied on are the Court's findings of fact or conclusions of law

17:31:25   13  in certifying the plaintiff class whose damages are being addressed

17:31:30   14  in this hearing?

17:31:30   15  A.  True again.

17:31:31   16  Q.  So let me refer you in particular to pages 11 and 12 of the

17:31:43   17  Court's findings of fact and conclusions of law, September 26, 2014,

17:31:48   18  Record Document 18028.  It's pages 11 and 12.  Under the heading --

17:32:17   19  A.  I see pages 11 and 12.

17:32:19   20  Q.  I wish I could read this better.  You are not aware before

17:32:37   21  writing your opinion of the judge's finding for purposes of class

17:32:42   22  cert that as a result of the Court having held evidentiary hearings

17:32:45   23  that determined the scope of remediation, cost of remediation, and

17:32:49   24  other property damages caused by Taishan Chinese drywall to the

17:32:55   25  seven *Germano* plaintiff intervenors, the Court's April 8th, 2010,

17:33:00  1   findings of fact conclusions of law resolved a multitude of factual

17:33:04  2   and legal issue for the seven plaintiffs against Taishan.  You're

17:33:08  3   not aware of that?

17:33:10  4          MR. FENTON:  Objection, your Honor.

17:33:11  5          THE COURT:  I sustain the objection.  We're moving away

17:33:14  6   from impeachment at this point.  He's not a lawyer.  To confront him

17:33:21  7   with what I said in a legal document, it's not fair to him.

17:33:26  8          MR. MEUNIER:  Well, your Honor, since it is a default

17:33:28  9   hearing, in our view these findings of the predicate and frame the

17:33:32 10   issues, we believe --

17:33:34 11          THE COURT:  That's argument.  That's argument.  But

17:33:37 12   whether he knows it or not, what's the difference?

17:33:42 13          MR. MEUNIER:  Okay.

17:33:45 14   BY MR. MEUNIER:

17:33:48 15   Q.  Now, you were here for and you heard the testimony of George

17:33:51 16   Inglis today, Dr. Marais?

17:33:55 17   A.  I was and I did.

17:33:55 18   Q.  And you agree you have no understanding of what Brown and

17:33:59 19   Wright -- or Berman and Wright's professional engineers and

17:34:02 20   Mr. Inglis himself learned about Chinese drywall remediation from

17:34:05 21   their field visits to the remediation projects for Beazer Homes in

17:34:10 22   Florida?

17:34:10 23   A.  I know what -- I certainly heard Mr. Inglis's testimony on that

17:34:18 24   topic today.  It was terse.  Beyond that, I have no knowledge of

17:34:26 25   what specifically they learned from their field visit.  Of course,

17:34:31  1   I've read Mr. Inglis's reports in this matter which, if I remember

17:34:37  2   right, make reference in passing, but, again, with no actual

17:34:42  3   substance.  Certainly no numeric data, no kind of calculation based

17:34:47  4   on any numbers from that they gathered in those field visits.

17:34:53  5        In other words, nothing of a statistical or a

17:34:55  6   mathematical or computational nature and no specific numeric support

17:35:02  7   for the $86.  That's pretty much what I know of the field visit.

17:35:07  8        MR. MEUNIER:  Your Honor, I move to strike as

17:35:09  9   non-responsive.

17:35:10  10  BY MR. MEUNIER:

17:35:10  11  Q.  My question is:  Do you have any understanding of what they

17:35:12  12  learned from their field visits to the Beazer projects, yes or no?

17:35:18  13  A.  Beyond my previous answer, no, sir.

17:35:20  14  Q.  Do you have any understanding of what they learned from the

17:35:22  15  field visits to remediation activities in Louisiana, Florida, North

17:35:24  16  Carolina, New Jersey, and Florida?

17:35:26  17       MR. FENTON:  Your Honor, the Court has already ruled that

17:35:29  18  this is not an expert in construction, not an expert in remediation.

17:35:32  19  When I asked questions that even came within a hair's width, I got

17:35:37  20  an objection.  And, now, Mr. Meunier is asking him about

17:35:40  21  construction and remediation.

17:35:42  22       MR. MEUNIER:  Your Honor, this is the problem.  We are

17:35:43  23  ships passing in the night.  This is a gentleman who says we've

17:35:47  24  extrapolated, and yet he has no idea what went into the number other

17:35:50  25  than what he sees as extrapolation.

17:35:52  1            THE COURT:  I understand.

17:35:53  2            MR. MEUNIER:  So if other things went into the number, he

17:35:56  3    doesn't know about it.

17:35:57  4            THE COURT:  That's argument and whether or not his

17:35:59  5    testimony is relevant on that --

17:36:01  6            MR. MEUNIER:  I just want to confirm he is not considering

17:36:03  7    any of that information in his analysis.

17:36:05  8            THE COURT:  Well, maybe that's what you ought to ask him.

17:36:07  9    BY MR. MEUNIER:

17:36:08  10   Q.  Are you considering in your analysis anything that the Berman

17:36:11  11   and Wright and Mr. Inglis himself learned from their field visits to

17:36:16  12   remediation activities in Louisiana, Florida, North Carolina, New

17:36:23  13   Jersey and -- Louisiana, North Carolina, Florida, and New Jersey?

17:36:25  14   A.  No, sir.  My analysis is confined to the specific verifiable

17:36:30  15   auditable numbers that Mr. Inglis presents.

17:36:33  16   Q.  Are you taking into account in your analysis any understanding

17:36:36  17   of what Berman & Wright and Mr. Inglis learned about Chinese drywall

17:36:39  18   remediation costs and costs per square foot based on the Villa Lago

17:36:45  19   remediation?

17:36:46  20            THE COURT:  Same answer.

17:36:49  21            THE WITNESS:  Same answer.

17:36:50  22            MR. MEUNIER:  Same answer.

17:36:51  23   BY MR. MEUNIER:

17:36:52  24   Q.  And you heard Mr. Inglis testify, didn't you, that Berman &

17:36:56  25   Wright's firm has had experience over the years with Chinese drywall

17:36:59  1   remediation, correct?

17:37:00  2   A.  I heard these testimony, all of it, including that.

17:37:04  3   Q.  And you heard him and his words in his own testimony talk about

17:37:08  4   how that reinforced the use of the $86 a square foot price that was

17:37:13  5   used from *Germano*?

17:37:14  6   A.  I heard his words to that effect.  I found no numbers to back

17:37:19  7   up those words.

17:37:20  8   Q.  So let me make sure I understand your testimony.  You concede

17:37:25  9   that he may have taken into account experiential information or

17:37:30 10   factors in deciding to use the 86, but since you see no statistical

17:37:34 11   profile of that component, you don't take it into account, true?

17:37:39 12   A.  If by that you mean to paraphrase my previous answers, I stand

17:37:44 13   on my previous answers, sir.

17:37:46 14   Q.  Do you have any understanding that RSMeans gives costs based on

17:37:54 15   historical information?

17:37:56 16   A.  I have a general understanding that RSMeans does compile

17:38:02 17   information over time, and so some of it, as time advances, does

17:38:06 18   become historical.

17:38:07 19   Q.  In your analysis, did you take into account how the use of the

17:38:12 20   tools of contractor bidding, unit pricing, and square foot pricing

17:38:18 21   contributed to the use of $86 a square foot in this case?

17:38:21 22           MR. FENTON:  Objection.  This is exactly the area that has

17:38:24 23   been excluded.

17:38:26 24           MR. MEUNIER:  The fact that he hasn't considered it in his

17:38:29 25   statistical analysis is relevant, your Honor.  That's the problem.

17:38:33 1          THE COURT:  I held that he couldn't talk about it and he

17:38:36 2 couldn't -- he is not experienced to do it.  Whether or not he is

17:38:39 3 taking it into consideration, he is not able to do it.  He is not an

17:38:44 4 expert in that.

17:38:46 5          MR. MEUNIER:  Well, if he took it into consideration, we

17:38:49 6 would object he is not qualified to know what it means.  The fact

17:38:51 7 that he hasn't even taken it into consideration means that this

17:38:55 8 extrapolation theory that he's come up does not fit the facts in the

17:38:59 9 case.

17:38:59 10         THE COURT:  That's argument.

17:39:01 11         MR. MEUNIER:  That's the relevance of the question.

17:39:02 12         MR. FENTON:  That is argument, your Honor.  The Court made

17:39:04 13 a ruling that this witness had to confine his answers to the field

17:39:08 14 of statistics, which is what he did, and now Mr. Meunier is

17:39:12 15 complaining that he confined his answers to the field of statistics.

17:39:16 16         MR. MEUNIER:  Let me move on, your Honor.

17:39:18 17         THE COURT:  Let's move on.

17:39:18 18 BY MR. MEUNIER:

17:39:20 19 Q.  Just make sure I understand your position, Dr. Marais.  Your

17:39:22 20 position in this case is that whatever else might have been taken

17:39:27 21 into account by the Berman and Wright professional engineers, in

17:39:30 22 your view, the class remediation cost calculation by Mr. Inglis in

17:39:35 23 your view rests entirely and exclusively on the seven *Germano*

17:39:41 24 properties; isn't that your position?

17:39:44 25 A.  It would be misleading for me to say either yes or no to that

17:39:50  1  question, and I would be glad to explain why.

17:39:53  2  Q.  Do you remember giving me that answer in your deposition?

17:39:55  3  A.  No.

17:39:55  4  Q.  Do you have your deposition in front of you?

17:40:20  5  A.  I have it now.

17:40:22  6  Q.  I am going to refer you to the question that begins at the

17:40:26  7  bottom of page 93, line 16.

17:40:41  8  A.  I am there.

17:40:43  9  Q.  I apologize for the length of this, partly was my wordiness and

17:40:52 10  partly yours.

17:40:53 11       "QUESTION:  I misunderstood.  So you believe that the

17:40:57 12  conclusions reached by Mr. Inglis do -- are informed to some extent

17:41:02 13  by the firm's evaluation of properties between 2009 and 2015?"

17:41:07 14       That was the question, correct?

17:41:10 15  A.  I agree that that's what the transcript shows.

17:41:12 16  Q.  And the answer was, "Not in any way that is visible in terms of

17:41:18 17  data or a specific calculation."  Correct?

17:41:23 18  A.  That's --

17:41:24 19       MR. FENTON:  Objection, your Honor.

17:41:26 20       THE WITNESS:  The answer continues.

17:41:28 21       MR. MEUNIER:  I'm going to get to it entirely.

17:41:28 22       THE COURT:  Let's read the whole thing first.

17:41:31 23  BY MR. MEUNIER:

17:41:31 24  Q.  "So to the extent that there is a calculation that can be

17:41:35 25  audited as opposed to merely commented upon, sort of color

17:41:40  1   commentary, to the extent that there's an auditable, verifiable,

17:41:55  2   replicable calculation, in the words of Mr. Inglis, it appears to me

17:42:00  3   to rest entirely on the -- on data from the seven *Germano* properties

17:42:07  4   of cost data.

17:42:08  5        There are other kinds of -- there is square footage

17:42:13  6   involved elsewhere in the calculation, but the remediation costs

17:42:16  7   appear to me to come entirely and exclusively from the *Germano*

17:42:20  8   properties."  Is that your testimony?

17:42:24  9        MR. FENTON:  It is not inconsistent with his testimony.

17:42:28 10   That is not impeachable.

17:42:30 11        THE COURT:  Did he read it correctly?

17:42:32 12        THE WITNESS:  He did read it correctly, except for the

17:42:35 13   word "replicable" that he turned into "replicable."

17:42:35 14   BY MR. MEUNIER:

17:42:39 15   Q.  Thank you.  Are both acceptable in the Oxford dictionary?

17:42:43 16   A.  They both are.

17:42:44 17   Q.  Thank you.  Finally, I want to ask you about your calculations

17:42:49 18   on the Knauf remediation.  If we could see the table that's attached

17:42:56 19   to your addendum to your declaration of 6/3/15.  Counsel just

17:43:11 20   reviewed this table with you, correct?

17:43:13 21   A.  Correct.

17:43:13 22   Q.  And you did this table, the language on it is yours?

17:43:18 23   A.  Yes.

17:43:18 24   Q.  So tell us again, what do you mean in this column that you

17:43:26 25   called "Actual Total Remediation Costs"?

17:43:30  1   A.  That is the remediation costs as reported in the Knauf data as

17:43:39  2   provided to me.

17:43:40  3   Q.  And that's $386,707,705?

17:43:46  4   A.  Apparently so.

17:43:47  5   Q.  And you were here today when Mr. Woody testified that the

17:43:50  6   remediation program is ongoing, correct?

17:43:53  7   A.  I was.

17:43:54  8   Q.  There are more moneys to be spent in that program, correct?

17:43:58  9   A.  I heard testimony to that effect, but I certainly don't have

17:44:06 10   verbatim recall of what he said.

17:44:10 11   Q.  And let me look at the next table that was attached to your

17:44:14 12   declaration, which is entitled "Overall Remediation Statistics,

17:44:18 13   Table 1."  And this gives the categories of information about the

17:44:22 14   Knauf remediation program with that same total cost we just saw,

17:44:27 15   386.7 million, correct?

17:44:30 16   A.  I don't see that number on this table, but --

17:44:34 17   Q.  But it's the same data?

17:44:35 18   A.  It rests on the same underlying data.

17:44:39 19   Q.  And that data adds up to that 386.7 million, right?

17:44:44 20   A.  Yes.

17:44:45 21   Q.  And you know that the $65.15 per square foot here was derived

17:44:51 22   from more than one year of activity?

17:44:53 23   A.  Yes.

17:44:53 24   Q.  It was over several years of time, right?

17:44:56 25               And you understand that certain move in/move out payments

17:45:00 1   by Knauf were removed from the BrownGreer data, or removed by

17:45:04 2   BrownGreer from its data in order to come up with these figures,

17:45:08 3   correct?

17:45:08 4   A.  I did -- I do have that understanding, yes.

17:45:12 5   Q.  So this is the Knauf remediation dollars spent, right?

17:45:16 6   A.  That's what I understand it to be.

17:45:17 7   Q.  On the other hand, you also know, don't you, that certain costs

17:45:24 8   associated with Chinese drywall remediation for these same

17:45:28 9   properties are not included in the BrownGreer data?  You know that,

17:45:33 10  don't you?

17:45:33 11  A.  I heard testimony to that effect today.

17:45:35 12  Q.  So, for example, it does not reflect the pre and post

17:45:43 13  inspection activities that are paid for in the remediation, correct?

17:45:47 14  A.  I do now have that understanding, yes.

17:45:52 15  Q.  It does not include the general contractor administrative fees

17:45:56 16  for overseeing administration, correct?

17:45:59 17  A.  I heard the testimony to that effect today, but I certainly,

17:46:03 18  beyond hearing the testimony, I have no other knowledge of that

17:46:09 19  issue.

17:46:09 20  Q.  It does not include insurance premiums for the coverage of

17:46:13 21  things like subcontractor work or the disposal of toxic drywall,

17:46:16 22  correct?

17:46:17 23  A.  Again, I heard the testimony to that effect today.  I have no

17:46:21 24  other knowledge of that issue.

17:46:22 25  Q.  And you also know that one contractor was used creating an

17:46:26  1  economy of scale for the Knauf remediation spending, correct?

17:46:30  2  A.  I heard testimony that one contractor was used, and whether or

17:46:36  3  not that created an economy of scale is an empirical question which

17:46:41  4  I have not examined.

17:46:42  5  Q.  But you haven't taken that into account in your accuracy check

17:46:47  6  to make sure you were comparing apples to apples?

17:46:50  7  A.  I compared the numbers as reported to the predictions from

17:46:54  8  Inglis method.

17:46:55  9  Q.  And you also didn't take into account in your comparison for

17:47:00  10  cross-check purposes the differences in the scope between the Knauf

17:47:04  11  remediation activity and what is being proposed in this case, did

17:47:10  12  you?

17:47:10  13  A.  I made no adjustments to the -- I made no accounting for scope

17:47:18  14  issues in my comparison of actual costs as reported -- as provided

17:47:25  15  to me in the Knauf spreadsheet to calculate the predictions from the

17:47:29  16  Inglis extrapolation formula.

17:47:31  17  Q.  In making your comparison nor did you take into account that

17:47:35  18  the Knauf remediation scope was a negotiated scope as opposed to one

17:47:40  19  resulting from litigation like this?

17:47:41  20  A.  I did not account for that.  I understood and I understand that

17:47:44  21  the Knauf remediation scope was a full and complete remediation.

17:47:48  22  That is still my understanding today.

17:47:49  23  Q.  But a negotiated settlement?

17:47:53  24  A.  A full and complete remediation arrived at through a process

17:47:58  25  that involved, as I understand it, negotiation.

17:48:01  1    Q.  Do you have any opinion, then, going back to the total you gave

17:48:06  2    of 386,707,000 to date for the Knauf remediation how that total

17:48:15  3    would be effected by making the adjustments we just talked about;

17:48:18  4    scope, items not included, economies of scale, all of those things?

17:48:21  5    A.  I have no opinion as I sit here today, because I don't know

17:48:26  6    whether economies of scale even exists in these data.  I don't know

17:48:32  7    the nature of what you have in mind when you talk about scope, and

17:48:35  8    it's anyway not my area of expertise to cost out scope.  I simply

17:48:41  9    have the understanding that this was a full remediation.  To arrive

17:48:47 10    at any quantitative opinion about the effect on numbers, I would

17:48:51 11    have to analyze those issues one by one and get more input than I

17:48:56 12    have as I sit here today.

17:48:57 13    Q.  And in this comparative analysis you have not done that, true?

17:49:02 14    A.  Not yet done that.

17:49:03 15             MR. MEUNIER:  Thank you, sir.

17:49:05 16             THE COURT:  Any redirect?

17:49:06 17             MR. FENTON:  Just briefly, your Honor.

17:49:06 18                          REDIRECT EXAMINATION

17:49:07 19    BY MR. FENTON:

17:49:09 20    Q.  Dr. Marais, Mr. Meunier asked you about the Knauf data, not

17:49:15 21    including pre and post remediation inspections.  I believe you

17:49:20 22    testified earlier about the six percent that was in Mr. Inglis's

17:49:25 23    numbers.  Can you explain to the Court again what that six percent

17:49:29 24    represented?

17:49:31 25    A.  My understanding is that it involves some form of inspection

17:49:38  1   and testing.  But I cannot speak with expertise about the nature of

17:49:44  2   the inspection and testing.  I simply have the understanding that it

17:49:48  3   is a kind of inspection and testing that was not included in the

17:49:53  4   cost figures included in the Knauf data and, therefore, excluded it

17:49:58  5   from the Inglis method for purposes of my comparison.

17:50:02  6   Q.  So that's why you backed it out --

17:50:04  7   A.  Yes.

17:50:04  8   Q.  -- to keep the comparisons apples to apples, I believe, as you

17:50:11  9   said.

17:50:11  10        And I think Mr. Meunier also asked you about insurance

17:50:16  11  premiums.  Have you seen any evidence that Mr. Inglis's numbers

17:50:19  12  included insurance premiums?

17:50:20  13  A.  I am aware of no evidence that it includes insurance premiums.

17:50:23  14  Q.  Now, Mr. Meunier also asked you about economies of scale.

17:50:30  15  Based on the data that you've seen of the Knauf remediation program,

17:50:36  16  can the differences between Mr. Inglis's calculation and the Knauf

17:50:42  17  actual remediation cost data be explained based on economies of

17:50:47  18  scale?

17:50:49  19        MR. MEUNIER:  Your Honor, I object.  I don't think --

17:50:50  20  there's no foundation.  He said he had no idea of what economy of

17:50:54  21  scale was.

17:50:54  22        THE COURT:  How would he know that?  There's a difference.

17:50:54  23        MR. FENTON:  He opened the door.

17:50:56  24        MR. MEUNIER:  But he told us he didn't know, he couldn't

17:51:00  25  account for.

17:51:01 1      MR. FENTON:  And now I'm asking whether he's drawn any --
17:51:01 2  he said he didn't know, and now I am asking whether he has an
17:51:06 3  opinion based on the data.
17:51:06 4      THE COURT:  The only problem I have is that he said that
17:51:09 5  in this industry he doesn't know whether it's an economy of scale or
17:51:13 6  not an economy of scale.
17:51:15 7      MR. MEUNIER:  We object because it would have to be
17:51:17 8  speculating, your Honor.  It's beyond his expertise.
17:51:20 9      THE COURT:  I really think so.
17:51:20 10 BY MR. FENTON:
17:51:22 11 Q.  With respect to the variability of the Knauf remediation data,
17:51:28 12 I believe you said that in some cases Mr. Inglis's numbers were much
17:51:33 13 higher, in some cases much lower?
17:51:35 14 A.  That is true.
17:51:35 15 Q.  Was there any particular pattern?
17:51:38 16 A.  No.  There is no pattern in the deviation between the Inglis
17:51:43 17 extrapolations and the -- what are reported as the actual costs in
17:51:50 18 the Knauf data.  There's no simple pattern that suggests a simple
17:51:54 19 left out component.
17:51:58 20 Q.  Okay.  Because --
17:51:59 21 A.  Because sometimes the Inglis extrapolations are high and
17:52:03 22 sometimes they're low.  And when they are high, sometimes they're
17:52:07 23 not high by a very large margin, and on other occasions, they are
17:52:12 24 high by a very large margin.  Sometimes they are high by 15 percent,
17:52:17 25 sometimes they are high by more than 100 percent.

17:52:19  1    Q.  So they're all over the place?

17:52:20  2    A.  Yes.

17:52:21  3    Q.  And that can't be explained by just, like, a 20 percent

17:52:24  4    discount?

17:52:24  5    A.  No simple discount could explain the pattern.

17:52:29  6             MR. FENTON:  May I have one moment, your Honor?  Nothing

17:52:36  7    further, your Honor.

17:52:36  8             THE COURT:  Okay.  Fine.  Any further witnesses from the

17:52:38  9    defendant?

17:52:41 10             MS. EIKHOFF:  Your Honor, we don't have any further

17:52:44 11    witnesses, but as a housekeeping measure, we did want to move

17:52:49 12    certain exhibits into evidence that have not already been admitted.

17:52:54 13    We are just going to go through the list.

17:53:05 14             MR. SEEGER:  Judge, you want the treatises moved into

17:53:08 15    evidence?

17:53:09 16             THE COURT:  I don't really need the treatises.  It's

17:53:12 17    generally not admissible.  You can cite the treatises, but under the

17:53:17 18    rules of evidence, the treatises themselves don't go into evidence.

17:53:20 19             MR. SEEGER:  The portions we like both sides read.

17:53:24 20             MR. MEUNIER:  I think you heard the portions, I don't

17:53:28 21    think the whole book goes in.

17:53:28 22             MS. EIKHOFF:  And then, the next one -- and I am not sure,

17:53:31 23    forgive me if this has already been admitted -- Defendant's 13,

17:53:35 24    which is Woody's remediation.  So, your Honor, we move Defendant's

17:53:50 25    Exhibit 13 into evidence.

17:53:52  1                MR. MEUNIER:  No objection.

17:53:54  2                MS. EIKHOFF:  And, your Honor, I don't believe that we had

17:53:58  3      previously put the declarations of our exhibits into the record, and

17:54:05  4      so we would like to move for Defendant's Exhibit 24, the declaration

17:54:08  5      of Laurentius Marais that was filed and served in this action on

17:54:13  6      May 8th, into evidence.

17:54:15  7                MR. MEUNIER:  Your Honor, I don't believe the declarations

17:54:18  8      or expert report of a witness who testifies should be admitted.

17:54:23  9                THE COURT:  They generally are not exhibits unless you all

17:54:27 10      agree on them.  If you agree on them, I don't have any problem.

17:54:28 11                MR. MEUNIER:  The only problem is that you made a Daubert

17:54:30 12      ruling and there's stuff covered in there --

17:54:33 13                THE COURT:  Of course I have them.  You all have given

17:54:35 14      them to me anyway.

17:54:37 15                MS. EIKHOFF:  There are some supplements, your Honor, that

17:54:39 16      were submitted and exchanged among the parties that the Court does

17:54:42 17      not have.  May we move those into evidence?

17:54:44 18                MR. MEUNIER:  We would object to the admission of

17:54:47 19      declarations.  The testimony is the best evidence.

17:54:50 20                THE COURT:  That's the ruling.  If they object -- if you

17:54:53 21      all agree, I don't have any problem; but if a witness testifies,

17:54:57 22      that's what his testimony is, unless he is impeached by something he

17:55:01 23      said.

17:55:02 24                MS. EIKHOFF:  Okay.  Thank you, your Honor.  We would like

17:55:04 25      to move for one of the demonstratives that was used in connection

17:55:08  1    with Mr. Pogorilich's testimony today into evidence as Defendant's

17:55:15  2    Exhibit 34.

17:55:15  3              THE COURT:  I'll admit that.

17:55:16  4              MS. EIKHOFF:  Thank you, your Honor.

17:55:39  5              MR. FENTON:  I do have a couple of others, your Honor.  We

17:55:41  6    would like to move into evidence Defendant's Exhibit 27, which is

17:55:44  7    Dr. Marais's addendum report.

17:55:47  8              MR. MEUNIER:  Your Honor, no, we object to the

17:55:49  9    declarations going in.

17:55:54 10              THE COURT:  The witness is here and testified, so you

17:55:56 11    can't have the reports in, unless you all stipulate to it.

17:56:00 12              MR. MEUNIER:  Your Honor, can we approach?

17:56:01 13              THE COURT:  Yes, let me say this.  I would profit from

17:56:05 14    having you all give me some findings of fact and conclusions of law.

17:56:10 15    I was thinking about two weeks, does that make sense to you all?

17:56:13 16              MR. SEEGER:  We were going to approach and ask you for two

17:56:15 17    weeks.

17:56:15 18              MR. MEUNIER:  Yes, your Honor, we have a current deadline

17:56:18 19    of a week.

17:56:18 20              THE COURT:  Two weeks is fine.

17:56:19 21              MR. FENTON:  Your Honor, I would also renew my request

17:56:22 22    that I made in chambers this morning, if we could keep the record

17:56:26 23    open in case there is supplements that we need based on the new data

17:56:30 24    that came in last night.  I know some of the witnesses were not able

17:56:33 25    to catch up with that, and we would like to have the opportunity to

17:56:37  1    file and respond.

17:56:39  2              THE COURT:  We talked about that.  Analyze and see whether

17:56:41  3    or not you need it.  If you do, I'll talk with you about it.

17:56:46  4    Because you just got the information and it's fair that you would

17:56:48  5    have an opportunity to rebut that; but before you do that, see

17:56:51  6    whether or not you need to do that.

17:56:54  7              MR. FENTON:  Will do.

17:56:55  8              THE COURT:  Anything else?  Let's make sure that Dean has

17:56:57  9    all of the documents, all of the exhibits that you all have put into

17:57:03 10    evidence, so that I have them in the record.

17:57:06 11              MR. MEUNIER:  Your Honor, are you going to entertain any

17:57:09 12    closing remarks?

17:57:10 13              THE COURT:  I really am not.  What I thought is that you

17:57:13 14    could do something like that with the findings of fact and

17:57:17 15    conclusions of law.  I've heard enough from you all.

17:57:24 16              MR. SEEGER:  Judge, just to push you 30 more seconds.

17:57:28 17              MR. MEUNIER:  Chris wanted to say more.  I'm done.

17:57:29 18              MR. SEEGER:  No, just to make the record really clear

17:57:32 19    because people read this who are following the litigation.  There

17:57:36 20    have been references to houses being taken out of the class.  These

17:57:39 21    people are not being abandoned.  Those damages are still out there.

17:57:42 22    They're just not being dealt with in this class proceeding.  But

17:57:44 23    people who remediated their homes, we are still trying to get the

17:57:48 24    remediation damages.

17:57:49 25              MR. MEUNIER:  We can make that clear in our findings, our

17:57:52  1    proposed findings.

17:57:54  2              THE COURT:  All right.  The Court will stand in recess.

17:57:55  3              THE DEPUTY CLERK:  All rise.

          4          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

          5

          6                          * * * * * *

          7

          8                      REPORTER'S CERTIFICATE

          9

         10          I, Karen A. Ibos, CCR, Official Court Reporter, United

         11    States District Court, Eastern District of Louisiana, do hereby

         12    certify that the foregoing is a true and correct transcript, to the

         13    best of my ability and understanding, from the record of the

         14    proceedings in the above-entitled and numbered matter.

         15

         16

         17               /s/ Karen A. Ibos
                          _____

         18               Karen A. Ibos, CCR, RPR, CRR, RMR

         19               Official Court Reporter

         20

         21

         22

         23

         24

         25