**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: CHINESE-MANUFACTURED                     MDL NO. 2047
DRYWALL PRODUCTS LIABILITY                      SECTION: L
LITIGATION                                      JUDGE FALLON
                                                MAG. JUDGE WILKINSON


THIS DOCUMENT RELATES TO:
ALL CASES

# Special Master's Recommendations
# Concerning Attorneys' Fees and Expenses

Courts that preside over complex litigation often appoint lead counsel to help prosecute the matter on behalf of the claimants.  Of course, like other individually-retained counsel, lead counsel receive compensation for representing their own clients.  But lead counsel receive additional compensation for the service that they render to claimants who are not their clients; that is, the work that they do for the common benefit.  In this case, the Court appointed a group of attorneys to lead the litigation effort on behalf of all claimants.  The Court then promulgated a process for compensating those attorneys.  As part of that process, the undersigned now submits his Recommendations concerning attorney compensation.


## I.   Attorneys help solve a problem.  It is time to compensate them.

### A.   Thousands of property owners complain about Chinese drywall.

This matter arises from an alleged defect[1] common to thousands of buildings: tainted

---

[1]The Court previously concluded that Chinese drywall (the subject of this litigation) is defective.  *See*, *e.g.*, R. Doc. 2380 at 64 (*In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 706 F.Supp.2d 655, 690 (E.D. La. 2010)); and R. Doc. 2713 at 15 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2010 WL 1710434 at 7 (E.D. La. 2010)).  However, the matter still proceeds against some defendants, and the Special Master need not address the preclusive effect of

drywall. Buildings, of course, have walls and ceilings. Those walls and ceilings are often made of

drywall. And the principal component of drywall is gypsum.[2] Gypsum is a mineral; its chemical

formula is calcium sulfate dihydrate ($CaSO_4$).[3] But, since it is usually mined rather than

manufactured, gypsum is often tainted by the presence of various other materials.

Beginning in approximately 2004, a shortage of drywall in the United States prompted

drywall manufacturers to more aggressively pursue sources of gypsum.[4] This led them to China.[5]

Unfortunately, undesirable non-gypsum materials tainted the Chinese gypsum.[6]

Knauf[7] and Taishan,[8] two drywall manufacturers, used the Chinese gypsum to manufacture

---

prior findings upon those defendants.

[2]"A drywall panel is composed of a layer of hardened gypsum plaster sandwiched between two layers of paper liner." R. Doc. 2380 at 15 (*In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 706 F.Supp.2d at 660).

[3]*See generally*, R. Doc. 20741 at 11 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 1421627 at 5 (E.D. La. 2017)).

[4]*Id.* at 1 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 1421627 at 1).

[5]*Id.*

[6]"The Chinese drywall in question has a significantly higher average concentration of strontium and significantly more detectable levels of elemental sulfur. It releases three main gases: (I) hydrogen sulfide (H2S), (ii) carbonyl sulfide (COS), and (iii) carbon disulfide (CS2)." R. Doc. 20741 at 13 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 1421627 at 6).

[7]When these Recommendations refer to "Knauf," that term includes The Knauf Entities, which are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States.

[8]When these Recommendations refer to "Taishan," that term includes The Chinese Defendants in the litigation, including the principal Chinese-based Defendant Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include the CNBM Defendants ("CNBM"), comprised of the China National Building Materials

drywall (which later became known as "Chinese drywall").[9]  Both companies sold the drywall to suppliers, who then passed it on to contractors, builders, installers, and property owners.[10]  Over the next few years, Chinese drywall found its way into the walls and ceilings of thousands of American buildings, including homes.  Eventually, many homeowners complained that the tainted drywall caused problems, including "emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices."[11]  Some homeowners even complained of bodily ailments.[12]

### B.     MDL litigation ensues and the Court appoints a Plaintiffs' Steering Committee.

Property owners began to file suit in both federal and state courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and

---

Group Corporation, China National Building Materials Company Limited, China National Building Materials & Equipment Import & Export Corporation, and CNBM Forest Products (Canada) Ltd.; and the BNBM Defendants ("BNMB"), comprised of Beijing New Building Materials Public Limited Company, and Beijing New Building Material (Group) Co. Ltd.  The relationship of these entities has been the subject of much litigation, but it is not relevant to the Special Master's Recommendations.

[9]R. Doc. 20741 at 2, 4 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 1421627 at 1, 2).

[10]See, generally, R. Doc. 16570 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2013 WL 499474).

[11]R. Doc. 20741 at 1 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 1421627 at 1).

[12]R. Doc. 20741 at 1 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 1421627 at 1).

manufacturers.[13]  The suits alleged that the above-described problems were caused by defective Chinese drywall.  On June 15, 2009, the Judicial Panel on Multidistrict Litigation transferred the pending federal cases to Judge Eldon Fallon in the Eastern District of Louisiana.[14]

On July 2, 2009, the Court appointed Russ Herman as Plaintiffs' Liaison Counsel.[15]  On July 27, 2009, the Court appointed following attorneys to serve on the Plaintiffs' Steering Committee ("PSC"): Dawn M. Barrios; Daniel E. Becnel, Jr.; Victor Manuel Diaz; Ervin Amanda Gonzalez; Ben Gordon; Hugh P. Lambert; Arnold Levin; Gerald E. Meunier; Jerrold Seth Parker; James Robert Reeves; Christopher Seeger; Bruce William Steckler; and Scott Weinstein.[16]

Over the next four years (until December 31, 2013[17]), the PSC spearheaded a coordinated enterprise which:

•       Filed and served complaints naming 1651 separate entities as defendants[18];

•       Appeared before the MDL Court on almost 200 occasions[19];

•       Filed well over 1000 pleadings in the MDL record[20];

---

[13]R. Doc. 20741 at 1 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 1421627 at 1-2).

[14]R. Doc. 1 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 626 F.Supp.2d 1346 (J.P.M.L. 2009).

[15]R. Doc. 21.

[16]R. Doc. 144-1.

[17]The Court currently is only allowing the recovery of attorneys' fees and expenses incurred on or before December 31, 2013.  R. Doc. 17402 (Pretrial Order No. 28(A)).

[18]FC exh. 1-3 (R. Doc. 17700-4).

[19]FC exh. 1-7 (R. Doc. 17700-8).

[20]FC exh. 1-18 (R. Doc. 17700-19).

- Negotiated the development of a protocol for the inspection of properties and the preservation of evidence[21];

- Propounded approximately 250 discovery requests (including notices of deposition)[22];

- Filed approximately 50 discovery-related motions in the MDL Court[23];

- Responded to approximately 150 discovery requests[24];

- Employed 34 experts[25];

- Countered 20 defense experts[26];

- Questioned 210 witnesses under oath, either via deposition or trial testimony, including in London, Frankfurt, and Hong Kong[27];

- Propounded 10 FOIA requests[28];

- Sought the support of elected officials in their effort to recover on behalf of the claimants[29]; and

- Prepared for several trials, at least two of which settled on the eve of trial, and three of which proceeded to verdict.

---

[21]R. Doc. 337 (Pretrial Order No. 1(B)).

[22]FC exh. 1-12 (R. Doc. 17700-13).

[23]FC exh 1-16 (R. Doc. 17700-17).

[24]FC exh. 1-13 (R. Doc. 17700-14).

[25]FC exh. 1-19 (R. Doc. 17700-20).

[26]FC exh. 1-20 (R. Doc. 17700-21).

[27]FC exh. 1-17 (R. Doc. 17700-18). See, e.g., *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 894 F.Supp.2d 819, 833 (E.D. La. 2012) (discussing 2011 and 2012 Hong Kong depositions).

[28]FC exh 1-14 (R. Doc. 17700-15).

[29]FC exh 1-15 (R. Doc. 17700-16).

Two of the trials that proceeded to verdict were *Germano v. Taishan Gypsum Co., Ltd.*[30] and *Hernandez v. Knauf Gips KG.*[31]  In *Germano*, the Court entered a default judgment against Taishan after a two-day hearing, finding that "the average cost per square foot to repair the *Germano* properties was $86" and the properties at issue were "representative of a cross-section of contaminated homes."[32]  In *Hernandez*, the Court presided over a contested trial, awarding a judgment in favor of plaintiffs "which represented a cost of $81.13 per square foot based on the footprint square footage of the house."[33]

In its *Germano* and *Hernandez* rulings, the Court focused on the importance of remediating the plaintiffs' homes.  In addition to determining the remediation cost, the Court formulated a remediation protocol.[34]  All of this laid the foundation for settlement.

### C.      The PSC enters into nine separate class settlements with hundreds of defendants.

On October 14, 2010, Knauf agreed to participate in a pilot remediation program which "was largely based upon the remediation protocol formulated by the Court in *Hernandez*."[35]  More than

---

[30]Case No. 09-6687.

[31]Case No. 09-6050.

[32]R. Doc. 20741 at 6 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 1421627 at 3).

[33]*Id.* at 3 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 1421627 at 1).

[34]R. Doc. 2713 at 20-36 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2010 WL 1710434 at 10-18 (E.D. La. 2010)).

[35]R. Doc. 20741 at 3 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 1421627 at 2).

2,200 claimants have remediated their homes pursuant to the pilot program.[36]  On December 20, 2011, the PSC and Knauf entered into a class settlement agreement.[37]  The PSC also entered into four additional class settlement agreements with some (but not all) of the "downstream" defendants (*i.e.*, those who had supplied or used Chinese drywall), as well as their insurers.[38]  On February 7, 2013, the Court approved these five settlements.[39]  On January 3, 2013, the PSC entered into four additional settlements involving hundreds of claimants, "the vast majority of whom reside in Virginia."[40]  These became known as "the Virginia settlements."  The Court approved these on July 9, 2013.[41]  All told, there are nine settlements.  Although they are unique, the Court has treated all nine as "inter-related."[42]

The case did not end with the settlements.  For one thing, the settlements themselves required

---

[36]*Id.*

[37]R. Doc. 12061-5.

[38]The four class settlements were with: (1) Interior Exterior Building Supply, LP ("Interior Exterior" or "InEx"); (2) the Banner Entities; (3) L&W Supply Corp. and USG Corp.; and (4) a group of numerous homebuilders, installers, suppliers (the "Global Settlement"). R. Docs. 10033-3, 12258-3, 13375-2, and 14404-2.

[39]R. Doc. 16570 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2013 WL 499474 (2013)).  The Court attributed the settlements to six successive "breakthroughs": (1) the Knauf pilot program; (2) the InEx settlement; (3) the Banner settlement; (4) the Knauf settlement; (5) the L&W settlement; and (6) the "Global Settlement" (i.e., the settlement with hundreds of homebuilders, installers, and suppliers, as well as their insurers).  R. Doc. 16570 at 5-6 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2013 WL 499474 at 2-3).

[40]R. Doc. 16934 at 6.

[41]*Id.*

[42]R. Doc. 20257 at 1.

implementation, which necessitated participation by administrative personnel,[43] individually-retained counsel (as will be discussed in further detail below), the PSC, and the Court.   Furthermore, hundreds of defendants did not participate in the settlements, and the case has proceeded against them.

### D.    The Court decides that it is time to compensate the attorneys.

Even though the case was not over (indeed, it still is not over today), the Court decided to take steps to pay the attorneys for the work that they had done through December 31, 2013.[44]  On January 10, 2014, the Court adopted Pretrial Order No. 28.[45]   The Court noted that the parties had entered into nine class settlements, and that those settlements included funds which could be used to pay attorneys' fees and expenses.   The Court then promulgated a six-step process to determine entitlement to the funds.   Some of these steps have been completed, and some have not.

• **Step One: Review of Time and Expenses**

This step actually began early in the MDL.   On July 28, 2009, the Court adopted Pretrial Order No. 9, which governed plaintiffs' attorneys' time and expense submissions.[46]  As is typical in MDL litigation, the Court set guidelines designed to allow attorneys to make a contemporaneous

-----

[43]For instance, the original Knauf Settlement Agreement envisions the employment of a "Settlement Administrator, Special Masters, escrow agents, accountants, pro se attorneys and Ombudsmen."   R. Doc. 16406-3 ¶1.2..   The Court record (especially the monthly status reports) reveals the continuing involvement of these agents in implementing the various settlements.

[44]R. Doc. 17402 (Pretrial Order 28(A)).

[45]R. Doc.17379.

[46]R. Doc. 147.

record of common benefit time and expenses to support a later recovery.  The attorneys submitted time and expense records to Philip Garrett, the Court-appointed accountant.[47]  Pretrial Order No. 9 specifically promised the timekeepers confidentiality, stating that the submissions "shall be considered as if under seal."[48]  Mr. Garrett compiled the data and provided the Court summaries on a monthly basis.  Mr. Garrett testified in his deposition that the Court took a proactive approach in vetting the time and expense submissions.  Pretrial Order No. 28 encouraged attorneys to revisit their previous submissions "to assure that their firm's information recorded is accurate and correct."[49]  With respect to pre-December 31, 2013 submissions, this step is complete.

- **Step Two: Submission of Initial Affidavit for Compensation for Common Benefit Time and Reimbursement of Expenses to FC and Identification of Individual Claimants Retained by Individual Counsel**

The Court appointed a seven-member Fee Committee ("FC"): Arnold Levin (as the Chair); Russ M. Herman (as the Co-Chair/Secretary); Dawn M. Barrios; Gerald E. Meunier; Michael J. Ryan; Christopher A. Seeger; and Richard J. Serpe.[50]  The Court directed any attorneys who sought common benefit fees or reimbursement of expenses to submit a supporting affidavit to the FC.[51]

---

[47]There has been some disagreement concerning Mr. Garrett's role.  Pretrial Order No. 9 states: "Plaintiffs' Liaison Counsel has retained and the Court approves the retention of Philip Garrett, CPA ("PG"), to assist and provide accounting services to Plaintiffs' Liaison Counsel, the Plaintiff's Steering Committee, and the Court in MDL 2047."  The Court typically refers to Mr. Garrett as "the Court-appointed accountant."  *See*, *e.g.*, R. Doc. 20789 at 2 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 2290198 at 2 (E.D. La. 2017)).  In any event, Mr. Garrett described his role at great length in his deposition.  See FC exh. 5-29.

[48]R. Doc. 147 at 2.

[49]R. Doc. 17379 at 3.

[50]*Id.* at 14-15.

[51]R. Doc. 17379 at 5.

With respect to pre-December 31, 2013 submissions, this step is complete.

- **Step Three: Filing of a Joint Fee Petition**

Pretrial Order No. 28 directed the FC to consider the affidavits that were submitted in Step Two, and, after coordinating with the PSC, to prepare and submit a joint fee petition to the Court.[52] On May 16, 2014, the FC and the PSC moved for leave to file their joint petition seeking a global fee and cost award.[53] The Court granted the motion for leave,[54] and, on May 20, 2014, the pleading was filed.[55] On April 15, 2016, the FC and the PSC filed an amended joint petition, asking for "a global request for Attorney's Fees and costs reimbursement, which includes both individual claimants' counsel and common benefit counsel, and reimbursement of costs, in the amount of $192,981,363.35."[56] The Court granted the petition on May 17, 2016.[57]

- **Step Four: Common Benefit Request for Other Cases**

Pretrial Order No. 28 invited attorneys to request a common benefit assessment for any Chinese Drywall case or claim not participating as a Class Member or claimant in any of the various Class Action Settlement Agreements.[58] This provision is not relevant to the Special Master's assignment.

---

[52]*Id.* at 7.

[53]R. Doc. 17687-2.

[54]R. Doc. 17699.

[55]R. Doc. 17700.

[56]R. Doc. 20205.

[57]R. Doc. 20257.

[58]R. Doc. 17379 at 8.

•    **Step Five: Establishment of Common Benefit and Individual Fees**

Since the Court has made the global fee and cost award (Step Three), the next step is to divide the award between common benefit fees and individual fees.[59]  On June 7, 2016, the FC filed its Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F).[60]  Several attorneys and firms ("Objectors"[61]) filed responses, some couched as objections or oppositions, others couched as independent motions to allocate.[62]    The Court appointed the undersigned as Special Master to address the issues surrounding the division of the global fee and cost award,[63] which the Special Master will do in these Recommendations.  After considering the FC's motion, the Special Master's Recommendations, and any objections, the Court will divide the global fee and cost award.[64]

•    **Step Six: Common Benefit Fee Allocation**

Once the Court divides the global fee and cost award between common benefit fees and individual fees, the Court will allocate the common benefit fee among the attorneys who are entitled

[59]*Id.*

[60]R. Doc. 20293.  The FC's motion refers to PTO 28(F), which the Court entered on May 25, 2016, and which supplemented Pretrial Order No. 28 in light of the Court's global fee and cost award (made on May 17, 2016).  R. Doc. 20282.

[61]Only some of the individually-retained counsel objected the FC's proposal.  Furthermore, of those who objected, only some participated in the ensuing limited discovery and evidentiary hearing discussed below.  For purposes of these Recommendations, the term "Objectors" may mean (depending on the context) either all individually-retained counsel who objected, or only those who participated the limited discovery and the evidentiary hearing

[62]R. Docs. 20309, 20336, 20337, 20338, 20343, 20344, 20346, 20347, 20348, 20349, 20350, 20351, 20354, 20355, 20356, 20357, 20376, 20380, 20390, 20392, and 20413.

[63]R. Docs. 20410 and 20478.

[64]R. Doc. 17379 at 9.

to it.[65]  This assignment necessarily awaits the completion of Step Five, and therefore is not before the Special Master at this time.

### E.   The Special Master presides over limited discovery and conducts an evidentiary hearing.

In Pretrial Order No. 28(F), the Court signaled that it was considering appointing a Special Master to aid in the division of the global fee and cost award.[66]  On July 15, 2016, several Objectors filed a motion for the appointment of a Special Master, for a case management order, and for the unsealing of certain records.[67]  On July 18, 2016, the Court appointed the undersigned as Special Master "to conduct limited discovery regarding time and expense submissions, procedures, . . . and to make appropriate recommendations regarding these motions and objections."[68]

On July 18, 2016, six Objectors moved for the appointment of their attorneys, Jimmy Faircloth and Val Exnicios, as Objectors' Co-Liaison Counsel.[69]  The Special Master granted the motion, except for the request for compensation of Co-Liaison Counsel.[70]

---

[65]*Id.*

[66]R. Doc. 20282 at 7.  The Court later issued an order clarifying and supplementing the appointment.  R. Doc. 20478.

[67]R. Doc. 20394.

[68]R. Doc. 20410.

[69]R. Doc. 20407.

[70]SM-16-09-25-1644-1.  The proposed order stated in part:  "Fees of Objectors' Liaison Counsel will not be compensated as common benefit but will be the responsibility of counsel who have retained said Co-Liaisons and/or other objector counsel and/or other non-PSC/FC counsel benefitting from said services."  R. Doc. 20407-2.  The Special Master repeatedly has stated that Objectors' Co-Liaison Counsel's were not appointed as lead counsel, but "have only been appointed as a conduit for the exchange of information."  *See*, *e.g.*, SM-17-04-11-1117.  The Special Master

On July 20, 2016, the Special Master reached out to the involved attorneys to solicit their thoughts on discovery.[71]  This started a process whereby the Special Master received input from the involved attorneys by formal submission or, more often, by email.  This process is detailed in the Special Master record.  Between July 18, 2016 and June 1, 2017 (the final day of the evidentiary hearing), the Special Master sent or received 460 emails concerning this matter.

Beginning on August 10, 2016, the Special Master periodically circulated detailed status reports to the attorneys.[72]  The August 10 status report invited input concerning pending motions and the scope of discovery.  On September 25, 2016, the Special Master promulgated Special Master Case Management Order No. 1, which addressed outstanding motions, ordered document production, and laid out a framework for depositions.[73]

On October 7, 2016, some Objectors sent a letter to the Special Master requesting more expansive discovery.[74]  On October 28, 2016, the Special Master modified CMO No. 1 in response to the Objectors' request, but for the most part held course.[75]  The Special Master's ruling discussed the due process issues inherent in a common benefit determination.   After analyzing the jurisprudence, the ruling culled several principles:

---

concludes that Objectors' Co-Liaison Counsel's  fees should be borne by their own clients, not by the other Objectors.

[71]SM-16-07-20-0826.

[72]SM-16-08-10-1257.

[73]SM-16-09-25-1644.

[74]SM-16-10-07-1332-1.

[75]SM-16-10-28-1739-1.

- "A court cannot simply rubber-stamp a Fee Committee's application."[76]

- "A court should only allow limited discovery in fee dispute matters, including issues surrounding the appropriate common benefit in an MDL."[77]

- "A court must be fair to both sides, giving each side equal chances to present the evidence that they have and to make arguments. . . . Fairness, however, does not equate to entitlement to full-blown discovery, cross-examination, and even an evidentiary hearing."[78]

- "Those objecting to a fee application may or may not be entitled to discover source time sheets."[79]

- "The contributions of the individually retained attorneys (*i.e.*, those not asking for a common benefit award) might have some relevance to the ultimate decision to be made by the Special Master."[80]

- Attorneys may be entitled to a common benefit award even for work done vis-à-vis non-settling defendants if the work is "found to be reasonable and designed to advance the common interest."[81]

---

[76]*Id.* at 12, *citing In re: High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220 (5th Cir. 2008).

[77]*Id.*, *citing In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995), *order vacated*, *In re Nineteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d. 603 (1st Cir. 1992); and *In re Genetically Modified Rice Litig.*, 764 F.3d 864 (8th Cir. 2014).

[78]*Id.*, *citing Nineteen Appeals* and *Thirteen Appeals*.

[79]*Id.* at 13, *citing Yamada v. Nobel Biocare Holding AG*, 821 F.3d 1058 (9th Cir. 2016), *order amended and superseded on other grounds*, 825 F.3d 536 (9th Cir. 2016); and *Genetically Modified Rice Litig.* In *Yamada*, plaintiffs' attorneys in a class action requested that attorneys' fees be awarded against a defendant using the lodestar method. The Ninth Circuit ordered production of the attorneys' timesheets. As will be discussed below, the Special Master has chosen to employ the percentage method rather than the lodestar method. The Special Master concludes that the time summaries which have been produced are sufficient under the circumstances.

[80]SM-16-10-28-1739-1 at 13, *citing Thirteen Appeals*. In fact, some of the effort pursuing non-settling defendants directly contributed to the nine settlements. The *Germano* trial, for instance, targeted Taishan (a non-settling defendant), but helped set the stage for the settlements with other defendants.

[81]SM-16-10-28-1739-1 at 14.

On November 14, 2016, the Special Master promulgated Special Master Case Management Order No. 2, which established a protocol for the upcoming depositions.[82]  In December 2016 and January 2017, the attorneys took four depositions: Philip Garrett (Court-appointed accountant)[83]; Russ Herman (Plaintiffs' Liaison Counsel, PSC member, and FC Co-Chair/Secretary)[84]; Sandra Duggan[85]; and Arnold Levin (PSC member and FC Chair).[86]

In two letters dated February 8 and 15, 2017, Mr. Faircloth (one of the two appointed Objectors' Co-Liaison Counsel) requested additional discovery.[87]  On April 5, 2017, the Special Master denied the requests, citing his reasoning in his October 28, 2016 ruling.[88]

On April 23, 2017, the Special Master issued the Case Management Order Regarding Evidentiary Hearing.[89]  The CMO required an exchange of witness and exhibit lists, and furthermore set forth the rules governing the hearing.  In the interest of efficiency, the Special Master encouraged the use of declarations in lieu of live testimony.[90]

---

[82]SM-16-11-14-1746-1.

[83]FC exh. 29.

[84]FC exhs. 5-8 and 5-13.

[85]FC exh. 5-18.

[86]FC exh. 5-1.

[87]SM-17-02-08-1650-1 and SM-17-02-15-1521-1.

[88]SM-17-04-05-1653-1.

[89]SM-17-04-23-2058-1.

[90]*Id*. at 2.

On May 31 and June 1, 2017, the Special Master conducted an evidentiary hearing.[91]  The Special Master stated that the entire MDL record would be considered part of the factual record (so that, in briefing the matter, the parties could refer to the MDL record to establish what the attorneys did or did not do for the common benefit).[92]  The attorneys submitted approximately 750 exhibits into evidence.  The following witnesses testified:

• Dawn Barrios, member of the PSC, testified concerning the work that she did for her individual clients.

• Luis Gonzales, a claimant represented by C. David Durkee, testified that concerning the circumstances surrounding his claim, including the hiring of his own contractor to remediate his home, and his recovery pursuant to Option 2 of the Knauf settlement.

• Jake Woody, senior counsel for BrownGreer (settlement administrator for the MDL settlements) testified concerning BrownGreer's accounting of the settlement funds.

• Kerry Miller, counsel for Knauf; testified concerning the circumstances surrounding the Knauf settlement.

• Russ Herman, who has served as the Plaintiffs' Liaison Counsel, a PSC member, and the FC Co-Chair/Secretary, testified concerning the PSC's conduct of the litigation and the FC's suggested allocation.

• Eric Hoaglund, an Objector; testified concerning the work he did for his individual clients.

• C. David Durkee, an Objector; testified concerning the work he did for his individual clients.

---

[91]*See* Transcript of the Testimony of Fee Hearing, Day 1 (May 31, 2017); and Transcript of the Testimony of Fee Hearing, Day 2 (June 1, 2017).

[92]Transcript of the Testimony of Fee Hearing, Day 2 at 344 (June 1, 2017).

On July 14, 2017, Objectors[93] and the FC[94] submitted post-hearing briefs[95] (Objector James V. Doyle, Jr. filed his own brief).  On July 20, 2017, the FC requested that the Special Master strike Exhibit A of Objectors' Brief.  The Objectors responded on July 24, 2017.[96]

## II.     The common fund doctrine and the percentage rule apply here.

Everyone agrees that: (1) the attorneys who did work for the common benefit deserve a fee for that work; (2) the common benefit fee must come from the global fee and cost fund; and (3) this will result in a reduction of the amount available to the individually-retained counsel.  There is even a consensus that the fee should be calculated using the percentage method, discussed below.  But there is strong disagreement concerning how to apply the percentage method to the facts of this case.

---

[93]Primary Counsel's Post-Evidentiary Hearing Brief (hereinafter, "Objectors' Brief").

[94]The Fee Committee's Post-Hearing Memorandum in Further Support of its Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) (hereinafter, "the FC's Brief").

[95]The post-evidentiary briefs synthesize most of the arguments made throughout the course of this process, beginning with the FC's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F). R. Doc. 20293.  Therefore, although the Special Master has reviewed all of the submissions, these Recommendations will mostly reference the arguments made in the post-evidentiary briefs.

[96]Certain offers of evidence were specifically disallowed at the evidentiary hearing, and the Special Master adheres to his rulings with respect to those matters.  Furthermore, the Special Master disallows any references to the testimony of Jerrold Parker in the *Cataphora* matter.  *See* SM-17-03-29-1932.  In all other respects, the Special Master has considered all evidentiary submissions previously taken under advisement, whether filed in the court record or offered at the evidentiary hearing.  The Special Master's ultimate conclusion in these Recommendations takes into account Objectors' arguments concerning expenses, including Exhibit A to Objectors' Brief, all evidence tendered at the evidentiary hearing (including the exhibits submitted by Baron & Budd), as well as the arguments presented in the July 20 and July 24 letters.  The Special Master has also taken into account Mr. Garrett's testimony, which supports the conclusion that the Court has taken a proactive role in monitoring common benefit expenses throughout this litigation.

A review of the percentage method's origins is helpful in resolving this dispute.

- **1796 – *Arcambel v. Wiseman*[97] announces the American Rule.**

    The American Rule traces as far back as (and possibly further than) *Arcambel v. Wiseman* in 1796. It provides that "[e]ach litigant pays his own attorney's fees, win or lose."[98] There are, however, exceptions. One such exception is the common fund doctrine, when a court "award[s] attorney's fees to a party whose litigation efforts directly benefit others."[99]

- **1881 – *Internal Improvement Fund Trustees v. Greenough*[100] establishes an exception to the American Rule, awarding a party reimbursement of attorneys' fees from a common fund.**

    The Supreme Court established the common fund doctrine as early as *Internal Improvement Fund Trustees v. Greenough*, decided in 1881. The facts of that case are as follows. The Internal Improvement Fund of Florida consisted of more than 10 million acres of land owned by the state of Florida, and was dedicated to paying Florida Railroad Company bondholders. One such bondholder, Francis Vose, sued the fund's trustees (along with associated entities), alleging that the trustees were selling large amounts of the fund's land for nominal amounts, thus dissipating the fund's corpus to the detriment of the bondholders. Mr. Vose succeeded, benefitting both himself and the other bondholders. "[Mr.] Vose . . . bore the whole burden of th[e] litigation, and advanced most of the

---

[97]3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796).

[98]*Baker Botts L.L.P. v. ASARCO LLC*, ___ U.S. ___ , 135 S.Ct. 2158, 2164, 192 L.Ed.2d 208 (2015), *quoting Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–253, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010) (internal quotation marks omitted).

[99]*Chambers v. NASCO, Inc*., 501 U.S. 32, 45, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27 (1991).

[100]105 U.S. (15 Otto) 527, 26 L.Ed. 1157 (1881).

expenses which were necessary for the purpose of rendering it effective and successful."[101]   Mr. Vose then filed a petition asking for reimbursement from the fund of his expenses and services, including his attorneys' fees.  A special master recommended that the request for reimbursement be granted, and the circuit court agreed.  On appeal, the Supreme Court reversed the reimbursement of Mr. Vose's personal time, but affirmed the reimbursement of Mr. Vose's attorneys' fees.  The Court acknowledged that, in the typical case, Mr. Vose would be responsible for his own attorneys' fees. This was not, however, the typical case.  The Court concluded that burdening Mr. Vose with all of the attorneys' fees "would not only be unjust to him, but it would give to the other parties entitled to participate in the benefits of the fund an unfair advantage."[102]   The Court therefore allowed Mr. Voss to recover his attorneys' fees from the fund.  Under the American Rule, Mr. Voss would have been responsible for all of his attorneys' fees.  But, in recognizing an exception to the American Rule, the Court shifted responsibility for some of Mr. Voss's fees to the common fund.

- **1885 – *Central R.R. & Banking Co. v. Pettus*[103] awards attorneys, as opposed to their clients, reimbursement of attorneys' fees from a common fund.**

Four years later, the Supreme Court extended the common fund doctrine even further.  In *Central R.R. & Banking Co. v. Pettus*,  Branch, Sons & Co., H.P. Hoadely, and C.S. Plank held bonds issued by Montgomery & West Point Railroad Company.  Montgomery & West Point subsequently sold its assets to Western Railroad Company.  Western then mortgaged the assets. Branch, Sons & Co., Mr. Hoadely, and Mr. Plank hired two law firms, Pettus & Dawson and Watts & Sons, to file suit.  The suit asked that the bondholders' interests be decreed superior to the newly

---

[101]*Id.* at 529, 26 L.Ed. 1157.

[102]*Id.* at 532, 26 L.Ed. 1157.

[103]113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885).

executed mortgage.  An Alabama state court agreed with the bondholders, and it referred the matter

to a neutral

> to ascertain and report the amounts due to the complainants and to
> such other unsecured creditors of the Montgomery & West Point
> Railroad Company as should prove their claims. . . .  Numerous
> parties, including the complainants, appeared before him and had
> their claims registered . . . .  The aggregate amount of such claims
> was very large.[104]

Even though Pettus & Dawson and Watts & Sons only represented three of the successful

bondholders (Branch, Sons & Co., Mr. Hoadely, and Mr. Plank), the two law firms filed a joint

petition to recover attorneys' fees for the work that benefitted all those who recovered as a result of

the suit.  The case was removed to federal court, and the circuit court awarded the law firms

attorneys' fees equaling 10% of the aggregate, with the exception of any individual contracts for

which a particular compensation had been specified.  On appeal, the Supreme Court reduced the

percentage recovery from 10% to 5%, but affirmed in all other respects.  In doing so, the Court cited

*Greenough* for the proposition that a party who incurs attorneys' fees while protecting a fund for

both himself and for similarly-situated others is entitled to "reimbursement either out of the fund

itself or by a proportional contribution from those who accept the benefit of his efforts."[105]  But there

was a further complication.  The clients in *Pettus* (Branch, Sons & Co., Mr. Hoadely, and Mr.

Plank), unlike the client in *Greenough* (Mr. Vose), were not personally responsible for the attorneys'

fees that the law firms were claiming.  The Court held that this distinction made no difference.  The

law firms, not the clients, did the work.  The law firms deserved the fees.

Importantly, the Supreme Court did not rely on statutory authority in either of these cases.

---

[104]*Id.* at 119, 5 S.Ct. at 389.

[105]*Id.* at 123, 5 S.Ct. at 390.

Instead, it relied on equity[106] – unjust enrichment in *Greenough*; *quantum meruit* in *Pettus*.[107]

• **1977 –** *In re Air Crash Disaster at Florida Everglades on December 29, 1972*[108] **awards MDL lead counsel attorneys' fees from a common fund.**

More recently, courts have used the common fund doctrine to compensate lead counsel in complex litigation, including multidistrict litigation ("MDL") cases.  In *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, a passenger plane crashed in the Florida Everglades, killing 96 and injuring many others.  Suits were filed in both state and federal courts.  The Judicial Panel for Multidistrict Litigation transferred the federal cases to the Southern District of Florida, where they were consolidated in an MDL proceeding.  The district court appointed three of the plaintiffs' attorneys to a Plaintiffs' Committee, which performed tasks ordinarily associated with liaison or lead counsel.  As the three principal defendants began settling the cases, the district entered an order "awarding the [Plaintiffs'] Committee and [its] counsel a fee of 8% of the settlement obtained by each plaintiff who had retained counsel not a member of the Plaintiffs' Committee, payable out of the fee of the attorney for each such plaintiff."[109]  On appeal, the Fifth Circuit held that an MDL court has the "inherent managerial powers" to appoint lead counsel, and that "if lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them."[110]  The Fifth Circuit affirmed the district court's use of the

---

[106]*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980).

[107]*Haggart v. Woodley*, 809 F.3d 1336, 1352 (Fed. Cir. 2016).

[108]549 F.2d 1006 (5th Cir. 1977).

[109]*Id.* at 1010.

[110]*Id.* at 1014, 1016.  Nevertheless, although it affirmed the district court's authority to award the Plaintiffs' Committee a fee, the Fifth Circuit remanded the matter so that the district court could conduct a more thorough hearing to determine the appropriateness of the fee.

common fund doctrine, but remanded the matter so that the district court could conduct a more thorough hearing to determine the appropriateness of the fee.

Since *In re Air Crash Disaster*, "the common benefit doctrine has been consistently used and is well established as the justification for the payment of common benefit fees in MDLs."[111] Courts have struggled, however, with the appropriate method to calculate the common benefit fee. Some have used the lodestar method, "in which the court computes fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate and, in its discretion, applying an upward or downward multiplier."[112] Others have used the percentage method, "in which the court awards fees as a reasonable percentage of the common fund."[113]

- **1980 – *Boeing Co. v. Van Gemert*[114] uses a percentage method to determine common benefit fees.**

In *Boeing Co. v. Van Gemert*, The Boeing Company announced, through newspaper notice and direct mailings, the call for redemption of certain convertible debentures. The call included a deadline: those who responded before the deadline received more favorable treatment than those who responded after. William Van Gemert, a nonconverting debenture holder, did not respond by the deadline. Mr. Van Gemert (along with several others) filed a class action against Boeing in the Southern District of New York, claiming that the notice was insufficient. The case bounced up and down the judicial ladder several times. Eventually, the district court entered a judgment in favor of

---

[111]Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 370, 379 (2014).

[112]*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642-43 (5th Cir. 2012).

[113]*Id.* at 642.

[114]444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980).

the class and against Boeing for $3,289,359.00, together with legal interest.  Due to the 14-year

duration of the litigation, the resulting fund exceeded $7 million.  The judgment contemplated that

individual class members could recover from the fund by submitting appropriate proof to a special

master.  The class attorneys asked for an award of approximately $2 million in attorneys' fees from

the fund.  Boeing opposed the request, noting that the fee request presupposed 100% participation

by class members, even though the actual participation rate was far lower.  The district court sided

with the class attorneys, the Second Circuit panel sided with Boeing, and the Second Circuit *en banc*

sided with the class attorneys.  The Supreme Court affirmed, finding in favor of the class attorneys.

The Court's principal focus was not *whether* the class attorneys were entitled to an attorneys' fee

from the common fund (i.e., a common benefit fee), but instead *how* to calculate the fee.  The Court

did not even discuss the possibility of calculating a lodestar (reasonable hours multiplied by

reasonable rates).  Instead, the Court settled upon a percentage-of-the-fund method (defining the

aggregate claimant benefit fund, and awarding the attorneys a reasonable percentage of that fund).

Even though, as of the time of argument, the participation rate was only 47%, the Court held that

the attorneys' fee should be determined by reference to the entire judgment, not 47% of the

judgment.

- **1998 – *Strong v. BellSouth Telecomm., Inc.*[115] refuses to base a common benefit fee on an "illusory" benefit to the claimants.**

In *Strong v. BellSouth Telecomm., Inc.*, BellSouth Telecommunications offered its customers

an inside wireless communications plan (IWCP), telling them that they would not receive the IWCP

unless they affirmatively elected it.  BellSouth then treated silence as acceptance.  BellSouth thereby

leveraged its telephone monopoly status into an IWCP monopoly.  Some customers sued in federal

---

[115] 137 F.3d 844 (5th Cir. 1998).

and state court.  The parties reached a global class settlement agreement.  The settlement gave each BellSouth customer the option of either (1) continuing as an IWCP subscriber, or (2) canceling the IWCP and receiving a credit on the customer's monthly telephone bill.  Plaintiffs' counsel estimated that if every customer exercised the second option, the aggregate credits would total $64 million.  Based on this, plaintiffs' counsel argued that the settlement value was $64 million.  As part of the settlement, BellSouth agreed to pay $6 million in attorneys' fees.  Plaintiffs' counsel attributed their fees equally among the four involved states (Alabama, Louisiana, Mississippi, and Tennessee).  The courts in three of the states (Alabama, Mississippi, and Tennessee) approved each state's corresponding attorneys' fees, totaling $4.5 million.  Nevertheless, the federal district court in the Louisiana case expressed reservations concerning the size of the attorneys' fees.  The parties agreed to amend the settlement to allow the Louisiana federal district court discretion to determine the appropriate additional attorneys' fee award (beyond the $4.5 million that had already been awarded). The district court determined that a lodestar calculation would result in an award of $3,847,453.02, less than the $4.5 million that had already been awarded.  The district court then turned to a percentage method:  "While a lodestar equation is a useful starting point, a valuation of the results achieved in a class action settlement is essential to a final determination of attorneys' fees."[116] Plaintiffs' counsel contended that the "valuation of the results achieved" should be $64 million, the aggregate of the potential credits if all class members participated.  But the district court noted the vast majority of class members chose to continue as IWCP subscribers rather than take the credit; in fact, the value of the actual credit requests was only $1,718,594.40 – less than the total requested attorneys' fee.  Given this, the district court concluded that plaintiffs' attorneys failed to justify any

---

[116]*Strong v. BellSouth Telecomm., Inc.*, 173 F.R.D. 167, 172 (W.D. La. 1997).

award beyond the $4.5 million that they had already received.  On appeal, the Fifth Circuit affirmed.
The court rejected the plaintiff attorneys' argument that *Boeing* required the district to use a
percentage method with the $64 million potential recovery as the class benefit.  Instead, the Fifth
Circuit quoted the district court's conclusion that the $64 million figure was "illusory."[117]  Because
the settlement gave class members the option to accept or reject the credit, and because only
$1,718,594.40 in credits were accepted, and because (perhaps most importantly of all) "[i]n contrast
to *Boeing*, . . . no money was paid into escrow or any other account,"[118] the Fifth Circuit held that
the district court was reasonable in concluding that $1,718,594.40 (not $64 million) was the benefit
to the class.  The attorneys, who had already received $4.5 million, had been well-paid for such a
relatively modest result.

• **2008 –** *In re: High Sulfur Content Gasoline Prods. Liab. Litig.*[119] **states that the Fifth Circuit "requires" the use of the lodestar method.**

In *In re: High Sulfur Content Gasoline Prods. Liab. Litig.,* Shell Oil Co. allegedly produced
contaminated gasoline.  Thousands of motorists filed suit, claiming damage to their vehicles.  The
claims were consolidated in a federal class action.  The parties settled the matter, setting aside
$6.875 million for plaintiffs' attorneys' fees, costs, and expenses.  The district court appointed a
five-member Fee Committee, which then submitted a proposal whereby the five members of the Fee
Committee would receive almost half of the $6.875 million.  The district court adopted the proposal
and later denied all motions for reconsideration.  On appeal, the Fifth Circuit reversed, holding that
the district court had effectively abdicated its responsibility to the Fee Committee.  In so doing, the

---

[117]*Strong*, 137 F.3d at 852-53.

[118]*Id.* at 852.

[119]517 F.3d 220 (5th Cir. 2008).

Court quoted *Strong* for the proposition that the Fifth Circuit "requires district courts to use the 'lodestar method' to 'assess attorneys' fees in class action suits.'"[120] This language from *High Sulfur* appears to exclude the possibility of using non-lodestar methods (for instance, the percentage method) for calculating attorneys' fees.  In fact, the complete quotation from *Strong* (which was cited by *High Sulfur*) reveals that the court in that case was simply describing the lodestar method; the court was not mandating its use in every attorneys' fee case: "Under the lodestar method, which this circuit uses to assess attorneys' fees in class action suits, the district court must first determine the reasonable number of hours expended on litigation and the reasonable hourly rates for the participating attorneys."[121]  In any event, *High Sulfur* addressed the allocation, not the size, of the common benefit fee.  The percentage method (which was discussed in *Strong*, but not in *High Sulfur*) is relevant to the calculation of the size of the common benefit fee, as the Supreme Court established in *Boeing*.

- **2012 – *Union Asset Mgmt. Holding A.G. v. Dell, Inc*.[122] endorses the percentage method for determining attorneys' fees in common fund cases.**

    The Fifth Circuit clarified this issue four years later, firmly stating that district courts have the discretion to use the percentage method to determine the amount of a common benefit fee.  In *Union Asset Mgmt. Holding A.G. v. Dell, Inc*., several stockholders sued Dell and its officers in the Southern District of Texas, alleging that Dell had violated the Securities Exchange Act.  The parties entered into a class settlement, with Dell agreeing to pay $40 million into a settlement fund to be allocated between class members and their attorneys.  The district court approved the settlement and,

---

[120]*Id*. at 228, *quoting Strong*, 137 F.3d at. 850.

[121]*Strong*, 137 F.3d at 850.

[122]669 F.3d 632 (5th Cir. 2012).

using the percentage method, awarded $7.2 million in attorneys' fees (18% of the settlement fund, rather than the 25% that the attorneys requested). Several objectors appealed. The Fifth Circuit affirmed. Among the issues that the court considered was the proper methodology for determining attorneys' fees. The Fifth Circuit noted that courts had been using either the percentage method or the lodestar method in common fund cases. Every other circuit already had explicitly endorsed the use of the percentage method. Even within the Fifth Circuit, district courts "regularly use the percentage method blended with a *Johnson* reasonableness check, and for some it is the 'preferred method.'"[123] But the objectors argued that the Fifth Circuit had mandated the use of a lodestar method, not the percentage method, to calculate attorneys' fees. The Fifth Circuit rejected the objectors' argument, and held that a district court has the discretion to choose either of the two methods:

> The objectors argue that the lodestar method is the only way to calculate attorneys' fees in this Circuit. They understandably point to the following sentence from [*High Sulfur*]: "This circuit requires district courts to use the 'lodestar method' to 'assess attorneys' fees in class action suits.'" But that sentence overstates the case it quotes [*Strong*], which said that the Circuit "uses" the lodestar method rather than "requires" it, did not involve a traditional common fund, and implied that the percentage method might be proper in other circumstances. Moreover, [*High Sulfur*], which was not a securities case, only addressed how to allocate a lump-sum attorneys' fee award among the plaintiffs' multiple attorneys rather than how to allocate a common fund between class counsel and the class itself, as here. The fact is that the Fifth Circuit has never reversed a district court judge's decision to use the percentage method, and none of our cases preclude its use.
>
> Given the Fifth Circuit's stance on choice of method, the district court did not abuse its discretion by using the percentage method

---

[123]*Id.* at 643, *quoting Batchelder v. Kerr–McGee Corp.*, 246 F.Supp.2d 525, 531 (N.D. Miss.2003).

> with a meticulous *Johnson* [*v. Georgia Highway Express., Inc.*[124]] analysis.  To be clear, we endorse the district courts' continued use of the percentage method cross-checked with the *Johnson* factors.  We join the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar methods in common fund cases, with their analyses under either approach informed by the *Johnson* considerations.[125]

As the *Union Asset* court noted, district courts in the Fifth Circuit routinely use the percentage fund method for determining common benefit fees, both in class actions and in MDLs.  In fact, many have used a "blended method," whereby the court will use the percentage method to determine the common benefit fee, and then cross-check the result for reasonableness by using the lodestar method.[126]

- **2017 – *In re Actos (Pioglitazone) Prods. Liab. Litig.*, [127] applies the percentage method to a super-mega-fund MDL.**

Perhaps the most recent example of a court employing the percentage method in an MDL is *In re Actos (Pioglitazone) Prods. Liab. Litig.*, which was decided on July 17 of this year.  Takeda Pharmaceutical Company, Ltd., manufactured a diabetes medication known as Actos.  In 2011, government regulators issued warnings that Actos might be associated with bladder cancer.  Lawsuits ensued, and, on December 29, 2011, the Judicial Panel for Multidistrict Litigation transferred the federal cases to the Western District of Louisiana.  The parties tried a single

---

[124]488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds*, *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989).

[125]*Union Asset*, 669 F.3d at 644.

[126]Eldon E. Fallon, *supra* note 111, at 385-86.

[127]2017 WL 3033134 (W.D. La. 2017).

bellwether, resulting in a judgment totaling $38.375 million.[128]   On April 28, 2014, the parties

entered into a global settlement agreement of approximately 11,000 claims for $2.4 billion.   The

district court then turned to compensating the common benefit attorneys.  Observing that "[v]irtually

all of the recent common fund fee awards by district courts in the Fifth Circuit – whether MDL or

class action – have used the percentage method, with an overlay analysis of reasonableness, using

the *Johnson* factors,"[129] the district court performed a percentage method analysis in which it: (1)

valued the benefit obtained by the claimants ($2.438375 billion plus non-monetary benefits); (2)

determined a benchmark percentage (8.6%[130]); (3) applied the *Johnson* factors[131]; and (4) performed

a lodestar cross-check[132]  After completing its analysis, the district court concluded that common

benefit fee award should be 8.6% of the aggregate benefit to the claimants.

---

[128]The jury awarded $1.5 million in compensatory damages and $9 billion in punitive damages, but the district court reduced the punitive damage award to $36.875 million.

[129]*Actos*, 2017 WL 3033134 at 26.

[130]The district court surveyed prior cases and concluded that the average fee award in a super-mega-fund case (i.e., one with a settlement value exceeding $1 billion) is 9.9%.  Nevertheless, noting that every case "is unique and should be treated as such," the district concluded the *Actos* MDL warranted a lower percentage of 8.6%.  *Id.* at 27.

[131]Many courts select a benchmark percentage and then decide whether to adjust it (up or down) after analyzing the *Johnson* factors.  The district court in *Actos* chose 8.6% as a "starting point," and then used the *Johnson* factors to determine if it was reasonable.

[132]The district court in *Actos* noted that the attorneys had expended more than 200,000 approved hours (202,421.65, to be exact) on the common benefit.  The court further noted: "Courts with MDLs of similar size within this area and the recent past have used $450 as an appropriate average/blended hourly rate for work performed."  *Actos*, 2017 WL 3033134 at 28.

## III.    The common benefit should be based on a percentage of the aggregate benefit to the claimants.

Objectors suggest that any of three possible methodologies be used to determine the common

benefit fee.[133]   The Special Master will address each alternative in turn.

- **The lodestar method cross-checked by the percentage method, as in *Strong*, with a steep downward adjustment to account for the deficient fee recovery negotiated by the PSC and the abundance of inappropriate time (e.g., Taishan time)**

In *Union Asset*, the Fifth Circuit "join[ed]" the majority of circuits in allowing our district

courts the flexibility to choose between the percentage and lodestar methods in common fund cases,

with their analyses under either approach informed by the *Johnson* considerations."[134]   However,

even though districts can use the lodestar method, most have chosen not to do so.  "Virtually all of

the recent common fund fee awards by district courts in the Fifth Circuit – whether MDL or class

action – have used the percentage method, with an overlay analysis of reasonableness, using the

Johnson factors."[135]   Notably, even though many courts that employ the percentage method also

perform a lodestar cross-check, such a cross-check is not a requirement.  The percentage method

informed by the *Johnson* factors, without any lodestar analysis at all, is enough.

- **The blended method determined by and applied against the Fee Fund ($233,078,270.33) as a traditional common fund, as in *Union Asset* and *Vioxx***

Objectors suggest that the fund at issue (against which the percentage should be applied) is

the Fee Fund (*i.e.*, the fund available for both common benefit fees and individually-retained counsel

fees).  In *Union Asset*, the district court awarded a common benefit fee equal to 18% of the

---

[133]Objectors' Brief at 20.

[134]*Union Asset*, 669 F.3d at 644.

[135]*Actos*, 2017 WL 3033134 at 26.

aggregate benefit to the claimants.  In *Vioxx*, the district court awarded a common benefit fee equal to 6.5% of the aggregate benefit to the claimants.  In neither case did the court apply the percentage to the "Fee Fund."

• **The blended method using the actual value of the Claimants' Recovery ($644,893,039.38) as a constructive common fund with the net percentage applied to the Fee Fund, which takes into consideration the deficiency and is consistent with the evolution of the percentage method in other circuits**

Objectors state that this is their preferred method.  The issue is whether the "actual value" of the aggregate benefit to the claimants is $644,893,039.38 (as Objectors claim), or something else. The Special Master will turn to that issue in the next section.

## IV.   In this case, the percentage method supports a $90 million award.

### A.   The aggregate benefit to the claimants totals more than $1.1 billion.

As discussed in Section II above, the common fund doctrine rewards attorneys for achieving benefits for a universe of claimants extending beyond their own clients.  The percentage method calculates the fee award as a percentage of the aggregate benefit to all claimants.  And the aggregate benefit includes all benefits, whether monetary or nonmonetary.[136]  Some comparisons help illustrate these principles:

• **Comparison 1:** Settlement One includes nonmonetary benefits plus $100 million in cash. Settlement Two includes $100 million in cash, with no nonmonetary relief.  The common benefit attorneys in Settlement One achieved a greater benefit for the claimants.[137] Therefore, they deserve a higher attorneys' fee.

---

[136]*See, e.g.*, Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, 35 (3d. Ed. 2010) ("[t]he primary method is based on a percentage of the actual value to the class of any settlement fund plus the actual value of any nonmonetary relief").

[137]*Id.*

- **Comparison 2:** In Settlement One, the defendant will pay $100 million in cash plus the claimants' attorneys' fees.  In Settlement Two, the defendant will pay $100 million in cash but will not pay the claimants' attorneys' fees.   The common benefit attorneys in Settlement One achieved a greater benefit for the claimants.[138]   Therefore, they deserve a higher attorneys' fee.

- **Comparison 3:**  In Settlement One, the defendant will pay $100 million in cash plus the costs associated with administering the settlement.  In Settlement Two, the defendant will pay $100 million in cash but will not pay the costs associated with administering the settlement.   The common benefit attorneys in Settlement One achieved a greater benefit for the claimants.[139]  Therefore, they deserve a higher attorneys' fee.

- **Comparison 4:** In Settlement One, the defendant will pay $100 million in cash to the claimants.  Only half of the claimants are represented by counsel, and therefore individually-retained counsel will only "participate" in (*i.e.*, be able to charge a fee for) $50 million of the settlement fund (this example assumes half of the claimants are entitled to half of the settlement fund).  In Settlement Two, the defendant will pay $100 million in cash to the claimants.  All of the claimants are represented by counsel, and therefore individually-retained counsel will participate in $100 million (*i.e.*, all) of the settlement fund.  Because the benefit to the claimants (not to the individually-retained counsel) is what counts, the common benefit attorneys would receive the same fee in both settlements.[140]

This last comparison addresses a recurring theme in Objectors' Brief.  Objectors contend that individually-retained counsel did not receive a fee with respect to: (1) pro se properties and

---

[138]*See In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 2016 WL 6215974 at 15 (E.D. La. 2016) ("[W]hen the settlement calls for the defendant to fund the payment of attorneys' fees to class counsel, it relieves the class of the burden of paying those fees from the recovery otherwise available to class members. As such, where a class settlement contains a provision that obliges the defendant to fund the payment of attorneys' fees to class counsel up to a specified amount, that amount is properly included in the value of the settlement for fee award purposes.").

[139]*See Burford v. Cargill, Inc.*, 2012 WL 5471985 at 1 (W.D. La. 2012) (the valuation of a settlement fund for purposes of the percentage method "includes administrative costs and attorneys' fees, which are generally viewed as an aspect of the class recovery").

[140]Objectors' Brief at 32.

properties outside the MDL[141]; (2) amounts paid to the homebuilders[142]; (3) the funds received from North River[143]; (4) the funds received from the Virginia settlements[144]; and (5) voluntary common benefit payments.[145]  If Objectors did not participate in the fee, they contend, the amount cannot be included in determining the common benefit.  To support this argument, they cite Judge Fallon's article on the subject, in which he notes that there is a difference between imposing a common benefit fee in a class action and imposing a common benefit fee in an MDL:

> In class actions the beneficiary of the common benefit work is the claimant; in MDLs the beneficiary is the primary attorney (the attorney who has the representation agreement with the claimant). For this reason, in MDLs, the common benefit fee is extracted from the fee of the primary attorney and not the claimant, as is the case with class actions.  Thus in MDLs, the claimant does not pay the common benefit fee; the primary attorney who is the beneficiary of the common benefit work pays it.[146]

This passage addresses how common benefit fees are *paid* (for class actions, from the claimants; for MDLs, from the individually-retained counsel), not how they are *calculated*.  As the above-cited jurisprudence makes clear, the calculation of common benefit fees is the same for class actions and for MDLs – as a percentage of the aggregate benefit to the claimants.

The FC contends that the aggregate benefit to the claimants consists of five elements: (1) the market value of remediation benefits provided by Knauf to KPT class members (Option 1)

---

[141]*Id*. at 36.

[142]*Id*. at 37.

[143]*Id*. at 38.

[144]*Id*. at 39.

[145]*Id*. at 39.

[146]Eldon E. Fallon, *supra* note 111, at 376.

($515,643,751.00); (2) additional payments made by Knauf to implement and finalize the class settlement, including payments for Options 2 & 3, Already Remediated Homes, and other losses, such as bodily injuries, lost rents, lost sales, personal property damage, etc. ($247,382,592.71); (3) payments made by other settling Defendants pursuant to the GBI settlements ($78,716,786.55); (4) attorneys' fees provided under the Knauf, GBI, and Virginia settlements ($233,078,270.33); (5) payments made to class members under the Virginia settlements ($10,962,000.00); and (6) administrative costs and the value of services essential to administer, implement and finalize the class settlements ($34,529,905.31).  These elements add up to more than $1.1 billion.  Objectors disagree.  The Special Master will address each element in turn.

### 1. The market value of remediation benefits provided by Knauf to KPT class members (Option 1)

The Knauf settlement gave qualifying claimants three options: (1) Knauf would pay a contractor to remediate the claimant's property (Option 1)[147]; (2) Knauf would pay a cash amount to a claimant who had self-remediated (Option 2)[148]; or (3) Knauf would pay a lesser cash amount to a claimant whether or not he intended to remediate (Option 3).[149]  If a claimant chose Option 1, Knauf would then pay Moss & Associates, LLC (the "Lead Contractor") to remediate the property in accordance with the Remediation Protocol promulgated in Exhibit F of the settlement agreement.[150]  Exhibit F was borrowed almost *verbatim* from Exhibit D (the scope of work) of the

---

[147]R. Doc. 12061-5 ¶4.3.1.

[148]*Id*. ¶4.3.2.

[149]*Id*. ¶4.3.3.

[150]R. Doc. 12061-14.

pilot program,[151] which "was largely based upon the remediation protocol formulated by the Court in *Hernandez*."[152]

When employing the percentage method, all benefits to the class, including non-cash benefits, count toward the aggregate claimant benefit.  When faced with a mixed settlement (with cash and non-cash components), courts often rely upon experts to give a fair market cash value to the non-cash component.[153]  In this case, the FC submitted the affidavit of George J. Inglis, P.E.  The Court already has accepted Mr. Inglis as an expert and has relied on his testimony concerning remediation costs in this matter, albeit in a different context.[154]  Mr. Inglis attached a spreadsheet to his affidavit which shows his methodology for estimating the total value of the remediations performed pursuant to Option 1.[155]  The spreadsheet takes into account the location of each property and the year of its remediation in valuing the property's remediation.  Mr. Inglis estimates that the aggregate market value of all of the Option 1 remediations was. $515,643,751.00.[156]

---

[151]R. Doc. 16189-1.  In their brief, Objectors argue that the remediation protocol in the Knauf Settlement Agreement substantially differed from the one in *Hernandez*. Objectors' Brief, at 31 & n.66.  The Court's previous statements do not support this contention; neither does an analysis of the various protocols.

[152]R. Doc. 20741 at 3 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 1421627 at 2).

[153]*See, e.g.*, *In re Auction Houses Antitrust Litig.*, 2001 WL 170792 (S.D.N.Y. 2001), *aff'd*, 42 Fed.Appx. 511 (2nd Cir. 2005).

[154]R. Doc. 20741 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 WL 1421627 (E.D. La. 2017)) (accepting Mr. Inglis's methodology for estimating remediation costs for Taishan properties).

[155]R. Doc. 20292-3.

[156]*Id.*

Objectors note that the remediations cost Knauf substantially less than $515,643,751.00.[157] But, in valuing the fund when employing the percentage, it is the value to the claimants that matters, not the cost to the defendant.[158]   Furthermore, Objectors contend that there is no basis to conclude that Moss brought to bear an economy of scale, and they cite anecdotal testimony from the evidentiary hearing that properties could be remediated for less than either the Moss price or the costs assumed by Mr. Inglis.[159]   However, the Court already has endorsed the methodology employed by Mr. Inglis, and the Court has concluded that the per square foot remediation costs are similar to those that Mr. Inglis proposes here.[160]

The Special Master concludes that the aggregate claimant benefit includes Knauf remediation benefits valued in the amount of $515,643,751.00.

> **2.      Additional payments made by Knauf to implement and finalize the class settlement, including payments for Options 2 & 3, Already Remediated Homes, and other losses, such as bodily injuries, lost rents, lost sales, personal property damage, etc.**

In its March 2016 monthly report, the PSC reported that Knauf had deposited a total of $548,182,144.61 into a trust account for potential payments under Options 1, 2, and 3.[161]   Of this, Knauf paid Moss $345,586,974.09 to remediate Option 1 properties, and it paid GFA International

---

[157]Objectors' Brief at 27.

[158]Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, *supra* note 135, at 35.

[159]Objectors' Brief at 27-32.

[160]R. Doc. 2380 at 57 (*In re Chinese Manufactured Drywall Prods. Liab. Litig*., 706 F.Supp.2d 655, 687 (E.D. La. 2010));  R. Doc. 2713 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig*., 2010 WL 1710434 (E.D. La. 2010)); and R. Doc. 20741 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig*., 2017 WL 1421627 (E.D. La. 2017)).

[161]FC exh. 2-3 (filed under seal) (this information is not confidential, since it was cited in the Components Table of R. Doc. 20292-3).

$1,159,406.24 for post-remediation environmental certifications.[162]  The value of the Moss and GFA International payments is subsumed into the overall remediation benefit value, which was discussed in the previous section.  In order to avoid double-counting, the FC subtracted the amount of these payments from Knauf's overall contribution to determine Knauf's additional payments to claimants, ($548,182,144.61 - $345,586,974.09 - $1,159,406.24 =) $201,435,764.28.[163]  The PSC's March 2016 monthly report also states that Knauf paid an additional $41,714,601.42 for already remediated homes.[164]  Furthermore, Jake Woody of BrownGreer (the settlement administrator) reports that Knauf paid $4,232,227.01 for "Other Loss Fund" claims.[165]  Thus, according to the FC, the aggregate claimant benefit.includes Knauf payments in the amount of $201,435,764.28 + $41,714,601.42 + $4,232,227.01 =) $247,382,592.71.

Objectors suggest a different approach, which yields a different result.  In his June 14, 2017 email to Allison Grant, Mr. Woody stated that Knauf had paid $70,658,600.67 in Option 2 payments, $32,365,164.70 in Option 3 payments, and $43,940,336.43 in already-remediated home payments, and was expected to pay an additional $3,815,352.88 to claimants.  Therefore, Objectors calculate the value of this component to be ($70,658,600.67 + $32,365,164.70 + $43,940,336.43 + $3,815,352.88 =) $150,779,454.68.

---

[162]R. Doc. 20292-3 n.2.

[163]The Components Table (R. Doc. 20292-3) affirms this calculation.  The FC's Brief states that Knauf's additional payments total $201,435,764.25, rather than $201,435,764.28.  The three penny difference appears to be the result of a clerical error.

[164]FC exh. 2-3 (filed under seal) (this information is not confidential, since it was cited in the Components Table of R. Doc. 20292-3).  The Knauf settlement provided for Other Loss Fund Benefits, which were designed to reimburse claimants for certain expenses not otherwise covered in the settlement.  R. Doc. 12061-5 ¶4.7.

[165]R. Doc. 20292-3.

The FC and Objectors are ($247,382,592.71 - $150,779,454.68 =) $96,603,138.03 apart. The reason is that FC suggests a starting point of $548,182,144.61, which was paid into a trust account for *potentia*l payments, but has not been (and, according to Mr. Woody, probably will not be) entirely paid out. Objectors' number reflects *actual* payments to claimants. As Judge Fallon recently noted in *In re: Vioxx Prods. Liab. Litig*.,[166] sometimes courts have counted potential (including unclaimed) payments (as in *Boeing*), and sometimes they have not (as in *Strong*). In light of Judge Fallon's discussion of the issue in *Vioxx*, the Special Master concludes that the FC has the better of the argument; the aggregate benefit to the claimants is $247,382,592.71.[167]

### 3. Payments made by other settling Defendants pursuant to the GBI settlements

The Global, Banner, and InEx ("GBI") settlements also generated benefits to the claimants. Knauf received some of the GBI settlement money. Mr. Woody calculated that, excluding payments to Knauf, the GBI settlements paid $40,279,825.14 for repair and relocation,[168] and $38,436,961.41 to the Other Loss Fund.[169]

A substantial portion of this amount was paid to builders who were defendants in the MDL, or was paid to Knauf as a result of assignments. Objectors contend that these amounts should not be counted toward the aggregate benefit to the claimants. The Special Master disagrees. With

---

[166]MDL No. 1657, R. Doc. 65537 at 16-21 (E.D. La. Sept. 1, 2017) (Fallon, J.).

[167]Indeed, in distinguishing *Boeing, Strong* seized upon the lack of actual payment by the defendant into an account, not the lack of actual payment to claimants. *Strong*, 137 F.3d at 852 ("[i]n contrast to *Boeing*, in this settlement no money was paid into escrow or any other account – in other words, no fund was established at all in this case"). Knauf paid money into the trust account in this case.

[168]R. Doc. 20293-3.

[169]*Id.*

respect to amounts paid to the builders, they were claimants vis-à-vis the upstream defendants, and therefore recovery for them constituted a recovery for the aggregate common benefit. With respect to the amounts paid to Knauf, those amounts would have been counted toward the aggregate common benefit but for the assignment; an assignment by a beneficiary to Knauf should not operate to reduce the common benefit fee.

The Special Master concludes that the aggregate benefit.includes the payments made to class members pursuant to the GBI settlements in the amount of ($40,279,825.14 + $38,436,961.41 =) $78,716,786.55.

### 4.    Attorneys' fees provided under the Knauf, GBI, and Virginia settlements

In addition to the other benefits to the claimants, the settlements provided that the defendants would pay certain attorneys' fees and costs. .Mr. Garrett has totaled these to be $233,078,270.33.[170] The Special Master concludes that the aggregate benefit to the claimants includes attorneys' fees and costs of $233,078,270.33.

### 5.    Payments made to class members under the Virginia settlements

In the four Virginia settlements, the defendants agreed to pay a total of $17,400,000.00.[171] Some of this was devoted to attorneys' fees, which were accounted for in the previous section. In order to avoid double-counting, any attorneys' fees should be deducted in calculating the claimants' benefit from the Virginia settlements. This would mean that the claimants' net recovery from the

---

[170]R. Doc. 20293-2.

[171] Builders Mutual settlement was for $1,700,000.00. R Doc. 16478-3. The Nationwide settlement was for $10,000,000.00. R. Doc. 15969-5. The Porter-Blaine/Venture Supply settlement was for $3,000,000.00. R. Doc. 15969-6. The Tobin Trading/Builders Plaster & Drywall/JMM Drywall settlement was for $2,700,000.00. R. Doc. 15969-7.

Virginia settlements was ($17,400,000.00 - $5,673,299.05[172] =) $11,726,700.95.[173]

The Special Master concludes that the aggregate benefit includes payments to claimants pursuant to the Virginia settlements in the amount of $11,726,700.95.

### 6. Administrative costs and the value of services essential to administer, implement and finalize the class settlements

The FC suggests that several categories of administrative costs should be included in calculating the aggregate benefit to the claimants.  These include: class notice ($2,829,925.34); settlement administrative services ($4,600,000.00 for BrownGreer, and $289,689.41 for Garretson Group); Pro Se Curator services ($734,209.37); Ombudsman services ($291,448.39); pre-remediation inspection costs ($6,078,195.00 to Benchmark, and $2,333,324.28 to MZA[174]); bidding, start-up, "core" staff, and consulting costs of Moss ($11,667,699.00 for bidding costs, $900,000.00 for initial start-up costs, $3,587,500.00 for "core" staff costs, and $319,551.01 for consulting services in connection with Already Remediated Homes); and Special Master services ($687,720.51); storage costs for preservation of drywall ($210,463.00).

The expenditure of these amounts aided in the implementation of the settlements, and therefore benefitted the claimants.  They should be counted toward the aggregate claimant benefit to the extent that defendants paid for them.  It appears that defendants paid for all of them, other than a portion of the Special Master services.  The Special Master has reviewed his records, and has determined that defendants (specifically, Knauf) paid only about $385,000.00 of the invoices

---

[172]FC exh. 3-2.

[173]This amount, while different from the amount suggested by the FC, is the amount supported by Mr. Garrett's updated reconciliation.

[174]In its brief, the FC suggests that MZA was paid $2,330,325.28.  FC's Brief at 45. However, the record reflects that the payments to MZA totaled $2,333,324.28.  R. Doc. 20293-3.

generated by the Special Master.  The balance was paid by individual claimants or the PSC.

The Special Master concludes that the aggregate benefit includes the above administrative and associated costs totaling $34,227,004.80.

## B.    The benchmark should reflect similar super-mega-fund cases.

Based upon the above, the value of the aggregate benefit to the claimants is more than $1.1 billion.  The next step typically would be to determine the benchmark to apply against it.

Courts have relied on a number of sources to determine the appropriate benchmark.  Many have turned to empirical studies, such as the two conducted and reported by Professors Theodore Eisenberg and Geoffrey Miller.[175]  While helpful, these studies have not taken into account newer cases.  The more recent of the Eisenberg and Miller articles reviews attorneys' fee awards through 2008.  Likewise, Professor Brian Fitzpatrick published an empirical study which reviewed attorneys' fee awards from 2006 to 2007.[176]  The Special Master suggests that more recent cases should also be considered.

For settlement funds totaling less than $100 million, courts often use a benchmark of 25%.[177]  However, when the settlement fund is between $100 million and $1 billion (which courts have come to refer to as a "mega-fund"), fee awards have varied.[178]  This trend is perhaps even more true where,

---

[175]Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27 (2004); and Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (2010).

[176]Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. Empirical Legal Stud. 811 (2010).

[177]*Actos*, 2017 WL 3033134 at 27.

[178]*Id.*

as here, the settlement fund exceeds $1 billion (a "super-mega-fund" case).[179]

Objectors suggest that assessments rather than final awards should provide guidance for the benchmark in this case. But assessments are at best a preliminary estimate of the common benefit effort; they often are subject to modification as the case progresses. For instance, Objectors cite *In re: Phenylpropanolamine (PPA) Prods. Liab. Litig.*, noting that the district court in that case imposed "an assessment of 4% in federal cases and 3% in state cases. . . ."[180] However, the district court later increased the assessment to 8%.[181] The Special Master concludes that final awards establish better data points than preliminary assessments do.

The following is a list of percentage awards in super-mega-fund cases from the last two decades:

- *In re NASDAQ Market-Makers Antitrust Litig.*[182] (MDL; 14% fee);

- *Shaw v. Toshiba America Information Sys., Inc.*[183] (class action; 15% fee);

- *In re Prudential Ins. Co. of America Sales Practice Litig.*[184] (class action; 4.8% fee);

- *In re Cendant Corp. Litig.*[185] (class action; 1.7% fee);

- *In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*[186].(MDL; 5.9% fee);

---

[179]*Id.*

[180]Objectors Brief at 55.

[181]*In re: Phenylpropanolamine (PPA) Prods. Liab. Litig.*, MDL No. 1407, R. Doc. 3141 (W.D. Wash. Dec. 13, 2004).

[182]187 F.R.D. 465 (S.D.N.Y. 1998).

[183]91 F.Supp.2d 942 (E.D. Tex. 2000).

[184]106 F.Supp.2d 721 (D.N.J. 2000).

[185]243 F.Supp.2d 166 (D.N.J. 2003).

[186]268 F.Supp.2d 907 (N.D. Ohio 2003).

- *Deloach v. Philip Morris Cos.*[187] (class action; 5.9% fee);

- *In re Visa Check/Mastermoney Antitrust Litig.*[188] (class action; 6.51% fee);

- *In re WorldCom, Inc. Sec. Litig.*[189] (MDL; 5.5% fee);

- *Allapattah Servs., Inc. v. Exxon Corp.*[190] (class action; 31.34% fee);

- *In re AOL Time Warner, Inc. Sec.*[191] (MDL; 5.9% fee);

- *In re Royal Ahold N.V. Sec. & ERISA Litig.*[192] (class action; 12% fee);

- *In re Tyco Intern., Ltd. Multidistrict Litig.*[193] (MDL; 14.5% fee);

- *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*[194] (MDL; 6.75% fee);

- *In re Enron Corp. Sec., Derivative & ERISA Litig.*[195] (MDL; 9.52% fee);

- *In re Vioxx Prods. Liab. Litig.*[196] (MDL; 6.5% fee);

- *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*[197] (MDL; 20% fee);

---

[187]2003 WL 23094907 (M.D.N.C. 2003).

[188]297 F.Supp.2d 503 (E.D.N.Y. 2003), *aff'd*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96 (2nd Cir. 2005).

[189]388 F.Supp.2d 319 (S.D.N.Y. 2005).

[190]454 F.Supp.2d 1185 (S.D. Fla. 2006).

[191]2006 WL 3057232 (S.D.N.Y. 2006).

[192]461 F.Supp.2d 383 (D. Md. 2006).

[193]535 F.Supp.2d 249 (D.N.H. 2007).

[194]553 F.Supp.2d 442 (E.D. Pa. 2008), *aff'd*, 582 F.3d 524 (3rd Cir. 2009).

[195]586 F.Supp.2d 732 (S.D. Tex. 2008).

[196]760 F.Supp.2d 640 (E.D. La. 2010).

[197]792 F.Supp.2d 1028 (N.D. Ill. 2011).

- *In re Avandia Mktg., Sales Practices and Prods. Liab. Litig.*[198] (MDL; 6.25% fee);

- *In re TFT-LCD (Flat Panel) Antitrust Litig.*[199] (MDL; 28.5% fee);

- *In re Bank of America Corp. Sec., Derivative, and Employee Retirement Income Security Act (ERISA) Litig.*[200] (MDL; 6.5% fee);

- *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab. Litig.*[201] (MDL; 12.2% fee);

- *In re Black Farmers Discrimination Litig.*,[202] (class action; 7.4% fee);

- *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*[203] (class action; 9.56% fee);

- *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*[204] (MDL; 4.3% fee);

- *In re Actos (Pioglitazone) Prods. Liab. Litig.*[205] (MDL; 8.6% fee)

An obvious solution would be to take the average of the above percentages. Whether averaging all of the percentages (*i.e.*, for class actions and for MDLs), or just averaging MDL percentages, the result is about 10%.[206]

But the average does not tell the whole story. Even restricting the analysis to MDL cases,

---

[198]2012 WL 6923367 (E.D. Pa. 2012).

[199]2013 WL 1365900 (N.D. Cal. 2013).

[200]2013 WL 12091355 (S.D.N.Y. 2013).

[201]2013 WL 3224585 (C.D. Cal. 2013).

[202]953 F.Supp.2d 82 (D.D.C. 2013)

[203]991 F.Supp.2d 437 (E.D.N.Y. 2014).

[204]2016 WL 6215974 (E.D. La. 2016).

[205]2017 WL 3033134 (W.D. La. 2017).

[206]In *Actos*, the district court conducted a similar survey, and calculated the average to be 9.9%. *Actos*, 2017 WL 3033134 at 27.

the courts have awarded anywhere from 4.3% to 28.5% of the settlement fund. Ignoring the two highest and two lowest awards, we can reduce this to a range of 5.5 to 14.5 (coincidentally, with a mid-point of 10%).[207]

The variety of awards reinforces the notion that the analysis should not be overly formulaic. Instead, while considering awards in a broad range of cases is helpful, the better approach is to consider the facts and circumstances of the case at hand. If other courts confronted similar facts and circumstances, their decisions can provide more precise guidance.

Of the super-mega-fund cases listed above, *Actos* stands out as analogous. The facts of that case were already discussed above. Of particular note is the following. The *Actos* settlement fund was just over $2.4 billion; the settlement fund here is just over $1.1 billion. The *Actos* attorneys submitted 202,421.65 hours in common benefit time; the attorneys here submitted 232,309.35 hours in common benefit time. The parties entered into the *Actos* settlement just under three years and four months after the MDL transfer; the parties entered into the last of the nine settlements here a little more than three years and six months after the MDL transfer. In some ways *Actos* was more complicated (the bellwether trial lasted ten weeks); in some ways this case is more complicated. But the similarities are striking.

After a thorough analysis the district court awarded an attorneys' fee of 8.6% of the common fund to the *Actos* attorneys. It is tempting to do the same here. However, one major difference between the two cases deserves attention. In this case, the common benefit fee will be drawn from a capped global fee and cost fund of $192,981,363.35. Any common benefit fee award will necessarily reduce the fees of individually-retained counsel. The problem hearkens back to the

---

[207]Objectors' Brief includes a section entitled: "A Lower Fee is Inherent in the MDL Structure." Objectors' Brief at 48. While this may be true for smaller settlement funds (where the typical class action benchmark is 25%), it does not appear to be true for super-mega-funds.

origins of the common fund doctrine.  If the doctrine was only rooted in *quantum meruit*, then we could solely focus on what the common benefit attorneys did.  But another justification has always been unjust enrichment: the concern that, as in *Greenough*, some would unfairly profit off of the sweat of others.

The individually-retained counsel in this case have not been freeloaders, and no one has suggested that they have.  The evidence in this case, including but not limited to the declarations filed into the record and the testimony at the evidentiary hearing, demonstrates their continuing involvement on behalf of their clients.  The Special Master was particularly impressed with the testimony of Eric Hoaglund and C. David Durkee in this respect.  Indeed, one of the Special Master's roles in this litigation has been conducting binding mediations when disputes have arisen under the Knauf settlement; Mr. Hoaglund, Mr. Durkee, and many others, including many Objectors, have appeared at those mediations and represented their clients well.  Another one of the Special Master's roles has been to address Other Loss Fund claims.  In this capacity, the Special Master has witnessed the amount of work that the individually-retained counsel have had to perform on behalf of their clients.  The above list is by no means exhaustive; there are many other responsibilities which individually-retained counsel performed that did not directly involve the Special Master, but which are apparent from the record.

The FC suggests an 8% benchmark, and the Objectors suggest 5%.  Given the unusual amount of tension caused by the zero-sum nature of the attorneys' fees,[208] the Special Master will consider the *Johnson* factors in conjunction with the benchmark before arriving at a final percentage.

---

[208]*Vioxx*, 760 F.Supp.2d at 653 ("in determining a reasonable common benefit fee the Court must resolve the 'taffy pull' between the interests of common benefit counsel and primary attorneys in receiving fair compensation for their respective work").

## C.     The *Johnson* factors weigh in favor of the common benefit attorneys.

The *Johnson* factors are a way to tell us if we should divert from the norm.  In applying

them, it is important to keep in mind what the norm is.  For our purposes, the norm is not the typical

case.  It is not even the typical class action or MDL.  The norm is the typical super-mega-fund case,

such as the ones listed above.  All of these cases involved stellar attorneys who spent gobs of time

resolving legal and factual conundrums to achieve greater-than-a-billion-dollar results.  The issue

is whether this case is distinguishable from them.

### 1.     The time and labor required

Mr. Garrett accepted 233,140.95 hours of common benefit time.  The Special Master took

this into account in his discussion in the previous section.  This factor does not warrant an additional

adjustment.

### 2.     The novelty and difficulty of the issues

Virtually all MDLs entail novel and difficult issues.  But one aspect of this matter was

particularly challenging: the number (1651) and variety of defendants.   The common benefit

attorneys had to identify the defendants, prepare omnibus complaints which matched the proper

plaintiffs to the proper defendants, serve the defendants (some of whom had to be served through

the Hague Convention, a difficult and expensive process), conduct and answer discovery on

numerous fronts, and (perhaps most difficult of all) construct a series of settlements involving

thousands of plaintiffs and hundreds of defendants.  The inter-related nature of the settlements

increased the level of complexity.  This factor warrants an upward adjustment.

### 3.     The skill required to perform the legal service adequately

The Special Master recognizes that it took great skill to resolve the difficult issues in this

case.  But, using the yardstick of other super-mega-fund cases, the Special Master does not believe

that this factor warrants an adjustment.

### 4. The preclusion of other employment by the attorney because he accepted this case

Any MDL requires a significant investment of time. The issue here is whether the common benefit attorneys had to give up their practices in a way that is not typical of an super-mega-fund MDL. This factor does not warrant an adjustment.

### 5. The customary fee for similar work in the community

This factor is not well-suited for an MDL such as this one. The better comparison, discussed in the previous section concerning the benchmark, is the customary fee for super-mega-funds. This factor does not warrant an adjustment.

### 6. Whether the fee is fixed or contingent

This case was no different from other super-mega-fund cases in this respect. This factor does not warrant an adjustment.

### 7. Time limitations imposed by the client or the circumstances

In its brief, the FC focuses on time limitations imposed by the Court. Such time limitations are common in MDLs. The most significant timing concern was the fact that many claimants had left their homes and could not return until their homes were remediated. This factor warrants a small upward adjustment.

### 8. The amount involved and the results obtained

The value of this settlement fund, just over $1.1 billion) is actually on the lower end of the spectrum of super-mega-fund cases, which by definition involve settlement funds in excess of $1 billion. But this fact may yield counterintuitive results. "[S]ome courts have used a sliding scale,

with the percentage decreasing as the magnitude of the fund increases . . . ."[209]  Furthermore, as the Court repeatedly has noted, the settlements in this case allowed many claimants to fully remediate their homes without having to pay any attorneys' fees.  This factor warrants an upward adjustment.

### 9.      The experience, reputation, and ability of the attorneys

The common benefit attorneys in this matter have an outstanding reputation.  In fact, many have been involved in the super-mega-fund cases discussed in the previous section (discussing the benchmark).  Ironically, this fact demonstrates that this factor is not distinguishable from the norm, if the norm is the typical super-mega-fund case.  This factor does not warrant an adjustment.

### 10.      The undesirability of the case

There is a difference between "undesirable" and "difficult."  Sometimes a legal assignment is undesirable because taking it will cause an attorney to be ostracized in his community, like Atticus Finch in *To Kill a Mockingbird*.  The attorney who takes such the case runs the risk that he will lose business, his friend, his family, or even his life.[210]  This case, while extremely difficult (a characteristic it has in common with other super-mega-fund cases), is not undesirable in that sense.  This factor does not warrant an adjustment.

### 11.      The nature and length of the professional relationship with the client

The vast majority of the claimants in this matter were brought into the case by individually-retained counsel other than the common benefit attorneys.  This factor does not warrant an adjustment.

### 12.      Awards in similar cases

The Special Master reviewed other awards in super-mega-fund cases in the previous section.

---

[209]Manual for Complex Litigation, Fourth, §14.121 (2004).

[210]*See*., *e.g*., *Vioxx*, 760 F.Supp.2d at 656, *quoting Johnson*, 488 F.2d at 719.

Those cases, the *Johnson* factors, and the unique facts of this case support a common benefit fee award of $90 million.[211]  This represents slightly more than 8% of the aggregate benefit to the claimants, and is just below the percentage (8.6%) awarded by the district court in *Actos*.

### D.      A lodestar cross-check supports the common benefit award.

Although the Fifth Circuit has specifically endorsed the percentage method, many courts have found it advisable to cross-check fee awards with a lodestar cross-check.  With the lodestar method, "the court computes fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate and, in its discretion, applying an upward or downward multiplier."[212]

Mr. Garrett, the Court-appointed CPA, performed several lodestar calculations based upon the approved 232,309.35 hours of common benefit time: (1) using the reported actual hourly rate at inception, $115,712,271.30; (2) using the reported current hourly rate, $146,854,654.40; and (3) using the blended hourly rates (the average between the reported actual hourly rate at inception and the reported current hourly rate), $131,588,525.35.  Even using a blended hourly rate of $450,[213] the lodestar calculation supports an award of $104,539,207.50.

It must be remembered that the lodestar serves, at best, as a cross-check.  In *Actos*, the

---

[211]Some, but not all, of the settlements cap the common benefit fee at no more than 15% of the settlement fund.  The Knauf settlement, which is the largest of the nine settlements, does not. In any event, a $90 million common benefit fee is well less than 15% of the approximately $1.1 billion settlement fund.

[212]*Union Asset*, 669 F.3d at 642-43.

[213]In *Actos*, the district court observed: "Courts with MDLs of similar size within this area and the recent past have used $450 as an appropriate average/blended hourly rate for work performed."  *Actos*, 2017 WL 3033134 at 28.

district court awarded a common benefit fee of more than $200 million. The common benefit hours would have only justified a common benefit attorneys' fee award of about $90 million.[214] In other words, the common benefit attorneys' fee award was more than twice the lodestar calculation. Likewise, in this case, a much lower (even drastically lower) lodestar calculation would not have persuaded the Special Master that the percentage method resulted in an unreasonable award. Even without giving the common benefit attorneys the benefit of an appropriate multiplier, the lodestar analysis supports the recommended award of $90 million.

# Conclusion

The Special Master recommends that the Court dispose of the below motions as indicated:

•   The Fee Committee's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F)[215] should be GRANTED IN PART and DENIED IN PART. The Court should allocate $90 million to common benefit fees.

•   Primary Counsel's Request to Allocate the Global Fee Award Between Common Benefit Counsel and Primary Counsel[216] should be GRANTED IN PART and DENIED IN PART. The Court should allocate $90 million to common benefit fees.

•   Parker Waichman LLP's Request for Discovery, Additional Briefing and a Contradictory Hearing Regarding the Proposed Allocation[217] should be DENIED AS MOOT.

•   The Court should direct the parties to show cause why the record of the Special Master proceedings, including but not limited to the depositions and the transcript of the evidentiary hearing, should not be unsealed.

---

[214]This assumes a $450 per hour blended rate and no multiplier, which are the same assumptions underlying the $104,539,207.50 lodestar calculation made in the previous paragraph.

[215]R. Doc. 20293.

[216]R. Doc. 20336.

[217]R. Doc. 20348.

Baton Rouge, Louisiana, this 11th day of September, 2017.

/s/ Daniel J. Balhoff
DANIEL J. BALHOFF
SPECIAL MASTER