**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION                                    **MDL NO. 2047**

                                              **SECTION: L**

                                              **JUDGE FALLON**
                                              **MAG. JUDGE WILKINSON**

**THIS DOCUMENT RELATES TO:**
*ALL CASES*
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**THE FEE COMMITTEE'S OBJECTIONS TO SPECIAL MASTER'S REPORT AND**
**RECOMMENDATIONS REGARDING ATTORNEYS' FEES AND EXPENSES**

**I.      INTRODUCTION**

        Pursuant to the process established by this Court for the adjudication of an award and

allocation of attorneys' fees in this matter, the Special Master has recommended that common

benefit counsel be awarded $90 million.[1]  In this case, more than 700 Defendants and their

insurers contributed in excess of $1.1 billion in settlement benefits to more than 3,000 class

members with defective Chinese Drywall in their homes, and thousands of homeowners enjoyed

complete remediation of their properties without having to pay counsel fees or costs.  Despite

this unprecedented result in a case involving more than 1,200 lawyers, the common benefit fee

award, if approved, would represent only "slightly more than 8% of the aggregate benefit to the

claimants,"[2] which is significantly *less* than the 10% average common benefit award in the most

---

[1] *See* Special Master's Recommendation Concerning Attorneys' Fees and Expenses dated 9/11/2017
("SM Recommendation") [Rec. Doc. 20950].

[2] SM Recommendation at 50.

recent super-mega-fund class actions and MDLs that the Special Master cites in his Recommendation and asserts are the "norm" for purposes of any comparison.[3]  An analysis of the Special Master's Recommendation reveals four principal flaws in his methodology and reasoning.

First, without explanation, the Special Master neglected to determine a benchmark percentage for the common benefit award recommendation, despite an acknowledgement that "[m]any courts select a benchmark percentage and then decide whether to adjust it (up or down) after analyzing the *Johnson* factors."[4]  The failure to specify an initial benchmark is odd considering the Special Master's contention that "[t]he benchmark should reflect similar super-mega-fund cases."[5]

Second, the error of not specifying a benchmark percentage was compounded by the Special Master's failure to increase that percentage based on a thorough analysis and application of the *Johnson* factors.  While acknowledging the need for an upward adjustment in reference to only three of the twelve factors, the Special Master inexplicably made no upward adjustment as to other factors simply because these same factors might be applicable in other, supposedly comparable, cases.  Importantly, the Special Master did not find any grounds for a downward adjustment of the benchmark percentage.

Third, the reasoning supporting the Special Master's Recommendation is inconsistent with the necessary and proper use of a lodestar fee calculation as a "cross-check" to assure that

---

[3] *See id.* at 44-45 & 47.

[4] *Id.* at 29 n.131.

[5] *Id.* at 41.

the percentage-of-fund calculation of the fee yielded a reasonable result.  Regardless of which hourly rates are used to calculate the lodestar cross-check, the Special Master has recommended that common benefit counsel receive *less* than the lowest lodestar fee calculation of $104,539,207.50 (using a $450 blended hourly rate), by a difference of more than $14 million. This "negative multiplier" outcome clearly suggests that the percentage fee calculation by the Special Master is flawed, insufficient in amount, and unfair to the common benefit counsel who have labored long hours to achieve an outstanding settlement for thousands of Plaintiffs in these proceedings.

Finally, and perhaps most troubling, the Special Master superimposed onto his analysis and determination of an appropriate common benefit award, views of the value of services performed by certain individually-retained attorneys based on his personal off-the-record observations of a limited number of appeals these attorneys took from settlement awards to their clients, and which he oversaw in his role as a Settlement Special Master.[6]  This is problematic for at least two reasons:  First, the Special Master did not have comparable first-hand familiarity with the efforts of the common benefit attorneys in representing the interests of all class members in this litigation, and so could not discern how those common benefit efforts may have facilitated the contract attorney activities to which he refers.  Second, the private, "binding mediations" evidence relied upon by the Special Master is, and remains, outside of this record (and under seal), rendering it irrefutable by common benefit counsel.  Clearly, such counsel are prejudiced in the current matter, if being unaware of the Special Master's views on this issue

---

[6] *See id*. at 46.

prior to his Recommendation, were given no opportunity to address or comment on the specific activities of counsel which have been weighed in the valuation of their services.[7]

For these reasons, the Fee Committee ("FC")[8] submits these Objections to the Special Master's Recommendation that $90 million be awarded to common benefit counsel. In this submission, the FC addresses only the aspects of the Recommendation that are objectively flawed and constitute clear error.[9] The FC continues to assert in accordance with its Allocation Motion that an appropriate common benefit award would equal 10.65% of the value of benefits to class members,[10] which is in line with the numerous super-mega-fund class action and MDL decisions cited by the Special Master. In this case, a common benefit award of 16.65% would result in a payment of $114,581,308.82 in attorneys' fees to common benefit counsel from the Global Fee Award.[11]

---

[7] This is especially true here where the Special Master uses his views to commend the work of individual counsel as a whole when these binding mediations took place in a small percentage of the cases and likely represented a day of work, far less than what would have been required if individual counsel had been required to litigate the case.

[8] Fee Committee Member Michael J. Ryan objects to this filing and dissents from the views advanced in this filing.

[9] The FC, *e.g.*, supports the analysis and conclusion of the Special Master regarding the value of settlement benefits provided to class members in this case.

[10] *See* Fee Committee's Memorandum of Law in Support of its Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) ("Allocation Memo.") [Rec. Doc. 20293-1] at 17-53.

[11] *See* Allocation Memo at 56. As explained previously, 10.65% of the value of settlement benefits to the class totals: $119,313,367.08. The FC appropriately subtracted from this sum additional monies intended for common benefit counsel, which were not included in the Global Fee Award of $192,981,363.35, specifically: fees related to the North River trial ($1,400,000), intended for counsel involved with the preparation and trial of InEx's excess insurance carrier (*see* Stipulation and Order Regarding Attorneys' Fees and Costs in the InEx/North River Trial [Rec. Doc. 16968]) and the voluntary contributions in the Court's Registry as of the date the Allocation Motion was filed ($3,332,058.26).

## II.    OBJECTIONS TO SPECIAL MASTER RECOMMENDATION

### A.    The Special Master Failed to Establish a Benchmark Percentage.

The starting point for an award of common benefit fees under the blended method used by the Special Master in accordance with Your Honor and the Fifth Circuit fee jurisprudence is the selection of an appropriate "benchmark" percentage of the value of plaintiffs' recovery, which percentage then may be subject to an upward or downward adjustment based on an application of the *Johnson* factors to the particular case.  *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir. 2012); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 861 (E.D. La. 2007).  Here, the Special Master did not follow this procedural framework even though he proposed to "consider the *Johnson* factors in conjunction with the benchmark before arriving at a final percentage."[12]

While the Special Master properly noted the need to determine a benchmark and then assess that benchmark using the *Johnson* factors, no such benchmark was ever enunciated.  He noted only that "[t]he FC suggests an 8% benchmark, and the Objectors suggest 5%,"[13] but the Special Master did not make a determination of the required benchmark from which to make upward or downward adjustments based on an analysis of the *Johnson* factors.  The necessary result is flawed methodology, and a critical departure from the percentage-of-fund calculation approach that governs this matter at issue.  A calculation methodology which effectively ignores its prescribed starting point (selection of a benchmark percentage) cannot and should not be deemed proper methodology by the Court.

---

[12] SM Recommendation at 46 (underscoring added).

[13] *Id.*

B.     **The Special Master Did Not Make Any Upward Adjustments in the Common Benefit Award Percentage Even Though He Found that <u>Increases Were Warranted for Three of the *Johnson* Factors.</u>**

In his analysis of the twelve *Johnson* factors, the Special Master failed to quantify his recommendation that upward adjustments be made for three of the *Johnson* factors:  (i) the novelty and difficulty of the issues in this case (factor 2),[14] (ii) the time limitations imposed (factor 7),[15] and (iii) the amount involved and the results obtained, which notably included the fact that "the settlements in this case allowed many claimants to fully remediate their homes without having to pay any attorneys' fees" (factor 8).[16]  At no point in his analysis does the Special Master identify the degree of the *Johnson* factor adjustment he recommends.  Thus, nowhere in the Special Master's Recommendation is there a way to know <u>either</u> the benchmark percentage selected at the outset, <u>or</u> the exact percentage increase of that initial percentage.  It is thus impossible to properly assess the Special Master's end calculations by addressing the two initial steps of the methodology that apply, *i.e.*, the appropriateness of the benchmark percentage <u>and</u> the appropriateness of the *Johnson* factor adjustment.

Moreover, the Special Master refused to make any *Johnson* factor adjustments for counsel's time and labor, skill, experience and reputation, or the preclusion of other work.[17]  His rationale appears to have been that (i) time and labor were already accounted for in the discussion of a benchmark percentage (one which he never specified), and (ii) the skill and

---

[14] *Id*. at 47.

[15] *Id*. at 48.

[16] *Id*. at 49.

[17] *See* Rec. Doc. 20950 at 47-49.

6

experience of common benefit counsel, as well as preclusion of other employment opportunities, in this case were typical of other "mega-fund" cases. Such reasoning is utterly deficient. Each of these *Johnson* factors is to be properly weighed for adjustment of a benchmark percentage, not merged with the "selection" of that percentage, and certainly not ignored because the same factors apply in other cases.

Instead, the Special Master worked backward, first establishing the common benefit fee award he felt was appropriate, $90 million, and then calculating the percentage of the aggregate benefit that it represented, *i.e.*, "slightly more than 8% of the aggregate benefit to the claimants,"[18] to use as a basis of comparison to other cases. The Special Master appeared to reason that 8% was reasonable because it was "just below the percentage (8.6%) awarded by the district court in *Actos*."[19] This failure to work forward through the proper analysis is important because it leaves the award seemingly untethered to any precedent or guidance from prior opinions other than *Actos*, which is distinguishable in any event. For example, the Special Master surveyed the fee award percentages from numerous cases finding that 10% was both the average and midrange of awards for cases of this size and he found upward adjustments were warranted under *Johnson*. Yet, without any explanation or justification, the common benefit fee award recommended by the Special Master represents almost <u>2% less</u> than the average/midrange figure he cites.[20]

---

[18] *Id.* at 50.

[19] *Id.*

[20] *Id.* at 41-46.

What makes that recommendation particularly inequitable and inappropriate is that the Special Master does not account for the numerous unique facts supporting a higher percentage award in this case even though he acknowledges their existence, even if only in passing.  As the Special Master appropriately noted, the Plaintiffs' Steering Committee ("PSC") in this MDL sued 1,651 Chinese Drywall manufacturers, exporters, importers, distributors, suppliers, installers, homebuilders, and sellers, as well as their insurers.  What the Special Master does not properly account for is that, at the beginning of the litigation, the identity of the manufacturers, exporters, importers, and distributors was unknown, and the path that the Chinese Drywall took in the stream of commerce from China to customers in the United States was convoluted, circuitous, and difficult to track.  Many of the Defendants were foreign entities, which required the PSC to serve them under the Hague Convention, an expensive and prolix process, especially when dealing with Chinese companies.[21]  In addition, in order to satisfy CAFA jurisdiction for more than 9,000 Plaintiffs, the PSC created a series of innovative Omnibus class action complaints, matching each Plaintiff to the appropriate manufacturer(s), distributor(s), supplier(s), installer(s), homebuilder(s), and insurer(s).  This case also has required the PSC to take numerous foreign depositions in Hong Kong, London, and Germany, requiring interpreters and human translations of hundreds of thousands of pages produced by Defendants in German and Chinese, with unintelligible machine translations only.  Moreover, discovery efforts (including FOIA requests) were met with resistance and motions to quash, and the PSC was required to file motions for sanctions in order to obtain vital information from Defendants and third parties.  The

---

[21] *See* Affidavit of Ann Mickow, Civil Action Group/APS International, Ltd., dated 5/4/2012 (attached as Exhibit 199 to the Affidavit of Russ M. Herman dated 5/8/2012, filed manually) [*see* Rec. Doc. 14215].

intense efforts of the PSC to prosecute Chinese Drywall claims resulted in more than 17,000

docket entries by the end of 2013.[22]  These novel and creative solutions to the complex issues

facing these cases enabled Plaintiff homeowners to achieve unprecedented results that would

have been unachievable by individually-retained counsel alone.

On numerous occasions throughout these proceedings, the Court has recognized the

complexity of these suits and the efforts of the PSC in prosecuting them.[23]  In fact, the Court has

remarked on the "monumental undertaking" of bringing more than 1,000 Defendants before the

Court, many of which were insurance providers.[24]  As the Court explained, "the scope of the

litigation is rather daunting," in light of the sheer number of Defendants, Plaintiffs, and lawyers

---

[22] At this point there are almost 21,000 entries on the MDL 2014 docket.

[23] *See*, *e.g.*, Transcript of Status Conference dated 2/11/2010 (attached hereto as Exhibit "1") at 21:9-14; Transcript of Status Conference dated 4/26/2011 (attached hereto as Exhibit "2") at 5:7-12; Transcript of Status Conference dated 6/14/2011 (attached hereto as Exhibit "3") at 5:21-6:2; Transcript of Status Conference dated 12/15/2011 (attached hereto as Exhibit "4") at 4:1-11; Transcript of Status Conference dated 3/22/2012 (attached hereto as Exhibit "5") at 14:21-24; Transcript of Status Conference dated 4/26/2012 (attached hereto as Exhibit "6") at 23:3-8; Transcript of Monthly Status Conference and Fairness Hearing dated 11/13/2012 (attached hereto as Exhibit "7") at 15:1-12; Transcript of Show Cause Hearing dated 1/4/2013 (attached hereto as Exhibit "8") at 5:24-6:3; 21:23-22:2; Transcript of Joint Fairness Hearing dated 5/21/2013 (attached hereto as Exhibit "9") at 36:1-6; Transcript of Status Conference dated 10/24/2013 (attached hereto as Exhibit "10") at 33:7-14; Transcript of Status Conference dated 1/16/2014 (attached hereto as Exhibit "11") at 5:22-23; Transcript of Status Conference dated 2/20/2014 (attached hereto as Exhibit "12") at 10:1-2; Transcript of Status Conference dated 5/20/2015 (attached hereto as Exhibit "13") at 13:15-22; Transcript of Motion Hearing dated 10/6/2015 (attached hereto as Exhibit "14") at 6:4-11.

[24] *See* Transcript of Status Conference dated 1/23/2013 (attached hereto as Exhibit "15") at 6:9-15 (Court: "As I've mentioned several times, oftentimes in these cases, an MDL case, you have a number of plaintiffs obviously, but there are one or two or three or four defendants. In this particular case, there's a thousand defendants and so many of them are insurance; and to bring all of those folks together was a monumental undertaking."); *see also* Transcript of Status Conference dated 11/9/2012 (attached hereto as Exhibit "16") at 13:2-7 ("[This case is] a little unusual situation. We have about a thousand defendants and so it's a difficult thing to coordinate all of that and for you to know it without having heard it.").

involved in the case.[25]  These facts alone pose challenges "from a logistical standpoint, an organizational standpoint."[26]  From the outset it was clear that "this is a different type of case."[27]  The Court pointed out that "[w]ith a thousand defendants, several dozen insurance companies in the case, there are claims, there are counterclaims, there are third-party claims, many of which have already been filed, but some of them haven't been filed. There are potential punitive claims, or penalty claims."[28]  Given these complexities, a benchmark percentage of 8% as recommended by the FC is fully supported in this matter; and an upward adjustment of the benchmark percentage is likewise warranted.  The failure of the Special Master to make recommendations consistent with the record herein makes this objection necessary and appropriate.[29]

Further, the nine interrelated and interdependent class settlements that produced over $1.1 billion in benefits to class members, including a complete and comprehensive uncapped remediation program that enabled KPT homeowners to move back into their properties free of Chinese Drywall, were incredibly complicated and challenging to administer and implement on a

---

[25] *See* Transcript of Status Conference dated 1/20/2011 (attached hereto as Exhibit "17") at 20:14-21; Transcript of Status Conference dated 1/15/2013 (attached hereto as Exhibit "18") at 4:16:21 ("…in this case we have a thousand defendants in addition to thousands of plaintiffs. So it's very complex."); Transcript of Status Conference and Fairness Hearing dated 8/20/2013 (attached hereto as Exhibit "19") at 25:15-20 ("This case has been made more complicated by the fact that there are about 1,000 defendants.").

[26] 1/20/2011 Tr. at 20:14-21.

[27] Motions Hearing dated 2/23/2011 (attached hereto as Exhibit "20") at 13:4-5.

[28] *Id*. at 13:9-13.

[29] During these proceedings, the Objectors complained about numerous tasks performed by the PSC during the litigation, contending that certain efforts did not constitute common benefit work.  In an attempt to respond to those complaints, the FC tried to introduce into this record certain evidence related to the *Cataphora* litigation.  The Special Master excluded that evidence during the fee depositions and thereafter.  *See* SM Recommendation at 17 n.96.  The FC continues to object to the Special Master's rulings excluding the *Cataphora* evidence.

class-wide basis.[30]  Special considerations were made for short sales, foreclosures, bankruptcies, loss of rents and sales for commercial owners, alternative living expenses for residential homeowners, bodily injury, and damages to personal property of tenants.  The Special Master noted this in his Recommendation but, inexplicably, made no defined or specified adjustment in the percentage award for this important element of the litigation.

Similarly, despite recognizing the urgency and time constraints involved in removing toxic Chinese Drywall from thousands of Plaintiffs' properties so they could return to their homes, and despite recommending "a small upward adjustment" of the percentage award on this ground, the Special Master again failed to specify the extent of the adjustment, either individually or in combination with other factors as part of a specified, collective adjustment. The characterization of the adjustment as "small" is unwarranted on the basis of this record.  In the end, there appears to have been no fair accounting for the efforts required of common benefit counsel to achieve remediation benefits for thousands of homeowners displaced from their residences.

Indeed, rather than making the appropriate increases in the percentage award, the Special Master relied on a comparison to *Actos*, which the Special Master contended is analogous to this case, to justify a percentage award of only "slightly more than 8%."[31]  The Special Master's

---

[30] *See* Transcript of Monthly Status Conference dated 6/29/2016 (attached hereto as Exhibit "21") at 8:2-6 ("In most cases you have one defendant or two defendants and then a vast number of plaintiffs. Here we have thousands of defendants in addition to vast numbers of plaintiffs. So the settlement worked out with Knauf was very, very complicated arrangement and it's become quite an issue to decipher it.").

[31] SM Recommendation at 45.

reliance on *Actos*, however, is unsupportable in light of several stark differences between these actions.

In *Actos*, where the common benefit fee award equaled 8.6% of the settlement value, eight defendants were sued, but there was only one main defendant and a single defense counsel representing all defense interests.  In *Chinese Drywall*, there were 1,651 Defendants and 1,200 lawyers before the Court.[32]  In addition, in this MDL, the PSC has appeared before the Court on more than 200 occasions for status conferences, evidentiary hearings, and oral argument on contested motions.  In contrast, in *Actos* there were 19 or 20 status conferences, but no other court appearances.  Further, the complexities of nine interrelated and interdependent class settlements in this MDL simply were not present in the *Actos* litigation, where a single settlement was confected.  Additionally, in *Actos* there was no full coordination of efforts of state courts with the MDL, as occurred here.  The lack of coordination was especially prominent and less than efficient in *Actos* since the Chicago state court had over 3,350 cases pending in those coordinated proceedings.  Even accepting the Special Master's contention that this case can be analogized to *Actos*, under that reasoning the percentage award here should be at least 8.6% rather than only slightly more than 8%.

## C.    The Lodestar Cross-Check Illustrates the Problem with the Special Master's Common Benefit Fee Award Recommendation.

A further inconsistency in the reasoning supporting the Special Master's Recommendation is the fact that the $90 million common benefit fee award constitutes a negative multiplier, whether using current hourly rates (amounting to $146,854,654.40), hourly

---

[32] Exhibit "17" (1/20/2011 Tr.) at 20:14-21.

rates at inception of the case (totaling $115,712,271.30), an average of those two rates ($131,588,525.35), or a blended rate of $450 hour ($104,539,207.50) to calculate the lodestar cross-check.[33]  Despite the Special Master's conclusion that this case is most analogous to *Actos*, where the common benefit award was <u>double</u> the lodestar in that litigation, the $90 million common benefit fee award here is at least $14 million <u>less</u> than the lowest lodestar calculation cited by the Special Master, using a blended hourly rate of $450.  The Special Master's recommended award equals only 86% of the lowest lodestar in this case, 77% of the lodestar using rates at inception of the case more than eight years ago, 68% of the lodestar using the average rate between current and inception, and only 61% of the lodestar at current rates. Nothing whatsoever in the Special Master's analysis, or in the case law, justifies such a small common benefit award.

Indeed, the relevant timeframe for the common benefit hours under consideration concluded in 2013, according to PTO 28, as revised.  Yet, common benefit counsel have continued to administer the nine class action settlements providing more than $1.1 billion in benefits to class members.[34]  In addition, common benefit counsel continue to prosecute

---

[33] SM Recommendation at 50.

[34] Lead and Liaison Counsel and their designees have devoted more than 2,500 hours to settlement administration since January 1, 2014, after the Court's cut-off date of December 31, 2013 for time submissions for this fee award.  In addition, in accordance with their duties specified by the Court in PTO 28, the FC spent 1,479.75 hours preparing the Global Fee Petition and all of its accompanying exhibits, which occurred between January 10, 2014, when the FC was appointed, and May 16, 2014, when the petition was filed. This time is not included in Mr. Garrett's lodestar calculations, even though the work benefitted all fee applicants, including individually-retained attorneys, and, therefore, it was not considered by the Special Master either.  The FC submits that it should be compensated for this time in some manner.  It should be noted also that this time does not include the additional work performed by the FC pursuant to PTO 28 (*e.g.*, interviews of common benefit fee applicants, preparation of the Allocation Motion, etc.), or the efforts made by the FC during the fee dispute proceedings since July 2016, which exceeds 9,500 hours.  That time benefited common benefit fee applicants only and is not

Plaintiffs' cases against the Taishan Defendants on a daily full-time basis even with the knowledge that it is possible that their work could be compensated at pennies on the dollar as illustrated by the lodestar cross-check.  A lodestar cross-check calculation inclusive of this relevant, additional time, would even further demonstrate the unfairness and inadequacy of the recommended fee award.

The Special Master also performed a lodestar cross-check using *Actos* as an exemplar, but in doing so failed to account for the relationship between the percentage fee awarded in *Actos* and the related multiplier.[35]  When performing a lodestar cross-check:

> [T]he Court multiplies the reasonable hours worked by reasonable billing rates to calculate a time-fee value for the common benefit work performed. Then, the Court divides the percentage-fee value by the time-fee value to determine a lodestar multiplier and to test whether the percentage fee value represents an unreasonable award or "windfall" over the reasonable value of the work performed.

*In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640, 659 (E.D. La. 2010), citing *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 457-58, 491-96 (E.D. Pa. 2008).  "The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work" and when analyzed in the process of performing a lodestar cross-check, it "serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award."  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305-06 (3d Cir. 2005).  For that reason, a large multiplier

---

included in any fee petition, but should be compensated at some point out of the common benefit fee award.

[35] SM Recommendation at 50-51.

often accompanies a lower percentage fee award so as to keep the fee award "reasonable" as is reflected in the bulk of the single-digit percentage award cases cited by the Special Master.[36]

On the flip side, courts understand that the award of a positive or upward multiplier is warranted to compensate attorneys for the quality of the representation, the risks incurred by undertaking the representation, the length of time that it takes to get paid for the attorney's efforts and the results of the litigation.  *See*, *e.g.*, *In re Rite Aid Corp. Sec. Litig*., 362 F. Supp. 2d 587 (E.D. Pa. 2005) (approving fee representing 6.96 multiplier finding "through the exercise of their considerable skill, plaintiffs' counsel obtained a historic recovery for the class in a rare and complex kind of case where victory at trial would have been, at best, remote and uncertain."); *In re Tyco International, Ltd.*, 535 F. Supp. 2d 249, 271 (D.N.H. 2007) (approving 2.71 multiplier finding it compensates the attorneys adequately for the risks they assumed).

The Special Master acknowledged that three of the *Johnson* factors warranted such an upward adjustment yet awarded a steep negative multiplier.  And, he did so when the average multiplier in a fee award for a case of this size and magnitude is between 2.5-3.5%.  *See In re Oil*

---

[36] *Id*. at 42-43; *see also In re Prudential Ins. Co. of America Sales Practice Litig*., 106 F. Supp. 2d 721,735 (D.N.J. 2000) (4.8% fee/2.13 multiplier); *Deloach v. Philip Morris Cos*., 2003 WL 23094907, at *11 (M.D.N.C. Dec. 19, 2003) (5.9% fee/4.45 multiplier); *In re Visa Check/Mastermoney Antitrust Litig*., 297 F. Supp. 2d 503,524 (E.D.N.Y. 2003), *aff'd*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96 (2d Cir. 2005) (6.51% fee/3.5 multiplier); *In re WorldCom, Inc. Sec. Litig*., 388 F. Supp. 2d 319, 353-54 (S.D.N.Y. 2005) (5.5% fee/4.0 multiplier); *In re AOL Time Warner, Inc. Sec*., 2006 WL 3057232, at *28 (S.D.N.Y. Oct. 25, 2006) (5.9% fee/3.15 multiplier); *Diet Drugs*, 553 F. Supp. 2d at 486-87 (6.75% fee/2.6 multiplier); *In re Enron Corp. Sec., Deriv. & ERISA Litig.,* 586 F. Supp. 2d 732, 779 (S.D. Tex. 2008) (9.52% fee/5.2 multiplier); *Vioxx*, 760 F. Supp. 2d at 658-59 (6.5% fee/1.2 multiplier); *In re Avandia Mktg. Sales Practices and Prods. Liab. Litig*., 2012 WL 6923367, at *10 (E.D. Pa. Oct. 19, 2012) (6.25% fee/2.6 multiplier); *In re Bank of America Corp. Sec., Derivative, and ERISA Litig*., 2013 WL 12091355 (S.D.N.Y. Apr. 8, 2013) (6.5% fee/1.87 multiplier); *In re Black Farmers Discrimination Litig*., 953 F. Supp. 2d 82, 101-02 (D.D.C. 2013) (7.4% fee/1.81 multiplier); *In re Payment Card Interchange Fee and Merchant Disc. Antitrust Litig*., 991 F. Supp. 2d 437, 447-48 (E.D.N.Y. 2014) (9.56% fee/3.41 multiplier); *Deepwater Horizon*, 2016 WL 6215974, at *20 (4.3% fee/2.34 multiplier).

Case 2:09-md-02047-EEF-MBN   Document 20999   Filed 09/29/17   Page 16 of 25


*Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, 2016 WL 6215974, at \*20 (E.D. La. Oct. 25, 2016) (discussing analysis of lodestar multipliers in 18 cases with settlements at or above $1 billion); *see also Diet Drugs*, 553 F. Supp. 2d at 486 (collecting cases showing multipliers between 2.4 and 4.5).

Here, even while recommending a common benefit fee award of $90 million, the Special Master found that the lodestar fee calculation ranged from $104,539,207.50 to $146,854,654.40, depending upon the hourly rates used.[37]   As discussed above, a $90 million fee award thus represents a negative multiplier ranging from 0.86 to 0.61.  Such a steep negative multiplier, in a case where the common benefit conferred on Plaintiffs was so substantial, is unprecedented, and yet not even discussed or analyzed by the Special Master.

Instead, the Special Master analogized the award here to the award in *Actos* where the court awarded a multiplier of over 2, but never recognized that multiplier as part of the justification for the reasonableness of the 8.6% percentage awarded there.  Indeed, the Special Master never reconciled his own observation that in *Actos*, "the district court awarded a common benefit fee of more than $200 million," with the fact that in that case, "[t]he common benefit hours would have only justified a common benefit attorneys' fee award of about $90 million."[38] Comparisons to *Actos*, and its 2 multiplier, are wide off the mark because, as noted above, the court in *Actos* was limited in its ability to award a higher percentage fee because of the 2 multiplier, and the case is not at all similar except for the fact that it is an MDL and in Louisiana.

---

[37] SM Recommendation at 50.

[38] *Id.* at 50-51.

16

The facts of this case and the ongoing litigation illustrate the very problems with awarding a negative multiplier for superlative work in a difficult contingent case where the outcome was less than certain, and the common benefit counsel expended millions of dollars in achieving the results for Plaintiffs.  In awarding fees and considering lodestar with a multiplier, courts have been mindful that "'[i]n order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.'"  *Enron*, 586 F. Supp. 2d at 801, quoting *WorldCom*, 388 F. Supp. 2d at 359; *see also In re Visa Check/Master Money Antitrust Litig.*, 297 F. Supp. 2d at 524 ("The fees awarded must be reasonable, but they must also serve as an inducement for lawyers to make similar efforts in the future.").  This is particularly true when the litigation is "conducted on an entirely contingent fee basis, and Lead Counsel paid millions of dollars to fund the litigation." *Id*., quoting *WorldCom*, 388 F. Supp. 2d at 359.  "'Without a fee that reflects the risk and effort involved in this litigation, future plaintiffs' attorneys might hesitate to be similarly aggressive and persistent when faced with a similarly complicated, risky case and similarly intransigent defendants.'" *Id*., quoting *In re Tyco International, Ltd.*, 535 F. Supp. 2d at 270.  As they are ethically required to do, the PSC continues to aggressively litigate against the remaining Taishan Defendants and will be doing so for the foreseeable future.  Yet, based on the common benefit fee recommendation of the Special Master, they would be called upon to expend time and money with the expectation that, regardless of the outcome, their total common benefit efforts to date will have resulted in a fee significantly less than what is meant to be a lodestar cross-check.  This turns common benefit fee award jurisprudence on its head.

The sole justification the Special Master used for this approach appears to be that the "common benefit fee will be drawn from a capped global fee and cost fund."[39]  He adds that "[a]ny common benefit fee will necessarily reduce the fees of individually-retained counsel."  But this is true in every case where common benefit fees are taken from the fee pot and not the claimants' recovery.[40]  *See*, *e.g.*, *Actos*, 2017 WL 3033134, at \*16 ("It should not be overlooked that any amount this Court might allocate as common benefit fees, does not come from any individual claimants' recovery, rather it comes from the amount the claimant had already agreed to pay to his or her attorney when he or she agreed to representation.  Thus, common benefit fees are taken from the original attorneys' compensation—not the claimants' MDL recovery.").  A further justification for the Special Master's recommendation might relate to the fact that the fee fund is limited and fixed in amount, having been negotiated separate and apart from the Knauf settlement that provided full and comprehensive remediation benefits to claimants.  But, self-evidently, <u>all</u> counsel have in this way been required to take less than a normal fee award and share in that reduction, so that the claimants benefitted by receiving full damages without having to pay percentage-of-recover counsel fees or costs (a result that all counsel in this case should be incredibly proud of!).  This sum-certain fee fund, however, cannot serve to justify a drastic reduction in the award to common benefit counsel, who created the fee fund and achieved results

---

[39] *Id.* at 45.

[40] *Id.*

18

that could not have been achieved by individually-retained counsel on a case-by-case basis, but rather should justify a large increase.[41]

Objectors themselves have admitted that if their contingency fee awards had dropped to 11-12%, they would never have signed up Chinese Drywall clients.[42]  They made this claim even though the percentage fee they will receive will be based off of a settlement result that far exceeds any result they could have achieved individually had they been required to litigate the cases fully – *e.g.*, serving complaints under the Hague, hiring causation and damage experts, traveling abroad for depositions, briefing jurisdictional issues, etc.  Under that scenario, the cases would have been less profitable on either an hourly or contingent basis.

In contrast to the Objectors' position, common benefit counsel will respect the decision of this Court as final.  Despite the fact that the common benefit fee most likely will not be commensurate with the excellent hard work performed on behalf of class members in this litigation, common benefit counsel will continue to prosecute the claims of Taishan Plaintiffs against the recalcitrant Chinese Defendants, as the Court has closely observed throughout these proceedings.

---

[41] Notably, all attorneys in this litigation were advised that the funds achieved by the PSC for counsel fees were intended to compensate both common benefit counsel and individually-retained attorneys.  No one objected to this at the time the class settlements were approved or when the PSC and the FC filed a joint motion for a global award of attorneys' fees and reimbursement of expenses.

[42] *See*, *e.g.*, 06/01/2017 Hearing Tr. at 230:19-232:1 (Mr. Hoagland testified that he would receive about an 11.9% fee under the FC proposal and he would never had signed up clients for that fee); *id.* at 306:11-308:11 (Mr. Durkee testified that he expected to end up with around 11% under the FC proposal, he would have never signed up clients for such a low fee and he doubts his firm would ever do cases like this again if such a low fee were awarded).

**D.  The Special Master Inappropriately Relied on His First-Hand
Observations of Certain Individual Counsel During Binding
Mediations of Their Clients' Settlement Recoveries, to the Prejudice
of Common Benefit Counsel.**

In concluding that "slightly more than 8% of the aggregate benefit to the claimants" was

an appropriate common benefit award in this case, the Special Master revealed that he was

"particularly impressed" with the efforts of individual counsel Objectors Eric Hoaglund and C.

David Durkee in representing their clients during a limited number of binding mediation sessions

he oversaw in his role as Settlement Special Master.[43]  Unfortunately, this evidence is outside the

record and cannot be examined or refuted by common benefit counsel.  Had common benefit

counsel been advised that the Special Master would consider anything outside the record, they

would have insisted on taking the depositions of these attorneys.

Originally, the Special Master ordered a deposition of a representative from the Objector

pool.[44]  The Objectors opposed this, and upon reconsideration the Special Master concluded that

"[t]he contributions of the individually retained attorneys (i.e., those not asking for a common

benefit award) *might* have some relevance to the ultimate decision to be made by the Special

Master,"[45] but this "**this factual issue can be sufficiently developed through the use of**

**affidavits and/or declarations. If a party wishes to depose an individual who signs such an**

---

[43] *See* SM Recommendation at 46 ("Indeed, one of the Special Master's roles in this litigation has been conducting binding mediations when disputes have arisen under the Knauf settlement; Mr. Hoaglund, Mr. Durkee, and many others, including many Objectors, have appeared at those mediations and represented their clients well.").

[44] *See* Special Master's Case Management Order No. 1 dated 9/25/2016, at 10.

[45] *See* Special Master's Ruling Concerning Objectors' October 7, 2016 Request to Modify Special Master Case Management Order No. 1 dated 10/28/2016, at 13.

**affidavit or declaration, the party may make a request to the Special Master.**"[46]  What the

Special Master neglected to state was that he would also rely on his observations of those

individual attorneys during binding mediations in a different role as Settlement Special Master at

which common benefit counsel were not present.  This constitutes error in the Special Master's

Recommendation, and one that has been prejudicial to common benefit counsel.

There is no question that the Special Master worked hard for over a year to fulfill his

duties to fairly recommend a split of the global fee award as between common benefit counsel

and individually-retained attorneys.  The Special Master oversaw significant and extensive

discovery from the court-appointed CPA Philip A. Garrett and the representatives of the FC, and

ultimately issued a 52-page Recommendation based on the testimony adduced during a contested

Evidentiary Hearing and a record containing over 400 emails and approximately 750 exhibits.

Unfortunately, however, the Special Master has ventured outside that record and made certain

evaluations of the value of services provided by individually-retained attorneys (including

Messrs. Hoaglund and Durkee) in this litigation based on his role as a Special Master overseeing

numerous appeals from individual settlement awards in this case.  But, the Special Master's

reliance on those observations without a corresponding familiarity with the common benefit

services of the PSC in this litigation provides, at least, a skewed view of the comparative services

of privately-retained and common benefit counsel.  For example, the Special Master was not

present during the hundreds of class settlement negotiation and mediation sessions or the

numerous settlement hearings and he did not observe first-hand the conduct of common benefit

counsel during the 200+ depositions that took place in this MDL.  Neither is the Special Master

---

[46] *See id.* at 13-14 (bolded language in original).

in a position to evaluate the extent to which the common benefit work of the PSC (in developing

inspection and produce ID protocols, in supporting the formulation of a remediation approach

based on square footage, etc.) may be embedded in, or may have facilitated, the efforts of private

counsel in the allocation of settlement benefits to their clients.  Since this issue was not

addressed in any way, the Special Master's weighing of these off-the-record services must be

considered problematic.

III.    <u>**CONCLUSION**</u>

Sadly, even in advance of the Special Master's Recommendation or any ruling by this

Court on the allocation of available funds for attorneys' fees as between common benefit counsel

and individually-retained attorneys, certain Objectors repeatedly have made it clear that they

intend to bring their complaints about a common benefit fee award to the Fifth Circuit, regardless

of how this Court rules.[47]  Most recently, one Objector wrote that:

> The Fifth Circuit will recognize that the fundamental freedom of
> Americans to contract with the legal counsel of their choice is at
> issue. Individually retained counsel have been stripped of their
> contract rights, including their rights to recoup hundreds of
> thousands of dollars of out-of-pocket litigation expenses. There is
> scant judicial authority justifying a judicial decision to destroy the
> contract rights of one group of lawyers solely to pay another, and
> given the evidence marshaled here, coupled with the clear violation
> of Rule of Evidence 1006, those of us who still serve clients will
> be positioned for a significant victory.

In pledging this crusade against the Court's common benefit fee award even before it is

---

[47] *See*, *e.g.*, Motion of Certain Objectors to Disqualify the Fee Committee [Rec. Doc. 20735] [Exhibit FC 10-16]; Mandamus Petition filed in the Fifth Circuit on the grounds that this Court did not rule on Objectors' Disqualification Motion quickly enough [*In re Parker*, Petition for a Writ of Mandamus, Fifth Circuit Docket 17-30430 (5/23/2017)]; 6/01/17 Evidentiary Fee Hearing Tr. at 162:13-15.
.

announced, such Objectors are committed to ignoring well-established precedent for adjustments to attorneys' fees, *e.g.*, *Vioxx*, 760 F. Supp. 2d at 652, as well as common benefit counsel's entitlement to be paid for the services they provided to all Plaintiffs in this litigation, *id*. at 647, citing *In re Genetically Modified Rice Litig.*, MDL No. 1811, 2010 WL 716190, at *4 (E.D. Mo. Feb. 24, 2010); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.,* MDL No. 1708, 2008 WL 682174, at *4 (D. Minn. Mar. 7, 2008); *accord In re Zyprexa*, 594 F.3d at 128-30 (Kaplan, J., concurring).  *See also* Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 376 (2014).  The doctrinal underpinning of deducting common benefit fees from retained counsel's contract fees is intended to prevent "unjust enrichment." *See id.*  The argument of certain Objectors that a common benefit fee calculated through established methodology, somehow offends a "sacred right," is as misguided as it is inequitable.

The FC submits that its Allocation recommendation is fair and reasonable and comports with governing fee jurisprudence, and respectfully asks the Court to adopt that recommendation and not that now made by the Special Master.

Respectfully submitted,

Dated: September 29, 2017

/s/ Russ M. Herman
Russ M. Herman, Esquire (Bar No. 6819) (on the brief)
Leonard A. Davis, Esquire (Bar No. 14190) (on the brief)
Stephen J. Herman, Esquire (Bar No. 23129)
HERMAN, HERMAN & KATZ, L.L.C.
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
RHerman@hhklawfirm.com
*Plaintiffs' Liaison Counsel MDL 2047*
*Fee Committee Co-Chair/Secretary*

23

Arnold Levin (on the brief)
Fred S. Longer (on the brief)
Sandra L. Duggan (on the brief)
Keith J. Verrier (on the brief)
Nicola F. Serianni (on the brief)
LEVIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone:  (215) 592-1500
Fax:  (215) 592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*
*Fee Committee Chair*

**ON BEHALF OF THE FEE COMMITTEE except for Michael J. Ryan, who dissents.**

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 29th day of September, 2017.

/s/ Leonard A. Davis
Leonard A. Davis, Esquire
Herman, Herman & Katz, L.L.C.
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
Plaintiffs' Liaison Counsel MDL 2047
*Co-counsel for Plaintiffs*
