# EXHIBIT "4"

```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3
      IN RE: CHINESE-MANUFACTURED )
 4    DRYWALL PRODUCTS            )
      LIABILITY                   )
 5    LITIGATION                  )
                                  ) CIVIL DOCKET NO. 09-MD-2047-EEF-JCW
 6                                ) SECTION "L"
                                  ) NEW ORLEANS, LOUISIANA
 7                                ) THURSDAY, DECEMBER 15, 2011
                                  ) 9:00 A.M.
 8    THIS DOCUMENT RELATES TO:   )
                                  )
 9    ROBERT C. PATE, AS TRUSTEE  )
      FOR THE CHINESE DRYWALL     )
10    TRUST                       )
                                  )
11    vs.                         )
                                  )
12    AMERICAN INTERNATIONAL      )
      SPECIALTY LINES INSURANCE   )
13    COMPANY, FCCI COMMERCIAL    )
      INSURANCE COMPANY, FCCI     )
14    INSURANCE COMPANY, ET AL    )
                                  )
15    2:09-CV-07791 (E.D. LA.)    )
      ****************************
16
                  TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
17
                  HEARD BEFORE THE HONORABLE ELDON E. FALLON
18
                      UNITED STATES DISTRICT JUDGE
19

20
      OFFICIAL COURT REPORTER:        SUSAN A. ZIELIE, RPR, FCRR
21                                    UNITED STATES DISTRICT COURT
                                      EASTERN DISTRICT OF LOUISIANA
22                                    500 POYDRAS STREET, ROOM B406
                                      NEW ORLEANS LA 70130
23                                    susan_zielie@laed.uscourts.gov
                                      504.589.7781
24

25    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
      PRODUCED BY COMPUTER AIDED TRANSCRIPTION.
```

```
 1                              APPEARANCES:

 2

 3    FOR THE PLAINTIFFS'
      STEERING COMMITTEE:               HERMAN HERMAN KATZ & COTLAR
 4                                       BY:  RUSS HERMAN, ESQUIRE
                                         820 O'KEEFE AVENUE
 5                                       NEW ORLEANS, LA 70113APPEARANCES

 6
      THE PLAINTIFFS:                    DANIEL BECNEL, ESQUIRE
 7                                       425 W. AIRLINE HIGHWAY
                                         SUITE B
 8                                       LAPLACE, LA 70086

 9
                                         LEVIN, FISHBEIN, SEDRAN & BERMAN
10                                       BY:  ARNOLD LEVIN, ESQUIRE
                                         510 WALNUT STREET, SUITE 500
11                                       PHILADELPHIA, PA 19106

12    DEFENDANT:                         Frilot, LLC
                                         BY:  KERRY J. MILLER, ESQUIRE
13                                       ENERGY CENTRE
                                         1100 POYDRAS STREET
14                                       SUITE 3700
                                         NEW ORLEANS, LA 70163
15

16    FOR THE STATE/FEDERAL
      COORDINATION COMMITTEE:            BARRIOS, KINGSDORF & CASTEIX
17                                       BY:  DAWN BARRIOS, ESQUIRE
                                         701 POYDRAS STREET, SUITE 3600
18                                       NEW ORLEANS, LA 70139

19
      ALSO APPEARING:                    STEVE GLICKSTEIN, ESQUIRE
20

21

22

23

24

25
```

1          NEW ORLEANS, LOUISIANA; THURSDAY, DECEMBER 15, 2011

2                              9:00 A.M.

3                      (COURT CALLED TO ORDER)

4          THE COURT:  Be seated, please.

5          Good morning, ladies and gentlemen.

6          Call the case, please.

7          CASE MANAGER:  MDL 2047, Chinese manufacturer drywall

8   products liability litigation.

9          THE COURT:  Counsel make their appearances for the

10  record.

11         MR. MILLER:  Good morning, Your Honor.  Kerry Miller on

12  behalf of Knauf and the Defense Steering Committee.

13         MR. HERMAN:  May it please the Court, good morning,

14  Judge Fallon.  Russ Herman on behalf of Plaintiffs' Steering

15  Committee and plaintiffs.

16         THE COURT:  Please use the microphone.  We have a full

17  courtroom, and also 500 people on the phone, one of whom is Judge

18  Farina, with whom I've worked very closely on this matter.

19         Today, ladies and gentlemen, I'm pleased to make a

20  significant announcement in this particular case.  First, let me

21  give you some background.

22         The case, In Re:  MDL 2047, known as Chinese

23  manufactured drywall products liability litigation, was referred

24  by the MDL panel to this Court on June 15th, 2009, about two and

25  a half years ago.

1          There was an estimated 10, 15,000 cases, approximately

2    12,000 properties, filed in the MDL alleging defective drywall

3    imported from China which caused property damage, and also there

4    were claims of personal injuries.

5          More than 4,200 of the properties are alleged to have

6    defective drywall manufactured by KPT, a Knauf subsidiary in

7    China.

8          In this particular case, we have thousands of

9    plaintiffs, but there were also a thousand defendants.

10         Also in this case we have 1,400 lawyers.  Some 26 states

11    looked like they may be involved in this litigation.

12         In March of 2010, eight months after the MDL was filed,

13    we tried the first case, the Hernandez case, No. 09-6050.  It was

14    tried, and it resulted in a judgment and an opinion of the Court.

15         The Court heard testimony from various experts for the

16    respective sides and felt that the testimony was sufficient to

17    create a protocol that could be used to remediate the homes.

18    That protocol was created, emanated from that case, and also with

19    the discussions following that particular case.

20         The protocol was on paper, it was theoretical.  And it

21    was suggested that the parties try to put that protocol in

22    practice to see how it worked.  Because we all know that

23    oftentimes theories, they sound good, but they just don't work.

24    So the protocol was created, but then the parties put it in

25    practice with the pilot program.

1       The pilot program was tweaked a bit, as was anticipated,

2   but it looked like it worked.  And then it was expanded from 100

3   homes to thousands of homes.

4       After the parties saw that it was possible to do it,

5   they began then focusing on trying to monetize this protocol to

6   see whether or not it could be monetized so that some global

7   resolution could be put into place.

8       The parties have met, 50 to 100 sessions, in New

9   Orleans, New York, Miami, Philadelphia, Germany, and a number of

10  telephone conversations.

11      The negotiation was monitored by the Court.  I've spoken

12  with the parties daily for the last two weeks and got updates.  I

13  asked them to come to New Orleans.  The German manufacturers'

14  CEOs or high officials were able to be here, and the parties

15  continued negotiating, sometimes into the wee hours of morning,

16  occasionally all day and all night.

17      In any event, their negotiations and hard work has paid

18  off, and I'm pleased to announce that a global settlement has

19  been reached between the plaintiffs and Knauf, Inc.

20      The settlement covers all plaintiffs in the Chinese

21  drywall litigation who have filed cases in either federal or

22  state court on or before December the 9th, 2011 and whose homes

23  or businesses had KPT drywall.

24      The settlement also covers individuals with homes

25  containing KPT drywall that had been remediated by builders and

1    suppliers outside of the litigation for purposes of compensating

2    them for alleged economic loss and also bodily injury caused by

3    KPT drywall.

4            The property owners who have already remediated their

5    properties on their own were offered a mediation process by which

6    to reach agreement with KPT on compensation for remediation

7    costs, and will be able to seek compensation for alleged economic

8    loss and bodily injury even if the mediation is unsuccessful.

9            This is a summary of the settlement.  The full documents

10   can be obtained after they've been signed by checking with the

11   Court's website, which is www.laed.uscourts.gov, and then click

12   on the drywall button.

13           In essence, the agreement creates two funds from which

14   the plaintiffs may recover, the remediation fund and the other

15   loss fund.

16           The remediation fund, which is uncapped, will pay costs

17   of three types of relief the class members can choose from.

18           One, the remediation by an approved builder, the Moss

19   and Associates, the contractor for the remediation program

20   established by the parties in October 2010.

21           Second, self-remediation by a qualified contractor of

22   the homeowner's choosing.

23           And, third, a cash-out option in which the homeowner can

24   elect to receive a cash payment.

25           The other loss fund, which is capped, will reimburse for

1    certain provable economic loss and provide a review process for

2    individuals who believe they have body injury claims.

3            In addition to those funds, Knauf will also pay an

4    additional amount for attorney fees and costs of the attorneys.

5    No fees and costs will be paid by the claimants to the attorneys.

6    So that what they receive will be for the remediation.

7            And this actually makes sense if you think about it.  We

8    don't want a situation to occur where the plaintiffs, the

9    litigants, receive full remediation costs, but then they have to

10   pay out of that remediation costs, fees of their attorneys.  That

11   would result in someone inviting a friend into the home after the

12   remediation process, and the friend looks around and says:  It

13   looks like a good job, but where's the roof?  And the property

14   owner said:  Well, I had to pay my attorney.  Well, where are the

15   windows?  I had to pay his costs.  So that doesn't work.  So, in

16   this settlement, the individuals receive full remediation.  They

17   can use all of their funds to remediate their properties; and

18   then, in addition, another fund, separate and apart, is for the

19   attorneys.

20           The global settlement was achieved in two and a half

21   years.  It was achieved through the hard work of the attorneys.

22           I also am very pleased to say that in this particular

23   case I had great support, great assistance, great help from some

24   terrific state court judges.  Judge Farina from Miami, Florida,

25   Joseph P. Farina, was lead among them.  He worked with us, worked

 1   with me all the way.  Helped guide me through some of the

 2   intricacies of Florida law, and I relied on his good judgment in

 3   many instances.  And I'm pleased that he can be with us today on

 4   the phone.

 5        I also had the pleasure of working with Judge Charles

 6   Green from Fort Lauderdale.

 7        I also recognize that United States Senator Bill

 8   Nelson's aide is with us here today, and I appreciate all of his

 9   work and the support that Senator Nelson has given to this

10   litigation.

11        Also I recognize Attorney General Luther Strange from

12   Alabama, and thank him for all of his good work.

13        The remaining cases in this MDL involve defective

14   drywall from other Chinese manufacturers, including Taishan and

15   BNBM.  The entire focus now of this litigation will be on and

16   shift to this aspect of the case.

17        In that regard, I'll be going to Hong Kong, China in

18   about three weeks to participate in the depositions of the

19   employees and representatives of the Taishan entities to be able

20   to focus on some of the motions regarding jurisdiction that the

21   Court has to deal with.

22        Again, I thank all the people for their support.  The

23   full draft of this document I expect to receive on December the

24   20th, and I'm going to set a preliminary approval for this

25   settlement on January the 4th at 9 o'clock.

1     Judge Farina, if you have anything to comment, say, I

2   certainly would be happy to hear from you.

3     JUDGE FARINA:  Thank you, Judge Fallon.  And I just want

4   to express my gratitude and much appreciation for everything that

5   you have done.  It's always great to have a strong locomotive

6   pulling these trains when we try to have these complicated and

7   extremely important litigation scenarios.  And I've been honored

8   and privileged to work with you, and I've played a comparative

9   small part.  At most, been somewhat of a junior partner, all of

10  these months.

11     And my thanks also to the Plaintiffs' Steering Committee

12  and the plaintiffs' attorneys, the Defense Steering Committee and

13  the defense attorneys.  And the parties themselves, both

14  plaintiffs and defendants, for having completed this Herculean

15  task.

16     So, Judge Fallon, my hat's off to you.  I look forward

17  to working with you as we, together, make this settlement a

18  reality and we continue to work together for the other

19  manufacturers and we now focus on them.

20     So, through your efforts, I think the holiday season is

21  better and brighter for a lot of individuals, both the homeowners

22  as well as the legal communities involved and as well as actually

23  this particular manufacturer.  Thank you again, Judge.

24     THE COURT:  Thank you very much, Judge Farina, for those

25  comments.

1        And I understand that Judge Green had to leave for a

2   moment because he's in the middle of a trial and had to address

3   the jury on an issue.

4        I now turn it over to the litigants and the lawyers, and

5   we'll hear from them.

6        First, Mr. Herman.

7        MR. HERMAN:  May it please the Court, thank you, Judge

8   Fallon.

9        I first want to acknowledge lead counsel Arnold Levin

10  and his partner Fred Longer and my partner Leonard Davis who

11  attended every one of the negotiation sessions.

12       I also want to thank our lead captain of trials, Chris

13  Seeger, and who gave us input in terms of the trials and

14  discovery that was ongoing, and Bruce Steckler who was in charge

15  of short sales, bankruptcies and foreclosures.

16       On the defense side, this negotiation was very hard

17  fought, tenacious.  I'm sure that we bared our teeth at times,

18  but never bared our fists.  There was a lot of cooperation and

19  mutual respect.  We want to thank Kerry Miller, who was lead for

20  Knauf, and your appointed liaisons Greg Wallance and Steve

21  Glickstein.

22       And then, from Germany, their general counsel Jörg

23  Schanow, their vice president Dr. Alexander Schultz and Mr.

24  Hans-Peter Ingenillem, the former executive officer soon to

25  retire, who traveled to the United States, these gentlemen from

1    Germany, multiple times during the last 18 months.

2            Again, we thank Senator Nelson.  And, if he has an aide

3    here, I know that the Court has expressed the Court would like to

4    personally meet with you after this.

5            And if Attorney General Luther Strange from Alabama --

6    who went to take a call, we appreciate everything that he did.

7            There were in negotiations 4,500 primary properties

8    within the census of Knauf properties of 5,200 alleged

9    properties.  That 4,500 is an estimate that involves 14,000

10   family members in primarily the Gulf states of Florida, where

11   55 percent of the cases are -- and these are rough percentages --

12   35 percent in Louisiana and 10 percent in Mississippi and

13   Alabama, and there are now some cases in Texas.

14           Unfortunately, our clients in Virginia will not receive

15   full compensation, because most of that defective drywall from

16   the Leon mine in China was imported into this country by Chinese

17   manufacturers Taishan, BNBM, which are located in the People's

18   Republic of China.

19           To fill out exactly what the case is about, the PSE's

20   estimate -- and it is an estimate -- of the value of the

21   settlement is between $800 million and $1 billion.

22           What Knauf has agreed to do in terms of the funds which

23   Judge Fallon has described are the following:

24           Upon approval, final approval, they will place $200

25   million in a fund in the United States for remediation.  Every

1    time that that fund reaches a balance of $25 million, they will

2    replace $50 million into that fund.

3         And that fund is completely uncapped, because it's

4    difficult to tell what remediation for what type of home with

5    what square footage, where it's located. Can't be precisely

6    done. And, in the negotiation, Knauf agreed that there would be

7    no cap on that fund.

8         Also pays administration expenses for any

9    court-appointed person, whether they're special masters, pro se

10   lawyers, ombudsman -- which I'll explain a little bit more in

11   detail -- depositories, claims administrators. All of the

12   administration expenses will come out of that fund.

13        The three funds, as Judge Fallon has explained -- and,

14   on behalf of all the lawyers that were involved in this, Judge

15   Fallon often says it's up to the lawyers. But the fact is that

16   there are many, many, as we plaintiff lawyers and defense lawyers

17   know, dark holes in an MDL, and there's never been one in the

18   eastern district and particularly in this division. And that's a

19   tribute to the judge that sets a rocket docket for trials and

20   affords everyone an opportunity, and is very stern with all of us

21   in terms of deadlines. And at the same time sets an example for

22   other federal judges, and always includes state court judges who

23   have comparable cases. So, Judge Fallon, on behalf of everyone,

24   we thank you.

25        The remediation fund offers full remediation

1   irrespective of whether it's a 1,500 square foot property or a

2   5,000 square foot property, and irrespective of whether it costs

3   $60 a square foot to fully remediate that property or $35 a

4   square foot.

5          Under self-remediation, what that means is that our

6   clients have an election.  If they want their own contractor,

7   they can choose their own contractor.  And there's certain

8   provisions that govern that type of remediation, because Knauf

9   actually assumes some risk with that type of remediation.

10  However, we have negotiated the ability for that to happen.

11         The cash-out fund, as Judge Fallon has explained, is

12  that clients may elect to receive cash.  The principal issue in

13  the cash-out fund for folks to remember is that there is a net $4

14  a square foot discount.  So, if the property per square foot is

15  $60 a square foot, the cash-out is $56 a square foot.

16         How do you arrange at that?  Well, there's 7.50

17  deduction right off the top for discount, but then there's $3.50

18  a square foot move-out.  So it works to a $4 per square foot

19  issue.

20         There are of course many other provisions that cover

21  owners and commercial owners and tenants.  And, generally, a lump

22  sum payment under various conditions of $8.50 a square foot or

23  $10 a square foot.

24         Knauf is also going to fund, upon approval, final

25  approval, a capped fund.  In other words, Knauf will no longer be

1   responsible to put any dollars in this fund.  And that fund is

2   $30 million, and it is called the other loss fund.  And, in that

3   fund, clients can apply for equity losses in foreclosures, in

4   short sales, and in situations of that kind.  And they can apply

5   for personal injury claims.  And there are a number of factors

6   that clients will have to comply with in order to prove those

7   claims.

8          Now, forgive me if I stand on a soapbox.  The plaintiff

9   bars continually, in the media, are beaten to death, because we

10  put up our own resources, we take all the risks, we are the true

11  capitalists; and, if we make a fee, it's a terrible thing.  I

12  suppose that will happen again, because they'll misconstrue what

13  we've done here.

14         The $160 million fund to take care of all attorney fees

15  and every cost of inspection is a capped fund by Knauf.  It's not

16  likely that it's going to cover full attorneys fees.  Certainly

17  won't cover full costs.

18         But ethics and professionalism require us to look to the

19  clients first, and I'm proud to say that Knauf agreed that no

20  client would have to pay a legal fee under these circumstances.

21  And I appreciate defense counsel working with us to reach an

22  agreement where the clients don't suffer.  They get their

23  properties rebuilt, in Louisiana, after having three insults:

24  Katrina, FEMA trailers and now Chinese drywall.

25         There's no question that Judge Fallon, setting not a

1    rocket docket but an intergalactic docket, calling for trials of

2    seven Virginia claimants and the Hernandezes who live in St.

3    Tammany Parish in March 2010, because that trial, that judgment,

4    set the basis for what a true remediation would be.  It wasn't

5    the Consumer Product Safety Commission protocol, it wasn't the

6    homebuilders' protocol.  It came out of the crucible of trial.

7    And that enabled another six, seven months of negotiation, to

8    come up with a pilot program as a test.

9         And we appreciate, again, all of the lawyers that

10   submitted cases to the pilot program, and the attention that

11   Knauf gave to the pilot program, because it then enabled us,

12   after 18 months, to reach a resolution today.

13        The other features that we consider most important to

14   plaintiffs are as follows.

15        Every attorney knows that, on the plaintiff's side, that

16   this case is very, very different.  You go into this case and you

17   say, hey, this is going to be easy, there's property damage.

18   It's not like a medical negligence case or a pharmaceutical case

19   or explosion.  And, actually, it's proven much more difficult as

20   a case, because the client contacts are daily.  We cannot abandon

21   the clients, even for a day, because they have questions, they

22   have problems.  Some of them are living in tents.

23        And, as a result, ombudsman will be designated by

24   plaintiffs.  Independent contractors, one in New Orleans, one in

25   Florida, who will act the way a patient's representative in a

 1   hospital works.  They will be plaintiff claimants' contacts.  If

 2   they have a problem with Moss Construction, or they don't

 3   understand what they're entitled to, or they have a complaint, it

 4   will first go to an ombudsman.  It takes the lawyers out of the

 5   situation.

 6        Now, in all of these situations, if Judge Fallon

 7   appoints special masters -- and we've recommended two special

 8   masters -- appeals from all these issues will go to a special

 9   master, under whatever process Judge Fallon may direct.  And

10   there will be another appeal to guarantee due process to Judge

11   Fallon, and no appeals after that.  So be aware that, if you

12   enter this agreement, the buck stops here, literally.

13        There are many reasons for that; but, chiefly, we cannot

14   have people waiting any longer after a controversy arrives in

15   order to be restored to their homes.

16        There will be an independent electronic depositor.  What

17   that means is, if the Court continues -- and we recommend that

18   jointly -- with BrownGreer as a claims administrator, Your Honor,

19   then they will have a master depositor.  But the plaintiffs will

20   have one, too.  Information will go in simultaneously, and every

21   attorney will receive an access code, every attorney's client

22   will have an access code.  So, as documents move through,

23   agreements to construct, inspections, et cetera, it can be

24   monitored without having to go through a third party.  And that

25   depositor will have identical documentation that BrownGreer has.

1    I want to conclude -- there are many questions which

2    will be answered when a final document is signed on the 20th and

3    posted.  I want to make it clear that the PSE unanimously, and

4    Knauf's representative, signed a term sheet.  And, as soon as the

5    term sheet is conformed to the final document, it also will be

6    posted, as Your Honor has directed.

7    Lastly, as we approach the holiday season, we're very

8    thankful for our clients.  Despite the pressures on the clients,

9    they've remained true.  What we've given them, hopefully, is a

10   happy holiday season.

11   But to some six to 8,000 folks who have suffered, and

12   continue to suffer, substantially, because their homes are not

13   covered in this settlement, they are the victims, innocent

14   victims, of corporate malfeasance by Chinese corporations

15   operating in mainland China who have shipped, knowingly,

16   defective product into the United States.  And, to them, we

17   pledge:  Keep the faith.  Our journey does not end here.  Every

18   member of the PSE has pledged, and we renew that pledge, to make

19   you whole, and to have those that have created harm a balance of

20   the scales.  And we appreciate Judge Fallon's willingness to go

21   to Hong Kong and oversee testimony from the corporate

22   representatives.

23   And at this time I wish everybody happy holidays, and I

24   call on Arnold Levin, lead counsel.

25   MR. LEVIN:  Good morning, Judge Fallon.

1          Good morning, Judge Farina.  I hope to meet you tomorrow

2     in Miami, as I will appear with defense counsel to answer any

3     questions that Your Honor has with regard to the settlement.

4          One of the nice things of following Russ Herman is,

5     ain't much to say after he talks.  And he certainly can talk.

6          Procedurally, what will happen now is that, on

7     December 20th, the final papers will be filed with the Court:

8     The agreement, our briefs in support of preliminary approval, a

9     suggested order for preliminary approval, notice forms and most

10    of the exhibits that are necessary to effectuate the settlement.

11         The procedure, after the 20th, will be somewhat pro lex.

12    On January 4th, this Court will hold a hearing to determine

13    whether preliminary approval will issue.  Hopefully, it will.

14         If it does issue, there will be a notice period with

15    individual notice sent to each of the plaintiff litigants who

16    have filed claims.  This is a class-only, composed of litigants,

17    active litigants, in this litigation and in the state litigation.

18         We anticipate a fairness hearing either in June or July

19    of this year.

20         Why?  This settlement started, the history of it, not

21    with an 800 to $1 billion settlement, but with a $8 million

22    settlement with one of the suppliers InEx, and a come card from

23    that settlement against their excess carrier.

24         Following that, there was a Banner settlement.

25         Mr. Miller, counsel for the defendant, early on, called

1    these defendants and the sums of money that could be obtained

2    from these defendants low-hanging fruit.  And our goal was to

3    make the plaintiffs whole.  And the low-hanging fruit contributed

4    to making them whole.  So that, the monies in Banner, $56

5    million, apportioned between Taishan and Knauf, flow into the

6    remediation fund.

7         Ellen W, another supplier whose settlement will be

8    finalized shortly, will certainly flow in that direction.  As

9    will InEx.  As will -- a potential settlement has not yet

10   resolved with the insurance interests for builders, et cetera,

11   that will also flow in that direction.

12        The attorneys fees from those settlements, pursuant to

13   an application to the Court, will be in addition to the $160

14   million that Knauf has paid on top of the remediation.

15        This is a very interesting case because it gave us the

16   ability to fit in a global economy a manufacturer outside of the

17   United States forced to contend or submit or become a part of our

18   system of jurisprudence.  With all of the horror stories that the

19   foreign manufacturers have of our system, which we adore, as

20   plaintiff's litigants and as jurists, and it gave us the

21   opportunity to work with German manufacturers, substantial

22   manufacturers, to show them that our system works.  That if, as

23   Tom Freedman says, the world is flat, it may be flat, but it's

24   very doable that manufacturers can stand by their products in

25   other countries, especially in this country.

1        Now, the Chinese have refused to adopt what these German

2   manufacturers chose to do.  They chose to do the right thing.

3   And, perhaps, if there are going to partake in a world economy,

4   they take a look at what occurred in this courtroom over the last

5   two and a half years and that they do the right thing.

6        The settlement is one that we're all proud of.  We're

7   especially proud that, at least as to the Knauf product, we made

8   our clients whole.  It's been reviewed by a professor of law who

9   specializes in mass courts at George Washington Law School,

10  university law school, and the press release has his comments.

11  And we're proud that he supports us in this endeavor and praised

12  this settlement as a unique settlement that accomplished what it

13  had to accomplish.

14        Does Your Honor have any questions?

15        THE COURT:  No, I don't.

16        Let's hear from Knauf.

17        MR. LEVIN:  Mr. Miller.

18        MR. HERMAN:  Thank you, Your Honor.  Kerry Miller on

19  behalf of the company that's referred to as KPT.

20        What KPT stands for is Knauf Plasterboard (Tianjin).

21  And I think sight shouldn't be lost of the fact that that is a

22  Chinese company.  That Chinese company, my client, is a settling

23  party, has decided to step up and settle these claims and do the

24  right thing.  So, while there are other related Knauf companies

25  that operate in Europe and other places, it's very important that

1    Knauf Plasterboard (Tianjin) be recognized as a Chinese company

2    as a participant in the settlement.  So everything is possible,

3    Your Honor.

4         I'd like to echo many of the comments already made by

5    the Court and opposing counsel, Mr. Herman and Mr. Levin, first

6    of all thanking this court, Judge Farina's court and the other

7    state courts and their staffs, including Ms. Butler, for all of

8    your help and support and encouragement to get this settlement

9    done.  It's been very helpful; and, without the assistance of the

10   courts, it wouldn't have gotten done in the way that it has.  And

11   certainly the tone is set by the way the Court deals with the

12   counsel, and we appreciate that.

13        Your Honor, I would also like to thank Mr. Herman and

14   Mr. Levin, Mr. Longer, Mr. Davis, Mr. Seeger and Mr. Steckler,

15   who were the principal participants and negotiators in the

16   various settlements.  Always very professional.  And they always

17   had their eye on the ball, which was getting relief for their

18   clients first.  You know, a lot of times, we were able to meet

19   and resolve issues that we thought were going to be difficult,

20   and we realized quickly in the negotiation that we were already

21   on the same page.  Maybe it was a language issue or a

22   misunderstanding.  While the negotiations were undoubtedly at

23   arms-length, heated at times, they were always professional and

24   courteous.  We appreciate their attitude in the way that they

25   negotiated the settlement.

1        Your Honor, I would like to thank my co-counsel Steve

2   Glickstein and Greg Wallance for their efforts in putting

3   together the settlement.  Really tireless efforts.

4        Also, Your Honor, some of the real workhorses on this

5   settlement, and they continue to work very hard, are Mark Spats

6   and Robert Grass, who worked with Greg and Steve and Karl

7   Spaulding of my office.  They're in court this morning.  And,

8   really, Your Honor, they've probably done more work than anybody

9   in putting these papers together that are going to be filed on

10  December 20th.  So they were really the workhorses in all this,

11  and their efforts ought to be appreciated and are appreciated I

12  think by everyone here.

13       Your Honor, in terms of the substance of the settlement,

14  we look forward to completing the document, filing it on

15  December 20th, working with co-counsel, working with the PSE and

16  obtaining preliminary approval on January 4th.  And it ultimately

17  is, as Russ Herman put it, bringing the settlement to reality.

18  Implementing the settlement, getting the job done, getting the

19  homeowners homes fixed, back in their homes.  And allowing our

20  clients, KPT and related entities, to getting back to what they

21  do best, manufacturing first-class building products.

22       Your Honor, in terms of one point of supplementation.

23  From Mr. Herman's description on the cash-out option, the total

24  discount is $12.50 off of the remediation option.  As Mr. Herman

25  put it, there's an inherent discount already in place, because,

1    if you're accepting cash, you're not moving out anyway.  So it's

2    the rent relocation that's netted out.  But the total discount is

3    $12.50.  There are two portions to it.  But one recognizes that

4    there is no move-out.

5          But, with that said, Your Honor, we look forward to

6    implementing the settlement.

7          From our standpoint, on the remediation fund, which is

8    uncapped, we don't know how many homes are ultimately going to

9    qualify.  There is an inspection process.  There's going to be a

10   detailed proof of a claim form.  And it always starts with the

11   proof in any kind of a settlement.  So we certainly encourage

12   counsel who represent class members, when the documents are filed

13   on the 20th, to get on the Court's website, access the inspection

14   protocol, access the claim form, begin to process that

15   information, understand how it works, disseminate the information

16   to their clients; so that, upon final approval, we can move into

17   the implementation phase of the settlement.

18         I don't want to speculate on my part how many homes are

19   ultimately going to participate or what the cost is, because we

20   just don't know.  But it's very important that these particular

21   forms, which kick start the process, be complied with and be

22   completed appropriately with adequate proof and documentation.

23   That will make the process go much smoother.

24         THE COURT:  Thank you very much.

25         MR. MILLER:  Your Honor, if Mr. Glickstein or Mr.

1    Wallance have any additional comments, I certainly welcome those.

2         MR. GLICKSTEIN:  Your Honor, Steve Glickstein on behalf

3    of Knauf Plasterboard (Tianjin) and the other Knauf defendants.

4         Feels a little bit like the academy awards.  I'm not

5    going to re-thank every individual who has already been thanked.

6         I will add two names that have not yet been named, and

7    those are my colleagues at Kaye Scholer, Jay Mesh and Karen

8    Garvey, who have worked extremely hard on the litigation side of

9    things.  And, as we all know, the deal that is ultimately struck

10   is a testament to the quality of the lawyering on the litigation

11   side, and they ought to be acknowledged.

12        I always enjoy listening to Mr. Herman speak.  He was

13   extremely eloquent, and he and Mr. Levin are great advocates on

14   behalf of the homeowners.

15        KPT is extremely happy that the homeowners and property

16   owners are going to be able to have their homes repaired.  The

17   company stands behind its product.  It wants these homes fixed,

18   it has always wanted these homes fixed.  As Your Honor indicated,

19   we needed to figure out how to do it.  That's why we had a pilot

20   program.  That's why it took the time it took.

21        And the company is very, very happy that the pilot

22   program was successful.  We demonstrated the feasibility, and now

23   we can expand it to all property owners with KPT product.

24        There's been some speculation about what the total

25   amount of the settlement will cost.  I don't think that KPT

1  subscribes to the dollar figure that the plaintiffs' lawyers have

2  tossed out.

3          What's important, though, is that it will be funded to

4  the extent of repairing every person's home.  As Mr. Miller

5  pointed out, we don't know at this point whether 2,500 homes have

6  KPT board, or 3,000 or 4,000.  The settlement contains a

7  mechanism in order to determine that.  And that is because

8  homeowners will have to submit proof that there is KPT board in

9  their homes, and that is subject to a confirmatory inspection.

10          So, whatever it costs to repair the homes, that's what

11  KPT is dedicated to paying.  But I think any attempt to speculate

12  on the amount it will cost is just that, it's speculation, we

13  don't know how many homes will be involved.

14          I wanted to emphasize a point that Arnie Levin made, and

15  that is the interrelationship between the KPT settlement and the

16  other settlements that have been reached and are being discussed.

17  They all fit together like pieces of a jigsaw puzzle.

18          In order to obtain the benefits of the KPT settlement,

19  if you want to have your home remediated pursuant to the KPT

20  settlement, and you got your KPT board through Banner, then you

21  must participate in the Banner settlement agreement.

22          If you got your KPT board through InEx, then you must

23  participate in the InEx settlement.

24          If you got your KPT board through L&W, and we anticipate

25  a settlement with L&W, then you will have to participate in that.

1          And the reasons are, Your Honor, because we want -- and

2     I know the Court wants -- global peace on behalf of everyone who

3     was involved in this supply chain.

4          And, as part of the cooperative effort, the homeowners

5     in those homes, in order to have their homes repaired, will be

6     assigning their shares of those settlements to the remediation

7     fund as a contribution towards getting their home repaired.

8          There's another settlement hopefully in the works

9     addressing the builders and suppliers who either built homes with

10    KPT to -- installers, I should have said -- who either built

11    homes with KPT drywall or the installers of KPT drywall.  That

12    settlement is being negotiated with the PSE as we speak.  It is a

13    condition of the KPT settlement that those negotiations be

14    successfully concluded, because a portion of that settlement will

15    go towards remediation, a portion of that settlement will go

16    towards increasing the amount of the other loss fund so that

17    there will be more money available to pay claims for economic

18    loss and personal injury if anybody can prove personal injury.

19         With respect to personal injury, it's important to note,

20    from KPT's point of view, that there has been no evidence, in our

21    opinion, that Chinese drywall can be associated with a personal

22    injury.  We note that the Centers for Disease Control and the

23    Consumer Products Safety Commission has found no health hazard

24    associated with KPT drywall.

25         However, the settlement allows homeowners to attempt to

1   prove that claim, subject to challenge and to Your Honor's

2   ultimate determination as to whether any such claim can survive

3   scrutiny.

4        So, just to sum up, we think it's a great day for

5   property owners.  We think it's a good day for the manufacturers.

6   The manufacturers are very, very happy for the ultimate customers

7   of its product.  It's standing behind its product, and we look

8   forward to the day when all these homes are fixed and everybody

9   can return to their daily lives and do what they do best.  Thank

10  you, Your Honor.

11       THE COURT:  Okay, thank you very much.

12       Anything further?

13       MR. WALLANCE:  Good morning, Your Honor.  Your Honor,

14  Gregory Wallance for the Knauf defendants.

15       I'm going to rest on the sentiments that were expressed

16  about the process, Your Honor's role, our client's commitment to

17  making this happen.  Because, we're lawyers, but it was our

18  client's commitment that made this possible.

19       I want to address, if I may briefly, a practical issue.

20  Which is, we have now at some point in the remediation process in

21  the pilot program something approaching 2,000 homes.  And, as

22  someone suggested, final approval of the class action settlement

23  is six to seven months away.  So, after discussions and putting

24  our heads together with the PSE, we've worked out the following

25  approach, which is a blend of our commitment to this class action

1    settlement as well as some practical constraints on our ability

2    to do certain things for certain homes.  And is as follows as far

3    as the homes that are in this process.

4         Homeowners who have not signed a work authorization --

5    and this is the binding contract between the homeowner and Moss,

6    that, in rather excruciating detail, lays out exactly what will

7    be done in the course of the remediation.  And it's the point at

8    which Moss starts spending money for permits, lining up

9    subcontractors, ordering materials, in order to move that

10   remediation forward.  So, for the homeowners who have not signed

11   a work authorization, they will have the ability, those

12   homeowners in the pilot program, will have the ability to choose

13   between the three options that were discussed earlier.  And, as

14   well, realize certain other benefits from the class action having

15   to do with some adjustments to the scope of work as regards

16   appliances and some adjustments to how the delayed payments will

17   be made.

18        However, as to homeowners who have executed a work

19   authorization -- and I'll provide the numbers in a moment -- we

20   will not be able to offer them the choice of cash or

21   self-remediation.

22        As far as these other benefits I just alluded to,

23   adjustments to the scope of work and how the delayed payments are

24   structured, we will deal with those on a case-by-case basis.  I

25   can't rule it out, I can't rule it in.  It depends on at what

1      stage the home is in in the remediation process.

2            Now, as far as those homeowners who have executed work

3      authorizations, the category I just described, let me tell you

4      what we're talking about.  There are a total at this point of 267

5      homeowners who have executed work authorizations.  104 of those

6      homes have already been finished.  77 are in actual remediation.

7      And there are 90 that are somewhere between execution of the work

8      authorization and the start of the remediation.  So, for those

9      homeowners, we will not be able to offer the cash or the

10     self-remediation.  And we'll do our best, on a case-by-case

11     basis, at least for those in remediation or about to go into

12     remediation, where it's still feasible to do so, to extend these

13     additional benefits that I've described.  I wanted that to be

14     mentioned.

15            There are going to be a lot of questions, we'll do our

16     best to answer them.  And we'll ask for people's patience as we

17     in effect turn the pilot program into a transition program to

18     this final class action settlement.  Thank you.

19            THE COURT:  Thank you very much.

20            Anybody else?

21            MR. HERMAN:  One more comment.

22            We understand Knauf's, for whatever reasons they have,

23     financially or otherwise, but I must at least give the basis for

24     the value of the settlement.  Because, in America, that's the

25     question that everybody asks.

1              4,250 homes times anywhere from an average of

2     2,300 square feet to 2,600 square feet, times either $40 a square

3     foot or the $60 a square foot, in Hernandez, will give you a

4     figure.  And then, when you add the other funds to it, we believe

5     that we are in the range, with the other settlements, of $800

6     million to $1 billion.  We don't think it's a speculation, at

7     least not on our part.

8              I did want to mention that during the negotiations Moss

9     represented that its intention is to do 200 homes per month, if

10    this were approved.  What that would mean -- our figures show

11    1,300 homes in the pilot program now.  If those figures hold up,

12    it would mean that, in 18 months, remediations would take place.

13    We know there's going to be some delays.  But that's an

14    extraordinarily ambitious count.

15             It wasn't speculation by Moss or Knauf.  It was a

16    representation which we considered.  And hopefully, for the

17    benefit of our clients, we can meet that expectation.  Thank you,

18    Your Honor.

19             THE COURT:  Okay, thank you very much.  Let's go back --

20    yes, Mr. Becnel.

21             MR. BECNEL:  The only people who haven't gotten credit

22    so far is the wives of this judge and the other judges in the

23    program, Mr. Herman's wife, Sandra, who just happens to be here

24    today, Arnold's wife, who never sees him, ever.

25             MR. LEVIN:  She's happy about that.

1      MR. BECNEL:  But, more than anything, as you know, Coach
2   Payton was the lead plaintiff in this case.  Mr. Wallance and his
3   team of experts met with our team of experts, and the lawyers got
4   out the way and let the experts do the work, just as you
5   suggested.  And it was one of the first to be settled.
6          And Mr. Wallance, I had gotten, because Coach Payton
7   asked me to give both you and he a helmet from the Super Bowl,
8   but he also asked for a helmet to be made, or a football, for a
9   group of kids that he's working with -- I forget the name of
10  them.  But, here it is, Greg.
11         Also, Your Honor, I had --
12         MR. HERMAN:  I want one.
13         MR. BECNEL:  I got something better for you.  Got
14  something better for you.
15         Happened to be in France a few weeks ago, and I ordered
16  from the sword maker of Napoleon some fleur-de-lis steak knives,
17  which I couldn't bring into the courtroom.  And Russ.
18         Now, Sandra, those are for steaks and not to cut his
19  throat because's always going out of town, doing something.
20         But, for Kerry Miller, we have something special.  He
21  has a unique son, and Coach Payton would like to invite him and
22  his son to the Saint's practice field whenever the time permits,
23  and we'll get him a football and get him to meet a lot of the
24  Saint's players.  Thank you, Your Honor.
25         THE COURT:  All right.  Thank you.

1        Let's go back to the --

2        MR. BECNEL:  For our fighting guy -- every time I come

3   here, he thinks he's Mohamed Ali.  I usually bring oranges and

4   fruit for him.  I've got a basket of fruit for Chris.  So those

5   are downstairs.  I couldn't carry them.

6        THE COURT:  All right.  Anyone else with gifts or

7   anything?

8        All right, folks, let's go back to the agenda.

9        And, before I do that, I do mean it when I say that

10  these matters can be resolved because of the quality and ability

11  of the attorneys.  That's the secret of the MDL process.  It

12  brings out the best of the best.  And, because of that, these

13  cases, as complicated as they are, can be resolved.  And I

14  appreciate all of the work that everybody has done on it.

15       The proposed agenda.  First, anything on the pretrial

16  orders?

17       MR. HERMAN:  Only one issue, Your Honor.  And that is

18  Your Honor ordered the plaintiffs to file plaintiff profile forms

19  by or to supplement them by a date-certain.  That's been done to

20  about 90 percent.  We still are missing 1,000 defendant fact

21  sheets.  And I just -- we will be willing to ask Your Honor to

22  extend the deadline, but we really need those fact sheets filed.

23       THE COURT:  I'll extend it to next time.  But we do need

24  to get all that material.  So let's work hard at it and get the

25  materials necessary.

```
 1            Any state court settlements?
 2            MR. HERMAN:  Yes.  With regard to II and V, Ms. Barrios
 3  is here, who handles our state liaison for the PSE.
 4            MS. BARRIOS:  Good morning, Your Honor, Dawn Barrios for
 5  the State/Federal Committee.
 6            Because Judge Farina is on the phone, I'd like to extend
 7  a special thank you and a note of appreciation from the
 8  State/Federal Committee, because we really had to do no work with
 9  him.  He was so enthusiastic and cooperative, he made our lives
10  much easier.  So I do thank you, Judge Farina.
11            And, not to be sexist, Mr. Becnel, but I'd also like to
12  thank the husband of Judge Hall, who probably did not see her
13  during all of the time that she was trying to get Taishan to step
14  up to the plate.
15            Your Honor, we have remands on our CD through CTO 23.
16            There's one state court trial setting that's different
17  from our last joint report, and that is that Judge Silver's
18  Staggs case, which was set for the week of December 5th, had been
19  settled.  The homeowners settled with the builder, and they just
20  have indemnity issues remaining, but that has not yet been set.
21            I'd also like to thank everyone who continues to forward
22  me state court information, particular Minor Pipe and Knauf and
23  Taishan as well.
24            I had not mentioned this to the Court before, but I have
25  with Mr. Herman and Mr. Levin's permission issued a forward to
```

1  the Consumer Products Safety Commission to get information on all

2  the complaints that they've received.  According to their

3  website, they've had approximately 300 complaints from homeowners

4  from almost all 50 states.  That process is dragging out longer

5  than I'd like it to.

6      But I wanted to alert Your Honor to the fact that I'd

7  like to get those names, because those homeowners should be given

8  notice of these settlements.  I understand that the Knauf

9  settlement goes to just the litigants.  But, the Banner and InEx

10 settlement, your order required that that settlement be placed on

11 the Consumer Products Safety website.  I have not found it on the

12 website.  It could be there, I have not found it.  So I think

13 it's important that we get these homeowners who have made the

14 complaints with the Consumer Products Safety Commission, we get

15 their information.

16      THE COURT:  Let's get with me on that, and whoever I

17 need to talk with, so we can take care of that issue.

18      MR. LEVIN:  Your Honor, the various websites that are

19 embodied in Banner and InEx, we have provided and requested that

20 they put them on their websites.  But, not being an Article III

21 judge, we can't force them.

22      THE COURT:  That's what I want to talk to them about.

23 Let's get to me so I can deal with it.

24      MR. HERMAN:  Your Honor, may it please the Court, I have

25 one other issue that regards the Consumer Products Safety

1    Commission.  Norma Jay Saveston, who is a consultant to the PSE,

2    advised that the Consumer Products Safety Commission wanted

3    additional materials that we have discovered.  And I've

4    communicated and asked and advised through Ms. Saveston that we

5    will not provide material to the Consumer Product Safety

6    Commission except for in exchange for their full reports

7    containing what Chinese manufacturers, mine operators and

8    government officials twice barred the United States of America's

9    Consumer Products Safety Commission from entering into the Leon

10   mine in mainland China and making tests of gypsum.

11          But I do want to affirm that we will fully cooperate

12   with the Consumer Products Safety Commission.  And, in the event

13   that they don't feel that they can reveal the information in

14   those reports, as we continue to pursue other manufacturers, then

15   we ask that they contact Your Honor.  There will be no need for

16   us to brief the issue, argue the issue.  Your Honor will just

17   tell us what Your Honor directs.

18          In terms of the next issues, there are no insurance

19   issues and no developments in insurance and nothing to report

20   with regard to home builders' fees and costs.  The matter is

21   under discussion.  I understand there will be an allocation

22   meeting, and we intend over the next two weeks to have full

23   discussions with the involved parties to see if we can reach

24   agreement.

25          Nothing knew on VII with regard to the pilot program.

1   Mr. Wallance has reported that there are approximately 227 homes

2   in the remediation process right now.

3           With regards to the term sheet, as soon as it conforms

4   to the documents, on December 20th, we'll first advise the PSE,

5   and it will be filed as soon as possible on Your Honor's website.

6   Hopefully, in advance of the full document being filed.

7           With respect to Knauf defendants, as the settlement

8   agreement will indicate, they will get full releases, and ten of

9   the Knauf entities will agree to the jurisdiction of the Court.

10  And Knauf Gyps in some form, which is the parent corporation of

11  KPT -- and I'm not sure I've given it the correct legal

12  designation -- also will guarantee the settlement.

13          With regard to Taishan defendants, their legal

14  representative is here.  We ask permission for Leonard Davis,

15  Chris Seeger and Irvin Gonzales to meet with Taishan's legal

16  representatives immediately following this conference or as Your

17  Honor will schedule in order to discuss issues regarding Hong

18  Kong depositions.

19          THE COURT:  Yeah.  We've worked through many of those,

20  but we've got to get that worked out.  Because I'll be there for

21  one week, and there are a lot of depositions scheduled, and also

22  a lot of documents.  So I want to cut through a lot of this and

23  see whether or not we can streamline it so that everybody knows

24  where we're going, and to the extent we can.  And get this work

25  done.

```
 1              MR. HERMAN:  Your Honor, with regard to VIII and IV --
 2    that's not right.  Should be IX.  But, with regard to
 3    Interior/Exterior, Banner and L&W, their counsel are here.
 4    They've labored with us over these months.  I don't know whether
 5    they wish to address the Court.
 6              I understand they don't.
 7              THE COURT:  I know they've played an integral part in
 8    it, and I appreciate their work in it also.
 9              MR. HERMAN:  Yes, they have.  And, again, they've been
10    very tenacious in serving clients' rights, in serving defenses
11    and in negotiating resolutions.
12              With regard to Venture Supply and Porter Blaine, there
13    are no new issues.
14              With respect to the plaintiff and defendant profile
15    forms, I've already reported to Your Honor.
16              Frequently asked questions.  Yesterday, we met with
17    Kerry Miller and his team, and we'll be working up a Q&A that can
18    also be posted in a summary so that folks everywhere can access
19    Your Honor's website and have their questions answered, many of
20    them.
21              With regard to pro se claimants --
22              THE COURT:  Robert's here.
23              MR. HERMAN:  Bob, would you like to address the Court?
24              He would, Your Honor.  He's a follower of Professor
25    Mitchel Franklin.
```

```
 1              THE COURT:  Anybody understood that?

 2              MR. JOHNSTON:  Your Honor, I never turn down an

 3      opportunity to speak with the Court.

 4              First thing I want to say is I want to thank you and

 5      counsel for asking me to be the curator.  As we know, this is my

 6      third time.  I was curator or am still curator in the Propulsid

 7      settlement.  I am curator in the Vioxx settlement.  And now

 8      Chinese drywall.

 9              I will tell the Court that, since you and I met and had

10      our brief initial discussion, I'm still very early in my learning

11      curve.  I have met with Russ Herman, I've met with Lenny Davis.

12      I have not met with defense counsel.  I intend to continue to do

13      so.  And, if I feel it's necessary, I may seek the input from the

14      Court on essentially where I want to get to, which is to be able

15      to be in a position to provide relative and essential information

16      to the pro ses.  I have no idea how many there are.  I've had

17      some brief communications.  And so that's where I am.  But I will

18      give you my best efforts, and all counsel, that I will get where

19      I need to get to to help these individuals through the process.

20              THE COURT:  Thank you very much.  That's really

21      important, because a lot of folks don't have lawyers, and they

22      need to be able to speak to a knowledgeable person to get

23      information.  And you certainly fit that category.  So I

24      appreciate your work.

25              MR. JOHNSTON:  Thank you, Your Honor.
```

```
 1              THE COURT:  There's a physical evidence preservation
 2    order that's --
 3              MR. HERMAN:  Your Honor, may it please the Court --
 4              THE COURT:  -- under discussion.  And I'd like to have
 5    Hillary Bass, who is involved in that, speak to the Court.
 6              MS. BASS:  Thank you, Your Honor.  Hillary Bass for the
 7    Builders' Steering Committee.
 8              I think we're very close to a modification of that
 9    agreement.  Unfortunately, people have been very busy on other
10    things over the last few days, so I would ask the Court to set a
11    telephonic hearing within the next week.  Hopefully, by that
12    time, we can report.
13              THE COURT:  Let's do that.  I'll do that.  Get back to
14    me on that.
15              The next status conference will be on January 26th.
16              And we'll need a February date, either the 9th, the 16th
17    or the 23rd.  What's good for the majority?  Probably the 16th or
18    the 23rd.
19              MR. HERMAN:  23rd, Your Honor.
20              THE COURT:  February 23rd, is that okay?
21              Again, thanks for all of your work.
22              MR. LEVIN:  Excuse me, Your Honor.  We had scheduled for
23    today a motion for default judgments.
24              THE COURT:  Yes.
25              MR. LEVIN:  That will be put off for one month to allow
```

1  late stragglers to file their entry of appearance.  They've been

2  coming in.  The motion didn't -- has worked.

3          THE COURT:  Right.  But the point is that, they have to

4  do that.

5          You have to follow the rules, and I'm going to give you

6  enough time to do it.  But, if it is not done, then I'll have no

7  choice but to either dismiss the case if it's a plaintiff case or

8  render judgment if it's a defendant case.

9          It looks like it's working, so I appreciate that.  I'll

10  move that to the next status conference.

11          MR. HERMAN:  Your Honor, there is one other matter of

12  personal privilege.

13          We got a call from really the only activist attorney

14  general that's really been helpful to us, from Attorney General

15  Luther Strange of Alabama, who -- all I can say is go Wave.  But

16  he's a product of the Tulane University Law School, where he was

17  a classmate of Jeff Bright.  And came to us and said that his

18  constituents in Birmingham were very concerned about Chinese

19  drywall, would we help.  And he organized a town hall meeting in

20  Birmingham.  We attended.  Members of the PSE attended.  And his

21  condition was that we not use it to sign up cases, and of course

22  we agreed to that.  And we had a very successful town hall

23  meeting, and those folks went out and got their regular lawyers.

24          He's in the courtroom now, and I'd just like him to

25  stand.

1         ATTORNEY GENERAL STRANGE:  I'd better defend myself.

2         THE COURT:  General, I appreciate you being here, and I

3    appreciate all the work you've done on this case.

4         ATTORNEY GENERAL STRANGE:  Thank you very much, Your

5    Honor.  My work on the MDL and the Deep Water Horizon has brought

6    me to New Orleans.  But I'm happy to thank the attorneys on both

7    sides and Your Honor for the great work in this case.  It means a

8    lot to our constituents.  Thank you, Your Honor.

9         THE COURT:  Thank you very much.  You've done a great

10   job for your constituents, and I appreciate your work.

11        MR. HERMAN:  The opt-out dates and the other settlements

12   that have been reached of course had been pushed in accordance

13   with discussions with Your Honor.

14        THE COURT:  Right.  And I'll mention that in my report.

15        MR. HERMAN:  Your Honor, thank you very much.

16        THE COURT:  Thank you very much.

17        The Court stands in recess.

18        (10:20 a.m., Proceedings concluded.)

19

20                          CERTIFICATE

21
          I, Susan A. Zielie, Official Court Reporter, do hereby
22   certify that the foregoing transcript is correct.

23

24
                         /S/ SUSAN A. ZIELIE, FCRR
25                       _____
                             Susan A. Zielie, FCRR