**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **IN RE: CHINESE-MANUFACTURED DRYWALL** | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **CIVIL ACTION** |
| | * | |
| | * | **MDL NO. 09-2047** |
| | * | |
| | * | **SECTION L (5)** |
| | * | |
| **THIS DOCUMENT RELATES TO: ALL CASES** | * | |

## <u>ORDER AND REASONS</u>

# TABLE OF CONTENTS

**INTRODUCTION**............................................................................................................3

**I. BACKGROUND** .........................................................................................................4

   A.  The Knauf Defendants ............................................................................................5

   B.  The Chinese Defendants..........................................................................................6

**II. LEGAL STANDARD**...............................................................................................11

**III. *BRISTOL-MYERS SQUIBB V. SUPERIOR COURT OF CALIFORNIA*** ..........................12

**IV. DISCUSSION** ........................................................................................................15

   A.  This Court Has Specific Personal Jurisdiction Over Taishan Under Settled Due Process Jurisprudence—Notwithstanding *BMS.* .............................................................16

      1. Louisiana.............................................................................................................17

      2. Florida ...............................................................................................................19

      3. Virginia .............................................................................................................20

   B.  *BMS* Is Inapplicable In This MDL. .....................................................................23

      1. *BMS* Does Not Address Class Actions. ...........................................................23

      2. Class Actions Are Different From Mass Torts. ...............................................27

      3. Congress Has Constitutional Authority To Shape Federal Court Jurisdiction And Permit Nationwide Class Actions. .....................................................................32

      4. Federalism Concerns Are Not Present Here. ..................................................38

   C.  *BMS* Does Not Impact This Court's Prior Agency Analysis. ...........................41

**CONCLUSION** ...........................................................................................................43

# INTRODUCTION

Pending before the Court is Defendants CNBM and BNBM's motion to dismiss for lack of personal jurisdiction. Rec. Doc. 20882. Defendants Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd. ("Taishan") join the instant motion. Rec. Doc. 20955. Because this Court as well as the Fifth Circuit have already extensively addressed personal jurisdictional questions, the Court will treat Defendants' request as a motion for reconsideration.[1]

Defendants rest their motion on a recent United States Supreme Court case: *Bristol–Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017) ("*BMS*"). According to Defendants, *BMS* indicates a great change in the controlling law on specific personal jurisdiction jurisprudence, which would alter this Court's prior decisions. Plaintiffs oppose the motion, arguing that *BMS* is not applicable in this case. On October 12, 2017, the Court held oral argument on the instant matter. Having reviewed *BMS*, the parties' submissions, and the applicable law, the Court now issues this Order and Reasons on Defendants' motion to reconsider the Court's prior opinions on jurisdiction, class certification, and agency relationship.[2]

---

[1] Although styled as a motion to dismiss, what Defendants really filed is a motion for reconsideration. This Court has found—and two separate panels on the Fifth Circuit have affirmed—jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig*., 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig*., 742 F.3d 576 (5th Cir. 2014). In addition, on April 21, 2017, this Court issued a 100-page opinion, finding Taishan "was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to BNBM." *In re Chinese-Manufactured Drywall Prods. Liab. Litig*., No. 09-2047, 2017 WL 1476595, at *46 (E.D. La. Apr. 21, 2017). This Court found that CNBM, BNBM Group, and BNBM were "part of a single business enterprise with Taishan" under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to Defendants and the Court has jurisdiction over Defendants "in relation to Plaintiffs' claims based on Louisiana law." *Id.*

[2] The purpose of this Order and Reasons is to address the applicability, if any, of *BMS* on the Court's prior opinions. For detailed findings of fact and conclusions of law, see *In re Chinese-*

## I.     BACKGROUND

From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829-30 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall.

These homeowners then began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused upon these two entities

_____

*Manufactured Drywall Products Liability Litigation*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Products Liability Litigation*, 742 F.3d 576 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Products Liability Litigation*, 894 F. Supp. 2d 819 (E.D. La. 2012) [jurisdiction]; Rec. Docs. 18028, 20740 & 20741 [class certification and property damages]; and Rec. Doc. 20739 [agency relationship].

and their downstream associates, and has proceeded on strikingly different tracks for the claims against each group.

### A.     The Knauf Defendants

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States.  The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts.

The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009. Rec. Doc. 18.  Thereafter, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall.  *See* Rec. Doc. 2713.  The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed Findings of Fact and Conclusions of Law, and entered a Judgment in the amount of $164,049.64, including remediation damages in the amount of $136,940.46—which represented a cost of $81.13 per square foot based on the footprint square footage of the house.  *See* Rec. Doc. 3012.

Subsequently, the Knauf Entities entered into a pilot remediation program with the Plaintiffs' Steering Committee ("PSC") in the MDL.  This program was largely based upon the remediation protocol formulated by the Court from the evidence in *Hernandez*.  The Knauf pilot remediation program is ongoing and has, at present, remediated more than 2,200 homes containing KPT Chinese drywall using the same general protocol.  At the Court's urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which is designed to resolve all Knauf-related, Chinese drywall claims.  *See* Rec. Doc. 12061-5.  In addition to the Knauf Settlement

Agreement, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. Although the Court occasionally must deal with settlement administration and enforcement issues, the Knauf portion of this litigation is largely resolved.

**B.** **The Chinese Defendants**

The litigation against the Chinese entities has taken a different course. The Chinese Defendants in the litigation include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include the CNBM and BNBM Entities.

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. *See* Rec. Docs. 52 & 1-7 (Case No. 09-6687). Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both of these cases. *See* Rec. Docs. 277 & 487.

Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the Preliminary Default in *Germano* on the Plaintiffs' claimed damages. *See* Rec. Docs. 502, 1223, 1258 & 2380. At this hearing, the Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases. Following this hearing on February 19 and 20, 2010,

the Court issued detailed Findings of Fact and Conclusions of Law. *See* Rec. Doc. 2380. On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of the Plaintiffs. Rec. Doc. 3013. On June 10, 2010, the last day to timely appeal, Taishan filed a Notice of Appeal of the Default Judgment in *Germano* and entered its appearance in *Germano* and *Mitchell*. Rec. Docs. 3668 & 3670.

After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. *See* Rec. Docs. 5436 & 5583. In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. *See* Rec. Docs. 5839 & 5840. Discovery has included the production of both written and electronic documents, as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery has often been contentious, requiring close supervision by the Court. The Court has presided over regularly-scheduled status conferences to keep the parties on track, and conducted hearings and issued rulings to resolve numerous discovery-related disputes. *See* Rec. Docs. 7136 & 7511.

In April 2012, Taishan filed various motions, including its motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the

11th Judicial Circuit Court of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss, and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal.

In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan and TTP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to voluntarily participate in this suit.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Rec. Doc. 17774. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt and ordered that Taishan pay $15,000.00 in attorney's fees to Plaintiffs' counsel; that Taishan pay $40,000.00 as a penalty for contempt; that Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process; and that if Taishan violates the injunction, it must pay a further penalty of 25-percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation. *See* Rec. Doc. 17869.

On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3).  Rec. Doc. 17883.  Taishan did not appear and, on September 26, 2014, this Court certified a class of

> [a]ll owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (i.e., not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2014 WL 4809520, at *16 (E.D. La. Sept. 26, 2014).  This nationwide class action is referred as the *Amorin* class.

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid both the sum of $15,000.00 in attorney's fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015.  Rec. Doc. 18764.  On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."  Rec. Doc. 17869.

In March 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b).  The Court determined that the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found that the commercial activity exception did not apply in this case, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because Plaintiffs failed to present evidence sufficient to overcome the presumption that CNBM

Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.  *See* Rec. Doc. 20150.

On April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised in four separate motions filed by Defendants.  Rec. Doc. 20739.  The Court found that Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to BNBM.  This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to Defendants, and the Court has jurisdiction over Defendants in relation to Plaintiffs' claims based on Louisiana law.

Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing, and adopted Plaintiffs' damage calculations methodology related to remediation of properties.  Rec. Doc. 20741.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify interlocutory appeal from this Court's jurisdiction order.  *See* Rec. Doc. 20779.  Because the Court found that its Order and Reasons involves a controlling question of law as to which there is substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal from that Order and Reasons may materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed the instant motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol–Myers Squibb v. Superior Court of California*.  Rec. Doc. 20882.  Based on *BMS*, Defendants contest this Court's findings of personal jurisdiction, class certification, and agency relationship.

On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argue that the *BMS* opinion impacts questions raised on appeal. *See* Rec. Doc. 20898-2 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 5th Cir. Docket 17-90027 (Pet. for Permission to Appeal)).

On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order[3] to avoid piecemeal litigations. The Court noted its duty to address the effect of *Bristol–Myers Squibb* on the jurisdictional issue before certifying the matter to the Fifth Circuit. The Court shall perform that duty with this opinion.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) states that "any order or other decision . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The district court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *See Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. 1981). This broad discretion, however, must be exercised sparingly in order to forestall the perpetual reexamination of orders and the resulting burdens and delays. *See Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1414-15 (5th Cir. 1993). The general practice of courts in this district has been to evaluate Rule 54(b) motions to reconsider interlocutory orders under the same standards that govern Rule 59(e) motions to alter or amend a final judgment. *See Castrillo v. Am. Home Mortg. Servicing, Inc.*, No. 09-4369, 2010 WL 1424398, at *3-4 (E.D. La. Apr. 5, 2010); *Rosemond v. AIG Ins.*, No. 08-1145,

---

[3] Following the Order vacating this Court's 28 U.S.C. § 1292(b) certification, the Fifth Circuit denied Defendants' petition for permission to appeal.

2009 WL 1211020, at *2 (E.D. La. May 4, 2009); *In re Katrina Canal Breaches*, No. 05-4182, 2009 WL 1046016, at *1 (E.D. La. Apr. 16, 2009).

On a motion to reconsider, the Court considers four factors: whether (1) the motion is necessary to correct a manifest error of law or fact upon which the judgment is based; (2) the movant presents newly discovered or previously unavailable evidence; (3) the motion is necessary in order to prevent manifest injustice; or (4) the motion is justified by an intervening change in controlling law. *See Castrillo*, 2010 WL 1424398, at *3-4.

A motion to reconsider "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *See Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989) (internal quotation marks omitted). "It is well settled that motions for reconsideration should not be used . . . to re-urge matters that have already been advanced by a party." *Helena Labs. Corp. v. Alpha Sci. Corp.*, 483 F. Supp. 2d 538, 539 (E.D. Tex. 2007) (citing *Browning v. Navarro*, 894 F.2d 99, 100 (5th Cir. 1990)). Accordingly, reconsideration is not to be lightly granted, and "should be used sparingly," *Templet v. HydroChem Inc.*, 367 F.3d 473, 478-79 (5th Cir. 2004), in instances where the motion "clearly establish[es]" that reconsideration is warranted. *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003).

## III. *BRISTOL-MYERS SQUIBB v. SUPERIOR COURT OF CALIFORNIA, SAN FRANCISCO COUNTY*

In *BMS*, a group of plaintiffs, consisting of California residents and predominately non-California residents, filed suit as a mass tort action in state court alleging injuries caused by a pharmaceutical drug called Plavix. 137 S. Ct. at 1778. The Supreme Court, in an 8–1 decision,[4]

---

[4] Sotomayor, J., dissenting.

held that California did not have personal jurisdiction over the defendant with regards to the claims of the non-California residents. *See id.* at 1783. Since the action arose as a mass tort case filed in California state court, the Supreme Court arrived at its decision based on the existing Fourteenth Amendment due process analysis for specific jurisdiction. *See id.* at 1783-84.

The Fourteenth Amendment ensures that individuals are subject only to legitimate adjudicatory authority, by "ensur[ing] that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). "The primary focus of our personal jurisdiction inquiry is the defendant's relationship to the forum State." *Bristol–Myers*, 137 S. Ct. at 1779 (citing *Walden v. Fiore*, 134 S. Ct. 1115, 1121-23 (2014); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 806-07 (1985)).

Since *International Shoe Co. v. Washington*, the Supreme Court has recognized two types of personal jurisdiction—general and specific—to ensure "fair play and substantial justice." *See* 326 U.S. 310, 317-18 (1945).

When the defendant is a foreign corporation, a court may assert general jurisdiction over it to hear any and all claims against the company when its affiliations with the State are so "continuous and systematic" as to render them essentially at home in the forum State. *See Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011). "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol–Myers*, 137 S. Ct. at 1779-81.

Specific jurisdiction, on the other hand, enables a court to adjudicate claims arising from activity that occurs within the forum state's borders, and is "therefore subject to the State's regulation." *Id.* "In order for a state to exercise specific jurisdiction, 'the *suit*' must aris[e] out of

or relat[e] to the defendant's contacts with the *forum*." *Id*. at 1780 (internal citations omitted) (emphasis original) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

The Supreme Court held that the nonresident *BMS* plaintiffs established no connection to the forum state. California did not have general jurisdiction over Bristol–Myers because the pharmaceutical company was incorporated in Delaware and headquartered in New York. *See Bristol–Myers*, 137 S. Ct. at 1783-84; *see also id*. at 1785 n.2 ("Respondents do not contend that the California courts would be able to exercise general jurisdiction over Bristol–Myers. . . .").

The *BMS* Court thus focused on specific jurisdiction. After a Fourteenth Amendment due process analysis, the Court concluded that California did not have specific jurisdiction because there was no connection to the non-residents' claims. The non-resident plaintiffs did not allege they were injured by Plavix (a blood thinner drug) or were treated for their injuries in California. *Id*. at 1778. They did not allege California physicians or any other California source provided the drug. *Id*. "The mere fact that *other* plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id*. at 1781. (internal citations omitted) (emphasis original). Moreover, "'a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.'" *Id*. What was needed—and what was missing in *BMS*—was a connection between the forum and the specific claims at issue. *Id*. The Supreme Court concluded that "all the conduct giving rise to the nonresidents' claims occurred elsewhere." *Id*. at 1782.

Additionally, "the bare fact that [Bristol–Myers] contracted with a California distributor is not enough to establish [specific] personal jurisdiction in the State." *Id*. at 1783. The Court stated

that plaintiffs did "not allege[] that [Bristol–Myers] engaged in relevant acts together with McKesson in California. Nor is it alleged that [Bristol–Myers] is derivatively liable for McKesson's conduct in California. And the nonresidents have adduced no evidence to show how or by whom the Plavix they took was distributed to the pharmacies that dispensed it to them." *Id.* (internal quotation marks omitted). Accordingly, the Supreme Court concluded that California courts did not have personal jurisdiction over Bristol–Myers. *See id.*

The *BMS* Court rejected the California court's theory establishing personal jurisdiction. Specifically, the Court noted: "The California Supreme Court's 'sliding scale approach' is difficult to square with [the U.S. Supreme Court's] precedents." *Id.* at 1781. Under the California approach, "the strength of the requisite connection between the forum and the specific claims at issue is relaxed if the defendant has extensive forum contacts that are unrelated to those claims." *Id.* What the California court did "resembles a loose and spurious form of general jurisdiction." *Id.* And for specific jurisdiction, a defendant's general connections with the forum state are not enough. *Id.* The issue in the present case is whether the *BMS* opinion has a determinative effect on this Court's prior rulings.

## IV. DISCUSSION

Defendants have previously filed a motion to dismiss based on lack of personal jurisdiction, which this Court denied and the Fifth Circuit affirmed. Defendants now seek reconsideration of the prior rulings based on *BMS*.

First, Defendants argue that *BMS* makes clear that this Court must dismiss claims brought by homeowners in states other than those in which their property is located because this Court lacks personal jurisdiction over nonresident defendants when claims arise from nonresident plaintiffs. *See* Rec. Doc. 20882-1 at 10-12. Second, Defendants claim that *BMS* underscores why

a general agency relationship between BNBM and Taishan is an insufficient basis for asserting jurisdiction over BNBM. *See* Rec. Doc. 20882-1 at 12-14. Finally, Defendants aver that *BMS* demands that a class action cannot be brought by plaintiffs across multiple states when the court's personal jurisdiction is rooted in a theory of specific jurisdiction. *See* Rec. Doc. 20882-1 at 14-15. The Court will address Defendants' arguments below.

    **A.**     **This Court Has Specific Personal Jurisdiction Over Taishan Under Settled Due Process Jurisprudence—Notwithstanding *BMS*.**

Generally, a federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant if (1) the long-arm statute of the forum state creates personal jurisdiction over the defendant, and (2) the exercise of personal jurisdiction comports with the Due Process Clause of the United States Constitution. *See Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010). *BMS*'s focus is on specific jurisdiction. As the Supreme Court has made clear, the specific jurisdiction analysis is a two-step process, and the reasonableness prong is separate from the minimum contacts prong.

"First, a court is to determine whether the connection between the forum and the episode-in-suit could justify the exercise of specific jurisdiction. Then, in a second step, the court is to consider several additional factors to assess the reasonableness of entertaining the case." *Daimler AG v. Bauman*, 134 S. Ct. 746, 762 n.20 (2014); *see* Charles Alan Wright, et al., Federal Practice and Procedure § 1067.2 (4th ed. 2015) (explaining that the Supreme Court "case law reflects a two-step approach that requires both (1) that the defendant establish minimum contacts with the forum State, and (2) that the assertion of personal jurisdiction is reasonable and comports with fair play and substantial justice").

The *BMS* Court applied established law in utilizing a Fourteenth Amendment due process analysis for specific jurisdiction, noting that a court must consider whether "the defendant has

'purposefully directed' his activities at the residents of the forum" and the litigation results from alleged injuries that "arise out of or relate to those activities." *See Bristol–Myers*, 137 S. Ct. at 1785-86 (internal citations and quotations omitted); *see also id.* at 1787 ("The majority casts its decision today as compelled by precedent.") (Sotomayor, J., dissenting).

So, too, did the Fifth Circuit and this Court in finding personal jurisdiction over Taishan in the class actions here. The Court, sitting as a MDL transferee court, has authority pursuant to 28 U.S.C. § 1407 to resolve personal jurisdiction challenges. *See Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61-63 (2d Cir. 1999); *In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 145, 163 (2d Cir. 1987) (citing *In re FMC Corp. Patent Litig.*, 422 F. Supp. 1163, 1165 (J.P.M.L. 1976)). In *Gross*, *Wiltz*, *Mitchell*, and *Germano*, this Court applied settled Fourteenth Amendment due process laws in Louisiana, Florida, and Virginia – just like the Supreme Court did to assess Bristol–Myers's contacts, or lack thereof, in California. And the Fifth Circuit affirmed this Court's jurisdictional findings.[5] *See generally In re Chinese-Manufactured Drywall*, 753 F.3d 521 (affirming this Court's jurisdiction in the *Gross*, *Wiltz*, and *Mitchell* class actions); *In re Chinese-Manufactured Drywall*, 742 F.3d 576 (affirming this Court's jurisdiction in the *Germano* class action). A brief recap of the Court's prior jurisdictional findings is necessary.

    1.    <u>Louisiana</u>

This Court sits in the Eastern District of Louisiana. The *Gross* and *Wiltz* actions were both filed in this Court and consolidated with the MDL litigation as nationwide class actions by property owners whose homes contain Taishan-manufactured Chinese drywall. In the *Gross* and *Wiltz* class

---

[5] Six judges on the Fifth Circuit have agreed with this Court's opinion on jurisdiction. *See In re Chinese-Manufactured Drywall*, 753 F.3d 521 (Higginson, Smith, and DeMoss, JJ.); *In re Chinese-Manufactured Drywall*, 742 F.3d 576 (Elrod, Reavley, and Haynes, JJ.).

actions, the class representatives were Louisiana property owners, and the Court applied Louisiana substantive law in finding personal jurisdiction over Taishan.

"The limits of the Louisiana long-arm statute are coextensive with constitutional due process limits. Therefore, the inquiry is whether jurisdiction comports with federal constitutional guarantees." *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 584 (5th Cir. 2010) (citing *Walk Haydel & Assocs. v. Coastal Power Prod. Co.*, 517 F.3d 235, 242-43 (5th Cir. 2008)). Due process in the personal jurisdiction context requires that (1) the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and (2) the exercise of jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice. *International Shoe*, 326 U.S. at 316.

In 2006 and 2007, Taishan sold at least 45,756 sheets of drywall, through a number of transactions, which ended up in Louisiana, earning Taishan a profit of $195,915.29. It had specific communications with customers regarding the manufacture and shipment of its drywall to Louisiana. In one particular email, for instance, Taishan was informed that "[a]fter Hurricane Katrina, the Great[er] New Orleans area need [to] rebuild, and housing market in USA is very hot in these days." *See In re Chinese-Manufactured Drywall*, 894 F. Supp. 2d at 898. Taishan held itself out to its U.S.-based customers as interested in and selling its drywall to Louisiana. It also provided shipping information and rates to its customers regarding shipment of drywall to New Orleans, Louisiana. Accordingly, this Court found it had personal jurisdiction over Taishan based on Taishan's Louisiana-related contacts.[6] The Fifth Circuit affirmed this Court's holding, *see In re Chinese-Manufactured Drywall*, 753 F.3d 521, and no writs were taken.

---

[6] For this Court's prior jurisdiction Order related to Taishan's contacts with Louisiana as well as Florida and Virginia, see *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (2012).

2. <u>Florida</u>

*Mitchell* was originally filed in the U.S. District Court for the Northern District of Florida as a class action on behalf of homebuilders in the states of Louisiana, Georgia, Texas and Florida. The class representatives were Florida homebuilders. These class members used drywall manufactured by Taishan for the construction, repair, or remodeling of properties, and who, as a result, incurred expenses associated with repair or replacement of this drywall or other property damaged by the drywall, or incurred liability for property damages. Shortly thereafter, *Mitchell* was transferred to this Court and consolidated with the MDL litigation.

The Court's authority in *Mitchell* derives from 28 U.S.C. § 1407, in which the Court, sitting as a transferee forum, applied the long-arm statute and substantive law in Florida. Florida confers personal jurisdiction over an entity which is or was "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." FLA. STAT. ANN. § 48.193(1)(a) (2016). To invoke long-arm jurisdiction under section 48.193(1)(a) of the Florida statute, the activities of the corporation must be considered collectively and show a general course of business activity in the state for pecuniary benefit. *Dinsmore v. Martin Blumenthal Assocs., Inc.*, 314 So.2d 561, 564 (Fla. 1975). "It is not necessarily the number of transactions, but rather the nature and extent of the transaction(s) that determines whether a person is 'carrying on a business or business venture' within the state." *Joseph v. Chanin*, 869 So.2d 738, 740 (Fla. Dist. Ct. App. 2004) (citing *Silver v. Levinson*, 648 So.2d 240 (Fla. Dist. Ct. App. 1994)).

In affirming this Court's jurisdiction over Taishan in Florida, the Fifth Circuit applied settled Fourteenth Amendment due process jurisprudence. The appellate court held:

> The evidence demonstrates that Taishan engaged in "additional conduct such that it could be said to have 'purposefully availed'

itself of the privilege of conducting business in" Florida. Among other availments, Taishan entered into a sole agency agreement with a Florida company to sell its products and arranged the shipping of its drywall to Florida. TTP agreed to sell OTC TG's exclusive brand of drywall and make OTC—a Florida company—the sole sales agent of TG's drywall, which reflects TG's purposeful availment of Florida through its agency relationship with TTP.

Moreover, Taishan specifically altered its products to suit the forum state by marking its packaging "Tampa," stamping a Florida phone number on the packaging, and marking its drywall with a certification that it met or exceeded American standards. . . . These actions go beyond merely placing a product in the stream of commerce and demonstrate purposeful availment.

*In re Chinese-Manufactured Drywall*, 753 F.3d at 541-42 (internal citations omitted). The Fifth Circuit found that Taishan had made substantial contacts in Florida. Accordingly, the Fifth Circuit concluded that this Court properly established jurisdiction over Taishan there. This decision became final when no writs were taken.

3.   Virginia

*Germano* was originally filed in the U.S. District Court for the Eastern District of Virginia as a Virginia class action against TG by owners of homes located in Virginia that allegedly contain Taishan-manufactured Chinese drywall. *Germano* was then transferred to the U.S. District Court for the Eastern District of Louisiana and consolidated with the MDL litigation on October 13, 2009. Thereafter, the Virginia class was expanded to a nationwide class. *See* Rec. Doc. 470.

This Court applied Virginia law and found personal jurisdiction existed. In *Germano*, the Fifth Circuit affirmed this Court's application of "the Fourth Circuit's more stringent approach" to uphold this Court's exercise of personal jurisdiction over Taishan. Finding personal jurisdiction is a facts-intensive investigation. *See In re Chinese-Manufactured Drywall*, 742 F.3d at 586. The Fifth Circuit saw that Taishan made significant contacts in Virginia. The Fifth Circuit noted:

TG designed its product and packaging for Venture, a Virginia resident. . . . These were active steps, specifically taken by TG, to purposefully direct its product toward Virginia. TG not only included the name of a Virginia company on its product, it also included a phone number with a Virginia area code. Through its own acts, TG connected its product to Virginia, and ensured that the product's end-users would identify its product with a Virginia resident. Thus, by "designing the product for the market in the forum State" TG engaged in the "additional conduct" necessary for the district court to exercise personal jurisdiction here.

Moreover, TG's contact with Virginia was neither random nor isolated. "[E]ven a single contact may be sufficient to create jurisdiction when the cause of action arises out of that . . . contact, provided that the principle of 'fair play and substantial justice' is not thereby offended.". . . TG entered into not just one, but two contracts to sell a substantial amount of drywall to a company that it knew to be a Virginia resident.

*Id.* at 589 (internal citations omitted). Therefore, given Taishan's substantial contacts in Virginia, the Fifth Circuit and this Court found personal jurisdiction over the Chinese entities.

Here, the substantial contacts that Taishan had with each respective state in the *Mitchell*, *Gross*, *Wiltz*, and *Germano* actions were discovered after years of in-depth unearthing by Plaintiffs.

In contrast, the *BMS* Court saw little contacts between Bristol–Myers and California. The Supreme Court held: "The bare fact that [Bristol–Myers] contracted with a California distributor is not enough to establish [specific] personal jurisdiction in the State." *Bristol–Myers*, 137 S. Ct. at 1783. Moreover, the Court stated that plaintiffs did "not allege[] that [Bristol–Myers] engaged in relevant acts together with McKesson in California. Nor [was] it alleged that [Bristol–Myers] is derivatively liable for McKesson's conduct in California. And the nonresidents [] adduced no evidence to show how or by whom the Plavix they took was distributed to the pharmacies that dispensed it to them." *Id.* "What is needed—and what is missing here—is a connection between the forum and the specific claims at issue." *Id.* at 1781. Accordingly, the Supreme Court

concluded that California courts did not have personal jurisdiction over Bristol–Myers under settled Fourteenth Amendment due process jurisprudence.

In the present case, this Court and the Fifth Circuit found that Taishan made substantial contacts with each forum state. The "bare fact[s]" in *BMS*, *see id*. at 1783, pale in comparison to the extensive record before this Court, documenting Taishan's extensive activities in Louisiana, Florida, and Virginia. In view of that, this Court and the Fifth Circuit concluded that it is fair, reasonable, and in the interest of justice to exercise personal jurisdiction over Taishan. The Fifth Circuit issued its opinions in 2014 affirming each class action, and Taishan did not take writ of certiorari to the Supreme Court. Thus, the issue of personal jurisdiction over Taishan became firmly and finally established.

However, Defendants are now attempting to resurrect these opinions and relitigate settled matters – simply because the Supreme Court recently handed down a decision about specific personal jurisdiction. The *BMS* Court, nonetheless, made its analytical due process framework clear: "Our settled principles regarding specific jurisdiction control this case," and "[o]ur straightforward application in this case of settled principles of personal jurisdiction will not result in the parade of horribles that respondents conjure up." *Bristol–Myers*, 137 S. Ct. at 1781-83. Because this Court and the Fifth Circuit applied the same due process principles as the *BMS* Court did, and the facts in *BMS* are not comparable here, reconsideration on specific personal jurisdiction over Taishan is not necessary. *BMS* did not change existing law, but rather applied settled Fourteenth Amendment jurisprudence—as did this Court.

## B.  *BMS* Is Inapplicable In This MDL.

### 1.  *BMS* Does Not Address Class Actions.

Even if this Court's jurisdictional analysis was different from that used in *BMS*, the decision in *BMS* would not affect the jurisdictional holding in the present case.

"[*BMS*] was not a class action; it was a mass tort action" in state court.  *Fitzhenry–Russell, et al. v. Dr. Pepper Snapple Group, Inc.*, No. 17-CV-00564 NC, 2017 WL 4224723, at *5 (N.D. Cal. Sept. 22, 2017); *see Bristol–Myers Squibb Co. v. Superior Court of Cal.*, 377 P.3d 874, 891 (Cal. 2016), *rev'd by Bristol–Myers*, 137 S. Ct. 1773.  "[T]his factor materially distinguishes this action from *Bristol–Myers* because in class actions, the citizenship of the unnamed plaintiffs is not taken into account for personal jurisdiction purposes."  *Fitzhenry–Russell*, 2017 WL 4224723, at *5 (citing *AM Tr. v. UBS AG*, 78 F. Supp. 3d 977, 986 (N.D. Cal. 2015), *aff'd*, 681 F. App'x 587 (9th Cir. 2017)); *accord Senne v. Kansas City Royals Baseball Corp.*, 105 F. Supp. 3d 981, 1022 (N.D. Cal. 2015).  Justice Sotomayor recognized that the majority in *BMS* did not address whether the Supreme Court's opinion "would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there."  *Bristol–Myers*, 137 S. Ct. at 1789 n.4 (Sotomayor, J., dissenting).

Recently, a sister court in California faced a similar issue as the one before this Court today: whether *BMS* alters existing personal jurisdiction jurisprudence in class actions created under Rule 23.  *See generally Fitzhenry–Russell*, 2017 WL 4224723.  The district court in *Fitzhenry–Russell* considered the difference between a mass tort action and a class action.  *Id.* at *5.  In a mass tort action, like the one in *BMS*, each plaintiff was a real party in interest to the complaints, meaning that they were named as plaintiffs in the complaints.  *Id.*  A class action, on the other hand,

generally involves one or more plaintiffs who seek to represent the rest of the similarly situated plaintiffs. *Id.* (citing Fed. R. Civ. P. 23).

In *Fitzhenry–Russell*, all of the named plaintiffs are California residents, and these named plaintiffs seek to represent a *nationwide* class of Ginger Ale purchasers, even though 88-percent of the class members are not California residents. *Id.* The court held that *BMS* did not extend its reasoning to bar the nonresident plaintiffs' claims in a federal nationwide class action, and *Bristol– Myers* is meaningfully distinguishable based on that case concerning a mass tort action. *See id.*; *but see McDonnell v. Nature's Way Products LLC*, 2017 WL 4864910, at *4 (N.D. Ill. October 26, 2017) (holding that the court lacked jurisdiction over claims brought on behalf of consumers whose claims arose in multiple other states). The *Fitzhenry–Russell* court concluded: "Dr. Pepper has not presented the Court with persuasive argument—much less binding law—compelling the extension of *Bristol–Myers* to class actions." *Id.* And neither have Defendants here.

Defendants point to several district court cases applying *BMS* to dismiss based on lack of personal jurisdiction. Many of these cases, however, are not class actions, and *BMS* was cited in those cases only to demonstrate the application of personal jurisdiction jurisprudence espoused by *International Shoe*, 326 U.S. 310, *Asahi Metal Industry Co. v. Superior Court*, 408 U.S. 102 (1987), and *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011). *See, e.g.*, *Jinright v. Johnson & Johnson, Inc.*, No. 4:17-CV-1849 ERW, 2017 WL 3731317, at *4 (E.D. Mo. Aug. 30, 2017) (dismissing claims of 79 of the 83 plaintiffs because they are nonresidents in *mass tort action* case); *Covington v. Janssen Pharms., Inc.*, No. 4:17-CV-1588, 2017 WL 3433611, at *5 (E.D. Mo. Aug. 10, 2017) (dismissing 53 of the 54 total plaintiffs because they are nonresidents in *mass tort action* case); *Turner v. Boehringer Ingelheim Pharm., Inc.*, No. 4:17-CV-1525-AGF, 2017 WL 3310696, at *3 (E.D. Mo. Aug. 3, 2017) (dismissing all nonresident plaintiffs in *mass tort action*

case); *Oliver v. Ethicon*, Inc., No. 12-CV-6950, 2017 WL 3193652, at *3 (S.D. W. Va. July 27, 2017) (dismissing *individual* plaintiff from Arkansas who filed suit in Minnesota); *Ergon Oil Purchasing, Inc. v. Canal Barge Co.*, No. 16-CV-5884, 2017 WL 2730853, at *5 (E.D. La. June 26, 2017) (dismissing *individual* Mississippi citizen from an action filed in Louisiana federal court against Texas corporate defendant). Despite being in federal court, the jurisdictional limits of these cases are based on the state boundaries in which those district courts sit. *See* Fed. R. Civ. P. 4(k).

Defendants highlight *In re Dental Supplies Antitrust Litig.*, 2017 WL 4217115 (E.D.N.Y. Sept. 20, 2017). Specifically, Defendants point to that court's dismay of Plaintiffs' "attempt to side-step the due process holdings in *Bristol–Myers* by arguing that the case has no effect on the law in class actions because the case before the Supreme Court was not a class action." *Id.* at *8. The *Dental Supplies* court held: "This argument is flawed. The constitutional requirements of due process does not wax and wane when the complaint is individual or on behalf of a class. Personal jurisdiction in class actions must comport with due process just the same as any other case." *Id.* at *9.

Defendants, however, have distorted the *Dental Supplies* court's strong wording and its implication. In that opinion, the dismissal only pertained to one defendant: Burkhart. It left in place the three largest distributors of dental supplies and equipment in the United States – Defendants Henry Schein, Benco, and Patterson.[7] That is because Burkhart barely had any contacts with New York. The court found:

---

[7] Henry Schein, Benco, and Patterson are the three largest distributors of dental supplies and equipment in the United States, collectively controlling roughly 85-percent of the market, while defendant Burkhart is a minor distributor. *In re Dental Supplies Antitrust Litig.*, 2017 WL 4217115, at *1 (E.D.N.Y. Sept. 20, 2017). Specifically, Henry Schein currently holds 41-percent

[P]rior to 2014, Burkhart never made any sale to New York dentists. Starting in 2014, Burkhart made some sales to New York dentists, but very few. For example, from January 2016 through October 2016, Burkhart made sales to 14 dentists in New York comprising approximately 0.07% of Burkhart's nationwide sales by volume.

Important to note, however, is that Burkhart's sales to these dentists were not direct; rather, Burkhart's sales were made entirely through a Washington entity, Kois Tribal Management, Inc. ("Kois"), one of the largest dental GPOs in the country, for which Burkhart is the exclusive supplier. Kois is a separate entity from Burkhart, and Kois alone decides which members to accept into its GPO. Burkhart exercises no control or influence over Kois' efforts to acquire members. Burkhart has no written or ongoing contractual relationships with any dentists in New York, and any sales to New York are through Kois alone. Even Kois' sales to New York dentists is small—Burkhart's overall sales to New York Kois members through October 2016 accounted for only 1.45% of all Kois sales. . . . Additionally, the contract between Burkhart and Kois (the "Kois Contract") is governed by Washington law and contains a mandatory Washington forum selection clause.

*Id.* at *2. What the court in New York did was simply dismiss a defendant that had no purposeful availment or direct activity in the forum state. And in that situation—this Court agrees—a class action cannot coerce a defendant into that court's jurisdiction. *See, e.g.*, *King Cty. v. IKB Deutsche Industriebank AG*, 769 F. Supp. 2d 309, 315 (S.D.N.Y. 2011) (dismissing class action complaint against individual defendants for lack of personal jurisdiction because defendants' conduct lacked an articulable nexus to the plaintiffs' claims).

Here, as noted above, the situation is different. After years of discovery, this Court, sitting as an MDL transferee court and applying the substantive laws of Louisiana, Florida, and Virginia, found specific personal jurisdiction over Taishan based on its contacts in the respective forum states. *Germano*, *Gross*, and *Wiltz* are all nationwide class actions, and *Mitchell* includes class

of the market, Patterson holds 34-percent, and Benco has approximately 10-percent. *Id.* In contrast, Burkhart holds about 3-percent of the national market. *Id.*

members from Louisiana, Georgia, Texas and Florida.  Two panels of the Fifth Circuit affirmed those class actions in this case, and the Fifth Circuit's holdings became final three years ago.

### 2. Class Actions Are Different From Mass Tort Actions.

This Court is cognizant of the superficial similarities between mass tort actions (like in *BMS*) and a class action in which every class member is a named plaintiff – as is the case here.[8] But there is, nevertheless, a significant difference:  a class action has different due process safeguards.  Based on *BMS*, however, Defendants argue that the Court must dismiss the nonresident claims from the Florida, Louisiana, and Virginia *Amorin* and *Brooke* Omni complaints and from every other operative complaint because those claims do not arise from or relate to Taishan's forum contacts.  *See* Rec. Docs. 20964 at 7 & 20964 at 12-13.

Class actions, nonetheless, are different from mass torts.  In particular, for a case to qualify for class action treatment, it needs to meet the additional due process standards for class certification under Rule 23 – numerosity, commonality, typicality, adequacy of representation, predominance and superiority.  Fed. R. Civ. P. 23(a)&(b).  Often, mass torts cannot qualify for class action treatment because they are unable to satisfy these standards, and at other times, actions can begin as a mass tort but ultimately be resolved as a class action in the settlement context because in that context, manageability concerns are alleviated.  *See, e.g.*, Manual for Complex Litigation § 22.7 (4th ed. 2015) (discussing turning mass torts into class actions in the settlement context).

---

[8] When faced with massive numbers of claims with overlapping issues, attorneys and courts are faced with choices regarding how to aggregate those claims.  Some options for aggregating these claims include filing a class action, intradistrict consolidation under Federal Rule of Civil Procedure 42, MDL transfers, and the assembling of tort claims that automatically accompanies a bankruptcy filing.  *See* Manual for Complex Litigation § 22.1 *et. seq.* (4th ed. 2015).

Here, when Taishan fled the jurisdiction of this Court after jurisdiction over Taishan was firmly established, the most procedurally sound manner to recover judgments on behalf of the injured homeowners impacted by Defendants' tortious conduct was for Plaintiffs to meet the standards of class certification and prove damages on their behalf. The alternative was to have thousands of individualized trials. Because of the default judgments, liability of the Taishan Defendants is conclusively established. In this case, the Court has certified the *Amorin* class under Rule 23 to determine class-wide damages pursuant to Rule 55(b)(2)(B).

The *Amorin* class includes (1) all Plaintiffs named on an omnibus class action complaint as of the date *Amorin* was filed directly in the MDL, (2) all Plaintiffs named in identical *Amorin* complaints filed in Florida and Virginia federal district courts and transferred to the MDL, (3) all Plaintiffs in *Germano* (filed in the Eastern District of Virginia and transferred to the MDL, (4) all Plaintiffs in *Wiltz* (filed directly in the MDL), and (5) all Plaintiffs in *Gross* (filed directly in the MDL).

As an MDL transferee court, this Court has personal jurisdiction over nonresident class members and has the power to do what many courts before it have done – approve a nationwide class and proceed with the action.

In certifying the *Amorin* class, this Court undertook a rigorous application of Rule 23(a) and 23(b)(3), considering the numerosity, commonality, typicality, adequacy, predominance, and superiority of the instant case. *See generally* Rec. Docs. 18028 & 20910 (granting class and denying decertification); *see also* Fed. R. Civ. P. 23. The Taishan Defendants have been held liable for damages caused by defective Chinese-manufactured drywall, and after several bellwether trials, a protocol has been established and utilized successfully in the Knauf portion of this litigation. Pursuant to this protocol, any properties containing Chinese-manufactured drywall

require complete removal of the drywall, remediation and cleaning. The only variation is the extent of the damages suffered, which is correlated with the square footage of the involved property.

This variation did not prevent class certification. *See generally In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2017 WL 1421627 (E.D. La. Apr. 21, 2017) (approving class-wide damages formula); *see, e.g.*, *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) ("'Even wide disparity among class members as to the amount of damages' does not preclude class certification 'and courts, therefore, have certified classes even in light of the need for individualized calculations of damages.'") (quoting *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 607 n.6 (E.D. La. 2006) (finding presence of claims for personal injury and mental anguish damages did not undermine a finding of predominance when they did not form a significant portion of the plaintiffs' claims). Importantly, in this case, the Plaintiffs' expert was able to establish an effective class-wide damages formula for property damages with appropriate modifications for geographical locations. *See In re Chinese-Manufactured Drywall*, 2017 WL 1421627, at *15-16. Accordingly, the Court held that *Amorin* met the demands of Rule 23.

Defendants' concern about fairness—the fundamental purpose of due process—in applying a different state's law can be addressed with choice-of-law principles if conflict of laws arises. Under *Klaxon Co. v. Stentor Electric Manufacturing Co.*, a federal district court exercising diversity jurisdiction is bound by the *Erie* doctrine to apply the choice-of-law methodology of the state in which it sits. 313 U.S. 487, 496 (1941) (holding that "[t]he conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts"). "Modern choice-of-law methodologies, such as the Restatement (Second)'s most

significant relationship test or analogous forms of [governmental] interest analysis, focus on a balancing of the respective interests of the relevant states in selecting the law to apply to the controversy." Ryan Patrick Phair, Comment, *Resolving the "Choice-of-Law Problem" in Rule 23(b)(3) Nationwide Class Actions*, 67 U. CHI. L. REV. 835, 840 (2000). "Since most of the methodologies consider a state to have a significant interest in protecting its citizens and in regulating activities within its own boundaries, they place a heavy emphasis on the plaintiff's domicile as the relevant factor in determining the applicable law." *Id.*

Indeed, the Supreme Court has repeatedly held that choice-of-law principles can be applied to resolve conflict-of-laws disputes arising from claims nationwide. *See* Brief of Civil Procedure Professors as *Amicus Curiae* in Support of Respondents, at 32, *Bristol–Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773 (2017) (No. 16-466). In *Keeton v. Hustler Magazine, Inc.*, the Supreme Court explained that choice of law can be litigated "after jurisdiction over respondent is established," and that "choice-of-law concerns should [not] complicate or distort jurisdictional inquiry." 465 U.S. 770, 778 (1984). Thus, in the present case, conflict-of-laws issues—if any— can be resolved by choice-of-law principles, thereby allowing this Court to continue using class action tools to manage this highly complex case without offending parties' substantive rights.

In *Phillips Petroleum Co. v. Shutts*, the Supreme Court sanctioned the use of a nationwide class action as long as the appropriate state substantive law was used. *See* 472 U.S. at 821-23. There, even though Kansas had personal jurisdiction over the defendant (through its conduct of business in that state) and the plaintiff class members, the Court recognized that these contacts were insufficient to justify applying Kansas law to the dispute. *Id.* at 819. Importantly, because there was a material conflict between the substantive law of Kansas and that of Texas and Oklahoma, the Court held the due process rights of the parties were violated by imposing Kansas

law upon them. *Id.* at 817-18. The Court held that a state adjudicating a nationwide set of claims against an out-of-state defendant may not, however, constitutionally apply its own substantive law to every plaintiff's cause of action. *Id.*

That is precisely what the non-resident plaintiffs in *BMS* wanted: to uniformly apply and benefit from California law irrespective of state residency. The non-resident plaintiffs in *BMS* filed their complaints based on the same 13 causes of action as the California residents:

> strict products liability (based on both design defect and manufacturing defect); negligence; breach of implied warranty; breach of express warranty; deceit by concealment (Civ. Code, §§ 1709, 1710); negligent misrepresentation; fraud by concealment; unfair competition (Bus. & Prof. Code, § 17200); false or misleading advertising (Bus. & Prof. Code, § 17500); injunctive relief for false or misleading advertising (Civ. Code, § 1750 *et. seq.*); wrongful death; and loss of consortium.

*See Bristol–Myers*, 377 P.3d at 878. Simply put, in *BMS*, the individual non-resident plaintiffs desired to disregard their own states' laws and instead apply California's consumer protection laws before a California jury. The Supreme Court rightly halted this form of forum shopping. This concern, however, is not an issue in the *Chinese-Manufactured Drywall* litigation.

In the instant case, Defendants' liability for its defective product is already firmly established, and this MDL Court has entered default judgments against each one of the Taishan defendants. *See In re Chinese-Manufactured Drywall*, MDL No. 2047, 2014 WL 4809520, at *3. Moreover, variation in state laws, if any, does not yet exist here. In this litigation, any variation in damages arising from different geographical locations is already captured, and adjusted for, in the class-wide damages formula. And any variation in state laws—if such conflict occurs—can be addressed with choice-of-law principles applied by the transferee court. Besides, in the class action context, variation of state laws that may arise can be considered as a "manageability" issue rather than thwarting class certification altogether. *See Mullins v. Direct Dig. LLC.*, 795 F.3d 654, 663

(7th Cir. 2015) (noting "the well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns."); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (holding the same).

Given the complex nature of this case and extensive history of the litigation, a class action is clearly the superior mechanism for managing and resolving these claims. Class certification is appropriate here under the factors in Rule 23. *See generally* Rec. Docs. 18028 & 20910 (granting class and denying decertification). *BMS* does not speak to or alter class action jurisprudence.[9] Thus, reconsideration on the Court's prior jurisdiction order and class certification is not necessary.

3. Congress Has Constitutional Authority To Shape Federal Court Jurisdiction And Permit Nationwide Class Actions.

Federal Rule of Civil Procedure 23 is a permissible vehicle built by Congress to orderly deal with large numbers of similar cases across the nation. Moreover, a federal court sometimes has jurisdiction to hear cases that a state court does not. *See Nicastro*, 564 U.S. at 884 ("For jurisdiction, a litigant may have the requisite relationship with the United States Government but not with the government of any individual State."). The jurisdiction of state courts are cabined by its state's geography. In contrast, federal court jurisdiction is broader based. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 406-07, 419 (2010) ("We must acknowledge the reality that keeping the federal-court door open to class actions that cannot

_____

[9] This Court has doubts that *BMS* changed the entire class action landscape. The Supreme Court has long followed a rule that it will not determine questions "not pressed or passed upon below," either as a jurisdictional restriction or a prudential matter, because the "framing of broad rules, seemingly sensible on one set of facts, which may prove ill-considered in other circumstances" and restricting its decisions to narrow, necessary rulings promotes "respect for the procedures by which our decisions are rendered, as well as confidence in the stability of prior decisions." *See Illinois v. Gates*, 462 U.S. 213, 222-24 (1983). Because class actions and CAFA were not at issue in *BMS*, the Court did not address them, even in dicta, as they were "not pressed or passed upon below." *Id.*

proceed in state court will produce forum shopping.").  In federal court, appropriately certified class actions under Rule 23 can encompass nonresident plaintiffs.  Defendants, however, argue that *BMS* makes clear that nonresident plaintiffs cannot avail themselves of the forum states where the claims did not arise from any activity there—even in a class action.

Not quite.  Rule 23 has been specifically found to be a valid exercise of congressional authority.  For example, jurisdiction over absent nonresident class members' claims has often been found to be a valid exercise of a federal court's jurisdiction.  *See, e.g.*, *Horton v. USAA Cas. Ins. Co.*, 266 F.R.D. 360, 364 (D. Ariz. 2009) (noting the argument that a district court lacks jurisdiction to certify a nationwide class "is frivolous," as a "federal court applying Rule 23 of the Federal Rules of Civil Procedure may certify a nationwide class if the requirements for certification are satisfied."); *In re Telectronics Pacing Systems, Inc.*, 137 F. Supp. 2d 985, 1029 (S.D. Ohio 2001) (certifying nationwide products liability settlement class).

Under Article III, Section 2 of the Constitution, Congress has great leeway in shaping federal court jurisdiction.  *See* U.S. CONST. art. III, § 2.  The following are a few areas in which Congress has exercised its authority in this regard.

### a.  *Federal Rule of Civil Procedure 4*

Rule 4 is a good example of the exercise of this congressional power.  Congress has generally directed that federal district courts "follow state law in determining the bounds of their jurisdiction over persons" by linking their jurisdiction to service of process on a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."  *See Daimler*, 134 S. Ct. at 753; Fed. R. Civ. P. 4(k)(1)(A).  Congress has expanded federal courts' jurisdiction beyond 100-miles from the state in which they sit.  *Id.*  "The bringing in of parties under [R]ule 4(f)'s 100 mile 'bulge' provision [illustrates] the territorial range of

service that federal statutes or rules permit." *Jacobs v. Flight Extenders, Inc.*, 90 F.R.D. 676, 679 (E.D. Pa. 1981). The *Jacobs* Court further noted: "The dictates of due process are not irrelevant in determining the validity of [R]ule 4(f) service since the [F]ifth [A]mendment's [D]ue [P]rocess [C]lause [—and not the due process clause of the Fourteenth Amendment—] applies to service that is effected under federal rules and statutes." *Id.*; *cf. Sprow v. Hartford Ins. Co.*, 594 F.2d at 416 ("application of the 100 mile bulge provision is limited to some extent by the due process clause"). A federal court sitting in diversity is confined to the state in which that court sits in, plus 100-miles, because of one known reason: Congress said so.

### b.   Multidistrict Litigation Act

MDL cases are another example of this principle. Recognizing the need for efficiency, Congress has passed the multidistrict litigation statute. *See* 28 U.S.C. § 1407. Under the MDL statute, when claims that were brought in or removed to federal court involve "one or more common questions of fact," a judicial panel may transfer the cases to a single district court for pretrial proceedings, if doing so will serve "the convenience of parties and witnesses" and "promote the just and efficient conduct" of the actions to be consolidated. 28 U.S.C. § 1407(a). Those procedures are commonly used to consolidate toxic tort, mass disaster, and product defect lawsuits – like the instant litigation before this Court. *See* Michael Dore, 3 LAW OF TOXIC TORTS § 21.2 (2017).

### c.   Class Action Fairness Act

The Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4, is yet another example of congressional power over federal court jurisdiction. CAFA authorizes removal to federal court of some "mass action[s]" involving 100 or more plaintiffs, even if there exists only minimal diversity of citizenship between the parties. 28 U.S.C. § 1332(d). Defendants argue that

CAFA is irrelevant because it involves subject matter jurisdiction and not personal jurisdiction. Nevertheless, CAFA illustrates that personal jurisdiction in federal court is permissible even when there are nonresident plaintiffs or class members whose claims arise from conduct outside of the forum state. These are the claims over which CAFA grants subject matter jurisdiction. *See* 28 U.S.C. §§ 1332(d)(4)(A)-(B) (class action "local controversy" exception applies when, among other things, greater than two-third of proposed class members are citizens of the forum state and "principal injuries" resulting from the alleged conduct of each defendant were incurred in the forum state); 28 U.S.C § 1332(d)(11)(B)(ii)(I) (mass action local controversy exception). The Omnibus Complaints here were filed in federal court based on CAFA jurisdiction and Rule 23.

### d. *Federal Rule of Civil Procedure 23*

Class actions under Rule 23 are also created under congressional authority. Rule 23 was passed pursuant to the Rules Enabling Act, 28 U.S.C. § 2072, and has been found to be a valid exercise of congressional authority. *See Shady Grove*, 559 U.S. at 408; *see also* David Marcus, *Erie, the Class Action Fairness Act, and Some Federalism Implications of Diversity Jurisdiction*, 48 WM. & MARY L. REV. 1247, 1283-84 (2007) (discussing acceptance of multistate class actions and mass tort actions); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (holding no abuse of discretion to certify nationwide class in class action challenging procedure for hearings prior to recoupment of social security overpayments).

Rule 23 "categorical[ly] . . . entitle[s] a plaintiff whose suit meets the specified criteria to pursue his [or her] claim as a class action." *Shady Grove*, 559 U.S. at 398 (plurality opinion); *see also id*. at 416 (Stevens, J., concurring). In *Shady Grove*, Justice Scalia noted that "[a] class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits. And like traditional

joinder, it leaves the parties' legal rights and duties intact and the rules of decision unchanged."

*Id.* at 408. Justice Scalia further addressed some policy concerns with federal class actions, but ultimately conceded that it is permissible as an act of Congress.

> We must acknowledge the reality that keeping the federal-court door open to class actions that cannot proceed in state court will produce forum shopping. That is unacceptable when it comes as the consequence of judge-made rules created to fill supposed "gaps" in positive federal law. For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, "state law must govern because there can be no other law." But divergence from state law, with the attendant consequence of forum shopping, is the inevitable (indeed, one might say the intended) result of a uniform system of federal procedure.

*Id.* at 415-16. "Congress itself has created the possibility that the same case may follow a different course if filed in federal instead of state court. . . . To hold otherwise would be to 'disembowel either the Constitution's grant of power over federal procedure' or Congress's exercise of it." *Id.* at 416.

In addition, courts have often approved national classes in mass tort cases in the settlement context. *See*, *e.g.*, *In re Telectronics Pacing Systems, Inc.*, 137 F. Supp. 2d at 1029 (certifying nationwide products liability settlement class); *In re Diet Drugs*, 2000 WL 1222042, at *1 (E.D. Pa. Aug. 28, 2000) (certifying nationwide products liability settlement class); *but see Cole v. General Motors Corp.*, 484 F.3d 717, 724-26 (5th Cir. 2007) (reversing certification of a nationwide class not because such classes were constitutionally impermissible but because plaintiffs had not met their burden of establishing predominance because they did not adequately address how variations in state law would not threaten to swamp the litigation). If due process acted as a constraint on nationwide class actions, then settlement classes would also be uncertifiable and the Class Action Fairness Act would have a meaningless exercise.

Defendants conclude that "Rule 23 must bow to the Due Process Clause," and proffers that Fifth Amendment and Fourteenth Amendment limitations are the same. Plaintiffs suggest that *BMS* applies to only state courts under the Fourteenth Amendment—and not federal forums where Fifth Amendment due process should apply. [10] This debate is irrelevant to the Court now. As discussed above, the Fifth Circuit has already affirmed personal jurisdiction over Taishan under settled Fourteenth Amendment due process framework – the same test used in *BMS*. Thus, this Court needs not address the potential, if any, Fifth Amendment constraints on Congress's power to provide for nationwide personal jurisdiction.

Defendants further argue that procedural mechanisms, such as Rule 23, cannot "abridge, enlarge, [or] modify the substantive rights of any litigants" under the Rules Enabling Act. Rec. Doc. 20964 at 14 (citing 28 U.S.C. § 2072). But "as conceived by the 1966 amendments to Rule 23, the class action was not designed, nor could it have purported, to change the substantive rights of the parties." Linda Silberman, *The Role of Choice of Law in National Class Actions*, 156 U. PA. L. REV. 2001, 2002 (2008). "The reason for the class device is that a coherence of rights and claims already exists among potential class members, and it is the existence of those elements that makes the representative suit appropriate." *Id.*

Accordingly, it is clear and beyond dispute that Congress has constitutional authority to shape federal court's jurisdiction beyond state lines to encompass nonresident parties. And

---

[10] In deciding *BMS*, the Supreme Court expressly "le[ft] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Bristol–Myers*, 137 S. Ct. at 1783-84 (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102, n.5 (1987). The Supreme Court has never squarely addressed this issue, but past cases and legal commentators allude to that possibility. *See Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987); *see also* Carol Rice Andrews, *The Personal Jurisdiction Problem Overlooked in the National Debate About "Class Action Fairness*," 58 SMU L. REV. 1313, 1375 (2005).

Congress has done so repeatedly—with Rule 4, MDLs, and class actions. Under Defendants' premise, *BMS* would require plaintiffs to file fifty separate class actions in fifty or more separate district courts across the United States – in clear violation of congressional efforts at efficiency in the federal courts.

### 4. Federalism Concerns Are Not Present Here.

Defendants attempt to extend the rule in *BMS* from mass tort actions in state court to class actions in federal court. *BMS*, however, only holds that in a mass tort action, a *state* may not assert specific jurisdiction over a nonresident's claim, where the connection to the state is based on the defendant's conduct in relation to a resident plaintiff and not the nonresident plaintiff. *See Bristol–Myers*, 137 S. Ct. at 1781. It says nothing about federal jurisdiction in class actions. As Justice Sotomayor stated, "[t]he majority's animating concern, in the end, appears to be federalism: '[T]erritorial limitations on the power of the respective States . . . .'" *Id.* at 1788 (Sotomayor, J., dissenting).

For good reasons, the Supreme Court's decision in *BMS* stops a state court's aggrandizement of jurisdiction that runs afoul of the Fourteenth Amendment and principles of interstate federalism. One justification is to protect a nonresident defendant "against the burdens of litigating in a distant or inconvenient forum." *World–Wide Volkswagen*, 444 U.S. at 292. The *BMS* Court noted that the "'primary concern" is "the burden on the defendant," and "'[a]ssessing this burden obviously requires a court to consider the practical problems resulting from litigating in the forum, but it also encompasses the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question.'" *Bristol–Myers*, 137 S. Ct. at 1776 (quoting *World–Wide Volkswagen*, 444 U.S. at 292)

Another reason is "to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World–Wide Volkswagen*, 444 U.S. at 290. And *BMS* protects these well-rooted principles.

Such concerns, nonetheless, mainly apply to state courts. "[R]estrictions on personal jurisdiction 'are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States.'" *Bristol–Myers*, 137 S. Ct. at 1780 (quoting *Hanson v. Denckla*, 357 U.S. 235, 251 (1958)). This concern involves "more abstract matter" that arises from the sovereign power of each state particularly in relation to its sister states. *See id.*; *see also World–Wide Volkswagon*, 444 U.S. at 293 ("[t]he sovereignty of each State . . . implie[s] a limitation on the sovereignty of all of its Sister states" that is "express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment.").

Moreover, "[e]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause [of the Fourteenth Amendment], acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment." *Bristol–Myers*, 137 S. Ct. at 1780-81 (citing *World–Wide Volkswagen*, 444 U.S. at 293). Accordingly, the Supreme Court refused the California court's attempt in a mass tort action to serve as a national forum for addressing issues arising from out-of-state plaintiffs against out-of-state defendants involving out-of-state events.

In this case, federalism concerns do not apply. *BMS* is about limiting a state court's jurisdiction when it tried to reach out-of-state defendants on behalf of out-of-state plaintiffs in a mass action suit. That scenario is inapplicable to nationwide class actions in federal court, such

as the cases before this MDL Court. Specifically, while *BMS* involves non-resident plaintiffs forum-shopping in California to reach a non-resident defendant with insufficient contacts, the *Chinese-Manufactured Drywall* litigation involves Defendants that have made enough contacts to the forum states to hold them liable there in nationwide class actions. Moreover, this Court exercises its authority under 28 U.S.C. § 1407. The Judicial Panel on Multidistrict Litigation transferred the state and federal actions to this federal court because *Chinese-Manufactured Drywall* involves one or more common question of fact. And this Court, as a transferee court, has the same pre-trial jurisdiction as the transferor courts where the cases were initially filed. Congress passed the MDL statute and enabled class actions because Congress recognizes the need for efficiency—for plaintiffs and defendants as well as the judicial system—in managing such mass filings. Class action promotes "efficiency and economy of litigation." *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 349 (1983). Therefore, a nationwide class action in federal court is not about a state's overreaching, but rather relates to the judicial system's handling of mass claims involving numerous—and in this case, thousands of—parties.

Since *BMS* is not a change in controlling due process law, does not apply to federal class actions, and Congress and courts have generally approved of using class actions, reconsideration of personal jurisdiction and class certification in this case is not needed. After eight years of litigation, it is clear to this Court that a class action remains to be the superior mechanism for managing such a complex case, particularly involving the property damages. The alternative to estimating property damages on a class-wide basis would be a series of costly—and wasteful—individualized mini-trials, inspections, and estimates that would not provide a meaningfully more reliable estimate for class remediation damages.

The Taishan property owners will still have an opportunity at later phases to seek damages for alternative living expenses and loss of use and enjoyment of their properties. Those issues can be addressed and resolved later when the Court remands the cases in this MDL. *See In re Depuy Orthopedics, Inc.*, 870 F.3d 345 (5th Cir. 2017). This Court does not intend to assume the transferor courts' duties after pre-trial matters are completed.

**C.      *BMS* Does Not Impact This Court's Prior Agency Analysis.**

Nothing in *BMS* addresses agency control. *BMS* is a decision about correcting a state court's action in a mass torts case that reached beyond its territorial boundaries in holding an out-of-state defendant liable on behalf of out-of-state plaintiffs.

Defendants argue that *BMS* clarifies any lingering uncertainty regarding the scope of the agency inquiry, in which it is not enough to simply show that a relationship exists between two companies. Defendants claim the uncertainty that was "lingering" derived from the Supreme Court's decision in *Daimler*. Specifically, Defendants argue there has been no finding that any defective drywall contained in the Florida and Virginia residents' homes specifically resulted from BNBM's supposed agency relationship with Taishan.

*Daimler*, however, discussed agency in the context of general jurisdiction—not specific jurisdiction—which is at issue here and in *BMS*. Importantly, and contrary to Defendants' assertion, the Supreme Court in *Daimler* made clear that an agent's contacts with the forum state are relevant to the analysis of specific jurisdiction. *Daimler* only limited the relevance of an agent's contacts for purposes of analyzing general jurisdiction. In *Daimler*, the Supreme Court expressly limited its holding to general jurisdiction cases and reaffirmed longstanding case law reaching a contrary result in specific jurisdiction cases. The Court stated:

> Agency relationships, we have recognized, may be relevant to the existence of specific jurisdiction. "[T]he corporate personality,"

> International Shoe Co. v. Washington, 326 U.S. 310 (1945),
> observed, "is a fiction, although a fiction intended to be acted upon
> as though it were a fact." *Id*. at 316. *See generally* 1 W. Fletcher,
> Cyclopedia of the Law of Corporations § 30, p. 30 (Supp. 2012–
> 2013) ("A corporation is a distinct legal entity that can act only
> through its agents."). As such, a corporation can purposefully avail
> itself of a forum by directing its agents or distributors to take action
> there. *See, e.g.*, *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J.)
> (defendant's act of "marketing [a] product through a distributor who
> has agreed to serve as the sales agent in the forum State" may
> amount to purposeful availment); *International Shoe*, 326 U.S. at
> 318 ("the commission of some single or occasional acts of the
> corporate agent in a state" may sometimes "be deemed sufficient to
> render the corporation liable to suit" on related claims).

*Daimler*, 134 S. Ct. at 759 n.13.

In this case, the Court previously held that a subsidiary's contacts may be attributed or imputed to the parent for personal jurisdiction purposes where the subsidiary is the parent's alter ego or general agent. *See In re Chinese-Manufactured Drywall*, 753 F.3d at 546; *accord Jackson*, 615 F.3d at 586; *Minn. Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1265 (Fed. Cir. 1985). This Court did not merely find that "a relationship exists," as Defendants put it, but rather, a controlling chain from BNBM to Taishan. For instance, the record shows that Taishan and BNBM share corporate officers, BNBM "controls Taishan's long-term strategic decisions" such as loan requests, BNBM combined its drywall statistics with Taishan's, BNBM monitored and approved Taishan's daily activities, and the companies shared logos and office space. *See* Rec. Doc. 20739 at 54-64 (Florida), 64-69 (Virginia). The totality of these facts, among others, sufficiently establishes an agency relationship. *See generally id.*

Accordingly, this Court imputed the contacts of such related entity because it is warranted by the present facts; courts are not limited to imputing the jurisdictional contacts of subsidiaries to direct parent companies only. *See, e.g.*, *Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 29 (1st Cir. 2000) ("While alter ego liability may be most common in an ordinary

parent-subsidiary context, 'the equitable doctrine of piercing the corporate veil is not limited to the parent-subsidiary relationship.'") (quoting *C M Corp. v. Oberer Dev. Co.*, 631 F.2d 536, 539 (7th Cir. 1980)). After extensive review of the record compiled from years of discovery, this Court found that personal jurisdiction exists as to BNBM under Louisiana law (because BNBM is an alter ego of Taishan), and under Florida and Virginia law (because BNBM has an agency relationship with Taishan). This Court also concluded that BNBM's direct contacts with Florida established personal jurisdiction because its sale of drywall and related activities in Florida brought it within the state's long-arm statute, and that exercising personal jurisdiction over BNBM based on these contacts is consistent with the Due Process Clause.

*BMS* is not a change to controlling law regarding personal jurisdiction, class action, or agency relationship. Therefore, this Court finds that revisiting these issues is not necessary.

## CONCLUSION

Based on the foregoing reasons, accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss for lack of personal jurisdiction (Rec. Doc. 20882) is hereby **DENIED**.

New Orleans, Louisiana, this 28th day of November, 2017.

**ELDON E. FALLON**
United States District Judge

43