UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


NOTICE OF MANUAL ATTACHMENT


IN RE: CHINESE MANUFACTURED MDL
NO.2047 DRYWALL PRODUCTS
LIABILITY LITIGATION


SECTION L

JUDGE: ELDON FALLON

MAGISTRATE: WILKINSON


ATTACHMENTS TO DOCUMENT NO. 21104

DESCRIPTION: Exhibits A-S

FILED BY: Guilfort Dieuvil

FILE DATE: 12/21/2017

ARE LOCATED IN THE CLERK'S OFFICE.

# TABLE OF CONTENTS
## PLAINTIFF /CLAIMANT'S OBJECTION TO SPECIAL MASTER'S REPORT
## KNAUF'S DEFECTIVE DRYWALLS

### 8757 BAYSTONE COVE
### BOYNTON BEACH, FL 33473

**SUBJECT**                                                                                          **PAGES**

1.  PLAINTIFF /CLAIMANT'S OBJECTION ……………………………………… 17

2.  EXECUTED SPECIAL WARRANTY DEED ……………………………………....…… 2
    EXHIBIT " A "

3.  Copy of Special Master's report ……………………………………………....…...……3
    EXHIBIT "B"

4.  Copy of emails correspondence from Glhomes, ……...…………………………...…… 5
    Exhibit "C"

5.  Copy of Email from Special  Master ……...…………………………….…………… 1
    Exhibit "D"

6.  Copy of email to Defendant Knauf   ……...………………...……………………….. 1
    Exhibit "E"

7.  Pictures of subject property Pre- Demolition …………………………………………….. 9
    Exhibit "F"

8.  Video of subject property Pre - Demolition ………………….…………………………1
    Exhibit "G" Available upon request at evidentiary hearing

9.  Copy of AirQuest Environmental, Inc inspection's report ………………………….. 16
    Exhibit "H"

10. Pictures of corroded coppers, coils and electrical wires ……………………………… 27
    Exhibit "I"

11. Pictures of samples of 10x10 Knauf's Drywalls …………………………..………… 33
    Exhibit "J"

12. Pictures of some full Knauf's Drywalls boards ………...……………………….....… 16
    Exhibit "k"

13. Pictures of American Gypsum drywalls' brands ........................................ 15
Exhibit "L"

14. Copy of Claimant's email for Knauf to see physical evidence, Knauf denied .......... 1
Exhibit "M"

15. Copy of emails from Glhome's counsel regarding transferring evidence ................ 3
Exhibit "N"

16. Pictures of Present condition of subject property ...........................9
Exhibit "O"

17. Copy of PTO - 1(B) Signed by Honorable Judge Fallon ........................ 8
Exhibit "P"

18. Copy of Business Card - Brad Wall, .......................... 1
Exhibit "Q"

19. Copy of floor Plan/building diagram, .......................... 2
Exhibit "R"

20. Copy Sworn Affidavit of Guilfort Dieuvil, .......................... 4
Exhibit "S"

21. Exhibit Sheets and Cover ........................ 22

TOTAL PAGES ........................ 193

8757 BAYSTONE COVE
BOYNTON BEACH, FL 33473
KNAUF'S DEFECTIVE DRYWALLS

# Exhibit "A"

### Executed Special Warranty Deed with custom upgrade

### Total purchase price of the subject property in 2007

### $1,142,015.00.

## Without Closing Cost

### 8757 Baystone Cove

### Boynton Beach, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS

CFN 20070024961
OR BK 21310 PG 1742
RECORDED 01/17/2007 12:42:37
Palm Beach County, Florida
AMT 1,142,015.00
Doc Stamp 7,994.70
Sharon R. Bock, CLERK & COMPTROLLER
Pgs 1742 - 1743; (2pgs)

RETURN TO:
NOVA TITLE COMPANY
1401 UNIVERSITY DR. SUITE 402
CORAL SPRING   33071-8909
(954) 755-9889

W/C 84

# SPECIAL WARRANTY DEED

**THIS INDENTURE** is made this ___9___ day of January, 2007, between **BOYNTON BEACH ASSOCIATES XVI, LLLP**, a Florida limited liability limited partnership ("Seller") whose post office address is 1600 Sawgrass Corporate Parkway, Suite 300, Sunrise, Florida 33323, and Guilfort Dieuvil, a married man ("Buyer"), whose Social Security Numbers are _____ and _____, respectively, and whose post office address is 8757 Baystone Cove, Boynton Beach, Florida 33437.

**WITNESSETH**, that Seller, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration to Seller in hand paid by Buyer, the receipt and sufficiency of which are hereby acknowledged, has granted, bargained and sold, and hereby grants, bargains and sells to Buyer, and Buyer's heirs, successors and assigns forever, the following described land, with a Property Appraiser's Identification Number of 00-42 45 32 03 000 0790.

    Lot   79 , CANYON ISLES - PLAT TWO, according to the plat thereof, as recorded in Plat Book 105 at Page 40, of the Public Records of Palm Beach County, Florida.

**THIS CONVEYANCE AND TITLE TO SAID PROPERTY** is subject to: (a) taxes and assessments for the present year and subsequent years, including, but not limited to, pending and certified county or municipal improvement liens; (b) restrictions, reservations, conditions, limitations, easements and other matters of record or imposed by governmental authorities having jurisdiction or control over the subject property, but this reference shall not operate to reimpose any of same; (c) all laws, ordinances, regulations, restrictions, prohibitions and other requirements imposed by governmental authorities, including, but not limited to, all applicable zoning, building, bulkhead, land use and environmental ordinances, rules and regulations, and rights or interests vested in the United States of America and/or the State of Florida; (d) those certain covenants, restrictions, agreements and lien rights set forth in **Exhibit "A"** attached hereto and by this reference made a part hereof; (e) the Declaration of Covenants, Restrictions and Easements for Canyon Isles, dated January 18, 2006 and recorded January 20, 2006 in Official Records Book 19820, at Page 216 of the Public Records of Palm Beach County, Florida, as amended and/or supplemented from time to time; (f) the plat of Canyon Isles – Plat One, as recorded in Plat Book 105, at Page 1 of the Public Records of Palm Beach County, Florida; (g) the plat of Canyon Isles – Plat Two, as recorded in Plat Book 105, at Page 40 of the Public Records of Palm Beach County, Florida; and (h) the plat of Canyon Isles – Plat Three, as recorded in Plat Book 106, at Page 61 of the Public Records of Palm Beach County, Florida.

**SELLER** does hereby specially warrant the title to said land, subject to the foregoing matters, and will defend same against the lawful claims of all persons claiming by, through or under Seller and no others.

**IN WITNESS WHEREOF**, Seller has hereunto set Seller's hand and seal the day and year first above written.

WITNESSES:

Print Name of Witness: Jennifer Fowler

Print Name of Witness: Kathleen M Coffman

BOYNTON BEACH ASSOCIATES XVI, LLLP, a
Florida limited liability limited partnership

By:  Boynton Beach XVI Corporation, a Florida
corporation, its general partner

By: _____
N. Maria Menendez, Vice President

STATE OF FLORIDA
COUNTY OF BROWARD

The foregoing instrument was acknowledged before me this ___9___ day of January, 2007, by N. Maria Menendez, as Vice President of Boynton Beach XVI Corporation, a Florida corporation, the general partner of Boynton Beach Associates XVI, LLLP, a Florida limited liability limited partnership, on behalf of said corporation and limited liability limited partnership. She is personally known to me.

_____
Notary Public
My Commission Expires:

This instrument prepared by:
**HENRY W. JOHNSON, ESQ.**
**HUME & JOHNSON, P.A.**
1401 University Drive, #301
Coral Springs, Florida 33071
(954) 755-9880



KATHLEEN M. COFFMAN
Notary Public - State of Florida
My Commission Expires Mar 18, 2009
Commission # DD 391078
Bonded By National Notary Assn.

**EXHIBIT "A"**
**COVENANTS, RESTRICTIONS, AGREEMENTS AND LIEN RIGHTS**

The title to the property described in the Special Warranty Deed to which this **Exhibit "A"** is attached (the "Deed") shall be subject to and burdened by the covenants, restrictions, agreements and lien rights set forth below:

1.  **Capitalized Terms and Definitions**.  All initial capitalized terms used in this **Exhibit "A"** but not defined herein shall have the meanings given to such terms as set forth in the Deed.  The following terms as used in this **Exhibit "A"** shall have the meanings given to such terms as set forth below.

"Gain" shall mean and refer to the amount, if any, by which: (i) the gross selling price of the Property (less and except: (y) the actual, documented costs of any physical improvements made by Buyer after the date of the Deed to the exterior of the home on the Property such as pools, patios, screen enclosures and extensions, and (z) the actual documented closing costs required to be paid by Buyer in connection with the sale of the Property such as documentary stamp taxes, recording fees and/or brokerage commissions), exceeds (ii) the "Total Purchase Price" paid to Seller by Buyer pursuant to and as defined in the Purchase Contract executed by Seller and Buyer.

"Hardship Event" shall mean and refer to a sale, transfer, lease or sublet of the Property, as appropriate, following a divorce of the Buyers (if married to each other), death or serious disability of one or more of the Buyers, job transfer of one or more of the Buyers to a location greater than fifty (50) miles from the Property, or other reason acceptable to Seller in Seller's sole and absolute discretion, as evidenced by a written waiver of this provision given by Seller.

"Property" shall mean and refer to the property described in the Deed together with the improvements thereon.

"Transfer Advertisement or Agreement" shall mean and refer to any or all of the following: (i) any listing or advertisement for the sale or lease of the Property or any portion thereof made with a broker, in any multiple listing service, in any classified or other advertisement, or otherwise (including, without limitation, "by owner"), (ii) any agreement (verbal or written) for transfer of title to the Property to any third party, and/or (iii) any agreement (verbal or written) for the leasing and/or subletting of the Property or any portion thereof, notwithstanding anything to the contrary in the Declaration.

2.  **Sales/Transfers of the Property**.  In the event that Buyer sells or transfers title to the Property (directly or indirectly): (a) at any time within one (1) year following the date of the Deed, and/or (b) at any time thereafter if such sale or transfer results from a Transfer Advertisement or Agreement made or entered into within one (1) year following the date of the Deed, then except only in the event of a Hardship Event released by Seller as provided in Paragraph 4 below, Buyer shall pay to Seller from the proceeds of such sale or transfer, an amount equal to one-hundred percent (100%) of the Gain realized from such sale or transfer.

3.  **No Leasing of the Property**.  Notwithstanding anything to the contrary in the Declaration, for a period of one (1) year following the date of the Deed, except only in the event of a Hardship Event released by Seller as provided in paragraph 4 below, Buyer shall not lease and/or sublet the Property or any portion thereof.  Any such lease and/or sublet shall be void and unenforceable.  All other leases or sublets, including those resulting from such a Hardship Event, shall be subject to the terms and conditions of the Declaration.

4.  **Lien Rights; Releases**.  There is and shall be a lien against the Property to secure Buyer's obligations set forth in this **Exhibit "A"**, which lien may be foreclosed on by Seller if Buyer breaches any of its obligations hereunder.  In the event of a proposed sale, transfer, lease or sublet of the Property due to a Hardship Event, Buyer must first provide to Seller evidence of such Hardship Event acceptable to Seller in Seller's sole and absolute discretion, and if acceptable to Seller, Seller shall deliver to Buyer a written acknowledgment of the Hardship Event and waiver of Seller's rights hereunder with respect only to such sale, transfer, lease or sublet. In addition, upon written request from Buyer to Seller and payment of the Gain due to Seller in connection with any sale or transfer of the Property as provided in this **Exhibit "A"**, then Seller shall provide to Buyer a written acknowledgment of such payment and release of Seller's lien rights with respect only to such sale or transfer provided that Buyer provides Seller with evidence satisfactory to Seller in Seller's sole and absolute discretion of the amount of the Gain due, including, without limitation closing or other settlement statements. Any release provided by Seller shall be specific only to the particular sale, transfer, lease or sublet described in the release and not to any subsequent sale, transfer, lease or sublet which shall remain subject to this **Exhibit "A"**.

5.  **Binding and Running with Title to the Property**.  The covenants, restrictions, agreements and lien rights set forth in this **Exhibit "A"** shall burden and run with title to the Property.

6.  **Remedies**.  In addition to its right of foreclosure, Seller shall have all remedies at law and/or in equity for a breach by Buyer under this **Exhibit "A"**.  In the event that Seller prevails in any action (legal or otherwise) to enforce its rights and/or Buyer's obligations, Seller shall be entitled to recover all of its costs incurred including, without limitation, reasonable attorneys' fees, through and including all appellate levels.  By acceptance of the Deed to the Property, Buyer, for itself, and its successors and assigns waives any homestead or other exemption now or hereafter existing or enacted under either Florida or federal law as same may relate to Seller's rights hereunder.

7.  **Subordination**.  This **Exhibit "A"** shall be subordinate to the right of any holder of an institutional first mortgage on the Property and shall not apply to any sales or leases by an institutional first mortgagee who acquires title to the Property by foreclosure or deed in lieu of foreclosure.

8.  **Miscellaneous**.  This **Exhibit "A"** shall be construed in accordance with the laws of the State of Florida and shall be binding on Buyer and Buyer's heirs, successors and assigns. In that regard, all references to Buyer in this **Exhibit "A"** shall also mean and refer to each and every of Buyer's heirs, successors and/or assigns. Should any term or provision of this **Exhibit "A"** be ruled to be illegal or otherwise invalid by a court of competent jurisdiction, such term or provision shall be given its nearest legal meaning or be construed as deleted as such court determines, and the same will not invalidate the remaining terms and provisions of this **Exhibit "A"**, which terms, provisions and portions of this Contract will remain in full force and effect. This **Exhibit "A"** may not be amended or modified except by an instrument in writing executed by Seller.

# EXHIBIT " B "

Exhibit "B"See copy of Special Master's report

8757 BAYSTONE COVE

BOYNTON BEACH, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE -MANUFACTURED          MDL NO. 2047
DRYWALL PRODUCTS LIABILITY
LITIGATION                            SECTION: L

                                      JUDGE ELDON FALLON
                                      MAGISTRATE WILKINSON

## Opinion and Decree

This matter involves a dispute between Guilfort Dieuvil and the Knauf Defendants ("Knauf").

In the mid-2000s, Mr. Dievil purchased the property located at 8757 Baystone Cove, Boynton Beach, Florida. In April 2009, he learned that the property might contain reactive Chinese drywall. Mr. Dievil initially gave GL Homes a chance to remediate the property, but he pulled them off the job before they completed it. In 2013, Mr. Dievil signed and submitted a Plaintiff Profile Form to the Knauf Class Settlement Agreement. Benchmark conducted an inspection and identified no corrosion and no existence of KPT drywall. Knauf denied Mr. Dieuvil's claim.

In 2015, the parties entered into an agreement whereby Mr. Dieuvil could recover to the extent that he could demonstrate "that evidence was preserved strictly in accordance with the requirements of MDL 2047 Pre-Trial Order 1(B)." On August 27, 2015, Knauf denied the claim because Mr. Dieuvil had not complied with Pretrial Order 1(B).

Since the last denial, Mr. Dieuvil has submitted additional documentation, including photographs, in an attempt to support his claim. The parties have now submitted the matter to the Special Master for decision.

On October 9, 2009, Judge Fallon issued Pretrial Order 1(B), which set forth the protocol

for the preservation of evidence in this MDL.  The protocol stated in part:

> [T]he Parties shall photograph the backside of each Chinese drywall
> board immediately after it is removed on-site, and, document on a
> floor plan, building diagram, or other similar form of documentaion,
> the location of each full or partial Chinese drywall board removed
> from the property and its photograph.  Photographs of the wall
> sections should be taken so that any markings on the backside of the
> drywall sections are most clearly visible in the photographs.

On December 20, 2011, Knauf filed a Settlement Agreement in the MDL.  The Settlement

Agreement, which was later approved by the Court, defined a settlement class, and gave the

members of the settlement class an opportunity to opt out.  Mr. Dieuvil did not opt out of the

Settlement Agreement.

The Settlement Agreement contemplates that Knauf will compensate certain class members

who have already remediated their homes.  To this end, the Settlement Agreement establishes a

procedure for resolving differences between the Owner and Knauf.  For purposes of this matter, the

key provision is found at section IV.D.4:

> The Special Master and the Court will take into consideration, in
> determining whether to allow a claim or the amount of the claim,
> whether the Owner has complied with MDL Pretrial Order 1B (if the
> claim is pending in the MDL) or with applicable state law
> requirements for preservation of evidence (if the claim is pending in
> state court).  Subject to review by the Special Master or the Court, the
> failure to preserve evidence as required by law will result in
> disallowance or reduction in the amount of the claim if the failure has
> been prejudicial to a determination of the claim.

The Settlement Agreement requires proof that Knauf manufactured the drywall at issue.

Knauf only agreed to pay certain claimants in the settlement; these did not include claimants that

could not satisfy Pretrial Order 1(B).  Although Mr. Dieuvil claims that he complied with Pretrial

Order 1(B), the evidence does not support this contention.  The Special Master finds that Mr.

Page 2 of  3

Dieuvil's failure to preserve evidence prejudiced Knauf's ability to present a defense, since Mr. Dievil had access to the reactive Chinese drywall before its disposal, but Knauf did not.

For these reasons, the Special Master finds in favor of Knauf and against Mr. Dievil. The Special Master will circulate an invoice in the near future. In accordance with the Settlement Agreement, the costs associated with the Special Master's services will be split between the parties (one-half each).

Dated: November 22, 2017

/s/ Daniel J. Balhoff
Daniel J. Balhoff, Special Master

# EXHIBIT "C"

Copy of emails correspondences from Glhomes, in which Glhomes has refused to repair the subject property, because Claimant refused to pay the builder $25,000.00 contribution toward the repair. Claimant / Plaintiff sent multiples emails to Glhomes to ask the builder to fix the subject property, and Glhomes has refused to repair the home. Instead Glhomes demanded to stop all communication to Plaintiff/Claimant; despite all, Glhomes deprived claimant of almost $1,200,000.00 for the home. **Even Glhomes Vice President acknowledged that Claimant, Guilfort Dieuvil has agreed for Glhomes to proceed with renovation and remediation of the home. Despite all, Glhomes was unwilling to finish the remediation & renovation.**

## 8757 BAYSTONE COVE

## BOYNTON BEACH, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS

Knauf's Drywall: 8757 Baystone Cove Boynton Beach FL 12/2017

Heather C. Keith
Assistant General Counsel
Boynton Beach Associates XVI, LLLP
1600 Sawgrass Corporate Parkway, Suite 400
Sunrise, FL 33323
(954) 753-1730 ext. 2383
(954) 603-0383 - direct dial
(954) 575-5383 - direct fax
email - heather.keith@glhomes.com
~~~~~~~~~~~~~~~~~~~~~~~~~~

**CONFIDENTIALITY NOTICE**: This e-mail communication and any documents, previous email messages or other attachments transmitted with it contain confidential information that may be legally privileged and is for the sole use of the intended recipient(s). If this email is received by any unintended recipient, please notify the sender by return email or by telephone and immediately discard this e-mail and all of its content. Unauthorized disclosure or distribution of the contents of this e-mail is **PROHIBITED**. Likewise, review of this e-mail by an unintended recipient shall not constitute a waiver of the attorney-client privilege.

**From:** Mike Toll
**Sent:** Saturday, December 11, 2010 6:54 AM
**To:** Heather Keith
**Cc:** Jamie Knott
**Subject:** CI79, Dieuvil; Metal Studs

Heather, Please see Dieuvil's email. He had previously indicated to me that he was okay with us proceeding.

**Mike Toll**
Director of Construction

---

**From:** guilf dieuvil [mailto:guilf5@hotmail.com]
**Sent:** Friday, December 10, 2010 7:04 PM
**To:** Mike Toll; Diane Cadorette; Jamie Knott; Elsa Nunes
**Subject:** RE: CI79, Change Order 7

Lot 79 canyon isles

## guilf dieuvil <guilf5@hotmail.com>

Sat 6/16/2012 9:50 AM

To: diane.cadorette@glhomes.com <diane.cadorette@glhomes.com>; jamie.knott@glhomes.com <jamie.knott@glhomes.com>; mike.toll@glhomes.com <mike.toll@glhomes.com>; heather.keith@glhomes.com <heather.keith@glhomes.com>;

Cc: jchanfrau@chanfraupa.com <jchanfrau@chanfraupa.com>; savvy.attorney@gmail.com <savvy.attorney@gmail.com>;

I recently receive a notice from City of Palm Beach with respect to a permit cancellation request for the reconstruction of my house. I appears that Glhomes has no interest to fulfill its obligation to fix my property and bring it to living standard. I am expected to hear from your office within the next 7 days to know if your office will file for permit and start reconstruction of my house as soon as possible.

Your immediate attention is required with respect to the reconstruction of my house. If you scientifically believe and have evidence that those metal frames that are discolored and used to hold those Chinese drywall have not been affected and they are not health hazard, you may submit to me your legal opinion in your letterhead, and proceed with the reconstruction of my house.

I want your office to start on the reconstruction of my house ASAP which I have been asking you from the beginning. .

Best regards

Gulfport Dieuvil

RE: CDW - Lot 79 Canyon Isles
= Reply to H/O on CDW
Reconstruction Work

guilf dieuvil <guilf5@hotmail.com>

Tue 6/19/2012 12:27 AM

Sent Items

To: heather.keith@glhomes.com
   <heather.keith@glhomes.com>;

Once again if you scientifically believe and have evidence
that those metal framing that are discolored and used to
hold those Chinese drywalls have not been affected, and they
are not health hazard, you may submit your legal opinion in
your letterhead, and process your paperwork for the
reconstruction of my house.

Guilfort Dieuvil

From: Heather.Keith@glhomes.com

enviromental test that you did prior of removing the drywall.

Best regards

Guilfort Guilfort

---

From: Heather.Keith@glhomes.com
To: guilf5@hotmail.com
CC: Diane.Cadorette@glhomes.com; jamie.knott@glhomes.com; mike.toll@glhomes.com; Elsa.Nunes@glhomes.com
Subject: RE: Canyon Isles Lot 79 - File Closed
Date: Fri, 25 Jan 2013 19:02:19 +0000

Dear Mr. Dieuvil — We are not in a position to help you further in regards to your home or any of your Chinese drywall related issues.  Please understand that no one from our staff will be contacting you or responding to you any further.  If you contact any of our staff, they have been instructed to not respond to you.  Any issues you have with the movers must be dealt directly with them.  We provided you ample opportunity to amicably resolve your issues to no avail.  We closed our file on this matter several months ago.

Heather C. Keith
Assistant General Counsel
**BOYNTON BEACH ASSOCIATES XVI, LLLP**
1600 Sawgrass Corporate Parkway, Suite 400
Sunrise, FL 33323
*(954) 753-1730*

# RE: Canyon Isles Lot 79 = Refusal to Address Storage Issues

### Heather Keith <Heather.Keith@glhomes.com>

Fri 3/17/2017 2:44 PM

To: 'guilf5@hotmail.com' <guilf5@hotmail.com>;

Cc: Becky Medley <Becky.Medley@glhomes.com>;

Dear Mr. Dieuvil – My assistant forwarded your 3/15/17 email to me. Our position remains unchanged. I've included below some of our prior emails which you are already aware of.   As you know, no one from our staff will have further contact with you. Our staff has already been repeatedly instructed to not respond to you. Any issues you have with the movers must be dealt directly with them. We will not have any further contact with Graebel with regards to your personal property. You should govern yourself accordingly and you must personally address any financial issues you have directly with Graebel.

**From:** guilf dieuvil [mailto:guilf5@hotmail.com]
**Sent:** Wednesday, March 15, 2017 10:06 PM
**To:** Becky Medley <Becky.Medley@glhomes.com>; Jamie Knott <jamie.knott@glhomes.com>; Mike Toll

# Exhibit "D"-

Copy of emails from Special Master, Balhoff when he failed to give proper information to Plaintiff/Claimant with respect to deadline to file objection to his report "Special Master's Report."

## 8757 BAYSTONE COVE

## BOYNTON BEACH, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS

## RE: CDW/Dieuvil

### Dan Balhoff <balhoff@pbmbllc.com>

Mon 12/4/2017 8:27 PM

To: Guilf Dieuvil <guilf5@hotmail.com>;

Cc: ddysart@bakerdonelson.com <ddysart@bakerdonelson.com>;

Mr. Dieuvil:

I am not allowed to give you legal advice.  I suggest you consult an attorney and/or review the settlement agreement.

Thank you.

Dan Balhoff

**From:** Guilf Dieuvil [mailto:guilf5@hotmail.com]
**Sent:** Monday, December 4, 2017 2:36 PM
**To:** Dan Balhoff <balhoff@pbmbllc.com>
**Cc:** ddysart@bakerdonelson.com
**Subject:** Re: CDW/Dieuvil

Mr. Ballhoff / Dysart

I saw your report last week on Thursday November 30, 2017. I believe that I shall file an objection to your report. Would please let me know how many days do I have to file such objection?. Pursuant to any rule or special order that the court may have set. Based on my understanding I think it is 21 or 30 days from the date that I become aware about your report.

Sincerely

Guilfort Dieuvil
786-344-5497

**From:** Guilf Dieuvil <guilf5@hotmail.com>
**Sent:** Sunday, December 3, 2017 9:57 PM
**To:** Dan Balhoff
**Cc:** ddysart@bakerdonelson.com

# Exhibit "E"

Copy of email to Defendant, Knauf's Counsel to request an extension to file

Objection to Special Master Report by December 29, 2017. Defendant did not object

for Prose, Claimant/Plaintiff to file this Objection by December 29, 2017.

## 8757 BAYSTONE COVE

## BOYNTON BEACH, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS

Re: CDW/Dieuvil

Guilf Dieuvil <guilf5@hotmail.com>

Thu 12/7/2017 5:59 PM

To:ddysart@bakerdonelson.com <ddysart@bakerdonelson.com>;

Mr. Dysart

I would like to have your agreement with respect to an extension to review some of the previous court orders and to seek legal advise, in order to file an objection to the opinion and decree. I need your office to agree to give Claimant untill December 29, 2017 to file the objection to the Opinion and Decree. If I do not hear from your office, than I will certainly assume that your office has approved and  agreed to extend the filling deadline of the Objection to Opinion and Decree to be filed by December 29, 2017; therefore, no objection will be presented from your office for the court to issue or grant any extension with respect to this matter.

Best regards

Guilfort Dieuvil
Cell 786-344-5497

---

**From:** Guilf Dieuvil <guilf5@hotmail.com>
**Sent:** Monday, December 4, 2017 3:36 PM
**To:** Ballhoff
**Cc:** ddysart@bakerdonelson.com
**Subject:** Re: CDW/Dieuvil

Mr. Ballhoff / Dysart

I saw your report last week on Thursday November 30, 2017. I believe that I shall file an objection to your report. Would please let me know how many days do I have to file such objection?. Pursuant to any rule or special order that the court may have set. Based on my understanding I think it is 21 or 30 days from the date that I become aware about your report.

Sincerely

Guilfort Dieuvil

# Exhibit "F"

Pictures of the subject property prior of interior demolition

by Glhomes, the builder.

## 8757 BAYSTONE COVE

## BOYNTON BEACH, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS



















# Exhibit "G"

Video of the subject property prior of interior demolition available

at evidentiary hearings

**8757 BAYSTONE COVE**

**BOYNTON BEACH, FL 33473**

**KNAUF'S DEFECTIVE DRYWALLS**

# Exhibit "H"

Copy of report of Inspection conducted by AirQuest Environment, Inc. per

collective request of Glhomes and/or Knauf. Such report revealed the existence of

of corrosion in all 3 AC units as well as the presence of sulfur levels

## 8757 BAYSTONE COVE

## BOYNTON BEACH, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS

# AIRQUEST® ENVIRONMENTAL, INC.

March 26, 2010

Mr. James A. Knott
Boynton Beach Associates XVI, LLLP
1600 Sawgrass Corporate Pkwy., Suite 400
Sunrise, FL 33323

RE:    Canyon Isles Lot 079
       Dieuvil Residence
       8757 Baystone Cove
       Boynton Beach, Florida 33437

Dear Mr. Knott:

AirQuest Environmental, Inc. ("AirQuest") is pleased to provide you with the results of air sampling for sulfur compounds conducted at the residence addressed at 8757 Baystone Cove, Boynton Beach, Florida 33437 ("the site"). The investigation was conducted to document levels of sulfur gases that may have been released from imported drywall present at the site.

### Executive Summary
On March 10, 2010, AirQuest Project Manager James Whalen conducted a limited site survey and collected air samples for reduced sulfur compounds. Low levels of hydrogen sulfide were detected using a direct read instrument. Detected levels were below those known to cause toxicity.

The results of the laboratory analysis did not find detectable levels of the sulfur compounds in any of the samples collected at the site.

### Introduction
On March 10, 2010, AirQuest Project Manager James Whalen conducted a limited site survey and collected air samples for sulfur compounds. The investigation consisted of field analysis for hydrogen sulfide ($H_2S$), collection of air samples for laboratory analysis of reduced sulfur compounds and photo documentation of the condition of the air conditioning coils.

### Procedures
*Direct Read Field Analysis for Hydrogen Sulfide*
Air samples were screened for $H_2S$ using a Jerome 631-X hydrogen sulfide direct reading instrument (serial number 2645). The instrument was regenerated and zeroed prior to sample collection. Twenty-four (24) samples were collected within the residence and two (2) samples were collected outside.

*Reduced Sulfur Compounds*
Samples for reduced sulfur compounds were collected by drawing air into a Tedlar® bag. Three (3) samples were collected within the residence and labeled 079-02 (Kitchen- AHU #3), 079-03

(Office- AHU #1) and 079-04 (2$^{nd}$ Floor SW Bedroom- AHU #2).   Two (2) samples were collected outside of the residence and labeled 079-01 (Front yard) and 079-05 (Back yard).

The samples were submitted to Lakeland Laboratories, Inc. ("Lakeland") for laboratory analysis by ASTM Method D5504.

***Results***

Photographs are included in Attachment I and document the condition of the air conditioning coils at the time of the site inspection.

Low levels of hydrogen sulfide were detected using a direct read instrument. Detected levels were below those known to cause toxicity.

A copy of the laboratory report and chain of custody record for the analysis of the air samples is included in Attachment II.  The ASTM Method D5504 was selected in order to achieve very low (part per billion) detection limits for the reduced sulfur compounds.  The detection limits achieved on the samples collected from within the residence are below levels known to cause toxicity.  There were no detectable concentrations of sulfur reducing compounds in any of the samples collected.

If you have any questions or comments, please don't hesitate to contact us at 954/792-4549.

Sincerely,
AirQuest Environmental, Inc.

Traci-Anne Boyle, CIH
Senior Project Manager

Attachment I – Photographs
Attachment II – Laboratory Report and Chain of Custody Record

**Attachment I**

**Photographs**



Photo 1- Exterior of Air Handler #1



Photo 2- Air Handler #1 Coils



Photo 3- Exterior of Air Handler #2



Photo 4- Air Handler #2 Coils



Photo 5- Exterior of Air Handler #3



Photo 6- Air Handler #3 Coils

**Attachment II**

**Laboratory Report and Chain of Custody Record**

# Analytical Report #: 21387

## for

## AirQuest Environmental, Inc.

**Project Manager: Jim Whalen**

**Project Name: GL Homes**

**Project ID: 3227 CIS079**

**Project Location: 8757 Baystone Cove - Boynton Beach, FL**

**22-MAR-10**



NELAP Certification Number: E84880

**1910 Harden Boulevard, Suite 101**
**Lakeland, Florida 33803-1829**
**Phone: (863) 686-4271**
**Fax: (863) 686-4389**



## LAKELAND
## LABORATORIES

22-MAR-10

**Jim Whalen**
**AirQuest Environmental, Inc.**
4990 SW 52nd Street
Suite 204
Ft. Lauderdale, FL 33314

Reference: LAKELAND Work Order No: **21387**
        **GL Homes**
        Project Location: 8757 Baystone Cove - Boynton Beach, FL
        Project Ref No: 3227 CIS079
        Lab Quote No:

Dear Jim Whalen :

The attached Analytical and QC Summaries list the analytical results from the analyses performed on the samples received under the project name referenced above and identified with the Lakeland Laboratories Work Order numbered **21387**.

All work recorded herein has been done in accordance with normal professional standards using accepted testing methodologies and QA/QC procedures. Lakeland Laboratories is limited in liability to the actual cost of the pertinent analysis done. Your samples will be retained by Lakeland Laboratories for a period of 30 days following receipt of the samples. After that time, they will be properly disposed of without further notice, unless there is a pre-arranged contractual arrangement. We reserve the right to return any unused samples, extracts or related solutions to you, if we consider it necessary (e.g., samples identified as hazardous waste, sample sizes exceeding analytical standard practices, controlled substances under regulated protocols, etc).

The validity and integrity of this report will remain intact as long as it is accompanied by this letter and reproduced in full, unless written approval is granted by Lakeland Laboratories. This report will be filed for at least 3 years in our archives after which time it will be destroyed without further notice, unless otherwise arranged with you.

We thank you for selecting Lakeland Laboratories Incorporated to serve your analytical needs. If you have any questions concerning this report, please feel free to contact us at any time.

Sincerely,

**Mark A. Alessandroni, PE**
Technical Director

1910 Harden Boulevard, Suite 101
Lakeland, Florida 33803-1829
Phone: (863) 686-4271
Fax: (863) 686-4389

**LAKELAND LABORATORIES**

*Client Name: AirQuest Environmental, Inc.*
*Project Name: GL Homes*

| | | | |
|---|---|---|---|
| *Project ID:* | 3227 CIS079 | *Report Date:* | 22-MAR-10 |
| *Work Order Number:* | 21387 | *Date Received:* | 11-MAR-10 |

### Sample receipt non conformances and Comments:

*Samples were delivered via overnight courier (Federal Express Airbill No. 7984 6325 7605) and received in the laboratory at 12:15 PM on March 11, 2010. The samples were analyzed the same day, within the mandated holding time of 24 hours. Unless noted elsewhere in the report, no deviations from the laboratory SOP were made.*

### Sample receipt Non Conformances and Comments per Sample:
None

### Analytical Non Conformances and Comments:

| Batch: LBA-69513 | Sulfur Compounds in Air By ASTM D5504-08 |
|---|---|

*All compounds fell within acceptance criteria for percent recovery (accuracy) and relative percent difference (precision) in the matrix spike-matrix spike duplicate and blank spike-blank spike duplicate QA pairs. A method reporting limit (MRL) standard was run and all target analytes were detected, confirming sensitivity of the analytical system.*

Project Id: 3227 CIS079
Contact: Jim Whalen
Project Location: 8757 Baystone Cove - Boynton Beach, FL

Date Received in Lab: Thu Mar-11-10 12:15 pm
Report Date: 22-MAR-10
Project Manager: Mark A. Alessandroni, PE

| Analysis Requested | Lab Id: | 21387-001 | | 21387-002 | | 21387-003 | | 21387-004 | | 21387-005 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Field Id: | 079-01 | | 079-02 | | 079-03 | | 079-04 | | 079-05 | |
| | Depth: | | | | | | | | | | |
| | Matrix: | AMBIENT AIR | | AMBIENT AIR | | AMBIENT AIR | | AMBIENT AIR | | AMBIENT AIR | |
| | Sampled: | Mar-10-10 15:11 | | Mar-10-10 15:19 | | Mar-10-10 15:24 | | Mar-10-10 15:28 | | Mar-10-10 15:33 | |
| | Extracted: | | | | | | | | | | |
| | Analyzed: | Mar-11-10 12:23 | | Mar-11-10 12:34 | | Mar-11-10 13:20 | | Mar-11-10 12:58 | | Mar-11-10 13:10 | |
| | Units/RL: | ppbv | PQL | ppbv | PQL | ppbv | PQL | ppbv | PQL | ppbv | PQL |
| Sulfur Compounds in Air By ASTM D5504-08 | | | | | | | | | | | |
| Hydrogen Sulfide | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Carbonyl Sulfide | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Methyl Mercaptan | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Ethyl Mercaptan | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Dimethyl Sulfide | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Carbon Disulfide | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Isopropyl Mercaptan | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| tert-Butyl Mercaptan | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| n-Propyl Mercaptan | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Ethyl Methyl Sulfide | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Thiophene | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Isobutyl Mercaptan | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| n-Butyl Mercaptan | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Diethyl Sulfide | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| 3-Methyl Thiophene | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Tetrahydrothiophene | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Dimethyl Disulfide | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| 2-Ethyl Thiophene | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| Diethyl Disulfide | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |
| 2,5-Dimethyl Thiophene | | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 | U | 5.00 |

**Quality Control Sample Legend**

LAKELAND
LABORATORIES

Lakeland Labs Quality Control Sample Legend

This analytical report may include results for various quality assurance/quality control (QA/QC) samples prepared and analyzed as required within various sample preparation and analytical batches. In-house sample identification is based on the Lakeland Labs Work Order No. followed by the Work Order Item No. For example, the second item on Work Order No. 10000 would be assigned Lab Sample ID 10000-002. The QA/QC sample identifications are affixed with suffixes to differentiate them from the actual sample results. For QA/QC samples generated in-house such as method blanks, blank spikes, blank spike duplicates, etc., the preparation or analytical batch number is used instead of the Work Order No. To assist the data reviewer, the following legend provides information on the various QA/QC samples and the suffixes used to denote them:

- BLK    Method Blank. A method blank, also known as a laboratory control blank (LCB), is a sample of a matrix similar to the batch of associated samples (when available) that is free from the analytes of interest and is processed simultaneously with and under the same conditions as samples through all steps of the analytical procedures, and in which no target analytes or interferences are present at concentrations that impact the analytical results for sample analyses.

- BKS    Blank Spike. A blank spike, also known as a calibration verification or laboratory control sample (LCS), is a sample matrix, free from the analytes of interest, spiked with verified known amounts of analytes. It is generally used to establish intra-laboratory or analyst-specific precision and bias (accuracy) or to assess the performance of all or a portion of the measurement system. Successful analysis of the blank spike sample demonstrates an analytical system's ability to accurately measure target analyte concentrations.

- BSD    Blank Spike Duplicate. A blank spike duplicate, also known as a laboratory control sample duplicate (LCSD), is a second blank spike sample, often bracketing a group of samples within a batch. Successful analysis of the blank spike duplicate sample demonstrates not only an analytical system's continuing ability to accurately measure target analyte concentrations, but also, when compared with the blank spike results, the system's precision.

- S    Matrix Spike (MS). A matrix spike is a sample prepared by adding a known mass of target analyte(s) to a specified amount of matrix sample for which an independent estimate of target analyte concentration is available. Matrix spikes are used, for example, to determine the effect of the matrix on a method's recovery efficiency.

- SD    Matrix Spike Duplicate (MSD). A matrix spike duplicate is a second replicate matrix spike prepared in the laboratory and analyzed to obtain a measure of the precision of the recovery for each analyte.

- D    Matrix Duplicate (MD). A matrix duplicate is a second replicate matrix prepared in the laboratory and analyzed to obtain a measure of precision.

- MRL    Method Reporting Limit. A method reporting limit standard is an analyte-free matrix similar to the sample matrices spiked with one or more of the target analytes at a concentration equal to or less than the method reporting limit (also known as the practical quantitation limit or PQL). Successful analysis of the MRL standard demonstrates the analytical system's ability to identify the spiked analytes of interest at the MRL/PQL.

**Flagging Criteria**

## FLORIDA Flagging Criteria

Data were reviewed by the Department Supervisor and QA Director

A    Value reported is the mean (average) of two or more determinations. This code shall be used if the reported value is the average of results for two or more discrete and separate samples. These samples shall have been processed and analyzed independently. Do not use this code if the data are the result of replicate analysis on the same sample aliquot, extract or digestate.

B    Results based upon colony counts outside the acceptable range. This code applies to microbiological tests and specifically to membrane filter colony counts. The code is to be used if the colony count is generated from a plate in which the total number of coliform colonies is outside the method indicated ideal range. This code is not to be used if a 100 mL sample has been filtered and the colony count is less than the lower value of the ideal range.

J    Estimated value. A "J" value shall be accompanied by a narrative justification for its use. Where possible, the organization shall report whether the actual value is less than or greater than the reported value. A "J" value shall not be used as a substitute for K, L, M, T, V, or Y, however, if additional reasons exist for identifying the value as estimate (e.g., matrix spiked failed to meet acceptance criteria), the "J" code may be added to a K, L, M, T, V, or Y. The following are some examples of narrative descriptions that may accompany a "J" code: .

    J1:  No known quality control criteria exist for the component;

    J2:  The reported value failed to meet the established quality control criteria for

        either precision or accuracy (the specific failure must be identified);

    J3:  The sample matrix interfered with the ability to make any accurate determination;

    J4:  The data are questionable because of improper laboratory or field protocols

Q    Sample held beyond the accepted holding time. This code shall be used if the value is derived from a sample that was prepared or analyzed after the approved holding time restrictions for sample preparation or analysis.

T    Value reported is less than the laboratory method detection limit. The value is reported for informational purposes, only and shall not be used in statistical analysis.

U    Indicates that the compound was analyzed for but not detected. This symbolshall be used to indicate that the specified component was not detected. The value associated with the qualifier shall be the laboratory method detection limit. Unless requested by the client, less than the method detection limit values shall not be reported (see "T" above).

V    Indicates that the analyte was detected in both the sample and the associated method blank. Note: the value in the blank shall not be subtracted from associated samples.

Y    The laboratory analysis was from an unpreserved or improperly preserved sample. The data may not be accurate.

I    The reported value is between the laboratory method detection limit and the laboratory practical quantitation limit.

  .

**Flagging Criteria**

LAKELAND
LABORATORIES

FLORIDA Flagging Criteria

\*  Not analyzed due to interference

R   Significant rain in the past 48 hours. (Significant rain typically involves rain in excess of 1/2 inch within the past 48 hours.) This code shall be used when the rainfall might contribute to a lower than normal value.

!   Data deviate from historically established concentration ranges.

+   Analyte falls outside current scope of NELAP accreditation.

X   In our quality control review of the data a QC deficiency was observed and flagged as noted.  MS/MSD recoveries were found to be outside of the laboratory control limits due to possible matrix /chemical interference, or a concentration of target analyte high enough to effect the recovery of the spike concentration. This condition could also effect the relative percent difference in the MS/MSD.

D   The sample(s) were diluted due to targets detected over the highest point of the calibration curve,  or due to matrix interference. Dilution factors are included in the final results. The result is from a diluted sample.

F   When reporting species: F indicates the female sex. Otherwise it indicates RPD value is outside the acceptable range.

L   Off-scale high. Actual value is known to be greater than value given. To be used when the concentration of the analyte is above the acceptable level for quantitation (exceeds the linear range or highest calibration standard) and the calibration curve is known to exhibit a negative deflection.

H   Value based on field kit determination; results may not be accurate. This code shall be used if a field screening test (i.e., field gas chromatograph data, immunoassay, vendor-supplied field kit, etc.) was used to generate the value and the field kit or method has not been recognized by the Department as equivalent to laboratory methods.

# Form 3 - MS / MSD Recoveries

## Project Name: GL Homes

**Report Date:** 22-MAR-10

**Project ID:** 3227 CIS079

**Work Order #:** 21387

**Lab Batch ID:** 69513

**Date Analyzed:** 03/11/2010

**Reporting Units:** ppbv

**QC-Sample ID:** 21393-001 S

**Date Prepared:** 03/11/2010

**Batch #:** 1

**Analyst:** GARGAR

**Matrix:** Ambient Air

### Sulfur Compounds in Air By ASTM D5504-08

MATRIX SPIKE / MATRIX SPIKE DUPLICATE RECOVERY STUDY

| Analytes | Parent Sample Result [A] | Spike Added [B] | Spiked Sample Result [C] | Spiked Sample %R [D] | Spike Added [E] | Duplicate Spiked Sample Result [F] | Spiked Dup. %R [G] | RPD % | Control Limits %R | Control Limits %RPD | Flag |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hydrogen Sulfide | <1.25 | 25.0 | 24.7 | 99 | 25.0 | 23.2 | 93 | 6 | 63-128 | 30 | |
| Carbonyl Sulfide | <0.900 | 25.0 | 30.5 | 122 | 25.0 | 30.7 | 123 | 1 | 78-195 | 30 | |
| Methyl Mercaptan | <1.80 | 25.0 | 25.2 | 101 | 25.0 | 24.2 | 97 | 4 | 58-131 | 30 | |
| Ethyl Mercaptan | <1.89 | 25.0 | 24.5 | 98 | 25.0 | 24.9 | 100 | 2 | 52-138 | 30 | |
| Dimethyl Sulfide | <0.750 | 25.0 | 24.2 | 97 | 25.0 | 24.3 | 97 | 0 | 75-118 | 30 | |
| Carbon Disulfide | <0.560 | 25.0 | 30.2 | 121 | 25.0 | 29.9 | 120 | 1 | 71-186 | 30 | |
| Isopropyl Mercaptan | <1.55 | 25.0 | 23.3 | 93 | 25.0 | 22.2 | 89 | 5 | 66-117 | 30 | |
| tert-Butyl Mercaptan | <1.67 | 25.0 | 24.1 | 96 | 25.0 | 23.6 | 94 | 2 | 52-138 | 30 | |
| n-Propyl Mercaptan | <1.96 | 25.0 | 23.1 | 92 | 25.0 | 20.8 | 83 | 10 | 61-128 | 30 | |
| Ethyl Methyl Sulfide | <0.790 | 25.0 | 24.5 | 98 | 25.0 | 25.1 | 100 | 2 | 70-123 | 30 | |
| Thiophene | <0.360 | 25.0 | 24.8 | 99 | 25.0 | 24.7 | 99 | 0 | 69-123 | 30 | |
| Isobutyl Mercaptan | <1.62 | 25.0 | 22.3 | 89 | 25.0 | 21.5 | 86 | 4 | 57-127 | 30 | |
| n-Butyl Mercaptan | <0.910 | 25.0 | 25.0 | 100 | 25.0 | 24.4 | 98 | 2 | 74-124 | 30 | |
| Diethyl Sulfide | <1.80 | 25.0 | 21.1 | 84 | 25.0 | 21.0 | 84 | 0 | 63-116 | 30 | |
| 3-Methyl Thiophene | <1.21 | 25.0 | 25.0 | 100 | 25.0 | 24.0 | 96 | 4 | 72-121 | 30 | |
| Tetrahydrothiophene | <1.06 | 25.0 | 25.9 | 104 | 25.0 | 24.1 | 96 | 7 | 60-128 | 30 | |
| Dimethyl Disulfide | <1.05 | 25.0 | 25.3 | 101 | 25.0 | 24.3 | 97 | 4 | 67-124 | 30 | |
| 2-Ethyl Thiophene | <0.450 | 25.0 | 27.2 | 109 | 25.0 | 23.7 | 95 | 14 | 63-131 | 30 | |
| Diethyl Disulfide | <0.960 | 25.0 | 25.7 | 103 | 25.0 | 24.3 | 97 | 6 | 57-135 | 30 | |
| 2,5-Dimethyl Thiophene | <0.880 | 25.0 | 26.1 | 104 | 25.0 | 24.9 | 100 | 5 | 58-136 | 30 | |

Matrix Spike Percent Recovery  [D] = 100*(C-A)/B

Relative Percent Difference  RPD = 200*(C-F)/(C+F)

Matrix Spike Duplicate Percent Recovery  [G] = 100*(F-A)/E


LAKELAND
LABORATORIES

# BS / BSD Recoveries

**Project Name:  GL Homes**

Work Order #: 21387

Analyst: GARGAR

Lab Batch ID: 69513

Units: ppbv

Sample: 69513-1-BKS

Date Prepared:  03/11/2010

Batch #:  1

Report Date  22-MAR-10

Project ID:  3227 CIS079

Date Analyzed:  03/11/2010

Matrix:  Air

## BLANK /BLANK SPIKE / BLANK SPIKE DUPLICATE  RECOVERY STUDY

### Sulfur Compounds in Air By ASTM D5504-08

| Analytes | Blank Sample Result [A] | Spike Added [B] | Blank Spike Result [C] | Blank Spike %R [D] | Spike Added [E] | Blank Spike Duplicate Result [F] | Blk. Spk Dup. %R [G] | RPD % | Control Limits %R | Control Limits %RPD | Flag |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hydrogen Sulfide | <1.25 | 25.0 | 23.8 | 95 | 25.0 | 22.9 | 92 | 4 | 63-128 | 30 | |
| Carbonyl Sulfide | <0.900 | 25.0 | 24.1 | 96 | 25.0 | 22.4 | 90 | 7 | 78-195 | 30 | |
| Methyl Mercaptan | <1.80 | 25.0 | 24.8 | 99 | 25.0 | 24.9 | 100 | 0 | 58-131 | 30 | |
| Ethyl Mercaptan | <1.89 | 25.0 | 23.5 | 94 | 25.0 | 23.0 | 92 | 2 | 52-138 | 30 | |
| Dimethyl Sulfide | <0.750 | 25.0 | 24.1 | 96 | 25.0 | 23.7 | 95 | 2 | 75-118 | 30 | |
| Carbon Disulfide | <0.560 | 25.0 | 24.6 | 98 | 25.0 | 23.9 | 96 | 3 | 71-186 | 30 | |
| Isopropyl Mercaptan | <1.55 | 25.0 | 26.0 | 104 | 25.0 | 22.4 | 90 | 15 | 66-117 | 30 | |
| tert-Butyl Mercaptan | <1.67 | 25.0 | 24.2 | 97 | 25.0 | 22.7 | 91 | 6 | 52-138 | 30 | |
| n-Propyl Mercaptan | <1.96 | 25.0 | 23.3 | 93 | 25.0 | 19.6 | 78 | 17 | 61-128 | 30 | |
| Ethyl Methyl Sulfide | <0.790 | 25.0 | 24.7 | 99 | 25.0 | 24.4 | 98 | 1 | 70-123 | 30 | |
| Thiophene | <0.360 | 25.0 | 24.7 | 99 | 25.0 | 23.8 | 95 | 4 | 69-123 | 30 | |
| Isobutyl Mercaptan | <1.62 | 25.0 | 23.8 | 95 | 25.0 | 23.1 | 92 | 3 | 57-127 | 30 | |
| n-Butyl Mercaptan | <0.910 | 25.0 | 25.0 | 100 | 25.0 | 23.3 | 93 | 7 | 74-124 | 30 | |
| Diethyl Sulfide | <1.80 | 25.0 | 23.9 | 96 | 25.0 | 22.5 | 90 | 6 | 63-116 | 30 | |
| 3-Methyl Thiophene | <1.21 | 25.0 | 24.7 | 99 | 25.0 | 22.7 | 91 | 8 | 72-121 | 30 | |
| Tetrahydrothiophene | <1.06 | 25.0 | 25.0 | 100 | 25.0 | 23.1 | 92 | 8 | 60-128 | 30 | |
| Dimethyl Disulfide | <1.05 | 25.0 | 25.9 | 104 | 25.0 | 22.4 | 90 | 14 | 67-124 | 30 | |
| 2-Ethyl Thiophene | <0.450 | 25.0 | 27.7 | 111 | 25.0 | 25.0 | 100 | 10 | 63-131 | 30 | |
| Diethyl Disulfide | <0.960 | 25.0 | 25.5 | 102 | 25.0 | 22.6 | 90 | 12 | 57-135 | 30 | |
| 2,5-Dimethyl Thiophene | <0.880 | 25.0 | 24.8 | 99 | 25.0 | 23.0 | 92 | 8 | 58-136 | 30 | |

Relative Percent Difference RPD = 200*|(D-F)/(D+F)|
Blank Spike Recovery [D] = 100*(C)/[B]
Blank Spike Duplicate Recovery [G] = 100*(F)/[E]
All results are based on MDL and Validated for QC Purposes

**Lakeland Laboratories, LLC**
1910 Harden Boulevard, Suite 101
Lakeland, Florida 33803-1829
Phone: (863) 686-4271  Fax: (863) 686-4389

Work Order # 21387

Florida NELAP Certificate No. E84880

Page 1 of 1

**Chain of Custody Record**

DEP Form #: 62-770.900(2)
Form Title: Chain of Custody Record
Effective Date: September 23, 1997

| Company: Air Quest Environmental, Inc. | Project Name: GL Homes |
|---|---|
| Address: 4990 SW 52nd Street, Ste. 204 | Project #: 3227 C15079 |
| Ft. Lauderdale, FL 33314 | Project Manager: Jim Whalen |
| Phone: 954-792-4549  Fax: 866-461-2791 | Project Location: 8757 Baystone Cove, Boynton Beach |
| Sampled by [Print Name(s)] / Affiliation: Jim Whalen / AirQuest | P.O. #: |

FDEP Facility No.:
Project Name:

| Item No. | Field ID No. | Sampled Date | Time | Grab or Composite | Matrix (see codes) | Number of Containers | ASTM D5504 | Bag # Remarks | Lab No. |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 079-01 | 3/10/10 | 15:11 | G | A | 1 | Y | 19015 | |
| 2 | 079-02 | | 15:19 | G | A | 1 | Y | 19012 | |
| 3 | 079-03 | | 15:24 | G | A | 1 | Y | 19019 | |
| 4 | 079-04 | | 15:28 | G | A | 1 | Y | 19014 | |
| 5 | 079-05 | ↓ | 15:33 | G | A | 1 | Y | 19052 | |

⇐ Total Number of Containers

| | Relinquished by / Affiliation | Date | Time | Accepted by / Affiliation | Date | Time |
|---|---|---|---|---|---|---|
| | J Whalen /Air Quest 1904 6325 7605 | 3/10/10 | 5:30PM | 7984 6325 7605 /Fed Ex | 3/10/10 | 5:30PM |
| | /Fed Ex | 3.11.10 | 12-15 | /Lakeland Labs | 3-11-10 | 12:15 |

Shipment Method
Out: 3/10/10 Via: Fed Ex   Item No. 1-5
Returned: / / Via:   1-5

Cooler No.(s) / Temperature(s) (°C): Ambient °C

Sampling Kit No.:            Equipment ID No.:

Additional Comments:

MATRIX CODES:   A = Air   GW = Groundwater   SE = Sediment   SO = Soil   SW = Surface Water   W = Water (Blanks)   O = Other (specify)
PRESERVATIVE CODES:   H = Hydrochloric acid + ice   I = Ice only   N = Nitric acid + ice

# Exhibit "I"

"Pursuant to PTO 1(B) which required to maintain samples and pictures of some of those related

components:  coppers, plumbing,  HVAC coil Materials, electrical wires"

Due to Knauf's toxic and defective drywalls that contain high levels of sulfur, released

hydrogen, sulfide gas from bacteria, and other toxic chemicals have tarnished,

damaged, impaired the entire house and tainted, damaged, and corroded

the entire copper, entire plumbings, entire HVAC coil Materials,

entire electrical system of the subject property,

it is obvious that multiples samples were taken from every section/portion of homes, and every

single sample of coppers, plumbing,  HVAC coil Materials, electrical wires, and

other components were completely affected, corroded, tainted,

impaired and damaged due to Knauf's defective drywall.

"Those tangible evidences speak for themselves."

## 8757 BAYSTONE COVE

## BOYNTON BEACH, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS

Knauf's Drywall: 8757 Baystone Cove Boynton Beach FL 12/2017















































CIS079 #11s
09-23-10
Loft
North Wall
Brad Wall

CIS079 #12

09-23-10

3rd Bedroom
North Wall
Brad Wall









# Exhibit "J"

"Pictures of multiples KPT's Drywall samples and other related evidences."

Upon removal of KPT drywall samples and all others related evidences, Glhomes

collected, labeled, photographed, videotaped and preserved those evidences and

samples as the construction company that initiated the demolition. Brad Wall & Jerry

Oneil are both Glhomes's employees, and they have their own handwriting on all

labels, also filled out and signed the building diagram/floor. Claimant solely relied on

Glhomes to collect all physical samples of the Knauf's drywalls in compliance with

PTO-1(B) requirements, as Glhomes represented itself to Plaintiff/Claimant

as an expert in this environment.

## 8757 Baystone cove

## boynton Beach, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS



Canyon Isles Lot 79
Crabero Bath/Living Rm
Jerry over 9/29/10



Cooper Isles Lot 79

Family Room
Jerry oneil 9/29/10

Canyon Isles Lot 79
Dining Room/Laundry Rm
Jerry Oneil 9/29/10



ed those Good American Drywalls. Also Knauf drywalls has already destroyed, damage
electrical wire system, HVAC coil Materials, and plumbings; therefore Knauf is directly l
lition of the subject property.

All Physical



Crayon Isles Lot 74

Kitchen/Dining Rm
Jeremy Audil 9/29/10





Canyon Isles Lot 79
· Kitchen Ceiling
Terry Dwier 9/29/10





CIS 079 #8

09-23-10

Master Bed

South Wall

Brad Wall



CIS 079 #11

09-23-10

Loft

North Wall

Brad Wall



CIS 079 #120
09.23-10
3rd Bedroom
North Wall
Brad Wall



CIS 079 #5.

09-23-10

Living Room

NE Colums

Brad Wall



CIS 079 #3D
09-23-10
Powder Room
South Wall
Brad Wall



CIS 079 #2

09-23-10

Family Room

East Wall

Brad Wall

CIS 079 #10D

09-23-10

4th Bedroom

East Wall

Brady Wall

CIS 079 # 60

09-23-10

Dining Room

West Wall

Brad Wall

Ziploc

Cayman Isles Lot 79
Jerry oneil 9/29/10

Jerry oneil 9/24/10

Cayman Isles Lot 79
Laundry Room?
Garage



Crongon Isles Cot 79
. Kitchen Ceiling
Jerry Oneil 9/29./10



Canyon Isles Lot 79
Bed #4 Ceiling
Jerry oneil 9/29/10

B. OGL



CIS 079 #9D
09.23.10
6th Bedroom
North Wall
Brad Wall



The handwriting reads:
"Canyon Isles. Lot 79
Living Room/Gallery
Sample Taken 9/29/10"







# Exhibit "K"

"Pictures of multiples Full KPT's Drywalls samples and other related evidences."
Upon removal of KPT drywall samples and all others related evidences, Glhomes
collected, labeled, photographed, videotaped and preserved those evidences and
samples as the construction company that initiated the demolition.

### 8757 BAYSTONE COVE

### BOYNTON BEACH, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS































Mail - gum5@hotmail.com









# Exhibit "L"

"Pursuant to PTO 1(B) which required to maintain of at least 2 samples of any drywall brand removed from an affected property."

Sample of American Drywalls brand (National/GridmarX) that were also installed at the house. The National Gypsum drywalls brands represented themselves to the public as their products are high-quality, safe and environmentally sound product. Every single false allegation against Gypsum has been rebutted by sound science from the nation's leading laboratories and safety experts, including Federal District Court's ruling vindicates this company's products (National Gypsum/GridmarX).

## 8757 BAYSTONE COVE

## BOYNTON BEACH, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS

Knauf's Drywall: 8757 Baystone Cove Boynton Beach FL 12/2017



  

Products | Resources | SDS | Specs | Submittals | Sales Terms | LEED - GPS | Continuing Education | Sustainability | About Us | News | Careers

News

**NGC Fact Sheet**

**Press Releases**

**Publications**

- *NGC Corporate Brochure*
- *Industry Update*
- *NGC Construction Guide*
- *ProForm Construction Guide*
- *On Board Newsletter*

**News Archive**

**Media Contacts**

July 24, 2012

## Court ruling vindicates company's products

Federal District Court Judge John E. Steele issued an order July 24 dismissing all claims against National Gypsum in the *Brincku* and *Brucker* lawsuits. The two cases claimed National Gypsum's American-made drywall caused the same corrosive effects in their homes as defective Chinese drywall.

The lawsuits alleged the company manufactured defective drywall which contained high levels of sulfur, released hydrogen sulfide gas from bacteria, and corroded copper and other metals inside the homes. Unrebutted, scientific evidence provided by the company proved this was not the case.

"We are extremely pleased that our company's products and reputation have been completely vindicated," said CEO Thomas C. Nelson. "This ruling confirms what we have said all along: National Gypsum drywall is a high-quality, safe and environmentally sound product. Every single false allegation has been rebutted by sound science from the nation's leading laboratories and safety experts".

The court's ruling concludes a long saga which began in 2009. In response to the plaintiffs' allegations, the company engaged Packer Engineering and Columbia Analytical Services, two well-known independent testing laboratories, to test its products found in the homes. A full battery of elemental sulfur, copper corrosion, and gas chamber tests were performed on the National Gypsum drywall. Other professionals, including HSA Engineers and Scientists, Inc., also tested the air, water, and surrounding environments of the homes.

These results, along with studies done for the Consumer Products Safety Commission by the Department of Energy's Lawrence Berkeley National Laboratory and Environmental Health & Engineering, were consistent. National Gypsum drywall does not cause the corrosive issues associated with defective



Chinese drywall. To the contrary, detailed study of the homes involved confirmed that the alleged metal corrosion was caused by hydrogen sulfide released from poorly or untreated well water or by defective, corrosive Chinese drywall, not by National Gypsum's products.

The dismissal of the Brincku and Brucker lawsuits is the latest in a series of similar cases that have been thrown out of court. In April 2011, an Arizona putative national class action against National Gypsum was voluntarily withdrawn, after the plaintiffs admitted having no scientific or causal evidence to support that lawsuit. In October 2011, an Alabama lawsuit was dismissed "with prejudice" – meaning the plaintiffs are barred from bringing the same claim against the company.

"The court's action will allow us to continue our 87-year tradition of producing high-quality gypsum drywall and finishing products in the United States without the unfounded and unwarranted distraction and expense of these suits," Nelson said. This is an important victory for National Gypsum, its customers, and its associates."













GridMarX ™ Patent Pending
ational Gypsum Properties LLC
roduct info @ www.gridmarx.com

Made
20:2
03-0

Canyon Isles Lot 79
Master Bed/ Mas-
Jerry O'Neil 9

Canyon Isles Lot 79
Bath
Jerry O'Neil 9/29/10

Ziploc® Smart Zip)) Seal™
BRAND BAGS
SACS DE MARQUE

A FAMILY COMPANY
UNE ENTREPRISE FAMILIALE
SC Johnson



Canyon Isles Lot 79
Master Exercise Area/close

O'Neil 9/24/10

Canyon Isles lot 79
Trip Over 9/24/10



Canyon Isles Lot. 79
Both #2
Item over-1

Compor Isles Lot. 79
Replace1 9/25/16







# Exhibit "M"

Copy of email that Knauf's counsel rejected the request to physically inspect the

evidence of KPT Drywalls and waived any opportunity to inspect all tangible samples

of their Knauf's Drywalls and related evidences that were installed in the home.

### 8757 BAYSTONE COVE

### BOYNTON BEACH, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS

Re: 8757 Baystone Cove Boynton
Beach FL 33473

Dysart, Danny <ddysart@bakerdonelson.com>

Thu 4/20/2017 3:15 PM

To: guilf dieuvil <guilf5@hotmail.com>;

An inspection is not necessary if you can submit pictures of all samples in your possession with readable markings on the drywall.

The ones below are readable. Could you please do the same for all samples.

Thank you.

> On Apr 20, 2017, at 2:00 PM, guilf dieuvil <guilf5@hotmail.com> wrote:
>
> This is the largest that I can make that pictures. Please let me know if this picture is satisfactory to your expectations. If you want to send your agent to the subject property, so he could actually see the sample of the knauf drywall, or if you want I can arrange my schedule next week to come to your office to bring you multiple samples of the knauf Chinese drywall that were taken from the home. Whatever way that you want to resolve this matter will be fine with me. I will pay for my own expense to bring you sample of those drywall, if this approach will resolve all pending issues. Please let me know.
> Thanks in advance for your corporation.
>
> Best regards

# Exhibit "N"

Copy of emails correspondence from Glhome's counsel regarding transferring those

physical KPT Drywalls and all other physical related evidences to Claimant

Mr. Dieuvil On October 27, 2015.

### 8757 BAYSTONE COVE

### BOYNTON BEACH, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS

# Rè: CDW - Dieuvil - 8757 Baystone Cv - GL Homes Letter - Destruction of drywall samples

### guilf dieuvil <guilf5@hotmail.com>

Tue 10/27/2015 11:50 AM

To: Vanessa Serrano <Vanessa.Serrano@glhomes.com>;

Will be there exactly at 2:00

Sent from my iPhone

> On Oct 27, 2015, at 11:44 AM, "Vanessa Serrano" <Vanessa.Serrano@glhomes.com> wrote:
>
> Mr. Dieuvil,
>
> I apologize but I now have a lunch appointment and may not be back by 1:30 p.m. Please come at 2:00 p.m., if that works for you.
>
> -----Original Message-----
> From: guilf dieuvil [mailto:guilf5@hotmail.com]
> Sent: Tuesday, October 27, 2015 11:29 AM
> To: Vanessa Serrano
> Subject: Re: CDW - Dieuvil - 8757 Baystone Cv - GL Homes Letter - Destruction of drywall samples
>
> I will be there at 1:30
>
> Sent from my iPhone
>
>> On Oct 27, 2015, at 9:41 AM, "Vanessa Serrano" <Vanessa.Serrano@glhomes.com> wrote:
>>
>> Good morning, Mr. Dieuvil. I can be only available between 1:30 p.m. and 4:00 p.m. today. Please let me know what time you will be here so I can be sure to have everything ready.
>>
>> Once you get here, I will meet you downstairs in front of the building. We have a driveway where you can wait and I will come outside. I will have the 2 boxes and the document I previously e-mailed you for you to sign.
>>

# Re: CDW - Dieuvil - 8757 Baystone Cv - GL Homes Letter - Destruction of drywall samples

## Heather Keith <Heather.Keith@glhomes.com>

Thu 9/24/2015 1:02 PM

To: guilf dieuvil <guilf5@hotmail.com>;

Cc: James V. Doyle, Jr. <jimmy@doylefirm.com>; Becky Medley <Becky.Medley@glhomes.com>;

I am in the field the next few days on site inspections but I will be back in my office next week. I have 2 boxes that contain various building materials from your home that were collected during the demolition phase of the remediation. We have had these materials on hold for you for years. We will release these 2 boxes to your sole custody and control but you will have to sign an acknowledgment for accepting full custody and control of the materials and releasing us from further responsibility for such materials. We will prepare the acknowledgment next week and contact you to make arrangements for you to get the 2 boxes in due course.

> On Sep 24, 2015, at 12:21 PM, guilf dieuvil <guilf5@hotmail.com> wrote:
>
> Dear Heather
> Re: 8757 Baystone Cv
>       Boynton Beach, FL 33473
>       GLHOMES
>
> It comes to my knowledge that glhomes has petitioned the court to destroy the the sample of Chinese drywall. It is critical that I need to pick up that evidence from your office by tomorrow. Please let me know where and what time that you will have the evidence for the Chinese drywall ready so I can come to pick it up from your office. I don't need the evidence of the Chinese drywall to be destroyed. GLHOMES has failed to fix my home, and I need those evidences to remain.
> Once again please let me know what time, and where I can come to pick up the evidence of those Chinese drywall and any evidence and all material and tangible facts that you have in your possession regarding my file and property.
>
> Best regards
>
> Guilfort Dieuvil
>

## **EVIDENCE RECEIPT ACKNOWLEDGEMENT FORM**

Guilfort Dieuvil and Magdadene Dieuvil ("Owners") currently own the home located on Lot 79 in Canyon Isles, Boynton Beach, Florida, otherwise known as 8757 Baystone Cove, Boynton Beach, FL 33473. Owners herein acknowledge and agree that Owners are taking full possession, custody and control of two (2) boxes containing various building related materials from the Home, including without limitation, samples of the drywall removed from the Owner's home in September, 2010 (the "CDW Materials").

Further, Owners hereby release Boynton Beach Associates XVI, LLLP, G.L. Building Corporation, each of their partners and/or affiliates, and each of their employees, representatives, contractors and attorneys from any further responsibility for the future care, custody, condition or control of the CDW Materials and acknowledge and agree that Owners are fully responsible for such CDW Materials going forward.

EXECUTED this _____ day of _____2015.

OWNER:

By:_____

Print Name: Guilfort Dieuvil_____

Signed in the presence of one (1) witness:

Witness:_____

Print Name:_____

By:_____

Print Name: Magdadene Dieuvil_____

Signed in the presence of one (1) witness:

Witness:_____

Print Name:_____

# Exhibit "O"

Pictures of present condition of the subject Property since 2010 when Glhomes stopped all repair and remediation work at the subject property. Claimant/Plaintiff solely relied on Glhomes to collect all physical samples of the Knauf's drywalls case in compliance with PTO-1(B) requirements, as Glhomes represented itself to Claimant as an expert in this environment. In addition to that Glhomes and Knauf have deprived Claimant of about $ 1,200,000.00 and still refused to repair Claimant's property and to assume their liabilities and responsibility.

8757 BAYSTONE COVE

BOYNTON BEACH, FL 33473

KNAUF'S DEFECTIVE DRYWALLS



















# Exhibit "P"

Copy of PTO 1(B) - Order -

## 8757 BAYSTONE COVE

## BOYNTON BEACH, FL 33473

## KNAUF'S DEFECTIVE DRYWALLS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED DRYWALL ) MDL No. 2047
PRODUCTS LIABILITY LITIGATION )
                                    )      SECTION: L
                                    )
                                    )      JUDGE FALLON
                                    )      MAG. JUDGE WILKINSON
                                    )

THIS DOCUMENT RELATES TO ALL CASES

PRE-TRIAL ORDER NO. 1(B)
(Preservation of Physical Evidence)

Pursuant to the Court's duty to supervise pretrial proceedings in this case, including discovery, and pursuant to the Court's inherent power, the Court hereby modifies Paragraph 14 of Pretrial Order No. 1 to address the Court's expectations, from this date forward, with respect to the preservation of physical evidence from properties that may be repaired by the parties during the course of this litigation. Those persons or entities who do not undertake to repair their properties are, by definition, preserving the physical evidence, so long as the drywall and any building components and contents that are believed to be affected by the allegedly defective drywall remain intact. This Order addresses preservation requirements for those persons or entities who (1) were transferred to this Court by the Judicial Panel on Multidistrict Litigation, pursuant to its Order of June 15, 2009; (2) any tag-along actions subsequently transferred to this Court by the Judicial Panel on Multidistrict Litigation pursuant to Rule 7.4 of the Rules of Procedure of that Panel; (3) all related cases originally filed in this Court or transferred or removed to this Court; (4) those persons or entities who intend to or may seek recovery relating to Chinese-manufactured drywall, including putative members of any class actions; and (5) any subsidiaries and affiliates of all defendants in any

such actions.

       In summary, from this date forward, all persons or entities who have or who intend to pursue a claim relating to allegedly defective Chinese-manufactured drywall and their agents, subsidiaries and affiliates shall preserve the following physical evidence at their own expense, subject to further order by the Court. Notwithstanding the foregoing, the Court reiterates that Paragraph 14 of Pre-Trial Order No. 1 remained in full force and effect up until this modification.

A.    <u>Preservation of Physical Evidence</u>:

1.    ***Drywall*** -- The Parties shall maintain at least two samples (of ten inches by ten inches (10" x 10") in size if possible) of every different drywall brand or marking removed from an affected property, including taking samples of unmarked drywall. If there are any markings on the sample, the samples should include as much of the identifiable marking as possible. In addition, the parties also shall preserve at least one sample of each type of drywall endtape, if any, that is found during inspection, repair or removal of drywall in or from a property. These drywall and endtape samples shall be labeled with the date of collection, the room location and the specific wall that the sample was taken from. These drywall and endtape samples shall be stored separately in double-bagged polyethylene zip-lock bags or equivalents, and not grouped together. Any drywall or endtape sample to be preserved under this paragraph shall be stored in reasonable climate controlled conditions and free of water or moisture. All samples should be clearly labeled on the outside of the plastic bag or equivalent, and then placed inside a second plastic bag or equivalent. The label shall include the name and address of the property from which the sample was taken, the date sampled, a sampler identification which identifies the type of item (e.g. drywall, copper wire, etc.), and where the item was taken from in the property.

In addition to taking these samples, the Parties shall photograph the backside of each Chinese drywall board immediately after it is removed on-site, and, document on a floor plan, building diagram, or other similar form of documentation, the location of each full or partial Chinese drywall board removed from the property and its photograph. Photographs of the wall sections should be taken so that any markings on the backside of the drywall sections are most clearly visible in the photographs.

2.     ***HVAC coil material samples*** --   Before removing any HVAC coils or attachments, the Parties shall identify the location of each HVAC system on a floor plan, building diagram, or other similar form of documentation, and photograph the HVAC coil and all affected attachments while the HVAC coil and other attachments remain intact. For each HVAC coil removed from the property, the Parties shall either: (a) preserve the entire removed HVAC coil, or (b) select and label: (i) at least eight representative copper U-bends (four from each side); and (ii) at least eight sections (at least six to ten inches long) of refrigerant line or other straight copper tubing associated with the coil or thermostatic expansion valve (TXV) for each HVAC system that is removed from the property. In the event that there are HVAC systems that are not removed or repaired, they should be also identified on the floor plan, building diagram, or other similar form of documentation. An appropriately trained HVAC technician should then cut off the labeled segments with a pipe cutter or saw. The serial number, make, and model of each affected HVAC coil shall be recorded and photographed.

All samples of copper U-bends, refrigerant line, and tubing (but not the HVAC coil with refrigerant line attached, if preserved) shall be placed separately in double-bagged zip-lock bags, and not grouped together. These samples must be allowed to dry, whether wet

from condensation or refrigerant, before the zip-lock bag is sealed and stored. Any HVAC coil or sample to be preserved under this paragraph shall be stored in reasonable climate controlled conditions. All such samples should be clearly labeled on the outside of the plastic bag or equivalent, and then placed inside a second plastic bag or equivalent. The label shall include the name and address of the property from which the sample was taken, the date sampled, a sampler identification which identifies the type of item (drywall, copper wire, etc.), and where the item was taken from in the property.

3.      ***Plumbing component samples*** – The parties shall photograph all of the allegedly affected plumbing fixtures removed from the property, while they are still in place before removal and identify their location on a floor plan, building diagram, or other similar form of documentation. If multiple allegedly affected bathroom or kitchen plumbing fixtures are removed from the property, the Parties shall preserve one complete allegedly affected fixture. In addition, if allegedly affected copper connecting segments to fixtures ("stubouts") are removed, the Parties shall preserve at least one segment (at least four (4) inches long) of such copper stubouts. To the extent that such items are removed, the Parties shall also preserve at least one allegedly affected brass shower valve and a section of any allegedly affected copper riser pipe (at least eight (8) inches long) from between the shower valves and shower head in a bathroom. The Parties shall photograph each sample before cutting or removing the sample from the corresponding location or fixture. An appropriately trained person should cut off, where necessary, each sample with a pipe cutter or saw, and protect all sharp edges with tape or by other appropriate means. These samples should be stored separately in double-bagged polyethylene zip-lock bags or equivalents (if possible due to the size of the sample taken), and not grouped together. These samples must be allowed to dry

before the zip-lock bag, if any, is sealed and stored.  Any fixture or sample to be preserved under this paragraph shall be stored in reasonable climate controlled conditions.  All samples should be clearly labeled on the outside of the plastic bag or equivalent and then placed inside a second plastic bag or equivalent.  The label shall include the name and address of the property from which the sample was taken, the date sampled, a sampler identification which identifies the type of item (drywall, copper wire, etc.), and where the item was taken from in the property.

4.      ***Electrical component samples*** -- The Parties shall preserve at least three affected electrical receptacles and three affected switches, if available, from a wall or walls with allegedly defective Chinese-manufactured drywall.  The samples do not need to be taken from a single wall.  Similarly, the Parties shall preserve at least three affected receptacles and three affected switches, if available, from a wall or walls with non-Chinese manufactured drywall.  These samples likewise do not need to be taken from a single wall but should be representative of the types of receptacles and switches found in the property.

Additionally, if smoke detectors, carbon monoxide detectors, intruder alarm devices or any similar life safety devices are present, the Parties shall collect at least two of each type of device from each floor, if available.  The Parties shall photograph these selected samples prior to their removal and identify the location of all samples and photographs on a floor plan, building diagram, or other similar form of documentation.  An appropriately trained person should cut the electrical wires connecting the receptacles, switches and other electrical fixtures, so that at least two (2) inches of each wire remain connected to the device.  For smoke detectors and similar devices, the electrician should cut the wires above any plug or similar connector.  If other less common devices with copper wire connections are found,

the Parties should preserve representative samples as described in this subparagraph 4.

These samples should be stored in zip-lock bags. Samples shall not be stored in wet conditions. If wet from condensation, the sample must be allowed to dry before the zip-lock bag is sealed and stored. Any sample devices and wiring to be preserved under this paragraph shall be stored in reasonable climate controlled conditions. All samples should be clearly labeled on the outside of the plastic bag or equivalent and then placed inside a second plastic bag or equivalent. The label shall include the name and address of the property from which the sample was taken, the date sampled, a sampler identification which identifies the type of item (drywall, copper wire, etc.), and where the item was taken from in the property.

5. ***Photograph or video affected items:*** To the extent that a party intends to seek a recovery for building components or contents not described herein allegedly affected by defective Chinese manufactured drywall, such claimed other building components shall be documented by photograph or video and reasonable sampling consistent with this Order. Unless otherwise agreed by all parties in advance of the repair or removal, to the extent that a Party is contending that an appliance has been damaged or affected by defective Chinese drywall and seeks to recover damages for same, then that party shall preserve representative samples of that portion of the appliance exhibiting those effects (e.g., blackened coils in a refrigerator). This paragraph is not related to incidental damages, such as damage to cabinetry, countertops, wood trim, or other materials that must be replaced in order to access or remove the allegedly defective Chinese-manufactured drywall or are necessarily damaged through the repairs to the property. All samples should be clearly labeled on the outside of the plastic bag or equivalent and then placed inside a second plastic bag or equivalent. The

label shall include the name and address of the property from which the sample was taken, the date sampled, a sampler identification which identifies the type of item (drywall, copper wire, etc.), and where the item was taken from in the property.

B.      Property owners and renters shall preserve, at their own expense, any and all personal property items that they claim to be affected by the allegedly defective Chinese-manufactured drywall for which they intend to pursue recovery.

C.      This duty to preserve only applies to those persons or entities that intend to seek recovery for damages in connection with repairs to properties that contain allegedly defective Chinese-manufactured drywall, or recovery for damages to personal property contained in such a property, or personal injury from allegedly defective Chinese-manufactured drywall.

D.      This Order pertains only to preservation of physical evidence in properties being repaired, and it replaces the provisions of Paragraph 14 of Pretrial Order #1 that pertain to physical evidence other than documents.  The Court may enter a separate order that pertains to documents, which may similarly replace the provisions of Paragraph 14 of Pretrial Order #1 that pertain to documents.

E.      Nothing in this Order shall be construed to affect the discoverability or admissibility of evidence.  All objections to discoverability, admissibility or sufficiency of evidence are maintained and may be asserted at any time.

F.      Evidence or material not preserved in compliance with this Pre-Trial Order may be subject to exclusion for use in either discovery or trial of the matter and further, the party responsible for failing to preserve evidence may be subject to the claim or defense of spoliation.

G.      This Order may be subject to future modification when and if a remediation protocol is developed in this litigation.

New Orleans, Louisiana, this 9th day of October, 2009.

ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

# Exhibit "Q"

Copy of Business Card - Brad Wall, Home Warranty Service Manager for Glhomes

Mr. Brad and Jerry Oneil are both Glhomes' employees that collected all samples and

hand-wrote labels, filled out and signed building floor plan/building diagram

#### 8757 BAYSTONE COVE

#### BOYNTON BEACH, FL 33473

#### KNAUF'S DEFECTIVE DRYWALLS



**BRAD WALL**
*Home Warranty Service Manager*

1600 Sawgrass Corporate Parkway, Suite 400
Sunrise, FL  33323 · 866-979-2424 office · 954-575-6822 fax
brad wall glhomes com · www glhomes com

# Exhibit "R"

Copy of floor Plan/building diagram identified the location of Knauf's Drywalls,

and all other related component evidences

### 8757 BAYSTONE COVE

### BOYNTON BEACH, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS



Aspen Collection

C15 074   Garage Loft

*Julian*

6 Bedrooms, Loft, 5½ Baths
3-Car Garage
5,772 a/c sq. ft.
7,343 total sq. ft.

First Floor

Second Floor

Model FA4CWC060
A/c Unit 1 / 1st Fl.
Serial 3806A 8253

A/c 1st Fl. Garage
Model: FA4CWC036
Serial 3506A 69833

A/c Unit 2 2nd Fl.
Model:
Serial

25



Canyon Isles Lot 79

PLAN 85
Julian 1st Floor



Canyon Isles Lot 79

PLAN 85 EXHIBIT
Julian 2nd Floor

# Exhibit "S"

SWORN AFFIDAVIT OF GUILFORT DIEUVIL

### 8757 BAYSTONE COVE

### BOYNTON BEACH, FL 33473

### KNAUF'S DEFECTIVE DRYWALLS

UNITED STATES DISTRICT COURT EASTERN

DISTRICT OF LOUISIANA

IN RE: CHINESE -MANUFACTURED MDL

   NO. 2047 DRYWALL PRODUCTS

   LIABILITY LITIGATION

                                                          SECTION: L

                                                          JUDGE: ELDON FALLON

                                                          MAGISTRATE WILKINSON

SWORN AFFIDAVIT OF GUILFORT DIEUVIL IN REGARDS

TO OBJECTION TO SPECIAL MASTER OPINION AND DECREE

1. My name is Guilfort Dieuvil, and I am over the age of eighteen (18) years.

2. I swear under oath that all facts and statements made in this Sworn Affidavit are true and
   correct to the best of my knowledge and understanding.

3. Affiant is one of the owners of the subject property located at: 8757 Baystone Cove Boynton
   Beach Fl 33473, and I did the closing in the subject property in 2007 with purchase price of $
   1,142,015.00 not including closing cost.

4. In 2010 Affiant learned that the property contained reactive Chinese drywalls in 2010, and
   2013 Affiant filed a claim against Defendant, Knauf in this MDL legal proceeding.

5. While Glhomes starting remediation and repair of the subject property, Glhomes made the
   following request to Claimant in writing: "Our cost estimate to replace the metal

framing together with this other necessary work is $25,000. Accordingly, this $25,000 must
be paid by you ASAP if you want the metal framing removed. In order to accommodate your
request, we must receive payment in the amount of **$25,000 by Monday January 3, 2011**. "
Glhomes ordered his staff to stop all works and communication to Affiant.

6. It is my understanding that AirQuest Environmental, Inc. was referred by Glhomes and/or
Knauf to conduct an inspection and report for the subject property. At that time, AirQuest
Environmental, Inc. took pictures of the coils for all (3) three AC units at the subject property
which showed evidence of corrosion in those AC coils.

7. It is my understanding that multiples physical samples of coppers, piece of coils in every
section to the home which showed evidence of corrosion at the subject property. Such
evidence was collected by Glhomes during initial interior demolition of the subject property,
and Defendant, Knauf already received copies of the air report and photographs that showed
evidence of corrosion that existed at the subject property due to Knauf's defective drywalls.

8. It is my understanding that Glhomes took multiples physical samples of the followings:
Knauf's drywalls, electrical switches, electrical outlets, coils, electrical wires, coppers/
plumbings, American National Gypsum's drywalls brands and piece of carpet as well.

9. On October 27, 2015 around 2:00 PM, Glhomes gave Claimant two boxes that contained
some physical samples of those evidence as described in paragraph 8 above, and both boxes
of physical samples have never been disposed.

10. At all material times, Affiant solely relied on Glhomes to collect all physical samples of the
Knauf's drywalls case to be in full compliance with PTO-1(B) requirements, as Glhomes
represented itself to Affiant as an expert in this environment. Glhomes collected multiples

knauf's defective drywalls samples, and reactive components samples, and they were preserved by Glhomes/builder and those samples were also labelled by the handwriting of Brad and Jerry Oneil as Glhomes's employees and/or associates.

11. At all material times, ample opportunity was given to Defendant, Knauf to have full access to inspect all physical samples of Knauf's defective drywalls, and reactive components that were installed at the subject property. and Knauf has deliberately declined to see and inspect those physical samples as evidence, and at no material times, Knauf has never been held prejudice or unable to present defenses or never denied access to see samples of their defective drywalls, and those physical samples are still available for Knauf to inspect them even today's date.

12. At all material times, Affiant /Plaintiff has preserved and maintained those physical samples as evidence, and they have never been disposed, misplaced or disregarded as falsely alleged and misconstrued by special master in his opinion and decree report.

13. PTO 1(B) in page 2 section (A) required; *"The parties shall maintain at least two samples ( of ten inches by ten inches(10" x 10") in size if possible) of every different drywall brand or marking removed from an affected property, including taking samples of unmarked drywall)"*. Glhomes as the builder removed those drywalls, collected and preserved multiples physical Knauf's drywalls samples brands including all other brands.

14. At all material times, Knauf was never held prejudice or has never been unable to present their defenses, Knauf's counsel declined to have full access to inspect and see those physical evidences. As a matter of facts, Affiant was willing at his own expense to travel and give those physical samples to Defendant, Knauf for inspection and analysis.

15. UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE

FOREGOING AFFIDAVIT AND THE FACTS STATED IN IT ARE TRUE. AND

CORRECT FURTHER AFFIANT SAYETH NAUGHT.

_____

Guilfort Dieuvil, Affiant

STATE OF FLORIDA

COUNTY OF _India River_

SWORN TO AND SUBSCRIBED before me this _20th_ day of _December_ _____ 2017,

Guilfort Dieuvil, ___ who is personally known to me, or ____ who produced the following

identification: _____.

_____

Print Name: _Page L Jarriel_

Notary Public, State of _Florida_


PAGE L. JARRIEL
Commission # FF 968344
Expires April 14, 2020
Bonded Thru Troy Fain Insurance 800-385-7019