# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| **IN RE: CHINESE-MANUFACTURED DRYWALL** | * | **CIVIL ACTION** |
| **PRODUCTS LIABILITY LITIGATION** | * | |
| | * | **MDL NO. 09-2047** |
| | * | |
| | * | **SECTION L (5)** |
| | * | |

**THIS DOCUMENT RELATES TO:**
   *Gross v. Knauf Gips KG*, **2:09-cv-6690**
   *Amorin v. Taishan Gypsum*, **2:11-cv-1395**
   *Amorin v. Taishan Gypsum*, **2:11-cv-1673**
   *Wiltz v. Beijing New Building Materials Public*
      *Limited Co.*, **10-cv-361**

## ORDER AND REASONS

Defendants China National Building Materials Co., Ltd. ("CNBM Company"), Beijing New Building Material (Group) Company, Limited ("BNBM Group"), and Beijing New Building Materials Public Limited Company ("BNBM PLC") (collectively, the "Movants" or "Defendants") have filed a motion to vacate the Court's default judgments against them. Rec. Doc. 21050. Plaintiffs oppose the motion. The Court held oral argument on this matter on December 14, 2017. Having considered the parties' submissions, the extensive record, and the applicable laws, the Court now issues this Order and Reasons.

## I.   BACKGROUND

From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects,

and the breaking down of appliances and electrical devices in their homes. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829-30 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall.

These homeowners then began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused upon these two entities and their downstream associates, and has proceeded on strikingly different tracks for the claims against each group.

### A.      The Knauf Defendants

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts.

The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009. Rec. Doc. 18. Thereafter, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall. *See*

Rec. Doc. 2713. The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed Findings of Fact and Conclusions of Law, and entered a Judgment in the amount of $164,049.64, including remediation damages in the amount of $136,940.46—which represented a cost of $81.13 per square foot based on the footprint square footage of the house. *See* Rec. Doc. 3012.

Subsequently, the Knauf Entities entered into a pilot remediation program with the Plaintiffs' Steering Committee ("PSC") in the MDL. This program was largely based upon the remediation protocol formulated by the Court from the evidence in *Hernandez*. The Knauf pilot remediation program is ongoing and has, at present, remediated more than 2,200 homes containing KPT Chinese drywall using the same general protocol. At the Court's urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which is designed to resolve all Knauf-related, Chinese drywall claims. *See* Rec. Doc. 12061-5. In addition to the Knauf Settlement Agreement, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. Although the Court occasionally must deal with settlement administration and enforcement issues, the Knauf portion of this litigation is largely resolved.

### B.    The Chinese Defendants

The litigation against the Chinese entities has taken a different course. The Chinese Defendants in the litigation include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include the CNBM and BNBM Entities.

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. *See* Rec. Docs. 52 & 1-7 (Case No. 09-6687). Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both of these cases. *See* Rec. Docs. 277 & 487.

Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the Preliminary Default in *Germano* on the Plaintiffs' claimed damages. *See* Rec. Docs. 502, 1223, 1258 & 2380. At this hearing, the Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases. Following this hearing on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. *See* Rec. Doc. 2380. On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of the Plaintiffs. Rec. Doc. 3013. On June 10, 2010, the last day to timely appeal, Taishan filed a Notice of Appeal of the Default Judgment in *Germano* and entered its appearance in *Germano* and *Mitchell*. Rec. Docs. 3668 & 3670.

After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. *See* Rec. Docs. 5436 & 5583. In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the

*Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. *See* Rec. Docs. 5839 & 5840. Discovery has included the production of both written and electronic documents, as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery has often been contentious, requiring close supervision by the Court. The Court has presided over regularly-scheduled status conferences to keep the parties on track, and conducted hearings and issued rulings to resolve numerous discovery-related disputes. *See* Rec. Docs. 7136 & 7511.

In April 2012, Taishan filed various motions, including its motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the 11th Judicial Circuit Court of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss, and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal.

In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan and TTP. *In re*

*Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to voluntarily participate in this suit.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Rec. Doc. 17774. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt and ordered that Taishan pay $15,000.00 in attorney's fees to Plaintiffs' counsel; that Taishan pay $40,000.00 as a penalty for contempt; that Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process; and that if Taishan violates the injunction, it must pay a further penalty of 25-percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation. *See* Rec. Doc. 17869.

On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Rec. Doc. 17883. Taishan did not appear and, on September 26, 2014, this Court certified a class of

> [a]ll owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (i.e., not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2014 WL 4809520, at *16 (E.D. La. Sept. 26, 2014).

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid both the sum of $15,000.00 in attorney's fees to Plaintiffs' counsel and the

contempt penalty of $40,000.00 in March 2015.  Rec. Doc. 18764.  On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."  Rec. Doc. 17869.

In March 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b).  The Court determined that the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5).  Further, the Court found that the commercial activity exception did not apply in this case, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States.  Because Plaintiffs failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.  *See* Rec. Doc. 20150.

On April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised in four separate motions filed by Defendants.  Rec. Doc. 20739.  The Court found that Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to BNBM.  This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to Defendants, and the Court has jurisdiction over Defendants in relation to Plaintiffs' claims based on Louisiana law.

Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing, and adopted Plaintiffs' damage calculations methodology related to remediation of properties. Rec. Doc. 20741.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify interlocutory appeal from this Court's jurisdiction order. *See* Rec. Doc. 20779. Because the Court found that its Order and Reasons involves a controlling question of law as to which there is substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal from that Order and Reasons may materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol–Myers Squibb v. Superior Court of California*. Rec. Doc. 20882. Based on *BMS*, Defendants contest this Court's findings of personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argue that the *BMS* opinion impacts questions raised on appeal. *See* Rec. Doc. 20898-2 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 5th Cir. Docket 17-90027 (Pet. for Permission to Appeal)). On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order[1] to avoid piecemeal litigations. The Court noted its duty to address the effect of *Bristol–Myers Squibb* on the jurisdictional issue before certifying the matter to the Fifth Circuit.

---

[1] Following the Order vacating this Court's 28 U.S.C. § 1292(b) certification, the Fifth Circuit denied Defendants' petition for permission to appeal.

Subsequently, on November 30, 2017, the Court denied Defendants' motion to dismiss, holding that *Bristol–Myers* does not change this Court's jurisdictional findings and class certification.

On October 20, 2017, Defendants CNBM Company, BNBM Group and BNBM PLC filed the instant motion to vacate the Court's default judgments. Rec. Doc. 21050. Specifically, these Defendants argue there is good cause to set aside the default judgments in *Gross* (Case No. 09-6690) (Louisiana); *Wiltz* (Case No. 10-351) (Louisiana); *Amorin* (Case No. 11-1395) (Louisiana); and *Amorin* (Case No. 11-1673) (Virginia). This opinion addresses Defendants' request.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 55(c) states that a court "may set aside an entry of default for good cause." FED. R. CIV. P. 55(c). "In determining whether to set aside a default decree, the district court should consider whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented." *Matter of Dierschke*, 975 F.2d 181, 183 (5th Cir. 1992) (quoting *United States v. One Parcel of Real Property*, 763 F.2d 181, 183 (5th Cir. 1985)). These factors, however, are neither "talismanic" nor exclusive, and courts have relied on "other factors including, [for example,] whether: (1) the public interest was implicated, (2) there was a significant financial loss to the defendant, and (3) the defendant acted expeditiously to correct the default." *Id*. at 184 (citations omitted). "Whatever factors are employed, the imperative is that they be regarded simply as a means of identifying circumstances which warrant the finding of 'good cause' to set aside a default." *Id*. Generally, courts favor resolving actions on the merits; therefore, "federal courts should not be agnostic with respect to the entry of default judgments which are 'generally disfavored in the law.'" *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) (internal citation omitted). Ultimately, nonetheless, "the

decision to set aside a default is committed to the sound discretion of the trial court." *Dierschke*, 975 F.2d at 183.

## IV.    PRESENT MOTION

### A.    Movants' Arguments

Movants proffer three reasons to set aside the Court's default judgments. First, Movants argue that, under Pre-Trial Orders 1G and 1H, they had no duty to respond to any complaint until Plaintiffs both submitted a notice of completion and filed a Master Complaint. Therefore, because they were not obligated to respond, Movants claim that their defaults cannot be deemed willful.

Specifically, Pre-Trial Order 1H states:

> The Court . . . is aware of inquiries regarding whether the triggering mechanism has been initiated, in other words, whether the Notice has been filed or not. Once the Amendments are filed and service is perfected the PSC shall file a Notice. Thereafter, the PSC is directed to file a Master Complaint within 60 days of the filing of the PSC's Notice. **Only after the Master Complaint is filed will counsel for any defendant identified therein be required to file responsive pleadings within thirty (30) days thereof.** The PSC is directed to file on the last day of each month a status report regarding the progress of the activities set forth above.

Pre-Trial Order 1H; Rec. Doc. 6083 at 2 (emphasis added). Movants say that neither of those events—filing of a notice of completion and Master Complaint—had occurred at the time the Court entered the default judgments. It was not until April 16, 2017 that Plaintiffs filed a notice of completion, but they still continue to file complaints thereafter. Plaintiffs have never filed a Master Complaint. Movants claim that they cannot have willfully defaulted because responsive pleadings were not yet due.

Furthermore, Movants argue that some service were improper because of multiple defects (*i.e.*, complaints were often unserved or served on the wrong company).

Second, Movants aver that setting aside the defaults would not prejudice Plaintiffs because Plaintiffs long have been required to preserve evidence.

Finally, Defendants claim they have meritorious defenses. Defendants argue that Plaintiffs have failed to establish the requisite causation between Plaintiffs' injuries and the Movants' conduct because (1) Plaintiffs have not demonstrated that the vast majority of Plaintiffs' homes contained Taishan drywall; (2) Plaintiffs have not shown that most, if not all, of Plaintiffs' properties contained generic drywall that could have been manufactured by any company; (3) any alleged BNBM PLC drywall products were not defective; and (4) neither CNBM nor BNBM Group ever manufactured drywall for sale into the United States, and they had no role in Taishan's sales of drywall. Moreover, Defendants argue that *Bristol–Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017) defeats this Court's jurisdiction to grant defaults over non-Louisiana property claimants.[2]

### B. Plaintiffs' Response

Plaintiffs bring attention to Movants' extensive attempts in evading this litigation from the onset, which led this Court to enter default judgments against the Chinese entities.

First, Plaintiffs highlight that Movants had knowledge of this litigation, and voluntarily chose to sit aside as proceedings were ongoing. Thus, Plaintiffs argue that good cause does not exist to set aside the defaults against CNBM, BNBM Group, and BNBM because Movants willfully made a calculated gamble to initially refuse to participate in this litigation.

---

[2] The instant motion to vacate was filed on October 20, 2017 before the Court issued its ruling on the impact of *Bristol–Myers* in this litigation. On November 30, 2017, this Court held that the Supreme Court's decision in *Bristol–Myers* does not defeat the Court's jurisdiction over non-resident plaintiffs in the current litigation. Therefore, the Court denied Defendants' motion to dismiss.

Second, Plaintiffs emphasize that any further delay—with this case in its ninth year—would result in prejudice to Plaintiffs.

Third, Plaintiffs claim that Movants do not have any meritorious defenses because all such defenses have already been brought and rejected. Specifically, jurisdiction over Movants is conclusively established with this Court's Agency Order and subsequent ruling on *Bristol–Myers*'s impact on this litigation.

## V. DISCUSSION

### A. This Court Has Already Held That Plaintiffs Have Properly Served Defendants.

As this Court previously noted in its April 21, 2017 Agency Order, "'[t]o acquire jurisdiction over the person, a court must serve on the person a document, such as a summons, notice, writ, or order.'" Rec. Doc. 20739 (quoting *McGuire v. Sigma Coatings*, 48 F.3d 902, 907 (5th Cir. 1995) (citing *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (5th Cir. 1988) (*per curiam*)). Other circuits have reasoned that "service of process is not legally defective simply because the complaint misnames the defendant in some insignificant way." *Morrel v. Nationwide Mut. Fire Ins. Co.*, 188 F.3d 218, 224 (4th Cir. 1999). The Fifth Circuit has applied this reasoning in the context of arbitration awards reasoning that a "technical defect" did not render the district court's decision erroneous and "certainly does not require reversal." *Cigna Ins. Co. v. Huddleston*, 986 F.2d 1418 (5th Cir. 1993).

"[T]he core function of service is to supply notice of the pendency of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections." *Henderson v. United States*, 517 U.S. 654, 672 (1996). The Hague Convention exists in order to facilitate service of process abroad and assure foreign defendants adequate notice. *Volkswagenwerk*, 486 U.S. at 704-05; *see also Burda Media, Inc. v.*

*Viertel*, 417 F.3d 292, 300 (2d Cir. 2005) ("The Hague Convention of 1965 was intended to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time.") (internal quotation omitted). Thus, the essential issue is whether service of the Chinese Defendants provided the Movant Entities with adequate notice of this litigation.

Here, Movants are, once again, repeating previously litigated and settled arguments—even after this Court held that Movants had adequate notice of this litigation. In their motions to dismiss for lack of jurisdiction, CNBM, BNBM Group, and BNBM already contended that the complaints against them were not properly served for a variety of reasons, including failure to serve, failure to timely serve, failure to serve at the correct address, and failure to correctly name the Defendant. *See In re Chinese-Manufactured Drywall*, 2017 WL 1476595, at *45 (E.D. La. Apr. 21, 2017). Nonetheless, this Court found that "everyone involved in the action . . . knew of and could identify the entity being sued[,] and that the misnomer . . . 'injured no one.'" *Id.* (citing *Huddleston*, 986 F.2d at 1418 (quoting *United States v. A.H. Fischer Lumber Co.*, 162 F.2d 872, 874 (4th Cir. 1947)). Therefore, the Court denied Defendants' motions to dismiss and vacate defaults for improper service.

Movants had adequate notice of this litigation as the record indicates. For instance, on May 28, 2010, BNBM announced it had been served with notice of the allegations against the company concerning defects in its Chinese Drywall, but rather than respond to the lawsuits, "[t]he Company and Taishan Gypsum w[ould] continue to keep an eye on the progress of the incident, and address and handle the same with due prudence, so as to be responsible to investors, consumers and the industry." *See* BNBM Announcement No. 2010-009 in Relation to Event about Gypsum Board in US dated 5/28/2010 ("So far as is known to the Company, the aggregate number of this

kind of complaints [referring to gypsum board of BNBM] is approximately 3,000."); *see also* BNBM 2010 Annual Report at 36, 38 & 143; BNBM 2011 Annual Report at 39 & 108; BNBM 2012 Annual Report at 36; BNBM 2013 Annual Report at 35, 95 & 96; BNBM 2014 Annual Report at 37; BNBM Announcement dated 2/13/2015 ("Since 2010, BNBM has engaged one US well-known law firm for legal consultation services in relation to the gypsum board litigation in the US.").

The evidence here indicates that the Chinese entities received notice of this action and had sufficient time to present their defense—but they did not. Moreover, these entities have refused to accept service at various points in this history of this litigation. Based on the extensive procedural history of this case, the Court is convinced service on these entities satisfies due process. "To now argue these minor technical deficiencies should warrant dismissal is with regard to service of process disingenuous." *In re Chinese-Manufactured Drywall*, 2017 WL 1476595, at *46.

Not only did the Movants fail to respond, but also failed to initially appear in this action. It was only after the Court certified the *Amorin* class and scheduled a hearing on class remediation damages that Movants decided to appear in the MDL in 2015—almost six years after suits were filed against them—to challenge Plaintiffs' evidence of damages, class certification, and the Court's jurisdiction over them. With this in mind, the Court now considers some factors to determine whether good cause exists to set aside the default judgments.

### B. Good Cause Does Not Exist To Set Aside Judgments.

#### 1. Whether the Default was Willful

"A willful default is an 'intentional failure' to respond to litigation." *In re OCA, Inc*., 551 F.3d 359, 370 n.32 (5th Cir. 2008) (quoting *Lacy*, 227 F.3d at 292). Defendants' motion mainly

rests on one argument – that Pre-Trial Orders 1G and 1H did not require any defendants to answer until a notice of completion and master complaint are filed. Therefore, Defendants suggest that it was improper for this Court to enter default judgments against Movants for failure to make an appearance because they were not obligated to answer.

Not so. Movants pinpoint this technicality to reason out of the default judgments. But never in their motion have Movants represented that they detrimentally relied on the language of PTO 1G and 1H as to not even appear before this Court in the first place. They merely point out the processes in which this Court established to promote efficiency in dealing with mass complaints. These procedures, nonetheless, never relinquished any defendants' obligation to participate in this litigation. Even though Movants had notice of this litigation early on when Plaintiffs filed their complaints, Movants chose not to appear or participate.

Even assuming *arguendo* that Defendants indeed failed to answer the complaints because Plaintiffs have not filed a notice of completion and a master complaint (which does not seem to be the case), Movants still did not make an appearance or participate until six years after the litigation commenced. Pre-Trial Order 1G, entered on May 27, 2010, clearly requires that ". . . counsel shall enter their appearance on behalf of their client(s) within twenty (20) days after service of a Complaint on a defendant." PTO 1G at 2. The Fifth Circuit has held that "[a] defendant's failure to appear is grounds for a default judgment." *Trang v. Bean*, 600 Fed. Appx. 191, 193 (5th Cir. 2015) (citing FED. R. CIV. P. 55(a)). Indeed, in *Metro. Life Ins. Co. v. Scott*, another section of this Court found that "a willful failure to participate in [] proceedings justifies entry of a default judgment." No. CV 15-362, 2015 WL 8478531, at *2 (E.D. La. Dec. 10, 2015).

Likewise, the Second Circuit has also held that a defendant's failure to appear, failure to respond to a complaint, and failure to respond to a motion sufficiently demonstrate willfulness.

*See United States v. Myers*, 236 F. Supp. 3d 702, 707 (E.D.N.Y. 2017); *see, e.g.*, *S.E.C. v. McNulty*, 137 F.3d 732, 738-39 (2d Cir. 1998) (unexplained failure to respond to complaint indicates willfulness); *Indymac Bank v. Nat'l Settlement Agency, Inc.*, No. 07 Civ. 6865, 2007 WL 4468652, at *1 (S.D.N.Y. Dec. 20, 2007) (finding defendants' failure to appear, failure to respond to the complaint and failure to respond to a motion for default judgment indicates willful conduct); *U.S. v. DiPaolo*, 466 F. Supp. 2d 476, 482 (S.D.N.Y. 2006) (grounds for default judgment were established by defendant's failure to answer the complaint, particularly in light of the fact that the defendant had expressed no intention to do so at a later time).

In this case, Plaintiffs' discovery has uncovered indications that Movants' early absence in this litigation was a calculated strategy—rather than a misunderstanding of this Court's pre-trial orders. Almost a year before Movants made an appearance before this Court, CNBM announced:

> Although the US lawyers of BNBM and Taishan Gypsum estimate that the damages that might be imposed in the US court's default judgments for the gypsum board cases might be very large, since the major assets of the Company, BNBM and Taishan Gypsum are all located in China, according to the US and Chinese lawyers whom BNBM and Taishan Gypsum have respectively consulted, there is no convention or treaty on mutual recognition and enforcement of judgments between China and the US such that the possibility of the US judgments being enforced in China is very low. Therefore, based on information currently available to the Company, the Company believes that the US courts' judgments will not result in significant economic loss to the Group and will not have material adverse impact on the Group's production and operation.

CNBM Voluntary Announcement on Development of Gypsum Board Litigation in the U.S. dated July 18, 2014; *see also* BNBM Announcement dated July 18, 2014; CNBM Voluntary Announcement: Updates on Recent Development in the Gypsum Board Litigation in the U.S. dated August 20, 2014; CNBM Announcement dated February 13, 2015; BNBM Announcement dated February 13, 2015.

Such deliberate avoidance of litigation is precisely what default judgments aim to deter. As the United States Court of Appeals for the District of Columbia Circuit explained in *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, "a default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party." 432 F.2d 689, 691 (D.C. Cir. 1970). "In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights. The default judgment remedy serves as such a protection. Furthermore, the possibility of a default is a deterrent to those parties who choose delay as part of their litigative strategy." *Id.*

In this case, the Court is disheartened that delay tactics have permeated every aspect of Defendants' litigation strategy: from their initial failure to appear to their now perpetual motions to re-litigate settled matters. This Court recognizes that entry of default judgments are "generally disfavored in the law." *See Lacy*, 227 F.3d 292. But when Movants had refused to participate— for years—this Court had limited recourse: An entry of default was necessary to advance the case in the interest of fairness and justice to all litigants and avoid further delays. Given Movants' initial blatant disregard, the Court was forced to enter default judgments against Defendants.

Now, after multiple default judgments, Movants argue that those entries were unjustified. Movants contend that "willfulness" to default requires culpability and that they cannot be found willful because they were not obligated to respond yet. To support their position, Movants cite to *Artec Grp., Inc. v. Klimov*, where a district court in California held: "In assessing whether a defendant has engaged in culpable conduct, a court cannot treat a defendant 'as culpable simply for having made a conscious choice not to answer [or litigate]; rather, . . . the [defendant] must have acted with bad faith, such as an 'intention to take advantage of the opposing party, interfere

with judicial decisionmaking, or otherwise manipulate the legal process.'"  No. 15-CV-03449-EMC, 2017 WL 4098801, at *1 (N.D. Cal. Sept. 15, 2017) (citation omitted).

*Artec* can be distinguished.  There, the defendant had initially participated and "mounted a vigorous defense" when the lawsuit was filed.  *Id.* at *2.  The *Artec* defendant "pursu[ed] its arguments that it should not be a party to this litigation.  But once it had exhausted these arguments [via its motion to dismiss for lack of personal jurisdiction and motion to dismiss for failure to state a claim for relief] and was faced with [plaintiff's] legitimate claims against it and the relevant discovery, [the defendant] claimed to no longer be able to afford U.S. litigation." *Id.*  The district court held that it was "not unreasonable" for the cash-strapped defendant to "conclude that it was no longer financially worthwhile to defend the lawsuit, but to still try to contest the default judgment motion which could render it financially liable and to still try to settle the dispute." *Id.* In this case, however, Movants had refused to participate in the litigation since the beginning—even before PTO 1G and 1H were entered.  That is quite different from the *Artec* defendant who appeared and challenged jurisdiction, but eventually defaulted because it could not afford litigation.

Movants also cite to *Henderson v. Compass Groups* to support their argument that a party cannot be held in default until it has failed to timely respond to the operative complaint in the litigation.  *See* No. CIV.A. 10-447-RET, 2010 WL 3488137, at *1 (M.D. La. Aug. 30, 2010).  There, the *pro se* plaintiff requested the court to prematurely enter judgment even though defendant's response to the complaint was not yet due.  *Id.*  The court denied plaintiff's motion because the defendant could still respond and the "plaintiff has put forth no evidence that the defendant has elected not to answer the complaint." *Id.*  In this case, nonetheless, ample evidence

suggested to this Court from 2009 to 2015 that Movants had no intention to participate in this litigation. Accordingly, default judgments were entered.

From the record, it seems to this Court that Movants' refusal to participate was deliberate. Movants had knowledge of the ongoing litigation prior to the default judgments. Pursuant to Pre-Trial 1G, defendants were required, at the very least, to enter an appearance within 20 days of receiving the complaint. They did not, however, make an appearance until after this Court issued default judgments and scheduled a hearing on class remediation damages in 2015. And Movants did not dispute these default judgments until October 20, 2017 – after their jurisdictional and class certification challenges failed. Pre-Trial Orders 1G and 1H do not provide Movants with good cause to set aside defaults because Movants had actual notice of this litigation from the outset, but voluntarily decided not to make an appearance until after the default judgments were entered. Therefore, the Court finds that Movants' early absence and refusal to participate did not arise from detrimental reliance or confusion of the Court's pre-trial orders. Instead, it was, in whole or in part, willful.

 "A finding of willful default ends the inquiry, for when the court finds an intentional failure of responsive pleadings there need be no other finding." *Lacy*, 227 F.3d at 292. Although such a finding of willful default is sufficient to end the instant inquiry, this Court will review other factors. Considering the totality—Movants' initial absence and the below factors—the Court finds that the entries of defaults were reasonable and within the Court's discretion.

### 2.  Prejudice to Plaintiff

Nearing its ninth year, this case involving the Chinese Entities has only made glacial progress. This MDL was consolidated in 2009. Movants did not make an appearance until 2015. And now, in 2018, Movants are asking this Court to go back to square one.

Meanwhile, plaintiffs here—thousands of them—are still without remedy after installing defective Chinese drywalls and suffering from them. Additionally, Plaintiffs have expended significant time and money in this litigation. Any further delays would undeniably prejudice the plaintiffs.

### 3. Meritorious Defense

Movants claim that *Bristol–Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017) removes this Court of personal jurisdiction over non-Louisiana plaintiffs; therefore, Movants argue that this Court did not have jurisdiction to enter default judgments in those cases. The Court has already held that *BMS* does not apply to this MDL, and now incorporates that prior ruling herein. *See generally In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. MDL 09-2047, 2017 WL 5971622 (E.D. La. Nov. 30, 2017). Accordingly, Movants' jurisdictional challenge is are not a meritorious defense.

Furthermore, as this Court previously recognized, "[g]iven that the defectiveness and corrosive effect of Chinese drywall is well-established, defendants are in default, [and] there is no contributory negligence. . . . [T]his Court already entered a liability judgment, [and] the only issue currently pending before the Court is the amount of damages which should be awarded to the Plaintiffs in order to accomplish the necessary remediation." *Chinese-Manufactured Drywall*, 2017 WL 1421627 at *9. Conducting discovery to measure the footage of Chinese-manufactured drywall in plaintiffs' homes and to determine property damages alleviates Movants' concerns that some properties may not contain Taishan or BNBM PLC drywall. Furthermore, Defendants will have an opportunity to challenge plaintiffs' discovery and measurements of Taishan-manufactured drywall. Accordingly, utilizing the class-wide formula in *Amorin* to calculate property damages is the proper next step in this litigation.

Because jurisdiction and liability are firmly established in this case, this Court finds that Movants have not presented any viable defense. Any meritorious defense that Defendants now raise is speculative at best.

### 4. Public Interest

As this Court and the Fifth Circuit recognized in its opinions concerning Taishan, "the public has an interest in seeing that persons harmed by defective, foreign products be accorded relief for their damages." *Chinese-Manufactured Drywall*, 894 F. Supp. 2d 819, 864 (E.D. La. 2014); *Chinese-Manufactured Drywall*, 753 F.3d 521, 545 (5th Cir. 2014); *Chinese-Manufactured Drywall*, 742 F.3d 576 (5th Cir. 2014). The same holds here.

### 5. Significant Financial Loss

The Court recognizes that Movants will suffer financial losses if ordered to pay under the Default Judgments. At the same time, however, Movants have benefitted financially from their agency relationship with Taishan from its earnings in drywall sales in the United States.

### 6. Whether Defendants Acted Expeditiously

As explained above, Movants did not act expeditiously upon receiving service of the Complaint. Movants did not make an appearance when they were first served. Instead, they waited six years—after the Court entered default judgments—before participating in this litigation, and waited two more years before filing the instant motion to vacate. Accordingly, the Court finds that Movants need to take responsibility for causing delay in this litigation.

## VI. CONCLUSION

Considering the aforementioned reasons, accordingly,

**IT IS ORDERED** that Defendants CNBM Company, BNBM Group, and BNBM PLC's motion to vacate the Court's default judgments (Rec. Doc. 21050) is hereby **DENIED**.

New Orleans, Louisiana, this 2nd day of January, 2018.

**ELDON E. FALLON**
United States District Judge