## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | CIVIL ACTION |
| | MDL NO. 2047 |
| THIS DOCUMENT RELATES TO:  ALL CASES | SECTION "L" (5) |

_____

### ORDER AND REASONS
### SETTING COMMON BENEFIT FEES
_____

### I.
### BACKGROUND

From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials in the United States, including drywall.  As a result, drywall manufactured in China was brought into the United States and used in the construction and refurbishing of homes in coastal areas of the country, notably the Gulf Coast and East Coast.  Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of foul-smelling gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes.  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829 (E.D. La. 2012), *aff'd*, 742 F. 3d 576 (5th Cir. 2014).  Many of these homeowners also began to report various physical afflictions allegedly caused by the Chinese drywall.

These homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors,

and manufacturers who were involved with the Chinese drywall.  Because of the commonality of facts in the various cases, this litigation was designated as multidistrict litigation.  Pursuant to a June 15, 2009 transfer order from the United States Judicial Panel on Multidistrict Litigation, all federal cases involving Chinese-manufactured drywall were consolidated for pretrial proceedings in MDL 2047 in the United States District Court for the Eastern District of Louisiana.

The Chinese drywall at issue was largely manufactured by two groups of defendants:  (1) the Knauf entities and (2) the Taishan entities.  Because the Taishan entities contested jurisdiction at the outset and refused to accept service of process, it was necessary to conduct this litigation along two tracks.  The first track involved the Knauf entities.

The Knauf entities ("Knauf") are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States.  The Knauf entities are named defendants in numerous cases consolidated with the MDL litigation as well as litigation in state courts.  The Knauf entities did not contest jurisdiction and first entered their appearance in the MDL litigation on July 2, 2009.  *See* Rec. Doc. 18.  On November 2, 2009, in Pretrial Order No. 17, KPT agreed to a limited waiver of service.  *See* Rec. Doc. 401.  After a period of intense discovery, the court set various bellwether trials.  From March 15–19, 2010, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall.  *See* Rec. Doc. 2713.  For purposes of the trial, Knauf stipulated that KPT Chinese drywall "emits certain reduced sulfur gases and the drywall emits an odor."  *Id*.  The Court, based on the evidence presented, found the KPT Drywall was a defective product and issued a detailed Findings of Fact and Conclusions of Law in favor of Plaintiff Hernandez ("*Hernandez* FOF /COL"), *see id.*, and entered a Judgment in the amount of $164,049.64, including remediation

damages in the amount of $136,940.46, which represented a cost of $81.13 per square foot based on the footprint square footage of the house.  *See* Rec. Doc. 3012.

On October 14, 2010, Knauf agreed to participate in a pilot program to remediate a number of homes using the remediation protocol formulated by the Court in the *Hernandez* case.  The Knauf pilot remediation program has, at present, remediated over 2,800 homes containing KPT Chinese drywall using essentially the same protocol.  At the Court's urging, after a number of homes had been remediated, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

Thereafter, the PSC and Knauf entered into settlement discussions, and on December 20, 2011, some two years after the formation of this MDL.  The PSC reached a global remediation settlement with Knauf, which is designed to resolve all Knauf-related Chinese drywall claims.

After a bellwether trial involving the downstream Knauf distributor, North River, numerous other settlement agreements were reached with other downstream entities in the chain of commerce with the Knauf.  These entities included various distributers, builders, and installers (and their insurers) of the Knauf-manufactured Chinese drywall.

Under the terms of the settlements, the claimants with KPT Chinese drywall (drywall manufactured by Knauf's Chinese subsidiary) were offered several options.  Under Option 1, the claimants were offered the opportunity to receive a complete, environmentally certified remediation of their properties.  Under Option 2, the claimants were offered cash reimbursement in the event the home was already remediated.  Finally, under Option 3, claimants were offered a cash payment instead of remediation as well as the opportunity to receive monetary benefits from the Knauf downstream chain of commerce entities to compensate them for other specifically designated losses.

As part of the Knauf remediation settlement, Knauf also agreed to pay reasonable costs, including the cost of administering the program, and an additional amount for attorneys' fees, which includes both the fees for contract counsel and those for common benefit counsel.  The total for both attorneys' fees and costs is $233,078,270.33, in which $197,803,738.17[1] is used for attorneys' fees and $35,274,532.16 has been used for costs.  This payment of fees and costs relieves each and every claimant of all contingency fee and cost reimbursement obligations to both retained contract counsel and common benefit counsel (with exception of the Virginia litigants), and thus represents an amount which otherwise would have been payable by the claimants out of their settlement recovery.  The claimants have now all received their appropriate portion of the settlement funds.  It is now time to focus on the attorneys' fees for this aspect of the litigation for the purpose of determining the appropriate distribution of these fees.

This process requires a two-step analysis.  The first step requires a determination of the proper split between the contract counsel and the common benefit counsel.  The second step involves an analysis of the appropriate distribution of the fees to each counsel.  The Court will now proceed with the first step in this process.  A future opinion will address the second step.

## II.
## INFRASTRUCTURE FOR DETERMINING A COMMON BENEFIT FEE

At an early stage in this case, the Court established procedures and guidelines to be followed by any attorney planning to seek a common benefit fee or the reimbursement of common benefit expense.  *See* PTO 28, 28A, B, C, D, E & F.  This produced abundant information for the Court to handle the instant issue:  determining the proper split between contract counsel and common benefit counsel.

---

[1]  See *infra* footnote 5.

A.      **CERTIFIED PUBLIC ACCOUNTANT**

The Court required all attorneys expecting to recover a common benefit fee and cost reimbursement for performing common benefit work to report (1) the time spent and nature of the work and (2) the amount of cost expended and the purpose of the costs. These reports were made on a monthly basis to a Court-appointed certified public accountant ("CPA"). The CPA has on staff a paralegal whose task is to monitor and verify the attorneys' filings required by these guidelines. If the time reported by counsel for a particular task is non-descriptive or not for common benefit, then the time is rejected and counsel is so advised. Throughout this litigation, the Court has met monthly with the CPA to review the work performed and the costs expended by those performing common benefit work for the purpose of assuring the accuracy and reasonableness of the attorneys' filings. These reports have now been summarized and show the total amount of time spent by those seeking common benefit fees, the type of work performed by them and the cost expended. The time and cost reports reveal the attorneys who performed common benefit work and put up common benefit costs. *See, e.g.*, Appendix A (CPA Report).

B.      **FEE ALLOCATION COMMITTEE**

In an effort to get attorneys' input as to the appropriate split between the contract and common benefit fees, the Court appointed a fee allocation committee comprised of a representative number of attorneys, including both members of the PSC and non-members of the PSC who were either active in the state litigation or who performed significant work in the MDL.

After meeting with all interested attorneys, the fee allocation committee was charged with the task of making a recommendation as to the appropriate division of the fees between contract counsel and common benefit counsel. This recommendation was then posted on the Court's website

to afford all counsel an opportunity to see the recommendation and respond.  A deadline was set for responses or objections.

## C.      SPECIAL MASTER

The Court then appointed a special master to review the objections and meet with the objectors and establish a method or procedure for affording them due process to state and advocate their respective positions.  The special master was authorized to allow reasonable discovery by the interested parties, request and receive briefs and hear oral argument.  Thereafter, the special master made a recommendation as to the appropriate division of the fees between the contract counsel and common benefit counsel.  *See generally* Rec. Doc. 20950.  This report was also posted on the Court's docket.

This management process from the onset has produced abundant information and data for the Court to make an informed decision as to the fee and cost allocations.  At this point, the Court has before it (1) the recommendations of the Attorneys' Fees Allocation Committee; (2) the responses or objections from objectors and other interested counsel; (3) the recommendations of the special master; and (4) the CPA's summary of the total time and work performed and costs expended by each attorney who followed the Court's directive and contemporaneously reported the common benefit work performed and cost incurred.

Taking all of this material into consideration together with the information collected and impressions formed during nine years of regular monthly meetings, a plethora of discovery motions, and a number of bellwether trials, the Court now undertakes the thankless task of determining the fair and appropriate division of the fees between contract counsel and common benefit counsel.  Because the time, tasks and costs of those seeking common benefit fees have been closely and regularly monitored and vetted for consistency and accuracy, a reasonable method of accomplishing

the task is to first determine a reasonable common benefit fee and see what amount is left after subtracting this sum from the total attorneys' fees paid by Knauf as part of the remediation settlement.   Then a determination can be made as to whether that sum is sufficient to fairly compensate the contract counsel for the responsibility they assumed and the work they performed.

### III.
### SETTING A COMMON BENEFIT FEE FOR THE
### KNAUF REMEDIATION SETTLEMENT

**A.   THE COURT'S DUTY AND AUTHORITY TO SET COMMON BENEFIT FEE**

This litigation qualified for MDL status because the cases involved common questions of fact and were filed in multiple jurisdictions.   As the litigation proceeded through the discovery process, however, it became clear that the cases in this MDL predominately involve property damage and, as such, there is enough commonality and preponderance to meet the class action requirements of Federal Rule of Civil Procedure 23.   Accordingly, this litigation was certified for class settlement under Rule 23(e).

Pursuant to Rule 23(h), the Court has the authority and responsibility for setting attorneys' fees.   *See* Fed. R. Civ. P. 23(h).   But even if this litigation were treated as a traditional MDL, without any class action status, this Court, as transferee court, would have the authority to fix a common benefit fee.   *See In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1008 (5th Cir. 1977); *In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524, 546-47 (3d Cir. 2009); *see generally Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371, 374 (2014).

The Fifth Circuit has explained that a district court has inherent authority "to bring management power to bear upon massive and complex litigation to prevent [the litigation] from monopolizing the services of the court to the exclusion of other litigants."   *In re Air Crash Disaster at Fla. Everglades*, 582 F.3d. at 1012.   Moreover, the policy rationale for the exercise of judicial

authority to award common benefit fees is the same regardless of whether it occurs in a Rule 23 or MDL context.  It avoids the unjust enrichment of those who profit from a common fund at the expense of those whose labors produced the fund, and it serves to encourage attorneys to accept the considerable risks associated with prosecuting complex, multi-plaintiff matters for the benefit and protection of all plaintiff rights.  Accordingly, based on either Rule 23 or MDL policy concepts, this Court concludes that it has the authority and responsibility to determine a reasonable common benefit fee.

**B.    METHODS FOR DETERMINING REASONABLENESS OF COMMON BENEFIT FEE**

Courts have employed various methods for determining the reasonableness of an award of common benefit fees.  These methods include: (1) the lodestar method, which entails multiplying the reasonable number of hours expended on the litigation by an adjusted reasonable hourly rate; (2) the percentage method, in which the court compensates common benefit attorneys based on a percentage of the amount recovered; or (3) the blended method, a combination of both methods, in which the percentage is selected and cross checked for reasonableness by utilizing the lodestar method.  *See Union Asset Mgmt. Holding A.G. v Dell Inc.*, 669 F.3d 632, 644 (5th Cir. 2012); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 652 (E.D. La. 2010) (finding the blended method to be in line with Fifth Circuit precedent).  It is appropriate to consider each of these methods in turn in an effort to determine a fair common benefit fee so that an appropriate split of the capped fee can be made between the common benefit counsel and contract counsel.

**1.    Loadstar Method**

Using the lodestar method to calculate reasonable common benefit fees begins with a determination of the reasonable number of hours spent on this part of the case.  Once this is done, the appropriate hourly rate is established.  This is then tested based on an analysis of 12 factors

known as the *Johnson* factors—first formulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974).  These factors include (a) the time and labor required; (b) the novelty and difficulty of the questions; (c) the skill required to perform the legal service properly; (d) the preclusion of other employment by the attorneys due to acceptance of the case; (e) the customary fee; (f) whether the fee is fixed or contingent; (g) time limitations imposed by the client or circumstances; (h) the amount involved and the results obtained; (i) the experience, reputation, and ability of the attorneys; (j) the "undesirability" of the case; (k) the nature and length of the professional relationship with the client; and (l) awards in similar cases.  *Id.* at 717-19; *see also Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir. 1990).  A review of these factors as they apply to the facts of this case is appropriate.

> ### *a.    The time and labor required*

Counsels performing common benefit work in this litigation have logged 232,309.35 hours on various common benefit tasks through December 31, 2013 (the date of the settlement).  *See* Appendix A (CPA Report).  These hours have been logged contemporaneously with performing the work and reported monthly in accordance with the protocol established by the Court in Pretrial Order 28(F).  These reports have been systematically audited and vetted by the Court-appointed CPA and regularly—monthly—reviewed by the Court.  A summary of these reports reflects the type of work performed and the total number of hours logged by common benefit counsel.

In most large MDLs, there are a sizable number of individual claimants filing claims but there is usually one, two or a small number of defendants.  Overseeing, prosecuting, and successively resolving thousands of claims typically represent the work of common benefit counsel in the average large MDL.  During the course of this MDL, however, not only did approximately 10,000 plaintiffs file individual claims, but also approximately 2000 defendants and their liability

insurers appeared in response to the claims.  The number of defendants alone presented challenges in organization and coordination that do not exist in most other MDL's.  The responsibility for both handling the issues common to so many claims and responding to the defenses asserted by so large and disparate a group of litigants entailed lawyering on levels ranging from claims data management to case strategy.  Each defendant was individually and vigorously represented by able counsel raising issues of jurisdiction, the applicable science, causation, damages, and insurance coverage.  The adversarial demands on common benefit counsel in prosecuting claims called for an unrelenting commitment to the plaintiffs' case.

Early on the litigation, the PSC drafted the first-known judicial use of "Omni Complaints," essentially a joint petition, which pleading devices proved helpful for plaintiffs and their individual counsel as a means to file and preserve claims and theories of recovery.  At the same time, this relieved individual counsel and their clients of costly and challenging foreign service efforts.  The preparation of these complaints was not a simple form exercise, but rather entailed strenuous efforts by the PSC to investigate and verify case-specific facts, compile material allegations, and perfect service of process both domestically and abroad.  The translation and service of the complaints on foreign defendants, pursuant to the Hague Convention, also involved significant costs and effort. This undertaking by the PSC advanced the litigation by creating the needed critical mass of cases in the MDL.

In preparation of the Omni Complaints, the PSC also took the opportunity to design a procedure for preserving key physical evidence.  These efforts culminated in a program, the Threshold Inspection Program (TIP), which was used to investigate and document the presence of Chinese drywall in thousands of properties, identifying the manufacturer in each case.  In addition,

a catalogue of markings, brands, intakes and other identifying markers was developed, to assist claimants in determining the proper defendants as to each claimant.

The sheer number of defendants also necessitated a significant effort in regard to securing experts and assembling scientific proof.  The discovery efforts of the PSC laid the groundwork for all plaintiffs' claims to be presented on the merits and the activity was made possible only through substantial commitment on the part of common benefit counsel.  In particular, it proved necessary in this case to (1) conduct discovery of hundreds of entities in the Chinese drywall supply chain including depositions (often with interpreters) in Frankfurt, London, and cities throughout the United States; (2) establish a document depository of more than 400,000 pages of documents received pursuant to a number of production request, many of which required translation in English; (3) test and preserve the drywall removed from plaintiffs' homes; (4) prepare and serve request upon the CPSC under the Freedom of Information Act; (5) retain experts in corrosion, metallurgy, electrical engineering, power electronics, electrical machinery and failure; (6) respond to hundreds of motions brought by a number of defendants raising complex legal issues ranging from exclusionary clauses in insurance policies and the applicability of the economic loss doctrine to the methodology requirements in *Daubert*.

The Court scheduled several bellwether trials.  In preparation for these trials, a litigation team of common benefit counsel assembled by the PSC began meeting with highly qualified experts from around the country to develop a testing program which would document and confirm both the presence of and the damages caused by Chinese drywall.  These counsel spent substantial time meeting with homeowners, doing the needed legal research to support claims under the law of the states involved in the bellwether trials.

This Court, from its own experience, knows well the strenuous and consuming nature of preparing for and carrying the plaintiff's burden of proof in a complex, product liability trial on the merits. Common benefit counsel spent long and arduous hours of review, preparation, analysis, strategy, research, strategic decision-making and courtroom presentation. In the *Germano* trial, this effort was manifest in a two-day hearing involving 535 exhibits and 17 witnesses—fourteen live and three by deposition. In the five-day trial of *Hernandez* trial, 216 of the 278 exhibits were offered by plaintiffs, and fifteen witnesses testified. In the *InEx/North /River* jury trial, which lasted six days, there were 116 exhibits introduced into evidence and twenty-two witnesses testified. Each of these trials constituted a significant contribution for the common benefit of the plaintiffs.

These trials established scientific proof of property contamination and damage due to the presence of Chinese manufactured drywall. They also established a protocol for the proper method for remediating the damage. This protocol later served as the stylobate on which the settlement rested.

The PSC also prepared two additional cases selected for bellwether trials: *Campbell v. KPT* and *Clement v. KPT*. The cases were fully worked up and ready for trial purposes. The PSC spent extensive time pre-trying these cases to mock juries, which enabled the PSC to develop trial themes and strategy. Depositions of the plaintiffs and property specific experts were taken and the witnesses were prepared for trial. On the eve of trial, these cases were settled.

Beginning in November 2009, the Court appointed a special master to explore opportunities for an ultimate resolution of Knauf related claims in this MDL. Following many months of settlement negotiations, the PSC reached an agreement in October 2010 with Knauf to undertake a program that called for Knauf to remediate a certain number of homes using the protocol established from the evidence introduced in the trials. This became known as the Pilot Program, and served as

the basis upon which the Knauf, Global, Banner, InEx and other settlements ultimately were negotiated.

The InEx, Banner, Knauf, L&W and global settlements are five separate but interrelated Rule 23(b)(3) class settlements that provide cash, remediation or other benefits to owners and tenants of property damaged by Chinese drywall. Each settlement was the result of serious arms-length negotiations, strategic maneuvering, extensive briefing and motion practice.

A total of nine class settlements including Virginia have been concluded in these proceedings. These agreements have resolved thousands of claims arising out of an environmental and defective product catastrophe of significant proportions. They include claims resolution with a major manufacturer operating in a foreign country. Almost 3000 homes have been remediated fully by the removal of defective Chinese drywall and the damaged effects and the remediation of the structure. The rehabilitation of these homes has been certified by environmental specialists.

The Knauf related settlements provide the plaintiffs with a "made whole" remediation in all Knauf (KPT Drywall) cases, combined with monetary relief for all (even some non-Knauf) class members. Most significant perhaps, with the exception of the Virginia litigants, the PSC achieved these remediation benefits without obliging a single class member to deduct any legal fees or case costs from his or her settlement recovery. In a non-statutory fee-shifting case, this is a significant accomplishment. In addition, the PSC negotiated Knauf settlement made available to plaintiff property owners the dispute resolution service of a court-appointed Ombudsman to assist class members in the remediation process with the remediation contractor. The PSC also supported the services of a *pro se* curator to assure that unrepresented class members might navigate the litigation and participate fully in the settlement process.

### b.    The novelty and difficulty of the questions

The corrosive environment shown to have resulted from the sulfur off-gassing of defective Chinese-manufactured drywall is an event unprecedented in the drywall industry.  There was little or no evidence that this condition was known or could or should have been anticipated.  Thus, proving negligence was a formidable hurdle.  Although this may not have been a significant factor in proving the liability of a manufacturer such as Knauf—since a manufacturer is "strictly liable" for manufacturing a defective product and proving negligence is not necessary—it was a significant factor in proving liability of the downstream Knauf entities such as the builders, suppliers and installers.  Nevertheless, with regard to Knauf, a foreign corporation with its principal offices in Germany, there were formidable issues of service, jurisdiction and limitations on any recovery.  Finally, the large number of defendants—over 2000—presented both challenging and novel issues of organization.

### c.    The skill required to properly perform the necessary legal services

The level of legal skills required to bring about the class settlements in this case was by no means ordinary.  Common benefit counsel was required to excel professionally in a number of areas, including organization and strategy in a case with several thousand defendants, merits discovery and trials involving a unique defect in a product made in China by a foreign entity, and in the negotiations of multiple interrelated settlements.  Counsel not only had to develop a liability case through ground-breaking proof of a corrosive environment caused by Chinese-manufactured drywall, but also faced formidable adversaries with significant resources and had to make the case credible enough to convince a foreign manufacturer and numerous non-manufacturer defendants to resolve thousands of claims at a substantial economic cost.

14

> **d.      The preclusion of other employment by the attorneys due to acceptance of this case**

As the time records and submissions in this case suggest, this litigation required that some members of the PSC devote themselves and their offices to the handling of this matter on virtually full-time basis.  The urgency of restoring plaintiffs to safe and habitable homes was recognized, and the Court imposed an intense pace on the attorneys.  Given the often-extraordinary time demands imposed on them, it was unavoidable that common benefit counsel was precluded from other employment by having accepted responsibilities inherent in this case.

> **e.      The customary fee**

As mentioned, the typical personal injury case involving injuries caused by a defect product would generally be about thirty-three and a third percent of the amount recovered or sometimes as much as forty percent of the amount recovered.  This case, however, turned out to be largely a property damage case and a smaller amount is justified in such a case.  A fee of somewhere about twenty percent of recovery is not inappropriate, per se.  The fee in this case is about nineteen and one half percent of the total recovered so it is not out of line with the usual property damage fee. But in this case, the total fee includes both the fee of the contract counsel as well as the common benefit counsel, so that both counsel will take a haircut and undoubtedly both will be disappointed. But that, unfortunately, is inherent in a contingent fee arrangement.

> **f.      Whether the fee is fixed or contingent**

As mentioned above, it is assumed that all or virtually all plaintiffs' counsel undertook this case on a contingent basis.  Both sets of counsel—common benefit and contract—were subject to similar risks inherent in a contingent fee arrangement.

### g.   Time limitations imposed by circumstance

Because of the urgency resulting from a large number of people being displaced from their homes, the Court put this matter on a fast track without sacrificing the rights and interest of the litigants.  The Court held monthly status conferences to discuss case developments and resolve any discovery issues that may have occurred during discovery.  Early bellwether trials were scheduled and pretrial activities were conducted under strenuous guidelines, which intensified the efforts of counsel but proved necessary to bring these matters to a prompt resolution.  Common benefit counsel responded diligently to this advanced time schedule and their efforts played the major role in bringing this matter to a prompt and successful conclusion

### h.   The amount involved and the result achieved

This *Johnson* factor is entitled to considerable weight in evaluating the reasonableness of a common benefit fee award.  In fact, the Supreme Court has observed:  "[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained."  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

With that principle in mind, the Court reviews the benefits of the settlement in this case. The Knauf settlement is a "made whole" settlement—for the property damage.  The remediation protocol includes the removal of all contaminated Knauf Chinese-manufactured drywall back to the studs, the removable of all wiring and contaminated appliances and equipment, a thorough cleaning and environmental testing with certification by a third-party testing entity that the property is free of all contaminated drywall.  After the cleaning and certification, new drywall is installed along with new wiring, appliances and equipment.  The claimants also have the opportunity to receive monetary benefits for other specifically designated losses.  Finally, in addition to these benefits, the

Knauf defendants agreed to pay all attorneys' fees and costs, including costs of implementing the settlement program.

By any measure, the Knauf settlement achieved in this MDL represents an extraordinary beneficial result for the claimants. The Court finds that the aggregate value of the class settlement benefits is approximately $1.12 billion:

| SETTLEMENT BENEFIT | VALUE |
|---|---|
| 1. Market Valuation of Option 1, Moss Remediation | $515,643,751.00 |
| 2. Additional Knauf Payments for Options 2 & 3, Already Remediated Homes, and Other Loss Claims | $247,382,592.71 |
| 3. GBI Settlement Payments | $78,716,786.55 |
| 4. Attorneys' Fees and Costs[2] | $233,078,270.33 |
| 5. Virginia Settlement Payments | $10,962,000.00 |
| 6. Administrative Services | $34,529,905.31 |
| GRAND TOTAL | $1,120,313,305.90 |

> ### i.      Experience, reputation and ability of common benefit counsel

All counsel on the PSC or authorized by the PSC to do common benefit work are highly skilled and very capable professionals.

> ### j.      The "undesirability" of the case

Significant economic risks were accepted by common benefit counsel in prosecuting a product liability case of this magnitude against a foreign defendant and thousands of domestic defendants. The fact that the major settling defendant was a foreign manufacturer with facilities in

---

[2] The Objectors oppose factoring in the amount of attorneys' fees paid by the settling defendants. Nonetheless, the Court finds it reasonable to include attorneys' fees and costs into the total settlement value. Because the defendants are paying plaintiffs' attorney's fees and costs, this relieves the class members of the burden of paying these amounts out of their own personal recoveries. Therefore, this amount funded by defendants enhances the settlement benefit achieved for the plaintiffs. "The award to the class and the agreement on attorney fees represent a package deal. Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class recovery." *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996).

both Germany and China only added to the degree of risk given the renowned difficulty enforcing judgments in those countries. Beyond these risks, the presence of these foreign manufacturers ensured that substantial litigation costs for travel would exist, and that difficulties with service of process, foreign discovery, translation services, sovereign immunity defenses and other jurisdictional defenses, would present themselves.

### k.     The nature and length of the professional relationship with the client

This factor was designed to consider those instances in which an attorney in private practice may vary his or her fee for similar work in the light of the professional relationship of the client with his or her office. Since few, if any longstanding client relations between common benefit counsel and class members preceded this MDL, this *Johnson* factor should be a neutral as it relates to the reasonableness of the common benefit fee.

### l.     Fee awards in similar cases

In MDL cases and also often in class action matters, the determination of a reasonable hourly fee is largely influenced by the relationship which the total fee bears to the total amount recovered. In fact, the purpose of computing an hourly fee is to test the reasonableness of the fee derived from the percentage method of determining the common benefit fee.

Fees in other cases involving a similar recovery range from $165.00 to $677.25 per hour. *See, e.g.*, *Vioxx*, 760 F. Supp. 2d at 660-61 (citing *In re Guidant*, 2008 WL 682174, at *15 (D.Minn. Mar. 7, 2008) (finding an average hourly rate of $443.25 was reasonable for work performed between 2005 and 2010 was reasonable)); *In Re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, MDL No. 2179, Doc. 21849 (E.D. La. Oct. 25, 2016) (finding $450.00 per hour was an appropriate average/blended hourly rate); *see also In re Avandia Marketing, Sales Practices and Products Liability Litigation*, MDL No. 1871, Pretrial Order No. 175, Doc. 2820 (E.D. Pa. Oct.

19, 2012) (approving staggered rates of $225.00, $285.00, $475.00 and $595.00 (for an average hourly rate of $353.00) for attorneys based on their experience and contribution to the case).

The total fees in this case, however, are capped, so the hourly rate may have to be adjusted to reflect that aspect of the total fee.

The lodestar method is not without flaws. Many courts and commentators have noted problems with the lodestar method including potential for manipulation, disincentive for an early settlement, reward for excessive and wasteful attorney effort, and confusion and lack of predictability in setting fees. *See* Vaughn R. Walker and Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Case*s, 18 GEO. J. LEGAL ETHICS 1453, 1456 (2005) (summarizing *Court Awarded Attorney Fees: Report of the Third Circuit Task Force*, 108 F.R.D. 237 (1985)). In response to the difficulties with the lodestar method, courts have used the percentage method for determining an appropriate common benefit fee.

### 2.   Percentage Method

The percentage method bases the common benefit fee on a fair percentage of the amount recovered. Some courts have concluded that the percentage method provides more predictability to attorneys and class members, encourages settlement, and avoids protracted litigation for the sake of racking up hours. *See* Walker and Horwich, *supra* at 1456-57 (citing *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1378 (N.D. Cal. 1989)); *accord In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009).

The percentage method, however, cannot be arbitrary, devoid of all reality, or inconsistent with usual fees for the type of case involved. There is no one percentage that should apply to all cases. The percentage should be informed by the facts and circumstances of the particular case.

Data compiled in empirical studies of attorneys' fees in class actions reveal that the higher the settlement, the lower the percentage of the fee. Eisenberg & Miller, *Attorneys' Fees and Expenses in Class Action Settlements 1993–2008*, 7 J. EMPIRICAL LEGAL STUDIES 248 (2010). For example, in settlements between $190 million and $900 million, common benefit fees between 10-percent and 12-percent have been allowed. *See id.* at 265. Whereas for settlements between $1 million and $2 million, common benefit fees between 32-percent and 37-percent have been awarded. *See id.* Of course, the percentages allowed in past cases are only guideposts, and each case should be analyzed on its own basis with the objective of determining a reasonable fee in the case before the court.

As a result of the terms of the settlement negotiated between the PSC and the Knauf defendants, the total available attorneys' fees in this case, as of October 2017, is $197,803,738.17[3]. This total fee includes both the common benefit fees and the fees of the contract attorneys; therefore, some equitable division must be made between these two groups.

Based on the information and data outlined above and applying the principles and precedent developed in prior similar cases, the Court concludes that a fair and appropriate division of the total fee is 52-percent to common benefit counsel and 48-percent to contract counsel.

A 52-to-48 division of the total fee would mean that the common benefit fee would be about **9.181-percent**[4] of the total settlement amount recovered. This percentage is consistent, albeit on the low end, with the percentage allowed in cases producing similar recoveries. This percentage,

---

[3] See *infra* footnote 5.

[4] Percentage method computation: ($197,803,738.17 x .52)[common benefit fee] / $1,120,313,305.90 [total settlement value] = 0.0918117 x 100 = 9.18117%

nonetheless, needs to be evaluated and tested in light of the hours logged by common benefit counsel in order to determine whether such a percentage is fair and reasonable.

### 3.     Blended Method

The blended method is usually used to ensure that the amount of the common benefit fee established by the percentage method is reasonable.  Under the blended method, the fee arrived at by the percentage method is cross-checked by the lodestar method utilizing the *Johnson* factors.  If the fee arrived at is within "the ballpark" of the fee that would result from the lodestar method, the reasonableness of the fee is more sustainable.  The blended method has been used by many district courts.  *See In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640 (E.D. La. 2010); *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008); *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525 (N.D. Miss. 2003).  All circuit courts, including the Fifth Circuit, have approved this use of the blended method.  *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012) ("To be clear, we endorse the district courts' continued use of the percentage method cross-checked with the *Johnson* factors.  We join the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar method in common fund cases, with their analyses under either approach informed by the *Johnson* considerations.").

### 4.     A 52-to-48 Division Is Reasonable When Tested Under the Blended Method.

According to the CPA, the total attorney's fees, as of October 2017, available now for distribution is $197,803,738.17.[5]  A split of 52-percent to common benefit counsel and 48-percent

---

[5] $187,803,738.17 [available funds] + $10,000,000.00 [Taishan advance] = $197,803,738.17 [total for distribution]

This total amount of $197,803,738.17 includes $10 million previously advanced to common benefit counsel for costs in connection with the Taishan portion of the *Chinese-*

to contract counsel yields $102,857,943.85 for common benefit counsel and leaves $94,945,794.32 for contract counsel.

A common benefit fee of approximately $102.86 million is reasonable when analyzed by the *Johnson* factors and compared to hourly fees in similar cases. As mentioned, a review of the contemporaneously filed and vetted time records in this case reveals that common benefit counsel spent 232,309.35 hours performing various common benefit tasks. A common benefit fee of approximately $102.86 million[6], which when divided by the number of hours of common benefit work, would result in an hourly fee of approximately **$442.76**[7] for common benefit work.

The Court finds that a 52–48 division between common benefit counsel and contract counsel, respectively, is fair. This division and final amount comport with both the loadstar method and the percentage method. The Court recognizes that contract counsel generally performed significant works for their clients. But the nature of their services were mostly administrative, such as collecting evidence, filling out forms, keeping clients abreast of the developments on the case, and such other similar work. This work is necessary and important in all cases, but it can be done— and usually is done—by non-lawyers working under the supervision and direction of attorneys. Accordingly, the work of contract counsel in this case is not entitled to the same consideration as the work performed by common benefit counsel.

---

*Manufactured Drywall* litigation. Accordingly, in calculating the division between common benefit counsel and contract counsel, it is appropriate to include this transferred amount since this advance is used to pursue Taishan and is unrelated to Knauf. From this advanced amount, only $3,000,000.00 has been used, and thus will be reduced from common benefit counsel's award in the final calculation below.

[6] ($197,803,738.17 x .52) = $102,857,943.85 [common benefit fees]

[7] Hourly rate computation: $102,857,943.85 [common benefit fees] / 232,309.35 [total hours] = $442.76 [average rate per hour]

## IV.
## <u>EXPENSES RELATED TO OBJECTORS' SPECIAL HEARING</u>

The Court tasked the Fee Allocation Committee to submit a recommendation for the division of the total fees between common benefit counsel and contract counsel. *See* PTO 28. The Committee proposed a 59–41 split between common benefit counsel and contract counsel, respectively. Contract counsel made an objection, as they had a right to do. But contract counsel "over played" their hand. They filed some 23 objections, commenced unnecessary proceedings, and prolonged the discovery process by filing unnecessary written discovery and seeking pointless depositions of the Court-appointed CPA and various members of the PSC and Fee Allocation Committee. Their accomplished results: havoc and needless delay. Their actions also caused additional expense by requiring the CPA and Special Master to conduct a special hearing and perform other services. Because the Objectors prolonged this process and triggered avoidable added costs—in effect, creating a second, unnecessary litigation—the Court finds it fair and appropriate for contract counsel to bear 80-percent of the CPA and Special Master's fees[8] associated with this dispute, in the amount of $323,877.15. The remaining 20-percent, or $80,969.29, is to be borne by common benefit counsel. *See* Rec. Doc. 21054.

Toward the end of this process, contract counsel and common benefit counsel requested the Special Master to attempt to mediate the dispute regarding the division of the total attorneys' fees. After a valiant attempt, the mediation process proved unsuccessful. The cost of the mediation attempt was $29,750.00. Because both common benefit counsel and contract counsel requested

---

[8]  The Special Master charged $385,000.00 and the CPA charged $19,846.44 for works performed and costs in connection with the Objector's hearings and proceedings involving common benefit fees. The total amount is $404,846.44.

this service, the Special Master's fees and costs in connection with this mediation shall be divided equally between both sets of counsel, so that each group pays $14,875.00.

**V.**

**CONCLUSION**

The CPA has informed the Court that $197,803,738.17[9] is available for attorneys' fees between common benefit counsel and contract counsel.[10]  Based on the foregoing, accordingly,

**IT IS ORDERED** that common benefit counsel is hereby **AWARDED** 52-percent of the total attorneys' fees from the Knauf Settlement, in the amount of $102,857,943.85, less $80,969.29 for the Objectors' hearing, less $14,875.00 for the mediation, and less $3,000,000.00 for the Taishan advance, for a grand total of **$99,762,099.56**.

**IT IS FURTHER ORDERED** that contract counsel is hereby **AWARDED** 48-percent of the total attorneys' fees from the Knauf Settlement, in the amount of $94,945,794.32, less $323,877.15 for the Objectors' hearing and less $14,875.00 for the mediation, for a grand total of **$94,607,042.17**.

New Orleans, Louisiana, this 31st day of January, 2018.

_____
**ELDON E. FALLON**
United States District Judge

---

[9]   This figure for attorneys' fees is correct as of October 2017.  The actual amount for distribution will be adjusted later by the CPA to reflect the account balance as of the distribution date.

   Furthermore, the $197,803,738.17 of available attorneys' fees has had the costs associated with the Objectors' hearing ($404,846.44) already paid, and therefore the available funds will be marginally higher before applying the 52–48 percent allocation.

[10]   This reported amount does not include attorneys' fees and costs from the downstream defendants and *North River* trial.  Common benefit counsel and contract counsel as well as Knauf entities have made a separate agreement involving those attorneys' fees and costs.

# APPENDIX A

Report by Phillip A. Garrett, CPA

# Time Totals by Firm - Sortable Report from November 2000 to December 2013

### Posted From 2000-11-01 to 2016-05-25
(as of 2016-05-25 22:00:40)

| | Firm | Assessment | PreTrial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|
| 1 | Allison Grant, P.A. | 26.75 | 7.75 | 9.75 | - | - | 40.75 | 85.00 |
| 2 | Alters, Boldt, Brown, Rash, & Culmo | 288.25 | 273.25 | 80.25 | 15.75 | - | - | 657.50 |
| 3 | Anderson Kill, PC | 2,045.88 | 1,519.75 | 428.50 | 30.00 | - | 156.70 | 4,180.83 |
| 4 | Aronfeld Trial Lawyers, P.A. | 109.95 | - | 3.00 | - | - | - | 112.95 |
| 5 | Barrios, Kingsdorf & Casteix | 1,923.05 | 1,050.00 | 1,030.75 | 3,718.50 | 35.25 | 206.75 | 7,964.30 |
| 6 | Becnel Law Firm LLC | 778.00 | 155.25 | 1,795.35 | 96.75 | - | 9.50 | 2,834.85 |
| 7 | Bruno & Bruno, LLP | 23.50 | 273.25 | 100.10 | 61.75 | - | - | 458.60 |
| 8 | Colson - Hicks Edison PA | 5,595.95 | 2,452.75 | 4,712.10 | 987.00 | 332.75 | - | 14,080.55 |
| 9 | Gainsburgh, Benjamin, et al | 641.05 | 220.25 | 120.50 | 6,752.00 | 98.00 | 131.75 | 7,963.55 |
| 10 | Gary, Naegele & Theado, LLC | 443.20 | 33.00 | - | - | - | - | 476.20 |
| 11 | Hausfeld LLP | 1,097.65 | 1,300.00 | 278.25 | 1,753.50 | 74.75 | 602.35 | 5,106.50 |
| 12 | HHK | 10,422.00 | 10,406.75 | 7,567.75 | 4,268.75 | 408.75 | 7,276.00 | 40,350.00 |
| 13 | Irpino Law Firm | 1,099.00 | 1,357.10 | 2,695.00 | 1,640.25 | 749.75 | 146.00 | 7,687.10 |
| 14 | Kanner & Whiteley, L.L.C. | 341.20 | 262.25 | 16.50 | 5.00 | - | - | 624.95 |
| 15 | Krupnick, Campbell, Malone, Buser, | 191.25 | 159.30 | 99.50 | 36.75 | 3.00 | 210.00 | 699.80 |
| 16 | Landskroner - Grieco - Madden LLC | 5.75 | 35.25 | - | 16.25 | - | - | 57.25 |
| 17 | Law Offices of Robert M. Becnel | 267.25 | - | 397.50 | 154.25 | - | - | 819.00 |
| 18 | Lemmon Law Firm, LLC | 152.75 | 360.50 | 3,480.75 | 601.50 | - | 99.75 | 4,695.25 |
| 19 | Leopold Kuvin, P.A. | 268.75 | 204.45 | 206.50 | 42.25 | - | 110.80 | 832.75 |
| 20 | Levin Papantonio Law | 2,530.70 | 498.85 | 40.85 | 1,056.80 | - | 9.70 | 4,136.90 |
| 21 | Levin, Fishbein, Sedran & Berman | 2,223.50 | 19,490.00 | 6,492.75 | 2,467.00 | 3,265.00 | 9,725.50 | 43,663.75 |
| 22 | Lewis & Roberts PLLC | 3,785.25 | 467.00 | 702.00 | 2,816.10 | - | 94.00 | 7,864.35 |
| 23 | Luckey & Mullins, PLLC | 38.75 | 2.00 | - | - | - | 7.00 | 47.75 |
| 24 | Martzell Bickford | 99.25 | 20.25 | 25.50 | 7.75 | - | 3.00 | 155.75 |
| 25 | Mason LLP | 166.20 | 28.50 | 19.00 | 3.00 | - | 10.00 | 226.70 |
| 26 | Milstein Adelman, LLP | 869.75 | 1,822.50 | 139.75 | - | - | 890.50 | 3,722.50 |
| 27 | Morgan & Morgan | 1,221.50 | 666.75 | 874.00 | 113.75 | - | 93.00 | 2,969.00 |
| 28 | Morris Bart, L.L.C | 1,555.75 | 67.25 | 49.25 | 62.41 | - | - | 1,734.66 |
| 29 | Parker Waichman LLP | 4,298.25 | 1,926.25 | 2,294.50 | 358.00 | - | 28.75 | 8,905.75 |
| 30 | Pender & Coward, PC | 223.70 | 360.40 | 87.45 | 19.30 | - | 11.30 | 702.15 |
| 31 | Pendley Baudin & Coffin, LLP | 495.20 | 63.00 | 105.00 | 49.75 | - | 4.50 | 717.45 |
| 32 | Podhurst Orseck, P.A | 4,373.75 | 768.00 | 161.00 | 111.00 | - | 69.50 | 5,483.25 |
| 33 | Reeves & Mestayer, PLLC | 4,171.50 | 1,499.58 | 2,847.99 | 787.39 | 19.50 | 38.75 | 9,364.71 |
| 34 | Rhine Law Firm, P.C. | 169.25 | 199.25 | 43.75 | 5.50 | - | - | 417.75 |
| 35 | Richard J. Serpe, P.C. | 3,440.73 | 2,866.50 | 2,034.25 | 3,462.35 | 250.50 | 1,358.75 | 13,413.08 |
| 36 | Seeger Weiss LLP | 2,621.10 | 934.90 | 3,096.85 | 7,377.75 | 48.25 | 301.50 | 14,380.35 |
| 37 | Singleton Law Firm | 115.50 | 34.25 | 33.50 | 155.75 | - | - | 339.00 |
| 38 | Taylor Martino, PC | 98.25 | 90.75 | 105.00 | - | - | 177.00 | 471.00 |
| 39 | The Lambert Firm | 3,274.00 | 218.75 | 704.00 | 503.50 | 19.50 | 30.25 | 4,750.00 |
| 40 | The Steckler Law Firm | 3,735.05 | 1,335.70 | 481.00 | 928.00 | 2.00 | 388.57 | 6,870.32 |
| 41 | Thornhill Law Firm | 29.25 | - | 72.00 | 9.50 | - | 5.00 | 115.75 |
| 42 | Vaughn Bowden & Wooten, PA | 45.25 | - | 55.25 | - | - | - | 100.50 |
| 43 | VM Diaz and Partners, LLC | 1,564.00 | 108.00 | 96.75 | 40.25 | 4.50 | 256.50 | 2,070.00 |
| | **Grand Total:** | **66,866.61** | **53,539.28** | **43,583.44** | **40,515.10** | **5,311.50** | **22,493.42** | **232,309.35** |