# Exhibit "2"
# to
# Knauf's Opposition to G. Dieuvil's Objection to Special Master Ruling



BAKER DONELSON
BEARMAN, CALDWELL & BERKOWITZ, PC

201 ST. CHARLES AVENUE
SUITE 3600
NEW ORLEANS, LOUISIANA 70170
PHONE:    504.566.5200
FAX:        504.636.4000

www.bakerdonelson.com

KERRY J. MILLER
Shareholder
Direct Dial:       (504) 566-8646
Facsimile:        (504) 585-6946
Email:             kjmiller@bakerdonelson.com

***PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATIONS***

September 1, 2017

**Via Email and Federal Express:**
Dan Balhoff
Perry, Balhoff, Mengis & Burns, LLC
2141 Quail Run Drive
Baton Rouge, LA 70808
Balhoff@pabmb.com

RE:    **Guilfort Dieuvil, 8757 Baystone Cove, Boynton Beach, FL 33473**

**CONFIDENTIAL POSITION PAPER**

Dear Mr. Balhoff:

In regards to the binding mediation of this matter, the Knauf Defendants[1] submit the

following confidential position paper regarding the claims listed below.

### I.    Background

Guilfort Dieuvil ("Claimant") owns property located at 8757 Baystone Cove, Boynton

Beach, FL 33473  (the "Property").[2]  The Property was built by GL Homes.[3] On or about January

---

[1] The Knauf Defendants include Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), Knauf Plasterboard (Wuhu) Co., Ltd., Guangdong Knauf New Building Material Products Co., Ltd., Knauf International GmbH, Knauf Insulation GmbH, Knauf AMF GmbH & Co. KG, Knauf UK GmbH, Knauf do Brasil Ltda., Gebr. Knauf Verwaltungsgesellschaft KG, PT Knauf Gypsum Indonesia, or Knauf Gips KG.

Page 2

1, 2010, Boynton Beach Associates XVI conducted an inspection of the Property and observed indications consistent with the presence of reactive Chinese drywall.[4] In March 2010, a building permit was issued for the remediation of the Property by GL Homes.[5]  In April 2010, a Scope of Work Agreement was issued by Boynton Beach Associates XVI, LLP and informed Claimant that the Property would be repaired and returned to its original condition at no cost to the Claimant.   Claimant executed the Scope of Work Agreement.[6]   Between September and December 2010, the remediation of the Property commenced wherein drywall was removed and the plumbing, electrical, and insulation was replaced.[7]  At this point in the remediation, without any stated reasons, Claimant refused to allow GL Homes to complete the remediation on the Property.[8]

On March 7, 2013, Claimant signed and submitted a Plaintiff Profile Form to the Knauf Class Settlement Agreement and the PPF indicated that the remediation began but was not completed on the Property.[9]  On September 16, 2013, Benchmark conducted an inspection of the Property and identified no corrosion and no existence of KPT drywall in the Property.[10]  Also,

---

[2] Exhibit A - Plaintiff Profile Form.

[3] *Id.*

[4] *Id.*

[5] Exhibit B - October 14, 2013 Letter from Boynton  Beach and Associates XVI, LLP to Claimant.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] Exhibit A - Plaintiff Profile Form.

[10] Exhibit C - Benchmark Inspection Report for the Property.

Page 3

there were no drywall samples saved on site.[11]   Therefore, Knauf denied the claim under the Knauf Class Settlement Agreement.

In 2015, Claimant's former counsel included Claimant in a package deal wherein Claimant would be permitted to seek benefits under the Knauf Class Settlement Agreement only if, in addition to complying with all other aspects of the Knauf Class Settlement Agreement, the Claimant could demonstrate "***that evidence was preserved strictly in accordance with the requirements of MDL 2047 Pre-Trial Order 1(B).***"[12] Claimant's former counsel uploaded all documentation related to the claim, which was reviewed by Knauf.   On August 27, 2015, Claimant was informed that his claim was not eligible to proceed under the Knauf Class Settlement Agreement because it did not comply with PTO 1(B).[13]

In 2017, Claimant, in pro se, requested status updates regarding his claim.   He was informed that his claim was previously denied.   Claimant submitted additional photos of samples from an unknown origin.   Despite being required to submit all documentation in 2013, Claimant submitted these new photos of samples for the first time in 2017.[14]   Knauf again reviewed the documentation and informed Claimant that his claim was not compensable under the Knauf Class Settlement Agreement because he failed to comply with PTO 1(B).   Claimant has now sought a decision from the Special Master to determine the issue.

## II.     Position of Knauf Defendants

---

[11] *Id.*

[12] Exhibit D - Redacted Term Sheet between Claimant's former counsel and Knauf Counsel.

[13] Exhibit E - Correspondence between Claimant's former counsel and Knauf Defendants' counsel.

[14] Because the photos of the demolition of the Property show no labeled drywall, there can be no confirmation whether these samples which are now labeled with a location come from the Property.

Page 4

Claimant is ineligible to receive settlement benefits under the Settlement Agreement because he has failed to comply with PTO 1(B) in presenting evidence of KPT Chinese drywall in the Property.  Claimant has therefore failed to comply with the preservation protocols of the Knauf Class Settlement Agreement and the Already Remediated Properties Protocol.  This has prejudiced the Knauf Defendants and the claim should be disallowed.

Claimants are subject to the Knauf Class Settlement Agreement, which mandates that the review of Already Remediated Home (ARH) claims are done pursuant to PTO 1(B).  PTO 1(B) establishes that all Claimants are required to preserve physical evidence by following a few basic procedures, including but not limited to  "photograph[ing] the backside of each Chinese drywall board immediately after it is removed on-site, and, document on a floor plan, building diagram, or other similar form of documentation, the location of each full or partial Chinese drywall board removed from the property and its photograph. Photographs of the wall sections should be taken so that any markings on the backside of the drywall sections are most clearly visible in the photographs." Claimant has failed to meet this requirement in the case at hand.

Under the Knauf Class Settlement Agreement, failure to preserve evidence can result in "disallowance" of a claim.[15] The Knauf Class Settlement Agreement states in pertinent part: "The Special Master and the Court will take into consideration, in determining whether to allow a claim…whether the Owner has complied with MDL Pretrial Order 1(B)… for preservation of evidence."[16] Further, subject to review by the Special Master or the Court, "the failure to

---

[15] *See*, Knauf Class Settlement Agreement; Exhibit A at IV(d)(4).

[16] *Id.*

Page 5

preserve evidence as required by law will result in disallowance or reduction in the amount of the claim if the failure has been prejudicial to a determination of the claim."[17]

Of the approximately 560 boards that would be contained in the Property, only five (5) installed KPT boards and only six (6) detached KPT boards were presented in accordance with PTO 1(B).[18]  PTO 1(B) and the adoption of the standard by the Knauf Class Settlement Agreement was to adopt objective standards to qualify under the Knauf Class Settlement Agreement for manufacturer identification.[19]  Here, Claimant had an opportunity to have his builder remediate the Property, at no cost to him, but Claimant purposely prevented the builder from completing the renovation. Now the renovation is incomplete and Claimant has failed to preserve and present evidence as required under the Knauf Class Settlement Agreement. Based on Claimant's failure to preserve and present evidence of KPT Chinese drywall in the Property in accordance with PTO 1(B) and the Knauf Class Settlement Agreement, the Knauf Defendants have been prejudiced in a determination of the claim.  Therefore, the Knauf Defendants submit that Claimant's ARH claim is not compensable under the Knauf Class Settlement Agreement.[20]

Respectfully submitted,

---

[17] *Id.*

[18] Exhibit F - Drywall Evidence Submitted by Claimant. In addition, photos of samples were provided in 2017. However, these samples are small in size, contained in ziplock bags, and are not in compliance with PTO 1(B). Furthermore, there is no way to determine that these are not samples from the same boards presented in other evidence as the drywall shown in the demolition photos was not labeled.

[19] Although the Claimant's statements that the Property only contained KPT Chinese drywall are irrelevant to the Special Master's determination, Claimant's credibility is questionable at best.  He was formerly indicted for fraud and was named as a defendant  in approximately twenty (20) lawsuits involving civil and bankruptcy matters wherein consumer plaintiffs and Chapter 7 Bankruptcy Trustees alleged that Claimant defrauded consumers and creditors.  Exhibit G.

[20] The Knauf Defendants also note that should the claim be compensable at all, it must be limited to the amount of Reimbursable Costs multiplied by the percentage of KPT in the Property determined by the Special Master. Already Remediated Properties Protocol, Section IV(C).  As set forth above the KPT percentage should be 0%.   Claimant has not incurred or set forth any costs associated with the partial remediation of this Property because the costs were borne by the builder, GL Homes.

Page 6

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC


 _/s/ Kerry J. Miller_
KERRY J. MILLER

# EXHIBIT A

Plaintiff Profile Form - Residential Properties

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL | MDL NO. 2047 |
| PRODUCTS LIABILITY LITIGATION | SECTION: L |
| THIS DOCUMENT RELATES TO: ALL CASES | JUDGE FALLON |
| | MAG. JUDGE WILKINSON |

**For Internal Use Only**

_____

File Number

Date Received

This Plaintiff Profile Form must be completed and signed by every person making a claim in this litigation using one form per affected address. In completing this Profile Form, you are under oath and must provide information that is true and correct to the best of your knowledge. If you cannot recall all of the details requested, please provide as much information as you can and expressly indicate "unknown" in the space provided when not known. You must supplement your responses if you learn they are incomplete or incorrect in any material respect. You may and should consult with your attorney if you have any questions regarding completion of this form. If you are completing the form for someone who has died or who cannot complete the Profile Form, please answer as completely as you can for that person.

The questions and requests for production contained within this Profile Form are non-objectionable and shall be answered without objection. By answering this Profile Form, you are not waiving the attorney work product and/or attorney client privileges. Similarly, by disclosing the identity of consultants, such consultants may remain non-testifying experts and are subject to all protections afforded by law.

To the extent that the form does not provide enough space to complete your responses, you may attach as many sheets of paper as necessary. All photographs produced in response to this form shall be in color and attached to or printed on 8 1/2" x 11" white paper.

### Section I. Property Information

| | |
|---|---|
| Name Property Owner | Guilfort Dieuvil |
| Address of Affected Property | 8757 Baystone Cove |
| | Boynton Beach, FL 33473 |
| Is this Property:* | (Residential) Commercial Governmental |
| Name of Person Completing this Form | Guilfort Dieuvil |
| Is above your primary residence? | (Yes) No |
| Mailing Address (if different) | |
| | |
| | |
| Phone: | ( 786 ) 344 - 5497 |

* If your response is commercial or governmental you should not fill out the remaining questions, you will receive a follow up form at a later date.

Circle one: (Owner-Occupant) Owner Only Renter-Occupant

| | |
|---|---|
| Represented By: | James V. Doyle, Jr. |
| Address: | DOYLE LAW FIRM, PC |
| | 2100 Southbridge Pkwy, Suite 650 |
| | Birmingham, AL 35209 |
| Phone: | ( 205 ) 533 - 9500 |
| Case No. /Docket Info: | Omni XVIII 13-0609 |

### Section II. Insurance Information

| | |
|---|---|
| Homeowner/ Renter Insurer: | |
| Policy #: | |
| Agent: | |
| Address: | |
| | |
| | |
| Phone: | ( ) - |

+ Attach Copy of Insurance Declaration Page

### Section III. Claimant Information

| Name of Claimant | Dates Occupied Move-in | Dates Occupied Leave | Gender | Date of Birth | Are you claiming personal injuries?* Circle One | | Identify Claimant Status as an Owner-Occupant, an Owner Only, or an Occupant or Renter Only |
|---|---|---|---|---|---|---|---|
| Guilfort Dieuvil | 01/01/07 | / / | (M)/ F | 11 /16/ 73 | (Yes) | No | Owner - Occupant |
| Magdadene Dieuvil | 01/01/07 | / / | M /(F) | 12 /21/ 70 | (Yes) | No | Owner - Occupant |
| Karissa Dieuvil | 01/01/07 | / / | M /(F) | 8 /21/ 00 | (Yes) | No | Occupant |
| Guil Barley Dieuvil | 01/01/07 | / / | M /(F) | 8 /20/ 02 | (Yes) | No | Occupant |
| Guilfort J. Dieuvil | 01/01/07 | / / | (M)/ F | 4 / 1 / 06 | (Yes) | No | Occupant |
| Guilfort B. Dieuvil | 01/01/07 | / / | (M)/ F | 01 /07/ 07 | (Yes) | No | Occupant |
| Guilfort Dieuvil | 06/01/10 | / / | (M)/ F | 6 / 1 / 10 | (Yes) | No | Occupant |
| Oebene Cosiunir | 01/01/08 | / / | M /(F) | 5 /20/ 50 | (Yes) | No | Occupant |
| | / / | / / | M / F | / / | Yes | No | |
| | / / | / / | M / F | / / | Yes | No | |

* Personal injuries include claims for mental anguish and medical monitoring.

Plaintiff Profile Form - Residential Properties

### Section IV. Inspection Information

**1.0.** Have you, or has anyone on your behalf, conducted an inspection into whether Chinese-manufactured drywall is present in your home?    (Yes)    No

**1.1,** If "Yes" to Question 1.0 Section IV. Who conducted the inspection?    Boynton Beach Associates XVI, LLP

**1.2.** When did the inspection take place?    01 / 01 / 10

**2.0.** Has a determination been made that Chinese-manufactured drywall is present in your home?    (Yes)    No

**2.1.** If "Yes" to Question 2.0. Section IV. Who made this determination?    Boynton Beach Associates XVI, LLP

**2.2.** When was this determination made?    01 / 01 / 10

### Section V. Drywall Information

| Drywall Manufacturer | Markings on Drywall | Location in Home |
|---|---|---|
| Knauf Plasterboard Tianjin | KNAUF TIANJIN CHINA ASTM C36 | Ceiling and walls |
|  |  |  |
|  |  |  |
|  |  |  |

### Section VI. Home Information

| | | | Yes | No |
|---|---|---|---|---|
| Approx. Sq. Ft. of House: | 7,400 | | | |
| Estimated Sq. Ft. of Drywall | ------------ | Occupied | X | |
| Height of interior Walls | 9'-16' | Year-round | X | |
| Number of Bedrooms: | 6 | Summer | X | |
| Number of Bathrooms: | 5.5 | Winter | X | |

#### Plumbing System

| | Blackening or Corrosion? | | |
|---|---|---|---|
| | Yes | No | N/A |
| PVC/ CPVC/ Plastic Piping | X | | |
| Copper Piping | X | | |
| Copper Fixtures | X | | |
| Other Fixtures | X | | |
| Were repairs made to the plumbing system? | | X | |
| Dates: | | | |

#### Electrical System

| | Blackening or Corrosion? | | |
|---|---|---|---|
| | Yes | No | N/A |
| Receptacles | X | | |
| Switches | X | | |
| Main Panel | X | | |
| 2nd Panel | X | | |
| Exposed Copper Wires | X | | |
| Were repairs made to the electrical system? | | X | |
| Dates: | | | |

**+ Attach Copy of Floor Plan on 8 1/2" X 11" paper**

### Section VII. Construction/Renovation Information

Date Range for New Home Construction: (Month/Day/Year)

| | | | | |
|---|---|---|---|---|
| Start Date: | / / | Completion Date | / / | |
| Move In Date: | 01 / 01 / 07 | Date Acquired Home | 01 / 01 / 07 | |

Date Range for Renovations: (Month/Day/Year)

| | | | | |
|---|---|---|---|---|
| Start Date: | 4 /15/ 10 | Completion Date | (unfinished) | |
| Move In Date: | / / | | | |

| Renovation(s) | Yes | No | N/A |
|---|---|---|---|
| First Floor: 1/2 Wall of drywall replaced | | | X |
| First Floor: Full Wall of drywall replaced | | | X |
| Second Floor: Any drywall replaced | | | X |

### Section VIII. Homebuilder/ General Contractor/ Developer Information

Homebuilder/ General Contractor/ Developer's Name:

G.L. Homes of Florida, Inc.

Address:    1600 Sawgrass Corp Parkway, Suite 400
Sunrise, FL 33323

Phone:    (        )        -

**+ Attach Copy of Construction/Renovation Contract**
**+ Attach Copy of New Home Warranty Declaration**

### Section IX. Drywall Installer

Drywall Installer's Name:

Boynton Beach Associates XVI, LLP

Address:    1600 Sawgrass Corporate Pkwy, Suite 400
Sunrise, FL  33323

Phone:    ( 954 )  753 - 1730

### Section X. Drywall Supplier

Drywall Supplier's Name:

Banner Supply Company

Address:    7195 NW 30 Street
Miami, FL 33122

Phone:    (        )        -

Dieuvil, Guilfort - 0002

Plaintiff Profile Form - Residential Properties

**Section XI. Verification of Plaintiff Profile Form**

I declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S.C. § 1746 that all information provided in this Plaintiff Profile Form is true and correct to the best of my knowledge, and that I have supplied all of the documents requested in this declaration to the extent that such documents are in my possession, custody or control.

| | | | |
|---|---|---|---|
| _____ | 03/07/13 | _____ | _____ |
| Claimant's Signature | Date Signed | Claimant's Signature | Date Signed |
| _____ | _____ | _____ | _____ |
| Claimant's Signature | Date Signed | Claimant's Signature | Date Signed |
| _____ | _____ | _____ | _____ |
| Claimant's Signature | Date Signed | Claimant's Signature | Date Signed |

Dieuvil, Guilfort - 0003

## Structural Element for Building 1

| No. | | |
|---|---|---|
| 1. | Exterior Wall 1 | CB STUCCO |
| 2. | Year Built | 2006 |
| 3. | Air Condition Desc. | HTG & AC |
| 4. | Heat Type | FORCED AIR DUCT |
| 5. | Heat Fuel | ELECTRIC |
| 6. | Bed Rooms | 6 |
| 7. | Full Baths | 5 |
| 8. | Half Baths | 1 |
| 9. | Roof Structure | WOOD TRUSS |
| 10. | Roof Cover | CONC. TILE |
| 11. | Interior Wall 1 | DRYWALL |
| 12. | Floor Type 1 | CERAM/QARY TILE |
| 13. | Floor Type 2 | CARPETING |
| 14. | Stories | 2.0 |



### Sketch for Building 1

## Subarea and Sq. Footage for Building 1

| No. | Code Description | Sq. Footage |
|---|---|---|
| 1. | BAS BASE AREA | 2935 |
| 2. | FOP FINISHED OPEN PORCH | 190 |
| 3. | FGR FINISHED GARAGE | 313 |
| 4. | FOP FINISHED OPEN PORCH | 98 |
| 5. | FGR FINISHED GARAGE | 486 |
| 6. | FUS FINISHED UPPER STORY | 2660 |
| 7. | FOP FINISHED OPEN PORCH | 56 |
| 8. | FOP FINISHED OPEN PORCH | 190 |
| | Total Square Footage : | 6928 |
| | Total Area Under Air : | 5595 |

Dieuvil, Guilfort - 0004

# EXHIBIT B



October 14, 2013

VIA E-mail - guilf5@hotmail.com and U.S. Mail

Guilfort and Magdadene Dieuvil
8757 Baystone Cove
Boynton Beach, FL 33473-4877

      Re:  Lot  79 Canyon Isles, 8757 Baystone Cove, Boynton Beach (the "Home")

Dear Mr. and Mrs. Dieuvil:

      As you are aware, on April 8, 2009 we conducted a visual inspection of your Home and observed indications consistent with the presence of Chinese drywall ("cdw").  After extensive negotiations with you, we obtained a building permit in March 2010 and commenced repairs in September 2010.  The cdw was removed from the Home and we removed and replaced the plumbing, electric and insulation.  Unfortunately, at that stage of reconstruction you refused to let us complete the work.  Accordingly, we vacated the premises in December 2010, the building permit expired and we have not had further access to your Home since you demanded we cease the reconstruction in December 2010.  To our knowledge, the cdw repair work at the Home was suspended after insulation was installed and just prior to the installation of new drywall.  We have no knowledge of what has been done in the Home since December, 2010, if anything.

      Recently, you communicated with us via email requesting certain documentation related to the repair work we conducted.  While you still have not advised us as to the reason you have requested these documents, we assume you need this information to submit a claim through the MDL-2047 cdw claims process.  For that reason, attached are the following documents:

1.     Original Warranty Deed dated January 9, 2007 between Boynton Beach Associates XVI, LLLP and Guilfort Dieuvil;

2.     Purchase Contract regarding Canyon Isles Lot 79 executed on March 28, 2005;

3.     Standard Construction Agreement for Canyon Isles between Boynton Beach Associates XVI, LLLP, G.L. Homes Building Corporation and Beta Drywall, LLC dated March 16, 2006;

4.     Copy of the Permit History with regard to Chinese Drywall repairs filed with Palm Beach County;

5.     Scope of Work agreement dated April 15, 2010; and

6.     Six (6) photos of the a/c coils and the drywall that was removed from the Home.

Guilfort and Magdadene Dieuvil
Canyon Isles Lot 79
October 14, 2013
Page Two


Although we are under no obligation to supply this information to you, we have done so as a courtesy. From this information, you can verify that Beta Drywall, LLC was the installer of the original drywall in your Home, which included cdw. Further, you can see that Knauf Tianjin drywall did exist in the Home and all the drywall was removed from your Home during our repair process. Of course, we cannot verify for you who the supplier and/or distributor of the drywall used in your Home was as we do not possess such information and were not in privity with the supplier or distributor.

Finally, we understand your lender has obtained a final judgment of foreclosure and the property is scheduled to be sold on October 23, 2013. To the extent the Home is sold at a foreclosure sale, such sale may impact any claim you have in the MDL-2047 and you should seek advice of counsel as appropriate.

Sincerely,

BOYNTON BEACH ASSOCIATES XVI, LLLP

Heather C. Keith
Assistant General Counsel

HCK/bcm

Enclosures

cc:   Brown Greer
      CDW/MDL Claims Administrator
      (Via email: cdwquestions@browngreer.com with enclosures)

      Kyle Spaulding, Esq.
      Frilot L.L.C.
      (Via email: kspaulding@frilot.com with enclosures)

CFN 20070024961
OR BK 21310 PG 1742
RECORDED 01/17/2007 12:42:37
Palm Beach County, Florida
AMT 1,142,015.00
Doc Stamp 7,994.70
Sharon R. Bock, CLERK & COMPTROLLER
Pgs 1742 - 1743; (2pgs)

RETURN TO:
NOVA TITLE COMPANY
1401 UNIVERSITY   SUITE 402
CORAL SPRING   33071-8909
(954) 755-9889

W/C 84

## SPECIAL WARRANTY DEED

THIS INDENTURE is made this ___9___ day of January, 2007, between BOYNTON BEACH ASSOCIATES XVI, LLLP, a Florida limited liability limited partnership ("Seller") whose post office address is 1600 Sawgrass Corporate Parkway, Suite 300, Sunrise, Florida 33323, and Gullfort Dieuvil, a married man ("Buyer"), whose Social Security Numbers are _____ and _____, respectively, and whose post office address is 8757 Baystone Cove, Boynton Beach, Florida 33437.

WITNESSETH, that Seller, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration to Seller in hand paid by Buyer, the receipt and sufficiency of which are hereby acknowledged, has granted, bargained and sold, and hereby grants, bargains and sells to Buyer, and Buyer's heirs, successors and assigns forever, the following described land, with a Property Appraiser's Identification Number of 00 42 45 32 03 000 0790.

 Lot   79  , CANYON ISLES - PLAT TWO, according to the plat thereof, as recorded in Plat Book 105 at Page 40, of the Public Records of Palm Beach County, Florida.

THIS CONVEYANCE AND TITLE TO SAID PROPERTY is subject to: (a) taxes and assessments for the present year and subsequent years, including, but not limited to, pending and certified county or municipal improvement liens; (b) restrictions, reservations, conditions, limitations, easements and other matters of record or imposed by governmental authorities having jurisdiction or control over the subject property, but this reference shall not operate to reimpose any of same; (c) all laws, ordinances, regulations, restrictions, prohibitions and other requirements imposed by governmental authorities, including, but not limited to, all applicable zoning, building, bulkhead, land use and environmental ordinances, rules and regulations, and rights or interests vested in the United States of America and/or the State of Florida; (d) those certain covenants, restrictions, agreements and lien rights set forth in Exhibit "A" attached hereto and by this reference made a part hereof; (e) the Declaration of Covenants, Restrictions and Easements for Canyon Isles, dated January 18, 2006 and recorded January 20, 2006 in Official Records Book 19920, at Page 216 of the Public Records of Palm Beach County, Florida, as amended and/or supplemented from time to time; (f) the plat of Canyon Isles – Plat One, as recorded in Plat Book 105, at Page 1 of the Public Records of Palm Beach County, Florida; (g) the plat of Canyon Isles – Plat Two, as recorded in Plat Book 105, at Page 40 of the Public Records of Palm Beach County, Florida; and (h) the plat of Canyon Isles – Plat Three, as recorded in Plat Book 105, at Page 61 of the Public Records of Palm Beach County, Florida.

SELLER does hereby specially warrant the title to said land, subject to the foregoing matters, and will defend same against the lawful claims of all persons claiming by, through or under Seller and no others.

IN WITNESS WHEREOF, Seller has hereunto set Seller's hand and seal the day and year first above written.

WITNESSES:

            BOYNTON BEACH ASSOCIATES XVI, LLLP, a
            Florida limited liability limited partnership

            By: Boynton Beach XVI Corporation, a Florida
            corporation, its general partner

Print Name of Witness: Jennifer Fowler    By: _____
               N. Maria Menendez, Vice President

Print Name of Witness: Kathleen M Coffman

STATE OF FLORIDA
COUNTY OF BROWARD

The foregoing instrument was acknowledged before me this ___9___ day of January, 2007, by N. Maria Menendez, as Vice President of Boynton Beach XVI Corporation, a Florida corporation, the general partner of Boynton Beach Associates XVI, LLLP, a Florida limited liability limited partnership, on behalf of said corporation and limited liability limited partnership. She is personally known to me.

_____
Notary Public
My Commission Expires:

This Instrument prepared by:
HENRY W. JOHNSON, ESQ.
HUME & JOHNSON, P.A.
1401 University Drive, #301
Coral Springs, Florida 33071
(954) 755-9880

KATHLEEN M. COFFMAN
Notary Public - State of Florida
My Commission Expires Mar 18, 2009
Commission # DD 391078
Bonded By National Notary Assn.

**EXHIBIT "A"**
**COVENANTS, RESTRICTIONS, AGREEMENTS AND LIEN RIGHTS**

The title to the property described in the Special Warranty Deed to which this **Exhibit "A"** is attached (the "Deed") shall be subject to and burdened by the covenants, restrictions, agreements and lien rights set forth below.

1.    Capitalized Terms and Definitions.  All initial capitalized terms used in this **Exhibit "A"** but not defined herein shall have the meanings given to such terms as set forth in the Deed.  The following terms as used in this **Exhibit "A"** shall have the meanings given to such terms as set forth below.

"Gain" shall mean and refer to the amount, if any, by which: (i) the gross selling price of the Property (less and except: (y) the actual, documented costs of any physical improvements made by Buyer after the date of the Deed to the exterior of the home on the Property such as pools, patios, screen enclosures and extensions, and (z) the actual, documented closing costs required to be paid by Buyer in connection with the sale of the Property such as documentary stamp taxes, recording fees and/or brokerage commissions), exceeds (ii) the "Total Purchase Price" paid to Seller by Buyer pursuant to and as defined in the Purchase Contract executed by Seller and Buyer.

"Hardship Event" shall mean and refer to a sale, transfer, lease or sublet of the Property, as appropriate, following a divorce of the Buyers (if married to each other), death or serious disability of one or more of the Buyers, job transfer of one or more of the Buyers to a location greater than fifty (50) miles from the Property, or other reason acceptable to Seller in Seller's sole and absolute discretion, as evidenced by a written waiver of this provision given by Seller.

"Property" shall mean and refer to the property described in the Deed together with the improvements thereon.

"Transfer Advertisement or Agreement" shall mean and refer to any or all of the following: (i) any listing or advertisement for the sale or lease of the Property or any portion thereof made with a broker, in any multiple listing service, in any classified or other advertisement, or otherwise (including, without limitation, "by owner"), (ii) any agreement (verbal or written) for transfer of title to the Property to any third party, and/or (iii) any agreement (verbal or written) for the leasing and/or subletting of the Property or any portion thereof, notwithstanding anything to the contrary in the Declaration.

2.    Sales/Transfers of the Property.  In the event that Buyer sells or transfers title to the Property (directly or indirectly): (a) at any time within one (1) year following the date of the Deed, and/or (b) at any time thereafter if such sale or transfer results from a Transfer Advertisement or Agreement made or entered into within one (1) year following the date of the Deed, then except only in the event of a Hardship Event released by Seller as provided in Paragraph 4 below, Buyer shall pay to Seller from the proceeds of such sale or transfer, an amount equal to one-hundred percent (100%) of the Gain realized from such sale or transfer.

3.    No Leasing of the Property.  Notwithstanding anything to the contrary in the Declaration, for a period of one (1) year following the date of the Deed, except only in the event of a Hardship Event released by Seller as provided in paragraph 4 below, Buyer shall not lease and/or sublet the Property or any portion thereof.  Any such lease and/or sublet shall be void and unenforceable.  All other leases or sublets, including those resulting from such a Hardship Event, shall be subject to the terms and conditions of the Declaration.

4.    Lien Rights; Releases.  There is and shall be a lien against the Property to secure Buyer's obligations set forth in this **Exhibit "A"**, which lien may be foreclosed on by Seller if Buyer breaches any of its obligations hereunder.  In the event of a proposed sale, transfer, lease or sublet of the Property due to a Hardship Event, Buyer must first provide to Seller evidence of such Hardship Event acceptable to Seller in Seller's sole and absolute discretion, and if acceptable to Seller, Seller shall deliver to Buyer a written acknowledgment of the Hardship Event and waiver of Seller's rights hereunder with respect only to such sale, transfer, lease or sublet.  In addition, upon written request from Buyer to Seller and payment of the Gain due to Seller in connection with any sale or transfer of the Property as provided in this **Exhibit "A"**, then Seller shall provide to Buyer a written acknowledgment of such payment and release of Seller's lien rights with respect only to such sale or transfer provided that Buyer provides Seller with evidence satisfactory to Seller in Seller's sole and absolute discretion of the amount of the Gain due, including, without limitation closing or other settlement statements. Any release provided by Seller shall be specific only to the particular sale, transfer, lease or sublet described in the release and not to any subsequent sale, transfer, lease or sublet which shall remain subject to this **Exhibit "A"**.

5.    Binding and Running with Title to the Property.  The covenants, restrictions, agreements and lien rights set forth in this **Exhibit "A"** shall burden and run with title to the Property.

6.    Remedies.  In addition to its right of foreclosure, Seller shall have all remedies at law and/or in equity for a breach by Buyer under this **Exhibit "A"**.  In the event that Seller prevails in any action (legal or otherwise) to enforce its rights and/or Buyer's obligations, Seller shall be entitled to recover all of its costs incurred including, without limitation, reasonable attorneys' fees, through and including all appellate levels.  By acceptance of the Deed to the Property, Buyer, for itself, and its successors and assigns waives any homestead or other exemption now or hereafter existing or enacted under either Florida or federal law as same may relate to Seller's rights hereunder.

7.    Subordination.  This **Exhibit "A"** shall be subordinate to the right of any holder of an institutional first mortgage on the Property and shall not apply to any sales or leases by an institutional first mortgagee who acquires title to the Property by foreclosure or deed in lieu of foreclosure.

8.    Miscellaneous.  This **Exhibit "A"** shall be construed in accordance with the laws of the State of Florida and shall be binding on Buyer and Buyer's heirs, successors and assigns. In that regard, all references to Buyer in this **Exhibit "A"** shall also mean and refer to each and every of Buyer's heirs, successors and/or assigns. Should any term or provision of this **Exhibit "A"** be ruled to be illegal or otherwise invalid by a court of competent jurisdiction, such term or provision shall be given its nearest legal meaning or be construed as deleted as such court determines, and the same will not invalidate the remaining terms and provisions of this **Exhibit "A"**, which terms, provisions and portions of this Contract will remain in full force and effect. This **Exhibit "A"** may not be amended or modified except by an instrument in writing executed by Seller.

## PURCHASE CONTRACT – CANYON ISLES

This Purchase Contract (the "Contract") is made between Seller, whose name is set forth below and whose address is 1401 University Drive, Suite 200, Coral Springs, Florida 33071-6039, and Purchaser, whose name and U.S. address are set forth below, for the purchase of the Lot as set forth below

**NAME AND ADDRESS OF PURCHASER:**

Purchaser: _Mirifort & Magdadene Dieuvil_

Social Security No. _593 95 2039_      Social Security No _____

☐ Permanent
Address _1425 NW 192nd Terr._      ☐ Local
Address _____
(check address to be used for the mailing of notices)

City: _Miami_      City _____

State: _Florida_   Zip: _33169-3444_      State _____ Zip _____

Telephone
(Home) _(305) 654 6099_ (Bus.) _____      Telephone
(Home) _(561) 732-7686_ (Bus) _786-344 549_

Fax Number _____      Fax Number _____

Purchaser hereby agrees to purchase, and Seller hereby agrees to sell and convey to Purchaser, real property comprising a residential lot and a detached house, as more particularly described below

**LOT.** The real property being purchased is Model _Julian 85_ on Lot _79_ in the community known as Canyon Isles (hereinafter defined as the "Home") in Boynton Beach, Florida

Plat Information (the "Plat") Name: _Canyon dales_

Plat Book _TBD_, Page _TBD_, Public Records of Palm Beach County, Florida

**PURCHASE PRICE.** The following items comprise the Purchase Price

|  | Price |
|---|---|
| House . . . | $ _928,900_ |
| Lot Premium . . . | $ _95,000_ |
| Option Items  Addendum Numbers: _Crystal 1626_  Total Option Items | $ _—0—_ |
| Other. _____ | $ _—0—_ |
| TOTAL PURCHASE PRICE . . . | $ _1,023,900_ |

**METHOD OF PAYMENT.** Purchaser agrees to pay the TOTAL PURCHASE PRICE in U.S. currency to Seller as follows

a) Reservation Deposit (if any) paid prior to the date of execution of this Contract      $ _5,000_

b) Deposit of five percent (5%) of Total Purchase Price, less Reservation Deposit, if any, paid upon execution of this Contract by Purchaser, receipt of which is acknowledged, subject to collection      $ _46,195_

c) Additional deposit of five percent (5%) of Total Purchase Price due thirty (30) days from the date of the execution of this Contract by Purchaser (i e , _____ , 200_5_ )      $ _51,195_

d) Mortgage Proceeds, subject to the conditions contained in Section A of the Standard Provisions      $ _921,500_

e) Balance of Total Purchase Price due in cash at closing      $ _—10_

TOTAL PURCHASE PRICE .      $ _1,023,900_

**CLOSING.** The estimated closing date of this transaction is _June / July_ , 200_6_
This date is for estimating purposes only  The actual closing date will be determined by (but not limited to) the conditions contained in Paragraphs E 3, E 4 and E 5 of the Standard Provisions

**DEPOSIT FUNDS - NOTICE TO PURCHASER.** THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10 PERCENT OF THE PURCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER  PURCHASER UNDERSTANDS THAT IF THE ABOVE RIGHT IS NOT WAIVED BY PURCHASER, ALL FUNDS (UP TO 10% OF THE PURCHASE PRICE) SHALL BE PLACED IN AN INTEREST BEARING ESCROW ACCOUNT ("ESCROW ACCOUNT") WITH NOVA TITLE COMPANY ("ESCROW AGENT")  In that regard, Purchaser hereby agrees as follows:

(Initial One)   (Check One)

_MD_  _GD_  ☐ A  Purchaser hereby waives the right to have the deposit funds placed in an interest-bearing escrow account and agrees that all deposits may be used by Seller solely for construction purposes, OR

_____  ☐ B.  Purchaser does not waive the right to have all of the deposit funds (up to 10% of the Purchase Price) placed in an interest-bearing escrow account, subject to the terms and conditions imposed by Paragraph G 1 of the Standard Provisions, which include, among others, that Seller can charge Purchaser interest on the money that Seller will have to borrow for construction purposes, or if Seller obtains a master surety bond, that Purchaser shall pay to Seller an amount equal to the premium for the applicable portion of said surety bond securing Purchaser's deposit funds  See Paragraph G 1 of the Standard Provisions.

**STANDARD PROVISIONS.** The Standard Provisions set forth on the following pages are incorporated herein and are an integral part of this Contract  Purchaser acknowledges having read same and agrees thereto

**THIS CONTRACT SHALL NOT BE BINDING ON SELLER UNTIL FULLY EXECUTED BY SELLER.**

_[signature]_
PURCHASER (1)

_[signature]_
PURCHASER (2)

BOYNTON BEACH ASSOCIATES XVI, LLLP,
a Florida limited liability limited partnership ("Seller")

By:   Boynton Beach XVI Corporation,
a Florida corporation, its general partner

By. _[signature]_
Authorized Signatory

DATE _3/24/05_      DATE _3/28/05_

Last Revision Date 07/10/04

# STANDARD CONSTRUCTION AGREEMENT

### Project: CANYON ISLES

This Standard Construction Agreement ("Agreement") is made the ___ day of _____ 20__ by and among BOYNTON BEACH ASSOCIATES XVI, LLLP ("Owner"), G.L. Homes Building Corporation ("Construction Manager"), and BETA DRYWALL, LLC ("Subcontractor"). By this Agreement: (a) Owner engages, authorizes, and designates Construction Manager to manage the construction of certain improvements at CANYON ISLES ("Project") and to obtain building permits for such improvements, (b) Construction Manager accepts the duty and responsibility of managing the construction of certain improvements at the Project and of obtaining building permits for such improvements, and (c) Owner, Construction Manager and Subcontractor set forth the terms and conditions pursuant to which Subcontractor is to perform the "Work" (as hereinafter defined) required to be completed under this Agreement.

Witnesseth that Owner, Construction Manager, and Subcontractor (collectively, "Parties") for the consideration named in the "Contract Documents" (as hereinafter defined), and other valuable consideration, agree as follows:

ARTICLE I. SCOPE OF WORK

Subcontractor will furnish all materials, personnel, supervision, labor, services, plant, facilities, appurtenances, tools, supplies, transportation, equipment (by way of example, but not limitation, cranes, generators, hoists, scaffolds, and pumps), and machinery, as well as, any and all other items necessary to perform and complete all of the work relating to Subcontractor's trade as set forth in Exhibit "A" ("Work"). Subcontractor acknowledges that the "Specifications" (as hereinafter defined) may not set forth certain details and may omit certain items relating to the Work; notwithstanding the omission of such details and items however, if the work in connection with said omitted details and items would normally be considered as part of or within the scope of the Work, then said work shall be deemed to be, and is to be performed and completed by Subcontractor as, part of the Work. It is the intent of the Parties that Subcontractor will fully perform and complete the Work in accordance with the Contract Documents at no additional cost, charge, or expense to Owner in excess of the stated "Contract Sum" and/or the "Option Sum" (as those terms are hereinafter defined) as specified in Article IV below.

The Work will be performed and completed by Subcontractor: (a) in strict accordance with (i) the drawings, plans, and specifications provided by Owner ("Specifications"), (ii) all applicable building and zoning laws, codes, ordinances, rules, and regulations, (iii) the Contract Documents, (iv) the requirements of the Project, and (v) the directions of Owner and Construction Manager; (b) in a first class workmanlike manner free from all defects and deficiencies; and, (c) to the satisfaction of Owner and Construction Manager.

ARTICLE II. TIME OF COMPLETION

The Work to be performed and completed under this Agreement by Subcontractor shall be performed and completed by Subcontractor according to the production schedule as determined (and as may be amended from time to time) by Owner and/or Construction Manager ("Schedule"). TIME IS OF THE ESSENCE IN THE PERFORMANCE OF THE CONTRACT DOCUMENTS (INCLUDING, BUT NOT LIMITED TO, THIS AGREEMENT) and Subcontractor agrees to perform and complete the Work in strict accordance with the Contract Documents and the Schedule. If in the opinion of Owner or Construction Manager Subcontractor fails to strictly adhere to the Schedule, then Owner and/or Construction Manager shall have the right to: (a) hire other persons and/or entities to do any and all work necessary to bring the Work into compliance with the Schedule, and (b) charge Subcontractor (including the deduction of payment from any monies due or that may come due Subcontractor) for all costs and expenses incurred by Owner and/or Construction Manager in connection with bringing the Work into compliance with the Schedule.

The Parties agree that Owner and Construction Manager will each share the exclusive right: (a) to determine the timing, order, and priority of all work to be performed at the Project, including, but not limited to, the Work to be performed and completed by Subcontractor under this Agreement, and (b) to temporarily suspend the performance of any work at the Project, including, but not limited to, the Work to be performed by Subcontractor under this Agreement. In the event of a temporary suspension of the Work, Subcontractor shall have no claim, and Subcontractor hereby waives any and all claims, against Owner or Construction Manager for damages of any kind or nature, whatsoever, in connection with any such temporary suspension.

ARTICLE III. TERM

This Agreement is for a period of eighteen (18) months commencing on the date on which this Agreement is fully executed by the Parties ("Term"). The Term may be extended only by the written consent of Owner and Construction Manager and only for such period of time as may be determined in writing by Owner and Construction Manager. In the event the Term is extended ("Extended Term"), then all of the terms and conditions of the Contract Documents shall continue to remain in full force and effect during the Extended Term. Entry into any subsequent agreement by Owner, Construction Manager, and Subcontractor (or any combination thereof) covering different lots in the Project, or a different project entirely, will have absolutely no effect on the Term (or Extended Term, if applicable). Notwithstanding anything contained in the Contract Documents to the contrary, Subcontractor acknowledges and agrees that nothing in the Contract Documents constitutes any guaranteed amount of Work (specifically) or work (generally).

ARTICLE IV. CONTRACT SUM AND OPTION SUM

Subcontractor acknowledges and agrees that Owner, and not Construction Manager, will be solely responsible for any and all payments of Contract Sums and Option Sums due and owing to Subcontractor. Owner will pay Subcontractor (a) the amount as set forth in the Contract Sum Addendum ("Contract Sum") attached hereto as Exhibit "B" for the performance and completion of the Work, and (b) the amounts as set forth in the Option Addendum ("Option Sum") attached hereto as Exhibit "B-1" for the performance and completion of options, if any. The Contract Sum and the Option Sum are both, separately and independently, subject to a ten percent (10%) holdback at the discretion of Owner.

Final payment on all holdbacks will be made by Owner to Subcontractor within ninety (90) days following the completion of the Work by Subcontractor and the proper submission of a Payment Voucher by Subcontractor to Owner as specified in Article V below. Completion of the Work will be verified by Owner and Construction Manager. No Work will be deemed completed unless and until all "Owner Punchlist Items," if any, have also been completed by Subcontractor. The Contract Sum and the Option Sum will remain firm and continue in full force and effect for the Term (and the Extended Term, if applicable), but subject to reduction in amount in accordance with the Contract Documents.

ARTICLE V. PROGRESS PAYMENTS

Owner will make progress payments at the stages and in the amounts as set forth in the Contract Sum Addendum and in the Option Addendum. Owner will make progress payments on the 1st and 15th of the month provided the following submissions are properly and timely made by Subcontractor and received by Owner: (a) All Payment Vouchers received by Owner at Owner's "Corporate Office" (located at the address set forth below the signature line for Owner) by 5:00 p.m. on the 1st day of a month will be paid on the 1st day of the following month, and (b) Payment Vouchers received by Owner at Owner's Corporate Office by 5:00 p.m. on the 15th day of the month will be paid on the 15th day of the following month. It is the responsibility of Subcontractor to (i) deliver Payment Vouchers to Owner's Corporate Office on a timely basis, (ii) document the date Subcontractor delivered the Payment Voucher to Owner's Corporate Office, and (iii) document the date on which Owner received the Payment Voucher at Owner's Corporate Office.

Subcontractor shall not submit a Payment Voucher for payment on any Work performed unless said Work has been fully completed; it being the intention of the Parties that Subcontractor is not and shall not be entitled to any payment for any partially completed Work except as may otherwise be expressly provided for in the Contract Documents. ANY PAYMENT VOUCHERS SUBMITTED BY SUBCONTRACTOR, WHETHER FOR WORK (INCLUDING ANY WORK PERFORMED BY SUBCONTRACTOR IN CONJUNCTION WITH OR IN EXCESS OF THE SCOPE OF WORK UNDER THIS AGREEMENT) OR FOR OPTIONS, MORE THAN SIXTY (60) DAYS AFTER COMPLETION OF SAID WORK, ADDITIONAL WORK, AND/OR OPTIONS WILL NOT BE PAID BY OWNER. Notwithstanding anything contained in the Contract Documents to the contrary, Owner has the absolute right to withhold any and all payments due Subcontractor when Subcontractor has failed to strictly comply with the terms and conditions of the Contract Documents.

Subcontractor _____
Owner _____

## STANDARD CONSTRUCTION AGREEMENT

Subcontractor will deliver to Owner original and properly executed Affidavits and Releases of Lien on a per lot basis simultaneously with Subcontractor's delivery of Payment Vouchers before Owner has any obligation to make any payment to Subcontractor. The Payment Voucher shall be in the form of Exhibit "C" and the form of Affidavit and Release of Lien shall be in the form of Exhibit "C-1" (as both forms may be modified by Owner or Construction Manager from time to time). The Affidavits and Releases of Lien submitted by Subcontractor will confirm that, among other things, all materials and labor for the Work purchased, performed, and completed have been paid for in full by Subcontractor.

Subcontractor will deliver to Owner original and properly executed Waivers and Releases of Lien from Subcontractor's subcontractors, laborers, and suppliers simultaneously with Subcontractor's delivery of Payment Vouchers before Owner has any obligation to make any payment to Subcontractor. The Waivers and Releases of Lien shall be in the form of Exhibit "C-2" (as the same may be modified by Owner or Construction Manager from time to time). If any "Notices to Owner" (as that term is defined by the Florida Construction Lien Law from time to time) are filed by any subcontractor, laborer, or supplier of Subcontractor against the Project, or any part thereof, Owner shall not be obligated to make any payment to Subcontractor until the original corresponding Waivers and Releases of Lien, properly executed, are provided to Owner.

Owner, in its sole discretion, may issue joint checks to subcontractors and/or materialmen of Subcontractor or single party checks directly to subcontractors or materialmen of Subcontractor. Subcontractor hereby (a) authorizes Owner to (but acknowledges that Owner is under no obligation to) make direct payment to any unpaid lienors listed in any affidavit and release of lien delivered to Owner, and (b) authorizes Owner to deduct such direct payments to unpaid lienors from any unpaid balance due or that may come due to Subcontractor. In the event that the amount of any such payment(s) exceed the unpaid balance due or that may come due to Subcontractor, Subcontractor shall immediately pay the difference to Owner, together with interest thereon at the rate of eighteen (18%) percent per annum from the date such payment(s) are made by Owner through and until the date such difference is paid by Subcontractor to Owner. Owner and/or Construction Manager may, from time to time, require Subcontractor to provide, and Subcontractor hereby agrees to provide, to Owner and/or Construction Manager from time to time, lists of its subcontractors and lists of all suppliers delivering material to the Project and/or proof of payments to such subcontractors and suppliers.

Upon final billing, Subcontractor shall furnish Owner with properly executed Final Payment Waivers and Releases of Lien in the form of Exhibit "C-3" on a per lot basis, for all persons and/or entities (including, without limitation, Subcontractor) that have performed or provided any labor, materials or services in connection with or under this Agreement.

It is imperative that all matters regarding payment for any Work performed be resolved in a timely manner. Accordingly, except as may otherwise be specifically provided to the contrary under the Florida Construction Lien Law, all claims for payment in favor of Subcontractor will expire and become null and void ninety (90) days after completion of the Work giving rise to said claim for payment. Subcontractor's lien rights, if any, for the Work performed shall be on a per lot basis only. In this regard, Subcontractor's lien rights on a particular lot, if any, will solely be in connection with the portion of the Work performed by Subcontractor on that particular lot, and not in connection with the portion of the Work performed by Subcontractor on any other lot, notwithstanding anything contained to the contrary in this Agreement or otherwise.

ARTICLE VI.  CONTRACT DOCUMENTS

The term "Contract Documents" shall include, collectively, the Specifications, this Agreement, the General Conditions of the Agreement and Exhibits "A" through and including "E-1" to this Agreement all of which are attached hereto and made a part hereof (Scope of Work is attached hereto and made a part hereof as Exhibit "A"; Contract Sum Addendum is attached hereto and made a part hereof as Exhibit "B"; Option Addendum is attached hereto and made a part hereof as Exhibit "B-1"; Payment Voucher is attached hereto and made a part hereof as Exhibit "C"; Affidavit and Release of Lien is attached hereto and made a part hereof as Exhibit "C-1"; Waiver and Release of Lien is attached hereto and made a part hereof as Exhibit "C-2"; Final Payment Waiver and Release of Lien is attached hereto and made a part hereof as Exhibit "C-3"; Certificate of Insurance Form is attached hereto and made a part hereof as Exhibit "D"; Field Conditions is attached hereto and made a part hereof as Exhibit "E"; and, Customer Service Performance Standards is attached hereto and made a part hereof as Exhibit "E-1"). The Contract Documents constitute the entire agreement between Owner, Construction Manager, and Subcontractor.

ARTICLE VII.  CONSTRUCTION MANAGER

Owner engages, authorizes, and designates Construction Manager to manage the construction of certain improvements at the Project, and Construction Manager accepts the duty and responsibility of managing the construction of certain improvements at the Project for and on behalf of Owner.

SUBCONTRACTOR:  BETA DRYWALL, LLC

By: _____   Title _President_   Date _3/16/06_

6601 LYONS ROAD SUITE I-10
COCONUT CREEK, FLORIDA 33073
954-429-2842

CONSTRUCTION MANAGER:  G.L. HOMES BUILDING CORPORATION

By: _____   Title _Pres._   Date _3/17/06_

1401 UNIVERSITY DRIVE
SUITE 200
CORAL SPRINGS, FL 33071
(954)753-1730

OWNER:  BOYNTON BEACH ASSOCIATES XVI, LLLP

By: _____   Title  Contracts Manager   Date _3/16/06_

1401 UNIVERSITY DRIVE
SUITE 200
CORAL SPRINGS, FL 33071
(954)753-1730

Bldg Plan Review/Inspection History - Print                                        Page 1 of 2

Print    Close

## Bldg Plan Review/Inspection History

App/Permit No: B-2010-004393-0000

| | | | |
|---|---|---|---|
| Permit Desc: | Alterations - Residential | Further Desc: | R/R drywall and insulation like for like. |
| Application Date: | 03/10/2010 | Status: | Permit Cancelled |
| Issued Date: | 03/16/2010 | Completion Date: | |
| Active Days Remaining: | 0 | Balance Due: | $ 0.00 |
| Projected Inactive Date: | | | |

PCN: 00-42-45-32-03-000-0790

Owner: Dieuvil, Guilfort

Contractor: GL Building Corp

Address: 8757 Baystone Cv, Boynton Beach, 33437

Fees not finalized until permit issuance

### Review Summary

| Date | HOLD | INTAKE STAFF | ATIC | PERMIT TECH | PE-B | PE-E | PE-M | PE-P | DATA ISSUANCE | ACCT CASHIER |
|---|---|---|---|---|---|---|---|---|---|---|
| Current Status | | A | A | A | A | A | A | A | A | A |
| 03/10/2010 | | X | X | | | | | | | |
| 03/15/2010 | | | A | A | A | A | A | A | | |
| 03/16/2010 | | | | | | | | | A | |
| 03/17/2010 | | | | | | | | | | X |
| 03/25/2010 | | | | | | | | | | A |
| Current Status | HOLD | INTAKE STAFF | ATIC | PERMIT TECH | PE-B | PE-E | PE-M | PE-P | DATA ISSUANCE | ACCT CASHIER |
| Elapsed Time (Days) | | 1 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 2 |

Total Days in Review: 11                                                Total Days In-House: 5
Total Business Days: 5                                        Total Building Review Days: 4

X-Processing     C-Processing ended with comment  CD-Checked out documents
H-Hold process  A-Processing ended with approval  HR-Hold removed

### Review History

| Date/Time | Reference No | Rev | Rnw | App Status | Agency/Section | Reviewer | Review Status | Action | C |
|---|---|---|---|---|---|---|---|---|---|
| 03/10/2010 15:07:51 | B-2010-004393-0000 | | | Submitted | Intake Staff | Boatwright, Joy E | | Application Submitted | |
| 03/10/2010 15:17:12 | B-2010-004393-0000 | | | In Process | ATIC | Valdez, Eva G | Unassigned | Package sent to agency/section Permit Tech | |
| 03/10/2010 16:06:57 | B-2010-004393-0000 | | | In Process | Permit Tech | Boatwright, Joy E | Assigned | Application assigned to reviewer | |
| 03/15/2010 08:10:52 | B-2010-004393-0000 | | | In Process | Permit Tech | Boatwright, Joy E | In Review | Application review started | |
| 03/15/2010 08:12:18 | B-2010-004393-0000 | | | In Process | Permit Tech | Boatwright, Joy E | Approved | Application approved by reviewer | |
| 03/15/2010 15:23:15 | B-2010-004393-0000 | | | In Process | PE-B | Knapp, George F | Assigned | Application assigned to reviewer | |
| 03/15/2010 15:23:47 | B-2010-004393-0000 | | | In Process | PE-B | Knapp, George F | In Review | Application review started | |
| 03/15/2010 15:25:39 | B-2010-004393-0000 | | | In Process | PE-B | Knapp, George F | Approved | Application approved by reviewer | |
| 03/15/2010 15:25:44 | B-2010-004393-0000 | | | In Process | PE-E | Knapp, George F | Approved | Application approved by reviewer | |
| 03/15/2010 15:25:49 | B-2010-004393-0000 | | | In Process | PE-M | Knapp, George F | Approved | Application approved by reviewer | |
| 03/15/2010 15:26:27 | B-2010-004393-0000 | | | Agency Approved | PE-P | Knapp, George F | Approved | Application approved by reviewer | |
| 03/15/2010 15:27:07 | B-2010-004393-0000 | | | Agency Approved | ATIC | Knapp, George F | Approved | Application approved by reviewer | |
| 03/15/2010 15:27:07 | B-2010-004393-0000 | | | Ready for Issuance | ATIC | Knapp, George F | Approved | Application approved by reviewer | |
| 03/16/2010 11:22:16 | B-2010-004393-0000 | | | In Process | Data Issuance | Boyd, Patricia G | Approved | Application approved by reviewer | |

Bldg Plan Review/Inspection History - Print

| | | | | Result | | | | Inspector | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/16/2010 11:22:16 | B-2010-004393-0000 | | | Active | System Generated | Boyd, Patricia G | | Permit issued | | | | |
| 03/17/2010 08:48:47 | B-2010-004393-0000 | | | Active | Acct Cashier | Nicar, Vania E | Assigned | Application assigned to reviewer | | | | |
| 03/17/2010 08:48:47 | B-2010-004393-0000 | | | Active | Acct Cashier | Nicar, Vania E | In Review | Application review started | | | | |
| 03/17/2010 08:48:47 | B-2010-004393-0000 | | | Active | Acct Cashier | Nicar, Vania E | In Review | Sign Off reversed by Cashier | | | | |
| 03/25/2010 09:37:03 | B-2010-004393-0000 | | | Active | Acct Cashier | Marta, Lisa M | Approved | Application approved by reviewer | | | | |
| 03/25/2010 09:37:03 | B-2010-004393-0000 | | | Active | Acct Cashier | Marta, Lisa M | Assigned | Application assigned to reviewer | | | | |
| 05/10/2012 10:58:04 | B-2010-004393-0000 | | | Permit Cancelled | System Generated | Sherpitis, Joseph R | | Permit Cancelled - See letter in file from G.L. General Counsel. | | | | |

C -To see comments use the 'All Agency Comments' tab

### All Agency Comments

No data found

### Inspection History

| App / Permit No | Permit Desc | Insp | Insp Desc | F.S | Result | Reasons | Re-Insp Fees | Paid | Inspector | Scheduled ᴬ⁵ | Resulted | Last Updated By | Hist Permit No |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-2010-004393-0002 | General Mechanical | 604 | Rough Mechanical | | Pass | | | | Dishman, James D | 11/23/2010 | 11/24/2010 | Dishman, James D | |
| E-2010-004393-0001 | General Electrical | 205 | Rough Electric | | Pass | | | | Kleinow, Michael D | 11/23/2010 | 11/23/2010 | Kleinow, Michael D | |
| P-2010-004393-0003 | General Plumbing | 704 | Rough Plumbing | | Pass | | | | Sexton, Richard D | 11/24/2010 | 11/24/2010 | Sexton, Richard D | |
| E-2010-004393-0004 | Low Voltage (Sub) | 205 | Rough Electric | | Pass | | | | Kleinow, Michael D | 11/24/2010 | 11/24/2010 | Kleinow, Michael D | |
| M-2010-004393-0002 | General Mechanical | 604 | Rough Mechanical | | Cancel | | | | Dishman, James D | 11/24/2010 | 11/24/2010 | Dishman, James D | |
| B-2010-004393-0000 | Alterations - Residential | 106 | Framing | | Pass | | | | Mcelvy, Thomas W | 12/01/2010 | 12/01/2010 | Mcelvy, Thomas W | |
| P-2010-004393-0003 | General Plumbing | 704 | Rough Plumbing | | Pass | | | | Sexton, Richard D | 12/02/2010 | 12/02/2010 | Sexton, Richard D | |
| B-2010-004393-0000 | Alterations - Residential | 107 | Insulation | | Pass | | | | Bell, Kevin E | 12/07/2010 | 12/07/2010 | Bell, Kevin E | |

| | | | |
|---|---|---|---|
| BL_150_INACTIV_CONTR marked as sent on 08/24/2010 | | Swartz, Robert I | 8/24/2010 8:08:00 AM |
| BL_150_INACTIV_OWNR marked as sent on 08/24/2010 | | Swartz, Robert I | 8/24/2010 8:13:00 AM |
| Permit status changed to Inactive | | System, Epzb | 9/25/2010 7:05:00 PM |
| Permit status changed to Inactive | | System, Epzb | 6/9/2011 7:13:00 PM |
| BL_6MON_INACTIV_CONT marked as sent on 12/12/2011 | | Swartz, Robert I | 12/12/2011 7:24:00 AM |
| BL_6MON_INACTIV_OWNR marked as sent on 12/12/2011 | | Swartz, Robert I | 12/12/2011 7:29:00 AM |

### Inspections Scheduled for this Permit today

The following are scheduled inspections for this permit today. Click on the Inspector Name to view his itinerary

No data found



April 15, 2010

Mr. Guilfort Dieuvil
8757 Baystone Cove
Boynton Beach, FL 33473-4890

Re:   *Scope of Work Agreement for Repairs to Lot 79 Canyon Isles ("Subject Property" or "Home")*
      *Seller of Home – Boynton Beach Associates XVI, LLLP (herein "GL Homes")*
      *Owner(s) of Home – Guilfort Dieuvil (herein, "Owner")*

Dear Mr. Dieuvil:

As you know, we have been investigating concerns in the Canyon Isles community regarding the use of defective Chinese drywall. Based on our ongoing investigation, we believe that certain independent subcontractors purchased and installed defective Chinese drywall in a limited number of our homes and we believe that your Home may contain such drywall. We also understand that certain conditions have been reported within the Subject Property which indicates there may be impacts to copper and some types of electrical wiring and/or other property.

At this time, we believe that the most appropriate repair program involves, among other things, removing and replacing the drywall, as well as repairing or replacing other affected building materials in your Home. It is important to recognize that this is a significant construction project. As such, there is the potential for unforeseen variables that may require alterations to be made throughout the construction process. As you know, we have been working to commence the repair work in your home and this letter will confirm our process for this matter:

1.       GL Homes agrees to repair the Subject Property and return it to its original condition as it existed at the time of the initial closing and as evidenced by the videotape(s) of the Subject Property taken by Visual Evidence, Inc. This work includes, but is not limited to; reinstalling all finishes that were added by GL Homes and/or by the Owner prior to the repair work. This repair work will be done at no cost to the Owner. Please understand that the reconstruction work will not include the reconstruction of any alterations or additions that were made after the original closing if they were done without appropriate permits or are in violation of any applicable code requirements.

Specifics to the repair process are listed as follows:

a)       Remove and replace all drywall (walls and ceiling) in the Subject Property. In some very limited circumstances, domestic drywall may be left intact, only if it is located in an isolated area behind stair-railing and/or bathroom tile baseboard, or along tile edge-line. Dura-rock and/or Hardi-board materials will not be removed or replaced unless damaged during the repair process.

b)       Finish and paint new drywall with same color and quality paint, and replace all wall coverings with same unless otherwise unavailable. If unavailable, alternate selections of like kind and quality will be coordinated with the Owner;

Scope of Work Agreement
Lot 79, Canyon Isles
April 15, 2010
Page 2 of 6

c)   Remove and replace all baseboards, crown moldings and custom moldings with like style and quality. Finish and paint new baseboards, crown moldings and custom moldings with same color and quality paint unless otherwise unavailable. If unavailable, alternate selections of like kind and quality will be coordinated with the Owner;

d)   Remove and replace all wall and ceiling insulation;

e)   Protect tile and hardwood floors during the work and repair any flooring damaged during the repair process. Remove and replace all wall-to-wall carpeting and padding with like style, color and brand unless otherwise unavailable. If unavailable, alternate selections of like kind and quality will be coordinated with the Owner;

f)   Remove, store and re-install all cabinets, countertops, sinks, mirrors and lavatories and the like and repair or replace if damaged during the work;

g)   Bathroom walls with tile shall not be replaced unless the brass fittings or copper piping behind said areas are corroded. If GL Homes is unable to access the brass fittings, copper piping or other plumbing structures to confirm the copper, brass and other metals are unaffected, then GL Homes shall remove and replace the building materials in order to assess the materials and repair or replace any affected materials;

h)   Remove and replace all low-voltage wiring, drywall mounted electrical items that was included in the original Home construction (including outlets, receptacles and switches) and other low voltage equipment (including intercoms, door bells, security alarm and smoke detectors, if applicable);

i)   Inspect all other electrical wiring, drywall mounted electrical items, breakers, main feeder and other electrical wiring that was included in the original Home construction. All of the aforementioned electrical wiring which is discolored black or corroded shall be repaired or removed and replaced. If it is possible to do so without leaving any portion of such items which are discolored black or corroded, a licensed electrician may clip any affected copper, and strip back the insulation so that the exposed wire is the proper length for reinstallation. If the wires are too short, a licensed electrician shall relocate electrical components and/or rewire.

j)   All copper piping will be inspected and any corroded materials will be replaced. There may be original segments of copper throughout the Home that may be left in place in order to allow for reconnection of the new copper piping; however, any areas of copper which are left in place will be cleaned to remove all visible corrosion. Alternatively, GL Homes may elect to remove all visible copper water pipe, abandon any copper below slab and install all new copper water pipe within the walls of the Home;

k)   Remove and replace all other metals which are corroded or discolored black from exposure to defective Chinese drywall including, but not limited to, fixtures, faucets, handles, fasteners, and door hardware;

l)   Remove and replace the A/C air-handler(s) and A/C duct-work;

m)   Unless otherwise damaged, remove and reinstall all wood trim, interior doors, and interior door accessories;

n)   Remove and reinstall all shelving and closet systems;

From: 5612000431      Page: 3/6      Date: 4/19/2010 4:41:29 PM

Scope of Work Agreement
Lot 79, Canyon Isles
April 15, 2010
Page 3 of 6

o)   Inspect garage door opener system and tracks and repair or replace if visual evidence of abnormal black discoloration or corrosion is present;

p)   Remove and replace refrigerator and microwave originally provided with the Home at closing. Remove, store and reinstall all other appliances. Other appliances that were provided with the Home at closing will be replaced before re-installation only if there are documented electrical problems, otherwise they will be stored and reinstalled.

q)   All mirrors that came with the Home at closing will be inspected and replaced if visual evidence is present of corrosion or deterioration of the silvering;

r)   After drywall is removed, inspect framing for abnormal discoloration, and abnormal corrosion caused by Chinese drywall or sulfur exposure. To the extent that any metal framing, joints or fasteners are abnormally discolored due to Chinese drywall and/or structurally impacted, GL Homes shall contact the Owner to discuss same before any further reconstruction work is undertaken;

s)   After the drywall demolition process is complete and before insulation or drywall reconstruction begins, the interior of the Home will be swept clean and drywall residue will be reasonably removed. HEPA-VAC, fans and/or air scrubbers, or other similar processes will be used as necessary to reasonably remove small debris and construction dust before reinstallation of the new insulation and drywall;

t)   GL Homes will retain an environmental consultant to conduct air testing of the indoor and outdoor environment before the repair work commences and also upon completion of the re-construction work. Provided the parties are not in litigation at the time the reconstruction of the Home is completed, GL Homes will provide copies of the air testing results to Owner;

u)   GL Homes will obtain all permits required by the applicable City or County. Subject to paragraph 9 below, GL Homes will use reasonable efforts to complete repair work and reconstruction in 12 – 16 weeks;

v)   GL Homes will retain a reputable insured moving company to pack and move the Owner's personal property to a secured air-conditioned storage facility. GL Homes will cover the storage costs during the repair and reconstruction through the end of that month if the storage company will not prorate charges. GL Homes will not cover any additional storage costs incurred after reconstruction is completed and GL Homes' Environmental Consultant and the Building Department have signed off on the work; Owner will be allowed reasonable access to the storage unit to their belongings provide that Owner shall be responsible to pay whatever fees are associated to provide such access; and

w)   Clean and restore your Home to a similar condition it was in on the date of closing.

2.      Owner and their experts shall have the right to inspect and conduct testing in the Subject Property, at Owner's own cost, at anytime during the repair process, provided the testing is non-destructive to any new construction and provided it does not interfere or unreasonably delay the ongoing repair process. Specifically, GL Homes will advise the Owner and provide Owner with an opportunity to inspect the Subject Property at the following times: (i) when demolition is complete which includes the removal of all drywall, and the removal or repair of all electrical wiring and affected copper piping. This first opportunity to inspect will be given before re-installation of any new building materials; (ii) a pre-drywall orientation will be offered before any new drywall is installed but after new electrical wiring, plumbing, and a/c duct



Scope of Work Agreement
Lot 79, Canyon Isles
April 15, 2010
Page 4 of 6

work are installed; and (iii) at the time air testing is being conducted after re-construction. There may be other times the Owner is requested to conduct inspections in order to facilitate the ongoing construction progress and Owner agrees to reasonably cooperate and will diligently work to avoid any delays in the construction process. Additionally, at the conclusion of the repair process, GL Homes will also conduct a walk-through inspection of the Subject Property to prepare a punch list of any items which Owner identifies regarding workmanship deficiencies or inaccuracies in the final work, and the parties agree to reasonably work together to rectify any punch list items within a reasonable amount of time.

3.      Upon Owner's request, GL Homes will provide Owner with copies of the photographs and videotape taken of the Home and its contents by Visual Evidence, Inc.

4.      GL Homes will repair all materials affected or damaged during the repair process in your Home and also repair any damages incurred outside the Home but on the Subject Property provided, however, that the damage occurred as a result of and during repair and reconstruction work. Such items that could be damaged outside the Home include pavers, exterior doors, windows, and stucco walls. Please note that we will not repair, replace or pay for any exterior landscaping or pool related issues that are damaged as a result of failed maintenance by the Owners. Owners are solely responsible for all exterior maintenance issues for the Home throughout the repair and reconstruction work.

5.      Please understand that it is Owners' responsibility to be prepared for and to take the necessary precautions for your Home in the event of a hurricane or other storm event. GL Homes will not install or assist in the installation of your hurricane shutters. Therefore, we suggest you take the opportunity before an impending storm to confirm the location and access of your hurricane shutters and hurricane shutter installation items including, but not limited to, shutter installation diagram, brackets, bolts, clips, fully-charged screw guns, and a ladder. We also recommended you do a dry-run installation to ensure that you have all the shutter panels and hardware needed <u>before</u> you vacate your Home for the Chinese drywall repairs. Please make sure you have all the hurricane related materials available to you <u>before</u> you move out and keep any needed items separate from anything being sent to storage. It is also your responsibility to remove the shutters once the storm passes so we can promptly proceed with the repair process as needed.

6.      All work will be performed by or overseen by licensed contractors and free from defects in material and workmanship. Upon sign off from the Building Department for completion of the work, GL Homes will provide a one year warranty against defects in materials and workmanship for all of the foregoing repair work and any appliances or A/C equipment replaced during the work. Other applicable third-party manufacturer's warranties will also be available to the Owner. GL Homes shall also provide an additional one year warranty for other appliances which were not replaced, but which fail within one year of completion of the repairs and remediation due to exposure to Chinese drywall. Additionally, nothing in this agreement shall void, interfere with or extend the existing 10 year structural warranty on the Subject Property which was provided at the time of closing, which shall continue in full force and effect, pursuant to its terms, without interruption or extension.

7.      Once reconstruction is completed, GL Homes will retain a reputable insured moving company to retrieve and move the Owner's personal property from the storage facility back to the Subject Property. To the extent there are any disputes regarding the condition of Owner's personal property as a result of exposure to Chinese drywall, the Owner agrees there is no advance agreement or obligations established at this time as to the personal property. If the Owner does not want the personal property

From: 5612000431       Page: 5/6       Date: 4/19/2010 4:41:30 PM

Scope of Work Agreement
Lot 79, Canyon Isles
April 15, 2010
Page 5 of 6

moved back into the Subject Property, then the Owner will be responsible for disposing of any such personal property or for any ongoing storage costs incurred after the Building Department signs off on the completion of the reconstruction.

8.      GL Homes will pay for temporary housing on a "monthly" basis and the payment for the temporary housing will commence as of the date set by GL Homes for the Owner's move-out. If Owner elects to relocate prior to the GL Homes' established move-out date, the costs associated for Owner's temporary housing during that time will be at Owner's expense. The specific terms of the temporary living expenses agreed to by GL Homes will be confirmed in a separate letter. GL Homes will not cover any other living expenses incurred during the repair work beyond the monthly rental cost agreed to in advance for the temporary housing. Owner is responsible for maintaining electrical and water service to the Home during the repair process.

9.      Before GL Homes can start any of the above work, it will be necessary for Owner to sign a notice of commencement, permit applications, and other documents that may be required from governmental agencies in order for GL Homes to commence the repair process. It is imperative that Owner provide GL Homes and its subcontractors full and unrestricted access to the Subject Property at all times during the entire repair and reconstruction process. With the Owner's full cooperation, GL Homes will work to complete the foregoing repairs as expeditiously as possible. Please understand however, if Owner interferes or obstructs our progress in completing the work, GL Homes will be forced to re-evaluate our position and may no longer be in a position to cooperate with Owner to complete the repairs or pay temporary housing or storage costs. Therefore, if Owner impedes or obstructs the ongoing construction process, we stop paying for any ongoing expenses associated with temporary housing or storage costs. In that event, Owner will be responsible for covering all further housing costs and complete any remaining repairs to the Home.

In our continued efforts to provide you with superior customer service, we are committed to performing all of the foregoing work at our expense. Unfortunately, none of the manufacturers, suppliers, or subcontractors have, thus far, agreed to accept responsibility for their actions. As this process continues, we will be attempting to collect at least some of the costs we incur to perform the work and any other damages from the responsible parties and/or from any governmental funds that may someday be available for builders who have elected to stand behind their products and undertake these repairs for their customers. We appreciate your ongoing cooperation in our efforts to recover our costs and damages as this process unfolds. You recognize that in connection with our efforts in this matter, we will be working with various other third parties to conduct inspections and possibly testing in the home during the demolition stages and prior to the reconstruction. It is necessary for us to work with other third parties involved so they can conduct their own evaluations of the implications of any defective Chinese drywall that may be contained in the Home.

We understand this repair process is an inconvenience to you and your family but we hope you can recognize that we are diligently working to address the multitude of issues involved in this situation in a reasonable manner. In the meantime, if you have any questions or concerns, please do not hesitate to contact us.

Kindly, counter-sign this letter as indicated below and we will proceed to schedule your move-out date upon our receipt of this executed letter with your original signatures and the fully executed permits necessary to start the work. Once your move-out date is established, we anticipate the repair process will

From: 5612000431      Page: 6/6      Date: 4/19/2010 4:41:30 PM

Scope of Work Agreement
Lot 79, Canyon Isles
April 15, 2010
Page 6 of 6

occur in a reasonable time thereafter.  Should you have any questions please contact us at 866-979-2424.

Sincerely,

BOYNTON BEACH ASSOCIATES XVI, LLLP

Jamie Knott
Vice President of Customer Service

Counter-signed by Homeowner(s):

Print Name: _____

_____
Print Name: _____



# EXHIBIT C



# Benchmark
## Remediation Group

September 16, 2013

Gregory Wallance
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Dear Mr. Wallance,

Please let me begin by thanking you for the opportunity to work with yourself and Kaye Scholer.
Attached is the documentation for the inspection done at 8757 Baystone Cove Boynton Beach, FL.

The purpose of this Phase 1 inspection was to identify contaminated drywall within the home,
indentify whether the home had any KPT drywall and identify whether the plumbing, electrical and
HVAC had any corrosion.

As a summary, we <u>have not</u> identified corrosion of the copper wiring throughout the home. In
addition, we <u>have not</u> discovered the existence of KPT Drywall in the home. Please see our detailed
report for further information or contact me should you have any questions.

This home had all ready been demoed. It had all new wiring and plumbing installed. There were no
drywall samples saved on site.

Sincerely,

Mr. Karell Locay
President



Benchmark Remediation Group LLC. 2455 East Sunrise Blvd Suite 510 Ft. Lauderdale, FL 33304
954-635-2307 fax 954-635-2400 Info@Benchmarkremediation.com

For Settlement Purposes Only

8757 Baystone Cove Boynton Beach, FL 33473

## Phase I        Validation Form

**File Number:** 12734

**Date of Inspection:** September 16, 2013

**Home Address:** 8757 Baystone Cove Boynton Beach, FL

**Community:** N/A

**Builders:** N/A

**Owner:** Dieuvil, Guilford

**Benchmark Personel Present:** Justin Hughes

**Types of Drywall Found In Houses:**

**Type of Home:** One Story

**Odor Present:** No

**Number of Rooms:** 0

**Drywall Inspected:** N/A

**Square Footage:** 6,129 Sq. Ft.

**Square Footage Source:** Zillow

**Is Floor Plan Available:** No

**Occupancy:** Vacant

Benchmark Remediation Group LLC. 2455 East Sunrise Blvd Suite 510 Ft. Lauderdale, FL 33304
954-635-2307 fax 954-635-2400 Info@Benchmarkremediation.com

Page: 2

For Settlement Purposes Only

8757 Baystone Cove Boynton Beach, FL 33473

## Phase I        Electrical

**Was Black Surface Accumulation Observed:** No

**How Many Outlets/Switches Were Observed:** 1

## Phase I        Plumbing

**Type of Water Line:** Copper

**Black Surface Accumulation Water Lines:** No

**Plumbing Fixtures Inspected:** No

## Phase I        HVAC

**Number of HVAC Units:** 3

**Black Surface Accumulation:**

## Phase I        Drywall Discovery

**The inspector checked for drywall manufacturer markings including the following:**
knauf-tianjin china-astm c36, knauf-tianjin c, the telltale yellow and blue paper end label on the knauf-tianjin board ends, knauf plasterboard natural

**Drywall Supplier:** UNKNOWN

**Percentages Drywall Manufactures Found:** N/A

**Manufacture and Percentage of Chinese Drywall Only:** N/A

**Combined percentages from two reports:** N/A

For Settlement Purposes Only

8757 Baystone Cove Boynton Beach, FL 33473

## <u>Findings</u>



Address



Front Elevation

Benchmark Remediation Group LLC. 2455 East Sunrise Blvd Suite 510 Ft. Lauderdale, FL 33304
954-635-2307 fax 954-635-2400 Info@Benchmarkremediation.com

Page: 4

For Settlement Purposes Only

8757 Baystone Cove **Boynton Beach**, FL 33473



Living Room



Dining Room

For Settlement Purposes Only

8757 Baystone Cove Boynton Beach, FL 33473



Family Room



Den

Benchmark Remediation Group LLC. 2455 East Sunrise Blvd Suite 510 Ft. Lauderdale, FL 33304
954-635-2307 fax 954-635-2400 Info@Benchmarkremediation.com

Page: 6

For Settlement Purposes Only

8757 Baystone Cove Boynton Beach, FL 33473



Master Bedroom



Bedroom 2

Benchmark Remediation Group LLC. 2455 East Sunrise Blvd Suite 510 Ft. Lauderdale, FL 33304
954-635-2307 fax 954-635-2400 Info@Benchmarkremediation.com

Page: 7

For Settlement Purposes Only

8757 Baystone Cove Boynton Beach, FL 33473



Bedroom 3



Bedroom 4

Benchmark Remediation Group LLC. 2455 East Sunrise Blvd Suite 510 Ft. Lauderdale, FL 33304
954-635-2307 fax 954-635-2400 Info@Benchmarkremediation.com

Page: 8

For Settlement Purposes Only

8757 Baystone Cove Boynton Beach, FL 33473



Attic



HVAC

Benchmark Remediation Group LLC. 2455 East Sunrise Blvd Suite 510 Ft. Lauderdale, FL 33304
954-635-2307 fax 954-635-2400 Info@Benchmarkremediation.com

Page: 9

For Settlement Purposes Only

8757 Baystone Cove **Boynton Beach, FL 33473**



Water Heater Copper

Benchmark Remediation Group LLC. 2455 East Sunrise Blvd Suite 510 Ft. Lauderdale, FL 33304
954-635-2307 fax 954-635-2400 Info@Benchmarkremediation.com

Page: 10

# EXHIBIT D

## JIMMY DOYLE SETTLEMENT TERM SHEET

Set forth below are terms reached between Jimmy Doyle ("Doyle") on behalf of his clients, Knauf and Moss as it relates to the settlement of various categories of "new claims" brought by Doyle clients.  Doyle, Knauf and Moss acknowledge and agree that this settlement term sheet constitutes a "package deal" meaning that individual terms of this settlement are not enforceable standing alone.  The terms are only enforceable as a "package deal."

1.      Knauf and Doyle agree that all of Doyle's Exhibit A and Exhibit B clients from the Beane complaint will participate in the Knauf "New Claims Settlement." [Rec. Doc. 16978]  (See attached Exhibits A and B).

2.      Knauf and Doyle agree that thirteen (13) of Doyle's clients' claims identified on Exhibit C to the Beane settlement will be allowed to participate in the original Knauf New Claims Settlement. (See Exhibit C attached hereto for a list of the 13 claims).  Under this provision, any attorney's fees due for the Doyle clients with claims identified on Exhibit C to the Beane settlement will be paid out of the $160 million attorney fee and cost fund in Section 14 of the Knauf Class Settlement Agreement.

3.      Knauf and Doyle agree that Doyle's "New, New Claims," which are claims that Doyle put Knauf on notice after August 12, 2013 and prior to October 26, 2013 will be settled pursuant to the terms of the Knauf New Claims Settlement (see attached Exhibit D). Doyle agrees not to sue Knauf in a separate action regarding these clients and the clients identified in No. 4 below. Knauf and Doyle agree that the properties identified on Exhibit D can be settled per the Knauf New Claims Settlement, provided that those claimants purchased the properties without knowledge of the presence of reactive KPT Chinese Drywall, KPT indicia is produced for each property, a confirmatory inspection verifies the presence of reactive KPT Chinese Drywall, and all other requirements of the settlement are met.

4.      For Doyle clients in any of the categories mentioned above that are considering Option 2, Moss will include in the scope of work the replacement of appliances, fixtures, and bathroom components attached to the types of drywall that are to be removed pursuant to Exhibit F of the Court approved remediation protocol provided the property owner at the time of the initial walkthrough with Moss identifies the appliances and/or fixtures that are corroded and/or not functioning. In addition, Moss will include in the Xactimate bid scope and final cost estimate the full cost of work to be performed, including the full cost of removing/replacing tile, for bathroom areas implicated by the preceding sentence.

5.      In all future initial walkthroughs conducted by Moss, it is the homeowner's burden to point out or identify fixtures and appliances that show evidence of corrosion and/or  non-functionality  (excluding  refrigerators,  microwaves,  hoods,  and

stoves/ranges, which shall be included in every Xactimate bid scope for properties less than or equal to 3,500 square feet "under air") in order to have these items noted as "remove/replace" in the Xactimate bid scope instead of "detach/reset." For properties over 3,500 square feet "under air," appliances shall only be replaced where evidence of corrosion and/or non-functionality is apparrant, as explained in Exhibit F of the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL no. 2047. It is also agreed that it is Moss' responsibility to provide the full cost of the items addressed in this section and to include the full cost of these items in the final cost estimate.

6.   Where Moss has performed a walkthrough prior to the execution of this agreement, it is hereby agreed that any homeowner may provide Moss with evidence that the bid scope is incorrect pursuant to CAP no. 2014-7 of the Chinese Drywall Settlement Program.

7.   Moss and Doyle agree that, in order to encourage Doyle clients to select Option 1,  Doyle will be able to select prime contractors for his clients' homes from a list provided by Moss/Knauf. At the time of this agreement, Doyle defines the preferred prime subcontractors for each market identified as follows:

- Alabama—BD Welch; Tri-State
- Mississippi—Tri-State
- Louisiana—JES, Stronghold; BD Welch
- Florida—to be assigned by Moss

8.   Moss agrees to review appliance, tile, and fixture issues as they relate to the Xactimate bid scope and final pricing for the following Option 2 homes whose homeowners are represented by Doyle where remediation has already begun or been completed:

- ███████████████████████████
  [Appliances, light fixtures, plumbing fixtures, bathroom tile]

- ████████████████████
  [Appliances, light fixtures, plumbing fixtures, bathroom tile]

- ███████████████████████████
  [Appliances, light fixtures, plumbing fixtures, bathroom tile, a/c condenser coil]

- ████████████████████
  [Appliances, bathroom jet tub, gas line to fireplace, light fixtures, plumbing fixtures, bathroom tile, insufficient allocation for insulation]

- ███████████████████████

---

**Privileged and Confidential Settlement Communication Protected by FRE 408.**

[Appliances, light fixtures, plumbing fixtures, bathroom tile]

9.    Knauf and Doyle agree that the Guilfort Dieuvil claim may be allowed to proceed under the terms of the Knauf New Claims Settlement if the following conditions are met:
- Doyle demonstrates that evidence was preserved strictly in accordance with the requirements of MDL 2047 Pre-Trial Order 1(B).
- Doyle provides evidence and/or indicia of the construction quality and finishes that existed in the property prior to the start of drywall remediation work. The evidence and/or indicia must be of a sufficient character and quality so as to allow Moss to formulate an accurate bid scope.

10.   Moss agrees to assign the following representatives as their points of contact for all Doyle clients:

Primary Client Contact:  William "Colby" Coates
Secondary and Dispute Resolution Contacts:   Chris Krause and Phil Adams

11.   Doyle agrees to have his clients, ████████████████ execute the settlement agreement that Moss has submitted to the ██████ with compensation totaling ████████ and a warranty as set forth therein, and that the ██████ have previously agreed to.  (See attached Exhibit E).

12.   Doyle and Knauf agree to dismiss (without prejudice) the claims of Nora Caswell previously filed in the Beane complaint.


_____
Jimmy Doyle
On Behalf of Doyle Clients

_____
Kerry J. Miller
As Attorney for Knauf

_____
Joseph L. Harris
On Behalf of Moss & Associates

Privileged and Confidential Settlement Communication Protected by FRE 408.

| Term Sheet Exhibit A | | | | | |
|---|---|---|---|---|---|
| Homeowner | Street Address | City | State | Zip | Counsel |

| Term Sheet Exhibit B | | | | | |
|---|---|---|---|---|---|
| Homeowner | Street Address | City | State | Zip | Counsel |
| Dieuvil, Guilford | 8757 Baystone Cove | Boynton Beach | FL | 33473 | Doyle Law Firm, PC |





Exhibit C

Beane Settlement Exhibit C Claims That Parties Agree to Include in "New Claims" Settlement

| Homeowner | Street Address | City | State | Zip | Counsel |
|-----------|----------------|------|-------|-----|---------|



Exhibit D

Doyle's New KPT Claims Identified After August 12, 2013 and Before October 26, 2013

| Name | Address | City | State | Zip | Firm |
|------|---------|------|-------|-----|------|



EXHIBIT

*E*











# EXHIBIT E

| | |
|---|---|
| **From:** | Merino, Rene |
| **Sent:** | Friday, August 14, 2015 2:51 PM |
| **To:** | James V. Doyle, Jr. |
| **Cc:** | Miller, Kerry |
| **Subject:** | RE: Guilfort Dieuvil & Michael Chamberlin - Status |
| **Attachments:** | PTO1B.pdf |

Jimmy, I attach PTO 1(B) for your reference. You will see that the vast majority of its requirements were not met. If you still believe PTO 1(B) was strictly followed, I believe the court-appointed mediator is the person to contact.

---

**From:** James V. Doyle, Jr. [mailto:jimmy@doylefirm.com]
**Sent:** Friday, August 14, 2015 2:45 PM
**To:** Merino, Rene
**Cc:** Miller, Kerry
**Subject:** Re: Guilfort Dieuvil & Michael Chamberlin - Status

Rene:

Thank you for the response, finally.   But, you are incorrect about the conditions not being met.  The evidence was preserved in accordance with the PTO and you were provided with evidence that each condition was met, including the samples kept by the original contractor.  Both a DVD with the condition of the property and the contact name for the person in possession of the samples were provided to you many months ago.  Receipt by Kerry Miller was confirmed by certified mail.

We can take this up with the court.  I intend to file a motion to enforce this claim.

Regards,

# Jimmy Doyle

## DOYLE LAW FIRM, PC

(205) 533-9500   phone

(205) 332-1362   fax

jimmy@doylefirm.com

 

---

**From:** "Merino, Rene" <rmerino@bakerdonelson.com>
**Date:** Friday, August 14, 2015 at 2:29 PM
**To:** James Doyle <jimmy@doylefirm.com>

1

Cc: "Miller, Kerry" <kjmiller@bakerdonelson.com>
**Subject:** RE: Guilfort Dieuvil & Michael Chamberlin - Status

Jimmy,

The Dieuvil claim was included in the term sheet we executed. Paragraph 9 of that agreement provided two conditions that must be met for the Dieuvil claim to proceed in the program. Most important of those conditions is that evidence must have been "preserved strictly in accordance with the requirements of MDL 2047 Pre-Trial Order 1(B)." That did not occur in this case; therefore, we cannot move this claim forward in the program.

Regards,

René

**René Merino**
Attorney

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
201 St. Charles Avenue
Suite 3600
New Orleans, LA 70170
Direct: 504.566.5237
Fax: 504-585-6937
E-mail: rmerino@bakerdonelson.com
www.bakerdonelson.com

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
represents clients across the U.S. and abroad from offices
in Alabama, Georgia, Louisiana, Mississippi, Tennessee
and Washington, D.C.

Please consider the environment before printing this e-mail.

---

**From:** James V. Doyle, Jr. [mailto:jimmy@doylefirm.com]
**Sent:** Tuesday, July 28, 2015 7:01 PM
**To:** Merino, Rene
**Cc:** Miller, Kerry
**Subject:** Re: Guilfort Dieuvil & Michael Chamberlin - Status

Kerry:

Please provide me with a response regarding Guilfort Dieuvil's claim. I sent you everything necessary to move forward with this remediation. The DVD I provided documents the condition of the property and you should have been able to view the KPT samples retained by the original builder by now. Let me know something so I can advise this plaintiff on his available recourse if your client refuses to move forward. It has been more than a year since we agreed to include this one in our agreement, so I think they've been extremely patient to this point.

Thanks.

# Jimmy Doyle

## DOYLE LAW FIRM, PC

# EXHIBIT F

































# EXHIBIT G

| Docket No. | Case Style | Court | Case Type | Date Filed |
|---|---|---|---|---|
| 2017-011498-SP-23 | Paullette Higgins Vs. Guilfort Dieuvil | Fla. Cir. Ct. - Miami Dade | Small Claims (Up to $5000) | Jun. 28, 2017 |
| 2017-002455-CA-01 | Ely Charles Et Al Vs. Nationwide Investment Firm, Cor | Fla. Cir. Ct. - Miami Dade | Civil Complaint (Recovery of Property) | Jan. 31, 2017 |
| CACE-16014883 | Prosper F. V. Dieuvil | Fla. Cir. Ct. - Broward | Fraud | Aug. 11, 2016 |
| 2016-AP-01212 | Mehdipour V. Dieuvil | Bankr. S.D. Fla. | Declaratory judgment - Recovery of Money/Property | May. 05, 2016 |
| 2015-bk-26560 | Debtor:  Guilfort Dieuvil | Bankr. S.D. Fla. | Chapter 11 - Voluntary | Sept. 16, 2015 |
| CACE15016422 | Fatal, Samuel Vs. Petion, Marie | Fla. Cir. Ct.- Broward | Fraud | Sept. 15, 2015 |
| 2015CA006885 | Raoul Charles V. Nationwide Investments | Fla. Cir. Ct. | | Jun. 19, 2015 |
| 2015CA004426 | Woodstock Property V. Nationwide Investment | Fla. Cir. Ct. | Assn Lien Foreclosure =< $50K | Apr. 17, 2015 |
| 14-bk-12478 | Debtor - Magdadene Dieuvil (Pro Se) | Bankr. M.D. Fla. | Chapter 11 - Voluntary | Nov. 10, 2014 |
| 14-bk-23775 | Guilfort Dieuvil | Bankr. S.D. Fla. | Chapter 11 - Voluntary | Jun. 16, 2014 |
| 14-bk-20651 | Debtor:  Guilfort Dieuvil | Bankr. S.D. Fla. | Chaper 11 - Voluntary | May. 08, 2014 |
| COWE13010704 | Dieuvil, Guilfort & Nationwide Investment Firm Corp v Marc Edward and Deoda Jacques | Fla. County Ct.- Broward | Removal of Tenant | Oct. 18, 2013 |
| 13-bk-32948 | Debtor:  Guilfort Dieuvil | Bankr. S.D. Fla. | Chapter 7 Voluntary Petition | Sep. 26, 2013 |
| CACE13019421 | Lezin, Nonlac Vs Lezin, Marie | Fla. Cir. Ct. | Real Prop Other - >$50K - <$250,000 | Aug. 21, 2013 |
| COWE13002554 | Dieuvil, Guilfort Vs Vazquez, Michelle | Fla. County Ct. | Removal of Tenant | Mar. 06, 2013 |
| 2011-037678-CA-01 | Pierre, Maryse A Vs. Dieuvil, Guilfort | Fla. Cir. Ct | Injuctive Relief (Greater than $15,000) | Nov. 14, 2011 |
| COSO10000109 | Dieuvil, Guilfort Vs Mccullum, Debra Denise, | Fla. County Ct. - Broward | Removal of Tenant | Jan. 07, 2010 |
| CACE08032397 | Bank Of America Na Vs. Dieuvil Guilfort | Fla. Cir. Ct. | Mortgage Foreclosure | Jul. 17, 2008 |
| 2008CA000336 | Countrywide Home Loans Inc Vs. Guerrier, Dieufaite | Fla. Cir. Ct. | Mortgage Foreclosure / Mech Lien | Jan. 11, 2008 |
| 2007CA002451 | Bank Of New York Vs. Cuerrier, Dieufaite, | Fla. Cir. Ct. | Mortgage Foreclosure / Mech Lien | Jul. 09, 2007 |
| 1998-019060-SP-23 | Francois, Nadine Vs. Dieuvil, Guilfort | Fla. Cir. Ct. | Summary Procedure - Contract & Indebtedness | Dec. 01, 1998 |