# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION

MDL 2047

SECTION: L

JUDGE FALLON
MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO:
*ALL CASES*
**************************************************************************

## MEMORANDUM IN SUPPORT OF
### PRIMARY COUNSEL'S MOTION FOR CERTIFICATION OF ORDER FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b), OR IN THE ALTERNATIVE ENTRY OF FINAL JUDGMENT UNDER RULE 54(b)

S. Ann Saucer (TX Bar No. 00797885;
LA Bar No. 21368)
Russell W. Budd (TX Bar No. 03312400)
Holly R. Werkema (TX Bar No. 24081202)
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
asaucer@baronbudd.com
rbudd@baronbudd.com
hwerkema@baronbudd.com

Allison Grant (FL Bar No. 858330)
ALLISON GRANT, P.A.
14 S.E. 4th St
Boca Raton, FL 33432-6111
Tel.: 561-994-9646
Fax: 561-431-4627
agrant@allisongrantpa.com

Jeremy W. Alters (FL Bar No. 111790)
Justin D. Grosz (FL Bar No. 984000)
Matthew T. Moore (FL Bar No. 70034)
ALTERS LAW FIRM, P.A.
1855 Griffin Road, Suite C470
Dania Beach, FL 33004
Tel.: (305) 571-8550
Fax: (305) 571-8558
jeremy@alterslaw.com
justin@alterslaw.com
matthew@alterslaw.com

Jimmy R. Faircloth, Jr. (Objectors' Co-Liaison
Counsel) (LA #20645)
Brook L. Villa (LA #31988)
Franklin "Drew" Hoffmann (LA #35824)
FAIRCLOTH, MELTON & SOBEL, LLC
301 Main Street, Suite 920
Baton Rouge, LA 70801
Phone: (225) 343-9535
Fax: (225) 343-9538
jfaircloth@fairclothlaw.com
bvilla@fairclothlaw.com
dhoffmann@fairclothlaw.com
*Attorneys for Parker Waichman LLP*

K. Edward Sexton, II
(AL Bar No. ASB-5463-O69K)
GENTLE, TURNER, SEXTON &
HARBISON, LLC
501 Riverchase Parkway East, Suite 100
Hoover, AL 35244
Phone: (205) 716-3000
Fax: (205) 716-3010
esexton@gtandslaw.com

Val Patrick Exnicios, Esq. (Objectors' Co-
Liaison Counsel)
LISKA, EXNICIOS & NUNGESSER
1515 Poydras Street
14th Floor, Ste. 1400
New Orleans, LA 70112
Phone: (504) 410-9611
Fax: (504) 410-9937
vpexnicios@exnicioslaw.com
*Attorney for Pendley Baudin & Coffin, Rhine
Law Firm and Luckey & Mullins*

Eric D. Hoaglund
(AL Bar No. ASB-3449-55E)
MCCALLUM, HOAGLUND, COOK &
IRBY, LLP
905 Montgomery Highway, Suite 201
Vestavia Hills, AL 35216
Phone: (205) 824-7767
Fax: (205) 824-7768
ehoaglund@mhcilaw.com

## TABLE OF CONTENTS

I.     Procedural History ..........................................................................................................1

II.    Argument and Authorities.............................................................................................3

    A.    "[A]n immediate appeal from the order may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b). ..................................4

    B.    The Order "involves a controlling question of law as to which there is substantial ground for difference of opinion." 28 U.S.C. § 1292(b). .....................4

        1.    A controlling issue of law is whether the common benefit fund doctrine, *quantum meruit,* unjust enrichment, and/or any other legal theories allow the nullification of contract rights in order to pay the PSC a greater share of a PSC-created inadequate limited fund. ..........................................................................................................6

        2.    Whether funds from a settlement with one defendant on behalf of a subset of plaintiffs can be used to pay for work on different plaintiffs' claims against different defendants is a controlling question of law. ...................................................................................................10

        3.    Whether Primary Counsel, before being deprived of their contract rights in order to pay the PSC more of a limited fund that it engineered, were entitled to the time record documents summarized, is a controlling question of law. ............................................11

        4.    Whether the quantum of the monetary transfer away from counsel with contract rights to court-appointed counsel is permissible is a controlling question of law. ......................................................................13

        5.    Whether the PSC could act in its own self-interest in negotiating attorneys' fees on behalf of Primary Counsel, in nullifying Primary Counsel's contract rights, and in transferring settlement funds among the different accounts, are controlling questions of law. ..............15

        6.    A controlling question of law is whether the benefit conferred can be artificially inflated as a basis for transferring entitlement to fees and expenses away from the counsel hired by the plaintiffs. ...................18

        7.    Whether the PSC and FC are bound by their prior successful representations of fact is a controlling question of law. ...........................21

    C.    In the alternative, the allocation should be certified as final under Rule 54(b)....................................................................................................................23

III.    Conclusion and Prayer for Relief.................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Crash Disaster at Florida Everglades*,
  549 F.2d 1006 (5th Cir. 1977) ................................................................. 12-13, 21

*Alyeska Pipeline Service Co. v. Wilderness Society*,
  421 U.S. 240 (1975) ...........................................................................................7

*Amerisourcebergen Drug Corp. v. Meier*,
  No. CIV.A.03-CV-6769, 2005 WL 2645000 (E.D. Pa. Oct. 14, 2005) ....................3

*Amitech U.S.A., Ltd. v. Nottingham Const. Co.*,
  57 So. 3d 1043 (La. Ct. App. 2010) ...................................................................16

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
  792 F. Supp. 2d 1028 (N.D. Ill. 2011) ...............................................................20

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ...........................................................................................7

*Castano v. American Tobacco Co.*,
  162 F.R.D. 112 (E.D. La. 1995) ...................................................................... 4-5

*Castellanos-Contreras v. Decatur Hotels, LLC*,
  622 F.3d 393 (5th Cir. 2010) (en banc) ................................................................4

*Central Railroad & Banking Co. v. Pettus*,
  113 U.S. 116 (1885) ...........................................................................................7

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
  No. 09-08030, 2013 WL 499474 (E.D. La. Feb. 7, 2013) ...............................10, 20

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
  No. MDL 2047, 2017 WL 1421627 (E.D. La. Apr. 21, 2017) ..............................10

*Curtiss-Wright Corp. v. Gen. Elec. Co.*,
  446 U.S. 1 (1980) .............................................................................................24

*Dardar v. Lafourche Realty Co.*,
  849 F.2d 955 (5th Cir. 1988) ..............................................................................3

*Evans v. Tin, Inc.*,
  Nos. 11-2182 *et al.*, 2013 WL 4501061 (E.D. La. Aug. 21, 2013) .......................14

*Fontana v. Barham*,
    707 F.2d 221 (5th Cir. 1983) ...............................................................................6

*In re Genetically Modified Rice Litig.*,
    764 F.3d 864 (8th Cir. 2014) ..............................................................................21

*Grant v. Chevron Phillips Chem. Co.*,
    309 F.3d 864 (5th Cir. 2002) ................................................................................3

*H&W Indus., Inc. v. Formosa Plastics Corp., USA*,
    860 F.2d 172 (5th Cir. 1988) ......................................................................... 23-24

*In re High Sulfur Content Gasoline Prod. Liab. Litig.*,
    517 F.3d 220 (5th Cir. 2008) .........................................................6, 10, 12, 15

*Hobbs v. McLean*,
    117 U.S. 567 (1886) ............................................................................................10

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D. N.Y. 2009) ..............................................................19

*Int'l Precious Metals Corp. v. Waters*,
    530 U.S. 1223 (2000) ..........................................................................................20

*Love v. Tyson Foods, Inc.*,
    677 F.3d 258 (5th Cir. 2012) ..............................................................................22

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970) ..............................................................................................7

*Mt. Hawley Ins. Co. v. Advance Prod. & Sys., Inc.*,
    972 F. Supp. 2d 900 (W.D. La. 2013), *rev'd and remanded*, 597 F. App'x 780 (5th
    Cir. 2015) ............................................................................................................24

*In re Nineteen Appeals*,
    982 F.2d 603 (1st Cir. 1992) ..........................................................................6, 12

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ..............................................................................18

*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th Cir. 2014) ..............................................................................18

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
    568 F.3d 345 (2d Cir. 2009) .................................................................................6

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005) ...............................................................................11

*S.E.C. v. JT Wallenbrock & Associates,*
    440 F.3d 1109 (9th Cir. 2006) .........................................................................11

*Saizan v. Delta Concrete Prod. Co.,*
    448 F.3d 795 (5th Cir. 2006) ...........................................................................12

*Sampson v. DCI of Alexandria,*
    970 So. 2d 55 (La. Ct. App. 2007).....................................................................16

*In re: Sears, Roebuck & Co. Front-loading Washer Products Liab. Litig.,*
    06 C 7023, 2016 WL 4765679 (N.D. Ill. Sept. 13, 2016), *rev'd on other grounds,* 867 F.3d
    791 (7th Cir. 2017)...........................................................................................11

*Shipes v. Trinity Indus.,*
    987 F.2d 311 (5th Cir. 1993) ................................................................8, 15, 19

*Strong v. BellSouth Telecommunications, Inc.,*
    137 F.3d 844 (5th Cir. 1998) ...........................................................................10

*Swint v. Chambers Cty. Comm'n,*
    514 U.S. 35 (1995).........................................................................................25

*Trustees v. Greenough,*
    105 U.S. 527 (1881)..........................................................................................7

*Turner v. Murphy Oil USA, Inc.,*
    472 F. Supp. 2d 830 (E.D. La. 2007)................................................................19

*In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,*
    886 F. Supp. 445 (E.D. Pa. 1995) ....................................................................11

*Vaughan v. Anderson Reg'l Med. Ctr.,*
    849 F.3d 588 (5th Cir. 2017) .............................................................................4

*In re Vioxx Products Liab. Litig.,*
    760 F. Supp. 2d 640 (E.D. La. 2010)................................................................14

*Von Clark v. Butler,*
    916 F.2d 255 (5th Cir. 1990) ................................................................8, 15, 19

*In re Vitamins Antitrust Litig.,*
    398 F. Supp. 2d 209 (D. D.C. 2005)..................................................................15

*Yamada v. Nobel Biocare Holding AG,*
    825 F.3d 536 (9th Cir. 2016) ...........................................................................12

*Young v. Pierce,*
    822 F.2d 1376 (5th Cir. 1987) ...........................................................................3

**Statutes**

28 U.S.C. § 1292(b) ...................................................................................................1, 3, 4, 25

**Rules**

FED. R. CIV. P. 23 ............................................................................................................9

FED. R. CIV. P. 23(h) ........................................................................................................9

FED. R. CIV. P. 54 (b) .............................................................................................. *passim*

FED. R. CIV. P. 54(d)(2)(B)(iii) .........................................................................................2

FED. R. APP. P. 5(a)(3) ......................................................................................................3

FED. R. EVID. 1006...................................................................................................1, 12

**Treatises**

John P. Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds*, 87 HARV. L. REV. 1597, 1601 (1974)........................................................................................................7

Aimee Lewis, *Limiting Justice: The Problem of Judicially Imposed Caps on Contingent Fees in Mass Actions*, 31 REV. LITIG. 209, 219 (2012) ................................................... 8-9

Charles Silver and Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigation: Problems and Proposals*, 63 VAND. L. REV. 107, 121 (2010) .......8, 10, 16

Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigation*, 79 FORDHAM L. REV. 1985, 1990 (2011)....................................................................16

Charles Silver, *What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation?*, J. TORT LAW 181, 183 (2012) ...........................................................12

**Other Authorities**

Manual for Complex Litigation (4th) § 14.121 ...........................................................7

William B. Rubenstein, Newberg on Class Actions (5th ed.) ...................................7, 8, 9, 10, 13

The undersigned objecting Primary Counsel respectfully request that this Court certify the Court's Order and Reasons Setting Common Benefit Fees (the "Order") (Doc. 21168), for interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b) or Federal Rule of Civil Procedure 54(b). This Court may certify its order for immediate appeal if the "order involves a controlling question of law as to which there is substantial ground for difference of opinion and … an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). In the alternative, because attorney fees are one of multiple claims, because the Order is final as to the fee allocation between common benefit work and Primary Counsel, and because there is no just reason for delaying an appeal, the Order should be certified as a final judgment pursuant to Federal Rule of Civil Procedure 54(b).

Undersigned counsel respectfully request that the Court certify the Order to avoid potential recalculation of future fee awards and expense reimbursement and waste of judicial resources, and further avoid delays caused by such recalculations. The legal issues for certification are Primary Counsel's property interest in their fee contracts, due process rights, the parameters of the common benefit fund doctrine, whether the transfer of property interest rights from counsel with contract rights to those without can be justified by legal principles (*e.g.*, restitution, unjust enrichment), Rule of Evidence 1006, case law defining limited funds, the requirements of billing judgment, legal limits on double counting, legal limits on the Court's jurisdiction, breaches of duty, and estoppel.

## I.    Procedural History

Pursuant to the settlements that the Plaintiffs' Steering Committee (PSC) negotiated, contractually retained Primary Counsel's fees and expenses are capped and limited to a fund that,

as first revealed in the Fee Committee's[1] 2016 Motion (Doc. 20290-4), is inadequate to compensate both common benefit work and contractually retained counsel's work. Contrary to the requirements of federal law, the PSC had failed, prior to its 2016 Motion, to "state the amount sought [in fees] or provide a fair estimate of it." FED. R. CIV. P. 54(d)(2)(B)(iii).

Twenty-three firms objected to the FC's unprecedented allocation recommendation. *See* Docs. 20336, 20337, 20338, 20343, 20344, 20346, 20348, 20349, 20350, 20351, 20353, 20354, 20355, 20356, 20357, 20370, 20392. Objecting Primary Counsel represent over 50% of the properties compensated by the settlement fund (*see* Doc. 19787-2).

To resolve the fee dispute, the Court appointed a Special Master to conduct limited discovery and make a recommendation (Doc. 20410). The Special Master conducted an evidentiary hearing on May 31 and June 1, 2017, wherein approximately 750 exhibits were introduced into evidence and seven witnesses testified. *See* Doc. 20950, at 16. The Special Master recommended that the Court should allocate $90 million as compensation for common benefit fees (Doc. 20950, at 51).

After Primary Counsel objected, the Order increased the common benefit award to $99,762,099.56 (Doc. 21168, at 24).[2] The Order will be followed by additional fee calculations, but it finally determines the allocation of $99,762,099.56 for common benefit work and $94,607,042.17 for contract counsel. *Id*.

---

[1]  The Fee Committee ("FC) is comprised of seven members of the PSC and one member of a non-PSC firm.

[2]  In actuality, common benefit counsel will receive several million dollars more than this amount as certain attorneys' fees have been removed from the fund from which Primary Counsel and other individually retained counsel will be compensated. *See* Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses (Doc. 20950) at 61, 93 (see Doc. 20993 (motion to file under seal)).

## II.      Argument and Authorities

Interlocutory appeal is warranted because the Order "involves a controlling question of law as to which there is substantial ground for difference of opinion and … an immediate appeal from the order may materially advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(b). The statute further provides that the court of appeals may permit an appeal of such an order. *Id*. Rule 5(a)(3) of the Federal Rules of Appellate Procedure allows a district court to amend an order to meet the requirement that the order appealed contain a statement certifying the appealability of the order. Certification for interlocutory appeal is appropriate here because the standards under Section 1292(b) are met—there are substantial grounds for a difference of opinion on controlling questions of law which must be resolved before fees can be quantified in the next step of the fee allocation. In the alternative, the Court may certify the allocation quantification pursuant to Rule 54(b).

The Fifth Circuit has referred to a district court's decision to certify an order pursuant to Section 1292(b) as "highly principled." *Grant v. Chevron Phillips Chem. Co*., 309 F.3d 864, 866 (5th Cir. 2002). In *Dardar v. Lafourche Realty Co*., 849 F.2d 955, 959 n. 11 (5th Cir. 1988), the Fifth Circuit explained that denials of interim attorney's fees "have been certified as final by the district court under Rule 54(b) and appealed pursuant to 28 U.S.C. § 1292(b)."[3] Moreover, legal entitlement to compensation was adjudicated in the Order, and such determination is akin to damages issues that the Fifth Circuit also has accepted for interlocutory review. *See, e.g.,*

---

[3] 849 F.2d at 959 n. 11 ("the only denials of interim attorney's fees which have been successfully appealed have been certified as final by the district court under Rule 54(b) and appealed pursuant to 28 U.S.C. § 1292(b). See *Young v. Pierce*, 822 F.2d 1376 (5th Cir. 1987).").

*Cf. Amerisourcebergen Drug Corp. v. Meier*, No. CIV.A.03-CV-6769, 2005 WL 2645000, at *5 (E.D. Pa. Oct. 14, 2005) (certified questions included liability for attorney fees and costs).

*Vaughan v. Anderson Reg'l Med. Ctr.*, 849 F.3d 588, 590 (5th Cir. 2017) (damages issue certified and leave to file an interlocutory appeal granted).

### A. "[A]n immediate appeal from the order may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b).

As the Order explains, it addressed the first step in a two-step analysis. Order, at 4 (Doc. 21168). The second step, the distribution of the fees to each counsel, will be resolved in a future order. *Id.* These future calculations will quantify fees to scores of law firms, including those seeking common benefit fees. Because these numerous mathematical calculations depend upon the proportionate allocation that the Order promulgates in step one, an interlocutory appeal may save the Court from having to re-calculate the sums in step two.[4] Further, as more fully explained in prior briefing[5] and below, the interlocutory appeal will resolve legal issues that potentially impact upon the propriety of common benefit fee or expense awards for specific categories of work (*e.g.*, work solely related to Taishan defendants), specific costs (*e.g.*, administrative), and handling of specific payments and expenses (*e.g.*, Virginia and North River), among other issues.

In short, an interlocutory appeal if successful would prevent a myriad of reassessments and mathematical calculations of both fees and expenses.

### B. The Order "involves a controlling question of law as to which there is substantial ground for difference of opinion." 28 U.S.C. § 1292(b).

"[A]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of the litigation in the district court."

---

[4] *Cf. Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 397 (5th Cir. 2010) (en banc) (question in FLSA of whether expenses should be reimbursed was certified for interlocutory appeal where "[t]he district court held that the only remaining issues were the strictly mathematical calculations of wages actually paid and, should that yield a finding of liability, the amount of damages due.").

[5] *E.g.*, Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses (Doc. 20950); Primary Counsel's Post-Evidentiary Hearing Brief (filed with Special Master 7/14/2017).

*Castano v. American Tobacco Co.*, 162 F.R.D. 112, 115 (E.D. La. 1995) (cit. & quot. om.). Here, there are numerous legal issues materially impacting, and potentially substantially changing, the proportionate fee calculated in the Order.

As explained below, legal commentators have expressed the need for controlling resolution regarding the source and scope of an MDL Judge's authority to abrogate the property interests of contractually retained counsel in order to award fees to court-appointed counsel (*see* § II.B.1 *infra*). This is an ideal case for these important issues to be presented to the Fifth Circuit. Whether the PSC can engineer the destruction of contractually retained counsel's rights to fees and reimbursement of expenses, in order to secure disproportionately favorable terms for the PSC's own compensation and reimbursement, is an interrelated controversy that places front and center the legal issues of whether the PSC owed primary counsel a duty when negotiating fees on its behalf (*see* § II.B.5 *infra*), the legality of the PSC's transfer of funds among different accounts so as to impose expenses without concomitant benefit of the fees generated by the expenses (*id*.), whether the quantum of the Order's unprecedented asset transfer is legally permissible (*see* § II.B.4 *infra*), and whether the PSC and FC are bound by their prior successful representations to the Court (*see* § II.B.7 *infra*).

The Order also compensates common benefit counsel for time pursuing non-settling defendants, and the federal courts which have addressed this issue have found that this is improper (*see* § II.B.2 *infra*). In addition, the Order strips Primary Counsel of their rights without allowing them access to the common benefit time records, which is legally erroneous under the Constitution, Rules of Evidence, and case law (*see* § II.B.3 *infra*). Further, the Order presents important issues regarding how the benefit conferred is calculated, including whether actual

value can be disregarded so as to inflate fees and whether court-appointed counsel can be compensated for fees on fees (*see* § II.B.6 *infra*).

> **1. A controlling issue of law is whether the common benefit fund doctrine, *quantum meruit,* unjust enrichment, and/or any other legal theories allow the nullification of contract rights in order to pay the PSC a greater share of a PSC-created inadequate limited fund.**

Primary Counsel's right to payment of attorneys' fees is a constitutionally protected property interest. *See Fontana v. Barham*, 707 F.2d 221, 226 (5th Cir. 1983); *see also In re Nineteen Appeals*, 982 F.2d 603, 613 (1st Cir. 1992) ("the affected private interest is the monetary share of the funds due each [primary attorney]"); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 568 F.3d 345, 354 (2d Cir. 2009) ("In reallocating contractually negotiated fees among counsel in a case of this nature, a court is disposing of a property interest."). "[W]hen a judge constructs a process for setting fees, the process must contain at least the procedural minima of due process." *In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 517 F.3d 220, 231 (5th Cir. 2008) (citing *Nineteen Appeals*, 982 F.2d at 614; quot. marks om.).

Here, Primary Counsel's constitutionally protected rights were abrogated to pay court-appointed counsel. Scrutiny of the legal requirements for common benefit payments, however, reveals insufficient legal authority for this transfer of assets. The Order is unprecedented in that it allocates more favorable compensation for court-appointed counsel *at the expense of* the lawyers that the plaintiffs in the case had actually agreed to pay. Those Primary Counsel have no recourse other than an inadequate limited fund because the PSC engineered the destruction of Primary Counsel's property interests as a settlement term without disclosing that those negotiated fees would be insufficient to compensate both common benefit and contract counsel.

Primary Counsel contend that common benefit remuneration has been elevated over constitutionally protected contract rights without legal authority. The federal rules are procedural

and do not provide "an independent source of law authorizing attorney fees." William B. Rubenstein, Newberg on Class Actions § 15.2 (5th ed.) ("Newberg"). As explained by one prescient commentator, who foretold in 1974 that the common benefit fund theory would "head[] off toward destinations that are as yet unknown," "[t]he 'common fund' as a source of counsel fees has been created, almost single-handedly, by the United States Supreme Court." John P. Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds*, 87 HARV. L. REV. 1597, 1601 (1974). According to Dawson, the Supreme Court was "cheerfully unaware that it had leaped across a gulf" when it transformed a client's right to contribution of litigation costs to an independent right of the lawyer. *Id.* at 1603 (criticizing *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885)). That court-invented right, however, is not without limitation.

A century after this sanguine leap of logic, the Supreme Court explained the "common fund doctrine":

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. [Citations] The common-fund doctrine reflects the traditional practice in courts of equity, *Trustees v. Greenough*, [105 U.S. 527, 532–537 (1881)], and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. [240, 257-258 (1975)]. The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. *See, e. g., Mills v. Electric Auto-Lite Co.*, 396 U.S. [375, 392 (1970)]. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also* Manual for Complex Litigation (4th) § 14.121 ("The common-fund exception to the American Rule is grounded in the equitable powers of the courts under the doctrines of *quantum meruit* and unjust enrichment.") (note 479 citing *Greenough*, 105 U.S. at 536). Thus, the common benefit fund doctrine, as created by the

Supreme Court as an exception to the American Rule, is not a carte blanche power to re-shuffle contractually imbued contract rights, but rather a power that must be premised upon sound equitable principles, such as unjust enrichment. Here, the Order transfers fees from counsel with contract rights to those without, but without concluding (or a basis for concluding) why Primary Counsel's contract rights are so subordinate to common benefit counsel's rights under unjust enrichment, restitution, or any other legal basis for common benefit fund compensation.[6]

The instant case thereby raises important legal issues that the Fifth Circuit should address. The rationale and legal basis for common benefit fees is contested and "neither substantive nor procedural norms exist to govern their administration." Newberg § 15.112 (note om.). Some scholars have explained that "it is clear that the common fund doctrine does not apply to MDLs." Charles Silver and Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigation: Problems and Proposals*, 63 VAND. L. REV. 107, 121 (2010). These scholars have also explained that there is insufficient justification for slashing primary counsel's contract rights.[7] Therefore, the breadth of a district court's authority to

---

[6]   *See Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir. 1993) ("the district court must explain with a reasonable degree of specificity the findings and reasons upon which the award is based") (citing *Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir. 1990)).

[7]   *See id.,* 63 VAND. L. REV. at 137 ("the caps varied greatly. … One might think the caps varied because the judges tailored them to the unique facts of their MDLs. The procedures they employed eliminate this possibility. The caps differed for no better reason than that the judges chose different numbers."); 138 ("As a matter of economic theory, … scale economies (assuming they exist) provide no justification for fee cuts."); 139 ("[W]hen concluding that lawyers' fees were hundreds of millions of dollars too high, Judges … considered no evidence of this type [expert testimony by an economist or accountant based on established methodology]--or any other. They appear to have thought that a court exercising its inherent power needs neither a sound methodology nor competent evidence when cutting fees. This cannot be right. The efficient price for legal services is an empirical matter, and judges cannot properly resolve empirical matters by means of armchair speculation. … [L]awyers' fees [were capped] at levels low enough to free up the money [the Judges] thought the managerial lawyers deserved."); Aimee Lewis, *Limiting Justice: The Problem of Judicially Imposed Caps on Contingent Fees in Mass Actions*, 31 REV. LITIG. 209, 219 (2012) (opining that bias against contingency fees "rears

abrogate contract rights in order to pay for common benefit work is a fiercely debated issue

appropriate for appellate resolution.[8]

Here, unjust enrichment and restitution principles are an insufficient legal basis for

paying the PSC at the expense of abrogating Primary Counsel's contract rights because the PSC

---

its ugly head" and that "[t]hese cases do not discuss the reasonableness of the fees charged by the defense attorneys."); *id*. at 220 ("The MDL courts cap the plaintiffs' attorneys' contingent fees, finding the fees unreasonable without any consideration of the reasonableness of the individual contracts.") (note om.).

[8]   That this MDL ended with a class settlement does not cure these concerns. Newberg explains:

> A number of courts have alluded to the class action rule, Rule 23, as a basis for authority to enact a common benefit fee. This argument is not quite right in that Rule 23(h), by its own terms, does not purport to be a source of fee authority. Thus, **even if an MDL does end through a class action settlement (which few do), the common benefit fee must find its justification in some other legal source** or in the parties' agreement.

Newberg § 15:114 ¶4 (notes om.; emphasis added).

Further, here each settlement limited certification for settlement only, and there are no certification orders prior to these settlements. Consistently, the Settlement Agreements were not entered into with Class Counsel, but rather with the PSC. Inex Settlement, p. 1 (Doc. 8628-3) ("This Settlement Agreement is entered into by and between the Plaintiffs' Steering Committee ...."), *id*. at 34-35 (signed on behalf of Plaintiffs' Steering Committee); Third Amended Knauf Settlement, p. 1 (Doc. 12061-5) ("This Settlement Agreement is entered into by and between the Plaintiffs' Steering Committee ...."), *id*. at p. 76 (signature page to be signed on behalf of PSC); Class Action Settlement Agreement L&W, p. 1 (Doc. 13375-2) ("This Settlement Agreement is entered into by and among the Plaintiffs' Steering Committee ..."), *id*. at pp. 24-25 (signed by Mr. Herman as "Plaintiffs' Liaison Counsel with the full authority and consent of the PSC" and signed by Mr. Levin as "Plaintiffs' Lead Counsel with the full authority and consent of the PSC"); Settlement Agreement with Builders, Installers, Suppliers (aka Global), p. 1 (Doc. 14404-2) ("This Settlement Agreement is entered into by and among the Plaintiffs' Steering Committee on behalf of the Class Members...."), *id*. at p. 39 (signed by Mr. Herman as "Plaintiffs' Liaison Counsel with the full authority and consent of the PSC" and signed by Mr. Levin as "Plaintiffs' Lead Counsel with the full authority and consent of the PSC"); Tobin Trading VA Settlement, p. 1 (Doc. 15969-7) ("This Settlement Agreement is entered into by and among the Plaintiffs' Steering Committee ...."), *id*. at 34 (signed by Mr. Herman as "Plaintiffs' Liaison Counsel with the full authority and consent of the PSC" and signed by Mr. Levin as "Plaintiffs' Lead Counsel with the full authority and consent of the PSC"); Nationwide Settlement, p. 1 (Doc. 15969-5) ("This Settlement Agreement is entered into by and among the Plaintiffs' Steering Committee on behalf of the Class Members ...."), *id*. at 33 (signed by Mr. Herman as "Plaintiffs' Liaison Counsel with the full authority and consent of the PSC" and signed by Mr. Levin as "Plaintiffs' Lead Counsel with the full authority and consent of the PSC").

acted in its own self-interest in negotiating the settlements, transferring monies among the different funds, and effectively terminating Primary Counsel's contract rights.[9] Thus, there is a serious legal question regarding the authority to re-allocate fees and expenses to this degree, contrary to the plaintiffs' selected counsel, based on the common benefit fund doctrine.

> **2. Whether funds from a settlement with one defendant on behalf of a subset of plaintiffs can be used to pay for work on different plaintiffs' claims against different defendants is a controlling question of law.**

The litigation track against the Knauf entities is undeniably "strikingly different" than the litigation track against the Taishan entities, and the different litigation activities attributable to each can be identified.[10] Notably, the Knauf entities agreed to settle several hundred claims less than one year after the first Omnibus complaint was filed in the MDL and agreed to settle all remaining pending claims just fourteen months later, while litigation continues against the

---

[9]  *See High Sulfur*, 517 F.3d at 235 (stating members of the Fee Committee had a direct conflict of interest; "How much deference is due the fox who recommends how to divvy up the chickens?") (cit. & quot. om.); Newberg § 15:61 ("Litigants generally cannot require others to share the costs of their fees if the other parties' interests are not harmonious with their own."); *id.* at n. 3 (citing *Hobbs v. McLean*, 117 U.S. 567, 581 (1886) ("We see no reason why [plaintiffs] should pay the defendant, who, instead of aiding them in securing their rights, has been an obstacle and obstruction to their enforcement.") (further cit. om.)); Silver & Miller, 63 VAND. L. REV. at 122 ("One condition for restitution is that after receiving benefits by others, claimants must be better off than they would have been on their own."); *id.* (explaining why enrichment requirement is not met in MDLs); *id.* at 130 ("The massive allocation schemes found in MDLs today--schemes that transfer funds among tens or hundreds of lawyers, each of whom may have made important contributions--go well beyond the traditional bounds of equity. MDL judges are presiding over sizeable business ventures, not doling out restitution."). *Cf. Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 850 (5th Cir. 1998) ("Because the defendant's adversarial role with regard to the attorneys' fees is thus diminished" where settling defendant agrees to pay fees to settle total liability, "the court must strive to minimize the conflict of interest between the class and its attorney inherent in such an arrangement.") (cit. om.).

[10]  *Compare In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 09-08030, 2013 WL 499474, at *2 (E.D. La. Feb. 7, 2013) (describing the "path that has led to the settlement" with the Knauf entities) *with In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. MDL 2047, 2017 WL 1421627, at *1 (E.D. La. Apr. 21, 2017) ("The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities, and (2) the Taishan Entities. The litigation … has proceeded on strikingly different tracks for the claims against each group.").

Taishan entities to date. The Order errs by using the Knauf settlement funds to compensate common benefit counsel for time and past costs pursuing non-settling Taishan defendants.[11]

>    **3.    Whether Primary Counsel, before being deprived of their contract rights in order to pay the PSC more of a limited fund that it engineered, were entitled to the time record documents summarized, is a controlling question of law.**

The Order errs because it relies on summaries of the time records[12]; however, Primary Counsel's repeated requests for the records were denied notwithstanding uncontroverted evidence that the summaries did not represent vetted common benefit time.[13]

---

[11] *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302 n. 11 (3d Cir. 2005) (district courts cautioned that they should "not conflate [ ] two distinct settlements ...."); *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 886 F. Supp. 445, 474 (E.D. Pa. 1995) ("It is clear that counsel may not be compensated for work expended solely on behalf of unsuccessful plaintiffs."); *In re: Sears, Roebuck & Co. Front-loading Washer Products Liab. Litig.*, 06 C 7023, 2016 WL 4765679, at *9 (N.D. Ill. Sept. 13, 2016) (agreeing that in association with settlement of "CCU" claims, defendants are not responsible for paying attorneys' fees for any work associated with "Biofilm" claims notwithstanding that the CCU and Biofilm claims were initially litigated together), *rev'd on other grounds*, 867 F.3d 791 (7th Cir. 2017); *cf. S.E.C. v. JT Wallenbrock & Associates*, 440 F.3d 1109, 1115 (9th Cir. 2006) (a party entrusted with the funds of another is required to disgorge funds spent "unrelated to the [parties'] expectations of the purposes, risks, and rewards of entrusting the [party] with their investment dollars.").

[12] *See, e.g.*, Order, at 6, 9-13.

[13] *See* Doc. 20728-2, at 5-8 (outlining the various requests made by Primary Counsel for common benefit time submission). *See also* Doc. 20394, Primary Counsel's 7/15/2016 motion for discovery; SM No. 16-09-23-1316-4, Primary Counsel's Proposed Case Management Order; Doc. 20518-1, Special Master Case Management Order No. 1 (9/25/2016); SM No. 16-10-7-1332-1, Letter from Primary Counsel to Special Master requesting additional discovery; SM No. 16-10-18-1142-1, Letter from Primary Counsel to Special Master replying to Fee Committee's 10/13/2016 letter; Doc. 20520, Primary Counsel's Objection and Request to Modify Special Master CMO No. 1; Doc. 20533, Special Master Ruling regarding CMO No. 1; Doc. 20575-2, Fee Committee's Opp. to PC's Obj. to Special Master Ruling; Doc. 20531, Order Dismissing Primary Counsel's Objection and Request to Modify Special Master CMO No. 1; SM No. 17-01-06-1640-1, Letter from Primary Counsel to Special Master requesting additional discovery following Garrett deposition and attaching Requests for Production of Documents; SM No. 17-02-08-1650, Letter from Primary Counsel to Special Master requesting time submissions; SM No. 17-02-15-1521-1, Letter from Primary Counsel to Special Master requesting documents in light of Fee Committee depositions; Doc. 20727-1, Special Master's Ruling Concerning Requests for Additional Discovery.

Sealing the time records violated the Fifth Circuit's decisions requiring documentation of billing judgement[14] and its decision in *High Sulfur* promulgating limits on the acceptance of fee committee proposals.[15] Interpreting authority cited with approval in *High Sulfur*, the Ninth Circuit found that the Due Process Clause requires that opposing counsel have access to the timesheets relied on to support the fee order. *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 545 (9th Cir. 2016) (citing *In re Nineteen Appeals*, 982 F.2d at 614; not. om.). The Order is irreconcilable with these legal principles.

Independently, the time records were discoverable pursuant to Federal Rule of Evidence 1006 because the Court relied on summaries of these records.[16]

In addition, keeping the time records sealed was improper because it deprived Primary Counsel of their right to effective cross examination. In *In re Air Crash Disaster at Florida Everglades,* 549 F.2d 1006 (5th Cir. 1977)*,* the 8% fee tax imposed by the district court was reversed because that court had exercised its authority "in an erroneous manner." *Id*. at 1008. The prerequisite for such an award is:

> The district court must set and conduct a hearing in the full sense of the word and must address the fee issue under the *Johnson* standards. The Committee and its counsel must offer relevant evidence and must be available for cross-examination. The court should enter findings of fact and conclusions of law setting out the basis

---

[14] *See Saizan v. Delta Concrete Prod. Co.*, 448 F.3d 795, 799 (5th Cir. 2006) ("Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant.") (note om.).

[15] *See* 517 F.3d at 230 ("Sealing the record protects no legitimate privacy interest that would overcome the public's right to be informed."), 234 n.22 ("We do not approve any gag order or sealing of the record in these cases"), 235 (dictating that upon remand, "No sealing or ex parte communications will be permitted."). *See also, generally,* Charles Silver, *What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation?*, 5 J. TORT LAW 181, 183 (2012) (explaining need for transparency and noting that, "much that happens inside MDLs reminds one of the Wild West").

[16] FED. R. EVID. 1006 ("The proponent may use a summary … to prove the content of voluminous writings …. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place.").

> for the fee award and adequately presenting the issue for further appellate review
> should this be necessary.

*Id*. at 1021 (note om.). Here, Primary Counsel lost substantial property interests – their right to

recoup fees and expenses – because the right to compensation for legal work and expenditures

was transferred to common benefit counsel, who could not be questioned regarding the records

allegedly substantiating this transfer of rights. The Order presents important legal questions

regarding what Due Process requires before contract rights can be extinguished.

> **4. Whether the quantum of the monetary transfer away from counsel with contract rights to court-appointed counsel is permissible is a controlling question of law.**

The degree to which Primary Counsel have been stripped of contract rights, in order to

pay counsel without such rights, is unprecedented. Newberg describes a common benefit fee

constituting 6% of the client's recovery as a "hefty" tax:

> [A] fee that is 6% of a client's total recovery, but that is paid entirely out of her
> attorney's fee, means that the attorney is likely losing 20% of a 30% contingent
> fee (6/30). That data point enables a court to pose the question: is a 20% tax
> justified? That's a hefty bite of the primary lawyers' contingent fee, significantly
> (33%) higher than the highest federal capital gains tax (15%) and roughly half the
> highest federal income tax rate (39.6%). Is the PSC entitled to a "tax" at th[at]
> level?

Newberg § 15:116.[17] Notably, this case is unique, even from the decisions analyzed by Newberg,

because a limited fund was created by the PSC, which only announced after the fact that the fund

was inadequate. As a result of the terms negotiated by the PSC, every common benefit dollar

comes at the expense of Primary Counsel's contract rights. This makes the common benefit

compensation all the more extraordinary and unprecedented.

---

[17] *See also, e.g.*, Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses, at 52, 58-60; B&B *et al*. Obj. in Op. to FC's Mot. to Determine Allocation of the Global Fee Award, at 8-16 (Doc. 20376, Pages 14-22 of 48).

Here, the Order states that it grants 9.181% as a common benefit fee (Order, at 20); in actuality the percent is 15.376%.[18] Either way, the number is significantly greater than 6%, an injustice compounded by the fact that Primary Counsel have sustained draconian cuts to their contract rights.

In *Vioxx*, the Court ultimately decided that **6.5%** of the recovery should be awarded to the common benefit lawyers, **leaving the remaining 25.5%** to privately retained lawyers. *In re Vioxx Products Liab. Litig.*, 760 F. Supp. 2d 640 (E.D. La. 2010); *see also Evans v. Tin, Inc.*, Nos. 11-2182 *et al.*, 2013 WL 4501061, at *12 (E.D. La. Aug. 21, 2013) ("The Court ultimately decided that 6.5% of the 4.85 billion dollar recovery should be awarded to the common benefit lawyers, leaving the remaining 25.5% to privately retained lawyers."). Thus, the Court applied a 1 to 3.9 ratio of common benefit fees compared to the fees of counsel with contract rights. Here, in stark contrast, the ratio is 1 to .92.[19]

Moreover, the manner in which respective expenses have been handled bears no relationship to any other reported authority. On the one hand, the lawyers who paid for the filing of hundreds of cases pursuant to their contract rights to reimbursement were stripped of those rights and left holding the bag for hundreds of thousands of dollars in out-of-pocket litigation expenses – a result that the PSC deliberately engineered.[20] The PSC intended to deprive contractually retained counsel of their contract rights to recoup hundreds of thousands of dollars in expenses, yet the PSC was a spendthrift when treating itself and others to an array of

---

[18] The real percentage, based on the actual total benefit conferred of $668,933,864.38 (*see* Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses, at 26-27), is 15.376% = ($197,803,738.17 x .52) / $668,933,864.38 x 100.

[19] Significantly, in *Vioxx*, there was no indication that the fee fund was insufficient to compensate both common benefit and contract counsel. *See* 760 F. Supp. 2d at 646.

[20] *See* Baron & Budd Ex. 1 (Affidavit of Barbara Eaton and supporting business records); Baron & Budd Ex. 2 (Affidavit of Matthew Moore and supporting business records).

luxuries.[21] The disparate treatment of litigation expenses is not defensible based on any legal principle and is extraordinarily unprecedented.

> **5.   Whether the PSC could act in its own self-interest in negotiating attorneys' fees on behalf of Primary Counsel, in nullifying Primary Counsel's contract rights, and in transferring settlement funds among the different accounts, are controlling questions of law.**

Lead counsel responsible for fee allocation must "'apply a ***universally fair*** standard of allocation to all participants, including itself.'" *See In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 517 F.3d 220, 232 (5th Cir. 2008) (reversing decision to accept fee allocation determined by a Fee Committee; parenthetically quoting *In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 234 (D. D.C. 2005)) (emphasis added). In *High Sulfur*, the Fifth Circuit was critical of "attorneys [who] were more interested in accommodating themselves than the people they represent." 517 F.3d at 229 (note om.); *see also id.* at 235 ("As Judge Ambro noted, 'They make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?'") (cit. om.). Here, an extensive record has been made describing the self-dealing of the PSC and the FC.[22] These and other serious issues were not addressed in the Order. As a matter of law, however, the basis for the fee award must be identified.[23] Thus, there are substantial legal issues regarding whether the PSC's and the FC's self-dealing could be ignored in the course of transferring property interests away from Primary Counsel and to court-appointed counsel.

---

[21] *See* Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorney's Fees and Expenses, at 105-124 and sources cited therein.

[22] *See* note 21 *supra*.

[23] *See Shipes, supra*, 987 F.2d at 320 ("the district court must explain with a reasonable degree of specificity the findings and reasons upon which the award is based, including an indication of how each of the *Johnson* factors was applied") (citing *Von Clark, supra*, 916 F.2d at 258).

Commentators have explained that lead plaintiffs' lawyers in mass tort litigation should bear fiduciary responsibilities, but that there is need for authoritative clarification on this issue.[24] The Order thus raises the important legal issue of whether, when standing in Primary Counsel's shoes purporting to negotiate the fund from which our attorneys' fees would be compensated as a substitute for our extinguished contract rights, the PSC assumed a fiduciary duty because the PSC purported to transact on Primary Counsel's behalf in obtaining a source of attorney fee funding.[25]

The legality of the PSC and FC's self-dealing, and their ability to wield power for their own gain while extinguishing the contract rights of other lawyers, are at issue, including:

---

[24] *See* Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigation*, 79 FORDHAM L. REV. 1985, 1990 (2011) ("Because disabled lawyers also have interests at stake in MDLs, one must also ask whether lead lawyers have fiduciary responsibilities to them. That disabled lawyers are at risk of being exploited is clear. … The fiduciary duty can protect disabled lawyers while still permitting lead attorneys' to do their jobs."); Silver & Miller, 63 VAND. L. REV. at 131 (lead attorneys "have built favorable fee and cost-reimbursement provisions into global settlements and have required certain claimants and non-lead attorneys to waive any objections they may have to these provisions as a condition for participating. Judges know about this behavior but have not condemned it. Some have even approved these self-enriching acts."); *id.* at 133 ("the lead attorneys used their control of settlement negotiations to enrich themselves. This was opportunistic behavior that violated their fiduciary duty to put others' interests ahead of their own."); *id.* at 135 ("The lead lawyers' job was to build a bridge from litigation to settlement for the benefit of all claimants and attorneys. They built the bridge, but they then forbade anyone from crossing it without paying them a toll. Were a lawyer for a single client to use a settlement negotiation to extract a fee increase from the client, the violation of the fiduciary duty would be patent. That the lawyers who used their control of settlement negotiations to enhance their fees were lead attorneys in an MDL changes nothing. They used their position to benefit themselves at the expense of those they were charged to represent. Conduct of this sort establishes a predicate for fee forfeiture, not for fee enhancement.") (notes om.).

[25] *Cf. Amitech U.S.A., Ltd. v. Nottingham Const. Co.*, 57 So. 3d 1043, 1054 (La. Ct. App. 2010) ("we find that Nottingham owed a fiduciary duty to Amitech with regard to this specific real estate transaction. The money Nottingham handled in connection with the final option extension and the business it transacted in that regard was not its own or for its benefit, but for the benefit of Amitech"); *Sampson v. DCI of Alexandria*, 970 So. 2d 55, 59 (La. Ct. App. 2007) ("In undertaking to obtain insurance for the Sampsons, DCI and/or Dunn became the mandatary of the Sampsons.").

- Primary Counsel were deprived of an accounting;[26] the record evidence nonetheless proves that the PSC handled the respective accounts so as to impose on Primary Counsel a share of the expenses, but deprive them of any share of the benefit, associated with the Virginia cases[27] and the North River Trial.[28] The PSC has never cited any authority allowing it to manipulate accounts in this manner and, in fact, this is improper according to the PSC's own prior admissions.[29]

- Significant monies were removed from the fee pot before the FC's 2016 fee allocation motion was filed and before the Order was entered. The settling defendants in this case have paid attorneys' fees in the amount of $233,078,270.33, yet per the Order, only $197,803,738.17 is available to pay attorneys' fees (Order, at 20). Certain expenses used to draw down the available fee pot are highly suspect, to say the least.[30]

- The voluntary common benefit payments are excluded from the attorneys' fund notwithstanding that Primary Counsel have been taxed a portion of the expenses associated with those cases; thus, as with the North River trial and the Virginia cases, Primary Counsel must share the costs while irreconcilably the PSC's machinations remove any of the benefits from the attorneys' fees available to Primary Counsel.[31]

---

[26] *See* Primary Counsel's Motion for Accounting and Adjustment of Global Award of Attorneys' Fees and Reimbursement of Expenses (Doc 20995 (motion to file under seal)).

[27] *See* Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses, at 40, 83-86, 101-103.

[28] *See id.* at 39, 84-85, 96-97. Common benefit counsel admitted that they attributed extensive work to the North River case. *Id.* at 84-85.

[29] *See* § II.B.7 *infra* (describing prior admissions re InEx/North River).

[30] *See* Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses, at 105-24.

[31] *See* Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses, at 41-42, 84-86.

**6. A controlling question of law is whether the benefit conferred can be artificially inflated as a basis for transferring entitlement to fees and expenses away from the counsel hired by the plaintiffs.**

The Order transgresses important principles of law recognizing Primary Counsel's property interests in their fee contracts, due process, equitable justifications for the common benefit fund doctrine, and case law dictating the proper procedures for a fee award (*see* cases cited above). No authority allows an attorney fee award to be based on a benefit that was not in actuality conferred. However, the FC's calculations, accepted in the Order, include benefits that were not part of the recovery obtained by the PSC's efforts. The Order's calculation of a 9.181 % recovery for common benefit work – which is independently too high under the circumstances – appears less than it actually is because the total settlement value is artificially raised to $1.2 billion. *See* Order, at 20 & n.4 (Doc. 22168, Page 20 of 26). The actual number is 15.376%.[32]

For one thing, administrative costs, either paid by defendants or by the PSC shared fund, are improperly counted as part of the benefit allegedly conferred by common benefit work.[33] As a matter of law such costs, and particularly costs paid by defendants for their own benefit, cannot be included in the benefit calculation.[34] Further, the administrative costs paid by the shared fund should not be included because as a matter of law counsel cannot recover both full

---

[32] *See* note 18 *supra*.

[33] *See* Special Master Recommendation, Doc. 20950, 40-41; Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses, at 42.

[34] *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) ("administrative costs should not have been included in calculating the division of the spoils between class counsel and class members. Those costs are part of the settlement but not part of the value received from the settlement by the members of the class. The costs therefore shed no light on the fairness of the division of the settlement pie between class counsel and class members.") (Posner, J.); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014) (quoting same). *See also* Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses, at 43-44 (citing slip opinions).

18

reimbursement of expenses *plus* a percentage of the expenses.[35] In calculating fees, double counting is not allowed.[36] The case law recognizing the legal limits on fee awards is particularly compelling and applicable where, as here, such double-counting comes at the expense of stripping other lawyers of their contract rights to recover hundreds of thousands of dollars of litigation costs and most of their fees.

Through the FC's math, common benefit compensation includes fees on fees, which also violates case law requiring that an attorney fee award must be based on the actual benefit conferred by the common benefit work. Common benefit/class counsel cannot calculate a reasonable fee request by including benefits not attributable to counsel's efforts. *See Turner v. Murphy Oil USA, Inc.,* 472 F. Supp. 2d 830, 861-62 (E.D. La. 2007) (declining to calculate fees based on $330 million total value of the settlement and instead using lower number, $195 million). One example of this is the FC's inclusion of fees obtained by individually retained counsel in private settlements as a benefit conferred by the PSC upon the class.[37] The PSC is depriving Primary Counsel of their right to receive attorneys' fees while simultaneously attempting to take credit for Primary Counsel's work. Thus, while there may be examples of attorneys' fees counted as part of the benefit, this has not been allowed under these facts. Here, the PSC engineered the destruction of Primary Counsel's rights, then collected a 17% cut of cases those Primary Counsel settled, and then claimed that the work of Primary Counsel is a

---

[35] *In re Initial Pub. Offering Sec. Litig.,* 671 F. Supp. 2d 467, 514 (S.D. N.Y. 2009) ("there is simply no reason why plaintiffs' counsel should be awarded a percentage of their expenses in addition to being reimbursed for those reasonable expenses. I therefore find that the percentage fee should be based on the net settlement fund rather than the gross settlement fund.") (note om.).

[36] *See Shipes, supra,* 987 F.2d at 320 ("the district court must be careful, however, not to double count a *Johnson* factor already considered in calculating the lodestar when it determines the necessary adjustments") (citing *Von Clark, supra*, 916 F.2d at 258).

[37] *See* Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses, at 38-42.

benefit imbued by the PSC. The PSC has taken credit for the legal services and earnings *by* other lawyers – as a reason for taking most of a limited fund *from* those lawyers. The PSC is claiming credit for our work as a reason for paying us less. None of the above-discussed definitions of the common benefit fund doctrine, or case law on fee awards, allows the equivalent of a shell game as justification for compensating court-appointed counsel.

Moreover, the benefit conferred should be calculated based on the actual value and not self-serving formulaic valuation.[38] Consistently, in approving the settlement the Court stated that, "the true value [of the Knauf settlement] will depend primarily on the **actual costs** of remediation, the funding for which is uncapped." *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 09-08030, 2013 WL 499474, at *4 (E.D. La. Feb. 7, 2013) (emph. added). However, the Order is inconsistent with the Court's prior statement and controlling legal principles in the following respects:

- The calculation of the benefit conferred artificially inflates the Knauf payments for Option 1 from the actual benefit conferred as reported by BrownGreer ($458,422,992.59) to a significantly higher value ($515,643,751.00).[39]

- The calculation of the benefit conferred also artificially inflates the Knauf payments for Options 2 and 3 to $201,435,764.28; this is error because the known, actual values of the

---

[38] *Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223 (2000) (statement of O'Connor, J.) (approval of attorneys' fees should inquire as to "rational connection between the fee award and the amount of the actual distribution"); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1035 (N.D. Ill. 2011) ("Because the $1.98–billion figure overinflates the value specific to the Settlement, the Court cannot calculate '10% of the aggregate value of the relief obtained for each Subclass.' As a result, the Court treats the fee request as being for a percentage of the actual cash recovered for each Subclass.").

[39] *See* Order, at 17; Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses, at 27-31.

remediation benefits paid by Knauf as reported by BrownGreer is $106,839,118.25.[40] This inflation includes double-counting.[41]

- The value of the created fund improperly included benefits to pro se claimants.[42]

- The value of the GBI Settlement payments is inflated.[43]

Finally, in *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1010 n. 5 (5th Cir. 1977), the Fifth Circuit noted the legal issue of whether the court had authority to assess a fee in cases not formally before it, but did not decide this issue because the appeals had settled. This important legal issue *is* before the Fifth Circuit here because the calculation of the benefit conferred contains the properties of 79 homeowners who did not file an Omnibus Complaint.[44] Primary Counsel contend that there is no federal jurisdiction allowing the benefit conferred to be based on payments to parties who were not before the Court.[45]

**7. Whether the PSC and FC are bound by their prior successful representations of fact is a controlling question of law.**

There is a controlling legal issue regarding whether the PSC could obtain a disproportionate amount of the limited funds based on purported facts that are contrary to the

---

[40] Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses, at 32-35.

[41] *See id.* at 35.

[42] *See id.* at 31-32.

[43] *See id.* at 36-37.

[44] *See id.* at 32.

[45] *See, e.g., In re Genetically Modified Rice Litig.*, 764 F.3d 864, 874 (8th Cir. 2014) (rejecting argument that the district court's jurisdiction over the defendant and plaintiffs' counsel, some of whom represented clients in the MDL, created jurisdiction for ordering holdbacks from state-court recoveries).

PSC's former declarations, which the Court had accepted.[46] Estoppel arises in at least three contexts here.

*Whether Primary Counsel Performed Extraordinary Legal Work Unique to this Litigation.* The PSC and FC's 2014 Memorandum filed in Support of the Petition for Global Fee Award described at length the unique pressures, responsibilities, and legal work required by the lawyers responsible for the claims of individuals whose homes were uninhabitable or otherwise severely damaged (Doc. 17700-1, Mem. at 32-38). The Global Fee Petition included a Declaration in which Messrs. Levin and Herman attested to the challenges faced by Primary Counsel, the extensive work conducted by Primary Counsel, the scope of work provided by Primary Counsel, the settlement administration tasks conducted by Primary Counsel, and the legal and factual complexity faced by the homeowners and primary counsel (Doc. 17700-2, Dec. at 33-39). In announcing the settlement in December 2011, Mr. Herman insisted that this case "has proven much more difficult" than a medical or pharmaceutical case "because client contacts are daily." Transcript of 12/5/2011 Status Conference (Doc. 11923, at 15). The Court stated that the Court required that attorneys be in the homes of their clients:

> [I]t has taken the work and cooperation of counsel. The thing that's helpful in this particular cases, too, is I asked counsel if they could have somebody on the ground, one of the **attorneys at the homes** to make sure that these homes were being done according to protocol.

---

[46] *See, generally, Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261 (5th Cir. 2012) ("In determining whether to apply judicial estoppel, we primarily look for the presence of the following criteria: (1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently…(cit. om.). However, judicial estoppel is not governed by inflexible prerequisites or an exhaustive formula for determining [its] applicability, and numerous considerations may inform the doctrine's application in specific factual contexts.") (citations and quotation marks omitted).

Transcript of 2/23/2011 Status Conference, at 7:4-8 (emph. added).[47] Inconsistently, however, the Order relies on the contrary finding that, allegedly, most of the work was done by non-lawyers and was allegedly administrative. Order, 22 (Doc. 21168, Page 22 of 26).

*Costs of remediation.* The doctrine of estoppel also was violated in the FC's significant inflation of the benefit conferred. At the time of the announcement of the Knauf settlement on December 15, 2011, Mr. Herman stated that the average cost of remediation was "$40 a square foot" or "$60 a square foot." Tr. Status Conference of 12/15/2011 (Doc. 11923), at 30:3-4. However, the cost per square foot number used to inflate the value of remediation that is the basis for the Order (*see* Order, 17 ($515,643,751.00)), is $86.00 per square foot.[48]

*North River/InEx accounting.* The PSC also should be estopped from changing its tune regarding the North River/InEx time and expenses. The Fee Committee admitted that it needed to segregate the North River/InEx time and expenses from the fee request.[49] Inconsistently, it failed to do so.[50]

### C.  In the alternative, the allocation should be certified as final under Rule 54(b).

In the alternative, the Order should be certified as a final judgment pursuant to Federal Rule of Civil Procedure 54(b). "A district court decision to certify its judgment on some portion

---

[47] In addition, Primary Counsel made a record of their personal involvement. *See, e.g.*, Supplemental Affidavit of Allison Grant, Esq. (SM 17-05-08-1217-1); Supplemental Affidavit of Holly Werkema (SM 17-05-08-1658-1); Affidavit of Eric D. Hoaglund (Doc. 20336-1); Affidavit of Edward K. Sexton, II (Doc. 20336-2); Special Master Evidentiary Hearing Transcript of 6/1/2017, at 189-225, 228-231, 294-331.

[48] *See* Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses 29-30.

[49] *See* Jt. Pet. of the FC and the PSC for a Global Award of Attorneys' Fees and Reimbursement of Expenses, at 4 n. 11 ("To avoid any duplication of recovery, the hours and expenses related to the InEx/North River trial will be removed from the global hours submitted by the law firms involved in that trial to the Court-appointed auditor when this agreement is presented to the Court for an allocation of these funds.") (Doc. 17700, Page 4 of 8).

[50] *See* Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses, at 84-85, 97.

of a multiple claim as an appealable final judgment under Rule 54(b) is a discretionary act." *H&W Indus., Inc. v. Formosa Plastics Corp., USA*, 860 F.2d 172, 175 (5th Cir. 1988). "It is left to the sound judicial discretion of the district court to determine the 'appropriate time' when each final decision in a multiple claims action is ready for appeal." *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980) (cit. om.).

Attorney fees represent one of multiple claims. Because the Order finally sets the two allocation categories in the amounts of $99,762,099.56 and $94,607,042.17, the Order is final on this specific issue, and interlocutory appeal would not force the Fifth Circuit to rule twice on the same matter.[51] There is no just reason for delay because an appellate determination that the Order is erroneous would save the Court and litigants from calculating scores of awards that would not withstand ultimate appellate scrutiny.[52]

### III.    Conclusion and Prayer for Relief

As quoted above, legal scholars have questioned the judicial authority for cutting contingency fee contract rights in mass torts. Against this backdrop, the Order transfers entitlement to fee compensation away from the lawyers actually hired by the plaintiffs to an unprecedented degree. Several decisions subsumed within the Order raise controlling legal issues that require definitive resolution by the Fifth Circuit. If the Court proceeds to the next step of

---

[51] *See, generally, Curtiss-Wright*, 446 U.S. at 8 (it is proper for a district court "to consider such factors as whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals.") (note om.).

[52] *See Mt. Hawley Ins. Co. v. Advance Prod. & Sys., Inc.*, 972 F. Supp. 2d 900, 911 (W.D. La. 2013) ("to delay entry of final judgment could result in the inefficient use of judicial resources. Should the appellate court determine this Court's Ruling was erroneous (and admittedly, it was a close question), the time, effort and expenditure of judicial resources—as well as the resources of the litigants—in determining any remaining amounts owed under the policy will have been without purpose."), *rev'd and remanded*, 597 F. App'x 780 (5th Cir. 2015).

quantifying scores of payments without resolving the underlying legal issues, then there is a risk that these future calculations will be erroneous and will need to be redone.

Congress' purpose in enacting Section 1292(b) was "to confer on district courts first line discretion to allow interlocutory appeals." *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 47 (1995) (cit. & note om.) For the foregoing reasons, the undersigned respectfully request that the Court exercise such discretion here and certify the Court's Order and Reasons Setting Common Benefit Fees (Doc. 21168), for interlocutory appeal to the Fifth Circuit under 28 U.S.C. § 1292(b), or alternatively under Federal Rule of Civil Procedure 54(b).

February 28, 2018

RESPECTFULLY SUBMITTED:

/s/ S. Ann Saucer
S. Ann Saucer (TX Bar No. 00797885;
LA Bar No. 21368)
Russell W. Budd (TX Bar No. 03312400)
Holly R. Werkema (TX Bar No. 24081202)
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
asaucer@baronbudd.com
rbudd@baronbudd.com
hwerkema@baronbudd.com

Allison Grant (FL Bar No. 858330)
ALLISON GRANT, P.A.
14 S.E. 4th St
Boca Raton, FL 33432-6111
Tel.: 561-994-9646
Fax: 561-431-4627
agrant@allisongrantpa.com

Jeremy W. Alters (FL Bar No. 111790)
Justin D. Grosz (FL Bar No. 984000)
Matthew T. Moore, Of Counsel (FL Bar No. 70034)
ALTERS LAW FIRM, P.A.
1855 Griffin Road, Suite C470
Dania Beach, FL 33004
Tel.: (305) 571-8550
Fax: (305) 571-8558
jeremy@alterslaw.com
justin@alterslaw.com
matthew@alterslaw.com

Jimmy R. Faircloth, Jr. (Objectors' Co-Liaison
Counsel) (LA #20645)
Brook L. Villa (LA #31988)
Franklin "Drew" Hoffmann (LA #35824)
FAIRCLOTH, MELTON & SOBEL, LLC
301 Main Street, Suite 920
Baton Rouge, LA 70801
Phone: (225) 343-9535
Fax: (225) 343-9538
jfaircloth@fairclothlaw.com
bvilla@fairclothlaw.com
dhoffmann@fairclothlaw.com
*Attorneys for Parker Waichman LLP*

K. Edward Sexton, II
(AL Bar No. ASB-5463-O69K)
GENTLE, TURNER, SEXTON & HARBISON,
LLC
501 Riverchase Parkway East, Suite 100
Hoover, AL 35244
Phone: (205) 716-3000
Fax: (205) 716-3010
esexton@gtandslaw.com

Eric D. Hoaglund
(AL Bar No. ASB-3449-55E)
MCCALLUM, HOAGLUND, COOK & IRBY,
LLP
905 Montgomery Highway, Suite 201
Vestavia Hills, AL 35216
Phone: (205) 824-7767
Fax: (205) 824-7768
ehoaglund@mhcilaw.com

26

Val Patrick Exnicios, Esq. (Objectors' Co-Liaison Counsel)
LISKA, EXNICIOS & NUNGESSER
1515 Poydras Street
14th Floor, Ste. 1400
New Orleans, LA 70112
Phone: (504) 410-9611
Fax: (504) 410-9937
vpexnicios@exnicioslaw.com
*Attorney for Pendley Baudin & Coffin, Rhine Law Firm, and Luckey & Mullins*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and electronic mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 28th day of February, 2018.

Dated: February 28, 2018                              RESPECTFULLY SUBMITTED:

/s/ S. Ann Saucer
S. Ann Saucer (TX Bar No. 00797885;
LA Bar No. 21368)
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
asaucer@baronbudd.com