**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION                                              MDL NO. 2047

                                                        SECTION: L

                                                        JUDGE FALLON
                                                        MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO:
*ALL CASES*
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFFS' LEAD AND LIAISON COUNSEL'S MEMORANDUM IN SUPPORT**
**OF THEIR MOTION ADDRESSING SUGGESTION OF REMAND'S REFERENCE TO**
**THE NEED TO ESTABLISH A PLAINTIFFS' ATTORNEYS' FEES FUND TO**
**COMPENSATE AND REIMBURSE ATTORNEYS FOR SERVICES PERFORMED AND**
**EXPENSES INCURRED FOR MDL ADMINISTRATION AND COMMON BENEFIT**

I.    **INTRODUCTION**

        Plaintiffs' Lead and Liaison Counsel and other common benefit counsel working at their

direction have been actively pursuing litigation on behalf of thousands of Plaintiff property owners

in this Multidistrict litigation since its inception in June 2009.   Throughout the extraordinary

course of this prolix consolidated litigation, the Plaintiffs' Steering Committee ("PSC") has

aggressively pursued the principal entities responsible for manufacturing defective Chinese drywall

and those responsible for exporting/importing, distributing, supplying, and installing that drywall

into thousands of properties in Louisiana, Florida, Virginia, Georgia, Texas, Alabama, Mississippi,

California, New York, and elsewhere.   Earlier in the litigation, the Plaintiffs globally resolved

approximately 4,000 claims involving the German-based Knauf Defendants and those entities in

the Knauf supply chain.   Unfortunately, the Chinese-based Defendants, referred to as the Taishan

Defendants,[1] continue to deny any liability and thwart this Court's authority, while still challenging even basic principles of personal jurisdiction.   Having frustrated the legal system for almost a decade, the formidable tools available to this MDL Court to resolve the thousands of claims brought by homeowners with Taishan Chinese drywall have been virtually exhausted.   With little hope for a conclusion in the transferee forum, the Court has begun the orderly remand of each individual case back to its original transferor forum for trial or other means of resolution.   The Court's March 12, 2018 Suggestion of Remand, Opinion and Order ("Florida Remand Order") (Rec. Doc. 21242) initiated remands starting with the *Amorin* Florida cases, while reserving its authority to award equitable common benefit fees and costs to compensate the counsel who have prosecuted these cases on behalf of all Plaintiffs with Chinese drywall claims.   As made expressly clear in the Florida Remand Order, the present circumstances warrant the establishment of an attorneys' fees fund to sequester available funds for future compensation of all counsel that have undertaken common benefit efforts at the direction of Plaintiffs' Lead and Liaison Counsel.

The valuable work product of these Common Benefit counsel to date, which includes a trial package that will be available for all Plaintiffs' counsel in the MDL transferee forum, has and will greatly benefit all Plaintiffs' counsel and their clients here and in the remand fora.   In addition, while this Court has embarked on the path beginning with the remand of the Florida *Amorin* cases

---

[1] The "Taishan Defendants" are defined to include: Taishan Gypsum Co. Ltd. ("Taishan"), Taishan's wholly-owned subsidiary and alter ego Tai'an Taishan Plasterboard Co., Ltd. ("TTP"); and Taishan's parents Beijing New Building Materials Public Limited Co. ("BNBM"); Beijing New Building Materials Group Co., Ltd. ("BNBM Group"); China National Building Materials Co., Ltd. ("CNBM"); and China National Building Materials Group Corporation ("CNBM Group").   *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2014 WL 4809520, *1 (E.D. La. Sept. 26, 2014).   CNBM Group was later dismissed from the litigation by order dated March 10, 2016, addressing the Foreign Sovereign Immunities Act (Rec. Doc. 20150).

in which default judgments were entered against the Taishan Defendants, there still remains litigation in the *Brooke* Omni cases where default judgments do not exist.   The *Brooke* Omni Complaints were filed in Florida, Virginia and Louisiana (and protective actions were also filed in Alabama, Georgia, California, Mississippi, Texas, North Carolina, and Illinois) because those venues received the Taishan Defendants' defective drywall.   The *Brooke* Omni actions continue to remain before this transferee court.   The Taishan Defendants have not yet answered the *Brooke* Complaints, no discovery has taken place in *Brooke*, and class certification of the matters has not yet been determined.   The *Brooke* actions will demand similar attention from Plaintiffs' leadership, who will not shirk their responsibilities.   Thus, Plaintiffs' Lead and Liaison Counsel request that this Court issue an order which shall impose on the responsible Defendant(s) an obligation to withhold funds from any and all settlements or verdicts due and owing to Plaintiffs, and pay a portion of these monies into a Court-supervised fund for later adjudication of distribution to common benefit counsel.   The remainder of the funds will be distributed to the individual Plaintiffs' counsel upon settlement or verdict reached.   While the Court's order shall be implemented within the MDL, its effect will be confirmed in any anticipated Final Pretrial Order, as set forth in the recent Suggestion of Remand to the Judicial Panel on Multidistrict Litigation, so that its effect extends to the parties upon their return to the transferee courts.

The motion to establish a Plaintiffs' Attorneys' Fees Fund should be granted for the reasons set forth below.

## II.     PROCEDURAL HISTORY AND STATEMENT OF FACTS

This complex multidistrict litigation was established to consolidate and coordinate pretrial proceedings for scores of individual and class action lawsuits that were brought in several federal district courts in the Gulf Coast region and East Coast by property owners whose homes or other properties were damaged by drywall manufactured in China and imported into the United States.

The imported Chinse drywall is defective.   When installed in certain structures and climates, it creates corrosive environments that wreak havoc in the properties by producing obnoxious, foul-smelling odors and damaging other parts of the structures and appliances. Chinese drywall has created such a substantial nuisance that numerous governmental agencies have studied it and found to be defective.[2]

On June 15, 2009, the Judicial Panel for Multidistrict Litigation entered an Order transferring all federal cases involving such claims to the United States District Court for the Eastern District of Louisiana for coordinated discovery and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.   *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L 2009).

On July 27, 2009, this Court, as the transferee court, entered Pretrial Order No. 8, which created the PSC consisting of Jerrold Seth Parker, Dawn M. Barrios, Victor Manuel Diaz, Ben Gordon, Daniel E. Becnel, Jr.,[3] Ervin Amanda Gonzalez,[4] Hugh P. Lambert, Arnold Levin,

---

[2] *See generally, In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 2014 WL 4809520 (E.D. La. Sept. 26, 2014) (Findings of Fact and Conclusions of Law with Respect to Plaintiffs' Omnibus Motion for Class Certification).

[3] By Order dated February 3, 2016, Mr. Becnel was substituted by his partner, Robert M. Becnel (Rec. Doc. 20029).

Christopher Seeger, Scott Weinstein, Gerald E. Meunier, James Robert Reeves, Bruce William Steckler, and Russ M. Herman (as an ex-officio member).   In addition, Arnold Levin was selected as Plaintiffs' Lead Counsel.   Previously, Russ Herman was appointed to serve as Plaintiffs' Liaison Counsel.   *See* Pretrial Order No. 3.   The Court set forth certain duties and responsibilities of the PSC, including the preparation and completion of pleadings; the filing of motions; responding to motions; discovery; pretrial preparation; settlement; docket management; the establishment and administration of a document depository; communication with individual Plaintiffs and their counsel; liaison with Defendants; and court appearances.   PTO 8 at 3-4.

In contemplation of the fact that the PSC would perform these services on behalf of all Plaintiffs in the litigation, the Court provided in Pretrial Order No. 9 a mechanism by which attorneys working for the PSC would report the amount of time expended for common benefit activities, with the expectation of being compensated for their time and reimbursed for expenses incurred on behalf of Chinese drywall Plaintiffs.

Since the entry of PTO No. 8, Plaintiffs' Lead and Liaison Counsel have set up the Plaintiffs' document depository, represented the Plaintiffs at 98 monthly status conferences to date,[5] undertaken the enormous burden and concomitant expense of preparing, filing, translating and serving the 34 Omni complaints and related complaints in intervention to attract and aggregate thousands of Plaintiffs and their associated Defendants into this litigation, and all the while

---

[4]  By Order dated July 31, 2017, the late Mr. Gonzalez was substituted by his partner, Mr. Montoya (Rec. Doc. 20878).

[5]  *See* Rec. Doc. 21245 (Joint Report No. 98).

undertaking the arduous task of managing this prolix litigation.[6]   Absent the common benefit

services bestowed upon the Plaintiffs through the provision of these Omni Complaints, few

Plaintiffs would have been able to perfect service of process under The Hague Convention on the

foreign manufacturers of Chinese drywall.   Plaintiffs' Lead and Liaison Counsel, along with other

counsel working at their direction, performed this function for all Plaintiffs and saved individual

property owners and their contract attorneys hundreds of thousands of dollars in service costs and

countless hours required to translate complaints and otherwise meet the requirements of The

Hague, especially in China.   These services performed by Plaintiffs' Lead and Liaison Counsel

aggregated the "mass" in this mass tort/class actions, which helped contribute to resolving much of

this litigation. In total, there were 1,651 named Defendants.[7]

Following a lengthy and in-depth investigation by Plaintiffs' Lead and Liaison Counsel into

the sources, supply chains, and damaging effects of Chinese Drywall, the preparation of detailed

jurisdictional and substantive discovery requests, the completion of more than 200 common benefit

depositions in the U.S. and abroad, the exchange of more than 1 million pages of documents[8] and

---

[6]  For a detailed analysis of the various Omni Complaints, and complaints in intervention, their
procedural history, including the Court's rulings on service and interventions, is recounted at length
in Liaison Counsels' monthly status reports, filed of record.   *See*, *e.g.*, Joint Report No. 98 of
Plaintiffs' and Defendants' Liaison Counsel at 2-10 (Rec. Doc. 21245).   These pleadings have
created tremendous efficiencies and streamlined the pleading process at great benefit to
individually retained counsel whose responsibilities for pleading have been avoided with virtually
no effort or expense to them.

[7]  *See* Declaration of Plaintiffs' Liaison Counsel Russ M. Herman and Plaintiffs' Lead Counsel
Arnold Levin, dated 5/14/2014 ("2014 Herman-Levin Decl."), Exhibit 2 (Rec. Doc. 17700-4).

[8]  A myriad of these documents was received in Chinese and German, which required translation.
As discussed, *infra*, at fn. 26, there is an outstanding sanctions order requiring Taishan to provide
accurate translations of documents the company produced (*see* Rec. Doc. 19700).

scores of expert reports, the issuance of dozens of FOIA requests, several successful bellwether trials establishing a comprehensive remediation protocol,[9] and the implementation of a remediation pilot program with the Knauf Defendants, Plaintiffs' leadership was able to negotiate and finalize nine interrelated class action settlement agreements with the Knauf entities, Banner, InEx, L&W, and hundreds of Builders, Installers, and Suppliers, and their Insurers.[10]   The Knauf settlement provided complete remediation benefits to Plaintiffs with KPT Chinese Drywall installed in their properties.   In addition, significant cash benefits were made available for other losses sustained by Plaintiffs (*e.g.*, alternative living expenses, short sales and foreclosures, loss of use and enjoyment, lost rent, personal property damage, and bodily injury).   Through these class settlements, Plaintiffs' leadership bestowed over $1.1 billion in remediation and cash settlement benefits to class members who chose to participate therein.[11]   The inter-related settlements with the Knauf Defendants and other Defendants were finally approved by the Court on February 7, 2013.[12]   Four related Virginia class settlements were approved by the Court on July 9, 2013.[13]   These efforts

---

[9] *See* Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses (with Exhibits) ("Global Fee Petition") (Rec. Doc. 17700); Fee Committee's Motion to Determine the Allocation of the Global Fee Award As Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) (with Exhibits) ("Allocation Motion") (Rec. Doc. 20290).

[10] *See* Rec. Doc. 16570 (final approval and class certification order for Knauf, Global, Banner, InEx, and L&W settlements, dated 2/7/2013); Rec. Doc. 16934 (final approval and class certification order for four Virginia settlements, dated 7/9/2013).

[11] Allocation Motion, at 36-49 & Exhibit B thereto; Rec. Doc. 21168 at 17.

[12] Rec. Doc. 16570.

[13] Rec. Doc. 16934.

have culminated in extraordinary results:  over 3,000 KPT properties have been completely remediated., *i.e.,* about 2,209 homes and 633 condominiums.  *See* Florida Remand Order at 3. Separately, the Court and counsel are engaged in an ongoing process to resolve compensation to counsel for their common benefit work in this litigation through year-end 2013, which relates to the inter-related Knauf settlements.

In stark contrast to the Knauf Defendants, the beleaguered procedural history of the Taishan Defendants' recalcitrant participation in this litigation is well-known and well-documented in the MDL and the Fifth Circuit Court of Appeals.  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig*., 894 F. Supp. 2d 819 (E.D. La. 2012) (Fallon, J.), *aff'd*, 742 F.3d 576 (5th Cir. 2014) (Elrod, J., Reavley, J., Haynes, J.) and 753 F.3d 521 (5th Cir. 2014) (Higginson, J., Smith, J., DeMoss, J.).  The Taishan Defendants are not parties with clean hands.  For more than eight years, they have abused and continue to abuse our legal justice system.  Recognizing these realities, this Court has determined that the time is now ripe to transfer these fully prepared cases to the various transferor federal courts in the states where the Plaintiffs reside and their properties are located, beginning with the Florida *Amorin* cases.

Beginning in 2005, these companies targeted American consumers for purposes of selling millions of dollars of their defective products.  When litigation began in 2009, with the advice of their present counsel who had traveled to China, CNBM and BNBM orchestrated a plan to ignore the lawsuits against them and against Taishan and allow default judgments to be entered, while hiding behind a wall preventing Plaintiffs from enforcing U.S. judgments in China.[14]  After

---

[14]  *See In re Chinese Manufactured Drywall Prod. Liab. Litig*., 168 F. Supp. 3d 918, 932 (E.D. La. 2016) ("Throughout the litigation, the Defendants have shared attorneys and law firms. On November 29, 2010, all of the parties—CNBM Group, CNBM, CNBM (USA), BNBM, Taishan,

Taishan was found liable in a bellwether trial in *Germano* in 2010, CNBM and BNBM arranged for Taishan/TTP to enter their appearances in the MDL, but solely for the purpose of contesting jurisdiction and opening the default judgments.   Two years later after significant discovery, including depositions personally overseen by the Court in Hong Kong, the Court issued its comprehensive opinion addressing Taishan's conduct in the United States and its alter ego status and responsibility for TPP's conduct and vice versa.[15]   Florida Remand Order at 6, *citing* 894 F. Supp. 2d 819 (E.D. La. 2012).   Thereafter, in 2014, two panels of the Fifth Circuit affirmed jurisdiction over these companies and affirmed this Court's finding that Taishan and TTP are alter egos.   *Id.*, citing *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 (5th Cir.

---

TTP, and Weifang—signed a Common Interest, Joint Defense and Confidentiality Agreement ("2010 JDA"). *See* [PSC Ex. 93]. Chris Vejnoska (who is the current counsel of record for the CNBM Entities) then represented BNBM. Joe Cyr of Hogan Lovells represented Taishan and Weifang, and his firm had been retained previously by BNBM. *See* Chen Dep. at 509.  . . . CNBM Group approved Taishan's decision not to appear at the Court-ordered Judgment Debtor Examination on July 17, 2014.").   Since the FSIA order issued, Mr. Vejnoska and the Orrick firm have taken over the representation of the BNBM entities, in addition to their representation of CNBM, which has looming influence over Taishan.

[15] This matter required a significant commitment from Plaintiffs' leadership which engaged in extensive jurisdictional discovery of Taishan and TTP, entailing months of effort and scores of depositions of various witnesses located on several continents.   *See, e.g.*, Rec. Doc. 17700-18 (Chart of Common Benefit Depositions).   Taishan's lack of forthrightness required the filing and adjudication of numerous motions to compel and for sanctions against Taishan.   Ultimately, due to conflicts between the parties' interpreters at the foreign depositions, the Court ordered that a second round of depositions of Taishan's witnesses would take place in Hong Kong under the Court's first-hand supervision, using a single court-appointed translator, to oversee witnesses bent on exaggeration and deception.   After extensive briefing, compilation of a monumental record, and an all-day evidentiary hearing in June, 2012, which was coordinated with related State-court proceedings, the Court determined in an epic 142-page opinion that Taishan and TTP were alter-egos subject to the Court's jurisdiction under Louisiana, Virginia, and Florida law.   *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012).

2014); *In re Chinese Manufactured Drywall Prod. Liab. Litig*., 753 F.3d 521 (5th Cir. 2014).[16]

Faced with having to pay the *Germano* judgment, the CNBM/BNBM entities devised a plan for

Taishan and TTP to fire their counsel and refuse to appear in open court for a judgment debtor

examination ("JDE") scheduled for July 17, 2014.   This litigation strategy was orchestrated from

the highest levels of CNBM Group, which unanimously voted 11-0 on July 11, 2014, to direct

Taishan not to appear at the July 17, 2014 Judgment Debtor Hearing.[17]   Taishan's deliberate

failure to appear at the JDE prompted the Court to enter a civil and criminal contempt order and

injunction enjoining Taishan and its affiliates and/or subsidiaries from conducting any business in

the U.S. until or unless Taishan participates in this judicial process.[18]

---

[16]  Taishan filed four separate appeals of the Court's jurisdictional rulings.   The record on appeal in *Germano* alone contained more than 16,000 pages.   Compiling the record and marshalling the facts and law before two different appellate panels, demanded significant resources and energy of Plaintiffs' leadership which unflinchingly provided outstanding appellate work and resulted in the affirmance of this Court's jurisdictional analysis and conclusions.   *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

[17]  *Chinese Drywall*, 168 F. Supp. 3d at 932.

[18]  During the period of contempt, various affiliates and subsidiaries of Taishan, including numerous CNBM/BNBM entities, blatantly violated the court's injunction by continuing to do business in the U.S. and using our courts to seek redress for contractual disputes with American companies.   *See* 7/17/2014 Contempt Order (Rec. Doc. 17869); PSC's Motion to Enforce the Court's July 17, 2014 Contempt Order (Rec. Doc. 18302-1); 1/8/2016 Order (Rec. Doc. 19959) (holding Taishan intentionally delayed responding to contempt track discovery); PSC's Substituted Motion to Enforce 7/17/2014 Contempt Order (Rec. Doc. 20032); PSC's Motion to Compel Complete Responses to Supplemental Discovery Directed to Taishan, TTP, BNBM, BNBM Group, CNBM and CNBM Group (Rec. Doc. 20661-1). Pursuant to the Court's directives of April 24, 2015 (Rec. Doc. No. 18757 (4/24/2015 Status Conference Minute Entry) at 2), Plaintiffs' leadership engaged in extensive expedited discovery of the Taishan Defendants, purported Taishan affiliates, subsidiaries, and third-parties related to contempt violations in addition to alter ego issues. Plaintiffs' leadership was required to travel to Hong Kong and other locations to depose the following Defendants and individuals related to said Defendants: Taishan (6/2-4/2015), CNBM (6/5-7/2015), CNBM Group (June 16-18, 2015), BNBM (7/8-11/2015), BNBM Group (July 15-18, 2015); CAO Jianglin, the Chairman of the Supervisory Committee of BNBM PLC, President and

Despite the Contempt Order, the Taishan Defendants blatantly continued to do business in the United States during the period of time that Taishan was held in contempt of court for its failure to appear for a JDE scheduled for July 17, 2014.   The CNBM Entities, the BNBM Entities, and Taishan received notice of the Court's order and injunction and understood its meaning. Nevertheless, they failed to instruct their affiliates and subsidiaries not to do business in the U.S., and they continued to do business in this country as usual, except for one important development. CNBM Group (<u>immediately prior</u> to the Contempt Order) instructed the CNBM Entities and the

---

Executive Director of CNBM, Chairman of the Supervisory Committee of BNBM Group, and General Manager and Director of CNBM Group (8/4-5/2015); WANG Bing, the Chairman and Director of BNBM PLC, Director of Taishan since 2005, and Vice President of CNBM (8/25-27/2015); SONG Zhiping, the Chairman and Executive Director of CNBM, and Chairman of BNBM Group and CNBM Group (9/14-15/2015); PENG Shou, the Vice President and Executive Director of CNBM, and President and Chairman of China Triumph International Engineering, Co. (9/16/2015); JIA Tongchun, the Chairman and General Manager of Taishan (9/17-18/2015); United Suntech Craft, Inc. (10/27/2015); CNBM Forest Products (Canada) Co., Ltd. (10/28/2015); CNBM USA (11/3/2015); China National Building Material Group Import & Export Company (11/4/2015); PENG Wenlong, manager of Taishan's foreign trade department until March 2014 and consultant to Taishan regarding this litigation from March 2014 until early 2015 (11/12-14/2015); HU Jinyu, supervisor of BNBM and General Manager of Audit Department of CNBM (12/7/2015).

Additionally, Plaintiffs' leadership undertook discovery of numerous third-parties to determine whether any Defendant and/or Taishan affiliate and/or subsidiary violated the Contempt Order and Injunction. Plaintiffs' leadership served subpoenas and notices of deposition on Plum Creek Timber Co., Inc., New Jersey Institute of Technology, Sunpin Solar Development, LLC, Walmart Stores, Inc., Hampton Affiliates (Trans-Pacific Trading U.S.) and Hampton Investment Company, Westerlund Log Handlers, LLC, Murphy Overseas USA Astoria Forest Products, CTIEC-TECO American Technology, Inc., Hull Forest Products, Inc., WH International, Inc., Steven J. Zika, Western Wood Lumber Co., Baillie Lumber Co., JP Morgan Chase & Co., Morgan Stanley, International Business Machines, Corp., BNK International, Inc., LLC, Jeffrey J. Chang, Great Western Building Materials, Baoan International Investment Co., Ltd., EAC & Son's Corporation, Davis Construction Supply, LLC, Triorient Trading, Inc., PABCO Building Products, LLC (d/b/a Pabco Gypsum), and Stepan Company.

These violations are the subject of the pending Substituted Motion to Enforce the Court's July 17, 2014 Contempt Order and Injunction (Rec. Doc. 20032).

BNBM Entities that when doing business in the U.S., they should not put any money in New York banks and they should not use company email accounts but rather only their personal emails when communicating overseas for business purposes.[19]

After Taishan fled the jurisdiction, with CNBM and BNBM's blessing, this Court certified a class of Taishan homeowners and scheduled a hearing to determine class damages.   On the day of that hearing in February 2015, BNBM entered an appearance and requested a continuance of the class damages hearing.   Shortly thereafter, Taishan and TTP returned to the litigation and paid the *Germano* judgment plus fines, and BNBM Group and the CNBM entities appeared for the first time.   Since then, these Defendants have fought hard to challenge jurisdiction,[20] decertify the Taishan class,[21] and avoid a class damages verdict.

---

[19]  *See* 7/11/2014 CNBM Group Resolution No. 17 of the Third Session of the Board of Directors of CNBM Group ("CNBM Group Resolution No. 17") [CONTEMPT Ex. 5] (Rec. Doc. 20032).  *See also* Chinese Drywall, 168 F.3d at 933 ("Following entry of the Contempt Order in this case, CNBM Group continued to monitor the litigation. During CNBM Group's Board of Directors meeting on August 15, 2014, Zhang Jian indicated that the CNBM Group need not be concerned about an American judgment: "Regardless of the ruling in the United States, the domestic assets will not be subject to enforcement." *See* CNBM Group 18th Meeting of the Third Session of the Board of Directors dated 8/15/14 [PSC Ex. 96].").

[20]  *See*, *e.g.*, Defendants' Supplemental Motion on Jurisdiction and Class Certification Following *BMS* filed by CNBM, BNBM Group, and BNBM (Rec. Doc. 20882) ("Supplemental Jurisdictional Motion"); Taishan's Reply Brief in Support of the Supplemental Jurisdictional Motion (Rec. Doc. 20955-2) ("Taishan *BMS* Reply"); Defendants' Motion to Certify an Immediate Appeal from the Court's Jurisdictional Order (§1292(b) Motion #1) filed by CNBM, BNBM Group, and BNBM (Rec. Doc. 20779); Defendants' Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b), Fifth Circuit Docket 17-90027, filed by CNBM Company, BNBM Group, and BNBM (Rec. Doc. 20898-2) (permission denied by the Fifth Circuit on September 1, 2017).

[21]  *See*, *e.g.*, Supplemental Jurisdictional Motion (Rec. Doc. 20882); Taishan *BMS* Reply (Rec. Doc. 20955-2); Defendants' Motion to Certify an Immediate Appeal from the Court's Order Denying their Motions to Decertify the Class (§1292(b) Motion #2) filed by CNBM, BNBM Group, and BNBM (Rec. Doc. 20780); Taishan's Motion to Amend the Order Denying Class Decertification and the Class Damages Order and to Certify for Interlocutory Appeal Under Section 1292(b) (Rec.

Whereas, the original class damages hearing was set for February 12, 2015, its initial continuance was again delayed because of Plaintiffs' leadership's insistence that Taishan first purge itself of contempt (Rec.Doc. 18367).   On March 17, 2015, the Court ordered Taishan to purge itself of contempt and again continued the damages hearing to April 28, 2015 (Rec. Doc. 18831).   Thereafter, the Court granted yet another request for a continuance and set the class damages hearing for June 9, 2015.

Following extensive pretrial briefing, which included Daubert motions, Plaintiffs' leadership presented evidence at the class damages hearing on June 9, 2015.   Plaintiffs' leadership presented two witnesses: Jacob Woody of BrownGreer, to describe the class members, and George J. Inglis, a Professional Engineer and Senior Project Consultant with Berman & Wright Architecture, Engineering and Planning, as its designated expert to testify about remediation damage estimates.   Plaintiffs' leadership also prepared and cross-examined the Defendants' experts, David Pogorolich, a certified general contractor, and Dr. M. Laurentis Marais, a statistician.   Afterwards, Plaintiffs' leadership labored to prepare extensive findings of fact and conclusions of law (Rec. Doc. 19197).

Based on this submission and the evidence presented at the class damages hearing, on April 21, 2017, this Court entered an order on class damages and denied Defendants' motion to decertify the Taishan class[22] (Rec. Doc. 20741).   The Court also entered its Order and Reasons holding that

---

Doc. 20778) ("Taishan's 1292(b) Motion").

[22]  Plaintiffs' leadership engaged in dogged efforts to establish a class-wide, evidence-based formula and methodology to calculate property damages involving defective drywall.   *See* Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(B) and Request for Approval of Supplemental Notice by Plaintiffs "CLASS FOFCOL" (Rec. Doc. 18086); Omnibus Reply/Response filed by the Plaintiffs' Steering Committee to Motions regarding Contempt,

(i) CNBM, BNBM Group, BNBM, and Taishan operate as a single business enterprise under Louisiana law, (ii) Taishan and BNBM are agents under Virginia and Florida law, and (iii) there is jurisdiction over BNBM under Florida law for its manufacture and sales of Dragon board and BNBM board in Florida.[23]   Following these rulings, Defendants filed multiple motions pursuant to 28 U.S.C. § 1292(b), seeking immediate appellate review of these rulings.   On August 4, 2017, the Court certified its Jurisdiction Order for immediate appeal.[24]   Thereafter, however, the CNBM and BNBM Defendants filed a supplemental motion to dismiss based on *Bristol-Myers Squibb v. Superior Court of California* ("BMS") (Rec. Doc. 20882).   At odds with their actions in this Court, these Defendants also petitioned the Fifth Circuit to review the Court's August 4, 2017 Order. Plaintiffs' leadership opposed these actions by highlighting the incongruous nature of the relief

---

Enforcement of Contempt Order, Class Damages Hearing, and Motion to Withdraw as Counsel for Taishan Gypsum Co., Ltd. and Taian Taishan Plasterboard Co., Ltd. (Rec. Doc. 18520); Response to Motion filed by Plaintiffs' Steering Committee re 18598 Emergency MOTION to Compel Production of Information Relevant to Plaintiffs' Motion for Assessment of Class Damages (Rec. Doc. 18612); Supplemental Memorandum by Plaintiff to 18612 Response to Motion, Supplemental Response of the PSC to Taishan's Emergency Motion to Compel Production of Information Relevant to Plaintiffs' Motion for Assessment of Class Damages (Rec. Doc. 18623); Plaintiffs' Reply Brief in Support of Motion for Assessment of Class Damages (Rec. Doc. 18958); Response/Memorandum in Opposition filed by Plaintiffs' Steering Committee re 19022 Motion for Leave to File Sur-Reply in Opposition to Plaintiffs' Motion for Assessment of Class Damages (Rec. Doc. 19302); Plaintiffs' Response to Taishan's Supplemental Memorandum in Opposition to Motion for Assessment of Class Damages (Rec. Doc. 19555); Response/Memorandum in Opposition filed by Plaintiff re 20778 MOTION to Amend the Order Denying Class Decertification and the Class Damages Order and to Certify for Interlocutory Appeal under Section 1292(b) (Rec. Doc. 20809).   Because of these efforts, this Court's Remand Order "strongly encouraged" the transferee courts to utilize the same to efficiently "determine the appropriate award" of damages in each remanded action.   Florida Remand Order at 10.

[23]  *See* Order and Reasons dated April 21, 2017 (Rec. Doc. 20739) (hereafter "Jurisdiction Order").

[24]  *See* Order and Reasons of August 4, 2017 (Rec. Doc. 20890).   Petitioners-Defendants' 1292(b) motions on class damages and decertification were denied by the Court's Order and Reasons of August 22, 2017 (Rec. Doc. 20910).

sought.   In response to Plaintiffs' leadership's efforts, on August 24, 2017, this Court vacated its

earlier order, and the Fifth Circuit denied the Defendants' petition for interlocutory relief (Rec.

Doc. 20927).   Extensive briefing occurred again on the issue of this Court's jurisdiction over the

Taishan Defendants.   And again, on November 30, 2017, this Court issued a scholarly opinion on

personal jurisdiction that rejected the Defendants' meritless challenges under *BMS* (Rec. Doc.

20188).[25]   The Taishan Defendants then revisited their request for interlocutory review, which

generated yet another round of briefing, which resulted in the Court's recent Order of March 6,

2018 (Rec. Doc. 21231).   Therein, this Court rejected the Taishan Defendants' efforts to further

delay these proceedings by certifying all the matters for interlocutory review, and only certified this

Court's original Jurisdiction Order of April 21, 2017.   Plaintiffs' leadership has steadfastly

participated in all of these proceedings.[26]

---

[25]  Plaintiffs' leadership labored to respond to the intricate and misleading briefs submitted by the
Defendants on this one subject.   In total this Court received a dozen briefs on the *BMS* issue alone,
four of which were prepared by Plaintiffs' leadership.   *See* CNBM-BNBM Defendants'
Supplemental Motion on Jurisdiction and Class Certification Following *BMS* (Rec. Doc. 20882);
PSC's Memorandum of Law in Opposition to Defendants' Supplemental Jurisdictional Motion
(Rec. Doc. 20935); CNBM-BNBM Defendants' Objection to the Court's Order Vacating its §
1292(b) Certification and Request for Expedited Resolution of *BMS* Motion (Rec. Doc. 20943);
PSC's Response to the CNBM-BNBM Objection (Rec. Doc. 20944); CNBM-BNBM Defendants'
Reply Brief in Further Support of their Supplemental Jurisdictional Motion (Rec. Doc. 20956-2);
Taishan's Reply Brief in Support of the Supplemental Jurisdictional Motion (Rec. Doc. 20955-2);
CNBM-BNBM Defendants' Supplemental Brief Addressing *In re Depuy Orthopaedics, Inc*. (Rec.
Doc. 20997); Taishan's Supplemental Brief in Support of the Supplemental Jurisdictional Motion
(Rec. Doc. 20996); PSC's Supplemental Memorandum Addressing *In re Depuy Orthopaedics, Inc*.
(Rec. Doc. 21000); PSC's Second Supplemental Memorandum in Further Opposition to
Defendants Supplemental Jurisdictional Motion (Rec. Doc. 21031); Defendant CNBM-BNBM's
Supplemental Brief Addressing the Difference, if any, Between a Mass Action and a Class Action
in Which Every Member Is a Named Plaintiff (Rec. Doc. 21038); Taishan's Supplemental Brief on
Mass Tort and Class Actions in Support of Defendants Supplemental Jurisdictional Motion (Rec.
Doc. 21036).

[26]  In addition, for the March 20, 2018 monthly status conference, the parties filed their Joint Report

Most recently, on March 15, 2018, the CNBM and BNBM Defendants filed a petition for interlocutory review in the Fifth Circuit Court of Appeals.   As in the past, Plaintiffs' leadership will oppose that petition and continue to represent the interests of all Plaintiffs in any of the Taishan appellate efforts addressing jurisdiction, contempt, etc.   In addition, due to Plaintiffs' leadership's steadfast and ongoing commitment, it will continue to represent all Plaintiffs in all other matters going forward, including cases that are subject to the current Florida Remand Order, who will be actively shepherded and aided in their prosecution in the remand court(s).

Because of these past milestones, where Plaintiffs' leadership has stewarded these cases through the myriad obstacles imposed by the Taishan Defendants, these actions are now ready for trial in their remand districts.   In its Florida Remand Order, this Court recognized that "extensive motions practice and bellwether trials that have occurred in this MDL" have laid the foundation for each of the cases subject to remand.   Florida Remand Order at 10.   As the potential for future verdicts or resolution of individual litigations will reach their fruition in this maturing atmosphere, Plaintiffs' leadership submits that now is the time to protect the *res* that would provide compensation to this Court's appointed steering committee and any common benefit lawyers (past

---

No. 98 of Plaintiffs' and Defendants' Liaison Counsel (Rec. Doc. 21245).   Therein, the parties detail the procedural history of matters still extant, including:   1) Substituted Motion to Enforce the Court's July 17, 2014 Contempt Order and Injunction (Rec. Doc. 20636), *id*. at 14-15; 2) Motion to Remove Confidentiality Designations With Respect to Documents Produced By and Testimony of the Taishan Defendants and Third Parties (Rec. Doc. 20598), *id.* at 21-22; and 3) Satisfaction by Taishan of the Court's Order Requiring Accurate Translations of Documents (*see* Rec. Docs. 19700; 20643; 20651; 20672), *id*. at 22.   Further, evaluation of the *Amorin* Plaintiffs' evidence of remediation and other damages is ongoing.   *See* Pretrial Order Nos. 11A and 11B (requiring that verified Supplemental Plaintiff Profile Forms be completed).   These matters remain pending on the docket of MDL 2047 and will be addressed by this transferee Court.

or future) whose work effort has been approved by Plaintiffs' Lead and Liaison Counsel.   This

Court's Florida Remand Order appears to agree because it states: "these attorneys should be entitled

to the fair and equitable assessment of any potential recovery for the services performed and

expenses incurred by attorneys acting for MDL administration and common benefit of all plaintiffs

in this complex litigation."   Florida Remand Order at 11.   Under these circumstances, where the

litigation has matured to the point of remand for trial purposes, an immediate sequestration of funds

is appropriate to preserve those assets and to avoid dissipation thereof.

Accordingly, the purpose of this motion is to seek an Order creating a "fund" consisting of a

portion of the recoveries in the federal and related state court cases, from which Plaintiffs' Lead and

Liaison Counsel and other attorneys performing authorized "common benefit work" for Plaintiffs

may be compensated.   This Order will provide a mechanism to protect against the

misappropriation of the work-product created by Plaintiffs' leadership.

For the reasons that follow, such relief is appropriate.

## III.   <u>ARGUMENT</u>

### A.   **Securing an Equitable Allocation of Fees and Costs for Plaintiffs' Leadership and the Attorneys They Designate to Administer the MDL Docket and Perform Common Benefit Work is Necessary and Appropriate at this Time.**

The common fund doctrine is a principle of equity designed to prevent unjust enrichment by

providing that "a litigant or a lawyer who recovers a common fund for the benefit of persons other

than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Sprague v. Ticonic National Bank*,

307 U.S. 161, 166 (1939); *Trustees v. Greenough*, 105 U.S. 527, 534-536 (1881); *In re SmithKline*

*Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990).   As the Third Circuit stated in

17

*Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487

F.2d 161, 165 (3d Cir. 1973):

> These equitable powers, may, under the equitable fund doctrine, be
> used to compensate individuals whose actions in commencing,
> pursuing or settling litigation, even if taken solely in their own name
> and for their own interest, benefit a class of persons not participating
> in the litigation.   *See Sprague v. Ticonic National Bank*, 307 U.S.
> 161, 59 S. Ct. 777, 83 L.Ed. 1184 (1939).
>
>            *   *   *
>
> The award of fees under the equitable doctrine fund is analogous to
> an action in quantum meruit: the individual seeking compensation
> has, by his actions, benefited another and seeks payment for the value
> of the service performed.

*See also Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974); *Strong*

*v. Bell South Telecommunications, Inc.*, 137 F.3d 844, 850 (5th Cir. 1998).

     In order for the common fund doctrine to apply, the beneficiaries of the fund need not be

members of a class and the benefit need not have been conferred in the context of a class action

because the common fund principle is a long-standing principle of equity which predates modern

class actions.   *See Trustees v. Greenough*, 105 U.S. 527 (1881).   As the court stated in *Vincent v.*

*Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir. 1977):

> The common fund doctrine provides that a private plaintiff, or his
> attorney, whose efforts create, discover, increase or preserve a fund
> to which others also have a claim is entitled to recover from the fund
> the costs of his litigation, including attorneys' fees.   The doctrine is
> "employed to realize the broadly defined purpose of recapturing
> unjust enrichment."   I Dawson 1597.   That is, the doctrine is
> designed to spread litigation costs proportionately among all the
> beneficiaries so that the active beneficiary does not bear the entire
> burden alone and the "stranger" beneficiaries do not receive their
> benefits at no cost to themselves.

*Id.* at 769.   *See also In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006 (5th Cir. 1977)

(court awarded fees to lead counsel by ordering each other attorney representing a plaintiff to pay to lead counsel part of his fee from his client); *City of Klawock v. Gustafson*, 585 F.2d 428, 431 (9th Cir. 1978) (court held that attorneys whose litigation efforts benefited their client as well as other native towns may be entitled to attorneys' fees under the common benefit theory); *In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522 (D. Nev. 1987) (same).   *See*, *generally*, Eldon E. Fallon, *Common Benefit Fees In Multidistrict Litigation*, 74 La. L. Rev. 371, 375 (2014) ("*Common Benefit Fees*") ("But this doctrine is not limited solely to class actions:   it has been used in complex litigation to compensate attorneys whose work benefits others similarly situated.").

Apart from application of the common fund doctrine as an equitable principle governing the payment of counsel fees and litigation expenses, it has consistently been recognized that federal courts possess the inherent power to appoint counsel to coordinate and manage complex multiparty litigation and to require that such counsel be paid for discharging these duties out of the proceeds of the litigation generally.   *See*, *e.g.*, *In re Vioxx Prod. Liab. Litig.*, MDL No. 1657, PTO No. 19 (E.D. La. Aug. 4, 2005); *In re Propulsid Prod. Liab. Litig.*, MDL No. 1355, PTO No. 16 (E.D. La. Dec. 26, 2001); *In re Rezulin Prod. Liab. Litig.*, MDL No. 1348, PTO No. 67 (S.D.N.Y. Mar. 20, 2002); *In re Diet Drugs Prod. Liab. Litig.*, 1999 WL 124414 (E.D. Pa. Feb. 10, 1999) (PTO No. 467); *In re Orthopedic Bone Screw Prod. Liab. Litig.*, MDL No. 1014, 1996 WL 900349 (PTO 402) (E.D. Pa. June 17, 1996); *In re Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 606-07 (1st Cir. 1992); *Florida Everglades*, 549 F.2d at 1011-17; *In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. at 522, 524-26.   *See also In re Diet Drugs Prods. Liab. Litig.*, MDL 1203, 2002 WL 32154197, at *17 (E.D. Pa. Oct. 3, 2002) (recognizing that assisting with the management of the complex docket, in addition to creating a fund, serves as a benefit for which a

"court must be permitted to compensate fairly the attorneys who serve on...a [court-appointed] committee."); *In re Genetically Modified Rice Litig.*, MDL 1811, 2010 WL 716190, at *4 (E.D. Mo. Feb. 24, 2010) ("An MDL court's authority to...order contributions to compensate leadership counsel derives from its 'managerial' power over the consolidated litigation, and, to some extent, from its inherent equitable power."), *aff'd*, 764 F.3d 864 (8th Cir. 2014), *cert. denied*, 135 S. Ct. 1455 (2015).

Thus, in mass tort/class action cases involving consolidated MDL proceedings, counsel who have been appointed by the Court to manage the litigation for the benefit of all plaintiffs should receive reimbursement for the costs expended in that effort and compensation for their services from all of the plaintiffs on a ratable basis. *Diet Drugs*, MDL 1203 *supra*; *Orthopedic Bone Screw*, MDL No. 1014; *Nineteen Appeals*, 982 F.2d at 606-07; *Smiley v. Sincoff*, 958 F.2d 498, 501 (2d Cir. 1992); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1296, 1317 (E.D.N.Y. 1985); *aff'd in part*, *rev'd in part*, 818 F.2d 226 (2d Cir. 1987); *Florida Everglades*, 549 F.2d at 1019-21.

These principles were articulated in *Nineteen Appeals* as follows:

> Under standard American rule practice, each litigant pays his or her own attorneys' fees. *See, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 245, 95 S. Ct. 1612, 1615, 44 L.Ed.2d 141 (1975). Yet, there are times when the rule must give way. For example, when a court consolidates a large number of cases, stony adherence to the American rule invites a serious free-rider problem. *See generally* Mancus Olson, *The Logic of Collective Action* (1071). If a court hews woodenly to the American rule under such circumstances, each attorney, rather than toiling for the common good and bearing the cost alone, will have an incentive to rely on others to do the needed work, letting those others bear all the costs of attaining the parties' congruent goals.
>
> A court supervising mass disaster litigation may intervene to prevent or minimize an incipient free-rider problem and to that end, may employ measures reasonably calculated to avoid "unjust enrichment

of persons who benefit from a lawsuit without shouldering its costs."
*Catullo v. Metzner*, 834 F.2d 1075, 1083 (1st Cir. 1987).   Such
courts will most often address the problem by specially
compensating those who work for the collective good, chiefly
through invocation of the so-called common fund doctrine.

\*         \*         \*

Here, [the District Court's] decision to use a steering committee [to
manage consolidated mass tort litigation on behalf of all plaintiffs]
created an occasion for departure from the American rule.   In
apparent recognition of the free-rider problem, the judge served
notice from the beginning that he would eventually make what he,
relying in part one appellees' counsel, *see Fees Op.*, 768 F. Supp. at
924 n. 42, later termed a "common fund fee award" to remunerate
PSC members for their efforts on behalf of communal interests.
This was a proper exercise of judicial power.   *See Mills v. Electric
Auto-Lite Co.*, 396 U.S. 375, 392 90 S. Ct. 616, 625, 24 L.Ed.2d 563
(1970); *see also In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d
226, 240 (2d Cir. 1987) (upholding a fee award to a plaintiffs'
steering committee under the equitable fund doctrine); *Bebchick v.
Washington Metro. Area Transit Comm'n*, 805 F.2d 396, 402 (D.C.
Cir. 1986) (collecting cases); *In re MGM Grand Hotel Fire Litig.*,
660 F. Supp. 522, 526 (D. Nev. 1987).

*Nineteen Appeals*, 982 F.2d at 606-07.

In order to protect the right of common benefit attorneys to receive a fee and reimbursement
of expenses from the proceeds of the litigation in which they have participated and diligently
worked on behalf of plaintiffs, courts have consistently ruled that it is appropriate to direct that all
or part of the counsel fees which may become payable in each action which was the subject of
coordinated or consolidated proceedings be deposited in an escrow account for allocation by the
Court in accordance with appropriate legal standards.   *Diet Drugs*, *supra*; *In re Thirteen Appeals
Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 300 (1st Cir. 1995);
*Smiley v. Sincoff*, 958 F.2d at 499; *Orthopedic Bone Screw*, MDL No. 1014, *Agent Orange*, 611 F.
Supp. at 1317; *In re Silicone Gel Breast Implant Prod. Liab. Litig.*, MDL 926, Pretrial Order Nos.

13 & 23 (N.D. Ala. July 23, 1993 and July 28, 1995).

The antecedent corollary to this Court's authority to compensate its appointed steering committee is the principle that this Court has the authority to (1) award common benefit fees in both class actions and non-class action MDLs and (2) modify or reduce contractually-created contingency fees irrespective of the law on common benefit fees.   As this Court has written, common benefit fee awards derive from "equity and her blood brother, *quantum merit*," for they avoid the unjust enrichment of successful litigants which otherwise would occur if the attorneys who created a common fund for the litigants' benefit were not fairly compensated (from the fund) for their services.   *See Common Benefit Fees*, 74 LA. L. REV. at 376; *see also Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 857 (E.D. La. 2007), *quoting* from 4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS §13:76 (4th ed. 2002).   Indeed, this Court has demonstrated that "[p]ursuant to Rule 23(h), the Court has the authority and responsibility for setting attorneys' fees . . . [b]ut even if this litigation were treated as a traditional MDL, without any class action status, this Court, as transferee court, would have the authority to fix a common benefit fee."[27]

Thus, this Court may properly enter an Order requiring that some portion of the fees earned in each individual action which is the subject of these consolidated MDL 2047 proceedings be withheld for distribution to counsel acting for the benefit of all litigants.

---

[27]  Common Benefit Fees Order at 7, *citing* Fed. R. Civ. P. 23(h); *Fla. Everglades*, 549 F.2d at 1008; *In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524, 546-47 (3d Cir. 2009); *Common Benefit Fees*, 74 LA. L. REV. at 374.

A question then remains as to the proportion of Plaintiffs' recoveries which should be subject to such sequestration.   Ultimately, the amount of the fee to be awarded must be determined either under the lodestar approach recognized by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) or under the percentage of the fund approach based upon a judicial assessment of the amount and quality of work performed by the common benefit lawyers in relation to the size of the recoveries and the expenses incurred to produce the recoveries which have been generated.   *See, e.g.*, *Diet Drugs*, *supra*; *Orthopedic Bone Screw*, MDL 1014, PTO 402; *Johnson*, 488 F.2d at 717-19; *Thirteen Appeals*, 56 F.3d at 304-07; *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1295 (9th Cir. 1994), *aff'd in part*, 19 F.3d 1306 (9th Cir. 1994); *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993); *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975 (7th Cir. 1991); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir.), *cert. denied*, 488 U.S. 822 (1988).

Because the instant action is ongoing, it is impossible to ascertain the total amount of time and expenses which will have been expended by Plaintiffs' Lead and Liaison Counsel and associated counsel for the common benefit or to ascertain the amounts which will be generated for the Plaintiffs as a whole.   What is known is that Plaintiffs' leadership has already expended enormous resources over the length of this MDL just to achieve this moment in the litigation.   A sampling of the work effort of these counsel is demonstrated by the summary charts attached hereto which identify court appearances from January 2014 to the present, Exhibit "A", and the Motions, briefs and other filings made by Plaintiffs' leadership from January 2014 to the present, Exhibit "B".[28]   Several of these counsel have devoted entire firm-years for the common benefit of all

---

[28] Previously, Plaintiffs' leadership presented similar summary charts reflecting appearances and

Plaintiffs participating in this MDL.   For example, between January 1, 2014 and December 31, 2017, Plaintiffs' Lead Counsel devoted without compensation over 31,135 hours of common benefit work and Plaintiffs' Liaison Counsel expended over 20,700 hours, with a collective lodestar in excess of $37,000,000.[29]   To appreciate the collective efforts of the principal firms that have prosecuted all the Plaintiffs' claims against the Taishan Defendants, a chart of all common benefit firms' lodestars from January 2014 through July 2017 is attached hereto as "Exhibit C."[30]   To date, Plaintiffs' leadership has outlaid hundreds of thousands of dollars for service, and millions of dollars in total costs prosecuting claims against the Taishan Defendants.   This same chart summarizes the held costs and paid assessments of each common benefit firm.   Since 2014, to address the ongoing needs to fund the litigation, Plaintiffs' leadership have requested appropriate assessments on a pro-rated basis commensurate with common benefit counsel's contributions to the litigation.   *Id.*

Even with this information, however, it remains impossible to determine the precise percentage of Plaintiffs' recoveries which should be subject to an Order requiring payment to the common benefit attorneys under the equitable principles set forth above.   However, the Court's

---

work performed earlier by Plaintiffs' leadership.   *See* Rec. Doc. Nos. 17700-8 & 17700-19.

[29] As discussed previously, time and expenses incurred up to December 31, 2013, are part of an ongoing process regarding fee distribution pursuant to Pretrial Order No. 28, as amended.   For present purposes, Plaintiffs' leadership therefore focuses on time and expenses incurred from January 1, 2014, going forward.   However, for completion of the record, a summary of time records for the initial phases of the litigation is identified in Exhibit C.

[30] As set forth in the accompanying motion to file exhibits under seal, upon request to Plaintiffs' Lead or Liaison Counsel these charts may be released to Plaintiffs' counsel who would be subject to the Court's holdback order, but Defendants should be prohibited from obtaining these materials under any circumstance.

recent Common Benefit Fees Order regarding the Knauf settlements is instructive. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* MDL 2047, Order and Reasons Setting Common Benefit Fees at 7 (E.D. La. Jan. 31, 2018) (Rec. Doc. 21168).    Previously, in this case, the Court determined that the appropriate distribution between common benefit fees and individually retained counsel was reasonably set at 52%/48%.  *Id.* at 24.    The Remand Order echoes this reasoning.  *See* Florida Remand Order at 11-12.   Because there will be even greater effort involved in the ongoing litigation against the Taishan Defendants in comparison to the efforts in the initial prosecution of MDL 2047, the proposed distribution for common benefit work should be enhanced to 60%.

Because of the unique circumstances of the instant litigation, Plaintiffs' leadership submits that a 32% holdback should be imposed.   The appropriate means to enforce a holdback is to require that the Defendants (who are and remain under this Court's ongoing jurisdiction even in the remand courts) be responsible for withholding from any claim payment of a remanded case the appropriate set-off amount for fees and costs, from which this Court can later make a final determination as to the proper distribution.  *See* Florida Remand Order at 12.   This will assure that the *res* is properly preserved, since these Defendants alone will have the intimate knowledge of sometimes confidential settlements and initial access to the funds themselves.   To further insure that adequate funds are sequestered, the Defendants should be required to hold back the entire fee award of 32% of any recovery.   From this holdback, Plaintiffs' leadership requests that in cases resolved prior to trial that the Plaintiffs' leadership be compensated in the amount of 60% of the holdback, with the remaining 40% distributed to individually retained counsel, and for cases that result in trial the holdback should be 50/50, in other words split evenly between common benefit and individually

retained counsel.

In *In re Vioxx Products Liab. Litig.*, 574 F. Supp. 2d 606 (E.D. La. 2009) (capping counsel fees at 32%), on reconsideration, 650 F. Supp. 2d 549 (E.D. La. 2009), this Court evaluated its authority to review contingent fee contracts for reasonableness.   In the context of multidistrict litigation, the Court determined it has both inherent and equitable authority to review contingent fees and impose a cap on fees to insure their reasonableness.   *Id.* at 612, *citing In re Zyprexa Prod. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y.2006); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05–1708, 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008).   The Court exercised its authority to cap fees at 32%.   Recently, this Court reiterated its "authority and responsibility for setting attorneys' fees" in the context of setting common benefit fees.

This plan of sequestering funds is designed to facilitate state and federal coordination. Under the unique circumstances of this litigation, it seems more than fair, particularly when viewed in light of the *Propulsid* and *Vioxx* experience.   *See* Remand Order at 11-12.   *See*, *generally*, Francis McGovern, *Toward a Cooperative Strategy for Federal and State Judges In Mass Tort Litigation*, 148 U. Pa. L. Rev. 1867 (2000); William Schwarzer, *Judicial Federalism in Action: Coordination of Litigation in State and Federal Courts*, 78 Va. L. Rev. 1689 (1992).

We respectfully submit that it is imperative that the Court immediately enter an order which we provides for a holdback that recognizes the significant efforts and expenses already paid for by Plaintiffs' leadership that have benefitted this litigation and will receive further support in the remand process through the trial package and other supportive efforts of these actions in the MDL and remand courts.

For all counsel, distribution of any funds sequestered will be pursuant to a subsequent order by the Court in accordance with applicable principles of law governing fee awards.   Specifically, it is proposed that upon deposit into the Plaintiffs' Attorneys' Fees Account of any holdback payment, the Escrow Agent shall within ten (10) days remit to the individual plaintiff's counsel his or her appropriate share of the holdback (*i.e.*, 40% if the case resolves prior to trial or 50% if the case resolves after trial begins or is settled thereafter).   As to the award of common benefit fees and costs, it is anticipated Plaintiffs' Lead and Liaison Counsel and common benefit attorneys, will file at timely junctures interim petitions in conformity with Fifth Circuit jurisprudence over the course of the ongoing litigation.   *See*, *e.g.*, *Johnson*, *supra*.

## IV.    CONCLUSION

For the foregoing reasons, movant request that the motion be granted and the proposed Order entered by the Court.

Dated: March 22, 2018                         Respectfully Submitted,

By: /s/ Russ M. Herman
Russ M. Herman (La Bar No. 6819) (on the brief)
Leonard A. Davis (La Bar No. 14190) (on the brief)
Stephen J. Herman (La Bar No. 23129)(on the brief)
Herman, Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
RHerman@hhklawfim.com
*Plaintiffs' Liaison Counsel MDL 2047*

Arnold Levin (on the brief)
Fred S. Longer (on the brief)
Sandra L. Duggan (on the brief)
Keith Verrier (on the brief)
Nicola F. Serianni (on the brief)
Levin Sedran & Berman LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail <u>or</u> by hand delivery and e-mail <u>and</u> upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, which will serve a notice of the uploading in accordance with the procedures established in MDL 2047, on this 22nd day of March, 2018.

/s/ Leonard A. Davis
Leonard A. Davis
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
Plaintiffs' Liaison Counsel
MDL 2047

*Co-Counsel for Plaintiffs*