**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047** |
| | **SECTION: L** |
| **THIS DOCUMENT RELATES TO:** *ALL CASES* | **JUDGE FALLON** **MAG. JUDGE WILKINSON** |

*****************************************************************************

**YANCE LAW FIRM'S MEMORANDUM IN SUPPORT OF MOTION TO IMMEDIATELY TRANSFER ATTORNEY FEE QUALIFIED SETTLEMENT FUND TO A DIFFERENT DEPOSITORY BANK OR BACK INTO THE COURT REGISTRY**

Comes now, the undersigned counsel and submits *Yance Law Firm's Memorandum in Support of Motion to Immediately Transfer Attorney Fee Qualified Settlement Fund To a Different Depository Bank or Back Into the Court Registry.* The undersigned's motion filed contemporaneously herewith moves the Court for an Order to immediately transfer each and every Attorney Fee Qualified Settlement Fund established in this action to a different Depository Bank or back into the Court Registry, because of 1) Esquire Bank's incredibly small size and 2) its multi-faceted conflicts of interest. In support of this motion, the movant states as follows:

1. Pursuant to multiple Court Orders (Docs. 17064 thru 17084) signed on September 9, 2013, this Court authorized the creation of numerous Qualified Settlement Funds appointing Esquire Bank as the Depository Bank for the QSFs upon motion to do so by Liaison Counsel Russ M. Herman and Lead Counsel Arnold Levin filed on August 19, 2013 (Doc. 17009). Numerous Attorney Fee Qualified Settlement Funds ("QSFs") are among the QSFs established by the Court on said date.

2. As of February 1, 2016, the Court ordered all the Attorney Fee QSFs to be consolidated into one Attorney Fee QSF (Doc. 20022).

3. Esquire Bank should no longer serve as the Depository Bank for the Attorney Fee QSF for multiple reasons.

4. First, as an initial major concern, Esquire Bank is unreasonably small in relation to the approximately 200 million dollars of attorney fees deposited therein, and extraordinarily small in relation to the dozens or hundreds of banks in existence that could provide the service.

5. According to the most recent Form 10-K Annual Report filed with the Securities and Exchange Commission the TOTAL deposits reported by Esquire Bank on its balance sheet equal a mere 448.4 million dollars. (See Ex. A- Annual Report p. 39- note all referenced page numbers to all exhibits herein are the page numbers printed at the bottom of each page, which often differ from the page of the PDF file itself).  The undersigned counsel has had a difficult time finding any other bank with SEC filings showing total deposit figures that low.

6. Just by way of comparison, a large bank like JP Morgan reports total deposits of 1.4 trillion dollars, and is thus three thousand times larger than Esquire Bank. (Ex. B- Excerpt from JP Morgan Annual Report)

7. A large regional bank in the southeast such as Regions Bank reports total deposits of 96 billion dollars and is thus 213 times larger than Esquire Bank (Ex. C- Excerpt from Regions Annual Report).

8. Mid-size regional banks well known in Louisiana, Mississippi and Alabama such as Iberia Bank and Hancock/Whitney Bank report total deposits of 21.4 billion dollars and

20.8 billion dollars respectively, and are thus 46 times larger than Esquire Bank (Ex. D- Excerpt from Iberia Annual Report and Ex. E- Excerpt from Hancock/Whitney Annual Report).

9. Even a small local bank such as Home Bank that services South Louisiana and Western Mississippi reports total deposits of 1.8 billion dollars and is thus 4 times larger than Esquire Bank (Ex. F- Excerpt from Home Bank Annual Report).

10. When you couple the eye-opening size comparison between Esquire Bank and other banks with the fact that the Attorney Fee QSF being held and managed there is extraordinarily large compared to the overall size of the bank as a whole (a number that is 44% the size of the total deposits reported on its balance sheet) it is clear that Esquire Bank is not an appropriate bank to hold and/or manage the QSF regardless of whether or not the QSF funds are being held via an on or off balance sheet Insured Cash Sweep (ICS) or other similar vehicle.

11. However, the troubling analysis does not stop at the size of the bank. Esquire Bank is far from a traditional bank. Despite the fact that it holds itself out as a "national bank," it only has one operating branch in the entire nation (located in Garden City, NY). (Ex. A- pp. 8, 12). It is a bank that was started by lawyers, for lawyers and is founded upon new-age financing instruments such as attorney case cost financing, working lines of credit for attorneys, attorney fee advances, and other loan instruments, most of which are secured in large part by attorney case inventories and undistributed settlement funds. (Ex. A- intro pp.1-2 body pp. 1-36). Esquire Bank, by its own admission has a very limited track record of success, and recognizes this and its new-age attorney financing business model

as significant risk factors affecting its chances to succeed as a bank in the future. (Ex A-pp. 21-22).

12. While the financing services Esquire Bank offers may be beneficial to the plaintiff's bar in general, a bank with such a modernistic approach to banking and lack of track record is not an appropriate place to entrust such a large amount of funds earned by and belonging to such a large number of people. A traditional bank with reasonable size and long track record would be much more appropriate under the circumstances.

13. Unfortunately, there also exists multi-faceted conflicts of interest pertaining to Esquire Bank continuing to serve as the Depository Bank.

14. As this Court is already aware, Liaison Counsel in this litigation and Co-Chair of the Fee Committee, Russ Herman, serves on the Board of Directors of Esquire Bank. In fact, Mr. Herman is one of the longest standing Members of the Board of Directors of Esquire Bank and has been serving since shortly after the bank's creation. Mr. Herman is a significant shareholder of Esquire Bank owning a stake therein currently valued at more than 1.4 million dollars. (Ex. G- Esquire Schedule 14A Proxy Statement pp. 9-19)

15. At the time Esquire Bank was appointed by this Court as the Depository Bank in 2013, it was a privately held company with limited publicly available financial and operating information. However, just this past summer (June 2017), Esquire Bank's holding company engaged in an initial public offering ("IPO") and now the stock is publicly traded on the Nasdaq stock exchange under the Ticker symbol "ESQ" . (Ex. H- Esquire IPO Prospectus).

16. As can be seen from its numerous SEC filings associated with the IPO, Esquire Bank only had a mere 290 million dollars in deposits reported on its balance sheet in 2014 (the

year after Esquire Bank was appointed by the Court in this case) and 383 million dollars in deposits at the time of the IPO. (Ex. H- p. 10)

17. The Attorney Fee QSF deposited with Esquire Bank appears to have been a major factor in marketing their stock for sale to the public in their IPO. If the entire Attorney Fee QSF was placed in "on-balance sheet" deposit accounts at the time of the IPO, the QSF accounted for approximately 51% of the total deposits advertised to the public. (Ex. H-p.10). If the entire Attorney Fee QSF was put in "off-balance sheet" sweep accounts with Esquire, the QSF accounted for 99.5% of their off-balance sheet sweeps they highlighted in their "Investment Highlights" section of their IPO Free Writing Prospectus presentation and confirmed in their full Prospectus. (Ex. I- Esquire IPO Free Writing Prospectus- p. 3, see also Ex. H- p.74). If the QSF is comprised of a combination of both on-balance sheet and off-balance sheet accounts, the net effect is still the same- the Attorney Fee QSF clearly seems to have been an extraordinarily major component of the Bank's overall financial picture at the time they advertised their stock for sale to the public.

18. It is worth pointing out, Esquire Bank appears to have paid a near zero interest rate on the subject $200 million dollar QSF while holding it for more than four years.

19. The majority of the subject $200 million was paid into Court near the end of 2013, and this Court ordered the Clerk of Court to fund the QSFs in January of 2014 (Doc. 17398), with a more specific funding clarification in February 2014 (Doc. 17426).

20. On June 6, 2016, Court-appointed CPA, Phillip Garret signed an affidavit attaching an "Attorney Fee Reconciliation" showing that as of February 29, 2016, the total interest that had been earned by the deposited attorney fees in an entire two-year period totaled a

mere $83,711.98. (Ex. J- Garrett Attorney Fee Reconciliation printed from Doc. 20290-5 p. 18). This equates to an approximate annual percentage rate of 0.02%. Although Esquire apparently only paid 0.02% on the Attorney Fee QSFs, it appears to have paid 0.50% on other QSFs in this litigation- 25 times the rate it paid on the Attorney Fee QSFs. (See Esquire Monthly Statement entitled "QSF Money Market" dated 9-30-16 for account # ************82). At 0.50% the Attorney fee QSFs would have earned approximately $2 million dollars instead of $87,711.98 during that time frame, and would have earned around $4 million dollars by now.

21. It is also worth noting as a comparison that the Treasury Bill rate on a 5 year T-Bill during that time period averaged around 1.5%- therefore 75 times higher than the interest rate being earned at Esquire Bank. At 1.5%, the Attorney Fee QSFs would have earned over 11 million dollars by now.

22. In its Initial Public Offering prospectus, Esquire boasted about its very low "cost of deposits", or to put it in layman's terms- Esquire doesn't pay much interest on deposits. It also very clearly boasted about its business model and how the legal settlement process and the delays inherent therein provide multiple "loan and deposit opportunities" and how those opportunities are "Funded with Core Low Cost Settlement Escrow and Commercial Operating Deposits from law firms, claims administrators, lien resolution firms, courts, etc." (Ex. I- pp. 4-16, Ex. H- pp. 68-81, see also Ex. A pp. 3-8).

23. In fact, it has come to the undersigned counsel's attention that Esquire Bank, while paying a near zero interest rate on the Attorney Fee QSFs in this case (0.02%), is actively lending money to attorneys who one day expect to receive a portion of those attorney fees in this case, in the form of loans, attorney fee advances, attorney lines of credit and/or

6

other financing instruments secured by each borrowing attorney's portion of the very cash in the very QSFs this Court appointed Esquire to hold and manage. Esquire is typically charging these attorneys approximately "prime plus two and a half" (i.e. around 7%) on these instruments.

24. Consequently, whenever the 200 million dollars of attorney fees are finally paid in this case, not only does it appear Esquire will be parting with a large portion of its business just by the mere size of the QSF in relation to the bank as a whole, it appears it will be parting with this very attractive interest rate spread on these unique cash-secured loans. Clearly, Esquire has a very significant financial incentive to hold onto the cash in the QSFs as long as possible.

25. This incentive to hold on to this 200 million dollar QSF appears to be magnified by the fact that Esquire just recently held its initial public offering at $14 per share and it is now trading at around $24 per share (an approximately 71% gain in stock price since the IPO less than a year ago). (Ex. H p.1 and see publicly available stock price as of today). Although any depository bank appointed by any court would likely rather hold onto a $200 million dollar deposit rather than see it disbursed, the situation with Esquire is exceedingly different. It would only make sense that Esquire would be extraordinarily eager to hold onto this QSF as long as possible since a) the QSF is so large in relation to the overall size of the business as advertised to investors in the IPO and Annual Report, b) it is engaged in unique attorney lending activity secured by the cash in the QSF, and thus c) the concern about an adverse effect on the overall financial picture and thus the stock price of the bank once the QSF is paid out appears much greater than it would be if the QSF were deposited with a much larger bank with a much longer track record, a more

traditional banking business model and without the unique attorney loans against the cash in the QSFs it were appointed by the Court to hold.

26. One natural defensive response to all of this might be to say "it doesn't matter what a depository bank *wants* when it comes to how long it holds an attorney fee QSF, because when a court orders the bank to disburse it, it must disburse the funds regardless of the bank's wishes." Unfortunately this is where the conflict gets deeper.

27. Esquire Bank, in its IPO and Annual Report has been quite brazen about the fact that there are "well-known" mass tort litigators on its board of directors and that Esquire intends to continue to "leverage" those contacts to attract deposits- including landing more mass tort business and scoring more court-appointed settlement deposits (Ex. I- pp. 4, 5, 6, 7, 10, 12, 16, Ex. H- p. 3, 6, 69, 70, 74, 81, Ex A- pp. 3-11).

28. It clearly was not happenstance that Russ Herman was serving on the Board of Directors at the time he asked this Court to appoint Esquire Bank as the Depository Bank in this case. Instead, that move fits squarely within Esquire Bank's advertised business strategy.

29. Russ Herman, as Liaison Counsel in this litigation and Co-Chair of the Fee Committee controls to a large degree the speed with which the attorney fee phase of this case proceeds. As a long-standing member of the Esquire Bank Board of Directors being paid approximately fifty to one hundred thousand dollars per year in salary and stock options to serve, Mr. Herman has a significant interest in seeing to it that Esquire is profitable and maintains and/or grows its stock price. (Ex. H- p. 105, Ex. G- p.40). This is especially true since the IPO took place less than a year ago and experienced a 71% jump in price. As a 1.4 million dollar shareholder, he has a significant personal financial incentive to see

Esquire Bank prosper and maintain and/or grow its stock price. (see Ex. G, p.9- note the # of Herman shares and multiply by current stock price).

30. Even assuming Mr. Herman has not allowed his director-related fiduciary duties, responsibilities, or feelings of obligation to Esquire stockholders, or his own personal financial interests as an Esquire stockholder affect his decisions regarding the speed with which he pushes the attorney fee process forward in this matter, there is clearly a conflict of interest that does exist, particularly given the unique circumstances surrounding Esquire Bank as described above.  This conflict of interest should be eliminated immediately, and Mr. Herman should be the first one in line asking for it to be eliminated so as to avoid any APPEARANCE of impropriety.

31. This is particularly true given the fact that Mr. Herman has been the subject of court filings by other counsel in this litigation regarding allegedly inexplicable delays in the Fee Committee Recommendation process. (Docs. 21319 and 21325).  The undersigned has also been a party to conversations with other counsel in this litigation during which there has been lots of pondering and bewilderment about why it seems Mr. Herman and Mr. Levin seem disinterested in and even resistant to moving the attorney fee issue to final resolution in this case.  Moreover, it is undisputed that many if not most attorneys have been working on this case for nine (9) years; the case settled six (6) years ago; the 200 million dollars in attorney fees have been sitting in the QSF accounts for more than four (4) years while many, if not an "overwhelming most" clients whose cases derived these attorney fees have been fully paid, remediated, and compensated pursuant to the various settlement agreements for much of that entire four-year period, yet we, the attorneys remain unpaid.

32. Finally, if Mr. Herman, Mr. Levin, and/or their firms have participated in, benefitted from, received funds from, and/or executed any loans, attorney fee advances, attorney lines of credit and/or other financing instruments provided to them by Esquire Bank and/or any other bank or financial institution that is holding or has ever held any of the settlement proceeds, attorney fees, or QSFs in this action or any other mass tort or class action in which they have had a leadership role, they should be required to disclose to the Court and all counsel in this litigation the complete terms and conditions of such instruments and/or arrangements including but not limited to interest rates, principal amounts, credit limits, balances owed, collateral, and all other terms and conditions.

33. The payment of attorney fees in this case has been plagued by an inordinate amount of delay while the funds are earning a near zero return.  The circumstances and conflicts surrounding Esquire Bank have no place in any legal matter, particularly one as plagued with delay as this one.

WHEREFORE, undersigned counsel moves the Court for an Order to immediately transfer each and every Attorney Fee Qualified Settlement Fund ("QSF") established in this action to a different Depository Bank or back into the Court Registry until final disbursement.

Respectfully submitted,

/s/ R. Tucker Yance
R. TUCKER YANCE
Ala. State Bar #- ASB-9775-H71Y
YANCE LAW FIRM, LLC
169 Dauphin Street Suite 318
Mobile, AL  36602
(251) 432-8003
(251) 432-8009 FAX
rty@yancelaw.com

**CERTIFICATE OF SERVICE**

     I hereby certify that the above and foregoing memorandum has been served upon Plaintiffs' Liaison Counsel Russ M. Herman and Defendants' Liaison Counsel Kerry Miller, by e-mail and upon all parties by electronically uploading the same to File & ServeXpress in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 18th day of May, 2018.

     /s/ R. Tucker Yance
R. TUCKER YANCE
Ala. State Bar #- ASB-9775-H71Y
YANCE LAW FIRM, LLC
169 Dauphin Street Suite 318
Mobile, AL  36602
(251) 432-8003
(251) 432-8009 FAX
rty@yancelaw.com