**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION                      **MDL NO. 2047**
                                           **SECTION: L**

                                             **JUDGE FALLON**
                                             **MAG. JUDGE WILKINSON**

THIS DOCUMENT RELATES TO:
*ALL CASES*
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM AND RESPONSE OF RUSS M. HERMAN, ON BEHALF OF
RUSS M. HERMAN IN HIS CAPACITY AS LIAISON COUNSEL AND ARNOLD LEVIN
AS LEAD COUNSEL IN RESPONSE TO YANCE LAW FIRM'S MOTION AND
MEMORANDUM TO IMMEDIATELY TRANSFER ATTORNEY FEE
QUALIFIED SETTLEMENT FUND TO A DIFFERENT DEPOSITORY
<u>BANK OR BACK INTO THE COURT REGISTRY</u>**

**MAY IT PLEASE THE COURT:**

       My name is Russ M Herman, Esq.  I am a Member of the Bar of the State of Louisiana, in

good standing; a Member of all United States District Courts in the State of Louisiana; a Member

of the Fifth Circuit Court of Appeals and several other Federal Courts of Appeal, all in good

standing.  I am admitted to practice before the Louisiana State Supreme Court, the United States

Supreme Court, and by Motion and Order, in many Federal District Courts.  I graduated with a BA

degree from Tulane University in 1963, and from Tulane Law School in 1966.

       I have been a Lead Trial Counsel or a Liaison Counsel in Complex Litigation, Class

Actions and MDLs since 1970.

I adopt the Affidavit of Arnold Levin, Esq., Lead Counsel (attached hereto as Exhibit "A"). I adopt the Affidavit submitted by Esquire Bank and sworn to by its Chief Financial Officer and Executive Vice President, Eric Bader (attached hereto as Exhibit "B").  I adopt the Affidavit of Jacob Woody, Esq., Brown/Greer, Court-appointed Administrator (attached hereto as Exhibit "C").

I made full disclosure of my relationship and stock ownership in Esquire Bank as per the attached transcript dated September 17, 2013.

Liaison/Lead each have many Contracts with Taishan claimants.  Liaison/Lead each had many Contracts with Knauf claimants.

Liaison/Lead have numerous and varied responsibilities:

- Officer of the Court;
- Responsibilities as set forth in PTOs directed by Judge Eldon Fallon;
- Responsibilities to treat Attorneys' Claimants in both Knauf Defendant entities and Taishan Defendants entities, as if and to the same extent of care, that Liaison/Lead have to their own Clients, and
- Responsibility to perform professionally and ethically.

In evidence of their dedication to the responsibilities of Liaison/Lead, each of the firms has performed 40,000 plus hours in Common Benefit work from the date of their appointments by Judge Eldon Fallon through December 31, 2013.

Plaintiffs' Lead and Liaison Counsel file this Response in Opposition to Yance Law Firm's Motion and Memorandum of May 18, 2018 [Rec. Doc. 21338] ("Yance Motion").   On May 22, 2018, Krupnick Campbell Malone Et Al.'s Joinder in Relief Sought in Yance Law Firm's Motion to Immediately Transfer Attorney Fee Qualified Settlement Fund to a Different Depository or Back Into the Court Registry was filed with the Court [Rec. Doc. 21341] ("KCM Motion").  On May

31, 2018, Taylor Martino, P.C.'s Joinder in Relief Sought in Yance Law Firm's Motion to Immediately Transfer Attorney Fee Qualified Settlement Fund to a Different Depository or Back Into the Court Registry was filed with the Court [Rec. Doc. 21350] ("TM Motion"). On June 5, 2018, Morris Bart, LLC's Motion to Join and Adopt Yance Law Firm's Motion to Immediately Transfer Attorney Fee Qualified Settlement Fund to a Different Depository Bank or Back Into the Court Registry was filed with the Court [Rec. Doc. 21360] ("MB Motion"). This Opposition is in response to the Yance Motion, the KCM Motion, the TM Motion and the MB Motion, which collectively are referred to as the "Esquire Transfer Motions" or "ET Motions." All of the ET Motions attack the creation of funds at Esquire Bank as the Depository Bank for Qualified Settlement Funds ("QSFs") and request a transfer of each Attorney Fee QSF to a different Depository Bank other than Esquire Bank or back into the Court Registry until final disbursement. At the most recent status conference on June 12, 2018, the Court addressed the motion and ordered that the Attorney Fee Qualified Settlement Fund be transferred from Esquire Bank and placed in the Court Registry until further notice [Rec. Doc. 21405]. For many reasons, the ET Motions are untimely, not appropriate, and should be denied. However, Plaintiffs' Lead and Liaison Counsel recognize that the Court has ultimate authority over where these funds are deposited and abides by decisions of the Court. Currently, Liaison Counsel has caused the Attorney Fee Qualified Settlement Fund at Esquire Bank to be transferred to the Registry of the Court in the United States District Court for the Eastern District of Louisiana.

Various Settlement Agreements in this matter were entered into many years ago. The Settlement Agreement regarding claims against the Knauf Defendants in MDL No. 2047 was

originally filed with this Court in December 2011 [Rec. Doc. 1206]. Section 14 of the Knauf Settlement Agreement specifically addresses Attorney's Fees.

On February 7, 2013, this Court entered an Order and Judgment certifying the InEx, Banner, Knauf, L&W and Global Settlement Classes; and Granting Final Approval to the InEx, Banner, Knauf, L&W and Global Settlements [Rec. Doc. 16570]. The Settlements provide additional substantial benefits to the Class Members and certain funds for Attorney's Fees. Each of these Settlements are interrelated and on August 19, 2013, a Motion to Establish Various Qualified Settlement Funds and to Appoint Fund Administrator and Depository Bank [Rec. Doc. 17009] was filed. The motion sought for the Court to authorize and establish various Qualified Settlement Funds for:

a. Banner Attorney Fee Settlement Fund;
b. Banner Repair and Relocation Set Aside Settlement Fund;
c. Banner Bodily Injury and Other Loss Set Aside Settlement Fund;
d. Builders, Installers, Suppliers and Participating Insurers Bodily Injury and Other Loss Set Aside Fund;
e. Builders, Installers, Suppliers and Participating Insurers Repair and Relocation Set Aside Fund;
f. Builders, Installers, Suppliers and Participating Insurers Attorney Fee Settlement Fund;
g. Interior/Exterior Building Supply, LP Repair and Relocation Set Aside Fund;
h. Interior/Exterior Building Supply, LP Bodily Injury and Other Loss Set Aside Fund;
i. Interior/Exterior Building Supply, LP Attorney Fee Settlement Fund;
j. Knauf Attorney Fee Settlement Fund;
k. Knauf Other Loss Settlement Fund;
l. USG and L&W Settlement Fund; and
m. USG and L&W Attorney Fee Settlement Fund.

Each fund was to be in separate identifiable accounts subject to the continuing jurisdiction of this Court. Esquire Bank, a financial institution doing business in New York, was suggested

as the Depository Bank. Information regarding Esquire Bank and its credentials to act as the Depository Bank were submitted to the Court. The Court ordered that Esquire Bank be the Depository Bank for each QSF and to hold and invest the monies in accordance with the Orders of the Court. At no time until now has anyone expressed an objection to Esquire Bank acting or being appointed as the Depository Bank. The Court ordered statements for each account were to be issued and provided on a routine basis to Class Counsel, the Administrator (BrownGreer) and the Court Appointed CPA (Philip Garrett). Liaison Counsel monthly reviewed the statements for the security of QSF Attorney Fee Funds. In the Motion to Establish the Various Qualified Settlement Funds and to Appoint Fund Administrator and Depository Bank, Class Counsel disclosed and informed the Court that members of the Plaintiffs' Steering Committee "cumulatively own less than 5% of the issued and outstanding stock in [Esquire Bank]" and that any Member of the Plaintiffs' Steering Committee were available to the Court for additional disclosure of information should the Court desire additional information (see footnote 1 of Rec. Doc. 17009-1]. [1]

The Motion to Establish the QSFs was presented to the Court following the monthly status conference on September 17, 2013 (see transcript pages 18 through 24). No opposition was filed to the motion. The Court requested representatives of Esquire Bank appear in Court to address the Esquire Bank operations and Esquire Bank's plan for safe, secure investment of the twenty-one (21) QSFs. Two (2) representatives, Andrew Sagliocca, President and CEO of Esquire Bank, and Eric Bader, Executive Vice-President and CFO of Esquire Bank, made a full report and

---

[1] It is believed that many lawyers representing plaintiffs in this case may also have stock ownership in Esquire Bank, but such information is confidential and has not been disclosed to movants.

presentation to the Court, which included a slide presentation that was filed in the record. At the presentation, an additional disclosure was made regarding outstanding shares of stock that were owned by individuals whose firms have some appointed position in the Chinese Drywall MDL and a list of those individuals and their shareholdings was provided to the Court. The Court determined that the QSFs were necessary and that it was important that QSFs be established. The Court directed Philip Garrett, the Court Appointed CPA, be placed in the loop of information about the QSFs so that Mr. Garrett could keep track of the funds and find out where they're going and how they're going out (see transcript page 19). Again, no opposition or issues were raised at that time concerning Esquire Bank. The Court acknowledged that meetings with the CPA took place on a monthly basis and a full disclosure of the QSF banking program for Esquire Bank was presented. Specifically, Mr. Sagliocca stated:

> MR. SAGLIOCCA: I appreciate the time to speak to the Court and present to the Court. The QSF banking program for Esquire Bank is we have senior management involved in all QSF programs, and the goal is always preservation of principal and maintaining low fees so as not to eat into principal.
>
> We have a very good understanding -- in-depth understanding of the QSF programs. We've worked with multiple programs, master settlement agreements; designed custom applications and investment agreements. We've worked with multiple blocking agreements and release documents; daily coordinate with various CPAs, defense attorneys, plaintiff attorneys, claims administrators; understand the release document protocol; have a full suite of online banking products; Positive Pay services, which are fraud protection services; electronic statements.
>
> The QSF team is a 24/7 team. So any of the CPAs, claims administrators, counsel have full access to the senior management team 24 hours a day 7 days a week with our cell phones.
>
> As I said, the goal is the preservation of principal. That's our fiduciary responsibility to make sure we do that with the claims administrator. So the products we utilize, the combination of, are either 100 percent FDIC insured, which are money market

type products or certificate of deposit type products. We also have a very strong relationship with Federated, who manages almost half a trillion dollars in funds.

We've primarily used Treasury funds, because that's usually what the court directs, so that it's backed by the full faith and security of the government.

Rates, Your Honor, for the products are at historic lows at this time. The money market FDIC products are around 5 basis points. And the Federated products, primarily the Treasury obligation products, are around 1 basis point because of the current rates on treasuries.

THE COURT: So you invest them in funds that are secured by the United States?

MR. SAGLIOCCA: Yes. Yes.

THE COURT: Okay.

MR. SAGLIOCCA: The fees are minimal. We really charge only fees to cover administrative costs. That's not our primary generator of revenue. This is the way we work with plaintiffs' counsel and defense counsel for our other products and services. So this is more of an accommodation. So we don't focus on the fees. They mainly surround wires and the Positive Pay fraud protection, release and review, and a minimum annual fee. Our goal is to minimize those expenses, not to -- as I said, not to –

THE COURT: What are the fees based on? How do you determine the fees?

MR. SAGLIOCCA: The fees are based on market type fees. So wire fees are around $20; Positive Pay fees, which is fraud protection, it's is required, is around $40 a month; release fees, $20; and an annual fee of only $100.

Every one of them, Your Honor, we've worked with the courts and the claims administrators, if either/or saw fit that these fees were too high -- as I said, they're not to generate revenue, but just to cover costs and recover costs.

We currently manage about 22 QSFs, including Avandia, Byetta, Chantix, Yaz; work with various CPAs and claims administrators; and again, always, always, always preservation of principal. Always.

The bank itself, away from using the Treasury funds and the FDIC insured funds, is a very, very safe, secure bank. Our capital position is almost double what the regulators want us to be at. We have a high level of liquidity, and virtually no -- 1 basis point of problem assets.  We have one problem loan. We don't want to focus

our time on managing problem loans like the rest of the industry. We're regulated by the OCC, the Office of Comptroller Currency. We also have annual audits.

The presentation, for the record, has a board of directors, the management team in it, which I won't spend any time, unless the Court wants me to.

THE COURT: All right. What's the capitalization of the bank?

MR. SAGLIOCCA: It's about 10 percent of our assets is in capital, which the minimum standards from the regulators are around 5 percent.

THE COURT: Okay. Thank you very much for being here today.

(See transcript page 20, line 10, through page 23, line 15.)

On September 9, 2013, the Court issued thirteen (13) different Orders [Rec. Docs. 17064, 17065, 17066, 17067, 17068, 17069, 17070, 17071, 17072, 17073, 17074, 17075, and 17076] and established QSFs, appointed Esquire Bank as the financial institution[2] as the Depository Bank to hold and invest the monies on deposit.  BrownGreer was ordered to be the Administrator of the Settlement Funds.  On September 9, 2013, the Court issued eight (8) additional Orders [Rec. Docs. 17077, 17078, 17079, 17080, 17081, 17082, 17083, and 17084] and established QSFs, appointed Esquire Bank as the financial institution as the Depository bank to hold and invest monies on deposit.  Garretson Resolution Group was ordered to be the Administrator of the Settlement Funds for the Virginia Settlements.  No appeals were taken or objections lodged to any of these Orders. For all of these QSF Orders, the Depository Bank was ordered to maintain separate accounts for each set aside and to provide separate and consolidated statements in accordance with directives and instructions set forth in the Order for investment of funds (see paragraph 6 of any of the QSF

---

[2] For the Banner and InEx Settlements, Esquire Bank was substituted and replaced United States Bank (U.S. Bank) as the Escrow Agent.

Orders.  The Order was specific with instructions on how investments were to be handled.  No investment or re-investment was to be made except in direct obligations of, or obligations fully guaranteed by, the United States of America or any Agency thereof.  Additionally, the Court recognized in the Order the disclosure made in the motion which identified members of the Plaintiffs' Steering Committee having ownership of less than 5% of the issued and outstanding stock of Esquire Bank.

On January 29, 2016, a Motion to Combine All Attorney Fee Settlement Fund Accounts to the Knauf Attorney Fee Settlement Fund Account was filed with the Court [Rec. Doc. 20016-1]. Esquire Bank was the Depository Bank for each of the QSF Orders and held and invested money for each of the accounts.  Based upon a recommendation by Philip Garrett, the Court Appointed CPA, following consultation with BrownGreer, the Court Appointed Settlement Administrator, and to promote efficiency, it was recommended that consolidation of the QSFs be made into one (1) account.  Up until the filing of the Yance Motion, there were no objections to any activities in connection with any of the Qualified Settlement Funds.

At the monthly status conference on June 12, 2018, Mr. Yance addressed the Court regarding the Motion to Transfer Qualified Settlement Fund [Rec. Doc. 21339] and the Court set a briefing schedule with oral argument to take place on the motions on July 12, 2018 at 9:00 a.m. The Court further ordered "that until further notice, the Attorney Fee Qualified Settlement Fund shall be transferred from the Esquire Bank to be place[d] in the Court Registry.  Counsel may contact the Court's Financial Unit for further instructions."

Upon receipt of the Court's Order of June 12, 2018, Plaintiffs' Liaison Counsel communicated with the Clerk of Court on June 13, 2018 and thereafter to assure that the transfer

of funds from Esquire Bank to the Court's Registry would progress smoothly in compliance with the Court's Order. A further inquiry was made by Plaintiffs' liaison Counsel to determine the current and historical amount of interest being paid for deposits of funds placed in the registry of the Court. On June 15, 2018 an email was received advising that the earnings are calculated on a daily basis and The Bureau of the Fiscal Service allocates earnings from maturing securities proportionately among the CRIS cases based on the ratio of the funds held in each individual case to the total of funds in the pool and that specific earnings amount will be provided. Further, Ms. Lange confirmed with BrownGreer and Philip A. Garrett that BrownGreer will continue to be the Administrator of the QSFs and have tax returns filed annually, as well as oversee tax deposits. On June 19, 2018, Jacob S. Woody of BrownGreer advised that Esquire Bank wired $165,996,702.31 from the Esquire Attorney Fee QSF to the Registry of the Court and Ms. Lange confirmed receipt of the funds. On June 22, 2018 the Bank wired an additional $7,720,567.76 to the Registry of the Court. Further, Jacob S. Woody advised that currently there are remaining funds in fully FDIC insured Certificates of Deposit at Esquire Bank that had not yet matured and that transferring these funds would have caused approximately $15,000.00 in early redemption fees. Mr. Woody advised that he consulted with the Court about these Certificates of Deposit and was instructed to wait until maturity to transfer those funds, which will be available for transfer on or about July 13, 2018. According to Mr. Woody $10,026,900.59 will be available on July 13, 2018 and $6,016,449.43 will be available on June 29, 2018.

**Upon personal knowledge, undersigned states Responses and Objections to Mr. Yance's contentions:**

1. Pursuant to multiple Court Orders (Docs. 17064 thru 17084) signed on September 9, 2013,

this Court authorized the creation of numerous Qualified Settlement Funds appointing Esquire Bank as the Depository Bank for the QSFs upon motion to do so by Liaison Counsel Russ M. Herman and Lead Counsel Arnold Levin filed on August 19, 2013 (Doc. 17009). Numerous Attorney Fee Qualified Settlement Funds ("QSFs") are among the QSFs established by the Court on said date.

**RESPONSE:**

Settlement funds were negotiated by Liaison/Lead in MDL 2047. The settlements were approved by the Court and certification proceeded. In order to effectuate the settlement provisions relating to Attorneys' Fees, the Court established thirteen (13) orders (Rec Docs 17064-17076). QSFs (Qualified Settlement Funds) to be administered by BrownGreer with Esquire Bank as a Depository. QSFs in MDL 2047 were deposited in safe and secure manner as directed by the Federal Court. The history of the Attorney Fee QSFs in MDL 2047 is more fully set out in pages 1-8 of this Response.

2. As of February 1, 2016, the Court ordered all the Attorney Fee QSFs to be consolidated into one Attorney Fee QSF (Doc. 20022).

    **RESPONSE:**

    On January 29, 2016, all QSFs were consolidated. (Rec Doc 216-1). Monthly reports of the Knauf Attorney Fee Fund, QSF investments and particulars were forwarded by Esquire Bank to Russ M. Herman, BrownGreer, represented by Jacob Woody, Esq., and Phillip Garrett, Court-appointed CPA, for review.

3. Esquire Bank should no longer serve as the Depository Bank for the Attorney Fee QSF for multiple reasons.

    **RESPONSE:**

    Esquire Bank successfully complied with the Directives of the Court. For almost four years, the Esquire Bank MDL 2047 QSF Knauf Attorney Fee Fund followed strictly the Orders to preserve the Fund in safe and secure manner. . Esquire Bank fully cooperated with Jacob Woody, Esq., and Phillip Garrett, CPA. Esquire Bank was responsive to all requests of the Court-appointed Administrator and the Court-appointed CPA. Until May 2018, there was no objection by any participant in the MDL, or by the Administrator, or the CPA, to the way in which QSF funds were handled by Esquire Bank, or to the full detailed reports that the Bank issued monthly.

4. First, as an initial major concern, Esquire Bank is unreasonably small in relation to the approximately 200 million dollars of attorney fees deposited therein, and extraordinarily

small in relation to the dozens or hundreds of banks in existence that could provide the service.

**RESPONSE:**

Esquire Bank's CET1 Ratio (Common Equity Tier 1 Capital ratio) is higher than any bank Yance refers to, including JP Morgan, Regions, Iberia, Hancock/Whitney, and Home Bank. The CET1 Ratio is a measurement of a bank's capital, utilized by regulators and investors because it shows how well a bank can withstand financial stress and remain solvent. Esquire Bank has been regularly reviewed by the OCC, FRB of New York and its independent public accounting firm, Crowe Horwath, LLP.

5. According to the most recent Form 10-K Annual Report filed with the Securities and Exchange Commission the TOTAL deposits reported by Esquire Bank on its balance sheet equal a mere 448.4 million dollars. (See Ex. A- Annual Report p. 39- note all referenced page numbers to all exhibits herein are the page numbers printed at the bottom of each page, which often differ from the page of the PDF file itself).  The undersigned counsel has had a difficult time finding any other bank with SEC filings showing total deposit figures that low.

**RESPONSE:**

There is a substantial difference between "On balance sheet deposits" and "Off balance sheet deposits" (predominantly represented by QSF's).

Large Banks could provide a service if they appeared before the Court and, in addition to Size of Deposits, could explain the $6 billion in fines (see attached Exhibit "D") which have been levied against them for fixing LIBOR RATES and other violations of Sarbanes-Oxley Act of 2002.  These same banks have contributed to lobbying groups who propose limitations on MDLs, Class Actions, Judgments, Plaintiffs' Contingent Fees and other "Tort Deforms".

6. Just by way of comparison, a large bank like JP Morgan reports total deposits of 1.4 trillion dollars, and is thus three thousand times larger than Esquire Bank. (Ex. B- Excerpt from JP Morgan Annual Report)

**RESPONSE:**

JP Morgan and six (6) of the other largest USA banks had substantial financial relationships with CNBM and the Bank of China.  CNBM is a Defendant in MDL 2047. For a period of time, JP Morgan held thousands of H shares as a shareholder in CNBM, as evidenced by CNBM's published reports.  JP Morgan has been censored by Federal authorities and in June 2018 agreed to pay $65 million in fines (see attached Exhibit "D").  The critical activities of JP Morgan occurred between 2007 and 2012 at a time when JP Morgan was heavily invested

in Defendants in this litigation. During the period, there were a number of U.S. bank failures. In the ten (10) years in which I have been a stockholder of Esquire Bank, there has never been a violation of Federal laws, and Esquire Bank has been regularly and consistently reviewed by the OCC and other Federal authorities.

7. A large regional bank in the southeast such as Regions Bank reports total deposits of 96 billion dollars and is thus 213 times larger than Esquire Bank (Ex. C- Excerpt from Regions Annual Report).

**RESPONSE:**

Regions' "CETI" is 12.92%, and Esquire Bank's "CETI" is considerably higher at 17.66%. The banks that failed in the 2008-2012-time frame were bigger than Regions Bank. There is no indication that Regions Bank was or is an experienced QSF Depository of Settlement Funds or Attorney Fee Funds. Esquire Bank's history of successful management of $2 billion in QSF funds is an accurate measure of Esquire's expertise.

8. Mid-size regional banks well known in Louisiana, Mississippi and Alabama such as Iberia Bank and Hancock/Whitney Bank report total deposits of $21.4 billion dollars and $20.8 billion dollars respectively, and are thus 46 times larger than Esquire Bank (Ex. D- Excerpt from Iberia Annual Report and Ex. E- Excerpt from Hancock/Whitney Annual Report).

**RESPONSE:**

Iberia Bank recently followed an example set by Esquire Bank. While Counsel refers to "brick and mortar" as a mainstay, he again demonstrates a conclusion not reflected in reality. During 2018, Iberia Bank closed 26 of its "brick and mortar" branches (see attached Exhibit "E"). At least ten (10) years ago, Esquire Bank was at the Vanguard of turning away from "brick and mortar" branches in this technological age.

As to assertions about Hancock/Whitney and its size of deposits, again Counsel the comparison Counsel makes to Hancock/Whitney Bank is irrelevant. The Whitney Bank "CETI" is 10.63 whereas Esquire Bank is 7 points to the better.

9. Even a small local bank such as Home Bank that services South Louisiana and Western Mississippi reports total deposits of 1.8 billion dollars and is thus 4 times larger than Esquire Bank (Ex. F- Excerpt from Home Bank Annual Report).

**RESPONSE:**

Again, the assertion is irrelevant. Home Bank's "CETI" ratio is lower than is Esquire Bank's. Counsel Opposite has not demonstrated that Home Bank has any experience at all in managing QSFs.

10. When you couple the eye-opening size comparison between Esquire Bank and other banks with the fact that the Attorney Fee QSF being held and managed there is extraordinarily large compared to the overall size of the bank as a whole (a number that is 44% the size of the total deposits reported on its balance sheet) it is clear that Esquire Bank is not an appropriate bank to hold and/or manage the QSF regardless of whether or not the QSF funds are being held via an on or off balance sheet Insured Cash Sweep (ICS) or other similar vehicle.

**RESPONSE:**

Again, Counsel attempts to compare apples to oranges.

11. However, the troubling analysis does not stop at the size of the bank. Esquire Bank is far from a traditional bank. Despite the fact that it holds itself out as a "national bank," it only has one operating branch in the entire nation (located in Garden City, NY). (Ex. A- pp. 8, 12). It is a bank that was started by lawyers, for lawyers and is founded upon new- age financing instruments such as attorney case cost financing, working lines of credit for attorneys, attorney fee advances, and other loan instruments, most of which are secured in large part by attorney case inventories and undistributed settlement funds. (Ex. A- intro pp.1-2 body pp. 1-36). Esquire Bank, by its own admission has a very limited track record of success and recognizes this and its new-age attorney financing business model as significant risk factors affecting its chances to succeed as a bank in the future. (Ex A- pp. 21-22).

**RESPONSE:**

More than ten (10) years ago, Esquire Bank was organized with the goal of becoming a Federally-regulated National Bank. Early in the bank's history, a portion of its focus was on the designed application of unique vehicles for Contingent Fee Attorneys and their Clients.

As early as 1991, Leadership in the Plaintiff Trial Bar was particularly concerned about the unfavorable treatment by Large Banks that did not understand Plaintiff litigation (Plaintiff single case advocacy and Plaintiff complex litigation in Consumer Class actions). The subject was highlighted in numerous leadership discussions in ATLA (now AAJ). By 2008, there were complaints that traditional banks were not accepting Contingent Fee-settled cases as sufficient collateral for lines of credit, and that the interest rates charged to their consumer clients on guaranteed loans had escalated. Discussions were led by ATLA Presidents, Officers and by Chief Executive Officer Tom Henderson, Esq., now deceased. Those discussions led to various recommendations for the creation or adoption of financial institutions that would treat Plaintiffs and Small Businesses, and the Lawyers who represented them, in a fair and even-handed approach. About ten (10) years ago, I was approached by Tom Henderson, Esq., acting on information he gathered from ATLA past presidents, who requested that I attend an Esquire Bank Board meeting.

14

Meanwhile, the so-called "Tort Reform" contributors - Large Banks, Big Tobacco, Big Pharma and the Oil Industry have attempted, somewhat successfully, to limit Plaintiffs' access to the Courts, with limitations on Fair Recoveries and Jury Trials. Esquire Bank contributes its resources to organizations that support Trials by Jury and Citizens' access to the Courts. I am proud of my active participation in Esquire Bank. I am proud of its direction. I am proud that Tom Henderson, Esq., recommended that I be interviewed and urged me to accept a Board appointment to Esquire Bank.

Counsel's supposition is that Attorney inventories, personal guarantees, settled cases, and other security are insufficient for bank loans. Counsel is not aware that loans at Esquire Bank and insider loans, including those to Directors, are reviewed by Esquire Bank's primary regulator, the OCC, a Bureau of the U.S. Department of the Treasury.

Counsel says that Esquire Bank was required to report risks in its annual reports and public offerings. Of course, that is true and is done. As evidenced by the history of Large Banks in the past ten (10) years, those Large Banks, which are also required to report risks, have much greater risks than Esquire Bank, as demonstrated by their publicly reported negligence and willful avoidance of Federal laws which govern banking activities. Esquire Bank, over a 10-year period, has a track record which is admirable, and that track record and frequent examinations and reviews by Federal authorities have resulted in a successful public offering.

12. While the financing services Esquire Bank offers may be beneficial to the plaintiff's bar in general, a bank with such a modernistic approach to banking and lack of track record is not an appropriate place to entrust such a large amount of funds earned by and belonging to such a large number of people. A traditional bank with reasonable size and long track record would be much more appropriate under the circumstances.

**RESPONSE:**

Counsel states that Esquire Bank's financing services are beneficial to the Plaintiff's Bar. Esquire Bank has been successful, without criticism, by any Court or Federal agency, in managing $2 billion of QSF funds in safe, secure and Federally-guaranteed products.

13. Unfortunately, there also exists multi-faceted conflicts of interest pertaining to Esquire Bank continuing to serve as the Depository Bank.

**RESPONSE:**

The statement that there exists "multi-faceted conflicts of interest" pertaining to Esquire Bank's continuing to serve as a Depository Bank is a statement not supported by facts. The PSC members who own or owned stock in Esquire Bank were disclosed to Judge Eldon Fallon, at inception, and the actual total was less than 5% of the outstanding stock. Secondly, Counsel ignores the careful and watchful eye of several Federal agencies; the reports monthly to BrownGreer, and also to Phillip Garrett, CPA. Counsel ignores that the Court found no

conflict of interest after full disclosure of Liaison Counsel of his relationship with Esquire Bank.

14. As this Court is already aware, Liaison Counsel in this litigation and Co-Chair of the Fee Committee, Russ Herman, serves on the Board of Directors of Esquire Bank. In fact, Mr. Herman is one of the longest standing Members of the Board of Directors of Esquire Bank and has been serving since shortly after the bank's creation. Mr. Herman is a significant shareholder of Esquire Bank owning a stake therein currently valued at more than 1.4 million dollars. (Ex. G- Esquire Schedule 14A Proxy Statement pp. 9-19)

**RESPONSE:**

I currently own approximately 0.8% of the outstanding common stock of Esquire Financial Holdings, Inc. or 62,412 shares, which amount includes 2,500 shares of restricted stock and 14,892 exercisable options to purchase shares of common stock of Esquire Financial Holdings, Inc. Stock options vest over a period of years and are exercised with the personal funds of the grantee. The weighted average price for Mr. Herman to exercise his 14,892 options is $12.50 per share. Accordingly, I would need to pay Esquire Financial Holdings, Inc. approximately $186,150 in order to exercise those options. I also received 2,500 shares of restricted common stock of Esquire Financial Holdings, Inc. in a single grant which vests in equal installments over a three-year period beginning January 23, 2022 and ending January 23, 2024. I made full disclosure of my relationship with and ownership in Esquire Financial Holdings, Inc. and Esquire Bank. Transcript of September 17, 2013 at pages 20-21 indicates full disclosure and response to all questions. BrownGreer, as Court-appointed Administrator, also made full disclosure of all processes on pages 8-16. The Court directed at that time that the Court-appointed CPA, Phil Garrett be involved in the process. The hearing transcript is attached.

15. At the time Esquire Bank was appointed by this Court as the Depository Bank in 2013, it was a privately held company with limited publicly available financial and operating information. However, just this past summer (June 2017), Esquire Bank's holding company engaged in an initial public offering ("IPO") and now the stock is publicly traded on the Nasdaq stock exchange under the Ticker symbol "ESQ". (Ex. H- Esquire IPO Prospectus).

**RESPONSE:**

Because of prudent and careful management decisions for ten (10) years and oversight by the OCC and FRB of New York and also the work of Esquire Bank's Strategic Oversight Committee, Esquire Bank's parent Holding Company, Esquire Financial Holdings, Inc. successfully achieved a listing on the NASDAQ stock exchange. Counsel, on the one hand, decries Esquire Bank as not successful, but on the other hand points to its success in June of 2017.

16. As can be seen from its numerous SEC filings associated with the IPO, Esquire Bank only had a mere 290 million dollars in deposits reported on its balance sheet in 2014 (the year after Esquire Bank was appointed by the Court in this case) and 383 million dollars in deposits at the time of the IPO.  (Ex. H- p. 10).

   **RESPONSE:**

   Again, Learned Counsel Opposite's "dollars in deposit" don't relate to the QSFs which were safe, secure and guaranteed by the Federal government as directed by the Court.

17. The Attorney Fee QSF deposited with Esquire Bank appears to have been a major factor in marketing their stock for sale to the public in their IPO.  If the entire Attorney Fee QSF was placed in "on-balance sheet" deposit accounts at the time of the IPO, the QSF accounted for approximately 51% of the total deposits advertised to the public. (Ex. H- p.10).  If the entire Attorney Fee QSF was put in "off-balance sheet" sweep accounts with Esquire, the QSF accounted for 99.5% of their off-balance sheet sweeps they highlighted in their "Investment Highlights" section of their IPO Free Writing Prospectus presentation and confirmed in their full Prospectus.  (Ex. I- Esquire IPO Free Writing Prospectus- p. 3, see also Ex. H- p.74).  If the QSF is comprised of a combination of both  on-balance sheet and off-balance sheet accounts, the net effect is still the same- the  Attorney Fee QSF clearly seems to have been an extraordinarily major component of the  Bank's overall financial picture at the time they advertised their stock for sale to the  public.

   **RESPONSE:**

   NO QSF FUNDS HAVE BEEN USED FOR COLLATERAL FOR LOANS.  One factor in marketing, is the number of unique products which the Bank has developed for offer to Contingency Law Claimants, and their lawyers.

   The contention that an entire Attorney Fee QSF was placed in On-Balance Sheet and was a "major factor in marketing their stock for sale" advertised to the public is not true.  It is true that the reputations of Attorneys and others who serve on the Board of Directors of Esquire Bank and the strong management team at Esquire are factors in marketing common stock for sale to the public.  None of the Director/Attorneys sits on the Strategic Oversight Committee, the Loan Committee, the Governance Committee, or the Audit Committee. None of the Attorney/Directors of Esquire Bank sit on any committee directing the investment of funds, loans, or Mergers and Acquisitions. (The Plaintiff Attorney/Directors of Esquire Bank account for less than 25% of the Board of Directors.)  What "appearance" Counsel factors in marketing is incorrect.

18. It is worth pointing out, Esquire Bank appears to have paid a near zero interest rate on the subject $200 million dollar QSF while holding it for more than four years.

**RESPONSE:**

Esquire Bank has fully explained the interest paid on QSFs in safe, secure funds which were reported monthly.  Until late 2016, very low interest rates nationally were reflective of interest rates on the funds.  On September 17, 2013, Esquire Bank appeared and through its President and CEO Andrew Sagliocca, in open Court, stated that rates were at historic lows. The interest rates in the two (2) Federally-guaranteed funds were particularly flat at that time; and began to rise nationally in 2016.     By mid-2017, interest rates on the Federally-guaranteed funds began to rise mirroring a rise in interest rates across the board nationally.

19. The majority of the subject $200 million was paid into Court near the end of 2013, and this Court ordered the Clerk of Court to fund the QSFs in January of 2014 (Doc. 17398), with a more specific funding clarification in February 2014 (Doc. 17426).

**RESPONSE:**

The recitation does not include the full history of the Court's original Orders.  For reference, see our Responses to Number 1 and Number 2.

20. On June 6, 2016, Court-appointed CPA, Phillip Garret signed an affidavit attaching an "Attorney Fee Reconciliation" showing that as of February 29, 2016, the total interest that had been earned by the deposited attorney fees in an entire two-year period totaled a mere $83,711.98.  (Ex. J- Garrett Attorney Fee Reconciliation printed from Doc. 20290-5 p. 18). This equates to an approximate annual percentage rate of 0.02%.   Although Esquire apparently only paid 0.02% on the Attorney Fee QSFs, it appears to have paid  0.50% on other QSFs in this litigation- 25 times the rate it paid on the Attorney Fee QSFs.  (See Esquire Monthly Statement entitled "QSF Money Market" dated 9-30-16 for account # ************82).  At 0.50% the Attorney fee QSFs would have earned approximately $2 million dollars instead of $87,711.98 during that time frame, and would  have earned around $4 million dollars by now.

**RESPONSE:**

The affidavit of Phillip Garrett, CPA, of February 29, 2016, is correct as to the figure of $83,711.98 interest paid on the QSF at issue.  However, the statement made to interest paid on other Attorney Fee QSFs is a misstatement and misconstruction by Mr. Yance.  All QSFs were invested in the same funds bearing the same interest.  The "QSF Money Market" Fund that paid a higher interest rate is a totally different issue.  That deposit was for approximately $7 million of potential fees, or funds for prosecuting further, the Taishan Defendants in litigation.  The Court ordered that the $10 million that had been designated previously for costs, the balance of which $7 million should be returned, and that $7 million, to be the subject of future determination.  It was prudently deposited by Esquire Bank and did not have and was not a part of, the Attorney Fee QSF. This amount was given to a "Hold Back"

18

account paying a higher rate and was routinely reported to BrownGreer and Phillip Garrett, CPA on monthly statements[3].

21. It is also worth noting, as a comparison, that the Treasury Bill rate on a 5 year T-Bill during that time period averaged around 1.5%- therefore 75 times higher than the interest rate being earned at Esquire Bank. At 1.5%, the Attorney Fee QSFs would have earned over 11 million dollars by now.

**RESPONSE:**

The Treasury bill rate on a 5-year Treasury bill is not a proper comparison, but a 1-year Treasury bill rate may be, although Liaison/Lead has not tracked Treasury bill rates on a 1-year or 5-year basis.

Esquire Banks responsibility was to preserve principal and maintain liquidity. Therefore, funds were invested in short-term Treasury money market funds and/or FDIC insured products. Esquire was not directed to invest in long term Treasuries, which creates potential principal risk as interest rates rise.

22. In its Initial Public Offering prospectus, Esquire boasted about its very low "cost of deposits", or to put it in layman's terms- Esquire doesn't pay much interest on deposits. It also very clearly boasted about its business model and how the legal settlement process and the delays inherent therein provide multiple "loan and deposit opportunities" and how those opportunities are "Funded with Core Low Cost Settlement Escrow and Commercial Operating Deposits from law firms, claims administrators, lien resolution firms, courts, etc." (Ex. I- pp. 4-16, Ex. H- pp. 68-81, see also Ex. A pp. 3-8).

**RESPONSE:**

It is true that Esquire Bank is funded in part by Core Low-Cost Settlement Escrows, Commercial Operating Deposits from Law Firms, Claims Administrators, Lien Resolution Firms, Courts, IOLTA, and similar sources. However, QSFs devoted to preservation of principal and liquidity are not Core funds of the Bank. Esquire Bank does have a very special business model, and a number of financial institutions have attempted to copy the unique services. Esquire Bank has products not available by other firms and financial institutions. Little, if any, of the Core value relates to QSF Funds. Esquire Bank will suffer no material losses as a result of shifting the MDL QSF Funds at issue to the Clerk of Court fund.

23. In fact, it has come to the undersigned counsel's attention that Esquire Bank, while paying a near zero interest rate on the Attorney Fee QSFs in this case (0.02%), is actively lending money to attorneys who one day expect to receive a portion of those attorney fees in this

---

[3] See Court Orders [Rec Docs 19488, 20896, 20922, 20930, 20932 and 21027]

case, in the form of loans, attorney fee advances, attorney lines of credit and/or other financing instruments secured by each borrowing attorney's portion of the very cash in the very QSFs this Court appointed Esquire to hold and manage. Esquire is typically charging these attorneys approximately "prime plus two and a half" (i.e. around 7%) on these instruments.

**RESPONSE:**

Counsel utilizes "gossip" from undisclosed persons, and Counsel has other references to vague but unnamed sources. Counsel's affirmed position is that he has no interest in the Knauf Attorney Fee Fund for Common Benefit work. Even the ruminations regarding loans to lawyers is incorrect. I don't know what has come to his attention. I'm not privy to investments of lawyers or loans to lawyers. At one time, some Fee opponents in MDL 2047 were Stockholders in Esquire Bank, but I have no knowledge and am not allowed to make inquiries as to whether they still own stock, have increased or sold their stock. The one exception is reflected in Arnold Levin's voluntary Affidavit, in which he states a stock investment but no loan by him or his firm. I have personally borrowed money from Esquire Bank at market rates and have received no special treatment. The loans are subject to Note: 012 CFR, Part 215, and have been reviewed annually by the OCC, the Loan Committee of Esquire Bank and outside independent auditors.

Counsel has no cases other than the eleven (11) Knauf cases. All of his clients have been fully paid for their losses due to defective Knauf drywall. At some point, Counsel will be paid a fee on the $1,965,753 his clients recovered. Herman Herman & Katz will be paid a fee on the $15,800,902 recovered its approximately 400 contract clients. The Herman Herman & Katz Attorney fees on its Contract clients will be paid in the exact proportion that Counsel and all other Attorneys are paid.

Counsel reports NO common benefit fees due him. In other words, he did not achieve one hour of Common Benefit, yet payment was made to his Knauf clients. On the other hand, Herman Herman & Katz has registered and been approved, by Phillip Garrett, CPA, in accord with the Court's direction, 40,000 plus Common Benefit hours before December 31, 2013. Levin Fishbein has registered 40,000 plus Common Benefit hours before December 31, 2013. Presumably, at some point, Herman Herman & Katz and Levin Fishbein will receive a Common Benefit Fee and a Contract fee from the Knauf Attorney Fee Fund. The record in the MDL 2047 case reflects that Counsel participated actively in Satellite Fee Litigation, which included Document Production, Depositions and Special Hearings.

24. Consequently, whenever the 200 million dollars of attorney fees are finally paid in this case, not only does it appear Esquire will be parting with a large portion of its business just by the mere size of the QSF in relation to the bank as a whole, it appears it will be parting with this very attractive interest rate spread on these unique cash-secured loans. Clearly, Esquire has a very significant financial incentive to hold onto the cash in the QSFs as long as possible.

**RESPONSE:**

I disagree with Counsel's argument. The $200 million QSF, which Esquire Bank once superintended, is not a "large portion of its business".  In terms of assets, Esquire Bank has fully disclosed in its Affidavit its position. Further, Counsel's contentions may become moot because the Fund has been transferred from Esquire Bank to the Clerk of Court.

25. This incentive to hold on to this 200 million-dollar QSF appears to be magnified by the  fact that Esquire just recently held its initial public offering at $14 per share and it is now trading at around $24 per share (an approximately 71% gain in stock price since the IPO less than a year ago). (Ex. H p.1 and see publicly available stock price as of today).  Although any depository bank appointed by any court would likely rather hold onto a $200 million dollar deposit rather than see it disbursed, the situation with Esquire is  exceedingly different.  It would only make sense that Esquire would be extraordinarily  eager to hold onto this QSF as long as possible since a) the QSF is so large in relation to  the overall size of the business as advertised to investors in the IPO and Annual Report, b) it is engaged in unique attorney lending activity secured by the cash in the QSF, and  thus c) the concern about an adverse effect on the overall financial picture and thus  the stock price of the bank once the QSF is paid out appears much greater than it would be if the QSF were deposited with a much larger bank with a much longer track record, a more traditional banking business model and without the unique attorney loans against the cash  in the QSFs it were appointed by the Court to hold.

**RESPONSE:**

Counsel has used his own "magnification" in an illustration that is irrelevant to the current issue.  I have no further comment about "Larger Banks."  No QSF Court-ordered fund can be held by any QSF Depository beyond what the Court orders.  It is probable that Counsel Opposite misapprehends the processes by which Federal Judges manage or choose to manage QSF Funds in an MDL or any other case.  Liaison/Lead, PSC member, or other Attorney should not act contrary to the Court's orders.  Additionally, any sums due Attorneys claiming Fees are subject to a Final Judgment by the Presiding Judge and Appellate Courts, if any.

26. One natural defensive response to all of this might be to say "it doesn't matter what a depository bank *wants* when it comes to how long it holds an attorney fee QSF, because when a court orders the bank to disburse it, it must disburse the funds regardless of the bank's wishes."  Unfortunately, this is where the conflict gets deeper.

**RESPONSE:**

I disagree with Counsel's argument that "this is where the conflict gets deeper." There is no conflict to begin with.  I am not certain what Counsel Opposite means here: On the one hand he seems to understand that the QSF is subject to a Court Order for dispersal, and on the

other, implies that there is some ethical conflict, even though the Depository Bank, the Court-appointed CPA, the Court-appointed Administrator and Liaison/Lead follow the strict Orders of the Court.

27. Esquire Bank, in its IPO and Annual Report has been quite brazen about the fact that there are "well-known" mass tort litigators on its board of directors and that Esquire intends to continue to "leverage" those contacts to attract deposits- including landing more mass tort business and scoring more court-appointed settlement deposits (Ex. I- pp. 4, 5, 6, 7, 10, 12, 16, Ex. H- p. 3, 6, 69, 70, 74, 81, Ex A- pp. 3-11).

**RESPONSE:**

The Contingency Fee Plaintiff lawyers who serve as Directors of Esquire Bank use their reputations for honesty, for achievement, their peer reviewed credentials, and networks, developed over a number of years, to answer questions from potential clients about the unique opportunities for Plaintiff lawyers and their Clients available at Esquire Bank. These opportunities are Esquire Banks unique products and services to the Plaintiff Bar and are examined at least annually by the OCC. Of the thirteen directors of Esquire Bank, only three are plaintiff attorneys.

28. It clearly was not happenstance that Russ Herman was serving on the Board of Directors at the time he asked this Court to appoint Esquire Bank as the Depository Bank in this case. Instead, that move fits squarely within Esquire Bank's advertised business strategy.

**RESPONSE:**

I began serving on the Board of Esquire Bank, seven (7) years before the Court ordered QSF deposits for Knauf Attorney Fee Funds. Liaison Counsel and Lead Counsel appeared in open Court disclosing any stockholdings they had in recommending Esquire Bank as a Depository. Counsel claims that the Order of QSF deposits by Judge Eldon Fallon fits squarely within Esquire Bank's strategy. One can form no logical connection with Esquire Bank's strategy and the Court's decisions. There is no conflict between the Orders of a United States District Judge requiring a Depository Bank to issue monthly reports to a Court-appointed Claims Administrator, a Court-appointed CPA and a Liaison Counsel. There is no conflict between a Court-appointed Liaison or Lead, after their full disclosure of a relationship with a Depository Bank and of which the Court was apprised. The connection is a false analogy.

29. Russ Herman, as Liaison Counsel in this litigation and Co-Chair of the Fee Committee controls to a large degree the speed with which the attorney fee phase of this case proceeds. As a long-standing member of the Esquire Bank Board of Directors being paid approximately fifty to one hundred thousand dollars per year in salary and stock options to serve, Mr. Herman has a significant interest in seeing to it that Esquire is profitable and maintains and/or grows its stock price. (Ex. H- p. 105, Ex. G- p.40). This is especially true since the IPO took

place less than a year ago and experienced a 71% jump in price. As a 1.4 million dollar shareholder, he has a significant personal financial incentive to see Esquire Bank prosper and maintain and/or grow its stock price. (see Ex. G, p.9- note the # of Herman shares and multiply by current stock price).

**RESPONSE:**

Over a ten year period, I have earned a total taxable receipt of $3,360 in net fees and was reimbursed $112,460.25 in expenses for service as a Director.  I have not received any salary.  I have paid for my own shares of stock with my after-tax personal funds.  I have not borrowed funds to pay for stock.  I have only a 0.8% stock position.  I do not sit on any Esquire Bank Board Committee relating to Loans, Strategy, Audits, Stock Options, Listings on Public Stock Exchanges, or Deposit Investments.

30. Even assuming Mr. Herman has not allowed his director-related fiduciary duties, responsibilities, or feelings of obligation to Esquire stockholders, or his own personal financial interests as an Esquire stockholder affect his decisions regarding the speed with which he pushes the attorney fee process forward in this matter, there is clearly a conflict  of interest that does exist, particularly given the unique circumstances surrounding Esquire Bank as described above.  This conflict of interest should be eliminated  immediately, and Mr. Herman should be the first one in line asking for it to be eliminated  so as to avoid any APPEARANCE of impropriety.

**RESPONSE:**

The overarching theme of Counsel's argument is that somehow Liaison/Lead made decisions regarding the speed with which the Attorney Fee process would go forward in this matter, and that they were uniquely able to delay Fee payments for some undescribed advantage.  The commentary of Counsel has posited no "appearance of impropriety" of Liaison/Lead or Esquire Bank or Phillip Garrett, CPA, or Jacob Woody, ESQ.  Esquire bank and Liaison / Lead follow the orders of the Court.

31. This is particularly true given the fact that Mr. Herman has been the subject of court filings by other counsel in this litigation regarding allegedly inexplicable delays in the Fee Committee Recommendation process. (Docs. 21319 and 21325).  The undersigned has also been a party to conversations with other counsel in this litigation during which there has been lots of pondering and bewilderment about why it seems Mr. Herman and  Mr. Levin seem disinterested in and even resistant to moving the attorney fee issue to final resolution in this case.  Moreover, it is undisputed that many if not most attorneys have been working on this case for nine (9) years; the case settled six (6) years ago; the 200 million dollars in attorney fees have been sitting in the QSF accounts for more than four (4) years while many, if not an "overwhelming most" clients whose cases derived  these attorney fees have been fully paid, remediated, and compensated pursuant to the  various settlement agreements for much

of that entire four-year period, yet we, the attorneys remain unpaid.

**RESPONSE:**

While Counsel argues that "Mr. Herman has been the subject of other Counsel's filings in this litigation regarding ….inexplicable delays", he again alludes to hearsay without naming the authors and the particular allegations.  One should not be surprised by Counsel's reliance on unattributed "gossip" and "hearsay" and of unnamed others from Court filings.  The "hearsay" and "gossip" on which Counsel relies, and his reliance on conversations with other unidentified Counsel in this litigation.  He then attacks Liaison/Lead as resistant to moving the Attorney Fee issue to final resolution.  Mr. Yance has misplaced angst as he attributes a delay to Liaison/Lead in the payment of the $200 million Fee Fund.

It is true that Mr. Yance's clients were fully paid in the Knauf settlements and he has no Common Benefit claim.  He complains that Attorneys remain unpaid.  He evidently does not accept the Court's Directive to Liaison/Lead to act immediately in Discovery and Bellwether Trials, and then to negotiate as quickly and as reasonably as possible, settlements with the Knauf Defendants, and the Global Defendants, and only then to negotiate Attorney Fees in each settlement.

Counsel quarrels with the Court's directives to Liaison/Lead that the homeowners injured by the Knauf Defendants will be paid first, before the process to determine a division of the Fee Fund between Contracts with Claimants and Common Benefit Attorney Fee Claimants. Counsel has ignored the Court's PTOs and the process of delay in which Counsel was himself an active participant.  It is an empirical fact that Counsel's Clients were paid without any substantial effort by Counsel in Discovery, Briefing, Motions, Appeals, Bellwether Trials, Pretrial preparation and Status Conferences.  Counsel does not have a Common Benefit claim for fees precisely because he did no substantive work and yet the process achieved payments to all of his eleven (11) clients.

32. Finally, if Mr. Herman, Mr. Levin, and/or their firms have participated in, benefitted  from, received funds from, and/or executed any loans, attorney fee advances, attorney lines of credit and/or other financing instruments provided to them by Esquire Bank and/or any other bank or financial institution that is holding or has ever held any of the  settlement proceeds, attorney fees, or QSFs in this action or any other mass tort or class action in which they have had a leadership role, they should be required to disclose to the Court and all counsel in this litigation the complete terms and conditions of such instruments and/or arrangements including but not limited to interest rates, principal  amounts, credit limits, balances owed, collateral, and all other terms and conditions.

**REPONSE:**

Denied.  There is not now nor has there ever been any evidence of unethical conduct by

Liaison/Lead, Esquire Bank, Phillip Garrett, CPA, and Jacob Woody, Esq., to delay payment from the MDL 2047 Knauf Attorney Fee Fund.

Despite Counsel's claims, there is not a scintilla of evidence of any act or failure to act of Liaison/Lead.

33. The payment of attorney fees in this case has been plagued by an inordinate amount of delay while the funds are earning a near zero return. The circumstances and conflicts surrounding Esquire Bank have no place in any legal matter, particularly one as plagued with delay as this one.

**RESPONSE:**

It is and was always Liaison/Lead's direction to achieve a fair and reasonable settlement with Knauf and Global Defendants with deliberate and continuous actions. There is no special benefit to Herman Herman & Katz and Levin Fishbein to not expedite fees from the QSF. Liaison/Lead are required to follow the Court's directives. The delays of which Counsel Opposite complains are due to payout process for over 8,000 homeowners and business owners who have been thrice subjected to extraordinary losses.

It is JUST that injured families who lost their homes and businesses due to defective Chinese drywall manufactured, marketed and shipped to the Gulf States and Virginia should be compensated for losses sustained, before lawyers receive Fees. It is also just that those who manufactured, shipped and marketed defective drywall in the United States should be held accountable FIRST to those who have suffered which is the directive of the Court. When one considers the result of litigation against Knauf and the Global Defendants, the claims processing of 8,000 plus claims proceeded with speed and acuity as a result of adherence to the Court's directives; the Claims Administrator, Brown/Greer; Phillip Garrett, Court-appointed CPA; "Pro Se", Court-appointed Robert Johnston, Court-appointed Ombudsman, Louis Velez, and others.

Fee considerations for Contract Lawyers and those claiming Common Benefit Fees could not proceed until the Court determined that a sufficient number of claims of those damaged Citizens had been processed. Attorney Fee payment delays for the most part, are due to the claims processing of 8,000 plus claims and the extensive Satellite litigation.

Liaison/Lead, Jacob Woody, Esq., and Esquire Bank, moved with deliberate speed to implement Judge Eldon Fallon's Order directing that QSF funds be transferred from Esquire Bank to the Clerk of Court. Because Liaison/Lead were unaware of the particulars of the Clerk of Court's Fund administrative mechanism, inquiries were made so that the PSC and Fee Claimants

could be advised of the processes and particulars of the fund.  The Court's directive to deposit the

Knauf Attorney Fee QSFs with the Clerk of Court has been complied with by Liaison/Lead and

Esquire Bank.

Respectfully submitted,

Dated: June 26, 2018

/s/ Russ M. Herman
Russ M. Herman, Esquire (Bar No. 6819) (on the brief)
Leonard A. Davis, Esquire (Bar No. 14190) (on the brief)
Stephen J. Herman, Esquire (Bar No. 23129)
HERMAN, HERMAN & KATZ, L.L.C.
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
RHerman@hhklawfirm.com
*Plaintiffs' Liaison Counsel MDL 2047*
*Fee Committee Co-Chair/Secretary*

Arnold Levin (on the brief)
Fred S. Longer (on the brief)
Sandra L. Duggan (on the brief)
LEVIN, SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone:  (215) 592-1500
Fax:  (215) 592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*
*Fee Committee Chair*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 26th day of June, 2018.

/s/ Leonard A. Davis
Leonard A. Davis, Esquire
Herman, Herman & Katz, L.L.C.
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
Plaintiffs' Liaison Counsel MDL 2047
*Co-counsel for Plaintiffs*