## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**IN RE: CHINESE-MANUFACTURED**
**DRYWALL PRODUCTS LIABILITY**        **MDL NO. 2047**
**LITIGATION**

                                      **SECTION: L**

**THIS DOCUMENT RELATES TO:**        **JUDGE FALLON**
***ALL CASES***                        **MAG. JUDGE WILKINSON**
****************************************************************************

### AFFIDAVIT OF ESQUIRE BANK, NATIONAL ASSOCIATION

Eric Bader, the Executive Vice President and Chief Financial Officer of Esquire Bank, National Association ("Esquire Bank"), who being first duly sworn upon oath, states:

1. I make this Affidavit based upon personal knowledge.

2. I am more than Eighteen (18) years of age and of sound mind.

3. I am an authorized agent and representative of Esquire Bank.

4. At the September 17, 2013 status conference, Esquire Bank presented information regarding its QSF Banking program to Judge Fallon. The information included Power Point presentations and exhibits, as well as an exchange of questions and answers with Judge Fallon. In attendance at the status conference were (i) representatives of BrownGreer, (ii) the attorney for Knauf, (iii) the attorney for insurers, (iv) other counsel representing various other parties, (v) Andrew Sagliocca, the President and Chief Executive Officer of Esquire Bank, (vi) Eric Bader, the Executive Vice President and Chief Financial Officer of the Bank, (vii) Lynn Greer who represented BrownGreer, (viii) Robert M. Johnston who appeared as Pro Se Curator, (ix) Arnold Levin who appeared as Lead Counsel for the claimants, and (x) Russ Herman and Lenny Davis who appeared as Liaison Counsel in MDL 2047.

5. Esquire Bank is national banking association, regulated and examined by the Office of the Comptroller of the Currency, a bureau of the U.S. Department of the Treasury ("OCC"). Esquire Bank's deposit accounts are insured by the Federal Deposit Insurance Corporation ("FDIC") up to the applicable limits established by federal law and regulation.

6. Esquire Bank is a highly capitalized FDIC-insured depository institution, with a Common Equity Tier 1 Capital Ratio ("CET1 Ratio") of 17.66% at March 31, 2018. By comparison, at March 31, 2018, the CET1 Ratio of following depository institutions were:

**EXHIBIT**
**C**

| Name of Depository Institution | CET1 Ratio |
|---|---|
| JP Morgan | 13.59% |
| Regions | 12.92% |
| Iberia | 11.16% |
| Hancock Whitney | 10.63% |
| Home Bank | 12.93% |

CET1 is a measure of bank solvency that gauges a bank's capital strength. In particular, the CET1 ratio measures a bank's capital against its assets. The higher the CET1 ratio, the greater the capital strength of the bank.

7.  Esquire Bank is the wholly owned subsidiary of Esquire Financial Holdings, Inc.  Esquire Financial Holdings, Inc. is a registered bank holding company with, and is inspected by, the Board of Governors of the Federal Reserve System ("FRB"), and is a public reporting company with the U.S. Securities and Exchange Commission ("SEC").  Esquire Financial Holdings, Inc.'s common stock trades on the NASDAQ under the symbol "ESQ".  At June 1, 2018, Esquire Financial Holdings, Inc. had 7,445,723 shares of common stock issued and outstanding.  Esquire Financial Holdings, Inc. has never paid a dividend to its stockholders.

8.  Russ Herman currently owns approximately 0.8% of the outstanding common stock of Esquire Financial Holdings, Inc. or 62,412 shares, which amount includes 2,500 shares of restricted stock and 14,892 exercisable options to purchase shares of common stock of Esquire Financial Holdings, Inc.  Stock options vest over a period of years and are exercised with the personal funds of the grantee.  The weighted average price for Mr. Herman to exercise his 14,892 options is $12.50 per share.  Accordingly, Mr. Herman would need to pay Esquire Financial Holdings, Inc. approximately $186,150 in order to exercise those options.  Mr. Herman also received 2,500 shares of restricted common stock of Esquire Financial Holdings, Inc. in a single grant which vests in equal installments over a three-year period beginning January 23, 2022 and ending January 23, 2024. As the court transcript indicates, Mr. Herman made full disclosure of his relationship with and ownership in Esquire Financial Holdings, Inc. and Esquire Bank. Transcript pages 20-21 indicate full disclosure and responses to all questions.  BrownGreer, as Court-appointed Administrator, also made full disclosure of all processes on pages 8-16.  The Court directed at that time that the Court-appointed CPA, Phil Garrett be involved in the process. The hearing transcript is attached.

9.  Since 2007, Russ Herman has been a member of the Board of Directors of Esquire Financial Holdings, Inc. and Esquire Bank, and has attended 93 meetings. Mr. Herman has never been a member of the Loan Committee, Audit Committee, Governance Committee or Strategic Oversight Committee of Esquire Financial Holdings, Inc. or Esquire Bank. As such, he is not privy to any customer information related to loans or deposits.

10. Until 2013, neither Esquire Financial Holdings, Inc. nor Esquire Bank ever paid board fees to members of their Board of Directors. From 2013 to 2018, Mr. Herman has received a total of $27,900 in Director fees, of which Mr. Herman has directly donated $24,540 to

the Jewish Endowment Fund of Louisiana. The net difference between his Board fees and charitable contributions is $3,360. Since 2007, Esquire Financial Holdings, Inc. or Esquire Bank have reimbursed Mr. Herman a total of $112,460.25 in expenses for travel, food, lodging and special events related to his service as a director of Esquire Financial Holdings, Inc. and/or Esquire Bank.

11. Esquire Bank has made a personal loan to Mr. Herman secured by his future receivables and personal guarantee. Because Mr. Herman is a director of Esquire Bank, the loan is subject to the requirements of Regulation O (12 CFR Part 215), a regulation promulgated by the FRB. Regulation O requires that a loan to directors (i) be made on substantially the same terms, including interest rate and collateral, as, and following the credit underwriting procedures that are not less stringent than, those prevailing at the time for comparable transactions with persons that are not subject to Regulation O; and (ii) not involve more than the normal risk of repayment or present other unfavorable terms. Additionally, Regulation O requires that a loan to a director be approved in advance by a majority of the entire board of directors and that the interested director abstain from participating directly or indirectly in the vote. Mr. Herman's loan fully complied with the requirements of Regulation O. The loan was approved in advance by a majority of the directors of Esquire Bank, with Mr. Herman not participating in any discussion or vote on the loan, at market interest rate and without any preferential terms or terms unfavorable to Esquire Bank. The loan is reviewed annually by OCC in connection with its annual examination of Esquire Bank.

12. The QSF funds at issue were administered by Esquire Bank in accordance with Judge Fallon's directive with a focus on safety and soundness, preservation of principal and available liquidity. Esquire Bank has waived all fees related to the QSF other than a $3,100 charge in 2014. See fee schedule in Esquire Presentation to Judge Fallon. Esquire Bank has complied with the directives provided by the Court and will comply with a directive from Judge Fallon should the decision be made to transfer the deposit.

13. Since the approval of Esquire Bank to hold the QSF funds, and in accordance with the Court's directive, account statements have been submitted monthly to BrownGreer and/ or Phil Garrett, CPA. These account statements, representing approximately 1,000 pages, provide detailed information regarding the balances and interest rates earned on the funds. The statements also indicate which products the funds were held in.

14. Esquire Bank provided the following materials concerning interest rates paid on deposits:

   (a) A graph representing the average FDIC insured depository rates for all US Banks and Thrifts for the deposit products listed below over the 5-year period from 2013 to 2018. This graph notes the very low interest rate environment for all average FDIC Insured Depository Rates for all US Banks and Thrifts from 2013 to 2017.

      ➢ Money Market Rates
      ➢ NOW Accounts
      ➢ 3 Month Certificates of Deposit
      ➢ 3 Month Jumbo Certificates of Deposit (greater than $250,000)

    ➢  One Month Treasury Rate – For Comparison)

(b) A graph representing the Federal Funds Target Rate set by the Federal Open Market Committee (FOMC), represented by the Green line. This graph reflects the very low interest rate environment from 2009 to 2016, with rates beginning to increase in 2017.

(c) A graph representing the 3-month and 10-year US Treasury Rates. This graph represents the very low interest rate environment from 2009 to 2016, with Treasury rates beginning to increase in 2017.

15. The QSF earned the following interest income on the Knauf Attorney Fee deposit as interest rates rose:

|          | Avg. Balance | Income  | YOY Change |
|----------|--------------|---------|------------|
| 2014 (a) | 118,824,875  | 8,696   |            |
| 2015     | 139,575,653  | 23,083  | 165%       |
| 2016     | 186,898,965  | 34,038  | 47%        |
| 2017     | 190,375,689  | 169,049 | 397%       |
| 2018 (b) | 189,578,157  | 673,971 | 299%       |

(a) Funds received in March of 2014
(b) Estimated Annualized Income

16. Esquire Bank has unique qualifications to manage QSFs. It has a strong understanding of QSF administration, working with plaintiff counsel, defense counsel, claims administrators, and/or lien resolution firms, as well as the courts. Esquire Bank also has a strong board, investor and customer knowledge base in the legal community, as well as Senior and Executive management team involvement in all discussions and decisions related to QSFs. Esquire Bank has worked with numerous administrators and law offices.

17. Esquire Bank has managed approximately $2,000,000,000 ($2 billion) in QSFs to date. Esquire Bank utilizes "sweep arrangements" for these funds, ensuring the funds are at all times secured by U.S. Treasury notes and/or FDIC-insured deposits, and are readily accessible. With respect to protecting QSF funds, Esquire Bank's goals, in order of priority, are: (1) preservation of principal; (2) daily liquidity to meet client demands on any given day, and (3) returns. The U.S. Treasury (Federated) and FDIC-insured (Promontory) funds that Esquire Bank utilizes for QSF fund management represent funds with total assets under management of approximately $250,000,000,000 billion ($250 billion). It is not Esquire Bank's business model to leverage off-balance sheet QSF funds into on-balance sheet deposit, thereby utilizing these funds to generate and fund asset growth (i.e. Loans and investment securities)

18. The type of funds/products used to manage the QSF deposits is the most important factor in managing QSF funds, not the asset size of the financial institution that manages the QSF. The products that Esquire Bank uses provides the necessary safety and soundness and preservation of principal needed to protect QSF funds. The amount of the deposit is also not relevant to the decision. What is important is Esquire Bank's unique experience

in the legal industry and managing QSFs. For example, The Bank of New York manages $1.9 trillion in assets, (trust department assets) and has total assets (balance sheet) of only $372,000,000,000 ($372 billion).

19. Esquire Bank is a branchless bank model because its attorneys and merchants, Esquire Bank's primary customer sources, do not require brick and mortar bank offices to manage their businesses.  Esquire Bank does business nationwide across the United States.  It processes in excess of $6,000,000,000 billion ($6 billion) in merchants' payments annually.

20. Esquire Financial Holdings, Inc. and Esquire Bank are both highly regulated entities. Esquire Bank receives annual safety and soundness examinations from the OCC and Esquire Financial Holdings, Inc. is subject to annual inspections by the FRB. These examinations and inspections are presented to the Boards of Directors of Esquire Bank and Esquire Financial Holdings, Inc. The Bank is also examined by the FDIC, which insures its deposits. Since June 2016, Esquire Financial Holdings, Inc. has been a public reporting company to the SEC.  Accordingly, both Esquire Financial Holdings, Inc. and Esquire Bank file current, quarterly and annual reports with the SEC, OCC and FDIC, all of which are available in the public domain.

21. Esquire Bank from its inception, adopted a 21st century technological mindset. Today, payment processing is done electronically by most banks.  Larger banks are downsizing their branch presence and have either instituted or are presently converting to a technological mindset.

22. The driving force behind Esquire Financial Holdings, Inc.'s Initial Public Offering (IPO) was its unique business model including its core deposits, IOLTA-IOLA accounts, unique assets/loan products, merchant servicing platform, and unique niche as the only bank servicing the legal community with a focus on plaintiff law firms and their clients. Esquire Bank lends to numerous law firms through various unique products, not made available by other banks. Esquire Bank takes the time to understand the unique needs regarding deposits and lending within the plaintiff lawyer community. Documents related to the IPO are available on the SEC website.

Dated this 26th day of June 2018.                    **ESQUIRE BANK, NATIONAL ASSOCIATION**

_____

Eric S. Bader, Affiant

## NOTARY

Subscribed and sworn before me, a Notary Public, this 26th day of June 2018.

Commission Expires: Sept 11th 2018     _____

Notary Public

FEONA KHAN
Notary Public, State of New York
No. 01BA6152435
Qualified in Queens County
Commission Expires Sept 11th 2018





# Forward Looking Statements

This presentation may contain statements relating to the future results or actions of the Company (including certain projections and business trends) that are considered "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Such forward-looking statements, in addition to historical information, which involve risk and uncertainties, are based on the beliefs, assumptions and expectations of management of the Company. Words such as "expects," "believes," "should," "plans," "anticipates," "will," "potential," "could," "intend," "may," "outlook," "predict," "project," "would," "estimated," "assumes," "likely," and variation of such similar expressions are intended to identify such forward-looking statements. Examples of forward-looking statements include, but are not limited to, possible or assumed estimates with respect to the financial condition, expected or anticipated revenue, and results of operations and business of the Company, including earnings growth; revenue growth in retail banking lending and other areas; origination volume in the consumer, commercial and other lending businesses; current and future capital management programs; non-interest income levels, including fees banking services as well as product sales; tangible capital generation; market share; expense levels; and other business operations and strategies. For this presentation, the Company claims the protection of the safe harbor for forward-looking statements contained in the PSLRA.

Factors that could cause future results to vary from current management expectations include, but are not limited to, changing economic conditions; legislative and regulatory changes, including increases in FDIC insurance rates; monetary and fiscal policies of the federal government; changes in tax policies; rates and regulations of federal, state and local tax authorities; changes in interest rates; deposit flows; the cost of funds; demands for loan products; demand for financial services; competition; changes in the quality and composition of the Bank's loan and investment portfolios; changes in management's business strategies; changes in accounting principles, policies or guidelines, changes in real estate values; an unexpected increase in operating costs; expanded regulatory requirements as a result of the Dodd-Frank Act, which could adversely affect operating results; and other factors discussed elsewhere in this presentation, and in other reports filed by the Company with regulatory agencies.  The forward-looking statements are made as of the date of this report, and the Company assumes no obligation to update the forward-looking statements or to update the reasons why actual results could differ from those projected in the forward-looking statements.



# Esquire QSF Banking Program

- Esquire Bank has developed a Qualified Settlement Fund ("QSF") banking program with an **innovative and well secured qualified settlement loan product**.  Esquire Bank is a unique provider of financial services and products to the legal community, developing a strong brand and reputation as the **"Bank of Choice" for attorneys** and their firms.

- Esquire Bank's **dedicated QSF Team** is compromised of members from our Senior Management Team. These individuals have **multiple years of banking experience** and assist our clients to fulfill their fiduciary responsibilities.

- Understanding the important principles of **preservation of capital and fiduciary responsibilities** of the Trustee is key to our successful program.  We have partnered with industry leaders to offer products that fulfill the investment requirements issued to the trustees by the courts for both on and off balance sheet products.



2

# Esquire QSF Banking Program

Esquire Bank has an **in-depth understanding of QSFs** and the legal documents required to establish and administer QSFs.

**Esquire's tailored services include, and are not limited to:**

- Understanding of the Master Settlement Agreements and related confidentiality and non-disclosure elements of the MSA
- Customized QSF Account Applications & Investment Agreements
- In-depth understanding of Blocking Agreements & related Release Documents
- Coordinate document between TPA, Defense Attorney & Plaintiff Attorney
- Understanding of Release Documents protocol
- Online Banking with ability to upload the necessary files for reconciliation
- Positive Pay services (fraud protection)
- Electronic statements
- Dedicated QSF Team available 24/7
- Remote Deposit Capture
- Streamlined KYC Process



3

# Esquire QSF Banking Program

Understanding the importance of **principle preservation and fiduciary responsibilities** of the Trustee is key to our successful program.

We have partnered with industry leaders to offer products that **fulfill the investment requirements** issued to the trustees by the courts for both on and off balance sheet products.

- **CDARS** – The Certificate of Deposit Account Registry Services is the most convenient way to access **100% FDIC Insurance** on multi-million dollar CD deposits.

- **Insured Cash Sweep (ICS) –** The Insured Cash Sweep Service provides access to multi-million dollar **100% FDIC Insurance** for funds placed into money market accounts, providing enhanced flexibility for funding needs.



4

# Esquire QSF Banking Program

- **Federated Investment Funds –** Since 1955, millions of investors in the United States and around the globe have relied on Federated Investors *for world-class investment management.* Federated has grown to become one of the nation's largest investment managers with $377.3 billion in assets under management. Federated diversified product line is distributed through approximately 5,500 financial intermediaries and institutions who assist investors in meeting their unique objectives. Esquire Bank offers numerous investment solutions including but not limited to:

  - Treasury Funds
  - Money Market Funds
  - Commercial Paper Funds (CP)
  - Corporate Bond Funds

- **Esquire Investment Services (EIS)** – Esquire Investment Services is a full service Investment Company, inclusive of Trust Services. Utilizing Esquire Investment Services is a great way to structure an investment portfolio with known parameters, such as *liquidity and maturity to maximize returns* with a focus on safety and soundness.



5

# QSF Rates

**100% FDIC Insured Products**
CDARS and ICS program market rates are set on a weekly basis. The rates for the week of September 9th are listed below and subject to change based on market conditions.

- Insured Cash Sweep (ICS) – 5bps

- **CDARS**
  - 4 week – 5bps
  - 13 week – 5bps
  - 26 week – 10bps
  - 52 week – 15bps
  - 2 year – 20bps
  - 3 year – 25bps

**Federated Investment Products**
*See funds and daily rates below as of 09/11/13.  Rates are subject to change based on market conditions.*

| | |
|---|---|
| U.S. Treasury Cash Reserves Fund – U.S. Treasury Securities | 0.00% |
| Treasury Obligations Fund – U.S. Treasury Securities and Repo | 0.01% |
| Government Obligations Fund – AAA Treasuries Agencies and Repo | 0.01% |
| Prime Obligations Fund – AAA Commercial Paper | 0.01% |
| Prime Cash Obligations Fund – AAA Commercial Paper with Int'l Paper | 0.03% |



# QSF Fee Overview

Esquire Bank's QSF Banking Program fees are **charged to cover partial administrative costs only**.   Esquire Bank's primary focus is delivering our products and services to law firms and their customers to generate revenue.

Our fees are minimal and consist mainly for the items listed below:

- Wires
- Positive Pay (Fraud Protection), if applicable
- Release Review and Processing
- Minimal Annual and Set-up Fee

Esquire Bank is prepared to work with the courts on all fees to **minimize expenses** to the QSF. The Bank will provide detailed and clear monthly statements to the courts for their review.



# Primary QSF Fee Schedule

| Service | Fee per unit | Fee per annum*<br>*It is estimated that CDW will have 21 bank accounts. |
|---|---|---|
| **Wires** | $20 per wire | Typical wire activity runs from 10-50 wires per $100 million in QSF annually or **$200 - $2,500 annually.  This fee can be adjusted.** |
| **Positive Pay**<br>*This represents the banking service required by Claims Administrators for disbursing funds directly to claimants (Fraud Protection).* | $40 per month per account<br>*(Esquire's cost)* | It is estimated that CDW will have 21 banking accounts x $40 per month = **$10,080 per annum**.  This fee represents recovery of our cost with no profit. Positive Pay only used when disbursements via check directly to plaintiffs. |
| **Charge for Release Review**<br>*Processing Blocked Account Agreements &  Review Release* | $20 per review | Typical activity runs from 10-50 reviews per $100 million in QSF annually or **$200 - $2,500 annually.  This fee can be adjusted.** |
| **Federated Investments** | $50 per month per account | **$12,600 per annum. This fee will be waived.** |
| **Annual Fee** | $100 per month per account | **$25,200 per annum.**  Typical fees by other institutions run $125-$200 per month per account or $31,500-$52,500 per annum. **This fee can be adjusted.** |



8

# Current QSF Program Management

- 22 Open QSFs to Date
    - Including, but not limited to:
        - Avandia
        - Byetta
        - Chantix
        - Yaz
- $513 million Funded
- Numerous TPA's & Claims Administrators
- **Primary Focus = Preservation of Principal**



ESQUIRE® BANK

# QSF Loan Program



**Esquire Bank's QSF Loan Program gives attorneys:**

- ***Liquidity***

  - No longer does an attorney have to wait for 90% of his plaintiffs to have settled before he and his clients can get paid.

- ***Flexibility***

  - Attorneys can decide how they want to get paid: a lump sum, a structured settlement, or a combination of the two.

# A Safe & Sound Institution
# Core Principles – June 2013

## Strong Capital Position

- Leverage Ratio 9.98%
- Tier 1 Risk Based Capital Ratio 17.78%
- Total Risk Based Capital Ratio 19.03%

## Excess Liquidity to Meet Customer Demands

- $100 million of Excess Liquidity; 50% of deposit base

## Pristine Asset Quality

- 32% Securities (Primarily FNMA/FHLMC MBS)
- 65% Loan to deposit ratio
- Non Performing Loans to Total Assets .01%

## Strong Core Deposit Base

- $200 million with 21bp cost of funds
- 64% Low Cost Core Deposits (DDA & NOW)



11

# A Safe & Sound Institution
# Excess Liquidity

## Maximize Liquidity Position

- $100+ million or 50% deposit base; industry average is 20%-30% of deposit base.
- Ability to consistently meet all customer demands in a timely manner.

## Deposit Aggregator

- High level of customer service; access to decision makers
- Free cash management solution; a "branch" in the office

## Regulation

- Esquire Bank is regulated by the Office of Comptroller of the  Currency  (OCC).
- Supplemented with Annual Audited Financial Statements



12

# Well Recognized Board of Directors

| Board Member | Background |
|---|---|
| Tony Coelho | Member of U.S. House of Representatives from 1978 – 89; author of Americans with Disabilities Act |
| Christopher E. Diamantis | Chairman of Integrated Financial Settlements |
| Marc D. Grossman | Senior partner of The Sanders Law Firm |
| Russ Herman | Senior Partner of Herman, Herman, & Katz LLC; past President of Civil Justice Founding and American Association of Justice |
| Harvey Hirschfeld | President and Director of Plaintiff Funding; Chairman of American Legal Finance Assoc |
| Robert Mitzman | President and CEO of Quick International Courier |
| Angelicque Moreno | Partner of Avanzino & Moreno |
| Richard Powers | Former President and CEO of Esquire Bank; EVP and COO of North Fork Bank |
| Andrew Sagliocca | Current President and CEO of Esquire Bank; Former SVP/Head of Finance, North Fork Bank |
| Christopher A. Seeger | Founding member of Seeger Weiss LLP |
| Michael J. Skoler | CEO of Sokolove Law |
| Dennis Shields | Chairman of Esquire; CEO of Plaintiff Funding |
| Kevin Waterhouse | Vice President and Investment Advisor of L.M. Waterhouse & Co |
| Selig Zises | Chairman of  Plaintiff Funding Holding, Inc. |

# Steering Committee Stock Ownership

Members of the Plaintiffs' Steering Committee cumulatively own less than 5% of the issued and outstanding stock in Esquire Financial Holdings, Inc.*

*Individual ownership available upon request.



# Experienced Senior Management

| Management | Role | Years Financial Services Experience | Prior Experience |
|---|---|---|---|
| **Dennis Shields** | Chairman of the Board | 24 | CEO of Plaintiff Funding Corp since its inception in 2000. |
| **Andrew Sagliocca** | Chief Executive Officer and President | 24 | Former Senior Vice President and Director of Finance of North Fork Bank for 13 years. |
| **Eric Bader** | EVP and Chief Financial Officer / Treasurer | 14 | Former Vice President and Investment Officer at North Fork Bank. |
| **Ayal Glezer** | SVP and Chief Lending Officer | 14 | Former Senior Commercial Underwriter for Global Investment Banking Firms.  Analyzed FDIC receivership portfolios for 24 separate financial institutions. |
| **Ari Kornhaber, Esq.** | EVP and Director of Sales | 14 | Former practicing plaintiff's lawyer with the law firm of Pariser and Vogelman, PC.  Former trial attorney for the law firm of Napoli, Kaiser and Bern, LLC. |

ESQUIRE® BANK



1

1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:   CHINESE MANUFACTURED      *    Docket 09-MD-2047
              DRYWALL PRODUCTS          *
6             LIABILITY LITIGATION      *    September 17, 2013
                                        *
7    This Document Relates to All Cases *    9:00 a.m.
     * * * * * * * * * * * * * * * * * *

8

9

10                 MONTHLY STATUS CONFERENCE BEFORE
                   THE HONORABLE ELDON E. FALLON
11                 UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   For the Plaintiffs:          Herman Herman Katz & Cotlar
                                  BY:   RUSS M. HERMAN, ESQ.
15                                BY:   LEONARD A. DAVIS, ESQ.
                                  820 O'Keefe Avenue
16                                New Orleans, Louisiana 70113

17

18                                Levin, Fishbein, Sedran & Berman
                                  BY:   ARNOLD LEVIN, ESQ.
19                                510 Walnut Street
                                  Suite 500
20                                Philadelphia, Pennsylvania 19106

21

22   For Knauf Entities:          Frilot, LLC
                                  BY:   KERRY J. MILLER, ESQ.
23                                1100 Poydras Street, Suite 3700
                                  New Orleans, Louisiana 70163

24

25

2

1  <u>APPEARANCES</u>:

2  For the Insurers:              Barrasso, Usdin, Kupperman,
                                    Freeman & Sarver
3                                  BY:  H. MINOR PIPES, ESQ.
                                   909 Poydras Street
4                                  24th Floor
                                   New Orleans, Louisiana  70112
5

6
   For State/Federal              Barrios, Kingsdorf & Casteix, LLP
7  Committee:                     BY:  DAWN M. BARRIOS, ESQ.
                                   701 Poydras Street
8                                  Suite 3650
                                   New Orleans, Louisiana 70139
9

10
   For Esquire Bank:              Esquire Bank
11                                 BY:  ANDREW SAGLIOCCA, PRESIDENT
                                   BY:  ERIC BADER, VICE PRESIDENT
12                                 320 Old Country Road, Suite 101
                                   Garden City, New York 11530
13

14
   Claims Administrator:          BrownGreen, PLC
15                                 BY: LYNN GREER, ESQ.
                                   250 Rockets Way
16                                 Richmond, Virginia 23231

17

18 Pro Se Curator:                Law Offices of Robert M. Johnston,
                                    LLC
19                                 BY:  ROBERT M. JOHNSTON, ESQ.
                                   400 Poydras Street
20                                 Suite 2450
                                   New Orleans, Louisiana 70130
21

22

23

24

25

3

1   APPEARANCES:

2   Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                    500 Poydras Street
3                                   Room B-406
                                    New Orleans, Louisiana 70130
4                                   (504) 589-7780

5

6   Proceedings recorded by mechanical stenography, transcript

7   produced by computer.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                        **PROCEEDINGS**

2                      **(September 17, 2013)**

3          (OPEN COURT)

4

5              **THE COURT:**  Be seated, please.

6                  Good morning, ladies and gentlemen.

7                  Let's call the case, please.

8              **THE DEPUTY CLERK:**  MDL-2047, *In re:  Chinese Drywall*

9    *Manufactured Drywall Products Liability Litigation.*

10             **THE COURT:**  We're here today for our monthly status

11   conference.  I met with liaison and lead counsel in this matter

12   before this meeting and went over the proposed agenda.  I'll

13   take them in the order that we discussed.

14                 Counsel, make their appearance for the record

15   first, please.

16             **MR. MILLER:**  Good morning, Your Honor.  It's Kerry

17   Miller on behalf of Knauf and the Defense Steering Committee.

18             **MR. HERMAN:**  May it please the Court, good morning,

19   Judge Fallon.  Russ Herman for plaintiffs.

20             **THE COURT:**  Okay.  The first order on the proposed

21   agenda is pretrial orders.  Anything on that?

22             **MR. HERMAN:**  No additional pretrial orders.  PTO 27

23   was entered and sets claims administrative procedures, which

24   are abbreviated, C-A-P, CAPs, and the CAPs.  As the program

25   proceeds and problems may arise, we'll approach Your Honor with

1    some amendments to PTO 27 for Your Honor to consider.  It's
2    been the experience that as the claims go forward, there are
3    always some unforeseen matters.
4           **THE COURT:**  The next items are the state court trial
5    setting and state/court federal coordination.  Anything on
6    that?
7           **MS. BARRIOS:**  Good morning, Your Honor.  Dawn Barrios
8    for the state.
9              We're nearing the end of my reporting to you.
10   Because of your good work, and the good work of the state court
11   judges, we're moving swiftly along.
12             There's only one change from Judge Hall.  The
13   *Caburian* case has been moved up a week.  With regard to *Ramirez*
14   and *Torres*, which are the aggregate settlements in Virginia,
15   they're almost winding up.  And class counsel on the other
16   settlements, we have a weekly conference call moving that
17   forward and doing the claim forms, using the MDL mostly as our
18   base.
19          **THE COURT:**  Okay.  Fine.
20          **MS. BARRIOS:**  Thank you, Your Honor.
21             Thank you very much.
22          **MR. HERMAN:**  There is one other -- I'm sorry, Your
23   Honor.  May it please the Court, there's one additional issue I
24   should mention for the record.  The *Lennar* appeal, a per curiam
25   came down affirming the trial judge, and Your Honor's opinion

1    is prominently mentioned.  It was reviewed by us yesterday.

2    And the federal Fifth Circuit has been advised of the opinion

3    in connection with the appeals presently pending, and we will

4    provide -- since that opinion is, in effect, a per curiam, we

5    are going to provide a copy to be posted on Your Honor's Web

6    site.

7              THE COURT:  All right.  That's with regard to

8    Taishan.  Judge Farina and I conferred on that and issued

9    similar opinions, holding that there was jurisdiction over

10   Taishan.  His opinion has been appealed, as I understand it,

11   and the appellate Court has affirmed him.  I think that that's

12   the end of the line, as I understand, at least in that

13   appellate court.

14              Anything on omnibus class actions?

15              MR. HERMAN:  May it please the Court, various motions

16   to dismiss have been filed.  Part of the settlement, except for

17   Lafarge and Boral, that would be No. XI, and dealt with in

18   XIX -- roman numeral XIX at page 21.

19              Does Your Honor want to hear those after we get

20   through?

21              THE COURT:  Yes.  I'll take a short break and hear

22   from them, because some folks on the line want to speak on

23   those issues.

24              MR. HERMAN:  For anyone listening, since there have

25   been a number of omni complaints, and the status report, as

1  directed by Judge Fallon, is placed on the judge's Web site,

2  you can review all of the omni complaints, particularly those

3  that may interest your clients, on pages 6, 7, 8 and 9 of the

4  status report.

5           THE COURT:  All right.  As I've mentioned before, you

6  won't find omni complaints in the Federal Rules of Civil

7  Procedure.  What we did was create another vehicle by which the

8  complaints could be joined because, particularly insofar as

9  service is concerned, it's over $100,000 to serve under the

10  Hague these days, at least in China.

11           Rather than have 200 complaints go out at

12  $100,000 each, we joined them together as an omni complaint and

13  made service of one sufficient for everybody.  So that's one of

14  the reasons for the omni complaints.

15           We don't have it on the agenda, but I understand

16  we have a report from the claims administrator as to the status

17  of that process.

18           MR. HERMAN:  Yes, we do, Your Honor.  Lynn Greer is

19  here from the firm of BrownGreer, and designated by the Court,

20  and with the support of all the parties, is here to report.

21           I do want to indicate to everyone here, and

22  folks on the phone, that the September 30th deadline is

23  approaching.  There is no agreement currently between Knauf and

24  the PSC to extend that deadline.  So, again, I'm going to urge

25  folks who represent claimants, and claimants representing

1    themselves or through Bob Johnston's pro se directions, to
2    please file before that deadline.
3              THE COURT:  All right.
4              MS. GREER:  Good morning, Your Honor.
5              THE COURT:  Good morning, Lynn.
6              MS. GREER:  Your Honor, Lynn Greer from BrownGreer in
7    Richmond, Virginia, and we're the settlement administrator in
8    this case.
9              What I'd like to do today is give Your Honor and
10   those here, as well as those on the phone, because we will be
11   posting these on our Web site, an overview of significant
12   activity in the settlement program today and an update on the
13   claims filing activity.
14             This slide, Your Honor, represents the number of
15   claims and properties and claimants who registered with the
16   program.  And the deadline for registration was July 8th of
17   this year.
18             This slide shows that there were 8,295 claimants
19   represented by 194 firms that registered with the program.
20   1,102 pro se claimants.  There were 15,623 properties
21   registered affected properties by those represented by counsel,
22   and 1,522 by those represented by pro se's.
23             And claims are an even higher number.  Because,
24   as Your Honor knows, a claimant, and actually a property, can
25   have several different claims that they're eligible to file.

9

1    23,094 claims by those who are represented by counsel, and
2    2,209 by pro se claimants, for a total of 25,303 claims that
3    were registered.
4              This slide shows the number of claims filed as
5    of Friday. And this slide also shows the breakdown of the
6    specific claims that are filed.
7              You'll see that the "Global, Banner, InEX Repair
8    and Relocation Expenses" has the most claims so far: 764
9    filed, another 620 in progress. The "In Progress" column shows
10   claims that we can tell folks are in there working on. They
11   have not yet hit the "Submit" button, but we know that they're
12   working to try to submit those. A total of 1,384 Global,
13   Banner, InEX Repair and Relocation Expense claims; 711 Knauf
14   Remediation claims either submitted or in progress. We have a
15   total of -- and this was as of Friday -- 1,798 claims
16   submitted.
17             I will tell the Court that there has been a
18   significant uptake in activity over the weekend. That number
19   is now more -- it's over 2,000 now of claims that have been
20   filed. So we are seeing a lot more activity coming in.
21             This just shows, Your Honor, activity since the
22   last status conference. And you'll see that over 1,500 claims
23   have either been filed or have been in progress since the last
24   status conference, again showing that there is activity
25   ongoing.

1          This slide, though, shows how many registered
2  "Claimants," "Affected Properties," and "Claims" have either
3  been submitted or are in progress and how many are remaining.
4          So of the 9,327 claimants that registered, we've
5  only gotten submissions from 12 percent; another 11 percent are
6  in progress; but 77 percent of those who registered have not
7  yet submitted a claim.
8          "Affected Properties," 17,145.  10 percent of
9  those properties have been submitted; another 13 percent in
10 progress; 77 percent remaining.
11         "Claims," 25,303.  We've received 8 percent of
12 those submissions; 5 percent in progress; but 87 percent of the
13 claims that are registered have not yet either been begun or
14 submitted.
15         THE COURT:  What's the reason for that, though, Lynn,
16 as you see it?
17         MS. GREER:  Well, I think a lot of people are working
18 very hard to gather the documents that they need to submit.
19 What I'd like to talk about in a minute, Your Honor, is to
20 encourage people, even if they don't have all of the documents,
21 to go ahead and submit them.  The process is a friendly one.
22 We do give people a chance to cure any claim that is
23 incomplete, and this is not atypical.
24         In a lot of claims programs, you usually see at
25 least 50 percent of the claims coming in within days of the

1  deadline.  But I do think it's a combination of just claim

2  filing behavior in general, but also the document requirements

3  that people are so anxious to get and submit a complete claim.

4              This shows a claim through the process, and I'll

5  just go over this generally.  This is just a flow chart.  It

6  starts with registration.  As I mentioned, the deadline was

7  July the 8th.  The current claims submission deadline is

8  September 30th, so just 13 days.

9              Once we get a claim, we will review the claim

10  and one of two things will happen.  We will either see that it

11  is incomplete and we will issue an "Incompleteness Notice."

12              And, Your Honor, we have promulgated, and the

13  Court has approved, CAP-3 which does address the incompleteness

14  process, and which clarifies that we will send an

15  incompleteness notice.  We will tell people specifically what

16  is missing.  They will then have 30 days to cure that

17  incompleteness.  After 25 days, we'll send a followup to anyone

18  who has not yet submitted to tell them they have five days left

19  to submit it again, trying to make this a friendly process.

20              If the claimant then cures the incompleteness,

21  then we will go forward with the eligibility or the denial

22  notice, but probably an eligibility notice.

23              Then following that, the claimant has another 30

24  days to appeal the decision or the outcome of our review.

25              The only denial notices that we will issue at

1   this juncture are those that are filing for remediation but we

2   can tell have already been remediated either in the pilot

3   program, or they're an already-remediated home, or if we can

4   tell that the claimant is not a class member.  Everything else

5   will go through the incompleteness track before we would issue

6   a denial notice.

7               This process flow is a little more detailed.

8   The purpose of this slide, Your Honor, is to show that for

9   Knauf remediation claims, the analysis and the review doesn't

10  stop with the settlement administrator.  If someone is seeking

11  remediation and we find sufficient indicia of drywall, it then

12  will go through the program inspector, the contractor, to be

13  able to do all of the paperwork and get the estimate together,

14  before the claimant even has to submit whether they want to

15  have their home remediated by Moss, by someone else, or just to

16  get the lump sum -- the payment at that point.

17              So this slide is only to show that a remediation

18  claim takes more work than just with the settlement

19  administrator.  It involves some third-party activity as well.

20              This is a highlight slide, Your Honor, of

21  significant settlement administrator activity that we have

22  undertaken with the cooperation and the involvement of the

23  parties.  We have a weekly status conference telephone call

24  with representatives of the parties to go through any

25  significant claims decisions.  We review CAPs.  That's been a

1   very fruitful exercise that we do every Thursday.

2                   But this shows, Your Honor, we have been able to

3   pull in for people who have submitted documents to us in the

4   prior phases of this program -- they submitted a lot of

5   documents to us -- we have been able to identify almost 80,000

6   documents that we already had that we were able to pull in for

7   claimants in this program so that they don't have to submit

8   them again.  And that has been for over 55-, 5600 affected

9   properties.

10                  We have also developed a master address system

11  that allows us to make sure that we have a unique identifier

12  for each property to make sure that we avoid duplication of

13  claims that are being filed in the system.

14                  We've designed the database screen so that our

15  reviewers can review these claims as they come in.  We have

16  developed an online notice system.  For people who are

17  participating in this program through the Web site, we will be

18  issuing notices online, informing counsel and pro se claimants

19  of activity in their claim.

20                  We also have developed the response system.  So

21  if someone needs to submit a document to cure a claim, they can

22  do that online and to avoid mail and hard copy submission,

23  although that is also available for people who don't want to

24  use the Internet.

25                  The other thing that we've done is we have

1    created a system -- this program's a little bit different than

2    some, where usually you just have a claimant submitting

3    information.  Here we have multiple levels of information

4    coming in from builders, for example, who are submitting their

5    claims on spreadsheet, or from the contractors who are

6    submitting documentation.  So we developed a system to be able

7    to get documentation from not just from plaintiffs but third

8    parties as well.

9              This is just a screen shot of the online

10   submission screen that allows us to drive the program.  If

11   someone, for example, picks that the manufacturer was

12   non-Knauf, then that informs the screens that we make available

13   for them.  For example, we would not then show them or give

14   them the ability to file a remediation claim -- a Knauf

15   remediation claim.

16             So this is what the claimants who use the online

17   system see initially.  It helps us bucket the claim and the

18   settlement in which it's proceeding.

19             This slide highlights the three CAPs that we

20   have developed and promulgated.  The first just discussed how

21   the CAP process would work, the claims administration

22   procedures.

23             The second is a CAP that helped flesh out proof

24   requirements and how to submit -- it actually provided a

25   template affidavit called a "Supply Chain Affidavit" for people

1   who knew who their builder and supplier was but they don't have

2   proof of that.  It also allowed us to accept claims from

3   builders on a spreadsheet.

4               And then CAP-3 is the incompleteness process

5   that we've described before that lays out the time frames for

6   how that will be handled.

7               This is just an example of what these CAPs look

8   like.  These are posted on our Web site and on the Court's Web

9   site.

10              This slide, Your Honor, just talks about all the

11  different levels of outreach that we and the pro se curator

12  have for claimants in this program.  I won't read each of

13  these, but it will be on the Web site.  So if anybody wants to

14  know how to call us, how to send a question, what the Web site

15  is, they can go to this slide.  We have actually answered

16  already over 2500 questions to the "Questions Inbox."  A lot of

17  activity and a lot of interaction is ongoing daily with

18  claimants and their law firms.

19              This is our contact information again.  We'll

20  post this on the Web site.  A lot of people already know this,

21  but it sets forth our address and our telephone number and the

22  Web site and the e-mail address.

23              Your Honor, the last slide is simply a list of

24  the QSFs that we are helping with Mr. Garrett and the parties

25  to be able to establish and be able to get funded and

1    disbursed.  We're working with Mr. Garrett and with Esquire
2    Bank to make sure that those funds are established and we can
3    pay out of those.
4            THE COURT:  The thing that concerns me is just that
5    we have 77 percent of the claims that were registered haven't
6    submitted any material.  I'd like you to see whether you can
7    get together a list of the attorneys who represent those
8    individuals and give it to liaison counsel.  He can make the
9    necessary calls, because sometimes it just gets put in a drawer
10   someplace.
11           MS. GREER:  Yes, Your Honor, we can do that.
12           THE COURT:  The same way with the pro se.  If you can
13   get in touch with Bob Johnston and give him the list of pro
14   se's so that maybe he can call them and make sure that they
15   understand that even if they don't have all of their material
16   together, if they submit what they have, that will get their
17   feet in the door, hopefully.
18           MS. GREER:  Yes.  We can do that, Your Honor.
19               The other thing that we are working on is
20   another CAP that outlines the appeals procedures.  So that if
21   there's concern out there about how a claim will go through an
22   appeal, that CAP should clarify that, and we're working with
23   the parties to finalize that.  But we will provide those lists
24   to liaison counsel and to Mr. Johnston.
25           THE COURT:  This program, unlike a lot of the

 1   programs that I've been involved in, it requires so much
 2   documentation that sometimes it can be daunting; and people
 3   want to get all of it before they submit it so they don't get
 4   rejected.  But maybe we ought to give them an opportunity to
 5   get what they have and then see whether or not we can get the
 6   rest later on.
 7             MS. GREER:  Yes, Your Honor.
 8             THE COURT:  Okay.  Thank you very much.
 9             MS. GREER:  Thank you.
10             MR. HERMAN:  May it please the Court.  Your Honor,
11   let me, if Your Honor will indulge me, just make a couple
12   comments about folks getting their materials in.
13             The PSC and Knauf had a, and have a, fairly
14   reliable estimate that there are about 4,200 Knauf homes.
15   About 50 percent of those went through a pilot program.  So
16   that when we look at these numbers, they're sort of skewed
17   because they've got different types of claims coming through.
18             But, nevertheless, meeting this deadline is very
19   important.  We'll get a notice to the attorneys, and I'll speak
20   with Bob Johnston afterwards on the pro se, but we do have to
21   do something to accelerate it.
22             Also, there was a meeting yesterday.  Kerry
23   Miller and Kyle were there on behalf of Knauf, Moss had three
24   representatives there, the PSC had representatives there, and
25   Moss is ready to schedule and progress through a number of

1    remediations.  So the sooner you can get the material in, the

2    sooner it can be vetted by BrownGreer and authorization of Moss

3    to start the remediation can begin.

4              We've also published a list of the materials

5    that would be essential for folks to accumulate if they don't

6    have and provide.  I do want to mention two Web sites.  The

7    first is https://chinesedrywallclass.com.  And the next is

8    chinesedrywallregistration -- one word -- @browngreer -- one

9    word -- .com.  You can access more information at page 11 of

10   the status conference report published on Judge Fallon's Web

11   site for CDW.

12             THE COURT:  Okay.  The next item is the various

13   motions to establish qualified settlement funds, QSFs.  I've

14   asked representatives of the banks that have been picked to

15   appear today to tell us something about their operations and

16   what they plan to do.

17             MR. HERMAN:  May it please the Court.  Your Honor,

18   thus far has, subject at the direction and approval of the

19   Court, established 21 QSFs.  Another QSF will be motioned

20   before the Court, one additional one.

21             With respect to the QSFs, Esquire Bank has two

22   representatives here, Your Honor, Andrew Sagliocca, president

23   of the bank, and Eric Bader, vice president of the bank, and

24   they have a full report to make to Your Honor.  I'm going to

25   ask that their report, which is in slides, be attached and

19

1    filed in the record.

2            In addition to that, I previously reported to

3    the Court that less than 5 percent of the issued and

4    outstanding shares were owned by individuals whose firms have

5    some appointed position in the Chinese Drywall MDL.

6            After reviewing all the records extensively, the

7    actual figure is 3.59 percent.  A list of those individuals and

8    their shareholdings are confidential; however, I've provided

9    them to the Court.  And, Your Honor, I'd like permission to

10   file that information of record in order that anyone may

11   petition the Court to take a look at that whenever upon good

12   cause shown.

13           THE COURT:  Okay.  With regard to the QSFs, these are

14   necessary.  Because what happens is that the funds have to be

15   placed on deposit so that those funds can be paid out

16   appropriately to the appropriate people.  In many cases,

17   there's one or two QSFs.  In this particular case, because of

18   the numbers involved -- as I say, we have over 1,000 defendants

19   in this case -- we've had to have 21 QSFs.

20           It's important that these be established.  Also,

21   it's important that the court-appointed CPA be placed in the

22   loop of information about these QSFs so that he can keep track

23   of the funds and find out where they're going and how they're

24   going out.

25           I meet with the CPA on a monthly basis to

20

1  discuss the filings with him, and the time put in, the expense

2  put in, and things of that sort; and another reason is to keep

3  track of these QSFs.

4          Let me hear from the bank representatives at

5  this time.

6          MR. HERMAN:  Yes.  Let me introduce to the Court the

7  president of Esquire Bank, Andrew Sagliocca.

8          MR. SAGLIOCCA:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10         MR. SAGLIOCCA:  I appreciate the time to speak to the

11 Court and present to the Court.  The QSF banking program for

12 Esquire Bank is we have senior management involved in all QSF

13 programs, and the goal is always preservation of principal and

14 maintaining low fees so as not to eat into principal.

15         We have a very good understanding -- in-depth

16 understanding of the QSF programs.  We've worked with multiple

17 programs, master settlement agreements; designed custom

18 applications and investment agreements.  We've worked with

19 multiple blocking agreements and release documents; daily

20 coordinate with various CPAs, defense attorneys, plaintiff

21 attorneys, claims administrators; understand the release

22 document protocol; have a full suite of online banking

23 products; Positive Pay services, which are fraud protection

24 services; electronic statements.

25         The QSF team is a 24/7 team.  So any of the

21

1   CPAs, claims administrators, counsel have full access to the
2   senior management team 24 hours a day 7 days a week with our
3   cell phones.
4                  As I said, the goal is the preservation of
5   principal.  That's our fiduciary responsibility to make sure we
6   do that with the claims administrator.  So the products we
7   utilize, the combination of, are either 100 percent FDIC
8   insured, which are money market type products or certificate of
9   deposit type products.  We also have a very strong relationship
10  with Federated, who manages almost half a trillion dollars in
11  funds.
12                 We've primarily used Treasury funds, because
13  that's usually what the court directs, so that it's backed by
14  the full faith and security of the government.
15                 Rates, Your Honor, for the products are at
16  historic lows at this time.  The money market FDIC products are
17  around 5 basis points.  And the Federated products, primarily
18  the Treasury obligation products, are around 1 basis point
19  because of the current rates on treasuries.
20        THE COURT:  So you investment them in funds that are
21  secured by the United States?
22        MR. SAGLIOCCA:  Yes.  Yes.
23        THE COURT:  Okay.
24        MR. SAGLIOCCA:  The fees are minimal.  We really
25  charge only fees to cover administrative costs.  That's not our

22

1    primary generator of revenue.  This is the way we work with
2    plaintiffs' counsel and defense counsel for our other products
3    and services.  So this is more of an accommodation.  So we
4    don't focus on the fees.  They mainly surround wires and the
5    Positive Pay fraud protection, release and review, and a
6    minimum annual fee.  Our goal is to minimize those expenses,
7    not to -- as I said, not to --
8             THE COURT:  What are the fees based on?  How do you
9    determine the fees?
10            MR. SAGLIOCCA:  The fees are based on market type
11   fees.  So wire fees are around $20; Positive Pay fees, which is
12   fraud protection, it's is required, is around $40 a month;
13   release fees, $20; and an annual fee of only $100.
14            Every one of them, Your Honor, we've worked with
15   the courts and the claims administrators, if either/or saw fit
16   that these fees were too high -- as I said, they're not to
17   generate revenue, but just to cover costs and recover costs.
18            We currently manage about 22 QSFs, including
19   Avandia, Byetta, Chantix, Yaz; work with various CPAs and
20   claims administrators; and again, always, always, always
21   preservation of principal.  Always.
22            The bank itself, away from using the Treasury
23   funds and the FDIC insured funds, is a very, very safe, secure
24   bank.  Our capital position is almost double what the
25   regulators want us to be at.  We have a high level of

1  liquidity, and virtually no -- 1 basis point of problem assets.
2  We have one problem loan.  We don't want to focus our time on
3  managing problem loans like the rest of the industry.  We're
4  regulated by the OCC, the Office of Comptroller Currency.  We
5  also have annual audits.
6          The presentation, for the record, has a board of
7  directors, the management team in it, which I won't spend any
8  time, unless the Court wants me to.
9          THE COURT:  All right.  What's the capitalization of
10 the bank?
11         MR. SAGLIOCCA:  It's about 10 percent of our assets
12 is in capital, which the minimum standards from the regulators
13 are around 5 percent.
14         THE COURT:  Okay.  Thank you very much for being here
15 today.
16         MR. SAGLIOCCA:  Thank you, Your Honor.
17         MR. HERMAN:  Your Honor, with respect to the QSFs,
18 there two comments I'd like to make for those in the courtroom,
19 those listening, and for the record, and that is there are a
20 number of fee funds set up, and no fees may be paid from any of
21 these fee funds except through application to the Court,
22 motion, hearing, and subject to court order.
23         In terms of funds to claimants as certified by
24 BrownGreer, they go through a process, then BrownGreer issues a
25 directive to the bank, and that's the process for paying funds

24

1   that inure to the benefit of eligible claimants.

2           THE COURT:  Okay.  Our next item was pilot program.

3   Anything on the pilot prom?

4           MR. PIPES:  Your Honor, before we get off the QSFs, I

5   just wanted to clarify something on the Interior Exterior QSF.

6               Minor Pipes on behalf of the insurance liaison

7   counsel; in this case on behalf of Liberty Mutual.

8               Liberty Mutual and the other defendants that

9   settled that case noticed that in the three QSFs that dealt

10  with the InEX, there was a provision in it that said that the

11  defendants would pay the costs for Esquire Bank and for

12  BrownGreer.

13              Actually, the agreement's called for that to

14  come out of the settlement fund that they're paying.  The PSC

15  has clarified that the payment of the Esquire Bank and

16  BrownGreer fees by the InEx defendants referenced in Paragraph

17  9A and 9B of the three QSF orders is to be made out of the

18  settlement funds provided for in the InEX settlement agreement

19  and it's not in addition to those funds.

20              I just wanted to clarify that.

21          MR. DAVIS:  We did address that earlier this week.

22  The intent is that the funds come in through the settlement

23  funds, and it is paid through the settlement funds, which is

24  through InEX.

25          THE COURT:  Right.  I saw that.

1          MR. PIPES:  Thank you.

2                  And, Your Honor, just an update on the Global.

3   We are working with the PSC and we'll file a motion soon to

4   fund those settlements.

5          THE COURT:  All right.  Anything on the pilot

6   program?

7          MR. MILLER:  Good morning, Your Honor.  Kerry Miller

8   on behalf of Knauf.

9                  It's basically as Russ Herman summarized.  It

10  continues to work.  Last week Moss pulled its 2,000th, the

11  number 2,000, permit in working on houses.  However, the number

12  of houses coming into the program has slowed down.  They are

13  down now to about 40 new homes a month.

14         THE COURT:  Okay.  By and large, that program has

15  worked well.  I know that there are some folks who feel that

16  they should get their homes repaired more quickly.  But in view

17  of the numbers, they're doing about the best they can with it.

18  But if they do have any problems with it, we have the

19  appropriate channels that they can go to to make themselves

20  heard.

21         MR. MILLER:  Your Honor, just to echo Mr. Herman's

22  comments in terms of anyone who is in the original omnibus

23  class actions that were settled as part of the Knauf

24  settlement:  If claimants, homeowners, plaintiffs out there do

25  seek remediation, they shouldn't wait.  They should do so now.

1  Because it's to a point now where their house can be acted on

2  pretty quickly.

3       THE COURT:  Okay.  Anything on the InEX, Banner,

4  Knauf, L&W, and Global settlements?  I have that on the

5  program.

6       MR. HERMAN:  May it please the Court, nothing at this

7  time.

8       THE COURT:  Anything on the shared cost fund?

9       MR. HERMAN:  Nothing at this time, Your Honor.

10      THE COURT:  Venture and Hobbie?  Anything on the

11  settlements of that?

12      MR. HERMAN:  I believe, Your Honor --

13      THE COURT:  I think we've covered that.

14      MR. LEVIN:  Just a report on the proceedings in the

15  Fifth Circuit, Your Honor.

16      THE COURT:  Yes.

17      MR. LEVIN:  Argument has been set on the *Germano*

18  class action and the default judgment and the issue of personal

19  jurisdiction for October 9th in the Fifth Circuit court, and

20  they're sitting in New Orleans that day.

21          The Plaintiffs' Steering Committee had made a

22  motion to consolidate the *Germano*, along with *Wiltz*, *Gross* and

23  *Mitchell*, and the Court denied our motion.  After the Court set

24  this hearing on October 9th, we have a renewed motion to

25  consolidate the three remaining appeals and to stay panel

1   decision on those appeals until such time as the panel in
2   *Germano* issues its opinion.  That is pending.
3              Also, there is a collateral appeal of Judge
4   Farina's order in Miami-Dade.  And that order, Lennar brought
5   that before the court, an appeal was taken, and the court will
6   per cur in favor of personal jurisdiction.  And it's my
7   understanding, as has been explained to me by Florida lawyers,
8   that a per cur opinion is not appealable.  So that is basically
9   set in stone.
10             That appeal, the first cite on the per cur was
11  Your Honor's opinion before this district court.
12             There is -- I guess we can go into the Hobbie
13  issue, Your Honor.
14        **THE COURT:**  Sure.
15        **MR. LEVIN:**  Mr. Mason is here.  I guess I could say
16  it.  The defendants failed to file a CAFA report with the
17  various parties that require it, the Attorney Generals, and as
18  a result, that order has been vacated by Your Honor.  As soon
19  as they file that order, I am sure Mr. Mason will notify you --
20  file that report, and receive the word from the recipients of
21  that report, within hours, Mr. Mason will inform the Court.
22        **THE COURT:**  When are we expecting that?
23        **MR. LEVIN:**  October 7th.
24        **THE COURT:**  All right.  Anything from the pro se?
25        **MR. HERMAN:**  Your Honor, I'd like to go back --

1        THE COURT:  All right.

2        MR. HERMAN:  -- to Item No. 10, Venture Supply and

3  Porter Blaine defendants.  These defendants primarily were

4  distributors or importers of Taishan products.  We've received

5  various requests for distributors and others that have

6  depositories of Taishan drywall to dispose of that drywall.

7        The PSC has not agreed to that, not out of

8  obstinacy, but we have four appeals now pending that involve

9  Taishan.  Our concern would be that counsel for Taishan has

10 argued in its briefs that there's no proof that their drywall

11 actually got to the distributors and then was installed.  So

12 we're acting in an abundance of caution with respect to saying,

13 please, don't get rid of Taishan drywall.

14        MR. LEVIN:  One additional factor with regard to

15 that, Your Honor.  Venture and Porter Blaine are suing Taishan.

16 They've appeared in Hong Kong to ask questions, but didn't ask

17 questions with regard to their pursuit of Taishan.

18        It seems to me if they are pursuing Taishan,

19 they would want the board.  I think this is just a way of

20 trying to shift the costs of warehousing that board to the

21 Plaintiffs' Steering Committee.

22        THE COURT:  Anybody from Venture want to speak on

23 that issue?

24        If they have a problem, I'll entertain it.  But

25 I do think it's necessary to keep some evidence.  I don't know

1   whether if it's millions of board feet, that you need that

2   much.  But I do think that until the smoke clears, so to speak,

3   on this aspect of the case, it would be helpful to everybody,

4   including Venture, to keep the material.

5           If it becomes overly burdensome, I'll listen to

6   some possibility of representative samples, with photographs,

7   and things of that sort, reports.  That might do something.

8   But until I hear some severe problem created by it, I'll expect

9   them to keep the material.

10          MR. HERMAN:  Your Honor, I brought this up in

11  connection with Venture and Porter Blaine, but there are

12  distributors in other states that do have Taishan product

13  presently, and we've taken the same position.

14          THE COURT:  All right.

15          MR. HERMAN:  Nothing new, Your Honor, on profile

16  forms.

17          On "Frequently Asked Questions," Arnold Levin,

18  lead counsel for plaintiffs, mentioned that the *Germano* hearing

19  is on October 9th and that was to be our next status

20  conference.  We ask the Court either for a new date, or maybe

21  that afternoon we can meet, whatever Your Honor's pleasure is.

22          THE COURT:  I thought it was Thursday, October the

23  24th.

24          MR. LEVIN:  It happens with us at this age, Your

25  Honor.  He's speaking of Vioxx.

1          MR. HERMAN:  What am I doing?  I don't know where I
2    am.  I don't know what I'm saying.  Obviously, it's now on the
3    record that I'm not in compass, and I've been hit on the head
4    by my co-counsel, and everybody in the jury box is laughing at
5    me, and that's not new in my career.
6          THE COURT:  So with that we'll hear from pro se.
7          MR. JOHNSTON:  Your Honor, Bob Johnston, curator for
8    pro se's.  Before I make my brief comments related to pro se's,
9    I'd like the Court to know, and I think you know personally,
10   that Russ Herman and I go back a long, long way, and he used to
11   be really sharp.  So I . . .
12         THE COURT:  Well, you told me he looked at your
13   papers, that's why he was sharp.
14         MR. JOHNSTON:  He did that a couple of times.
15         MR. HERMAN:  If I'd have done that, I wouldn't have
16   graduated.
17         MR. JOHNSTON:  His downfall started when we drank too
18   much beer in law school.
19              All right.  Your Honor, I have filed the Curator
20   Status Report No. 19.  As I would believe you would expect,
21   we've had a very active last month.  Two letters have been sent
22   out by me, which I have attached to the curator's report.
23              The first related to the *Beane* settlement and
24   went out to every pro se, less than 100, listed in Exhibits A
25   and B as having been able to participate in the *Beane*

1    settlement, essentially telling them very strongly, you better

2    get your opt-in forms by the 12th or 11th of September.

3              But the next was even bigger, and that is, and

4    it relates to what the Court has expressed as some significant

5    concerns, about the completion of the claim filing process by

6    those who have registered, and we saw the numbers that Lynn

7    Greer put up on the screen.

8              I have interacted with Russ Herman.  It was

9    agreed that it would be very important for me to send

10   communication to every pro se plaintiff who had timely

11   registered, did not have counsel, and may well not be aware of

12   the September 30th deadline.

13             So I drafted a letter, which is also attached,

14   and the reference is about as strong as I could make it, with

15   the assistance of Russ Herman.  It says:  "Reference:  Be aware

16   of the September 30th, 2013 deadline for submitting Chinese

17   Drywall claim forms."

18             I sent out 887 of those letters to every pro se

19   who we had addresses for.  I also interacted directly with the

20   BrownGreer personnel and attached to those letters the

21   specifics of what BrownGreer is looking for with regard to

22   documentary evidence, proving photographs; and that also

23   included a number of color photographs which was put up on the

24   Web site as samples.

25             So having done that this morning, Lynn Greer and

1   I talked.  The number that you saw up on the screen was 1,102.

2   My office has checked, and I think there are a number of

3   duplications, but we're going to get it straight, because we've

4   got 13 more days.

5              I simply wanted to take the time to talk to the

6   Court relating to this because Russ Herman's concern, Kerry

7   Miller's concern, both sides, and certainly my concern is to

8   not stay passive, because there is a deadline that is fast

9   approaching.  So we have taken very affirmative actions.  We'll

10  continue to do so.  That's the role that the Court asked me to

11  do.  Obviously the uptake that we've had has been significant.

12  I've spent a lot of time talking to individuals, but I think

13  we've made a lot of progress.

14              With that, that's the report that I have for

15  this month.

16       THE COURT:  Okay.  Well, thank you very much for all

17  your help on this one.

18       MR. JOHNSTON:  Sure.

19       THE COURT:  We talked about the physical evidence,

20  the preservation order.

21              The entry of preliminary default.  Can you tell

22  me about that?  This is a motion to default Taishan -- or some

23  other entities, including Taishan.

24       MR. LEVIN:  Your Honor, the PSC tracks service by our

25  process server, APS, for foreign service pursuant to the Hague.

1   Periodically, after service has been made, as a matter of
2   housekeeping, we file for preliminary defaults.
3                   We request that the Court not enter anything on
4   that order other than to keep it in place.  Since filing it, we
5   received an answer from a Chinese defendant.  Unfortunately, it
6   wasn't Taishan or NBM or CNBM, but we will correct that order
7   with regard to that, but just hold it in place.  There's no use
8   of creating work for the Court and for counsel, especially
9   while the appeals are pending in the Fifth Circuit.
10                  **THE COURT:**  Yes.  I'm going to stay that order.  I
11  don't know whether the appeal has any effect on it; but, in any
12  event, I don't see any reason to act on that order, so I will
13  stay it.
14                  **MR. LEVIN:**  Thank you, Your Honor.
15                  **THE COURT:**  Anything on already remediated homes that
16  we haven't talked about?
17                  **MR. HERMAN:**  I believe it's already been addressed,
18  Your Honor, by Kerry Miller.
19                  **THE COURT:**  Okay.  We have some motions.  I'll take
20  those in a moment.
21                  Our next meeting is October the 24th.  The
22  November meeting is November the 21st.  October 24th and
23  November 21st.  I'll take a five-minute break here and come
24  back and we'll take up the motions.  Court will stand in
25  recess.

1     THE DEPUTY CLERK:  All rise.

2          (WHEREUPON, the proceedings were concluded.)

3                    *  *  *  *  *

4                       *****

5                    <u>CERTIFICATE</u>

6          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

7     for the United States District Court, Eastern District of

8     Louisiana, do hereby certify that the foregoing is a true and

9     correct transcript, to the best of my ability and

10    understanding, from the record of the proceedings in the

11    above-entitled and numbered matter.

12

13

14                         <u>s/Jodi Simcox, RMR, FCRR</u>
                          Jodi Simcox, RMR, FCRR
15                        Official Court Reporter

16

17

18                              .

19

20

21

22

23

24

25



Average FDIC Insured Depository Rates - U.S. Banks & Thrifts

Source: S&P Global Market Intelligence & Bloomberg

# Monetary policy tightening cycles differ by starting level, amount, pace and duration

### Fed Funds target rate, %



Source:  Federal Reserve Board (data through 4Q:17; periods and change based on monthly data through January 2017)

Office of the Comptroller of the Currency     **2018 Banker Outreach**     21

# Treasury yield curve usually flattens as Fed tightens



Net interest margin, %

Source: Call Reports

24

The income earned on the Knauf Attorney Fee deposit increases year to year as interest rates rise.  Please note the table below:

| | Avg. Balance | Income | YOY Change |
|---|---|---|---|
| 2014 (a) | 118,824,875 | 8,696 | |
| 2015 | 139,575,653 | 23,083 | 165% |
| 2016 | 186,898,965 | 34,038 | 47% |
| 2017 | 190,375,689 | 169,049 | 397% |
| 2018 (b) | 189,578,157 | 673,971 | 299% |