```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2
      ********************************************************************
 3    IN RE:  CHINESE-MANUFACTURED        Docket No. 09-MD-2047
      DRYWALL PRODUCTS LIABILITY          New Orleans, Louisiana
 4                                        Thursday, February 18, 2016
      THIS DOCUMENT RELATES TO:
 5    09-6687, 09-6690, 10-261, 11-1672,
      11-1395, 10-340, 11-1673, 14-1727,
 6    11-3094, 09-6531, 09-6530
      ********************************************************************
 7

 8                 TRANSCRIPT OF DEFENDANTS' MOTION TO DISMISS
                   HEARD BEFORE THE HONORABLE ELDON E. FALLON
 9                      UNITED STATES DISTRICT JUDGE

10
      APPEARANCES:
11
      FOR THE PLAINTIFFS:            HERMAN, HERMAN & KATZ
12                                   BY:  RUSS HERMAN, ESQ.
                                     820 O'Keefe Avenue
13                                   New Orleans, LA 70130

14                                   LEVIN, FISHBEIN, SEDRAN & BERMAN
                                     BY:  ARNOLD LEVIN, ESQ.
15                                   510 Walnut Street, Suite 500
                                     Philadelphia, PA 19106
16

17    FOR THE BNBM GROUP AND
      BNBM, PLC:                     DENTONS
18                                   BY:  MICHAEL H. BARR, ESQ.
                                     1221 Avenue of the Americas
19                                   New York, NY 10020-1089

20
      FOR THE CNBM GROUP,
21    CNBM, COMPANY, CNBMIT,
      UNITED SUNTECH and CNBM USA:   ORRICK, HERRINGTON & SUTCLIFFE, LLP
22                                   BY:  JAMES L. STENGEL, ESQ.
                                     51 West 52nd Street
23                                   New York, NY 10019

24

25
```

```
 1   FOR THE LOUISIANA
     ATTORNEY GENERAL:              PERKINS COIE
 2                                  BY:  DAVID L. BLACK, ESQ.
                                    1900 Sixteenth St., Suite 1400
 3                                  Denver, CO 80202-5255

 4
     Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR
 5                                  500 Poydras Street, Room HB-406
                                    New Orleans, Louisiana 70130
 6                                  (504) 589-7776

 7

 8      Proceedings recorded by mechanical stenography, transcript
     produced by computer.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                                              PAGE/LINE:

3   By Mr. Barr                            6/4

4   By Mr. Stengel                         35/12

5   By Mr. Herman                          53/6

6   By Mr. Levin                              68/23

7   By Mr. Black                              80/17

8   By Mr. Barr                            85/10

9   By Mr. Levin                              88/13

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(DEFENDANTS' MOTION TO DISMISS)

08:55:45    (OPEN COURT.)

08:55:45    THE COURT:  Be seated, please.  Good morning, ladies and
08:55:47    gentlemen.  Counsel make your appearance for the record, please --
08:55:50    wait, call the case first.

08:55:51    THE DEPUTY CLERK:  MDL-2047, *In Re:  Chinese Manufactured*
08:55:58    *Drywall Products Liability Litigation*.

08:56:01    THE COURT:  Would you make your appearance for the
08:56:02    record, please.

08:56:02    MR. HERMAN:  May it please the court, good morning, Judge
08:56:08    Fallon.  Russ Herman and Arnold Levin will argue for the PSC, and
08:56:13    Mr. Black will argue for the Attorney General.  We've ceded ten
08:56:21    minutes to Mr. Black.  We do not anticipate that we're going to
08:56:25    take 80 minutes in our combined argument.

08:56:29    THE COURT:  Okay.

08:56:32    MR. BARR:  Thank you, your Honor.  Michael Barr on behalf
08:56:34    of BNBM Group and BNBM, PLC.

08:56:39    MR. STENGEL:  Good morning, your Honor.  Jim Stengel with
08:56:41    Orrick Herrington for CNBM Group, CNBM Company, CNBMIT, United
08:56:46    Suntech, and CNBM USA.

08:56:49    THE COURT:  As we know, the present litigation arises
08:56:51    from alleged property damage sustained as a result of the presence
08:56:57    of Chinese manufactured drywall in the homes and buildings of

08:57:01  1    various states in the United States.  Discovery revealed that the

08:57:05  2    drywall in question and much of the drywall in question was

08:57:09  3    manufactured by Taishan.  Suits were filed against Taishan, other

08:57:17  4    entities associated with Taishan, specifically CNBM Group and

08:57:22  5    various CNBM entities, BNBM and various BNBM entities.

08:57:29  6         After considerable discovery, both here and in China, the

08:57:35  7    Court issued an opinion holding in essence that the Court had

08:57:38  8    jurisdiction over Taishan; the Fifth Circuit in two panels affirmed

08:57:45  9    that ruling.

08:57:46 10         The motions today concern the other entities that I

08:57:50 11    mentioned:  The CNBM Group and the CNBM entities and the BNBM and

08:57:56 12    BNBM entities.  They've presently moved to dismiss.  We have

08:58:02 13    actually four motions, but as I understand from the parties,

08:58:06 14    they're going to argue all of them basically together.  But the

08:58:11 15    motions are to dismiss.

08:58:14 16         The plaintiffs have sued these entities arguing that they

08:58:19 17    are also liable because they are either alter egos of Taishan or

08:58:27 18    control Taishan in some way, shape, or form.  The facts seem to be

08:58:35 19    uncontested, at least from the standpoint of the lineup.  CNBM

08:58:42 20    Group owned at one time 100 percent, but limited amount of CNBM.

08:58:51 21    CNBM was a large shareholder in BNBM.  BNBM owns a large percentage

08:59:00 22    of Taishan.  The plaintiffs say that that control makes the other

08:59:08 23    entities liable or the other entities have an alter ego

08:59:15 24    relationship with Taishan.  The other entities indicate that

08:59:18 25    they're simply shareholders and have -- they are not alter egos and

08:59:25 1    have no reason to be in this lawsuit.  So the motions deal with

08:59:29 2    their presence in this lawsuit.

08:59:31 3            I'll hear from the parties now.

08:59:34 4            MR. BARR:  Good morning, your Honor.  Again, Michael Barr

08:59:43 5    here on behalf of both BNBM Group and BNBM, PLC.  And, your Honor,

08:59:49 6    I would like to pick up just at the beginning from your Honor's

08:59:53 7    remarks and just mention one or two things here.

08:59:56 8            First of all, as I noted, I am here on behalf of both

08:59:59 9    BNBM, PLC and BNBM Group.  While to a certain extent the plaintiffs

09:00:04 10   have lumped them together in their various briefs and the like,

09:00:07 11   they are not the same.  They have very distinct roles.  And indeed,

09:00:12 12   your Honor, and as I will explain in greater detail, when you look

09:00:15 13   at their papers, there's almost not anything stated with respect to

09:00:19 14   BNBM Group at all.  BNBM Group did not have any ownership in BNBM,

09:00:24 15   PLC.  BNBM Group did not ever have any ownership interest in

09:00:29 16   Taishan.  So respectfully, among the other things we're going to

09:00:34 17   seek today, is to have them dismissed outright from the case

09:00:37 18   because they really have absolutely no role here.

09:00:39 19           But essentially, your Honor, we had moved to dismiss on

09:00:42 20   two grounds.  And again, the Court focused on the alter ego issues

09:00:46 21   here, but there really are with respect to BNBM, PLC two issues:

09:00:50 22   One of which is that they lack the minimum, both BNBM, PLC and

09:00:55 23   Group, lack the minimum contacts with any of the forum states at

09:00:58 24   issue here required for personal jurisdiction on a direct basis;

09:01:01 25   and furthermore, that neither the BNBM, PLC nor BNBM Group are

09:01:09  1    alter egos of Taishan.  And then, thus, respectfully, the Court

09:01:14  2    should not impute the jurisdictional contacts of Taishan to either

09:01:18  3    of those two entities.

09:01:20  4            And again, as I noted, with respect to BNBM Group in

09:01:24  5    particular, the alter ego issues effectively should fall out of

09:01:30  6    this case completely because they, again, had no ownership interest

09:01:32  7    in Taishan at all and have at current point no ownership interest

09:01:37  8    in BNBM, PLC, and that's been true for a decade or more.

09:01:41  9            Your Honor, the reality in this case is that in the year

09:01:45 10    that we have been here, it's now been just almost a year, the Court

09:01:48 11    has essentially heard nothing from the PSC about any direct claims

09:01:54 12    against either BNBM, PLC or BNBM Group; and for good reason, your

09:01:59 13    Honor, because effectively there is no basis to hold them directly

09:02:02 14    liable here, have direct jurisdiction over them because the basic

09:02:07 15    facts, the types of things that your Honor knows well are looked at

09:02:11 16    in these kind of contexts, none of those exists here.  Neither of

09:02:15 17    those entities were registered to do business here, maintained

09:02:18 18    offices or employees in the U.S., paid taxes, leased property,

09:02:22 19    marketed or advertised their drywall in the U.S., sent any sales

09:02:26 20    representatives to the U.S., sold drywall to buyers in Louisiana or

09:02:31 21    Virginia or shipped drywall to either of those states.

09:02:34 22            And that's a point we're going to come back to, your

09:02:38 23    Honor, because respectfully we're dealing here with cases that were

09:02:40 24    filed originally in Florida, Louisiana, and Virginia.  And with

09:02:43 25    respect to both BNBM, PLC and BNBM Group, there was absolutely no

09:02:48  1    drywall sold to any buyers by them in either Louisiana or Virginia.

09:02:54  2    BNBM, PLC is a manufacturer of drywall.  Certain PLC drywall did

09:02:59  3    end up in the United States, but absolutely none of it was sold to

09:03:02  4    a distributor in either Louisiana or Virginia, and absolutely none

09:03:06  5    of that drywall ended up in either Louisiana or Virginia.  So

09:03:10  6    important points here.

09:03:11  7         With respect to Florida, your Honor, the contacts were

09:03:17  8    very limited; first of all, that the buyers who purchased the

09:03:21  9    drywall from PLC solicited BNBM, PLC in China.  Between

09:03:29 10    November 2005 and July 2006, and that is the totality of the period

09:03:33 11    in which PLC sold any drywall that ended up in the United States,

09:03:37 12    they sold it to just five American customers.  Again, the Court

09:03:41 13    will note neither in the Louisiana nor in Virginia.  No one from

09:03:45 14    BNBM, PLC came to the U.S. in connection with any of those sales.

09:03:50 15    All of those transactions were negotiated in China and all of the

09:03:53 16    customers took possession of that drywall in China.

09:03:57 17         So again, you have none of the typical factors that you

09:04:01 18    would find for general jurisdiction in the U.S.  And, furthermore,

09:04:04 19    with respect to the specific sales that were made by BNBM, PLC, all

09:04:10 20    of the relevant acts took place in China.

09:04:13 21         THE COURT:  Wasn't that the same argument, though, that

09:04:15 22    Taishan made and I held that that was not consistent with the facts

09:04:23 23    and the Fifth Circuit approved that?

09:04:26 24         MR. BARR:  Your Honor, respectfully, no, the facts are

09:04:31 25    not the same.  The contacts were much more attenuated.  You will

09:04:34  1    see from looking at the record before you and the briefs, there
09:04:38  2    were far fewer contacts with the states, far fewer communications
09:04:41  3    made to the U.S., far fewer changes were made with respect to the
09:04:46  4    drywall in order to sell it to the U.S.
09:04:49  5           But in addition to those factors here, there are a couple
09:04:51  6    of others that are most important in terms of distinguishing them.
09:04:54  7           First of all, just one last point on that score.  BNBM,
09:04:58  8    PLC only sold its Dragon Brand drywall to the U.S., they had
09:05:03  9    nothing whatsoever to do with Taishan sales.
09:05:05 10           But the critical difference here, your Honor, between
09:05:08 11    what your Honor found with respect to Taishan and what's relevant
09:05:11 12    for BNBM, PLC is no matter the level of context, no whatever how
09:05:18 13    the Court views the evidence to this point, the PSC cannot
09:05:21 14    establish jurisdiction in Florida.  And again, we're only talking
09:05:24 15    about Florida, not Louisiana or Virginia, because there are no
09:05:27 16    contacts there whatsoever.
09:05:28 17           The fundamental difference here is that the plaintiffs'
09:05:33 18    claims do not arise out of BNBM, PLC sales.  Let me be very
09:05:38 19    specific in terms of what that means in real terms.  The bottom
09:05:41 20    line is that BNBM, PLC's drywall was not defective.  And I want to
09:05:46 21    discuss very specifically what we see in the record now after six
09:05:50 22    months of discovery of how they did not injure anyone in Florida or
09:05:55 23    in any of the other forum states.
09:06:00 24           Your Honor, I know the court is fully familiar with the
09:06:03 25    Consumer Product Safety Commission study that was done, and as your

09:06:09  1    Honor knows, the Consumer Product Safety Commission hired the

09:06:12  2    Lawrence Livermore National Laboratory Berkeley to conduct the

09:06:17  3    drywall tests that they did.

09:06:17  4         And their report made crystal clear that BNBM, PLC,

09:06:21  5    drywall was not defective.  Your Honor, if you look at the chart, I

09:06:25  6    think your Honor has dealt in litigation both with Knauf and,

09:06:29  7    respectfully, and with respect to Taishan some of the bar graph,

09:06:33  8    the entities that are on the left side.

09:06:35  9         But look where BNBM, PLC Dragon Brand's drywall is.  Look

09:06:40 10    in terms of the result, look -- I think your Honor yesterday was

09:06:43 11    speaking in terms of the potential damage to homes by virtue of the

09:06:47 12    presence of sulphur dioxide and hydrogen sulfide.  Look how low the

09:06:54 13    BNBM, PLC Dragon Brand is on that chart.  And, your Honor, we've

09:06:58 14    also highlighted in red all of the domestic manufacturers that are

09:07:01 15    on that chart.  And again, the court will see that PLC's drywall is

09:07:05 16    squarely in the middle of it.

09:07:07 17         But, your Honor, that's not all that we can show here,

09:07:11 18    because the Consumer Product Safety Commission in issuing this

09:07:15 19    report made very clear in terms of how they differentiated between

09:07:19 20    the drywall coming from different manufacturers.  And they said,

09:07:23 21    other Chinese Drywall samples have low or no detectable emissions

09:07:27 22    of hydrogen sulfide, as did the drywall samples tested that were

09:07:32 23    manufactured domestically.  They include Dragon Brand Beijing New

09:07:38 24    Building Material Company, Limited.  That's BNBM, PLC, your Honor.

09:07:41 25         But, your Honor, even beyond what the Consumer Product

09:07:45  1  Safety Commission said, is the fact of what was stated by the

09:07:48  2  actual purchasers of the drywall that was sold by BNBM, PLC.  The

09:07:56  3  PSC in connection with its six months of discovery, probably almost

09:07:59  4  ten months of discovery that we went through deposed every single

09:08:02  5  one of the purchasers, the distributors who purchased drywall from

09:08:08  6  BNBM, PLC.  And what did they say?  First of all, one of these is

09:08:12  7  Edgar Chaparro from EAC and Sons.  And what did he testify?  First

09:08:20  8  he said that the Consumer Product Safety Commission received the

09:08:23  9  samples from them.  "And you said that the CPSC told you that the

09:08:26 10  drywall was fine?  Answer:  A clear, clean bill."

09:08:31 11       He goes on in terms of the fact that EAC and Davis are

09:08:36 12  still sitting with BNBM, PLC drywall in their warehouse, a fact

09:08:41 13  that the PSC tries to make much of.  But he says, the problem is we

09:08:45 14  can't sell it because of what's happened with respectfully in this

09:08:48 15  litigation.  But he said that is better material than the one that

09:08:52 16  we produce in the United States.  And this is testifying

09:08:55 17  specifically about PLC drywall.

09:09:00 18       This is the second of the distributors Davis Construction

09:09:04 19  Supply.  And what did you respond to the Consumer Product Safety

09:09:08 20  Commission?  "We have received no complaints of any sort related to

09:09:12 21  the drywall problem.  And, again, that would be complaints from

09:09:17 22  anyone under the sun that could have come into contact with that

09:09:20 23  drywall?  That is correct."

09:09:21 24       And then with the third supplier, "To the best of your

09:09:25 25  knowledge, there's been no complaints received by Triorient Trading

09:09:28 1   with respect to that drywall?  We have received no complaint."

09:09:32 2          Your Honor, that is what the record shows with respect to

09:09:37 3   the qualities of BNBM, PLC's drywall.  And in contrast to that

09:09:44 4   dispositive evidence, respectfully, your Honor, the PSC, because we

09:09:47 5   served them with an interrogatory, and we asked them what evidence

09:09:51 6   do you have that there were problems with PLC drywall?  And their

09:09:57 7   response in responding to that interrogatory was to point us to the

09:10:00 8   Consumer Product Safety Commission study and to reference the

09:10:03 9   experts that your Honor heard from in the *Germano* trial.  We went

09:10:08 10  back and we read every word of those expert reports from the

09:10:11 11  *Germano* trial.  BNBM, PLC was not tested and not mentioned once.

09:10:16 12         So you have, your Honor, respectfully a record that has

09:10:20 13  only this evidence in it with respect to the quality issue.

09:10:22 14         But again, your Honor, there's more here because as the

09:10:26 15  court knows, as part of the process that you ordered in order to

09:10:29 16  identify the plaintiffs, you had all of the plaintiffs through

09:10:34 17  their counsel submit profile forms to the Court in terms of

09:10:37 18  identifying what their -- what drywall they had, what evidence they

09:10:41 19  might have.  And again, those profile forms just are the basic

09:10:44 20  level of indicating whether drywall may have even existed in the

09:10:49 21  homes.  They are not definitive results in terms of the quality of

09:10:52 22  that drywall or what damage might have been caused.  And as your

09:10:55 23  Honor also knows, in a number of homes you had mixed drywall some

09:10:58 24  from one company some from another.

09:11:00 25         Virginia.  We looked at 29,000 profile forms, I had my

09:11:04  1   team to the point that they were bleary-eyed reviewing every single

09:11:10  2   one of the profile forms that was filed here.  Zero of them

09:11:12  3   identified any BNBM, PLC in Virginia.  Zero profiles identified

09:11:18  4   anyone in Louisiana.  And a grand sum total of just 66 identified

09:11:24  5   BNBM, PLC drywall in Florida.

09:11:30  6          Your Honor, this is relevant in two directions here:  One

09:11:34  7   obviously is in terms of, as I said, if you don't have an injury,

09:11:37  8   you don't have the plaintiffs claims arising out of the conduct,

09:11:42  9   whatever context that BNBM, PLC may have had in the U.S.; but it's

09:11:48 10   also relevant for alter ego, because they were trying to mush

09:11:52 11   together all of the parties that you see in this room here, all of

09:11:55 12   the different entities that your Honor listed before.  And

09:11:57 13   respectfully, these facts show that's simply not the case.  You

09:12:03 14   have two different manufacturers of drywall - BNBM, PLC and

09:12:07 15   Taishan - both selling drywall that ended up in the United States.

09:12:11 16          As is evidenced from these profile forms and what the

09:12:14 17   Consumer Product Safety Commission study said, they were different,

09:12:18 18   they were targeting different ends of the market.  They had

09:12:21 19   different characteristics.  Obviously to a certain extent they had

09:12:25 20   different quality characteristics.

09:12:26 21          Your Honor, this is not something where effectively you

09:12:30 22   have these cooperations all fused together.  Quite the contrary.

09:12:34 23   You had competitors here who were each selling their drywall, each

09:12:39 24   ultimately having to go to the United States with completely

09:12:42 25   different results.  So that this evidence has both bearing on the

09:12:46 1   issues of direct jurisdiction, but it also has bearing on the

09:12:51 2   issues of alter ego jurisdiction.

09:12:55 3         Your Honor, just a very brief sidelight because this is

09:12:58 4   all that I am going to say with respect to the Louisiana AG's

09:13:02 5   motion.  Respectfully they cannot have claims against BNBM, PLC or

09:13:06 6   BNBM Group when zero drywall ended up in Louisiana from our

09:13:12 7   companies.  There's simply no basis for that claim.  Their whole

09:13:17 8   complaint is predicated upon a claim for damages due to the, "the

09:13:22 9   presence of defendant's drywall in the state."  Your Honor, there

09:13:24 10  is no drywall in the state.  Their motion should be -- excuse me,

09:13:28 11  their complaint should be dismissed on that ground alone.

09:13:31 12        Let me turn very briefly to BNBM, PLC because I know my time

09:13:36 13  is limited here -- excuse me, BNBM Group.  Their activities with

09:13:40 14  respect to the forum were far less.  They were just the export

09:13:44 15  agent for three of PLC sales to American customers.  They did

09:13:50 16  nothing else in connection with those sales.  What that means in

09:13:53 17  terms of saying they're an export agent is that they completed

09:13:56 18  Custom declarations in their own name, they executed the sales

09:13:59 19  contract as export agent, and they collected payments in China on

09:14:04 20  behalf of BNBM, PLC.

09:14:06 21        Under Florida law, and again that can be the only law

09:14:09 22  we're talking about here, an export agent -- and we've cited this

09:14:12 23  authority in our briefs.  An export agent for allegedly defective

09:14:16 24  products simply does not have sufficient context as a matter of law

09:14:20 25  for jurisdiction.

09:14:23  1          And again, specifically focussing on issues with respect

09:14:26  2    to the BNBM Group, they didn't make any drywall.  Period.  They

09:14:31  3    didn't sell any drywall to the U.S.  Period.  They didn't negotiate

09:14:34  4    those contracts.  They never took physical possession of that

09:14:37  5    drywall.  They didn't pack the drywall.  They didn't physically

09:14:42  6    inspect the drywall.  They didn't send any employees to the U.S.

09:14:45  7          Again, your Honor, I just want throughout this argument

09:14:48  8    to keep those two companies separate, they are not the same.  Just

09:14:51  9    because they start with the BNBM as the beginning, they are not the

09:14:55  10   same company, they played very different roles in these

09:14:57  11   transactions.

09:14:58  12         Your Honor, again, because my time is limited here.  What

09:15:03  13   we have presented both with respect to the lack of contacts, the

09:15:07  14   lack of injury, the lack of a connection to, say, the rises from

09:15:13  15   the sales that were made in terms of the plaintiffs' injuries here,

09:15:18  16   there simply are not the requisite minimum of contacts for

09:15:22  17   jurisdiction over either of these entities on a direct basis.

09:15:25  18         THE COURT:  Aren't the plaintiffs' positions, PSC's

09:15:32  19   positions also that BNBM owns 81 percent of the shares in Taishan,

09:15:37  20   they control the production of drywall by Taishan, Taishan had to

09:15:46  21   seek their approval, specific approval before manufacturing, they

09:15:53  22   set the details for the drywall, they designed the material, the

09:16:00  23   quality, and at least that's their position.

09:16:06  24         They also point to the Morgan Stanley global offering.

09:16:12  25   Morgan Stanley as I understand was a sponsor to the global

09:16:16  1    offering.  And in that global offering they say that these

09:16:23  2    companies, meaning CNBM Group, CNBM, BNBM, BNBM Group, Taishan are

09:16:33  3    all marketed as one group, at least that's their argument.

09:16:38  4         MR. BARR:  Your Honor, I would like to address all of

09:16:39  5    those points, and they are all ones that we have both addressed in

09:16:43  6    our papers but I would like to speak to here.

09:16:45  7         But let me just start with one of those and some of the

09:16:48  8    others respectfully, your Honor, if I may address along the way

09:16:51  9    during the argument.

09:16:52 10         THE COURT:  Sure.

09:16:53 11         MR. BARR:  The drywall that Taishan sold here, BNBM, PLC

09:16:57 12    and BNBM Group had absolutely nothing to do with those sales.

09:17:02 13    There is not one document, one drop of testimony here, because

09:17:07 14    remember, everyone from Taishan was deposed.  30(b)(6)s were

09:17:13 15    deposed from BNBM, PLC and Group, the chairman of BNBM, PLC was

09:17:17 16    deposed here.  There is not one word in this record showing that

09:17:21 17    with respect to the drywall sales that were made here that BNBM,

09:17:27 18    PLC had absolutely anything to do with it.

09:17:29 19         Your Honor, you wouldn't have the situation where you had

09:17:32 20    two different manufacturers both selling into the U.S. market with

09:17:35 21    no record of any communications between them, no record in terms of

09:17:39 22    their dealing with them, nothing in terms of -- on any of the

09:17:44 23    Taishan sales documents, or for that matter the PLC documents,

09:17:50 24    showing that either one of them was assisting in that sales effort.

09:17:54 25         As your Honor has recognized, and I want to come back to

09:17:57  1   this, the relevant issue with respect to control, the time of

09:18:00  2   control has to be with respect to what caused the alleged injury

09:18:03  3   here, which is the sale of the drywall here.  There is no evidence

09:18:07  4   in this record demonstrating that kind of connection.

09:18:11  5       I will come along the way here, your Honor, if I might,

09:18:13  6   to some of those more general issues, but let's be very clear:

09:18:16  7   With respect to those sales, the ones that we are talking about

09:18:20  8   here that are up on the board and Taishan's as well, BNBM, PLC was

09:18:24  9   not consulted by Taishan.  There is no record saying, "Oh, we're

09:18:29 10   thinking of selling drywall into the U.S.  What do you think about

09:18:33 11   that?"  Zero.  They have every single board of shareholders as well

09:18:41 12   as board of directors resolution that was passed here.  And, yes,

09:18:46 13   those do cover the kinds of high level things that you would expect

09:18:49 14   to see dealing with a company, because Taishan is a subsidiary of

09:18:54 15   BNBM, PLC, they own 65 percent, not 81 percent, during the relevant

09:18:59 16   period of time here, and it does deal with things like guaranties,

09:19:03 17   the building of new plants, and all of the like.

09:19:06 18       But the only document that they've been able to reference

09:19:09 19   at all here is one talking in terms of something coming from BNBM,

09:19:16 20   PLC saying to Taishan you should get an export license.  Period.

09:19:21 21   There is nothing saying that that was in connection with these

09:19:24 22   sales.  Taishan sells drywall to other countries around the world

09:19:28 23   as well.  There's nothing tying that here.  So I just really want

09:19:33 24   to be very clear about that because I think that with respect to my

09:19:36 25   friends and colleagues here on this side, they're way, way, way

09:19:40  1    overstating that what evidence shows.

09:19:43  2              Let's turn to this issue of imputing jurisdictional

09:19:46  3    contacts here.  And there are a couple of basic principles, which

09:19:50  4    again, I think that are in most respects honored in the brief by

09:19:54  5    the PSC as they are dealing with these issues.  First of all, and

09:19:57  6    your Honor knows this, knows these principles, so I am going to go

09:19:59  7    through them very quickly.  The bottom line is it's their burden

09:20:04  8    because we are here in an evidentiary hearing with a voluminous

09:20:08  9    record before the Court.  They need to prove that they have

09:20:12 10    jurisdiction over us by a preponderance of the evidence here.

09:20:15 11              The courts impose this kind of alter ego finding only in

09:20:23 12    the most rare and extraordinary of circumstances.  It's an

09:20:27 13    extraordinary remedy that's supposed to only be granted rarely.

09:20:31 14              Your Honor, there is a lot in everybody's briefs talking

09:20:34 15    about the law here.  We, just like the CNBM Group, believe that it

09:20:39 16    is appropriate that Chinese law apply.  But respectfully, your

09:20:42 17    Honor, I think at this point I've read just about every case that

09:20:45 18    exists in the country, and certainly every one that exists in

09:20:49 19    Louisiana, with respect to alter ego findings, and there are a

09:20:52 20    couple of basic principles that exist here in all of that

09:20:56 21    jurisprudence.

09:20:59 22              All of those cases and all of the facts of the case, even

09:21:03 23    whether you're applying the *Green* factors in single business

09:21:07 24    enterprise, whether you're applying a higher standard nexus in

09:21:09 25    Florida, whether you're looking at the Fifth Circuit jurisprudence,

09:21:12  1    and again, whether you're looking at Chinese law, every one of

09:21:15  2    those cases at end of the day the courts that have found alter ego

09:21:20  3    to exist have basically said that what they were dealing with with

09:21:23  4    respect to the company whose veil was being pierced was that they

09:21:28  5    were either a shell or a sham or that a fraud had been committed.

09:21:30  6    That's true with respect to all of these cases.

09:21:33  7            And again, I know your Honor is very experienced in this

09:21:36  8    area, none of that exists here.

09:21:38  9            Second, what you see, your Honor, again, looking at all

09:21:45 10    of the documents that the PSC has put in, and there is no question

09:21:49 11    by the poundage method here they've put a lot before the Court.

09:21:53 12    But respectfully, that's not relevant to the legal principles the

09:21:55 13    Court should apply.  They focus and ultimately when you look at

09:21:59 14    their expert Mr. Milhaupt, what he focuses on is a capacity to

09:22:03 15    control.  They say that by virtue of these directives, by virtue of

09:22:10 16    the shareholder interest, by virtue of board seats that they have

09:22:14 17    the capacity, that CNBM and BNBM have the capacity to control

09:22:19 18    Taishan.  Your Honor, that simply is not the law.  Capacity,

09:22:25 19    potential control is not enough.

09:22:26 20            The reason, your Honor, that we cite a Third Circuit case

09:22:29 21    there at the top, *Craig v. Lake Asbestos*, is because that case,

09:22:35 22    which is mentioned nowhere in the PSC's brief, reversed one of the

09:22:39 23    primary cases that they relied upon discussing on multiple pages

09:22:42 24    about what are the relevant principles here.  That case said,

09:22:46 25    "Potential control is not enough."  And of course that is

09:22:49  1   completely consistent with the jurisprudence from this circuit

09:22:52  2   where it says that, "The control required for liability ... amounts

09:22:56  3   to total domination," such that there are no separate corporate

09:23:01  4   interests and that the subsidiary functions solely to achieve the

09:23:05  5   purposes of the dominant corporation.  Your Honor, those kinds of

09:23:09  6   language, the degree of control exercised, not the degree of

09:23:13  7   control that could be exercised, the degree of control actually

09:23:17  8   exercised must be greater than normally associated with the common

09:23:20  9   ownership and directorship.  It's not capacity to control.

09:23:23 10          And I think it's very telling, your Honor, that when they

09:23:27 11   present their expert in response to Professor Gordan and Bruce Deal

09:23:32 12   that we presented, his basic theme is China is different because

09:23:37 13   there is this capacity of the state on a parallel basis to act in

09:23:42 14   certain ways.  But that's not the law.  Capacity control is not the

09:23:46 15   issue.

09:23:47 16          And then lastly, in terms of the legal principles that must

09:23:53 17   govern here, because again, when you put this key legal principle

09:23:58 18   here in terms of what time you have to look at for control against

09:24:02 19   so much of the evidence that they've presented here, the relevant

09:24:06 20   issue for the kind of domination control such that effectively the

09:24:11 21   companies are fused together, has to be at the time of the wrongful

09:24:15 22   act.  That's what this circuit said in *Flourine* and that's what

09:24:21 23   again the Third Circuit in reversing the *Craig v. Johns-Manville*

09:24:27 24   case that they rely upon so heavily.

09:24:29 25          Your Honor, they talk a lot about the issue of Taishan's

09:24:30  1    withdrawal from the litigation, lack of appearance at the judgment

09:24:33  2    debtor examination.  And they say that you can look at as evidence

09:24:37  3    of the control that they could have exercised back a number of

09:24:40  4    years before.  That's not the law in this circuit and that's

09:24:43  5    certainly the case that they rely upon for that proposition was

09:24:46  6    reversed on that exact ground that said you have to look at the

09:24:51  7    control in respect to the transaction attack so that the corporate

09:24:55  8    entity as to this transaction had at the time no separate mind,

09:25:00  9    will, or existence of its own.

09:25:03  10           And again, your Honor, since Taishan basically went into

09:25:05  11   the market and made these sales and this record is bereft of

09:25:09  12   showing any of that, that the companies were directing or

09:25:12  13   controlling that activity, they simply have not shown the kind of

09:25:15  14   control that they must.

09:25:17  15           Let's move forward, please.  And again, your Honor, I

09:25:24  16   want to come back to that first principle that they have to show

09:25:26  17   fraud or a sham or somehow that the assets were dissipated or

09:25:32  18   commingled in some fashion.  There is no evidence of that in the

09:25:36  19   record at all.  And let's look at the most proof positive of that

09:25:39  20   if we might.

09:25:41  21           BNBM, PLC first invested in Taishan in 2005.  They have

09:25:52  22   had from 2005 essentially right up to the present a 65 percent

09:25:56  23   interest in that company.  If they were being treated as a shell or

09:26:01  24   Taishan were a sham or some fraud was being committed at any time

09:26:05  25   during this time period, much less the 2005, 2006 period that's

09:26:10 1    relevant here, you would not see this kind of record in terms of

09:26:15 2    growth of assets of Taishan.  Taishan has been an independently

09:26:19 3    operated company through this period.  The actions that have been

09:26:24 4    taken and virtually all of the evidence they point to has been with

09:26:28 5    the purpose of not dominating or controlling Taishan for illicit

09:26:33 6    purpose but rather for improving the profitability of Taishan.

09:26:37 7    Indeed, your Honor, I think the statement in the offering

09:26:39 8    memorandum that the court was referring to where there are the

09:26:42 9    words of an ability to influence the daily operations, they ignore

09:26:49 10   the key phrase there which says with a view towards increasing the

09:26:53 11   profitability of Taishan.  Your Honor, that's what this chart

09:26:58 12   reflects is actions taken to enhance the strength of Taishan.

09:27:06 13          Again, your Honor, Taishan is the furthest thing from a

09:27:09 14   shell.  Not only did they have the growth in assets over that

09:27:12 15   relevant period, they had effectively an extraordinarily steep

09:27:16 16   positive curve in terms of the development of their -- in terms of

09:27:22 17   the growth of their revenue and the growth of their profitability.

09:27:25 18          THE COURT:  They also point to a provision with the

09:27:32 19   comments of CNBM Group's intention to have BNBM acquire a

09:27:37 20   controlling interest in Taishan.  They say the directors of the

09:27:41 21   company believe that the acquisition will enable CNBM Group to

09:27:46 22   further enhance its competitiveness and consolidate the leading

09:27:51 23   position in the PRC gypsum board market, as it will participate

09:27:57 24   more actively in the daily operations and management of Taishan

09:28:02 25   with a view to improving its profitability.

09:28:05  1          MR. BARR:  Yes, your Honor, that's why I want to point to
09:28:08  2   that.  I think these statements have to be looked at in an
09:28:11  3   appropriate context.  When Disney acquired Pixar I think for
09:28:16  4   $7.4 billion from Steve Jobs and his compatriots, they did it to
09:28:22  5   enhance their competitiveness in the movie business.  When they
09:28:25  6   bought additional studies, they were doing the same.
09:28:29  7          These are not odd kinds of actions.  You don't have a
09:28:33  8   company buy 65 percent of the shares of a company and have it
09:28:39  9   become their subsidiary and then ignore it.  You don't have a
09:28:42 10   company buy 65 percent of the shares and not say that they believe
09:28:45 11   that they can take actions themselves to enhance the success of
09:28:49 12   that company.  They have to look at how the control is being
09:28:52 13   exercised and for what purpose.  It's not being exercised for the
09:28:55 14   purpose of dissipating assets.  It's not being exercised for the
09:28:59 15   purpose of making Taishan judgment proof.  It's not being exercised
09:29:04 16   for any illicit purpose at all, and it's certainly not being
09:29:07 17   exercised to create -- to make Taishan a sham corporation.  These
09:29:12 18   figures don't lie, your Honor, these are incontestable --
09:29:16 19   incontestable or uncontestable, not sure which, both of those
09:29:20 20   things.  This success of this company cannot be challenged here.
09:29:23 21          Your Honor, I don't have to go through the math, we do it
09:29:26 22   in our brief in terms of what multiple that we have in terms of
09:29:30 23   improving the performance.  I think the charts speak for
09:29:34 24   themselves, and I've been going on for awhile at this point that I
09:29:38 25   want to proceed if I might.

09:29:39  1          But let me, if I might, just simply got the casino across

09:29:44  2   the street and the hotel where we're staying; let me just lay down

09:29:47  3   a marker here, and the marker is they cannot point to a single case

09:29:51  4   in the hundreds and hundreds and hundreds of pages of briefs that

09:29:54  5   are before the Court, they cannot point to a single case applying

09:29:57  6   any legal standard - single business enterprise, alter ego, veil

09:30:02  7   piercing.  I don't care what it is, they can't point to one case

09:30:06  8   where alter ego has been found, where the subsidiary has

09:30:10  9   demonstrated the kind of financial strength, revenue, and asset

09:30:13 10   growth during the period of putative control.  It simply doesn't

09:30:17 11   exist, your Honor.  They are asking you to reach a finding here for

09:30:20 12   which there is not a single case that exists in the law any place.

09:30:24 13          THE COURT:  I think the elephant in the room that they're

09:30:26 14   concerned about is that if BNBM and CNBM Groups and all of the

09:30:32 15   alphabet gets out, and Taishan is by themselves, that somehow or

09:30:40 16   another those companies will vacuum up all of the assets of Taishan

09:30:46 17   and what will be left is a shell corporation, which in essence is

09:30:51 18   judgment proof albeit within the jurisdiction of this court.

09:30:55 19   That's their concern basically, isn't it?

09:30:58 20          MR. BARR:  Your Honor, that may be their concern, I'll

09:31:01 21   leave it to them to express.  If they want to concede they have no

09:31:04 22   basis for an alter ego finding now, I will take that because,

09:31:08 23   respectfully, this court and any appellate court would look at that

09:31:10 24   and say they have no basis for alter ego and we would be dismissed

09:31:14 25   on that basis.

09:31:15 1     But looking at what that principle would be, it's sort of

09:31:19 2  akin to their capacity control.  Well, they say the capacity to

09:31:22 3  control but we can't demonstrate that it was exercised.  There is a

09:31:26 4  fear, a speculative fear that assets will be stripped, but they

09:31:30 5  have absolutely no record of it.

09:31:32 6     Your Honor, they recognized and raised with you when the

09:31:36 7  share exchange between Taishan and BNBM, PLC was announced about

09:31:41 8  their concern that that would happen.  But actually when you looked

09:31:44 9  at what those papers said, it stated very specifically that Taishan

09:31:49 10 was going to continue to be operated independently, the goal was to

09:31:54 11 enhance their profitability.  When BNBM, PLC first bought their

09:32:00 12 shares, the purpose of that share purchase was to then invest in

09:32:03 13 Taishan.

09:32:05 14    Your Honor, they don't -- there is, again, simply no case

09:32:10 15 saying that speculation about what may occur down the road.  At

09:32:15 16 which time they would have other remedies they might be able to

09:32:18 17 exercise, whether it was an enforcement proceeding or any other,

09:32:22 18 that that justifies a finding now.  They have to show that the

09:32:26 19 control has already been exercised for an illicit purpose.  Their

09:32:33 20 speculation about saying, "we want to gather as many defendants in

09:32:36 21 the courtroom as we possibly can," and, you know, therefore, no

09:32:39 22 matter what may happen down the road, that we would have a pocket

09:32:43 23 that we could pick is, respectfully, your Honor, not appropriate

09:32:45 24 here.

09:32:46 25    Taishan is here, Taishan has made clear to the court in

09:32:49  1   terms of their views and their intentions in terms of what may

09:32:53  2   occur here.  But respectfully, your Honor, we're not that company.

09:32:56  3   And unless they can demonstrate that control was exercised in 2005

09:33:00  4   and 2006 for an elicit purpose in connection with the sales that

09:33:06  5   were made here, or that some act has already occurred now that

09:33:10  6   dissipated those assets, that commingled those assets, that a fraud

09:33:15  7   has been committed on this Court, they don't have that basis for

09:33:18  8   imputing jurisdiction.  The imputation of jurisdictional contacts

09:33:23  9   is not a speculative exercise; it's not what might happen, it's

09:33:26 10   what has happened.  And they, respectfully, your Honor, have to

09:33:29 11   demonstrate to the Court that it has happened, and they have not

09:33:32 12   been able to do that.

09:33:34 13          Your Honor, and again, I am going to be very brief here.

09:33:39 14   Their own expert has confirmed that Taishan is not a shell in his

09:33:43 15   testimony, because, of course, he couldn't conclude anything

09:33:47 16   otherwise given the results that we've shown.

09:33:51 17          Again, the Court has this in our papers.  All of the

09:33:55 18   different factors that are generally looked at, all of the *Green*

09:34:00 19   factors that you would look at single business enterprise don't

09:34:05 20   apply here; and I can address those at further length, your Honor,

09:34:09 21   but you have in our papers.

09:34:11 22          One very critical one, though, that I would like to

09:34:12 23   mention is that in virtually all of the cases where alter ego has

09:34:17 24   been found, the entity whose assets are being pierced through has

09:34:22 25   been formed by the parent company for some elicit purpose.  Taishan

was a very successful business before PLC first acquired their

shares.  Everything that has happened, then, as your Honor has seen

from the charts, has been towards enhancing that profit.

And, your Honor, since that time in terms of the way that

they have operated, they have to show that some of the stuff has

happened, in fact most of it has happened.  They have to show that,

again, the formation was for an illicit purpose, that PLC has been

paying their debts, their payroll, their losses, that cooperate

formalities have not been observed here.  Your Honor, we provided

to them, and of course the Court has them as well, all of the

shareholder meetings, the results, the resolutions passed by the

board of directors.  One of the things that struck me, your Honor,

and respectfully one of the reasons why we ultimately went to an

American corporate governance expert to assist the Court in terms

of analyzing these facts was because when I looked at their

articles of association, I looked at the resolutions, and I looked

at the board minutes, I said, this looks a whole lot like the way a

million and one Delaware corporations that I've looked at over the

course of my career look in terms of how they handle various

things.  And when I looked in terms of seeing that formally, there

would be consideration of whether or not to guarantee any loans of

Taishan so Taishan could expand its business, and I think the one

place they even try to talk about under capitalization is to refer

to the fact that Taishan's business has expanded and Taishan has

taken out certain loans.

09:35:55  1        Your Honor, in every major corporation you would look at

09:35:59  2   in the U.S., any conglomerate family, you enhance the

09:36:03  3   creditworthiness of your subsidiary by a parent guaranteeing their

09:36:07  4   loans.  That's commonplace, that's typical, that's not illicit.

09:36:11  5   The kinds of actions that have been taken here, the kinds of

09:36:16  6   actions that have been taken -- skip one more forward.

09:36:20  7        The kinds of actions that have been taken here were to

09:36:22  8   strengthen Taishan's business.  Your Honor, that goes back to the

09:36:26  9   question your Honor was raising before about the speculation about

09:36:29 10   what may occur down the road.

09:36:31 11        Let's look at what has occurred over a nine-year period,

09:36:34 12   ten-year period now.  Initially, they buy the shares, that cash

09:36:38 13   goes into Taishan, not out of, into Taishan to expand its business.

09:36:42 14   The loan guarantees to lower interest rates.  They point to

09:36:46 15   documents that somehow evidencing something problematic where they

09:36:51 16   help Taishan improve their technology to use -- to create gypsum

09:36:55 17   out of waste products from power plants is a good thing, then

09:36:59 18   you're not taking it from a mine where you're not exactly certain

09:37:02 19   what its quality may be.  That's a positive development.  To have

09:37:07 20   standardized auditing procedures, there's not a corporation in

09:37:11 21   America that doesn't require their subsidiaries to follow the same

09:37:14 22   kind of procedures.

09:37:15 23        Your Honor, the Supreme Court in *Bestfood*s made clear

09:37:19 24   that these kinds of actions are not the sorts of things that would

09:37:24 25   justify veil piercing.  This is what you would expect to find.

09:37:28  1        They put in their papers a bunch of logos to show CNBM

09:37:32  2   logos.  The only problem is in their brief when they put in all of

09:37:34  3   the pretty pictures, they left out two.  They left out Taishan and

09:37:38  4   they left out BNBM, PLC.  Your Honor, there can be no confusion

09:37:43  5   with anybody looking at those logos in terms of whose drywall was

09:37:47  6   being sold and what company that they were dealing with.

09:37:54  7        Your Honor, as I said, we ultimately decided that it

09:38:00  8   would be useful for the Court, given as I said I am looking at this

09:38:04  9   body of evidence, I have been doing this for 35 years, looked at

09:38:08 10   this body of evidence and said, boy, this stuff really looks

09:38:11 11   familiar to me.  These kinds of actions being taken by BNBM, PLC

09:38:17 12   with respect to Taishan look awfully familiar.  They look like what

09:38:21 13   my experience has been with American companies throughout time.

09:38:25 14        And so we did retain Professor Jeffrey Gordon from

09:38:28 15   Columbia University Law School, one of the leading corporate

09:38:35 16   governance experts in the country, and also an expert in

09:38:35 17   comparative corporate governance.  And we didn't ask him to go look

09:38:38 18   at what SASAC's role has been or the shadow enterprises that they

09:38:41 19   talk about, which I'll come to in a minute.  We asked him to look

09:38:44 20   at the facts of this case, to look at the evidence in the record of

09:38:49 21   this case.  And, your Honor, every time they filed a brief and

09:38:54 22   attached a whole pile of documents to it claiming that something

09:38:57 23   wrong was going, we immediately shipped that stuff off to Professor

09:39:01 24   Gordon for him to take a look at it so that his opinion would be

09:39:03 25   based on the totality of the record here.

09:39:06  1          And what did he conclude in looking at that based against

09:39:09  2   the frame of reference that he has as one of our country's leading

09:39:12  3   experts?  He said that CNBM business group, because it is a group

09:39:16  4   of companies, nobody has ever contested that, has adopted

09:39:20  5   organizational structures, business relationships, internal

09:39:22  6   financing practices, and corporate governance relationships similar

09:39:27  7   to those that exist among many large U.S. public corporations.  And

09:39:32  8   that would require a far reaching change to the customary legal

09:39:35  9   standards that apply to any jurisdiction in this country to find

09:39:39 10   that those structures, practices, and relationships violated the

09:39:43 11   norms of corporate separateness, so as to lose the benefits of the

09:39:48 12   limited liability generally provided by the corporate forum.

09:39:52 13          Your Honor, that is what he concluded.  He did that based

09:39:54 14   upon a look at the complete record that they have put forward here,

09:39:58 15   as well as looking at the organizational documents, the articles of

09:40:01 16   resolutions, and all of the like, in order to reach those

09:40:05 17   conclusions.

09:40:07 18          And these were some of the factors that he found

09:40:10 19   important as he looked at the record:  That Taishan was successful

09:40:13 20   before BNBM, PLC acquired its stock; the consistent growth, the

09:40:18 21   superior results that they've had, which, your Honor, ironically

09:40:22 22   Taishan's result are better than BNBM, PLC results over the same

09:40:26 23   period of time.  If they were really trying to treat Taishan as a

09:40:31 24   sham, we would have, of course, expected the reverse to be the

09:40:33 25   case, you would have expected assets and revenue to be sucked out

09:40:37 1    of Taishan to improve PLC's results.  Not the case.  Your Honor,

09:40:41 2    you have those additional charts, I didn't want to put too many

09:40:44 3    slides before the court.

09:40:45 4         The fact that Taishan has had consistent management

09:40:49 5    before the acquisition and thereafter; the fact that -- and again,

09:40:53 6    this is the evidence in the record -- we have separate books,

09:40:56 7    records, bank accounts, offices, their offices are 300 miles apart.

09:41:00 8    That other than Chairman Jia of Taishan who after that acquisition

09:41:06 9    went on the board of BNBM, PLC for a period of time, you have no

09:41:10 10   overlap of employees.

09:41:12 11        None of the people, none of the executives of Taishan are

09:41:17 12   the people who are operating Taishan, the day-to-day business

09:41:20 13   operations are BNBM, PLC officers and directors.

09:41:24 14        And again, your Honor, I have to come back to the simple

09:41:28 15   example of Disney.  When Disney acquired Pixar, Steve Jobs went on

09:41:33 16   the board of Disney.  That's not a surprising thing to happen when

09:41:37 17   you have a substantial shareholder of an entity who is the brains

09:41:41 18   behind the outfit, that you acquire them that they, now that

09:41:45 19   they're part of a bigger corporate family, they want a role looking

09:41:50 20   upward, not to dissipate things downward but to protect their

09:41:54 21   company looking upward.  And again, your Honor, you see all of the

09:41:57 22   corporate formalities being observed.

09:41:58 23        We had Bruce Deal from Analysis Group, an econometric

09:42:04 24   group.  Again, let's not test this antidotally, let's look at the

09:42:08 25   whole S&P 1500 and see what we find.  98 percent have at least one

09:42:13 1    sub.  95 percent of those subs are majority owned.  And critically,

09:42:17 2    again in terms of facts that I believe they spent the first 25

09:42:20 3    pages of their brief focussing on, 64 percent of the companies of

09:42:25 4    the S&P 1500 have subsidiaries where the directors on their board

09:42:31 5    include C-level executives or board members of the direct or

09:42:35 6    ultimate parent.  It's commonplace, your Honor.

09:42:38 7          They keep pointing to things, again, it's not surprising.

09:42:42 8    You own a subsidiary by a majority, even a minority, it's certainly

09:42:45 9    the point you have 100 percent that you have that kind of influence

09:42:49 10   over your subsidiaries.  You don't just let your subsidiaries run

09:42:53 11   amuck and do whatever they want.  You've made a substantial

09:42:56 12   investment of them, of course, you're going to play a significant

09:42:59 13   role.  And we present the case studies to that effect.

09:43:03 14         So what do they put up, your Honor, really ultimately in

09:43:09 15   response?  Your Honor focused on a few of the documents that they

09:43:12 16   did, and hopefully, your Honor, I've been able to respond

09:43:14 17   appropriately with respect to those.

09:43:16 18         But when they put forward an expert to respond to

09:43:18 19   Professor Gordan and Bruce Deal and they say this is someone who

09:43:24 20   has this experience in China and talks in terms of their being

09:43:30 21   effectively a parallel governance structure from the Chinese

09:43:35 22   government on down to the communist party, that what does he

09:43:39 23   concede?  Not that he looked in this record and can show control

09:43:44 24   and found control and show that controlled was exercised in 2005

09:43:48 25   and 2006; he said my analysis goes to and I think speaks of

09:43:53  1    capacity, capacity to influence and capacity to control.  Your

09:44:01  2    Honor, respectfully, that's not the law as we looked at before.

09:44:03  3    That doesn't suffice for an alter ego finding.

09:44:07  4            When we asked him, and my colleague Mr. Fenton deposed

09:44:11  5    him for an entire day, and asked him question after question after

09:44:15  6    question going to what was the actual evidence in the record.  And

09:44:20  7    in addition to him conceding that this certainly is not Taishan

09:44:23  8    certainly not a sham corporation, he could not present a single

09:44:28  9    instance that the Chinese Communist Party or SASAC interfered with

09:44:34 10    the business and daily operations of Taishan.

09:44:37 11            Your Honor, capacity control is not enough.  You have to

09:44:38 12    show the evidence.  So they're going to say Professor Gordon is

09:44:42 13    wrong, he doesn't understand that China is different.  Well, you

09:44:46 14    have to show in the record that China is different.  And

09:44:49 15    Mr. Milhaupt, Professor Milhaupt said he looked at the same record

09:44:54 16    that Professor Gordon did, and he could not point to a single

09:44:57 17    instance where you had that level of influence.

09:45:00 18            And again, that's perhaps not surprising because when we

09:45:02 19    confronted Professor Milhaupt with his own writings, indeed this

09:45:06 20    was I think an article that just came out in January of this year,

09:45:10 21    just a month ago, he says and this is a direct quote, "The Chinese

09:45:15 22    State does not exercise control over SOEs to the degree that its

09:45:21 23    equity ownership would indicate."  "Chinese SOEs enjoy far greater

09:45:27 24    managerial autonomy," that's what we're talking about, the

09:45:30 25    managerial autonomy from the day-to-day operations, "from the

09:45:35 1   state, than the state's ownership interest would suggest."

09:45:38 2         Once again, it's not surprising that he couldn't point to

09:45:39 3   a single instance of that, because the reality is that control,

09:45:42 4   while it may exist theoretically, there may be that capacity to

09:45:48 5   control, you have to show that it was actually exercised.

09:45:52 6         Professor Milhaupt had an artful phrase in one of his

09:46:00 7   articles where he said, "In many respects the concept of state

09:46:04 8   capitalism in China - particularly the organizational structure and

09:46:07 9   broad governance regime surrounding these national champions -" the

09:46:11 10  national champions being SOEs - "remains a black box."  Your Honor,

09:46:16 11  that's a professor who has studied and has looked at some of these

09:46:19 12  structures, and his view from afar is that this looked like a black

09:46:24 13  box.

09:46:26 14        But Professor Gordon responded to that, hopefully he is

09:46:30 15  about to respond, there it is.  And what did he say?  He said,

09:46:35 16  "I've been able to open the black box and, therefore, my analysis

09:46:40 17  is not based on a projection, theoretical or otherwise, about how

09:46:46 18  this firm," and of course this firm referring to the CNBM group of

09:46:50 19  companies, "works, it is based on particulars I have seen."

09:46:54 20        Your Honor, that contrast between the two is telling

09:46:57 21  here.  He looked at the evidence.  He said I don't need to worry in

09:47:03 22  terms of what theoretically might exist, I've been given the

09:47:07 23  benefit through the discovery record that the PSC and everyone here

09:47:10 24  on the PSC has worked so hard to provide, to produce and to provide

09:47:15 25  to the court in time for this hearing.  He said I looked at that,

09:47:19 1  I've done my analysis based upon the actual particulars I have seen

09:47:24 2  and concluded, as we have demonstrated before, that nothing

09:47:28 3  inappropriate has gone on here.

09:47:32 4         Now, your Honor, I don't have Mr. Herman's flair in terms

09:47:34 5  of bringing props and the like.  But if I had that black box here

09:47:40 6  in front of you and I turned it over, it would be empty because

09:47:42 7  those facts to justify imputing Taishan's jurisdictional contacts

09:47:46 8  simply don't exist.

09:47:48 9         Unless the Court has questions, I'll reserve a minute or

09:47:51 10 two, since I probably overstayed my welcome already.  Thank you

09:47:56 11        THE COURT:  No, I've asked them already.  Thank you very

09:47:57 12 much.

09:48:20 13        MR. STENGEL:  Good morning, your Honor, Jim Stengel of

09:48:30 14 Orrick for CNBM Group, CNBM Company, CNBMIT, CNBM USA, and United

09:48:37 15 Suntech.  So I don't spend all of the time left for me reciting the

09:48:42 16 names of my clients, I'll refer to those as the movants and moving

09:48:47 17 defendants here.

09:48:48 18        But I don't want that to obscure a very important fact

09:48:51 19 here, which I think builds on what Mr. Barr said to you was

09:48:55 20 important for the Court to recognize that this is a complex

09:48:58 21 corporate structure.  There are many independent corporate entities

09:49:01 22 involved, and the analytical process, the burden of proof that

09:49:06 23 resides with the PSC, the plaintiffs here requires them to take due

09:49:10 24 recognition of that structure.  They can't say this is an

09:49:14 25 agglomeration, they can't make summary statements as to who is

09:49:18  1    responsible for what, and proceed on that basis.  They have to,

09:49:21  2    they are required as a matter of law to square the circle as to

09:49:25  3    each of those links in the chain.

09:49:27  4          Now, my task here is a fairly simple one now.  In part I

09:49:32  5    can rely on Mr. Barr's excellent presentation of many on the basic

09:49:35  6    facts and some of the legal regiment that applies here.

09:49:40  7          Further, though, as the case resides right now, as much

09:49:43  8    as I might like to have an erudite conversation with your Honor

09:49:46  9    about the Supreme Court's recent jurisprudence on personal

09:49:49 10    jurisdiction, the issues as they relate to my clients, the CNBM

09:49:52 11    entities are actually fairly straightforward, because the

09:49:56 12    plaintiffs have produced no evidence that would support an

09:50:00 13    assertion of general jurisdiction over any of the entities in the

09:50:05 14    Gulf Coast region -- I will put a footnote in place, your Honor,

09:50:08 15    that we can talk about USA and Suntech with respect to having been

09:50:13 16    California corporations, which has an impact on their general

09:50:16 17    jurisdictional access for purposes of one *Amorin* case in

09:50:20 18    California.

09:50:21 19          But as to the bulk of this litigation, as to Group, as

09:50:23 20    to Company, there is no basis, none of them are at home in the

09:50:26 21    relevant jurisdictions.  So we can take general jurisdiction to the

09:50:30 22    side.  Not an issue.

09:50:32 23          Even as to specific jurisdiction, there is no allegation,

09:50:38 24    there are no facts in the record as to any of these entities that

09:50:42 25    would connect them, provide the nexus with the sale of Taishan

09:50:47 1  drywall, or for that matter BNBM drywall, in the relevant

09:50:52 2  jurisdictions.  There are no allegations to support an exercise of

09:50:55 3  specific jurisdiction.

09:50:58 4       The one comment I will make about the Supreme Court's

09:51:02 5  recent jurisprudence on personal jurisdiction is I think it's fair

09:51:05 6  to say it has been restrictive in nature and protective of

09:51:08 7  defendants generally, inviting a lot of critical response one might

09:51:11 8  say.  But when we look through the lens, that's the framing device

09:51:16 9  for what this argument, what this motion is now all about; which is

09:51:23 10 is there a basis on which to penetrate the corporate veil, to find

09:51:29 11 alter ego, to attribute jurisdictional contacts on the part of

09:51:34 12 Taishan up the chain to Company or Group.  And on this record, your

09:51:40 13 Honor, the answer is clearly and unequivocally no.

09:51:44 14      Now, one of the things I think has been obscured in this

09:51:47 15 litigation, and this litigation is nothing if not complex and has a

09:51:52 16 complex history that I have not been part of other than last year,

09:51:56 17 but we tend to underestimate or under appreciate how extraordinary

09:52:02 18 the remedy the plaintiffs seek at this juncture is.  The United

09:52:07 19 States and its courts have historically recognized the corporate

09:52:11 20 forum.  They honor the selection that parties have made to organize

09:52:15 21 themselves in that fashion, be they U.S. corporations or foreign

09:52:19 22 corporations, including corporations in other jurisdictions like

09:52:23 23 China.  That is commonplace.

09:52:27 24      For a plaintiff to persuade a court to disregard the

09:52:32 25 corporate forum, to pierce the veil is extraordinary, and we'll

09:52:37  1    talk about what at a minimum has to be shown to do that.  The

09:52:46  2    authority is extensive, Mr. Barr made reference to this fact; there

09:52:50  3    are some common elements to alter ego and veil piercing

09:52:56  4    jurisprudence, and I want to stress the one thing that is a common

09:52:59  5    element that is absent in its entirety in this litigation.

09:53:07  6    Mr. Barr showed you the growth and in-common assets of Taishan.

09:53:12  7    All of the jurisprudence relating to alter ego and veil piercing --

09:53:15  8    and remember, alter ego is becoming one, it is a one entity for

09:53:20  9    legal purposes, juridical distinctions are no longer recognized.

09:53:26 10    But the concept of a shell, insolvency of abuse, is in all of these

09:53:29 11    cases, even I would submit in Louisiana, minority doctrine single

09:53:34 12    business enterprise.  It's an abuse.

09:53:35 13         That is not here, it's not alleged, and on the facts as

09:53:40 14    to Taishan, that case cannot be made.  For that reason, and we've

09:53:46 15    looked both in China and the United States, we have multiple layers

09:53:51 16    of publicly created companies here.  This isn't TTP and Taishan.

09:53:56 17    And I know your Honor has had that experience, we are in a very

09:53:59 18    different world now.  But there has never been a piercing of a

09:54:05 19    public corporation, and for good and sufficient reasons that we'll

09:54:08 20    talk about.

09:54:10 21         Now, the first issue we have to struggle with is choice

09:54:13 22    of law.  We think it's fairly clear that given that these are, at

09:54:18 23    least with respect to Group, CNBMIT, and Company, Chinese

09:54:24 24    corporations formed in China, all of the relevant jurisdictions

09:54:28 25    when you look to their choice of law regimes would apply Chinese

09:54:33  1    law.  That means we apply the relevant standards there, and we have

09:54:40  2    put in evidence through Professor Clarke of what the Chinese

09:54:44  3    company law would provide; and it requires, not dissimilarly to the

09:54:50  4    U.S. law, very strong evidence of abuse of the corporate forum.

09:54:54  5        As a threshold matter, it is not can you show fraud or

09:54:58  6    abuse, a shell, or can you show control, you have to check all of

09:55:04  7    those boxes.  In here we've laid out the factors that are

09:55:11  8    identified.  And again, these all have to be present.  You can't

09:55:14  9    pick and choose and check one box.  And again, for your Honor,

09:55:19 10    these standards will not be unfamiliar, they look much like U.S.

09:55:22 11    law; but these factors are simply not present as we trace the

09:55:30 12    corporate structure of these defendants.

09:55:33 13        Now, the PSC disputes this.  They have chosen to proceed

09:55:39 14    under analysis of what would happen under the domestic law of

09:55:43 15    Florida, Virginia, Louisiana.  They have chosen not to apply

09:55:49 16    Chinese law, saying Chinese law is too vague.  That's their choice.

09:55:56 17    But having made that, we think the record is now uncontroverted as

09:56:01 18    to what Chinese law would provide, and Chinese law would provide

09:56:04 19    that there is no veil piercing, there is no alter ego attribution.

09:56:10 20    So the CNBM entities are released.

09:56:13 21        But, in a sense, and I don't want to get into an

09:56:16 22    extensive discussion of what false conflicts may require, I think

09:56:21 23    rationally applied there is very little difference between the

09:56:25 24    Chinese legal regime and the domestic.  The only exception is when

09:56:28 25    the plaintiffs attempt to construct, relying on SB in Louisiana or

09:56:35  1   otherwise, a standard for veil piercing or alter ego that does not

09:56:38  2   require a shell or abuse, it doesn't require what we think is the

09:56:43  3   threshold for all reasoned applications of alter ego law.  Then you

09:56:47  4   do have a clear conflict with Chinese law.  I think you actually

09:56:50  5   have a conflict with many domestic regimes.  We don't think that

09:56:57  6   regime or that positive legal structure is supportable, but it

09:57:01  7   misstates in our view the law and the approach that is to be taken

09:57:04  8   here.

09:57:05  9        Again, Louisiana, the same standard, situation of fraud

09:57:10 10   or deceit has been practiced by the shareholder acting through the

09:57:14 11   corporation.  Well, plaintiffs do not allege shareholder fraud, a

09:57:17 12   heavy burden; they disregard the corporate entity, so it became

09:57:21 13   indistinguishable.  These are not easy standards to meet, this is

09:57:24 14   not a light standard because it is so extraordinary a remedy

09:57:28 15   because it's under -- it's ignoring a factor which is extremely

09:57:32 16   important as a matter of U.S. law.

09:57:36 17        Looking, though, under the single business enterprise,

09:57:42 18   *Bone Fide* is a Judge Vance opinion fairly recently.  She recounted

09:57:45 19   the fact that had been criticized.  One interesting note from that

09:57:50 20   case, which your Honor should be aware of, is her view was if the

09:57:51 21   plaintiff wanted to use the SBE theory, that required clear and

09:57:55 22   convincing, not preponderance of evidence, recognizing that it is a

09:57:59 23   species of fraudulent conspiracy.

09:58:03 24        Even under the SBE, if you take the evidence in the

09:58:07 25   record, after extensive discovery, the CNBM entities do not qualify

09:58:15  1    for veil piercing under the SBE.  And I am sure you may hear

09:58:18  2    differently; but if you look at each of these factors, the evidence

09:58:22  3    is clear from competent percipient witnesses that we do not

09:58:30  4    qualify.

09:58:30  5         Now, as I said previously as a threshold matter, as a

09:58:34  6    predicate for application of veil piercing, there is this concept

09:58:38  7    that Taishan had to have been a shell, it had to have been

09:58:41  8    insolvent, had to have been abused in some format to disadvantage

09:58:45  9    the creditors of Taishan.  And all that typically resolves itself

09:58:49 10    into the plaintiffs proving that there was a disposition of assets

09:58:52 11    from the junior company to the senior company.  That is, as

09:58:57 12    Mr. Barr's presentation demonstrated, absolutely contrary to the

09:59:00 13    record.  Taishan is a stronger entity today than it was, it's a

09:59:04 14    substantially stronger entity than it was when Taishan -- or excuse

09:59:09 15    me, when BNBM, PLC purchased those shares.

09:59:13 16         And even Professor Milhaupt who has looked at this

09:59:17 17    evidence, concedes that Taishan is not a shell.  "Taishan has its

09:59:21 18    own management, its own sales force, its own manufacturing

09:59:24 19    facilities, its own customer base, and earns substantial profits,

09:59:27 20    do you think it's fair to describe Taishan as a shell?  It appears

09:59:31 21    to have operating assets."  Not necessarily responsive, "Which is

09:59:34 22    another way of saying that it's not a shell, correct?  Answer:

09:59:37 23    Yes."  The PSC's expert.

09:59:39 24         Now, and I'll get to the sort of analytical structure

09:59:44 25    that I think this case requires, your Honor, which reflects some of

09:59:50 1    the complexity.  But the plaintiffs have come forward with a number

09:59:53 2    of allegations, most of them, other than the summary allegations

09:59:56 3    which recite the legal standard, are descriptions of situations

10:00:02 4    which would be commonplace, as Mr. Barr has demonstrated, in U.S.

10:00:07 5    corporate structures.

10:00:07 6         Investors do not act indifferently to what their

10:00:10 7    investments do.  Keep in mind that CNBM Group and CNBM Company are

10:00:15 8    just that, that is their role in this case.  They never

10:00:19 9    manufactured, sold, shipped, arranged for shipping, or anything

10:00:21 10   else related to drywall.  The other entities had absolutely no

10:00:24 11   contact, they weren't even investors indirectly in Taishan.  So

10:00:29 12   we're all a long distance from Taishan and its sale of drywall.

10:00:32 13        But what I wanted to focus the Court's attention on,

10:00:35 14   which I think is critical for this purpose, and I talked about the

10:00:39 15   analytical framework.  And here is a simplified corporate

10:00:44 16   structural chart.  And the plaintiffs put in some evidence, and I

10:00:51 17   think as to each part of that there's a question that the Court has

10:00:54 18   to ask about the relevance, the competence of the evidence; and

10:01:00 19   that is, we talk about veil piercing and the focus has been on the

10:01:04 20   first level, to get from Taishan to BNBM.  I think Mr. Barr

10:01:08 21   presented convincingly that can't happen.  There's no basis for

10:01:12 22   that to happen, there's no legal ability for that to happen.

10:01:15 23        But from the CNBM Company and Group perspective, it's an

10:01:20 24   even further stretch.  What makes this so extraordinary from our

10:01:23 25   perspective is -- and your Honor will recall we discussed this at

10:01:27 1   some length in the conversations over sovereign immunity -- the

10:01:31 2   need to close each link of the chain.  And when the -- and I won't

10:01:36 3   call it evidence, but the factual assertions that I suspect you

10:01:39 4   will hear at great length when I sit down, as to each you have to

10:01:43 5   wonder:  Okay.  Which company is it from?  What relationship are

10:01:46 6   they speaking to?  Is it to get from Taishan to BNBM?  Is it to get

10:01:50 7   from BNBM to China National Company?  Is it to get to Group?  And

10:01:55 8   what about these other companies?

10:01:57 9        The documents relate to all companies, which ones

10:02:02 10  specifically do they relate to, what relationship is it addressing,

10:02:06 11  when was the document authored.  Mr. Barr averted to this, there is

10:02:09 12  evidence that will be shown or factual assertions that we recited

10:02:13 13  that relate to things that happened in this litigation, not

10:02:15 14  relevant to piercing the veil as to conduct on the part of Taishan

10:02:18 15  in 2006 to 2009.  Is it evidentially competent?  Is it speculation?

10:02:26 16  Is it inadmissible hearsay?

10:02:28 17        Then probably most importantly, under any relevant

10:02:30 18  standard, does it matter?  Just taking as a "for instance."  The

10:02:34 19  plaintiffs have made a great deal about the fact that there's

10:02:37 20  intercompany lending and guarantees here.  The problem they have is

10:02:41 21  that's all documented.  It's in the offering materials.  These are

10:02:45 22  big corporations with outside auditors.  And the case law reflects

10:02:50 23  not only do they not consider intercompany lending or guarantees to

10:02:55 24  be indicia of a common enterprise, they view it in *Alpine View* and

10:03:01 25  other Fifth Circuit cases recited that, is a contrary indication

10:03:04  1    that the fact that there is lending which is documented, which is

10:03:07  2    made at commercial rates is all indication of corporate

10:03:10  3    separateness and independence.

10:03:12  4           So as to each category of factual assertion, that

10:03:16  5    analytical framework has to be applied.  And here what makes this

10:03:20  6    particularly extraordinary and what the PSC invites this Court to

10:03:27  7    do, is not only to pierce the veil as between Taishan and BNBM,

10:03:32  8    PLC, which would be unprecedented given the financial vibrance of

10:03:36  9    Taishan, but they would have this Court without an evidentiary

10:03:44 10    basis, without any demonstration that BNBM, PLC is a shell or

10:03:50 11    insolvent or that China National Building Material Company, LTD. is

10:03:55 12    a shell or insolvent, on up to CNBM Group, ignoring substantial

10:04:01 13    public investment, ignoring the fact that these are exchange traded

10:04:05 14    stocks with all of the regulatory requirements that apply in that

10:04:08 15    context, they would have this court pierce multiple levels of

10:04:11 16    public companies.

10:04:13 17           No public company has had the veil pierced, no public

10:04:16 18    company has been the subject of an alter ego finding for these

10:04:19 19    purposes.  But they're not satisfied with moving one level up, and

10:04:24 20    again, in an unprecedented, unjustified assertion, but they want to

10:04:28 21    do it at multiple levels.  That, your Honor, is just simply not

10:04:33 22    supportable.  That's why when I say this is an extraordinary

10:04:37 23    situation, it's not hyperbole.  This is clearly an unprecedented

10:04:44 24    legal situation.

10:04:46 25           Now, I talked about the things the Court ought to be

10:04:50   1    sensitive to.  And these are among, and I've tried to distill -- as

10:04:56   2    your Honor knows, the opposition papers went well over 200 pages,

10:05:01   3    there were thousands of pages of exhibits -- evidence of how

10:05:04   4    extensive the discovery has been in this case so far.  But these

10:05:08   5    give you the broad assertions of some of the items that the PSC

10:05:13   6    thinks are relevant.  None of those, your Honor, are relevant to

10:05:18   7    this determination because they don't rise to the level of an abuse

10:05:22   8    of the corporate structure.

10:05:23   9           Now, what does the evidence show here?  And I will go

10:05:28  10    through this quickly because I am mindful of the fact that time has

10:05:32  11    passed.  We put in extensive declarations on the part of competent

10:05:36  12    percipient witnesses.  We met our burden on this subject by laying

10:05:40  13    out what role Group and Company played in each case.  We attested

10:05:45  14    to the adequacy of capitalization, the adequacy of any commingling

10:05:50  15    of accounts, that we were not involved in the daily operations of

10:05:52  16    subsidiaries.  All of this is conclusively determinative, if you

10:05:58  17    even got to this point, that there is no basis to pierce the veil.

10:06:03  18    And it's true as to both Company and Group.

10:06:06  19           And again, given the remoteness of CNBMIT, Suntech, and

10:06:12  20    USA, the same things are true, but they are not even in the zone of

10:06:18  21    connection with Taishan.  They prepare independent financial

10:06:23  22    statements.  And again, to reiterate the point, both at the CNBM

10:06:27  23    Company and the BNBM Company basis, these are publicly traded,

10:06:30  24    exchange traded companies.  They have outside auditors.  They

10:06:35  25    comply with the disclosure standards in those regimes.  So these

10:06:39 1    are not fly by night two guys with a shoe box running insurance

10:06:44 2    companies, and that's where the alter ego veil piercing law really

10:06:48 3    comes from.

10:06:50 4          Then we have evidence from the PSC's own expert.  Does he

10:06:56 5    have any evidence that CNBM Group made business decisions for its

10:06:59 6    subsidiaries?  No, he doesn't have any.  As I said, the fact that

10:07:03 7    they exchange rated is highly significant.

10:07:05 8          So where are we on this?  I mean, part of this is also an

10:07:09 9    exercise in imposing reality.  The sort of hindsight construct that

10:07:15 10   the PSC would put on this is that CNBM Group that sit in Beijing,

10:07:20 11   intermittal with the daily operations of a third-level subsidiary

10:07:25 12   on the part of Taishan.  There is no evidence of that happening but

10:07:29 13   it also just strains reality.  This is a small company at the

10:07:33 14   holding company level.  They have large numbers of investments.

10:07:37 15   The idea that they'd be worried about di minimus sales to the

10:07:41 16   United States of drywall belies any sense of rationality.

10:07:49 17         One of the things, again, and your Honor asked a question

10:07:52 18   about this and the public offing document made a reference to the

10:07:55 19   Group's position in the gypsum board market.  Again, it should be

10:08:01 20   noted in the People's Republic of China.  This is a conglomerate.

10:08:08 21   By accounting standards they have to under certain circumstances

10:08:10 22   consolidate financial reporting, and one of the reasons you have

10:08:13 23   conglomerates is because they're viewed as competitive advantage.

10:08:17 24   But we use here, and this is for the court's education, not

10:08:22 25   evidentiary, we pulled out materials for General Electric, a very

10:08:25  1   well-known U.S. conglomerate.  And they make the same statements

10:08:29  2   about what GE as a global entity does when, in fact, GE is a

10:08:35  3   conglomeration of subsidiaries.

10:08:38  4       And again, Professor Milhaupt admitted this is a very

10:08:41  5   common U.S. corporate structure.  And here you have GE -- and I

10:08:45  6   will assure you that when you read releases from GE, when you look

10:08:49  7   at their annual reports and their disclosure documents, they're

10:08:53  8   going to talk about what happens with transportation, railroad

10:08:56  9   engines, with jet planes, with jet engines, all of those being

10:09:00 10   talked about as under the rubric of GE.  And that's no different

10:09:03 11   than what CNBM Group has done, between all of the constituent

10:09:09 12   enterprises in which they invest is part of the group; but that

10:09:12 13   doesn't mean they exercise undue control, that any of the entities

10:09:17 14   are insolvent or being abused, or that there is any basis for veil

10:09:20 15   piercing.

10:09:21 16       Same issue on use of trade "dress".  Again, very typical

10:09:26 17   for members of a group to use common logos, not evidence of

10:09:30 18   anything untorrid, not evidence which would support veil piercing.

10:09:35 19       We did go through and look at the common elements of

10:09:38 20   those limited number of cases where a veil had been pierced.  And,

10:09:42 21   again, they are night and day difference from what circumstances

10:09:46 22   face us here.

10:09:47 23       We also looked at the purported evidence that the PSC

10:09:50 24   described as having.  They attributed to Mr. Song, the chairman of

10:09:54 25   Group, a statement that Taishan is not independent.  When Professor

10:10:01 1    Milhaupt was shown the actual document, Professor Milhaupt came to

10:10:05 2    the rationale conclusion well, he's not saying that's his opinion,

10:10:07 3    he's paraphrasing what he believes the U.S. plaintiffs in this

10:10:10 4    litigation are asserting.  Hardly a fact which supports piercing

10:10:13 5    the corporate veil.

10:10:14 6            The daily operational management.  Again, doesn't mean

10:10:20 7    daily domination or control, as the PSC would have the Court

10:10:24 8    believe.

10:10:25 9            THE COURT:  But the PSC says that the CNBM Group issues

10:10:30 10   technical safety codes regarding its gypsum, which are mandatory,

10:10:35 11   they provide training to middle and senior leaders of BNBM and

10:10:42 12   Taishan, and they have to go to them, to these meetings.  What's

10:10:49 13   your response to that?  Is that more than usually control or

10:10:56 14   interference?

10:10:57 15           MR. STENGEL:  I don't think it's control or interference,

10:11:01 16   your Honor.  I think, for example, safety standards which, if I

10:11:04 17   recall the document at issue, related both to manufacturing safety

10:11:08 18   as well as product safety.  In the United States, all corporations

10:11:10 19   now have extensive stewardship programs.  So I'm sure General

10:11:14 20   Electric manages product safety and manufacturing safety for its

10:11:17 21   subsidiaries, or at least attempts to; that's not an intrusion,

10:11:20 22   that's not becoming one corporation for purposes of misusing the

10:11:24 23   form to disadvantaged creditors.  Again, it's a night and day

10:11:27 24   situation.

10:11:27 25           In terms it of training, it's a similar situation.  It's

10:11:30  1    not saying -- and here, let's put this in very concrete terms, your

10:11:35  2    Honor.  The daily control that would be relevant here is if someone

10:11:37  3    at CNBM Group said, "Okay.  Chairman Jia, time to go to the United

10:11:44  4    States with some bad drywall.  It's Tuesday.  I would like to see

10:11:48  5    some sales by Thursday."  It's not corporate stewardship.

10:11:53  6           And by the way, as you are well aware, there is no

10:11:56  7    evidence of any conversation along those lines, anything close to

10:12:00  8    that.  What we have are these bits and pieces of really responsible

10:12:04  9    corporate citizenship of parents -- I don't want the Court to lose

10:12:06  10   sight of the fact that we have a long chain here -- trying to

10:12:10  11   impose quality standards or rigger and management.  There's

10:12:14  12   absolutely nothing wrong, and the cases are replete with reference

10:12:17  13   to this, with the fact that investors who are parent corporations

10:12:21  14   will try and get their subsidiaries to improve their performance.

10:12:26  15   They will approve asset acquisitions, they will approve capital

10:12:31  16   transactions, they will approve hiring of high level executives.

10:12:34  17   All that is fine, all of that is prudent investment management.  It

10:12:37  18   doesn't go to the level of domination, control, and misuse of the

10:12:41  19   entity.  It would be required to support veil piercing.

10:12:45  20          And finally, we've talked, I think, enough about this.  I

10:12:52  21   think the Court knows what the record is on the withdrawal from the

10:12:56  22   litigation.  It's not relevant, frankly, at this point.  We may

10:12:59  23   have to face a more refined discussion of exactly what happened and

10:13:04  24   who made what decisions, but the record right now is Taishan made a

10:13:10  25   decision and the directors chose to, in their terms, respect that.

10:13:14  1       And just as an aside, your Honor, I mean, it's a weird

10:13:18  2  causation structure, it seems to me that if the PSC wanted to make

10:13:23  3  anything out of this, they would have to be in a position to say,

10:13:27  4  well, Taishan was intending to stay and they were directed to leave

10:13:29  5  by the parent corporations.  For them to have made the decision and

10:13:34  6  there is uncontroverted evidence by Chairman Jia that he made the

10:13:38  7  decision and they were going to do this, and the only issue was

10:13:41  8  they informed parents, the parents did nothing other than respect

10:13:44  9  their decision.  Again, not a relevance, and I apologize for taking

10:13:48 10  the court's time at this moment, but the weight put on the

10:13:53 11  fragments of the Dong e-mail at this point bothers me.  And I think

10:13:57 12  we can move on.

10:13:58 13       But there's substantially additional material, it all

10:14:03 14  goes really to the issue of what sort of detailed behavior or what

10:14:06 15  detailed assertions of behavior are there.  Unless there are

10:14:09 16  questions, your Honor.

10:14:11 17       THE COURT:  Just one.  I asked your colleague the same,

10:14:16 18  it seems to me that the elephant in the room in all of this is the

10:14:22 19  PSC's concerned that they will have Taishan with jurisdiction in

10:14:29 20  this court, but Taishan, all of the assets of Taishan will be

10:14:35 21  vacuumed by CNBM Group, which can do that through their BNBM and

10:14:41 22  CNBM.  Is that significant in the analysis of this?

10:14:47 23       MR. STENGEL:  It's certainly not significant or frankly

10:14:51 24  with respect even relevant to the jurisdictional analysis now,

10:14:53 25  because the court has to determine its power over these defendants

10:14:56  1    based on the facts and circumstances before it based on the

10:14:59  2    evidence before it.  The speculative concern that some transactions

10:15:05  3    might happen in the future is not a basis on which to make this

10:15:08  4    decision.

10:15:09  5            I would also say as a practical matter, first of all,

10:15:13  6    and this litigation as your Honor is painfully aware of has been

10:15:17  7    going on for quite awhile.  And if you look at the asset growth of

10:15:21  8    Taishan, it's continued and frankly accelerated during the period

10:15:24  9    that this litigation has been pending.  So nothing has happened to

10:15:28 10    date to suggest that there's going to be any disposition of assets

10:15:34 11    that disadvantage the plaintiffs in this litigation.

10:15:37 12            Further, to the extent some suggestion of that were to

10:15:40 13    occur, I think this Court would then since it has jurisdiction over

10:15:44 14    Taishan, it's within its power to control what Taishan does.  So I

10:15:49 15    don't think -- I think that's an illusory concern, frankly, given

10:15:54 16    the power of this court over entities as to which it does have

10:15:57 17    jurisdiction.  But again, it's a speculative concern.  And if you

10:16:01 18    look at value that's in Taishan -- and to put this very bluntly,

10:16:05 19    your Honor, I understand the plaintiff's desire to marshal assets,

10:16:10 20    but this Court can't ignore the existing corporate forum, it can't

10:16:15 21    ignore the limitations on its power in terms of asserting

10:16:19 22    jurisdiction over non-present defendants to facilitate that.

10:16:22 23            And to the extent if there were a real and concrete

10:16:27 24    concern at this time, I think the Court can deal with that with

10:16:31 25    respect to its power over those entities which are before it, and I

10:16:35 1   think it's particularly peculiar in the context of Taishan having

10:16:42 2   said since the damage hearing last June that they understood where

10:16:47 3   they were in the litigation and the issues -- and this is from

10:16:49 4   Taishan's perspective, not from anyone else in the stream of

10:16:52 5   defendants -- that this case was about, you know, how much they

10:16:55 6   owed and who they had to pay.  So if Taishan had not reappeared and

10:16:59 7   not subjected itself to this court and begun the litigation

10:17:03 8   process, including the damage proceeding, I think those might be --

10:17:07 9   they don't, again, don't have any legal significance in terms of

10:17:11 10  how the Court should rule on the jurisdictional issues, but they

10:17:14 11  might be a more concrete concern than right now, which seems like

10:17:18 12  what the PSC is inviting your Honor to do is chase phantom

10:17:21 13  concerns, which are not relevant, they're not legally dispositive,

10:17:25 14  and they're not even real at this point in time.

10:17:28 15          THE COURT:  What about since everybody's before me now

10:17:33 16  enjoining everybody from doing that, enjoining Taishan as well as

10:17:38 17  CNBM Group as well as BNBM and CNBM from vacuuming any assets?

10:17:47 18          MR. STENGEL:  I think, your Honor -- and I'll let

10:17:50 19  Taishan's counsel address what you can or should do with Taishan.

10:17:54 20  You know, I think the injunction against the other entities would

10:17:59 21  depend first and foremost on the court having jurisdiction.  But I

10:18:03 22  suspect where there's a will, there's a way.  Your control over

10:18:07 23  Taishan should give the court substantial leverage to protect the

10:18:12 24  legitimate interest of the plaintiffs, but I'll let Taishan deal

10:18:15 25  with that.

10:18:15   1              THE COURT:  Okay.  Thank you very much.

10:18:15   2              MR. STENGEL:  Thank you, your Honor.

10:18:15   3              THE COURT:  Let's take a ten-minute break here and we'll

10:18:18   4    come back and hear from the plaintiffs.  The court will stand in

10:18:21   5    recess.

10:18:21   6              THE DEPUTY CLERK:  All rise.

10:18:22   7          (WHEREUPON, A RECESS WAS TAKEN.)

10:25:32   8          (OPEN COURT.)

10:25:32   9              THE COURT:  Be seated, please.  Let me hear a response

10:25:35  10    from the plaintiffs.  I understand they're dividing their time in

10:25:38  11    two.

10:25:38  12              MR. HERMAN:  May it please the court.  Good morning,

10:25:40  13    Judge Fallon, Russ Herman for Plaintiff Steering Committee.

10:25:44  14          I think that learned counsel opposite have comported

10:25:49  15    themselves extraordinarily well.  However, this case is fact

10:25:53  16    intensive, and application of facts to law is really the gravamen

10:25:59  17    of what I would like to address to your Honor.  I do agree with

10:26:04  18    Mr. Barr that it makes no difference whether we talk about alter

10:26:10  19    ego, single business enterprise, or agency, the facts, all of the

10:26:17  20    facts in this case would find jurisdiction based on any theory.

10:26:23  21          I find it strange, but happily strange, that the learned

10:26:32  22    counsel opposite would indicate to your Honor that the SOEs in

10:26:39  23    China are independent.  Of course that runs counter to the argument

10:26:44  24    that they made under the Foreign Sovereign Immunities Act.

10:26:51  25          Also, that because they're a publicly traded company,

10:26:56 1   jurisdiction should not attach, and that is contrary to arguments

10:27:01 2   that they made under the Foreign Sovereign Immunities Act.

10:27:09 3        But dealing with the issues here, as Mr. Barr stated,

10:27:17 4   "You don't just let your subsidiaries run amuck, that is a

10:27:21 5   difference here."  It's not the Disney model.  The way that the

10:27:28 6   Chinese corporations in this matter CNBM-G, CNBM, BNBM-G, BNBM,

10:27:37 7   Taishan prevented the subsidiaries from running amuck by

10:27:44 8   controlling them through boards, policies, financing, and daily

10:27:50 9   operations of the subsidiaries.

10:27:53 10       THE COURT:  They contest the daily operations, but they

10:27:56 11  say the other things like financing is not significant, not

10:28:01 12  sufficient.

10:28:02 13       MR. HERMAN:  Yes, I am aware of that, your Honor, but

10:28:05 14  does a Chairman Song who virtually is in control of CNBM-G, CNBM,

10:28:15 15  BNBM-G, and BNBM actually have to mine gypsum for that to be a

10:28:22 16  daily activity?  And actually, daily activities are not really

10:28:29 17  defined in the law.  There are a multitude of facts which indicate

10:28:36 18  control of daily activities.

10:28:39 19       Your Honor pointed out earlier MTD Exhibit 13, the CNBM

10:28:46 20  announcement of connected transaction.  Can I go to the first

10:28:50 21  slide, please.

10:28:51 22       Your Honor, the CNBM Group wanted to enhance its

10:29:00 23  competitiveness and consolidate its leading position in gypsum

10:29:07 24  board market so that it would participate more actively in daily

10:29:13 25  operations.  And this is on August 28th, 2006, at a time when

10:29:23  1    gypsum from Taishan was being manufactured, marketed, sold, and

10:29:32  2    delivered to the United States.

10:29:34  3         Let's go to the second evidence of control in operation.

10:29:41  4    The assets to be acquired was that BNBM gained long-term control.

10:29:50  5    Long-term control.  That's not our doc, that's not our statement,

10:29:55  6    it's their statement.  The consideration was borrowings from CNBM

10:30:00  7    Group.  Why?  Because they wanted to be involved more in daily

10:30:04  8    operations.  The condition of share transfer needed approvals of

10:30:12  9    BNBM and CNBM.

10:30:15 10         Let's go to the next.

10:30:18 11         The terms of the loan.  State owned company, TSOMAC

10:30:26 12    (VERBATIM) was involved in the loan that allowed CNBM to make this

10:30:32 13    transaction.  The collateral was state owned collateral.  And an

10:30:39 14    equity interest in Taishan.

10:30:41 15         Next slide.  The conditions of the loan agreement needed

10:30:49 16    approval of all directors and all shareholders.  The reasons for

10:30:54 17    entering into the loan agreement, CNBM Group, again, became the

10:30:59 18    largest board producer, enhanced the group's presence in the gypsum

10:31:04 19    board industry, and BNBM made the loan but "the Company" CNBM-G and

10:31:12 20    TSOAMC are the ones that decided to enter the loan.  So you've got

10:31:18 21    entities making loans, guaranteeing loans, but the decisions are

10:31:23 22    made at the top.

10:31:24 23         Now, I am not going to belabor this point anymore, but I

10:31:32 24    think it is responsive to the question that your Honor asked as to

10:31:36 25    whether there are daily operations and what are daily operations.

10:31:41   1   And when you control all of these various activities, I believe

10:31:46   2   that's where we are now.

10:31:48   3        I'd like to at this point indicate that we're not going

10:31:55   4   to argue *Daubert*. Your Honor has the briefs, it's your Honor's

10:32:01   5   decision to make. I will say this, I think their experts have no

10:32:06   6   methodology that makes sense to me. And if we look at one of the

10:32:13   7   arguments, this is the chart that was put up. If Walt Disney as a

10:32:21   8   corporation owned 60 percent of CNBM and CNBM owned 54 percent of

10:32:27   9   BNBM and BNBM owned 65 percent of Taishan and Taishan sent 4,000

10:32:35 10   lead-based Mickey Mouses to our children who then got lead

10:32:42 11   poisoning, that would be a comparison worthy of comparing Disney

10:32:47 12   with what we have here. And I believe that that entire comparison

10:32:53 13   attempting to show that Walt Disney and other entities in the U.S.

10:33:00 14   are the same as what we're faced with here is faulty.

10:33:09 15        Now, learned counsel also had indicated that he did not

10:33:14 16   see any evidence regarding BNBM-G. However, your Honor, if we look

10:33:24 17   at the slide under General Control, clearly this same Exhibit 13

10:33:44 18   shows that BNBM Material Group Company Limited and CNBM China

10:33:53 19   National Building Material, et cetera, et cetera, they all had to

10:33:55 20   give approval for the acquisition to take place. It's just not

10:33:58 21   correct to say that there's no evidence of BNBM-G involvement. And

10:34:04 22   there's plenty other evidence. I'd rather at this juncture get to

10:34:11 23   some of the law.

10:34:12 24        I want to say at the outset *Craig* was reversed but it was

10:34:17 25   reversed on other issues. *Craig* also states control of finances is

10:34:23  1    an issue, policy and business practices is an issue, and I don't

10:34:29  2    think that *Craig* really supports the defendants' arguments.

10:34:35  3          In addition, *Hollowell* at 217 F. 3d, fraud isn't required

10:34:40  4    in Louisiana to pierce a veil.  It's the totality of circumstances

10:34:47  5    under *Riggins* and under the other cases which control.  And

10:34:51  6    certainly the totality of circumstances here indicate that there is

10:34:58  7    an alter ego relationship.

10:34:59  8          THE COURT:  They take the position that the closest

10:35:01  9    you've come is showing potential.  And while they say they may have

10:35:10 10    potential control, there's no evidence of actual control.

10:35:16 11          MR. HERMAN:  Your Honor, I am familiar with the argument

10:35:19 12    they make, but I can't accept it because control, according to both

10:35:25 13    the Fifth and Fourth Circuit, is inferential.  It's sort of like

10:35:34 14    Robinson Crusoe is on the island, she's shipwrecked, he starts to

10:35:39 15    build a home, he thinks there's nobody else on the island, he sees

10:35:43 16    footprints in the sand and he says, oh, they're not mine, there

10:35:47 17    must be somebody else on the island.  And that's a concrete

10:35:50 18    example, I think, or a metaphor of inferential presence.

10:35:54 19          Now, the cases are legion that you don't need control at

10:36:00 20    the time of the event, it can be before the event, during the

10:36:04 21    event, or after the event.

10:36:14 22          Let's look at where we came from.  Your Honor, in 2014,

10:36:22 23    I'll use the Westlaw cite, 4809520 analyzed Virginia law, the unity

10:36:31 24    of interest, unfair advantage, Alabama injustice, inequitable

10:36:36 25    result, control inferred from the facts, that's the *Power* case at

10:36:44   1    263 Virginia; Mississippi at 472 F. 2d.  What is fair and

10:36:52   2    reasonable.  This is where the inspection was made in the U.S. of a

10:36:55   3    single helicopter platform.  And, your Honor also analyzed Florida

10:37:01   4    agency at 742 F. 3d in *Germano*, Court of Appeal, fair play,

10:37:08   5    substantial justice, stream of commerce -- we believe there's

10:37:13   6    stream of commerce plus here -- purposeful availment, there's no

10:37:17   7    question there was intent here.  Minimum contact, 753 F. 3d gross

10:37:24   8    imputation of contacts, imputation, manufacturers, subsidiary

10:37:32   9    agency under Florida law, public interest has to be looked to.  And

10:37:36  10    the public here is not just the public of 4,000 homeowners, it's of

10:37:42  11    an entire economy, global economy in which China through various

10:37:50  12    mechanisms control activities in the United States.

10:37:53  13        The *Eddie* case, which they cite of an Indian manufacturer

10:37:58  14    of a press had no contacts at all in the U.S., not directly or

10:38:03  15    indirectly.  They cite *Hargrave*, same thing.  Had to do with Texas

10:38:11  16    and Pennsylvania and an English alleged corporation and control.

10:38:19  17        *Jackson*, there was no manufacturing until even after the

10:38:22  18    object itself had caused an injury.

10:38:26  19        We don't see how those cases in any way support the

10:38:33  20    arguments that have been made, your Honor.

10:38:34  21        Now, I would like to go to the other -- just some

10:38:42  22    evidence that supports your Honor's opinions and the opinions of

10:38:48  23    the Fifth Circuit, because, your Honor, the facts haven't changed.

10:38:51  24    The facts have only gotten stronger since 2014.  The facts have

10:38:58  25    only gotten stronger since the Court of Appeal in the Fifth Circuit

| | |
|---|---|
| 10:39:02 | 1 |

10:39:02  1  ruled.  And the law itself is stronger.  And I might point out that

10:39:08  2  every circuit Court of Appeal in Louisiana has adopted the *Green*

10:39:12  3  factors.

10:39:13  4        Can I have the next slide, please.

10:39:18  5        This is Knauf Plasterboard's CNBM's public offering.  And

10:39:24  6  whose handling it?  Morgan Stanley, a U.S. outfit.  It's in early

10:39:31  7  2006, it's Exhibit MTD 38.

10:39:36  8        Now, again, this is during the time period that drywall

10:39:40  9  is being manufactured, sold, shipped to the United States by

10:39:45 10  Taishan.  And indeed, in 2006 the defendants are all put on notice

10:39:52 11  by Knauf through correspondence, et cetera, and their own documents

10:39:57 12  and reports reflect that they knew what was going on.  And despite

10:40:03 13  what learned counsel has argued, if that vote had been 11-0 the

10:40:09 14  other way, Taishan would have still been before your Honor.  The

10:40:14 15  fact that they say, well, it's of no note, certainly defies logic.

10:40:22 16        Why is this important?  Well, one of the reasons is is

10:40:33 17  that, and I may not pronounce this right and I apologize, Z-H-O-U,

10:40:43 18  the representative, corporate representative 30(b)(6) of CNBM Group

10:40:55 19  testifies about trips made to the U.S. - Los Angeles, San

10:41:02 20  Francisco, New York City, Washington, D.C., Atlanta, and other

10:41:08 21  cities.  That's 2005, they're preparing to sell stock.  They talk

10:41:18 22  about, this is CNBM 30(b)(6) representative, and we have trips in

10:41:31 23  2006 in connection with CNBM Company's global offering, Chairman

10:41:38 24  Song actually traveled to the U.S. in connection with CNBM's

10:41:42 25  offerings to American investors.  And he is the actual controller

10:41:49  1    through CNBM Group of all of the defendants.

10:41:53  2         So the fact that we have a global offering, that's

10:42:01  3    public, where the representatives of the defendants come to the

10:42:05  4    United States to sell American stock in that public company in

10:42:11  5    their own words, as we'll see, they have indicated that they

10:42:17  6    control, that they're the actual controllers, they're the

10:42:22  7    controllers of each of these entities.  This isn't a casual

10:42:29  8    control, it is a continuous control.

10:42:32  9         Now, put up, if you would, the next slide.  Thank you.

10:42:45 10         Now, Davis Construction Company is in Florida.  They're

10:42:48 11    in receipt of a letter from Mr. Perry Zhang dated April 24th, 2006.

10:42:56 12    This is, again, during the time frame of the two previous entity

10:43:04 13    documents, which I've shown your Honor on related transactions and

10:43:09 14    public offerings.  Let's see what is happening while that's going

10:43:15 15    on and which the defendants have attempted to divorce themselves

10:43:20 16    from.

10:43:21 17         Will you give me the next page.  "We have delivered

10:43:24 18    numerous truckloads to supply houses across the Southeast United

10:43:30 19    States."  This is Taishan drywall.

10:43:33 20         Next slide.  The contacts, at least at that point in

10:43:38 21    time, 450,000 boards and $1 million in cash.  And we want to become

10:43:47 22    your exclusive distributor in the USA and Caribbean.

10:43:54 23         Quote, next slide, "On another note, BNBM material is now

10:43:59 24    being distributed throughout the Southeastern United States and we

10:44:04 25    expect future shipments to be distributed along the Eastern

10:44:08  1    Seaboard."

10:44:10  2         Now --

10:44:11  3         THE COURT:  They take the position, though, that their

10:44:14  4    material wasn't defective, that this is a material that was not

10:44:18  5    sued upon.

10:44:20  6         MR. HERMAN:  Your Honor, I believe that DragonBoard is

10:44:25  7    the subject of a number of complaints.  Whether there's liability

10:44:31  8    there or not isn't before the court at this juncture.

10:44:35  9         But what did the witness mean by southeastern United

10:44:43 10    States?  Can I have the next slide.

10:44:48 11         Well, what he meant was Texas, Florida, Louisiana,

10:44:52 12    Mississippi, North Carolina, South Carolina, Georgia, and Virginia.

10:44:58 13    So there are certain contacts there.  But what's even more

10:45:02 14    important, when we read all of the cases, they talk about

10:45:06 15    purposeful -- excuse me, my lips -- my words got caught in my

10:45:13 16    lips -- purposeful targeting.  I use the word targeting.  The cases

10:45:21 17    use the word purposeful availment.

10:45:24 18         There's no question.  And really this isn't an

10:45:29 19    independent fact because BNBM controlled Taishan.  In fact, let's

10:45:38 20    assume that at the same time they controlled Taishan, which is a

10:45:43 21    given, they were then shipping to the same states that are affected

10:45:48 22    now by the defective drywall.  Even if it's not their own, if we

10:45:55 23    find alter ego, and we believe alter ego exists, then their

10:46:00 24    contacts, their activities of Taishan are imputed under the law

10:46:07 25    whether we're talking about Florida or any of these other states up

10:46:12  1      the line.

10:46:13  2            There's a lot of talk about *Green* factors.  Can we look

10:46:17  3      at the *Green* factors.  *Green* v. Champion, 577 So. 2d, 249 (1991).

10:46:28  4      And learned counsel attempted to say, or he did say, well, that's

10:46:33  5      not a Supreme Court case.  However it's been relied on by the Fifth

10:46:39  6      Circuit federal Court of Appeals, it's been relied on by your

10:46:43  7      Honor.  In fact, it's relied on by every Court of Appeal in every

10:46:50  8      circuit Court of Appeal in Louisiana.  In fact, *Green* has become

10:46:56  9      really a touchstone, to the extent that other jurisdictions use

10:47:02 10      these non-exclusive factors.  And I am going to get to the issue of

10:47:09 11      formality, which the defendants seem to rely on.  Well, we had

10:47:14 12      Articles of Incorporation and we had minutes and we filed papers

10:47:19 13      under Chinese law, and, therefore, alter ego can't apply.

10:47:23 14            I am going to get to that.  But if we look at the *Green*

10:47:27 15      factors, here there's a substantial identity of ownership, there

10:47:33 16      are common directors and officers, unified administrative control.

10:47:41 17      The officers and directors are not independent of each other

10:47:44 18      because each has a majority on the board, if we go up or we go

10:47:52 19      down.  Inadequate capitalization, I don't know.  I mean, if all of

10:47:58 20      your assets are tied up in loans and you're switching collateral

10:48:03 21      when there is collateral back and forth, how do you indicate that

10:48:08 22      there's adequate capitalization?

10:48:14 23            Incidentally, learned counsel indicated that this logo

10:48:26 24      business, they didn't use the logo.  But I think if we looked at

10:48:32 25      MTD Exhibit 111, we find an e-mail from Peng Weng Long and/or

10:48:39  1    pronounced Peng, to an advertising executive Mr. Xu, X-U, that has

10:48:47  2    an attachment with instructions to create a logo with the company

10:48:51  3    name, that is the Taishan name, to read China National Building

10:48:56  4    Material Group - Taishan Gypsum Company.  They all look alike and

10:49:04  5    they read alike.  And you can ignore evidence if you choose to, and

10:49:10  6    yet the evidence you ignore may be the evidence which causes the

10:49:16  7    greatest problem for you.

10:49:19  8              As we go down the 18 *Green* factors, none of which are

10:49:26  9    exclusive, we believe that we have cited facts and facts and facts

10:49:33 10    that support each one of these issues.  I did note in reading the

10:49:38 11    cases, if we look at 18, there's not only a question of excessive

10:49:43 12    fragmentation, but there also is a corresponding principle of

10:49:51 13    integration, meaning you have directors, directives, ways of doing

10:49:58 14    business in which each is integrated in some way or another.

10:50:08 15              Let's go to the next slide.  In *Rive v. Briggs of Cancun*,

10:50:25 16    the Fifth Circuit in applying -- which was a Middle District

10:50:28 17    Louisiana case, also applied the fact that under SBE theory and

10:50:36 18    also alter ego every Court of Appeal in Louisiana has adopted

10:50:41 19    *Green*.  It's a viable legal theory.  And when we look to the other

10:50:48 20    states, we find that if it's not alter ego, if it's not SBE, it's

10:50:55 21    agency.  And some authorities say, well, that's a higher degree of

10:51:03 22    proof.  However, when you look at the *Green* 18 elements, you find

10:51:09 23    that actually agency can go to the restatement of agency or any

10:51:16 24    other authority, the *Green* touchstones are important.

10:51:26 25              Now, learned counsel has made an argument that it has to

10:51:31  1    be actual control, not the capacity to control.  Would you put up

10:51:36  2    the next slide.

10:51:37  3           In *Flourine*, 380 F.3d 819 and 961 F. Supp. 969.  And even

10:51:55  4    in the part of the *Craig* case that was not reversed, it's clear

10:52:00  5    that courts in the Fifth Circuit look to any and all relevant

10:52:04  6    evidence of the capacity to exert control.  Capacity to exert

10:52:10  7    control.  Whether it was before, during, or after the time the acts

10:52:14  8    complained of took place.  And in this situation you have BNBM,

10:52:19  9    CNBM, CNBM-G, BNBM-G, all meeting after suits are filed and they're

10:52:27 10    notified and they're not taking any action to prevent Taishan from

10:52:33 11    leaving, they're approving.  And Taishan leaves twice.

10:52:38 12           So what is control?  Does it have to be when Louis Valez

10:52:49 13    (PHONETIC) installs the defective Taishan drywall in his home?  No.

10:52:54 14    It's the capacity control before, during, and after.  And there

10:52:59 15    certainly is plenty of evidence of control afterwards.

10:53:02 16           Next slide, please.

10:53:09 17           Again, post-tort activity and capacity to control.

10:53:16 18    Various cases, including *Bridas*, we looked at *Bridas*, one or two,

10:53:21 19    and we look at *Morgan* and other cases, quote, "Events that depict

10:53:25 20    the control of the parent over the subsidiary may be shown each

10:53:30 21    though they occurred before or after the transactions in question

10:53:36 22    because such actions may 'cast a light on the nature and extent of

10:53:42 23    control exercised at the time' of the transaction."

10:53:49 24           And so what are those?  Those are evidence of the

10:53:54 25    connected transaction, evidence of the CNBM public offering,

10:54:02  1    evidence of the actual activity of various officers and directors

10:54:10  2    of these various entities who are also involved in various aspects

10:54:17  3    of Taishan's life.

10:54:23  4         And I tried to find an analogy.  I know I'm accused of

10:54:28  5    rhetoric, but I sort of like rhetoric.  Aristotle did and he is a

10:54:34  6    lot smarter than I am.

10:54:36  7         But our lungs carry the oxygen by which we live to our

10:54:43  8    brain, to our organs.  On each side of those lungs is a phrenic

10:54:50  9    nerve.  That nerve controls whether we -- lungs act as a bellow.

10:54:57 10    No phrenic nerves you die.

10:55:00 11         Where do the nerves of Taishan reside?  They reside in

10:55:06 12    BNBM, CNBM, and ultimately in CNBM-G, which is why Chairman Song is

10:55:16 13    in control of every one of these entities.  I have no doubt that

10:55:24 14    the corporate, and I misstated before, but that the BNBM 30(b)(6)

10:55:34 15    deposition and the CNBM-G 30(b)(6) deposition and Mr. Chairman

10:55:42 16    Song's deposition all indicate that the phrenic nerves that operate

10:55:47 17    the oxygen for Taishan's lungs start at the top and move down.

10:55:54 18         Now, I want to go to some other law, and I should be

10:55:59 19    through in about three or four minutes, your Honor.

10:56:02 20         Let's go to the next slide.

10:56:05 21         "The alter ego test for attribution of contacts, personal

10:56:11 22    jurisdiction, is less stringent, less stringent than that for

10:56:15 23    liability."

10:56:16 24         Now, that's not just Fifth Circuit law in the *Stuart*

10:56:24 25    case.  We can't find a contradictory cite on burden of proof and

10:56:31  1   attribution of contacts.

10:56:37  2          Let's go to the next one.  Imputation of alter ego

10:56:41  3   liability is compatible with due process analysis of personal

10:56:45  4   jurisdiction.  So it's quite proper, as your Honor did twice, and

10:56:51  5   as the Fifth Circuit did twice, to talk about in terms of the facts

10:56:58  6   that involve Taishan and TAIHE and extending beyond that the

10:57:08  7   imputation of alter ego liability is compatible with due process.

10:57:14  8          What's the touchstone in every case?  They cite, we cite

10:57:19  9   in all of these opinions?  It's fundamental fairness.  And that's

10:57:25 10   the bottom question here, is it fundamentally fair for five Chinese

10:57:30 11   corporations who operate as a single entity to not be responsible,

10:57:38 12   not be responsible for 3,000 to 4,000 American homes since 2006 and

10:57:48 13   2007 and 2005 that have been deprived of a domicile that's healthy

10:57:56 14   due to their defective product.

10:57:58 15          Let's go to the next one.

10:58:02 16          The cases also speak about the difference between reality

10:58:08 17   and appearance.  And of all of the fundamental poisonous arrows

10:58:16 18   which Chinese entities have set forth to protect themselves from

10:58:23 19   any liability, it's the illusion that formal requisites under

10:58:35 20   Chinese law somehow clothe them with an impenetrable bulletproof

10:58:43 21   vest; that as long as you deal with formalities, you're safe.

10:58:48 22   Well, we need to deal not with appearance but reality.

10:58:57 23          Would you go to the next.  And I'm also reminded that

10:59:01 24   Justice Holmes also wrote extensively about why substance was more

10:59:10 25   valued than form.

10:59:14  1      In the *Offshore Tech Services* case, "The presumption of
10:59:18  2  corporate separateness enjoyed by entities must give way to clear
10:59:22  3  evidence demonstrating 'something beyond the mere existence of a
10:59:26  4  corporate relationship' between the two entities."
10:59:41  5      Can I go to the next slide.
10:59:47  6      "Based upon the Court's above findings of fact, the Court
10:59:51  7  concludes that Taishan, TTP, BNBM, BNBM Group, CNBM, and CNBM Group
10:59:57  8  constitute a single business enterprise for purposes of piercing
11:00:01  9  the corporate veil and holding each of these entities liable for
11:00:05 10  the conduct of their affiliated entities.  More specifically, the
11:00:13 11  Court concludes that Class Counsel satisfies the factors 1-8 and
11:00:20 12  10-18 of the *Green* eighteen-factor test."
11:00:25 13      Now, I know the defendants BNBM, BNBM Group, CNBM, CNBM
11:00:27 14  Group say this doesn't count.  This doesn't count.  But what does
11:00:31 15  count is the fact that factors 1 through 18 still apply here to
11:00:38 16  them; and they can try and run away from it, but what we get down
11:00:47 17  to is the last thing that I would like to address your Honor to
11:00:55 18  before my colleague and lead counsel Arnold Levin steps up.
11:01:02 19      Could I get the last slide.  What are the concepts
11:01:08 20  inherent in every single case?  The public interest - have to
11:01:16 21  measure whether the public has an interest in a company and those
11:01:25 22  that control it being responsible.
11:01:28 23      Due process.  Certainly been a lot of due process in this
11:01:32 24  case.  Your Honor protects everybody as your Honor does.
11:01:35 25      Injustice, was an injustice done?  Not fraud because

11:01:40 1   fraud's not dispositive, but was an injustice done.

11:01:46 2          What is fundamental fairness?  What is inter-dependence?

11:01:51 3   What is stream of commerce and even stream of commerce plus?  What

11:01:55 4   is purposeful availment?  And what are the defendants' real

11:02:03 5   defenses here?  You can read and read and read, and what comes

11:02:07 6   through are corporate formalities, we and our experts tell us that

11:02:15 7   were corporate formalities.

11:02:16 8          And secondly, in CNBM's brief, the PSC has given us a

11:02:25 9   "Dogs' breakfast of facts."  Nice piece of rhetoric.  Maybe.

11:02:32 10  Because where I practice and in the states I practice in, when we

11:02:41 11  talk about facts, this dog will hunt.

11:02:45 12         And lastly, your Honor, the defendants say we made up the

11:02:52 13  control issues, we don't have facts.  These are their public

11:02:56 14  documents in English that they disseminated around the world, that

11:03:00 15  they sent to Louisiana, that they sent to every single state

11:03:04 16  through their investors, American investors saying we're the

11:03:10 17  ultimate controller.  We are controlling shareholders, we're the

11:03:15 18  actual controller, we're the controlling entity.  Those are not PSC

11:03:21 19  terms.

11:03:25 20         In their annual reports of CNBM, in their periodic

11:03:29 21  interim reports, in the reports of BNBM and their interim reports,

11:03:36 22  everywhere you look these terms are their terms.  It is sort of

11:03:46 23  difficult to argue when someone writes, disseminates worldwide

11:03:52 24  "we're controlling everything," and then comes into a court when it

11:03:56 25  suits them and the defendants say, well, we made up the word

11:04:01  1    control.

11:04:02  2            Your Honor, I'll answer any question your Honor might

11:04:05  3    have.

11:04:05  4            THE COURT:  I don't have any.  Thank you very much.

11:04:07  5            MR. HERMAN:  Thank you, your Honor.

11:04:20  6            MR. LEVIN:  Well, it's still morning, your Honor.  Good

11:04:24  7    morning, sir.

11:04:24  8            THE COURT:  Good morning.

11:04:25  9            MR. LEVIN:  Mr. Herman really fully and adequately

11:04:30 10    covered the waterfront, and I'll be very specific with the areas

11:04:34 11    that I am going to speak to.  In many ways I feel like Admiral

11:04:43 12    James Stockdale, that was for those that can remember, that was --

11:04:49 13    and it's hard to remember, he said very little, but that was Ross

11:04:54 14    Perot's running mate.  And he said at the debate, "Why am I here?"

11:05:04 15            Let me tell you why I am here.  I am here to discuss

11:05:15 16    three topics:  The interplay of the Chinese law and SASAC with

11:05:24 17    regard to the facts and law here; the DragonBoard coming in to

11:05:36 18    Florida; and the personal jurisdiction in Florida with regard to

11:05:44 19    DragonBoard, which they spent a lot of time saying it's safe.  It's

11:05:51 20    not safe, there are 60 people that have come forward with

11:05:55 21    DragonBoard claims, they're in the Omni complaints, and they have

11:05:59 22    an allegation.

11:06:01 23            And we have not moved for class action certification on

11:06:05 24    DragonBoard because, like with Taishan, you had to determine

11:06:09 25    personal jurisdiction first.  They're there.  And in the

11:06:13  1    marketplace there's a lot more plaintiffs with DragonBoard.  We

11:06:19  2    know that $10 million worth of the product came in to the country.

11:06:24  3    We also know that one entrepreneur is stuck with a warehouse full

11:06:31  4    of it.  He wants to sell it.  Of course he is going to say it's

11:06:34  5    safe.  You can't sell a defective product.

11:06:42  6         And also Mr. Barr overlooked one important factor.  His

11:06:50  7    clients have been defaulted.  He cannot contest the liability

11:06:58  8    situation with DragonBoard unless for some reason, which he hasn't

11:07:03  9    done, he moves to vacate the default and we have a history that

11:07:09  10   that vacation will be false as to Taishan.  Where I come from they

11:07:18  11   don't say the dog doesn't hunt, we don't hunt.  But, Russ, that dog

11:07:27  12   won't hunt.

11:07:28  13        Now, I also speak to the service issue, but I believe

11:07:35  14   that I will just hand you a chart, which is not evidence, your

11:07:40  15   Honor, but just goes complaint for complaint for complaint and

11:07:46  16   shows that we adequately served.

11:07:49  17        I am not going to go into all of the facts of the *Green*

11:07:54  18   case because we've given your Honor enough, and enough is enough.

11:08:00  19   We gave you in our response, reply to the *Daubert* motions, we

11:08:09  20   provided you with charts of the *Green* factors, both as to CNBM and

11:08:16  21   BNBM.

11:08:17  22        Before I get started, your Honor said something that was

11:08:25  23   very telling, especially to the Plaintiff Steering Committee and to

11:08:30  24   the clients that we represent.  It dealt with how we got here,

11:08:37  25   dealt with basically with control; not only the capacity to

11:08:42  1   control, but the actual exercise of control.  Because a lot of

11:08:52  2   complaints were filed and a lot of shenanigans occurred with not

11:08:57  3   accepting them, address being on the Website but they had moved but

11:09:05  4   it's still on the Website, that's no good.  And they made and they

11:09:10  5   had American lawyers at the time, this was a judgment of how to

11:09:16  6   handle this matter and how to control this matter, and they decided

11:09:24  7   to ignore us.

11:09:28  8           Then CNBM and BNBM represented at the time that they knew

11:09:35  9   American law, there was no question about that; they said they

11:09:38 10   didn't, but the American lawyers certainly knew American law and

11:09:42 11   their Chinese lawyers knew American law.  And they certainly had

11:09:47 12   American lawyers in Beijing.  In 2007 our expert in Taishan, we

11:09:53 13   didn't know it at the time, her name was Bing, she worked for

11:09:58 14   Orrick in Shanghai and in Palo Alto.

11:10:04 15           They decided to stick Taishan up there and see if they

11:10:13 16   could beat jurisdiction.  They didn't come in, CNBM and BNBM, they

11:10:17 17   decided that they were going to be the one company that was going

11:10:24 18   to put their toes into the water of United States jurisprudence.

11:10:30 19   And they did.  CNBM and BNBM nowhere.  And your Honor ruled and the

11:10:38 20   Fifth Circuit ruled twice.  And what did they do?  They decided,

11:10:45 21   all of them, 11 zip with CNBM Group for Taishan to get out of the

11:10:52 22   United States.

11:10:54 23           Then there was the contempt.  Thank you, your Honor,

11:10:58 24   because that contempt brought them all back in, and now they're

11:11:05 25   contesting jurisdiction.  Six years have gone by.  Six years.

11:11:11  1    Bankruptcies, foreclosures, and misery.  And that's the situation

11:11:19  2    we're faced with and we believe, or at least I do, that even

11:11:28  3    paranoids have enemies, and I don't trust them to stay.  I don't

11:11:32  4    trust them at all to stay, and I want to keep them all here because

11:11:38  5    they are a single business enterprise.  And that in itself shows

11:11:48  6    the reality of control

11:12:02  7            Now I'll move on.  They conducted a study and they came

11:12:14  8    up with two experts:  Deal and Professor Gordon, who is two doors

11:12:20  9    away from our Professor Milhaupt at Columbia.  Milhaupt is an

11:12:28 10    expert on China, Chinese law.  And they're going to look at

11:12:39 11    American corporations, 1,500 of them, Walt Disney, Federal Express,

11:12:43 12    Pixar.  You can't overlook the fact that the elephant in the room

11:12:50 13    is an -- they were American corporations, not Chinese corporations.

11:12:57 14    And there is a big difference and the law in China isn't so clear

11:13:06 15    when it comes to piercing corporate veils, going up to a

11:13:14 16    state-owned enterprise or SASAC, it's very protective of Chinese

11:13:20 17    money not leaving China, especially for a bunch of litigants and

11:13:25 18    4,000 of them in Louisiana, Florida, Virginia, and elsewhere.

11:13:33 19            And you can't overlook the fact, as much as in a

11:13:39 20    deposition the Communist Party Committee in every corporation was a

11:13:46 21    social club.  It wasn't.

11:13:53 22            May I have the first slide.  China National Building

11:13:58 23    Materials Group Corporation, Articles of Association.  Mr. Herman

11:14:04 24    didn't do that, I didn't do that, they did it.  Article 8:  "The

11:14:08 25    Company shall establish an organization of the Communist Party of

11:14:12  1    China ("CPC") to carry out activities of the CPC pursuant to the

11:14:18  2    Constitution of the Communist Party of China.  The organization of

11:14:21  3    the CPC shall play a political core role in decision-making on

11:14:26  4    major issues of the Company.  The Company shall provide necessary

11:14:30  5    conditions for the activities of organization of the CPC."

11:14:37  6            Next.

11:14:39  7            Article 19.  "The Board of Directors shall perform the

11:14:48  8    following obligations:  (1) Implementing the decisions of the

11:14:55  9    SASAC, being responsible for the capital contributor and protecting

11:14:57 10    the interests of the company; requiring (VERBATIM) the annual work

11:15:02 11    to the SASAC."  There's SASAC up top, controlling.  Not thinking

11:15:08 12    about control, actually controlling the single business enterprise.

11:15:16 13    And we have found out in the contempt proceedings that this single

11:15:20 14    business enterprise has its tentacles all over the United States

11:15:23 15    with an alphabet of companies, which are BNBM, CNBM, CNBMI, this,

11:15:30 16    that, and that's being controlled by SASAC.

11:15:33 17            Next slide.

11:15:38 18            China National Building Materials Group corporation

11:15:43 19    administrative measures for appointing representatives of capital

11:15:47 20    contributors.  Article 15.  "When the enterprise to which the

11:15:51 21    representative is assigned is involved in any of the following

11:15:55 22    significant decisions, the representative shall request for

11:15:59 23    instructions and give a written report to the group corporation

11:16:04 24    beforehand.  The decision can only be implemented after the group

11:16:09 25    corporation gives a reply."

11:16:11  1          I was thinking about this and I was thinking of a PFC in

11:16:19  2     a foxhole.  That's a private first class.  And he had a squad

11:16:25  3     leader who is a buck sergeant.  Not in the foxhole.  And a platoon

11:16:33  4     leader, a lieutenant, and a captain who had the company, and the

11:16:39  5     major who had the battle group, and a light colonel who had a

11:16:44  6     battalion, and a full bird that was a staff officer, and it went

11:16:53  7     all the way up to a general officer of a division, the core group

11:16:59  8     and the Army itself with three stars.

11:17:02  9          Does anybody think that that three star general officer

11:17:07 10     had to be in the foxhole with that PFC to control what was

11:17:12 11     happening there?  This is a military operation the way this

11:17:16 12     corporation -- the way the corporate law in China is set up.

11:17:20 13          Next slide.

11:17:22 14          This is from the State-owned Assets Supervision and

11:17:33 15     Administration Commission of the state counsel.  That's a lot more

11:17:38 16     telling than just calling it SASAC.  And what's it say?  "SASAC

11:17:44 17     appoints and removes the top executives of the supervised

11:17:49 18     enterprises, and evaluates their performance through legal

11:17:53 19     procedures and either grants rewards or inflicts punishment based

11:17:58 20     on their performances; establishes corporate executives selection

11:18:04 21     system in accordance with the requirement of the socialist market

11:18:09 22     economy system and modern enterprise system, and improves

11:18:14 23     incentives and restraints system for corporate management."

11:18:31 24          Now, we produced Professor Curtis Milhaupt not to tell

11:18:35 25     your Honor on how to rule on the *Green* factors.  He was not charged

11:18:39  1    to do that.  In fact, in his deposition he said that's for the

11:18:44  2    judge to do.  He was there to explain Chinese corporate law, and,

11:18:52  3    you know, some of us have testified here today and a little

11:18:56  4    testimony from me as counsel.  I've always thought that an Article

11:19:02  5    III judge, and I don't know how you think about it, your Honor, but

11:19:08  6    it was pretty offensive to be told what the law is when you've been

11:19:12  7    sitting on the bench for as long as some of you have and for the

11:19:19  8    time period that I've observed Article III judges to bring in a

11:19:23  9    professor that's never tried a case, never made a ruling, and he

11:19:27 10    knows everything about it and that was your job.  And Milhaupt said

11:19:34 11    that.  That was not his job.  And he's really well-qualified.  In

11:19:44 12    fact, in his text their other expert Clarke appears in a book as

11:19:52 13    Milhaupt having approved one of his articles.

11:19:55 14             But in any event, next slide.

11:19:59 15             Thirty-nine.  This is Milhaupt.  "Accordingly, in

11:20:04 16    assessing whether the CNBM Business Group entities named as

11:20:08 17    defendants in this litigation should be considered a single

11:20:11 18    business entity, it would be a mistake, as the scholarship cited in

11:20:17 19    paragraphs 15-17 *supra* suggests," that we don't have, "to look only

11:20:24 20    at those outward aspects of CNBM Business Group's corporate

11:20:28 21    attributes that are familiar to U.S. legal practitioners, on the

11:20:33 22    assumption that those attributes convey a complete picture of the

11:20:37 23    CNBM Business Group's actual governance practices and intra-group

11:20:44 24    relations.  The unique, non-corporate features of Chinese SOE

11:20:52 25    governance must be considered as well.  Considering these features,

11:20:56   1    there is evidence in the record to support a finding that CNBM

11:20:59   2    Business Group is a single business entity."  And that they are.

11:21:05   3            Now, the defendants have produced Donald C. Clarke as

11:21:14   4    their expert.  We have a motion pending to strike his second

11:21:22   5    affidavit, which was delivered on a Friday night, six days before

11:21:27   6    this hearing.  Your Honor will deal with that.  There's no sense in

11:21:31   7    dealing with it now.  Just like our *Daubert* motions, this is a

11:21:36   8    bench trial of sorts.

11:21:40   9            But let's see what Donald C. Clarke has to say.  Next.

11:21:47   10           "Yet the reality of corporate governance practices in

11:21:55   11   China remains very different from what appears in the statute

11:21:59   12   books, and indeed is so opaque that it is difficult to measure

11:22:03   13   reliably where it is, let alone to know in what direction it is

11:22:08   14   moving."

11:22:12   15           Now, this didn't come from the affidavits that were

11:22:14   16   submitted from the report, this came from his article, *Nothing But*

11:22:20   17   *Wind*.  *The Past and Future of Comparative Corporate Governance*, and

11:22:26   18   it's published at 59 Am J. Comp. L. 75-110.

11:22:38   19           Next.

11:22:40   20           Now he wrote, not in the affidavits that he provided to

11:22:45   21   this Court, *Regulating the Visible Hand*?  *The Institutional*

11:22:50   22   *Implications of Chinese State Capitalism*.  "China's insistence on

11:22:59   23   maintaining a strong state sector combined with the reform

11:23:02   24   imperative of having a single set of principles for corporate law

11:23:06   25   has meant that the logic of the state sector has infected the set

11:23:11 1    of rules applicable to the private sector."

11:23:16 2          And then he puts in red, this is communism.  "This means

11:23:22 3    that it must retain its ability to influence even firms in which it

11:23:26 4    is a minority shareholder, and that has consequences for corporate

11:23:32 5    law as it governs firms with state investment."

11:23:42 6          Next -- let's just stay here temporarily.  We looked for

11:23:55 7    decisional law of China, and quite frankly, we didn't find case

11:24:03 8    books, we didn't find West, we didn't find any of the textbooks

11:24:10 9    that I've learned to use in 50 something years.  I wish my office

11:24:17 10   had used Shepard's and then you wouldn't have had -- you would have

11:24:21 11   said with regard to the late asbestos case reversed on other

11:24:29 12   grounds, but it didn't.  And I apologize to the Court and to

11:24:34 13   Counsel for that.

11:24:35 14         But you find decisional law in China by looking at law

11:24:43 15   reviews.  And no wonder, no wonder you can't find the piercing of

11:24:51 16   the corporate veil of SASAC or CNBM-G, which at least some in this

11:25:01 17   courtroom believe to be an SOE.  They're not going to roll against

11:25:09 18   themselves when they control everything.

11:25:19 19         Now, moving on to something that's very important, you

11:25:24 20   know, it's not as sexy as these slides.  But DragonBoard in

11:25:33 21   Florida.  You would think, your Honor, that your decision with

11:25:39 22   regard to Taishan product, two of the Fifth Circuit's decisions

11:25:46 23   with regard to Taishan product, didn't exist when the argument was

11:25:53 24   made with regard to BNBM's product in Florida, brought there by

11:26:03 25   BNBM through their agent BNBM Group.  But unfortunately for BNBM,

11:26:12  1   we do have decisional law, and in our reply brief on the *Daubert*

11:26:26  2   motion we submitted to the Court a chart, and I'll submit it one

11:26:31  3   more time, comparing your ruling in Taishan with the BNBM's

11:26:44  4   footprint in Florida.  May I approach your clerk?

11:26:48  5           THE COURT:  Yes.

11:26:57  6           MR. LEVIN:  It's there and I am not going to belabor too

11:27:00  7   much of the point.

11:27:01  8           I'd also like to submit a chart that is BNBM's minimum

11:27:12  9   contacts in Florida and the United States.  And what we've done is

11:27:18 10   we've gone through the factors on minimum contacts and show how

11:27:25 11   pervasive the factors were in Florida with regard to bringing the

11:27:33 12   DragonBoard in.  It's almost like reading the transcript that we

11:27:42 13   dealt with before your Honor in Taishan.  I mean, they had

11:27:48 14   distributors, they brought people to China, they came to the United

11:27:52 15   States, they incorporated various corporations in the United

11:27:57 16   States, and on and on.  They had their trademark registered on

11:28:04 17   August 15th of this year; it's no longer registered.  They created

11:28:08 18   a company BNBM of America, one of the directors in the Articles of

11:28:17 19   Incorporation is Chairman Song, we heard a lot about Chairman Song,

11:28:21 20   and on and on and on.

11:28:23 21           And, your Honor, I think to argue, it's in the brief, to

11:28:33 22   argue the minimum contacts under the Florida long-arm statute, it's

11:28:39 23   clear, it's only Florida.  Although the product did get to the

11:28:45 24   southeastern part of the United States and that was targeted as

11:28:51 25   Mr. Herman said, the footprint is in Florida.

11:28:57 1        The law hasn't changed since the Taishan situation.  I
11:29:06 2   mean, we're still dealing with Asahi, we're still dealing with
11:29:12 3   *McIntyre*, we're still dealing with Ainsworth, we're still dealing
11:29:18 4   with the law of Fifth Circuit with regard to the federal issues;
11:29:21 5   and if we have to have Eleventh Circuit law, which is the opinion
11:29:28 6   of Justice O'Connor and Kennedy, we meet those tests, there's no
11:29:35 7   question about it.  It's in the briefs, it's over and over and over
11:29:42 8   again, and I think we've covered it adequately.  There's no
11:29:46 9   question about it.
11:29:47 10       In the Fifth Circuit we have a lot of cases that we've
11:29:56 11  dealt with that show when cigarette lighters are targeted, I think
11:30:03 12  that's *Oswald* for the United States and they end up in Louisiana,
11:30:07 13  there's minimum contacts in Louisiana.  You have the *Bean* case,
11:30:11 14  they're all in the brief.
11:30:15 15       But the last thing that I want to do, because I think the
11:30:18 16  charts helped me shorten my argument, which probably everybody is
11:30:23 17  happy about.  I want to talk a little bit about the service of
11:30:35 18  process issue because it wasn't mentioned in their argument, but I
11:30:40 19  want to briefly touch on it.  And I have here -- well, I don't have
11:30:49 20  a copy of my chart, I probably will provide it to the court
11:30:53 21  afterwards, showing the issues raised in service.  But they are
11:31:02 22  unbelievable.
11:31:03 23       May I have the next slide, please.
11:31:07 24       They have challenged everything.  They challenged that
11:31:12 25  we -- CNBMIT should be CNBMI, I think, and yet at the bottom of the

11:31:33  1   page they made the same mistake.  They can't get the letters

11:31:39  2   straight either.  They challenged where we served the complaint.

11:31:44  3   We got it off the internet.  They said we moved.  We said, how

11:31:50  4   would we know you moved?  You were defaulted and you were in China.

11:31:56  5         They challenged that BNBM served BNBM-G.  But then the

11:32:05  6   Chinese authority said they translated it wrong.  They couldn't

11:32:10  7   even get it straight.  Even our process server couldn't get it

11:32:15  8   straight.  We couldn't get these complaints to China, they didn't

11:32:19  9   want them to see the light of day in China.  We had to come to the

11:32:23 10   Court and ask you for an extension, and you gave it to us because

11:32:28 11   these complaints were piling up in China and China didn't know what

11:32:34 12   to do with them.

11:32:43 13         You know, this would be a Laurel & Hardy situation, but

11:32:49 14   it's real.  We finally -- your Honor gave us the ability to serve

11:32:57 15   counsel.  Whatever they're doing, they're here, they've been

11:33:03 16   served, and they're partaking in this litigation.

11:33:13 17         That's basically -- I think Mr. Herman and I have

11:33:15 18   concluded everything that we want to say, but the paper that we

11:33:18 19   have given you, your Honor, is really complete.

11:33:22 20         THE COURT:  All right.  Okay.

11:33:23 21         MR. HERMAN:  May it please the court.  I don't have

11:33:25 22   further argument, but I did forget to thank Arnold Levin, Fred

11:33:31 23   Longer, Sandra Duggan, Lenny Davis, Madelyn Breedlove, Regina

11:33:39 24   Valenti, Anthony Irpino, Pearl Robertson, Bruce Steckler,

11:33:45 25   Mr. Meunier, Ms. Sternlieb, and Scott George for all of the work

81

| | |
|---|---|
| 11:33:53 | 1 |

that they put into the jurisdiction issues on behalf of the PSC,

and I did want to state that on the record.

        THE COURT:  Let me hear from the Attorney General.

        MR. BLACK:  Good morning, your Honor.  I think it's still

morning.  David Black for Perkins Coie for the State of Louisiana

Attorney General.  I will be very brief.

        And perhaps just to address, I had three issues to

address, let's do it in the order in which it follows up on what

the PSC has just said.  There's been a motion that relates to the

service of process of the Attorney General's petition.  I think

Mr. Levin has addressed it all.  It was served per your alternative

service order, which was dated December 24 of 2014.  And it's the

beginning of the service predated their entry into the case.

Ultimately in about September there surfaced a document indicating

that there was counsel dating all the way back to 2010 representing

these parties.  So in the interest of being careful, we also

provided service on those counsel, as well as the present counsel.

        And I think the arguments made are just collateral

attacks on the alternative service order.

        With respect to the petition, and for some reason the

BNBM has chosen to attack the Attorney General's petition, has not

attacked other petitions in the case.  The Attorney General's

petition has not been amended, nor has any other petition at issue

in this case since the events of the last 12 months or as I recall

somebody described the six months of discovery that's occurred.

11:36:02  1    Certainly there are many facts that have come to light in the past

11:36:06  2    several months.  Your office, I'm sure, is a testament to that with

11:36:11  3    the volumes of documents and the materials that have been provided.

11:36:14  4         Based on your past orders and based upon the settlement

11:36:20  5    and the law here, you can take judicial notice of things you found

11:36:24  6    and things that you do find concerning facts here and use that to

11:36:31  7    supplement the pleadings in a motion to dismiss context, and we

11:36:35  8    would ask that to occur.

11:36:36  9         If for some reason you believe there's something where you

11:36:41 10    think our petition should be more fulsome, we would ask the Court

11:36:46 11    for the right to amend the petition in light of the facts that have

11:36:51 12    occurred in the last several months, concerning which there has

11:36:56 13    been much discovery.

11:36:57 14         I might add parenthetically that the Attorney General's

11:37:02 15    role with respect to discovery has been somewhat limited.  You

11:37:06 16    quite, I think, properly held in May of 2015 after the folks here

11:37:17 17    have entered the litigation that because the issues at that time

11:37:21 18    that were being discussed related to the class action damages and

11:37:27 19    related to the contempt order, neither of which the Attorney

11:37:31 20    General is a part of, that the Attorney General should participate,

11:37:35 21    could participate but couldn't ask questions without your prior

11:37:39 22    consent, and also that we should get copies of documents.  We

11:37:43 23    haven't always gotten the copies expeditiously, we got copies last

11:37:48 24    Friday of some documents from BNBM, I guess, and didn't realize

11:37:52 25    there had been some earlier productions that we haven't received.

11:37:56 1         But be that as it may, and there is still outstanding

11:37:59 2    discovery with respect to, I guess, the Taishan documents that are

11:38:01 3    the subject of the Court's January 8 order, so we would ask the

11:38:05 4    Court, if there is any question concerning our petition, that we be

11:38:09 5    allowed to amend in light of that discovery and any other

11:38:12 6    discovery.

11:38:12 7         Then the last point I was going to make, and this relates

11:38:16 8    to something that, again, appears to have occurred in each of these

11:38:22 9    hearings and occurred from both counsel from BNBM and CNBM.  And

11:38:28 10   that's this claim that the plaintiffs haven't shown that in the

11:38:31 11   2005, 2006 -- 2004, five, six, seven time frame that there was any

11:38:37 12   activity by the CN Business Group in urging, acting as one, urging

11:38:44 13   the sale of drywall to the U.S.  And I think in responding to that,

11:38:49 14   I think inferences from evidence out there should also be

11:38:51 15   considered.

11:38:52 16        And you'll recall, and if I may approach, in last

11:38:56 17   argument, the foreign sovereign immunity argument we introduced a

11:39:03 18   chart.  And if I may approach, your Honor.  That chart relates

11:39:16 19   to -- Mr. Allely presented this chart when he appeared before you

11:39:39 20   in December, but the facts relating to it hold true with respect to

11:39:43 21   the allegations made today, that there is no evidence of any

11:39:47 22   involvement of this business group in the sale of products, the

11:39:52 23   defending products here to the U.S.

11:39:56 24        As you recall, and I'll just very briefly go through this

11:40:00 25   and refer you back to the transcript of the Foreign Sovereign

11:40:03  1    Immunities Act of broader treatment of it all.  But CNBM Group

11:40:08  2    retained Morgan Stanley before April 30th of 2004 based on the

11:40:12  3    testimony of Mr. Keyes, which is also in the record here.  And that

11:40:16  4    they incorporated -- for the purpose of basically having CNBM

11:40:21  5    Company do an IPO and obtain moneys from the U.S.

11:40:29  6    They incorporated CNBM in 2005, and the document that I think

11:40:37  7    Mr. Herman showed you, which is MTD Exhibit 38, is that global

11:40:44  8    offering memorandum that was developed by Morgan Stanley and

11:40:51  9    BNBM -- CNBM Group and CNBM to basically sell the shares on the

11:40:58 10    market, including to the United States.  In that group, and you'll

11:41:02 11    recall from looking at that I'm sure that offering circular many

11:41:08 12    times, there is reference to the fact that they owned Taishan and

11:41:14 13    BNBM and that Taishan and BNBM have UL certifications and that they

11:41:19 14    are looking to export products to a number of countries, including

11:41:24 15    the United States.  Chinese drywall products.

11:41:30 16            In fact, that occurred, and that occurred it seems in

11:41:35 17    part as a result of these, of the storms that came to Louisiana and

11:41:40 18    the dates of those storms are set forth in the chart.  But the

11:41:43 19    point is that provided the opportunity, and the motive for this

11:41:46 20    whole thing was set forth in Chairman Song's testimony, which has

11:41:50 21    been referred to, MTD 36, where he testified that they wanted to

11:41:56 22    increase the market share and the branding for BNBM and TAIHE and

11:42:01 23    that they wanted to buildup a good image in the capital markets so

11:42:05 24    that they could sell their shares.  And how do you do that?  Well,

11:42:11 25    you make more sales.  And where do you sell it?  You sell it where

11:42:17  1   there's an opportunity to sell it.  Just so happened that there was

11:42:20  2   an opportunity presented by the hurricanes in Louisiana and

11:42:23  3   elsewhere, and it seems that there was quite a bit of drywall that

11:42:32  4   was sold in the period right around that time.

11:42:34  5           And why is that significant?  Well, the result that they

11:42:43  6   were seeking, the CNBM shares to be sold closed on March 23rd of

11:42:51  7   2006, and it doesn't take a lot of inference to come to the

11:43:01  8   conclusion that the whole process was a connected transaction.  And

11:43:07  9   what I think Professor Milhaupt did in terms of his scholarship in

11:43:12  10  the case, in terms of his affidavit in the case that has been

11:43:15  11  discussed by the PSC, is kind of tied it together, tied it together

11:43:19  12  in the sense that this whole process is one enterprise and that the

11:43:23  13  enterprise engaged in transactions for a purpose that at least a

11:43:27  14  leader of the enterprise felt was important, and that was to market

11:43:32  15  the shares, and did so with a goal of marketing product in the

11:43:36  16  United States and indeed they did.

11:43:38  17          And it's that product that we're here in this court to

11:43:41  18  discuss.  It's not coincidence, it's not a temporal association,

11:43:45  19  it's reality.  And therefore, the arguments of the PSC has made are

11:43:51  20  strengthened by those facts.  I appreciate it.  Thank you

11:43:55  21          THE COURT:  All right.  Thank you very much.  Let me hear

11:43:59  22  rebuttal.

11:44:10  23          MR. BARR:  Judge, I know it's late, which is too bad

11:44:13  24  because I actually have a lot to say but I won't, so I'll try to

11:44:17  25  limit this just to a few key points.

11:44:20   1          First of all, with respect to the Louisiana AG action, he

11:44:24   2   didn't say anything, even after all of this discovery and all of

11:44:27   3   this time, to indicate that any sales were made by my clients into

11:44:32   4   Louisiana.  That standing alone warrants dismissal of that case.

11:44:36   5          Mr. Levin provided the court with a number of charts,

11:44:40   6   most of which I think we saw for the first time Monday night.

11:44:43   7   We're going to want to put in a response, we have a response with

11:44:47   8   respect to one of those we'll hand up after the argument.

11:44:50   9          THE COURT:  That's fine.

11:44:50 10          MR. LEVIN:  We have no objection, your Honor.

11:44:52 11          MR. BARR:  But, your Honor, he was speaking very quickly

11:44:56 12   but there were a lot of things that were said that were untrue.

11:44:59 13   First and foremost with respect to Florida, no default was entered

11:45:03 14   against BNBM, PLC or BNBM Group as per the Court's decision, the

11:45:07 15   charts they have put in; so that is all fair game, there is no

11:45:10 16   default there.

11:45:11 17          They also had absolutely no response with respect to

11:45:15 18   the -- the fact that there were no sales with respect to either

11:45:16 19   Virginia or Louisiana.  Again, that stands unchallenged in the

11:45:20 20   record.

11:45:20 21          You also did not hear one thing from either Mr. Herman or

11:45:24 22   Mr. Levin challenging at all the issues and terms or lack of issues

11:45:29 23   with respect to the quality of the BNBM dragon drywall, that is

11:45:35 24   unchallenged in the record.  And again, for jurisdiction, you have

11:45:37 25   to show that someone was injured arising out of certain conduct.

11:45:41  1    That linkage doesn't exist, so, therefore, there's no jurisdiction.

11:45:45  2         Finally, your Honor, with respect to Florida, and this is

11:45:48  3    the last thing I am going to say about that, it's a far cry from

11:45:52  4    saying that 66 people at least put in a profile form that might

11:45:57  5    indicate with respect to those 66 people there's some claim they

11:46:00  6    may be able to make, although for all of the reason we've said

11:46:04  7    after this length of discovery they have to show that by a

11:46:07  8    preponderance of the evidence and have failed to do that.

11:46:09  9         Even putting that aside, that is a far cry from saying

11:46:12  10   that there is jurisdiction in this court over BNBM, PLC and BNBM

11:46:17  11   Group with respect to all of the Taishan sales on alter ego basis.

11:46:21  12        So I want to focus just on my last sort of minute here

11:46:24  13   just on alter ego.  Mr. Herman noted that there is a difference

11:46:27  14   between imputing jurisdictional contacts versus imputing liability.

11:46:32  15   That may be true, but he quoted *Stuart v. Spademan*, which we had

11:46:38  16   also quoted before.  They must show, they don't have to show both a

11:46:42  17   shell corporation and fraud, but they have to show either a shell

11:46:45  18   corporation or fraud.  And Judge, for all of the reasons that we

11:46:50  19   enunciated before, they don't even come close to respect to doing

11:46:53  20   that.

11:46:54  21        It is also, obviously, a weighted burden that they face

11:46:57  22   here, and when your Honor posed the question to Mr. Herman, he

11:47:02  23   started to talk about inferred control.  Your Honor, at this point

11:47:05  24   in the proceedings after the length of discovery that we had, we

11:47:09  25   shouldn't be talking about inferred control.  They need to show, if

11:47:12  1    they could, and they can't, that there was that level of control in

11:47:17  2    2005 and 2006 when those sales were being made.

11:47:20  3          They also quoted the *Freudensprung* case, if I am

11:47:24  4    pronouncing that correctly.  And they contrasted -- it was first a

11:47:26  5    conversation about poisonous arrows coming from China.  Your Honor,

11:47:31  6    respectfully, I am offended by the level of xenophobia that's been

11:47:33  7    shown in this courtroom with respect to those issues.  I don't want

11:47:38  8    to say anymore than that, but you know there are state-owned

11:47:39  9    enterprise in France, in Germany, in the United States.  Amtrak is

11:47:41 10    a state-owned enterprise in the United States.  You would never

11:47:45 11    hear the notion that just because you have a state-owned enterprise

11:47:49 12    that the government may be an ultimate shareholder that, therefore,

11:47:54 13    that is a justification to pierce the corporate veil all the way

11:47:58 14    up.

11:47:58 15          Indeed, if that were the case, your Honor, every single

11:47:59 16    time any court in the United States had a Chinese defendant in

11:48:03 17    front of it that might be a subsidiary of a state-owned enterprise,

11:48:07 18    automatically you would be piercing the corporate veil all the way

11:48:11 19    to the top.  That, of course, is not the law.  And the reason that

11:48:14 20    is not the law is because you have to show evidence.

11:48:15 21          And, your Honor, I think Mr. Herman pointed out something

11:48:19 22    or other had to give way to clear evidence.  Your Honor, nothing's

11:48:24 23    given way to clear evidence here of that level of control.

11:48:27 24    Respectfully we ask that we be dismissed from the actions at this

11:48:30 25    time.  Thank you.

| | | |
|---|---|---|
| 11:48:31 | 1 | THE COURT:  Thank you. |
| 11:48:34 | 2 | MR. STENGEL:  Your Honor, Jim Stengel again.  Turning |
| 11:48:48 | 3 | first to the AG's argument relating to the public offering.  I've |
| 11:48:52 | 4 | seen fewer starker examples of the fallacy of post hoc, ergo |
| 11:48:58 | 5 | propter hoc.  There is a coincidence in time of two events, there |
| 11:49:02 | 6 | is no relationship, there was an offing on the Hong Kong Exchange |
| 11:49:06 | 7 | in Hong Kong dollars, yes, U.S. investors may have been involved, |
| 11:49:10 | 8 | but that's a long way from saying there was solicitation of |
| 11:49:12 | 9 | purchasers of wallboard in Louisiana and elsewhere.  It's just a |
| 11:49:18 | 10 | fallacy.  It adds nothing to the debate, it added nothing when it |
| 11:49:23 | 11 | was raised. |
| 11:49:23 | 12 | That linked us back to the argument on the Foreign |
| 11:49:26 | 13 | Sovereign Immunities Act, and there was a suggestion, I don't |
| 11:49:28 | 14 | remember whether it was by Mr. Herman or Mr. Levin about taking |
| 11:49:31 | 15 | inconsistent positions because I was talking about the publicly |
| 11:49:35 | 16 | registered shares in the chain.  Those, as your Honor knows, are |
| 11:49:38 | 17 | well below Group.  The only entity as to which we've asserted |
| 11:49:42 | 18 | sovereign immunity is Group, which is the top of the chain. |
| 11:49:42 | 19 | THE COURT:  Right. |
| 11:49:44 | 20 | MR. STENGEL:  Now, as to Group, I join in Mr. Barr's |
| 11:49:48 | 21 | concerns about the xenophobia shown here.  We've seen lots of |
| 11:49:53 | 22 | suggestions about how things happen in the PRC, and the PRC is |
| 11:49:58 | 23 | admittedly a different legally and economic system than ours.  But |
| 11:50:02 | 24 | this Court applies law to what happens based on facts put before |
| 11:50:07 | 25 | it.  And I would take the Court back to -- and we talked about the |

11:50:11  1    *Bancec* case out of the Supreme Court when I was before you in

11:50:14  2    December to talk about sovereign immunity.  And *Bancec* cautioned --

11:50:18  3    one of the reasons they created an exception or a presumption of

11:50:20  4    independent status was not because they were concerned about Cuba.

11:50:23  5    Remember, *Bancec* was written at a time when we were avowed enemies

11:50:29  6    of Cuba.

11:50:30  7            This isn't the PRC where we find accommodations as their

11:50:33  8    system becomes in many ways more like ours.  They said U.S. courts

11:50:36  9    have to be cautious in what they do and how they treat entities

11:50:39 10    from different regimes, not only because of comity concerns that we

11:50:46 11    want to respect other nations, but for the fundamental reason that

11:50:49 12    we, when we are looking after the interest of our own corporations

11:50:53 13    should not create an environment where we're encouraging foreign

11:50:57 14    courts or foreign adjudicators to ignore our structures and our

11:51:02 15    rights.  And that applies with full force here.

11:51:05 16            Yes, there are differences, but what this record has no

11:51:08 17    content with respect to right now is why any of that is material to

11:51:12 18    the issue before the court today, which is alter ego and

11:51:16 19    attribution and whether that creates personal jurisdiction over my

11:51:19 20    clients.

11:51:20 21            Now, to be very concise, I hope, we heard a lot about SBE

11:51:27 22    in Louisiana law, and we've briefed this extensively so I will not

11:51:32 23    burden the court with too much more.

11:51:34 24            Other than the fact that I think the footnote in Judge

11:51:38 25    Vance's opinion in *Bone Fide* is probably worth looking at.  She's

11:51:43  1    obviously struggled with what SBE means.  And as an aside, SBE is

11:51:47  2    not the law in Virginia, it's not the law in Florida, and I know of

11:51:51  3    no basis by which forum courts would apply Louisiana law to those

11:51:58  4    plaintiffs.  Again, we think Chinese law controls.

11:52:00  5         But Judge Vance reached an interesting conclusion, which

11:52:05  6    is she thought that for purposes of piercing from entity to

11:52:08  7    shareholder, Louisiana recognized classic veil piercing and alter

11:52:13  8    ego, and that SBE was only called in to operation in the strange

11:52:19  9    situation where the *Green* case resolved it, which is where you had

11:52:22  10   basically a criminal enterprise and you needed to move laterally.

11:52:27  11   Because of that, she again as I noted, said clear and convincing

11:52:32  12   evidence and then also said but you apply traditional law to go up

11:52:36  13   the chain.

11:52:36  14        And as we discussed earlier in my presentation, what's at

11:52:40  15   issue here for the CNBM entities is a movement vertically, and I

11:52:45  16   don't think there's any question that the traditional standards for

11:52:49  17   veil piercing should apply, whether for attribution for liability

11:52:53  18   purposes or jurisdictional purposes.

11:52:54  19        Now on that score you were told there is no authority,

11:52:57  20   and I won't represent that it's squarely on point, but I think the

11:53:01  21   Supreme Court's relatively recent decision in *Bowman* speaks to this

11:53:05  22   issue, because the Ninth Circuit had formulated a, frankly, fairly

11:53:08  23   weak version of agency, and that was recognized by the Ninth

11:53:12  24   Circuit as an adequate basis to hold the parent Daimler into the

11:53:17  25   court in California.

11:53:18  1          And the court spoke maybe if you can show alter ego.

11:53:21  2    What's clear from the context of that decision, the alter ego there

11:53:24  3    is what we literally are talking alter ego.  Fairness here requires

11:53:29  4    if you've become the same, if you can really collapse two entities

11:53:33  5    into one, then the due process fairness concerns go away.

11:53:38  6          And I in closing just want to make one reference to

11:53:42  7    Mr. Herman's presentation because he took you through fragments of

11:53:45  8    a lot of cases, and I think it was a little hard to follow.  I

11:53:49  9    think both sides have briefed that and you know fairly clearly what

11:53:51 10    our legal position is.

11:53:53 11          But one thing I didn't want to leave unrebutted was from

11:53:56 12    a due process perspective, and I don't know whether this relates to

11:53:59 13    my clients as much as the BNBM clients because I don't think there

11:54:03 14    has been an assertion of even specific jurisdiction as to the

11:54:06 15    C-level entities.  And I think the cases he was discussing were

11:54:09 16    literally in the context of specific jurisdiction and going back to

11:54:12 17    *Worldwide Volkswagen* and *Burger King* and those kinds of issues.

11:54:17 18    But fairness is certainly one of the elements.  But from an

11:54:20 19    attribution perspective, it's one of many the court has to

11:54:23 20    consider.  You can't just say because I am a plaintiff and it would

11:54:26 21    be to my advantage to marshal the assets and have these entities

11:54:30 22    here for my selfish perspective, it would be more fair to have

11:54:35 23    access to these assets, therefore, I have jurisdiction.  Not the

11:54:39 24    way the law works.  So again, fairness is a consideration but not a

11:54:41 25    predominant consideration, and the other requirements of piercing

11:54:44  1     the corporate veil have to be met.

11:54:47  2                Thank you, your Honor, unless there's questions.

11:54:51  3                THE COURT:  Thank you very much.

11:54:51  4                Okay.  Thank you very much to all of you all.  I've

11:54:53  5     gotten a lot of material, and your arguments have been very helpful

11:54:56  6     to me.  The Court will stand in recess.

          7                (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

          8

          9                          *  *  *  *  *  *

          10

                                  REPORTER'S CERTIFICATE
          11

          12             I, Karen A. Ibos, CCR, Official Court Reporter, United
                States District Court, Eastern District of Louisiana, do hereby
          13    certify that the foregoing is a true and correct transcript, to the
                best of my ability and understanding, from the record of the
          14    proceedings in the above-entitled and numbered matter.

          15                   /s/ Karen A. Ibos
                          Karen A. Ibos, CCR, RPR, CRR, RMR
          16              Official Court Reporter

          17

          18

          19

          20

          21

          22

          23

          24

          25