**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION

THIS DOCUMENT RELATES TO:
*ALL CASES*

MDL NO. 2047

SECTION: L

JUDGE FALLON
MAG. JUDGE WILKINSON

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>YANCE LAW FIRM'S REPLY TO PLAINTIFFS' LEAD AND LIAISON COUNSEL'S
RESPONSE IN OPPOSITION TO YANCE LAW FIRM'S MOTION TO
IMMEDIATELY TRANSFER ATTORNEY FEE QUALIFIED SETTLEMENT FUND
TO A DIFFERENT DEPOSITORY BANK OR BACK INTO THE COURT REGISTRY</u>

Comes now, the undersigned counsel and submits *Yance Law Firm's Reply to Plaintiffs'
Lead and Liaison Counsel's Response in Opposition to Yance Law Firm's Motion to
Immediately Transfer Attorney Fee Qualified Settlement Fund To a Different Depository Bank or
Back Into the Court Registry.* The undersigned's motion filed on May 18, 2018 (Rec. Doc.
21338 and attachments-hereinafter "Yance Motion") moves the Court for an Order to
immediately transfer each and every Attorney Fee Qualified Settlement Fund established in this
action to a different Depository Bank or back into the Court Registry, because of 1) Esquire
Bank's incredibly small size and 2) its multi-faceted conflicts of interest. In further support of
this motion and in reply to the response in opposition filed by Lead and Liaison Counsel on June
26, 2018 and substituted response filed on June 27, 2018 (Rec. Doc. 21429 and attachments and
Rec. Doc. 21432 and attachments- collectively hereinafter "Herman Response") the movant
states as follows:

1. With all due respect to Lead and Liaison Counsel, the undersigned Counsel has never
   seen a filed response to a motion so deliberately aimed at opposing a motion paragraph

by paragraph on the one hand, yet so unwilling to actually address the points raised in each such paragraph on the other. The Herman Response dodges and avoids directly answering, refuting, and/or responding to so many key points raised by the undersigned that the Yance Motion remains largely unopposed.

2. Rather than go through and "demonstrate the obvious" with regard to each and every failure of the Herman Response to oppose key points, the undersigned counsel is going to begin by pointing out some additional, very troubling issues that have come to light as a result of the Herman Response and related filings.

3. First, Eric Bader on behalf of Esquire Bank states under oath in his affidavit attached to the Herman Response that "Esquire Bank has waived all fees related to the QSF other than a $3,100 charge in 2014." [Rec. Doc. 21432-5 para. 12]. This statement seems highly inconsistent with the SEC filings and other financial documents of Esquire. Here's how:

4. Mr. Bader confirms in the Esquire Affidavit that Esquire "utilizes sweep arrangements" for QSF funds so as to ensure "the funds are at all times secured by U.S. Treasury notes and/or FDIC-insured deposits, and are readily accessible." [*Id.* At para. 17].

5. These FDIC insured "sweep arrangements" are more particularly identified as Insured Cash Sweep Service (ICS) and Certificate of Deposit Account Registry Service (CDAR) arrangements in the "slide-show" attachment Mr. Bader referenced in his affidavit and attached thereto. [*Id.* At p. 13]. The undersigned mentioned ICS and similar deposit arrangements in the Yance Motion as potential vehicles used by Esquire for the QSFs, and Mr. Bader has now confirmed that they were in fact used. [Yance Motion Memo para. 10, Rec. Doc. 21338-1]

2

6. The ICS and CDAR services are very similar to each other.  The way the ICS/CDAR services work is relatively simple, and the explanation that follows herein is supported by service descriptions advertised by the entity implementing the service, Promontory Interfinancial Network, LLC, and attached hereto as Exhibit  K (for ease of reference the exhibits to this Reply will begin with H so as to continue from the last exhibit in the Yance Motion, Exhibit J).  A depositing customer that deposits money in a bank typically wants the entire deposit to be FDIC-insured.  If a customer wishes to deposit more than the $250,000 FDIC insurance limit, that customer would typically need to spread that deposit among multiple banks for it to remain FDIC insured in its entirety.  A bank that has a relationship with a customer wishing to make a large deposit typically would not want to send that customer down the road to a competitor if possible and the customer may also prefer to only deal directly with one bank (the "relationship bank") instead of travelling around to and/or dealing with multiple banks.  As a result, the ICS/CDAR service can be used to in effect spread the money around to other banks that are members of the ICS/CDAR network in $250,000 increments or less without the customer having to directly deal with other banks and without the bank risking losing the relationship to a competitor.  The customer then usually receives a single monthly statement from the relationship bank and never has to deal directly with the other banks.  Many banks across the country are participants in the ICS/CDAR service.

7. As an ICS/CDAR participant, the relationship bank receiving a multi-million dollar deposit and placing it into the ICS/CDAR system has two primary options.  First, it can elect to receive matching deposits from other ICS/CDAR member banks on a dollar for dollar basis ("Reciprocal Deposits") and thus keep the entire multi-million dollar amount

on its balance sheet for making loans and/or other asset growth.  Second, it can choose the "off-balance sheet" approach and allow the member banks receiving the deposits to put the deposits on their own balance sheets in exchange for <u>fee income</u> paid to the relationship bank.  Under either option, the relationship bank decides what interest rate to pay the customer on the entire ICS/CDAR deposit.

8. Through monthly statements received from Jake Woody last week, the amount of Attorney Fee QSF money placed in the ICS/CDAR systems total around $150 million. (The undersigned is still in the process of reviewing the 1,734 pages of monthly statements, and has questions as to some items but has gained a reasonable grasp of much of the information therein).

9. Mr. Bader in his affidavit also mentioned the use of "Federated" as another "sweep arrangement" to invest some of the QSF money in a way that is "secured by U.S. Treasury Notes."    [Rec. Doc. 21432-5 para. 17].  According to the monthly statements, the amount of the Attorney Fee QSFs invested in the Federated fund fluctuated between approximately $5 million and $39 million over the years.    The Federated statements list "Esquire Bank as Agent for the Knauf Attorney Fee Settlement Fund."  According to the prospectus for the Federated fund in which the QSF is placed (the "Federated U.S. Treasury Cash Reserves SS), it is authorized to pay <u>fees</u> to banks that place a customer's money into the fund.  [See Federated Prospectus attached as Exhibit L].

10. Now, with that background in mind, recall that the Yance Motion points out Esquire Bank paid a near zero interest rate (.02%) on the attorney fee QSFs during 2014, 2015 and 2016.  Furthermore, the undersigned has now confirmed through monthly statements that the same .02% interest rate was paid on the $150 million of Esquire ICS/CDAR

accounts for the <u>entire</u> year of 2017 as well. [as example See Esquire statements from December 2017 attached hereto as Exhibit M].  This is true despite Mr. Bader's attempted explanation in his affidavit regarding increases in interest/income paid to the QSFs as interest rates rose in 2017 (This issue will be discussed in more detail later).

11. Recall that Mr. Bader testified in his affidavit that "It is <u>not</u> Esquire Bank's business model to leverage off-balance sheet QSF funds into on-balance sheet deposit, thereby utilizing these funds to generate and fund asset growth (i.e. Loans and investment securities)." [Rec. Doc. 21432-5 para. 17].  Thus he makes it clear that Esquire uses the "off-balance sheet" approach described above for the QSF funds in this case.

12. Recall that at the time of the Initial Public Offering (IPO) of the Esquire stock in June, 2017, Esquire highlighted in its "Investment Highlights" section of its Free-Writing Prospectus that it had "198.6 million in off balance sheet funds/sweeps as of March 31, 2017," and recall that the Full IPO Prospectus confirmed that the source of the funds/sweeps were due to Esquire's mass tort banking relationships, saying: "We continue to experience significant growth in our mass tort business banking with off-balance sheet sweeps totaling $198.6 million at March 31, 2017".  [See Yance Motion Exhibit I p. 4 and Exhibit H p. 74].  This advertised amount is quite similar to the total amount of the Attorney Fee QSFs held by Esquire in this case as set forth by Mr. Bader in paragraph 15 of his affidavit ($190, 375, 689).

13. Thus it appears clear that approximately 96% of the 198.6 million dollars of sweeps advertised by Esquire in its IPO were Chinese drywall Attorney Fee QSFs.  If you flip a few pages over in the Free-Writing Prospectus to page 11, you will see a graph and discussion about "Non-Interest Income."  You will see that "customer fees" totaled

$1,160,000 for 2016, and you will also see a statement in no uncertain terms that "Off balance sheet funds/sweeps drive the majority of customer fees".  Consequently, it appears quite clear on the faces of Esquire's SEC filings and the documents filed with the Herman Response that while Esquire paid the Attorney Fee QSFs only $34,038 in interest for the entire year of 2016, Esquire was paid somewhere in the neighborhood of a million dollars in "customer fees" for placing our Attorney Fee QSF money into these off-balance sheet sweeps.

14. As for 2017, the situation is more alarming.  Despite rising interest rates in 2017 as admitted by Mr. Bader, Esquire continued to pay a mere .02% on the approximately $150 million of ICS/CDAR deposits, yet in the first quarter of 2017 Esquire collected $366,000 in "customer fees", and in the second quarter $528,000, and in the third quarter $548,000, thus on track to make somewhere around $2 million dollars in "customer fees" for the 2017 year while the vast majority of the money earning those fees clearly appears to have been Chinese drywall Attorney Fee QSF money (The fourth quarter "customer fees" were $752,000, however Esquire's financial statements indicate that Esquire acquired another significant off-balance sheet sweep during the fourth quarter so it is unknown how much of the $752,000 was attributable to the newly acquired sweep funds versus Chinese drywall QSFs) [See Excerpts from Esquire 2017 Quarterly reports attached hereto as Exhibit N].

15. Esquire's own documents reveal that Esquire management was well aware of what was going on.  In its 2017 third quarter report, while discussing increases in various types of "non-interest income" Esquire clearly stated: "Customer related fees and charges have also increased primarily due to increases in sweep fee income on off-balance sheet funds

as a result of rising rates." [see Exhibit N p. 3]. In fact that fee income it was discussing had nearly doubled in comparison to the third quarter of 2016. *Id.* In a nutshell, Esquire was making lots more money in fee income from off-balance sheet sweeps, yet still paying our ICS and CDAR deposits "peanuts" at the rate of .02%.

16. Consequently, for a bank that reported a total net income for the whole company of only $3.6 million in 2017 to suggest that the group of Attorney Fee QSFs it was holding in this case was not a significant part of its overall financial picture is hard to believe.

17. The gravity of this "sweep fee" issue increases exponentially by virtue of representations made to the Court by President of Esquire Bank, Andrew Sagliocca at the September 17, 2013 status conference during his presentation to this Court in an effort to achieve the Court appointment as depository bank. Mr. Bader attached the transcript of that hearing and presentation to his affidavit. During that presentation, at page 21 of the transcript, Mr. Sagliocca severely downplayed the issue of fees to the Court, identified them in a way that made them appear so small as to be nearly non-existent in relation to the size of the QSFs, and described Esquire's desire to serve as the depository bank as "more of an accommodation" to counsel involved in the litigation, rather than earning fees from doing so. [See attachment to Esquire/Bader Affidavit- Rec. Doc. 21432-5 p. 44]

18. In Mr. Sagliocca's presentation, he provided a table with a list of five different types of fees, all of which were quite low and insignificant compared to the size of the QSFs. [See attachment to Esquire/Bader Affidavit- Rec. Doc. 21432-5 p. 15]. He never disclosed or discussed in any way the "sweep fee" relationship described hereinabove, never disclosed how the bank would benefit therefrom, and stood by his description of Esquire's appointment as depository bank being an "accommodation."

19. Consequently, because the testimony and statements to the Court by both Mr. Bader and Mr. Sagliocca appear highly inconsistent with Esquire's financial statements and SEC filings, the undersigned feels it would be appropriate to fully investigate the existence of and exact amount of such fees collected by Esquire Bank, and to further "claw back" into the Attorney Fee QSFs any and all such fees. Based on Esquire's statements made in its SEC filings, the sweep fees it collected between 2014 and 2018 could very well be in the range of $5 million or more. [See Yance Motion Exhibits A and I].

20. Now let's turn to the actual interest rates paid by Esquire on the Attorney Fee QSFs. There is more troubling information that has come to light. As mentioned, on the ICS and CDAR deposits, which account for around $150 million of the Attorney Fee QSFs, Esquire paid a mere .02% during 2014, 2015, 2016 and even throughout the entire year of 2017 when interest rates were clearly rising. [See again Exhibit M hereto]. It was not until early January 2018 that Esquire raised the rates on the CDAR deposits and February 2018 on the ICS deposits. Interestingly, these increases in rates began to occur immediately after interested attorneys began asking questions and sending emails (in mid to late December 2017) about interest rates and why they were so low. [See Exhibit O attached hereto which is an email referenced in the KCM Joinder in Relief Sought by Yance Motion]. The CDAR rates were then immediately raised to .498% (25 times higher than before) and the ICS rates were raised to .15% (7.5 times higher).

21. As for the reasonableness of the .02% interest rate that Esquire was paying for all those years, the Yance Motion gave some specific examples for comparison purposes. The Herman Response discussed low interest rates in general in an effort to justify the nearly zero rate, but did not provide specific examples of competitive rates that were similar to

what Esquire was paying.  In fact, the Yance Motion gave a specific example of a QSF deposit at Esquire that was NOT an Attorney Fee QSF and that Esquire was paying .50 % interest on that QSF (a rate that is 25 times higher than what Esquire was paying on the Attorney Fee QSFs).  Mr. Herman's response to that assertion was to re-state the fact that it was not an Attorney Fee QSF, to erroneously suggest that the Yance Motion said it was an Attorney Fee QSF, and then to provide the interesting information that the specific QSF identified in the Yance Motion was the 10 million dollars held out of the Knauf attorney fees for the purpose of funding the prosecution of the Taishan Defendants.  [See Herman Response- Herman Affidavit Rec. Doc. 21432-3 p. 15].  The undersigned cannot help but point out that this 10 million dollars earning this much higher interest rate was the very money that would reduce the obligations of Mr. Herman's law firm and the PSC to fund the expenses related to prosecution of the Taishan Defendants.

22. In any event, the undersigned has recently learned that even regular Court Registry funds earned a significantly higher interest rate than Esquire was paying on the Attorney Fee QSFs during the relevant time frame.  According to an email from the Budget and Financial Administrator of this Court:  "Until early 2015 the court's registry funds were located at Whitney Bank and earned interest at a rate of 0.10%.  Court Registry Investment System (CRIS) - 2016 earnings was 0.25% and 2017 earnings was 0.80%." [See Exhibit P- email from Court Budget and Financial Administrator].  Therefore, in 2014 and 2015, even if the Attorney Fee money had merely remained in the Court Registry instead of being deposited at Esquire, it would have earned 5 times more interest than it did with Esquire.  In 2016, it would have earned 12.5 times more, and in 2017 it would have earned 40 times more interest than the ICS and CDAR deposits at Esquire.

23. Another troubling issue worth pointing out is that the Herman Response reveals "Esquire Bank has made a personal loan to Mr. Herman secured by his future receivables and personal guarantee."  [See Esquire/Bader Affidavit Rec. Doc. 21432-5 p. 3].  However it does not disclose the amount of the loan or provide any detailed terms thereof.  It does not indicate that this loan has ever been disclosed to the Court.  Although the Herman Response argues that the existence of this loan was made known to certain federal agencies, those agencies are tasked with overseeing banks in the banking industry and insider conflicts relating thereto.  Quite obviously, those agencies are not tasked with overseeing this litigation and conflicts that loans to leadership counsel that sought appointment of, serve on the board of, and own shares in the Court-appointed bank can create in the litigation.  Esquire and/or Mr. Herman should be required to disclose all amounts, terms and provisions of any and all loans to Mr. Herman, and to provide copies of any and all loan agreements, collateral and/or security agreements, and/or any and all loan-related documents.

24. Now the undersigned will turn to specific replies to the Herman Response.  The Yance Motion set forth many disturbing facts and supporting documents concerning Esquire Bank as well as Mr. Herman's relationship thereto.  The Herman Response attempts to oppose the Yance Motion paragraph by paragraph.  However, the Herman Response fails to actually address, discuss and/or oppose many of the key points raised in each paragraph.  The Herman Response repeatedly ignores things that the Yance Motion did say, and then also pretends that the Yance Motion said things that it did not say.  The undersigned will resist the temptation to painstakingly point out every single shortcoming, because many of them are obvious to any individual reading the Herman

Response.  For the most part, the undersigned would point the Court back to the Yance Motion and its attachments, and state that most of them have clearly not been opposed, however, there are a few points that the undersigned feels the need to address here.

25. First, it should be noted that the Herman Response was originally filed as a 26-page, mostly single-spaced "memorandum" which referenced and attached 3 affidavits/declarations and other exhibits. [Rec. Doc. 21429 and attachments].  The 26-page memorandum made quite a few over-reaching arguments and statements, many of which, Mr. Herman could not possibly have personal knowledge of.  Much of this is OK because making arguments, stating facts known by others, pointing to evidence and/or knowledge possessed by others, and providing information and drawing conclusions with a good faith belief that they are true is what a memorandum in response is for.  However, the day after the original Herman Response was filed, Mr. Herman filed a motion to substitute the response with a new response.  Therein, Mr. Herman indicated that the "formatting" of the original pleading was improper (I presume because of the single-spacing and the extreme number of pages by which the memorandum would exceed the Court's page limitation if it were converted to double-space).  Astonishingly, rather than fixing whatever formatting issues existed, and/or asking the Court for relief from the formatting requirements, Mr. Herman converted his entire 26-page response to an under-oath Declaration, signed and sworn to "under penalty of perjury that the foregoing is true and correct." [Rec. Doc. 21432-3].  The undersigned will just simply say this is disappointing.  The undersigned does ask the Court under the circumstances to disregard and/or strike the Herman Declaration in its entirety insofar as it is purported to be

"evidence" and/or "under-oath testimony", and only consider it for what it really is- a memorandum in response.

26. In any event, the Herman Response does not dispute the eye-popping, extraordinarily small size of Esquire Bank compared to other banks in the industry that could provide the depository service.  It does not address Esquire's extraordinarily small size in relation to the large Attorney Fee QSFs held there, and how they have constituted a significant portion of Esquire's overall financial picture advertised to the public in the IPO.  Instead, the Herman Response ignores size, fails to point to a single bank of a similar size that has been appointed to hold such an enormous amount of money compared to that size, and instead focuses on a specific internal "ratio" in which Esquire Bank happens to beat some of the bigger banks.   Without getting into a recitation about the CET1 ratio repeatedly touted in the Herman Response and why it is used in the banking industry, simply stated, it is just that-an internal ratio- and has nothing to do with the size.  As a simple example as I understand the CET1 ratio, if I start a bank with my own one thousand dollars and I am the only shareholder, and I turn around and make a one hundred dollar loan to the U.S. Government, and that is the only loan I make, my bank's CET1 ratio would be extremely high, yet that would not mean my bank would be the appropriate place to handle large settlement funds.

27. The Herman Response does not dispute the approximately $1.4 million dollar stock interest Mr. Herman owns in Esquire Bank.  It admits he owns 62,412 shares including 2,500 restricted and 14,892 exercisable options.  The Herman Response merely points out that Mr. Herman would have to pay $186,150 to exercise those options.  Even taking that required payment into account, the net value of Mr. Herman's ownership is still above the

$1.4 million amount stated in the Yance Motion (62,412 shares X $26.40 per share = $1,647,676.8 - $186,150 option payment = $1,465,526.80).  Moreover, clearly Esquire does not intend to remain one of the smallest publicly traded banks in the world.  In fact, Esquire focuses on the theme of high growth throughout all of its major SEC filings.  If the stock price tracks growth of the bank in any reasonable fashion as stock prices typically do, the value of Mr. Herman's ownership interest has the potential of being huge.  Just take for example if Esquire were to grow even to the size of a mid-size regional bank such as Hancock/Whitney or Iberia, and thus would be 46 times larger than it is right now, as explained in the Yance Motion.  If the stock price tracked growth exactly, his ownership interest would be worth over $75 million dollars.  If the stock price tracked growth in any reasonable fashion, needless to say the value of his ownership interest would be substantial, and this is value to him personally, not value to be spread amongst his law firm.  Being in on the ground level of an IPO is a huge opportunity to make a lot of money, and maintaining and/or growing the stock price following an IPO is critically important.  Consequently, that importance has no business having the potential to influence anything in this litigation.

28. The Herman Response does respond to the issue of yearly compensation Mr. Herman receives as an Esquire board member.  However, it only addresses the cash aspect of his compensation and ignores the fact that the Yance Motion clearly and expressly included yearly stock option awards in its calculation of Mr. Herman's yearly compensation.  In fact, including both items of compensation is exactly how the SEC requires Esquire to report it, and the Yance Motion attached those SEC filings as Exhibits G and H to the Yance Motion.  Including all aspects of compensation is absolutely relevant to the

13

analysis of a conflict in this case, and thus the Herman Response fails to properly address it.

29. The Yance Motion states:

> it has come to the undersigned counsel's attention that Esquire Bank, while paying a near zero interest rate on the Attorney Fee QSFs in this case (0.02%), is actively lending money to attorneys who one day expect to receive a portion of those attorney fees in this case, in the form of loans, attorney fee advances, attorney lines of credit and/or other financing instruments secured by each borrowing attorney's portion of the very cash in the very QSFs this Court appointed Esquire to hold and manage.

In addressing this paragraph, Mr. Herman admits among other things: "I'm not privy to investments of lawyers or loans to lawyers." In response to another unrelated paragraph in the Yance Motion that had nothing to do with loans to lawyers, the Herman Response does state in all caps: "NO QSF FUNDS HAVE BEEN USED FOR COLLATERAL FOR LOANS." However, this statement is contrary to admissions in literature disseminated by Esquire on its website, as well as direct statements made to the undersigned by Esquire Bank representatives. [See Exhibit Q p.7 – Esquire Brochure, and Exhibit R- Yance Affidavit p. 1]. Moreover, the above statement is made in the Herman Declaration, which is nothing more than a converted memorandum. The Bader/Esquire Bank affidavit avoids discussing attorney fee advance loans and how they are structured or collateralized, but does confirm that Mr. Herman is not privy to any customer information related to loans or deposits. Consequently, the weight of the evidence certainly supports that Esquire is collateralizing loans with each borrowing attorney's portion of the funds in the Attorney Fee QSFs.

30. As to the multi-faceted conflict of interest set forth in the Yance Motion, the Herman Response in a nutshell relies significantly on his disclosure to the Court of his ownership

and board membership at the time Esquire was appointed in 2013.  However, he has pointed to no authority establishing that obtaining Court approval prevents a later finding that a conflict of interest does in fact exist, or that a conflict of interest later developed or deepened following Court approval, or that a Court approval was abused or taken advantage of, or that a Court approval was used in a way that created the appearance of using Court approval for improper significant personal gain, or any other number of situations that could ultimately lead to a finding of a conflict of interest and the need to eliminate it.

31. After all, an attorney handling a case- particularly an attorney who is one of the two primary attorneys in charge of and largely controlling a case involving thousands of claimants, hundreds of lawyers, and hundreds of millions of dollars- should make an attorney's fee as compensation- period.  He should not make money on his "side business" by virtue of a Court appointment of that side business.  He should not even put himself in a position of appearing to do so.

32. Along these same lines, the undersigned is glad Mr. Herman brought up a comparison between the 400 claimants his 15-lawyer firm represents, the approximately $16 million his firm has collected for them, and the attorney fees his firm is expected to receive for those cases versus the 11 claimants the undersigned's 1-lawyer firm represents, the $2 million dollars he has collected for them, and the undersigned's expected fees for those cases.  The undersigned certainly does acknowledge, it is quite disappointing after working on a group of cases for nine years, and doing exponentially more work per claimant than any other MDL he has ever heard of, that he currently stands to make substantially less money than Mr. Herman made in one year by virtue of his post-IPO

stock price increases in the bank he petitioned the Court to appoint.   It "rubs salt in the wound" especially when considering that the bank has benefited substantially from the continued extreme delay in the payment of the attorney fees in this case- and even more so considering the fee the undersigned currently stands to make in this 9-year, extraordinarily labor intensive case equates to a percentage fee that is less than what the law directs a lawyer to be paid in a simple, easy, straightforward Alabama Workers' Compensation case that can be handled in a matter of a few months.  (See Ala. Code (1975) 25-5-90(a)

33. The Herman Response makes the nonsensical statement "under oath" regarding my work in this case that "Counsel does not have a Common Benefit claim for fees precisely because he did no substantive work and yet the process achieved payments to all of his eleven (11) clients."   This statement is absolutely absurd, as any responsible contract counsel involved in this litigation was required to do loads of substantive work in relation to each client.  In fact, Mr. Herman has seen numerous affidavits regarding the extensive work performed by contract counsel in this case, has heard very compelling live testimony from Eric Hoaglund (who made no common benefit claim) and David Durkee regarding the enormous amount of work required to properly represent claimants in this litigation.  Not only did the undersigned do loads of work for each client prior to the settlement being reached, Mr. Herman conveniently negotiated the Knauf settlement so as to place an enormous burden on all claimants' contract counsel requiring them among many other things, to oversee and often get intimately, and repeatedly involved in the remediation and construction process of tearing each claimant's home to the studs, then rebuilding it, and dealing with all of the disputes and other issues related thereto.  After

the undersigned dealt with building his own house in 2005, he swore he would never do it
again.  However, Mr. Herman gave the undersigned no choice but to do it again 11 times,
and gave some other contract counsel no choice but to do it hundreds of times.  The
settlement was a fair deal for the claimants but a terrible deal for contract counsel.
However because it was a fair deal for the claimants, the undersigned of course had no
choice but to recommend the clients agree to it.  Even though the amount of work
performed by any counsel in this litigation has ZERO to do with the Yance Motion, Mr.
Herman chose to bring it up and to make an absolutely inaccurate statement about it.
Because Mr. Herman made the statement regarding my "work" under oath in a
declaration, the undersigned feels compelled to attach his own affidavit to this reply
which sets forth a description of just some of the work performed. [See Exhibit R- Yance
Affidavit].

34. The Yance Motion moved this Court for an Order to immediately transfer each and every
Attorney Fee Qualified Settlement Fund ("QSF") established in this action to a different
Depository Bank or back into the Court Registry until final disbursement.  Following the
June monthly status conference and the undersigned's preliminary argument to the Court
at that time, the Court *sua sponte* Ordered:  "that until further notice the Attorney Fee
Qualified Settlement Fund shall be transferred from the Esquire Bank to be place[d] in
the Court Registry. Counsel may contact the Court's financial unit for further
instructions."

35. Consequently, most of the money has already been moved into the Court Registry.  The
Court Budget and Financial Administrator reported by email that she received
information regarding the current rates, and that:  "At the beginning of 2018, the rate was

approximately 1.20%, but has been rising throughout the year. As of yesterday, the yield was 1.84%." Consequently, given all of the information set forth in the Yance Motion as well as the extraordinarily high yield as it sits in the Registry today compared to any rate Esquire ever paid, the undersigned respectfully urges the Court grant the Yance Motion, and leave the Attorney Fee QSFs in the Court Registry until time for disbursement or if necessary transfer to a different depository bank.


Respectfully submitted,

/s/ R. Tucker Yance
R. TUCKER YANCE
Ala. State Bar #- ASB-9775-H71Y
YANCE LAW FIRM, LLC
169 Dauphin Street Suite 318
Mobile, AL  36602
(251) 432-8003
(251) 432-8009 FAX
rty@yancelaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing memorandum has been served upon Plaintiffs' Liaison Counsel Russ M. Herman and Defendants' Liaison Counsel Kerry Miller, by e-mail and upon all parties by electronically uploading the same to File & ServeXpress in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 3rd day of July, 2018.

/s/ R. Tucker Yance
R. TUCKER YANCE
Ala. State Bar #- ASB-9775-H71Y
YANCE LAW FIRM, LLC
169 Dauphin Street Suite 318
Mobile, AL  36602
(251) 432-8003
(251) 432-8009 FAX
rty@yancelaw.com