## AFFIDAVIT OF R. TUCKER YANCE

STATE OF ALABAMA)

COUNTY OF MOBILE)

Before me, a Notary Public in and for said county and state, personally appeared R. Tucker Yance, who is known to me, and who, after first being duly sworn, deposes and says:

My name is R. Tucker Yance and I am over the age of nineteen (19) and have personal knowledge of the facts contained herein.

I graduated from the University Of Alabama School Of Law in 2001 and have been a member of the Alabama State Bar since 2001, continuously practicing in the State of Alabama.

On or about May 3, 2018, I spoke on the telephone with two different representatives of Esquire Bank. The first was Steven Krauser who I believe is the Chief Administrative Officer of Esquire Bank and the other is Iain Worsley who I believe is a relationship manager at Esquire Bank. Both individuals confirmed to me that Esquire Bank is actively making attorney fee advance loans in relation to the Chinese Drywall matter and that the collateral for such loans includes the borrowing attorney's share of the money in the Chinese Drywall Attorney Fee QSFs.

As to my work as an attorney in this matter, I have been involved as Primary Counsel (hereafter "PC") in Chinese Drywall litigation since 2009. I inspected many properties suspected of having Chinese Drywall. I have been involved in the litigation of 12 Knauf Chinese Drywall cases, 11 of which were Knauf KPT cases and one of which was a "lower-case" Knauf case. I have participated in the remediation of approximately 11 properties in connection with the Knauf drywall remediation settlement.

1

Exhibit R

A Chinese Drywall case is far from a typical personal injury and property damage case. In dealing with a home suffering property damage and potentially causing health issues, a homeowner requires a very high level of individual attention and attorney involvement in all aspects of the litigation and settlement process.

Unlike other mass litigation, the individual issues addressed by PC in Chinese Drywall were unprecedented. The Plaintiffs' Steering Committee (hereafter "PSC") produced a settlement that required PC to implement and oversee a remediation construction project for each qualifying home. As a result of the structure of the settlement negotiated by the PSC, PC spent years overseeing construction projects and dealing with disputes related thereto. Further, these issues were left to the responsibility of PC with little or no involvement by Common Benefit Counsel (hererafter"CBC"). All individual client contact outlined herein took place through PC.

The first step in the Chinese Drywall litigation was to determine where the Chinese Drywall was located and the time frame for installation. This process took hours of research, review of thousands of supplier invoices, review of builder permits, correspondence to potential clients, phone interviews and many inspections attended by and with active participation by PC. Early in the process, PC did not have a clear profile for a Chinese Drywall home and inspected homes that, after inspection, PC discovered did not contain Chinese Drywall. These inspections were necessary in PC's attempt to determine the typical profile of a Chinese Drywall home. As such, PC spent many hours inspecting homes personally and with inspectors as well as expenses on inspection costs for homes that did not contain Chinese Drywall. These expenses cannot be recouped and must be paid from fees payable to PC.

PC fielded many phone calls and emails from homeowners concerned that their home contained Chinese Drywall as well as problems and issues associated therewith. Accordingly, PC

2

established the criteria to determine if a particular home might contain Chinese Drywall, including the time frame of the construction, the builder and supplier involved in the construction, and the symptoms of Chinese Drywall damage. If PC determined the home might contain Chinese Drywall, an inspection was scheduled by PC to determine if the home contained Chinese Drywall. PC attended the inspections and verified the presence of Chinese Drywall and assessed any damages to electrical, plumbing and HVAC units typically seen with Chinese Drywall homes. PC personally attended the inspections and typically attempted to determine the manufacturer of the sheet rock, the number and the percentage of the defective sheets in the home, and the level of damage.

Following the inspection process, PC made a determination to accept or reject cases. This required a legal analysis and evaluation of various factors, including, but not limited to, the possible builders, suppliers, installers, which Chinese Drywall manufacturer was involved, the availability of insurance, caveat emptor/second homeowner issues, and other issues.

PC would then meet with the homeowner to discuss possible legal claims, possible repair scenarios, possible outcomes of litigation, and negotiate the fee agreement. Clients sought advice regarding possible health effects and the ramifications of moving out of their home. Clients wanted to know whether they should move out because of health issues, and, if they moved out because of health issues, whether they would be compensated for their expenses, what would happen to their homeowner's insurance coverage if they did so as well as many other issues.

PC would next issue to the client forms requesting specific information regarding the history of the home and certain documents, including contracts for construction, deeds, HUD-1 statements, warranties, and appraisals. PC discussed the ins and outs of the MDL with clients and the advantages and disadvantages of filing their cases in the MDL. PC often had to spend a great

deal of time and answer many questions related to the decision of whether or not to file the case in state court versus the MDL. PC reviewed the documentation from the client and prepared information for the inclusion of the homeowner on an Omnibus Complaint or prepared a separate complaint for filing. To include a homeowner on an Omnibus Complaint, PC had to obtain and provide detailed information regarding the owners of the home and information regarding the property, including an inspection report, as well as information regarding each potential defendant.

Once the Omnibus Complaint was filed, PC was responsible for ensuring all homeowners were included on the proper complaint and all Defendants were properly named. In addition, as a requirement by the PSC, PC provided a Plaintiff Profile Form providing information and documentation for each home, and, in some cases, PC had to provide an amended Plaintiff Profile Form to supply additional information. Further, in conjunction with the Plaintiff Profile Forms, PC provided to the PSC information regarding the number of HVAC coils replaced in each home. As such, PC completed a survey of all homeowners regarding the number of HVAC unites in each home and the number of affected HVAC coil replacements.

During the course of the litigation process, PC consistently responded to questions and advised homeowners regarding homeowner insurance claims, possible tax assessment protests, IRS casualty loss issues, litigation updates, time-frame for settlement and/or remediation, whether the client should self-remediate and countless other issues. Homeowners consistently sought advice regarding the potential health issues associated with Chinese Drywall, whether they should move out of their homes, and/or whether they should stop paying their mortgages. Homeowners required research regarding health issues and information regarding the results of studies about health risks associated with Chinese Drywall. Potential health issues proved to be

4

very difficult for PC because so little scientific information was available, but yet clients wanted reassurances that their health was not in jeopardy.

Three (3) of PC's homeowner clients were sued by the builders' liability insurance company in declaratory judgment actions filed in the United States District Court for the Southern District of Alabama, asking the Court to rule that there was no coverage for the builders and no duty to defend. PC had to represent and defend the clients in the DJ actions in Court, prepare and file answers to the complaint, confer with clients regarding discovery, draft and serve discovery responses, file pleadings, prepare clients for depositions, defend clients' depositions, review documents to prepare for and take depositions of other parties, perform outside investigation, interview witnesses, prepare and send emails and correspondence, conduct settlement negotiations, prepare and file responses to summary judgment motions and conduct legal research related thereto, and many other tasks typically associated with federal court litigation. PC achieved a very favorable Order for his clients on the summary judgment motion that provided precedential benefit to many cases in the Chinese Drywall MDL, and the same was acknowledged by members of the PSC in a chain of emails on which Russ Herman and Arnold Levin were recipients. The emails will be filed under seal. The emails also set forth an accurate description of the significant settlement negotiations that followed the favorable ruling, and the way the Lead and Liaison Counsel settled these cases with this builder's carrier for approximately 70% less than PC had negotiated with the carrier, despite PC's open communications to them ahead of time.

Three (3) of PC's homeowner clients were also sued in Alabama state court in Declaratory Judgment actions filed by their homeowner's insurance carrier. PC had to represent and defend the clients in the DJ actions in Court, prepare and file answers and counter-claims to

the complaint, confer with clients regarding the lawsuit, prepare clients for depositions/EUOs, defend clients' depositions/EUOs, review documents, attend inspections, attend court hearings, perform outside investigation, prepare and send emails and/or correspondence, conduct settlement negotiations, conduct legal research, and other tasks associated with litigation.

PC attended MDL status conferences, court hearings, out of town meetings, meetings at claimant's homes in various parts of the state. Throughout the litigation process, PC provided regular updates to clients regarding the status of the MDL and the progress of their cases towards resolution. Between the discovery of Chinese Drywall in homes and the remediation of the home, PC advised homeowners regarding mortgage forbearance issues and possible foreclosure issues.

Once the PSC announced the Pilot Program as a possible settlement resolution, PC undertook a review of each file to determine if the home was eligible for the Pilot Program. PC negotiated for the inclusion of homes in the pre-settlement Knauf remediation program. In addition, PC met with and discussed with clients the possibility of enrolling their home in the pre-settlement Knauf remediation program and the possible benefits and legal ramifications of the Program. Around December of 2011 the Knauf settlement was announced. Once a client agreed to participate in the Pilot Program or the Knauf Settlement, PC prepared the packets containing certain information required by Knauf to consider a home for the Knauf Settlement and/or Pilot Program. Once accepted into the Program, a series of inspections took place to determine the eligibility for homes. PC personally attended nearly all inspections of all homes involved. Following the Knauf Settlement Agreement, PC spent numerous hours reviewing the Settlement Agreement, interpreting the Settlement Agreement, and explaining the Settlement Agreement to clients. An evaluation of each file was once again required to determine the

possible impact on each homeowner. PC conferred with each client regarding the possibility of opting out of the settlement.

PC met with each client to explain the benefits of the settlement under Option 1, 2, or 3, explained the inspection and remediation process, scope of remediation, and determined which option was best for each client. After a client chose a particular option, PC reported to Knauf and BrownGreer which clients were participating in which option. Due to the benefits of possible cost increases during construction and the availability of change orders for these cost increases, the vast majority of clients chose Option 1, requiring a remediation construction project.

Following the choice of an option under the Knauf Settlement Agreement, PC coordinated an inspection of each home. PC attended and oversaw the inspections for compliance with the inspection protocol. Often times, PC provided the inspectors with vital information regarding the location of the Knauf Chinese Drywall and information regarding damages to the home. In addition, the homeowners often had additional questions and concerns regarding the Knauf Settlement Agreement that arose at the inspections and required responses from an attorney familiar with the settlement. Following the inspection, PC monitored the inspection results to determine if the home qualified for benefits under the Knauf Settlement Agreement. Responses to these questions required an attorney familiar with the process.

If the home qualified for benefits following the inspection, a second inspection and estimate was performed by Moss or another qualified contractor. PC coordinated and attended the Moss inspection and estimate to ensure compliance with the ANSI square footage measurements and the Exhibit F remediation protocol. Again, during many inspections, clients asked additional questions regarding the remediation process, scope of the remediation, and the legal ramifications of settling under the Knauf Settlement Agreement.

Following the inspection by Moss, PC received an Xactimate estimate which provided a scope of work for the home and the ANSI square footage that determined the lump sum payment for each client. PC reviewed the Xactimate estimate to ensure compliance with Exhibit F protocol, confirmed that all areas of home were listed in the scope of work, and verified the ANSI square footage. The estimates sometimes required corrections. PC then conferred with each homeowner to explain the Xactimate scope of work and seek approval of the Xactimate scope and ANSI square footage. Once the Xactimate scope was approved, PC monitored the Xactimate estimated cost for the home and the Final Cost Estimates to ensure that the costs were in line with the size of the home, the quality of the original construction of the home, and the Xactimate scope of work.

Assuming the homeowner chose Option 1, after the inspection and estimate process was complete, BrownGreer prepared a generic work authorization package to be completed by PC and homeowner. PC then prepared a work authorization package specific to the particular homeowner and provided the package to the homeowner for review. PC then met with each homeowner to review the work authorization package and discuss the remediation program. This meeting included discussions regarding legal implications of executing the work authorization and signing of releases. In addition, the practical aspects of implementing the remediation, moving out, lump sum payments, and other moving and repair issues were discussed.

Following the return of the work authorization package, BrownGreer provided a move out notice indication when the homeowner must be out of the home in order for the remediation to begin. In addition, BrownGreer and/or Knauf provided a date and time for a kick off meeting between the contractors, PC, and homeowners. Between the time of the receipt of the move out

notice and the kick off meeting, PC received the lump sum payment for the homeowner. PC verified the amount of the lump sum payment and disbursed the funds to the clients.

PC then attended the kick off meeting at each home. At this meeting, PC oversaw compliance with the Exhibit F remediation protocol and the Xactimate scope of work. Often times, issues regarding the scope of work, including appliance issues and HVAC issues, were discussed and corrected onsite. Typically, numerous return trips to the project were required during the remediation process to ensure compliance with the remediation protocol and to monitor the timing and completion of the construction. Usually during the construction process, the homeowner raised questions regarding the scope and quality of the contractor's work. For most homes, PC mediated disputes and disagreements between homeowners and the contractors regarding the scope and the quality of work. There were often disputes regarding the replacement of "like-for-like" materials, as required by the Knauf Settlement Agreement. This process of monitoring the remediations and mediating the disputes resulted in countless hours of time expended by PC. Further, this process of dispute resolution required a firm grasp of the Knauf Settlement Agreement and legal interpretations of the agreement, work authorizations, and remediation protocols.

Following the kick off meeting, Moss provided an appliance binder to PC outlining the appliances to be replaced and setting forth the choices the homeowner had in regards to the replacement of the appliances. Once again, PC had to determine if the appliance binder complied with the Knauf Settlement Agreement, the Exhibit F protocol, and the Xactimate scope of work. Sometimes, appliances were not included in the binder, or the wrong appliances were included and corrections or adjustments to the binder had to be made. This required intimate knowledge of the Knauf Settlement Agreement and the remediation protocols to determine which appliances

9

were to be replaced. PC then explained the appliance binder and potential choices to the homeowner and reported to Moss the homeowner's decision regarding appliances.

As a project neared completion, there were delays which required negotiations for delay payments owed to the homeowner. PC was responsible for monitoring the deadlines, calculating the delay payments, and negotiating the delay payments for homeowners.

After a project obtained a Certificate of Occupancy, the contractor, PC, and the owner met onsite to review the completed work. PC was responsible for determining if the scope and quality of work complied with the Knauf Settlement Agreement and the remediation protocols. At this meeting the homeowner and contractor created a punch list of items for the contractor to complete prior to returning the home to the owner. Disputes between the contractor and the owner often arose at this stage and were painstakingly addressed and resolved by PC. In order to resolve these issues, PC was required to have a thorough understanding of the Knauf Settlement Agreement, remediation protocols, and interpretations of the Knauf Settlement Agreement.

Once the punch list items were complete or the contactor and homeowner reached an agreement regarding the completion dates for punch list items, a close out meeting was usually held at the home with the contractor, PC, and the homeowner in attendance. At this point, the contractor sought to return the home to the owner and have the homeowner sign a release required by the Knauf Settlement Agreement upon substantial completion of the project. Disputes regarding whether the release should be signed sometimes arose at this stage, and PC had to determine a resolution. In addition, at this meeting, or thereafter, PC provided the homeowner with a final package, including documents from the remediation such as the Knauf inspection report, the GFA certification, the warranty information, the Certificate of Occupancy, and the contractor's certification.

Further, once the home was released to the homeowner, PC was required to monitor ongoing punch list items and disputes regarding punch list items. For many homes it took months to complete the punch list and resolve these issues. It was not unusual for a three (3) month remediation project to take many more months for a total completion of the construction. In addition, the homeowners received a one (1) year warranty from the contractor regarding all work performed on the home. As such, the homeowners often required warranty work to be performed by the contractor. PC monitored and oversaw the warranty requests and completion of the warranty requests. Disputes often arose involving whether the repairs fell within the scope of the warranty and legal consultation was required. Due to this one (1) year warranty, many (3) month projects took a minimum of a one (1) year and three (3) months to bring to a complete and total resolution.  Some homeowners had issues following the expiration of the (1) year warranty and PC had to get involved to resolve the issue.

The final step in resolving homeowners' claims involved the filing and monitoring of claims under the various settlements, including, but not limited to, bodily injury claims, global builder and supplier claims, foreclosure claims, pre-remediation moved out claims, and miscellaneous claims. This process required an evaluation of all potential claims available under all settlements and an evaluation of each client's circumstances to determine if a client was eligible for a particular claim. This involved legal interpretations of the Knauf Settlement Agreement, the various other settlement agreements, and the various claims materials. Once a determination was made for each client, PC was responsible for drafting the claim form, gathering the required documentation, and timely filing the claims. Once the claims were filed, PC monitored the progress of the claims and updated clients regarding the progress of the claims. Eventually, BrownGreer issued a Notice of Claim Eligibility form. PC discussed the Notice of

Claim Eligibility with each client and determined whether to accept or appeal the notice. If the claim was accepted, PC was responsible for the execution of the Verification of Claim form, execution of a W9 form, verification of the payment of the claims, and execution of releases. If the eligibility notice was appealed, PC was responsible for the appeals process to the Special Master or the Court.

One of PC's clients remediated his home out of his own finances and thus ended up as an "Already Remediated Home" claimant. Dealing with a self-remediation contains an entirely different set of circumstances and tasks to be performed by PC. Communications before, during and after the self-remediation were very frequent. PC had to have extensive and lengthy discussions and written communications with the homeowner and builder regarding preservation of evidence, documentation of remediation, scope of work, and a very careful analysis and application of the Germano and Hernandez decisions in an effort to give the client the best chance of being fully compensated for the self –remediation through a later settlement with the defendants. Once the self-remediation was complete and the Knauf settlement agreement was in place, PC had to prepare a very extensive and time consuming claim package to support the Already Remediated Home Claim. Numerous discussions and negotiations took place with Counsel for Knauf in order to reach a settlement.

Over and over again throughout the years of the litigation, there were repeated requests by the PSC for spreadsheets, data, help, and all sorts of information related to PC's clients as well as all other primary counsel for Knauf claimants in the litigation. Many times the requests were urgent and required immediate attention and immediate communications with clients to get the requested information. PC began handling most of these requests almost immediately and

often had to forego other important work to do so.  These requests were frequent and often labor intensive.

In short, in order to bring a client to a complete resolution, PC invested countless hours and significant expenses not reimbursed by the expense stipend to accomplish tasks that could not be accomplished by CBC. In fact, many of the tasks required of PC to provide a homeowner with a complete resolution were tasks which were required by the PSC or because the PSC negotiated a settlement that required PC to implement the settlement on his own. The resolution of homeowners' claims required extensive and repeated client contact and involvement which was handled exclusively by PC. A resolution of a homeowner's claims required consistent work on behalf of the client over a four (4) to six (6) year period of time. Without PC involvement, the resolution of these claims would have proved impossible.

Once the Fee Committee in this litigation finally filed their request for common benefit allocation, PC filed an objection thereto because the common benefit request was unprecedented and totally unreasonable.  PC spent countless hours participating in the attorney fee litigation in an effort to achieve a more equitable division of the attorney fee fund as well as making concerted efforts to help and encourage all sides to reach a global resolution, including drafting a global settlement proposal and fielding calls and emails from numerous interested attorneys.

Once PC discovered the multi-faceted conflicts related to Esquire Bank, he performed countless hours of investigation and financial analysis, thousands of pages of document review, countless hours of motion and brief writing.  This was done in an effort to protect the Attorney Fee QSFs in this litigation and see to it that all conflicts and/or unreasonable causes for delay are eliminated.

R. Tucker Yance

STATE OF ALABAMA            )

MOBILE COUNTY               )

      SWORN TO AND SUBSCRIBED before me the undersigned Notary Public on this the

3rd day of July, 2018.

Notary Public

My Commission Expires: 3/9/21