UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br><br>SECTION: L |
| THIS DOCUMENT RELATES TO: | JUDGE FALLON |
| ALL *CASES* | MAG. JUDGE WILKINSON |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY FEE COMMITTEE CHAIR AND CO-CHAIR, TO STRIKE THE STEP SIX RECOMMENDATION OF THE MAJORITY OF FEE COMMITTEE REGARDING ALLOCATION OF THE COMMON BENEFIT (R. DOC. 21455), AND TO LIFT THE SEAL ON RELATED FILINGS**

*MAY IT PLEASE THE COURT:*

## INTRODUCTION

This motion seeks to purge conflicts of interests causing harm to the integrity of this proceeding and to promote greater transparency regarding issues of public concern. In particular, mover requests disqualification of Arnold Levin ("Levin") and Russ Herman ("Herman") from the Fee Committee ("FC") and that the Step Six Recommendation of the Majority of the Fee Committee Regarding Allocation of the Common Benefit (R. Doc. 21455) be stricken from the record. Additionally, mover requests that the seal be lifted on related filings.[1] At that point, the Court should proceed without an FC recommendation under Step Six and use a lodestar analysis consistent with the Order and Reasons Setting Common Benefit Fees, R. Doc. 21168.[2]

---

[1] R. Docs. 20735, 20788, 21003, 21005, 21442, 21053, 20759, 20770, and 20775.

[2] To set the aggregate common benefit fee, the Court found support in similar jurisprudence for an effective average hourly rate of $442.76. R. Doc. 21168 at 22 ("A common benefit fee of approximately $102.86 million, which when divided by the number of hours of common benefit work, would result in an hourly fee of approximately **$442.76** for common benefit work.") This, according to the Court, is consistent with "other cases involving similar recovery [which] range

4

Grounds supporting disqualification fall into three categories: (1) Conflicts raised in the Motion to Disqualify the FC (R. Doc. 20735) not addressed by the Court in its Order and Reasons denying disqualification of the FC (R. Doc. 20789);[3] (2) Additional self-dealing, patronage and retribution; and (3) the Esquire Bank conflicts.[4]

## A. Fee Proceedings to Date

PTO 28 (R. Doc. 17379) was entered January 14, 2014, following nine related settlement agreements.[5] Dedicated proceeds from these settlements were combined to form a Settlement Fee and Cost Account for payment of attorney fees and reimbursement of litigation expenses for primary (individual-retained) attorneys and common benefit attorneys. To allocate and distribute these funds (the "Fee Fund"), the Court established a six-step process:

Step One: Review of [Common Benefit] Time and Expenses

Step Two: Submission of Initial Affidavit For Compensation For Common Benefit Time And Reimbursement of Expenses To FC and Identification Of Individual Claimants Retained by Individual Counsel

---

from $165.00 to $677.25 per hour. *See, e.g.*, Vioxx Prods. Liab. Litig., 760 F. Supp.2d 640, 660-61 (E.D. La. 2010) (citing In re Guidant, 2008 WL 682174, at * 15 (D.Minn. Mar. 7, 2008) (finding an average hourly rate of $443.25 was reasonable for work performed between 2005 and 2010 was reasonable); In Re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, MDL No. 2179, Doc.21849 (E.D. La. Oct. 25, 2016) (finding $450.00 per hour was an appropriate average/blended hourly rate); see also In re Avandia Marketing, Sales Practices and Product Liability Litigation, MDL No. 1871, Pretrial Order No. 175, Doc. 2820 (E.D. Pa. Oct. 19, 2012) (approving staggered rates of $225.00, $285.00, $475.00 and $595.00 (for an average hourly rate of $353.00) for attorneys based on their experience and contribution to the case."). R. Doc. 21168 at 18.

[3] *In re Chinese Manufactured Drywall Products Liability Litigation*, 2017 WL 22909198 (E.D. La. May 24, 2017).

[4] Given the posture of the MDL, this motion does not challenge the appointments of Levin and Herman as leaders of the Plaintiffs' Steering Committee. Rather, it is directed solely to the fee allocation proceedings and seeks the least disruptive remedy warranted by the circumstances.

[5] *See* PTO 28. R. Doc. 17379 at 1-2.

5

  Step Three:  Filing Of A Joint Fee Petition
  Step Four:  Common Benefit Request For Other Cases
  Step Five:  Establishment of Common Benefit and Individual Fees
  Step Six:  Common Benefit Fee Allocation

PTO 28 also appointed a Fee Committee responsible for assisting the Court in the administration of fee allocation proceedings. The FC's duties included responsibility for submitting a joint request with the PSC for "an award of common benefit attorney fees and reimbursement of expenses" under Step Three and for making recommendations and administering the process for allocating common benefit fees under Step Six.

On March 26, 2014, the Court entered PTO 28(B) (R. Doc. 17567) expanding the FC's authority to include an active role in the Step Five allocation process,[6] which placed the FC in the middle of a conflict between the two stakeholder groups. Repeatedly, Levin and Herman have used this authority to conflate the process under Step Five with the process under Step Six for the purpose of manipulating both halves of the fee allocation proceeding to their personal advantage.

On May 25, 2016, the Court issued PTO 28 (F) (R. Doc. 20282) instructing the FC to file a Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees, which was accomplished June 7, 2016. R. Doc. 20293 (the "Allocation Motion"). The Allocation Motion urged the Court to divide the Fee Fund 60-40 in favor of the common benefit, the largest percentage common benefit allocation in this Court's

---

[6] Paragraph 1 of PTO 28(B) provides: "The deadline set forth in paragraph 6 of PTO 28 for the Fee Committee's filing a consolidated, joint fee petition ("Joint Global Fee Petition") with the Plaintiffs' Steering Committee ("PSC") for a global award of attorney fees, ***inclusive of common benefit attorneys' fees and individual retained counsel fees***, and reimbursement of expenses shall be extended to May 2, 2014." (emphasis added to expanded language). PTO 28(F) directed the FC to file a Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F).

history.[7] The Court posted the Allocation Motion on its website and invited objections.[8] Twenty three firms objected.[9]

A special master was then appointed to preside over discovery, conduct an evidentiary hearing, and make recommendations to the Court concerning the Allocation Motion and objections (the "Step Five Allocation Proceeding"). R. Doc. 20410.

Under the direction of Levin and Herman, the FC immediately abandoned any pretense of objectivity and assumed the role of advocate for the common benefit stakeholders in the Step Five Allocation Proceeding. Primary Counsel repeatedly objected, to no avail, on the basis of *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 232 (5th Cir. 2008)

---

[7] *Compare Vioxx Prods. Liab. Litig.*, 760 F. Supp.2d 640, 660-61 (E.D. La. 2010) (dividing fees 79.69% to primary counsel and 20.31% to common benefit counsel). The highest reported split in this Court was 50-50 in *In re FEMA Trailer Formaldihyde Prods. Liab. Litigation*, MDL No. 07-1873, 2013 WL 1867117, at *1 (E.D. La. May 2, 2014) and *In re Educational Testing Services*, 555 F.Supp.2d 661, 664, 671 (E.D. La. 2007).

[8] *See* Order and Reasons Setting Common Benefit Fees, R. Doc at 5-6 (The FC's "recommendation was then posted on the Court's website to afford all counsel an opportunity to see the recommendation and respond") and Order and Reasons [denying the Motion to Disqualify the FC], R. Doc. 20789 ("Having received this recommendation, the Court sought input from contract attorneys, and asked them to object to the Fee Committee's recommendation.").

[9] Parker Waichman LLP (R. Doc. 20348); Baron & Budd, P.C., Allison Grant, P.A., Alters Law Firm, P.A. (R. Doc. 20353-3); Whitfield Bryson & Mason LLP, Pendley Baudin & Coffin, Rhine Law Firm, Luckey & Mullins (R. Doc. 20346); Gentle, Turner, Sexton & Harbison, LLC, McCallum, Hoaglund, Cook & Irby, LLP (R. Doc. 20336); Willis & Buckley, APC (R. Doc. 20349);Collins & Horsley, P.C. (R. Doc. 20351); Alters Law Firm, P.A. Rec. (R. Doc. 20355); Hawkins/Gibson, PLLC (R. Doc. 20356); Milstein, Adelman, Jackson, Fairchild & Wade, LLP, Roberts and Durkee, LLP (R. Doc. 20337); Taylor Martino, P.C. (R. Doc. 20338); Cohen Milstein Sellers & Toll PLLC, Mrachek, Fitzgerald, Rose, Konopka, Thomas & Weiss, P.A. (R. Doc. 20343); Paul A. Lea, Jr. (R. Doc. 20344); Doyle Law Firm, PC (R. Doc. 20350); Morgan & Morgan, P.A. (R. Doc. 20354); Yance Law Firm, LLC (R. Doc. 20357); and Morris Bart, LLC (R. Doc. 20392-2).

7

("lead counsel for fee allocation must 'apply a universally fair standard of allocation to all participants, including self.'").[10]

On August 10, 2016, fifteen firms filed a Motion for Immediate Disbursement of Undisputed Fees (R. Doc. 20434) to authorize the distribution of primary counsel fees as recommended in the Allocation Motion for firms wanting to avoid the fee dispute. The FC inexplicably opposed the motion, effectively trapping every primary attorney in the fee litigation. R. Doc. 20440. The Court has not ruled on this motion.[11]

After enduring eight months of staunch opposition from the FC, Parker Waichman *et al.* filed the Motion to Disqualify the FC on April 13, 2017, alleging that the FC's participation as an advocate was undermining transparency and impartiality, conflicts of interest and self-dealing by Levin and Herman, and misuse of funds. R. Doc. 20735. Levin and Herman retaliated with a Motion for Sanctions (R. Doc. 20759), improperly filed in their capacities as leaders of the PSC (another conflict) and without complying with the safe harbor provisions of Rule 11.[12]

On May 24, 2017, the Court denied the Motion to Disqualify the FC on the basis that "the Fee Committee's recommendation will not receive any heightened weight in the Court's decision." *In re Chinese Manufactured Drywall Products Liability Litigation*, 2017 WL 22909198, *3 (E.D.

---

[10] The extent of the FC's advocacy in the Step Five Fee Allocation Proceeding is more fully described in the Motion to Disqualify the FC. R. Doc. 20735 at 20-22.

[11] More recently, on March 6, 2018, the firm of Krupnick Campbell filed a similar motion to allow disbursements based on the allocation recommended by the Court in the Order and Reasons Setting Common Benefit Fees. *See* Krupnick Campbell Malone Et Al. Motion for Interim Disbursement of Fees, R. Doc. 21212. Levin and Herman, this time acting as Lead and Liaison Counsel, opposed the motion. R. Doc. 21247. The motion was denied May 18, 2018 (within the Order and Reasons denying interlocutory appeal of the fee allocation ruling). R. Doc. 21322 at 15.

[12] *See* Opposition to Motion for Sanctions, R. Doc. 20770. The Court has not ruled on this motion. The FC later filed an opposition (R. Doc. 20788) to the Motion to Disqualify the FC on the same day the Court denied that motion.

8

La. May 24, 2017) (R. Doc. 20789 at 5). The Court directed its reasoning to a "misunderstanding"[13] by the movers regarding the role of the FC, while not addressing the grounds alleged in support of disqualification.[14]

The Step Five Allocation Proceeding was tried before the Special Master on May 31, 2017 and June 1, 2017, with the FC representing the common benefit stakeholders against primary counsel. On September 11, 2017, the Special Master issued his Recommendation Concerning Attorneys' Fees and Expenses, R. Doc. 20950.

On September 29, 2017, Primary Counsel[15] filed their Objections and Response to the Special Master Recommendations Concerning Attorney Fees and Expenses. R. Doc. 20993-2. Primary Counsel's arguments fall under two categories: (1) The division of the Fee Fund; and (2)

---

[13] According to the Court: "While the Court appreciates the objections of contract counsel, it finds contract counsel misunderstands the role of the Fee Committee's recommendation in the overall process which will ultimately lead to a decision on the fee allocation issue. At the core of this misunderstanding seems to be contract counsel's belief that the Court will view the Fee Committee's recommendation as more significant, or accord it more weight, than the position of contract counsel during the final determination of the fee award. This position is contrary to the procedure established by this Court." Order and Reasons, R. 20739 at 4, 2017 WL 22909198 at *2.

[14] The Court accurately summarized the alleged grounds as follows: "The contract attorneys argue the Fee Committee has taken an active role as a party in the fee dispute, which has undermined the transparency and impartiality of the process used to determine the fee allocation issue. R. Doc. 20735 at 2-3. Further, they aver that members of the Plaintiff's Steering Committee manipulated settlement discussions to prolong the settlement process and maximize the common benefit fee award. R. Doc. 20735 at 8-10. Contract counsel then take issue with specific expenses the Fee Committee has submitted to the Court-appointed CPA, and argue the Fee Committee has improperly used MDL funds for personal expenses. R. Doc. 20735 at 15-20. Finally, contract counsel argue that disqualification is warranted because of what they perceive to be ex parte communications between the Court and members of the Fee Committee regarding the fee allocation. R. Doc. 20735 at 33-38." R. Doc 20789 at 3.

[15] Baron & Budd, P.C.; Allison Grant, P.A.; Alters Law Firm, P.A.; Parker Waichman LLP; Whitfield Bryson & Mason LLP; Pendley Baudin & Coffin; Rhine Law Firm; Luckey & Mullins; Gentle, Turner, Sexton & Harbison, LLC; McCallum, Hoaglund, Cook & Irby, LLP; Milstein, Jackson, Fairchild & Wade, LLP; Roberts and Durkee, LLP; and Yance Law Firm, LLC.

9

Improper expenditures and accounting activities affecting the size of the Fee Fund. Separately, Primary Counsel filed a related Motion for Accounting and Adjustment of Global Fee Award of Attorneys' Fees and Reimbursement of Expenses (R. Doc 21005) ("Motion for Accounting and Adjustment"). The FC opposed that motion, relying heavily on the Court's involvement and oversight in the process. R. Doc 21542.[16]

On January 31, 2018, the Court issued its Order and Reasons Setting Common Benefit Fees. R. Doc. 21168. Contrary to the FC's repeated arguments, the Court used the lodestar method as the primary methodology cross-checked by the twelve *Johnson* factors. R. Doc 20789 at 8-19.[17] The Court then incorporated an abbreviated version of the percentage method to arrive at the 52-48 division. *Id.* at 19-22.[18]

As for the fiscal and accounting issues raised by Primary Counsel,[19] the Court addressed only the "$10,000,000 Taishan Set Aside," agreeing that "this advance is used to pursue Taishan and is unrelated to Knauf" and therefore must be returned to the Fee Fund. R. 20993-2 at 21 n5. In addition, the Court has not ruled on the Motion for Accounting and Adjustment (R. Doc. 21005).

On May 18, 2018, The Yance Law Firm filed a Motion and Memorandum to Immediately Transfer Attorney Fee Qualified Settlement Fund to a Different Depository Bank or Back Into the

---

[16] To be clear, the Motion for Accounting and Adjustment (R. Doc. 21005) is directed to expenditures and disbursements *not* authorized by the Court, directly or indirectly.

[17] This was confirmed by the Court in its Order and Reasons denying certification or, alternatively, entry of final judgment on the common benefit fee award. *See* R. Doc. 21322 at 8 ("In setting the 52-48 allocation, the Court spent countless hours reviewing the record, ***and then applied the lodestar method and Johnson factors to arrive at its decision***.") (emphasis added).

[18] Mover reserves its right to challenge on appeal all issues relating to the methodology used by the Court in making allocations.

[19] *See* R. Doc. 20993-2 at 91-123, Section "N" under the heading "Millions of Dollars Have Been Improperly Charged Against the Attorneys' Fund".

Court Registry, R. Doc. 21338, which was joined in whole or part by three firms (*See* R. Doc. 21341, 21350, 21360) (collectively "Esquire Transfer Motions"). The Esquire Transfer Motions raise questions regarding potential conflicts by Herman relating to his ownership and board position with Esquire Bank, the Depository Bank holding the funds at issue, and Esquire Bank's use and management of those funds.

On June 12, 2018, the Court ordered that the Attorney Fee Qualified Settlement Fund ("QSF") be transferred from Esquire Bank and placed into the registry of the Court, set a briefing schedule for Herman and Yance, and set the matter for hearing on Jury 12, 2018. R. Doc. 21405.

On June 28, 2018, Herman filed a Memorandum and Response (R. Doc. 21429-2), along with several exhibits, including an Affidavit of Esquire Bank, National Association. R. Doc. 21429-4. Yance replied on July 3, 2018.[20]

Also on July 3, 2018, the FC filed a Step Six Recommendation of the Majority of the Fee Committee Regarding Allocation of the Common Benefit ("Step Six Recommendation"). R. Doc. 21455. The Step Six Recommendation allocates $76,649,699.57 – *76.68% of the entire common benefit award* – to the firms of the six FC Members supporting the recommendation, including $53,049,699.56 (*53.18%*) to the firms of Levin and Herman. In addition the Step Six Recommendation includes a bonus for "the efforts of those firms that worked diligently to obtain, over strenuous objection, the Court's approval of the total common benefit fee now to be allocated." *See* Exhibit "A" email of Herman and Levin (May 23, 2018).

On July 5, 2018, the dissenting member of the FC, Michael J. Ryan, filed a Minority Fee Committee Report (R. Doc. 21473), challenging the lack of methodology to support the excess

---

[20] R. Docs 21467-1, 21467-2, 21467-3, 21467-4, 21467-5, 21467-6, 21467-7, 21467-8, 21467-9, 21467-10 (collectively "Yance's Reply Regarding Esquire").

11

and disproportionate awards to Levin and Herman and the bonus for work performed in the Step Five Allocation Proceeding.

The Court has ordered that objections to the Step Five Recommendation be filed no later than 5:00 P.M. on July 20, 2018. R. Doc. 21482.[21]

**B. <u>Disqualification is Necessary to Cure Actual and Apparent Conflicts and to Protect the Appearance of Impartiality in Further Fee Allocation Proceedings</u>**

"[C]omplex litigation places greater demands on counsel in their dual roles as advocates and officers of the court." MANUAL FOR COMPLEX LITIGATION (FOURTH), § 10.21 (2004). First and foremost, as officers of the Court, Levin and Herman have an obligation to avoid conflicts that threaten to undermine public confidence in the integrity of these proceedings.[22] Further, as leaders of the FC, they have a duty of fairness to all attorney stakeholders. *See In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 232 (5th Cir. 2008) ("lead counsel for fee allocation must 'apply a universally fair standard of allocation to all participants, including self.'").[23]

---

[21] Mover reserves its right to file a separate objection to the Step Five Recommendation in accordance with the Court's Order.

[22] "In order to determine whether a court's impartiality is reasonably in question, the objective inquiry is whether a well-informed, thoughtful and objective observer would question the court's impartiality." *Republic of Panama v. America Tobacco Company*, 217 F.3d 343, 346 (5th Cir. 2000) citing *Trust Co. v. N.N.P.,* 104 F.3d 1478, 1491 (5th Cir.1997) (disqualifying district judge); *Hall v. Small Business Administration*, 695 F.2d 175, 179 (5th Cir. 1983) (disqualifying magistrate judge). *See also In re Kensington Intern. Ltd*., 368 F.3d 289 (3rd Cir. 2004) (disqualifying court advisor); *In re Kempthorne*, 449 F.3d 1265 (D.C. Cir. 2006) (disqualifying special master).

[23] Quoting with approval, *In re Vitamins Antitrust Litig.*, 398 F.Supp.2d 209, 234 (D.C. 2005). *See also* MANUAL FOR COMPLEX LITIGATION (FOURTH), § 10.22 (2004) (describing lead lawyers as fiduciaries who are required to "act fairly, efficiently, and economically in the interest of all parties and parties counsel."); PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 1.04 reporter's notes cmt. A (2010) (observing that "[c]lass counsel is a [] fiduciary to a client [the named plaintiff,] who is also a fiduciary [to other class members]," and that "[a] similar relationship obtains between lead attorneys and other lawyers in multidistrict litigation."); Lynn A. Baker and Charles Silver, *Fiduciaries and Fees: Preliminary Thoughts*, 79 Fordham L. Rev. 1833 (2010); Charles Silver,

12

Whereas the conflicts of Levin and Herman arguably could be shielded from the outcome of the Step Five allocation decision by the Court's *de novo* review and equal weighting of the evidence, that same result is not possible under Step Six because the majority recommendation, by its nature, is an "inside" document that relies on highly subjective opinions.  In other words, it is impossible for the Court to use the Step Six Recommendation for any purpose without deferring to Levin and Herman.  Thus, disqualification is necessary in this instance.

The conflicts and misconduct alleged in the Motion to Disqualify the FC (R. Doc. 20735) continue to impact this proceeding and remain valid reasons to grant this motion.  Subsequent actions and disclosures involving the Step Six Recommendation and Esquire Bank heighten the need for immediate action by the Court.

1.  *Self-dealing, Patronage and Retribution*

The conflicts and actions at issue are rooted in the financial expectations of Levin and Herman in the outcome of this proceeding, which they refused to disclose during the Step Five Allocation Proceeding.  *See* R. Doc. 20735 at 6.  According to the Step Six Recommendation, however, Herman and Levin have laid claim to $53,049,699.40 ($26,524,849.78, *each*) – that is, 53.18% of all common benefit fees and 27.48% of the entire Fee Fund.[24]  Further, the Step Six Recommendation awards $23,600,000.00 to the firms of the other FC Members in the majority. Those firms logged 44,421 common benefit hours.  This leaves roughly $23,112,400.00 for the remaining 44 firms with 104,088 hours.

---

*The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigation*, 79 Fordham L. Rev. 1985 (2011); *Quasi-Class Action Method*, *supra* note 36.

[24] The Minority Fee Committee Report (R. Doc. 21473) reveals the arbitrary, non-methodological manner in which this grossly disproportionate award was determined.

13

To recap, the six FC Members making the Step Six Recommendation have allocated 76.68% of the entire common benefit award to themselves and the remaining 23.32% to the other 44 common benefit firms based on no objective methodology or rate structure. Any "well-informed, thoughtful and objective observer" (*Republic of Panama v. America Tobacco Company*, 217 F.3d at 346) would view it with deep suspicion.

Further, the FC Majority attempts to cloud the record concerning one of the most important issues in the fee allocation proceeding: the allocation methodology. Right or wrong, the FC has a duty to accurately report and implement the Order Setting Common Benefit Fees, R. Doc. 21168. Instead, the Step Six Recommendation misrepresents the methodology used by the Court and disregards the substance of the Court's lodestar analysis and findings.[25] According to the FC Majority, the Court "discussed the lodestar, percentage-of-recovery, and 'blended' calculation methods, noting that the 'blended' approach entails a percentage-of-recovery calculation cross-checked by the lodestar method." R. Doc. 21455 at 4. On the contrary, the Court did not merely discuss the lodestar; the Court *applied* the lodestar. And the lodestar was not used as a cross-check; it was used as the primary method and then cross-checked by the *Johnson* factors. *See* Order and Reasons [denying interlocutory appeal] (R. Doc. 21322 at 8) ("In setting the 52-48 allocation, the Court spent countless hours reviewing the record, and then applied the lodestar method and Johnson factors to arrive at its decision."). Such obfuscation of a foundational ruling by the Court creates an impression of inherent unfairness that cannot be allowed to stand. *See* Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 380 (2014) ("Disproportionate results and inconsistent standards threaten to damage the public's faith in the judicial resolution of mass tort litigation by creating an impression of inherent unfairness.").

---

[25] *See* note 2, *infra*.

14

In addition, the bonus feature used by the FC Majority to reward firms for work during the Step Five Allocation Proceeding is improper for several reasons. First, it is proof-positive of the structural conflict in allowing the FC to litigate as a party in the Step Five Allocation Proceeding. In the best light, the FC was merely attempting to "hit a homerun" with the 60-40 request and get paid for the effort no matter the outcome.[26] This clearly offends the "universally fair standard of allocation to all participants" required by *In re High Sulfur*, 517 F.3d at 232.

Second, the bonus effectively pays firms for work after the December 31, 2013 cutoff date imposed by PTO 28. No doubt, the driving force here is the volume of work performed by the firms of Levine and Herman in pursuit of Taishan after the Knauf settlements, which may go uncompensated (a risk that was knowingly assumed). According to the Minority Fee Committee Report, "[t]hroughout the Fee Committee work, there has been a pervasive theme involving the volume of work performed by HHK and LSB related to the Taishan litigation in contrast to other firms." R. Doc. 21473. This too explains the FC's overreaching request and why Levin and Herman seemed unwilling to fairly resolve the fee dispute.

Third, the bonus provision is not deserved because the Court rejected the FC's proposed 60-40 allocation and returned the $10,000,000 Taishan Set Aside to the Fee Fund. As stated in the Minority Fee Committee Report, "Lead and Liaison Counsel did not prevail on the two major positions of the Fee Committee (the Taishan holdback and the allocation between common benefit and individual retained counsel.)" R. Doc. 21473 at 6. It is fundamentally unfair to compensate the firms who lost the fee allocation proceeding, while forcing the firms who prevailed to absorb their time and expense.

---

[26] According to the Minority Fee Committee Report, the allocation proposed by the Fee Committee in June 2015 was based on a 50-50 allocation (R. Doc. 21473 at 3).

15

In contrast to patronage for self and supporters, Levin and Herman are punishing certain objecting firms. For example, Parker Waichman has been allocated $650,000 for 8,905.75 approved common benefit hours, rendering an effective hourly rate of $72.98 for a member of the PSC (former)[27] who followed all the rules but challenged Levin and Herman's conflicts and misconduct. This indefensible recommendation follows a more blatantly vindictive preliminary recommendation of $100,000, effectively $11.29 per hour. *See* Email of Levin and Herman (Exhibit "A") and Parker Waichman LLP's Objection to the Fee Committee's Common Benefit Fee Allocation Recommendation (Exhibit "B").

The actions of Levin and Herman in connection with Step Six Recommendation rise to the level of pervasive bias, particularly in the context of their actions during Step Five. *See* Liteky v. United States, 510 U.S. 540, 551 (1994) ("A favorable or unfavorable predisposition can also deserve to be characterized as "bias" or "prejudice" because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment.").[28] Such conduct is corrosive to the appearance of impartiality.

## 2. *Herman's Esquire Bank Conflicts*

Herman's filings in response to the Esquire Transfer Motions focus on his ownership and board position with Esquire Bank, which were previously disclosed to the Court, as well as the bank's placement and administration of the QSF funds. But they do not address two critical issues:

---

[27] *See* Order allowing voluntary withdrawal of Jerry Parker from PSC on June 29, 2018. R. Doc. 21440.

[28] Pervasive bias is "[a]n exception to the general rule that the bias [supporting recusal] must stem from an extrajudicial source.'" *United States v. Meester,* 762 F.2d 867, 867 (11th Cir.), *cert. denied,* 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985) (quoting *Davis v. Board of School Commissioners,* 517 F.2d 1044, 1051 (5th Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).

(1) the extent to which the QSF funds were used by Esquire Bank to promote its 2016 public offering during the same time period that Herman was leading the FC in the Step Five Allocation Proceeding, and (2) whether Herman's anticipated interest in the common benefit allocation is part of the "future receivables" securing Herman's loan from Esquire Bank.[29] Further, Herman's filings do not adequately address the appearance that the IPO may have influenced his advocacy in the Step Five Allocation Proceeding. The temporal relationship between these events cannot and has not been denied.[30]

The extent to which the QSF funds were material to the IPO is important to determine whether Herman (and the bank) had an obligation to inform the Court about the impact of the IPO on the value of Esquire Bank stock held by Members of the PSC, and thus the magnitude of the previously disclosed conflict.

The use of Herman's "future receivables" as collateral is more clearly and immediately problematic. If Herman monetized his common benefit interest through a loan from the Court's appointed Depository Bank in the midst of the fee allocation proceeding without first notifying the Court, he committed a serious breach of his duty to the Court and the fee allocation stakeholders. The appearance that he may have used his relationships with Esquire Bank and the Court to take advantage of an opportunity that was not available to other stakeholders is unavoidable. Simply put, it appears that he may have "cashed out" while making others wait as he stubbornly continued the litigation. *If this occurred*, he must be disqualified to preserve the integrity of this proceeding.

---

[29] Many additional questions about the adequacy and accuracy of Herman's filings are raised by Yance's Reply Regarding Esquire.

[30] On June 7, 2016, the FC filed the Allocation Motion (R. Doc. 20293). Esquire filed its Draft Registration Statement on October 13, 2016 (*See* http://www.snl.com/Cache/c2000863925.html) and announced its completion of the IPO on June 30, 2017. *See* http://investorrelations.esquirebank.com/Docs.

Herman admits in his Memorandum and Response that he has a personal loan from Esquire Bank, although he does not state whether the loan is secured. Herman Memorandum and Response (R. Doc. 21429-2 at 20) ("I have personally borrowed money from Esquire Bank at market rates and have received no special treatment"). In response to an allegation about the IPO, Herman randomly states that "==NO QSF FUNDS HAVE BEEN USED FOR COLLATERAL FOR LOANS==" (*Id*. at 17) (caps and highlight in original), without further explanation. But, by comparison, the Affidavit of Esquire Bank describes the loan to Herman as secured by "future receivables" without identifying the source of those receivables. R. Doc 21429-4 at 3 ("Esquire Bank has made a personal loan to Mr. Herman secured by his future receivables and personal guarantee"). Given the magnitude of this issue, both Herman and Esquire Bank should have unequivocally stated whether the "future receivables" securing Herman's loan include his anticipated interest in the QSF. Instead, their responses appear carefully coordinated to avoid this important question, while implying that there is no relationship. Obviously, any loan by Esquire Bank to Herman is an actual conflict that should have been disclosed and may have warranted disqualification. But a loan secured, *directly or indirectly*, by Herman's "future receivables" from the QSF is a direct financial conflict compelling disqualification under these circumstances.[31]

Levin does not escape the Esquire Bank conflict issues. As Co-Chair of the FC with Herman, it must be presumed that he knew or should have known of the actual extent of Herman's conflicts and withheld information from the Court and the fee allocation stakeholders.

---

[31] *See The Chase Manhattan Bank v. Affiliated FM Insurance Company*, 342 F.3d 120, 127 (2nd Cir. 2003) ("[28 U.S.C. §] 445(b)(4) embodies an actual knowledge test regarding disqualifying circumstances and provides a bright line as to disqualification based on a known financial interest in a party—i.e., an equity financial interest of any size is disqualifying." *Citing See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859-60 n.8 (1988)).

**C. Lifting the Seal on Related Filings is Necessary and Appropriate**

Records of the Court are presumptively public and a decision to seal a record "must be made in light of the strong presumption that all trial proceedings should be subject to scrutiny by the public." *United States v. Holy Land Found*, 624 F.3d 685, 690 (5th Cir. 2010).[32] *In Re High Sulfur* emphasized the strength of this presumption in fee allocation proceedings:

> On a broad public level, fee disputes, like other litigation with millions at stake, ought to be litigated openly. Attorneys' fees, after all, are not state secrets that will jeopardize national security if they are released to the public. As the Third Circuit has noted, "[p]ublic confidence [in our judicial system] cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view." *United States v. Cianfrani,* 573 F.2d 835, 851 (3d Cir.1978). From the perspective of class welfare, publicizing the process leading to attorneys' fee allocation may discourage favoritism and unsavory dealings among attorneys even as it enables the court better to conduct oversight of the fees. If the attorneys are inclined to squabble over the generous fee award, they are

---

[32] Judge Vance provides the following excellent summary of the law on this subject in *In Liljeberg Enters Int'l, LLC v. Vista Hosp. of Baton Rouge*, No. 04-2780, 2005 WL 1309158, at *1 (E.D May 19, 2005): "To determine whether to disclose or seal a judicial record, the Court must balance the public's common law right of access against the interests favoring non-disclosure. *See S.E.C. v. Van Waeyenberghe,* 990 F.2d 845, 849 (5th Cir.1993). Courts recognize a common law right to access judicial records and proceedings, but "the right is not absolute." *Bahwell v. Stanley-Bostitch, Inc.,* No. Civ.A. 00-0541, 2002 WL 1298777, at * 1 (E.D.La. June 10, 2002). Public access serves to enhance the transparency and trustworthiness of the judicial process, to curb judicial abuses, and to allow the public to understand the judicial system better. *Id.* (citing *Van Waeyenberghe,* 990 F.2d at 849). It follows then that " 'the district court's discretion to seal the record of judicial proceedings is to be exercised charily." ' *Id.* (quoting *Van Waeyenberghe,* 990 F.2d at 848). Although countervailing interests can outweigh the right of public access, the party seeking to overcome the presumption of access bears the burden to show that the interest in secrecy outweighs the presumption. *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.,* 998 F.2d 157, 165 (3d Cir.1993). The decision as to access is left to the discretion of the trial court, *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 599, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), but any doubt must be construed in favor of disclosure. *Marcus v. St. Tammany Parish Sch. Bd.,* No. Civ.A. 95-3140, 1997 WL 313418, at *5 (E.D.La. June 9, 1997) (citing *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.,* 24 F.3d 893, 897 (7th Cir.1994)). Finally, that no third party objects to the sealing of the records here is "inconsequential," because the presumption of openness does not depend on such an objection. *Stalnaker v. Novar Corp.,* 293 F.Supp.2d 1260, 1263 (M.D.Ala.2003); *see also Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.,* 178 F.3d 943, 945 (7th Cir.1999)("The judge is the primary representative of the public interest in the judicial process and is duty-bound therefore to review any request to seal the record (or part of it).")."

19

well positioned to comment—publicly—on each other's relative contribution to the litigation.

517 F.3d at 230.

The oft-repeated rationale for filing documents relating to the fee dispute under seal in this proceeding has been to avoid the potential disclosure of privileged information to the detriment of the claimants who continue to litigate against the non-settling defendants. In the absence of objection, prophylactic protection was appropriate. However, considering the remand of the non-settling claims, the advanced stage of the fee allocation proceeding, and the allegations and evidence of conflicts undermining the appearance of impartiality, the Court should lift the seal on documents that shed light on the issues raised in this motion. At a minimum, the Court should require that objectors carry the heavy burden to maintain the seal in whole or part for the filings at issue.[33]

## **CONCLUSION**

For the reasons set forth above, Parker Waichman LLP requests that the Court:

  a. Remove Arnold Levin and Russ Herman from the Fee Committee;

  b. Strike the Step Six Recommendation of the Majority of the Fee Committee Regarding Allocation of the Common Benefit (R. Doc. 21455);

  c. Lift the seal on R. Docs. 20735, 20788, 21003, 21005, 21442, 21053, 20759, 20770, and 20775;[34] and

---

[33] Mover has no objection to maintaining confidentiality for discrete portions of pleadings or exhibits where the public right of access is genuinely outweighed by the need to preserve confidentiality.

[34] Motion to Disqualify the Fee Committee by Parker Waichman; Whitfield Bryson & Mason LLP; Pendley Baudin & Coffin; the Rhine Law Firm; Luckey & Mullins; Milstein, Adelman, Jackson, Fairchild & Wade, LLP; and Roberts and Durkee, LLP [Under Seal] (R. Doc. 20735); The Fee Committee's Response in Opposition to Primary Counsel's Motion to Disqualify the Fee Committee, Strike Its Allocation Recommendations, and Stay or Dismiss Proceedings Before the Special Master and Request for Expedited Consideration [Under Seal] (R. Doc. 20788); Primary Counsel's Objections and Responses to Special Master's Recommendation Concerning Attorney Fees and Expenses [Under Seal] (R. Doc. 21003); Primary Counsel's Motion for Accounting and

    d.  Proceed with Step Six allocations based on a lodestar analysis consistent with the Order and Reasons Setting Common Benefit Fees (R. Doc. 21168).

Respectfully Submitted:

**FAIRCLOTH, MELTON & SOBEL, LLC**

By:    /s/ *Jimmy R. Faircloth, Jr.*
    Jimmy R. Faircloth, Jr. (LA #20645)
    jfaircloth@fairclothlaw.com
    Brook L. Villa (LA #31988)
    bvilla@fairclothlaw.com
    Franklin "Drew" Hoffmann (LA #35824)
    dhoffmann@fairclothlaw.com
    412 N. 4th Street, Suite 230
    Baton Rouge, LA 70802
    Phone: (225) 343-9535
    Fax: (225) 343-9538

*Attorneys for Parker Waichman LLP*

---

Adjustment of Global Fee Award of Attorneys' Fees and Reimbursement of Expenses [Under Seal] (R. Doc. 21005); The Fee Committee's Response to Primary Counsel's Motion for Accounting and Adjustment of Global Award of Attorneys' Fees and Reimbursement of Expenses [Under Seal] (R. Doc. 21442); Reply to Fee Committee's Response to Motion for Accounting and Adjustment of Global Award of Attorneys' Fees and Reimbursement of Expenses by Primary Counsel [Under Seal] (R. Doc. 21053); Plaintiffs' Lead and Liaison Counsel's Motion for Sanctions Pursuant to Rule 11 [Under Seal] (R. Doc. 20759); Response in Opposition to Plaintiffs' Lead and Liaison Counsel's Motion for Sanctions Pursuant to Rule 11 [Under Seal] (R. Doc. 20770); Plaintiffs' Lead and Liaison Counsel's Reply Brief in Support of Motion for Sanctions Pursuant to Rule 11 [Under Seal] (R. Doc. 20775).

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing *Memorandum in Support of Motion to Disqualify Fee Committee Chair and Co-Chair, to Strike the Step Six Recommendation of the Majority of Fee Committee Regarding Allocation of the Common Benefit (R. Doc.21455), and to Lift the Seal on Related Filings* has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail <u>or</u> by hand delivery and e-mail <u>and</u> upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 10th day of July, 2018.

                                                                                       /s/ *Jimmy R. Faircloth, Jr.*
                                                                                          OF COUNSEL