UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY      MDL No. 2047
LITIGATION

SECTION: L

THIS DOCUMENT RELATES TO:       JUDGE FALLON
*ALL CASES*                     MAGISTRATE JUDGE WILKINSON
*****************************************************************************

### OBJECTION BY ALLISON GRANT, P.A. TO THE FEE COMMITTEE'S RECOMMENDATION AS TO COMMON BENEFIT AWARD

Allison Grant, P.A. (hereinafter "GRANT") respectfully submits her objection to the Fee Committee's recommendation as to common benefit award dated July 3, 2018 as follows:

On January 10, 2014, the Court entered Pre-Trial Order (hereinafter "PTO") 28, which set forth a six step process for an efficient presentation to the Court for purposes of determining attorneys' fees and reimbursement of litigation expenses. *See* Rec. Doc. 17379. On May 17, 2016, the Court entered an Order approving attorneys' fees in the amount of $192,981,363.35. *See* Rec. Doc. 20257. On June 7, 2016, pursuant to Step Three of PTO 28 (Rec. Doc. 17379), the Fee Committee filed a Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees (Rec. Doc. 20290-4, at 56-57), which urged the Court to allocate an unprecedented 59.37%[1] (*i.e.,* $119,313,367.08) of the fee

---

1. The proposed allocation to common benefit counsel was actually greater than 59% of the available attorneys' fees because the Voluntary Common Benefit payments (Rec. Doc. 8389) and attorneys' fee and costs in connection with the North River settlement (Rec. Doc. 16968) were excluded. Additionally, the Fee Committee later requested that the attorneys' fees in connection with the four Virginia-based Class Action Settlements be subtracted from the total fee fund, further increasing their percentage. Notwithstanding said exclusion, upon information and belief, the common benefit hours associated with the above matters were included in Fee Committee's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees.

fund to common benefit counsel.   Without rehashing the numerous substantive grounds, in short, GRANT objected to the disproportionate division of fees in favor of common benefit counsel, particularly in the face of a severely limited and insufficient fee fund to fully compensate all counsel.[2]   Following objections by twenty-three firms and proceedings (including an evidentiary hearing) before a Special Master, on January 31, 2018, the Court entered an Order awarding a total common benefit fee in the amount of 52% (*i.e.*, $99,762,099.56) to common benefit attorneys.   Rec. Doc 21168.[3]   GRANT reserves the right to object to the final order regarding fees at the appropriate time.

On July 3, 2018, pursuant to Step Six of PTO 28 (Rec. Doc. 17379), the Fee Committee recommended to the Court individual allocations of the total common benefit fee among counsel who performed common benefit services.   Rec. Doc. 21455.   As to GRANT, the Fee Committee recommended compensation in the amount of $28,000.00 for 85 hours of common benefit work.   Rec. Doc. 21455-1.   GRANT objects as this amount grossly undercompensates GRANT for her valuable common benefit work.

GRANT explained at her interview with the Fee Committee on July 9, 2014 that she had significant time that had not been submitted because even though her work benefitted all claimants, it was initiated for the benefit of her individual clients and not at anyone's specific

---

2 *See* Primary Counsel's Post-Evidentiary Hearing Brief (filed with Special Master on July 14, 2017); Primary Counsel's Obj. and Resp. to Special Master's Recommendations Concerning Attorneys' Fees and Expenses (Rec. Doc. 20950) (*see* Rec. Doc. 20993 (motion to file under seal)); Primary Counsel's Motion for Accounting and Adjustment of Global Award of Attorneys' Fees and Reimbursement of Expenses (*see* Rec. Doc. 20995 (motion to file under seal)).

3. Again, this amount did not include the Voluntary Common Benefit payments (Rec. Doc. 8389) or the attorneys' fee and cost payment in connection with the North River Stipulation (Rec. Doc. 16968).   *See* Rec. Doc. 20257, at 3, fn. 4.   Additionally, attorneys' fees from the four Virginia-based Class Action Settlements were not included.

request and, therefore, GRANT had been advised that said time was not eligible for common benefit. For this reason, GRANT advised the Fee Committee that she was only seeking compensation for the 85 hours which was expressly authorized in advance. The Fee Committee was silent.

GRANT was astonished to later discover that other common benefit attorneys were permitted to submit time that was similarly initiated for the benefit of their individual clients (which presumably also had the effect of benefitting other claimants), and that the Fee Committee was recommending compensation for such work. Upon information and belief, some of this work was not authorized in advance. Indeed, some of the work was performed prior to the formation of the MDL and in other cases, time was submitted long after the fact. GRANT's intent is not disparage the work of others, but to object to the disparate treatment. Had GRANT been advised that she too could submit all of her time which benefitted other claimants, she would have done so.

Furthermore, GRANT's work was severely undervalued. Pursuant to PTO 28, the Fee Committee was charged with evaluating "the relative contribution of each common benefit attorney to the outcome of the litigation." Rec. Doc. 17379, at 9-10. This includes "weigh[ing] reported hours of common benefit . . . in degrees of importance to the relief achieved." *Id*. at 11 (citing *In re: Vioxx Products Liability Litigation*, 802 F. Supp 2d 740, 764-765 (E.D. La 2011)). As detailed below, GRANT's work (which spanned several years) played a very important role in obtaining and improving relief for all claimants, yet the compensation recommended by the Fee Committee suggests that the work had little value.

As more particularly set forth in her Initial Affidavit for Compensation for Common Benefit Time and Second Affidavit in Connection with Request for Allocation of Common

Benefit Fee and Cost Award (Exhibits "A" and "B", respectively, filed under seal), GRANT has been actively involved since the inception of this MDL. GRANT started investigating Chinese drywall in 2008 when she discovered a problem with her own property in Port St. Lucie, Florida. She spent months speaking with government officials, homeowners, builders, installers, experts and longshoremen to gather information, which she then published on a website she created in late 2008 in order to exchange information with others. At the time, there was no other information available on the internet regarding Chinese drywall. This website educated tens of thousands of property owners and future claimants.

By early 2009, which was prior to the formation of the MDL, GRANT had already begun working with home inspectors throughout Florida to establish a protocol for the inspection of properties with suspected Chinese drywall. Thereafter, GRANT's work with inspectors expanded to educate them to identify specific drywall markings. GRANT served as a guest lecturer for a national organization of home inspectors, appeared on local and national media and appeared on panels in an effort to raise awareness and educate the public. GRANT also frequently provided photographs of markings to the PSC and other attorneys. GRANT was always eager to assist.[4] In fact, GRANT often voluntarily shared her work product, findings and discoveries, and documents obtained from third parties with other primary counsel and the PSC whenever she believed it would be helpful to other claimants and their counsel. Several members of the PSC called upon GRANT as a resource person for quick answers when information and documentation were needed, particularly on an expedited basis.

GRANT also investigated and identified more than one hundred builders, installers and

---

4 Early on, GRANT also delved into scientific evidence, including hiring experts to analyze drywall. When appropriate, GRANT shared these findings to assist other attorneys.

suppliers, and as early as February 2009, began sending pre-suit demand letters pursuant to Chapter 558, Florida Statutes.[5]  Much of the information GRANT obtained was as a result of her perseverance and important relationships she had established early on with parties in the supply chain.  The fact that GRANT (and her co-counsel) had such a large inventory of clients (ultimately over 1,000), most of whom were geographically concentrated, was an important factor in her ability to open the lines of communication with many defendants. Again, GRANT shared this information with other attorneys and the PSC, and later forwarded information and documentation to Minor Pipes, Esq. to help fill in the gaps and enlist additional defendants to participate in the Global and Banner settlements.  GRANT also provided evidence to Brown Greer to help link properties of other claimants to particular defendants.  GRANT's work increased the number of participating plaintiffs and defendants, it pushed many recalcitrant Defendants to work with Mr. Pipes and ultimately settle, and supplied other attorneys with evidence to aid in the approval of their GBI claims.

In addition to GRANT's hands-on work in connection with administering the Pilot Program for her clients[6], GRANT's work involving condominium associations greatly benefitted other claimants in the MDL.  GRANT extensively researched Florida law regarding standing. GRANT and her co-counsel filed a class action in state court on behalf of one of their

---

5  GRANT is also co-counsel on numerous individual and class actions filed in Florida State Courts.  GRANT performed substantial legal work on these cases prior to the Court's Order Staying Claims Involving KPT Chinese Drywall (hereinafter the "Stay").  Rec. Doc. 12270.

6 GRANT and her co-counsel represented the first homeowner to have her property remediated under the Pilot Program.  There was a tremendous learning curve for everyone, and all claimants benefitted from the countless hours GRANT spent working with Knauf's counsel and Moss to improve the Pilot Program in terms of timeliness, scope and quality of remediation, and ensuring prompt initial and delay payments when appropriate.

condominium association clients, namely, Magdalena Gardens Condominium Association, Inc., which involved approximately 70 affected units.[7] GRANT performed important work on this state case including several months of communicating and negotiating with counsel for the builder prior to the Stay. Following the Stay, GRANT attended a mediation in Miami with Knauf and its counsel to discuss Magdalena Gardens as well as other condominium association claimants. This led to months of negotiations and eventually several settlements with Knauf with respect to GRANT's condominium association clients.

GRANT continued working with Knauf's counsel to establish a protocol for inspecting condominiums, and thereafter, to structure settlements for the remediation of condominium buildings. There were several meetings with Moss onsite to address the logistics of undertaking this type of remediation including, but not limited to, rotating occupants, the hiring of a fire marshal, arranging for security and addressing parking issues. GRANT and Knauf's counsel negotiated specific term sheet and several different releases to address different circumstances. None of these issues had been previously addressed. GRANT's work paved the way and set a framework for other attorneys to settle their own condominium claims with Knauf drywall, an important and substantial benefit to this MDL.[8]

---

7 Magdalena Gardens also presented unique challenges because it contained several mixed properties, an issue never previously addressed in the context of condominiums. GRANT worked tirelessly with Knauf's counsel in drafting documents pertaining to Mixed Properties, and later convinced Knauf's counsel to dispense with the requirement of lender approval for all Mixed Properties.

8 GRANT also worked on important ancillary matters that benefitted many Pilot Program participants, including foreclosures that occurred prior to or during remediation work. GRANT had an ongoing relationship with lenders with whom she had worked to educate about the effects of Chinese drywall. GRANT often kept lenders apprised of the litigation. But the key to success at the remediation stage was enlisting the cooperation of Moss and Knauf's counsel, both of whom worked with GRANT to provide lenders with documentation and a remediation schedule so they would feel more comfortable in providing homeowners with a

Members of the Fee Committee acknowledged the value of the above work both at the July 2014 meeting and in their Recommendation regarding Allocation of Common Benefit dated July 3, 2018 (Rec. Doc. 21455-2, under seal). However, there is clearly a disconnect between the amount that the Fee Committee recommended be allocated to GRANT and the significant and important work GRANT performed that benefitted all claimants in this MDL. An award of $28,000.00 grossly undercompensates GRANT for her valuable common benefit work.

## CONCLUSION

Based on the foregoing and applying the Johnson factors, GRANT objects to the Fee Committee's Recommendation and respectfully requests that the Court increase her fee award to at least $150,000.00 in light of her dedication and significant and valuable contribution to this MDL.

Respectfully submitted,

Dated: July 20, 2018                    /s/ Allison Grant
                                        Allison Grant, Esquire (Fla. Bar 858330)
                                        Allison Grant, P.A.
                                        14 S.E. 4th Street
                                        Boca Raton, Florida 33434
                                        Phone: (561) 994-9646
                                        Fax: (561) 431-4627
                                        agrant@allisongrantpa.com

---

moratorium on their mortgage during the remediation process. Many properties were saved and owners (some of whom were not GRANT's clients) were able to participate in the Pilot Program as a result of GRANT's work.

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 20th day of July, 2018.

Dated: July 20, 2018             RESPECTFULLY SUBMITTED:

/s/ Allison Grant
Allison Grant, Esquire (Fla. Bar 858330)
Allison Grant, P.A.
14 S.E. 4th Street
Boca Raton, Florida 33434
Phone: (561) 994-9646
Fax: (561) 431-4627
agrant@allisongrantpa.com