## UNITED STATE DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | **CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047**<br><br>**SECTION: L** |
| | **THIS DOCUMENT RELATES TO:** | **JUDGE FALLON** |
| | **ALL *CASES*** | **MAG. JUDGE WILKINSON** |

### MORRIS BART, LLC'S OBJECTION TO THE RECOMMENDATION OF THE SUBSET OF THE FEE COMMITTEE

Morris Bart, LLC (hereinafter "Bart"), through undersigned counsel and pursuant to this Court's Order,[1] respectfully submits the instant objection to the recommendation of a subset of the Fee Committee regarding allocation of the common benefit (hereinafter "Recommendation").[2] Specifically, Bart objects to the Recommendation of a subset of the Fee Committee as:

(1) facially deficient as:

    a. it was improperly rendered by a subset of the Fee Committee, rendering it nothing more than individual advocacy for the specific stakeholders offering the same;

    b. it fails to apply a proper methodology and/or provide the required transparency as to the methodology utilized and the actual application of the same vis-à-vis each firm, precluding the Court and each of the common benefit firms from confirming deliberative fairness and the propriety of the proffered Recommendation;

    c. it disregards the temporal limitations expressly imposed by the Court as to the facts and circumstances that can be considered in the allocation process; and

(2) substantively without merit as it grossly undercompensates Bart for the common benefit work it performed in the instant litigation.

Each of these items is addressed separately below.

---

[1] *See* R. Doc. 21482.
[2] *See* R. Doc. 21455.

## ARGUMENT

### I.    THE MAJORITY RECOMMENDATION IS FACIALLY DEFICIENT.

The Majority Recommendation is facially deficient and should be disregarded for three reasons: (1) due to lack of unanimity; (2) due to the failure to apply a proper methodology and/or provide the required transparency as to the methodology utilized and the actual application of the same vis-à-vis each firm; and (3) it improperly considers facts and circumstances expressly precluded from being considered by the Court.

First, the subset of the Fee Committee was without authority to render a recommendation to this Court without unanimity, and accordingly, it should not be considered.  Although both Pretrial Order No. 28 and jurisprudence speak to the general authority for the Court to appoint a fee committee to collect evidence and make a recommendation to the Court, neither contemplate nor provide for individualized recommendations to be made by subsets thereof under the guise of being from the "Fee Committee."  Accordingly, where such division exists, both Pretrial Order No. 28 and jurisprudence provide for the Court to perform its own *de novo* common benefit allocation based upon the record evidence presented by each participating firm or appoint an independent, special master to address this conflict and assist the Court in performing the allocation if need be.[3]  Indeed, a recommendation from a subset of such a committee in and of

---

[3]    *See e.g.,* R. Doc. 17379 at p. 16 ("The Court … will institute any additional procedures it deems necessary, including the appointment of a Special Master to further consider these matters."); *see also, See Turner v. Murphy Oil USA, Inc.,* 582 F.Supp.2d 797, 801-802 (E.D. La. 2008)("Because counsel were unable to reach an agreement, the Court appointed Judge Robert Klees (Ret.) as Special Master and Mr. Dominic J. Gianna as Counsel to the Special Master to assist the Court with the apportionment of the award.") and at 808 ("The Court could have appointed a committee made up of counsel to allocate the Common Benefit Fund.  But a committee of the whole had their opportunity and failed to agree. … Therefore, the Court appointed a well-qualified and independent special master to take evidence and recommend an allocation."); *In re Vioxx Prod. Liab. Litig.,* 802 F.Supp.2d 740, 773 ("It is beyond dispute that a court may 'appoint a committee of plaintiffs' counsel to recommend how to divide up an aggregate fee award.'  The court has previously used this mechanism with the hope that the committee could 'achieve a **_unanimous_** agreement as to how the Common Benefit Fund should be allocated among counsel.  If all counsel had an opportunity for informed arms-length discussion with an allocating committee, and the committee could recommend an allocation of a fixed pot of common benefit fees acceptable to all interested counsel, the Court would give weight to that mutual agreement.  Unfortunately,

2

itself should sound as a warning flag to the Court that any such "recommendation" is more properly viewed as the individual advocacy of the stakeholder firms proposing the same.  This is even more true in the instant case where the report of the non-joining member of the referenced fee committee tends to support that conflicts of interest may have played a part in in reaching the referenced recommendation of a subset of the committee and why a unanimous decision could not be reached based thereon.[4]  As a result, the Recommendation should be disregarded, or if it is to be considered, viewed as nothing more than the advocacy for the individual interests of the proposing firms and given no preferential weight.

Second, the subset of the Fee Committee fail to properly apply the standards set forth by this Court for the allocation of the common benefit fee fund, or, if it did, which is not clear, it lacks the requisite transparency required to allow the Court and individual stakeholders to verify the same, assure deliberative fairness was afforded in their application, and evaluate the propriety of the ultimate recommendation made.  The Recommendation of the subset of the Fee Committee provides an unquestionably vague statement vis-à-vis the methodology utilized, if any, merely regurgitating the guidance provided by the Court of Pretrial Order No. 28 without any meaningful discussion thereon.[5]  Indeed, it is meaningless to state:

- that this subset of the Fee Committee used "objective measures" – without stating what those "objective measures" were;[6]

- that this subset of the Fee Committee "weighed the contributions of counsel by reference to the twelve *Johnson* factors, as applicable, as well as under "special considerations" – without stating which of the *Johnson* factors it deemed "applicable," the "special

---

unanimity is hard to achieve.  Hence, the Court maintains the 'responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest I the resulting awards.'  To deal with this potential conflict a Special Master was appointed who had no financial interest in the awards.  The Special Master was charged with conducting discovery and making his own recommendation.")(internal citations omitted)(emphasis added).

[4]   *See* R. Doc. 21473.
[5]   *See* R. Doc. 21455 at p. 4-6.
[6]   *See* R. Doc. 21455 at p. 4.

considerations" it used, how the work was weighed, and the analysis of the work of each firm thereunder;[7] and/or

- that this subset of the Fee Committee "weighed reported hours of common benefit attorneys in degrees of importance to the relief achieved"[8] – without stating how it weighed the reported hours of common benefit attorneys in degrees of importance to the relief achieved (i.e., according to the point system utilized in *Vioxx* or otherwise).

Moreover, the "analysis" of the subset of the Fee Committee attached to its Recommendation is nothing more than a subjective and brief summary of the work performed by each firm and provides no meaningful discussion of how the same was analyzed under the unspecified methodology purportedly applied.  Indeed, this presents an unacceptable and palpable analytical gap as the subset of the Fee Committee fails to even apply the nebulous and ill-defined methodology to the incomplete and subjective summary.  Critically, the foregoing failure of the subset of the Fee Committee precludes the Court and the individual stakeholder firms from verifying the actual methodology used in this case, if any, and that the methodology was properly applied, much less the ability to traverse the same where found to be deficient, as required under the law.[9]  This warrants the Recommendation not be considered or that it be given little to no weight.

It has long been recognized that a fee committee makes "recommendations on their own fees and thus have a financial interest in the outcome.  How much deference is due the fox who recommends how to divvy up the chickens?"[10]  Members of the fee committee have "a direct conflict of interest" as they suggest to the district court "how to proceed on matters near and dear – dividing a limited fund among themselves and other firms."[11]  "Such a direct conflict of

---

[7]   *See* R. Doc. 21455 at p. 5.
[8]   *See* R. Doc. 21455 at p. 5.
[9]   *See e.g.*, *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 235 (5th Cir. 2008); *Turner v. Murphy Oil USA, Inc.*, 582 F.Supp.2d 797, 808 at n. 33 (E.D. La. 2008);
[10]  *In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 517 F.3d 220, 235 (5th Cir. 2008), *citing In re Diet Drugs Products Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005)(Ambro, J., concurring).
[11]  *In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 517 F.3d 220, 235 (5th Cir. 2008).

interest strongly suggests that affording substantial deference is inappropriate."[12]   This is particularly true in the instant case where there is no basis to determine the methodology actually utilized by the subset of the Fee Committee or how it was applied to each firm (or that it was applied to each firm to support deliberative fairness).  Indeed, the report of the non-joining Fee Committee member – *who was privy to the entirety of the deliberative process* – expressly states that the Recommendation of this subset of the Fee Committee is *not* supported by an analytical and sustainable methodology and sets forth specific examples supporting that conclusion.[13]  Accordingly, the Recommendation of the subset of the Fee Committee should not be considered.

Third, even if a subset of the Fee Committee was authorized to render a recommendation and if that recommendation was supported by an articulable methodology that was properly applied, both of which are denied, the face of the Recommendation demonstrates that the subset of the Fee Committee improperly took into consideration facts and circumstances that the Court expressly precluded from consideration.  Specifically, pursuant to this Court's pretrial orders, the cut-off for consideration of common benefit hours was December of 2013.[14]  Despite this, the Recommendation improperly and patently takes into consideration and gives weight to expenses or events that occurred after December of 2013.[15]  This failure to follow the Court's express directive further warrants that the Recommendation be disregarded.

For all of these reasons, Bart objects to the Recommendation of the subset of the Fee Committee and urges the Court to disregard it entirely or, at a minimum, treat the

---

[12] *In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 517 F.3d 220, 235 (5th Cir. 2008).
[13] *See* R. Doc. 21473.
[14] *See* R. Doc. 17402.
[15] *See e.g.*, R. Doc. 21455-3 (Improperly including: (1) the Lodestar reports for the time period of January 2014 through December 2017 as well as the total lodestar throughout the entirety of the litigation,  (2) held costs accepted through 2014, those accepted from 2015-2017, as well as the total held costs throughout the entirety of the litigation; (3) the assessment contribution for the time period of January 2014-December of 2017 and the total assessment contribution throughout the entirety of the litigation); *see also*, Exhibit B to the Recommendation concerning post-December 2013 work at p. 1, 2, 5 (first full  footnote paragraph thereon), 9, 14, 15, 17, 19, 20, 21, 22, 23, 25, 27, 28, 29, 30, 34.

recommendation for what it actually is, individual advocacy by the stakeholder firms proposing the same and afford it little to no preferential weight.

## II.      THE RECOMMENDATION FAILS TO ADEQUATELY COMPENSATE BART FOR ITS COMMON BENEFIT WORK.

In addition to the objections to the facial deficiencies of the Recommendation of the subset of the Fee Committee, Bart also objects to the Recommendation on the substantive underlying Recommendation as it fails to adequately compensate Bart for its common benefit work.

Bart's work for the common benefit was clear and important from the outset of this case. Bart filed the first Chinese drywall case in Louisiana on March 3, 2009,[16] and its effort and assistance was critical in informing the public and helping the litigation become an MDL.  It is undisputed that there were strong efforts at the outset of the litigation to prevent the Chinese Drywall litigation from becoming an MDL.  Bart has been credited with playing a key role in overcoming this resistance, helping to establish the MDL (without which expedited global litigation and resolution would likely have been infeasible) and providing much needed public awareness of the issues posed to the public (without which many individuals affected would have been unaware of the issues they were facing and/or unable to assert a timely claim based thereon).[17]  Indeed, Bart's assistance in creating and facilitating the public information campaign and administering an assistance line is credited with generating hundreds of cases for the PSC (not Bart individually) and an overall increase of 2,000 claims filed as a result thereof.[18]

---

[16]   *See* Original Affidavit of Bart, being filed herewith under seal as Exhibit "2" and Second Affidavit of Bart, being filed herewith under seal as Exhibit "3".

[17]   *See* Herman Deposition at p. 328: 14-329:22, being filed herewith under seal as Exhibit "4".

[18]   *See* Exhibit 4 at p. 329:4-8, 17-22; *see also* Deposition of Morris Bart at p. 44:43-45:4, being filed herewith under seal as Exhibit "1".

Concomitant therewith, at the direction of the PSC, Bart also assisted in dealing with the media.[19]

Even once the MDL was established and the litigation began in earnest, Bart's common benefit work did not stop, despite not being a member of the PSC. Indeed, Bart provided meaningful, substantive and demonstrable common benefit work at all levels of the litigation.[20] For example, in terms of fact investigation and development, Bart worked with and assisted the Insurance Committee in creating and administering a comprehensive and sortable database of Louisiana insurance as part of the Louisiana insurance project.[21] As it pertains to pleadings, Bart assisted with the drafting of the omnibus complaint as well as other offensive complaints at the request of the PSC.[22] In terms of conferences, Bart attended and assisted with various monthly status conferences at the request of the PSC.[23]

As it pertains to written discovery, Bart was involved from the outset, drafting the responses to the Defendant Steering Committee's first set of interrogatories and requests for production of documents, as well as through trial, assisting in responding to written discovery as part of one of the bellwether trials.[24] In terms of document discovery, Bart performed extensive and substantial, in-depth review of documents received in the litigation, in general, as well as to identify "hot documents" for specific use in connection with depositions.[25] It assisted in the review of thousands of pages of documents, including financial records and shipping records, critical in establishing certain elements of the case.[26] Indeed, this work was so extensive that a

---

[19]   *See* Exhibit 1 at p. 46:2-14.
[20]   *See* Exhibits 1-3.
[21]   *See e.g.*, Exhibit 1 at p. 40:1-25; 41:4-7; 443:12-15.
[22]   *See e.g.*, Exhibit 1 at p. 52:12-53:4.
[23]   *See e.g.*, Exhibit 1 at p. 9:10:-10:22.
[24]   *See e.g.*, Exhibit 1 at p. 33:21-24 and p. 51:25-52:11; *see also* Exhibits 2 and 3.
[25]   *See e.g.*, Exhibit 1 at p. 50:2-9 and p. 27:1-16; *see also* Exhibits 2 and 3.
[26]   *See e.g.*, Exhibit 1 at p. 41:7-12; p. 43:6-11; *see also* Exhibits 2 and 3.

member of the Fee Committee described the work performed by Bart in this regard as "working tirelessly."[27]

In terms of depositions, Bart assisted in the PSC in preparing for the deposition of Tony Robinson as well as assisting in his actual deposition, including travelling to London to do so at the direction of the PSC.[28]   Bart also assisted the PSC in preparing for the depositions of Grundke and Isabel Knauf,[29] Martin Struemer, Frolich, Hummel, Jeff Brisley, and Robert Claxton.  It digested and summarized key deposition testimony for use by and at the direction of the PSC,[30] and it prepared certain bellwether plaintiffs for their deposition testimony, located and prepared another fact witness for his deposition testimony in the bellwether case, as well as assisted in defending both of the same.[31]

Bart also assisted with experts.  For example, Bart assisted the Shipping Committee in identifying experts in international shipping, providing materials for their review and examination, and coordinating and speaking with such experts thereafter at the request of the PSC.[32]  Bart even retained one such expert for the use of the PSC.[33]  Bart also identified and assisted in the retention of a German translation expert to translate and interpret documents for the benefit of the PSC as well as the identification and retention of an expert interpreter for the PSC, who was critical in assisting the PSC in obtaining testimony provided during the Hong Kong depositions.[34]

Additionally, Bart even assisted with one of the bellwether trials, which work included, among other things, assisting in preparation of exhibits, preparing the bellwether plaintiffs for

---

[27] *See e.g.*, Exhibit 1 at p. 53:22-54:3; *see also* Exhibits 2 and 3.
[28] *See e.g.*, Exhibit 1 at p. 27:1-16; p. 42:3-21; *see also* Exhibits 2 and 3.
[29] *See e.g.*, Exhibit 1 at p. 42:24-43:1; *see also* Exhibits 2 and 3.
[30] *See e.g.*, Exhibit 1 at p. 26:8-24; *see also* Exhibits 2 and 3.
[31] *See e.g.*, Exhibit 1 at p. 33:21-35:24; *see also* Exhibits 2 and 3.
[32] *See e.g.*, Exhibit 1 at p. 36:9-37:8; p. 43:6-11.
[33] *See e.g.*, *id*. at p. 53:5-16.
[34] *See e.g.*, *id*. at p. 36:9-37:8; p. 41:2-4; 42:22-23.

their trial testimony, preparing another fact witness for his trial testimony, and assisting and attending the actual trial itself.[35]   The Court has previously acknowledged that this bellwether trial, among others, "constituted a significant contribution for the common benefit of the plaintiffs."[36]

Furthermore, Bart also contributed common benefit work towards the settlement and ultimate resolution of claims.   Specifically, Bart had extensive, substantive and material participation in the development and success of the pilot program.[37]   The firm extended great efforts towards making sure that the program succeeded.[38]   Indeed, this work was previously corroborated by members of the Fee Committee, acknowledging that Bart's work arranged for and facilitated the meeting of those involved in the investigation and helped modify and refine issues with the program so as to make it a success.[39]   It was through the common benefit work of Bart, among others, that the Pilot Program succeeded, a critical basis upon which this case ultimately settled.   Indeed, the Court has previously acknowledged that the Pilot Program "served as the basis upon which the Knauf, Global, Banner, Inex and other settlements ultimately were negotiated."[40]

Despite the foregoing non-exhaustive examples of material and meaningful common benefit work at every level of the litigation that Bart performed, the subset of the Fee Committee recommends that Bart be allocated a mere $350,000 in common benefit fees from the $99,842,822.29 in total common benefit fee fund.[41]   This proposed allocation is 0.35% – a third of one percentage point – of the entirety of the common benefit fee award.   Indeed, the amount

---

[35]   *See e.g.*, Exhibit 1 at p. 33:21-35:24; p. 46:17-24; 62:9-17; *see also* Exhibits 2 and 3.
[36]   *See* R. Doc. 21168 at p. 12.
[37]   *See* Exhibit 1 at p. 30:16-33:9; *see also* Exhibits 2 and 3.
[38]   *See id.*
[39]   *See e.g.*, Exhibit 1 at p. 30:16-33:9.
[40]   *See* R. Doc. 21168 at p. 12-13.
[41]   *See* R. Doc. 21455-1 at p. 2.

proposed to be allocated to Bart is less than *half* of the lodestar for Bart, which lodestar in and of itself undervalues the work contributed by Bart as it takes the hours only at face value, unweighted for their relative contribution, and utilizes inaccurately low and incorrect numbers in calculating the same.[42]  Indeed, if the common benefit hours accepted by Phil Garrett (2376.25) are multiplied by the rate set forth by the Court as reasonable and applicable to this case ($442.76), even this unweighted, face value assessment of Bart's common benefit contribution totals $1,052,108.45.  The proposal made by the subset of the Fee Committee is a mere fraction of this amount.

Furthermore, if the work of Bart had been analyzed under the *Johnson* factors[43] and weighted for the importance of the work to the relief achieved, as the Fee Committee was required to do, Bart's common benefit allocation should be much higher than even its $1,052,108.45 lodestar:

- <u>Bart expended significant time and labor on this litigation.</u>[44]  Again, Bart began work on this litigation in the spring of 2009, filing suit on March 3, 2009.  As of December of 2013, Bart had accumulated 3,715.21 hours in common benefit hours, 3,291.71 of which were expressly accepted by Garrett.  Upon request by the Fee Committee, Bart nonetheless, reviewed and voluntarily withdrew purported objectionable billing entries, reducing the overall common benefit hours submitted by Bart and approved by Garrett to

---

[42]   Specifically, the lodestar report only considers the hours approved by the Fee Committee, as opposed to those originally accepted by Phil Garrett (reducing the hours from 2376.25 to 1734.66), the hours are unweighted in terms of degrees of importance (and fail to account for some ministerial errors in which codes were applied to which work), and it fails to apply the common benefit fee rate previously identified by this Court and found to be the proper rate by which to judge the common benefit work - $442.76 (R. Doc. 21168 at p. 22).

[43]   *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974).

[44]   "Although hours claimed or spent on a case should not be the sole basis for determining a fee, they are a necessary ingredient to be considered."  *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717 (5th Cir. 1974).  This first *Johnson* factor instructs the court to weigh the hours claimed against his own knowledge, experience and expertise of the time required to complete similar activities.  *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974); *In re Enron Securities, Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 786 (5th Cir. 2008).

10

2376.25 hours.  This reflects that Bart, despite not being a member of the PSC or in a designated leadership role, nonetheless expended substantial and significant time and labor, as requested, for the common benefit of this case.  As discussed above, if the hours accepted by Garrett (2376.25) are multiplied by the rate the Court found to be reasonable and applicable to the common benefit work for this case ($442.76), Bart's lodestar totals $1,052,108.45.  The Recommendation by the subset of the Fee Committee will only compensate Bart for 33% of its total lodestar, indicating that the proposal fails to reasonably and adequately compensate Bart.

- <u>Bart handled novel and complex issues.</u>[45]  As discussed in detail above, Bart contributed common benefit work on novel and complex issues, including but not limited to the development and administration of a public service campaign, creation and administration of an assistance hotline related thereto, liaising with various media sources where required, identifying and retaining expert interpreters and translators to assist in the translation and review of thousands of documents as well as the proper transcription of critical testimony, the review of thousands of documents produced in discovery, many of which focused on complex issues such as financial ties and shipping events, assisting in the preparation of and/or taking of complex depositions, including that of Tony Robinson in London, Grundke and Isabel Knauf, as well as that of Mark Norris taken in Hong Kong, assisting in the identification and coordination with experts in unusual areas, such as international shipping, as well as the participation, facilitation, and assistance in

---

[45]  As it pertains to the second *Johnson* factor, "[c]ases of first impression generally require more time and effort on the attorney's part."  *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 718 (5th Cir. 1974);  *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 445 (S.D. Tex. 1999).  "Although this greater expenditure of time in research and preparation is an investment by counsel in obtaining knowledge which can be used in similar later cases, he should not be penalized for undertaking a case which may 'make new law.'"  *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 718 (5th Cir. 1974).  Instead, he should be appropriately compensated for accepting the challenge.

the development and successful promotion of the pilot program, which was completely novel in the litigation.  The complexity and the value of the work performed by Bart is underscored by the fact that the PSC expressly and repeatedly requested that Bart assist in performing common benefit work, despite not being a member of the PSC or otherwise in a leadership role.  Again, this tends to support that the proposed common benefit allocation to Bart tends to undercompensate it for its work.

- Substantial skill was required to perform the required legal services.[46]  It is indisputable that the substantive work performed by Bart required skill.  Bart facilitated the crafting of a public information campaign to inform the public concerning the presence of and issues presented by Chinese Drywall, it performed the review of voluminous documents containing complex information, including but not limited to financial information pertaining to the ties and chain of business of the defendants, it assisted in the preparation of and/or attended the depositions of various important witnesses, facilitated important and accurate translation of evidence in the case, assisted with the identification and coordination with experts in a unique area of expertise (international shipping) and assisted in the preparation for and actual trial of one of the bellwethers conducted in this case.  On its face, the work performed by Bart required accuracy, attention to detail, a high level legal sophistication and understanding, as well as a high level of skill to successfully perform.  Again, the type of work performed and the skill required to properly perform the same as compared to the common benefit proposal for Bart supports that the proposal undercompensates Bart for its common benefit work.

---

[46]   The third *Johnson* fact – the skill requisite to perform the legal service – speaks to the diligence and skill of counsel, achieving a speedy and fair settlement, distinguished by the use of informal discovery and cooperative investigation to provide the information necessary to analyze the case and reach a resolution.  *In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d 1040, 1083 (S.D. Tex. 2012).

- Several attorneys at Bart were precluded from working on any other matter due to the volume of work common benefit work they performed in the instant case.[47]   Multiple attorneys at Bart were hired specifically to and performed only common benefit work on the Chinese Drywall Litigation.[48]   They were completely occupied by this common benefit work to such an extent that they were precluded from working on any other cases at Bart.[49]   Again, these facts support that Bart is entitled to a greater common benefit allocation that that currently proposed.

- The Court has already established the reasonable rate to be used to evaluate to common benefit work performed.   Specifically, the Court expressly found that the common benefit fee divided by the number of hours of common benefit work results in a reasonable hourly fee of approximately $442.76 for the common benefit work.[50]   However, the proposal of the subset of the Fee Committee seeks to utilize an excessively low hourly rate of $147.29 to compensate Bart.[51]   Accordingly, these facts again demonstrate that the proposal fails to reasonably and adequately compensate Bart for is common benefit work.

- The proposal seeks to pay Bart less than the customary fee.[52]   If other cases are consulted, the customary fee for the amount and type of work performed by Bart in the instant case would be at least 1.5%.[53]   As the proposal seeks to compensate Bart for a mere one-third

---

[47] "This guideline involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes."   *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 718 (5th Cir. 1974).

[48] *See* Exhibit 1 at p. 47:18-49:22; 69:1-18.

[49] *See id.*

[50] *See* R. Doc. 21168 at p. 22.

[51] *See* Proposed Common Benefit Allocation ($350,000.00)/ Bart Common Benefit Hours = $147.29/hour.

[52] Although "[t]he customary fee for similar work in the community should be considered," the significance of this factor has been questioned in cases of this magnitude.   *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 718 (5th Cir. 1974); *See In re Prudential Ins. Co. America Sales Practice Litig.*, 148 F.3d 283, 340 (3d Cir. 1998); *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 866 (E.D. La. 2007).

[53] *See e.g., Turner v. Murphy Oil USA, Inc.*, 582 F.Supp.2d 797, 823 (E.D. La. 2008).

of the reasonable customary fee, this factor also tends to demonstrate that the proposal fails to adequately and reasonably compensate Bart for its common benefit work.

- <u>Bart's fee was not fixed.</u>[54]   Indeed, Bart took its cases on a contingency basis, and as to its common benefit work, it did not perform such work on contract or fixed fee basis. Based upon information and belief, all of the common benefit work performed by all of the common benefit firms in the instant litigation was not fixed, and accordingly, this factor should be treated as neutral for all.

- <u>Bart was subject to time limitations imposed by the circumstances of the case.</u>[55]   Given the nature of the work performed by Bart and its importance to the ability of the PSC to move the case forward, particularly as it pertains to facilitation in informing the public, the review of documents, facilitation and administration of the translation of documents, preparation for depositions, assistance and participation in the bellwether trial, as well as substantive and in-depth participation and facilitation of the pilot program often required quick turnaround times in connection with the work it performed.   Accordingly, this factor also tends to demonstrate that the proposal fails to adequately and reasonably compensate Bart for its common benefit work

---

[54]   As a general rule, "[t]he fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating the attorney's fee expectations when he accepted the case." *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 718 (5th Cir. 1974); *In re OCA, Inc. Securities and Derivative Litig.*, No. 05-2165, 2009 WL 512801 at *21 (E.D. La. Mar. 2, 2009), *citing Johnson*, 488 F.2d at 718; *In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litig.*, 447 F.Supp.2d 612, 631 (E.D. La. 2006).   This factor ordinarily considers the financial risks a contingency fee arrangement places on counsel. *In re OCA, Inc. Securities and Derivative Litig.*, No. 05-2165, 2009 WL 512801 at *21 (E.D. La. Mar. 2, 2009); *In re Vioxx Prod. Liab. Litig.*, 760 F.Supp.2d 640, 657 (E.D. La. 2010).

[55]   The seventh *Johnson* factor considers that "priority work that delays the lawyer's other legal work is entitled to some premium." *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 718 (5th Cir. 1974); *In re Combustion, Inc.*, 968 F.Supp. 1116, 1138 (W.D. La. 1997).   However, regular litigation and appearance deadlines implemented in complex litigation or time pressures involving statute of limitations and legal maneuvering to gain the best bargaining positions are inherent in every type of litigation and call for this factor to be treated neutrally. *See Shipes v. Trinity Indus.*, 987 F.2d 311, 321 (5th Cir. 1993)*; Koehler v. Freightquote.com, Inc.*, 12-2505, 2016 WL 3743098 at * 7 (D. Kan. July 13, 2016).

- The amount involved and the results obtained.[56]  The settlements reached in this case were very large, valued by the Court as an aggregate value of $1.12 billion.[57]  In addition to the additional and extensive work delineated above, it is undeniable that Bart substantively and meaningfully contributed to the size and value of the recovery due to its early and substantive work on informing the public through a public service campaign as well as the administration of an assistance line related thereto.  This work has been credited with generating hundreds of cases for the PSC and an overall increase of 2,000 claims being filed. Moreover, it is undeniable that Bart substantively and meaningfully contributed to the size and value of this recovery due to its facilitation, refinement, and assistance in the administration of the Pilot Program, as previously acknowledged by members of the Fee Committee, including Lead Counsel.[58]  Further, as previously noted by this Court, it was the Pilot Program upon which the subsequent settlements were based.[59]  Accordingly, this factor weighs in favor of Bart and tends to indicate that the proposed allocation to it fails to adequately compensate Bart for its common benefit work.

---

[56]  "The most critical factor in determining an attorney's fee award is the degree of success obtained."  *See In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, MDL No. 2179, 2016 WL 6215974 at *18 (E.D. La. Oct. 25, 2016); *In re Enron Securities, Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 796 (5th Cir. 2008).  Where recovery of private damages is the purpose, consideration to the amount of damages award represents the primary means to evaluate this factor.  *See Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998).  .[56] However, "[i]ncreasing the fee award based on the eighth factor (the amount involved and the results obtained) is only proper when the applicant shows that 'it is customary in the area for attorneys to charge an additional fee above their hourly rates for an exceptional result.'"  *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 586 F.Supp.2d 732 (S.D. Tex. 2008), *citing Shipes v. Trinity Indus.*, 987 F.2d 311, 322 (5th Cir. 1993).  "[56]  Furthermore, where the size of the recovery is large, the court should also consider the fact that percentage fee awards generally decrease as the amount of the recovery increases.  *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 444 (S.D. Tex. 1999); *In re Prudential Ins. Co. America Sales Practice Litig.*, 148 F.3d 283, 339 (3d Cir. 1998).  This holds true because of the belief that in many instances, the increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.  *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 444 (S.D. Tex. 1999); *In re Prudential Ins. Co. America Sales Practice Litig.*, 148 F.3d 283, 339 (3d Cir. 1998).

[57]  *See* R. Doc. 21168 at p. 17.

[58]  *See* Bart Deposition at p. 30:16-33:9

[59]  *See* R. Doc. 21168 at p. 12-13.

15

- <u>Experience, reputation, and ability of the attorneys.</u>[60]   Despite the subset of the FC's characterization of the work being performed by Bart as administrative and/or by "young attorneys" (implicitly and baselessly implying a lack of sophistication or skill), the record bears out differently.   In addition to Morris Bart, himself, who has years of experience and oversaw every aspect of the common benefit work performed by his firm, the "young" associates to whom the Fee Committee refers were also highly qualified and highly skilled.[61]   These associates were more than capable of performing and did, in fact, perform very skilled work for the common benefit, despite the unjustified disparagement of their work based upon age.   Moreover, it was the reputation and skill of Morris Bart that created and assisted in proving the public information campaign to be a success, generating hundreds of cases for the PSC.   In any event, although the experience, reputation, and ability of counsel holding a leadership role may be clear and unquestioned, these attributes are required for their appointment as common benefit counsel in the first place (as in this case), and accordingly, this factor should be treated as neutral as to all common benefit counsel.

---

[60]   The ninth *Johnson* factor takes into consideration the experience, reputation and ability of the attorneys as "[m]ost fee scales reflect an experience differential with the more experienced attorneys receiving larger compensation."  *See Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 719 (5th Cir. 1974).   That being said, the experience of counsel is often accounted for in considering the skill necessary to litigate the case (factor three) as well as the result obtained (factor eight), and as such, it should not serve as a basis for an increase in the percentage afforded to one firm over another.  *See In re OCA, Inc. Securities and Derivative Litig.*, No. 05-2165, 2009 WL 512801 at *21 (E.D. La. Mar. 2, 2009); *In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litig.*, 447 F.Supp.2d 612, 632 (E.D. La. 2006); *Jones v. JGC Dallas, LLC*, 11-2743, 2014 WL 7332551 at * 9 (N.D. Tex. Nov. 12, 2014).   Furthermore, the extensive experience, fine reputation, and ability of counsel may be clear and unquestioned, but if these attributes are required for their appointment as common benefit counsel in the first place (as in this case), this factor should be treated as neutral.  *See* PTO 1 at ¶ 17.  *See e.g., In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d 1040, 1085 (S.D. Tex. 2012).   Additionally, if it is not shown that the skill required by the attorneys performing some common benefit work was so superior to that possessed by the other common benefit attorneys, an increase under this factor would impermissibly and unjustly shift attorneys' fees from one group to the other.  *See In re Vioxx Prod. Liab. Litig.*, 760 F.Supp.2d 640, 657 (E.D. La. 2010).

[61]   *See* Exhibit 1 at p. 47:18-49:22; 69:1-18.

- <u>Undesirability</u>.[62]   When Bart first became involved in this litigation, the case was undesirable if measured upon the quality and number of attorneys who had filed suit at that time.   That being said, Bart acknowledges that as the MDL developed and information concerning the case and the issues presented developed, the undesirability or risk of stigmatization was minimized if not entirely eradicated, as amply demonstrated by the sheer number of individual suits ultimately filed.   Accordingly, this factor favors Bart slightly, or alternatively, should be treated as neutral for all.

- <u>The nature and length of the professional relationship with the client</u>.[63]   As discussed repeatedly herein, Bart's relationship with two of the bellwether plaintiffs and its facilitation of the litigation related thereto for the common benefit cannot be denied.

---

[62]   The tenth *Johnson* factor is an attempt to account for the stigmatization that may result from taking certain types of cases.   *See Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 719 (5th Cir. 1974).   In attempting to elucidate the nature of this consideration, the Fifth Circuit stated that "Civil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant.   Oftentimes his decision to help eradicate discrimination is not pleasantly received by the community or his contemporaries.   This can have an economic impact on his practice which can be considered by the Court."   *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 719 (5th Cir. 1974).   Whether a given case may be considered undesirable can often be measured by the quality and number of attorneys who file suit, which has a proportional relationship to the desirability of the case.   *See In re Dell Inc.*, 06-726, 2010 WL 2371834 at *19 (W.D. Tex. June 11, 2010); *In re Enron Securities, Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 797 (5th Cir. 2008);   *In re Combustion, Inc.*, 968 F.Supp. 1116, 1139 (W.D. La. 1997); *In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d 1040, 1085 (S.D. Tex. 2012); *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 447 (S.D. Tex. 1999); *In re Harrah's Entertainment, Inc.*, 95-3925, 1998 WL 832574 at *6 (E.D. La. Nov. 25, 1998); *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 865-866 (E.D. La. 2007).   Moreover, the mere fact that a case is prosecuted on a contingency fee basis does not render the case undesirable and the risk associated with the same is already accounted for in factor five.   *Koehler v. Freightquote.com, Inc.*, 12-2505, 2016 WL 3743098 at * 8 (D. Kan. July 13, 2016).

[63]   The eleventh *Johnson* factor attempts to account for the fact that "[a] lawyer in private practice may vary his fee for similar work in light of the professional relationship of the client with his office."   *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 719 (5th Cir. 1974).   If the relationship does not pre-date and is not anticipated to post-date the litigation, the factor may be treated as neutral.   *See In re Vioxx Prod. Liab. Litig.*, 760 F.Supp.2d 640, 657 (E.D. La. 2010); *In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litig.*, 447 F.Supp.2d 612, 632 (E.D. La. 2006); *In re Harrah's Entertainment, Inc.*, 95-3925, 1998 WL 832574 at * 6 (E.D. La. Nov. 25, 1998); *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, MDL No. 2179, 2016 WL 6215974 at * 19(E.D. La. Oct. 25, 2016); *Koehler v. Freightquote.com, Inc.*, 12-2505, 2016 WL 3743098 at *8 (D. Kan. July 13, 2016).   However, the absence of evidence showing communications between common benefit counsel and the plaintiffs who he represents can support a slight negative adjustment.   *See In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d 1040, 1086 (S.D. Tex. 2012).

Accordingly, this factor weighs in favor of Bart and tends to indicate that the proposed allocation to it fails to adequately compensate Bart for its common benefit work.

- <u>Awards in similar cases</u>.[64]  It is difficult to compare individual common benefit awards rendered in one case to the instant case, but for purposes of analysis, the case of *Turner v. Murphy Oil USA, Inc.* is useful.  In *Turner*, firms receiving approximately one-third of one-percent of the total common benefit fund, as is proposed to be allocated to Bart in the instant case, performed substantially less total common benefit hours by several orders of magnitude and the work that was performed was less in terms of scope and substance than that performed by Bart in the instant case.[65]  This further tends to indicate that the proposed common benefit allocation for Bart made by the subset of the Fee Committee fails to properly and materially compensate Bart for the common benefit work performed in this case.

Based upon the evidence presented, consideration of Bart's lodestar, as well as consideration of the work performed by Bart if analyzed under the *Johnson* factors and weighted for its relative contribution to the results achieved, the allocation proposed by the subset of the Fee Committee grossly undercompensates Bart for the common benefit work it performed.  Bart is entitled to an award of $1,596,42.49 (1.5%) in common benefit fees to raise its compensation to a level comparable to that awarded in other cases for similar work in terms of scope, quantity,

---

[64]  The twelfth *Johnson* factor calls upon the court to consider the reasonableness of the requested fee in light of awards made in similar litigation within and without the court's circuit.  *See Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 719 (5th Cir. 1974);  *In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d 1040, 1086 (S.D. Tex. 2012); *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 447 (S.D. Tex. 1999); *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 866 (E.D. La. 2007); *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, MDL No. 2179, 2016 WL 6215974 at * 19 (E.D. La. Oct. 25, 2016).

[65]  *See Turner v. Murphy Oil USA, Inc.*, 582 F.Supp.2d 797, 823 (E.D. La. 2008)(Robichaux, Glago, Cunard, Beychock, Bradley, and Wimberly all received approximately 0.3% of the common benefit fee fund, the same amount proposed to be allocated to Bart in the instant case.  However, there is a vast discrepancy between the work performed by Bart in this case versus the work performed by those firms in *Turner*, both quantitative and qualitatively.  For example, each of the firms incurred less than 500 common benefit hours each, many of which far below that amount and differs materially in terms of the substance of the type of common benefit work performed.) .

and quality, or, at a minimum, $1,052,108.45 in common benefit fees to at least compensate it for its unweighted, face value share of the lodestar.  Further, Bart is also entitled to receive compensation for its unreimbursed held costs and assessments ($9,439.42).

## CONCLUSION

For the foregoing reasons, Bart objects to the Recommendation of the subset of the Fee Committee and requests that it be disregarded, or if considered, that the proposed common benefit allocation for Bart be adjusted upwards to a level that would fairly and reasonably compensate it for the common benefit work it performed in this case.

Respectfully submitted:

/s/ Victoria E. Emmerling
Andrew A. Braun (#3415)
Victoria E. Emmerling (#33117)
GIEGER, LABORDE & LAPEROUSE, LLC
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone:    (504) 561-0400
Facsimile:    (504) 561-1011
Email: abraun@glllaw.com
Email: temmerling@glllaw.com

*Counsel for Morris Bart, L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Objection to the Recommendation of the Subset of the Fee Committee has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, this 20th day of July, 2018.

/s/ Victoria E. Emmerling