# EXHIBIT "B"

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

*IN RE:* CHINESE-MANUFACTURED DRWALL    : MDL No. 2047
PRODUCTS LIABILITY LITIGATION         :
                                              : SECTION: L
                                              :
                                              : JUDGE FALLON
                                              :
............................................................      : MAG. JUDGE WILKINSON
                                              :

<u>**SECOND AFFIDAVIT OF VM DIAZ AND PARTNERS  IN CONNECTION WITH
REQUEST FOR ALLOCATION OF COMMON BENEFIT FEE AND COST AWARD**</u>

STATE OF **FLORIDA**

COUNTY/PARISH OF **MIAMI-DADE**

      BEFORE ME, the undersigned authority;

      PERSONALLY CAME AND APPEARED:

                  *VICTOR M. DIAZ, JR., ESQ.*

who, after being first duly sworn, under penalty of perjury, did depose and declare that the following
are true and correct:

    1.     I am a partner in the law firm of VM Diaz and Partners, LLC.

    2.     The address of the law firm identified in number 1 above is 119 Washington Avenue,

Suite 402, Miami Beach, Florida 33139.

    3.     I have complied with Pre Trial Order No. 9 or 9A in all material aspects and the law

firm identified herein has submitted true and correct time and expense submissions pursuant

to the Court's Pre Trial Orders.  This Affidavit is submitted on behalf of all the members of

the law firm of which I am a partner.

    4.     The Court may rely on the information submitted by my firm to Philip Garrett, the

Court appointed Certified Public Accountant, which is contained in his Case Cost

Management System in this litigation.

5.      The extent to which the law firm identified in paragraph no. 1 above made a substantial common benefit contribution to the outcome of the litigation is described as follows:

**A.    THE CONSISTENCY, QUANTUM, DURATION, AND INTENSITY OF THE FIRMS' COMMITMENT TO THE LITIGATION IS AS FOLLOWS:**

6.      Mr. Diaz and V.M. Diaz & Partners, LLC have made a substantial investment of his and the firm's human resources exclusively to Chinese drywall (CDW) related matters for over four years. Mr. Diaz filed the first case **in the United States** against the Knauf Defendants (*Morris-Chin v. Knauf Plasterboard (Tianjin),* Case No. 1:09-cv-20796 filed on 03/27/2009) and the first case **in the United States** against the Banner Supply Defendants (*Harrell v. South Kendall Construction,* et. al. Case No, 09-08210 CA 42 filed on February 3, 2009) arising out of defective Chinese Drywall – giving genesis to the start of these consolidated proceedings. From the beginning Mr. Diaz has attempted to support the work of Judge Fallon, the PSC and the MDL proceedings.

7.      Mr. Diaz attended the Judicial Panel on Multi-District Litigation hearing for Chinese drywall and assisted in securing consent from several prominent Florida lawyers with substantial inventory of Chinese Drywall cases to the assignment of these MDL proceedings to the Eastern District of Louisiana, foregoing any argument in favor of other jurisdictions. In the succeeding years, Mr. Diaz and VM Diaz & Partners, LLC have filed suits or claims on behalf of over 100 victims of this defective product. In addition, Mr. Diaz has served **continuously** for the past four years as Co-Lead Counsel for the state court cases pending in Miami-Dade and Broward Counties – ensuring coordination of the state court proceedings with the MDL proceedings. As detailed below, this commitment has required Mr. Diaz (personally in most cases) or members of his firm to attend 104 status conferences in Miami-Dade County and 18 status conferences in Broward County. Finally, Mr. Diaz has served as a

VM DIAZ AND PARTNERS | 119 WASHINGTON AVE SUITE 402 | MIAMI BEACH FLORIDA, 33139 | INFO@DIAZPARTNERS.COM | T: (305)704-3200

member of the court-appointed Plaintiffs' Steering Committee from July 27, 2009 to January 11, 2011 and from March 19, 2012 through the present[1]. The continuous commitment to this litigation precluded the pursuit of employment in other cases of by Mr. Diaz and his firm. Mr. Diaz and V.M. Diaz & Partners, LLC (given its small size) forewent many other employment and fee-generating opportunities to fully commit to the Chinese drywall litigation.

8.      Mr. Diaz accepted all his Chinese drywall cases on a pure contingency basis and has expended thousands of hours and millions of dollars in attorney's time with no guarantee of recovery. Mr. Diaz and his firm's efforts have been diligent and their work-product – and results obtained - greatly benefitted these consolidated proceedings and the plaintiff victims. Unlike typical class actions involving such matters as securities violations or excessive fees imposed by domestic lending institutions - where factual discovery can be easily developed through conventional discovery means and by compelling the deposition of US based witnesses - these consolidated cases involved defective products manufactured in a foreign country, in plants owned by multi-national corporations (each characterized by a complicated network of affiliated corporate defendants) based in several different countries, an international chain of distribution, and an extensive network of affected US Importer, Distributor, Home-Builder and Installer defendants and thus involved an extremely novel, complex, and difficult set of facts and governing laws.

**B.      THE LEVEL OF PARTNER PARTICIPATION BY THE FIRM IS AS FOLLOWS:**

---

[1] During his short tenure off the PSC, Mr. Diaz continued to work on the Chinese drywall litigation -- without any interruption in his commitment or advocacy for the plaintiff victims. Mr. Diaz' continued commitment to this litigation during his brief absence from the PSC was recognized by the PSC Leadership and Judge Fallon -- who invited Mr. Diaz to re-join the PSC in early 2012 -- and agreed to have the time devoted to advancing the case of the plaintiff victims while off the PSC as part of the Common Benefit Submission. *See Court Order dated 03/16/2012.*

VMDIAZ AND PARTNERS | 119 WASHINGTON AVE SUITE 402 | MIAMI BEACH FLORIDA, 33139 | INFO@DIAZPARTNERS.COM | T: (305)704-3200

9.      VM Diaz and Partners, LLC is comprised of two partners, Victor M. Diaz, Jr., Esq., and Ailyn Popowski, Esq. Both partners devoted a significant amount of hours dedicated to the Chinese drywall litigation.

10.      Mr. Diaz has been a member of the PSC for over three years and Co-Lead Counsel in the two largest jurisdictions with pending state court Chinese drywall cases. He has dedicated the better part of four years of his practice to prosecuting Chinese drywall claims.

11.      Ms. Popowski spent numerous hours heading up the firm's review of documents produced by the Banner Supply Defendants, the La Suprema Defendants and the Knauf Defendants (please see Section "D" below for further detail). In Mr Diaz' absence, Ms. Popowski has supervised the firm's employees engagement in these cases.

12.      Perhaps no other firm can state that **all** of their partners devoted substantial effort in support of these consolidated proceedings – a level of commitment by a small firm that has had a tremendous impact on the firm's overall bottom-line throughout its existence.

## C.   THE FIRM'S MEMBERSHIP AND LEADERSHIP ON THE PLAINTIFFS' STEERING COMMITTEE ("PSC") IS AS FOLLOWS:

13.      On July 27, 2009, the Honorable Judge Eldon Fallon executed Pre-Trial Order No. 8, creating the first Plaintiffs' Steering Committee ("PSC") for the consolidated Chinese Drywall actions.

14.      Prior to the entry of this Order, Mr. Diaz had met with the proposed Lead and Liaison counsel in Washington, D.C. to discuss the organization of the PSC and his participation on it. Thereafter, a meeting was subsequently held in New Orleans organized by Mr. Russ Herman. More than 100 lawyers attended the initial meeting for attorneys wishing to participate in the MDL. Mr. Diaz worked with Russ Herman and Arnold Levin in helping to form the initial proposed Plaintiff Steering Committee and securing buy-in from the many lawyers – particularly Florida counsel – who represented affected victims. Pursuant to PTO #8, Mr. Diaz' appointment

was "of a personal nature" and could not "be substituted by other lawyers, including members of the appointee's law firm, to perform the PSC's exclusive functions…".

15.     Upon acceptance of his appointment to the PSC, Mr. Diaz was appointed by Lead and Liaison Counsel to serve as the Chief Liaison between the Consumer Products Safety Commission (CPSC) and the PSC.

16.     The CPSC received over 3,991 reports from residents in 43 states, the District of Columbia, American Samoa, and Puerto Rico, who believed their health symptoms or the corrosion of certain metal components in their homes were related to problematic drywall. As Chief Liaison Counsel, Mr. Diaz secured the production of thousands of pages of documents from the CPSC, including the issuance of fifteen status reports to the United States Congress, press statements, and – ultimately CDW identification and remediation guidelines. Mr. Diaz participated – along with other PSC members - in helping to formulate the PSC input into both the identification and the remediation guidelines. In addition, Mr. Diaz was tasked with monitoring the government's investigation, coordinated meetings between the CPSC and the PSC in Washington DC, and regularly interacted with the CPSC personnel – as the main point of contact with the PSC and victims' lawyers. Mr. Diaz regularly updated the PSC regarding the evolution of the CPSC's testing, opinions and impressions, as well as reviewed the content of the thousands of documents produced by the CPSC in response to the PSC's FOIA requests.

17.     Mr. Diaz was also tasked by Lead and Liaison Counsel to serve on the Science and Expert Committee, investing a considerable amount of hours pioneering testing protocols and vetting potential experts - in an effort to identify appropriate testifying experts and consultants to be retained by the PSC and working with them - and to fellow PSC members of the Committee – to formulate the best understanding of the then evolving science regarding the underlying nature of the alleged product defect.

18.     Mr. Diaz was the first attorney **in the United Sates** to successfully perfect service through the Hague Service Convention on the Knauf Defendants. It was the service and appearance obtained through Mr. Diaz' efforts in the case of *Morris-Chin v. Knauf Plasterboard (Tianjin),* Case No. 1:09-cv-20796 (filed on 03/27/2009), which served as the **sole** basis for the MDL Court's jurisdiction over the Knauf Defendants – until the PSC was able to perfect service through *Payton v. Knauf,* 2:09-cv-07628, MDL No. 2047, Eastern District of Louisiana, filed in December of 2009. In addition, due to his knowledge and expertise on issues of international service of process and procedure, Mr. Diaz briefed and successfully argued the PSC's defense to the Knauf Defendants' efforts to require discovery through the Hague Evidence Convection. Through this early favorable victory, Mr. Diaz helped subject the Knauf Defendants to discovery through the Federal Rules of Civil Procedure – streamlining the means for the PSC to obtain document discovery and depositions in this case. Thereafter, Mr. Diaz personally attended and participated in the deposition of almost all the key Knauf witnesses and helped obtain key admissions and testimony – which led to KPT's admission of liability in these consolidated proceedings. This testimony, together with admissions obtained by Mr. Diaz from the Banner Defendants' helped contribute to the collective pressure placed by the PSC on these defendants which led to the global settlements with both these key Defendants. In fact, Mr. Diaz was the first lawyer who was successful in getting Chartis Insurance Company to tender any sums in satisfaction of the obligations of the Banner Defendants (which occurred during the mediation of the Harrell case on 08/31/2010). As evidence of Mr. Diaz' contribution to the early settlement efforts of the PSC, it is notable to highlight that Mr. Diaz was one of only three signatories designated in the original Knauf Remediation Pilot Program – having pre-qualified 39 of his client's homes for participation in this early settlement program.

VMDIAZ AND PARTNERS | 119 WASHINGTON AVE SUITE 402 | MIAMI BEACH FLORIDA, 33139 | INFO@DIAZPARTNERS.COM | T: (305)704-3200

19.     In recognition of Mr. Diaz' leadership and resolve on behalf of the victims of Chinese drywall, Lead and Liaison Counsel and Judge Fallon in early 2012 personally invited Mr. Diaz to rejoin the PSC. This invitation came with personal assurances from the Court and Lead and Liaison Counsel (ultimately embodied in a Court order dated 03/16/2012) that Mr. Diaz' common benefit time for work accomplished during the 13 months that he was off the PSC would be considered and valued in the ultimate fee determination. Mr. Diaz and his firm relied on their complete trust of Judge Fallon and the assurances of Lead and Liaison Counsel in re-joining the PSC and committing to work in full coordination with Lead and Liaison Counsel in implementing the global settlements.

20.     Mr. Diaz' service on the PSC and passionate prosecution of these consolidated cases reflect his significant contribution and personal efforts.

**D.     THE FIRM'S PARTICIPATION AND LEADERSHIP IN DISCOVERY (MOTIONS, DEPOSITIONS) AND THE FIRM'S PARTICIPATION AND LEADERSHIP IN DOCUMENT REVIEW IS AS FOLLOWS:**

21.     It was through Mr. Diaz' efforts that the Knauf and Banner Defendants' early knowledge and active concealment of the defective nature of the drywall was discovered via the production of the Banner-Knauf "Secret Settlement Agreement."

22.     Banner was the largest supplier of Chinese manufactured drywall in Florida and, as proven by Mr. Diaz, was the first domestic supplier to actively participate with the Knauf Defendants' in covering-up the nature of the defect.

23.     Mr. Diaz prepared for and first-chaired the depositions of key Banner witnesses, including Donald "Mickey" Coblentz, Gus Coffinas and the Corporate Representative for Banner Supply Company. In preparing for these depositions, Mr. Diaz and his legal team reviewed tens of thousands of pages comprising the Banner Production. It was during this document review that Mr. Diaz and his paralegal, Iliana Yarzabal, discovered the infamous "Banner Secret Settlement" agreement. Pursuant to that agreement, the Knauf Entities

silenced Banner from ever revealing any of its knowledge regarding "any perceived or actual smell or health risks relating to Knauf Tianjin plasterboard… to the press and public media… any organization or association, or any internet websites of the fact and circumstances of their claims". The Banner Secret Settlement Agreement was first used in the consolidated depositions of the Banner defendants coordinated by Mr. Diaz on behalf of the Florida state litigants and the PSC. In all, Mr. Diaz attended and participated in 15 depositions of Banner witnesses and related installer defendants with early knowledge of the discovery and notice of the defect on the east coast of Florida in late October or early November 2006 – two and half years before public disclosure by Lennar Homes (who filed suit in Florida state court in January 2009), the Florida Department of Health or the CPSC. Members of his litigation team, including Jorge Lorenzo, Esq., participated in another 9 depositions of employees and former employees of Banner.

24.     Thereafter, Mr. Diaz led the briefing and advocacy efforts to unseal the Banner Secret Settlement Agreement, ultimately obtaining an order, dated 06/18/2010, from the Honorable Judge Joseph Farina allowing public disclosure of the until then sealed and confidential document.

25.     Almost directly preceding the disclosure of this secret settlement agreement to the American public, the Banner defendants entered into global settlement discussions.

26.     Mr. Diaz then turned his attention to the pending Knauf discovery.  Mr. Diaz and his firm began the arduous task of reviewing hundreds of thousands of pages of documents produced by the Knauf Defendants. Using "hot documents" discovered by himself and his firm, Mr. Diaz traveled to Germany, on three separate occasions, and New York to personally participate in the depositions of key Knauf witnesses.  Mr. Diaz personally elicited the substantial key testimony, including as a brief example the following admissions of material facts:

VMDIAZ AND PARTNERS | 119 WASHINGTON AVE SUITE 402 | MIAMI BEACH FLORIDA, 33139 | INFO@DIAZPARTNERS.COM | T: (305)704-3200

    a. <u>Key Witness No. 1: Baldwin Knauf</u> – elicited testimony from Knauf Gips' Managing Partner, admitting that the United States was targeted to receive drywall manufactured by Knauf's "low cost producer" based on "economic considerations" (establishing causation and agency relationship);

    b. <u>Key Witness No. 2: Hans Peter Ingenillem</u> – elicited testimony that Knauf Gips paid KPT's $8 million dollar attorneys' fee bill from Baker & McKenzie (establishing agency relationship);

    c. <u>Key Witness No. 3: Martin Halbach</u> – elicited testimony that Knauf Gips' supplied KPT with the recipes for drywall manufacturing (establishing causation and agency relationship);

    d. <u>Key Witness No. 4: Hans Hummel</u> – elicited testimony that although Professor Hummel suggested in-vivo and in-vitro testing be conducted in December of 2006, no such testing was conducted to ensure the safety of human beings;

    e. <u>Key Witness No. 5 : Dr. Christian Scherer</u> - Elicited testimony that Knauf Gips' main concern regarding the Fraunhofer Institute's dissemination of test results was "less sales, bad publicity" and that Professor Hummel instructed the Fraunhofer Institute to keep test results from its own experts and the American government. (establishing cover-up, exposure to punitive damages).

27.    As noted above, Mr. Diaz' questioning secured various key admissions from the Knauf Defendants regarding the defective nature of their product – and contributed to the PSC's Leadership's successful efforts to bring Knauf to the MDL settlement table.

28.    As previously noted, Mr. Diaz, as the Chief Liaison between the Consumer Products Safety Commission (CPSC) and the PSC, secured the production of thousands of pages of documents from the CPSC. Mr Diaz and his firm undertook to compile, index and analyze this massive production, which proved a prolific tool in solidifying the prosecution of

Plaintiffs' case against the Knauf and chain of distribution defendants. In fact, the CPSC reports and studies still serve as the backbone of all the expert testimony that has been elicited in this case regarding the confirmed methodology for testing for sulfur off-gassing; the corrosive effects of the sulfur off-gassing and the volatility of the sulfur gasses in home environments, which makes them less susceptible to air testing and requires other scientific means of detection.

29.    In addition to securing and reviewing production from the CPSC and their testing laboratories, Mr. Diaz, through heavily litigated means (involving hearings in Miami-Dade County on 12/17/2009, 04/16/2010 and 03/05/2010 and ultimately a Court order requiring production dated 02/04/2010 and 03/05/2010), procured the Environ studies commissioned by Lennar and other Florida home-builders in late 2006 and 2007 – which confirmed the early detection of corrosive effect of defective Chinese drywall. These studies proved that several homebuilders were aware – and made Knauf and Banner aware of the problematic nature of the Chinese manufactured drywall - long before consumers were made aware of the defective nature of the drywall installed in their homes. Bringing these studies to the light of day, assisted in pressuring the homebuilders and developers to participate in the Global Settlement.

30.    Mr. Diaz and his team also acquired tens of thousands of pages of documents from Banner Supply and the La Suprema entities, the importer/distributor of a vast majority of KPT drywall introduced into the US Market. Using delivery company invoices and bills of lading produced by La Suprema Trading, Mr. Diaz undertook the task of linking the receipt of KPT drywall at Chinese ports, through delivery to the Port of Miami, customs clearing, and ultimately Banner's acceptance at US ports. This effort – the first to be completed successfully in the nation allowed the tracing directly into Florida victims' homes of Knauf manufactured drywall distributed by the Banner Defendants. This tracing exercise – required

for class certification of the *Harrell* class — established the ability of other Florida homeowners to directly prove up the direct chain of distribution of the problematic drywall in their home.

## E.    THE FIRM'S PARTICIPATION AND LEADERSHIP IN LAW AND BRIEFING MATTERS IS AS FOLLOWS:

31.    Mr. Diaz filed the first case against the Banner Supply Defendants, *Harrell v. South Kendall Construction*, et. al., Case No: 09-08210 CA 42, in Miami-Dade County, Florida on February 3, 2009.

32.    Recognizing the need for obtaining lawful jurisdiction over the principal foreign manufacturers of the defective drywall, Mr. Diaz, on March 27, 2009, filed the first lawsuit against the Knauf Defendants, *Morris-Chin v. Knauf Plasterboard (Tianjin)*, Case No. 1:09-cv-20796 and was the first attorney to successfully perfect service through the Hague Service Convention on the Knauf Defendants.  It is important to note that for the first ten months of these consolidated MDL proceedings, the service and appearance obtained through Mr. Diaz' efforts served as the <u>sole</u> basis for the MDL Court's jurisdiction over the Knauf Defendants — until the PSC was able to perfect service through *Payton v. Knauf*, 2:09-cv-07628, MDL No. 2047, Eastern District of Louisiana, filed in December of 2009.

33.    Mr. Diaz, as State Court Liaison for Miami-Dade and Broward County, *successfully* briefed and/or argued the following dispositive motions:

> i.    Defendants Omnibus Motions to Dismiss Plaintiffs' Tort Claims under Economic Loss Rule (Miami-Dade County) — establishing viable tort claims for all plaintiffs;
>
> ii.    Installers' Omnibus Motion to Dismiss (Miami-Dade County) —establishing an installer's duty to test, inspect and make the defective product safe by changing it or providing adequate warning;

11

iii.  Installers' (Second) Omnibus Motion to Dismiss — establishing that installer defendants fell within the distribution chain of CDW and therefore were liable in strict liability in tort (Miami-Dade County);

iv.  Suppliers' Omnibus Motion to Dismiss on the Duty to Disclose Latent Defects, Negligence and Private Nuisances issues (Miami-Dade County — establishing a duty to disclose Latent Defect and establishing plaintiffs' right to plead cognizable negligence and private nuisance cause of action (the latter opening the door to exposure to loss of use and enjoyment claims against all defendants);

v.  Defendants' Omnibus Motions for Summary Judgment for a Determination of Joint & Several Liability Pursuant to Fla. Stat. 768.81(4)(b) (Miami-Dade County) — establishing that installer, supplier, builder and manufacturer defendants could all be held jointly and severally liable for economic damages;

vi.  Plaintiffs' Omnibus Motions for Leave to Amend Complaint to Add Claims for Punitive Damages against Knauf Gips and KPT (Miami-Dade County)- establishing a basis for Plaintiffs' right to amend to seek punitive damages against KPT and Knauf Gips;

vii.  Defendant Homebuilders' Omnibus Motion to Dismiss (Broward County) — successfully defeating homebuilders' motion to dismiss plaintiffs' strict liability, negligence and medical monitoring claims;

viii.  Defendant Developers' Omnibus Motion to Dismiss (Broward County) — successfully defeating developers' motion to dismiss claims under the economic loss rule;

VMDIAZ AND PARTNERS | 119 WASHINGTON AVE SUITE 402 | MIAMI BEACH FLORIDA, 33139 | INFO@DIAZPARTNERS.COM | T: (305)704-3200

ix. Installer Defendants' Omnibus Motion to Dismiss Plaintiffs Complaint (Broward County)- successfully defeating installer's motion to dismiss on grounds that installers are providers of a service, not a product;

x. Plaintiffs' Motion to Compel Production of the Baker & McKenzie Memorandum (Broward County) – ordering the production and unsealing of the confidential memo dated 11/15/2006 by Baker & McKenzie to the Knauf Family outlining a strategy for suppression of pubic knowledge of the known problems with Knauf manufactured drywall).

Additionally, Mr. Diaz together with other local PSC attorneys (Ervin Gonzalez, Esq.), drafted the Master Complaint used in Miami Dade and Broward Counties and, in coordination with the PSC, contributed to and drafted the motion to amend existing complaints to add counts for punitive damages against the Knauf entities – which motion was granted – substantially increasing the legal exposure of the Knauf Defendants.

**F.    THE FIRM'S PARTICIPATION AND LEADERSHIP IN SCIENCE AND EXPERTS MATTERS IS AS FOLLOWS:**

33.    As noted above, as an appointed member of the PSC's Science and Expert Committee, Mr. Diaz worked with fellow PSC members Dan Bryson and Ben Gordon early on to identify experts in each of the key scientific disciplines, identify appropriate testing protocols, gain an understanding of the evolving nature of the product defect, the various causes for the sulfur off-gassing, and vet alternative testing and remediation strategies. The work of the PSC Science and Expert Committee ultimately led to the selection of the final slate of Plaintiffs' experts that testified in the *Germano* and *Hernandez* bell-weather trials. Ultimately, the efforts expended by Mr. Diaz resulted in the PSC's retaining of the following experts:

VMDIAZ AND PARTNERS | 119 WASHINGTON AVE SUITE 402 | MIAMI BEACH FLORIDA, 33139 | INFO@DIAZPARTNERS.COM | T: (305)704-3200

i. **Dr. Lori Streit**, a Ph.D. chemist with Unified Engineering, who investigated homes with Chinese drywall and performed analysis on drywall samples taken therefrom. Dr. Streit offered opinions that the ICP_tests of Chinese drywall indicated that the drywall emitted various gasses including hydrogen sulfide, carbonyl sulfide and carbon disulfide.

ii. **Dean Rutila, P.E.**, a professional engineer with the engineering firm of Simpson Gumpertz & Heger, offered opinions about the defective nature of the drywall and the nature and extent of the damages caused by the off-gassing associated with the drywall.

iii. **Donald Galler, P.E.**, a professional engineer with Electrical Engineering Solutions, investigated various electrical systems components and devices taken from homes containing Chinese drywall and offered opinions that the building components tested exhibited copper sulfide and silver sulfide corrosion. As a result of the exposure to Chinese drywall, these components have a diminished useful life and should be replaced.

iv. **Bradley Krantz**, Director of Laboratory Services with Corrosion Testing Laboratories, offered opinions that building components tested from homes containing Chinese drywall had significantly diminished the useful life of the component as indicated by the pit depths and corrosion thickness and concluded that the components should be replaced.

G. **THE FIRM'S ACTIVITIES IN SUPPORT OR CONDUCT TRIALS OF INDIVIDUAL CHINESE DRYWALL CLAIMANTS, INCLUDING BELLWETHER TRIALS AND NON-MDL TRIALS, WHICH IMPACTED PROCEEDINGS ON A COMMON BENEFIT LEVEL (IDENTIFY THE CLAIMANT, DOCKET NUMBER AND VENUE OF EACH TRIAL AND OUTCOME) IS AS FOLLOWS:**

34. Mr. Diaz filed the first case against the Banner Supply Defendants, *Harrell v. South Kendall Construction*, et. al. Case No: 09-08210 CA 42, in Miami-Dade County, Florida on

VMDIAZ *AND PARTNERS* | 119 WASHINGTON AVE SUITE 402 | MIAMI BEACH FLORIDA, 33139 | INFO@DIAZPARTNERS.COM | T: (305)704-3200

February 3, 2009, alleging that the drywall installed in these homes was defective because, when exposed to heat and humidity, the drywall emits sulphur gases, which can cause damage to homes.

35.     Through the tracing efforts described above in Section D Paragraph 29, Mr. Diaz and his legal team were able to obtain the first – and to this day only involuntary certification of a Chinese drywall class (other than a voluntary settlement class).

36.     In addition to establishing the ability to successfully establish a plaintiff class and the means to do so, the *Harrell* action set precedent on several matters of law that have been used for the benefit of other plaintiffs nationwide, including the availability of loss of use and enjoyment damages on a negligence cause of action, the successful assignment of distribution chain causes of actions to a certified class and the elements of recoverable compensatory damages in CDW cases, including relocation expenses, remediation expenses, pre-judgment storage and moving expenses interest, damage to personal property, and environmental certification and cleaning expenses. Although this case – the prosecution of which was fully coordinated with the PSC (in fact the case was continued **three times** at the request of Judge Fallon and the PSC in order to allow global settlement discussions between the PSC and the Knauf Defendants to proceed to fruition) - was settled the third day of trial, these legal precedents – binding on all defendants in Miami Dade County – increased the collective leverage of the plaintiffs on the distribution chain defendants to participate in the global MDL settlement – or face the possibility of hundreds of substantial verdicts in state and federal courts.

37.     Mr. Diaz was also Plaintiffs' counsel in the case, *Synalovski v. Knauf*, et. al., Case No: 10-41716 CA 12, 17th Circuit in and for Broward County, Florida, the only case fully prosecuted in Broward County and the last state court case settled prior to (**and as a coordinated part of)** the announcement of the global settlement program. Mr. Diaz'

VMDIAZ AND PARTNERS | 119 WASHINGTON AVE SUITE 402 | MIAMI BEACH FLORIDA, 33139 | INFO@DIAZPARTNERS.COM | T: (305)704-3200

determination to not only zealously litigate this case on behalf of his clients, but also to facilitate negotiations between the Knauf Defendants and the PSC led to the ultimate settlement of the Synalovski matter in order to ensure certain evidence was not made public which would have the unintended effect of damaging the Knauf MDL Settlement. In fact, it was at the request of Judge Fallon that the unprecedented step was taken of negotiating the settlement of the Synalovski case in New Orleans – despite the fact that at the time Mr. Diaz was not on the PSC, but was asked by the Court to facilitate the settlement of this case to avoid disrupting the global MDL settlement. The negotiated settlement included the agreement to vacate the order unsealing the Baker and McKenzie Memo of 11/15/2006 referenced in ¶ 32(x). This salutary effect on the ultimate resolution of Chinese drywall litigation further demonstrates Mr. Diaz' commitment to the PSC and the global resolution of these consolidated cases.

38.     In addition to his service on the PSC for three of the four years this litigation has been pending, Mr. Diaz played a critical role in communicating with state court lawyers, state court judges and facilitating communication between state courts and the MDL court. Team work between state and federal proceedings was a hallmark of the litigation and essential to its overall success. As evidenced by Mr. Diaz' voluntary coordination of his litigation efforts in Miami-Dade County in the *Harrell* case and his voluntary coordination of settlement efforts in Broward County in the *Synalovski* case, Mr. Diaz – while not compromising the rights of his clients or his professional ethics – honored every good request made by the MDL court directly to him to assist in coordination of state court litigation and avoid jury verdicts that could upset the global settlement effort of the Court and the PSC leadership.

39.     As recognized in PTO 28, common benefit work includes the efforts of counsel not only in the MDL, but also in the "coordinated state actions". Mr. Diaz was **one of three** attorneys appointed by the Honorable Joseph Farina, coordinating judge for the state court

cases pending in the 11th Judicial Circuit in and for Miami-Dade County, Florida (which had the single largest volume of coordinated state court cases) and **one of two** attorneys appointed by the Honorable Charles Greene, coordinating judge for the 17th Judicial Circuit in and for Broward County, Florida, to serve as Lead Plaintiffs' Counsel. In this role, Mr. Diaz and his co-lead counsel assumed the responsibility for 1) securing consolidated discovery with the MDL proceeding; 2) keeping the state court judges and lawyers informed of developments in the MDL and 3) facilitating direct communication between Judge Farina, Judge Greene and the MDL Court and PSC.

40.     As Lead Counsel, Mr. Diaz was also called upon by Judges Farina and Greene to personally brief and argue innumerable key jurisdictional, substantive and procedural motions (outlined in section E above) – which allowed the state court proceedings to become at issue – allowing the state court litigation to proceed on a coordinated basis with the MDL.

I.     **THE FIRM'S PARTICIPATION AND LEADERSHIP IN SETTLEMENT NEGOTIATIONS, DRAFTING OF SETTLEMENT DOCUMENTATION AND CLOSING PAPERS, AND ADMINISTRATION OF SETTLEMENT AGREEMENTS (EXCLUDING INDIVIDUAL REPRESENTATIONS) IS AS FOLLOWS:**

41.     In the fall of 2010, Mr. Diaz participated in settlement negotiations with the Banner and other distribution chain defendants - over the *Harrell* class action litigation. At this point in time, neither Banner nor the other distribution chain defendants had settled with **any party in any Chinese drywall matter**.

42.     Mr. Diaz, as a member of the PSC, invited Russ Herman to attend these settlement negotiations, including mediation in Miami, Florida in order to ensure that any settlement reached would be in accordance with the goals of these consolidated cases.

43.     During the mediation, the Banner Defendants, together with Mr. Diaz and Mr. Herman, created the formula by which Banner's insurers would contribute its insurance proceeds – a formula which would ultimately lead to the Banner MDL Settlement.

VMDIAZ AND PARTNERS | 119 WASHINGTON AVE SUITE 402 | MIAMI BEACH FLORIDA, 33139 | INFO@DIAZPARTNERS.COM | T: (305)704-3200

44.     Due to certain professional requirements imposed on Mr. Diaz by his former firm, Mr. Diaz was not permitted to sign the original Demonstration Remediation Program. This, however, was not a governing factor in Mr. Diaz' ability to enroll – at Judge Fallon's request - all of the *Harrell* class members into the original pilot program, ensuring that the *Harrell* settlement would not sidetrack the progress of global settlements in the MDL.

45.     In addition to Mr. Diaz' pioneering efforts with the Demonstration Remediation Program, Mr. Diaz was vital in the implementation of the Knauf MDL Settlement. It was through the progress made in the bellwether *Synalovski* litigation that Mr. Diaz exposed the efforts taken by the Knauf Defendants to conceal a known defect, to the danger and detriment of the American public. Although not a member of the PSC at that time, Mr. Diaz conferred with the PSC leadership and Judge Fallon regarding the evidence he obtained and intended to use during the *Synalovski* case, including the Baker & McKenzie Memorandum, which outlined the early attempts by the Knauf Defendants to conceal this known danger. As noted above, Mr Diaz also voluntarily coordinated – at Judge Fallon's request – his settlement efforts in *Synalovski* with those of the PSC in order to avoid disrupting the global settlement discussions at a very sensitive stage. One month after the *Synalovski* settlement, the Knauf, Banner and Global Settlements were announced.

46.     It was as a result of this good faith and voluntary coordination - despite having been removed from the PSC - that Mr. Diaz was subsequently asked by Lead and Liaison Counsel and Judge Fallon to re-join the PSC in order to facilitate the orderly implementation of the global settlement program. Following the announcement, Mr. Diaz faithfully enrolled over 100 of his firms' cases into the settlement program, including ten multi-million dollar homes where Mr. Diaz had secured individual service on the Knauf Defendants through The Hague Service convention and three putative class actions.

VMDIAZ AND PARTNERS | 119 WASHINGTON AVE SUITE 402 | MIAMI BEACH FLORIDA, 33139 | INFO@DIAZPARTNERS.COM | T: (305)704-3200

J.    **THE FIRM'S ACTIVITIES OF COMMON BENEFIT WORK IN THE FOLLOWING NON-MDL JURISDICTIONS:**

48.    Miami-Dade and Broward County, Florida.

K.    **THE FOLLOWING MEMBERS OF THE FIRM HELD LEADERSHIP POSITIONS ON THE REGULAR COMMITTEES ENGAGED IN COMMON BENEFIT WORK (STATE POSITION AND COMMITTEE):**

49.    Victor M. Diaz, Jr.

L.    **COUNSEL IN THE FIRM WERE OR WERE NOT INVOLVED IN THE CHINESE DRYWALL LITIGATION PRIOR TO THE JPMDL, AND THE TIME AND EXPENSE INCURRED DURING SUCH TIME PERIOD OUTLINED BELOW WAS FOR COMMON BENEFIT:**

50.    As noted above in section A, Mr Diaz was the first attorney in the country to file a Chinese drywall case against the **Knauf Defendants and the first in the United States to perfect service upon them.** Also, as noted in Section A, Mr. Diaz was the first attorney in the country to sue the Banner Defendants – both of these seminal cases were filed before the JPMDL. The service obtaining in the *Chin Green* case – which was subsequently transferred to these consolidated proceedings served as the sole basis for this Court's jurisdiction over the Knauf Defendants for the first ten months of these proceedings.

M.    **THE MEMBERS OF THE FIRM WHO WERE PSC MEMBERS OR COMMITTEE MEMBERS WHOSE COMMITMENT TO THE LITIGATION DID NOT EBB INCLUDED:**

51.    Victor M. Diaz, Jr.

N.    **A COMPLETE AND ACCURATE LISTING OF ALL SOURCES AND AMOUNTS OF PRIOR PAYMENTS RECEIVED FROM A CHINESE DRYWALL CLAIMANT OR OTHER SOURCES (IDENTIFY AMOUNTS PAID FOR FEES AND AMOUNTS PAID FOR COSTS) TO THE FIRM:**

52.    Judge Farina awarded VM Diaz and Partners $250,000.00 to administer the disbursement of settlement proceeds to the *Harrell* Class members. However, VM Diaz and Partners did **not** receive a share of the *Harrell* Class Attorney's Fee. VM Diaz and Partners

VMDIAZ AND PARTNERS | 119 WASHINGTON AVE SUITE 402 | MIAMI BEACH FLORIDA, 33139 | INFO@DIAZPARTNERS.COM | T: (305)704-3200

also received $480,000.00 in fees for its prosecution and settlement of the Synalovski)
matter.

_____
Victor M. Diaz, Jr.

SWORN TO AND SUBSCRIBED BEFORE ME THIS 11th DAY OF April, 2014.

_____
NOTARY PUBLIC

Print Name: Adriana Vanegas
My commission expires: 8/4/14
[APPLY SEAL]

ADRIANA S. VANEGAS
Notary Public - State of Florida
My Comm. Expires Aug 4, 2014
Commission # EE 872904
Bonded Through National Notary Assn.

VMDIAZ AND PARTNERS | 119 WASHINGTON AVE SUITE 402 | MIAMI BEACH FLORIDA, 33139 | INFO@DIAZPARTNERS.COM | T: (305)704-3200