UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION                                    MDL NO. 2047

                                              SECTION: L

                                              JUDGE FALLON
                                              MAG. JUDGE WILKINSON
THIS DOCUMENT RELATES TO:
*ALL CASES*
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


**FEE COMMITTEE'S RESPONSE IN OPPOSITION TO PARKER WAICHMAN
LLP'S MOTION TO: (1) DISQUALIFY FEE COMMITTEE CHAIR AND
CO-CHAIR, (2) STRIKE THE STEP SIX RECOMMENDATION OF THE
MAJORITY OF THE FEE COMMITTEE REGARDING THE ALLOCATION OF
COMMON BENEFIT FEES, AND (3) LIFT THE SEAL ON RELATED FILINGS[1]**

---

[1] Rec. Doc. 21489 (the "Motion to Disqualify").

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................. ii

I.      INTRODUCTION ......................................................................................... 1

II.     BACKGROUND ........................................................................................... 4

        A.      The *Chinese-Manufactured Drywall* MDL—Claims and Class Settlements. ........ 4

        B.      Summary of the Attorneys' Fee Award Process. ................................... 9

        C.      Allocation of Common Benefit Fee. ..................................................... 14

        D.      Efforts to Undermine the Court and Short Circuit the Fee Award Process. ......... 19

III.    ARGUMENT ................................................................................................ 25

        A.      Disqualification Is an Extreme Measure and Is Moot in Any Event Since
                the Fee Committee Has Already Made its Final Recommendation to the
                Court for Allocating Common Benefit Fees. ........................................ 26

        B.      The Motion to Disqualify (And Strike) Is Based Upon a Flawed Premise. ......... 29

                1.      The Final FC Recommendation is Just That – a Recommendation. ......... 29

                2.      Parker Once Again Ignores the Process that Is in Place. .................... 30

                3.      Parker's Proposed Alternate Allocation Suggestion Has No Support. ..... 31

        C.      Parker's Purported Grounds for Disqualification Are Meritless. ................ 33

                1.      Grounds Previously Relied Upon. ............................................ 33

                2.      Claims of Additional Self-Dealing, Patronage and Retribution Are
                        Factually Unsupported and Legally Do Not Support Disqualification..... 33

                3.      The Esquire Bank Issue Has Been Fully Briefed and Argued
                        to the Court, and Parker's Statements add Nothing to the Issue............... 36

        D.      It Would Be Inappropriate to Lift the Seal on Related Fee Filings,
                Particularly in Light of the Ongoing Chinese Drywall Litigation. ...................... 36

IV.     CONCLUSION ............................................................................................ 38

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Bd. of Educ. of New York City v. Nyquist,*
   590 F.2d 1241 (2d Cir. 1979)..................................................................................27

*DISH Network, LLC v. WLAJ-TV, LLC,*
   2017 WL 1333057 (W.D. La. Apr. 3, 2017)............................................................37

*Hall v. Small Business Administration,*
   695 F.2d 175 (5th Cir. 1983) ...................................................................................28

*In re Factor VIII or IX Concen. Blood Prod. Litig,*
   59 F.3d 1016 (7th Cir. 1998) ...................................................................................30

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
   626 F. Supp. 2d 1346 (J.P.M.L. 2009).......................................................................5

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
   706 F. Supp. 2d 655 (E.D. La. 2010).........................................................................6

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
   894 F. Supp. 2d 819 (E.D. La. 2012).........................................................................7

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
   2013 WL 499474 (E.D. La. Feb. 7, 2013).................................................................8

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
   2014 WL 4809520 (E.D. La. Sept. 26, 2014)............................................................6

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
   2017 WL 1421627 (E.D. La. Apr. 21, 2017)..............................................5, 6, 7, 8

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
   2017 WL 1476595 (E.D. La. Apr. 21, 2017)............................................................7

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
   2018 WL 279629 (E.D. La. Jan. 2, 2018)................................................................6

*In re Copley Pharm., Inc., Albuterol Prod. Liab. Litig.,*
   50 F. Supp. 2d 1141 (D. Wyo. 1999)......................................................................25

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.,*
   2003 WL 21641958 (E.D. Pa. May 15, 2003).........................................................25

*In re General Motors LLC Ignition Switch Litig.*, Civil Action,
  2016 WL 1441804 (S.D.N.Y. Apr. 12, 2016) ........................................................................ 29

*In re Genetically Modified Rice Litig.*,
  764 F.3d 864 (8th Cir. 2014) ................................................................................................ 29

*In re Kempthorne*,
  449 F.3d 1265 (D.C. Cir. 2006) ............................................................................................ 28

*In re Kensington Intern. Ltd.*,
  368 F.3d 289 (3rd Cir. 2004) ................................................................................................ 28

*In re ProEducation Int'l., Inc.*,
  587 F.3d 296 (5th Cir. 2009) ................................................................................................ 27

*In re Vitamins Antitrust Litig.*,
  398 F. Supp. 2d 209 (D.D.C. 2005) ...................................................................................... 28

*Lietky v. United States*,
  510 U.S. 540 (1994) .............................................................................................................. 35

*Nixon v. Warner Commc'ns, Inc.*,
  435 U.S. 589 (1978) .............................................................................................................. 37

*Procaps S.A. v. Patheon Inc.*,
  2013 WL 5928586 (S.D. Fla. Nov. 1, 2013) ........................................................................ 36

*Republic of Panama v. America Tobacco Company*,
  217 F.3d 343 (5th Cir. 2000) ................................................................................................ 28

*Schiessle v. Stephens*,
  717 F.2d 417 (7th Cir. 1983) ................................................................................................ 27

*Trust Co. v. N.N.P.*,
  104 F.3d 1478 (5th Cir.1997) ............................................................................................... 28

*Turner v. Murphy Oil USA, Inc.*,
  582 F. Supp. 2d 797 (E.D. La. 2008) ................................................................................... 15

*United States v. Holy Land Found. for Relief & Dev.*,
  624 F.3d 685 (5th Cir. 2010) ................................................................................................ 37

*West v. Crawford*,
  2017 WL 1494661 (E.D. La. Apr. 26, 2017) ........................................................................ 38

**<u>Other Authorities</u>**

*Common Benefit Fees in Multidistrict Litigation*,
    74 La. L. Rev. 371 (2014)..........................................................................................25

## I.    __INTRODUCTION__

Parker Waichman LLP's ("Parker") Motion to Disqualify has little to do with any actual or perceived conflicts of the Fee Committee ("FC") Chair or Co-Chair.  Instead, Parker's Motion is simply the latest in a series of scorched earth efforts made by Parker to cause havoc in his never-ending attorneys' fee dispute, in his own self-interest of trying to receive a greater amount of money.  Parker has tried to maximize his personal fee recovery since 2016, first as individually-retained counsel and now as common benefit counsel.  Parker has utilized invective and accusations as his primary fulcrum against fellow counsel and even the Special Master, while spawning and encouraging a full-blown second, satellite litigation involving fees.

Sadly, while Parker is entitled to object and even advocate for a different balance of fee award, Parker's motion practice has continued to distract from the substantial work necessary to seek justice for Taishan Plaintiffs as a means to leverage a better recovery for himself.  This type of pleading behavior is not lost on the Court in other contexts.  As the Court noted at the July 12, 2018 hearing: "The disappointing thing to me is that we're not talking about clients at this point. We're just talking about lawyers and lawyer fees. . . .  And then you're trying to use whatever you feel you could use either to get a better fee or a better portion of the fee . . . ."[2]

Once again, we are not talking about clients.  In fact, Parker's Motion to Disqualify makes clear that he does *not* seek to remove either Mr. Levin or Mr. Herman from the leadership of the ongoing litigation against the Taishan Defendants, but rather only from any consideration of what common benefit fee allocation is appropriate.[3]  In other words, the professionalism and ethics of Mr. Levin and Mr. Herman are sufficient to represent the interests of thousands of

---

[2] July 12, 2018 Hearing Tr., at 10:13-22, attached hereto as Exhibit "A."

[3] Rec. Doc. 21489-1, at 5 n.4.

1

Plaintiff-homeowners, including Parker's clients, in this MDL, but are somehow so beyond the pale when it comes to offering a recommendation to the Court as to the proper allocation of the common benefit fee that it requires the drastic sanction of disqualification.  Parker's position is untenable.

Attacking fellow Plaintiffs' counsel and motions such as seeking disqualification, rather than simply objecting and advocating to this Court, is a modus operandi for Parker.  In fact, Parker previously attempted to disqualify the entire FC, including the dissenting Fee Committee member, when he was dissatisfied with the recommended allocation of the global fee award as between common benefit counsel and individually-retained attorneys.  Now, at the next step of the process, Parker limits his Motion to Disqualify to just the Chair and Co-Chair of the FC.[4] To what end?  As this Court has explained to Plaintiffs' counsel over the years, a fee committee recommendation is just one factor which the Court may consider, or even reject, in whole or in part.   Knowing this basic fact, seeking disqualification after the recommendation is finalized is less about an alleged self-interest of Chair and Co-Chair, and more about Parker's self-interest over the interests of all other Plaintiffs' counsel who wish to find a resolution of this protracted litigation.  Despite his expected millions in fees to be earned, Parker continues to want more and more and will threaten all those who stand in his path towards this self-interested goal, including seeking and threatening appeals as well as further protracted litigation.

---

[4] At this point in the proceedings, Parker is acting alone.  When Judge Marcia G. Cooke, United States District Court for the Southern District of Florida, held an initial conference to get a handle on the remand issues for Florida *Amorin* cases and noted that Mr. Montoya would be the interim liaison counsel for Plaintiffs, Parker's attorney, Mr. Faircloth, who attended the hearing on behalf of Parker, stated "Mr. Montoya has no authority to speak for Parker Waichman's clients."  July 13, 2018 Hearing Tr., at 22:19-21, attached hereto as Exhibit "B."

None of the purported conflicts factually materialize, and Parker cites no case law to the contrary.  In addition, the efforts to piggyback on the alleged Esquire Bank issues that have been raised in a separate motion is a misfire.  Not only was Mr. Herman's relationship with Esquire Bank disclosed prior to the Court's approval of Esquire Bank as the depository institution for the escrowed funds, but the purported conflict is nonexistent and centers around elaborate allegations and suppositions by attorneys with a vested interest in the attorneys' fees fund.  As the Court succinctly and accurately stated: "I don't see any problem with having had the funds in Esquire Bank."[5]

Furthermore, Parker's suggestion that the recommendation of the majority of the FC be stricken receives little analysis in his papers, likely because the notion has no support in the law and makes no sense.  Parker has the authority to file an objection to the Recommendation raising any and all grounds he wishes.  In fact, Parker filed his objection.[6]  In so doing, Parker already has outlined all that he believes is in error related to the FC Majority Recommendation.  There was clearly a defined process for the FC consideration pursuant to the orders of this Court, and whether or not Parker agrees with the analysis or outcome, there was a lengthy and thoughtful recommendation put forward by the FC.  In response, Parker does not simply suggest the Court apply a *pro rata* allocation based solely on lodestar with no consideration given to the work that generated that lodestar or the impact it had on the ultimate resolution of the litigation, but that prior to doing so the Court should disqualify members of the FC.  There is no support in fact or law for this type of litigation strategy.

---

[5] July 12, 2018 Hearing Tr., at 6:22-23.  *See also* Order of Sept. 10, 2013 (Rec. Doc. 17064) (When originally approving the QSFs and Esquire Bank as the depository institution, the Court held that "adequate disclosures have been made and the Court does not find this to be a conflict of interest.").

[6] Rec. Doc. 21590.

Finally, Parker, rather than simply seeking access, seeks to unseal fee-related filings, which will only provide aid and comfort to the non-settling Taishan Defendants in the ongoing Chinese Drywall litigation to the prejudice of not only Parker's clients, but all Taishan Plaintiffs. There is every reason to believe that Defendants could exploit information contained in these filings to the disadvantage of Plaintiffs who are still litigating their cases against these recalcitrant Chinese companies. Parker's request reflects a willingness to disadvantage the Plaintiffs, including his own clients, in the actual litigation in order to gain a small advantage for himself in the fee litigation and should not be countenanced.

It is notable that not a single other law firm or counsel has, in a litigation replete with total and partial joinders, joined Parker's Motion to Disqualify, adopted his reasoning, or sought similar relief.[7] Instead, as has been too common, Parker has adopted a rogue mentality in an effort to maximize his own personal fee award no matter the delay attendant to additional motion practice. In the end, this tactic does nothing but prevent lawyers who have waited for years from receiving their earned fee.

For those reasons, as elaborated on more fully below, the Motion to Disqualify should be denied in its entirety.

## II.    BACKGROUND

### A.    The Chinese-Manufactured Drywall MDL—Claims and Class Settlements.

This MDL, now in its tenth year, involves claims for property damage and personal injuries caused by Chinese-manufactured drywall ("Chinese Drywall") installed in homes and other buildings in the United States from approximately 2005 to 2008. During that time, the

---

[7] *See*, *e.g*., Second Declaration of Robert H. Klonoff, attached hereto as Exhibit "C" ("7/31/2018 Klonoff Decl."), at ¶ 45 (noting that "it is telling that this motion is filed solely by Parker Waichman").

destruction caused by Hurricanes Rita and Katrina led to an increase in construction, which, in conjunction with a housing boom, led to a severe shortage of domestic drywall, resulting in the importation of millions of square feet of Chinese Drywall into this country.  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig*., 2017 WL 1421627, at *1 (E.D. La. Apr. 21, 2017). Chinese Drywall was used in the construction and reconstruction of many thousands of homes and other buildings, primarily in states along the Gulf Coast and East Coast – Florida, Louisiana, Alabama, Mississippi, Texas, Georgia, Tennessee, North Carolina, Virginia, and elsewhere. *Id*. When the defects of the drywall became apparent, thousands of Plaintiffs filed suit in federal and state courts against various Defendants, including "homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall."  *Id.*  On June 15, 2009, the Judicial Panel on Multidistrict Litigation consolidated the federal cases in this Court for pretrial proceedings, noting that this Court "has extensive experience in multidistrict litigation as well as the ability and temperament to steer this complex litigation on a steady and expeditious course."  *In re Chinese-Manufactured Drywall Prod. Liab. Litig*., 626 F. Supp. 2d 1346, 1347 (J.P.M.L. 2009).

Discovery in the MDL revealed that the drywall at issue was manufactured primarily by two groups of Defendants: (1) the Knauf entities (German-based international manufacturers of drywall and other building products, whose Chinese subsidiary Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT") advertised and sold Chinese Drywall in the United States), and (2) the Taishan entities (Chinese-based drywall manufacturers).  *See Chinese Drywall*, 2017 WL 1421627, at *1. The litigation proceeded simultaneously against both groups of Defendants and their various downstream associates – importers, exporters, distributors, manufacturers, homebuilders,

installers, realtors, brokers, suppliers, and developers – who were involved in the chain of commerce leading to the defective drywall being installed.  *Id.*

Knauf's Chinese subsidiary KPT appeared before the Court early in the litigation, in July 2009, agreeing to a limited waiver of service in November 2009.  *See id.* at *1.  In contrast, the Taishan entities deliberately failed to respond to the complaints against them and were defaulted as part of their "limited response" strategy to avoid judgments from U.S. courts.  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2014 WL 4809520 (E.D. La. Sept. 26, 2014). According to the Chinese companies, all of the "major assets of the Company, BNBM and Taishan Gypsum are located in China" and there is "no convention or treaty on mutual recognition and enforcement of judgments between China and the U.S."  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629, *8 (E.D. La. Jan. 2, 2018). Therefore, "the possibility of the U.S. judgments being enforced in China is very low."  *Id.*

In February 2010, this Court presided over a bellwether trial of seven families' claims against Taishan Gypsum Co., Ltd. ("Taishan"),[8] after which the Court found in favor of Plaintiffs.[9]  In March 2010, this Court presided over a bellwether trial of a homeowner's claims against KPT, *Hernandez v. Knauf Gips KG*, Case No. 09-6050, after which the Court found in favor of Plaintiffs.  *Chinese Drywall*, 2017 WL 1421627, at *1.  The Court's findings in *Germano* and *Hernandez* provided a foundation for Knauf and the PSC to enter into a pilot remediation program on October 14, 2010 ("KPT Pilot Program").

---

[8] *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D. La.).

[9] *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 706 F. Supp. 2d 655 (E.D. La. 2010).

As the Court is well aware, the litigation against the Taishan entities has proceeded on a tortuous track.  The Taishan Defendants willfully refused to appear and participate in this litigation, despite having been properly served, and this Court later entered a final default judgment in favor of Plaintiffs in those cases.  *See Chinese Drywall*, 2017 WL 1421627, at *3. Taishan then entered an appearance solely to contest this Court's exercise of personal jurisdiction over it, which resulted in substantial litigation, including approximately 18 months of discovery on the jurisdictional issue, multiple motions to compel discovery and for sanctions, several trips to Hong Kong for depositions (which included this Court's personal oversight at the depositions in Hong Kong), a 142-page opinion by this Court finding personal jurisdiction over Taishan and its wholly-owned subsidiary and alter ego TTP in Louisiana, Florida, and Virginia, and two separate panels of the Fifth Circuit affirming that ruling.  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012), *aff'd*, 753 F.3d 521 & 742 F.3d 576 (5th Cir. 2014).  On September 26, 2014, this Court certified the *Amorin* class against the Taishan Defendants, and on April 21, 2017, it issued a lengthy opinion denying motions to dismiss on jurisdictional grounds filed by several related parent entities (CNBM, BNBM Group, and BNBM).  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1476595 (E.D. La. Apr. 21, 2017).

Since that time, the litigation against the Chinese Defendants has only become more contentious and drawn out.  Taishan's parent companies, the CNBM and BNBM entities, avoided the Court's jurisdiction, orchestrated Taishan's fleeing of the jurisdiction, and upon entering the litigation, seemingly sought to reopen every issue that had been decided in the case since its inception.  As the Court is aware, the litigation against the Taishan Defendants has involved, among other things, significant contempt and sanctions proceedings, with the Court's

jurisdiction ruling over CNBM, BNBM Group, and BNBM proceeding now in the Fifth Circuit on a 1292(b) appeal.  In addition, 1,734 Florida *Amorin* cases against the Taishan entities have been remanded to the federal court in Florida for trial,[10] and 919 Louisiana *Amorin* and *Brooke* cases against the Taishan entities will be set for trial as well.[11]

As to the litigation against the Knauf entities, on December 20, 2011, after the KPT Pilot Program had been ongoing for a little over a year, the Knauf entities and the PSC entered into a class settlement agreement that the Court certified as a class action and approved on February 7, 2013 (the "Knauf settlement").  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig*., 2013 WL 499474 (E.D. La. Feb. 7, 2013).  In addition, numerous other downstream Defendants – homebuilders, suppliers, and installers (and most of their insurers) – entered into class action settlement agreements, resulting in the resolution of "almost all of the Knauf Entities' chain-of-commerce litigation."  *Chinese Drywall*, 2017 WL 1421627, at *2.  The additional, related class settlements involve claims against (1) Interior Exterior Building Supply, LP ("InEx"); (2) the Banner entities ("Banner"); (3) L&W Supply Corp. ("L&W"); and (4) the "Global" settlement involving more than 700 homebuilders, installers, suppliers, and their insurers (collectively, the "GBI settlements").  *See Chinese Drywall*, 2013 WL 499474 (certifying classes and approving Knauf, InEx, Banner, L&W, and Global settlements).  Relatedly, the parties negotiated, and this Court approved, four additional settlements for the benefit of mostly Virginia claimants valued at more than $17 million with "several downstream entities in the Taishan chain of commerce and their insurers."  *See* Order and Judgment dated 7/9/2013 [Rec. Doc. 16934], at 6 (certifying

---

[10] *See* Suggestion of Remand, Opinion & Order [Rec. Doc. 21242] ("Florida Remand Order").

[11] *See* Rec. Doc. 21339.

classes and granting final approval of four settlements with Virginia Defendants: Nationwide, Venture Supply, Builders Mutual, and Tobin Trading).

In total, the parties negotiated, and this Court approved, nine interrelated class settlements with an aggregate estimated value of $1.1 billion.  As part of those settlements, an attorney's fees fund was created from which all counsel in the litigation – common benefit counsel and individually retained attorneys – would be compensated.[12]

**B.      Summary of the Attorneys' Fee Award Process.**

On July 28, 2009, this Court issued PTO 9, setting forth "standards and procedures … to be utilized by any counsel seeking fees and/or expense reimbursement."[13]  From the outset, monthly time and expense reporting was required to be made to the court-appointed CPA, Philip Garrett, for all common benefit time and expense incurred in the MDL by attorneys seeking common benefit fees, and Mr. Garrett, in turn, provided monthly reports to the Court.[14]  In addition, the Court met regularly with Mr. Garrett, and sometimes Lead and/or Liaison Counsel, to review the monthly reports of fees and expenses for various categories of common benefit work.[15]

On January 10, 2014, the Court issued PTO 28, which "provides direction and establishes guidelines for the efficient presentation to this Court to allow for the determination of making an award of attorneys' fees and reimbursement of litigation expenses, and subsequently an

---

[12] *See* Rec. Doc. 17379; Rec. Doc. 20257.

[13] Rec. Doc. 147 at 1.

[14] Rec. Doc. 147; Rec. Doc. 21168, at 5 ("Step Five Fee Order").

[15] *See* Step Five Fee Order, at 5.

allocation from such an award."[16]  PTO 28, as amended by PTOs 28(A)-(G), set up a multi-stage

process for attorneys' fees and cost reimbursement in this MDL.[17]

In addition, PTO 28 established the FC and named Arnold Levin (Chair), Russ M.

Herman (Co-Chair/Secretary), Dawn M. Barrios, Gerald E. Meunier, Michael J. Ryan,[18]

Christopher A. Seeger, and Richard J. Serpe as FC members.[19]  As this Court noted, "[t]hese

individuals have been involved since the beginning of the Chinese Drywall litigation and have

performed significant roles in either or both the MDL and State Court litigation and are familiar

with the work performed by common benefit counsel in all Chinese Drywall matters."[20]  The

members of the FC collectively represent a significant number of individual clients and in turn,

many of the individually-retained attorneys, including Parker, have submitted common benefit

hours (preparing fee affidavits and appearing for interviews before the FC).  No one objected to

PTO 28 or any of its amendments.

Throughout the fee award process, members of the FC and PSC have analyzed,

monitored and been intimately aware of the work being done by firms submitting common

benefit hours and expenses.  In addition, the Court met regularly with Mr. Garrett, and

sometimes Lead and/or Liaison Counsel, to review the monthly reports of fees and expenses for

---

[16] Rec. Doc. 17379, at 2.

[17] The six-step process is set forth in PTO 28 [Rec. Doc. 17379].  Various amendments were made as
follows PTO 28(A) [Rec. Doc. 17402], 28(B) [Rec. Doc. 17567], PTO 28(C) [Rec. Doc. 17639], PTO
28(D) [Rec. Doc. 17832], PTO 28(E) [Rec. Doc. 18037], PTO 28(F) [Rec. Doc. 20282], and PTO 28(G)
[Rec. Doc. 21330].

[18] Mr. Ryan does not serve on the Plaintiffs' Steering Committee ("PSC").

[19] *Id*. at 14-15.  Leonard Davis was later appointed as Assistant Secretary to the FC.  *See* PTO 28(D) [Rec.
Doc. 17832].

[20] Rec. Doc. 17379, at 15 n.10.

various categories of common benefit work.[21]  More generally, the Court directly oversees the conduct of the litigation, common benefit time and expenses necessary to advance the litigation, and the contribution that counsels' efforts have made to the overall advancement of the litigation. The decisions with respect to fees have been well-informed at each stage of the process.

The FC has proceeded mechanically through the six-step process despite numerous roadblocks and obstacles:

(1)    <u>Step One – review of time and expenses</u>.  Because the Court continually reviewed the information submitted to Mr. Garrett dating back to the beginning of the litigation, some counsel were encouraged to review and revise their firm's common benefit time and expense submissions as the case progressed.  Step One bolstered that review and correction process by requiring all common benefit counsel to review and self-audit the time and expenses they submitted *via* the Court-appointed CPA's case management system.  The guidelines for review sought to assure both the accuracy of the information provided to the Court and the ability of counsel to verify their submissions as needed.

(2)    <u>Step Two - submission of initial affidavits for compensation for common benefit time and reimbursement of expenses to the FC and identification of individual claimants retained by individual counsel</u>.  During this step, the FC spent significant time reviewing the time and expense submissions of all common benefit fee applicants and "Initial Affidavits" from all counsel seeking common benefit fees and/or the reimbursement of costs.[22]  The FC relied on the Initial

---

[21] *See* Rec. Doc. 21168, at 5.

[22] Rec. Doc. 17379, at 5-6.

Affidavits as important, threshold indicators of what counsel themselves viewed as their respective contributions to the Knauf and GBI settlements.

(3)   Step Three - filing of a Global Fee Petition on behalf of common benefit counsel and individual contract attorneys.  On May 20, 2014, the PSC and FC filed a Joint Global Fee Petition seeking an award of fees that would later be allocated between common benefit counsel and individually retained attorneys.[23]   On May 17, 2016, the Court approved global legal fees of $192,981,363.35 in connection with the settlements.[24]

(4)   Step Four - a request for a common benefit assessment for other cases.  Pursuant to this step, on July 9, 2014, the PSC filed a motion to establish a common benefit assessment for Chinese Drywall cases not participating in any of the class settlements.[25]   After the Court issued its Step Five Fee Order on January 31, 2018,[26] the PSC filed a Supplemental Memorandum in Support of Its Assessment Motion.[27]   On May 14, 2018, the Court entered PTO 28(G) to address the issues raised in the Assessment Motion.[28]

---

[23] The PSC had filed a Petition for the award of such fees on May 20, 2014 [Rec. Doc. 17700], and a First Amended Petition on April 15, 2016 to account for additional settlement payments made by Knauf after the Court's approval of the class settlements [Rec. Doc. 20205].  Various homebuilders filed objections to the Global Fee Petition [*see* Rec. Doc. 17727].  The homebuilders' objections were later resolved by agreement of the parties [Rec. Doc. 20467], and approved by the Court [Rec. Doc. 20641].

[24] Rec. Doc. 20257.

[25] Rec. Doc. 17831 ("Assessment Motion").

[26] Rec. Doc. 21168.

[27] Rec. Doc. 21174.

[28] Rec. Doc. 21330.

(5)     Step Five - division of available funds as between common benefit counsel and

individual contract attorneys.  On June 6, 2016, the FC filed its motion to

determine the allocation of the global fee award as between common benefit fees

and individual attorneys' fees ("Step Five Allocation Recommendation").[29]  In

preparation for that filing, the FC conducted extensive legal research regarding

the methodology to be used in the Court's quantification of a common benefit fee

and in its brief in support of its motion, the FC addressed the lodestar, percentage-

of-fund and "blended" methods of calculating fees (while noting that both the

Fifth Circuit and this Court previously had been supportive of the blended

method).  The FC recommended that the Court use the blended approach and

approve and award a total common benefit fee of $119,313,367.08.[30]  Numerous

firms, including Parker, objected to the FC recommendation.  The Court

appointed a Special Master to oversee limited discovery and issue a

recommendation as to the common benefit/individual attorney split.[31]  The

objections and the Special Master's recommendation were considered by the

Court.  On January 31, 2018, the Court issued its Step Five Fee Order awarding a

total common benefit fee in the amount of $99,762,099.56.[32]  In doing so, it

discussed the lodestar, percentage-of-recovery, and "blended" calculation

---

[29] Rec. Doc. 20293.  Mr. Ryan dissented from the Step Five Allocation Recommendation.

[30] Rec. Doc. 20293-1, at 53.

[31] Rec. Doc. 20410; Rec. Doc. 20478.

[32] Rec. Doc. 21168, at 24.

methods, noting that the "blended" approach entails a percentage-of-recovery calculation cross-checked by the lodestar method.[33]

After the Step Five Allocation Recommendation was filed, Parker turned the fee proceeding into an ongoing, contentious, satellite litigation.  As the Court put it in the Step Five Fee Order, while contract counsel had every right to object, they went overboard by "commenc[ing] unnecessary proceedings, and prolong[ing] the discovery process by filing unnecessary written discovery and seeking pointless depositions of the Court-appointed CPA and various members of the PSC and Fee Allocation Committee."[34]  Indeed, all that his efforts accomplished was to cause "havoc and needless delay."[35]

### C.    Allocation of Common Benefit Fee.

After the Court issued its Step Five Fee Order, it was incumbent upon the FC to undertake Step Six, recommending to the Court an allocation of the total common benefit fee among the counsel who performed common benefit services related to the class settlements.  To discharge this duty, the FC adhered to the guidelines set forth on pages 9 through 13 of PTO 28.[36]

First, the FC reviewed the time and expense submissions by counsel as well as their affidavits, taking into account the work of all counsel in the MDL and State Court actions.  The FC evaluated the contributions of common benefit counsel using both "objective measures" and the FC members' "subjective understanding of the relevant contributions of counsel toward

---

[33] *Id.*, at 8-21.

[34] *Id.*, at 23.

[35] *See id.*

[36] Rec. Doc. 17379.

generating the various Settlement Funds . . . ."  In addition, it conducted its evaluation according to the general principles set forth in PTO 28, but with the "over-arching guideline" that "the relative contribution of each common benefit attorney to the outcome of the litigation" must be considered.  Such consideration is essential as this Court has noted on multiple occasions that, while there are many types of work required in a case of this magnitude, not all work merits the same fee award.[37]  Certain work – "taking depositions, participating in hearings, or trials, actively participating in developing the appropriate litigation strategies and tactics (through moot court presentations or similar practices), drafting briefs, actively participating in Court conferences, arguing motions, negotiating with opposing counsel to reach a settlement, and actively managing and organizing the administrative aspects of the case" – are the more significant aspects of the case that "require[] and deserve[] the most recognition" because "not all types of work are created equal."[38]

The FC afforded "appropriate deliberate fairness" to all common benefit fee applicants by extending full opportunities for them "to advocate their positions in a variety of ways in addition to providing time record submissions."  The contributions of counsel were evaluated by reference to both the twelve *Johnson* factors, as applicable, and the several "special considerations" identified by the Court in PTO 28.  The FC adhered to the Court's admonition to "weigh reported hours of common benefit attorneys in degrees of importance to the relief achieved," an effort that was facilitated by reference to a "Second Affidavit" in which each

---

[37] *See Turner v. Murphy Oil USA, Inc.*, 582 F. Supp. 2d 797, 810-11 (E.D. La. 2008); *see also In re Vioxx Prod. Liab. Litig.*, No. 05-md-1657 (E.D. La. June 23, 2017) [Rec. No. 65535], Order & Reasons at 10 (quoting *Murphy Oil*).

[38] *See Murphy Oil*, 582 F. Supp. 2d at 810-11; *see also Vioxx*, 6/23/2017 Order & Reasons at 10 (quoting *Murphy Oil*).

common benefit fee applicant was to address and verify with "specificity" the specific matters enumerated in PTO 28.  These considerations, in addition to the *Johnson* criteria, were meant to clarify for the record what each counsel considered the "best" description of his firm's "common benefit contributions"; and, notably, the first consideration listed and to be addressed by counsel was "[t]he extent to which each common benefit firm made a substantial contribution to the outcome of the litigation."

As further required under the Step Six process, the FC conducted meetings with each and every common benefit fee counsel who had submitted the required Second Affidavit.  These meetings were held in person (or *via* video conference in a few instances), and were occasions for fee applicants to "present the reasons, grounds, and explanations for entitlement to common benefit fees and reimbursement of expenses."   The counsel who appeared before the FC in these meetings were required, and expected, to "be prepared to respond to any questions or concerns raised by the FC during his/her presentation," and each meeting was "recorded by a court reporter" as required by PTO 28.

The format for each meeting was the same.  A designated lead questioner on the FC interviewed the fee applicant based on a prior review of the firm's time submissions, affidavits and any other material relevant to the common benefit services performed.  The applicant was afforded a full opportunity not only to answer such questions but also to expound upon the answers.  In a number of cases, firms were allowed to participate in the meetings through more than one counsel in the firm, particularly if doing so provided the FC with a better understanding of the relevant contributions by the firm.  Before the conclusion of the meeting, each counsel was given the opportunity to make a statement on the record as to what he or she considered the most salient aspects of the common benefit work performed.  Members of the FC then conferred to

exchange impressions and seek a general consensus as to the appropriate common benefit contribution of that counsel's firm.

The dollar-specific allocations recommended by the FC are not driven by mathematical formulation nor are they based upon the mere counting of attorney hours.  Instead, consistent with the Step Six process of PTO 28, the FC arrived at its Step Six recommendation based upon the exercise of "its discretion . . . in evaluating which work and expenses furthered the common benefit of the litigation."[39]  The members of the FC are confident that they collectively possessed the case experience and knowledge to intelligently evaluate the extent and quality of the common benefit work performed by each common benefit firm.  Close familiarity with the litigation has allowed the FC to put each common benefit counsel's services in appropriate context.

On May 23, 2018, the FC provided the common benefit fee applicants with the FC's initial recommendation (with Mr. Ryan dissenting) for an allocation of the common benefit fee awarded by the Court.  Thereafter, some of the applicants submitted objections to the FC.  The FC convened, considered the objections, and came up with a final recommendation (with Mr. Ryan dissenting) for allocating the common benefit fee.  On July 3, 2018, a majority of the FC filed with the Court the "Step Six Recommendation" for allocation of common benefit fees.[40] Mr. Ryan, dissented and filed a Minority Fee Committee Report on July 5, 2018, in which he raised several objections to facets of the Step Six Recommendation (the "FC Minority Report").[41]  While Parker frequently cites to the FC Minority Report, he fails to note that the report specifically states:

---

[39] Rec. Doc. 17379, at 14.

[40] Rec. Doc. 21455.

[41] Rec. Doc. 21473.

> [W]hile the undersigned takes issue with the methodology identified herein as it relates to the proposed attorneys' fee recommendation for the common benefit work, **these concerns are not intended to disparage the work performed by Lead and Liaison Counsel or the other common benefit counsel who committed large sums of money and time to effort related to Knauf and Global resolutions**.  In many ways, **their collective efforts were unprecedented**, particularly in terms of the number of plaintiffs and defendants who participated in the ultimate resolution.  Similarly, **this Minority Report is not intended to disparage the Fee Committee, which has dedicated enormous hours to interviewing and reviewing information submitted by common benefit attorneys**.[42]

In the Step Six Recommendation, the FC expressly recognized that this recommendation is only one of several available resources or data points for the Court's consideration in making its independent determination on how the common benefit fee should be allocated.[43]  The FC Minority Report acknowledges the same fundamental principle, noting that the "reports of the Fee Committee are but one factor for the Court to consider and that the Court is certainly empowered to give this minority report or the Fee Committee recommendations little or no weight in the final determination."[44]  Common benefit fee applicants who were not satisfied with the fee recommended to be allocated to them by the Step Six Recommendation were permitted to file objections with the Court by July 20, 2018.  In response, 19 objections were filed.

Presented with majority and minority views of the FC, objections from counsel, and its own knowledge gained by continual oversight of the litigation over the past nine-plus years, the Court is in a position to make its own independent determination of the appropriate amount of

---

[42] *Id.*, at 3 (emphasis added).

[43] Rec. Doc. 21455, at 9.

[44] Rec. Doc. 21473, at 1 n.2.

common benefit fees and expenses to be awarded to each firm.  Dissatisfied counsel will also have the opportunity to appeal the Court's ruling once it has been reduced to a final fee award.[45]

### D.  Efforts to Undermine the Court and Short Circuit the Fee Award Process.

Parker aggressively opposed the Step Five Allocation Recommendation and expanded these proceedings.[46]  First, Parker sought extensive discovery of the FC's work product as well as detailed time records.[47]  The Court appointed a Special Master "to conduct limited discovery regarding time and expense submissions, procedures, and the relevant work of Philip [Garrett], CPA, and to make appropriate recommendations regarding these motions and objections."[48] Parker moved to have his counsel appointed Co-Liaison Counsel for objectors *in the fee dispute*.[49]  That motion was granted, and Mr. Faircloth was appointed one of two Co-Liaison Counsel.[50]

By July 20, 2016, Objectors began to seek discovery on the fee issues, a process that did not end until ***over a year later***, after the Special Master had permitted extensive discovery, motions practice was conducted, interlocutory appeals were attempted, an evidentiary hearing

---

[45] Parker has already expressed his intent to appeal the fee matter to the Fifth Circuit.  *See, e.g.*, *In re Parker Waichman, L.L.P., et al*., Petition for a Writ of Mandamus, Fifth Circuit Docket 17-30430 (5/23/2017); Rec. Doc. 21216 (1292(b) related to the Step Five Fee Order).

[46] *See, e.g.*, Rec. Doc. 20348 (Parker Opposition).

[47] Primary Counsel's Motion for Case Management Order Providing for Discovery, Unsealing of Records Regarding Common Benefit Fees, and Appointment of Special Master [Rec. Doc. 20394], at 1.

[48] Order (7/19/2016) Appointing Special Master [Rec. Doc. 20410], at 1; *see also* Order (8/30/2016) Clarifying Order Appointing Special Master [Rec. Doc. 20478]; Common Benefit Fees Order, at 6-7 (discussing appointment of Special Master).

[49] Rec. Doc. 20407.

[50] Rec. Doc. 20950, at 12.  The Special Master appointed Co-Liaison Counsel as a means of exchanging information and not to be compensated as common benefit counsel.  *Id*. at 12 n.70.

was held, post-hearing briefing was completed and the Special Master issued his recommendation on September 11, 2017.[51]  During the course of this process, the Special Master permitted significant discovery, including all monthly time and expense reports, lodestar charts, and held cost charts prepared by Mr. Garrett; all backup materials supporting Mr. Garrett's affidavit filed with the FC's Allocation Motion; and access to the shared cost ledgers and receipts in Mr. Garrett's Case Cost Management System.[52]  Objectors were also given an opportunity to depose Mr. Garrett and three representatives of the Plaintiffs' leadership group.

Objectors appealed the Special Master's ruling on discovery and sought even more discovery, including all time entries and held cost receipts submitted by over 500 timekeepers during the entire time this litigation has been in existence, as well as additional time to examine the witnesses they already deposed, and an opportunity to depose additional witnesses.[53]

At every step of the process, Parker sought to amplify the fee proceedings.  In fact, as the fee litigation heated up, Parker raised new arguments on issues he had never previously contested, such as asserting that the Court's meetings with members of the PSC, which were known publicly, were impermissible *ex parte* communications, and asserting that members of the PSC prolonged the settlement process to inflate the appearance of the common benefit conferred upon the class.[54]  The tone and language adopted by the Objectors' Liaison Counsel in the

---

[51] Rec. Doc. 20950, at 13.  For a summary of all proceedings before the Special Master, *see* Special Master's Recommendation Concerning Attorneys' Fees and Expenses [Rec. Doc. 20950], at 12-17.

[52] *See* FC's Memo in Opposition to Primary Counsel's Objection to Special Master Denying Allegedly Necessary Discovery and Request for Expedited Consideration [Rec. Doc. 20748], at 3.

[53] *See* FC's Response to Objections to Denial of Discovery Requests at 3-4 [Rec. Doc. 20748, filed under seal] (summarizing seven different broad categories of documents sought by Primary Counsel).

[54] Order and Reasons denying Motion to Disqualify the FC [Rec. Doc. 20789], at 3.

process, particularly that directed at the Special Master, was certainly not a behavior which would have been taken directly with or expected by this Court.  However, in the effort to raise the temperature on the satellite litigation, Parker, through his counsel, continued to choose invective which has become too common in this proceeding.

Parker even moved to disqualify the entire FC, strike the Step Five Allocation Recommendation and suspend proceedings before the Special Master.[55]  Then, he filed a mandamus petition before the Fifth Circuit, seeking an immediate ruling on their disqualification motion.[56]  After the Court promptly denied the motion to disqualify the FC, it was noted that "contract counsel misunderstands the role of the Fee Committee's recommendation in the overall process which will ultimately lead to a decision on the fee allocation issue."[57]  This concept holds true in Step Six.

After a two-day evidentiary hearing before the Special Master, both the FC and Objectors submitted post-hearing briefs, and the Special Master issued his recommendation that a common benefit fee of $90 million be awarded.[58]  Both parties filed an appeal to this Court and the Court issued the Step Five Fee Order on January 31, 2018, awarding the $102,857,943.85 to common benefit counsel, which represents a split of available funds equal to 52% for common benefit counsel and 48% for individual contract attorneys.[59]  The figure awarded by the Court was over

---

[55] Rec. Doc. 20735 (filed under seal).

[56] *In re Parker Waichman, L.L.P.*, Mandamus Petition, Fifth Circuit Docket 17-30430 (5/23/2017).

[57] Rec. Doc. 20789, at 4.

[58] Rec. Doc. 20950, at 17.

[59] Rec. Doc. 21168.  This Order determined the appropriate division of available funds for attorneys' fees as between common benefit counsel (52%) and individual contract attorneys (48%).

$12.8 million greater than the Special Master's recommendation and greater than the

46.9%/53.1% split advanced by Parker when he initially objected to the Step Five Allocation

Recommendation.[60]

Despite the fact that there has been no final fee award, Parker filed a motion to certify the

Common Benefit Fees Order for immediate appeal or, in the alternative, for the entry of a final

order pursuant to Rule 54(b).[61]  In seeking interlocutory appeal of the Step Five Fee Order,

Parker challenged everything fee-related, going as far back in time as when common benefit

hours and expenses were first submitted to the Court-appointed CPA in 2009 and when the

negotiations of the KPT Pilot Program and the class settlements occurred, beginning in 2010.[62]

The FC opposed the 1292(b) motion, and the Court denied the motion on May 7, 2018.[63]

After this Court issued a Suggestion of Remand Order for the *Amorin* Florida cases, Lead

and Liaison Counsel filed a motion seeking to address the suggestion for the need to establish a

Plaintiffs' attorneys' fees fund to compensate and reimburse attorneys for services performed for

MDL administration and common benefit (the "Holdback Motion").[64]  Parker opposed the

Holdback Motion.[65]  In addition, while that process was ongoing, Parker sought to get paid while

they continued to hold up the Court-approved six-step process by filing motions for an interim

---

[60] *See* Rec. Doc. 20348.

[61] Rec. Doc. 21216.

[62] Rec. Doc. 21216-1.

[63] Rec. Doc. 21322, at 15.

[64] Rec. Doc. 21267.

[65] *See* Rec. Doc. 21289-1 ("Primary Counsel's" (which includes Mr. Parker) opposition).

disbursement of fees.[66]  In other words, Parker was seeking to short-circuit the Court's process for awarding fees to collect money he claims he will eventually receive to use that money to continue to appeal the Court's fee decision.

The contentious nature of the fee dispute unfortunately became personal, as shown in the recently filed motion related to Esquire Bank.[67]  At the hearing on Yance's Esquire Bank Motion, the Court stated plainly: "I don't see any problem with having had the funds in Esquire Bank" and then, seemingly understanding what the motion was really about, noted disappointment at the tactics that have been used to secure the highest fee possible.[68]

To date, Parker has used his right to object to the FC's allocation proposal as a means to disrupt and delay the Court's consideration and adjudication of the various requests for attorneys' fees.  The current Motion to Disqualify is just the most recent attempt.

Parker seeks to disqualify the Chair and Co-Chair of the FC, Mr. Levin and Mr. Herman, strike the Step Six Recommendation,  and lift the seal related to filings in the fee matter.[69]  In seeking to disqualify Messrs. Levin and Herman, Parker relies upon the reasons set forth in the previous motion to disqualify the entire FC (reasons which were previously rejected by this Court); allegations of self-dealing, patronage and retribution; and purported conflicts arising from the Esquire Bank allegations that have already been addressed in the motions filed by other

---

[66] *See*, *e.g.*, Rec. Doc. 21240 ("primary counsel" which includes Mr. Parker); Rec. Doc. 21247 (opposition to Primary Counsel's motion).

[67] *See*, *e.g.*, Yance Law Firm ("Yance") Motion to Immediately Transfer Attorney Fee Qualified Settlement Fund to a Different Depository Bank or Back Into the Court Registry [Rec. Doc. 21338] (the "Esquire Bank Motion").  Lead and Liaison Counsel filed a response [Rec. Doc. 21429], and Yance filed a Reply [Rec. Doc. 21477].

[68] July 12, 2018 Hearing Tr., at 6:22-23, 10:13-22.

[69] Rec. Doc. 21489-1.

counsel discussed above.[70]  The bulk of Parker's argument is merely an objection to the amount

of the common benefit fee allocated to their firm and the firms of Mr. Levin and Mr. Herman,

not a legitimate argument for the drastic move of disqualification.[71]  This is nothing more than an

attempt to retread the previously rejected reasons for disqualification and smear the good name

of Mr. Herman.

Furthermore, Parker advocates for scrapping all of the work of the FC that was done

pursuant to the very lengthy, detailed and time-consuming procedures of PTO 28 in favor of a

black and white *pro rata* allocation of the common benefit fee based upon lodestar that is

contrary to fee jurisprudence.[72]  Finally, Parker argues, with little reasoning, that documents

related to the fee dispute should be unsealed.[73]  It is notable that not a single other firm or lawyer

has, in a litigation that has been replete with total and partial joinders, joined Parker's Motion,

adopted his reasoning or sought similar relief.

In taking the scorched earth approach that has marked this fee dispute, Parker has taken

positions that are contrary to his own clients' interests (such as suggesting the PSC could have –

and should have – negotiated an all-cash deal as opposed to a remediation settlement so

individual counsel could have taken their contingency fees from their clients' recoveries).  In

fact, Parker's current Motion to Disqualify does the very same thing by seeking to unseal fee

dispute-related documents that contain information that could be used by defendants to gain an

---

[70] *Id.* at 5.

[71] *See, e.g.*, 7/31/2018 Klonoff Decl., at ¶¶ 38, 41, 71-74.

[72] *Id.* at 21.

[73] *Id.* at 19-20.

advantage in the ongoing *Chinese Drywall* litigation.  This type of conduct should not be rewarded.

### III.   <u>ARGUMENT</u>

The Motion to Disqualify is unsustainable.  Parker's own memorandum in support of his Motion to Disqualify reveals the fallacy behind the entire motion.  Parker, after asserting that the Chair and Co-Chair of the FC engaged in self-dealing, retribution and other sorted behavior extreme enough to call into question the integrity of the proceedings, clarifies that "the motion does not challenge the appointments of Levin and Herman as leaders of the Plaintiffs' Steering Committee."[74]  In other words, Messrs. Levin and Herman have enough integrity to continue to prosecute the litigation on behalf of thousands of Plaintiffs, including Parker's clients, but allegedly are so ethically infirm that they cannot be charged with offering a recommendation to the Court, which the Court may accept or reject, in whole or in part, as to an appropriate allocation of common benefit fees to firms who contributed to the very litigation they are spearheading.[75]  This is clearly preposterous and fails as a matter of fact and law.[76]

---

[74] Rec. Doc. 21489-1, at 5 n.4.

[75] In complex litigation, courts routinely request recommendations from fee committees or lead counsel to aid their ultimate determination of how a common benefit fee should be allocated.  *See, e.g., In re Copley Pharm., Inc., Albuterol Prod. Liab. Litig.*, 50 F. Supp. 2d 1141, 1148 (D. Wyo. 1999), *aff'd and remanded sub nom. In re Copley Pharm., Inc.*, 232 F.3d 900 (10th Cir. 2000); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, Case No. 99-20593, 2003 WL 21641958, at *6 (E.D. Pa. May 15, 2003); *In re National Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, Explanation and Order at 8 (E.D. Pa. May 24, 2018) (ECF No. 10019).  *See, generally*, Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371, 387 (2014) (While noting "in the end" it is the Court's ultimate responsibility to allocate fees, it was recognized that along the way "[i]t is helpful for the transferee court to get input from the plaintiffs' attorneys who occupied leadership roles, those who actually did the work both in the MDL and the state courts, and a third party, someone outside of this group, who can bring an objective perspective to the [allocation] issue.").

[76] *See* 7/31/2018 Klonoff Decl., at ¶¶ 48, 74.

A.      **Disqualification Is an Extreme Measure and Is Moot in Any Event
Since the Fee Committee Has Already Made its Final
Recommendation to the Court for Allocating Common Benefit Fees.**

While Parker couches his Motion to Disqualify in terms of curing "actual and apparent

conflicts," it is clear that the real objection is to the amount of the common benefit fee allocated

to his firm and the amount allocated to Mr. Levin's and Mr. Herman's firms.  Of course, as was

the case with the prior motion to disqualify the entire FC, filed after the Step Five Allocation

Recommendation, Parker misapprehends the role of the FC.[77]  *See* 5/25/2017 Order and Reasons

[Rec. Doc. 20789], at 4 ("While the Court appreciates the objections of contract counsel, it finds

contract counsel misunderstands the role of the Fee Committee's recommendation in the overall

process which will ultimately lead to a decision on the fee allocation issue.").  Here, the Step Six

Recommendation will be considered as one data point among several, including the FC Minority

Report, counsels' objections, and the Court's own experience supervising the litigation.  *See id.*

at 5.

Mr. Parker understands that this limitation is of equal force here so he states, with no

support, that while conflicts during Step Five may be less problematic because of the Court's *de*

*novo* review, "it is impossible for the Court to use the Step Six Recommendation for any purpose

without deferring to Levin and Herman."[78]  Not only is there no support for this proposition but

---

[77] *See, e.g.*, 7/31/2018 Klonoff Decl., at ¶ 39 & n.103 (questioning whether it can really be
misapprehension the second time given the previously ill-fated attempt at disqualification and noting that
"to engage in an essentially duplicative strategy after losing the first time puts the new motion in a very
different light.").

[78] Rec. Doc. 21489-1, at 13.  Of course, this is a reversal of Parker's prior position with respect to the
Court's alleged inability to perform a *de novo* review at Step Five.  *See* 7/31/2018 Klonoff Decl., at ¶¶ 60-
62.

the record reflects the opposite as the Court will engage in the very same *de novo* review at Step Six.

The Court specifically stated it will make an independent determination, the FC acknowledges the limits of its recommendation in the Step Six Recommendation itself, and the FC Minority Report acknowledges that the Court will make an independent determination in allocating common benefit fees.  In fact, the very presence of the FC Minority Report illustrates that the Court will have all sides of the issue before it when it makes its ultimate determination under Step Six.  In addition, the Court's familiarity with the contributions of counsel in this case from its oversight and monitoring of the litigation and common benefit submissions since the case's inception gives it the information it needs to make its own independent determination.

All of this leads to the basic proposition that courts routinely reject efforts to obtain extraordinary relief, such as disqualification, before the need for such relief is clear.  *See, e.g., In re ProEducation Int'l., Inc.*, 587 F.3d 296, 300 (5th Cir. 2009) ("Because of the severity of disqualification … this sanction must not be imposed cavalierly.") (citation and internal quotation marks omitted); *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1983) ("disqualification is a drastic measure which courts should hesitate to impose except when absolutely necessary") (citation and internal quotation marks omitted); *Bd. of Educ. of New York City v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979) (noting that "disqualification motions are often made for tactical reasons" and that "such motions inevitably cause delay").  Given the transparent, multi-step process that is still ongoing, there is no need to impose such a drastic sanction at this time, especially since the FC's final recommendation has been submitted to the Court.[79]

---

[79] *See* 7/31/2018 Klonoff Decl., at ¶¶ 40-41 (discussing premature nature of motion and drastic nature of disqualification).

The cases relied upon by Parker to suggest that there is a real or imagined conflict simply do not warrant finding a conflict herein. The cases cited by Parker address disqualification when the integrity of the proceedings is thrown into doubt because of questions of the impartiality of the court itself.[80]  *See Republic of Panama v. America Tobacco Company*, 217 F.3d 343, 346 (5th Cir. 2000), citing *Trust Co. v. N.N.P.*, 104 F.3d 1478, 1491 (5th Cir.1997) (disqualifying *district judge*); *Hall v. Small Business Administration*, 695 F.2d 175, 179 (5th Cir. 1983) (disqualifying *magistrate judge*); *In re Kensington Intern. Ltd.*, 368 F.3d 289 (3rd Cir. 2004) (disqualifying *court advisor*); *In re Kempthorne*, 449 F.3d 1265 (D.C. Cir. 2006) (disqualifying *special master*).  The cases cited by Parker with respect to fee allocation do not deal with FC members being disqualified for apparent or actual conflicts but instead deal with parties who are **objecting** to the fee they received.  *See*, *e.g.*, *In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 234 (D.D.C. 2005).  In fact, in *Vitamins*, the court considered the possibility of disqualifying the firm that it determined had not fairly allocated the fee award but found "[t]he other solution, disqualifying CMHT and letting the court make the distribution, denies the court and the law firms of an important resource – the benefit of the determination of CMHT, as lead counsel, as to the firms' entitlements based on the actual, daily experience of the development of the lawsuit and plaintiffs' victory."  *Id.* at 235.  *Vitamins* illustrates why you should not disqualify members of the leadership simply because you do not agree with the proposed allocation.

---

[80] *See* 7/31/2018 Klonoff Decl., at ¶¶ 50-58 (discussing problems with the bulk of the authority cited by Parker).

**B.**    **The Motion to Disqualify (And Strike) Is Based Upon a Flawed Premise.**

   *1.    The Final FC Recommendation is Just That – a Recommendation.*

As discussed above, Parker's Motion to Disqualify primarily rests upon its disagreement with an allocation that was *recommended* by the FC.[81]  Parker cites no case in which an allocation recommendation, which is not binding upon the Court, provides the basis for disqualification.

In addition, the recommendation is the result of the process laid out very clearly in PTO 28, many years ago, which Parker now claims amounts to "no objective methodology or rate structure."[82]  The FC engaged in the court-directed process that included, among other steps delineated in PTO 28, submissions by counsel, interviews, subjective and objective components, opportunities for each firm to make their case, and deliberations within the FC.  If Parker had an issue with this approach, he should have objected at the time PTO 28 or any of its amendments were entered.[83]  *See In re General Motors LLC Ignition Switch Litig.*, Civil Action No. 14-md-2543, 2016 WL 1441804, at *6 (S.D.N.Y. Apr. 12, 2016) ("Orderly litigation depends on lawyers raising issues and problems in a timely fashion; a failure to do so not only prevents a court from nipping problems in the bud, but also casts doubt on whether the alleged problems were in fact so problematic.").[84]

---

[81] *See*, *e.g.*, 7/31/2018 Klonoff Decl., at ¶ 40.

[82] Rec. Doc. 21489-1, at 14.

[83] In addition, to the extent that Parker is reasserting certain claims of conflict in the structure of the FC which were asserted as part of the prior motion to disqualify the entire FC, the arguments advanced in opposition thereto are incorporated herein by reference.  *See* Rec. Doc. 20788-2.

[84] *Accord*, *e.g.*, *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 871 (8th Cir. 2014) (finding that challenge to MDL settlement agreement was waived when the attorney who sought to challenge it had

Parker's failure to object until such time as he became dissatisfied with the Step Five allocation recommended by the FC, and then his decision to lead the charge in objecting to each act by the FC, in and of itself, should call into question its motives and warrant denial of the Motion.[85]

### 2.     *Parker Once Again Ignores the Process that Is in Place.*

To protect his interests, Parker does not need to seek disqualification of the FC Chair or Co-Chair or an order striking the Step Six Recommendation because the Court has established a transparent, multi-step process for determining the allocation of fees that protects its interest.[86]

First, the Step Six Recommendation came only after the FC engaged in the multi-step process contained in PTO 28 and discussed at length above.  However, even having considered all of the information presented to it, only the majority of the FC filed the Step Six Recommendation while a dissenter, Mr. Ryan, filed the FC Minority Report.  In addition, any firm that was dissatisfied with the proposed common benefit allocation was given the opportunity to file an objection with the Court by July 20, 2018.  Indeed, 19 firms did exactly that.[87]  Therefore, from a recommendation perspective, the Court has before it both FC filings as well as the objections filed by various common benefit counsel.

---

agreed to be bound by its terms by submitting claims pursuant to the agreement); *In re Factor VIII or IX Concen. Blood Prod. Litig.*, 159 F.3d 1016, 1020 (7th Cir. 1998) (finding attorneys had waived their right to seek additional fees where, "[h]aving participated in the settlement proceeding and having failed to make timely objection to it, they are barred by the principles of waiver and equitable estoppel from challenging the settlement after it has become final and the defendants have paid and the class members have received hundreds of millions of dollars") (citation omitted).

[85] *See* 7/31/2018 Klonoff Decl., at ¶¶ 39-42.

[86] *See* Declaration of Robert H. Klonoff Addressing Primary Counsel's Motion to Disqualify the Fee Committee and, *inter alia*, Strike its Allocation Recommendation filed May 24, 2017, at ¶¶ 55-58 [Rec. Doc. 20788-2]; *see also* 7/31/2018 Klonoff Decl., at ¶¶ 40, 47, 54.

[87] *See* Rec. Doc. 21517; Rec. Doc. 21549; Rec. Doc. 21554; Rec. Doc. 21559; Rec. Doc. 21560; Rec. Doc. 21563; Rec. Doc. 21564; Rec. Doc. 21566; Rec. Doc. 21568; Rec. Doc. 21573; Rec. Doc. 21578;

By itself, that information would be sufficient for the Court to make its own reasoned decision with respect to the allocation of the common benefit fee.  Yet, this Court has much more as it has lived with the case for more than nine years and taken an active role since the case's inception monitoring common benefit time and expenses.  The Court is intimately aware of the contributions of counsel and is more than capable to make a knowledgeable decision in its own right.  Here, the submissions by counsel are truly advisory as the Court can assess their validity based upon the documents and records before it along with the knowledge gained through personal experience.[88]

This process illustrates why Parker's concerns about the Chair and Co-Chair of the FC are rooted in a scorched earth litigation strategy focused on attacking counsel, rather than addressing the FC's reasoning through the process of objections, as expected by the Court.  For the same reasons relied upon by the Court in dismissing the prior motion to disqualify, Parker's current motion should be denied as well.

### 3. *Parker's Proposed Alternate Allocation Suggestion Has No Support.*

Rather than simply focusing on disqualification, and dissatisfied with the allocation of common benefit fees to his firm, Parker then moves on to propose that the Court simply apply a lodestar analysis to allocate the funds.[89]   While this argument is best left for the objections

---

Rec. Doc. 21580; Rec. Doc. 21583; Rec. Doc. 21586; Rec. Doc. 21589; Rec. Doc. 21592; Rec. Doc. 21594; Rec. Doc. 21596; Rec. Doc. 21597.

[88] *See* 7/31/2018 Klonoff Decl., at ¶¶ 40, 47 (discussing process established by the Court that will allow all arguments to be considered prior to a final fee allocation).

[89] Rec. Doc. 21489-1, at 21; *see also* 7/31/2018 Klonoff Decl., at ¶¶ 66-67 (noting that striking the allocation recommendation makes no sense because even if the two members of the FC are disqualified, a majority of the FC still supports the Step Six Recommendation).

Parker is empowered to file and argument Parker can make to the Court in that context, Parker nonetheless offers no reasoning as to why this approach is fair, reasonable or consistent with the case law on fee awards.  Perhaps it is the allure of mathematical simplicity that Parker believes equates to "fairness."  Nothing could be further from the truth.

The Court put in place procedures in PTO 28 that were intended to lead to a fair and equitable result.  Putting aside that those procedures are still in progress and therefore, have yet to produce a result, one of the cornerstones of the procedures was that common benefit time would be awarded based upon the respective firms' contributions to the outcome of the litigation.[90]  As the Court stated: "The over-arching guideline that the FC is to consider is the relative contribution of each common benefit attorney to the outcome of the litigation."[91]  The Court's guidance comports with the law.

Parker's lodestar approach flies in the face of the Court's guidance and the law.  Indeed, among the twelve factors to be considered under *Johnson*, the "time and labor" by counsel is one which should be weighted not mathematically but relatively.  Courts consistently have characterized the "amount involved and the result achieved" as the key *Johnson* factor.  In fact, this Court's decision awarding a total common benefit fee noted that this "contribution to outcome" factor should be given "considerable weight," citing U.S. Supreme Court authority to the effect that the degree of success achieved through an attorney's effort was "the most critical factor" in assessing a reasonable fee for that effort.[92]  In its brief supporting the Petition for a global fee award based on the Knauf/GBI class settlements, the PSC cited the same authority to

---

[90] Rec. Doc. 17379, at 9-13.

[91] *Id.* at 9-10.

[92] *See* Rec. Doc. 21168, at 16.

suggest that the "most critical" weight under the *"Johnson* factors" analysis was to be given to the "result achieved" through the efforts of counsel.[93]

Assessing the contributions of each firm was a key part of the process that was lengthy and time-consuming.  Parker would just throw those efforts out presumably because it will earn him more money.  But, that flies in the face of governing fee jurisprudence and the Court's established procedures and prior recognition, that not all hours are the same; some work is more valuable than other work.  While Parker and others have the right to contest the FC's evaluation of the fee applicants' work, throwing it aside in favor of an ill-considered black and white *pro rata* calculation has no support in fee jurisprudence.[94]

### C.   Parker's Purported Grounds for Disqualification Are Meritless.

#### *1.   Grounds Previously Relied Upon.*

Parker claims to rely on conflicts raised in his prior motion to disqualify the Fee Committee, which were not addressed by the Court.  In truth, the Court considered the "conflicts" and rejected them by denying the motion.  Bringing these previously rejected arguments a second time truly calls into question Parker's motives.[95]

#### *2.   Claims of Additional Self-Dealing, Patronage and Retribution Are Factually Unsupported and Legally Do Not Support Disqualification.*

Parker's claims of "Self-Dealing, Patronage and Retribution" on the part of the FC Chair and Co-Chare are without support.[96]

---

[93] *See* Rec. Doc. 17700-1, at 109.

[94] *See*, *e.g.*, 7/31/2018 Klonoff Decl., at ¶¶ 68-70 (discussing problems with applying a strict lodestar analysis).

[95] *See* 7/31/2018 Klonoff Decl., at ¶¶ 39 & n.103, 54 & n.119.

[96] Rec. Doc. 21489-1, at 5, 13-16.

As it relates to alleged self-dealing and patronage, Parker reiterates some form of an argument that was previously made in support of disqualification of the FC – the fact that the attorneys on the FC also have an interest in the fee being allocated inherently makes them conflicted.  Parker occupies two pages simply arguing that the common benefit fee allocated to Mr. Levin's firm and Mr. Herman's firm is too high.[97]   This is true for every FC ever formed.[98]

In addition, Parker reiterates his prior argument that the FC has an inherent conflict when it litigates the fee.[99]  This argument also fails because it is the very purpose of the FC – to arrive at a recommendation and defend it while those who oppose it offer their reasons in opposition. Through this process, the Court gets both viewpoints and can make a more informed choice. Relatedly, Parker asserts that rewarding members of the FC by compensating them for work done defending the FC's allocation is fundamentally unfair particularly when, according to Parker, the FC "lost the fee allocation proceeding."[100]  While the FC may not have been awarded its initial recommendation, objections were made asserting that the common benefit percentage of the available funds should be as low as 20%, and the Special Master originally awarded only $90 million (approximately 47.8% of the available funds).  Because of the efforts of Mr. Levin and Mr. Herman, along with their firms, the common benefit fee ultimately awarded was in

---

[97] *Id.*, at 13-14.  Parker attempts to argue it's unclear whether the Court applied the blended approach, the lodestar approach or the percentage of the fund approach.  *Id.*, at 14.  This is of no moment with respect to the Motion to Disqualify.  Parker may disagree with how the FC characterizes the Court's analysis in the Step Five Fee Order, but the Court's opinion is a public record.  *See also* 7/31/2018 Klonoff Decl., at ¶¶ 12-16, 63 (discussing Court's consideration of the various approaches to awarding fees).

[98] *See* 7/31/2018 Klonoff Decl., at ¶¶ 50-58 (Professor Klonoff discusses in detail the problem with Parker's arguments related to fee committees and purported fiduciary duties owed to counsel).

[99] Rec. Doc. 21489-1, at 15.

[100] *Id.*

excess of $102 million (52% of the available funds), a $12 million increase.[101]  Finally, it can

certainly be argued persuasively that Parker's own self-interest has dominated his litigation

strategy, including attempts to and threats to take this matter to the Court of Appeals, to the

detriment of all the other attorneys who are waiting to receive attorneys' fees earned.

   With respect to retribution, Parker points to his original common benefit fee allocation of

$100,000 and claims that it was retribution for cnging the work of the FC.[102]  Again, this is an

objection issue, not a reason for disqualification.[103]  In addition, the ultimate allocation to Parker

reflects how the process worked effectively – an initial allocation was transmitted to Parker, an

objection was made, that objection was considered, and the fee allocation was increased.  In

truth, the allocation given to Mr. Parker fairly represented the common benefit work performed

in the case as discussed more fully, and more appropriately, in the majority of the FC's response

to Parker's objections.[104]

   Again, in making an argument that bias requires disqualification, Parker cites several

cases dealing with instances where the court itself is alleged to be biased.  *See*, *e.g.*, *Lietky v.*

*United States*, 510 U.S. 540, 551 (1994).  While citing such cases it is doubtful Parker meant to

suggest this Court is biased or acted inappropriately, Parker's confusion on this matter illustrates

his misapprehension of the process for awarding fees in this case.  The FC has no final authority

---

[101] Parker asserts that a running theme of the FC work was the amount of time spent by Mr. Levin's and
Mr. Herman's firms prosecuting the litigation against Taishan.  *See* Rec. Doc. 21489-1, at 15.  Work
related to the Taishan matter has no relevance to this fee dispute even if discussed.

[102] Rec. Doc. 21489-1, at 16.

[103] *See* 7/31/2018 Klonoff Decl., at ¶ 65.

[104] *See, e.g.,* Reply of the Majority of the Fee Committee to 1) the Minority Fee Committee Report, 2) the
Joinder of Multiple Common Benefit Attorneys in the Fee Committee Minority Report, and 3) the
Objections to Step Six Recommendation Regarding Allocation of Common Benefit [Rec. Doc. 21617-2],
at 35-37.

to award fees, the Court will make that ultimate determination.  Therefore, alleged bias or self-interest on the part of a couple of members of the FC, if it existed, would not merit disqualification because legal and factual predicate raised in the cases cited are simply not implicated.

### 3.   *The Esquire Bank Issue Has Been Fully Briefed and Argued to the Court, and Parker's Statements add Nothing to the Issue.*

Parker, who did not join in the prior motion regarding Esquire Bank, has taken this opportunity, with little support, to add more layers of conjecture in an effort to create the appearance of a conflict where there is none.  The Court has already transferred the funds to the court registry and the Esquire Bank motions are, in large part, moot.[105]  In addition, as discussed above, the issues have been fully briefed and argued before the Court, and the Court has taken the matter under advisement.  As we have noted several times, the Court itself has said that it does not see a problem with the money having been placed in Esquire Bank and realized that the motion had more to do with maximizing fees rather than addressing any real conflict.  Parker's suggestions here add nothing to the issue.[106]

### D.   It Would Be Inappropriate to Lift the Seal on Related Fee Filings, Particularly in Light of the Ongoing Chinese Drywall Litigation.

Unlike many attorneys' fees disputes, this case involves a dispute that is occurring at the same time that a significant portion of the case is still ongoing, being vigorously litigated against Defendants on behalf of thousands of Plaintiffs-homeowners.  Unlike many claims for keeping records under seal in an attorney fee dispute, the purported justification for sealing the records here is not to keep secret the amount of hours a firm spent on the case or to keep an attorney's

---

[105] Rec. Doc. 21405.

[106] *See*, *e.g.*, 7/31/2018 Klonoff Decl., at ¶¶ 71-74.

hourly rate from being reviewed.  *See, e.g., Procaps S.A. v. Patheon Inc.*, 2013 WL 5928586, *2
(S.D. Fla. Nov. 1, 2013) (denying attorneys' efforts to seal record because it revealed their
hourly rates).  Here, the filings at issue contain information that could be used by the Defendants
to the detriment of the Plaintiffs whose cases are ongoing.  The interest in not allowing Plaintiffs
to be prejudiced by information Defendants could glean from filings in the fee dispute outweighs
the public right of access to these documents at this time.

As Parker correctly notes, there is a public presumption of access to court records even if
those court filings occur in the context of fee proceedings.[107]  However, it is equally well-settled
"that the right to inspect and copy judicial records is not absolute. Every court has supervisory
power over its own records and files, and access has been denied where court files might have
become a vehicle for improper purposes."  *Nixon v. Warner Commc'ns, Inc*., 435 U.S. 589, 597-
98 (1978); *see also United States v. Holy Land Found. for Relief & Dev*., 624 F.3d 685 (5th Cir.
2010).  "Despite the public's general right to inspect and copy public record, a court may order
documents sealed where, on balance, the party's interest in having them sealed outweighs the
public's interest in open access to judicial records." *See DISH Network, LLC v. WLAJ-TV, LLC*,
No. 16-cv-0869, 2017 WL 1333057, at *2 (W.D. La. Apr. 3, 2017) (discussing situations where
courts will seal documents).

In balancing the public right of access to the parties' right to protect certain information,
the Court here should look to the interests of counsel, the parties to the fee dispute, but more
importantly, the *Chinese Drywall* Plaintiffs-homeowners who are the real parties in interest.
Here, the fee dispute is ancillary to the main, *Chinese Drywall* litigation.  Certainly, some
counsel here could make an argument that the sealing is appropriate in light of the many filings

---

[107] Rec. Doc. 21489-1, at 19.

that contain numerous, unsupported *ad hominem* attacks on the ethics and character of the leadership in this case.  Plaintiffs' counsel's efforts to unseal the documents, which seem to harm their own clients, make no sense unless they are attempting to use the Court's docket to gain an advantage in the fee litigation rather than to advance any legitimate interest.  *See West v. Crawford*, No. 17-cv-1294, 2017 WL 1494661, at *1-2 (E.D. La. Apr. 26, 2017) (granting motion to seal finding "[a]fter considering all the applicable factors as well as the record here, the Court concludes that its docket is being used by West for improper purposes" and explaining, in part, "[i]ndeed, this Court has substantial concerns that the entire mandamus petition was a subterfuge to obtain discovery and then to use the Court's docket to publicly release documents.").

However, more importantly, the interest in protecting the Plaintiffs in the *Chinese Drywall* litigation should be paramount.  A review of the fee-related filings by defense counsel could reveal trial strategy.  For example, counsel openly discuss steps that were taken to prepare for trial, ongoing efforts that are being made to move the litigation forward, and numerous other work performed by common benefit counsel in this case.  That is in addition to the seemingly innocuous statements or insight into the relationship among Plaintiffs' counsel that would provide some insight to defense counsel that could act to the detriment of Plaintiffs in the ongoing cases.  The Plaintiffs' interest in keeping a level playing field and not providing Defendants with insight into their attorneys' thought process outweighs the public right of access to these materials at the present time.

## IV.   <u>CONCLUSION</u>

Based upon the foregoing, the entire FC respectfully requests that Parker's Motion to Disqualify be denied in its entirety.

Respectfully submitted,

Dated:    July 31, 2018

*/s/ Russ M. Herman*
Russ M. Herman, Esquire (Bar No. 6819)
Leonard A. Davis, Esquire (Bar No. 14190)
Stephen J. Herman, Esquire (Bar No. 23129)
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel in MDL 2047*
*Fee Committee Co-Chair/Secretary*

Arnold Levin (on the brief)
Fred S. Longer (on the brief)
Sandra L. Duggan (on the brief)
Keith J. Verrier (on the brief)
LEVIN, SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel in MDL 2047*
*Fee Committee Chair*

## FEE COMMITTEE MEMBERS

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Christopher A. Seeger
SEEGER WEISS, LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Richard J. Serpe
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

Michael J. Ryan
KRUPNICK CAMPBELL MALONE, et al.
700 S.E. Third Avenue, Suite 100
Fort Lauderdale, FL 33316-1186
Phone: (954) 763-8181
Fax: (954) 763-8292
mryan@krupnicklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail <u>or</u> by hand delivery and e-mail <u>and</u> upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, which will serve a notice of the uploading in accordance with the procedures established in MDL 2047, on this 31st day of July, 2018.

<div style="margin-left: 40%;">

*/s/ Leonard A. Davis*
Leonard A. Davis
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
Plaintiffs' Liaison Counsel
MDL 2047
*Co-Counsel for Plaintiffs*

</div>