# EXHIBIT

# "C"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br><br>SECTION: L |
| THIS DOCUMENT RELATES TO:<br><br>*ALL CASES* | JUDGE FALLON<br><br>MAG. JUDGE WILKINSON |

## SECOND DECLARATION OF ROBERT H. KLONOFF

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I.  INTRODUCTION

1.  I am the Jordan D. Schnitzer Professor of Law at Lewis & Clark Law School.  I have been asked by the members of the Fee Committee ("FC") to render my opinion on the merits of the Motion of Parker Waichman LLP ("Parker Waichman") to Disqualify Fee Committee Chair and Co-Chair, To Strike the Step Six Recommendation of the Majority of the Fee Committee Regarding Allocation of the Common Benefit (R. Doc. 21455), and To Lift the Seal on Related Filings (hereafter "7/10/18 Motion to Disqualify").[1]

## II.  QUALIFICATIONS

---

[1] (Doc. 21489) (filed 07/10/18); *see also* Memorandum in Support of Motion to Disqualify Fee Committee Chair and Co-Chair, To Strike the Step Six Recommendation of the Majority of the Fee Committee Regarding Allocation of the Common Benefit (R. Doc. 21455), and To Lift the Seal on Related Filings (Doc. 21489-1) (filed 07/10/18) ("Waichman Memo").

2.  My qualifications are set out in my prior Declaration in this litigation, a copy of which is attached for the Court's convenience as Appendix A.[2]  I have included an up-to-date statement of my qualifications as Appendix B and my current CV as Appendix C.  I am being compensated at the rate of $785 per hour.  My fee is not contingent on the substance of my opinions.

## III. BASIS FOR TESTIMONY

3.  A list of documents that I relied upon is attached as Appendix D.

## IV.  BACKGROUND

4.  In my prior Declaration, I summarized the relevant facts through May 24, 2017.[3]  Those facts are incorporated herein by reference.  Here, I supplement that discussion with the relevant facts that have occurred since the filing of my prior Declaration.

### A.  Disposition of the Previous Disqualification Motion

5.  On May 25, 2017, this Court denied Primary Counsel's motion for disqualification of the FC.[4]  In doing so, it found that "contract counsel misunderstands the role of the Fee Committee's recommendation in the overall process which will ultimately lead to a decision on the fee allocation issue."[5]  Specifically, the Court disagreed with "contract counsel's belief that the Court will view the Fee Committee's recommendation as more significant, or accord it more weight, than the position of contract counsel during the final determination of the fee award."[6]  The Court explained that in ruling on the fee issue, it would "consider all the evidence anew, including the Fee Committee recommendation, the objections of the contract attorneys, the recommendation of the Special Master, and the evidence of time submissions gathered and

---

[2] Declaration of Robert H. Klonoff Addressing Primary Counsel's Motion to Disqualify the Fee Committee and, *inter alia*, Strike its Allocation Recommendation (Doc. 20794-3) (filed 05/25/17) ("Klonoff Decl.").

[3] *See* Klonoff Decl. (Doc. 20794-3) (filed 05/25/17), at ¶¶ 15–38.

[4] Parker Waichman sought mandamus from the Fifth Circuit before this Court had ruled on the disqualification motion. *In re Parker Waichman, L.L.P.*, Mandamus Petition, Fifth Circuit Docket 17-30430 (05/23/2017).  The Fifth Circuit denied the petition on the same day that this Court denied the disqualification motion. (Doc. 00514006676) (entered on 05/25/17).

[5] Order and Reasons (Doc. 20789) (filed 05/25/17), at 4.

[6] *Id.*

reviewed by Phil Garrett."[7]   All such evidence, according to the Court, would be "equally evaluated when allocating the global fee award between common benefit and contract counsel."[8]

### B. The Step Five Allocation: Determining the Split Between Common Benefit Counsel and Contract Counsel

6.   On January 31, 2018, the Court issued its Order and Reasons Setting Common Benefit Fees, thereby determining the fee allocation between common benefit counsel and individual counsel.[9]

7.   To provide context for the Court's order, I briefly review the events leading up to it.   On June 7, 2016, the Fee Committee ("FC") moved for a determination of the fee allocation between common benefit counsel and individual counsel.[10]   In an accompanying memorandum, the FC discussed in detail the governing jurisprudence on attorneys' fees (including the lodestar, percentage, and "blended" methods that courts have used) and this Court's fee decisions in some comparable cases.[11]   The FC submitted that, as a starting point for the Court's analysis, an appropriate benchmark percentage would be "8% of the value of the plaintiffs' total class recoveries from all settlements," and that an analysis of the *Johnson* factors[12] supported an upward adjustment of 2.65% of the benchmark, resulting in a common benefit percentage of 10.65%.[13]   The FC analyzed the case under the *Johnson* factors, particularly the first factor ("time and effort required")[14] and the eighth factor ("the amount of the fund involved and/or the result obtained for the clients").[15]   The FC explained how the various components of the

---

[7] *Id.* at 4–5.

[8] *Id*. at 5.

[9] Order and Reasons Setting Common Benefit Fees (Doc. 21168) (filed 01/31/18).

[10] Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO28(F) (Doc. 20293) (filed 06/07/16).

[11] (Doc. 20293-1) (filed 06/07/16), at 3–17 (discussing *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640 (E.D. La. 2010), and *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830 (E.D. La. 2007)).

[12] *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).

[13] (Doc. 20293-1) (filed 06/07/16), at 17.

[14] *Id.* at 18–31.

[15] *Id.* at 35–49.

interrelated class settlements had a total value of approximately $1.1 billion.[16]  As such, the FC's recommendation of 10.65 percent would result in a common benefit fee award of $119,313,367.08.[17]  The FC's proposed fee award would result in a split of 59.37 percent of the available fees for common benefit counsel, and the other 40.63 percent for contract counsel.[18]

    8.  Parker Waichman objected to the FC's proposal.[19]  Referencing the *Vioxx* litigation as support, Parker Waichman criticized the FC's proposed allocation as "unprecedented, unwarranted, unfair and patently inequitable."[20]  It also argued that the approximately 60/40 proposed allocation was "arbitrary" and "preposterous."[21]  The objection also argued that the FC had undervalued both the contributions of Primary Counsel generally, and the efforts of Parker Waichman specifically,[22] and sought additional discovery on the fee issue.[23]

    9.  On May 31 and June 1, 2017, the Special Master held evidentiary hearings in anticipation of preparing his fee recommendation.  During the hearings, the parties submitted approximately 750 exhibits into evidence.[24]  In his report issued September 12, 2017, the Special Master recommended a $90 million common benefit fee award, representing a split of about 46.64 percent for common benefit counsel and 53.36 percent for contract counsel.[25]  Both the FC and Parker Waichman lodged objections to the Special Master's recommendation.

    10.  The FC's objection noted that the Special Master's recommendation, if approved by the Court, "would represent only 'slightly more than 8% of the aggregate benefit to the claimants,'

---

[16] *Id.* at 49.

[17] *Id.* at 53.

[18] *Id.* at 56–57.

[19] Parker Waichman LLP's Opposition to the Fee Committee's Motion to Determine the Allocation of the Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F), Request for Discovery, Additional Briefing and a Contradictory Hearing Regarding the Proposed Allocation (Doc. 20348) (filed 06/28/16); and accompanying memorandum (Doc. 20348-1).

[20] (Doc. 20348-1), at 1.

[21] *Id.* at 12.

[22] *Id.* at 14–18.

[23] *Id.* at 18–20.

[24] *See* Special Master's Recommendations Concerning Attorneys' Fees and Expenses (Doc. 20950) (filed 09/12/17), at 16.

[25] *Id.* at 50 (recommending $90 million common benefit fee award); *id.* at 45 (total amount available for all fees is $192,981,363.35).

which is significantly *less* than the 10% average common benefit award in the most recent super-mega-fund class actions and MDLs that the Special Master cites in his Recommendation and asserts are the 'norm' for purposes of any comparison."[26]

11.   Primary Counsel also objected to the Special Master's recommendations.   Their submission, dated October 2, 2017, was joined by Parker Waichman.[27]   Primary Counsel's submission claimed that the Special Master's proposal would allocate *too much* to common benefit counsel.[28]

12.   The Court concluded at the outset of its January 31, 2018 ruling that, "based on either Rule 23 or MDL policy concepts, this Court . . . has the authority and responsibility to determine a reasonable common benefit fee."[29]

13.   Finding it "appropriate to consider" a variety of methods "to determine a fair common benefit fee,"[30] the Court initially turned to the lodestar method.   After explaining the basic concept of the lodestar, the Court analyzed the *Johnson* factors with respect to the common benefit work in this litigation.[31]   In particular, the Court devoted several pages to the first *Johnson* factor, "time and labor required."[32]   Among other things, the Court observed that the attorneys performing common benefit work had "logged 232,309.35 hours on various common benefit tasks through December 31, 2013 (the date of the settlement)";[33] that the MDL involved not only about 10,000 plaintiffs, but also about 2,000 defendants and their liability insurers;[34]

---

[26] Fee Committee's Objections to Special Master's Report and Recommendations Regarding Attorneys' Fees and Expenses (Doc. 20999) (filed 09/29/17), at 1–2 (emphasis in original) (quoting SM Recommendation at 50, 44–45 & 47).

[27] Objections and Responses to Special Master's Recommendations Concerning Attorneys' Fees and Expenses (Doc. 21003) (filed under seal 10/02/17).

[28] *See id.*   Parker Waichman also filed a standalone objection to the Special Master's conclusion that Parker Waichman should be responsible for paying the fees of its own counsel in the fee hearing. Parker Waichman, *et al.* Standalone Objections to Special Master's Recommendations Concerning Attorneys' Fees and Expenses (Doc. 20991) (filed 09/29/17), at 1–2.

[29] Order and Reasons Setting Common Benefit Fees (Doc. 21168) (filed 01/31/18), at 8.

[30] *Id.*

[31] *Id.* at 9–19.

[32] *Id.* at 9–13.

[33] *Id.* at 9.

[34] *Id.* at 9–10.

that the PSC had created innovative "Omni Complaints" that "proved helpful for plaintiffs and their individual counsel as a means to file and preserve claims and theories of recovery" and also "relieved individual counsel and their clients of costly and challenging foreign service efforts";[35] and that the PSC had prepared for and conducted several bellwether trials.[36]

14.   The Court also emphasized the eighth *Johnson* factor, "the amount involved and the result achieved," which it said was "entitled to considerable weight in evaluating the reasonableness of a common benefit fee award."[37]   "By any measure," the Court wrote, "the Knauf settlement achieved in this MDL represents an extraordinary beneficial result for the claimants."[38]   The Court found that the aggregate value of the class settlement benefits was about $1.12 billion (including fees and costs).[39]

15.   After evaluating the remaining *Johnson* factors,[40] the Court discussed the percentage method.[41]   The total amount available for attorneys' fees (for both individual and common benefit counsel) was $197,803,738.17, and the Court concluded that, "[b]ased on the information and data outlined above and applying the principles and precedent developed in prior similar cases . . . a fair and appropriate division of the total fee is 52-percent to common benefit counsel and 48-percent to contract counsel."[42]   This 52/48 allocation, the Court noted, "would mean that the common benefit fee would be about 9.181-percent of the total settlement amount recovered."[43]

---

[35] *Id.* at 10.

[36] *Id.* at 11–12.

[37] *Id.* at 16.

[38] *Id.* at 17.

[39] *Id.*

[40] *See id.* at 14 (evaluating *Johnson* factors #2 ("the novelty and difficulty of the questions") and #3 ("the skill required to properly perform the necessary legal services")); *id.* at 15 (evaluating *Johnson* factors #4 ("the preclusion of other employment by the attorneys due to acceptance of this case"), #5 ("the customary fee"), and #6 ("whether the fee is fixed or contingent")); *id.* at 16 (evaluating *Johnson* factor #7 ("time limitations imposed by circumstance")); *id.* at 17 (evaluating *Johnson* factor #9 ("experience, reputation and ability of common benefit counsel")); *id.* at 17–18 (evaluating *Johnson* factor #10 ("the 'undesirability' of the case")); *id.* at 18 (evaluating *Johnson* factor #11 ("the nature and length of the professional relationship with the client")); *id.* at 18–19 (evaluating *Johnson* factor #12 ("fee awards in similar cases")).

[41] *Id.* at 19–21.

[42] *Id.* at 20.

[43] *Id.* (emphasis deleted; footnote omitted).

6

16.   The Court then discussed the blended method, under which "the fee arrived at by the percentage method is cross-checked by the lodestar method utilizing the *Johnson* factors."[44]   The Court thus conducted a lodestar cross-check to ensure that the 9.181 percentage amount was reasonable under the *Johnson* factors and compared to hourly fees in similar cases.[45]   Under that analysis, the Court determined that the common benefit award would result in an hourly rate of about $442.76, which the Court found reasonable.[46]   Based on its analysis, the Court concluded that the allocation of 52 percent for common benefit counsel and 48 percent for contract counsel was fair.[47]

17.   Under the Court's fee allocation, common benefit counsel would receive $102,857,943.85 and individual counsel would receive $94,945,794.32.[48]   This was about $16.46 million less for common benefit counsel than the $119,313,367.08 award that the FC had recommended (although it was nearly $12.8 million more than the $90 million common benefit award recommended by the Special Master).

18.   In its order setting the fee allocation, the Court found that Primary Counsel had "prolonged the discovery process by filing unnecessary written discovery and seeking pointless depositions," leading to "havoc and needless delay."[49]   As such, the Court taxed individual counsel with 80 percent of the CPA and Special Master's fees associated with the fee dispute.[50]

19.   In response to the Court's fee allocation ruling, Primary Counsel filed a motion with this Court seeking an order certifying the Court's fee allocation order for interlocutory appeal to the Fifth Circuit under 28 U.S.C. § 1292(b), or alternatively, an order of final judgment under Fed. R. Civ. P. 54(b).[51]   On May 7, 2018, the Court denied the motion.[52]   The Court found that

---

[44] *Id.* at 21.

[45] *Id.* at 21–22.

[46] *Id.* at 22 & nn. 6–7 ($102,857,943.85 in common benefit fees divided by 232,309.35 common benefit hours = $442.76 average rate per hour).

[47] *Id.* at 22.

[48] *Id.* at 21–22.

[49] *Id.* at 23.

[50] *Id.*

[51] Primary Counsel's Motion for Certification of Order for Interlocutory Appeal Under 28 U.S.C. § 1292(b), or in the Alternative Entry of Final Judgment Under Rule 54(b) (Doc. 21216) (filed 02/28/18).

Primary Counsel's motion met none of the three necessary conditions for interlocutory appeal. First, it did not present a controlling question of law, but rather was "mainly grounded in disagreement of facts—*i.e.*, common benefit counsel's logged hours and overall value of settlement."[53]   Second, the Court saw "little, if any, ground for difference of opinion on the applicability of the common benefit doctrine in multidistrict litigations."[54]   Third and finally, interlocutory appeal would not "materially advance the ultimate termination of litigation."[55] Rather, immediate appeal of the common benefit fee order would "create unnecessary piecemeal appeals, whereby certain attorneys could persistently seek the Fifth Circuit's intervention."[56] The Court also denied Primary Counsel's request for an entry of final judgment under Fed. R. Civ. P. 54(b), explaining:

> Movants have not shown any hardship or injustice that may arise without immediate appeal. Although they argue that the Court's common benefit fees order has created two categories of funds, any available [funds], nonetheless, are interrelated and come from the same pot. Therefore, any adjustments to the amounts would require this Court to recalculate the individual awards, again and again. For the sake of judicial economy, the Court says no.[57]

## C. The Step Six Allocation: Determining Fee Awards Among Common Benefit Firms

20.   On July 3, 2018, a majority of the FC (with one dissent) filed its "Step Six" Recommendation Regarding Allocation of Common Benefit.[58]   Exhibit A to that recommendation listed the FC majority's suggested distribution of the available funds among

---

[52] Order and Reasons (Doc. 21322) (filed 05/07/18).

[53] *Id.* at 9.

[54] *Id.*

[55] *Id.* at 12.

[56] *Id.*

[57] *Id.* at 14.   The Court also denied certain contract counsel's motion for interim disbursement of fees, noting that it "expects completion of the attorneys' fees disbursement process . . . by the end of this year" and emphasizing that "[t]he focus now should be arriving at a final resolution—not taking pointless detours." *Id.* at 15.

[58] Step Six Final Recommendation of the Majority of the Fee Committee Regarding Allocation of the Common Benefit (Doc. 21455) (filed 07/03/18) ("FC Step Six Recommendation").

attorneys/firms doing common benefit work.[59]  The FC majority recommended common benefit fee awards to 46 law firms, and expense and/or assessment reimbursement for another 13 law firms.[60]  The largest recommended awards were to Herman Herman & Katz and Levin Sedran & Berman, each of which would receive $26,524,849.78.  Other significant recommended fee awards included those for Gainsburgh, Benjamin, *et al.* ($8,600,000); Seeger Weiss LLP ($8,600,000); Colson-Hicks Eidson P.A. ($3,900,000); Richard J. Serpe, P.C. ($3,650,000); Whitfield Bryson & Mason (fka Lewis & Roberts) ($3,000,000); Barrios, Kingsdorf & Casteix ($2,750,000); and the Irpino Law Firm ($2,000,000).[61]  The lowest recommended award was $900, to Berrigan, Litchfield, *et al.*[62]  The FC majority recommended an award for Parker Waichman of $650,000.[63]

21.  The FC majority's Step Six Recommendation summarized the steps it had taken to arrive at its proposed fee awards following the Court's ruling on the Step Five allocation.[64]  The FC majority's recommendation also specified that it had "conducted its evaluation according to the general principles set forth in PTO 28, but with the 'over-arching guideline' that 'the <u>relative contribution</u> of each common benefit attorney <u>to the outcome of the litigation</u>' must be considered."[65]  Thus, the FC majority noted that, pursuant to PTO 28, it "considered the submitted time of counsel for common benefit fee purposes as entitled to allocation weight only in relationship to outcome contribution."[66]  That is, the key question for the FC majority in its analysis was "[n]ot simply how much time an attorney has spent and submitted, . . . but whether

---

[59] (Doc. 21455-1) (filed 07/03/18).

[60] *Id.* at 1–3.

[61] *Id.* at 1–2.

[62] *Id.* at 1.

[63] *Id.* at 2.

[64] These steps included: "review[ing] the time and expense submissions by counsel as well as their affidavits, taking into account the work of all counsel in the MDL and State Court actions"; *id.* at 4; "evaluat[ing] the contributions of common benefit counsel using both 'objective measures' and the FC members' 'subjective understanding of the relevant contributions of counsel toward generating the various Settlement Funds'"; *id.* at 4–5 (quoting PTO 28); and conducting meetings with all common benefit fee applicants who submitted the required affidavit, during which the fee applicants were able to "'present the reasons, grounds, and explanations for entitlement to common benefit fees and reimbursement of expenses.'" *Id.* at 6 (quoting PTO 28).  After each of these meetings, "[m]embers of the FC then conferred to exchange impressions and seek general consensus as to the appropriate common benefit contribution of that counsel's firm." *Id.* at 6–7.

[65] *Id.* at 5 (quoting PTO 28 at 9–10; underlining in original).

[66] *Id.* at 7–8.

and how an attorney's time contributed to the outcome of these class settlements."[67]   In concluding its recommendation, the FC majority explicitly "recognize[d] that its recommendation [was] only one of several available resources for the Court's independent determination on how the common benefit fee should be allocated."[68]

22.   On July 5, 2018, FC member Michael J. Ryan filed a minority report taking issue with some of the FC majority's recommendations.[69]   Ryan argued, *inter alia*, that the FC majority's recommendations resulted in a disproportionate share of the total available common benefit fee (53%) going to the two law firms of the PSC's lead and liaison counsel.[70]   But despite his concerns, Ryan emphasized that he did "not intend[] to disparage the work performed by Lead and Liaison Counsel or the other common benefit counsel who committed large sums of money and time [and] effort related to Knauf and Global resolutions."[71]   Ryan also made clear that the minority report "is not intended to disparage the Fee Committee," which, the report noted, "has dedicated enormous hours to interviewing and reviewing information submitted by common benefit attorneys."[72]

23.   On July 20, 2018, Parker Waichman filed an objection to the FC majority's Step Six recommendation.[73]   Referring to the reasons stated in its 7/10/18 Motion to Disqualify, Parker

---

[67] *Id.* at 8.

[68] *Id.* at 9.

[69] Krupnick Campbell Malone *et al.*'s Minority Fee Committee Report Consistent with "Step Six" Pursuant to Pre-Trial Order 28 (Doc. 21473) (filed 07/05/18).

[70] *Id.* at 2.   Ryan also contested the FC majority's recommendation that the Herman Herman & Katz firm and the Levin Sedran & Berman firm "receive the identical dollar amount of common benefit fee, despite having dedicated substantially different hours to the effort," arguing that "no analytical and sustainable methodology" supported the proposed awards. *Id.* at 4.   Ryan also objected to those two firms receiving approximately $7,200,000 in additional common benefit funds that were obtained after the FC's initial June 2015 recommendation, particularly after the FC had sought a 60/40 split of fees, which Ryan characterized as an "overreach." *Id.* at 4–5.

[71] *Id.* at 3.

[72] *Id.*

[73] Parker Waichman LLP's Objection to the Final Recommendation of the Majority of the Fee Committee Regarding Allocation of Common Benefit Fees (Doc. 21589) (filed 07/20/18) ("Waichman Objection"). Eighteen other objections were filed as well.   For example, the law firm of Gary, Naegele & Theado, LLC objected to the FC majority's exclusion of time spent investigating the case prior to the creation of the MDL. Gary, Naegele & Theado, LLC's Objections to the Final Recommendation of the Majority of the Fee Committee Regarding Allocation of the Common Benefit Fees (Doc. 21560) (filed 07/20/18), at 6–9.   Allison Grant, P.A., argued that her common benefit work was "severely undervalued" in the FC majority's recommendation, and that her recommended $28,000 award should be increased to at least $150,000.

Waichman argued in its objection that "the Court should proceed without a Fee Committee recommendation under Step Six and conduct a fully *de novo* analysis consistent with the Order and Reasons Setting Common Benefit Fees."[74]  "Use of the 'Step Six Recommendation' by the Court for any purpose," Parker Waichman argued, "would severely undermine the appearance of impartiality in these proceedings."[75]  Parker Waichman also sought additional discovery, alleging that there are "serious questions about the integrity of the lodestar data for allocating common benefit fees claimed in connection with the Knauf-related settlements, including the standard for approval and disapproval of hours and the number of hours approved and disapproved."[76]

24.  Parker Waichman further alleged that "the fee committee process was neither fair nor transparent."[77]  Briefly stated, the firm argued that "the Fee Committee's treatment of Parker Waichman" during Step Six was "not merely arbitrary, but blatantly punitive."[78]  It also argued that "the entire process for allocating common benefit work was inequitably skewed to allot the majority of common benefit work to only a handful of firms," that "many of the reported and accepted common benefit hours were unnecessary and conducted solely for the purpose of artificially inflating the common benefit allocation," that "the Fee Committee recommended the payment of common benefit fees to firms who failed to timely pay assessments," and that "the Fee Committee's weighting of time [was] unfairly arbitrary, at best," because "it appear[ed] to reward firms who supported the self-serving objectives of the PSC leadership and punish firms who lawfully objected."[79]  Most fundamentally, ignoring the mandate of PTO 28—*i.e.*, that the "over-arching guideline" should be "the relative contribution . . . to the outcome of the

---

Objection by Allison Grant, P.A. to the Fee Committee's Recommendation as to Common Benefit Award (Doc. 21559) (filed 07/20/18), at 3, 7.  The Rhine Law Firm argued that FC majority's recommended $47,000 award should be increased to at least $199,000 in view of the firm's common benefit work and the risk it undertook as a firm with only three lawyers. Rhine Law Firm Objection to Recommendation of Fee Committee Dated July 3, 2018 (Doc. 21554) (filed 07/19/18), at 1–3.

[74] Waichman Objection (Doc. 21589), at 1–2 (emphasis deleted).

[75] *Id.* at 2.

[76] *Id.*

[77] *Id.* at 3 (initial capitalization deleted).

[78] *Id.* at 4.

[79] *Id.* at 4–5.

litigation"[80]—Parker Waichman complained about the FC majority's determination that "certain types of work are worthy of a higher fee than others."[81]

### D. The Esquire Bank Transfer Motions

25.  Following the Court's February 7, 2013 approval of five interrelated class settlements,[82] on September 10, 2013, the Court issued an order establishing the Knauf settlement fund as a Qualified Settlement Fund and appointing Esquire Bank as the financial institution to hold and invest the settlement funds.[83]   No party objected to the order.   In a footnote, the Court noted: "Class Counsel has informed the Court that members of the Plaintiffs' Steering Committee cumulatively own less than 5% of the issued and outstanding stock in this financial institution and that adequate disclosures have been made and the Court does not find this to be a conflict of interest."[84]

26.  Nearly five years later, in a series of motions filed from May 18 to June 5, 2018, certain individual counsel (*not* including Parker Waichman) moved for transfer of the settlement funds to a different depository or bank.[85]   The motions for transfer argued that "Esquire Bank is unreasonably small in relation to the approximately 200 million dollars of attorney fees deposited therein."[86]   Additionally, the motions alleged "multi-faceted conflicts of interest,"[87]

---

[80] PTO 28 (Doc. 17379) (filed 01/10/14), at 9–10.

[81] (Doc. 21589), at 5.

[82] Order and Judgment: (1) Certifying the InEx, Banner, Knauf, L&W, and Global Settlement Classes; and (2) Granting Final Approval to the InEx, Banner, Knauf, L&W, and Global Settlements (Doc. 16570) (filed 02/07/13).

[83] Order (Doc. 17073) (filed 09/10/13).

[84] *Id.* at 2 n.1.

[85] *See* Yance Law Firm's Memorandum in Support of Motion to Immediately Transfer Attorney Fee Qualified Settlement Fund to a Different Depository Bank or Back Into the Court Registry (Doc. 21338-1) (filed 05/18/18); Krupnick Campbell Malone et al.'s Joinder in Relief Sought in Yance Law Firm's Motion to Immediately Transfer Attorney Fee Qualified Settlement Fund to a Different Depository or Back Into the Court Registry (Doc. 21341) (filed 05/22/18); Taylor Martino, P.C.'s Joinder in Relief Sought in Yance Law Firm's Motion to Immediately Transfer Attorney Fee Qualified Settlement Fund to a Different Depository or Back Into the Court Registry (Doc. 21350) (filed 05/31/18); Morris Bart, LLC's Motion to Join and Adopt Yance Law Firm's Motion to Immediately Transfer Attorney Fee Qualified Settlement Fund to a Different Depository Bank or Back Into the Court Registry (Doc. 21360) (filed 06/05/18) (collectively, the "Esquire Transfer Motions").

[86] (Doc. 21338-1), at 2.

[87] *Id.* at 4.

stemming from the fact that Liaison Counsel Russ Herman serves on the board of directors of Esquire Bank, suggesting that this position creates an incentive to delay resolution of the case while the bank earns money lending out the funds under its control.[88]   Another of the motions took issue with the amount of interest earned on the deposited funds.[89]

27.  On June 12, 2018, this Court ordered that the Attorney Fee Qualified Settlement Fund be transferred from the Esquire Bank to the Court Registry until further notice.[90]

28.  On June 26, 2018, Liaison Counsel (Russ Herman) and Lead Counsel (Arnold Levin) responded to the Esquire Transfer Motions in detail.[91]   The response noted, *inter alia*, that Mr. Herman "made full disclosure of [his] relationship and stock ownership in Esquire Bank" on September 17, 2013.[92]   The memo also noted that "[a]t no time until now has anyone expressed an objection to Esquire Bank acting or being appointed as the Depository Bank."[93]

29.  The Court held a hearing on Esquire Bank on July 12, 2018.[94]   During that hearing, the Court stated: "I don't see any problem with having had the funds in Esquire Bank.  I don't attribute anything to any improper actions or anything of that sort."[95]   After hearing from Russ Herman on behalf of the PSC and R. Tucker Yance on behalf of the objectors, the Court expressed dismay at how far the *Chinese Drywall* litigation had strayed from its original goals:

> The disappointing thing to me is that we're not talking about clients at this point. We're just talking about lawyers and lawyer fees. And lawyers themselves can't get it together about fees.

---

[88] *See id.* at 8–9.

[89] (Doc. 21341) (filed 05/22/18).

[90] Order (Doc. 21405) (filed 06/12/18).

[91] Memorandum and Response of Russ M. Herman, on Behalf of Russ M. Herman in his Capacity as Liaison Counsel and Arnold Levin as Lead Counsel in Response to Yance Law Firm's Motion and Memorandum to Immediately Transfer Attorney Fee Qualified Settlement Fund to a Different Depository Bank or Back into the Court Registry (Doc. 21429-2) (filed 06/26/18).

[92] *Id.* at 2 (citing court transcript); *id.* at 5 ("In the Motion to Establish the Various Qualified Settlement Funds . . . Class Counsel disclosed and informed the Court that members of the Plaintiffs' Steering Committee 'cumulatively own less than 5% of the issued and outstanding stock in [Esquire Bank]' . . . .").

[93] *Id.* at 5.

[94] *See* Transcript of Motion Hearing Proceedings, July 12, 2018.

[95] *Id.* at 6:22–25.

You're arguing not necessarily the fee, but where to put the fee, and how much interest can be earned with the fee.

And then you're trying to use whatever you feel you could use either to get a better fee or a better portion of the fee, and it's just disappointing to me to see lawyers fighting about their money. I'm not talking about the clients' money. The clients have no interest in this. This is just attorney's fees. And you all can't even get together on deciding where to put the money, not a question of how much to get, but even where to put the money. It's just disconcerting.[96]

### E.  The Instant Motion

30.  On July 10, 2018, Parker Waichman filed the 7/10/18 Motion to Disqualify, which is the subject of my present Declaration.  No other Primary Counsel who participated in the prior motion to disqualify joined Parker Waichman in its July 10, 2018 motion.

31.  Parker Waichman's motion and accompanying memorandum[97] seeks (1) disqualification of the Fee Committee chair and co-chair; (2) an order striking the Fee Committee majority's Step Six recommendation; and (3) an order lifting the seal on related filings.  With respect to disqualification, the Waichman motion argues that such a remedy is necessary because of "self-dealing, patronage and retribution,"[98] and because of Russ Herman's purported conflicts regarding Esquire Bank.  The motion also asks the Court to lift the sealing of related filings.

32.  On July 20, 2018, with its disqualification motion still pending, Parker Waichman filed its Objection to the Final Recommendation of the Majority of the Fee Committee Regarding Allocation of Common Benefit Fees.[99]  As noted, this objection argued that the Court should not rely on the FC Step Six Recommendation for any purpose, sought additional discovery, and contended that the fee committee process was inherently unfair.  See ¶¶ 23–24 (discussing Parker Waichman's objection in connection with Step Six).

---

[96] Id. at 10:13–11:1.

[97] (Doc. 21489-1) (filed 07/10/18).

[98] Id. at 13 (initial capitalization omitted).

[99] Parker Waichman LLP's Objection to the Final Recommendation of the Majority of the Fee Committee Regarding Allocation of Common Benefit Fees (Doc. 21589) (filed 07/20/18).

## V.  SUMMARY OF OPINIONS

33.   My primary focus in this Declaration is on Parker Waichman's arguments regarding "self-dealing, patronage and retribution," although I briefly address the Esquire Bank argument as well.[100]

34.   There are several overarching problems with Parker Waichman's motion.  In particular, the motion: (1) has nothing to do with achieving the best relief for the class; (2) is especially egregious in light of the Court's denial of Primary Counsel's prior motion to disqualify, which raises many of the same points; (3) is premature because the Court has not yet ruled on the Step Six allocation; (4) relies on concerns about the fee committee structure that have been known for years; (5) is flawed because Parker Waichman has less drastic ways of securing relief, such as lodging its only recommendation and offering a critical analysis of the FC majority's recommendation; (6) seeks to disqualify only Herman and Levin, which still leaves a majority of the FC who support the recommendation at issue; (7) is suspect because no other Primary Counsel have joined Parker Waichman; (8) is unpersuasive because FC member Ryan's minority report confirms that no one was pressured to join the majority; (9) is meritless because the Step Five process shows that the Court will not simply rubber stamp the FC's recommendations; and (10) is suspect because of Parker Waichman's concession that Levin and Herman can retain their leadership roles on the PSC.

35.   Parker Waichman repeats two arguments that Primary Counsel made in the prior motion to disqualify: that courts should be wary of fee committees generally, and that fee committee members have a fiduciary duty to other lawyers on the case.  As I explain below, those arguments are no more meritorious now than they were before.

36.   Parker Waichman's new arguments fare no better.  First, the argument that the Court cannot exercise *de novo* review at Step Six is unsupported and contrary to what occurred at Step

---

[100] I do not opine on Parker Waichman's request to lift the sealing of related filings.  I would note, however, that the FC's response makes strong arguments in opposition to unsealing.  The response notes that while there is a presumption of public access to court records, here the unsealing of the records would disadvantage class members in ongoing litigation with defendants.  According to the FC, that is too high a price to pay just so Parker Waichman can attempt to secure a tactical advantage in a collateral fee dispute that does not implicate the interests of class members. *See* Fee Committee's Response in Opposition to Parker Waichman LLP's Motion to: (1) Disqualify Fee Committee Chair and Co-Chair, (2) Strike the Step Six Recommendation of the Majority of the Fee Committee Regarding the Allocation of Common Benefit Fees, and (3) Lift the Seal on Related Filings, at 36–38.

Five.  Second, the argument that the FC majority misstated the Court's Step Five methodology is incorrect; it is Parker Waichman that misstates the methodology.  Third, Parker Waichman's argument that certain lawyers would receive an improper bonus under the FC majority's approach is based on a misunderstanding of the facts and, in any event, is not a basis for disqualification or striking the recommendation.  Fourth, Parker Waichman's assumption that some law firms are being punished is based on nothing more than speculation, and in any event is not a basis for disqualification or striking the recommendation.  Fifth, Parker Waichman's argument that the FC majority's recommendation should be stricken is overkill; the Court will review that recommendation and all other submissions *de novo*.  Sixth, Parker Waichman's argument that the Court should apply a strict lodestar analysis is flawed because the focus needs to be not just on sheer hours but on how the work benefited the class.  Finally, Parker Waichman's argument for disqualification of Herman and Levin based on the Esquire Bank situation is flawed, as the Court has recognized, and is moot because the funds have been transferred to the Court's registry.

## VI.  DISCUSSION

### A. Overarching Problems with Parker Waichman's Motion

37.  In my May 24, 2017 Declaration regarding Primary Counsel's Motion to Disqualify the Fee Committee and, *inter alia*, Strike Its Allocation Recommendation, I noted a number of overarching reasons why Primary Counsel's motion should be denied.  Several of those reasons apply equally to Parker Waichman's motion, and there are additional overarching reasons to deny Parker Waichman's motion.

38.  First, as I explained in connection with Primary Counsel's prior motion,[101] Parker Waichman's instant motion has nothing to do with allegedly deficient relief for class members.  Nor could it, given the extraordinary remediation settlement achieved for the class.  Significantly, Parker Waichman did not object to either the class settlements or the total amount of attorneys' fees at the time those amounts were approved by this Court.  In short, Parker Waichman's motion is simply an effort to maximize the firm's share of the attorneys' fee award.  As this Court noted in a hearing involving the recent Esquire Bank related briefing, "[t]he

---

[101] Klonoff Decl. (Doc. 20794-3) (filed 05/25/17), at ¶ 45–46.

disappointing thing to me is that we're not talking about clients at this point.  We're just talking about lawyers and lawyer fees."[102]

39.   Second, the instant motion is especially egregious coming on the heels of the ill-conceived motion of Parker Waichman and other Primary Counsel to disqualify and strike at Step Five.  There, Primary Counsel not only filed a flawed motion, but then engaged in meritless appellate strategies, including: seeking mandamus from the Fifth Circuit (before this Court had even ruled on the motion); moving for certification of an order for interlocutory appeal under 28 U.S.C. § 1292(b); and moving for an entry of final judgment under Fed. R. Civ. P. Rule 54(b)—all in the name of fighting solely for Parker Waichman's fees.[103]  One might be inclined to overlook one ill-conceived filing (or set of filings), as this Court did in characterizing the first motion to disqualify as stemming from a "misunderstand[ing]."[104]  However, to engage in an essentially duplicative strategy after definitively losing the first time puts the new motion in a very different light.[105]  It is inconceivable that the instant motion is based on a mere misunderstanding.

40.   Third, Parker Waichman's motion, like the prior motion of Primary Counsel, seeks relief that is premature.[106]  Neither Parker Waichman nor the FC knows how the Court will eventually rule with respect to the Step Six allocation, nor what the Court's rationale will be.  The process will be transparent and rigorous.  As the Court noted in its May 25, 2017 order in connection with Step Five, all views will be considered, and the views of the Fee Committee will not be

---

[102] July 12, 2018 Hearing Tr. at 10:13–15.

[103] Indeed, Parker Waichman's prior motion to disqualify (and failed appellate strategy) is simply one piece of a broader scorched-earth strategy.  As this Court noted in its opinion setting common benefit fees, contract counsel had a right to object to the FC's proposed allocation, but they "'over played' their hand" by "fil[ing] some 23 objections, commenc[ing] unnecessary proceedings, and prolong[ing] the discovery process by filing unnecessary written discovery and seeking pointless depositions of the Court-appointed CPA and various members of the PSC and Fee Allocation Committee."[103]  These actions, the Court stated, "prolonged this process and triggered avoidable added costs—in effect, creating a second, unnecessary litigation." (Doc. 21168), at 23.

[104] (Doc. 20789), at 4.

[105] Cf. 28 U.S.C. § 1927 (authorizing sanctions when an attorney "multiplies the proceedings in any case unreasonably and vexatiously."); KCI USA, Inc. v. Healthcare Essentials, Inc., No. 1:14CV549, 2018 WL 3428711, at *6 (N.D. Ohio July 16, 2018) ("The purpose of imposing sanctions under § 1927 is to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy. Thus, an attorney is sanctionable when he intentionally abuses the judicial process or knowingly disregards the risk that his actions will needlessly multiply proceedings.") (citations and internal quotation marks omitted).

[106] Klonoff Decl. (Doc. 20794-3) (filed 05/25/17), at ¶ 48–50.

given more weight than the views of others.  *See* ¶ 5.  Indeed, the Court's actual approach at Step Five confirms that the Court will be completely independent in considering all interests. Although Parker Waichman claims to worry that at Step Six the Court will simply rubber-stamp the FC, at Step Five the Court *rejected* the FC's proposed 59.37/40.63 percent split between common benefit counsel and contract counsel, deciding instead on a 52/48 percent split and rejecting the removal of $10 million for the Taishan litigation.[107]

41.  Relatedly, as I explained in my prior Declaration, numerous authorities have rejected efforts to obtain extraordinary relief, such as disqualification, before the need for such relief is clear.[108]  Parker Waichman has not made a case for the extraordinary relief that it seeks.  Once the Court issues its decision, Parker Waichman will have a full opportunity (if it is unhappy with the outcome) to seek reconsideration or appellate review.

42.  Fourth, like the prior motion of Primary Counsel, Parker Waichman's motion is *too late* because it relies on purported conflict-of-interest concerns that have been clear for several years.[109]  Parker Waichman has been aware of the identities of the FC's members for more than four years,[110] but never previously objected, other than as part of the prior Primary Counsel's 2017 objection.  Nor did it object to the basic concept of a fee committee, even though it was obvious back in 2014 that the FC was created to perform a representative function.  Indeed, even now, Parker Waichman does not deny that the FC was authorized to file its allocation recommendations and object to recommendations by others.  Moreover, Parker Waichman never objected to the entry of PTO 28, 28(B), or 28(F), although it now complains that the procedures imposed by those orders—especially looking at how hours spent contributed to the outcome—

---

[107] The Court similarly did not rubber-stamp the recommendation of the Special Master, who had proposed a 46.64/53.36 percent split—a split to which Primary Counsel objected.

[108] Klonoff Decl. at ¶ 50 (citing cases discussing the extraordinary and drastic nature of the remedy of disqualification).

[109] Klonoff Decl. at ¶¶ 52–54.

[110] *See* PTO 28 (Doc. 17379) (filed 01/10/14), at 14–15 (appointing FC members); *see also id.* at 15 n. 10 ("These individuals have been involved since the beginning of the Chinese Drywall litigation and have performed significant roles in either or both the MDL and State Court litigation and are familiar with the work performed by common benefit counsel in all Chinese Drywall matters.").

are unfair.  Parker Waichman's unexplained delay in making its challenges is itself a strong reason to deny the extraordinary relief that it seeks.[111]

43.  Fifth, Parker Waichman has more conventional—and less drastic—ways to protect its interests and make its views known.  Parker Waichman has already pursued and obtained substantial discovery.[112]  It has offered its own extensive briefing on why the FC majority's approach is flawed.[113]  And, as noted, if it is unhappy with the Court's ultimate ruling, Parker Waichman can seek reconsideration or pursue an appeal.  These approaches, in my view, are far more appropriate than Parker Waichman's pursuit of the extreme and unnecessary remedies of disqualification and striking the FC majority's Step Six recommendation.

44.  Sixth, the fact that the current motion, unlike the prior motion by Primary Counsel, seeks disqualification only of Herman and Levin (as opposed to the entire FC) undermines the entire argument for striking the FC majority's recommendation.  There are seven members on the FC.  Putting aside Herman and Levin, as well as Ryan (who filed a minority report), a majority of the FC still supports the July 3, 2018 recommendation.  Since Parker Waichman has no quarrel with any of the four FC members (excluding Herman and Levin) who support the FC majority's July 3, 2018 recommendation, its argument for striking the proposal makes no sense.[114]

45.  Seventh, it is telling that this motion is filed solely by Parker Waichman.  None of the five other law firms that joined Primary Counsel's April 13, 2017 disqualification motion have joined Parker Waichman's current motion.[115]  The absence of support by other Primary Counsel

---

[111] *See, e.g., Central Milk Producers Co-op. v. Sentry Food Stores*, 573 F.2d 988, 992 (8th Cir. 1978) ("A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion."); *In re: General Motors LLC Ignition Switch Litigation*, No. 1:14-md-02543-JMF, 2016 WL 1441804, at *6 (S.D.N.Y. Apr. 12, 2016) ("orderly litigation depends on lawyers raising issues and problems in a timely fashion."). *See also* Klonoff Decl. at ¶ 54 n. 35 (citing additional authorities).

[112] *See* Klonoff Decl. at ¶¶ 31–33 (describing discovery).  The Court will also consider Parker Waichman's request for even more discovery.

[113] *See*, *e.g.*, Parker Waichman LLP's Objection to the Final Recommendation of the Majority of the Fee Committee Regarding Allocation of Common Benefit Fees (Doc. 21589) (filed 07/20/18).

[114] Parker Waichman does not argue, for example, that the four FC members exercised no independent judgment but simply deferred to Herman and Levin.

[115] *Compare* Motion to Disqualify the Fee Committee, Strike its Allocation Recommendation, and Stay or Dismiss Proceedings Before the Special Master and Request for Expedited Consideration (Doc. 20735) (filed under seal 04/13/17), at 1 (listing Parker Waichman and five other law firms as the moving parties), *with* Waichman Motion (Doc. 21489) (filed 07/10/18), at 1 (listing Parker Waichman as the only moving party).

speaks volumes about the merits of Parker Waichman's motion, especially given that the other Primary Counsel demonstrated, in the prior disqualification motion, that they were perfectly willing to take extreme legal positions.

46.  Eighth, the fact that FC member Michael J. Ryan issued a minority report confirms that the FC was indeed a deliberative body, with each member feeling comfortable in deciding the issues on the merits.  Ryan's minority report demonstrates that no one was pressured to go with the majority or suppress his or her concerns.  If the FC majority was unable to exercise control over one of its own members, there is no conceivable basis for concern that the majority will have undue influence over the Court.

47.  Ninth, as noted, neither the Special Master nor the Court rubber-stamped the FC's Step Five allocation recommendation, and Parker Waichman offers no credible reason to think the process for Step Six will be anything but fair and transparent.  Parker Waichman's assumption that the Court will simply do whatever the FC majority wants is an insult to the Court and is directly belied by the Court's careful and independent approach at Step Five.

48.  Finally, and most tellingly, I find it significant that Parker Waichman challenges Herman and Levin solely in their roles as FC members, but does *not* challenge them as leaders of the PSC.[116]  If Parker Waichman really believed that Levin and Herman were fatally compromised, the firm would not be acquiescing in Levin's and Herman's continued involvement as key players of the PSC in the ongoing aspects of the case.  Again, this fact only confirms that Parker Waichman's motion is purely strategic to maximize its own fees, and that the firm does not have any genuine concern about a lack of integrity or objectivity on the part of Herman and Levin.

**B. Parker Waichman's Specific Arguments for Seeking Relief**

49.  Having noted my overarching concerns with Parker Waichman's motion, I now address the firm's specific arguments for disqualifying Herman and Levin and striking the FC majority's Step Six recommendation.  Some of those arguments merely repeat ill-conceived arguments made by Primary Counsel in 2017.  Other arguments are new, but are equally unconvincing.

---

[116] As Parker Waichman notes: "Given the posture of the MDL, this motion does not challenge the appointments of Levin and Herman as leaders of the Plaintiffs' Steering Committee." Waichman Memo at 5 n. 4.  (Note: Citations to the Waichman Memo are to the page numbers that appear at the bottom of each page; for some reason, the memorandum begins on page 4.)

## 1. Parker Waichman's Arguments that Merely Repeat PC's Arguments in 2017

### a. Skepticism Regarding Fee Committees

50.   Like Primary Counsel, Parker Waichman argues that FC members in general (and Herman and Levin in particular) "have an obligation to avoid conflicts that threaten to undermine public confidence in the integrity of these proceedings."[117]   The problem with that argument is that it proves too much.   As one prominent Third Circuit Judge has noted, FC members "have inherent conflicts. They make recommendations on their own fees and thus have a financial interest in the outcome." *In re Diet Drugs Prods. Liab.*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring).   At its core, the argument that fee committee members must avoid all conflicts—made by Primary Counsel and repeated by Parker Waichman—is an attack on the entire fee committee structure.   The crucial question is whether there is a *disabling* conflict— which means focusing on "how much deference" counsel receive. *Id.*   Or, as the Fifth Circuit noted in *High Sulfur*, "[i]t is the court's procedure, not those employed by counsel, which is relevant." 517 F.3d at 233 n. 19.

51.   As this Court is well aware, and as numerous courts and commentators have indicated, fee committees and similar bodies are relatively common in complex litigation and serve an important function.   For example, in *In re Copley Pharmaceutical, Inc.*, 50 F. Supp. 2d 1141, 1148 (D. Wyo. 1999), the district court utilized a fee committee structure.   As the Fifth Circuit noted in *High Sulfur*, *Copley Pharmaceutical* has become "a helpful model for other district courts." *In re High Sulfur Gulf Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 233 (5th Cir. 2008).   Clearly, *High Sulfur* refutes any argument that a fee committee, by its very nature, creates a disabling conflict.

52.   In a case like the instant MDL, with thousands of participating attorneys, it would be highly impractical for all of the attorneys to appear monthly before the Court to discuss common benefit attorney hours and expenses.   A fee committee structure assures efficiency, while still leaving to the Court the role of making all decisions relating to the amount and allocation of fees.

53.   As I explained in ¶¶ 5 and 40, the Court has structured the process so that all arguments will be considered and no deference will be given to the FC's recommendation.   Thus, to answer

---

[117] Waichman Memo (Doc. 21489-1), at 12.

the inquiry posed by Judge Ambro in *Diet Drugs*, the FC members in the instant case will receive *no* deference from the Court.  Given that reality, Parker Waichman's attack on the use of the fee committee structure must be rejected.

### b. Fiduciary Duty Owed by Fee Committee to Other Attorneys in the Case

54.  As in Primary Counsel's prior motion to disqualify, Parker Waichman bases its request for disqualification on the theory that the FC members owe a fiduciary duty to other attorney stakeholders.[118]  Not surprisingly, Parker Waichman offers no relevant authority to support its novel—and conclusory—argument.[119]  Parker Waichman's main authority, *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220 (5th Cir. 2008), is not at all supportive. Parker Waichman quotes a statement from *High Sulfur* that "lead counsel responsible for fee allocation must 'apply a universally fair standard of allocation to all participants, including itself.'"[120]  But neither that sentence (which is essentially a truism that lead counsel must act fairly), nor anything else in *High Sulfur* supports the contention that the FC owes a *fiduciary duty* to other attorney stakeholders.  As I explained in my prior Declaration,[121] the problem in *High Sulfur* was not the allocation of fees per se, but rather the *district court's* failure to provide objecting attorneys a constitutionally adequate opportunity to be heard.[122]  Here, in sharp contrast to *High Sulfur*, the fee allocation process is fully transparent and includes multiple layers of review and opportunities for other attorney stakeholders, such as Parker Waichman, to be heard.  Numerous courts have similarly distinguished *High Sulfur*.[123]

---

[118] Waichman Memo (Doc. 21489-1), at 12.

[119] Parker Waichman cites and quotes, verbatim, the same authorities relied on unsuccessfully by Primary Counsel in the prior Motion to Disqualify. *Compare* PC Memo (Doc. 20735) (filed 04/13/17), at 30–31 & nn. 85–88, *with* Waichman Memo (Doc. 21489-1) (filed 07/10/18), at 12 & n. 23.  The fact that Parker Waichman would offer up the identical authorities and quotations that the Court previously found unpersuasive—without adding a citation (or even changing a comma)—strikes me as abusive and as a sufficient reason—standing alone—for the Court to deny the motion.

[120] Waichman Memo at 12 & n. 23 (quoting *High Sulfur*, 517 F.3d at 232).

[121] Klonoff Decl. at ¶ 89.

[122] 517 F.3d at 232 ("Because the court sealed the fee allocation list and placed a gag order on plaintiffs' attorneys, Appellants could not compare their awards to those of other attorneys. They were not furnished with the hours and rates that other attorneys submitted or informed of the Fee Committee's process, yet such information was essential to enable them to challenge how the Fee Committee valued their work.").

[123] *See, e.g.*, *In re Diet Drugs*, 582 F.3d 524, 538 (3d Cir. 2009) ("Far from adjudicating the fee award in an ex parte hearing, the District Court solicited submissions from all interested parties . . . [and] permitted

55.  Parker Waichman's other authorities are similarly weak.  The firm mischaracterizes the MANUAL FOR COMPLEX LITIGATION, FOURTH, § 10.22, at 24 (Fed. Jud. Ctr. 2004) ("MCL"), as "describing lead lawyers as fiduciaries."[124]  In fact, the sentence upon which Parker Waichman relies states: "Counsel designated by the court also assume a responsibility to the court and an obligation to act fairly, efficiently, and economically in the interests of all parties and parties' counsel." *Id.* at § 10.22.  Again, the MCL's focus is solely on basic fairness.  Nowhere in this section (or any other section) does the MCL state that lead counsel are "fiduciaries" to individually retained counsel.[125]

56.  Parker Waichman also cites for support the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 1.04 reporter's notes cmt. A (2010).[126]  The language relied upon by Parker Waichman states:

> Class counsel is a … fiduciary to a client who is also a fiduciary. A similar relationship obtains between lead attorneys and other lawyers in a multi-district litigation. The lead attorneys must "act fairly, efficiently, and economically in the interests of all … parties' counsel." Manual for Complex Litigation (Fourth) § 10.22, at 24 (2004). Because "parties' counsel" are fiduciaries of the clients they directly represent, in multi-district litigations a double layer of fiduciary relationships also obtains. Finally, whenever a group of litigants works together, its members may owe each other duties by agreement or common law.[127]

This passage cannot bear the weight that Parker Waichman ascribes to it.  First, the only authority cited in the above-quoted passage is the MCL 4th § 10.22, which (as explained above)

---

objections and allowed objectors to take limited discovery, though it need not have granted any discovery at all") (citation omitted); *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 872 (8th Cir. 2014) (finding fee procedures were not an abuse of discretion even though district court did not permit discovery; court of appeals noted, "Here, by contrast [to *High Sulfur*], the court appointed a Special Master to review the fee request, and the Special Master invited and considered the objections of plaintiffs' attorneys, met with the parties, and reviewed the affidavits submitted by Lead Counsel and other common benefit attorneys"), *cert. denied*, 135 S. Ct. 1455 (2015).

[124] Waichman Memo at 12 n. 23.

[125] *See* Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations*, 79 FORDHAM L. REV. 1985, 1988 (2011) ("[T]he language used in [MCL 4th § 10.22] falls short of stating the fiduciary standard.").

[126] Waichman Memo at 12 n. 23.

[127] *Id.* at § 1.04 reporter's notes cmt. A, at 49 (2010).

does not support Parker Waichman's fiduciary argument.  Second, the entire purpose of the ALI PRINCIPLES is to suggest what the law *should* be, not to restate existing law.[128]   Third, the language cited by Parker Waichman appears in the Reporters' Notes, not as black-letter text. Thus, it represents only the personal views of the reporter who wrote the notes; that language (unlike the black letter sections) did not receive the imprimatur of the American Law Institute.[129] Fourth, even if one reads the PRINCIPLES as stating that the FC here has some sort of a fiduciary duty to Parker Waichman and other attorney stakeholders, the specific obligations under such a duty are exceedingly vague and provide no basis for disqualification of the FC.[130]   Indeed, Professor Charles Silver, the Associate Reporter who had primary responsibility for that part of the ALI PRINCIPLES, has recognized that the ALI note in question (like the MCL) is weak authority for the notion that such a fiduciary duty exists.[131]

57.   The law review articles that Parker Waichman cites also fail to support its claim.  The articles were all authored or co-authored by Professor Silver, who (as noted above) has explicitly recognized—in one of the very articles cited by Parker Waichman[132]—that there is no established legal authority for imposing a fiduciary duty like the one asserted by Parker Waichman.  Similarly, in another article co-authored by Professor Silver that Parker Waichman cites,[133] the authors do not purport to describe the law as it actually exists; rather, by their own

---

[128] *See* ALI, *Capturing the Voice of the American Law Institute: A Handbook for ALI Reporters and Those Who Review Their Work* (2015), at 13 (explaining that, unlike the Restatements, the ALI's PRINCIPLES "are primarily addressed to legislatures, administrative agencies, or private actors").

[129] *See id.* at 45 (Reporters' Notes "furnish a vehicle for the Reporter to convey views not necessarily those of the Institute").

[130] *See*, *e.g.*, ALI PRINCIPLES § 1.04 Reporters' Note, at 50 ("To a degree, . . . a lead lawyer in an aggregate proceeding may operate without the usual tethers of loyalty and obedience. Even so, the fiduciary duty retains some content. It requires a lawyer to take all steps that have reasonable potential to make one or more parties or represented persons better off without harming others.").

[131] Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigation*, 79 FORDHAM L. REV. 1985, 1989 (2011) (the Reporters' Notes to § 1.05 "cite no statutory or common law authority" and thus "show plainly that the law governing lead lawyers' responsibilities is immature"); *see also id.* at 1987–88 ("Although commentators argue that lead attorneys are fiduciaries and should be treated as such, solid authority for the proposition is surprisingly scarce. The MDL statute does not address the matter and the common law is undeveloped.").

[132] Waichman Memo at 12–13 n. 23 (citing Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigation*, 79 FORDHAM L. REV. 1985 (2011)).

[133] Lynn A. Baker & Charles Silver, *Fiduciaries and Fees: Preliminary Thoughts*, 79 FORDHAM L. REV. 1833 (2010) (cited in PC Memo at 31 n. 88).

admission, they seek "to *begin* a scholarly discussion, not to have the final say in one."[134] Thus, none of the law review articles cited by Parker Waichman comes close to supporting its argument that, *under existing law*, the FC owed it a fiduciary duty. At most, the articles represent legally unsupported academic musings. They are clearly not a legal basis for the extreme relief sought by Parker Waichman.[135]

58. In the face of its failure to offer any relevant legal authority for its fiduciary duty argument, Parker Waichman's position that "disqualification is necessary"[136] cannot be taken seriously.

### 2. Parker Waichman's New Arguments

59. In its current motion, Parker Waichman makes several new arguments. In my opinion, however, the new arguments are no stronger than the ones that this Court previously rejected in denying Primary Counsel's disqualification motion at Step Five.

### a. Argument that the Court's Rationale at Step Five Does Not Apply to Step Six

60. As noted, a principal argument in response to the prior motion by Primary Counsel, and one embraced by the Court, is that the Court will do the ultimate weighing and analysis and will not give deference to the FC's recommendation.[137] After intensively litigating that issue as part of Primary Counsel's prior motion to disqualify, Parker Waichman now concedes that "the conflicts of Levin and Herman arguably could be shielded from the outcome of the Step Five

---

[134] *Id.* at 1837 (emphasis added); *see also id.* ("Here and throughout, we emphasize the limited nature and tentativeness of our position. . . . We disavow any intention of writing about fiduciary relationships in general. We also ignore certain important issues, such as how far lawyers can go when using contractual provisions to carve out areas in which they may consider their own interests. Our object is to begin a scholarly discussion, not to have the final say in one.").

[135] I noted all of these flaws when Primary Counsel relied on the same authorities in their Step Five disqualification motion. Inexplicably, Parker Waichman simply ignores the discussion in my prior Declaration of why these authorities are not persuasive.

[136] Waichman Memo at 13.

[137] *See* Fee Committee's Response in Opposition to Primary Counsel's Motion to Disqualify the Fee Committee, Strike its Allocation Recommendations, and Stay or Dismiss Proceedings Before the Special Master and Request for Expedited Consideration (Doc. 20794) (filed 05/25/17), at 21–23; Order and Reasons (Doc. 20789) (05/25/17), at 5 ("Contrary to the arguments contract counsel make in their motion, the Fee Committee's recommendation will not receive any heightened weight in the Court's decision. The Fee Committee's recommendation, the Special Master's impartial report and recommendation, and the objections from contract attorneys will all be equally evaluated when allocating the global fee award between common benefit and contract counsel.")

allocation decision by the Court's *de novo* and equal weighting of the evidence."[138]   In other words, Parker Waichman now acknowledges that its argument at Step Five—that the Court was incapable of reviewing the FC's recommendation *de novo*—was wrong.

61.   Incredibly, however, in the instant motion, Parker Waichman hearkens back to its original argument, asserting that the Court will be unable to exercise *de novo* review for Step Six.   As it argues: "[T]he same result [*de novo* review as in Step Five] is not possible under Step Six because the majority recommendation, by its nature, is an 'inside' document that relies on highly subjective opinions.   In other words, it is impossible for the Court to use the Step Six Recommendation for any purpose without deferring to Levin and Herman."[139]

62.   This argument makes no sense.   The contention that the Step Six recommendation is an "inside document" is gibberish.   The FC recommendation for Step Six is only that: a recommendation.[140]   The Court will not give it any deference.   The Court will consider not only the FC majority's recommendation, but also the FC dissent (Ryan), and the detailed Parker Waichman objection, along with the other 18 objections.   The Court is perfectly capable of sorting through those materials and figuring out, *de novo*, how to divide up the common benefit pie.   The fact that the FC majority may have made some qualitative judgments does not mean the Court cannot review those judgments—or is somehow bound by them.   Indeed, in its objection to the FC majority's recommendation, Parker Waichman claims that the FC majority's recommendation can be refuted with *objective evidence*.   For instance, it argues that "it is clear that a large number of hours are improperly included in the common benefit lodestar and that the PSC leadership employed a double standard for screening time and assigning value."[141]   As an example, Parker Waichman notes that "the lodestar includes thousands of hours in pursuit of

---

[138] Waichman Memo at 13.

[139] *Id.*

[140] *Accord*, Order and Reasons (Doc. 20789) (05/25/17), at 4 ("While the Court appreciates the objections of contract counsel, it finds contract counsel misunderstands the role of the Fee Committee's recommendation in the overall process which will ultimately lead to a decision on the fee allocation issue. At the core of this misunderstanding seems to be contract counsel's belief that the Court will view the Fee Committee's recommendation as more significant, or accord it more weight, than the position of contract counsel during the final determination of the fee award. This position is contrary to the procedure established by this Court.").

[141] (Doc. 21589) (filed 07/20/18), at 3.

claims against non-settling parties."[142]  Parker Waichman further claims that it (and some other firms) "were instructed to conduct extensive work in drafting and gathering data for omnibus complaints, but this time was later rejected."[143]  Those arguments—correct or incorrect—can be reviewed and analyzed *de novo* by this Court.  Indeed, Parker Waichman calls the FC majority's recommendation "*quantifiably* unreasonable,"[144] hardly a description of a recommendation that is so couched in subjectivity as to be unreviewable.  In short, I fail to understand why, in addressing Parker Waichman's (or anyone else's) challenges to the FC majority recommendation, this Court must defer to the FC majority.  To the contrary, I am confident that—just as it did in Step Five—the Court will independently review all the submissions and render an objective opinion that gives no deference to the FC.

### b. Argument that the FC Majority Misstated the Court's Step Five Methodology

63.    Parker Waichman claims that the FC majority's "Step Six Recommendation misrepresents the methodology used by the Court and disregards the substance of the Court's lodestar analysis and findings."[145]  The motion accuses the FC majority of "obfuscation of a foundational ruling."[146]  But it is Parker Waichman that misstates the Court's order.  According to Parker Waichman, the Court used the lodestar method "as the *primary* method and then cross-checked by the *Johnson* factors."[147]  These assertions are incorrect:  The Court analyzed the issue under the lodestar (and the *Johnson* factors) but also conducted an analysis under the percentage method, and then utilized the blended method (the percent method cross-checked by the lodestar method utilizing the *Johnson* factors).[148]  The court stated that it was "appropriate to consider each of these [three] methods."[149]  Put another way, the Court considered various methods

---

[142] *Id.*

[143] *Id.*

[144] *Id.* at 7 (emphasis added).

[145] Waichman Memo at 14.

[146] *Id.*

[147] *Id.* (emphasis added).

[148] (Doc 21168), at 19–21.

[149] *Id.* at 8.

27

without endorsing any particular one.  Thus, Parker Waichman has attempted to build a basis for disqualification of Levin and Herman out of its own misreading of the Court's order.

### c. Argument that the FC Majority Improperly Seeks to Reward Law Firms for Work Done in Step Five

64.  Parker Waichman challenges "the bonus feature used by the FC Majority to reward firms for work during the Step Five Allocation Proceeding."[150]  According to the firm, the bonus feature "is proof positive of the structural conflict in allowing the FC to litigate as a party in the Step Five Allocation Proceeding" because the FC proposed an approximately 60/40 split at Step Five, but the Court rejected that split and decided instead on a 52/48 split.  In other words, in Parker Waichman's view, the firms who would be compensated "lost the fee allocation proceeding."[151]  Putting aside the fact that this argument completely undercuts Parker Waichman's purported concern that this Court will simply rubber-stamp what the FC wants, the argument is meritless.  It is true that the Court was not persuaded to adopt the FC's proposed split of 59.37 percent for common benefit counsel and 40.63 percent for contract counsel.  But the Court *was* persuaded to reject the Special Master's proposed 46.64/53.36 split and instead to go with a 52/48 split.  *See* ¶¶ 16–17.  Thus, the firms who sought to support the FC's proposed split were partially successful.  In all events, there is no basis for disqualification or striking the recommendation.  The Court can independently review whether this aspect of the FC majority's proposal is well taken.

### d. Argument that the FC Majority Has Punished Certain Firms for Prior Challenges to FC Members' Conduct

65.  Parker Waichman argues that the FC majority's recommendation is an effort to punish certain law firms for their prior challenges to the FC.  In my view, this argument goes to the merits of the Step Six allocation; it is not an argument for disqualification or striking the recommendation.  Parker Waichman is attempting to infer bad motive simply because it does not like the recommendation.  In its recommendation, the FC majority provides a detailed analysis of each component of its recommendation.   And it explained that, consistent with PTO 28, it

---

[150] Waichman Memo at 15.

[151] *Id.*

focused not just on sheer hours, but on the extent to which the work contributed to the outcome, *i.e.*, the $1.1 billion settlement. The fact that Parker Waichman does not like aspects of the FC majority's recommendation does not mean that the FC majority acted in bad faith or out of a desire to punish particular lawyers.

### e. Argument that the Step Six Recommendation Should be Stricken

66. Parker Waichman argues not only that Herman and Levin should be disqualified, but also that the entire Step Six recommendation of the FC majority should be stricken. Yet, as noted, *see* ¶ 44, four other FC members (a majority of the seven)—who are not being challenged by Parker Waichman—supported the majority's recommendation. Striking the recommendation would thus make no sense even if Parker Waichman had plausible arguments against Herman and Levin, which it does not.

67. In all events, putting aside the fact that Parker Waichman is challenging only two members of the FC, Parker Waichman's proposed remedy of striking the recommendation is overkill. The recommendation, as noted, is accompanied by a dissent, and Parker Waichman was permitted to lodge its own objections and proposal.[152] Numerous others have also lodged objections and counterproposals. *See* ¶ 23 n. 73. Since the Court has made clear that it is not giving any deference to the FC's recommendations, there is simply no basis to strike the FC majority's Step Six recommendation.

### f. Argument that the Court Should Apply a Lodestar

68. Although it is not really an argument for disqualifying Levin and Herman or striking the FC majority's recommendation, Parker Waichman argues that the proper methodology for analyzing Step Six is the pure lodestar method.[153] I disagree. Particularly under the facts and circumstances of this MDL, the lodestar method has serious flaws.

69. The lodestar method is troublesome because it gives class counsel an incentive to work more hours than are necessary and to avoid early settlement.[154] As one district court

---

[152] Parker Waichman LLP's Objection to the Final Recommendation of the Majority of the Fee Committee Regarding Allocation of Common Benefit Fees (Doc. 21589) (filed 07/20/18).

[153] Waichman Memo (Doc. 21489-1), at 21.

[154] *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 650 (E.D. La. 2010) (drawbacks of the lodestar method include "disincentive for early settlement") (citations omitted); *McDaniel v. Cnty. of*

emphasized, "[t]he lodestar method encourages attorneys to bill as many hours as possible, preferably to the firm's most expensive attorneys, and discourages early settlement, even on terms favorable to plaintiffs, because the attorneys will earn more the longer a litigation lasts."[155] Another court observed that "the lodestar approach incentivizes attorneys to work more hours, without regard to the quality of the output or the class's needs . . . ."[156]  Moreover, the lodestar method has been heavily criticized as "difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation to reach a predetermined result."[157]  Finally, a mechanical application of the lodestar here would ignore the fact that what is important is not the sheer number of hours, but how the work contributed to the successful outcome—the test embodied in PTO 28. *See* ¶ 21.[158]  As this Court has explained:

> In a case of this kind, not all types of work are created equal. Hours spent taking depositions, participating in hearings, or trials, actively participating in developing the appropriate litigation strategies and tactics (through moot court presentations or similar practices), drafting briefs, actively participating in Court conferences, arguing motions, negotiating with opposing counsel to reach a settlement, and actively managing and organizing the administrative aspects of the case are some of the more significant types of work that a case of this sort requires and deserves the most

---

*Schenectady*, 595 F.3d 411, 418 (2d Cir. 2010) ("The lodestar method . . . creates an incentive for attorneys to bill as many hours as possible, to do unnecessary work, and for these reasons also can create a disincentive to early settlement.  Under certain conditions, moreover, lodestar awards can create the near opposite incentive, encouraging attorneys to settle before trial even when it is not in their clients' best interest.") (citation omitted); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n. 5 (9th Cir. 2002) ("[I]t is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary . . . , [and] the lodestar method does not reward early settlement.") (citations omitted); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001) ("[T]he lodestar approach creates [an] incentive to run up the billable hours."); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1268–69 (D.C. Cir. 1993) ("[U]sing the lodestar approach . . . attorneys are given incentive to spend as many hours as possible, billable to a firm's most expensive attorneys [and] . . . there is a strong incentive against early settlement since attorneys will earn more the longer a litigation lasts.") (citations omitted).

[155] *In re Copley Pharm., Inc.*, 1 F. Supp. 2d 1407, 1411 (D. Wyo. 1998) (citation omitted).

[156] *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 762 (S.D. Ohio 2007).

[157] *Ramah Navajo Chapter v. Babbitt*, 50 F. Supp. 2d 1091, 1108 (D.N.M. 1999).  *Accord, e.g.*, *Swedish Hosp. Corp.*, 1 F.3d at 1269–70 ("The lodestar method makes considerable demands upon judicial resources since it can be exceptionally difficult for a court to review attorney billing information over the life of a complex litigation and make a determination about whether the time devoted to the litigation was necessary or reasonable. . . . A related weakness in the lodestar approach is that it often results in substantial delay in distribution of the common fund to the class. . . .").

[158] *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 766 (E.D. La. 2011) (fact that common benefit fee award was supported by a rough lodestar cross-check did not "prohibit the Court from prioritizing certain common benefit work when dividing the fund among the applicants").

> recognition.  This, of course, is not the only type of work that such
> a case requires.  Documents must be reviewed, categorized, and
> analyzed; e-mails must be read and responded to; claimants must
> be kept advised; meetings must be attended and in general the
> litigation must be monitored.  This work, while necessary and
> often time consuming does not deserve equal treatment when
> allotting fees.[159]

70.  Here, the Court should focus on how counsel seeking fees contributed to the resulting settlement.  Treating all hours equally would reward counsel who simply compiled large numbers of hours but did little to impact the outcome.  Indeed, Parker Waichman's motion highlights the concern about treating all hours the same: It touts its 8,905.75 hours without providing *any* explanation of how those hours helped to achieve the $1.1 billion settlement.  In all events, this Court can (and will) independently review Parker Waichman's hours and determine—without deference—whether the FC majority was correct in its treatment of those hours.

### g.  Argument that the Esquire Bank Situation Independently Justifies Disqualification and Striking the Step Six Recommendation

71.  Parker Waichman argues that, despite the time and energy that the Court and the parties have already spent on the Esquire Bank issue, *see* ¶¶ 25–29, there remain "clearly and immediately problematic" conflicts of interest.[160]  I see nothing about the Esquire Bank situation that warrants the drastic relief sought by Parker Waichman.  As noted, the alleged conflict was

---

[159] *In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 772 (E.D. La. 2011) (quoting *Turner v. Murphy Oil USA, Inc.*, 582 F. Supp. 2d 797, 810–11 (E.D. La. 2008)).  As this Court further explained in *Vioxx*:

> In short, there is a hierarchy of value for work that tends to have a greater
> impact on the litigation and generates more 'common benefit.' Such work
> deserves greater compensation. This is not a unique concept. It is a common
> practice in the legal profession to bill certain work at a higher rate than other
> work. Mechanically calculating hours and allocating fees solely on that basis
> would incentivize padded hours and diminish the work that truly moved the
> litigation toward its conclusion. A lodestar calculation is important in
> comparing the relative contribution of attorneys doing the same kind of
> work, and it is also an important check to ensure that the spread between
> compensation for attorneys doing more or less significant work is not
> grossly unfair, but it is not the end-all of allocating fees in an MDL case
> such as this.

802 F. Supp. 2d at 772–73 (citation omitted).

[160] Waichman Memo at 17.

disclosed to the Court and the parties back in 2013.  Only now does Parker Waichman cite the Esquire Bank issue as a conflict requiring disqualification.

72.  At the oral argument on motions relating to Esquire Bank, this Court said that "I don't see any problem with having had the funds in Esquire Bank."[161]   Moreover, the Court has transferred the funds from Esquire Bank to the Court's registry, which would appear to moot the argument (or at least eliminate any conceivable basis for disqualification or striking the FC majority's recommendation).  Significantly, although Parker Waichman now wants to use the Esquire Bank issue to its advantage to secure higher fees, it did not join in any of the prior motions involving the Esquire Bank issue.  Parker Waichman's silence at the time that the issue was being briefed and argued is strong evidence that this is a makeweight argument and should not be taken seriously.

73.  Also troubling is that Parker Waichman sweeps Levin into the Esquire Bank issue, even though only Herman had a directorship with the bank.  It argues that "it must be presumed that [Levin] knew or should have known of the actual extent of Herman's conflicts and withheld information from the Court and the fee allocation stakeholders."[162]   But this same argument could be made as to any attorney with a leadership role in the MDL.  Parker Waichman's inclusion of Levin in its Esquire Bank argument illustrates the extent to which it is willing to advance wholly meritless arguments to secure an advantage on the issue of attorneys' fees.

74.  Finally, common sense suggests that, if the involvement of Esquire Bank in this litigation truly represented an egregious conflict on the part of Herman and Levin, then Parker Waichman would not tolerate *any* further role for Herman and Levin.  Yet Parker Waichman has no problem allowing Herman and Levin to stay in leadership roles in the ongoing litigation against the Taishan Defendants.[163]   The timing and the nature of Parker Waichman's allegations of conflict thus strongly suggest that Parker Waichman's disqualification motion is motivated by

---

[161] July 12, 2018 Hearing Tr. at 6:22–23.

[162] Waichman Memo at 18.

[163] *See* Waichman Memo at 5 n. 4 ("Given the posture of the MDL, this motion does not challenge the appointments of Levin and Herman as leaders of the Plaintiffs' Steering Committee. Rather, it is directed solely to the fee allocation proceedings and seeks the least disruptive remedy warranted by the circumstances.")

its own financial interests, rather than by any genuine concern about protecting "the integrity of this proceeding" and "promot[ing] greater transparency regarding issues of public concern."[164]

## VII. CONCLUSION

75. I recommend that the Court deny Parker Waichman's motion in its entirety.

I declare that the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.

Robert H. Klonoff

July 31, 2018

---

[164] *Id.* at 4.

33

**APPENDIX A**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 |
| | SECTION: L |
| | JUDGE FALLON |
| | MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: *ALL CASES* | |

**DECLARATION OF ROBERT H. KLONOFF ADDRESSING PRIMARY COUNSEL'S MOTION TO DISQUALIFY THE FEE COMMITTEE AND, *INTER ALIA*, STRIKE ITS ALLOCATION RECOMMENDATION**

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I. INTRODUCTION

1. I am the Jordan D. Schnitzer Professor of Law at Lewis & Clark Law School. I have been asked by the Fee Committee ("FC") to render my opinion on the merits of the Motion to Disqualify the Fee Committee and, *inter alia,* to Strike Its Allocation Recommendation. That motion was filed on behalf of certain lawyers who have contingent fee agreements with individual class members.[1] (The movants are a small subset of the fee objectors referred to as Primary Counsel, the name designated by this Court in a law review article,[2] and they are

---

[1] Specifically, the movants are: Parker Waichman LLP; Whitfield Bryson & Mason LLP; Pendley, Baudin & Coffin; Rhine Law Firm; Luckey & Mullins; Milstein, Adelman, Jackson, Fairchild & Wade, LLP; and Roberts & Durkee, LLP.

[2] *See* WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 15.24 (5th ed. 2016) (noting that "Judge Fallon appears to have coined this term") (citing Hon. Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371, 376 (2014)).

referred to herein as "moving Primary Counsel.")   I am offering my opinions for the Court's consideration based on my background and experience.   I recognize, of course, that my role is limited and that this Court will make the ultimate decision.

## II.  QUALIFICATIONS

2.  I have served as the Jordan D. Schnitzer Professor of Law since June 1, 2014.  This is an endowed, tenured position at the rank of full professor.  My areas of expertise include complex civil litigation and civil procedure.  From July 1, 2007, to May 31, 2014, I served as the Dean of Lewis & Clark Law School, and I was also a full professor at Lewis & Clark during that time. Immediately prior to assuming the deanship at Lewis & Clark, I served for four years as the Douglas Stripp/Missouri Professor of Law at the University of Missouri-Kansas City School of Law (UMKC).  That appointment was an endowed, tenured position at the rank of full professor. I taught courses on complex litigation, civil procedure, and appellate procedure.  Prior to my academic post at UMKC, I served for more than a dozen years as an attorney with the international law firm of Jones Day, working in the firm's Washington, D.C. office.  For most of that time, I was an equity partner at the firm.  While working at Jones Day, I also served for many years as an adjunct professor of law at Georgetown University Law Center, where I taught courses on class actions.  Before joining Jones Day, I served as an Assistant United States Attorney and as an Assistant to the Solicitor General of the United States.  I also served as a law clerk for Chief Judge John R. Brown of the U.S. Court of Appeals for the Fifth Circuit.  I received my law degree from Yale Law School.

3.  I am the author of the first casebook devoted specifically to class actions, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017) (forthcoming June 2017).  As a textbook author in the class action field, I annually supplement my casebook, and thus remain up to date on the latest case law developments.  I am also the author of the Nutshell on class actions, Robert H. Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 5th ed. 2017) (forthcoming August 2017).  These texts are used at law schools throughout the United States and have been cited by many courts and commentators.[3]  I have also authored

_____

[3] *See, e.g., Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 468 (1st Cir. 2013) (citing class action *Nutshell* (4th ed.)); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (citing class action *Nutshell* (1st ed.)); *Adams v. United Services Automobile Ass'n*, No. 2:14-CV-02013, 2016 WL 1465433, at *7 (W.D. Ark. Apr. 14, 2016) (citing class action *Nutshell* (4th ed.)); Jaime Dodge, *Privatizing Mass Settlement*, 90 NOTRE DAME L.

or co-authored numerous scholarly articles on class actions.[4]  In addition, I serve on the advisory board of Class Action Litigation Report, a Bloomberg/BNA publication.

4.  I served for five years as an Associate Reporter for the American Law Institute's class action (and other multi-party litigation) project, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION.  I was the principal author of the chapter that addresses class action settlements and attorneys' fees (chapter 3).  The project was unanimously approved by the membership of the American Law Institute at its annual meeting in May 2009, and was published in May 2010.  It has been frequently cited by courts and commentators.[5]

---

REV. 335, 337 n. 12 (2014) (citing class action casebook); Vaughn R. Walker, *Class Actions Along the Path of Federal Rule Making*, 44 LOY. U. CHI. L.J. 445, 449 n. 17 (2012) (citing class action *Nutshell* (1st ed.)); Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 COLUM. L. REV. 149, 151 n. 5 (2003) (citing casebook); Kenneth S. Rivlin & Jamaica D. Potts, *Proposed Rule Changes to Federal Civil Procedure May Introduce New Challenges in Environmental Class Action Litigation*, 27 HARV. ENVTL. L. REV. 519, 521 n. 10 (2003) (citing class action *Nutshell* (1st ed.)).

[4] For example, my 2013 article, *The Decline of Class Actions*, 90 WASH. U. L. REV. 729 (2013), has been widely cited. *See, e.g.*, *In re National Football League Players' Concussion Injury Litig.*, 775 F.3d 570, 576 (3d Cir. 2014); *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014) (Posner, J.); *In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014); *Dickens v. GC Services Limited Partnership*, ___ F. Supp. 3d ___, 2016 WL 6681468, at *8 (M.D. Fla. Nov. 14, 2016); *In re Kosmos Energy Ltd. Secs. Litig.*, No. 3:12-cv-373-B, 2014 WL 1095326, at *2 n. 20 (N.D. Tex. Mar. 19, 2014); Claire E. Bourque, Note, *Liability Only, Please—Hold the Damages: The Supreme Court's New Order for Class Certification*, 22 GEO. MASON L. REV. 695, 698 n. 29 (2015); Martin H. Redish & Julie M. Karaba, *One Size Doesn't Fit All: Multidistrict Litigation, Due Process, and the Dangers of Procedural Collectivism*, 95 B.U. L. REV. 109, 110 n. 2 (2015); Robert G. Bone, *The Misguided Search For Class Unity*, 82 GEO. WASH. L. REV. 651, 654 n. 6 (2014); David Freeman Engstrom, *Private Enforcement's Pathways: Lessons From Qui Tam Litigation*, 114 COLUM. L. REV. 1913, 1920 n. 17 (2014); Howard M. Erichson, *The Problem of Settlement Class Actions*, 82 WASH. U. L. REV. 951, 956 n. 20 (2014); Arthur R. Miller, Keynote Address, The Preservation and Rejuvenation of Aggregate Litigation: A Systemic Imperative, 64 EMORY L.J. 293, 294 n. 7 (2014); Linda S. Mullenix, *Ending Class Actions As We Know Them: Rethinking the American Class Action*, 64 EMORY L.J. 399, 403 n. 14 (2014); Stephen R. Subrin & Thomas O. Main, *The Fourth Era of American Civil Procedure*, 162 U. PA. L. REV. 1839, 1853 n. 80 (2014); Erin L. Geller, *The Fail-Safe Class as an Independent Bar to Class Certification*, 81 FORDHAM L. REV. 2769, 2775 n. 38 (2013); Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. REV. 286, 314 n. 105 (2013); D. Theodore Rave, *Governing the Anticommons in Aggregate Litigation*, 66 VAND. L. REV. 1183, 1186 n. 5 (2013); Brandon L. Garrett, *Aggregation and Constitutional Rights*, 88 NOTRE DAME L. REV. 593, 610 n. 82 (2012); Richard Marcus, *Still Confronting the Consolidation Conundrum*, 88 NOTRE DAME L. REV. 557, 560 n. 17, 589 n. 154 (2012); *Hearing on "The State of Class Actions Ten Years after the Class Action Fairness Act" Before the Committee on the Judiciary, Subcommittee on the Constitution and Civil Justice* (U.S. House of Representatives, Feb. 27, 2015) (statement of Prof. Patricia W. Moore), at 2 n. 4.

[5] *See, e.g.*, *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2381 n. 11 (2011); *Baker v. Microsoft Corp.*, 797 F.3d 607, 615 n. 5 (9th Cir. 2015), *cert. granted*, 136 S. Ct. 890 (No. 15-457) (Jan. 15, 2016); *Hill v. State Street Corp.*, 794 F.3d 227, 229, 231 (1st Cir. 2015); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060, 1063–67 (8th Cir. 2015); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19–20 (1st Cir. 2015); *In re Trans Union Corp. Privacy Litig.*, 741 F.3d 811, 813 (7th Cir. 2014); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 171–72 (3d Cir. 2013); *Ira Holtzman, CPA v. Turza*, 728 F.3d 682, 689–90 (7th Cir. 2013); *In re Lupron Marketing & Sales Practices Litig.*, 677 F.3d 21, 32–33 (1st Cir. 2012); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 474–75 nn. 14–16 (5th Cir. 2011); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 n. 2 (9th Cir. 2011); *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 116 (D.D.C. 2015);

5.   I have extensive experience as a practicing lawyer.  I have had eight oral arguments before the U.S. Supreme Court, and numerous oral arguments in other federal and state courts throughout the country.  As an attorney at Jones Day, I personally handled more than 100 class action cases, mostly (but not entirely) on the defense side.  These cases have included some of the largest and most highly publicized civil cases in U.S. history.  My class action experience includes, among other things, class certification, class discovery, notice, settlement, claims administration, and a variety of appellate issues.  I have handled many types of class actions, including mass torts, antitrust, consumer, insurance, securities fraud, employment discrimination, RICO, and numerous others.

6.   I have given lectures and taught courses on class actions and other litigation topics throughout the United States and abroad, including presentations at law schools in Cambodia, Canada, China, Colombia, Croatia, Ecuador, India, Israel, Italy, Japan, the Philippines, Russia, South Korea, Taiwan, and Turkey.  Over the years, I have frequently appeared as an invited speaker at class action symposia, conferences, and continuing legal education programs.[6]

7.   In September 2011, Chief Justice John G. Roberts, Jr., appointed me to serve a three-year term as the sole academic voting member of the Judicial Conference Advisory Committee on Rules of Civil Procedure.  That Committee considers and recommends amendments to the Federal Rules of Civil Procedure.  In May 2014, Chief Justice Roberts reappointed me to serve a second three-year term on the Committee.  I also served on the Advisory Committee's Class Action Subcommittee, which took the lead for the full Committee on possible amendments to the federal class action rule, Federal Rule of Civil Procedure 23.  The Committee's recent package of proposed amendments to Rule 23 includes proposals dealing with class objectors and the fairness of class settlements.[7]

---

*In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1355–56 (S.D. Fla. 2011); Sergio J. Campos, *Mass Torts and Due Process*, 65 VAND. L. REV. 1059, 1063 (2012); Tanya J. Monestier, *Transnational Class Actions and the Illusory Search for Res Judicata*, 86 TUL. L. REV. 1, 66 (2011); Rhonda Wasserman, *Cy Pres in Class Action Settlements*, 88 S. CAL. L. REV. 97, 111 (2014); Ryan C. Williams, *Due Process, Class Action Opt Outs, and the Right to Sue*, 115 COLUM. L. REV. 599, 649–50 (2015).

[6] Examples of those courses and speaking engagements are contained in my attached curriculum vitae (Appendix A).

[7] *See, e.g.*, Andrew McGuinness, *Rule 23 Proposed Changes En Route*, American Bar Ass'n (Feb. 29, 2016), http://apps.americanbar.org/litigation/committees/classactions/articles/winter2016-0216-rule-23-proposed-changes-en-route.html.

8.   In October 2014, I was elected to membership in the International Association of Procedural Law (IAPL), an organization of preeminent civil procedure scholars from around the world.  I was selected in a competitive process to present a scholarly article on class actions at the May 2015 Congress of the IAPL, an event held once every four years.

9.  I have testified as an expert in numerous class action cases, and in other cases raising civil procedure issues.  Between 2011 and the present, I testified in the following cases:

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration addressing objections by class members to proposed 3.0-liter and Bosch settlements) (dated 4/28/17);

- *State of Louisiana & Vermillion Parish School Board v. Louisiana Land and Exploration Co., et al.,* No. 82162 (15th Judicial Court, Parish of Vermilion) (submitted expert declaration on attorneys' fees issues) (dated 3/9/17);

- *Thacker v. Farmers Insurance Exchange*, Case No. 2006CV342 (Dist. Ct. Boulder County, Colo.) (submitted expert declaration on class certification issues) (dated 1/24/17);

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration addressing objections by class members to proposed 2.0-liter settlement) (dated 9/30/16);

- *In the Matter of Gosselin Group*, No. 15/3925/B (Antwerp Court of First Instance, Belgium) (submitted expert declaration discussing the role of federal appellate courts in the factfinding process) (dated 9/27/16);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, Nos. 12-970, 15-4143, 15-4146, and 15-4645 (E.D. La.) (submitted expert declaration on class certification, settlement fairness, and attorneys' fees relating to proposed Halliburton/Transocean class settlement) (filed 8/5/16);

- *Ben-Hamo v. Facebook, Inc. and Facebook Ireland Limited*, No. 46065-09-14 (Central District Court, Israel) (submitted expert declaration on Sept. 3, 2015, on behalf of Facebook, Inc. and Facebook Ireland Limited addressing various issues of U.S. civil procedure and class action law);

- *Skold v. Intel Corp.*, Case No. 1-05-CV-039231 (Super. Ct. of CA, Santa Clara County) (submitted expert declaration on class settlement approval, attorneys' fees, and incentive payments to class representatives) (filed 12/30/14);

- *In re National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB (E.D. Pa.) (submitted expert declaration on class certification, class notice, and settlement fairness) (Doc. No. 6423-9) (filed 11/12/14);

• *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La.) ("Deepwater Horizon") (submitted expert declarations on class settlements for economic and property damages (Doc. No. 7104-3), and personal injuries (Doc. No. 7111-4) (both filed 08/13/12), and supplemental expert declarations for both class settlements (Doc. No. 7727-4) (economic), (Doc. No. 7728-2) (medical) (both filed 10/22/12));

• *MBA Surety Agency, Inc. v. AT&T Mobility, LLC*, Case No. 1222-CC09746 (Mo. 22d Dist.) (submitted expert declaration on class certification and settlement fairness on Feb. 13, 2013; submitted supplemental expert declaration on Feb. 19, 2013; and testified in court on Feb. 20, 2013);

• *Robichaux v. State of Louisiana, et. al.* (No. 55,127) (18th Judicial Dist. Ct., Iberville Parish, La.) (submitted written report on class action attorneys' fees on February 20, 2012, gave deposition testimony on March 7, 2012, and testified in court on April 11, 2012); and

• *In re AT&T Mobility Wireless Data Svcs. Sales Tex Litig.*, MDL No. 2147, Case No. 1:10-cv-02278 (N.D. Ill.) (submitted expert declarations on the fairness of a proposed settlement (Doc. No. 163-3) and on attorneys' fees and incentive payments (Doc. 164-1) (both filed 03/08/11), and testified in court on March 10, 2011).

10.   Courts reviewing class settlements and attorneys' fee requests have relied extensively on my testimony.   For example, in the *AT&T Mobility* litigation, Judge Amy St. Eve cited and quoted my Declarations more than 20 times in upholding a class settlement and awarding attorneys' fees.[8]   In the *Deepwater Horizon* case, Judge Carl Barbier cited and quoted my Declarations (relating to a proposed settlement with British Petroleum) more than 60 times in his analysis of class certification and fairness.[9]   In a later order in that MDL, Judge Barbier repeatedly cited my Declaration (which I filed in support of a class settlement with Transocean and Halliburton).[10]   In *Skold v. Intel Corp.*, Judge Peter Kirwan cited my Declaration in approving a class settlement and awarding attorneys' fees.[11]   Most recently, in the *Volkswagen*

---

[8] *See In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 956–59, 961, 963–65 (N.D. Ill. 2011) (approving class settlement); *In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 n. 3, 1034–35, 1037, 1040, 1042 (N.D. Ill. 2011) (awarding attorneys' fees).

[9] *See In re Deepwater Horizon*, 910 F. Supp. 2d 891, 903, 914–16, 918–21, 923–24, 926, 929–33, 938, 941, 947, 953, 955, 960, 962 (E.D. La. 2012) (approving economic and property damages settlement), *aff'd*, 739 F.3d 790 (5th Cir. 2014); *In re Deepwater Horizon*, 295 F.R.D. 112, 133–34, 136, 138–41, 144–45, 147 (E.D. La. 2013) (approving medical benefits settlement).

[10] *See* Order and Reasons, Case No. 2:10-md-02179-CJB-JCW (Doc. 22252) (E.D. La. 02/15/17); *available at* http://www.laed.uscourts.gov/sites/default/files/OilSpill/2152017OrderAndReasons%28HESI%26TOsettlement%29 .pdf (last visited Apr. 23, 2017).

[11] *See Skold v. Intel Corp.*, No. 1-05-CV-039231 (Cal. Super. Ct. Santa Clara County) (Jan. 29, 2015), at 7.

*Clean Diesel* litigation, Judge Charles Breyer repeatedly cited and quoted two of my Declarations—in three separate opinions—in granting final approval of the 2.0-liter VW class settlement, 3.0-liter VW class settlement, and class settlement with Bosch.[12]

11.  In my many years of work as a law professor, class action expert, and practicing lawyer, I have reviewed untold numbers of class action decisions analyzing various attorneys' fees issues.  I have also devoted substantial time and attention to studying class action attorneys' fees issues in the course of my work as an Associate Reporter for the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION project and as a member of the Advisory Committee on Rules of Civil Procedure and the Class Action Subcommittee.

12.  I am being compensated for my work at my standard rate of $700 per hour.  Payment is not contingent on the substance of my opinions.

13.  Additional information regarding my qualifications and experience—including a list of my publications—can be found in my curriculum vitae, attached hereto as Appendix A.

## III. BASIS FOR TESTIMONY

14.  A list of documents that I reviewed is attached as Appendix B.

## IV.  BACKGROUND

### A. The Chinese-Manufactured Drywall MDL—Claims and Class Settlement

15.  This Court is thoroughly familiar with the background of this litigation, so I discuss only the points that are essential to my analysis.

16.  This MDL involves claims for property damage and personal injuries caused by Chinese-manufactured drywall installed in homes and other buildings from approximately 2005 to 2008.  During that time, the destruction caused by Hurricanes Rita and Katrina led to an increase in construction, which in conjunction with a housing boom in turn led to a shortage of domestic drywall, resulting in the importation of large quantities of Chinese-manufactured

---

[12] *See In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods Liab. Litig.*, No. 3:15-md-02672-CRB, 2016 WL 6248426, at *18, *19, *20 (N.D. Cal. Oct. 25, 2016), *appeal filed*, No. 16-17185 (9th Cir. Nov. 29, 2016); Order Granting Final Approval of the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. 3229) (filed 05/17/17), at 34, 35, 38; Order Granting Final Approval of the Bosch Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. 3230) (filed 05/17/17), at 18.

drywall. The Chinese-manufactured drywall was used in the construction and reconstruction of thousands of homes and other buildings, primarily in states on the Gulf Coast and East Coast— Florida, Louisiana, Alabama, Mississippi, Texas, and Virginia. When the defects of the drywall became apparent, numerous plaintiffs filed suit in federal and state courts against various defendants, including "homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall." 2017 WL 1421627, at *1. On June 15, 2009, the Judicial Panel on Multidistrict Litigation consolidated the federal cases in this Court for pretrial proceedings, noting that this Court "has extensive experience in multidistrict litigation as well as the ability and temperament to steer this complex litigation on a steady and expeditious course."[13]

17. Discovery in the MDL revealed that the drywall at issue was manufactured primarily by two groups of defendants: (1) the Knauf entities (German-based international manufacturers of drywall and other building products, whose Chinese subsidiary advertised and sold Chinese-manufactured drywall in the United States), and (2) the Taishan entities (Chinese-based drywall manufacturers). The litigation proceeded simultaneously against both groups of defendants and their various downstream associates—importers, exporters, distributors, manufacturers, homebuilders, installers, realtors, brokers, suppliers, and developers—who were involved in the chain of commerce leading to the defective drywall being installed.

18. Knauf's Chinese subsidiary ("KPT") appeared before this Court early on, in July 2009, and it agreed to a limited waiver of service in November 2009. *See* 2017 WL 1421627, at *1 (E.D. La. Apr. 21, 2017). The Taishan entities, on the other hand, failed to appear in the litigation and were defaulted. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2014 WL 4809520, at *2 (E.D. La. Sept. 26, 2014). In February 2010, this Court presided over a bellwether trial of seven families' claims against Taishan, *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687, after which the Court found in favor of plaintiffs. 706 F. Supp. 2d 655 (E.D. La. 2010). In March 2010, this Court presided over a bellwether trial of a homeowner's claims against KPT, *Hernandez v. Knauf Gips KG*, Case No. 09-6050, after which the Court found in favor of plaintiffs. 2017 WL 1421627, at *1. The Court's findings in *Germano* and *Hernandez* provided a foundation for

---

[13] *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F. Supp. 2d 1346, 1347 (J.P.M.L. 2009).

Knauf and the PSC to enter into a pilot remediation program on October 14, 2010. As this Court noted in April 2017, that program "is ongoing and has, at present, remediated over 2,200 homes containing KPT Chinese drywall using the same protocol." 2017 WL 1421627, at *2.

19. On December 20, 2011, the Knauf entities and the PSC entered into a class settlement agreement, which this Court certified as a class action and approved on February 7, 2013. *See* 2013 WL 499474 (E.D. La. Feb. 7, 2013). In addition, numerous other downstream defendants—homebuilders, suppliers, and installers (and most of their insurers)—entered into class action settlement agreements, resulting in the resolution of "almost all of the Knauf Entities' chain-of-commerce litigation." 2017 WL 1421627, at *2. The additional, related class settlements involve claims against (1) Interior Exterior Building Supply, LP ("InEx"); (2) the Banner entities; (3) L&W Supply Corp. ("L&W"); and (4) the "Global" settlement involving more than 700 homebuilders, installers, suppliers, and their insurers. *See* 2013 WL 499474 (certifying classes and approving Knauf, InEx, Banner, L&W, and Global settlements).

20. As noted above, the litigation against the Taishan entities proceeded on a different track. The Taishan defendants initially declined to appear in two cases, despite having been properly served, and this Court later entered default judgment in favor of plaintiffs in those cases. *See* 2017 WL 1421627, at *3. Taishan then entered an appearance to contest this Court's exercise of personal jurisdiction over it, which led to substantial litigation, including approximately 18 months of discovery on the jurisdictional issue, a 142-page opinion by this Court finding that it *did* have jurisdiction, and two separate panels of the Fifth Circuit affirming that ruling. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012), *aff'd*, 753 F.3d 521, and 742 F.3d 576 (5th Cir. 2014). On September 26, 2014, this Court certified a class against the Taishan defendants, and on April 21, 2017, it issued a lengthy opinion denying motions to dismiss on jurisdictional grounds filed by several related entities. 2017 WL 1476595 (E.D. La. Apr. 21, 2017). Relatedly, the parties negotiated, and this Court approved, four additional settlements valued at more than $17 million with "several downstream entities in the Taishan chain of commerce and their insurers." *See* Order and Judgment (Doc. 16934) (filed 07/09/13), at 6 (certifying classes and granting final approval of four settlements with Virginia defendants: Nationwide, Venture Supply, Builders Mutual, and Tobin Trading).

21.   Ultimately, the parties negotiated, and this Court approved, a total of nine interrelated class settlements with a total estimated value of $1.1 billion.[14]

### B. Attorneys' Fee Proceedings

#### 1. PTO 9

22.   On July 28, 2009, this Court issued PTO 9, setting forth "standards and procedures … to be utilized by any counsel seeking fees and/or expense reimbursement." Doc. 147 at 1.  PTO 9 also described the role of Philip Garrett, CPA:

> Plaintiffs' Liaison Counsel has retained and the Court approves the retention of Philip Garrett, CPA ("PG"), to assist and provide accounting services to Plaintiffs' Liaison Counsel, the Plaintiff's Steering Committee, and the Court in MDL 2047. PG will be assisting in compiling submissions and will provide reports to Plaintiff's Liaison Counsel who shall submit them with the Court on a monthly basis. These reports will include both time and expenses and will summarize, with back-up detail, the submissions of all firms. Submission of time and expense records to PG and the Court shall be considered as if submitted under seal.

(Doc. 147) (filed 07/28/09), at 2.

#### 2. PTO 28 and Amendments

23.   On January 10, 2014, this Court issued PTO 28, which "provides direction and establishes guidelines for the efficient presentation to this Court to allow for the determination of making an award of attorneys' fees and reimbursement of litigation expenses, and subsequently an allocation from such an award." (Doc. 17379), at 2.  PTO 28, as amended by PTOs 28(A)–(F), set up a multi-stage process for attorneys' fees and cost reimbursement in this MDL.  From the outset, all attorneys seeking common benefit fees were required to keep contemporaneous

---

[14] *See* Memo in Support of FC's Motion to Determine Allocation of Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) (Doc. 20293-1) (filed 06/07/16), at 2; *see also* Transcript of Status Conference Proceedings, July 17, 2014 at 25:4–8 (The Court: "And as I mentioned earlier on, this developed into a pilot program and then a remediation program, and then the parties, the Knauf entity agreed to monetize that program, and as a result the cases involving Knauf drywall were settled for a billion dollars or thereabouts, upwards or downwards for the Knauf based drywall."); Transcript of Status Conference, Nov. 16, 2015 at 8:23–9:1 (The Court: "And as I always remind everyone, this [referring to Other Loss claims] is in addition to the remediation aspects of the Knauf settlement which amounted to—or is anticipated to amount to $1 billion or thereabouts.").

records of their time, and to submit their hours and expenses on a monthly basis to the Court-appointed CPA, Mr. Garrett.

24.   PTO 28 also established the FC and its members, *see id.*, and announced that "[a]t a later date, … this Court shall make an allocation from the total funds awarded for attorneys' fees amongst counsel seeking common benefit fees and counsel fees for the handling of individual claims." *Id.*   The members selected (and identified by name in the order) are Arnold Levin (Chair), Russ M. Herman (Co-Chair/Secretary), Dawn M. Barrios, Gerald E. Meunier, Michael J. Ryan, Christopher A. Seeger, and Richard J. Serpe. *Id.* at 14–15.   Leonard Davis was later appointed as Assistant Secretary. *See* Pre-Trial Order No. 28(D) (Doc. 17832) (filed 07/09/14). The FC includes one member, Michael Ryan, who does not serve on the PSC.

25.   The members of the FC collectively have 1,955 individual clients (out of an estimated 4,500 (see PC Memo at 7) individual class members).[15]   Correspondingly, many of the fee objectors, including all of the moving Primary Counsel, have submitted common benefit hours (preparing fee affidavits and appearing for interviews before the FC). *See* Letter from Arnold Levin & Russ Herman, Fee Committee, to Special Master Daniel J. Balhoff (Oct. 13, 2016) at 3 n. 3.[16]   None of the fee objectors or moving Primary Counsel (or anyone else, for that matter) objected to PTO 28.

26.   PTO 28 was amended on several occasions.   For instance, in PTO 28(B), issued on March 26, 2014, the Court extended several important deadlines from PTO 28, including the deadline for the FC to file a "Joint Global Fee Petition … for a global award of attorneys' fees, inclusive of common benefit attorneys' fees and individual retained counsel fees, and reimbursement of expenses." (Doc. 17567), at 1.   The Court also extended related deadlines for filing separate common benefit fee applications, objections to the joint petition, and responses. *See id.* at 1–2.   In PTO 28(E), issued on October 6, 2014, the Court elaborated on the steps by

---

[15] Specifically, I am advised by the FC that the number of individual claimants represented in this litigation by each of the FC members is as follows: (1) Russ M. Herman – 333; (2) Arnold Levin & Richard J. Serpe – 958 (jointly represented by Levin & Serpe and by two other non-FC law firms, each of which has a 25% interest); (3) Dawn Barrios – 93; (4) Chris Seeger – 14; (5) Jerry Meunier – 135; and (6) Mike Ryan – 422.

[16] The following fee objectors are also common benefit fee applicants (some in applications with other counsel): Allison Grant, P.A.; Alters Law Firm, P.A.; Cohen, Milstein, Sellers & Toll PLLC (Theodore J. Leopold); Luckey & Mullins; Milstein, Adelman, Jackson, Fairchild & Wade, LLP; Morgan & Morgan, P.A.; Morris Bart, LLC; Mrachek, Fitzgerald, Rose, Konopka, Thomas & Weiss, P.A.; Parker Waichman, LLP; Pendley, Baudin & Coffin; Rhine Law Firm; Roberts & Durkee, PA; Taylor Martino; and Whitfield, Bryson & Mason, LLP.

which it would address the allocation between common benefit fees and individual counsel fees. (Doc. 18037). The Court explained that after it ruled on the Global Fee Petition filed pursuant to PTO 28, it would set a date for the FC to "file a motion to determine the allocation of the global fee award as between common benefit fees and individual counsels' fees." *Id.* at 3. Following the allocation motion, the Court provided that there would be 20 days for objections, and another 15 days for replies. *Id.* at 3. None of the objectors or moving Primary Counsel (or anyone else) objected at the time this Court issued PTO 28(B) or 28(E).

27.   Throughout the period of this MDL, the Court has met regularly with the Court-appointed CPA, Mr. Garrett, to review the monthly reports of fees and expenses for various categories of common benefit work. At times (when requested by the Court), plaintiffs' lead counsel, liaison counsel, or liaison counsel's designee (Lenny Davis) attended these meetings as well. Members of the PSC—including moving Primary Counsel objectors Dan Bryson and Jerry Parker—were aware since at least October 2011 that these meetings with Mr. Garrett (and sometimes others) were occurring, *see* Herman/Levin Decl. (May 23, 2017), at ¶¶ 7–9. Indeed, *all* counsel in the case had been informed by the Court at the inception of the MDL that the Court was having monthly meetings with Mr. Garrett.[17] Yet, neither Mr. Bryson, Mr. Parker, nor any other Primary Counsel objector complained about those meetings until the filing of the instant motion.

28.   At the April 2017 Monthly Status Conference, this Court summarized PTO 28's common benefit fee review process as follows:

> In a matter of this sort, we had 1,400 lawyers in this case. I can't have 1,400 lawyers dealing with the case. It just makes it impossible to do. So I appoint committees to handle the case. The plaintiffs' committee has been handling the case, has been trying the case, has been discovering the case. So now I have to decide how much of that fee goes to the plaintiffs' committee and how much goes to the contract lawyers.

---

[17] *See*, *e.g.*, Transcript of Status Conference Proceedings, July 9, 2009, at 7:9–14 (in open court) ("In this particular matter I will in addition to the meetings of open court, this type meeting at which I will hear reports and make some decisions on where we go for the next meeting, what we do for the next meeting, I'll be meeting with the committees, liaison counsel, and whoever else I need to meet with in-between that period of time."); Transcript of Status Conference Proceedings, Mar. 22, 2012, at 4:16–20 (in open court) (The Court: "I … meet with the CPA every month, he gives me a preliminary account of who has submitted their time records and their costs and things of that nature. I review them to see whether or not anything stands out that is of concern, and then I file those under seal and we proceed accordingly.")

> After I'm finished with that, then I'll focus on how much each
> individual in the plaintiffs' committee is entitled to. I do that by
> having the reports of the plaintiffs' steering committee, by having
> the reports of the special master, and also the reports of a CPA,
> who I appoint immediately as the case begins. The individuals who
> do common benefit work have to report contemporaneously to that
> CPA how much time they put on it and what work they did for that
> particular time. I'm not interested in just a blank figure but what
> they did for that period of time.
>
> Those hours are scrubbed, so to speak. We have a paralegal who
> looks at them to make sure that they're valid. If they're not, then
> they're returned to the lawyer for another review so that they can
> take another shot at it. But the hours are legitimately done and
> looked at, and I look at them every month.
>
> So I've had the benefit of watching this case unfold throughout the
> period. With all that information, I'm able to make some rational
> decision on how much each side gets and how to distribute it.

Transcript of Monthly Status Conference dated 4/6/17 at 11:6–12:8 (attached as Exhibit P to Fee Committee's Memo of Law in Opposition to Primary Counsel's Objection to Special Master Ruling Denying Allegedly Necessary Discovery and Request for Expedited Consideration (Doc. 20748-8) (filed 04/24/17)).

### 3. Attorneys' Fees Motions

29.   Pursuant to PTO 28, the FC and the PSC filed their Consolidated Joint Petition for a Global Award of Attorneys' Fees and Reimbursement of Expenses on May 20, 2014. (Doc. 17700).  The joint petitioners sought a global fee award of $193,552,383.14, plus an amount to be determined for the L&W settlement, and reimbursement of costs of $5,547,011.68. *Id.* at 1. None of the objectors or moving Primary Counsel herein objected to the proposed fee award.[18]

30.   On May 17, 2016, this Court determined that the "global amount of funds available to compensate common benefit counsel and individually retained counsel at this time is $192,981,363.35." Order (Doc. 20257) (filed 05/17/16), at 3.   The Order explained that, "[c]onsistent with PTO 28, and, in particular, paragraph 10 of PTO 28, this Court will subsequently allocate the global fee and cost award to determine 1) the total common benefit fund and 2) the amount of funds for individual counsel for claimants." *Id.* at 3.

---

[18] Various Homebuilders filed an objection (Doc. 17727), which was later resolved by agreement of the parties (Doc. 20467), and approved by the Court (Doc. 20641).

31. On June 7, 2016, the FC filed its Motion to Determine the Allocation of The Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees. (Doc. 20293). Various other plaintiffs' counsel filed responses in opposition, as well as a motion for discovery on the fee issue. *See* Primary Counsel's Motion for a Case Management Order Providing for Discovery, the Unsealing of Records Regarding Common Benefit Fees, and the Appointment of a Special Master (Doc. 20394) (filed 07/15/16), at 1 (seeking "a Case Management Order (1) allowing Primary Counsel to conduct limited discovery pertaining to the Fee Committee's requested allocation of fees … (2) requiring the unsealing of records evidencing the allocation urged by the FC on behalf of the PSC; and (3) appointing a special master to oversee discovery and to recommend an allocation appropriate under these unique circumstances"). The FC opposed such discovery. *See* Preliminary Memo in Opposition to Primary Counsel's Motion for a Case Management Order Providing for Discovery, the Unsealing of Records Regarding Common Benefit Fees, and the Appointment of a Special Master (Doc. 20411) (filed 07/19/16), at 4.

32. Based on the discovery-related disputes, this Court appointed a special master, Daniel Balhoff, "to conduct limited discovery regarding time and expense submissions, procedures, and the relevant work of Philip [Garrett], CPA, and to make appropriate recommendations regarding these motions and objections." Order (Doc. 20410) (filed 07/19/16), at 1.

33. Special Master Balhoff granted Primary Counsel substantial discovery, including all monthly time and expense reports, lodestar charts, and held cost charts prepared by Mr. Garrett; all backup materials supporting Mr. Garrett's affidavit filed with the FC's allocation motion; and access to the shared cost ledgers and receipts in Mr. Garrett's Case Cost Management System.[19] Primary Counsel were also given permission to depose Mr. Garrett, plaintiffs' lead counsel Arnold Levin, plaintiffs' liaison counsel Russ Herman, and Sandra Duggan.[20] Nonetheless, Primary Counsel objected to the limitations imposed by the special master and sought numerous additional categories of documents, including all time entries and held cost receipts submitted to Mr. Garrett by over 500 timekeepers.[21]

---

[19] *See* FC's Memo in Opposition to Primary Counsel's Objection to Special Master Denying Allegedly Necessary Discovery and Request for Expedited Consideration (Doc. 20748) (filed 04/26/17), at 3.

[20] *Id.* at 3.

[21] *See* Response to Objections to Denial of Discovery Requests at 3–4 (summarizing seven different categories of documents sought by Primary Counsel).

14

34.  On May 31, 2017, the special master will conduct an evidentiary hearing on the fee allocation issue.  Both the FC and Primary Counsel are entitled to put on evidence, and there will be post-hearing briefing. *See generally* PTO 28 (Doc. 17379) (filed 01/10/14).  After the special master rules, Primary Counsel are free to challenge the allocation before this Court, which will conduct de novo review of the special master's recommendation. *See* FED. R. CIV. P. 53(f)(3)–(4) (district court "must decide de novo all objections to findings of fact made or recommended by a master" unless the parties stipulate otherwise, and "must decide de novo all objections to conclusions of law made or recommended by a master").  In the proceeding before this Court, Primary Counsel will again have the opportunity for briefing and oral argument.

35.  On May 9, 2017, Primary Counsel filed a Motion for Leave to File Motion to Stay the May 31, 2017 hearing before the special master, claiming that they cannot go forward with the hearing until they obtain all of the discovery that they seek. Motion for Leave to File Motion to Stay Outside of Time Limits Provided by Local Rule (Doc. 20761).  On May 12, 2017, this Court denied the motion. Order & Reasons (Doc. 20767).  In doing so, it overruled Primary Counsel's objections to the discovery limits imposed by the special master, finding that Primary Counsel "have received a substantial amount of information and accounting reports from Phil Garrett" and that "[t]hey had an opportunity to depose Mr. Garrett, as well as members of the Fee Committee." *Id.* at 3.  In the Court's view, that is "a sufficient basis from which to present their objections to the Fee Committee's recommendation." *Id.*  Moreover, the Court made clear that it will not "giv[e] extra consideration to the position of either [Primary Counsel or the FC]," and that the "the Court will review all the evidence … before issuing [an allocation] ruling …." *Id.*

**C. Motion to Disqualify Fee Committee and,** *inter alia,* **Strike Its Allocation Recommendation**

36. On April 13, 2017, moving Primary Counsel filed under seal the motion that I address in this Declaration—the Motion to Disqualify the Fee Committee, Strike its Allocation Recommendation, and Stay or Dismiss Proceedings Before the Special Master and Request for Expedited Consideration. (Doc. 20735).  In a memorandum accompanying the motion ("PC Memo"), moving Primary Counsel make three arguments: (1) that the FC has exceeded its authority by resisting Primary Counsel's efforts to conduct additional discovery on fee issues, PC Memo at 3, 22–24; (2) that the FC's fee recommendation is "tainted" by conflicts of interest, *id.*

at 3, 24–33; and (3) that certain alleged ex parte communications raise concerns "about the impartiality of this proceeding in its current posture." *Id.* at 4, 33–39.  By way of relief, moving Primary Counsel ask that the FC "be disqualified from this allocation proceeding," that the FC's "recommendation … be stricken from the record," and that "[t]he Court should then either appoint a new committee to make a recommendation or, alternatively, proceed directly to a full evidentiary hearing without a committee recommendation." *Id.* at 40.  Although this Court has not yet ruled on the motion, moving Primary Counsel filed a Petition for a Writ of Mandamus with the Fifth Circuit on May 23, 2017.

### D. Unusual Features of This Litigation

37.  Before I opine on moving Primary Counsel's April 13, 2017 motion, I wish to highlight some unusual features of this litigation.  On the one hand, this case is unusual for an MDL mass tort case in that, in contrast to many such MDLs (such as *Vioxx*), this is not a "quasi-class action," but instead is an actual Rule 23(b)(3) class action, subject to all of the protections afforded under that Rule.  On the other hand, it is unusual for a class action in that: (1) the individual claims are substantial enough for many claimants to have hired their own lawyers in the first instance; and (2) unlike many mass tort cases, general causation issues predominate, and individualized damages are easily calculated because all of the drywall at issue is defective and needs to be replaced. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2017 WL 1421627, at *15 (E.D. La. Apr. 21, 2017) (discussing why "Chinese drywall presents a truly unique dilemma, and the damages from Chinese drywall are not easily analogized to those of typical class actions").

38.  It should also be noted that the settlements here are mainly remediation settlements, as opposed to cash payments to class members.  Under the Knauf settlement agreement, class members with drywall manufactured by Knauf have been given the opportunity for a complete remediation of their properties, plus other compensation.  Other class members have been given money to compensate them (at least in part) for their damages.[22]  Thus, although the class members have received valuable relief, there is not a large pot of money because so much of the

---

[22] *See* Memo in Support of FC's Motion to Determine Allocation of Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) (Doc. 20293-1) (filed 06/07/16), at 2.

recovery was in the form of remediation.[23]  To pay attorneys' fees and costs, a separate pot of money was negotiated, and the resulting fund represents the totality of money available for both common benefit and contract attorneys' fees and costs.[24]

## V.  SUMMARY OF OPINIONS

### Threshold Points

39.   For six threshold reasons, this Court should deny moving Primary Counsel's motion. First, contrary to moving Primary Counsel's suggestion, their motion is not about protecting class members but is simply an attempt by moving Primary Counsel to secure the largest possible share of attorneys' fees.  Second, the motion is premature because the Court has not even ruled on the proper fee allocation.  Third, the motion should be denied based on principles of estoppel and waiver because moving Primary Counsel have known for years about the concerns they are raising, and thus the motion is too late.  Fourth, moving Primary Counsel have more conventional remedies, including securing discovery (which they have already done) and making their case before the special master and this Court.  Fifth, this Court has well-established legal authority for modifying contingent fee contracts.  Sixth, the fact that the FC seeks a significant portion of the fee award is not a valid basis to disqualify the FC or strike its proposed allocation.  Based on these six grounds, this Court can deny moving Primary Counsel's motion without the need to even address their three main arguments.

### Movant Primary Counsel's Arguments

40.   Moving Primary Counsel make three meritless arguments in their attempt to disqualify the FC and strike the FC's proposed allocation.   First, they erroneously argue that the FC exceeded its authority by not acquiescing in any and all discovery sought by moving Primary Counsel.   There is no legal authority requiring the FC to stand mute and agree to anything moving Primary Counsel seek, no matter how burdensome or irrelevant.   Second, moving

---

[23] *See id.* at 37–39 (describing expert valuation of remediation program in terms of value to individual class members).

[24] *See* Third Amended Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047 (Doc. 16407-3) (filed 12/11/12), at ¶ 14.1 ("Separately and in addition to any consideration received by a Participating Class Member under this Settlement, the Knauf Defendants shall pay a singular attorneys' fee (to be allocated among the PSC and common benefit counsel authorized and working at the direction of the PSC, other common benefit counsel, Settlement Class Counsel and individual retained counsel) and reasonable and appropriate costs ….").

Primary Counsel erroneously contend that there is a disabling conflict of interest on the part of the FC.  As explained in detail below, moving Primary Counsel can make all of their arguments, and submit evidence, to the special master, and then they can obtain de novo review from this Court, without any deference being given to the FC.   Third, contrary to moving Primary Counsel's contention, no improper ex parte communications occurred.  Moving Primary Counsel have long understood that the Court would be having private sessions with the CPA (and, on occasion, with lead counsel, liaison counsel, or his designee), yet they failed to object until recently.  Moreover, moving Primary Counsel concede that they cannot show actual bias or prejudice from the ex parte communications with the Court.

## VI.  DISCUSSION

41.  In section VI.A, *infra*, I discuss several threshold reasons why, in my opinion, moving Primary Counsel's motion is flawed.  In section VI.B, *infra*, I opine specifically on moving Primary Counsel's three arguments, summarized in ¶ 36, *supra*.  As I explain, moving Primary Counsel's arguments do not justify the drastic relief that they seek.

42.  Preliminarily, I wish to comment on the tone of moving Primary Counsel's memorandum in support of their motion.  That memorandum is replete with ad hominem attacks on the FC, the Court, and the court-appointed CPA.  For example, with the respect to the FC, moving Primary Counsel accuse Messrs. Herman and Levin of "us[ing] their positions … to bankroll luxuries for themselves, family, and friends," PC Memo at 14, argues that those attorneys engaged in "improprieties," *id.* at 15, asserts that the FC was perhaps "the most financially-conflicted fee committee in history," *id.* at 25, and maintains that Messrs. Herman and Levin "manipulate[d] and leverage[d] the process as they saw fit." *Id.* at 29.  With respect to the Court, moving Primary Counsel invoke the federal statute requiring disqualification of judges in certain specified circumstances (28 U.S.C. § 455), accusing the Court of setting up a procedure that "may cause a reasonable person to 'harbor doubt' about the impartiality of th[e] proceeding." PC Memo at 2.  Moving Primary Counsel further accuse the Court of entering PTO 28(B) not to extend deadlines as announced, but "[i]n fact" for the purpose of "enabl[ing] the FC to manipulate the process at the expense of Primary Counsel." PC Memo at 12.  And moving Primary Counsel lecture this Court—quoting the Court's own words—about the need to "avoid '[d]isproportionate results and inconsistent standards' that create the 'impression of inherent

unfairness,'" PC Memo at 2 (quoting Louisiana Law Review article authored by Judge Fallon). Moving Primary Counsel also accuse Mr. Garrett of being "a conduit for communications between the FC and the Court concerning the merits of the issues now before the Court …." PC Memo at 7.

43.  Moving Primary Counsel's personal attacks violate the admonishment of the late Fifth Circuit Judge Alvin B. Rubin to "[a]void sarcasm, disparagement, and ad hominem attacks—*especially on the trial judge and opposing counsel*." Alvin B. Rubin, *The Admiralty Case on Appeal in the Fifth Circuit,* 43 LA. L. REV. 869, 874 (1983) (emphasis added).  The tone of moving Primary Counsel's memorandum is especially disconcerting because moving Primary Counsel make these personal attacks not to champion the rights of others but solely to maximize their own attorneys' fees.  Nonetheless, I have endeavored to put aside the tone of moving Primary Counsel's memorandum and to focus exclusively—and objectively—on the merits of moving Primary Counsel's arguments.

## A. FOR SEVERAL THRESHOLD REASONS, MOVING PRIMARY COUNSEL'S MOTION IS FLAWED

44.  Before opining specifically on moving Primary Counsel's three arguments for seeking to disqualify the FC and to strike the FC's proposed allocation, I discuss six threshold reasons why, in my view, the extraordinary relief sought by moving Primary Counsel is unwarranted.

### 1. Moving Primary Counsel's Motion Has Nothing To Do With Protecting Class Members

45.  On the very first page of their memorandum in support of its motion, moving Primary Counsel invoke the salutary goal of ensuring that the class action device is not used to generate massive attorneys' fees while the class gets little or nothing.  Thus, moving Primary Counsel quote Professor John Coffee, who warns against a "'settlement process [that] may amount to a covert exchange of a cheap settlement for a high award of attorneys' fees.'"[25]  They quote Professor Susan Koniak, who raises concerns about "'lawyers [who] make fabulous fees for

---

[25] PC Memo at 1 n. 2 (quoting John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 COLUM. L. REV. 669, 714 (1986)).

achieving very little.'"[26]   They quote Professor Christopher Leslie, who warns about "'[s]elf-interested class counsel [who] are willing to settle on the cheap in exchange for generous attorneys' fees.'"[27]   They quote the Fifth Circuit's warning about "strike suits promoted by attorneys who are simply seeking fat fees ....'"[28]   And they invoke the Supreme Court's warning in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 (1999), that the "'potential for gigantic fees'" can jeopardize class counsel's adequate and effective representation of class members.[29] Reading these and moving Primary Counsel's other introductory cites and quotes, one would think that this is a case where common benefit counsel are seeking huge fees while class members are getting worthless relief, such as valueless coupons.[30]   Nothing could be further from the truth.

46.   Despite its introductory citations, moving Primary Counsel's motion has nothing to do with allegedly deficient relief for class members.   Nor could it, given the extraordinary remediation settlement achieved for thousands of class members.   This is the antithesis of a settlement that benefits lawyers but not class members.   Indeed, moving Primary Counsel concede the PSC's "skills [and] their excellent work toward achieving the global settlement." PC Memo at 22.   Moreover, it is important to note that moving Primary Counsel did not object to either the class settlements or the total amount of attorneys' fees at the time those amounts were approved by this Court.   In short, moving Primary Counsel's motion is simply an effort to maximize their share of the attorneys' fee award.

---

[26] *Id.* at 1 n. 1 (quoting Susan P. Koniak & George M. Cohen, *In Hell There Will Be Lawyers Without Clients or Law*, 30 HOFSTRA L. REV. 129, 145 (2001)).

[27] *Id.* (quoting Christopher R. Leslie, *De Facto Detrebling: The Rush to Settlement in Antitrust Class Action Litigation*, 50 ARIZ. L. REV. 1009, 1016 (2008)).

[28] *Id.* (quoting *In re High Sulfur Content Gas Prods. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008) (citations omitted)).

[29] *Id.*

[30] *Cf. Eubank v. Pella Corp.*, 753 F.3d 718, 725 (7th Cir. 2014) (Posner, J.) (reversing district court's approval of class settlement where, *inter alia*, "some claimants are entitled only to 'coupons' (discounts on *future* purchases of Pella windows, discounts that may be worth very little to current owners of Pella's defective windows)—a warning sign of a questionable settlement.") (emphasis in original); *In re Bluetooth Headset Prods. Liab.*, 654 F.3d 935, 947 (9th Cir. 2011) (reversing settlement approval where "indicia of possible implicit collusion" included fact that "the settlement's provision for attorneys' fees [was] apparently disproportionate to the class reward"); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 195 (5th Cir. 2010) (reversing settlement approval where there was "no demonstration on the record below that the settlement will benefit the class in any way").

20

47.   I have no quarrel with the invocation of well-grounded arguments to pursue rightful attorneys' fees; that is to be expected and is entirely proper.   All counsel involved in this case should receive reasonable fees that represent the value of their contributions to the case.   And the fact that numerous attorneys have contracts with individual clients is certainly an important fact. But the instant motion, in my opinion, seeks relief that is unprecedented and unwarranted.   Thus, while I do not disparage legitimate efforts by moving Primary Counsel to secure fair and just fees, I do quarrel with the timing of, and relief sought by, the instant motion.   I discuss those concerns below.

### 2. Moving Primary Counsel's Claim for Drastic Relief is Ill-Conceived Because the Court Has Not Even Ruled on the Allocation of Fees

48.   Moving Primary Counsel acknowledge that their motion is "drastic" but claim that the FC has "forced" the motion by *requesting* a large fee allocation for common benefit counsel. PC Memo at 2.   In my view, that argument is not well taken.   Moving Primary Counsel were not forced to file their motion, and certainly were not forced to seek extraordinary relief *now*.   As the Court explained most recently in its May 12, 2017 order refusing to stay the special master's upcoming May 31st hearing, the award of fees will occur through a multi-step process.   The Court has appointed a special master to oversee the fee dispute, including granting Primary Counsel significant discovery and overseeing Primary Counsel's depositions of lead counsel, liaison counsel, a colleague in lead counsel's office, and the Court-appointed CPA.   Once the special master conducts its evidentiary hearing on May 31, 2017, and makes its recommendation regarding the proper allocation, the final decision will rest with this Court.   Neither moving Primary Counsel nor the FC has any idea how the Court will eventually rule with respect to the FC's proposed allocation, nor what the Court's rationale will be.   The process will be transparent and rigorous, and the Court will consider all arguments.   There will be no presumption that the FC's recommendation is correct.   As this Court noted, "[n]either the Fee Committee recommendation, nor Primary Counsel's objections are entitled to more weight than the other." Order & Reasons (Doc. 20767) (filed 05/12/17), at 2.   Given this transparent, multi-step process, there is no basis for moving Primary Counsel's purported concern about an "appearance that the outcome on the merits may be a foregone conclusion." PC Memo at 34.

49.   To justify the drastic relief that they seek in their motion, moving Primary Counsel express concern that the PSC improperly negotiated an in-kind settlement in order to maximize

the PSC's fees, PC Memo at 8–9, and that certain attorneys inflated common benefit time and have claimed improper expenses. *Id.* at 9, 15–20.[31]  Common benefit counsel vigorously deny moving Primary Counsel's allegations and, indeed, have filed a motion for sanctions under FED. R. CIV. P. 11.[32]  I take no position on the merits of these contentions.  Suffice it to note that moving Primary Counsel will have a full opportunity to make and support their arguments before the special master—and, ultimately, before the Court.  My point here is that moving Primary Counsel have jumped the gun by filing an extreme motion without waiting to see what the actual allocation will be, and how the Court will justify it.

50.  Myriad authorities have rejected efforts to obtain extraordinary relief, such as disqualification, before the need for such relief is clear. *See*, *e.g.*, *In re ProEducation Int'l., Inc.*, 587 F.3d 296, 300 (5th Cir. 2009) ("Because of the severity of disqualification … this sanction must not be imposed cavalierly.") (citation and internal quotation marks omitted); *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1983) ("disqualification is a drastic measure which courts should hesitate to impose except when absolutely necessary") (citation and internal quotation marks omitted); *Bd. of Educ. of New York City v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979) (noting that "disqualification motions are often made for tactical reasons" and that "such motions inevitably cause delay").  In my view, the rationale of these authorities applies here.  Moving Primary Counsel simply have not made a case for the extraordinary relief that they seek.

51.  One additional point should be noted with respect to moving Primary Counsel's request to disqualify the FC.  Moving Primary Counsel claim that that request is *not* one of the more drastic remedies that they seek in their motion.  They note that "[g]ranting disqualification" would "avoid[] having to reach the more troublesome grounds presented by [their] motion." PC Memo at 3.  I find it inexplicable that moving Primary Counsel have so minimized the significance of their request to disqualify the entire FC, a request that in my opinion is far-reaching and unprecedented.

---

[31] Ironically, moving Primary Counsel cite myriad examples of supposedly improper time and expense charges despite their repeated assertion that they have been denied meaningful discovery and that the process here is not transparent.

[32] *See* Plaintiffs' Lead and Liaison Counsels' Memorandum in Support of Motion for Sanctions Pursuant to Rule 11 Against Jimmy R. Faircloth, Jr., Esq., Val Patrick Exnicios, Esq., Mark Milstein, Esq., and C. David Durkee, Esq. (Doc. 20759-1) (filed 05/09/17).

### 3. The Grounds for Moving Primary Counsel's Motion Have Been Known to Primary Counsel for Years, Yet They Failed to Object Until Recently

52.   As noted above, moving Primary Counsel's motion for extraordinary relief is premature because the Court has not even ruled yet on fees.   At the same time, under basic principles of waiver and estoppel, moving Primary Counsel's motion is *too late* because it relies on purported concerns that were clear to moving Primary Counsel for several years.   Thus, moving Primary Counsel take issue with the composition of the FC, asserting that "the interest of Primary Counsel [in attorneys' fees] is woefully under-represented on the FC."  PC Memo at 7.   Yet, moving Primary Counsel have been aware of the identities of the FC's members for more than three years.[33]   Moving Primary Counsel did not object back in 2014.   Nor did moving Primary Counsel object more generally to the basic concept of a fee committee, even though it was obvious back in 2014 that the FC was created to perform a representative function.   Indeed, even now, moving Primary Counsel concede that "[n]o doubt the FC was authorized to file the Allocation Motion and to respond to and oppose objections to its recommended allocation."  PC Memo at 23.   Moreover, moving Primary Counsel did not object to the entry of PTO 28, 28(B), and 28(F), although they now claim that the procedures imposed by those orders were inherently unfair on their face.[34]

53.   Finally, moving Primary Counsel have known for years that the Court was having monthly meetings with Mr. Garrett and various counsel.  *See*, *e.g.*, Transcript of Status Conference Proceedings, July 9, 2009, at 7:9–14 (quoted in ¶ 27 n. 17, *supra*); Transcript of Status Conference Proceedings, Mar. 22, 2012, at 4:16–20 (quoted in ¶ 27 n. 17, *supra*); Herman/Levin Decl. (May 23, 2017), at ¶¶ 7–9.   Yet again, moving Primary Counsel made no timely objection to those meetings, even though they now say that such meetings constituted improper ex parte communications that necessitate extraordinary relief.   In short, moving

---

[33] *See* PTO 28 (Doc. 17379) (filed 01/10/14), at 14–15 (appointing FC members); *see also id.* at 15 n. 10 ("These individuals have been involved since the beginning of the Chinese Drywall litigation and have performed significant roles in either or both the MDL and State Court litigation and are familiar with the work performed by common benefit counsel in all Chinese Drywall matters.").

[34] *See* PC Memo at 12 (arguing that "PTO 28(B) fundamentally changed the nature of the proposed fee petition and altered the timing the direction of the fee allocation process" by "expand[ing] the role of the FC from court advisor on common benefit allocations to court advisor on *all* fee allocations") (emphasis in original); *id.* at 13–14 (arguing that "[w]hereas PTO 28(B) laid the foundation for putting the FC in charge of recommending an allocation of fees for *both* stakeholder groups, PTO 28(F) made it official") (emphasis in original).

Primary Counsel's entire presentation involves complaints about a structure and process that they have known about, and acquiesced in, for years.

54.   Moving Primary Counsel's unexplained delay in challenging the FC structure, FC membership, and the Court's monthly meetings is itself a strong reason to deny the extraordinary relief that moving Primary Counsel request.   As the Eighth Circuit has noted: "A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion." *Central Milk Producers Co-op. v. Sentry Food Stores*, 573 F.2d 988, 992 (8th Cir. 1978).   Or as the district court recently noted in the *General Motors LLC Ignition Switch Litigation*, "orderly litigation depends on lawyers raising issues and problems in a timely fashion; a failure to do so not only prevents a court from nipping problems in the bud, but also casts doubt on whether the alleged problems were in fact so problematic." No. 1:14-md-02543-JMF (Doc. 2763), at 12 (S.D.N.Y. Apr. 12, 2016).[35]   Here, moving Primary Counsel's delay, by itself, warrants denial of their motion.

### 4.   Established Procedures Exist for Moving Primary Counsel to Seek Relief

55.   To protect their interests, moving Primary Counsel do not need to seek disqualification of the FC or an order striking the FC's proposed allocation.   Their motion is overkill.   Moving Primary Counsel have more conventional—and less drastic—ways to protect their interests.

56.   First, moving Primary Counsel have already pursued and obtained substantial discovery. *See generally In re Nineteen Appeals arising out of the San Juan Dupont Plaza Hotel Fire Litigation*, 982 F.2d 603, 614 (1st Cir. 1992) (in challenging a fee allocation, attorneys have "a wide range of procedures available," including taking discovery).   Although "district courts generally decide fee awards without full-blown discovery," *In re Prudential Ins. Co. America Sales Litigation*, 148 F.3d 283, 342 (3d Cir. 1998), moving Primary Counsel have obtained a massive amount of discovery.   As noted in ¶ 33, *supra*, such discovery included all monthly time and expense reports, lodestar charts, and held cost charts prepared by Mr. Garrett, all backup

---

[35] *Accord*, *e.g.*, *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 871 (8th Cir. 2014) (finding that challenge to MDL settlement agreement was waived when the attorney who sought to challenge it had agreed to be bound by its terms by submitting claims pursuant to the agreement); *In re Factor VIII or IX Concen. Blood Prod. Litig.*, 159 F.3d 1016, 1020 (7th Cir. 1998) (finding attorneys had waived their right to seek additional fees where, "[h]aving participated in the settlement proceeding and having failed to make timely objection to it, they are barred by the principles of waiver and equitable estoppel from challenging the settlement after it has become final and the defendants have paid and the class members have received hundreds of millions of dollars") (citation omitted).

materials supporting Mr. Garrett's affidavit filed with the FC's allocation motion, and access to the shared cost ledgers and receipts in Mr. Garrett's Case Cost Management System, as well as depositions of three attorneys (lead counsel, liaison counsel, and a colleague in lead counsel's office) and the Court-appointed CPA.  The deposition testimony alone totals more than 1,500 transcript pages.

57.   Second, the Court has devised a transparent, multi-step process for moving Primary Counsel (and those Primary Counsel fee objectors who have not joined in the motion) to defend their contract-based percentages and to challenge the FC's proposed allocation.  As noted in ¶ 34, *supra*, moving Primary Counsel will have a full opportunity on May 31, 2017, to make their case to the special master, and to build a record for this Court.  Moving Primary Counsel will be entitled to put on evidence at the May 31 hearing; they can submit briefs and present oral argument to the special master; and (in their evidence and arguments) they can attack the evidence and arguments made by the FC.  They can then pursue a similar strategy in the de novo review of the special master's recommendation that this Court intends to conduct—either defending or challenging the special master's recommendations.

58.   These approaches, in my view, are far more appropriate than moving Primary Counsel's pursuit of the extreme and unnecessary remedies of disqualifying the entire FC and striking the FC's proposed allocation.

### 5. This Court Has Authority to Modify Contingent Fee Contracts

59.   Moving Primary Counsel's motion appears to be based on the belief that individual fee contracts are somehow sacrosanct, and that common benefit awards must give way to ensuring that private fee agreements are enforced in full—without regard to what private counsel did in a particular case.  Thus, for example, in an October 7, 2016 letter to Special Master Balhoff, Primary Counsel expressed their concern that contract counsel "will be deprived of attorneys' fees, a constitutionally protected interest, for the sake of common benefit counsel." *Id*. at 2 (footnote omitted).  And Primary Counsel noted that contract counsel have "a contractual right to attorneys' fees by virtue of their client contracts," whereas "common benefit counsel seek compensation based on a *quantum meruit* principle." *Id*. at 3.  In essence, Primary Counsel take the position that contingent fee agreements are legally protected and should always take priority

over common benefit fees.  In my opinion, however, the allocation issues must be decided based on the precise facts at issue.

60.  To illustrate, assume two scenarios.  In one, lawyers sign up hundreds of clients with a 40% contingent fee and thereafter do extensive work investigating the claims, marshaling evidence, and the like.   In the other, lawyers sign up hundreds of clients with the same contractual arrangement as in the first scenario but thereafter do no work at all; the clients recover only because of the efforts of common benefit counsel.  No one could reasonably argue that the individually retained lawyers in the two scenarios should receive the same percentage of recovery.  And in neither situation would it be fair to charge the individual claimants more than the 40% of their recovery to pay attorneys' fees.  As one court has stated, the supervisory power of a federal court "includes the power to determine … that the amount of the fee is not unfair or excessive under the circumstances of the case."[36]

61.  Consistent with this common sense approach, numerous courts have recognized their authority to modify contingent fee contracts as circumstances warrant.[37]  This practice has been adopted in a number of MDLs,[38] and a court's power to limit contingent fees is at its zenith in a class action, given that the court has precise authority under Federal Rule of Civil Procedure

---

[36] *In re Zyprexa Prods Liab. Litig.*, 424 F. Supp. 2d 488, 492 (E.D.N.Y. 2006) (Weinstein, J.) (citation omitted).

[37] *See, e.g., In re Vioxx Prods Liab. Litig.*, 760 F. Supp. 2d 640, 648 n. 15 (E.D. La. 2010) (noting "the Court's equitable and managerial authority and duty to award fair common benefit fees or to adjust contingent fees exists independent of contractual agreement"); *In re Zyprexa Prods Liab. Litig.*, 424 F. Supp. 2d 488, 493 (E.D.N.Y. 2006) ("While the plaintiffs' attorneys … are highly skilled and have achieved an exceptional result for their clients, there is a danger that adherence to any previously negotiated contingency fee contracts might result in excessive fees...."); *In re World Trade Center Disaster Site Litig.*, 754 F.3d 114, 125 (2d Cir. 2014) ("Federal courts have supervisory power over attorneys' fee arrangements.") (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 240 (2d Cir. 1987)).

[38] *See, e.g., In re Vioxx Prods Liab. Litig.*, 760 F. Supp. 2d 640, 648 n. 15 (E.D. La. 2010); *In re Zyprexa Prods Liab. Litig.*, 424 F. Supp. 2d 488, 493 (E.D.N.Y. 2006) (modifying contingent fees to account for the "risk of excessive fees" where law firms "all benefitted from the effectiveness of coordinated discovery carried out in conjunction with the plaintiffs' steering committee and from other economies of scale, suggesting a need for reconsideration of fee arrangements that may have been fair when the individual litigations were commenced"); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708 (DWF/AJB), 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008) (modifying contingent fees where, "[b]ecause of the mass nature of this MDL, the fact that several firms/attorneys benefited from economies of scale, and the fact that many did or should have benefited in different degrees from the coordinated discovery, motion practice, and/or global settlement negotiations, there is a high likelihood that the previously negotiated contingency fee contracts would result in excessive fees") (citation omitted), *aff'd in relevant part*, 2008 WL 3896006 (D. Minn. Aug. 21, 2008); WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 15.115 (5th ed. 2016) (MDL court may set a cap on individual counsel's contingency fees, because "[w]ith the individual client effectively responsible for paying both her own lawyer and the PSC, the cap operates to ensure that the client is not doubly taxed").

23(h) and the case law to set fees.[39]  Thus, to the extent that moving Primary Counsel's motion is premised on the view that any modification of contingent fees is impermissible *in any case*, that view is legally flawed.  If, instead, moving Primary Counsel believe that *in this case* the contingent fee percentages should not be modified, they will have a full opportunity to press those arguments and marshal the relevant facts, as explained above.

### 6.  The Fact that the Proposed Allocation Urges that a Significant Portion of the Award Should Go to Common Benefit Counsel Provides No Basis for Disqualifying the FC or Striking the Proposed Allocation

62.  The allocation proposed by the FC would divide the $192,981,363.35 global fee award as follows: $114,581,308.82 (59.37%) to common benefit counsel, and $78,400,054.53 (40.63%) to individually retained counsel.  Moving Primary Counsel complain that, in seeking an approximately 60% allocation for common benefit counsel, the FC has "request[ed] the largest percentage benefit common benefit allocation in history …." PC Memo at 2.

63.  Moving Primary Counsel are complaining only about a fee committee *request*, not an actual ruling.  They cite no case in which a *request* for a particular allocation provides a basis for the extreme relief that they seek.  As noted, all Primary Counsel will have a full and fair opportunity to challenge the requested allocation and propose their own alternative.

64.  In any event, moving Primary Counsel's claim that the common benefit request is the largest "in history" is exaggerated.  There are a number of cases in which counsel have requested (and courts have awarded) very large percentages to common benefit counsel.  For instance, in *Evans v. TIN, Inc.*, 2013 WL 4501061 (E.D. La. Aug. 21, 2013), the court awarded $3.495 million for common benefit counsel, $1.8 million for individual counsel, and $9 million for claimants—a split of approximately 66.67% to 33.33% in favor of common benefit counsel.  The court found that "privately retained attorney's fees should be limited to 20% of any individual claimant's recovery." *Id.* at *15.  It explained:

> First, after considering the *Johnson* factors, a 20% contingency fee represents a reasonable fee for the services provided by the

---

[39] *See* FED. R. CIV. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."); *In re High Sulfur Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008) ("In a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel.") (citations omitted).

> privately retained lawyers, especially when compared to the nature
> and value of the common benefit work performed in his case.
> Second, allowing privately retained attorneys to recover up to 20%
> of the $9,000,000 dedicated to the claimants will ensure that the
> overall amount of attorney's fees awarded in the case is no more
> than 39.22% of the $13,500,000 settlement, which is the maximum
> amount of attorney's fees the Court finds would be reasonable in
> this case. Finally, the Court agrees with the special master that
> counsel should have an opportunity to request an exception from
> the limitation based on extraordinary circumstances.

*Id.* (footnotes omitted). Similarly, in *In re Thirteen Appeals arising out of the San Juan Dupont Plaza Hotel Fire Litigation*, 56 F.3d 295 (1st Cir. 1995), common benefit counsel requested— and the district court granted—a 70% allocation for common benefit fees. Although the First Circuit reduced that percentage, it still awarded common benefit counsel 50%, *id.* at 312, and it nowhere suggested that common benefit counsel had engaged in unethical conduct in making their recommendation.[40]

65. Importantly, the FC maintains—with considerable force—that this case involved unusually difficult challenges for common benefit counsel, including: (1) the pursuit of discovery at a time when plaintiffs did not even know the identities of the defendant manufacturers or the many others who were potentially liable; (2) intensive research on potential claims and defenses, including difficult issues of personal jurisdiction, alter ego theories, piercing the corporate veil, service on foreign defendants under the Hague Convention, and market share liability; (3) extensive research and development of scientific and other expert testimony; (4) preparation for, and the conduct of, three bellwether trials (two bench trials and one jury trial); and (5) complicated negotiations with more than 1,000 defendants to produce nine interrelated settlements worth a combined $1.1 billion.[41]  Moving Primary Counsel, of

---

[40] *Accord, e.g., In re Bayou Sorrel Class Action*, No. 6:04CV1101, 2006 WL 3230771, at *6 (W.D. La. Oct. 31, 2006) (in class action settlement, court awarded 36% of the common fund "for all plaintiff's attorneys, 50% of which is to be distributed to the PSC for the common benefit work and 50% to the various private attorneys representing individual plaintiffs in an amount corresponding to the plaintiffs that each private attorney represents, as determined by the Special Master."); *In re Educational Testing Service*, 555 F. Supp. 2d 661, 664, 671 (E.D. La. 2007) (granting fee committee's proposed 50/50 split between common benefit and privately retained counsel); *In re FEMA Trailer Formaldehyde Prods Liab. Litig.*, MDL No. 07-1873, 2013 WL 1867117, at *1 (E.D. La. May 2, 2014) (Doc. 26047) (approving 50/50 split between common benefit and privately retained counsel).

[41] *See* Memo in Support of FC's Motion to Determine the Allocation of the Global Fee Award as between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) (Doc. 20293-1) (filed 06/07/16), at 17–52 (analyzing *Johnson* factors).

course, will have the chance to convince this Court that the FC has exaggerated the achievements of common benefit counsel.[42]   Because moving Primary Counsel will have a full and fair opportunity to make their arguments—and attempt to refute those by the FC—there is no need for the extreme relief that moving Primary Counsel seek in their motion.

### B. MOVING PRIMARY COUNSEL'S THREE OVERARCHING ARGUMENTS ARE MERITLESS

66.   The threshold points I discuss in Part A, *supra*, are more than sufficient for the Court to summarily deny moving Primary Counsel's motion.   Wholly apart from those points, however, moving Primary Counsel's three specific arguments are meritless.   Indeed, the lack of merit in those three arguments may explain why a majority of Primary Counsel fee objectors have not joined the movants' motion.

### 1. The FC Did Not Exceed Its Appointed Authority

67.   Moving Primary Counsel's first argument is that the FC should be disqualified because it "exceed[ed] its appointed authority." PC Memo at 22 (initial capitalization omitted).   In particular, moving Primary Counsel protest the fact that the FC "aggressively oppos[ed] production of evidence to challenge its recommendation." PC Memo at 23.   Moving Primary Counsel appear to contend that if the FC opposes *any* discovery, its appointment should be invalidated.

68.   In my opinion, moving Primary Counsel's argument is utterly implausible.   Read literally, it would require the FC to acquiesce in *any and all* discovery requests with respect to attorneys' fees, regardless of how burdensome or irrelevant such discovery is to the issues before the Court.   The whole purpose of the Federal Rules of Civil Procedure is to "secure the *just, speedy, and inexpensive* determination of every action and proceeding." FED. R. CIV. P. 1 (emphasis added).   Yet, moving Primary Counsel claim that the FC must remain mute even if moving Primary Counsel seek unjust, protracted, and expensive discovery.   Not surprisingly, moving Primary Counsel cite nothing to support that illogical position.   Certainly, there is

---

[42] Thus, moving Primary Counsel argue in their memorandum in support of their motion that the Knauf claims and many others were "from the outset … ripe for settlement," and that Messrs. Herman and Levin "appear to have used their appointment authority to prolong and manipulate the process to support an inflated common benefit allocation …." PC Memo at 8.   Hindsight, of course, is 20/20.   It will be up to the Court to decide, in awarding fees, whether the settlements were true accomplishments or whether, as moving Primary Counsel suggest, the settlements were so easy to negotiate that any attorney of marginal ability could have negotiated them.

nothing in PTO 28 (or any other ruling in this MDL) to suggest that the FC must remain passive even if it believes that moving Primary Counsel are seeking inappropriate and burdensome discovery.  To the contrary, the Court's process for awarding attorneys' fees envisions that the FC will play an active role, not one that requires it to simply rubber stamp whatever moving Primary Counsel want.

69.   This case illustrates the flaw in moving Primary Counsel's view.  Moving Primary Counsel have requested essentially every piece of paper involving the time recorded by more than 500 timekeepers—potentially millions of pages.  I am advised by the FC that, before any such production can occur, every piece of paper would have to be reviewed for possible confidentiality and redaction.  Moreover, it is unclear *why* moving Primary Counsel need all of this discovery.  As this Court noted in its May 12, 2017 Order, moving Primary Counsel have already received massive discovery, including several depositions, as described in ¶ 33, *supra*. The notion that the FC should be *disqualified* for raising an objection to this massive additional discovery sought by moving Primary Counsel makes no sense.

70.   Indeed, as the FC argues, moving Primary Counsel's claim that they genuinely need the millions of additional documents that they seek is undermined by the fact that the common benefit award is being sought based on a percentage of the fund, with a lodestar used only as a cross-check.[43]   Moving Primary Counsel cite virtually no authority requiring the review and analysis of every time record where the calculation is done pursuant to the percentage-of-the-fund method.  To the contrary, many courts have cited the lack of need to review detailed time records as a major benefit of the percentage-of-the-fund approach over the lodestar method.[44]

---

[43] *See* FC's Memo of Law in Opposition to PC's Objection to Special Master Ruling Denying Allegedly Necessary Discovery and Request for Expedited Consideration, (Doc. 20748) (filed 04/24/17), at 16–20.

[44] *See, e.g.*, *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269–70 (D.C. Cir. 1993) ("The lodestar method makes considerable demands upon judicial resources since it can be exceptionally difficult for a court to review attorney billing information over the life of a complex litigation and make a determination about whether the time devoted to the litigation was necessary or reasonable. … It is much easier to calculate a percentage-of-the-fund fee than to review hourly billing practices over a long, complex litigation."); *In re Copley Pharmaceutical, Inc.*, 1 F. Supp. 2d 1407, 1411 (D. Wyo. 1998) ("When using the lodestar method, a judge must review the voluminous time records of a multitude of attorneys in order to determine the necessity and reasonableness of every hour expended," making for a "tedious and time consuming" inquiry); Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 246 (1985) (a major disadvantage of the lodestar method is that it "increases the workload of an already overtaxed judicial system" and renders "the fee-setting process … more costly in terms of the time and effort expended on it" due to, *inter alia*, "[t]he increased documentation demanded").

71.   The special master has already refused to order the broad discovery that moving Primary Counsel have sought,[45] and this Court recently entered an order affirming the special master's ruling.[46]   Those rulings vindicate the FC's decision to resist such discovery, and thus they completely refute moving Primary Counsel's argument that the FC's objection to such discovery requires the entire FC's disqualification.

### 2. Moving Primary Counsel's Conflict of Interest Arguments are Meritless

72.   Moving Primary Counsel make a host of arguments in support of their overarching contention that the FC suffers from a disabling conflict of interest.   In my opinion, those arguments are all meritless.

### a. Reliance on *Amchem* and Similar Cases as Support for the Purported Structural Conflicts

73.   Moving Primary Counsel argue that *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and similar cases involving adequacy of representation under Rule 23(a)(4), demonstrate that the fee committee structure is fatally flawed and suffers from a disabling conflict of interest. PC Memo at 24, 26–28.   *Amchem*, however, is inapposite, as are the other cases that moving Primary Counsel cite on pages 26–28 of their memo.   Those cases involved adequacy of representation issues in the representation of *class members*.   Here, there is no complaint about class member representation; moving Primary Counsel's sole argument is about *their own fees.*

74.   Moreover, even as a loose analogy, that case law is not on point.   Contrary to the impression one might have from reading moving Primary Counsel's brief, Primary Counsel and the FC are not two clearly defined, separate groups—with the FC pursuing only common benefit fees and Primary Counsel pursuing only their contractual fees.   Numerous FC members have individual clients.   I am advised by the PSC that the members of the FC have a total of *1,955* individual clients, *see* ¶ 25 & n. 15, *supra*, about four times higher than the 500 clients that moving Primary Counsel allege. *See* PC Memo at 6–7.   At the same time, numerous Primary Counsel have requested common benefit time.   I am advised by the FC that *eleven* of the 23 law firms that make up Primary Counsel are also common benefit fee applicants.   It is thus not

---

[45] *See* Special Master's Ruling Concerning Objectors' Oct. 7, 2016 Request to Modify Special Master Case Management Order No. 1 (Doc. 20533) (filed 11/03/16), at 13–17.

[46] *See* Order and Reasons (Doc. 20767) (filed 05/12/17) (denying Primary Counsel's motion for leave to file motion to stay May 31, 2017 evidentiary hearing before special master).

accurate to claim that there is a square conflict between common benefit attorneys on the one hand and private contract attorneys on the other.  Both the FC and Primary Counsel include, in significant numbers, both categories of attorneys. [47]

### b.   Argument that a Fee Committee, By Its Very Nature, Creates an Inherent Conflict

75.   Moving Primary Counsel's motion reflects great skepticism about fee committees in general.[48]  In moving Primary Counsel's view, "[a]ll members of the FC" have a conflict. PC Memo at 24.  Yet, as this Court is well aware, and as numerous courts and commentators have indicated, fee committees and similar bodies are relatively common in complex litigation and serve an important function.[49]

76.   For example, in *In re Copley Pharmaceutical, Inc.*, 50 F. Supp. 2d 1141, 1148 (D. Wyo. 1999), the district court utilized a fee committee structure.  As the Fifth Circuit noted in *High Sulfur*, *Copley Pharmaceutical* has become "a helpful model for other district courts." *In re High Sulfur Gulf Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 233 (5th Cir. 2008).  As the Fifth Circuit explained:

---

[47] *Cf. In re Deepwater Horizon*, 910 F. Supp. 2d 891, 919–20 (E.D. La. 2012) (finding subclasses "neither useful, necessary, nor appropriate," particularly "where many class members would fall into multiple different subclasses") (citations omitted).

[48] *See*, *e.g.*, PC Memo at 23 ("the recommendation of a self-interested fee committee is of limited value, if any, and that courts should rely [on it] with suspicion").

[49] *See*, *e.g.*, *In re High Sulfur Gulf Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008) ("In this circuit, a district court can in its discretion appoint a committee of plaintiffs' counsel to recommend how to divide up an aggregate fee award.") (citation omitted); *In re Diet Drugs*, MDL No. 1203, No. 99-20593, 2002 WL 32154197, at *22 (E.D. Pa. Oct. 3, 2002) ("There is ample authority for a court making an award of attorneys' fees out of a common fund to permit lead counsel to allocate fees among all counsel entitled to share in the award.") (collecting cases), *as modified by* 2003 WL 22218322 (May 15, 2003), *judgment entered by* 2008 WL 2890878 (July 21, 2008), *aff'd*, 582 F.3d 524 (3d Cir. 2009); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708 (DWF/AJB), 2008 WL 682174, at *16 (D. Minn. Mar. 7, 2008) (creating "Common Benefit Attorney Fee and Cost Committee," which was composed "of lead counsel and others representing certain categories of objectors and non-objectors, to allocate fees among all counsel entitled to share in the common benefit fund") (citations omitted); Hon. Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371, 387–89 (2014) (describing fee allocation processes in *Vioxx* litigation, including appointment of fee allocation committee); *id.* at 387 ("It is helpful for the transferee court to get input from the plaintiffs' attorneys who occupied leadership roles, those who actually did the work both in the MDL and the state courts, and a third party, someone outside of this group, who can bring an objective perspective to the issue."); WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 15.115 (5th ed. 2016) (in common benefit cases, "[o]ften, the PSC (or a fee-focused subcommittee, sometimes called 'common benefit fee committee' or 'fee application committee') self-orders the allocation (or at least the proportional allocation) of the available fees amongst all counsel—PSC, local, and otherwise—who performed common benefit work") (footnote omitted).

> *Copley* was a class action in which the district court appointed a fee committee to recommend the allocation of a lump-sum fee award. After a contested hearing at which the court approved the fee committee's proposal, several attorneys objected to their awards. In response to the objections the court held a de novo hearing, received motions, and reviewed time and expense statements and other materials. The court did not limit its review to the fee awards and contributions of the objectors. Instead, it reviewed the entire fee allocation and all attorneys' contributions. Because its order approving the fee allocation had been brief, the court wrote a detailed decision explaining its review of the fee allocation and why it concluded the allocation was correct. The court's decision applied the *Johnson* [*v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974)] factors. It also set forth findings and reasons explaining its allocations to lead counsel, who ran the fee committee and received the largest awards, and the objectors.

517 F.3d at 233 (footnotes omitted). Clearly, *High Sulfur* refutes moving Primary Counsel's view that a fee committee, by its very nature, creates a disabling conflict.

77. In a case like the instant MDL, with thousands of participating attorneys, it would be highly impractical for all of the attorneys to appear monthly before the Court to discuss common benefit attorney hours and expenses. Indeed, if that were required, scheduling conflicts would be insurmountable, and the monthly meetings would have to be conducted at the New Orleans Morial Convention Center or a similarly large venue. A fee committee structure assures efficiency, while still leaving to the Court the role of making all decisions relating to the amount and allocation of fees. *See* ¶ 48, *supra*. Indeed, despite their complaint about the concept of a fee committee, moving Primary Counsel urge the Court (after disqualifying the FC and striking its recommendation) to "either *appoint a new committee* to make a recommendation, or, alternatively, proceed directly to a full evidentiary hearing without a committee recommendation." PC Memo at 40 (emphasis added). Obviously, moving Primary Counsel themselves concede the value of a fee committee, notwithstanding their protestations to the contrary.

78. To be sure, whenever a small group of lawyers makes a fee recommendation that impacts myriad other lawyers, there is some inherent conflict. As Judge Ambro has noted, fee committee "counsel have inherent conflicts. They make recommendations on their own fees and thus have a financial interest in the outcome." *In re Diet Drugs Prods. Liab.*, 401 F.3d 143, 173

(3d Cir. 2005) (Ambro, J., concurring).  But the issue, as Judge Ambro explained, is "how much deference" counsel receive. *Id.*  Or, as the Fifth Circuit noted in *High Sulfur*, "[i]t is the court's procedure, not those employed by counsel, which is relevant." 517 F.3d at 233 n. 19.

79.  Here, the Court has structured the process so that all arguments will be considered, with the special master making a recommendation and the Court making the ultimate decision. *See* ¶¶ 34–35, *supra*.  Thus, focusing on Judge Ambro's (and *High Sulfur*'s) inquiry, here the Court has made clear that *it* is in control and that *no deference* will be given to the FC's recommendation. Accordingly, there is no *disabling* conflict of interest.

### c. Argument that the Purported Conflicts Raise Due Process Concerns

80.  Moving Primary Counsel argue that the FC's conduct—in particular, the FC's allocation proposal—has denied them due process and fundamental fairness. *See* PC Memo at 4, 25–26, 33. I disagree.  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citations omitted).  "The Due Process Clause does not require freewheeling adversarial discovery as standard equipment in fee contests." *In re Thirteen Appeals arising out of the San Juan Dupont Plaza Hotel Fire Litigation*, 56 F.3d 295, 303 (1st Cir. 1995) (citation omitted). Here, as explained above, *see* ¶¶ 34–35, *supra*, moving Primary Counsel will have the right to be heard by the special master and this Court, with the opportunity to put on evidence and make all of their arguments orally and in writing.  These procedures, in my view, fully comport with due process.

### d. Argument that the FC's Valuation of the Settlement Demonstrates a Fatal Conflict

81.  Moving Primary Counsel complain that the FC's valuation of the settlements is itself proof of a fatal conflict of interest.  According to moving Primary Counsel, the FC's methodology was based on $1.1 billion in benefits when, in moving Primary Counsel's view, the benefits were only about $658 million. PC Memo at 28–29.  That erroneous valuation, according to moving Primary Counsel, was designed to inflate common benefit fees. *Id.*  Moving Primary Counsel complain in particular about the inclusion of separately paid attorneys' fees in considering the total value of the settlement, as well as about not taking into account economies of scale in devising a remedy.

82.  In the first place, I believe that this argument comes far too late.  In the settlement approval process, class counsel argued that the value of the settlement was $1.1 billion,[50] and moving Primary Counsel did not object at that time to the $1.1 billion figure.  It is thus unpersuasive—and too late—for them to object now.  Moreover, moving Primary Counsel fail to acknowledge that this Court itself has frequently noted that the Chinese-manufactured drywall settlements are worth more than a billion dollars. *See* ¶ 21 n. 14, *supra*.  At no time prior to the filing of the FC's Allocation Motion did moving Primary Counsel advise the Court that its understanding of the settlements' value was erroneous.

83.  Moreover, the FC has offered strong justifications in response to moving Primary Counsel's challenges to the $1.1 billion figure.  As the FC argues,[51] there is ample authority for the proposition that separately paid attorneys' fees should be recognized as a benefit to the class, because otherwise class members would have to pay fees out of their own recovery. [52] And with respect to the economies of scale point, the FC takes the position that it is reasonable to base the settlement on the cost of each individual's remediation if done separately, because that is the value of the relief to *that person*. *See* Memo in Support of FC's Motion to Determine Allocation of Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) (Doc. 20293-1) (filed 06/07/16), at 37–39 (discussing formula used in *Germano* and *Hernandez* bellwether trials and in Knauf settlement).

84.  In all events, in the context of this disqualification motion, there is no need to determine the correct valuation of the settlement.  The important point is that moving Primary Counsel can make all of their arguments about the value of the settlement to the special master and the Court.

---

[50] *See* Memo of Law in Support of Consolidated Joint Fee Petition (Doc. 17700-1) (filed 05/20/14), at 1.

[51] Memo in Support of FC's Motion to Determine Allocation of Global Fee Award as Between Common Benefit Fees and Individual Counsel's Fees Pursuant to PTO 28(F) (Doc. 20293-1) (filed 06/07/16), at 41–42.

[52] *See, e.g., Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 845 (E.D. La. 2007) (fact that fees would be paid separately from class recovery, and that fee amount was left to the court's discretion, was "significant because it exponentially decreases the possibility of collusion among counsel"); *In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, Civ. No. 04-5184-GEB, 2007 WL 1652303, at *4 (D.N.J. June 5, 2007) (noting that the fact that defendants had agreed to pay attorneys' fees separately from the class relief weighed in favor of approving fee award); *aff'd* 579 F.3d 241 (3d Cir. 2009); *In re Deepwater Horizon*, 910 F. Supp. 2d 891, 933–34 (E.D. La. 2012) ("[Defendant] has also agreed not to oppose a significant award of common benefit attorneys' fees and costs, effectively sparing the class from having to pay for common-benefit fees and expenses."), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).

The fact that the FC has *argued* that the settlement has a $1.1 billion value is not a reason to disqualify the FC or strike its recommendation.

### e.  Arguments Relating to the Assignment of Common Benefit Work and the Reporting of Common Benefit Time

85.  Moving Primary Counsel complain about the lack of formality in the assignment of common benefit tasks and the reporting of common benefit time. PC Memo at 14–20.  Such conduct, according to moving Primary Counsel, warrants disqualification of the FC and the striking of its allocation recommendation. *Id*. at 22.  I am not persuaded.

86.  First, moving Primary Counsel take issue with the fact that Messrs. Levin and Herman gave out assignments without specific work orders. PC Memo at 29–30 & nn. 82–83.  In the context of complex multidistrict litigation, however, this practice would seem to be entirely appropriate: work assignments are constantly being handed out, and it would seem reasonable to do so by phone, in meetings, via notes, emails, and the like.[53]  In any case, moving Primary Counsel's complaint about the allocation of assignments, even if plausible, does not warrant the extreme relief that they seek.  They can raise their concerns in contesting the FC's allocation recommendation.

87.  Second, moving Primary Counsel complain about "the failure to segregate common benefit time and costs devoted to claims against the settling Knauf defendants from time and costs devoted to the continuing pursuit of Taishan." PC Memo at 30.  But the fact that tasks are overlapping does not prevent the recovery of fees.[54]  Here, the FC argues that it would be

---

[53] Moving Primary Counsel also complain about the involvement of Leonard Davis, who is not liaison counsel but is a partner at Herman Herman & Katz, LLC.  But I know of no requirement that liaison counsel do everything personally.  It would seem perfectly reasonable for liaison counsel to assign out tasks within his firm.  Moreover, Mr. Davis was appointed by the Court to serve as Assistant Secretary to the FC, *see* Pre-Trial Order No. 28(D) (Doc. 17832) (filed 07/09/14), and according to Mr. Garrett, the Court was aware of Mr. Davis's involvement in monitoring and vetting common benefit time and expenses, s*ee* Garrett Dep. 65:22–66:3.

[54] *See*, *e.g.*, *In re Diet Drugs*, 582 F.3d 524, 539 n. 32 (3d Cir. 2009) (rejecting argument that district court erred in "finalizing the [fee] award without requiring Class Counsel to specify how many hours and which expenses were related to each aspect of their common benefit work"); *id*. at 541 n. 35 (finding that "neither law nor logic required the District Court to consider the division of counsel's labor while determining the appropriate percentage of recovery" when using the percentage method with a lodestar cross-check and applying the Third Circuit's version of the *Johnson* factors); Declaration of Professor Brian Fitzpatrick in *In re Deepwater Horizon*, No. 2:10-md-02179-CJB-JCW (Doc. 21098-3) (filed 07/21/16), at 10 ("In this case, I believe the settlement can be reliably valued and therefore the percentage method should be used. In fact, I do not believe it is even possible to use the lodestar method here because it is impossible for class counsel to disaggregate the time they have spent on behalf of the classes here from the time they have spent on behalf of the other plaintiffs in this MDL.").

impossible to determine how much time was spent on Knauf work versus Taishan work because the issues are inter-related, and counsel were never ordered to segregate their time in that fashion. *See* Letter from Arnold Levin & Russ Herman, Fee Committee, to Special Master Daniel J. Balhoff (Oct. 13, 2016), at 10–13.   Additionally, the FC argues that many class members have "mixed" properties, with Chinese-manufactured drywall from both Knauf and Taishan entities. *See id.* at 11.   And the FC argues that, due to the interrelated nature of the class settlements, a great many class members stood to benefit from multiple settlements. *Id.* at 11.   As such, they argue, it would make little sense (if indeed it would even be possible) for this Court to require that common benefit hours be strictly segregated. *Id.* at 10–11.   For purposes of this motion, there is no need to decide if the FC's arguments are correct.   They are, at the very least, plausible.   To the extent that moving Primary Counsel disagree, they can make their arguments in challenging the proposed allocation.   But the fact that there is a dispute between the FC and moving Primary Counsel with respect to the calculation of common benefit time does not mean that the FC should be disqualified or that its recommended allocation should be stricken.

### f.   Argument that the FC Members Owed a Fiduciary Duty to Primary Counsel and Violated that Duty

88.   Moving Primary Counsel argue that, as a legal matter, the FC lawyers are "fiduciaries" on behalf of Primary Counsel. PC Memo at 3, 30.   Moving Primary Counsel maintain that, by opposing discovery and not acquiescing in Primary Counsel's preferred allocation, the FC has breached its fiduciary duty.   In making that argument, moving Primary Counsel implicitly concede that they are on shaky legal ground; thus, while they assert early in their memorandum that FC members are "fiduciaries to all counsel," PC Memo at 3, they later state that "the Court need not decide the extent of that duty in this instance." *Id*. at 30.   In my opinion, however, it makes no sense for moving Primary Counsel to contend that the FC has breached its fiduciary duty if moving Primary Counsel fail to explain the underpinnings or contours of that duty.

89.   Not surprisingly, moving Primary Counsel offer no relevant authority to support their novel and conclusory argument that the FC owes a fiduciary duty to Primary Counsel.   Their main authority, *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220 (5th Cir. 2008), is not at all supportive.   Moving Primary Counsel quote a statement from *High Sulfur* that "lead counsel responsible for fee allocation must 'apply a universally fair standard of allocation to all participants, including itself.'" 517 F.3d at 232 (quoting *In re Vitamins Antitrust Litig.*, 398

F. Supp. 2d 209, 234 (D.D.C. 2005)).  *See* PC Memo at 30–31 & n. 85.  But neither that sentence (which is essentially a truism that lead counsel must act fairly), nor anything else in *High Sulfur* endorses the contention that the FC owes a *fiduciary duty* to Primary Counsel.  The problem in *High Sulfur* was not the allocation of fees per se, but rather the *district court's* failure to provide objecting attorneys a constitutionally adequate opportunity to be heard.[55]  Here, in sharp contrast to *High Sulfur*, the fee allocation process is fully transparent and includes multiple layers of review and opportunities for Primary Counsel to be heard.  *See* ¶¶ 34–35, *supra*.  Numerous courts have similarly distinguished *High Sulfur*.[56]

90.    Moving Primary Counsel's other authorities are similarly weak.  Moving Primary Counsel mischaracterize the MANUAL FOR COMPLEX LITIGATION, FOURTH, § 10.22, at 24 (Fed. Jud. Ctr. 2004) ("MCL"), as "describing lead lawyers as fiduciaries." PC Memo at 31 n. 86.  In fact, the sentence relied upon by moving Primary Counsel states: "Counsel designated by the court also assume a responsibility to the court and an obligation to act fairly, efficiently, and economically in the interests of all parties and parties' counsel." *Id.* at § 10.22.  Again, the MCL's focus is simply on basic fairness.  Nowhere in this section (or any other section) does the MCL state that lead counsel are "fiduciaries" to individually retained counsel. *See* Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations*, 79 FORDHAM L. REV. 1985, 1988 (2011) ("[T]he language used in [MCL 4th § 10.22] falls short of stating the fiduciary standard.").

---

[55] 517 F.3d at 232 ("Because the court sealed the fee allocation list and placed a gag order on plaintiffs' attorneys, Appellants could not compare their awards to those of other attorneys. They were not furnished with the hours and rates that other attorneys submitted or informed of the Fee Committee's process, yet such information was essential to enable them to challenge how the Fee Committee valued their work."); *see also id.* at 223 (proposed fee allocation "might be permissible, except that the court was so persuaded in an ex parte hearing and apparently without the benefit of supporting data"); *id.* at 227 ("Our review here is limited to one issue: the procedures the district court used to allocate the $6.875 million lump-sum attorneys' fee award among plaintiffs' counsel.").

[56] *See, e.g.*, *In re Diet Drugs*, 582 F.3d 524, 538 (3d Cir. 2009) ("Far from adjudicating the fee award in an ex parte hearing, the District Court solicited submissions from all interested parties … [and] permitted objections and allowed objectors to take limited discovery, though it need not have granted any discovery at all") (citation omitted); *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 872 (8th Cir. 2014) (finding fee procedures were not an abuse of discretion even though district court did not permit discovery; court of appeals noted, "Here, by contrast [to *High Sulfur*], the court appointed a Special Master to review the fee request, and the Special Master invited and considered the objections of plaintiffs' attorneys, met with the parties, and reviewed the affidavits submitted by Lead Counsel and other common benefit attorneys"), *cert. denied*, 135 S. Ct. 1455 (2015).

91.  Moving Primary Counsel also cite the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 1.04 reporter's notes cmt. A (2010) (PC Memo at 31 n. 87).  The language relied upon by moving Primary Counsel states:

> Class counsel is a … fiduciary to a client who is also a fiduciary. A similar relationship obtains between lead attorneys and other lawyers in a multi-district litigation. The lead attorneys must "act fairly, efficiently, and economically in the interests of all … parties' counsel." Manual for Complex Litigation (Fourth) § 10.22, at 24 (2004). Because "parties' counsel" are fiduciaries of the clients they directly represent, in multi-district litigations a double layer of fiduciary relationships also obtains. Finally, whenever a group of litigants works together, its members may owe each other duties by agreement or common law.

*Id.* at § 1.04 reporter's notes cmt. A, at 49 (2010).  This passage cannot bear the weight that moving Primary Counsel ascribes to it.  First, the only authority cited in the above-quoted passage is the MCL 4th § 10.22, which (as explained above) does not support moving Primary Counsel's fiduciary argument.  Second, the entire purpose of the ALI PRINCIPLES is to suggest what the law *should* be, not to restate existing law.[57]  Third, the language cited by moving Primary Counsel appears in the Reporters' Notes, not as black-letter text.  Thus, it represents only the personal views of the reporter who wrote the notes; that language (unlike the black letter sections) did not receive the imprimatur of the American Law Institute.[58]  Fourth, even if one reads the PRINCIPLES as stating that the FC here has some sort of a fiduciary duty to Primary Counsel, the specific obligations under such a duty are exceedingly vague and provide no basis for disqualification of the FC.[59]  Indeed, Professor Charles Silver, the Associate Reporter who

---

[57] *See* ALI, *Capturing the Voice of the American Law Institute: A Handbook for ALI Reporters and Those Who Review Their Work* (2015), at 13 (explaining that, unlike the Restatements, the ALI's PRINCIPLES "are primarily addressed to legislatures, administrative agencies, or private actors").

[58] *See id.* at 45 (Reporters' Notes "furnish a vehicle for the Reporter to convey views not necessarily those of the Institute").

[59] *See*, *e.g.*, ALI PRINCIPLES § 1.04 Reporters' Note, at 50 ("To a degree, … a lead lawyer in an aggregate proceeding may operate without the usual tethers of loyalty and obedience. Even so, the fiduciary duty retains some content. It requires a lawyer to take all steps that have reasonable potential to make one or more parties or represented persons better off without harming others.").

had primary responsibility for that part of the ALI PRINCIPLES, has recognized that the note in question, like the MCL, is weak authority for the notion that such a fiduciary duty exists.[60]

92.   The law review articles cited by moving Primary Counsel also fail to support their claim. The articles were all authored or co-authored by Professor Silver, who (as noted above) has explicitly recognized—in one of the very articles cited by moving Primary Counsel (PC Memo at 31 n. 88)—that there is no established legal authority for imposing a fiduciary duty like the one asserted by moving Primary Counsel.   Similarly, in another article co-authored by Professor Silver that moving Primary Counsel cite,[61] the authors do not purport to describe the law as it actually exists; rather, by their own admission, they seek "to *begin* a scholarly discussion, not to have the final say in one."[62]   Thus, none of the law review articles cited by moving Primary Counsel comes close to supporting their argument that, *under existing law*, the FC owed them a fiduciary duty.   At most, the articles represent legally unsupported academic musings.   They are clearly not a legal basis for the extreme relief sought by moving Primary Counsel.

93.   Thus, contrary to moving Primary Counsel's contention (PC Memo at 23), nothing in the MCL, the ALI PRINCIPLES, or the law reviews suggests that common benefit counsel must acquiesce in all discovery sought by individually retained counsel.   Nor does the ALI PRINCIPLES suggest, contrary to moving Primary Counsel's contention (*id*. at 3), that common benefit counsel must invariably advocate for the percentages in the individual attorneys' contracts, without any regard to the work actually performed.   Indeed, such purported "fiduciary duties" would make common benefit counsel captives to retained counsel, depriving common benefit counsel of the ability to argue for what, in their view, is fair and just based on the facts of the case.   As the Louisiana Supreme Court explained in holding that an attorney does not have a

---

[60] Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigation*, 79 FORDHAM L. REV. 1985, 1989 (2011) (the Reporters' Notes to § 1.05 "cite no statutory or common law authority" and thus "show plainly that the law governing lead lawyers' responsibilities is immature"); *see also id*. at 1987–88 ("Although commentators argue that lead attorneys are fiduciaries and should be treated as such, solid authority for the proposition is surprisingly scarce. The MDL statute does not address the matter and the common law is undeveloped.").

[61] Lynn A. Baker & Charles Silver, *Fiduciaries and Fees: Preliminary Thoughts*, 79 FORDHAM L. REV. 1833 (2010) (cited in PC Memo at 31 n. 88).

[62] *Id*. at 1837 (emphasis added); *see also id*. ("Here and throughout, we emphasize the limited nature and tentativeness of our position. ... We disavow any intention of writing about fiduciary relationships in general. We also ignore certain important issues, such as how far lawyers can go when using contractual provisions to carve out areas in which they may consider their own interests. Our object is to begin a scholarly discussion, not to have the final say in one.").

fiduciary duty to co-counsel, "It would be inconsistent with an attorney's duty to exercise independent professional judgment on behalf of his client to impose upon him a fiduciary obligation to take into account the interests of co-counsel in recovering any prospective fee." *Scheffler v. Adams and Reese, LLP*, 950 So.2d 641, 652–53 (La. 2007).

94.   In sum, in the face of their failure to offer substantial legal authority, moving Primary Counsel's argument that the FC should be *disqualified* for violating *established* fiduciary duties cannot be taken seriously.

### g.  Argument that Moving Primary Counsel Relied on Caps in the Settlements

95.   Moving Primary Counsel argue that they were "led to believe that the common benefit allocation would be less than the fees of Primary Counsel based on fee caps built into the separate agreements."[63]   In support of that argument, however, moving Primary Counsel cite only the Global Settlement and ignore all of the other settlements.[64]   I am advised by the FC that none of the other settlements contained similar caps.   As a result, moving Primary Counsel cannot have reasonably relied on the cap in one settlement as a guarantee that the FC would base its *overall* allocation recommendation on that same cap.

96.   Moving Primary Counsel can certainly argue to the special master and the Court that the fee cap in the Global Settlement provides a ground to challenge the FC's overall recommended allocation.   But the cap provides no basis for them to argue that the FC should be disqualified or that its proposed allocation should be stricken.

### 3. No Improper Ex Parte Communications Occurred

97.   As their third argument, moving Primary Counsel claim that improper and disqualifying ex parte communications occurred, especially involving Mr. Garrett. PC Memo at 33–39.   That argument, in my view, also lacks merit.

98.   Critically, moving Primary Counsel concede that they "*do not know the extent of the ex parte communications or whether these communications have caused actual bias.*" PC Memo at 34 n. 95.   Given this admission, it is difficult to fathom how moving Primary Counsel can

---

[63] PC Memo at 31 (citing Doc. 15695-2).

[64] *Id.* at 31 n. 91.

maintain that such ex parte contacts require that the FC be disqualified and that their proposed allocation be stricken.

99.  Clearly, not all ex parte contacts are disqualifying.  As explained in a case cited by moving Primary Counsel:

> We do not hold that *ex parte* communications alone—in the absence of any conflict of interest—require recusal. We emphasize that it is the *conflict of interest* and not the particular specialty of the neutral expert or advisor that concerns us. A judge may engage an expert or someone to assist him who has no conflict and is 'disinterested.' … Hence, any decision by us that would preclude a judge from obtaining assistance from a non-conflicted advisor would unnecessarily restrict a judge's ability to communicate with neutral experts.

*In re Kensington Int'l Ltd.*, 368 F.3d 289, 305 (3d Cir. 2004) (emphasis in original); *see also* PC Memo at 36–37 (citing *Kensington*).  Only ex parte contacts that are accompanied by other indicia of serious bias or conflict require remedial relief. *See*, *e.g.*, *In re Brooks*, 383 F.3d 1036, 1043 (D.C. Cir. 2004) (cited in PC Memo at 37–38) (holding ex parte communications did not require district judge's recusal; court found it "not surprising that the district judge met many times with the Special Master and the Court Monitor; he had to oversee and to coordinate their efforts on the court's behalf during four years of complicated and contentious litigation"); *Kaufman v. American Family Mut. Ins. Co.*, 601 F.3d 1088, 1095 (10th Cir. 2010) ("Mere speculation that an ex parte contact has occurred or that a judge was affected by it … does not warrant relief or further investigation.") (citation omitted); *Drobny v. CIR*, 113 F.3d 670, 680 (7th Cir. 1997) ("'[N]ot every ex parte communication is a procedural defect so substantial and so likely to cause prejudice that it entitles the claimant to an entirely new ... proceeding.'") (citations and alteration omitted; ellipsis in original).  Here, as noted above, moving Primary Counsel concede that they cannot show that the ex parte communications caused actual bias, or stemmed from a demonstrable conflict of interest.

100.  In their memorandum, moving Primary Counsel raise the question whether Mr. Garrett was a court-appointed CPA or one chosen by the FC.  According to moving Primary Counsel, "it is unclear whether Mr. Garrett is an agent of the PSC, the FC, the Court, or all three." PC Memo at 7.  But after raising the issue, moving Primary Counsel contend that the answer does not matter because, "[e]ither way," disqualifying ex parte contacts would have occurred. *Id.*

101.  That argument proves too much.  It would mean that, even absent a showing of bias, a CPA who is designated by counsel could never communicate privately with the Court, and a CPA who is appointed by the Court could never communicate privately with counsel.  Such hard and fast restrictions would greatly impede the efficient, streamlined structure that the Court set up with Mr. Garrett and the FC to facilitate fee review in this massive MDL.[65]

102.  With respect to Mr. Garrett, this Court followed an identical practice in *In re Vioxx Prods. Liab. Litig.*[66]  Judge Barbier followed a similar practice in the *Deepwater Horizon* litigation,[67] and Mr. Garrett has performed the same role for several other judges.[68]  Moving Primary Counsel's argument that Mr. Garrett's contacts with the Court are impermissible ex parte communications would mean that his conduct in all of these other cases was improper as well.  I am unwilling to embrace such a sweeping conclusion.  It does not appear that Mr. Garrett has any sort of conflict of interest or has done anything in any of the MDL cases that would raise any cause for concern.  And, again, although Mr. Garrett was assigned to this case in 2009, moving Primary Counsel had no objection to him (or the role he has served) until they received the FC's proposed allocation seven years later.  Now, suddenly, they have called Mr. Garrett's integrity into question.

103.  Moving Primary Counsel had the opportunity to question Mr. Garrett at length, *see* Garrett Dep. (332 transcript pages), yet (as noted) they have adduced nothing to show that Mr. Garrett's involvement created actual bias or caused Primary Counsel prejudice.  Similarly, moving Primary Counsel have not shown any prejudice from the participation of lead counsel,

---

[65] With respect to Primary Counsel's confusion about whether the Court appointed Mr. Garrett in this case, the evidence suggests to me that Mr. Garrett was appointed by the Court. *See* Garrett Dep. 16:1–7 ("Q: You said the Judge contacted you. Were you contacted by any of the attorneys who were representing claimants in the Chinese Drywall before Judge Fallon contacted you?  A: No. First call I got was Judge Fallon.").  He was also *retained* by the FC in order to create the contract for the payment of his fees.  Regardless of the correct answer, however, moving Primary Counsel have provided no basis for the FC's disqualification or the striking of the FC's proposed allocation.

[66] *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, PTO No. 6, 2005 WL 850963, at *3 (E.D. La. Apr. 8, 2005) ("Plaintiffs' Liaison Counsel has retained and the Court approves the retention of Philip Garrett, CPA … to assist and provide accounting services to Plaintiffs' Liaison Counsel, the Plaintiff's Steering Committee, and the Court in MDL 1657."); *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, PTO No. 8 (E.D. La. Sept. 2, 2015) (noting appointment and role of Garrett); Garrett Dep. 15 (Garrett explained that he performed a similar role in the *Vioxx* litigation).

[67] *See In re Deepwater Horizon*, Case No. 2:10-md-02179-CJB-SS, PTO No. 9 (Doc. 508) (filed 10/08/10), at 2.

[68] *See, e.g., Evans v. TIN, Inc.*, 2013 WL 4501061, at *5 (E.D. La. Aug. 21, 2013) (Africk, J.); *In re Pool Prods. Distribution Market Antitrust Litig.*, MDL No. 2328, 2016 WL 235781, at *10 (E.D. La. Jan. 20, 2016) (Vance, J.).

liaison counsel, or liaison counsel's designee in monthly meetings with the Court—meetings they have long known about (*see* ¶ 27 & n. 17, *supra*).

### C. GRANTING MOVING PRIMARY COUNSEL'S REQUESTED RELIEF WOULD TURN EVERY MDL FEE DISPUTE INTO A PROTRACTED FIGHT AND WOULD ENCOURAGE GROUNDLESS DISQUALIFICATION MOTIONS

104.   Finally, I am concerned that, were this Court to grant moving Primary Counsel's motion, serious consequences would ensue for future MDLs.  This Court is highly respected as an MDL judge, and a ruling disqualifying the FC would be taken seriously by other MDL judges. I am concerned that meritless disqualification motions—and ad hominem attacks—would be encouraged.

105.   Moreover, because moving Primary Counsel's main complaint is that the FC refused to produce all of the requested discovery, I am concerned that every attorneys' fee question in an MDL would henceforth turn into a second round of litigation (with requests for massive discovery).  Fee disputes are not supposed to be second major litigation fronts.[69]  Here, moving Primary Counsel have already received extensive discovery, yet they claim that because the FC did not acquiesce in substantial *additional* discovery, its members should be disqualified. Granting the extraordinary relief requested by moving Primary Counsel would encourage and reward burdensome discovery requests and groundless disqualification motions.  The Fifth Circuit has admonished that courts should not allow motions to disqualify counsel "to be manipulated for strategic advantage on the account of an impropriety which exists only in the minds of imaginative lawyers." *Woods v. Covington Cty. Bank*, 537 F.2d 804, 819 (5th Cir. 1976).  Yet, granting the relief requested by moving Primary Counsel would encourage exactly that sort of manipulation.

106.    By the same token, striking the FC's proposed allocation, thus leaving no recommendation whatsoever from the FC, would be an extreme step that would make no sense—

---

[69] *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation."); *Id.* at 442 (Brennan, J., concurring in part, dissenting in part) (attorneys' fee disputes are "one of the least socially productive types of litigation imaginable"); *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 331 (5th Cir. 1995) (district court's findings on fee awards not required "to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose") (citation and internal quotation marks omitted); *Mid-Continent Cas. Co. v. Chevron Pipe Line Co.*, 205 F.3d 222, 233 (5th Cir. 2000) ("No authority need be cited for the fact that [attorneys' fee] disputes should *not* be a separate, or second, litigation.") (emphasis in original).

and, again, would encourage objecting counsel to pursue such relief in future MDLs. At bottom, granting moving Primary Counsel's motion would not only be unjustified here; it would have negative ramifications in a host of MDLs going forward.

## VII. CONCLUSION

107. In my opinion, moving Primary Counsel's motion to disqualify the FC and, *inter alia*, strike its recommendation, is legally and factually unwarranted and should be denied.

I declare that the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.

Robert H. Klonoff

May 24, 2017

# APPENDIX A
## CURRICULUM VITAE

**ROBERT H. KLONOFF**
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
Tel:  503-768-6601 (Office)
E-Mail:  klonoff@lclark.edu

Date of Birth:  March 15, 1955
Place of Birth:  Portland, Oregon

**EDUCATION:**

J.D., Yale University, 1979

A.B., University of California, Berkeley, 1976, Majored in Political Science/Economics (Highest Honors)

**WORK EXPERIENCE:**

**Current Position:**

Jordan D. Schnitzer Professor of Law, Lewis & Clark Law School (since 2014)

**Prior Positions:**

Dean of the Law School, Lewis & Clark Law School (2007-2014)

Douglas Stripp/Missouri Endowed Professor of Law, University of Missouri-Kansas City School of Law (2003-2007)

Jones Day, Washington, D.C. (Partner, 1991-July 2003; Of Counsel, 1989-1991, 2003- 2007)

Adjunct Professor of Law, Georgetown University Law Center (class action law and practice) (1999-2003)

Visiting Professor of Law, University of San Diego School of Law (1988-1989)

Assistant to the Solicitor General of the United States (1986-1988)

Assistant United States Attorney (Criminal Division, District of Columbia) (1983-1986)

Associate, Arnold & Porter, Washington, D.C. (1980-1983)

Law Clerk to the Honorable John R. Brown, Chief Judge, United States Court of Appeals for the Fifth Circuit (1979-1980)

Summer Associate, Baker & Botts, Houston, and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (1978)

Summer Associate, Sidley & Austin, Washington, D.C. (1977)

## SPECIAL HONORS AND ACHIEVEMENTS:

Elected Member, International Association of Procedural Law

Selected in November 2013 for the J. William Fulbright Specialist Roster

Recipient, Oregon Consular Corps Award for Individual Achievement in International Outreach, Portland, Oregon (May 2013)

Member, United States Judicial Conference Advisory Committee on Civil Rules (appointed by Chief Justice John G. Roberts, Jr., in 2011 as the sole voting member from the law school academy; reappointed May 2014 for a second three-year term)

Associate Reporter, American Law Institute's *Principles of the Law of Aggregate Litigation* (class action project; drafts presented at several annual meetings; final version approved by full ALI in May 2009 annual meeting and published in May 2010)

Fellow, American Academy of Appellate Lawyers

Fellow, American Bar Foundation

Academic Fellow, Pound Institute

Elected Member, American Law Institute

Recipient, 2007 Award for Outstanding UMKC Law Professor (based on vote of 3d year class)

2007 UMKC Law School Commencement Speaker (based on vote of 3d year class)

Recipient, 2006 UMKC Law School Elmer Pierson Teaching Award for Most Outstanding Teacher in the Law School (selected by the Dean)

Recipient, 2005 President's Award for Outstanding Service from the UMKC Law School Foundation

Reporter, 2005 National Conference on Appellate Justice (co-sponsored by the Federal Judicial Center, National Center for State Courts, and other organizations)

Co-Recipient, District of Columbia Bar's Frederick B. Abramson Award for Superior Service to the Community (June 1998)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant to the Solicitor General of the United States (1986, 1987)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant United States Attorney (1984, 1985)

The Benjamin N. Cardozo Prize for Best Moot Court Brief for Academic Year 1978-1979, Yale Law School

Semi-Finalist, Moot Court Oral Argument, Yale Law School (Fall, 1978)

Phi Beta Kappa

U.C. Berkeley's Most Outstanding Political Science Student (1976)

The Edward Kraft Award for Outstanding Work as a Freshman Student, U.C. Berkeley (1974)

## **MEMBERSHIPS:**

U.S. Supreme Court Bar

Various Federal Circuit and District Courts

District of Columbia Bar

Missouri State Bar

Oregon State Bar

Multnomah County Bar

American Law Institute

American Bar Association

American Bar Association Committee on Class Actions & Derivative Suits (Section of Litigation)

**PUBLICATIONS:**

    **Books:**

Castanias & Klonoff, *Federal Appellate Practice in a Nutshell* (West Publishing Co. 2d ed. 2017) (forthcoming)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 5th ed. 2017) (forthcoming)

Klonoff, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017) (forthcoming)

Klonoff, *Introduction to the Study of U.S. Law:  Cases and Materials* (West Publishing Co. 2016)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 4th ed.) (2012)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed.) (2012 and 2013 update) (with teacher's manual)

Klonoff (associate reporter), *Principles of the Law of Aggregate Litigation*, American Law Institute Publications (2010)(along with Samuel Issacharoff, reporter, and associate reporters Richard Nagareda and Charles Silver)

Castanias & Klonoff, *Federal Appellate Practice and Procedure in a Nutshell* (Thomson West) (2008)

Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (NITA 3d ed.) (2007)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 3d ed.) (2007)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (Thomson West 2d ed.) (2006) (with teacher's manual)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 2d ed.) (2004)

Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (Lexis Nexis 2d ed.) (2002)

Klonoff & Bilich, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West Group 2000)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West Group 1999)

Klonoff & Colby, *Sponsorship Strategy:  Evidentiary Tactics for Winning Jury Trials* (Michie Co. 1990)

### Articles and Book Chapters:

*Class Actions in the U.S. and Israel: A Comparative Approach*, 19(1) Theoretical Inquiries in the Law (forthcoming January 2018) (co-author)

*Class Actions Part II: A Respite from the Decline*, 92 N.Y.U. L. Rev. __ (forthcoming October 2017)

*Class Actions in the Year 2025: A Prognosis*, 65 Emory L.J. 1569 (2016)

*Why Most Nations Do Not Have U.S.-Style Class Actions*, 16 BNA Class Action Litigation Report, Vol. 16, No. 10, at 586 (May 22, 2015) (selected for presentation at the May 2015 World Congress of the International Association of Procedural Law, Istanbul, Turkey)

*Federal Rules Symposium:  A Tribute to Judge Mark R. Kravitz -- Introduction to the Symposium*, 18 Lewis & Clark L. Rev. 583 (2014) (co-author)

*Class Actions for Monetary Relief Under Rule 23(b)(1)(A) and (b)(1)(B):  Does Due Process Require Notice and Opt-Out Rights?*, 82 Geo. Wash. L. Rev. 798 (2014)

*The Decline of Class Actions,* 90 Wash. U. (St. Louis) L. Rev. 729 (2013)

*Reflections on the Future of Class Actions,* 44 Loy. U. Chi. L.J. 533 (2013)

*Richard Nagareda: In Memorium,* 80 U. Cin. L. Rev. 289 (2012)

*Introduction and Memories of a Law Clerk,* 47 Houston L. Rev. 529, 573 (2010)

*ALI's Aggregate Litigation Project Has Global Impact,* 33 ALI Reporter 7 (Fall 2010)

Book Review, *In the Public Interest,* 39  Env. Law 1225 (2009)

*The Public Value of Settlement,* 78 Fordham L. Rev. 1177 (2009)(co-author)

*Making Class Actions Work:  The Untapped Potential of the Internet,* 69 U. Pitt. L. Rev. 727 (co-author) (2008), adapted and published in 13 J. Internet Law 1 (2009)

*The Class Action Fairness Act:  An Ill-Conceived Approach to Class Settlements*, 80 Tul. L. Rev. 1695 (co-author) (2006)

5

*The Twentieth Anniversary of* Phillips Petroleum v. Shutts, *Introduction to the Symposium*, 74 UMKC L. Rev. 433 (2006)

*The Adoption of a Class Action Rule:  Some Issues for Mississippi to Consider*, 24 Miss. C. L. Rev. 261 (2005)

*Antitrust Class Actions:  Chaos in the Courts*, 11 Stan. J. L. Bus. & Fin. 1 (2005), reprinted in Litigation Conspiracy:  An Analysis of Competition Class Actions (Stephen G.A. Pitel ed. Irwin Law 2006), and 3 Canadian Class Action Review 137 (2006)

*The Judiciary's Flawed Application of Rule 23's "Adequacy of Representation" Requirement*, 2004 Mich. St. L. Rev. 671 (2004)

*Class Action Rules — Are They Driven by Substance?*, 1 Class Action Litigation Report 504 (Nov. 10, 2000) (co-author)

*Response to May 2000 Article on Sponsorship Strategy*, 63 Tex. B.J. 754 (Sept. 2000) (co-author)

*A Look at Interlocutory Appeals of Class Certification Decisions Under Rule 23(f)*, 1 Class Action Litigation Report 69 (May 12, 2000) (co-author)

*The Mass Tort Class Action Gamble*, 7 Metro. Corp. Counsel 1, 8 (Aug. 8, 1999) (co-author)

"Legal Approaches to Sex Discrimination" (co-author), in H. Landrine & E. Klonoff, *Discrimination Against Women: Prevalence, Consequences, Remedies* (Sage Pub. 1997)

*Sponsorship Strategy: A Reply to Floyd Abrams and Professor Saks*, 52 Md. L. Rev. 458 (1993) (co-author)

*A Trial Lawyer's Roadmap for Handling Bad Facts: The Role of Credibility*, 16 Trial Diplomacy Journal 139 (July/Aug. 1993) (co-author)

*Opening Statement*, 17 Litigation 1 (ABA Spring 1991) (co-author)

Contributing Editor, *Criminal Practice Institute Trial Manual*, Young Lawyers Section, Bar Ass'n of D.C. (1986)

*The Congressman as Mediator Between Citizens and Government Agencies:  Problems and Prospects*, 15 Harv. J. Legis. 701 (1979)

*A Dialogue on the Unauthorized Practice of Law*, 25 Villanova L. Rev. 6 (1979) (co-author)

*The Problems of Nursing Homes: Connecticut's Non Response*, 31 Admin. L. Rev. 1 (1979)

## SIGNIFICANT LEGAL EXPERIENCE:

Argued eight cases before the U.S. Supreme Court

Authored dozens of U.S. Supreme Court filings (certiorari petitions, certiorari oppositions, merits briefs, reply briefs)

Briefed and argued numerous cases before various U.S. circuit and district courts and state trial and appellate courts

Tried dozens of cases (primarily jury trials)

Handled more than 100 class action cases as counsel

Served as an expert witness in numerous federal and state class action cases, including the British Petroleum Deepwater Horizon oil spill case, the National Football League Concussion case, and the Volkswagen "Clean Diesel" case

Worked extensively with testifying and consulting experts on class action issues, including economists, securities experts, medical and scientific experts, and leading academics

Presented more than 100 cases to the grand jury while serving as an Assistant U.S. Attorney

Handled hundreds of sentencing hearings, preliminary hearings, and probation revocation hearings

## SIGNIFICANT TEACHING AND SPEAKING ENGAGEMENTS

Visiting Professor of Law, University of Trento School of Jurisprudence, Trento, Italy (May 2017) (taught course on Introduction to U.S. Law)

Panelist on Class Actions, Beard Group, Class Action Money and Ethics Conference (May 1, 2017)

Visiting Professor of Law, Tel Aviv University, Tel Aviv, Israel (January 2017) (taught course on class actions)

Panelist on Class Actions, Tel Aviv University, Fifty Years of Class Actions – A Global Perspective (January 4, 2017)

Panelist on Class Actions, New York University Law School Conference on Rule 23@50, New York, New York (December 2, 2016)

Panelist on Class Actions, Appellate Judges Education Institute, Philadelphia, Pennsylvania (November 11, 2016)

Speaker on Class Actions, National Legal Aid Defender Association National Farmworker Conference, Indianapolis, Indiana (November 10, 2016)

Panelist on Class Actions, American Bar Association Class Action Institute, Las Vegas, Nevada (October 20, 2016)

Panelist, Duke University Law School Conference on Class Action Settlements, San Diego, California (October 6, 2016)

Fulbright Scholar, Hong Kong University School of Law (August- September 2016) (taught course on class actions and delivered campus-wide lecture on criminal procedure)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (June 2016) (taught course on Introduction to United States Law)

Speaker on Class Actions, University of Zagreb Law School, Zagreb, Croatia (May 11, 2016)

Panelist on Civil Litigation, Association of American Law Schools Annual Meeting, New York, New York (January 8, 2016)

Visiting Professor of Law, Bahçeşehir University School of Law, Istanbul, Turkey (December 2015) (taught Introduction to United States Law)

Invited Participant, Conference on Civil Justice (Pound Institute) Emory University Law School, Atlanta, Georgia (October 15, 2015)

Invited Participant, Conference on Class Actions, Duke Law School, Arlington, Virginia (July 23-24, 2015)

Invited Participant, Conference on Class Actions, Defense Research Institute, Washington, D.C. (July 23-24, 2015)

Invited Participant, Civil Procedure Workshop, Seattle University Law School, Seattle, Washington (July 17, 2015)

Panelist on Class Actions, Annual Meeting, American Association for Justice, Montreal, Canada (July 12, 2015)

Speaker on Class Actions, International Association of Procedural Law, Istanbul, Turkey (May 28, 2015)

Panelist, Subcommittee on Class Actions of U.S. Judicial Conference Advisory Committee on Civil Rules, American Law Institute Annual Meeting, Washington, D.C. (May 17, 2015)

Moderator, Ethical Issues in Class Actions and Non-Class Aggregate Litigation, American Law Institute Annual Meeting, Washington, D.C., (May 17, 2015)

Visiting Professor of Law, University of Trento, Trento, Italy (March 2015) (taught U.S. Class Actions)

Speaker on Class Actions, European University Institute, Fiesole, Italy (February 23, 2015)

Visiting Professor of Law, University of Notre Dame, Fremantle Australia (January 2015) (taught course on U.S. Civil Rights and Civil Liberties)

Visiting Professor of Law, Universidad Sergio Arboleda, Bogota and Santa Marta, Colombia (December 2014) (taught course on Introduction to United States Law)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (November 2014) (taught course on Introduction to United States Law)

Panelist, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 23, 2014)

Visiting Professor of Law, East China University of Political Science and Law, Shanghai, China (October 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Herzen State Pedagogical University of Russia, St. Petersburg, Russia (September 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (July 2014) (taught Introduction to United States Law)

Speaker on U.S. Legal Education, Universidad Sergio Arboleda School of Law, Bogota, Colombia (June 3 and 5, 2014)

Speaker on Class Actions, Superintendencia de Industria y Comercio, Bogota, Colombia (June 3, 2014)

Speaker on Class Actions and the Fukushima Nuclear Accident, Waseda University School of Law, Tokyo, Japan (January 24, 2014)

Speaker on Class Actions, Osaka Bar Association, Osaka, Japan (January 23, 2014)

Speaker on Class Actions, East China University of Political Science and Law, Shanghai, China (January 15, 2014)

Speaker on Class Actions, AmCham Shanghai, Shanghai, China (January 14, 2014)

Speaker on Development of Animal Law in the Legal Academy, 2013 Animal Law Conference, Stanford Law School, Palo Alto, California (November 25, 2013)

Speaker on U.S. Law and Legal Education, Royal University of Law and Economics, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Law and Legal Education, Paññāsāstra University of Cambodia, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Legal Education, International Association of Law Schools International Deans' Forum, National University of Singapore Law School, Singapore (September 26, 2013)

Speaker on Class Actions, Japan Federation of Bar Associations, Tokyo, Japan (September 19, 2013)

Speaker on Class Actions, Waseda University School of Law, Tokyo, Japan (September 19, 2013)

Speaker on Ethics of Aggregate Settlements, American Association for Justice Annual Meeting, San Francisco, California (July 22, 2013)

Speaker on the British Petroleum Class Action Settlement, International Water Law Conference, National Law University of Delhi, Delhi, India (May 31, 2013)

Speaker on U.S. Supreme Court Confirmation Process, Jewish Federation of Greater Portland's Food for Thought Festival, Portland, Oregon  (April 21, 2013)

Speaker on Class Actions, Class Action Symposium, George Washington University Law School, Washington, D.C. (March 8, 2013)

Speaker on Class Actions, Impact Fund Class Action Conference, Oakland, California (March 1, 2013)

Speaker on Class Actions, Hong Kong University Department of Law (November 15, 2012)

Speaker on Class Actions, Fudan University Law School (Shanghai, China) (November 13, 2012)

Keynote Speaker, National Consumer Law Center Symposium, Seattle, Washington (October 28, 2012)

Speaker, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 25, 2012)

Speaker, Conference on Class Actions, Washington University St. Louis School of Law and the Institute for Law and Economic Policy (April 27, 2012)

Speaker, Conference on Class Actions, Loyola Chicago School of Law (April 13, 2012)

Panelist on leadership and world peace with Former South African President F.W. De Klerk, University of Portland (February 29, 2012)

Panelist on class actions before the Standing Committee on Rules of Practice and Procedure, Phoenix, Arizona (January 5, 2012)

Speaker on Class Actions Lawsuits in the U.S., University of the Philippines, College of Law, Quezon City, Philippines (August 2011)

Speaker on Environmental Class Actions, Kangwon University Law School, Chuncheon, South Korea (August 2011)

Speaker on Class Actions, Federal Judicial Center Conference on Class Actions, Duke University School of Law (May 20, 2011)

Speaker, Conference on Aggregate Litigation, University of Cincinnati College of Law (April 1, 2011)

Speaker on Class Actions, Seoul National University School of Law (May 18, 2010)

Keynote Speaker (addressing US Supreme Court confirmation process), Alaska Bar Annual Meeting (April 28, 2010)

Speaker, Conference on the Future of Animal Law, Harvard Law School (April 11, 2010)

Speaker, Conference on Aggregate Litigation: Critical Perspectives, George Washington University Law School (Mar. 12, 2010)

Speaker, U.S. Supreme Court Confirmation Process, Multnomah County Bar Association and City Club of Portland, (Sept. 30, 2009)

Speaker on Class Actions, American Legal Institutions, and American Legal Education at National Law Schools of India in Bangalore, Hyderabad, Calcutta, Jodhpur, and Delhi (August 2009)

Speaker, China/U.S. Conference on Tort and Class Action Law, Renmin University of China School of Law, Beijing, China (July 11-12, 2009)

Speaker on Class Actions, Southeastern Association of Law Schools annual meeting, Palm Beach, Florida (August 1, 2008)

Speaker on Class Actions, National Foundation for Judicial Excellence (meeting of 150 state appellate court judges), Chicago, Illinois (July 12, 2008)

Speaker on Class Actions, Practising Law Institute, New York, NY (July 10, 2008)

Speaker at Conference on Class Actions in Europe and North America, sponsored by New York University School of Law, the American Law Institute, and the European University Institute, Florence, Italy (June 13, 2008)

Speaker on Class Actions at the American Bar Association Tort and Insurance Section Meeting, Washington, D.C. (Oct. 26, 2007)

Speaker on Antitrust Class Actions at the American Bar Association's Annual Antitrust Meeting, Washington D.C. (April 18, 2007)

Chair, Organizer, and Moderator of Class Action Symposium at UMKC School of Law (April 7, 2006) (other speakers (26 in all) included, *e.g.*, Professors Arthur Miller, Edward Cooper, Sam Issacharoff, Geoffrey Miller, and Linda Mullenix, as well as several prominent federal judges and practicing lawyers)

Speaker on Class Actions, Missouri CLE (Nov. 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 29, 2005)

Speaker on Class Actions, Kansas CLE (June 23, 2005)

Speaker on Class Actions at Bureau of National Affairs Seminar on the Class Action Fairness Act of 2005 (June 17, 2005)

Visiting Lecturer on Class Actions, Peking University (May 30-June 3, 2005)

Speaker on Oral Argument, American Bar Association 2005 Section of Litigation Annual Conference (April 22, 2005) (part of panel including Second Circuit Chief Judge Walker and several others)

Speaker on Class Actions, Federal Trade Commission/Organization for Economic Co-operation and Development, Workshop on Consumer Dispute Resolution and Redress in the Global Marketplace (April 19, 2005)

Speaker at Antitrust Class Action Symposium, University of Western Ontario College of Law (April 1, 2005)

Speaker at Class Action Symposium, Mississippi College of Law (February 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 30, 2004)

12

Visiting Lecturer on Class Actions, Peking University (June 2004)

Visiting Lecturer on Class Actions, Tsinghua University (June 2004)

Speaker at Class Action Symposium, Michigan State University (April 16-17, 2004)

Speaker on U.S. Supreme Court advocacy, David Prager Advanced Appellate Institute (Kansas City Metropolitan Bar Association) (Feb. 27, 2004)

Speaker on Class Actions, Institute of Continuing Legal Education in Georgia (Oct. 24, 2003)

Speaker on Class Actions, Practising Law Institute (July 31, 2003)

Speaker on Class Actions, Practising Law Institute (Aug. 5, 2002)

Speaker on Class Actions, Practising Law Institute (Aug. 16, 2001)

Speaker on many occasions throughout the country on "Sponsorship Strategy" (1990-present) and advocacy before the U.S. Supreme Court (1988-present)

## OTHER LEGAL ACTIVITIES:

Member of American Bar Association Group Evaluating Qualifications of Merrick Garland to serve on the U.S. Supreme Court

Advisory Board Consulting Editor, *Class Action Litigation Report* (BNA)

Advisory Board, The Flawless Foundation (an organization that serves troubled children)

Member, Board of Directors, Citizens' Crime Commission (Portland, Oregon) (2007-2011)

Served on numerous UMKC School of Law committees, including Programs (Chair), Promotion and Tenure, Appointments, and Smith Chair Appointment

Chair of pro bono program for all 27 offices of Jones Day (2000-2004); also previously Chair of Washington office pro bono program (1992-2003)

Member, Board of Directors, Bread for the City (a D.C. public interest organization providing medical, legal, and social services) (2001-2003)

Master, Edward Coke Appellate Practice Inn of Court in Washington, D.C. (other participants include Ted Olson, Seth Waxman, Ken Starr, Walter Dellinger, and several sitting appellate judges) (2001-2003)

Member, Board of Directors, Washington Lawyers' Committee for Civil Rights and Urban Affairs (2000-2003); Advisory Board Member (2003-present)

Member, D.C. Court of Appeals Committee on Unauthorized Practice of Law (1997-2000)

Handled and supervised numerous pro bono matters (*e.g.*, death penalty and other criminal defense, civil rights, veterans' rights)

Played a major role in establishing a walk-in free legal clinic in Washington, D.C.'s Shaw neighborhood

**<u>VOLUNTEER WORK</u>:**

Numerous guest speaker appearances at public schools and retirement homes; volunteer at local soup kitchen; volunteer judge for Classroom Law Project.

## APPENDIX B

## Documents Reviewed By Professor Klonoff[*]

1. July 25, 2016 Letter from FC to Special Master Balhoff

2. July 29, 2016 Letter from Jimmy Faircloth to Special Master Balhoff

3. October 7, 2016 Letter from Jimmy Faircloth to Special Master Balhoff

4. October 13, 2016 Letter from FC to Special Master Balhoff

5. October 18, 2016 Letter from Jimmy Faircloth to Special Master Balhoff

6. January 6, 2017 Letter from Jimmy Faircloth to Special Master Balhoff

7. January 9, 2017 Letter from FC to Special Master Balhoff

8. February 1, 2017 Letter from FC to Special Master Balhoff

9. February 8, 2017 Letter from Jimmy Faircloth to Special Master Balhoff

10. February 15, 2017 Letter from FC to Special Master Balhoff

11. February 15, 2017 Letter from Jimmy Faircloth to Special Master Balhoff

12. February 22, 2017 Letter from FC to Special Master Balhoff

13. March 14, 2017 Letter from Sandra L. Duggan to Special Master Balhoff

14. Pre-Trial Order No. 28 (Doc. 17379)

15. Pre-Trial Order No. 28(F) (Doc. 20282)

16. January 24, 2017 Transcript of the Deposition of Russ M. Herman with word index and errata sheet

17. January 25, 2017 Transcript of the Supplement to the Deposition of Russ M. Herman with word index

18. January 25, 2017 Transcript of the Deposition of Sandra L. Duggan with word index and errata sheet

19. January 26, 2017 Transcript of the Deposition of Arnold Levin with word index and errata sheet

20. December 14, 2016 Transcript of the Deposition of Philip A. Garrett with word index

---

[*] I do not list published court opinions.

21. THE FEE COMMITTEE'S MOTION TO DETERMINE THE ALLOCATION OF THE GLOBAL FEE AWARD AS BETWEEN COMMON BENEFIT FEES AND INDIVIDUAL COUNSEL'S FEES PURSUANT TO PTO 28(F) (Doc. 20293)

22. MEMORANDUM IN SUPPORT OF THE FEE COMMITTEE'S MOTION TO DETERMINE THE ALLOCATION OF THE GLOBAL FEE AWARD AS BETWEEN COMMON BENEFIT FEES AND INDIVIDUAL COUNSEL'S FEES PURSUANT TO PTO 28(F) (Doc. 20293-1)

23. PRIMARY COUNSEL'S MOTION FOR A CASE MANAGEMENT ORDER PROVIDING FOR DISCOVERY, THE UNSEALING OF RECORDS REGARDING COMMON BENEFIT FEES, AND THE APPOINTMENT OF A SPECIAL MASTER (Doc. 20394)

24. PRIMARY COUNSEL'S OBJECTION TO SPECIAL MASTER'S RULING CONCERNING OBJECTORS' REQUEST TO MODIFY SPECIAL MASTER CMO NO. 1 AND REQUEST FOR EXPEDITED CONSIDERATION (Doc. 20522)

25. MOTION AND MEMO TO DISQUALIFY THE FEE COMMITTEE, STRIKE ITS ALLOCATION RECOMMENDATION, AND STAY OR DISMISS PROCEEDINGS BEFORE THE SPECIAL MASTER AND REQUEST FOR EXPEDITED CONSIDERATION

26. EXHIBITS TO MOTION TO DISQUALIFY THE FEE COMMITTEE, STRIKE ITS ALLOCATION RECOMMENDATION, AND STAY OR DISMISS PROCEEDINGS BEFORE THE SPECIAL MASTER AND REQUEST FOR EXPEDITED CONSIDERATION

27. Held Costs Chart – Inception through December, 2013

28. Held Costs Chart – Inception through December, 2014

29. Lodestar Chart – Inception through December, 2013

30. Lodestar Chart – January, 2014 through April, 2016

31. Order & Reasons re: Motions to Dismiss (Doc. 20739)

32. Order & Reasons re: Motion to Disqualify (Doc. 20740)

33. Findings of Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing (Doc. 20741)

34. Response of FC to Objections to Denial of Discovery Requests with Exhibits A through U

35. Amended Complaint in *Wiltz v. BNBM, et al.*, Case No. 10-361 (E.D. La.) (Omni II)

36. Joint Fee Petition and exhibits (filed) 2-09-md-02047-EEF-JCW (Doc. 17700)

37. MOTION FOR LEAVE TO FILE A REPLY TO THE FEE COMMITTEE'S MEMORANDUM OF LAW IN OPPOSITION TO PRIMARY COUNSEL'S OBJECTION TO SPECIAL MASTER RULING DENYING ALLEGEDLY NECESSARY DISCOVERY AND REQUEST FOR EXPEDITED CONSIDERATION (Doc. 20753)

38. Memorandum Opinion and Order in re: KEVIN BARNES, ET AL v. SEARS, ROEBUCK AND CO., 7th Cir., September 28, 2016

39. 03/22/2012 CDW Status Conference Transcript

40. 08/20/2013 CDW Status Conference and Fairness Hearing Transcript

41. 02/20/2014 CDW Status Conference Transcript

42. 07/17/2014 CDW Status Conference & Motion Proceedings Transcript

43. 06/29/2016 CDW Status Conference Transcript

44. 08/25/2016 CDW Status Conference Transcript

45. BP common benefit fee order - PTO 9

46. CDW common benefit fee order - PTO 9 (Doc. 147)

47. Propulsid common benefit fee order - PTO 2

48. Propulsid common benefit fee expense fund order - PTO 16

49. Vioxx common benefit fee order - PTO 6

50. 04/17/2014 Status Conference Transcript

51. 07/17/2014 Status Conference and Motions Proceedings Transcript

52. 05/20/2015 Status Conference Transcript

53. 11/16/2015 Status Conference Transcript

54. 12/07/2015 Status Conference Transcript

55. 01/14/2016 Status Conference Transcript

56. 04/06/2017 Status Conference and Motions Proceedings Transcript

57. Chart of Fee Allocation Objectors

58. 07/09/2009 Status Conference Transcript

59. SUPPLEMENTAL DECLARATION OF SANDRA L. DUGGAN IN SUPPORT OF THE FEE COMMITTEE'S MOTION TO DETERMINE THE ALLOCATION OF THE GLOBAL FEE AWARD AS BETWEEN COMMON BENEFIT FEES AND INDIVIDUAL COUNSEL'S FEES PURSUANT TO PTO 28(F)

60. SUPPLEMENTAL DECLARATION OF RUSS M. HERMAN AND ARNOLD LEVIN IN SUPPORT OF THE FEE COMMITTEE'S MOTION TO DETERMINE THE ALLOCATION OF THE GLOBAL FEE AWARD AS BETWEEN COMMON BENEFIT FEES AND INDIVIDUAL COUNSEL'S FEES PURSUANT TO PTO 28(F)

61. SUPPLEMENTAL DECLARATION OF RUSS M. HERMAN IN SUPPORT OF THE MOTION TO DETERMINE THE ALLOCATION OF THE GLOBAL FEE A WARD AS BETWEEN COMMON BENEFIT FEES AND INDIVIDUAL COUNSEL'S FEES PURSUANT TO PTO 28(F)

62. SUPPLEMENT AL DECLARATION OF ARNOLD LEVIN IN SUPPORT OF THE FEE COMMITTEE'S MOTION TO DETERMINE THE ALLOCATION OF THE GLOBAL FEE AWARD AS BETWEEN COMMON BENEFIT FEES AND INDIVIDUAL COUNSEL'S FEES PURSUANT TO PTO 28(F)

63. DECLARATION OF KERRY J. MILLER. ESQ

64. Herman/Levin Declaration (May 23, 2017)

65. EMERGENCY PETITION FOR A WRIT OF MANDAMUS DIRECTED TO THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA IN *IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION*, MDL NO. 2047

66. Lodestar chart, Chinese Drywall MDL, Time Totals by Employee Nov. 2000 to Dec. 2013

67. Held Cost Report, Chinese Drywall MDL 2047, Combined Cases from Nov. 2000 to Dec. 2013

**APPENDIX B**

**UPDATED STATEMENT OF QUALIFICATIONS**

1.  I have served as an expert in numerous class action cases.  I am currently the Jordan D. Schnitzer Professor of Law at Lewis & Clark Law School and have held that position since June 1, 2014.  This is an endowed, tenured position at the rank of full professor.  From July 1, 2007, to May 31, 2014, I served as the Dean of Lewis & Clark Law School, and I was also a full professor at Lewis & Clark during that time.  Immediately prior to assuming the deanship at Lewis & Clark, I served for four years as the Douglas Stripp/Missouri Professor of Law at the University of Missouri-Kansas City School of Law (UMKC).  That appointment was an endowed, tenured position at the rank of full professor.  Prior to my academic post at UMKC, I served for more than a dozen years as an attorney with the international law firm of Jones Day, working in the firm's Washington, D.C. office.  For most of that time, I was an equity partner at the firm.  (I continued to work at Jones Day while I was employed at UMKC; my status with the firm during that period changed from partner to of counsel.)  While working at Jones Day (before joining the UMKC faculty), I also served for many years as an adjunct professor of law at Georgetown University Law Center.  Before joining Jones Day, I served as an Assistant United States Attorney and as an Assistant to the Solicitor General of the United States.  Immediately after graduating from law school, I served as a law clerk for Chief Judge John R. Brown of the U.S. Court of Appeals for the Fifth Circuit.  I received my law degree from Yale Law School.

2.  In my various academic positions, I have taught (among other subjects) complex litigation, class actions, civil procedure, federal courts, and federal appellate procedure.

3.  In September 2011, the Chief Justice of the United States appointed me to serve a three-year term as the academic voting member of the Judicial Conference Advisory Committee on Rules of Civil Procedure ("Advisory Committee").  The Advisory Committee considers and recommends amendments to the Federal Rules of Civil Procedure.  Only one civil procedure professor in the United States is selected by the Chief Justice to serve in that role during any three-year term.  In May 2014, the Chief Justice reappointed me to serve a second three-year term on the Advisory Committee.  I completed that service in May 2017.  (The maximum period of service on the Advisory Committee is six years.)  I also served on the Advisory Committee's Class Action Subcommittee, which took the lead for the full Advisory Committee on proposed amendments to the federal class action rule, Federal Rule of Civil Procedure 23.  Those proposed amendments are

## APPENDIX B

currently making their way through the rules adoption process and are on track to become effective on December 1, 2018.[1]

4.   I served for five years as an Associate Reporter for the American Law Institute's class action (and other multi-party litigation) project, *Principles of the Law of Aggregate Litigation*.  I was the principal author of Chapter 3, which addresses class action settlements and attorneys' fees.  The ALI project was unanimously approved by the membership of the American Law Institute at its annual meeting in May 2009, and was published by the American Law Institute in May 2010.  It has been frequently cited by courts and commentators.[2]

5.   I have more than 30 years of experience as a practicing lawyer.  I have had eight oral arguments before the U.S. Supreme Court, and numerous oral arguments in other federal and state appellate courts throughout the country, including oral arguments in eight federal circuits.  As an attorney at Jones Day, I personally handled more than 100 class action cases, mostly (but not entirely) on the defense side.

6.   I have lectured and taught on class actions and other litigation topics throughout the United States and abroad, including presentations at law schools in Cambodia, Canada, China, Colombia, Croatia, Ecuador, Germany, India, Israel, Italy, Japan, the Philippines, Russia, South Korea, Taiwan, and Turkey.  Over the years, I have frequently appeared as an invited speaker at class action symposia, conferences, and continuing legal education programs.[3]

---

[1] *See* Pending Rules and Forms Amendments, U.S. COURTS, http://www.uscourts.gov/rules-policies/pending-rules-and-forms-amendments (last visited July 1, 2018).

[2] *See, e.g., Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2381 n.11 (2011); *Keepseagle v. Perdue*, 856 F.3d 1039, 1069–70 (D.C. Cir. 2017) (Brown, J., dissenting); *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 744, 749 (9th Cir. 2017); *Baker v. Microsoft Corp.*, 797 F.3d 607, 615 n. 5 (9th Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 1702 (2017); *Hill v. State Street Corp.*, 794 F.3d 227, 229, 231 (1st Cir. 2015); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060, 1063–67 (8th Cir. 2015); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19–20 (1st Cir. 2015); *In re Trans Union Corp. Privacy Litig.*, 741 F.3d 811, 813 (7th Cir. 2014); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 171–72 (3d Cir. 2013); *Ira Holtzman, CPA v. Turza*, 728 F.3d 682, 689–90 (7th Cir. 2013); *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 32–33 (1st Cir. 2012); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 474–75 nn.14–16 (5th Cir. 2011); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 n.2 (9th Cir. 2011); *Cabiness v. Educ. Fin. Solutions, LLC*, No. 16-cv-01109-JST, 2018 WL 3108991, at *8 n.4 (N.D. Cal. June 25, 2018); *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 116 (D.D.C. 2015); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1355–56 (S.D. Fla. 2011); Richard Marcus, *Revolution v. Evolution in Class Action Reform*, 96 N.C. L. REV. 903, 927–28, 933 n.161, (2018); Sergio J. Campos, *Mass Torts and Due Process*, 65 VAND. L. REV. 1059, 1063 (2012); Tanya J. Monestier, *Transnational Class Actions and the Illusory Search for Res Judicata*, 86 TUL. L. REV. 1, 66 (2011); Rhonda Wasserman, *Cy Pres in Class Action Settlements*, 88 S. CAL. L. REV. 97, 111 (2014); Ryan C. Williams, *Due Process, Class Action Opt Outs, and the Right to Sue*, 115 COLUM. L. REV. 599, 649–50 (2015).

[3] Examples of those courses and speaking engagements are contained in my curriculum vitae (Appendix C).

**APPENDIX B**

7.  I co-authored the first casebook devoted specifically to class actions, and I am now the sole author of that book:  *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017).  I am also the sole author of the Nutshell on class actions: Robert H. Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 5th ed. 2017).  These texts are used at law schools throughout the United States and have been cited by many courts and commentators.[4]  In addition, I have authored or co-authored numerous scholarly articles on class actions and other topics.[5]  I also serve on the advisory board of Class Action Litigation Report, a Bloomberg/BNA publication.

---

[4] *See, e.g.*, *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 468 (1st Cir. 2013) (citing *Nutshell*); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (citing *Nutshell*); *Adams v. United Services Automobile Ass'n*, No. 2:14-CV-02013, 2016 WL 1465433, at *7 (W.D. Ark. Apr. 14, 2016) (citing *Nutshell*), *rev'd on other grounds*, 863 F.3d 1069 (8th Cir. 2017); Libby Jelinek, *The Applicability of the Federal Rules of Evidence at Class Certification*, 65 UCLA L. REV. 280, 286 n.27, 291 n.65, 316 n.206 (2018) (citing casebook and *Nutshell*); Jaime Dodge, *Privatizing Mass Settlement*, 90 NOTRE DAME L. REV. 335, 337 n.12 (2014) (citing casebook); Vaughn R. Walker, *Class Actions Along the Path of Federal Rule Making*, 44 LOY. U. CHI. L.J. 445, 449 n. 17 (2012) (citing *Nutshell*); Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 COLUM. L. REV. 149, 151 n.5 (2003) (citing casebook); Kenneth S. Rivlin & Jamaica D. Potts, *Proposed Rule Changes to Federal Civil Procedure May Introduce New Challenges in Environmental Class Action Litigation*, 27 HARV. ENVTL. L. REV. 519, 521 n.10 (2003) (citing *Nutshell*).

[5] For example, my 2013 article, *The Decline of Class Actions*, 90 WASH. U. L. REV. 729 (2013), has been widely cited. *See, e.g.*, *Mielo v. Steak N' Shake Operations, Inc.*, No. 17-2678, ___ F.3d ___ (3d Cir. July 26, 2018), at 35 & n.18 (slip op.); *In re National Football League Players' Concussion Injury Litig.*, 775 F.3d 570, 576 (3d Cir. 2014); *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014) (Posner, J.); *In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014); *Dickens v. GC Services Limited Partnership*, 220 F. Supp. 3d 1312, 1324 (M.D. Fla. 2016), *vacated on other grounds*, 706 F. App'x 529 (11th Cir. 2017); *In re Kosmos Energy Ltd. Sec. Litig.*, No. 3:12-cv-373-B, 2014 WL 1095326, at *2 n.20 (N.D. Tex. Mar. 19, 2014); David C. Miller, *Abuse of Discretion and the Sliding Scale of Difference: Restoring the Balance of Power Between Circuit Courts and District Courts for Rule 23 Class Certification Decisions in Oil and Gas Royalty Litigation*, 103 IOWA L. REV. 1811 *passim* (2018); Libby Jelinek, *The Applicability of the Federal Rules of Evidence at Class Certification*, 65 UCLA L. REV. 280, 297 n.101 (2018); Andrew D. Bradt & D. Theodore Rave, *Aggregation on Defendants' Terms:* Bristol-Myers Squibb *and the Federalization of Mass Tort Litigation*, 59 B.C. L. REV. 1251, 1261 n.39, 1266 n.78, 1286 n.196 (2018); Joseph A. Seiner, *Tailoring Class Actions to the On-Demand Economy*, 78 OHIO ST. L.J. 21, 25 n.14, 32 n.54 (2017); Brian T. Fitzpatrick, *Justice Scalia and Class Actions: A Loving Critique*, 92 NOTRE DAME L. REV. 1977, 1979 (2017); Deborah R. Hensler, *From Sea to Shining Sea: How and Why Class Actions Are Spreading Globally*, 65 KAN. L. REV. 965, 965 n.2 (2017); Richard Marcus, *Bending in the Breeze: American Class Actions in the Twenty-First Century*, 65 DEPAUL L. REV. 497, 497 & n.2 (2016); Maureen Carroll, *Class Action Myopia*, 65 DUKE L.J. 843, 846 n.8, 876–78 & nn.181, 183 & 190–93, 881 nn.211 & 213, 883 n.225 (2016); Claire E. Bourque, Note, *Liability Only, Please—Hold the Damages: The Supreme Court's New Order for Class Certification*, 22 GEO. MASON L. REV. 695, 698 n.29 (2015); Martin H. Redish & Julie M. Karaba, *One Size Doesn't Fit All: Multidistrict Litigation, Due Process, and the Dangers of Procedural Collectivism*, 95 B.U. L. REV. 109, 110 n.2 (2015); Robert G. Bone, *The Misguided Search For Class Unity*, 82 GEO. WASH. L. REV. 651, 654 n.6 (2014); David Freeman Engstrom, *Private Enforcement's Pathways: Lessons From Qui Tam Litigation*, 114 COLUM. L. REV. 1913, 1920 n.17 (2014); Howard M. Erichson, *The Problem of Settlement Class Actions*, 82 WASH. U. L. REV. 951, 956 n.20 (2014); Arthur R. Miller, Keynote Address, The Preservation and Rejuvenation of Aggregate Litigation: A Systemic Imperative, 64 EMORY L.J. 293, 294 n.7 (2014); Linda S. Mullenix, *Ending Class Actions As We Know Them: Rethinking the American Class Action*, 64 EMORY L.J. 399, 403 n.14 (2014); Stephen R. Subrin & Thomas O. Main, *The Fourth Era of American Civil Procedure*, 162 U. PA. L. REV. 1839, 1853 n.80 (2014); Erin L. Geller, *The Fail-Safe Class as an Independent Bar to Class Certification*, 81 FORDHAM L. REV. 2769, 2775 n. 38 (2013); Arthur

3

**APPENDIX B**

8.  In October 2014, I was elected to membership in the International Association of Procedural Law (IAPL), an organization of preeminent civil procedure scholars from around the world.  I was selected in a competitive process to present a scholarly article on class actions at the May 2015 Congress of the IAPL, an event held once every four years.

9.  I have testified as an expert in numerous class action cases and in other cases raising civil procedure issues.  Between 2011 and the present, I testified in the following cases:

- *In re Syngenta AG MIR162 Corn Litigation*, No. 2:14-md-02591-JWL-JPO (D. Kan.) (submitted expert declaration on attorneys' fees, expenses, and incentive payments on 7/10/18);

- *Jabbari v. Wells Fargo & Co.*, No. 15-cv-02159-VC (N.D. Cal.) (submitted expert declaration on class certification, settlement fairness, attorneys' fees, costs, and incentive payments in unauthorized accounts litigation, dated 1/19/18; submitted supplemental declaration on 5/21/18);

- *Lynch v. Lynch*, No. F.D. 14-6239-006 (Pa. Ct. Comm. Pl., Allegheny Cnty.) (submitted expert declaration on the nature of class action law practice in the context of a divorce proceeding involving a class action attorney) (dated 9/05/17);

- *In re Chinese-Manufactured Drywall Litigation*, MDL No. 2047 (E.D. La.) (submitted expert declaration on attorneys' fees issues) (dated 5/04/17);

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration addressing objections by class members to proposed 3.0-liter and Bosch settlements) (dated 4/28/17);

- *State of Louisiana & Vermilion Parish School Board v. Louisiana Land and Exploration Co., et al.*, No. 82162 (15th Judicial Court, Parish of Vermilion) (submitted expert declaration on attorneys' fees issues) (dated 3/9/17);

- *Thacker v. Farmers Insurance Exchange*, Case No. 2006CV342 (Dist. Ct. Boulder County, Colo.) (submitted expert declaration on class certification issues) (dated 1/24/17);

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert

---

R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. REV. 286, 314 n.105 (2013); D. Theodore Rave, *Governing the Anticommons in Aggregate Litigation*, 66 VAND. L. REV. 1183, 1186 n.5 (2013); Brandon L. Garrett, *Aggregation and Constitutional Rights*, 88 NOTRE DAME L. REV. 593, 610 n.82 (2012); Richard Marcus, *Still Confronting the Consolidation Conundrum*, 88 NOTRE DAME L. REV. 557, 560 n.17, 589 n.154 (2012); *Hearing on "The State of Class Actions Ten Years after the Class Action Fairness Act" Before the Committee on the Judiciary, Subcommittee on the Constitution and Civil Justice* (U.S. House of Representatives, Feb. 27, 2015) (statement of Prof. Patricia W. Moore), at 2 n.4.

### APPENDIX B

declaration addressing objections by class members to proposed 2.0-liter settlement) (dated 9/30/16);

- *In the Matter of Gosselin Group*, No. 15/3925/B (Antwerp Court of First Instance, Belgium) (submitted expert declaration discussing the role of U.S. federal appellate courts in the factfinding process) (dated 9/27/16);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, Nos. 12-970, 15-4143, 15-4146, and 15-4645 (E.D. La.) (submitted expert declaration on class certification, settlement fairness, and attorneys' fees relating to proposed Halliburton/Transocean class settlement) (dated 8/5/16);

- *Ben-Hamo v. Facebook, Inc. and Facebook Ireland Limited*, No. 46065-09-14 (Central District Court, Israel) (submitted expert declaration on Sept. 3, 2015, on behalf of Facebook, Inc. and Facebook Ireland Limited addressing various issues of U.S. civil procedure and class action law);

- *Skold v. Intel Corp.*, Case No. 1-05-CV-039231 (Super. Ct. of Cal., Santa Clara County) (submitted expert declaration on class settlement approval, attorneys' fees, and incentive payments to class representatives) (dated 12/30/14);

- *In re National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB (E.D. Pa.) (submitted expert declaration on class certification, class notice, and settlement fairness) (dated 11/12/14);

- *MBA Surety Agency, Inc. v. AT&T Mobility, LLC*, Case No. 1222-CC09746 (Mo. 22d Dist.) (submitted expert declaration on class certification and settlement fairness on 2/13/13; submitted supplemental expert declaration on 2/19/13; and testified in court on 2/20/13);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La.) ("Deepwater Horizon") (submitted expert declarations on class certification, fairness, and attorneys' fees for the economic and property damages settlement (Doc. No. 7104-3) and class certification, fairness, and attorneys' fees for the personal injuries settlement (Doc. No. 7111-4) (both dated 08/13/12), and submitted supplemental expert declarations for both class settlements (Doc. No. 7727-4) (economic), (Doc. No. 7728-2) (medical) (both dated 10/22/12));

- *Robichaux v. State of Louisiana, et. al.* (No. 55,127) (18th Judicial Dist. Ct., Iberville Parish, La.) (submitted written report on attorneys' fees on February 20, 2012, gave deposition testimony on March 7, 2012, and testified in court on April 11, 2012); and

- *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, MDL No. 2147, Case No. 1:10-cv-02278 (N.D. Ill.) (submitted expert declarations on the fairness of a proposed class action settlement (Doc. No. 163-3) and on attorneys' fees and incentive payments (Doc. 164-1) (both dated 03/08/11), and testified in court on March 10, 2011).

**APPENDIX B**

10.  Courts reviewing class settlements and attorneys' fees issues have relied extensively on my testimony.  For example, in the *Wells Fargo Unauthorized Accounts* litigation, Judge Chhabria cited my testimony in ordering that objectors to the class settlement post an appeal bond.[6]  In the *Volkswagen Clean Diesel* litigation, Judge Charles Breyer repeatedly cited and quoted my two Declarations in his three opinions—relating to the 2.0-liter VW class settlement, the 3.0-liter VW class settlement, and the class settlement with VW's co-defendant, Bosch.[7]  In the *Deepwater Horizon* case, Judge Carl Barbier cited and quoted my Declarations (relating to a proposed settlement with British Petroleum) more than 60 times in his two opinions analyzing class certification and fairness.[8]  In a later order in that MDL, Judge Barbier repeatedly cited my Declaration (which I filed in connection with a class settlement involving Transocean and Halliburton).[9]  In the *AT&T Mobility* litigation, Judge Amy St. Eve (now a Judge on the Seventh Circuit) cited and quoted my Declarations more than 20 times in approving a class settlement and awarding attorneys' fees.[10]  And in *Skold v. Intel Corp.*, Judge Peter Kirwan cited my Declaration in approving a class settlement and awarding attorneys' fees.[11]

11.  Along with my expertise and experience in the areas of class certification and settlement fairness, I have done extensive work in the area of attorneys' fees.  In addition to my expert witness work, I have litigated attorneys' fees issues in private practice, have worked on such issues in my role as Associate Reporter for the ALI *Aggregate Litigation* project, and have addressed attorneys'

---

[6] *See Jabbari v. Wells Fargo & Co.*, No. 15-cv-02159-VC, slip op. at 14 (N.D. Cal. June 14, 2018) (Dkt. No. 271), *available at* https://www.courthousenews.com/wp-content/uploads/2018/06/Wells-Fargo-settlement.pdf.

[7] *See In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods Liab. Litig.*, No. 3:15-md-02672-CRB, 2016 WL 6248426, at *18, *19, *20 (N.D. Cal. Oct. 25, 2016), *appeal filed*, No. 16-17185 (9th Cir. Nov. 29, 2016); Order Granting Final Approval of the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. 3229) (filed 05/17/17), at 34, 35, 38; Order Granting Final Approval of the Bosch Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. 3230) (filed 05/17/17), at 18.

[8] *See In re Deepwater Horizon*, 910 F. Supp. 2d 891, 903, 914–16, 918–21, 923–24, 926, 929–33, 938, 941, 947, 953, 955, 960, 962 (E.D. La. 2012) (approving economic and property damages settlement), *aff'd*, 739 F.3d 790 (5th Cir. 2014); *In re Deepwater Horizon*, 295 F.R.D. 112, 133–34, 136, 138–41, 144–45, 147 (E.D. La. 2013) (approving medical benefits settlement).

[9] *See* Order and Reasons, Case No. 2:10-md-02179-CJB-JCW (Doc. 22252) (E.D. La. 02/15/17); *available at* http://www.laed.uscourts.gov/sites/default/files/OilSpill/2152017OrderAndReasons%28HESI%26TOsettlement%29.pdf (last visited Aug. 26, 2017).

[10] *See In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 956–59, 961, 963–65 (N.D. Ill. 2011) (approving class settlement); *In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 n.3, 1034–35, 1037, 1040, 1042 (N.D. Ill. 2011) (awarding attorneys' fees).

[11] *See Skold v. Intel Corp.*, No. 1-05-CV-039231 (Cal. Super. Ct. Santa Clara County) (Jan. 29, 2015), at 7, *available at* http://lawzilla.com/blog/janet-skold-et-al-vs-intel-corporation/.

**APPENDIX B**

fees issues in my academic writings.[12]   In those various tasks, I have developed expertise in attorneys' fees concepts, such as percentage of the fund and the lodestar.

12.  I have extensive knowledge of typical hourly rates for attorneys and paralegals in complex litigation.  I have served as counsel and as an expert in class action cases throughout the United States, and have gained knowledge of hourly rates during that work. I have also gained familiarity with hourly rates of legal personnel through my work as a scholar.

13.  Additional information regarding my qualifications and experience—including a list of my publications—can be found in my curriculum vitae (Appendix C).

---

[12] *See, e.g.*, ROBERT H. KLONOFF, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION: CASES AND MATERIALS 632–49 (West 4th ed. 2017) (overview of attorneys' fees issues); ROBERT H. KLONOFF, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION IN A NUTSHELL 351–56 (West 5th ed. 2017) (similar); Robert H. Klonoff & Mark Herrmann, *The Class Action Fairness Act: An Ill-Conceived Approach to Class Settlements*, 80 TULANE L. REV. 1695 (2006) (discussing attorneys' fees issues in the settlement context); PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION §§ 3.08, 3.13 (Am. Law Inst. 2010) (addressing attorneys' fees in class actions and other aggregate litigation).

APPENDIX C

## CURRICULUM VITAE

**ROBERT H. KLONOFF**
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
Tel:  503-768-6601 (Office)
E-Mail:  klonoff@lclark.edu

Date of Birth:  March 15, 1955
Place of Birth:  Portland, Oregon

## EDUCATION:

J.D., Yale University, 1979

A.B., University of California, Berkeley, 1976, Majored in Political Science/Economics (Highest Honors)

## WORK EXPERIENCE:

### Current Position:

Jordan D. Schnitzer Professor of Law, Lewis & Clark Law School (since 2014)

### Prior Positions:

Dean of the Law School, Lewis & Clark Law School (2007-2014)

Douglas Stripp/Missouri Endowed Professor of Law, University of Missouri-Kansas City School of Law (2003-2007)

Jones Day, Washington, D.C. (Partner, 1991-July 2003; Of Counsel, 1989-1991, 2003- 2007)

Adjunct Professor of Law, Georgetown University Law Center (class action law and practice) (1999-2003)

Visiting Professor of Law, University of San Diego School of Law (1988-1989)

Assistant to the Solicitor General of the United States (1986-1988)

Assistant United States Attorney (Criminal Division, District of Columbia) (1983-1986)

Associate, Arnold & Porter, Washington, D.C. (1980-1983)

1

APPENDIX C

Law Clerk to the Honorable John R. Brown, Chief Judge, United States Court of Appeals for the Fifth Circuit (1979-1980)

Summer Associate, Baker & Botts, Houston, and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (1978)

Summer Associate, Sidley & Austin, Washington, D.C. (1977)

## SPECIAL HONORS AND ACHIEVEMENTS:

Member, 2011-2017, United States Judicial Conference Advisory Committee on Civil Rules (appointed by Chief Justice John G. Roberts, Jr., in 2011 as the sole voting member from the law school academy; reappointed May 2014 for a second three-year term)

Elected Member, International Association of Procedural Law

Selected in November 2013 for the J. William Fulbright Specialist Roster

Recipient, Oregon Consular Corps Award for Individual Achievement in International Outreach, Portland, Oregon (May 2013)

Associate Reporter, American Law Institute's *Principles of the Law of Aggregate Litigation* (class action project; drafts presented at several annual meetings; final version approved by full ALI in May 2009 annual meeting and published in May 2010)

Fellow, American Academy of Appellate Lawyers

Fellow, American Bar Foundation

Academic Fellow, Pound Institute

Elected Member, American Law Institute

Recipient, 2007 Award for Outstanding UMKC Law Professor (based on vote of 3d year class)

2007 UMKC Law School Commencement Speaker (based on vote of 3d year class)

Recipient, 2006 UMKC Law School Elmer Pierson Teaching Award for Most Outstanding Teacher in the Law School (selected by the Dean)

Recipient, 2005 President's Award for Outstanding Service from the UMKC Law School Foundation

Reporter, 2005 National Conference on Appellate Justice (co-sponsored by the Federal Judicial Center, National Center for State Courts, and other organizations)

Co-Recipient, District of Columbia Bar's Frederick B. Abramson Award for Superior Service to the Community (June 1998)

**APPENDIX C**

Attorney General's Special Achievement Award for Outstanding Work as an Assistant to the Solicitor General of the United States (1986, 1987)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant United States Attorney (1984, 1985)

The Benjamin N. Cardozo Prize for Best Moot Court Brief for Academic Year 1978-1979, Yale Law School

Semi-Finalist, Moot Court Oral Argument, Yale Law School (Fall, 1978)

Phi Beta Kappa

U.C. Berkeley's Most Outstanding Political Science Student (1976)

The Edward Kraft Award for Outstanding Work as a Freshman Student, U.C. Berkeley (1974)

**MEMBERSHIPS:**

U.S. Supreme Court Bar

Various Federal Circuit and District Courts

District of Columbia Bar

Missouri State Bar

Oregon State Bar

Multnomah County Bar

American Law Institute

American Bar Association

American Bar Association Committee on Class Actions & Derivative Suits (Section of Litigation)

APPENDIX C

**PUBLICATIONS**:

**Books**:

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 5th ed. 2017)

Castanias & Klonoff, *Federal Appellate Practice in a Nutshell* (West 2d ed. 2017)

Klonoff, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017) (with teacher's manual)

Klonoff, *Introduction to the Study of U.S. Law: Cases and Materials* (West 2016)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 4th ed.) (2012)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed.) (2012) (with teacher's manual)

Klonoff (associate reporter), *Principles of the Law of Aggregate Litigation*, American Law Institute Publications (2010) (along with Samuel Issacharoff, reporter, and associate reporters Richard Nagareda and Charles Silver)

Castanias & Klonoff, *Federal Appellate Practice and Procedure in a Nutshell* (Thomson West) (2008)

Klonoff & Colby, *Winning Jury Trials: Trial Tactics and Sponsorship Strategies* (NITA 3d ed.) (2007)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 3d ed.) (2007)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (Thomson West 2d ed.) (2006) (with teacher's manual)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 2d ed.) (2004)

Klonoff & Colby, *Winning Jury Trials: Trial Tactics and Sponsorship Strategies* (Lexis Nexis 2d ed.) (2002)

Klonoff & Bilich, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West Group 2000)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West Group 1999)

## APPENDIX C

Klonoff & Colby, *Sponsorship Strategy:  Evidentiary Tactics for Winning Jury Trials* (Michie Co. 1990)

### **Articles and Book Chapters:**

*Application of the New Discovery Rules in Class Actions: Much Ado About Nothing,* 6 Vanderbilt L. Rev. ___ (forthcoming, 2018)

*Class Actions in the U.S. and Israel: A Comparative Approach*, 19 Theoretical Inquiries in the Law 151 (2018) (co-author)

*Class Actions Part II: A Respite from the Decline*, 92 N.Y.U. L. Rev. 971 (2017)

*The Remedy For Election Fraud Is A New Election,* Law 360 (July 20, 2017) (www.law360.com/whitecollar/articles/946569/the-remedy-for-election-fraud-is-a-new-election)

*Class Actions in the Year 2025: A Prognosis,* 65 Emory L.J. 1569 (2016)

*Why Most Nations Do Not Have U.S.-Style Class Actions*, 16 BNA Class Action Litigation Report, Vol. 16, No. 10, at 586 (May 22, 2015) (selected for presentation at the May 2015 World Congress of the International Association of Procedural Law, Istanbul, Turkey)

*Federal Rules Symposium:  A Tribute to Judge Mark R. Kravitz -- Introduction to the Symposium*, 18 Lewis & Clark L. Rev. 583 (2014) (co-author)

*Class Actions for Monetary Relief Under Rule 23(b)(1)(A) and (b)(1)(B):  Does Due Process Require Notice and Opt-Out Rights?*, 82 Geo. Wash. L. Rev. 798 (2014)

*The Decline of Class Actions,* 90 Wash. U. (St. Louis) L. Rev. 729 (2013)

*Reflections on the Future of Class Actions,* 44 Loy. U. Chi. L.J. 533 (2013)

*Richard Nagareda: In Memorium,* 80 U. Cin. L. Rev. 289 (2012)

*Introduction and Memories of a Law Clerk,* 47 Houston L. Rev. 529, 573 (2010)

*ALI's Aggregate Litigation Project Has Global Impact,* 33 ALI Reporter 7 (Fall 2010)

Book Review, *In the Public Interest,* 39 Env. Law 1225 (2009)

*The Public Value of Settlement,* 78 Fordham L. Rev. 1177 (2009)(co-author)

*Making Class Actions Work:  The Untapped Potential of the Internet,* 69 U. Pitt. L. Rev. 727 (co-author)(2008), adapted and published in 13  J. Internet Law 1 (2009)

# APPENDIX C

*The Class Action Fairness Act:  An Ill-Conceived Approach to Class Settlements*, 80 Tul. L. Rev. 1695 (co-author) (2006)

*The Twentieth Anniversary of* Phillips Petroleum v. Shutts, *Introduction to the Symposium*, 74 UMKC L. Rev. 433 (2006)

*The Adoption of a Class Action Rule:  Some Issues for Mississippi to Consider*, 24 Miss. C. L. Rev. 261 (2005)

*Antitrust Class Actions:  Chaos in the Courts*, 11 Stan. J. L. Bus. & Fin. 1 (2005), reprinted in Litigation Conspiracy:  An Analysis of Competition Class Actions (Stephen G.A. Pitel ed. Irwin Law 2006), and 3 Canadian Class Action Review 137 (2006)

*The Judiciary's Flawed Application of Rule 23's "Adequacy of Representation" Requirement*, 2004 Mich. St. L. Rev. 671 (2004)

*Class Action Rules — Are They Driven by Substance?*, 1 Class Action Litigation Report 504 (Nov. 10, 2000) (co-author)

*Response to May 2000 Article on Sponsorship Strategy*, 63 Tex. B.J. 754 (Sept. 2000) (co-author)

*A Look at Interlocutory Appeals of Class Certification Decisions Under Rule 23(f)*, 1 Class Action Litigation Report 69 (May 12, 2000) (co-author)

*The Mass Tort Class Action Gamble*, 7 Metro. Corp. Counsel 1, 8 (Aug. 8, 1999) (co-author)

"Legal Approaches to Sex Discrimination" (co-author), in H. Landrine & E. Klonoff, *Discrimination Against Women:  Prevalence, Consequences, Remedies* (Sage Pub. 1997)

*Sponsorship Strategy:  A Reply to Floyd Abrams and Professor Saks*, 52 Md. L. Rev. 458 (1993) (co-author)

*A Trial Lawyer's Roadmap for Handling Bad Facts:  The Role of Credibility*, 16 Trial Diplomacy Journal 139 (July/Aug. 1993) (co-author)

*Opening Statement*, 17 Litigation 1 (ABA Spring 1991) (co-author)

Contributing Editor, *Criminal Practice Institute Trial Manual*, Young Lawyers Section, Bar Ass'n of D.C. (1986)

*The Congressman as Mediator Between Citizens and Government Agencies:  Problems and Prospects*, 15 Harv. J. Legis. 701 (1979)

APPENDIX C

*A Dialogue on the Unauthorized Practice of Law*, 25 Villanova L. Rev. 6 (1979) (co-author)

*The Problems of Nursing Homes:  Connecticut's Non Response*, 31 Admin. L. Rev. 1 (1979)

## SIGNIFICANT LEGAL EXPERIENCE:

Argued eight cases before the U.S. Supreme Court

Authored dozens of U.S. Supreme Court filings (certiorari petitions, certiorari oppositions, merits briefs, reply briefs)

Briefed and argued numerous cases before various U.S. circuit and district courts and state trial and appellate courts

Tried dozens of cases (primarily jury trials)

Handled more than 100 class action cases as counsel

Served as an expert witness in numerous federal and state class action cases, including the British Petroleum Deepwater Horizon oil spill case, the National Football League Concussion case, and the Volkswagen "Clean Diesel" case

Worked extensively with testifying and consulting experts on class action issues, including economists, securities experts, medical and scientific experts, and leading academics

Presented more than 100 cases to the grand jury while serving as an Assistant U.S. Attorney

Handled hundreds of sentencing hearings, preliminary hearings, and probation revocation hearings

## SIGNIFICANT TEACHING AND SPEAKING ENGAGEMENTS

Visiting Professor of Law, University of Bologna School of Law, Ravenna, Italy (July 2018) (faculty member for environmental law program; lectured on environmental class actions)

Speaker on Class Actions, Freie University Faculty of Law, Berlin, Germany (June 26, 2018)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (April 2018) (taught course on Introduction to United States Law)

Co-Chair, Moderator, and Panelist, Posner on Class Actions, Columbia Law School, New York, New York (March 2, 2018)

**APPENDIX C**

Panelist on Civil Discovery, Vanderbilt University School of Law, Nashville, Tennessee (October 13, 2017)

Panelist on the Civil Rules Committee Process, University of Arizona College of Law, Tucson, Arizona (October 7, 2017)

Visiting Professor of Law, University of Bologna School of Law, Ravenna, Italy (July 2017) (faculty member for environmental law program; lectured on environmental class actions)

Visiting Professor of Law, University of Trento School of Jurisprudence, Trento, Italy (May 2017) (taught course on Introduction to U.S. Law)

Panelist on Class Actions, Beard Group, Class Action Money and Ethics Conference, New York, New York (May 1, 2017)

Visiting Professor of Law, Tel Aviv University, Tel Aviv, Israel (January 2017) (taught course on class actions)

Panelist on Class Actions, Tel Aviv University, Fifty Years of Class Actions – A Global Perspective (January 4, 2017)

Panelist on Class Actions, New York University Law School Conference on Rule 23@50, New York, New York (December 2, 2016)

Panelist on Class Actions, Appellate Judges Education Institute, Philadelphia, Pennsylvania (November 11, 2016)

Speaker on Class Actions, National Legal Aid Defender Association National Farmworker Conference, Indianapolis, Indiana (November 10, 2016)

Panelist on Class Actions, American Bar Association Class Action Institute, Las Vegas, Nevada (October 20, 2016)

Panelist, Duke University Law School Conference on Class Action Settlements, San Diego, California (October 6, 2016)

Fulbright Scholar, Hong Kong University School of Law (August- September 2016) (taught course on class actions and delivered campus-wide lecture on criminal procedure)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (June 2016) (taught course on Introduction to United States Law)

Speaker on Class Actions, University of Zagreb Law School, Zagreb, Croatia (May 11, 2016)

Panelist on Civil Litigation, Association of American Law Schools Annual Meeting, New York, New York (January 8, 2016)

**APPENDIX C**

Visiting Professor of Law, Bahçeşehir University School of Law, Istanbul, Turkey (December 2015) (taught Introduction to United States Law)

Invited Participant, Conference on Civil Justice (Pound Institute) Emory University Law School, Atlanta, Georgia (October 15, 2015)

Invited Participant, Conference on Class Actions, Duke Law School, Arlington, Virginia (July 23-24, 2015)

Invited Participant, Conference on Class Actions, Defense Research Institute, Washington, D.C. (July 23-24, 2015)

Invited Participant, Civil Procedure Workshop, Seattle University Law School, Seattle, Washington (July 17, 2015)

Panelist on Class Actions, Annual Meeting, American Association for Justice, Montreal, Canada (July 12, 2015)

Speaker on Class Actions, International Association of Procedural Law, Istanbul, Turkey (May 28, 2015)

Panelist, Subcommittee on Class Actions of U.S. Judicial Conference Advisory Committee on Civil Rules, American Law Institute Annual Meeting, Washington, D.C. (May 17, 2015)

Moderator, Ethical Issues in Class Actions and Non-Class Aggregate Litigation, American Law Institute Annual Meeting, Washington, D.C., (May 17, 2015)

Visiting Professor of Law, University of Trento, Trento, Italy (March 2015) (taught U.S. Class Actions)

Speaker on Class Actions, European University Institute, Fiesole, Italy (February 23, 2015)

Visiting Professor of Law, University of Notre Dame, Fremantle Australia (January 2015) (taught course on U.S. Civil Rights and Civil Liberties)

Visiting Professor of Law, Universidad Sergio Arboleda, Bogota and Santa Marta, Colombia (December 2014) (taught course on Introduction to United States Law)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (November 2014) (taught course on Introduction to United States Law)

Panelist, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 23, 2014)

Visiting Professor of Law, East China University of Political Science and Law, Shanghai, China (October 2014) (taught U.S. Class Actions)

APPENDIX C

Visiting Professor of Law, Herzen State Pedagogical University of Russia, St. Petersburg, Russia (September 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (July 2014) (taught Introduction to United States Law)

Speaker on U.S. Legal Education, Universidad Sergio Arboleda School of Law, Bogota, Colombia (June 3 and 5, 2014)

Speaker on Class Actions, Superintendencia de Industria y Comercio, Bogota, Colombia (June 3, 2014)

Speaker on Class Actions and the Fukushima Nuclear Accident, Waseda University School of Law, Tokyo, Japan (January 24, 2014)

Speaker on Class Actions, Osaka Bar Association, Osaka, Japan (January 23, 2014)

Speaker on Class Actions, East China University of Political Science and Law, Shanghai, China (January 15, 2014)

Speaker on Class Actions, AmCham Shanghai, Shanghai, China (January 14, 2014)

Speaker on Development of Animal Law in the Legal Academy, 2013 Animal Law Conference, Stanford Law School, Palo Alto, California (November 25, 2013)

Speaker on U.S. Law and Legal Education, Royal University of Law and Economics, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Law and Legal Education, Paññāsāstra University of Cambodia, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Legal Education, International Association of Law Schools International Deans' Forum, National University of Singapore Law School, Singapore (September 26, 2013)

Speaker on Class Actions, Japan Federation of Bar Associations, Tokyo, Japan (September 19, 2013)

Speaker on Class Actions, Waseda University School of Law, Tokyo, Japan (September 19, 2013)

Speaker on Ethics of Aggregate Settlements, American Association for Justice Annual Meeting, San Francisco, California (July 22, 2013)

APPENDIX C

Speaker on the British Petroleum Class Action Settlement, International Water Law Conference, National Law University of Delhi, Delhi, India (May 31, 2013)

Speaker on U.S. Supreme Court Confirmation Process, Jewish Federation of Greater Portland's Food for Thought Festival, Portland, Oregon  (April 21, 2013)

Speaker on Class Actions, Class Action Symposium, George Washington University Law School, Washington, D.C. (March 8, 2013)

Speaker on Class Actions, Impact Fund Class Action Conference, Oakland, California (March 1, 2013)

Speaker on Class Actions, Hong Kong University Department of Law (November 15, 2012)

Speaker on Class Actions, Fudan University Law School (Shanghai, China) (November 13, 2012)

Keynote Speaker, National Consumer Law Center Symposium, Seattle, Washington (October 28, 2012)

Speaker, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 25, 2012)

Speaker, Conference on Class Actions, Washington University St. Louis School of Law and the Institute for Law and Economic Policy (April 27, 2012)

Speaker, Conference on Class Actions, Loyola Chicago School of Law (April 13, 2012)

Panelist on leadership and world peace with Former South African President F.W. De Klerk, University of Portland (February 29, 2012)

Panelist on class actions before the Standing Committee on Rules of Practice and Procedure, Phoenix, Arizona (January 5, 2012)

Speaker on Class Actions Lawsuits in the U.S., University of the Philippines, College of Law, Quezon City, Philippines (August 2011)

Speaker on Environmental Class Actions, Kangwon University Law School, Chuncheon, South Korea (August 2011)

Speaker on Class Actions, Federal Judicial Center Conference on Class Actions, Duke University School of Law (May 20, 2011)

Speaker, Conference on Aggregate Litigation, University of Cincinnati College of Law (April 1, 2011)

APPENDIX C

Speaker on Class Actions, Seoul National University School of Law (May 18, 2010)

Keynote Speaker (addressing US Supreme Court confirmation process), Alaska Bar Annual Meeting (April 28, 2010)

Speaker, Conference on the Future of Animal Law, Harvard Law School (April 11, 2010)

Speaker, Conference on Aggregate Litigation: Critical Perspectives, George Washington University Law School (Mar. 12, 2010)

Speaker, U.S. Supreme Court Confirmation Process, Multnomah County Bar Association and City Club of Portland, (Sept. 30, 2009)

Speaker on Class Actions, American Legal Institutions, and American Legal Education at National Law Schools of India in Bangalore, Hyderabad, Calcutta,  Jodhpur, and Delhi (August 2009)

Speaker, China/U.S. Conference on Tort and Class Action Law, Renmin University of China School of Law, Beijing, China (July 11-12, 2009)

Speaker on Class Actions, Southeastern Association of Law Schools annual meeting, Palm Beach, Florida (August 1, 2008)

Speaker on Class Actions, National Foundation for Judicial Excellence (meeting of 150 state appellate court judges), Chicago, Illinois (July 12, 2008)

Speaker on Class Actions, Practising Law Institute, New York, NY (July 10, 2008)

Speaker at Conference on Class Actions in Europe and North America, sponsored by New York University School of Law, the American Law Institute, and the European University Institute, Florence, Italy (June 13, 2008)

Speaker on Class Actions at the American Bar Association Tort and Insurance Section Meeting, Washington, D.C. (Oct. 26, 2007)

Speaker on Antitrust Class Actions at the American Bar Association's Annual Antitrust Meeting, Washington D.C. (April 18, 2007)

Chair, Organizer, and Moderator of Class Action Symposium at UMKC School of Law (April 7, 2006) (other speakers (26 in all) included, *e.g.*, Professors Arthur Miller, Edward Cooper, Sam Issacharoff, Geoffrey Miller, and Linda Mullenix, as well as several prominent federal judges and practicing lawyers)

Speaker on Class Actions, Missouri CLE (Nov. 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 29, 2005)

Speaker on Class Actions, Kansas CLE (June 23, 2005)

# APPENDIX C

Speaker on Class Actions at Bureau of National Affairs Seminar on the Class Action Fairness Act of 2005 (June 17, 2005)

Visiting Lecturer on Class Actions, Peking University (May 30-June 3, 2005)

Speaker on Oral Argument, American Bar Association 2005 Section of Litigation Annual Conference (April 22, 2005) (part of panel including Second Circuit Chief Judge Walker and several others)

Speaker on Class Actions, Federal Trade Commission/Organization for Economic Co-operation and Development, Workshop on Consumer Dispute Resolution and Redress in the Global Marketplace (April 19, 2005)

Speaker at Antitrust Class Action Symposium, University of Western Ontario College of Law (April 1, 2005)

Speaker at Class Action Symposium, Mississippi College of Law (February 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 30, 2004)

Visiting Lecturer on Class Actions, Peking University (June 2004)

Visiting Lecturer on Class Actions, Tsinghua University (June 2004)

Speaker at Class Action Symposium, Michigan State University (April 16-17, 2004)

Speaker on U.S. Supreme Court advocacy, David Prager Advanced Appellate Institute (Kansas City Metropolitan Bar Association) (Feb. 27, 2004)

Speaker on Class Actions, Institute of Continuing Legal Education in Georgia (Oct. 24, 2003)

Speaker on Class Actions, Practising Law Institute (July 31, 2003)

Speaker on Class Actions, Practising Law Institute (Aug. 5, 2002)

Speaker on Class Actions, Practising Law Institute (Aug. 16, 2001)

Speaker on many occasions throughout the country on "Sponsorship Strategy" (1990-present) and advocacy before the U.S. Supreme Court (1988-present)

## OTHER LEGAL ACTIVITIES:

Member of American Bar Association Group Evaluating Qualifications of Merrick Garland to serve on the U.S. Supreme Court

Advisory Board Consulting Editor, *Class Action Litigation Report* (BNA)

Advisory Board, The Flawless Foundation (an organization that serves troubled children)

APPENDIX C

Member, Board of Directors, Citizens' Crime Commission (Portland, Oregon) (2007-2011)

Served on numerous UMKC School of Law committees, including Programs (Chair), Promotion and Tenure, Appointments, and Smith Chair Appointment

Chair of pro bono program for all 27 offices of Jones Day (2000-2004); also previously Chair of Washington office pro bono program (1992-2003)

Member, Board of Directors, Bread for the City (a D.C. public interest organization providing medical, legal, and social services) (2001-2003)

Master, Edward Coke Appellate Practice Inn of Court in Washington, D.C. (other participants include Ted Olson, Seth Waxman, Ken Starr, Walter Dellinger, and several sitting appellate judges) (2001-2003)

Member, Board of Directors, Washington Lawyers' Committee for Civil Rights and Urban Affairs (2000-2003); Advisory Board Member (2003-present)

Member, D.C. Court of Appeals Committee on Unauthorized Practice of Law (1997-2000)

Handled and supervised numerous pro bono matters (*e.g.*, death penalty and other criminal defense, civil rights, veterans' rights)

Played a major role in establishing a walk-in free legal clinic in Washington, D.C.'s Shaw neighborhood

**<u>VOLUNTEER WORK:</u>**

Numerous guest speaker appearances at public schools and retirement homes; volunteer at local soup kitchen; volunteer judge for Classroom Law Project.

## APPENDIX D

## MATERIALS RELIED UPON[*]

1.  5/25/17 Order on Prior Motion to Disqualify the Fee Committee (Rec. Doc. 20789).

2.  5/7/2018 Order and Reasons Denying 1292(b) and Motion for Interim Disbursement (Rec. Doc. 21322).

3.  PTO 32 – Initial Steps to Determine Allocation of Settlement Funds or Judgments Resulting from Remanded Cases (Rec. Doc. 21328).

4.  PTO 28(G) – Supplemental Instructions Under Step Four of PTO 28 (Rec. Doc. 21330).

5.  6/7/2018 Order re Yance Motion (Rec. Doc. 21382).

6.  6/12/2018 Order Denying KCM Motion to Compel FC to Transmit Recommendation (Rec. Doc. 21403).

7.  6/12/2018 Order re Esquire Bank Motion (Rec. Doc. 21405).

8.  Transcripts from the Evidentiary Fee Hearing (5/31/17 – 6/1/17).

9.  Special Master's Recommendation (Rec. Doc. 20950).

10. Primary Counsel's Objection to SM Recommendation (Rec. Doc. 20991).

11. FC Objection to SM Recommendation (Rec. Doc. 20999).

12. 1/31/2018 Order and Reasons Setting Common Benefit Fees (Rec. Doc. 21168).

13. Primary Counsel's 1292(b) Motion with respect to Fees (Rec. Doc. 21216).

14. Lead and Liaison Counsel's Opposition to 1292(b) Motion with respect to Fees (Rec. Doc. 21248).

15. Primary Counsel's Reply in Further Support of 1292(b) (Rec. Doc. 21273).

16. Supplement Memorandum of Law in Support of Additional Common Benefit Assessments – Step Four of Pretrial Order No. 28 (Rec. Doc. 21182) (with clarification Rec. Doc. 21183 and corrected footnote Rec. Doc. 21213).

17. Primary Counsel's Opposition to Motion for Additional Common Benefit Assessments (Rec. Doc. 21251).

---

[*] Additional materials relied upon are listed in Appendix B of Declaration of Robert H. Klonoff Addressing Primary Counsel's Motion to Disqualify the Fee Committee and, *inter alia*, Strike its Allocation Recommendation (filed 05/24/17).

APPENDIX D

18.   Doyle Law Firm's Opposition to Motion for Additional Common Benefit Assessments (Rec. Doc. 21253).

19.   Lead and Liaison Counsel's Reply in Further Support of Common Benefit Assessment (Rec. Doc. 21271).

20.   KCM Motion for Interim Disbursement of Undisputed Amount of Attorney's Fees (Rec. Doc. 21212).

21.   Primary Counsel Motion for Interim Disbursement of Fees (Rec. Doc. 21240).

22.   Primary Counsel Response to KCM Motion for Interim Disbursement of Fees (Rec. Doc. 21241).

23.   Lead and Liaison Counsel Opposition to KCM Motion for Interim Disbursement (Rec. Doc. 21239).

24.   Lead and Liaison Counsel Opposition to Primary Counsel Motion for Interim Disbursement of Fees (Rec. Doc. 21247).

25.   Primary Counsel's Reply in Support of Interim Disbursement (Rec. Doc. 21264).

26.   Suggestion of Remand, Opinion and Order (Rec. Doc. 21242).

27.   Lead and Liaison Counsel's Motion Regarding Remand's Reference to the Need to Establish a Plaintiffs' Attorneys' Fees Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL Administration and Common Benefit (Rec. Doc. 21267).

28.   KCM Opposition to Motion Regarding Need to Establish Attorney's Fee Fund After Remand (Rec. Doc. 21278).

29.   Morgan & Morgan Response to Motion Regarding Need to Establish Attorney's Fee Fund After Remand (Rec. Doc. 21291).

30.   Lead and Liaison Counsel's Reply Regarding Need to Establish Attorney's Fee Fund After Remand (Rec. Doc. 21294).

31.   Lead and Liaison Counsel's Supplemental Reply Regarding Need to Establish Attorney's Fee Fund After Remand (Rec. Doc. 21305).

32.   Primary Counsel Opposition to Motion re Need to Establish a Fund upon Remand (Rec. Doc. 21372).

33.   KCM Motion to Compel FC to Transmit Recommendation (Rec. Doc. 21319).

34.   Lead and Liaison Counsel Response to KCM Motion to Compel FC to Transmit Recommendation (Rec. Doc. 21321).

APPENDIX D

35.     KCM Reply Regarding Motion to Compel FC to Transmit Recommendation (Rec. Doc. 21327).

36.     Fee Committee Step Six Recommendation of the Majority of the Fee Committee (Rec. Doc. 21455).

37.     KCM Minority Fee Committee Report re Step Six Recommendation (Rec. Doc. 21473).

38.     Yance Law Firm Motion to Transfer QSF (Esquire Bank Motion) (Rec. Doc. 21338).

39.     Joinder in Yance Law Firm Esquire Bank Motion (Rec. Doc. 21350).

40.     Joinder in Yance Law Firm Esquire Bank Motion (Rec. Doc. 21360).

41.     Lead and Liaison Counsel's Opposition to Yance Law Firm Esquire Bank Motion (Rec. Doc. 21439).

42.     Yance Reply regarding Yance Law Firm Esquire Bank Motion (Rec. Doc. 21477).

43.     KCM Reply regarding Yance Law Firm Esquire Bank Motion (Rec. Doc. 21499).

44.     Motion to Disqualify Fee Committee Chair and Co-Chair, Strike Step Six Recommendation and Lift Seal on All Pleadings (Rec. Doc. 21489-1).

45.     Transcript from Hearing – July 12, 2018.

46.     Parker Waichman LLP's Objection to the Final Recommendation of the Majority of the Fee Committee Regarding Allocation of Common Benefit Fees (Rec. Doc. 21589).

47.     Objections and Responses to Special Master's Recommendations Concerning Attorneys' Fees and Expenses (Rec. Doc. 21003).

48.     Fee Committee's Response in Opposition to Parker Waichman LLP's Motion to: (1) Disqualify Fee Committee Chair and Co-Chair, (2) Strike the Step Six Recommendation of the Majority of the Fee Committee Regarding Common Benefit Fees, and (3) Lift the Seal on Related Filings.