**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |

**THIS DOCUMENT RELATES TO:**

*Gross v. Knauf Gips KG, 2:09-cv-6690*
*Amorin v. Taishan Gypsum, 2:11-cv-1672*
*Amorin v. Taishan Gypsum, 2:11-cv-1395*
*Amorin v. Taishan Gypsum, 2:11-cv-1673*
*Amorin v. SASAC, 2:14-cv-1727*
*State of Louisiana v. Knauf, 2:10-cv-340*
*Abner v. Taishan Gypsum, 2:11-cv-3094*
*Posey v. BNBM Co., 2:09-cv-6531*
*Morris v. BNBM Co., 2:09-cv-6530*
*Germano v. Taishan Gypsum,* **2:09-cv-6687**
*Wiltz v. Beijing New Building Materials Public*
*Limited Co.,* **2:10-cv-361**

**PLAINTIFFS' STEERING COMMITTEE'S OMNIBUS RESPONSE**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

| | |
|---|---|
| Russ M. Herman | Arnold Levin |
| Leonard A. Davis | Fred S. Longer |
| Stephen J. Herman | Sandra L. Duggan |
| Madelyn O. Breerwood | Matthew C. Gaughan |
| HERMAN, HERMAN & KATZ, LLC | LEVIN, FISHBEIN, SEDRAN & BERMAN |
| 820 O'Keefe Avenue | 510 Walnut Street |
| New Orleans, Louisiana 70113 | Suite 500 |
| Phone: (504) 581-4892 | Philadelphia, PA  19106 |
| Fax: (504) 561-6024 | Phone:  (215) 592-1500 |
| Ldavis@hhklawfirm.com | Fax:  (215) 592-4663 |
| *Plaintiffs' Liaison Counsel* | ALevin@lfsblaw.com |
| *MDL 2047* | *Plaintiffs' Lead Counsel* |
| | *MDL 2047* |

(Additional Counsel on Signature Page)

## TABLE OF CONTENTS

**Page**

Table of Authorities ...........................................................................................ix

Index of Exhibits................................................................................................xx

I.      INTRODUCTION .....................................................................................1

II.     STATEMENT OF FACTS .........................................................................6

        A.  CNBM Group, BNBM Group, CNBM, and BNBM Are the Alter Egos of
            Taishan .........................................................................................6

            1.  From 2005-Present, CNBM Group Has Been the Ultimate Controlling
                Shareholder of .........................................................................8

                    a.  BNBM Group.................................................................8

                    b.  CNBM...........................................................................9

                    c.  BNBM...........................................................................17

                    d.  Taishan .......................................................................22

            2.  CNBM Group Exercises Cascading Control Over the Internal
                Business Operations and Affairs of BNBM Group, CNBM, BNBM,
                and Taishan ............................................................................24

                    a.  CNBM Group Directly or Indirectly Appoints and Controls
                        Board of Directors Members and/or Executive Officers for
                        Each of its Subsidiaries ............................................. 25

                    b.  CNBM Group Issues Various and Extensive Business Policies
                        and Procedures that Are Followed by its Subsidiaries in
                        Cascading Order...........................................................28

                    c.  CNBM Group Issues Directives to its Subsidiaries....................34

                    d.  CNBM Group Trains the Middle- and Senior-Level Leaders of
                        BNBM Group, CNBM, BNBM and Taishan .............................37

i

3.  Defendants Have Admitted that Through BNBM They Controlled the Daily Operations and Decision-Making of Taishan ..............................38

    a.  August 28, 2006 Public Statement from CNBM Admitting to CNBM Group's/CNBM's Active Participation in the Daily Operation and Management of Taishan ......................................40

    b.  April 23, 2007 Official Reply from BNBM to Inquiry Letter from the Beijing Securities Regulatory Bureau ..........................40

    c.  October 16, 2007 BNBM Inter-Company "Special Inspection Report on the Management and Control of its Branches and Subsidiaries." ............................................................................41

4.  Defendants Share Numerous Common Officers and Directors ...............43

5.  CNBM Group Controls Financing for its Subsidiaries ...........................50

6.  CNBM Group Shares and Controls Similar Business Functions with the CNBM/BNBM Entities and Taishan ...................................................53

7.  The CNBM/BNBM Entities Share the Same Accounting Firms .............54

8.  BNBM and Taishan Share the Same Auditors ....................................... 54

9.  CNBM/BNBM and Taishan Share Common Offices ..............................55

10. Defendants Share a Common Logo, Corporate Identity, and Website Advertisements ........................................................................................59

11. CNBM Group Transferred Assets Among its Interrelated Entities for Nil Consideration ...................................................................................63

12. The CNBM/BNBM and Taishan Defendants Failed to Follow Proper Corporate Formalities and Procedure ...........................................65

    a.  JIA Tongchun's Ownership of 5% of Taishan's Stock While He Was Deputy General Manager and Director of BNBM, and His Receipt of Compensation Therefor, Were Improper......................................................................................65

    b.  JIA Jianjun Improperly Held Director Positions at BNBM, Taishan and Several Other BNBM and Taishan Subsidiaries And Affiliates...............................................................................68

c. CNBM, BNBM and Taishan Comingled and Improperly Transferred Funds Between and Among Each Other ...................69

d. BNBM Failed to Properly Account for and Report Dividends from Taishan Gypsum...................................................................70

e. BNBM and Taishan Jointly Owned Property and Businesses Without Following Proper Procedures or Negotiations .................................................................................71

f. BNBM and Taishan Had Numerous Documentation Failures with Companies and Properties that they Owned Jointly and Individually ..........................................................................73

g. Taishan and BNBM Failed to Follow Corporate Procedures for Establishing Subsidiaries and Constructing Drywall Factories ........................................................................74

13. BNBM's Ownership and Control of Taishan .........................................74

a. From the Outset, BNBM Promoted Itself and Taishan as a Single Entity, Reporting Production Statistics of Both Companies as One.......................................................................76

b. BNBM Controls Taishan's Board Through Stock Ownership and Overlapping Officers and Directors ....................................77

c. BNBM Controls the Construction of Taishan Drywall Factories...............................................................................78

d. BNBM Controls the Production of Taishan Drywall...................80

e. BNBM Controls Taishan's Export of Drywall to the United States ...............................................................................81

f. BNBM Controls Taishan's Funding and Finances........................82

g. BNBM Compelled Taishan to Make it a Co-Owner of Taishan Subsidiaries .................................................................84

h. BNBM Is Responsible for Taishan's Land-Use Certificates ..................................................................................85

iii

      i.  BNBM Includes Taishan as Part of its Regular Internal Audit Process.................................................................................86

      j.  BNBM Conducts Regular Financial Audits of Taishan.................87

      k.  BNBM Imposes Strict Administrative Policies on Taishan as Part of Controlling and Managing Taishan's Operations..........88

      l.  BNBM Controls Taishan's Financial Management.......................89

      m.  BNBM Controls Taishan's Operational Management.................89

      n.  BNBM Controls Taishan's Management of its Human Resources Department....................................................................90

      o.  BNBM controls Taishan's establishment of subsidiaries..............90

      p.  Taishan Is Required to Report Various Matters to BNBM ...................91

      q.  BNBM Controls Taishan's Handling of Significant Events Such as Investments, Loans, Financing, Contracts, Donations, and Risks ..................................................................................................92

B.  CNBM Group, CNBM, CNBM USA, United Suntech, and CNBMIT Are Likewise Alter Egos........................................................................................93

      1.  CNBM USA.....................................................................................94

      2.  United Suntech................................................................................95

      3.  CNBMIT ........................................................................................97

C.  CNBM Group Orchestrated a Comprehensive, Unified Strategy on Behalf of the CNBM and BNBM Entities and Taishan to Avoid the U.S. Drywall Litigation  Any Judgment ............................................................................98

    1.  From the Outset, CNBM Group Controlled Defendants' Participation (or Lack Thereof) in the U.S. Chinese Drywall Litigation ....................99

    2.  Throughout the Litigation, CNBM Group, CNBM, BNBM Group, BNBM and Taishan have Shared the Same Law Firms .........................107

3.   The CNBM and BNBM Entities Were Directly Involved in and
     Controlled the Decision for Taishan Not to Appear at the Court-
     Ordered Judgment Debtor Examination on July 17, 2014......................111

D.  BNBM and BNBM Group Targeted Florida and Other Gulf
    States for Sales and Distribution of Millions of Square Feet
    of BNBM Drywall ........................................................................................115

1.   BNBM of America Was Established in Florida as U.S. the Marketing
     Arm for BNBM.......................................................................................118

2.   BNBM Invited and Hosted Representatives from Multiple
     Florida Drywall Distributors to Tour BNBM's Facilities
     in China.................................................................................................119

3.   BNBM Acquired a U.S. Authorization for its Drywall and
     Manufactured its Drywall to Meet U.S. Standards .................................121

4.   BNBM Provided U.S. Customers with a Material Safety Data Sheet
     for its Drywall Pursuant to OSHA Standards ..........................................123

5.   BNBM Customized the Labeling for its Drywall to Suit the U.S.
     Market and Forum States .......................................................................124

6.   BNBM and BNBM Group Arranged Shipping of BNBM Drywall to
     Florida Ports..........................................................................................124

7.   BNBM Entered into an Exclusive Agency Agreement with a Florida
     Drywall Distributor to Sell BNBM Drywall in the U.S. – Particularly
     in the Gulf States...................................................................................126

8.   BNBM Knew That its Drywall Was Being Distributed in Florida and
     the Southeast United States...................................................................127

9.   BNBM Continued to Expand its Drywall Sales in Florida and the other
     Gulf States.............................................................................................128

10.  BNBM Entered into an Agency Agreement with a Florida Company in
     Order to Obtain Additional UL Certifications on its Drywall ................129

11.  BNBM Sold and Shipped Over 400,000 Sheets of Defective Drywall
     to Florida, and This Defective Drywall is Still Being Stored in Florida
     and Alabama ..........................................................................................130

v

12.     BNBM Manufactured and Sold Over 68 Million Square Feet /
        $10,000,000+ of its Drywall to U.S. Customers, and With the
        Help of BNBM Group, Exported this Drywall to Florida and Other
        Gulf States ................................................................................................. 131

13.     In 2007, BNBM Registered its Company Trademark for Drywall and
        Drywall Materials with the U.S. Patent and Trademark Office, and
        Maintained Same into 2015 ...................................................................... 133

E.  The CNBM/BNBM Entities were Directly Involved in the
    Issues Surrounding Taishan's Sales of Drywall to the United
    States ............................................................................................................ 133

F.  The Defaulted BNBM and CNBM Entities Have Long Been on Notice of
    the Claims Against Them ............................................................................ 140

III. ARGUMENT ............................................................................................................ 148

A.  THIS COURT MAY ASSERT PERSONAL JURISDICTION OVER
    THE CNBM AND BNBM ENTITIES BECAUSE THEY ARE
    ALTER EGOS OF TAISHAN .................................................................... 148

    1.  The Applicable Standards for Imputation of Alter Ego Liability ........... 148

        a.  Imputing Taishan's Contacts to the Defendants Should Be
            Analyzed Under the Forum State's Laws, Not Chinese Law,
            Because the Defendants Agree That No Conflict Exists ................. 152

        b.  Establishing Alter-Ego for the Imputation of Contacts for Personal
            Jurisdiction is a Less Stringent Test than Establishing Alter-Ego
            for Liability ..................................................................................... 156

        c.  In Making Alter Ego Determinations Courts Must Look to the
            Realities of Corporate Governance Rather than Form ...................... 157

        d.  Factors Indicative of Control are Assessed at the Time of the
            Alleged Injury but Evidence of Such Control May Extend to the
            Present Date ..................................................................................... 164

    2.  In Connection with the *Amorin* (Louisiana), *Gross* and *Wiltz*
        Complaints, the CNBM and BNBM Entities and Taishan Are Alter
        Egos of One Another Under Louisiana Law ........................................... 167

        a.  Louisiana Law on Imputation of Alter Ego Liability ...................... 167

b. Imputation of Contacts Under Louisiana Law is Proper ..................172

3. In Connection with the *Amorin* (Florida) Complaint, the CNBM and
BNBM Entities and Taishan Are Alter Egos of
One Another Under Florida Law ..........................................................174

a. Florida's Law on Imputation of Alter Ego Liability .......................174

b.   Imputation of Contacts Under Florida Law is Proper....................176

4. In Connection with the *Amorin* (Virginia) Complaint, the CNBM and
BNBM Entities and Taishan Are Alter Egos of One Another Under
Virginia Law ........................................................................................177

a.   Virginia's Law on Imputation of Alter Ego Liability....................177

i. Virginia Agency Law ................................................................178

ii. Virginia Alter-Ego Law ..........................................................178

b. Imputation of Contacts is Proper Under Virginia Law .....................180

5. Imputation of Contacts is Proper Under The Other Relevant Forum
States' Laws .........................................................................................180

B.   THE BNBM ENTITIES ARE SUBJECT TO PERSONAL
JURISDICTION IN FLORIDA ..................................................................182

1. The Court Has Personal Jurisdiction Over BNBM Group and BNBM
Under Florida's Long-Arm Statute .......................................................184

2. The Court's Exercise of Personal Jurisdiction Over BNBM Group
and BNBM Is Consistent with Constitutional Due Process .................189

a. The BNBM Entities Have Minimum Contacts with  Florida
Sufficient to Warrant the Court's Exercise of Specific Personal
Jurisdiction....................................................................................196

b. The "Arise Out of" or "Relate to" Requirement Is Satisfied ..........198

c. Personal Jurisdiction Over the BNBM Entities Is Consistent with
Constitutional Reasonableness.......................................................199

C.  THE DEFAULTED BNBM AND CNBM ENTITIES' CHALLENGES TO
    SERVICE OF PROCESS SHOULD BE REJECTED BY THE COURT ..........202

    1.  A Minor Typographical Error in CNBMIT's Name in the Complaint or
        Summons Does Not Constitute a Basis for Dismissing the Complaint for
        Insufficient Service of Process ..................................................................203

    2.  Service of the Amorin (LA) Complaint Was Properly Accomplished on
        CNBMIT .....................................................................................................205

    3.  The *Abner*, *Morris*, and *Posey* Complaints Should Not be Dismissed .......205

    4.  The PSC Properly Served BNBM PLC with its Complaints .....................207

    5.  The PSC Properly Served BNBM Group with its Complaints ..................211

    6.  The Defaulted BNBM and CNBM Entities Have Long Been on Notice
        of the Claims Against Them ....................................................................213

IV.  CONCLUSION ....................................................................................................214

# TABLE OF AUTHORITIES

Cases

*Acordia of Virginia Ins. Agency, Inc. v. Genito Glenn, L.P.*, 560 S.E.2d 246 (Va. 2002) ......... 178

*Aerielle Technologies, Inc. v. Procare Int'l Co.*, 2011 WL 767775
 (E.D. Tex. Feb. 28, 2011) ...................................................................................... 203,

*Ainsworth v. Moffett Eng. Ltd.*, 716 F.3d 174 (5th Cir. 2013)........................................... 183, 195

*All Custom Exteriors, Inc. v. Bilyea*, No. 1 CA-CV 10-0702, 2011 WL 5964528
 (Ariz. Ct. App. Nov. 29, 2011) .................................................................................. 180

*Am. Investors Life Ins. Co. v. Webb Life Ins. Agency, Inc.*, 876 F. Supp. 1278 (S.D. Fla. 1995)184

*Asahi Metal Ind. Co. v. Super. Ct.,* 480 U.S. 102 (1987) ...................................................... passim

*Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296 (Ga. 2005) .................................................. 181

*Barton v. Moore*, 558 N.W.2d 746 (Minn. 1997) ................................................................... 181

*Bean Dredging Corp. v. Dredge Technology Corp.*, 744 F.2d 1081 (5th Cir. 1984) ................ 188

*Becerra v. Asher*, 105 F.3d 1042 (5th Cir. 1997) .................................................................... 168

*Benson v. Richardson*, 537 N.W.2d 748 (Iowa 1995) ............................................................. 181

*Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.,* 210 F.3d 18 (1st Cir.2000) .. 150, 153

*Boles v. Nat'l Dev. Co.*, 175 S.W.3d 226 (Tenn. Ct. App. 2005) ............................................. 181

*Bona Fide Demolition & Recovery, LLC v. Crosby Const. Co. of Louisiana*,
 690 F. Supp. 2d 435 (E.D. La. 2010) ......................................................................... 170

ix

*Brackens v. USA Credit*, 233 F.R.D. 613 (D. Kan. 2005) ........................................................ 203

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan,* 447 F.3d 411 (5th Cir. 2006)....................... 157, 166

*Brown v. Benton Creostoting Co.,* 147 So. 2d 89 (La. App. 2 Cir. 1962) .................................. 170

*Brownsberger v. Gexa Energy, LP,* 2011 WL 197464 (S.D. Fla. Jan. 20, 2011)...................... 175

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985)...................................... 189, 190, 192, 200

*Canadian Nat. Ry. Co. v. Waltman*, 94 So. 3d 1111 (Miss. 2012) ............................................ 181

*Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925) ...................... 158, 159

*Chan v. Soc'y Expeditions, Inc.,* 39 F.3d 1398 (9th Cir. 1994)................................................. 149

*Clark v. B.H. Holland Co.*, 852 F. Supp. 1268 (E.D. N.C. 1994)............................................. 181

*Clemens v. McNamee,* 615 F.3d 374 (5th Cir. 2010)........................................................ 189, 190

*Cole v. Caterpillar Machinery Corp.,* 562 F. Supp. 179 (M.D. La. 1983)................................ 151

*Cooper v. McDermott Int'l, Inc.,* 62 F.3d 395 (5th Cir. 1995) .......................................... 160, 161

*Coulter v. Sears, Roebuck & Co.*, 426 F.2d 1315 (5th Cir. 1970) ............................................ 188

*Craig v. Johns-Manville Corp*. 1987 WL 10191 (E.D. Pa. Mar. 31, 1988) ...................... 164, 165

*Daimler, AG v. Bauman,,* 134 S. Ct. 746, (2014) .................................................................... 175

*David v. Signal International, L.L.C.*, 2010 WL 4879194 (E.D. La. Nov. 23, 2010) ............... 151

*Dev. Corp. of Palm Beach v. WBC Constr., LLC,* 925 So.2d 1156 (Fla. Dist. Ct. App. 2006).. 174

*DeWitt v. Sealtex Co.*, No. 273387, 2008 WL 2312668 (Mich. Ct. App. June 5, 2008) ............ 181

*Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331 (5th Cir. 1999) ............................ 158, 183

*Dishon v. Ponthie,* 918 So. 2d 1132 (La. App. 3 Cir. 2005) ...................................................... 169

*Doty v. Magnum Research, Inc.*, 994 F. Supp. 894 (N.D. Ohio 1997) ...................................... 213

*Duris v. Erato Shipping, Inc.,* 684 F.2d 352 (6th Cir. 1982) ...................................................... 151

*Eddy v. Printers House (P) Ltd*., No. 15-10370, 2015 WL 5771925 (5th Cir. Oct. 2, 2015)..... 195

*Enic, PLC v. F.F. S. & Co.,* 870 So. 2d 888 (Fla. Dist. Ct. App. 2004) ..................................... 175

*Estate of Miller v. Toyota Motor Corp.,* 2008 WL 4525058 (M.D. Fla. Oct. 6, 2008) .............. 175

*Exxon Mobil Corp. v. Freeman Holdings of Washington, LLC*, 779 F. Supp. 2d 1171 (E.D. Wash. 2011) ........................................................................................................................ 181

*F.G. Bruschweiler (Antiques) Ltd. v. GBA Great British Antiques, LLC,* 860 So. 2d 644 (La. App. 5 Cir. 2003)........................................................................................................... 170

*First Am. Title Ins. Co. v. First All. Title, Inc.,* 718 F. Supp. 2d 669 (E.D. Va. 2010).............. 178

*Fletcher-Harlee Corp. v. Szymanski*, 936 A.2d 87 (Pa. Super. Ct. 2007) .................................. 181

*Flores v. Bodden*, 488 F. App'x 770 (5th Cir. 2012) .................................................................. 180

*Flourine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849 (5th Cir. 2004).................................... 164

*Freeman Decorating Co. v. Encuentro Las Americas Trade Corp*., 2005 WL 2060997 (E.D. La. Aug. 24, 2005)........................................................................................................... 169

*Freudensprung v. Offshore Tech. Servs., Inc.,* 379 F.3d 327 (5th Cir. 2004) ................... 158, 166

*Grayson v. R.B. Ammon & Assocs., Inc.,* 778 So.2d 1 (La. App. 1 Cir. 2000)........................... 171

*Green v. Champion Ins. Co.*, 577 So. 2d 249 (La. Ct. App. 1991)....................................... passim

*Ham v. La Cienega Music Co.*, 4 F.3d 413 (5th Cir. 1993)......................................................... 196

*Hanson v. Denckla,* 357 U.S. 235 (1958) ................................................................................. 190

*Hargrave v. Fibreboard Corp.,* 710 F.2d 1154 (5th Cir. 1983) ......................................... 148, 149

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ................................ 190

*Hensgens v. Deere & Co.*, 869 F.2d 879 (5th Cir. 1989)............................................................ 203

*Hesni v. Williams & Boshea, L.L.C.*, 2002 WL 373273 (E.D. La. Mar. 7, 2002) ..................... 169

*Hill v. Fairfield Nursing & Rehab. Ctr., LLC*, 134 So. 3d 396 (Ala. 2013) ............................... 180

*Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379 (5th Cir. 2000)...................................... 172

*Holly & Smith Architects, Inc. v. St. Helena Congregate Facility,* 872 So. 2d 1147
  (La. App. 1 Cir. 2004)............................................................................................................... 171

*Horizon Aggressive Growth, L.P. v. Rothstein–Kass, P.A.,* 421 F.3d 1162 (11th Cir. 2005) .... 185

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819
  (E.D. La. 2012) ...................................................................................................................... passim

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 767 F. Supp. 2d 649
  (E.D. La. 2011) ........................................................................................................................... 168

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.* 742 F.3d 576 (5th Cir. 2014) .......passim

In re Chinese-Manufactured Drywall Prodcs. Liab., Litig., 753 F.3d 521 (5th Cir. 2014) ....passim

*In re Leonetti*, 28 B.R. 1003 (E.D. Pa. 1983) ........................................................................... 168

*In re Moll Industries, Inc.,* 454 B.R. 574 (Bankr. D. Del. 2011) ................................................ 150

*Inter-Tel Techs., Inc. v. Linn Station Properties, LLC,* 360 S.W.3d 152 (Ky. 2012) ......... 150, 181

*Int'l Shoe, Co. v. Washington,* 326 U.S. 310 (1945) .................................................................. 189

*Iron Workers Local 58 v. Citizens Bank*, 2002 WL 31427329 (E.D. La. Oct. 25, 2002) ........... 169

*ITL Int'l, Inc. v. Constenla, S.A.,* 669 F.3d 493 (5th Cir.2012) .......................................... 183, 199

*Jackson v. FIE Corp.*, 302 F.3d 515 (5th Cir. 2002) ........................................................ 185, 186

*Jackson v. Tanfoglio Giuseppe, S.R.L.,* 615 F.3d 579 (5th Cir. 2010) ...................... 148, 149, 172

*Joseph v. Chanin,* 869 So.2d 738 (Fla. Dist. Ct. App. 2004) .................................................... 185

*JSA, LLC v. Golden Gaming, Inc.*, No. 58074, 2013 WL 5437333
   (Nev. Sept. 25, 2013) ............................................................................................................ 181

*Knights Armament Co. v. Optical Sys. Tech., Inc.,* 2008 WL 2157108
   (M.D. Fla. May 21, 2008) ...................................................................................................... 175

*Koehler v. Bank of Bermuda, Ltd.*, 12 N.Y.3d 533, 883 N.Y.S.2d 763,
   911 N.E.2d 825 (N.Y. 2009) .......................................................................................... passim

*Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175 (9th Cir. 1980) .......................... 149

*Lamb By & Through Donaldson v. Volkswagenwerk Aktiengesellschaft,*
   104 F.R.D. 95 (S.D. Fla. 1985) ............................................................................................ 212

*Lennar Homes, LLC v. Knauf Gips KG*, No. 09-07901 CA 42, 2012 WL 3800187 (Fla. Cir. Ct.
   Aug. 31, 2012) .............................................................................................................. 99, 187

*Long v. Chevron Corp.*, No. 4:11CV47, 2011 WL 3903066 (E.D. Va. Sept. 2, 2011) ...... 177, 179

*Lothrop v. N. Am. Air Charter, Inc.*, 95 F. Supp. 3d 90 (D. Mass. 2015).................................. 181

*LTD Mgmt. Co., LLC v. Holiday Hosp. Franchising, Inc.*, No. CIV.A. 2:07CV530, 2008 WL 7281926 (E.D. Va. Mar. 11, 2008) ................................................................. 178, 179

*Luv N' Care, Ltd. v. Insta-Mix, Inc.* 438 F.3d 465 (5th Cir. 2006).................................... 187, 199

*Mangano Consultants, Inc. v. Bob Dean Enters. Inc.,* 921 So. 2d 1081 (La. App. 5 Cir. 2006).............................................................................................. 169

*Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899 (2d Cir. 1981) ......................................... 156

*McFadin v. Gerber*, 587 F.3d 753 (5th Cir.2009) ..................................................................... 200

*McIntyre Machinery, Ltd. v. Nicastro,* 131 S.Ct. 2780 (2011) .......................................... 194, 195

*McManus v. Washington Gas Light Co.*, 1991 WL 222345 (D.D.C. Oct 15, 1991) ................. 203

*Microsys Computing, Inc. v. Dynamic Data Sys., LLC,* No. 4:05 CV 2205, 2006 WL 2225821 (N.D. Ohio Aug. 2, 2006).......................................................................................... 181

*Mid-S. Mgt. Co. Inc. v. Sherwood Dev. Corp.*, 649 S.E.2d 135 (S.C. Ct. App. 2007) .............. 181

*Miller v. Entergy Servs., Inc.,* 913 So. 2d 143 (La. App. 4 Cir. 2005) .............................. 169, 170

*Miner v. Fashion Enterprises, Inc.,* 794 N.E.2d 902 (Ill. Ct. App. 2003) .................................. 181

*Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.,* 757 F.2d 1256 (5th Cir. 1985) .............. passim

*Mobius Mgmt. Sys., Inc. v. W. Physician Search, L.L.C.*, 175 S.W.3d 186 (Mo. Ct. App. 2005)............................................................................................................ 181

*Morales v. Bayou Concessions Salvage, Inc.,* 2004 WL 2381525 (E.D. La. 2004).................. 168

xiv

*Morgan v. Burks*, 611 P.2d 751 (Wash. 1980)..........................................................................166

*Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168 (5th Cir. 1985)..................................................151

*Naples v. Keystone Bldg. & Dev. Corp.*, 990 A.2d 326 (Conn. 2010) .......................................180

*S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123 (2d Cir. 2010) .............................181

*Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374 (5th Cir. 2002)................................196

*Ohio Central Railroad Company v. Central Trust Company of New York,*
    133 U.S. 83 (1889)................................................................................................................185

*Oswalt v. Scripto, Inc.,* 616 F.2d 191 (5th Cir. 1980)...............................................................188

*Pallas Shipping Agency, Ltd. v. Duris,* 461 U.S. 529 (1983) ...................................................151

*Parker v. Bell Asbestos Mines.,* 607 F.Supp. n.5 ......................................................................165

*Patin v. Thoroughbred Power Boats, Inc.,* 294 F.3d 640 (5th Cir. 2002) .................148, 149, 170

*Paz v. Brush Engineered Materials, Inc*., 445 F.3d 809 (5th Cir. 2006)...................................183

*PBM Products v. Mead Johnson Nutrition Co.,* No. 3:09-CV-269, 2009
    WL 3175665 (E.D. Va. Sept. 29, 2009).......................................................................177, 179

*Peterson v. Sealed Air Corp.*, 902 F.2d 1232 (7th Cir. 1990) ...................................................213

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) .............................................................155

*Rasmussen v. Gen. Motors Corp.,* 803 N.W.2d 623 (Wis. 2011)..............................................181

*Reistroffer v. Person,* 439 S.E.2d 376 (Va. 1994) ....................................................................178

*Revell v. Lidov,* 317 F.3d 467 (5th Cir. 2002) ............................................................................. 189

*Riggins v. Dixie Shoring Co., Inc.,* 590 So. 2d 1164 (La. 1991) ........................................ 170, 171

*Rive v. Briggs of Cancun, Inc.,* 2003 WL 22838542 (5th Cir. 2003) ......................................... 169

*Rockwell Automation, Inc. v. Kontron Modular Computers*, 2012 WL 5197934
  (S.D. Cal. Oct. 19, 2012) ....................................................................................................... 213

*Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415 (5th Cir. 1993) ................... passim

*Saudi v. Northrop Grumman Corp.,* 427 F.3d 271 (4th Cir. 2005) ............................................ 179

*Schmitt-Doss v. Am. Regent, Inc.,* No. 6:12-CV-00040, 2012 WL 6474038
  (W.D. Va. Dec. 13, 2012) ....................................................................................................... 177

*Scottsdale Ins. Co. v. Littlepage*, 1993 WL 275162 (E.D. Pa. July 16, 1993) ........................... 203

*Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266 (5th Cir. 2006) .............................. 189, 190

*Sonora Diamond Corp. v. Superior Court,* 99 Cal. Rptr. 2d 824 (Cal. Ct. App. 2000) ............. 180

*Southern Capitol Enterprises, Inc. v. Conseco Servs., L.L.C.,* 476 F. Supp. 2d 589
  (M.D. La. 2007) ............................................................................................................ 168, 169, 170

*State v. Am. Tobacco Co.,* 707 So. 2d 851 (Fla. Dist. Ct. App. 1998) ....................................... 174

*Steele v. United States*, 813 F.2d 1545 (9th Cir. 1987) .............................................................. 164

*Stuart v. Spademan,* 772 F.2d 1185 (5th Cir. 1985) .......................................................... 156, 157

*Town of Haynesville, Inc. v. Entergy Corp.,* 840 So. 2d 597 (La. App. 2 Cir. 2003) ................ 169

xvi

*Tremps v. Ascot Oils, Inc.*, 561 F.2d 41 (7th Cir. 1977) .................................................... 203

*Triangle Distributing, Inc. v. Shafer, Inc.*, 1991 WL 164333 (6th Cir. Aug. 23, 1991)............. 203

*Tulane Educ. Fund v. Ipsen, S.A.*, 450 Fed. App'x. 326 (5th Cir. 2011)........................... 167, 170

*U.S. ex rel. Small Bus. Ass'n v. Chang*, 2006 WL 757823 (D.N.J. Mar. 20, 2006) .................. 168

*United Rubber, Cork, Linoleum and Plastic Workers of Am., AFL–CIO v. Great Am. Indus., Inc.,* 479 F. Supp. 216 (S.D.N.Y. 1979) ........................................................ 150

*United States v. A.H. Fischer Co., Inc.*, 162 F.2d 872 (4th Cir.1947) ......................................... 203

*United States v. Emor*, 850 F. Supp. 2d 176 (D.D.C. 2012) ...................................................... 181

*United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686 (5th Cir. 1985) ..................................... 157

*United States v. Wallace*, 961 F. Supp. 969 (N.D. Tex. 1996) ................................................... 164

*Van Dusen v. Barrak*, 376 US 612 (1964) ................................................................................. 167

*Vermeulen v. Renault, U.S.A., Inc.*, 958 F.3d 1534 (11th Cir. 1993) ......................................... 197

*Verreries de l'hermitage v. Hickory Furniture*, 704 F.2d 140, (4th Cir 1983).......................... 165

*Videocipher v. Satellite Earth Stations SESE, Inc.*, 1992 WL 208037 (W.D. La. Jul. 30, 1992) ................................................................................................... 169

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F3d 235 (5th Cir. 2008) .......... 182

*Watson v. Sunrise Sr. Living Servs., Inc.*, No. CIV.A. 10-230 KM, 2013 WL 103966 (D. N.J. Jan. 8, 2013) ................................................................................... 181

*Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406 (9th Cir. 1977)........................ 149

*William v. AES Corp.,* 28 F. Supp. 3d 553 (E.D. Va. 2014) ...................................................... 179

*World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980) ........................................... 183

*Wu v. Tseng,* No. 2:06cv346, 2007 WL 201087 (E.D. Va. Jan. 24, 2007) ................................. 179

Statutes

28 U.S.C. § 1746 ....................................................................................................................... 160

Fla. Stat. Ann. § 48.193 ........................................................................................................... 185

Fla. Stat. Ann. § 48.193(1)(a) .......................................................................................... 174, 188

Louisiana Civil Code article 3462 ........................................................................................... 203

Va. Code Ann. § 8.01–328.1(A) .............................................................................................. 177

Rules

Fed.R.Civ.P. 12(b)(5) ............................................................................................................... 202

Fed.R.Civ.P. 4(m) .................................................................................................................... 205

Fed.R.Evid. 402 ....................................................................................................................... 165

Fed.R.Evid. 1006 ..................................................................................................................... 188

Other Authorities

4A *Federal Practice & Procedure Civil* § 1069.4 (3d ed. 2013) .............................................. 152

*Piercing the Veil to Assert Personal Jurisdiction over Corporate Affiliates: An Empirical Study of the Cannon Doctrine,* 84 B.U. L. Rev. 445 (2004) ................................... 163

*The Ideals and Reality of a Legal Transplant – The Veil-Piercing Doctrine in China,* 50 Stan. J. Int'l L. 319 (2014) ................................................................. 156, 157, 158

xviii

*The Political Logic of Corporate Governance in China's State-owned Enterprises*,
47 C<small>ORNELL</small> I<small>NT'L</small> L.J. 631 (2014) .................................................................... 3, 166

*We Are the (National) Champions:  Understanding the Mechanisms of State
Capitalism in China*, 65 S<small>TAN</small>. L. R<small>EV</small>. 697 (2013)............................................................ 3, 166

# INDEX OF EXHIBITS

| MTD EX. NUMBER | DESCRIPTION |
|---|---|
| 1 | Summary Chart of Taishan, BNBM, CNBM Officers and Directors, with supporting documentation (Exhibit 23-1 and exhibits thereto) |
| 2 | Manufacturer Profile Forms for Taishan Gypsum Co., Ltd. and TTP (Herman Affidavit Exhibit 19 filed 5/8/2012) |
| 3 | "Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan Gypsum Company Limited" dated 5/11/2009 [TG-0208428-30] (Exhibit 825[1]) |
| 4 | Organizational Chart of CNBM Group & Controlled Subsidiaries |
| 5 | Deposition of BNBM Group (ZHAO Yanming) dated 7/15-17/2015 |
| 6 | Nicolas C. Howson, *Protecting the State from Itself?  Regulatory Intervention in Corporate Governance and the Financing of China's "State Capitalism,"* U. OF MICHIGAN PUBLIC LAW RESEARCH PAPER NO. 423 (Jan. 13, 2015) |
| 7 | Jiangyu Wang, *The Political Logic of Corporate Governance in China's State-owned Enterprises*, 47 CORNELL INT'L L.J. 631 (2014) |
| 8 | Li-Wen Lin & Curtis J. Milhaupt, *We Are the (National) Champions:  Understanding the Mechanisms of State Capitalism in China*, 65 STAN. L. REV. 697 (2013) |
| 9 | Adam Hersh, *Assessing China's Economic Reform Agenda,* CENTER FOR AMERICAN PROGRESS (May 1, 2014) available at https://www.americanprogress.org/issues/economy/report/2014/05/01/88864/assessing-chinas-economic-reform-agenda/ |
| 10 | Meeting Minutes of the Seminar on Deepening Reform, CNBM Group Board of Directors dated 2/26/2014 [CNBMGRP00023355-75] (Exhibit 816) |
| 11 | CNBM Group "Global Presence" Tab, available at http://www.cnbm.com.cn/EN/c_0000001600030001/ |
| 12 | 2014 China National Building Materials Group Corporation Social Responsibility Report |
| 13 | CNBM Announcement: "Connected Transaction Acquisition of the Entire Equity Interest in Tai'an Donglian Investment Trading Company Limited; Connected Transaction Provision of Financial Assistance to Taian State Owned Assets |

---

[1] Exhibits referenced as "Exhibit _#_ are those that were introduced in depositions of Defendants and individuals; specific prefixes will be used for deposition exhibits not in the main set of deposition exhibits.

|  | Management Company" dated 8/28/2006 [Q000010-12] (Herman Affidavit Exhibit 134 filed 5/8/2012) |
|---|---|
| 14 | CNBM Company Announcement of Connected Transactions by Beijing New Building Material Company Material Company Limited published 4/13/2007 |
| 15 | 2005 CNBM Annual Report [ALRMH-CNBM00004244-4352] (Exhibit 4) |
| 16 | 2005 BNBM Annual Report [BNBMPLC0000288-380] (Exhibit 136) |
| 17 | 2005 BNBM Group Auditor's Report [BNBM(Group)00000427R-518R] (Exhibit 168R) |
| 18 | 2006 CNBM Annual Report [ALRMH-CNBM00004106-4243] (Exhibit 5) |
| 19 | 2006 BNBM Annual Report [BNBMPLC0000489-605] (Exhibit 14) |
| 20 | 2007 CNBM Annual Report [ALRMH-CNBM00000782-949] (Exhibit 6) |
| 21 | 2007 BNBM Annual Report [BNBMPLC0000722-841] (Exhibit 15) |
| 22 | 2008 CNBM Annual Report [ALRMH-CNBM00001118-1315] (Exhibit 7) |
| 23 | 2008 BNBM Annual Report [BNBMPLC0000961-1080] (Exhibit 16) |
| 24 | 2008 BNBM Group Auditor's Report [BNBM(Group)0000745R-807R] (Exhibit 171R) |
| 25 | 2009 CNBM Annual Report [ALRMH-CNBM00001514-1719] (Exhibit 8) |
| 26 | 2009 BNBM Annual Report [BNBMPLC0001229-1378] (Exhibit 17) |
| 27 | 2011 CNBM Annual Report [ALRMH-CNBM00002354-571] (Exhibit 10) |
| 28 | 2012 CNBM Annual Report [ALRMH-CNBM00002790-3007] (Exhibit 11) |
| 29 | 2012 BNBM Annual Report [BNBMPLC00002273-480] (Exhibit 20) |
| 30 | 2013 CNBM Annual Report [ALRMH-CNBM00003226-443] (Exhibit 12) |
| 31 | 2013 BNBM Annual Report [BNBMPLC0002743-944] (Exhibit 21) |
| 32 | 2011 BNBM Annual Report [BNBMPLC0001862-2018] (Exhibit 19) |
| 33 | 2014 CNBM Annual Report [ALRMH-CNBM00003662-883] (Exhibit 13) |
| 34 | 2014 BNBM Annual Report [BNBMPLC0003164-336] (Exhibit 22) |
| 35 | Deposition of CNBM (CHANG Zhangli) dated 6/5-7/2015 |

| 36 | Deposition of SONG Zhiping dated 9/14-15/2015 |
| 37 | 2015 CNBM Interim Report [PSC00000001-102] (Exhibit 334) |
| 38 | 2006 CNBM Global Offering Prospectus [ALRMH-CNBM000001-643] (Exhibit 3) |
| 39 | 2010 CNBM Annual Report [ALRMH-CNBM00001926-2139] (Exhibit 9) |
| 40 | Deposition of Morgan Stanley (Terence Keyes) dated 11/13/2015 |
| 41 | Morgan Stanley Post-Mortem PowerPoint for CNBM dated 3/16/2006 [MS056130-38] (Keyes Exhibit 17) |
| 42 | Hong Kong Stock Exchange Rules, Chapter 1 (Keyes Exhibit 2) |
| 43 | Hong Kong Stock Exchange Rules, Chapter 19A (Keyes Exhibit 3) |
| 44 | BNBM press release "BNBM General Manager Mr. Wang Visited Saint-Gobain and Lafarge" dated 4/15/2007 |
| 45 | BNBM press release "Founding Ceremony for BNBM Taicang 60 million Sq.m. Per Annum Gypsum Board Base" dated 5/23/2007 |
| 46 | 2010 BNBM Annual Report [BNBMPLC0001542-695] (Exhibit 18) |
| 47 | Partial Translation of the Stock Listing Rules of the Shenzhen Stock Exchange (2014 Revision), No. 378 |
| 48 | CNBM Announcement: Disclosable Transaction, Connected Transaction, Acquisition of Equity Interest in Taishan Gypsum Through Share Issuance of BNBM dated 10/13/2015 |
| 49 | Deposition of JIA Tongchun dated 9/17-18/2015 |
| 50 | Deposition of Taishan (CHE Gang) dated 6/2-4/2015 |
| 51 | "General Manager Bing Wang's work report at the 3rd meeting of the 5th session of BNBM staff representative meeting" dated 3/23/2007 [BNBMPLC-E-004827-4847 and partial translation] (Exhibit 315R) |
| 52 | China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors [BNBM(Group)-E-0005107-5115 and partial translation] (Exhibit 249) |
| 53 | Deposition of HU Jinyu dated 12/7/2015 |
| 54 | "CNBM Co., Ltd. 2010, 6th Working Meeting" dated 6/11/2010 [CNBMCO000327370-00327390 and partial translation] |

55          "Present the People, the Object, and the Mindset, Integrate Strictness with Reliability, and Change the Work Style" [CNBMCO00055606-611 and partial translation] (Exhibit 392)

56          "China National Building Material Group Corporation Sample Document" [CNBMGRP00006793-6795 and partial translation] (Exhibit 75)

57          "China National Building Material Group Corporation Year of 2015-2017 Development Strategy and Plan" dated April, 2015 [CNBMGRP000013290-13347 and partial translation] (Exhibit 91)

58          "Beijing New Building Materials (Group) Company Limited Internal Control System Construction Work Summary" dated 5/28/2014 [BNBM(Group)-E-0004986-4990 and partial translation] (Exhibit 247)

59          CNBM Co., Ltd. [2011] "The Second Office Meeting" held 2/28/2011 [CNBMCO00366842-873 and partial translation]

60          WANG Bing's "Welcome Speech on the 2008 BNBM Annual Marketing Meeting" [BNBMPLC-E-0005889-5892 and partial translation] (Exhibit 316R)

61          Email from BNBM PLC to Taishan Gypsum instructing over CNBM Group's Comprehensive Risk Management Notice dated 4/5/2010 [TG-0217959 and translation] (Exhibit 815)

62          "Taishan Gypsum Company Limited Comprehensive Risk Management Report for the Year 2011" submitted to CNBM Group, CNBM and BNBM [CNBMGRP00371516-371562 and partial translation] (Exhibit 416)

63          ██████████████████████████████████████████████ [CNBMGRP00330873-330934 and partial translation] (Exhibit 388)

64          "China National Building Material Group Corporation Interim Measure on Fully Implementing the Decision-Making Rules for the 'Three Significant Issues and One Large Operation'" [BNBMPLC-E-0001156-1172 and partial translation] (Exhibit 113)

65          Email chain between and among CNBM, BNBM, and Taishan re: "Notice on submitting the information of import and export business operation and countermeasures of the enterprises during the financial crisis" dated 11/3-5/2008 [TG-0218944-946 and translation] (Exhibit 814)

66          Attachment to 11/3-5/2008 email chain between and among CNBM, BNBM, and Taishan, "The Operation Situation and Relevant Suggestions on the Import and Export Business of Taishan Gypsum Company Limited" [TG-0218947-948 and translation] (Exhibit 814-1)

| | |
|---|---|
| 67 | "Statement on Implementing the Requirements from the Group Corporation's Meeting of International Business Risk Prevention," dated 7/11/2014 [Translation of BNBM(Group)-E-0000444-446 and translation] (Exhibit 215) |
| 68 | Technical Code for Safety of Gypsum Plasterboard Enterprises: Instructions for Preparation [CNBMGRP00071458-480 and partial translation] (Exhibit 810-1) |
| 69 | "Report on Submitting the Implementation Plan on the Three-year Objective of Legal Work of China National Building Material Company Limited and Its Subordinate Enterprises" [CNBMCO00216986-994 and partial translation] |
| 70 | "Request for Instructions on Establishing the Trade Union at the Headquarters of China National Building Material Company Limited" dated 5/10/2006 [CNBMCO00032583-32585 and translation] (Exhibit 656) |
| 71 | "CNBM Request for Instructions on Trade Union Election at Expiration of Office Terms" dated 9/2/2014 [CNBMCO00073630-631 and translation] (Exhibit 652) |
| 72 | "Work Report of China National Building Material Company Limited on Special Treatment of 'Private Coffers'" dated 11/11/2011 [CNBMGRP00211002-211011 and partial translation] (Exhibit 653) |
| 73 | "V. Problems found in the audit" [CNBMGRP00331473-331500 and partial translation] (Exhibit 662) |
| 74 | Email and attachment to JIA Tongchun re: Notice on Matters Relevant to CNBM Group's Training Class in 2011 for Leaders at Middle and Senior Levels dated 6/29/2011 [TG-0073103-73111 and translation] |
| 75 | BNBM PLC's Report on the Management and Control of its Branches and Subsidiaries dated 10/16/2007 [BNBMPLC-E-0006050-6051 and translation] (Exhibit 124R) |
| 76 | BNBM Reply on the Inquiry Letter about 2006 Annual Report Verification written to Beijing Securities Regulatory Bureau dated 4/23/2007 [BNBMPLC-E-0004781-84 and partial translation] (Exhibit 121R) |
| 77 | Deposition of BNBM (CHEN Yu) dated 7/8-11/2015 |
| 78 | Deposition of WANG Bing dated 8/25-27/2015 |
| 79 | 2001-2005 Uniform Business Reports of BNBM America from FL Secretary of State (Exhibit 144-3) |
| 80 | Deposition of CAO Jianglin dated 8/4-5/2015 |
| 81 | Deposition of CNBM Group (ZHOU Guoping) dated 6/16-18/2015 |

82          CNBM Group Board of Directors Meeting Minutes, 23rd Meeting of the Third Session of Board dated 1/29/2015 [Partial Translation of CNBMGRP00012512-522] (Exhibit 98)

83          Deposition of PENG Shou dated 9/16/2015

84          Resolutions of the General Meeting of Shareholders [of Taishan Gypsum] dated 4/25/2005 [TG0020601-602] (Herman Affidavit Exhibit 185 filed 5/8/2012) (Jia Def. 1/9/12 Exhibit 8A)

85          Shandong Taihe Dongxin Co., Ltd. Resolution of the First Extraordinary General Meeting of 2006 dated 4/15/2006 [TG0020675-676] (Herman Aff. Ex. 187 filed 5/8/2012)

86          CNBM Group's "Reply on Beijing New Building Material (Group) Co., Ltd.'s 2013 annual loan and guarantee plan" dated 3/5/2013 [CNBMGRP00000564] (Exhibit 86)

87          BNBM Group Guarantee for Taishan for 100,000,000 yuan with Taian Quingnian Street Branch of China - "Maximum Guarantee Contract Serial No. 2013-123010-ZG03" dated 1/10/2013 [TG-068133-53 & English translation provided by Taishan]

88          BNBM Group Guarantee for Taishan for 350,000,000 yuan with Agricultural Bank of China Taian Longze Sub Branch - "Maximum Guarantee Contract Serial No. 3710052013005I039" dated 7/11/2013 [TG-067973-90 & English translation provided by Taishan]

89          Chart of BNBM Guarantees to/Investments in Taishan Gypsum from 2005 to 2014 - FRE 1006 Summary Chart (Exhibit 162)

90          BNBM PLC Public Announcement of the External Guarantees for the year 2015 dated 3/18/2015 [BNBMPLC-E-0112095R-112112R] (Exhibit 322R)

91          BNBM PLC Resolution of the 2013 Annual General Meeting of Shareholders dated 4/16/2014 [BNBMPLC-E-0011157R-0011166R and partial translation] (Exhibit 305R)

92          Chart of CNBM Guarantees to BNBM from 2005 to 2007 - FRE 1006 Summary Chart (Exhibit 346)

93          2012 BNBM Group Auditor's Report [BNBM(Group)00001154R-213R] (Exhibit 175R)

94          2013 BNBM Group Auditor's Report [BNBM(Group)00001266R-337R] (Exhibit 176R)

95          2014 BNBM Group Auditor's Report [BNBM(Group)00003274R-330R] (Exhibit 177R)

| | |
|---|---|
| 96 | Taishan Gypsum Co., Ltd. Resolutions of the 5th Session of the 1st Meeting of the Board of Supervisors held 8/11/2011 [TG-040615-0028689] |
| 97 | "Communications and Confirmation Letter on the Auditing Schedule of the 2008 Annual Financial Report" dated 11/27/2008 [BNBMPLC-E-0005724-5725 and partial translation] (redlined) |
| 98 | "Letter of Communication and Confirmation about the Audit Schedule for the 2009 Annual Financial Statements" dated 11/28/2009 [BNBMPLC-E-0005169-5170 and partial translation] (Exhibit 311R) |
| 99 | Minutes of BNBM PLC's 2nd Meeting of the 4th Session of the Board of Directors dated 8/5/2008 [BNBMPLC0005982-5984] (part of Exhibit 103) |
| 100 | 2006 BNBM Group Auditor's Report [BNBM(Group)00000560R-611R] (Exhibit 169R) |
| 101 | 2007 BNBM Group Auditor's Report [BNBM(Group)0000651R-701R] (Exhibit 170R) |
| 102 | Declaration of Yan Gao dated 1/8/2016 |
| 103 | CNBM Group website page "Contact Us," available at http://www.cnbm.com.cn/EN/c_000000160005/ (last accessed 1/18/2016) |
| 104 | Deposition of JIA Tongchun dated 4/4-5/2011 |
| 105 | Deposition of JIA Tongchun dated 1/9-10/2012 |
| 106 | Taishan Gypsum Co., Ltd. Resolutions of the First Meeting of the Fourth Board of Directors held 5/20/2008 [TG 0020787 and translation provided by Taishan] (Exhibit 14 to Exhibit 23-1) |
| 107 | CNBM trademark records, United States Patent and Trademark Office |
| 108 | Deposition of CNBM Forest Products Canada, Ltd. (DENG Jianjun) dated 10/28/2015 |
| 109 | CNBM Group Storefront on Alibaba.com [ALRMH-CNBM00010001-10002] (Exhibit 270-1) |
| 110 | BNBM Group website pages [ALRMH-CNBM00008873-85 & 8886-97] (Exhibits 214, 214A) |
| 111 | Email and attachment from PENG Wenlong to Manager XU (advertising executive) dated 11/2/2010 [TG-071054-56 and translation] (Exhibits 809, 809-1) |
| 112 | Deposition of PENG Wenlong dated 11/12-14/2015 |

113         Deposition of New Jersey Institute of Technology (Donald Sebastian) dated
            4/22/2015

114         Deposition of CTIEC-TECO American Technology, Inc. (Fred Paulsen) dated
            4/24/2015

115         Deposition of Sunpin Solar Development, LLC (Steve Kim) dated 4/17/2015

116         Deposition of Western Wood (John Salamanca) dated 5/21/2015

117         Web Article, OKorder.com Official Launch, from cnbm.com.cn, dated 2/18/2011
            [ALRMH-CNBM0008810-8812] (Exhibit 81)

118         Web Article, CTIEC signs Wal-Mart Roof Power Plant Project from cnbm.com.cn,
            dated 3/2/2015 [ALRMH-CNBM0008813-8814] (Exhibit 82)

119         Web Article, CTIEC signed a 100 MW Photovoltaic Power Plant Project in the U.S.,
            from cnbm.com.cn., dated 12/2/2014 [ALRMH-CNBM0008854-8855] (Exhibit 82-
            1)

120         Letter from CNBM (USA) to Eastern Metal Supply, Inc. created on 4/3/2008
            [CNBMUSA00045438]

121         "Main Issues in State-owned Asset Supervision and Administration Commission's
            Audit of Economic Responsibility" [BNBMPLC-E-0010163 and translation] (Exhibit
            134R)

122         "Award for Significant Business Contributors from Taishan Gypsum and BNBM
            Homes" dated 1/20/2012 [BNBMPLC000729-91 and translation] (Exhibit 143)

123         "Problems Discovered During Auditing Review" [CNBMGRP00009807-9838 and
            translation] (Exhibit 133R)

124         Communications about the Problems of BNBM [BNBMPLC-E-0006059-6060 and
            partial translation]

125         "Explanation on the Rectification Status" dated 3/20/2013 [BNBMPLC-E-0010164
            and translation] (Exhibit 134-1)

126         Announcement for Decision of 12th Interim Meeting of the Third Board of Directors
            dated 4/23/2005 [BNBMPLC0004402-4403] (part of Exhibit 101)

127         Declaration of JIA Tongchun dated 9/16/2015

  
| | |
|---|---|
| 128 | Shandong Taihe Building Material Co., Ltd. Forms: Enterprise Public Information on Taishi Rock Wool Co., Ltd. (translation of http://218.57.139.24/pub/gsgsdetail/1152/374f95a2146616e7862c28ae20f2d13764b76397a89841a166c150b0cc281942) and National Enterprise Credit Information Publication System (translation of http://218.57.139.24/pub/nb/detail/1130/0B820811D242E295E05012AC9E010483) |
| 129 | Resolution of the 4th Extraordinary General Meeting of Shareholders for the Year of 2005 of Shandong Taihe Dongxin Co., Ltd. dated 6/26/2005 [TG0020682-85 and translation] |
| 130 | Taishan Gypsum Communication Letter on Economic Responsibility Audit and Financial-based Audit dated 5/16/2012 [BNBMPLC-E-0008152-8166 and partial translation] (Exhibit 355) |
| 131 | Taishan Articles of Association dated 6/20/2007 [TG0020725-48] (Jia Def. 1/9/2012 Exhibit 12A) |
| 132 | Shandong Taihe Dongxin Co., Ltd. Third Meeting of the Third Board of Directors Resolutions dated 4/15/2006 [TG0025900-25902] (Jia Def. 1/9/2012 Exhibit 22A) |
| 133 | BNBM Announcement of the Resolution of the 7th Interim Meeting of the 4th Session of Board of Directors, dated 7/31/2009 [BNBMPLC0004629-4636] (part of Exhibit 101) |
| 134 | BNBM "Report on the Improvement and Solution of Relevant Issues Raised in the Site Inspection of Beijing Securities Regulatory Bureau" dated 7/7/2008 [BNBMPLC-E-0006064-6066 and partial translation] (Exhibit 318R) |
| 135 | BNBM Announcement of the Resolutions of the Twelfth Interim Meeting of the 4th Session of the Board of Directors dated 2/22/2011 [BNBMPLC0004689-4691] (part of Exhibit 101) |
| 136 | BNBM Announcement of the Resolutions of the Eighth Meeting of the Fourth session of Board of Directors dated 8/18/2011 [BNBMPLC0004717-4721] (part of Exhibit 101) |
| 137 | "Rectification Status on the Inversion of Procedure in the Fixed Investment Projects of the Stock Company – Weekly Report" [BNBMPLC-E-0011442 and translation] (Exhibit 326R) |
| 138 | BNBM Announcement of Final Resolution of the 25th Interim Meeting of the 3rd Session of Board of Directors dated 6/15/2007 [BNBMPLC0004480-82] (part of Exhibit 101) |
| 139 | Shandong Taihe Dongxin Co., Ltd. Shareholder Meeting Resolution dated 11/8/2005 [TG0020666-67 and Translation provided by Taishan] |

140      Shandong Taihe Dongxin Co., Ltd. Amendment of Article of Incorporation dated 11/8/2005 [TG0020668-69 and Translation provided by Taishan]

141      Contract between Taishan and Venture Supply for 100,000 sheets of drywall dated 11/17/2005 [TG0001684-85] (Herman Affidavit Exhibit 80 filed 5/8/2012) (Fu 1/10/2012 Exhibit 3)

142      2nd Contract between Taishan and Venture Supply for 100,000 sheets of drywall dated 12/16/2005 [TG019854-57] (Herman Affidavit Exhibit 81 filed 5/8/2012) (Fu 1/10/2012 Exhibit 4)

143      BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006 by the International Business Department" [BNBMPLC-E-0029161] (Exhibit 138)

144      Shandong Taihe Dongxin Co., Ltd. Resolutions of the General Meeting of Shareholders dated 3/24/2005 [TG0020598-600] (Jia Def. 1/9/2012 Exhibit 6A)

145      BNBM Project Information Statistical Tables (Gypsum and Non-Gypsum Board) dated 2013 [BNBMPLC-E-0001215-1224 and partial translation]

146      BNBM Announcement of Final Decision of the 15th (Temporary) Meeting of the Third Session of Board of Directors dated 1/23/2006 [BNBMPLC0004415-4417] (part of Exhibit 101)

147      BNBM Announcement of Final Decision of the 21st Temporary Meeting of the Third Session of Board of Directors dated 2/9/2007 [BNBMPLC0004454-4456] (part of Exhibit 101)

148      BNBM Announcement of Resolution of the 3rd Session of the 32nd meeting of the Board of Directors dated 2/18/2008 [BNBMPLC0004521-4523] (part of Exhibit 101)

149      BNBM "Maximum Amount Guarantee Contract" for TG dated 6/13/2010 [TG0067647-63 & 67725-68, as produced]

150      BNBM "Maximum Amount Guarantee Contract" for TG dated 7/1/2011 [TG0067667-74 & 67687-98, as produced]

151      BNBM "Maximum Amount Guarantee Contract" for TG dated 8/22/2012 [TG0067709-28, as produced]

152      BNBM "Maximum Amount Guarantee Contract" for TG dated 9/30/2013 [TG0067729-47, as produced]

153      BNBM "Maximum Amount Guarantee Contract" for TG dated 4/16/2014 [TG0067748-66, as produced]

154     BNBM Announcement of Resolution of the 3rd Meeting of the 4th Session of Board of Directors dated 3/17/2009 [BNBMPLC0004610-4615] (part of Exhibit 101)

155     BNBM Announcement of the Annual Shareholders' Meeting Resolution 2013 dated 4/16/2014 [BNBMPLC0005180-5186] (part of Exhibit 102)

156     Comprehensive Team of CNBM Listing Office dated 8/3/2005 [CNBMCO00324565-324578 and translation]

157     ███████████████████████████████████████████
        ██████████████████████████ [BNBMPLC-E-0002155-2156 and partial translation] (redlined)

158     Email from CHEN Haixian to CHEN Zhucai dated 12/29/2010 [CNBMCO00215626-215627]

159     Email from CNBM to Taishan Gypsum dated 8/16/2011 [CNBMCO00280477-478 and translation] and attachment, "Certification by the Subsidiary Company on Housing Accumulation Funds" [CNBMCO00280479 and translation]

160     BNBM PLC 2014 Final Financial Account Report [BNBMPLC-E-0019395-19407 and partial translation] (redlined)

161     BNBM PLC Investment document No. 62 (2013), "Notice on Publishing 3 Regulations, the Administrative Measures of the Branches/Subsidiary Companies of BNBM PLC, the Administrative Measures of the External Investments of BNBM PLC, and the Administrative Measures of the Development and Strategy of BNBM PLC dated 6/18/2013 [BNBMPLC-E-0058974-58995 and partial translation] (Exhibit 330)

162     Deposition of CNBM USA Corp. (ZHANG Shaojun) dated 11/3/2015

163     CNBM USA "Building a Mutually Rewarding Partnership" Powerpoint dated 4/2/2007

164     Defendant Affiliate/Subsidiary/Parent Manufacturers' Profile Form of China National Building Material & Equipment Import & Export Corp. (Exhibit 287)

165     CNBM International Corporation "Company Profile," available at http://www.icnbm.com/en/info (last visited January 4, 2016) (Exhibit 81-2)

166     Taishan Corporate Registration Form dated 8/1/2008 [TG-040615-0027610 and translation]

167     Beijing Securities Company Issue [2008] No. 95: Regulatory Opinion on Beijing New Building Materials Public Limited Company dated 7/9/2008 [BNBMPLC-E-0006061-6063 and partial translation] (Exhibit 317R)

168    CNBM (USA) Corp. Papers Relating to Incorporation from the State of California, Secretary of State (Exhibit 599)

169    CNBM International Corporation – Company Profile for Gypsum Division [CNBMUSA00004146-58]

170    BNBM Reply to the Inquiry Letter on Evaluating the 2007 Annual Report dated 4/10/2008 [BNBMPLC-E-0005884-5888 and partial translation] (Exhibit 329)

171    BNBM Announcement of the 3rd Session of Resolution of the 38th interim meeting of the Board of Directors dated 6/30/2008 [BNBMPLC0004559-4560] (part of Exhibit 101)

172    BNBM Announcement of the 29th Interim Meeting of the 3rd Session of Board of Directors dated 10/15/2007 [BNBMPLC0004504-4507] (part of Exhibit 101)

173    BNBM Announcement of the 3rd Session of the 34th Meeting of the Board of Directors dated 4/3/2007 [BNBMPLC0004542-4544] (part of Exhibit 101)

174    BNBM Announcement of the Resolution of the 9th Interim Meeting of the 4th Session of Board of Directors dated 2/22/2011 [BNBMPLC0004731-4738] (part of Exhibit 101)

175    United Suntech Craft Meeting Notes dated 9/3/2003 [SUNTECH00000042] (Exhibit 479)

176    Stock Purchase Agreement dated 6/2/2008 [SUNTECH00000033-36] (Exhibit 434)

177    BNBM Announcement of the Resolutions of the 15th Interim Meeting of the 4th Session of the Board of Directors dated 6/5/2012 [BNBMPLC0004741-4742] (part of Exhibit 101)

178    Email from Sharon to UNITEDSUNTECHCRAFT@gmail.com dated 9/18/2012 and attached Application for Title Registration for United Suntech Craft, Inc. dated 9/16/2012 [SUNTECH000001000-01] (Exhibits 432, 432-1)

179    Email re: 2010 Annual Audit Arrangements dated 1/5/2011 [SUNTECH00000046-47 and translation] (Exhibit 480)

180    CNBM Notice on Doing a Good on the Formulation of 2012 Financial Statements dated 1/7/2013 [SUNTECH00000078-81 and translation]

181    Deposition of United Suntech Craft Inc. (LIU Weisheng) dated 10/27/2015

182    CNBMI USA tab, CNBMIT Co. webpage, available at http://www.cnbmit.com/en/overseas/Detail.aspx?MenuID=050602 (last accessed 1/19/2016)

183    CNBMIT "About Us" Tab, available at http://www.cnbmit.com/en/about/index.aspx (last visited 1/19/2016)

184    CNBM International Corporation History [CNBMUSA00004859-4862]

185    *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, MDL No. 2047, Hearing Transcript (E.D. La.  Dec. 8, 2015)

186    The Course of Events on Hiring Foreign Law Firms for the Gypsum Board Litigation in the United States [BNBMPLC-E-0059967-77] (redacted pursuant to Court Order at Rec. Doc. No. 19792)

187    Letters with attachments from Knauf to SONG Zhiping (CNBM Group) and WANG Bing (BNBM  Group) dated 5/15/2009 [KNAUFGIPS0160544-888] (Exhibit 61)

188    Announcement of Beijing New Building Materials Public Limited Company in Relation to the Developments of Gypsum Board Litigation in the U.S. dated 7/18/2014 [ALRMH-CNBM00005108R-5111R] (Exhibit 26R)

189    Announcement of Beijing New Building Materials Public Limited Company in Relation to the Developments of Gypsum Board Litigation in the U.S. dated 2/13/2015 [ALRMH-CNBM00005114R-5117R] (Exhibit 30R)

190    CNBM Announcement: Further Updates on Recent Developments in the Gypsum Board Litigation in the U.S. dated 2/13/2015 [CNBMCO00000329-331 and translation] (Exhibit 31)

191    Email from PENG Wenlong [Taishan] to China Building Materials Academy dated 5/31/2009 [TG-0370699 and translation] (Exhibit 817)

192    CNBM Group Corporation Meeting Minutes of the 5th Work Meeting of Managers of CNBM Group dated 7/9/2010 [CNBMGRP00026029-39 and translation] (Exhibit 822)

193    Attachment to 5/31/2009 email from PENG Wenlong to China Building Materials Academy: "Questions to the Enterprise(s)" [TG-0370700 and translation] (Exhibit 817-1)

194    Email from ZHANG Jian re: Report of the Board of Directors dated 6/3/2010 [TG-0374792 and translation] (Exhibit 821)

195    Attachment to 6/3/2010 Email from ZHANG Jian: "Informational Report on Seriously and Proactively Doing a Good Job in Responding to the Incident of 'Problematic Gypsum Boards Shipped to the United States'" (Opinion Soliciting Draft) [TG-0374793-801 and translation] (Exhibit 821-1)

196    Email from PENG Wenlong to ZHANG Jian dated 6/27/2010 [TG-0129674 and translation] (Exhibit 801)

197                     Attachment 1 to 6/27/2010 Email from PENG Wenlong to ZHANG Jian (CNBM Group): "Statement on the Data and Statistics of Exports to the U.S. from 2005 to 2007" [TG-0129675-76 and translation] (Exhibit 801-1)

198                     Attachment 2 to 6/27/2010 Email from PENG Wenlong to ZHANG Jian (CNBM Group): "Statistics of U.S. Gypsum Boards of Self-managed Export during 2005-2007" [TG-0129677 and translation] (Exhibit 801-2)

199                     Common Interest Joint Defense and Commonality Agreement dated 11/29/2010 (Exhibit 358)

200                     Privilege Log Produced by Hogan Lovells (Exhibit 66)

201                     ██████████████████████████████████████ ██████████████████████ [TG-0369908-13 and translation] (Exhibit 800)

202                     Common Interest, Joint Defense and Commonality Agreement dated March, 2015 [BNBMPLC0007605-7625] (Exhibit 310)

203                     CNBM Group website Biography of PENG Xuefeng, available at http://www.cnbm.com.cn/EN/c_0000001600070003/d_26385.html

204                     "Dacheng and Dentons Combine to Create the Largest Law Firm in the World," available at  http://www.dachenglaw.com/en/news/dachengNews/33589.html (last accessed 1/19/2016)

205                     CNBM Group Resolution No. 17 of the 3rd Session of the Board of Directors of CNBM Group dated 7/11/2014 [CNBMGRP00393000-002 and translation] (Exhibit 332)

206                     CNBM Group 18th Meeting minutes of the Third Session of the Board of Directors of CNBM Group dated 8/15/2014 [CNBMGRP00346624-6636] [Rec. Doc. 19492-3] (Exhibit 356)

207                     Transcript of Special Hearing dated 2/12/2105 [Rec. Doc. No. 18475-7]

208                     CNBM Group Notice of 17th Meeting of Third Session of the Board of Directors of CNBM Group dated 7/11/2014 [CNBMGRP00010052-53 and translation]

209                     ████████████████████████████████████ ██████ [HL00000026 and HL00000026A] (part of Exhibit 1)

210                     ██████████████████████████████████████ ████████ [HL_00000306] (part of Exhibit 1)

211                     ██████████████████████████████████████████ [HL00000104-105] (Exhibits 40, 40A)

212         Deposition of Wood Nation (Richard Hannam) dated 2/14/2011

213         Deposition of Richard Hannam dated 2/13/2012

214         BNBM Group's Explanation about the Accounts Receivable of BNBM of America
            Inc. [BNBM(Group)-E-00001744-45 and translation] (Exhibit 245)

215         BNBM PLC's listing of drywall contracts and exports with/to U.S. customers
            [BNBMPLC-E-0000819-20 and translation] (Exhibit 110)

216         Deposition of EAC & Sons (Edgar Chaparro) dated 5/18/2015

217         Deposition of Davis Construction Supply, LLC (Stefan Davis) dated 5/19/2015

218         Deposition of Guardian Building Produced Distribution, Inc. (John Gunn) dated
            7/22/2011

219         Underwriters Laboratories Authorization for BNBM PLC to use "UL" marks on
            drywall dated 10/10/2005 (IMT 01362)

220         BNBM 3/3/2006 Export Product Order for drywall to be shipped to U.S.
            [BNBMPLC0007494-95]

221         BNBM 4/28/2006 Export Product Order for drywall to be shipped to U.S.
            [BNBMPLC0007522-23]

222         2006 BNBM Drywall MSDS – for drywall manufactured by BNBM PLC (Chaparro
            Exhibit 4)

223         Exclusive Purchase & Supply Agreement for drywall to be sold/supplied from
            BNBM PLC to Davis Construction Supply, LLC dated 3/12/2006 (Chaparro Exhibit
            5; Davis Exhibit 3)

224         Sales Contract for 200,000 boards of BNBM PLC drywall to EAC & Sons
            Corporation dated 11/18/2005 (Chaparro Exhibit 2)

225         BNBM Invoice to Wood Nation for 240,000 sheets of drywall dated 1/6/2006 (Wood
            Nation Exhibit 2)

226         Letter from Stefan Davis (Davis Construction Supply, LLC) to U.S. CPSC re:
            drywall imports from the People's Republic of China dated 6/3/2009
            [DAVISCONSTRUCTION000365-399] (Davis Exhibit 9)

227         Letter from Stefan Davis to WANG Bing, sent via e-mail, dated 4/27/2006 (Davis
            Exhibit 6)

228         UL  Agency Authorization Notification signed by BNBM PLC in favor of Davis
            Construction Supply, LLC dated 4/13/2006 (Davis Exhibit 4)

229         Sworn Statement of Stefan Davis dated 6/15/2015 (Exhibit 107)

| 230 | Video of Sworn Statement of Stefan Davis dated 6/16/2015 (Exhibit 107-1) |

| 231 | Export Agency Agreement, dated 11/30/2005 [BNBMPLC0007427-7429] (Exhibit 230) |

| 232 | Export Agency Agreement, dated 11/30/2005 [BNBMPLC0007437-7440] (Exhibit 231) |

| 233 | Export Agency Agreement, dated 11/16/2005 [BNBMPLC0007452-7455] (Exhibit 232) |

| 234 | United States Patent and Trademark Office information sheet on "BNBM" trademark – owned/registered by Beijing New Building Materials, Public Limited Company (Exhibit 148) |

| 235 | Comprehensive Team of CNBM Listing Office dated 8/19/2005 [CNBMCO00339345-48] |

| 236 | "Global Gypsum Conference and Exhibition-Delegates," available at http://globalgypsum.com/conferences/global-gypsum/delegates (last accessed 6/2/2015) (Exhibit 80-2) |

| 237 | "Global Gypsum Awards from the Global Gypsum Conference and Exhibits," available at http://www.globalgypsum.com/awards (last accessed 6/15/2015) (Exhibit 80-1) |

| 238 | CNBM web article "Cao Jianglin Visits CNBM Dubai Logistics Center for Investigation," available at http://www.cnbm.com.cn/wwwroot/c_0000000500010002/d_30588.html (last accessed 1/19/2016) |

| 239 | Memorandum re: "The Course of Events on Hiring Foreign Law Firms for the Gypsum Board Litigation in the United States – Brief Version of the Related Meetings" [BNBMPLC-E-0059965-66] (redacted pursuant to Court Order at Rec. Doc. No. 19792) |

| 240 | The Explanation Regarding the Product Quality Dispute Litigation in the United States dated 9/16/2011 [BNBMPLC-E-0001225 and translation] (Exhibit 115) |

| 241 | Summary Chart of Payments Made for Legal Fees for BNBM and Taishan Gypsum Related to Chinese Drywall Litigation Based on Annual Reports, with supporting documents – FRE 1006 Chart (Exhibit 67) |

| 242 | BNBM Announcement in relation to the Developments of Gypsum Board Litigation in the US dated 3/13/2015 [ALRMH-CNBM00005118R-5120R] (Exhibit 32R) |

xxxv

| 243 | CNBM Voluntary Announcement: Updates on Recent Developments in the Gypsum Board Litigation in the US dated 8/20/2014 [CNBMCO00000021-24] (Exhibit 29) |
| 244 | Refusals of Service by BNBM Group (Exhibit 95) |
| 245 | Refusals of Service by BNBM (Exhibit 93) |
| 246 | Refusals of Service by CNBM (Exhibit 263) |
| 247 | Refusals of Service by CNBM Group (Exhibit 264) |
| 248 | Affidavit of Professor Liu Junhai dated 5/4/2012 [Rec. Doc. 14203-1] |
| 249 | *Tang Energy Group, Ltd. v. Catic USA, Inc.*, Case No. 01-14-0001-4150, Final Award (Int'l Centre for Dispute Resolution Dec. 21, 2015) |
| 250 | BNBM Announcement of the Resolutions of the 10th Interim Meeting of the 4th Session of the Board of Directors dated 8/15/2012 [BNBMPLC4757-4771] (part of Exhibit 101) |
| 251 | Affidavit of Ann Mickow dated 1/11/2016 |
| 252 | BNBM Announcement No. 2010-009 in Relation to Event about Gypsum Board in US dated 5/28/2010 [ALRMH-CNBM00005105R–5107R] (Exhibit 24R) |
| 253 | BNBM (Group) "Contact Us" webpage, available at https://web.archive.org/web/20100330085341/http://www.bnbmg.com.cn/en/contact.asp (March 30, 2010 Printout from the Internet Archive) |
| 254 | Deposition of Fu Tinghuan dated 1/10/2012 |
| 255 | CNBM Offering Memorandum for 654,214,000 H Shares dated 3/16/2006 [MS001946-93] (Keyes Exhibit 14) |
| 256 | Chart of Defendants' Business Visits to the U.S. |
| 257 | BNBM Announcement of the Resolutions of the 2nd Interim Meeting of the 5th Session of the Board of Directors dated 3/12/2013 [BNBMPLC4826-4839] (part of Exhibit 101) |
| 258 | BNBM Announcement of the Resolutions of the 3rd Interim Meeting of the 5th Session of the Board of Directors dated 10/28/2013 [BNBMPLC4848-4850] (part of Exhibit 101) |
| 259 | BNBM Announcement of the Resolutions of the 5th Interim Meeting of the 5th Session dated 8/18/2014 [BNBMPLC4925-4926] (part of Exhibit 101) |

260          BNBM Meeting Document: The 10th Meeting of the Fourth Session of the
             Supervising Committee, Appendix: BNBMPLC Internal Control Self-evaluation
             Report dated 3/16/2015 [BNBMPLC-E-0001339-1353 and partial translation]
             (Exhibit 118)

261          BNBM PLC Internal Control System Self-Evaluation report dated 4/8/2007
             [BNBMPLC4871-4874 and partial translation] (Exhibit 122)

262          BNBM Announcement of Final Resolution of the 30th Interim Meeting of the 3rd
             Session of Board of Directors dated 12/7/2007 [BNBMPLC4510-4512] (part of
             Exhibit 101)

263          Deposition of Bruce Deal dated 12/17/2015

264          Deposition of Jeffrey Gordon dated 1/15/2016

265          Declaration of Curtis Milhaupt dated 1/21/2016

266          Shandong Taihe Dongxin Co., Ltd. [Taishan Gypsum] Resolution of the Fourth
             Extraordinary General Meeting of Shareholders for the Year of 2005 held 6/26/2005
             [TG 040615-0028530-32 and partial translation]

267          Minutes of Shandong Taihe Dongxin Limited Liability Company [Taishan Gypsum]
             2006 General Meeting of Shareholders [TG 040615-0028572-74 and translation
             provided by Taishan]

268          Minutes of 1st Extraordinary General Meeting of Shareholders for the Year of 2007
             of Shandong Taihe Dongxin Co., Ltd. [Taishan Gypsum] dated 6/20/2007 [TG-
             040615-0028564-65 and translation]

269          Taishan Gypsum Co., Ltd. 2008 Annual General Meeting Resolutions dated
             5/18/2009 [TG0020795-98] (Jia Def. 1/9/2012 Exhibit 15A)

270          Taishan Gypsum Co., Ltd., Resolution of the Fifth Extraordinary General Meeting in
             2010 dated 6/12/2010 [TG0020805-06]

271          Taishan Gypsum Co., Ltd., Resolutions of the 2010 General Meeting of Shareholders
             dated 8/11/2011 [TG 040615-0028676-682 and translation]

272          "Notice of the State Administration of Taxation on Issuing the Measures for the
             Implementation of Special Tax Adjustments (for Trial Implementation)" (No. 2
             [2009] of the State Administration of Taxation) (Exhibit 90)

273          Declaration of Professor James Feinerman dated 9/16/2015

274          CNBM Co., Ltd. [2007] No. 22, The Tenth President's Office Meeting held
             10/12/2007 [CNBMCO00102014-102025 and partial translation] (Exhibit 351)

275     2009 BNBM Group Auditor's Report [BNBM(Group)00000850R-913R] (Exhibit 172R)

276     2010 BNBM Group Auditor's Report [BNBM(Group)0000956R-1011R] (Exhibit 173R)

277     2011 BNBM Group Auditor's Report [BNBM(Group)0001054R-1109R] (Exhibit 174R)

278     Statement on the Gypsum Boards Exported to the U.S. by BNBM Group from the End of 2005 to the Beginning of 2006 [BNBM(Group)-E-0003186 and translation]

279     Chart of Sales of Taishan Drywall to U.S., with supporting docs (Exhibit 394)

Shandong Taihe Dongxin Co., Ltd. Articles of Incorporation dated 4/25/2005 [TG0020608-20629 and translation] (Jia Def. 1/9/2012 Exhibit 9A

**PLAINTIFFS' STEERING COMMITTEE'S RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS[2]**

## I.     INTRODUCTION

Thousands of homeowners in Florida, Louisiana, Virginia, and other states suffered

damages as a result of having defective Chinese drywall installed in their properties from 2005-

2008.  After the devastation of Hurricanes Katrina and Rita along the Gulf Coast, and as a result

of a housing boom in this country, there was a shortage of drywall available domestically.  This

created an opportunity for foreign manufacturers to sell their drywall and related building

materials to American customers.

In response to the increased demand for drywall, beginning in the fall of 2005 and

continuing through 2008, hundreds of millions of square feet of gypsum wallboard manufactured

in China ("Chinese drywall") were exported to the United States,[3] with the intention and

expectation that the drywall would be installed in homes, primarily along the East Coast and in

the Gulf Coast States:  namely, Florida, Louisiana, Mississippi, Alabama, Georgia, Texas,

Virginia, and New York.  Taishan Gypsum Co., Ltd. ("Taishan" or "Taishan Gypsum") and its

wholly-owned subsidiary and alter ego Tai'an Taishan Plasterboard Co., Ltd. ("TTP") shipped

almost 86 million square feet of their Chinese drywall to customers in the U.S. during this

---

[2] Attached hereto as Exhibit "A" in opposition to the Motions to Dismiss is the Affidavit of Russ M. Herman dated 1/21/2016, with Exhibits that are referred to herein as [MTD Ex. __].

[3] *See* Gypsum Association Comments, archived at http://web.archive.org/web/20101216021748/http://gypsum.org/pdf/Gypsum_Association_Comments_on_Chinese_Wallboard_Issue.pdf.

1

timeframe.[4]  *See*, *generally*, *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014) & 753 F.3d 521 (5th Cir. 2014).

Taishan's parent Beijing New Building Materials Public Limited Company ("BNBM" or "BNBM PLC"), with assistance from Beijing New Building Material (Group) Co., Ltd. ("BNBM Group") (collectively, the "BNBM Entities"), also targeted customers in Florida and other Southeastern States for the sales and distribution of "Dragon" brand gypsum board manufactured by BNBM.  In fact, in 2006, the BNBM Entities exported and sold over 68 million square feet of BNBM's Chinese drywall to the U.S.,[5] with the knowledge and expectation that the drywall would be installed in people's homes.

The U.S. sales of Chinese drywall manufactured by Taishan and BNBM were ultimately controlled by China National Building Material Group Corporation ("CNBM Group"), which in turn controlled the "CNBM Business Group" of subsidiary companies,[6] including China National Building Material Co., Ltd. ("CNBM"), CNBM USA Corp. ("CNBM USA"), CNBMIT Co. Ltd.

---

[4] *See* Affidavit of Russ M. Herman, filed on 5/8/2012, as Exhibit A to the PSC's Global Statement of Facts in Opposition to Taishan's Jurisdictional Motions [Rec. Doc. No. 14215-3], attaching 202 Exhibits filed manually due to their volume [Rec. Doc. No. 14224] (incorporated herein by reference); *see also* Summary Chart of Taishan Gypsum Board Sales to United States, with supporting documentation [MTD Ex. 279]; Manufacturer Profile Forms ("MPFs") for Taishan Gypsum and TTP [MTD Ex. 2]; 6/27/2010 Statement on the Data and Statistics of Exports to the U.S. from 2005 to 2007 [MTD Ex. 197] (in response to a directive from CNBM Group, Taishan had PENG Wenlong prepare a report detailing shipments and sales of 7,292,804.536 square meters of drywall to the United States).

[5] *See* BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006 by the International Business Department" (BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006") [MTD Ex. 143].

[6] *See*, *generally*, Declaration of Professor Curtis J. Milhaupt dated 1/21/2016 ("Milhaupt Decl.") [MTD Ex. 265].

("CNBMIT"), and United Suntech Craft, Inc. ("United Suntech") (collectively with CNBM Group, the "CNBM Entities"), the BNBM Entities, and Taishan.[7]  As set forth herein, these companies operate as a single business entity and are the alter egos of one another.[8]

The corporate structure of the CNBM Business Group has permitted CNBM Group, known within its ranks as the "Big Group Corporation," to dominate and control each of its lesser subsidiaries.[9]  This controlling structure is so well-known and commonly understood that commentators now recognize the "Chinese party state as a multi-faceted and over-bearing economic actor spawning a parade of politically well-endowed controlling shareholders uniquely positioned to dominate subsidiary corporations established as passive vehicles to attract public capital markets financing, and entirely in their own interest."[10]

---

[7] *See* Organizational Chart of CNBM Group & Controlled Subsidiaries [MTD Ex. 4].

[8] *Cf.* Milhaupt Decl. at ¶ 12 & n.2.

[9] *See* Deposition of BNBM Group (ZHAO Yanming) dated 7/15-17/2015 ("ZHAO Dep.") [MTD Ex. 5] at 385:4-6 (Q: "This document refers to the 'big group corporation.' Do you know which corporation that is?" A: "CNBM Group."); *id*. at 385:7-386:9 & 406:6-15.

[10] *See* Nicolas C. Howson, *Protecting the State from Itself?  Regulatory Intervention in Corporate Governance and the Financing of China's "State Capitalism,"* U. OF MICH. PUB. LAW AND LEGAL RESEARCH PAPER SERIES No. 423 at 19 n.27 (Jan. 13, 2015) [MTD Ex. 6].  *See also* Jiangyu Wang, *The Political Logic of Corporate Governance in China's State-owned Enterprises*, 47 CORNELL INT'L L.J. 631, 635 (2014) ("[A]lthough Chinese SOEs are legally organized in the corporate form featuring all of most attributes of the separation of ownership and control model, the real control comes from the CCP, or the Party-state.") [MTD Ex. 7]; Li-Wen Lin & Curtis J. Milhaupt, *We Are the (National) Champions:  Understanding the Mechanisms of State Capitalism in China*, 65 STAN. L. REV. 697, 701 (2013) ("[S]cholars often begin and end their analyses by benchmarking the governance attributes of Chinese listed companies against global (which typically means U.S.) corporate governance standards and institutions. This approach produces insights, to be sure, but it invariably focuses the analyst's attention on what the Chinese system lacks, not on how it is constructed and actually functions.") [MTD Ex. 8]; Adam Hersh, *Assessing China's Economic Reform Agenda*, CENTER FOR AMERICAN PROGRESS at 4 (May 1, 2014) ("These reorganized corporations assume many of the trappings of a modern global business, often including publicly traded shares and corporate

3

In this case, CNBM Group dominated and controlled the actions of CNBM, the BNBM Entities, and Taishan during the period when Taishan and BNBM sold Chinese drywall to American customers and when BNBM Group exported BNBM's drywall to the relevant forum jurisdictions.  CNBM Group advertises that the CNBM Business Group is the "Largest gypsum board producer in the world."[11]  However, rather than respond to Plaintiffs' claims that the drywall is defective, Defendants rejected service of process on them under the Hague Convention and allowed default judgments to be entered against them pursuant to instructions from CNBM Group.[12]  Then, after sitting out of the litigation for more than five years, and despite the fact that two panels of the Fifth Circuit affirmed personal jurisdiction over Taishan and TTP, the CNBM and BNBM Entities have challenged jurisdiction over them in these proceedings.

Pursuant to this Court's Second Amended Order [Rec. Doc. No. 19920], Plaintiffs submit this omnibus response to three motions to dismiss: 1) Motion to Dismiss filed by the CNBM

---

boards with ostensibly independent external directors.  But function does not necessarily follow form.  In practice, these firms operate under quite different decision-making mechanisms, through official capacities or otherwise, than do comparable firms in the United States or other advanced economies."), available at https://www.americanprogress.org/issues/economy/report/2014/05/01/88864/assessing-chinas-economic-reform-agenda/ [MTD Ex. 9].

[11] *See* 2014 China National Building Materials Group Social Responsibility Report [MTD Ex. 12] at 6.

[12] In contrast, CNBM Group's German competitor Knauf not only responded to Plaintiffs' claims in this MDL, but ultimately settled the litigation on behalf of thousands of homeowners in a series of interrelated agreements, with hundreds of builders, distributors, installers, and insurers, worth more than $1 billion.  As a result, Plaintiffs with Knauf's Chinese drywall in their properties were able to have their homes completely remediated under the settlement, and Knauf paid attorneys' fees and costs in addition, so that Plaintiffs could be made whole.

Entities (Rec. Doc. No. 19527) [hereafter "CNBM Brf."][13]; 2) Motion to Dismiss the Complaints Pursuant to Rules 12(b)(2) and 12(b)(5) filed by BNBM (Rec. Doc. No. 19646) [hereafter "BNBM Brf."]; and 3) Motion to Dismiss the Complaints Pursuant to Rules 12(b)(2) and 12(b)(5) filed by BNBM Group (Rec. Doc. No. 19664) [hereafter "BNBM Group Brf."].  Each of the Defendants are defaulted parties seeking to avoid their deliberate choice to allow default judgments to be entered against them, by contesting personal jurisdiction and, in some cases, service of process.  None of these defenses have merit.

Generally, the Defendants assert that personal jurisdiction is lacking because either they had nothing to do with the sale of the drywall or they did not target any particular forum state to sell the defective drywall that is the root cause of Plaintiffs' claims.  Against these contentions, there is substantial evidence that these foreign corporate entities acted as alter egos of one another and as a single business enterprise, in unison with Taishan to sell its drywall to the U.S. and in unison with BNBM to sell its drywall to American customers.  Defendants' assertions must be measured against the testimony of one of their witnesses earlier in this litigation:  "In China, we exaggerate a little bit.  Exaggerate a little bit, that's allowed."[14]  In addition, Morgan Stanley, the sponsor for the 2006 CNBM Global Offering Prospectus ("Global Offering"), emphasized that:  "We cannot guarantee the accuracy of facts and statistics derived from official sources and industry publications with respect to the PRC, the PRC economy and the PRC

_____

[13] CNBM Group and CNBM both incorrectly identified themselves in their moving papers as China *New* Building Material Group Corporation and China *New* Building Material Company, Limited.  This minor typographical error will be overlooked for the non-substantive error that it is.  As discussed later in connection with the PSC's service upon CNBMIT, similar treatment should apply.

[14] Deposition of Fu Tinghuan dated 1/10/2012 [MTD Ex. 254] at 86:14-15.

building materials industry contained in this prospectus, and investors should not place undue reliance on them."[15]

It is the law of the case that personal jurisdiction has been established upon Taishan.  *See Chinese Drywall*, 742 F.3d 576 & 753 F.3d 521.  Therefore, if the CNBM and BNBM Entities are determined to be alter egos of Taishan and/or a single business enterprise, then Taishan's minimum contacts may be imputed to the CNBM/BNBM Entities, and this Court's earlier findings, upheld by the Fifth Circuit, warrant a denial of the subject jurisdictional motions.

Moreover, BNBM's own contacts with the United States and the relevant forum jurisdictions for the sale and distribution of millions of square feet of its drywall, which was exported by BNBM Group, are sufficient to deny the BNBM Entities' jurisdictional motions. Both the BNBM and CNBM Entities had significant contacts in the United States.[16]  In addition, the CNBM Entities' control over Taishan and the BNBM Entities, as their alter ego, warrants denial of the CNBM Entities' motions.

Finally, Defendants' Rule 12(b)(5) arguments that service of process was inadequate will be disproven.

## II.   STATEMENT OF FACTS

### A.   CNBM Group, BNBM Group, CNBM, and BNBM Are the Alter Egos of Taishan.

At all relevant times, CNBM Group has controlled, both directly and indirectly, the share capital in the CNBM/BNBM Entities and Taishan.  Since 2005, CNBM Group has held and

---

[15] *See* 3/16/2006 CNBM Offering Memorandum for 654,214,000 H Shares [MTD Ex. 255].

[16] *See* Section II.D, *infra* & Chart of Defendants' Business Visits to the U.S. [MTD Ex. 256].

continues to hold "ownership of sufficient stock to give it actual working control" over each of these entities.  *See Chinese Drywall*, 753 F.3d at 546 (*quoting Green v. Champion Ins. Co.*, 577 So. 2d 249, 257-58 (La. Ct. App. 1991)).  CNBM Group's control permeates through all of its subsidiaries, including BNBM and Taishan.  Proof of Defendants' words matching their deeds is provided by CNBM's August 28, 2006 Announcement of CNBM Group's intention to have BNBM acquire the controlling interest in Taishan <u>so that CNBM Group could control Taishan's daily operations</u>, as the very reason for the purchase:

> **<u>Reasons for the entering into the Share Transfer Agreement</u>**
> Following BNBM's acquisition of the 42% equity interest of Taihe, the Company [CNBM] has become the largest producer of gypsum boards in the PRC.  The acquisition has also enhanced the Company's ability to serve a broader base of customers.  The directors of the Company believe that the Acquisition will enable <u>CNBM Group</u> to further enhance its competitiveness and consolidate the leading position in the PRC gypsum board market <u>as it will participate **_more actively_** in the _daily operations and management_ of Taihe</u> with a view to improving its profitability.[17]

This Announcement makes plain that CNBM Group in fact participated in the "daily operations and management" of Taishan *prior to* August 28, 2006, and that CNBM Group "*more actively*" participated in the daily operations and management of Taishan *after* August 28, 2006 – *i.e.*, during all relevant time periods.  In the words of CNBM Group's Chairman, SONG Zhiping, "Although a limited company, Taishan is not independent."[18]

---

[17] *See* 8/28/2006 CNBM Announcement "Connected Transaction Acquisition of the Entire Equity Interest in Taian Donglian Investment Trading Company Limited; Connected Transaction Provision of Financial Assistance to Taian State Owned Assets Management Company" ("8/28/2006 Connected Transaction Announcement") (emphasis added) [MTD Ex. 13] at Q000010.

[18] *See* 2/26/2014 Meeting Minutes of the Seminar on Deepening Reform, CNBM Group Board of Directors [MTD Ex. 10] at CNBMGRP00023369.

As the mounting evidence, described in detail below, demonstrates, CNBM Group, through its techniques of cascading management over its subsidiaries, asserts absolute control such that it is the alter ego of the entire "CNBM Business Group," including BNBM Group, CNBM, BNBM and Taishan.  This Business Group acts as a single business enterprise.

### 1. From 2005-Present, CNBM Group Has Been the Ultimate Controlling Shareholder of:

#### a.  BNBM Group

Since 2005, CNBM Group has had complete control over BNBM Group, by directly and/or indirectly holding 100% of BNBM Group's shares.[19]  Beginning in 2005, CNBM Group was the sole shareholder of BNBM Group, directly holding 100% of BNBM Group's stock.[20]  On December 31, 2005, CNBM Group transferred 25% of its equity holding in BNBM Group to China National Building Material Group Import & Export Company ("CNBM Import & Export"), another wholly-owned subsidiary of CNBM Group.[21]  Thereafter, CNBM Group continued to maintain total ownership of BNBM Group's stock (*i.e.*, 100%), although the

---

[19] *See* ZHAO Dep. at 385:4-24; *see also id.* at 386:1-9 & 406:6-15.

[20] *See* 2005 CNBM Annual Report [MTD Ex. 15] at 8; 2005 BNBM Annual Report [MTD Ex. 16] at 8.

[21] *See* 2005 BNBM Group Auditor's Report [MTD Ex. 17] at 6.  As a result of this transaction, in 2006, 2007 and 2008, shares *directly* held by CNBM Group in BNBM Group decreased to 75%, and the remaining 25% of its shares were held by CNBM Import & Export.  *See* 2006 CNBM Annual Report [MTD Ex. 18] at 10; 2007 CNBM Annual Report [MTD Ex. 20] at 10; 2007 BNBM Annual Report [MTD Ex. 21] at 11; 2008 CNBM Annual Report [MTD Ex. 22] at 11; 2008 BNBM Annual Report [MTD Ex. 23] at 11.

percentages of CNBM Group's direct holdings, and the corresponding percentages of its indirect

holdings, of BNBM Group's shares have shifted over the years.[22]

### b. **CNBM**

Through direct and indirect ownership, CNBM Group has remained the controlling entity

of CNBM from 2004 to the present.[23]  During 2004, in anticipation of the Global Offering on

the Hong Kong Stock Exchange ("HKSE"), Morgan Stanley was retained as the company's

investment banker and underwriter for its initial public offering or IPO.[24]  The Global Offering

---

[22] *E.g.*, on June 20, 2008, CNBM Group transferred an additional 10% equity interest it held in BNBM Group to CNBM Import & Export.  *See* 2008 BNBM Group Auditor's Report [MTD Ex. 24] at 10.  As a result, from June 21, 2008 through 2010, CNBM Group's *direct* ownership interest in BNBM Group consisted of 65% equity interest, and its *indirect* ownership interest was 35% (maintaining CNBM Group's 100% direct and indirect equity interest in BNBM Group). *See* 2009 CNBM Annual Report [MTD Ex. 25] at 13; *see also* 2009 BNBM Annual Report [MTD Ex. 26] at 10.

In 2011, 2012 and 2013, CNBM Group directly held 69.45%, and indirectly held 30.55%, equity interest in BNBM Group, which maintained its 100% direct and indirect ownership interest in BNBM Group.  *See* 2011 CNBM Annual Report [MTD Ex. 27] at 12; 2012 CNBM Annual Report [MTD Ex. 28] at 13; 2013 CNBM Annual Report [MTD Ex. 30] at 13.  *See also* 2011 CNBM Annual Report at 12.

In 2014, CNBM Group's direct equity interest in BNBM Group was reported to increase to 70.04%, with a corresponding reduction to 29.96% of its indirect equity interest in BNBM Group (through CNBM Import & Export).  *See* 2014 CNBM Annual Report [MTD Ex. 33] at 13.  As of June 30, 2015, the ownership percentages of BNBM Group's shares are the same as they were in 2014, *i.e.*, 100%.  *See* 2015 CNBM Interim Report [MTD Ex. 37] at 12.

[23] *See* Global Offering [MTD Ex. 38] at VIII-2;  2005 CNBM Annual Report at 8 & 62; 2006 CNBM Annual Report at 10; 2007 CNBM Annual Report at 10; 2008 CNBM Annual Report at 11; 2009 CNBM Annual Report at 13; 2010 CNBM Annual Report [MTD Ex. 39] at 13; 2011 CNBM Annual Report at 12; 2012 CNBM Annual Report at 13; 2013 CNBM Annual Report at 64; 2014 CNBM Annual Report at 61; 2015 CNBM Interim Report at 12; Deposition of CNBM (CHANG Zhangli) dated 6/5-7/2015 ("CHANG Dep.") [MTD Ex. 35] at 70:14-71:7.

[24] Deposition of Morgan Stanley (Terence Keyes) dated 11/13/2015 ("Keyes Dep.") [MTD Ex. 40] at 22:14-17.  *See also id.* at 25:8-26:18 (Mr. Keyes acted as the manager of CNBM's IPO).

was intended to bring in cash to be used to fund CNBM's subsidiaries' operations.[25]  To accomplish the public offering, CNBM Group executed a massive reorganization of its controlled subsidiaries aimed to "position the Company [CNBM], then a wholly-owned subsidiary of [CNBM Group], as the holding company of [its] cement, lightweight building materials [*i.e.*, plasterboard], glass fiber and FRP [fiberglass reinforced plastics] products and engineering services businesses."[26]  As part of its marketing efforts, Morgan Stanley, as the sponsor of the Global Offering,[27] confirmed that these companies were marketed to investors as "one group."[28]  The conversion of CNBM into a publicly listed company on the HKSE shifted CNBM Group's ownership of share capital in the Company, but did not affect its control.  After completion of the Global Offering, CNBM Group (Parent Group) held 60.34% of CNBM's share capital, making CNBM Group the "controlling shareholder" of CNBM.[29]

In other words, "CNBM was actually controlling its subsidiaries in a consolidated fashion" and as an "integrated group."[30]  Accordingly, CNBM Group "Management focuses on

---

[25] *Id*. at 108:19-110:12.

[26] *See* Global Offering at 89.

[27] Morgan Stanley received $1 million "to commend that company's contribution to the successful implementation of allotment of shares at lightning speed and for their longstanding support of CNBM."  *See* Deposition of SONG Zhiping dated 9/14-15/2015 ("SONG Dep.") [MTD Ex. 36] at 67:6-13; 10/12/2007 CNBM Co., Ltd. Tenth President's Office Meeting [MTD Ex. 274] at CNBMCO00102023.

[28] Keyes Dep. at 253:5-7.

[29] *See* 2006 CNBM Annual Report at 43-45; *see also* Global Offering at 21 (defining controlling shareholder as having the meaning ascribed thereto under the Listing Rules).

[30] Keyes Dep. at 253:2-4 & 294:7-13.

ensuring strong integration across different business's segments by cultivating a <u>unified</u> corporate culture and establishing coordinated purchasing sales, logistics and other operational processes and procedures."[31]  Therefore, despite Defendants' protestations otherwise, CNBM Group has been and continues to be the ultimate controlling shareholder of CNBM and its subsidiaries, including BNBM and Taishan.[32]

In preparation for the Global Offering, on March 28, 2005, CNBM was converted into a publicly traded joint stock limited company on the HKSE, with CNBM Group and several wholly-owned CNBM Group subsidiaries (*i.e.*, the "Parent Group")[33] possessing "…approximately 94.75% of the share capital of the Company [CNBM] immediately prior to the Global Offering."[34]  After completion of the Global Offering, CNBM Group/Parent Group held 60.34% of CNBM's share capital, making CNBM Group/Parent Group the "controlling shareholder" of CNBM.[35]  As stated by CNBM, "Parent [CNBM Group] controlled the Transferred Operations before the Restructuring and continues to control the Transferred Operations after the effective date of the Restructuring…."[36]

---

[31] Keyes Dep. at 253:22-254:6 (emphasis added).

[32] *See* 3/16/2006 Morgan Stanley Post-Mortem PowerPoint for CNBM [MTD Ex. 41] at MS056132 (corporate structure); Keyes Dep. at 250:10-254:14.

[33] BNBM Group, CNBM Import & Export & China Building Materials Academy ("Building Materials Academy").

[34] *See* Global Offering at 153.

[35] *See* 2006 CNBM Annual Report at 10 & 43-45; *see also* 2006 BNBM Annual Report [MTD Ex. 19] at 11; ZHAO Dep. at 62:5-20, 102:2-7 & 102:22-24.

[36] *See* 2005 CNBM Annual Report at 62.

Given that CNBM's stock is listed on the HKSE, this company is subject to the rules and regulations of the Exchange.[37]  Morgan Stanley's then-Managing Director of the Mergers, Acquisitions and Restructuring Department and current Head of Corporate Finance Execution for Asia, Terence Keyes, is intimately familiar with the Hong Kong Stock Exchange, being a former member of the HKSE Listing Committee, and the manager of CNBM's IPO.[38]  With his expertise on the subject, Mr. Keyes testified that under HKSE Rules, CNBM Group is a "Close Associate" of CNBM, which in turn is a "Close Associate" of BNBM, which is a "Close Associate" of Taishan.[39]  This means that each company was able to exercise or control 30

---

[37] Keyes Dep. at 29:18-22.

[38] *Id.* at 25:8-26:18.

[39] *Id*. at 39:2-21; HKSE Rules, Chapter 1 [MTD Ex. 42]; HKSE Rules, Chapter 19A [MTD Ex. 43].  HKSE Rules, Chapter 1, Section 1.04 defines "Close Associate" as:
(b) in relation to a company means:
  (i)  Its subsidiary or holding company or a fellow subsidiary of its holding company;*** and
  (iv) Any other company in the equity capital of which the company, its subsidiary or holding company, [and/or] a fellow subsidiary of its holding company, … taken together are directly or indirectly interested so as to exercise or control the exercise of 30% … or more of the voting power at general meetings, or to control the composition of a majority of the board of directors and any subsidiary of this other company.

HKSE Rules, Chapter 19.A, Section 19A.04 defines "Close Associate" for a PRC issuer as:
(b) in relation to a company means:
  (i)  Its subsidiary or holding company or a fellow subsidiary of its holding company; ***
  (iv) Any other company (including an equity joint venture established under PRC law) in the equity capital of which the company, its subsidiary or holding company, [and/or] a fellow subsidiary of its holding company, … taken together are directly or indirectly interested so as to exercise or control the exercise of 30% … or more of the voting power at general meetings, or to control the composition of a majority of the board of directors and any subsidiary of this other company; and
  (v)  Any other company with which or any individual with whom the company, its subsidiary or holding company, [and/or] a fellow subsidiary of its holding

percent or more of the voting power at general meetings.[40]  In addition, Mr. Keyes confirmed

that under HKSE Rules, CNBM Group is the Controlling Shareholder of CNBM.[41]  Further, he

confirmed that under HKSE Rules, BNBM is a "subsidiary" of CNBM, and Taishan is a

subsidiary of both BNBM and CNBM.[42]  Last, he confirmed that CNBM is a "Substantial

Shareholder" of BNBM and BNBM is a "Substantial Shareholder" of Taishan.[43]

---

company, … taken together are directly or indirectly interested in a cooperative or contractual joint venture (whether or not constituting a separate legal person) under PRC law where it, its subsidiary or holding company, [and/or] a fellow subsidiary of its holding company, … taken together directly or indirectly have 30% … or more interested either in the capital and/or assets contributions to such joint venture or in the contractual share of profits or other income from such joint venture.

[40] Keyes Dep. at 38:20-39:1.

[41] *Id*. at 48:16-19.  HKSE Rules, Chapter 19A, Section 19A.14 defines "Controlling Shareholder" as follows:
In this connection, in the case of a new applicant which is a PRC issuer, "controlling shareholder" means any shareholder or other person or group of persons together entitled to exercise, or control the exercise of 30% (or such other amount as may from time to time be specified in applicable PRC law as being the level for triggering a mandatory general offer or for otherwise establishing legal or management control over a business enterprise) or more of the voting power at general meetings of the new applicant or who is in a position to control the composition of a majority of the board of directors of the new applicant.  For the purposes of this rule, the Exchange will normally not consider a PRC Governmental Body (see definition in rule 19A.04) as a "controlling shareholder" of a PRC issuer.

[42] Keyes Dep. at 74:13-75:16.  HKSE Rules, Chapter 1, Section 1.01 defines "Subsidiary" as:
(b) any entity which is accounted for and consolidated in the audited consolidated accounts of another entity as a subsidiary pursuant to applicable Hong Kong Financial Reporting Standards or International Financial Reporting Standards; and
(c) any entity which will, as a result of acquisition of its equity interest by another entity, be accounted for and consolidated in the next audited consolidated accounts of such other entity as a subsidiary pursuant to applicable Hong Kong Financial Reporting Standards or International Financial Reporting Standards.

[43] Keyes Dep. at 76:1-79:20.  HKSE Rules, Chapter 1, Section 1.01 defines "Substantial Shareholder" as "in relation to a company means a person (including a holder of depositar

The Ordinances of the Hong Kong Special Administrative Region of the PRC[44] provide similar definitions for "Controlling Entity"[45] and "Controlling Entity Relationship."[46]  Under these definitions, CNBM Group is the "Controlling Entity" of CNBM, and these companies are part of a "Controlling Entity Relationship."  Further, CNBM Group "is deemed to own the shares directly held by BNBM Group, CNBM Import & Export, and Building Materials Academy."[47]  Thus, by virtue of its shareholdings, in 2006, CNBM Group directly and indirectly held a total of

---

receipts) who is entitled to exercise, or control the exercise of, 10% or more of the voting power at any general meeting of the company…."

[44] *See*, *generally*, http://www.hklii.hk/eng/hk/legis/ord/.

[45] *See* Chapter 571 (Securities and Futures Ordinance), Schedule 1 Interpretation: in relation to a corporation, "Controlling Entity" is defined as:  a person who, either alone or with any of his associates –
(a)  is entitled to exercise or control the exercise of not less than –
    (i)  subject to subparagraph (ii), 20%; or
    (ii)  where any other percentage is prescribed by rules made under section 397 of this Ordinance for the purposes of this definition, such other percentage, of the voting power at general meetings of the corporation;
(b)  has the right to nominate any of the directors of the corporation; or
(c)  has an interest in shares carrying the right to –
    (i)  veto any resolution; or
    (ii)  amend, modify, limit or add conditions to any resolution, at general meetings of the corporation.  *See* http://www.hklii.hk/eng/hk/legis/ord/571/sch1.html.

[46] Chapter 571 (Securities and Futures Ordinance), Schedule 1 Interpretation: in relation to a corporation, "Controlling Entity Relationship" is defined to mean:  its relationship with an intermediary by virtue of –
    (a)  the intermediary being a controlling entity of the corporation;
    (b)  the corporation being a controlling entity of the intermediary; or
    (c)  another person, who is a controlling entity of the corporation, being also a controlling entity of the intermediary.  *See* http://www.hklii.hk/eng/hk/legis/ord/571/sch1.html.

[47] *See* 2006 CNBM Annual Report at 45 n.1; 2006 CNBM Annual Report at 10 & 43-45; Divisions 2 and 3 of Part XV of the Securities and Futures Ordinance.

60.34% of CNBM's total share capital, thereby making it the Controlling Shareholder of the

company.[48]

---

[48] *See* 2006 CNBM Annual Report at 10 & 43-45.  It should be noted that the provisions defining "affiliation" in the Rules on Taxation, which are applicable to the Defendants, are instructive as well.  *See* "Notice of the State Administration of Taxation on Issuing the Measures for the Implementation of Special Tax Adjustments (for Trial Implementation)" (No. 2 [2009] of the State Administration of Taxation) [MTD Ex. 272], which defines "affiliation" for tax purposes in China as "relationships between an enterprise and other enterprises, organizations or individuals":

1.  One party directly or indirectly holds at least 25% of the total shares of the other party, or 25% of the shares of both parties are directly or indirectly held by a same third party. If one party indirectly holds the shares of the other party through an intermediate party, as long as it holds at least 25% of the shares of the intermediate party, the proportion of the other party's shares held by it shall be computed on the basis of the other party's shares held by the intermediate party;

2.  The loans received by one party from the other party (excluding an independent financial institution) account for at least 50% of one party's paid -in capital, or at least 10% of the total loans received by one party are guaranteed by the other party (excluding an independent financial institution);

3.  At least half of one party's senior management (including members of the board of directors and managers) are or at least 1 senior member of the board of directors who has the controlling power over the board of directors is appointed by the other party, or at least half of both parties' senior management (including members of the board of directors and managers) are or at least 1 senior member of the board of directors who has the controlling power over the board of directors is appointed by a same third party;

4.  At least half of one party's senior management (including members of the board of directors and managers) are also senior management of the other party (including members of the board of directors and managers), or at least 1 senior member of the board of directors of one party who has the controlling power over the board of directors is also a senior member of the board of directors of the other party;

5.  The normal production and business operations of one party must depend on the industrial property, know-how or any other franchise provided by the other party;

6.  One party's purchase or sale activities are largely controlled by the other party;

7.  The services that one party receives or provides are largely controlled by the other party; or

8.  One party exercises a substantive control over the other party's production, business operations or transactions, or the two parties have any other affiliation of interest, such as a relationship that one party and the main shareholder of the other party enjoy basically the same economic interests though the shareholding

CNBM Group's status as the "Controlling Entity" of CNBM has remained a constant from 2004 through 2015, though its equity interest percentages have changed over the years:

| Year | CNBM Group's % Direct & Indirect Ownership in CNBM's Shares |
|---|---|
| 2004 | 100%[49] |
| 2005 (pre-Global Offering | 94.75%[50] |
| 2005 (post-Global Offering) | 60.34%[51] |
| 2006 | 60.34%[52] |
| 2007 | 56.02%[53] |
| 2008 | 48.82%[54] |
| 2009 | 48.82%[55] |
| 2010 | 44.10%[56] |

percentage described in subparagraph 1 hereof is not reached, a clanship or a kinship.
See also Declaration of Professor James Feinerman dated 9/16/2015 [MTD Ex. 273].

[49] See Global Offering at VIII-2 & VIII-6 (PDF pp. 582 & 586); see also 2005 CNBM Annual Report at 62.

[50] See Global Offering at 153.

[51] See 2005 CNBM Annual Report at 8.

[52] See 2006 CNBM Annual Report at 10 & 43-45; see also 2006 BNBM Annual Report at 11.

[53] See 2007 CNBM Annual Report at 10 & 43-45; see also 2007 BNBM Annual Report at 11.

[54] See 2008 CNBM Annual Report at 11; see also 2008 BNBM Annual Report at 11.

[55] See 2009 CNBM Annual Report at 13; see also 2009 BNBM Annual Report at 8-10.

[56] See 2010 CNBM Annual Report at 13 & 50; see also 2010 BNBM Annual Report [MTD Ex. 46] at 9.

| 2011 | 44.10%[57] |
| 2012 | 44.10%[58] |
| 2013 | 44.10%[59] |
| 2014 | 44.10%[60] |
| 2015 | 44.10%[61] |

From 2004 through 2015, CNBM Group always has controlled the highest percentage of CNBM's total shares, and consequently, CNBM Group has been and still remains the "Controlling Entity" of CNBM.

### c.  BNBM

From 2005 to present, BNBM has been a controlled subsidiary of CNBM, which in turn is a controlled subsidiary of CNBM Group *via* direct and indirect equity interest.  In fact, in each of BNBM's annual reports from 2005 through 2014, CNBM is defined as BNBM's "Controlling Shareholder," and CNBM Group is defined as its "Actual Controller."[62]

---

[57] *See* 2011 CNBM Annual Report at 12 & 55; *see also* 2011 BNBM Annual Report [MTD Ex. 32] at 10.

[58] *See* 2012 CNBM Annual Report at 13 & 60-61.

[59] *See* 2013 CNBM Annual Report at 64; *see also* SONG Dep. at 15:12-17.

[60] *See* 2014 CNBM Annual Report at 61.  CNBM Group's Chairman SONG Zhiping publicly proclaimed, "…the Group's [CNBM and its subsidiaries] consolidated revenue amounted to RMB 122,011 million for the year of 2014."  *Id*. at 3 & 18.

[61] *See* 2015 CNBM Interim Report at 12 & 45.

[62] *See* 2005 BNBM Annual Report at 7; 2006 BNBM Annual Report at 10-11; 2007 BNBM Annual Report at 10-11 & 104; 2008 BNBM Annual Report at 10-11 & 107; 2009 BNBM Annual Report at 9; 2010 BNBM Annual Report at 8; 2011 BNBM Annual Report at 9; 2012 BNBM Annual Report [MTD Ex. 29] at 46-47; 2013 BNBM Annual Report [MTD Ex. 31] at 4; 2014 BNBM Annual Report [MTD Ex. 34] at 4.

As part of the restructuring of CNBM in 2004, CNBM Group "transferred its interests in certain businesses engaged in the production and sale of cement, lightweight building materials, glass and fiberglass reinforced plastics products and provision of engineering services, and its equity interest in ... BNBM ... and certain other relevant assets associated with the Transferred Operations to the Company [CNBM] ... at nil consideration."[63]  Of importance to BNBM's ownership, on December 27, 2004, BNBM Group's 60.33% equity interest in BNBM was transferred, **at the direction of CNBM Group**, to CNBM.[64]  Thus, as a result of the foregoing transfer, in 2005, the attributable direct equity interests held by CNBM in BNBM were 60.33%.[65]  This share transfer or "restructuring" was considered to be "a business combination under common control," as CNBM Group retained control over the entities and operations transferred both prior to and following the restructuring.[66]

Since 2005, CNBM has been the "Controlling Shareholder" of BNBM, and, CNBM Group has been the "Actual Controller" of BNBM.[67]  CNBM Group's "actual control" of BNBM

---

[63] See 2005 CNBM Annual Report at 62 (emphasis added).

[64] See Global Offering at 90; see also 2005 CNBM Annual Report at 62 ("Parent [CNBM Group] controlled the Transferred Operations before the Restructuring and continues to control the Transferred Operations after the effective date of the Restructuring…").

[65] See 2005 CNBM Annual Report at 8 & 14.

[66] See 2005 CNBM Annual Report at 62 (emphasis added).

[67]  See 2005 BNBM Annual Report at 7.  See also 2006 BNBM Annual Report at 9-11; 2007 BNBM Annual Report at 10-11 & 104; 2008 BNBM Annual Report at 10-11 & 107; 2009 BNBM Annual Report at 9; 2010 BNBM Annual Report at 8; 2011 BNBM Annual Report at 9; 2012 BNBM Annual Report at 46-47; 2013 BNBM Annual Report at 53; 2014 BNBM Annual Report at 52.

 Under the Stock Listing Rules of the Shenzhen Stock Exchange ("SZSE"), where BNBM's stock is listed, "Controlling Shareholder" is defined as:  "the shareholder whose equity shares

18

was such that, in June of 2006, CNBM Group orchestrated a "share conversion" of BNBM stock in order to transfer 45,630,000 of CNBM's non-tradable BNBM shares into tradable shares.[68] Moreover, **CNBM Group** paid RMB 87,381,000 for the cost of this share conversion.[69]  As a result of the foregoing share conversion, in 2006, CNBM directly held 52.40% equity interest in BNBM, keeping CNBM as the "Controlling Shareholder" and CNBM Group as the "Actual

---

account for more than 50% of the Company's total stock; or the shareholder who holds less than 50% of equity shares, but still has major influence on the resolutions made by the general meeting of shareholders because of the voting rights entitled to the equity shares thereof." Partial Translation of SZSE Stock Listing Rules (2014 Revision) No. 378, Chapter XVIII, 18.1(5) [MTD Ex. 47].

"Actual Controller" is defined as: "any natural person, legal person or other organization that is capable of dominating and actually dominating the conducts of the Company by virtue of investment relationship, agreement or any other arrangement."  *Id*. at Chapter XVIII, 18.1(6).

"Control" is defined as: "the right to decide the finance and business policy of an enterprise, and based thereon, to obtain interests from the business activities of this enterprise. Any of the following circumstances will be regarded as having the controlling right to a listed company:"
    i.   Being the controlling shareholder that holds more than 50% of the listed company's equity shares;
    ii.  Being capable of actually dominating more than 30% of the voting rights entitled to the listed company's equity shares;
    iii. Being capable of deciding the appointment and selection of more than half of members to the board of directors of the Company by virtue of actually dominating the voting rights entitled to the listed company's equity shares;
    iv.  Because of the voting rights entitled to the listed company's equity shares it actually dominates, it is enough to have major influence on the resolutions made by the general meeting of shareholders;
    v.   Any other circumstance recognized by the China Securities Regulatory Commission or this Stock Exchange.  *Id*. at Chapter XVIII, 18.1(7).

[68] *See* 2006 CNBM Annual Report at 101 n.(b).

[69] *See* 2006 CNBM Annual Report at 101 n.(b).

Controller."[70]  CNBM retained its 52.40% direct equity interest in BNBM in the years 2007,[71]

2008,[72] 2009,[73] 2010,[74] 2011,[75] 2012,[76] and 2013.[77]  In each of these years, while CNBM

continued to be the Controlling Shareholder of BNBM, CNBM Group remained the "Actual

Controller of the Company."[78]

On September 30, 2014, BNBM offered private placements on listed shares with sales

restriction and raised RMB 2,120 million as registered share capital and RMB 1,962 million as

share premium.[79]  "After that, the Group's effective equity interests in BNBM were reduced

from 52.40% to 45.20%.  BNBM is controlled by the Group by virtue of the dominant voting

[70] *See* 2006 CNBM Annual Report at 10, 17 & 113; *see also* 2006 BNBM Annual Report at 9-11; CHANG Dep. at 213:25-214:13.

[71] *See* 2007 CNBM Annual Report at 10 & 128; 2007 BNBM Annual Report at 9-11, 67-69 & 104.

[72] *See* 2008 CNBM Annual Report at 11 & 131; 2008 BNBM Annual Report at 11.

[73] *See* 2009 CNBM Annual Report at 13 & 162; 2009 BNBM Annual Report at 8-10; *see also* SONG Dep. at 138:22-139:3.

[74] *See* 2010 CNBM Annual Report at 13 & 166; 2010 BNBM Annual Report at 7-9.

[75] *See* 2011 CNBM Annual Report at 12 & 162; 2011 BNBM Annual Report at 7-9.

[76] *See* 2012 CNBM Annual Report at 13 & 164; 2012 BNBM Annual Report at 47-50.

[77] *See* 2013 CNBM Annual Report at 13 & 169; 2013 BNBM Annual Report at 50-54; *see also* CHANG Dep. at 228:1-13.

[78] *See* 2007 BNBM Annual Report at 10-11 & 104; 2008 BNBM Annual Report at 10-11 & 107; 2009 BNBM Annual Report at 9; 2010 BNBM Annual Report at 8; 2011 BNBM Annual Report at 9; 2012 BNBM Annual Report at 46-47; 2013 BNBM Annual Report at 53; 2014 BNBM Annual Report at 52.

[79] *See* 2014 CNBM Annual Report at 13, 175 & 177 n.(iii).

20

interest in BNBM, dispersion of holding of other vote holders, participation rate of shareholders and previous shareholders' meetings."[80]

Very recently, on October 13, 2015, CNBM publicly announced, through the HKSE, a Framework Agreement between BNBM and Taishan Gypsum's minority shareholders pursuant to which "BNBM will directly and indirectly hold 100% equity interest in Taishan Gypsum. Taishan's Minority Shareholders will become shareholders of BNBM, and the equity interest directly held by [CNBM] in BNBM will reduce from approximately 45.20% to approximately 35.84%. Both BNBM and Taishan will remain as subsidiaries of [CNBM]."[81]  In exchange for the remaining shares in Taishan, 368,997,400,000 BNBM shares were privately issued to Taishan's minority shareholders.  By virtue of its percentage ownership, directly and indirectly, in CNBM's share equity, CNBM Group indirectly held the following percentage of BNBM's total share capital for the years 2005 through 2015:

| Year | CNBM Group's % Direct & Indirect Ownership in CNBM's Shares | CNBM's % Direct Ownership interest in BNBM's Shares | CNBM Group's % Indirect Ownership Interest in BNBM |
|------|------|------|------|
| 2005 | 68.22% | 60.33% | 41.16% |
| 2006 | 60.34% | 52.40% | 31.62% |
| 2007 | 56.02% | 52.40% | 29.35% |
| 2008 | 48.82% | 52.40% | 25.58% |
| 2009 | 44.10% | 52.40% | 23.11% |
| 2010 | 44.10% | 52.40% | 23.11% |
| 2011 | 44.10% | 52.40% | 23.11% |
| 2012 | 44.10% | 52.40% | 23.11% |

---

[80] *See* 2014 CNBM Annual Report at 13, 175 & 177 n.(iii) (emphasis added); *see also* CHANG Dep. at 205:3-206:10.

[81] *See* 10/13/2015 CNBM Announcement: Acquisition of Equity Interest in Taishan Gypsum Through Share Issuance of BNBM (emphasis added) ("10/13/2015 CNBM Announcement") [MTD Ex. 48].

| 2013 | 44.10% | 52.40% | 23.11% |
| 2014 | 44.10% | 45.20% | 19.93% |
| 2015 | 44.10% | 35.84% | 15.81% |

Accordingly, as a result of CNBM Group's controlling stake in CNBM from 2005 to the present date, CNBM Group has been and remains the controlling shareholder of its share-controlled subsidiary's subsidiary (*i.e.*, BNBM). Moreover, from 2005 through 2015, among the top ten shareholders of [BNBM], CNBM has been the sole shareholder with a 5% or higher stake in the company."[82]

### d. **Taishan**

From 2005 through present (which includes the entire period when Taishan's defective drywall was shipped to the United States), BNBM has been Taishan Gypsum's controlling shareholder. On March 19, 2005, BNBM entered into a share subscription agreement and acquired 42% of Taishan's total shares – giving BNBM operative and voting control of Taishan's Board of Directors as the "Controlling Shareholder."[83]

Next, in August, 2006, under the direction of CNBM Group's Chairman SONG Zhiping and General Manager CAO Jianglin, BNBM increased its equity interest in Taishan by purchasing an additional 23% of Taishan's equity shares.[84] CNBM published BNBM's increased equity acquisition of Taishan as a "Connected Transaction" on the HKSE, stating that

---

[82] *See* 2005 BNBM Annual Report at 7; 2006 BNBM Annual Report at 10; 2007 BNBM Annual Report at 10; 2008 BNBM Annual Report at 10; 2009 BNBM Annual Report at 9; 2010 BNBM Annual Report at 8; 2011 BNBM Annual Report at 8; 2012 BNBM Annual Report at 48-49; 2013 BNBM Annual Report at 53-55; 2014 BNBM Annual Report at 52-52.

[83] *See* 2005 BNBM Annual Report at 17-18 & 48; *see also* 4/23/2005 Announcement for Decision of the 12th Interim Meeting of the Third Board of Directors [MTD Ex. 126].

[84] *See* SONG Dep. at 51:20-52:2.

the acquisition was made to "enable CNBM Group to further enhance its competitiveness and consolidate its leading position in the PRC gypsum board market."[85]  From 2006 through October 12, 2015, BNBM continuously controlled 65% of Taishan's equity shares – all along maintaining control over Taishan's Board of Directors as the "Controlling Shareholder."[86]

The coup de grâce confirming CNBM Group's intention, first announced in 2006, to control Taishan is demonstrated by the recent Framework Agreement between BNBM and Taishan's minority shareholders, which solidified BNBM's equity ownership in Taishan.[87] Thus, in order for BNBM to become the sole shareholder of Taishan, CNBM transferred 6.7% of

---

[85] *See* 8/28/2006 Connected Transaction Announcement; *see also* 3/23/2007 "General Manager Bing Wang's work report at the 3rd meeting of the 5th session of BNBM staff representative meeting" [MTD Ex. 51] at BNBMPLC-E-0004827, 4836 (WANG Bing described the 8/28/2006 Connected Transaction Announcement as necessary "[f]or the strategic needs of further integrating Shandong Taihe [Taishan] gypsum boards, strengthening the controlling power over Shandong Taihe [Taishan]… under the strong support of CNBM and under the direct direction of Chief Song [CNBM Group & CNBM] and Chief Cao [CNBM Group & CNBM], BNBM further purchased 23% of equity of Shandong Taihe [Taishan], which made the Company's [BNBM's] equity share in Shandong Taihe increase up to 65% in total, and the Company [BNBM] thus obtained the substantial equity control over Shandong Taihe…").

[86] *See* 2006 CNBM Annual Report at 10 & 113-114; 2006 BNBM Annual Report at 28-29, 62-63 & 85-86; *see also* 2007 CNBM Annual Report at 10 & 128; 2007 BNBM Annual Report at 28, 67-69 & 92-93; 2008 CNBM Annual Report at 11, 131; 2008 BNBM Annual Report at 32, 69-70 & 96; 2009 CNBM Annual Report at 13 & 162; 2009 BNBM Annual Report at 26-27, 72-79 & 114; 2010 CNBM Annual Report at 13 & 166; 2010 BNBM Annual Report at 26, 74-75 & 78; 2011 CNBM Annual Report at 12 & 162; 2011 BNBM Annual Report at 26; 2012 CNBM Annual Report at 13 & 164; 2012 BNBM Annual Report at 47-50, 111-113 & 161-162; 2013 CNBM Annual Report at 13 & 169; 2013 BNBM Annual Report at 54, 116-120 & 157; 2014 CNBM Annual Report at 13 & 175; 2014 BNBM Annual Report at 148-149; Deposition of Taishan (CHE Gang) dated 6/2-4/2015 ("CHE Dep.") [MTD Ex. 50] at 29:21-25; 47:7-14; 141:24-142:9; 190:2-12; 350:23-351:14; CHANG Dep. at 210:20-211:10 & 229:3-15; SONG Dep. at 17:2-12 & 174:10-15; Deposition of JIA Tongchun dated 9/17-18/2015 ("JIA Dep. III") [MTD Ex. 49] at 180:2-9.

[87] *See* 10/13/2015 CNBM Announcement.

its ownership in BNBM's total shares to the minority shareholders of Taishan.  CNBM Group

through CNBM and BNBM will now own completely and have full legal responsibility for

Taishan's tortious conduct.

> **2.   CNBM Group Exercises Cascading Control Over the Internal Business Operations and Affairs of BNBM Group, CNBM, <u>BNBM, and Taishan.</u>**

CNBM Group has routinely and continuously exercised control over the internal business

operations and affairs of its subsidiaries, including, but not limited to, CNBM, BNBM Group,

BNBM, Taishan, CNBM USA, United Suntech, and CNBMIT.  First and foremost, CNBM

Group dictates and controls the business operations and decision-making of its subsidiaries by

directly or indirectly appointing Board of Directors members and/or Executive Officers for each

of its subsidiaries[88] <u>AND</u>, importantly, by dictating how those appointees report to CNBM

Group, obtain approval from CNBM Group, and vote on all important matters at the respective

subsidiaries.[89]  Separate and apart from controlling the actions of Board of Directors members

and/or Executive Officers of its subsidiaries, CNBM Group also controls the business operations

of its subsidiaries by dictating various business policies and procedures that are implemented

through cascading management techniques.  The end result is a cascading, multi-level CNBM

Group-controlled "checks and balances" system whereby CNBM Group: 1) installs its appointee

representatives in high-ranking and controlling positions at its subsidiaries – acting according to

CNBM Group's rules and decision-making, and 2) issues various and extensive directives and

---

[88] *See*, *e.g.*, Section II.A.4, *infra*; Summary Chart of Overlapping Executives and Officers ("Chart of Overlapping Executives and Officers") [MTD Ex. 1].

[89] *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors [MTD Ex. 52].

24

business policies and procedures that its subsidiaries must follow. This system has been in place since the time of the commercial activity and tortious conduct, which gave rise to this litigation.

**a. CNBM Group Directly or Indirectly Appoints and Controls Board of Directors Members and/or Executive Officers for <u>Each of its Subsidiaries.</u>**

CNBM Group's control over its subsidiaries goes far beyond the normal parent-subsidiary relationship. CNBM Group has implemented specific instructions and directives: a) appointing CNBM Group representatives into high-level positions at subsidiaries, and b) specifying how those CNBM Group representatives conduct their activities at the subsidiary to which they have been appointed. These relevant CNBM Group instructions and directives are memorialized in the "China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors."[90] CNBM Group makes clear that: "These Measures are specially formulated in order to strengthen the management of State-owned assets … and adapt to the needs for regulating the corporate governance structure and managing the representatives of capital contributors appointed by China National Building Group Corporation (abbreviated below as 'the Group Corporation')."[91]

"These Measures are applicable to the representatives of capital contributors appointed to all the wholly-owned subsidiaries [BNBM Group, CNBM Trading, CNBM Investment], controlled subsidiaries [CNBM, BNBM PLC, Taishan Gypsum], associates and any other types of enterprises (referred to as enterprises hereinafter) having an asset relationship with the Group

---

[90] *Id.*

[91] *Id.* at BNBM(Group)-E-0005107.

Corporation."[92]  Additional rules governing the appointment of CNBM Group representatives at its subsidiaries, like Taishan Gypsum, include the following:

- "Representatives of capital contributors refer to those board directors, supervisors, shareholder representatives, operational team members, chief financial officers, and others who are lawfully appointed by the Group Corporation according to the capital contribution relationship …"[93]

- "The appointment and removal procedures for the representatives of capital contributors are performed according to the relevant provisions in the 'Administrative Measures for Appointment and Removal of Group Corporation's Enterprise Management Personnel.'"[94]

- "The scope of enterprises to which the Group Corporation appoints representatives of capital contributors include: (I) Wholly owned enterprises; (II) Controlled subsidiaries, associate enterprises; (III) Other types of legal entities directly invested by the Group Corporation; and (IV) Important legal entities indirectly invested by the Group Corporation."[95]

Once installed in their executive positions, CNBM Group dictates and controls the conduct of its appointees.  Directives to appointees include "[c]arefully implementing and executing the Group Corporation's development strategy, scheme, and plan, give an expression of the Group Corporation's minds and requirements, faithfully protecting the lawful rights and interests of the Group Corporation."[96]  In order to ensure that the expressions of the Group Corporation are fully executed, CNBM Group further requires strict reporting by the appointees:

**When the enterprise to which the representative is assigned is involved in any of the following significant decisions**, the

---

[92] *Id.*

[93] *Id.*

[94] *Id.* at BNBM(Group)-E-0005108.

[95] *Id.*

[96] *Id.* at BNBM(Group)-E-0005110.

> representative shall request for instructions and give a written
> report to the Group Corporation beforehand. **The decision can
> only be implemented after the Group Corporation gives a
> reply**. (I) The enterprise that has the board of directors selects and
> appoints, or changes its general manager, chief financial officer, or
> chief accountant; (II) **There are any decisions on significant
> investments and directions of operation**; (III) The enterprise has
> an investment increase plan, profit (income) distribution plan, or
> bond issuance; (IV) **The enterprise provides guarantees to any
> other entities**; (V) The enterprise asset collaterals exceed one third
> of its net assets; … (X) Any other matters that may affect the
> capital contributor's rights and interests.[97]

These directives show how CNBM Group's control over its high-ranking officer-appointees at its subsidiaries is extensive, and covers financial as well as operational management. CNBM Group's directives extend into the boardrooms of its subsidiaries, requiring appointees/ representatives to "execute the Group Corporation's intentions when deliberating and voting on the proposal."[98] Basically, the "subsidiaries' daily operations are in the charge of various operation and management teams appointed or recommended by the Group Corporation."[99]

CNBM Group ensures that its appointees comply with its directives by routinely evaluating their performances. In fact, CNBM centralizes the administrative management relative to its representatives appointed to high-ranking positions at subsidiaries, as "[t]he Group Corporation's Human Resources Department is the centralized management department for representatives of capital contributors, and it is specifically responsible for the work on selecting,

---

[97] *Id*. at BNBM(Group)-E-0005111 (emphasis added).

[98] *Id*. at BNBM(Group)-E-0005112.

[99] *See* 4/2015 "China National Building Material Group Corporation Year of 2015-2017 Development Strategy and Plan" ("CNBM Group 2015-2017 Strategy Plan") [MTD Ex. 57] at CNBMGRP00013297-13298.

appointing (recommending), adjusting, evaluating, giving rewards and penalties to, the representatives of capital contributors."[100]  CNBM Group evaluates representatives of capital contributors "through the combination of regular evaluations, annual evaluations, and end-of-term evaluations."[101]  CNBM Group also controls the salaries and bonuses of its appointees at subsidiaries.  "The salary system for the representatives of capital contributors during the term shall be 'position-based salary' … and [t]he standards of the position-based salary shall be implemented upon review and approval by the Group Corporation based upon different categories."[102]

> **b. CNBM Group Issues Various and Extensive Business Policies and Procedures that Are followed by its Subsidiaries in Cascading Order.**

CNBM Group also controls the operations and finances of its subsidiaries through various and extensive business policies and procedures its subsidiaries must follow.  This fact was confirmed by HU Jinyu, General Manager of the Audit Department of CNBM since 2005.[103] The CNBM Audit Department requires CNBM subsidiaries to conduct internal audits pursuant to company policies, produce reports, and submit the same to the Audit Department.  In the event improprieties or missteps occur, Ms. HU issues a report outlining corrective actions that must be

---

[100] *Id*. at BNBM(Group)-E-0005107.

[101] *Id.* at BNBM(Group)-E-0005113.

[102] *Id*. at BNBM(Group)-E-0005115.

[103] *See* Deposition of HU Jinyu dated 12/7/2015 ("HU Dep.") [MTD Ex. 53] at 11:17-23 & 24:25-25:11 (HU Jinyu learned of the General Manager position at CNBM from CAO Jianglin when she was working as the Deputy General Manager of the Audit Department and Financial Controller of BNBM).

taken in order for CNBM Group to maintain its discipline over its subsidiaries, by having them comply with company policies.[104]

Given the integrated nature of the CNBM/BNBM Entities, since 2005, the process for drafting audit policies and practices are the product of CNBM work meetings, which are hosted by the company President CAO Jianglin and CNBM Group's Chairman SONG Zhiping, and attended by managers and directors of CNBM Group and CNBM subsidiary companies.[105]  For these meetings, Ms. HU described the attending subsidiaries as either second-tier or third-tier companies.[106]  In doing so, she explained that a second-tier company is one in which CNBM directly holds shares; where a third-tier company is one that is owned by a second-tier company.[107]  Thus, CNBM drafts the audit policies, sends them to second-tier companies, such as BNBM, for implementation, and then third-tier companies, such as Taishan, are apprised by BNBM of CNBM's audit policies and they are directed to follow these policies.[108]

At least for the past few years, Ms. HU is personally responsible for requiring each subsidiary to send to CNBM their internal audit plan once a year and their internal audit reports

---

[104] HU Dep. at 99:16-100:11.

[105] HU Dep. at 31:1-16.  *See*, *e.g.*, 6/11/2010 "CNBM Co., Ltd. 2010, 6th Working Meeting" [MTD Ex. 54].

[106] *Id.* at 31:9-16.

[107] HU Dep. at 31:17-32:5; *id.* at 32:6-20 (further explaining that BNBM is a second-tier company of CNBM and Taishan is a third-tier company of CNBM).

[108] *Id.* at 111:11-112:7; *see also* JIA III Dep. at 279:11-24 ("...They [Taishan] did it according to some of the requirements by BNBM Company, Limited.  Among those requirements they required us to do that in accordance with CNBM Company, Limited's requirements....").

twice a year.[109]  Thus, CNBM controls its audit process tier-by-tier, so that "the management are done in the form of cascade."[110]  In other words, as the controlling company, CNBM obtains the internal audit information from its second-tier subsidiaries, which must demand from their third-tier subsidiaries the internal audit information required of them, so that all of this information is reported to CNBM.  Through this cascading audit process, CNBM implements and enforces the directives of CNBM Group.[111]  Confirming this fact, Taishan's Chairman JIA testified that "CNBM's audit group required us to do it according to CNBM's requirements."[112]

There is evidence that CNBM Group audited Taishan Gypsum directly, which demonstrates CNBM Group's ability to police even third-tier companies like Taishan to ensure that they comply with management policy.[113]  CNBM Group requires Taishan to seek approval prior to the establishment of subsidiaries, construction projects for gypsum board production, and

---

[109] HU Dep. at 109:6-10.

[110] Id. at 112:8-9 (emphasis added).

[111] In furtherance of its cascading management, CNBM Group participates and coordinates meetings that involve supervisory teams and three tiers of review over Taishan's management and operation.  See "Present the People, the Object, and the Mindset, Integrate Strictness with Reliability, and Change the Work Style" [MTD Ex. 55].  Seeming to occur each year, CNBM Group sends leadership groups to Taishan in order to instruct, supervise and identify management problems.  Id.  Most notably, the meeting documents show that there are three tiers of supervisory teams that assess the activities of Taishan, and that none of the three tiers include Taishan executives, employees, or directors.  Id.  Yet again, CNBM Group is shown to pay close attention to the "supervision and instruction" over Taishan.  Id. at CNBMCO00055606.

[112] JIA Dep. III at 280:11-12 (referring to Taishan's submission of its "Comprehensive Risk Management" report to CNBM Group).  See [MTD Ex. 62].

[113] See "V. Problems found in the audit" [MTD Ex. 73] (describing situations, such as the construction of certain gypsum board production lines, where Taishan failed to comply with company   y policies such as setting up subsidiary companies without proper approval from the Group corporation).

engineering bids; and when Taishan fails to comply, the Group Corporation issues an audit report identifying violations of company policies to enforce future compliance.[114]

CNBM Group's demanding policies are further evidenced by multiple documents – including "group-wide" policies and procedures issued by CNBM Group to its subsidiaries, covering nearly all aspects of their business.  For example, "China National Building Material Group implements a parent-subsidiary company management system."[115]  In fact, "Acting as the strategic center, decision making center, resource center, policy and culture center, the Group Corporation exercises its contributor's rights."[116]

CNBM Group controls its subsidiaries in four primary aspects:

1) **Strategy management** – "[t]he Group Corporation guides all subsidiaries to strictly adhere to the Group Corporation's determined strategy on business activities, to ensure the realization of the Group Corporation's strategic goals";[117]

2) **Decision-making management** – "… the Group exercises the decision making power as the fund contributor on major issues such as its subsidiaries' investment and financing, restructuring, etc.";[118]

3) **Resource management** – "[t]he Group Corporation coordinates and integrates various domestic and overseas resources, which

---

[114] HU Dep. at 97-99.

[115] *See* "China National Building Material Group Corporation Sample Document" [MTD Ex. 56].

[116] *Id.*

[117] *See* 4/2015 "China National Building Material Group Corporation Year of 2015-2017 Development Strategy and Plan" ("CNBM Group 2015-2017 Strategy Plan") at CNBMGRP00013297-13298.

[118] *Id.*

purports to the reasonable utilization of resources among the various subsidiaries";[119] and

4) **Culture Management** – "the Group Corporation guides all subsidiaries to commence establishing enterprise culture … forming a set of unified enterprise culture values within the Group Corporation."[120]

As stated by CNBM Group, "[t]hrough refining and formulating various rules, the Group Corporation standardizes and institutionalizes its management."[121]

As the strategic, decision-making policy and cultural center of all CNBM Group subsidiaries, CNBM Group issues detailed "group-wide" policies dictating many aspects of the internal business operations of its subsidiaries, including, but not limited to:

- Internal Control Systems[122];

---

[119] *Id.*

[120] *Id.*  The unified culture is demonstrated by CNBM Group proudly touting its global success in the building materials industry generally.  On its website and in reports, CNBM Group boasts that "[a]s the leader in China's building materials industry, CNBM is the largest comprehensive building materials industry group in China.  It has been ranked first among the top 500 enterprises in the building materials industry for many years, 41st among the Top 500 Enterprises in China and 270th among the Fortune Global 500."  *See* 2014 CNBM Group's Social Responsibility Report at 6 ("Up to the end of 2014, the total assets of the Group amounted to RMB 406.9 billion and the total number of employees reached 176,854.  In 2014, CNBM achieved revenue of RMB 250.4 billion with total profit of RMB 13.0 billion, whilst taxes paid amounted to RMB 14.6 billion.").  With respect to the manufacturing of drywall, the Company claims that CNBM Group is the "Largest gypsum board producer in the world."  *Id.*; *see also id.* at 8 ("annual productivity of gypsum plasterboard exceeds 1.78 billion m$^2$, ranking the first in the world.").  Through its alter ego relationships with BNBM and Taishan, CNBM Group takes credit for the volume of gypsum board produced by its controlled subsidiaries.

[121] *Id.*

[122] *See* 5/28/2014 "Beijing New Building Materials (Group) Company Limited Internal Control System Construction Work Summary" submitted to CNBM Group [MTD Ex. 58] (BNBM Group affirming creation of an internal control system pursuant to CNBM Group requirements).

- Management Methodology[123];

- Risk Management[124];

- Significant Business Decisions[125];

- Significant Personnel Appointments and Removals[126];

- Significant Project Arrangements[127];

---

[123] *See* WANG Bing's "Welcome Speech on the 2008 BNBM Annual Marketing Meeting" [MTD Ex. 60] at BNBMPLC-E-0005889 ("BNBM, according to the requirements of CNBM Group's 'unified, modelized, streamlined, systemized, and digitized' management model, fully implemented KPI management, and satisfactorily accomplished the three missions given by the Group.").

[124] *See* 4/5/2010 Email from BNBM to Taishan Gypsum regarding "Notice about the Year 2010 Comprehensive Risk Management Work Arrangement [MTD Ex. 61] (BNBM instructing Taishan to complete a Risk Management Report as required by CNBM Group). *See also* "Taishan Gypsum Company Limited Comprehensive Risk Management Report for the Year 2011" submitted to CNBM Group, CNBM and BNBM ("Taishan's 2011 Risk Management Report") at CNBMGRP00371516, 371521; ██████████████████████████ ██████████████████████████████████████████ [MTD Ex. 63] at CNBMGRP00330873, 330878, 330881-883; "Report on Submitting the Implementation Plan on the Three-year Objective of Legal Work of China National Building Material Company Limited and Its Subordinate Enterprises" [MTD Ex. 69] ("the Company [CNBM] carefully prepared the legal work objectives and arrangements for the Headquarters of the Company according to the requirements of the SASAC and the Implementation Plan of your Company [CNBM Group]").

[125] *See* "China National Building Material Group Corporation Interim Measure on Fully Implementing the Decision-Making Rules for the 'Three Significant Issues and One Large Operation'" [MTD Ex. 64] at BNBMPLC-E-001156-1159. *See also* CNBM Co., Ltd. [2011] No. 2, "The Second Office Meeting" [MTD Ex. 59] (deliberating Taishan's gypsum board production line construction projects).

[126] *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors.

[127] *See* "The Second Office Meeting" (deliberating Taishan's gypsum board production line construction projects); *see also* 6/18/2013 BNBM Investment document No. 62 (2013), "Notice on Publishing 3 Regulations, the Administrative Measures of the Branches/Subsidiary Companies of BNBM, the Administrative Measures of the External Investments of BNBM, and the Administrative Measures of the Development and Strategy of BNBM [MTD Ex. 161].

-   Capital Operation Issues[128]; and

-   Trade Union Issues.[129]

The end result is that CNBM Group implements and maintains policies of strict control over the business operations of its subsidiaries, which include BNBM and Taishan.

### c.   CNBM Group Issues Directives to its Subsidiaries.

CNBM Group issues directives to its subsidiaries as part of the overall control that the Company maintains over them.  A clear example of this can be found in the "Statement on Implementing the Requirements from the Group Corporation's Meeting of International Business Risk Prevention," sent to the "Leaders of the company" following CNBM Group's meeting on

---

[128] In 2008, CNBM Group expressed concern over the economic environment and placed specific requests for information from Taishan related to its import and export business.  *See* 11/3-5/2008 Email chain between and among CNBM, BNBM, and Taishan re: "Notice on submitting the information of import and export business operation and countermeasures of the enterprises during the financial crisis" [MTD Ex. 65].  CNBM Group sent a Notice to its subsidiaries via email requesting full information related to the import and export business of each.  *Id.*  Pursuant to the request, Taishan dutifully outlined for CNBM Group the influx of import and export percentages for the years 2006, 2007, and 2008.  *See* "The Operation Situation and Relevant Suggestions on the Import and Export Business of Taishan Gypsum Company Limited," attached to 11/3-5/2008 Email chain between and among CNBM, BNBM, and Taishan [MTD Ex. 66].

[129] *See*, *e.g.*, 5/10/2006 "Request for Instructions on Establishing the Trade Union at the Headquarters of China National Building Material Company Limited" [MTD Ex. 70] (showing that CNBM Group requested all of the entities to strengthen the construction of trade union organizations and pointed out that all the entities should "establish and improve the trade union organizations at all levels according to the provisions of the trade union law and the newly established economic organizations to establish trade unions.") (emphasis added).  As a result of implementing CNBM Group's directive, Ms. HU was listed as a candidate and then elected, and later re-elected, to be an economic audit committee member for CNBM's trade union.  HU Dep. at 59:17-21; 9/2/2014 "CNBM Request for Instructions on Trade Union Election at Expiration of Office Terms" [MTD Ex. 71].

34

international risk prevention held July 11, 2014[130] – six days before Taishan refused to appear for

its Judgment Debtor Examination before this Court.  The July 11, 2014 meeting "mainly

introduced the international situations and existing risks the Group Corporation would face in the

process of implementing its 'Going Global' strategy."[131]  The Statement produced as a result of

that meeting purports to "sort[] out the company's current situations according to the Group

Corporation's requirements," concerning international business risk prevention.  At that meeting,

CNBM Group directed its subsidiaries "to avoid depositing funds in banks that have branches in

the State of New York, United States,"[132] which of course would avoid seizures of the

Company's assets. *Koehler v. Bank of Bermuda, Ltd.*, 12 N.Y.3d 533, 883 N.Y.S.2d 763, 911

N.E.2d 825 (N.Y. 2009).  Further, CNBM Group required that overseas personnel "carry out

business activities only in the name of their own legal person unit," that "communications on

overseas projects should be conducted by specially appointed people using special email

accounts," and that "business personnel use their own [personal] emails."[133]

Equally notable, the July 11, 2014 International Business Risk Prevention meeting also

discussed the progress of the U.S. gypsum board lawsuit.[134]  Discussed fully at Section II.C.4,

*infra*, on July 11, 2014, the Board of CNBM Group unanimously approved a Resolution deciding

---

[130] *See* 7/11/2014 "Statement on Implementing the Requirements from the Group Corporation's Meeting of International Business Risk Prevention" ("Requirements for International Business Risk Prevention") [MTD Ex. 67] at BNBM(Group)-E-0000445-446.

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *Id.*

that Taishan Gypsum shall not appear for the Judgment Debtor Examination in the United States scheduled for July 17, 2014.[135]

Sometimes, the directives originate with or are issued in conjunction with SASAC. For example, in 2011, CNBM prepared a "Work Report" on the "Special Treatment of Private Coffers, which implemented a directive of SASAC and CNBM Group to their subsidiaries to prevent employees from hiding money, *i.e.*, creating private coffers.[136]

In addition to guiding the decisions of its subsidiaries, CNBM Group also issues policies and manuals that direct the manufacturing operations of the controlled companies. For example, CNBM Group issues technical safety codes to its gypsum plasterboard enterprises, and assigns BNBM with specific responsibility "for drafting of the code."[137] CNBM Group's policies control the "safety technology of gypsum plasterboard production enterprises," and are mandatory in nature.[138]

CNBM Group also requires that its subsidiaries complete annual Comprehensive Risk Management Reports "stating what are the risks for [the particular] year, what are the things that need to be done and how to prevent."[139] As the controlling shareholder of Taishan (through

---

[135] *See* 7/11/2014 CNBM Group Notice of 17th Meeting of Third Session of the Board of Directors of CNBM Group ("Notice of 17th Meeting") [MTD Ex. 208].

[136] *See* 11/11/2011 "Work Report of China National Building Material Company Limited on Special Treatment of "Private Coffers" [MTD Ex. 72].

[137] *See* Technical Code for Safety of Gypsum Plasterboard Enterprises: Instructions for Preparation [MTD Ex. 68] at CNBMGRP00071460.

[138] *Id.* at CNBMGRP00071479.

[139] *See*, *e.g.*, Taishan's 2011 Risk Management Report; JIA Dep. III at 277:8-11.

36

BNBM Group, CNBM, and BNBM), CNBM Group's records specify precisely the level of oversight and control this company ultimately has over Taishan, which extends to "daily operational management."[140]  Naturally the risk management reports focus on budget and investment plans of the subsidiary and require absolute approval by the parent entities in order to "ensure the safety of capital."[141]  As a result, CNBM Group's risk management directives require Taishan to submit "project feasibility reports" to BNBM for consideration.[142]  Then, BNBM considers the project proposals and seeks approval from BNBM's Board of Directors and BNBM's shareholders, namely, CNBM.[143]  Only after the companies follow CNBM Group's plan can Taishan secure the funding and begin operation of construction projects.[144]

### d.  CNBM Group Trains the Middle- and Senior-Level Leaders of BNBM Group, CNBM, BNBM and Taishan.

An integral part of CNBM Group's control over the leadership of its subsidiaries is to provide training to Middle- and Senior-level operatives of BNBM Group, CNBM, BNBM, Taishan, and other entities within the CNBM Group conglomerate.  In 2011, for example, CNBM Group held a 3-day course for "people in charge of a functional department in the headquarters of the Group Corporation and the people of a higher level, and the personnel who

---

[140] *E.g.*, Taishan's 2011 Risk Management Report at CNBMGRP00371521, 371559; JIA Dep. III at 281:21-282:9.

[141] *See* Taishan's 2011 Risk Management at CNBMGRP00371559.

[142] *Id.*

[143] *Id.*

[144] JIA III Dep. 284:20-85:13 (Confirming the scope of conduct described in the Risk Management Directive as true.).

come from a subsidiary (group) company or a research institute but are managed by the Group

Corporation or are subject to the pre-placement archival management."[145]  The training

addressed Enhancement of Leading Cadre's Cultivation, Officialdom, Social Management, The

Science and Art of Leadership, and Organizational Behavior (Management Psychology).[146]

CNBM Group's Chairman SONG Zhiping was a lecturer at this seminar.  Taishan's Chairman

JIA Tongchun was directed by BNBM to attend this course.[147]  The materials for the training

were distributed by CNBM.[148]

### 3.  Defendants' Have Admitted that Through BNBM They Controlled the Daily Operations and Decision-Making of Taishan.

The Defendants have admitted – in public statements, statements to authorities, and inter-

company reports – that, through BNBM, they control the daily operations and decision-making

of Taishan.  These admissions are consistent with defendants' original plan to dominate

Taishan's actions - as outlined in the Global Offering as follows: a) "BNBM intends to leverage

its technical expertise to improve Taihe's gypsum boards,"[149] b) "We [CNBM] intend to make

use of our combined market positions to increase our bargaining power with suppliers,"[150] and c)

---

[145] *See* 6/29/2011 Email and attachment to JIA Tongchun re: Notice on Matters Relevant to CNBM Group's Training Class in 2011 for Leaders at Middle and Senior Levels [MTD Ex. 74] at TG-0073104.

[146] *Id*. at TG-0073104-73105.

[147] *Id*. at TG-0073103.

[148] *Id*.

[149] *See* Global Offering at 115.

[150] *Id*.

"We also intend to leverage the combined technical, sales and financial strengths of BNBM and

Taihe to jointly construct or relocate production lines to strategic locations in the PRC."[151]

Defendants' original plan came to fruition, and from 2005-2015, BNBM and its parents

(CNBM Group and CNBM) controlled the daily operations and management of Taishan.  In fact,

in 2006, CNBM admitted that it and CNBM Group had been actively involved "in the daily

operations and management of Taishan," and that both companies would participate even "more

actively."[152]  Moreover, in 2007, BNBM admitted that it conducted "management and control of

the daily operation and important activities of the branches and subsidiaries [including

Taishan]."[153]

As detailed below, such admissions include: a) an August 28, 2006 public statement from

CNBM,[154] b) an April 23, 2007 official reply from BNBM to an inquiry from the Beijing

Securities Regulatory Bureau,[155] and c) an October 16, 2007 BNBM inter-company "special

inspection report on the management and control of its branches and subsidiaries."[156]

---

[151] *Id.*

[152] *See* fn. 16, *supra.*

[153] *See* 10/16/2007 BNBM Special Inspection Report on the "Management and Control of its Branches and Subsidiaries" ("10/16/2007 BNBM Special Inspection Report") (emphasis added) [MTD Ex. 75].

[154] *See* 8/28/2006 Connected Transaction Announcement at Q000010.

[155] *See* 4/23/2007 BNBM Reply on the Inquiry Letter about 2006 Annual Report Verification written to Beijing Securities Regulatory Bureau ("4/23/2007 BNBM Reply on the Inquiry Letter about 2006 Annual Report Verification") [MTD Ex. 76].

[156] *See* 10/16/2007 BNBM Special Inspection Report.

### a. August 28, 2006 Public Statement from CNBM Admitting to CNBM Group's/CNBM's Active Participation in the Daily Operation and Management of Taishan.

On August 28, 2006, pursuant to HKSE Rules, CNBM issued a public statement regarding BNBM's acquisition of an additional 23% interest in Taishan (a/k/a "Taihe") - which gave BNBM 65% ownership of Taishan.[157]  This CNBM public statement specified that "[t]he directors of the Company [CNBM] believe that the Acquisition will enable CNBM Group to further enhance its competitiveness and consolidate the leading position in the PRC gypsum board market as it **will participate more actively in the daily operations and management of Taihe** [Taishan] with a view to improving its profitability."[158]  This statement proves that – through BNBM – CNBM Group/CNBM in fact participated in the "daily operations and management" of Taishan before August 28, 2006, and they "*more actively*" participated in the daily operations and management of Taishan after August 28, 2006 – all during the time period when Taishan's defective drywall was being transported to the United States.

### b. April 23, 2007 Official Reply from BNBM to Inquiry Letter from the Beijing Securities Regulatory Bureau.

On April 23, 2007, BNBM submitted an official reply to an inquiry letter from the Beijing Securities Regulatory Bureau regarding BNBM's 2006 Annual Report.  BNBM's official reply stated that **"[t]he Company's [BNBM's] control over Shandong Taihe [Taishan]** and BND: the Company [BNBM] respectively holds 65% shares of Shandong Taihe [Taishan] and 80% shares of BND; **the directors assigned by the Company [BNBM] are the majority**

---

[157] *See* 8/28/2006 Connected Transaction Announcement at Q000010.

[158] *Id.*

40

among the above two subsidiaries' [Taishan's and BND's] board of directors and can

influence their production and operation decision-making."[159]  This April 23, 2007 official

reply from BNBM further stated that "[t]he Company [BNBM] conducts vertical management in

important business management links in the aspects of finance and external investment, to

achieve the goal of effective control of relevant conduct."[160]  Importantly, when replying to the

Beijing Securities Regulatory Bureau's inquiry about "control over Shandong Taihe [Taishan],"

BNBM specified its influence on Taishan's "production and operation decision-making" as

well as its management of Taishan's finances.  Moreover, BNBM provided this official reply

knowing that the law required truthfulness.[161]

> ### c. October 16, 2007 BNBM Inter-Company "Special Inspection Report on the Management and Control of its Branches and Subsidiaries."

On October 16, 2007, BNBM issued an inter-company special inspection report on the

management and control of its branches and subsidiaries.  BNBM's special inspection report

specifies Taishan as a "Controlled Subsidiary," and moreover, the report makes several damning

admissions regarding multiple methods by which BNBM exercises control over the daily

operations and decision making of Taishan and other BNBM subsidiaries and branches,

including:

> The Company [BNBM] formulated 'Outside Investment
> Management Measures,' 'Important Information Internal Report

---

[159] *See* 4/23/2007 BNBM Reply on the Inquiry Letter about 2006 Annual Report Verification at
BNBMPLC-E-0004784 (emphasis added).

[160] *Id.*

[161] *See* Deposition of BNBM PLC (CHEN Yu) dated 7/8-11/2015 ("CHEN Dep.") [MTD Ex. 77]
at 458:17-459:1.

Regulations,' **and strictly followed the relevant regulations to conduct management and control of the <u>daily operation and important activities</u> of the branches and subsidiaries**.[162]

According to 'Important Information Internal Report Regulations,' **the Company [BNBM] <u>emphasized and strengthened the control of its controlled subsidiaries'</u>** related party transactions, outside guarantees, usage of financing funds, major investments, information disclosure and other activities.[163]

The Company [BNBM] clarified the responsibilities and limitation of authorities held by the directors, supervisors and important high level management personnel who were assigned to the controlled subsidiaries and joint stock companies, **through assigned directors, supervisors and high level management personnel, strengthened the participation of subsidiaries' <u>management decision making</u>**.[164]

**Through the implementation of the management measures above, the Company [BNBM] <u>ensured effective control</u> of its branches and subsidiaries [including 'controlled subsidiary' Taishan]**, protected the Company's interest to the maximum, and prevented investment risks.[165]

The October 16, 2007 "Special Inspection Report" from BNBM regarding the "management and control of its branches and subsidiaries" explicitly states how BNBM conducts "<u>management and control of the daily operation and important activities</u>" of its subsidiaries – and explicitly identifies Taishan as such a "Controlled Subsidiary."[166]  Thus, it is no surprise that BNBM has "ensured effective control of its branches and subsidiaries," including Taishan.

---

[162] *See* 10/16/2007 BNBM Special Inspection Report at BNBMPLC-E-00006050-6051.

[163] *Id.* (emphasis added).

[164] *Id.* (emphasis added).

[165] *Id.* (emphasis added).

[166] *Id.* (emphasis added).

### 4. **Defendants Share Numerous Common Officers and Directors.**

In accordance with the strict hierarchical-controlling ownership structure established by CNBM Group, as the ultimate controlling parent company for all of its subsidiaries, there are many overlapping Officers and Directors among Defendants.[167]  This is significant, because during relevant time periods (2005-present), it would not have been possible for the decision-makers at these various companies to have acted independently when voting to provide loans, guarantees, financing, etc., when, in fact, the same people were operating in two or more of the subject companies at the same time.

This is borne out by the testimony of WANG Bing.  Mr. WANG has served as Chairman of BNBM PLC and a Vice President of CNBM since 2009.[168]  From 2004-2009, he was the General Manager of BNBM,[169] and since 2004, he has also been a Director of BNBM.[170]  In 2005, Mr. WANG became a Director of Taishan; a position he still holds today.[171]  Incredibly, when he was asked about his ability to fulfill his fiduciary duties and disregard conflicts of interest arising from concurrent appointments to Taishan, BNBM, and CNBM, Mr. WANG testified as follows:

---

[167] *See*, *generally*, Summary Chart of Overlapping Executives and Officers.

[168] Summary Chart of Overlapping Executives and Officers at p. 3 & Ex. 10 thereto.

[169] *Id.*

[170] Summary Chart of Overlapping Executives and Officers at p. 3 & Ex. 11 thereto.  In July, 2014, Mr. WANG was appointed Secretary to the Party Committee of BNBM.  *Id.* at p. 3 & Ex. 10 thereto.

[171] Summary Chart of Overlapping Executives and Officers at p. 3 & Ex. 9 thereto.

Q. When you vote as a director of Taishan, often it's not only for the benefit of Taishan, but it's for the benefit of BNBM as well, is it not?

A. No. When I vote as a director of Taishan Gypsum, according to the law I am accountable to the interest of Taishan Gypsum. I would only vote representing Taishan Gypsum.

Q. And if you had to vote at Taishan Gypsum and you were accountable only to the board of Taishan Gypsum, and the vote was adverse to BNBM, would you recuse yourself?

A. When I vote as a director of Taishan Gypsum, I only represent Taishan Gypsum. I do not have the position or interest of BNBM.

\* \* \*

Q. When you vote as a director of BNBM concerning matters of Taishan, have you ever found yourself in a position where your vote at BN[BM] would adversely affect the operation of Taishan?

A. We have never assessed if any issue would adversely affect Taishan Gypsum, because issues that are dealt with in BNBM's board of directors meeting all represent the interest of BNBM. We would not consider other companies.

\* \* \*

Q. Now, as vice-president of CNBM, you're interested in the general operations of CNBM because you have a fiduciary duty to CNBM to carry out your duties as vice-president, and in order to perform your fiduciary duty you make yourself aware of things that are happening at CNBM, do you not?

A. As the vice-president of CNBM, my duty is to be in charge of BNBM's investment and return. I do not have an office in CNBM, nor do I work in CNBM. I do not in charge of any other works in CNBM, and I'm not in charge of CNBM's daily operation.[172]

---

[172] Deposition of WANG Bing dated 8/25-27/2015 ("WANG Dep.") [MTD Ex. 78] at 291:4-20, 292:1-10 & 376:9-377:5 (objections omitted).

Further, Mr. WANG testified that his only obligation as a Vice President of CNBM is to manage CNBM's equity and investment in BNBM.[173]  As the Chairman of BNBM's Board of Directors, Mr. WANG further acknowledged that his primary duty at BNBM is to make money and pay dividends to CNBM.[174]  For this reason, it can only be assumed that Mr. WANG's primary obligation as a member of Taishan's Board of Directors is to ensure Taishan's payment of dividends to its upstream, controlling parent BNBM, with the flow of this money ultimately going to CNBM, and eventually to CNBM Group.[175]

Additional high-level overlapping Officers and Directors among the various CNBM/BNBM Entities and Taishan include the following individuals:

SONG Zhiping is the Chairman of CNBM Group since October, 2005.  In addition, he is the Chairman of BNBM Group.  Incredibly, Mr. SONG is also the Chairman and Executive Director of CNBM, since March 2005.  Previously, Mr. SONG was the Chairman of BNBM,

---

[173] *Id*. at 378:4-22.

[174] *Id*. at 378:24-379:18:
> Q. "And you then perform your task at BNBM to ensure that BNBM operates successfully and creates dividends for CNBM, where you're vice-president, is that correct?"
> A. "My function as the Chairman of BNBM is that I'm only accountable to BNBM.  I'm accountable to all the shareholders of BNBM."
> Q. "And that's to operate successfully and make money for the shareholders?"
> A. "The duty of a Chairman of the Board is, of course, to be in charge of the board of directors meetings, and to guaranty that the company will operate more successfully."

*Id.* at 379:6-18.

[175] Under the structure established by CNBM Group, Taishan's payment for its contempt of court was in effect financed by CNBM Group.

while he served in an executive capacity at BNBM Group and CNBM Group.[176]  He was also a

Director for BNBM of America.[177]

CAO Jianglin, since 2005, has been a Director of CNBM Group, Chairman of the

Supervisory Committee of BNBM Group, and President and Executive Director of CNBM.[178]

Since 2009, he also has served as Chairman of the Supervisory Committee of BNBM, and in

2014, he was appointed General Manager of CNBM Group.[179]  Additionally, from 2005-2011,

Mr. CAO was a Supervisor and Chairman of the Supervisory Committee of Taishan,[180] and from

2005-2009, he was the Chairman and Secretary to the Party Committee of BNBM.[181]  Further,

Mr. CAO was a Director and Officer of BNBM of America.[182]

---

[176] Summary Chart of Overlapping Executives and Officers at p. 1 & Ex. 1 thereto.

[177] 2001-2005 Uniform Business Reports of BNBM America from FL Secretary of State [MTD Ex. 79] at 1 & 6-11.

[178] Summary Chart of Overlapping Executives and Officers at p. 2 & Ex. 5 thereto.  *See also* Deposition of CAO Jianglin dated 8/4-5/2015 ("CAO Dep.") at 37:15-24 & 38:11-14 [MTD Ex. 80].

[179] *Id.*

[180] Summary Chart of Overlapping Executives and Officers at p. 2 & Exs. 2, 3 & 4 thereto.

[181] Summary Chart of Overlapping Executives and Officers at p. 2 & Exs. 5 & 6 thereto.

[182] 2001-2005 For Profit Corporation Uniform Business Report and Articles of Incorporation for BNBM of America, Inc.

ZHOU Guoping is the Chief Economist for CNBM Group.[183]  She is also a Supervisor for CNBM, since 2005.[184]  In January, 2015, she was appointed as Vice President and Director of CNBM Import and Export.[185]

TAO Zheng currently serves as the General Manager, Director, and Deputy Secretary to the Party Committee of BNBM Group.[186]  At the same time, he is a Non-Executive Director for CNBM.[187]

HUANG Anzhong is the Vice General Manager for CNBM Group and he also serves as a Non-Executive Director for CNBM.[188]  In addition, from 2005-2015, he was the General Manager of CNBM Import and Export, and now he is that company's Chairman.[189]

GUO Chaomin, since 2003, has been the General Manager and Vice President to the Standing Committee of the Party Committee for CNBM Group.[190]  In 2001, he has also served as

---

[183] Summary Chart of Overlapping Executives and Officers at p. 7 & Ex. 31 thereto; *see also* Deposition of CNBM Group (ZHOU Guoping) dated 6/16-18/2015 ("ZHOU Dep.") [MTD Ex. 81].

[184] *Id.*

[185] 1/29/2015 CNBM Group Board of Directors Meeting Minutes, 23rd Meeting of the Third Session of Board [MTD Ex. 82].

[186] Summary Chart of Overlapping Executives and Officers at p. 5 & Exs. 8 & 21 thereto.

[187] Summary Chart of Overlapping Executives and Officers at p. 5 & Ex. 21 thereto.

[188] Summary Chart of Overlapping Executives and Officers at p. 10 & Ex. 21 thereto.

[189] *Id.*

[190] Summary Chart of Overlapping Executives and Officers at p. 9 & Ex. 21 thereto.

a Non-Executive Director for CNBM.[191]  From 2006-2010, he served as General Manager for China National United Equipment Group Corporation.[192]

CHANG Zhangli is the Vice President and Executive Director of CNBM.[193]  Since 2005, he has been Secretary to the Board for CNBM.[194]  He is also a Director of BNBM.[195]

PENG Shou has been a Vice President for CNBM since 2005 and an Executive Director for CNBM since 2006.[196]  Since 2004, he has also served as the Chairman of CNBM Triumph.[197]

HU Jinyu, has been the General Manager of the Audit Department of CNBM since 2005.[198]  Ms. HU is the Vice President and Financial Controller of Northern Cement Company, a subsidiary company of CNBM.[199]  In addition, she is the Supervisor of BNBM, China Jushi,

---

[191] *Id.*

[192] *Id.*

[193] Summary Chart of Overlapping Executives and Officers at p. 4 & Exs. 18 & 19 thereto.

[194] Summary Chart of Overlapping Executives and Officers at p. 4 & Ex. 18 thereto.

[195] Summary Chart of Overlapping Executives and Officers at p. 4 & Exs. 18 & 19 thereto.

[196] Summary Chart of Overlapping Executives and Officers at p. 12 & Ex. 5 thereto; *see also* Deposition of PENG Shou dated 9/16/2015 ("PENG S. Dep.") [MTD Ex. 83] at 14:14-17; 16:21-17:2.

[197] *Id.*

[198] Summary Chart of Overlapping Executives and Officers at p. 11.  *See also* HU Dep. at 11:17-23; 24:25-25:11 (HU Jinyu learned of the General Manager position at CNBM from CAO Jianglin when she was working as the General Manager of the Audit Department of BNBM).

[199] *Id.* at 11:10-13.

CNBM Investment Co. and Southern Cement Company.[200]  Previously, she served as a Director for Taishan.[201]

CHEN Yu is the General Manager of BNBM and he also serves as a Director of both BNBM and Taishan.[202]

JIA Jianjun, from 2005-2008, served as Deputy General Manager and Secretary to the Board of BNBM and also as a Director of Taishan.[203]

JIA Tongchun, since 2002, has served as the Chairman and General Manager of Taishan.[204]  At the same time, from 2005-2012, Mr. JIA was the Deputy General Manager of BNBM and from 2008-2012, he was a Director of BNBM.[205]

---

[200] *Id.* at 12:2-16.

[201] *See* 4/25/2005 Resolutions of the General Meeting of Shareholders of Taishan Gypsum [MTD Ex. 84] (electing HU Jinyu to the Board of Directors of Taishan); *see also* Shandong Taihe Dongxin Co., Ltd. Resolution of the First Extraordinary General Meeting of 2006 [MTD Ex. 85] ("Due to work-related reasons, Ms. Jinyu Hu shall no longer serve as Director of the Company.").

[202] Summary Chart of Overlapping Executives and Officers at p. 4 & Exs. 18 & 20 thereto.

[203] Summary Chart of Overlapping Executives and Officers at p. 6 & Exs. 9, 13, 23 & 24 thereto.

[204] Summary Chart of Overlapping Officers and Directors at p. 3 & Exs. 12, 13, 14, 15 & 16 thereto.

[205] Summary Chart of Overlapping Officers and Directors at p. 3 & Exs. 12 & 17 thereto.

YANG Yanjun was another Director at Taishan[206] who held a variety of leadership roles at BNBM, including Director, Chief Accountant and Deputy General Manager.[207]

### 5. CNBM Group Controls Financing for its Subsidiaries.

CNBM Group has routinely and continuously exercised control over the financing for its subsidiaries. "The Group Corporation coordinates and integrates various domestic and overseas resources, which purports to the reasonable utilization of resources among the various subsidiaries."[208] CNBM Group exercises this control, in part, by dictating various financing policies and procedures to be implemented and followed by subsidiaries, including but not limited to:

- "China National Building Material Group Corporation's Measures for Management of Loans and Guarantees";[209]

- "China National Building Material Group Corporation's Interim Measures for Comprehensive Budgetary Management";[210]

- "Notice on Strengthening Bank Loan Management of Subsidiaries";[211] and

---

[206] 4/15/2006 Shandong Taihe Dongxin Co., Ltd. Resolution of the First Extraordinary General Meeting of 2006.

[207] BNBM 2014 Annual Report at 56 ("Ms. Yang has served as a director of the Company [BNBM] from November 17, 2009 to present and served as a deputy general manager and chief accountant of the Company from September 2009 to present.").

[208] *See* CNBM Group 2015-2017 Strategy Plan at CNBMGRP00013297-13298.

[209] *See* CNBM Group's 3/5/2013 "Reply on Beijing New Building Material (Group) Co., Ltd.'s 2013 annual loan and guarantee plan" [MTD Ex. 86].

[210] *Id.*

[211] *Id.*

- Requiring "annual loan and guarantee plans" to be submitted by subsidiaries and approved by CNBM Group.[212]

The end result is that CNBM Group controls the financing for all levels of subsidiaries within the Group Corporation – including BNBM and Taishan.

Guarantees that Taishan received from BNBM Group illustrate how CNBM Group controls financing for its subsidiaries. For example, Taishan received 450,000,000 yuan in guarantees from BNBM Group in 2013.[213] However, these guarantees were not allowed without sanctioning from CNBM Group, as BNBM Group was required to submit its 2013 "annual loan and guarantee plan" to CNBM Group for approval.[214] On March 5, 2013, CNBM Group provided its response to BNBM Group, approving: 1) a "ceiling" of 1.75 billion yuan for BNBM Group's 2013 annual loans (including bonds), and 2) a "ceiling" of 3 billion yuan credit guarantee provided to BNBM Group from CNBM Group in 2013.[215] Thus, CNBM Group controlled the amounts which BNBM Group could loan/guarantee to/for other companies, as well as the amount of credit which BNBM Group could receive. This ultimate control by CNBM Group is further evidenced by the other above-listed CNBM Group policies governing loans and guarantees made by subsidiaries.

---

[212] *Id.*

[213] *See* 1/10/2013 BNBM Group Guarantee for Taishan for 100,000,000 yuan with Taian Quingnian Street Branch of China - "Maximum Guarantee Contract Serial No. 2013-123010-ZG03" [MTD Ex. 87]; *see also* 7/11/2013 BNBM Group Guarantee for Taishan for 350,000,000 yuan with Agricultural Bank of China Taian Longze Sub Branch - "Maximum Guarantee Contract Serial No. 37100520130051039" [MTD Ex. 88].

[214] *See* CNBM Group's 3/5/2013 "Reply on Beijing New Building Material (Group) Co., Ltd.'s 2013 annual loan and guarantee plan."

[215] *Id.*

Similarly, BNBM has continuously guaranteed the loans of Taishan and Taishan's subsidiaries.[216]  As set forth in Taishan's 2011 Risk Management Report, "[a]t the end of every year, according to the anticipated operational activities of the entire Group and the cash flow produced by the investment activities in the coming year, the main office of the Company would uniformly formulate financing plans which include financing amounts and guarantee methods, and submit them to BNBM PLC."[217]  The loan guarantees by BNBM for Taishan and its subsidiaries are approved at BNBM's Board of Director and Shareholder meetings.[218]  CNBM, as the controlling shareholder of BNBM, has voted to approve these loan guarantees at the BNBM Shareholder meetings.[219]  CNBM has also continuously guaranteed the loans of

---

[216] *See* WANG Dep. at 362:21-364:15; *id*. at 362:21-25 (Q. "Okay. Let's go to guaranties. Did there come a time in the events of BNBM where BNBM would make guaranties to Taishan and Taishan's wholly-owned subsidiaries?" A. "Yes."); CHEN Dep. at 357:20-358:13 & 360:25-363:23; *id*. at 363:18-23 (Q. "Sir, is it a fact that from 2005 through 2014, there are guaranties, substantial guaranties, provided [by BNBM] to Taishan each and every year in order for Taishan to maintain its profitability and business interest?" A. "Yes.").  *See also* Chart of BNBM Guarantees to/Investments in Taishan Gypsum from 2005 to 2014 [MTD Ex. 89]; 3/18/2015 BNBM Public Announcement of the External Guarantees for the year 2015 (indicating that BNBM plans to provide guarantees to Taishan of no more than 1 billion yuan in 2015) [MTD Ex. 90]; 4/16/2014 BNBM Resolution of the 2013 Annual General Meeting of Shareholders re: approval of Guarantees to Taishan Gypsum (reflecting that BNBM's shareholders approved guarantees to Taishan not exceeding 1 billion yuan) [MTD Ex. 91].

[217] Taishan's 2011 Risk Management Report at CNBMGRP00371521.

[218] WANG Dep. at 364:17-366:1.

[219] CHANG Dep. at 275:1-276:17; *id*. at 276:4-17 (Q. "But did CNBM Company, Limited, as a shareholder of BNBM Plc approve of the action of BNBM Plc to make loan guarantees to Taishan Gypsum?" A. "CNBM Company, Limited, as a shareholder of BNBM according to the percentage of shares we hold voted approval on the shareholders' meeting.") (objections by counsel and discussion between the witness and the interpreter omitted).

BNBM.[220]  Through these loan guarantees, controlled in a cascade by CNBM Group, CNBM and

BNBM, Taishan and its subsidiaries are able to finance their business operations.[221]

### 6.  CNBM Group Shares and Controls Similar Business Functions with the CNBM/BNBM Entities and Taishan.

According to CNBM Group's Strategy Plan, "[t]he Group Corporation is the strategy

center, decision-making center, resource center, policy and culture center of the Group," which

includes all of the CNBM/BNBM Entities and Taishan.[222]  In fact:

> The Group Corporation mainly manages its subsidiaries in 4
> aspects:  First, Strategy Management, **The Group Corporation
> guides all subsidiaries to strictly adhere to the Group
> Corporation's determined strategy on business activities**, to
> ensure the realization of the Group Corporation's strategic goals.
> Second, Decision-Making Management: according to the modern
> enterprise system, and in compliance with relevant rules of the
> Group Corporation, **the Group exercises the decision making
> power as the fund contributor on major issues** such as its
> subsidiaries' investment and financing, restructuring, etc.  Third,
> Resource management: **The Group Corporation coordinates and
> integrates various domestic and overseas resources**, which
> purports to the reasonable utilization of resources among the
> various subsidiaries.  Fourth, Culture Management: the Group
> Corporation guides all subsidiaries to commence establishing
> enterprise culture, allowing the spreading and cultivation of **the
> Group Corporation's culture among all subsidiaries**, and
> forming a set of unified enterprise culture values within the Group
> Corporation.  Through refining and formulating various rules, **the**

---

[220] *See* WANG Dep. at 373:13-377:20; *id.* at 373:13-16 (Q. "Has BNBM gotten any guaranties from either CNBM or CNBM Group?" A. "BNBM had obtained guaranty from CNBM Company, Limited.").  *See also* Chart of CNBM Guarantees to BNBM from 2005 to 2007 [MTD Ex. 92].

[221] JIA Dep. III at 254:13-255:10; CHEN Dep. at 361:18-362:2, 363:18-23; *id.* at 361:18-22 (Q. "Sir, when the board of directors approves the guaranties of Taishan, they're doing so, so that Taishan can succeed in its business endeavors, are they not?" A. "Correct.").

[222] *See* CNBM Group 2015-2017 Strategy Plan at CNBMGRP00013297-13298.

> **Group Corporation standardizes and institutionalizes its management**.[223]

As the strategic, decision-making, resource, and policy & cultural center of the entire Group, CNBM Group not only shares, but controls, these all-encompassing business functions of its subsidiaries.

### 7.   The CNBM/BNBM Entities Share the Same Accounting Firms.

Since 2010, CNBM has used the accounting firm of Baker Tilley Hong Kong Ltd. for its accounting needs.[224]  In lockstep, BNBM Group has used Baker Tilley for its accounting services since 2012.[225]  In cascading fashion, BNBM has used Baker Tilley for its accounting services since 2013.[226]

### 8.   BNBM and Taishan Share the Same Auditors.

When external audits of these companies were done between 2006 and 2010, BNBM and Taishan shared the same auditing firm - Beijing Xinhua Certified Public Accountants Co., Ltd.

---

[223] *Id*. (emphasis added).

[224] *See* 2010 CNBM Annual Report at 88; 2011 CNBM Annual Report at 85; 2012 CNBM Annual Report at 93; 2013 CNBM Annual Report at 96; 2014 CNBM Annual Report at 101.

[225] S*ee* 2012 BNBM Group Auditor's Report [MTD Ex. 93] at 1; 2013 BNBM Group Auditor's Report [MTD Ex. 94] at 1; 2014 BNBM Group Auditor's Report [MTD Ex. 95] at 1.

[226] *See* 2013 BNBM Annual Report at 6; 2014 BNBM Annual Report at 6.

("Beijing Xinhua CPAs").[227]   In fact, CNBM Group directed that Beijing Xinhua CPAs be used

as the audit firm, and BNBM followed this directive.[228]

### 9. CNBM/BNBM and Taishan Share Common Offices.

Since 2005, BNBM Group, CNBM and BNBM have shared registered addresses and

physical office addresses.  From 2005 through 2007, while Chinese-manufactured drywall was

shipped to the United States, BNBM Group, CNBM, and BNBM listed the same registered

address: No. 11 (A) Sanlihe Road, Haidian District, Beijing China.[229]   In 2008, BNBM Group

changed its registered address, but CNBM and BNBM consistently shared the No. 11 (A)

Sanlihe Road address until 2013.[230]

---

[227] *Cf.* BNBM 2006 Annual Report at 4-5 & Minutes of Shandong Taihe Dongxin Limited
Liability Company [Taishan Gypsum] 2006 General Meeting of Shareholders [MTD Ex. 267] at
TG-040615-0028572; BNBM 2010 Annual Report at 3 & 8/11/2011 Taishan Gypsum Co., Ltd.,
Resolutions of the 2010 General Meeting of Shareholders [MTD Ex. 271] at TG-040615-
0028676 (showing that Beijing Xinghua CPAs are the auditors of record for BNBM and
Taishan).  *See also* 11/27/2008 "Communications and Confirmation Letter on the Auditing
Schedule of the 2008 Annual Financial Report" [MTD Ex. 97]; 11/28/2009 "Letter of
Communication and Confirmation about the Audit Schedule for the 2009 Annual Financial
Statements" [MTD Ex. 98].

[228] *See*, *e.g.*, 8/5/2008 Minutes of BNBM PLC's 2nd Meeting of the 4th Session of the Board of
Directors [MTD Ex. 99].

[229] *See* 2005 BNBM Group Auditor's Report at 6; *see also* 2005 CNBM Annual Report at 4;
2005 BNBM Annual Report at 3; 2006 BNBM Group Auditor's Report [MTD Ex. 100] at 6;
2006 CNBM Annual Report at 4; 2006 BNBM Annual Report at 4; 2007 BNBM Group
Auditor's Report [MTD Ex. 101] at 6; 2007 CNBM Annual Report at 4.

[230] *See* 2008 CNBM Annual Report at 4; 2008 BNBM Annual Report at 4; 2009 CNBM Annual
Report at 5; *see also* 2009 BNBM Annual Report at 3; 2010 CNBM Annual Report at 5; 2010
BNBM Annual Report at 2; 2011 CNBM Annual Report at 5; 2011 BNBM Annual Report at 3;
2012 CNBM Annual Report at 5; 2012 BNBM Annual Report at 6; 2013 CNBM Annual Report
at 5; 2013 BNBM Annual Report at 6.  When the PSC served BNBM Group, it relied on a page
posted on BNBM Group's website – the "Contact Us" page – which listed the company's
address at No. 16, West Road, Jiancaicheng Xisanqui, Haidian District, Beijing, China.  *See*
Declaration of Yan Gao dated 1/8/2016 [MTD Ex. 102] at ¶¶ 4-7.

In addition to listing the same registered address in corporate documents, BNBM Group, CNBM and BNBM periodically shared physical office space over the years.  Specifically, CNBM and BNBM shared the same physical office building for their "principal place of business" from 2005 through 2010,[231] and 2013 to present.[232]  Further, ZHAO Yanming, BNBM Group's corporate witness, confirmed that BNBM Group and BNBM PLC have, in fact, shared common office space.[233]

Mr. ZHAO explained that both entities had offices in the same building, but on different floors, with BNBM Group's offices located on the fourth floor and BNBM PLC's offices located on the third floor.  Out of five floors in the building, BNBM PLC additionally occupied the first and second floors.[234]  When asked who occupied the fifth floor, BNBM Group's corporate designee could not recall whether the occupant was BNBM PLC or BNBM Group or some other BNBM entity.[235]  Similarly, Mr. ZHAO could not recall specifically which BNBM entity owned

---

[231] 2005 CNBM Annual Report at 4; 2005 BNBM Annual Report at 3; 2006 CNBM Annual Report at 4; 2006 BNBM Annual Report at 4; 2007 CNBM Annual Report at 4; 2007 BNBM Annual Report at 4; 2008 CNBM Annual Report at 4; 2008 BNBM Annual Report at 4; 2009 CNBM Annual Report at 5; *see also* 2009 BNBM Annual Report at 3; 2010 CNBM Annual Report at 5; 2010 BNBM Annual Report at 2 (listing No. 11 (A) Sanlihe Road, Haidian District, Beijing, China as the physical office location.)

[232] 2013 CNBM Annual Report at 4; 2013 BNBM Annual Report at 6; 2014 CNBM Annual Report at 4; 2014 BNBM Annual Report at 6.  For a time, BNBM listed the physical address of: Floor 29, North Star Times Tower, No. 8 East Beichen Road, Chaoyang District, Beijing.  *See,* 2011 BNBM Annual Report at 4; 2012 BNBM Annual Report at 6.

[233] *See* ZHAO Dep. at 73:19-76:20, 249:3-250:13.

[234] *See* ZHAO Dep. at 164:13-165:5.

[235] *See* ZHAO Dep. at 165:9-166:16.

the building, but he explained that it was owned by an entity with the letters "BNBM" in its name.[236]

    As mentioned previously, in 2013 CNBM and BNBM resumed sharing physical office space.  Notably, the move relocated CNBM and BNBM to the large office building already occupied by CNBM Group;[237] finding CNBM Group on the 22nd and 23rd floors,[238] CNBM on the 21st floor[239] and BNBM occupied the 15th floor.[240]

    In addition to using the same registered addresses and occupying the same office space, the Defendants also use each other's conference rooms for Board of Directors, Shareholders, and Annual General meetings.[241]  For example, Taishan held its "2005 Fourth Extraordinary General

---

[236] *See* ZHAO Dep. at 166:17-167:7.

[237] *See* CNBM Group website page "Contact Us," *available at*, http://www.cnbm.com.cn/EN/c_000000160005/ (last accessed 1/18/2016) (listing Group's address as 2nd Building, Guohai Plaza, No. 17 Fuxing Road, Haidian District, Beijing) [MTD Ex. 103].

[238] *Id.*

[239] *See* 2013 CNBM Annual Report at 5; 2014 CNBM Annual Report at 5-6.

[240] *See also* 2013 BNBM Annual Report at 6; 2013 BNBM Annual Report at 6.  *Also see,* HU Dep. at 14:2-16:17 (CNBM Group's offices are on the 23rd, 22nd & 19th floors, CNBM Co.'s offices are on the 21st and 20th floors, China United Cement's offices are on the 18th and 17th floors, BNBM PLC's offices are on the 16th floor, and China Jushi's offices are on the 10th floor).

[241] *See* WANG Dep. at 147:23-25; "Resolutions on Board of Director's meeting delivered at First Session of the Fifth Elected Board of Taishan Gypsum Co., Ltd." ("Board of Directors of Taishan Gypsum Co., Ltd. (Hereinafter referred to as company) hold a meeting at conference room of China Building Material Co., Ltd.") held 8/11/2011 [MTD Ex. 96].

Meeting of Shareholders" in a conference room at BNBM,[242] and its 2006 "General Meeting of Shareholders" at CNBM.[243]  In 2007, Taishan held an "Extraordinary General Meeting of Shareholders" at BNBM,[244] and in 2008, Taishan held its Annual General Meeting in CNBM's conference room.[245]  At the 2008 meeting, it was decided that Taishan would acquire ownership of four different plasterboard companies,[246] and that the four acquisitions "will become effective upon approval by the President's Office of China National Building Material Company Limited."[247]  On more than one occasion, Taishan's shareholders convened in CNBM's conference room.[248]   On May 20, 2008, Taishan's Board of Directors conducted a meeting in the conference room of CNBM. [249]

---

[242] *See* Shandong Taihe Dongxin Co., Ltd. [Taishan Gypsum] Resolution of the Fourth Extraordinary General Meeting of Shareholders for the Year of 2005 held 6/26/2005 [MTD Ex. 266].

[243] *See* Minutes of Shandong Taihe Dongxin Limited Liability Company [Taishan Gypsum] 2006 General Meeting of Shareholders.

[244] *See* 6/20/2007 Resolution of 1st Extraordinary General Meeting of Shareholders for the Year of 2007 of Shandong Taihe Dongxin Co., Ltd. [Taishan Gypsum] [MTD Ex.268].

[245] *See* 5/18/2009 Taishan Gypsum Co., Ltd. 2008 Annual General Meeting Resolutions [MTD Ex. 269] at TG 0020795.

[246] *Id*. at TG0020796.

[247] *Id.*

[248] *See* 6/12/2010 Taishan Gypsum Co., Ltd., Resolution of the Fifth Extraordinary General Meeting in 2010 [MTD Ex. 270]; 8/11/2011 Taishan Gypsum Co., Ltd., Resolutions of the 2010 General Meeting of Shareholders.

[249] *See* Taishan Gypsum Co., Ltd. Resolutions of the First Meeting of the Fourth Board of Directors held 5/20/2008 [MTD Ex. 106].

Presumably, the interests of convenience of the key players control the location of important meetings, as many CNBM/BNBM and Taishan Officers and Directors hold positions with two or more of these companies, but maintain just one office where they undertake activities on behalf of several of the Defendant corporations.[250]

### 10. Defendants Share a Common Logo, Corporate Identity, and Website Advertisements

To further solidify the identity of the CNBM/BNBM and Taishan Defendants as a single business enterprise, CNBM Group and its CNBM- named and BNBM-named subsidiaries share the same logo.



Source: *http://www.cnbm.com.cn/EN/c_0000001600070001/*



Source: *http://www.bnbmg.com.cn/en/gybx/A0201index_1.htm*

 China National Building Material Company Limited

Source: *http://www.cnbmltd.com/english/zgjc/*

---

[250] *See* SONG Dep. at 223:10-224:12; *id*. at 223:10-15 (Q. "Now, let me ask you a slightly different question. Where is your office as chairman of the board of BNBM Group?" A. "I do not have an office at BNBMG. I only have one office which is located at CNBMG."); *id*. at 224:5-12 (Q. "From that office at CNBMG, do you also perform your work as the chairman of CNBM?" A. "As for CNBM's office since I am also the chairman of the board of CNBM; therefore, I am – also only perform my work whenever there is a board of directors' meeting of CNBM."); WANG Dep. at 83:10-85:2 & 102:13-16 (although Mr. WANG holds positions at Taishan, BNBM and CNBM, he maintains just one office at BNBM).

59



*Source:* http://www.icnbm.com/en/



*Source:* http://www.cnbminternational.com/en/gywm/index.jsp

This red hexagonal icon on the websites, reports, and other documents of the various

CNBM/BNBM Entities is "a group logo that belong[s] to CNBM Group Company, Limited."[251]

It is "common practice" for every company and entity in the CNBM Group, including CNBM

Company, Limited, to utilize the same logo.[252]   The websites of CNBM Group, CNBM Co., Ltd.,

CNBM Equipment Import & Export Company, China Triumph International Engineering

Company ("CTIEC"), CNBM Investment ("CNBMI"), CNBM International Trading, *et al*., as

shown above each share the identical red icon logo.   CNBM Group's company profile on

Alibaba.com likewise uses this logo.[253]   Further, on BNBM Group's website, BNBM Group uses

CNBM Group's logo as its own.[254]   CNBM Forest Products, Ltd. ("CNBM Forest") (a wholly-

---

[251] *See* ZHOU Dep. at 291:16-292:5.  Interestingly, the logo is no longer actively registered with the United States Patent Office, which shows CNBM Group's trademark was cancelled on April 10, 2015.  *See* CNBM trademark records, United States Patent and Trademark Office [MTD Ex. 107].

[252] *See* ZHAO Dep. at 83:25-84:22; CAO Dep. at 220:22-221:24; *see also* Deposition of CNBM Forest Products (Canada) Co. Ltd. ("CNBM Forest (Canada)") (DENG Jianjun) dated 10/28/2015 ("DENG Dep.") [MTD Ex. 108] at 77:4-78:20.

[253] *See* CNBM Group Storefront on Alibaba.com [MTD Ex. 109].

[254] ZHAO Dep. at 83:25-84:22; CAO Dep. at 220:22-221:24; *see also* BNBM Group website pages [MTD Ex. 110].

owned subsidiary of CNBM Import & Export) and its wholly-owned subsidiary CNBM Forest

(Canada) likewise use this logo.[255]  Even Taishan, through the efforts of PENG Wenlong, got on

board and redesigned Taishan Gypsum's logo to read, "China National Building Material Group

Taishan Gypsum Company."[256]  Not surprisingly, this has caused commercial confusion among

companies doing business with the CNBM group of companies, because they "don't understand

that relationship between CNBM and the other companies that share a logo."[257]

The relationships among the various CNBM- and BNBM- entities is confusing to CNBM

Group's customers and in the marketplace.  For example, the corporate representative for a joint

venture with CTIEC testified that "now that you point out that there's a difference between the

two [CNBM Group and CNBM Company, Limited], I don't know how to distinguish between

the two."[258]  The corporate representative for Sunpin Solar Development LLC was similarly

confused.  When asked whether he had heard of a company called CNBM, distinct from CNBM

Group, he responded that he "didn't know there was a difference."[259]  As to other CNBM

---

[255] DENG Dep. at 77:4-78:20.  CNBM Forest uses the logo to promote the business of its company.  *Id.* at 79:9-23.

[256] *See* 11/2/2010 Email and attachment from PENG Wenlong to Manager XU [advertising executive] [MTD Ex. 111].  *See also* Deposition of PENG Wenlong dated 11/12-14/2015 ("PENG Dep.") [MTD Ex. 112] at 101:25-103:5.

[257] *See* Deposition of New Jersey Institute of Technology ("NJIT") (Donald Sebastian) dated 4/22/2015 [MTD Ex. 113] at 249:24-251:5.

[258] *See* Deposition of CTIEC-TECO American Technology, Inc. (Fred Paulsen) dated 4/24/2015 [MTD Ex. 114] at 149:2-23.

[259] *See* Deposition of Sunpin Solar Development LLC (Steve Kim) dated 4/17/2015 [MTD Ex. 115] at 12:21-14:11.

entities, the Western Wood corporate representative testified that he would "consider them one in the same, so CNBM is the same to me as CNBM Forest Products, China National Building Material Import and Export. I consider --- I consider them the same."[260]

CNBM Group treats these entities as one and the same, announcing "cooperation agreements," joint ventures, projects, and deals by CNBM Group subsidiaries on the CNBM Group website.  For example, CNBM International Corporation's launch of Okorder.com in 2011 was highlighted on the CNBM Group website.[261]  Likewise, CTIEC's agreement with Wal-Mart and Sunpin Solar in 2014 and 2015 to have roof solar panels constructed for Wal-Mart's stores in the United States appeared in the CNBM Group website news center.[262]

The CNBM Group of companies are so unified with CNBM Group that they sometimes identify themselves as CNBM Group when trying to solicit American customers.  In fact, on April 3, 2008, CNBM (USA) (identified on CNBM Group's website as part of the Company's global presence in the U.S.A.[263]), wrote a letter to the Purchasing Manager for Eastern Metal Supply, Inc. and stated:  "we are writing about the possibility of establishing aluminum business

---

[260] *See* Deposition of Western Wood (John Salamanca) dated 5/21/2015 [MTD Ex. 116] at 18:18-22.

[261] *See* 2/18/2011 Web Article, OKorder.com Official Launch from cnbm.com.cn, [MTD Ex. 117].

[262] *See* 3/2/2015 Web Article, CTIEC signs Wal-Mart Roof Power Plant Project from cnbm.com.cn [MTD Ex. 118]; 12/2/2014 Web Article, CTIEC signed a 100 MW Photovoltaic Power Plant Project in the U.S., from cnbm.com.cn. [MTD Ex. 119].

[263] *See* CNBM Group "Global Presence" Tab, available at http://www.cnbm.com.cn/EN/c_0000001600030001/ [MTD Ex. 11].

with you.  We are CNBM group (China National Building Material group), the top 56 group

operated by China government.[264]

### 11. CNBM Group Transferred Assets Among its Interrelated Entities for Nil Consideration

In 2004-2005, CNBM Group orchestrated a massive reorganization of its subsidiaries and

affiliates that created the conglomerate that includes all CNBM/BNBM and Taishan

Defendants.[265]  Through this reorganization, CNBM Group shifted assets and redefined business

purposes in order to accomplish its end goal – taking CNBM public.  Specifically, the Global

Offering stated, "[a]s part of the Reorganization, Parent Group [CNBM Group, BNBM Group,

China Building Academy, CNBM Trading] has transferred to us [CNBM] substantially all of its

building materials businesses, including all relevant properties, equipment and necessary

employees necessary to carry on such business."[266]  Prior to the Reorganization, CNBM Group

wholly-owned China National Building Material and Equipment Import and Export Company

("CNBM Equipment"), which owned equity interests in multiple subsidiaries including equity

interests in BNBM PLC and China Fiberglass Company Limited.[267]  In order for CNBM Group

to establish a publicly traded joint stock company, CNBM Group redirected CNBM Equipment's

ownership interests in targeted subsidiaries engaged in the production and sale of materials to a

---

[264] *See* Letter from CNBM (USA) to Eastern Metal Supply, Inc. created on 4/3/2008 [MTD Ex. 120].

[265] *See* Section II.A, *supra.*

[266] Global Offering at 4.

[267] *Id.* at I-1.

"new" company.[268]  Significantly, this goal was achieved through a series of asset transfers for

"nil consideration."[269]

In order for CNBM Group to establish CNBM, the following transactions were made for

nil consideration:

1) China United retained all assets and liabilities of its subsidiaries, other assets, including cement and mining rights were transferred to CNBM Group for nil consideration;[270]

2) BNBM Group transferred 37.79% of its equity interest in China Fiberglass (now called China Jushi) to CNBM Equipment for nil consideration;[271]

3) CNBM Group approved the transfer of China Composites' equity interests in all non-fiberglass related entities to the Parent Group;[272] and

4) BNBM Group transferred its 60.33% equity ownership in BNBM PLC to CNBM Group "without compensation, thus making CNBM Group the controlling shareholder of BNBM PLC."[273]

Basically, CNBM Group redefined the business scope of CNBM Equipment in September, 2004

in order to capitalize CNBM Co., Ltd. for public offering.[274]

---

[268] *Id.*

[269] *See*, *generally*, Global Offering at 94-95.

[270] *Id.* at 94.

[271] *Id.*

[272] *Id.* at 95.

[273] 2006 BNBM Annual Report at 52; *see also* Global Offering at 90.

[274] Global Offering at 95.

Prior to the reorganization, CNBM Equipment transferred all operations, related assets and liabilities to the Parent Group at nil consideration.[275]  In return, the Parent Group transferred its interest in businesses engaging in the production and sales of various cement, fiberglass and FRP products, certain provisions related to engineering services, and all its equity interests in BNBM and China Fiberglass to CNBM.[276]  Further, CNBM Group transferred its 91% interest in China Triumph to CNBM Equipment for nil consideration.[277]  And finally, CNBM Equipment transferred all aforementioned assets and liabilities to CNBM Import and Export (commonly referred to in translations as "CNBM Trading") by way of nil consideration, which established the trading arm of CNBM Group.[278]

### 12. The CNBM/BNBM and Taishan Defendants Failed to Follow Proper Corporate Formalities and Procedure.

CNBM, BNBM and Taishan failed to follow corporate formalities and violated various corporate procedures, dating back to 2005.  These improprieties further expose the corporate culture of indifference to "separateness" between Taishan and the other Defendants.

### a. JIA Tongchun's Ownership of 5% of Taishan's Stock While He Was Deputy General Manager and Director of BNBM, and His Receipt of Compensation Therefor, Were Improper.

As General Manager of Taishan, JIA Tongchun at all material times has been

---

[275] *Id.*

[276] *Id.*

[277] *Id.*

[278] *Id.* at 582.

65

"responsible for the normal operation and development of TG [Taishan]."[279]  During the years

2005-2012, JIA Tongchun held concurrent management posts at Taishan and BNBM while also

owning 5% of Taishan,[280] which was improper.  In addition, starting at least in 2008, Mr. JIA

improperly received payments from BNBM for his service on BNBM's Board of Directors,[281]

and for his work at Taishan.[282]   BNBM made these payments to Mr. JIA notwithstanding

BNBM's repeated statements that: "the director and deputy general manager [of BNBM] Mr. Jia

Tongchun received no remuneration from the Company [BNBM] as he also held a position in the

proprietary subsidiary Taishan Gypsum Co., Ltd."[283]  Thus, throughout the 2005-2012

timeframe, BNBM and Taishan violated or failed to follow corporate formalities in three

---

[279] Deposition of JIA Tongchun dated 4/4/2011 ("JIA Dep. I") [MTD Ex. 104] at 160:14-15.

[280] *See* 3/24/2005 Taishan Resolutions of the General Meeting of Shareholders (JIA owns 5% of Taishan) [MTD Ex. 144].  Mr. JIA was appointed Chairman of Taishan's Board of Directors and General Manager of Taishan in 2002 (continuing in said positions to present), and from 2005-2012, he served as Deputy General Manager of BNBM, and from 2006-2012 Mr. JIA served as a Director on BNBM's Board of Directors.  *See* 2011 BNBM Annual Report at 12; 2012 BNBM Annual Report at 52.  *See also* Deposition of JIA Tongchun dated 1/9-10/2012) ("JIA Dep. II") [MTD Ex. 105] at 745:18-746:9 ("I have been the director for BNBM and TG ever since the second half year of 2006 up to today.").

[281] *See* JIA Dep. II at 880:17-23 & 935:1-936:5 (After initially testifying that he received no compensation from BNBM, Mr. JIA later admitted that BNBM paid him 25,000 RMB for his Director position at BNBM).  *See also* 2008 BNBM Annual Report at 15; 2009 BNBM Annual Report at 13; 2010 BNBM Annual Report at 13; 2011 BNBM Annual Report at 14; 2012 BNBM Annual Report at 55.

[282] *See* 1/20/2012 "Award for Significant Business Contributors from Taishan Gypsum and BNBM Homes" (congratulatory announcement describing, *inter alia*, an additional 500,000 RMB bonus paid by BNBM to Mr. JIA for his work with Taishan) [MTD Ex. 122].

[283] *See*, *e.g.*, 2006 BNBM Annual Report at 16; 2007 BNBM Annual Report at 15; 2008 BNBM Annual Report at 15; 2009 BNBM Annual Report at 13.  *See also* 2012 BNBM Annual Report at 55 (reason provided for JIA's removal as BNBM director simply states "Board re-election").

significant ways specifically relating to JIA Tongchun: 1) JIA improperly holding concurrent management positions in BNBM and Taishan while owning part of Taishan; 2) BNBM making improper payments to JIA; and 3) BNBM making misrepresentations in its annual reports regarding JIA's compensation and about the reason for his removal as a BNBM Director.

Not surprisingly, these 2005-2012 improprieties involving Mr. JIA were discovered during a 2012 SASAC-sponsored audit of BNBM, and were written up and submitted to CNBM Group for rectification and explanation.[284]  Among the issues identified, SASAC found that Mr. JIA's ownership stake in Taishan and his position at BNBM was in violation of relevant SASAC rules.[285]  Specifically, SASAC noted that Mr. JIA held a management post in BNBM ("a higher level enterprise") and participated in dividend distribution as a 5% shareholder of Taishan.[286]  Consequently, CNBM Group requested that BNBM rectify the situation and "improve relevant management regulations, seriously clean up wrong behaviors, and make adjustment and changes according to the relevant requirements of SASAC.[287]  In a document titled "Communications about the Problems of BNBM," BNBM reported how Mr. JIA received his bonus without the company reporting to the Compensation Committee, which was determined to be "inconsistent

---

[284] See "Problems Discovered During Auditing Review" [MTD Ex. 123] at CNBMGRP00009832-9833.

[285] Id.

[286] Id.

[287] See "Main Issues in State-owned Asset Supervision and Administration Commission's Audit of Economic Responsibility" [MTD Ex. 121].

with the Annual Report."[288]   In response, BNBM had JIA Tongchun resign from all positions at

BNBM, but still misrepresented the reason for same in its 2012 Annual Report.[289]

> **b.  JIA Jianjun Improperly Held Director Positions at**
> **BNBM, Taishan, and Several Other BNBM and**
> **Taishan Subsidiaries and Affiliates.**

JIA Jianjun improperly held concurrent Director positions at BNBM, Taishan, and

several other BNBM and Taishan subsidiaries and affiliates during the 2005-2008 timeframe.  A

June 2008 Beijing Securities Regulatory Bureau audit of BNBM uncovered that "Mr. Jianjun Jia

---

[288] *See* Communications about the Problems of BNBM [MTD Ex. 124] at BNBMPLC-E-0006059, which stated:

> 5. During the course of inquiry with independent directors, it was reflected that the Compensation Committee reviewed and approved the over 500 thousand yuan of special award to the General Manager, and the assessments of and awards to other senior management were determined by the General Manager, without reporting or archival filing to the Compensation Committee; which is inconsistent with the annual report.  In addition, the assessments of and awards to senior management, etc. haven't been disclosed in the annual report, the Compensation Committee did not review or approve the data disclosed in the annual report, which is inconsistent with the annual report; except the special award to the General Manager, the remunerations and awards to senior management haven't been reviewed or decided by the Compensation Committee, namely, the board of directors, which is inconsistent with relevant  regulations, (we) advise to bring into full play the role of Compensation Committee after the election upon expiration of this office term, and to pay attention to the  implementation of regulations.  (Corresponding procedures shall be fulfilled for the year-end remunerations)…

[289] *See* 3/20/2013 "Explanation on the Rectification Status" [MTD Ex. 125].  *See also* 2012 BNBM Annual Report at 55 (reason provided for JIA's removal as BNBM director simply states "Board re-election").

formerly held concurrent positions as the director of 8 wholly owned subsidiaries, 2 subsidiaries,

and 7 affiliates."[290]  In admitting to these improprieties, BNBM responded stating:

> On the issue that Mr. Jianjun Jia holds concurrent positions as the director of subsidiaries and affiliates, we will raise a proposal to change the director when the subsidiaries and affiliates hold their annual general meetings, it will come into force after the general meetings reviewed and passed it. … For the change of directors at [BNBM & Taishan jointly-owned subsidiaries] Hubei Taishan Building Material Company Limited, Pizhou Taihe Building Material Company Limited, and Jiangyin Taishan Gypsum Building Material Company Limited, the general meeting resolution on changing the director will be made as soon as possible and it is estimated to complete it within one month.[291]

Within weeks of BNBM's July 2008 response to this Beijing Securities Regulatory Bureau audit,

Mr. Jianjun Jia was removed from Taishan's board of directors.[292]

### c.  CNBM, BNBM and Taishan Comingled and Improperly Transferred Funds Between and Among Each Other.

CNBM and BNBM comingled funds with Taishan, including 40,000,000 RMB, which

passed from CNBM through BNBM, eventually to Taishan, and vice versa.  A 2008 audit of

BNBM found that the companies improperly used BNBM as the conduit to transfer 40,000,000

RMB from CNBM to Taishan, and from Taishan to BNBM, without explanation:

> We found in a spot-check that the December No. 1301 voucher at the Company's Headquarters is a 40 million fund transfer from the same account number but it was actually a transfer from CNBM to

---

[290] 7/7/2008 BNBM "Report on the Improvement and Solution of Relevant Issues Raised in the [June 2008] Site Inspection of Beijing Securities Regulatory Bureau" [MTD Ex. 134] at BNBMPLC-E-0006066.

[291] *Id.*

[292] *See* 8/1/2008 Taishan Corporate Registration Form (identifying Taishan Directors as JIA Tongchun, WANG Bing, ZHANG Nailing, YANG Yanjun, and SHAN Jianmin) [MTD Ex. 166] at 1.

BNBM and then to Taishan Gypsum; likewise the No. 1304 voucher displayed a transfer of 40 million yuan as Taihe's repayment to CNBM through BNBM's account.[293]

This 2008 audit of BNBM also discovered that for 292.06 million Yuan of entrusted loans from BNBM's majority shareholder (CNBM), "the rate was lower than normal loan rates."[294]  The Audit Report reflects additional problems with BNBM including that arrears had been extended with Tai'an State-owned Assets Commission,[295] uncertainty about interest payments on arrears,[296] uncertainty as to whether depreciation of fixed assets were adjusted, [297] and evidence that interest rates charged on loans were below market rates.[298]  According to the metadata, this document was created and last saved on June 25, 2008.[299]

### d.  BNBM Failed to Properly Account for and Report Dividends from Taishan Gypsum.

BNBM failed to properly account for and report over 100,000,000 RMB in dividends receivable from Taishan Gypsum and BNBM Logistics during the 2007 fiscal year.  In 2008, the Beijing Securities Regulatory Bureau issued a notice to BNBM about flaws with BNBM's 2007

---

[293] *See* Communications about the Problems of BNBM.

[294] *Id.*

[295] *Id.* at BNBMPLC-E-0006060, ¶ 11.

[296] *Id.*

[297] *Id.* at BNBMPLC-E-0006060, ¶ 12.

[298] *Id.* at BNBMPLC-E-0006059, ¶ 9.

[299] *Id.* at 4.  Taishan also allowed its shareholders to comingle dividend payments from Taishan. *See* 5/16/2012 Taishan Gypsum Communication Letter on Economic Responsibility Audit and Financial-based Audit [MTD Ex. 130] at BNBMPLC-E-0008163 (when Taishan paid out a dividend to shareholders, JIA and Shandong Taihe Building Material Company, Ltd. deposited the dividend funds into the same account).  In fact, Taishan directly deposited its dividend payments for two of its shareholders (JIA Tongchun and Shandong Taihe Building Material Company, Ltd.) into a single account.  *Id.*

Annual Report, including that BNBM "did not disclose 102,880,000 Yuan of dividends and any details on the names of relevant investing companies and etc."[300]  In addressing this failure, BNBM stated that: "Taishan Gypsum, Donglian Investment [a Taishan shareholder wholly-owned by BNBM], and BNBM Logistics are the Company's [BNBM's] subsidiaries, the dividends distributed should be categorized as investment income according to the cost method, [and] the dividends of the Company from Taishan Gypsum, Donglian Investment, and BNBM Logistics also belong to dividend income, however, the accounting firm did not combine the two when compiling the data."[301]

e.  **BNBM and Taishan Jointly Owned Property and Businesses Without Following Proper Procedures or Negotiations.**

BNBM and Taishan jointly owned various companies, factories and properties without following proper procedures or negotiations for said ownership.[302]  For example, as outlined in the June 26, 2005 Resolution of the 4th Extraordinary General Meeting of Shareholders for the year of 2005 for Taishan Gypsum (controlled by BNBM and held in BNBM's conference room), it was determined, without explanation and without negotiations, that for three new factories (2 plasterboard factories and 1 gypsum powder plant), Taishan will own 80% and BNBM will own

---

[300] 7/9/2008 Beijing Securities Regulatory Bureau "Regulatory Opinion on Beijing New Building Materials Public Limited Company [BNBM]" [MTD Ex. 167].

[301] *See* 4/10/2008 BNBM "Reply to the Inquiry Letter on Evaluating the 2007 Annual Report [MTD Ex. 170] at BNBMPLC-E-0005887.

[302] *See* 6/26/2005 Resolution of the 4th Extraordinary General Meeting of Shareholders for the Year of 2005 of Shandong Taihe Dongxin Co., Ltd. (now Taishan Gypsum) [MTD Ex. 129] at 1-2 (TG 0020682-20683).  *See also* JIA Dep. II at 752:11-753:19.

71

20%.[303]  This same 2005 BNBM-controlled Taishan shareholder meeting determined that BNBM

would be a co-shareholder of existing and future Taishan subsidiaries – without any explanation

or negotiations between BNBM and Taishan.[304]  Thereafter in 2005, BNBM became a co-owner

in three different Taishan subsidiaries.[305]  In 2007, BNBM directly purchased a 30% equity

interest in a Taishan subsidiary (Jiangyin Taishan Gypsum Building Material Co., Ltd.) which

manufactured drywall in the Jiangyin area.[306]  After the purchase, BNBM and Taishan jointly

owned 97.5% of this Taishan subsidiary, however, documentation regarding this related

transaction was not properly provided to relevant authorities.[307]

Another example of such joint ownership involves Tai'an Taihe Building Decoration

Materials Co., Ltd. ("Taihe Decoration") – which was jointly established in 2008 by BNBM,

BNBM Group, Taishan, Shandong Taihe Building Materials Co., Ltd., and Tai'an State-owned

---

[303] *Id.*

[304] MTD Ex. 129 at pp. 2-3 (TG 0020683-84) ("For all existing [Taishan] subsidiaries … if any subsidiary must have more than two shareholders, BNBM will purchase 5% of equity shares" and "For any [Taishan] subsidiary to be established in the future, if the subsidiary must have more than two shareholders, BNBM will hold 20% of equity shares.").

[305] *See* 2005 BNBM Annual Report at 49 ("Pizhou Taihe Building Materials Co., Ltd., Hubei Taishan Building Materials Co., Ltd. and Jiangjin Taishan Building Materials Co., Ltd. are sub-subsidiaries jointly owned by the Company [BNBM] and its controlled subsidiary – Shandong Taihe Dongxin Co., Ltd. [Taishan]").

[306] 4/13/2007 CNBM Company Announcement of Connected Transactions by Beijing New Building Material Company Material Company Limited [MTD Ex. 14] at pp. 1, 6 & 7 ("4/13/2007 CNBM Announcement").

[307] *Id.* at p. 8 ("The Company inadvertently did not publish a press announcement immediately after the Taishan Acquisition in accordance with Rule 14A.47 of the Listing Rules. The Company will take appropriate measures to ensure future compliance with the Listing Rules.").

Assets Management Co., Ltd.[308]  BNBM (29% owner) and Taishan (30% owner) jointly were

Taihe Decoration's majority owners.[309]  A subsequent 2011 audit of this BNBM-Taishan jointly

owned company found multiple procedural improprieties, including transfer of equities in eight

subsidiary companies without relevant resolutions and without board approval.[310]

> **f.   BNBM and Taishan Had Numerous Documentation
> Failures with Companies and Properties that They Owned
> Jointly and Individually.**

Dating back to 2005, BNBM and Taishan had numerous documentation and property

management irregularities with companies and real estate that they owned jointly and

individually.[311]  In fact, an August 3, 2005 report from CNBM characterizes these troubles

involving BNBM and Taishan as "Problems that need the [CNBM] leaders' special attention."[312]

Among the problems discovered, all of Taishan's workshops and factories built at its

headquarters "are built on leased land, and none of them have property ownership

certificate[s],"[313] and the facilities of Pizhou Taihe (jointly owned by BNBM and Taishan) "have

---

[308] 6/30/2008 BNBM Announcement of the 3rd Session of Resolution of the 38th interim meeting
of the Board of Directors [MTD Ex. 171].  Tai'an State-owned Assets Management was a 14%
owner/shareholder of Taishan from 2005-2015.  *See, e.g.*, 3/24/2005 Taishan Resolutions of the
General Meeting of Shareholders; 10/13/2015 CNBM Announcement.

[309] 2008 BNBM Annual Report at 42.

[310] *See* "V. Problems found in the audit" at p 1.

[311] *See* 8/3/2005 Report of CNBM's Comprehensive Team [MTD Ex. 156].

[312] *Id*. at CNBMCO00324566.

[313] *Id*. at CNBMCO00324567.

the same problem."[314]  Similar documentation problems occurred with Hubei Taishan Building

Materials Co., Ltd. - another Taishan subsidiary jointly owned by BNBM and Taishan.[315]

> **g.  Taishan and BNBM Failed to Follow Corporate Procedures for Establishing Subsidiaries and Constructing Drywall Factories.**

In a comprehensive review of BNBM and Taishan investment projects, CNBM Group

identified <u>numerous abuses</u> to the corporation rules of CNBM Company between the years 2009-

2011.[316]  Among those, CNBM Group identified that Taishan and BNBM did not comply with

certain bid invitations, did not follow previously approved budget plans, and did not establish

subsidiaries according to company policy.[317]  These corporate improprieties related to bid

invitations and budget plans occurred with three separate Taishan drywall production

facilities.[318]  The corporate improprieties involving establishment of subsidiaries occurred with

five Taishan subsidiaries established between 2009 and 2011.[319]

### 13. <u>BNBM's Ownership and Control of Taishan.</u>

On March 19, 2005, BNBM acquired 42% of Taishan Gypsum's total shares – giving

---

[314] *Id.  See also* 2005 BNBM Annual Report at 49 (showing Pizhou Taihe as jointly owned by BNBM and Taishan).

[315] *Id*. at CNBMCO00324569.  *See also* 2005 BNBM Annual Report at 49 (showing Hubei Taishan Building Materials Co., Ltd. as jointly owned by BNBM and Taishan).

[316] *See* "V. Problems found in the audit."

[317] *Id.*

[318] *Id*. at CNBMGRP00331483 (The 3 facilities identified were: Taishan Gypsum (Sichuan) Co., Ltd., Taishan Gypsum (Shaanxi) Co., Ltd., and at Taishan Gypsum Co., Ltd.).

[319] *Id*. at CNBMGRP00331477 (The 5 subsidiaries identified were: Taishan Gypsum (Jiangxi) Co., Ltd., Shandong Taihe Guangneng Co., Ltd., Taishan Gypsum (Liaocheng) Co., Ltd, Taishan Gypsum (Guangdong) Co., Ltd., and Taishan Gypsum (Sichuan) Co., Ltd.).

BNBM operative and voting control of Taishan's Board of Directors as the "Controlling Shareholder."[320]  On August 28, 2006, "under the direction" of CNBM Group and CNBM executives,[321] BNBM:  a) increased its equity interest in Taishan from 42% to 65%,[322] and b) secured rights over an additional 16% of Taishan by loaning 50 million RMB to a co-shareholder of Taishan – giving BNBM practical control over 81% of Taishan's shares.[323]

As for BNBM's control over the remaining 19% of Taishan's shares, Taishan's Chairman and General Manager JIA Tongchun[324] (who was also Deputy General Manager and Director of BNBM from 2005-2012[325]) personally retained 5% equity ownership in Taishan, and was the majority shareholder and legal representative of the investment company Shandong Taihe Building Material Company, Ltd., f/k/a Taian Anxin Investment & Trade Co., Ltd., which owned the remaining 14% of Taishan's equity shares.[326]  As such, BNBM and its Director JIA

---

[320] See 2005 BNBM Annual Report at 17, 18 & 48; see also JIA Dep. III at 180:2-9; CHE Dep. at 317:13-318:1.

[321] See SONG Dep. at 51:20-52:2.

[322] Id.

[323] See 8/28/2006 Connected Transaction Announcement at Q000011-12.

[324] See 4/23/2005 Announcement for Decision of 12th Interim Meeting of the Third Board of Directors.

[325] See CHEN Dep. at 275:19-276:5; see also WANG Dep. at 255:20-256:1.

[326] See 9/16/2015 Declaration of JIA Tongchun ("JIA Declaration") [MTD Ex. 127].  See also Shandong Taihe Building Material Co., Ltd. Forms [MTD Ex. 128]; 6/26/2005 Taishan Shareholders Resolutions (JIA signed the resolutions as the legal representative of Taian Anxin Investment & Trade Co., Ltd. n/k/a Shandong Taihe Building Material Co., Ltd.); 5/16/2012 Taishan Gypsum Communication Letter on Economic Responsibility Audit and Financial-based Audit at BNBMPLC-E-0008163 (when Taishan paid out a dividend to shareholders, JIA and Shandong Taihe Building Material Company, Ltd. deposited the dividend funds into the same account).

Tongchun had total ownership of Taishan – resulting in true control of Taishan's Board of Directors and management.

### a. From the Outset, BNBM Promoted Itself and Taishan as a Single Entity, Reporting Production Statistics of Both Companies as One.

In 2006, Taishan produced 189,600,000 square meters of drywall, and BNBM produced less than one-third of that amount – 56,500,000 square meters.[327]  In 2007, Taishan produced 241,600,000 square meters of drywall, and BNBM again produced less than one-third of that amount – 64,500,000 square meters.[328]  Nonetheless, BNBM represented itself as the company producing all of the drywall – combining the production numbers of both companies in reports and marketing materials.  BNBM's 2006 and 2007 Annual Reports each stated that "the business scale of gypsum boards of the company [BNBM] reached an annual capacity of 400 million square meters, ranking first in China, and second in Asia."[329]  BNBM continued to make this same type of representation in subsequent annual reports.[330]

As for similar single entity representations in marketing materials, an April 2007 BNBM press release cited SONG Zhiping's representation that BNBM's production scale is "about 400

---

[327] *See* 2007 CNBM Annual Report at 14.

[328] *Id.*

[329] *See* 2006 BNBM Annual Report at 26; 2007 BNBM Annual Report at 26.

[330] *See*, *e.g.*, 2008 BNBM Annual Report at 30 ("the business scale of gypsum boards of the company reached an annual capacity of 560 million square meters, ranking first in Asia"); 2009 BNBM 2009 Annual Report at 24 ("the business scale of gypsum boards of the company reached an annual capacity of 720 million square meters, ranking first in Asia"); 2010 BNBM Annual Report at 23 ("the business scale of gypsum boards of the company reached an annual capacity of 1,000 million square meters, ranking first in Asia").

million square meters."[331]  Further, a May 2007 BNBM press release stated that "[c]urrently BNBM is the largest manufacturer for gypsum board in China, with a scale of 360 million square meters."[332]  Unbeknownst to readers of the press releases, BNBM was combining its production statistics with those of Taishan (which was not mentioned anywhere in the press releases).

### b.  BNBM Controls Taishan's Board Through Stock Ownership and Overlapping Officers and Directors.

Since 2005, BNBM Directors and Officers have maintained voting control over Taishan's Board of Directors.[333]  BNBM Directors and Officers also have served in critically important executive roles at Taishan (*e.g.*, General Manager, Chairman of Supervisory Committee).[334] BNBM continued to directly nominate and appoint the majority of members (3 of 5) to Taishan's Board of Directors, JIA Tongchun and his company, Shandong Taihe, collectively appointed a fourth, and Tai'an State-Owned Assets (indebted to BNBM for 50,000,000 RMB) appointed the fifth member.  In fact, between 2009 and 2014, only two Taishan Board members were changed, and in each of those instances, the replacements were "like kind" (*e.g.*, BNBM replaced one of its appointees with a different BNBM appointee).[335]

---

[331] 4/15/2007 BNBM press release "BNBM General Manager Mr. Wang Visited Saint-Gobain and Lafarge" [MTD Ex. 44].

[332] 5/23/2007 BNBM press release "Founding Ceremony for BNBM Taicang 60 million Sq.m. Per Annum Gypsum Board Base" [MTD Ex. 45].

[333] *See*, *e.g.*, 4/23/2007 BNBM Reply on the Inquiry Letter about 2006 Annual Report Verification at BNBMPLC-E-0004784; 4/25/2005 Taishan Resolutions of the General Meeting of Shareholders; 6/20/2007 Taishan Articles of Association [MTD Ex. 131] at TG0020734.

[334] *See* Section II.A.2.a., *supra*.

[335] *See* Summary Chart of Overlapping Executives and Officers at p. 4 and Ex. 20 thereto (CHEN Yu of BNBM replaced ZHANG Nailing of BNBM on Taishan's Board in 2014);

These facts have allowed BNBM to control and direct Taishan's daily activities and management.

### c.  BNBM Controls the Construction of Taishan Drywall Factories.

BNBM has controlled the construction of new Taishan drywall plants – through the BNBM-dominated Taishan Board of Directors[336] and as Taishan's "Controlling Shareholder."[337] This control resulted in four Taishan drywall factory construction projects in June of 2005 (just 3 months after BNBM took control of Taishan),[338] and two Taishan drywall factory construction projects in April of 2006.[339]  Mid-year 2007, BNBM's Board of Directors passed the resolution to embark in a plan to construct gypsum board productions lines "all over the country" beginning in 2008.[340]  To achieve this goal, BNBM invested in the construction of drywall factories, plants, and gypsum board production lines by offering guarantees to Taishan Gypsum.  In total, from

---

Summary Chart of Overlapping Executives and Officers at p. 6 and Ex. 25 thereto (ZHOU Changxin replaced SHAN Jianmin in 2010).

[336] *See* CHEN Dep. at 345:20-346:3.

[337] *Id.* at 345:20-346:21 & 349:10-19.  *See also* 4/15/2006 Taishan Board of Director Resolutions – requiring shareholder [BNBM] approval of gypsum board factory construction projects – with detailed parameters and specifications for production [MTD Ex. 132].

[338] *See* 6/26/2005 Taishan Shareholders Resolutions – approving various gypsum board factory construction projects – with detailed parameters and specifications for production.

[339] *See* 4/15/2006 Taishan Board of Director Resolutions – requiring shareholder [BNBM] approval of gypsum board factory construction projects – with detailed parameters and specifications for production.

[340] *See* 10/15/2007 BNBM Announcement of the 29th Interim Meeting of the 3rd Session of Board of Directors [MTD Ex. 172].

2008 through 2014, BNBM funded the construction of 38 Taishan-owned gypsum board production lines.[341]

Further, BNBM consistently has tracked its investments made in Taishan's production lines through weekly reports. These reports detail the project name, the commencement date, the projected completion date, the reason/goal behind the project and the "unit in charge," among

---

[341] *See* 2/18/2008 BNBM Announcement of the Resolution of the 3rd Session of the 32nd Meeting of the Board of Directors (approving joint guarantee of 140,000,000 RMB to meet construction needs) [MTD Ex. 148]; 4/3/2007 BNBM Announcement of the 3rd Session of the 34th Meeting of the Board of Directors (resolution to provide guarantees for investment in four production lines) [MTD Ex. 173]; 7/31/2009 BNBM Announcement of the Resolution of the 7th Interim Meeting of the 4th Session of Board of Directors (describing the promise of guarantees to Taishan for the construction of eight gypsum production lines) [MTD Ex. 133]; 2/22/2011 BNBM Announcement of the Resolutions of the Twelfth Interim Meeting of the 4th Session of the Board of Directors (approving four construction projects for thermal power desulphurization gypsum board production lines) [MTD Ex. 135] (totaling 13 construction projects for 2009); 2/22/2011 BNBM Announcement of the Resolution of the 9th Interim Meeting of the 4th Session of Board of Directors (passing resolutions for investment in three desulphurization gypsum board production lines for year 2010) [MTD Ex. 174]; 8/18/2011 BNBM Announcement of the Resolutions of the Eighth Meeting of the Fourth session of Board of Directors (passing resolutions for investment in eight desulphurization gypsum board production lines) [MTD Ex. 136]; 6/5/2012 BNBM Announcement of the Resolutions of the 15th Interim Meeting of the 4th Session of the Board of Directors (approving the investment in construction of a Taishan production line in Liaocheng City) [MTD Ex. 177]; 8/15/2012 BNBM Announcement of the Resolutions of the 10th Interim Meeting of the 4th Session of the Board of Directors (approving the investment in three construction projects to develop new production lines) [MTD Ex. 250]; 3/12/2013 BNBM Announcement of the Resolutions of the 2nd Interim Meeting of the 5th Session of the Board of Directors (approving resolutions providing the construction of two comprehensive by-product gypsum production lines) [MTD Ex. 257]; 10/28/2013 BNBM Announcement of the Resolutions of the 3rd Interim Meeting of the 5th Session of the Board of Directors (approving resolutions authorizing the construction of two by-product gypsum production lines) [MTD Ex. 258]; 8/18/2014 BNBM Announcement of the Resolutions of the 5th Interim Meeting of the 5th Session (reviewed and approved investment and construction of two new lines of by-product gypsum) [MTD Ex. 259].

other things.[342]  In all instances, the unit in charge is listed as BNBM.[343]  BNBM's careful

monitoring and supervision over its guarantees and investments in Taishan shows daily control

over the production and manufacture of Taishan's drywall business.

### d.  BNBM Controls the Production of Taishan Drywall.

BNBM's domination over Taishan included the ability to control how Taishan produced

drywall.  BNBM's control included determining the capacity of the new Taishan drywall

factories, the manufacturing process to be used, the type of gypsum to be used, and where the

drywall produced by the Taishan plants would be marketed and sold.[344]  Taishan had to seek

specific approval from BNBM regarding the detailed parameters for materials to be used, design,

quality, technology, and processes of drywall production.[345]  In March of 2007, WANG Bing

(BNBM General Manager) outlined the results from the newly constructed Taishan drywall

factories – as controlled by BNBM:

> After all newly-built production lines had put into normal
> production successively and the logistics had become more
> convenient, Shandong Taihe [Taishan] realized a slight increase in
> the stable sales prices of its products, gave full play to the value
> increase of brand, technology and quality brought about by BNBM
> as the controlling shareholder, brought into play the driving effect

---

[342] See "Rectification Status on the Inversion of Procedure in the Fixed Investment Projects of the Stock Company – Weekly Report" [MTD Ex. 137].

[343] Id.

[344] See 4/15/2006 Taishan Board of Director Resolutions – requiring shareholder [BNBM] approval of gypsum board factory construction projects - with detailed parameters and specifications for production at TG0025901-25902.

[345] Id.  See also 6/26/2005 Taishan Shareholders Resolutions – approving various gypsum board factory construction projects – with detailed parameters and specifications for production.

and synergistic effect of BNBM, improved the profitability of
Taihe, and also brought good investment returns to BNBM.[346]

BNBM indeed controlled the "technology and quality" of Taishan's drywall production.  In June
of 2007, BNBM began and oversaw the "technological transformation of the original gypsum
board production line" of Taishan.[347]  In announcing this "technological transformation" of the
Taishan gypsum board production line, BNBM specifically stated that "we [BNBM] will replace
natural gypsum plaster board with industrial waste gypsum."[348]  Moreover, BNBM financed this
"technological transformation" – stating that "[a]ccording to the actual needs for construction of
the Taihe project, the company [BNBM] agrees to provide joint liability guarantee for a four-
year 41,000,000 Yuan loan of Commercial Bank of China Limited Ningyang branch."[349]

### e.  BNBM Controls Taishan's Export of Drywall to the United States.

BNBM's domination over Taishan included the ability to control if and when Taishan
would export drywall to the United States.  At the time that BNBM gained ownership and
control of Taishan (in March of 2005), Taishan's official scope of business registration did not
include export of its drywall.[350]  However, in November of 2005 (within months after BNBM
took over ownership control of Taishan), BNBM changed Taishan's official scope of business

---

[346] *See* 3/23/2007 "General Manager Bing Wang's work report at the 3rd meeting of 5th session
of BNBM staff representative meeting" at BNBMPLC-E-0004832 (emphasis added).

[347] *See* 6/15/2007 BNBM Announcement of Final Resolution of the 25th Interim Meeting of the
3rd Session of Board of Directors [MTD Ex. 138].

[348] *Id*. (emphasis added).

[349] *Id*.

[350] *See* 4/25/2005 Shandong Taihe Dongxin Co., Ltd. [Taishan] Articles of Association [MTD Ex.
280] at p. 3, Article 12 (TG0020611).

81

registration to specifically include the export of drywall.[351]   At that time, Taishan and BNBM

both then began exporting drywall to the various customers in America.[352]

### f.   BNBM Controls Taishan's Funding and Finances.

In 2005, immediately after BNBM took over ownership control of Taishan, in order to

"accelerate project development" and encourage the growth of Taishan, BNBM compelled the

issuance of an additional 72,625,000 equity shares in Taishan of which BNBM purchased

90%.[353]   The increase of capital stock allowed BNBM to pump an additional 117,652,500 RMB

into the operating capital of Taishan, setting the precedent of financial control over the gypsum

manufacturer.[354]

BNBM's control over Taishan's production lines and construction projects are considered

part of BNBM's comprehensive business assets.[355]   In addition, BNBM has consistently financed

Taishan by providing the company guaranties for loans.

> At the time of acquisition, Taishan financed its business through
> various lending banks.   In order to secure its investment in
> Taishan, BNBM compelled the termination of all mutual
> guarantees with third parties and stepped in place of external

---

[351] 11/8/2005 Taishan Shareholders Resolution [MTD Ex. 139]; 11/8/2005 Taishan Amendment to Articles of Incorporation [MTD Ex. 140].

[352] *See* 11/17/2005 Contract between Taishan and Venture Supply for 100,000 sheets of drywall [MTD Ex. 141]; 12/16/2005 2nd Contract between Taishan and Venture Supply for 100,000 sheets of drywall [MTD Ex. 142].   *See also* BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006" (identifying two November 2015 contracts with U.S. companies for sales of drywall).

[353] 3/24/2005 Taishan Resolutions of the General Meeting of Shareholders.

[354] *Id.*

[355] *See* 2013 BNBM Project Information Statistical Tables, Gypsum Board and Non-Gypsum Board (BNBM Product Lines that have been put into Production) [MTD Ex. 145].

guarantors.[356]  BNBM's guarantees to Taishan increased each year, based on BNBM's Board of Directors' determination of need.  At the beginning of 2006, BNBM's Board deliberated and approved guarantees for Taishan with eight (8) banks, amounting to 388,600,000 RMB.[357]  By 2007, BNBM determined that the actual needs of Taishan, based on the decision to increase the production scale of drywall, required an additional 200,000,000 RMB in general credit – so BNBM provided Taishan with a general credit limit and working capital loan of 578,600,000 RMB for 2007.[358]  In 2008, BNBM increased Taishan's credit lines an additional 181,000,000 RMB in order to support the production needs of Taishan.[359]

BNBM's General Manager CHEN Yu confirmed that "from 2005 through 2014, there are guaranties, substantial guarantees, provided to Taishan each and every year in order for Taishan to maintain its profitability and business interest."[360]  To support the business operations and investment of Taishan, BNBM annually renews guarantee contracts to Taishan.[361]  The renewal of guarantees is in addition to an increased line of credit over the years.

---

[356] 1/23/2006 BNBM Announcement of Final Decision of the 15th (Temporary) Meeting of the Third Session of Board of Directors [MTD Ex. 146].

[357] *Id.*

[358] 2/9/2007 BNBM Announcement of Final Decision of the 21st Temporary Meeting of the Third Session of Board of Directors [MTD Ex. 147].

[359] 2/18/2008 BNBM Announcement of Resolution of the 3rd Session of the 23rd meeting of the Board of Directors.

[360] *See* CHEN Dep. at 363:18-23.

[361] CHEN Dep. at 367:18-23.  *See, e.g.*, 6/13/ 2010 BNBM "Maximum Amount Guarantee Contract" for TG [MTD Ex. 149]; 7/1/2011 BNBM "Maximum Amount Guarantee Contract" for TG [MTD Ex. 150]; 8/22/2012 BNBM "Maximum Amount Guarantee Contract" for TG [MTD Ex. 151]; 9/30/2013 BNBM "Maximum Amount Guarantee Contract" for TG dated [MTD Ex. 152]; 4/16/2014 BNBM "Maximum Amount Guarantee Contract" for TG dated [MTD Ex. 153] (the guarantees listed are for example only, BNBM offers annual guarantees to TG from several different financial institutions.  The guarantees listed here are for an annual amount of 220,000,000 RMB/ year financed by Bank of China Co., Ltd., Tai'an Branch).

For example, at the start of 2009, BNBM's guarantees to Taishan Gypsum amounted to 633,000,000 RMB.[362]  Each year, the annual amount increased, and by 2014, BNBM's extended guarantees to Taishan were approved by BNBM's shareholders in amounts "not to exceed 1,000,000,000 RMB" in order to meet Taishan's needs of normal production.[363]

### g.  BNBM Compelled Taishan to Make it a Co-Owner of Taishan Subsidiaries.

BNBM's control over Taishan was so extensive that BNBM was able to require that Taishan make it a co-owner of Taishan subsidiaries.  In June of 2005 (within months of BNBM taking over ownership and control of Taishan), the BNBM-controlled Taishan shareholder meeting resolved that:

1. For all existing [Taishan] subsidiaries, the shares held by shareholders other than the Company [Taishan] (except strategic partners) shall be purchased back by the Company [Taishan].  If any subsidiary must have more than two shareholders, BNBM will purchase 5% of equity shares.
2. For any [Taishan] subsidiary to be established in the future, if the subsidiary must have more than two shareholders, BNBM will hold 20% of equity shares.[364]

Consequently, BNBM became a co-owner in three different Taishan drywall manufacturing subsidiaries in 2005, and continued such co-ownership for years thereafter.[365]

---

[362] 3/17/2009 BNBM Announcement of Resolution of the 3rd Meeting of the 4th Session of Board of Directors [MTD Ex. 154] at BNBMPLC0004613-4614.

[363] 4/16/2014 BNBM Announcement of the Annual Shareholders Meeting Resolution 2013 [MTD Ex. 155].

[364] *See* "6/26/2005 Resolution of the 4th Extraordinary General Meeting of Shareholders for the Year of 2005 of Shandong Taihe Dongxin Co., Ltd. [Taishan]" at TG 0020683-84.

[365] *See* 2005 BNBM Annual Report at 49 ("Pizhou Taihe Building Materials Co., Ltd., Hubei Taishan Building Materials Co., Ltd. and Jiangjin Taishan Building Materials Co., Ltd. are sub-subsidiaries jointly owned by the Company [BNBM] and its controlled subsidiary – Shandong

84

In 2007, BNBM added ownership in a fourth Taishan subsidiary, by purchasing a 30% equity interest in Jiangyin Taishan Gypsum Building Material Co., Ltd.[366]  BNBM's stated reason for the this acquisition was for "CNBM Group to benefit from the synergy between BNBM and Taishan, increase its competitiveness and consolidate its leading position in the gypsum board market …"[367]  In 2008, BNBM added ownership in a fifth Taishan subsidiary, when it and Taishan jointly established (and jointly held controlling ownership interest in) Tai'an Taihe Building Decoration Materials Co., Ltd. ("Taihe Decoration").[368]  BNBM's stated reason for this joint acquisition with Taishan was to "ensur[e] the on-going and stable supply of raw materials to Taishan Gypsum for production of paperbacked plasterboards …"[369]

### h.  BNBM Is Responsible for Taishan's Land-Use Certificates.

BNBM has the responsibility to resolve issues related to Taishan's real estate holdings and lease-land uses.  Similar to the overt control admitted to by BNBM  (identified in the above 2005-2008 discussion), BNBM reports establish that it is  continuously deferred to and asked to obtain proper certificates of ownership for the land used by Taishan.[370]  As an example, at the

---

Taihe Dongxin Co., Ltd. [Taishan]").  *See also* 2006 BNBM Annual Report at 64; 2007 BNBM Annual Report at 69.

[366] 4/13/2007 CNBM Announcement at 2 & 7.

[367] *Id*. at p. 7.

[368] 6/30/2008 BNBM Announcement of the 3rd Session of Resolution of the 38th Interim Meeting of the Board of Directors.  *See also* 2008 BNBM Annual Report at 42.

[369] *Id*.

[370] *See* ███████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████ [MTD Ex. 157].

close of 2010, BNBM received an inquiry email from CNBM's Legal Affairs Department identifying issues with the land and real estates used by Taishan Gypsum.  Specifically, CNBM requested that BNBM contact the relevant departments of Taishan Gypsum in order to determine whether any progress was made in resolving the real estate and land issues.[371]  Although this is but one example, Taishan's land use certificates are a recurring issue for BNBM, yet Taishan continues to operate despite the fact BNBM is unable to produce the proper paperwork to CNBM Company.[372]  In fact, in some instances, CNBM Company is seen drafting the template response for Taishan and Taishan subsidiaries in order for the companies to show legal compliance.[373]

### i.   BNBM Includes Taishan as Part of its Regular Internal Audit Process.

BNBM is the responsible party for clearing up and explaining improprieties discovered through audits conducted by the CNBM entities.  As part of this responsibility, BNBM is required to conduct internal audits pursuant to CNBM Company's audit policies.[374]  Some internal audits conducted by BNBM require contemplation of the control exercised over BNBM

---

[371] 12/29/2010 Email from CHEN Haixian to CHEN Zhucai [MTD Ex. 158].

[372] *See Id*. at p. 1.  ("Taishan Gypsum Limited operates gypsum board production business on the 78,126.66 square meters of collective-owned land that the company leased at Dawenkou Township, Tai'an City, while the land shall be held for collective construction purposes.").

[373] *See* 8/11/2011 Email from CNBM to Taishan Gypsum and attachment, "Certification by the Subsidiary Company on Housing Accumulation Funds" [MTD Ex. 159].

[374] HU Dep. at 108:11-18 (describing that CNBM subsidiaries' internal audit plans are due to CNBM at the beginning of each year).

subsidiaries, including Taishan Gypsum.[375]  BNBM's audits of its subsidiaries, including

Taishan, inspect the conduct of management personnel, board resolutions, investment plans, and

regular financial statements among other things.[376]  Described as "Critical Control Activities"

BNBM reported the following:

> the Company [BNBM] clarified the responsibility and limitation of
> authority of those personnel assigned to the subsidiaries such as the
> board of directors, supervisors, and important high level
> management personnel, and strengthened the participation in to the
> subsidiaries' management decision-making through assigning
> board directors, supervisors, and high level management,
> strengthened the exercising of shareholder's rights, expressed the
> Company's positions, and effectively protected the Company's
> interests.

The audit control conducted by BNBM over Taishan is for the direct purpose of ensuring

the subsidiary company is aware of its financial responsibility to the controlling shareholder and

to protect the project investment of its controlling shareholder, BNBM.[377]

### j.   BNBM Conducts Regular Financial Audits of Taishan.

Similar to internal control audits, BNBM also conducts financial audits of Taishan.

These audits are conducted annually and are set by BNBM's audit committee, which serves

under BNBM's Board of Directors.[378]  It is further noteworthy that the one BNBM board

---

[375] *See*, *generally*, 3/16/2012 BNBM Meeting Document: The 10th Meeting of the Fourth Session of the Supervising Committee, "Appendix: BNBMPLC Internal Control Self-evaluation Report" [MTD Ex. 260].

[376] *Id.*

[377]*See*, *generally*, HU Dep. at 28:1-17 (describing the purpose of the auditing work conducted).

[378] *See* 11/28/2009 "Letter of Communication and Confirmation about the Audit Schedule for the 2009 Annual Financial Statements"; *see also* 11/27/2008 "Communications and Confirmation Letter on the Auditing Schedule of the 2008 Annual Financial Report."

member on the BNBM audit committee is one of the directors shared between Taishan and

BNBM – WANG Bing.[379]  Here again, the purpose of the financial audit is described as

necessary because BNBM is the shareholder of Taishan and the two file consolidated financial

statements.[380]

### k.  BNBM Imposes Strict Administrative Policies on Taishan as Part of Controlling and Managing Taishan's Operations.

BNBM controls Taishan's operational management by way of controlling Taishan's

board of directors, and through BNBM [former] Director and Deputy General Manager, JIA

Tongchun, serving as the Chairman and General Manager of Taishan.  However, BNBM also

imposes strict administrative policies upon Taishan, and uses same as one method to control and

manage nearly all aspects of Taishan's operations.  BNBM issues policies sent from the

Enterprise Control Division, Department of Administrative Personnel, that outline the

appropriate policies and methods by which Taishan must conduct its business, including (as

outlined further below) to conduct its financial management, develop operational management,

manage its human resources department, establish subsidiaries, and handling of significant

events.[381]  Taishan's execution of BNBM's administrative policies are checked through various

---

[379] *See* 11/28/2009 "Letter of Communication and Confirmation about the Audit Schedule for the 2009 Annual Financial Statements."

[380] WANG Dep. at 436:16-437:3; *see also* "2014 Financial Account Report" (listing Taishan as a tier 2 subsidiary in the scope of BNBM's consolidated financial statements) [MTD Ex. 160].

[381] *See* discussion, *supra* at Section II.13.i.  *See also* 6/18/2013 BNBM Investment document No. 62 (2013), "Notice on Publishing 3 Regulations, the Administrative Measures of the Branches/Subsidiary Companies of BNBM, the Administrative Measures of the External Investments of BNBM, and the Administrative Measures of the Development and Strategy of BNBM ("6/18/2013 BNBM Investment document No. 62").

internal and external audits conducted by and/or for BNBM.  In the event BNBM's audits reveal problems, Taishan is instructed to cure the identified issues.

### l.  BNBM Controls Taishan's Financial Management.

BNBM controls all aspects of Taishan's financial management.  This control ranges from debt financing (obtaining loans) to accounting policies.  The financial management policies of BNBM disallow Taishan from requesting guarantees from any other companies aside from BNBM.  Moreover, Taishan may not act independently when desiring to increase loans, BNBM must approve all increases.[382]  With respect to accounting and general financial management, Taishan must follow the accounting policies unified by BNBM and may not make any changes to those policies.  Taishan must submit monthly, quarterly, and yearly budget plans to BNBM, and is required to provide monthly, quarterly, and yearly financial reports to BNBM.[383]

### m. BNBM Controls Taishan's Operational Management.

BNBM's strict administrative policies serve as a redundancy control over Taishan's operational management.  For example, Taishan's annual production and operation plan must be submitted to BNBM for approval.[384]  In addition to requiring Taishan to submit project plans and production goals each year, Taishan must further include sales plans and sales budgets along with their annual submissions.[385]

---

[382] *Id.* at BNBMPLC-E-0058978.

[383] *Id.* at BNBMPLC-E-0058980.

[384] *Id.*

[385] *Id.*

89

**n.  BNBM Controls Taishan's Management of its Human
Resources Department.**

BNBM has direct control over Taishan's directors, supervisors, and senior managers.
Under BNBM's administrative policies, there is no independent selection of such positions.
Succinctly, BNBM recommends the candidate for appointment and reports same to the superior
entity for approval.  If approved, BNBM then prepares an official recommendation document for
review by the shareholders and board of directors of the subsidiary company.[386]  In the instance
of senior managers, BNBM chooses a candidate and submits the name to the superior entity for
approval.  After approval is gained, the superior entity has the power to appoint the senior
manager of the subsidiary.[387]

**o.  BNBM Controls Taishan's Establishment of Subsidiaries.**

Taishan Gypsum is not prohibited from establishing subsidiaries under BNBM's
administrative policies, however, explicit approval must be obtained through an application
process before any subsidiary is established.[388]  The purpose of this requirement is included in
BNBM's policy as follows:

> The Company [BNMB] needs to conduct optimization and
> organization for the wholly owned companies, controlled
> subsidiaries, and partially owned companies that were acquired
> through merger, purchase, restructuring, and exchange.  The
> optimization and organization include the organization of the
> management level, the operational organization, and asset
> organization, the debt organization, and the organization of
> intellectual property.[389]

---

[386] *Id.* at BNBMPLC-E-0058979.

[387] *Id.*

[388] *Id.* at BNBMPLC-E-0058975.

[389] *Id.*, "Article 7," at BNBMPLC-E-0058976.

90

Basically, it is within BNBM's province to approve or deny the establishment of subsidiaries depending on BNBM's assessment and desires.

**p.   Taishan Is Required to Report Various Matters to BNBM.**

Pursuant to BNBM's requirements, Taishan has regularly reported to BNBM on various matters.  In an April 2007 report to the Beijing Securities Regulatory Bureau, BNBM outlined some of its "management control" methods over subsidiaries, stating that "BNBM required that the subsidiaries report to BNBM's secretary of the board of directors their board of director meeting resolutions, shareholder meeting resolutions, and other important documents in time."[390] BNBM continued to state that "BNBM also acquired and analyzed the subsidiaries' monthly financial statements."[391]  These reporting procedures for BNBM's subsidiaries, including Taishan, were reconfirmed in an October 2007 internal report of BNBM, which stated:

> The Company [BNBM] required that its controlled subsidiaries and joint stock subsidiaries timely report their board resolutions, shareholder meeting resolutions, and other important documents and financial statements to the relevant departments in the company [BNBM].  For the board resolutions and shareholder meeting resolutions submitted by the controlled subsidiaries and joint stock subsidiaries, the Company's [BNBM's] relevant departments will conduct analyses and researches, raise questions and give suggestions, and protect the company's [BNBM's] interest to the maximum, to prevent investment risks; for the financial statements submitted by the controlled subsidiaries and joint stock subsidiaries, the Company's [BNBM's] relevant departments will conduct analyses and researches, so as to timely grasp the production and operation situation and financial situation

---

[390] *See* 4/8/2007 BNBM Internal Control System Self-Evaluation Report to Beijing Securities Regulatory Bureau, Department of Public Company Monitoring [MTD Ex. 261].

[391] *Id.*

and to raise relevant disposal opinions at proper timing, to ensure
profit realization and risk control of the equity investments.[392]

BNBM's reporting requirements continued to be imposed upon Taishan thereafter.

### q. BNBM Controls Taishan's Handling of Significant Events Such as Investments, Loans, Financing, Contracts, Donations, and Risks.

BNBM's administrative procedures imposed on Taishan allow for BNBM's control of

how Taishan handles significant events, including but not limited to significant: investments,

loans, contracts, donations, and risks – including lawsuits.[393]  As stated by BNBM:

> The branches and subsidiary companies shall strictly execute the
> Company's *Regulations on Internally Reporting the Major
> Information.*  The major events include but are not limited to major
> investment and financing, major affiliated transactions, major
> contracts, loans and guarantees, major risks, external donations and
> other matters that may cause major impact on the transaction prices
> of the company's stocks and other derivative type products.[394]

With each "major event," Taishan's Board of Directors are required to submit the event

to BNBM's working meeting, where Taishan's action is deliberated on and eventually submitted

to BNBM's Board of Directors and BNBM's shareholders for approval.[395]

As discussed above, Taishan's execution of BNBM's administrative policies are checked

through internal and external audits.  In the event BNBM's audits reveal problems, Taishan is

instructed by BNBM to cure the identified issues.[396]  In some instances, BNBM's audits and

---

[392] *See* 10/16/2007 Special Inspection Report.

[393] 6/18/2013 BNBM Investment document No. 62.

[394] *Id.* at BNBMPLC-E-0058977.

[395] *Id.*

[396] *See*, *e.g.*, HU Dep. at 32:3-20 & 112:3-16.

control likewise fail in properly managing Taishan's business, in which case, BNBM's parent

[CNBM] steps in to ensure compliance with the overall goals of CNBM Group.[397]

      BNBM' control and authority to control Taishan's daily operations is well documented as

demonstrated above through the many policing actions and policies implemented by BNBM.  As

a result, BNBM is the alter ego of Taishan.

**B.    CNBM Group, CNBM, CNBM USA, United Suntech, and CNBMIT
      Are Likewise Alter Egos.**

      Defendants' efforts to have CNBM USA, United Suntech and CNBMIT dismissed for

lack of jurisdiction are also unavailing.  Each of these companies are alter egos of CNBM Group

(and therefore BNBM and Taishan as well) and each are import and export agents in the United

States for CNBM products, including building materials like plasterboard.  More fundamentally,

CNBM USA and United Suntech are United States corporations for which Defendants concede

that general jurisdiction lies in California, the place of incorporation.[398]  In addition, CNBMIT

maintains offices in the United States for the distribution of CNBM building products.[399]

      Plaintiffs allege that CNBM USA, United Suntech and CNBMIT each "acted as an agent

for [other defendants] …by promoting and marketing the drywall at issue in this litigation to

---

[397] *Id*. at 27:15-29:7, 36:3-23, 99:3-100:11 & 112:3-16.

[398] CNBM Brf. at 7 and 25, n.16.

[399] *See* CNBMI USA tab, CNBMIT Co. webpage, *available at*
http://www.cnbmit.com/en/overseas/Detail.aspx?MenuID=050602, (last accessed 1/19/2016)
("With a localized professional sales team and matured sales channels, CNBMI USA has become
an important supplier of building materials and machinery in the USA and North American
markets.") [MTD Ex. 182].

American suppliers."[400]  While the CNBM Entities endeavor to cast CNBM USA, United Suntech and CNBMIT as independent, the reality is that these companies were established as branches of CNBM Group's parent-subsidiary corporate management structure.[401]  Simply, CNBM Group functions as the overseeing parent to numerous subsidiaries, each directed by CNBM Group to accomplish the end goal of the company – profitable global presence.  In fact, CNBM Group's website lists both CNBM USA and United Suntech as companies included in CNBM Group's overseas branches.[402]

### 1. CNBM USA

CNBM USA has a "boots on the ground" presence in the United States for CNBM Group and its subsidiary companies.  CNBM USA was established in 2006 as the U.S. branch of CNBM Group, and tasked with the mission to distribute CNBM made products throughout the

---

[400] *Amorin v. Taishan Gypsum*, Case No. 11-1395, Rec. Doc. 1, ¶¶ 31, 34-35; *Amorin v. Taishan Gypsum*, Case No. 11-672, Rec. Doc. 1, ¶¶ 31, 34-35; *Amorin v. Taishan Gypsum*, Case No. 11-1673, Rec. Doc. 1, ¶¶ 31, 34-35; *Abner v. Taishan Gypsum*, Case No. 11-3094, Rec. Doc. 1, ¶¶ 45, 48-49.

[401] *See* CNBM International Corporation History at 2 ("CNBM practices the parent-subsidiary management system, and is one of those wholly state-owned enterprises carrying out the pilot trial of Board of Directors system and innovation system.  As the strategic center, decision center, resources center, and policy & culture center, our Group exercises its right as a contributor.  Whereas, our sub-groups functioning as business platforms, are mandated to construct the profit center based on their core competences to enlarge brand awareness and increase market share.") [MTD Ex. 184].

[402] *See* CNBM Group "Global Presence" Tab.

United States. [403]   In 2011, immediate ownership of CNBM USA was transferred to an

intermediary entity, CNBM International, which shared offices with CNBM Import & Export. [404]

  Once CNBM USA started operations, it was presented as the trading face for CNBM and

CNBM Group in the United States, providing immediate contact with U.S. customers, "easy

communication," "customer" and "sales support," and general "information service or other ...

products." [405]   To develop business in the United States, CNBM USA emphasized the fact that

"CNBM has become the largest building supplier in China.... [and] will improve our market

share and become one of the largest building supply companies known throughout the world." [406]

  **2. United Suntech**

  United Suntech is the grandson company of CNBM Company.  Currently, United

---

[403] *See* Papers Relating to Incorporation from the State of California, Secretary of State [MTD Ex. 168]; CNBM Group "Contact Us," USA Tab.

[404] Deposition of CNBM USA Corp. (ZHANG Shaojun) dated 11/3/2015 ("ZHANG Dep.") [MTD Ex. 162] at 18:7-20:7, 63:21-64:20 & 82:9-84:3 (clarifying references to CNBM International), 105:12-106:19; *see, generally,* CNBM USA "Building a Mutually Rewarding Partnership" Powerpoint dated 4/2/2007 [MTD Ex. 163]; *see also* Defendant Affiliate/Subsidiary/Parent Manufacturers' Profile Form of China National Building Material & Equipment Import & Export Corp. [MTD Ex. 164] (listing office addresses for CNBM Import & Export and CNBM International as No. 9 Shouti South Road, Haidan District, Beijing, China). CNBM USA continues to be listed as the U.S. operation for CNBM International.  *See* CNBM International Corporation "Company Profile" available at http://www.icnbm.com/en/info (last visited January 4, 2016) [MTD Ex. 165].

[405] *See* CNBM USA "Building a Mutually Rewarding Partnership" at CNBMUSA00054685-54686.

[406] *Id.* at CNBMUSA00054682.  It is noteworthy that CNBM International's operations include a "Gypsum Division," which is part of the building materials operations of CNBM Group and spans "relationships with over 60 countries in the fields of building materials."  *See* CNBM International Corporation – Company Profile for Gypsum Division [MTD Ex. 169] at 8-13 (containing a "Reference List" of plasterboard production facilities that includes the plasterboard facilities under the orbit of BNBM).

Suntech's direct parent is CNBM Investment.[407]  CNBM Investment (f/k/a BND) was majority

owned by BNBM until December 7, 2007, when BNBM's Board of Directors announced a

resolution on transferring its 80% share ownership in BND to CNBM Company.[408]  In addition

to the 80% share acquisition, CNBM acquired the remaining 20% of equity shares from China

Fiberglass, making CNBM Investment a wholly-owned subsidiary of CNBM by 2008.[409]

CNBM Investment acquired full ownership of United Suntech by 2008.[410]  Thereafter, United

Suntech would also be referred to as CNBMI US or CNBM Investment US.[411]

Like all of CNBM Group's subsidiaries under its dominion and control, United Suntech

must report to CNBM and CNBM Group and is subject to audits by these entities.[412]  Yet, United

Suntech does not observe corporate formalities, *e.g.*, it has not held a board of directors meeting

---

[407] *See* Deposition of United Suntech (LIU Weisheng) dated 10/27/2015 ("LIU Dep.") [MTD Ex. 181] at 37:21-22 ("Suntech is 100% owned by CNBM Investment); *see also id.* at 50:10-19 (witness described CNBM Investments as United Suntech's "parent company.")

[408] 12/7/2007 BNBM Announcement of Final Resolution of the 30th Interim Meeting of the 3rd Session of Board of Directors [MTD Ex. 262]; *see also* Global Offering at 118. (BND was established in 2001 and owned 80% by BNBM.)

[409] CNBM 2008 Annual Report at 59.

[410] *See* 9/3/2003 United Suntech Meeting Notes [MTD Ex. 175]; 6/2/2008 Stock Purchase Agreement [MTD Ex. 176].

[411] *See* LIU Dep. at 81:5-82:16.

[412] *See*, *e.g.*, 9/18/2012 Email from Sharon to UNITEDSUNTECHCRAFT@gmail.com and attached 9/16/2012 Application for Title Registration for United Suntech Craft, Inc. [MTD Ex. 178]; 1/5/2011 Email re: 2010 Annual Audit Arrangements [MTD Ex. 179]; 1/7/2013 Notice of Doing a Good on the Formulation of 2012 Financial Statements [MTD Ex. 180] (directions on reporting to United Suntech from CNBM Group through CNBM).

in over five years.[413]  Although United Suntech's wholesale business was wide-ranging, it

encompassed not only the business of CNBM Investment (on up to CNBM), but also included

support for the business for CNBM Import & Export, regarding lumber sales.[414]

### 3. **CNBMIT**

CNBMIT is "a member of China National Building Material Group Corporation."[415]  As

described on its website, CNBMIT "has *five business sections* including *import & export agency,

import & export*, domestic trade, bulk trade, and warehouse logistics trade. *Six business

departments* in the Company *focus on the import & export*, domestic trade, re-export and bonded

trade of *building materials*, hardware, chemical products, electronic products, in-flight articles,

coal and mineral resources and provide professional trading service such as financing, customs

declaration and clearance, storage and delivery."[416]  Importantly, CNBMIT maintains local

offices in three strategic locations outside of China, one of which is in based in the United

States.[417]  From its United States location, CNBMIT "*promotes Chinese building materials* and

machinery and establishes a distribution network in North America. With a localized

---

[413] *See* LIU Dep. at 49:7-50:3 (The corporate designee is not aware of either a shareholder
meeting or board of director meeting since June 2010).

[414] *See* LIU Dep. at 109:9-19.

[415] *See* CNBMIT "About Us" Tab, available at  http://www.cnbmit.com/en/about/index.aspx (last
visited 1/19/2016) [MTD Ex. 183].

[416] *Id.* (emphasis added).

[417] *See* CNBMIT webpage, CNBMI USA Tab.

professional sales team and matured sales channels, *CNBMI USA has become an important supplier of building materials* and machinery in the USA and North American markets."[418]

C.    **CNBM Group Orchestrated a Comprehensive, Unified Strategy on Behalf of the CNBM and BNBM Entities, and Taishan to Avoid the U.S. Drywall Litigation and Any Judgment.**

Employing the same capacity to control its subsidiaries in their business operations, CNBM Group has controlled these companies in this litigation.[419]  From the dawn of CDW litigation in the United States, CNBM Group's Chairman SONG Zhiping proactively organized and implemented the Group response to the lawsuits on behalf of all of the CNBM/BNBM and Taishan Defendants.[420]  Following an alert of impending litigation from the Company's major competitor, Knauf Gips, in April 2009, the Company devised a comprehensive, unified strategy, which included input from multiple foreign law firms.  CNBM Group closely monitored the lawsuits filed not only against Taishan as the manufacturer of the problematic drywall, but also against Taishan's BNBM and CNBM parent entities.  As part of its tactics, the Company advised its subsidiaries that were subject to suit to "reject the legal service of process," with the understanding that judgments likely could not be enforced against these Defendants in China.

---

[418] *Id.* (emphasis added).

[419] *See*, *generally*, *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, Hearing Transcript (E.D. La.  Dec. 8, 2015) [MTD Ex. 185] at 12 (By the Court:  "The fact that they are able or were able to control the litigation is evidence of the fact that they had the capacity to control the companies in litigation. If they had the capacity, then they say, they also had the capacity to do day-to-day activity. Whether or not they did day-to-day activity is a question of fact, which they have tried to discover, or feel they still need to discover.").

[420] *See* SONG Dep. at 58:20-59:2 ("Ever since I heard about the lawsuit in 2009, I have been getting information about the lawsuit.").  *See also* The Course of Events on Hiring Foreign Law Firms for the Gypsum Board Litigation in the United States ("Course of Events Memo") [MTD Ex. 186] at BNBMPLC-E-0059975.

Then, after the *Germano* judgment was entered on May 11, 2010, CNBM Group adopted a "limited response to litigation" game plan, whereby Taishan, as its stalking horse, would enter its appearance in the litigation for purposes of challenging personal jurisdiction.

Following multiple failed attempts to avoid the jurisdiction of this Court[421] and other U.S. courts where Chinese Drywall suits were pending,[422] on July 11, 2014, CNBM Group's Board of Directors deliberated on and unanimously blessed the decision for Taishan not to appear on July 17, 2014, for a court-ordered Judgment Debtor Examination in MDL 2047, and, instead, withdraw from all U.S. litigation and refuse to participate further in these proceedings. Subsequent to the Contempt Order entered against Taishan, and the injunction prohibiting Taishan and any of its affiliates and subsidiaries from doing business in the U.S. unless or until Taishan participates in this action, CNBM Group continued deliberately to sit on the sidelines of the litigation while it assessed the impact of the Contempt Order and the ongoing proceedings on the Company and its shareholders.  In the meantime, CNBM Group's subsidiaries, including CNBM Import and Export, CNBM Forest (Canada), CNBM (and its subsidiaries), BNBM, and Taishan continued to do business in the U.S. in violation of the Contempt Order and in further derogation of this Court's authority.

        **1.  From the Outset, CNBM Group Controlled Defendants' Participation (or Lack Thereof) in the U.S. Chinese Drywall Litigation.**

On April 21, 2009, the Chairman of Knauf Plasterboard (Tianjin) Co., Ltd., David

---

[421] *See Chinese Drywall*, 894 F. Supp. 2d 819.

[422] *Lennar Homes, LLC v. Knauf Gips KG*, No. 09-07901 CA 42, 2012 WL 3800187 (Fla. Cir. Ct. Aug. 31, 2012), *aff'd*, *Taishan Gypsum Co. Ltd. v. Lennar Homes, LLC*, 123 So. 3d 637 (Fla. App. 2013) (per curiam).

Gregory, wrote to SONG Zhiping regarding the U.S. Chinese Drywall lawsuits.[423]  Then, on

May 8, 2009, Taishan was served with process under the Hague Convention in the first of

hundreds of U.S. lawsuits complaining of defects with Taishan's Chinese-manufactured

drywall.[424]  Three days later, Taishan compiled for its leaders at CNBM Group an "Informational

Report on the Class Actions Brought by the U.S. Parties Against Taishan Gypsum Company

Limited."[425]  The report, addressed to Chief SONG and Chief CAO as Taishan's Leaders, is

dated May 11, 2009.[426]  Therein, Taishan detailed the large quantity of gypsum boards exported

to the United States and acknowledged that shipments of its drywall occurred during the relevant

period of 2005-2008.[427]  Despite Taishan's acknowledgment that more than 70 million square

feet of its drywall [6,656,748.44 square meters] were sent to the United States and were the

subject of complaints from customers, Taishan reported that "[it] is not inclined to respond to the

---

[423] *See* 5/15/2009 Knauf Letters to SONG Zhiping (CNBM Group) and WANG Bing (BNBM Group), with attachments ("Knauf Letters") [MTD Ex. 187] at KNAUFGIPS0160548-49.

[424] *See Chinese Drywall*, 894 F. Supp. 2d at 832 (referencing *The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115).

[425] *See* 5/11/2009 "Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan Gypsum Company Limited" [MTD Ex. 3].  At that time, Mr. SONG was also Chairman of BNBM Group and Chairman of CNBM.  Meanwhile, Mr. CAO was Chairman of BNBM, President and Executive Director of CNBM, and Chairman of the Supervisory Committee of both BNBM Group and Taishan.  *See* Summary Chart of Overlapping Executives and Officers.

[426] 5/11/2009 "Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan Gypsum Company Limited."

[427] *Id.* at TG-0208428-29.

lawsuit." Taishan asked Chiefs SONG and CAO for instructions and approval as to whether such inaction was appropriate.[428]

Taishan expressed concern that "responding to the lawsuit would incur a large amount of attorney's fees and traveling fees."[429] In addition, since "there is no judicial treaty signed between China and the U.S. on mutual recognition and enforcement of court judgements, and **Taishan Company does not have assets within the continental U.S.**, even if the lawsuit was lost, **the U.S. court cannot enforce Taishan's assets in China**."[430] Admittedly, Taishan prepared this report for CNBM Group "so that the leaders can understand the facts of the case and give relevant instructions."[431] The company proposed to Chiefs SONG and CAO that "when necessary, it will provide documents that are beneficial to Taishan Company to the court that accepted the case."[432]

Just a few days later, on May 15, 2009, Mr. Gregory at Knauf again wrote to request "that CNBM and BNBM … take effective measures to respond to the U.S. consumer lawsuits

---

[428] *Id.* at TG-0208430.

[429] *Id.*

[430] *Id.* (emphasis added). Not coincidentally, CNBM and BNBM made public announcements to the same effect. *See* 7/18/2014 Announcement of Beijing New Building Materials Public Limited Company in Relation to the Developments of Gypsum Board Litigation in the US [MTD Ex. 188] at 3; 2/13/2015 Announcement of Beijing New Building Materials Public Limited Company in Relation to the Developments of Gypsum Board Litigation in the U.S. [MTD Ex. 189] at 3; and 2/13/2015 Announcement of CNBM re Further Updates on Recent Developments in the Gypsum Board Litigation in the U.S. [MTD Ex. 190] at 2.

[431] *Id.*

[432] *Id.*

and media coverage as soon as possible."[433]  Knauf expressed its "willing[ness] to, under the leadership of CNBM, safeguard the international reputation of Chinese-made building materials and Chinese building material enterprises together with other relevant Chinese building material enterprises."[434]  To that end, Knauf sent CNBM Group lists of more than 90 lawsuits naming Taishan and/or BNBM as Defendants, including the *Germano* action, relevant litigation documents, and media reports.[435]

Shortly after Knauf's second entreaty to CNBM Group, and now with its controlled subsidiary embattled in litigation, PENG Wenlong of Taishan Gypsum, at the "arrangements of the Company's leaders," corresponded with China Building Materials Academy ("Building Materials Academy"),[436] a wholly-owned subsidiary of CNBM Group that took the lead in researching and analyzing the issues related to American reports of defective gypsum board.[437] Mr. PENG offered Building Materials Academy a report on Taishan Gypsum's drywall manufacturing.[438]  He attached to his communication with Building Materials Academy a

---

[433] Knauf Letters at KNAUFGIPS0160548-49.

[434] *Id.*

[435] Knauf Letters at KNAUFGIPS0160550-716.  It is not surprising that Knauf's Chairman reached out to Mr. SONG when the Drywall suits were first filed.  Back in 1995 or 1996, Mr. SONG visited Knauf's headquarters in Iphofen. SONG Dep. at 30:5-30:15. Then, in 2006 (or 2009 -- 2010), Mr. SONG met with a Knauf executive, perhaps Baldwin Knauf, in Beijing, concerning Chinese production of drywall. *See* SONG Dep. at 30:23-31:22.

[436] *See* 5/31/2009 Email from PENG Wenlong [Taishan] to China Building Materials Academy [MTD Ex. 191].

[437] *See* 7/9/2010 CNBM Group Corporation Meeting Minutes of the 5th Work Meeting of Managers of CNBM Group [MTD Ex. 192] at TG-00026030-31.

[438] 5/31/2009 Email from PENG Wenlong to China Building Materials Academy.

completed questionnaire that included succinct answers to important questions imposed upon

Taishan about the quality of its drywall, shipping and loading information for the boards

exported to the U.S. in 2006, and whether the packages were sealed.[439]  This email exchange

again shows CNBM Group's instant concern over the U.S. Drywall litigation, as well as its

control over Taishan.

On June 3, 2010, less than a month after the *Germano* judgment was entered on May 11,

2010, CNBM Group hosted two telephonic conferences.  ZHANG Jian, Manager of CNBM

Group's Business Administration Department,[440] had a telephonic meeting with WANG Bing of

BNBM, JIA Tongchun of Taishan, Attorney DONG Chungang, and CHEN Daozheng (a/k/a

Eugene Chen) of Hogan Lovells to discuss "the Strategy for Responding to the Gypsum Board

Litigation in the United States."[441]  A memorandum that was produced by BNBM in this

litigation provides a summary of that meeting:

> Mr. Knauf visited Zhiping Song, chairman of the board of
> directors, and hoped that CNBM Group could offer a helping hand
> to them in responding to the United States drywall event.[442]  The
> situations that Knauf reported were that the Knauf Company had
> done some work and that, for the construction companies, for the
> moment it did not explore the truth of the matter, nor did it divide
> up liabilities.  They cooperated to fix the issue of home renovation,
> but the small homeowners who did their own decorations were

---

[439] *See* Attachment to 5/31/2009 email from PENG Wenlong to China Building Materials
Academy: "Questions to the Enterprise(s)" [MTD Ex. 193].

[440] *See* SONG Dep. at 86:17-19.

[441] *See* Course of Events Memo at BNBMPLC-E-0059975.

[442] CNBM Group's Chairman confirmed this fact during his deposition.  *See* SONG Dep. at
107:5-9 ("Q:  Now, is it accurate that Mr. Knauf visited Chairman Song and hoped that CNBM
Group could offer a helping hand to them in responding to the United States drywall event?   A:
It is correct to my recollection.").

waiting for the result of the litigation.  Knauf was worried that their assets would be enforced in the United States.  Knauf has 3 factories in the United States, and the main market is in the heart insulating materials.  The plaintiffs have formed an attorney team of more than 100 people.  Among them, a leadership body of 5 people has been established to negotiate with the defendants about the compensation.  The goal of the team of plaintiffs' attorneys is to work hard to have the court make a judgment on 1-2 cases first and set a precedent for the ruling and settlement negotiations of other recent cases.  For the judgment made against Knauf, the Knauf Company has appealed, hoping to delay the time and to reduce the amount of compensation.

Chairman Song agreed that CNBM Group should organize the response to the litigation, but the purposes of the response are: 1. for the images of Chinese products and Chinese enterprises; 2. for the friendship with Mr. Knauf of more than 30 years.  Reluctant to see the Knauf Company fighting alone; 3. insisting on the position that our products do not have any problems.  We should consider the situations as we deal with the litigation.  The Company may ask the Knauf Company to help recommend attorneys for us and delay the effectiveness of the judgment.[443]

A second teleconference also took place on June 3, 2010, which included Chief CAO Jianglin and ZHANG Jian of CNBM Group, CHANG Zhangli of CNBM, YU Chen of BNBM, JIA Tongchun of Taishan, and attorney DONG Chungang.[444]  The topic of this call was "the strategy for responding to the United States gypsum board litigation."[445]  This discussion, to the extent revealed, addressed the strengths and weaknesses of hiring the Hogan Lovells law firm.

---

[443] Mr. SONG did not have a clear recollection as to most of the remaining facts set forth in the memorandum of this meeting.  *See* SONG Dep. at 107:10-108:2.  He did, however, recall that he was not in any way involved in a plan to delay the effectiveness of the judgment against Taishan. *Id.* at 108:2-4 ("as a shareholder, I encouraged Taishan to actively respond to the litigation. That I remember.").  The weight of the evidence, however, as set forth herein, *infra*, refutes Mr. SONG's testimony on this point.

[444] Course of Events Memo at BNBMPLC-E-0059976.

[445] *Id.*

104

Collectively, the summary memorandum memorializing these teleconferences reveals that (i) the owner of Taishan's competitor Knauf invited SONG Zhiping and CNBM Group to consider a collaborative effort in responding to the U.S. Gypsum lawsuit, (ii) Chairman SONG would organize the response to the litigation, (iii) CNBM Group's Board of Directors would discuss and decide the direction of the U.S. Drywall litigation, and (iv) Taishan should retain the Hogan Lovells law firm.[446]  Overall, the June 3, 2010 teleconferences reiterate that CNBM Group would organize Taishan's response to the U.S. Drywall lawsuits.

Also on June 3, 2010, ZHANG Jian circulated *via* email to WANG Bing (BNBM Chairman, CNBM VP, and Taishan Director), CHEN Yu (BNBM General Manager and Director), and JIA Tongchun (Taishan Chairman and BNBM Director) an opinion soliciting draft from CNBM Group's Board of Directors titled, "Informational Report on Seriously and Proactively Doing a Good Job in Responding to the Incident of 'Problematic Gypsum Boards Shipped to the United States.'"[447]  The Report describes the timeline of the lawsuit in great detail, relating 3,296 CPSC complaints, receipt of 81 class action subpoenas, and acknowledgment that "subordinate enterprises of the Group ... exported 14,220,000 square meters [of gypsum board] to the U.S."[448]  Significantly, the CNBM Group report demonstrates the degree of CNBM Group control over Taishan Gypsum and BNBM by stating, "[d]uring the

---

[446] *Id.* at BNBMPLC-E-0059975-76.

[447] *See* 6/3/2010 Email from ZHANG Jian [MTD Ex. 194]; *see also* Attachment to 6/3/2010 Email from ZHANG Jian: "Informational Report on Seriously and Proactively Doing a Good Job in Responding to the Incident of 'Problematic Gypsum Boards Shipped to the United States'" (Opinion Soliciting Draft) ("Opinion Soliciting Draft Informational Report") [MTD Ex. 195].

[448] Opinion Soliciting Draft Informational Report at TG-0374795.

entire development process of the incident, CNBM Group has required and arranged BNBM

PLC and Taishan Gypsum to actively cooperate....”[449]  CNBM Group consistently hosted

meetings to discuss the U.S. Drywall lawsuits, which required attendance by CNBM, BNBM,

and Taishan.

To further comply with CNBM Group's requirements and demands for information

regarding the litigation, on June 27, 2010, Taishan's Foreign Sales Manager, PENG Wenlong

wrote to CNBM Group's Business Manager regarding Taishan's sales of drywall to the United

States.  Mr. PENG (using email address v20100526@163.com) wrote to Chief ZHANG Jian (at

email address zj@cnbm.com.cn) in an effort to fulfill a request from CNBM Group that included

a detailed analysis of Taishan's U.S. gypsum board lawsuits, the origin of gypsum used in

Taishan's boards (specific gypsum mine information), and a spreadsheet showing Taishan's U.S.

exports for the years 2005-2007.[450]  Chairman JIA Tongchun and Secretary ZHANG [Jianchun]

of Taishan were copied on the email.  Mr. PENG's email contained two attachments, titled

"Statement on the export data and statistics.doc" and "Invoice statistics100627.xls,"

respectively.[451]  The first attachment shows that Taishan reported in detail to CNBM Group the

---

[449] *Id.* at TG-0374797.

[450] 6/27/2010 Email from PENG Wenlong to ZHANG Jian (CNBM Group) [MTD Ex. 196];
Statement on the Data and Statistics of Exports to the U.S. from 2005 to 2007; Attachment 2 to
6/27/2010 Email from PENG Wenlong to ZHANG Jian (CNBM Group): "Statistics of U.S.
Gypsum Boards of Self-managed Export during 2005-2007" [MTD Ex. 198].

[451] Contrary to Mr. PENG's claim at his deposition on November 12, 2015, that his email to
CNBM Group and its attachments are merely the result of "speculation," in actuality, the email
and accompanying documents reflect a very thorough analysis of the gypsum board litigation,
the nature of Taishan's manufacturing, customer base, and operating business related to gypsum
board, and the mineral origin of same.  PENG Dep. at 85:8-86:12.

city, state, square meters, and source of the gypsum ore, in some instances down to the 1/1000 percent.[452]  Further, the second attachment is a spreadsheet detailing the exact shipment dates, invoice serial numbers, U.S. Customers, volume, value, *et al.*, all of which was provided in 2010 at the request of CNBM Group.[453]

### 2. Throughout the Litigation, CNBM Group, CNBM, BNBM Group, BNBM and Taishan Have Shared the Same Law Firms.

On November 29, 2010, shortly after BNBM formally engaged Orrick to represent it in these proceedings (but never entering an appearance on the record), all of the parties – CNBM Group, CNBM, CNBM (USA), BNBM, Taishan, TTP, and Weifang Aotai Plaster Co. Ltd. ("Weifang") – signed a Common Interest, Joint Defense and Confidentiality Agreement ("2010 JDA").[454]  Therein, L. Christopher Vejnoska of Orrick, Herrington & Sutcliff LLP (who is the current counsel of record for the CNBM Entities) represented BNBM PLC.  Joe Cyr of Hogan Lovells represented Taishan and TTP, and Weifang, even though his firm had previously been retained by BNBM.[455]  Kyle Schonekas of Schonekas, Evans, McGoey & McEachin, L.L.C. represented CNBM and CNBM Group.  This 2010 JDA, which was provided to the PSC by the CNBM Defendants, provides further evidence of the deliberate strategy of the controlling

---

[452] Statement on the Data and Statistics of Exports to the U.S. from 2005 to 2007.

[453] Statistics of U.S. Gypsum Boards of Self-managed Export during 2005-2007.

[454] *See* 11/29/2010 Common Interest Joint Defense and Commonality Agreement [MTD Ex. 199].

[455] *See* CHEN Dep. at 509:4-23.

CNBM/BNBM parents of Taishan and TTP to avoid this litigation directly, and monitor it indirectly through their stalking horse subsidiary, Taishan.[456]

Since the beginning of the litigation, attorney DONG Chungang has appeared at numerous meetings of all of the CNBM/BNBM and Taishan Defendants.[457] ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████[458] ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ ████[459] Further, Mr. DONG is a signatory to the more-recent Common Interest, Joint Defense and Confidentiality Agreement of March 2015 ("2015 JDA").[460]

---

[456] *See also* Taishan's 2011 Risk Management Report, wherein Taishan provides CNBM Group with detailed information about the U.S. Drywall litigation.

[457] *See* Course of Events Memo.

[458] *See, generally,* Hogan Lovells Privilege Log ("HL Privilege Log") [MTD Ex. 200].

[459] ████████████████████████████████████████████████████
████████████████ at TG-0369911-12 ████████████████████████
████████

[460] *See* 3/2015 Common Interest, Joint Defense and Commonality Agreement ("2015 JDA") [MTD Ex. 202] at BNBMPLC0007625.

The 2015 JDA reflects the new alignments of counsel once the CNBM/BNBM and Taishan Defendants re-evaluated their strategy following this Court's July 17, 2014 Contempt Order, and decided to appear in the litigation.  In 2015, Taishan has been represented by Alston & Bird, not Hogan Lovells.  The CNBM Entities are now represented by Orrick, Herrington & Sutcliffe LLP and White & Case LLP, but White & Case never formally entered its appearance in these proceedings.  And, interestingly, the BNBM Entities are represented by Dentons US LLP and Beijing Dacheng Law Offices.

Now simply known as Dentons, the merger between the two firms was accomplished on January 15, 2015.  The unquestioned leader of the combined firm happens to be CNBM Group's independent Director PENG Xuefeng, who was appointed by SASAC, as proclaimed on the firm's website:[461]

> The new firm would have three key management bodies:  Global Board, Global Advisory Committee and Global Management Committee.  Global Board is the top decision-making authority, the chairman of which would be Peng Xuefeng, the current chairman of Dacheng. Peng would also be chairman of Global Advisory Committee.[462]

In effect, the merger between Dentons and Dacheng results in PENG Xuefeng being an independent Director of CNBM Group and an employee of BNBM Group's and BNBM PLC's legal counsel.

---

[461] SONG Dep. at 85:20-21.  *See also* CNBM Group website Biography of PENG Xuefeng, http://www.cnbm.com.cn/EN/c_0000001600070003/d_26385.html [MTD Ex. 203].

[462] See "Dacheng and Dentons Combine to Create the Largest Law Firm in the World," available at  http://www.dachenglaw.com/en/news/dachengNews/33589.html (last accessed 1/19/2016) [MTD Ex. 204].

The significance of this merger is yet another example of an interconnected high-level officer between and among the CNBM/BNBM and Taishan Defendant companies (*see* Section II.A, *supra*), as shown through PENG Xuefeng's participation at CNBM Group's Board of Directors meetings.  For example, PENG Xuefeng was in attendance at CNBM Group's Seventeenth Meeting of the Third Board of Directors held on July 11, 2014, when the resolution was deliberated on and passed to permit Taishan to withdraw from the U.S. ligation.[463]  The resolution was unanimously passed, as a SASAC-appointed independent Director of CNBM Group, PENG Xuefeng, is included as one of the 11 voters.[464]  Further, at the Eighteenth Meeting of the Third Board of Directors of BNBMG, held on August 15, 2014, PENG Xuefeng participated in discussions that concerned the U.S. Drywall litigation and the cost of attorney's fees following a statement by CAO Jianglin that SASAC found the costs too high.[465]  The Dacheng/Dentons merger is the latest example in an already interwoven story of key players having key roles between and among the CNBM/BNBM and Taishan Defendant companies.

In all, it took five years and nine months from the formation of MDL 2047 for counsel to finally enter their appearance for the BNBM Entities, and even a few weeks more for counsel for the CNBM Entities to do the same.[466]

---

[463] *See* 7/11/2014 CNBM Group Resolution No. 17 of the Third Session of the Board of Directors of CNBM Group ("CNBM Group Resolution No. 17") [MTD Ex. 205].

[464] *Id.*

[465] *See* 8/15/2014 CNBM Group 18th Meeting of the Third Session of the Board of Directors of CNBM Group ("18th Meeting") [MTD Ex. 206] [Rec. Doc. No. 19492-3].

[466] *See* Transcript of 2/12/2015 Special Hearing [MTD Ex. 207]; Rec. Doc. Nos. 18430, 18352, 18397, 18406, 18410, 18411, 18427, 18428, 18431, 18444, 18445, 18582, 18568, 18675, 18676, 18677, 19115) (Entries of Appearance by Counsel for the CNBM Entities, BNBM Entities, and Taishan Defendants).

3.   **The CNBM and BNBM Entities Were Directly Involved in and**
     **Controlled the Decision for Taishan Not to Appear at the Court-**
     **Ordered Judgment Debtor Examination on July 17, 2014.**

Despite certain Defendants' self-serving claim that Taishan acted independently when it refused to appear for its court-ordered Judgment Debtor Examination on July 17, 2014,[467] there is even more evidence demonstrating that CNBM Group and the other Defendants were directly involved in and controlled their subsidiary's decision to withdraw from the litigation. On July 7, 2014, CNBM Group issued a "Notice on Holding the Seventeenth Meeting of the Third Session of the Board of Directors of China National Building Material Group Corporation"[468] Therein, CNBM Group summoned Taishan's Chairman JIA Tongchun to appear at its Board of Directors meeting scheduled for July 11, 2014.[469] The third item on the agenda was unambiguous: "Deliberating on the proposal on strategies of coping with the event of gypsum boards transported to the U.S."[470]

---

[467] *E.g.*, SONG Dep. at 93:5 ("This is a decision made by Taishan Gypsum."); ZHOU Dep. at 314:20-315:4 ("As far as my understanding was that the decision was approved by independent votes by the directors of the board of directors of Taishan Company.").

[468] *See* 11/7/2014 CNBM Group Notice of 17th Meeting of Third Session of the Board of Directors of CNBM Group ("Notice of 17th Meeting").

[469] *Id*.

[470] *Id.* Chairman JIA testified that he did not recall attending CNBM Group's Board of Directors meeting on that particular date – July 11, 2014, but he did recollect being summoned in unprecedented fashion to provide a status report on the U.S. litigation to a CNBM Group Board of Directors meeting "[p]erhaps a month or two months prior, approximately." *See* JIA Dep. III at 189:7-190:11; 195:18-196:1; 197:3-198:19; 211:1-212:6. The written Notice of 17th Meeting from CNBM Group's business records provides a more accurate recitation of the facts than Chairman JIA's approximate misremembrance.

At the July 11, 2014 CNBM Group Board of Directors meeting, CNBM Group deliberated on and signed a unanimous resolution – 11 to 0 – authorizing Taishan's decision "not to attend the judgment debtor hearing on July 17, 2014,"[471] in direct violation of a valid order of this Court. CNBM Group's Chairman SONG Zhiping admitted that on that day, only six days before Taishan's Judgment Debtor hearing, the Board of Directors for CNBM Group unanimously resolved to "respect" the decision for Taishan not to appear before this Court, but he disclaimed any "support" for the decision.[472]

CNBM Group's direct involvement in and control over Taishan's withdrawal from the litigation is supported by the Company's directive to its subsidiaries also on July 11, 2014 – with awareness of the Plaintiffs' efforts to collect on the final *Germano* judgment and in anticipation of the repercussions of Taishan's contempt of court – to cease depositing any funds in N.Y. banks and to have personnel use their own personal email accounts, rather than company emails, when doing business internationally.[473]

---

[471] *See* CNBM Group Resolution No. 17; SONG Dep. at 91:12-93:17. ZHANG Jian, who helped coordinate the response to the U.S. Drywall litigation on behalf of CNBM Group (*see* Course of Events Memo), played an integral part in this decision as he is listed as one of the signers on CNBM Group Resolution No. 17.

[472] *See* SONG Dep. at 92:8-15 ("It is not support but rather respect, respect the decision made by Taishan Gypsum."). This appears to be a distinction without a difference. According to Webster's Dictionary, to "respect" means to "hold in esteem or honor." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE, at 1640 (1996). As explained, "Respect is commonly the result of admiration and approbation, together with deference." *Id.*

[473] Requirements for International Business Risk Prevention.

112

The emails produced by Taishan's former counsel of record Hogan Lovells, following the denial of the law firm's Petition for Mandamus by the Fifth Circuit Court of Appeals,[474] vividly demonstrate the open contempt for this Court collectively contemplated by Taishan and its controlling CNBM/BNBM parents.  The documents make clear that the ultimate decision to ignore this Court's orders and engage in contempt of court was made at the highest levels of CNBM Group.  In particular, on July 7, 2014, DONG Chungang (who was involved in the plan to avoid this litigation from the start[475] and is a non-designated signatory to the 2015 JDA[476]) informed Hogan Lovells that:  "It's not Mr. Jia who can make the decision. This case involves many high-level officers at CNBM group now."[477]  ████████████████████████████

████████████████████████████ [478]

---

[474] *In re Hogan Lovells US LLP*, Case No. 15-30114, Order denying Petition for Writ of Mandamus (5th Cir. Feb. 20, 2015).

[475] *See* Hogan Lovells Privilege Log; Course of Events Memo.

[476] 2015 JDA.

[477] *See* ████████████████████████████████████████ [MTD Ex. 209].

[478] *Id.*; *see also* JIA Dep. III at 177:20-21.  Mr. DONG was regularly involved in communications between Taishan, Taishan's former counsel, and leadership of CNBM and BNBM. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████ [MTD Ex. 210].  These "high-level officers at CNBM Group" would necessarily include Chairman SONG, who has been the Chairman of CNBM Group and CNBM since 2005, as well as Chairman of BNBM Group since 1996.  *See* SONG Dep. at 11:23-12:14; Summary Chart of Overlapping Executives and Officers.

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████ [479]

Following entry of the Contempt Order in this case, CNBM Group continued to monitor these proceedings from the sidelines and discuss participation therein by the CNBM/BNBM and Taishan Defendants.[480]  During the Eighteenth Meeting of the Third Board of Directors of CNBM Group on August 15, 2014,[481] for example, ZHANG Jian reported that after inquiry with the Supreme People's Court, CNBM Group did not need to be concerned about an American judgment:  "Regardless of the ruling in the United States, the domestic assets will not be subject to enforcement…."[482]  The minutes from this meeting reflect that "China National Building Material will respond in four ways.  The enterprise should make preparations for media promotions."[483]  Noteworthy comments from CNBM Group participants at the 18th Meeting include:

- <u>CAO Jianglin</u>: "The attorneys are familiar with the case and with American law."[484]

---

[479] *See* ███████████████████████████████████ [MTD Ex. 211].

[480] Rec. Doc. No. 17869.

[481] *See* 18th Meeting.

[482] *Id.* at 9.

[483] *Id*. (redactions follow these comments).

[484] *Id*.

- <u>YAN Guozhe</u>: "On July 18, Beijing New Building Materials made a public announcement, which could have caused massive losses…."[485]

- <u>CAO Jianglin</u>: "The joint stock company [CNBM] has to prepare too, otherwise the effects will be even bigger."[486]

- <u>CAO Jianglin</u>: "I think whenever JIA Tongchun leaves the country, there is risk."[487]

- <u>ZHU Yanfu</u>: "It's more likely to detain the ship than to detain the person."[488]

- <u>SONG Zhiping</u>: "State-owned Assets Supervision and Administration Commission wrote a letter to have us engage in litigation.  Engage in limited response to the lawsuit, dealing with an order of over 2 million [presumably referring to the *Germano* judgment].  Now we really can't engage.

- <u>ZHUANG Laiyou</u>:  "We'll keep ignoring them.  What else is there to do?"[489]

- <u>CAO Jianglin</u>: "There is one thing we need preliminary decision on: Beijing New Building Materials is not going to respond to the lawsuit."[490]

### D.   BNBM and BNBM Group Targeted Florida and Other Gulf States for Sales and Distribution of Millions of Square Feet of BNBM Drywall.

Specific jurisdiction is proper over the BNBM Entities because Plaintiffs' causes of

---

[485] *Id*. at 12.

[486] *Id*. at 12.

[487] *Id*. at 12.

[488] *Id*. at 13.

[489] *Id*. at 15-16.

[490] *Id*. at 16.

action arise out of and result from the BNBM Entities' contacts with Florida and other Gulf

States.  Plaintiffs have been damaged by defective drywall that BNBM manufactured, marketed

and sold to U.S. customers,, and which BNBM Group distributed to U.S. customers.[491]

Plaintiffs' claims against the BNBM Entities arise from and relate to BNBM PLC's activities

marketing and selling its defective drywall to Florida and other Gulf State customers in 2005 and

2006, and to BNBM Group's conduct distributing said defective drywall to Florida and other

Gulf State customers in 2006.

Starting in 2005 and continuing through 2006, the BNBM Entities intensified their

targeting of the U.S. market for drywall sales and distribution – with a focus on Florida and other

Gulf States.[492]  As a result, "a great amount of BNBM gypsum board entered the U.S. market."[493]

In fact, in 2006 alone, the BNBM entities exported over 68 million square feet ($10,000,000+

---

[491] *Gross v. Knauf Gips KG, et al*, 2:09-md-20147, 10/19/2009 (Rec. Doc. 366) at ¶¶39, 43; *Amorin v. Taishan Gypsum*, Case No. 11-1395, Rec. Doc. 1, ¶¶ 26, 29; *Amorin v. Taishan Gypsum*, Case No. 11-672, Rec. Doc. 1, ¶¶ 26, 29; *Amorin v. Taishan Gypsum*, Case No. 11-1673, Rec. Doc. 1, ¶¶ 31, 34-35; *Abner v. Taishan Gypsum*, Case No. 11-3094, Rec. Doc. 1, ¶¶ 26, 29.

[492] Prior to 2005, between 1999 and 2004, the BNBM Entities worked together exporting multiple shipments of BNBM's drywall to the U.S. - with BNBM Group acting as BNBM's export agent.  *See* ZHAO Dep. at 183:15-184:18.  In 1999 and 2000, BNBM Group exported two shipments (over 100,000 sheets) of BNBM's drywall to Florida and Texas, respectively.  *See* Deposition of Wood Nation (Richard Hannam) dated 2/14/2011 ("Wood Nation Dep.") [MTD Ex. 212] at 18:21-21:10; Deposition of Richard Hannam dated 2/13/2012 ("Hannam Dep.") [MTD Ex. 213] at 11:25-12:7 & 13:6-15.  In 2000, the BNBM Entities officially established BNBM of America, Inc. ("BNBM of America") in Florida by leasing warehouse space, buying equipment and filing corporate registration paperwork with the State of Florida.  *See* Wood Nation Dep. at 20:22-21:2; 2000-2005 BNBM of America, Inc. Business Reports to Florida Secretary of State.  The BNBM Entities maintained BNBM of America as a Florida corporation from 2001 through 2005, and into 2006.  *Id.*

[493] *See* BNBM Group's "Explanations on accounts receivable of BNBM of America" [MTD Ex. 214].

116

worth) of BNBM PLC drywall to the United States – with the vast majority knowingly being sold and distributed to/in Florida and other Southeastern U.S. states.[494] During the relevant time period:

- BNBM of America maintained its mailing address and principal place of business in Tampa, FL, and maintained its status as a Florida corporation – with SONG Zhiping as Chairman and CAO Jianglin as Director;

- BNBM invited and hosted representatives from various Florida drywall distributor companies to tour BNBM's facilities in China;

- BNBM acquired a U.S. authorization for its drywall and manufactured its drywall to meet U.S. standards;

- BNBM provided U.S. customers with a Material Safety Data Sheet ("MSDS") for its drywall pursuant to standards prescribed by the U.S. Occupational Safety & Health Administration ("OSHA");

- BNBM specifically labeled its drywall to suit the U.S. market and forum states;

- BNBM and BNBM Group arranged shipping of BNBM drywall to U.S. ports, including Florida ports;

- BNBM entered into an exclusive agency agreement with a Florida drywall distributor company to sell BNBM drywall throughout the Gulf States;

- BNBM knew that its drywall was being distributed and would continue to be distributed specifically in Florida and the Southeast United States;

- BNBM continued its attempts to expand its drywall business in Florida and the other Gulf States;

- BNBM entered into an agency agreement with a Florida company in order to obtain additional UL certifications on other types of BNBM drywall;

---

[494] *See* BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006." *See also* BNBM's listing of drywall contracts and exports with/to U.S. customers [MTD Ex. 215].

- BNBM sold and shipped over 350,000 sheets of its defective drywall to a Florida company, and this drywall is still being stored in Florida and Alabama;

- BNBM manufactured and sold over 68 million square feet / $10,000,000+ of its drywall to United States customers – and with the help of BNBM Group as the export agent, BNBM exported this drywall to the U.S. – specifically targeting Florida and other Gulf States; and

- BNBM registered its company trademark "BNBM" with the U.S. Patent and Trademark Office.

These contacts are sufficient to exercise personal jurisdiction over the BNBM Entities.

### 1. BNBM of America Was Established in Florida as the U.S. Marketing Arm for BNBM.

BNBM America was essentially a marketing arm, established, funded and directed by BNBM in China.[495]  The leadership of BNBM of America included SONG Zhiping as Chairman[496] and CAO Jianglin as Director.[497]  "BNBM Group also assigned special people to the U.S. to take charge of sales work …" for BNBM of America.[498]  From approximately 2001 through 2004, BNBM of America had about eight permanent employees, paid U.S. taxes, sold

---

[495] Hannam Dep. at 15:3-17:6 & 24:11-24.  Richard Hannam of Wood Nation testified that he worked with "BNBM," there is no clear indication as to which BNBM entity Hannam was working with.  As far as he was concerned, there was only one BNBM and it was a company in China desiring to sell drywall in the United States.  *See* Hannam Dep. at 10:22-25 & 13:2-14:5.

[496] *See* 2000-2005 BNBM of America, Inc. Business Reports to Florida Secretary of State (identifying SONG Zhiping as Chairman from 2000-2005, and CAO Jianglin as Director from 2000-2005).  *See also* Summary Chart of Overlapping Executives and Officers at pp. 1-2 (identifying SONG Zhiping as Chairman of BNBM Group from 1996-present, and Chairman of BNBM from 1997-2002, and CAO Jianglin as Assistant General Manager of BNBM Group from 1998-2005 and Chairman of BNBM from 2004-2009).

[497] *Id.*

[498] *See* BNBM Group's "Explanations on accounts receivable of BNBM of America."

over $1 million of BNBM drywall in the U.S., purchased heavy equipment (*e.g.*, boom trucks, forklift, trailers), and rented heavy equipment (*e.g.*, tractors, a 2nd forklift).[499]

While BNBM of America was winding-down its business in 2004, it still maintained its mailing address and principal place of business in Tampa, Florida during 2005, and into 2006.[500] Also, BNBM of America maintained its status as a Florida corporation in 2005, and into 2006.[501] While BNBM of America ceased corporate existence in 2006, the BNBM Entities did not exit or abandon the U.S. market. Instead, BNBM continued to target Florida, Louisiana and other Gulf Coast states for sales of its drywall, and exported drywall to the U.S. directly and through BNBM Group as its export agent.[502]

### 2. BNBM Invited and Hosted Representatives from Multiple Florida Drywall Distributors to Tour BNBM's Facilities in China.

BNBM invited and hosted representatives from various Florida companies, including Davis Construction Supply, LLC ("Davis Construction") and EAC & Sons Corporation ("EAC"), to tour BNBM's facilities in China.[503] BNBM extended the initial invitation and assisted with obtaining business visas for Stefan Davis of Davis Construction and Edgar

---

[499] Hannam Dep. at 33:23-37:7.

[500] *See* 2001-2005 Uniform Business Reports of BNBM America from FL Secretary of State at 13.

[501] *Id.*

[502] *See* BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006" – identifying BNBM Group as the export agent for multiple shipments of BNBM drywall.

[503] *See* Deposition of EAC & Sons Corporation (Edgar Chaparro) dated 5/18/2015 ("Chaparro Dep.") [MTD Ex. 216] at 28:22-30:4; Deposition of Davis Construction (Stefan Davis) dated 5/19/2015 ("Davis Dep.") [MTD Ex. 217].

Chaparro of EAC.[504]  Mr. Davis and Mr. Chaparro's initial visit to China was in 2005.[505]  During

that visit, Mr. Davis and Mr. Chaparro met with Cai Kai, Manager of BNBM's Drywall

Division, and were taken on a tour of BNBM's factory.[506]  They also met with Mr. Li from

BNBM to discuss the terms of contract.  Numerous other building products were manufactured

at the factory and the BNBM employees attempted to sell these to Mr. Davis and Mr. Chaparro

for sale in Florida in addition to the drywall.[507]  Some of the other BNBM products that BNBM

representatives attempted to sell to Mr. Davis and Mr. Chaparro included doors, windows,

windowsills and tile flooring.[508]  Later on in their dealings with BNBM, Mr. Davis and Mr.

Chaparro met with BNBM General Manager WANG Bing – who expressed a clear interest in

doing business with the United States.[509]

 Eventually, BNBM arranged for Mr. Davis and Mr. Chaparro to have a meeting with

CNBM.[510]  CNBM's President and Vice President also wanted to conduct business in the United

States.[511]  Mr. Chaparro from EAC described this meeting as BNBM's attempt to impress him

and Mr. Davis by having them meet with the highest level of the construction industry in

---

[504] Chaparro Dep. at 24:7-21.

[505] Chaparro Dep. at 27:2-3.

[506] Chaparro Dep. at 28:22-30:4.

[507] Chaparro Dep. at 39:3-17.

[508] *Id*.  *See also* Hannam Dep. at 14:6-14.

[509] Davis Dep. at 36:2-22.

[510] Chaparro Dep. at 21:19-22:2.

[511] Chaparro Dep. at 43:2-21.

China.[512]  Throughout the course of EAC's and Davis Construction's dealings with BNBM, Mr. Chaparro visited China to meet with BNBM approximately 10-20 times, and each time at the invitation of BNBM.[513]

BNBM also hosted John Gunn from Guardian Building Products in an attempt to solicit his business and to have Guardian source its drywall from BNBM.[514]  During the meeting, BNBM assured Mr. Gunn that its drywall was ASTM certified and would meet United States Standards.[515]  Although Guardian did not ultimately source its drywall from BNBM, BNBM made every effort to win its business.[516]

### 3.   BNBM Acquired U.S. Authorization for its Drywall and Manufactured its Drywall to Meet U.S. Standards.

BNBM knew that its drywall had to meet proper U.S. codes and regulations in order for its U.S. sales efforts to be successful.[517]  Accordingly, in October of 2005 (a month prior to its re-entry into the U.S. market), BNBM acquired an authorization to use U.S.-based Underwriters Laboratories ("UL") certifications on its 5/8" Type X drywall.[518]  Also, BNBM manufactured its

---

[512] Chaparro Dep. at 21:19-22:2.

[513] Chaparro Dep. at 29:3-21.

[514] Deposition of Guardian Building Products Distribution, Inc. (John Gunn) dated 7/22/2011 ("Gunn Dep.") [MTD Ex. 218] at 31:9-32:20.

[515] *Id.*

[516] *Id.*

[517] Hannam Dep. at 39:1-40:9 & 42:4-9.

[518] *See* 10/10/2005 Underwriters Laboratories Authorization for BNBM PLC to use "UL" marks on drywall [MTD Ex. 219].  *See also* Davis Dep. at 52:1-7.

121

drywall to: a) meet American Society for Testing and Materials ("ASTM") standards,[519] and b) conform to U.S. drywall size specifications.[520]   Moreover, BNBM's agreements with U.S. customers included a provision that "should the quality or specification be found not in conformity with the stipulation of the UL standards or ASTMC 1396-04 standards … the Buyers shall … have the right to claim for replacement with new commodity, or for compensation."[521]

The fact that BNBM obtained the UL certificate and met ASTM standards specifically attracted EAC and Davis Construction, Florida-based companies, to conduct business with BNBM in 2005.  While researching potential drywall sources online, EAC and Davis Construction chose to purchase from BNBM because it was the only available manufacturer with a UL certification.[522]   BNBM PLC's product was listed on UL's website as having a UL certification.[523]   Further, BNBM represented that it previously sold material to the U.S.[524]   Later, in the course of its business with EAC and Davis Construction, BNBM expressed interest in obtaining a UL certification for their Type C drywall.[525]   BNBM even went so far as to include

───────────────────

[519] *See*, *e.g.*, BNBM 3/3/2006 Export Product Order for drywall to be shipped to U.S. [MTD Ex. 220]; BNBM 4/28/2006 Export Product Order for drywall to be shipped to U.S. [MTD Ex. 221].

[520] Chaparro Dep. at 93:19-23; Davis Dep. at 42:23-43:11.

[521] BNBM's listing of drywall contracts and exports with/to U.S. customers at 2.

[522] Chaparro Dep. at 24:22-25, 25:1-11.

[523] Chaparro Dep. at 25:12-25, 26:1-18.

[524] Chaparro Dep. at 38:3-20.

[525] Davis Dep. at 36:11-22.

language in its contracts with these Florida companies, requiring their assistance in obtaining certifications for other BNBM drywall products.[526]

### 4.   BNBM Provided U.S. Customers with a Material Safety Data Sheet for its Drywall Pursuant to OSHA Standards.

BNBM provided U.S. customers with a Material Safety Data Sheet ("MSDS") for BNBM drywall – pursuant to standards prescribed by OSHA.[527]  BNBM's MSDS for its drywall detailed compliance with various U.S. standards and regulations, including UL, ANSI (American National Standards Institute), U.S. Department of Transportation, OSHA, and numerous U.S. EPA (Environmental Protection Agency) regulations.[528]  In fact, BNBM's MSDS for its drywall was an important consideration for its U.S. customers – such as EAC – a Florida company.[529]

### 5.   BNBM Customized the Labeling for its Drywall to Suit the U.S. Market and Forum States.

To further entice U.S. customers to purchase its drywall, BNBM offered to customize its label (and in fact labeled) the drywall as desired by the customer.[530]  For example, in the case of Davis Construction – a Florida company, BNBM labeled two shipments of drywall (hundreds of thousands of sheets) with "Distributed by Davis Construction U.S.A"[531]  BNBM also

---

[526] Chaparro Dep. at 83:13-84:10.

[527] *See* 2006 BNBM Drywall Material Safety Data Sheet– for drywall manufactured by BNBM [MTD Ex. 222] at 5-7.  *See also* Chaparro Dep. at 59:7-16 & 62:11-17.

[528] *Id*.

[529] Chaparro Dep. at 59:7-16 & 62:11-17.

[530] *See*, *e.g.*, Davis Dep. at 42:3-43:21; Chaparro Dep. at 72:7-22.

[531] *Id*.

123

manufactured and marked its drywall with U.S. product dimensions (*e.g.*, 5/8") as requested by

U.S. customers.[532]  Additionally, BNBM labeled its drywall with certifications that it met

American standards – including a UL certification.[533]  In fact, BNBM's contracts with U.S.

customers included requirements that: a) "All gypsum board products shall be designed and

manufactured in full compliance and in strict accordance with ASTM 1396-04, ASTM 1264-05

and UL Standards";[534] and b) "All products shall be stamped with the appropriate UL

certification and the correct board designation (i.e., 5/8" Type X gypsum board …)."[535]  In

connection with its U.S. drywall sales and shipments, BNBM was willing to customize its

drywall labeling to suit the American customers' needs.[536]

### 6.  BNBM and BNBM Group Arranged Shipping of BNBM Drywall to Florida Ports.

BNBM and BNBM Group arranged for shipping of BNBM drywall to U.S. ports,

including Florida ports.  By way of example, on November 18, 2005, BNBM entered into an

initial agreement with EAC for the sale of 200,000 boards of BNBM drywall to be shipped CIF

---

[532] Chaparro Dep. at 93:19-23; Davis Dep. at 42:23-43:11.

[533] Davis Dep. at 42:23-43:11.

[534] *See* 3/12/2006 Exclusive Purchase & Supply Agreement for drywall to be sold/supplied from BNBM PLC to Davis Construction ("3/12/2006 Exclusive Purchase & Supply Agreement") [MTD Ex. 223] at 2.  *See also* BNBM's listing of drywall contracts and exports with/to U.S. customers at 2.

[535] *Id*.

[536] Davis Dep. at 42:16-19.

to Florida.[537]  BNBM drafted the initial agreement.[538]  The contract price for this drywall was

$2,350,000.[539]  According to EAC, BNBM made all shipping arrangements for the board to be

shipped to the Port of Tampa in Florida.[540] In fact, EAC testified that, pursuant to this November

18, 2005 CIF contract for drywall, "BNBM [did] all the shipping transaction and the delivery

and everything to the point that [EAC] take the material from the ship once it's inside the

port."[541]  Although BNBM assumed the responsibility for this shipment of drywall, unbeknownst

to EAC, BNBM actually used BNBM Group as the export agent to deliver this drywall to

Tampa.[542]

In a strikingly similar drywall sale and shipment arrangement, on November 16, 2005,

BNBM agreed to sell and ship (CFR) 240,000 boards of BNBM drywall to Wood Nation in Port

Manatee, Florida.[543]  The contract price for this drywall was $2,040,541.00.[544]  According to

---

[537] See 11/18/2005 Sales Contract for 200,000 boards of BNBM PLC drywall to EAC [MTD Ex. 224].

[538] Chaparro Dep. at 67:9-23.

[539] Chaparro Dep. at 46:15-48:1. See also 11/18/2005 Sales Contract for 200,000 boards of BNBM PLC drywall to EAC at 2, ¶ 13.

[540] Chaparro Dep. at 43:22-46:19.

[541] Chaparro Dep. at 43:22-44:5.

[542] See BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006" at 2 (stating "BNBM Group as the export agency" for the drywall shipment involving the 11/18/2005 contract with EAC); see also "Statement on the Gypsum Boards Exported to the U.S. by BNBM Group from the End of 2005 to the Beginning of 2006 [MTD 280].

[543] See 1/6/2006 BNBM Invoice to Wood Nation for 240,000 sheets of drywall [MTD Ex. 225] at 21.  See also BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006" at 2.

[544] Id.

125

Wood Nation, BNBM made all shipping arrangements for the board to be shipped to Port Manatee, Florida.[545]  In fact, Richard Hannam testified on behalf of Wood Nation that, "BNBM lined up the ship and the transportation for this drywall shipment to Port Manatee, Florida."[546]  BNBM again used BNBM Group as the export agent to deliver this drywall to Port Manatee.[547]

### 7.   BNBM Entered into an Exclusive Agency Agreement with a Florida Drywall Distributor to Sell BNBM Drywall in the U.S. – Particularly in the Gulf States.

On March 12, 2006, BNBM entered into a written exclusivity agreement with Davis Construction – a Florida corporation – for the sale of BNBM brand drywall in the United States.[548]  However, the discussions between BNBM and Stefan Davis (Owner of Davis Construction) specifically identified drywall sales to include the entire Southeast and Eastern Seaboard of the U.S., and BNBM "certainly knew that [Davis Construction] was based out of Florida."[549]  In fact, Davis "absolutely" spoke with BNBM about the drywall distribution plan involving Florida and other states, including Texas, Louisiana, and Mississippi, among others.[550]

---

[545] Wood Nation Dep. at 63:1-25.

[546] *Id.* at 63:23-25.

[547] *See* BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006" at 2 (stating "BNBM Group as the export agency" for the drywall shipment involving the 11/16/2005 contract with Wood Nation); *see also* "Statement on the Gypsum Boards Exported to the U.S. by BNBM Group from the End of 2005 to the Beginning of 2006.

[548]  *See* 3/12/2006 Exclusive Purchase & Supply Agreement at 5.

[549] Davis Dep. at 37:19-38:6.

[550] Davis Dep. at 38:7-18.

126

The effective dates of the exclusivity agreement between BNBM and Davis Construction were March 12, 2006 through December 31, 2006.[551]  The exclusivity agreement with BNBM required Davis Construction to purchase a minimum amount of drywall during the term of the contract.[552]  A three-page amendment was signed on May 15, 2006.[553]  Two BNBM drywall shipments were made under the Exclusivity Agreement.  The first shipment from BNBM to Davis Construction consisted of more than 250,000 sheets of drywall, and the second shipment consisted of more than 100,000 sheets.[554]  Both shipments were made to Davis Construction in Florida, and the total amount paid to BNBM for these two shipments was approximately $2,000,000.[555]

### 8.   BNBM Knew That its Drywall Was Being Distributed in Florida and the Southeast United States.

Stefan Davis not only "absolutely" spoke with BNBM about its drywall distribution plan involving Florida and other southeastern states, he also wrote to BNBM to confirm that the distribution plan had been effectuated.[556]  In fact, on April 27, 2006, Mr. Davis wrote a letter and emailed same to BNBM Board Chairman WANG Bing – detailing the status and progress

---

[551] 3/12/2006 Exclusive Purchase & Supply Agreement.

[552] *Id.*

[553] *Id.* at pp. 11-13.

[554] *See* 6/3/2009 Letter from Stefan Davis (Davis Construction Supply, LLC) to U.S. CPSC re: drywall imports from the People's Republic of China [MTD Ex. 226].  *See also* Chaparro Dep. at 79:1-80:2.

[555] *Id.*  *See also* BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006" at 2-3.

[556] Davis Dep. at 38:7-18.

127

relative to the geographic distribution of BNBM's drywall which was purchased by Davis Construction.[557]  Mr. Davis' April 27, 2006 letter stated that "[w]e have delivered numerous truckloads to supply houses across the Southeast United States only to find when the packaging was removed that the drywall was split in the middle, thereby causing us to pay twice the transportation cost to replace defective material."[558]  The letter further states that "BNBM material is now being distributed throughout the Southeastern United States and we expect future shipments to be distributed along the Eastern Seaboard of the United States."[559]  Thereafter, neither WANG Bing nor anyone else at BNBM expressed any concern or objection to Davis Construction distributing BNBM's drywall across the Southeastern U.S.[560]

### 9. BNBM Continued to Expand its Drywall Sales in Florida and the Other Gulf States.

BNBM continued its attempts to expand its business in the Florida and Gulf States markets, even while under the terms of the Exclusivity Agreement with Davis Construction.[561] Davis Construction became aware of shipments that BNBM had made to another U.S. customer in Port Manatee, Florida during the term of the BNBM-Davis Exclusivity Agreement.[562]  When Davis Construction confronted BNBM about the shipments, made in violation of their exclusive

---

[557] *See* 4/27/2006 letter from Stefan Davis to WANG Bing – sent via e-mail [MTD Ex. 227].

[558] *Id*. at p. 2.

[559] *Id*. at p. 3.

[560] Davis Dep. at 75:24-76:4.

[561] Davis Dep. at 39:20-42:2.

[562] *Id*.

contract, BNBM was less than forthright, and actually denied what Davis knew to be true.[563]

Additionally, unbeknownst to Davis Construction, BNBM was engaged in shipments to Florida

for other U.S. customers during the time-frame of their Exclusivity Agreement.  For example, on

June 5, 2006, BNBM shipped almost 300,000 sheets of drywall (at a price of $1,778,013.60) to

the Everglades port in Florida for Triorient Trading.[564]

### 10. BNBM Entered into an Agency Agreement with a Florida Company in Order to Obtain Additional UL Certifications on its Drywall.

In addition to the UL certification which BNBM already had on its 5/8" Type X drywall,

BNBM wanted to obtain UL certifications on its other drywall products.[565]   Thus, on April 13,

2006, BNBM signed an agency authorization which designated Davis Construction to be

BNBM's U.S. agent for assistance with obtaining these additional UL certifications.[566]  BNBM

appointed this Florida company to be its agent "with respect to matters regarding UL's

investigation of components, products or systems, Follow-Up Service, and/or other various

matters involved in the relationship between UL and [BNBM PLC]."  Thereafter, Davis

Construction did work as BNBM's U.S. agent in efforts to obtain UL certifications on other

BNBM drywall products.[567]

---

[563] *Id.*

[564] *See* BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006" at 1.

[565] Davis Dep. at 47:3-50:4 & 52:1-7.

[566] *Id.  See also* 4/13/2006 UL Agency Authorization Notification signed by BNBM in favor of Davis Construction [MTD Ex. 228].

[567] Davis Dep. at 51:3-15.

### 11. BNBM Sold and Shipped over 400,000 Sheets of Defective Drywall to Florida, and This Defective Drywall is Still Being Stored in Florida and Alabama.

As of June 15, 2015, over 200,000 sheets of BNBM's defective drywall were being stored in a Davis Construction warehouse in Ocala, Florida.[568]  The inventory includes 139,000 sheets of 5/8" Type X drywall 4 x 12, and 87,000 sheets of 1/2" drywall 4 x 12, totaling 226,000 sheets.[569]  These shipments are the unsold remnants of BNBM's sale and export of its defective drywall to Florida companies Davis Construction and EAC.[570]  The BNBM drywall takes up approximately 85% of a 50,000 square foot warehouse and has done so for eight years.[571]  Additionally, a similar inventory of defective BNBM drywall shipped to Davis Construction by BNBM in 2006 is currently in storage in Mobile, Alabama.[572]

---

[568] Sworn Statement of Stefan Davis dated 6/15/2015 ("Davis Sworn Statement") [MTD Ex. 229] at 4:16-5:23.

[569] *Id.*

[570] Davis Sworn Statement at 10:12-20.  *See also* BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006" at 1-2.

[571] *Id.*; *see also* 6/16/2015 Video of Davis Sworn Statement regarding the 226,000 sheets of BNBM drywall stored in Ocala, Florida [MTD Ex. 230].

[572] *Id.*

130

**12. BNBM Manufactured and Sold Over 68 Million Square Feet / $10,000,000+ of its Drywall to U.S. Customers, and With the Help of BNBM Group, Exported this Drywall to Florida and Other Gulf States.**

In 2006 alone, BNBM PLC manufactured and sold over 68 million square feet – more than $10,000,000 – of its drywall to United States customers in Florida and other Gulf States.[573] In fact, BNBM compiled a spreadsheet and a listing of its gypsum boards exported to the United States,[574] detailing as follows:

| U.S. State Delivery | Date of Contract | Date of Shipment | Quantity (Sq. Ft.) | Name of Customer | U.S. Dollar Amount |
|---|---|---|---|---|---|
| California | 11/1/2005 | 3/1/2006 | 2,826,102 | Great Western | $502,396.62 |
| Florida | 11/16/2005 | 2/1/2006 | 11,552,991 | Wood Nation | $2,040,541.00 |
| Florida | 11/18/2005 | 1/1/2006 | 9,591,782 | EAC&Sons | $2,345,018.00 |
| California | 12/1/2005 | 1/22/2006 | 2,470,821 | BAOAN Intl. | $431,827.20 |
| Florida | 3/12/2006 | 6/15/2006 | 12,373,715 | Davis Const. Supply | $1,127,406.00 |
| Florida | 3/12/2006 | 7/28/2006 | 5,753,329 | Davis Const. Supply | $819,254.00 |
| Florida | 4/1/2006 | 4/21/2006 | 10,353,916 | Triorient Trading | $1,184,832.00 |
| Florida | 5/3/2006 | 6/5/2006 | 14,059,139 | Triorient Trading | $1,778,013.60 |
| **BNBM U.S. Shipments in 2006:** | | | **68,981,795 sq. ft.** | | **$10,229,288.42** |

---

[573] *See* BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006." *See also* BNBM's listing of drywall contracts and exports with/to U.S. customers. NOTE: Square meters have been converted to square feet (1 sq. meter = 10.7639 sq. feet).

[574] *Id.*

131

In 2006 alone, BNBM PLC sold and exported at least eight shipments of drywall to U.S. customers – consisting of 1,435,238 sheets of drywall totaling over $10,000,000.[575]  Of these BNBM drywall sales, six of the shipments (constituting over 1,300,000 sheets of drywall and amounting to more than $9,000,000.00) were exported to ports in Florida.[576]  In fact, currently, a warehouse of BNBM's defective and unsellable drywall is still being stored in the State of Florida.[577]

BNBM Group acted as the exporting agent of BNBM shipments to the United States on at least three occasions.[578]  Specifically, BNBM Group shipped BNBM's drywall from China to four American companies through these three shipments: namely, EAC,[579] Great Western Building Materials,[580] Baoan International Investment Co., Ltd.,[581] and Wood Nation.[582]  BNBM

---

[575] *Id.*

[576] *Id.*

[577] As of June 15, 2015, approximately 230,000 sheets of BNBM drywall were being stored in a Davis Construction warehouse in Ocala, Florida. Davis Sworn Statement at 4:16-5:23.  The inventory includes 139,000 sheets of 5/8" Type X drywall 4 x 12, and 87,000 sheets of 1/2" drywall 4 x 12, totaling 226,000 sheets.  *Id.*  These shipments are the unsold remnants of Davis Construction's drywall import dealings with BNBM.  *Id.* at 10:12-20.  An even larger inventory of drywall shipped to Davis Construction from BNBM is on hand in Mobile, Alabama.  The BNBM drywall takes up approximately 85% of a 50,000 square foot warehouse and has done so for eight years.  *Id.*; Video of Davis Sworn Statement.

[578] ZHAO Dep. at 184:14-16; *see also* "Statement on the Gypsum Boards Exported to the U.S. by BNBM Group from the End of 2005 to the Beginning of 2006."

[579] *See* Export Agency Agreement, dated 11/30/2005 [MTD Ex. 231].

[580] *See* Export Agency Agreement, dated 11/30/2005 [MTD Ex. 232].

[581] *Id.*

[582] *See* Export Agency Agreement, dated 11/16/2005 [MTD Ex. 233].

Group's corporate witness testified that BNBM Group merely acted as a customs agent for BNBM, however, the reality is that BNBM Group and BNBM simply continued the business relationship they enjoyed prior to the reorganization.  In other words, BNBM manufactured the drywall, and BNBM Group ensured distribution of same.

### 13. In 2007, BNBM Registered its Company Trademark for Drywall and Drywall Materials with the U.S. Patent and Trademark Office, and Maintained Same into 2015.

On July 26, 2007, BNBM registered its company trademark "BNBM" with the U.S. Patent and Trademark Office.[583]  Notably, the "goods and services" for which BNBM registered its trademark included, among other products: "drywall joint tape, sound insulation materials, non-metal building materials, namely gypsum …"[584]  The owner/registrant of this "BNBM" trademark has been confirmed as BNBM PLC.[585]  Moreover, BNBM's trademark remained registered with the U.S. Patent and Trademark Office until 2015.[586]

### E.    The CNBM/BNBM Entities Were Directly Involved in the Issues Surrounding Taishan's Sales of Drywall to the United States.

As this Court determined in 2012, Taishan placed its drywall in the stream of commerce in the United States in Florida, Virginia, and Louisiana from 2005-2009 to sell approximately

---

[583] *See* United States Patent and Trademark Office information sheet on "BNBM" trademark – owned/registered by Beijing New Building Materials, Public Limited Company [MTD Ex. 234].

[584] *Id*. at 1.

[585] *Id*. at 2.  *See also* CHEN Dep. at 544:12-19 (BNBM Group stopped manufacturing drywall, and shifted to distribution of products around 1997).

[586] *Id*.

1,825,202 sheets of drywall, with sufficient "purposeful availment" in the wake of the drywall

shortages following Hurricane Katrina.  *See*, *generally*, *Chinese Drywall*, 894 F. Supp. 2d 819.

It is no coincidence that since 2005, CNBM Group, CNBM and BNBM treated Taishan's

business as their own and effectively oversaw operation of the drywall business.  Plaintiffs allege

clearly that CNBM Group, CNBM and BNBM were directly involved in Taishan's drywall

business and "caused" the drywall to be "imported, distributed, delivered, supplied, inspected,

marketed and/or sold."[587]  These allegations are fully borne out by the discovery to date.  As

detailed above, starting in 2005 and continuing through 2008, CNBM Group and CNBM –

through BNBM – controlled: a) the construction of Taishan drywall factories,[588] b) the

production of Taishan drywall,[589] and c) Taishan's export of drywall to the United States.[590]

And, there is even more evidence proving that these defendants were directly involved with the

issues surrounding Taishan's export of drywall to the U.S.

Even prior to the time that CNBM went public in 2006, CNBM was already determining

the future prospects of its "Light Building Materials Section" which included the drywall

businesses of BNBM and Taishan.  On August 19, 2005, CNBM planned the integration of

BNBM and Taishan "to enhance the Company's [CNBM's] operating efficiency,

---

[587] *Amorin v. Taishan Gypsum*, Case No. 11-1395, Rec. Doc. 1, ¶¶ 28-30, 34-35; *Amorin v. Taishan Gypsum*, Case No. 11-1672, Rec. Doc. 1, ¶¶ 28-30, 34-35; *Amorin v. Taishan Gypsum*, Case No. 11-1672, Rec. Doc. 1, ¶¶ 28-30, 34-35; *Abner v. Taishan Gypsum*, Case No. 11-3094, Rec. Doc. 1, ¶¶ 42-45, 48-49; *State of Louisiana v. Knauf Gips KG*, Case No. 10-340, ¶¶ 32-33.

[588] *See* Section II.A.13.c. ("BNBM Controls the Construction of Taishan Drywall Factories.").

[589] *See* Section II.A.13.d. ("BNBM Controls the Production of Taishan Drywall.").

[590] *See* Section II.A.13.e. ("BNBM Controls Taishan's Export of Drywall to the United States.").

competitiveness and profitablility."[591]  As part of the Global Offering on March 31, 2006,

CNBM explained that BNBM's already strong standing in the Chinese drywall market was

enhanced by its acquisition of a 42% interest in Taishan, and included the largest drywall board

production capacity in China.[592]

On August 28, 2006, when BNBM was leveraging the further purchase of 23% interest in

Taishan (making it a controlling interest), CNBM again publicly announced its and CNBM

Group's engagement in the drywall business and Taishan's "daily operations":

> Following BNBM's acquisition of the 42% equity interest of
> Taihe, the Company [CNBM] has become the largest producer of
> gypsum boards in the PRC [People's Republic of China].  The
> acquisition has also enhanced the Company's ability to serve a
> broader base of customers. The directors of the Company believe
> that the Acquisition will enable CNBM Group to further enhance
> its competitiveness and consolidate its leading position in the PRC
> gypsum board market as it will participate more actively in the
> daily operations of Taihe with a view to improving its
> profitability.[593]

Given the interests of CNBM Group in the acquisition of controlling interest in Taishan's daily

operations, "written approval of the Acquisition will be obtained from China National Building

Material Group Corporation, the parent company and a substantial shareholder of the

---

[591] 8/19/2005 Comprehensive Team of CNBM Listing Office [MTD Ex. 235] at
CNBMCO00339345-46.  These plans included the decision by CNBM to use Taishan production
lines to manufacture BNBM brand "Dragon" drywall while using BNBM technologies to
enhance Taishan's "profitability and further reduce its production costs.  *Id*. at CNBM00339346-
47.  Further, while Taishan was seen as a product for the "low-end" market, CNBM considered
labelling the Taishan drywall with BNBM's "Dragon" brand to sell the drywall at a higher price.
*Id.*

[592] Global Offering at 113.

[593] 8/28/2006 Connected Transaction Announcement at Q000010, 12.

Company."[594]  Finally, CNBM made clear that it might likely assume even more control over

Taishan once these transactions are completed: "The Company may consider making further

investments in Taihe upon expiry of the Loan Agreement [underlying the acquisition]."  *Id.*

For each of the following years and as part of its active engagement in Taishan's

business, CNBM declared Taishan's annual drywall production and sales alongside BNBM.[595]

Notably, during this period, CNBM Group, CNBM and BNBM do guide Taishan to greater sales

and profitability (fueled in part by the new sales to the United States market), with CNBM

claiming to grow from "the largest drywall producer in the PRC" in 2006, to "the largest drywall

producer in Asia" by 2008.[596]

CNBM was instrumental in the development of Taishan Gypsum's business, taking an

active role in overseeing its enterprise.  For example, in the disclosure of Connected Transactions

in 2007, through which CNBM sought to gain further control over Taishan Gypsum through

BMBM's acquisition of 30% ownership of a Taishan Gypsum subsidiary ("Taishan Subsidiary"),

CNBM explained that:

> CNBM Group is one of the largest producers of gypsum board in
> the PRC [People's Republic of China].  The acquisition in August
> 2006 of the entire equity interest in Donglian (which in turn holds
> a 23% interest in Taihe ... ) has enhanced CNBM Group's presence
> in the PRC gypsum board market.  During 2006, Taishan
> [Subsidiary] built new production facilities ... and increased its
> production capacity.  The directors of the Company [CNBM]
> believe that Taishan [Subsidiary] Acquisition will allow CNBM
> Group to benefit from the synergy between BNBM and Taishan,

---

[594] *Id.* at Q000012.

[595] 2006 CNBM Annual Report at 14; 2007 CNBM Annual Report at 14; 2008 CNBM Annual Report at 14; 2009 CNBM Annual Report at 16.

[596] *Compare* 2006 CNBM Annual Report at 2 *with* 2008 CNBM Annual Report at 17.

increase its competitiveness and consolidate ints leading position
in the gypsum board market which as a result, will improve the
profitability of CNBM Group.[597]

At the time of this 2007 acquisition, Taishan Gypsum already owned nearly all of the remaining

ownership interest in this Taishan Subsidiary, thus, after BNBM's purchase, Taishan Gypsum

and BNBM jointly owned 97.5% of this Taishan Subsidiary.[598]   CNBM also made clear in this

Connected Transaction disclosure that "Taishan remains a subsidiary of the Company and its

financial accounts has (sic) been consolidated into CNBM Group's financial accounts."[599]

        In the immediate wake of the 2008 financial crisis, and the plunging need for drywall and

other light building supplies, CNBM Group and CNBM solicited reports through BNBM from

Taishan about its production and sales, including the strength of its exports.[600]   Taishan

explained to CNBM Group and CNBM that "[u]nder the influence of many factors, most of the

customers from the U.S., Russia, and the Middle East sharply reduced the volume of their

orders."[601]

        Thereafter, in 2009, Taishan prepared a preliminary report to "Chief CAO" and "Chief

SONG" about the Chinese drywall litigation, and requested their instruction and approval for the

---

[597] 4/13/2007 CNBM Announcement at p. 7.

[598] *Id*. at pp. 3 & 7.

[599] *Id*. at p. 7.

[600] 11/5/2008 emails re: Notice on submitting the information of import and export business
operation and the countermeasures of the enterprises during the financial crisis.

[601] The Operation Situation and Relevant Suggestions on the Import and Export business of
Taishan Gypsum Company Limited at TG-0218947.

approach to the drywall litigation.[602]  In 2010, CNBM convened a meeting (attended by Mr. JIA)

to establish a "gypsum board business planning and development committee," which included

JIA Tongchun (for Taishan) and WANG Bing (for BNBM) as committee directors.[603]  The main

functions of this CNBM committee were to strategically plan CNBM's (*i.e.*, Taishan's and

BNBM's) drywall business:

1. Summarizing up the current layout of gypsum board business;

2. Making plans on the gypsum board business layout for the future three
   years, including the layout of resources and production lines, as well as the
   division of regions between BNBM PLC and Taishan Gypsum; and

3. New projects of gypsum board business need to be first deliberated upon
   by the planning and development committee, and then can be submitted to
   the working meeting of the Co., Ltd.[604]

CNBM again directed Taishan to make a detailed report on its export business, this time a

report of exports to the United States market because of the Chinese drywall litigation.[605]

Importantly, in this report, CNBM is told that its drywall had been shipped directly to Virginia,

Florida (among other ports of destination).[606]  Similarly, CNBM Group required Taishan to make

"Comprehensive Risk Management Report" in 2010, through which CNBM Group would be

apprised of the current and anticipated business risks faced by its drywall producer.[607]  At the

---

[602] 5/11/2009 Informational Report on the Class Actions Brought by the U.S. Parties Against
Taishan Gypsum Company Limited.

[603] 6/11/2010 "CNBM Co. Ltd 2010 6th Working Meeting" at CNBMCO00327384-85.

[604] *Id.*

[605] 6/27/2010 email re: Spreadsheet of TSG Exports and attachments thereto.

[606] Statistics of U.S. Gypsum Boards by Self-managed Export during 2005-2007.

[607] 4/5/2010 Email from BNBM PLC to Taishan Gypsum instructing over CNBM Group's
Comprehensive Risk Management Notice.

same time, CNBM was providing Taishan with a report from its Board of Directors, including a status report of the Chinese drywall litigation.[608]

The Defendants' efforts to become a global drywall distributor include membership and active participation in trade shows.  In fact, at the invitation of U.S. Company Guardian Building Products Distribution, Inc., CNBM and possibly BNBM attended a 2007 U.S. trade show in Las Vegas, hosted by Guardian, and showcased their drywall products.[609]  At the Las Vegas trade show, CNBM and BNBM were afforded the opportunity to meet with Guardian's marketing team with the hope to form a partnership.[610]

In addition to the Guardian trade show, BNBM and CNBM are also members of "Global Gypsum," and international industry group.  Global Gypsum holds annual meetings that are attended by CNBM and its affiliates.  Notably, in 2011 and 2015, the annual conferences were held in U.S. cities and attended by representatives of CNBM and BNBM.[611]  Further, in 2009, 2010 and 2013, BNBM was honored as a recipient of annual awards.[612]  CNBM and BNBM

---

[608] 6/3/2010 email re: Report of the Board of Directors and attachment thereto.

[609] Gunn Dep. at 148:4-149:23.

[610] *Id.* at 153:5-24.

[611] *See* "Global Gypsum Conference and Exhibition-Delegates," *available at*, http://globalgypsum.com/conferences/global-gypsum/delegates (last accessed 6/2/2015) (The 2011 exhibition was held in Las Vegas and attended by CNBM Import & Export representatives. The 2015 exhibition was held in New Orleans and attended by CNBM Technology and CNBM International) [MTD Ex. 236].

[612] *See* "Global Gypsum Awards from the Global Gypsum Conference and Exhibits," *available at*, http://www.globalgypsum.com/awards (last accessed 6/15/2015) [MTD Ex. 237].

actively participate in the market industry of gypsum boards in an effort to build their global brand and image, which includes participation in U.S. trade shows and conferences.

Since 2005 and continuing through today, key personnel from the CNBM Business Group of companies attended numerous road shows in various cities in the United States to tout CNBM Group's businesses and to promote CNBM's stock to investors and banks.  They also travelled to the U.S. for management training, business development, and for the purpose of increasing BNBM's exports.[613]

Under CNBM's and CNBM Group's active stewardship and operation of Taishan's (and BNBM's) drywall business, CNBM could claim by 2014 to be the "Largest gypsum board producer in the world."[614]  This was one of the goals of CNBM and CNBM Group, "to increase the market share and branding influence of the gypsum board of BNBM and Taihe."[615] Ultimately, the attestation by CAO that CNBM and CNBM Group "have nothing more than a thread of financial investments connecting them to companies, like Taishan and TTP, that actually sold drywall in the United States" does not hold water, and should be disregarded by the Court.[616]

## F.   The Defaulted BNBM and CNBM Entities Have Long Been on Notice of the Claims Against Them.

Defendants have been aware of the claims against them since the very early stages of these proceedings.  Despite their actual awareness of the litigation, the BNBM and CNBM

---

[613] *See*, *generally*, Chart of Defendants' Business Visits to the U.S.; SONG Dep. at 57:15-59:8.

[614] 2014 CNBM Group Social Responsibility Report at 6.

[615] SONG Dep. at 57:8-17.

[616] CNBM Brief at 26 (citing Cao Decl. ¶ 17).

Entities elected to disregard service of process made upon them and permit default judgments to be entered. Beginning in 2009, Plaintiffs filed lawsuits against Taishan, its wholly-owned subsidiary TTP, and its parents BNBM, CNBM, BNBM Group, and CNBM Group, seeking damages resulting from defective Chinese Drywall installed in their properties. It is now the law of the case that on <u>May 8, 2009</u>, service of Plaintiffs' complaint in *The Mitchell Co., Inc. v. Knauf Gips KG, et al.*, Case No. 09-4115 (E.D. La.), was executed on Taishan. *See Chinese Drywall*, 894 F. Supp. 2d at 832; Rec. Doc. No. 52. On <u>August 3, 2009</u>, Taishan was served with the complaint in *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687 (E.D. La.). *Id.*; Rec. Doc. No. 1-7 (Case No. 09-6687).

Even before the service of the *Mitchell* and *Germano* complaints, beginning on April 21, 2009, both the BNBM and CNBM Entities were communicating and meeting with their fellow competitor Knauf to discuss their involvement in and concerns over the Chinese Drywall litigation in the United States. As noted above, on <u>May 15, 2009</u>, Knauf wrote to SONG Zhiping, Chairman of the Board of CNBM Group, BNBM Group, and CNBM, stating that "Taishan Gypsum Co., Ltd. and/or BNBM have been named as defendants in more than 90 lawsuits" and expressing concerns about reports of "the relationship among Taishan Gypsum, BNBM and CNBM."[617] Knauf encouraged the BNBM and CNBM Entities to "take effective measures to respond to the U.S. consumer lawsuits ... as soon as possible." *Id*.

Similarly, on <u>May 15, 2009</u>, Mark Norris, Commercial Director for Knauf, shared with WANG Bing, Chairman of BNBM, a Vice President at CNBM, and a regional manager at

---

[617] *See* Knauf Letters at KnaufGIPS0160548 (enclosing list of lawsuits against Taishan and BNBM and "relevant litigation documents").

BNBM Group, their mutual concerns over the Chinese Drywall litigation – "we are both facing more pressures from the U.S. plasterboard incident."[618]  Knauf offered "to share with [BNBM] [its] experiences in dealing with the U.S. lawsuits and media."  "We will make our best efforts to help you take all necessary actions to jointly respond to the crisis in the U.S. and to protect the international image of Chinese enterprises and Chinese-made building material products."  *Id.*

Moreover, on May 11, 2009, Taishan prepared a report to Chief SONG and Chief CAO just three days after Taishan was served in *Mitchell*, seeking instructions from the leaders as to whether Taishan should ignore the complaint, and thus, permit a default judgment to be entered.[619]  Why did these Chinese defendants determine that they would allow a default judgment to be entered in the *Mitchell* case?  Quite simply in their own words, "the most important reason [for not responding to the complaint and allowing a default judgment to be entered] is that there is no judicial treaty signed between China and the U.S. on mutual recognition and enforcement of court judgments, and Taishan Company does not have assets within the continental U.S., even if the lawsuit was lost, the U.S. court cannot enforce Taishan's assets in China."  *Id.* at 4.  Thus, despite their claims of lack of notice and improper service, the BNBM and CNBM Entities were clearly on notice of the claims against them and willfully permitted default judgments to be entered against them.

████████████████████████████████

████████████████████████████████

---

[618] *See* Knauf Letters at KnaufGIPS0160720 (enclosing list of lawsuits against Taishan and BNBM and "relevant litigation documents" and noting that "CNBM also became a target").

[619] *See* 5/11/2009 Informational Report on the Class Actions Brought by U.S. Parties Against Taishan Gypsum Company Limited.



(*i.e.*, Zhucai Chen, Bian Ziqiang & Zheng Tao[620]),

[621] Thus, Defendants were not only aware of and monitoring the litigation against them as early as 2009, but they were also represented by capable American lawyers to devise their legal strategies, including deliberately allowing default judgments to be entered against them.

Further, BNBM's Annual Reports for 2010 through 2014 confirm that "[t]he Company [BNBM] and Taishan [promised their shareholders that they] would continue to attach great importance and keep a close eye on this matter's developments [*i.e.*, the Chinese Drywall proceedings], prudently respond to and deal with this matter on the attitude of being responsible to investors, consumers and the industry."[622]

CNBM certainly shared that awareness of this litigation.  Beginning as early as June 3, 2010, CHANG Zhangli, CNBM's Vice President at the time (currently its Executive Director),

---

[620] TAO Zheng serves many functions. He was BNBM's Assistant General Manager, General Manager of Procurement Department and Board Secretary (2005-2009), BNBM Group's General Manager and Deputy Secretary of the Party Committee and Director (2014 to present), a Non-Executive Director for CNBM (2014-present), and Deputy General Manager and Board Secretary of China Fiberglass Co., Ltd. (2009 - 2014).  *See* CNBM 2014 Annual Report at 89, CNBM web article "Cao Jianglin Visits CNBM Dubai Logistics Center for Investigation," available at http://www.cnbm.com.cn/wwwroot/c_0000000500010002/d_30588.html [MTD Ex. 238].

[621] *See* HL Privilege Log at No. 10, p. 3.

[622] *See* BNBM 2010 Annual Report at 38 & 143; BNBM 2010 Annual Report at 36; BNBM 2011 Annual Report at 39; BNBM 2011 Annual Report at 108; BNBM 2012 Annual Report at 36; BNBM 2013 Annual Report at 35; BNBM 2013 Annual Report at 95 & 96; BNBM 2014 Annual Report at 37.

and Board of Directors Secretary who also happens to be a BNBM Director since 2008, and was BNBM's Deputy General Manager and Secretary to the Board from 2000-2005,[623] ██████

████████████████████████████████████████████████████████

████████████████████[624]

      Further, as discussed in detail above, on June 3, 2010, the BNBM Entities, the CNBM Entities, and Taishan conducted a telephone conference with their Chinese lawyers and Hogan Lovells and determined that they would "adopt the 'limited response to litigation' strategy …," as well as a strategy of "continuing to reject the service of legal process."[625]  Thus, not only were the BNBM and CNBM Entities aware of the litigation, their rejection of legal process was a deliberate strategy employed to frustrate the PSC's litigation efforts.  These Defendants were also well aware of the scope of the litigation against them as reflected by the notes from a second call also conducted on June 3, 2010:

> Abstract II: The statistics from the Supreme Court showed that there are a total of 81 subpoenas that were served, involving 48 enterprises.[626]

Even though the BNBM and CNBM Entities were fully aware of the scope of the litigation against them and the fact that service of process was being attempted under the Hague, they elected to continue rejecting service of process and to permit default judgments to be entered

---

[623] *See* CNBM 2014 Annual Report at 88.

[624] *See* HL Privilege Log at Nos. 11 & 13, p. 3.

[625] *See* Memorandum re: "The Court of Events on Hiring Foreign Law Firms for the Gypsum Board Litigation in the United States—Brief Version of the Related Meetings" ("Course of Events Memo – Brief Version") [MTD Ex. 239] at 3-4.

[626] *See* Course of Events Memo – Brief Version at 5.

against them.  These defaulted Defendants continued to monitor the litigation and did not deviate

from their strategy of ignoring service of process and allowing defaults to be entered.[627]

It is clear from Defendants' documents that they nevertheless were very familiar with the

details of the Chinese Drywall litigation.  BNBM reported that: "A number of homeowners and

construction companies in the US sued BNBM for the reason of problems in gypsum board, and

claimed damages for their acclaimed various losses resulting from gypsum board quality

problem."[628]  And, as promised, BNBM kept a close eye on Taishan's situation:

> Before Taishan Gypsum responded to any legal action, the US
> District Court for the Eastern District of Louisiana had made a
> default judgment against Taishan Gypsum in the sum of
> US$2,609,129.99.  Taishan Gypsum had filed motions to vacate
> the preliminary default judgment, and to dismiss legal action on
> the ground that the US courts did not have personal jurisdiction.
> Currently, the US court has held hearings limited to the above
> motions of Taishan Gypsum.  Up to the present, the US courts
> have not yet made final decision on these motions, nor did made
> effective judgments against Taishan Gypsum, no result yet.[629]

BNBM also publically admitted that it consulted with legal experts and considered

entering this litigation to defend itself.  In its 2012 Annual Report, BNBM announced that the

Company "Engaged a famous American law firm as legal advisor to study and response to the

---

[627] *See* 9/16/2011 "The Explanation Regarding the Product Quality Dispute Litigation in the United States" [MTD Ex. 240] ("Until September 16, 2011, [BNBM and Taishan Gypsum had been served summons in 12 lawsuits. Among them, BNBM was involved in 3 cases, Taishan Gypsum was involved in 9.  BNBM and Taishan Gypsum were not the only defendants in those cases mentioned above, and the plaintiffs did not clarify specific claim amounts in these cases.]").

[628] *See* BNBM 2012 Annual Report at 35; *see also* BNBM 2013 Annual Report at 34-35.

[629] *Id.*

<u>above-said lawsuits.</u>"[630]   Ultimately, though, until very recently (and just as the class damages hearing was about to commence), BNBM strategically stayed out of this litigation, preferring to watch from the sidelines.

Despite its refusal to enter its appearance in these proceedings until very late in the game, *i.e.*, February 2015, BNBM has reported expending significant sums on legal costs related to these lawsuits.  In fact, from 2010 through 2014, BNBM spent over $2.3 million (U.S. dollars) in legal fees, including traveling costs, "to deal with the litigation," and the Company had not even entered its appearance in the MDL.[631]   Taishan spent more than $14.1 million (U.S. dollars) on attorneys during that same period of time.[632]

These Defendants have declared publicly their calculated reasons for sitting on the sidelines of this litigation for so long:  "The [CNBM] Group's major assets and principal commercial activities are all located in China and ... since there is no convention or treaty on mutual recognition and enforcement of judgments between China and US, the respective US and Chinese legal counsels of BNBM and Taishan Gypsum believe that the possibility of the US judgments being enforced in China is very low."[633]

---

[630] *See* BNBM 2012 Annual Report at 32-33.

[631] *See* BNBM 2010 Annual Report at 143 (reporting on US Chinese Drywall litigation and legal fees incurred by the Company "to deal with the litigation"); BNBM 2012 Annual Report at 32-33(reporting on "the sum of attorney fees <u>and traveling costs</u> incurred by the Company") (emphasis added); BNBM 2013 Annual Report at 36 (same) and 190; BNBM 2014 Annual Report at 34 (same) and 164.

[632] *See* Summary Chart of Payments Made by BNBM and Taishan Gypsum for Legal Fees Related to Chinese Drywall Litigation based on Annual Reports [MTD Ex. 241].

[633] *See* 2/13/2015 CNBM Public Announcement; *see also* 3/13/2015 BNBM Announcement [MTD Ex. 242] ("**The major assets of BNBM and Taishan Gypsum are all located in China**. According to the U.S. and Chinese lawyers whom BNBM and Taishan Gypsum have

146

In addition, notwithstanding their nonparticipation in these proceedings, the PSC has made considerable efforts to keep the BNBM and CNBM Entities apprised on the litigation against them, by sending the following documents to the BNBM and CNBM Entities:

- December 15, 2009 - Notice sent notifying the BNBM and CNBM Entities and other Defendants that they have been or will be served with the complaint in *Gross* and instructing Defendants to become familiar with PTOs and directing them to the Court's website in MDL 2047;

- February 10, 2010 - Notice sent to the BNBM and CNBM Entities and other Defendants in *Gross*, including Plaintiffs' Motion to Intervene (Exhibits on CD-ROM);

- March 18, 2010 – Notice sent to the BNBM and CNBM Entities and other Defendants in *Gross*, including Plaintiffs' Motion to Substitute Complaint in Intervention (with Exhibits on CD);

- July 12, 2010 – Notice sent to the BNBM and CNBM Entities and other Defendants in *Gross*, including Plaintiffs' Motion to Intervene, Memo in Support and Proposed Order and Amended Certificate of Service;

- February 25, 2011 – Notice sent to the BNBM and CNBM Entities and other Defendants, including Notice of Entry of Preliminary Default Judgment Pursuant to Order dated 2/1/11 in *Gross*; and

- March 4, 2011 – Notice sent to the BNBM and CNBM Entities and other Defendants, including Notice of Entry of Preliminary Default Judgment Pursuant to Order dated 2/24/11 in *Wiltz*.[634]

---

respectively consulted, there is no convention or treaty on mutual recognition and enforcement of judgments between China and the U.S. such that **the possibility of the US judgments being enforced in China is very low**.") (emphasis added); 8/20/2014 CNBM Voluntary Announcement: Updates on Recent Developments in the Gypsum Board Litigation in the US [MTD Ex. 243].

[634] *See* Additional Efforts to Serve Complaints and Related Pleadings on BNBMG [MTD Ex. 244]; Additional Efforts to Serve Complaints and Related Pleadings on BNBM [MTD Ex. 245]; Additional Efforts to Serve Complaints and Related Pleadings on CNBM [MTD Ex. 246]; Additional Efforts to Serve Complaints and Related Pleadings on CNBM Group [MTD Ex. 247].

Thus, not only have the BNBM and CNBM Entities been independently aware of and monitoring the litigation against them through their Chinese and American lawyers, but the PSC also took steps to keep the BNBM and CNBM Entities informed of the litigation, including the status of default judgments that had been taken against them.  Despite all of this, it was not until February of 2015 that the BNBM and CNBM Entities finally elected to discontinue their practice of ignoring service of process and permitting default judgments to be entered.  Faced with the harsh consequences of their deliberate strategy, the BNBM and CNBM Entities should not be permitted to attack service of process or to argue that they did not have notice of the proceedings against them since the documents produced in this litigation indicate otherwise.

Accordingly, for the reasons set forth above, the BNBM and CNBM Entities challenges to service of process should be rejected by the Court.

III.   **ARGUMENT**

    A.  **THIS COURT MAY ASSERT PERSONAL JURISDICTION OVER THE CNBM AND BNBM ENTITIES BECAUSE THEY ARE ALTER EGOS OF TAISHAN.**

       1.  **The Applicable Standards for Imputation of Alter Ego Liability.**

The Fifth Circuit has long recognized that "a court which has jurisdiction over a corporation has jurisdiction over its alter egos." *Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.,* 757 F.2d 1256, 1265 (5th Cir. 1985); *see also Jackson v. Tanfoglio Giuseppe, S.R.L.,* 615 F.3d 579, 586 (5th Cir. 2010); *Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1159 (5th Cir. 1983). "[F]ederal courts have consistently acknowledged that it is compatible with Due Process... to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." *Jackson,*

148

615 F.3d at 586 (quoting *Patin v. Thoroughbred Power Boats, Inc.,* 294 F.3d 640, 653 (5th Cir. 2002)). "The theory . . . is that, because the two corporations (or the corporation and its individual alter ego) are the same entity, the jurisdictional contacts of one are the jurisdictional contacts of the other for the purposes of the . . . Due Process analysis." *Id.*

It likewise is well-settled law that a subsidiary's contacts may be attributed or imputed to the parent for personal jurisdiction purposes where the subsidiary is the parent's alter ego or general agent. *See Chinese Drywall,* 753 F.3d at 546; *see also Jackson,* 615 F.3d at 586 (recognizing that contacts can be imputed to alter egos for the purpose of specific personal jurisdiction); *Minnesota Mining,* 757 F.2d at 1265 (5th Cir. 1985) (finding that the exercise of personal jurisdiction over a successor corporation with no ties to the forum state was appropriate when the successor corporation was a "mere continuation" of the predecessor corporation and exercise of personal jurisdiction would have been appropriate over the predecessor); *Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1159 (5th Cir. 1983); *Chan v. Soc'y Expeditions, Inc.,* 39 F.3d 1398, 1405–06 (9th Cir. 1994); *Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175, 1177–78 (9th Cir. 1980); *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 422–24 (9th Cir. 1977).

The exercise of *in personam* jurisdiction ultimately derives from a Due Process analysis addressed to fundamental fairness; and the legal doctrine of contact attribution is utterly consistent with that analysis. Where two entities, separate on the surface, choose to operate as one and the same, the forum activities of the one should and must be considered the forum activities of the other. Otherwise, the fundamental accountability which underlies our system for the legal redress of wrongdoing, is made avoidable by elevating form over substance.

149

> [I]f the subsidiary is merely an agent through which the parent
> company conducts business in a particular jurisdiction or its
> separate corporate status is formal only and without any semblance
> of individual identity, then the subsidiary's business will be viewed
> as that of the parent and the latter will be said to be doing business
> in the jurisdiction through the subsidiary for purposes of asserting
> personal jurisdiction.

Wright & Miller, 4A *Federal Practice & Procedure Civil* § 1069.4 (3d ed. 2013). The record

here having established just such an alter-ego/agency relationship between and among Taishan

and CNBM Group, CNBM, BNBM Group, BNBM PLC, CNBM USA, United Suntech, and

CNBMIT, the jurisdictionally-relevant forum contacts of Taishan are attributable to these

entities, and are the basis for denying their instant motions to dismiss.

Notably for present purposes, the jurisdictional attribution of contacts is not limited to

subsidiaries and their immediate parent entity. Courts may "pierc[e] the veil of any related entity

where the facts justify it." *Inter-Tel Techs., Inc. v. Linn Station Properties, LLC,* 360 S.W.3d

152, 166 (Ky. 2012); *see also Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.,* 210

F.3d 18, 29 (1st Cir.2000) (veil-piercing is not limited to the parent corporation but may include

other entities "in the same corporate family"); *United Rubber, Cork, Linoleum and Plastic*

*Workers of Am., AFL–CIO v. Great Am. Indus., Inc.,* 479 F. Supp. 216, 242-45 (S.D.N.Y. 1979)

(piercing veils of parent and grandparent); *In re Moll Industries, Inc.,* 454 B.R. 574, 587 (Bankr.

D. Del. 2011) ("It is not necessary for the [Appellant] to make allegations sufficient to pierce

every layer of the corporate structure between [the subsidiary] and [the grandparent

corporation].").

Adding to the complexity of the alter ego analysis, BNBM recently announced its intent

to acquire 100% of Taishan's available share capital. *See* October 13, 2015 CNBM

Announcement.  Should the acquisition ultimately result in BNBM becoming Taishan's

successor, personal jurisdiction over BNBM will be proper by imputation of Taishan's contacts to BNBM as its successor in interest. *See Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 175 (5th Cir. 1985) (a successor corporation may be held liable for the debts and liabilities of an acquired, predecessor corporation). While the general rule is that the acquiring companies do not assume the liabilities of the companies they purchase, there are four recognized exceptions: "(1) when the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) when the transaction may be considered a de facto merger; (3) when the successor may be considered a "mere continuation" of the predecessor; or (4) when the transaction was fraudulent." *Id.* Where the foundation for an exception is properly demonstrated, courts do not hesitate to attribute the predecessor's acts to the successor company. *See, e.g., Minnesota Mining,* 757 F.2d at 1262 (applying continuation of enterprise theory); *David v. Signal International, L.L.C.*, 2010 WL 4879194, *5 & n.2 (E.D. La. Nov. 23, 2010) (court permitted amended complaint to name successor corporation under the continuation of enterprise theory). With mergers, courts routinely attribute the contacts of the predecessor company to the acquiring company to assert personal jurisdiction upon the successor. *See Cole v. Caterpillar Machinery Corp.,* 562 F. Supp. 179, 180 (M.D. La. 1983) (finding that since the successor could have sued in this state to collect money owed to the predecessor, it would be fair for the successor to expect to answer for its predecessor's liability in this state); *Duris v. Erato Shipping, Inc.,* 684 F.2d 352, 356 (6th Cir. 1982) (reasoning that even where the successor entity had no business contacts in the forum state, where "its constituent corporation . . . clearly has," jurisdiction could be imputed), *aff'd sub nom., Pallas Shipping Agency, Ltd. v. Duris,* 461 U.S. 529 (1983).

Currently, the details of BNBM's acquisition remain contingent, but all of the Defendants are under an ongoing obligation to supplement discovery, especially as to the circumstances of

this significant event.  The PSC reserves the right to supplement this response and prove BNBM

subject to imputation of Taishan's contacts as its successor, should the issue become ripe.[635]

At the threshold of the alter-ego analysis, which is necessitated by Defendants' motions,

lie several legal issues for this Court to address namely: (a) which law applies, (b) the level of

scrutiny required in attributing contacts for jurisdictional purposes, (c) the weight to which

corporate formalities are entitled, and (d) whether the analysis is to be performed with the benefit

of hindsight.  Each of these threshold matters are addressed in the following:

> **a.  Imputing Taishan's Contacts to the Defendants Should Be
> Analyzed Under the Forum State's Laws, Not Chinese Law,
> Because the Defendants Agree that No Conflict Exists.**

The BNBM Entities and, by adoption, the CNBM Entities, rely on the  opinion of Donald

Clark, a professor of law at George Washington University Law School, for the proposition that

Chinese veil-piercing law should apply in deciding the question of *in personam* jurisdiction

before the Court, pursuant to which they argue that their corporate formalities would (and

---

[635]The significance of this reservation of rights is left to be decided, and it is not the PSC's intention to burden the Court with the task of exploring the matter at this time.  Of course, when the matter becomes ripe, we will attend to it with the Court and appropriate counsel.  This reservation therefore should suffice as a meet-and-confer in advance of any effort on the PSC's part to seek a declaratory judgment or other appropriate relief regarding BNBM's successor liability.  As the facts of this case have demonstrated, the Defendants' litigation strategy has been orchestrated from the highest levels of CNBM Group, which unanimously voted 11-0 on July 11, 2014, to direct Taishan not to appear at the July 17, 2014 Judgment Debtor Hearing.  The PSC is concerned that just as Taishan absented itself from the litigation, BNBM (and possibly others), who was involved in the decision to have Taishan not appear at the Judgment Debtor Hearing, may adopt the same strategy.  To avoid such an ill-considered consequence and to protect the interests and rights of the Plaintiffs, who have suffered for years with the calamity of the Defendants' defective products, an appropriate measure of security may need to be imposed.  It behooves BNBM to address this issue <u>NOW</u>.

should) be observed.  Interestingly, if Chinese law were to apply, the pertinent provision in the

2005 Company Law, Art. 20(3), states that

> Where shareholders of a corporation abuse the corporate
> independent status or the limited liability of shareholders for the
> purpose of escaping the debts, and seriously injures the interests of
> the creditors of the corporation, such shareholders shall be jointly
> and severally liable for the debts of the corporation.[636]

As the language indicates, this article addresses liability, not jurisdiction, but, more than this, is

law which provides little practical guidance.  Indeed, it has been characterized as purposefully

vague.  *See* Chao Xi, *Piercing the Corporate Veil in China:  How Did We Get There?*, 2011 J.

Bus. L. 413, 414 (2011).  At the same time, when the article of Chinese law has been interpreted,

legal scholars have concluded that it effectively states the U.S. common law doctrine of

corporate veil-piercing.  *See Piercing the Corporate Veil*, 2011 J. Bus. L. at 424; Shuangge Wen,

*The Ideals and Reality of a Legal Transplant – The Veil-Piercing Doctrine in China*, 50 Stan. J.

Int'l L. 319, 321 (2014).   As these sources, and Professor Clark recognize, the Supreme People's

Court of China has yet to issue any definitive ruling on the meaning and effect of Article 20(3).

*See Protecting the State, supra* at 19 n.27 ("To date, only one of such Guiding Cases has

involved corporate governance matters, "Guiding Case No. 10" ...  a corporate resolution

revocation dispute.").

     Lacking specific guidance in China's own jurisprudence, there nonetheless are any

number of factors which would appear to be relevant to a veil-piercing analysis under Article

20(3).  *See* Affid. Of Liu Junhai ¶56 ("The list of factors considered by Chinese courts is non-

exhaustive and parties may argue that any factor relating to whether a single-shareholder limited

---

[636] *See* Affidavit of Prof. Dr. Liu Junhai dated 5/4/2012, [MTD Ex. 248] at ¶49.

liability corporation's property has been kept "independent" is relevant.").  This suggests a

"totality of circumstances" analysis not unlike that required under U.S. law (as discussed *infra*).

      Also important to consider is the influence of Chinese politics and culture in any attempt

to construe Chinese law on the subject of alter-ego.  The Chinese culture's imposition of top-

down corporate structure and authority, has persuaded some scholars to conclude that ignoring

the corporate form is in fact to be <u>expected</u> in China.  *E.g., Piercing the Corporate Veil*, 2011 J.

Bus. L. at 426 (noting SASAC's opposition to veil piercing law derived from fear of liability

because "the line between the SOEs and their subsidiaries is often, at best, blurred and, in many

cases, virtually non-existent.").  Indeed, Chinese legal scholars recognize that:

> . . . in practice the relationship between the SOEs and their
> subsidiaries is often messy without clear separation of personnel,
> finance, or business activities . . .it would open the floodgates to
> piercing claims against many SOEs. The end result of the political
> bargaining was that the current veil-piercing law fails to define any
> specific standards and remains unclear as to its application.

*Id*. at 773.  For that reason, Chinese legal scholars have noted the "[E]vidence shows that courts

in China have been carefully circumventing the use of veil-piercing for State-owned assets" and

as a result, SOEs have been "insulated" from veil-piercing claims in China.  *We are the (National)*

*Champions*, 50 Stan. J. Int'l L. at 342 and *Piercing the Corporate Veil*, 2011 J. Bus. L. at 773.

      In the final analysis, however, the threshold choice-of-law question is an academic one.

Each of the moving Defendants acknowledges that there is no meaningful difference in outcome

here, whether the Court applies Chinese or applicable U.S. state law.  *See* BNBM Group's Brf.

At 23 ("The result is the same if the law of Florida, Louisiana, or Virginia is applied."); BNBM's

Brf. at 60 ("Even if this Court were to apply the law of the forum states, there is still no basis to

impute Taishan's forum contacts to BNBM PLC as an alter ego."); CNBM Entities Brf. at  43

n.37 & n.44 ("Nor, based on the factual record, would an alter ego relationship exist under the forum states' laws . . .." & "Under both Chinese and U.S. law, exercising controlling shareholder rights falls far short of demonstrating that a subsidiary is so totally subsumed by a shareholder that they should be treated as a single entity.").

As this Court well knows, this very same "false conflict" has been acknowledged previously in these proceedings.  Taishan conceded in its jurisdictional challenge that no difference in outcome derives from the application of Chinese or U.S. forum law, in regard to the jurisdictional imputation of contacts.  On this basis, the Fifth Circuit declined to find an actual conflict of law and therefore applied forum law in addressing Taishan's jurisdictional challenge:

> TG faults the district court for applying the forum state's law (Florida law) instead of Chinese law to the question of whether to impute TTP's Florida contacts to TG. TG concedes, however, that "Chinese law is not materially different on this issue from Florida law, and the outcome should be the same under either law." Accordingly, we need not choose because "if the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 839 n. 20 (1985). Therefore, we apply Florida Law.

*Chinese Drywall,* 753 F.3d at 529.

Given the lack of an authoritative interpretation of the applicable Chinese law, and corresponding acknowledgment by Defendants that there is no real conflict between Chinese and

the applicable domestic law, this Court should now apply the laws of the forum states which govern the claims at issue.

### b.  Establishing Alter-Ego for the Imputation of Contacts for Personal Jurisdiction Is a Less Stringent Test than Establishing Alter-Ego for Liability.

Defendants erroneously conflate the requirements for establishing alter ego for *jurisdictional* imputation of contacts with the corporate veil-piercing test used to establish *liability* over a parent entity.[637]  It now is the law of this case, however, that "the alter ego test for attribution of contacts, *i.e.,* personal jurisdiction, is *less stringent* than that for liability." *Chinese Drywall,* 753 F.3d at 546 (quoting *Stuart v. Spademan,* 772 F.2d 1185, 1198 n.12 (5th Cir. 1985)) ("It should be noted that the alter ego test for attribution of contacts, *i.e.*, personal jurisdiction, is less stringent than that for liability.").  S*ee also Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981).  The imputation of contacts to determine *in personam* jurisdiction over a parent entity requires a showing that the parent's subsidiary was, in reality, a shell for the parent entity at the time of the subsidiary's contacts with the forum; it does not require a showing that a shell of corporate formality was used to deprive claimants of legal redress, which is the pertinent inquiry where recovery from, not jurisdiction over, the parent is at issue.  *Id.* (finding the lower court's application of the strict alter ego test used for liability determinations erroneous in determining whether contacts should be imputed to exercise jurisdiction).  Hence, the jurisdictional thrust of the alter-ego analysis makes the manipulation of corporate form to the prejudice of plaintiffs a sufficient, but not necessary, element of plaintiffs' proof.  "[F]or jurisdiction to exist, there need not be both the existence of a mere shell corporation and fraud.

---

[637] *See* BNBM Brf. at 60-62; BNBM Group Brf. at 17-19; CNBM Entities' Brf. at 40-44.

Rather, either factor, a shell corporation or fraud, is sufficient by itself to justify jurisdiction." *Stuart,* 772 F.2d at 1198 n.12 (citation omitted).

This distinction is more than theoretical in the matter at hand.  The case law relied on by Defendants consists of decisions that applied the alter-ego test to impose tort liability on a company for the actions of its subsidiary or other related entity.  Defendants likewise frame their arguments in terms of whether or not the Court should find that corporate form has been abused and therefore pierce the corporate veil.[638]  But as this Court previously has observed in these proceedings, this is not the proper juncture to determine the whether a defendant-parent entity's corporate veil should be pierced, as that question is one which relates to tort liability and not *in personam* jurisdiction.  *See Chinese Drywall*, 894 F. Supp. 2d at 867 ("Piercing the corporate veil is not necessary for imputing contacts of one affiliated corporation to another for purposes of *personal jurisdiction,* but rather is the test conducted for imposing *liability* as between related corporations.").

### c.  In Making Alter Ego Determinations Courts Must Look to the Realities of Corporate Governance Rather than Form.

By suggesting that the abuse of corporate form is not currently at issue, however, the PSC does not mean to suggest that corporate form is irrelevant.  Understandably, Defendants emphasize the formalities of separate corporate governance as between parent and subsidiary entities.  But, whether making alter ego determinations for jurisdictional purposes or for liability purposes, a court must discern reality, not mere appearance or form. The driving inquiry is "how the corporation operated." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan,* 447 F.3d 411, 416 (5th Cir. 2006) (*Bridas II*) (quoting *United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686, 693 (5th

---

[638] *See* BNBM Brf. at 60-62; BNBM Group Brf. at 17-19; CNBM Entities' Brf. at 40-44.

Cir. 1985) (internal quotations omitted)) (reversing the lower court's decision where its "error lay in elevating form over substance of the relationship as it pertained to the transaction with [the plaintiff]"). The presumption of corporate separateness enjoyed by entities must give way to clear evidence demonstrating "something beyond the mere existence of a corporate relationship" between the two entities. *See Freudensprung v. Offshore Tech. Servs., Inc.,* 379 F.3d 327, 346 (5th Cir. 2004) (quoting *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999) (internal quotations omitted)). *See also Tang Energy Group, Ltd. v. Catic USA, Inc.*, Case No. 01-14-0001-4150, Final Award at 25 (Int'l Centre for Dispute Resolution Dec. 21, 2015) (International Arbitration Tribunal determined that the defendant Chinese SOE "used related entities in the form of its subsidiaries and their subsidiaries to pursue its interests in renewable energy for the benefit of itself and those entities" such that it would be "unjust"  not to treat them as "one entity" or "alter egos").[639]

　　　In nonetheless seeming to advocate to the Court that corporate form trumps all, the BNBM Entities and the CNBM Entities by incorporation contend that the formal separation of corporate entities, *ab initio* prevents imputation of a subsidiary's contacts to a parent, so long as the separation is "not pure fiction."[640]  It is a position that lacks authoritative support, as evidenced by the fact that the Defendants place undue weight on the United States Supreme Court's holding in *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925). This 90-year old case simply does not warrant Defendants' reliance, cannot stand the test of time

---

[639] *See* MTD Ex. 249.

[640] *See* BNBM Brf. at 60 (citing *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335-37 (1925)).

and dramatic changes in commerce, and, correspondingly, in the jurisprudence dealing with *in personam* jurisdiction, the *Cannon* decision now is seen as dated, at best, and no longer authoritative.[641]

In any event, as noted in the Court's earlier decision addressing jurisdiction over Taishan, "[n]umerous courts have . . . read *Cannon* as permitting, in certain circumstances, based on the relationship of affiliated corporations, imputation of one corporation's forum contacts to another for personal jurisdiction purposes." *Chinese Drywall,* 894 F. Supp. 2d at 867-68. This opinion was twice affirmed by the Fifth Circuit.

Further impacting on this Court's evaluation of the alter ego or single business enterprise status as between the CNBM Entities, the BNBM Entities, and Taishan, lies the fact that these are not ordinary domestic companies whose corporate governance principles are dictated by American standards. All of the moving Defendants, either directly or by incorporation, go to great lengths to suggest that this Court's jurisdictional veil piercing analysis is a "business as usual" affair. To reinforce their argument, BNBM retained two experts who never considered looking behind the Chinese curtain when evaluating whether the corporate veil could be pierced. They retained Bruce Deal, an economist who prepared a statistical evaluation of overlapping directorates of United States companies; and Jeffrey N. Gordon, a Professor of corporate law at Columbia Law School, who used Mr. Deal's analysis to opine on the similarities that the BNBM Entities and their subsidiaries seemingly share with United States corporations. Both experts

---

[641] BNBM also overstates the significance of a dozen-year-old statistical analysis of the Fifth Circuit's application of *Cannon* made in *Piercing the Veil to Assert Personal Jurisdiction over Corporate Affiliates: An Empirical Study of the Cannon Doctrine*, 84 B.U. L. Rev. 445, 472-73 (2004). As the above authority reflects, the cases and analysis performed by the author 12 years ago have been overtaken by time and circumstances. Moreover, under the circumstances and the facts of this case, *Cannon* is inapposite. *See Chinese Drywall,* 894 F. Supp. 2d at 867-68.

presented unverified, hearsay statements which are inadmissible evidence in these

proceedings.[642]

Mr. Deal, who candidly admits that he is not an expert on Chinese corporate structure, has

no idea whether a parent corporation in China can dictate and direct the activities of a subsidiary

company.[643]  Far from focusing on the realities of corporate governance in China, Mr. Deal's report

only analyzes the S&P 1500 companies and their subsidiaries in the United States to determine if

such companies compete in the same industry, and whether they share overlapping directorates.[644]

Mr. Deal concedes that his report does not even touch upon the difference between overlapping

leadership of U.S. Corporations as compared to those of the Chinese defendants, although he holds

out that he could by inference only.[645]   Unquestionably, he did not analyze any State Owned

Enterprises, like those that exist in China.[646]

Professor Gordon, who is not an expert on Chinese corporate law,[647] nevertheless

attempted to compare the relationships between the BNBM Entities and Taishan against the

traditional corporate structure understood here in the United States.   Employing Mr. Deal's

---

[642] As unverified documents that fail to satisfy 28 U.S.C. § 1746, neither expert's declaration is competent or admissible evidence.  *See, e.g., Cooper v. McDermott Int'l, Inc.,* 62 F.3d 395, *5 (5th Cir. 1995) (Defendants' evidence must be "properly contained in affidavits" (or other admissible evidence), not mere allegations).  For this and other reasons, the PSC will separately file a motion to exclude or strike these so-called expert declarations.

[643] *See* Deposition of Bruce Deal dated 12/17/2015 ("Deal Dep.") [MTD Ex. 263] at 55, 68-69.

[644] *See* 10/20/2015 Declaration and Expert Report of Bruce Deal, BNBM Ex. 11 at 2.

[645] *See* Deal Dep. at 120.

[646] *Id.* at 190.

[647] *See* Deposition of Jeffrey N. Gordon dated 1/15/2016) ("Gordon Dep.") [MTD Ex. 264] at 41.

misdirected analyses as his foundation, he concluded that veil-piercing is not in order because he perceived that obedience to corporate formalities was being observed by the BNBM Entities and Taishan.  Based on "customary legal standards governing U.S. firms," Mr. Gordon opined in his unverified Declaration that the BNBM Entities were not in such positions of dominance and control as to be the alter ego of Taishan.[648]  When deposed, however, he "frankly, did not think were [sic,] relevant" the fact that the defendants include a Chinese SOE, *i.e.,* CNBM Group, and that all of the Defendants are governed by Chinese law, or under the influence of the Chinese Communist Party, when making his comparison to American legal norms.[649]  However, he readily acknowledged that differences exist between the operation of Chinese SOEs and American legal norms, but he is not an expert in the field to make an expert's analysis on the subject.[650]  Numerous Chinese legal scholars have criticized and cautioned against Professor Gordon's approach in comparing Chinese listed companies against global (U.S.) corporate governance standards and legal institutions because it may show what the Chinese system lacks, but this analysis will *not* demonstrate how it is constructed and actually functions. *See Political Logic*, 47 Cornell Int'l L.J. at 634;[651] *We are the (National) Champions*,  65 Stan.L.Rev. at 701.

Thus, a fundamental oversight is instantly apparent from the BNBM Entities' expert reports:  they ignore that the Defendant companies are from the People's Republic of China -- a communist country.  As such, while these companies may appear on the surface to have corporate

---

[648] *See* 10/22/2015 Declaration of Professor Jeffrey N. Gordon, BNBM Ex. 12 at 5, ¶15.

[649] Gordon Dep. at 503.

[650] *Id*. at 503-505.

[651] Gordon Dep., Exb. 7 [MTD Ex. 264].

governance similar to what one would expect in the United States, what lurks beneath the surface is quite different.[652]  To address this gap in the defendants' logic, Plaintiffs retained Professor Curtis J. Milhaupt, the Director of the Parker School of Foreign and Comparative Law at Columbia Law School.[653]  Professor Milhaupt has extensive experience teaching in China and Hong Kong, researching the best practices in Chinese corporate governance of mixed-ownership enterprises, and has written extensively on the subject of Chinese SOEs and Chinese State capitalism.[654] Because the BNBM Entities overlook the underlying political, legal and institutional circumstances attendant to Chinese state owned enterprises (SOEs) under the supervision of the State-owned Asset and Supervision Commission ("SASAC"),[655] Professor Milhaupt exposes the defendants' position as being half-baked.[656]

Based on his expertise, Professor Milhaupt opines that to fully appreciate the governance structure of CNBM Group and its subsidiaries "it is necessary to examine the complex architecture of Chinese SOE business groups under SASAC supervision and the *non-corporate* systems in which these groups operate."[657]  Because of the influence of the Chinese Communist Party, "[c]ertain corporate governance norms and practices in a Chinese SOE business group differ

---

[652] *See* fn 9, *supra.*

[653] *See* Milhaupt Decl., *supra*.

[654] *Id*. at ¶6-8, and Curriculum Vitae (Exhibit A Milhaupt Declaration).

[655] *Id. at* ¶12.

[656] Professor Milhaupt also recognizes that CNBM Group's shares "are owned ostensibly on behalf of the Chinese people, by SASAC."  *Id.* ¶13.  This fact is pertinent to the present motion but also relevant to the pending matter regarding CNBM Group's FSIA defense.

[657] *Id*. at ¶18.

162

significantly from U.S. corporate governance norms and practices."[658] He continues, "these differences are highly relevant in considering questions of corporate separateness among the defendant corporations named in the above-referenced litigation."[659]

Professor Milhaupt concludes:

> Accordingly, in assessing whether the CNBM Business Group entities named as defendants in this litigation should be considered a single business entity, it would be a mistake… to look only at those outward aspects of CNBM Business Group's corporate attributes that are familiar to U.S. legal practitioners, on the assumption that those attributes convey a complete picture of the CNBM Business Group's actual governance practices and intra-group relations. The unique, non-corporate features of Chinese SOE governance must be considered as well. Considering these features, there is evidence in the record to support a finding that the CNBM Business Group is a single business entity.[660]

Plaintiffs submit that this Court's evaluation of the exaggerated testimony of the defendants' witnesses, and the arguments of the defendants, are easily outweighed by the admissible evidence presented by the Plaintiffs.  The Court's decision should be informed and guided by the reality that significant corporate governance differences exist between the United States and China, which, given the proofs presented, amply justify a finding of alter ego or single business enterprise.

---

[658] *Id.* at ¶11.

[659] *Id.*

[660] *Id.* at ¶39.

### d. Factors Indicative of Control are Assessed at the Time of the Alleged Injury, but Evidence of Such Control May Extend to the Present Date.

The BNBM Entities contend that the only relevant time to examine whether the parent companies exercised dominion and control over Taishan for purposes of imputing Taishan's contacts with the relevant forum states would be at the time of Taishan's drywall sales to the United States.[661]  They especially dismiss any consideration of their directorial role in Taishan's failure to appear at the July 17, 2014 Judgment Debtor hearing, or other subsequent indicia of the ability to control Taishan, which might reflect on their control at the time.  BNBM Brf. at 47.  For this proposition, they rely upon *Flourine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849 (5th Cir. 2004) and *United States v. Wallace*, 961 F. Supp. 969 (N.D. Tex. 1996).  Without doubt *Flourine* and *Wallace* recognize that the time of the alleged tortious conduct is the relevant focus for the determination of control for imputation purposes.  But to make that assessment from an evidentiary standpoint, courts in the Fifth Circuit will look to any and all relevant evidence of the capacity to exert control, whether it was before, during or after the time the acts complained of took place.  *Compare Flourine*, 380 F.3d at 861 n.15 (citing *Wallace,* 961 F. Supp. at 979 & *Craig v. Johns-Manville Corp*. 1987 WL 10191 (E.D. Pa. Mar. 31, 1988) (Scirica, J.)) *with Minnesota Mining*, 757 F.2d at 1264 ("Post-tort activity, when conducted to strip the corporation of its assets in anticipation of impending legal liability, may be considered in making the

---

[661] The CNBM Entities only address the time period to consider contacts for purposes of the Court's minimum contacts analysis, *citing Steele v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987).  CNBM Brf. at 33.  They neglect altogether the imputation of contacts under the alter ego doctrine.

determination whether to disregard the corporate entity.") (citations omitted). *See also* Fed.R.Evid. 402.

In the seminal *Craig* case, a third-party asbestos plaintiff ("LAQ") asserted liability against its insurer ("Charter") for the acts of its subsidiary ("Cape"). Like the Defendants in the present case, Cape "adopted the strategy of not appearing to defend" itself in many asbestos cases because it believed no default judgment entered against it could be enforced in England, its state of incorporation. *Craig,* 1987 WL 10191 at *1. LAQ therefore sued Charter contending that because Charter owned 67.3% of Cape's stock and dominated and controlled Cape, it was liable as Cape's alter ego. In the course of evaluating whether to pierce the corporate veil between the two companies, then-District Court Judge Scirica concluded that "evidence probative of the relationship between Charter and Cape *at any time* is relevant." *Id.* at *13 (emphasis added). The court reasoned:

> Charter here seeks to limit inquiry to the time period between 1965, when Charter became a Cape shareholder, and 1972, when original plaintiff Clarence Craig was exposed to asbestos fiber.
>
> I agree with the court in *Lee v. Carey-Canada* that such a limitation '[m]ischaracterizes the 'acts complained of'.' . . . In this action the acts complained of are not those related to asbestos exposure, but those defeating a plaintiff's litigation remedy by corporate decisions, policies and practices which insulate Cape from any liability whatsoever. 'Events that depict the control of the parent over the subsidiary may be shown even though they occurred before or after the transactions in question' because such actions may 'cast light on the nature and extent of control . . . experienced at the time' of the transaction. *Verreries de l'hermitage v. Hickory Furniture*, 704 F.2d 140, 142, (4th Cir 1983). *See also Parker v. Bell Asbestos Mines.,* 607 F.Supp. at 1404 n.5 (rejecting 'Charter's contention that post-tort . . . activities may not constitute the basis for piercing the corporate veil).

*Id.* at *12 (emphasis added).

Further, because of the multifactorial analysis applicable to whether the level of control between and among the Defendants is sufficient for the imputation of jurisdictional contacts, *Freudensprung,* 379 F.3d at 346, it stands to reason that the analysis must take into account facts and circumstances existing over the entire period between the alleged harm's occurrence and the time the analysis is conducted.  *See Bridas II*, 447 F.3d at  419-20.   In reversing a lower court's determination, *Bridas II* concluded that an alter ego relationship was established where, **after** the alleged wrongful act the Government (1) manipulated an undercapitalized Government-owned subsidiary company to repudiate contract, (2) paid arbitration costs, (3) diverted corporation's revenues into state oil and gas fund, and (3) changed law to prevent seizure of corporation's assets after arbitration process began. *Id*. The court reasoned that "[d]espite some indicia of separateness, the reality was that" after the alleged wrongful act, "the Government then exercised its power as a parent entity to deprive [the plaintiff] of a . . . remedy."  *Id*. at 420.  *See also Minnesota Mining, supra; Morgan v. Burks*, 611 P.2d 751, 755 (Wash. 1980) (holding that post-tort activities may be considered in making alter ego determinations).

The consideration of facts existing *ex ante* in such matters is consistent with the aim of the jurisdictional analysis. The pertinent focus is not on the transfer of liability between corporations based on wrongdoing, but rather on the reality of a single, operating enterprise, as to which it is fair to exercise jurisdiction over the related entities based on the forum contacts of only one.  The other imperative for considering jurisdictional contacts continuing past the particular conduct giving rise to plaintiffs' claims, is that the analysis must embrace not merely

the <u>exercise</u>, but also the <u>capacity</u>, of a parent entity to exert control over a subsidiary.[662]  The

mere exercise invites an artificial snapshot of reality; the added focus on capacity allows proper

discernment of substance and reality over form.

> ### 2.  In Connection with the *Amorin* (Louisiana), *Gross* and *Wiltz* Complaints, the CNBM and BNBM Entities and Taishan Are Alter Egos of One Another Under Louisiana Law.

> #### a.  <u>Louisiana Law on Imputation of Alter Ego Liability.</u>

In the Fifth Circuit, "[w]here federal jurisdiction is based on diversity of citizenship, this

Court applies the applicable state law to determine whether contacts should be imputed to a

parent company due to an alter-ego or agency relationship."  *See Admin. of Tulane Educ. Fund v.*

*Ipsen, S.A.*, 450 Fed. App'x. 326, 330 n.5 (5th Cir. 2011). The Court has held that "an alter ego

analysis in Louisiana diversity cases should be performed under factors enunciated under

Louisiana law." *Id*. Thus, as the MDL court overseeing an action originally filed in Louisiana

under CAFA, the Court must apply the substantive state law of Louisiana and the federal law of

its own circuit, the Fifth Circuit.[663]

BNBM contends that the applicable test in Louisiana is the traditional veil-piercing

analysis, inasmuch as "Louisiana's highest court continues to adhere to [it]" rather than the

---

[662] *See* December 8, 2015 Hearing Transcript at 12, *supra*.

[663] As the transferee court in this MDL proceeding, this Court follows a prescribed analysis attending the choice of law for actions subject to transfer here. For diversity actions originally filed in another jurisdiction, the state law of the transferor jurisdiction in which the case was originally filed applies.  *See Van Dusen v. Barrak*, 376 US 612 (1964); *see also Chinese Drywall*, 894 F. Supp. 2d at 836-37. The transferee court, however, applies the federal law of the Circuit Court in which the transferee court resides.  *Id.*  As this Court recognized earlier in this litigation: "It appears to be reasonably well established, given the plethora of cases on the point, that in actions in which a federal court would be guided or governed by state law, the transferee court is bound to apply the law that the transferor court would follow. . . . in cases involving federal questions, the transferee court follows the interpretation of federal law that has been

single business enterprise (hereinafter "SBE") test articulated by the Louisiana First Circuit

Court of Appeal in *Green, supra.*  BNBM, for example, cites *Morales v. Bayou Concessions

Salvage, Inc.,* 2004 WL 2381525 (E.D. La. 2004), in support of the application of a traditional

veil-piercing test rather than the more expansive SBE test articulated in *Green*.

The flaw in BNBM's position is its overly-restrictive reading of Louisiana law. Entirely

ignored by Defendant, for example, is the holding in *Southern Capitol Enterprises, Inc. v.

Conseco Servs., L.L.C.,* 476 F. Supp. 2d 589, 594 (M.D. La. 2007), a case which this *Court ha*s

relied on in its Class Certification Findings of Fact and Conclusions of Law ("Class Cert

FOFCOL"), and one it has cited to apply the *Green* factors to the question whether Taishan,

TTP, BNBM, BNBM Group, CNBM, and CNBM Group were a single business enterprise."  *In

re Chinese-Manufactured Drywall Prods. Liab. Litig,* 2014 WL 4809520, at *8 (E.D. La. Sept.

26, 2014) (Class Cert FOFCOL).  That these FOFCOL may be subject to challenge in the event

Defendants set defaults aside on jurisdictional grounds, does not diminish the reasoning of the

Court in its decision to cite the *Green* test as authoritative.[664]

In *Southern Capitol Enterprises*, in fact, the defendant argued, as BNBM and BNBM

Group do here, that in *Morales* the Louisiana Supreme Court decided not to embrace the SBE

---

established by its own court of appeals."  *In re Chinese-Manufactured Drywall Prods. Liab.
Litig.*, 767 F. Supp. 2d 649, 656 n.2 (E.D. La. 2011) (citations omitted).

[664] *See* BNBM Brf. at 69; *see also* BNBM Group Brf. at 17. The CNBM and BNBM Entities argue
that Taishan's Rule 36 Requests for Admission that were deemed admitted by virtue of Taishan's
failure to respond, cannot be imputed to them. Citing *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th
Cir. 1997), Defendants argue that deemed admissions by one adverse party cannot be used against
another adverse, co-party. Their arguments, however, are without merit. The cases relied on by
Defendants in their motions are readily distinguishable in that all involved unrelated co-
defendants. Here, however, all co-defendants at issue share an identity of interest, and in such
situations, courts have held that admissions by one may bind its co-defendants.  *See U.S. ex rel.
Small Bus. Ass'n v. Chang*, 2006 WL 757823, at *4 (D.N.J. Mar. 20, 2006); *see also In re Leonetti*,

168

analysis of *Green*. *Southern Capitol Enterprises, Inc.*, 476 F. Supp. 2d at 594. The district court easily rejected this argument on the ground that "all five circuits of the Louisiana appellate court have adopted the SBE theory." *Id.* at 594-95 (citing *Mangano Consultants, Inc. v. Bob Dean Enters. Inc.,* 921 So. 2d 1081 (La. App. 5 Cir. 2006), *writ denied,* 927 So. 2d 295, 2006 WL 1307952; *Dishon v. Ponthie,* 918 So. 2d 1132 (La. App. 3 Cir. 2005), *writ denied,* 927 So. 2d 317, 2006 WL 1308842; *Miller v. Entergy Servs., Inc.,* 913 So. 2d 143 (La. App. 4 Cir. 2005); *Town of Haynesville, Inc. v. Entergy Corp.,* 840 So. 2d 597 (La. App. 2 Cir. 2003), *writ denied,* 845 So. 2d 1090; *Green, supra*). Moreover, "[b]oth the eastern and western federal district courts in Louisiana have addressed and/or applied the SBE theory." *Southern Capitol*, 476 F. Supp. 2d at 595.[665] *See also Chinese* Drywall, 2014 WL 4809520, at *8 (Class Cert FOFCOL). Finally, the district court noted that "the Fifth Circuit has also applied the SBE theory under Louisiana law." *Southern Capitol Enterprises, Inc.*, 476 F. Supp. 2d at 595 (citing *Rive v. Briggs of Cancun, Inc.,* 2003 WL 22838542 (5th Cir. 2003)(applying Louisiana Law). Accordingly,

---

28 B.R. 1003, 1009 (E.D. Pa. 1983). *The CNBM* and BNBM entities are not simply Taishan's co-defendants. Rather, they are *affiliates* and *alter egos* to Taishan. In fact, this Court has explicitly made findings of fact concerning the interrelatedness of the CNBM and BNBM Entities with Taishan, and even found that they constitute a single business enterprise. *See Chinese Drywall*, 2014 WL 4809520, at ¶¶ 28-47. Moreover, the Defendants' arguments invite the Court to render conflicting judicial determinations: Taishan has been *conclusively determined* to be the alter ego of the CNBM and BNBM Entities, yet the latter ask the Court now to disregard Taishan's admissions and find that this is not so. The Court should reject Defendants' arguments.

[665] The court cited *Freeman Decorating Co. v. Encuentro Las Americas Trade Corp*., 2005 WL 2060997 (E.D. La. Aug. 24, 2005); *Iron Workers Local 58 v. Citizens Bank*, 2002 WL 31427329 (E.D. La. Oct. 25, 2002); *Hesni v. Williams & Boshea, L.L.C*., 2002 WL 373273 (E.D. La. Mar. 7, 2002); *Videocipher v. Satellite Earth Stations SESE, Inc*., 1992 WL 208037 (W.D. La. Jul. 30, 1992).

there is both ample and persuasive authority for this Court to agree that "the SBE theory is a viable legal theory under Louisiana Law." *Id*. at 595.

In Louisiana, corporations are generally recognized as distinct legal entities. *Riggins v. Dixie Shoring Co., Inc.,* 590 So. 2d 1164, 1167 (La. 1991). However, the legal fiction of a distinct corporate entity may be disregarded when a corporation is so organized and controlled as to make it merely an instrumentality of another corporation. *Green.* 577 So. 2d at 257. When corporations have the same interest at stake, courts are free to disregard their separate corporate identity. *Id; see also Brown v. Benton Creostoting Co.,* 147 So. 2d 89, 94 (La. App. 2 Cir. 1962).

When a company is "so organized and controlled" to become an instrumentality of another, Louisiana law reflects a clear policy of maintaining accountability to the judicial system. It allows for the attribution of jurisdictional contacts under either an alter ego theory (vis-à-vis SBE) or an agency theory. *Chinese Drywall,* 753 F.3d at 546 (citing *Admins. of Tulane,* 450 Fed. App'x. at 330–33). Moreover, it should be noted that SBE theory differs from traditional veil-piercing in two significant respects. *See Bona Fide Demolition & Recovery, LLC v. Crosby Const. Co. of Louisiana,* 690 F. Supp. 2d 435, 443-44 (E.D. La. 2010). First, when jurisdiction is at issue, traditional veil piercing operates vertically to impute a corporation's contacts to its shareholders and/or to parent entities. *Id*. (citing *Patin,* 294 F.3d at 653). But, while some Louisiana courts may use traditional veil-piercing in a horizontal manner to fuse two affiliated corporations,[666] the SBE theory is consistently applied to fuse, both vertically and

---

[666] *See*, *e.g., Miller,* 913 So. at 148 (citing *Green,* 577 So. 2d 249, 257), *writ denied,* 580 So. 2d 668 (La. 1991); *see also F.G. Bruschweiler (Antiques) Ltd. v. GBA Great British Antiques, LLC,* 860 So. 2d 644, 651 (La. App. 5 Cir. 2003).

170

horizontally, all affiliated and unaffiliated corporations.[667]   Second, the Louisiana legal analysis

utilized in traditional veil-piercing cases encompasses four or five primary factors, and an

overview of the "totality of the circumstances."   *See Riggins,* 590 So. 2d at 1168 (considering

commingling of funds, adherence to corporate formalities, under-capitalization, failure to

provide separate bank accounts, and holding of regular shareholder meetings). The SBE theory,

on the other hand, uses an <u>eighteen</u>-factor test, in which no single factor is dispositive, and the

list is non-exhaustive, before inviting a final consideration of the "totality of the circumstances."

*See Green*, 577 So. 2d at 251–53.

This illustrative, non-exhaustive list of factors used to determine whether, under the

totality of the circumstances, one or more entities constitute a "single business enterprise," is as

follows:

> (1)  corporations with identity or substantial identity of ownership,
> that is, ownership of sufficient stock to give actual working
> control; (2) common directors or officers; (3) unified
> administrative control of corporations whose business functions
> are similar or supplementary; (4) directors and officers of one
> corporation act independently in the interest of that corporation;
> (5) corporation financing another corporation; (6) inadequate
> capitalization ("thin incorporation"); (7) corporation causing the
> incorporation of another affiliated corporation; (8) corporation
> paying the salaries and other expenses or losses of another
> corporation; (9) receiving no business other than that given to it by
> its affiliated corporations; (10) corporation using the property of
> another corporation as its own; (11) noncompliance with corporate
> formalities; (12) common employees; (13) services rendered by the
> employees of one corporation on behalf of another corporation;
> (14) common offices; (15) centralized accounting; (16)
> undocumented transfers of funds between corporations; (17)
> unclear allocation of profits and losses between corporations; and

---

[667] *See*, *e.g.*, *Grayson v. R.B. Ammon & Assocs., Inc.,* 778 So.2d 1 (La. App. 1 Cir. 2000), *writ denied*, 782 So. 2d 1026 (La. 2001) & 782 So. 2d 1027 (La. 2001); *Holly & Smith Architects, Inc. v. St. Helena Congregate Facility,* 872 So. 2d 1147, 1156 (La. App. 1 Cir. 2004).

(18) excessive fragmentation of a single enterprise into separate
corporations.

*Chinese Drywall,* 894 F. Supp. 2d at 894-95 (citing *Green,* 577 So. 2d at 257–58; *Hollowell v.*

*Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 385-89 (5th Cir. 2000)).

### b.  Imputation of Contacts Under Louisiana Law Is Proper.

*Applying* these factors and the SBE analysis to the facts of record confirms this Court's

Class Cert. FOFCOL ruling that the CNBM and BNBM Entities constitute a "single business

enterprise" inclusive of Taishan.  *See Chinese Drywall,* 2014 WL 4809520, at *9.  On this basis,

the jurisdictional contacts and activities of Taishan are imputable to these Defendants and the

Court's exercise of personal jurisdiction over them is proper.  *See Jackson*, 615 F.3d at 586;

*Chinese Drywall,* 894 F. Supp. at 894-95.  CNBM Group totally dominated its subsidiaries.

During the time that Taishan was selling drywall to the United States, it had CNBM instruct

BNBM to acquire Taishan just so CNBM Group could control Taishan's daily operations.[668]  In

addition, CNBM's control through cascading management assured CNBM Group's control.

Through this practice, CNBM Group imposed policies and directives, and other top-down

requirements on its subsidiaries, including Taishan.[669]  This "cascading" structure (more fully

discussed, *supra*) is what has enabled CNBM Group to so organize and control its subsidiaries

that they functioned either as an instrumentality or a single business enterprise, *i.e.,* as entities

---

[668] *See* 8/28/2006 Connected Transaction Announcement at Q000010; 4/13/2007 CNBM
Announcement at 6-8.

[669] *See* Statement of Facts, Section II.A.2, *supra*.

with a comprehensive and unified business purpose, each subsidiary controlled by CNBM Group.

As noted above, among other attributes, CNBM Group was the controlling shareholder, both directly and indirectly, of the share capital in BNBM Group, CNBM, BNBM and Taishan;[670] it directly or indirectly appointed Board of Director members and/or Executive Officers for each of its subsidiaries;[671] and it issued and implemented "group-wide" policies and procedures to all of its subsidiaries that were mandatorily followed.[672]  Clearly evidencing CNBM Group's total control over Taishan was its comprehensive unified strategy over all of the litigation activities involving its subsidiaries, from the limited response approach to the litigation, to the directive to Chairman JIA to appear before the CNBM Group Board of Directors to account for Taishan's activities in the United States, to its command to Taishan to contemptuously ignore this Court's directive to appear at the July 17, 2014 Judgment Debtor hearing, and on.  Flexing its muscles now, as it did then, demonstrates that CNBM Group had then and still has today the ultimate capacity to control the operations of Taishan.  After all, Taishan is not independent.[673]

---

[670] *See* Statement of Facts, Section II.A.1, *supra*.

[671] Evidence of this can be seen by looking at the number of interlocking and overlapping Executives and Officers of CNBM Group, BNBM Group, CNBM, BNBM, and Taishan, *See* Statement of Facts, Section II.A.2.a. *supra.  See also* Summary Chart of Overlapping Executives and Officers.

[672]*See* Statement of Facts, Section II.A.2.b-c, *supra*.

[673] *See* fn. 17, *supra.*

173

Ultimately, these enumerated facts, along with all the others discussed in our Statement of Facts, confirm that the CNBM Entities, BNBM Entities, and Taishan function as a single business enterprise, which justifies imputing Taishan's contacts to all the moving Defendants.

### 3.   In Connection with the *Amorin* (Florida) Complaint, the CNBM and BNBM Entities and Taishan are Alter Egos of One Another Under Florida Law.

#### a.   Florida's Law on Imputation of Alter Ego Liability.

Florida's long-arm statute recognizes that an agent's contacts with Florida can be imputed to its principal for jurisdictional purposes: "A person, whether or not a citizen or resident of this state, who personally *or through an agent* does any of the acts enumerated in this subsection thereby submits ... to the jurisdiction of the courts of this state." Fla. Stat. Ann. § 48.193(1)(a) (emphasis added); *see also Dev. Corp. of Palm Beach v. WBC Constr., LLC,* 925 So.2d 1156, 1161 (Fla. Dist. Ct. App. 2006) ("While a parent corporation is not subject to jurisdiction in Florida solely because its subsidiary does business here, the control of a parent over a subsidiary may permit the conclusion that the subsidiary is acting as the agent of the parent, thus subjecting the parent to jurisdiction under section 48.193(1) and supporting 'minimum contacts.' " (internal citations omitted)).

An actual agency relationship is established under Florida law when the following conditions exist: "(1) acknowledgement by the principal that the agent will act for it, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *State v. Am. Tobacco Co.*, 707 So. 2d 851, 854 (Fla. Dist. Ct. App. 1998).  "The issue of control is critical to the determination of agency."  *Id.*  Thus, for a parent entity to be liable for its subsidiary's acts under Florida agency theory, the parent "must exercise control to the extent the subsidiary manifests no separate corporate interests of its own and functions solely to achieve the

174

purposes of the dominant corporation." *Enic, PLC v. F.F. S. & Co.,* 870 So. 2d 888, 891 (Fla.

Dist. Ct. App. 2004).   As the Fifth Circuit observed in *Chinese Drywall*, under Florida law

imputation is proper if:

> [T]he subsidiary is merely an agent through which the parent company
> conducts business in a particular jurisdiction or its separate corporate
> status is formal only and without any semblance of individual identity,
> then the subsidiary's business will be viewed as that of the parent and the
> latter will be said to be doing business in the jurisdiction through the
> subsidiary for purposes of asserting personal jurisdiction.

*Chinese Drywall,* 753 F.3d at 530 (citations omitted).

The touchstone for any Florida agency analysis is control.   "[P]roof of control by the

parent over the internal business operations and affairs of the subsidiary is required to fuse the

two for jurisdictional purposes." *Chinese Drywall,* 894 F. Supp. 2d at 868 (quoting

*Brownsberger v. Gexa Energy, LP,* 2011 WL 197464, at *3 (S.D. Fla. Jan. 20, 2011)).   The

extent of the parent entity's exercise of control over the subsidiary must be a greater degree than

would normally be associated with ownership and directorship. *Id.*   Florida courts have

articulated this level of control as that which demonstrates that the subsidiary "functions solely to

achieve the purpose of the dominant corporation," or can be said to be a "mere instrumentality"

of the parent.   *Id.* (quoting *Estate of Miller v. Toyota Motor Corp.,* 2008 WL 4525058, at *5

(M.D. Fla. Oct. 6, 2008); *Knights Armament Co. v. Optical Sys. Tech., Inc.,* 2008 WL 2157108,

at *6 (M.D. Fla. May 21, 2008) (internal quotations omitted)).[674]

---

[674] The Fifth Circuit separately determined that the imputation of jurisdictional contacts between
an agent and principle would under Florida law comport with Federal Due Process requirements
under a specific-jurisdiction analysis. *Chinese Drywall,* 753 F.3d at 529-530.  Addressing the
Supreme Court's concerns in *Daimler AG v. Bauman*, the Fifth Circuit concluded that "a parent
corporation could purposefully avail itself of a forum by directing its agents or distributors to
take action there." *Id.* (quoting *Daimler, AG,* 134 S. Ct. 746,759 n.13 (2014) (internal quotations
omitted)).

### b.  **Imputation of Contacts Under Florida Law Is Proper.**

Applying the foregoing analysis to the facts set forth above, the CNBM and BNBM

Entities, at all relevant times, controlled or had the absolute right of control over Taishan.

Taishan was so dominated by these companies that Taishan's actions may be imputed to its

controlling parent companies through agency principles.

At the time Taishan was selling drywall to the United States, BNBM controlled Taishan's

Board of Directors through stock ownership and overlapping officers and directors to the point

that Taishan became an instrumentality of BNBM.[675]  BNBM controlled Taishan's ability to

construct plants, and its production of drywall.[676]  It specifically controlled Taishan's export of

drywall to the United States by having it change its business registration to include export of

drywall.[677]  And, as noted above, BNBM's directives cascaded down upon it from above, *i.e.,*

from CNBM and CNBM Group.  These entities boldly acknowledged that Taishan is not

independent, and that the company was acquired for the purpose of being subject to CNBM

---

[675] CNBM Group, BNBM Group, CNBM, BNBM, and Taishan share numerous common officers and directors, and in many instances, individuals simultaneously wear multiple hats on various boards and committees and in countless management roles. This overlap during the pertinent time period (2005-present) renders impossible any sort of independence or autonomy among the CNBM and BNBM Entities, and Taishan, particularly with respect to voting on issues such as the provision of (1) loans; (2) guarantees; (3) financing; etc.  *See* Statement of Facts, Section II.A.13., *supra.*

[676] *See* Statement of Facts, Section II.A.13.c. and d., *supra.*

[677] *See* Statement of Facts, Section II.A.13.e., *supra.*

Group's complete and total control.[678]  This capacity to control was recently demonstrated by the parent companies ability to acquire 100% of Taishan's shares.[679]

This evidence proves that the CNBM and BNBM Entities acknowledged that Taishan would act for them, and that Taishan accepted the undertaking, and further that the CNBM and BNBM Entities controlled every aspect of Taishan's actions.  Thus, the Defendants may collectively be treated as alter egos of one another for jurisdictional purposes.

### 4.  In Connection with the *Amorin* (Virginia) Complaint, the CNBM and BNBM Entities and Taishan are Alter Egos of One Another Under Virginia Law.

#### a.  Virginia's Law on Imputation of Alter Ego Liability.

Under Virginia Law, a court may "impute the behavior of an instate subsidiary to an out-of-state parent corporation if the plaintiff proves that the defendant operates in state through an agent." *PBM Products v. Mead Johnson Nutrition Co.,* No. 3:09-CV-269, 2009 WL 3175665, at *3-4 (E.D. Va. Sept. 29, 2009) (*citing* Va. Code Ann. § 8.01–328.1(A)).   Thus, for the court to exercise *in personam* jurisdiction over a defendant parent corporation, the plaintiff must show (1) that the subsidiary's activities in Virginia are sufficient to confer jurisdiction and (2) that the relationship between the parent and its subsidiary is such that the subsidiary's actions can be imputed to the parent.  *Id.*  Put differently, a court may exert personal jurisdiction over a parent corporation where the subsidiary acts as either an agent or alter ego of the parent.  *Long v. Chevron Corp.*, No. 4:11CV47, 2011 WL 3903066, at *7 (E.D. Va. Sept. 2, 2011); *see also Schmitt-Doss v. Am. Regent, Inc.,* No. 6:12-CV-00040, 2012 WL 6474038, at *7 (W.D. Va. Dec.

---

[678] *See* Statement of Facts, Section II.A., *supra*.

[679] *See* Statement of Facts, Section II.A.1.d., *supra.*

13, 2012) (noting that the second requirement is satisfied by a showing that the parent uses the subsidiary as an alter ego or that the subsidiary is the implied agent of the parent); *LTD Mgmt. Co., LLC v. Holiday Hosp. Franchising, Inc.*, No. CIV.A. 2:07CV530, 2008 WL 7281926, at *6 (E.D. Va. Mar. 11, 2008) (holding that plaintiffs' jurisdictional allegations as to parent company based imputation of subsidiary's contact were sufficient where greater than normal degree of control existed, despite parent's following "all necessary corporate formalities.").

### i.  Virginia Agency Law.

Virginia courts define "agency" as "a fiduciary relationship resulting from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to act."  *Reistroffer v. Person,* 439 S.E.2d 376, 378 (Va. 1994).  The determining factor when evaluating whether an agency relationship exists is the principal's power of control.  *First Am. Title Ins. Co. v. First All. Title, Inc.,* 718 F. Supp. 2d 669, 678-79 (E.D. Va. 2010), *aff'd on other grounds sub nom. First Am. Title Ins. Co. v. W. Sur. Co.,* 491 F. App'x 371 (4th Cir. 2012).  "***Actual control, however, is not the test; it is the right to control which is determinative***."  *Id.* (emphasis added) (internal citations omitted).  The relevant question is **not** "whether the party exercises control over the agent, but ***whether he has it***." *Id.* (emphasis added). An agency relationship "may be inferred from the conduct of the parties and from the surrounding facts and circumstances." *Acordia of Virginia Ins. Agency, Inc. v. Genito Glenn, L.P.*, 560 S.E.2d 246, 249-50 (Va. 2002) (internal citations omitted).

### ii.  Virginia Alter-Ego Law.

In determining whether a parent and subsidiary are alter egos of one another for the

purposes of imputing jurisdictional contacts, "courts look at factors such as whether the corporations maintain the necessary formalities, have separate books, have separate officers, directors, and employees, separately manage their own day to day affairs, and the degree of control exercised by the parent over the subsidiary." *Long v. Chevron Corp.*, No. 4:11CV47, 2011 WL 3903066, at *7 (E.D. Va. Sept. 2, 2011); *William v. AES Corp.,* 28 F. Supp. 3d 553, 562 (E.D. Va. 2014) (Alter ego liability may attach "where there is such unity between a corporation and an individual that the separateness of the corporation has ceased."); *Wu v. Tseng,* No. 2:06cv346, 2007 WL 201087 (E.D. Va. Jan. 24, 2007) ("The alter ego doctrine states that, when the corporation is deemed an instrumentality or business conduit of another corporation or person, the corporate form may be disregarded."); *Saudi v. Northrop Grumman Corp.,* 427 F.3d 271, 274 (4th Cir. 2005)(where a significant degree of control over the subsidiary is proven alter ego may be established). *Accord PBM Products v. Mead Johnson Nutrition Co.,* No. 3:09-CV-269, 2009 WL 3175665, at *3-4 (E.D. Va. Sept. 29, 2009) ("[A] court can assert jurisdiction over a parent corporation if the plaintiff's evidence demonstrates that the subsidiary is a fictitious shield erected by the parent to protect itself from liability.").

In *LTD Mgmt. Co., supra,* although the Court found that the parent and subsidiary were clearly not alter egos of one another, it also found sufficient that plaintiffs' allegations that the defendant parent company "exercised control over its subsidiaries' specific decision" were "at the heart of the Plaintiffs' Complaint." *Id.,* 2008 WL 7281926, at *6.  The court further determined that the plaintiff "may be capable of proving that [the defendant parent company] exerted a greater than normal degree of control over this particular decision and that [the subsidiaries] acted as mere agents[.]" *Id.*   The court therefore denied the defendants' motion to dismiss.

179

### b.  **Imputation of Contacts Is Proper Under Virginia Law.**

To avoid burdening the Court by repeating factual arguments made previously, we adopt

the analyses made regarding both Florida and Louisiana law set forth above.  Suffice it to say,

application of the foregoing law to these facts establishes that Taishan, at all relevant times, was

operating as an alter ego and/or agent of the BNBM and CNBM Entities.

### 5.  **Imputation of Contacts Is Proper Under the Other Relevant Forum States' Laws.**

To the extent that Plaintiffs in states other than Florida, Louisiana and Virginia are at

issue, the alter-ego law of these states can be condensed and summarized as follows.  In general,

the twenty-five (25) additional states at issue,[680] apply a three-part test to determine whether

imputation of a subsidiary's contacts to its parent entity under an alter-ego theory, in which a

plaintiff must demonstrate 1) control by one corporation of another, which is 2) used in a way

that results in fraud or injustice; and which 3) is the proximate cause of plaintiff's alleged injury.

*See Flores v. Bodden*, 488 F. App'x 770, 776 (5th Cir. 2012); *see also Hill v. Fairfield Nursing &*

*Rehab. Ctr., LLC*, 134 So. 3d 396, 408 (Ala. 2013); *All Custom Exteriors, Inc. v. Bilyea*, No. 1

CA-CV 10-0702, 2011 WL 5964528, at *4 (Ariz. Ct. App. Nov. 29, 2011); *Sonora Diamond*

*Corp. v. Superior Court,* 99 Cal. Rptr. 2d 824, 836 (Cal. Ct. App. 2000); *Naples v. Keystone*

*Bldg. & Dev. Corp.*, 990 A.2d 326, 339 (Conn. 2010); *United States v. Emor*, 850 F. Supp. 2d

176, 206 (D.D.C. 2012); *Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296, 300-01 (Ga. 2005);

---

[680]Based upon a census of the applicable complaints, Plaintiffs in the following states asserted
claims in connection with the defective Chinese-manufactured Drywall at issue in this litigation:
(1) Alabama; (2) Arizona; (3) California; (4) Connecticut; (5) District of Columbia; (6) Georgia;
(7) Iowa; (8) Illinois; (9) Kentucky; (10) Massachusetts; (11) Maryland; (12) Minnesota; (13)
Missouri; (14) Mississippi; (15) North Carolina; (16) New Jersey; (17) Nevada; (18) New York;
(19) Ohio; (20) Pennsylvania; (21) South Carolina; (22) Tennessee; (23) Texas; (24)
Washington; and (25) Wisconsin.

*Benson v. Richardson*, 537 N.W.2d 748, 761 (Iowa 1995);  *Miner v. Fashion Enterprises, Inc.,*
794 N.E.2d 902, 911 (Ill. Ct. App. 2003); *Inter-Tel Techs., Inc. v. Linn Station Properties, LLC*,
360 S.W.3d 152, 165 (Ky. 2012);  *Lothrop v. N. Am. Air Charter, Inc.*, 95 F. Supp. 3d 90, 100
(D. Mass. 2015); *DeWitt v. Sealtex Co.*, No. 273387, 2008 WL 2312668, at *13 (Mich. Ct. App.
June 5, 2008); *Barton v. Moore*, 558 N.W.2d 746, 749 (Minn. 1997); *Canadian Nat. Ry. Co. v.
Waltman*, 94 So. 3d 1111, 1115 (Miss. 2012); *Mobius Mgmt. Sys., Inc. v. W. Physician Search,
L.L.C.*, 175 S.W.3d 186, 188 (Mo. Ct. App. 2005); *Clark v. B.H. Holland Co.*, 852 F. Supp.
1268, 1276 (E.D. N.C. 1994); *Watson v. Sunrise Sr. Living Servs., Inc.*, No. CIV.A. 10-230 KM,
2013 WL 103966, at *13 (D. N.J. Jan. 8, 2013); *JSA, LLC v. Golden Gaming, Inc.*, No. 58074,
2013 WL 5437333, at *5 (Nev. Sept. 25, 2013); *S. New England Tel. Co. v. Glob. NAPs Inc.*,
624 F.3d 123, 138 (2d Cir. 2010); *Microsys Computing, Inc. v. Dynamic Data Sys., LLC,* No.
4:05 CV 2205, 2006 WL 2225821, at *5 (N.D. Ohio Aug. 2, 2006); *Fletcher-Harlee Corp. v.
Szymanski*, 936 A.2d 87, 96 (Pa. Super. Ct. 2007); *Mid-S. Mgt. Co. Inc. v. Sherwood Dev. Corp.*,
649 S.E.2d 135, 140 (S.C. Ct. App. 2007); *Boles v. Nat'l Dev. Co.*, 175 S.W.3d 226, 244 (Tenn.
Ct. App. 2005); *Exxon Mobil Corp. v. Freeman Holdings of Washington, LLC*, 779 F. Supp. 2d
1171, 1178 (E.D. Wash. 2011); *Rasmussen v. Gen. Motors Corp.,* 803 N.W.2d 623, 641 (Wis.
2011).

As demonstrated above, under any and all of the applicable laws, the complete
domination and control of Taishan by its parent companies renders them all alter egos of one
another, and therefore subject to attribution of Taishan's contacts with the various forum states.
*See* Statement of Facts, *supra* (discussing facts supporting imputation of contacts under an alter
ego theory).

181

## B.  THE BNBM ENTITIES ARE SUBJECT TO PERSONAL JURISDICTION IN FLORIDA.

In the event that alter ego attribution of Taishan's contacts can not be ascribed to all the CNBM and BNBM Entities, BNBM and BNBM Group also argue in the alternative that the Court lacks personal jurisdiction over them, as they have no minimum contacts with the forum states.[681] These arguments are without merit, as ample evidence exists demonstrating that BNBM Group and BNBM purposely sold their drywall products, BNBM's defective Dragon board, with the expectation they would be delivered in Florida.[682]  Each has requisite minimum contacts with Florida, and potentially the other forum states, sufficient to satisfy Due Process.

Whether or not a forum state may exercise specific jurisdiction over a nonresident defendant is an inquiry that focuses on the relationship among the defendant, the forum, and the litigation. *See Chinese Drywall*, 753 F.3d at 529.  It is well-settled that: "A federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2)

---

[681] *See* BNBM Brf. at 70-84; BNBM Group Brf. at 14-17.  The CNBM Entities recognize that Plaintiffs have alleged their involvement for having "imported, distributed, delivered, supplied, inspected, marketed and/or sold" drywall, s*ee, e.g., Amorin v. Taishan Gypsum*, (Florida), Complaint at ¶28-30, but deny that they have any contact with Plaintiffs sufficient to warrant the imposition of personal jurisdiction over them in any jurisdiction.  *See* CNBM Brf. at 23-36. Plaintiffs submit that jurisdiction over the CNBM Entities is proper in this litigation given their alter ego relationships with the BNBM Entities and Taishan.  Although both CNBM USA and United Suntech concede that general jurisdiction exists as to their activities in California, CNBM Brf. at 25, challenges regarding their susceptibility to litigation will be addressed in connection with *Abner v. Taishan Gypsum Co., Ltd.*, No. 11-3094 (E.D. La.), a matter that was filed in the Central District of California and transferred to the MDL.

[682] Personal jurisdiction may be established on a *prima facie* standard based upon allegations in a complaint, *Ruston Gas*, 9 F.3d at 418 n.3, or on a preponderance of the evidence standard where an evidentiary hearing is conducted.  *See Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F3d 235, 241-42 (5th Cir. 2008); *Chinese Drywall*, 753 F.3d at 529.

exercise of such jurisdiction by the forum state is consistent with Due Process under the United States Constitution." *Chinese Drywall*, 753 F.3d at 534.  *See also Ainsworth v. Moffett Eng. Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013); *Paz v. Brush Engineered Materials, Inc*., 445 F.3d 809, 812 (5th Cir. 2006); *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc*. 9 F.3d 415, 418 (5th Cir. 1993).

The first prong of this two-prong jurisdictional analysis asks "whether the long-arm statute of the forum state confers personal jurisdiction over the defendant." *Chinese Drywall*, 753 F.3d at 535.[683]  Once a showing has been made that the forum state's long-arm statute has been satisfied, "for specific jurisdiction to be proper, Due Process requires (1) minimum contacts by the defendant purposefully directed at the forum state, (2) a nexus between the defendant's contacts and the plaintiff's claims, and (3) that the exercise of jurisdiction over the defendant be fair and reasonable." *Chinese Drywall*, 753 F.3d at 539-40 (citing *ITL Int'l, Inc. v. Constenla, S.A.,* 669 F.3d 493, 498 (5th Cir.2012)).

In sum, to satisfy Due Process, the defendant's connection with the forum state must be such that it "should reasonably anticipate being haled into court" in the forum state. *See World-*

---

[683] To the extent that the forum states of Virginia or Louisiana are implicated, those states' long-arm statutes are co-extensive with the Due Process Clause, which permits the Court to focus its analysis solely on the second-prong addressing the constitutional requirements of the Due Process Clause.  *See Chinese Drywall*, 753 F.3d at 547; *Dickson Marine Inc. v. Panalpina, Inc.,* 179 F.3d 331, 336 (5th Cir. 1999) ("Louisiana's long-arm statute extends to the limits of Due Process…."). *See also Chinese Drywall*, 742 F.3d at 586 ("Because the scope of Virginia's long-arm statute is coextensive with the Due Process Clause, we proceed directly to the constitutional analysis.").

*Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980); *Chinese Drywall*, 753 F.3d at 540.

### 1. The Court has Personal Jurisdiction Over BNBM Group and BNBM Under Florida's Long-Arm Statute.

Florida's long-arm statute applies to the *Amorin* (Florida) complaint, as it was originally filed in the federal district court there and was later transferred into this MDL.  In *Chinese Drywall*, the Fifth Circuit considered the Florida long-arm statute and determined that some courts interpreting the statute have found that it may confer less jurisdiction than allowed by Due Process, by requiring "more activities or contacts to sustain personal jurisdiction than demanded by the constitution." *Chinese Drywall*, 753 F.3d at 535 (quoting *Am. Investors Life Ins. Co. v. Webb Life Ins. Agency, Inc.*, 876 F. Supp. 1278, 1280 (S.D. Fla. 1995).  Nevertheless, the BNBM Entities' contacts with Florida easily satisfy the statutory requirements.

Florida's long-arm statute provides, in pertinent part:

> (1)(a) A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:
>
> 1. Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
> 2. Committing a tortious act within this state.
> *       *       *
> 6. Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
>
> > a. The defendant was engaged in solicitation or service activities within this state; or
> > b. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or

184

> consumed within this state in the ordinary course of
> commerce, trade, or use.

Fla. Stat. Ann. § 48.193.

As briefly discussed below, the BNBM Entities' contacts with Florida satisfy sections

(a)(1) (regarding carrying on a business), (a)(2) (regarding tortious acts) & (a)(6) (regarding

causing injury to persons within the state by products processed, serviced or manufactured by the

defendant). Just as Taishan had extensive contacts with Florida, so, too, did the BNBM Entities

have a "general course of business activity in the State for pecuniary benefit," and more.

*Chinese Drywall*, 753 F.3d at 538 (addressing only Section (a)(1)).[684]  There is ample further

evidence proving that the exercise of personal jurisdiction over BNBM and BNBM Group for

sales of defective drywall is proper.[685]

---

[684] The court further noted, "[i]t is not necessarily the number of transactions, but rather the nature and extent of the transaction(s) that determines whether a person is 'carrying on a business venture' within the state." *Id.* (quoting *Joseph v. Chanin,* 869 So.2d 738, 740 (Fla. Dist. Ct. App. 2004)). In making such determinations, "[f]actors relevant, but not dispositive" to this analysis have been identified as follows: (1) "the presence and operation of an office in Florida," (2) "the possession and maintenance of a license to do business in Florida," (3) "the number of Florida clients served," and (4) "the percentage of overall revenue gleaned from Florida clients." *Id.* (quoting *Horizon Aggressive Growth, L.P. v. Rothstein–Kass, P.A.,* 421 F.3d 1162, 1167 (11th Cir. 2005).

[685] As defaulted parties that have *chosen* to be in default for a perceived strategic reason, the BNBM Entities have no right to challenge Plaintiffs' allegations regarding the defective nature of their drywall products. The jurisprudence of the United States Supreme Court, dating from the 19th century, mandates that a defendant which fails to set aside the entry of a default is thereafter barred from contesting any and all facts established by that default. *See Ohio Central Railroad Company v. Central Trust Company of New York,* 133 U.S. 83 (1889). While the Defendants are at liberty to challenge factual matters addressing jurisdiction, the quality of their drywall relates to the underlying merits, which they are precluded from re-litigating. *See Jackson v. FIE Corp.,* 302 F.3d 515, 529 (5th Cir. 2002). Accordingly, having failed to set aside the entry of default, the PSC's allegations regarding product defect are binding on the BNBM Entities. For example, paragraphs 99-110 of the *Amorin* (Florida) Complaint, Dkt. No. 11-1672 [Rec.Doc. 1-1], discuss the defective nature of Defendants' problematic drywall at length, including that it off-gases Sulphur compounds which cause rapid sulfidation and damage to

BNBM indisputably held itself out as a Chinese manufacturer of new building materials, particularly drywall, which exported its products world-wide, including the U.S. and Florida, in particular.[686]  Beginning with their beachhead foray into Florida with the incorporation of BNBM of America, the BNBM Entities sought to take advantage of the Florida market for drywall.[687]

After inviting American customers (Davis Construction and EAC) to visit its plant and employing other solicitations over the internet, BNBM manufactured drywall specifically intended for the United States market.[688]  It obtained UL labeling and ASTM approval, and sized its products to U.S. dimensions and specifications.[689]  BNBM even further customized its drywall for Davis Construction, a Florida-based distributor.  First, it entered into an exclusivity agreement with Davis, and then it labelled two shipments of drywall with the inscription, "Distributed by Davis Construction U.S.A."[690]  These two shipments alone involved hundreds of thousands of sheets of drywall.[691]  It is not disputed that BNBM used BNBM Group as its export

---

personal property and that the product is unfit for its ordinary purpose.  These facts addressing the merits of Plaintiffs' product liability claims are deemed admitted by the BNBM Entities' deliberate default.  The BNBM Entities are estopped from saying otherwise.

[686]*See* Statement of Facts, Section II.D., *supra.*

[687] BNBM of America continued in business into 2005, just as sales contracts were being developed for Wood Nation and EAC & Sons.  *Id.*

[688] *See* Statement of Facts, Section II.D.2., *supra.*

[689] *See* Statement of Facts, Section II.D.3., *supra.*

[690] *See* Statement of Facts, Section II.D.5., *supra.*

[691] *Id.*

agent, and together, the two companies deliberately sold and shipped hundreds of thousands of

sheets of drywall, worth millions of dollars, destined for Florida ports, and intended for

distributors known to be incorporated and doing business in Florida (Davis Construction, EAC

and Wood Nation).[692]

     Overall, BNBM PLC manufactured and sold over 21 million square feet / ten million

dollars ($10,000,000+) of defective drywall to United States customers, the majority of this sold

and shipped to Florida, all with the necessary assistance of BNBM Group as the export agent.[693]

     Facts analogous to these were more than sufficient for the Fifth Circuit to determine that

Taishan had met the requisite level of activities and contacts to meet §48.193(1)(a)(1) of

Florida's long-arm statute. *Chinese Drywall*, 753 F.3d at 538.  The Court of Appeals examined

this Court's findings that 1) the amount of drywall sold in volume and dollar value, 2) that

shipping arrangements were handled by the defendant, 3) the existence of an exclusivity

contract, and 4) that boards were stamped specifically to identify the customer, to conclude that

"[t]hese and the other Florida contacts 'show a general course of business activity in the state for

pecuniary benefit.'"  *Id*.  The same reasoning should apply here as well.  *See also Chinese*

*Drywall,* 894 F. Supp. 2d at 882; *Lennar Homes, LLC v. Knauf Gips KG*, No. 09-07901 CA 42,

---

[692] To the extent BNBM contends that its Florida customers took title to the drywall in China, either under FOB or similar terms, and therefore it did not purposefully avail itself of the Florida market, this argument was rejected as grounds for "vitat[ing the defendants''] other contacts with Florida."  *Chinese Drywall*, 753 F.3d at 542 n.19; *Chinese Drywall*, 894 F.Supp. at 856 ("…the Fifth Circuit has held that 'a F.O.B. term does not prevent a court from exercising personal jurisdiction over a non-resident where other factors…suggest that jurisdiction is proper,' *Luv N' Care*, 438 F.2d at 471-72; these 'other factors' are present here.").

[693] *See* Statement of Facts, Section II.D.13., *supra*.

2012 WL 3800187 (Fla. Cir. Ct. Aug. 31, 2012), *aff'd, Taishan Gypsum Co. Ltd. v. Lennar Homes, LLC,* 123 So. 3d 637 (Fla. App. Ct. 2013) (per curiam).

These same facts also support a finding that both Defendants committed tortious acts by selling defective drywall in the State of Florida, and causing injury to persons within the state by products processed, serviced or manufactured by the Defendant under §48.193(1)(a)(2 & 6) of Florida's long-arm statute.[694] *Chinese Drywall*, 894 F. Supp. 2d at 883-84 (finding tortious acts committed by the manufacture and sale of defective drywall which the Defendant caused to be shipped to Florida where it was used and caused tortious damage, and that defendant caused injury to plaintiffs in Florida by manufacturing and designing defective drywall and failing to warn Plaintiffs of the defect all while 1) soliciting business in Florida and while Defendants' products were used in the ordinary course of commerce).

As demonstrated above, Plaintiffs have proven by a preponderance of the evidence that Florida's long-arm statute has been satisfied by the BNBM Entities' Florida-related activities.

---

[694]BNBM has even provided the June 8, 2015 Supplemental Declaration of Carolyn F. Taylor in Support of the federal Rule of Evidence 1006 Summary of Property Owners Identifying BNBM or Dragon Board Drywall [Rec.Doc.No. 19646-31], which confirms that dozens of Florida homeowners have completed Plaintiffs' Fact Sheets and complained under oath about the tortious injury caused to their homes by the presence of BNBM's defective Dragon board. Obviously, this Declaration says nothing about absent class members, who may yet present claims from other jurisdictions. As to these class members, the Court's jurisdiction will extend to them since "a manufacturer [that] voluntarily chooses to sell his product in a way in which it will be resold . . . and transported from state to state, he cannot reasonably claim that he is surprised at being haled to answer in *any* state for the damage the product causes." *Coulter v. Sears, Roebuck & Co.*, 426 F.2d 1315, 1318 (5th Cir. 1970). *See also Bean Dredging Corp. v. Dredge Technology Corp.*, 744 F.2d 1081, 1082 (5th Cir. 1984) (recognizing that once product is placed in stream of commerce sufficient contacts could be found ever though the product "might go virtually anywhere"); *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 199-200 (5th Cir. 1980) (finding personal jurisdiction where manufacturer made no effort to limit sales and knew they could be nation-wide).

2.  **The Court's Exercise of Personal Jurisdiction Over BNBM Group and BNBM Is Consistent with Constitutional Due Process.**

Having shown that the Court's exercise of personal jurisdiction is permitted by the forum state's long-arm statute, Plaintiffs must next demonstrate that the assertion of personal jurisdiction upon the BNBM Entities is consistent with the Due Process Clause of the Fourteenth Amendment. For specific jurisdiction to be proper, Due Process requires: (1) minimum contacts by the defendant purposefully directed at the forum state, (2) a nexus between the defendant's contacts and the plaintiff's claims, and (3) that the exercise of jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice.  *Chinese Drywall*, 753 F.3d at 540.

"The 'constitutional touchstone' of the inquiry to determine if personal jurisdiction can be exercised is whether the defendant 'purposefully established minimum contacts in the forum state.'" *Chinese Drywall,* 894 F. Supp. at 841-42.  *See also Asahi Metal Ind. Co. v. Super. Ct.,* 480 U.S. 102, 108–09 (1987); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985); *Int'l Shoe, Co. v. Washington,* 326 U.S. 310, 316 (1945). The concept of "minimum contacts" encompasses two types or forms of contacts: those that give rise to specific personal jurisdiction and those which give rise to general jurisdiction. *Id.* (citing *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir. 2010); *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266, 271 (5th Cir. 2006); *Revell v. Lidov,* 317 F.3d 467, 470 (5th Cir. 2002); *Ruston Gas Turbines, Inc.,* 9 F.3d at 418).

Specific jurisdiction exists when "the defendant has "purposefully directed" his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." *Chinese Drywall,* 894 F. Supp. 2d at 842.  In circumstances where the defendant's contacts with the forum are "continuous and systematic," a court may exercise

189

general jurisdiction over the defendant regardless of whether the litigation is related to the defendant's forum contacts. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984).  However, even where "a defendant has relatively few contacts [with the forum], a court may still exercise specific jurisdiction 'in a suit arising out of or related to the defendant's contacts with the forum.'" *Seiferth*, 472 F.3d at 271 (quoting *Helicopteros*, 466 U.S. at 414 & n.8).

Here, because the BNBM Entities' activities directed to marketing, sales, shipment, and export of the defective drywall to customers in Florida were purposely directed to the forum, Plaintiffs focus their attention on specific jurisdiction.

For specific personal jurisdiction to attach, "[t]he non-resident's purposefully directed activities in the forum must be such that he could reasonably anticipate being haled into court in the forum state." *Clemens*, 615 F.3d at 377 (quoting *Burger King,* 471 U.S. at 474).  Specific personal jurisdiction requires a sufficient nexus between the non-resident's contacts with the forum and the cause of action.  *Id.* at 378–79 (citing *Helicopteros Nacionales,* 466 U.S. 408, 414 n. 8).  A defendant who purposefully avails himself of the privilege of conducting activities in the forum state invokes the benefits and protections of the forum's laws. *Id.* at 379 (citing *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)). "The 'purposeful availment' requirement ensures that a defendant will not be hauled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Id.* (citing *Burger King,* 471 U.S. at 472). The activities of a defendant are not measured by quantity, but rather quality as "[a] single act by the defendant directed at the forum state ... can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston Gas,* 9 F.3d at 419.  As this Court noted, the "fundamental transformation of the American economy" has had a substantial impact on the interpretation of

190

the Due Process Clause, which in turn has led to a more "relaxed" interpretation of personal jurisdiction. *Chinese Drywall*, 894 F. Supp. 2d at 841. But to fully appreciate the development of the law on specific personal jurisdiction*,* a detailed explication of the relevant Supreme Court and Fifth Circuit jurisprudence is in order.

In *World-Wide Volkswagen*, the Supreme Court first recognized that placing a product into the stream of commerce with knowledge that the product will be used in the forum is enough to constitute minimum contacts. *World–Wide Volkswagen*, 444 U.S. at 297-98.  There, plaintiffs filed a products liability lawsuit in Oklahoma against the New York distributer and vehicle dealer/seller of an automobile for injuries sustained while operating the vehicle in Oklahoma.  *Id*. at 288.  The plaintiffs, who purchased the car in New York, were involved in an automobile accident in Oklahoma.  The Supreme Court agreed with the New York defendants' argument that personal jurisdiction in Oklahoma was lacking because the defendants did not carry out any activity, close any sales, perform any services, or solicit any business in Oklahoma, they did not sell cars at wholesale or retail to Oklahoma customers, nor did they avail themselves of the privileges or benefits of Oklahoma state law.  In so holding, the Court reasoned: "if the sale of a product of a manufacturer . . . . arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its products in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." *Id*. at 297.  Where, however, a corporation "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State," a court may properly exercise personal jurisdiction over the foreign defendant. *Id*. at 298.

191

Following its decision in *World-Wide Volkswagen*, the Supreme Court again addressed specific personal jurisdiction in *Burger King Corp.* There, a Florida fast-food restaurant franchisor filed suit in a Florida district court against a Michigan-based franchisee for breach of franchise obligations and trademark infringement. *Burger King Corp.*, 471 U.S. at 464-68. The Court determined that personal jurisdiction existed over the defendant despite its lack of physical ties with the forum state. In so holding, the Court reasoned that personal jurisdiction "may not be avoided merely because the defendant did not physically enter the forum State . . . [since] it is an escapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines," and concluded "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* at 476.

The Court again addressed specific personal jurisdiction in *Asahi*. However, this time, the Court was split on the issue of whether the foreign defendant had sufficient minimum contacts with the forum to satisfy specific personal jurisdiction, but it agreed that due process was violated by the exercise of personal jurisdiction over the defendant on fairness and reasonableness grounds. *Asahi*, 480 U.S. at 112, 117.  The plaintiffs in Asahi brought products liability claims for injuries sustained in California while riding a motorcycle containing tire tubes manufactured by a Taiwanese defendant. The Japanese manufacturer of tire valves used in tire tubes was brought into the suit by the Taiwanese defendant.  *Id.* at 105–06. The Japanese manufacturer contested personal jurisdiction in the forum.  *Id.* at 106. Writing for a plurality of the Court, Justice O'Connor found that the defendant's minimum contacts with the forum state were lacking:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.* at 112. Justice O'Connor's above-quoted interpretation of the minimum contacts requirement, requiring more than just placing a product into the stream of commerce, is what is now referred to as the "stream-of-commerce-plus" test."

In his concurring opinion, Justice Brennan disagreed with the plurality's interpretation of the stream-of-commerce theory and its conclusion that the defendant did not purposefully avail itself of the form state:

> Under [the plurality's] view, a plaintiff would be required to show 'additional conduct' directed toward the forum before finding the exercise of jurisdiction over the defendant to be consistent with the Due Process Clause. I see no need for such a showing, however. **The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise.** Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final products in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State. Accordingly, most courts and commentators have found that jurisdiction premised on the placement of a product into the stream

193

>of commerce is consistent with the Due Process Clause, and have
>not required a showing of additional conduct.

*Asahi*, 480 U.S. at 116-17 (Brennan, J., concurring) (emphasis added). Justice Brennan noted that

"by affirming the lower court's finding of minimum contacts on the basis that although [the

Japanese manufacturer] did not design or control the system of distribution that carried its valve

assemblies into [the forum], the [manufacturer] was aware of the distribution system's operation,

and it knew that it would benefit economically from the sale in [the forum] of products

incorporating its components." *Chinese Drywall*, 894 F.Supp at 845 (quoting *Asahi*, 480 U.S. at

121) (internal quotations omitted)).

More recently, in *McIntyre Machinery, Ltd. v. Nicastro*, 131 S.Ct. 2780 (2011), a

products-liability case, certiorari was granted to clarify the "decades-old questions left open in

*Asahi*" of the proper test under the stream-of-commerce doctrine. *Id.* at 2785. However, the

Court rendered a fractured plurality opinion instead. Justice Kennedy, writing for the plurality,

embraced the "stream-of-commerce-plus" test:

>Since *Asahi* was decided, the courts have sought to reconcile the
>competing opinions. But Justice Brennan's concurrence,
>advocating a rule based on general notions of fairness and
>foreseeability, is inconsistent with the premises of lawful judicial
>power. This Court's precedents make clear that it is the
>defendant's actions, not his expectations, that empower a State's
>courts to subject him to judgment.

*Id.* at 2789.

In a concurring opinion, Justice Breyer did not accept Justice O'Connor's stream of

commerce plus theory, but instead opined:

>I do not doubt that there have been many recent changes in
>commerce and communication, many of which are not anticipated
>by our precedents. But this case does not present any of those
>issues. So I think it unwise to announce a rule of broad

> applicability without full consideration of the modern-day
> consequences.... In my view, the outcome of this case is
> determined by our precedents.

*Id.* at 2791 (Breyer, J., concurring).

Where plurality opinions issue, the narrowest grounds for the decision control.  As a result, Justice Breyer's concurrence is the controlling opinion at the high court, and his opinion changed nothing.

As a consequence, in four successive appeals before the Fifth Circuit since *McIntyre* was decided the law has been and remains that the stream of commerce theory applies.  *See Ainsworth v. Moffett Engineering, Ltd.,* 716 F.3d 174, 179 (5th Cir. 2013) (where a manufacturer's products are sold or marketed "in all fifty states, and [the manufacturer] makes no attempt to limit the territory in which [its distributor] sells its products[,]" Due Process permits the exercise of jurisdiction over the manufacturer in any state where its products are sold, but especially in a state where its products are particularly suited for that jurisdiction, because the manufacturer "could have 'reasonably anticipated' being hauled into court [there]."); *Chinese Drywall,* 742 F3d at 586 ("we apply the stream-of-commerce test from Justice Brennan's concurrence in *Asahi,* and Justice Breyer's concurrence in *McIntyre*."); *Chinese Drywall,* 753 F.3d at 548 ("in order to satisfy the minimum contacts requirements, plaintiffs must show that the defendant delivered the product in the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state."); *Eddy v. Printers House (P) Ltd.*, No. 15-10370, 2015 WL 5771925, at *3 (5th Cir. Oct. 2, 2015) ("In cases involving products sold or manufactured by foreign defendants, we apply the 'stream-of-commerce' approach to personal jurisdiction.  . . . Under this approach, minimum contacts exist when the court 'finds that the

195

defendant delivered the product into the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state.").

### a. The BNBM Entities Have Minimum Contacts with Florida Sufficient to Warrant the Court's Exercise of Specific Personal Jurisdiction.

Despite the varying approaches detailed above, <u>in this case</u>, this Court's analysis of Taishan's minimum contacts set the proper legal standards applicable to personal jurisdiction determinations in an identical factual situation. *See Chinese Drywall*, 894 F. Supp. 2d at 848-49. As such, "in order to satisfy the minimum contacts requirements, plaintiffs must show that the defendant delivered the product in the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state." *Chinese Drywall*, 753 F.3d at 548.

Under the law of this case, "foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce." *Chinese Drywall*, 753 F.3d at 548.  Due Process "is met so long as the court 'finds that the defendant delivered the product into the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state.'" *Id*.  The only qualification is that "[t]he defendant's contacts must be more than 'random, fortuitous, or attenuated, or of the unilateral activity of another party or third person.'" *Id*. But even just "[a] single act by the defendant *directed at the forum state*...can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston Gas*, 9 F.3d at 419 (emphasis added); *Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 379 (5th Cir. 2002); *Ham v. La Cienega Music Co.*, 4 F.3d 413, 415-16 (5th Cir. 1993).

Defendants argue, however, that the interpretation employed by the Eleventh Circuit should apply because it is the law of the transferor court, and further that circuit applies the more

196

stringent "stream-of-commerce-plus" test.[695] These arguments, however, are without merit.[696] Assuming *arguendo* that the Eleventh Circuit's interpretation of the stream of commerce analysis should be applied by this MDL Court, which Plaintiffs contend it does not, the factual circumstances presented by BNBM and BNBM Group's sales of drywall to Florida meet either standard.

More particularly, even if the stream-of-commerce-plus analysis was applied to the facts of this case, the standard has been satisfied.  BNBM, with BNBM Group as its exporting agent, both shipped drywall products intended to be marketed in Florida that was specifically made for the forum.  The fact that BNBM's Dragon board was cut in dimensions for the U.S. market, had UL and ASTM labelling, and, in particular was stamped "Davis Construction USA," at the request of its Florida customer, easily satisfy the more rigorous analysis of the stream-of-commerce-plus test.  Virtually identical facts were presented in all of Taishan's appeals, and in no uncertain terms did both panels of the Fifth Circuit reject similar arguments; Taishan's "active steps" of "designing the product for the market in the forum State" clearly sufficed under the more demanding "stream-of-commerce-plus" test, so which test applied was of little consequence. *Chinese Drywall*, 742 F.3d at 589; *Chinese Drywall*, 753 F.3d at 541-42 & n.19 (selling the product directly to Florida residents is a significant contact that alone may be sufficient, but because the product was "designed for the market in [Florida] and because it was

[695] *See* CNBM Brf. at 29-30 (arguing that the transferor court's interpretation of the law should apply and further, that the Fifth Circuit should adopt the "stream-of-commerce-plus" test because "it is more consistent with Constitutional Due Process."); *see also* BNBM Group Brf. at 15-17.

[696] *See* fn. 662 *supra*.  Of course, the Eleventh Circuit has not even expressly endorsed the stream-of-commerce-plus test.  See *Vermeulen v. Renault, U.S.A., Inc.*, 958 F.3d 1534, 1548-49 (11th Cir. 1993).

197

not an isolated sale," the court found that purposeful availment was satisfied under either stream-of-commerce standard).

Here, the same reasoning applies. Defendants' argument for the application of the "stream-of-commerce-plus" test as opposed to the broader stream of commerce test is of no consequence. Accordingly, the record and above-discussed facts demonstrate that the BNBM Entities have engaged in "additional conduct such that it could be said to have 'purposefully availed' itself of the privilege of conducting business in" the forum states. *Chinese Drywall*, 753 F.3d at 541.

### b.  The "Arise Out of" or "Relate to" Requirement Is Satisfied.

The Fifth Circuit has framed the second prong of the Due Process analysis as requiring that "the plaintiff's cause of action . . . arise out of or result from the defendant's forum-related contacts." *Chinese Drywall*, 753 F.3d at 549.   Not too long ago, this Court analogously held that the Plaintiffs' claims for allegedly defective drywall installed in their homes "arise from Taishan's manufacturing allegedly defective drywall, marketing it to Louisiana customers, and shipping it to Louisiana."   *Chinese Drywall,* 894 F.Supp.2d at 857.  Further, the Court found in *Gross* that the plaintiffs' market-share liability claim, which rests on the theory that Taishan drywall, among other defective drywall, was shipped to Louisiana and injured plaintiffs, likewise arose out of Taishan's Louisiana contacts*, i.e.,* Taishan's marketing, sales, and shipment of drywall to Louisiana customers.  *Id*. at 899.  In this regard, this Court previously recognized plaintiffs' profile firms were sufficient to confirm that their claims arise from and relate to the Defendants' defective products:

> The profile forms, TIP inspections, and photographic catalog, all
> Court-ordered and providing information on the type of drywall in
> homes, also demonstrate the presence of Taishan's drywall in the

198

> homes of Louisiana plaintiffs. The Court finds no law which
> supports Taishan's narrow reading of the "arise from" and "relate
> to" requirement for specific personal jurisdiction.

*Chinese Drywall,* 894 F.Supp.2d at 902   These findings were affirmed.

This Court's previous findings as to the "arising out of" requirement of the Due Process inquiry are the law of this case, and as such, the holdings necessarily apply with equal force to the inquiry into the second prong as it relates to the claims at issue. Specifically, just as the court concluded in *Wiltz* and *Gross*, the Plaintiffs' claims for damages from BNBM's defective drywall installed in their homes arise from BNBM's manufacturing, marketing, exporting and shipping it to Florida customers, with BNBM Group acting as its export agent.[697]   Accordingly, the *Amorin* (Florida) plaintiffs' claims arise out of or relate to the BNBM Entities' Florida contacts of marketing, selling, and shipping drywall to Florida customers. *See Chinese Drywall,* 753 F.3d at 549.  *See also Luv N' Care, Ltd. v. Insta-Mix, Inc.* 438 F.3d 465, 469 (5th Cir. 2006).

### c.  Personal Jurisdiction Over the BNBM Entities Is Consistent with Constitutional Reasonableness.

The final Due Process inquiry asks whether jurisdiction "would comport with fair play and substantial justice." *Chinese Drywall,* 753 F.3d at 544.  A proper analysis of the fairness component takes into consideration several factors, including:  "(1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies." *Id.*   Nevertheless, the exercise of personal jurisdiction does not affect traditional notions of fair play when there is a nexus between the defendant's conduct and plaintiff's injury.  *ITL Int'l,* 669 F.3d at 500.  It is rare to find that jurisdiction is not

---

[697] *See Amorin, et al. v. Taishan, Gypsum, (Florida) Complaint* at ¶¶26-30.

met when minimum contacts are shown. *McFadin v. Gerber*, 587 F.3d 753, 759-60 (5th Cir.2009), *cert. denied*, 131 S.Ct. 68 (2010). Here, Plaintiffs have proven that there is a nexus between the BNBM Entities' conduct and the Plaintiffs' injuries. Plaintiffs are seeking to recover for injuries they suffered from the defective Chinese Drywall installed in their homes due to the BNBM Entities' purposeful activity directed to Florida.

Further, where non-resident defendants put products into the stream of commerce and those products cause harm to plaintiffs in the forum state, courts have consistently found that the exercise of personal jurisdiction does not offend traditional notions of fair play. *See Burger King*, 471 U.S. at 473 (noting that "[a] State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."); *Chinese Drywall, supra; Ruston, supra.* In these MDL proceedings, dozens of Plaintiffs have a strong interest in obtaining efficient relief for the damages caused to their homes by BNBM's defective drywall.

Even though BNBM and BNBM Group are Chinese companies who contend that they are greatly burdened by this litigation, the Supreme Court has stated that "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum will justify even the serious burdens placed on the alien defendant." *Asahi*, 480 U.S. at 114-15. The Fifth Circuit has similarly held this to be the case in *Chinese Drywall*, 753 F.3d at 544.

When weighing the interests of the Plaintiffs against the BNBM Entities' burden of defending claims related to damages caused by products they deliberately shipped to Florida and elsewhere, Due Process is not offended by the exercise of personal jurisdiction over them.

When the BNBM Entities' controlled subsidiary, Taishan, first appeared in this litigation and challenged jurisdiction and the burden of litigation here, this Court's reasoning that the

Plaintiffs' and forum's great interests in litigating in in the U.S., when combined with the judicial interests, and traditional notions of fair play and substantial justice render the exercise of personal jurisdiction over Taishan fair was affirmed.  *See Chinese Drywall,* 742 F.3d at 592. Following that appeal, a second panel of the Fifth Circuit again confirmed this Court's reasoning, that the exercise of personal jurisdiction over Taishan in *Gross*, *Wiltz*, and *Mitchell* was consistent with Constitutional fairness. *Chinese Drywall*, 753 F.3d at 544.  In so holding, the Fifth Circuit again noted that the only factor disfavoring the exercise of personal jurisdiction was the burden on the defendant.  However, when balanced against the remaining four (4) factors, notions of fair play and substantial justice were not offended by exercising jurisdiction over Taishan in Florida or in Louisiana.  *See Chinese Drywall*, 753 F.3d at 544, 549.  Citing *Asahi,* the Fifth Circuit concluded that when weighed against Taishan's sophistication, Florida and Louisiana's respective interests in litigating against defendants that harmed their residents, the Plaintiffs' interest in litigating in the U.S. as opposed to China, the judicial system's interest in resolving these cases (and Taishan's failure to appear), and the interests of comity, this Court's finding of jurisdiction was proper despite the burden on Taishan. *Id.*

The same rationale applies to BNBM and BNBM Group. Any burden on these Defendants is heavily outweighed by these Defendants' apparent sophistication, Florida's respective interest in permitting litigation against defendants that harmed their residents, the Plaintiffs' interest in litigating in the U.S. as opposed to China, the judicial system's interest in resolving these cases (and the defendants' failure to appear), and the interests of comity.

****

As all the prerequisites of the Due Process analysis have been satisfied, personal jurisdiction is therefore proper over the BNBM Entities in Florida.

201

### C.  THE DEFAULTED BNBM AND CNBM ENTITIES' CHALLENGES TO SERVICE OF PROCESS SHOULD BE REJECTED BY THE COURT.

Pursuant to Fed.R.Civ.P. 12(b)(5), the CNBM and BNBM Entities assert several discrete arguments addressing matters they contend amount to insufficient service of process. Defendants raise these challenges to service of process notwithstanding their orchestrated plan to evade service of process and to engage in a limited response to litigation strategy.  *See* Section C, *infra*.  Specifically, the CNBM Entities take the position that 1) service of process on CNBMIT Co. Ltd. was insufficient because each of the *Amorin* complaints as well as the *Abner* complaint and the corresponding summonses served on this defendant included a typographical error; 2) CNBMIT Co. Ltd. should be dismissed from the Louisiana *Amorin* proceedings because the service of this complaint on CNBMIT Co. Ltd. was never completed; and 3) the *Abner*, *Morris*, and *Posey* complaints should be dismissed because these complaints were never served on CNBM Group, CNBM Co., CNBM USA, CNBMIT, or United Suntech.

The BNBM Entities argue that 1) the *Gross*, *Wiltz*, and *Amorin* actions should be dismissed against BNBM PLC because certain of the service documents identify "BNBM Group" as being served, not BNBM PLC, and there is no evidence demonstrating that BNBM PLC was properly served with the complaints in the *Amorin* proceedings; and 2) service on BNBM Group in the *Gross* and *Amorin* proceedings was improper because allegedly the wrong service address was used.

Each of these arguments should be rejected for the reasons set forth below.

202

### 1. A Minor Typographical Error in CNBMIT's Name in the Complaint or Summons Does Not Constitute a Basis for Dismissing the Complaint for Insufficient Service of Process

The CNBM Entities contend that the *Amorin* and *Abner* complaints should be dismissed because the complaints improperly identify CNBMIT Co. Ltd. as "CNBMI Co. Ltd." In other words, the letter "T" was omitted. This argument should be rejected since such a minor typographical error is immaterial and service on CNBMIT Co., Ltd. was otherwise proper.

A minor difference in how a defendant's name is spelled consistently has been held to be an improper basis for finding lack of service of process. *See United States v. A.H. Fischer Co., Inc.*, 162 F.2d 872, 873 (4th Cir.1947) ("A suit at law is not a children's game but a serious effort on the part of adult human beings to administer justice; and the purpose of process is to bring parties into court. If it names them in such terms that every intelligent person understands who is meant, …it has fulfilled its purpose; and courts should not put themselves in the position of failing to recognize what is apparent to everyone else."); *Aerielle Technologies, Inc. v. Procare Int'l Co.*, 2011 WL 767775 (E.D. Tex. Feb. 28, 2011); *Brackens v. USA Credit*, 233 F.R.D. 613, 614 (D. Kan. 2005); *Scottsdale Ins. Co. v. Littlepage*, 1993 WL 275162, * 4 (E.D. Pa. July 16, 1993) (refusing to overturn default judgment where there was a minor inaccuracy in the defendant's name); *McManus v. Washington Gas Light Co.*, 1991 WL 222345, * 6 (D.D.C. Oct 15, 1991); *Tremps v. Ascot Oils, Inc.*, 561 F.2d 41, 44 (7th Cir. 1977). *See also Hensgens v. Deere & Co.*, 869 F.2d 879, 884 (5th Cir. 1989) ("Law is not a game of scrabble. The original timely filed petition naming John Deere Corp. as the defendant interrupted prescription against Deere & Company under Louisiana Civil Code article 3462."); *Triangle Distributing, Inc. v. Shafer, Inc.*, 1991 WL 164333, *3 (6th Cir. Aug. 23, 1991) (overturning lower court's order refusing to grant motion to correct name of party defendant).

In *Aerielle Technologies, supra*, the court granted the plaintiff's motion for default judgment even though the summons improperly identified "Procare International Co." as "Procare International, Inc."  In so ruling, the Court observed that, "[i]t is well established that [t]he fact that the Defendant's name is in some minor respect inaccurate is not necessarily fatal to service. A mere mistake as to a party's name does not defeat the service." *Aerielle Technologies*, 2011 WL 767775 at *2 (internal quotations omitted).  Critical to the court's determination that default judgment was appropriate in *Aerielle Technologies* was the fact that the defaulted defendant had received actual notice of the litigation.  *Id.*  Likewise, in the instant litigation, the difference between CNBMI Co. Ltd. and CNBMIT Co. Ltd. is almost imperceptible.  To the extent there is an inaccuracy, *i.e.,* a missing "T," the defendant's name is misspelled by just one letter.  This minor inaccuracy should be disregarded as a basis for avoiding service of process, especially since the defendants had actual notice of the litigation.  Ironically, the CNBM Entities mistook their correct name in their moving papers, but they do not deny the operative effect of their motions.  Presented with the alphabet soup that is CNBM Group, where even their own counsel mistake their clients' identity, the PSC should not be penalized for what was simply a typographical error.

The CNBM Entities also argue that service on CNBMIT should be disregarded because its legal name is similar to other CNBM Entities.  Notwithstanding this argument, they do not contend that any entity with a similar name was located at the same address where service of process was perfected on CNBMIT.[698]  Rather, they resort to misdirection.  The CNBM Entities

---

[698] Service of CNBMIT in *Amorin* (VA) and *Amorin* (LA) both occurred on July 18, 2013.  *See* Rec.Doc.Nos. 17269 and 19947.  Service upon CNBMIT in *Amorin* (FL) occurred a month later on August 15, 2013.  *See* Rec.Doc. No. 19945.

204

suggest that the PSC's questioning at the June 3, 2015 deposition of CHE Gang (Taishan's 30(b)(6) witness) regarding another entity altogether, "CNBMI Investment," is evidence that CNBMIT would not have been on notice of the claims against it. This testimony was taken two years _after_ service of process was perfected on CNBMIT. Defendants' efforts to link the two is a stretch, and can not possibly relate to whether or not CNBMIT was on notice of the claims against it, or justify dismissal on such a non-substantive ground.

Accordingly, there is no evidence to suggest that the minor typographical error in the PSC's complaint failed to apprise CNBMIT of the claims against it.

### 2. Service of the Amorin (LA) Complaint Was Properly Accomplished on CNBMIT.

The CNBM Entities incorrectly argue that service was not completed on CNBMIT in the "_Amorin_ Louisiana case (11-cv-1672)." _See_ CNBM Brf. at pg. 47. However, this docket number, 11-cv-1672, actually corresponds to the _Amorin_ Florida complaint. The correct docket number for the _Amorin_ Louisiana complaint is 11-cv-1395. More importantly, the PSC properly served CNBMIT with both the Florida and Louisiana _Amorin_ complaints, as demonstrated by the proofs of service submitted in discovery. _See_ Rec.Doc. Nos. 19945 (Florida _Amorin_) and 19947 (Louisiana _Amorin_). Thus, the CNBM Entities' argument that the PSC failed to serve CNBMIT with the _Amorin_ Louisiana case is unfounded, and based on a flawed reading of the PSC's service documents.

### 3. The _Abner_, _Morris_, and _Posey_ Complaints Should Not be Dismissed.

The CNBM Entities take the position that the _Abner_ complaint should be dismissed on the grounds that the PSC did not serve the complaint within the time provided by Fed.R.Civ.P. 4(m). This argument is misplaced since the PSC obtained an extension to serve the _Abner_

205

complaint on April 12, 2012, *see* Order [Rec.Doc.No. 13733], and pursuant to this Order it served the *Abner* complaint on December 2, 2015.  *See* Rec.Doc.No. 19849.  While the CNBM Entities contend that the PSC waited too long to perfect service of process of the *Abner* complaint, the delay in service was necessitated by the complicated procedural hurdles that exist in China, which are attributable to service under the Hague Convention.  *See* Order and Reasons dated November 9, 2015 (discussing the complexities of serving the PSC's complaints in China) [Rec.Doc.No. 19713].[699]   For instance, the PSC's process server, APS International, advised the PSC to stagger service of process on the Chinese defendants so as to avoid confusion of the Chinese Central Authority responsible for serving complaints on Chinese defendants.[700]

In any event, the CNBM Entities' argument concerning service of the *Abner* complaint is now moot since the PSC has since perfected service of the *Abner* complaint on the CNBM Entities following the issuance of the Court's November 9, 2015 Order & Reasons permitting alternative service of process on defendants.  *See* Rec.Doc.No. 19713; *see also* Affidavit of Service by Arnold Levin of Summonses and Complaint, Rec.Doc.No. 19849. [701]   At all times, the

___

[699] *See, generally*, Rosler, *China's Great Legal Firewall: Extraterritoriality of Chinese Firms in the United States*, U.S. – China Economic and Security Review Comm'n, at 4 (May 5, 2015)(the process is unduly time consuming, and "cooperation cannot always be expected." ), available at http://origin.www.uscc.gov/sites/default/files/Research/Extraterritoriality%20of%20Chinese%20Firms_Research%20Report_0.pdf.

[700] *See* Affidavit of Ann Mickow dated 1/11/2016 ("Mickow Aff.")[MTD Ex. 251] at ¶ 3.  For this reason, the PSC was forced to prioritize service of certain complaints over the service of others.  *Id.*

[701] So far as the non-PSC sponsored complaints in *Morris* and *Posey* are concerned, the plaintiffs in these proceedings are participating in the PSC's other omnibus complaints.  Therefore, the PSC understands that they have not yet attempted service of process of the *Morris* and *Posey* complaints to avoid the financial expenditure associated with serving a complaint in China.  To the extent the failure to serve these complaints is deemed material, the PSC respectfully requests that the Court allow these plaintiffs to serve their complaints on all defendants through counsel

206

PSC acted promptly in serving the defendants.  The difficulty with service abroad in China is not of Plaintiffs' doing, and Plaintiffs should not be penalized for matters outside of their control that exist solely in China.  Similarly, defendants should not be permitted to take advantage of the delay in service necessitated by peculiarities in China's Central Authority as justification for dismissal.

### 4.  <u>The PSC Properly Served BNBM PLC with its Complaints.</u>

The BNBM Entities take the position that the *Gross*, *Wiltz*, and *Amorin* actions should be dismissed against BNBM PLC because certain of the service documents suggest that the documents being served on BNBM PLC identified "BNBM Group" as the defendant and, thus, were properly rejected by BNBM PLC.  This argument should be rejected for multiple reasons.

First, the BNBM Entities facts are not correct.  The PSC has identified two affidavits of service that are the likely source of the confusion by the BNBM Entities.  *See* Rec.Doc. Nos. 4217 (*Gross*) and 7027 (*Wiltz*).  While the English language translation of the proof of service from the Beijing Superior People's Court for each of these affidavits of service indicates that service was made upon "Beijing New Building Material (Group) Co., Ltd. (BNBW)," the PSC's process server, APS International, has cross-checked the affidavits of service in question and subsequently confirmed that the documents that were served identified BNBM PLC, not BNBM Group.[702]

---

consistent with the Court's Order granting the PSC's motion requesting permission to serve the BNBM and CNBM defendants through their United States lawyers.  *See* Order and Reasons dated November 9, 2015.

[702] *See* Mickow Aff. at ¶ 6-7.

With respect to the affidavit of service involving the *Gross* matter, the original Chinese language proof of service from the Beijing Superior People's Court actually identifies BNBM PLC, but was improperly translated by APS's translator.[703]  Because this document was improperly translated by APS's translator, APS has provided an amended affidavit of service with a corrected translation of the proof of service now identifying BNBM PLC as the party being served.[704]  Thus, BNBM PLC is simply incorrect in arguing that it properly rejected service in *Gross*, as the documents that were served were, in fact, directed to BNBM PLC.  Thus, the BNBM Entities' argument regarding the alleged failure of service of process in *Gross* is just another extension of their deliberate campaign to refuse service of process.  *See* Statement of Facts, *supra.*

With respect to the affidavit of service involving the *Wiltz* matter, BNBM is understandably mistaken that these documents were served upon BNBM Group.  Upon inspection of the affidavit of service, the Chinese Central Authority created specific markings on each page of its response to APS.[705]  Each of the pages in the response clearly identifies BNBM PLC as the party being served.[706]  Unlike in the *Gross* matter, the Chinese language proof of service from the Beijing Superior People's Court does identify BNBM Group as the party being served.  However, based on its past practices of serving defendants in China, APS believes there is a scrivener's error in the proof of service from the Beijing Superior People's Court and that

---

[703] *Id*. at ¶ 6.

[704] *See* Exhibit "C" to Mickow Aff.; *see also* Rec.Doc.No. 19957.

[705] Mickow Aff. at ¶7.

[706] *Id.*

208

BNBM was served because the documents served properly identify BNBM PLC.  *Id.*
Accordingly, BNBM PLC is wrong to argue that it was justified to refuse service of process in
the *Wiltz* matter.

Second, the PSC served BNBM PLC on two other occasions in the *Gross* proceedings.
On these two additional occasions, BNBM PLC was served with the amended class action
complaint [Rec.Doc.No. 13775] as well as the Omnibus III complaint [Rec.Doc.No. 19946].
The corresponding affidavits of service expressly identify BNBM PLC, not BNBM Group, as the
party being served.  *See* Rec.Doc. Nos. 19946 (confirming service of the Omnibus III complaint
on BNBM PLC) and 13775  (confirming service of supplement to amended class action
complaint as well as the amended class action complaint itself on BNBM PLC).  Thus, to the
extent BNBM PLC contends that it was justified in rejecting prior efforts to serve it in *Gross*
(which is specifically denied), the PSC properly served BNBM PLC in the *Gross* proceedings.

Third, despite its multiple refusals of service, BNBM PLC admitted in its May 28, 2010
public announcement that the Company was served with a summons from the United States
related to Chinese-manufactured drywall board.   This public announcement confirms that
BNBM PLC was not only served with notice of this litigation, but also the Company was well
aware of these proceedings and closely followed them for its investors, the industry, and
Taishan:

> [T]he Company [BNBM] was served a summons from the US
> concerning the litigation in relation to the use of Chinese gypsum
> boards, which involves an amount of USD150,000, while Taishan
> Gypsum was served some summons from the US concerning the
> litigation in relation to the use of Chinese gypsum boards, which
> involve an amount of USD5,225,000. The defendants of the above
> summons include not only the Company and Taishan Gypsum, but
> also tens of Chinese manufacturers and exporters engaged in
> export of gypsum boards to the US, as well as domestic importers,

209

property developers, construction companies and a number of other enterprises in the US. <u>The Company and Taishan Gypsum will continue to keep an eye on the progress of the incident, and address and handle the same with due prudence, so as to be responsible to investors, consumers and the industry</u>.[707]

BNBM PLC's May 28, 2010 public announcement belies each denial that service never occurred.[708]

Finally, BNBM PLC's contention that there is no evidence demonstrating that it was properly served with the complaints in the *Amorin* proceedings is simply incorrect.  The PSC served BNBM PLC with all three of the *Amorin* complaints on April 9, 2014.  *See* Rec.Doc.Nos. 17910 (affidavit of service confirming service of the Florida *Amorin* complaint on BNBM PLC); 17915 (affidavit of service confirming service of the Virginia *Amorin* complaint on BNBM PLC); 17922 (affidavit of service confirming service of the Louisiana *Amorin* complaint on BNBM PLC).  Given this proof of service of process, BNBM has failed to establish the ineffectiveness of service and there are no grounds for dismissing BNBM PLC from the *Amorin* complaints.

---

[707] *See* 5/28/2010 BNBM Announcement No. 2010-009 [MTD Ex. 252](noting that: "The Company and all members of the board of directors hereby warrant the truthfulness, accuracy and completeness of the contents of this announcement, and that there are no false representations, misleading statements or material omissions contained herein.") (emphasis added).

[708] Further, in the February 13, 2015 announcement of the company, BNBM PLC acknowledges that "[s]ervice of the summons in respect of the civil action initiated by Eduardo and Carmen Amorin individually and on behalf of all others similarly situated plaintiffs (Case No.: 2:14-cv-1727) (the "Amorin Case") from the United States District Court of Eastern District of Louisiana (the "US District Court") has been made on Beijing New Building Materials Public Limited Company (hereinafter "the Company" or "BNBM") through Beijing Higher People's Court in China on February 12, 2015." *See* 2/13/2015 BNBM Announcement.

## 5.  **The PSC Properly Served BNBM Group with its Complaints**

BNBM Group challenges service of process in the *Gross* and *Amorin* proceedings on the grounds that the PSC attempted service at the wrong service address.

The BNBM Entities dispute service of process on BNBM Group in *Gross* on the ground that service of process was attempted at No.16, West Road, Jiancaicheng, Xisanqi, Haidian District, Beijing, China.  The BNBM Entities contend that this address was improper and that service of process should have been attempted at 10/F Building 4, Interwest Business Center, No. 9 South Road, Suouti, Haidian District, Beijing, China.  However, the No. 16, West Road address where the PSC attempted service of process in *Gross* was proper since that is the address BNBM Group  provided to the public for contact purposes.[709]  At the time the PSC attempted service of process in *Gross* in July 2010, the PSC's research located BNBM Group at the No. 16, West Road address.[710]  (archived page from BNBM Group's website on August 17, 2009 identifies the No. 16, West Road address).

Only when BNBM Group began producing documents in 2015, did the PSC come into possession of documents and testimony suggesting that BNBM Group relocated in 2008 to the 10/F Building 4, Interwest Business Center, No. 9 South Road, Suouti, Haidian District, Beijing, China address.  However, this newly produced evidence was not publicly available to the PSC, which had no access to this information at the time service of process was being attempted.  Instead, at the time the PSC was attempting service, BNBM Group was still representing to the

---

[709] *See* Affidavit of Yan Gao.

[710] *Id*. at ¶ 3-5.  *See also* BNBM (Group) "Contact Us" webpage, available at https://webarchive.org/web/20100330085341/http://www.bnbmg.com.cn/en/contact.asp (3/30/2010 Printout from the Internet Archive)[MTD No. 253].

World that it was located at the No. 16, West Road address.[711]  Further, as noted below in the next section, the BNBM Entities were clearly on notice of the Chinese drywall litigation even before service of process in 2009, yet refused to participate or defend themselves in the proceedings before this Court.  This failure of the BNBM Entities to participate in these proceedings deprived the PSC of the ability to identify any alleged shortcomings in the address where it had attempted service of process.  The BNBM Entities should not be allowed to benefit from their own deliberate nonparticipation in these proceedings.

BNBM Group also disputes service of process in each of the *Amorin* complaints.  The PSC's affidavits of service confirm that service of each of the *Amorin* complaints on BNBM Group was made at the offices of BNBM PLC, where service was deliberately refused.  *See* Rec.Doc.Nos. 17909, 17914, and 17921 (all reflecting that service of process was attempted at 15/F, Tower 2, Guohai Plaza, 17 Fuxing Road, Haidian District, Beijing, China, 100036).[712] Given the alter ego relationship between BNBM PLC and BNBM Group, service of process on BNBM Group at BNBM PLC offices should be considered adequate to provide BNBM Group with notice of the instant proceedings, especially in light of the fact that BNBM Group's Chairman SONG Zhiping (who also was and is Chairman of CNBM Group) took charge of the response to the litigation and made the strategic decision for BNBM Group and BNBM (along with CNBM and CNBM Group) to refuse all service attempts in these proceedings.  *See Lamb*

---

[711] *See* 2008 BNBM Group Auditor's Report at p. 10; *see also* 2009 BNBM Group Auditor's Report [MTD Ex. 275] at p. 8; 2010 BNBM Group Auditor's Report [MTD Ex. 276] at p. 9; 2011 BNBM Group Auditor's Report [MTD Ex. 277] at p. 9; 2012 BNBM Group Auditor's Report at p. 9; 2013 BNBM Group Auditor's Report at p. 9; 2014 BNBM Group Auditor's Report at p. 9;  ZHAO Dep. at 326:4-327:14.

[712] This address where service of process was attempted on BNBM Group is the registered address of BNBM PLC.  *See* 2013 BNBM Annual Report at p. 6; WANG Dep. at 151:10-15.

*By & Through Donaldson v. Volkswagenwerk Aktiengesellschaft*, 104 F.R.D. 95, 101 (S.D. Fla. 1985) ("the Court finds and holds that the parent-subsidiary relationship between VWAG and VWOA is such as to make it more than reasonably certain that VWOA will turn over the process served on it for VWAG to VWAG, and that the service of process on VWOA in this cause was sufficient to give adequate notice to the parent corporation, Defendant VOLKSWAGENWERK AKTIENGESELLSCHAFT.").[713]

Accordingly, BNBM Group has been properly served with the PSC's complaints and should not be dismissed from these proceedings.

### 6. The Defaulted BNBM and CNBM Entities Have Long Been on Notice of the Claims Against Them

Finally, even assuming service of the BNBM and CNBM Entities was somehow flawed (which is denied), the purpose of service was accomplished since these defendants have been

---

[713] *See also Doty v. Magnum Research, Inc.*, 994 F. Supp. 894 (N.D. Ohio 1997), where the court determined service of process on a domestic subsidiary of an Israeli firearm manufacturer substantially complied with the requirements of the Foreign Sovereign Immunities Act (FSIA) and, thus, constituted proper service of process on the Israeli firearm manufacturer. Critical to the court's conclusion that this manner of service of process was proper was the fact that the Israeli firearm manufacturer had "received actual notice" of the lawsuit in the United States. *Doty*, 994 F. Supp. at 897. Also critical to the court's ruling was its "[f]inding [that] IMS and IMS Services [are] so closely related so that, at the very least, IMS Services was an involuntary agent for service of process …". *Id*. Likewise, in the instant litigation, it is abundantly clear that BNBM Group had actual notice of the proceedings against it in this Court, *see* Section 6 *infra*, and that the relationship between BNBM and BNBM Group is sufficiently close for BNBM to be considered the involuntary agent of BNBM Group for purposes of service of process. *See Rockwell Automation, Inc. v. Kontron Modular Computers*, 2012 WL 5197934, at *5 (S.D. Cal. Oct. 19, 2012) (concluding that proper service upon Kontron America can impute service upon Kontron Modular since there was "overwhelming evidence of interconnectedness between the Kontron entities …".); *Peterson v. Sealed Air Corp.*, 902 F.2d 1232 (7th Cir. 1990) (corporate manufacturer received notice within meaning of relation back rule no later than date that registered agent for service of process, independent contractor, received complaint, even though complaint had named manufacturer's subsidiary which had been formed to hold and license trademark).

aware of the claims against them since the very early stages of these proceedings and actually

strategized to defend them on a "limited response" basis, which included dodging service of

process.  Despite their actual awareness of the litigation against them, the BNBM and CNBM

Entities instead elected to disregard service of process made upon them and then deliberately

allowed default judgments to be entered against them.  *See* Statement of Facts Section II.F.

Under these circumstances, which facts are set forth above, the BNBM and CNBM Entities

challenges to service of process should be rejected by the Court.

**IV.**     **CONCLUSION**

For the reasons set forth above, each of the separate motions presented by the Defendants

should be denied.

Dated: January 22, 2016                    Respectfully Submitted,


BY: /s/ Russ M. Herman
Russ M. Herman (La Bar No. 6819) (on the Brief)
Leonard A. Davis (La Bar No. 14190) (on the Brief)
Stephen J. Herman (La Bar No. 23129)(on the brief)
Madelyn O. Breerwood (La Bar No. 35538) (on the Brief)
Herman, Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
ldavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel MDL 2047*

214

Arnold Levin (on the Brief)
Fred S. Longer (on the Brief)
Sandra L. Duggan (on the Brief)
Matthew Gaughan (on the Brief)
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm, LLC
425 W. Airline Highway, Suite B
Laplace, LA 70068
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Peter Prieto
Podhurst Orseck, PA
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com

Bruce William Steckler (on the brief)
Steckler LLP
12720 Hillcrest Road, Suite 1045
Dallas, TX 75230
Phone: (972) 387-4040
Fax: (972) 387-4041
bruce@stecklerlaw.com

Ervin A. Gonzalez (on the brief)
Patrick Montoya (on the brief)
Colson, Hicks, Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
  Echsner & Proctor, PA
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
The Lambert Firm
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@thelambertfirm.com

Jerrold Seth Parker
Parker Waichman, LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Myers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves
Reeves & Mestayer, PLLC
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@attorneys4people.com

Christopher Seeger (on the brief)
Scott George (on the brief)
Diogenes P. Kekatos (on the brief)
Seeger Weiss, LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
Whitfield, Bryson & Mason, LLP
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5002
dan@wbmllp.com

Richard J. Serpe
Law Offices of Richard J. Serpe
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

Victor M. Diaz, Jr.
V.M. Diaz and Partners, LLC
119 Washington Ave., Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

Gerald E. Meunier (on the Brief)
Rachel A. Sternlieb (on the Brief)
Gainsburgh, Benjamin, David,
  Meunier & Warshauer, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2800
Phone:  (504) 522-2304
Fax:  (504) 528-9973
gmeunier@gainsben.com

216

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Richard S. Lewis (on the brief)
HAUSFELD LLP
1700 K Street, N.W., Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Anthony D. Irpino (on the Brief)
Pearl A. Robertson (on the Brief)
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 22nd day of January, 2016.

Respectfully Submitted,

BY:  /s/ Leonard A. Davis
Leonard A. Davis
Herman, Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
ldavis@hhklawfirm.com

*Plaintiffs' Liaison Counsel MDL 2047*

217