

PUBLIC LAW AND LEGAL THEORY RESEARCH PAPER SERIES

PAPER NO. 423

LAW & ECONOMICS RESEARCH PAPER SERIES

PAPER NO. 14-017

# PROTECTING THE STATE FROM ITSELF? REGULATORY INTERVENTIONS IN CORPORATE GOVERNANCE AND THE FINANCING OF CHINA'S "STATE CAPITALISM"

*NICHOLAS C. HOWSON*

*CHINESE STATE CAPITALISM AND INSTITUTIONAL CHANGE: DOMESTIC AND GLOBAL IMPLICATIONS*
BENJAMIN L. LIEBMAN & CURTIS J. MILHAUPT EDS.,
OXFORD UNIVERSITY PRESS (FORTHCOMING 2015)

THE SOCIAL SCIENCE RESEARCH NETWORK ELECTRONIC PAPER COLLECTION:
HTTP://SSRN.COM/ABSTRACT=2515383

FOR MORE INFORMATION ABOUT THE PROGRAM IN LAW AND ECONOMICS VISIT:
HTTP://WWW.LAW.UMICH.EDU/CENTERSANDPROGRAMS/LAWANDECONOMICS/PAGES/DEFAULT.ASPX

MTD Exhibit #6

**Protecting the State from Itself?  Regulatory Interventions in Corporate Governance and the Financing of China's "State Capitalism"**

Nicholas Calcina Howson
University of Michigan Law School

**Draft Date:  13 January 2015**

## ABSTRACT

*From the start of China's "corporatization without privatization" process in the late 1980s, a Chinese corporate governance regime, apparently shareholder-empowering and determined by enabling legal norms, has been altered by mandatory governance mechanisms imposed by a state administrative agency, most often to protect minority shareholders against exploitation by the party state controlling shareholders which are the accepted powers of "state capitalism." This chapter reviews the path of that benign intervention and the structural reasons for it, and then speculates on why this novel identity of the Chinese party state's "fragmented authoritarianism" continues to be tolerated by the same party state, and indeed how it is necessary for the continued financing of China's "state capitalism."*

**PROTECTING THE STATE FROM ITSELF?**
**REGULATORY INTERVENTIONS IN CORPORATE GOVERNANCE AND THE**
**FINANCING OF CHINA'S "STATE CAPITALISM"**


## I.   Introduction

Many observers assume that the "state capitalism" model for the People's Republic of China ("PRC" or "China") implicates relatively unfettered control of listed subsidiary corporations by the agents of the PRC party state, whether direct state equity owners, state-affiliated holding companies (or groups), or the *nomenklatura*-origin individuals appointed or elected to the Chinese Communist Party committee, board, supervisory board, or senior management of such firms.  This assumption may not be entirely accurate.  Instead, China's securities regulator (the China Securities Regulatory Commission ("CSRC")) and other bureaucratic agencies have for many years imposed mandatory governance constraints on a formally shareholder-oriented and "enabling" law-based corporate governance system, and with the express goal of empowering minority shareholders and constraining the power and discretion of the PRC's strongest political economic actors under the state capitalism model.[1]  This chapter reviews the structural reasons for this sustained intervention, and speculates on how and why one tentacle of the party state – the CSRC – has been permitted to implement this constraining mechanism on the heads of other, far more powerful, tentacles of the same political economic structure, corporatized state-owned enterprises ("SOEs").  I conclude with thoughts on how these

---

[1]        *See* Nicholas Calcina Howson, *"Quack Corporate Governance" as Traditional Chinese Medicine – the Securities Regulation Cannibalization of China's Corporate Law and a State Regulator's Battle Against Party State Political Economic Power*, 37 SEATTLE U. L. REV. 667 (2014) (hereinafter, *Battle Against Party State Power*).

constraints and enhanced accountability mechanisms contribute in a significant way to the financing, and thus continuing viability, of China's state capitalism.

## II.  A "Mandatory" Regulatory Intervention into the Province of "Enabling" Law

China's public company regulators have over the past two decades consistently acted to create, re-craft or anticipate the most fundamental aspects of the PRC's formal legal corporate governance system, and institute robust board-related and/or minority shareholder-empowering norms designed to protect against controlling shareholder oppression or malfeasance.  The CSRC has historically made these incursions via two distinct methods: (i) the filling-in of substantive corporate law doctrines which still have to be enforced by a state actor, whether the judiciary or a regulator (*e.g*., corporate fiduciary duties); and (ii) the establishment of "self-enforcing" mechanisms designed to be effective as between the parties to a firm before the state or any external actor needs to be involved in enforcement, if at all (*e.g*., minority shareholder "class" negative veto rights).  These interventions include, *inter alia*:

- Corporate fiduciary duties for orthodox fiduciaries and even controlling shareholders, in both the operational and takeover contexts;

- Super-majority approval/negative veto mechanisms empowering so-called "public" shareholders;

- Super-majority approval (and/or controlling shareholder recusal), and super-majority director approval (and/or director recusal) for controlling shareholder related party transactions and self-dealing;

- Independent directors; and

- Broad shareholder "class" negative veto rights (even when shareholder classes were prohibited).[2]

I should emphasize that the self-enforcing *genus* of regulatory intervention, which can be effective without recourse to enforcement by any external institution, is far more likely to be effective given the structure of China's political economy.  For example, if there is concern about the political and economic power of the PRC party state's controlling shareholders, or doubts about the competence, autonomy and independence of the Chinese judiciary, the implantation of substantive corporate fiduciary duties for orthodox fiduciaries or controlling shareholders into China's company law is not likely to have much effect because articulation and enforcement of these norms may be frustrated by the phenomena animating the reform in the first place.  Conversely, a self-enforcing mechanism such as the negative veto rights conferred on non-controlling shareholders for approval of related party "external" guarantees forced out of listed companies constitutes a very effective constraint for the identified abuse, especially when compared to reliance on any doctrinal fill-in, a vague and unevenly-applied duty of loyalty standard applied *ex post*.  Indeed, the real effectiveness of such self-enforcing mechanisms was seen in the run-up to the China National Offshore Oil Company ("CNOOC") bid for Unocal (where the independent directors blocked a Unocal-invited bid) and the bid by Singapore Airlines for a controlling stake in China Eastern Airlines (vetoed by a class (really "type") vote).[3]

---

[2]     *Id.* at 677-84.

[3]     *See* Nicholas C. Howson, *China's Acquisitions Abroad – Global Ambitions, Domestic Effects*, 48 LAW QUADRANGLE NOTES 73, 78, 83-4 (2006) (regarding the CNOOC directors' vote initially blocking the proposed CNOOC bid) and Barry Naughton, *SASAC and Rising Corporate Power in China*, 24 CHINA LEADERSHIP MONITOR 1 (2007) (regarding the veto rendered by China Eastern Airlines' "H" shareholders).

### III.   The Consequences of Corporatization without Privatization

Why has the CSRC been obligated to execute this regulatory intervention?  The answer to that question lies in the PRC's two decades-old "corporatization without privatization" program and resultant state capitalism, the commitment in Chinese corporate law to what is called "shareholder primacy," and the development of China's broader political economy.

"Corporatization" as commenced in the 1980s sought to implement a "modern enterprise system," abolish the traditional SOE as an organizational form[4] by converting SOEs into a legal form of "company" authorized and apparently governed by PRC company law -- (i) a company limited by shares ("CLS"), a joint stock company form for widely held firms; (ii) a limited liability company ("LLC"), for a smaller and closely knit group of investors; or (iii) a wholly state-owned sub-form of the LLC ("WSOC"), a company owned by a state agency with no shareholders' meeting and an optional board of directors -- and create and empower a new class of property rights owners in the PRC, namely equity shareholders.

Critically, that process of corporatization did not implicate "privatization" of the Chinese economy generally or SOEs individually, or any real withdrawal from the economy of the state or the Communist Party.  This is because a controlling equity interest in the SOE/state-owned asset groups converted into a company went to or was maintained by state entities, and party committees remained important actors behind the formal governance structures required by the corporate form.[5]   To the present day, the party state remains absolutely committed to retaining

---

[4]         The SOE was not given a *legal* form until 1988 and the promulgation of a "law" governing SOEs, concurrent, ironically, with elimination of the SOE organizational form.

[5]         *See* Nicholas C. Howson, *China's Restructured Commercial Banks: Nomenklatura Accountability Serving Corporate Governance Reform?*, *in* CHINA'S EMERGING FINANCIAL MARKETS: CHALLENGES

control over converted asset groups and enterprises in a very broad range of sectors – not just the usual suspects for state control (*e.g.*, defense, natural resources, key infrastructure) but also non-national security and non-key infrastructure sectors that promise high returns to central or local state or party insiders when financed with the aid of passive public investors.

Moreover, it appears that the corporatization without privatization program was motivated by desires very similar to those which animated late 19th century Qing dynasty attempts to engage in "state (court) capitalism" via establishment of *guandu shangban* ("government promoted/supervised-merchant operated") and later *guanshang heban* ("government merchant co-operated") entities like the China Merchant Steamships Company (*lunchuan zhaoshangju*), the Kaiping Mining Company, the Shanghai Cotton Cloth Mill, the Jiangnan Arsenal, etc. -- attempts to re-order state-owned asset groupings into a new, "modern" and "Western," form that could attract passive capital investment from the domestic and global capital markets, without ceding any real governance power over the subject businesses.[6]  At least in this regard, the PRC has been fabulously successful, as corporatized SOEs perceived as the mainstays of China's state capitalism model – still absolutely controlled by the party state or

---

AND GLOBAL IMPACT 123 (Zhu Min et al. eds., 2009) (hereinafter *Nomenklatura Accountability*) (detailing how party committees operate behind, and over, boards of directors at the PRC's largest international issuers).

[6]     *See*, generally, Wellington K.K. Chan, MERCHANTS, MANDARINS AND MODERN ENTERPRISE IN LATE CH'ING CHINA (1977) and C.K. Lai, *The Qing State and Merchant Enterprise: The China Merchant's Company, 1872-1902*, *in* TO ACHIEVE SECURITY AND WEALTH: THE QING IMPERIAL STATE AND THE ECONOMY, 1644-1911 139 (J.K. Leonard & J.R. Watts eds., 1991).

state holding companies – bring off some of the largest IPOs in history and are included among the world's largest firms by market capitalization.[7]

This design for corporatization without privatization coupled with maintenance of central or local state (and behind them, Communist Party) control has impacted both closely held LLC firm establishments and widely held CLSs, with a very pronounced effect on the ownership, control, legal and governance structures applicable to the PRC's listed CLS issuers and the disempowerment of those companies' dispersed public minority shareholders:  First, the strong prevalence of concentrated ownership in Chinese companies (especially listed firms) means that the key agency problem for PRC corporate governance is not *vertical* (between management insiders and a large body of disaggregated shareholders) but *horizontal* (between controlling shareholders and minority shareholders).[8]  Second, the controlling shareholder and its insider appointees are not run-of-the-mill control parties/insiders, but instead are very often an identity of state or party organizations, representatives of central or local government institutions, or party *nomenklatura*  appointments, giving them a heady mix of *political* and economic power, especially against disaggregated, non-politically privileged minority shareholders.  Third, the combination of a strong horizontal agency problem, and the nature of who and what the control

---

[7]     For example, China National Petroleum (no. 4 on Fortune's 2014 Global 500), the State Grid (no. 7), Industrial and Commercial Bank of China (no. 25), China Construction Bank (no. 38), the Agricultural Bank of China (no. 47), China State Construction Engineering (no. 52), China Mobile (no. 55), etc.  *See* (Jan. 13, 2015, 11:30AM), http://fortune.com/global500/.

[8]     The same problem has operated across the Taiwan Straits, in the Republic of China/Taiwan, and continues to elicit similar substantive law and institutional changes.  *See* Christopher J. Guinello, *The Revision of Taiwan's Company Law: The Struggle Toward a Shareholder-oriented Model in One Corner of East Asia*, 28 DEL. J. CORP. L. 92 (2003).

parties are, means that China's listed companies have been run as vehicles to attract passive investment from information-deprived public investors entirely in the interest of those largely unaccountable party state controlling shareholders.  The same firms have therefore represented a ready invitation to opportunism, tunneling, minority shareholder exploitation and oppression, and outright fraud by the controlling shareholders and their appointed insiders -- an invitation taken up with particular gusto at Chinese CLSs with a public float, subject to little monitoring by, or accountability to, a passive, politically disempowered and disaggregated shareholder interest and/or thoroughly compromised judicial enforcement institutions.[9]  Fourth, and as addressed more than a decade ago by Don Clarke, [10] this process of corporatization without privatization has led to a very fundamental dilemma in the design and implementation (or not) of Chinese corporate governance and the legal structure supporting it. The state continues to operate enterprises in China and exercise control in furtherance of its goals, which -- good or bad[11] --

---

[9]       *See*: Y. Cheung, L. Jing, T. Lu, R. Rau & A. Stouraitis, *Tunneling and Propping Up: An Analysis of Related Party Transactions by Chinese Listed Companies*, 17 PAC. BASIN FIN. J. 372 (2009); H. Berkman, R. Cole & L. Fu, *Expropriation Through Loan Guarantees to Related Parties*, 33 J. BANK. & FIN. 141 (2009); G. Jiang, C. Lee & H. Yue, *Tunneling Through Intercorporate Loans: The China Experience*,  98 J. FIN. ECON. 1 (2010); and Nancy Huyghebaert & Lihong Wang, *Expropriation of Minority Investors in Chinese Listed Firms: The Role of Internal and External Corporate Governance Mechanisms*, 20 CORP. GOV. INT'L REV. 308 (2012).

[10]      *See* Donald C. Clarke, *Corporate Governance in China: An Overview*, 14 CHINA ECON. REV. 494, 494-5 (2003) (hereinafter, *Corporate Governance in China*).

[11]      The "goals" for which the state exercises its control rights can range from the assumed private interests of officials and cadres asked to represent "all of the people" of the state (much discussed in public governance literature) to various wider political or social imperatives (*e.g.*, cross-subsidization of failing firms, full employment.) which seem more benign, but still potentially operate to the detriment of external minority investors in a specific firm.

must be understood as distinct from the presumed narrower shareholder wealth maximization

goal of all other shareholders, *i.e.*, the minority shareholders.  (Admittedly, the goals of the state

control party and the minority shareholders may converge from time to time, in particular with

respect to short-term shareholder gains; however, there is nothing in the corporatization program,

or law formal and applied, which requires the state control party to  exercise its control in the

service of wealth maximization for *all* shareholders in the firm.)  Thus, the state through its

controlling shareholders in corporatized entities very openly exercises an undiluted form of what

(U.S.) Delaware jurisprudence has called the "right to selfish ownership" and exploits the

minority shareholders, who have no other way to benefit from their investment in the

corporatized firm.  As long as Chinese ideology and national industrial policy continue to

sanction state shareholders controlling corporate entities where there are other shareholders, real

protections for such other shareholders present either (i) a constraint on the state's ability to

operate in a way that is the very reason the state has maintained control, or (ii) if those

constraints are not to operate on state-controlled firms, then the necessity for separate corporate

law regimes applicable to state-controlled corporatized firms, on one hand, and all other firms,

on the other.  There is no immediate prospect of a formal, separate legal regime for state-

controlled firms.  Indeed, the 1994 PRC Company Law, the 2006 PRC Company Law, and the

"modern enterprise system" and corporatization policies were all proclaimed as major steps in

the opposite direction, elimination of any distinction between state firms and non-state controlled

companies.  Instead, the history of *non*-implementation/adjudication of China's company law

with respect to public capital markets-financed and corporatized SOE issuers [12] – a neat

---

[12]       *See*, for example, Nicholas Calcina Howson, *Corporate Law in the Shanghai Courts, 1992-2008:*

*Judicial Autonomy in a Contemporary Authoritarian State*, 5 PENN. E. ASIA L.REV. 303, 400-16 (2010)

expression of the dilemma which Mary Gallagher refers to as "authoritarian legality"[13] --
indicates resistance to the idea of any constraint on, or accountability for, the party state's ability
to operate subsidiary firms in the way in which it desires, again the reason for which it
maintained control in the first place.

---

(hereinafter, *Corporate Law in the Shanghai Courts*), and Donald C. Clarke & Nicholas Calcina Howson, *Pathway
to Minority Shareholder Protection – Derivative Actions in the People's Republic of China*, *in* THE DERIVATIVE
ACTION IN ASIA: A COMPARATIVE AND FUNCTIONAL APPROACH (Daniel Puchniak et al. eds., 2012)
243, 254-56, 267-69 & 275-78 (2012) (hereinafter, *Derivative Actions in the PRC*) (both noting the complete
absence of widely held or listed company governance-related shareholder company law-related suits (other than
securities law claims alleging fraudulent or misleading disclosure pursuant to a very limited allowance made under
pressure by the PRC Supreme People's Court) in the Chinese courts, and the partially related hostility of the
People's Courts to any cases involving a large number of parties, resulting in large parts of the PRC Company Law
left unimplemented).

[13]     *See* MARY GALLAGHER, AUTHORITARIAN LEGALITY: LAW, WORKERS, AND THE
STATE ___ (forthcoming 2015) ("… institutionalization brings the allure of constraints and rules on others while
continued state-led control over deployment of these institutions provides opportunity for discretion and
flexibility…  This is one of the privileges (and dilemmas) of single-party regimes.  It makes the rules; it doesn't
necessarily bind itself to those rules.").

IV.     **Shareholder Primacy and Enabling Corporate Law in China -- Enabling
Exploitation of Minority Shareholders by the Party State**

Since 1994, China's corporate law has expressed fealty to a robust version of what

scholars call a "shareholder primacy" model.  Moreover, for the last decade China's company

law has been made increasingly "enabling", as epitomized by the wholesale changes seen in the

2006 Company Law.  Continued shareholder primacy and the increasingly enabling orientation

of the corporate law and governance system, when coupled with the corporatization without

privatization program, has resulted in something widely acknowledged as pernicious in China

and abroad -- the open and continued exploitation of minority shareholders in Chinese firms.  It

is that phenomenon which has made necessary the CSRC-imposed mandatory provisions noted

here.

"Shareholder primacy" refers to a model of corporate law and governance that bestows

significant formal governance power on firm shareholders, as the firm's ultimate owners, rather

than the agents of those owners, the firm's directors and officers.  In theory, shareholder primacy

can appear well justified because shareholders are the true owners or stakeholders in the firm

residual.  Moreover, in a corporate ecology characterized by widely held firms and extensive

separation of ownership and management, where there is concern about those agents acting in

their own interest and not that of all the owners (*i.e.*, the firm), any mechanism that can rein in

those agents and make them accountable to the firm's owners seems advisable.  Indicia of

shareholder primacy include the power to elect members of the firm's centralized management

body, the board of directors, oust incumbent directors mid-stream with or without cause, and

vote on significant firm decisions.  From this view, China's modern corporate law system

represents a strong version of the shareholder primacy model, for example requiring that the

general shareholders' meeting approve dividend distributions.

"Enabling" corporate laws are general corporation codes which provide something like a standard form contract structured around default provisions, with very few mandatory or immutable rules working on firm participants' internal rights and obligations or the firm's external activities.  In most developed capitalist jurisdictions, corporate governance at specific firms is now determined by a mixed application of some default provisions left unchanged by the participants, specific arrangements crafted *ex ante* by contracting out of other default rules, and extremely broad common law doctrines interpreted and enforced *ex post* by a usually circumspect (and business judgment rule-constrained) judiciary as prodded by private shareholder plaintiffs (and in the U.S. their attorneys working with the benefit of contingency fee arrangements and liberal cost-sharing/class action rules).  Basic theories of the corporation have developed in parallel, from the 18th and 19th century idea that firms were a creation of the state pursuant to a specific legislative act, to the 20th century contractarian conception of the company as a creation of private contract.  For many analysts, it is the enabling, standard form contract- and default rule-providing – and *non*-mandatory – character of corporate law that both defines and recommends it.  Indeed, in the Anglo-American capitalist economies there is a bedrock confidence that private capital accumulates and will be efficiently allocated to useful projects through an infinite variety of complex and individualized arrangements regarding entity governance and investor rights, which arrangements are in turn determined by different levels of information availability, the value brought to the table by specific investors, and many other factors.  Said another way, there is a strong belief in many of the developed capitalist economies that any attempt to significantly pattern or constrain those arrangements beyond what the public

interest or basic accountability absolutely requires will impede realization of optimal privately negotiated arrangements and thus fatally dampen capital formation.[14]

In 1993-4 the Chinese Communist Party-led government began its experiment with company law making decidedly in the "mandatory" and not the "enabling" mode.[15]  Indeed, that orientation was but a continuation of China's earliest identities of corporate law[16] and general approach to law (as "rule *by* law").[17] All of that in turn is consistent with the Chinese state's (and before that, the Chinese imperial court's) desire to control or monitor very closely potentially independent capital accumulation and business activity, and benefit from it.[18]  At the same time,

---

[14]     *See*, for example, Frank H. Easterbrook, *The Race for the Bottom in Corporate Governance*, 95 VA. L. REV. 685, 688 (2009) ("Corporate law came to be enabling rather than directory in the United States because that serves investors' interests, not because it serves managers' interest.  States that adopt inefficient regulation propel capital out of their jurisdictions.")

[15]     *See* Corporate Governance in China, *supra* note 10, at 496, 500 ("…and the [1994] Company Law is thus clearly more concerned with regulating and suppressing than with fostering and nurturing."… "The policy choice in the current [1994] Company Law is clear; the rules are almost uniformly mandatory.")

[16]     *See* William C. Kirby, *China Unincorporated: Company law and Business Enterprise in Twentieth-Century China*, 54 J. ASIAN STUD. 43 (1995).

[17]     *See* Liang Zhiping, *Explicating "Law": A Comparative Perspective of Chinese and Western legal Culture*, 3 COLUM. J. CHINESE L. 55, 61, 89 (1989) .

[18]     *See* Chan, *supra* note 6; Kirby, *supra* note 16, at 44 ("The history of this first modern Chinese [company] law is to some degree a barometer of the state's assumptions towards the economy over the course of the twentieth century…. [T]he Chinese state would be the prime beneficiary of the adoption of the corporate form of business activity.  But the first assumption of the [early twentieth century] Qing reformers, that the modern corporation on a Western model would be the essential vehicle for *private* Chinese economic development, would prove quite mistaken."); and Madeleine Zelin, *The Firm in Early Modern China*, 71 J. ECON. BEHAV. & ORG. 623 (2009).

China's first post-1949 corporate law held high the banner of shareholder primacy, putting significant formal power into the hands of shareholders over directors, officers or supervisors. Without any doubt, this was deemed permissible to PRC policy makers and legislators, and the promoters of what became state capitalism, because of the distinctive capital structure of corporatized SOEs described above -- featuring a large, party state-tied, controlling shareholder given full power to dominate the subsidiary firm directly as a shareholder or via a board of directors elected entirely by it also acting as a shareholder.

Only with the passage of the 2006 PRC Company Law did the PRC move away from a business regulation philosophy and in a new direction: towards an enabling statute which allows for increased contracting-out of default rules *ex ante* alongside continuing self-enforcing mechanisms, and which creates very significant work for the judiciary applying standards *ex post*. In fact, this development in the direction of a formally enabling corporate law system has been celebrated widely in the PRC among academics and People's Court officials alike. For example, a 2007 commentary by the Shanghai Higher People's Court (regarding a 2003 case where the Shanghai No. 1 Intermediate People's Court had to choose between *statutory* rights of first refusal due to existing shareholders and the rights of a good faith purchaser under a fraudulently approved securities purchase *contract*) appears to channel U.S. federal appellate judge and law and economics theorist Frank Easterbrook[19] directly:

> First and foremost, the thing we must clarify is this: the jurisprudential logic
> underlying the giving of priority to the [right of first refusal] over the purchase
> rights of the transferee is absolutely not because the former right is in statute
> and the latter is merely a contractual right. This is because statutory rights are

---

[19]     *Supra* note 14 and accompanying text.

not always superior to contractual rights – in fact, it is just the opposite.
Approaching it systematically and *adhering to the orientation which protects*
*private ordering, regulation of the market requires that application of the law*
*fully respect the freedom to contract to encourage successful transactions*….
There is significant meaning in this.[20]

Yet, notwithstanding this rhetorical fealty to enabling corporate law, the mandatory norms
imposed by the CSRC and other agencies discussed in this chapter (and the absorption of many
of those regulatory mandates into the 2006 PRC Company Law)[21] have pushed the applied law
of corporate governance in precisely the opposite direction.[22]

---

[20]    Commentary regarding the case reported as "A Investment Company v. Wang and Other
Shareholders" (Shanghai No. 1 Intermediate People's Court, on appeal 2003), in 2005 年上海法院案例精选 (2005
SELECTION OF SHANGHAI COURT CASES) 106-109 (Shanghai Higher People's Court ed. 2007); with the
quoted portion of the commentary *id.* at 111 (emphasis added).

[21]    *See,* for example, 2006 PRC Company Law, arts. 20 (fiduciary duties for controlling shareholders
and an oppression remedy), 106 (cumulative voting, formally enabling but made mandatory by CSRC regulation and
approval practice), 16 & 122 (cap on external guarantees, recusal of controlling shareholders on shareholder votes
for such guarantees, and a supermajority vote for any such guaranty greater in value than 30% of corporate assets, or
a majority of non-control shareholders; supermajority shareholder vote on disposition of significant assets), 123
(independent directors), 125 (recusal of conflicted directors), and 127 (allowance for different classes of shares and
preferred shares), and 148 (fiduciary duties for orthodox corporate fiduciaries).

[22]    Interestingly, my own research has shown how the Chinese People's Courts – contrary to some
expectations  and certainly the doctrinal rhetoric quoted from the A. Investment Company v. Wang case
commentary above -- have mimicked this trajectory, adjudicating some enabling provisions of the 1994 and 2006

## V. Regulatory Intervention – Structural Exploitation, Legislative Competence and Independence, and the Judiciary

The pernicious implications of the corporatization without privatization program, coupled with an ever more enabling and thus controlling shareholder-empowering corporate law, make the reasons for the CSRC's counter-strike obvious. Given lopsided capital structures and thoroughly dominated directorates and shareholders' meetings, not to mention the unconstrained political and economic power of state controlling shareholders (and their appointed insiders) and a radical information asymmetry between such controlling shareholders and diffuse public investors, an enabling company law design built on strong notions of shareholder primacy has been a broad invitation for dominant shareholders to oppress and exploit far weaker actors in the firm, especially where minority shareholders have very little power to bargain for information or effective protections, or obtain any price discount[23] to compensate for their disadvantageous

---

PRC Company Laws as mandatory. *See* Corporate Law in the Shanghai Courts, *supra* note 12, at 382-3 ("'Conservative' Adjudication – iii. Enabling to Mandatory").

[23]     This has been demonstrated empirically by the long-standing A share price premium over H shares for the same issuer listing A shares on the PRC exchanges and H shares on the Hong Kong Stock Exchange, and has been tracked by the Hang Seng "China AH Premium Index" since January 2006. *See* (Jan. 13, 2015, 11:30AM), http://www.hsi.com.hk/HSI-Net/static/revamp/contents/en/dl_centre/factsheets/FS_AHPe.pdf. This A share premium has been thought to result from the limited supply of, and strong demand for, A share issues for domestic PRC purchasers who have not been permitted to invest in "overseas" (including Hong Kong) markets. No one has seriously asserted that the A share premium over H shares results from stronger investor protections or better corporate governance associated with a listing on the Shanghai or Shenzhen Exchanges. In recent years the A share premium over H shares has reduced because of increased foreign investment in the A share markets (*e.g.*, via the Qualified Foreign Institutional Investor program), and greater access by PRC purchasers to such overseas markets (*e.g.*, via the Qualified Domestic Institutional Investor program, the recent mutual recognition of mutual funds

position.  Therefore, mandatory provisions – from whatever source -- designed to protect the basic informational and governance rights of minority capital providers against such control parties were required.

Observers might respond that the remedy to this baked-in exploitation of minority property rights holders should have been available from either the legislator or the court system. Certainly there was an effort to create or make more effective legal remedies for minority shareholders against politically powerful insiders and controlling shareholders via wholesale reformation in 2005-6 of the defective 1994 PRC Company, with the concretization of CSRC regulatory mandates[24] and the addition of substantive claims (*e.g.*, duty of care, controlling shareholders' fiduciary duties, piercing of the corporate veil) and procedural innovations (*e.g.*, a derivative action, the ability of shareholders to call special shareholders' meetings).  However, China's developing legal system and the institutional *status quo ante* made clear that substantive legal change would not be enough, because of at least three additional factors:  First, there have been and remain serious issues pertaining to the technical competence of PRC legislators at the National People's Congress, especially with respect to complex areas like corporate law and securities regulation.  Moreover, it is apparent that China's national law-making institutions may lack objectivity, at least insofar as their legislative product conflicts with the interests of the party state's SOE systems.[25]  Second, while the situation is better than some observers surmise, there

---

between Hong Kong and the PRC -- allowing PRC domiciled, RMB yuan, investors to participate in Hong Kong domiciled mutual funds (with holdings in non-PRC exchange, foreign currency, traded securities) -- and the newly-unveiled Shanghai-Hong Kong (Exchange) Link (the *Hu-Gang Tong*)).

[24]     *Supra* note 21.

[25]     *See*, for example, Xi Chao, *Piercing the Corporate Veil in China – How Did We Get There?*, 5 J. BUS. L. 413, 423-7 (2011) (describing the role of  the State-owned Assets Supervision and Administration

must be continuing doubts about the competence, autonomy and political independence of PRC judicial institutions called upon to implement, *ex post*, corporate law standards, accountability or remedies.[26]   Even if state-of-the-art substantive provisions and procedural mechanisms are introduced into PRC company law – as they assuredly were in November 2005 with promulgation of the final 2006 PRC Company Law -- there is a continuing concern as to whether the PRC People's Courts will be competent and powerful enough to utilize, adjudicate, and enforce such law with respect to any kind of PRC corporation, LLC, CLS or WSOC, much less accept or be permitted to accept disputes concerning the same.[27]   Third, a basic dilemma in

---

Commission ("SASAC") in sabotaging the CSRC's more permissive statutory veil-piercing standard originally set forth in the Company Law Amendment's Consultation Draft, due to SASAC concern that the more liberal doctrine would also be applied to the control groups of unlisted corporatized SOEs).

[26]      *See*, for example, Corporate Law in the Shanghai Courts, *supra* note 12 (corporate law adjudication in the Shanghai Higher People's Court system between 1992 and 2008); Wang Jun 王军,

公司经营者忠实和勤勉义务诉讼研究 – 以14 省，直辖市的137 件判决书为样本 (Analysis of Litigation Regarding Company Management's Duties of Loyalty and Care – Using 137 Judgment Opinions from 14 Provinces and Directly Administered Municipalities), 2011 北方法学(Northern Jurisprudence) no. 5, 24 (corporate fiduciary litigation nationwide); Derivative Actions in the PRC, *supra* note 12 (the corporate derivative action); and Hui Huang, *Piercing the Corporate Veil in China: Where is it Now and Where is It Headed?*, 60 AM. J. COMP. L. 743 (2012) (corporate veil piercing).

[27]      I should note in passing that the PRC judicial *bureaucracy – i.e.,* not courts issuing opinions on adjudicated cases -- has played some role in implanting substantive corporate law doctrine and procedural innovations into China's corporate law and governance system.  Before 2005, this was done via the creation by individual (Provincial/Directly-Administered Municipality) Higher Level People's Court systems of "opinions" on issues presented in litigation concerning the woefully deficient 1994 PRC Company Law.  Notable Higher People's Court opinions on corporate law came from Jiangsu (2003), Shanghai (2003), and Beijing (2004).  Importantly, none of

China's corporate governance project revealed in my own research on the People's Courts and a hallmark of Mary Gallagher's concept of "authoritarian legality" is the almost complete *non-*implementation of China's company law for minority shareholder plaintiffs in public capital markets-financed corporatized issuers, arising in part from the system's denial of any constraint on the state's ability to operate firms as it sees fit, the reason it maintained control in the first place.

---

these local court system opinions attempted to institute self-enforcing governance mechanisms like supermajority negative veto rights in the style the CSRC has for public companies. After the effectiveness of the 2006 PRC Company Law, the Supreme People's Court has released three judicial "regulations" concerning the company statute, and has embarked on a Guiding Cases project, none of which, however, remake corporate governance norms in the same fashion as the CSRC regulation described here. To date, only one of such Guiding Cases has involved corporate governance matters, "Guiding Case No. 10"

(李建军诉上海佳动力环保科技有限公司公司决议撤销纠纷案 (Li Jiangjun v. Shanghai Jiapower Environmental Protection Science and Technology Co., Ltd., a corporate resolution revocation dispute) (最终版本 (Final Version), Nov. 9, 2012)) , (Jan. 13, 2015, 11:30AM), http://cgc.law.stanford.edu/wp-content/uploads/2013/04/CGCP-Chinese-Guiding-Case-10.pdf (shareholder challenge to a board resolution).

## VI.    The CSRC – A Conflicted Actor

From an institutional standpoint then, the above-described factors worked together to leave the CSRC as one of the only state institutions in China capable of: (i) expert drafting of substantive provisions, in particular of the self-enforcing type; (ii) technical resistance against controlling state shareholders (and the political economic systems backing them); and (iii) substituting for an inexpert, overly bureaucratic or politically cowed judiciary, at least with respect to publicly-listed firms.[28]

I do not mean to assert in this chapter that the CSRC is entirely, or even mostly, a "good actor" under the Chinese party state's model of state capitalism, or that it uniformly acts to constrain the power of SOE party state controlling shareholder groups.  Chen Ruoying's eloquent lament in this volume regarding the low quality human capital trap created by state capitalism -- including specifically the CSRC with respect to IPO approvals[29] -- my own work on illegal and *ultra vires* enforcement by the CSRC against insider trading[30] and many other bodies of

---

[28]     Note that from January 1, 2013, the CSRC asserted expanded jurisdiction beyond domestically or overseas exchange-listed companies to include CLSs with more than 200 shareholders, and CLSs which have issued securities "to the general public" or "in a public manner", an elaboration of regulatory power very likely to gain a statutory basis in the revised PRC Securities Law.  *See* Battle Against Party State Power, *supra* note 1, at 713.

[29]     *See* Chen Ruoying, *State Monopoly and Human Capital Development*, *in* CHINESE STATE CAPITALISM AND INSTITUTIONAL CHANGE: DOMESTIC AND GLOBAL IMPLICATIONS __  (Benjamin L. Liebman & Curtis J. Milhaupt eds., 2015).

[30]     *See* Nicholas Calcina Howson, *Enforcement Without Foundation? – Insider Trading and China's Administrative Law Crisis*, 60 AM. J. COMP. L. 955 (Fall 2012) (critiquing the CSRC as acting illegally with respect to the enforcement of insider trading prohibitions, a critique acknowledged as valid with issuance of a responsive joint explanation by the PRC Supreme People's Court and the PRC Supreme People's Procuratorate

evidence[31] render implausible any claim that the CSRC and its human agents are the saviors of the PRC capital markets, or are immune from agency capture.

Instead, I would note that the CSRC can be a "bad actor" in its day-to-day gatekeeper, approval and enforcement roles, while still being the "good actor" in the sense of supplying longer-term, highly sophisticated (and thus perhaps opaque) pre-enforcement or legal constraints on the power of state capitalism's control groups analyzed in this chapter.

---

("SPP") drawing such illegal enforcement back within the bounds of legality, at least in criminal prosecutions by the SPP.)

[31]     *See*, for example, China University of Politics and Law's Zhou Tianshu's:  *Is the CSRC Protecting a "Level Playing Field" in China's Capital Markets: Public Enforcement, Fragmented Authoritarianism and Corporatism*, (Jan. 13, 2015, 11:30AM),  http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2505568.

VII.    "How" Have the CSRC and Other Agencies Been Permitted to Push Back, and
        What Does It Mean for China's State Capitalism Model?

I have reviewed some of the reasons *why* the CSRC and other agencies have intervened

to constrain or hold more accountable party state-rooted controlling shareholders in the

paradigmatic firm operating under state capitalism.  If I were to conjecture further on a separate

*why* question -- the reasons for the dichotomy of action by the CSRC alluded to immediately

above: a sometimes corrupt, captured agency with increasingly degraded human capital creating

sophisticated constraints on powerful actors in the economy -- there is little doubt about the

significance of (i) input from foreign capital markets regulators and academics (often delivered

via foreign-educated officials or academics active inside the PRC), and (ii) the competitiveness

of greatly more integrated international capital markets requiring such mechanisms for Chinese

issuers to attract capital.

The far more intriguing question is *how* the CSRC has been permitted to erect and

enforce effective constraints on the power of China's party state-tied controlling shareholders.

While the PRC party state is not the monolith many popular accounts perceive, it does seem

startling that there is any allowance for an agency that is embedded in the same party state (with

no economic and little independent political power) to conceive and implement mechanisms

which limit the power of, or seek to hold accountable, politically far better-endowed actors –

SOEs and their controlling shareholders and the sprawling systems they spring from.

In starting to answer this question, I note at the outset that I do not address the more

traditional political scientist's inquiry: the sources of the CSRC's concrete power over more than

two decades.  Thus, for example, I do not seek to answer the following questions:  What rank

does the CSRC have in the state bureaucracy (and its party organ in the parallel party system)?

What, or whose, patronage network does the CSRC lie in?  What individual or groups of leaders

have empowered the CSRC at different times in its development?  What resources are the CSRC

able to attract, and conversely what resources does it control?  Is the CSRC able to resist agency

capture, and how?  While the development of the CSRC as an institution of the PRC party state

is a rich area for continued research, the answers to these questions will vary greatly over time,

given the varied power (and power bases) of different individuals and their allies (*e.g.*, compare

recent CSRC Chairmen Zhou Xiaochuan (2000-2002), Shang Fulin (2002-2011), Guo Shuqing

(2011-2013) and the present incumbent Xiao Gang (2013-date)), and the development of the

PRC capital markets and their engagement with global capital markets.  Variance along these

dimensions may in turn obscure larger structural features which explain what the CSRC is doing.

Instead, I address the CSRC's normative power in trying to explain the phenomenon identified in

this chapter and its relationship with state capitalism as practiced in the PRC.

   Although what I describe in this chapter may appear to be a very specific and technical

aspect of the established PRC "fragmented authoritarianism" narrative,[32] I think it is different.

---

[32]   *See* Kenneth Lieberthal & Michel Oksenberg, POLICY MAKING IN CHINA: LEADERS,

STRUCTURES AND PROCESSES 3-34 (1988); Kenneth Lieberthal, *Introduction: The "Fragmented*

*Authoritarianism" Model and Its Limitations*, *in* BUREAUCRACY, POLITICS AND DECISION MAKING IN

POST-MAO CHINA 1-32 (Kenneth Lieberthal & David M. Lampton eds., 1992); and Kenneth Lieberthal,

GOVERNING CHINA – FROM REVOLUTION THROUGH REFORM 186-88 (2004).  Political Scientist Andrew

C. Mertha has also written more recently on this aspect of PRC governance.  *See*: Andrew C. Mertha, *"Fragmented*

*Authoritarianism 2.0": Political Pluralization of the Chinese Policy Process*, 200 THE CHINA QUARTERLY 1

(December 2009); and Andrew C. Mertha, *Policy Enforcement Markets – How Bureaucratic Redundancy*

*Contributes to Effective Intellectual Property Implementation in China*, 38 COMPARATIVE POLITICS 295 (April

2006).  However, all of these studies focus on horizontal competition (or, in Professor Mertha's case, redundancy in

enforcement) between vertically-arranged *governmental and bureaucratic* actors, and usually with respect to

specific policy decisions or approvals.

The traditional fragmented authoritarianism account focuses on how vertical (from center to locality) *governmental* and *bureaucratic* systems battle across *horizontal* lines (within a given geographic area) with respect to *governmental policy or approvals*.  This chapter addresses something distinct, and a phenomenon directly tied to the rise of state capitalism: a *horizontal* contest between a central government agency creating *pre-enforcement* mechanisms and *ex post*-applied doctrines which systemically constrain the economic and directorial power of a supremely powerful, *non-governmental, non-regulatory*, constituency – SOE groups and the controlling shareholders they produce.  It goes without saying that this new kind of fragmentation of the purportedly authoritarian party state is the inevitable result of the state capitalism model, where units endowed with both political and economic power are ranged against other units with governmental/administrative power alone.

My tentative answers to the *how* question focus on the CSRC's normative power against corporatized SOEs, their control groups, and the systems which support them, and the extent to which the expression of that normative power is necessary for the flourishing of state capitalism in contemporary China.  In the following section, I consider the issue from four different perspectives:  (i) what it is about the CSRC, as a new kind of government unit in China, that empowers it to act in this fashion?; (ii) what might cause powerful controlling shareholder groups to allow the CSRC this provocative space for maneuver?; (iii) why the human agents who are appointed by the party state to run corporatized SOEs might welcome such constraints; and (iv) why the state capitalism model might require both the expression and enforcement of the constraints identified here to finance itself in a sustained manner.

## A.   The CSRC as New Kind of PRC Party State Agency

The CSRC was the first agency and subsequently ministry-level body in the PRC's history with jurisdiction over an area that is not a specific *industrial sector*, but a *market activity* in an increasingly market-oriented economy.   Thus, just as the Ministry of Textile Industry, for example, once governed the PRC's entire textile industry and its productive SOEs, the CSRC can be seen – and more importantly, sees itself -- as China's "Ministry of Capital Markets," a regulator certainly, but also a government department charged with maintaining the operation, integrity and attractiveness of China's domestic capital markets.   This sense of ownership of the capital markets, and bureaucratic investment in the success of the market it governs, contributes to the CSRC's concrete moves to resist the power of even politically well-endowed SOEs and their supporting systems.   In addition, and notwithstanding the strengthening of its regional offices, the CSRC is very much an organ of the central government, and therefore an organ of the party state which is not tied to or reliant upon any given industrial or manufacturing sector, or any geographic region.   While most large SOE systems have their origin in some kind of central authority (usually a former ministry metamorphosed into a group holding company), their admittedly robust political and economic interest eventually becomes narrowed into a specific sector (*e.g.*, telecoms, power generation, downstream oil and gas and petrochemicals) and a part of that specific sector (as part of a duopoly or tri-opoly), and then often into a region.[33]   Consider how the three giant SOEs in the oil industry, CNOOC, the China National Petroleum Corporation/PetroChina and Sinopec, have their origins at the national level, but have since each been directed into specific sectors (upstream exploration, development and production (onshore

---

[33]        *See*, generally, Li-Wen Lin & Curtis J. Milhaupt, *We are the (National) Champions: Understanding the Mechanisms of State Capitalism in China*, 65 STAN. L. REV. 697, 704-33 (2013).

vs. offshore) vs. downstream oil and gas and petrochemicals) and in specific geographical areas in China.  The same might be observed for the corporatized offspring of the former PRC Ministry of Post and Telecommunications - China Telecom, China Mobile and China Unicom. Thus, while observers may understand the corporatized SOE systems of China's state capitalism as all-powerful, and rooted in the center, the breadth of their power is actually narrower than that of a purely central, all sectors encompassing organ like the CSRC.

**B.    Party State Controlling Shareholders**

From the standpoint of the PRC party state's political economic behemoths, corporatized SOE systems and their control groups, the CSRC pushback described in this chapter may be perceived as harmlessly expressive, understood *ex ante* by such powerful forces to be without effect or risk of real enforcement, or to take an idiom from 19th century Brazil, "*para inglês ver*" ("for English eyes").[34]  This view might explain the long-standing allowance for the CSRC's mandatory constraint mechanisms, especially if they are understood as intended merely to be expressive for foreign investors and the domestic capital markets audience, or are symbolically enforced to provide comfort to public investors in each case given the open exploitation of minority shareholders under the corporatization without privatization program.  If this is true, the control groups which occupy the heights of China's state capitalism might be quite content to allow such mechanisms, secure in the knowledge that they will not generally be enforced or provide any real obstacles to their power and discretion with respect to dominated subsidiaries. In my view this explanation does not possess real force, however, precisely because many of the

---

[34]    Under pressure from the anti-slave trade British Parliament, in 1831 Brazil promulgated a law declaring free all slaves trafficked to Brazilian ports.  As was intended, the law went largely unenforced, as slaves continued to arrive at Brazilian ports and be sold, and so the law was "for English eyes" or "for appearances only," known ahead of time as a norm for external consumption that would not be enforced.

CSRC-initiated mechanisms have nothing to do with overseas listing issuers and work purely with respect to domestically listed issuers.  Moreover, while the "for English eyes" answer might fit for some of the doctrinal gap-filling that the CSRC has pursued over the years – *e.g.*, fiduciary duties for, and anti-oppression remedies against, controlling shareholders which are never subject to adjudication because they involve large plaintiff groups – it does not account for the self-enforcing *genus* of constraints such as supermajority shareholder or board votes after recusal of related parties, which are respected and implemented at China's largest firms, and where there is ample evidence of concrete application of the mandatory constraints described in this chapter. And, of course, there is no guaranty that even some of the non-self-enforcing constraints introduced into the governance mix for China's state capitalism powers might not increasingly gain traction over time.  A perhaps more nuanced version of this view is that these mechanisms – the self-enforcing type in particular – are understood immediately by the SOE control groups as being more than merely expressive, and known to be subject to implementation in fact, but that the prospect of implementation spurred by private claimants is nonetheless largely discounted by the most powerful controlling shareholders because of familiar collective action, information deficit and passivity problems for the great mass of public (minority) shareholders.

C.   **Party *Nomenklatura* Appointees to State Controlled Firms**

It is now well established that many of the human agents of party state control at the largest corporatized SOEs are party officials embedded in the Chinese Communist Party's personnel appointments or *nomenklatura* system who seek advancement in reform-era China through both governmental and enterprise appointments, and rotate easily through both spheres. Thus, the nominal CEOs (but more importantly ranking party officials) at direct competitors China Mobile and China Unicom may switch jobs, the CEO of Sinopec may leave that corporate

position to take up the post of governor of a major coastal province, or the head of one of the

major state-owned commercial banks may become the Governor of the PRC's central bank, or

the Chairman of the CSRC, or the governor of a provincial People's Government.  When such

appointment rotations result in members of the *nomenklatura* being charged with direction of a

large corporatized SOE that is a key instrument of the PRC's state capitalism, it may be critical

for that individual's further advancement that the SOE assets or the firm they are tasked with

operating are successful in business terms, but also do not attract public opprobrium, shareholder

dissension, or negative press attention, domestically or abroad.[35]  It is therefore not absurd to

think that these individuals might counter-intuitively welcome constraints on their power (and

indirectly on the power of the party state which brought them to the firm) to protect themselves

against having to direct, for example, inefficient or unprofitable related party transactions, or at

least allow them the safety of prior super-majority, interested party-recused, approvals.[36]  Flat

constraints may allow them to avoid risky, possibly pressurized decisions entirely; adherence to

mandatory procedures for super-majority approvals and the like may provide for some measure

of *ex post* protection for transactions that go sour.

### D.    The Financing of State Capitalism

Finally, and perhaps most importantly, the governance constraints visited on the control

parties of China's state capitalism addressed in this chapter may be welcomed or at least

tolerated by corporatized SOE systems and the controlling shareholders they have spawned as

the small price of continued access to financing in the domestic and global capital markets.  Put

---

[35]    *See* Nomenklatura Accountability, *supra* note 5.

[36]    I am grateful to my former University of Michigan colleague Professor Zhao Minyuan for this

insight.

differently, formal constraints on controlling shareholder governance power within a listed firm

may be the price that has to be paid for the appearance of functioning capital markets capable of

attracting capital, something even the heights of China's state capitalist establishment

desperately needs.  It is difficult to prove this point to the satisfaction of law and finance

scholars, as it is exceedingly unlikely that the CSRC-origin mandatory constraints presently

imposed on state controlling shareholder power will be removed or weakened,[37] and thus there is

no possibility of an event study tracking the pricing of PRC-listed issuers before and after such

change.  We do know, however, that many of the CSRC-implemented mandatory rules – like the

paradigmatic December 2004 "Regulations Regarding Strengthening Protection of the Rights

and Interests of Public Shareholders" which defined public equity shareholders other than

controlling shareholders as a kind of class and conferred upon that class negative veto rights

regarding a broad range of important decisions[38] – were issued by the CSRC in direct response to

complaints from domestic investors and the increasingly autonomous PRC financial press.  This

was also the dynamic at work in India more than a decade ago, where in 2001 the Indian

securities regulator implemented similar reforms originating in a voluntary corporate governance

code promulgated by an organization made up of, and representing the interests of, India's

largest public firms.[39]  Finally, this proposed rationale for acceptance of significant constraints

---

[37]     Just the opposite in fact – the author has reviewed a draft of the  revised PRC Securities Law distributed inside China (at the time of this writing, in January 2015), and its provisions incorporate all of the CSRC-origin mandatory rules described here, and provide for new and more robust constraints (and mandatory disclosure).

[38]     *See* Battle Against Party State Power, *supra* note 1, at 680-1.

[39]     *See* Bernard S. Black & Vikramaditya Khanna, *Can Corporate Governance Reforms Increase Firm Value? Event Study Evidence from India*, 4 J. EMPIRICAL LEGAL STUD. 749, 759 (2007) ("Corporate governance reform efforts in India were largely triggered by [the Confederation of Indian Industry's] promulgation

on state controlling shareholders aligns perfectly with what I assert is the original policy

rationale for the corporatization without privatization process itself – the re-ordering of SOE

asset groupings into a new legal form able to attract passive capital investment from the domestic

and global capital markets.

---

of its Corporate Governance Code in 1998.  CII then followed up by lobbying SEBI to implement mandatory

reforms – presumably consistent with the CII Code…. Much like the Business Roundtable in the United States,

major Indian firms were the interest group most likely to oppose governance reform.  Instead, however, CII *initiated*

the reform effort." )

## VIII.    Conclusion

In this chapter I have reviewed two distinct, and often opposing, projects of the PRC party state with respect to corporatized SOE groups -- the undisputed engines of China's domestic and global economic activity under state capitalism.  On the one hand, we can understand the Chinese party state as a multi-faceted and over-bearing economic actor spawning a parade of politically well-endowed controlling shareholders uniquely positioned to dominate subsidiary corporations established as passive vehicles to attract public capital markets financing, and entirely in their own interest.  On the other hand, the same PRC party state has also established a securities markets regulator with the undisputed power to regulate the internal corporate governance arrangements for such dominated subsidiary corporations, which regulator has conceived sophisticated mechanisms of resistance against the control parties of state capitalism.

From a legal systems perspective, this understanding of two opposing prongs of the PRC party state should help us to comprehend better the CSRC's serial mandatory-type regulatory incursions into the province of enabling legal corporate governance norms.  With the PRC's corporatization without privatization in the embrace of a shareholder primacy model, we are confronted with a notional and mostly rhetorical retreat from the economy of the party state "under law" (the enabling Company Law specifically).  This is a retreat, however, which in fact cloaks the reassertion or maintenance of concentrated power by the party state metamorphosed into a politically privileged controlling shareholder.  Moreover, this operates in a context of "authoritarian legality" where the control parties can reliably ensure that formally conferred "legal" protections for the exploited minority are not utilized (*i.e.,* the absence of listed company

32

corporate governance cases in the Chinese courts, and obstacles placed in the way of multi-party actions of any kind).

The only effective remedy for this structurally-determined exploitation of minority shareholders, and the inability of the system to enforce whatever legal protections are on offer, is state intervention of another sort: the injection by a competing party state institution of immutable substantive doctrines and mandatory corporate governance provisions, with the best kind being self-enforcing mechanisms whereby the party state rule maker cannot escape being bound by its own rules.   That is precisely the path pursued by the CSRC and other bureaucratic actors over the last several decades.

From the distinct perspective of understanding how the PRC party state operates in the context of state capitalism, we may query how a bureaucratic agency like the CSRC has been permitted this counter-strike against the focal point of party state power.  In this regard, we must remind ourselves of a central idea behind the twenty year-old PRC corporatization program, itself a direct echo of China's 19th century imperial fetish for the corporate form – repackaging SOEs and SOE asset groupings into a legal entity that can attract large-scale public investment with only minor disruption of incumbent governance arrangements.  That major underlying policy driver for the corporatization program from inception aligns well with one explanation for how the CSRC and other bureaucracies have been permitted to impose constraints on the power and discretion of dominant state-tied controlling shareholders of China's listed companies. Those constraints imposed by administrative regulation, in theory and as applied, only make corporatized SOEs more competitive as they seek financing from domestic and global capital markets, and thereby help ensure continued access by the very same vehicles of China's state capitalism to abundant, relatively passive, capital.  Said another way, these effective governance

33

constraints and accountability mechanisms imposed on PRC party state controlling shareholders in listed firms may be one of the most critical long term elements enhancing the party state's ability to finance state capitalism on the domestic and global capital markets.  More than merely protecting the state from itself, these mechanisms are necessary for the Chinese party state's continued ability to finance its involvement in capital intensive sectors of the domestic and global economies.