# The Political Logic of Corporate Governance in China's State-owned Enterprises

## Jiangyu Wang[†]

| | | |
|---|---|---|
| Introduction | | 632 |
| I. | **Legitimacy Management in Government Regulation of Business in China: The Conceptual Framework** | 637 |
| | A. A Conceptual Framework of Legitimacy Management | 637 |
| | B. Legitimacy Management in China | 638 |
| | 1. *Controlling Financial Resources for Solidifying the CCP's Economic Powerbase* | 639 |
| | 2. *Maintaining Official Ideology* | 639 |
| | 3. *Maintaining Stability* | 640 |
| | 4. *Managing Interest Groups* | 641 |
| | 5. *Curbing Official Rent-seeking* | 641 |
| | 6. *Pursuing Good Policy* | 642 |
| II. | **The Rise, Demise, and Rise Again of Chinese SOEs** | 644 |
| III. | **The Twin Governance Structures of SOEs** | 648 |
| | A. Legal Governance in SOEs: The Law on Paper | 648 |
| | B. Political Governance in SOEs | 651 |
| | 1. *The Foundation of Political Governance in SOEs* | 651 |
| | 2. *SASAC as the De Facto State Shareholder* | 652 |
| | 3. *All CCP Members in SOEs Must Comply with Party Line* | 654 |
| | 4. *Party Organizations' Participation in SOE Decision-Making* | 655 |
| | 5. *CCP Controlled Personnel Appointment in SOEs* | 658 |
| IV. | **SOE Governance and Legitimacy Management: Explaining the Political Logic** | 660 |
| | A. Reasons for Political Control in SOE Governance | 660 |
| | B. Legal Governance to Offer Credible Commitment to Private and Foreign Investors | 664 |

---

† Associate Professor, Faculty of Law, National University of Singapore. The paper was first presented at the *Cornell International Law Journal* 2014 Symposium titled "Never the Twain: Emerging U.S.-Chinese Business Relations" on February 21, 2014 at Cornell Law School. The author would like to thank the conference participants, including particularly Professors Charles K. Whitehead, Guo Li, Jacques deLisle, and Curtis Milhaupt, for their valuable comments, as well as, the editors of the Cornell International Journal for their meticulous editing work. Special thanks are given to Professor Whitehead for his guidance on the public interest aspect of the Berle-Means thesis. Of course, all errors remain my own. Email: lawwjy@nus.edu.sg.

MTD Exhibit #7

    V.  **Implications for Future Reform of SOEs in China** . . . . . . . . .   666
**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   669

**Introduction**

The "End of History" theory in corporate law, developed by Professors Henry Hansmann and Reinier Kraakman, asserts that corporate laws around the world are converging toward a "single, standard model" based on commonly accepted best practices that are economically most efficient.[1]  The two scholars maintain that the failure of alternative models (including the manager-oriented, labor-oriented, state-oriented, and stakeholder models), together with the competitive pressure of global commerce and the shift of interest-group influence in favor of shareholders,[2] has led to the assured "triumph of the shareholder-oriented model of the corporation over its principal competitors."[3]

The text of *Gongsi Fa* (Company Law),[4] a national law that governs business companies in China, provides great examples for readers who are looking for signs of convergence. Several of the provisions of *Gongsi Fa* suggest that the corporate form in China contains fundamental characteristics of the corporation which are the same as or similar to the functional features of companies in other jurisdictions: "(1) legal personality; (2) limited liability; (3) transferable shares; (4) centralized management under a board structure; and (5) shared ownership by contributors of capital."[5] Many examples of these characteristics exist in the *Gongsi Fa*. For instance, Article 3 defines the company as "an enterprise legal person, which has independent property of a legal person and enjoys the property rights of a legal person."[6]  Further, Article 3 explicitly provides that shareholders are liable to the company—and the company's creditors—to the extent of the equity interest or shares of the company they have purchased or subscribed to.[7]  The spirit of Article 3, embodying the universal core

---

    1.  Henry Hansmann & Reinier Kraakman, *The End of History for Corporate Law*, 89 GEO. L.J. 439, 439 2000–2001); *see also* REINIER R. KRAAKMAN ET AL., THE ANATOMY OF CORPORATE LAW: A COMPARATIVE AND FUNCTIONAL APPROACH (2009).
    2.  Hansmann & Kraakman, *supra* note 1, at 443–49.
    3.  Hansmann & Kraakman, *supra* note 1, at 468.
    4.  *See* Zhonghua Renmin Gongheguo Gongsi Fa (中华人民共和国公司法) [The Company Law of the People's Republic of China] [hereinafter *Gongsi Fa*] (promulgated by the Standing Comm. Nat'l People's Cong., Dec. 29, 1993, effective July 1, 1994, revised by the Standing Comm. Nat'l People's Cong., Oct. 27, 2005, effective Jan 1. 2006) (China).  *Gongsi Fa* was the first national companies law enacted by the PRC, and it was adopted by the Standing Committee of the National People's Congress on December 29, 1993. Since its promulgation, it has been revised four times, in 1999, 2004, 2005, and 2013. The 2005 revision changed most provisions of the law, resulting in a text that was almost new. For this reason, the existing law is often called the 2005 *Gongsi Fa*. The 2013 revision loosens the requirements on capital contributions and capital maintenance, making it possible to register a company in China with very low or even zero capital.
    5.  KRAAKMAN ET AL., *supra* note 1, at 5. *See also* Hansmann & Kraakman, *supra* note 1, at 439–40.
    6.  *Gongsi Fa*, *supra* note 4, at art. 3.
    7.  *See id.*

features of the corporation, is reflected throughout the text of various provisions of the *Gongsi Fa* throughout its text. In particular, the 2005 *Gongsi Fa* has abandoned most of the restrictive rules on company incorporation and governance that originated in China's planned economy, and introduced new rules in line with international practice.[8]

These signs of convergence have led many scholars, practitioners, and international organizations to believe that corporate governance in Chinese companies can be understood and analyzed along the lines of the separation of ownership and control. As such, research on various issues relating to corporate governance in China has been conducted as if the property owner, investor, or shareholder of the company "surrenders his wealth to those in control of the corporation [so] that he has exchanged the position of independent owner for one in which he may become merely recipient of the wages of capital."[9] Examples of these issues include agency costs,

---

8. The China Securities Regulatory Commission noted that the 2005 *Gongsi Fa* has the following improvements:

> [It] improved companies' governance structure and mechanisms to protect lawful shareholders' rights and public interests. It highlighted the legal obligations and responsibilities of those in actual control of the company—the directors, senior management and supervisors. It improved companies' financing and financial accounting systems of companies and the systems governing corporate mergers, divisions and liquidation. While ensuring the lawful rights and interests of the creditors are well protected, it facilitated the reorganization of companies.

*See Corporate Governance of Listed Companies in China: Self-Assessment by the China Securities Regulatory Commission* (2011), ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT (OECD), *available at* http://www.oecd.org/dataoecd/47/10/48444985.pdf.

9. ADOLF A. BERLE & GARDINER C. MEANS, THE MODERN CORPORATION AND PRIVATE PROPERTY 355 (1932). For some of the existing work on corporate governance and enterprise reform (especially SOE reform) in China, *see* Xu Xiaonian & Wang Yan, *Ownership Structure, Corporate Governance, and Firm's Performance: The Case of Chinese Stock Companies*, 1794 WORK BANK POLICY RESEARCH (1997); STOYAN TENEV & CHUNLIN ZHANG, CORPORATE GOVERNANCE AND ENTERPRISE REFORM IN CHINA: BUILDING THE INSTITUTIONS OF MODERN MARKETS (2002); ROSS GARNAUT, SONG LIGANG, STOYAN TENEV & YAO YANG, CHINA'S OWNERSHIP TRANSFORMATION: PROCESS, OUTCOMES, PROSPECTS (2005); SHAHID YUSUF, KAORU NABESHIMA & DWIGHT H. PERKINS, UNDER NEW OWNERSHIP: PRIVATIZING CHINA'S STATE-OWNED ENTERPRISES (2006); OECD, REFORMING CHINA'S ENTERPRISES (2000); CHARLES A. PIGGOT, OECD, CHINA IN THE WORLD ECONOMY: THE DOMESTIC POLICY CHALLENGES (2002); Carsten A. Holz, *Long Live China's State-owned Enterprises: Deflating the Myth of Poor Financial Performance*, 13 J. ASIAN ECON. 493 (2002); Hua, Jinyang, Paul Miesing & Mingfang Li, *An Empirical Taxonomy of SOE Governance in Transitional China*, 10 J. MGMT GOVERNANCE 401 (2006); Liu Qiao, *Corporate Governance in China: Current Practices, Economic Effects and Institutional Determinants*, 52 CESIFO ECON. STUD. 415 (2006); Cyril Lin, *Corporatization and Corporate Governance in China's Economic Transition*, 34 ECON. PLAN. 5 (2001); Li Shaomin & Xia Jun, *The Roles and Performance of State Firms and Non-state Firms in China's Economic Transition*, 36 WORLD DEV. 39 (2008); Lu Yuan & Yao Jun, *Impact of State Ownership and Control Mechanisms on the Performance of Group Affiliated Companies in China*, 23 ASIA PACIFIC J. MGMT. 485 (2006); Chang, Eric C. & Sonia M.L. Wong, *Political Control and Performance in China's Listed Companies*, 32 J. COMP. ECON. 617 (2004); Donald C. Clarke, *Corporate Governance in China: An Overview*, 14 CHINA ECON. REV. 494 (2003); Sonia M.L. Wong, Sonja Opper & Ruyin Hu, *Shareholding Structure, Depoliticization and Firm Performance*, 12 ECON. TRANSITION 29 (2004); Takao Kato & Cheryl Long, *CEO Turnover, Firm Performance, and Enterprise Reform in China: Evidence from Micro Data*, 34 J. COMP. ECON. 796

board structure and decision-making, CEO turnover, executive pay, the relationship between owner identity and firm performance, and enterprise reform. As Lin and Milhaupt have succinctly observed, scholars on corporate governance in China "often begin and end their analyses by benchmarking the governance attributes of Chinese listed companies against global (which typically means U.S.) corporate governance standards and institutions."[10] In so doing, scholars are probably able to tell "what the Chinese system *lacks*," but not "how it is constructed and actually functions."[11]

International organizations, such as the World Bank and the OECD, have engaged China extensively on corporate governance issues in recent years. The prescriptions the organizations have offered to China follow "international best practices," which are still based on the separation of ownership and control. These prescriptions treat the parties of corporate governance in China as shareholders, managers, and stakeholders in a commercial entity located in a market economy of a democratic system.[12] Since 2004, the OECD has organized several policy dialogues with Chinese authorities.[13] One of the key aims of the dialogues was to encourage "use of the OECD Principles of Corporate Governance and OECD Guidelines on Corporate Governance of State-Owned Enterprises."[14] Arguably, the aforesaid OECD Principles and Guidelines, although internationally agreed upon and widely accepted, are rooted in Western models of corporate governance.[15] In essence, they require (1) strong legal protection of shareholders and (2) the independence of the board of directors.[16] The Chinese

---

(2006); SHANGHAI STOCK EXCHANGE RESEARCH CENTER, ZHONGGUO GONGSI ZHILI BAOGAO (中国公司治理报告) [CHINA CORPORATE GOVERNANCE REPORT 2003] (2003); SHANGHAI STOCK EXCHANGE RESEARCH CENTER, ZHONGGUO GONGSI ZHILI BAOGAO: DONGSHIHUI DULIXING YU YOUXIAOXING (中国公司治理报告：董事会独立性与有效性) [CHINA CORPORATE GOVERNANCE REPORT: THE INDEPENDENCE AND EFFECTIVENESS OF THE BOARD OF DIRECTORS] (2004); SHANGHAI STOCK EXCHANGE RESEARCH CENTER, ZHONGGUO GONGSI ZHILI BAOGAO: GUOYOU KONGGU GONGSI SHANGSHI ZHILI (中国公司治理报告：国有控股公司上市治理) [CHINA CORPORATE GOVERNANCE REPORT: CORPORATE GOVERNANCE IN STATE-CONTROLLED LISTED COMPANIES] (2006).

10. Li-Wen Lin & Curtis J. Milhaupt, *We Are the (National) Champions: Understanding the Mechanisms of State Capitalism in China*, 65 STAN. L. REV. 697, 701 (2013).

11. *Id.*

12. *See generally Corporate Governance of Listed Companies in China: Self-Assessment by the China Securities Regulatory Commission*, OECD (2011).

13. *See China-OECD corporate governance policy dialogue*, OECD, http://www.oecd .org/china/china-oecdcorporategovernancepolicydialogue.htm (last visited Feb. 15, 2014).

14. *Id.*

15. *See, e.g.*, Justin Iu & Jonathan Batten, *The Implementation of OECD Corporate Governance Principles in Post-Crisis Asia*, 4 J. CORPORATE CITIZENSHIP 47, 48 (2001). However, the OECD has also taken into account the experiences of non-OECD countries in its recent version of the Principles. *See, e.g.*, Abdussalam Mahmoud Abu-Tapanjeh, *Corporate governance from the Islamic perspective: A comparative analysis with OECD principles*, 20 CRITICAL PERSPECTIVES ON ACCOUNTING 556, 559 (2009) (stating that the 2004 OECD revision reflects not only the experience of OECD countries but also the emerging and developing economies).

16. The *OECD Principles of Corporate Governance 2004* are organized into six broad parts: I. Ensuring the Basis for an Effective Corporate Governance Framework; II. The

government even provided a self-assessment on China's compliance with the OECD Principles to the OECD, completed by the China Securities Regulatory Commission (CSRC),[17] in the way a good student would report the learning process to his teacher.

Both the academic analysis and the engagement approach of international organizations mentioned above tend to ignore an essential dimension of corporate governance in China, especially in state-owned enterprises (SOEs): the political control of state enterprises by the Party-state that comingles the Chinese Communist Party (CCP) and the CCP-controlled government. In a society based on private property, an investor abandons property rights to his assets when he invests his assets as capital in enterprise. In exchange, this investor becomes a shareholder. Although he is customarily called an "owner", he does not literally own the firm or its assets. Instead, he acts as a shareholder and exercises shareholder rights. As a result of the separation of ownership and control by law and contracts, the power to manage the company is shifted to the board of directors and managers. The board and managers control the company, and their authority is only subject to constraints written in the contract with the shareholder (often in the form of the company's articles of association) and the regulatory power of the state. However, the state normally has no economic stake in the company. The state claims that it regulates for the public good. This shareholder-based control is typical for Anglo-American companies, and it has become increasingly popular in other jurisdictions with the continuing Americanization of corporate governance across the world in recent decades.[18]

It would be wrong to make the same assumption about the corporate world in China for several reasons. First, a large portion of Chinese companies are SOEs.[19] In fact, SOEs constitute the most important pillar of the Chinese economy. Most of the large enterprises, including most of the listed companies, are state-owned. In contrast, SOEs are either rare or insignificant in other major economies. Second, the state is both the controlling shareholder and the regulator of SOEs.[20] It is both the judge and the most powerful player in corporate China. Third, although Chinese SOEs are legally organized in the corporate form featuring all or most attributes of the separation of ownership and control model, the real control comes from the CCP, or the Party-state. The Party-state controls SOEs

---

Rights of Shareholders and Key Ownership Functions; III. The Equitable Treatment of Shareholders; IV. The Role of Stakeholders in Corporate Governance; V. Disclosure and Transparency; and VI. The Responsibilities of the Board. *See Principles of Corporate Governance 2004*, OECD (2004).

17. *See* OECD (2011), *supra* note 8.

18. *See* Douglas M. Branson, *The Very Uncertain Prospect of "Global" Convergence in Corporate Governance*, 34 CORNELL INT'L L.J. 321, 343 (2001).

19. Gao Xu, *State-owned enterprises in China: How big are they?*, THE WORLD BANK (Jan. 19, 2010), http://blogs.worldbank.org/eastasiapacific/state-owned-enterprises-in-china-how-big-are-they.

20. Mariana Pargendler, *State Ownership and Corporate Governance*, FORDHAM L. REV. 2917, 2943–944 (2012).

through both general requirements on policy compliance and specific powers such as appointing the senior executives of SOEs.[21] This is a phenomenon largely unique to China, a country that is ironically rather open to international trade and investment. State and business may be very close in some other economies with SOEs, such as Korea, Japan, Singapore or Brazil, but a degree of direct control over SOEs by an economy's ruling party is rarely seen in other open economies.[22]

Party-state control of SOEs in China is a puzzle to many observers. If, as the Party-state has vowed it would many times since 1992, the state determines to steer the country toward a true market economy,[23] it should follow the neo-liberal teaching of privatizing SOEs. At the least, it should allow the SOEs to be truly independent legal persons with the autonomy to operate purely on a commercial basis. Instead, as illustrated below, the Party-state in China directly controls not only the personnel but also sometimes the operation of SOEs, bypassing the legal governance structure consisting of the board of directors and management.[24] On the other hand, if the underlying purpose of the CCP's SOE policy is to control the state firms as tightly as possible, one might be curious about why the Party-state has promulgated—and enforced to a large degree—so many national laws, regulations and rules to institutionalize corporate governance, many of which set legal procedures and restrictions to limit external interference of enterprise management and governance. Further, if Lord Acton's most famous pronouncement, "Power tends to corrupt and absolute power corrupts absolutely"[25] is true, the Party-state's predatory hands would have destroyed Chinese SOEs a long time ago. Although SOEs experienced gloomy days in the 1980s and 1990s, they are rather successful and pros-

---

21. Adam Hersh, *China's State-Owned Enterprises and Nonmarket Economics*, Testimony before the U.S.-China Economic and Security Review Commission (Feb. 21, 2014), *available at* http://www.americanprogress.org/issues/china/report/2014/03/05/85372/chinas-state-owned-enterprises-and-nonmarket-economics.

22. A special report on state capitalism by *The Economist* states, "What might be called the 'party state' [of China] exercises a degree of control over the economy that is unparalleled in the rest of the state-capitalist world." *A choice of models: Theme and variations*, in *Special report: State capitalism*, THE ECONOMIST, Jan. 21, 2012, *available at* http://www.economist.com/node/21542924.

23. The most recent articulation of this policy is in a 2013 Party resolution stating that "[t]he basic economic system [of China] should evolve on the decisive role of the market in resource allocation." The reform plan announced sweeping changes across broad swathes of China's economic, social, and governance systems. *See Zhonggong Zhongyang Guanyu Quanmian Shenhua Gaige Ruogan Zhongda Wenti de Jueding* (中共中央关于全面深化改革若干重大问题的决定) [Decision on Major Issues Concerning Comprehensively Deepening Reforms], adopted at the Third Plenum of the 18th CCP Central Committee on 12 November 2013, *available at* http://news.xinhuanet.com/politics/2013-11/15/c_118164235.htm. [hereinafter *CCP Decision on Major Issues (2013)*].

24. *See Party sets course for next decade*, CHINA DAILY, Nov. 16, 2013, *available at* http://usa.chinadaily.com.cn/china/2013-11/16/content_17110079.htm.

25. JOHN EMERICH EDWARD DALBERG, LORD ACTON, ACTON-CREIGHTON CORRESPONDENCE (1887), *available at* http://oll.libertyfund.org/titles/acton-acton-creighton-correspondence#lf1524_label_010.

perous these days.[26]

This paper attempts to adopt a political approach to analyze the relationship between the state and state-owned business in China, focusing on the corporate control and governance of SOEs. It aims to explain the political logic behind the Party-state's achievements in introducing market reforms through communist political institutions and to discuss their implications for future SOE reform in China. It argues that SOE reform is part of the CCP's effort to rebuild and maintain political legitimacy of the Chinese Party-state. In other words, the management of legitimacy to strengthen the ruling position of the CCP is embodied in all major aspects of the governance structures of SOEs. Corporate governance in Chinese SOEs is a system in which the components come from different countries of origin, but are installed together to ensure the whole system runs in ways that not only economically benefit the owner but also stay within the owner's control.

Part I of this paper introduces the theoretical framework of legitimacy management. Part II examines the developmental path of SOEs in China since their inception at the early stage of the PRC. Part III discusses the "twin governance structure" in SOEs, which is comprised of a structure for legal governance and a second structure for political governance—namely, CCP control of SOEs. The two structures run separately but intersect in the decision-making process in SOEs. Part IV explains the political logic of SOE governance to examine how legitimacy management considerations are embodied within it. Part V discusses the implications of the twin governance structure for future SOE reform in China.

## I.    Legitimacy Management in Government Regulation of Business in China: The Conceptual Framework

### A.    A Conceptual Framework of Legitimacy Management

Political legitimacy can be broadly defined to include "both citizens' trust in public officials and their conviction that governmental institutions are fair, responsive, and valuable."[27] It deals with a fundamental question about "who deserves to have authority and why."[28] As Weber noted, "So far as it is not derived merely from fear or from motives of expedience, a willingness to submit to an order . . . always in some sense implies a belief in the legitimate *authority* of the source imposing it."[29] Put simply, a legitimate regime, whether it is good, peaceful, or democratic, is accepted by the people (or the majority of the people) as a government with political authority.

---

26.    *See* Patrick Foulis, *Business in Asia: How to keep roaring*, THE ECONOMIST, May 31, 2014, *available at* http://www.economist.com/news/special-report/21602825-over-past-two-decades-asias-companies-have-enjoyed-huge-success-now-they-need.

27.    Bert Useem & Michael Useem, *Government Legitimacy and Political Stability*, 57 SOC. FORCES 840, 841 (1979).

28.    Guo Baogang, *Political Legitimacy and China's Transition*, 8 J. CHINESE POL. SCI. 1, 2 (2003).

29.    MAX WEBER, THE THEORY OF SOCIAL AND ECONOMIC ORGANIZATION 132 (1964).

Broadly, political legitimacy has two aspects: control of power and popular acceptance.[30] Legitimacy cannot be taken for granted by the ruler, even though the ruler has taken control of the territory of a country. As Lipset points out, it also "involves the capacity of the [political] system to engender and maintain the belief that the existing political institutions are the most appropriate ones for the society."[31] In other words, legitimacy must be managed in order to be viable and sustainable; it is a continuous process. Political legitimacy management involves three tasks: gaining legitimacy, maintaining legitimacy, and repairing legitimacy.[32] A political regime, after gaining power, must constantly take measures to win and maintain public acceptance of its authority to rule. Specifically, the regime must fulfill the following tasks, which, although often in conflict with each other, need to be deployed concurrently and balanced carefully: (1) concentration and preservation of power; (2) promotion and maintenance of the ruler's ideology; (3) coordination of interest groups politics; (4) control of bureaucratic politics (departmentalism) and official rent-seeking (corruption); (5) pursuit of good policy to rationalize governance, including institutional building; and (6) creation of an interface to establish legitimacy in the international society.[33]

## B. Legitimacy Management in China

As an authoritarian Party-state, the Chinese government cannot base its legitimacy on democratic elections. This, however, does not mean the regime is one without legitimacy. Guo argues that political legitimacy in the Chinese context can be understood from the perspectives of original justification and utilitarian justification.[34] Original justification, tracing the origin of the ruling authority, refers to four Chinese concepts: mandate of Heaven (*tianming*), rule by virtue (*dezhi*), popular consent (*minben*), and legality (*hefa*).[35] Utilitarian justification addresses "the capacity of the rulers to meet people's needs, such as material well-being or physical security."[36] Utilitarian justification addresses managing legitimacy in a direct way, namely "maintain[ing] people's belief that the political system is legitimate."[37] In the Chinese context, this entails that the government, as a provider of benefits, should implement public policies which are consistent with the concepts of "benefiting the people" (*limin*) and "equality of wealth" (*junfu*).[38] In short, the Chinese cognitive pattern of political legiti-

---

30. *See id. See also* David Beetham, *Max Weber and the Legitimacy of the Modern State*, 13 ANALYSE & KRITIK 34 (1991).
31. SEYMOUR MARTIN LIPSET, POLITICAL MAN: THE SOCIAL BASES OF POLITICS 64 (1983).
32. *See* Mark C. Suchman, *Managing Legitimacy: Strategic and Institutional Approaches*, 20 ACAD. MGMT. REV. 571, 586 (1995).
33. For discussions on some of the conditions, *see* FRANCIS FUKUYAMA, STATE-BUILDING: GOVERNANCE AND WORLD ORDER IN THE 21ST CENTURY (2004).
34. Guo, *supra* note 28, at 3.
35. *Id.* at 3–5.
36. *Id.* at 3.
37. *Id.* at 5.
38. *Id.* at 6.

macy can be stated as follows:[39]

> [A] ruler, who has the mandate of Heaven, possesses the quality of virtue, shows respect to his subjects, follows the rules of the ancestors, and tries to win the hearts and minds of the people, will be considered a just and legitimate one. A just ruler will strengthen his legitimacy by promoting policies that will benefit the people, not himself, by ensuring relatively equal distribution of these benefits, and by allowing the people to do what they do the best.

It is no surprise that the primary purpose of the CCP is maintaining its status as the sole ruling Party of the Chinese state. For the CCP, staying in power is not achieved through free elections. Instead, it must use other means to hold on to power, which are centered on two key elements: controlling resources and delivering performance.[40] The former involves the control of the country's economic, political, and social resources so that citizens depend on the ruling Party, and the latter entails delivery of sustained improvements in consumption and living standards for the Chinese people through economic growth. In the Reform Era, political legitimacy management has focused on the following agenda, with the ultimate goal of preserving the CCP's power base: maintaining the dominant status of the CCP's evolving ideology, maintaining social stability, pursuing good policy to build institutions and rationalize governance, balancing the conflicting objectives of interest groups, and containing departmentalism and corruption.[41]

### 1. Controlling Financial Resources for Solidifying the CCP's Economic Powerbase

To rule in China, the Party-state has to ensure that it controls sufficient financial and non-financial resources. This objective determines, to a large extent, the state's policy-orientations towards state- and private-owned enterprises. In other words, SOEs provide the economic foundation for the CCP's reign as they not only enable the Party-state to pay for the requisite human and political expenses, but also cause the citizens of China to depend on the Party-state for a living.

### 2. Maintaining Official Ideology

"Ideological adaptation and innovation are thus seen as *the* prerequisite of relegitimating party rule."[42] Party scholars in China assert that "ideology fulfills various functions crucial to political, social and economic life, such as interpreting political order, cementing national identity, mobilizing support, and reducing economic transaction costs by enhancing social

---

39. Guo, *supra* note 28, at 7.
40. *See* Hersh, *supra* note 21.
41. *See* Thomas Heberer & Gunter Schubert, *Political Reform and Regime Legitimacy in Contemporary China*, 99 Asien 9 (2006).
42. Bruce Gilley & Heike Holbig, *The Debate on Party Legitimacy in China: a mixed quantitative/qualitative analysis*, 18 J. Contemp. China 339, 346 (2009).

trust."[43]

In the 1980s and early 1990s, the battle over Marxism and capitalism in China was still intense. Reformers at that time had to face tough questions from the conservatives when a particular public policy could possibly lead to capitalism. They had to convince the conservative leaders and officials that the public policy or project was not only in line with the official ideology, but would also promote it.[44]

With the gradual demise of support for Marxism, nationalism became the new favored ideology. It now "serves as an integral part and important ingredient of ideological modernization"[45] and the Chinese state increasingly employs it to justify its legitimacy. Any major public policy, if characterized as something that may contribute to China's rise to a superpower, its national unity, or its "national self-confidence and pride," could easily gain public support.[46] In this context, the securities market, featuring the most listed companies as SOEs, has been promoted as being crucial to China's "peaceful ascendancy to the status of a great power."[47]

### 3. Maintaining Stability

Bearing in mind the chaos and turmoil of the Mao Era, Chinese leadership since Deng Xiaoping has been obsessed with maintaining social stability.[48] Deng Xiaoping's famous 1989 phrase, "stability overrides everything," has been carried out throughout the Reform Era.[49] All government agencies at the central and local levels are required to vigorously maintain political and social stability. The major report to the 2002 Sixteenth CCP Congress stated, "It is essential for the Party to give top priority to development [but] stability is a prerequisite for reform and development."[50] The stability orientation has had a significant impact on the behavior of officials and regulators. In the case of economic regulation, this may mean that regulators have to intervene in the market activities to maintain political stability, even though doing so may undermine market efficiency.

---

43. *Id.*
44. Liu Hongru, the first Chairman of the CSRC, wrote about how he was criticized at a committee meeting of the National People's Congress (NPC) in 1992; the conservative legislators stated that all systems of shareholding and stock markets would lead to privatization (and hence the collapse of socialism). *See* LIU HONGRU, TUPO - ZHONGGUO ZIBEN SHICHANG FAZHAN ZHI LU ((突破—中国资本市场发展之路) [BREAKTHROUGH—THE PATHWAY OF CHINA'S CAPITAL MARKETS], Vol. 1, p. 19 (Beijing: Zhongguo Jinrong Chubanshe).
45. Gilley & Holbig, *supra* note 42, at 349.
46. Gilley & Holbig, *supra* note 42, at 350.
47. Qi Bin, *Ziben Shichang yu Daguo Jueqi* (资本市场与大国崛起) [*Capital Markets and the Rise of Great Powers*], occasional research paper (2009), Research Department of the China Securities Regulatory Commission, http://www.csrc.gov.cn.
48. JOSEPH FEWSMITH, CHINA SINCE TIANMANMEN 79 (2001) ("Chinese policy makers (not just 'hardliners') and intellectuals . . . are keenly aware of the turmoil of twentieth-century politics and worry openly about the costs of political imposition.").
49. *Id.* at 35.
50. KENNETH LIEBERTHAL, GOVERNING CHINA: FROM REVOLUTION THROUGH REFORM 317 (2004).

### 4.  Managing Interest Groups

The absence of democracy does not necessarily mean that China lacks special interest groups.  As ownership has increasingly dispersed and society becomes more diversified, different interest groups have emerged.[51]  The "life-cycle" accounts of the regulatory capture theory suggest that regulatory agencies go through various stages, from vigorously enforcing rules at the beginning of its establishment to becoming the protectors of the regulated as it reaches maturity.[52]  Regulatory capture in China takes place in a different context: the regulated enterprises were initially created or sponsored by the regulators.  During the planned-economy period, China established a central power structure that divided the administration of all aspects of the national economy among different agencies, with most agencies running state-run enterprises.[53]  Premier Zhu Rongji's Government Restructuring Project in 1998 deprived most economic agencies of their direct powers and interests over domestic industries and significantly weakened the ministries-industries complex.[54]  But even after this reform, SOEs found protection from the remaining government agencies.  These agencies, driven both by ideological traditions and departmental benefits such as "soft money income," as long as the SOEs remained state-owned and continued to funnel economic benefits to them.  Over time, a Chinese style of departmentalism (*benwei zhuyi*) has emerged as one of the most salient features in Chinese politics.[55]

### 5.  Curbing Official Rent-seeking

The public sector in China has a notorious reputation for being corrupt.  As Pei Pinxin has observed, corruption "undermines the legitimacy of the ruling [CCP], fuels social unrest, contributes directly to the rise in socioeconomic inequality. . . .[Ultimately,] if the Party fails to curb corruption, China will most likely witness the rise of a form of authoritarian crony-capitalism that marries unaccountable political power with ill-gotten private wealth."[56]  Corruption tends to concentrate in sectors that involve extensive state investment or heavy state regulation.[57]  The Chinese gov-

---

51.  ANTHONY OGUS, REGULATION: LEGAL FORM AND ECONOMIC THEORY 57 (2004).

52.  *See id.*

53.  Su Chen, *The Establishment and Development of Chinese Economic Legal System in the Past 60 Years*, Institute of Law and Institute of International Law, Chinese Academy of Social Sciences, *available at* http://www.iolaw.org.cn/global/en/showNews.asp?id=245 58.

54.  David Zweig, *China's Stalled "Fifth Wave": Zhu Rongji's Reform Package of 1998–2000*, 41 ASIAN SURVEY 231, 233–34 (2001).

55.  For example, departmentalism in the legislative process was said to have four common manifestations: "(1) Using the law to expand a department's rights beyond its own sphere; (2) Using law to push one department's duties onto another department; (3) Using law to force resolution of larger problems a department cannot solve in its daily work; (4) Drafting laws which are either illegal or unconstitutional." *See* MURRAY SCOT TANNER, THE POLITICS OF LAWMAKING IN POST-MAO CHINA: INSTITUTIONS, PROCESSES AND DEMOCRATIC PROSPECTS 120 (1999).

56.  Pei Minxin, *Corruption Threatens China's Future*, 55 POL'Y BRIEF 230 (2007).

57.  *Id.* at 238.

ernment acknowledges the problem, but whether it is able to wage an effective war against corruption remains an open question. Fighting corruption needs not only the rule of law, but also the commitment of the political elites to relinquish opportunities to use public office to gain private benefits.[58] Many anti-corruption measures have been adopted in China,[59] but their success within the current political framework eventually depends on whether the CCP's good policy can override the rent-seeking temptations. At least for now, the central leadership has been successful in casting itself as an opponent of corruption.[60]

### 6. Pursuing Good Policy

Political approaches based on public choice theory to interpreting economic regulation in China tend to underestimate Chinese leadership's commitment to pursue good public policy, which is understood mainly as economic policies serving the purpose of modernizing China.[61] Leaving aside the controversial debate over Mao Zedong's motives for launching the Cultural Revolution, it is widely recognized that the central leadership after Mao has been consistently seeking for the right path through which China can achieve modernization.[62] For the current CCP, this means delivering economic performance through effective government policies, as well as taking into consideration the interests of other social groups in policy-making.

Zheng Yongnian characterizes the CCP as "an organizational emperor" which "wields its power in a way similar to Chinese emperors of the past."[63] Playing such a role, "the CCP cannot achieve national leadership and become a hegemonic organization, if it confines itself only to its own organizational interests or the interests of the social forces upon which it

---

58. *See* Susan Rose-Ackerman, *The Political Economy of Corruption*, in Kimberly Ann Elliott, Corruption and the Global Economy 34 (1997) (stating "An effective anticorruption strategy should both reduce the benefits and costs under the control of public agents and limit their discretion to allocate gains and impose harms").

59. *See* Eric M. Pedersen, *The Foreign Corrupt Practices Act And Its Application To U.S. Business Operations In China*, 7 J. Int'l Bus. & L. 13, 14 (2008).

60. *See* Fu Hualing, *Stability and Anticorruption Initiatives: Is There a Chinese Model?* 2 (University of Hong Kong Working Paper No. 032, 2013), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2293025.

61. The Constitution of the Chinese Communist Party states, "In building socialism, the basic task [of the Party] is to further release and develop the productive forces and achieve socialist modernization step by step by carrying out reform in those aspects and links of the production relations and the superstructure that do not conform to the development of the productive forces." *See* CCP Constitution, Preamble, *infra* note 117.

62. *See* Liebenthal, *supra* note 50, at 127 (stating "Deng [Xiaoping], like most other twentieth-century Chinese leaders, sought to make the country prosperous and strong."); *see also* Susan L. Shirk, The Political Logic of Economic Reform in China (1993); Jonathan D. Spence, The Search for Modern China (1999); Richard Baum, *The Road to Tiananman: Chinese Politics in the 1980s*, in The Politics of China: The Eras of Mao and Deng (Roderick MacFarquhar ed., 1997); John King Fairbank & Merle Goldman, China: A New History (2006); David Shambaugh, China's Communist Party: Atrophy and Adaptation (2008).

63. Zheng Yongnian, The Chinese Communist Party as Organizational Emperor: Culture, Reproduction and Transformation 16 (2010).

has built its hegemonic position."[64]

After ending the Cultural Revolution in 1976, Deng Xiaoping and his comrades steered the country toward a different direction by launching a comprehensive reform program oriented to market economy. The new program, first of all, required the Party-state to withdraw from its former all-intrusive roles in the life of the whole nation and the people. In spite of the risks of undermining the Party's autocratic power, the reform program was steadily implemented. As remarked by David Shambaugh, "Deng's programme changed the very nature of the state from being a proactive agent of social-political change to being a more passive facilitator of economic change and reactive arbiter of social-political tensions".[65]

In the wake of Mao's death, Deng Xiaoping arguably had a good chance of becoming another dictatorial ruler. Instead, Deng used the chance to put into practice his beliefs that China could become prosperous and strong only after firms and individuals in the country were allowed to pursue their own fortune and to face competitions from the outside world.[66] For example, Lieberthal identified the major motives underlying Deng's reform measures and observed that most of them were driven by a desire to facilitate good policies.[67] Another example is China's accession to the World Trade Organization (WTO). In fact, domestic opposition was at its strongest when the Chinese leadership accepted the packages the U.S. drafted in 1999.[68] Chinese leaders still used the outside pressure from the WTO as an opportunity to push for bolder and wider domestic economic and regulatory reform.[69] As Lardy remarked, although "[p]olitical leaders rarely are willing to impose high short-term economic costs in order to reap benefits in the medium and long term" China appeared to be an exception.[70]

Good policy in the contemporary Chinese political context means that the ruling Party must deliver sustained economic growth, which is one of the pillars of the Party-state's legitimacy. Lardy noted that Chinese elites have hotly debated many details of the economic reform, but "the view that economic growth is the sine qua non for retaining political power seems almost unanimous."[71] At the operational level, good policy pursuance has led to substantial regulatory reform in China, featuring efforts to improve legalism, transparency, accountability, and independence in the regulatory

---

64. *Id,* at 134.

65. David Shambaugh, *The Chinese State in the Post-Mao Era*, in DAVID SHAMBAUGH, THE MODERN CHINESE STATE 163 (Cambridge, ed., 2000).

66. *See* JONATHAN D. SPENCE, THE SEARCH FOR MODERN CHINA 655 (1999).

67. *See* LIEBERTHAL, *supra* note 50, at 129–30.

68. *See* Ross P. Buckley & Weihuan Zhou, *Navigating Adroitly: China's Interaction with the Global Trade, Investment and Financial Regimes* 3 (University of New South Wales, Research Paper No. UNSW Law Research Paper No. 68, 2013), *available at* http:///papers.ssrn.com/sol3/papers.cfm?abstract_id=2331843.

69. *See* Joseph Fewsmith, *China and the WTO*, 11 NBR ANALYSIS 25 (1999).

70. NICHOLAS R. LARDY, INTEGRATING CHINA INTO THE GLOBAL ECONOMY 10 (2002).

71. LARDY, *supra* norte 70, at 11.

systems.[72]

This paper hence argues that the governance practice of China's SOEs has incorporated all the elements of legitimacy management above, which will be examined in detail in the following parts.

## II.  The Rise, Demise, and Rise Again of Chinese SOEs

One can only appreciate the level of difficulty in reforming Chinese SOEs by understanding their developmental path since the early stages. The origins of the PRC SOEs can be traced back to the revolutionary period before the establishment of the PRC, when the communist Party established shops, factories, and banks in territories under its control.[73]  Rapid establishment and growth of SOEs started in the 1950s, after the CCP took over the power of Mainland China.  Through nationalization and expropriation of enterprises and assets that originally belonged to capitalists and foreign investors in the Republic of China period, SOEs quickly dominated all aspects of the PRC economy and continued such dominance for several decades under the planned economy.[74]  In fact,[75]

> [a]t the start of the economic reform in the late 1970s, Chinese industry was largely state owned and urban.  In 1978, SOEs delivered 78 percent of industrial output and employed 76 percent of all industrial workers; state firms also absorbed 84 percent of increments to industrial fixed assets during 1975–1980.

Before the reform period, traditional SOEs had the following characteristics.  First, they were not autonomous firms with a separate existence, but "basic production units run directly by the government."[76]  Such an SOE was part of the government, having the "basic task of carrying out all the instructions and directives from its superiors" in the government.[77]  Second, SOEs had multiple roles and objectives because they were also "grassroots organizations of the party-state political system with extensive social functions."[78]  For the employees, the SOE was a working and social unit commonly known as the *Danwei*:[79]

---

72.  *See* DALI L. YANG, REMAKING THE CHINESE LEVIATHAN: MARKET TRANSITION AND THE POLITICS OF GOVERNANCE IN CHINA 251 (2004).

73.  *See* DONG FUREN, ZHONGHUA RENMIN GONGHEGUO JINGJISHI (中华人民共和国经济史) [THE ECONOMIC HISTORY OF THE PEOPLE'S REPUBLIC OF CHINA] 37 (2001); *see also* WU JINGLIAN, *infra* note 76, at 139–40.

74.  *See* DONG FUREN, *supra* note 73, at 37–38; *see also* WU JINGLIAN, *infra* note 76, at 139–140.

75.  Loren Brandt, Thomas G. Rawski, & John Sutton, *China's Industrial Development*, in CHINA'S GREAT ECONOMIC TRANSFORMATION 571 (Loren Brandt & Thomas G. Rawski ed., 2008).

76.  WU JINGLIAN, UNDERSTANDING AND INTERPRETING CHINESE ECONOMIC REFORM 139 (2005).

77.  *Id.* at 140.

78.  *Id.*

79.  STOYAN TENEV & CHUNLIN ZHANG, CORPORATE GOVERNANCE AND ENTERPRISE REFORM IN CHINA: BUILDING THE INSTITUTIONS OF MODERN MARKETS 10 (2002).

The state regarded SOEs as instruments to achieve its political and economic objectives, such as to establish a strong military industry and to catch up with and surpass Western countries. Therefore, managers of SOEs were regarded as cadres of the party and were governed in the same way under the same system as staff of the party and government organs. Moreover, SOEs integrated the functions of employment, social security, and social relief, providing a full spectrum of social services from cradle to grave.[80]

Third, state ownership in traditional SOEs was shared vertically among governments at various levels from local to central and was shared horizontally among different bureaus.[81] Fourth, the non-existence of markets in pre-reform PRC exempted the SOEs from considering supply and demand as a firm in the market economy must do. They needed to execute the instructions of the planners, but they did not need to consider the costs or profits. In other words, the SOEs were subject to "soft budget constraints," and the state would always serve as the "last resort" lifesaver to rescue a troubled SOE.[82]

The aforesaid traditional attributes have profound implications for SOE reform today. First, to the extent that SOE development in China is path dependent, these attributes are the initial conditions for SOE reform to address. Further, some of the characteristics have persisted into the governance structures of contemporary SOEs, even though SOEs have been converted into "modern corporations" according to the Chinese government.[83]

Reform started in 1978 to introduce market-oriented incentives with the aim of granting SOEs some degree of autonomy by allowing them to retain a portion of the profits (if any), sell output produced in excess of the plan, and appoint lower-level staff.[84] The initial measures were followed by the "enterprise contracting system," through which the relevant government organs and the SOE management signed a contract entrusting the management to operate the SOE on the government's behalf.[85] Of course, SOE managers were neither owners nor professional managers hired by the SOE. They were agents hired for the government. To institutionalize these reforms, the National People's Congress (NPC) enacted *The Law on Industrial Enterprise Owned by the Whole People*, commonly known as the SOE Law, which still governs the management of the very few SOEs yet to be corporatized.[86]

The reform above was, overall, unsuccessful.[87] This led the government to formally launch a nationwide movement in 1993 towards corpora-

---

80. WU, *supra* note 76, at 140–41.

81. *See* WU, *supra* note 76, at 141.

82. WU, *supra* note 76, at 141–42.

83. *See id.* at 151.

84. *See* TENEV & ZHANG, *supra* note 79, at 11–12; *see also* WU, *supra* note 76, at 144–53 (describing the initial SOE reform as "power-delegating and profit-sharing").

85. *See* WU, *supra* note 76, at 146–48; *see also* TENEV & ZHANG, *supra* note 79, at 13.

86. An example of such traditional SOEs existing today is the China Railway Corporation, which was established in 2013 after the Chinese government dismantled the Ministry of Railway.

87. *See* WU, *supra* note 76, at 151–53.

tization in the aftermath of the famous Southern tour of Deng Xiaoping, during which Deng called for a radical shift of China's economic system from a planned economy to a market economy. What looks revolutionary about this stage of reform, at least from a legal perspective, is that it was preceded by a national law, namely *Gongsi Fa*, which, adopted in December of 1993, provided a systemic body of rules covering the company from its incorporation to termination. In 1994, the State Council, China's Central Government, decided to establish the "modern enterprise system" (*xiandai qiye zhidu*), by initially selecting 100 SOEs for corporatization under the *Gongsi Fa*.[88] In 1999, the CCP Central Committee adopted *The Decision on Several Important Issues Regarding Reform and Development of State-owned Enterprises*,[89] which urged the acceleration of the corporatization of large and medium-sized SOEs and the privatization of small SOEs. As Wu Jinglian has summarized:

> Corporatization of large and medium-sized SOEs after 1998 basically included three successive steps: (1) separation of administrative function and enterprise function; (2) reorganization of monopoly enterprises into competitive enterprises; and (3) IPO on domestic and overseas securities markets after asset restructuring.[90]

The establishment of the State-owned Assets Supervision and Administration Commission (SASAC) of the State Council in March 2003 marked a milestone in SOE reform. SASAC's main responsibility was to represent the State Council in order to "exercise the duties and responsibilities of the state investor."[91] Ostensibly, the creation of SASAC at both the central and local levels was an effort by the Chinese government to consolidate the control rights over SOEs. Before SASAC came into being, the ownership of SOEs within the government was very fragmented, and many bureaucracies, from central ministries to departments of local governments, had control over SOEs. As a centralized representative of the state investor at least for industrial enterprises, SASAC would "assume a combination of powers previously dispersed among different ministries and agencies."[92]

The majority of Chinese SOEs once faced serious problems in their economic and financial performances, especially in the 1980s and 1990s. A 1995 report of the Market Economy Research Centre of the Shanghai Academy of Social Sciences suggested that a third of the SOEs had been

---

88. *See* Wu, *supra* note 76, at 155.

89. *See Zhonggong Zhongyang Guanyu Guoyou Qiye Gaige he Fazhan Ruogan Zhongda Wenti de Jueding* (中共中央国有企业改革和发展若干重大问题的决定) [Decisions of the CCP Central Committee on Some Major Issues Concerning the Reform and Development of State-owned Enterprises], (promulgated by the CCP Central Committee at the Fourth Plenary Session of the 15th Meeting, Sept. 22, 1999) (China). [hereinafter "1999 CCP Decisions on SOE Reform"].

90. Wu, *supra* note 76, at 155.

91. David C. Donald, A Financial Centre For Two Empires: Hong Kong's Corporate, Securities and Tax Laws in its Transition From Britain To China 236 (Cambridge ed., 2014).

92. Barry Naughton, *The State Asset Commission: A Powerful New Government Body*, 8 China Leadership Monitor 2 (2003).

suffering losses since the inception of the Reform Era.[93]  According to a study by the OECD, the SOE after-tax profit rate (relative to fixed assets) was close to 18 percent in 1985, but eventually dropped to 0.9 percent in 1998.[94]  The OECD found, "[t]he proportion of industrial SOE incurring (after-tax losses) has risen from 31 per cent in 1994 to 42 per cent in 1997 and nearly 50 per cent in 1998."[95]

In the 2000s, however, SOEs have been striking back with incredible financial performances, although their total numbers and share in China's economy have been declining.  With the state's retreat from labor-intensive, low-value added downstream sectors, the SOEs share in industrial output and total industrial employment declined from 50 percent and 60 percent, respectively, in 1998 to 27 percent and 20 percent, respectively, in 2010.[96]  The number of SOEs dropped from 65,000 to 20,000 during the same period, reducing their share in the total industry in China from 40 percent to less than 5 percent.[97]  However, the Party-state fostered the growth of SOEs in capital-intensive, upstream sectors, or strategic sectors, including banking, telecom, energy, and natural resources.  Centrally managed SOEs are especially successful when measured by growth and profitability.  As a documentary on SOE produced by the Xinhua, China's state press agency, proudly announced,

> From 2003 to 2011, SOEs (other than state-owned financial institutions) realized the annual growth rates of 17.6%, 25.2% and 19.4% in revenue, net profits and tax, respectively, which were far higher than China's GDP growth rates for the same period. . . . In 2012, 69 Chinese SOEs – of which 53 were supervised by the SASAC – made to the list of the *Fortune Global 500* in 2012, with CNPC, SINOPEC and China State Grid Corporation included in the top 10.  Nowadays, the monthly profits of the 115 SOEs centrally administered by the SASAC of the State Council reached RMB100 billion.[98]

In other words, it would be an error to regard Chinese SOEs as "dying dinosaurs that continuously absorb resources from the economy but pro-

---

93. *See* SASS, *Guoyou Kuisun Qiye Pochan, Daobi yu Chanquan Liudong Yanjiu* (国有亏损企业破产、倒闭与产权流动研究) [*Study Report on the Bankruptcy, Close-down and Property Rights Trading of Loss-suffering SOEs*], 6 JINGJI LILUN YU JINGJI GUANLI (经济理论与经济管理) [ECON. THEORY & ECON. MGMT.] 13, 13 (1995).

94. OECD, CHINA IN THE GLOBAL ECONOMY: REFORMING CHINA'S ENTERPRISES 22–23 (2000).

95. *Id.* at 24.

96. Sarah Tong & Huang Yanjie, *China's State-owned Enterprises in the Post-Crisis Era: Development and Dilemma*, 694 EAI BACKGROUND BRIEF 7, National University of Singapore (2012).

97. *Id.*

98. Xinhua News Agency, *Qianli zhi ren, Xing si xingyuan – Guoziwei Chengli Shinian Lai Guoyou Qiye Gaige Fazhan Jishi* (千里之任，行思行远—国资委成立十年来国有企业改革发展纪实) [*A Documentary of the Reform and Development of SOEs in the Decade after the Establishment of SASAC*], May 27, 2013, *available at* http://vod.sasac.gov.cn/play.jspa?indexid=846&streamid=531 (last visited Feb. 1, 2014) [hereinafter SOE Documentary].

duce little economic value."[99] Although the SOEs' share in the economy continues to decline, SOEs still make up a substantial part of the economy and dominate the strategic and upstream sectors. SOEs have also registered large profits in the past decade.

## III.   The Twin Governance Structures of SOEs

As noted previously, the existing literature on corporate governance and control of SOEs has largely focused on the universal elements in the legal framework of the *Gongsi Fa*, looking mainly at the interactions among the shareholders, directors, supervisors and managers, as if the rights and duties with respect to their relations are mainly or only provided in the corporate law.[100] This is misleading. This paper argues that SOEs in China are subject to a system of corporate governance that features two parallel structures, one for legal governance and the other for political governance. Mechanisms and controls in the legal governance structures stem from the corporate form based on *Gongsi Fa* and other relevant state laws, and resemble those implemented in other jurisdictions. Political governance is a CCP-dominated process that actually controls personnel appointments and decision-making in SOEs. The two structures run separately, although the same group of players participates in the decision-making processes of both structures. In short, legal governance and political governance coexist in the control and operation of Chinese SOEs. In most cases, the informal, non-legal, rules in political governance, which run in the shadows, prevail over the legal rules in China's corporate and securities laws.

## A.   Legal Governance in SOEs: The Law on Paper

Like the company law in most jurisdictions, *Gongsi Fa* provides a common structure for business corporations possessing core structural characteristics including legal personality, limited liability, transferable shares or equity interest, centralized management under a board structure, and shared ownership by contributors of capital.[101] In addition to the *Gongsi Fa*, business companies are also subject to a wide range of other laws, including the PRC Securities Law (*Zhengquan Fa*), the PRC Law on State-owned Assets in Enterprises (*Guoyou Zichan Fa*), Accounting Law, a number of Administrative Regulations issued by the State Council (which is China's Central Government), a voluminous body of ministerial rules formulated by the various ministries under the State Council, as well as, the self-regulatory rules of the stock exchanges.

---

99. Xu Gao, *State-owned Enterprises in China: How big are they?*, https://blogs.worldbank.org/eastasiapacific/state-owned-enterprises-in-china-how-big-are-they (last visited Jan. 1, 2014).

100. *See* Lin & Milhaupt, *supra* note 10, at 701.

101. KRAAKMAN, *supra* note 1, at 1 (noting 'corporate law everywhere must, of necessity, provide for [these characteristics]').

Under the *Gongsi Fa*, business companies take two legal forms: limited liability company (*Youxian Zeren Gongsi*, or LLC) and joint stock limited company (*Gufen Youxian Gongsi*, or JSLC).[102]    An LLC is a functional equivalent of the "private company" under English law or the "closely held corporation" in the United States.    Its capital, however, is not divided into equal units in the form of shares (*Gupiao*).    That is, although members of the LLC are also called "shareholders" (*gudong*), the company does not issue shares to shareholders.    Instead, the percentage of ownership of a shareholder in the LLC is provided in the shareholders' agreement and the company's articles of association.    In addition, an LLC cannot have more than 50 shareholders.[103]    For these reasons, an LLC cannot offer shares to the public and become a listed company.    In comparison, the JSLC is the business form for public companies.    Its capital is divided into equal units in the form of shares, which can be offered to the general public and listed in a stock exchange.[104]

The legalized corporate governance structure of a typical Chinese company features a two-tier board system, and comprises three levels of controls: the shareholders' general meeting (also known as the general assembly), a two-tier board system consisting of a board of directors and a supervisory board, and a (general) manager (chief executive officer or CEO).[105]    The general meeting is called the 'power organ' (*quanli jigou*) of the company,[106] indicating that the shareholders in China are more powerful than their counterparts in some other jurisdictions.    Indeed, in addition to the usual power of electing directors and supervisors, the general meeting can also decide the company's business strategies and investment plans, although "strategies" and "plans" are never defined in any law.    The general meeting also has the authority to hear reports from the board of directors and the supervisory board, and to adopt resolutions as to whether to approve such reports.    It has similar authority on issues concerning the company's financial budgets, profit distribution or the make-up of losses, amending the company's articles of association, increasing or decreasing of the company's registered capital, the issuance of corporate bonds, and fundamental corporate changes such as merger, division, dissolution, and liquidation.[107]

The board of directors is the company's "operational implementation organ."[108]    It reports the general shareholders' meeting, and it has both the power and duty to "implement the resolutions" of the general meeting.    It also has the legal power to establish the internal management structure for the company, and appoint or remove the key management personnel including the general manager.    In addition, it is tasked with formulating

---

102.    *See Gongsi Fa*, *supra* note 4.
103.    *See id.* at art. 23, 24, 25.
104.    *See id.* at art. 77, 126, 127, 130, 135, 145.
105.    *See* WANG JIANGYU, COMPANY LAW IN CHINA: REGULATION OF BUSINESS ORGANIZATIONS IN A SOCIALIST MARKET ECONOMY 151–95 (2014).
106.    *See Gongsi Fa*, *supra* note 4, at art. 37.
107.    *See Gongsi Fa*, *supra* note 4, at art. 38.
108.    OECD (2011), *supra* note 8, at 18.

the various reports or plans that are subject to the approval of the general shareholders' meeting.[109]

Listed companies are required to install independent directors on their board of directors, and those independent directors should constitute at least a third of the board's membership. The independent directors are empowered by the CSRC to examine and approve major related-Party transactions, propose and convene board meetings and extraordinary general meetings of the shareholders, independently hire auditors and consultants to help them perform duties, and launch proxy battles against the board.[110]

The supervisory board (SB) supposedly adds another layer of protection for the interests of the company and shareholders. The SB both reports to and is responsible for general shareholders' meetings, and so is on the same level as the board of directors in the company's internal governance structure. Although the SB does not participate in corporate management, it exercises independent supervisory power over the board of directors and executive officers, including the power to inspect the company's financial status, to propose the removal of any director or senior executive that has violated relevant laws or rules from office, to convene general shareholders' meetings, and, under certain conditions, to initiate lawsuits against directors and senior executives.[111]

The 2005 *Gongsi Fa* confers upon the shareholders a broad array of rights. In general, shareholders have the right to transfer their shares, inspect company documents, participate and vote in the general shareholders' meeting, elect and remove directors and supervisors, and sue the company, directors, and supervisors. Shareholders are not entitled under the *Gongsi Fa* to compulsory profit distribution, but certain CSRC rules make it compulsory for listed companies to distribute dividends to shareholders.[112]

From a legal perspective, directors, supervisors, and senior executives are responsible to the company and its shareholders under the newly unveiled framework of legal duties "resembling common law fiduciary duties."[113] With Articles 148, 149, 150, 152, and 153 of the 2005 *Gongsi*

---

109. *See Gongsi Fa*, *supra* note 4, at art. 47.

110. *See generally* China Securities Regulation Commission (CSRC), *Guanyu zai Shangshi Gongsi Jianli Duli Dongshi Zhidu de Zhidao Yijian* (关于在上市公司建立独立董事制度的指导意见) [*Guidelines for Introducing Independent Directors to the Board of Directors of Listed Companies*], *available at* http://www.csrc.gov.cn/pub/newsite/flb/flfg/bmgf/ssgs/gszl/201012/t20101231_189696.html.

111. *See Gongsi Fa*, *supra* note 4, art. 54.

112. For instance, the CSRC issued the Provisions on Strengthening the Protection of the Rights and Interests of the General Public Shareholders in 2004 to order listed companies to implement "proactive profit distribution." The CSRC's Guidance for the Articles of Association of Listed Companies (most recently revised in 2006), which has been adopted by all listed companies under regulatory pressure, stipulates that shareholders are to receive dividends or other forms of interest distribution in proportion to their equity stake in the company. *See* OECD (2011), *supra* note 8, at 33.

113. *See* Nicholas C. Howson, *The doctrine that dared not speak its name: Anglo-American fiduciary duties in China's 2005 company law and case law intimations of prior conver-*

*Fa*, amongst others, this appears to be the first time that China has systematically codified—even if not in its entirety—the scope and enforcement of common law fiduciary duties in China. In particular, Article 148 provides that "[d]irectors, supervisors and senior managers of a company shall observe laws, administrative regulations and the company's articles of association and shall assume the duties of loyalty and diligence to the company."[114]

Most SOEs have been corporatized as companies with the legal structure described above, and they are thus subject to *Gongsi Fa* and other relevant laws. The Chinese SOEs that are listed in the Hong Kong Exchange (HKE) must be JSLCs established under the *Gongsi Fa*.[115] In theory, all of the players in the SOEs, including the state-shareholder and other shareholders, the general manager and its deputies, the chairman and directors of the board, and the supervisors, are entitled to exercise these rights and are forced to perform the obligations provided in the *Gongsi Fa*. Ideally, in a country based on the rule of law, the players would only need to act within the four corners of corporate law. As discussed below, this is far from true in China given the political control of SOEs by the Party-state, even though SOEs still have to comply, at least on the surface, with the formalities and rules in China's corporate and securities law.

## B. Political Governance in SOEs

### 1. The Foundation of Political Governance in SOEs

If corporate governance and control in Chinese SOEs only followed the rule of law, then the following events would occur. SASAC, or any other state agency authorized to exercise shareholder rights on behalf of the state, would, together with any other qualified shareholders, elect the members of the board of directors and the supervisory board at the shareholders' meeting. The board of directors, according to *Gongsi Fa* and its associated laws, would exercise three categories of powers: (1) the decisional powers to make plans for the company's business operations, investment strategies, financial budget, profit distribution, loss recovery, and fundamental corporate changes, etc.; (2) the appointment powers to select the company's corporate executives (including the general manager or CEO) and decide their compensation; and (3) the oversight powers to monitor the performance of the executives.[116]

SOEs, however, are not operated this way. In fact, decision-making for important matters regarding an SOE is typically in the hands of the CCP,

---

*gence, in* TRANSFORMING CORPORATE GOVERNANCE IN EAST ASIA 198 (Hideki Kanda, Kon-Sik Kim, & Curtis J. Milhaupt ed., 2008).

114. *Gongsi Fa, supra* note 4, art. 148.

115. Under the *Gongsi Fa*, only JSLCs can issue shares and become listed companies. *See Gongsi Fa, supra* note 4, arts. 77 and 121. For discussions on the Chinese legal framework on mainland companies listed in Hong Kong, *see* JiangYu Wang, *Regulatory Competition and Cooperation between Securities Markets in Hong Kong and Mainland China*, 4 CAP. MARKETS L. J. 383, 388–91 (2009).

116. *See* WANG, *supra* note 105, at 170.

which operates through the company's twin governance structures. According to the Constitution of the Communist Party of China, the Party's leadership role in the country "means mainly political, ideological and organizational leadership."[117] A 1997 resolution of the CCP Central Committee elaborated on such "leadership" as follows:[118]

> Maintaining the Party's political leadership over SOEs is a principle of fundamental importance that shall never be shaken and undermined. The political leadership of the Party is embodied in the following aspects: adhering to the Socialist direction of SOEs to ensure that Party's line, principles, policies as well as state laws and regulations are thoroughly implemented in SOEs; adhering to the principle of Party control of the cadres by lawfully selecting or recommending property representatives on behalf of the state or persons in charge of managing the SOEs according to the respective administrative authorities of the Party organizations concerned, as well as, taking charge of their education, training, evaluation and supervision; and ensuring that the Party organizations play the role of the political core and that individual Party members play exemplary roles in SOEs. The emphasis on upholding the Party's political leadership of SOEs does not mean that the Party should act on behalf of or to replace the government or the enterprise.

Insofar as corporate governance and control of SOEs is concerned, an SOE is controlled by the Party-state through the following four mechanisms: (1) the fundamental discipline of the CCP requires all Party members to comply with the Party line; (2) the CCP decides the appointment and promotion of the top executives of SOEs; (3) Party cells within the SOEs convene meetings to make important decisions for the company and to ensure the operation of the company is consistent with the Party line; and (4) SOE executives accused of wrongdoing are investigated by the CCP and punished under Party discipline.[119] These mechanisms are examined in detail in the following sections.

### 2.    *SASAC as the De Facto State Shareholder*

SASAC is customarily called the controlling shareholder,[120] but it does not have such a legal role. SASAC has the authority to act as the state

---

117. *Zhongguo Gongchandang Zhangcheng* (中国共产党章程) [Constitution of the Chinese Communist Party] (promulgated by the Ninth Nat'l Cong. Communist Party, effective Apr. 14, 1969, revised by the Eighteenth Nat'l Cong. Communist Party, Nov. 14, 2012) [hereinafter CCP Constitution], Preamble, *available at* http://www.china.org.cn/chinese/18da/2012-11/19/content_27156212_2.htm.

118. *Zhonggong Zhongyang Guanyu Jinyibu Jiaqiang he Gaijin Guoyou Qiye Dang de Jianshe Gongzuo de Tongzhi*
(中共中央关于进一步加强和改进国有企业党的建设工作的通知) [Notice of the Central Committee of the CCP on Further Strengthening and Improving the Party Building Work in SOEs], (promulgated by the CCP Central Committee, Zhong Fa [1997] 4 Hao, Jan. 24, 1997), Part II, *available at* http://cpc.people.com.cn/GB/64162/71380/71382/71383/4844844.html [hereinafter 1997 CCP Notice on Party Building in SOEs].

119. *See* Christopher A. McNally, *Strange Bedfellows: Communist Party Institutions and New Governance Mechanisms in Chinese State Holding Corporations*, 4 BUS. & POL. 91 (2002).

120. *See e.g.*, Lin & Milhaupt, *supra* note 10 (stating that "the law formally recognizes SASAC as an investor—a shareholder in the national SOEs").

shareholder in industrial enterprises, but it is not the state shareholder itself, according to the legal conceptualization of state ownership as envisaged in the *Qiye Guoyou Zichan Fa*, or State Assets Law.[121]  State assets, including equity interests in SOEs, belong to the State, namely the Chinese people as a whole (*Quanmin suoyou*).[122]  In essence, the *de jure* shareholder is the State, which is otherwise known as the *whole people*.  The State Council, representing the *whole people* as the "investor," performs the investor's functions and responsibilities, and also enjoys the powers and interests of the investor.[123]  The State Council further authorizes—or delegates the powers to—SASAC to exercise these aforementioned rights, duties, and responsibilities.[124]  However, SASAC is not entitled to receive the benefits ordinarily given to a shareholder.  For example, SASAC cannot take distributed dividends.  Instead, the dividends distributed to the state shareholder go directly to the central or local government, and are received by the relevant finance department.  For these reasons, SASAC may be regarded as a *de facto* shareholder only insofar as it exercises only some of a shareholder's traditional powers.

Corporatized SOEs, including listed SOEs, should in theory comply with all the rules of China's national laws.  Legal governance based on corporate law is thus the external aspect of SOE governance under which SASAC, acting as the *de facto* shareholder, "represent[s] the people's government of the same level to receive the earnings from investment, participate in major decision-making, and elect the management personnel in accordance with the law."[125]  For example, SASAC's appointment power is provided by Article 22 of the State Assets Law.  Under Article 22, and in accordance with national laws made by the National People's Congress or its Standing Committee, administrative regulations made by the State Council, or the articles of association of the SOE, SASAC can: (1) appoint or remove the general manager, deputy general manager, chief of financial affairs, and other senior executives of a wholly state-owned enterprise (presumably not yet corporatized pursuant to the *Gongsi Fa*); (2) appoint or remove the chairman and deputy chairman of the board of directors, directors, chairman of the supervisory board, and supervisors; and (3) propose candidates for directors and supervisors to the general shareholders' meeting of a company in which the State has controlling interest or one in which the State has an equity, but not necessarily controlling, interest.[126]

As discussed below, SASAC's actual ability to exercise these legal rights is subject to tight control by the Party-state regime in China.  In one sense, SASAC itself is part of the Party-state establishment that is fully con-

---

121.  *See Qiye Guoyou Zichan Fa* (企业国有资产法) [Law on State-owned Assets in Enterprises] (promulgated by the Fifth Session of the Standing Comm. Nat'l People's Cong., Oct. 28, 2008, effective May 1, 2009) (China) [hereinafter State Assets Law].

122.  *See id.* art. 3.

123.  *See id.* art. 4.

124.  *See id.* art. 11.

125.  State Assets Law, *supra* note 121, art. 12; *see also Gongsi Fa*, *supra* note 4, art. 4.

126.  *See* Interim Regulations on Supervision and Management of State-owned Assets of Enterprises, art. 12 (2009) [hereinafter Interim Regulations].

trolled by the CCP. It is not wrong to say that SASAC exercises shareholder's rights on behalf of the Party-state. This, however, has not prevented the Party-state from adding several other layers of control in the SOEs.

### 3. *All CCP Members in SOEs Must Comply with Party Line*

The Constitution of the Communist Party of China requires all CCP members to comply with the Party's political line.[127] The CCP, as a Leninist Party, practices the basic principles of "democratic centralism," which is defined in the CCP Constitution in the following way:[128]

> Individual Party members are subordinate to the Party organization, the minority is subordinate to the majority, the lower Party organizations are subordinate to the higher Party organizations, and all the constituent organizations and members of the Party are subordinate to the National Congress and the Central Committee of the Party.

In particular, Party members have duties, such as studying, understanding, and taking the lead in implementing the "Party's line, principles, policies and resolutions," putting "the interest of the Party and the people [ ] above everything," abiding by the Party's discipline, upholding the Party's solidarity and unity, maintaining close ties with the masses to ensure that the Party's policies are implemented, and collecting public views and feedback to inform the Party.[129]

Given that all or most of the top executives and many other employees at SOEs are CCP members, the obligations imposed upon the Party members listed in the previous paragraph have profound implications in the corporate governance practices of SOEs. The obligations form a general and ideological control on the minds and behaviors of CCP members, who, from the CEO to the factory workers, must, at least in theory, implement Party policies and execute Party orders faithfully when performing their duties in a SOE.

This Party-member relationship in SOEs has been most recently embodied in a political campaign launched by President Xi Jinping that was aimed at reviving Mao-Era self-criticism in order to bring CCP officials closer to the people. In a campaign titled, The Party's Mass-Line Education Exercise (*Qunzhong Luxian Jiaoyu Shijian*), hundreds of millions of CCP members were required to study the talks and speeches of Xi Jinping, study the resolutions of the 18th CCP Congress, and convene meetings to "highlight one another's faults and confess any transgressions that might undermine the [Party's] credibility among the masses."[130] As some scholars noted, these meetings represented a crucial element of Xi's mass-line cam-

---

127. *See* CCP Constitution, *supra* note 117, art. 3.
128. CCP Constitution, *supra* note 117, art. 10, para. 1.
129. CCP Constitution, *supra* note 117, art. 3.
130. Dan Levin, *China Revives Mao-Era Self-Criticism, but This Kind Bruises Few Egos*, N.Y. Times (Dec. 20, 2013), *available at* http://www.nytimes.com/2013/12/21/world/asia/china-revives-mao-era-self-criticism-but-this-kind-bruises-few-egos.html?pagewanted=all&_r=0; *see also* Willy Lam, *Increasingly Maoist Xi Jinping: campaign to promote princes*

paign, which was "intended to bolster the Party's legitimacy among a public increasingly disgusted by official graft, gross mismanagement and unseemly activities that involve sex, overpriced liquor or luxury watches, or sometimes all three."[131]  Like all other state agencies and institutions, SOEs, under SASAC's umbrella, have been mobilized to participate in the campaign under the guidance set by Xi.  The central SASAC itself convened a grand meeting on January 23, 2014, after a series of intra-SASAC meetings of smaller size, to summarize the "intermediate achievements" of such exercises.[132]  In the grand meeting, Zhang Yi, who concurrently serves as the Governor of SASAC, the Secretary of the CCP Committee in SASAC, and the Director of the Leading Group for promoting Xi's aforesaid campaign within SASAC, made a four-point statement about SASAC's own compliance with Xi's requirements. Zhang emphasized (1) the need for Party members in SASAC to have "consciousness" in their minds and actions to implement the CCP's mass-line; (2) the need for SASAC to strengthen the CCP practice of "democratic centralism" by better utilizing criticism and self-criticism amongst Party officials; (3) the need for SASAC to take action to adopt the results of the campaign; and (4) the need for SASAC to institutionalize the practice of the campaign based on the instructions of Xi Jinpin and relevant CCP resolutions.[133]  Indeed, nothing can be more telling for the importance of Party influence within SOEs than Zhang's speech on the "political and ideological" leadership of the Party in the SASAC system.[134]

### 4.  *Party Organizations' Participation in SOE Decision-Making*

Each SOE has at least one Party organization, known either as the Party Group (*dangzu*), Party Committee (*dangwei*), Party Subgroup (*dangzhibu*).  The functions of the Party cells in SOEs are defined in the CCP Constitution as follows:[135]

> In a state-owned or collective enterprise, the primary Party organization acts as the political nucleus and works for the [better] operation of the enterprise.  The primary Party organization guarantees and supervises the implementation of the principles and policies of the Party and the state in its own enterprise and backs the meeting of shareholders, board of directors, board of supervisors and manager (factory director) in the exercise of their relevant

---

*with 'Red DNA'*, ASIA NEWS.IT (July 17, 2013), http://www.asianews.it/news-en/Increasingly-Maoist-Xi-Jinping:-campaign-to-promote-princes-with-'Red-DNA'-28494.html.

131.  *Id.*

132.  Guoziwei Dangwei Zhaokai Zhishu Jiguan Shenru Kaizhan Dangde Qunzhong Luxian Jiaoyu Shijian Huodong Zongjie Dahui
(国资委党委召开直属机关深入开展党的群众路线教育实践活动总结大会) [SASAC Headquarters Convenes a Grand Summarizing Meeting for Thoroughly Conducting the Campaign for Study and Practice of the Party's Mass-Line], STATE-OWNED ASSETS SUPERVISION AND ADMINISTRATION COMMISSION OF THE STATE COUNCIL (Jan. 26, 2014), *available at* http://www.sasac.gov.cn/n1180/n15066072/n15390580/n15390689/15685018.html.

133.  *Id.*

134.  *See generally* PEOPLE'S DAILY, *available at* http://dangjian.people.com.cn/gq (containing reports of meetings convened by individual SOEs on Party building in SOEs by the CCP's flagship newspaper on Party building in SOEs).

135.  CCP Constitution, *supra* note 117, art. 32, para. 2.

functions and powers according to law. It relies wholeheartedly on the workers and office staff, supports the work of the congresses of representatives of workers and office staff and participates in making final decisions on major questions in the enterprise. It works to improve its own organization and provides leadership over ideological and political work, efforts for cultural and ethical progress and the trade unions, the Communist Youth League and other mass organizations.

The responsibilities and powers of the Party organization in an SOE are more explicitly stated in the 1997 CCP Notice on Party Building in SOEs, which requires the Party organization to supervise the enterprise in order to ensure that the CCP line is faithfully implemented, and authorizes it to "participate in the decision-making on material and important matters of the SOE and provide support to the factory leader/general manager, shareholders' general meeting, board of directors and supervisory board to perform their duties according to law."[136] Accordingly, the board of directors or general manager is required to "consult and respect the opinion of the Party organization" before making any important decisions, and brief the Party organization on the implementation of said decision.[137] Further, the trade unions, youth leagues, and, to some extent, the workers' congress of the SOE are under the leadership of the Party organization.[138]

To clarify the ambiguities caused by the CCP Notice, the CCP issued a more detailed decision to institutionalize the Party's supervision of SOEs in 2004.[139] The 2004 decision was also a response to the excessive interference of the Party organization in some SOEs and the lack of Party participation in others.[140] In particular, the decision defines the "material and important matters" as involving "the SOE's development strategy, medium- and long-term planning, production and business operation policies, annual financial budget and financial accounts, corporate asset restructuring, the drafting of the enterprise's major reform plans and key rules and institutions of management, the enterprise's important personnel arrangements, as well as issues of vital personal interests to the workers."[141] Unfortunately, this definition still seems vague. The 2004 Joint Opinions

---

136. The 1997 CCP Notice on Party Building in SOEs, *supra* note 118.

137. The 1997 CCP Notice on Party Building in SOEs, *supra* note 118, Part IV.

138. The 1997 CCP Notice on Party Building in SOEs, *supra* note 118, Part VII.

139. *See Guanyu Jiaqiang he Gaijin Zhongyang Qiye Dangjian Gongzuo de Yijian* (关于加强和改进中央企业党建工作的意见) [Joint Opinions on Strengthening and Improving Party Building Work in Central SOEs] (promulgated by the CCP Central Organization Department and SASAC Party Committee (2004), Zhong Ban Fa [2004] 31 Hao, effective Oct. 31, 2004, *available at* http://cpc.people.com.cn/GB/64162/71380/102565/182143/10993484.html [hereinafter 2004 Joint Opinions on SOE Party Building Work].

140. *See id. See also* Li Yizhong, *Li Yizhong jiu Liang Buwei 'Guanyu Jiaqiang he Gaijin Zhongyang Qiye Dangjan Gongzuo de Yijian'Da Jizhe* Wen (李毅中就两部委'关于加强和改进中央企业党建工作的意见'答记者问) [Interview of Li Yizhong, Secretary of the Party Committee of SASAC, on the Two Ministries' Joint Opinions on Strengthening and Improving Party Building Work in SOEs], Peoples Daily, Feb. 22, 2005, *available at* http://www.sasac.gov.cn/n1180/n20240/n7291307/9293286.html.

141. 2004 Joint Opinions on SOE Party Building Work, *supra* note 139, art. 5, para. 1.

most clearly set out a number of rules and mechanisms to enable the Party's penetration into SOE corporate governance through the cross holding of positions in the political and legal governance structures, which are outlined as follows:[142]

a. As a general principle, SOEs should adopt the governing system of "two-way access and cross holding of positions" by appointing members of Party organizations to company's legal governance institutions.

b. Particularly, in wholly state owned companies and companies in which the state is the controlling shareholder, the members of the Party committee can hold positions in the leadership body (*banzi*) of the company, which comprises of the board of directors, the supervisory board, and a group of management executives, according to legally prescribed procedures. Conversely, Party members in the aforesaid leadership body can also join the Party committee.

c. Typically the role of the Secretary of the Party Committee and the Chairman of the board of directors can be assumed by the same person on the condition that the roles of the Chairman of the board and the general manager are separated. However, in SOEs without a board of directors, the Party Secretary can be appointed as the Deputy General Manager, while the General Manager can serve as the Vice Secretary of the Party Committee. This does not preclude a single officer from assuming both the roles of the Party Secretary and the general manager.

d. In SOEs that have already established a proper legal governance structure, procedural rules should be made to ensure that the Party organization can take part in corporate decision-making concerning material and important matters. That is, the Party organization shall have the chance to deliberate on those matters, and their decisions or opinions will be voiced by Party members who serve in the company's legal governance institutions including the board of directors, supervisory board and management team. Implicitly, the aforesaid Party members should cast their votes according to the decisions or opinions of the Party organization made in advance of the board meeting.

e. SOEs that do not have a board of directors can also hold joint meetings between the Party organization and the SOE's management team in order to make decisions.

f. After a major corporate decision is made with the participation of the Party organization, the Party organization shall mobilize Party members in the SOEs in order to take the lead in implementing the decision.

g. The Party organization shall closely monitor the SOE's decision-making on material and important matters. Once it spots anything materially inconsistent with the Party's line or policies, state laws, or anything that is divorced from reality (*tuoli shiji*), it should advise the management of the company in a timely manner and report to the higher authorities of the SOE in case these wrong decisions are not corrected.

The above requirements may look daunting to observers who are used to the typical Berle and Means corporations. Essentially, the requirements

---

142. 2004 Joint Opinions on SOE Party Building Work, *supra* note 139, art. 5, para. 2.

turn the SOE's decision-making body into a political assembly that adopts the practice of the Party-line vote for members of the CPC, where every Party member must vote the same way based on the Party's collective will. The explicit, naked requirements for incorporating the Party organization's views into the decision-making of the company, coupled with the fact that all or most of the senior executives are often appointed by a competent CCP organization department, make the SOE an economic entity almost completely controlled by the CCP.

5. *CCP Controlled Personnel Appointment in SOEs*

The primary principle of the Party-state's personnel system is the *Dangguan Ganbu Yuanze* (the Principle of Party Control of Cadres),[143] under which the CCP dominates the appointment of all state officials in China. The CCP, through its Organization and Personnel *xitong*,[144] maintains the nomenclature system that covers cadre selection and appointment in all state-related institutions in China. It is a unified management system that "reaches into almost every important nook and cranny in the public sector of the Chinese system."[145] Through this formidable nomenclature system, the CCP controls the appointment, ranking, promotion, transfer, and removal of all but the lowest ranking state officials.

Personnel in SOEs, especially top leaders such as the chairperson and deputy chairperson of the board of directors or the senior corporate executives, are managed and openly appointed by the CCP organizational departments.[146] Each SOE is placed in the political system of the Party-state and given a bureaucratic ranking; the personnel management of SOE leaders is managed by the organizational department of that bureaucratic level.[147] Specifically, the Joint Opinions of the CCP Central Organization Department and the SASAC Party Committee articulates the following principles with respect to personnel appointment in SOEs:[148]

> a. The Party Controls Cadres system requires the Party organization's participation in the appointment, management and supervision of all SOE officers above the middle level. The main responsibility of the Party organization is to set the selection criteria, select the initial candidates, carefully examine these candidates, and recommend these candidates for

---

143. *See* Sebastian Heilmann & Sarah Kirchberger, *The Chinese* Nomenklatura *in Transition: A Study Based on Internal Cadre Statistics of the Central Organization Department of the Chinese Communist Party*, CENTER FOR EAST ASIAN AND PACIFIC STUDIES, TRIER UNIVERSITY, GERMANY (2000), http://www.chinapolitik.de/resources/analysis1.pdf.

144. *Xitong*, literally meaning 'system,' is defined as a group of bureaucracies in the Party-state of China, from the top level to local levels, that handles affairs in particular spheres. Kenneth Lieberthal noted that "six *Xitong* have been particularly important for concrete management of the country: Party Affairs, Organization and Personnel, Propaganda and Education, Political and Legal Affairs, Finance and Economics, and the Military." *See* LIEBERTHAL, *supra* note 50, at 218.

145. LIEBERTHAL, *supra* note 50, at 221.

146. *See* John Lee, *China's Economy a Party Plan*, HUDSON INSTITUTE (Jan. 5, 2012), http://www.hudson.org/research/8618-china-rsquo-s-economy-a-Party-plan.

147. *See* Interim Regulations, *supra* note 127, art. 12 (2009).

148. 2004 Joint Opinions on SOE Party Building Work, *supra* note 139, art. 10.

final appointment. In addition, the Party organization, not the board or general manager, is in charge of supervising the SOE's personnel system.

b. In principle, a balance should be maintained between the principle of Party Control Cadres and the requirements of China's corporate laws that authorize the board to appoint managers and the general manager to appoint lower-level officers. Technically, the selection of personnel can adopt market-based mechanisms to recruit the most competent and competitive candidates.

c. The appointment of senior corporate executives should follow these steps: (1) the Party organization department's examination of the qualifications of the candidates; (2) the Party Committee's full deliberation of the candidates; and (3) the appointment of the candidates by the board of directors based on the recommendation of the Party Committee, following all legal procedures and formalities.

The personnel of the central SOEs, ranked at either the ministerial level or vice-ministerial level in the political system, is under the jurisdiction of the CCP Central Organization Department. From the 117 central SOEs under SASAC, at least 53 are companies of vice-ministerial level.[149] These, however, do not include big state-owned financial institutions such as banks, insurance companies, and securities companies, which are not under SASAC's umbrella but are controlled by the Party-state under a separate system.[150] As a result, the Central Organization Department directly appoints all the top leaders of these vice-ministerial-level firms, including the chairman of the board of directors, chairman of the supervisory board, the general manager, and other senior executives.[151] Although SASAC is

---

149. *See* Cao Wei, *Fubuji Yangqi Laozong Huo Tiba Shengqian Cheng Changtai* (副部级央企老总获提拔升迁成常态) ["It's Becoming Increasingly Normal for the Top Leaders of Central SOEs to Get Promoted in Their Political Career"], ZHONGGUO XINWEN ZHOUKAN (中国新闻周刊) [CHINA NEWSWEEK], Apr. 9, 2012, *available at* http://district.ce.cn/newarea/sddy/201204/09/t20120409_23224122.shtml (last visited Sept. 1, 2013). So far, only two State-owned companies are ranked at the ministerial level; they are the China Investment Corporation (CIC) and the newly established China Railway Ltd.

150. Banks are under the supervision of the China Banking Regulatory Commission (CBRC) and the People's Bank of China (which is China's central bank). Securities companies and insurance companies are respectively supervised by the China Securities Regulatory Commission (CSRC) and the China Insurance Regulatory Commission (CBRC). Michael F. Martin, *China's Banking System: Issues for Congress*, CONGRESSIONAL RESEARCH SERVICE (Feb. 20, 2012), http://fas.org/sgp/crs/row/R42380.pdf (Banks are under the China Banking Regulatory Commission (CBRC) and the People's Bank of China, which is China's central bank); ABOUT CSRC, CHINA SECURITIES REGULATORY COMMISSION (2008), http://www.csrc.gov.cn/pub/csrc_en/about/ (Securities companies are supervised by the China Securities Regulatory Commission (CSRC)); CIRC HOME, CHINA INSURANCE REGULATORY COMMISSION, http://www.circ.gov.cn/Default.aspx?alias=www.circ.gov.cn/english (Insurance companies are supervised by the China Insurance Regulatory Commission (CIRC)).

151. Although the methods for appointing SOE executives by the CCP is not codified in the *Gongsi Fa* or any other national laws, and thus remain as shadows and informal rules, the Party-state never intended to hide this practice from the public. In fact, such appointments are usually reported publicly in newspapers. For example, *ZHONGGUO BAOXIAN BAO* (*CHINA INSURANCE DAILY*), the flagship newspaper of China's insurance sector, reported in 2012 that a Deputy Director of the Central Organization Depart-

theoretically the authorized representative of the State, it has essentially been deprived of the power to appoint corporate executives and directors in the centrally controlled SOEs. SASAC can, of course, still offer advisory opinions to the Central Organization Department with respect to the relevant appointment or removal of officers in centrally controlled SOEs, but it has no actual power to appoint or remove these officers.[152]

Under the unified nomenclature system, the CCP maintains a cadre rotation system that opens the "revolving door" wide for movement of personnel between roles as SOE executives and senior government officials or regulators. As of 2010, 43 of the 263 governors and vice governors for China's provinces and provincial-level municipalities had business backgrounds.[153] Furthermore, 23 of China's 31 provinces had governors or vice governors who had worked as SOE executives.[154] For these former executives, the "new positions . . . greatly extend their career ladders in the party-state hierarchy, bringing them more prestige and a higher political status."[155] On the other hand, a recent report by the People's Daily, the CCP's newspaper, indicated that the position of senior SOE executive is merely compensation for senior government officials who do not expect to be promoted in their political career.[156]

## IV.    SOE Governance and Legitimacy Management: Explaining the Political Logic

### A.    Reasons for Political Control in SOE Governance

The legitimacy management model can help us understand why the Party-state adopts a combination of legal governance and political governance structures for SOEs. The first and foremost reason involves the Party's control of economic resources through SOEs; that control constitutes the financial basis of the CCP regime. Indeed, SOEs form the most

---

ment went to PICC and China Life, two of the largest insurance companies in China, to appoint Mr. Wu Yan as the chairman of the board of PICC, Mr. Lin Fan as the chairman of the supervisory board of PICC, and Mr. Yang Mingsheng, who was currently a Vice Chairman of the China Banking Regulatory Commission, as the chairman of the board of directors of China Life. *Zhongzubu Xuanbu Zhongguo Renbao Zhongguo Renshou Gaoceng Renshi Biandong* (中组部宣布中国人保中国人寿高层人事变动) [*The Central Organization Department Announces Personnel Changes in PICC and China Life*], ZHONG-GUO BAOXIAN BAO, Mar. 20, 2012, *available at* http://finance.sina.com.cn/money/insurance/bxyx/20120320/085411630947.shtml (last visited June 8, 2014).

152.  *See* CHINA NEWSWEEK, *supra* note 149.

153.  Lance L. P. Gore, *China Recruits Top SOE Executives into Government: A Different Breed of Politicians?*, BACKGROUND BRIEF NO. 661, EAST ASIAN INSTITUTE, NATIONAL UNIVERSITY OF SINGAPORE (2011), http://www.eai.nus.edu.sg/BB661.pdf.

154.  *Id.*

155.  *Id.* at ii.

156.  *See* Wan Qian, *Yangqi Gaoguan Cheng Shengguan Wuwang Buchang, Dangbuliao Shengzhang jiu Dang Dongshizhang* (央企高管成升官无望补偿，当不了省长就当董事长) [*Top Management Positions in Central SOEs became Compensation for Those Who Could Not Get Promoted in Their Political Career, and Thus if You Cannot become a Provincial Governor then Come to be a Chairman of the Board of Director of an SOE*], RENMIN RIBAO (人民日报) [PEOPLE'S DAILY], Jan. 16, 2013, *available at* http://paper.people.com.cn/rmrbhwb/html/2013-01/16/content_1186503.htm.

important part of the CCP's power base, and the CCP itself is fully aware of the vital importance of SOEs to its rule of China. Xi Jinping's famously stated, "SOEs are an important part of the foundation for our Party to rule the country."[157] This statement is now extensively quoted and favorably analyzed by government scholars,[158] and has been codified into Party decisions and resolutions.[159] Li Rongrong, the first governor of central SASAC, once verbally conferred the title of "PRC's eldest son" [*gongheguo zhangzi*] upon the SOEs, indicating that they had the greatest financial, social, and political importance to the Party-state.[160]

The financial might of SOEs today is beyond doubt. As noted previously, although both the total number and share of SOEs in the overall industrial output in China have declined significantly over the past decade, they are still the most important pillar of the Chinese economy, with total estimated assets of RMB32 trillion (approximately USD 5 trillion) in 2012.[161] In 2009, SOEs were responsible for 29 percent of the total employment of urban workers.[162] The SOE share of tax revenues has declined, but it still constituted 48 percent of China's total tax revenue in 2009.[163] Controlling the economic forces of SOEs will thus undoubtedly improve the governing capacity of the Party-state, at least from a financial perspective. Moreover, SOEs are also tools for the Party-state to implement industrial policies, and they serve as conduits for foreign policy.[164]

In addition to generating revenue, tight and direct political control enables the Party-state to use the SOEs to fulfill tasks that an independent company under market pressure would not be willing to undertake. As noted previously, one of the key characteristics of the traditional SOE is that it has multiple roles and multiple objectives. To a large extent, although SOEs are now legally separate economic entities with distinctive legal personalities under the law, this is still the case today. Shaomin Li and Jun Xia's work, which uses the institutional and principal-agent perspective to examine how firms with different ownership structures formulate strategies to achieve their goals, reveals that "[Chinese] SOEs tend to

---

157. Wu Jing, *Xi Jinping Qiangdiao yi Gaige Chuangxin Jingshen Tuijin Guoyou Qiye Dangde Jianshe* (习近平强调以改革创新精神推进国有企业党的建设) [*Xin Jinping stresses the importance of Party building in the spirit of reform and innovation*], XINHUA NEWS AGENCY, Aug. 17, 2009, *available at* http://www.gov.cn.

158. Numerous research articles on Party building work in SOEs have been published on SASAC's website at http://www.sasac.gov.cn.

159. *See* 2004 Joint Opinions on SOE Party Building Work, *supra* note 139, at art. 1 (stating that "making the SOEs to play a leading role in the national economy is indispensable in consolidating the Party's ruling status").

160. *See* China News Services, *Li Rongrong: Guoqi Wukuiyu Gongheguo Zhangzi Diwei* (李荣融：国企无愧于共和国长子地位) ['*Li Rongrong says SOEs deserve to be called the PRC's eldest son*'], NEWSWIRE, Aug. 1, 2009.

161. SASAC, *Guozi Jianguan Shinian Lu* (国资监管十年路) ["*Ten Years of SASAC Supervision of State-owned Assets*"], http://www.sasac.gov.cn/n1180/n15066072/n15204872/index.html.

162. *See* ANDREW SZAMOSSZEGI & COLE KYLE, AN ANALYSIS OF STATE-OWNED ENTERPRISES AND STATE CAPITALISM IN CHINA 17 (2011).

163. *See id.*

164. *See id.* at 33–90.

adopt strategies conductive to fulfilling administrative tasks or empire-building."[165]  The Party-state's political control of SOEs is associated with its treatment of the SOEs as favorites.  Accordingly, "[i]n order to continue receiving government-allocated resources, SOEs must help fulfill government goals and policies in return, rather than solely dedicating [themselves] to making profit[s]."[166]

This phenomenon may have led to agency problems, with the SOEs having to absorb the corresponding agency costs.  The fact that SOE managers have to follow government orders to undertake political and administrative tasks will inevitably cause both inefficient use of resources and managerial indiscretion.[167]  The Party-state, as both the controlling shareholder and the regulator of SOEs, actually desires such an approach however and is even proud of it, as long as this approach helps strengthen its legitimacy.

An article published on the central SASAC's website succinctly outlined the multiple roles and objectives of contemporary Chinese SOEs.  First, SOEs shoulder the responsibility to "thoroughly implement and enforce the Party's line and policies as well as the state's strategic planning."[168]  That is, irrespective of the economic costs incurred, SOEs must comply with the Party's policies and follow the Party's orders in order to ensure the Party-state achieves its objectives, which include macro-economic management, inflation control, stabilizing the supply of certain commodities, and international balance of payment.  Second, SOEs have the responsibility of safeguarding the country's "economic security," which is broadly defined as the control of the strategic sectors concerning state security and the basic well-being of the people.[169]  Third, SOEs have the responsibility to promote the common prosperity of the Chinese people through a transfer of profits.  The State collects and uses the taxes and revenues of SOEs to improve the living standards and income of people who are less well-off.[170]  Fourth, SOEs have to undertake "significant special tasks" (*zhongda de teshu renwu*) in China's economic and social development; "[i]n recent years, SOEs have come forward and played an

---

165.  Li Shaomin & Xia Jun, *The Roles and Performance of State Firms and Non-state Firms in China's Economic Transition*, 36 World Dev. 39, 41 (2008).

166.  *Id.* at 42.

167.  *See id.*

168.  SASAC, *Guoyou Qiye Yao Fahui Youshi Dandang Zhengzhi Zeren* (国有企业要发挥优势担当政治责任) [*SOEs should Shoulder Political Responsibilities based on its institutional advantage*], http://www.sasac.gov.cn/n1180/n1271/n20515/n2697175/15535105.html. [hereinafter SOE Political Responsibility]; *see also* Li Yuanchao, *Yi Gaige Chuangxin Jingshen Tuijin Guoyou Qiey Dangde Jianshe* (李源潮：以改革创新精神推进国有企业党的建设) [*Advancing Party Building in SOEs with the Spirits of Reform and Innovation*], statement of Li Yuanchao (Director of the Central Organization Department of the CCP), speech at the National Conference on Party Building Work in SOEs, Aug. 17, 2009, published in *Qiushi*, No. 17 (2009), *available at* http://www.qstheory.cn/zxdk/2009/200917/200908/t20090831_10488.htm (Last visited Mar. 1, 2014).

169.  *See* SOE Political Responsibility, *supra* note 168.

170.  *See id.*

important role at the crucial moments of all major events in China, including China's major achievements such as the manned space flight, [the] Beijing Olympic Games, [the] Shanghai World Expo, and [the] Guangzhou Asian Games, as well as the fight against natural disasters such as [ ]snow and ice disaster[s], [the] Wenchuan earthquake, [the] Yushu earthquake and [the] Zhouqu landslides."[171]

One of these "significant special tasks" is participating in the Party-state's natural disaster management.  Under the current system, once a significant natural disaster occurs, the State Council immediately mobilizes the financial and human resources under state control for disaster relief.  Almost all state institutions, including the government, military, armed police, and SOEs, are asked to help.  According to a *Xinhua* report, twenty-four hours after the Qinghai Yushu earthquake hit on April 14, 2010, China's big SOEs, including the state-owned airlines and airports, energy companies, telecoms, transportation firms, medical companies, and agricultural trading companies, were called upon by the CCP Central Committee and the State Council (*Dangzhongyang, Guowuyuan*) to participate in the rescue efforts by providing services and materials.[172]  In the wake of the Wenchuan earthquake in 2008, "subsidiaries and branch offices of 20 SOEs around the disaster areas worked closely with the command of the State Council and took emergency measures to mobilize specialist rescue equipment[ ] including 936 sets of forklifts, cranes, and other such engineering equipment."[173]  Eventually, all the "good deeds" in the relief, including those contributed by the SOEs, were translated into pronounced achievements of the Party-state, that showed the government's capacity to rule for the benefit of the people (*limin*) in the Prime Minister's Work Report to the National People's Congress.[174]

The participation of SOEs in the above-mentioned disaster reliefs was not without financial and human resource costs.  However, SOEs ordinarily are not compensated by the State or those rescued.  One general manager of an SOE in Yunnan Province stated, "Of course we will not ask them to pay for this but the Party and the state will remember and appreciate our contribution."[175]  It would be fair to say that no privately-owned company would provide disaster relief on this scale at its own cost.  Mobilizing SOEs to undertake such tasks, which are important for the Party-state to main-

---

171.  *Id.*; *see also* Li Yuanchao (2009), *supra* note 168.

172.  *See 'Guo' Zi Hao de Dandang  -Guoyou Qiye Qinghai Yushu Kangzhen Jiuzai Jishi* (国字号的担当—国有企业青海玉树抗震救灾纪实) [*The Will to Assume Responsibilities: A Documentary on the Performance of SOEs in Qinghai Yushu Earthquake Relief*], Xinhua Newswire, May 3, 2010, http://news.xinhuanet.com/2010-05/03/c_1271211.htm.

173.  MOFCOM, *Quake Response: SOEs Lead the Way with Rapid Response and Disaster Relief*, May 13, 2009, http://csr2.mofcom.gov.cn/article/supply/200905/20090506244 460.shtml.

174.  *See Work Report of the State Council*, delivered by Premier Wen Jiabao at the National People's Congress, Mar. 5, 2009, *available at* http://english.gov.cn/official/ 2009-03/14/content_1259415.htm.

175.  Author's interview of managers of an SOE from Yunnan, China, (Dec. 10, 2013).

tain its legitimacy but often run contrary to profit maximization, requires tight and direct control of the SOEs by the CCP.

B.  Legal Governance to Offer Credible Commitment to Private and Foreign Investors

If tight control of SOEs is necessary for maintaining the legitimacy of the Party-state, it is potentially curious as to why the CCP has allowed SOEs to be corporatized. After all, corporatization of SOEs, initially called shareholding reform in China, inevitably imposes two restrictions on the State's control. First, the use of the corporate form can dilute the State's shareholding, because the corporate form is necessarily associated with further ownership diversification when non-State shareholders are introduced into the SOE. Second, use of the corporate form requires the establishment of a corporate governance structure in the SOE with formal rules and institutions that limit the Party-state's ability to intervene in the decision-making process.

The introduction of the corporate form, viewed as the pursuance of good policy from the perspective of legitimacy management, arose out of a practical need: it was necessary to raise funds from other sources—non-state and foreign—for the SOEs. The "[p]revious efforts to instill more efficiency into the SOEs," including efforts to instill power-delegating and profit-sharing schemes, as well as the contract responsibility system, "had largely failed."[176] In the wake of the Party-state's decision to shift to the "modern enterprise system," two arguments for introducing the securities market for SOE reform were advanced by reformers:[177]

> [O]ne was that the securities market could bring private capital to finance the ailing SOEs, and the other was that securities market could improve corporate governance of SOEs. Obviously, the first argument is directly related to concentration of state power, and the second is concerned with good public policy.

Ownership diversification and corporate governance are necessarily associated with a unified treatment of state and non-state investors (if they are shareholders in the same company), rapid capital market development, and the protection of shareholders' property rights. This "created a demand for a broad legal and regulatory framework consistent with a rules-based environment."[178] The promulgated corporate and securities laws thus help create an impression that the Party-state is willing to offer credible commitment to protect the interests of investors if investors put their capital into Chinese enterprises by using legal rules to curb the discretionary interference of corporate affairs.

---

176. STEPHEN GREEN, CHINA'S STOCKMARKET: A GUIDE TO ITS PROGRESS, PLAYERS AND PROSPECTS 10 (2003).

177. Wang Jiangyu, *The political logic of securities regulation in China*, in THE DEVELOPMENT OF THE CHINESE LEGAL SYSTEM: CHANGE AND CHALLENGES 232 (Guanghua Yu ed., 2011).

178. TENEV & ZHANG, *supra* note 79, at 16.

In this regard, the adoption of China's first law in the Reform Era tells an interesting story. The enactment of the Sino-Foreign Equity Joint Venture Law,[179] known as the EJV Law or *Hezi Qiye Fa*, in the late 1970s was the result of an arduous but exciting process. When Li Lanqing, a senior manager in an automobile factory in China who later became a Deputy Prime Minister and one of the nine members of the CCP's powerful Polibureau Standing Committee, visited General Motors (GM) to invite technology transfer and direct investment into China, GM offered him an agreement to establish a joint venture between GM and his factory, on the condition that China set up a legal framework for such an investment.[180] The legal preconditions required by GM were quickly understood and accepted by the Chinese government, as interviews of senior Chinese officials later revealed:[181]

> "They would not dare to [invest in China] without our laws [protecting them]", said Xiang Chunyi, the Vice Chairman of the Law Commission of the National People's Congress Standing Committee. Xiang further explained that nobody would put a huge amount of money in a land without legal protection, and only legal construction could demonstrate China's determination and ability to [accommodate foreign investment]. As such, it was extremely imperative then to adopt laws which could make foreign investors confident [of China's investment environment] at that time.

Probably the most telling message about the nature of the EJV Law was Deng Xiaoping's description of the law as a "declaration of our [the Party-state's] political intent."[182] The EJV Law adopted the corporate form for foreign-invested enterprises, paving the way for the adoption of the Company Law in 1993. What was very clear was that the political intent behind these laws was to create a legal framework for business organizations in order to persuade investors that doing business in China was just like doing business in Western countries, where international best practices on shareholder protection and corporate governance are in place.

---

179. *See Zhongwai Hezi Jingying Qieye Fa*, adopted 1 July 1979 by the 2nd Session of the 5th National People's Congress, amended in 1990 and 2001 respectively.

180. *See* Li Lanqing, *Gaige Kaifang Chuqi Guanyu Chuangban Hezi Jingying Qiye de Jiannan Tansuo* (改革开放初期关于创办合资企业的艰难探索) ['*The Hard Exploring Process on Establishing Joint Ventures with Foreign Investors at the Early Stage of the Reform and Opening Up Era*'], 6 DANGDE WENXIAN (党的文献) [CCP LITERATURE] (2008), http://news.xinhuanet.com/theory/2009-02/06/content_10772265.htm (last visited Feb. 15, 2014) (2008); *see also* Zhao Xin & Zhang Li, *Deng Xiaoping Tan Zhongwai Hezi Qiye Fa: Shi Zhengzhi Yixiang de Shengming* (邓小平谈中外合资企业法：是政治意向的生命) ['*Deng Xiaoping on EJV Law: It's a Declaration of Our Political Intent*'], http://npc.people.com.cn/GB/15157/10137795.html (last visited Jan. 1, 2014) (2009); Li Honggu, *Deng Xiaoping De 1979: Heping Jueqi Yuannian* (邓小平的1979：和平崛起元年) [*Deng Xiaoping's 1979: Peaceful Rise Year One*], SANLIAN SHENGHUO ZHOUKAN (三联生活周刊) [SANLIAN LIFE WEEKLY], Aug. 12, 2004, *available at* http://www.lifeweek.com.cn/2004/0813/9518.shtml (last visited Feb. 15, 2014).

181. *See* Zhao Xin & Zhang Li, *supra* note 180.

182. Li Lanqing, *supra* note 180; *see also* Zhao Xin & Zhang Li, *supra* note 180.

## V. Implications for Future Reform of SOEs in China

We have examined the twin governance structures in China's SOEs and used the legitimacy management theory to explain the rationale behind those structures. What does the above analysis tell us about the future of corporate governance reform for SOEs? The following three implications are worth noting.

The first implication is that the political control structure in SOE governance is here to stay. Despite the short-term experiments in the 1990s to eliminate direct control and ownership,[183] the Party-state has created new institutionalized arrangements to fortify the CCP's political control in SOE governance. As noted above, a number of detailed rules issued jointly by powerful Party organs and state organs have secured the Party organization's participation in the decision-making process of SOEs, in spite of the legal rules in corporate law that empower the board to make independent decisions. The CCP also monopolizes the appointment of any corporate officers above the middle level in any SOE, and supervises their training, evaluation, and promotion. In addition, Party members in SOEs, including both executives and workers, must generally follow the CCP's line and policies.

From the perspective of maintaining the Party-state's legitimacy, the CCP sees tremendous advantages in putting SOEs under tight Party-control. Through such control, the Party-state not only receives huge financial revenues on a yearly basis, but can also direct SOEs to pursue other objectives for the benefit of strengthening the legitimacy of the CCP's ruling of the country. The Party-state can direct SOEs to engage in macro-economic management, disaster relief, and maintaining state security, while ignoring the SOEs' commercial interests. Without such political control, no enterprise that operates on a commercial basis would be willing to pursue those objectives.

Asking the Party-state to abandon its political control or to privatize SOEs, an idea enthusiastically promoted by many international and domestic organizations and scholars,[184] appears "too simple, [and] sometimes naïve" at this stage[185] for the following reasons. First, no research or empirical evidence has convincingly shown that SOEs are doomed to fail.

---

183. In 1998, in the wake of Premier Zhu Rongji's reorganization of the government, the Party-state even ordered all CCP and government administrative organs to sever their links with the SOEs they control. *See* TENEV & ZHANG, *supra* note 79, at 23.

184. *See e.g.*, UNIRULE INST. OF ECON., GUOYOU QIYE DE XINGZHI, BIAOXIAN YU GAIGE (国有企业的性质、表现与改革) [THE NATURE, PERFORMANCE AND REFORM OF THE STATE-OWNED ENTERPRISES] (2011); OECD (2000), *supra* note 9; SHAHID YUSUF, KAORU NABESHIMA & DWIGHT H. PERKINS, UNDER NEW OWNERSHIP: PRIVATIZING CHINA'S STATE-OWNED ENTERPRISES (2006); WORLD BANK, 16265-CHA, CHINA'S MANAGEMENT OF ENTERPRISE ASSETS: THE STATE AS SHAREHOLDER (1997).

185. "Too simple, sometimes naïve" is a quote from Chinese President Jiang Zemin, who criticized Hong Kong journalists for asking provocative questions. This quote has become satirically popular on the internet in China. *See* Mark Landler, *Leader of China Angrily Chastises Hong Kong Media*, N.Y. TIMES, Oct. 29, 2000, *available at* http://www.nytimes.com/2000/10/29/world/leader-of-china-angrily-chastises-hong-kong-media.html.

The global rise of state capitalism, featuring the extraordinary perform-ance of "national champions" that are mainly state owned, has added weight to the argument that SOEs, if run well, can be comparatively more economically successful than some privately-owned companies. Insofar as China is concerned, several studies have shown that State involvement in SOEs is not a problem per se.[186] Furthermore, putting aside the debate on the merits of SOEs, the Party-state simply would not give up SOEs for utili-tarian reasons: if SOEs are profitable from a business perspective and obe-dient from a political perspective, there is no incentive to change their existing governance structures. After all, the CCP views its political control over SOEs as one of the SOEs' core competitive advantages.[187]

For China's SOE reform, the current "talk of the town" is the idea of "mixed ownership." A resolution adopted by the CCP Centre Committee in November 2013 has called for a "proactive development of mixed owner-ship," which is defined as a type of ownership featuring "crossholding by, and mutual fusion between, state-owned capital, collective capital and non-publicly owned capital."[188]

It is not entirely clear whether this "mixed ownership" reform will have any significant impact on the Party's political control of SOEs. For the foreseeable future, it is still safe to say that this reform measure will at least not weaken the Party-state's control of SOEs for a simple reason: the mixed-ownership model concerns mainly limited-ownership reform, which gives private investors minority ownership but no control. As some scholars have observed, "the effects of ownership reform may be limited unless the state is willing to cede substantial control of mixed ownership enterprises to private investors."[189] However, it is clear that the aforesaid resolution mentions nothing about reducing Party control of SOEs—and the Party has no reason to do so.

A second implication is that China seems to be developing a new model of SOE governance that combines universal elements of corporate law with communist political institutions. While it is still too early to tell whether this combination will work in the long run, the Party-state seems to believe that it is a functioning model, at least for the time being and in the foreseeable future.

As discussed previously, the basic attributes of the Chinese model of SOE governance, which is comprised of a legal governance structure and a political governance structure, are as follows. First, the CCP controls the

---

186. *See e.g.*, Holz, *supra* note 9; Chang & Wong, *supra* note 9; Wong, Opper & Hu, *supra* note 9; Qian Sun, Wilson H.S. Tong & Jing Tong, *How Does Government Ownership Affect Firm Performance: Evidence from China's Privatization Experience*, 29 J. Bus. Fin. & Accounting 1 (2002).

187. *See generally* 2004 Joint Opinions on SOE Party Building Work, *supra* note 139; SOE Documentary, *supra* note 98.

188. *See CCP Decision on Major Issues (2013)*, *supra* note 23, § 6.

189. Marshall W. Meyer & Changqi Wu, *Making Ownership Matter: Prospects for China's Mixed Ownership Economy*, Paulson Policy Memorandum, Paulson Institute (2014), *available at* http://www.paulsoninstitute.org/media/143761/ppm_making_ownership_matter_meyer_and_wu_english.pdf.

appointment and promotion of SOE officers above the middle level in accordance with its personnel management system. Second, decision-making on "material and important matters" concerning the SOE has to go through both structures. The political structure, which features meetings of the SOE's internal Party organization, considers the issue in question first and generates Party views or opinions. The legal governance structure, consisting of the board of directors and the management team, formally adopts the decision by incorporating the aforesaid Party views and opinions. Party members in the legal governance structure are expected to vote in accordance with the decisions of the Party organization. Third, cross-position holding exists between the two structures; the leaders of the political governance structure also assume senior positions in the legal governance structure, and vice versa. Fourth, once a decision is made, the political structure will mobilize Party members in the SOE to thoroughly implement it, and will also report anything inconsistent with the Party line, policies, or disciplines to the higher authorities. Finally, despite the rules in corporate law on fiduciary duties, SOE executives who are Party members are first subject to the CCP's investigation and punishment according to Party disciplines, rather than the penalties proscribed by corporate law.

From the perspective of the Party-state, this hybrid approach combines the advantages of state control and international best practices. The Party's political dominance of the SOE helps reduce agency costs, as Party-appointed SOE officers are subject to Party discipline, which is often more severe than State laws. Corruption in SOEs might still be rampant and widespread, but that corruption was arguably caused by lax enforcement of Party rules, not by the system itself. The CCP also believes that this system is better at selecting capable and loyal executives with good moral character, as the selection process for CCP's personnel system is based on meritocracy. Furthermore, the co-existence of political governance and legal governance ensures that the SOEs, to the extent that they are public institutions, generously deploy their resources to achieve multiple objectives so that people in the whole country can benefit.

A third implication is that the corporate governance of SOEs will continue to ignore the rights and interests of minority shareholders. If the Party-state, as the controlling shareholder, the political leader, and the regulator, makes decisions independent of and regardless of all other shareholders, non-state shareholders (if any) of the SOE have virtually no 'voice' when it comes to crucial company decisions.[190] The strong political governance necessarily requires executives to make decisions in favor of the interests of the Party-state in case there is a conflict between the State and minority shareholders:[191]

> [G]iven this structure [of political control], what happens when a listed subsidiary [of an SOE] is faced with two options, one that benefits the finan-

---

190. *See* Sonja Opper & Sylvia Schwaag-Serger, *Institutional Analysis of Legal Change: The Case of Corporate Governance in China*, 26 Wash. U. J. L. & Pol'y 245, 255 (2008).

191. Szamosszegi & Kyle, *supra* note 162, at 77.

cial interests of shareholders, or one that benefits the national interests of China as defined by the State Council? Company management would have to choose.

　　The incentives they face ensure that they will choose state interests over those of non-state shareholders. The executives of SOE owners are chosen and/or approved by [the CCP Central Organization Department] and SASAC, which also determine executive salaries and their career paths. Their careers and financial success depends on how well they adhere to CCP priorities and/or government orders. . . . The executives of the listed subsidiaries' main shareholder, therefore, are incentivized to follow what is best for the state.

In this regard, however, the Party-state seems to face a dilemma that might eventually undermine its legitimacy. Enterprise reform over the past three decades in China has led to the establishment of a sophisticated framework of corporate and securities laws, featuring impressive investor protection rules on par with international standards in many respects. The 1993 and 2005 *Gongsi Fa*, according to the official line, represent the Party-state's determination to move toward a shareholder-centered framework.[192] However, under certain circumstances, SOE managers might inevitably follow the Party line and execute government orders by violating corporate laws (e.g. discriminating against the interests of minority shareholders). These kinds of violations, if they become a publicly observable pattern, will undoubtedly weaken the legitimacy of the Party-state.

## Conclusion

In this paper I use the theoretical framework of legitimacy management to approach corporate governance in SOEs in China. This paper argues that Chinese SOEs are subject to twin governance structures, which combine political governance and legal governance. It examines how these two structures interact with each other and explains the rationale of this hybrid approach. It also discusses the implications of this approach on the future development of SOE governance and corporate law development in China.

The analysis of this paper confirms wisdom that has almost become conventional today; the effect of a legal transplant cannot be observed merely from the plain language of the law, although it would also be misleading to ignore the law's transfer of technical rules and institutions. In the realm of SOE governance, corporate laws and institutions which operate successfully in Western market economies have been transferred into China by the Party-state to work in tandem with communist political institutions, but it still too early to tell whether this experiment will be successful and sustainable.

---

192. *See e.g.*, OECD (2011), *supra* note 8, at ch. 2 and 3.