# WE ARE THE (NATIONAL) CHAMPIONS: UNDERSTANDING THE MECHANISMS OF STATE CAPITALISM IN CHINA

## Li-Wen Lin & Curtis J. Milhaupt*

*China now has the second-largest number of Fortune Global 500 companies in the world. Most of the Chinese companies on the list are state-owned enterprises (SOEs) organized into massive corporate groups with a central government agency, known as SASAC, as their ultimate controlling shareholder. Despite these groups' importance to China's domestic economy and foreign investment strategy, many features of the SOE sector—particularly the organizational structure and governance characteristics of the SOE groups—remain a black box. Unpacking the black box requires moving away from the standard focus on agency costs in listed firms that predominates in the corporate governance literature. Instead, we examine the relational ecology in which the SOE groups exist, with a focus on institutionalized mechanisms linking the business groups with other organs of the party-state. We argue that through these linkages, Chinese managerial elites in the economy have assembled what Mancur Olson called an "encompassing organization"—a coalition whose members "own so much of the society that they have an important incentive to be actively concerned about how productive it is."*

*Exposing the mechanisms of Chinese state capitalism in this way raises many questions for scholars and policymakers, the salience of which increases as the global interaction of Chinese firms expands. For example, is the rise of Chinese SOEs adequately explained by prevailing theories in the comparative corporate governance literature? How might the increased operation of Chinese SOEs in foreign markets change the institutional trajectory of corporate capitalism in*

---

* Lin is a Ph.D. Candidate in the Sociology Department of Columbia University and received her J.S.D. from the University of Illinois at Urbana-Champaign. Milhaupt is the Parker Professor of Comparative Corporate Law and Fuyo Professor of Japanese Law at Columbia Law School. Helpful comments on a draft of the Article were received from Yuen Ang, Donald Clarke, Robert Ferguson, Ronald Gilson, Jeffrey Gordon, Nicholas Howson, Sung-Yong Kim, Benjamin Liebman, Mariana Pargendler, Hugh Patrick, Randall Peerenboom, Frank Upham, and participants at workshops in Beijing and Seoul, and at Columbia, Cornell, Fordham, and Vanderbilt Law Schools and NYU School of Law. We also thank interviewees in Beijing from business, government, and academia who generously shared their knowledge and insights with us. Interviews were conducted on an anonymous, background basis.

MTD Exhibit #8

*China? Do the institutions of market and investment regulation in the United States adequately contemplate hybrid business-political actors like Chinese SOEs? By examining the organizational structure of SOEs, this Article provides a foundation for future research on a pivotal aspect of China's contemporary political economy.*

INTRODUCTION.................................................................................................699
I.  UNDERSTANDING CHINESE INDUSTRIAL ORGANIZATION ...............................704
    A. *Introduction*.....................................................................................704
    B. *Chinese Industrial Organization as a Networked Hierarchy*....................706
        1.  *A simple analytical construct* ...............................................707
        2.  *A stylized model* ....................................................................709
    C. *Origins of Chinese Corporate Groupism* .........................................712
II. NATIONAL BUSINESS GROUPS ........................................................................716
    A. *Components*........................................................................................717
        1.  *Core (parent) company* ...........................................................717
        2.  *Listed company* ........................................................................717
        3.  *Finance company* .......................................................................717
        4.  *Research institutes* .....................................................................721
    B. *Membership and Internal Governance*................................................721
    C. *Networks*............................................................................................723
        1.  *Intergroup networks* .................................................................723
        2.  *Central-local intergroup networks*....................................................725
        3.  *Business group-party-state networks* ....................................726
    D. *Examples* ............................................................................................728
        1.  *China National Nonferrous Metals Industry Group* .........................728
        2.  *China Datang Group*..................................................................731
III. THE PARTY-STATE AS CONTROLLING SHAREHOLDER .....................................734
    A. *SASAC as Controller* ..........................................................................735
        1.  *Control rights in management*.............................................737
        2.  *Control rights in state enterprise assets*.............................................743
        3.  *Cash flow rights* .........................................................................744
    B. *Consequences* .....................................................................................745
IV. IMPLICATIONS AND QUESTIONS ......................................................................746
    A. *Implications for Comparative Corporate Governance Scholarship*..........746
        1.  *Law and finance* .........................................................................746
        2.  *Convergence*...............................................................................750
    B. *Questions for the Future* .....................................................................753
        1.  *Legal reform?*..............................................................................753
        2.  *Temasek-ization of SASAC?* ....................................................754
        3.  *Great reversal?* ...........................................................................755
        4.  *Dis-integration of the national-champion groups?* ............................756
    C. *Implications for the U.S. Legal System* ..............................................757
CONCLUSION.....................................................................................................759

INTRODUCTION

China's emergence as a global economic power poses enormous explanatory challenges for scholars of comparative corporate governance. While China appears to present a new variety of capitalism, frequently labeled *state capitalism*, the features and implications of this system are still poorly understood.[1] Particularly since China's economic system may be in its early stages of development, understanding the mechanisms by which state capitalism currently operates and how they may change as Chinese enterprises globalize is a pressing task for researchers.

One highly distinctive characteristic of state capitalism in China is the central role of about 100 large, state-owned enterprises (SOEs) (*guoyou qiye*) controlled by organs of the national government in critical industries such as steel, telecom, and transportation. Although only a handful of these firms, such as Sinopec and China Mobile, have become widely known in the West, the state sector dominates major industries in China and is increasingly active in global markets. As the *Economist* recently noted, "[A]s the economy grows at double-digit rates year after year, vast state-owned enterprises are climbing the world's league tables in every industry from oil to banking."[2] China now has the world's second-largest number of companies (seventy-three) on the Fortune Global 500 list of the world's largest corporations,[3] and the number of Chinese companies on the list has increased at an average annual rate of approximately twenty-five percent since 2005.[4] These globally significant SOEs are China's national champions.

More than half of the Chinese companies in the 2012 Fortune Global 500 are SOEs supervised by an organ of the central government.[5] Excluding major

---

1. As one commentator puts it, "[H]aving co-opted Western capitalism and mirrored many of its surface features, China today poses an unprecedented and profound challenge to Western capitalism that scholars and policymakers have only begun to grasp." Marshall W. Meyer, *Is It Capitalism?*, 7 MGMT. & ORG. REV. 5, 8 (2011).

2. *Let a Million Flowers Bloom*, ECONOMIST, Mar. 12-18, 2011, at 79, 79, *available at* http://www.economist.com/node/18330120.

3. *Global 500—Countries: China*, FORTUNE (July 23, 2012), http://money.cnn.com/magazines/fortune/global500/2012/countries/China.html [hereinafter *Global 500 2012*] (ranking China as second behind the United States in number of corporations in *Fortune*'s 2012 list of the world's largest corporations by revenues); *Global 500 2011: Countries—China*, FORTUNE (July 25, 2011), http://money.cnn.com/magazines/fortune/global500/2011/countries/China.html (ranking Japan as second to the United States, and China as third, in the 2011 Fortune Global 500 list).

4. *See Global 500 2012*, *supra* note 3 (listing seventy-three Chinese companies on the 2012 Fortune Global 500 list); *Global 500: Countries*, FORTUNE (July 25, 2005), http://money.cnn.com/magazines/fortune/global500/2005/countries/C.html (listing sixteen Chinese companies on the 2005 list).

5. *See* State-Owned Assets Supervision & Admin. Comm'n of the State Council, *Central SOEs*, http://www.sasac.gov.cn/n2963340/n2971121/n4956567/4956583.html (last visited Mar. 23, 2013). Many other Chinese firms on the Fortune Global 500 are SOEs controlled by provincial or local governments.

*STANFORD LAW REVIEW* [Vol. 65:697

banks[6] and insurance companies, controlling stakes in the largest and most important of the firms are owned, ostensibly on behalf of the Chinese people, by a central holding company known as the State-Owned Assets Supervision and Administration Commission of the State Council (SASAC), which has been described as "the world's largest controlling shareholder."[7] Though the elite firms that serve as the outward face of Chinese SOEs (again, think of Sinopec or China Mobile) are listed on stock exchanges in Shanghai, Hong Kong, or other world financial capitals, they are nested within vertically integrated groups. Each company's majority shareholder is the *core* (parent) company of the group—which is itself 100% owned by SASAC. The core company coordinates the group's activities and transmits business policy to group members, who are contractually bound to promote the policies of the state. Individual corporate groups are often linked through equity ownership and contractual alliances to groups in the same or complementary industries, to provincial-level business groups, and even to noneconomic state-controlled institutions, such as universities.[8] Top managers of national champions simultaneously hold important positions in the government and in the Communist Party.

Although the basic outlines of this system are now widely known, in many respects the concept of state capitalism in China—particularly the organizational structure and broad governance regime surrounding these national champions—remains a black box.[9] Scholars have explored numerous facets of investment, monitoring, and organization in Western firms, but for Chinese firms, research is only beginning to unpack questions raised by state ownership: How were failing state enterprises transformed into global players, and what foreign models did Chinese economic strategists look to for inspiration? How are na-

---

6. The so-called equitized banks are majority owned by other agencies of the state and supervised by the China Banking Regulatory Commission and the People's Bank of China. *See* MICHAEL F. MARTIN, CONG. RESEARCH SERV., R42380, CHINA'S BANKING SYSTEM: ISSUES FOR CONGRESS 8 (2012). Joint stock commercial banks, by contrast, "have a mixture of ownership structures" that can include large ownership stakes held by state agencies as well as SASAC-controlled companies. *Id.* at 24; *see, e.g.*, CHINA BOHAI BANK CO., SUMMARY OF ANNUAL REPORT 2010, at 6 (2011) (listing three SASAC companies on Bohai Bank's list of seven shareholders).

7. Marcos Aguiar et al., *SASAC: China's Megashareholder*, BCG PERSPECTIVES (Dec. 1, 2007), http://www.bcgperspectives.com/content/articles/globalization_strategy_sasac_chinas_megashareholder. SASAC's distinctive qualities as a controlling shareholder are analyzed in Part III, *infra*.

8. *See infra* Part II.

9. The black box quality perpetuates sweeping generalizations that may obscure the mechanisms at work within the system. Consider the following characterization:

> China is the world's leading practitioner of state capitalism, a system in which governments use state-owned companies and investment vehicles to dominate market activity. The primary difference between this form of capitalism and the Western, more market-driven variety, is that decisions on how assets should be valued and resources allocated are made by political officials (not market forces) with political goals in mind.

Ian Bremmer & Devin T. Stewart, *China's State Capitalism Poses Ethical Challenges*, ASIA TIMES (Aug. 17, 2010), http://www.atimes.com/atimes/China_Business/LH17Cb01.html.

tionally important firms related to one another and to their sources of financing, and what links the national champions to government and Party institutions? What incentive structures operate within this system? How does the Chinese party-state behave in its role as controlling shareholder? What are the implications of this system for our understanding of Chinese corporate governance and for the potential future transformation of corporate capitalism in China?

Scholarship to date has provided only fragmentary answers to such questions. In part, this stems from the scarcity of reliable data, but it also results from the way scholars have approached the subject.[10] Most corporate governance scholars working on China, for example, have taken the individual firm—the publicly listed company—as the unit of analysis, even though corporate groups are pervasive in China's state-owned sector and the listed firm is just one part of a complex web of corporate entities and relationships that characterize Chinese state capitalism.[11] Moreover, scholars often begin and end their analyses by benchmarking the governance attributes of Chinese listed companies against global (which typically means U.S.) corporate governance standards and institutions. This approach produces insights, to be sure, but it invariably focuses the analyst's attention on what the Chinese system *lacks*, not on how it is constructed and actually functions. We believe that, as was the case with scholarship on Japanese corporate governance in the 1990s,[12] real headway in understanding China's variety of capitalism will come by analyzing the system on its own terms rather than principally by reference to something it is not.

In this Article, we explore the mechanisms of state capitalism in China by analyzing the distinctive system of industrial organization in which the country's largest state-owned enterprises were assembled and operate. To aid in the analysis, we expand our focus beyond the usual corporate governance concern with agency relationships and try to understand the relational ecology that fosters production in a system where all roads eventually lead to the party-state. We introduce two simple analytical constructs for this purpose: *Networked hierarchy* is our term for the way top-down governance features within individual state-controlled corporate groups are coupled with extensive linkages to other state-controlled institutions. *Institutional bridging* is our term for the pervasive use of personnel-rotation systems, linked equity-ownership structures, and stra-

---

10. This phenomenon is hardly unique to China. During Japan's economic ascendance, scholars working within the U.S. tradition had theoretical blinders that obstructed their understanding of Japanese corporate structures and economic institutions. *See* Ronald J. Gilson & Mark J. Roe, *Understanding the Japanese Keiretsu: Overlaps Between Corporate Governance and Industrial Organization*, 102 YALE L.J. 871, 881, 905 (1993); *infra* text accompanying notes 22-23.

11. The oversight is puzzling because many corporate governance scholars are legal academics, and the corporate group is a *legal* concept in China. *See infra* text accompanying notes 52-55.

12. *See infra* text accompanying notes 21-23.

tegic forms of cooperation, such as joint ventures, which serves to unite separate components of the state sector. These mechanisms create networks among businesses and other organs of the party-state, promote information flow, and provide high-powered incentives to actors in the system by linking corporate performance and political advancement. Together, these features can be thought of as means to assemble what Mancur Olson called an "encompassing organization"—a coalition whose members "own so much of the society that they have an important incentive to be actively concerned about how productive it is."[13]

While there is much more to the Chinese economy than the national champions,[14] there are many good reasons to examine the institutional ecology in which these SOEs function. By several measurements, the state sector is a significant part of the national economy.[15] Perhaps more importantly for our purposes, as a scholar recently noted, "SOEs [everywhere] remain surprisingly understudied."[16] China's nationally important SOEs have joined the ranks of the largest firms in the world and are plainly worthy of deep exploration in their own right. The national champions are the fullest expression of state capitalism in China—the global face of China Inc. It is impossible to fully understand the

---

13. MANCUR OLSON, THE RISE AND DECLINE OF NATIONS: ECONOMIC GROWTH, STAGFLATION, AND SOCIAL RIGIDITIES 48 (1982).

14. For an argument that the success of the Chinese economy lies not with state capitalism, but with "bamboo" (entrepreneurial) capitalism, see *Bamboo Capitalism*, ECONOMIST, Mar. 12-18, 2011, at 13. For other work emphasizing private entrepreneurship in China, see generally, for example, YASHENG HUANG, CAPITALISM WITH CHINESE CHARACTERISTICS: ENTREPRENEURSHIP AND THE STATE (2008); and KELLEE S. TSAI, BACK-ALLEY BANKING: PRIVATE ENTREPRENEURS IN CHINA (2002).

15. In 2011, more than 60% of China's largest 500 enterprises (310 enterprises, including all its 30 largest enterprises) were SOEs, with total assets of $13.43 trillion and profits of 0.3 trillion RMB. *See* Press Release, China Enterprise Confederation/China Enterprise Directors Association, Zhongguo Qiye 500 Qiang GuoQi Zhan Juedui Youshi Lirun Shi Minqi Qibei (中国企业 500 强国企占绝对优势利润是民企 7 倍) [500 Chinese State-Owned Enterprises Dominate the Profits of the Private Sector by Over Seven Times] (Sept. 1, 2012), *available at* http://finance.qq.com/a/20120903/000473.htm. With only 9.36 million workers in the national SOEs as of 2009, however, the SOEs' share of total national employment is very low. *See* SASAC, Zhongguo Guoyou Zichan Jiandu Guanli Nianjian (中国国有资产监督管理年鉴) [CHINA'S STATE-OWNED ASSETS SUPERVISION AND ADMINISTRATION YEARBOOK 2010] 91 (2010) [hereinafter SASAC Y.B. 2010]. Measuring the size of the state sector in China is not easy, and estimates vary. An OECD report using 2006 data estimated that the SOEs' share of GDP was 30%. OECD WORKING GRP. ON PRIVATISATION & CORP. GOVERNANCE OF STATE OWNED ASSETS, STATE OWNED ENTERPRISES IN CHINA: REVIEWING THE EVIDENCE 6 (2009). A U.S. congressional commission's study recently estimated that the state's observable share is nearly 40%. *See* U.S.-CHINA ECON. & SEC. REVIEW COMM'N, 2011 REPORT TO CONGRESS 43-44 (2011) (citing ANDREW SZAMOSSZEGI & COLE KYLE, CAPITAL TRADE, INC., AN ANALYSIS OF STATE-OWNED ENTERPRISES AND STATE CAPITALISM IN CHINA (2011)). These estimates include SOEs at the provincial level, in addition to the central SOEs we focus on in this Article. *See* SZAMOSSZEGI & KYLE, *supra*, at 7.

16. Mariana Pargendler, *State Ownership and Corporate Governance*, 80 FORDHAM L. REV. 2917, 2973 (2012).

institutional features of the Chinese economy without examining its largest, most central actors. Bigness, as signified by the Fortune Global 500 list, does not necessarily indicate efficiency or innovative capacity, traits that will be key to the long-term success of the national champions in the global economy. But the emergence of large Chinese SOEs as major domestic and global actors may have enormous implications across a range of dimensions.[17] Finally, given the relatively early stage of development of Chinese capitalism, a robust exploration of China's largest and most politically connected firms may provide insights into how the state-directed system may evolve over time—or at least suggest which features of the current system are susceptible to change and the possible directions in which change may occur.[18]

Having defined our task as unpacking the conceptual black box of Chinese state capitalism, we focus on the major SOEs with the tightest connections to the Chinese party-state in its various institutional manifestations—that is, the approximately 100 SOE groups with a core company controlled by SASAC at the national level.[19] Our analytical focus is not an attempt to demonstrate the comparative advantages of state ownership of enterprise; to hold the national champions aloft as paradigms of efficiency, innovativeness, or good governance; or to show that the state-owned sector is more important to the development of the Chinese economy than is the private sector. Moreover, as with any stylized account, ours at times sacrifices granular detail in the hopes of achieving conceptual insight. In operation, Chinese state capitalism is likely more conflict laden and heterogeneous, and less internally cohesive, than our account may imply.

The Article proceeds in four Parts. We begin in Part I by providing some conceptual background for the study of Chinese SOEs and briefly trace the de-

---

17. A nonexhaustive list of these implications includes: too-big-to-fail dynamics, monopoly power, Chinese global soft power, negative externalities generated by poor corporate governance practices, and resource-allocation issues.

18. Comparing the institutions of nineteenth- and twenty-first-century U.S. corporate capitalism may be instructive in considering China's future institutional trajectory. The system in existence today in the United States—from firm-ownership structures to the surrounding set of regulatory and market institutions—eventually emerged out of the so-called robber baron era. Three aspects of the U.S. experience seem relevant to China. First, China's present system of national champion capitalism bears some similarity to the U.S. robber baron era: China's economy is dominated by large, politically connected conglomerates operating in a weak institutional environment without robust antitrust scrutiny. Second, the U.S. experience from the late nineteenth century to the early twentieth century shows that massive change in corporate capitalism can occur in the span of several decades. Third, the U.S. experience serves as a reminder that large corporations exert tremendous influence on the social, political, and institutional structures in which they operate. For illuminating discussions of the U.S. historical experience, see, for example, WILLIAM G. ROY, SOCIALIZING CAPITAL: THE RISE OF THE LARGE INDUSTRIAL CORPORATION IN AMERICA (1997); and MARTIN J. SKLAR, THE CORPORATE RECONSTRUCTION OF AMERICAN CAPITALISM, 1890-1916: THE MARKET, THE LAW, AND POLITICS (1988).

19. There are also provincial SOE groups, supervised by provincial-level SASACs, as well as SOEs controlled by major city governments, such as those of Beijing and Shanghai.

velopment of the corporate groups to their present state. In Part II, we illuminate the key components and main organizational characteristics of the national business groups and contrast certain features of the groups with those in Japan and Korea, which served as models for Chinese economic strategists in the 1990s. In Part III, we analyze SASAC's behavior as a controlling shareholder within the larger institutions of the party-state. In Part IV, we explore the implications of our analysis both for comparative scholarship on the Chinese corporate system and for the future evolution of China's variety of capitalism, particularly in light of increasing global activity by its national champions. We also briefly examine the implications of Chinese national champion capitalism for the U.S. legal system.

## I. UNDERSTANDING CHINESE INDUSTRIAL ORGANIZATION

### A. *Introduction*

Two decades of comparative corporate governance scholarship have shown that successful forms of corporate capitalism do not have identical features around the world. To the contrary, firms differ systematically in their ownership structures, sources of financing, and the surrounding set of national legal and market institutions in which they develop.[20] The spark for this insight, now so thoroughly explored as to seem prosaic in hindsight, was the striking economic ascendance of another East Asian country—Japan—in the 1980s. Two decades ago, observers recognized that while Japanese firms were globally competitive, their ownership structures, financing patterns, and governance norms bore little outward resemblance to those of U.S. public firms, whose features had long been taken for granted as the natural end point of an evolutionary process in the formation of the "modern" corporation.[21]

Today, the world once again faces a distinctive and globally important economic system in East Asia whose features appear opaque, and even menacing, to outsiders.[22] Although China's economic system has received a label,

---

20. This basic insight spawned a related literature on the "varieties of capitalism." The seminal work contrasts "liberal market economies," such as that of the United States, with "coordinated market economies," such as those of Japan and Germany. *See generally* VARIETIES OF CAPITALISM: THE INSTITUTIONAL FOUNDATIONS OF COMPARATIVE ADVANTAGE (Peter A. Hall & David Soskice eds., 2001).

21. The standard reference on the rise of the modern corporation is ADOLF A. BERLE, JR. & GARDINER C. MEANS, THE MODERN CORPORATION AND PRIVATE PROPERTY (1932). *See also* MARK J. ROE, STRONG MANAGERS, WEAK OWNERS: THE POLITICAL ROOTS OF AMERICAN CORPORATE FINANCE xiii (1994) (exposing the historical and political contingency of the U.S. corporate governance structures analyzed by Berle and Means).

22. Analysis of congressional hearings in the 1980s and 2000s suggests that U.S. lawmakers had many of the same questions and anxieties about Chinese firms and government industrial policy in the last decade as they had with respect to Japan two decades earlier. *See* Curtis J. Milhaupt, *Is the US Ready for FDI from China? Lessons from Japan's*

much work remains to understand how state capitalism is organized. As in the case of Japan in the 1980s, most of the corporate governance literature on China is preoccupied with agency costs and monitoring in publicly listed firms. Indeed, Ronald Gilson and Mark Roe's twenty-year-old observation on the intellectual obstacle to understanding Japanese industrial organization remains apt in relation to China: "Viewing the Japanese system through Berle-Means blinders, in the belief that it reflects only an effort to bridge the separation of ownership and control, will cause us to misunderstand it and, as a result, to miss the lessons that comparative analysis can offer."[23]

Similar to the way in which the early literature on Japan sought to locate the "missing" monitor in the main bank system,[24] many analysts of Chinese corporate capitalism have focused exclusively on agency problems in listed companies.[25] The search for solutions has taken most commentators down a path with grooves cut by U.S. corporate governance logic, with a focus on independent directors, the market for corporate control, and robust securities regulation. This approach generates a lengthy list of (predominantly U.S.-style) formal institutions whose development is deemed crucial to the future transformation and improvement of Chinese corporate governance.[26] But this leaves largely unexplored a puzzle at the core of contemporary Chinese capitalism: how is a system missing many of the formal institutions deemed important to Western firms producing a rapidly expanding list of Fortune Global 500 companies and supporting sustained levels of economic development in China?

Some commentators claim that "relationships" are the key to success of the Chinese economy.[27] This is almost certainly an accurate observation, and scholars have made some headway in exposing these relationships.[28] But much

---

*Experience in the 1980s, in* INVESTING IN THE UNITED STATES: IS THE US READY FOR FDI FROM CHINA? 185 (Karl P. Sauvant ed., 2009).

23. Gilson & Roe, *supra* note 10, at 881.

24. *See, e.g.,* Paul Sheard, *The Main Bank System and Corporate Monitoring and Control in Japan*, 11 J. ECON. BEHAV. & ORG. 399 (1989).

25. An example of this approach is Chi-Wei Huang, *Worldwide Corporate Convergence Within a Pluralistic Business Legal Order: Company Law and the Independent Director System in Contemporary China*, 31 HASTINGS INT'L & COMP. L. REV. 361, 386-88 (2008).

26. For insightful analyses of Chinese corporate governance within the agency-cost paradigm, see, for example, Donald C. Clarke, *The Role of Non-Legal Institutions in Chinese Corporate Governance, in* TRANSFORMING CORPORATE GOVERNANCE IN EAST ASIA 168 (Hideki Kanda, Kon-Sik Kim & Curtis J. Milhaupt eds., 2008); and Xin Tang, *Protecting Minority Shareholders in China: A Task for Both Legislation and Enforcement, in* TRANSFORMING CORPORATE GOVERNANCE IN EAST ASIA, *supra*, at 141.

27. *See, e.g.,* Franklin Allen et al., *Law, Finance, and Economic Growth in China*, 77 J. FIN. ECON. 57, 96-97 (2005).

28. A small number of Western scholars have focused on Chinese corporate groups. *See, e.g.,* Lisa A. Keister, *Engineering Growth: Business Group Structure and Firm Performance in China's Transition Economy*, 104 AM. J. SOC. 404 (1998) [hereinafter Keister, *Engineering Growth*]; Lisa A. Keister, *Interfirm Relations in China: Group Structure and Firm*

*STANFORD LAW REVIEW* [Vol. 65:697

work remains in examining the precise nature and function of the relationships supporting Chinese corporate governance and economic development, particularly in the absence of robust legal institutions. As one of us argued with Ronald Gilson, "governmentally encouraged performance of commercial obligations" under a growth-oriented authoritarian political regime may be doing the work of formal legal institutions in the Chinese economy, allowing small-scale, reputation-based trading to be scaled up to the point where entry into the global economy is possible.[29] And as that article suggested, business groups fostered by the political regime and deeply entwined with Chinese Communist Party leadership may be central to the developmental success of the regime.[30]

This Article is an attempt to dig more deeply into the structure and organizational ecology of the business groups at the center of China's system of state capitalism. Our account attempts to unearth the mechanisms underlying the uniquely encompassing nature of Chinese industrial organization and its concern not only with corporate governance but also with production, the transmission and implementation of industrial policy, and the maximization of *state* welfare, at least as interpreted by elite actors within the system.[31]

## B. *Chinese Industrial Organization as a Networked Hierarchy*

Chinese state capitalism has a remarkably complex architecture. It will be helpful to get a view of the entire edifice before examining the plumbing. In this Subpart, we develop a simple, stylized model of Chinese industrial organization as it relates to nationally important firms and the corporate groups in

---

*Performance in Business Groups*, 52 AM. BEHAV. SCIENTIST 1709 (2009). A rare corporate governance account of China focusing on party structures and their influence on corporate law norms is Nicholas Calcina Howson, *China's Restructured Commercial Banks:* Nomenklatura *Accountability Serving Corporate Governance Reform?*, in CHINA'S EMERGING FINANCIAL MARKETS: CHALLENGES AND GLOBAL IMPACT 123 (Zhu Min et al. eds., 2009).

29. Ronald J. Gilson & Curtis J. Milhaupt, *Economically Benevolent Dictators: Lessons for Developing Democracies*, 59 AM. J. COMP. L. 227, 239, 261-62 (2011).

30. *See id.* at 262, 276.

31. Taking the group, rather than the individual firm, as the unit of analysis produces immediate insights. One salient—and to date completely unexplored—facet of business groupism in China is that it is a *legal* concept: business groups must be registered with the state in order to enjoy the advantages of such affiliation, and they are formally bound together by legal agreements known as articles of grouping that specify the groups' objectives, membership, and governance structures. Thus, analysis of business groups in China is not subject to the criticism advanced by one strand of Japanese corporate governance commentary, which argues that the concept of *keiretsu* described is a "fable" created through ideologically driven data mining. *See generally* YOSHIRO MIWA & J. MARK RAMSEYER, THE FABLE OF THE KEIRETSU: URBAN LEGENDS OF THE JAPANESE ECONOMY (2006). Whatever one makes of this argument (for a rebuttal, see Curtis J. Milhaupt, *On the (Fleeting) Existence of the Main Bank System and Other Japanese Economic Institutions*, 27 LAW & SOC. INQUIRY 425 (2002)), business groups in China clearly exist in the eyes of the state. *See infra* text accompanying notes 50-56.

which they are nested. We identify the principal components of the groups and illustrate their linkages graphically. After we sketch the outlines of the system, we take a step back to briefly trace its origins.

### 1.  *A simple analytical construct*

As just noted, we believe that an agency-cost perspective on listed firms fails to capture key aspects of Chinese corporate governance and industrial organization. To expand our analytical lens, we introduce two simple, novel concepts. We call the organizational structure of Chinese state capitalism a *networked hierarchy.* This term captures a chief characteristic of the Chinese scheme of industrial organization: vertically integrated corporate groups organized under SASAC, strategically linked to other business groups—as well as to governmental organs and state institutions, such as universities—enmeshed in a helical personnel-appointment process of rotations managed jointly by the Communist Party and SASAC.

The hierarchical aspects of Chinese industrial organization are readily apparent: they range from the vertical integration of firms along the production chain to the top-down character of industrial-policy formulation and transmission in an authoritarian political regime.[32] But the Chinese system is not simply one in which vertically integrated groups transmit commands from state economic planners to SASAC and down through a chain of vertically integrated firms. These hierarchical structures are embedded in dense networks—not only of other firms, but also of party and government organs. These networks appear to facilitate information flow from the bottom up as well as from the top down. They foster relational exchange and collaboration on many levels of the production and policy-implementation processes. And they provide high-powered incentives to leaders within the system, because success in business leads to promotion and accompanying rewards in the political realm, and vice versa. This combination of authoritarian hierarchy and collaboration within high-powered incentive structures is reminiscent of another mechanism of economic transitions—private equity investments.[33]

---

32. The vertical authority structure in Chinese SOEs is a reflection of the siloed, hierarchical governmental structure (known as *xitong*, or "system") for economic management from which they were created. A *xitong* is "a group of bureaucracies that together deal with a broad task the top political leaders want performed." KENNETH LIEBERTHAL, GOVERNING CHINA: FROM REVOLUTION THROUGH REFORM 218 (2d ed. 2004). China's SOEs were created out of reform efforts that sought

> to restructure ... relationships so that the government and the party no longer directly administer most enterprises and social organizations (such as research institutes). The government [intended] to focus on providing a regulatory and broad policy framework, rather than detailed administrative control. . . . The communist party [planned on] retaining the right, however, to appoint the leaders of these units, even after they are no longer subject to government administrative management.

*Id.*

33. *See* Gilson & Milhaupt, *supra* note 29, at 233.

*STANFORD LAW REVIEW* [Vol. 65:697

As we discuss below in detail, these dense networks are the result of numerous pathways that link individual components of the system. Some pathways are engineered through formal legal means, such as by contract or through shareholding relationships. Others are the result of personnel practices followed by the Communist Party and SASAC. Still others are incorporated into the distinctive notion of representation in Chinese governmental organs, which assigns seats to select business leaders. We call this feature of the system *institutional bridging.*

One helpful way to view these constructed networks at the center of Chinese state capitalism is through the lens of Mancur Olson's concept of an "encompassing organization."[34] For Olson, this is a group representing a large enough segment of the population that it has incentives to grow the pie, as opposed to a "distributional coalition" representing a narrow segment of society, which tries to get a bigger slice for its members.[35] Olson focused on group size as the key distinguishing characteristic between encompassing and distributional coalitions, but it seems important that an encompassing coalition include all potential members whose participation can have a major impact on development—a broad cross section of political and business elites in society. The networked hierarchy, encompassing both business group managers and senior party and government officials, is a means of creating precisely this type of large, managerial coalition with control over the formulation and implementation of development policy.

Our aim in introducing these concepts is descriptive, not normative. We do not claim that these features of Chinese industrial organization necessarily lead to production efficiency. Olson noted that encompassing organizations will not necessarily lead to efficiency under all circumstances.[36] The networks we describe most likely produce countervailing effects: They enhance efficiency by fostering information sharing, reducing opportunism through repeat play, providing high-powered incentives, and reducing frictions in policy implementation. But they also reduce competition and transparency, multiply agency relationships, and soften budget constraints.[37] The interesting question for us is

---

34. *See* OLSON, *supra* note 13, at 48.

35. *See id.* at 44, 48. Olson provides a typical special interest group representing a narrow segment of society as an example of a distributional coalition; a lobbying organization that includes all of the major firms in an industrialized country is an example of an encompassing organization. *See id.* at 41-48.

36. *Id.* at 48.

37. Consistent with this conclusion, studies provide conflicting accounts of the efficiency of China's state-owned sector. *See, e.g.,* William T. Allen & Han Shen, *Assessing China's Top-Down Securities Markets, in* CAPITALIZING CHINA 149, 175 (Joseph P.H. Fan & Randall Morck eds., 2013) ("The studies done . . . are inconclusive . . . ."). For a positive account of SOEs' development over the last decade, see Alberto Gabriele, *The Role of the State in China's Industrial Development: A Reassessment,* 52 COMP. ECON. STUD. 325 (2010). At least according to data released by SASAC, the national SOEs are more profitable than the country's largest private firms. *See* SASAC, ZHONGGUO QIYE GUANLI NIANJIAN (中

not whether the state sector is more efficient than the private sector but how the state sector has produced globally important firms and supported economic growth in the absence of formal infrastructure deemed essential in the standard theories on the relationship between institutions and development.

### 2.   *A stylized model*

Next, we make use of the networked hierarchy and institutional bridging concepts to bring into focus the main organizational features of, and linkages among, the corporate group structures in which the national champions are nested. Figure 1 is a stylized picture of a national champion group.

---

国企业管理年鉴) [CHINA ENTERPRISE MANAGEMENT ANNUAL] 196-97 (2010) (showing total profits in 2009 for 133 national champions of 815 billion RMB, versus 218 billion RMB for China's 500 largest privately owned enterprises by revenue); SASAC Y.B. 2010, *supra* note 15, at 89. Of course, access to low-cost funding and other state subsidies, as well as monopoly rents, may help account for the higher profitability of the state sector. For a highly critical assessment of SOEs in the Chinese economic reform process, see UNIRULE INST. OF ECON., GUOYOU QIYE DE XINGZHI BIAOXIAN YU GAIGE (国有企业的性质、表现与改革) [THE NATURE, PERFORMANCE, AND REFORM OF THE STATE-OWNED ENTERPRISES] (2011).

*STANFORD LAW REVIEW*

FIGURE 1

National Champions Situated in a Networked Hierarchy

Four features of this structure are highlighted here, as they will be the focus of our attention in the succeeding Parts of the Article. First, in contrast to the main postwar Japanese *keiretsu* and Korean *chaebol* corporate groups,[38] Chinese business groups are vertically integrated firms focused on a particular industry or sector, not diversified groups involved in a wide range of industries. In complementary fashion, and again in contrast to *keiretsu* and *chaebol* structures, shareholding is hierarchical: firms higher in the structure own downstream subsidiaries, but there is very little upstream or cross-ownership among group firms. Second, most of the national business groups in China contain four main components: (1) the core (parent) holding company, whose shares are wholly owned by SASAC; (2) one or more publicly traded subsidiaries—the global face of the national champion—a majority of whose shares are held by the core company; (3) a finance company that serves many important financing needs of the group and has certain parallels with Japanese main banks;[39] and (4) a research institute that coordinates the group's innovation processes. Third, two parallel structures provide for monitoring: one based on the corporate law, with SASAC as controlling shareholder, and a second, party-based structure that shadows the corporate hierarchy, especially with respect to high-level managerial appointments.

Crucially, however, these group components, as well as their top individual managers, are extensively networked to the larger system of industrial organization. Although the various corporate groups are both legally and functionally distinct from each other, complementary groups are linked in important ways. Intergroup joint ventures, strategic alliances, and equity holdings are the corporate mechanisms providing such linkages. The party-state, acting through SASAC and the Organization Department of the Party, provides another, probably more crucial, means of uniting the groups into a complementary whole.[40] Finally, the economic aspects of this structure are linked, through institutionalized personnel channels and political practices, to governmental organs, such as the National People's Congress; to important party organs; and to noneconomic state institutions, such as universities.[41] These are the institutional bridges that unite separate components of the system.

---

38. *Keiretsu* typically are diversified groups of firms (e.g., the Mitsubishi Group) organized around a *main bank* that provides loans and holds shares of member firms. Korean *chaebol* are large, diversified industrial groups (e.g., Samsung Group) organized around a founding entrepreneur or his heirs, with extensive cross-ownership and other forms of collaboration among members. For more on these groups, see, for example, Curtis J. Milhaupt, Essay, *Property Rights in Firms*, 84 VA. L. REV. 1145, 1161-65 (1998).

39. In China, eligibility to set up a finance company is one of the key benefits of registration as a corporate group. *See infra* text accompanying note 55.

40. *See infra* Part III.

41. *See infra* Part II.C.3.

## C. *Origins of Chinese Corporate Groupism*

We have seen that the predominant organizational characteristic of Chinese SOEs is groupism. While, as explained below, the present contours of the system are a product of two decades of experimentation, the decision to organize firms into groups was part of the initial economic reform strategy, based on observations of economic development elsewhere. As one scholar has noted,

> The formation of business groups has been one of the most profound components of China's efforts to engineer industrial growth. The deliberate disengagement of formerly state-owned enterprises from the command of administrative bureaus is, in part, a result of the perception that business groups with specific structural characteristics protected firms in other countries from the shocks and challenges of development.[42]

Indeed, governmental encouragement of business group formation to foster the growth of national champions is a common strategy. In the twentieth century, business groups served as engines of development in many countries around the world pursuing radically different economic strategies, including South Korea under Park Chung-Hee, Chile under Augusto Pinochet, and Japan under the Meiji oligarchs.[43] In many respects, China's use of business groups reflects the same motivations for group formation at work elsewhere, including filling institutional voids in weak rule-of-law environments, internalizing capital markets, marshaling scarce resources, and reducing the transaction costs of administering economic policy.[44]

Business groups around the world have typically originated with family-founded enterprises. Family ties, reputational networks, and repeated dealings create an environment conducive to commercial activity in the absence of formal institutions. Successful entrepreneurs may be handpicked by political leaders to work with the state and may also receive a variety of state-provided benefits to promote business group growth and diversification. Thus, in the typical pattern, business groups form as an outgrowth of the family firm in response to both institutional weaknesses (e.g., the lack of functional courts to enforce con-

---

42. Keister, *Engineering Growth, supra* note 28, at 436.

43. See Gilson & Milhaupt, *supra* note 29, at 243-57, for more on the role of business groups in the economic development of South Korea and Chile, and Randall Morck & Masao Nakamura, *Business Groups and the Big Push: Meiji Japan's Mass Privatization and Subsequent Growth*, 8 ENTERPRISE & SOC'Y 543 (2007), for more on the role of business groups in pre-1945 Japan.

44. *See* Guanyu Xuanze Yipi Daxing Qiye Jituan Jinxing Shidian de Qingshi (关于选择一批大型企业集团进行试点的请示) [Instructions on Selecting a Group of Large Business Groups for Experimentation] (promulgated by the St. Council, Aug. 28, 1991, effective Dec. 14, 1991) ST. COUNCIL GAZ., Aug. 28, 1991 (China); Guanyu Zujian he Fazhan Qiye Jituan de Jidian Yijian (关于组建和发展企业集团的几点意见) [Several Opinions on the Construction and Development of Business Groups] (promulgated by the Nat'l Econ. Sys. Reform Comm'n & the Nat'l Econ. Comm'n, Dec. 16, 1987), http://www.law-lib.com/law/law_view.asp?id=48977 (China) [hereinafter Several Opinions].

tracts among trade partners) and government policy (e.g., loans at preferential interest rates to make large-scale investments in heavy industry).[45]

In post-reform China, the path was quite different. When China moved away from central planning, the economy was bereft of private entrepreneurs, littered with redundancies in productive capacity resulting from autarkic economic policies, and highly fragmented along bureaucratic lines. Chinese economic strategists were intrigued by Japanese and Korean business groups as models for promoting economic development,[46] but there was no blueprint for their replication in China. The business groups in existence today did not spring fully formed from the minds of Chinese economic planners; rather, they resulted from a long process of experimentation with collaborative forms of production.

Early on, the most pressing task was integrating disjointed economic structures and improving resource allocation. In the early 1980s, the Chinese government launched a series of regional and enterprise-level initiatives to promote these reforms. One such initiative was the introduction of business alliances (*jingji lianying*) as a mechanism of enterprise-level integration. These alliances, typically formed by contract, were designed to encourage interjurisdictional and cross-industry collaboration among SOEs and between SOEs and other organizations, such as research institutes and universities. Collaboration within a business alliance took various forms, such as stabilization of supply-demand relationships and sharing of marketing and production facilities.[47] Used primarily from 1980 to 1986, approximately 32,000 business alliances were formed among over 63,000 SOEs.[48]

---

45. *See* Ronald J. Gilson, *Controlling Family Shareholders in Developing Countries: Anchoring Relational Exchange*, 60 STAN. L. REV. 633, 645 (2007).

46. In 1979, a group of Chinese scholars visited Japan several times to understand the organization and operation of the *keiretsu* and reported their research to the State Council. *See* HU ZONGLIANG (胡宗良) & ZANG WEI (臧维), JITUAN GONGSI ZHANLUE: FENXI ZHIDING, SHISHI YU PINGJIA (集团公司战略：分析、制定、实施与评价) [GROUP COMPANIES' STRATEGIES: ANALYSIS, IMPLEMENTATION, AND EVALUATION] 3 (2005); *see also* Keister, *Engineering Growth*, *supra* note 28, at 405-06. A government official who served in an economic ministry under Deng Xiaoping emphasized the Chinese leader's attraction to Japanese industrial organization and economic regulatory structures. Interview with former official, SASAC, in Beijing, China (June 20, 2011).

47. Regulations promulgated by the State Council in 1980 provided the framework for such alliances. The regulations specified that alliances should be formed by contract, with provisions governing the scope of collaboration and allocation of profit and loss. In addition, the regulations required the formation of a committee comprised of alliance members to manage the alliance.

48. *See* 1987 NIAN GUO WUYUAN ZHENGFU GONGZUO BAOGAO (1987 年国务院政府工作报告) [1987 GOVERNMENT WORK REPORT OF THE STATE COUNCIL], released in the Fifth Meeting of the Sixth National People's Congress (Mar. 25, 1987) (China); WU YUE (吴越), QIYE JITUAN FALI YANJIU (企业集团法理研究) [RESEARCH ON THE LEGAL THEORY OF CORPORATE GROUPS] 102 (2003).

The business alliance concept, however, proved ineffective in promoting economic reform. The alliances suffered from a lack of unified leadership and created regulatory gridlock by multiplying the number of government agencies with jurisdiction over economic ventures.[49] Over time, economic strategists in the government became dissatisfied with purely contract-based collaboration and shifted their strategy in the second half of the 1980s. Although business alliances fell out of favor, these early forms of collaboration created nascent firm networks and governance mechanisms that became the building blocks for the formation of business groups in the years to follow.

In the next phase, policymakers relied on more durable and encompassing forms of collaboration among enterprises. In place of contracts, they used organizational structures based on shareholding to link firms. SOEs were organized into groups to deepen specialization, promote economies of scale, build competitiveness in domestic and international markets, and separate the commercial activities of SOEs from the regulatory role of the government. In 1987, the central government unveiled a legal definition of "business group" (*qiye jituan*) and specified the organizational requirements for registering as such.[50] The introduction of a formal business group concept by central government authorities sparked a fever of group formation at the local level. But often these groups were little more than hastily transformed administrative units of local governments, lacking in economic coherence and functional governance mechanisms.

In response to these problems, the Chinese central government took more control over the creation of business groups in the 1990s. The State Council constructed fifty-seven experimental business groups in 1991 and added sixty-three additional groups in 1997. These 120 experimental groups were concentrated in critical industries, such as automobiles, machinery, electronics, steel, and transportation. The groups benefited from a range of preferential policies in areas ranging from taxation to government contracts and eligibility for stock exchange listing. The government's stated purpose in forming these groups was to achieve economies of scale, facilitate interfirm collaboration, and enhance international competitiveness. The formation of vertically integrated groups also had the administrative advantage of streamlining control over the economy: a small number of major firms would serve as conduits through which policy could be transmitted to vast numbers of enterprises organized under the core firms. By the mid-1990s, creation of national champions was explicitly recognized as a goal of the central government.[51]

---

49. For example, a business alliance between two enterprises in different industries and located in different regions would result in oversight by four government agencies—two industry regulators and two local governments.

50. *See* Several Opinions, *supra* note 44.

51. *See* GUANYU GUOMIN JINGJI HE SHEHUI FAZHAN "JIU WU" JIHUA HE 2010 NIAN YUANJING MUBIAO GANGYAO JI GUANYU "GANG YAO" BAOGAO DE JUEYI (关于国民经济和社会发展 "九五" 计划和 2010 年远景目标纲要及关于《纲要》报告的决议) [AN

After years of experimentation with organizational structure, a relatively clear concept of the business group emerged in 1998 with the promulgation of the Provisional Rules on Business Group Registration.[52] Though "provisional," these rules are still in effect. Subject to various threshold qualifications,[53] a business group is defined as a group of entities comprised of four layers: (1) a parent company and (2) its controlled subsidiaries (the two required layers), along with two optional layers—(3) noncontrolled subsidiaries and (4) other firms that collaborate with the core company or its subsidiaries. Figure 2 illustrates the basic structure of a business group under the regulatory framework. In order to be registered, group members must enter into an agreement (in the form of articles of grouping) specifying the group's boundaries and internal governance rules.[54] Only registered business groups qualify for important benefits, such as eligibility to establish a finance company.[55]

OUTLINE REPORT ON THE NINTH FIVE-YEAR PLAN OF NATIONAL ECONOMY AND SOCIAL DEVELOPMENT AND THE PERSPECTIVE AND GOALS OF 2010], passed on March 17, 1996, by the Fourth Meeting of the Eighth National People's Congress.

52. Qiye Jituan Dengji Guanli Zhanxing Guiding (企业集团登记管理暂行规定) [Provisional Rules on Business Group Registration] (promulgated by the St. Council, Sept. 1, 2006, effective Jan. 1, 1997) ST. COUNCIL GAZ., 1997 (China) [hereinafter Provisional Rules].

53. In order to form a group, the parent company must have registered capital of at least 50 million RMB (about $8 million, as of March 2013) and at least five subsidiaries. The total registered capital of the parent and its subsidiaries must be at least 100 million RMB (about $16 million). Provisional Rules, *supra* note 52, art. 5.

54. *See* Qiye Jituan Caiwu Gongsi Guanli Banfa (企业集团财务公司管理办法) [Administrative Measures on Finance Companies in Business Groups] (promulgated by the Banking Regulatory Comm'n, July 27, 2004, revised Oct. 28, 2006), art. 1, ST. COUNCIL GAZ., 2004 (China) [hereinafter Administrative Measures on Finance Companies].

55. *See infra* Part II.A.3.



[Vol. 65:697

FIGURE 2

Basic Structure of Registered Business Groups



This group formation process, together with the more basic step of "corporatization" of state enterprises—that is, the transformation of state agencies involved in economic activity into joint stock corporations—raised a vexing agency problem: when a corporate asset is theoretically owned by "the people," who is the principal? In recognition of this problem, several attempts were made to create a controlling shareholder, leading to the establishment of SASAC in 2003.[56] In theory, SASAC represents the state as "owner" and exercises shareholders' rights on the state's behalf. SASAC's distinctive role as controlling shareholder within the context of the party-state will be examined in Part III, below.

## II.  NATIONAL BUSINESS GROUPS

We now use the networked hierarchy and institutional bridging concepts to examine in some detail the key members, networked structure, and internal governance mechanisms of the groups (in Part II.A-C) and provide two examples to illustrate the variants of corporate groupism in China (in Part II.D).

---

56. *See infra* Part III.A.

### A. *Components*

#### 1. *Core (parent) company*

As noted, Chinese corporate groups have a multitiered hierarchical structure. At the top of the group is the core company. Core companies were typically formed by "corporatizing" a government ministry with jurisdiction over a particular industry. For example, each of the core companies in the national petroleum groups was separated from the former oil ministry and transformed into a corporate entity. The core company acts as a holding company, serving as an intermediary between SASAC and group firms that engage in actual production. The core company coordinates information flow and resource allocation within the group. It transmits policy downward from the state to group members, and provides information and advice upward from the group to state economic strategists and planners. As Chinese commentators explain,

> The key sectors and backbone industries are still controlled by the state through wholly state-owned or state-invested enterprises. . . . In reality, the state can control the nationally important industries and key areas to lead the economy simply by grasping a few hundred large state-owned holding companies or business groups.[57]

#### 2. *Listed company*

The external face of the national champion is not a group of companies but a single firm with shares publicly traded on Chinese or Hong Kong stock exchanges and, often, also on other major exchanges. For example, PetroChina, one of the largest oil companies in the world, whose shares are listed on the Shanghai and New York Stock Exchanges, is the external face of the CNPC Group, whose core company is the China National Petroleum Corporation. SASAC's strategy in managing groups under its supervision has been to consolidate high-quality assets in specific companies and to seek public listing for those firms. These listed firms are the focus of most existing scholarship on Chinese corporate governance.

#### 3. *Finance company*

One of the key benefits of registration as a group is eligibility to establish a finance company—a nonbank financial institution that provides services to

---

57. ZHENG HAIHANG (郑海航) ET AL., GUOYOU ZICHAN GUANLI TIZHI YU GUOYOU KONGGU GONGSI YANJIU (国有资产管理体制与国有控股公司研究) [RESEARCH ON MANAGEMENT SYSTEM OF STATE-OWNED ASSETS AND STATE-OWNED HOLDING COMPANIES] 2 (2009).

*STANFORD LAW REVIEW*                    [Vol. 65:697

group members.[58] Finance companies are exempt from the general prohibition on intercompany lending.[59] Under the current legal framework, a finance company provides services on behalf of group members similar to those provided by commercial and investment banks. Subject to approval by banking regulators, the finance companies may engage in a wide range of activities, including accepting deposits from and making loans to member companies; providing payment, insurance, and foreign exchange services to members; and underwriting the securities of member firms. They also engage in consumer finance related to the products of group members and invest in securities issued by financial institutions.[60] Deposits from group member companies are the finance companies' main source of funds. Almost all finance companies are members of state-owned groups, either at the national or provincial level,[61] and many are formidable in size. Table 1 compares the asset values of the largest finance companies as of 2009 with the asset values of Chinese banks. As the Table indicates, by assets, the largest finance company in China is comparable in size to the country's twentieth-largest bank.

---

58. *See* Administrative Measures on Finance Companies, *supra* note 54, art. 2. Authorization is not automatic. Aside from various threshold capital and profitability requirements, bank regulators require that the business group's functions be consistent with the government's industrial policies. *See id.* art. 7.

59. *See* Daikuan Tongze (贷款通则) [General Provisions on Lending] (promulgated by the People's Bank of China, June 28, 1996, effective Aug. 1, 1996), art. 61 (China).

60. *See* Administrative Measures on Finance Companies, *supra* note 54, arts. 28-29.

61. As of 2009, there were nine collectively or privately owned Chinese finance companies and four under foreign ownership, the latter serving German and Japanese corporate groups. Six foreign-owned finance companies that operated independently of business groups were forced to close or transform into banks in 2000. *See* SASAC, ZHONGGUO QIYE JITUAN CAIWU GONGSI NIANJIAN (中国企业集团财务公司年鉴) [ALMANAC OF FINANCE COMPANIES OF CHINESE BUSINESS GROUPS] 284 (2010) [hereinafter ALMANAC OF FINANCE COMPANIES].

TABLE 1

Top 10 Finance Companies in China, by Assets, 2009[62]

| Rank | Company Name | Year Est'd | Assets (USD billion) | Affiliated Group's Industry | Bank with Comparable Total Assets (national rank) | Controlling Owner (State / Nonstate) |
|------|------|------|------|------|------|------|
| 1 | China Petroleum Finance Co. | 1995 | 40.87 | Oil | Beijing Rural Commercial Bank (20) | State |
| 2 | China Power Finance Co. | 2000 | 16.46 | Electricity | Shengjing Bank (36) | State |
| 3 | Sinopec Finance Co. | 1988 | 8.31 | Oil | Bank of Hebei (52) | State |
| 4 | China Shipbuilding Industry Finance Co. | 2001 | 6.85 | Shipbuilding | Bank of Nanchang (57) | State |
| 5 | SAIC Finance Co. | 1994 | 6.43 | Automobile | Bank of Qingdao (58) | State |
| 6 | China Aerospace Science & Tech. Finance Co. | 2001 | 4.56 | Aerospace | Bank of Weifang (79) | State |
| 7 | CNOOC Finance Co. | 2002 | 4.44 | Oil | Qishang Bank (82) | State |
| 8 | Haier Group Finance Co. | 2002 | 3.64 | Home Appliances | Kushan Rural Commercial Bank (93) | Nonstate |
| 9 | China Power Investment Financial Co. | 2005 | 3.55 | Electricity | Chang'An Bank (95) | State |
| 10 | WISCO Finance Co. | 1993 | 3.27 | Steel | Bank of Jujiang (96) | State |

62. Raw data from ALMANAC OF FINANCE COMPANIES, *supra* note 61, at 275. The exchange rate of RMB to USD was 6.82:1, as of June 1, 2010.

*STANFORD LAW REVIEW*                    [Vol. 65:697

In its role as the hub of group financial transactions, the Chinese finance company is a partial analogue to the Japanese main bank, at least as it operated in the heyday of postwar Japanese corporate finance and governance. However, there are several key differences. In contrast to widespread, if low-level, cross-shareholding ties between Japanese main banks and their most important borrowers,[63] the Chinese finance company holds virtually no equity in other group member firms, and few or no firms, other than the core company, own shares in the finance company. While the finance company can be utilized by the core company to help monitor group members, there is no evidence that finance companies perform an independent monitoring function, particularly with respect to the core company or listed companies in the group.[64]

The Japanese banking system was attractive to Chinese observers during the formative period of China's process of economic transition in the early 1990s, particularly for its perceived corporate governance benefits.[65] In this period, legal scholars and economists widely argued that equity ownership by the main bank in its borrowers had important governance benefits[66] and that the main bank served as a "delegated" or "contingent" monitor on behalf of other lenders to group firms.[67] It was even argued that the main bank substituted for the market for corporate control in Japan by displacing managers of financially troubled firms.[68] Yet China's finance companies bear only a weak resemblance to the main bank system and serve primarily as instruments of the core companies to effect internal group capital allocation. Unlike the situation in Japan, moreover, the Chinese corporate sector has not traditionally held significant equity stakes in the banking sector.

Given China's attraction to the Japanese model during a formative period in the emergence of its business groups, why didn't China's economic strategists structure the finances and governance of the business groups to resemble the Japanese system circa the late 1980s? Two complementary explanations,

---

63. *See supra* note 38.

64. *See* Yingyi Qian, *Financial System Reform in China: Lessons from Japan's Main Bank System, in* THE JAPANESE MAIN BANK SYSTEM: ITS RELEVANCE FOR DEVELOPING AND TRANSFORMING ECONOMIES 552, 585-86 (Masahiko Aoki & Hugh Patrick eds., 1994). For example, the finance company may help monitor group members by refusing to remit group funds outside the group without approval from the core company, and it can report financial transactions by member companies to the core company.

65. *See, e.g., id.* at 577, 585 ("The historical similarities suggest that China may benefit more from adopting features of the Japanese financial model than from other [arm's-length financial] models in achieving its objective of restructuring the corporate sector while stabilizing its economy.").

66. *See, e.g.,* Sheard, *supra* note 24, at 403; Qian, *supra* note 64, at 585-86.

67. *See, e.g.,* Masahiko Aoki et al., *The Japanese Main Bank System: An Introductory Overview, in* THE JAPANESE MAIN BANK SYSTEM: ITS RELEVANCE FOR DEVELOPING AND TRANSFORMING ECONOMIES, *supra* note 64, at 1.

68. *See* Sheard, *supra* note 24, at 400.

closely linked to China's overall system of economic governance, are plausible. The first is that dispersion of governance rights in member firms to nonbank financial institutions might dilute and complicate the hierarchical structure of economic management made possible by group formation under centralized state supervision. Second, the creation of nonbank finance companies within business groups—what one commentator has called "outside-the-plan financial intermediaries"[69]—poses an obvious competitive threat to the (largely state-owned) commercial bank sector. As such, Chinese regulators have been vigilant about not expanding the scope of finance company activities to the point that these institutions might constitute complete substitutes for Chinese commercial banks.

### 4. *Research institutes*

Chinese policymakers have encouraged business groups to include research institutes as members to promote high technology development and to increase international competitiveness.[70] Most of the national business groups contain one or more research institutes. The research institutes conduct R&D, with particular emphasis on applied research in areas related to the group's products and production processes. Often, the research institutes collaborate with universities on particular projects to derive complementarities between the applied focus of business R&D programs and the theoretical approach of academic researchers.

Typically established as nonprofit institutions, the research institutes receive funding from the core company in the group. Research institutes in groups with a diverse range of products may be multilayered, with a chief institute affiliated with the core company and second-tier institutes established under particular operating subsidiaries. Intellectual property arising out of the research activities is typically owned by the core company or allocated by contract in joint projects with outside institutes.

### B. *Membership and Internal Governance*

Membership in most business groups is based on equity ownership of member firms by the core company. Although membership based on purely contractual relations among firms is permitted under the regulations on busi-

---

69. Qian, *supra* note 64, at 569.

70. *See* Several Opinions, *supra* note 44; Guanyu Tuijin Keyan Sheji Danwei Jinru Da Zhong Xing Gongye Qiye de Guiding (关于推进科研设计单位进入大中型工业企业的规定) [Rules on Promoting Scientific and Design Institutes to Be Included in Large- and Medium-Sized Industrial Enterprises] (promulgated by the St. Council, Jan. 20, 1987, effective Jan. 20, 1987), http://std.xjtu.edu.cn/ziliao/show.php?bid=7&listid=486 (China).

ness groups, it is not common.[71] The predominance of equity ties is a reflection of governance concerns held by both the core company and the state. For the core company, equity ownership provides a more direct and flexible form of control than contract. For the state, the objectives of group formation are more effectively advanced through corporate ownership than through loose affiliations—indeed, the original business alliance concept was abandoned in favor of the business group concept for precisely this reason.[72]

In marked contrast to the ownership of business groups in Japan and Korea, equity ownership in Chinese business groups typically runs in only one direction: from the core company to downstream subsidiaries. Very little share cross-ownership is found in Chinese business groups. As with the predominance of equity ties over purely contractual relations, governance concerns—both corporate and political—appear to be the primary reason for top-down ownership patterns. The core company—as the group's dominant player, with ultimate group-wide decisionmaking authority over personnel and strategic issues—has little use for upstream share ownership; top-down stock holdings reflect and reinforce the hierarchical structure of the group. For the government, the core company's role as delegated manager and monitor of group firms would not be enhanced—indeed, it might be complicated—by cross-shareholding linkages among group firms. Moreover, to the extent that cross-shareholding is used to promote enhanced monitoring of, or risk sharing among, group members in countries such as Japan, this function may not be complementary to Chinese corporate group structures, given pervasive party involvement in group firms and other forms of party-state monitoring outside the confines of corporate law norms.[73]

Internal group governance structures are specified in legally binding agreements called articles of grouping, which are adopted by all group members. The articles of grouping are state-supplied, standard form contracts required of all registered business groups, and their specific provisions are largely composed of default rules. In reality, the core company dictates the terms of the articles, and the internal governance rules grant the core company veto rights and other enhanced governance rights with respect to the group. Many articles of grouping provide for plenary or management bodies to facilitate group or delegated decisionmaking, respectively, but these organs typically either have only advisory power or are structured so that the core company effectively controls their decisionmaking processes. In short, governance in a Chinese busi-

---

71. In 2000, 87% of Chinese business groups had equity ties between parents and subsubsidiaries, as opposed to contract-based or administratively connected groups. Donghoon Hahn & Keun Lee, *Chinese Business Groups: Their Origins and Development*, *in* BUSINESS GROUPS IN EAST ASIA: FINANCIAL CRISIS, RESTRUCTURING, AND NEW GROWTH 207, 226 (Sea-Jin Chang ed., 2006).

72. *See supra* text accompanying note 49.

73. *See infra* text accompanying notes 86-98.

ness group is a largely top-down process, but it is open to information and participation from below.

## C.  *Networks*

The foregoing are the main components of Chinese corporate groups and the mechanisms by which member firms are linked. But the mechanisms of Chinese state capitalism operate by joining the corporate groups into much larger networks of organizations affiliated with the party-state. These state-affiliated networks generate Chinese state capitalism's most distinctive features and raise the thorniest questions for foreign competitors and regulators. We now explore the larger networks in which individual corporate groups are embedded.

### 1.  *Intergroup networks*

While groups in the same industry do sometimes compete domestically, SASAC has encouraged the national groups to collaborate in overseas projects to increase their global competitiveness. These linkages, often among groups in complementary industries, are designed to facilitate technological development and a host of other objectives, such as information sharing, marketing, and pooling of capital for capital-intensive projects. As shown below, these linkages typically take two forms: equity joint ventures and contractual alliances.

In most economies, these forms of collaboration would raise obvious antitrust concerns. China enacted an Antitrust Law in 2008 that, as a formal matter, would appear to subject these alliances (along with mergers and other combinations between SOEs) to antitrust scrutiny.[74] In practice, however, the national enterprises under SASAC supervision have thus far been virtually exempt from antitrust enforcement.[75]

---

74. *See* Zhonghua Renmin Gongheguo Fan Longduan Fa (中华人民共和国反垄断法) [Anti-Monopoly Law of People's Republic of China] (promulgated by the Standing Comm., Nat'l People's Cong., Aug. 30, 2007, effective Aug. 1, 2008) (Lawinfochina) (China).

75. *See, e.g.*, Wentong Zheng, *China's Antimonopoly Law—One Year Down Part 5: A De Facto "Dual-Track" Competition Regime?*, ANTITRUST & COMPETITION POL'Y BLOG (Dec. 30, 2009), http://lawprofessors.typepad.com/antitrustprof_blog/2009/12/chinas-antimonopoly-lawone-year-down-part-5-a-de-facto-dualtrack-competition-regime-.html. The only major exception to date is an antitrust investigation into abuse of dominance of the domestic broadband market by China Telecom and China Unicom. Wei Tan, *SOEs and Competition Policy in China*, COMPETITION POL'Y INT'L, https://www.competitionpolicyinternational.com/assets/Columns/cpi-asia-antitrust-column-tanFINAL.pdf (last visited Mar. 23, 2013). Despite SOEs' size and active role in mergers and acquisitions, very few merger rulings, to date, involve SOEs. *Id.* China has three separate antitrust enforcement agencies: the Ministry of Commerce, responsible for merger review; the National Development and Reform Commission, responsible for price-related agreements and abuses; and the State Administration for Industry and Commerce, which reviews non-price-related agreements and abuses. Angela Huyue Zhang, *The Enforcement of*

We illustrate a few of the intergroup networks in the national steel groups by way of example in Figures 3A and 3B. The number of relationships involving companies in these groups is actually much greater than is pictured here.[76] These Figures illustrate the use of both ownership and contract to construct intergroup networks. They also show how networks are constructed among both complementary groups and groups comprised of erstwhile direct competitors.

FIGURE 3A

**Intergroup Networks: An Illustration**

Joint Ventures (Equity Linkages)
Across National Steel Groups, 2000-2010

Triangle nodes indicate other national business groups supervised by SASAC. A line connecting two nodes indicates that two groups have set up a joint venture.

---

*the Anti-Monopoly Law in China: An Institutional Design Perspective*, 56 ANTITRUST BULL. 631, 633-34 (2011). The institutional design of China's antitrust regime may create a host of problems, including conflicts of interest, selective enforcement, prosecutorial bias, and lack of transparency. *See id.* at 639-56. These design problems likely exacerbate the political insulation of SOEs from antitrust scrutiny.

    76. Figures 3A and 3B are based on data hand-collected by the authors from Thomson Reuters's SDC Platinum database (on file with authors). This database focuses on international deals, so purely domestic linkages may be significantly underreported.

FIGURE 3B
Intergroup Networks: An Illustration (continued)

Strategic Alliances (Contractual Linkages)
Across National Steel Groups, 2000-2010



Triangle nodes indicate other national business groups supervised by SASAC. A line connecting two nodes indicates that two groups have set up a strategic alliance.

### 2.  *Central-local intergroup networks*

National groups under SASAC control are sometimes linked to business groups under the control of local governments. Figures 3A and 3B, above, provide an example from the steel industry: provincial group Hebei Iron and Steel has an indirect equity ownership interest in the same joint venture as national champion Baosteel. These linkages are the result of an evolving dynamic between the central and local governments. Initially, local governments sought investment from the national groups to rescue moribund local SOEs. As the national groups expanded, local governments began to view them as competitive threats to local businesses. Local protectionism increased, and a push was made to create "provincial champions." The relationship between national and local groups appears to be in flux again because of the global financial crisis, which prompted renewed central-local cooperation. The local governments now view the national champions as sources of support for small and midsize enterprises, which suffered when they lost the backing of foreign and private companies.[77]

---

77. As an example of the importance provincial governments are now placing on tie-ups with national groups, over a one-month period in 2011, the Guangdong provincial government reached 249 collaboration agreements, representing a total investment of $40 million, with 71 national groups. *See* Li Peng (李鹏), *Yangqi ru Yuechao* (央企入粤潮) [*The Influx of the Central SOEs into Guangdong*], CAIJING GUOJIA ZHOUKAN (财经国家周刊)

*STANFORD LAW REVIEW*       [Vol. 65:697

For the national groups, which are under pressure from their governmental supervisors to grow, tie-ups with local groups are an avenue of expansion.

### 3. *Business group-party-state networks*

Of course, as SOEs supervised by SASAC, all national champions are connected to the central government. But this simple syllogism masks the density of the networks that tie the leading business groups to institutions of the central government and the Communist Party. Multiple institutional bridges facilitate the network. The first is the China Group Companies Association (the Association), which is formally designed as an intermediary between the national business groups and the central government.[78] SASAC and the Ministry of Commerce oversee the Association, which has a board of directors composed of senior government officials from these and other economic ministries, as well as top managers of the most important national business groups. The Association functions as a vehicle for airing issues of concern to the central SOEs and reporting to the State Council. Recent issues discussed by the Association include streamlining the government approval process for foreign investments and improving internal risk controls in connection with foreign investments. The Association also lobbied, against strong resistance from banking regulators, for the establishment of the finance companies within corporate groups discussed above in Part II.A.[79]

A second bridge is the practice, which has roots dating to the era before SASAC's establishment, of granting substantive management rights in a nationally important SOE to the ministry with supervisory authority over the industry in which that SOE operates. For example, the Ministry of Industry and Information Technology retains important management rights over China Mobile, including the power to nominate its top managers, even though China Mobile is part of a national business group whose core company is 100% owned by SASAC.[80] In some industries, high-level, two-way personnel exchanges between ministries and national groups reinforce this link.[81]

A third institutional bridge is the routine exchange of personnel between SASAC and the central SOEs it supervises. In a policy designed to promote

---

[ECON. & NATION WKLY.] (Apr. 5, 2011), http://msn.finance.sina.com.cn/gdxw/20110405/080431242.html.

78. Interview with senior administrative official, China Grp. Cos. Ass'n, in Beijing, China (June 21, 2011).

79. *Id.*

80. Interview with legal scholar in Beijing, China (June 2011).

81. A recent example is the virtually simultaneous move in 2011 by the Vice-Minister of the Ministry of Industry and Information Technology to become Party Secretary of China Mobile, and the appointment of China Mobile's Vice-CEO to the newly vacated Vice-Minister position.

"mutual adaptation in political and professional qualities,"[82] fifty to sixty SOE managers are seconded to SASAC annually for one-year periods and vice versa. Available data on this practice suggest that the corporate managers seconded to SASAC are fairly senior and come from leading enterprises, while the SASAC officials are relatively junior. This suggests that the exchanges are not primarily designed to facilitate SASAC's monitoring of the SOEs, but rather to build SASAC capacity and promote cooperation between the SOE sector and the government.

A fourth institutional bridge between the national champions and the government is the practice of reserving a number of positions in several elite (if functionally obscure) government and party bodies for leaders of the national SOEs. Chief among these bodies are the National People's Congress, the central government's symbolic legislative body; the National People's Political Consultative Conference, an advisory body composed of representatives of different social and political groups; and the National Congress of the Chinese Communist Party, the Party's general assembly. For example, based on a pool of candidates recommended by the party committees of the 120 central enterprises extant at the time, SASAC nominated 22 managers as representatives to the current (Eleventh) National People's Congress, and 99 managers to the Eleventh National People's Political Consultative Conference, both of which run from 2008 to 2013.[83] In 2007, the Party Committee of SASAC and the party committees of the 120 central enterprises selected 47 members to the 17th National Congress of the Chinese Communist Party.[84] The composition of the selected members was based on instructions from the Central Organization Department of the Party, which specified that no more than 70% of the positions should go to top managers of the core companies and that no less than 30% should go to middle managers of core companies and top managers of their subsidiaries.[85]

As explained in detail below, the Party also plays a major role in personnel appointments in the national business groups. One-third of the employees in the

---

82. Press Release, Bureau of Personnel, SASAC, Guowuyuan Guoziwei Ganbu yu Zhongyang Qiye Ganbu Shuangxiang Jiaoliu Gongzuo Lakai Xumu (国务院国资委干部与中央企业干部双向交流工作拉开序幕) [Kick-off of the Two-Way Exchange of SASAC and Central Enterprise Cadres] (June 21, 2007), *available at* http://www.sasac.gov.cn/n1180/n1566/n259790/n265436/11695536.html.

83. *See* SASAC, ZHONGGUO GUOYOU ZICHAN JIANDU GUANLI NIANJIAN (中国国有资产监督管理年鉴) [CHINA'S STATE-OWNED ASSETS SUPERVISION AND ADMINISTRATION YEARBOOK] 81, 93 (2008) [hereinafter SASAC Y.B. 2008].

84. *See* Guanyu Zuohao Zhongyang Qiye Xitong (Zaijing) Shiqida Daibiao Houxuanren Tuijian Gongzuo de Tongzhi (关于做好中央企业系统(在京)十七大代表候选人推荐工作的通知) [Notice on the Work of Nominating the Party's 17th National Congress Members Representing the Central Enterprise System (Beijing-Based)] (promulgated by the Party Comm. of SASAC, Sept. 22, 2006, effective Dec. 1, 2006), http://www.tyjl.cn/images/66.doc (China).

85. *See* SASAC Y.B. 2008, *supra* note 83, at 81, 93.

*STANFORD LAW REVIEW*     [Vol. 65:697

national SOEs are members of the Party,[86] and Party organizations exist within each level of the business group hierarchy. At one time, there may have been ideological reasons for the Party's pervasive role in SOEs. But a compelling political economy explanation for the practice is also apparent: the Party constitutes a massive interest group that maintained extensive ties to economic enterprises in the central-planning era. Indeed, in that era, there was often little separation between governmental, economic, and social organizations, and the Party was involved pervasively across all three spheres of activity. Corporatization and other economic reforms could have posed a major threat to important dimensions of party rule. Institutionalized party involvement in the post-reform state-owned sector can be seen as a way of buying the support of the Party for reforms that it might have otherwise blocked. From a functional perspective, the Party is also well situated to monitor personnel in the SOEs. As one commentator notes:

> The Party's control over personnel was at the heart of its ability to overhaul state companies, without losing leverage over them at the same time. . . .
> The party body with ultimate power over personnel, the Central Organization Department, is without a doubt the largest and most powerful human resources body in the world.[87]

### D. *Examples*

For illustrative purposes, we describe below the corporate structure and governance characteristics of two national champions: Chinalco, one of the world's largest aluminum producers, and giant power producer China Datang. As the structure of national champions go, Chinalco is unusual; Datang is typical. We include Chinalco both by way of contrast and because its structure is a legacy of a form of business alliance prevalent in an earlier stage of China's reform process. The contrast between Chinalco and Datang helps illustrate how organizational forms in the state sector have evolved over time.

#### 1. *China National Nonferrous Metals Industry Group*

The Aluminum Corporation of China (Chinalco) is a Fortune Global 500 company.[88] Its origins can be traced to the Bureau of Nonferrous Metals, established in 1979 under the Ministry of Metallurgical Industry. The company was reincarnated several times before it came into its present form as the crown jewel of the Aluminum Group Corporation of China in 1999. The Chinalco

---

86. As of the end of 2009, 3.03 million of the 9.36 million employees of the central SOEs were party members. *See* SASAC Y.B. 2010, *supra* note 15, at 91.

87. RICHARD MCGREGOR, THE PARTY: THE SECRET WORLD OF CHINA'S COMMUNIST RULERS 69 (2010).

88. *See Global 500 2012, supra* note 3 (ranking Aluminum Corp. of China 298th worldwide).

group has retained some features of the business alliance concept prevalent in the 1980s, the firm's formative period. Thus, Chinalco is not only a group in its own right; it is also the centerpiece of a larger alliance of firms, the China National Nonferrous Metals Industry Group (CNNG, by its English abbreviation).[89] CNNG has four levels of firms organized to collaborate along the nonferrous metals production chain. The first three levels resemble the structure of the other national SOE groups. They consist of the core company, Chinalco; its wholly owned subsidiaries; and its noncontrolled, downstream subsidiaries. What makes this group unusual is the huge fourth level consisting of over 100 companies in which Chinalco holds no shares but with which it or other Chinalco group members have long-term trading relationships.[90] Some members of the fourth level are also members of local corporate groups and act as bridges to other business networks.[91] Because SASAC's supervisory authority is based on share ownership, the many contractual members of CNNG are not within the SASAC governance system and do not count toward the rankings of business groups by size. In essence, CNNG is an industry association with a vertically integrated, national-champion business group embedded in its core. Now consisting of 197 members,[92] CNNG is a hybrid between the contractual alliances of the 1980s and contemporary business groups, in which hierarchical equity relations prevail. Figure 4 illustrates CNNG's group structure. The dotted line delineates the group boundary. The triangle shows the boundary of SASAC's jurisdiction.

---

89. CNNG is the successor of the Aluminum Group of China (CHINALG), which formed in 2003. In April 2007, CHINALG was transformed into CNNG, but CHINALG's basic governance structure was retained. *Zhongguo Luye Jituan Gaikuang* (中国铝业集团概况) [*An Overview of CHINALG*], CHINALCO, http://www.chalco.com.cn/zl/html/40/2007/20071015154236016590199/20071015154258391709486.pdf (last visited Mar. 23, 2013).

90. *See id.* CHINALG includes four research institutes, nine state-private joint ventures, and twenty-one private firms. *Id.*

91. *See Zhongguo Luye Jituan Changwei Zucheng Qingkuang* (中国铝业集团常委组成情况) [*Council Member List of CNNG*], CHINALCO, http://www.chalco.com.cn/zl/html/40/2007/20071015154208781539156/20071015154222828274339.pdf (last visited Mar. 23, 2013).

92. See the information reported in *Zhongguo Youse Gongye Jituan Sanjie Sanci Guanweihui zai Jing Zhaokai* (中国有色工业集团三届三次管委会在京召开) [*Third Meeting of the Third Management Council of CNNG, March 2011*], CNNG (Apr. 8, 2011), http://www.chalco-qhb.com/hy_show.asp?id=3100.



FIGURE 4
CNNG Group Structure



The formal governance documents of CNNG serve as a capsule summary of state capitalism and reflect both political and business concerns. According to the Articles of Grouping, a major purpose of CNNG is to undertake important functions requested by the state, including implementing national economic development policies and advising the government in enacting industrial policies and in implementing corporate, industrial, and national standards.[93] This is a formal recognition of the state's goal of establishing corporate groups as a mechanism for exerting control and implementing development policies through the networks organized around the core companies. The Articles also state a straightforward business rationale for the formation of CNNG: to coordinate resources among member companies. According to the Articles, CNNG was created to provide a platform for technological exchange, capital reorganization, and sales and marketing collaboration; to improve resource allocation among member companies; to support the internationalization of research, production, and sales by member firms; to disseminate data within the Group; and to coordinate relationships among member companies.[94]

Policy and resource collaboration among a large number of firms requires coordination mechanisms within the group. Yet the lack of ownership ties among many firms in CNNG leaves the group without corporate law mechanisms to facilitate coordination. In place of organizational structures, CNNG uses contractual governance mechanisms featuring ostensibly democratic principles. CNNG's internal affairs are governed by a management council com-

---

93. *See* Zhongguo Youse Jinshu Gongye Jituan Zhangcheng (中国有色金属工业集团章程) [CNNG Articles of Grouping], art. 7, items 1-3.

94. *See id.* art. 7, items 4-8.

posed of one representative of each member company and chaired by an appointee of the core company.[95] The management council has a large executive committee, comprised of three subcommittees, to implement its decisions. The executive committee is composed not only of representatives of the core company and its controlled subsidiaries, but also of representatives of firms that only have contractual relationships with these companies. In both the management council and the executive committee, decisions are made by majority vote, with one vote per member.

This group governance structure is reminiscent of the Presidents' Councils in Japanese *keiretsu*.[96] While some commentators placed considerable weight on the Presidents' Councils as corporate governance institutions, it is more likely that they were used mainly as information-sharing devices and to make decisions on noncore business issues in areas such as public relations. We do not have enough information about CNNG's intragroup governance mechanisms, which have parallels in many other Chinese groups, to know how important a role they play in practice.

### 2.  *China Datang Group*

China Datang Group is a Fortune Global 500 company[97] and one of the five largest power-generation companies in China. Figure 5 shows the ownership structure of the Group, which is comprised of 143 companies. We have chosen this group because it is typical of national-champion groups and nicely illustrates the networked hierarchy common in major Chinese SOEs today. Note the layered structure, which features a core holding company at the top and layers of subsidiaries directly or indirectly controlled by the holding company below. Also note the top-down nature of the ownership structure and a nearly complete absence of cross-shareholding among group member companies. The Group includes three publicly listed companies controlled by the holding company. These include Datang International Power Generation Corporation (Publicly Traded Company #1 in the Figure), the shares of which are listed on the Hong Kong Stock Exchange and the London Stock Exchange. Another key member is the finance company, also controlled by the core company but with some shares held by the publicly listed companies.

But China Datang Group is not an island unto itself. As Figure 5 shows, the Group has extensive linkages to companies outside the Group: 84 nonmember

---

95.  *See id.* art. 8. The responsibilities of the management council include coordinating the relationships among member companies to achieve synergy, to convey the advice of member companies to the State Council, to research domestic and international market trends, to approve the group's strategic plans, to approve and amend the group's governance rules, and to approve the group's annual reports and financial statements. *Id.*

96.  This is a regular meeting of the presidents of companies affiliated with a particular *keiretsu* corporate group.

97.  *See Global 500 2012, supra* note 3 (ranking China Datang 369th worldwide).

companies have equity relations with group members. These networks appear to be strategic, comprised of firms operating in related or complementary industries. For example, the Group has equity joint ventures with China's other major power-generation companies, including Guodian Group, Huadian Group, and Huaneng Group.[98] China Datang Group also has a joint venture with Three Gorges Group, which is also active in power generation. Thus, the largest power-generation companies not only share a common controlling shareholder, SASAC, but also have joint ownership of a number of companies.

---

98. In 2002, the Chinese government reorganized the national power industry. National Power Corporation, which controlled half the power generators and all of the power grids in China, was dissolved, and its assets were divided into eleven business groups under SASAC supervision. Datang is one of the power-generation companies created in the reorganization. *See* HENGYUN MA & LES OXLEY, CHINA'S ENERGY ECONOMY: SITUATION, REFORMS, BEHAVIOR, AND ENERGY INTENSITY 129 (2012).

FIGURE 5

Ownership Network of China Datang Group



The black, round nodes indicate member companies of China Datang Group; the gray, square nodes indicate nonmember companies. There are 143 member companies and 84 nonmember companies in the figure. The gray arrows indicate ownership direction. For example, X→Y means X Company has an ownership stake in Y Company. There are 248 ownership connections in this graph. Data from CHINA DATANG CORP., YEARBOOK OF CHINA DATANG GROUP (2009).

*STANFORD LAW REVIEW*                    [Vol. 65:697

Although the parallel is far from perfect, in some ways, the Chinese national-group structure as a whole resembles the structure of a Korean *chaebol*.[99] That is, while individual corporate groups in China are vertically integrated along the production line and lack cross-shareholding among member firms, the groups under SASAC supervision, taken as a whole, resemble a giant diversified conglomerate under a single controlling shareholder with extensive cross-ownership and other forms of collaboration among members.

## III.   THE PARTY-STATE AS CONTROLLING SHAREHOLDER

Atop the national groups is SASAC, ostensibly "the world's largest controlling shareholder."[100] Controlling-shareholder regimes are prevalent throughout the world,[101] and, in this sense, China's variety of capitalism shares an important trait with corporate capitalism in many other developing and recently developed countries. In contrast to state control in China, however, the controlling shareholder in other countries is often the founder or members of his family.[102] But as one scholar recently argued, "it is easy to overstate the extent to which the interests of the government as a controlling shareholder differ from those of private controlling shareholders."[103] This is because, regardless of identity, all controlling shareholders face similar incentives. The size of their ownership stakes provides incentives to monitor managerial performance more closely than do shareholders in dispersed ownership systems. But controlling shareholders also have unique incentives to maximize "private benefits of control" by engaging in transactions that expropriate wealth from minority shareholders.[104]

Macro-level generalizations and comparisons with other controlling-shareholder regimes, however, are likely to mislead, because several aspects of China's regime make it highly distinctive. First, it is uniquely encompassing in scope. In no other country is a single shareholder—private or public—so pervasively invested in the leading firms in the national economy. SASAC directly or indirectly controls a majority stake in virtually every leading firm in every

---

99. *See supra* note 38 (describing the structure of *chaebol*).

100. Aguiar et al., *supra* note 7.

101. *See* Ronald J. Gilson, *Controlling Shareholders and Corporate Governance: Complicating the Comparative Taxonomy*, 119 HARV. L. REV. 1641, 1645 (2006).

102. *See, e.g., id.* at 1660 (noting that 34% of S&P 500 companies have founding-family equity ownership); *cf.* Ronald J. Gilson & Curtis J. Milhaupt, *Sovereign Wealth Funds and Corporate Governance: A Minimalist Response to the New Mercantilism*, 60 STAN. L. REV. 1345, 1346 (2008) ("[S]ome major developing countries . . . increasingly reflect a form of state capitalism . . . . For developing economies, . . . the state, acting through [sovereign wealth funds], through direct ownership of operating companies, and through regulation, seeks to level the playing field.").

103. Pargendler, *supra* note 16, at 2923.

104. *Id.* at 2923 n.18; *see id.* at 2924 & n.21.

critical industry in China, from telecom to energy and autos to steel.[105] More importantly, as we explain below, it is misleading to attribute to SASAC the same bundle of control rights associated with controlling shareholders in other regimes.

## A. *SASAC as Controller*

The complexity of SASAC's control rights in the national champions cannot be understood without at least a thumbnail sketch of the agency's origins. The national SOEs were carved out of central-government ministries in the corporatization process, which transformed governmental organs into joint stock companies. Initially, control shares in the SOEs were held by the ministries from which they had been created, which led to predictably negative results.[106] The State Council experimented with different control structures for national SOEs, eventually leading to the creation of SASAC.

SASAC, established under the State Council in 2003, represents a second attempt to consolidate control rights over the national SOEs. SASAC has a long list of formal functions and responsibilities, including preserving and enhancing the value of state-owned assets, restructuring central SOEs, appointing and removing top SOE executives, and drafting regulations on the management of SOE assets.[107] It has a staff of about 800 employees organized into diverse bureaus ranging from enterprise restructuring to foreign affairs.[108] But despite outward appearances of consolidated control over the SOEs it formally supervises, SASAC is a work in progress, and the SOEs' legacy of shared control rights was not overcome simply by SASAC's establishment. This is particularly true given SASAC's location in the government organizational chart: alt-

---

105. *Cf.* Jason Dean et al., *China's "State Capitalism" Sparks a Global Backlash*, WALL ST. J., Nov. 16, 2010, at A1, *available at* http://online.wsj.com/article/SB10001424052748703514904575602731006315198.html (reporting that as of 2008, total assets of state enterprises in China were $6 trillion (133% the size of the Chinese economy), and comparing China to France, another country with extensive state involvement in the economy, where the assets of state enterprises totaled $686 billion (about 28% of the French economy)). SOEs under SASAC supervision account for 62% of China's GDP. *See* SASAC, ZHONGYANG QIYE NIANDU FENHU GUOYOU ZICHAN YUNYING QINGKUANG BIAO (中央企业 2010 年度分户国有资产运营情况表) [INDIVIDUAL OPERATION CONDITIONS OF CENTRAL ENTERPRISES 2010] (Oct. 21, 2011), *available at* http://www.sasac.gov.cn/n1180/n1566/n258203/n259490/13878095.html.

106. The difficulties included lack of central coordination mechanisms, weak oversight, and conflicts between each ministry's separate roles as regulator and economic actor.

107. *See* SASAC, *Main Functions and Responsibilities of SASAC*, http://www.sasac.gov.cn/n2963340/n2963393/2965120.html (last visited Mar. 23, 2013).

108. SASAC does not publicly disclose the number of employees it has, and we were informed by the agency's public affairs office that this figure is "confidential." However, an EU antitrust ruling involving a Chinese SOE put the number at 800, based on information provided to European regulators. Commission Decision (EC), China National Bluestar/Elkem, Case No. COMP/M.6082, 2011 O.J. (C 274) 1, at para. 21 (Mar. 31, 2011).

*STANFORD LAW REVIEW* [Vol. 65:697]

hough SASAC is a ministry-level agency, so are fifty-three of the most important SOEs under its supervision.[109] SASAC faces potential resistance not only from the firms it supervises but also from the competing agendas pursued by other important ministries, such as the Ministry of Finance.[110] As one commentator notes, "In practice, SASAC has faced an uphill struggle to establish its authority over the SOEs that it supposedly controls as a representative of the state owner."[111]

Until recently, there was no overarching legal authority governing SASAC in its role as controlling shareholder. In 2008—tellingly, after an arduous process of interest group balancing that began in 1993[112]—the Law of the People's Republic of China on State-Owned Assets of Enterprises (SOE Asset Law) was enacted to "safeguard[] the basic economic system of China . . . , giving full play to the leading role of the State-owned economy in the national economy."[113] In essence, the law formally recognizes SASAC as an *investor*—a shareholder in the national SOEs, with the ordinary rights and duties of a shareholder. Ostensibly, the law confines SASAC to this role[114] and governs the agency's performance of its functions as an investor.[115] But there are no formal mechanisms in the law to enforce SASAC's responsibilities, and in reality, the law grants SASAC powers *greater* than those available to it as a shareholder under China's Corporate Law.

In short, SASAC has both less and more power as a controlling shareholder than meets the eye.

---

109. Some have argued that, consistent with ownership of state assets by "the whole people," the National People's Congress is the proper entity to hold shares in the SOEs, rather than the State Council. CARL E. WALTER & FRASER J.T. HOWIE, RED CAPITALISM: THE FRAGILE FINANCIAL FOUNDATION OF CHINA'S EXTRAORDINARY RISE 167 (2011).

110. *See* Barry Naughton, *SASAC and Rising Corporate Power in China* at 1, 6, CHINA LEADERSHIP MONITOR, Spring 2008, *available at* http://media.hoover.org/sites/default/files/documents/CLM24BN.pdf.

111. Mikael Mattlin, Finnish Inst. of Int'l Affairs, *Whose Money?: The Tug-of-War over Chinese State Enterprise Profits* 5 (FIIA Briefing Paper No. 79, 2011).

112. A working group was established in 1993 to draft the law. One law professor we interviewed stated that he resigned from the working group when it became clear that the SOE Asset Law would not be consistent with market-oriented principles of corporate governance or with the Corporate Law. Interview with legal scholar in Beijing, China (June 2011).

113. Zhonghua Renming Gonghe Guo Qiye Gouyou Zichan Fa (中华人民共和国企业国有资产法) [SOE Asset Law] (promulgated by the Standing Comm. Nat'l People's Cong., Oct. 28, 2008, effective May 1, 2009), art. 1, http://www.gov.cn/jrzg/2008-10/28/content_1133922.htm (China).

114. *See id.* arts. 11-14.

115. *See e.g., id.* art. 69 (providing for unspecified disciplinary measures against SASAC staff who neglect their duties as investors); *see also id.* art. 70 (subjecting a shareholder representative appointed by SASAC to personal liability for loss caused by failure to carry out SASAC's instructions).

1. *Control rights in management*

As with controlling shareholders everywhere, one of SASAC's main powers with respect to the national champions is the selection and compensation of top managers. But SASAC exercises this power in the shadow of party control. As just noted, various party organs held appointment power in the central SOEs prior to the establishment of SASAC and retained this practice even after its establishment. "Political qualities," including party membership, are among the major criteria against which managerial performance in the national champions is evaluated.[116]

There are two parallel personnel systems in all Chinese SOEs: the regular corporate management system and the party system.[117] In the corporate management system, positions are similar to those commonly found in firms elsewhere and include CEO, Vice-CEO, chief accountant, and if the company has a board of directors, a chairman and independent board members. A leadership team in the party system includes the secretary of the Party Committee, several deputy secretaries, and a secretary of the Discipline Inspection Commission (an anticorruption office), along with other members of the Party Committee. Institutionalizing party penetration of corporate roles is formal policy, and overlaps between the two systems appear rather uniform, such that a corporate manager of a given rank typically holds a position of equivalent rank in the party system.[118]

Party and corporate leadership appointments take place in a highly institutionalized sharing arrangement between the Party and SASAC. In fifty-three

---

116. *See* Zhongyang Qiye Lingdao Banzi he Lingdao Renyuan Zonghe Kaohe Pingjie Banfa (Shixing) (中央企业领导班子和领导人员综合考核评价办法（［试行］）) [Measures Concerning the Integrated Evaluation of the Top Management Teams and Managers of the Central Enterprises (Provisional)] (promulgated by the Org. Dep't Communist Party of China, Nov. 6, 2009), http://gzw.xinjiang.gov.cn/10050/10090/10012/2010/19547.htm.

117. On the party personnel system, see generally John P. Burns, Research Note, *Strengthening Central CCP Control of Leadership Selection: The 1990* Nomenklatura, 1994 CHINA Q. 458; Hon S. Chan, Research Report, *Cadre Personnel Management in China: The* Nomenklatura *System, 1990-1998*, 2004 CHINA Q. 703; and Howson, *supra* note 28.

118. In 2004, the Organization Department of the Chinese Communist Party and the Party Committee of SASAC released Guanyu Jiaqiang he Gaijin Zhongyang Qiyedang Jian Gongzuo de Yijian (关于加强和改进中央企业党建工作的意见) [Opinions Concerning Strengthening and Improving the Party Construction Work in the Central Enterprises] (promulgated by the Org. Dep't Communist Party of China & Party Comm. SASAC, Oct. 31, 2004). A key principle of the Opinions is the policy of "bilateral entries and cross appointments." *See id.* The term *bilateral entries* means that members of the Party Committee can serve on the board of directors, the supervisory board, and the top management team, while board members and top managers who are party members can join the Party Committee. The term *cross appointments* means that, if the company has a board of directors, the secretary of the Party Committee and the board chair can be assumed to be the same person. If the company does not have a board of directors, then the secretary of the Party Committee can be assumed to be the CEO, and the Vice-CEO can be assumed to be the deputy secretary of the Party Committee. *Id.* § 2, item 5, para. 2.

central enterprises, the occupants of top positions, including board chairmen, CEOs, and party secretaries, are appointed and evaluated by the Organization Department of the Party's Central Committee. This is a legacy of the appointment practice prior to the establishment of SASAC. Some of these positions hold ministerial rank equivalent to provincial governors and members of the State Council; others hold vice-ministerial rank. Deputy positions in these enterprises are appointed by the Party Building Bureau of SASAC (the Party's organization department within SASAC). A separate division of SASAC, the First Bureau for the Administration of Corporate Executives, assists in this appointment process. Appointments and evaluations of top executives in the remaining central enterprises are made by yet another division of SASAC, the Second Bureau for the Administration of Corporate Executives. While the appointments power formally resides with SASAC, appointments are made with input from various party organs and ministries supervising relevant business operations, and are subject to approval by the State Council.[119]

The appointment and evaluation process for top managers of the national SOEs is supported in two ways: ministry recommendations and party leadership training. The Party's Organization Department and SASAC compensate for information asymmetries about talent and suitability of individual SOE managers by obtaining input from the ministries overseeing the industries in which SOEs operate. Moreover, SOE managers are trained in the Party school system, which serves as a think tank and midcareer training center for cadres. The Central Party School in Beijing, the most important and prestigious of these schools, offers specialized training classes for SOE managers.[120] While little information is available about the content of this training, the Party school system appears to provide an excellent opportunity for Party leadership to evaluate the intelligence, skills, and commitment of those who pass through its programs.

The standard corporate mechanism for the appointment and evaluation of senior executives—the board of directors—is missing entirely from this process. Indeed, only 51 of the core companies of the 117 national business groups even had boards of directors as of December 31, 2012.[121] Although SASAC and the Party have begun to bring boards of directors into the appointment process and to create boards for those core companies that do not yet have them,

---

119. *See* SASAC, ZHONGGUO GUOYOU ZICHAN JIANDU GUANLI NIANJIAN (中国国有资产监督管理年鉴) [CHINA'S STATE-OWNED ASSETS SUPERVISION AND ADMINISTRATION YEARBOOK] 99 (2004) [hereinafter SASAC Y.B. 2004] (outlining processes for appointments from various party organs).

120. *See* David Shambaugh, *Training China's Political Elite: The Party School System*, 2008 CHINA Q. 827, 828, 837.

121. *See Angang Sheli Woguo Yangqi di 51 Jia Dongshihui* (鞍鋼設立我國央企第 51 家董事會) [*Anshan Iron and the Establishment of the Board of Directors of 51 of China's Central Enterprises*], JINGJI CANKAO BAO (經濟參考報) [ECON. INFO. DAILY] (Dec. 31, 2012), http://big5.xinhuanet.com/gate/big5/news.xinhuanet.com/fortune/2012-12/31/c_124169718.htm.

the steps taken thus far leave little doubt that the Party does not intend to relinquish appointment authority over the most important enterprises and the highest-level appointments.[122]

To understand how the party-state manages executives of the national champions, we collected data on appointments and removals of "leaders" of the enterprises under SASAC supervision from 2003 to 2009. SASAC uses the term "leaders" to refer to holders of top positions in both corporations and the Party. These data include a limited number of high-level corporate appointments for which SASAC runs a public recruitment process.[123]

---

122. In 2008, SASAC and the Organization Department of the Communist Party promulgated Guidance Opinions on Top Manager Appointments by the Board of Directors of Central Enterprises. These Opinions for the first time gave some appointment power to boards. However, the CEOs of the top fifty-three central enterprises are not covered by the Opinions. Even with respect to other enterprises, the nomination committee of the board is required to "fully consult" with the Party Committee and SASAC before nominating a CEO. The preliminary appointment must be filed with SASAC before the appointment becomes final.

123. Since 2003, SASAC has publicly solicited applications for some top corporate leadership positions. From 2003 to 2008, this process resulted in the appointment of eight CEOs, fifty-one Vice-CEOs, fifty chief accountants, and twenty-six chief legal counsels. Hand-collected data from recruiting advertisements and decisions posted on SASAC, http://www.sasac.gov.cn (on file with authors). Based on more recent data, although the recruitment process is open to the public and attracts large numbers of applications, the process often (in about 40% of appointments), perhaps unsurprisingly, results in the appointment of an existing employee at the firm and, in most of the remaining cases, the appointment of an employee of another firm under SASAC supervision. *Id.* Finer-grained data from this process provide some insight into the type of manager viewed as attractive by SASAC. The average age of the 115 managers appointed through the open recruitment process is forty-two years old. *Id.* Almost 90% of those appointed are members of the Party. *Id.* The majority have graduate-level education, and over half of those appointed as CEO or Vice-CEO are trained as engineers. *Id.*

*STANFORD LAW REVIEW* [Vol. 65:697

TABLE 2

Appointments and Removals of Leaders of the Chinese Central Enterprises[124]

| Year | Number of Central Enterprises | Number of Central Enterprises with Appointments or Removals | Percentage of Central Enterprises with Appointments or Removals | Number of Appointments | Number of Removals |
|------|------|------|------|------|------|
| 2003 | 196 | 65 | 33.16% | 150 | 79 |
| 2004 | 178 | 77 | 43.26% | 224 | 155 |
| 2005 | 169 | 113 | 66.86% | 237 | 158 |
| 2006 | 159 | 101 | 63.52% | 323 | 136 |
| 2007 | 155 | 90 | 58.06% | 317 | 113 |
| 2008 | 148 | 95 | 64.19% | 358 | 146 |
| 2009 | 129 | 97 | 75.19% | 312 | 145 |

Leaders include members of boards of directors, CEOs, Vice-CEOs, chief accountants, secretaries of the Party Committee, deputy secretaries of the Party Committee, and secretaries of the Party's Discipline Inspection Committee.

Table 2 shows that from one-third to three-quarters of the national SOEs experienced at least one appointment or removal of a leader by SASAC in the covered years. SASAC does not explain why the number of appointments systematically exceeds the number of removals. But the most likely explanations are that (1) some appointments are actually reappointments of incumbents without any corresponding removal and (2) some enterprises established a board of directors during the covered period, creating new positions for appointment.

SASAC also rotates senior corporate and party leaders among business groups. Table 3 shows that rotations are fairly common. Our analysis of the data suggests that most of the corporate rotations reflected in the table are of directors or Vice-CEOs and that the party rotations are for positions below secretary of the Party Committee. From time to time, however, SASAC has rotated top executives in key industries. For example, in April 2011, SASAC rotated CEOs of the three central petroleum enterprises, each of which is a Fortune Global 500 company.[125] SASAC made similar rotations among top executives in the energy sector in 2008 and the telecom sector in 2004 and 2007. Such rotations obviously ignore the separate identity of the corporate groups and flout

124. *See* SASAC Y.B. 2004, *supra* note 119; sources cited *infra* note 127.

125. These companies were China National Petroleum Corporation (CNPC), China Petrochemical Corporation (Sinopec), and China National Offshore Oil Corporation (CNOOC). Erica Downs & Michal Meidan, *Business and Politics in China: The Oil Executive Reshuffle of 2011*, CHINA SECURITY, no. 19, 2011, at 3, 3; *see Global 500 2012*, *supra* note 3 (ranking CNPC 6th, Sinopec 5th, and CNOOC 101st worldwide).

standard corporate law concepts. But the practice is less jarring conceptually if, as we argued above, all the national SOEs are viewed as one diversified metagroup under the common (if somewhat attenuated) control of SASAC. Our interviews suggest that Chinese actors within the system view, or at least explain, rotations of senior managers as a monitoring device in groups without boards of directors. Rotations are said to reduce concentration of authority in a single individual in firms in which institutionalized corporate oversight organs have yet to be developed.[126]

As Table 3 shows, leaders are also rotated across the spheres of business, government, and Party. These data, together with the data on appointments of business leaders to various government and party positions presented above, again powerfully illustrate institutional bridging at work in China's system of state capitalism.

TABLE 3

Leader Rotations in the Chinese Central State-Owned Enterprises[127]

| | Leader Rotations | | | | |
|---|---|---|---|---|---|
| Year | Between Central Enterprises | From Central Enterprises to Government or Party | From Government or Party to Central Enterprises | From Local SOEs to Central SOEs | Total Rotations |
| 2004 | 27 | 6 | 13 | 0 | 46 |
| 2005 | 27 | 5 | 14 | 0 | 46 |
| 2006 | 20 | 3 | 10 | 1 | 34 |
| 2007 | 33 | 7 | 16 | 0 | 56 |
| 2008 | NA | NA | NA | NA | 50 |
| 2009 | NA | NA | NA | NA | 27 |

Leaders include members of board of directors, CEOs, Vice-CEOs, chief accountants, secretaries of the Party Committee, deputy secretaries of the Party Committee, and secretaries of the Party's Discipline Inspection Committee.

---

126. Interview with senior administrative official, *supra* note 78.

127. *See* SASAC, ZHONGGUO GUOYOU ZICHAN JIANDU GUANLI NIANJIAN (中国国有资产监督管理年鉴) [CHINA'S STATE-OWNED ASSETS SUPERVISION AND ADMINISTRATION YEARBOOK] (2005); SASAC, ZHONGGUO GUOYOU ZICHAN JIANDU GUANLI NIANJIAN (中国国有资产监督管理年鉴) [CHINA'S STATE-OWNED ASSETS SUPERVISION AND ADMINISTRATION YEARBOOK] (2006); SASAC, ZHONGGUO GUOYOU ZICHAN JIANDU GUANLI NIANJIAN (中国国有资产监督管理年鉴) [CHINA'S STATE-OWNED ASSETS SUPERVISION AND ADMINISTRATION YEARBOOK] (2007); SASAC Y.B. 2008, *supra* note 83; SASAC, ZHONGGUO GUOYOU ZICHAN JIANDU GUANLI NIANJIAN (中国国有资产监督管理年鉴) [CHINA'S STATE-OWNED ASSETS SUPERVISION AND ADMINISTRATION YEARBOOK] (2009); SASAC Y.B. 2010, *supra* note 15.

Unfortunately, available data on appointments, removals, and rotations do not allow us to make more fine-grained assessments about a number of important issues, such as the specific enterprises involved, the reasons for removals (e.g., firing versus promotion), and distinctions between corporate and party personnel management. But taken as a whole, the available data suggest, contrary to some assertions,[128] that SASAC exercises fairly extensive control rights over top managers in the central SOEs (or at least that SASAC is the mechanism through which the Party exercises such control rights), albeit in ways that pay little obeisance to ordinary corporate law norms.

Concomitant to its appointment power, SASAC also supervises executive compensation at the central SOEs. Prior to SASAC's establishment, managerial compensation was determined by the SOEs themselves, which led to a series of problems as well as major inequalities in pay across firms.[129] In 2004, SASAC introduced a system to supervise compensation at the central enterprises. Under this system, the basic structure of managerial compensation consists of base salary, performance bonuses, and mid- to long-term incentive compensation.[130] The standard corporate law organs for determining executive compensation—boards of directors or, perhaps, boards in cooperation with shareholders—are bypassed by this process. Indeed, there is evidence that the board-approved, shareholder-disclosed compensation paid to executives of listed national champions is something of a fiction—the actual compensation received by the executive is the one set by SASAC.[131]

Comprehensive data on executive compensation in China are difficult to obtain, and formally reported data are likely to be misleading. Based on public reports, the highest-paid executive in 2007 was the Chairman of China Mobile Group, who earned 1.3 million RMB (about $176,000, as of December 2007). The average compensation for the CEOs of the central enterprises supervised

---

128. *See, e.g.*, WALTER & HOWIE, *supra* note 109, at 167-71 (arguing that SASAC is weak and akin to a compliance department vis-à-vis the enterprises it ostensibly supervises).

129. Based on SASAC's investigation, the major problems included lack of state supervision and mechanisms to encourage long-term performance, loose linkage between compensation and performance, and great pay inequalities across firms. *See* SASAC Y.B. 2004, *supra* note 119, at 85-86.

130. SASAC employs complex personnel-evaluation systems to determine managerial compensation, appointments, and removals. Top managers enter into binding annual performance agreements with SASAC that specify evaluation criteria and benchmarks, along with applicable rewards and punishments. Annual performance scores are transformed into letter grades from A to E, and bonuses are determined according to these grades.

131. Both news reports and our own interviews suggest that at the time of listing shares on the Hong Kong and New York Stock Exchanges in 2001, the executives of CNOOC, Inc., the major subsidiary of national-champion oil company CNOOC, reached an internal agreement whereby they would "donate" the compensation approved by the board to the parent company (the core company in the group). Thus, the compensation approved and reported in compliance with corporate and securities law norms is not actually received by the executives. Actual compensation is determined outside the corporate law process. Our preliminary research suggests that this practice is common.

by SASAC in 2009 was 600,000 RMB (about $88,000, as of December 2009).[132] While this reported compensation is obviously very low on an international scale, it must be understood in context. The figures do not include a host of perquisites and privileges enjoyed by corporate executives and their families, such as free—or nominally priced—housing, education, and medical care. Generous corporate expense accounts and side payments for nominal additional services provided to the firm by top managers are also commonplace and may comprise a far larger portion of executives' income than formal compensation.[133] And in contemporary Chinese society, leadership positions in any sphere attract other remunerative opportunities, a reality succinctly summarized by the phrase "money for power," which we heard often in our interviews.

### 2.   *Control rights in state enterprise assets*

SASAC's central mission is to preserve and increase the value of state assets while transforming SOEs into public companies. Since its establishment, SASAC has pursued a policy of building several large enterprises in each key industry. In recent years, SASAC has consolidated smaller and weaker SOEs into larger business groups. In the process, the number of SOEs under SASAC supervision has declined to 121 in 2010, from 198 in 2003.[134] SASAC's goal is to bring the number below 100. Simultaneously, as the Fortune Global 500 list attests, SASAC has successfully pursued the goal of building globally competitive conglomerates.

This central mission makes SASAC a gatekeeper with respect to transfers of SOE assets. With passage of the SOE Asset Law, SASAC now has solid legal backing for this role. Under the SOE Asset Law, share transfers involving national SOEs require SASAC's approval, even transactions over which it does not have veto power as a shareholder under the Company Law.[135] Some Chi-

---

132. About one-third was base pay and two-thirds was performance based. *See Li Rongrong: Yangqi Gaoguan Pingjun Nianxin 60 Wan Zuoyou Bing Bugao* (李荣融：央企高管平均年薪 60 万左右 并不高) [*Li Rongrong: Central-Enterprise Executives Average Annual Salary of About 600,000*], PEOPLE.COM.CN   (Jan.   10,   2010), http://politics.people.com.cn/GB/1027/10736395.html.

133. *See Shrouded in Mystery: Chinese Executive Compensation and the Numbers Behind the Numbers*, KNOWLEDGE@WHARTON   (May   14,   2012), http://knowledge.wharton.upenn.edu/arabic/article.cfm?articleid=2824.

134. *See* SASAC Y.B. 2004, *supra* note 119; ZHONGGUO GUOYOU ZICHAN JIANDU GUANLI NIANJIAN（中国国有资产监督管理年鉴）[CHINA'S STATE-OWNED ASSETS SUPERVISION AND ADMINISTRATION YEARBOOK] (2011).

135. *See* Zhonghua Renming Gonghe Guo Qiye Gouyou Zichan Fa (中华人民共和国企业国有资产法) [SOE Asset Law] (promulgated by the Standing Comm. Nat'l People's Cong., Oct. 28, 2008, effective May 1, 2009), art. 5, http://www.gov.cn/jrzg/2008-10/28/content_1133922.htm (China). For example, SASAC's approval is required to transfer shares of a subsidiary of a company under its supervision. *See generally* CHENGWEI LIU, CHINESE COMPANY AND SECURITIES LAW: INVESTMENT VEHICLES, MERGERS AND ACQUISITIONS AND CORPORATE FINANCE IN CHINA 281-96 (2008). Under corporate law

STANFORD LAW REVIEW [Vol. 65:697

nese courts have upheld SASAC's superior control rights under the SOE Asset Law by holding that contracts for transfer of shares entered into without SASAC's approval are unenforceable or invalid, even when they are consistent with the Company Law.[136] SASAC has super control rights in the transfer of SOEs.

### 3. Cash flow rights

The separation of cash flow rights from control rights is a central problem in controlling-shareholder regimes. When a shareholder's control rights exceed its rights to cash flows, the agency problem between the controller and minority shareholders is magnified; the scale of the problem grows as the wedge increases. As Ronald Gilson puts it: "Conditional on maintaining control, the less equity the controlling shareholder has, the greater the incentive to extract private benefits [at the expense of minority shareholders]; increased productivity accrues to shareholders in proportion to their equity, while private benefits of control are allocated based on governance power."[137]

In controlling-shareholder regimes outside the SOE context, the separation of control rights from cash flow rights, and the ensuing potential to extract private benefits, arises because controllers are able to magnify equity's voting power through pyramiding and circular stock-ownership arrangements among corporations in the group. In the SOE context, regulators and politicians acting as "owners" on behalf of the state may reap private benefits of control not shared with ordinary financial investors, such as political influence, opportunities for patronage or corruption, and national prestige. These types of pecuniary and nonpecuniary private benefits of control over the national champions are clearly available to the Chinese party-state's managerial elite, and SASAC is a major vehicle through which such control is exercised. Beyond its role as a vehicle for party-state governance of the central-SOE sector, the organizational incentives of SASAC as the formal "owner" of the national SOEs are affected by a peculiar historical circumstance: SASAC's control rights exceed its rights to cash flows because, until recently, the state collected no dividends from

---

principles, only the board of directors of the company in control of the subsidiary has authority to approve such a transaction. *See Zhonghia Renmin Gongheguo Gongsifa* (中华人民共和国公司法) [Company Law] (promulgated and amended by the Standing Comm. Nat'l People's Cong. (Present Order No. [2005] 42), effective (as amended) Jan. 1, 2006) (Lawinfochina) (China).

136. *See, e.g.*, Beijing Jinggong Fuzhuang Jituan Youxian Gongsi yu Zhang Bo (北京京工服装集团有限公司与张博) [Zhang Buo v. Beijing Jinggong Garments Grp.] (Beijing Interm. People's Ct. May 20, 2009) (Lawyee) (China); Hunan Zhengqing Zhiyao Jituan Gufen Youxian Gongsi Dengyu Chengdu Yinghuacheng Touzi Guanli Youxian Zeren Gong (湖南正清制药集团股份有限公司等与成都盈华成投资管理有限责任公司) [Hunan Zhengqing Grp. v. Chengdu Yinghua Inv. Co.], (Huaihua City Interm. People's Ct. May 27, 2009) (lvshi9.com) (China).

137. Gilson, *supra* note 101, at 1651.

wholly state-owned firms.[138] This arrangement was reversed in 2007; the wholly owned subsidiaries of SASAC—the core companies—now pay dividends to the state, but still do so at rates below those of the publicly traded SOEs.[139] Moreover, SASAC receives only a portion of the dividends collected by the state; it uses that portion for asset acquisitions, restructurings, and emergency support for failing enterprises.[140] Thus, SASAC does not fully internalize the financial consequences of its control rights over the national-champion groups, and it cross-subsidizes the firms under its supervision with the cash flow rights that it does hold.

These realities suggest that the central-SOE sector as a whole, rather than individual firms, is of greatest concern to SASAC in carrying out its governance responsibilities, and they may account for several outwardly puzzling aspects of national-champion governance in China. For example, the practice of rotating top managers among firms in the same industry makes a good deal of sense if maximizing shareholder wealth at individual firms is less important to the controlling shareholder than building up a number of globally competitive firms in critical industries. Another example is SASAC's heavy emphasis on the corporate social responsibility (CSR) of the enterprises under its supervision.[141] CSR is a theme typically trumpeted by nonshareholder corporate constituencies or by NGOs, not by large investors. But the CSR campaign by SASAC might be a means of building support for state capitalism domestically, improving its image abroad, and justifying management of the SOEs in ways that are not explicable solely from the standpoint of profitability and efficiency of individual firms.

## B. *Consequences*

SASAC is not only the largest controlling shareholder in the world, at least in formal terms; it may also be the most idiosyncratic. Deconstructing SASAC's control rights in the firms it ostensibly owns reveals that it is simultaneously weaker and more powerful than a typical controlling shareholder in other regimes. It is weaker because it lacks the exclusive power to appoint top management of the most important enterprises whose shares it controls and defers to other agencies—and even to the SOEs themselves—on substantive is-

---

138. Naughton, *supra* note 110, at 1. Publicly listed subsidiaries paid dividends to their parent (core) companies and other shareholders, but the core companies paid no dividends to the state. *Id.*

139. *Id.* at 6.

140. *See id.* at 6-7.

141. *See* Li-Wen Lin, *Corporate Social Accountability Standards in the Global Supply Chain: Resistance, Reconsideration, and Resolution in China*, 15 CARDOZO J. INT'L & COMP. L. 321 (2007); Li-Wen Lin, *Corporate Social Responsibility in China: Window Dressing or Structural Change?*, 28 BERKELEY J. INT'L L. 64 (2010); Li-Wen Lin, *Legal Transplants Through Private Contracting: Codes of Vendor Conduct in Global Supply Chains as an Example*, 57 AM. J. COMP. L. 711 (2009).

sues outside its realm of expertise. It is more powerful due to the vast scope of its holdings over the most important firms in the national economy and because of its super control rights, which trump standard corporate law norms, in state-enterprise assets. Even beyond this disjuncture in its formal status and powers, SASAC is unique as the focal point for state capitalism in a rapidly rising economic superpower. SASAC appears, by design, to be yet another institutional bridge in the networked hierarchy—a high-level link between the national SOEs and other major components of the party-state. To be sure, many questions remain about SASAC's internal operations, relationships with the firms it ostensibly controls, and its oversight by party and governmental organs.

One major consequence of this arrangement is clear, even if all of its implications are not: the national champions represent much more than a purely financial investment for the party-state. SASAC, as the organizational manifestation of the party-state in its role as controlling shareholder, seeks to maximize a range of benefits extending from state revenues to technological prowess and from soft power abroad to regime survival at home. As one of us recently put it in a separate coauthored work, in state capitalism "the government attempts to ensure that company-level behavior results in country-level maximization of economic, social, and political benefits."[142] Of course, the country's interests are defined by and consistent with the interests of the managerial elites that play key roles in the operation and evolution of the system.

## IV.  IMPLICATIONS AND QUESTIONS

### A.  *Implications for Comparative Corporate Governance Scholarship*

The last decade of comparative corporate governance scholarship has been dominated by two big, related questions: whether, and how, law influences corporate ownership structures around the world; and whether global systems of corporate governance are converging, particularly on a shareholder-centered, market-oriented model. In these debates, particularly in the seminal works that set the terms of the inquiry, China is conspicuous by its absence, which raises something of a China problem for both bodies of literature.

#### 1.  *Law and finance*

The now-familiar law and finance literature asserts that the quality of legal protections for investors determines the degree to which share ownership in a given country is dispersed. "Bad" law that protects investors poorly leads to concentrated corporate ownership; "good" law results in dispersed ownership. Legal systems of common law origin appear to systematically provide superior

---

142. Gilson & Milhaupt, *supra* note 102, at 1346.

investor protections than do systems of civil law origin, which explains pronounced differences in ownership structures around the world.[143]

Critiques of this literature are legion, and we simply note that China's experience, like that of many other countries, seems consistent with the law and finance hypothesis on a surface level but far less so upon careful examination.[144] Rather than asking whether China's experience supports the predictions of the law and finance literature, we use the big questions in that body of work to motivate inquiries about the role of law and legalism in the growth of large, globally active Chinese firms and, at least by plausible extension, the development of the Chinese economy.

The law and finance literature emphasizes the sticky effects of a country's "legal origin" on the structure of firms. Putting aside the thorny question of how to properly code legal families that bedevils attempts to support this assertion empirically, let's consider whether the approach of Chinese economic strategists in building national champions has been heavily influenced (or bounded) by a particular tradition of legalism inherited from the civil law system. The Chinese approach certainly shares with the French civil law tradition a high degree of comfort with state involvement in the economy and regulatory paternalism.[145] Moreover—and contrary to the distrust of bigness that has animated U.S. corporate law, governance, and institutional design over the course of the past century—bigness has not only been tolerated but celebrated in the Chinese economic reform period.[146] Generalizing to a high degree, it is thus

---

143. *See, e.g.*, Rafael La Porta et al., *Law and Finance*, 106 J. POL. ECON. 1113 (1998).

144. For a critique of the law and finance approach, see, for example, CURTIS J. MILHAUPT & KATHARINA PISTOR, LAW AND CAPITALISM: WHAT CORPORATE CRISES REVEAL ABOUT LEGAL SYSTEMS AND ECONOMIC DEVELOPMENT AROUND THE WORLD 17-25 (2008). At first blush, China's experience comfortably fits the law and finance hypothesis. China's legal system, ostensibly of civil law origin, provides weak formal protections to investors. Its stock market is underdeveloped, corporate ownership structures are highly concentrated, and the economy is populated by corporate groups. But as this Article has shown, large elements of the structure of contemporary Chinese corporate capitalism are products of conscious policy design, or at least governmentally structured experimentation. Corporate groupism may have partially been a response to institutional voids in the early reform period, but production concerns and the desire to transmit industrial policy played major roles in motivating the assembly of business groups. Where the state chose to use corporate law and other legal concepts, such as contract-based alliances and business group registration, in assembling its firms, it had the required institutional capacity. Thus, it is hard to identify specific corporate law defects, let alone any pervasive legal weaknesses, attributable to China's civil law origin that promoted formation of corporate groups under the control of the party-state.

145. *Cf.* Peter A. Hall & David Soskice, *An Introduction to Varieties of Capitalism, in* VARIETIES OF CAPITALISM, *supra* note 20, at 1, 60 n.42 (noting France's former reliance on extensive state intervention in corporate governance).

146. *See, e.g.*, Hu Jintao, President, People's Republic of China, Hu Jintao zai Zhongguo Gongchandang di Shiqi Ci Quanguo Daibiao Dahui shang de Baogao (胡锦涛在中国共产党第十七次全国代表大会上的报告) [Report in the Seventeenth General Meeting of the Communist Party of China] (Oct. 25, 2007), *available at*

*STANFORD LAW REVIEW*                    [Vol. 65:697

possible to say that China's approach to corporate law and governance reso-nates with attitudes prevalent in the civil law tradition.

But ending with this generalization would not capture the full story of how the legal order has influenced China's approach to corporate governance. Chi-nese institutional designers have been highly eclectic in the foreign models they have used in building the state sector. In early phases, consistent with the sen-timents just discussed, Japanese and Korean corporate groupism and its institu-tional accoutrements held a high degree of attraction. More recently, the rights-based, shareholder-oriented approach of the United States, with its emphasis (if less than perfect track record) on accountability and transparency, has held sway over Chinese drafters of corporate law, policymakers, and regulators. SASAC's rather schizophrenic role in national-champion governance may re-sult from the amalgam of these two sentiments—the quest for size and state control alongside an emphasis on independent accountability mechanisms and at least outward adherence to global corporate governance standards. Im-portantly, the absence of a firmly developed and entrenched legal order in re-form-era China may have freed the hands of economic strategists to select forms of organization that they believed would best promote Chinese corporate development at a given time.

The law and finance literature also raises the important question of precise-ly *what* matters in corporate law—i.e., which of its features are key to the growth of firms? For the authors of this literature, of course, the answer is le-gally enforceable investor protections.[147] The law and finance literature em-phasizes investor protections on the reasonable assumption that capital is typi-cally a scarce resource, so governance rights should be allocated to attract investment. But China's experience (along with those of Korea and Japan dur-ing their formative periods of development) suggests that where capital is available, at least to firms favored by the state, investor protections are not a first-order priority.[148]

Yet China's experience appears to confirm the importance of the corporate *form* to firm growth and perhaps, by extension, to economic development. We have seen how central the corporatization process has been to the hydraulics of industrial organization in China's state sector: separating the regulatory from the operational aspects of enterprise in the corporatization process was a crucial first step in the development of a functional SOE sector.[149] Corporatization alone, of course, did not complete the separation, and to a significant extent, the

http://cpc.people.com.cn/GB/104019/104099/6429414.html (extolling plan "to develop industries from bigness to strongness . . . and to encourage the development of internationally-competitive large business groups").

147. *See supra* text accompanying note 143.

148. External constraints, such as competitive product markets, may be a necessary condition for the success of a state-led growth model without robust corporate governance institutions.

149. *See supra* Part III.A.

line between regulation and operation remains blurred in China's SOEs. But use of the corporate form is a powerful channel for organizational behavior, and it has provided a template for the structure of the state sector. Throughout the reform period, Chinese economic strategists have selectively chosen from among the menu of corporate attributes, making extensive use of the corporation's hierarchical governance structure and separate legal existence in building networks of firms responsive to direction from the party-state in its role as controlling shareholder. At the same time, the corporation's key decisionmaking and oversight organ, the board of directors, has been largely sidelined, and shareholder rights enforcement mechanisms have been downplayed. We have also seen how important the rearrangement of assets within and creation of linkages among corporate entities has been to the formation of industries deemed critical by the party-state. Unlike the early contractual business alliance, the corporate form has proven to be extraordinarily useful in providing the Chinese state with an enduring, highly adaptable, and to some extent anonymous vehicle for investment and economic activity. China's state capitalism is thus powerful confirmation of the genius of the corporate *form* as a vehicle for promoting investment and productive enterprise. Corporate *law*, however, in the narrow sense of an effective menu of readily enforceable legal protections for investors, has played little role in the emergence of large Chinese firms.

Indirectly, the law and finance literature raises an existential question about the linkage between corporate ownership structures and economic growth. The unstated assumptions in the literature are that such a linkage does exist and that dispersed ownership structures produce better economic outcomes than concentrated ones. Yet the business group, the form of corporate structure prevalent in "bad" law jurisdictions around the world,[150] has been the engine of development in countries pursuing a diverse range of economic strategies over the past half century. These countries now prominently include China in its pursuit of a state capitalism strategy. Thus, while the genius of the corporate form is present in all economic miracles, "good" corporate law (again, in the narrow sense) is not an essential contributor to its genius, and dispersed corporate ownership is not a necessary condition for transformative economic development.[151] In this respect, China's recent history confirms the lessons provided by the experience of the United States in the late nineteenth and early twentieth centuries—an

---

150. Business groups are prevalent in at least one "good" law jurisdiction, as well. *See* Gilson, *supra* note 101, at 1665-67 (discussing reasons for the prevalence of controlling-shareholder regimes in Sweden).

151. A "law first" approach to investment and development might be preferable on the grounds of predictability, transparency, and accountability. But it may simply be too time consuming—and thus politically impossible—for countries at early stages of development to pursue this approach. An authoritarian state, and developing democracies displaying imaginative pragmatism in institutional design, can credibly commit to development and encourage investment without resort to frictionless legal enforcement. *See* Gilson & Milhaupt, *supra* note 29, at 271-81.

*STANFORD LAW REVIEW* [Vol. 65:697

economically transformative but institutionally rough-and-tumble period in U.S. history.[152]

### 2. *Convergence*

Law and finance scholarship added fuel to the convergence debate, which considers whether corporate governance systems around the world are converging on a single shareholder-centered, market-oriented model. In the decade since the debate flowered and then promptly reached a theoretical stalemate,[153] China has emerged as one of the world's major economic powers. With the benefit of hindsight, the turn-of-the-century convergence debate now seems rather quaint. Scholars never seriously considered the possibility that domestic political legitimacy and international influence could be a major goal of a corporate governance regime.[154] The concept of "nonpecuniary private benefits of control" was developed to help explain the persistence of controlling-shareholder regimes but was also used to describe social standing and influence of private founding entrepreneurs within the domestic political economy.[155] Chinese state capitalism blurs the distinction between pecuniary and nonpecuniary benefits of corporate control and highlights major international soft-power ramifications of corporate governance structures in the struggle between state capitalism and market capitalism.

We noted at the outset that Chinese corporate governance is often defined by what it lacks in comparison to other systems.[156] Hopefully, the previous Parts of the Article have made some headway in understanding its features other than by reference to negative space. As for the convergence debate, however, it bears emphasizing that, regardless of where the Chinese system is headed, it

---

152. *See supra* note 18.

153. *See* Marc Goergen et al., *Corporate Governance Convergence: Evidence from Takeover Regulation Reforms in Europe*, 21 OXFORD REV. ECON. POL'Y 243, 245 (2005). The stalemate is between path-dependence theories predicting persistence of national institutions that protect vested interests, *see, e.g.*, Lucian Arye Bebchuk & Mark J. Roe, *A Theory of Path Dependence in Corporate Ownership and Governance*, *in* CONVERGENCE AND PERSISTENCE IN CORPORATE GOVERNANCE 69 (Jeffrey N. Gordon & Mark J. Roe eds., 2004), and market-imperative theories predicting global internalization of shareholder-wealth-maximization norms, *see, e.g.*, Henry Hansmann & Reinier Kraakman, *The End of History for Corporate Law*, *in* CONVERGENCE AND PERSISTENCE IN CORPORATE GOVERNANCE, *supra*, at 33.

154. The only literature of which we are aware that even begins to grapple with this dimension of the issue is Jeffrey N. Gordon, *The International Relations Wedge in the Corporate Convergence Debate*, *in* CONVERGENCE AND PERSISTENCE IN CORPORATE GOVERNANCE, *supra* note 153, at 161, 167 (considering Germany's interest in promoting integration of the European Union when privatizing Deutsche Telekom).

155. *See* Gilson, *supra* note 101, at 1661-64.

156. *See supra* text accompanying notes 11-12.

does not presently fit neatly into any of the standard taxonomies.[157] Chinese corporate governance of the national champions is neither bank based nor stock market based. It is not shareholder oriented or stakeholder oriented, unless the concept of a corporate "stakeholder" is stretched to include the ruling political party and the government in its policymaking, regulatory, and enforcement capacities. Nor is it a liberal market economy (LME) or a coordinated market economy (CME) per the "varieties of capitalism" literature.[158] None of these taxonomies provides much analytical leverage on a system of national-champion capitalism in which a party-state is residual claimant, controlling shareholder, financier, and chief engineer of an Olsonian encompassing coalition that ties the economic and political fortunes of a vast array of actors to national economic growth.

Of course, each country's governance structures are unique. The point is that the map used by comparative corporate governance scholars in recent decades to understand the world may lead observers of China astray or at least cause them to overlook fertile areas for further investigation. To take an example relevant to the convergence question, most scholars have assumed both that state capitalism in China is transitional and that the speed of the transition is a function of state capacity and political will to make improvements in the formal institutional environment. Relatedly, many observers have emphasized the vast divergence between formal law and actual practice in Chinese corporate governance.[159] The gulf, some commentators imply, would close up if China were more "law abiding."[160]

---

157. The following comment, made over a decade ago by observers focused on the same aspects of the Chinese system that we have addressed, is prescient: "Neither the term 'developmental state' nor 'entrepreneurial state' is adequate to capture the complex web of interests that now connect government and emerging big businesses in China. Whatever the name one chooses to give it, it is clear that a new institutional form is being born." Peter Nolan & Wang Xiaoqiang, *Beyond Privatization: Institutional Innovation and Growth in China's Large State-Owned Enterprises*, 27 WORLD DEV. 169, 191 (1999).

158. *See, e.g.*, Hall & Soskice, *supra* note 145, at 8. For an attempt to analyze China using the varieties-of-capitalism rubric, see Michael A. Witt, *China: What Variety of Capitalism?* (INSEAD, Working Paper No. 2010/88/EPS, 2010), *available at* http://ssrn.com/abstract=1695940. The utility of the varieties-of-capitalism framework as applied to China is questionable: the author concludes that some aspects of Chinese capitalism work like an LME, others make it resemble a CME, while the Chinese financial system suggests either LME or CME characterization, depending on the scope of analysis. *See id.* at 11-12.

159. *See* Donald C. Clarke, *"Nothing but Wind"?: The Past and Future of Comparative Corporate Governance*, 59 AM J. COMP. L. 75, 101-02 (2010) ("[T]he reality of corporate governance practices in China remains very different from what appears in the statute books, and indeed is so opaque that it is difficult to measure reliably where it is, let alone to know in what direction it is moving."); Witt, *supra* note 158, at 12-13.

160. *See* Witt, *supra* note 158, at 12-13 (arguing that because the original varieties-of-capitalism literature (which did not address China) was based on a sample of "law-abiding societies," analysis of Chinese capitalism will need to take account of social capital as a

*STANFORD LAW REVIEW* [Vol. 65:697

Our analysis of SOE governance, however, points to a closer fit between law and practice. There certainly appears to be a yawning gap between law and practice if one focuses on Chinese *corporate law* and related institutions. Direct involvement of the Communist Party in high-level executive appointments, SASAC's practice of bypassing boards of directors in the appointment and re-muneration processes and maintaining veto power over downstream corporate transactions are all inconsistent with basic corporate law principles. (They also violate soft-law norms of SOE governance promoted by international organiza-tions such as the OECD.)[161] But if one focuses on the regulations governing business group formation and governance and on the SOE Asset Law govern-ing SASAC in its formal role as controlling shareholder of the national cham-pions,[162] the gap between law and practice in China's SOE sector narrows sub-stantially. The existing legal environment is actually quite complementary to the current economic system in which the state sector is advancing ahead of the private sector.

Whatever its disadvantages, and they are likely substantial, Chinese state capitalism of the past thirty years represents a form of industrial organization that produces substantial benefits to members of the encompassing coalition—the managerial elite with control over economic policy formation and imple-mentation within the party-state system. The national champions themselves are now forceful players in the Chinese political economy. We need look no further than the U.S. historical experience to see that large corporations—even ones not linked to the state—can exert tremendous influence on the design of national institutions and the nature of social relations.[163] It is therefore quite possible that China's formal legal institutions will "improve" in ways that rein-force the current system of industrial organization rather than prompt a transi-tion to different forms of corporate organization. State capitalism may prove to be a durable institutional arrangement because of interest group politics, public policy, and path dependence.

Thus, for the convergence debate, China raises the possibility of a new, du-rable, and possibly influential variety of capitalism. The Chinese system has already garnered attention as a model of state intervention in the economy among countries with authoritarian political traditions—most prominently, in

---

means of understanding the divergence between formal structures and actual practice in China).

161. For example, OECD, OECD GUIDELINES ON CORPORATE GOVERNANCE OF STATE-OWNED ENTERPRISES (2005), *available at* http://www.oecd.org/daf/corporateaffairs/ corporategovernanceofstate-ownedenterprises/34803211.pdf, provides that "SOEs should not be exempt from the application of general laws and regulations," such as antitrust rules, and should face competition in access to finance, establish transparent board-nomination processes, and allow boards to independently exercise their responsibilities, including the power to appoint and remove the CEO. *Id.* at 12-13, 17.

162. *See supra* Parts II.B, III.A.

163. *See supra* note 18.

Russia.[164] Of course, imitating the Chinese model may prove difficult for a host of reasons. But as we have shown, Chinese firms have entered the global economy through a path that bears almost no resemblance to the standard institutionalist account of how firms grow and large-scale commercial economies develop. Thus, even short of replication elsewhere, China's variety of capitalism may still influence countries lacking the formal institutional foundations of growth.[165] Quite apart from these forms of influence, it is apparent that China's rise is a significant disruptive force in global capitalism. It has disrupted previously settled notions about the nature of capitalism[166] and has sparked a predictable backlash in some realms.[167] The competitive challenges posed by an economic system in which, for many of the largest and most globally active firms, the *country* is the unit of maximization are profound. At a minimum, China's global economic rise, like that of Japan two decades ago, will likely encourage reconsideration of cooperative links between the state and the private sector and refocus attention on networked varieties of corporate capitalism. In corporate governance, as in politics, the "end of history" is nowhere in sight.

## B. *Questions for the Future*

If the current system represents a relatively stable equilibrium, as opposed to a transitional device, what forces, short of political regime change, might prove destabilizing to it? We survey some possibilities below. As the plethora of question marks suggests, the discussion is intended to identify possible pathways of change and to highlight areas for further research, not to offer predictions.

### 1. *Legal reform?*

As noted, the current structure of corporate capitalism in China is a policy choice enshrined in law—to date, a highly successful one as measured against

---

164. *See, e.g.*, Clifford J. Levy, *In Chinese Communist Party, Russia's Rulers See a Role Model for Governing*, N.Y. TIMES, Oct. 18, 2009, at A6, *available at* http://www.nytimes.com/2009/10/18/world/europe/18russia.html.

165. *See* Gilson & Milhaupt, *supra* note 29, at 271-81.

166. For insightful commentary, see generally Neil Fligstein & Jianjun Zhang, *A New Agenda for Research on the Trajectory of Chinese Capitalism*, 7 MGMT. & ORG. REV. 39 (2011); Nan Lin, *Capitalism in China: A Centrally Managed Capitalism (CMC) and Its Future*, 7 MGMT. & ORG. REV. 63 (2011); Meyer, *supra* note 1; and Andrew G. Walder, *From Control to Ownership: China's Managerial Revolution*, 7 MGMT. & ORG. REV. 19 (2011).

167. *See, e.g.*, IAN BREMMER, THE END OF THE FREE MARKET: WHO WINS THE WAR BETWEEN STATES AND CORPORATIONS? (2010); Jason Dean et al., *China's 'State Capitalism' Sparks a Global Backlash*, WALL ST. J., Nov. 16, 2010, at A1, *available at* http://online.wsj.com/article/SB10001424052748703514904575602731006315198.html.

*STANFORD LAW REVIEW*                    [Vol. 65:697

the primary goals of the regime, including sustained economic growth, international influence, and regime survival and legitimacy. In which direction will future corporate and securities law reforms lead China's state capitalism? Our narrative at least suggests the possibility that ensuing reforms will further enhance and legitimize state control over important corporate assets rather than impel a transition to dispersed ownership structures and diminished political involvement in corporate governance.[168] As we have shown in respect of the national-champion groups, there are overrides of corporate law principles at key points to ensure continued party-state control. In the future, more boards of directors may be established for the parent companies of the national-champion groups, SOE boards may take on somewhat more power, and independent directors may become more prevalent. (These are reforms that have preoccupied many corporate law commentators.) But they will hardly alter the fundamental governance norms of Chinese SOEs, which are determined by the party-state in its role as controlling shareholder.

Of course, this does not mean that reforms to corporate and securities laws and to the surrounding enforcement environment are inconsequential. Incremental improvements in the institutional environment for corporate governance are taking place in China, and they have the potential to improve corporate governance in the SOEs. But the most important long-term impact of legal reform may lie not in bringing a greater market orientation to the state sector but in creating an institutional environment in which firms without access to the party-state network can raise capital and grow, ultimately diminishing the importance of the national champions in the Chinese economy.

### 2. *Temasek-ization of SASAC?*

Another possible pathway of change is a reorientation of the party-state in its role as a controlling shareholder. The foreign economic models that China has sought to emulate have changed over time. As noted, Japan and Korea were once major role models for the construction of corporate groups under state control. Today, Singapore's state holding company, Temasek, is a favorite of Chinese economic strategists. Temasek, wholly owned by Singapore's Ministry of Finance, holds major equity stakes in numerous Singapore corporations. It has a constitutional responsibility "to . . . safeguard [the country's] critical assets and past reserves."[169] The Minister for Finance appoints the board of direc-

---

168. Antitrust law and enforcement are a different matter. If the antitrust regime were to be applied to the national champions, the present structure of state capitalism would be virtually impossible. For that very reason, it is almost inconceivable that the antitrust law will be vigorously enforced in the state sector without a major change in the political system.

169. TEMASEK, TEMASEK REVIEW 2012: EXTENDING PATHWAYS 45 (2012), *available at* http://www.temasekreview.com.sg/documents/TR2012_Eng.pdf. *Past reserves* are the excess of the Singaporean government's assets over its liabilities, not counting those

tors, with the concurrence of the President, and a majority of the board is comprised of nonexecutive directors, who are all businesspeople, currently including one foreign businessman. No government officials serve on the board, although the CEO and Executive Director of Temasek is the wife of the Prime Minister.[170] Publicly, Temasek claims to exercise only the rights of an investor and to leave management of its portfolio companies to their respective boards of directors.[171] But Temasek maintains strong ties to the ruling People's Action Party, which has presided over the country's economic development.[172]

A reorientation of SASAC toward the Temasek model would require a relaxation of party involvement in key managerial appointments and further devolution of control over the national champions to outside investors and independent directors. It might improve the transparency and rule of law quality of China's state capitalism by reducing party-state involvement in management of the SOEs.[173]

### 3. *Great reversal?*

China's encompassing coalition of managerial elites has thus far agreed on financial repression. The financial system serves the interests of the national champions quite well, even if it serves private firms very poorly.[174] But history shows that countries can undergo dramatic reversals in financial structure based on shifting political alignments.[175] As Raghuram Rajan and Luigi Zingales have shown, over the twentieth century, such reversals often led to repression of the financial system: incumbents blocked reforms that would have provided

---

accumulated during the current government. Valerie Chew, *National Reserves (Net Assets)*, SING. INFOPEDIA (2009), http://infopedia.nl.sg/articles/SIP_1487_2009-03-17.html.

170. TEMASEK, *supra* note 169, at 44, 48, 52, 53; *see* Sara Webb, *Temasek's Chief, Ho Ching, Likes to Take Risks*, N.Y. TIMES (July 27, 2007), http://www.nytimes.com/2007/07/27/business/worldbusiness/27iht-temasek.1.6862331.html.

171. *See, e.g.*, TEMASEK, *supra* note 169, at 46.

172. *See, e.g.*, DIANE K. MAUZY & R.S. MILNE, SINGAPORE POLITICS UNDER THE PEOPLE'S ACTION PARTY 28-30, 71-77 (2002) (discussing Temasek in connection with "government-linked companies" and the ruling party in Singapore).

173. In a similar vein, a recent high-level report suggests that SASAC should "confine itself to policy making and oversight, leaving asset management" to professional, market-oriented "[state asset management companies] . . . adher[ing] to international standards for transparency." *See* WORLD BANK & DEV. RESEARCH CTR. OF THE ST. COUNCIL, PEOPLE'S REPUBLIC OF CHINA, CHINA 2030: BUILDING A MODERN, HARMONIOUS, AND CREATIVE HIGH-INCOME SOCIETY 119 (conference ed. 2012) (unedited supporting report).

174. *See, e.g.*, Michael A. Witt & Gordon Redding, *China: Authoritarian Capitalism*, in THE OXFORD HANDBOOK OF ASIAN BUSINESS SYSTEMS (Michael A. Witt & Gordon Redding eds., forthcoming 2013) (manuscript at 5-6), *available at* http://ssrn.com/abstract=2171651 (contrasting the Chinese financial system's supply of capital to SOEs and to private firms).

175. *See* Raghuram G. Rajan & Luigi Zingales, *The Great Reversals: The Politics of Financial Development in the Twentieth Century*, 69 J. FIN. ECON. 5, 21 (2003).

*STANFORD LAW REVIEW* [Vol. 65:697

access to finance for potential competitors.[176] But the reversals did not always go in one direction. As Rajan and Zingales point out, in Japan the government brought the financial system under its control in wartime to the great benefit of large Japanese banks for much of the postwar period. But the system broke down in the 1980s as quality firms deserted the highly regulated domestic financial sector in favor of the international financial markets.[177]

To date, relatively little attention has been paid to the Chinese financial system's potential effect on corporate structures and governance. Might some managers of the national champions seek greater financial autonomy from the state-owned banks, particularly if accumulated nonperforming loan problems and misallocation of capital by the banking sector lead to more arm's-length lending relationships with SOEs? (This was essentially the spark for Japan's great reversal in the 1990s.) Might innovative private companies, which often list on foreign stock exchanges due to restrictions in the domestic equity market, generate pressure on Chinese regulators to liberalize the capital markets in ways that diminish the role of the banks? Alternatively, will growing equity links between nationally important SOEs and state-owned banks cement the existing coalition in favor of financial repression? Any of these potential developments in the financial sector could have profound consequences for Chinese state capitalism. Of course, history suggests that a crash or other unexpected shock may also intervene, precipitating a realignment of the coalition or triggering reforms that fundamentally change the orientation of the Chinese system of corporate finance and governance.[178]

### 4. *Dis-integration of the national-champion groups?*

Recent scholarship has highlighted the way rapid technological change has led to corporate "vertical dis-integration." Where a single firm cannot maintain state-of-the-art capacity in all of the technologies required to produce advanced products, contract-based interfirm collaboration may emerge as an alternative to vertical integration.[179] This phenomenon has interesting potential implications for the Chinese national-champion groups. As currently constructed, the groups are vertically integrated, although as we have shown, the groups appear to achieve the benefits of collaborative production through contractual and ownership-based alliances.

---

176. *Id.* at 7.

177. *Id.* at 39-41.

178. This was essentially Korea's experience after the 1997 Asian financial crisis. Japan's economic problems, which started with weaknesses in the banking sector, are also potentially instructive for China. *See* Michael Schuman, *Is China Facing a Japanese Future?*, TIME (Feb. 14, 2011), http://business.time.com/2011/02/14/is-china-facing-a-japanese-future (exploring both the Korean and Japanese examples).

179. Ronald J. Gilson et al., *Contracting for Innovation: Vertical Disintegration and Interfirm Collaboration*, 109 COLUM. L. REV. 431, 436-43 (2009).

The future structure of national-champion capitalism may depend on how well the current networks of Chinese state-linked firms, including their international collaborations, promote innovation and diffusion of knowledge. Can the state sector, as currently configured, generate state-of-the-art technology in all the domains required to produce globally competitive products and to move out along the technological frontier in the face of rising domestic labor costs? Changes in interfirm governance structures driven by global business imperatives could produce new firm-level structures and interfirm collaborations that disrupt the current networked hierarchy and strain the bridges between business leaders and their party-state overseers. Cross-border collaborations may be particularly potent devices for change in this regard.

### C. *Implications for the U.S. Legal System*

Contemporary reality is that Chinese SOEs are major actors in the global economy, important potential sources of foreign direct investment in the United States, and formidable competitors of U.S. firms and others around the world. This raises a basic question for U.S. legislators and other policymakers worldwide: do existing laws regulating market activity adequately contemplate an economy in which state-owned or state-controlled enterprises are major players?

In some specific areas of U.S. law, measures have been taken to address the issue. For example, the Department of Justice, with judicial support, takes the position that under the Foreign Corrupt Practices Act, a bribe to an employee of an SOE is an improper payment to a foreign government official.[180] And in a recent amendment to the U.S. foreign investment screening regime known as the Committee on Foreign Investment in the United States (CFIUS) process, Congress resolved several possible areas of ambiguity with respect to acquisitions of U.S. corporations by government-controlled enterprises.[181]

In other important areas, however, it may be necessary to reexamine the adequacy of the current legal regime in the face of Chinese SOE market activity. Without attempting to provide an exhaustive list, we offer three examples of possible gaps or uncertainties in important economic regulatory schemes: First, does the federal securities law disclosure regime provide investors with a complete and accurate picture of the ownership and governance of Chinese SOEs? This question is important both when the shares of a Chinese SOE are listed on a U.S. exchange and when a Chinese SOE acquires shares of a U.S. publicly listed company. Problems with Chinese firms listed on U.S. securities markets

---

180. *See, e.g.*, United States v. Aguilar, 783 F. Supp. 2d 1108, 1109-10 (C.D. Cal. 2011).

181. *See, e.g.*, Foreign Investment and National Security Act of 2007, Pub. L. No. 110-49, § 2, 121 Stat. 246, 246-52 (codified at 50 U.S.C. app. § 2170 (2011)) (requiring an automatic forty-five-day investigation of an acquisition of a U.S. firm by a "foreign government or an entity controlled by or acting on behalf of a foreign government").

*STANFORD LAW REVIEW*                    [Vol. 65:697

through the so-called "reverse merger" process have generated significant skepticism about the quality of auditing practices and the accuracy of public disclosures of Chinese firms accessing the U.S. capital markets.[182] While reverse mergers have not been the listing method used by Chinese SOEs, these problems do highlight potential inadequacies in the U.S. listing and disclosure regimes vis-à-vis Chinese issuers. With respect to securities investments in U.S. firms, the Williams Act[183] disclosure regime should be reexamined to ensure that it is adequately designed to reveal all material information about a foreign state-owned or state-controlled shareholder, particularly when the shareholder may be investing in concert with other entities under ultimate control of the state.

Second, is the antitrust regime equipped to accurately assess the competitive effects of SOE behavior in U.S. markets? What is the relevant unit of analysis in considering market effects of SOE conduct—a specific firm, the business group to which that firm belongs, or a number of groups under common control of a state shareholder? The European Commission appears to have adopted a sensible approach to this issue. In two recent cases involving Chinese SOEs, the Commission "delved deeply into [the] SOE's relationship with the wider Chinese State."[184] In those cases, the Commission took the position that since the SOEs are owned by the Chinese state, it is necessary to assess whether the SOE is an independent entity or whether it belongs to a larger group, including other enterprises over which the state exercises decisive influence.[185]

Third, what is the proper scope of investment treaties to which the United States is a party? Bilateral investment treaties (BITs) generally provide for investor-state, but not state-state, dispute resolution. When an investment is made by a state-owned or state-controlled enterprise, should that entity be characterized as an "investor" for purposes of the treaty, such that a dispute relating to the investment falls within the scope of the BIT's procedures? Or is the dispute more properly characterized as state-state and thus outside the scope of the BIT?[186]

As these brief examples illustrate, given the increasing interactions of Chinese SOEs in the global economy, evaluating the adequacy of U.S. laws regu-

---

182. *See, e.g.*, Dinny McMahon & Andrew Ackerman, *SEC Wrestles with China: Deloitte Case Highlights Agency's Frustration with Beijing*, WALL ST. J. (Sept. 10, 2011), http://online.wsj.com/article/SB10001424053111904103404576560320138101738.html.

183. 15 U.S.C. §§ 78*l*, 78m, 78n (2011).

184. Herbert Smith LLP, *Chinese State-Owned Enterprises Under the Microscope: Increased Antitrust Scrutiny by the EU and Chinese Authorities*, COMPETITION REG. & TRADE E-BULL. (Oct. 3, 2011), http://www.herbertsmithfreehills.com/-/media/HS/L-031011-5.pdf.

185. China National Bluestar/Elkem, *supra* note 108; Commission Decision (EC), DSM/Sinochem/JV, Case No. COMP/M.6113, 2011 O.J. (C 177) 1 (May 19, 2011).

186. For analysis of this issue, see Mark Feldman, *The Standing of State-Owned Entities Under Investment Treaties*, *in* YEARBOOK ON INTERNATIONAL INVESTMENT LAW AND POLICY 2010-2011, at 615, 615-17 (Karl P. Sauvant ed., 2012).

lating market activity by state-owned or state-controlled enterprises requires a deeply contextualized understanding of the organizational structure of Chinese business groups and their relationship to the wider Chinese state.

CONCLUSION

In this Article, we have tried to begin unpacking the black box of "state capitalism" in China by examining business group ownership structures within the national state-owned enterprises and exposing the mechanisms connecting the national champions to organs of the party-state. Shifting the focus from agency problems in individual listed firms to networks of firms enmeshed in the party-state advances several important objectives. It provides a richer understanding of China's state sector and the architecture supporting a central component of the state's economic development model. It brings the corporate dimension of China's developmental experience to bear on important recent debates in scholarly literature. It provides new perspectives on China's future path of institutional development. And it raises significant questions about the adequacy of U.S. regulatory structures in addressing investment and other market activity by Chinese SOEs, a newly important type of global economic actor.

This early effort to understand the contours of industrial organization in the Chinese SOE sector raises many big questions. To identify just a few: Is the large and growing role of SOEs crowding out private enterprises to the long-term detriment of entrepreneurship, innovation, and efficient capital allocation in the Chinese economy? How are corporate governance dynamics in key areas such as managerial incentives, internal controls, and capital-market discipline affected by extensive government and party penetration of SOEs? How is Chinese institutional development affected by the close connections between SOEs and the regulatory apparatus of the party-state?

While this Article does not attempt to fully answer these important questions, understanding the organizational structure of Chinese SOEs and their links to the party-state is an essential first step in analyzing these issues. In that respect, we hope our project has provided a foundation for future research on this pivotal feature of China's contemporary political economy.

*STANFORD LAW REVIEW*