

# Assessing China's Economic Reform Agenda

Even with New Reform Efforts, The State, Not Market, Still Poised to Drive China's Economy



SOURCE: AP/Andy Wong

A worker climbs up a crane at a construction site near a Chinese government billboard with the words "China Dream" in Beijing, China.

By Adam Hersh | Thursday, May 1, 2014

MTD Exhibit #9

Last year's announcements of a new Shanghai Pilot Free Trade Zone and a new economic governing agenda at the Communist Party's Third Plenum under President Xi Jinping and Premier Li Keqiang offered hope of a new direction in China's economic reform. This Third Plenum decision document promised to clean up the problems widely associated with ongoing state involvement in and control over China's economy, including inefficient subsidies to state-owned enterprises, or SOEs; control and ownership of the financial system; price interventions that skew incentives and distort

not just China's markets but global markets as well; and the rampant and related problems of environmental degradation and corruption.

Many in China and around the world applauded the Chinese leadership's overture to reform, which China proclaimed would establish a "decisive role for the market" in its economy. The positive response came even as China simultaneously pledged to uphold and strengthen the economic role of the state in the Third Plenum decision, as the reform nonetheless signaled a landmark shift in the direction of China's fundamental economic institutions away from what the world has seen up to this point.

But while China watchers focus on the optimistic vision imbued in the reform agenda, more substantive questions remain: How will China's reforms affect its nonmarket economic structure and, in turn, the commercial landscape for the United States and the rest of the global economic community? Can China's leaders overcome the political and structural barriers that stand in reform's way?

When China acceded to the World Trade Organization, or WTO, in December 2001, it did so after all members of the world trading community agreed that, as a transitioning economy, China still operated on nonmarket principles. Because of its prevalent anti-competitive industrial policies and the contradictions between state control and market mechanisms built into its fundamental economic institutions, China's economy could skew the commercial competitive environment for the entire global economy. As a result, the agreement provided member countries a means to take into account China's nonmarket economy status for the purposes of monitoring and enforcing trade rules set under the WTO and other international agreements.

In addition to the benefits of greater market access to the WTO community and the ability to press their own grievances through the WTO dispute settlement mechanism, China got the opportunity to gradually phase in many of its market opening commitments to tariff and non-tariff barriers and investment restrictions. China was also able to keep in place many of its nonmarket institutions and policy levers. The mutual expectation upon the agreement's negotiation held that, over time, China's deepening commercial engagements with the global economy would nudge business practices toward international norms of competitive neutrality—perhaps even ahead of the phase-in schedule of commitments.

China grew rapidly following its WTO entry, quickly becoming the world's second-largest economy and the largest trading nation, both as it developed its indigenous capacity and as many multinational investors relocated production to China's shores. Although investment, exports, and growth surged, China's economic development moved increasingly in a state-centered direction. In the words of China scholar Minxin Pei, "China's reform died in the [2000s], following the country's entry into the World Trade Organization (so much for the prognostication that WTO accession would spur reform)." The increasing non-marketization of China's economy was so universally obvious that native Chinese speakers developed a token expression: guo jin min tui, which means, "the state advances while the private sector retreats.

President Xi and Premier Li's agenda is ambitious, to say the least, and change is difficult in the world's most populous country and second-largest and fastest-growing economy—even given that leaders are shooting for a target date of 2020 to launch all of the envisioned reforms. But questions remain about what specific reforms underway actually mean, how they will change China's domestic economy, and in what ways they will affect the way Chinese producers compete on the global playing field.

This issue brief examines key documents from the Communist Party's Third Plenum program, reform pronouncements in government bulletins, and work progress reports to assess how reforms will affect the way China's economy works. The brief focuses specifically on several key aspects relevant to the ways in which China's nonmarket economic structure affects the global commercial environment and assesses whether planned reforms will meet the standards of China's partners in the global economy:

- The Communist Party, state ownership, and transactional relationships that drive China's economy
- Market-access barriers and investment restrictions that deter imports and open investment into China's domestic economy to support developing and diversifying into advanced domestic industries
- Financial reform and China's "going out" strategy, which aims to invest Chinese capital abroad and to propel Chinese brands and companies to global prominence

On many fronts, China's reform agenda is taking the right steps forward. But even if reforms are implemented fully sometime after 2020 or by the time President Xi and Premier Li hand over the mantle at the end of their 10-year terms, these reforms seem unlikely to fundamentally change the institutional foundations of China's economy. Specifically, reforms will do little to change the state's broad involvement in ownership, finance, and authority over key decisions and prices in China's economy.

## Party, state ownership, and transactional relationships

Understanding how China's economy works necessitates an in-depth look at how its political system works, as well as at the intertwining political and personal relationships that permeate China's economy. Even as China's economic institutions have evolved away from centralized economic planning since 1978, the political institutions that govern China's economy endure and have calcified. Governance in China begins with the Communist Party, which exists above the authority of the state and rules with an unchecked monopoly on power. The state institutions administer the party's rule and provide a veil for one-party control.

Economic reforms since 1978 have transformed China's economic landscape in ways that would have been unimaginable to the prior generation's leaders; these changes yielded an unprecedented streak of economic development never before seen in human history. From an economic perspective, what matters most for how China's economy works is who holds control over the nation's economic resources and what incentives

and constraints they face in making basic economic decisions—namely, where and in what to invest. But reforms underway do little to change the existing system of extensive state involvement in direct and indirect control over China's economy.

### Social structure of China's state ownership and economic governance

The formal institutions that comprise China's governance structure can often mask the underlying dynamics of political power. The reach of the party's organization into China's economic life is extensive, including household decisions on reproduction and where people can live, work, and go to school; where and what investments can be made; and party work committees and the management and boards of state-owned and private enterprises. The party also has control over setting prices for key economic inputs such as energy, as well as intermediate manufactured and other inputs in industries deemed strategic for the national economy, such as finance, steel, chemicals, renewable energy, and the nearly 24 other "commanding heights" industries China views as essential to its national economic security.

The Third Plenum decision and subsequent leader statements called for SOEs to be opened to more mixed ownership—allowing private capital to take minority stakes through strategic partnerships in protected SOEs. For example, Sinopec—China's oil, gas, and chemicals giant—plans to offer up to 30 percent of its retail oil business to outside investors. However, this model has been seen before with respect to ownership restrictions on investment in China's state-owned commercial banks as part of its WTO accession commitments. Although Chinese banks attracted strategic foreign bank investors and scored world-record-setting initial public offerings, one cannot conclude that such minority ownership stakes marketized China's financial institutions.

Both the extent of state ownership and the means for delivering preferential treatment to favored businesses are becoming increasingly obscured by policies that have transformed enterprises into corporate structures. These reorganized corporations assume many of the trappings of a modern global business, often including publicly traded shares and corporate boards with ostensibly independent external directors.

But function does not necessarily follow form. In practice, these firms operate under quite different decision-making mechanisms, through official capacities or otherwise, than do comparable firms in the United States or other advanced economies. Namely, they operate under the authority of Chinese officials who may be acting as regulators and policymakers in industries in which they simultaneously hold ownership or indirect economic interests.

Shareholders do not select the top managers and members of boards of directors of China's major and minor corporations; this duty falls to the Communist Party and its working groups established within most state-owned and many privately owned firms. Senior managers and directors often hold positions of power simultaneously in government institutions, within the party, and on boards of related enterprises. Senior managers of central SOEs—the 117 enterprises controlled by China's State-owned

Asset Supervision and Administration Commission, commonly referred to as SASAC—hold the equivalent of senior minister-level status in China's political system and run some of the world's largest corporations.

What's more, scholars have identified a system of institutional bridging through which the related personnel departments rotate individuals between industry, government, and party posts to coordinate activities and strategy across discrete organizations. In 2007, for example, senior executives of China Mobile, China Telecom, China Netcom, and China Unicom all rotated positions between these firms.

Such social structures create an interlocking web of relationships that drive decision making in China's economy. These relationships, referred to as guanxi, involve cultivating and trading social capital—chits earned for favors provided to other individuals in the social network. In a hierarchical social structure such as China's one-party-led state, guanxi is the necessary social capital for people to get ahead in their careers and family lives. China's economy is built upon such transactional relationships.

A recent editorial in *Caixin* magazine—which, in many ways, is *The Economist* of China—observed:

Nowadays, many state firms are undertaking shareholding reforms, and many have become listed companies. However, since state shareholders have absolute control of these firms, there has been no marked improvement in their governance structure.

The move toward corporate restructuring is driven as much by policy imperatives for enterprises to support Chinese investment and brand expansion into the global economy as it is by the opportunity for substantial personal enrichment of an SOE's senior managers, their friends, and their families through privileged share grants and access to initial public offerings.

A decisive role for the market requires more than converting SOEs into publicly traded corporations. A shareholding structure does not automatically implant market-oriented norms of behavior in these firms; it merely privatizes part of the assets and income while preserving the structure of relational transactions in the economy. But even where public listings sell shares to private investors, Chinese laws and regulations constrain the control that shareholders can exercise over management. This is a somewhat moot point because only non-controlling minorities of shares are ever in play in China's stock markets. As a result, the market can do little to weigh in when it comes to choosing firm managers and boards of directors—positions appointed by party personnel systems. Thus, senior managers of state-involved firms are insulated from the possibility that independent investors could threaten state control.

Even if governance institutions change, the thread of party influence will still run throughout China's economy as members continue to occupy key positions in the party, government, and business hierarchies—often at the same time. The relational linkages between key personnel rotating through China's productive enterprises and political

institutions provide a strong inertial force against changing the rules of the game by which local officials' authority and autonomy creates the opportunities to deliver support and protection to favored firms. This is not purely back scratching. Officials are engaged a fierce competition to advance based on successful management of affairs under their domain. Thus, local officials face incentives to push economic development at full speed irrespective of what central government leaders may want.

The rigidity of the power structure governing China's economy can be seen in the existence of corporate-governance insiders and outsiders even among China's state-owned institutions. In a series of ventures beginning in 2007, state-owned China Railway Investment Company co-invested with two outside partners—the National Social Security Fund, the state's social insurance fund, and Ping An Asset Management Company, a major domestic financial services firm. These ventures soured and ultimately dissolved when the two outside partners tired of having no say in company policies. Because the state still owns the vast majority of shares, outside investors—especially private ones—will always have difficulty exercising their voice over company policy.

The critical question here is whether Chinese leaders view private investment as a tool for use by state firms or as something that can foster diverse forms of ownership and help solve China's employment, environmental, and innovation challenges. The jury is still out. But one significant indicator is China's recent increased application of the 2006 Anti-Monopoly Law, from which state-sanctioned monopolies and SOE-dominated sectors enjoy exemptions. The law shows that enforcement bodies have wide discretion in the law's application, which allows officials to support locally favored firms by pursuing anti-trust actions against their competitors.

## Reforms devolve economic authority to special interest groups

China scholar Pei describes China's system of political economy as a "sprawling political patronage system filled with self-interested individuals eager to cash in [on] their political investments." As a result, Pei concludes that "the CCP's political objective of reform is fundamentally incompatible with a market economy." Pei's observation is particularly true at the level of local governments, which have vested interest in maintaining China's status quo. At this level, economic reforms seek to devolve a lot of authority over regulatory and administrative decision making in both industrial and commercial affairs.

Local government's significance in China's economic boom is often not appreciated enough. Measured by assets, output, or exports, China's local-government-controlled enterprises are much more extensive than the 117 enterprises and subsidiaries SASAC manages for the central government. Often in joint ventures with foreign partners, local enterprises comprise a significant share of China's total exports and manufacturing output. Research shows that local government support for increasingly advanced industrial development was the strongest determinant of export development in China's regional economies in the late 1990s and 2000s. These firms attained levels of

efficiency comparable to that in private and foreign-owned firms operating in China before a spate of corporate governance restructurings transformed most of them into hybrid state-private ownership firms.

The capacity of local officials to conjure and direct resources for economic development is underscored by the massive off-balance-sheet debts borrowed through "local finance platforms," which finance infrastructure and real estate construction, industrial development, and other technological initiatives that strive to create local champion companies. This drive to invest reflects the competition among local officials to race their region to the head of the pack in development performance. This spontaneous expansion of financial leverage concurred with China's domestic stimulus in response to the 2007–2009 global financial crisis, and at last count, total local government debt stood at 17.9 trillion yuan, or nearly $3 trillion at current exchange rates.

Local governments also dominate China's warped corporate bond markets—where local government-invested firms account for the more than 90 percent of capital raised. What's more, this state-backed capital flows largely to areas typically thought to be China's most commercially advanced regions: Shanghai, Jiangsu, and Zhejiang accounted for 45 percent of all corporate bond borrowing in 2009, and Beijing, Tianjin, and Guangdong accounted for another 21 percent.

Reforms currently underway aim to devolve authority for key regulatory and administrative decisions that are essential to whether China creates competitive neutrality among firms of different ownership classifications away from the central government to local governments. In March, Premier Li delivered a "Report on the Work of Government," announcing that 416 items for regulation previously subject to state council review and approval had been removed or delegated to lower levels of government in the past year. A further 200 items are slated to be removed or delegated in the remainder of 2014.

Decentralizing reforms are setting up the fox to guard the hen house, giving enterprising local government officials across China the authority to make decisions on investment approvals and regulatory and administrative matters. This means that local officials will gain powers of regulatory discretion, even as they retain their financial means to cultivate infant industries into champions. This leads to a result that contradicts the Third Plenum decision's declared goal to "tidy up and arrange all sorts of regulations and methods that impede national unified markets and fair competition," with real punishment for those extending preferential policies, local protection, monopolies, and unfair competition.

While it is understandably useful for official rhetoric to highlight reducing the number of regulations in effect, in practice, the regulatory count is irrelevant because the same regulatory requirements are often reconsolidated within other programs instead of functionally removed, according to participants in recent survey research. These participants included a range of public affairs professionals, public officials, and

business leaders in China.

## Internal party reform

Reform leaders are keenly aware of the principal-agent problem that China must overcome in order to elicit actions from local governments in accordance with the will of the central government—a challenge all of China's rulers have historically faced. It is possible, but unlikely, that proposed internal party reforms—those affecting the party discipline committees and the metrics and incentives used to evaluate performance in the party personnel system—could solve this problem, which is a necessary condition for much of China's overall economic reform effort to succeed.

First, the Third Plenum decision indicates a reform to the party discipline system. At present, matters of party discipline—including violations of the party's code of conduct, which is independent from China's public legal system—are handled at the same level of government as the position under investigation. This creates what is basically self-policing, or peer monitoring where all the peers are on the same payroll. But reforms to the party discipline system will make officials at one level of government responsible for investigating and upholding party discipline on the level below—from the village level all the way to the top of the pyramid.

This change is being pursued, in part, through a national anti-corruption campaign intended to intimidate potential resistance and to consolidate power in support of President Xi and Premier Li's reform agenda. This campaign already felled a number of high-profile officials, including senior executives at China's National Petroleum Corporation, or CNPC; high-ranking military officials; and the usual dissidents. It is unclear, however, whether this current round of purges differs significantly from those that occurred following previous power transitions in China.

Official and unofficial corruption is rampant in China among those with opportunities to trade access to the state economic levers for economic and political rewards. So far, however, the anti-corruption campaign seems to have only skimmed the surface. Privileges for foreign travel and official cars are being more tightly controlled, but the most visible face of this anti-corruption campaign seems to be the dictate that official meals consist of no more than "four dishes and one soup," rather than the more luxurious meals for which many officials seem to have grown a sense of entitlement.

The spectacles of public self-criticisms broadcasts on China Central Television are certainly chilling for many across China, and the message to get in line is clear. But this anti-corruption campaign will at some point, probably in the not-too-distant future, draw to a conclusion well short of tackling China's corruption problems. These problems are systemic, as demonstrated by recent journalistic reports on the offshore wealth holdings of 22,000 clients registered in Hong Kong or mainland China that include relatives of many senior officials—even relatives of President Xi.

These 22,000 clients represent accounts from just two financial services companies, operating in Singapore and the British Virgin Islands, whose data were leaked to

reporters in 2013. These accounts offer just a glimpse into the overall accumulation and offshore transfers of assets from China; they also highlight the clients' connections to those in the top echelons of party power.

Second, the Third Plenum decision noted that economic officials are evaluated for career advancement on performance criteria including maximizing economic growth and minimizing social discord, which causes policies to focus on short-term growth over all other concerns. The decision, however, established a broader set of criteria on which officials' performance will be evaluated in the party personnel system. New metrics will go beyond economic growth and social control to include metrics for environmental outcomes, innovation achievements, debt management, and the limiting of speculative and wasteful over-investment.

It is not clear how adding further criteria to officials' evaluation checklists will alter their cost-benefit analyses of which priorities to pursue and with what methods to pursue them. In reality, this group of criteria is comprised of a fuzzy set of objectives, some of which are complementary and some of which are contradictory. Amid this ambiguity, and in places where personal objectives may not align with public objectives, the reform to broaden priorities for local officials should have little impact on policy choices to pursue development and support favored domestic firms.

### Summation

The answer to the questions of who controls what in China's economy and with what goals and constraints they control it is that the same people, with most of the same policy levers and facing the same set of incentives, will still sit in positions that allow them to control China's productive and financial resources, even if the Third Plenum reform agenda is fully implemented as envisioned by 2020. Linkages across the collection of governance and productive institutions that make up China's economy will continue to be built on connections through formal and informal networks of social relations that allow coordination of activities across discrete institutions.

The previous section described the bottom-up structure of state ownership and party control pervading much of China's economy. Policymakers have combined the microeconomic foundation of China's nonmarket economy with top-down policies to create a favorable macroeconomic environment for industrial development, including through engineering an undervalued exchange rate; setting the price of capital and other inputs for production; coordinating relationships between firms; and restricting access to the domestic market for goods, services, and investments.

# Market access and investment restrictions

Today's economic reality is that much of the world's economic growth is much more dispersed and increasingly happening outside of the advanced economies. In order for global companies to grow, they must be able to expand where the growth is, and a big block of this growth is in China and other fast-growing, developing countries.

In 1995, the year before China gained permanent normal trade relations status, the United States accounted for 23 percent of global economic output, and China accounted for less than 6 percent. By 2013, however, the U.S. share had shrunk to less than 19 percent, and China's share of world output had expanded nearly threefold, to almost 16 percent. In fact, by 2013, the group of advanced economies accounted for less than half of world output for the first time since the International Monetary Fund began collecting such data, and emerging and developing Asian countries accounted for another one-quarter of the world total.

Companies need to grow in China, among other developing Asian economies, to survive in a globally competitive environment. However, many of these countries also practice industrial policies that restrict access to their domestic markets for goods and services and use investment restrictions to promote the competitiveness of domestic industry and domestic technological innovation. Individual business's imperative to grow endows China's developmental state with powerful leverage in setting the terms for entering China's economy. This advantage is harnessed through China's Shanghai Pilot Free Trade Zone policy, or SFTZ.

The SFTZ, similar to other aspects of China's national economic strategy, aims to draw broader, deeper, higher value-added investments in innovation and industrial development to its shores. Restricted market access due to tariff and non-tariff barriers protecting China's domestic economy means that foreign businesses must invest directly in China—and often must share core technological assets with local partners—in order to take advantage of the country's domestic growth opportunities. However, investment in China is restricted, and China's market-access policies enable officials to set take-it-or-leave-it terms for private-sector and foreign investment in the Chinese economy.

Since 1995, a positive list detailing the areas in which investment is encouraged, restricted, or prohibited for non-state and foreign investors governed China's investment restriction regime. The most current list went into effect at the beginning of 2012, and in many ways, it illustrates the technological limitations of China's economic production possibilities. The list itemizes in great detail which industries are protected as strategic industries, the industries in which Chinese policymakers want to deepen the development of technological and manufacturing capabilities, and industries where policymakers see little risk of upsetting state economic control. The latter areas represent primarily low-tech manufacturing and non-tradable social services, such as health and education, which help China's economy develop human capital for longer-term, supply-side growth.

The Third Plenum decision called for China to shift from this positive-list approach to a negative-list approach—a regulation specifying only areas where investment is not allowed, rather than where it is allowed. This list not only limits the scope of industries but also limits the share of ownership that is open to private and foreign investors. In most industries, non-state ownership is restricted to less than 50 percent. In order to enter the market, outside investors must take a minority stake and put valuable product

and process technologies into the bargain.

The shift to a negative list is currently being tested out in China's SFTZ, along with a number of other related reforms to streamline and bring certainty to inward foreign direct investment. In theory, the negative-list approach could help level the playing field for investors of all stripes, establishing the principle of national treatment to preclude discriminatory practices in the commercial marketplace. National treatment is the notion that all companies and investors should receive equivalent regulatory and administrative treatment regardless of their nationalities. In practice, however, the list merely replicates a mirror image of the existing positive-list investment catalog in negative-list form.

There is the prospect that the extensive negative list—which is more than 190 items long—may be culled at some time in the future when policymakers feel comfortable with the direction of reform, or policymakers may instead decide to add items to it. As it stands now, the negative-list approach in China's SFTZ is really no different than the regime of restricted investment market access that China enforces outside of the zone. Firms that choose to invest in the zone will enjoy a number of complementary reforms to incentivize investment. Examples of such additional reforms include speeding up administrative decisions to permit investments and lowering the amount of "paid-in" capital, which is essentially a deposit with the government that is required to open a business. Investments not proscribed by the negative list would qualify for a similar process of approval through filing relevant documentation on a predictable and expedited basis, but investment will still be subject to an approval process—only quicker than before.

Filing requirements for business investment coming into the SFTZ will become more transparent and less onerous, although these entities will still be subject to all other relevant laws and regulations applying in the zone and elsewhere in China. And for the first time, foreign investors from Hong Kong, Macao, and Taiwan will be on equal footing with those from other foreign countries. Under Chinese law, companies originating from Hong Kong, Macao, and Taiwan enjoy investment access and tax privileges that go beyond those afforded to other non-Mainland investors.

All in all, the bargain does not appear to be especially enticing to foreign investors. In an early count two months after the zone's launch, the *Shanghai Daily* reported that only 24 foreign firms had registered in the new zone, but foreign investment continues to flow strongly into Shanghai. No further public announcements on the zone's progress have reported figures on the number of foreign businesses that have registered to take advantage of the zone's benefits.

In many respects, both the foreign investment catalog and the SFTZ negative list reflect the boundaries of China's technological possibilities frontier. For example, the current foreign investment catalogue lists as encouraged areas alternative fuel cars, biotechnology, environmental and energy-saving technologies, alternative energy, advanced materials, new-generation information technology, and advanced technology

1/5/2016
Assessing China's Economic Reform Agenda | Center for American Progress
Case 2:09-md-02047-EEF-MBN   Document 21641-10   Filed 08/06/18   Page 12 of 17

manufacturing equipment—all of which were identified as new strategic industries in China's 2012 Five Year Plan for the national economy.

As long as this regime of market access and investment restrictions in China remains in place, competitors in the global marketplace will be at a disadvantage when selling and investing in China's economy, as well as in competing with Chinese producers both in home and in third-party markets across the globe.

## Financial reform and China's 'going out' strategy

One of the most important and sensitive areas for reform is China's state-dominated financial system. This section considers how proposed reforms will affect control of China's financial system, as well as both the inward flow of investment into China and the outward flow of investment as China pushes forward with its "going out" strategy. With this strategy, China hopes to propel its offshore direct investment and to establish its brands and companies as fixtures in the global marketplace.

Not only does the Chinese state directly own the vast majority of the country's financial institutions—its banks, brokerages, insurance, and investment firms—but it is also the largest actor in China's financial markets, owning a controlling majority of corporate shares in publicly listed companies and dominating origination and trading of financial assets in bonds, derivatives, and foreign exchange markets.

Many of the nonmarket distortions pervasive in China's financial system are baked into the cake by the extent of state involvement in financial institutions and its control over nonfinancial corporations. That is to say, financial markets in China cannot operate like financial markets in other developed economies in:

- Pricing and allocating capital based on economic risk assessments
- Providing a market for corporate control and a price signal to guide firm managers' performance
- Providing an opportunity to participate in control over firms, including governance and ownership decisions
- Paying income shares to firm owners

The state institutions that control China's financial system preclude the functioning of market-based mechanisms that are seen to serve these roles in other non-state-driven advanced and developing economies. Economist Hyman Minksy argued for understanding the financial system as an interlocking web of financial claims and contracts for income payments between firms. In China's case, these are not financial relationships between two parties at arms length, but rather separate transaction entries on a larger balance sheet of one party—the overall government. In other words, it is not possible for market forces to set a price for capital when the state owns so much of the capital and conducts so much of the market trading.

For now, interest rates and the currency exchange rate remain policy-determined prices within China's financial structure. Reforms in these areas have moved at a cautious pace, limited to widening the bands around centrally determined benchmarks for lending and deposit interest rates and the exchange rate. When it comes to these two things, financial institutions have marginal discretion in the rates they can offer for various financial services. The depreciation of the renminbi-dollar exchange rate since the start of 2014, following years of slow-but-steady appreciation, shows that China's monetary authorities still hold strong control over setting the exchange rate to use in pursuit policy goals—whether it be to deter financial speculation or to adjust the exchange rate up or down as suits macroeconomic policy needs.

The narrow opening under consideration with the current reform agenda outlined in the Third Plenum and currently being tested in the Shanghai Pilot Free Trade Zone is unlikely to overcome structural barriers to reform presented by China's existing nonmarket financial system. Finance will remain a strategic industry for China given its central role in allocating capital for investment, thereby determining where growth occurs and the quality of that development. The Third Plenum decision and steps taken in the SFTZ may open cracks in the vermillion wall of China's financial system, but they will not greatly disrupt this essential piece of China's overall economic development strategy.

At the same time, China's stunted financial development inhibits its ability to take the payment inflows from long-running trade surpluses and recycle them back into the world economy. As a result, those surpluses have accumulated, in large part, to the tune of the $4 trillion in official foreign exchange reserves invested primarily in low-yielding U.S. Treasury bonds or absorbed into China's domestic monetary base. This adds to inflation pressures and asset bubbles.

In order for China to adjust its unbalanced economy and to continue appreciating its exchange rate, some of that money now needs to flow back out into the rest of the world. As a shrewd investor, China is also poised to diversify its portfolio from financial assets into real direct investments, to establish Chinese companies as globally recognized brands, and to wean its economy from its financial dependence on the U.S. dollar by deepening the offshore use of its own currency—all goals of China's "going out" strategy.

### Market access for financial services

A number of key financial liberalization reforms reserve crucial elements for only domestically funded financial institutions in China—including the ability to open non-bank finance institutions such as group finance companies, automobile loans and other consumer financial services, leasing services, and financial trust and asset management companies. While foreign-owned and foreign-invested banks will be invited to participate in financial transactions within the SFTZ, the opportunity to be established as a "qualified financial institution" under China's existing regulatory regime will remain unchanged.

Market entry of new private banks in the SFTZ will be limited to a choice of four test banking models: Internet-based microlending, corporate banking, private banking, and other unspecified activities. Regulations specify, however, that only Chinese nationals are allowed to found or to control a new private bank. Nonetheless, foreign financial institutions will have access to a broader range of commercial financial services within the zone, including commodity trade finance, supply chain finance, and cross-border investment and asset management services.

With the government set to implement greater capital account convertibility for the zone, foreign financial institutions will also gain the ability to trade more freely in China's state-dominated capital markets. Not only will capital be allowed to be brought in or taken out for financial transactions between an entity registered in the SFTZ or with an account registered there, but it could also be used to entice investment inflows through capital gains income tax subsidies for businesses and individuals registered in or working in the zone.

### Internationalization of the renminbi and outbound investment

As part of China's approach to macroeconomic rebalancing, the Third Plenum decision established the explicit economic goal of developing the offshore use of China's currency, beginning to internationalize the use of the renminbi and providing more open currency convertibility for financial transactions.

Currency convertibility for trade transactions—those on the so-called current account of the international balance of payments—was already relatively available in China, consistent with its commitments to the International Monetary Fund Articles of Agreement. Convertibility for transactions in the international financial account, however, has long been restricted by policies used to support the management of China's pegged exchange rate and to increase the bargaining power of domestic enterprises and joint venture partners that receive foreign investment inflows.

Much of how Chinese policymakers plan to approach the reform of capital convertibility, as well as the related issue of China's exchange rate management, remains unclear. Official policy documents strain to identify tangible reforms, often merely proclaiming that "the supervision and government service systems will be improved," without providing concrete direction or goals for functional outcomes.

Again, initial steps toward reform are being piloted in the SFTZ, and these reforms seem targeted more at facilitating outward capital flows than at opening China to international financial competition. Several SFTZ reforms seek to create financial volume in markets for renminbi-denominated assets. Reform directives focus on liberalizing the issuance of renminbi-denominated bonds in the SFTZ. This would entail opening opportunities for surplus capital to be raised in China and deployed to investment projects around the world

SFTZ reforms also prioritize the creation of a renminbi-denominated oil futures market that is open to foreign capital flows. This move is less significant for creating an

onshore market for pricing oil in China than it is for providing a mechanism for domestic firms to reduce the transaction costs for procuring oil from abroad. The latter allows for renminbi price hedging and increasing the demand for international renminbi usage.

The SFTZ will further enable banks in the zone to provide cross-border trade settlement denominated in renminbi. Although international use of the renminbi is small—it accounts for a mere 1.1 percent of international transactions, according to Bank for International Settlement data—in December 2013, the renminbi overtook the euro as the world's most used currency in trade settlement, the commercial banking service that guarantees payments and delivery of goods and services sold internationally.

Through the SFTZ, Chinese policymakers aim to increase openness to outbound capital flows for direct investment projects by taking a controlling ownership of real assets, as opposed to merely owning shares or other financial stakes in an investment. Reforms will streamline administrative measures for filing documents needed to move money out of China for such investment projects. Businesses registered in the zone, upon submitting the relevant documents for application, will receive an expedited approval or an explanation of rejection within five business days.

This provision carves out an array of broadly construed exceptions from expedited consideration. This includes investment projects in countries that China deems sensitive for security, as well as those in sensitive industries such as telecommunications, energy and water, and media; and countries sensitive for national sovereignty, security, or public interest reasons. In these cases, the central government's National Development and Reform Commission would ultimately decide whether the projects are approved.

### Summation

China's financial system remains underdeveloped and stunted as a result of its nonmarket foundations. Reforms are shifting the financial landscape in China, but they are not deviating significantly from the path of state ownership and control over most financial relationships in the economy. The reforms that are moving ahead are in the areas serving niche markets for financial services that are underserved at present; reducing business transaction costs for foreign investors in and exporters from China; and promoting greater international use of China's currency and facilitating outbound capital flows.

# Conclusion

China's new political leaders face a daunting list of social, political, and economic challenges as they attempt to advance an ambitious agenda for national reform. While an ambitious agenda, economically, the reforms underway and under consideration will fail to move the needle in a significant way toward a market-oriented economy where all firms can compete on even ground.

Although the reform agenda covers more policy areas than could be covered here in detail, this issue brief analyzed several key aspects relevant to the ways in which China's nonmarket economic structure impacts the global commercial environment:

- Party, state ownership, and transactional relationships
- Market access barriers and investment restrictions that deter imports and open investment into China's domestic economy to support development of and diversification into advanced domestic industries
- Financial reform and China's "going out" strategy

Reforms in these areas will not fundamentally change China's basic economic institutions and the way its economy works. Even if the Third Plenum and related reforms are implemented fully as announced, China's economy will still operate with broad state involvement in ownership, finance, and authority over key economic decisions and prices. Rather than establishing a "decisive role for the market," the Third Plenum decision has simply put a new gloss on what remains fundamentally a nonmarket economic system dominated by the party and the state.

*Adam S. Hersh is a Senior Economist at American Progress focusing on economic growth and inequality in the United States, China, and the global economy.*

**To speak with our experts on this topic, please contact:**

**Print:** Liz Bartolomeo (poverty, health care)
202.481.8151 or lbartolomeo@americanprogress.org

**Print:** Tom Caiazza (foreign policy, energy and environment, LGBT issues, gun-violence prevention)
202.481.7141 or tcaiazza@americanprogress.org

**Print:** Allison Preiss (economy, education)
202.478.6331 or apreiss@americanprogress.org

**Print:** Tanya Arditi (immigration, Progress 2050, race issues, demographics, criminal justice, Legal Progress)
202.741.6258 or tarditi@americanprogress.org

**Print:** Chelsea Kiene (women's issues, TalkPoverty.org, faith)
202.478.5328 or ckiene@americanprogress.org

**Print:** Benton Strong (Center for American Progress Action Fund)
202.481.8142 or bstrong@americanprogress.org

**Spanish-language and ethnic media:** Jennifer Molina
202.796.9706 or jmolina@americanprogress.org

**TV:** Rachel Rosen

202.483.2675 or rrosen@americanprogress.org

**Radio:** Chelsea Kiene

202.478.5328 or ckiene@americanprogress.org