**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
International Arbitration Tribunal

---

TANG ENERGY GROUP, LTD.,
SOARING WIND ENERGY, LLC,
JAN FAMILY INTERESTS, LTD.,
THE NOLAN GROUP, INC.,
KEITH P. YOUNG,
MITCHELL W. CARTER,

                                          Case No. 01-14-0001-4150

        Claimants,

    vs.

CATIC USA, INC., A/K/A AVIC INTERNATIONAL USA, INC.,
AVIC INTERNATIONAL HOLDING CORP.,
AVIATION INDUSTRY OF CHINA,
CHINA AVIATION INDUSTRY GENERAL AIRCRAFT CO., LTD.,
AVIC INTERNATIONAL RENEWABLE ENERGY CORP.,
ASCENDANT RENEWABLE ENERGY CORP.,
AVIC INTERNATIONAL TRADE & ECONOMIC DEVELOPMENT,
PAUL E. THOMPSON,

        Respondents.

---

## <u>FINAL AWARD</u>

---

<u>The Panel:</u>

Hon. Glen Ashworth, Joseph Byrne, Richard Capshaw,
Hon. Jeff Kaplan, Hon. John Marshall, Gregory Shamoun,
William Toles, Hon. Mark Whittington, and Steven Aldous.

MTD Exhibit #249

The panel of arbitrators[1] presided over the oral hearing of the above-referenced matter held in Dallas, Texas, on August 10-14, 2015.  The parties submitted post-oral-hearing briefs and proposed findings of fact and conclusions of law.  This Final Award includes findings of fact and conclusions of law as required by the contract between the parties,[2] and is based upon the testimony and documentary evidence presented by the parties at the hearing and the evidence submitted to the panel subsequent to the hearing.   The parties' objections to post-hearing evidentiary submissions are overruled.  The panel will consider all evidence submitted and give the evidence the weight the panel deems appropriate as required by Section R-34(b) of the AAA Commercial Arbitration Rules.  Having received and considered only the appropriate evidence, having read and considered the written arguments of counsel, having heard and considered the oral arguments of counsel, and having reviewed, considered and followed the applicable law, the undersigned now enter the following Final Award as majority decision:

### Abbreviations

The following terms and definitions apply to this award:

"CX" means Claimants' Exhibit followed by the exhibit number.

"AX" means Respondent AVIC USA Exhibit followed by the exhibit number.

"TX" means Respondent Thompson Exhibit followed by the exhibit number.

"SWE" or "Soaring Wind" means Soaring Wind Energy, LLC.

"SWE Agreement" refers to the contract between members of SWE.

"Tang" means Tang Energy Group, Ltd.

"Jan" means Jan Family Interest, Ltd.

"Nolan" means The Nolan Group, Inc.

"Young" means Keith P. Young.

"Carter" means Mitchell Carter.

"AVIC" means Aviation Industry of China.

---

[1]	The majority of the panel who signed this award includes Joseph Byrne, Richard Capshaw,  Hon. John Marshall, Gregory Shamoun, William Toles,  and Steven Aldous.  The three arbitrators who did not concur with the award include Hon Mark Whittington, Hon, Jeff Kaplan, and Hon. Glen Ashworth.  This final award is signed and notarized by those arbitrators who approved of the award in accordance with Section R-46.  Those who dissented signed electronically.

[2]	The contract referred to is the Soaring Wind Agreement, which is discussed at length in this Award.

"AVIC HQ" means Aviation Industry Corporation of China Group Company.

"AVIC USA" means AVIC International USA, Inc. f/k/a CATIC (USA)

"AVIC International" means AVIC International Holding Corp.

"Ascendant" refers to respondent Ascendant Renewable Energy Corp.

"AVIC IRE" refers to respondent AVIC International Renewable Energy Corp.

"AVIC TED" refers to respondent AVIC International T.E.D., Ltd., f/k/a CATIC TED, Ltd.

"CATIC" refers to the China National Aero-Technology Import & Export Company.

"CAIGA" refers to respondent China Aviation Industry General Aircraft Co., Ltd.

"Thompson" refers to respondent Paul E. Thompson.

## OVERVIEW

Tang, Nolan, Young, Carter, and Jan, filed a Demand for Arbitration with the AAA on June 13, 2014 ("Demand"). Subsequently, Tang filed a claim on behalf of Soaring Wind. This Final Award refers to them collectively as "Claimants." The Demand referenced paragraph 13.2(a) of the SWE Agreement as the contractual basis for arbitration of the claims set forth in the Demand. Each of the Claimants (other than Soaring Wind) is a member of SWE.

The Demand named as respondents CATIC USA, Inc., Aviation Industry of China ("AVIC"), China Aviation Industry General Aircraft, Co., Ltd. ("CAIGA"), AVIC International Holding Corp., AVIC International USA, Inc., AVIC International Renewable Energy Corp., Ascendant Renewable Energy Corp., CATIC T.E.D., Ltd., and Paul E. Thompson. CATIC USA, Inc. changed its name to AVIC International USA, Inc. sometime prior to the Demand and is referred to in this Final Award only as AVIC USA. "Respondents" refers to these entities and Thompson collectively. Among those named as Respondents in the Demand, AVIC USA and Thompson are members of SWE. The remaining respondents—AVIC, CAIGA, AVIC IRE, Ascendant, CATIC T.E.D., and AVIC International (referred to collectively as the "Non-Signatories")—did not sign the SWE Agreement. Claimants allege that the arbitration provision in the SWE Agreement binds the Non-Signatories to arbitrate in this proceeding under several legal theories including alter ego. The Non-Signatories either sent letters to the AAA/ICDR or filed pleadings objecting to Claimants' attempt to include the Non-Signatories in the arbitration. In addition, the Non-Signatories provided the AAA/ICDR notice that those entities did not intend to participate in the arbitration.

Claimants' live pleading is Tang's Verified Fourth Amended Statement of Matters in Controversy dated April 6, 2015, with the addition of the remedy of disgorgement as asserted in Tang's Verified Fifth Amended Statement of Matters in Controversy filed August 7, 2015.[3]

---

[3]     See Order 26, allowing the addition of the remedy of disgorgement.

AVIC USA's live pleading at the time of the hearing is its Second Amended Answer, Affirmative Defenses, Counterclaim and Reservation of Rights dated May 7, 2015. Thompson' live pleading is his Fifth Amended Answer, Affirmative Defenses, Objections to Designation of Arbitrators, Counterclaim, Reservation of Rights and Designation of Arbitrator dated April 30, 2015.

In addition to the arbitration, at least three lawsuits were filed related in some way to the subject matter of the arbitration. *Ascendant Renewable Energy Corp. v. Tang Energy Group, Ltd., et. al.*, (Case No. 3:14-CV-03314-K, in the Northern District of Texas, Dallas Division), in which Ascendant sought a declaratory judgment with respect to whether it could be compelled to arbitrate, whether arbitrability of claims against it is for judicial rather than arbitral determination, that the arbitration panel could make no determinations regarding Ascendant, and that the arbitration should be stayed. The Honorable Ed Kinkeade entered his memorandum opinion and order dated August 4, 2015, granting Ascendant's motion for summary judgment in two respects— (1) "whether Ascendant, a non-signatory to the Agreement, can be subject to arbitration based on the arbitration clause of the Agreement is for a court, not the arbitration panel, to decide because Ascendant disputes the very existence of an agreement between these parties; and (2) because the existence of any agreement between the parties is in dispute, any determination by the arbitration panel as to the jurisdiction over Ascendant is not controlling on a court." [4] No appeal followed that order.

*AVIC International USA, Inc., and Paul Thompson v. Tang Energy Group, Ltd., et. al.*, (Case No. 3:14-cv-02815-K, in the Northern District of Texas, Dallas Division) in which AVIC USA and Thompson sought an order staying the arbitration and an order that the arbitration panel be reconstituted to a total of three arbitrators, one selected by each "side," and one "neutral" arbitrator selected by the other two arbitrators. Defendants sought dismissal of the case based upon lack of subject matter jurisdiction. The Honorable Ed Kinkeade granted Defendants' motion to dismiss on February 5, 2015, finding "it has no jurisdiction under the FAA to address Plaintiffs' claims and grant the requested relief."[5] AVIC USA appealed that order to the Fifth Circuit. The Fifth Circuit affirmed Judge Kinkeade's order in a per curiam opinion.[6]

In addition to the foregoing, the panel is aware that AVIC USA filed a lawsuit in Delaware Chancery Court challenging Tang's assertion of claims in this arbitration on behalf of SWE as unauthorized by the SWE Agreement and sought declaratory and injunctive relief.[7] The panel has no information on the outcome of this proceeding.

## FINDINGS OF FACT

### General

---

[4]     See DE 93; 3-14-CV-03314-K.
[5]     DE 123, 3:14-CV-02815-K.
[6]     *See* 15-10190; filed 9/16/2015.
[7]     In the Court of Chancery State of Delaware, No. 11182.

1.     AVIC was formerly the Ministry of Aviation Industry in China.  The first Aviation Industry Corporation was created in 1993, and the former Ministry was abolished in 1999.  All of China's state-run aviation industry operates under the direction of AVIC HQ, which sits at the top of a pyramid of companies.  AVIC HQ is one of 112 companies owned by the Chinese government through the State Asset Supervision and Administration Commission ("SASAC").  AVIC HQ is one of 45 corporations controlled through SASAC which evolved from industrial ministries within the Chinese government and which still enjoy a "rank" within the government equal to vice-ministerial status.  The top management of AVIC HQ is appointed by the Organization Department of the central Chinese Communist Party.  AVIC HQ is the top level of one of the nine centrally run defense industry conglomerates in China.

2.     AVIC HQ has 19 primary business units including CATIC, AVIC International, and CAIGA.  AVIC HQ has always maintained a controlling interest in its first tier subsidiaries.  These first level subsidiaries also have, in many cases, subsidiaries of their own.  AVIC HQ regularly appoints the Chairman and the members to the Boards of Directors to the subsidiaries.  In addition, AVIC HQ controls appointment of many of the key management personnel to its first tier subsidiaries.  The first tier subsidiaries consider themselves AVIC HQ companies that follow AVIC HQ strategic advice.

3.     CATIC was formerly part of the industrial ministry that later became a subsidiary of AVIC HQ.  CATIC is primarily engaged in the import and export of military and military use products.  AVIC International is a first tier subsidiary of AVIC HQ and was formerly a subsidiary of CATIC, at which time it was known as CATIC Trade and Development Company (CATIC TED).  In 1995, AVIC International spun out of CATIC and became a direct subsidiary of AVIC HQ, making CATIC and AVIC International both international subsidiaries of AVIC HQ.  On November 6, 2008, AVIC HQ reorganized into its current form.  In addition, AVIC HQ or at AVIC HQ's direction, reorganized its subsidiaries causing CATIC to concentrate in the military products arena and to have its civilian products arena to come under AVIC International.  Among the non-military segments devoted to AVIC International was alternative energy.  Several months later, China Aviation Industry General Aircraft Co., Ltd. (CAIGA) was created as an AVIC HQ subsidiary to compete in the general aviation sector.  AVIC HQ has continuously reorganized in an effort to create competitive companies with strong corporate governance.  All of the reorganizations have been top down, directed by AVIC HQ.

4.     AVIC HQ's reorganization in the 2008-9 timeframe accompanied a new business development strategy in which AVIC HQ subsidiaries became partners.  As set forth above, AVIC International took responsibility for non-military operations of CATIC and AVIC HQ directed AVIC International to be solely responsible for development of the wind power sector, which AVIC HQ's CEO identified as a focal point for AVIC HQ.  In order to carry this directive out for AVIC HQ, AVIC International created AVIC International Renewable Energy Corp. (AVIC IRE) in July 2010.  AVIC International made AVIC IRE responsible for vigorously developing the renewable energy industry for AVIC HQ.

5.     The historical relationship between Tang and AVIC, began in 1997 when they signed a joint venture agreement to build a gas-fired power plant at the western end of the Great Wall.  In the early 2000s, Patrick Jenevein ("Jenevein") and other investors in his group made an investment in an entity in China named Zhong Hang (Baoding) Huiteng Wind Power Equipment

Co. Ltd. (also known as "HT Blade"). The entity through which Jenevein and his group invested in HT Blade was named Tang Wind Energy LP, which subsequently became Tang Wind Energy Hong Kong. Some of the other investors in HT Blade included Baoding Huiyang Aviation Propeller Factory and China Aviation Industry Gas Turbine Power (Group) Company, both of which were subsidiaries of AVIC HQ. HT Blade is a manufacturer of wind turbine blades and apparently is a successful venture.

6.     In 2007, because of its successful investment in HT Blade and the development of several wind power projects, Tang, Jenevein, and some of its investors decided to create a business to develop wind farms and promote the sale of wind power equipment as part of the development. Out of this idea came the creation of Soaring Wind Energy. AVIC HQ expressed an interest in being part of Soaring Wind Energy.

### The Memorandum of Understanding

7.     In order to carry out their desire to create a company to promote wind power and develop wind power projects, AVIC USA, a subsidiary of AVIC International, and Tang entered into a Memorandum of Understanding (the "MOU") effective January 28, 2008, to set out the terms by which they would establish a limited liability company named Soaring Wind Energy. Although the MOU states that it is between AVIC USA (formerly CATIC USA) and Tang Energy Group, Ltd., the agreement also references CATIC, which at the time was CATIC TED, the precursor to AVIC International, as an equity participant and is signed by Liu Rongchun on behalf of "CATIC." At the time, Mr. Rongchun was Vice President of AVIC International and held no position with AVIC USA.

8.     The MOU is the precursor to the SWE Agreement.

9.     The MOU states that "SWE will be the exclusive vehicle for both Tang and CATIC[8] interest in the wind industry" and that the geographical area will "initially include North America, Central America and South America. Expansion to Europe, Africa, and Asia is designated for future expansion."[9]

10.     The MOU also provides that CATIC USA will be responsible for different aspects of the business and that "CATIC offices and employees in China will be available for support as needed." Tang was to be responsible for general management as well as "wind farm development." The MOU identifies Thompson as the person to fill the role as SWE's general manager.

11.     MOU recites that wind farm development projects will have separate budgets with CATIC USA as the primary source for development funds.

12.     The MOU further states that "[i]t is not a binding document and there will be no damages to the parties if the LLC is not established."

---

[8]     As previously stated, CATIC became AVIC International.

[9]     The quotes in this Award of the various agreements are quoted verbatim without noting the grammatical deficiencies.

<u>Final Award:</u>                                                                    **Page 5 of 33**

**The Soaring Wind Energy Agreement**

13.     In accordance with the MOU, Soaring Wind Energy (SWE) was created effective June 1, 2008.

14.     SWE is a limited liability company organized under the laws of the State of Delaware.

15.     CX 2 is the operative agreement setting forth the terms for membership in SWE.

16.     The members of SWE are Tang, Nolan, Jan, Young, Carter, AVIC USA, and Thompson (Thompson signed as a Class B Member) (collectively "Members").

17.     Some definitions in section 1.1 of the SWE Agreement are relevant to this dispute include the following:

> "Affiliate" means with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with that first Person.

> "Control" means the possession, directly or indirectly, through one or more intermediaries, of either of the following: (i) in the case of a corporation, more than 50% of the outstanding voting securities thereof; (ii) in the case of a limited liability company, partnership, limited partnership or venture, the right to more than 50% of the distributions therefrom (including liquidating distributions); (iii) in the case of a trust or estate, including a business trust, more than 50% of the beneficial interest therein; and (iv) in the case of any other Entity, more than 50% of the economic or beneficial interest therein; or (v) in the case of any Entity, the power or authority, through the ownership of voting securities, by contract or otherwise, to exercise a controlling influence over the management of the Entity.

> "Member" means either a Class A Member or a Class B Member, or any Person hereafter admitted to the Company as a member as provided in this Agreement, but such term does not include any Person who has ceased to be a member in the Company.

> "Person" means any natural person or Entity.

18.     Section 2.3 of the SWE Agreement provides that "[t]he purpose and nature of the business to be conducted by the Company shall be to provide worldwide marketing of wind energy equipment, services and materials related to wind energy including, but not limited to, marketing wind turbine generator blades and wind turbine generators and developing wind farms (the "Business"), and to engage in any other business or activity that now or hereafter may be necessary, incidental, proper, advisable or convenient to accomplish the foregoing purposes (including the borrowing of money and the investment of funds) and that is not forbidden by the law of the jurisdiction in which the Company engages in that business.

19.     Section 2.7 of the SWE Agreement states that the term of the company is from commencement until dissolved or terminated in accordance with the terms of the Agreement.

20.     Section 6.8 of the SWE Agreement provides in part that no Member shall be required to devote full time to Company business and the "Members expressly acknowledge and agree hereby that their relationship to the Company and each other is strictly contractual in nature and is not that of partners, joint venturers or any similarly situated persons and is not fiduciary in nature.  No Member shall take, or cause or permit its Affiliates, Officers, employees or agents to take, any action that would bind or obligate the Company in any manner not expressly authorized by this Agreement. Each Member may grant or withhold their consent, approval or vote, in their sole discretion, as directed or otherwise determined by such Member, without regard to the interests of the other Members, it being understood that each such Member shall have no fiduciary duty or other duty to represent or act in the best interests of the other Members."

21.     Section 6.10 of the SWE Agreement provides that each Member "agrees that during the term of this Agreement, each shall only conduct activities constituting the Business in and through the Company and its Controlled subsidiaries."

22.     Section 6.11 of the SWE Agreement provides:

> Except as restricted by Section 6.10, each of the Members and its respective Affiliates shall be free to engage in other businesses or activities and to receive the income and benefits thereof (and neither the Company nor any other Member shall have any interest therein by reason of this Agreement), and no Member shall have any duty or obligation to present to the Company or any other Member any such other business opportunities that are outside the scope of the Business. Subject to the terms of this Agreement, nothing in this Agreement shall restrict any Member from establishing, independently or with other Persons, any business in any part of the world, other than the Business, and each Member acknowledges and agrees that the other Member and its Representatives and Affiliates, and the managers, directors, employees or other representatives of such other Members or its Representatives or Affiliates serving as Managers of the Company (any such Person being referred to herein as a "Designee") or as Officers of the Company (any such Person being referred to herein as a "Common Officer") may engage in any business other than the Business. Further, there is no contractual, legal or other requirement on any Member or its Affiliates, Designees, Common Officers or any other Person to offer any business opportunity or participation in any business opportunity, other than the Business, to the Company, and each Member acknowledges and agrees that all Members and their respective Affiliates, Designees, Common Officers and other Persons have the right to pursue any business opportunity or activity that does not consist of the Business. Each Member recognizes that the other Members and their respective Affiliates, Designees, Common Officers and other Persons (a) participate and will continue to participate in businesses other than the Business, directly and through their respective Affiliates, (b) may have interests in, participate with, and maintain

seats on the boards of directors of or serve as managers or employees of other Persons engaged in such other businesses (other than the Business) and (c) may develop business opportunities outside of the Business for themselves and their Affiliates and such other Persons. Subject to the terms of this Agreement, each Member (i) acknowledges and agrees that neither a Member, its Affiliates, Designees, Common Officers nor any such other Person shall be restricted or prohibited, by the relationships that exist between or among the Members and the Company, or by a Member's or its Affiliates' designees serving as a Manager of the Company or Common Officer, from engaging in any business other than the Business, (ii) acknowledges and agrees that neither a Member nor its Affiliates, Designees, Common Officers nor any such other Person shall have any obligation to offer the Company or any of its Affiliates any business opportunity other than with respect to the Business, and (iii) waives any claim that any business opportunity pursued by a Member or any of its Affiliates, Designees, Common Officers or any such Person constitutes a corporate opportunity of the Company or any of its Affiliates that should have been presented to the Company, unless such business opportunity was pursued in violation of the terms of this Agreement.

23.     Section 6.12 provides:

"Each of the Class A Members hereby covenant and agree that neither they nor their Affiliates or Representatives will participate in wind farm land development projects (each a "Project") except through an entity owned by both the Company and CATIC (each a "Project Entity"), the governing documents of which shall provide that (a)

(a) CATIC shall contribute 100% of the capital to the Project Entity required to fund such Project;

(b) Distributions made by the Project Entity, whether distributions of available cash or distributions of proceeds in connection with the sale of a Project or in liquidation, shall be made in the following order of priority unless agreed otherwise in writing by a Supermajority Interest of the Members based upon Secondary Sharing Ratios: (i) first, to CATIC until the sum of all distributions made to CATIC equals an amount which equates to (A) the return of all capital contributions made by CATIC plus (B) an amount equal to 25% of the aggregate amount of capital contributions made by CATIC, and then (ii) all remaining amounts (on liquidation, sale of assets, distributions of available cash or otherwise, to the Company)."

24.     Section 8.2 provides in part that "Each Member shall indemnify . . . the other Members, and their Managers, directors, officers, employees, agents, Affiliates and Representatives from all claims, losses, damages, liabilities, costs and expenses of whatever nature, including reasonable attorney's fees, incurred by them, arising out of . . .(b) any breach by the indemnifying Member or any of its Representatives or Manager designees of any obligation or representation or warranty contained in the Agreement."

25.     Section 8.4 of the SWE Agreement relates to confidentiality and generally prohibits Members and their Affiliates from revealing to third parties confidential or proprietary information of the Company and its Members except under certain conditions.

26.     Section 9.1 of the SWE Agreement provides that a "Member shall be in default if . . . (b) such Member otherwise fails to perform any of its material obligations or breaches a material representation, warranty or agreement under, or its Representatives fail to comply with the terms of this Agreement or any guaranty entered into pursuant to, this Agreement . . .   If a Member is in Default, the other Members and the Company shall have all rights and remedies available at law and in equity with respect to such breach, including the remedies of specific performance and injunctive relief."

27.     Article XIII of the SWE Agreement contains an agreement to arbitrate "any controversy, dispute, or claim arising under or related to this Agreement (whether arising in contract, tort or otherwise, and whether arising at law or in equity), including (a) any dispute regarding the construction, interpretation, performance, validity or enforceability of any provision of this Agreement, and (b) the applicability of this Article XIII to a particular dispute."

28.     Section 13.1 of the SWE Agreement provides that with respect to a particular dispute, "each Member that is a party to such Dispute is referred to herein as a 'Disputing Member.'"

29.     Section 13.2 of the SWE Agreement describes the procedure that "shall" be followed to attempt to resolve a "Dispute."   The section states "the Disputing Member shall provide written notice to the other Disputing Members of the matter in Dispute," the executive officers of the Disputing Members meet in a good faith attempt to resolve the Dispute, and only then may an arbitration be initiated.

30.     Section 13.3 (a) and (b) requires the "Disputing Member" initiating arbitration to notify the other "Disputing Members" of the arbitrator appointed by the "Disputing Member" and the demand for arbitration and statement of matters in controversy.  Within 15 days, "each other Disputing Member" shall name an arbitrator.   In the event there are more than two "Disputing Members" to the dispute, the arbitrators selected by the "Disputing Members" shall cause the appointment of either one or two arbitrators as is necessary to create an odd number of total arbitrators.

31.     Section 13.3 (e) provides that the Commercial Arbitration Rules of the AAA will apply to the arbitration unless otherwise stated in the SWE Agreement.

32.     Section 13.3 (f) provides in part that the "Disputing Members" shall make their witnesses available in a timely manner for discovery and if a "Disputing Member" fails to comply with discovery requests, the arbitrators may take such failure to comply into consideration in reaching their decision.

33.     Section 13.3 (i) provides that any decision by a majority of the arbitrators shall be final and binding with no right of appeal.

34.     Section 13.3 (j) provides that the statute of limitations will be tolled from the date of the notice of a Dispute is provided to the Disputing Members.

35.     Section 13.3 (l) provides that the arbitrators shall have no authority to award special, exemplary, punitive or consequential damages.

36.     Section 13.4 provides that the prevailing Member(s) in arbitration are entitled to recover court costs, fees and expenses, including reasonable attorney's fees.

37.     Section 17.8 of the SWE Agreement provides that the agreement is governed by the laws of the State of Delaware.

38.     The SWE Agreement does not require capital contributions from the members beyond the initial capital requirements set out in Exhibit A to the Agreement.

39.     Section 17.11 of the SWE Agreement provides that the Agreement constitutes the entire agreement among the Members and supersedes all prior agreements among them with respect to the subject matter hereof.

40.     The notable changes from the MOU to the SWE Agreement are that AVIC USA is the only AVIC affiliated entity with an equity interest in SWE and its profit interest is 50% rather than a lesser amount set forth in the MOU for any "AVIC" entity.

41.     CX 2 is not the first version of the SWE Agreement.  It is a corrected version substituting Nolan for Jenevein individually and Young in place of Tersus Energy PLC.  However, there is no evidence of any other changes between the initial version and CX 2.  All of the parties agreed that CX 2 contains the same material terms as the original agreement other than the names of two of the members.  Although Thompson contends that his signature on CX 2 is a forgery, he admits that he signed an agreement to create SWE and that the terms of CX 2 are materially the same as the version he signed.

42.     All members of SWE paid their initial capital requirements set forth in Exhibit A to the Agreement.

43.     All members of SWE had the opportunity to review the SWE Agreement prior to signing the Agreement.

44.     All members of SWE signed the SWE Agreement freely and voluntarily.

45.     The SWE Agreement was not procured through artifice or fraud on the part of any Member.

46.     All members of SWE agreed to the material terms of CX 2.

**Final Award:**                                                                                          Page 10 of 33

**The Chicago Agreement**

47.     On April 28, 2009, Tang and AVIC TED signed an agreement entitled "Preliminary Agreement for Wind Power Project Development" (the "Chicago Agreement"). The agreement recites in part that "CATIC-TED" wishes to participate in the development of wind power industry in the United States" and "has experience in oversea projects development" and has "sales and after-sales service capacity and related resources in the United States." The agreement also states, "Tang has been committed in energy industry and has professional staff to develop wind power projects in the United States." The agreement recites that in consideration of the mutual covenants in the agreement and other consideration, "both sides agree to cooperate for develop wind power projects in the United States . . .."

The Chicago Agreement further states:

"Both sides agree to develop wind power projects together through cooperation and finish the development of wind power projects for total capacity of 200 Megawatt within 5 years after this preliminary agreement becoming effective. "CATIC-TED" will totally finance 300,000,000.00 US Dollars in wind power projects development, in which 200,000,000.00 US Dollars will be used to purchase related wind power equipments from China, 100,000,000.00 US Dollars will be used to purchase services including, transportation, warranty services, after-sales services, operation services and related spare parts and consumables parts.

Due to the specialty of wind power projects and related equipments, the 200 Megawatt wind power project is not a single project but composed of several projects. The total capacity of these projects is 200 Megawatt with 5% tolerances. The above wind power projects include Cohasset project, Plymouth project, Ratheon and other projects which now being estimated by both sides. The total capacity of these projects is 45 Megawatt and they constitute the first phase of the whole program."

48.     The Chicago Agreement called for Tang to perform a "preliminary assessment" for projects in the United States, but CATIC TED would be responsible for the "entire project development."

49.     Bian Tao signed the Chicago Agreement on behalf of CATIC TED and Jenevein signed on behalf of Tang. At the time he signed the Chicago Agreement, it is unclear whether Mr. Tao was an officer of AVIC International or CATIC TED, or whether those two were one and the same. Some evidence suggests that CATIC TED had already been folded into AVIC International as part of the 2008-9 reorganization. Xu Hang of CATIC TED authored the Chicago Agreement.

50.     The Chicago Agreement is part of the sequence of agreements between the Tang "side" and the AVIC "side", which began with the MOU, followed by the SWE Agreement, and completed by the Chicago Agreement.

51.     Although the Chicago Agreement is difficult to read and poorly worded at times, its language imposes no affirmative duty on CATIC TED to agree to any specific wind power project in sufficiently definite terms.

**Cirrus Aircraft**

52.     Technical similarities exist between aviation and wind power technologies.  In April of 2009, Cirrus Aircraft informed Jenevein that Cirrus was interested in expanding into wind-turbine blade manufacturing.

53.     Tang alerted AVIC USA to the possible opportunities presented through some association or acquisition of Cirrus Aircraft.

54.     AVIC USA could make no decision on Cirrus Aircraft and had to report the opportunity to AVIC entities up the chain of AVIC companies.  The evidence is unclear whether Sherman Zhang of AVIC USA took the matter up with AVIC International or AVIC HQ.

55.     After Tang and CATIC TED held a signing ceremony for the Chicago Agreement in April of 2009, Tang escorted a delegation of AVIC officials to Duluth, Minnesota to meet the officials with Cirrus Aircraft and tour its facilities.

56.     AVIC executives invited Jenevein to Paris, France in June 2009, to the Paris Air Show to meet with Cirrus management, to answer additional questions concerning Cirrus Aircraft and discuss AVIC's acquisition of the company.

57.     In July of 2009, AVIC HQ created CAIGA, a wholly owned AVIC "subsidiary," to make the Cirrus Aircraft acquisition, which closed in June of 2011.

58.     After the Paris meeting, Jenevein did not hear from AVIC about the Cirrus Aircraft acquisition until after it closed.

59.     There is no evidence in the record that Cirrus Aircraft manufactured wind-turbine blades after the CAIGA acquisition of Cirrus Aircraft.

**Breach of Contract by AVIC USA and Thompson**

60.     The Members of SWE agreed in the SWE Agreement that the "Business" is worldwide marketing of wind energy equipment, services and materials related to wind energy and includes development of wind farms.

61.     The Members of SWE agreed that SWE would be the exclusive vehicle through which its Members would conduct activities constituting the "Business."

62.     The extent of the exclusive arrangement agreed to by the Members as set out in the Agreement is ambiguous.  Section 6.10 appears to apply only to Members.  On the other hand, Section 6.11 prohibits any Member, its Representatives and Affiliates from engaging in the "Business" of SWE except through SWE.  Section 6.12 prohibits Class A Members and their

Affiliates from "participating" in wind farm land development projects except through entities owned jointly by SWE and CATIC.  The Agreement's confidentiality provision prohibits Members and their Affiliates from revealing confidential information about the company, the Members, Affiliates or the Agreement.  The Chicago Agreement clearly states that "SWE will be the exclusive vehicle for both Tang and CATIC interest in the wind industry."  The great weight of the evidence supports a construction that Members, their Affiliates and Representatives will only conduct the "Business" through SWE.

63.     With regard to Class B Members of SWE, the SWE Agreement also prohibits them from engaging in the "Business" of SWE except through SWE.  The SWE Agreement's use of the term "participating" in 6.12 is different from the phrase "activities constituting the Business" and the "Business" as used in Sections 6.10 and 6.11.  The term "participating" as used in Section 6.12 means taking an equity position in a Project as defined by the SWE Agreement.

64.     The SWE Agreement requires Members and their Representatives and Affiliates to conduct the "Business" of SWE solely through SWE or its Controlled Companies.

65.     AVIC USA itself did not violate the contractual provision to refrain from engaging in the Business of SWE except through SWE.

66.     However, AVIC USA's affiliates as defined by the SWE Agreement, competed against SWE and engaged in the "Business" of SWE thereby violating the SWE Agreement's exclusive arrangement.  Specifically, AVIC HQ, AVIC International, AVIC IRE and Ascendant, are "Affiliates" of AVIC USA because they directly or indirectly controlled AVIC USA and all are under the common control of AVIC HQ.  As a result, AVIC USA breached the SWE Agreement by its Affiliates engaging in the "Business" of SWE.

67.     Thompson violated the SWE Agreement by engaging in the "Business" of SWE on behalf of Ascendant.

68.     Sections 6.10, 6.11, and 6.12 do not limit former employees of SWE in their professional mobility or restrict former employees from soliciting SWE's customers.  Sections 6.10, 6.11, and 6.12 by their terms relate to Members and their Representatives and Affiliates. As a result, the provisions are not covenants not to compete.

**Theft of Trade Secrets**

69.     Section 8.4 of the SWE Agreement prohibits Members and their Affiliates from disclosing any confidential or proprietary information of the other Members or of SWE to third parties.

70.     Claimants failed to produce evidence of any specific confidential or proprietary information that any other Member or its Affiliates provided to a third party.

71.     Claimants failed to identify any information that derives independent economic value from not being generally known or readily ascertainable by proper means, which

Claimants provided any Respondent.  While Claimants demonstrated a benefit to Respondents' access to Claimants contacts and general knowledge, those facts alone are insufficient to show the information was a trade secret.

### Tortious Interference

72.    Claimants' assertion of tortious interference with existing contracts is an alternative allegation to its alter ego claims.  As a result of the panel's decision on alter ego, it will not consider the claims for tortious interference of existing contracts.

73.    With respect to Claimants' allegation of tortious interference with prospective business opportunities, Claimants offered no evidence that they had a reasonable probability of entering into a business relationship with Wind Tex related to what became the Cirrus 1 project without financing from AVIC.  Further, Claimants offered no evidence that intentional interference by Respondents is what caused Claimants from entering into a business relationship with Wind Tex.

### Breach of Fiduciary Duty

74.    Section 6.8 (b) of the SWE Agreement disclaims any fiduciary duty between Members or between Members and the Company.  The Members "expressly acknowledge and agree hereby that their relationship to the Company and each other is strictly contractual in nature and is not that of partners, joint venturers or any similarly situated persons and is not fiduciary in nature."

75.    Claimants failed to offer any evidence of a fiduciary relationship between them and any of the Respondents outside of the SWE arrangement, other than that which may have existed while Thompson was a managerial employee of SWE prior to his termination.  However, Claimants failed to produce any evidence of a breach of a fiduciary duty by Thompson while he held such a position.

### Unjust Enrichment

76.    A contract exists between Claimants and Respondents governing the relationship between the parties with respect to the claims alleged.

### Single Business Enterprise/Alter Ego

77.    The evidence overwhelmingly shows that AVIC HQ, AVIC International, AVIC IRE, AVIC TED, and Ascendant operated as one entity with respect to the MOU, SWE Agreement, and the Chicago Agreement.  AVIC HQ exercised such complete control over the other entity Respondents in this case the AVIC Respondents operate as one entity.

78.    The Organization Department of the central Chinese Communist Party ("CCP") appoints the top management of AVIC HQ.  Among the AVIC Respondents, it is undisputed that officers of parent companies frequently serve as officers and/or directors of subordinate units. By virtue of its controlling interest in its subsidiaries, AVIC HQ appoints its own managers to

key positions in the subsidiaries, including the Chairman and members of the Board of Directors and the Board of Supervisors to insure compliance with its directives.  The leadership of AVIC HQ has its own personnel department that makes the personnel appointments for its subsidiary units.  Lin Zuoming, the Chairman of AVIC HQ, is also a member of the Central Committee of the CCP.

79.     All of China's state-run aviation industry operates under the direction of AVIC HQ, which sits at the top of a pyramid of subsidiary companies.  AVIC HQ is one of 112 companies owned by the Chinese government through the State Asset Supervision and Administration Commission ("SASAC").

80.     SASAC represents the Chinese government in overseeing the management of assets, personnel and operations of State Owned Entities (SOEs), like AVIC HQ and its subsidiaries.  SOE leaders are treated like government officials.  AVIC HQ previously argued to the Sixth Circuit that it is a part of the Chinese Government.[10]  AVIC HQ follows the policy guidance from an organization called the State Administration for Science Technology Industry for National Defense (SASTIND).  In 2007, SASTIND directed AVIC to get involved in alternative energy including wind power.  In response, AVIC HQ established a project group designed to take responsibility for wind power development and Xu Hang was the head of that group.  Lin Zuoming, the CEO of AVIC HQ, also stated that the resources of the entire AVIC group would be employed to develop wind power.

81.     The MOU came about as a direct result of AVIC HQ's desire to compete in the wind power industry as directed by SASTIND.  Although the MOU was facially an agreement between Tang and CATIC USA, the agreement also proposed that CATIC receive an equity interest in the new company.  A CATIC officer signed the MOU.  CATIC USA had no experience in the wind power business at the time the MOU was signed and it did not have the financial ability to fund wind power development projects except through its parent company or companies.

82.     The SWE Agreement was a continuation of AVIC HQ's directive from SASTIND.  The original idea for SWE came from Tang and CATIC TED or AVIC HQ were the AVIC entities indicating a desire to be part of the business.  Further, the MOU states that SWE would be the exclusive vehicle for Tang and CATIC in the wind power industry.  When AVIC USA signed the SWE Agreement, it was doing so on orders from AVIC HQ.

---

[10]     Global Tech. Inc. v. Yubei (Xinxiang) Power Steering Sys. Co., 2015 U.S. App. LEXIS 21147, *8-9 (6th Cir. 2015) ("The People's Republic of China ("PRC") owns AVIC. The company has a business license for both military products and "general business items," including automobile parts. AVIC's business license shows a stamp of the official seal of the State Administration for Industry and Commerce of the People's Republic of China, and the license states that AVIC is "Owned by the Whole People." AVIC is a Fortune 500 company, with over 400,000 employees and $23 billion in annual revenue, directly owned by China's State Council (the chief administrative authority of the Chinese central government). The State Council's State-Owned Assets Supervision and Administration Commission supervises and manages the state-owned assets of enterprises like AVIC.")

83.     AVIC HQ has a finance section, it has an accounting section, it has an audit section, but it has no sales or products of its own.  AVIC HQ uses these sections to govern the access to resources of its subsidiaries and its subsidiaries of subsidiaries by determining how much the subsidiaries can retain of their funds, by assisting them with access to credit from state-owned banks and by distributing quotas for bond and equity money raising.  For instance, Xu Hang testified to the effect that AVIC International used money from AVIC TED to capitalize AVIC IRE.  Prof. deLisle, AVIC USA's expert, indicated that AVIC HQ– which all parties agree engages in no commercial activity *independent* of its subordinate units – has "powerful design, research and development, and product manufacturing abilities."

84.     AVIC HQ's subsidiaries readily acknowledge that they are controlled by AVIC HQ.  AVIC International's shareholder introduction states that it is controlled by AVIC HQ.  AVIC IRE's web site describes itself as a unit directly subordinate to AVIC HQ.  For further example, Sherman Zhang, AVIC USA's president, stated, "… we have a division in charge of International Affair[s] … AVIC has an international affairs division," which he suggested might assist Tang in resolving its complaints.  Xu Hang, stated AVIC USA was responsible for the networks of AVIC Group and who described AVIC USA on March 25, 2015, as "just really an office" from which Sherman tries to support "the entire group . . . AVIC group," providing "information or support or assistance … for anything they want."  Sherman Zhang acted as a spokesman of AVIC Group and commented publicly on Cirrus Aircraft sales trends, the merits of AVIC IHC's corporate acquisitions, and held himself out as a representative of AVIC Group generally.  AVIC HQ owns a controlling interest in AVIC International, which in turn owns 100% of AVIC IRE.  AVIC IRE, in turn, owns 100% of Ascendant.

85.     AVIC HQ capitalizes its subsidiaries and directs the transfer of assets, including securities and cash, from one subsidiary to another and from subsidiaries to AVIC HQ itself.  Prof. deLisle noted that "the way that group companies of this type generally operate where funding/financing is provided from higher levels to lower levels.  And in some of these entities the financial side in the sense of the providing of capital for projects by lower-level entities is subject to a degree of central control."  He also testified that "[i]t's a special set of rules for state-owned assets. And there are limits to the degree to which entities subject to the state-owned assets, regulations, and laws can acquire or dispose of property and assets outside of China.  So there are limits.  They do not even … have complete authority to do exactly as they wish with all of their [own] property."  Prof. Naughton and Col. Stokes testified that one particular AVIC entity oversees the financing of the subordinate units, and that this fact is acknowledged in credit rating letters from Moody's and Fitch.  SASAC must approve all joint venture investments made by AVIC subsidiaries overseas.  AVIC HQ assigns employees to specific subsidiaries with no input from the subsidiary to which the employee is assigned, and transfers employees from one subsidiary to another without consulting the employee or the subsidiary.  At any given time, multiple employees will have multiple roles with different subsidiaries simultaneously.  For example, CAIGA admits that it operates "under the strategic guidance of AVIC," and that it owner-controlled by AVIC HQ as its majority shareholder, and its Chairman, Qu Jingwen, is a career AVIC employee and was concurrently the chairman of AVIC Harbin Aircraft Industry Group, another AVIC HQ subsidiary.  As another example, Peng Bo sent emails as a Deputy Director for both AVIC IRE and Ascendant.  Thompson states that Tiger Lu was an Ascendant employee but was never on Ascendant's payroll and AVIC IRE employees were assigned to

Ascendant.  Xu Hang stated that Sherman Zhang, the President of AVIC USA, is paid by AVIC International.

86.    Xu Hang stated in an interview that he was the head of a "project group [ ] set up specifically by AVIC Group HQ to take responsibility solely for development of the wind power sector."

87.    AVIC HQ's CEO at the time, now Chairman of AVIC HQ (Lin Zuoming), was quoted: "[D]evelopment of non-aviation civilian products is a strategic [decision] for the scientific development of AVIC Group, and wind power will be a focal point for the Group's future development.  There are many commonalities between aviation and wind power technologies,… developing wind power sector will draw on all the capabilities of AVIC in order to maintain the development of the entire value chain."

88.    Employees of AVIC subsidiaries present themselves as agents of the AVIC Group.

89.    AVIC HQ maintains clear ownership control over its subsidiaries, even when it allows other entities to own non-controlling interests.  Even in situations where it does not own a controlling interest on its own, AVIC HQ uses subsidiaries to maintain control.  As an example, AVIC HQ unilaterally decided that it should own a 25% interest in HT Blade.  To make room for AVIC HQ's interest, its subsidiary shareholders, Baoding Huiyang Aviation Propeller Factory and China Aviation Industry Gas Turbine Power (Group) Company, simply relinquished the necessary percentage of their own interests without consideration.  Subsequently, even though AVIC HQ was only a 25% owner, it appointed the Chairman of the Board of Directors for HT Blade.  AVIC HQ caused HT Blade to pay Baoding Huiyang Aviation Propeller Co., Ltd. (an AVIC subsidiary) $8 million from HT Blade's account without the consent or approval of the shareholders of HT Blade so that Huiyang could meet its payroll.

90.    AVIC HQ charges a "service coordination fee" from HT Blade and from its other subsidiaries without any legal basis for doing so, without an agreement authorizing the fee and without offering any consideration in exchange for the fee.

91.    AVIC HQ, AVIC International, or AVIC IRE made all the hiring and firing decisions for AVIC IRE's subsidiary Ascendant.  AVIC HQ, AVIC International or AVIC IRE presented Thompson, the President of Ascendant, with a business plan for Ascendant and instructed him to sign it.  Thompson stated that he recalled Xu Hang saying that "big AVIC" would decide what opportunities identified by Sherman Zhang would go to which AVIC entity.  According to Thompson, "some entity at the very top of the chain decides where they go – or who takes advantage," and Cirrus Aircraft was an example of that.  Thompson indicated that he was "waiting around for months" until the [Chinese] government approved the funding of Ascendant.  During that time, AVIC International provided Ascendant with U.S. dollars from an AVIC entity in Hong Kong.  Xu Hang of AVIC IRE informed Thompson that Mr. Peng and Mr. Lu would work for Ascendant in project development without Thompson's input.

92.    Thompson testified in his deposition that AVIC IRE loaned Ascendant $800,000, and that Ascendant was only able to repay AVIC IRE when AVIC IRE bought stock from

Ascendant for $1 million.  The "leaders" of AVIC IRE decided that Ascendant had to loan AVIC Energy Cambodia $250,000.00 and dictated the terms of the loan for Thompson to include in a resolution from Ascendant.  Thompson stated that Ascendant's loan to AVIC Cambodia was a bridge until the "Chinese government" approved funding for that enterprise.  On a temporary basis, therefore, AVIC IRE financed AVIC Cambodia using the money in Ascendant's account.

93.     Baoying Wang, the President of AVIC IRE, directed Thompson as the President of Ascendant to accelerate the registration of AVIC International Canada Enterprises, Inc. so that AVIC IRE could capture a portion of the Canadian market even though the Canadian enterprise was supposed to be a subsidiary of Ascendant.  Xu Hang on behalf of AVIC IRE directed Thompson of Ascendant to pay for the attendance of AVIC IRE employees to Canada's Wind Energy Association meeting because "AVIC Canada" had no funds.  CX 303.  Xu Hang also directed Thompson to sign documents transferring Ascendant's shares in AVIC International Canada Enterprises, Inc. to AVIC International without any compensation to Ascendant.

94.     Thompson received a bonus in 2012 of $50,000 even though Ascendant's profits for that year were approximately $5,700.  Thompson's employment agreement defined "AVIC" to include "any proprietorship, partnership, limited liability company, or corporation controlled directly or indirectly by it."

95.     With regard to SWE, it was directed by both AVIC USA and AVIC International to present proposals for projects under the agreement to Xu Hang at AVIC International rather than Sherman Zhang at AVIC USA.  Sherman Zhang stated that a non-specific "team" that includes people in China who are not employees of AVIC USA, who would support AVIC USA and Soaring Wind in carrying out the SWE Agreement.  AVIC USA could not agree to finance any SWE projects because its capital was inadequate.  Jenevein testified that Sherman Zhang agreed that $700,000 in capital set aside for SWE would never be enough to finance the development of a wind farm.  AVIC USA (through SWE) could engage in no wind energy business without the approval of AVIC International, AVIC TED, and later AVIC IRE.

96.     Ascendant could do no work without the approval of AVIC IRE.  By way of example, Ascendant could not sign a contract with WindTex, a Texas company controlled by Mr. DeWolf, unless both Thompson and DeWolf travel from Texas to Beijing for the signing.

97.     Among the AVIC Respondents, the parents sometimes pay the salaries and expenses of the subordinate units.

98.     Further, the timing of events demonstrates the control AVIC HQ wielded over its subsidiaries particularly with regard to the dispute before the panel.  In 2007, SASTIND directed AVIC HQ to get involved in alternative energy including wind power.  In response, AVIC HQ established a project group designed to take responsibility for wind power development and Xu Hang was the head of that group.  As a result, CATIC TED and Tang entered into the MOU.  Mr. Rongchun was Vice President of CATIC TED and held no position with AVIC USA.  The MOU led to the SWE Agreement signed by CATIC USA and Tang.  Shortly thereafter, or about the same time, AVIC HQ began its reorganization.  As part of that reorganization, Wu Guangchuan was named the Chairman of AVIC International.  Sherman Zhang stated it succinctly:  "when leadership change[s], management change[s]," and "the new leaders don't care about the

commitments" their predecessors made to their partners.  In an apparent shift in strategy, AVIC International created AVIC IRE in 2010.  AVIC IRE was created "according to the strategy of AVIC [HQ] to vigorously develop the renewable energy industry."  Liu Rongchun, the individual who signed the MOU with Tang, became the founding chairman of AVIC IRE, and was given the mission to explore renewable energy projects throughout the world.  AVIC IRE decided to do this without the participation of SWE.  In 2011, AVIC IRE created Ascendant to compete with SWE in the wind energy arena.  After AVIC HQ set the strategic goal and AVIC International created AVIC IRE and set its mission, AVIC USA and AVIC TED no longer had authority from AVIC HQ to engage in wind power development on behalf of AVIC.  AVIC HQ used it subsidiaries and its control over its subsidiaries to commit a fraud and work an injustice on Claimants.  AVIC HQ dominated its subsidiaries in the transactions at issue in this case, namely, directing the establishment of SWE and the subsequent establishment of a new subsidiary (and its Texas-based subsidiary Ascendant) intended to compete directly and effectively against SWE.  AVIC HQ and its wholly owned subsidiaries created additional subsidiaries in an attempt to get around its promises made in the SWE Agreement to Claimants.

**Damages**

99.    The Members of SWE bargained for the mutual and exclusive worldwide marketing of wind energy equipment, services and materials related to wind energy including the development of wind farms.

100.    By November 3, 2013, AVIC IRE, by its own admission, had invested $50 million in wind power projects in the United States.  The evidence establishes that AVIC IRE and/or Ascendant and/or single asset entities created by those entities developed the Ralls Wind Farm, and Cirrus Wind I.  In addition, AVIC IRE's web site details a 1.5 megawatt turbine project in Minnesota, 10 sets of 1 megawatt turbines in Lubbock, Texas, and a 1 megawatt turbine in Tooele, Utah.  Independent evidence is lacking as to whether the individually identified wind projects are part of the $50 USD million investment by AVIC IRE in wind power projects in the United States.

101.    In addition to the United States, AVIC IRE reported on its web site that it developed wind power projects in Bulgaria, Mongolia, Romania, New Zealand, Australia, Canada, Brazil, Chile, and South Africa.

102.    Other than identifying a project in 2012 in Bulgaria named "Somovit," describing an installed capacity of 4.5 megawatts, AVIC IRE's web site's reference to wind projects in countries other than the United States does not set forth any specifics.  Further, Claimants were unable to present evidence of specific wind power projects undertaken by AVIC IRE outside of the United States other than the Bulgaria project.

103.    AVIC IRE considered 15% to be its minimum anticipated return on investment before it would undertake any given project if financing is the sole measure of profitability.  AVIC IRE would not finance a wind power project unless it anticipated a 15% return on its investment.

104.    9.25%, determined based upon the Buildup Method, is an appropriate discount rate for AVIC IRE's $50 USD million investment in wind power projects in the United States to calculate the present value of future damages.  In addition, the Buildup Method for determining an appropriate discount rate is generally accepted and recognized methodology for determining the discount rate to be applied.

105.    The lifespan of wind farm development projects that come to fruition is anywhere from 25 to 30 years.  Although the lifespan of wind farms is anywhere from 25 to 30 years, there is very little evidence in the record as to the time that investors maintain their equity position in any given wind farm development.

106.    The present value of cumulative potential return on $50 USD million in capital investment using the 15% minimum return on investment and a discount rate of 9.25%, after deducting the initial $50 USD million investment, is $62.9 USD million after 10 years, $94.7 USD million after 15 years, $131 USD million after 20 years, and $174.8 USD million after 25 years.   The present value of the return on the $50 USD million investment is what Claimants bargained for and only an award of some amount of these lost profits will put Claimants in the same position they would have occupied had the SWE Agreement not been breached by AVIC USA and its Affiliates.

107.    Claimants contend that they expended significant capital in reliance on the promises made by AVIC USA in the SWE Agreement.  A portion of the reliance damages sought by Claimants relates to the Flat Water and Corpus Christi projects.  The evidence shows that Claimants presented those projects to AVIC USA and AVIC USA, either directly or through non-action, chose not to participate in those projects.  If Claimants chose to pursue those projects further, they did so on their own because the SWE Agreement did not require AVIC USA to participate in particular projects.  In addition, in terms of the operating expenses allegedly funded by the Claimants for the benefit of SWE, Claimants failed to show the allocation of those expenses and whether Claimants would have incurred those expenses absent the existence of the SWE Agreement.

108.    Section 9.1 of the SWE Agreement provides in part that "[1]f a Member is in Default, the other Members and the Company shall have all rights and remedies available at law and in equity with respect to such breach, including the remedies of specific performance and injunctive relief."  AVIC USA's breaches of the SWE Agreement constitute a default of the agreement making it no longer reasonably practicable for the Members to carry on the business of SWE in conformity with the SWE Agreement.

109.    The lost profits set forth in this award are due to SWE for distribution to the Claimants through their percentages set forth in the SWE Agreement.  However, in order to prevent AVIC USA and Thompson from profiting from their breaches of the SWE Agreement, they should be prohibited from receiving any profit from any award to SWE.  This is true with respect to Thomson even though we are not ordering him to pay any damages.  On the other hand, AVIC USA contributed $350,000.00 USD as an initial capital contribution to SWE.  Thompson made no capital contribution to SWE.  AVIC USA and Thompson's equity interest in SWE should be divested, but AVIC USA should receive a credit for its capital contribution to SWE.

**Attorney's Fees and Arbitration Expenses**

110.    Paragraph 13.4 of the SWE Agreement provides that the prevailing Members in any arbitration or litigation are entitled to recover "all court costs, fees and expenses of such arbitration (or litigation), including reasonable attorneys' fees."

111.    Claimants are the prevailing Members in this arbitration.

112.    The administrative fees of the AAA/ICDR amount to $85,800.00 USD. The arbitrator compensation totals $900,893.85 USD. Claimants have incurred a total of $897,730.72 USD for fees paid directly to the AAA/ICDR for administrative fees and arbitrator compensation.

113.    Tang paid or agreed to pay the reasonable attorney's fees and expenses of the other Claimants.   For all Claimants, Tang has incurred a total of $3,719,533.23 USD in reasonable attorneys' fees and expenses as of the issuance of this Final Award.

114.    In the event Claimants are required to obtain a judgment confirming this Final Award and effect service on multiple defendants through the Hague Convention, we find Claimants will reasonably incur a total of another $1,200,000.00 USD in legal fees and expenses.

115.    In the event Claimants are required to collect a judgment, we find Claimants will reasonably incur a total of another $500,000.00 USD in legal fees and expenses.

116.    In the event Claimants are required to successfully prosecute or defend against an appeal of the District Court's judgment to the Fifth Circuit or any other circuit court of appeals, we find Claimants will reasonably incur a total of another $250,000.00 USD in legal fees and expenses for that appeal.  In the event Claimants are required to prosecute or defend against a petition for review to the United States Supreme Court, Claimants will reasonably incur a total of $50,000.00 USD in legal fees and expenses.  In the event the United States Supreme Court grants review of any appeal, we find that Claimants will reasonably incur an additional $150,000.00 USD in legal fees and expenses.

117.    In addition, Tang has incurred additional expenses directly related to this arbitration in the amount of $1,875,264.71 USD, including without limitation, experts' fees and expenses, all costs associated with depositions, mediation, arranging facilities, graphics, and trial consultation.

118.    We find that AVIC USA and Thompson are not prevailing Members under the SWE Agreement and that no factual circumstances exists which would compel the panel to award them attorney's fees or expenses.

**Jurisdiction and Composition of the Panel**

119.    The Members of SWE agreed that "any controversy, dispute, or claim arising under or related to this Agreement (whether arising in contract, tort or otherwise, and whether arising at law or in equity), including (a) any dispute regarding the construction, interpretation, performance, validity or enforceability of any provision of this Agreement, and (b) the applicability of this Article XIII to a particular dispute" would be submitted to binding

arbitration.  All of the claims raised by all of the parties in this arbitration come within the scope of this agreed arbitration provision.

120.    Claimants sent notice of its claims to Respondents on May 14, 2014, describing the matters in dispute between Claimants and AVIC USA and its affiliates.  The notice complied with section 13.2 of the SWE Agreement insofar as Claimants' allegations against all Respondents other than Thompson.

121.    Claimants notice failed to describe the "matter in dispute" with regard to Thompson.  Although the notice letter complained of "AVIC's" hiring of Thompson, a member of SWE, it failed to set forth complaints about Thompson's actions as opposed to AVIC's actions.

122.    Claimants initiated this arbitration on June 13, 2014, by filing the Demand with the AAA/ICDR.

123.    The Members of SWE agreed to arbitrate the disputes before the panel in accordance with the AAA Commercial Arbitration Rules.

124.    The Members appointed the arbitrators in accordance with the terms of the SWE Agreement and AAA Commercial Arbitration Rules without a lapse in that process.

125.    The composition of the panel is in accord with the SWE Agreement.[11]

126.    The Members agreed that the arbitrators would have the power to rule on panel's jurisdiction, including the arbitrability of any claim or defense by incorporating Section R-7 of the AAA Commercial Arbitration Rules.

127.    The Non-Signatories were properly served with the Arbitration Demand in this matter and have had due notice of all proceedings before the panel.  Despite this, the Non-Signatories chose to not participate directly.  It is clear to the panel that the Non-Signatories participated in some respects in this arbitration through its subsidiary AVIC USA and to an extent through Thompson.  AVIC USA and Thompson claimed in response to many discovery requests by Claimants that they did not have possession, custody or control over documents and witnesses relevant to these proceedings.  Despite these claims, Ms. Wu Lili, the current President of AVIC IRE, wrote a letter responding to certain questions presented to her by counsel for Thompson.  In addition, Xu Hang, Vice President of AVIC IRE, testified "voluntarily" when asked by Thompson after Claimant's served their damage report in May of 2015.  Prior to that time, Claimants sought to depose Xu Hang without success.  At his deposition, Xu Hang claimed he was represented in the deposition by Thompson's counsel and refused to testify, on counsel's advice, whether he was aware that Claimants sought his deposition.  Even so, Xu Hang admitted that his attorney's fees for his voluntary deposition where being paid by AVIC IRE.  In addition,

---

[11]    Although not binding in a "law of the case" sense, the panel notes that its reading of the SWE Agreement with respect to the appointment of arbitrators is consistent with the opinion of Judge Kinkeade in 3:14-cv-2815 and a panel of the Fifth Circuit, 15-10190.

<u>Final Award:</u>                                                                                      **Page 22 of 33**

Xu Hang made himself available to speak with AVIC USA's damages expert who testified at the hearing.

128. Further, the Non-Signatories refusal to produce documents in this case to Claimants is in contravention of Orders from the panel. Section R-23 of the AAA Commercial Arbitration permits the panel, in an effort to achieve a **fair**, efficient and economical resolution of the case, in the case of willful non-compliance with any order issued by the panel, to draw adverse inferences, exclude evidence and other submissions, and/or make special allocations of costs or an interim award of costs arising from such non-compliance. In addition, the SWE Agreement, section 13.3 (f), permits the panel to consider discovery non-compliance into account in reaching a decision. In a typical case, Claimants would be able to discover the factual basis for its claims that Respondents breached the agreement by entering into X agreement, or financing Y wind project, or making Z equity investment. Respondents' refusal to participate in discovery, except when Respondents felt it was to their benefit, prevented Claimants from getting the information to prove X, Y, and/or Z. As a result, the panel has opted to infer that Xu Hang's statement in CX 330 that AVIC International has invested $50 USD million in wind power projects in the United States is accurate without any additional evidence.

**Defenses**

**Limitations**

129. Claimants did not discover facts constituting the basis of their claims in this case sufficient to put a person of ordinary intelligence and prudence on inquiry prior to May 14, 2011.

130. The facts constituting the basis of Claimant's causes of action were concealed by Respondents and were not inherently discoverable by Claimants.

**Standing**

131. To the extent AVIC USA contends that SWE is not a proper party to this arbitration, the panel determines that SWE is a proper Claimant. The management committee of SWE took action in accordance with article VI of the SWE Agreement authorizing SWE's claims.

**Estoppel, Unclean Hands, Forgery, Waiver, Latches, Duress, Forgery**

132. Tang offered the Members investment in Tang wind farm development projects known as Flat Water and Corpus Christi. AVIC USA chose not to participate in those projects through its silence when the opportunity was presented.

133. Respondents failed to present any evidence that Claimants intentionally waived a known right to proceed against Respondents.

134. Respondents failed to present any evidence that any Claimant executed a written waiver of any part of the SWE Agreement as required by section 17.12 of the Agreement.

135.    Respondents failed to present any evidence that Claimants unreasonably delayed asserting their claims, or that Respondents changed their course of action in a detrimental way in reliance on Claimants' delays in action.

136.    Respondents failed to present any evidence that any Respondent signed the SWE Agreement against his or her will.

137.    The limitations on conducting the business of SWE placed upon Members of SWE are not restrictions on former employees of SWE in their professional mobility and do not restrict former employees from soliciting SWE's customers. Sections 6.10, 6.11, and 6.12 by their terms relate to Members and their Representatives and Affiliates.  As a result, the provisions are not covenants not to compete.

### Counterclaims

138.    AVIC USA contends that Tang breached the SWE Agreement by continuing to receive distributions related to its equity investment in HT Blade.  HT Blade was created in 2001, and was an impetus for the parties to create SWE.  Tang Energy Hong Kong is the owner of the 25% interest in HT Blade.  As a result, the claim could only be made that Tang violated the agreement through an affiliate.  However, the same would be true for AVIC because AVIC HQ and two of its subsidiaries also hold interests in HT Blade.  If the parties to the SWE Agreement intended for their investments in HT Blade to be part of the pooling of interest reflected in the SWE Agreement, they would have explicitly said so.

139.    AVIC USA is not a prevailing party under the SWE Agreement.

140.    Thompson is not a prevailing party under the SWE Agreement.

## CONCLUSIONS OF LAW

1.    Article XIII of the SWE Agreement is unambiguous and may be construed as a matter of law.

2.    Article XIII of the SWE Agreement relevant to this arbitration is not fairly susceptible to different interpretations.

3.    The arbitration panel is composed in the manner provided by the unambiguous agreement of the parties as set forth in Article XIII of the SWE Agreement.

4.    The arbitration panel has the power to decide the disputes raised in this arbitration by virtue of Article XIII of the SWE Agreement.

5.    The SWE Members clearly and unmistakably empowered this panel to determine whether this arbitration involves a controversy, dispute, or claim arising under or related to the SWE Agreement (whether arising in contract, tort or otherwise, and whether arising at law or in

equity), including any dispute regarding the construction, interpretation, performance, validity or enforceability of any provision of the SWE Agreement

6.      Extrinsic evidence may not be used to interpret the intent of the parties or vary the terms of an unambiguous provision of a contract.  *Eagle Industries v. DeVilbiss Health Care*, 702 A.2d 1228, 1232 (Del. 1997).

7.      A contract is not ambiguous simply because the parties disagree concerning its intended construction.  *Eagle Industries v. DeVilbiss Health Care*, 702 A.2d 1228, 1232 n. 8 (Del. 1997).

8.      The "Business" of Soaring Wind as set forth in paragraph 2.3 of the SWE Agreement is unambiguous and may be construed as a matter of law.  The definition of the "Business" of SWE is worldwide marketing of wind energy equipment, services and materials related to wind energy and includes development of wind farms.

9.      The MOU is a preliminary agreement to agree between CATIC T.E.D. and Tang. *See* AVIC USA HRG EXH 169; *See, e.g.*, *Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1186 (Del. Ch. 2009) (agreement lacking material terms is unenforceable); *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) ("[A] mere agreement to agree, in which a material term is left for future negotiations, is unenforceable."). "[O]ne of the central tenets of contract law is that a contract must be reasonably definite in its terms to be enforceable." *Scarborough v. State*, 945 A.2d 1103, 1112 (Del. 2008).

10.     Delaware's three-year statute of limitations applies to all Claimants' causes of action against Thompson and AVIC USA.

11.     The parol evidence rule bars "evidence of additional terms to a written contract, when that contract is a complete integration of the agreement of the parties."

12.     The SWE Agreement is an integrated agreement.

13.     The determination of whether one entity is the alter ego of another under federal common law requires a finding that (1) the non-signatory exercised complete control over the signatory with respect to the transaction at issue, and (2) such control was used to commit a fraud or wrong that injured the claimants.  *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 359 (5th Cir. 2003) (*Bridas I*).  The elements of alter ego under Delaware law is substantially the same as the elements under federal common law.

14.     This panel concludes (1) that AVIC HQ used related entities in the form of its subsidiaries and their subsidiaries to pursue its interests in renewable energy for the benefit of itself and those related entities, and (2) that it would be unjust to require Claimants to treat them other than as one entity; and we conclude that AVIC HQ, AVIC International, AVIC IRE, AVIC TED, CAIGA, and Ascendant are the alter egos of AVIC USA with respect to the SWE Agreement.  In this case, we conclude that AVIC IRE was bound by the agreements of AVIC IHC and AVIC USA, and it follows that AVIC USA and AVIC IHC and AVIC HQ are liable for any conduct of AVIC IRE (or any other AVIC affiliate) that breached those agreements.

<u>Final Award:</u>                                                                                                  **Page 25 of 33**

15.     The panel concludes that (1) AVIC HQ exercises such complete dominion and control over the other AVIC Respondents that they all operate as a single economic entity, and (2) AVIC HQ used its control over its subsidiaries to commit a fraud or injustice against Claimants, and there was an overall element of injustice that injured Claimants.

16.     We further conclude that based on AVIC HQ's role in its subsidiaries' conduct, the local, relevant activities of CAIGA, AVIC IHC, AVIC USA, CATIC TED, AVIC IRE and Ascendant, including the execution of the MOU, the SWE Agreement, and the Chicago Agreement, as well as all of AVIC IRE's and Ascendant's activities in the wind farm development business are properly attributed to AVIC HQ and to its affiliates because they are the same legal entity.

17.     The panel concludes that AVIC HQ and the other Non-Signatories are properly before this Panel on theories of alter ego, attribution and merger, and that they all may be charged with the obligations of AVIC USA, including the obligation to arbitrate pursuant to Article XIII of the SWE Agreement.

18.     As a result of the panel's determination that the Non-Signatories are alter egos of AVIC USA, we conclude that the merger clause of the SWE Agreement supersedes the MOU. As a result, we conclude that no damages are warranted based upon the MOU.

19.     We conclude that all Respondents, other than Thompson, are liable for damages for the breach of the SWE Agreement.  As a result of Respondents engaging in "Business" activities in violation of the Soaring Wind Agreement, Claimants are entitled to damages as well as disgorgement of Respondents profit interest in SWE.

20.     We conclude that while Thompson breached the SWE Agreement, Claimants failed to give him notice of their claims in that regard which is a condition precedent to liability under section 13.2 of the SWE Agreement.

21.     We conclude that the Chicago Agreement is preliminary agreement to agree between CATIC T.E.D. and Tang and therefore unenforceable as a breach of contract.

22.     We conclude that Respondents are not liable to Claimants for theft of trade secrets.

23.     We conclude that Respondents did not tortuously interfere with Claimants' prospective contractual relations with Wind Tex Energy related to the Cirrus Wind Project.

24.     We conclude that the SWE Agreement specifically disclaims the existence of a fiduciary duty between the Members of SWE or the Members and SWE.  Therefore, we conclude that no fiduciary relationship existed between Claimants and Respondents.

25.     We conclude that because a contract exists which controls the relationship between Claimants and Respondents; unjust enrichment is not available as a remedy to Claimants.

26.     We conclude that Claimants have stated a claim entitling them to relief.

27.     We conclude that Soaring Wind has properly intervened to assert its own claims for damages resulting from the conduct of Respondents.  We conclude the individual Claimants – the members of Soaring Wind other than Thompson and AVIC USA – have rightfully sought the divestiture of Thompson's and AVIC USA's interests in Soaring Wind.  Accordingly, the defense fails.

28.     We conclude that the evidence does not support the defense of unclean hands.

29.     We conclude that the evidence does not support a defense of estoppel.

30.     We conclude that Thompson agreed to all of the material terms of the SWE Agreement and was a Class B Member of SWE.

31.     We conclude that the evidence does not support a defense of waiver.

32.     We conclude that the evidence does not support a defense of laches.

33.     We conclude that the evidence does not support a defense of duress.

34.     We conclude that the contractual restrictions on Members set forth in the SWE Agreement are not covenants not to compete.

35.     We conclude that the evidence does not support AVIC USA's counterclaim for breach of the SWE Agreement.

36.     We conclude that the evidence does not support a counterclaim of unreasonable restriction on competition.

37.     As a result of Respondent's breach of the SWE Agreement, we conclude that, in equity, the Soaring Wind interests that belong to Thompson and AVIC USA should be divested, and that AVIC USA should have its initial capital investment of $350,000.00 USD offset against the award against Respondents.

38.     We conclude that SWE is the owner of the claims asserted by Claimants against Respondents for breach of the SWE Agreement.

39.     We conclude that the claims for equitable divesture of Thompson's and AVIC USA's interests in Soaring Wind belong to Tang, JFI, Nolan, Carter and Young in proportion to their ownership interests in SWE.

40.     We conclude that all Respondents other than Thompson are jointly and severally liable to SWE in the amount of $62.9 USD million for breach of the SWE Agreement.

41.     We conclude that all Respondents other than Thompson, who shall bear its own administrative fees and arbitrator compensation incurred, are jointly and severally liable to Claimants for $897,730.72 USD for fees paid directly to the AAA/ICDR for administrative fees and arbitrator compensation; $3,719,533.23 USD in reasonable attorneys' fees and expenses as of the issuance of this Final Award; $1,200,000.00 USD in legal fees and expenses Claimants will reasonably incur in the event Claimants are required to obtain a judgment confirming this Final Award and effect service on multiple defendants through the Hague Convention; $500,000.00 USD in legal fees and expenses in the event Claimants are required to attempt collection of this award; $250,000.00 USD in legal fees and expenses in the event Claimants are successful in any appeal of a District Court's judgment confirming this award; $50,000.00 USD in legal fees and expenses in the event Claimants are required to respond to a petition for writ of certiorari to the United States Supreme Court; $150,000.00 USD in legal fees and expenses in the event the United States Supreme Court grants review and Claimants are successful; and $1,875,264.71, USD for Tang's arbitration expenses including without limitation, experts' fees and expenses, all costs associated with depositions, mediation, arranging facilities, graphics, and trial consultation.

### THEREFORE, the PANEL hereby makes an award as follows:

1.     SOARING WIND ENERGY, LLC is awarded its damages against all Respondents, other than Paul Thompson, jointly and severally, in the total amount of $62,900,000.00, USD, less AVIC USA's capital contribution in SWE, plus post judgment interest at the rate of 5% per year, beginning from the date of this Award.

2.     Tang Energy Group, Ltd., is awarded against Respondents, other than Paul Thompson, jointly and severally, $897,730.72 USD for fees paid directly to the AAA/ICDR for administrative fees and arbitrator compensation. Thompson shall bear its costs as incurred.

3.     Tang Energy Group, Ltd., is awarded against Respondents, other than Paul Thompson, jointly and severally, $3,719,533.23 USD in reasonable attorneys' fees and expenses as of the issuance of this Award.

4.     Tang Energy Group, Ltd., is awarded against Respondents, other than Paul Thompson, jointly and severally, $1,200,000.00 USD in legal fees and expenses Claimants will reasonably incur in the event Claimants are required to obtain a judgment confirming this Final Award and effect service on multiple defendants through the Hague Convention.

5.     Tang Energy Group, Ltd., is awarded against Respondents, other than Paul Thompson, jointly and severally, $500,000.00 USD in legal fees and expenses that Claimants will reasonably incur if they are required to attempt collection of this award.

6.     Tang Energy Group, Ltd., is awarded against Respondents, other than Paul Thompson, jointly and severally, $250,000.00 USD in legal fees and expenses in the event Claimants are successful in any appeal of a District Court's judgment confirming this award.

7.     Tang Energy Group, Ltd., is awarded against Respondents, other than Paul Thompson, jointly and severally, $50,000.00 USD in legal fees and expenses in the event Claimants are required to respond to a petition for writ of certiorari to the United States Supreme Court.

8.      Tang Energy Group, Ltd., is awarded against Respondents, other than Paul Thompson, jointly and severally, $150,000.00 USD in legal fees and expenses in the event the United States Supreme Court grants review and Claimants are successful.

9.      Tang Energy Group, Ltd., is awarded against Respondents, other than Paul Thompson, jointly and severally, $1,875,264.71, USD, for Tang's arbitration expenses including without limitation, experts' fees and expenses, all costs associated with depositions, mediation, arranging facilities, graphics, and trial consultation.

10.     Thompson's membership interest in SWE divested and belongs to Tang, JFI, Nolan, Carter and Young in proportion to their ownership interests in SWE.

11.     AVIC USA's membership interest in SWE divested and belongs to Tang, JFI, Nolan, Carter and Young in proportion to their ownership interests in SWE.

12.     All relief requested and not granted in this Final Award is denied.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made, as a majority decision, in Dallas, Texas, U.S.A.

SIGNED this 21st day of December, 2015.

I, Steven E. Aldous, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

Steven E. Aldous, Arbitrator

State of Texas                   )
                                   )
County of Dallas              )

On this 21st day of December, 2015, before me personally came and appeared Steven E. Aldous, known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

*SARAH M. IRISH*
Notary Public, State of Texas
My Commission Expires
July 15, 2017

Sarah M. Irish
Notary Public within and for the State of Texas

My Commission Expires: 7-15-17

I, John M. Marshall, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____
John M. Marshall, Arbitrator

State of Texas                   )
                                     )
County of Dallas              )

On this _____ day of _____, 2015, before me personally came and appeared John M. Marshall, known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public within and for the State of Texas

My Commission Expires: _____

**Final Award:**                                               **Page 30 of 33**

SIGNED this 21st day of December, 2015.

I, Steven E. Aldous, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____
Steven E. Aldous, Arbitrator

State of Texas          )
                             )
County of Dallas      )

On this _____ day of _____, 2015, before me personally came and appeared Steven E. Aldous, known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public within and for the State of Texas

My Commission Expires: _____

I, John M. Marshall, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____
John M. Marshall, Arbitrator

State of Texas          )
                             )
County of Dallas      )

On this 2/st day of December 2015, before me personally came and appeared John M. Marshall, known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

> JOSE J. DURAN
> Notary Public
> STATE OF TEXAS
> My Comm. Exp. 05-07-17

_____
Notary Public within and for the State of Texas

My Commission Expires: 05/07/17

**Final Award:**                                                                      **Page 30 of 33**

I, William Toles, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____
William Toles, Arbitrator

State of Texas          )
                        )
County of Dallas        )

On this 21st day of December, 2015, before me personally came and appeared William Toles, known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public within and for the State of Texas

My Commission Expires: _____

> LINDA S. HAMMON
> Notary Public, State of Texas
> My Commission Expires
> **January 17, 2018**

I, Richard Capshaw, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____
Richard Capshaw, Arbitrator

State of Texas          )
                        )
County of Dallas        )

On this _____ day of _____, 2015, before me personally came and appeared Richard Capshaw, known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public within and for the State of Texas

My Commission Expires: _____

**Final Award:**                                              **Page 31 of 33**

I, William Toles, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____
William Toles, Arbitrator

State of Texas            )
                          )
County of Dallas          )


On this _____ day of _____, 2015, before me personally came and appeared William Toles, known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public within and for the State of Texas

My Commission Expires: _____


I, Richard Capshaw, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____
Richard Capshaw, Arbitrator

State of Texas            )
                          )
County of Dallas          )


On this 21st day of December, 2015, before me personally came and appeared Richard Capshaw, known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public within and for the State of Texas

My Commission Expires: _____

ANNA B. NEWTON
MY COMMISSION EXPIRES
August 15, 2016

**Final Award:**                                                                 Page 31 of 33

I, Gregory Shamoun, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____
Gregory Shamoun, Arbitrator

State of Texas                )
                              )
County of Dallas              )

On this _21_ day of _December_, 2015, before me personally came and appeared Gregory Shamoun, known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public within and for the State of Texas

My Commission Expires: _10/31/2018_

**IRENE FLORES RIVERA**
Notary Public, State of Texas
My Commission Expires
October 31, 2018

I, Joseph Byrne, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____
Joseph Byrne, Arbitrator

State of Texas                )
                              )
County of Dallas              )

On this _____ day of _____, 2015, before me personally came and appeared Steven E. Aldous, known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public within and for the State of Texas

My Commission Expires: _____

**Final Award:**                                                            **Page 32 of 33**

I, Gregory Shamoun, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____
Gregory Shamoun, Arbitrator

State of Texas                       )
                                     )
County of Dallas                     )

On this _____ day of _____, 2015, before me personally came and appeared Gregory Shamoun, known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public within and for the State of Texas

My Commission Expires: _____

I, Joseph Byrne, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____
Joseph Byrne, Arbitrator

State of Texas                       )
                                     )
County of Dallas                     )

On this 21 day of DECEMBER, 2015, before me personally came and appeared Joseph Byrne, known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

**MICHAEL J ALEMAN**
Notary Public
STATE OF TEXAS
My Comm. Exp. 03-07-16

_____
Notary Public within and for the State of Texas

My Commission Expires: _3/7/16_

Final Award:                                                      Page 32 of 33

The following arbitrators dissent to this Final Award:

- Hon. Glen Ashworth

- Hon. Jeff Kaplan

- Hon. Mark Whittington