# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L |
| THIS DOCUMENT RELATES TO:<br>ALL CASES AND | JUDGE FALLON |
| *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.); | MAG. JUDGE WILKINSON |
| *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.); | |
| *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Case No 10-361 (E.D.La.); | |
| *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1672 (E.D.La.); | |
| *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.); | |
| *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.) | |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR ASSESSMENT OF CLASS DAMAGES PURSUANT TO RULE 55(b)(2)(B)

# FILED UNDER SEAL

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  The Historical Actions of the Defendants Demonstrates Their
        Intentional Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.  The Procedural History of the Damage Assessment Hearing . . . . . . . . . . . . . . 18

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A.  Pursuant to the Principles of FRCP 55, The Extent of the BNBM
        and CNBM Defendants' Participation in the June 9th Hearing Is
        Limited to Challenging the Amount of Damages Owed
        to the Plaintiff Class. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        1.  Liability Issues Are Conclusively Established by Default and,
            Thus Not Subject to Challenge by Defendants at the
            June 9th Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        2.  Defendants' Reliance on *Jackson v. FIE Corp.* Is Misplaced. . . . . . . . . 28

        3.  Defendants are Estopped From Relitigating Issues that Have
            Already Been Fully Litigated and Determined by This Court in
            *Germano* and *Hernandez* and Again Considered in the Court's
            Consideration of Class Certification. . . . . . . . . . . . . . . . . . . . . . . . . 30

    B.  Plaintiffs May Present Aggregated Class Damages . . . . . . . . . . . . . . . . . . 38

        1.  Class Action Jurisprudence in this Circuit Recognizes
            the Ability to Present Class Damages on an
            Aggregated Basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        2.  Class Damages May Be Proven on an Aggregated Basis
            Provided a Formulaic Method for Calculating Such
            Damages Is Established . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        3.  Plaintiffs' Damage Theories Do Not Implicate a
            *Chevron* Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    C.  Defendants' Efforts to Defeat Class Manageability By Raising

**False Conflicts of Law Are Unavailing As the Relevant State Laws Uniformly Permit Recovery of Repair Damages.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**D.**    **Plaintiffs' Use of a Formulaic Damages Methodology to Calculate Damages for Each Class Member is a Widely Accepted Methodology to Establish Class Damages Under Rule 23.** . . . . . . . . . . . . . . . . . . . . . . . . 52

     **1.**    **Scope of Work** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

     **2.**    **Contractor Bids and Unit Pricing Converted to Dollars Per Square Foot Pricing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

     **3**.    **Local Cost Factors** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**E.**    **The Defendants, as a Result of Their Defaults Are Subject to Class-wide Damage Assessments.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

     **1.**    **CNBM/BNBM May Not Relitigate The Issue of Their Affiliation with Taishan.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

     **2.**    **CNBM/BNBM Are in Complete Default in This Litigation** . . . . . . . 72

     **3.**    **Defendants CNBM Group and CNBM Wrongly Argue That the Court Cannot Award Damages Against Them because There Are Merits Proceedings Still to Occur Against Non-Defaulting Parties.** . . . . . . . . . . . . . . . . . . . . . 74

**IV. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

## I. **INTRODUCTION**

Plaintiffs respectfully submit this reply brief to address the responses submitted in opposition to the motion for assessment of damages filed by Taishan Gypsum Co. Ltd. ("Taishan") and Tai'an Taishan Plasterboard Co., Ltd. ("TTP")(Rec.Doc. 18877);  Beijing New Building Material (Group) Co., Ltd. ("BNBM Group") and Beijing New Building Materials Public Limited Company ("BNBM")(Rec.Doc. 18890) and China National Building Materials Company Limited ("CNBM"), China National Building Materials Group Corporation ("CNBM Group")(Rec.Doc. 18887).

Following its rigorous analysis of the Rule 23 standards, this Court issued detailed findings of fact and conclusions of law supporting its certification of a class of active litigants with claims against the defaulted Taishan Defendants.  *In re Chinese Manufactured Drywall Products Liab. Litig.*, 2014 WL 4809520 (E.D.La. Sept. 26, 2014)(Rec.Doc. 18028)[hereinafter "*Class FOFCOL*"].  The certified class Plaintiffs then moved for an assessment of class damages pursuant to Rule 55(b)(2)(B) (Rec.Doc. 18086).  When the time came to hear this motion, the absent Defendants, Taishan, TTP, CNBM, CNBM Group, BNBM Group and BNBM, awakened from their feigned slumber of the past five years to seek an adjournment.  Their past inattentiveness, however, has consequences. As a result of their default, all of the well-pleaded allegations of the complaint are now admitted.  The only defense available to the defendants at the hearing set for June 9, 2015, is to the quantum of damages that may be awarded against them. On this score, their arguments presented by their serial oppositions to the assessment of damages are full of sound and fury, but signify nothing.

1

Plaintiffs below will address the effect of the Defendants' default judgments first. Thereafter, the principal arguments raised by the Defendants will be addressed including 1) the straw-man challenge to the accepted methodology of awarding formulaic damages in class actions; 2) the manageability argument that differences exist in state law regarding the recovery of repair damages (when the laws of the impacted jurisdictions uniformly permit such damages); 3) that Plaintiffs' expert cannot reliably employ his formulaic damage methodology, which Defendants mis-characterize as statistical extrapolation;[1] and 4) that damages cannot be assessed against defaulting parties when on-going proceedings against non-defaulting parties conclude (while ignoring that all of the Defendants are in default).

As discussed in more detail below, Defendants' arguments are not well founded.

## II.  FACTUAL BACKGROUND

### A.  The Historical Actions of the Defendants Demonstrates Their Intentional Default

"Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence."[2]  The facts and evidence of record in these MDL proceedings demonstrate that, for years, the Taishan, BNBM,

---

[1]Plaintiffs have informed the Defendants of their intention to reserve until subsequent phases the determination of individual damages related to class members' alternative living expenses ("ALE") and loss of use and enjoyment.  The Plaintiffs' Steering Committee ("PSC") has determined that streamlining the proceedings to focus solely on calculating class members' actual damages for repair and remediation is the soundest way to proceed on an aggregated formulaic basis.

[2]John Adams, Argument in Defense of the British Soldiers in the Boston Massacre Trials on November 27, 1770, published by William Emmons (Boston 1824), at 117, available at http://www.loc.gov/law/help/rare-books/pdf/john_adams_1824_version.pdf.

and CNBM entities steadfastly clung to their strategic decision to ignore this litigation, despite receiving notice of the complaints against them. These Defendants intentionally tried to thwart proper service of the complaints under the Hague Convention, then chose to sit on the sidelines even as the Court repeatedly invited them to participate or risk default, even as default judgments were entered against them, even as claims were tried in *Germano* and *Hernandez* even as two panels of the Fifth Circuit affirmed personal jurisdiction over Taishan and TTP, even as a Judgment Debtor Examination Order was flouted and counsel representing their interests were summarily discharged, even as a Contempt Order and Injunction was entered, and even as a class was certified in *Amorin* and a hearing was scheduled to assess class damages. Now, upon re-appearing through counsel, they again challenge jurisdiction over them and even in corporate filings contend that any judgment entered against them would not be enforceable in China, in any event.

Such a remarkable record of non-participation is all the more extraordinary in that it was by design; and the net effect is that justice has been delayed for thousands of Plaintiffs with Taishan Chinese Drywall in their homes. After waiting almost six years to have their claims resolved, after watching Taishan flee the jurisdiction in order to avoid paying the *Germano* judgment, after finally obtaining a date for a hearing to assess class damages, Plaintiffs were forced to wait even longer as two additional adjournments were granted to allow Defendants' new counsel an opportunity to catch up.[3] And, now, virtually on the eve of that hearing, Defendants have filed hundreds of pages of motions and briefs seeking to derail these proceedings once again. Despite their previous and calculated avoidance of the *Chinese Drywall*

---

[3] *See* Transcript of Motion Hearing, 2/12/2015, at 6-8 (attached hereto as Exhibit 1).

litigation altogether, at the 11th hour, Defendants seek to decertify the class, vacate portions of

the class certification order, upend liability and alter ego findings, challenge Plaintiffs' damages

model, dispute the make-up of the class, restructure the hearing on damages so that it consists of

oral argument rather than an evidentiary proceeding, and adjudicate motions to dismiss for lack

of personal jurisdiction and lack of service, motions to vacate default judgments, and a myriad of

other issues – all in an unscrupulous effort to bring the proceedings to a screeching halt to avoid

an assessment of class damages.

Defendants, of their own volition, missed multiple opportunities to raise these points

earlier.  At this juncture, other than a challenge to Plaintiffs' evidence of damages, Defendants

have forfeited their right to bring these issues before the Court in a thinly veiled attempt to

scuttle the class damages hearing.  As this Court already has ruled, "it's too late" to "appeal

certification of the class.... The deadline has passed."[4]  The reasons for this are manifold.  As the

Court stated:

> I knew the defective condition of the drywall and how much
> square footage it costs to repair or remedy the situation.  So I
> granted the class certification.  I certified the class.  <u>Taishan and all
> of the defendants in that class action failed to respond</u>.  I certified
> the class in September of 2014 for the claimants who had
> defectively manufactured drywall in their home for property
> damages resulting therefrom on a square footage basis.  I saw that
> would be the appropriate way of doing it.  <u>No defendants
> responded, no appeals were taken</u>, and several months later I set a
> date for a hearing to determine the damages.  The first class action

---

[4] Transcript of Telephone Status Conference, 4/24/2015, at 25 (attached hereto as
Exhibit 2).

determined the scope of the class and the liability of the
defendants, and the second one had to do with damages.[5]

The Court has explained (and BNBM apparently agrees) that discovery on the personal

jurisdiction motions of the BNBM entities (and the CNBM entities once filed) can take place

after the June 9, 2015 hearing on class damages.[6]

Plainly, the equities do not lie in Defendants' favor to delay any further a hearing on

Plaintiffs' damages where the facts and evidence manifest that "Taishan and CNBM and BNBM

... have created this problem[,]"[7] as established by the following:

1.      Beginning in 2009, Plaintiffs filed lawsuits against Taishan, its wholly-owned

subsidiary TTP, and its parents BNBM, CNBM, BNBM Group, and CNBM Group, seeking

damages resulting from defective Chinese Drywall installed in their properties.  Pursuant to the

Hague Convention, the PSC translated the complaints and summonses into Chinese and

endeavored to serve the Defendants in China.[8]  The PSC also sent Defendants relevant pleadings,

including Interventions, notices of default, and the like.[9]

2.      It is undisputed that, on May 8, 2009, service of Plaintiffs' complaint in *The*

*Mitchell Co., Inc. v. Knauf Gips KG, et al.*, Case No. 09-4115 (E.D. La.), was executed on

---

[5]  Transcript of Oral Argument, 3/17/2015, at 11-13 (emphasis added) (attached hereto as
Exhibit 3).

[6]  Transcript of Telephone Status Conference, 4/30/2015, at 5-7, 17-23 (attached hereto
as Exhibit 4); *see also* BNBM's Joinder in Taishan's Hearing Plan at 3-4 ("This Court Should
Resolve Challenges to Default Judgments and Personal Jurisdiction After the Damages
Hearing") (Rec. Doc. 18888).

[7]  4/24/2015 Tr. at 25 (attached hereto as Exhibit 2).

[8]  *See* Proofs of Service (attached hereto as Exhibit 5).

[9]  *See* Service of Pleadings Chart (attached hereto as Exhibit 6).

Taishan.[10]  On <u>August 3, 2009</u>, Taishan was served with the complaint in *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687 (E.D. La.).[11]

3.     The Privilege Log of Hogan Lovells US LLP ("HL") (Taishan's counsel engaged to contest personal jurisdiction over Taishan and TTP), reveals that, on <u>August 18, 2009</u> (*i.e.*, within days of Taishan being served with the *Germano* complaint), HL was exchanging emails with not only Taishan, but also with the principals of Taishan's parent BNBM (*i.e.*, Zhucai Chen, Bian Ziqiang & Tao Zheng[12]), regarding "███████████████████████

███████████████████████████████████████"[13]  This is not surprising.  Taishan's Chairman, Jia Tongchun, was wearing multiple hats – in addition to running Taishan, he was a member of the Board of Taishan's controlling parent, BNBM, at the time.[14]

---

[10]  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 832 (E.D. La. 2012); Rec. Doc. 52.

[11]  *Id.*; Rec. Doc. 1-7 (Case No. 09-6687).

[12]  Tao Zheng serves many functions. He was BNBM's Assistant General Manager, General Manager of Procurement Department and Board Secretary (2005-2009), BNBM Group's General Manager and Deputy Secretary of the Party Committee and Director (BNBM(Group)0002765) (2014 to present), a Non-Executive Director for CNBM (2014-present), and Deputy General Manager and Board Secretary of China Fiberglass Co., Ltd. (2009 - 2014).  *See* Exhibit 56 to the Declaration of Yan Gao, dated 5/13/2015 ("5/13/2015 Yan Gao Dec.") (attached hereto as Exhibit 7); http://www.cnbm.com.cn/wwwroot/c_0000000500010002/d_30588.html.

[13]  HL Privilege Log (filed under seal) (attached hereto as Exhibit 8) at No. 10, p. 3.

[14]  *See* BNBM Board First Extraordinary General Meeting of Shareholders for the Year 2007 of Shandong Taihe Dongxin Co., Ltd. (TG0020715), at p. 40, Sec. III(8) (Herman Aff. Ex. "135") (attached hereto as Exhibit 9).

4.      BNBM's documents show that it controlled Taishan at the time these suits were instituted and it continues its control over Taishan today.[15]  BNBM, in turn, is controlled by CNBM and CNBM Group.[16]

5.      Early on, beginning in April, 2009, both CNBM and BNBM were communicating and meeting with their fellow competitor Knauf Plasterboard (Tianjin) Co., Ltd. ("Knauf") to discuss their involvement in and concerns over the Chinese Drywall litigation in the United States.  On May 15, 2009, Knauf wrote to Song Zhiping, Chairman of the Board of CNBM Group, noting that "Taishan Gypsum Co., Ltd. and/or BNBM have been named as defendants in more than 90 lawsuits" and expressing concerns about reports of "the relationship among

---

[15]  *See* BNBMPLC0001308 ("Taishan Gypsum Co. Ltd. is a subsidiary controlled by the Company [BNBM]") (emphasis added) (attached as Exhibit 10 hereto); BNBMPLC0001359 (referring to Taishan Gypsum Co., Ltd. as "a share-controlled subsidiary of the Company [BNBM]") (attached as Exhibit 11 hereto); BNBMPLC0002304-05 (same) (attached as Exhibit 12 hereto); *see also* BNBMPLC0001674-75 (chart of guarantees provided by BNBM to Taishan) (attached as Exhibit 13 hereto); BNBMPLC0001679-83 (loan guarantees from BNBM to Taishan and report of mortgages of Taishan) (attached as Exhibit 14 hereto); BNBMPLC0003921-22 (same) (attached as Exhibit 15 hereto); BNBMPLC0002923-29 (same) (attached as Exhibit 16 hereto).

[16]  *See* BNBMPLC0001282 ("In accordance with the reply given in the document (Guo Zi Chan Quan [2004] No.1204) issued by State-owned Assets Supervision and Administration Commission of the State Council on January 4, 2005, Beijing New Building Material (Group) Co., Ltd. (BNBM Group), the original controlling shareholder of the Company, will transfer 60.33% equity held by it in the Company (347mn shares) to China National Building Materials Group Corporation (CNBM Group, previously known as – China National Building Material and Equipment Import and Export Company) without compensation, thus making CNBM Group the controlling shareholder of the Company.") (emphasis added) (attached as Exhibit 17 hereto); BNBMPLC0001597 (same) (attached as Exhibit 18 hereto); BNBMPLC002348 (same) (attached as Exhibit 19 hereto); BNBMPLC0002821 (same) (attached as Exhibit 20 hereto); BNBMPLC0001358-59 ("actual controller" of BNBM is "China National Building Material Company Limited") (emphasis added) (attached as Exhibit 21 hereto); BNBMPLC0001551 (same) (attached as Exhibit 22 hereto); BNBMPLC0002794-96 (same) (attached as Exhibit 23 hereto); BNBMPLC0003213-16 (same) (attached as Exhibit 24 hereto).

Taishan Gypsum, BNBM and CNBM."[17]  Knauf encouraged CNBM and BNBM to "take

effective measures to respond to the U.S. consumer lawsuits ... as soon as possible."[18]  On May

15, 2009, Mark Norris, Commercial Director for Knauf, shared with Wang Bing, General

Manager for BNBM Group, their mutual concerns over the Chinese Drywall litigation –  "we are

both facing more pressures from the U.S. plasterboard incident."[19]  Knauf offered "to share with

[BNBM] [its] experiences in dealing with the U.S. lawsuits and media."  "We will make our best

efforts to help you take all necessary actions to jointly respond to the crisis in the U.S. and to

protect the international image of Chinese enterprises and Chinese-made building material

products."[20]

6.      Meanwhile, throughout the proceedings, and at least as early as August 11, 2009,

this Court encouraged Defendants to participate in the litigation or risk the consequences of

failing to enter an appearance:

> I need to know who is in the litigation, and from that standpoint
> the people who have been sued and who have been served, those
> individuals have to make some appearance.  And if they don't
> make the appearance, I am going to instruct the plaintiffs who have

---

[17]  *See* Letter from David Gregory, Chairman of the Board for Knauf Plasterboard
(Tianjin) Co., Ltd. to Song Zhiping, Chairman of the Board for CNBM Group, dated 5/15/2009
(enclosing list of lawsuits against Taishan and BNBM and "relevant litigation documents")
(attached hereto as Exhibit 48).

[18]  *Id*.

[19]  *See* Letter from Mark Norris, Commercial Director for Knauf to Wang Bing,
Chairman of the Board for BNBM Group, dated 5/15/2009 (enclosing list of lawsuits against
Taishan and BNBM and "relevant litigation documents" and noting that "CNBM also became a
target") (attached hereto as Exhibit 49).

[20]  *Id*.

sued them to file with me a motion for default judgment and I will
have to act on that.[21]

Despite the Court's efforts in this regard, Taishan, BNBM, and CNBM failed to enter their

appearances.

       7.     There is no doubt, however, that not only was BNBM served with notice of this

litigation, but also the Company was well aware of these proceedings and closely followed them

for its investors, the industry, and Taishan.  Indeed, on <u>May 28, 2010</u>, BNBM announced this

major event to its shareholders:

> <u>[T]he Company [BNBM] was served a summons from the US</u>
> <u>concerning the litigation in relation to the use of Chinese gypsum</u>
> <u>boards,</u> which involves an amount of USD150,000, while <u>Taishan</u>
> <u>Gypsum was served some summons from the US concerning the</u>
> <u>litigation in relation to the use of Chinese gypsum boards,</u> which
> involve an amount of USD5,225,000. The defendants of the above
> summons include not only the Company and Taishan Gypsum, but
> also tens of Chinese manufacturers and exporters engaged in
> export of gypsum boards to the US, as well as domestic importers,
> property developers, construction companies and a number of
> other enterprises in the US. <u>The Company and Taishan Gypsum</u>
> <u>will continue to keep an eye on the progress of the incident, and</u>
> <u>address and handle the same with due prudence, so as to be</u>
> <u>responsible to investors, consumers and the industry.</u>[22]

---

[21]  Transcript of Status Conference, 8/11/2009, at 10-11 (attached hereto as Exhibit 25);
Minute Entry dated 8/11/2009 (modifying PTO 1 "to reflect that those who have been served and
who have not made an appearance will be subject to default. The Court instructed the parties to
file a motion for default in cases involving parties who have been served but who have not made
an appearance, before the next status conference.") (Rec. Doc. 165) (attached hereto as Exhibit
26); *see also* Transcript of Status Conference, 9/24/2009, at 20-21 (discussing preliminary
default against Taishan in *Mitchell*) (attached hereto as Exhibit 27); Transcript of Status
Conference, 10/15/2009, at 16 (noting preliminary default against one company and Court's
authority as MDL judge to "issue orders seizing either vessels, or bank accounts, or transfers"
once default is confirmed and money judgment is entered) (attached hereto as Exhibit 28).

[22]  *See* BNBM Announcement No. 2010-009 dated 5/28/2010 (emphasis added) (noting
(continued...)

8.      BNBM's Annual Reports for 2010 through 2014 confirm that "[t]he Company [BNBM] and Taishan Gypsum [promised their shareholders that they] would continue to attach great importance and keep a close eye on this matter's developments [*i.e.*, the Chinese Drywall proceedings], prudently respond to and deal with this matter on the attitude of being responsible to investors, consumers and the industry."[23]

9.      CNBM certainly shared that awareness of this litigation.  Beginning as early as June 3, 2010, Chang Zhangli, CNBM's Vice President at the time (currently its Executive Director), and Board of Directors Secretary,[24] who also happens to be a BNBM Director since 2008, and was BNBM's Deputy General Manager and Secretary to the Board from 2000-2005,[25] was exchanging emails with attorneys at HL '███████████████████████ ██████████████████████████████████████████████████.'[26] Interestingly, Zhang Jianchun, Board Secretary for both Taishan and TTP, was part of these

_____

[22](...continued)
that: "The Company and all members of the board of directors hereby warrant the truthfulness, accuracy and completeness of the contents of this announcement, and that there are no false representations, misleading statements or material omissions contained herein.") (Translation in English, attached as Exhibit 8 to the 5/13/2015 Yan Gao Dec.).

[23]   *See* BNBM 2010 Annual Report at 38 (attached as Exhibit 14 to the 5/13/2015 Yan Gao Dec.); BNBM 2011 Annual Report at 39 & 108 (attached as Exhibit 22 to the 5/13/2015 Yan Gao Dec.); BNBM 2012 Annual Report at 36 (attached as Exhibit 30 to the 5/13/2015 Yan Gao Dec.); BNBM 2013 Annual Report at 35, 95 & 96 (attached as Exhibit 38 to the 5/13/2015 Yan Gao Dec.; BNBM 2014 Annual Report at 37 (attached as Exhibit 46 to the 5/13/2015 Yan Gao Dec.); *see also* BNBMPLC0001578 (attached as Exhibit 29 hereto); BNBMPLC0001686 (reporting on US Chinese Drywall litigation) (attached as Exhibit 30 hereto).

[24]   *See* CNBM Annual Report, 2014, at 88 (attached as Exhibit 55 to the 5/13/2015 Yan Gao Dec.).

[25]   *Id.*

[26]   *See* HL Privilege Log at Nos. 11 & 13, p. 3 (Exhibit 8 hereto).

communications regarding legal representation for BNBM and/or CNBM in these MDL proceedings.[27]

10.    On <u>October 13, 2010</u>, James Stengel, from the Orrick, Herrington & Sutcliffe, LLP (hereinafter "Orrick") law firm that now represents the CNBM Defendants in these proceedings, wrote to Plaintiffs' Lead Counsel Arnold Levin, to inform the PSC that <u>BNBM had retained Mr. Stengel as their national counsel to represent them in this litigation</u> and he was aware of and inquired about a conference before Judge Fallon.[28]  At the same time, beginning on <u>October 22, 2010</u> and continuing through <u>November 19, 2010</u>, James Stengel, Christopher Vejnoska, and others from Orrick were communicating with Taishan's counsel regarding

"███████████████████████████████"[29]  The leadership at CNBM was also involved in these discussions.[30]  Ultimately, though, the BNBM and CNBM entities chose not to enter

---

[27] *See* HL Privilege Log at No. 13, p. 3 (Exhibit 8 hereto); *see also* Transcript of Deposition of Zhang Jianchun, dated 4/6/2011, at 20:3-6 (attached hereto as Exhibit 31).

[28] *See* Herman Aff. Ex. "144" (attached hereto as Exhibit 32).

[29] *See* HL Privilege Log at No. 64, p. 12; No. 70, p. 13; No. 76, p. 14; No. 83, p. 15; No. 93, p. 17 (Exhibit 8 hereto).

[30] *See* HL Privilege Log at Nos. 34, 35, & 37, p. 7 (referencing emails dated <u>September 19 & October 12-15, 2010</u>, among Taishan's attorneys and Chang Zhangli and/or Jian Zhang, General Manager of Enterprise Management Department of CNBM Group, (http://www.hcrdi.com/index.php?m=content&c=index&a=show&catid=75&id=1518), ████████████████████████████████ ) (Exhibit 8 hereto); *id.* at Nos. 41 & 44, p. 8 (referencing emails dated <u>October 13-14 & 15, 2010</u> re same); *id.* at No. 61, p. 12 (referencing emails dated <u>October 21, 2010</u> re same); *id.* at Nos. 72 & 73, p. 13 (referencing emails dated <u>October 22-26, 2010</u> re same); *id.* at No. 79, p. 14 (referencing emails dated <u>October 26, 2010</u> re same); *id.* at No. 84, p. 15 (referencing emails dated <u>October 28, 2010</u> re same); *id.* at Nos. 88 & 90, p. 16 (referencing emails dated <u>November 15 & 17, 2010</u> re same); *id.* at Nos. 92, 93 & 94, p. 17 (referencing emails dated <u>November 19 & 25, 2010</u> re same); *id.* at No. 100, p. 18 (referencing emails dated <u>February 2, 2011</u> re same).

their appearances, preferring to remain silent and allow default judgments to be entered against them.

11.     It is clear from Defendants' documents that they nevertheless were very familiar with the details of the Chinese Drywall litigation.  BNBM reported that: "A number of homeowners and construction companies in the US sued BNBM for the reason of problems in gypsum board, and claimed damages for their acclaimed various losses resulting from gypsum board quality problem."[31]  And, as promised, BNBM kept a close eye on Taishan's situation:

> Before Taishan Gypsum responded to any legal action, the US District Court for the Eastern District of Louisiana had made a default judgment against Taishan Gypsum in the sum of US$2,609,129.99.  Taishan Gypsum had filed motions to vacate the preliminary default judgment, and to dismiss legal action on the ground that the US courts did not have personal jurisdiction. Currently, the US court has held hearings limited to the above motions of Taishan Gypsum.  Up to the present, the US courts have not yet made final decision on these motions, nor did made effective judgments against Taishan Gypsum, no result yet.[32]

12.     BNBM admits it consulted with legal experts and considered entering this litigation to defend itself.  In its 2012 Annual Report, BNBM announced that the Company "Retained one US well known law firm as legal counsel for considering and responding to the gypsum board litigation in US."[33]  Ultimately, though, until very recently (and just as the class

---

[31]  *See* BNBM 2012 Annual Report at 35 (Exhibit 30 to the 5/13/2015 Yan Gao Dec.); *see also* BNBM 2013 Annual Report at 34-35 (Exhibit 38 to the 5/13/2015 Yan Gao Dec.); BNBMPLC0002304-05 (same) (Exhibit 12 hereto).

[32]  *Id*.

[33]  *Id*.; *see also* BNBMPLC0002304-05 ("a famous American law firm [is] legal adviser to respond to lawsuits relating to plaster boards in the U.S.A and involving the Company [BNBM] and Taishan Gypsum") (Exhibit 12 hereto).

damages hearing was about to commence), BNBM strategically stayed out of this litigation, preferring to watch from the sidelines.

13.     Despite its refusal to enter its appearance in these proceedings until very late in the game, *i.e.*, February 2015, BNBM has reported expending significant sums on legal costs related to these lawsuits.  In fact, from 2010 through 2014, BNBM spent over $2.3 million (U.S. dollars) in legal fees, including traveling costs, "to deal with the litigation,"[34] and the Company had not even entered its appearance in the MDL.  Taishan spent more than $14.1 million (U.S. dollars) on attorneys during that same period of time.[35]

14.     These Defendants have declared publicly their calculated reasons for sitting on the sidelines of this litigation for so long:  "The [CNBM] Group's major assets and principal commercial activities are all located in China and ... since there is no convention or treaty on mutual recognition and enforcement of judgments between China and US, the respective US and Chinese legal counsels of BNBM and Taishan Gypsum believe that the possibility of the US judgments being enforced in China is very low."[36]

---

[34]  *See* BNBMPLC0001686 (reporting on US Chinese Drywall litigation and legal fees incurred by the Company "to deal with the litigation") (attached as Exhibit 33 hereto); BNBMPLC0002304-05 (reporting on "the sum of attorney fees and traveling costs incurred by the Company") (emphasis added) (Exhibit 12 hereto); BNBMPLC0002778 (same) (attached as Exhibit 34 hereto); BNBMPLC0002932 (same) (attached as Exhibit 35 hereto); BNBMPLC0003197 (same) (attached as Exhibit 36 hereto); BNBMPLC0003327 (same) (attached as Exhibit 37 hereto).

[35]  *See* Summary Chart of Payments Made by BNBM and Taishan Gypsum for Legal Fees Related to Chinese Drywall Litigation based on Annual Reports (attached hereto as Exhibit 38).

[36]  *See* CNBM Public Announcement dated 2/13/2015, available at: http://www.hkexnews.hk/listedco/listconews/SEHK/2015/0213/LTN20150213741.pdf. (attached hereto as Exhibit 39); *see also* BNBM Announcement dated 3/13/2015 ("The major assets of
(continued...)

15.     For this reason, Defendants orchestrated the decision to put Taishan up as a stalking horse to contest personal jurisdiction, and when that failed, they withdrew Taishan from the litigation, resulting in a criminal and civil contempt of court citation and injunction.[37]

16.     As this Court is well aware, these Chinese Defendants have exhibited a propensity for failing to enter their appearances, and, even when they do appear, they fire their attorneys and leave the litigation.[38]  This gamesmanship and abuse of our legal system is shown in the HL Privilege Log where there is evidence that, beginning as early as June 27, 2011 (in the middle of discovery related to Taishan's motions to dismiss for lack of personal jurisdiction), Taishan's Chief of Foreign Trade, Peng Wenlong (whose whereabouts now unknown), communicated with Taishan's Chairman Jia Tongchun, Taishan's Board Secretary Zhang Jianchun, and others about "█████████████████████████████████

---

[36](...continued)
BNBM and Taishan Gypsum are all located in China. According to the US and Chinese lawyers whom BNBM and Taishan Gypsum have respectively consulted, there is no convention or treaty on mutual recognition and enforcement of judgments between China and the US such that the possibility of the US judgments being enforced in China is very low.") (attached as Exhibit 54 to the 5/13/2015 Yan Gao Dec.); CNBM Public Announcement dated 8/20/2014 (CNBMCO00000023-24) (attached hereto as Exhibit 40).

[37]  *See* Contempt Order (Rec. Doc. 17869).

[38]  *Id.  See also* Transcript of Status Conference and Motions Proceedings, 7/17/2014, at p. 30 (attached hereto as Exhibit 41).

██████████████████████████████████████████"[39]   Eventually, these talks

dealt with "████████████████████████████████████████"[40]

17.     As the Plaintiffs discovered during the depositions of Taishan's witnesses in 2011

and 2012, the spoken and written word in China may not be worth very much.  As Taishan's

Deputy General Manager Fu Tinghuan explained: "In China, we exaggerate a little bit.

Exaggerate a little bit, that's allowed."[41]  Accordingly, in hindsight, the comments of Taishan's

counsel to the Court at the hearing to adjudicate Taishan's personal jurisdiction motions turned

out to be suspect.  Mr. Cyr represented:

> [W]e're very grateful to have the opportunity to have this hearing.
> Mr. Jia, the chairman and general manager of TG, whom you've
> met, wanted me to convey to you his respect for the process,
> respect for the court.  Yes, their companies have gone through a
> whole lot with this litigation, but he's grateful that this matter is
> before this Court.  He thinks that they are going to get a fair
> deliberation.[42]

And, yet, as soon as the Defendants did not get the result they were looking for, they appealed to

the Fifth Circuit, and when two appellate panels ruled against them, they fled back to China.

18.     Leading up to Taishan's refusal to appear for its court-ordered Judgment Debtor

Examination on July 17, 2014, the decision for Taishan to engage in contemptuous acts

---

[39]  *See* HL Privilege Log at No. 101, p. 18 (emphasis added) (Exhibit 8 hereto); *see also id*. at Nos. 104 & 108, p. 19 (same); *id*. at Nos. 109-114, p. 20 (same); *id*. at Nos. 115 & 116, p. 21 (same).

[40]  *See* HL Privilege Log at No. 117, p. 21 (Exhibit 8 hereto).

[41]  *See* Deposition of Fu Tinghuan dated 1/10/2012, at 86:14-15 (Herman Aff. Ex. "2") (attached hereto as Exhibit 42).

[42]  *See* Transcript of Motion Hearing Proceedings, 6/29/2012, at 11 (attached hereto as Exhibit 43).

constituting criminal and civil contempt of court was made at the highest levels of this

conglomerate of companies.  In fact, Taishan's long-time counsel, Dong Chungang,[43]

acknowledged that "██████████████████████████████████████████

████████████████████████████████████"[44]  Accordingly, Mr. Chungang "████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████"[45]

     19.    Through these de-privileged documents, Defendants' motivations have been

exposed: "████████████████████████████████████████████████

████████████████████████████████"[46]

---

[43] *See* Transcript of Motion Hearing Proceedings, 6/29/2012, at 11-12 (Dong Chungang
was introduced to the Court at the 6/29/12 hearing on Taishan's personal jurisdiction motions, as
Taishan's "primary outside counsel from China" who "work[ed] with Hogan Lovells on this case
for two years.") (Exhibit 43 hereto).

[44] *See* Email from Dong Chungang to Joe [Cyr] and Eugene [Chen] [HL], dated 7/7/2014
(5:14 am) (HL00000026) (emphasis added) (filed under seal) (attached hereto as Exhibit 44).

[45] *See* Email from Eugene Chen at HL to Joe Cyr at HL, dated 8/5/2014 (HL00000304-
305 ) (filed under seal) (attached hereto as Exhibit 45); *see also* Email from Dong Chungang to
Eugene Chen, dated 8/5/2014 (HL00000306-309)████████████████████████
████████████████████████████████████████████████
████████████████ (emphasis added) (filed under seal)
(attached hereto as Exhibit 46).

[46] *See* Email from Dong [Chungang] to Eugene Chen at HL, dated 8/5/2014
(HL00000306) (emphasis added) (Exhibit 46 hereto).

20.     The Defendants recognized the seriousness of the Court's injunction resulting from Taishan's failure to appear for its Judgment Debtor Examination.  In fact, Peng Wenlong understood that "████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████"[47]  It may include others as well; however, "███████████████████████" if the injunction extended to "████████████"[48]

21.     In the face of Defendants' recalcitrance, the Court continued its efforts to keep Defendants apprised of the litigation, even after Taishan fired its counsel.

> I tried my best to get Taishan and BNBM and CNBM involved in the case long before this.  It's been about five or six years.  Almost every time I have done my best to keep them advised of it.  When they walk away from me, I even after that tried to keep them advised of it through their counsel.  They fire their counsel; I don't let their counsel go.  I tell their counsel, "Stay in the case because I want you to continue to advise Taishan, BNBM, CNBM about the information."[49]

*     *     *

The hearing to assess class damages should go forward on June 9, 2015.  As the Court has ruled (*see* Rec.Doc. 18921), the motions of BNBM to vacate preliminary default judgments and to dismiss for lack of service or lack of personal jurisdiction may be deferred for a later date, after appropriate third-party discovery, after complete document productions by the Defendants, including the custodial files of the individual witnesses requested by the PSC and the 30(b)(6)

---

[47]  *See* HL00000261 (filed under seal) (attached hereto as Exhibit 47).

[48]  *Id*.  As has been shown preliminarily by the PSC (Rec. Docs. 18671, 18684), and as will be presented to the Court in greater detail following discovery, the Defendants' awareness of the Court's injunction did not stop Defendants from violating the Court's order.

[49]  4/24/2015 Tr. at 25 (Exhibit 2 hereto).

deponents, after privilege logs are produced, and after the 30(b)(6) depositions of Taishan, BNBM, BNBM Group, CNBM, and CNBM Group are completed.  As it is, before June 9th, the PSC will have an opportunity to only begin the Defendants' depositions due to a lack of complete document productions from them, and due to the fact that only machine translations have been provided.  The PSC has been scrambling to sort out the gibberish in these documents — translations that make no sense and are illogical.  Moreover, Taishan chose to provide only summaries in many instances, which has required that the PSC complete those translations.  Recently, on May 8, 2015, Taishan produced 4,886 pages of documents dealing with shipments of CDW to Africa and the Middle East, but still has not produced the requested custodial files of Jia Peng or of Taishan's selected 30(b)(6) deponent.  Thousands of Plaintiffs with Chinese Drywall in their homes, who received notice of the class certification and the hearing on class damages, who declined to opt out, and who have been waiting a very long time for redress, are entitled to their day in Court on June 9th.

### B.  The Procedural History of the Damage Assessment Hearing

Plaintiffs filed            their motion for assessment of class damages on October 29, 2014 (Rec.Doc. 18086).  Therein, Plaintiffs explained their intention to recover remediation damages for the class on an aggregated basis.   Plaintiffs supported their motion with the Affidavit of Ronald Wright.  With his background and experience in the construction industry, Mr. Wright opined on the cost of remediation for all class members.[50]   As the motion was uncontested, it

---

[50]At least the BNBM Defendants take issue with the Plaintiffs' effort to recover the cost of remediation or repair for all class members by misreading the class definition as limiting class members only to those asserting claims for *remediated* damages.  BNBM Brf at 1-2.  This novel interpretation demands a distorted reading of the class definition which is contrary to this

(continued...)

was originally set for hearing on December 17, 2014.[51]   At the December 17, 2014 hearing,

Plaintiffs requested that a supplemental notice be issued to the class to advise them that certain

individual claims would not be pursued and that only remediation claims that could be

formulaically proven would be advanced. The Court agreed that supplemental notice should

issue, and, therefore, granted a continuance of the hearing until February 12, 2015 to allow for

the supplemental notice and an opportunity for class members to opt-out.[52]

The February 12, 2015 hearing was remarkable.  Well over five years since the formation

of this MDL, BNBM suddenly appeared to request a continuance of the hearing to assess class

damages for the thousands of victims of their Chinese Drywall, who have been suffering for

more than eight years since this defective material was installed in their homes, while they await

relief from the parties ultimately responsible.[53]   The Court granted Defendants a five-week

---

[50](...continued)
Court's extensive findings of fact and conclusions of law suggesting no such limitation.  *See
Class FOFCOL*, 2014 WL 4809520 at *4 ("Moreover, the average cost of repairing class
members' homes is subject to calculation on a formulaic, square footage basis.").

[51]*See* Order dated October 30, 2014 (Rec.Doc. 18097).  The order also required responses
in opposition to be filed no later than December 9, 2014.  Consistent with Defendants'
intentional strategy to avoid this Court's authority, no responses were filed by the deadline set by
the Court.

[52]*See* Minute Entry of December 17, 2014 (Rec.Doc.18214).  *See also* Order of
December 17, 2014 (Rec.Doc. 18222).  Once again, the Court permitted responses in opposition
to be filed no later than February 4, 2015.  The Taishan Defendants again ignored the Court's
order.

[53]As the hearing transcript reflects, the Deputy Clerk called the motion, and the Court
asked Counsel to make their appearance for the record. *See* Transcript of Proceedings, dated
2/12/2015 ("2/12/2015 Tr.") (Rec.Doc. 18475-7).  After Lead Counsel Arnold Levin spoke up
for the PSC, the Court asked whether "Anybody from the defendant? Anybody from either the
defendant or any of their affiliates?" was present in the courtroom, because there "was at least a
rumor that they were interested in having a continuance, but they didn't put up anybody to
(continued...)

19

extension, until March 17, 2015.  Rec.Doc.Nos. 18331, 18400.  During that interim, all of the

Taishan Defendants appeared *en masse*, including Taishan, TTP. BNBM Group, CNBM and

CNBM Group.[54]

Incredibly and unashamedly, these Defendants contended that "fundamental due process"

required another adjournment of the hearings set by the Court to address Defendants' contempt

of court and an assessment of damages for the thousands of Plaintiffs who have been waiting for

almost six years for relief,[55] and they had the temerity to suggest they are "new parties" coming

into the litigation to defend against "new allegations."  Recognizing that the Defendants were all

in contempt of Court, the PSC filed a motion to preclude Taishan and its affiliates from

participating in the class damages proceeding unless and until Taishan purges itself from

Contempt.[56]  That motion, not the assessment of damages, was heard on March 17, 2015.  The

Court ruled that the Taishan Defendants were still in contempt and to purge themselves of

contempt, Taishan was required to pay (a) $15,000 in attorneys' fees to the PSC; (b) the

*Germano* judgment that formed the basis of the judgment debtor proceedings, amounting to

---

[53](...continued)
represent them formally and ask for a continuance." *Id*. at 3. It was at that moment that Mr.
Levin noted: "We have some activity in the back of the courtroom, Your Honor." *Id*. at 4.
Attorney Aaron Block from Alston & Bird, LLP stood up to announce that he was "entering a
formal appearance for BNBM," *Id*. at 4 &6,  but that he needed "a brief extension given [his firm
had] just [been] retained [that] morning." *Id*. at 6. In fact, Mr. Block "got on the last seat on the
last flight," *id*., to arrive on time. Therefore, he argued, "[i]n order for us to have time to
understand and get our arms around this," "we would ask for an extension of two months."  *Id.* at
6-7.

[54]Rec.Docs. 18352, 18406, 18427, 18428, 18411 & 18444.

[55]CNBM Motion for Continuance at 3 (Rec.Doc. 18455-1).

[56]Rec.Doc. 18367.

$2,609,099.99 plus pre-judgment interest of $149,256.53 plus postjudgment interest at the judicial rate under 28 U.S.C. § 1961, as of the date of payment, (Rec. Doc. 3013); and (c) the associated bill of costs, (*see* Rec. Docs. 17825, 18034). The Court also noted that Taishan had paid the $40,000 contempt penalty.  (*See* Rec. Doc. 18448).[57]  In addition, the Court ordered the immediate commencement of discovery regarding the violation of the Contempt Order's injunction, and permitted discovery regarding whether affiliate or alter ego status exists.[58]  The Court also continued the motion for class damages until April 28, 2015.

As discovery disputes increased, the Court continually monitored and administered the litigation.  On April 24, 2015, the Court conducted a telephonic status conference to address the many outstanding procedural matters.  During the conference, the Court set an outside date of June 9, 2015 for the assessment of damages hearing.[59] The Court's Minute Entry from the conference imposed additional cut-off dates  for the depositions, production of documents to be relied upon at the June 9, 2015 Hearing, and witness lists.[60]  Although the Defendants, except BNBM and BNBM Group, have been glacially slow to produce documents or witnesses for depositions, the PSC has persevered in its efforts to address matters related to the two tracks regarding the damages hearing, as well as violations of the Court's Contempt Order by Affiliates of Taishan.  On April 29, 2015, the BNBM Defendants filed motions to dismiss for lack of personal jurisdiction and lack of service (Rec.Docs. 18774, 18775, 18776), and a joint motion to

---

[57]Rec.Doc. 18493.

[58]*Id.*

[59]Minute Entry of April 24, 2015 (Rec.Doc. 18757).

[60]*Id.*

21

vacate entries of preliminary default (Rec.Doc. 18777).  These motions opened up yet another track, "the jurisdictional track, at least as to BNBM."[61]

Unfortunately, due to personal reasons (and the postponements caused by the repeated continuances and delays created by the Defendants), Mr. Wright was no longer able to support Plaintiffs' efforts as an expert witness.[62]  Plaintiffs were required to quickly replace Mr. Wright with a substitute expert and were fortunate to have Mr. Wright's partner, George Inglis, replace him.  Mr. Inglis's vast experience and credentials make him a worthy replacement.[63]  Under acute time pressure, Mr. Inglis was able to provide a substitute report, which was transmitted to the Defendants on April 27, 2015, (attached hereto as Exhibit 51).  In light of the scrutiny imposed by the Defendants, at Plaintiffs' request, Mr. Inglis amended his report to remove all calculations of alternative living expenses (hereinafter "ALE") and to remove remediation damage calculations for former, not current, property owners.  On May 15, 2015, Mr. Inglis produced his amended report to address these matters (attached hereto as Exhibit 52).  The PSC intends for these claims to be deferred until a subsequent Phase and not presented for class-wide damages to be assessed at the June 9, 2015 hearing.  Mr. Inglis's report well supports the calculation of class members' actual damages based on the formulaic principles endorsed by this Court in its *Class FOFCOL*.  Based on his amended report, class damages may be determined to be:

---

[61]Scheduling Order dated May 13, 2015 at 1 (Rec.Doc. 18921)(noting that "after the damages hearing, the Court will set deadlines, briefing schedules, and hearing dates for the contempt track and jurisdiction track.").

[62]*See* April 15, 2015 Email on behalf of Gerald E. Meunier (attached hereto as Exhibit 50).

[63]*Id.,* attachment of Mr. Inglis' C.V.

22

The class damages calculation and formula is set out below. Class damages amount = *remediation and inspection and clearance* cost of buildings [cost per square foot - i.e. $118.89 figure (national average before adjustment by the applicable localized cost factor) x total square feet of buildings]. Thus, the formula establishes total remediation damages (including CIH) at a national average of $118.89 per square foot. This data is refined by applying zip code specific RS Means cost data to the available square footage data. We have made this refinement as is demonstrated in the spreadsheet in Comp. Ex. 10. In sum, property damages to the class of 2,888 buildings in Comp. Ex. 10 are $607,361,039.00.

*See* Declaration of George J. Inglis, P.E. at ¶8 (Exhibit 52).

## III.  ARGUMENT

### A.  Pursuant to the Principles of FRCP 55, the Extent of the BNBM and CNBM Defendants' Participation in the June 9th Hearing is Limited to Challenging the Amount of Damages Owed to the Plaintiff Class.

Despite CNBM and BNBM's arguments to the contrary, the PSC has never opposed or challenged the decision of the BNBM and CNBM defendants to actively participate in the Rule 55(b)(2) hearing. The legal consequences of that decision, given that these defendants also have filed a motion to set aside the default (which is the predicate for the hearing but will not have obtained a final decision on the requested set-aside by the time of the hearing) are another matter. But, whether a defendant waives or reserves certain grounds to set aside a default at the time it chooses to participate in a 55(b)(2) hearing is a question which has no bearing or effect on the legally-prescribed nature and scope of the hearing itself. The hearing remains one conducted under 55(b)(2), *i.e.,* a proceeding which occurs only on the entry of defaults under 55(a). The provisions of Rule 55 are in full force and effect for purposes of the June 9 hearing, notwithstanding the pendency of a motion to set aside the very defaults that make the June 9 hearing necessary and appropriate. Any tension or uncertainty for defendants with respect to

their decision to participate in the hearing after filing motions to set aside the defaults, is a consequence of their *own* strategy in the litigation.  Their decision does not, and cannot, operate to diminish the legal consequences of default under Rule 55.[64]  Stated simply: Whose problem is it?  The Defendants'.

Pursuant to Rule 55(b)(2), "[t]he court ***may*** conduct hearings . . . when, to enter or effectuate judgment it needs to . . . determine the amount of damages." Fed. R. Civ. P. 55(b) (emphasis added). In light of the foregoing permissive language in the Rule, the Fifth Circuit in *James v. Frame*, 6 F.3d 307 (5th Cir. 1993), explained that "Fed. R. Civ. P. 55(b) does not mandate an evidentiary hearing but, rather, gives the judge wide latitude in determining whether such a hearing will be beneficial." *James*, 6 F.3d at 311. Thus, when it has ample evidence before it to determine the amount of damages, "the court need not jump through the hoop of an evidentiary hearing." *Id*.  As will be discussed in detail below, this Court fully addressed and litigated the issues regarding the scope of Chinese drywall remediation, the methodology of the unit pricing to determine the cost of remediation in both *Germano* and *Hernandez*, and then, again, as a predicate for class certification.[65] In effect, the Court has provided these defendants, who willfully and deliberately sat out of the MDL until recently, an opportunity to challenge the amount of damages owed to the Plaintiff Class, an opportunity not mandated by Rule 55(b).

---

[64] Moreover, to the extent the grounds for the requested default set-aside directly relate to the status of these defendants as alter egos of Taishan Gypsum, or to the Court's personal jurisdiction over these defendants, the Court now has acknowledged that the pending motions to set aside the defaults on the part of these participating defendants requires a new and separate "track" in the case which has no effect on the "class damages track" now culminating in the June 9 hearing.

[65] *See* Rec. Doc. No. 2380 (Germano FOFCOL); *see also* Rec. Doc. No. 2713 (Hernandez FOFCOL).

Defendants, nonetheless, contend that they are owed such opportunity after the fact, so that they might relitigate matters that this Court already has resolved.

### 1.  Liability Issues Are Conclusively Established by Default and Thus Not Subject to Challenge by Defendants at the June 9th Hearing.

In its *Class FOFCOL*, this Court unequivocally stated that, as to defendants participating in the 55(b)(2) hearing, "liability is conceded by default."[66] This accords with well-established precedent of the Fifth Circuit. (*See Myers v. Powell,* No. 12-2181, 2013 WL 3832414, at *4 (E.D. La. July 23, 2013) (citing *U.S. ex rel. M–CO Const., Inc. v. Shipco Gen., Inc.,* 814 F.2d 1011, 1014 (5th Cir. 1987)) "a default judgment is a final judgment on the merits that conclusively establishes the defendant's liability."). "Liability" issues are those which give rise to the need to quantify a legal indebtedness, in this case:  the defectiveness of the Chinese drywall in plaintiffs' property, the corrosive effects on this property, the scope of the needed remediation, and the unit-pricing methodology to calculate remediation costs per-property.  To the extent well-pled allegations of fact are admitted, the issues of drywall defectiveness and corrosive effect are now resolved in plaintiffs' favor for purposes of the 55(b)(2) hearing as a predicate for determining the amount defendants owe in damages.  In addition, as to the remaining issues of remediation scope and costing methodology, defendants are equitably and collaterally estopped from re-litigating such matters as they relate to the quantification of damages, having chosen not to appear on several occasions when these issues were being adjudicated (*i.e.*, *Germano*, *Hernandez*, and *class certification*).

---

[66] *See Class FOFCOL*, 2014 WL 4809520, at *15.

Where, as here, a defendant fails to answer the claims brought against him, the well-pled allegations to which he failed to respond are deemed admitted.  The Fifth Circuit has consistently held that "[a]ttempts by a defendant to escape the effects of his default should be strictly circumscribed; he should not be given the opportunity to litigate what has already been considered admitted in law." *Nishimatsu Const. Co. v. Houston Nat. Bank,* 515 F.2d 1200, 1206 (5th Cir. 1975).  As Taishan points out in its opposition, "[a] judgment by default is a judgment on the merits that conclusively establishes a defendant's liability." *U.S. ex rel. M-CO Const., Inc.,* 814 F.2d at 1014).[67]  Again, as contemplated under Rule 55(b)(2), the only issue open to contest by the defendants on June 9 is the quantification of damages.

In its earlier-filed memorandum on the effects of default, etc., the PSC cited extensively to the well-pled allegations in the various class action complaints where defaults have been entered, to demonstrate the specific grounds for the asserted liability of Taishan Gypsum as a manufacturer/seller of defective drywall, and the BNBM and CNBM entities as alter-egos of, or single business enterprises with, Taishan Gypsum as manufacturer/seller.  These allegations constitute the basis for the legal concession of liability by all of these defendants as participants in the June 9 hearing. [68]

---

[67] *See also* Rec. Doc. No. 18880, at p. 9.

[68] *See Wiltz v. Knauf GIPS KG,* No. 09-3488 (E.D. La.), Rec. Doc. No. 1, p. 2 ¶ 2; p. 6 at ¶11; pp. 8-11 at ¶¶ 19-29; pp. 25-29 at ¶¶ 80-91 (Count IV: Negligence per se);  pp. 29-31  at ¶¶ 93-109 (Count V: Strict Products Liability); pp. 52-54 at ¶¶ 227-234 (Count XVIII: Breach of Express Warranty); pp. 58-59 at ¶¶ 260-268 (Count XXI: Violation of the Deceptive and Unfair Trade Practices Act); *see also Germano v. Taishan Gypsum Co., Ltd,* No. 09-06687 (E.D. Va.), Rec. Doc. No. 1-2, p. 3 at  ¶¶ 10-11; p. 4 at ¶ 19; pp. 5-6 at ¶¶ 20-28; pp. 10-11 at ¶¶ 42-47 (Count 1: Negligence); pp. 11-12 at ¶¶ 49-53 (Count II: Negligence Per Se); pp. 12-13 at ¶¶ 55-61 (Count III: Breach of Express and/or Implied Warranties); p. 14 at ¶¶ 67-72 (Count V: Private Nuisance); p. 15 (continued...)

The PSC also previously discussed in briefs the policy basis for the default process set

---

(...continued)

at ¶¶ 74-76 (Count VI: Unjust Enrichment); and pp. 15-17 at ¶¶ 78-84 (Count VII: Violation of the Virginia Consumer Protection Act); *see also Gross, et al. v. Knauf Gips, KG,* No. 09-6690 (E.D. La.) Rec. Doc. No. 1 (Class Complaint), p. 5 at ¶¶ 4-8; p. 6 at ¶¶ 11-14; pp. 11-12 at ¶¶ 33-34; p. 16 at ¶¶ 71-72; pp. p. 22 at ¶¶ 107-108; pp. 22-24 at ¶¶ 112-117 (Facts Giving Rise to Industry Wide Alternative Liability); pp. 24-26 at ¶¶ 118-130 (Facts Regarding Product Defect); pp. 36-37 at ¶¶ 206-212 (Count I: Negligence); pp. 38-39 at ¶¶ 214-218 (Count II: Negligence Per Se); pp. 38-40 at ¶¶ 220-226 (Count III: Breach of Express and/or Implied Warranties); pp. 40-41 at ¶¶ 228-233 (Count IV: Private Nuisance); pp. 41-42 at ¶¶ 235-240 (Count V: Discharge of a Corrosive Substance); p. 42 at ¶¶ 242-244 (Count VI: Unjust Enrichment); pp. 42-43 at ¶¶ 246-249 (Count VII: Violation of Consumer Protection Acts); *see also Amorin, et al v. Taishan Gypsum Co.,* No. 11-1395 (E.D. Va) Rec. Doc. 1, p. 10 at ¶ 25; pp. 25-26 at ¶ 85; p. 27 at ¶ 89; pp. 29-30 at ¶¶ 96- 98; pp. 30-33 at ¶¶ 99-110; pp. 38-39 ¶¶ 134-140 (Count I: Negligence); pp. 39-40 at ¶¶ 142-147 (Negligence Per Se); pp. 40-42 at ¶¶ 149-165 (Count III: Strict Liability); pp. 42-43 at ¶¶ 167-173 (Count IV: Breach of Express and/or Implied Warranties); pp. 43-44 at ¶¶ 175-182 (Count V: Redhibition); pp. 44-46 at ¶¶ 184-194 (Count VI: LPLA); and pp. 46-47 at ¶¶ 196-201 (Count VII: Private Nuisance); p. 47 at ¶¶ 203-205 (Count VIII: Unjust Enrichment); and pp. 47-48 at ¶¶ 207-210 (Count IX: Consumer Protection Acts). *See Amorin, et al v. Taishan Gypsum Co.,* No. 11-22408 (S.D. Fla.) Rec. Doc. 1, p. 11 at ¶ 25; p. 26 at ¶ 85; p. 30 at ¶¶ 96- 98; pp. 31-33 at ¶¶ 99-110; pp. 38-39 at ¶¶ 134-140 (Count I: Negligence); pp. 39-40 at ¶¶ 142-147 (Negligence Per Se); pp. 40-42 at ¶¶ 149-165 (Count III: Strict Liability); pp. 42-43 at ¶¶ 167-173 (Count IV: Breach of Express and/or Implied Warranties); pp. 43-44 at ¶¶ 175-182 (Count V: Redhibition); pp. 44-46 at ¶¶ 184-194 (Count VI: LPLA); pp. 46-47 at ¶¶ 196-201 (Count VII: Private Nuisance); p. 47 at ¶¶ 203-205 (Count VIII: Unjust Enrichment); and pp. 47-48 at ¶¶ 207-210 (Count IX: Consumer Protection Acts); *see also Amorin, et al v. Taishan Gypsum Co., et al,* Case No. 11-377 (E.D. La.) Rec. Doc. 1, pp. 10-11 at ¶¶ 25, 27; p. 26 at ¶ 85; pp. 26-28 at ¶¶ 86-91; pp. 29-32 at ¶¶ 96- 107; pp. 37-38 at ¶¶ 131-137 (Count I: Negligence); pp. 38-39 at ¶¶ 139-144 (Negligence Per Se); pp. 39-41 at ¶¶ 146-162 (Count III: Strict Liability); pp. 41-42 at ¶¶ 164-170 (Count IV: Breach of Express and/or Implied Warranties); pp. 42-43 at ¶¶ 172-179 (Count V: Redhibition); pp. 43-45 at ¶¶ 181-191 (Count VI: LPLA); pp. 45-46 at ¶¶ 193-198 (Count VII: Private Nuisance); p. 46 at ¶¶ 200-202 (Count VIII: Unjust Enrichment); and pp. 46-47 at ¶¶ 204-207 (Count IX: Consumer Protection Acts); *see also Wiltz v. BNBM,* No. 10-00361, Rec. Doc. No. 1 (Plaintiffs' Omnibus Class Action Complaint II), pp. 96-98, ¶¶ 506-509; pp. 98-99, at ¶ 511; pp. 151-153, at ¶¶741-751; pp. 171-172, at ¶¶ 783-789 (Count I: Negligence); pp. 172-173 , at ¶¶ 791-796 (Count II: Negligence per se); pp. 179-175 , at ¶¶ 798-814 (Count III: Strict Liability); pp. 175-176, at ¶¶ 816-822 (Count IV: Breach of Express and/or Implied Warranties); pp. 182-183, at ¶¶ 854-862 (Count IX: Redhibition); pp. 184-186, at ¶¶ 865-876 (Count X: Louisiana Products Liability); pp. 186-187, at ¶¶ 878-883 (Count IX: Private Nuisance); pp. 187-188, at ¶¶ 885-890 (Count XII: Negligent Discharge of a Corrosive Substance); p. 188, at ¶¶ 892-894 (Count XII: Unjust Enrichment); p. 189, at ¶¶ 896-899 (Count XIV: Violation of Consumer Protection Acts).

forth in FRCP 55, the fundamental purpose of which is to assure that a defendant in default not be allowed to reopen issues in a 55(b)(2) damages hearing which must be viewed as conceded.[69] Applying such a time-honored policy is even more appropriate where the defendants have **chosen** to be in default for a perceived strategic advantage.  Both BNBM and CNBM *deliberately* elected not to appear through counsel because they thought it beneficial to their interests. Their tactic of delay was substantially prejudicial to plaintiff property owners seeking remediation.  These Defendants should not be heard to complain about the preclusive effects of determinations made in their period of purposeful absence. Defendants knew of this litigation and **chose** not to enter the case prior to the *Germano* trial.  They were not forced to be inactive in the litigation; they **chose** not appear through counsel, prior to the *Hernandez* trial.  These defendants then continued to stand outside of the litigation rather than make appearances through counsel and participate, at the time the Court entertained and granted the PSC's motion to certify for class-treatment of the very claims now the subject of the June 9th damages hearing.

### 2.  **Defendants' Reliance on *Jackson v. FIE Corp*. Is Misplaced**.

Defendants cite *Jackson v. FIE Corp.,* 302 F.3d 515 (5th Cir. 2002), for the proposition that a defendant contesting the prior entry of a default judgment is not bound by the preclusive effect of a district court's factual findings made in the course of entering that judgment.[70] *Jackson* and its holding are inapposite.  In *Jackson*, the default judgments were entered against several defendants when they failed to appear, despite proper service. *Id.*  at 518-520. Nearly two years after a judgment was entered by the district court, one of the defaulted defendants moved

---

[69] *See* Rec. Doc. No. 18694, at pp. 2-4.

[70] *See* Rec. Doc. No. 18874 (BNBM's Response), at pp. 6-7.

to vacate the judgment under FRCP 60(b)(4). *Id.* at 520. The district court denied the defendant's motion, concluding that the well-plead allegations in the plaintiffs' complaint conclusively established that the defendant manufactured, sold, and distributed the that caused plaintiffs' harm (i.e. liability). That finding *also provided* a basis for the district court's determination that it had personal jurisdiction over the defendant.  However, "[b]ecause the identity of the [product's] manufacturer has ramifications for both jurisdiction and the merits, the 'foundational principle' embodied in Rule 60(b0(4) collides head-on with a well-established rule of claim preclusion." *Id.* at 524.  Here, however, the Court has made clear, "there are presently three tracks to these proceedings: (1) the damages track; (2) the contempt track; and (3) the jurisdictional track[.]"[71] As such, the only question for purposes of the June 9 hearing (tack one), is how much is owed by defendants. The matters defendants seek to reopen and relitigate are those which are predicates to a Rule 55(b)(2) damages hearing; namely, matters that have already been resolved (the well-pled allegations of fact concerning liability, as well as those already adjudicated concerning scope of remediation and methodology).  The *Jackson* case addresses the question whether, in a *later* hearing on the defendant's motion to set-aside defaults, well-pled allegations bearing on both personal jurisdiction and liability hearing should have preclusive effect inasmuch as they support a court's exercise of personal jurisdiction over a defaulted defendant.  That is a different question, and not germane to what should, or should not, be re-litigated at the 55(b)(2) hearing itself.

### 3.  Defendants are Estopped from Relitigating Issues that Have Already Been Fully Litigated and Determined by This Court in *Germano* and *Hernandez* and Again Considered in the Court's

---

[71] *See* Rec. Doc. No. 18921 (May 13, 2015 Scheduling Order).

## Consideration of Class Certification.

The collateral estoppel doctrine is a creature of equity.  It addresses notions of fundamental fairness by protecting litigants from the burden of relitigating an identical issue with the same party, or one in privity, for the sake of "promot[ing] judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 (1979) (citing *Blonder-Tongue Labs. v. Univ.y of Il. Found.*, 402 U.S. 313, 328–29 (1971)). The relitigation of particular issues will be precluded under the doctrine of collateral estoppel where: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts must have been essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.  *See State Farm Fire & Cas. Co. v. Fullerton,* 118 F.3d 374, 377 (5th Cir. 1997) (citing *Sysco Food Servs., Inc. v. Trapnell,* 890 S.W.2d 796, 801 (Tex. 1994)); *see also Nations v. Sun Oil Co. (Delaware),* 695 F.2d 933, 938 (5th Cir. 1983). "The general rule is that default judgments do constitute res judicata for purposes of both claim preclusion and issue preclusion." *Overseas Motors, Inc. v. Imp. Motors Ltd.,* 375 F. Supp. 499, 516 (E.D. Mich. 1974) *aff'd,* 519 F.2d 119 (6th Cir. 1975) (citing *Last Chance Mining Co. v. Tyler Mining Co.,* 157 U.S. 683, 691 (1985).

It is true that this general rule is subject to certain restrictions, which chiefly require that the issue sought to be precluded was "actually" or "fully" litigated in the prior proceeding. Notably, however, this requirement "does not refer to the quality or quantity of argument or evidence addressed to an issue." *Overseas Motors,* 375 F. Supp. at 516.  Rather, this prong is

satisfied so long as (1) the issue was effectively raised in the prior action,[72] either in the

pleadings[73] or through development of the evidence and argument at trail or on motion;[74] and (2)

the losing party has had "a fair opportunity procedurally,[75] substantively, and evidentially" to

contest the issue.[76]

In a default judgment setting, the doctrine of issue preclusion recognizes that the lack of

participation by one party in the proceedings might result in the absence of adversary truth-

finding; and, therefore, equitable and social policy concerns warrant consideration of whether a

'fair opportunity' to participate should substitute for 'actual participation.' *Id.* at 516, n. 49.  As

the district court in *Overseas Motors,* explained:

> These reasons are essentially the same as those permitting binding
> default judgments to be entered in the first place and they boil
> down to a single, essential proposition: **a party cannot be
> permitted to avoid the law merely by avoiding the courts**.
>
> This willingness to forego the comfortable assurances of accuracy
> generated by a full dress trial is justified by the defaulting party's
> willful failure to make an adversary input into the prior
> proceedings. The law cannot force a party to make the best case
> possible or even any case at all; it only **permits** him to do so,
> prompted by his own self-interest. The only logical alternative
> would be to accept a prior judgment as binding only if both sides
> had supported their positions at some minimal level of

---

[72] *Overseas Motors, Inc.*, 375 F.Supp. at 516 (citing 1B J.Moore, Federal Practice
¶0.443(3) at 3909 (2d ed. 1965)).

[73] *Id.* (citing *James Talcott, Inc. v. Allabahad Bank, Ltd.*, 444 F.2d 451, 459-460 (5th Cir.
1971); *Paine & Williams Co. v. Baldwin Rubber Co.*, 113 F.2d 840, 843 (6th Cir. 1940)).

[74] *Id.* (citing *Hardy v. Bankers Life & Cas. Co.*, 232 F.2d 205, 209 (7th Cir. 1956); *Panie &
Williams Co. v. Baldwin Rubber Co.,* 113 F.2d 840, 843 (6th Cir. 1940)).

[75] *Id.* (citing *Blonder-Tongue*, 402 U.S. at 333).

[76] *Overseas Motors, Inc.*, 375 F.Supp. at 516.

competence, for mere appearance is hardly a guarantee of effective advocacy. Such searching and highly subjective reviews of prior performances by counsel are probably impossible and certainly unacceptable even if possible. 'If an issue is raised and the party who has the burden fails in his proof and the issue is decided against him, he is just as much bound by collateral estoppel as though he had presented a barrel of testimony.' *United States v. Silliman*, 167 F.2d 607, 617 (3d Cir. 1948), cert. denied, 335 U.S. 825, 69 S.Ct. 48, 93 L.Ed. 379. **The party who defaults ought therefore to be given no greater protection from preclusion than one who simply fails in his proof**. In both instances he is entitled to a full and fair opportunity to litigate, and having received that, ought then to be precluded from rearguing the issues decided in his absence, whether the absence was formal or merely effective.

*Id*. at 516, n. 49  (emphasis added).

The Court was the factfinder in *Germano*, the factfinder in *Hernandez*, the determiner of facts for class certification purposes, and now will be the factfinder for the 55(b)(2) damages hearing on June 9.  Yet defendants have the temerity to suggest that the Court, as the sole and continuing factfinder in these proceedings, now should be obliged, for the defendants' sake, to readjudicate core, well-established issues, such as the scope of Chinese drywall remediation, or unit-pricing methodology to determine the cost of remediation. Pointedly, the Court has already <u>exhaustively</u> addressed and adjudicated these very issues in *Germano*, in *Hernandez*, and then as a predicate for class certification.  Defendants do not deny, because they cannot deny, that they had—and ignored—fair opportunity to participate in these prior proceedings. They could have entered the litigation at any one of these moments and challenged the findings of fact on these questions.  That they chose not to do so as a matter of strategy, is likewise undisputed.   As a matter of fundamental fairness, defendants, therefore, should be estopped from requiring the Court and plaintiffs to readjudicate–in a 55(b)(2) hearing necessitated by their election to be

32

placed in default–already-resolved issues that are a predicate to quantification of damages. *See e.g. In re Chinese Manufactured Drywall Products Liab. Litig.*, 742 F.3d 576, 595 (5th Cir. 2014).[77]

Defendants cite the Court's Order of December 4, 2009 [Rec. Doc. No. 576], entered prior to the *Germano* damages hearing of February 2010, in which the Court stated that the results of the *Germano* hearing would only have preclusive effect as to the seven properties which were the subject of that hearing. But, notably, the Court, in the *same Order* stated that the results of the *Germano* hearing hopefully would "provide guidance for similarly-situated and/or affected properties."[78] What was at the time "guidance" in *Germano*, came to assume far more weight and meaningful effect in the course of five years of further proceedings. Indeed, after *Germano*, the Court concluded:

> These homeowners represent a broad cross-section, demographically, of families, ranging from families with young children to couples approaching retirement, with a broad cross-section of employments, including law enforcement, the military, the insurance industry, academia, religious ministry, and business management. (citations omitted). The economic disruption and hardship suffered by these families are found to be representative of the impact CDW has on homeowners. *Id*. Because of the wide spectrum encompassed by these representative structures, the general principles found applicable to them will have relevance, if

---

[77] Knowing far less than is known at present, the Fifth Circuit affirmed this Court's refusal to vacate the *Germano* default judgment. In doing so, the court concluded that, based on the facts before it, TG failed to demonstrate that its neglect was excusable to justify vacating the default judgment–a decision, undoubtedly grounded on the notions of fundamental fairness and equity. "When pressed at oral argument, TG was again unable to provide any justification acceptable under [Fifth Circuit] case law for its failure to make a timely response." *Id.* at 594.

[78] *See* Rec. Doc. 576.

not in toto, to all of the homes contaminated by the defective
Chinese drywall.[79]

Moreover, the Court's findings in *Germano*, even viewed as "guidance" rather than binding in a preclusive sense, were the result of the adversarial process–Knauf actively participated prior to withdrawing as intervenor.  Knauf's intervention in *Germano* afforded the Court an opportunity to address and decide *contested* questions such as the scope of defective drywall remediation and the unit-pricing methodology of remediation cost assessment. In fact, in the *Germano* FOFCOL, the Court made several references to the competing evidence presented by both the PSC and Knauf regarding various considerations concerning the scope of remediation necessary.[80] These issues were the subject of substantial motion practice and other pre-hearing procedures and as to these damages-related matters, the interests of the manufacturer Knauf and Taishan were aligned.  Indeed, the very fact that Knauf was allowed to intervene in *Germano* establishes that the Court's determinations in *Germano* would have broader effect. Whatever the Court set out to adjudicate with respect to these issues in *Germano*, in other words, would have a direct effect on Knauf.  The plaintiffs' allegations of drywall contamination and the effects of off-gassing sulfur are identical as to Taishan and Knauf drywall, and, as the record reflects, it has never been otherwise. Indeed, in its *Class Certification* FOFCOL, the Court also

---

[79] Rec. Doc. No. 2380 (*Germano* FOFCOL), at pp. 63-64.

[80] *See* Rec Doc. No. 2380 (*Germano* FOFCOL), at p. 29 (discussing Knauf expert evidence and testimony as to the lack of reliability and precision necessary to locate all of the CDW in a mixed drywall home); pp. 29-30 (discussing the lack of scientific reliability of Knauf's proposed methods for selective drywall identification, including the contents of expert reports provided by Knauf regarding the same).

acknowledged that, prior to its withdrawal, Knauf's participation in *Germano* presented and afforded an opportunity for the adjudication of remediation scope and cost as contested issues.[81]

*Hernandez*, of course, was a case against Knauf; but, that trial was yet another opportunity for the Taishan defendants to intervene, had they chosen to do so.  Taishan's and Knauf's defensive interests were, once again, exactly aligned in a trial addressed specifically to the issues of remediation scope and cost assessment. The exhaustive *Hernandez* FOFCOL make it clear that the issues of the scope of remediation,[82] both scientifically and as a practical matter (through the Beazer witnesses), as well as the use of unit-pricing as a methodology for quantifying remediation amounts,[83] were vigorously contested questions adjudicated in that bench trial.  The defensive portions of a Chinese drywall manufacturer were fully and adequately represented by able counsel for Knauf; and surely nothing in logic or reality, much less the record, supports any notion that the respective interests of Knauf and Taishan, as the manufacturers of Chinese drywall alleged to have the same off-gassing and corrosive effect on property, were anything <u>other than</u> aligned on these specific, damage-related questions of fact.

---

[81] *See* Rec. Doc. No. 18028 (Class Certification FOFCOL), at p. 26, fn. 7.

[82] *See* Rec. Doc. No. 2713 (Hernandez FOFCOL), at pp. 18-19 (Discussing the PSC and Knauf's competing evidence presented concerning the issue of whether, if the copper sulfide wire remains in the home after all CDW is removed, corrosion will continue to develop); pp. 24-28 (Discussing the testing used by Knauf's experts and the results thereof, of the effects of electrical wire corrosion on the functionality of those wires); pp. 29-30 (Discussing Knauf's position regarding the need to replace all copper and silver plumbing components due to corrosion); pp. 40-40 (Discussing Knauf's position as to the Plaintiffs' recovery of damages for personal property and the evidence submitted in support thereof).

[83] *See* Rec. Doc. No. 2713 (Hernandez FOFCOL), at pp. 36-38 (Discussing the cost estimates and methodologies used for ascertaining those estimates submitted by both the Plaintiffs and Knauf).

Defendants now have moved to vacate the Court's *Class FOFCOL*.  That motion also remains undecided, and according to the May 13, 2015 Scheduling Order (Rec.Doc. 18921), will not have been decided at the time of the June 9 hearing; and, just as Rule 55(a) remains effective for purposes of the hearing despite a pending motion to set aside the 55(a) defaults, so should the Court's *Class FOFCOL*.  The latter includes a restatement of the Court's position as to the issues of remediation scope and remediation costing methodology.  The defendants (yet again) deliberately chose not to appear and contest class certification and the decision on these same issues.  They must abide on June 9 by the Court's *Class FOFCOL*, in which, among other findings, the Court noted that it "already has found sufficient facts to establish the causation issue associated with these types of claims."  *See Class FOFCOL,* 2014 WL 4809520 at *15.

In sum, the scope of "back-to-studs" Chinese drywall remediation is a matter already fully litigated in both *Germano* and *Hernandez*.  The Court's findings in *Germano* are an important precedent, and the Court's findings of fact in *Hernandez* should be given preclusive effect under the doctrine of collateral estoppel (Knauf's interest in defending these issues being exactly aligned with the interest of the Taishan defendants).  Unit pricing to calculate remediation costs on a square foot basis likewise was tried and accepted by the Court in both *Germano* and *Hernandez*.  Again, with *Germano,* as precedent and guide on that question, the Court resolved the question in *Hernandez,* using Xactimate (another version of unit pricing similar to RS Means) to calculate remediation costs on a square foot basis.  That pricing methodology has been litigated; and need not be re-litigated at the Rule 55(b)(2) hearing.

The Taishan defendants participation in the June 9 class damages hearing must be predicated on the fact that, under FRCP 55, liability is conceded and the only issue for June 9 is

the quantification of class damages. To allow defendants to reopen and seek to re-litigate questions such as the needed scope of Chinese drywall remediation and/or the use of unit-pricing and per square foot methodology to arrive at the cost of remediation for each property, would be a colossal inefficiency as well as fundamentally unfair to plaintiffs.[84]

These defendants, having deliberately invited default, do not come to the Court "with clean hands" and the opportunity to argue that due process would be violated unless they can put on their own evidence as to the scope of remediation and the unit pricing or square foot approach to the cost of remediation.  They had not one, but more than one, "day in court" to do so, and deliberately chose otherwise.  Knauf, both as a pre-hearing intervenor in *Germano* and then as an active defendant in *Hernandez*, has afforded this Court ample opportunity to appraise defensive approaches and evidence to contest plaintiffs' positions on both remediation scope and per-property cost methodology.  The Court has been, and remains, the sole factfinder on these questions.

The 55(b)(2) damages hearing therefore *must* remain confined to the subject of calculating the total amount of class wide damages, and not be allowed to improperly expand to re-litigate already-decided questions.  The Court should not revisit its prior findings of fact that: have linked defective Chinese-manufactured drywall to the needed repairs of plaintiff properties, established the corrosive effects of such drywall, necessitated "back-to-studs" remediation as a

---

[84] Defendants create a false issue by contending that plaintiffs seek to "extrapolate" in order to quantify class-wide damages.  In truth, plaintiffs are simply calculating a class wide total of remediation costs based on values that are known per property.  The underlying unit-pricing approach, whether by contractor bid or a software program such as RS Means or Xactimate, is the quantification methodology at issue.  The methodology has been approved more than once by the Court and the Court need not hear further challenge to it on June 9.

means to make plaintiffs whole, and accepted unit, square-footage pricing as a methodology to calculate remediation damages for any given property.  The question for June 9 is *solely* the amount owed to the plaintiff class, based on these established (or conceded) findings.

**B.     Plaintiffs May Present Aggregated Class Damages**

**1.     Class Action Jurisprudence in this Circuit Recognizes the Ability to Present Class Damages on an Aggregated Basis**

The procedural posture of this case is unique in the annals of Fifth Circuit class action jurisprudence.  It may very well be the premier assessment of damages hearing for a class certified *after* default judgments have been entered upon a group of derelict affiliated entities. As a consequence, the concerns regarding collective proofs of damages in complex, phased jury trials and reliance upon jury findings for thousands of unknown individual class members asserting personal injury claims due to exposure to asbestos, like in *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998) and *In re FibreBoard Corp.*, 893 F.3d 76 (5th Cir. 1990), fall away as they are inapposite.[85]  All three defendant groups, Taishan, BNBM, and CNBM, raise the specter that, because of these noted precedents (and others), the law in the Fifth Circuit holds that bellwether trials intending to comprehensively resolve causation of specific injuries or

---

[85]Both cases are distinguishable on their facts alone, being cases involving "personal injuries to individuals at widely different times and places."  *Cimino*, 151 F.3d at 316.  Likewise, Defendants' reliance on *Robertson v. Monsanto Co.*, 287 F.App'x 354 (5th Cir. 2008); *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996); and *In re Deepwater Horizon,* 739 F.3d 790 (5th Cir. 2014), is equally misplaced because each of these cases involved causal resolution of personal injury damages.  No such proof will be required in this case due to the admissions resulting from Defendants' defaults.  *See In re Dierschke*, 975 F.3d 181, 185 (5th Cir. 1992) ("It is universally understood that a default operates as a deemed admission of liability.").  By operation of law, default judgments have consequences.  For example, BNBM contends that its Dragonboard drywall is not defective.  BNBM Brf. at 5.  Because it is in default, BNBM is not entitled to contradict its admission of liability.  In other words, BNBM has admitted that its drywall is defective.

damages are prohibited. *See* Taishan Brf. at 11; BNBM Brf. at 11; CNBM Brf. at 10-11.

Defendants contend that such collective litigation would infringe upon their Seventh

Amendment right to a trial by jury and due process, and would even abridge the Rules Enabling

Act, because, causation and damages are determined with respect to "individuals, not groups."

*Cimino*, 151 F.3d at 313 (applying Texas law).  These arguments overlook one fundamental

premise: as a result of their defaults, the Defendants have forfeited their right to a jury trial.  *See*

*In re Dierschke*, 975 F.3d at 185 & n. 19 ("'[I]n a default case neither the plaintiff nor the

defendant has a constitutional right to a jury trial on the issue of damages.'") (quoting treatise).

This oversight not only undermines, but is fatal to Defendants' arguments.

This Court, not a jury, will sit as the trier of fact, and decide all facts relative to the

quantum of damages owed to the class.  Without any concern about overstepping the Seventh

Amendment's bounds, *e.g.*, *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931),

this Court may conduct serial proceedings about damages *from the bench*.  Indeed, this process is

precisely that outlined in the Plaintiffs Steering Committee's Second Revised Trial Plan for the

Assessment of Class Damages (Rec.Doc. 18753), which proposes the assessment/quantification

of class-wide damages, followed by subsequent phases intended to finally arrive at the

distribution of individual damage awards.

Plainly, as the trier of fact in the *Germano* trial, this Court is already familiar with the

facts involving this relatively straightforward products liability case.  Notably, this Court has

already ruled that damages may be calculated in a formulaic manner.  *Class FOFCOL,* 2014 WL

4809520 at *4 ("[T]he average cost of repairing class members' homes is subject to calculation

on a formulaic, square footage basis.").  This reasoning is entirely consistent with Fifth Circuit

jurisprudence which approves of a "suitable formula for calculation of damages" in the class

context.  *See Corley v. Orangefield Indep. Sch. Dist.*, 152 F.App'x. 350, 355 (5th Cir. 2005),

*citing Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2006); *see also Deepwater*

*Horizon*, 739 F.3d at 815 (rejecting BP's argument that *Comcast Corp. v. Behrend,* 133 S.Ct.

1426 (2013), "precludes certification under Rule 23(B)(3) in any case where the class members'

damages are not susceptible to a formula for classwide measurement.") .

### 2.      Class Damages May Be Proven on an Aggregated Basis Provided a Formulaic Method for Calculating Such Damages Is Established

In class actions, "[o]nce liability is established . . . a plaintiff's proof of damages is

evaluated under a more lenient standard." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 533

(6th Cir. 2008) (*citing* J. *Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 567 (1981)).

Given the inherent difficulty of proving damages, courts do not require that damages be

measured with certainty, but rather that they be demonstrated as "a matter of just and reasonable

inference." *Bigelow v. RKO Radio Pictures.*, 327 U.S. 251, 258 (1946); *Story Parchment Co. v.*

*Paterson Parchment Paper* Co., 282 U.S. 555, 563 (1931)).  Thus, where the fact of damages is

proven, as it is here, by default, the computation of actual damages may suffer from minor

imperfections without incident and still be permitted. *Scrap Metal*, 527 F.3d at 533.  *See also*

*AAA Tire Finishing Equip. & Supplies, Inc. v. Tire Cosmotology, Inc.*, 530 F.Supp. 1530, 1532

(E.D.La. 1984) ("Damage approximation is appropriate.").  After all, "[t]he most elementary

conceptions of justice and public policy require that the wrongdoer shall bear the risk of the

uncertainty which his own wrong has created." *Bigelow*, 327 U.S. at 265. It is therefore the case

that, even where the amount of damages cannot be proven with certainty, Plaintiffs are entitled

to recover for the wrong they suffered. *Id.* at 265-66 ("The constant tendency of the courts is to

find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery for a proven invasion of the plaintiff's rights.") (internal quotation marks omitted).

In a class action trial, plaintiffs may present evidence of damages for the entire class in the aggregate. *In re: Pharms. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197-98 (1st Cir. 2009) ("Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages.... Challenges that such aggregate proof affects substantive law and otherwise violates the defendants' due process or jury trial rights to contest each member's claim individually, will not withstand analysis....Just as an adverse decision against the class in the defendants' favor will be binding against the entire class in the aggregate without any rights of individual class members to litigate the common issues individually, so, too, an aggregate monetary liability award for the class will be binding on the defendant without offending due process."). Although there is no requirement under Rule 23 to present an aggregate damage calculation, courts have allowed plaintiffs to proceed on this basis provided that the aggregate damage calculation is based on a reasonable methodology and the individual damage calculations that follow can be made according to a common methodology or formula. *See In re: Nexium Antitrust Litig.*, 296 F.R.D. 47, 58 (D.Mass.2013) ("Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages[.]"); *In re: NASDAQ Market Makers Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996) ("Once a measure of damages is established, it can be applied to the aggregate trading volumes in Class Securities to determine aggregate damages for the Class as a whole, or to individual transactions to determine damages for individual Class members."); *In re Neurontin*

41

*Antitrust Litig.,* 2011 WL 286118 at *10 (D.N.J. Jan. 25, 2011)("[T]he use of an aggregate

approach to measure class-wide damages may be appropriate.") (citing authorities); *In re:*

*Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 324 (E.D.Mich. 2001) ("Moreover, despite

Defendants' claims to the contrary, the use of an aggregate approach to measure class-wide

damage is appropriate."); *Allied Orthopaedic Applicances, Inc. v. Tyco Healthcare Group, LP*,

247 F.R.D. 156, 175 (C.D.Cal. 2007) ("[T]he plaintiffs may prove class-wide damages in the

same manner as class-wide impact[.]"); *In re Static Random Access Antitrust Litig.*, 2008 WL

4447592, *6 (N.D. Cal. 2008) ("Plaintiff has proffered methods for calculating aggregate

damages for overcharges paid by class members, based on average market prices."); *see also*

William B. Rubenstein *et al.*, *Newberg on Class Actions*, § 12:2 (5th ed. 2014).  So long as there

is a common formula to provide individual damages to each class member, certifying a class for

aggregate damages is appropriate. *See In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir.

2014)*; In re: Pharms.. Indus. Average Wholesale Price Litig.*, 582 F.3d at 197-98 ("The use of

aggregate damages calculations is well established in federal court and implied by the very

existence of the class action mechanism itself.").

Courts have also found that it is entirely appropriate in a class action trial for the jury to

award defendant's total liability without identifying those entitled to the award.  *See Hilao v.*

*Estate of Marcos*, 103 F.3d 767, 786 (9th Cir. 1996) (noting that a defendant's interest is "only in

the total amount of damages for which it will be liable,"  not "the identities of those receiving

damage awards"); *see also Forcellati v. Highlands, Inc.*, 2014 WL 1410264 at *6 (C.D. Cal.

Apr. 9, 2014) ("Aggregate computation of class monetary relief is lawful and proper.").

Defendants' criticism of Plaintiffs' reliance on antitrust cases to support the use of aggregate damage calculations for the class, is without merit.  The persuasiveness of this authority is not dependant the fact that these cases arise under the antitrust laws.  Rather, aggregate damage models have been found to be appropriate in products liability cases, *e.g.* *Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 39-42 (Pa. 2011), trespass and property damage cases, *Meighan v. U.S. Sprint Communications Co.,* 924 S.W. 632, 638 (Tenn. 1996),[86] and the Fifth Circuit has endorsed the concept in other contexts where the class plaintiffs could present damages in a formulaic manner.  *See generally Deepwater Horizon*, 739 F.3d at 815. And, importantly, *this Court agrees*:  damages may be calculated formulaically.  *See Class FOFCOL*, 2014 WL 4809520 at *4.  Because they are in default, Defendants have forfeited their right to seek reconsideration of this finding.

Moreover, district courts are encouraged to "devise imaginative solutions to problems created by the presence in a class action of individual damages issues." *Pella Corp. v. Saltzman,* 606 F.3d 391, 396 (7th Cir. 2014); *see also Byrd v. Aaron's Inc.*, ___ F.3d ___, 2015 WL 1727613, *14 (3d Cir. Apr. 16, 2015) (Rendell, J., concurring) (when damages are determined in the aggregate, issues of proper allocation may be addressed during claims processing).  Here, the PSC has accommodated individual class damage issues by shifting the individual damage components to subsequent adjudicative phases.  For purposes of the June 9 hearing, Plaintiffs intend to solely establish, on a class-wide basis, the aggregate measure of damages for the entire class of active litigants.  This procedure  is clearly superior to the thousands of individual

---

[86]*Compare Corley,* 152 F.App'x. at 355 (unpublished decision) (affirming denial of class action where a district court found predominance could not be satisfied due to variances in the injury to land owners' easements precluded "any mechanical calculations of damages[.]").

proceedings that would result if Defendants' arguments were accepted.  Of course, courts that have addressed such invitations to abandon class proceedings for cost-intensive and inefficient procedures have rejected them.  *See, e.g., In re: Antibiotic Antitrust Actions*, 333 F.Supp. 278, 289 (S.D.N.Y. 1971) ("[T]he court cannot conclude that the defendants are constitutionally entitled to compel a parade of individual plaintiffs to establish damages."); *Phila. Elec. Co. v. Anaconda Am. Brass Co.,* 43 F.R.D. 452, 463 (E.D. Pa. 1968) ("I see no necessity for encumbering the judicial process with 25 lawsuits, if one will do.").  And here, where there would be <u>thousands</u> of individual proceedings, the costs and inefficiencies would be significant.

In sum, this Court has ample authority to proceed to calculate and award aggregate class damages.

### 3.  Plaintiffs' Damage Theories Do Not Implicate a *Chevron* Analysis.

Defendants' reliance on *In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir. 1997) is misplaced.  In *Chevron*, the Fifth Circuit considered the question of utilizing statistics to extrapolate the results of bellwether trials for toxic tort personal injuries and property damage claimants, not in the context of a class action, but in the context of a Rule 42(a) consolidation. *Id.*, at 1017.  Over 3000 cases were consolidated in federal court and the district court selected thirty bellwether plaintiffs (fifteen chosen by the plaintiffs and fifteen by the defendants) to participate in a single trial to determine "general liability or causation" issues on behalf of the remaining plaintiffs.  *Id.* at 1020. The district court clearly intended that the combined bellwether and unitary trial would have preclusive effects, either establishing or defeating general liability or causation with respect to all plaintiffs' claims.  *Id.*   Chevron petitioned the Fifth Circuit for a writ of mandamus for relief from the trial plan.  The Fifth Circuit concluded that the trial plan's

selection process, whereby each side chose an equal number of bellwether plaintiffs, could be used to facilitate settlement, but not as representative of the remaining claims. *Id.* at 1019-20.

*Chevron* suggested, however, that a trial court could choose a representative sample by using inferential statistics. The Fifth Circuit concluded that a "unitary trial" of a randomly selected, statistically significant sample would comport with the "historical understanding of both procedural and substantive due process." *Id.* at 1021 (*citing Hilao*, 103 F.3d at 782-84, 786).

Replying upon *Chevron*, defendants argue that "Plaintiffs have not shown by competent, scientific, statistical evidence that the cases tried are representative of the large group of cases or claims. Indeed, they have made no attempt at all to show representativeness." Taishan Brf. at 23. This argument is a red herring. Plaintiffs are <u>not</u> relying on statistical sampling. *See* discussion *infra*. at Section III(C). Moreover, adequacy of representation was established at class certification, a proceeding the Defendants consciously avoided, for which they now must suffer the consequences.

Not only did *Chevron* involve individual personal injuries in addition to property damage claims, but it did not entail a class action. The Fifth Circuit rejected the bellwether trial plan in *Chevron* because the cases selected lacked "in representativeness." *Chevron*, 109 F.3d at 1020. But what was lacking in *Chevron*, a determination of representativeness, plainly exists here. *See Class FOFCOL, supra.*

> **C.    Defendants' Efforts to Defeat Class Manageability by Raising False Conflicts of Law Are Unavailing As the Relevant State Laws <u>Uniformly Permit Recovery of Repair Damages.</u>**

This Court has already ruled on class certification and determined that Plaintiffs' trial plan for calculation of aggregate damages for the class is feasible and manageable.  *See Class FOFCOL*, 2014 WL 4809520, at *15-16.  Defendants now challenge the Court's prior certification ruling, but Defendants may only challenge the quantum of damages to be proven at trial.  The Court deferred Defendant's motion to decertify the class until <u>after</u> the conclusion of the June 9th  Rule 55(b)(2) hearing.  *See* Scheduling Order (Doc. No. 18921).  Nevertheless, Defendants attack the propriety of awarding remediation damages on the false ground that variations in state law preclude such aggregated practice.  No material conflict or disparity among the state laws addressing the calculation of property damage, however, exists.  When common factual and legal issues arising from an action predominate over variations in state law, certification of a class is appropriate. *In re Sch. Asbestos*, 789 F.2d 996, 1010-11 (3d Cir. 1986); *see also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013) (concluding that district court did not abuse its discretion in determining that state law variations did not preclude certification).

Courts disfavor the denial of class certification on manageability grounds.[87]  Taishan

relies on *Castano v. Am. Tobacco Co.,* 84 F.3d 734 (5th Cir. 1996), to suggest that a conflict

exists between the laws of the nineteen states at issue in this litigation regarding damages

available to Plaintiffs for injury to real property.[88]  Taishan Brf. at 13.  *Castano* is far afield of

this litigation.  *Castano* involved tobacco-related personal injury claims, and the Fifth Circuit

there held that the district court had failed to consider the numerous factual differences among

the plaintiffs (different products smoked, the length of exposure to nicotine, knowledge about the

effects of nicotine) and the impact that these differences had on the multitude of applicable laws

addressing causation, reliance, and comparative fault.  84 F.3d at 743-44.  Unlike *Castano*, the

nineteen states' repair damage laws uniformly allow for the cost of repairs or remediation.[89]  *See*

_____

[87]*See In re: Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001)
(the "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be
unmanageable is disfavored and 'should be the exception rather than the rule.' "); *DeLoach v.
Philip Morris Cos., Inc.*, 206 F.R.D. 551, 567 (M.D. N.C. 2002) ("Though any case of such
magnitude certainly poses problems of manageability . . . dismissal for management reasons, in
view of the public interest involved in class actions, should be the exception rather than the
rule."); *In re: S. Cent. States Bakery Prods. Antitrust Litig.*, 86 F.R.D. 407, 423 (M.D. La.
1980)("[T]he dismissal of a class action for management reasons is disfavored."); *Carnegie v.
Household Int'l., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("[A] class action has to be unwieldy
indeed before it can be pronounced an inferior alternative[.]"); *Glen v. Fairway Indep. Mortg.
Corp.*, 265 F.R.D. 474, 482 (E.D. Mo. 2010) (citing *In re: Workers'
Compensation*, 130 F.R.D. 99, 110 (D. Minn. 1990) ("dismissal for management reasons is never
favored" because class actions are meant "to permit plaintiffs with small claims and little money
to pursue a claim otherwise unavailable."); *In re: Live Concert Antitrust Litig.*, 247 F.R.D. 98,
148 (C.D. Cal. 2007) ("[D]ismissal for management reasons is never favored."); *Klay v.
Humana, Inc.*, 382 F.3d 1241, 1272 (11th Cir. 2004) (manageability concerns "will rarely, if ever,
be in itself sufficient to prevent certification of a class.").

[88]Out of an abundance of caution, plaintiffs have analyzed nineteen states' laws as the
parties are grappling with the disputed location of one specific property.  In reality, only eighteen
states' laws are actually at issue.  *See* discussion in the Declaration of George J. Inglis, P.E.

[89]Although unnecessary because of the uniformity in the applicable state laws, courts

(continued...)

47

Analysis of Damage Jurisprudence [attached hereto as Exhibit 53].  Only recently the Fifth

Circuit distinguished *Castano* to permit class certification of a consumer class of ATM users.

*See Frey v. First Nat'l Bank Sw.*, ___F. App'x ___, 2015 WL 728066, at *8 (5th Cir. Feb. 20,

2015) (distinguishing *Castano's* novel smoking addiction claims because of the complex choice

of law issues and because there was "no history from which a court could determine which

common issues were 'significant,' as compared to the individual issues").[90]

_____

[89](...continued)
have alternative methods to address variations in state law namely, creation of subclasses.  *See Klay*, 382 F.3d at 1262 (certification appropriate "if the applicable state laws can be sorted into a small number of groups"); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 817-18 (3d Cir. 1995) (certifying nationwide class where laws of the fifty states could be reduced to several sub-classes if the nationwide action proved to be unmanageable.); *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (R.B. Ginsburg, J.) (class certification was appropriate where state law variations could be grouped by similar legal doctrines.); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 293-94 (S.D. Ohio 1997) (certifying two negligence subclasses and four strict liability subclasses.); *In re Ins. Broker Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009) (stating that "subclasses are appropriate 'where a class is found to include subclasses divergent in interest.'") (citation & alteration omitted).

[90]Other courts have stated that manageability is a comparative inquiry.  As the Eleventh Circuit has put it, "[W]e are not assessing whether or not the class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives." *See also Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009) (quoting *Klay*, 382 F.3d at 1273 (affirming certification of a class of doctors in a RICO suit against HMOs for underpayment); *accord Demmick v. Cellco P'ship*, No. 06-2163, 2010 WL 3636216, at *10 (D.N.J. Sept. 8, 2010) ("[A] court is not required to find that there will be no management difficulties.  Rather, a court need only determine whether certification would create relatively more management problems than any other alternative."); *In re: NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 529 ("[D]ifficulties in management are of significance only if they make the class action a less 'fair and efficient' method of adjudication than other available techniques.").  The alternatives to a class action suit in trial are rarely more manageable than aggregate litigation and, as such, manageability "will rarely, if ever, be in itself sufficient to prevent certification of a class."  *In re: Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 140 .

Plaintiffs' trial plan to calculate class-wide damages in the aggregate does not run afoul of each of the damage laws of the nineteen states in this action.  To the contrary, Plaintiffs' aggregate damages calculation is based on the cost of repair or remediation of the property which all of the nineteen state laws involved in this litigation allow as a measure of damages. *See* Analysis of Damage Jurisdiction, *supra*.  Not one of the state laws involved precludes a plaintiff from seeking the cost of repair or remediation as a measure of damages.  *Id.*  As such, Plaintiffs' trial plan and legal theories directed to the calculation of class members' aggregated damages accord with the damage laws of all nineteen of the states involved.  The Court plainly will not have to grapple with material variations in a large number of different states' laws. Where a uniformity of laws exist, manageability exists as well.

Despite the uniformity of the nineteen states' damage laws allowing costs of repair or remediation, Taishan attempts to conflate minor variations in a few of the damage laws of the nineteen states into unwieldy conflict.  *See* Taishan Brf. at 12-13.  For instance, Taishan claims that, in Mississippi, a plaintiff can elect either diminution in value or cost of repair as the appropriate measure of real property damages.  *Id*.  Taishan alleges that there is a conflict because they have the right to prove that an alternate measure of damages is more appropriate. *Id*.  This is incorrect.  Allowing the defendant to attempt to demonstrate that there is a more appropriate measure of damages for plaintiffs' real property damages, does not create a material conflict of interest with the other eighteen states.  Rather, it allows the defendant to present an alternative damage theory as an affirmative defense, which Taishan has not done in this matter.

Taishan would also lead this Court to believe that a conflict exists between Virginia and Louisiana law regarding damages where no conflict exists.  *Id.* at 13-14.  Taishan claims that

Virginia rejects the use of repair costs in favor of diminution of market value, while Louisiana primarily looks to the cost of restoring the property. *Id.* Not so. Both states permit recovery for the cost of repairs for damages to real property. *See Banks v. New Orleans City*, 620 F.Supp.2d 741, 744 (E.D. La. 2009) (stating that a measure of damages for injury to property is the cost of restoring the property to its former condition); *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 706 F.Supp.2d 655, 690-92 (E.D. La. 2010) (stating that, under Virginia property law, a plaintiff "can recover both the cost of repair and the loss in value of their property after the repairs are completed"). In addition, all of the other seventeen states allow cost of repair or remediation as a measure of real property damages. *See* Analysis of Damage Jurisprudence, *supra*. Moreover, Taishan's assertion would not lead to a true conflict between the states' laws because it would merely provide another type of damage available to the class.

Therefore, Defendants' argument that Plaintiffs' trial plan ignores varying and often conflicting measures of property damage is nothing more than a strawman. There are no conflicting measures of property damage amongst the nineteen state laws. All of the state damage laws uniformly allow the cost of repair or remediation as a measure of real property damages.

Next, Taishan claims that "Plaintiffs' Trial by Formula Plan unconstitutionally denies Taishan's right to litigate that alternative measure defense for individual Mississippi properties." Taishan Brf. at 13. This argument too is fatally flawed. As stated above, Plaintiffs' Trial Plan does not prevent Taishan from presenting that an alternative measure of damages (diminution in property value) is more appropriate for Mississippi properties or properties in any of the other eighteen states as an affirmative defense. Nor is Taishan prohibited from arguing that the

50

projected remediation cost would exceed the diminution in value of any property.[91]  But these

arguments are purely speculative, because there is nothing in the record to prove that the

diminished value of any individual property exceeds the repair costs.  Furthermore, Taishan has

not proffered any expert with any alternative measure of damages for the class to support its

speculative argument that diminution of value is a more appropriate measure of damages or that

the remediation cost would exceed the diminution of value of any property.  Rather, it thrashes a

strawman to create the illusion of a conflict in the laws of the nineteen states where none exists.

It is not enough to claim that a conflict or variance in state law exists creating an impediment to

certification or to the manageability of a class action.  Defendants must prove it.  *See*

*Montgomery Cnty. Pa. v. Merscort, Inc.*, 298 F.R.d. 202, 212 (E.D.Pa. 2014).

Finally, the manageability concern raised by most courts addressing confusing jury

instructions to the venire does not exist.  *Cf. Smith v. Merial Ltd.*, No. 10-439, 2012 WL

2020361, at *4 (D.N.J. June 5, 2012) (state law variations create manageability concerns

"particularly because these matters have the potential to be tried before a jury").  Here, the

determination of damages will not be made by a jury, but rather, by the Court, as part of a Rule

55(b)(2) Assessment of Damages Hearing.  This Court is more than capable of evaluating and

---

[91]The cases cited by Taishan regarding the economic waste doctrine are distinguishable
from the present matter.  First, *Poffenbarger v. Merit Energy Co.*, 972 So.2d 792, 801 (Ala.
2007) and *Johnson v. Black Brothers, Inc.*, 879 So.2d 525, 528-29 (Miss. 2004), greatly differ
from the present matter because each addressed damages where the record contained evidence of
diminution in value of the property.  There is nothing in the record here to prove diminished
value.  Next, *Grossman Holding Ltd. v. Hourihan*, 414 So.2d 1037, 1037-38 (Fla. 1982),
addressed a factually unique situation where the value of the home had increased substantially
despite the presence of numerous defects.  Finally, *7-Eleven, Inc. v. Dept. of Env't Quality,* 590
S.E.2d 84, 104 (Va. Ct. App. 2003)*,* addressed permanent damage to the property that could not
be repaired, unlike the plaintiffs' homes.

judiciously applying the damages laws of the applicable states.  Defendants' challenge to the

applicability of uniform laws to the damage assessment hearing is without merit.

> **D.     Plaintiffs' Use of a Formulaic Damages Methodology to Calculate Damages for Each Class Member is a Widely Accepted Methodology to Establish Class Damages Under Rule 23.**

George Inglis, P.E.'s expert Declaration and damages opinion prepared for the June 9,

2015 Fed. R. Civ. P. 55(b)(2) default judgment damages trial is limited to remediation

damages.[92]  Mr. Inglis' methodology for calculating these damages is based on a formula that is

applied to every individual home based on three factors: (1) scope of work, (2) unit costs and bid

costs converted to square footage costs, and (3) localization building cost factors.  Individual

damages are calculated for each home and set forth in Exhibit 10 to the Inglis Declaration in a

spreadsheet.  The damages calculation is not a "lump sum award," an "extrapolation," a

"generalized proof," or any of the other labels given to it in the defendants' briefs.  Rather, the

damages calculation is a house by house damages determination, based on a formula.[93]

The calculation of class damages by a formulaic method is an acceptable class damages

determination methodology which has been accepted by courts for decades, and neither *Dukes*

---

[92] Mr. Inglis has been asked to determine the remediation damages for a class of 2,888 buildings in 18 states, but primarily in the Gulf and Southeastern U.S. states.  Mr. Inglis initially was asked to calculate alternative living expenses.  Counsel has instructed Mr. Inglis to delete the alternative living expenses from the damages calculations so they can be pursued in a later phase of the litigation.  Mr. Inglis has reduced the number of buildings he is evaluating at the instruction of counsel.  BrownGreer has provided a revised spreadsheet to Mr. Inglis with addresses, names and square footage.  The claims of the former owners have been deleted from the Inglis damages analysis (subject to verification by BrownGreer) and they will be deferred to a later phase of this proceeding.  BrownGreer has made additional deletions/modifications to the spreadsheet of class members whose remediation damage claims are the subject of the June 9, 2015 damages trial.  The analysis now covers 2,888 buildings.

[93] *See* Inglis Declaration at ¶ 8.

nor *Comcast* has altered that body of law.[94]  For example, in *In re U.S. Foodservice Inc. Pricing Litig.,* a case in which plaintiffs alleged Racketeering Influenced and Corrupt Organizations ("RICO") and breach of contract claims regarding a fraudulent pricing scheme, the Second Circuit upheld an expert's methodology against a *Daubert* challenge that calculated damages on a class-wide basis with a simple formula, using data extracted from the defendant's databases. 729 F.3d at 129.  The lower court stated: "[i]t is a rare case where computation of each individual's damages is so complex, fact-specific, and difficult that the burden on the court is intolerable." *In re U.S. Foodservice Inc. Pricing Litig.*, 2011 WL 6013551, at *16 (D. Conn. Nov. 29, 2011) (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004) (in ERISA and RICO suit, "[p]articularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification")). Calculating damages "using standard methodology premised on data common to all class members . . . is sufficiently reliable to establish that damages are susceptible of measurement across the entire class." *Rai v. Santa Clara Valley Transp. Auth.*, No. 5:12-CV-004344-PSG, 2015 WL 860761, at *15 (N.D. Cal. Feb. 24, 2015) (internal quotation marks omitted) (finding in employee compensation case that expert's methodology met *Comcast*'s requirements). It is, therefore, unnecessary to hold individual mini-trials to determine remediation damages in this case because each class member suffered the same kind of injury, and the only individualized

---

[94] *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011).

determination required can be calculated using a formula to estimate each class member's damages.  *See Goldenberg v. Indel, Inc.*, 2012 WL 3780555 at *13-17 (D.N.J. Aug. 30, 2012) (explaining in ERISA case how a formula based on class members' ages can be applied to determine classwide damages); *see also In re Polyurethane Foam Antitrust Litig.,* 2014 WL 6461355 at *44 (N.D.Ohio Nov. 17, 2014) (permitting approximation of aggregate damages proven as a matter of just and reasonable inference in antitrust class action, where damages were "susceptible to computation using a 'mathematical or formulaic' calculation"); *In re Pharm. Indus. Average Wholesale Price Litig.,* 582 F.3d at 197 ("The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself.").[95]

While defendants claim that aggregating classwide damages is always improper, they ignore the distinction between cases in which there are *particularized* damages—where each plaintiff suffers a distinctly different *kind* of individualized wrong—and damages that are of the

---

[95] Defendants' claim that plaintiffs improperly cite to antitrust cases, *see* Taishan Br. at 24, is a red herring. Although containing different substantive legal claims, antitrust cases are instructive regarding the type of formulaic methodology acceptable in the calculation of aggregate classwide damages.  *See, e.g.*, *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 699 (S.D. Fla. 2004) (endorsing "reasonable damage methodologies for measuring class-wide damages on an aggregate basis and for calculating damages for individual class members" based on a regression model); *In re NASDAQ*, 169 F.R.D. at 524 (finding "aggregate damages here may be susceptible to being assembled and organized in a relatively straightforward manner" where a formula could be applied to data from computerized databases). Furthermore, as noted above, courts have repeatedly recognized that formulaic damages meet Rule 23 standards in a variety of cases, not just antitrust cases. *See, e.g.*, *In re U.S. Foodservice Inc. Pricing Litig.*, *supra* (permitting the use of formulaic damages in RICO and fraud causes of action); *Klay v. Humana, Inc.*, *supra*; *Rai v. Santa Clara Valley Transp. Auth.*, *supra* (approving formulaic damages methodology in an employment law case); *Goldenberg v. Indel, Inc.*, *supra* (explaining in ERISA case how formula based on class members' age can be applied to determine classwide damages).

same type suffered by each member of the class which are susceptible to a formulaic damages calculation as to the *amount* of damages to be assessed to each plaintiff.  The cases on which Defendants rely are inapposite because each of those cases considered particularized distinct injuries which rendered the class mechanism less appropriate. *See, e.g.*, *Corley*, 152 F. App'x at 355 (finding aggregate damages to be inappropriate because "injury to the landowners varies in substantial ways"—differences in the prices telecommunications companies would pay for access to different parcels of land based on desirability of location required individualized inquiries); *Robertson*, 287 F. App'x at 362 (finding aggregate damages inappropriate where "each individual plaintiff suffered different alleged periods and magnitudes of exposure and suffered different alleged symptoms as a result"); *In re Deepwater Horizon*, 739 F.3d at 815 (affirming certification of settlement class but finding aggregate damages inappropriate where a formula for classwide measurement of damages could not be developed due to need for individualized inquiry into the extent to which an oil spill caused decline in business); *Kemp v. Metabolife Int'l, Inc.*, No. CIV. 00-3513, 2002 WL 113894, at *3 (E.D. La. Jan. 25, 2002) (finding aggregate damages inappropriate in products liability case where individual issues included knowledge and expertise of the user, degree to which each was exposed to the product, different types of medical conditions caused, and degree to which diseases were caused by other factors).  Plaintiffs in this case have each suffered the same injury—corrosion damage from reactive Chinese Drywall present in their homes or buildings —and require the same remedies—remediation costs.  The class remediation damages here do not present significant individualized issues, like physical ailments and loss of business profits, as do the cases on which Defendants rely.  *Id.*  Rather, the only variance is in the amount required to pay for each

remediation, which can be readily determined using the formulaic methodology in Mr. Inglis'
report. *See, e.g., Klay*, 382 F.3d at 1260 (holding that it was permissible to calculate damages on
an individual basis using a formula when individual questions regarding damages to subscribers
to HMOs in ERISA were not outweighed by the common aspects of the conspiracy).

Defendants' refrain that Mr. Inglis's method of calculating remediation damages is based
on an invalid statistical sample is just <u>not</u> so. Here, Plaintiffs' expert used multi-disciplinary
science (including corrosion science and reconstruction science as detailed in the *Germano*,
*Hernandez*, and *Taishan* Findings of Fact and Conclusions of Law (hereinafter "FOFCOL")
scope of work sections), in conjunction with bid pricing, unit pricing, square footage pricing, and
localized construction costs factors, to establish the *damages formula*, <u>not</u> statistical sampling.
This formula is applied to each individual building in the class to determine individual awards
for each class member.[96]

This method of calculating damages (in this case, repair costs for only the interior of
buildings damaged by a corrosive environment from sulfur emissions from Taishan drywall) is
referred to and explained in the RS Means Residential Cost Data Guide, 34th Annual Edition
2015 in the Unit Price and Square Foot Cost Sections. The construction industry has relied on
RS Means cost guides for more than 70 years.[97] The RS Means Guide explains the use of unit
and square footage pricing to estimate construction costs in an approach which includes the

---

[96] *See* Inglis Declaration, Exhibit 52 at ¶ 8.

[97] RS Means 2015 at p. v (attached hereto as Exhibit 54).

fundamental components Mr. Inglis has employed in this case.[98]  The Guide also recognizes the use of square footage pricing for typical construction projects, but, in this case, remediation is limited only to removing drywall and renovating aspects of building interiors; the issues of exteriors need not be addressed. The results of using RS Means unit pricing, Xactimate unit pricing, RS Means square footage pricing, or bids from contractors (which generally also rely on unit pricing),[99] or a combination of these tools, provide reasonable estimates of remediation costs—not microscopic actual costs.  This method of calculating damages has been recognized by this Court on multiple occasions and is shown in *Germano*, *Hernandez*, and several projects carried out by Mr. Inglis' firm, Berman&Wright, over the time period 2010- 2015.  Thus, there is a voluminous record consisting of scientific and construction evidence (experts in multiple disciplines presented their findings in *Germano* on the science and practical construction realities of Chinese Drywall remediation) showing the reliability of this method of estimating remediation damages for Chinese Drywall buildings.

---

[98] *Id.* at p. vii – viii; p. 3 (identifying "scope of project", "price the quantities", "estimate summary", and "square footage costs").

[99] *See, i.e., Ravens Grp., Inc. v. United States*, 112 Fed. Cl. 39, 46 (2013) (discussing use of RS Means in a standard government contract).

1.  **Scope of Work**

The first component of Mr. Inglis' damages methodology is the "scope of work"[100] which is described in the RS Means Unit Pricing Section.  The scope of work is the list of repairs that must be made to the corrosive interior environment of a Taishan drywall building to make it safe and livable.  In sum, this scope of work has eight elements and includes removal of drywall – the source of the corrosive atmosphere—and replacement of the interior parts of the building that are damaged by the corrosion or damaged by the necessary removal in order to repair the corroded components, such as air conditioning, copper piping, wiring, circuitry, electrical devices, and appliances.[101]  The scope of work used here is supported by a mountain of scientific evidence. Ten PSC experts in different scientific disciplines collected and analyzed hundreds of samples of damaged or destroyed home building materials, reviewed the relevant scientific literature, and reported their scientific findings to this Court in *Germano* and *Hernandez*.[102]  In addition to this Court's findings on scientific corrosion and samples analyzed by PSC experts as well as independent experts Battelle Labs[103] and Sandia labs[104], the Court made scope of work findings on the practical construction and remediation experience of builders based on testimony of an independent third party, Beazer Homes from Florida, as well as multiple PSC building and

---

[100] RS Means 2015 at p. vii (Exhibit 54).

[101] *See* Inglis Declaration at ¶ 3; *Germano* FOFCOL, Rec. Doc. 2380 at p. 15-36; *Hernandez* FOFCOL Rec. Doc. 2713 at p. 15-36.

[102] *Germano* FOFCOL, Rec. Doc. 2380 at p. 15-36; *Hernandez* FOFCOL, Rec. Doc. 2713 at p. 15-36.

[103] *Germano* FOFCOL, Rec. Doc. 2380 at p. 17.

[104] *Id.* at p. 20.

constructions experts, all of whom endorsed the scope of work.[105]  This evidence lead this Court

to find *on three separate occasions*[106] that this scope of work for the repair of Chinese drywall

homes damaged by corrosion was reliable, fair and reasonable.  Furthermore, nearly every

component of the scope of work and the PSC experts who testified regarding its scientific and

practical foundation were subjected to a full blown *Daubert* attack by Knauf in 2010 in *Germano*

and *Hernandez*, and every motion was denied by this Court.[107]  The defendants want to re-litigate

the scope of work issue at the June 9th trial, but that would be both a waste of this Court's time

and legally unnecessary in light of the default entered here and the findings made in the Taishan

September 26, 2014 FOFCOL.[108]  As a result of this court's prior rulings under *Daubert* and the

three sets of FOFCOL, there can be no question that the scope of work provides a reliable[109]

---

[105] *Germano* FOFCOL, Rec. Doc. 2380 at p. 15-36; *Hernandez* FOFCOL, Rec. Doc. 2713 at 27-34.

[106] *Germano* FOFCOL at 15-36; *Hernandez* FOFCOL at 23, *Taishan* FOFCOL at 23.

[107] *See, e.g., Taishan* FOFCOL at 11, 26, fn. 7; *Germano* FOFCOL at p. 19; *Hernandez* FOFCOL at p. 6-7; Rec. Doc. 1090 at 9 (denying Knauf's Motion to Exclude Dean Rutila, expert witness regarding the cause and scope of chemical-based, electrical wiring corrosion, and resulting damages in homes with Taishan Drywall); *Id.* (denying Knauf's Motion to Exclude Donald Galler, expert witness who examined samples of silver contacts on switches in Chinese Drywall homes and determined that these samples exhibited exceptional corrosion, "providing objective support to his opinion the extrapolation of this data shows other similar switches will fail"); *Id.* at 10 (denying Knauf's Motion to Exclude Dr. J.R. Scully, a corrosion scientist, retained by the PSC to testify as an expert witness that measurements of corrosion on copper wires directly, can be used to determine the corrosivity of environments and future risk); Rec. Doc. 1140 at 3 (denying Knauf's Motion to Exclude Testimony and Opinions that Electrical Equipment may fail).

[108] *Taishan* FOFCOL, Rec. Doc. 18028 at p. 23; *see also Hernandez* FOFCOL Rec. Doc. 2713 at p. 15-36; *Germano* FOFCOL at p. 57.

[109] Defendants' allegation that the original Affidavit has certain errors is incorrect, and, in any case, does not diminish its reliability.  BrownGreer has made several updates to the

(continued...)

59

professional tool to remediate a Taishan Drywall building to render it safe again. The scope of

work is the result of exhaustive scientific investigation and consideration of the various practical

concerns involved in ripping out drywall and material behind and in front of the drywall to

render the building safe and livable again. These investigations and practical concerns are

detailed at length in this Court's findings.

Further, the scope of work is *not based* on statistical sampling, and defendants' argument

that the *Germano* homes are not a valid statistical sample[110] simply does not address the

*formulaic* damages model that Mr. Inglis employs.  The scope of work must be measured by its

reliability as a scientific investigation of a corrosive environment and what is needed to repair it,

and this Court has found at least three times that the scope of work used by Inglis passes that

test.

### 2.  Contractor Bids and Unit Pricing Converted to Dollars Per Square Foot Pricing.

The second component of Mr. Inglis' damages methodology relies on unit pricing and

bid pricing converted to square footage pricing.  The scope of work remediation costs were

priced in *Germano* (using bids and a unit pricing index from the building and construction

industry—RS Means—as a cross check) and then these costs per home were divided by the

square footage of each home to determine the $86 per square foot number in 2010 dollars.[111]  In

---

(...continued)
underlying data and the problems the defendants refer to as "errors" no longer exist.  *See supra*
note 1. *See also Goldenberg v. Indel, Inc.*, 2012 WL 3780555, at *16 (a purported "flaw in the
application of the methodology does not render the methodology itself unreliable").

[110] BNBM Motion, Rec. Doc. 18890-2 at p. 20.

[111] *Germano* FOFCOL at p. 61.

*Hernandez*, using a unit pricing index from the insurance industry—Xactimate—and bids as a cross check,[112] similar remediation costs were calculated.  Since that time, Berman&Wright (George Inglis and Ron Wright) have employed this scope of work in CDW remediation costs projects in Florida, Louisiana, Virginia, North Carolina, and New Jersey, and found that, whether they employ bids from those builders who understand the challenges of CDW remediation, or they employ RS Means unit costs estimates, $86 per square foot for remediation costs is a reliable estimate (when updated to 2015 dollars and modified by local building cost factors). In general, however, the estimates here (*i.e.,* Inglis Comp. Ex. 10) are even more conservative (*i.e.,* lower estimates).[113]  The bids approach, a RS Means unit pricing approach, a dollars per square footage approach, or a combination of the tools, provides an *estimate*, not a precise actual remediation cost.  These methodologies deliver a reasonable estimate of class remediation damages, and that is what is required by the Rule 23 damages jurisprudence.  *See Merenda v. VHS of Michigan, Inc.*, 296 F.R.D. 528, 543-44 (E.D. Mich. 2013) (a conservative estimate of damages based on formulaic calculation is sufficient under Rule 23); *DeLoach v. Philip Morris Companies, Inc.*, 206 F.R.D. 551, 559 (M.D.N.C. 2002) (reasonable estimate of damages is all that is required); *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 566 (S.D.N.Y. 2004) *opinion modified on reconsideration on other grounds*, 361 F. Supp. 2d

---

[112] *Hernandez* FOFCOL at p. 37-38.

[113] *See Germano* FOFCOL for Remediation & CIH vs. Comp. Ex. 10 (attached hereto as Exhibit 55); *see also*, 2010 RS Means Residential Cost Data (when direct costs are compared, the various estimates are consistent with each other) (attached hereto as Exhibit 56); Ronald Wright Summaries of Cost Estimates (attached hereto as Exhibit 57).

237 (S.D.N.Y. 2005) (endorsing a formulaic estimate of damages). As this court previously stated in its *Class FOFCOL*:

> Moreover, the average cost of repairing class members' homes is subject to calculation on a formulaic, square footage basis. Indeed, this Court made similar findings in the later Hernandez trial. *See* April 27, 2010 Findings of Fact and Conclusions of Law, Rec. Doc. # 2713. The same approach to the determination of damages for repair and remediation is applicable to the class representatives and class members subject to appropriate cost adjustments. (Rec. Doc. 18028 at ¶ 23).

*Class FOFCOL,* 2014 WL 4809520 at *5.

The defendants have failed to make a showing that the bids and unit pricing converted to the dollars per square footage utilized by Mr. Inglis are unreliable or any better or worse than RS Means unit pricing, or bids by a builder who visits the home. Defendants can argue, at best, that some of these estimates may be a little high and some may be a little low – a routine characteristic of any damage estimate whether it is formulaic, individualized, or otherwise. *See Gutierrez v. Wells Fargo & Co.*, No. C07-05923 WHA, 2010 WL 1233810, at *11 (N.D. Cal. Mar. 26, 2010) ("[P]laintiffs cannot be expected to determine, with 100% accuracy, the exact [damages] . . . In sum, defendant *cannot* object to a damage study that is as close to the best possible using its own data, especially if class-wide methods of proof would be no less imprecise than individual methods of proof.").

In this context, the issue of variability[114] of particular building features like "mechanical items" or "number of bedrooms," as raised by the defendants,[115] does not interfere with each class member receiving a reliable and certified remediation (*i.e.* removal of the corrosive environment and replacement of damaged building components with new undamaged building components). Rather, the issue of intra-plaintiff variability on "mechanical items" or "number of bedrooms" (which is also reflected in size of the home) is an issue of intra-plaintiff allocation – *i.e.* the defendant has no standing to advocate for the hypothetical class member who has a small, but luxurious, kitchen and receives medium grade kitchen cabinets instead of high grade kitchen cabinets during remediation. Defendants' hypothetical situation is hardly a reason to determine that a remediation plan which provides all class members full professional and reliable building remediation with removal of the corrosive environment and replacement of all damaged building components is somehow methodologically flawed. This is the classic case of the defendant arguing for a plaintiff to receive greater damage recovery under the guise of "due process," when the goal of the defendant is to advocate for no recovery whatsoever. *See* 22 Am.Jur.2d, Damages, § 23, p. 42. ("An element of uncertainty in the amount of damages or the fact that they cannot be calculated with mathematical accuracy or with absolute certainty or exactness is not a bar to recovery. Nor is mere difficulty in the assessment of damages a sufficient reason for refusing them where the right to them has been established."). *See also Umbriac v. American Snack Food*, 388 F.Supp. 265, 275 (E.D.Pa. 1977) ("It is in the nature of the motion practice on

---

[114] *See* RS Means Costs vs. Size and Quality (attached hereto as Exhibit 58). This analysis shows there is little variability in pricing (maximum 6%) when comparing the most extreme homes (small economy to large custom).

[115] Taishan Brf. at 15; Ex. 3 (18777-3) at 4-8.

class determination issues that defendants, who naturally have no interest in the successful

prosecution of the class suit against them, are called upon to interpose arguments in opposition to

class determination motions verbally grounded upon a concern for the 'best' representation for

the class while the implicit, but nonetheless real, objective of their vigorous legal assaults is to

insure 'no' representation for the class."); *Sley v. Jamaica Water and Utilities, Inc.*, 77 F.R.D.

391, 394 (E.D.Pa. 1977) ("defendants who take such a position on class certification or

decertification motions are realistically not concerned with the "best" representation for the

plaintiff class but rather their goal is to ensure "no" representation").

The remedy of remediation is a limited remedy[116] – encompassing only removal of the

corrosive environment and replacement of damaged building parts.  Other forms of personal

property damage, hedonic damages, and other individualized damages are reserved for phase

three of these damages proceeding.

There is no doubt that unit pricing and square footage pricing, such as that published by

RS Means and Xactimate, provide reliable estimates of the costs of repair, and numerous courts

have recognized this.  *See, e.g., Gulbankian v. MW Mfrs., Inc.,* 2014 WL 7384075, at *5 (D.

Mass. Dec. 29, 2014) (noting that use of RS Means "as the starting point for calculating damages

is widespread and accepted" and approving settlement that used RS Means in calculating

damages for class of thousands of homeowners to repair defective windows over class member

objections to the damages methodology); *accord Denley v. Hartford Ins. Co. of Midwest*, 2008

WL 2951926, at *4 (E.D. La. July 29, 2008) (noting that the Xactimate tool "is widely

---

[116] *See, e.g., St. Paul Fire & Marine Ins. Co. v. Del Webb Communities, Inc.,* 2013 WL
1181904, at *4 (D. Nev. Mar. 19, 2013) (discussing plaintiffs' claims for remediation as
"limited").

64

recognized and used in the insurance industry to estimate damage" and finding that its use as an estimate tool meets the soundness criteria under *Daubert*); *Shadow Lake Mgmt. Co. Inc. v. Landmark Am. Ins. Co.,* 2008 WL 2510121, at *4 (E.D. La. June 17, 2008) ("Because Rake used Xactimate, a program commonly used in the insurance industry, his opinions are sufficiently reliable. Indeed, the Xactimate methodology is reliable under *Daubert* because inputting the same data into the analysis would reliably result in the same output.").

There is no doubt that, utilizing RS Means data, one can determine the square footage cost of constructing or rebuilding the interior of a house.[117]  The scope of work here has been priced as $86 per square foot (+ 6% for CIH inspection certification).[118]  Berman&Wright have utilized this estimate in conjunction with bids and against RS Means estimates in five states from 2010 – 2015, and found the $86 per square foot to be a reliable estimate of the remediation work required to return a plaintiff's building to safety.  The Court has confirmed unit pricing, square footage pricing, and these actual costs estimates to be reliable on two occasions.[119]  Mr. Inglis utilizes the relevant provisions of the RS Means Unit Price Cost Data Section and the Square Foot Cost Section to inform his estimates.[120]

Again, the defendants argue that, in determining the $86 per square foot cost, Mr. Inglis did not employ a valid sampling technique, and improperly extrapolated. In fact, however, Mr.

---

[117] *See* RS Means 2015 at 3-4 (Exhibit 54).

[118] Inglis Declaration at ¶ 4; *see also Hernandez* FOFCOL at p. 34, 39; *Germano* FOFCOL at p. 53.

[119] *Hernandez* FOFCOL at p. 37-38; *Germano* FOFCOL at p. 53.

[120] From the Unit Cost Data Section, Mr. Inglis utilizes a scope, quality, price quantities, multiply, project overhead and estimate summary.  From the Square Foot Cost Section, Mr. Inglis utilizes a living area and appropriate average costs for demolition and interiors.

Inglis *did not extrapolate at all* because he applied the cost remediation dollar amount established through scientific and practical building experience investigation and then converted that amount to dollars per square foot for each home and applied local building costs factors.  If one applies a formulaic method to each class member's claim and individually calculates his or her damage, there is no need for a sample because each class member has his or her damages determined by application of the formula.  *See, e.g., Merenda v. VHS of Michigan, Inc.*, 296 F.R.D. 528, 544 (E.D. Mich. 2013) (approving class certification based on damages expert's formula without requiring statistical sampling); *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 566 (S.D.N.Y. 2004) (same); *Gutierrez v. Wells Fargo & Co.*, No. C07-05923 WHA, 2010 WL 1233810, at *10 (N.D. Cal. Mar. 26, 2010) (same).  Like the scope of work issue, the defendants want to re-litigate this issue, but, under this court's prior holdings, that would be neither necessary nor efficacious.  Defendants' attack on the underlying methodology of the $86 square footage remediation cost estimate does not demonstrate a lack of methodological reliability; at best, defendants make the un-extraordinary point that there is more than one way to develop a reliable estimate of remediation damages.

Defendants also challenge the use of estimates in Mr. Inglis's damages calculations for those properties for which BrownGreer (the CDW Claims Administrator for prior settlements) lacked verified square footage information for 131 buildings.  Mr. Inglis used the state average of the validated square footage to establish a reasonable estimate of square footage for the unverified buildings in each state with the largest groups of verified square footage values (Alabama, Florida, Mississippi, Louisiana, and Virginia).  For the remaining buildings with unverified square footage (only 7), Inglis used the national mean due to the small sample size.

This approach has been reviewed and recommended by a professional statistician.[121]  This falls

well within the range of reasonable estimates and averages accepted by courts.  *See In re*

*Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 691-693 (N.D. Ga. 1991) ("The fact that

the methodologies contain some form of averaging does not automatically render them methods

of fluid recovery. On the contrary, Dr. Beyer's economic analysis evidences common impact and

permits, with reasonable certainty, formulaic calculation of damages."); *In re Cardizem CD*

*Antitrust Litig.*, 200 F.R.D. 326, 350 (E.D. Mich. 2001) (a formulaic calculation based on

computer records and averaging is proper under Rule 23); *In re Ready-Mixed Concrete Antitrust*

*Litig.*, 261 F.R.D. 154, 165 (S.D. Ind. 2009) (noting that the use of widely accepted methodology

to estimate damages is proper).

      This error range around these estimates would account for a small percentage of any

individual class member's claim, but, more importantly, this estimate in the case of 131

unverified square footages is only to serve as a placeholder, subject to verification in claims

processing. *See Byrd, supra*.  If the square footage number cannot be verified, the actual

recovery will be reduced accordingly by the claims administrator.  Thus, the Inglis estimate is a

reasonably accurate prediction of the true square footage value for those buildings for which

BrownGreer lacked data, and there is no prejudice to the defendants, because no class member

lacking square footage data will recover for one dollar per square foot beyond what he or she can

verify in claims processing.  *See Frey*, 2015 WL 728066, at *5 (affirming district court

determination of class ascertainability where purported "individualized" issues regarding class

members' bank accounts were largely "administrative").

---

[121]  *See* Inglis Dec., Ex. 11 (Grossman Letter 05/15/2015) (Exhibit 54).

### 3. **Local Costs Factors**

The third and final component of Mr. Inglis's damages formula employed a local

building costs factor by zip code. Mr. Inglis added this factor to the previous analysis performed

by his colleague Mr. Wright (who was unable to continue with his assignment). The addition of

this local building costs factor refines the final damages calculation for each class member to

make each award more sensitive to the local building costs.  For all of the states at issue here

(18) this meant that the remediation damages award was decreased by Mr. Inglis from Mr.

Wright's estimate (where a national rather than a localized factor was used).  Nearly all of the

zip codes in the 18 states had a local building and costs factor below "1." On average, the local

costs and labor adjustment factor in the 18 states was 87% of the national average, (or 13% less

than the national average) so the individual and class damages were reduced accordingly in Mr.

Inglis' estimate.  The local zip code building costs factor, along with the updating of estimates

from prior years to 2015 dollars, gives the final result reported in the amended Inglis Declaration

of $607,361,039 for the class of 2,888 building owners.  The local building cost factors and

dollars adjustment to 2015 dollars are derived from the RS Means database, costs books, and

"Costworks," and provide data that is updated annually and widely respected and utilized by the

US building industry.  As recognized by numerous courts, the data and methodology used to

develop the RS Means local labor and building adjustment costs factors is reliable.  *See, e.g., In

re Louisiana–Pac. Inner–Seal Siding Litig.,* 2004 WL 1246050, at *6 (D.Or. May 24, 2004)

(construction class action settlement used "an independent court-approved supplier of

construction cost information, the R.S. Means Company, Inc." to calculate location-specific per

square foot compensation rate); *In re CertainTeed Fiber Cement Siding Litig.,* 303 F.R.D. 199,

205 (E.D. Pa. 2014) (approving class action settlement which calculated amount of settlement payments for class of thousands of claimants with damaged siding using RS Means cost estimator and noting that "RS Means is a cost estimator that accounts for regional differences in labor and materials costs by using zip codes to factor in the specific costs of nearly any type of construction in a particular area of the country . . . It has been used in the construction/building industry for almost 40 years").

In conclusion, Plaintiffs' damages expert is qualified by training and experience to estimate costs of building repair.  He has extensive experience estimating the cost of repair in Chinese Drywall buildings, including those which were the subject of the *Germano* FOFCOL. His methodology to estimate remediation damages in this case for a class of Taishan Drywall building owners is formulaic.  It utilizes an exhaustively researched scope of work, extensive unit cost and construction bid repair estimates converted to dollars per square foot of interior living space repairs, and standardized RS Means local cost factors.  This methodology produces a reliable damages estimate under the Rule 23 standard for formulaic damages and based on an extensive record of Chinese Drywall repair estimates.  Therefore, this Court may consider this damages estimate and rely on it under all applicable legal standards.

### E.   The Defendants, as a Result of Their Default Are Subject to Class-Wide Damage Assessments.

#### 1.   CNBM/BNBM May Not Relitigate the Issue of Their Affiliation with Taishan.

In their sundry filings, CNBM/BNBM repeatedly contend that the Rule 36 Requests for Admission ("RFAs"), that were deemed admitted by reason of Taishan's failure to respond, *see* Fed. R. Civ. P. 36(a)(3), "unambiguously" cannot be imputed to them.  Rec.Doc. Nos. 18872, at

7-8; 18,876-1, at 9-11; 18,886, at 2-4; *see also* Rec.Doc. 18887, at 6-7.  They cite cases, such as *Becerra v. Asher*, 105 F.3d 1042, 1048 & n.28 (5th Cir. 1997), standing for the proposition that deemed admissions by one adverse party cannot be used against another adverse co-party.  CNBM/BNBM's argument is unavailing.

CNBM/BNBM's cases all involved *unrelated* co-defendants.  Where, however, co-defendants share an identity of interest, a defendant's admissions may bind its co-defendant. *See U.S. ex rel. Small Bus. Ass'n v. Chang*, 2006 WL 757823, at *4 (D.N.J. Mar. 20, 2006) ("[T]he admissions merely address the status, as a matter of law, of those corporate entities as alter egos of Defendant and, in isolation, do not implicate the Transferee Defendants."), *aff'd sub nom. Chang v. United States*, 248 F. App'x 414 (3d Cir. 2007).  One of CNBM/BNBM's own authorities recognizes this principle.  *See In re Leonetti*, 28 B.R. 1003, 1009 (E.D. Pa.) ("Under certain circumstances, it could be that responses to Rule 36 requests would be admissible against a co-defendant *where the two defendants had an identity of interest*.") (emphasis added), *aff'd mem.*, 725 F.2d 667 (table) (3d Cir. 1983).  Indeed, it would be an anomalous result for a court to simply disregard a defendant's admissions about its interlocking relationship with its co-defendants, which is what CNBM/BNBM are asking the Court to do here.

In this respect, CNBM/BNBM are not simply Taishan's co-defendants.  Rather, they are *affiliates and alter egos* of Taishan.  All of these defendants form, in effect, a single business enterprise, and this Court made express findings of fact to that effect.[122]  Although those findings

---

[122]  CNBM/BNBM's assertion that the "single business enterprise" rule is an incorrect legal standard is meritless.  *See* Rec.Doc. 18876-1, at 7-8.  The Louisiana Court of Appeal has repeatedly employed that test for nearly a quarter-century.  *E.g.*, *Lee v. Clinical Research Ctr. of Fla., L.C.*, 889 So. 2d 317, 323 (La. Ct. App. 2004); *Berg v. Zummo*, 851 So. 2d 1223, 1225 (La.

(continued...)

cited Taishan's deemed admissions from the RFAs, *see Class FOFCOL* ¶¶ 28-47, the admissions

are not the only grounds for that determination.  Contrary to CNBM/BNBM's contention that

there is no competent evidence to support Taishan's admissions, Rec.Doc. 18876-1, at 10-11,

discovery amply confirms these defendants' alter ego status and resoundingly validates the

Court's determination.  *See* Factual Background, §A, *supra*.

In short, it was perfectly appropriate for the Court to rely on Taishan's admissions in

finding CNBM/BNBM to be alter egos of Taishan.  Thus, putting aside CNBM/BNBM's

inapposite "axiomatic" authorities, because there is evidence beyond Taishan's admissions to

establish that these defendants constitute a single business enterprise, CNBM/BNBM's tardy

effort to wriggle free of Taishan's admissions is beside the point and fails.

Given what the discovery confirms and the fact that the disputed admissions relate to

these defendants' interrelationship, this is plainly not the archetypal situation contemplated by

the general rule that CNBM/BNBM cite, in which a court would be "saddling" a defendant with

the deemed admissions of an unrelated co-defendant, *Riberglass, Inc. v. Techni-Glass Indus.,*

*Inc.*, 811 F.2d 565, 567 (11th Cir. 1987), or making "[t]he rights or liabilities of one party . . .

beholden to the failure of another party . . . to respond to requests for admissions."  *First*

*Acceptance Ins. Co. v. Ramirez*, 2010 WL 779315, at *6 (M.D. Fla. Feb. 26, 2010).

---

[122](...continued)
Ct. App. 2003); *In re New Orleans Train Car Leakage Fire Litig.*, 690 So. 2d 255, 257 (La. Ct.
App. 1997); *Brown v. Auto. Cas. Ins. Co.*, 644 So. 2d 723, 727-28 (La. Ct. App. 1994); *Green v.*
*Champion Ins. Co.*, 577 So. 2d 249, 257-58 (La. Ct. App. 1991).  Furthermore, contrary to
CNBM/BNBM's assertion, the Louisiana Supreme Court has implicitly accepted it as well.  *See*
*Brown v. ANA Ins. Grp.*, 994 So. 2d 1265, 1272 (La. 2008).

Moreover, CNBM/BNBM's dubious argument invites the Court to render conflicting judicial determinations: Taishan has been *conclusively determined* to be the alter ego of CNBM/BNBM, yet the latter ask the Court now to disregard Taishan's admissions and find that this is not so. CNBM/BNBM made the conscious, strategic decision to sit on the sidelines until only recently. Their contention is, at bottom, a backdoor attempt to relieve Taishan of its defaulted admissions – a request that would ordinarily have to satisfy a high standard[123] – so as to effectively nullify the *Class FOFCOL* on the matter of defendants' relationship to one another, in general, and the effect of Taishan's admissions concerning its status, in particular. The Court should reject this eleventh-hour ploy.

### 2. CNBM/BNBM Are in Complete Default in This Litigation

Next, CNBM/BNBM maintain that they cannot be treated as defaulting parties because a default was not formally rendered against all Taishan Affiliates in each constituent action. Rec.Doc. Nos. 18886 at 5-6; 18887 at 5-6. That argument also fails.

An examination of the *Class FOFCOL* leaves no genuine doubt that the Court considered all of the Taishan Affiliates to be in default. *See Class FOFCOL,* 2014 WL 4809520 at *3-4 (¶¶13-19). That a default was not officially entered in each action against every Taishan Affiliate is sheer hairsplitting. It is the kind of "artificially restrictive or hypertechnical" argument, *Beach Mart, Inc. v. L & L Wings, Inc.,* 302 F.R.D. 396, 413 (E.D.N.C. 2014), that the

---

[123] *E.g., In re Heritage Bond Litig.*, 220 F.R.D. 624, 626 (C.D. Cal. 2004) (party may be relieved of default on RFAs only "[u]nder compelling circumstances") (citation and internal quotation marks omitted); *Capitol Car Care, Inc. v. United States*, 1994 WL 397288, at *2-3 (W.D. Okla. Mar. 23, 1994) (refusing to relieve defendant of deemed admissions where no formal application made and no showing of "excusable hardship").

Fifth Circuit and other courts repeatedly frown upon. *Cf. Broad. Music, Inc. v. M.T.S. Enters., Inc.*, 811 F.2d 278, 281 (5th Cir. 1987) ("The Federal Rules do not in any way suggest that a defendant may halfway appear in a case, giving plaintiff and the court the impression that he has been served, and, at the appropriate time, pull failure of service out of the hat like a rabbit in order to escape default judgment. To countenance this train of events would elevate formality over substance and would lead plaintiffs to waste time, money, and judicial resources pursuing a cause of action."); *Babcock v. CAE-Link Corp.*, 878 F. Supp. 377, 386 (N.D.N.Y. 1995) (characterizing as hypertechnical defendant's argument that plaintiff's failure to fill in return date until after expiration of deadline for filing of motion rendered it untimely); *SEC v. Dumont Corp.*, 49 F.R.D. 342, 345 (S.D.N.Y. 1969) (similarly characterizing argument that preliminary injunction motion papers were defective because they had been served before completion of service of summons and complaint); *In re Gotwald*, 488 B.R. 854, 870-71 (Bankr. E.D. Pa. 2013) (similarly characterizing argument that injunction requiring relinquishment of assets was inoperative as to bank account titled only in name of related entity).

The defaults against the Taishan Affiliates were not based on mere technical errors. *Cf. McKenzie v. Wakulla Cnty.*, 89 F.R.D. 444, 445 (N.D. Fla. 1981) ("Default judgments should not be entered because of technical errors."); *DIRECTV, Inc. v. Gagnard*, 2005 WL 1968445, at *1 (W.D. La. Aug. 16, 2005) (in determining whether to enter default judgment, court "must consider whether the defendant's failure to plead or defend is primarily technical"); *Cooper v. Faith Shipping*, 2010 WL 2360668, at *13 n.112 (E.D. La. June 9, 2010) ("In certain circumstances, a litigant may be relieved from the effect of a default judgment that resulted from 'a technical error or a slight mistake' by the litigant's attorney.") (citing cases). Rather, defaults

were properly entered against them inasmuch as "having been given every opportunity to defend, [they] appear[ed] to have no intention of answering or appearing in the lawsuit[s]." *In re Suprema Specialties, Inc.*, 330 B.R. 40, 49 (S.D.N.Y. 2005).

CNBM/BNBM cannot now escape the consequences of their litigation strategy – and broad default – by pointing to a ministerial failure to dot every "i" and cross every "t" in each individual action.  *Cf. In re Suprema Specialties, Inc.*, 330 B.R. at 45 (defendants in adversary bankruptcy proceeding "s[ought] to relieve themselves of the consequences of their disregard for the letter of procedural rules by insisting on the punctilio of exact compliance with . . . the rules governing defaults").  As one court has aptly put it, "Litigation is more than an exercise in playing 'Gotcha.'"  *Baltimore Cnty. v. AT & T Corp.*, 735 F. Supp. 2d 1063, 1098 (S.D. Ind. 2010).

Like the defendants in *Suprema Specialties*, CNBM/BNBM "made a strategic decision to ignore [this litigation] . . ., reversed that decision, retained counsel, and sought to defend this case."  *In re Suprema Specialties, Inc.*, 330 B.R. at 52 (noting that defendants' "default was a deliberate strategic choice").  The district court there termed such a strategy "gamesmanship," *id.* at 52, and, despite its acknowledgment of the general policy that federal courts strongly prefer to resolve cases on the merits, *id.* at 54, refused to set aside their default.  CNBM/BNBM's similar gamesmanship should hold no less true here.  They are in default in this litigation, pure and simple – as this Court has found – and the lack of a formal entry of default as to each of them in every action does not negate that status.

### 3. Defendants CNBM Group and CNBM Wrongly Argue That the Court Cannot Award Damages Against Them because There Are <u>Merits Proceedings Still to Occur Against Non-Defaulting Parties.</u>

74

Citing *Frow v. De La Vega*, 82 U.S. 552 (1872), and its progeny, CNBM Group and CNBM argue that the Court cannot enter damages against them as defaulting parties before merits proceedings are completed against the "non-defaulting parties" because doing so could result in inconsistent or incongruous results.  That argument is disingenuous.  As noted above, in this consolidated litigation, defaults have occurred against each Taishan Defendant in at least one or more of the cases that have all been consolidated so, in substance, there are *no* non-defaulting Taishan Defendants who will be the subject of merits proceedings. In the absence of merits proceedings to occur against a non-defaulting defendant that can impact the status of the defaulted defendants, including CNBM Group and CNBM, the concern expressed by *Frow* is not present here.

As noted above, this Court has already found that default judgments have been entered in these consolidated cases against *all* of the Taishan Defendants.  *See Class FOFCOL*,  2014 WL 4809520 at *1-2.   Thus, the law of this case is that a default has been entered against Defendants CNBM and CNBM Group by reason of their being part of the "Taishan Defendants."  Moreover, the *Class FOFCOL* states that the Taishan Affiliates have also been held in default with respect to the proceedings in *Wiltz, Gross* and *Amorin*.  *Id.* at *2.  Consequently, there are no true "non-defaulting" defendants in the consolidated cases so as to make *Frow* relevant here.

*Frow* and the other cases upon which Defendants rely are, therefore, distinguishable because each case involved the presence of both defaulting *and* non-defaulting defendants that were not interconnected with one another such that the result of a merits proceeding against the non-defaulting defendants could impact the status of the defaulting defendant. But here, effectively (1) all of the Taishan Defendants and Taishan Affiliates are in a default posture, and

75

(2) each complaint alleged that they are each jointly and severally liable to the plaintiffs and the class.  Indeed, here, this Court has already held that the Taishan Affiliates "are liable to the class as affiliates of Taishan or under the theory of alter ego/piercing the corporate veil." *Id.* at *4-9. This holding establishes the interconnection of the Defendants to one another, their joint and several liability to the plaintiffs and the class, and ties each to the defaults of the others so that, in effect, there is no non-defaulting party to present the risk of inconsistent results that concerned the *Frow* Court.

Turning more specifically to *Frow*, that case involved a land deal where it was alleged that eight separate defendants combined to form a single conspiracy to defraud the plaintiff out of a large tract of land.  *Frow*, 82 U.S. at 553.  Each defendant was a separate "person," not an alter ego or affiliate of another unlike the situation here.  *Id.*  Furthermore, there was no determination of liability against all of the other defendants when the default was entered against the defendant who failed to answer the matter and no allegation that each defendant was jointly and severally liable to the plaintiff.  *Id.*  All of the defendants, *except* Frow, answered the matter on the merits[124] so a default judgment was entered against Frow.  *Id.*  After entry of the default judgment, the case proceeded on the merits against the remaining defendants who had timely answered the matter.  *Id.*  The remaining defendants prevailed on the merits.  *Id.*  The question framed by the Supreme Court was whether, in such a case, a lower court could lawfully enter a merits judgment against one defendant separately, through a default, whilst the case was proceeding undetermined against the others.  *Id*. at 554.  Although the Supreme Court answered

---

[124] Defendant Frow allegedly prepared an answer as well but ultimately it was not filed and leave to file it out of time was denied, resulting in a default being entered against him.  *Id.*

this question in the negative, and therefore reversed the default judgment against Frow, what makes *Frow* distinguishable from the instant matter, is that, in *Frow,* there were, in fact, non-defaulting defendants against whom a merits proceeding had not yet occurred as of the time of entry of the default against Frow.  Thus, there was the possibility that the outcome of the merits proceeding against the non-defaulting parties could impact whether the defaulting defendant could be held liable at all.  *Id.* at 554.  Here, all defendants have defaulted in at least one of the consolidated cases, and they have been found to be alter egos of each other and jointly and severally liable to the Plaintiffs, so they are not entitled to any merits proceedings where the outcome could impact the liability of one defendant or another.  All defendants are similarly situated, as inter-connected *defaulting* defendants in at least one case.  They are each tainted by a default that binds each, jointly and severally, so there are no undetermined issues to be litigated on the merits that would warrant delaying this Court proceeding to a damages assessment.

In addition, *Frow* involved a matter of the "joint" liability of all of the defendants as compared to the "joint and several" liability here of all of the Taishan Defendants and Taishan Affiliates.  *Id*. at 553-54.  This meant that the liability of at least another besides Frow had to be established in order for Frow himself to be liable.  *Id.*  With the merits proceedings against the non-defaulting defendants resulting in a determination that none of the non-defaulting defendants was liable, it is understandable why the Supreme Court found it unreasonable to hold Frow in default.  *Id.*  That matter involved a single *res* and a single event where liability was premised on the joint liability of all defendants.  *Id.*  Each defendant was an essential party to the liability of the other defendants, since the case pleaded only the joint liability of them all.  *Id.*  With the finding that the other defendants, who were essential parties to the alleged wrongful

conduct, were all not liable on the merits and that the wrongful conduct did not actually occur, a default against Frow could not stand because he could not be liable himself without there being liability of other defendants as well.  *Id*.  In other words, once the merits trial occurred as to the non-defaulting defendants concluding that there was no conspiracy and no fraud, Frow could not be held liable on the basis of his default.  *Id*.  To have not opened the default would have meant the absurd, if not incongruous, result that Frow had conspired with himself alone to defraud the plaintiff out of the land title.  *Id*.  The Supreme Court therefore held it was inconsistent to hold Frow liable where his liability required a finding of liability by others as well (as members of an alleged conspiracy participating in a joint act to defraud) and no others who were alleged to be members of the conspiracy were found to be liable or have committed a fraud.  *Id*.

*In re Uranium Antitrust Litigation*, 617 F. 2d 1248 (7th Cir. 1980), illustrates the inapplicability of *Frow* to the situation here.  That case involved multiple foreign and domestic uranium producers, and several of the foreign defendants chose not to appear, resulting in defaults being entered against them, followed by the entry of final judgments on the issue of their liability.  The Seventh Circuit held that *Frow* did not preclude the entry of the final judgments on liability against the defaulting defendants, because *Frow* had involved a situation of an alleged "joint" fraud and not a claim of "joint and several liability" of the multiple defendants.  The court noted that, where *"joint and several"* liability is alleged, *"there is little possibility of inconsistent adjudications of liability"* and hence *Frow* did not apply.  *Id*. at 1257 (emphasis

added).  Thus, in this litigation, where there are no non-defaulting parties and allegations of joint

and several liability, *Frow* is completely inapposite.[125]

Other cases that Defendants rely on also do not support their request to delay assessing

damages.  Each of the cases present the situation of combination of defaulting and non-

defaulting parties where the outcome of a merits proceeding against the non-defaulting parties

could impact the rights of the defaulting parties.  They also present situations where the

Defendants are not each alter egos of others and alleged to be jointly and severally liable.  *See*

*Lewis v. Lynn*, 236 F. 3d 766 (5th Cir. 2001) (finding it "incongruous" and "unfair" to allow non-

defaulting litigants to prevail on summary judgment, while not providing the same benefit to

similarly situated defaulting defendants); *Fehlhaber v. Indian Trails,Inc.,* 425 F.2d 715 (3d Cir.

1970) (involving third party contribution liability and no allegation of joint and several liability);

*Gulf Coast Fans, Inc., v. Midwest Elecs. Imps., Inc.,* 740 F. 2d 1499 (11th Cir. 1984) (finding it

would be incongruous and unfair to allow Gulf Coast to collect from the defaulting defendant on

a contract that a jury found Gulf Coast had breached in the related but separate case); *Neilson v.*

*Chang,* 253 F.3d 520 (9th Cir 2001) ("similarly situated" defendants  analogy does not apply in

the circumstances of this case).

Here, there is no risk of inconsistencies between the defendants. This Court has found

alter ego/piercing the corporate veil liability against all of the Taishan related Defendants and

---

[125] In *Uranium Antitrust,* the court did state that even where there is joint and several
liability the assessment of damages against the defaulting parties must wait until there is a merits
determination against all non-defaulting defendants, unless the plaintiff chooses to dismiss the
non-defaulting defendants and proceed against the defaulting defendants for the entirety of
damages based on their joint and several liability for the whole.  But this point is not relevant
here because all defendants are in default. *Id.* at 1262.

Affiliates and defaults have been entered against all of these related defendants in one or more cases.  All of the Taishan Defendants and Affiliates are in default and there is joint and several liability. There is no reason to delay proceeding to a damages determination against each of the Taishan Defendants, because there is no possible risk of an inconsistent outcome under *Frow*. All of Defendants' arguments are without merit.[126]

---

[126]Defendants also suggest there is a standing problem for the Plaintiff Class.  That begs the issue.  Each Plaintiff is an active litigant, and as noted in Section III. A., *supra,* class damages may be established on an aggregated basis and pursuant to a formulaic methodology.

## IV. <u>CONCLUSION</u>

Thousands of class members have waited far too long to obtain relief for losses they suffered on account of Defendants' acts and omissions.  It is long past time to bring down the curtain on the Taishan Defendants' stalling tactics and attempts to avoid their day of reckoning. Defendants' latest delay tactics are unavailing.  At this point, the Plaintiff Class should be permitted to demonstrate the extent of their damages.  Plaintiffs are ready, willing and more than able to put on their proofs.  At the conclusion of the damages assessment hearing, Plaintiffs should be entitled to fully recover their class damages.

For the reasons set forth above, the Plaintiffs' motion for assessment of class damages should be granted.

Respectfully submitted,

Dated: May 15, 2015

/s/ Russ M. Herman
Russ M. Herman (LA Bar No. 6819)(on the brief)
Leonard A. Davis (LA Bar No. 14190)(on the brief)
Stephen J. Herman (LA Bar No. 23129)(on the brief)
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

81

Arnold Levin (on the brief)
Fred S. Longer (on the brief)
Sandra L. Duggan (on the brief)
Matthew C. Gaughan (on the brief)
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

**PROPOSED CLASS COUNSEL TO CLASS
PLAINTIFFS' STEERING COMMITTEE**

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm, LLC
425 W. Airline Highway, Suite B
Laplace, LA 70068
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Peter Prieto
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com

Bruce William Steckler

Steckler, LLP
12720 Hillcrest Road, Ste 1045
Dallas, TX 75230
Phone: (972) 387-4040
Fax: (972) 387-4041
bruce@stecklerlaw.com

Ervin A. Gonzalez
Colson, Hicks, Eidson
255 Alhambra Circle, Penthouse
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
The Lambert Firm

82

701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@thelambertfirm.com

Gerald E. Meunier (on the brief)
Rachel Sternlieb (on the brief)
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
Parker Waichman, LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves
Reeves & Mestayer, PLLC
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@attorneys4people.com

Christopher Seeger (on the brief)
Dion Kekatos (on the brief)
Seeger Weiss, LLP

77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Victor M. Diaz, Jr.
V.M. Diaz and Partners, LLC
119 Washington Ave, Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

Daniel K. Bryson
Whitfield, Bryson & Mason, LLP
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5002
dan@wbmllp.com

Richard J. Serpe
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

### OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Richard S. Lewis (on the brief)
Kristen Ward Broz (on the brief)
HAUSFELD LLP
1700 K Street, N.W
Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com


Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Anthony D. Irpino (on the brief)
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

84

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 15th day of May, 2015.

/s/ Leonard A. Davis
Leonard A. Davis
HERMAN, HERMAN & KATZ, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
Plaintiffs' Liaison Counsel
MDL 2047

*Co-counsel for Plaintiffs*