# EXHIBIT 31

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2
       _____
 3                             §  MDL NO. 2047
       IN RE:                  §
 4     CHINESE-               §  SECTION: L
       MANUFACTURED            §
 5     DRYWALL PRODUCTS        §  JUDGE FALLON
       LIABILITY               §
 6     LITIGATION              §  MAGISTRATE
       _____    §  JUDGE WILKINSON
 7
                      -  -  -
 8
        CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
10
                      -  -  -
11
                   April 6, 2011
12
                      -  -  -
13
         CONFIDENTIAL - SUBJECT TO FURTHER
14            CONFIDENTIALITY REVIEW
15                    -  -  -
16         Videotaped deposition of JIANCHUN
       ZHANG, held at 3 Pedder Street, Central,
17     Hong Kong, China, commencing at 9:12
       a.m., on the above date, before Linda L.
18     Golkow, Certified Court Reporter,
       Registered Diplomate Reporter, Certified
19     Realtime Reporter and Notary Public.
20
21                    -  -  -
22
            GOLKOW TECHNOLOGIES, INC.
23      ph 877.370.3377 | fax 917.591.5672
                deps@golkow.com
24
```

Page 2

APPEARANCES:

COLSON HICKS EIDSON
BY: PATRICK S. MONTOYA, ESQUIRE
255 Alhambra Circle
Penthouse
Coral Gables, Florida 33134
(305) 476-7400
patrick@colson.com
Representing Plaintiffs' Steering
Committee in the Federal and State
Coordinated Actions

SEEGER WEISS LLP
BY: CHRISTOPHER A. SEEGER, ESQUIRE
BY: JEFFREY S. GRAND, ESQUIRE
One William Street
New York, New York 10004
(212) 584-0700
cseeger@seegerweiss.com
jgrand@seegerweiss.com
Representing the Plaintiffs' Steering
Committee

LAW OFFICES OF RICHARD SERPE, P.C.
BY: RICHARD J. SERPE, ESQUIRE
580 East  Main Street
Suite 310
Norfolk, Virginia 23510
(757) 233-0009
rserpe@serpefirm.com
Representing the MDL Plaintiffs and
the Germano Plaintiffs

- - -

Page 3

APPEARANCES (CONTINUED):

HOGAN LOVELLS US LLP
BY: ERIC D. STATMAN, ESQUIRE
BY: RENEE GARCIA, ESQUIRE
875 Third Avenue
New York, New York 10022
(212) 918-3000
Renee.garcia@hoganlovells.com
eric.statman@hoganlovells.com
Representing Taishan Gypsum Co.
Ltd. and Tai'an Taishan
Plasterboard Company Ltd. and the
Witness, Jianchun Zhang

HOGAN LOVELLS INTERNATIONAL LLP
BY: EUGENE CHEN, ESQUIRE
18th Floor, Park Place
1601 Nanjing Road West
Shanghai, China 200040
(86 21) 6122 3800
eugene.chen@hoganlovells.com
Representing Taishan Gypsum Co.
Ltd. and Tai'an Taishan
Plasterboard Company Ltd. and the
Witness, Jianchun Zhang

HOGAN LOVELLS INTERNATIONAL LLP
BY: STACY YUAN, ESQUIRE
31st Floor - Tower 3
China Central Place
Beijing, China 100025
(86 10) 6582 9488
stacy.yuan@hoganlovells.com
Representing Taishan Gypsum Co.
Ltd. and Tai'an Taishan
Plasterboard Company Ltd. and the
Witness, Jianchun Zhang

Page 4

APPEARANCES (CONTINUED):

GREENBERG TRAURIG, LLP
BY: HILARIE BASS, ESQUIRE
1221 Brickell Avenue
Miami, Florida 33131
(305) 579-0745
bassh@gtlaw.com
Representing the Home Builders
Steering Committee

GALLOWAY JOHNSON TOMPKINS BURR and
SMITH
BY: CARLINA C. EISELEN, ESQUIRE
One Shell Square
701 Poydras Street, 40th Floor
New Orleans, Louisiana 70139
(504) 525-6802
ceiselen@gjtbs.com
Representing Interior/Exterior
Building Supply

PERKINS COIE LLP
BY: DAVID L. BLACK, ESQUIRE
    CRAIG M.J. ALLELY, ESQUIRE
1899 Wynkoop Street - Suite 700
Denver, Colorado 80202
(303) 291-2300
DBlack@perkinscoie.com
Representing the State of Louisiana

Page 5

APPEARANCES (CONTINUED):

WEINBERG, WHEELER, HUDGINS, GUNN &
DIAL, LLC
BY: NICHOLAS P. PANAYOTOPOULOS, ESQ.
3344 Peachtree Road, NE
Suite 2400
Atlanta, Georgia 30326
(404) 876-2700
npanayo@wwhgd.com
Representing Various Banner
Defendants

BRENNE, EVANS & MILLMAN, P.C.
BY: THEODORE I. BRENNER, ESQUIRE
411 East Franklin Street
Suite 200
Richmond, Virginia 23218
(804) 644-1300
Representing Tobin Trading Company

McKENRY, DANCIGERS, DAWSON &
LAKE, P.C.
BY: J. BRIAN SLAUGHTER, ESQUIRE
192 Ballard Court
Suite 400
Virginia Beach, Virginia 23462
(757) 461-2500
Jbslaughter@va-law.org
Representing Atlantic Homes LLC and
Multiple Other Virginia-Based
Defendants

Page 6

2 APPEARANCES (CONTINUED):

4   SHER GARNER CAHILL RICHTER KLEIN & HILBERT, L.L.C.
5   BY:  MATTHEW C. CLARK, ESQUIRE
    909 Poydras Street
6   Suite 2800
    New Orleans, Louisiana 70112
7   (504) 299-2100
    mclark@shergarner.com
8   Representing the Southern Home Defendants

10  SINNOTT, NUCKOLS & LOGAN, PC
11  BY:  KENNETH F. HARDT, ESQUIRE
    13811 Village Mill Drive
12  Midlothian, Virginia 23114
    (804) 378-7600
13  khardt@snllaw.com
    Representing Venture Supply, Inc. and
14  Porter-Blaine Corp.

Page 7

1   APPEARANCES VIA TELEPHONE:

3   KUCHLER POLK SCHELL WEINER & RICHESON LLC
4   BY:  FRANCIS X. deBLANC, III,
    1615 Poydras Street
5   Suite 1300
    New Orleans, Louisiana 70112
6   (504) 592-0691
    slauricella@kuchlerpolk.com
7   Representing Creola Ace Hardware and
    Thomas Gould Inc. in the MDL

10  HUNTON & WILLIAMS LLP
    BY:  A. TODD BROWN, ESQUIRE
11  Bank of America Plaza
    101 South Tryon Street
    Suite 3500
12  Charlotte, North Carolina  28280
    (704) 378-4700
13  Representing Stock Building Supply,
    LLC

16  JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE LLP
    BY:  MEGAN E. DONOHUE, ESQUIRE
17  600 Jefferson Street, Suite 1600
    Lafayette, Louisiana 70501
18  (337) 262-9062
    mdonohue@joneswalker.com
19  Representing Fireman's Fund Insurance
    Company

Page 8

1   APPEARANCES VIA TELEPHONE (CONTINUED):

3   DUPLASS ZWAIN BOURGEOIS PFISTER & WEINSTOCK
4   BY:  PHILIP WATSON, ESQUIRE
    3838 N. Causeway Boulevard
5   Suite 2900
    Metairie, Louisiana 70002
6   (504) 832-3700
    pwatson@duplass.com
7   Representing R&H Masonry, Inc., and
    Swedberg Enterprises, Inc.

10  RUMBERGER, KIRK & CALDWELL, P.A.
    BY:  ABIGAIL ROBERTS, ESQUIRE
11  Brickell Bayview Centre
    Suite 3000
12  80 Southwest 8th Street
    Miami, Florida 33130
13  (305) 358-5577
    aroberts@rumberger.com
    Representing Defendants' Liaison
14  Counsel for  Installers

16  PHELPS DUNBAR LLP
    BY:  MITCHELL P. HASENKAMPF, ESQUIRE
17  Canal Place
    365 Canal Street, Suite 2000
18  New Orleans, Louisiana 70130-6534
    (504) 584-9249
19  mitchell.hasenkampf@phelps.com
    Representing State Farm

Page 9

1   APPEARANCES VIA TELEPHONE (CONTINUED):

3   FULMER LEROY ALBEE BAUMANN
    BY:  MICHAEL MCCAHILL, ESQUIRE
4   2866 East Oakland Park Boulevard
    Ft. Lauderdale, Florida 33306
5   (954) 707-4430
    mosscandace@fulmerleroy.com
6   Representing Independent Builders
    Supply Association (IBSA)

8   THOMPSON COE COUSINS & IRONS, L.L.P.
9   BY:  SUZANNE M. PATRICK, ESQUIRE
    One Riverway, Suite 1600
10  Houston, Texas 77056
    (713) 403-8210
11  spatrick@thompsoncoe.com
    Representing The North River
12  Insurance Company

Confidential - Subject to Further Confidentiality Review

| | Page 10 |
|---|---|

1 APPEARANCES VIA STREAM:
2
3 BECNEL LAW FIRM, L.L.C.
   BY: ROBERT BECNEL, ESQUIRE
4 106 W. 7th Street
   Reserve, Louisiana 70084
5 (985) 536-1186
   robbecnel@aol.com
6 Representing the Plaintiffs'
   Steering Committee
7
8
9 QUINN EMANUEL URQUHART & SULLIVAN,
   LLP
   BY: CLINTON DOCKERY, ESQUIRE
10 51 Madison Avenue, 22nd Floor
   New York, New York 10010
11 (212) 849-7000
   clintondockery@quinnemanuel.com
12 Representing Chartis Select Insurance
   Company and Related Chartis Insurers
13
14
15 JONES, WALKER, WAECHTER, POITEVENT,
   CARRERE & DENEGRE LLP
   BY: MEGAN E. DONOHUE, ESQUIRE
16 600 Jefferson Street, Suite 1600
   Lafayette, Louisiana 70501
17 (337) 262-9062
   mdonohue@joneswalker.com
18 Representing Fireman's Fund Insurance
   Company
19
20
21 HAYNSWORTH SINKLER BOYD, P.A.
   BY: CHRISTOPHER B. MAJOR, ESQUIRE
22 75 Beattie Place - 11th Floor
   Greenville, South Carolina 29601
23 (864) 240-3200
   cmajor@hsblawfirm.com
24 Representing USG Corporation and L&W
   Supply Corporation

| | Page 11 |
|---|---|

1 APPEARANCES VIA STREAM (CONTINUED):
2
3 TAYLOR WALKER, P.C.
   BY: CHRISTOPHER J. WIEMKEN, ESQUIRE
4 555 E. Main Street
   Suite 1300
5 Norfolk, Virginia 23510
   (757) 625-7300
6 Cwiemken@taylorwalkerlaw.com
7
8
9
10 DEUTSCH, KERRIGAN & STILES
   BY: MELISSA M. SWABACKER, ESQUIRE
   755 Magazine St.
11 New Orleans, Louisiana 70130
   (504) 581-5141
12 mswabacker@dkslaw.com
   Representing Landmark American
13 Insurance Company
14
15 KUCHLER POLK SCHELL WEINER &
   RICHESON LLC
16 BY: SOPHIA L. LAURICELLA, ESQUIRE
   1615 Poydras Street
17 Suite 1300
   New Orleans, Louisiana 70112
18 (504) 592-0691
   slauricella@kuchlerpolk.com
19 Representing Creola Ace Hardware and
   Thomas Gould Inc. in the MDL
20
21
22
23
24

| | Page 12 |
|---|---|

1 APPEARANCES (CONTINUED):
2
3 ALSO PRESENT:
4
5 Stephanie Chin, Official Interpreter
   (Interpreter 1)
6
7 Una Wong, Check Interpreter
   (Interpreter 2)
8
9
10    - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24

| | Page 13 |
|---|---|

1    - - -
2    I N D E X
3    - - -
4
5 Testimony of: JIANCHUN ZHANG
6 By Mr. Montoya            17
   By Mr. Panayotopoulos        174
7
8
9    - - -
   E X H I B I T S
10   - - -
11

NO.        DESCRIPTION        PAGE

12
Jianchun-13 Handwritten Note in 56
13    Chinese
14 Jianchun-14 Handwritten note in 74
   Chinese
15
Jianchun-15 Handwritten note in 103
16    Chinese
17 Jianchun-16 Handwritten note in 131
   Chinese
18
Jianchun-17 Document in Chinese, 163
19    Bates stamped TG
   0020116 and TG
20    0020117, and English
   Translation,
21    Reconciliation
   Agreement, October
22    3, 2008
23
24

Page 14

```
 1              - - -
 2     DEPOSITION SUPPORT INDEX
 3              - - -
 4
       Direction to Witness Not to Answer
 5
                 Page Line
 6
 7
 8
 9
       Request for Production of Documents
10
                 Page Line
11
12
13
14
       Stipulations
15
                 Page Line
16
17
18
19
20     Question Marked
21       Page Line
22       35   24
         59   18
23       60   7
24
```

Page 15

```
 1              - - -
 2     THE VIDEOTAPE TECHNICIAN:
 3  We are now going on the record.
 4  The date today is April 6, 2011.
 5  The time now is approximately
 6  9:12 a.m.
 7      This is the videotape
 8  deposition of Mr. Zhang Jianchun
 9  taken in reference to the Chinese
10  Manufactured Drywall Products
11  Liability Litigation.
12      The deposition today is
13  being held in Hong Kong.
14      My name is Melissa Bardwell,
15  videographer, representing Golkow
16  Technologies, and the court
17  reporter today is Linda Golkow.
18      Would the court reporter now
19  please swear in the witness.
20     MR. STATMAN:  Excuse me.
21  Before you do that, can I just
22  mention, I'd like to ask you to
23  affirm the witness rather than to
24  swear him, if you don't mind.
```

Page 16

```
 1     MR. SEEGER:  Excuse me?
 2  What's the difference?
 3     MR. STATMAN:  I'm asking
 4  that she not ask him to swear an
 5  oath before God.  I'm asking that
 6  she affirm that he tell the truth.
 7     MR. PANAYOTOPOULOS:  No
 8  objection from us.
 9     MR. MONTOYA:  Excuse me?
10     MR. PANAYOTOPOULOS:  No
11  objection.
12              - - -
13     (STEPHANIE CHIN, OFFICIAL
14  INTERPRETER, INTERPRETER 1, was
15  sworn to interpret Chinese into
16  English and English into Chinese.)
17              - - -
18     JIANCHUN ZHANG, after having
19  been affirmed through the
20  interpreter, was examined and
21  testified as follows:
22              - - -
23     (UNA WONG, CHECK
24  INTERPRETER, INTERPRETER 2, was
```

Page 17

```
 1  sworn to interpret Chinese into
 2  English and English into Chinese.)
 3              - - -
 4        EXAMINATION
 5              - - -
 6  BY MR. MONTOYA:
 7     Q.   Tell us your name, please,
 8  sir.
 9     MR. STATMAN:  Just before we
10  get started, I want to reserve our
11  right to review and to correct the
12  transcript at a later date.
13  BY MR. MONTOYA:
14     Q.   Please tell us your name,
15  sir.
16     A.   Zhang Jianchun.
17     Q.   Who is your current
18  employer?
19     A.   TG.
20     Q.   Sir, today, to make this
21  process go faster, I'm going to ask you
22  to take a look at Exhibit 2.  And I'm
23  going to read the English that says
24  Shandong Taihe Dongxin Company Limited.
```

Page 18

1  Do you see that?
2      MR. STATMAN: Objection. I
3  just want to clarify that you are
4  only asking him to look at the
5  front page?
6      MR. MONTOYA: That's
7  correct.
8      MR. STATMAN: Okay.
9  Can you read that?
10     THE WITNESS: I see that.
11 BY MR. MONTOYA:
12     Q.   And this is Exhibit 2 from
13 yesterday's deposition of Mr. Jia. And,
14 sir, my question for you, is, do you
15 understand that the company Shandong
16 Taihe Dongxin Company Limited is now
17 known as Taishan Gypsum or TG?
18     A.   I know.
19     Q.   So, for the purposes of
20 today, I will be referring to Taishan
21 Gypsum as TG. Is that okay with you?
22     A.   Yes.
23     Q.   And are you familiar with
24 the company known as Tai'an Taishan

Page 19

1  Plasterboard Company Limited?
2      A.   I'm familiar.
3      Q.   We will refer to that
4  company today as TTP.
5      MR. CHEN: Objection. Just
6  for clarification to the
7  interpreter, the Chinese name does
8  not have --
9      INTERPRETER 1: They have it
10 here.
11     MR. CHEN: For TTP, there is
12 no Guifen.
13     INTERPRETER 1: I got it
14 from the glossary.
15     MR. CHEN: Right. And I
16 told you yesterday that that was a
17 mistake.
18     INTERPRETER 1: Okay,
19 because I -- okay.
20 BY MR. MONTOYA:
21     Q.   Is that okay with you, sir?
22     A.   Fine.
23     INTERPRETER 1: Thank you.
24 BY MR. MONTOYA:

Page 20

1      Q.   You currently work for which
2  company?
3      A.   I am now the secretary of
4  the board of directors for TG. I am also
5  the secretary for the board of directors
6  of TTP.
7      Q.   How long have you been the
8  secretary of the board of directors for
9  TG?
10     A.   After the year 2002, I
11 became the secretary of the board of
12 directors of TG.
13     Q.   And you hold that position,
14 that same position today, correct?
15     A.   Yes.
16     Q.   Do you have any other job
17 titles at TG?
18     A.   No.
19     Q.   Have you had in the past any
20 other job titles at TG from 2002 until
21 today?
22     A.   I have always been in this
23 position. I did not have others.
24     Q.   What are your job

Page 21

1  responsibilities at TG as secretary of
2  the board of directors?
3      INTERPRETER 1: The
4  interpreter asked the witness to
5  pause once in a while.
6      THE WITNESS: As the
7  secretary of the board of
8  directors of TG, I drafted
9  documents for the board of
10 directors. I organize and make
11 preparations for the meetings for
12 the board of directors and the
13 shareholders. At the same time,
14 I'm helping with the directors of
15 the board of directors to run the
16 daily business.
17     INTERPRETER 2: The check
18 interpreter believed that it
19 should be the chairman of the
20 board to -- to assist the chairman
21 of the board to manage the
22 everyday operation of the
23 business.
24     INTERPRETER 1: It was

Confidential - Subject to Further Confidentiality Review

Page 22

1  wrong.  That's wrong by the check
2  interpreter.  He was saying dong
3  shi ju, he did not say dong shi
4  zhang.  Dong shi zhang is the
5  chairman of the board of
6  directors, but dong shi is the
7  director.  So, directors.
8       MR. CHEN:  We disagree, but
9  you may wish to clarify.
10 BY MR. MONTOYA:
11      Q.   Have you finished your
12 answer, sir?
13      A.   That's the chairman of the
14 board of directors.
15      Q.   Who is the chairman of the
16 board of directors?
17      A.   Mr. Jia Tongchun.
18      Q.   Do you report directly to
19 Mr. Jia?
20      A.   Yes.
21      Q.   How long have you been
22 secretary of the board of directors for
23 TTP?
24      A.   I acted as the secretary of

Page 23

1  the board of directors for TTP after mid
2  August of 2010.
3       Q.   Did you hold any other
4  positions at TTP before August of 2010?
5       A.   No.
6       Q.   Did you have any
7  responsibilities at TTP before August of
8  2010?
9       INTERPRETER 1:  TTP?
10      MR. MONTOYA:  Correct.
11      MR. STATMAN:  Objection,
12      vague and ambiguous.
13 BY MR. MONTOYA:
14      Q.   You can answer, sir.
15      A.   I don't understand.  What do
16 you mean by "responsibilities"?
17      Q.   Did you do any work for TTP
18 before August of 2010?
19      A.   No.
20      Q.   Did you have any
21 communications or interactions with
22 anybody at TTP before August of 2010?
23      MR. STATMAN:  Objection,
24      time frame.

Page 24

1  BY MR. MONTOYA:
2       Q.   You can answer, sir.
3       MR. MONTOYA:  I said before
4  August 2010.
5       THE WITNESS:  We did not
6  have any communication.
7  BY MR. MONTOYA:
8       Q.   How are you able to testify
9  about TTP's activities before 2010?
10      A.   As the secretary of the
11 board of directors of TG also -- as the
12 secretary of the board of directors of
13 TG, I have understanding of TG and of its
14 subsidiaries regarding its operations,
15 organizations and structure.
16      Q.   How do you have that
17 knowledge?
18      MR. STATMAN:  Objection,
19      asked and answered.
20      But you can go ahead and
21      answer.
22      THE WITNESS:  I did answer
23      earlier.
24 BY MR. MONTOYA:

Page 25

1       Q.   Sir, do you have any --
2       Do you do any daily
3  activities for TTP?
4       MR. STATMAN:  Objection,
5       time frame.
6       THE WITNESS:  What time
7       frame are you referring to?
8  BY MR. MONTOYA:
9       Q.   Sir, how much English do you
10 understand?
11      A.   I don't understand English.
12      Q.   Do you understand your
13 counsel sitting next to you when he
14 speaks English?
15      A.   He speak English.
16      Q.   Yes.
17      Do you understand your
18 counsel when he speaks to you in English?
19      A.   I don't understand.
20      Q.   Can you read any English?
21      A.   I cannot read it.
22      Q.   It seems that she has not
23 been able to finish her interpretation
24 and you're answering the questions.  It

Confidential - Subject to Further Confidentiality Review

Page 26

1 seems like you understand my English.
2       MR. STATMAN:  Objection.
3 That's --
4       THE WITNESS:  No.
5       MR. STATMAN:  I object to
6 the form.
7       You can answer.
8       Mr. Montoya --
9       THE WITNESS:  No.  I just
10 want to have a clear understanding
11 of the question earlier for
12 myself.
13       MR. STATMAN:  Are you
14 instructing him to wait until the
15 translator finishes her
16 translation before he answers?
17       MR. MONTOYA:  I am not
18 instructing your witness to do
19 anything.
20       MR. STATMAN:  Do you
21 understand Chinese?
22       MR. MONTOYA:  I'm not
23 answering your questions today.
24       MS. BASS:  He noted an

Page 27

1       objection for the record.  Let's
2       move on.
3       MR. MONTOYA:  I just want to
4 know if he's able to speak
5 English.  That's why I'm asking,
6 and that's all I've asked.
7       MR. STATMAN:  You indicated
8 that he was answering before she
9 finished her translation, and I
10 was wondering where that came
11 from.
12       MR. MONTOYA:  Because he had
13 done so.
14 BY MR. MONTOYA:
15       Q.   Sir, do you conduct any
16 business in English?
17       A.   No.
18       Q.   Who at TTP reports to you
19 since you have been secretary of the
20 board of directors at TTP?
21       A.   Not who report to me.
22       Q.   Here's what I'm trying to
23 understand.  How you are able to testify
24 about the activities of TTP?  Where do

Page 28

1 you get your information from about TTP?
2       A.   I get it from the office of
3 TTP.
4       Q.   Who at the office of TTP?
5       MR. STATMAN:  Objection to
6 form.
7       INTERPRETER 2:  The check
8 interpreter believes that the
9 interpreter did not interpret
10 every word.
11       INTERPRETER 1:  Which word?
12 I said, who at the office of TTP.
13 I did exactly translate it.
14       INTERPRETER 2:  No.  She
15 said that when --
16       MR. MONTOYA:  Please --
17       INTERPRETER 2:  From whom
18 that you get the information, but
19 not from whom at the office.
20       INTERPRETER 1:  But that's
21 the question being stated.
22       MR. MONTOYA:  Please ask the
23 question again as it's framed.
24       INTERPRETER 1:  I did

Page 29

1       translate exactly, but I will
2       repeat.
3       MR. MONTOYA:  Thank you.
4       (Interpreter repeats
5       question.)
6       THE WITNESS:  Zhang Min.
7 BY MR. MONTOYA:
8       Q.   Could you write the name for
9 us, please, sir.
10       A.   (Witness complies.)
11       Q.   What's the name of the
12 person?
13       A.   Zhang Min.
14       Q.   Is that a male or a female?
15       A.   Female.
16       Q.   Okay.  Would it be Ms.
17 Zhang, would that be the correct
18 pronunciation?  I just want to make sure
19 I'm identifying Ms. Zhang correctly.
20 What is Ms. Zhang's position at TTP?
21       A.   You can call her Ms. Zhang.
22       Q.   Thank you.
23       What is Ms. Zhang's position
24 at TTP?

Page 30

1   A.   She is now responsible for
2  the financial duties at TTP.
3      Q.   Is the only person you talk
4  to at TTP to gain your information of TTP
5  Ms. Zhang?
6         MR. STATMAN:  Objection to
7  form.
8         But you can answer.
9         THE WITNESS:  There is
10  another person.
11 BY MR. MONTOYA:
12     Q.   Who?
13     A.   Meng Fan Long.
14     Q.   Mao Fan Long.
15     A.   Meng.
16     Q.   Meng.
17         Is that a male or a female?
18     A.   Male.
19     Q.   Okay.
20         So, Mr. Meng; is that
21 correct?
22     A.   You can say that.
23     Q.   Okay.  Thank you.
24         What is Mr. Meng's position

Page 31

1  at TTP?
2      A.   He is the assistant of Ms.
3  Zhang.
4      Q.   Regarding the finances of
5  TTP?
6      A.   Now TTP has stopped
7  production.  It has stopped operation.
8      Q.   TTP has stopped its
9  production and operation in 2008?
10     A.   Yes.
11     Q.   After 2008, what business,
12 if any, has TTP done?
13     A.   No business.
14     Q.   Did you --
15         Have you spoken to anybody
16 else besides the two people you've
17 mentioned before regarding the activities
18 of TTP for the information you are
19 designated to testify about today?
20     A.   What time frame are you
21 talking about?
22     Q.   I'm talking about for the
23 information that you're here to testify
24 about today.

Page 32

1   A.   We did talk.
2      Q.   The only people you've
3  spoken to to get the information that
4  you're here to testify about today
5  regarding TTP were the two individuals
6  you identified before?
7         MR. STATMAN:  Objection,
8  mischaracterizes his testimony.
9  BY MR. MONTOYA:
10     Q.   You can answer, sir.
11     A.   I did talk to other people.
12     Q.   What people?
13     A.   Mr. Peng Wenlong.
14     Q.   Who else?
15     A.   I can't recall.
16     Q.   Who else?
17     A.   Peng Wenlong's name.
18     Q.   Anybody else?
19     A.   I don't recall.
20     Q.   Is Mr. Peng an employee of
21 TTP?
22     A.   What time frame?
23     Q.   Has he ever been an employee
24 of TTP?

Page 33

1   A.   Yes.
2      Q.   When?
3      A.   Between the year 2006 and
4  2007.
5      Q.   Do you know where Mr. Peng
6  was employed before 2006?
7      A.   He was at TG.
8      Q.   While Mr. Peng was an
9  employee of TG, was he also an employee
10 of TTP?
11        MR. STATMAN:  Objection to
12 form.
13 BY MR. MONTOYA:
14     Q.   You may answer, sir.
15        MR. STATMAN:  Form.
16        MR. CHEN:  I'm just going to
17 ask the interpreter not to -- to
18 just translate what he says.
19        INTERPRETER 1:  I need to
20 clarify.  Sometimes I want to make
21 sure --
22        MR. MONTOYA:  If you need to
23 clarify, simply ask if you may
24 clarify, and then we will say yes

Confidential - Subject to Further Confidentiality Review

Page 34

1 or no, and then you can do so --
2 INTERPRETER 1: No problem.
3 MR. MONTOYA: -- no problem.
4 INTERPRETER 1: Because when
5 I feel that I may not hear
6 clearly, I just want to make sure
7 that I hear clearly. That's what
8 I was doing.
9 MR. MONTOYA: That's okay.
10 INTERPRETER 1: I am asking
11 him to repeat because I got
12 interrupted.
13 THE WITNESS: According to
14 my understanding.
15 MR. STATMAN: Can I ask the
16 interpreter to speak up, because
17 it's not a private conversation
18 between you and the witness.
19 MR. MONTOYA: We're not
20 going to understand it anyway, but
21 go ahead.
22 INTERPRETER 1: Yeah.
23 THE WITNESS: According to
24 my understanding, Mr. Peng

Page 35

1 Wenlong, he was an employee of TTP
2 between 2006 to 2007.
3 BY MR. MONTOYA:
4 Q. At the same time he was an
5 employee of TTP, was he also employed by
6 TG?
7 A. No.
8 Q. Do you know if Mr. Peng at
9 any time has worked for both TTP and TG?
10 MR. STATMAN: Objection. I
11 want to clarify. You are asking
12 him based on his own personal
13 knowledge?
14 MR. MONTOYA: He's the only
15 person here.
16 BY MR. MONTOYA:
17 Q. Go ahead.
18 A. I don't know.
19 MR. STATMAN: Excuse me.
20 Ms. Interpreter, could you please
21 translate what I said? It's part
22 of the record.
23 BY MR. MONTOYA:
24 Q. Sir --

Page 36

1 Sir, is it your testimony
2 that Mr. Peng only worked for TTP in 2006
3 and 2007 and not TG?
4 MR. STATMAN: This time I'm
5 going to object as it's outside
6 the scope of his designation. So,
7 if he's testifying, he's
8 testifying based on his personal
9 knowledge.
10 MR. SEEGER: He's a
11 representative of the company.
12 MR. STATMAN: Look at the
13 designations.
14 BY MR. MONTOYA:
15 Q. You can answer the question,
16 sir.
17 A. I have forgotten about what
18 you asked earlier.
19 Q. I understand.
20 MR. MONTOYA: Mr. Statman,
21 I'm going to ask you to --
22 MR. SEEGER: I'm sorry, I've
23 just got to respond to this
24 objection.

Page 37

1 MR. MONTOYA: That's what I
2 was going to do.
3 MR. SEEGER: It is
4 problematic. You know, saying
5 that he's here to testify on his
6 personal knowledge, I don't think
7 you have read the designations if
8 you are saying that. He's here to
9 testify on the company's position
10 on a bunch of topics. This topic
11 is clearly dealing with topic 8 in
12 the designations. You will see
13 that it is clearly a topic he's
14 designated for.
15 MR. STATMAN: No.
16 MR. SEEGER: I'm not going
17 to fight with you. We'll record
18 our position. We'll mark it for a
19 ruling. But he's here to give the
20 company's position on the
21 topics --
22 MR. STATMAN: Mark it for a
23 ruling.
24 MR. MONTOYA: -- but he's

Page 38

1 here to give the company position
2 on these topics.
3     MR. STATMAN: Mark it for a
4 ruling.
5     MR. MONTOYA: His answer was
6 that Peng was an employee of TTP.
7 He's here to talk about TTP and
8 its employees. If that's outside
9 the scope, then I don't know what
10 we're doing here today.
11     MR. STATMAN: He's here to
12 talk about the topics which he's
13 been designated, and if he's asked
14 questions beyond the scope of the
15 designations, he can testify as to
16 his personal knowledge.
17     MS. BASS: Well, let me just
18 mark for the record that category
19 number 8 for which this witness
20 has been designated to testify
21 states the following: "Employees
22 of Tai'an Taishan Plasterboard
23 Company Limited and the Taishan
24 entities in the United States and

Page 40

1     MR. GRAND: Just to be clear
2 for the record, we're also going
3 to note that he should testify
4 under employees of TTP and Taishan
5 entities, corporate structure and
6 management of TTP and related
7 entities --
8     MR. STATMAN: I'm sorry,
9 where is the -- which one is --
10     MR. MONTOYA: Number 5.
11     MR. STATMAN: -- employees
12 of TTP in the -- and the first one
13 you mentioned?
14     MR. GRAND: Number 5.
15     MR. STATMAN: Corporate
16 structure.
17     MR. GRAND: Number 8.
18     MR. STATMAN: Number 8 we
19 discussed.
20     MR. GRAND: And, frankly,
21 Number 18, in light of the
22 documents that you produced two
23 days ago for these depositions,
24 which include -- it was for TTP to

Page 39

1 the job-related duties during the
2 relevant time period."
3     I don't know anything more
4 relevant than the line of
5 questioning --
6     MR. STATMAN: My
7 understanding --
8     MS. BASS: -- that's
9 currently being --
10     MR. STATMAN: My
11 understanding of the designation
12 is that it includes -- it's meant
13 to be TTP and Taishan entities in
14 the United States. If I'm wrong
15 about that interpretation, the
16 judge will decide that, but he's
17 answering the question.
18     MS. BASS: Fine. Let's mark
19 it for the record. We'll have the
20 judge decide. And to the extent
21 you prevent him from answering,
22 we'll all be back here at your
23 expense. That's fine.
24     MR. STATMAN: Continue --

Page 41

1 sell the Taishan brand.
2     MR. STATMAN: And you are
3 asking him about employment
4 status?
5     MR. GRAND: Right. Of
6 employees who sold the Taishan
7 brand.
8     MR. STATMAN: Right. I have
9 my objection on the record. He
10 can answer.
11     MS. BASS: Good.
12 BY MR. MONTOYA:
13     Q. Sir, so while Mr. Peng was
14 employed by TTP from 2006 until 2007, was
15 he paid by TG?
16     MR. STATMAN: Same
17 objection.
18     THE WITNESS: No.
19 BY MR. MONTOYA:
20     Q. How do you know that?
21     INTERPRETER 2: The check
22 interpreter believes the
23 interpreter did not interpret the
24 objection.

Confidential - Subject to Further Confidentiality Review

Page 42

1  MR. MONTOYA: He's already
2  answered the question.
3  BY MR. MONTOYA:
4  Q. How do you know that, sir?
5  A. Employees of TTP, they are
6  all paid by TTP.
7  Q. Did you review the financial
8  records of TTP to prepare for your
9  deposition today?
10  A. I did not look at the
11  records.
12  Q. Sir, you testified that you
13  joined TTP in 2010, correct?
14  A. I was the secretary of the
15  board of directors of TTP. In August of
16  2010, I was hired.
17  Q. Before August of 2010, you
18  did not have a role at TTP; is that
19  correct?
20  MR. STATMAN: Objection to
21  form.
22  INTERPRETER 2: The check
23  interpreter --
24  THE WITNESS: I don't know

Page 43

1  what kind -- what is the content
2  when you're referring to the
3  interaction.
4  INTERPRETER 2: The check
5  interpreter doesn't believe -- I
6  believe that the interpreter did
7  not correctly interpret the
8  witness's testimony. And the
9  witness stated, I do not
10  understand what you mean by the
11  role that you are talking about.
12  What does it include?
13  INTERPRETER 1: Objection.
14  That was wrong. The witness did
15  not say the role. He wrote it
16  down as to what interaction. Jiao
17  she, not the role.
18  MR. CHEN: I will note for
19  the record that the original term
20  that the interpreter used when she
21  was translating your question,
22  "role," was that same term. So,
23  she's translated it back is a
24  different word.

Page 44

1  INTERPRETER 2: Also, the
2  check interpreter --
3  MR. MONTOYA: I would like
4  to proceed.
5  INTERPRETER 1: Disagree.
6  MR. MONTOYA: Thank you.
7  BY MR. MONTOYA:
8  Q. How long have Ms. Zhang and
9  Mr. Meng been employed by TTP?
10  A. The two of them, until now,
11  they have always been the employees of
12  TTP.
13  Q. Starting on what dates?
14  A. Since the establishment of
15  TTP.
16  Q. In what year?
17  A. The year 2006.
18  Q. Are you aware of Mr. Peng's
19  sales activities regarding the United
20  States?
21  MR. STATMAN: Objection to
22  form, vague and ambiguous and
23  assumes facts not in evidence.
24  You can answer.

Page 45

1  THE WITNESS: I did not know
2  about.
3  BY MR. MONTOYA:
4  Q. Do you know about any of the
5  sales activities of TTP regarding the
6  United States?
7  MR. CHEN: Objection to the
8  translation. The way that the
9  interpreter is translating it is,
10  do you know about any of the sales
11  of TTP in the United States.
12  INTERPRETER 1: Sales
13  activities, I did translate
14  activities.
15  MR. CHEN: Right. And you
16  are saying in the United States,
17  as opposed to sales activities
18  regarding the United States.
19  INTERPRETER 1: That is what
20  is stated on the script, regarding
21  the United States.
22  MR. MONTOYA: All right.
23  That's the translation.
24  BY MR. MONTOYA:

Confidential - Subject to Further Confidentiality Review

Page 46

1    Q.  Go ahead, you may answer.
2        MR. STATMAN:  Objection to
3    form, vague and ambiguous and
4    assumes facts not in evidence.
5        You can answer.
6        THE WITNESS:  Can you repeat
7    the earlier question?
8    BY MR. MONTOYA:
9    Q.  Did you ever --
10       Have you ever talked to Mr.
11   Peng about any sales in the United
12   States?
13       MR. STATMAN:  Objection to
14   the form, vague and ambiguous.
15       You can answer.
16       THE WITNESS:  I did not talk
17   to Mr. Peng regarding the sales in
18   the United States.
19   BY MR. MONTOYA:
20   Q.   Have you talked to anybody
21   at TTP regarding any sales of TTP's
22   products in the United States?
23       MR. STATMAN:  Objection,
24   assumes facts not in evidence.

Page 47

1        You can answer.
2        THE WITNESS:  I cannot
3    respond to any questions that that
4    is an assumption.
5        MS. BASS:  Can you repeat
6    that, please?
7        MR. MONTOYA:  Could you
8    repeat that for her, please?
9        -  -  -
10       (Whereupon, the requested
11   portion of the transcript was read
12   by the court reporter as follows:
13       "A.  I cannot respond to
14   any questions that that is an
15   assumption.")
16       -  -  -
17   BY MR. MONTOYA:
18   Q.   Sir, do you have any
19   knowledge regarding any drywall product
20   that was made by TTP being sold to the
21   United States?
22       MR. STATMAN:  Objection to
23   form.
24       You can answer.

Page 48

1        MR. CHEN:  Can the
2    interpreter please translate the
3    objection?
4        MR. SEEGER:  I need to -- as
5    a matter of protocol, Joe at times
6    wanted his objections translated,
7    and at times he didn't.  So, let's
8    have a policy so we keep this
9    moving.  Either she'll translate
10   them all or none.  Or do you want
11   to just say she won't interpret
12   any unless you want her to?
13       MR. STATMAN:  I would like
14   her to interpret all.
15       MR. SEEGER:  She's not doing
16   anything wrong.  That's what
17   happened yesterday.
18       MR. STATMAN:  I understand.
19   I understand.  He doesn't
20   understand any English whatsoever.
21   I would like the objection
22   interpreted.
23       MR. SEEGER:  Did Mr. Jai
24   understand any English?

Page 49

1        MR. STATMAN:  I have no
2    idea.
3        INTERPRETER 1:  I was going
4    to interpret the objection, and I
5    don't want Eugene to jump into my
6    interpretation beforehand.  He's
7    making an assumption that I am not
8    going to --
9        MR. SEEGER:  That's fair.
10   Let her finish her interpretation
11   before anybody says anything.
12       INTERPRETER 1:  I prefer
13   just the check interpreter to
14   bring this up.
15       MR. PANAYOTOPOULOS:
16   Actually, I would like to raise an
17   objection as well.  There's been
18   two people check interpreting
19   today.  Can we get an agreement
20   that it is going to be only one
21   person, I don't care who it is,
22   that raises the objections, like
23   we did yesterday?
24       MR. CHEN:  Well, actually,

Confidential - Subject to Further Confidentiality Review

Page 50

1  yesterday one person always spoke
2  up. It was either myself or the
3  check interpreter. We were
4  comfortable with that process
5  yesterday.
6      MR. SEEGER: Today you both
7  have spoken at the same time. So,
8  can we just have one, whatever it
9  is. If you want to alternate,
10  that's fine, just one person.
11      MR. CHEN: That's fine.
12      MR. MONTOYA: What I would
13  like to have you do is read back
14  my question, read Mr. Statman's
15  objection so he can answer.
16          - - -
17      (Whereupon, the requested
18  portion of the transcript was read
19  by the court reporter as follows:
20      "Q. Sir, do you have any
21  knowledge regarding any drywall
22  product that was made by TTP being
23  sold to the United States?")
24          - - -

Page 51

1      (Interpreter repeats the
2  question.)
3      MR. STATMAN: Then I
4  objected to form.
5      MR. MONTOYA: Translate his
6  objection, please.
7      THE WITNESS: Can you make
8  that question more clear?
9  BY MR. MONTOYA:
10      Q. Sir, do you know anything
11  about TTP's sales of drywall to the
12  United States?
13      MR. STATMAN: Objection to
14  the form.
15      THE WITNESS: According to
16  my knowledge, TTP did not sell
17  products to the United States.
18  BY MR. MONTOYA:
19      Q. Do you have any knowledge
20  regarding TTP's sales of drywall to
21  customers in the United States?
22      INTERPRETER 1: Customers in
23  the United States?
24      MR. MONTOYA: Correct.

Page 52

1      THE WITNESS: Before the
2  year 2009?
3  BY MR. MONTOYA:
4      Q. I believe I said between
5  2002 to --
6      A. Before 2009, I did not know.
7      MR. MONTOYA: Is his answer
8  complete?
9      THE WITNESS: Before 2009, I
10  did not know.
11  BY MR. MONTOYA:
12      Q. Meaning you didn't know
13  there were sales of drywall to the United
14  States until 2009?
15      MR. STATMAN: Objection.
16  Mischaracterizes his testimony,
17  and it's vague and ambiguous.
18  BY MR. MONTOYA:
19      Q. You can answer, sir.
20      A. I don't know.
21      Q. Okay. My question was, do
22  you have any knowledge regarding TTP's
23  sales of drywall to customers in the
24  United States, and I will say between

Page 53

1  2005 and 2008?
2      MR. STATMAN: Objection to
3  form.
4      You can answer if you can
5  answer.
6      THE WITNESS: TTP was not
7  established yet in the year 2005.
8  BY MR. MONTOYA:
9      Q. So, from the time TTP was
10  established until 2008, do you have any
11  knowledge regarding sales of drywall to
12  customers in the United States?
13      MR. STATMAN: Objection to
14  form.
15      But you can answer.
16      THE WITNESS: At that time,
17  I did not know there were this
18  type of behavior occurred.
19  BY MR. MONTOYA:
20      Q. Sir, what has your role been
21  at TTP -- what have you done -- strike
22  that.
23      What have you done for TTP
24  since 2008 since TTP stopped doing

Page 54

1 business?
2     A.   I became the secretary of
3 the board of directors of TTP in mid
4 August 2008.
5         MR. CHEN:  2010.
6         THE WITNESS:  After mid
7     August of 2010.
8 BY MR. MONTOYA:
9     Q.   But what do you do for a
10 company that no longer does business as
11 the secretary of the board of directors?
12         MR. STATMAN:  Objection to
13     form.
14 BY MR. MONTOYA:
15     Q.   You can answer, sir.
16     A.   Now they need a spokesperson
17 on behalf of TTP, therefore, the board of
18 directors of TTP, they selected me.
19     Q.   Are there currently any
20 employees of TTP?
21     A.   I did answer earlier.
22     Q.   And what was that answer?
23     A.   Zhang Min and Meng Fan Long.
24     Q.   Are those two people

Page 55

1 currently employees of TTP?
2     A.   I insist on answer that I
3 provided earlier.
4     Q.   As a courtesy, sir, I would
5 ask you to answer my question.
6         Are those two people
7 currently employees of TTP?
8     A.   Yes.
9     Q.   Are they also currently
10 employees of TG?
11     A.   No.
12     Q.   Who pays them for their work
13 at TTP?
14     A.   TTP pay them.
15     Q.   To do what for a company
16 that is no longer doing business?
17         MR. STATMAN:  Objection to
18     form.
19         You can answer.
20 BY MR. MONTOYA:
21     Q.   You can answer.
22         MR. CHEN:  The objection
23     needs to be translated.
24         MR. STATMAN:  Can you please

Page 56

1     translate my objection?
2         THE WITNESS:  When you talk
3     about "them," are you referring to
4     these two person or TTP?
5 BY MR. MONTOYA:
6     Q.   I'm referring to --
7         MR. MONTOYA:  Let's mark
8     this as an exhibit.
9         -  -  -
10         (Whereupon, Deposition
11     Exhibit Jianchun-13, Handwritten
12     Note in Chinese, was marked for
13     identification.)
14         -  -  -
15 BY MR. MONTOYA:
16     Q.   Sir, we're going to mark
17 this as Exhibit 13 so it is easier to
18 refer to.
19         MR. MONTOYA:  Translate
20     that.
21 BY MR. MONTOYA:
22     Q.   The people listed on Exhibit
23 13 were the two individuals that you
24 identified that worked at TTP, correct?

Page 57

1         MR. STATMAN:  Objection to
2     form.
3 BY MR. MONTOYA:
4     Q.   You can answer, sir.
5     A.   Yes, these two, they work
6 for TTP.
7     Q.   What are their daily
8 responsibilities for TTP?
9     A.   TTP has already stopped
10 production and operation, but this
11 company continue to exist.  It still has
12 some assets.  It's still got some
13 business and some left over accounts that
14 requires handling.  Therefore, these two
15 people, meaning they still have to work
16 for TTP and for the matters that happen.
17     Q.   What are the assets that you
18 referred to?
19     A.   It still has some factories
20 and equipment.
21     Q.   Is TTP currently producing
22 any product at all?
23     A.   No.
24     Q.   Sir, I'm going to show you

Page 58

1  what's been marked as Exhibit 12 from
2  yesterday's deposition of Mr. Jia.  And
3  I'm showing you the Chinese language
4  version.  Have you seen this document
5  before?
6          MR. STATMAN:  Are you asking
7  about the entire document or the
8  front page?
9          MR. MONTOYA:  I'm asking
10  about the document, and I'll
11  narrow my question, and I'm
12  referring to the first page of the
13  Chinese translation in Exhibit 12.
14          THE WITNESS:  I need to take
15  time to read this document.
16  BY MR. MONTOYA:
17      Q.   Take a moment.
18      A.   (Reviewing document.)
19          MR. MONTOYA:  Eric, I'm
20  going to stop him, because I don't
21  want to waste any further time
22  here.
23  BY MR. MONTOYA:
24      Q.   Go ahead, sir.

Page 59

1      A.   Only to read this one page?
2      Q.   My question was, have you
3  seen this document before?
4      A.   No.
5      Q.   So, I'm going to ask you to
6  take a second look at Exhibit 12.  Is
7  that your signature?  I'm referring to
8  the Chinese interpretation of the
9  manufacturer profile form, the last page.
10      A.   It is not my signature.
11      Q.   Do you know whose signature
12  it is?
13      A.   Song Qinghai.
14      Q.   Is Mr. Qinghai qualified to
15  talk about the production of TTP drywall
16  and what was exported to the United
17  States?
18          MR. STATMAN:  Objection to
19  the form.  Assumes a fact not in
20  evidence, but you can answer.
21          MR. PANAYOTOPOULOS:  I'm
22  going to object to the speaking
23  objections.  I would appreciate it
24  if counsel would simply state an

Page 60

1  objection to the form, and if any
2  of the rest of counsel asks for a
3  clarification, then make that
4  clarification.  But, otherwise, I
5  would appreciate it if objections
6  are limited as to form.
7          MR. STATMAN:  I'll object as
8  I see proper.  Thank you.
9          MR. PANAYOTOPOULOS:  Will
10  you mark that, please.
11          I think you are going to
12  have to read back the question.
13          MR. MONTOYA:  Yeah.
14  BY MR. MONTOYA:
15      Q.   Sir, is Mr. Qinghai
16  qualified to talk about the export of TTP
17  drywall to the United States?
18          MR. STATMAN:  Same
19  objection.
20  BY MR. MONTOYA:
21      Q.   Sir, what was Mr. Qinghai's
22  job at TTP?
23      A.   Manager of production.
24      Q.   How long was he the manager

Page 61

1  of production?
2      A.   Between 2006 to 2007.
3      Q.   Does he work in the sales
4  office of TTP?
5          MR. STATMAN:  Objection to
6  form.  Assumes a fact not in
7  evidence.
8  BY MR. MONTOYA:
9      Q.   You can answer, sir.
10      A.   I did not know the situation
11  at that time.
12      Q.   Do you know if Mr. Qinghai
13  ever worked in sales at TTP?
14      A.   I don't know.
15      Q.   Do you know where Mr.
16  Qinghai is today?
17      A.   I know.
18      Q.   Where?
19      A.   He work for a company in
20  China for the province -- in the province
21  of Anhui, A-N-H-U-I, one word.
22      Q.   What's the name of the
23  company?
24      A.   It is called --

Confidential - Subject to Further Confidentiality Review

Page 62

1 MR. STATMAN: Can we take a
2 break in about ten minutes?
3 MR. MONTOYA: Just a moment.
4 Let me finish this line.
5 THE WITNESS: It is called
6 Taishan Gypsum Co. (Tongling)
7 Company Limited.
8 BY MR. MONTOYA:
9 Q. Is that company a subsidiary
10 of TG?
11 A. Yes.
12 Q. Did you talk with him to
13 prepare for your testimony today?
14 A. I did not talk to him.
15 MR. MONTOYA: Let's take a
16 break, sir.
17 THE VIDEOTAPE TECHNICIAN:
18 The time now is approximately
19 10:21 a.m., and we are now off the
20 record.
21 - - -
22 (Whereupon, a recess was
23 taken from 10:21 a.m. until
24 10:35 a.m.)

Page 63

1 - - -
2 THE VIDEOTAPE TECHNICIAN:
3 This begins Tape 2 of today's
4 deposition. The time now is
5 approximately 10:35 a.m., and
6 we're back on the record.
7 BY MR. MONTOYA:
8 Q. Sir, from 2006 until 2011,
9 did TTP produce or create an annual
10 report?
11 A. Mr. Attorney, before I
12 answer your question, can I bring up a
13 request?
14 Q. I would like you to answer
15 my question first, and then after, you
16 can make your request.
17 A. Would you mind to repeat
18 that question earlier?
19 Q. From 2006 until 2011, did
20 TTP create an annual report regarding its
21 business?
22 A. Between 2006 to 2007, it did
23 create.
24 Q. Have you reviewed those

Page 64

1 reports?
2 A. I did not review.
3 Q. Are they available to you?
4 A. Can you repeat the question?
5 Q. Could you get the 2006 and
6 2007 reports?
7 A. I can.
8 Q. Why were there no annual
9 reports between 2008 until 2011?
10 A. Because TTP has already
11 stopped production and operation.
12 Q. But I understood from your
13 testimony before that TTP was still doing
14 business today.
15 MR. STATMAN: Objection to
16 form.
17 BY MR. MONTOYA:
18 Q. You may answer.
19 A. TTP now is no longer doing
20 business.
21 Q. And it has employees but
22 does not create annual reports; is that
23 correct?
24 A. I did not see.

Page 65

1 Q. Do you know if an annual
2 report was created from 2008 until today?
3 A. Let me recall. The year '06
4 to the year '09, continue to do it.
5 Between the year 2006 and 2009, it
6 continue to do it.
7 Q. So, is there an annual
8 report in 2008 and 2009 for TTP?
9 MR. STATMAN: Object to
10 form.
11 You can answer.
12 THE WITNESS: Yes.
13 BY MR. MONTOYA:
14 Q. So, is it your testimony
15 that there are annual reports from TTP
16 from 2006 until 2009 that you have not
17 reviewed?
18 MR. STATMAN: Objection to
19 form. I'm sorry. Objection to
20 form.
21 You may answer.
22 THE WITNESS: I did not
23 review it.
24 BY MR. MONTOYA:

Confidential - Subject to Further Confidentiality Review

Page 66

1      Q.   Does TTP currently have an
2   income for its operations?
3      A.   No income.
4      Q.   How does it pay its
5   employees?
6      A.   The salary of these two
7   employees of TTP now is paid on behalf of
8   them by TG.
9          MR. MONTOYA:  Did he finish
10   his answer?
11          THE WITNESS:  Not yet.
12          MR. CHEN:  Actually, hold
13   on.
14          MR. MONTOYA:  And let me
15   stop you for a second.  We've got
16   objections being made by your
17   lawyer, who is also acting as an
18   interpreter.  I would prefer to
19   have the objections to the
20   interpretation made by the
21   interpreter, because she's been
22   sworn in.  It's nothing against
23   you at all.
24          INTERPRETER 2:  The check

Page 67

1   interpreter believes the witness
2   said it is now TG, that these two
3   employees' salary is being paid by
4   TG, but advancing by TG.
5          INTERPRETER 1:  I don't
6   understand what is advancing.  He
7   was saying they are to pay on
8   behalf.  That is exact word.
9          MR. MONTOYA:  Okay.  Ask him
10   to finish his answer, please.
11          THE WITNESS:  Earlier I
12   wanted to make a request, and you
13   did not allow me.  Now I want to
14   bring this up.
15   BY MR. MONTOYA:
16      Q.   Please do so.
17      A.   I pause -- due to the reason
18   of the interpretation, I pause once in a
19   while for the interpreters to interpret,
20   and then I want to give a complete
21   answer.  When I paused, I did not mean
22   that I had completed my answer.  I want,
23   Mr. Attorney, you allow me to complete my
24   answer before you bring up the next

Page 68

1   question, therefore, I can complete my
2   answer.
3      Q.   In the future, if I cut you
4   off or stop you from talking early,
5   please let me know.
6      A.   Yes.
7      Q.   And if you let me know when
8   you finish your answer, that would help
9   us.
10      A.   Thank you very much for your
11   request.
12          INTERPRETER 1:  And the
13   interpreter would like to ask, to
14   request that the witness don't do
15   the body language, otherwise, it
16   will be difficult for me to
17   interpret.  I want everything to
18   be verbal instead of using --
19          MR. MONTOYA:  That's okay.
20   You don't need to interpret the
21   body language.
22          MR. STATMAN:  I don't want
23   her instructing him about body
24   language.  He's answered every

Page 69

1   question verbally.
2          MR. MONTOYA:  No, I was
3   talking to her.
4   BY MR. MONTOYA:
5      Q.   Does TTP -- strike that.
6          Did TTP have sales records
7   from 2006 until 2011?
8      A.   Between the year 2006 and
9   2007, there were sales records.
10      Q.   Have you finished?
11      A.   Yes, finished.
12      Q.   Did you review the sales
13   records for 2006 and 2007?
14      A.   I did not hear clearly the
15   question.
16      Q.   Did you review the sales
17   records of TTP from 2006 until 2007?
18      A.   No.
19      Q.   Did you review any sales
20   records, contracts or invoices regarding
21   drywall from TTP to the United States?
22          MR. STATMAN:  Objection as
23   to form.  Assumes a fact not in
24   evidence.

Confidential - Subject to Further Confidentiality Review

Page 70

1 BY MR. MONTOYA:
2     Q.   You can answer, sir.
3     A.   I did not see any invoice or
4 record.
5     Q.   Do you know --
6          When did you first become
7 aware of any sales of drywall from TTP to
8 customers in the United States?
9          MR. STATMAN:  Objection as
10 to form.
11 BY MR. MONTOYA:
12     Q.   You may answer.
13     A.   The first time, are you
14 referring to I, myself?
15     Q.   Yes, sir.
16     A.   I did not discover that.
17     Q.   When have you --
18          When did you first become
19 aware that any drywall from TTP ended up
20 in the United States?
21          MR. STATMAN:  Again,
22 objection as to form.
23 BY MR. MONTOYA:
24     Q.   You can answer.

Page 71

1     A.   I did not discover the
2 drywall of TTP ended up in the United
3 States.
4     Q.   As we sit here talking
5 today, do you have any knowledge
6 regarding TTP drywall being in the United
7 States?
8          MR. STATMAN:  I'm going to
9     object to this as outside the
10     scope, and if he has personal
11     knowledge, he can testify about
12     it.  That being said -- I'm sorry.
13     With that objection in mind, I
14     also object to the form of the
15     question.
16 BY MR. MONTOYA:
17     Q.   You can answer.
18     A.   Would you mind repeating
19 your earlier question?
20     Q.   Yes, sir.
21          I just want to know what
22 knowledge you have regarding TTP's
23 drywall that it manufactured being
24 present in the United States?

Page 72

1          MR. STATMAN:  Again, I
2     repeat my objections as to the
3     scope and as to form.
4 BY MR. MONTOYA:
5     Q.   You can answer, sir.
6     A.   I did not know whether our
7 drywall really has a presence in the
8 United States or not.  But in February of
9 2010, TTP receive an allegation.
10          INTERPRETER 2:  The check
11     interpreter believes the witness
12     said in 2010, February, TTP
13     received litigation, not
14     allegation.
15          INTERPRETER 1:  It's the
16     same.
17 BY MR. MONTOYA:
18     Q.   Sir, are you able to list,
19 to provide us a list of names of
20 employees at TTP from 2006 until 2008 and
21 their positions and job responsibilities?
22          MR. STATMAN:  Object to the
23     scope.
24          But you can answer.

Page 73

1          MR. MONTOYA:  It's number 5.
2 BY MR. MONTOYA:
3     Q.   You can proceed, sir.  You
4 can answer.
5     A.   TTP has already stopped
6 production and operation.  I don't know
7 whether they have kept the list of the
8 names of the employees.
9     Q.   As you sit here today, you
10 cannot give us a list of names of
11 employees and their positions at TTP from
12 2006 until 2008; is that correct?
13          MR. STATMAN:  Objection to
14     form and as to scope.
15          You can answer.
16          THE WITNESS:  Now I am
17     unable to provide.  I don't know
18     now whether these names exist or
19     not.
20 BY MR. MONTOYA:
21     Q.   Can you provide us a list
22 and the names of the officers and
23 directors of TTP from 2006 until 2008?
24     A.   I can provide a list of the

Confidential - Subject to Further Confidentiality Review

Page 74

1  names of the directors of TTP.
2      Q.   Please give us a listing of
3  the names and the positions of those
4  directors from 2006 until 2008.
5          INTERPRETER 2:  The check
6      interpreter believes the witness
7      said, I can produce the list of
8      names of the directors.
9          MR. STATMAN:  The record
10     just said can't.
11         INTERPRETER 1:  She hasn't
12     finished yet.  She jumps in too
13     early.
14         MR. MONTOYA:  Okay.  It's
15     okay.
16 BY MR. MONTOYA:
17     Q.   Sir, can you write us a list
18 of the directors and officers of TTP from
19 2006 until 2008, please, and we'll mark
20 it as Exhibit 14.
21          - - -
22     (Whereupon, Deposition
23     Exhibit Jianchun-14, Handwritten
24     note in Chinese, was marked for

Page 75

1      identification.)
2          - - -
3          MR. STATMAN:  Again, just
4      objection.  I want to clarify.  He
5      said directors, that he could do a
6      list of the directors.  I'm sorry,
7      he said he would do a list of the
8      directors.
9          MR. MONTOYA:  Let's clear it
10     up then.
11 BY MR. MONTOYA:
12     Q.   Sir, can you provide us a
13 list of the officers and directors of TTP
14 from 2006 until 2008?
15         INTERPRETER 2:  The check
16     interpreter believes that
17     officers -- the interpreter
18     interpreted officers into just as
19     staff in the office, but it should
20     be the management, senior
21     management of the office.
22         INTERPRETER 1:  Objection.
23     As an interpreter, we don't try to
24     digest and figure out what is the

Page 76

1      meaning of it.
2  BY MR. MONTOYA:
3      Q.   Sir, please write down the
4  list to the best of your ability on
5  Exhibit 14.
6          MR. STATMAN:  The list of
7      what?
8          MR. MONTOYA:  The list of
9      officers and directors.
10         MR. STATMAN:  Again, I
11     object as to form, but do your
12     best.
13 BY MR. MONTOYA:
14     Q.   Sir, we've now asked you to
15 write a list of the officers and
16 directors of TTP from 2006 until 2008.
17 If you could please write them down on
18 Exhibit 14.
19         MR. STATMAN:  Can we take a
20     second?  Apparently the problem is
21     she's asking for all office staff.
22         MR. MONTOYA:  Well, she's
23     the official interpreter, and her
24     interpretation goes.  So, that's

Page 77

1      where we are right now.
2          If you could please
3      translate the last question.
4          And perhaps it would satisfy
5      you if we said managers and
6      directors instead and translated
7      that.
8          MR. STATMAN:  I believe that
9      would work.
10         INTERPRETER 1:  The word
11     "officers," there are many ways of
12     interpreting.
13         MR. MONTOYA:  That's okay.
14     I'm going to ask the question.
15         INTERPRETER 1:  Right.
16 BY MR. MONTOYA:
17     Q.   Sir, we've asked you to
18 write down a list of the managers and
19 directors of TTP from 2006 until 2008.
20 Could you please write that down on
21 Exhibit 14?
22     A.   Yes.
23     Q.   There's a pen right over
24 there.  If you could list them starting

Page 78

1 with the number 1 and list their name and
2 their title. And if you need to put the
3 year down, or the years, please also do
4 so.
5     A.  I don't understand.  What do
6 you mean by the year?
7     Q.   The years that the people
8 that you are writing down either served
9 as a manager and/or director.
10     A.  Yes.
11     Q.   Sir, is that a complete list
12 of managers and directors of TTP from
13 2006 until 2008?
14     A.  Yes.
15     Q.   Do you know if there are any
16 titles that you listed that are missing
17 from this list?
18     A.  Okay.  The titles they have
19 at TTP are these ones.
20     Q.   So, that's a complete
21 listing of all the managers and directors
22 from 2006 until 2008 at TTP?
23     A.  Yes.
24     Q.   Could you read the names --

Page 79

1         Could you read for us what
2 you wrote on Exhibit 14, please?
3     A.  Yes.
4     Q.   Please do so.
5     A.  Peng Shiliang, chairman of
6 the board, general manager.  Wang FenQin,
7 director.  Fu Tingwen, director.
8         MR. MONTOYA:  I would ask
9     the interpreter to please write to
10     the best of her ability the names
11     and the titles in English, please.
12         INTERPRETER 1:  Counsel, can
13     I ask the witness if he knows the
14     English that he help me?
15 BY MR. MONTOYA:
16     Q.   Sir, do you know the English
17 translations of any of those names that
18 you've listed on Exhibit 14?
19     A.  I don't know.
20         MR. MONTOYA:  If the
21     interpreter can please do it to
22     the best of her ability.
23         INTERPRETER 1:  Okay.  I'll
24     try my best.

Page 80

1         (Handing over document.)
2         MR. MONTOYA:  Thank you.
3 BY MR. MONTOYA:
4     Q.   Sir, are any of the people
5 listed on Exhibit 14 officers or
6 directors of TG?  Or officers or
7 managers, excuse me.  Let me reask the
8 question, and you can object.
9         Are any of the people on the
10 list on Exhibit 14 officers or managers
11 of TG?
12         INTERPRETER 1:  Counsel,
13     would you mind to help me to
14     replace the word -- what's
15     officer, because it is very
16     difficult to translate the word
17     "officers" clearly.
18         MR. MONTOYA:  That's fine.
19     Let me rephrase the question.
20 BY MR. MONTOYA:
21     Q.   Are any of the people on the
22 list in Exhibit 14, were they ever
23 managers or directors of TG?
24     A.  No.

Page 81

1     Q.   Were any of the people on
2 the list in Exhibit 14 managers or
3 directors of Beijing New Building
4 Materials Company?
5     A.  No.
6     Q.   Are any of the people on the
7 list on Exhibit 14 managers or directors
8 of Chinese National Building Materials
9 Company?
10     A.  No.
11     Q.   Were any of the people that
12 are listed on Exhibit 14 managers or
13 directors of any other Taishan
14 subsidiary?
15         MR. STATMAN:  Objection as
16     to form with regard to time frame.
17         You can answer.
18 BY MR. MONTOYA:
19     Q.   You can answer.
20     A.  I don't recall.
21     Q.   Who were the shareholders of
22 TTP from 2006 until 2008?
23     A.  TG is the shareholder.
24     Q.   From 2006 until today?

Confidential - Subject to Further Confidentiality Review

Page 82

1    A.   Yes.
2    Q.   Have there been any changes
3  in the shareholders of TTP after 2008
4  when TTP stopped its operations?
5    A.   No.
6    Q.   Do you have any knowledge
7  regarding any employees of TTP doing work
8  in the United States?
9       MR. STATMAN:  Objection as
10      to form.  Assumes a fact not in
11      evidence.
12 BY MR. MONTOYA:
13   Q.   You can answer, sir.
14   A.   I want to ask, is it TG or
15 TTP?
16   Q.   TTP.
17   A.   No.
18   Q.   Did you have --
19       Who would you ask to find
20 out if there were any employees of TTP
21 that did work in the United States?
22   A.   According to my knowledge,
23 there were no employees of TTP worked in
24 the United States.

Page 83

1    Q.   Sir, you were never in
2  charge of any hiring of employees at TTP,
3  correct?
4    A.   Yes.
5    Q.   You did hiring for TTP?
6    A.   No.
7    Q.   Do you have any knowledge of
8  any employees of TG working in the United
9  States?
10      MR. STATMAN:  Objection as
11      to form, and it's outside the
12      scope, but if he has personal
13      knowledge, he can answer.
14      THE WITNESS:  According to
15      my knowledge, TG also don't have
16      any employee working in the United
17      States.
18 BY MR. MONTOYA:
19   Q.   Have you ever reviewed any
20 documents regarding any business done by
21 TTP relating to the United States?
22      MR. STATMAN:  Are you
23      finished?  I'm sorry.
24      INTERPRETER 1:  Yes.

Page 84

1       MR. STATMAN:  Objection to
2  the form, vague and ambiguous.
3  BY MR. MONTOYA:
4    Q.   You may answer.
5    A.   Mr. Attorney, would you mind
6  to say it more clearly?
7    Q.   Sir, have you ever reviewed
8  any documents regarding any business done
9  by TTP regarding sales of drywall to the
10 United States?
11      MR. STATMAN:  Objection as
12      to form.
13      But you can answer.
14      THE WITNESS:  I have never
15      seen such a document.
16 BY MR. MONTOYA:
17   Q.   Have you ever asked for any
18 such documents?
19      MR. STATMAN:  Same
20      objection.
21 BY MR. MONTOYA:
22   Q.   You can answer.
23   A.   No.
24   Q.   Would those documents be

Page 85

1  important for you to review?
2       MR. STATMAN:  Objection as
3       to form.
4  BY MR. MONTOYA:
5    Q.   You can answer.
6    A.   I don't know whether this
7  document exists or not.
8    Q.   Because you haven't asked
9  for them; is that right?
10      MR. STATMAN:  Objection as
11      to form.
12      If you can answer.
13      THE WITNESS:  Mr. Attorney,
14      I don't understand the meaning of
15      this question.
16 BY MR. MONTOYA:
17   Q.   You have not requested from
18 anyone at TTP or TG any documents
19 regarding the sales of drywall to the
20 United States; isn't that true?
21      MR. STATMAN:  Objection as
22      to form.  Among other things, it's
23      compound.
24 BY MR. MONTOYA:

Page 86

1    Q.   You may answer, sir.
2    A.   You are confusing me.
3    Q.   You understand the word
4 "compound," apparently.
5         You didn't ask any of the
6 existing employees at TTP for any
7 documents relating to any sales of
8 drywall to the United States from TTP?
9         MR. STATMAN:  Objection as
10    to form.
11        You can answer.
12 BY MR. MONTOYA:
13    Q.   Please answer, sir.
14    A.   Well, what do you mean?
15 What are you asking?
16    Q.   I'm asking if you requested
17 from the employees at TTP, the people
18 that you listed in the earlier exhibit,
19 did you ask them for any documents about
20 sales of drywall by TTP to the United
21 States?
22        MR. STATMAN:  Objection as
23    to form.
24 BY MR. MONTOYA:

Page 87

1    Q.   You may answer, sir.
2    A.   I did not ask.
3        MR. STATMAN:  Just so the
4    record indicates, he was pointing
5    to the names on Exhibit 14.
6 BY MR. MONTOYA:
7    Q.   Sir, did you ask anybody
8 listed in Exhibit 13 about sales of
9 drywall by TTP to the United States?
10       MR. STATMAN:  Objection as
11    to form.
12       You can answer.
13 BY MR. MONTOYA:
14    Q.   You can answer, sir.
15    A.   Before this, I did not ask.
16 But after we received the litigation, in
17 the process, during the process, I did
18 ask Mr. Peng Wenlong whether this
19 happened or not.
20    Q.   I appreciate your answer,
21 but did you ask -- the answer --
22       My question was, did you ask
23 any of the people listed on Exhibit 13
24 for documents relating to sales of

Page 88

1 drywall by TTP to the United States?
2        MR. STATMAN:  Objection.
3    And I just want to point out that
4    Mr. Peng -- I'm told that Mr.
5    Peng's name is on that list.
6        MR. MONTOYA:  That was my
7    question.  Please don't interfere
8    with my questioning.
9        THE WITNESS:  I want to ask,
10    Mr. Attorney, are you asking have
11    I ever have any interaction with
12    these people, or have I obtained
13    any document from these people,
14    these people who are listed on the
15    Exhibit 13?
16 BY MR. MONTOYA:
17    Q.   Yes.
18       MR. STATMAN:  I want to
19    instruct the witness not to be
20    asking the attorney questions
21    unless something is unclear.
22    Okay?  Just answer his questions.
23 BY MR. MONTOYA:
24    Q.   And I'd like to tell the

Page 89

1 witness that it's perfectly okay for him
2 to clarify with me my questions.
3    A.   I am not sure whether your
4 question is referring to obtaining of the
5 document or that I consulted these
6 people.
7    Q.   Let's talk about obtaining
8 the documents first.
9        Did you obtain any documents
10 from Mr. Peng?
11    A.   No.
12    Q.   You never obtained any
13 documents from anybody regarding sales of
14 drywall from TTP to the United States,
15 correct?
16       MR. STATMAN:  Objection as
17    to form.
18       If you can answer.
19       THE WITNESS:  TTP did not
20    sell directly the plasterboard to
21    the United States.  I also did not
22    see such documents.
23 BY MR. MONTOYA:
24    Q.   Did you consult with Mr.

Confidential - Subject to Further Confidentiality Review

Page 90

1 Peng regarding sales of drywall to the
2 United States by TTP?
3        MR. STATMAN:  Objection as
4 to form.
5 BY MR. MONTOYA:
6    Q.   You can answer, sir.
7    A.   I did ask -- I did consult
8 Mr. Peng Wenlong.
9    Q.   Tell me about your
10 conversations with Mr. Peng.
11    A.   I haven't finished it yet.
12        After the litigation, I did
13 have an exchange with Mr. Peng Wenlong.
14 I asked him what happened to the drywall.
15 He told me that some of the customers
16 that were said to come from the United
17 States, they purchase the drywall in
18 China.  They said it could possibly ship
19 to the United States.  I don't know
20 concretely what happened.
21    Q.   Does it surprise you to know
22 that millions of tons of TTP's drywall
23 are now in the United States?
24        MR. STATMAN:  Objection to

Page 91

1 form.
2 BY MR. MONTOYA:
3    Q.   You may answer, sir.
4    A.   I don't know whether that is
5 a fact or not.
6    Q.   Would it surprise you if it
7 were true?
8        MR. STATMAN:  Objection to
9 form.
10        THE WITNESS:  I cannot give
11 out my opinions to speculations.
12 BY MR. MONTOYA:
13    Q.   Did you discuss any other
14 matters relating to TTP with Mr. Peng?
15    A.   Other matters?  I don't know
16 what you're referring to.
17    Q.   Regarding the sales of
18 drywall to the United States.
19        MR. STATMAN:  Objection to
20 form.
21        THE WITNESS:  Earlier I did
22 mention about the interaction I
23 had with Mr. Peng Wenlong, how did
24 this behavior of the trading

Page 92

1 happen.  We did not talk about any
2 other thing.
3 BY MR. MONTOYA:
4    Q.   Did you talk with Mr. Peng
5 about the operations of TTP from 2006
6 until 2008?
7    A.   I don't understand what are
8 the content of operations.
9    Q.   The day-to-day business of
10 TTP from 2006 to 2008, did you discuss
11 that with anyone?
12    A.   No.
13        MR. MONTOYA:  Break?  Do you
14 want to break?
15        MR. STATMAN:  Off the
16 record.
17        MR. SEEGER:  It can be on or
18 off.  Yesterday -- the other day
19 Mr. Jia liked to take lunch at
20 11:30.  Mr. Montoya is saying he
21 can break now if he wants to take
22 a lunch break.
23        MR. CHEN:  He usually eats
24 around 11:30 as well.

Page 93

1        MR. SEEGER:  You want to
2 take a break?
3        MR. STATMAN:  Let's take a
4 break.
5        THE VIDEOTAPE TECHNICIAN:
6 The time now is approximately
7 11:35 a.m., and we are now off the
8 record.
9        - - -
10        (Whereupon, a luncheon
11 recess was taken from 11:35 a.m.
12 until 12:44 p.m.)
13        - - -
14        THE VIDEOTAPE TECHNICIAN:
15 This begins tape 3 of today's
16 deposition.  The time now is
17 approximately 12:45 p.m., and
18 we're back on the record.
19        MR. MONTOYA:  Mr. Statman
20 has let me know that his witness
21 has a supplement to one of his
22 answers.  If you want to have him
23 do that, please.
24        MR. CHEN:  Over the break,

Confidential - Subject to Further Confidentiality Review

Page 94

1    Mr. Zhang recalled that there was
2  another individual he needed to
3  add to, I believe it was Exhibit
4  14, I think it was described as a
5  list of directors and managers.
6        Can you translate that,
7  Stephanie, so he knows.
8  BY MR. MONTOYA:
9    Q.   Is that true, sir, do you
10 need to make a supplemental answer to
11 Exhibit 14, or do you need to make an
12 addition to Exhibit 14?
13   A.   Yes.  I need to add one
14 person to it.
15   Q.   Please go ahead and do so.
16       MR. MONTOYA:  What has the
17 witness written down?
18       THE WITNESS:  Number 4.
19       MR. MONTOYA:  Let me ask
20 him.
21 BY MR. MONTOYA:
22   Q.   Sir, what did you just write
23 down?
24   A.   Song Qinghai, production

Page 95

1  manager.
2        MR. MONTOYA:  And if the
3  interpreter can please do her best
4  to put that name in English and
5  the title as well.
6        INTERPRETER 1:  Do I need to
7  put also the time period?
8        MR. MONTOYA:  Yes.
9  BY MR. MONTOYA:
10   Q.   The first name you just
11 wrote down as Number 4, that was the
12 production manager for TTP from 2006 to
13 2007?
14   A.   Yes.
15   Q.   Sir, do you have any
16 knowledge of any banking relationships
17 between TTP and any banks in the United
18 States?
19   A.   No.
20   Q.   Do you have any basis for
21 knowing about any relationships between
22 TTP?
23       MR. CHEN:  Objection.
24 Sorry.  Just for the "no," I think

Page 96

1  it's unclear as to whether he was
2  saying there is none or no.
3        MR. MONTOYA:  All right.
4  I've got the same issue with the
5  interpretation.  If we're going to
6  have the interpreter object to the
7  interpretation, we need her to do
8  so.
9        INTERPRETER 2:  The check
10 interpreter did not find cause to
11 object because he did say no.  But
12 as to no meaning no to what, I
13 cannot determine.
14       INTERPRETER 1:  But the
15 meaning of the word "no" is not up
16 to the interpreter to speculate.
17       MR. MONTOYA:  Thank you.
18 BY MR. MONTOYA:
19   Q.   Do you have any basis for
20 knowing about the relationship between
21 TTP and any financial institutions in the
22 United States?
23       MR. STATMAN:  Objection to
24 form.

Page 97

1        MR. MONTOYA:  You can
2  answer, sir.
3        INTERPRETER 2:  The check
4  interpreter does not believe the
5  interpreter interpret clearly of
6  the question to the witness.
7        INTERPRETER 1:  Objection.
8        MR. MONTOYA:  You don't need
9  to object.  Are you comfortable
10 with your interpretation?
11       INTERPRETER 1:  I'm
12 comfortable it was 100 percent.
13 It is not the interpreter's job to
14 explain the meaning of the
15 question.
16       MR. MONTOYA:  Please ask the
17 witness the question again.
18       THE WITNESS:  TTP has no
19 relationship with any financial
20 institutes in the United States.
21 BY MR. MONTOYA:
22   Q.   How do you know that?
23   A.   Because TTP did not
24 establish any organizations overseas,

Page 98

1 therefore, it did not establish any
2 relationship.
3     Q.   My question was to financial
4 institutions.  What documents have you
5 reviewed, if any, about any relationships
6 between TTP and any financial
7 institutions in the United States?
8         MR. STATMAN:  Objection to
9     form.
10 BY MR. MONTOYA:
11     Q.   You can answer, sir.
12     A.   I have never seen any such
13 document.  We don't have any such
14 document exist.
15     Q.   How do you know that?
16     A.   I did answer earlier.  TTP
17 did not have any relationship with anyone
18 overseas.
19     Q.   I simply want to know about
20 any banking or financial dealings in the
21 United States by TTP?
22         MR. STATMAN:  Objection.  Do
23     you have a question?
24         MR. MONTOYA:  Yes.

Page 99

1         MR. STATMAN:  What's your
2     question?
3 BY MR. MONTOYA:
4     Q.   You can answer, sir.  Go
5 ahead.
6     A.   The institution that you
7 just mentioned earlier, TTP has no
8 relationship with them.
9     Q.   Have you asked to look at
10 any banking records of TTP between TTP
11 and any bank in the United States?
12         INTERPRETER 2:  The check
13     interpreter believes the
14     interpreter did not interpret
15     "have you asked to."  She simply
16     asked, have you looked at.
17         MR. MONTOYA:  Do you believe
18     your interpretation is accurate?
19         INTERPRETER 1:  Yes.
20 BY MR. MONTOYA:
21     Q.   You may answer, sir.  Go
22 ahead, sir.
23     A.   I insist on my answer
24 earlier.  TTP had no relationship with

Page 100

1 any organizations overseas, and there's
2 no such relationship with any financial
3 institutions.
4     Q.   Who would have the most
5 knowledge about TTP's relationships with
6 any banks in the United States?
7         MR. STATMAN:  Objection as
8     to form.  Assumes a fact not in
9     evidence.
10         MR. MONTOYA:  You can
11     answer, sir.
12         INTERPRETER 2:  The check
13     interpreter believes the
14     interpreter did not interpret the
15     -- fully the objection.
16         INTERPRETER 1:  I did, but I
17     do upside down grammar.  I did 100
18     percent did it.
19 BY MR. MONTOYA:
20     Q.   Please answer the question,
21 sir.
22     A.   Would you mind to make the
23 question clear.
24     Q.   Sure.

Page 101

1         Who would have the most
2 knowledge about TTP's relationships with
3 any banks in the United States?
4         MR. STATMAN:  Same
5     objection.
6         THE WITNESS:  I answered,
7     and what I mentioned earlier was a
8     fact.
9 BY MR. MONTOYA:
10     Q.   No.  My question was, who,
11 what person would have the most knowledge
12 regarding TTP's relationship with any
13 banks or financial institutions in the
14 United States?
15         MR. STATMAN:  Same
16     objection.  Assumes a fact not in
17     evidence.
18         THE WITNESS:  I insist on
19     answer I gave earlier.  TTP did
20     not have any relationship with any
21     financial institutions or bank
22     overseas.
23 BY MR. MONTOYA:
24     Q.   Sir, are you able to read

Confidential - Subject to Further Confidentiality Review

Page 102

1 the screen that the interpreter is
2 looking at?
3     A.  I can see it.
4     Q.  Can you read the English on
5 it?
6     A.  I don't understand.
7     Q.  Can you read the English
8 that's on the screen in front of the
9 interpreter?
10     A.  I can see it, but I cannot
11 understand it.
12     Q.  Because it seems to me that
13 you're following along with the
14 transcript on the screen?
15     A.  I want to communicate with
16 the interpreter closely because I worry
17 that I want her to hear me clearly.  I
18 was not looking at the screen.
19     Q.  Okay.
20     Who has the most knowledge
21 regarding the finances of TTP between
22 2006 and 2008?
23     A.  Zhang Min.
24     Q.  Could you write down Zhang

Page 103

1 Min's name on Exhibit 15 -- or, actually,
2 let me make a new one -- Exhibit 15 for
3 us?
4     A.  Yes.
5     Q.  Please write it for us.
6     A.  (Witness complies.)
7
8        - - -
9     (Whereupon, Deposition
10 Exhibit Jianchun-15, Handwritten
11 note in Chinese, was marked for
12 identification.)
13        - - -
14     Q.  Could you read the name for
15 us again.
16     A.  Zhang Min.
17     Q.  What was Zhang Min's
18 position at TTP?
19     A.  He is the person in charge
20 of finance, finance department.
21     MR. MONTOYA:  If the
22 interpreter can please write his
23 name in English to the best of her
24 ability, the name that's written

Page 104

1 on Exhibit 15.
2     INTERPRETER 1:  In case the
3 witness does know the English
4 name, can I ask him to help me
5 with this and then I will try?
6     MR. MONTOYA:  Is that okay
7 with you, Counsel?
8     MR. STATMAN:  I'm not sure I
9 understood the request.
10     MR. MONTOYA:  Does the
11 witness know the English name of
12 the person written down on Exhibit
13 15?
14     THE WITNESS:  I don't know
15 how to spell it.
16     INTERPRETER 1:  The
17 interpreter will try her best.
18 BY MR. MONTOYA:
19     Q.  Before you came to testify
20 here today, did you speak with the
21 gentleman identified in Exhibit Number 15
22 regarding the finances in TTP?
23     A.  This is a lady, not a
24 gentleman.

Page 105

1     Q.  I'm sorry.  Did you speak
2 with the lady before you came here to
3 today to testify?
4     A.  I did communicate with her.
5     Q.  About what?
6     MS. BASS:  Did or did not?
7     MR. MONTOYA:  Did.
8     INTERPRETER 1:  Did.
9     THE WITNESS:  I did.
10 BY MR. MONTOYA:
11     Q.  About what?
12     A.  About the conditions of the
13 operations of TTP.
14     Q.  What did you ask her?
15     A.  The current situation of
16 TTP.
17     Q.  What did she tell you?
18     A.  She told me that now TTP has
19 stopped production and operation.
20     Q.  Did you only ask her about
21 the current financial situation of TTP?
22     A.  Mainly we communicate about
23 the current situation.
24     Q.  She has more knowledge than

Page 106

1 you regarding the finances of TTP from
2 2006 to 2008, correct?
3      A.   Yes.
4      Q.   Did you ask the person
5 identified on Exhibit 14 about any loans
6 between TTP and any other Taishan
7 companies?
8          MR. CHEN:  I think that's
9      Exhibit 15, by the way.
10         MR. MONTOYA:  You are right.
11     Let me reask the question.
12 BY MR. MONTOYA:
13     Q.   Did you ask the person
14 identified on Exhibit 15 about any loans
15 between TTP and any other Taishan
16 companies?
17         MR. STATMAN:  Objection,
18     vague and ambiguous.
19 BY MR. MONTOYA:
20     Q.   You can answer, sir.
21     A.   I did ask.
22     Q.   What did you ask?
23     A.   The question that Mr.
24 Attorney, you asked earlier.

Page 107

1      Q.   I want to know if you asked
2 her about any loans between TTP and any
3 other Taishan subsidiary?
4          MR. STATMAN:  Objection to
5      form.  Again, vague and ambiguous.
6 BY MR. MONTOYA:
7      Q.   You can answer, sir.
8      A.   I did ask.  He said no.
9      Q.   But what did you ask her?
10 What questions did you ask her?
11     A.   The questions that Mr.
12 Attorney asked earlier.
13     Q.   What I want to know is what
14 your conversation was with the person
15 identified on Exhibit 15.  Tell me about
16 your conversation with her.
17         MR. STATMAN:  Object to
18     form.
19 BY MR. MONTOYA:
20     Q.   You can answer, sir.
21     A.   It is not possible for me to
22 recall what I spoke to her.  It is also
23 impossible for me to recall about her of
24 what she said originally.

Page 108

1      Q.   When did you speak with her?
2      A.   When I making preparation
3 for the litigation.
4      Q.   Was it weeks, months ago,
5 days ago?  How long ago?
6      A.   I cannot give you an exact
7 time.
8      Q.   Do you remember your
9 conversation with her at all?
10         MR. STATMAN:  I object to
11     the form.
12 BY MR. MONTOYA:
13     Q.   You can answer.
14     A.   I cannot recall concretely
15 what was being said.
16     Q.   And she was the person who
17 has the most knowledge regarding loans
18 and the financial dealings of TTP from
19 2006 to 2008, correct?
20     A.   Yes.
21     Q.   Where is she working today?
22 Where is she?  Who is her employer now?
23     A.   She is still at TTP.
24     Q.   What is your knowledge

Page 109

1 regarding any sharing of equipment
2 between TTP and any other Taishan
3 subsidiary?
4          MR. STATMAN:  Objection to
5      form, but you can answer.
6          THE WITNESS:  Can you
7      clearly ask your earlier question?
8 BY MR. MONTOYA:
9      Q.   Sure.
10         What knowledge do you have,
11 if any, regarding any sharing of
12 equipment between TTP and any other
13 Taishan subsidiary?  For example,
14 machines for the production of drywall,
15 office equipment, laboratories,
16 computers, these type of items.
17         MR. STATMAN:  I object as to
18     form, and I object as to scope.
19         If you have knowledge, you
20     can answer.
21         MR. MONTOYA:  Please answer,
22     sir.
23         THE WITNESS:  TTP has no
24     subsidiaries.

Confidential - Subject to Further Confidentiality Review

Page 110

1 BY MR. MONTOYA:
2    Q.  I'll ask you the same
3 question but as to between TTP and any
4 other company, any Taishan company?
5       MR. STATMAN:  I object as to
6    form, as to scope, but you can
7    answer.
8       THE WITNESS:  Mr. Attorney,
9    would ask your earlier question
10    clearly to me again.
11 BY MR. MONTOYA:
12    Q.  Sure.
13       What knowledge do you have
14 regarding any sharing of equipment such
15 as machines for the production of
16 drywall, office equipment, lab equipment,
17 computers, those types of items between
18 TTP and any other Taishan company?
19       MR. STATMAN:  Objection to
20    form, objections to scope.  If you
21    can answer.
22       MR. MONTOYA:  That's topic
23    number 11.
24 BY MR. MONTOYA:

Page 111

1    Q.  Please answer the question,
2 sir.
3    A.  Now I understand your
4 question.  TTP, TG and other subsidiaries
5 of TG, they did not share any of these
6 equipments.
7    Q.  How did you find out this
8 information?
9    A.  They are all independent
10 companies.
11    Q.  Did you do any research
12 yourself to determine that TTP did not
13 share any of the types of equipment that
14 I asked you about before with any other
15 Taishan company?
16    A.  Because to the TTG company,
17 their operation have done, I had
18 understanding they don't need any
19 equipment to share.  They themselves have
20 it.
21    Q.  Does TTP have any -- share
22 any of its costs with TG for doing
23 business?
24       MR. STATMAN:  Objection to

Page 112

1    the form.
2 BY MR. MONTOYA:
3    Q.  You can answer.
4    A.  What do you mean by share
5 any of its costs?
6    Q.  When TTP incurs costs for
7 doing -- incurred costs for doing
8 business, did it have any agreements with
9 TG to share those costs between 2006 and
10 2008?
11    A.  I'm still not clear about
12 what are you referring to as "the sharing
13 of costs."
14
15       INTERPRETER 2:  The check
16    interpreter may supply a Mandarin
17    term for sharing the costs?
18       INTERPRETER 1:  It is not
19    upon the interpreter to speculate
20    the meaning of the terms "sharing
21    of cost."
22       MR. MONTOYA:  Please supply
23    the term.
24       (Discussion in Chinese

Page 113

1    between Interpreter 2 and
2    witness.)
3       THE WITNESS:  Okay.  I
4    understand.
5 BY MR. MONTOYA:
6    Q.  Go ahead, sir, if you can
7 answer. If you can tell him he can please
8 answer.
9    A.  Can you repeat the question
10 earlier that you mentioned?
11    Q.  Yes.  When TTP incurred
12 costs for doing business between 2006 and
13 2008, did they have any agreement with TG
14 to share those costs?
15       MR. CHEN:  She needs to
16    translate his comment.
17       MR. STATMAN:  Let her --
18       MR. MONTOYA:  That's fine.
19       THE WITNESS:  I want to ask
20    the costs that you mentioned
21    earlier, does it come from TG or
22    does it occur from TTG -- TTP?
23 BY MR. MONTOYA:
24    Q.  From TTP to TG.

Page 114

1    A.  Are you talking about the
2  costs coming from TTP to TG?
3    Q.  Correct.
4    A.  When TG provide assistance
5  or help to TTP, TTP has to pay a fee to
6  TG.
7    Q.  Where are the records of
8  those fees being paid?
9      MR. STATMAN:  Objection to
10  form, but you can answer.
11 BY MR. MONTOYA:
12    Q.  Please answer.
13    A.  Are you talking about the
14  record for paying the fee --
15    Q.  Yes.  You said --
16    A.  -- where it is?
17    Q.  You said TTP has to pay a
18  fee to TG.  Are there any records showing
19  that those fees have been paid?
20      MR. STATMAN:  Object to
21  form.
22      THE WITNESS:  Yes.
23 BY MR. MONTOYA:
24    Q.  Where are those records?

Page 115

1    A.  At the finance of TTP.
2    Q.  Who keeps those records,
3  what person?
4      MR. STATMAN:  Objection to
5  form from the previous question.
6  BY MR. MONTOYA:
7    Q.  You can answer, sir.
8    A.  It should be Zhang Min.
9    Q.  You say there are services
10  that TTP pays TG for.  Are there any
11  services that TG does not charge TTP for?
12      MR. STATMAN:  Objection to
13  form.
14 BY MR. MONTOYA:
15    Q.  You can answer, sir.
16    A.  The support and help that TG
17  provided for TTP, they are all charged.
18    Q.  Do you have any knowledge
19  regarding the business plans of TTP from
20  2006 to 2008?
21      MR. STATMAN:  Objection to
22  form, but you can answer.
23      THE WITNESS:  Mr. Attorney,
24  would you mind to tell me exactly

Page 116

1  what do you mean by "business
2  plans."
3  BY MR. MONTOYA:
4    Q.  Did TTP have any written
5  plans about doing business from 2006 to
6  2008?
7    A.  In the years 2006 and 2007,
8  it has its own plan.
9      MR. MONTOYA:  Is he
10  finished?
11 BY MR. MONTOYA:
12    Q.  Are you finished?
13    A.  I finished it, but I want to
14  ask you one question.
15    Q.  Go ahead.
16    A.  In order to help to do the
17  interpretation better, I would still like
18  to ask you for permission for me to turn
19  my head to this direction.  Therefore, I
20  can listen to her better.
21    Q.  Absolutely.
22    A.  Is that okay?
23    Q.  Fine with me.
24      INTERPRETER 2:  Check

Page 117

1  interpreter points out that the
2  witness also says it doesn't mean
3  that I am looking at the screen.
4      THE WITNESS:  When you tell
5  me that I can only do this,
6  (indicating), it was very
7  uncomfortable.
8  BY MR. MONTOYA:
9    Q.  Sir, I did not make that
10  instruction to you.  I just wanted to
11  note that I thought that you were reading
12  the screen.
13      You said that there was a
14  business plan for TTP from 2006 and 2007.
15  Where is that document?
16    A.  We might not have kept it.
17    Q.  Do you know if the business
18  records of TTP have been disposed of from
19  2006 to 2008?
20      MR. STATMAN:  Objection to
21  form.  The time frame was
22  confusing.
23 BY MR. MONTOYA:
24    Q.  You can answer, sir.

Confidential - Subject to Further Confidentiality Review

Page 118

1    A.   Mr. Attorney, would you mind
2 to repeat it?
3    Q.   Are there any --
4        Do you know of any business
5 records of TTP that have been disposed
6 of, that they no longer have?
7    A.   This I am not sure.
8    Q.   Are you aware of any other
9 documents that may not have been kept by
10 TTP?
11       MR. STATMAN:  Objection to
12    the form, vague and ambiguous.
13    But if you can answer it, go
14    ahead.
15       THE WITNESS:  Mr. Attorney,
16    I would like to ask you to repeat
17    it to me more clearly again.
18 BY MR. MONTOYA:
19    Q.   I believe before you
20 testified that the business plan for 2006
21 to 2007 may not have been kept.  Are you
22 aware of any other documents that may not
23 have been kept by TTP?
24       MR. STATMAN:  Object to

Page 119

1    form, but you can answer.
2        THE WITNESS:  Yes, I know.
3    Probably there are some documents
4    that may not have been kept.
5 BY MR. MONTOYA:
6    Q.   Do you have any knowledge
7 regarding TTP's marketing plans from 2006
8 to 2008?
9        MR. STATMAN:  Objection to
10    form.
11 BY MR. MONTOYA:
12    Q.   You can answer, sir.
13    A.   According to my knowledge,
14 they don't have any marketing plans.
15    Q.   Who did you ask --
16        Did you ask anyone about the
17 marketing plans for TTP and if they exist
18 between 2006 and 2008?
19    A.   We don't have such a plan.
20    Q.   Do you have any knowledge
21 regarding the marketing plans of any
22 other Taishan-related business from 2006
23 to 2008?
24       MR. STATMAN:  Objection as

Page 120

1    to form.
2 BY MR. MONTOYA:
3    Q.   You can answer, sir.
4    A.   I did not understand the
5 questions you asked.
6    Q.   Do you have any knowledge
7 regarding the marketing plans of any
8 other Taishan-related business from 2006
9 to 2008?
10       MR. STATMAN:  Objection to
11    form.
12       THE WITNESS:  Who is related
13    to Taishan?
14 BY MR. MONTOYA:
15    Q.   Any other businesses that
16 have the Taishan as their first name?
17 For example, Taishan Gypsum Jiangyin,
18 Taishan Gypsum Wenzhou, et cetera, or any
19 Taishan subsidiaries?
20       MR. STATMAN:  Objection to
21    form, and here I'm going to jump
22    in.  I think the confusion is
23    Taishan is a place, and by talking
24    about Taishan subsidiaries, it

Page 121

1    just isn't a question that makes
2    sense.
3 BY MR. MONTOYA:
4    Q.   You can answer, sir.
5    A.   I am still not sure what you
6 are asking about.
7        INTERPRETER 2:  Counsel, may
8    the check interpreter try to
9    interpret your question for the
10    witness.
11       MR. MONTOYA:  That's okay,
12    no.
13 BY MR. MONTOYA:
14    Q.   I'm asking about Taishan
15 Gypsum subsidiaries.  Do you have any
16 knowledge of marketing plans of Taishan
17 Gypsum subsidiaries?
18    A.   I don't know anything about
19 the subsidiaries of Taishan Gypsum of the
20 marketing plans.
21    Q.   Do you have any knowledge
22 regarding any promotional materials by
23 Taishan, by TG subsidiaries?
24       MR. STATMAN:  Objection to

Page 122

1 form. Assumes a fact not in
2 evidence.
3      You can answer.
4      THE WITNESS: Mr. Attorney,
5 would you mind to put it in some
6 other way so that it might help me
7 to understand the question better.
8 BY MR. MONTOYA:
9    Q.  Do you have any knowledge
10 regarding any promotional materials by
11 TTP or sales materials?
12    A.  No.
13    Q.  Sir, tell us about your
14 educational background. Where did you go
15 to school? And I don't know the
16 educational system here, so, starting
17 with university level, if you went to a
18 university.
19    A.  Fine. I went to university
20 between 1999 and 1995.
21    Q.  Let me clarify. 1995 to
22 1999?
23    A.  1991 to 1995.
24      INTERPRETER 1: I made a

Page 123

1 mistake.
2      THE WITNESS: 1991 to 1995.
3 BY MR. MONTOYA:
4    Q.  Did you obtain a degree?
5    A.  Yes.
6    Q.  In what subject?
7    A.  Education, to teach
8 history -- education in history.
9    Q.  What university did you
10 graduate from? What was the name of it?
11    A.  Normal University, a
12 teachers college.
13    Q.  Do you have any other
14 degrees besides the teaching degree?
15    A.  I did not have any other
16 degree, but I have done other studies.
17    Q.  What other studies have you
18 done?
19    A.  Between the years 2006 and
20 2009, in Shandong Province at the party
21 school, Communist party school. I did
22 learn from the distance learning.
23      MR. CHEN: Distance or
24 correspondence learning.

Page 124

1 BY MR. MONTOYA:
2    Q.  In what field, what area of
3 study?
4    A.  Management of economics.
5      INTERPRETER 2: And
6 management.
7      INTERPRETER 1: I did say
8 that.
9 BY MR. MONTOYA:
10    Q.  Did you obtain a degree in
11 either economics or management after your
12 studies from 2006 to 2009?
13    A.  I did not have a degree, but
14 I had a certificate for graduation.
15    Q.  From what school from 2006
16 to 2009?
17    A.  I did mention it earlier.
18    Q.  Do you have any other
19 licenses or certifications in any other
20 fields of study?
21    A.  No.
22    Q.  Do you have an office at
23 TTP?
24    A.  No office.

Page 125

1    Q.  Are the two people that are
2 still working at TTP, where are their
3 offices located?
4    A.  Still at TTP.
5    Q.  Are there any other
6 employees at TTP besides the two people
7 you mentioned earlier?
8      MR. STATMAN: Objection to
9 form.
10 BY MR. MONTOYA:
11    Q.  You can answer.
12    A.  Mr. Peng Shiliang, he is
13 still the chairman of the board and the
14 general manager.
15    Q.  Where is his office located?
16    A.  Mr. Peng Shiliang, he has an
17 office at TTP. He also has an office at
18 the factories that he is at now.
19    Q.  Do those factories include
20 TG factories?
21      MR. STATMAN: Objection to
22 form.
23 BY MR. MONTOYA:
24    Q.  You can answer.

Page 126

1     A.   He is at the factory called
2  Lucheng.
3     Q.   If the witness could please
4  write it down.
5     A.   (Witness complies.)
6         It is called the branch
7  office of Lucheng.
8     Q.   Is that owned by Taishan
9  Gypsum?
10    A.   Yes.
11    Q.   Are there other employees
12 that share offices between TTP and
13 Taishan Gypsum?
14        MR. STATMAN:  Objection to
15    form.  Assumes a fact not in
16    evidence.
17 BY MR. MONTOYA:
18    Q.   You can answer, sir.
19    A.   I did not understand when
20 you asked it earlier.
21    Q.   Are there other employees
22 that share offices between TG and TTP?
23        MR. STATMAN:  Objection to
24    form.  You can answer the

Page 127

1     question?
2         THE WITNESS:  What time
3     period?
4  BY MR. MONTOYA:
5     Q.   Any time period, from 2006
6  to present?
7     A.   No.
8     Q.   So, Mr. Peng Shiliang is the
9  only employee of TTP that shares an
10 office with a TG company; is that
11 correct?
12        MR. STATMAN:  Objection to
13    form.
14 BY MR. MONTOYA:
15    Q.   You can answer, sir.
16    A.   Are you talking about Mr.
17 Peng Shiliang or other people?
18    Q.   I'm asking if there are
19 other people that share offices between
20 TTP and TG like Mr. Peng Shiliang?
21    A.   Now I understand.  No.
22    Q.   Why does Mr. Peng Shiliang
23 have an office at a TG factory?
24    A.   Mr. Peng Shiliang is now a

Page 128

1  manager of the factory.
2     Q.   Did TTP have a legal
3  department between 2006 to 2008?
4         MR. GRAND:  Clarify the
5     answer to what he just said.  Is
6     now a manager or is not a manager?
7         MR. MONTOYA:  It's "now."
8         MR. GRAND:  Because you
9     typed "not."
10        MR. STATMAN:  What was the
11    question?
12 BY MR. MONTOYA:
13    Q.   I'll start over again.
14        COURT REPORTER:  Sorry.  Did
15    you say Mr. Peng Shiliang is now a
16    manager?
17        THE WITNESS:  Can we take a
18    break right now?
19        INTERPRETER 1:  Now.  It
20    looks like "now."
21        MR. STATMAN:  It's close to
22    2:00, if you don't mind.
23        THE VIDEOTAPE TECHNICIAN:
24    The time now is approximately 1:54

Page 129

1  p.m., and we are now off the
2  record.
3         - - -
4         (Whereupon, a recess was
5     taken from 1:54 p.m. until
6     2:05 p.m.)
7         - - -
8         THE VIDEOTAPE TECHNICIAN:
9     This begins tape 4 of today's
10    deposition.  The time now is
11    approximately 2:06 p.m., and we're
12    back on the record.
13 BY MR. MONTOYA:
14    Q.   Sir, does TTP have a legal
15 department?
16    A.   No.
17    Q.   Did TTP ever have a legal
18 department?
19    A.   No.
20    Q.   Did TG assist TTP with any
21 legal issues?
22        MR. STATMAN:  Objection,
23    time frame, but go ahead and
24    answer.

Page 130

1        THE WITNESS:  This I'm not
2    sure.
3 BY MR. MONTOYA:
4    Q.   Who would know?
5    A.   The people in the legal
6 department of TG, they would know.
7    Q.   Who would you ask to answer
8 that question?
9    A.   I never ask this type of
10 question before.
11    Q.   I understand.  But if you
12 wanted to know if TG assisted TTP with
13 any legal issues, who would you ask at TG
14 to get that information?
15    A.   I would talk to the head --
16 I would talk to TG, the department head
17 of a department called wei jian fu.
18        INTERPRETER 1: And the
19    interpreter have difficulty
20    translating this term exactly, but
21    by reading on the surface, it's
22    like protection of the rights the
23    department.
24 BY MR. MONTOYA:

Page 131

1    Q.   Could you write the name of
2 the head of the department that you just
3 mentioned on Exhibit 16, please.
4    A.   Yes.
5    Q.   Please do so.
6    A.   (Witness complies.)
7        - - -
8        (Whereupon, Deposition
9    Exhibit Jianchun-16, Handwritten
10    note in Chinese, was marked for
11    identification.)
12        - - -
13    Q.   Could you say the name,
14 please, sir?
15    A.   Zhuo jun feng.
16    Q.   If the interpreter could
17 please write it --
18        Do you know the name in
19 English, sir?
20        MR. MONTOYA:  (Addressing
21    the interpreter.)
22        You need to translate what
23    he said.
24        INTERPRETER 1: The

Page 132

1 interpreter will try, but she
2 cannot guarantee the accuracy.
3 I'll try.
4        MR. MONTOYA:  Wait a second.
5 I asked him if he could say the
6 name in English.  He gave an
7 answer.  You need to interpret
8 that.  I'll do it again.
9 BY MR. MONTOYA:
10    Q.   Can you write the name in
11 English, sir?
12    A.   I don't know his English
13 name, but I can use the Romanizations to
14 write that in the Romanization form.
15    Q.   What is the Romanization
16 form?
17    A.   It is the Pinyin, but like
18 for the first name, these two words,
19 maybe they are connected together, they
20 should be put together.
21    Q.   Sir, that was very helpful.
22 Thank you.
23        In 2006 to 2008, did TTP
24 have a department that handled any

Page 133

1 quality issues with the production of
2 drywall?
3    A.   Is it from 2006 to 2008?
4    Q.   Yes.
5    A.   Are you referring to TTP?
6    Q.   Yes.
7    A.   Yes.
8    Q.   What is the name of that
9 department?
10        MR. STATMAN:  Objection to
11    form.
12        You can answer.
13        THE WITNESS:  Some people
14    take up the responsibility for
15    this matter.
16 BY MR. MONTOYA:
17    Q.   Where were those people's --
18        Where was the office of
19 those people?
20    A.   At TTP.
21    Q.   What were the names of those
22 people from 2006 to 2008?
23    A.   That I cannot recall.
24    Q.   Did they consult with anyone

Page 134

1  at TG regarding any quality issues with
2  the production of drywall at TTP?
3      A.   Would you mind to repeat it.
4      Q.   Not a problem.
5          Did the people that handled
6  any quality issues at the TTP factory for
7  the production of drywall from 2006 to
8  2008 rely upon anyone at TG for advice?
9      A.   That I'm not sure.
10     Q.   Who would know the answer to
11 that question?
12     A.   If this exists, that would
13 also be the people related to the
14 business or people who handle the
15 business.
16     Q.   Do you know the names of
17 those people?
18     A.   I don't know.
19     Q.   Are the people that work in
20 that department at TTP, where are they
21 working now, if you know, for quality
22 issues for drywall production?
23     A.   I still don't understand.
24         INTERPRETER 1: The

Page 135

1      interpreter would like to
2      reinterpret by doing it upside
3      down.  That's the Chinese way.
4          INTERPRETER 2:  The check
5      interpreter may help?
6          MR. MONTOYA:  You need to
7      say it in English first for us.
8          INTERPRETER 2:  The
9      interpreter did not interpret it
10     wrong.  It's just that she puts
11     the order rambled up.  So, perhaps
12     that the witness would find it
13     very difficult.
14         INTERPRETER 1:  It seems
15     like the witness is ready to
16     answer.
17         MR. MONTOYA:  That's okay.
18 BY MR. MONTOYA:
19     Q.   Sir, if you can answer the
20 question, please do so.
21     A.   I still am not sure what Mr.
22 Attorney, you want to ask.
23     Q.   Here's what I'm trying to
24 ask.

Page 136

1          MR. CHEN:  Counsel, just
2      for -- it's your deposition.  The
3      more clauses you add on to a
4      sentence, the translation of
5      Chinese becomes very, very
6      disjoint.  And so I think it
7      makes it hard for all the
8      interpreters to try and figure out
9      how to phrase it in a way that
10     makes sense.
11         MR. MONTOYA:  Thank you.
12 BY MR. MONTOYA:
13     Q.   There were people that
14 worked at TTP from 2006 to 2008 that
15 dealt with quality issues for the
16 production of drywall, correct?
17     A.   Are you talking about
18 quality control?
19     Q.   Yes.  Yes.  Quality control.
20     A.   Are you talking about
21 quality control during the process of
22 production?
23     Q.   Yes.
24     A.   Yes, I understand.

Page 137

1      Q.   If you can answer.
2      A.   We do have such a
3  department.
4      Q.   From 2006 to 2008 at TTP,
5  who were the people in that department?
6      A.   They have such a department,
7  but who are the ones in the department
8  there, I don't recall.
9      Q.   Do you know if the people
10 that worked in quality control at TTP
11 from 2006 to 2008 received advice on the
12 quality control from anybody at TG?
13     A.   That is a speculation
14 question.  It is difficult for me to
15 answer.
16     Q.   Who would be the best person
17 to ask that question?  Who would be the
18 best person for me to ask that question
19 to?
20     A.   It should be the person in
21 charge of the QC.
22     Q.   What's the name of that
23 person?
24     A.   I cannot recall, it was such

Page 138

1 a long time ago.
2     Q.   Did TG have a quality
3 control department from 2006 to 2008?
4     A.   Yes.
5     Q.   Did the other Taishan
6 subsidiaries rely upon advice from the
7 quality control department from TG?
8         MR. STATMAN: I'm going to
9     object to this as being outside
10    the scope. If you can answer, go
11    ahead, based on your own personal
12    knowledge.
13        THE WITNESS: The
14    subsidiaries of TG, they have
15    their own independent QC
16    department.
17 BY MR. MONTOYA:
18    Q.   But do those people in those
19 subsidiaries, do they rely upon the
20 quality control department of TG?
21        MR. MONTOYA: I'm letting
22    counsel know that I'm asking this
23    question under topic 17.
24        MR. STATMAN: I understand

Page 139

1     what topic 17 says, and I believe
2     it's outside the scope, but he can
3     go ahead and answer.
4         THE WITNESS: They don't
5     rely, they are not to rely. They
6     have their own department. They
7     can handle it on their own.
8 BY MR. MONTOYA:
9     Q.   Where is your office
10 located, you, personally, your own?
11    A.   At TG.
12    Q.   At a particular plant or
13 factory?
14    A.   Inside an office building.
15    Q.   Where?
16    A.   In the city of Tai'an, the
17 province of Shandong, in China.
18    Q.   Are there any TTP employees
19 in your office?
20        MR. STATMAN: Objection to
21    form. It's vague and ambiguous.
22 BY MR. MONTOYA:
23    Q.   You can answer, sir.
24    A.   No.

Page 140

1     Q.   At any time were there any
2 employees of TTP that had offices at TG
3 in the building where your office is?
4     A.   No.
5     Q.   Why was TTP formed?
6     A.   For the purpose of issuing
7 the invoice for VAT.
8     Q.   Could TG do the same type of
9 invoicing for VAT?
10        MR. STATMAN: Objection,
11    time frame.
12 BY MR. MONTOYA:
13    Q.   From 2006 to 2008?
14    A.   Mr. Attorney, would you mind
15 to ask this question again completely.
16    Q.   Sure.
17        Let me first ask you what
18 you mean by TTP being set up for
19 invoicing VAT?
20    A.   According to the rules of
21 the requirement for the tax, TG needs to
22 set up an independent company.
23    Q.   To do what?
24    A.   What do you mean by "what"?

Page 141

1     Q.   To set up an independent
2 company to do what?
3     A.   To issue the invoice for
4 VAT.
5     Q.   Was that a business
6 advantage for TG?
7         MR. STATMAN: Objection to
8     form, vague and ambiguous.
9 BY MR. MONTOYA:
10    Q.   You can answer.
11    A.   It is a question related to
12 the finance, so, it is very troublesome
13 to make it clear.
14    Q.   Do your best, please.
15    A.   Some of the customers, they
16 need us to issue the invoices for the VAT
17 purpose. But TG is an enterprise
18 exempted from the VAT tax. Let me take a
19 minute to think about it before I respond
20 to you.
21        Do you want me to continue
22 to respond here?
23    Q.   Please, please.
24    A.   The bureau, the tax bureau

Confidential - Subject to Further Confidentiality Review

Page 142

1 informed TG during the second half of the
2 year 2006, if TG wants to continue to
3 enjoy the exemption for VAT tax, they
4 cannot issue VAT invoices to these
5 customers that requested for the invoices
6 for VAT. But for some of the customers,
7 it is a must that they get the invoices
8 for VAT. In order to fulfill the
9 requirement of these customers that wants
10 to have the VAT invoices, TG must
11 independently establish a company totally
12 independent from TG to produce and to
13 sell the drywalls to the customers that
14 want to have the VAT type of invoices.
15 This company must be totally independent
16 from TG. The tax bureau must monitor
17 this company. It is for the purpose of
18 resolving the problem of issuing VAT
19 invoices. So, after discussion and
20 consultation with the tax bureau, under
21 their suggestion, TG established TTP.
22      When I'm saying this, I
23 don't know whether, Mr. Attorney, whether
24 you can understand me or not.

Page 143

1      Q.   I understand you completely
2 fine.
3          The customers that requested
4 VAT invoicing, were they outside -- were
5 any of them outside of China?
6          MR. STATMAN: Objection to
7      form.
8          THE WITNESS: It is a
9      financial knowledge. I cannot
10      give a professional explanation.
11 BY MR. MONTOYA:
12      Q.   It may be my question that's
13 confusing.
14      Were any of the customers
15 that requested VAT invoicing located
16 outside of China?
17          INTERPRETER 1: Counsel, a
18      lot of time for the questions to
19      be translated into the way the
20      Chinese says it, a lot of time I
21      need to interpret it upside down.
22      So, sometimes I need to finish
23      listening to the whole sentence
24      before I can flip over to

Page 144

1      translate.
2          MR. MONTOYA: Okay. If you
3      could translate the way you think
4      is best, I understand.
5          INTERPRETER 1: Thank you.
6          THE WITNESS: I don't know,
7      because the policy for taxation is
8      different for each country.
9 BY MR. MONTOYA:
10      Q.   Would I need to look at the
11 VAT invoices to see if those customers
12 were outside the United States?
13          INTERPRETER 1: Outside the
14      United States?
15          MR. MONTOYA: I'm sorry,
16      outside of China. Thank you.
17          MR. STATMAN: Can you reask
18      the question.
19 BY MR. MONTOYA:
20      Q.   Would the best way for me to
21 find out if the VAT invoicing was for
22 customers outside of China be to look at
23 the VAT invoices?
24          MR. STATMAN: Objection to

Page 145

1      form, but if you can answer, go
2      ahead.
3          THE WITNESS: I don't
4      understand. What do you mean?
5 BY MR. MONTOYA:
6      Q.   Where are the VAT invoices
7 that we've been discussing for TTP
8 located, the documents?
9          INTERPRETER 1: What?
10          MR. MONTOYA: The documents.
11          THE WITNESS: Who are you
12      referring to?
13 BY MR. MONTOYA:
14      Q.   TTP's VAT invoices.
15      A.   At the finance of TTP.
16      Q.   Are those documents still
17 available?
18      A.   Yes.
19      Q.   Do you know if they are in
20 paper or on a computer?
21      A.   Written.
22      Q.   Do you have a company e-mail
23 address for either TTP or TG?
24          INTERPRETER 1: Company

Page 146

1      e-mail address?
2 BY MR. MONTOYA:
3      Q.  Do you have an e-mail
4 address that was issued by either TG or
5 TTP for you to use?
6           MR. STATMAN:  Counsel,
7      that's a new question?
8           MR. MONTOYA:  Yes.
9           MR. STATMAN:  I'll object on
10     the grounds that it's compound,
11     but you can answer.
12          THE WITNESS:  I do not
13     understand what you are asking.
14 BY MR. MONTOYA:
15     Q.  Do you have a company e-mail
16 address issued by TG?
17     A.  You mean the company's?
18     Q.  Yes.
19     A.  No.
20     Q.  Are you aware of any
21 licensing agreements between TTP and TG
22 allowing the use of a brand name in
23 February of 2006 to 2008?
24          MR. STATMAN:  I object on

Page 147

1      the ground that it's vague and
2      ambiguous, but you can go ahead
3      and answer.
4           MR. MONTOYA:  Counsel,
5      you've produced one in this
6      litigation.
7 BY MR. MONTOYA:
8      Q.  But you can go ahead and
9 answer, sir.
10     A.  Can I look at this document?
11     Q.  I just asked you if you were
12 aware of any agreement?
13     A.  Mr. Attorney, would you mind
14 to repeat the question?
15     Q.  Do you know if a licensing
16 agreement exists between TG and TTP for
17 the years 2006 to 2008?
18          INTERPRETER 1:  Counsel, the
19     licensing agreement for the use of
20     the brand name?
21          MR. MONTOYA:  No.  I said
22     between TG and TTP.
23          INTERPRETER 1:  Any
24     licensing agreement or licensing

Page 148

1 agreement for using the brand
2 name?
3           MR. MONTOYA:  Yes.
4           INTERPRETER 1:  For using
5      the brand name.
6           MR. STATMAN:  I object as to
7      form.  And I also object to the
8      interpreter reinterpreting your
9      question.  You asked simply was
10     there a licensing agreement, and
11     then she decided that she needed
12     to change it to be a different
13     question entirely.
14          MR. MONTOYA:  And I object
15     to your speaking objection, and I
16     clarified the question.
17 BY MR. MONTOYA:
18     Q.  You can answer, sir.
19          MR. STATMAN:  I'll also
20     object to the form of it as
21     compound.
22          INTERPRETER 1: There are
23     many ways to interpret licensing.
24     I need to know what that is, then

Page 149

1      I know how to choose the correct
2      wording.
3 BY MR. MONTOYA:
4      Q.  Are you aware of any
5 licensing agreement for the brand name --
6 for any brand name between TG and TTP
7 between 2006 and 2008?
8      A.  Now I understand.
9      Yes.
10     Q.  Do you know about any sales
11 of equipment between TG and TTP?
12     A.  I don't understand what you
13 mean.
14     Q.  Or production lines or the
15 sales of production lines?
16          MR. STATMAN:  The question
17     is compound and getting more
18     compound by the minute.  I object.
19          THE WITNESS:  Mr. Attorney,
20     would you mind to clearly and
21     completely restate your question.
22 BY MR. MONTOYA:
23     Q.  Sure.
24          Are you aware of any

Page 150

1 contracts or agreements for the sale of
2 equipment between TG and TTP regarding
3 production lines?
4    A.   I want to confirm something.
5    Q.   Please.
6    A.   I want to clarify.  Are you
7 asking the agreement by saying that TTP
8 or TG, is there any sales of equipment
9 from TTP to TG or from TG to TTP, this
10 kind of agreement for this kind of
11 dealing?
12    Q.   I would like to know about
13 either one, from TG to TTP or from TTP to
14 TG.
15    A.   Yes.
16    Q.   Do you know about the
17 existence of those agreements?
18       MR. STATMAN:  Objection to
19 form, but you can answer.
20       THE WITNESS:  I know.
21 BY MR. MONTOYA:
22    Q.   What do you know?
23    A.   I know these agreements
24 exist.

Page 151

1    Q.   For what?  What is the
2 nature of the agreements?
3    A.   TG sold to TTP their
4 production line and production equipment.
5    Q.   Between 2006 to 2008, did
6 TTP manufacture drywall under the TG
7 brand name?
8       MR. STATMAN:  Objection to
9 form, but you can answer.
10       THE WITNESS:  To be
11 accurate, it is between the year
12 2006 to the year 2007.
13 BY MR. MONTOYA:
14    Q.   That's fine.
15    A.   They did use.
16    Q.   Why was production stopped
17 for drywall by TTP in 2008?
18    A.   For the consideration of
19 economic interests.
20    Q.   What interests were those?
21    A.   To explain this question, it
22 takes quite some time.
23    Q.   Please do.
24    A.   Let me think about it, and

Page 152

1 then I'll summarize it, and then I will
2 give you an answer.
3    Q.   Okay.
4    A.   During the process of the
5 operation of TTP, it was discovered that
6 the customer that required the VAT
7 invoices were not that many.  The
8 capacity for the production of the
9 drywall by TTP was 40 million square
10 meters.
11       Here I need to add a
12 question in order to be able to answer
13 better.
14       MR. MONTOYA:  Is that him
15 speaking or you speaking?
16       INTERPRETER 1:  Him
17 speaking.
18       I need to fix the
19 translation from one word earlier.
20 Now I know what he's talking
21 about.
22       (Interpreter clarification.)
23       To add explanation in order
24 to be able to answer better..

Page 153

1       MR. MONTOYA:  Please do.
2       INTERPRETER 1:  The
3 question, the word is not question
4 on page 107 --
5       (Interpreter clarification.)
6       Here I need to add an
7 explanation in order to be able to
8 answer better.
9       THE WITNESS:  In the year
10 between 2006 and 2007, TTP
11 implemented the tax policy coming
12 from the government to cut -- to
13 exempt half of the tax.  However,
14 TG implemented the policy to
15 talk -- to exempt all the VAT tax.
16 I did mention earlier that during
17 the operations, TTP find out that
18 there were not that many customers
19 requiring VAT invoicing, but it
20 has the production capacity for 40
21 million square meters.  If we have
22 to sell this 40 million square
23 meters of drywall, they have to --
24 they can only follow the policy

Confidential - Subject to Further Confidentiality Review

Page 154

1 exempting only half of the tax.
2 Even those products that does not
3 require for the VAT policy, they
4 still have to pay 50%, half of the
5 tax.
6 Let me think. If TTP also
7 wants to enjoy the policy for VAT
8 exemption, then it also enjoy the
9 50% tax -- the other policy with
10 the 50% tax exemption. Therefore,
11 their consideration was coming
12 from this perspective of economic
13 interest. To establish a company
14 with a smaller capacity of
15 production, it would be okay for
16 this company to fulfill the need
17 of the customers requiring for the
18 VAT invoicing. Based on this
19 reason, TTP stopped production and
20 operation.
21 MR. STATMAN: Are you
22 finished?
23 THE WITNESS: That's it.
24 BY MR. MONTOYA:

Page 155

1 Q. Did TG make the decision to
2 shut down TTP's production of drywall?
3 A. It was a decision made
4 together by the board of directors of TG
5 and TTP.
6 Q. After TTP stopped producing
7 drywall in 2008, did TTP sell back the
8 equipment for making drywall to TG?
9 A. Yes.
10 Q. What other products between
11 2006 to 2008 did TTP produce apart from
12 drywall?
13 MR. STATMAN: Objection to
14 form. You can answer based on
15 your knowledge.
16 THE WITNESS: TTP only
17 produce drywalls.
18 BY MR. MONTOYA:
19 Q. What was the name of the
20 factory that the TG production line was
21 purchased -- that TG purchased back from
22 TTP? Where was the factory?
23 Let me start again.
24 What was the name of the

Page 156

1 factory of the --
2 What was the name of the TTP
3 factory that TG bought back the drywall
4 equipment from?
5 MR. STATMAN: Objection to
6 the form.
7 THE WITNESS: Industrial
8 park production line.
9 BY MR. MONTOYA:
10 Q. How many factories did TTP
11 produce drywall at from 2006 until 2008?
12 A. TTP?
13 Q. Yes.
14 A. TTP has only the old
15 factories. They don't have any other
16 factory.
17 Q. And what was the name of
18 that factory?
19 A. TTP?
20 Q. Yes. What was the name of
21 the factory where they produced drywall
22 from 2006 to 2008?
23 A. Let me make a correction.
24 This should be between the year 2006 to

Page 157

1 the year 2007.
2 Q. Okay.
3 A. It was called TTP.
4 Q. The name of the factory was
5 called TTP?
6 A. I need to explain this, so
7 let me think.
8 MR. STATMAN: Do you
9 understand the question?
10 I'm talking to the
11 interpreter.
12 THE WITNESS: Yes, I
13 understand it. But I want to
14 think about it so that I will be
15 able to respond in a way that he
16 can understand.
17 You can say -- you can put
18 it this way. TTP does not have
19 any other factory. TTP itself on
20 its own is a factory.
21 BY MR. MONTOYA:
22 Q. And the name of that factory
23 is TTP, right?
24 A. Let me think about how I can

Page 158

1 explain to you.
2       MR. STATMAN: Okay. I'm
3 going to object as to the form
4 because it's vague and ambiguous.
5 He's obviously struggling. If you
6 can reask him the question --
7       MR. MONTOYA: I asked him
8 the name of the factory. I'm not
9 going to reask it.
10       MR. STATMAN: Assumes facts
11 not in evidence.
12       MR. MONTOYA: That they
13 don't have a factory for drywall?
14       MR. STATMAN: No. If it has
15 a name.
16       MR. GRAND: Then he can say
17 it doesn't have a name.
18       MR. STATMAN: He's
19 apparently struggling.
20       MS. BASS: You don't have
21 any idea why he's struggling.
22       MR. STATMAN: That's true.
23 That's why I said apparently.
24       THE WITNESS: The production

Page 159

1 line of TTP is under the name of
2 TTP.
3       MR. STATMAN: Are we ready
4 for another break?
5       MR. MONTOYA: I think we
6 are, yes.
7       THE VIDEOTAPE TECHNICIAN:
8 The time now is approximately 3:09
9 p.m., and we are now off the
10 record.
11             - - -
12       (Whereupon, a recess was
13 taken from 3:09 p.m. until
14 3:21 p.m.)
15             - - -
16       THE VIDEOTAPE TECHNICIAN:
17 This begins Tape 5 of today's
18 deposition. The time now is
19 approximately 3:21 p.m., and we're
20 back on the record.
21       MR. STATMAN: Before Mr.
22 Montoya recommences with his
23 questions, I just want to note
24 that originally that Mr. Zhang was

Page 160

1 scheduled to have his deposition
2 taken over a period of two days.
3 I understand that yesterday you
4 all agreed that his deposition
5 would be taken only today and that
6 you would take Mr. Peng's
7 deposition over the next two days
8 and you would not be taking any
9 depositions on Saturday. I see
10 nods on the other side of the
11 table, and I'm assuming that's all
12 correct and no one disagrees with
13 that.
14       MR. PANAYOTOPOULOS: I've
15 not agreed to that, but I suspect
16 it's okay as long as I have an
17 opportunity to ask a few questions
18 today.
19       MR. STATMAN: That's what I
20 was getting to. The time is now
21 3:20 approximately. My watch
22 never seems to be right here, but
23 it's about 3:20. I interpret a
24 day to generally mean a 9 to 5

Page 161

1 full day. We've tried to keep the
2 breaks to a minimum. I've tried
3 to keep the testimony flowing as
4 best we can. I'm certainly
5 willing to give a little leeway on
6 the 5:00 issue, but there isn't
7 that much room for leeway. And so
8 I want you among you, if you can,
9 to reach an agreement about your
10 time. I'm not going to tell you
11 how to manage your deposition.
12 But if you want some time to ask
13 questions, I think you need to
14 keep that in mind that he's not
15 going to be here indefinitely
16 merely because you decided to
17 reduce his time from two days to
18 one day.
19       MR. PANAYOTOPOULOS: You
20 just need to understand that we
21 actually have adverse interests.
22 There's no team over here working
23 together. My clients, I'm the
24 only one who represents my

Confidential - Subject to Further Confidentiality Review

Page 162

1 clients, and we have directly
2 adverse interests with the people
3 that are asking the questions.
4 So, I don't have a choice in that.
5 So, as long as our rights are
6 preserved, I'm fine with that.
7 But I'm not willing to give up my
8 rights for somebody else.
9     MR. BRENNER:  The same
10 applies to Mr. Peng.  We've all
11 come here to ask him questions.
12 And to the extent that others with
13 adverse interests monopolize the
14 time, we're not going to waive our
15 rights.  We've got a Saturday set
16 aside.  We're not going to waive
17 our rights.
18     MR. STATMAN:  I'm not going
19 to make any ruling or ask you to
20 waive any rights you may have, but
21 he's here for a full day's worth
22 of deposition today.  We're making
23 an honest effort to give you a
24 full day's worth of deposition,

Page 163

1 and how you all work it out is not
2 really my concern.  I need to tell
3 you that we should just continue
4 and try to get it done.
5     MR. MONTOYA:  Let's get
6 started.  I'm going to be
7 exceedingly brief.
8         - - -
9     (Whereupon, Deposition
10 Exhibit Jianchun-17, Document in
11 Chinese, Bates stamped TG 0020116
12 and TG 0020117, and English
13 Translation, Reconciliation
14 Agreement, October 3, 2008, was
15 marked for identification.)
16         - - -
17 BY MR. MONTOYA:
18     Q.  Sir, I'm going to hand you
19 what's been marked as Exhibit Number 17,
20 the Chinese language version.  And I'm
21 handing your counsel a translation.
22     MR. STATMAN:  Can I give
23 that to Eugene to look at?
24     MR. MONTOYA:  Yes.

Page 164

1 BY MR. MONTOYA:
2     Q.  Sir, the company that is
3 mentioned in the upper left-hand corner
4 of the document is translated as U.S.
5 Jiadian Building Material Company.  And
6 I've highlighted it in yellow for you.
7 Do you see that?
8     A.  I see that.
9     Q.  Have you ever heard of that
10 company before?
11     A.  No.
12     Q.  Are you aware of any
13 settlement agreement between TG or TTP
14 and U.S. Jiadian Building Material
15 Company?
16     MR. STATMAN:  Objection to
17 the form.
18 BY MR. MONTOYA:
19     Q.  You can answer, sir.
20     A.  Can I look at it first?
21     Q.  Let me ask you this.  Have
22 you ever seen that document before,
23 Exhibit 16?
24     A.  I have -- I did not see it

Page 165

1 before.
2     Q.  And I'll ask you this.  Are
3 you aware of any settlements between TTP
4 or TG and any company based in the United
5 States?
6     MR. STATMAN:  I'm going to
7 object.  I just want to clarify.
8 You are talking about independent
9 now of looking at this thing?
10     MR. MONTOYA:  That's right.
11     MR. STATMAN:  Well, let's
12 take this away because he's
13 staring at it.
14     MR. MONTOYA:  I don't want
15 to take it away from him.  And
16 it's okay if she translates your
17 comments.  It's fine with me.
18     If you could translate
19 counsel's comments, please.
20 BY MR. MONTOYA:
21     Q.  Let me start over again.
22 Putting Exhibit 16 aside, are you aware
23 of any settlement agreement between TG
24 and TTP and any company based in the

Page 166

1 United States?
2     A.   What time period?
3     Q.   Between 2006 to present.
4     A.   I did not know about it
5 before.
6     Q.   What do you know about any
7 settlements?
8         MR. STATMAN: I'm going to
9     object on scope, but you can
10    answer if you know.
11        THE WITNESS: I said I did
12    not know about this settlement
13    before.
14 BY MR. MONTOYA:
15    Q.   Do you know about any
16 settlements, apart from Exhibit 16,
17 between TG and TTP and any company in the
18 United States from 2006 until present?
19    A.   Are you talking about
20 Exhibit 16?
21    Q.   Except for Exhibit 16, any
22 other settlement agreements?
23    A.   I don't know.
24    Q.   When did you first learn

Page 167

1 about the settlement in Exhibit 16?
2         MR. STATMAN: Objection as
3     to form.
4 BY MR. MONTOYA:
5     Q.   You can answer.
6     A.   When I was making
7 preparation to -- for this litigation,
8 preparing for the questions being asked,
9 I heard of this matter, but I have not
10 seen this document yet.
11    Q.   Were you provided with any
12 documents relating to the settlement?
13    A.   I did not see.
14        MR. STATMAN: The answer is
15    no.
16        INTERPRETER 1: The
17    interpreter reinterpret it. The
18    first time I said did you see.
19    The second time I ratify. I said,
20    what were you provided with?
21        MR. MONTOYA: And his
22    answer? Did he answer?
23        INTERPRETER 1: He did
24    answer I did not see.

Page 168

1 BY MR. MONTOYA:
2     Q.   Is the answer no, he was not
3 provided with any documents regarding the
4 settlement?
5         MR. STATMAN: Objection as
6     form, but you can answer.
7         THE WITNESS: No.
8 BY MR. MONTOYA:
9     Q.   Did you ask for any
10 documents regarding the settlement in
11 Exhibit 16?
12    A.   I did not ask.
13    Q.   Did you discuss with anyone
14 the settlement in Exhibit 16 except for
15 any conversations you've had with your
16 lawyers?
17        MR. STATMAN: Thank you.
18        THE WITNESS: Let me repeat
19    the question.
20        MR. CHEN: I'm --
21 BY MR. MONTOYA:
22    Q.   Let me ask it this way.
23        Who, if anyone, did you
24 discuss the settlement agreement in

Page 169

1 Exhibit 16 with?
2     A.   I did not discuss about this
3 document, this settlement, but I heard
4 about this matter.
5     Q.   Who did you hear about it
6 from?
7     A.   Mr. Peng Wenlong.
8     Q.   Did you and Mr. Peng Wenlong
9 have a conversation about the settlement
10 agreement?
11        MR. STATMAN: I want to
12    object and instruct the witness
13    that if the discussions occurred
14    in the presence of lawyers that
15    the attorney-client privilege
16    applies and you don't have to
17    answer. I just want to make that
18    clear.
19        THE WITNESS: That means I
20    cannot answer.
21        MR. MONTOYA: Thank you.
22    And for the record, I'm going to
23    attach the translation to Exhibit
24    16, which it's marked translation

Page 170

1 of TG 20116 and 20117.
2        Sir, at this time, I have
3 finished my questioning, and I
4 want to thank you for your time
5 today.
6        THE WITNESS:  Thank you very
7 much for your patience to listen
8 to my answers.
9        MR. MONTOYA:  And your
10 patience with me.
11        I pass the witness.
12        MS. BASS:  Hello, my name is
13 Hilarie Bass, and I represent the
14 Home Builders steering committee.
15        I am going to pass the
16 witness, but only after making a
17 statement for the record.
18        Through no fault of the
19 witness, I do not believe that
20 this individual was put forth
21 today in good faith as a corporate
22 representative of TTP.  That is
23 the case because, first of all, he
24 was not an employee of TTP at the

Page 171

1 relevant time.  Secondly, he
2 appears today and tells us that he
3 has never even read the profile
4 form submitted by the client about
5 which he is theoretically supposed
6 to be testifying today.  He tells
7 us that there are annual reports
8 for the company, but he hasn't
9 even bothered to review them.  He
10 admits that there are all kinds of
11 documents reflecting the very
12 categories of information that he
13 has been designated to talk about
14 today, and he hasn't reviewed any
15 of them.
16        I would just like to note
17 for the record that there were
18 more than 13 lawyers who flew
19 thousands of miles to come here in
20 good faith to ask questions of a
21 witness which we were told was an
22 individual who had the most
23 knowledge about the specific
24 categories of information

Page 172

1 described in the deposition
2 designations.  And, in fact, we
3 find that there is somebody still
4 employed by a subsidiary of this
5 company who actually executed the
6 profile form who apparently does
7 have personal knowledge about the
8 information relevant to this
9 lawsuit, but interestingly enough,
10 he is not being produced any time
11 during the week to allow us the
12 appropriate opportunity to ask him
13 questions about issues that are
14 relevant to this lawsuit.
15        It's my view that the bulk
16 of our time today has been wasted.
17 Patrick has been very patient in
18 trying to elicit whatever
19 interesting information this
20 witness might have, but that I
21 believe we are entitled to be
22 reimbursed for our time to be here
23 today, because I do not believe
24 that this individual by anyone's

Page 173

1 stretch of the imagination can be
2 described as someone who has the
3 best knowledge about the relevant
4 information that are described in
5 the deposition topics.  And so for
6 that reason, I'm not going to
7 waste any further time by
8 questioning him.
9        I will pass the witness.
10        MR. STATMAN:  I just want to
11 respond briefly.  You're wrong on
12 the facts, and you're wrong on the
13 law.  We'll start with the law.
14 The 30(b)(6) witness does not have
15 to be an employee of the company
16 for which he is giving testimony.
17        Second, he's fully answered
18 questions that were directed and
19 clear about each and every one of
20 the categories in which he's been
21 designated.  He is the -- he is
22 qualified and has shown that he's
23 qualified to answer all of those
24 questions, and that is our

Page 174

1    obligation.
2         MS. BASS:  That's fine.
3    We'll take it up with Judge
4    Fallon.  Thank you.
5         MR. STATMAN:  That's right.
6         MR. SERPE:  There's no need
7    to translate that, I wouldn't
8    think.
9         MR. STATMAN:  No, absolutely
10   not.
11        MR. PANAYOTOPOULOS:  I also
12   join in the objections from Ms.
13   Bass, but I'm going to try to get
14   some of the questions that
15   possibly this witness has
16   knowledge about while we're here.
17              - - -
18        EXAMINATION
19              - - -
20   BY MR. PANAYOTOPOULOS:
21    Q.   Hello.  My name is Nick
22   Panayotopoulos, and I represent certain
23   entities by the name of Banner.
24        When did TTP first hear

Page 175

1    about claims being made in America about
2    its drywall?
3         INTERPRETER 1:  Counsel, the
4    word claims is not a very --
5    cannot be translated too clearly.
6    Will you help me?
7         INTERPRETER 2:  The check
8    interpreter disagrees.  Claims
9    should be interpreted as shuo pei.
10        INTERPRETER 1:  That is one
11   way of interpreting that.
12        MR. PANAYOTOPOULOS:  That's
13   fine.
14        INTERPRETER 1:  I did
15   translate it similar to that, but
16   I don't want to guess.
17        MR. PANAYOTOPOULOS:  You can
18   ask it that way.  That's fine.
19        MR. STATMAN:  Are you
20   finished with your translation?
21        INTERPRETER 1:  Yes.
22        MR. STATMAN:  I object to
23   the form of that question.  I
24   object to the scope of that

Page 176

1    question insofar as it concerns
2    the designations, and I am
3    objecting to the scope of that
4    question insofar as it has nothing
5    to do with the jurisdiction.  I'll
6    let him answer because I want to
7    move this along, but out of
8    concern for everybody's time, I'm
9    not going to let a whole series of
10   questions like this be asked.
11   He's designated, and these
12   depositions are meant to be for
13   jurisdictional purposes.
14        MR. PANAYOTOPOULOS:  Thank
15   you.
16        MR. STATMAN:  You can
17   translate that, please.
18        THE WITNESS:  Around the
19   year 2010, TTP received legal
20   documents.
21   BY MR. PANAYOTOPOULOS:
22    Q.   I'm not asking when TTP
23   first received legal documents.  I'm
24   asking when did TTP first hear about

Page 177

1    claims in America that the drywall was
2    defective?
3         MR. STATMAN:  Same objection
4    as to form and on scope, but you
5    can answer the question if you
6    can.
7         MR. PANAYOTOPOULOS:  Please
8    translate his objection.
9         INTERPRETER 1:  I did
10   translate it.  Let me try to use
11   another word for claim.  I just
12   used the word from Una.  Let me
13   use another word here.
14        MR. PANAYOTOPOULOS:  And
15   please go ahead and translate his
16   objection again.
17        MR. STATMAN:  Same objection
18   as to the previous question.
19        INTERPRETER 1:  I got this
20   Chinese translation from the
21   glossary.
22        MR. CHEN:  If I could just
23   make one clarification, Mr.
24   Panayotopoulos.  The question is

Confidential - Subject to Further Confidentiality Review

Page 178

1 whether you're referring to
2 allegations or complaints or if
3 you're referring to demands for
4 payment. I think that's where the
5 confusion over the term "claims"
6 between all the interpreters is
7 occurring.
8 MR. PANAYOTOPOULOS: Let me
9 be clear. It doesn't matter about
10 litigation. What I'm asking about
11 is anybody making a claim, making
12 a statement that this drywall was
13 defective. So, it does not have
14 to be in the legal context. It
15 just has to be in the context of
16 I'm making this particular claim
17 that something is wrong. I'm just
18 making a statement.
19 INTERPRETER 1: I
20 understand. Counsel, I stated
21 that we tried to translate the
22 word claims in three different
23 ways, and we still don't get the
24 answer across because under

Page 179

1 different situation, the word
2 claims can be translated
3 differently. Is there a better
4 word that can help us better
5 translate?
6 MR. PANAYOTOPOULOS: How
7 about a concern.
8 MR. STATMAN: I can never
9 tell when she's done.
10 MR. PANAYOTOPOULOS: Are you
11 done?
12 MR. STATMAN: I object as to
13 form, and I object as to scope,
14 but please answer the question.
15 MR. PANAYOTOPOULOS: Go
16 ahead and translate what he just
17 said, please.
18 THE WITNESS: I did not hear
19 clearly what were you asking
20 about.
21 BY MR. PANAYOTOPOULOS:
22 Q. I'm sorry?
23 A. I did not hear clearly the
24 questions that you just asked.

Page 180

1 Q. When did TTP first hear that
2 there were concerns in America about its
3 drywall being defective?
4 MR. STATMAN: Objection to
5 form, objection to scope. Please
6 answer the question.
7 INTERPRETER 2: The check
8 interpreter believes that the
9 interpreter did not put defective
10 into the interpretation.
11 INTERPRETER 1: I did. I
12 did exactly every time, I did put
13 a word defective. Huai diao, that
14 is defect. Sometimes the check
15 interpreter cannot hear because it
16 is an upside down translation.
17 MR. PANAYOTOPOULOS: I don't
18 want a justification.
19 THE WITNESS: I answered
20 earlier.
21 BY MR. PANAYOTOPOULOS:
22 Q. Please answer it again.
23 A. Around February of 2010.
24 Q. That's when it received the

Page 181

1 legal papers?
2 MR. STATMAN: I just want to
3 make sure you understand. I have
4 a continuing objection to scope, I
5 don't want to have to reiterate it
6 after every question in this line,
7 so we can move the questioning
8 forward.
9 MR. PANAYOTOPOULOS: I asked
10 a question already.
11 THE WITNESS: When you're
12 talking about "it," who are you
13 referring to? I don't understand.
14 INTERPRETER 1: When "it
15 received the legal papers," who
16 are you referring to as "it?
17 BY MR. PANAYOTOPOULOS:
18 Q. You gave me a date in 2010,
19 correct?
20 A. Yes.
21 Q. That was the date when your
22 company received legal papers; is that
23 correct?
24 A. Yes.

Page 182

1    Q.  Before that date, had
2 anybody at your company heard about any
3 complaints about its drywall in America?
4      MR. STATMAN:  Objection as
5 to form.
6      THE WITNESS:  TTP has
7    already stopped production.  Only
8    two people stayed.  How can I put
9    it?
10 BY MR. PANAYOTOPOULOS:
11    Q.  Prior to the date you gave
12 me, did anybody at TTP have knowledge
13 about any concerns being raised in
14 America about the TTP drywall?
15    A.  I don't know whether there
16 is anyone who knows it or not.
17    Q.  You don't know when the date
18 is?
19    A.  Just earlier, well, I want
20 to find out what question was he asking?
21    Q.  When was the first time that
22 you found out that anyone in America was
23 complaining about TTP drywall?
24      MR. STATMAN:  Objection,

Page 183

1    vague and ambiguous.  Answer,
2    please.
3      THE WITNESS:  Mr. Attorney,
4    would you mind to clarify this
5    question?
6 BY MR. PANAYOTOPOULOS:
7    Q.  Have you ever heard that
8 there are problems, that people are
9 claiming there are problems with TTP
10 drywall in America?
11      MR. STATMAN:  Objection as
12    to form.
13      THE WITNESS:  Mr. Attorney,
14    would you mind to rephrase it
15    using another method to ask me?
16      MR. CHEN:  The witness also
17    added, the way it's being
18    interpreted, I really don't
19    understand.
20      INTERPRETER 1:  Did he say
21    that?
22      MR. CHEN:  Yes, he did.
23      INTERPRETER 1:  I did not
24    hear that.

Page 184

1      THE WITNESS:  I'm talking
2    about, I don't understand the
3    meaning, what is the meaning of
4    what the attorney -- Mr. Attorney,
5    you want to convey.
6 BY MR. PANAYOTOPOULOS:
7    Q.  Are you aware that there are
8 people in America complaining that
9 there's a problem with TTP drywall?
10      MR. STATMAN:  Objection to
11    form.
12      THE WITNESS:  I know.
13 BY MR. PANAYOTOPOULOS:
14    Q.  When did you first find out?
15    A.  I cannot tell the exact
16 time.  After the litigation.
17    Q.  The first time you heard
18 from any source that there were
19 complaints about the drywall was after
20 the litigation was started?
21      MR. STATMAN:  Objection to
22    form.
23      THE WITNESS:  Yes.
24 BY MR. PANAYOTOPOULOS:

Page 185

1    Q.  You never read anything in
2 the papers about problems with TTP
3 drywall in America before that time?
4      MR. STATMAN:  Objection to
5    form.
6      INTERPRETER 2:  The check
7    interpreter believe paper here
8    means newspaper.
9      INTERPRETER 1:  Interpreters
10    do not speculate the meaning of
11    the words.  It's up to the lawyers
12    to clarify.
13      MR. PANAYOTOPOULOS:  Please
14    use the word newspaper or press.
15      THE WITNESS:  Yes.
16 BY MR. PANAYOTOPOULOS:
17    Q.  When was that, the first
18 time that you heard that?
19      MR. STATMAN:  Objection to
20    form.
21      THE WITNESS:  I did answer.
22      INTERPRETER 2:  The check
23    interpreter believes that when the
24    question posed to the witness, you

Confidential - Subject to Further Confidentiality Review

Page 186

1  never read from the papers about
2  the litigation -- about the
3  complaints, and the witness'
4  answer is correct, meaning I have
5  never read from the newspaper,
6  it's not yes, I have read from the
7  paper.
8       INTERPRETER 1: The check
9  interpreter is digesting and
10  speculating the meaning of what
11  was being said. What was said was
12  not as long as what she said.
13 BY MR. PANAYOTOPOULOS:
14     Q.   Did TTP have a customer base
15 in 2006 to 2007?
16       MR. STATMAN: Objection as
17  to form.
18       THE WITNESS: I don't
19  understand. What do you mean by
20  "customer base"?
21 BY MR. PANAYOTOPOULOS:
22     Q.   Did TTP have customers in
23 2006 and 2007 for its drywall?
24     A.   TTP has customers for the

Page 187

1  drywalls.
2     Q.   In 2006/2007?
3     A.   Yes.
4     Q.   What happened to those
5  customers when TTP and TG boards decided
6  to shut down TTP's business?
7       MR. STATMAN: Finished?
8       Objection to the form.
9       THE WITNESS: I don't
10  understand the meaning of this
11  question. What do you mean?
12 BY MR. PANAYOTOPOULOS:
13     Q.   Did the customers that used
14 to get drywall from TTP begin to get
15 drywall from a different TG entity after
16 TTP shut down?
17     A.   The customers of TTP, they
18 are not fixed customers. They can buy
19 the drywall from anywhere.
20     Q.   Did TTP give its client list
21 to a different TG client -- TG entity
22 when TTP went out of business?
23       MR. STATMAN: Objection as
24  to form.

Page 188

1       THE WITNESS: I did answer
2  this question earlier. The
3  customers of TTP, they are not
4  fixed customers of TTP.
5       MR. PANAYOTOPOULOS: Would
6  you repeat my question to him,
7  please.
8       MR. STATMAN: Objection to
9  form.
10       THE WITNESS: I have never
11  seen such a customer list.
12 BY MR. PANAYOTOPOULOS:
13     Q.   Is it your testimony that
14 TTP never had a list of who its customers
15 were?
16       MR. STATMAN: Objection as
17  to form, and I'm going to object
18  as to the scope of this. And I
19  think that's part of the problem.
20       You can answer if you know.
21  And any answer he gives is within
22  the scope of his personal
23  knowledge.
24       THE WITNESS: According to

Page 189

1  my personal understanding?
2 BY MR. PANAYOTOPOULOS:
3     Q.   According to any
4 understanding you had from any source
5 whatsoever.
6     A.   What I mean is that the
7 customers of TTP keeps on changing.
8 Therefore, there's no way for them to
9 write out a list.
10     Q.   So, your testimony is that
11 TTP never had a list of who its customers
12 were, correct?
13       MR. STATMAN: Objection to
14  form.
15       THE WITNESS: That is
16  according to my own understanding,
17  I have never seen such a list.
18 BY MR. PANAYOTOPOULOS:
19     Q.   You spoke earlier about the
20 VAT tax issues, correct?
21     A.   Yes.
22     Q.   And part of the reason that
23 TTP shut down or stopped producing
24 drywall was so that TG could apply for

Page 190

1 VAT exemptions, correct?
2       MR. STATMAN: Objection to
3   form.
4       THE WITNESS: I don't
5   understand the meaning, Mr.
6   Attorney.
7 BY MR. PANAYOTOPOULOS:
8    Q.   The meaning of what?
9    A.   I don't understand what
10 you're talking about. What do you imply?
11   Q.   The boards of TTP and TG
12 decided at some point to shut down TTP's
13 production, correct?
14   A.   Yes.
15   Q.   And the reason that they
16 decided to do that was so they could
17 apply for VAT tax exemption, correct?
18       MR. STATMAN: Objection to
19   form.
20       THE WITNESS: Mr. Attorney,
21   when you are talking about the
22   word "they," who are you referring
23   to?
24 BY MR. PANAYOTOPOULOS:

Page 191

1    Q.   TTP and TG.
2    A.   TTP has already stopped the
3 production, therefore, there is no more
4 tax issue.
5    Q.   It's TG that applies for the
6 VAT exemption, correct?
7       MR. STATMAN: Objection to
8   form, time frame.
9       THE WITNESS: TG enjoy the
10   VAT tax before this.
11       MR. CHEN: Tax exemption.
12       INTERPRETER 1: He did not.
13   He did not say the word
14   "exemption." He just said "enjoy
15   VAT tax."
16       Let me ask the witness to do
17   it over again.
18       THE WITNESS: TG can enjoy
19   the exemption of the VAT tax
20   before this.
21 BY MR. PANAYOTOPOULOS:
22   Q.   The reason --
23       What was the reason that TTP
24 production was shut down?

Page 192

1       MR. STATMAN: Objection,
2   asked and answered.
3       THE WITNESS: I insist on
4   the answer I gave before.
5 BY MR. PANAYOTOPOULOS:
6    Q.   Please repeat it, if you
7 could.
8    A.   The answer I gave earlier
9 was too long. I am unable to repeat it.
10   Q.   Was part of the reason the
11 TTP production was shut down so that some
12 Taishan Gypsum entity could enjoy VAT tax
13 exemption?
14   A.   That is not the case.
15   Q.   Please repeat the reason,
16 then, that you said why TTP was shut
17 down.
18       MR. STATMAN: Objection,
19   asked and answered. And to the
20   extent you can answer that
21   question, please do.
22       THE WITNESS: I insist on
23   the answer that I gave out
24   earlier, and I did explain about

Page 193

1 this because it is a very
2 professional knowledge regarding
3 the finance. I spent a long time
4 to explain this. If I have to
5 repeat it again, it is
6 meaningless.
7       MR. PANAYOTOPOULOS: We're
8 going to be here a very long time
9 if I'm not going to get any
10 answers to my questions, and I
11 don't know what the best way to go
12 about it is, but I can't get any
13 answers out of this -- the
14 witness.
15       MR. STATMAN: Let me suggest
16 that you asked exactly the same
17 question that he had previously
18 been asked which he gave a very
19 long answer. And he's saying that
20 he can't repeat that answer. And
21 let me further suggest that you
22 may have misunderstood some of the
23 things he said. Now, if you'd
24 like to go back and read his

Page 194

1 answer while someone else takes
2 over the questioning, I have no
3 problem with that. But he can't
4 give exactly the same answer that
5 he gave before.
6 MR. PANAYOTOPOULOS: Well,
7 I'm not asking for the exact same
8 answer.
9 MR. STATMAN: You are asking
10 for an answer to exactly the same
11 question. There's no reason he
12 has to repeat it.
13 MR. PANAYOTOPOULOS: The
14 problem is, he's refusing to
15 answer the questions that came
16 before that, and so now I've got
17 to take him through the entire
18 loop. But it's fine. I'm going
19 to let somebody else, if they want
20 to go first, then I'll come back.
21 MR. HARDT: I just have a
22 statement for the record. This is
23 Ken Hardt. I represent Venture
24 Supply and Porter-Blaine

Page 195

1 Corporation. I independently
2 noticed these depositions in the
3 Germano class action and am making
4 a special appearance at these
5 depositions. Pursuant to that
6 notice in the Germano action, I
7 agree with Ms. Bass' statements.
8 The topics that I would have asked
9 have been covered by the
10 attorneys. I don't think the
11 answers are representative of a
12 corporate representative that
13 should have been prepared to
14 answer these questions. Again, no
15 disrespect to the witness, but I
16 think the wrong witness was put up
17 for -- they could have put up a
18 number of witnesses to address the
19 topics, therefore, I'm not going
20 to ask any questions at this time.
21 MR. STATMAN: Rather than
22 respond, we'll let the judge
23 decide when it comes to that.
24 MS. EISELEN: This is

Page 196

1 Carlina Eiselen. I represent
2 Interior/Exterior. I along with
3 other counsel, I cross-noticed
4 this deposition in the MDL, and I
5 share Ms. Bass and Mr. Hardt's
6 objections.
7 MR. BLACK: I'm David Black
8 representing the State of
9 Louisiana.
10 I also share the statements
11 made by Ms. Bass and Mr. Hardt and
12 Carlina. I think this witness was
13 a very, very poor representative.
14 There are many other folks who
15 have been identified in exhibits
16 and otherwise who could have been
17 put here. Instead, they put
18 somebody who didn't have anything
19 to do with the daily operations of
20 TTP during the time that it was in
21 operation for the very clear
22 purpose of avoiding a witness who
23 can answer questions about what
24 TTP did. And I thought the

Page 197

1 purpose of this deposition is to
2 find out what TTP did, how it
3 reacted to what was out there.
4 This witness did not provide that
5 basis.
6 MR. STATMAN: I'm prepared
7 to let everybody join in with what
8 Ms. Bass said before, but when the
9 attorneys' motives are impugned, I
10 have to say something about that.
11 I think that if you press
12 this further, you'll find out that
13 whatever you ascribe to the
14 attorneys is not true. I think
15 when you read the transcript, you
16 will see that the witness, in
17 fact, was capable and did answer
18 all the proper questions that were
19 posed to him and was a fine
20 30(b)(6) designee.
21 MR. BLACK: I respectfully
22 disagree.
23 MR. CLARK: This is Matthew
24 Clark representing Southern Homes.

Page 198

1 Southern Homes joins in the
2 statements of Mr. Black, Ms. Bass
3 and the others and lodges its
4 objection.
5     MR. SLAUGHTER: This is
6 Brian Slaughter. I represent
7 Atlantic Homes, and I join in the
8 objections raised by the other
9 parties previously.
10 BY MR. PANAYOTOPOULOUS:
11    Q. Hello again.
12       Is it true that as a result
13 of TTP shutting down its operations, TG
14 could enjoy full tax exemption from VAT?
15    A. You cannot say this.
16    Q. Is it true that TG
17 implemented a different policy in 2006 --
18 I'm sorry. Let me start over.
19       What policy did TG implement
20 to exempt all the VAT tax?
21    MR. STATMAN: Objection to
22 form.
23       THE WITNESS: Mr. Attorney,
24 would you mind to say your

Page 199

1    question to describe it once more.
2 BY MR. PANAYOTOPOULOS:
3    Q. Sure.
4       And I'm reading from the
5 rough transcript of his testimony from
6 earlier today. Did TTP implement some
7 tax policy to cut the exemption, the VAT
8 exemption?
9    A. TTP? Are you talking about
10 TTP or TG?
11    Q. TG. I'm sorry, TG.
12    A. Mr. Attorney, would you mind
13 to describe this question to me
14 completely.
15    Q. You talked earlier about a
16 policy that TG implemented related to
17 VAT, correct?
18    A. Yes.
19    Q. Tell me about that policy.
20 What is that policy?
21    MR. STATMAN: Objection to
22 form, asked and answered. If you
23 can answer the question.
24    THE WITNESS: I cannot tell

Page 200

1    accurately the name of that
2 policy. I cannot tell accurately
3 the name of this document. There
4 is a tax policy promulgated by the
5 tax bureau of the Chinese
6 government.
7 BY MR. PANAYOTOPOULOS:
8    Q. I'm not asking for the name.
9 I'm asking for your understanding of what
10 that policy was.
11    MR. STATMAN: Okay. I think
12 this really is outside the scope.
13       But you can answer to the
14 best of your knowledge.
15       THE WITNESS: To put it
16 simple, TG.
17    MR. STATMAN: (Addressing
18 the interpreter.)
19       Would you let him finish his
20 entire answer before you start
21 interjecting.
22       Thank you.
23       INTERPRETER 1: Yeah, sure.
24 No. I just want to double check.

Page 201

1    I did not hear.
2    MR. STATMAN: You said TG
3 three times.
4       THE WITNESS: Are you asking
5 about TG or TTP?
6 BY MR. PANAYOTOPOULOS:
7    Q. Whose policy were you
8 talking about earlier related to VAT?
9    A. The state tax bureau.
10    Q. I understand that state
11 issued a new policy related to VAT,
12 correct?
13    A. I don't know about the new
14 ones.
15    Q. The one you were talking
16 about just now.
17    A. Now I understand. Mr.
18 Attorney, you're referring the tax policy
19 TG implemented at that time, right?
20    Q. Correct. Tell me what that
21 policy was, please.
22    A. TG can enjoy the exemption
23 of VAT. Finished.
24    Q. And did that --

Confidential - Subject to Further Confidentiality Review

Page 202

1        In order for TG to enjoy
2    that VAT exemption, was that in any way
3    related to the shutdown of TTP
4    production?
5        A.   No relationship.
6        Q.   Does TG submit forms to get
7    VAT exemptions today?
8        MR. STATMAN:  I object as
9    outside the scope.  This witness
10    is clearly designated to talk
11    about TTP.  If he can answer based
12    on his own personal knowledge,
13    that's fine.  But he's not a
14    designated witness of TG.
15        You can answer that.
16        THE WITNESS:  I have already
17    enough regarding the contents of
18    this question.
19        MR. PANAYOTOPOULOS:  I'm
20    going to insist on an answer.
21        MR. STATMAN:  Can you reask
22    the question?  I think he's gotten
23    lost.  I don't know, but I think
24    it --

Page 203

1  BY MR. PANAYOTOPOULOS:
2        Q.   Does TG submit forms to get
3    VAT exemptions today?
4        A.   I don't know.
5        Q.   Are you aware whether TG
6    ever submitted for VAT exemptions?
7        MR. STATMAN:  Again, it's
8    outside the scope of his
9    designation, but to the extent he
10    has personal knowledge, he can
11    answer.
12        INTERPRETER 1:  The
13    interpreter needs to clarify with
14    the witness because the Chinese
15    words doesn't have the present
16    tense, past tense.  I want to know
17    what tense he's using.
18        MR. CHEN:  I would just note
19    that she's asking was it in the
20    past or the present.
21        INTERPRETER 1:  No.  Because
22    the Chinese word has no "ed" or
23    future tense.  It's all the same.
24        MR. CHEN:  I just wanted to

Page 204

1    reflect what she's asking.  I'm
2    fine with that.
3        MR. PANAYOTOPOULOS:  Fine,
4    thank you.  Go ahead.
5        INTERPRETER 1:  I'm
6    clarifying with the witness.  I
7    said there's no future tense and
8    the present tense and past tense
9    in the Chinese.  I want him to
10    clarify with me.  He said yes,
11    yes, right.  So, that's why he
12    wants you, the attorney, also to
13    clarify what the time frame are
14    you talking about today.
15        INTERPRETER 2:  The check
16    interpreter believe the witness
17    said TG should have submitted some
18    material.
19        INTERPRETER 1:  He did not
20    say that.  It is a speculation of
21    the check interpreter.  That is
22    not right.
23        MR. PANAYOTOPOULOS:  Sorry.
24    Tell me again what you think he

Page 205

1    said.
2        INTERPRETER 2:  TG should
3    have submitted some material.
4        INTERPRETER 1:  He did not
5    say that.
6        MR. CHEN:  For the record, I
7    agree with that, with the check
8    interpreter.
9        INTERPRETER 1:  It is a
10    speculation, because it has no
11    tense.
12        MR. STATMAN:  Please ask him
13    again.
14  BY MR. PANAYOTOPOULOS:
15        Q.   In the past, has TG ever
16    submitted for VAT tax exemption?
17        MR. STATMAN:  Objection to
18    form.
19        THE WITNESS:  Need to submit
20    some reports.
21  BY MR. PANAYOTOPOULOS:
22        Q.   TG would submit the reports
23    and then get money back from the
24    government, correct?

Page 206

1    MR. STATMAN: Objection to
2  the scope, objection to the form.
3    THE WITNESS: The earlier
4  question, the way you bring it up,
5  I cannot understand.
6    MR. PANAYOTOPOULOS: You
7  want to go and change the tape
8  because we're going to be here for
9  a long time.
10    MR. STATMAN: No, we're not.
11  You're asking him questions about
12  TG's VAT applications that you may
13  very well have wanted to ask of
14  somebody else, but you are not
15  going to ask them of this witness.
16  This witness is designated to
17  testify on behalf of TTP. So, I'm
18  going to give you a few more
19  minutes on this line, and then I'm
20  shutting it down.
21    MR. PANAYOTOPOULOS: I
22  understand that you may want to do
23  that. I'm going to ask my
24  questions, and then we'll take it

Page 207

1  up with The Court. You can
2  obviously instruct the witness not
3  to answer if you want, and then we
4  can deal with it at that point.
5    MR. STATMAN: I'll instruct
6  him not to answer if you continue
7  this.
8    MR. PANAYOTOPOULOS: I
9  understand.
10    MR. STATMAN: I will
11  instruct the witness not to
12  answer. If you continue, I will
13  get up and leave. This does not
14  have anything to do with TTP
15  anymore.
16    MR. PANAYOTOPOULOS: I
17  understand.
18    THE VIDEOTAPE TECHNICIAN:
19  The time now is approximately 4:37
20  p.m. and we're now off the record.
21    - - -
22    (Whereupon, a recess was
23  taken from 4:46 p.m. until
24  4:46 p.m.)

Page 208

1    - - -
2    THE VIDEOTAPE TECHNICIAN:
3  This begins Tape 6 of the
4  deposition. The time is
5  approximately 4:46 p.m., and we're
6  back on the record.
7    MR. STATMAN: Nick, it's my
8  intention to go no longer than
9  5:00. I'll give you a little
10  leeway on that, but only if you
11  are going to be asking questions
12  within the scope of his
13  designation, and I don't see the
14  connection right now on the
15  questions that you are asking and
16  anything having to do with his
17  designation.
18    MR. PANAYOTOPOULOS: I
19  understand. Rather than taking
20  the time to argue about it, I
21  figured I'll just ask some
22  questions and maybe we can get
23  through this.
24    MR. STATMAN: Great.

Page 209

1  BY MR. PANAYOTOPOULOS:
2    Q.  Do you have any knowledge
3  regarding what TTP did in regards to VAT
4  in the 2006/2007 time frame?
5    A.  They don't have particularly
6  to do anything.
7    Q.  Do you have knowledge about
8  what TTP did in relation to VAT?
9    MR. STATMAN: Asked and
10  answered. Go ahead.
11    THE WITNESS: It is the same
12  question, therefore, I would give
13  the same -- the answer that I gave
14  earlier -- that I gave earlier.
15  BY MR. PANAYOTOPOULOS:
16    Q.  I asked the question
17  earlier. I didn't get an answer to that
18  question. Are you saying that TTP didn't
19  have anything to do with VAT?
20    MR. STATMAN: Object to the
21  form and particularly the
22  statement before the question, but
23  you can answer the question.
24    THE WITNESS: I don't know

Page 210

1  who -- what relationship that
2  you're referring to, the
3  relationship about who.
4  BY MR. PANAYOTOPOULOS:
5      Q.   Did TTP pay VAT in the
6  2006/2007 time period?
7      A.   Yes, they have to pay.
8      Q.   In the 2006/2007 time
9  period, did TTP ever apply for exemptions
10 from VAT?
11     A.   I did explain about this
12 question earlier.  It pays half of the
13 tax and exempt it for half of the tax.
14     Q.   TTP would apply for
15 exemptions from VAT in certain situations
16 in the 2006-2007 time period, correct?
17         INTERPRETER 1:  2006 time
18 period?
19 BY MR. PANAYOTOPOULOS:
20     Q.   '06/07.
21         MR. STATMAN:  Objection as
22 to form.
23         THE WITNESS:  The policy
24 implemented during the period '06

Page 211

1  and '07 by TTP was 50% exemption
2  for the tax.
3  BY MR. PANAYOTOPOULOS:
4      Q.   And that was -- that
5  exemption was in instances where TTP was
6  exporting its products, correct?
7          MR. STATMAN:  Objection.
8          Is she finished?
9          MR. CHEN:  Yes.
10         MR. STATMAN:  Objection to
11 form.
12         You can answer.
13         THE WITNESS:  I don't know,
14 Mr. Attorney, when you're
15 referring to export, I don't know
16 concretely what you're talking
17 about, export.  How do you define
18 concretely the behavior called
19 export?
20 BY MR. PANAYOTOPOULOS:
21     Q.   You understand that TTP
22 would not have been entitled to the VAT
23 exemption unless it was reporting to the
24 Chinese government that it was exporting

Page 212

1  the material?
2      A.   Incorrect.
3      Q.   You believe TTP was entitled
4  to a VAT exemption even in instances
5  where it was selling drywall in China?
6          MR. STATMAN:  Are you asking
7  him what his understanding is?
8          MR. PANAYOTOPOULOS:  Yes.
9          MR. STATMAN:  I object to
10 the form.  You can answer if you
11 can.
12         THE WITNESS:  Let me restate
13 this.  The policy implemented by
14 TTP was the policy for 50% tax
15 exemption.
16         MR. PANAYOTOPOULOS:  Would
17 you please reread my question.
18           - - -
19 (Whereupon, the requested
20 portion of the transcript was read
21 by the court reporter as follows:
22     "Q.   You believe TTP was
23 entitled to a VAT exemption even
24 in instances where it was selling

Page 213

1  drywall in China?")
2            - - -
3          MR. STATMAN:  Same
4  objections.
5          THE WITNESS:  Regarding this
6  question, what I can answer is
7  only that the policies that TTP
8  implemented was the VAT 50% tax
9  exemption.
10         MR. PANAYOTOPOULOS:  I'm
11 going to note for the record this
12 witness is not answering my
13 question, and we'll move on, and
14 we'll take it up later with the
15 judge.
16 BY MR. PANAYOTOPOULOS:
17     Q.   Do you know where the
18 VAT-related documents for TTP are today?
19     A.   Documents related to VAT,
20 where they are being kept today?
21     Q.   Correct.
22     A.   What documents are you
23 referring to?
24     Q.   Documents related to VAT

Confidential - Subject to Further Confidentiality Review

Page 214

1 from the 2006/2007 time period.
2 　　　　MR. STATMAN: Objection to
3 form.
4 　　　　You can answer the question.
5 　　　　THE WITNESS: I'm not sure
6 whether this document exists or
7 not. If we still have it, that
8 should be in the office of TTP.
9 　　　　MR. PANAYOTOPOULOS: Thank
10 you. That's all I have. Subject
11 to our reservations and objections
12 from earlier, I'm done.
13 　　　　MR. STATMAN: I have no
14 direct. So, unless anybody else
15 has something, I think we're done.
16 　　　　THE VIDEOTAPE TECHNICIAN:
17 The time now is approximately 5:00
18 p.m. Today's deposition
19 consisting of six tapes is now
20 concluded.
21 　　　　　　- - -
22 　　　　(Whereupon, the deposition
23 concluded at 5:00 p.m.)
24 　　　　　　- - -

Page 216

1 　　　　INSTRUCTIONS TO WITNESS
2
3
4 　　　　Please read your deposition
5 over carefully and make any necessary
6 corrections. You should state the reason
7 in the appropriate space on the errata
8 sheet for any corrections that are made.
9
10 　　　　After doing so, please sign
11 the errata sheet and date it. It will be
12 attached to your deposition.
13
14 　　　　It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you. If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Page 215

1 　　　C E R T I F I C A T E
2
3
4 　　　　I, LINDA L. GOLKOW, a
Registered Diplomate Reporter, Certified
Court Reporter and Notary Public, do
5 hereby certify that, pursuant to notice,
the deposition of JIANCHUN ZHANG was duly
6 taken on April 6, 2011 at 9:12 a.m.
before me.
7
8 　　　　The said JIANCHUN ZHANG was
duly sworn by me through the interpreter
9 according to law to tell the truth, the
whole truth and nothing but the truth and
10 thereupon did testify as set forth in the
above transcript of testimony. The
11 testimony was taken down stenographically
by me.
12
13 　　　　I do further certify that
the above deposition is full, complete
14 and a true record of all the testimony
given by the said witness.
15
16
17 　　　Linda L. Golkow
　　　　Registered Diplomate Reporter
18 　　　　Certified Realtime Reporter
19
20 　　　　(The foregoing certification
of this transcript does not apply to any
21 reproduction of the same by any means,
unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Page 217

1 　　　- - - - - -
　　　E R R A T A
2 　　　- - - - - -
3 PAGE LINE CHANGE
4 ____ ____ _____
5 　　REASON: _____
6 ____ ____ _____
7 　　REASON: _____
8 ____ ____ _____
9 　　REASON: _____
10 ____ ____ _____
11 　　REASON: _____
12 ____ ____ _____
13 　　REASON: _____
14 ____ ____ _____
15 　　REASON: _____
16 ____ ____ _____
17 　　REASON: _____
18 ____ ____ _____
19 　　REASON: _____
20 ____ ____ _____
21 　　REASON: _____
22 ____ ____ _____
23 　　REASON: _____
24

Page 218

1
2        ACKNOWLEDGMENT OF DEPONENT
3
        I,_____, do
4  hereby certify that I have read the
   foregoing pages, 1 through 218 and that
5  the same is a correct transcription of
   the answers given by me to the questions
6  therein propounded, except for the
   corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.
8
9  _____
   JIANCHUN ZHANG          DATE
10
11
12
13
14
15
16  Subscribed and sworn
    to before me this
17  _____ day of _____, 20_____.
18  My commission expires:_____
19
    _____
20  Notary Public
21
22
23
24

Page 219

1        LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____