# EXHIBIT 42



Transcript of the Testimony of:  **Tinghuan Fu**

01/10/2012

Chinese Drywall

**HERMAN AFFIDAVIT**

**EXHIBIT**

**2**

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

    _____
 3                            §  MDL NO. 2047
    IN RE:                    §
 4  CHINESE-                  §  SECTION: L
    MANUFACTURED              §
 5  DRYWALL PRODUCTS          §  JUDGE FALLON
    LIABILITY                 §
 6  LITIGATION                §  MAGISTRATE
    _____      §  JUDGE WILKINSON
 7

                       -  -  -
 8
       CROSS NOTICED IN VARIOUS OTHER ACTIONS
 9
                       -  -  -
10
                  January 10, 2012
11
                       -  -  -
12
        CONFIDENTIAL - SUBJECT TO FURTHER
13            CONFIDENTIALITY REVIEW
14                     -  -  -
15         Videotaped deposition of
    TINGHUAN FU, held at the Executive
16  Centre, Level 3, Three Pacific Place, One
    Queen's Road East, Hong Kong, China,
17  commencing at 1:30 p.m., on the above
    date, before Linda L. Golkow, Certified
18  Court Reporter, Registered Diplomate
    Reporter, Certified Realtime Reporter and
19  Notary Public.
                       -  -  -
20
21
22
            GOLKOW TECHNOLOGIES, INC.
23      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

Page 2

1  BEFORE:
2      HONORABLE ELDON E. FALLON
       UNITED STATES FEDERAL COURT -
3      EASTERN DISTRICT OF LOUISIANA
4
   APPEARANCES:
5
6  GAINSBURGH, BENJAMIN, DAVID, MEUNIER
   & WARSHAUER, L.L.C.
7  BY:  GERALD E. MEUNIER, ESQUIRE
   2800 Energy Centre
8  1100 Poydras Street
   New Orleans, Louisiana 70163
9  (504) 522-2304
   gmeunier@gainsben.com
10 Representing the Plaintiffs'
   Steering Committee
11
12 HERMAN HERMAN KATZ & COTLAR, LLP
   BY:  LEONARD A. DAVIS, ESQUIRE
13 820 O'Keefe Avenue
   New Orleans, Louisiana 70113
14 (504) 581-4892
   Ldavis@hhkc.com
15 Representing the Plaintiffs'
   Steering Committee
16
17 COLSON HICKS EIDSON
   BY:  ERVIN GONZALEZ, ESQUIRE
18 BY:  PATRICK S. MONTOYA, ESQUIRE
   255 Alhambra Circle
19 Penthouse
   Coral Gables, Florida 33134
20 (305) 476-7400
   Ervin@colson.com
21 Patrick@colson.com
   Representing Plaintiffs' Steering
22 Committee in the Federal and State
   Coordinated Actions
23
24

Page 3

1  APPEARANCES (CONTINUED):
2
   LEVIN, FISHBEIN, SEDRAN & BERMAN
3  BY:  ARNOLD LEVIN, ESQUIRE
   510 Walnut Street - Suite 500
4  Philadelphia, Pennsylvania 19106
   (215) 592-1500
5  Alevin@lfsblaw.com
   Representing the Plaintiffs'
6  Steering Committee
7
   SEEGER WEISS LLP
8  BY:  SCOTT A. GEORGE, ESQUIRE
   One William Street
9  New York, New York 10004
   (212) 584-0700
10 Sgeorge@seegerweiss.com
   Representing the Plaintiffs'
11 Steering Committee
12
   HOGAN LOVELLS US LLP
13 BY:  FRANK T. SPANO, ESQUIRE
   875 Third Avenue
14 New York, New York 10022
   (212) 918-3000
15 Frank.spano@hoganlovells.com
   Representing Taishan Gypsum Co.
16 Ltd. and Taian Taishan
   Plasterboard Company Ltd. and the
17 Witness, Tinghuan Fu
18
   HOGAN LOVELLS INTERNATIONAL LLP
19 BY:  EUGENE CHEN, ESQUIRE
   18th Floor, Park Place
20 1601 Nanjing Road West
   Shanghai, China 200040
21 (86 21) 6122 3800
   eugene.chen@hoganlovells.com
22 Representing Taishan Gypsum Co.
   Ltd. and Taian Taishan Plasterboard
23 Company Ltd. and the Witness,
   Tinghuan Fu
24

Page 4

1  APPEARANCES (CONTINUED):
2
   GREENBERG TRAURIG, LLP
3  BY:  HILARIE BASS, ESQUIRE
   1221 Brickell Avenue
4  Miami, Florida 33131
   (305) 579-0745
5  bassh@gtlaw.com
   Representing the Home Builders
6  Steering Committee
7
   PERKINS COIE LLP
8  BY:  DAVID L. BLACK, ESQUIRE
   1899 Wynkoop Street
9  Suite 700
   Denver, Colorado 80202
10 (303) 291-2300
   DBlack@perkinscoie.com
11 Representing the State of Louisiana
12
   THOMPSON COE COUSINS & IRONS, L.L.P.
13 BY:  KEVIN F. RISLEY, ESQUIRE
   One Riverway
14 Suite 1600
   Houston, Texas 77056
15 (713) 403-8210
   krisley@thompsoncoe.com
16 Representing The North River
   Insurance Company
17
18 BRENNER, EVANS & MILLMAN, P.C.
   BY:  THEODORE I. BRENNER, ESQUIRE
19 411 East Franklin Street
   Suite 200
20 Richmond, Virginia 23218
   Tbrenner@beylaw.com
21 (804) 644-1300
   Representing Tobin Trading Company
22
23
24

Page 5

1  APPEARANCES (CONTINUED):
2
3  McKENRY, DANCIGERS, DAWSON & LAKE, P.C.
   BY:  J. BRIAN SLAUGHTER, ESQUIRE
4  192 Ballard Court
   Suite 400
5  Virginia Beach, Virginia 23462
   (757) 461-2500
6  Jbslaughter@va-law.org
   Representing Atlantic Homes LLC and
7  Multiple Other Virginia-Based
   Defendants
8
9  QUINN EMANUEL URQUHART & SULLIVAN,LLP
   BY:  JANE M. BYRNE, ESQUIRE
10 BY:  JULIA BESKIN, ESQUIRE
   51 Madison Avenue
11 22nd Floor
   New York, New York 10010
12 (212) 849-7000
   Janeburne@quinnemanuel.com
13 Juliabeskin@Quinnemanuel.Com
   Representing Chartis Select Insurance
14 Company and Related Chartis Insurers
15
16 WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
   BY:  MICHAEL SEXTON, ESQUIRE
17 3344 Peachtree Road, NE
   Suite 2400
18 Atlanta, Georgia 30326
   (404) 876-2700
19 msexton@wwhgd.com
   Representing Various Banner
20 Defendants
21
22
23
24

Page 6

1   APPEARANCES (CONTINUED):
2
      SINNOTT, NUCKOLS & LOGAN, PC
3     BY:  KENNETH F. HARDT, ESQUIRE
      13811 Village Mill Drive
4     Midlothian, Virginia 23114
      (804) 378-7600
5     khardt@snllaw.com
      Representing Venture Supply, Inc. and
6     Porter-Blaine Corp.
7
      ALSO PRESENT:
8
      SUNNY WANG, INTERPRETER
9
10
11            - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1   APPEARANCES VIA TELEPHONE:
2
3     GALLOWAY JOHNSON TOMPKINS BURR and SMITH
      BY:  CARLINA C. EISELEN, ESQUIRE
4     One Shell Square
      701 Poydras Street, 40th Floor
5     New Orleans, Louisiana 70139
      (504) 525-6802
6     ceiselen@gjtbs.com
      Representing Interior/Exterior
7     Building Supply
8
      HUNTON & WILLIAMS LLP
9     BY:  A. TODD BROWN, ESQUIRE
      Bank of America Plaza
10    101 South Tryon Street
      Suite 3500
11    Charlotte, North Carolina  28280
      (704) 378-4700
12    Representing Stock Building Supply, LLC
13
14    JONES, WALKER, WAECHTER, POITEVENT,
      CARRERE & DENEGRE LLP
15    BY:  MEGAN E. DONOHUE, ESQUIRE
      600 Jefferson Street, Suite 1600
16    Lafayette, Louisiana 70501
      (337) 262-9062
17    mdonohue@joneswalker.com
      Representing Fireman's Fund Insurance
18    Company
19
      FULMER LEROY ALBEE BAUMANN
20    BY:  MICHAEL P. McCAHILL, ESQUIRE
      2866 East Oakland Park Boulevard
21    Ft. Lauderdale, Florida 33306
      (954) 707-4430
22    mmccahill@fulmerleroy.com
      Representing Independent Builders
23    Supply Association (IBSA)
24

Page 8

1   APPEARANCES VIA TELEPHONE (CONTINUED):
2
3     WRIGHT, FULFORD, MOORHEAD & BROWN, P.A.
      BY:  DORYK B. GRAF, JR., ESQUIRE
4     145 N. Magnolia Ave.
      Orlando, Florida 32801
5     (407) 425-0234
      dgraf@wfmblaw.com
6     Representing West Construction, Inc.
7
8     QUINN EMANUEL URQUHART & SULLIVAN, LLP
      BY:  CLINTON DOCKERY, ESQUIRE
9     51 Madison Avenue, 22nd Floor
      New York, New York 10010
10    (212) 849-7000
      clintondockery@quinnemanuel.com
11    Representing Chartis Select Insurance
      Company and Related Chartis Insurers
12
13    RUMBERGER, KIRK & CALDWELL, P.A.
      BY:  MONICA C. SEGURA, ESQUIRE
14    Brickell Bayview Centre, Suite 3000
      80 Southwest 8th Street
15    Miami, Florida 33130
      (305) 358-5577
16    Representing several defendants and
      Defendants' Liaison Counsel for
17    Installers
18    BUCHANAN INGERSOLL & ROONEY
      BY:  C. ROBERT ZAPPALA, ESQUIRE
19    One Oxford Centre
      301 Grant Street, 20th Floor
20    Pittsburgh, Pennsylvania 15219
      (412) 392-2135
21    bobby.zappala@bipc.com
      Representing 84 Lumber
22
23
24

Page 9

1   APPEARANCES VIA TELEPHONE (CONTINUED):
2
3     WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
      BY:  P. SHANE O'NEILL, ESQUIRE
4     3344 Peachtree Road, NE
      Suite 2400
5     Atlanta, Georgia 30326
      (404) 876-2700
6     soneill@wwhgd.com
      Representing Various Banner
7     Defendants
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Confidential - Subject to Further Confidentiality Review

Page 10

1  APPEARANCES VIA STREAM:
2
3  BECNEL LAW FIRM, L.L.C.
   BY: ROBERT BECNEL, ESQUIRE
   106 W. 7th Street
4  Reserve, Louisiana 70084
   (985) 536-1186
5  robbecnel@aol.com
   Representing the Plaintiffs'
6  Steering Committee
7
   PARKER WAICHMAN ALONSO LLP
8  BY: JORDAN L. CHAIKIN, ESQUIRE
   3301 Bonita Beach Road
9  Bonita Springs, Florida 34134
   (239) 390-1000
10 Jchaikin@yourlawyer.com
   Representing Plaintiffs' Steering
11 Committee
12
   MORGAN & MORGAN
13 BY: PETE V. ALBANIS, ESQUIRE
   12800 University Drive
14 Suite 600
   Fort Myers, Florida 33907
15 (877) 667-4265
   Representing the Plaintiffs
16
17 IRPINO LAW FIRM
   BY: ANTHONY IRPINO, ESQUIRE
18 2216 Magazine Street
   New Orleans, Louisiana 70130
19 Airpino@irpinolaw.com
   (504) 525-1500
20 Representing the Plaintiffs
21
22
23
24

Page 11

1  APPEARANCES VIA STREAM (CONTINUED):
2
3  GALLOWAY JOHNSON TOMPKINS BURR and SMITH
   BY: CARLINA C. EISELEN, ESQUIRE
4  One Shell Square
   701 Poydras Street, 40th Floor
5  New Orleans, Louisiana 70139
   (504) 525-6802
6  ceiselen@gjtbs.com
   Representing Interior/Exterior
7  Building Supply
8
   HEARD & MEDACK, P.C.
9  BY: JAMES DAVIS, ESQUIRE
   9494 Southwest Freeway, Suite 700
10 Houston, Texas 77074
   (713) 772-6400
11 jdavis@heardmedackpc.com
   Representing CastleRock Communities, L.P.
12
13
   HUNTON & WILLIAMS LLP
14 BY: A. TODD BROWN, ESQUIRE
   Bank of America Plaza
15 101 South Tryon Street
   Suite 3500
16 Charlotte, North Carolina 28280
   (704) 378-4700
17 tbrown@hunton.com
   Representing Stock Building Supply, LLC
18
19
   SHER GARNER CAHILL RICHTER KLEIN &
20 HILBERT, L.L.C.
   BY: MATTHEW C. CLARK, ESQUIRE
21 909 Poydras Street
   Suite 2800
22 New Orleans, Louisiana 70112
   (504) 299-2100
23 mclark@shergarner.com
   Representing the Southern Home
24 Defendants

Page 12

1  APPEARANCES VIA STREAM (CONTINUED):
2
3  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   BY: CLINTON DOCKERY, ESQUIRE
4  51 Madison Avenue, 22nd Floor
   New York, New York 10010
5  (212) 849-7000
   clintondockery@quinnemanuel.com
6  Representing Chartis Select Insurance
   Company and Related Chartis Insurers
7
8  JONES, WALKER, WAECHTER, POITEVENT,
   CARRERE & DENEGRE LLP
9  BY: MEGAN E. DONOHUE, ESQUIRE
   600 Jefferson Street, Suite 1600
10 Lafayette, Louisiana 70501
   (337) 262-9062
11 mdonohue@joneswalker.com
   Representing Fireman's Fund Insurance
12 Company
13
   DEUTSCH, KERRIGAN & STILES
14 BY: MELISSA M. SWABACKER, ESQUIRE
   755 Magazine St.
15 New Orleans, Louisiana 70130
   (504) 581-5141
16 mswabacker@dkslaw.com
   Representing Landmark American
17 Insurance Company
18
19 WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
   BY: SHUBHRA MASHELKAR, ESQUIRE
20 3344 Peachtree Road, NE
   Suite 2400
21 Atlanta, Georgia 30326
   (404) 876-2700
22 Smashelkar@wwhgd.com
   Representing Various Banner
23 Defendants
24

Page 13

1
2           - - -
          I N D E X
3  WITNESS              PAGE NO.
   TINGHUAN FU
4
5    By Mr. Spano          22
     By Mr. Meunier        37
6    By Mr. Gonzalez      111
7    By Mr. Spano         124
8           - - -
          E X H I B I T S
9
10 NO.      DESCRIPTION    PAGE NO.
11 Fu-1        Information on the    59
              Members to the
12            Board of Directors,
              Members to the
13            Board of
              Supervisors and
14            Managers of
              Shandong Taihe
15            Dongxin Co., Ltd.,
              Bates stamped TG
16            0020710
17 Fu-1A       Document in          59
              Chinese, Bates
18            stamped TG 0020710
19 Fu-2        Information on       60
              Directors,
20            Supervisors and
              Managers of
21            Shandong Taihe
              Dongxin Co., Ltd.,
22            Bates stamped TG
              0020712
23 Fu-2A       Document in          60
              Chinese, Bates
24            stamped TG 0020712

Page 14

```
 1
 2   Fu-3      Contract, Bates    98
              stamped TG 0001684
              and TG 0001685
 3
     Fu-4      Contract, Bates   101
 4            stamped TG 00019854
              through TG 00019857
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 16

```
 1   appearing for the Plaintiffs'
 2   Steering Committee in the MDL.
 3       MR. DAVIS:  Leonard Davis on
 4   behalf of the Plaintiffs' Steering
 5   committee and Plaintiffs' Liaison
 6   Counsel.
 7       MS. BASS:  Hilarie Bass from
 8   Miami, Florida on behalf of the
 9   Home Builders Steering Committee.
10       MR. GONZALEZ:  Good
11   afternoon.  Ervin Gonzalez on
12   behalf of the PSC and the MDL
13   liaison states.
14       MR. MONTOYA:  Patrick
15   Montoya on behalf of the PSC and
16   the MDL liaison states' counsel.
17       MR. SLAUGHTER:  Brian
18   Slaughter from McKenry, Dancigers,
19   Dawson & Lake.  I'm here
20   representing Atlantic Homes, LLC.
21       MR. BRENNER:  Theodore
22   Brenner.  I represent Tobin
23   Trading in the Germano action.
24       MR. HARDT:  Kenneth Hardt, I
```

Page 15

```
 1           - - -
 2       THE VIDEOTAPE TECHNICIAN:
 3   We are now on the record.  My name
 4   is Dan Lawlor.  I'm a videographer
 5   for Golkow Technologies.
 6       Today's date is January 10,
 7   2012, and the time is 1:30 p.m.
 8       This video deposition is
 9   being held in Hong Kong, China in
10   the matter of Chinese Drywall
11   Litigation for the United States
12   District Court, Eastern District
13   of Louisiana, MDL Number 2047 and
14   cross-noticed in various other
15   actions.
16       The deponent today is Fu,
17   Tinghuan.
18       Will Your Honor and all
19   those present state your presence
20   for the record.
21       THE COURT:  Judge Eldon
22   Fallon, Eastern District of
23   Louisiana.
24       MR. MEUNIER:  Gerry Meunier
```

Page 17

```
 1   represent Venture Supply in the
 2   Germano action and in the
 3   Alexander state court action.
 4       MS. BYRNE:  Jane Byrne from
 5   Quinn Emanuel on behalf of the
 6   Chartis insurers.  With me is my
 7   colleague, Julia Beskin.
 8       MR. SEXTON:  Mike Sexton for
 9   certain Banner Supply entities.
10       MR. BLACK:  David Black for
11   the State of Louisiana, with
12   reservations that are pending in
13   our motion to remand.
14       MR. LEVIN:  Arnold Levin,
15   lead counsel, Plaintiffs' Steering
16   Committee.
17       MR. SPANO:  Frank Spano for
18   the defendants, Taishan Gypsum and
19   TTP.
20       MR.CHEN:  Eugene Chen from
21   Hogan Lovells for Taishan Gypsum
22   and TTP.
23       THE VIDEOTAPE TECHNICIAN:
24   The court reporter today is Linda
```

Confidential - Subject to Further Confidentiality Review

Page 18

1 Golkow. Your Honor, please
2 proceed.
3         - - -
4         TINGHUAN FU, after having
5 been duly sworn, was examined and
6 testified as follows:
7         - - -
8         THE WITNESS: Yes, I do.
9         THE COURT: Have a seat,
10 please.
11         You may proceed, Counsel.
12         - - -
13         EXAMINATION
14         - - -
15 BY MR. SPANO:
16     Q.   Mr. Fu, who is your current
17 employer?
18     A.   Taishan Gypsum Company,
19 Limited.
20     Q.   What position do you hold
21 with Taishan Gypsum?
22     A.   My current position or prior
23 position? What time period?
24     Q.   What's your job now?

Page 19

1     A.   I am the manager of the
2 sales company. I'm also the deputy
3 general manager in charge of sales.
4     Q.   When did you first start
5 working for the company?
6     A.   July 1999.
7     Q.   What was the name of the
8 company at that time?
9     A.   Shandong Taihe Dongxin
10 Company, Limited.
11     Q.   What was your position when
12 you joined the company in July of 1999?
13     A.   When I first joined the
14 company, I was a salesperson.
15     Q.   What did you do as a
16 salesperson?
17     A.   To sell gypsum board all
18 over China.
19     Q.   How long did you work as a
20 salesperson?
21     A.   As a salesperson, I worked
22 for over two years.
23     Q.   Until approximately 2001 you
24 worked as a salesperson?

Page 20

1     A.   In the year 2001, I was a
2 deputy director of sales department.
3     Q.   What did you do as deputy
4 director of the sales department
5 beginning in 2001?
6     A.   To assist our director of
7 sales for daily management.
8     Q.   Who was the director of
9 sales in 2001?
10     A.   Mr. Li Ruizhong.
11     Q.   To your knowledge, did the
12 company have any export sales between
13 1999 and 2001?
14     A.   I don't know. No, not in
15 that period of time.
16     Q.   What was your next position
17 after deputy sales manager?
18     A.   In May 2004, I became the
19 sales manager. The Li that I mentioned
20 earlier, Director Li, retired.
21     Q.   What were your major
22 responsibilities as sales manager
23 beginning in May 2004?
24     A.   To manage the sales

Page 21

1 assignment.
2     Q.   Please explain what you mean
3 by "sales assignment."
4     A.   Which is to sell gypsum
5 boards.
6     Q.   As sales manager, did you
7 have anyone that you supervised?
8     A.   I supervised the
9 salespeople.
10     Q.   Approximately how many
11 salespeople did Taishan Gypsum have in
12 the 2004/2005 time frame?
13     A.   More than 40, less than 50.
14     Q.   After 2005, between 2006 and
15 2008, did the number of salesmen go up or
16 down significantly?
17     A.   A few people left, about six
18 or seven people left to TTP.
19     Q.   When did that occur?
20     A.   2006.
21     Q.   Do you recall the names of
22 the people who left the TG sales
23 department to join TTP?
24     A.   There was a Peng Wenlong and

Page 22

1 Yang Jiapo, Kong Qingguo, Che Gang. And
2 also a Hou Jie and a few more which I
3 cannot recall. I cannot recall their
4 names.
5 Q. Did you remain as the sales
6 manager of Taishan Gypsum through the end
7 of 2007?
8 A. I still am until today.
9 Q. To your knowledge, when did
10 Taishan Gypsum begin getting involved in
11 export sales?
12 A. Perhaps 2005, the second
13 half of 2005.
14 Q. What happened in the second
15 half of 2005 in terms of the company
16 getting involved in export sales?
17 A. What do you mean, what
18 happened?
19 Q. Describe generally how the
20 company started getting involved in
21 export sales?
22 A. At the time, some trading
23 companies came to our company and also
24 some foreign customers came to our

Page 23

1 company.
2 Q. How did the company respond
3 to those events?
4 A. For these matters, I
5 arranged somebody who was able to speak
6 foreign language, such as Mr. Peng
7 Wenlong, to greet these people.
8 Q. Did there come a time when
9 you assigned any other employees in TG to
10 get involved in export sales besides Mr.
11 Peng Wenlong?
12 A. I only arranged Peng Wenlong
13 to be in charge of receiving the other
14 people, but I'm not sure whether he has
15 arranged other people to assist him of
16 doing that.
17 Q. Did you, yourself, have any
18 contacts with the trading companies or
19 foreign companies that came to TG in
20 connection with export sales?
21 A. No. Because I don't
22 understand English, only Peng Wenlong
23 could communicate with them.
24 Q. Did you supervise Mr. Peng

Page 24

1 Wenlong's activities in connection with
2 export sales?
3 A. Yes. I supervised Peng
4 Wenlong.
5 Q. What did you do to supervise
6 him?
7 A. At the time, because we were
8 not very familiar of exporting, so, I
9 told Mr. Peng Wenlong some principles of
10 dealing with the foreign customers and
11 trading companies, being that contracts
12 should be signed in China and the
13 products should be loaded in China. I
14 have also told him the pricing and the
15 risk that come along with it and also the
16 principle of prepayment. Because at the
17 time, we were not very familiar with
18 foreign trading, so, I arrange him to get
19 familiar with these principles.
20 Q. Other than establishing the
21 principles for dealing with export sales,
22 did you do anything else in terms of
23 supervising the export sales activities?
24 A. For example, the contracts

Page 25

1 that we sign and the price of the
2 contracts, I will have to have the final
3 saying of that. And also the
4 specification that required by the
5 customers, whether the products could be
6 manufactured, it was also my
7 responsibility to communicate with the
8 manufacturing department.
9 Q. Did Peng Wenlong get your
10 approval for each of the export sales
11 that the company entered into?
12 A. No.
13 Q. Did he have the authority to
14 enter into contracts involving export
15 sales without your approval?
16 A. Yes. For example -- yes.
17 Q. Was it the practice that he
18 would consult with you regarding the
19 terms of each sale?
20 A. What is it? What is it that
21 he needed to consult me with?
22 Q. I'll withdraw the question.
23 Did Mr. Peng Wenlong consult
24 with you regarding the pricing of sales?

Page 26

1    A.   For the pricing, as long as
2  the money could arrive and as long as it
3  has been a pricing that we agreed prior
4  to that.  Of course, for the first time
5  he had to consult me, but afterwards, he
6  didn't have to consult me for pricing.
7    Q.   Do you recall Mr. Peng
8  consulting with you regarding any sales
9  to American customers?
10       MR. GONZALEZ:  Your Honor,
11    can we have a date on those, a
12    time reference on those?
13       THE COURT:  I'm sorry.
14    Let's ask time reference so that
15    we understand what the time frame
16    is.
17 BY MR. SPANO:
18    Q.   During what period did Mr.
19  Peng Wenlong work in foreign sales for
20  Taishan Gypsum?
21    A.   2005, from the second half
22  of 2005.
23    Q.   Until when?
24    A.   What is it that you said?

Page 27

1  But in February of 2006, he went to TTP.
2    Q.   During that time period,
3  approximately the second half of 2005,
4  until when Mr. Peng went to work for TTP,
5  did he consult with you regarding any
6  sales or potential sales to American
7  customers?
8       INTERPRETER:  Interpreter
9    clarification.
10       THE WITNESS:  Not really for
11    the sales, but for the first time,
12    when a contract was entered, I
13    would need to calculate the cost,
14    the thickness of the gypsum board.
15    But for the contracts, afterwards,
16    he did not need to consult me.
17 BY MR. SPANO:
18    Q.   Do you recall Mr. Peng
19  consulting with you regarding a contract
20  for 12.7 millimeter thick drywall in the
21  second half of 2005?
22    A.   I'm aware of that.  He
23  consulted me for the pricing of the
24  specification of 12.7 millimeter

Page 28

1  thickness.
2    Q.   Did he consult with you
3  regarding any other aspect of that sale
4  of 12.7 millimeter drywall?
5    A.   I was not in charge of other
6  aspects of the business as of who did he
7  sell it to.  I was only in charge of the
8  cost to produce gypsum board of this
9  thickness and the pricing of the gypsum
10  board accordingly.
11    Q.   Do you recall learning the
12  name of the customer of the 12.7
13  millimeter drywall?
14    A.   I don't know.
15    Q.   Do you recall whether the
16  customer for the 12.7 millimeter drywall
17  was an American company?
18    A.   No, I don't know.
19    Q.   Do you recall hearing the
20  name of a company called Venture Supply
21  in 2005 or 2006?
22    A.   I don't understand English,
23  so, I don't know what is that at all.
24    Q.   Were you introduced to any

Page 29

1  customers for 12.7 millimeter drywall in
2  2005 or 2006?
3    A.   I was introduced to or did I
4  introduce to someone else?  What?
5    Q.   I'll withdraw the question.
6       Do you recall meeting with
7  or speaking with any customers or
8  potential customers for the 12.7
9  millimeter thick drywall in 2005 or 2006?
10    A.   No.
11    Q.   Have you ever held any
12  positions in TTP?
13    A.   I'm the director of TTP.
14    Q.   Are there other directors of
15  TTP?
16    A.   Yes.
17    Q.   Who are they?
18    A.   There are three directors,
19  the others being Peng Shiliang and Wang
20  Fenqin.
21    Q.   During what time period have
22  you been a director of TTP?
23    A.   Starting from February 2006
24  until after three years according to the

Confidential - Subject to Further Confidentiality Review

Page 30

1 company rule. However, there was no
2 election after three years. That was the
3 end of it. And TTP in the year 2007
4 stopped its operation, so, there was no
5 reelection.
6     Q.   Did T -- withdrawn.
7         What were your main
8 responsibilities when you served on the
9 board of TTP?
10     A.   To review and discuss the
11 reports of the company, annual reports.
12 To make -- to review the reports. And
13 sometimes our directors meet for some
14 daily matters as well.
15     Q.   Was there an annual report
16 for TTP for 2006?
17     A.   Yes.
18     Q.   For 2007?
19     A.   Yes.
20     Q.   Did you see both of those
21 annual reports?
22     A.   Yes.
23     Q.   Did those annual reports
24 contain any information regarding export

Page 31

1 sales?
2     A.   The profit distribution and
3 performance, all that. But for the
4 sales, it would not be reflected in the
5 report. How could the sales be reflected
6 in the report?
7     Q.   Were TTP sales reflected in
8 the annual report in any way?
9     A.   To be reflected in any way?
10     Q.   I'll withdraw the question.
11         Did the TTP annual reports
12 that you saw show the amount of sales of
13 drywall by TTP?
14     A.   There was -- the volume of
15 sales included square meters that was
16 sold.
17     Q.   Was the volume of sales
18 differentiated in any way between
19 domestic sales and export sales?
20     A.   There was a volume, but
21 which one you are talking about? I know
22 that there was a total sales volume.
23     Q.   In addition to showing total
24 sales, did the annual reports also show

Page 32

1 the portion of the total sales that was
2 export sales?
3     A.   No.
4     Q.   Did TTP have a sales
5 manager?
6     A.   TTP has a responsible
7 person, who is Peng Wenlong.
8     Q.   Was Peng Wenlong the person
9 responsible for sales of TTP?
10     A.   Yes.
11     Q.   Did you supervise Peng
12 Wenlong's sales activities in TTP?
13     A.   I was not in charge. I was
14 only the director.
15     Q.   As a director, did you play
16 any role in supervising TTP's sales?
17     A.   When we first formed the
18 board of directors, we had elected Peng
19 Shiliang as the chairman of the board of
20 directors. I was told that whenever
21 there was a need for guidance in the
22 business, I was the one to ask.
23         INTERPRETER: Interpreter
24     clarification.

Page 33

1         THE WITNESS: Basically I
2     did not give any guidance.
3 BY MR. SPANO:
4     Q.   Did Mr. Peng Shiliang give
5 any guidance to the sales activities of
6 TTP?
7     A.   I'm not sure about that.
8 He's the general manager.
9     Q.   Did Peng Wenlong consult
10 with you regarding any of the sales
11 transactions of TTP?
12     A.   He did not consult me.
13         MR. SPANO: Pass the
14     witness.
15         THE COURT: Are you
16     finished?
17         MR. SPANO: Yes, sir.
18         THE COURT: You tender the
19     witness?
20         MR. SPANO: Yes.
21         - - -
22         EXAMINATION
23         - - -
24 BY MR. MEUNIER:

Confidential - Subject to Further Confidentiality Review

Page 34

1    Q.   Good afternoon, Mr. Fu.
2         You testified that you are
3   the manager of the sales company and the
4   deputy general manager in charge of sales
5   for Taishan Gypsum today, true?
6    A.   Correct.
7    Q.   Are those different
8   positions?
9    A.   I was the general -- I was
10  the deputy general manager and the
11  director of the sales company.  There's
12  supposed to be a separate director for
13  the sales company, but there was none of
14  that.  So, I also became the manager of
15  the sales company.
16   Q.   What is the name of the
17  sales company?
18   A.   Actually, it's only a
19  department.  It is a department that was
20  in charge of sales for Taishan Gypsum
21  Company.
22   Q.   Who is the general manager
23  in charge of sales?
24        INTERPRETER:  Interpreter

Page 35

1   clarification.
2         THE WITNESS:  There was a
3   general manager Jia, J-I-A, above
4   me, but I am the deputy general
5   manager, and my last name is Fu,
6   which also, coincidentally, means
7   deputy in Chinese.
8         MR. CHEN:  I'm sorry.  At
9   least half of his comments weren't
10  translated.
11        THE INTERPRETER:  Can you
12  tell me what was that?
13        MR. CHEN:  I shouldn't, but
14  you might ask him.
15        THE COURT:  Let him restate
16  it.
17        INTERPRETER:  Well, he's
18  further explaining, so before
19  that, do you want to --
20        THE COURT:  No.  No.  You
21  can comment.  Ask him to restate
22  it.
23        THE WITNESS:  I was the
24  deputy general manager in charge

Page 36

1   of sales.  I was also the manager
2   of the sales company.
3   BY MR. MEUNIER:
4    Q.   Who was your boss as deputy
5   general manager in charge of sales?
6    A.   On top of me was General
7   Manager Jia, J-I-A.  I report to him.
8    Q.   Who reports to you as boss
9   as deputy general manager in charge of
10  sales?
11   A.   Because I'm the manager of
12  sales, the salespeople report to me.
13   Q.   And who is your boss as the
14  manager of the sales department?
15   A.   Who is my boss?  That would
16  be General Manager Jia.
17   Q.   Is that Mr. Jia who gave his
18  deposition earlier today?
19   A.   Yes.
20   Q.   So, as I understand it, in
21  the area of sales, you report at Taishan
22  Gypsum to Mr. Jia as your boss?
23   A.   Correct.
24   Q.   And all of the sales

Page 37

1   personnel at Taishan Gypsum report to you
2   as their boss, is that true?
3    A.   Yes.
4    Q.   And that includes sales
5   personnel involved in export sales, true?
6         MR. SPANO:  Objection.
7         THE COURT:  Do you have an
8   objection?  Did you object?
9         MR. SPANO:  Yeah.  I object
10  to --
11        THE COURT:  I overrule the
12  objection.
13        Look, let me tell the
14  witness something.  She has to
15  interpret what you're saying.  So,
16  give her an opportunity to
17  interpret.  Pause in between your
18  paragraphs so she can catch up
19  with you.
20        Do you want to restate the
21  question?
22        MR. MEUNIER:  I didn't get a
23  response.
24  BY MR. MEUNIER:

Confidential - Subject to Further Confidentiality Review

Page 38

1    Q.   The question is, is it true
2  that all sales personnel, including those
3  involved in export sales, report to you
4  as their boss?
5    A.   I'm a manager.  Not all the
6  salespeople report to me.
7    Q.   Who else do salespeople
8  report to as their boss other than you?
9    A.   I have a deputy manager.
10    Q.   Who is that?
11    A.   Xue Shufeng.  X-U,
12  S-H-U-F-E-N-G.  Correction.  X-U-E, last
13  name, instead of X-U.
14    Q.   Does Mr. Xue report to you
15  on the activities of the salespeople who
16  report to him?
17    A.   It's not necessary.
18    Q.   Does Mr. Xue, therefore,
19  have full authority to supervise the
20  sales personnel, including those in
21  export sales?
22    A.   He managed in assistance of
23  me.
24    Q.   You told us that there were

Page 39

1  40 to 50 sales employees at TG before TTP
2  was formed in 2006; is that correct?
3    A.   Which year was that?
4    Q.   Before TTP was formed in
5  2006 --
6    A.   Yes.
7    Q.   -- is it true there were 40
8  to 50 salespeople working for TG?
9    A.   Less than 50.
10    Q.   But more than 40?
11    A.   Correct.
12    Q.   How many were involved in
13  export sales?
14    A.   You mean the employee of TG?
15    Q.   Yes.
16    A.   During the time 2005 and
17  2006, it was Peng Wenlong who was
18  assigned to be in charge of that.  Some
19  people who understood foreign language
20  was assigned to greet those people.  But
21  we did not assign in detail who would be
22  responsible for that.
23    Q.   How many others besides Peng
24  Wenlong were assigned to deal with

Page 40

1  foreign customers?
2    A.   Che Gang, Yang Jiapo.  They
3  are also salespeople.
4    Q.   Yang Jiapo also known as
5  Apollo Yang?
6    A.   I don't know he has this
7  name.
8    Q.   Che Gang also known as Frank
9  Clem?
10    A.   I'm not sure.
11    Q.   I'm sorry.  I misspoke.  Che
12  Gang also known as Bill Cher?
13        MR. SPANO:  Objection to
14        form.
15        THE WITNESS:  I don't know.
16  BY MR. MEUNIER:
17    Q.   Do you know why training
18  companies and foreign customers came to
19  your company in the second half of 2005,
20  which you say is when export sale
21  activity began?
22        MR. SPANO:  Objection to
23        form.  I think it came out
24        training, and I think he meant to

Page 41

1    say trading, but he can clarify.
2  BY MR. MEUNIER:
3    Q.   Training companies is what I
4  heard him say.
5        THE COURT:  Let him answer
6        the question.  I'll overrule the
7        objection.
8        THE WITNESS:  I also don't
9        know why they came to our company.
10  BY MR. MEUNIER:
11    Q.   Did the foreign customers
12  who came to your company include the
13  United States?
14    A.   I don't know.  I already
15  responded to you earlier.
16    Q.   Do you know which foreign
17  customers came to your company?
18    A.   I don't know.
19    Q.   When Peng Wenlong, Yang
20  Jiapo and Che Gang left to become
21  employees of TTP in 2006, were they given
22  any principles for dealing with foreign
23  customers?
24    A.   They were in charge of the

Confidential - Subject to Further Confidentiality Review

Page 42

1  detailed operation.  I was not.
2      Q.   To your knowledge, did any
3  supervisor give to these three sales
4  personnel guidance on how to deal with
5  foreign customers when they became
6  employees of TTP in 2006?
7      A.  I don't know.
8      Q.   Who supervised Peng Wenlong,
9  Yang Jiapo and Che Gang as sales
10  employees of TTP?
11      A.   TTP's general manager, which
12  I'm not sure about their detailed
13  arrangements.
14      Q.   And TTP's general manager is
15  Peng Shiliang?
16      A.   Peng Shiliang is the general
17  manager.
18      Q.   You told us that one of the
19  principles you gave Peng Wenlong for
20  dealing with export sales was that
21  contracts should be signed in China.  Is
22  that true?
23      A.   Yes, because that was our
24  first time dealing with exporting.  I did

Page 43

1  not quite -- I was not quite familiar
2  with that.  In order to decrease the
3  risk, we decided to do that.
4      Q.   What risk are you referring
5  to?
6      A.   To deliver in China, to pay
7  in China.  We were afraid that we were
8  not going to get the money.
9      Q.   Aside from the risk of not
10  getting paid, did you see any other risks
11  in making sales contracts with foreign
12  customers?
13      A.   I don't know.  It was only
14  in the second half year of 2005.  I have
15  not done that before.  That's all I could
16  think of.
17      Q.   Did you give Mr. Peng
18  Wenlong any other instructions about
19  contracts being signed, other than the
20  ones you have mentioned so far today?
21      A.   No.
22      Q.   Did Peng Wenlong have a
23  company seal to use in signing sales
24  contracts with foreign customers?

Page 44

1      MR. SPANO:  Objection to
2  form.
3      THE COURT:  If he knows, he
4  can answer.  If he doesn't, he
5  doesn't.
6      MR. SPANO:  Your Honor, it's
7  a question of time frame, which
8  company.
9      THE COURT:  That's a
10  legitimate objection.  I sustain
11  it.
12      MR. MEUNIER:  Let me break
13  it down.
14  BY MR. MEUNIER:
15      Q.   First I ask you this
16  question for the period from the second
17  half of 2005 to February of 2006 when
18  Peng Wenlong was involved in export sales
19  for TG.  During that period of time, did
20  he have a company seal to use for signing
21  sales contracts with foreign customers?
22      A.   What company seal are you
23  talking about?  I don't understand.
24      Q.   A company seal of either

Page 45

1  Shandong or Taishan Gypsum?
2      A.   I don't know that.
3      Q.   Did Peng Wenlong, to your
4  knowledge, ever have a company seal of
5  any kind to use for signing contracts?
6      A.   I don't know.
7      THE COURT:  Is it a seal or
8  a stamp?
9      MR. MEUNIER:  Am I using a
10  word that might be confusing?
11      INTERPRETER:  In Chinese, it
12  is the same translation.
13  BY MR. MEUNIER:
14      Q.   Did any of the sales
15  personnel for Taishan Gypsum have company
16  seals or stamps to use in signing
17  contracts?
18      A.   The stamps are necessary
19  when signing of a contract.
20      Q.   Yes.
21      Did Peng Wenlong have a
22  stamp that he was given by the company,
23  by Taishan Gypsum?
24      A.   I don't know.

Confidential - Subject to Further Confidentiality Review

Page 46

1    Q.   Was there any restriction on
2  who got stamps?
3    A.   I believe there should be
4  somebody who is in charge of the stamps.
5  The stamps cannot be easily accessed by
6  just anyone.
7    Q.   So who is in charge of the
8  stamps, Mr. Fu?
9    A.   It should be somebody in the
10 office. I'm not sure who exactly that
11 person is.
12   Q.   Are you saying that stamps
13 are kept in a safe or locked so that
14 sales personnel cannot get to them
15 without permission?
16   A.   I don't know about the
17 stamps. I don't know how -- or them
18 being managed. I'm not sure about that.
19 I'm not sure about the management of the
20 stamps.
21   Q.   Who, if not you, would know
22 about the management of the stamps for
23 Taishan Gypsum?
24   A.   I don't know the stamps. I

Page 47

1  don't know the management of the stamps.
2  I go out every day for sales. I don't
3  know who is responsible for the stamps
4  and who manages the stamps.
5    Q.   But is it true that you
6  assume that a sales personnel who uses a
7  stamp has permission from the company to
8  use it?
9       MR. SPANO: I object to the
10   form.
11      THE COURT: Restate that. I
12   agree. Restate the question.
13 BY MR. MEUNIER:
14   Q.   If a salesperson employed by
15 Taishan Gypsum has possession of a stamp
16 and uses it, is it true that he got the
17 stamp with permission from the company?
18   A.   If he thinks it is
19 reasonable, he could put a stamp on it.
20 As long as he thinks that, there is no
21 risk, because he has the money, he could
22 stamp it.
23   Q.   And that's true for any
24 salesperson working for Taishan Gypsum?

Page 48

1    A.   I know for the salesperson,
2  that's the case. I'm not sure about
3  other people.
4    Q.   You told us that one of the
5  principles you gave Mr. Peng Wenlong for
6  export sales contracts was that the
7  products should be loaded in China. Is
8  that true?
9    A.   Yes.
10   Q.   Was it okay if Taishan
11 Gypsum arranged for the freight costs of
12 shipping the product to a foreign country
13 after loading?
14      MR. SPANO: I object to the
15   form.
16      THE COURT: I'm sorry.
17   Object to the form.
18      MR. SPANO: On vagueness.
19      THE COURT: If you can put
20   some time in there.
21 BY MR. MEUNIER:
22   Q.   When you communicated to Mr.
23 Peng Wenlong that product should be
24 loaded in China for export sales

Page 49

1  agreements that he made, did you tell him
2  that Taishan Gypsum could not pay for
3  freight costs in shipping the product
4  after it was loaded to a foreign country?
5    A.   I'm not sure about that
6  part. I only know according to the
7  principle that we had been following for
8  local transactions, the manufacturer
9  would produce, and the products would be
10 verified and loaded in China. I'm not
11 sure about the trading part.
12   Q.   You told us that Peng
13 Wenlong did not get authority from the
14 company on all of the export sales
15 agreements he signed. Is that true?
16   A.   I only said that as long as
17 the price is reasonable and as long as he
18 could get back the payment, he could go
19 ahead with it.
20   Q.   Do you know of any sales
21 agreements with foreign customers made by
22 Peng Wenlong which were made without the
23 authority of your company?
24   A.   I don't know.

Confidential - Subject to Further Confidentiality Review

Page 50

1      Q.   Do you know of any sales
2   agreements made by Che Gang with foreign
3   customers that were made without the
4   authorization of your company?
5      A.   I don't know.
6      Q.   You referred to a contract
7   sale -- I'm sorry -- a sales contract in
8   2005 or 6 dealing with 12.7 millimeter
9   thickness of drywall.  Do you remember
10  that?
11     A.   I did mention the thickness
12  of the gypsum board, and I did say that I
13  calculated for the cost and the price of
14  that.
15     Q.   Are you saying, Mr. Fu, that
16  that sales contract was not authorized by
17  your company?
18     A.   I only have the guidance
19  that as long as the price is reasonable
20  and the money can be received, they could
21  go ahead with it.  That's all I said.
22     Q.   So the record is clear, I
23  want to be sure I understand your
24  testimony.

Page 51

1           You know of no sales
2   contract entered into with a foreign
3   customer by Taishan Gypsum sales
4   personnel that was unauthorized by the
5   company; is that correct?
6      A.   Authorization?  What is the
7   definition of authorization?
8   Authorization is -- let me tell you that
9   we authorize all the salespeople as a way
10  of doing business in China to do
11  business.  That's authorization.
12     Q.   So, your company, to your
13  knowledge, has approved all export sales
14  agreements with foreign customers that
15  have been made by your sales personnel to
16  this date; is that true?
17     A.   You have to specify what
18  kind of agreement are you talking about.
19  For the agreements which we have already
20  received a payment, that would be a valid
21  agreement, not including the oral
22  agreement.
23     Q.   Have you or anyone, to your
24  knowledge, on behalf of Taishan Gypsum

Page 52

1   ever advised a foreign customer that a
2   salesperson did not have authority to
3   enter into a sales agreement for drywall?
4      A.   Can you repeat your
5   question?
6           THE COURT:  Why don't you
7      read it again.
8           THE WITNESS:  I have never
9      met a foreign customer.  How could
10     I even tell them all the above?
11  BY MR. MEUNIER:
12     Q.   Thank you.
13          And to your knowledge, sir,
14  no one else on behalf of Taishan Gypsum
15  has given that advice to a foreign
16  customer?  Is that true?
17     A.   I don't know.
18     Q.   During the time TTP operated
19  between February 2006 and 2007, was the
20  nature of its drywall business different
21  from the nature of the business of
22  Taishan Gypsum?
23     A.   The product, gypsum boards,
24  are all the same.

Page 53

1      Q.   Were the sales and marketing
2   activities of TTP the same as the sales
3   and marketing activities of TG?
4      A.   I don't know that of TTP.  I
5   only know TG.  I'm not in charge of that.
6      Q.   You were a director at TTP,
7   were you not?
8      A.   I'm the director, but I was
9   not in charge of the sales.
10     Q.   Do you know of any
11  differences in the sales practices of TTP
12  and TG?
13     A.   I don't know if there is any
14  differences.
15     Q.   Do you know of any
16  differences in the marketing practices of
17  TTP and TG?
18     A.   I don't know if there is any
19  differences.  I have never compared them.
20     Q.   You told us that the 2006
21  and 2007 annual reports of TTP gave the
22  total volume of drywall sales in square
23  meters.  Is that true?
24     A.   Correct.

Page 54

1  Q.  To know the total volume of
2  those sales, the company needed to know
3  the total volume of export sales; is that
4  true?
5  A.  There was specific people
6  who are in charge of drafting the annual
7  report. I was only in charge of
8  reviewing it.
9  Q.  Who would know the total
10  volume of export sales for TTP for 2006
11  and 2007?
12  A.  I don't know that. I only
13  know in the year 2006, it was 26 million.
14  And in 2007, it was 40 million. I do not
15  know the detailed categories.
16  THE COURT:  Okay. We have
17  to change the tape at this time.
18  We'll take a break for 15 minutes.
19  THE VIDEOTAPE TECHNICIAN:
20  Off the record. The time is 2:51,
21  end of Tape Number 2.
22  - - -
23  (Whereupon, a recess was
24  taken from 2:51 p.m. until 3:08

Page 55

1  p.m.)
2  - - -
3  THE COURT:  Sir, you are
4  still under oath.
5  THE VIDEOTAPE TECHNICIAN:
6  We're going back on the video
7  record. The time is 3:08.
8  THE COURT:  You may proceed,
9  Counsel.
10  BY MR. MEUNIER:
11  Q.  Mr. Fu, during the period of
12  your entire employment by Shandong and
13  Taishan Gypsum, and during the period of
14  time as a director of TTP, do you know of
15  any written policy of any of those
16  companies that specifically dealt with
17  contracts for the foreign sale of
18  drywall?
19  A.  Never.
20  Q.  Were sales personnel at
21  Shandong and Taishan Gypsum and then also
22  at TTP assigned e-mails for the purpose
23  of doing business?
24  MR. SPANO:  Object to the

Page 56

1  form. The name Shandong is a
2  place.
3  MR. MEUNIER:  Shandong Taihe
4  Dongxin.
5  THE COURT:  That's the full
6  name, or is it just the place of
7  the location?
8  MR. CHEN:  That's what we've
9  agreed as the shortened form of
10  the company name as opposed to
11  Shandong, which alone is just a
12  province.
13  THE COURT:  Right.
14  BY MR. MEUNIER:
15  Q.  Shall I ask the question
16  again? I'll ask the question.
17  INTERPRETER:  Do you want me
18  to repeat it in Chinese? I have
19  it too.
20  MR. MEUNIER:  Just make sure
21  Shandong is spelled out.
22  (Interpreter repeats
23  question to witness.)
24  THE WITNESS:  They all have

Page 57

1  their own e-mails.
2  BY MR. MEUNIER:
3  Q.  Were they allowed to use
4  their own e-mails to conduct sales
5  business for these companies?
6  A.  We never have such
7  regulation nor have we any restriction
8  about that. As long as they get the
9  payment and have the deal done.
10  Q.  Were they also allowed to
11  use instant messaging to conduct sales
12  business?
13  A.  There is no such regulation,
14  nor was there any arrangement about that
15  either.
16  Q.  As long as they got the
17  money?
18  A.  Correct.
19  Q.  That was the main
20  requirement, wasn't it?
21  A.  Correct. In our local
22  business, that's the same way.
23  Q.  Right. But it's true in
24  your export business too. The main

Confidential - Subject to Further Confidentiality Review

Page 58

1 requirement was to get the money in
2 export sales, true?
3     A.   Correct.  As long as you
4 get -- I get the payment, I will ship out
5 the product for you.
6     Q.   Yes.  And you did that,
7 didn't you?  The company did that?
8     A.   That's my requirement to
9 them.
10     Q.   It was your requirement as
11 an employee of your company?
12     A.   That's my requirement.
13     Q.   Were sales personnel allowed
14 to use text messaging in sales activity
15 as long as they got the money?
16     A.   We don't have any
17 regulations about that.
18     Q.   So, text messaging was not
19 prohibited, true?
20     A.   It was not prohibited,
21 neither was there a regulation to permit
22 or not permit that.
23     Q.   Mr. Fu, let me show you a
24 document which has been Bates numbered TG

Page 59

1 20710.
2     A.   I don't understand.
3     MR. MEUNIER:  There's a
4 translation.
5     MS. BASS:  What Exhibit
6 Number will that be?
7     MR. MEUNIER:  This will be
8 Fu Number 1.
9         - - -
10     (Whereupon, Deposition
11 Exhibit Fu-1, Information on the
12 Members to the Board of Directors,
13 Members to the Board of
14 Supervisors and Managers of
15 Shandong Taihe Dongxin Co., Ltd.,
16 Bates stamped TG 0020710, and
17 Deposition Exhibit Fu-1A, Document
18 in Chinese, Bates stamped TG
19 0020710, was marked for
20 identification.)
21         - - -
22     MR. MEUNIER:  20710 is the
23 Bates Number.
24 BY MR. MEUNIER:

Page 60

1     Q.   Is it true, Mr. Fu, that you
2 are listed on this document as a member
3 of the board of supervisors of Shandong
4 Taihe Dongxin Company Limited?
5     A.   Supervisors, yes, I was a
6 supervisor.
7     Q.   And you were elected as a
8 member of the board of supervisors; is
9 that true?
10     A.   Correct.
11         - - -
12     (Whereupon, Deposition
13 Exhibit Fu-2, Information on
14 Directors, Supervisors and
15 Managers of Shandong Taihe Dongxin
16 Co., Ltd., Bates stamped TG
17 0020712, and Deposition Exhibit
18 Fu-2A, Document in Chinese, Bates
19 stamped TG 0020712, were marked
20 for identification.)
21         - - -
22     MR. MEUNIER:  And I show you
23 a document which has been Bates
24 numbered 20712.  I'll mark as Fu

Page 61

1 Number 2 the English and as Fu-2
2 the Chinese version of that
3 document.
4     MR. SPANO:  What number is
5 the exhibit?
6     MR. MEUNIER:  20712.  It's
7 Fu Number 2.
8 BY MR. MEUNIER:
9     Q.   Would you confirm that that
10 is your photograph and your correct
11 personal information as a member of the
12 board of supervisors of Shandong Taihe
13 Dongxin?
14     A.   Yes, yes.
15     Q.   For what period of time were
16 you a member of the board of supervisors
17 of Shandong Taihe Dongxin?
18     A.   From April 2005 to 2008.
19     Q.   When the company changed its
20 name to Taishan Gypsum, did you remain an
21 elected member of the board of
22 supervisors?
23     A.   Yes.
24     Q.   What is your understanding

Page 62

1 of the duties and responsibilities of a
2 supervisor of Shandong, or Taishan
3 Gypsum, as it was later called?
4     A.   To supervise and review the
5 ways the managers act according to the
6 company's regulations.  For those that
7 were not in compliance with regulations,
8 I would correct them.
9     Q.   Did you ever, as a member of
10 the board of supervisors of Shandong,
11 later called Taishan Gypsum, have the
12 need to correct a manager or director of
13 the company?
14     A.   No.
15     Q.   Were the export sales
16 activities of Shandong, later called
17 Taishan Gypsum, always conducted in
18 accordance with the shareholder
19 resolutions when you served as a
20 supervisor?
21     A.   We stopped doing that
22 afterwards.  TTP did it.
23     Q.   Up until the time TTP was
24 formed, is it true that the export sales

Page 63

1 activities of the directors of Shandong
2 and Taishan Gypsum were always conducted
3 in accordance with shareholder
4 resolutions?
5         MR. SPANO:  Objection,
6 foundation.
7         THE COURT:  Well, if he
8 knows, I'll let him do it.  What
9 is the foundation?  What's your
10 problem?
11         MR. SPANO:  The problem is
12 that there's no foundation that
13 there were shareholder resolutions
14 that addressed export sales.
15         THE COURT:  Let's ask him
16 that.
17         MR. MEUNIER:  Let me
18 rephrase the question.
19 BY MR. MEUNIER:
20     Q.   Up until the time TTP was
21 formed, is it true that the export sales
22 activities of the directors of Shandong
23 and Taishan Gypsum were always conducted
24 in accordance with the policies of those

Page 64

1 companies?
2     A.   First of all, exporting
3 policy, exporting policy, we never had a
4 policy for exporting policy.  How should
5 I put it?  What word should I put it?  We
6 have not emphasize on that.
7     Q.   You did have export sales
8 activity, correct?
9     A.   Yes, we do have the
10 activity, but...
11     Q.   And you had certain
12 guidelines for conducting that activity,
13 correct?
14     A.   No.  What do you mean by
15 "guidelines"?
16     Q.   Were there any company
17 practices for conducting export sales?
18     A.   The policy --
19         INTERPRETER:  Interpreter
20 clarification.
21         THE COURT:  Let's just
22 translate.  Let's not have any
23 discussions with the witness.
24 What did he say?  Let's restate

Page 65

1 the question.
2         INTERPRETER:  He repeated
3 what he said.  He had an accent,
4 so...
5         THE COURT:  Let's ask the
6 question again and then translate
7 it.
8 BY MR. MEUNIER:
9     Q.   Aside from getting paid,
10 were there any company requirements of
11 Shandong, or later Taishan Gypsum,
12 concerning the export sales of drywall to
13 foreign customers?
14         THE COURT:  Gerry, he was
15 going to object.  You've got to
16 put time on there.
17 BY MR. MEUNIER:
18     Q.   For the time frame starting
19 when export sales activity began at
20 Taishan Gypsum or Shandong, ending when
21 TTP was formed.
22     A.   Yes.
23     Q.   What were they?
24     A.   My requirement was an oral

Page 66

1 requirement, which we did not set the
2 exporting as our main direction of sales.
3 Because of the value of the exporting
4 goods were low, the cost for shipment was
5 high. It was easy to be damaged. We
6 would not have that as a direction.
7 Wherever there is a customer who come
8 with money, we would, however, do
9 business with them. That's our guidance.
10     Q.   Including a customer from
11 the United States, true?
12     A.   All tradings, all
13 exportings.
14     Q.   Including the United States?
15     A.   Yes.
16     Q.   So, my question, sir, is
17 that for the entire time you served as a
18 supervisor for Shandong and then Taishan
19 Gypsum, did you ever know those
20 guidelines to be violated?
21     A.   I don't know.
22     Q.   How often did the Shandong
23 board of supervisors meet when you were a
24 member?

Page 67

1     A.   During a board of directors
2 meeting or during the meeting of the
3 supervisors, maybe once or twice a year.
4     Q.   How often did the board of
5 supervisors of Taishan Gypsum meet when
6 you were a member?
7     A.   The supervisors? Twice a
8 year.
9     Q.   Were there discussions at
10 these meetings about the marketing of
11 drywall by the company?
12     A.   That would not be discussed.
13     Q.   Were there discussions at
14 these meetings about the export sales of
15 drywall by the company?
16     A.   No.
17     Q.   How did the supervisors
18 become informed about the marketing and
19 sales, export sales of drywall?
20     A.   It is not necessary for the
21 supervisors to know this information.
22     Q.   Who, other than supervisors,
23 needed to know that information?
24     A.   I don't know who would know.

Page 68

1 Why are you asking me?
2     Q.   Who at Shandong, and later
3 Taishan Gypsum, kept informed about --
4     THE INTERPRETER:  Excuse me.
5 I need a break for five minutes.
6 Is that okay?
7     THE COURT:  Sure.
8     THE VIDEOTAPE TECHNICIAN:
9 We are off the record. The time
10 is 3:30.
11     - - -
12     (Whereupon, a recess was
13 taken from 3:30 until 3:36 p.m.)
14     - - -
15     THE VIDEOTAPE TECHNICIAN:
16 We're back on the record. The
17 time is 3:36.
18 BY MR. MEUNIER:
19     Q.   Mr. Fu, you have told us
20 that marketing and export sales
21 activities were not discussed at the
22 meetings of the Shandong, and later
23 Taishan Gypsum, board of supervisor
24 meetings you attended. Is that correct?

Page 69

1     A.   Correct.
2     Q.   Which, if any, job positions
3 at Shandong, and later Taishan Gypsum,
4 were kept informed of these marketing and
5 export sales activities?
6     A.   Can you repeat the question?
7     (Interpreter repeats the
8 question.)
9     For those who are in charge
10 of the daily operations in sales in the
11 company, the supervisors and board of
12 directors were not required to know the
13 information.
14     Q.   You've indicated that
15 Shandong, and later Taishan Gypsum, did
16 not keep separate records of the volume
17 of export sales. Is that true?
18     A.   Separate records?
19     Q.   Yes. The volume of only
20 export sales, was that ever kept as a
21 record by either Shandong or Taishan
22 Gypsum?
23     A.   There should be a volume.
24 There should be a statistic number, but

Page 70

1  it's not on the advertisement.
2      Q.   Was someone in charge of
3  keeping that statistic or measurement
4  that is the volume of export sales?
5      A.   I believe there should be a
6  record.
7      Q.   Who is the person who keeps
8  that record today?
9      A.   You mean TG?
10     Q.   I want to include Shandong,
11 when the export sales activity was
12 occurring when it was called Shandong, as
13 well as TG.
14     A.   I believe Peng Wenlong
15 should have the information.
16     Q.   Were records of the volume
17 of export sales kept for TTP when it was
18 in operation?
19     A.   I believe a record should
20 exist also for that.
21     Q.   Which individual would have
22 those records?
23     A.   I do not know who was in
24 charge of the record, but I only know

Page 71

1  that Peng Wenlong is in charge of sales.
2      Q.   Was Peng Wenlong's salary
3  influenced by the amount of sales he
4  made?
5          MR. SPANO:  Objection.
6          THE COURT:  "Influenced"
7      might be a problem.
8  BY MR. MEUNIER:
9      Q.   Dependent on?
10         THE COURT:  Related to.
11 BY MR. MEUNIER:
12     Q.   Related to?
13     A.   I believe there should be a
14 relation.
15     Q.   Tell me what --
16     A.   There is a relation.
17     Q.   Excuse me.
18         Explain the relation.
19     A.   There is no detailed
20 explanation for that.  If the amount is
21 not much, then the salary is not that
22 much.
23     Q.   But is it true that the
24 greater the volume of sales Peng Wenlong

Page 72

1  was responsible for, the greater his
2  salary?
3      A.   He could get promoted.
4      Q.   In addition to being
5  promoted, would he also make more money,
6  the more sales he made?
7      A.   Yes, yes.
8      Q.   Is the same true of other
9  salespeople in addition to Peng Wenlong?
10     A.   Yes.  There are also
11 relationships between -- for their sales.
12     Q.   So that would be true for
13 both Che Gang and Yang Jiapo?
14     A.   Both of them.
15     Q.   As Mr. Peng Wenlong's direct
16 supervisor, did you evaluate his job
17 performance?
18         MR. SPANO:  Objection to
19     form.  Which company are you
20     referring to?
21 BY MR. MEUNIER:
22     Q.   You were his direct
23 supervisor when he was employed by
24 Taishan Gypsum; is that true?

Page 73

1      A.   Correct.
2      Q.   And you were a director at
3  TTP when he was an employee of TTP after
4  that, true?
5      A.   Correct.
6      Q.   For the period when he
7  worked at both Taishan Gypsum and TTP,
8  did you consider Peng Wenlong to be a
9  competent employee?
10     A.   He was very diligent in his
11 work.
12     Q.   Trustworthy?
13     A.   I believe he's good.
14     Q.   Have you ever had reason to
15 discipline or criticize him for his job
16 performance?
17     A.   I have not criticized him
18 during the period of time that I managed
19 TG.  I did not manage him either in TTP.
20     Q.   Are you also familiar with
21 the work of Che Gang as a sales employee
22 of Taishan Gypsum?
23     A.   Peng Wenlong was in charge
24 of that.  I was not in charge of the

Page 74

1 details.
2     Q.   Even though you were not in
3 charge of the details, were you generally
4 aware of the job performance of Che Gang?
5     A.   I think he's also good.
6     Q.   Trustworthy?
7     A.   I trust him.
8     Q.   To your knowledge, was there
9 ever any reason for him to be disciplined
10 or criticized in his job performance
11 either at Taishan Gypsum or at TTP?
12     A.   No.
13     Q.   Would you say the same about
14 Yang Jiapo?
15     A.   Yang Jiapo resigned.
16     Q.   Yes, but before he resigned,
17 did you consider him to be a competent
18 employee?
19     A.   This young man was a little
20 lazy.
21     Q.   Under what circumstances did
22 he resign?
23     A.   He did not keep a good
24 working relationship with other

Page 75

1 colleagues.
2     Q.   Aside from him being, as you
3 put it, lazy and not getting along with
4 his colleagues, did you know of any other
5 problems with his performance as a sales
6 employee?
7     A.   He started a company with
8 his older brother.
9     Q.   Is that why he left the
10 employment of Taishan Gypsum?
11     A.   He established a company
12 with his older brother.
13     Q.   And is that why he resigned
14 from the employment of your company?
15     A.   That was the reason.
16     Q.   While he was an employee of
17 Shandong, Taishan Gypsum and TTP, did you
18 ever know Yang Jiapo to exceed his
19 authority as a salesperson?
20     A.   I don't know.
21     Q.   Is it true that together
22 with director Xue Yuli, X-U-E, Y-U-L-I,
23 you have had responsibility for
24 supervising the product marketing plans

Page 76

1 of Taishan Gypsum?
2     A.   What time period?
3     Q.   During any period of time,
4 have you had responsibility for
5 supervising the product marketing plans
6 of Taishan Gypsum?
7     A.   Xue Yuli was in charge of
8 sales before 2008.
9     Q.   Mr. Fu, if Mr. Jia testified
10 under oath on April 4th, 2011, and I'll
11 give counsel the page and line numbers of
12 that deposition if needed, that together
13 with Director Yuli, you had
14 responsibility for supervising the
15 product marketing plans of Taishan
16 Gypsum, would you agree with that
17 testimony?
18     A.   Before 2008, that was the
19 case.
20     Q.   Tell me what you did in
21 order to supervise the product marketing
22 plans of Taishan Gypsum before 2008?
23     A.   The product marketing plan
24 was to act according to the report of

Page 77

1 general manager Jia made in the end of
2 the year.
3     Q.   Part of that plan was to
4 intensify online sales; is that true?
5         MR. SPANO:  Objection,
6     foundation.
7         MR. MEUNIER:  The testimony
8     of Mr. Jia.
9         THE COURT:  Don't speak,
10     please.
11         MR. MEUNIER:  Sorry, Judge.
12         THE COURT:  It's before me.
13     I'll allow him to answer.
14         THE WITNESS:  I don't
15     recall.  I don't recall when was
16     the report made.
17 BY MR. MEUNIER:
18     Q.   Do you recall as part of
19 product marketing plans of Taishan Gypsum
20 that you helped supervise before 2008
21 that the company intensified its efforts
22 in the area of online sales?
23     A.   We did not say intensify the
24 online sales.  There was online sales

Page 78

1 exists, existence.
2    Q. How did the company promote
3 online sales?
4    A. We did not promote online
5 sales.
6    Q. Did the company have a
7 website that customers could use to
8 conduct online sales of drywall?
9    A. What website? The customer
10 did not conduct that on the website. The
11 transaction could not be made online.
12    Q. How were online sales of
13 drywall conducted by Taishan Gypsum?
14    A. We only have a website of
15 Taishan Gypsum Company. You can only
16 view the website. There was no online
17 sales. It's a company website. You
18 cannot make transactions on it.
19    Q. So, your testimony is that
20 Taishan Gypsum has never conducted sales
21 of drywall through online transactions?
22    A. I don't know what you're
23 referring to. I don't understand this
24 part. I have never done online

Page 79

1 transactions.
2    Q. All right. Let's get back
3 to marketing.
4    A. Okay.
5    Q. You told me in supervising
6 the marketing plans of Taishan Gypsum
7 before 2008, you acted according to the
8 report of the company chairman Jia. Is
9 that correct?
10    A. Yes, yes.
11    Q. And please tell me in as
12 much detail as you can how the marketing
13 plans were conducted in accordance with
14 the reports of Mr. Jia?
15    A. We investigated the markets
16 according to the occupation -- the
17 percentage that our competitor had
18 occupied. We would want to take part --
19 take some of that.
20    Q. Did you investigate foreign
21 markets?
22    A. Like I mentioned, we did not
23 set foreign market as our main direction.
24 Naturally, we would not promote that

Page 80

1 part.
2    Q. Are you familiar with this
3 document, Mr. Fu, which has been
4 previously marked as Jia Exhibit 20?
5    A. I'm familiar with it.
6    Q. Is that a brochure that was
7 used by Shandong to market its products,
8 including drywall?
9    A. Yes.
10    Q. Did you have input or did
11 you contribute to the language in this
12 brochure?
13    A. No, I did not write on it.
14    Q. Was this same brochure later
15 used when the company changed its name to
16 Taishan Gypsum?
17    A. Yes.
18    Q. Do you agree that the
19 brochure states that the company has
20 export ability and that its products sell
21 well in many countries, including the
22 United States of America?
23    A. This is only a general way
24 of saying that when you do business in

Page 81

1 China. This is not necessarily be the
2 fact.
3    Q. Are you saying that the
4 brochure is not true in making that
5 statement?
6    A. Correct. This is the way we
7 do business in China. Our purpose is to
8 let our local customer have the
9 impression of an image of a big company.
10    Q. Is this brochure published
11 in English?
12    A. Not in English. Most of
13 them are in Chinese. It is for the local
14 customers.
15    Q. Is the information in this
16 brochure on the company's website?
17    A. Some of them. Perhaps part
18 of them.
19    Q. Is the language on the
20 company's website English?
21    MR. SPANO: Object to form,
22 time frame.
23    THE COURT: Put the time
24 frame in.

Page 82

1  BY MR. MEUNIER:
2      Q.   Is the language on the
3  company Taishan Gypsum's website today in
4  English?
5      A.   I don't know if there is
6  Chinese on it. I know there is Chinese
7  version on it.
8          THE COURT REPORTER: I don't
9      know if there is Chinese on it. I
10     know there is Chinese version on
11     it.
12         THE WITNESS: I don't know
13     if there is English on it. I know
14     there is Chinese version on it.
15         I don't read English. I
16     always type Chinese character
17     Taishan Gypsum, and then our
18     website would pop up.
19 BY MR. MEUNIER:
20     Q.   But your website does have
21 English language, allowing those who
22 speak English to read what is on the
23 website; is that correct?
24     A.   If there is Chinese version,

Page 83

1  they could read it.
2          MR. CHEN: I'm sorry.
3          MR. MEUNIER: I didn't ask
4      you about Chinese.
5          INTERPRETER: Excuse me,
6      interpreter clarification.
7          Correction, interpreter
8      correction.
9          THE WITNESS: If there is an
10     English version, they could read
11     it.
12 BY MR. MEUNIER:
13     Q.   Does the website have
14 information on it in the English
15 language?
16     A.   I don't know, because we
17 didn't make that. It is the sales
18 department who made it.
19     Q.   Who is in charge of the
20 company's website today?
21     A.   The office.
22     Q.   Who in the office?
23     A.   I don't know who, but the
24 office in the headquarter is in charge of

Page 84

1  the website.
2      Q.   In your various positions
3  managing and supervising sales activity,
4  is it your testimony you have never dealt
5  with the company's website?
6      A.   Correct.
7      Q.   Referring again to the
8  brochure which is Jia Exhibit 20, I'm
9  showing you the last page which has a map
10 of the countries in the world. Do you
11 see that?
12     A.   I see it.
13     Q.   Do you see the line drawn
14 from China to the United States of
15 America?
16     A.   Yes, I see it.
17     Q.   Is that an accurate
18 statement of the export ability of the
19 company?
20         MR. SPANO: Object to form.
21         THE COURT: Ability or
22     activity?
23 BY MR. MEUNIER:
24     Q.   Does that map accurately

Page 85

1  reflect the export activity of the
2  company?
3      A.   No.
4      Q.   Why not?
5      A.   No. This is also just like
6  what I described before. It is for the
7  people to realize it is a big company.
8  The small companies, the private
9  companies in China also do things like
10 this.
11     Q.   So, does your company want
12 foreign customers to be misled about the
13 export ability and activity of your
14 company?
15     A.   No. This is for the
16 impression of a good image of a big
17 company for the local customers, for the
18 local customers.
19     Q.   So, are you misleading local
20 customers when you tell them about the
21 export ability and activity of your
22 company?
23         MR. SPANO: Objection.
24         Objection to form. It's not

Confidential - Subject to Further Confidentiality Review

Page 86

1 personal statements.
2 MR. MEUNIER: I'll restate
3 the question, Your Honor.
4 BY MR. MEUNIER:
5 Q. Is Shandong Taihe Dongxin
6 Company misleading the customers who read
7 this brochure about the export ability
8 and activity of the company?
9 A. No. It is Chinese mode.
10 Q. Is it the Chinese mode to
11 not tell the truth about the company?
12 A. That's not true. You
13 shouldn't be understanding it that way.
14 In China, we exaggerate a little bit.
15 Exaggerate a little bit, that's allowed.
16 Q. You exaggerate it, but it is
17 still true that the company had export
18 ability and activity as indicated in the
19 brochure? Is that true?
20 A. Yes. We exported some.
21 Q. Did you export to all the
22 places where the lines are drawn on the
23 map that I showed you?
24 A. No, no, that's not true.

Page 87

1 Q. Which ones did you not
2 export to, Mr. Fu?
3 A. I'm sure it exaggerated a
4 little bit. But I'm not sure exactly
5 where had it not exported to.
6 Q. Based on your knowledge and
7 experience, can you tell us where the
8 company has exported to?
9 A. I'm not in charge of that.
10 I'm not in charge of the detailed sales,
11 so, I don't know exactly where they were
12 shipped to. We deliver in China. We
13 don't know where did some of the
14 customers send the products to.
15 Q. Mr. Yang Jiapo was employed
16 as a salesperson at Shandong, Taishan
17 Gypsum and then TTP; is that correct?
18 A. Correct.
19 Q. I want to show you a
20 document which is Bates numbered 1443
21 through 1448. I'm sorry, I don't have a
22 translation with me.
23 A. I don't understand this.
24 Q. Mr. Fu, please turn to the

Page 88

1 last page of this document, which is
2 1448. Do you see the three e-mail
3 addresses given there?
4 A. I don't know where they are.
5 I don't know whose e-mail addresses are
6 those.
7 Q. You don't recognize those as
8 the e-mail addresses of Yang Jiapo?
9 A. No, I don't recognize this.
10 I don't really use e-mail myself.
11 Q. Let me refer you to another
12 document, Mr. Fu, that's been previously
13 marked as Jia number 13. It's entitled
14 "Sole Agency Agreement." It is dated
15 October 20, 2006, and at that time, you
16 were one of the directors of TTP; is that
17 true?
18 A. Correct.
19 Q. And the title of this "Sole
20 Agency Agreement" -- I'm sorry, the sole
21 agency agreement refers to the seller as
22 Taian Taishan Plasterboard Company,
23 Limited and the buyer, Oriental Trading
24 Company, LLC. Are you familiar with this

Page 89

1 agreement?
2 MR. SPANO: Objection to
3 form.
4 THE COURT: Do you want to
5 show him the document? Where is
6 the document?
7 MR. SPANO: He hasn't shown
8 it to him.
9 THE COURT: Show him the
10 document.
11 THE WITNESS: Please, first
12 of all, do not ask me any sales
13 business regarding TTP. Perhaps
14 you don't understand the way we do
15 business in China. In China, the
16 directors and the supervisors do
17 not in charge of detailed
18 business. Maybe you don't
19 understand the responsibilities of
20 directors and supervisors in
21 China.
22 - - -
23 (Whereupon, a discussion off
24 the record occurred.)

Page 90

1      - - -
2          THE WITNESS: Can you
3      translate for me.
4  BY MR. MEUNIER:
5      Q.   Mr. Fu, please refer to the
6  third page of this document.
7      A.   (Witness complies.)
8      Q.   Is it true that the Chinese
9  language appearing on that page states
10 that Taian Taishan Plasterboard Company,
11 Limited certifies that Oriental Trading
12 Company, LLC as its exclusive agency for
13 the Dun brand in the United States of
14 America?
15     A.   Don't ask me. I'm not in
16 charge of the sales of TTP. You don't
17 understand. And also please tell him
18 that the supervisors in China, including
19 directors, do not in charge of the
20 detailed operation. They only meet twice
21 a year for supervisors' meeting and for
22 directors' meeting to discuss the annual
23 reports. Now you're showing me these. I
24 don't know how to answer you.

Page 91

1      Q.   Did Taishan Gypsum, or
2  before it, Shandong Taihe Dongxin,
3  manufacture drywall under the brand name
4  Dun, D-U-N?
5      A.   I don't know. I don't
6  recall.
7      Q.   You have never heard of the
8  brand name Dun?
9      A.   I've heard of it, but we do
10 not necessarily manufacture all the
11 brands that have the name as the brand.
12     Q.   Has Shandong Taishe -- I'm
13 sorry -- Shandong Taihe Dongxin or
14 Taishan Gypsum ever manufactured drywall
15 under the brand name Dun?
16     A.   I don't know like I said
17 before.
18     Q.   Has TTP ever manufactured
19 drywall under the brand name Dun?
20     A.   TTP, I don't know.
21     Q.   Have any of the companies I
22 just mentioned, Shandong Taihe Dongxin,
23 Taishan Gypsum or TTP manufactured
24 drywall for customers with thickness,

Page 92

1  length and width measured in inches and
2  feet?
3      A.   I don't know the inches and
4  the feet. I don't understand the
5  details. I only know the specifics.
6          INTERPRETER: The
7      interpreter need clarification.
8          THE WITNESS: I don't
9      understand what you said about the
10     specifications in inches and feet.
11     We custom made products according
12     to requirements of customers. I
13     only know the prices and
14     coordinate on the manufacturer.
15     If we can do it, we'll do it. I
16     don't know anything else.
17 BY MR. MEUNIER:
18     Q.   Inches and feet are not
19 measurements used in China, true?
20     A.   In China, we produce drywall
21 according to national standard 9.5 or 12.
22 I don't know anything else.
23     Q.   9.5 or 12 what?
24     A.   China National Standard.

Page 93

1      Q.   If a customer requests that
2  you do so, will Taishan Gypsum
3  manufacture drywall to sell to that
4  customer in measurements of inches and
5  feet?
6      A.   You have to convert it to
7  the thickness according to Chinese
8  measurement. When you are talking about
9  feet and inches, I do not understand.
10     Q.   I will try to ask the
11 question again.
12         If a customer wants to buy
13 drywall from Taishan Gypsum and wants it
14 to have a thickness measured in inches,
15 will the company make the drywall with
16 that thickness?
17     A.   After converting into the
18 measurements in China, if we could make
19 it, we would make it. If we could not,
20 we would not accept the order.
21     Q.   Did you ever advise Che Gang
22 before October 20, 2006 that he was not
23 authorized to do business with Oriental
24 Trading Company LLC?

Page 94

1    A.   What was the time again?

2    Q.   At any time before October

3  20, 2006.

4    A.   I have never arranged works

5  for Che Gang.  It had always been Peng

6  Wenlong who did that.

7    Q.   What do you mean you never

8  arranged words for Che Gang?  I don't

9  understand.

10      THE COURT REPORTER:  I'm

11    sorry, it's works, not words?

12      INTERPRETER:  Works,

13    W-O-R-K-S.

14  BY MR. MEUNIER:

15    Q.   Did you or anyone else on

16  behalf of Taishan Gypsum or TTP ever

17  advise a representative of Oriental

18  Trading Company that Mr. Che Gang was not

19  authorized to do business with that

20  company?

21    A.   I don't know anything about

22  the detail of the businesses.

23      MR. MEUNIER:  Your Honor, I

24    object to the nonresponsiveness of

Page 95

1    the answer.  I'll ask the question

2    again.

3      THE COURT:  Let's ask the

4    question.  Listen closely.  Listen

5    closely to the question, and

6    answer it, if you can.

7  BY MR. MEUNIER:

8    Q.   Mr. Fu, did you or anyone

9  else on behalf of Taishan Gypsum or TTP

10  ever advise a representative of Oriental

11  Trading Company that Mr. Che Gang was not

12  authorized to do business with that

13  company?

14    A.   I don't know Oriental

15  Trading Company.  I don't know whether

16  anybody else advised this company of

17  such.

18    Q.   Did you ever advise a

19  representative of that company that Mr.

20  Che Gang was not authorized to do

21  business with the company?

22    A.   Like I said before, I don't

23  know the existence of this company.

24    Q.   Please look at the third

Page 96

1  page of the document again.  Do you

2  recognize the signature on that page

3  under the company name Taian Taishan

4  Plasterboard Company, Limited?

5    A.   I know that's Che Gang's,

6  and a seal which says Taishan

7  Plasterboard Company.

8    Q.   Do you agree that Mr. Che

9  Gang on that document used a seal given

10  to him by his company?

11    A.   Tell him that during this

12  period of time, these are two separate

13  companies.  It has nothing to do with me

14  whether he stamped the company seal or

15  not.

16    Q.   Does it appear to be a seal

17  given to sales personnel such as Mr. Che

18  Gang by the employer of that salesperson?

19    A.   How do I know about it?

20    Q.   I'm asking you to look at

21  the seal on the document.

22    A.   The seal has nothing to do

23  with me.  I'm in charge of two

24  independent companies.  The company

Page 97

1  you're talking about has nothing to do

2  with me.

3    Q.   My question is different.

4  Do you recognize that seal as a seal

5  given to Mr. Gang?

6    A.   Like I said, I know the

7  seal, and I know Che Gang's name.

8    Q.   When you say you "know the

9  seal," what do you mean?

10    A.   You asked me whether I

11  recognize this.  I said I do recognize

12  these characters.

13    Q.   Do you recognize that as a

14  company seal given to salespeople

15  employed by the company?

16    A.   How do I know about it?  I'm

17  not in charge of this company.

18      THE COURT:  Is that the

19    company seal?

20      THE WITNESS:  It is the

21    company seal where the employee

22    worked.

23      MR. MEUNIER:  Thank you.

24    Thank you, Judge.

Page 98

BY MR. MEUNIER:

1     Q.  In November and December of
2 2005, you directly supervised the sales
3 activity of Peng Wenlong. Is that true?
4     A.  Correct.
5     Q.  Have you heard of a US
6 company called Venture Supply Inc.?
7     A.  You asked me once, but I
8 don't know that name.
9     Q.  I show you a document which
10 is Bates numbered TG 1684 and 1685.
11     MR. SPANO:  Is this going to
12 be marked as an exhibit?
13     MR. MEUNIER:  I'll mark this
14 document as Fu Exhibit 3.
15     - - -
16     (Whereupon, Deposition
17     Exhibit Fu-3, Contract, Bates
18     stamped TG 0001684 and TG 0001685,
19     was marked for identification.)
20     - - -
21 BY MR. MEUNIER:
22     Q.  Were you aware, Mr. Fu, that
23 on November 17, 2005, Shandong Taihe

Page 99

1 Dongxin Company, Limited entered into a
2 sales contract with Venture Supply Inc.
3 of Norfolk, Virginia for the sale of
4 100,000 sheets of drywall?
5     A.  I don't know which country
6 was the buyer. I only was aware that
7 Peng Wenlong consulted me for the
8 thickness of the drywall, which is 12.7,
9 as well as the pricing of the drywall.
10     Q.  Did you approve the
11 thickness and pricing of the drywall for
12 this sale?
13     A.  I approved it.
14     Q.  This contract indicates that
15 the drywall was sold at the price of
16 $3.58 a sheet for a total of $358,000.
17 Is that the price you approved?
18     A.  Yes.
19     Q.  Is $3.58 a sheet consistent
20 with the price that Shandong Taihe
21 Dongxin was charging customers for
22 drywall in November of 2005?
23     MR. SPANO:  Objection to
24     form.

Page 100

1     THE WITNESS:  I don't recall
2 clearly the price at the time.
3     THE COURT:  It's time to
4 change the tape as I understand
5 it. Let's take a break, 10-minute
6 break.
7     THE VIDEOTAPE TECHNICIAN:
8 We're going off the record. The
9 time is 4:38.
10     - - -
11     (Whereupon, a recess was
12 taken from 4:38 p.m. until 4:47
13 p.m.)
14     - - -
15     THE VIDEOTAPE TECHNICIAN:
16 This is the beginning of Tape
17 Number 3. We're going back on the
18 record. The time is 4:47.
19 BY MR. MEUNIER:
20     Q.  Mr. Fu, this November 2005
21 contract between Shandong and Venture
22 Supply provides that the drywall will be
23 inspected by Mr. Phillip Perry of Tobin
24 Trading Inc. before the sale is final.

Page 101

1 Were you aware of that provision?
2     A.  Peng Wenlong had reported to
3 me the pricing of it. I approved of the
4 contract. I'm not sure about the
5 business details that they discussed
6 about.
7     Q.  I meant to ask you this
8 before. But Mr. Peng Wenlong, you said,
9 was assigned to work with export sales
10 because he spoke English? Is that true?
11     A.  Correct.
12     Q.  I think I've marked that as
13 Fu-3.
14     MR. MEUNIER:  I next show
15 you a document which is Bates
16 numbered 19854 through 19857 which
17 I will mark as Fu Number 4.
18     - - -
19     (Whereupon, Deposition
20     Exhibit Fu-4, Contract, Bates
21     stamped TG 00019854 through TG
22     00019857, was marked for
23     identification.)
24     - - -

Page 102

BY MR. MEUNIER:

Q.   Mr. Fu, this is a contract dated December 6, 2005 between Shandong Taihe Dongxin Company and Venture Supply of Norfolk, Virginia for the sale of 100,000 additional sheets of drywall. Were you aware of this agreement?

A.   I know that, but I don't know the detailed content of it.

Q.   Yes, sir.  But again, you approved the price, which in this case was $3.58 a sheet -- I'm sorry, $3.66 a sheet, for a total sale price of $366,800.  You approved that, did you?

A.   It is so for the price.

Q.   And you approved the agreement, didn't you?

A.   Yes.

Q.   Why was the price increased from $3.58 a sheet to $3.66 a sheet between November 17 and December 16, 2005?

A.   The costs were different. The costs for each time period were

Page 103

different.

Q.   So, the price per sheet could change even in one month, true?

A.   Because this was the first time we did business, we had to be careful.  Afterwards, we could have some small changes.  This was the first time we had carefully calculated the price for the specification of 12.7.  Therefore, this has a reference value for future transactions.

Q.   Are you saying that you expected to continue to sell drywall to Venture Supply at a price that would become customary for that customer?

A.   As long as it takes its money to China and we deliver the products in China, we could do that.  We deliver in China, but they would have to take care of where they want it to ship to because it was the first time we did business together.

Q.   But the contract did specify a price in US dollars, correct?

Page 104

A.   Yes, yes.

Q.   And like the November 2005 contract with Venture Supply, this one provides for an inspection of the product by Mr. Phillip Perry before the sale is final, that, again, was a detail that you left to Mr. Peng Wenlong, true?

A.   Correct.

Q.   If you look at the second page of the contract which is Bates numbered 19855, I ask you to confirm that that is the signature of Peng Wenlong using the company seal of Shandong Taihe Dongxin?

A.   I don't see the signature of Peng Wenlong.

Q.   You don't see a signature written in the area where the seal stamp is made?

A.   This is my signature.

Q.   This is your signature?

A.   That's my signature.

Q.   So, you signed this contract?

Page 105

A.   Yes.

Q.   So, you have seen --

A.   I approved it, including the price.

Q.   And you signed it?

A.   Yes.

Q.   And you signed it in English?

A.   That was our first time I did business.  No.  This is Chinese character.

Q.   Yes, but the document is written in English, and your signature is on the document in English, true?

MR. SPANO:  Objection, asked and answered.

THE WITNESS:  That's Chinese character.

BY MR. MEUNIER:

Q.   Is the language of the contract in English?

MR. SPANO:  Objection.

THE COURT:  I'm going to overrule the objection.

Confidential - Subject to Further Confidentiality Review

Page 106

1 THE WITNESS: This was the
2 first time we did business. We
3 have never done that before. Peng
4 Wenlong translated it into
5 Chinese. I reviewed the contract.
6 I saw it was okay. I approved it.
7 BY MR. MEUNIER:
8 Q. So, all of the language in
9 this contract which you signed was read
10 to you in China in Chinese by Mr. Peng
11 Wenlong translating the document?
12 A. Correct. I saw that.
13 Q. And with the authority of
14 Shandong Taihe Dongxin, you then approved
15 and signed this sales contract, didn't
16 you?
17 A. Yes, yes.
18 Q. And you put your company's
19 seal on the place where you signed,
20 right?
21 A. Yes.
22 MR. MEUNIER: Your Honor, if
23 you would just give me five
24 minutes recess, I'll just review

Page 107

1 my notes and see if there's
2 anything further.
3 THE COURT: Let's do it in a
4 couple of minutes. I don't think
5 we need five.
6 MR. MEUNIER: Yes.
7 THE VIDEOTAPE TECHNICIAN:
8 Going off the record. The time is
9 4:59.
10 - - -
11 (Whereupon, a recess was
12 taken from 4:59 p.m. until 5:01
13 p.m.)
14 - - -
15 MR. MEUNIER: Your Honor,
16 I'll tender the witness.
17 THE COURT: No further
18 questions from Mr. Meunier.
19 THE VIDEOTAPE TECHNICIAN:
20 We're going back on the video
21 record. The time is 5:01.
22 - - -
23 EXAMINATION
24 - - -

Page 108

1 BY MR. GONZALEZ:
2 Q. Hi, Mr. Fu. I'm Ervin
3 Gonzalez.
4 Once TTP was formed, were
5 all of the export sales conducted through
6 it as opposed to TG?
7 A. Correct.
8 Q. So, at that point, TG
9 stopped selling export sales, and they
10 were all done through TTP, correct?
11 A. It is not entirely so.
12 There was a person who remained there
13 whose name is -- there is a person called
14 Zhang Nan, Z-H-A-N-G, last name, first
15 name, N-A-N. He did not go to TTP. He
16 remained there at TG. He remained at TG.
17 Q. Was he a salesperson to sell
18 exports?
19 A. He was in charge of trading,
20 not necessarily exporting.
21 Q. But the exporting part of
22 the business was through TTP once TTP was
23 formed, correct?
24 A. If TG could have some

Page 109

1 businesses of their own, they could also
2 do that.
3 Q. Right.
4 A. But for some local
5 businesses, if they needed value added
6 invoices, they would need to go to TTP
7 because only TTP could issue such
8 invoices.
9 Q. That's how TG worked through
10 TTP?
11 A. What is it?
12 Q. That's how TG worked through
13 TTP? When they needed to export and use
14 the VAT benefits of TTP, it went through
15 TTP?
16 A. No. At the time that we
17 established TTP was because many of the
18 local customers wanted to have value
19 added invoices.
20 Q. So TG established TTP to
21 carry that out?
22 A. Correct.
23 Q. And TG and TTP worked
24 closely together?

Page 110

1    A.    It's an independent company.

2    Q.    Yes.  But you worked closely

3 together?

4    A.    They don't work together.

5    Q.    Well, you sold the same

6 brands of drywall, correct?

7    A.    We could authorize them to

8 sell this brand of drywall.

9    Q.    And they, in fact, did sell

10 the same brands of drywall that were

11 manufactured by TG?

12    A.    Correct.

13    Q.    And the employees that were

14 working for TTP previously worked for TG?

15    A.    Correct.

16    Q.    And when TTP stopped

17 existing, those employees like Bill --

18 like Che Gang and Peng Wenlong went back

19 to work at TG?

20    A.    Correct.

21    Q.    And the address we heard

22 yesterday from Mr. Jia, the address for

23 TTP and TG were the same?

24    A.    What was the address you're

Page 111

1 talking about?  I don't understand.

2    Q.    The address for the

3 businesses.

4    A.    They were about three

5 kilometers distance of the two companies.

6 TTP is located at Houzhou Village of

7 Taian, while TG is located at Dawenkou.

8    Q.    The directors that were

9 established for TTP came from TG, right?

10    A.    Yes.

11    Q.    The plant that was used by

12 TTP was previously owned by TG, correct?

13    A.    Yes.

14    Q.    When TTP stopped existing,

15 those plants went back to TG, correct?

16    A.    It was purchased back

17 because it was bought in the first place.

18    Q.    Same plant?

19    A.    Yes.

20    Q.    And the formulas that were

21 used to make drywall were the same for

22 TTP and for TG?

23    A.    The formulas of

24 manufacturing, I believe each of the

Page 112

1 companies has slight difference from the

2 others because some of the equipments

3 were added.  After adding of the

4 equipments, the efficiency were better.

5    Q.    For the newer companies?  In

6 terms of efficiency, they were better for

7 the newer companies because they had new

8 machines, right?

9    A.    No.  Some dryer was added.

10    Q.    But the ingredients were --

11    A.    After adding of the dryer,

12 it is not necessary that the speed was

13 added.

14    Q.    The ingredients were the

15 same?

16    A.    Yes.

17    Q.    And if a product had the

18 name, for example, Dun, and it was made

19 at TTP's plant, or the same Dun was made

20 at TG, it's the same quality of drywall

21 that would be coming from each plant,

22 correct?

23    A.    I don't know who made Dun

24 brand products.  I knew that we made

Page 113

1 Taishan brand products.  We all made

2 Taishan brand products.

3    Q.    I represent to you that the

4 Dun brand is listed in the TG catalog

5 that's Exhibit Number 13 --

6        MR. DAVIS:  20.

7 BY MR. GONZALEZ:

8    Q.    20 in your deposition.

9    A.    I haven't seen that.

10    Q.    May I have the exhibit,

11 please?

12    A.    Where is it?

13        (Handing over document.)

14    Q.    I will show you.

15    A.    This is our trademark.  We

16 have registered many trademarks.  It is

17 not necessarily that we would manufacture

18 the trademark.

19    Q.    The trademark that you

20 registered, when you say "you," it's the

21 corporation, TG?  Yes?

22    A.    Yes.

23    Q.    And that's true for the Dun

24 trademark?

Page 114

1    A.   Yes.
2    Q.   Okay.  And are these other
3  trademarks on that Exhibit 20?
4    A.   Yes.
5    Q.   And can you identify all of
6  the registered trademarks for TG that are
7  listed there, please?
8    A.   All of these?
9    Q.   Yes.  But can you tell the
10  names, because some of them are in
11  Chinese, and I can't read Chinese?
12    A.   Taishan, West Lake, Five
13  Star, Dun, Ma.
14    Q.   You were previously shown,
15  when my colleague was asking you some
16  questions, an exclusive agency agreement
17  to sell the Dun product in the United
18  States of America.  Were you aware that
19  that was occurring at the time that the
20  contract was entered into?
21        MR. SPANO:  Objection, no
22    foundation.
23        THE COURT:  I'll allow him
24    to answer.

Page 115

1        THE WITNESS:  I was not
2    aware of that.
3  BY MR. GONZALEZ:
4    Q.   Let me ask you just a few
5  other questions, and then I'll pass you
6  to my other colleague.  Were you
7  compensated, without telling us the
8  amount, for your services on the board of
9  directors of TTP?
10    A.   I had no compensation.  TG.
11    Q.   So, you were only
12  compensated by TG, correct?
13    A.   Correct.
14    Q.   And you served also on the
15  board of TTP for no additional
16  compensation, correct?
17    A.   Correct.
18    Q.   Did the board of directors
19  of TTP have the right to hire and fire
20  employees for TTP?
21    A.   We did not have such a
22  right.
23    Q.   Who had the right to hire
24  and fire employees for TTP?

Page 116

1    A.   Peng Shiliang.
2    Q.   Who is that by title?
3    A.   He's the general manager,
4  general manager's responsibility.
5    Q.   General manager of TTP?
6    A.   TTP's.
7    Q.   Prior to his working for
8  TTP, did he also work for TG?
9    A.   Yes.
10    Q.   Did he go back to work for
11  TG after TTP stopped working?
12    A.   Yes, currently, yes.
13    Q.   As TTP was being formed, who
14  at -- let me restate that.
15        As TTP was being formed, who
16  at TG decided what employees would stop
17  working at TG and begin working at TTP?
18    A.   They volunteer.  They could
19  volunteer because a new company was
20  formed.
21    Q.   Who was asking for the
22  volunteers on behalf of TG?
23    A.   By notification because we
24  formed TTP company.

Page 117

1    Q.   Who issued the notification?
2  Was it the board, was it the general
3  manager?  And to be specific, here's what
4  I'm asking.  What person on behalf of TG
5  or entity on behalf of TG said to the TG
6  employees, we're creating TTP, and we're
7  looking for volunteers to work at TTP?
8        MR. SPANO:  Objection.  Your
9    Honor, he answered the first
10    question.  I think it should be
11    translated.
12        THE COURT:  Yes.
13        THE INTERPRETER:  Do you
14    want me to answer the question, or
15    what was the first?
16        MR. SPANO:  I'm asking that
17    you to translate his answer to the
18    first question which I heard him
19    give you.
20        INTERPRETER:  He did?
21        THE COURT:  Let's back up
22    then.
23        MR. SPANO:  We can move on.
24  BY MR. GONZALEZ:

Confidential - Subject to Further Confidentiality Review

Page 118

1    Q.   What person on behalf of TG
2  or entity on behalf of TG said to the TG
3  employees, we're creating TTP, and we're
4  looking for volunteers to work at TTP?
5    A.   There was no such a person.
6  It was the office.
7    Q.   But somebody at the office
8  must have come up with the idea, we need
9  volunteers to set up TTP, send out a
10 notice?
11   A.   That I do not know.
12   Q.   We were discussing the
13 brochure that discussed shipments or
14 exports to the United States of America,
15 and you were telling us that it was in
16 the brochure because it actually was good
17 to show that exports were made to foreign
18 countries including the United States of
19 America.  Do you agree with me that being
20 able to sell goods to the United States
21 of America is a good thing for the
22 business?
23      MR. SPANO:  Objection to
24      form.  Lack of foundation.

Page 119

1      THE COURT:  You have to be a
2      little more specific.  Good thing
3      for business?
4  BY MR. GONZALEZ:
5    Q.   You agree with me that
6  selling goods to the United States of
7  America is something that it would be
8  considered a positive factor for the
9  business in terms of prestige?
10      MR. SPANO:  Objection, calls
11      for speculation.
12      THE COURT:  I'll overrule
13      the objection.  He's speaking for
14      the company.
15      THE WITNESS:  It was not
16      only to sell to the United States,
17      but the image was meant to be a
18      global company, not necessarily
19      any specific country.
20 BY MR. GONZALEZ:
21   Q.   And that was actually one of
22 the reasons that you created the brochure
23 that's known as Exhibit 20, correct,
24 "you," the business?

Page 120

1    A.   Yes, like I said.
2      MR. GONZALEZ:  Thank you.
3  That's all I have.  I'll pass the
4  witness.
5      MR. SPANO:  Your Honor, for
6  the record, I would like to renew
7  my objection.  Mr. Fu is not
8  speaking for the company.
9      THE COURT:  Okay.  I
10 understand.  The same ruling.  I
11 overruled the objection.
12      Anybody else from any
13 company?
14      MS. BASS:  No.
15      Any redirect on Mr. Wu?
16          - - -
17      EXAMINATION
18          - - -
19 BY MR. SPANO:
20   Q.   Mr. Fu, I have to ask you a
21 few questions.
22   A.   Okay.
23   Q.   Do you recall testifying
24 earlier this afternoon to the effect that

Page 121

1  if you were paid the money, you would
2  ship out the product?
3    A.   Yes.
4    Q.   Did Taishan Gypsum ship out
5  any products to any state in the United
6  States of America?
7    A.   No.
8    Q.   Do you recall answering a
9  series of questions regarding the export
10 activities of Taishan Gypsum described in
11 the product brochure, Jia Exhibit 20?
12   A.   Our products had always been
13 delivered in China.  As of the shipping
14 cost and where they shipped to, it would
15 be handled and decided by the customers.
16 We don't know where they were shipped to.
17   Q.   Did Taishan Gypsum or TTP's
18 export activities ever include shipping
19 drywall to any state in the U.S.?
20   A.   No.
21      MR. SPANO:  That's all I
22      have.
23      THE COURT:  Okay.  That's
24      the end.  Thank you very much.

Page 122

1  Tomorrow we're going to start at
2  8:30 and try to get through a
3  little bit faster.
4         THE VIDEOTAPE TECHNICIAN:
5  This concludes today's deposition
6  of Fu Tinghuan. The total number
7  of tapes today is four. Going off
8  the record at 5:23.
9            - - -
10    (Whereupon, the deposition
11  concluded at 5:23 p.m.)
12            - - -
13
14
15
16
17
18
19
20
21
22
23
24

Page 124

1         INSTRUCTIONS TO WITNESS
2
3
4         Please read your deposition
5  over carefully and make any necessary
6  corrections. You should state the reason
7  in the appropriate space on the errata
8  sheet for any corrections that are made.
9
10        After doing so, please sign
11  the errata sheet and date it. It will be
12  attached to your deposition.
13
14        It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you. If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 123

1         C E R T I F I C A T E
2
3
4         I, LINDA L. GOLKOW, a
   Registered Diplomate Reporter, Certified
   Court Reporter and Notary Public, do
5  hereby certify that, pursuant to notice,
   the deposition of TINGHUAN FU was duly
6  taken on January 10, 2012 at 1:30 p.m.
   before me.
7
8         The said TINGHUAN FU was
   duly sworn by The Court according to law
9  to tell the truth, the whole truth and
   nothing but the truth and thereupon did
10 testify as set forth in the above
   transcript of testimony. The testimony
11 was taken down stenographically by me.
12
          I do further certify that
13 the above deposition is full, complete
   and a true record of all the testimony
14 given by the said witness.
15
16
          Linda L. Golkow
17        Registered Diplomate Reporter
          Certified Realtime Reporter
18
19
20        (The foregoing certification
   of this transcript does not apply to any
21 reproduction of the same by any means,
   unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Page 125

1         - - - - - -
          E R R A T A
2         - - - - - -
3  PAGE  LINE  CHANGE
4  ____  ____  _____
5      REASON: ___  _____
6  ____  ____  _____
7      REASON: ____  _____
8  ____  ____  _____
9      REASON: _____  _____
10 ____  ____  _____
11     REASON: _____  _____
12 ____  ____  _____
13     REASON: _____  _____
14 ____  ____  _____
15     REASON: _____  _____
16 ____  ____  _____
17     REASON: _____  _____
18 ____  ____  _____
19     REASON: _____  _____
20 ____  ____  _____
21     REASON: _____  _____
22 ____  ____  _____
23     REASON: _____  _____
24

Confidential - Subject to Further Confidentiality Review

Page 126

1
2          ACKNOWLEDGMENT OF DEPONENT
3
        I,_____, do
4   hereby certify that I have read the
    foregoing pages, 1-126, and that the same
5   is a correct transcription of the answers
    given by me to the questions therein
6   propounded, except for the corrections or
    changes in form or substance, if any,
7   noted in the attached Errata Sheet.
8

    _____
9   TINGHUAN FU           DATE
10
11
12
13
14
15

    Subscribed and sworn
16  to before me this
    _____ day of _____, 20_____.
17
    My commission expires:_____
18
19  _____
    Notary Public
20
21
22
23
24

Page 127

1          LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____