# EXHIBIT E

# In Re:
*Chinese Drywall Litigation*

*Mark Patrick Norris*
*November 11, 2010*
*Confidential – Subject to Further Confidentiality Review*

*GOLKOW TECHNOLOGIES, INC.*
*Excellence In Court Reporting For Over 20 Years*
*877.370.3377*
*deps@golkow.com*

Original File mn111110.TXT
**Min-U-Script®**

98

```
 1    to the U.S.
 2         Q.    From whom?
 3         A.    We had inquiries from a
 4    trader from Taiwan.  We had -- we
 5    actually had several inquiries from
 6    different traders.
 7         Q.    Well, let's start with the
 8    trader in Taiwan.  Was that Rothchilt?
 9         A.    That was Rothchilt.
10         Q.    How did Rothchilt come to
11    you, do you know?
12         A.    He didn't come to me
13    directly.  He came to my export
14    supervisor.  She informed me that --
15         Q.    Who was that?
16         A.    Cecilia Wang, W-A-N-G.
17         Q.    Who was she employed by?
18         A.    KPT.
19         Q.    Go ahead.
20         A.    So, she informed me that a
21    gentleman from Ningbo, N-I-N-G-B-O --
22         Q.    Say that again.
23         A.    Ningbo.
24         Q.    Spell.
```

103

1           Q.   If I asked you to go back to
2      your records, could you find an address
3      for them today?
4           A.   I could give you the
5      Taiwanese address.
6           Q.   Yes, could you?
7           A.   I think it's on the sales
8      documents.  So, I would just you give
9      that.
10          Q.   I meant where they are
11     presently located in 2010.
12          A.   No.  I don't know.
13          Q.   Do you know whether they're
14     still in business?
15          A.   I have no idea.
16          Q.   When did you lose track of
17     them, after the smelly drywall problem?
18          A.   200 -- end of 2007, if I had
19     to guess.
20          Q.   What did Cecilia tell you
21     they needed and what they needed it for
22     and where your drywall would go?
23          A.   They -- he said that they
24     needed several million square meters.

104

1  They wanted to send it to the U.S., and
2  they wanted a supply contract that was
3  ongoing.  So, not all in one hit, but
4  periodically.
5           Q.   Did they tell you where in
6  the U.S. it was going?
7           A.   In the first initial
8  contact, no.
9           Q.   Did you later learn where it
10 was going?
11          A.   Yes.
12          Q.   And where was it?
13          A.   The port of Miami.
14          Q.   And did you know why Miami
15 was in need -- the Florida area was in
16 need of this drywall?
17          A.   I had only been told from
18 the customers that there was a drywall
19 shortage.
20          Q.   What customers?
21          A.   From Jawahar when he had
22 written to -- sorry -- when he had spoken
23 to Cecilia.
24          Q.   Did he tell you why there

119

1          MR. MAYESH:  Objection.
2          THE WITNESS:  No.  They
3      referred a customer to me.  If --
4      it was actually three customers
5      they referred to me.  I'm sorry I
6      can't recall the third.  The first
7      one was INEX, the second one was
8      Mike somebody.  The third one, I
9      can't remember.  We gave
10     quotations to all three, and two
11     of them didn't purchase.  Two of
12     them -- one didn't respond nor was
13     interested.
14  BY MR. LEVIN:
15     Q.   But INEX did purchase?
16     A.   INEX did purchase.
17     Q.   And who created the price
18  structure for the INEX purchasing?
19     A.   Myself, John Davis and Ann
20  Zhong.
21     Q.   Did Tony have anything to do
22  with that?
23     A.   Did Tony have anything to do
24  with the pricing?

120

1    Q.   Setting the prices.
2    A.   No, Tony did not.  I asked
3  Jeff Brisley what the current market
4  prices were because I had no idea what
5  they were.
6    Q.   And Jeff sent them to you?
7    A.   And Jeff sent them to me.
8  He said, to the best of my knowledge,
9  this is what drywall costs in the U.S.
10   Q.   And who made the
11 arrangements for shipping to bring the
12 product into the United States, INEX
13 product?
14   A.   INEX.
15   Q.   You also brought the product
16 into Florida, did you not?
17   A.   Into Miami?
18   Q.   Yes.
19   A.   Yes.
20   Q.   How did it get there?  Not
21 by boat, you know, not by a vessel.  I
22 mean, what occurred, and who did you
23 communicate with, and who were you
24 dealing with to get the drywall into

163

1       Q.    Did you ever find out why
2 you as a majordomo at KPT weren't told of
3 this problem for two years?
4       A.    I wasn't aware that it had
5 been reported there was an impact on
6 copper before the 2008 period of time.
7       Q.    But did you ever make a
8 determination as to why it took two years
9 for somebody to tell you that?
10       A.    No.
11       Q.    Who finally told you that?
12       A.    I believe that it was
13 brought to our attention by Lennar Homes.
14       Q.    By Lennar?
15       A.    Yes.
16       Q.    In 2008?
17       A.    Yes.
18       Q.    How did Lennar impart that
19 particular knowledge on you?
20       A.    Through L&W.  They're the
21 people they bought the plasterboard
22 through.
23       Q.    They bought from L&W, which
24 was a subsidiary or affiliate of US

Mark Patrick Norris
Confidential – Subject to Further Confidentiality Review

164

1   Gypsum?
2       A.   I think so.
3       Q.   And how did the plasterboard
4   get to L&W?  Who made the arrangements to
5   bring in the Knauf product to L&W?  And
6   that was in Florida, was it not?
7       A.   L&W or is -- Tampa is
8   Florida?
9       Q.   Yes.
10      A.   Yes.  It was Tampa.
11      Q.   Who made the arrangements?
12      A.   Of the dispatch?
13      Q.   No.  Of getting the product
14  to L&W.
15      A.   L&W looked after their
16  freight.  It originally started with the
17  freight, and then we took over the entire
18  process of delivering it to them.
19      Q.   So, you were actually
20  delivering the product into Florida?
21      A.   Yes.  We did a CIF.
22      Q.   KPT was making the
23  arrangements for the freight?
24      A.   Yes.

Mark Patrick Norris
Confidential – Subject to Further Confidentiality Review

364

1        C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a
  Registered Diplomate Reporter, Certified
4 Court Reporter and Notary Public, do
  hereby certify that, pursuant to notice,
5 the deposition of MARK PATRICK NORRIS was
  duly taken on November 11, 2010 at 9:13
6 a.m. before me.

7
              The said MARK PATRICK NORRIS
8 was duly sworn by me through interpreters
  according to law to tell the truth, the
9 whole truth and nothing but the truth and
  thereupon did testify as set forth in the
10 above transcript of testimony.  The
  testimony was taken down stenographically
11 by me.

12
              I do further certify that
13 the above deposition is full, complete
  and a true record of all the testimony
14 given by the said witness.

15

16       [signature]

17
        Linda L. Golkow
18      Registered Diplomate Reporter
        Certified Realtime Reporter

19

20

21             (The foregoing certification
  of this transcript does not apply to any
22 reproduction of the same by any means,
  unless under the direct control and/or
23 supervision of the certifying reporter.)

24

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377