# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |
| **THIS DOCUMENT RELATES TO:**<br><br>*Gross v. Knauf Gips KG, 2:09-cv-6690*<br>*Amorin v. Taishan Gypsum, 2:11-cv-1672*<br>*Amorin v. Taishan Gypsum, 2:11-cv-1395*<br>*Amorin v. Taishan Gypsum, 2:11-cv-1673*<br>*Amorin v. SASAC, 2:14-cv-1727*<br>*State of Louisiana v. Knauf, 2:10-cv-340*<br>*Abner v. Taishan Gypsum, 2:11-cv-3094*<br>*Posey v. BNBM Co., 2:09-cv-6531*<br>*Morris v. BNBM Co., 2:09-cv-6530* | |

## RESPONSE OF PLAINTIFFS' STEERING COMMITTEE TO CNBM GROUP'S MOTION TO DISMISS ON GROUNDS OF THE FOREIGN SOVEREIGN IMMUNITIES ACT

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
Madelyn O. Breerwood
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

Arnold Levin
Fred S. Longer
Sandra L. Duggan
Matthew C. Gaughan
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street
Suite 500
Philadelphia, PA  19106
Phone:  (215) 592-1500
Fax:  (215) 592-4663
ALevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

(Additional Counsel on Signature Page)

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................v

TABLE OF EXHIBITS ....................................................................................................x

PRELIMINARY STATEMENT ......................................................................................1

I.   INTRODUCTION ...................................................................................................3

II.  STATEMENT OF FACTS ......................................................................................5

      A.  CNBM Group Is the Alter Ego of BNBM Group, CNBM, BNBM, and Taishan ...........................................................................................................5

            1.  From 2005-Present, CNBM Group has Been the Ultimate Controlling Shareholder of: .................................................................5

                  a.  BNBM Group..............................................................................5

                  b.  CNBM.........................................................................................7

                  c.  BNBM.........................................................................................13

                  d.  Taishan......................................................................................18

            2.  During the Period When Taishan's Defective Drywall was Shipped to the United States, Taishan Was Controlled by CNBM Group ...........................................................................................21

                  a.  BNBM.........................................................................................21

                  b.  Shandong Taihe Building Materials (f/k/a Tai'an Anxin Investment & Trade Company) ............................................22

                  c.  Beijing Donglian Investment & Trading Limited Company ..................................................................................22

                  d.  Tai'an State-owned Asset Management Company.............................23

        e.   JIA Tongchun......................................................................23

3.    CNBM Group Exercises Control Over the Internal Business
      Operations and Affairs of BNBM Group, CNBM, BNBM, and
      Taishan....................................................................................25

        a.   CNBM Group Directly or Indirectly Appoints and
            Controls Board of Directors Members and/or Executive
            Officers for Each of its Subsidiaries ..................................26

        b.   CNBM Group Issues Various and Extensive Business
            Policies and Procedures for its Subsidiaries to Follow......29

        c.   CNBM Group Issues Requirements to its Subsidiaries......32

        d.   CNBM Group Trains the Leaders at Middle and Senior
            Levels of BNBM Group, CNBM, BNBM and Taishan......................35

4.    CNBM Group, BNBM Group, CNBM, BNBM, and Taishan
      Share Common Numerous Officers and Directors ...........................36

5.    CNBM Group Controls Financing for its Subsidiaries,
      Including BNBM Group, CNBM, BNBM, and Taishan ...............................43

6.    CNBM Group Shares and Controls Similar Business Functions
      with BNBM Group, CNBM, BNBM, and Taishan .........................46

7.    CNBM/BNBM and Taishan Share Common Offices...................47

8.    Defendants Share a Common Logo, Corporate Identity, and
      Website Advertisements .................................................................51

9.    CNBM Group Transferred Assets Among its Inter-related
      Entities for Nil Consideration ........................................................54

10.   The CNBM/BNBM and Taishan Defendants Failed to Follow
      Proper Corporate Procedure...........................................................57

a. JIA Tongchun's Position as a Director of BNBM While He Owned 5% of Taishan's Stock Was Improper ............................................. 57

b. There Is Evidence of Improper Transfers of Funds from CNBM to BNBM, and Then to Taishan ............................................. 59

B. CNBM Group Was Directly Involved in the Issues Surrounding Taishan's Sales of Drywall to the United States ..................................................... 60

C. CNBM Group Orchestrated a Comprehensive, Unified Strategy for Defendants' Response to the U.S. Drywall Litigation ........................................... 61

1. CNBM Group's Chairman Met with the Company's Competitor and Co-Defendant Knauf to Discuss the Chinese Drywall Problem .................................................................................... 63

2. CNBM Group Closely Monitored the Chinese Drywall Lawsuits Filed Against Taishan and its Parent Companies and Controlled Their Participation in the Litigation ............................................. 65

3. CNBM Group's Course of Action Included Joint Defense Agreements With its Subsidiaries and the Sharing and Swapping of the Same Law Firms ................................................................. 70

4. CNBM Group was Directly Involved in and Controlled the Decision for Taishan Not to Appear at the Court-Ordered Judgment Debtor Examination on July 17, 2014 ............................................. 73

D. CNBM Group Through Its Controlled Subsidiaries Uses the U.S. Market for Commercial Purposes ......................................................................... 78

E. The Untimely Productions of CNBM Group and the Other Defendants Left the PSC at a Distinct and Realized Disadvantage with Respect to Learning CNBM Group's True Relationship with BNBM Group, CNBM, BNBM, and Taishan ..................................................... 83

III. ARGUMENT ............................................................................................................. 86

iv

A.  CNBM Group Is Not Entitled to FSIA Immunity .................................................86

    1.  Historical and Statutory Background .............................................................86

    2.  CNBM Group Is Not a Foreign Agency or Instrumentality for Purposes of the FSIA ......................................................................................89

    3.  Even If CNBM Group Was a Foreign Agency or Instrumentality Covered by the FSIA, The Statutory Exceptions to Immunity Apply ....................................................................94

        a.  The Burden of Proving That the Commercial Activity Is Inapplicable Ultimately Rests with CNBM Group .............................94

        b.  The FSIA's Commercial Activity Exception Applies ........................95

        c.  The Tort Exception to FSIA Immunity Also Applies .......................104

        d.  Both the Tortious Activity and Commercial Conduct Exceptions Apply on the Basis of the Actions of CNBM Group's Affiliates, Which Can Be Imputed to It ................105

    4.  In the Alternative, Plaintiffs Are Entitled to Additional Discovery on the Issue of Whether the Commercial Activity Exception Applies .........................................................................................113

IV.  CONCLUSION .........................................................................................................116

v

## TABLE OF AUTHORITIES

### Cases

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n,*
    528 F.3d 934 (D.C. Cir. 2008) .................................................................... 98

*Alfred Dunhill of London, Inc. v. Republic of Cuba,*
    425 U.S. 682 (1976).................................................................................. 84, 95

*Altmann v. Republic of Austria,*
    317 F.3d 954 (9th Cir. 2002) .................................................................... 98

*Arriba Ltd. v. Petroleos Mexicanos,*
    962 F.2d 528 (5th Cir. 1992) .................................................................... 111

*Bank of the Republic of China v. Grenada,*
    768 F.3d 75 (2d Cir. 2014)...................................................................... 84, 85

*Bank of United States v. Planters' Bank of Ga.,*
    22 U.S. 904 (1824).................................................................................. 95

*Bd. of Regents of Univ. of Tex. Sys. v. Nippon Tel. & Tel. Corp.,*
    478 F.3d 274 (5th Cir. 2007) .................................................................... 88

*Best Med. Belgium, Inc. v. Kingdom of Belgium,*
    913 F. Supp. 2d 230 (E.D. Va. 2012) ...................................................... 100

*Bowers ex rel. NYSA-ILA Pension Trust Fund v. Transportes Navieros Ecuadorianos*
    *(Transnave),* 719 F. Supp. 166 (S.D.N.Y. 1989) .................................... 94

*Box v. Dallas Mexican Consulate Gen.,*
    487 F. App'x 880 (5th Cir. 2012) .................................................... 110, 112

*Callejo v. Bancomer, S.A.,*
    764 F.2d 1101 (5th Cir. 1985) .................................................................. 96

*Can-Am Int'l, LLC v. Republic of Trinidad & Tobago,*
    169 F. App'x 396 (5th Cir. 2006) ............................................................ 94

*Cannon Manufacturing Co. v. Cudahy Packing Co.,*
    267 U.S. 333 (1925)................................................................................ 103

*Cmty. Fin. Grp., Inc. v. Republic of Kenya,*
    663 F.3d 977 (8th Cir. 2011) .................................................................... 99

*Compania del Bajo Caroni (Caromin) v. Bolivarian Republic of Venezuela,*
    556 F. Supp. 2d 272 (S.D.N.Y. 2008)...................................................... 111

*Conn. Bank of Commerce v. Republic of Congo,*
    309 F.3d 240 (5th Cir. 2002) .................................................................... 110

*Dale v. Colagiovanni,*
    443 F.3d 425 (5th Cir. 2006) ............................................................ 109, 110

*Daly v. Castro Llanes,*
    30 F. Supp. 2d 407 (S.D.N.Y. 1998)........................................................ 95

*De Sanchez v. Banco Central De Nicaragua,*
    770 F.2d 1385 (5th Cir. 1985) .................................................................. 102

*European Cmty. v. RJR Nabisco, Inc.,*
    764 F.3d 129 (2d Cir. 2014)...................................................................... 88

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*,
    322 F.3d 635 (9th Cir. 2003) ..................................................................... 91
*Evans v. Pemex*,
    390 F. Supp. 2d 587 (S.D. Tex. 2005) ..................................................... 111
*Filus v. Lot Polish Airlines*,
    907 F.2d 1328 (2d Cir. 1990)................................................................... 111
*First Inv. Corp. of the Marshall Islands v. Fujian Mawei Shipbuilding, Ltd. of People's Republic of China*,  858 F. Supp. 2d 658 (E.D. La.)............................................... 111
*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983)........................................................................... 108, 109
*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
    905 F.2d 438 (D.C. Cir. 1990) ............................................................ 88, 90
*Forsythe v. Saudi Arabian Airlines Corp.*,
    885 F.2d 285 (5th Cir. 1989) ..................................................................... 93
*Freund v. Republic of France*,
    592 F. Supp. 2d 540 (S.D.N.Y. 2008)..................................................... 110
*Gang Chen v. China Cent. Television*,
    320 F. App'x 71 (2d Cir. 2009) ................................................................. 90
*Glencore, Ltd. v. Chase Manhattan Bank, N.A.*,
    No. 92 Civ. 6214 (JFK), 1998 WL 74294 (S.D.N.Y. Feb. 20, 1998)...................... 91
*Green v. Champion Ins. Co.*,
    577 So. 2d 249 ...................................................................... 5, 105, 107
*Guevara v. Republic of Peru*,
    468 F.3d 1289 (11th Cir. 2006) ............................................................ 96, 98
*Hansen v. PT Bank Negara Indonesia (Persero), TBK*,
    601 F.3d 1059 (10th Cir. 2010) ............................................................... 113
*Hatzlachh Supply Inc. v. Savannah Bank of Nigeria*,
    649 F. Supp. 688 (S.D.N.Y. 1986)............................................................. 99
*Hester Int'l Corp. v. Fed. Republic of Nigeria*,
    879 F.2d 170 (5th Cir. 1989) ............................................................... 93, 94
*Holden v. Canadian Consulate*,
    92 F.3d 918 (9th Cir. 1996) ...................................................................... 98
*In re 650 Fifth Ave. & Related Properties*,
    881 F. Supp. 2d 533 (S.D.N.Y. 2012)........................................................ 92
*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
    753 F.3d 521 (5th Cir. 2014) ............................................................. passim
*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
    894 F. Supp. 2d 819 (E.D. La. 2012).................................................... passim
*In re Potash Antitrust Litig.*,
    686 F. Supp. 2d 816 (N.D. Ill. 2010) ........................................................ 99
*Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1024 (9th Cir. 1987) ........... 96, 97
*Kato v. Ishihara*,
    360 F. 3d 106 (2d Cir. 2004)................................................................... 100

*Kelly v. Syria Shell Petroleum Dev. B.V.*,
  213 F.3d 841 (5th Cir. 2000) ............................................................................ 88, 91, 111

*Kim v. Korea Trade Promotion-Inv. Agency*,
  No. 13-CV-7576 (RJS), 2014 WL 4494136 (S.D.N.Y. Sept. 11, 2014) ............................ 100

*Koehler v. Bank of Bermuda, Ltd.*,
  12 N.Y.3d 533, 883 N.Y.S.2d 763, 911 N.E.2d 825 (N.Y. 2009) ..................................... 32

*Long v. Chevron Corp.*,
  2011 WL 3903066 (E.D. Va. Sept. 2, 2011) ................................................................... 107

*Marathon Int'l Petroleum Supply Co. v. I.T.I. Shipping, S.A.*,
  728 F. Supp. 1027 (S.D.N.Y. 1990) ................................................................................. 99

*Millicom Int'l Cellular v. Republic of Costa Rica*,
  No. 96-315(RMU), 1997 WL 527340 (D.D.C. Aug. 18, 1997) ................................... 110, 111

*Ministry of Oil of Republic of Iraq v. 1,032,212 Barrels of Crude Oil Aboard United Kalavrvta*,
  No. G-14-249, 2015 WL 93900 (S.D. Tex. Jan. 7, 2015) .................................................... 99

*Moran v. Kingdom of Saudi Arabia*,
  27 F.3d 169 (5th Cir. 1994) ........................................................................................... 102

*NLRB v. Deena Artware, Inc.*,
  361 U.S. 398 (1960) ...................................................................................................... 109

*Ocean Line Holdings Ltd. v. China Nat'l Chartering Corp.*,
  578 F. Supp. 2d 621 (S.D.N.Y. 2008) .............................................................................. 90

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*,
  No. 04-332 EGS, 2006 WL 2711527 (D.D.C. Sept. 21, 2006) ............................................ 99

*Patrickson v. Dole Food Co.*,
  251 F.3d 795 (9th Cir. 2001) ........................................................................................... 92

*Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*,
  476 F.3d 140 (2d Cir. 2007) ............................................................................................ 90

*Pere v. Nuovo Pignone, Inc.*,
  150 F.3d 477 (5th Cir. 1998) ........................................................................................... 93

*Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*,
  185 F. Supp. 2d 335 (S.D.N.Y. 2002) ............................................................................ 111

*Republic of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992) ......................................................................................... 84, 94, 95

*Republic of Austria v. Altmann*,
  541 U.S. 677 (2004) ........................................................................................................ 85

*RSM Prod. Corp. v. Petroleos de Venezuela Societa Anonima (PDVSA)*,
  338 F. Supp. 2d 1208 (D. Colo. 2004) .............................................................................. 91

*Rubin v. The Islamic Republic of Iran*,
  637 F.3d 783 (7th Cir. 2011) ........................................................................................... 87

*Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*,
  877 F.2d 574 (7th Cir. 1989) ........................................................................................... 95

*Samantar v. Yousuf*,
  560 U.S. 305 (2010) ......................................................................................... 84, 85, 86

*Santilli v. Cardone*,
  No. 807-CV-308-T-23MSS, 2008 WL 2790242 (M.D. Fla. July 18, 2008) .................... 90, 92

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993)..................................................................................... 94
*Southway v. Cent. Bank of Nigeria*,
   994 F. Supp. 1299 (D. Colo. 1998)............................................................. 113
*Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo Gen. del Sindicato*
   *Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C.*,
   923 F.2d 380 (5th Cir. 1991) ............................................................... 93, 101
*supra. Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazy*
   *na JSC*, 2 F. Supp. 3d 550 (S.D.N.Y. 2014) ........................................... 100
*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
   No. 97 Civ. 6124 (JGK), 1999 WL 307666 (S.D.N.Y. May 17, 1999).................. 91
*Ungar v. Palestine Liberation Org.*,
   402 F.3d 274 (1st Cir. 2005)..................................................................... 2, 3
*USX Corp. v. Adriatic Ins. Co.*,
   345 F.3d 190 (3d Cir. 2003)......................................................................... 88
*Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation*
   *(C.N.A.N.)*,
   730 F.2d 195 (5th Cir. 1984) .................................................................... 101
*Verlinden B.V. v. Cent. Bank of Nigeria*,
   461 U.S. 480 (1983)................................................................................ 85, 86
*Voest-Alpine Trading USA Corp. v. Bank of China*,
   142 F.3d 887 (5th Cir. 1998) ...................................................................... 93
*Wahba v. Nat'l Bank of Egypt*,
   457 F. Supp. 2d 721 (E.D. Tex. 2006)...................................................... 113
*Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*,
   965 F.2d 1375 (5th Cir. 1992) .............................................................. 96, 108
*Walters v. Indus. & Commercial Bank of China, Ltd.*,
   651 F.3d 280 (2d Cir. 2011)........................................................................ 86
*Welch v. PUC Servs., Inc.*,
   No. 2:06-CV-230, 2007 WL 2818805 (W.D. Mich. Sept. 25, 2007) ...................... 90

**Statutes**
28 U.S.C. § 1600........................................................................................... 1
28 U.S.C. § 1604......................................................................................... 86
28 U.S.C. § 1605(a)(2).................................................................................. 94
28 U.S.C. § 1605(a)(5).................................................................................. 102
28 U.S.C. §§ 1601-11.................................................................................... 84
28 U.S.C. §§ 1605-07.................................................................................... 86

**Rules**
Fed. R. Civ. P. 12(b)(1).................................................................................. 1
FRE 1006 ................................................................................................... 44

**Other Authorities**
1976 U.S.C.C.A.N. 6604 ......................................................................... 86, 96

ix

1976 U.S.C.C.A.N. 6605 ................................................................................................... 97

1976 U.S.C.C.A.N. 6613 ................................................................................................... 97

1976 U.S.C.C.A.N. 6614 ................................................................................................... 93

1976 U.S.C.C.A.N. 6615 ................................................................................................... 99

1976 U.S.C.C.A.N 6606 .................................................................................................... 86

H.R. 11315 ......................................................................................................................... 97

H.R. Rep. No. 94-1487 ............................................................................................... passim

x

## INDEX OF EXHIBITS

**FSIA EXHIBIT**
**NUMBER**

| | |
|---|---|
| 1 | Deposition of BNBM Group (ZHAO Yanming) dated 7/15-17/2015 |
| 2 | 2005 CNBM Annual Report [ALRMH-CNBM00004244-4352] (Exhibit 4) |
| 3 | 2005 BNBM Annual Report [BNBMPLC0000288-380] (Exhibit 136) |
| 4 | Deposition of CNBM Forest Products (Canada) Ltd.DENG Jianjun dated 10/28/2015 |
| 5 | 2006 CNBM Global Offering Prospectus [ALRMH-CNBM000001-643] (Exhibit 3) |
| 6 | 2005 BNBM Group Auditor's Report [BNBM(Group)00000427R-518R] (Exhibit 168R) |
| 7 | 2006 CNBM Annual Report [ALRMH-CNBM00004106-4243] (Exhibit 5) |
| 8 | 2006 BNBM Annual Report [BNBMPLC0000489-605] (Exhibit 14) |
| 9 | 2007 CNBM Annual Report [ALRMH-CNBM00000782-949] (Exhibit 6) |
| 10 | 2007 BNBM Annual Report [BNBMPLC0000722-841] (Exhibit 15) |
| 11 | 2008 CNBM Annual Report [ALRMH-CNBM00001118-315] (Exhibit 7) |
| 12 | 2008 BNBM Annual Report [BNBMPLC0000961-1080] (Exhibit 16) |
| 13 | 2008 BNBM Group Auditor's Report 2008 [BNBM(Group)0000745R-807R] (Exhibit 171R) |

14          2009 CNBM Annual Report [ALRMH-CNBM00001514-719] (Exhibit  8)

15          2009 BNBM Annual Report [BNBMPLC0001229-378] (Exhibit 17)

16          2011 CNBM Annual Report [ALRMH-CNBM00002354-571] (Exhibit 10)

17          2012 CNBM Annual Report [ALRMH-CNBM00002790-3007] (Exhibit 11)

18          2012 BNBM Annual Report [BNBMPLC00002273-480] (Exhibit 20)

19          2013 CNBM Annual Report [ALRMH-CNBM00003226-443] (Exhibit 12)

20          2013 BNBM Annual Report [BNBMPLC0002743-944] (Exhibit 21)

21          2011 BNBM Annual Report [BNBMPLC0001862-2018] (Exhibit 19)

22          2014 CNBM Annual Report [ALRMH-CNBM00003662-883] (Exhibit 13)

23          2014 BNBM Annual Report [BNBMPLC0003164-336] (Exhibit 22)

24          Deposition of CNBM (CHANG Zhangli) dated 6/5-7/2015

25          Deposition of SONG Zhiping dated 9/14-15/2015

26          2015 CNBM Interim Report [PSC00000001-0102] (Exhibit 334)

27          Deposition of Taishan (CHE Gang) dated 6/2-4/2015

28          2010 CNBM Annual Report [ALRMH-CNBM00001926-2139] (Exhibit 9)

| | |
|---|---|
| 29 | 2010 BNBM Annual Report [BNBMPLC0001542-695] (Exhibit 18) |
| 30 | CNBM Announcement: Acquisition of Equity Interest in Taishan Gypsum Through Share Issuance of BNBM dated 10/13/2015 |
| 31 | Deposition of JIA Tongchun dated 9/17-18/2015 |
| 32 | Articles of Association of Shandong Taihe Dongxin Co., Ltd., dated 8/8/2006 [Herman Aff. Ex. 132 filed 5/8/2012] |
| 33 | Announcement for Decision of 12th Interim Meeting of the Third Board of Directors, dated 4/23/2005 [BNBMPLC0004402-4403] (part of Exhibit 101) |
| 34 | BNBM PLC Annual General Meeting of Shareholders, dated 4/8/2004 [BNBMPLC0006280-6283] (part of Exhibit 103) |
| 35 | Shandong Taihe Building Materials Corporation Forms |
| 36 | Declaration of JIA Tongchun ("JIA Declaration") dated 9/16/2015 (Exhibit 335) |
| 37 | CNBM Public Regulatory Announcement: "Connected Transaction Acquisition of the Entire Equity Interest in Tai'an Donglian Investment Trading Company Limited" dated 8/28/2006 (Herman Aff. Ex. 134 filed 5/8/2012) |
| 38 | CNBM Group's "Home" webpage, www.cnbm.com.cn/EN/ |
| 39 | CNBM trademark records, United States Patent and Trademark Office |
| 40 | Deposition of BNBM PLC (CHEN Yu) dated 7/8-11/2015 |
| 41 | Deposition of WANG Bing dated 8/25-27/2015 |
| 42 | Summary Chart of Overlapping Executives and Officers (Exhibit 23-1) |
| 43 | China National Building Material Group Corporation Administrative    Measures for Appointing Representatives of Capital Contributors [BNBM (Group)-E-0005107-5115] (Exhibit 249) |

44              China National Building Material Group Corporation Sample
                Document [CNBMGRP00006793-6795](Exhibit 75)

45              "China National Building Material Group Corporation Year of
                2015 - 2017 "Development Strategy and Plan" dated April, 2015
                [CNBMGRP000013290-13347](Exhibit 91)

46              "Beijing New Building Materials (Group) Company Limited
                Internal Control System Construction Work Summary"
                submitted to CNBM Group [BNBM(Group)-E-0004986-4990]
                (Exhibit 247)

47              "Taishan Gypsum Company Limited Comprehensive Risk
                Management Report for the Year 2011" submitted to CNBM
                Group, CNBM and BNBM [CNBMGRP00371516-371562]
                (Exhibit 416)

48              "China National Building Material Group Corporation
                Comprehensive Risk Management Report of the Year 2010"
                [CNBMGRP00330873-330934] (Exhibit 388)

49              "China National Building Material Group Corporation Interim
                Measure on Fully Implementing the Decision-Making Rules for
                the 'Three Significant Issues and One Large Operation'"
                [BNBMPLC-E-0001156-1172] (Exhibit 113)

50              "Statement on Implementing the Requirements from the Group
                Corporation's Meeting of International Business Risk
                Prevention," dated 7/11/2014 [Translation of BNBM(Group)-E-
                0000444-446] (Exhibit 215)

51              Email and attachment to JIA Tongchun re: Notice on Matters
                Relevant to CNBM Group's Training Class in 2011 for Leaders
                at Middle and Senior Levels dated 6/29/2011 [Translation of TG-
                0073103-73111]

52              Stock Listing Rules of the Shenzhen Stock Exchange (2014
                Revision), No. 378 and Partial Translation of same

53              CNBM Group Board of Directors Meeting Minutes, 23rd Meeting
                of the Third Session of Board of Directors, dated 1/29/2015
                [Translation of CNBMGRP00012512) (Exhibit 98)

54     CNBM Group's "Reply on Beijing New Building Material (Group) Co., Ltd.'s 2013 annual loan and guarantee plan" [CNBMGRP00000564] (Exhibit 86)

55     BNBM (Group) Guarantee for Taishan for 100,000,00 yuan with Taian Quingnian Street Branch of China- "Maximum Guarantee Contract Serial No. 2013-123010-ZG03" dated 1/10/2013 [TG-068133-53 English translation provided by Taishan]

56     BNBM Group Guarantee for Taishan for 350,000,000 yuan with Agricultural Bank of China Taian Longze Sub Branch- "Maximum Guarantee Contract Serial No. 371000520130051039" dated 7/11/2013 [TG-067973-90 English translation provided by Taishan]

57     BNBM Guarantees to/Investments in Taishan Gypsum - FRE 1006 Summary Chart (reflecting BNBM's Guarantees from 2005 to 2014) (Exhibit 162-1)

58     CNBM Storefront on Alibaba.com [ALRMH-CNBM00010001-10002](Exhibit 270-1)

59     BNBM PLC Public Announcement of the External Guaranties for the year 2015 dated 3/18/2015 [BNBMPLC-E-0112095R-112112R] (Exhibit 322R)

60     BNBM PLC Resolution of the 2013 Annual General Meeting of Shareholders dated 4/16/2014 [BNBMPLC-E-0011157R-0011166R] (Exhibit 305R)

61     CNBM Guarantees to BNBM - FRE 1006 Summary Chart (Exhibit 346)

62     Deposition of CTIEC-TECO American Technology, Inc. (Fred Paulsen) dated 4/24/2015

63     CNBM Group's "Global Presence" webpage, http://www.cnbm.com.cn/EN/c_00000016000300001/ (Exhibit 89)

64     2006 BNBM Group Auditor's Report [BNBM(Group)00000560R-611R] (Exhibit 169R)

| 65 | 2007 BNBM Group Auditor's Report [BNBM(Group)0000651R-701R] (Exhibit 170R) |

66   Transcript of Motion Hearing Proceedings dated 10/6/2015

67   2009 BNBM Group Auditor's Report [BNBM(Group)00000850R-913R] (Exhibit 172R)

68   2010 BNBM Group Auditor's Report [BNBM(Group)00000956R-1011R] (Exhibit 173R)

69   2011 BNBM Group Auditor's Report [BNBM(Group)00001054R-109R] (Exhibit 174R)

70   2012 BNBM Group Auditor's Report [BNBM(Group)00001154R-213R] (Exhibit 175R)

71   2013 BNBM Group Auditor's Report [BNBM(Group)00001266R-337R] (Exhibit 176R)

72   2014 BNBM Group Auditor's Report [BNBM(Group)00003274R-330R] (Exhibit 177R)

73   Taishan Gypsum Co., Ltd. Resolutions of the First Meeting of the 4th Board of Directors [TG 0020787] (Exhibit 23-1 at Exhibit 14)

74   "Main Issues in State-owned Asset Supervision and Administration Commission's Audit of Economic Responsibility" [BNBMPLC-E-0010163R] (Exhibit 134R)

75   "Award for Significant Business Contributors from Taishan Gypsum and BNBM Homes," dated 01/20/2012 [BNBMPLC0007291] (Exhibit 143)

76   Problems Discovered During Auditing Review [CNBMGRP00009807-9838](Exhibit 133)

77   Explanation on the Rectification Status [BNBMPLC-E-0010164](Exhibit 134-1)

78   Communications about the Problems of BNBM [Partial Translation of BNBMPLC-E-0006059-6060] (Exhibit 123)

79             Summary Chart of Taishan Gypsum Board Sales to United States, with supporting documentation (Exhibit 394)

80             Summary Chart of BNBM Sales, Contracts, and Shipments of Gypsum Drywall to U.S. (Exhibit 96)

81             Email from PENG Wenlong (Taishan) to ZHANG Jian (CNBM Group) dated 6/27/2010 re Spreadsheets of TSG Exports [Translation of TG-0129674-676]

82             CNBM Group Resolution No. 17 of the Third Session of the Board of Directors of CNBM Group dated 7/11/2014[CNBMGRP00393000-002] (part of Exhibit 332)

83             Memorandum re "The Course of Events on Hiring Foreign Law Firms for the Gypsum Board Litigation in the United States – Brief Version of the Related Meetings" (redacted version of Exhibit 323) [BNBMPLC-E-0059965-0059966]

84             Letters with attachments from Knauf to SONG Zhiping (CNBM Group) and WANG Bing (BNBM Group) dated 5/15/2009 [KNAUFGIPS0160544-888] (Exhibit 61)

85             Memorandum [Translation of BNBMPLC-E-0059967-77] (redacted version of Exhibit 331)

86             Privilege Log Produced by Hogan Lovells showing over 200 emails beginning in August, 2009 (Exhibit 66)

87             Refusals of Service by CNBM Group (Exhibit 264)

88             Refusals of Service by BNBM Group (Exhibit 95)

89             Refusals of Service by CNBM (Exhibit 263)

90             Refusals of Service by BNBM (Exhibit 93)

91             Letter from James Stengel of Orrick to Arnold Levin dated 10/13/13 advising that Orrick had been retained as counsel for BNBM (Herman Aff. Ex. 144 filed 5/8/2012)

92        Transcript of Special Hearing dated 2/12/2015  [Rec. Doc. No. 18475-7]

93        Common Interest Joint Defense and Commonality Agreement dated 11/29/2010 (Exhibit 358)

94        Common Interest, Joint Defense and Commonality Agreement dated March 2015 [BNBMPLC0007605-7625] (Exhibit 310)

95        CNBM Group's Biography of PENG Xuefeng webpage, http://www.cnbm.com.cn/EN/c_0000001600070003/d_26385.html

96        CNBM Group 18th Meeting of the Third Session of the Board of Directors of CNBM Group dated 8/15/2014 [CNBMGRP00346624-6636] (Exhibit 356) [Rec.Doc. No. 19492-3]

97        BNBM Group website pages [ALRMH-CNBM00008874, 8887] (Exhibits 214 and 214A)

98        CNBM Group Notice of 17th Meeting of Third Session of the Board of Directors of CNBM Group dated 11/7/2014 [CNBMGRP00010052-53]

99        Email from DONG Chungang to Joe Cyr and Eugene Chen at Hogan Lovells dated 7/7/2014 [HL00000026 and HL00000026A](part of Exhibit 1)

100       Email from DONG Chungang to Eugene Chen at Hogan Lovells regarding payment of legal bills dated 8/5/2014 [HL_00000306](part of Exhibit 1)

101       Email from PENG Wenlong to Eugene Chen dated 7/7/2014 [HL00000104-105] (Exhibits 40 and 40A)

102       Chart of CNBM Group Document Productions Before and After 30(b)(6) Deposition

103       Email chain among CNBM Group, Taishan, BNBM and CNBM employees re: Drywall Lawsuit Press Release dated 8/19/2014 [CNBMGRP00346665](Exhibit 342)

104            First Quarter 2012, CNBM Group International Trade Report
               [CNBMGRP00117685-117696](Exhibit 344-2)

105            Chart of CNBM Document Productions Before and After
               30(b)(6) Deposition

106            Chart of Taishan Document Productions Before and After
               30(b)(6) Deposition

107            Chart of BNBM Group Document Productions Before and After
               30(b)(6) Deposition

108            Deposition of New Jersey Institute of Technology (Donald
               Sebastian) dated 4/22/2015 (Exhibit 42-1(A))

109            Deposition of Sunpin Solar Development, LLC (Steve Kim)
               dated 4/17/2015 (Exhibit 42-1(K))

110            Deposition of Western Wood (John Salamanca) dated 5/21/2015
               (Exhibit 43-1(D))

111            Web Article, OKorder.com Official Launch from cnbm.com.cn
               dated 2/18/2011 [ALRMH-CNBM0008810-8812] (Exhibit 81)

112            Web Article, CTIEC signs Wal-Mart Roof Power Plant Project
               from cnbm.com.cn dated 3/2/2015 [ALRMH-CNBM0008813-
               8814] (Exhibit 82)

113            Web Article, CTIEC signed a 100 MW Photovoltaic Power Plant
               Project in the U.S., from cnbm.com.cn dated 12/2/2014
               [ALRMH-CNBM0008854-8855] (Exhibit 82-1)

114            Transcript of Phone Conference Proceedings dated 9/17/2015

115            Letter from CNBM (USA) to Eastern Metal Supply, Inc. created
               on 4/3/2008 [CNBMUSA00045438]

116            2003 For Profit Corporation Uniform Business Report and
               Articles of Incorporation for BNBM of America, Inc. [part of Ex.
               1 to the Deposition of Richard Hannam dated 2/13/2012]
               (Exhibit 144-3)

| | |
|---|---|
| 117 | Notice of the State Administration of Taxation on Issuing the Measures for the Implementation of Special Tax Adjustments (for Trial Implementation) (No. 2 [2009] of the State Administration of Taxation) [ALRMH-CNBM00008856-8872] (Exhibit 90) |
| 118 | Declaration of Professor James Feinerman dated 9/16/2015 (Exhibit 409) |
| 119 | Deposition of CNBM Group ZHOU Guoping dated 6/16-18/2015 |
| 120 | Deposition of PENG Shou dated 9/16/2015 |
| 121 | Resolutions of the General Meeting of Shareholders [of Taishan Gypsum] dated 4/25/2005 [TG0020601-602 & Translation] (Herman Aff. Ex. 185 filed 5/8/2012) |
| 122 | Shandong Taihe Dongxin Co., Ltd. Resolution of the First Extraordinary General Meeting of 2006 of Taishan [TG0020675-676 & Translation] (Herman Aff. Ex. 187 filed 5/8/2012) |
| 123 | *CNBM Import & Export v. Murphy Overseas USA Astoria Forest Products, LLC, et al.*, No. 14-cv-00746 (D.Ore.) [Rec.Doc. No. 18302-8] (Exhibit 508) |
| 124 | Deposition of Jeffrey J. Chang (BNK) dated 5/20/2015 |
| 125 | Deposition of CAO Jianglin dated 8-4-5/2015 |
| 126 | Deposition of Steve Zika dated 5/18/2015 (Exhibit 43-1(S)) |
| 127 | Memorandum of Understanding between Hampton Affiliates and CNBM Group (Exhibit 4 to Zika Deposition) |
| 128 | Murphy Overseas USA Astoria Forest Products, LLC v. CNBM Import & Export, et al., No. 14-cv-00752 (D. Ore.); Westerlund Log Handlers, LLC, et al. v. CNBM Import & Export, et al., No. 14-cv-00618 (Clatsop Cty. Cir. Ct. Ore.) |

129 Joint Post-Hearing Memorandum of Clarification, CNBM Import & Export v. Murphy dated 1/26/15 & 2/10/15 [Rec. Doc. No. 18302-9]

130 Letter from counsel for Murphy/Astoria dated 4/3/2015, Stipulation dated 8/8/2014, Settlement Agreement dated 11/10/2014, and related materials [Rec. Doc. No. 18671-2]

131 Plaintiff China National Building Material Investment Co., Ltd. (f/k/a BND Co., Ltd.'s) Corporate Disclosure Statement filed in CNBMI v. BNK Int'l, No. 14-701 (W.D. Tex.) [part of Rec. Doc. No. 18671-13]

132 Complaint and exhibits thereto in CNBMI v. BNK Int'l, No. 14-701 (W.D. Tex.) [Rec. Doc. No. 18671-13]

133 CNBM Forest Products (Canada) Co., Ltd. "Contracts Status Check" [partial Translation of CNBMFP00001663] (Exhibit 511)

134 "Strengthen Operation, Accelerate Construction, Develop Harmoniously, Work Together to Create Success" [Partial Translation of BNBMPLC-E-0004827-4847] (Exhibit 315R)

135 "Welcome Speech on the 2008 BNBM Annual Marketing Meeting, BNBM General Manager Bing Wang" [Partial Translation of BNBMPLC-E-0005889-92] (Exhibit 316R)

## PRELIMINARY STATEMENT

The Plaintiffs' Steering Committee ("PSC") files this response[1] in opposition to the

Amended Motion of China New [sic] Building Materials Group ("CNBM Group") to Dismiss

the Complaints in the above-captioned actions pursuant to Fed. R. Civ. P. 12(b)(1) for lack of

subject matter jurisdiction on grounds of the Foreign Sovereign Immunities Act, 28 U.S.C. §

1600, *et seq.* [Rec. Doc. No. 19527) (hereafter "FSIA Motion").   "CNBM Group" is an

abbreviation for China *National* Building Material Group Corporation, not China *New* Building

Materials Group.   Counsel for CNBM Group entered their appearance in these proceedings for

the first time in February, 2015, for the correct entity, China National Building Materials Group

Corporation.[2]   However, as shown herein, CNBM Group is the ultimate and actual controlling

shareholder of a deliberately opaque conglomerate of numerous subsidiary companies engaged

in a business enterprise, including Beijing New Building Materials (Group) Co., Ltd. ("BNBM

Group"), China National Building Material Company, Limited ("CNBM"), Beijing New

Building Materials Public Limited Company ("BNBM" or "BNBM PLC"), and others, all having

a CNBM- or BNBM- in their name, using the same recognizable corporate logo, sharing similar

business functions, and often sharing common Officers and Directors, as well as office space.

This single business enterprise has so many moving parts that not even their own counsel, much

less customers in the marketplace, can keep the names straight.

---

[1] Attached to this Response (and filed herewith as Exhibit "A") is the Affidavit of Russ M. Herman dated 10/29/2015, with Exhibits (referred to and cited herein as FSIA Ex. "[__]").

[2] *See* Rec. Doc. No. 18411 (NOTICE of Appearance by Christopher Vejnoska, Ian Johnson, Andrew Davidson, Jason Wu, James L. Stengel, Xiang Wang, Eric A. Shumsky on behalf of Defendants China National Building Materials Group Corporation, China National Building Materials Company Limited); *see also* Rec. Doc. No. 18431 (NOTICE of Appearance by Christopher Vejnoska on behalf of Defendants China National Building Materials & Equipment Import & Export, CNBM Forest Products Canada Ltd.).

Importantly, sovereign immunity is not "a trump card that may be held in reserve until a defendant sees fit to play it, thus enabling the defendant to stop the litigation in its tracks at a time of its choosing." *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 293 (1st Cir. 2005). Nevertheless, CNBM Group has flouted this tenet of the law.  After properly receiving service of process through the Hague Convention, CNBM Group strategically and deliberately refused to answer the Plaintiffs' complaints, it refused to allow its subsidiaries to answer the Plaintiffs' complaints, and it allowed default judgments to be entered against the Company and its subsidiaries, because "there was no treaty to facilitate judicial enforcement between China and the United States."  Then, only after its affiliate and controlled subsidiary, Taishan Gypsum Co., Ltd. ("Taishan Gypsum" or "Taishan"), was found in contempt of court in 2014 did CNBM Group finally choose to enter its appearance, and then, only after actively participating in this case did CNBM Group file its FSIA Motion.  CNBM Group should not be permitted to abuse the legal process, Plaintiffs, and this Court.

To the extent that CNBM Group's Amended Motion to Dismiss is based on lack of personal jurisdiction, lack of service, or other grounds, the PSC will respond at an appropriate time in accordance with a briefing schedule to be established by the Court.  *See* Rec. Doc. No. 19549.

## I.   <u>INTRODUCTION</u>

China National Building Material Group Corporation ("CNBM Group") proudly advertises that it is "No. 1 worldwide" in the Drywall manufacturing business.[3]  In fact, its annual gypsum sales exceed 1.65 billion square meters.  Far from constituting an entity that performs traditional governmental functions, or any governmental function for that matter, this Company has "set up more than 38 branches and 8 offices worldwide involving 28 countries and regions located over five continents around the world, and established import and export business relations with more than 120 countries and regions."[4]  The "Big Group Corporation," as CNBM Group refers to itself internally[5] "has more than 60 overseas building material production lines, including completed ones and those under construction."[6]  CNBM Group's "Global Presence" includes the U.S.A.

---

[3] *See* CNBM Group's "Home" web page, accessible at http://www.cnbm.com.cn/EN/ (attached hereto as FSIA Ex. "38") (highlighting added).  On its website, CNBM Group refers to itself as "CNBM."  *Id.*

[4] *See* CNBM Group "Global Presence" Tab, available at http://www.cnbm.com.cn/EN/c_0000001600030001/ (Exhibit 89) (attached hereto as FSIA Ex. "63").

[5] *See* Deposition of BNBM Group (ZHAO Yanming) dated 7/15-17/2015 ("ZHAO Dep.") (attached hereto as FSIA Ex. "1") at 385:4-6 (Q: "This document refers to the 'big group corporation.' Do you know which corporation that is?" A: "CNBM Group."); *id.* at 385:7-386:9; 406:6-15.

[6] *See* CNBM Group "Global Presence" Tab, available at http://www.cnbm.com.cn/EN/c_0000001600030001/.



At present, the Group has more than 60 overseas building material production lines, including completed ones and those under construction.

USA
CTIEC-TECO American Technology Inc
CNBM International (USA)
CNBM Investment UNITED SUNTECH CRAFT INC

CNBM Group's ultimate and actual control over BNBM Group, CNBM, BNBM, and Taishan, as set forth in detail below, renders these entities a single business enterprise and alter egos of each other under applicable law.  Due to the commercial activity and tortious conduct of BNBM and Taishan in manufacturing and selling defective Chinese Drywall to customers in the United States, which activity and conduct, as alleged in Plaintiffs' Complaints, caused Plaintiffs' injuries,[7] CNBM Group is not entitled to sovereign immunity, even if it were a foreign sovereign

---

[7] Taishan sold more than $8 million worth of its drywall to customers in the United States from 2005-2008.  *See* Affidavit of Russ M. Herman, filed on 5/8/2012, as Exhibit A to the PSC's Global Statement of Facts in Opposition to Taishan's jurisdictional motions [Rec. Doc. No. 14215-3], attaching 202 Exhibits filed manually due to their volume (and referred to as "Herman Aff. Ex. [__] filed 5/8/2012") [*see* Rec. Doc. No. 14224] (incorporated herein by reference); *see also* Summary Chart of Taishan Gypsum Board Sales to United States, with supporting documentation) (Exhibit 394) (attached hereto as FSIA Ex. "79") and Summary Chart of BNBM Sales, Contracts, and Shipments of Gypsum Drywall to U.S. (Exhibit 96) (attached hereto as FSIA Ex. "80").

or an agency or instrumentality of a foreign sovereign, which it is not.  The FSIA Motion is meritless and therefore should be denied.

## II.  STATEMENT OF FACTS

### A.  CNBM Group Is the Alter Ego of BNBM Group, CNBM, BNBM, and Taishan

At all relevant times, CNBM Group has controlled, both directly and indirectly, the share capital in BNBM Group, CNBM, BNBM and Taishan.  Stated otherwise, since 2005, CNBM Group has held and continues to hold "ownership of sufficient stock to give it actual working control" over each of these entities.  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521, 546 (5th Cir. 2014) (quoting *Green v. Champion Ins. Co.*, 577 So. 2d 249, 257-58).

#### 1.  From 2005-present, CNBM Group has Been the Ultimate Controlling Shareholder of:

##### a.  BNBM Group

CNBM Group internally refers to itself as the "Big Group Corporation."  Since 2005, this Company has had complete control over BNBM Group, by directly and/or indirectly holding 100% of BNBM Group's shares.[8]  Beginning in 2005, CNBM Group was the sole shareholder of BNBM Group, directly holding 100% of BNBM Group's stock.[9]  On December 31, 2005, CNBM Group transferred 25% of its equity holding in BNBM Group to China National Building

---

[8] *See* ZHAO Dep. at 385:4-24; *see also id.* at 386:1-9; 406:6-15.

[9] *See* 2005 CNBM Annual Report [ALRMH-CNBM00004244-4352] (Exhibit 4) (attached hereto as FSIA Ex. "2") at 8; 2005 BNBM Annual Report [BNBMPLC0000288-380] (Exhibit 136) (attached hereto as FSIA Ex. "3") at 8.

Material Group Import & Export Company ("CNBM Import & Export"), another wholly-owned

subsidiary of CNBM Group.[10]   Thereafter, CNBM Group continued to maintain total ownership

of BNBM Group's stock (*i.e.*, 100%), although the percentages of CNBM Group's direct

holdings, and the corresponding percentages of its indirect holdings, of BNBM Group's shares

have shifted over the years.[11]   Because BNBM Group is a wholly-owned subsidiary of CNBM

---

[10] *See* 2005 BNBM Group Auditor's Report [BNBM(Group)00000427R-518R] (Exhibit 168R) (attached hereto as FSIA Ex. "6") at 6.  As a result of this transaction, in 2006, 2007 and 2008, shares *directly* held by CNBM Group in BNBM Group decreased to 75%, and the remaining 25% of its shares were held by CNBM Import & Export.  *See* 2006 CNBM Annual Report [ALRMH-CNBM00004106-4243] (Exhibit 5) (attached hereto as FSIA Ex. "7") at 10; 2006 BNBM Annual Report [BNBMPLC0000489-605] (Exhibit 14) (attached hereto as FSIA Ex. "8") at 11; 2007 CNBM Annual Report [ALRMH-CNBM00000782-949] (Exhibit 6) (attached hereto as FSIA Ex. "9") at 10; 2007 BNBM Annual Report [BNBMPLC0000722-841] (Exhibit 15) (attached hereto as FSIA Ex. "10") at 11; 2008 CNBM Annual Report [ALRMH-CNBM00001118-315] (Exhibit 7) (attached hereto as FSIA Ex. "11") at 11; 2008 BNBM Annual Report [BNBMPLC0000961-1080] (Exhibit 16) (attached hereto as FSIA Ex. "12") at 11.

[11] *E.g.*, On June 20, 2008, CNBM Group transferred an additional 10% equity interest it held in BNBM Group to CNBM Group's wholly-owned subsidiary CNBM Import & Export.  *See* 2008 BNBM Group Auditor's Report 2008 [BNBM(Group)0000745R-807R] (Exhibit 171R) (attached hereto as FSIA Ex. "13") at 10.  As a result of this transfer, from June 21, 2008 through 2010, CNBM Group's *direct* ownership interest in BNBM Group consisted of 65% equity interest, and its *indirect* ownership interest, through CNBM Import & Export, was 35% (maintaining CNBM Group's 100% direct and indirect equity interest in BNBM Group).  See 2009 CNBM Annual Report [ALRMH-CNBM00001514-719] (Exhibit 8) (attached hereto as FSIA Ex. "14") at 13; see also 2009 BNBM Annual Report [BNBMPLC0001229-378] (Exhibit 17) (attached hereto as FSIA Ex. "15") at 8-10.  Note that this change in ownership of BNBM Group is not reflected in CNBM's Annual Report until 2009.

In 2011, 2012 and 2013, CNBM Group reported through CNBM's Annual Reports that it directly held 69.45%, and indirectly held 30.55%, equity interest (through CNBM Import & Export), in BNBM Group, which maintained its 100% direct and indirect ownership interest in BNBM Group.  *See* 2011 CNBM Annual Report [ALRMH-CNBM00002354-571] (Exhibit 10) (attached hereto as FSIA Ex. "16") at 12, 160-61; 2012 CNBM Annual Report [ALRMH-CNBM00002790-3007] (Exhibit 11) (attached hereto as FSIA Ex. "17") at 13; 2012 BNBM Annual Report [BNBMPLC00002273-480] (Exhibit 20) (attached hereto as FSIA Ex. "18") at 47-50; 2013 CNBM Annual Report [ALRMH-CNBM00003226-443] (Exhibit 12) (attached hereto as FSIA Ex. "19") at 13; *see also* 2013 BNBM Annual Report [BNBMPLC0002743-944]

Group, the equity interests of all of BNBM Group's subsidiaries are deemed to be held indirectly

by CNBM Group.[12]

### b.  CNBM

Through direct and indirect ownership, CNBM Group has remained the controlling entity

of CNBM from 2004 to the present.[13]  During 2004, in anticipation of the CNBM Global

Offering on the Hong Kong Stock Exchange, CNBM Group executed a massive reorganization

---

(Exhibit 21) (attached hereto as FSIA Ex. "20") at 54.  *See also* 2011 CNBM Annual Report at
12; 2011 BNBM Annual Report [BNBMPLC0001862-2018] (Exhibit 19) (attached hereto as FSIA Ex.
"21") at 10.  CNBM Group never explained how its direct ownership interest in
BNBM Group increased from 65% to 69.45%, or how its corresponding indirect ownership
interest, through CNBM Import & Export, decreased from 35% to 30.55%.

However, in any event, CNBM Group's direct and indirect ownership interest in BNBM
Group always remained at 100%.  In 2014, CNBM Group's direct equity interest in BNBM
Group was reported to increase to 70.04%, with a corresponding reduction to 29.96% of its
indirect equity interest in BNBM Group (through CNBM Import & Export).  *See* 2014 CNBM
Annual Report [ALRMH-CNBM00003662-883] (Exhibit 13) (attached hereto as FSIA Ex. "22")
at 13; *see also* 2014 BNBM Annual Report [BNBMPLC0003164-336] (Exhibit 22) (attached
hereto as FSIA Ex. "23") at 53; Deposition of CNBM (CHANG Zhangli) dated 6/5-7/2015
("CHANG Dep.") (attached hereto as FSIA Ex. "24") at 79:4-20; Deposition of SONG Zhiping
dated 9/14-15/2015 ("SONG Dep.") (attached hereto as FSIA Ex. "25") at 16:4-14.  As of June
30, 2015, the ownership percentages of BNBM Group's shares are the same as they were in
2014, *i.e.*, 100%, with direct ownership interests of 70.04% and indirect ownership interests of
29.96%.  *See* 2015 CNBM Interim Report [PSC00000001-102] (Exhibit 334) (attached hereto as
FSIA Ex. "26") at 12; *see also* ZHAO Dep. at 85:11-86:9; 90:7-15; 126:3-8.

[12] *See* 2006 CNBM Global Offering Prospectus ("CNBM Global Offering") [ALRMH-
CNBM000001-643] (Exhibit 3) (attached hereto as FSIA Ex. "5") at 123.

[13] *See* CNBM Global Offering at VIII-2 & VIII-6 (PDF pages 582 & 586).  *See also*: 2005
CNBM Annual Report at 8 & 62; 2006 CNBM Annual Report at 10, 43-45; 2007 CNBM Annual
Report at 10, 43-45; 2008 CNBM Annual Report at 11; 2009 CNBM Annual Report at 13; 2010
CNBM Annual Report [ALRMH-CNBM00001926-2139] (Exhibit 9) (attached hereto as FSIA
Ex. "28") at 13, 50; 2011 CNBM Annual Report at 12, 55; 2012 CNBM Annual Report at 13,
60-61; 2013 CNBM Annual Report at 64; 2014 CNBM Annual Report at 61; 2015 CNBM
Interim Report at 12, 45; CHANG Dep. at 70:14-71:7; *see also* SONG Dep. at 15:12-17 &
19:22-24.

of its controlled subsidiaries that aimed to "position the Company [CNBM], then a wholly-owned subsidiary of [CNBM Group], as the holding company of [its] cement, lightweight building materials [*i.e.*, plasterboard], glass fiber and FRP products and engineering services businesses."[14]  On March 28, 2005, CNBM was converted into a publicly traded joint stock limited company on the Hong Kong Stock Exchange, with CNBM Group and several wholly-owned CNBM Group subsidiaries ("Parent Group")[15] possessing "… approximately 94.75% of the share capital of the Company [CNBM] immediately prior to the Global Offering."[16]  After completion of the [March 28, 2005] Global Offering, CNBM Group/Parent Group held 60.34% of CNBM's share capital, making CNBM Group/Parent Group the "controlling shareholder" of CNBM.[17]  As stated by CNBM, "Parent [CNBM Group] controlled the Transferred Operations before the Restructuring and continues to control the Transferred Operations after the effective date of the Restructuring…."[18]

Given that CNBM's stock is listed on the Hong Kong Stock Exchange ("HKSE"), this company, whose business is commercial,[19] is subject to the rules and regulations of the HKSE. Pursuant to the Ordinances of the Hong Kong Special Administrative Region (HKSAR) of the

---

[14] *See* CNBM Global Offering at 95.

[15] BNBM Group (wholly-owned by CNBM Group), CNBM Import & Export (wholly-owned by CNBM Group), China Building Materials Academy ("Building Materials Academy") (wholly-owned by CNBM Group).

[16]  *See* CNBM Global Offering at 153.

[17] *See* 2006 CNBM Annual Report at 10, 43-45; *see also* 2006 BNBM Annual Report at 11; ZHAO Dep. at 62:5-20; 102:2-7; 102:22-24.

[18] *See* 2005 CNBM Annual Report at 62.

[19] *See* 2014 CNBM Annual Report at 3, 18.

People's Republic of China,[20] Chapter 571,[21] Schedule 1 Interpretation, a "<u>controlling entity</u>"

(**控權實體**), in relation to a corporation, is defined as:

> a person who, either alone or with any of his associates –
>
>> (a) is entitled to exercise or control the exercise of not less than –
>>
>>> (i) subject to subparagraph (ii), 20%; or
>>>
>>> (ii) where any other percentage is prescribed by rules made under section 397 of this Ordinance for the purposes of this definition, such other percentage, of the voting power at general meetings of the corporation;
>>
>> (b) has the right to nominate any of the directors of the corporation; or
>>
>> (c) has an interest in shares carrying the right to –
>>
>>> (i)  veto any resolution; or
>>>
>>> (ii)  amend, modify, limit or add conditions to any resolution, at general meetings of the corporation.[22]

A "<u>controlling entity relationship</u>" (**控權實體關係**), in relation to a corporation, is

defined to mean:

> its relationship with an intermediary by virtue of -

---

[20] *See* http://www.hklii.hk/eng/hk/legis/ord/.

[21] Chapter 571 ("Securities and Futures Ordinance" or "SFO") is:  "An Ordinance to consolidate and amend the law relating to financial products, the securities and futures market and the securities and futures industry, the regulation of activities and other matters connected with financial products, the securities and futures market and the securities and futures industry, the protection of investors, and other matters incidental thereto or connected therewith, and for connected purposes."  *See* http://www.hklii.hk/eng/hk/legis/ord/571/longtitle.html.

[22] *See* http://www.hklii.hk/eng/hk/legis/ord/571/sch1.html.

9

> (a) the intermediary being a controlling entity of the corporation;
>
> (b) the corporation being a controlling entity of the intermediary; or
>
> (c) another person, who is a controlling entity of the corporation, being also a controlling entity of the intermediary.[23]

Under these definitions, CNBM Group would be the "controlling entity" of CNBM and they would be part of a "controlling entity relationship."[24]   Pursuant to divisions 2 and 3 of Part

---

[23] *Id.*

[24] *See also* Notice of the State Administration of Taxation on Issuing the Measures for the Implementation of Special Tax Adjustments (for Trial Implementation) (No. 2 [2009] of the State Administration of Taxation) [ALRMH-CNBM00008856-8872] (Exhibit 90) (attached hereto as FSIA Ex. "117"), which defines "affiliation" for tax purposes in China as "relationships between an enterprise and other enterprises, organizations or individuals":

1. One party directly or indirectly holds at least 25% of the total shares of the other party, or 25% of the shares of both parties are directly or indirectly held by a same third party. If one party indirectly holds the shares of the other party through an intermediate party, as long as it holds at least 25% of the shares of the intermediate party, the proportion of the other party's shares held by it shall be computed on the basis of the other party's shares held by the intermediate party;

2. The loans received by one party from the other party (excluding an independent financial institution) account for at least 50% of one party's paid -in capital, or at least 10% of the total loans received by one party are guaranteed by the other party (excluding an independent financial institution);

3. At least half of one party's senior management (including members of the board of directors and managers) are or at least 1 senior member of the board of directors who has the controlling power over the board of directors is appointed by the other party, or at least half of both parties' senior management (including members of the board of directors and managers) are or at least 1 senior member of the board of directors who has the controlling power over the board of directors is appointed by a same third party;

4. At least half of one party's senior management (including members of the board of directors and managers) are also senior management of the other party (including members of the board of directors and managers), or at least 1 senior member of the board of directors of one party who has the controlling power over the board of directors is also a senior member of the board of directors of the other party;

10

XV of the SFO, and the complete direct and/or indirect ownership interests of CNBM Group in the shareholders of CNBM (*i.e.*, CNBM Import & Export, Building Materials Academy, and BNBM Group[25]), CNBM Group "is deemed to own the shares directly held by BNBM Group, CNBM Import & Export, and Building Materials Academy."[26]  Thus, by virtue of its shareholdings, in 2006, CNBM Group directly and indirectly held a total of 60.34% of CNBM's total share capital, thereby making it the controlling shareholder of the company.[27]

CNBM Group's status as the "controlling entity" of CNBM has remained a constant from 2004 through 2015, though its equity interest percentages have changed over the years:

---

5.   The normal production and business operations of one party must depend on the industrial property, know-how or any other franchise provided by the other party;

6.   One party's purchase or sale activities are largely controlled by the other party;

7.   The services that one party receives or provides are largely controlled by the other party; or

8.   One party exercises a substantive control over the other party's production, business operations or transactions, or the two parties have any other affiliation of interest, such as a relationship that one party and the main shareholder of the other party enjoy basically the same economic interests though the shareholding percentage described in subparagraph 1 hereof is not reached, a clanship or a kinship.

*See also* Declaration of Professor James Feinerman dated 9/16/2015 (Exhibit 409) (attached hereto as FSIA Ex. "118").

[25] *See* 2006 CNBM Annual Report at 10, 43-45.

[26] *See* 2006 CNBM Annual Report at 45 n.1.

[27] *See* 2006 CNBM Annual Report at 10, 43-45.

| Year | CNBM Group's % Direct & Indirect Ownership in CNBM's Shares |
|---|---|
| 2004 | 100%[28] |
| 2005 (pre-Global Offering | 94.75%[29] |
| 2005 (post-Global Offering) | 60.34%[30] |
| 2006 | 60.34%[31] |
| 2007 | 56.02%[32] |
| 2008 | 48.82%[33] |
| 2009 | 48.82%[34] |
| 2010 | 44.10%[35] |
| 2011 | 44.10%[36] |
| 2012 | 44.10%[37] |
| 2013 | 44.10%[38] |

[28] *See* CNBM Global Offering at VIII-2 & VIII-6 (PDF pages 582 & 586); *see also*, 2005 CNBM Annual Report at 62.

[29] *See* CNBM Global Offering at 153.

[30] *See* 2005 CNBM Annual Report at 8.

[31] *See* 2006 CNBM Annual Report at 10, 43-45; *see also* 2006 BNBM Annual Report at 11.

[32] *See* 2007 CNBM Annual Report at 10, 43-45; *see also* 2007 BNBM Annual Report at 11.

[33] *See* 2008 CNBM Annual Report at 11; *see also* 2008 BNBM Annual Report at 11.

[34] *See* 2009 CNBM Annual Report at 13; *see also* 2009 BNBM Annual Report at 8-10.

[35] *See* 2010 CNBM Annual Report [ALRMH-CNBM00001926-2139] (Exhibit 9) (attached hereto as FSIA Ex. "28") at 13, 50; *see also* 2010 BNBM Annual Report [BNBMPLC0001542-695] (Exhibit 18) (attached hereto as FSIA Ex. "29") at 9.

[36] *See* 2011 CNBM Annual Report at 12, 55; *see also* 2011 BNBM Annual Report at 10.

[37] *See* 2012 CNBM Annual Report at 13, 60-61.

[38] *See* 2013 CNBM Annual Report at 64; *see also* SONG Dep. at 15:12-17.

| 2014 | 44.10%[39] |
|------|-----------|
| 2015 | 44.10%[40] |

From 2004 through 2015, CNBM Group has always controlled the highest percentage of CNBM's total shares, and consequently, CNBM Group has been and still remains the "controlling entity" of CNBM.

### c. <u>BNBM</u>

From 2005 to present, BNBM has been a controlled subsidiary of CNBM, which in turn is a controlled subsidiary of CNBM Group *via* direct and indirect equity interest.  In fact, in each of BNBM's annual reports from 2005 through 2014, CNBM is defined as BNBM's "controlling shareholder," and CNBM Group is defined as its "actual controller."[41]

On December 27, 2004, BNBM Group's 60.33% equity interest in BNBM was transferred, **at the direction of CNBM Group**, to CNBM (previously known as China National Building Materials and Equipment Import and Export Corporation).[42]  As part of the

---

[39] *See* 2014 CNBM Annual Report at 61.  CNBM Group's Chairman SONG Zhiping publicly proclaimed "…the Group's [CNBM and its subsidiaries] consolidated revenue amounted to RMB 122,011 million for the year of 2014."  *Id*. at 3, 18.

[40] *See* 2015 CNBM Interim Report at 12, 45.

[41] *See* 2005 BNBM Annual Report at 7; 2006 BNBM Annual Report at 10-11; 2007 BNBM Annual Report at 10-11, 104; 2008 BNBM Annual Report at 10-11, 107; 2009 BNBM Annual Report at 9; 2010 BNBM Annual Report at 8; 2011 BNBM Annual Report at 9; 2012 BNBM Annual Report at 46-47; 2013 BNBM Annual Report at 53; 2014 BNBM Annual Report at 52; *see also* SONG Dep. at 124:23-125:18.

[42] *See* CNBM Global Offering at VIII-3 ("On February 5, 2005, Parent issued a decision on the conversion of CNBM Equipment into a joint stock limited company with Parent, BNBMG, CNBM Trading, Cinda and Building Materials Academy as its promoters."); *see also* 2005 CNBM Annual Report at 62 ("Parent [CNBM Group] controlled the Transferred Operations

restructuring of CNBM in 2004, CNBM Group "transferred its interests in certain businesses engaged in the production and sale of cement, lightweight building materials, glass and fiberglass reinforced plastics products and provision of engineering services, and its equity interest in . . . BNBM . . . and certain other relevant assets associated with the Transferred Operations to the Company [CNBM] . . . at nil consideration."[43]  Thus, as a result of the foregoing transfer, in 2005, the attributable direct equity interests held by CNBM in BNBM were 60.33%.[44]  This share transfer or "restructuring" was considered to be "a business combination under common control," as CNBM Group retained control over the entities and operations transferred both prior to and following the restructuring.[45]

Under the Stock Listing Rules of the Shenzhen Stock Exchange ("SZSE"), where BNBM's stock is listed, "Controlling Shareholder" is defined as:

> the shareholder whose equity shares account for more than 50% of the Company's total stock; or the shareholder who holds less than 50% of equity shares, but still has major influence on the resolutions made by the general meeting of shareholders because of the voting rights entitled to the equity shares thereof.

SZSE (2014) No. 378, Chapter XVIII, 18.1(5).[46]

"Actual Controller" is defined as:

---

before the Restructuring and continues to control the Transferred Operations after the effective date of the Restructuring…").

[43] See 2005 CNBM Annual Report at 62 (emphasis added).

[44] See 2005 CNBM Annual Report at 8 & 14.

[45] See 2005 CNBM Annual Report at 62 (emphasis added).

[46] See Stock Listing Rules of the Shenzhen Stock Exchange (2014 Revision), No. 378 and Partial Translation of same (attached hereto as FSIA Ex. "52").

14

> any natural person, legal person or other organization that is
> capable of dominating and actually dominating the conducts of the
> Company by virtue of investment relationship, agreement or any
> other arrangement.

*Id*. at Chapter XVIII, 18.1(6).

The SZSE rules define "<u>Control</u>" as:

> the right to decide the finance and business policy of an enterprise,
> and based thereon, to obtain interests from the business activities
> of this enterprise. Any of the following circumstances will be
> regarded as having the controlling right to a listed company:
>
>    i.   Being the controlling shareholder that holds more than 50% of the
> listed company's equity shares;
>
>    ii.   Being capable of actually dominating more than 30% of the voting
> rights entitled to the listed company's equity shares;
>
>    iii.   Being capable of deciding the appointment and selection of more
> than half of members to the board of directors of the Company by
> virtue of actually dominating the voting rights entitled to the listed
> company's equity shares;
>
>    iv.   Because of the voting rights entitled to the listed company's equity
> shares it actually dominates, it is enough to have major influence
> on the resolutions made by the general meeting of shareholders;
>
>    v.   Any other circumstance recognized by the China Securities
> Regulatory Commission or this Stock Exchange.

*Id*. at Chapter XVIII, 18.1(7).

Since 2005, CNBM has been the "<u>controlling shareholder</u>" of BNBM, and, CNBM

Group has been the "<u>actual controller</u>" of BNBM.[47]  CNBM Group's "actual control" of BNBM

---

[47]  *See* 2005 BNBM Annual Report at 7.  *See also* 2006 BNBM Annual Report at 9-11; 2007
BNBM Annual Report at 10-11, 104; 2008 BNBM Annual Report at 10-11, 107; 2009 BNBM

was such that, in June of 2006, CNBM Group orchestrated a "share conversion" of BNBM stock in order to transfer 45,630,000 of CNBM's non-tradable BNBM shares into tradable shares.[48] Moreover, **CNBM Group** paid RMB 87,381,000 for the cost of this share conversion.[49]  As a result of the foregoing share conversion, in 2006, CNBM directly held 52.40% equity interest in BNBM, keeping CNBM as the "controlling shareholder" and CNBM Group as the "actual controller."[50]  CNBM retained its 52.40% direct equity interest in BNBM in the years 2007,[51] 2008,[52] 2009,[53] 2010,[54] 2011,[55] 2012,[56] and 2013.[57]  In each of these years, while CNBM

---

Annual Report at 9; 2010 BNBM Annual Report at 8; 2011 BNBM Annual Report at 9; 2012 BNBM Annual Report at 46-47; 2013 BNBM Annual Report at 53; 2014 BNBM Annual Report at 52.

[48] *See* 2006 CNBM Annual Report at 101 n.(b).

[49] *See* 2006 CNBM Annual Report at 101 n.(b).

[50] *See* 2006 CNBM Annual Report at 10, 17, 113; *see also* 2006 BNBM Annual Report at 9-11; CHANG Dep. at 213:25-214:13.

[51] *See* 2007 CNBM Annual Report at 10, 128; 2007 BNBM Annual Report at 9-11, 67-69, 104.

[52] *See* 2008 CNBM Annual Report at 11, 131; 2008 BNBM Annual Report at 11.

[53] *See* 2009 CNBM Annual Report at 13, 162; 2009 BNBM Annual Report at 8-10; *see also* SONG Dep. at 138:22-139:3.

[54] *See* 2010 CNBM Annual Report at 13, 166; 2010 BNBM Annual Report at 7-9.

[55] *See* 2011 CNBM Annual Report at 12, 162; 2011 BNBM Annual Report at 7-9.

[56] *See* 2012 CNBM Annual Report at 13, 164; 2012 BNBM Annual Report at 47-50.

[57] *See* 2013 CNBM Annual Report at 13, 169; 2013 BNBM Annual Report at 50-54; *see also* CHANG Dep. at 228:1-13.

continued to be the controlling shareholder of BNBM, CNBM Group remained the "actual controller of the Company."[58]

On September 30, 2014, BNBM offered private placements on listed shares with sales restriction and raised RMB 2,120 million as registered share capital and RMB 1,962 million as share premium.[59] "After that, the Group's effective equity interests in BNBM were reduced from 52.40% to 45.20%. BNBM is controlled by the Group by virtue of the dominant voting interest in BNBM, dispersion of holding of other vote holders, participation rate of shareholders and previous shareholders' meetings."[60]

Very recently, on October 13, 2015, CNBM publicly announced, through the Hong Kong Stock Exchange, a Framework Agreement between BNBM and Taishan Gypsum's minority shareholders pursuant to which, "BNBM will directly and indirectly hold 100% equity interest in Taishan Gypsum. Taishan Gypsum Minority Shareholders will become shareholders of BNBM, and the equity interest directly held by [CNBM] in BNBM will reduce from approximately 45.20% to approximately 35.84%. Both BNBM and Taishan Gypsum will remain as subsidiaries of [CNBM]."[61] In exchange for the remaining shares in Taishan, 368,997,400,000 BNBM shares

---

[58] *See* 2007 BNBM Annual Report at 10-11, 104; 2008 BNBM Annual Report at 10-11, 107; 2009 BNBM Annual Report at 9; 2010 BNBM Annual Report at 8; 2011 BNBM Annual Report at 9; 2012 BNBM Annual Report at 46-47; 2013 BNBM Annual Report at 53; 2014 BNBM Annual Report at 52.

[59] *See* 2014 CNBM Annual Report at 13, 175, 177 n.(iii).

[60] *See* 2014 CNBM Annual Report at 13, 175, 177 n.(iii) (emphasis added); *see also* CHANG Dep. at 205:3-206:10.

[61] *See* CNBM Announcement: Acquisition of Equity Interest in Taishan Gypsum Through Share Issuance of BNBM dated 10/13/2015 ("October 13, 2015 CNBM Announcement") (emphasis added) (attached hereto as FSIA Ex. "30").

were privately issued to Taishan's minority shareholders.  By virtue of its percentage ownership,

directly and indirectly, in CNBM's share equity, <u>CNBM Group indirectly held the following</u>

<u>percentage of BNBM PLC's total share capital for the years 2005 through 2015</u>:

| Year | CNBM Group's % Direct & Indirect Ownership in CNBM's Shares | CNBM's % Direct Ownership interest in BNBM's Shares | CNBM Group's % Indirect Ownership Interest in BNBM |
|------|------|------|------|
| 2005 | 68.22% | 60.33% | 41.16% |
| 2006 | 60.34% | 52.40% | 31.62% |
| 2007 | 56.02% | 52.40% | 29.35% |
| 2008 | 48.82% | 52.40% | 25.58% |
| 2009 | 44.10% | 52.40% | 23.11% |
| 2010 | 44.10% | 52.40% | 23.11% |
| 2011 | 44.10% | 52.40% | 23.11% |
| 2012 | 44.10% | 52.40% | 23.11% |
| 2013 | 44.10% | 52.40% | 23.11% |
| 2014 | 44.10% | 45.20% | 19.93% |
| 2015 | 44.10% | 35.84% | 15.81% |

Accordingly, as a result of CNBM Group's controlling stakes in CNBM from 2005 to the

present date, CNBM Group has been and remains the controlling shareholder of its share-

controlled subsidiary's subsidiary (*i.e.*, BNBM).  Moreover, from 2005 through 2015, among the

top ten shareholders of [BNBM], CNBM has been the sole shareholder with a 5% or higher stake

in the company."[62]

### d.  Taishan

From 2005 through present (which includes the entire period when Taishan's defective

drywall was shipped to the United States), BNBM has been Taishan Gypsum's controlling

---

[62] *See* 2005 BNBM Annual Report at 7; 2006 BNBM Annual Report at 10; 2007 BNBM Annual Report at 10; 2008 BNBM Annual Report at 10; 2009 BNBM Annual Report at 9; 2010 BNBM Annual Report at 8; 2011 BNBM Annual Report at 8; 2012 BNBM Annual Report at 48-49; 2013 BNBM Annual Report at 53-55; 2014 BNBM Annual Report at 52-52.

shareholder. As such, Taishan is considered to be controlled by CNBM because Taishan is the subsidiary of another CNBM subsidiary (*i.e.*, BNBM).[63] Notably, CNBM Group's Chairman SONG explained that "CNBM is Taishan's biggest shareholder," and Taishan's Chairman JIA confirmed the same at his deposition.[64] On March 19, 2005, BNBM entered into a share subscription agreement and acquired 42% of Taishan Gypsum's total shares – giving BNBM operative and voting control of Taishan's Board of Directors as the "controlling shareholder."[65]

In August, 2006, under the direction of CNBM Group's Chairman SONG Zhiping and General Manager CAO Jianglin, BNBM increased its equity interest in Taishan Gypsum by purchasing an additional 23% of Taishan's equity shares.[66] CNBM published BNBM's increased equity acquisition of Taishan as a "Connected Transaction" on the HKSE, stating that the acquisition was made to "enable CNBM Group to further enhance its competitiveness and consolidate its leading position in the PRC gypsum board market."[67] From 2006 through

---

[63] *See* 2014 CNBM Annual Report at 177;  *see also* CHANG Dep. at 206:11-207:18; 228:15-229:1.

[64] *See* 2005 BNBM Annual Report at 17, 18, 48; *see also* 2014 CNBM Annual Report at 175-177; SONG Dep. at 131:4-11; Deposition of JIA Tongchun dated 9/17-18/2015 ("JIA Dep.") (attached hereto as FSIA Ex. "31") at 212:16-213:6 & 255:24-256:7.

[65] *See* 2005 BNBM Annual Report at 17, 18, 48; *see also* JIA Dep. at 180:2-9; Deposition of Taishan (CHE Gang) dated 6/2-4/2015 ("CHE Dep.") (attached hereto as FSIA Ex. "27") at 317:13-318:1.

[66] *See* SONG Dep. at 51:20-52:2.

[67] *See* CNBM Public Regulatory Announcement: "Connected Transaction Acquisition of the Entire Equity Interest in Tai'an Donglian Investment Trading Company Limited" dated 8/28/2006 [Herman Aff. Ex. 134 filed 5/8/2012] (attached hereto as FSIA Ex. "37"); *see also* "General Manager Bing Wang's work report at the 3rd meeting of the 5th session of BNBM staff representative meeting" with leaders from CNBM Group and CNBM present [BNBMPLC-E-004827-4847] (Exhibit 315-R) (attached hereto as FSIA Ex. "134") at 1 & 3 (As stated by BNBM GM WANG Bing, the August 2006 purchase of an additional 23% of Taishan's shares,

October 12, 2015, BNBM continuously controlled 65% of Taishan's equity shares – all along maintaining control over Taishan's Board of Directors as the "controlling shareholder."[68]

The recent October 13, 2015 Framework Agreement between BNBM and Taishan's minority shareholders solidified BNBM's equity ownership in Taishan. Pursuant to this agreement, "BNBM will directly and indirectly hold 100% equity interest in Taishan Gypsum. Taishan Gypsum Minority Shareholders will become shareholders of BNBM, and the equity interest held by the Company [CNBM] in BNBM will reduce from approximately 45.20% to approximately 35.84%. Both BNBM and Taishan Gypsum will remain as subsidiaries of the Company [CNBM]."[69] Thus, in order for BNBM to become the sole shareholder of Taishan, CNBM transferred 6.7% of its ownership in BNBM's total shares to the minority shareholders of Taishan.

---

giving BNBM a 65% equity interest in Taishan, was made: "For the strategic needs of further integrating Shandong Taihe [Taishan] gypsum boards, strengthening the controlling power over Shandong Taihe [Taishan]… under the strong support of CNBM and under the direct direction of Chief Song [CNBM Group & CNBM] and Chief Cao [CNBM Group & CNBM], BNBM further purchased 23% of equity of Shandong Taihe [Taishan], which made the Company's [BNBM's] equity share in Shandong Taihe increase up to 65% in total, and the Company [BNBM] thus obtained the substantial equity control over Shandong Taihe…").

[68] *See* 2006 CNBM Annual Report at 10, 113-114; 2006 BNBM Annual Report at 28-29, 62-63, 85-86; *see also* 2007 CNBM Annual Report at 10, 128; 2007 BNBM Annual Report at 28, 67-69, 92-93; 2008 CNBM Annual Report at 11, 131; 2008 BNBM Annual Report at 32, 69-70, 96; 2009 CNBM Annual Report at 13, 162; 2009 BNBM Annual Report at 26-27, 72-79, 114; 2010 CNBM Annual Report at 13, 166; 2010 BNBM Annual Report at 26, 74-75, 78; 2011 CNBM Annual Report at 12, 162; 2011 BNBM Annual Report at 26; 2012 CNBM Annual Report at 13,164; 2012 BNBM Annual Report at 47-50, 111-113, 161-162; 2013 CNBM Annual Report at 13, 169; 2013 BNBM Annual Report at 54, 116-120, 157; 2014 CNBM Annual Report at 13, 175; 2014 BNBM Annual Report at 148-149; CHE Dep. at 29:21-25; 47:7-14; 141:24-142:9; 190:2-12; 350:23-351:14; CHANG Dep. at 210:20-211:10; 229:3-15; SONG Dep. at 17:2-12; 174:10-15; JIA Dep. at 180:2-9.

[69] *See* October 13, 2015 CNBM Announcement.

20

### 2. During the Period When Taishan's Defective Drywall Was Shipped to the United States, Taishan Was Controlled by BNBM, which in Turn Was Controlled by CNBM Group

Until very recently, Taishan was owned by five interconnected entities or persons, all of which are financially linked to or constitute BNBM PLC. These five shareholders by name are: BNBM, Shandong Taihe Building Materials, Beijing Donglian Investment & Trading Limited Company, Tai'an State-owned Asset Management Company and JIA Tongchun.[70] The relationship among these companies confirms that Taishan's equity shares were controlled in full by BNBM and JIA Tongchun at the time Taishan's drywall was manufactured and shipped to the United States. Thus, through its controlling stock holdings in BNBM Group, CNBM, and BNBM, CNBM Group owns Taishan through BNBM Group, CNBM, and BNBM.

### a. BNBM

As shown above, on March 19, 2005, BNBM signed a stock purchase agreement for 42% equity shares of Taishan Gypsum Co., Ltd.'s (then-named Shandong Taihe), which resulted in the consolidation of Taishan with BNBM PLC.[71] This acquisition made BNBM the largest

---

[70] *See* Articles of Association of Shandong Taihe Dongxin Co., Ltd., dated 8/8/2006 [Herman Aff. Ex 132 filed 5/8/2012] (attached hereto as FSIA Ex. "32.") (At the time of incorporation, Shandong Taihe Building Materials was named Tai'an Anxin Investment Trading Company Ltd. and Beijing Donglian Investment & Trading Limited Company was named Tai'an Donglian Investment Trading Company Limited (at TG 0020689)); *see also* 2014 BNBM Annual Report at 86.

[71] *See* BNBM Announcement for Decision of 12th Interim Meeting of the Third Board of Directors, dated 4/23/2005 [BNBMPLC0004402-4403] (part of Exhibit 101) (attached hereto as FSIA Ex. "33").

shareholder of Taishan, granted BNBM the right to appoint the majority of Taishan's directors,

and gave BNBM pre-emptive voting rights at shareholder meetings of Taishan.[72]

### b. Shandong Taihe Building Materials (f/k/a Tai'an Anxin Investment & Trade Company)

Tai'an Anxin Investment & Trade Co. ("Tai'an Anxin"), an investment company that

held shares in Taishan, was established in or about January, 2005.  Its sole function was to

purchase shares in other businesses.  It did not manufacture or produce its own products, goods,

or services.  At inception, the main shareholder of Tai'an Anxin was JIA Tongchun, who

represented the largest capital contributor, offering nearly 60% of the total invested capital to

establish that company.[73]  Tai'an Anxin is now known as Shandong Taihe Building Materials,

and it currently owns 14 % of Taishan's equity shares.  The company's largest shareholder

remains JIA Tongchun.[74]

### c. Beijing Donglian Investment & Trading Limited Company (f/k/a Tai'an Donglian Investment & Trading Company[75]

On August 28, 2006, BNBM PLC acquired 100% of Donglian Investment & Trading

Limited Company ("Donglian Investment"), at the time, Donglian Investment directly owned

---

[72] *See* BNBM PLC Annual General Meeting of Shareholders, dated 4/8/2004 [BNBMPLC0006280-6283] (part of Exhibit 104) (attached hereto as FSIA Ex. "34").

[73] *See* Shandong Taihe Building Materials Corporation Forms (attached hereto as FSIA Ex. "35").

[74] *See* Declaration of JIA Tongchun ("JIA Declaration") dated 9/16/2015 (Exhibit 335) (attached hereto as FSIA Ex. "36").

[75] Hereinafter referred to as "Donglian Investment."  As mentioned above, Beijing Donglian was formerly known as Tai'an Donglian.  The name change occurred in 2014.  *See* 2014 BNBM Annual Report at 124.

23% of Taishan's equity shares.[76]  As a result of the acquisition, BNBM PLC took control over Donglian Investment's ownership of Taishan and has since described its ownership in Taishan as being 65% of all equity shares (until its October 13, 2015 complete acquisition).[77]

### d.  Tai'an State-owned Asset Management Company

Tai'an State-owned Asset Management Company owned and controlled 16% of Taishan's equity shares following BNBM's acquisition of Taishan.[78]  On August 28, 2006, in a connected transaction signed off on by CNBM Group,[79] Tai'an State-owned received a loan from BNBM PLC in the amount of 50 million RMB.[80]  In exchange, Tai'an State-owned pledged its 16% interest in Taishan to BNBM PLC in order to secure the loan.[81]

### e.  JIA Tongchun

After BNBM's takeover of Taishan, JIA Tongchun retained 5% equity owner in the company, and was named Chairman and General Manager.[82]  Further, beginning in 2005 and

---

[76] *See* CNBM Public Regulatory Announcement: "Connected Transaction Acquisition of the Entire Equity Interest in Tai'an Donglian Investment and Trading Company Limited" dated 8/28/2006 ("Connected Transaction dated 8/28/206") (Herman Aff. Ex. 134 filed 5/8/2012) (attached hereto as FSIA Ex. "37").

[77] *See* 2014 BNBM Annual Report at 124.

[78] *See* Articles of Association of Shandong Taihe Dongxin Co., Ltd. dated 8/8/2006 [Translation and Original of TG 0020686-20709] (Herman Aff. Ex. 132 filed 5/8/2012) (attached hereto as FSIA Ex. "32").

[79] *See* Connected Transaction dated 8/28/2006.

[80] *See* Connected Transaction dated 8/28/2006.

[81] *Id*.

[82] *See* Announcement for Decision of 12th Interim Meeting of the Third Board of Directors, April 23, 2005 [BNBMPLC0004402-4403].

continuing through 2012, JIA Tongchun served as a manager and director of BNBM PLC.[83]

Until October 13, 2015, JIA Tongchun remained a 5% equity owner in Taishan, as well as

Chairman of the company.[84]

The effect of the interconnected nature of Taishan's shareholders includes the fact that at

all relevant times, BNBM PLC and JIA Tongchun have possessed and continue to possess both

the controlling share capital and actual control over Taishan.  From 2006 through October 2015,

BNBM owned both directly and indirectly, 65% of Taishan's total share capital.[85]  BNBM

further controlled an additional 16% of the equity shares of Taishan through its retention of

Tai'an State-owned's equity shares via the pledged collateral for the 50 million RMB loan.

Finally, JIA Tongchun controlled his own 5% of Taishan's shares, as well as the 14% investment

held by Shandong Taihe Building Materials.  In total, BNBM PLC has controlled 81%, more

than a super majority, of Taishan's equity shares and JIA controls the remaining 19% of equity

---

[83] *See* Deposition of BNBM PLC (CHEN Yu) dated 7/8-11/2015 ("CHEN Dep.") (attached hereto as FSIA Ex."40") at 275:19-276:5; *see also* Deposition of WANG Bing dated 8/25-27/2015 ("WANG Dep.") (attached hereto as FSIA Ex. "41") at 255:20-256:1.

[84] *See* JIA Dep. at 20:24- 21:14; *see also* CHEN Dep. at 275:19-276:13; CHE Dep. at 31:5-10.

[85] *See* 2006 CNBM Annual Report at 10, 113-114; 2006 BNBM Annual Report at 28-29, 62-63, 85-86; *see also* 2007 CNBM Annual Report at 10, 128; 2007 BNBM Annual Report at 28, 67-69, 92-93; 2008 CNBM Annual Report at 11, 131; 2008 BNBM Annual Report at 32, 69-70, 96; 2009 CNBM Annual Report at 13, 162; 2009 BNBM Annual Report at 26-27, 72-79, 114; 2010 CNBM Annual Report at 13, 166; 2010 BNBM Annual Report at 26, 74-75, 78; 2011 CNBM Annual Report at 12, 162; 2011 BNBM Annual Report at 26; 2012 CNBM Annual Report at 13,164; 2012 BNBM Annual Report at 47-50, 111-113, 161-162; 2013 CNBM Annual Report at 13, 169; 2013 BNBM Annual Report at 54, 116-120, 157; 2014 CNBM Annual Report at 13, 175; 2014 BNBM Annual Report at 148-149; CHE Dep. at 29:21-25; 47:7-14; 141:24-142:9; 190:2-12; 350:23-351:14; CHANG Dep. at 210:20-211:10; 229:3-15; SONG Dep. at 17:2-12; 174:10-15.

shares.  This control existed at and during the period of Taishan's shipments of drywall to the United States.

### 3. CNBM Group Exercises Control Over the Internal Business Operations and Affairs of BNBM Group, CNBM, BNBM, and Taishan

CNBM Group has routinely and continuously exercised control over the internal business operations and affairs of its subsidiaries, including, but not limited to, CNBM, BNBM Group, BNBM PLC, and Taishan.  First and foremost, CNBM Group dictates and controls the business operations and decision-making of its subsidiaries by directly or indirectly appointing Board of Director members and/or Executive Officers for each of its subsidiaries[86] AND, importantly, by dictating how those appointees report to CNBM Group, obtain approval from CNBM Group, and vote on all important matters at the respective subsidiaries.  Separate and apart from controlling the actions of Board of Directors members and/or Executive Officers of its subsidiaries, CNBM Group also controls the business operations of its subsidiaries (including BNBM Group, CNBM, BNBM PLC, and Taishan) by dictating various business policies and procedures to be implemented and followed.  The end result is a multi-level CNBM Group-controlled "check and balance" system whereby CNBM Group: 1) installs its appointee representatives in high-ranking and controlling positions at its subsidiaries – acting according to CNBM Group's rules and decision-making, and 2) issues various and extensive directives and business policies and

---

[86] Evidence of this can be seen by looking at the number of interlocking and overlapping Executives and Officers of CNBM Group, BNBM Group, CNBM, BNBM, and Taishan, as set forth in Section II.A.4, *infra*; *see also* Summary Chart of Overlapping Executives and Officers (Exhibit 23-1) (attached hereto as FSIA Ex. "42").

procedures that its subsidiaries must follow.  This system has been in place since the time of the commercial activity and tortious conduct, which give rise to this litigation.

### a. CNBM Group Directly or Indirectly Appoints and Controls Board of Directors Members and/or Executive Officers for Each of its Subsidiaries

CNBM Group has implemented specific instructions and directives for: a) appointing CNBM Group representatives into high-level positions at subsidiaries, and b) how those CNBM Group representatives conduct their activities at the subsidiary to which they have been appointed.  These relevant CNBM Group instructions and directives are memorialized in the "China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors."[87]  CNBM Group makes clear that:  "These Measures are specially formulated in order to strengthen the management of State-owned assets … and adapt to the needs for regulating the corporate governance structure and managing the representatives of capital contributors appointed by China National Building Group Corporation (abbreviated below as 'the Group Corporation')."[88]

Additional rules relative to the appointment of CNBM Group representatives at subsidiaries include the following:

- "These Measures are applicable to the representatives of capital contributors appointed to all the wholly-owned subsidiaries, controlled subsidiaries, associates and any other types of enterprises (referred to

---

[87] *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors [BNBM(Group)-E-0005107-5115] (Exhibit 249) (attached hereto as FSIA Ex. "43").

[88] *Id.* at 1.

26

as enterprises hereinafter) having an asset relationship with the Group Corporation".[89]

- "Representatives of capital contributors refer to those board directors, supervisors, shareholder representatives, operational team members, chief financial officers, and others who are lawfully appointed by the Group Corporation according to the capital contribution relationship …"[90]

- "The appointment and removal procedures for the representatives of capital contributors are performed according to the relevant provisions in the 'Administrative Measures for Appointment and Removal of Group Corporation's Enterprise Management Personnel.'"[91]

- "The scope of enterprises to which the Group Corporation appoints representatives of capital contributors include: (I) Wholly owned enterprises; (II) Controlled subsidiaries, associate enterprises; (III) Other types of legal entities directly invested by the Group Corporation; and (IV) Important legal entities indirectly invested by the Group Corporation."[92]

CNBM Group appoints high-ranking Officers and Executives (*e.g.*, Board Directors, Supervisors, Operational team members, Chief Financial Officers, etc.) at its subsidiaries, including "controlled subsidiaries" and "legal entities indirectly invested by the Group Corporation" – includes BNBM Group, CNBM, BNBM PLC, and Taishan.

Once installed in their executive positions, CNBM Group dictates and controls the conduct of its appointees.  As dictated in the "China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors,"

---

[89] *Id*. at 1.

[90] *Id*. at 1-2.

[91] *Id*. at 2.

[92] *Id*. at 2.

the responsibilities of CNBM Group's appointees (at subsidiaries) include "[c]arefully

implementing and executing the Group Corporation's development strategy, scheme, and plan,

give an expression of the Group Corporation's minds and requirements, faithfully protecting the

lawful rights and interests of the Group Corporation."[93]   These same CNBM Group measures

also direct appointees to subsidiaries as follows:

> **When the enterprise to which the representative is assigned is
> involved in any of the following significant decisions**, the
> representative shall request for instructions and give a written
> report to the Group Corporation beforehand.  **The decision can
> only be implemented after the Group Corporation gives a
> reply**.  (I) The enterprise that has the board of directors selects and
> appoints, or changes its general manager, chief financial officer, or
> chief accountant; (II) **There are any decisions on significant
> investments and directions of operation**; (III) The enterprise has
> an investment increase plan, profit (income) distribution plan, or
> bond issuance; (IV) **The enterprise provides guarantees to any
> other entities**; (V) The enterprise asset collaterals exceed one third
> of its net assets; … (X) Any other matters that may affect the
> capital contributor's rights and interests.[94]

These directives show how CNBM Group's control over its appointees of high-ranking officers

at its subsidiaries is extensive, and covers financial as well as operational management.  CNBM

Group's directives extend into the board rooms of its subsidiaries, requiring

appointees/representatives to "execute the Group Corporation's intentions when deliberating and

voting on the proposal."[95]

---

[93] *Id*. at 4-5.

[94] *Id*. at 6 (emphasis added).

[95] *Id*. at 7.

CNBM Group ensures that its appointees comply with its directives by routinely evaluating their performances. "The evaluations of representatives of capital contributors shall be conducted through the combination of regular evaluations, annual evaluations, and end-of-term evaluations."[96] CNBM Group also controls the salaries and bonuses of its appointees at subsidiaries. "The salary system for the representatives of capital contributors during the term shall be 'position-based salary' … and [t]he standards of the position-based salary shall be implemented upon review and approval by the Group Corporation based upon different categories."[97]

### b. CNBM Group Issues Various and Extensive Business Policies and Procedures for its Subsidiaries to Follow

CNBM Group also controls the operations and finances of its subsidiaries through various and extensive business policies and procedures that its subsidiaries must follow. This fact is evidenced by multiple documents – including "group-wide" policies and procedures issued by CNBM Group to its subsidiaries. CNBM Group's control of subsidiaries, through these group-wide policies and procedures, covers nearly all aspects of its business.

For example, "China National Building Material Group implements a parent-subsidiary company management system."[98] In fact, "Acting as the strategic center, decision making

---

[96] *Id.* at 8.

[97] *Id.* at 10.

[98] *See* "China National Building Material Group Corporation Sample Document" [CNBMGRP00006793-6795] (Exhibit 75) (attached hereto as FSIA Ex. "44").

center, resource center, policy and culture center, the Group Corporation exercises its

contributor's rights."[99]  CNBM Group controls its subsidiaries in four (4) primary aspects:

1) **Strategy management** – "[t]he Group Corporation guides all subsidiaries to strictly adhere to the Group Corporation's determined strategy on business activities, to ensure the realization of the Group Corporation's strategic goals";[100]

2) **Decision-making management** – "… the Group exercises the decision making power as the fund contributor on major issues such as its subsidiaries' investment and financing, restructuring, etc.",[101]

3) **Resource management** – "[t]he Group Corporation coordinates and integrates various domestic and overseas resources, which purports to the reasonable utilization of resources among the various subsidiaries";[102] and

4) **Culture Management** – "the Group Corporation guides all subsidiaries to commence establishing enterprise culture … forming a set of unified enterprise culture values within the Group Corporation."[103]

As stated by CNBM Group, "[t]hrough refining and formulating various rules, the Group

Corporation standardizes and institutionalizes its management."[104]

---

[99] *Id.*

[100] *See* "China National Building Material Group Corporation Year of 2015-2017 Development Strategy and Plan" dated April, 2015 ("CNBM Group 2015-2017 Strategy Plan") [CNBMGRP000013290-13347] (Exhibit 91) (attached hereto as FSIA Ex. "45") at 1.

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *Id.*

As the strategic, decision-making policy and cultural center of all CNBM Group

subsidiaries, CNBM Group issues detailed "group-wide" policies dictating the internal business

operations of its subsidiaries, including, but not limited to:

- Internal Control Systems[105]

- Management Methodology[106]

- Risk Management[107]

- Significant Business Decisions[108]

- Significant Personnel Appointments and Removals[109]

---

[105] *See* "Beijing New Building Materials (Group) Company Limited Internal Control System Construction Work Summary" submitted to CNBM Group [BNBM(Group)-E-0004986-4990] (Exhibit 247) (attached hereto as FSIA Ex. "46") at 2 ("According to requirements in the Group Corporation's 'Notice on Further Doing Well Relevant Work on Internal Control System Construction'").

[106] *See* WANG Bing's "Welcome Speech on the 2008 BNBM Annual Marketing Meeting" with CNBM Group Board Chairman Zhiping Song present [BNBMPLC-E-005889-5892] (Exhibit 316-R) (attached hereto as FSIA Ex. "135") at 1 ("BNBM, according to the requirements of CNBM Group's 'unified, modelized, streamlined, systemized, and digitized' management model, fully implemented KPI management, and satisfactorily accomplished the three missions given by the Group …").

[107] *See* "Taishan Gypsum Company Limited Comprehensive Risk Management Report for the Year 2011" submitted to CNBM Group, CNBM and BNBM ("Taishan's 2011 Risk Management Report") [CNBMGRP00371516-371562] (Exhibit 416) (attached hereto as FSIA Ex. "47") at 1, 4 ("This plan is made according to the requirements in the '*Opinions on the Work Arrangement of the Comprehensive Risk Management for the year 2011*' … issued by China National Building Materials Group Corporation …"). *See also* "China National Building Material Group Corporation Comprehensive Risk Management Report of the Year 2010" [CNBMGRP00330873-330934] (Exhibit 388) (attached hereto as FSIA Ex. "48") at 1-4.

[108] *See* "China National Building Material Group Corporation Interim Measure on Fully Implementing the Decision-Making Rules for the 'Three Significant Issues and One Large Operation'" [BNBMPLC-E-0001156-1172] (Exhibit 113) (attached hereto as FSIA Ex. "49") at 1.

[109] *Id.*

- Significant Project Arrangements[110]

- Capital Operation Issues[111]

The end result is that CNBM Group implements and maintains policies of strict control over the business operations of its subsidiaries, which include Taishan.

### c. CNBM Group Issues Directives to its Subsidiaries

CNBM Group issues directives to its subsidiaries as part of the overall control that the Company maintains over them.  A clear example of this can be found in the "Statement on Implementing the Requirements from the Group Corporation's Meeting of International Business Risk Prevention," which was sent to the "Leaders of the company" following CNBM Group's meeting on international risk prevention held July 11, 2014[112] – six days before Taishan refused to appear for its Judgment Debtor Examination before this Court.  The July 11, 2014 meeting "mainly introduced the international situations and existing risks the Group Corporation would face in the process of implementing the 'Going Global' strategy."[113]  "The meeting also reported the progress of the US customers' lawsuit about the gypsum boards exported from China."[114] The Statement produced as a result of that meeting purports to "sort[] out the company's current

---

[110] *Id.*

[111] *Id.*

[112] *See* "Statement on Implementing the Requirements from the Group Corporation's Meeting of International Business Risk Prevention," dated 7/11/2014 ("Requirements for International Business Risk Prevention") [Translation of BNBM(Group)-E-0000444-446] (Exhibit 215) (attached hereto as FSIA Ex. "50") at 2-3.

[113] *Id.* at 2.

[114] *Id.*

situations according to the Group Corporation's requirements," concerning international business risk prevention.  At that meeting, CNBM Group directed its subsidiaries "to avoid depositing funds in banks that have branches in the State of New York, United States,"[115] which of course would avoid seizures of the Company's assets.  *Koehler v. Bank of Bermuda, Ltd.*, 12 N.Y.3d 533, 883 N.Y.S.2d 763, 911 N.E.2d 825 (N.Y. 2009).  Further, CNBM Group required that overseas personnel "carry out business activities only in the name of their own legal person unit" and that "communications on overseas projects should be conducted by specially appointed people using special email accounts."[116]  The Statement also required that "business personnel use their own emails."[117]

Another example of the means by which CNBM Group controls its subsidiaries through directives is the Company's requirement that its subsidiaries complete Comprehensive Risk Management Reports "stating what are the risks for [the particular] year, what are the things that need to be done and how to prevent."[118]  According to Taishan's Chairman JIA, "CNBM's audit group required us to do it according to CNBM's requirements."[119]  As the controlling shareholder of Taishan (through BNBM Group, CNBM, and BNBM PLC), CNBM Group's

---

[115] *Id.*

[116] *Id.* at 3.

[117] *Id.*

[118] *See*, *e.g.*, Taishan's 2011 Risk Management Report; JIA Dep. at 277:8-11.

[119] JIA Dep. at 280:10-11.

records specify precisely the level of oversight and control this company ultimately has over

Taishan, which extends to "daily operational management."[120]

> At the end of every year, according to the anticipated operational activities of the entire Group and the cash flow produced by the investment activities in the coming year, the main office of the Company would uniformly formulate financing plans which include financing amounts and guarantee methods, and submit them to BNBM PLC. All financing activities of the subsidiary companies must be appraised by main office of the Company and approved by the general shareholders' meeting of the Company, and after that financing amounts shall be reasonably arranged, the payment plans shall be formulated, the funds shall be reasonably allocated and used according to the needs of production and operation as well as the progress of project completion, to ensure the smooth flow of capital chain and the smooth progression of production, operation, and project construction.

> As to investment, in order to ensure the safety of capital, the Company's main office and subsidiaries may not invest in any security or fund without authorization. As to project investment, the technology development center shall uniformly formulate project feasibility report and budget and investment plan, report to BNBM PLC for archiving, and implement it upon the approval from the board of directors and the general shareholders' meeting. The expenditure in an investment project shall strictly follow the approval system, after the investments are completed, relevant departments shall work together to conduct the project acceptance check and final accounting. This strengthened the management of the acceptance check of engineering projects, established a management system for the acceptance check of engineering projects, and standardized the management of the establishment of project, approval, contracting, construction, final accounting, acceptance check, and other segments of the engineering projects. This ensured the small investment, high quality and fast result of the projects, and made the management of project construction more systematic, standardized, and efficient.[121]

---

[120] *E.g.*, Taishan's 2011 Risk Management Report at CNBMGRP00371521 & 371559; JIA Dep. at 281:21-282:9.

[121] 2011 Taishan's Risk Management Report at CNBMGRP00371559; JIA Dep. at 284:20-285:13.

CNBM Group's subsidiaries take notice when CNBM Group promulgates requirements. These three examples prove the rule:  1) Taishan dutifully submitted yearly Risk Management Reports to CNBM Group.[122]  2) As shown below, when CNBM Group summoned Taishan's Chairman to its July 11, 2014 Board of Directors meeting, he went and reported on the status of the U.S. Drywall litigation.[123]  3) Upon receipt of the July 11, 2014 Statement on CNBM Group's requirements for international business risk prevention, BNBM Group circulated an email and told "Everyone, please take a look at the material…."[124]

### d.  CNBM Group Trains the Leaders at Middle and Senior Levels of BNBM Group, CNBM, BNBM and Taishan

An integral part of CNBM Group's control over the leadership of its subsidiaries is to provide training to Middle- and Senior-level operatives of BNBM Group, CNBM, BNBM, Taishan, and other entities within the CNBM Group conglomerate.  In 2011, for example, CNBM Group held a 3-day course for "people in charge of a functional department in the headquarters of the Group Corporation and the people of a higher level, and the personnel who come from a subsidiary (group) company or a research institute but are managed by the Group Corporation or are subject to the pre-placement archival management."[125]  The training

---

[122] *See* JIA Dep. at 277:3-11 ("In the ordinary course of business every company every year would come up with a report stating what are the risks for this year, what are the things that need to be done and how to prevent."); *see also id.* at 278:3-15; 279:10-23.

[123] *See* Section II.C.4, *infra*.

[124] 2011 Taishan's Risk Management Report at 1.

[125] *See* Email and attachment to JIA Tongchun re: Notice on Matters Relevant to CNBM Group's Training Class in 2011 for Leaders at Middle and Senior Levels dated 6/29/2011 [Translation of TG-0073103-0073111] (attached hereto as FSIA Ex. "51") at 3.

addressed Enhancement of Leading Cadre's Cultivation, Officialdom, Social Management, The

Science and Art of Leadership, and Organizational Behavior (Management Psychology).[126]

CNBM Group's Chairman SONG Zhiping was a lecturer at this seminar.  Taishan's Chairman

JIA Tongchun was directed by BNBM to attend this course.[127]  The materials for the training

were distributed by CNBM.[128]

### 4.  CNBM Group, BNBM Group, CNBM, BNBM, and Taishan Share Numerous Common Officers and Directors

In accordance with the strict hierarchical-controlling ownership structure established by

CNBM Group, as the ultimate controlling parent Company for all of its subsidiaries, there are

many overlapping Officers and Directors among CNBM Group, BNBM Group, CNBM, BNBM,

and Taishan.[129]  This is significant, because during relevant time periods (2005 – present), it

would not have been possible for the decision-makers at these various companies to have acted

independently when voting to provide loans, guarantees, financing, etc., when, in fact, the same

people were operating in two or more of the subject companies at the same time.

This is borne out by the testimony of WANG Bing.  Mr. WANG has served as Chairman

of BNBM PLC and a Vice President of CNBM since 2009.[130]  From 2004-2009, he was the

---

[126] *Id*. at 3-4.

[127] *Id*. at 1.

[128] *Id*. at 1-2.

[129] *See*, *generally*, Summary Chart of Taishan, BNBM, CNBM Officers and Directors (Exhibit 23-1), with supporting documentation.

[130] Exhibit 23-1 at 2 & Ex. 10.

General Manager of BNBM,[131] and since 2004, he has also been a Director of BNBM.[132]  In 2005, Mr. WANG became a Director of Taishan; a position he still holds today.[133]  Incredibly, when he was asked about his ability to fulfill his fiduciary duties and disregard conflicts of interest arising from concurrent appointments to Taishan, BNBM, and CNBM, Mr. WANG testified as follows:

> Q. When you vote as a director of Taishan, often it's not only for the benefit of Taishan, but it's for the benefit of BNBM as well, is it not?
>
> A. No. When I vote as a director of Taishan Gypsum, according to the law I am accountable to the interest of Taishan Gypsum. I would only vote representing Taishan Gypsum.
>
> Q. And if you had to vote at Taishan Gypsum and you were accountable only to the board of Taishan Gypsum, and the vote was adverse to BNBM, would you recuse yourself?
>
> A. When I vote as a director of Taishan Gypsum, I only represent Taishan Gypsum. I do not have the position or interest of BNBM.
>
> * * *
>
> Q. When you vote as a director of BNBM concerning matters of Taishan, have you ever found yourself in a position where your vote at BN[BM] would adversely affect the operation of Taishan?
>
> A. We have never assessed if any issue would adversely affect Taishan Gypsum, because issues that are dealt with in BNBM's board of directors meeting all represent the interest of BNBM. We would not consider other companies.
>
> * * *

---

[131] *Id.*

[132] Exhibit 23-1 at 2 & Ex. 11.  In July, 2014, Mr. WANG was appointed Secretary to the Party Committee of BNBM.  Exhibit 23-1 at 2 & Ex. 10.

[133] Exhibit 23-1 at 2 & Ex. 9.

Q. Now, as vice-president of CNBM, you're interested in the general operations of CNBM because you have a fiduciary duty to CNBM to carry out your duties as vice-president, and in order to perform your fiduciary duty you make yourself aware of things that are happening at CNBM, do you not?

A. As the vice-president of CNBM, my duty is to be in charge of BNBM's investment and return. I do not have an office in CNBM, nor do I work in CNBM. I do not in charge of any other works in CNBM, and I'm not in charge of CNBM's daily operation.[134]

Further, Mr. WANG testified that his only obligation as a Vice President of CNBM is to manage CNBM's equity and investment in BNBM.[135] As the Chairman of BNBM's Board of Directors, Mr. WANG further acknowledged that his primary duty at BNBM is to make money and pay dividends to CNBM.[136] For this reason, it can only be assumed that Mr. WANG's primary obligation as a member of Taishan's Board of Directors is to ensure Taishan's payment

---

[134] WANG Dep. at 291:4-20, 292:1-10 and 376:9-377:5 (objections omitted).

[135] *Id*. at 378:4-22.

[136] *Id*. at 378:24-379:18:

> Q. "And you then perform your task at BNBM to ensure that BNBM operates successfully and creates dividends for CNBM, where you're vice-president, is that correct?"
> A. "My function as the Chairman of BNBM is that I'm only accountable to BNBM. I'm accountable to all the shareholders of BNBM."
> Q. "And that's to operate successfully and make money for the shareholders?"
> A. "The duty of a Chairman of the Board is, of course, to be in charge of the board of directors meetings, and to guaranty that the company will operate more successfully."

*Id.* at 379:6-18.

of dividends to its upstream, controlling parent BNBM, with the flow of this money ultimately going to CNBM, and eventually to CNBM Group.[137]

Additional high-level overlapping Officers and Directors among the various CNBM/BNBM and Taishan Defendants include the following individuals:

SONG Zhiping is the Chairman of CNBM Group since October, 2005.  In addition, he is the Chairman of BNBM Group.  Incredibly, Mr. SONG is also the Chairman and Executive Director of CNBM, since March 2005.  Previously, Mr. SONG was the Chairman of BNBM PLC, while he served in an executive capacity at BNBM Group and CNBM Group.[138]  He was also a Director for BNBM America.[139]

CAO Jianglin, since 2005, has been a Director of CNBM Group, Chairman of the Supervisory Committee of BNBM Group, and President and Executive Director of CNBM.[140]  Since 2009, he has served as Chairman of the Supervisory Committee of BNBM, and in 2014, he was appointed General Manager of CNBM Group.[141]  From 2005-2011, Mr. CAO was a Supervisor and Chairman of the Supervisory Committee of Taishan,[142] and from 2005-2009, he

---

[137] Under the structure established by CNBM Group, Taishan's payment for its contempt of court was in effect financed by CNBM Group.

[138] Exhibit 23-1 at 1 & Ex. 1 thereto.

[139] 2003 For Profit Corporation Uniform Business Report and Articles of Incorporation for BNBM of America, Inc. [part of Ex. 1 to the Deposition of Richard Hannam dated 2/13/2012] (Exhibit 144-3) (attached hereto as FSIA Ex. "116").

[140] Exhibit 23-1 at 2 & Ex. 5 thereto.  *See also* Deposition of CAO Jianglin dated 8/4-5/2015 ("CAO Dep.") at 37:15-24, 38:11-14 (attached hereto as FSIA Ex. "125").

[141] *Id.*

[142] Exhibit 23-1 at 2 & Exs. 2, 3, 4 thereto.

39

was the Chairman and Secretary to the Party Committee of BNBM.[143] Mr. CAO was also a Director and Officer of BNBM of America.[144]

ZHOU Guoping is the Chief Economist for CNBM Group.[145] She is also a Supervisor for CNBM, since 2005.[146] In January, 2015, she was appointed as Vice President and Director of CNBM Import and Export.[147]

TAO Zheng currently serves as the General Manager, Director, and Deputy Secretary to the Party Committee of BNBM Group.[148] At the same time, he is a Non-Executive Director for CNBM.[149]

HUANG Anzhong is the Vice General Manager for CNBM Group and he also serves as a Non-Executive Director for CNBM.[150] In addition, from 2005-2015, he was the General Manager of CNBM Import and Export, and now he is that company's Chairman.[151]

---

[143] Exhibit 23-1 at 2 & Exs. 5, 6 thereto.

[144] 2003 For Profit Corporation Uniform Business Report and Articles of Incorporation for BNBM of America, Inc.

[145] Exhibit 23-1 at 5 & Ex. 31 thereto; *see also* Deposition of CNBM Group (ZHOU Guoping) dated 6/16-18/2015 ("ZHOU Dep.") (attached hereto as FSIA Ex. "119").

[146] *Id*.

[147] CNBM Group Board of Directors Meeting Minutes, 23rd Meeting of the Third Session of Board Meeting, dated 1/29/2015 [Translation of CNBMGRP00012512] (Exhibit 98) (attached hereto as FSIA Ex. "53").

[148] Exhibit 23-1 at 3 & Exs. 8, 21.

[149] Exhibit 23-1 at 3 & Ex. 21.

[150] Exhibit 23-1 at 8 & Ex. 21.

[151] *Id*.

40

GUO Chaomin, since 2003, has been the General Manager and Vice President to the Standing Committee of the Party Committee for CNBM Group.[152]  In 2001, he has also served as a Non-Executive Director for CNBM.[153]  From 2006-2010, he served as General Manager for China National United Equipment Group Corporation.[154]

CHANG Zhangli is the Vice President and Executive Director of CNBM.[155]  Since 2005, he has been Secretary to the Board for CNBM.[156]  He is also a Director of BNBM.[157]

PENG Shou has been a Vice President for CNBM since 2005 and an Executive Director for CNBM since 2006.[158]  Since 2004, he has also served as the Chairman of CNBM Triumph.[159]

HU Jinyu, since 2005, has been a Supervisor for BNBM and the General Manager of the Audit Department for CNBM.[160]  She is also the Vice President and Financial Director for North Cement Co., Ltd.[161]  Previously, she served as a Director for Taishan.[162]

---

[152] Exhibit 23-1 at 7 & Ex. 21.

[153] *Id.*

[154] *Id.*

[155] Exhibit 23-1 at 3 & Exs. 18, 19.

[156] Exhibit 23-1 at 3 & Ex. 18.

[157] Exhibit 23-1 at 3 & Exs. 18, 19.

[158] Exhibit 23-1 at 9 & Ex. 5; *see also* Deposition of PENG Shou dated 9/16/2015 ("PENG S. Dep.") (attached hereto as FSIA Ex. "120").

[159] *Id.*

[160] Exhibit 23-1 at 8 & Ex. 36.

[161] *Id.*

CHEN Yu is the General Manager of BNBM and he also serves as a Director of both BNBM and Taishan.[163]

JIA Jianjun, from 2005-2008, served as Deputy General Manager and Secretary to the Board of BNBM and also as a Director of Taishan.[164]

JIA Tongchun, since 2002, has served as the Chairman and General Manager of Taishan.[165]  At the same time, from 2005-2012, Mr. JIA was the Deputy General Manager of BNBM and from 2008-2012, he was a Director of BNBM.[166]

YANG Yanjun was another Director at Taishan[167] who held a variety of leadership roles at BNBM, including Director, Chief Accountant and Deputy General Manager.[168]

---

[162] *See* Resolutions of the General Meeting of Shareholders [of Taishan Gypsum] dated 4/25/2005 [TG0020601-602 & Translation] (Herman Aff. Ex. 185 filed 5/8/2012) (attached hereto as FSIA Ex. "121") (electing HU Jinyu to the Board of Directors of Taishan); *see also* Shandong Taihe Dongxin Co., Ltd. Resolution of the First Extraordinary General Meeting of 2006 of Taishan [TG0020675-676 & Translation] (Herman Aff. Ex. 187 filed 5/8/2012) (attached hereto as FSIA Ex. "122") ("Due to work-related reasons, Ms. Jinyu Hu shall no longer serve as Director of the Company.").

[163] Exhibit 23-1 at 3 & Exs. 18, 20.

[164] Exhibit 23-1 at 4 & Exs. 9, 13, 23, 24.

[165] Exhibit 23-1 at 3 & Exs. 12, 13, 14, 15, 16.

[166] Exhibit 23-1 at 3 & Exs. 12, 17.

[167] Shandong Taihe Dongxin Co., Ltd. Resolution of the First Extraordinary General Meeting of 2006 of Taishan.

[168] BNBM 2014 Annual Report at p. 56 ("Ms. Yang has served as a director of the Company [BNBM] from November 17, 2009 to present and served as a deputy general manager and chief accountant of the Company from September 2009 to present.").

### 5.  CNBM Group Controls Financing for its Subsidiaries, Including BNBM Group, CNBM, BNBM, and Taishan

CNBM Group has routinely and continuously exercised control over the financing for its subsidiaries, including but not limited to BNBM Group, CNBM, BNBM PLC, and Taishan. "The Group Corporation coordinates and integrates various domestic and overseas resources, which purports to the reasonable utilization of resources among the various subsidiaries."[169] CNBM Group exercises this resource control, in part, by dictating various financing policies and procedures to be implemented and followed by subsidiaries, including but not limited to:

- "China National Building Material Group Corporation's Measures for Management of Loans and Guarantees";[170]

- "China National Building Material Group Corporation's Interim Measures for Comprehensive Budgetary Management";[171]

- "Notice on Strengthening Bank Loan Management of Subsidiaries";[172] and

- Requiring "annual loan and guarantee plans" to be submitted by subsidiaries and approved by CNBM Group.[173]

The end result is that CNBM Group controls the financing for all levels of subsidiaries within the Group Corporation – including Taishan.

---

[169] *See* CNBM Group 2015-2017 Strategy Plan at 1.

[170] *See* CNBM Group's "Reply on Beijing New Building Material (Group) Co., Ltd.'s 2013 annual loan and guarantee plan" [CNBMGRP0000564] (Exhibit 86) (attached hereto as FSIA Ex. "54") at 1.

[171] *Id.*

[172] *Id.*

[173] *Id.*

Guarantees that Taishan received from BNBM Group illustrate how CNBM Group controls financing for subsidiaries, including Taishan.  For example, Taishan received four hundred fifty million (450,000,000) yuan of guarantees from BNBM Group in 2013.[174] However, these guarantees were not allowed without sanctioning from CNBM Group, as BNBM Group was required to submit its 2013 "annual loan and guarantee plan" to CNBM Group for approval.[175]  Subsequent thereto, on March 5, 2013, CNBM Group provided its response to BNBM Group, approving: 1) a "ceiling" of 1.75 billion yuan for BNBM Group's 2013 annual loans (including bonds), and 2) a "ceiling" of 3 billion yuan credit guarantee provided to BNBM Group from CNBM Group in 2013.[176]  Thus, CNBM Group controlled the amounts which BNBM Group could loan/guarantee to/for other companies, as well as the amount of credit which BNBM Group could receive.  This ultimate control by CNBM Group is further evidenced by the other above-listed CNBM Group policies governing loans and guarantees made by subsidiaries – such as BNBM Group.

---

[174] *See* BNBM Group Guarantee for Taishan for 100,000,000 yuan with Taian Quingnian Street Branch of China - "Maximum Guarantee Contract Serial No. 2013-123010-ZG03" dated 1/10/2013 [TG-068133-53 & English translation provided by Taishan] (attached hereto as FSIA Ex. "55"); *see also* BNBM Group Guarantee for Taishan for 350,000,000 yuan with Agricultural Bank of China Taian Longze Sub Branch - "Maximum Guarantee Contract Serial No. 3710052013005139" dated 7/11/2013 [TG-067972-90 & English translation provided by Taishan] (attached hereto as FSIA Ex. "56").

[175] *See* CNBM Group's "Reply on Beijing New Building Material (Group) Co., Ltd.'s 2013 annual loan and guarantee plan" (Exhibit 86) at 1.

[176] *Id*.

Similarly, BNBM has continuously guaranteed the loans of Taishan and its subsidiaries.[177]  As set forth in Taishan's 2011 Risk Management Report, "[a]t the end of every year, according to the anticipated operational activities of the entire Group and the cash flow produced by the investment activities in the coming year, the main office of the Company would uniformly formulate financing plans which include financing amounts and guarantee methods, and submit them to BNBM PLC."[178]  The loan guarantees by BNBM for Taishan and its subsidiaries are approved at BNBM's Board of Director and Shareholder meetings.[179]  CNBM, as the controlling shareholder of BNBM, has voted to approve these loan guarantees at the BNBM Shareholder meetings.[180]  CNBM has also continuously guaranteed the loans of

---

[177] *See* WANG Dep. at 362:21-364:15; *id*. at 362:21-25 (Q. "Okay. Let's go to guaranties. Did there come a time in the events of BNBM where BNBM would make guaranties to Taishan and Taishan's wholly-owned subsidiaries?" A. "Yes."); CHEN Dep. at 357:20-358:13 and 360:25-363:23; *id*. at 363:18-23 (Q. "Sir, is it a fact that from 2005 through 2014, there are guaranties, substantial guaranties, provided [by BNBM] to Taishan each and every year in order for Taishan to maintain its profitability and business interest?" A. "Yes.").  *See also* BNBM Guarantees to/Investments in Taishan Gypsum - FRE 1006 Summary Chart (reflecting BNBM's Guarantees from 2005 to 2014) (Exhibit 162-1) (attached hereto as FSIA Ex. "57"); BNBM PLC Public Announcement of the External Guarantees for the year 2015 dated 3/18/2015 (indicating that BNBM plans to provide guarantees to Taishan of no more than 1 billion yuan in 2015) [BNBMPLC-E-0112095R-112112R] (Exhibit 322R) (attached hereto as FSIA Ex. "59"); BNBM PLC Resolution of the 2013 Annual General Meeting of Shareholders dated 4/16/2014 re: approval of Guarantees to Taishan Gypsm (reflecting that BNBM's shareholders approved guarantees to Taishan not exceeding 1 billion yuan) [BNBMPLC-E-0011157R-0011166R at 11160R] (Exhibit 305R) (attached hereto as FSIA Ex. "60").

[178] Taishan's 2011 Risk Management Report at CNBMGRP00371521.

[179] WANG Dep. at 364:17-366:1.

[180] CHANG Dep. at 275:1-276:17; *id*. at 276:4-17 (Q. "But did CNBM Company, Limited, as a shareholder of BNBM Plc approve of the action of BNBM Plc to make loan guarantees to Taishan Gypsum?" A. "CNBM Company, Limited, as a shareholder of BNBM according to the percentage of shares we hold voted approval on the shareholders' meeting.") (objections by counsel and discussion between the witness and the interpreter omitted).

45

BNBM.[181]  Through these loan guarantees, Taishan and its subsidiaries are able to finance their business operations.[182]

### 6. CNBM Group Shares and Controls Similar Business Functions with BNBM Group, CNBM, BNBM, and Taishan

CNBM Group shares major overarching business functions with its subsidiaries, including, but not limited to, BNBM Group, CNBM, BNBM, and Taishan.  As set forth in greater detail in Section II.A, *supra*, CNBM Group shares, and in fact controls, four (4) all-embracing business functions relative to each of its subsidiaries: strategy management, decision-making management, resource management, and policy & culture management.[183]  Indeed, "[t]he Group Corporation is the strategy center, decision-making center, resource center, policy and culture center of the Group."[184]

CNBM Group details precisely how it shares and controls these all-embracing business functions (relative to its subsidiaries) in its April, 2015 development and strategy plan, as follows:

---

[181] *See* WANG Dep. at 373:13-377:20; *Id*. at 373:13-16 (Q. "Has BNBM gotten any guaranties from either CNBM or CNBM Group?" A. "BNBM had obtained guaranty from CNBM Company, Limited.").  *See also* CNBM Guarantees to BNBM - FRE 1006 Summary Chart (reflecting CNBM's Guarantees from 2005 to 2007) (Exhibit 346) (attached hereto as FSIA Ex. "61").

[182] JIA Dep. at 254:13-255:10; CHEN Dep. at 361:18-362:2; 363:18-23; *id*. at 361:18-22 (Q. "Sir, when the board of directors approves the guaranties of Taishan, they're doing so, so that Taishan can succeed in its business endeavors, are they not?" A. "Correct.").

[183] *See* "China National Building Material Group Corporation Year of 2015 - 2017 Development Strategy and Plan" dated April, 2015 at 1.

[184] *Id*. at 1.

46

The Group Corporation mainly manages its subsidiaries in 4 aspects:  First, Strategy Management, **The Group Corporation guides all subsidiaries to strictly adhere to the Group Corporation's determined strategy on business activities**, to ensure the realization of the Group Corporation's strategic goals.  Second, Decision-Making Management: according to the modern enterprise system, and in compliance with relevant rules of the Group Corporation, **the Group exercises the decision making power as the fund contributor on major issues** such as its subsidiaries' investment and financing, restructuring, etc.  Third, Resource management: **The Group Corporation coordinates and integrates various domestic and overseas resources**, which purports to the reasonable utilization of resources among the various subsidiaries.  Fourth, Culture Management: the Group Corporation guides all subsidiaries to commence establishing enterprise culture, allowing the spreading and cultivation of **the Group Corporation's culture among all subsidiaries**, and forming a set of unified enterprise culture values within the Group Corporation.  Through refining and formulating various rules, **the Group Corporation standardizes and institutionalizes its management**.[185]

As the strategic, decision-making, resource, and policy & cultural center of the group, CNBM Group shares, and in fact controls, these all-encompassing business functions with all subsidiaries.

### 7.   CNBM/BNBM and Taishan Share Common Offices

Since 2005, CNBM Group, BNBM Group, and CNBM have shared registered addresses and physical office addresses.  For instance, from 2005 through 2007, BNBM Group, CNBM, and BNBM had identical registered addressed: No. 11 (A) Sanlihe Road, Haidian District,

---

[185] *Id.* (emphasis added).

Beijing China.[186]  ZHAO Yanming, BNBM Group's corporate witness, confirmed that BNBM Group and BNBM PLC have, in fact, shared common office space.[187]

Mr. ZHAO explained that both entities had offices in the same building, but on different floors:  BNBM Group's offices being located on the fourth floor and BNBM PLC's offices being He further added that out of five floors in the building, BNBM PLC occupied the first, second, and third floors of the building.[188]  When asked who occupied the fifth floor BNBM Group's corporate designee could recall whether the occupant was BNBM PLC or BNBM Group or some other BNBM entity.[189]  Nonetheless, he could confirm that the entity had the letters "BNBM" in its name.[190]  Similarly, Mr. ZHAO could not recall specifically which BNBM entity owned the building that housed the offices of BNBM PLC and BNBM Group, but he explained that the building was owned by an entity with the letters "BNBM" in its name.[191]  Mr. ZHAO's testimony further demonstrates the interconnectedness of these Defendants.

Beginning in 2008 and continuing through present, BNBM Group relocated to 1001#, 10/F Building 4 Interwest Business Center No. 9 South Shouti Rd. Haidian District Beijing

---

[186] *See* 2005 BNBM Group Auditor's Report [BNBM(Group)0000435-R] (Exhibit 168R) at 6; *see also* 2005 CNBM Annual Report at 4; 2005 BNBM Annual Report at 3; 2006 BNBM Group Auditor's Report [BNBM(Group)00000560R-611R] (Exhibit 169R) (attached hereto as FSIA Ex. "64") at 6; 2006 CNBM Annual Report at 4; 2006 BNBM Annual Report at 4; 2007 BNBM Group Auditor's Report [BNBM(Group)0000651R-701R] (Exhibit 170R) (attached hereto as FSIA Ex. "65") at 6; 2007 CNBM Annual Report at 4.

[187] *See* ZHAO Dep. at 73:19-76:20; 249:3-250:13.

[188] *See* ZHAO Dep. at 164:13-165:5.

[189] *See* ZHAO Dep. at 165:9-166:16.

[190] *See* ZHAO Dep. at 165:9-166:16.

[191]*See* ZHAO Dep. at 166:17-167:7.

China.[192]  Despite BNBM Group's relocation in 2008, both CNBM and BNBM's registered

addresses have remained identical from 2005 through 2014.[193]

Not only have CNBM and BNBM PLC shared the same registered address from 2005

through 2009, but they have also shared the same "office address," as reported in each entity's

annual reports for these years.[194]  From 2005 through 2009, CNBM and BNBM PLC's offices

were located at:  No. A-11 Sanlihe Road, Haidian District, Beijing, 100037.[195]  In 2013,

however, both CNBM and BNBM's offices relocated.[196]  Once again, BNBM and CNBM shared

an office building, this time located at: Tower 2, Guohai Plaza, 17 Fuxing Road, Haidian

---

[192] *See* 2008 BNBM Group Auditor's Report at 10; *see also* 2009 BNBM Group Auditor's
Report [BNBM(Group)00000850R-913R] (Exhibit 172R) (attached hereto as FSIA Ex. "67") at 8;
2010 BNBM Group Auditor's Report [BNBM(Group)00000956R-1011R] (Exhibit 173R)
(attached hereto as FSIA Ex. "68") at 9; 2011 BNBM Group Auditor's Report
[BNBM(Group)00001054R-109R] (Exhibit 174R) (attached hereto as FSIA Ex. "69") at 9; 2012
BNBM Group Auditor's Report [BNBM(Group)00001154R-213R] (Exhibit 175R) (attached
hereto as FSIA Ex. "70") at 9; 2013 BNBM Group Auditor's Report [BNBM(Group)00001266R-
337R] (Exhibit 176R) (attached hereto as FSIA Ex. "71") at 9; 2014 BNBM Group Auditor's
Report [BNBM(Group)00003274R-330R] (Ex. 177R) (attached hereto as FSIA Ex. "72") at 9;
ZHAO Dep. at 326:4-327:14.

[193] *See* 2008 CNBM Annual Report at  4; 2008 BNBM Annual Report at  4; 2009 CNBM Annual
Report at 5; *see also* 2009 BNBM Annual Report at 3; 2010 CNBM Annual Report at 5; 2010
BNBM Annual Report at 2; 2011 CNBM Annual Report at 5; 2011 BNBM Annual Report at 3;
*see also* 2012 CNBM Annual Report at  5; 2012 BNBM Annual Report at 6; 2013 CNBM
Annual Report at 5; 2013 BNBM Annual Report at 6; 2014 CNBM Annual Report at 5-6; 2014
BNBM Annual Report at 6; 2015 CNBM Interim Report at 3-4.

[194]  *See* 2005 CNBM Annual Report at 4; *see also* 2005 BNBM Annual Report at p. 3; 2006
CNBM Annual Report at 4; 2006 BNBM Annual Report at 4; 2007 CNBM Annual Report at 4;
2007 BNBM Annual Report at 4; 2008 CNBM Annual Report at 4; 2008 BNBM Annual Report
at 4; 2009 CNBM Annual Report at 5; 2009 BNBM Annual Report at 3.

[195] *See id*.

[196] *See* 2013 CNBM Annual Report at 5; *see also* 2013 BNBM Annual Report at 6.

District, Beijing.  CNBM occupied the 21st floor and BNBM occupied the 15th floor.[197]  Today, it appears that CNBM and BNBM have maintained offices at the foregoing address since the move in 2013.[198]

In his deposition, WANG Bing confirmed that as of late (August 2015), BNBM and CNBM's offices are "in the same building because BNBM is under[going] remodeling."[199]

Finally, on May 20, 2008, Taishan's Board of Directors conducted a meeting in the conference room of CNBM.[200]  Although not with regularity, over the years Taishan's Board of Directors periodically met at the offices of CNBM and BNBM.  The conclusion can be drawn that the interests of convenience controlled, due to the overlapping CNBM/BNBM/Taishan Officers and Directors, who hold positions with two or more of these corporate entities, but maintain just one office where they undertake activities on behalf of several of the Defendant corporations.[201]

---

[197] *See* 2013 CNBM Annual Report at 5; *see also* 2013 BNBM Annual Report at p. 6; 2014 CNBM Annual Report at 5-6; 2013 BNBM Annual Report at 6; 2015 CNBM Interim Report at 3-4; WANG Dep. at 151:10-15.

[198] *See id*; *see also* 2014 CNBM Annual Report at 5-6; 2013 BNBM Annual Report at 6; 2015 CNBM Interim Report at 3-4; WANG Dep. at 151:10-15.

[199] *See* WANG Dep. at 151:10-15.

[200] *See* Taishan Gypsum Co., Ltd. Resolutions of the First Meeting of the Fourth Board of Directors [TG 0020787] (Exhibit 23-1 at Ex. 14) (attached hereto as FSIA Ex. "73").

[201] *See* SONG Dep. at 223:10-224:12; *id*. at 223:10-15 (Q. "Now, let me ask you a slightly different question. Where is your office as chairman of the board of BNBM Group?" A. "I do not have an office at BNBMG. I only have one office which is located at CNBMG."); *id*. at 224:5-12 (Q. "From that office at CNBMG, do you also perform your work as the chairman of CNBM?" A. "As for CNBM's office since I am also the chairman of the board of CNBM; therefore, I am – also only perform my work whenever there is a board of directors' meeting of CNBM."); WANG Dep. at 83:10-85:2 and 102:13-16 (although Mr. WANG holds positions at Taishan, BNBM and CNBM, he maintains just one office at BNBM).

**8.  Defendants Share a Common Logo, Corporate Identity, and Website Advertisements**

To further solidify the identity of the CNBM/BNBM and Taishan Defendants as a single business enterprise, CNBM Group and its CNBM- and BNBM-named subsidiaries share the same logo.



*Source: http://www.cnbm.com.cn/EN/c_0000001600070001/*



*Source: http://www.bnbmg.com.cn/en/gybx/A0201index_1.htm*



*Source: http://www.cnbmltd.com/english/zgjc/*



*Source: http://www.icnbm.com/en/*



*Source: http://www.cnbminternational.com/en/gywm/index.jsp*

This red hexagonal icon on the websites, reports, and other documents of the various CNBM/BNBM and Taishan Defendant companies is "a group logo that belong[s] to CNBM Group Company, Limited."[202]  It is "common practice" for every company and entity in the CNBM Group, including CNBM Company, Limited, to utilize the same logo.[203]  The websites of CNBM Group, CNBM Co., Ltd., CNBM Equipment Import & Export Company, China Triumph International Engineering Company ("CTIEC"), CNBM Investment ("CNBMI"), CNBM International Trading ("CNBMIT"), *et al*., as shown above each share the identical red icon logo. CNBM Group's company profile on Alibaba.com likewise uses this logo.[204]  Further, on BNBM Group's website, BNBM Group uses CNBM Group's logo as its own.[205]  Finally, CNBM Forest Products, Ltd. ("CNBM Forest") (the wholly-owned subsidiary of CNBM Import & Export) and its wholly-owned subsidiary, CNBM Forest Products (Canada), Ltd. ("CNBM Forest (Canada)" likewise use this logo.[206]  In fact, this logo is used by CNBM Forest in materials used to promote the business of its company.[207]  Not surprisingly, this has caused commercial confusion among

---

[202] *See* ZHOU Dep. at 291:16-292:5.  Interestingly, the logo is no longer actively registered with the United States Patent Office, which shows CNBM Group's trademark was cancelled on April 10, 2015.  *See* CNBM trademark records, United States Patent and Trademark Office (attached hereto as FSIA Ex. "39").

[203] *See* ZHAO Dep. at 83:25-84:22; CAO Dep. at 220:22-221:24; *see also* DENG Dep. at 77:4-78:20.

[204] *See* CNBM Group Storefront on Alibaba.com [ALRMH-CNBM00010001-10002] (Exhibit 270-1) (attached hereto as FSIA Ex. "58").

[205] ZHAO Dep. at 83:25-84:22; CAO Dep. at 220:22-221:24; *see also* BNBM Group website pages [ALRMH-CNBM00008874 & 8887] (Exhibits 214 and 214-A) (attached hereto as FSIA Ex. "97").

[206] DENG Dep. at 77:4-78:20.

[207] DENG Dep. at 79:9-23.

companies doing business with the CNBM group of companies, because they "don't understand that relationship between CNBM and the other companies that share a logo."[208]

The relationships among the various and numerous CNBM- and BNBM- entities is confusing to CNBM Group's customers and in the marketplace (and even with their own counsel). For example, the corporate representative for a joint venture with CTIEC testified that "now that you point out that there's a difference between the two [CNBM Group and CNBM Company, Limited], I don't know how to distinguish between the two."[209] The corporate representative for Sunpin Solar Development LLC was similarly confused. When asked whether he had heard of a company called CNBM, distinct from CNBM Group, he responded that he "didn't know there was a difference."[210] As to other CNBM entities, the Western Wood corporate representative testified that he would "consider them one in the same, so CNBM is the same to me as CNBM Forest Products, China National Building Material Import and Export. I consider --- I consider them the same."[211]

CNBM Group certainly treats these entities as its own. Advertisements and announcements for "cooperation agreements," joint ventures, projects, and deals by CNBM Group subsidiaries are highlighted on the CNBM Group website. For example, CNBM

---

[208] See Deposition of New Jersey Institute of Technology (Donald Sebastian) dated 4/22/2015 (Exhibit 42-1(A)) (attached hereto as FSIA Ex. "108") at 249:24-251:5.

[209] See Deposition of CTIEC-TECO American Technology, Inc. (Fred Paulsen) dated 4/24/2015 (attached hereto as FSIA Ex. "62") at 149:2-23.

[210] See Deposition of Sunpin Solar Development, LLC (Steve Kim) dated 4/17/2015 (Exhibit 42-1(K)) (attached hereto as FSIA Ex. "109") at 12:21-14:11.

[211] See Deposition of Western Wood (John Salamanca) dated 5/21/2015 (Exhibit 43-1(D)) (attached hereto as FSIA Ex. "110") at 18:18-22.

International Corporation's launch of Okorder.com in 2011 was announced on the CNBM Group website.[212]  Likewise, CTIEC's agreement with Wal-Mart and Sunpin Solar in 2014 and 2015 to have roof solar panels constructed for Wal-Mart's stores in the United States appeared in the CNBM Group website news center.[213]

The CNBM Group of companies are so unified with CNBM Group that they sometimes identify themselves as CNBM Group when trying to solicit American customers.  In fact, on April 3, 2008, CNBM (USA) (identified on CNBM Group's website as part of the Company's global presence in the U.S.A.[214] and located in California), wrote a letter to the Purchasing Manager for Eastern Metal Supply, Inc. and stated:  "we are writing about the possibility of establishing aluminum business with you.  We are CNBM group (China National Building Material group), the top 56 group operated by China government.[215]

### 9.  CNBM Group Transferred Assets Among its Inter-related Entities for Nil Consideration

In 2004-2005, CNBM Group orchestrated a massive reorganization of its subsidiaries and affiliates that created the conglomerate that includes all CNBM/BNBM and Taishan

---

[212] *See* Web Article, OKorder.com Official Launch from cnbm.com.cn dated 2/18/2011 [ALRMH-CNBM0008810-8812] (Exhibit 81) (attached hereto as FSIA Ex. "111").

[213] *See* Web Article, CTIEC signs Wal-Mart Roof Power Plant Project from cnbm.com.cn, dated 3/2/2015 [ALRMH-CNBM0008813-8814] (Exhibit 82) (attached hereto as FSIA Ex. "112"); Web Article, CTIEC signed a 100 MW Photovoltaic Power Plant Project in the U.S., from cnbm.com.cn., dated 12/2/2014 [ALRMH-CNBM0008854-8855] (Exhibit 82-1) (attached hereto as FSIA Ex. "113").

[214] *See* CNBM Group "Global Presence" Tab, available at http://www.cnbm.com.cn/EN/c_0000001600030001/

[215] *See* Letter from CNBM (USA) to Eastern Metal Supply, Inc. created on 4/3/2008 [CNBMUSA00045438] (attached hereto as FSIA Ex. "115").

Defendants.[216]  Through this reorganization, CNBM Group shifted assets and redefined business purposes in order to accomplish its end goal.  Specifically, the CNBM Global Offering stated, "[a]s part of the Reorganization, Parent Group [CNBM Group, BNBM Group, China Building Academy, CNBM Trading] has transferred to us [CNBM] substantially all of its building materials businesses, including all relevant properties, equipment and necessary employees necessary to carry on such business."[217]  Prior to the Reorganization, CNBM Group wholly-owned China National Building Material and Equipment Import and Export Company ("CNBM Equipment"), which owned equity interests in multiple subsidiaries including equity interests in BNBM PLC and China Fiberglass Company Limited.[218]  In order for CNBM Group to establish a publicly traded joint stock company, CNBM Group redirected CNBM Equipment's ownership interests in targeted subsidiaries engaged in the production and sale of materials to a "new" company.[219]  Significantly, this goal was achieved through a series of asset transfers for "nil consideration."[220]

In order for CNBM Group to establish CNBM, the following transactions were made for nil consideration:

---

[216] *See* Section II.A, *supra.*

[217] CNBM Global Offering at 4.

[218] *Id.* at I-1.

[219] *Id.*

[220] *See*, *generally*, CNBM Global Offering at 94-95.

1) China United retained all assets and liabilities of its subsidiaries, other assets, including cement and mining rights were transferred to CNBM Group for nil consideration;[221]

2) BNBM Group transferred 37.79% of its equity interest in China Fiberglass (now called China Jushi) to CNBM Equipment for nil consideration;[222]

3) CNBM Group approved the transfer of China Composites' equity interests in all non-fiberglass related entities to the Parent Group;[223] and

4) BNBM Group transferred its 60.33% equity ownership in BNBM PLC to CNBM Group "without compensation, thus making CNBM Group the controlling shareholder of BNBM PLC."[224]

Basically, CNBM Group redefined the business scope of CNBM Equipment in September, 2004 in order to capitalize CNBM Co., Ltd. for public offering.[225]

Prior to the reorganization, CNBM Equipment transferred all operations, related assets and liabilities to the Parent Group at nil consideration.[226] In return, the Parent Group transferred its interest in businesses engaging in the production and sales of various cement, fiberglass and FRP products, certain provisions related to engineering services, and all its equity interests in

---

[221] *Id.* at 94.

[222] *Id.*

[223] *Id.* at 95.

[224] 2006 BNBM Annual Report at p. 52; *see also* CNBM Global Offering at 90.

[225] CNBM Global Offering at 95.

[226] *Id.*

BNBM and China Fiberglass to CNBM.[227]  Further, CNBM Group transferred its 91% interest in

China Triumph to CNBM Equipment for nil consideration.[228]  And finally, CNBM Equipment

transferred all aforementioned assets and liabilities to CNBM Import and Export (commonly

referred to in translations as "CNBM Trading" by way of nil consideration, which established the

trading arm of CNBM Group.[229]

### 10. The CNBM/BNBM and Taishan Defendants Failed to Follow Proper Corporate Procedure

#### a. JIA Tongchun's Position as a Director of BNBM While He Owned 5% of Taishan's Stock Was Improper

JIA Tongchun simultaneously held posts at Taishan Gypsum and BNBM PLC during the

years 2005-2012.[230]  At all relevant times, JIA also owned 5% equity shares in Taishan.[231]

Further, for years 2008-2012, JIA received payment from BNBM for his service on BNBM

PLC's Board of Directors.[232]  Moreover, in 2012, BNBM's Human Resources Department

published a congratulatory announcement describing a 500,000 RMB bonus paid to Mr. JIA for

---

[227] *Id.*

[228] *Id.*

[229] *Id.* at 582.

[230] JIA was appointed Chairman of Taishan's Board of Directors and General Manager of Taishan in 2002.  From 2005-2012, JIA served as Deputy General Manager of BNBM, and from July 2008-September 2012, JIA served as a Director on BNBM's Board of Directors.  *See* 2011 BNBM Annual Report at 12; *see also* 2012 BNBM Annual Report at 52.

[231] *See* "Main Issues in State-owned Asset Supervision and Administration Commission's Audit of Economic Responsibility" [BNBMPLC-E-0010163R] (Exhibit 134R) (attached hereto as FSIA Ex. "74").

[232] *See* 2008 BNBM Annual Report at 15; 2009 BNBM Annual Report at 13; 2010 BNBM Annual Report at 13; 2011 BNBM Annual Report at 14; 2012 BNBM Annual Report at 55.

his work with Taishan Gypsum.[233]  These payments were made notwithstanding BNBM's

statements to the contrary, *e.g.*, "the director and deputy general manager Mr. Jia Tongchun

received no remuneration from the Company [BNBM] as he also held a position in the

proprietary subsidiary Taishan Gypsum Co., Ltd."[234]  Not surprisingly, Mr. JIA's overlapping

positions with Taishan and BNBM eventually caught the attention of State-owned Asset

Supervision and Administration Commission ("SASAC") and required BNBM's parent

companies to intervene and rectify the situation.

In 2012, SASAC engaged in an economic accountability audit of BNBM PLC and

discovered a number of questionable practices, which were written up and submitted to CNBM

Group for rectification and explanation.[235]  Among the issues identified, SASAC found that

JIA's ownership stake in Taishan Gypsum and his position at BNBM PLC was in violation of

relevant SASAC rules.[236]  Specifically, SASAC noted that Mr. JIA held a management post in

BNBM ("a higher level enterprise") and participated in dividend distribution as a 5% shareholder

of Taishan.[237]  To rectify the situation, CNBM Group requested that BNBM PLC rectify the

situation and "improve relevant management regulations, seriously clean up wrong behaviors,

---

[233] *See* "Award for Significant Business Contributors from Taishan Gypsum and BNBM Homes," dated 1/20/2012 [BNBMPLC0007291 (E)] (Exhibit 143) (attached hereto as FSIA Ex. "75").

[234] *See*, *e.g.*, 2008 BNBM Annual Report at 15.

[235] *See* "Problems Discovered During Auditing Review" [CNBMGRP00009807-9838] (Exhibit 133) (attached hereto as FSIA Ex. "76") at CNBMGRP00009832-9833.

[236] *Id.*

[237] *Id.*

and make adjustment and changes according to the relevant requirements of SASAC.[238]  In

response, BNBM PLC had JIA Tongchun resign from all positions at BNBM.[239]

### b. There Is Evidence of Improper Transfers of Funds from CNBM to BNBM, and Then to Taishan

In a document titled "Communications about the Problems of BNBM," certain

improprieties in the company's accounting are revealed.  For example, there was an unexplained

transfer of funds from CNBM to BNBM, and then to Taishan, and vice versa.  The companies

used BNBM as the conduit to transfer funds from CNBM to Taishan without explanation:

> We found in a spot-check that the December No. 1301 voucher at
> the Company's Headquarters is a 40 million fund transfer from the
> same account number but it was actually a transfer from CNBM to
> BNBM and then to Taishan Gypsum; likewise the No. 1304
> voucher displayed a transfer of 40 million yuan as Taihe's
> repayment to CNBM through BNBM's account.[240]

BNBM's document reports that:  "The financial management of some subsidiaries was not

standardized enough, for example, the incubator company did not record the income and

expenditure of bank savings according to facts."[241]  Further, the accountants for BNBM

discovered that for 292.06 million Yuan of entrusted loans from BNBM's majority shareholder

---

[238] *See* "Main Issues in State-owned Asset Supervision and Administration Commission's Audit of Economic Responsibility" [BNBMPLC-E-0010163] (Exhibit 134R).

[239] *See* "Explanation on the Rectification Status" [BNBMPLC-E-0010164] (Exhibit 134-1) (attached hereto as FSIA Ex. "77").

[240] Communications about the Problems of BNBM [Partial Translation of BNBMPLC-E-0006059-6060] (Exhibit 123) (attached hereto as FSIA Ex. "78").

[241] *Id*.

(CNBM), "the rate was lower than normal loan rates."[242]  According to the metadata, this document was created in 2008.[243]

## B. CNBM Group Was Directly Involved in the Issues Surrounding Taishan's Sales of Drywall to the United States

Documents recently produced by Taishan Gypsum show that CNBM Group had direct involvement in analyzing the volume of Taishan's sales of Chinese Drywall to the United States, including shipments to particular jurisdictions, such as Virginia, Florida, New York, and New Jersey.  For example, on June 27, 2010, PENG Wenlong, who was the Manager of Taishan's Foreign Trade Department and who had extensive involvement in sales of drywall manufactured by Taishan and TTP to the United States,[244] apologized profusely to CNBM Group's business manager ZHANG Jian[245] for not providing CNBM Group with timely reports of the statistics of Taishan's export data.[246]  Mr. PENG's email to Mr. ZHANG (with copies to JIA Tongchun, Taishan's Chairman, and ZHANG Jianchun, Taishan's Secretary of the Board) explains that:

---

[242] *Id.*

[243] *Id.*

[244] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 850 (E.D. La. 2012) (noting that Taishan's employees "used Americanized names and communicated in English with U.S. customers," and "Peng Wenlong … used the name[] Frank Clem … when dealing with U.S. customers"), *aff'd*, 742 F.3d 576 (5th Cir. 2014) & 753 F.3d 521 (5th Cir. 2014).

[245] *See* SONG Dep. at 86:17-19.

[246] Email from PENG Wenlong (Taishan) to ZHANG Jian (CNBM Group) dated 6/27/2010 re Spreadsheets of TSG Exports ("Chief Zhang: Hello! I'm very sorry that I was unable to timely report the relevant statistics to you.") [Translation of TG-0129674-676] (attached hereto as FSIA Ex. "81").  ZHANG Jian is a manager of CNBM Group's Business Administration Department. SONG Dep. at 86:17-19.  As explained in Section II.C.4, *infra*, Mr. ZHANG was present at the key CNBM Group Board of Director meeting where, following deliberations on Taishan's

The statistical spreadsheet we prepared and the analysis of the summary of concluding the lawsuit are hereby sent to you. Chief Zhang, please refer to the attachment. Due to a lack of tracking record for the origins of the gypsum boards produced in the factories, we cannot accurately account for the corresponding gypsum mines' origins for every batch of gypsum boards. Tomorrow, we will try our best to accurately account for the origins of gypsum on a monthly basis, and will report to you as soon as we finish.[247]

**C.   CNBM Group Orchestrated a Comprehensive, Unified Strategy for Defendants' Response to the U.S. Drywall Litigation**

Early on, CNBM Group's Chairman SONG Zhiping took charge to organize the response to the U.S. Drywall Litigation on behalf of all of the CNBM/BNBM and Taishan Defendants.[248] The Company devised a comprehensive, unified strategy beginning in 2009, which included input from multiple foreign law firms as well as the Company's major competitor in the drywall industry and co-Defendant in many of the Chinese Drywall actions – Knauf Gips.   CNBM Group closely monitored the lawsuits filed not only against Taishan as the manufacturer of the problematic drywall, but also against Taishan's BNBM and CNBM parent entities.   As part of its

---

withdrawal from this litigation, the Board voted unanimously to "respect" the decision for Taishan not to appear at the court-ordered Judgment Debtor Examination before this Court on July 17, 2014.  *See* CNBM Group Resolution No. 17 of the Third Session of the Board of Directors of CNBM Group dated 7/11/2014 ("CNBM Group Resolution No. 17") [CNBMGRP00393000-3002] (part of Exhibit 332) (attached hereto as FSIA Ex. "82").

[247] *Id.*  Noteworthy is the fact that this report to CNBM Group provides the percentage of Taishan's drywall that originated from the Luneng Mine (1.47%), *id.* at 4, and, yet, the 30(b)(6) witness for CNBM Group denied any knowledge of the Luneng Mine.  *See* ZHOU Dep. at 217:24-218:16.

[248] *See* Memorandum re "The Course of Events on Hiring Foreign Law Firms for the Gypsum Board Litigation in the United States – Brief Version of the Related Meetings" ("Course of Events Memo") (redacted version of Exhibit 323) [Translation of BNBMPLC-E-0059965-0059966] (attached hereto as FSIA Ex. "83") at 3.  This document is the subject of a pending Disclosure Motion [Rec. Doc. No. 19590 & Rec. Doc. No. 19628].

tactics, the Company advised its subsidiaries that were subject to suit to "reject the legal service of process," with the understanding that judgments likely could not be enforced against these Defendants in China.  Then, after the *Germano* judgment was entered on May 11, 2010, CNBM Group adopted a "limited response to litigation" game plan, whereby Taishan, as its stalking horse, would enter its appearance in the litigation for purposes of challenging personal jurisdiction.

Following multiple failed attempts to avoid the jurisdiction of this Court[249] and other U.S. courts where Chinese Drywall suits were pending,[250] on July 11, 2014, CNBM Group's Board of Directors deliberated on and unanimously blessed the decision for Taishan not to appear on July 17, 2014, for a court-ordered Judgment Debtor Examination in MDL 2047, and, instead, withdraw from all U.S. litigation and refuse to participate further in these proceedings. Subsequent to the Contempt Order entered against Taishan, and the injunction prohibiting Taishan and any of its affiliates and subsidiaries from doing business in the U.S. unless or until Taishan participates in this action, CNBM Group continued deliberately to sit on the sidelines of the litigation while it assessed the impact of the Contempt Order and the ongoing proceedings on the Company and its shareholders.  In the meantime, CNBM Group's subsidiaries, including CNBM Import and Export, CNBM Forest (Canada), CNBM (and its subsidiaries), BNBM PLC, and Taishan continued to do business in the U.S. in violation of the Contempt Order and in further derogation of this Court's authority.

---

[249] *See Chinese Drywall*, 894 F. Supp. 2d 819; *Chinese Drywall*, 742 F.3d 576 & 753 F.3d 521.

[250] *Lennar Homes, LLC v. Knauf Gips KG*, No. 09-07901 CA 42, 2012 WL 3800187 (Fla. Cir. Ct. Aug. 31, 2012), *aff'd*, *Taishan Gypsum Co. Ltd. v. Lennar Homes, LLC*, 123 So. 3d 637 (Fla. App.  2013) (per curiam).

1. **CNBM Group's Chairman Met with the Company's Competitor and Co-Defendant Knauf to Discuss the Chinese Drywall Problem**

At the very outset of this litigation, even before the MDL was formed, CNBM Group's Chairman was in communications with the Company's principal competitor in the drywall marketplace – a German conglomerate known as "Knauf" – regarding the status of U.S. Chinese Drywall lawsuits against Taishan, BNBM, and CNBM.  On April 21 and May 15, 2009, the Chairman of Knauf Plasterboard (Tianjin) Co., Ltd., David Gregory, wrote to SONG Zhiping to request "that CNBM and BNBM … take effective measures to respond to the U.S. consumer lawsuits and media coverage as soon as possible."[251]  Knauf expressed its "willing[ness] to, under the leadership of CNBM, safeguard the international reputation of Chinese-made building materials and Chinese building material enterprises together with other relevant Chinese building material enterprises."[252]  To that end, Knauf sent CNBM Group lists of more than 90 lawsuits naming Taishan and/or BNBM as Defendants, including the *Germano* action, relevant litigation documents, and media reports.[253]  It is not surprising that Knauf's Chairman reached out to Mr. SONG when the Drywall suits were first filed.  Back in 1995 or 1996, Mr. SONG visited Knauf's headquarters in Iphofen.[254]  Then, in 2006 (or 2009 -- 2010),[255] Mr. SONG met with a

---

[251] *See* Letters with attachments from Knauf to SONG Zhiping (CNBM Group) and WANG Bing (BNBM  Group) dated 5/15/2009 [KNAUFGIPS0160544-888] (Exhibit 61) (attached hereto as FSIA Ex. "84") at KNAUFGIPS0160548-49.

[252] *Id*.

[253] Knauf Letter to CNBM Group (Exhibit 61) at KNAUFGIPS0160550-716.

[254] SONG Dep. at 30:5-30:15.

[255] SONG's recollection is not clear as to a precise timeframe for his meeting with Mr. Knauf.

Knauf executive, perhaps Baldwin Knauf, in Beijing, concerning Chinese production of drywall.[256]

On June 3, 2010, less than a month after the *Germano* judgment was entered on May 11, 2010, ZHANG Jian, a manager of CNBM Group's Business Administration Department,[257] had a telephonic meeting with WANG Bing of BNBM PLC, JIA Tongchun of Taishan, Attorney DONG Chungang, and CHEN Daozheng (a/k/a Eugene Chen) of Hogan Lovells to discuss "the Strategy for Responding to the Gypsum Board Litigation in the United States."[258]  A memorandum that was produced by BNBM in this litigation provides a summary of that meeting:

> Mr. Knauf visited Zhiping Song, chairman of the board of directors, and hoped that CNBM Group could offer a helping hand to them in responding to the United States drywall event.[259]  The situations that Knauf reported were that the Knauf Company had done some work and that, for the construction companies, for the moment it did not explore the truth of the matter, nor did it divide up liabilities.  They cooperated to fix the issue of home renovation, but the small homeowners who did their own decorations were waiting for the result of the litigation.  Knauf was worried that their assets would be enforced in the United States.  Knauf has 3 factories in the United States, and the main market is in the heart

---

[256] *See* SONG Dep. at 30:23-31:22.

[257] *See* SONG Dep. at 86:17-19.

[258] *See* Memorandum [Translation of BNBMPLC-E-0059967-77] (redacted version of Exhibit 331) (attached hereto as FSIA Ex. "85") at 14-15.  This document is the subject of a pending Disclosure Motion [Rec. Doc. No. 19590 & Rec. Doc. No. 19628].  *See also* SONG Dep. at 105:10-107:4.

[259] CNBM Group's Chairman confirmed this fact during his deposition.  *See* SONG Dep. at 107:5-9 ("Q:  Now, is it accurate that Mr. Knauf visited Chairman Song and hoped that CNBM Group could offer a helping hand to them in responding to the United States drywall event?   A: It is correct to my recollection.").

insulating materials.  The plaintiffs have formed an attorney team of more than 100 people.  Among them, a leadership body of 5 people has been established to negotiate with the defendants about the compensation.  The goal of the team of plaintiffs' attorneys is to work hard to have the court make a judgment on 1-2 cases first and set a precedent for the ruling and settlement negotiations of other recent cases.  For the judgment made against Knauf, the Knauf Company has appealed, hoping to delay the time and to reduce the amount of compensation.

Chairman Song agreed that CNBM Group should organize the response to the litigation, but the purposes of the response are: 1. for the images of Chinese products and Chinese enterprises; 2. for the friendship with Mr. Knauf of more than 30 years.  Reluctant to see the Knauf Company fighting alone; 3. insisting on the position that our products do not have any problems.  We should consider the situations as we deal with the litigation.  The Company may ask the Knauf Company to help recommend attorneys for us and delay the effectiveness of the judgment.[260]

## 2.  CNBM Group Closely Monitored the Chinese Drywall Lawsuits Filed Against Taishan and its Parent Companies and Controlled Their Participation in the Litigation

CNBM Group's initial scheme, beginning in 2009, to avoid any Chinese Drywall judgments against any of the CNBM/BNBM and Taishan Defendants is outlined clearly in a Memorandum titled "The Course of Events on Hiring Foreign Law Firms for the Gypsum Board Litigation in the United States – Brief Version of the Related Meetings":

Stage One (September-October, 2009): "Hiring Foreign Law Firms to Issue Legal Opinion Letters";

---

[260] Mr. SONG did not have a clear recollection as to most of the remaining facts set forth in the memorandum of this meeting.  *See* SONG Dep. at 107:10-108:2.  He did, however, recall that he was not in any way involved in a plan to delay the effectiveness of the judgment against Taishan. *Id.* at 108:2-4 ("as a shareholder, I encouraged Taishan to actively respond to the litigation. That I remember.").  The weight of the evidence, however, as set forth herein, *infra*, refutes Mr. SONG's testimony on this point.

Stage Two (April-June, 2010): "Hiring the Law Firm by Taishan Gypsum"; and

Stage Three (July, 2010): "Hiring the Law Firm by BNBM PLC."[261]

As part of this plan, beginning in September, 2009, "the representatives of BNBM Group and Taishan Gypsum had meetings with representatives of Orrick, Hogan Lovells, and K&L Gates (generally referred to as 'foreign law firms') respectively."[262]  They met in person and over the telephone regarding "Hiring Attorneys for the 'Toxic Drywall Event' and the Response to the Default Judgment."[263]  In October, 2009, "The Legal Affairs Department of BNBM PLC issued *the Report on Hiring Foreign Law Firms for the Gypsum Board Litigation in the United States*, preliminarily decided to have Hogan Lovells answer those questions of concern from BNBM PLC, collect information, provide suggestions and strategies, and issue legal opinions letters."[264]

Stage Two of the plan began on April 12, 2010, when BNBM's General Manager and Acting Secretary of the Board CHEN Yu (who also has served as a Director of Taishan since 2014), met with CHEN Zuchai, DONG Chungang of Jingtian & Gongcheng Law Firm, and

---

[261] *See* Course of Events Memo (redacted version of Exhibit 323) at 3; *see also* Privilege Log Produced by Hogan Lovells showing over 200 emails beginning in August, 2009 among representatives of Taishan (JIA Tongchun, PENG Wenlong, ZHANG Jianchun), BNBM (CHEN Zhucai, BIAN Ziqiang, TAO Zheng), CNBM (CHANG Zhangli), CNBM Group (ZHANG Jian), Orrick (C. Vejnoska and J. Stengel), DONG Chungang and/or Hogan Lovells re ██████████ ████████ (Exhibit 66) (attached hereto as FSIA Ex. "86").

[262] *See* Course of Events Memo (redacted version of Exhibit 323) at 1.

[263] Course of Events Memo (redacted version of Exhibit 323) at 2.

[264] Course of Events Memo (redacted version of Exhibit 323) at 2.

Hogan Lovells to discuss this Court's order that Taishan Gypsum "pay a sum of USD 2,600,000 to 7 families in the United States as compensatory damages."[265]

By June 3, 2010, ZHANG Jian from CNBM Group[266] was meeting (via telephone) with WANG Bing of BNBM, JIA Tongchun of Taishan, DONG Chungang of Jingtian & Gongcheng Law Firm, and CHEN Daozheng (a/k/a Eugene Chen) of Hogan Lovells.[267]  A written summary of this meeting, which was produced by BNBM, confirms that "Chairman Song agreed that CNBM Group will organize the response to the litigation,"[268] notwithstanding Mr. SONG's lack of "a clear recollection" on that point.[269]  Further, the parties discussed that:  "The document issued by the SASAC to CNBM Group held that the company's response to the Drywall Event in the United States was a little passive."[270]  The parties, however, were "Determined to adopt the 'limited response to litigation' strategy."[271]  After discussing "[t]he time limitation for appealing the judgment against Taishan Gypsum," and WANG Bing's opinion that "the response to the litigation means the recognition of jurisdiction of the U.S. courts," and "[a]lthough there was no treaty to facilitate judicial enforcement between China and the United States, the U.S. government would take this opportunity to pressure the Chinese government and make the

---

[265] Course of Events Memo (redacted version of Exhibit 323) at 3.

[266] *See* SONG Dep. at 86:17-19.

[267] *See* Course of Events Memo (redacted version of Exhibit 323) at 3; *see also* SONG Dep. at 105:10-107:4.

[268] Course of Events Memo (redacted version of Exhibit 323) at 3 (emphasis added).

[269] SONG Dep. at 107:10-108:2.

[270] Course of Events Memo (redacted version of Exhibit 323) at 3.

[271] Course of Events Memo (redacted version of Exhibit 323) at 3 (emphasis added).

enforcement of the judgment become an exception," "[t]he meeting reached preliminary

consensuses":

> first, it is better to continuously let the Lovells firm, which had issued opinion letters to BNBM PLC before, institute the appeal. If the Lovells firm could not complete on schedule, then the attorney recommended by Knauf can be retained;
>
> second, when the appeal proceeded into the substantive stage, no attorney recommended by Knauf may be used because there is potential conflict of interest;
>
> third, continuing to reject the service of legal process;[272]
>
> third [sic], it is suggested that leaders should consider the method for [REDACTED]  Currently, Knauf is hiring an attorney team to respond to the litigation as a package.[273]

In a separate meeting on that same day, CAO Jianglin (who at the time was a Director of

CNBM Group, Chairman of the Supervisory Committee of BNBM Group, President and

Executive Director of CNBM, Chairman of the Supervisory Committee of BNBM, and

Supervisor and Chairman of the Supervisory Committee of Taishan), along with ZHANG Jian

(CNBM Group), CHANG Zhangli (CNBM), WANG Bing (BNBM), JIA Tongchun (Taishan),

and DONG Chungang, discussed the "Introduction of the Lovells firm and its strengths after the

merger" and "statistics from the Supreme Court [that] showed that there are a total of 81

---

[272] The record in this matter is replete with examples of Defendants' efforts to reject service of Chinese Drywall complaints pursuant to the Hague Convention.  *See* Refusals of Service by CNBM Group (Exhibit 264) (attached hereto as FSIA Ex. "87"); Refusals of Service by BNBM Group (Exhibit 95) (attached hereto as FSIA Ex. "88"); Refusals of Service by CNBM (Exhibit 263) (attached hereto as FSIA Ex. "89"); Refusals of Service by BNBM (Exhibit 93) (attached hereto as FSIA Ex. "90").

[273] Course of Events Memo (redacted version of Exhibit 323) at 3-4 (emphasis added).

subpoenas that were served, involving 48 enterprises."[274]  At this meeting, Chief CAO provided

certain instructions, but they were redacted from the memorandum, so their details are

unknown.[275]

About a week later on June 9, 2010, representatives from CNBM Group, CNBM, BNBM,

and Taishan met and discussed the "Retainer Agreement with Hogan Lovells,"[276] which Taishan

signed the following day.[277]

Stage Three of the plan was implemented on July 28, 2010, when BNBM met with

Orrick and DONG Chungang, eventually signing a retainer agreement on September 17, 2010,

with Orrick "as the representing firm of BNBM PLC for the gypsum board litigation in the

United States."[278]

The following month, on October 13, 2010, Orrick briefly appeared in the litigation

(albeit informally) on behalf of BNBM when James Stengel advised Plaintiffs' Lead Counsel

that he had been retained by the company, but was unable to attend a Court conference in MDL

2047 the following day.[279]  After that brief encounter, the Plaintiffs did not hear from BNBM

again for more than four years, when Alston & Bird entered an appearance for the company on

---

[274] Course of Events Memo (redacted version of Exhibit 323) at 4-5.

[275] *Id*.

[276] *Id.* at 5.

[277] *Id*.

[278] *Id*. at 6.  BNBM's General Manager CHEN Yu testified that his company had previously retained Hogan Lovells in 2009.  *See* CHEN Dep. at 509:4-23.

[279] *See* Letter from James Stengel of Orrick to Arnold Levin dated 10/13/2010 advising that Orrick had been retained as counsel for BNBM (Herman Aff. Ex. 144 filed 5/8/2010) (attached hereto as FSIA Ex. "91").

February 12, 2015, at the start of the Hearing to assess class damages for Plaintiffs with Taishan's Chinese Drywall in their properties.[280]

### 3. CNBM Group's Course of Action Included Joint Defense Agreements With Its Subsidiaries and the Sharing and Swapping of the Same Law Firms

On November 29, 2010, shortly after BNBM formally engaged Orrick to represent it in these proceedings (but never entering an appearance on the record), all of the parties – CNBM Group, CNBM, CNBM (USA), BNBM, Taishan, TTP, and Weifang Aotai Plaster Co. Ltd. ("Weifang") – signed a Common Interest, Joint Defense and Confidentiality Agreement ("2010 JDA").[281]   Therein, L. Christopher Vejnoska of Orrick, Herrington & Sutcliff LLP (who is the current counsel of record for the CNBM Entities) represented BNBM PLC.  Joe Cyr of Hogan Lovells represented Taishan and TTP, and Weifang, even though his firm had previously been retained by BNBM.[282]   Kyle Schonekas of Schonekas, Evans, McGoey & McEachin, L.L.C. represented CNBM and CNBM Group.  This 2010 JDA, which was just recently provided to the PSC by the CNBM Defendants, provides further evidence of the deliberate strategy of the controlling CNBM/BNBM parents of Taishan and TTP to avoid this litigation directly, and monitor it indirectly through their stalking horse subsidiary, Taishan.[283]

---

[280] *See* Transcript of Special Hearing dated 2/12/2105, at 6:14-19 [Rec. Doc. No. 18475-7] (attached hereto as FSIA Ex. "92").

[281] *See* Common Interest Joint Defense and Commonality Agreement dated 11/29/2010 (Exhibit 358) (attached hereto as FSIA Ex. "93").

[282] *See* CHEN Dep. at 509:4-23.

[283] *See also* Taishan's 2011 Risk Management Report, wherein Taishan provides CNBM Group with detailed information about the U.S. Drywall litigation.

Since the beginning of the litigation, attorney DONG Chungang has appeared at numerous meetings of all of the CNBM/BNBM and Taishan Defendants.[284]  In fact, ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████,"[285]  None of the Defendants' corporate witnesses has claimed Mr. DONG of Jingtian & Gongcheng Law Firm as their legal counsel, and, yet, he is a signatory to the more-recent Common Interest, Joint Defense and Confidentiality Agreement of March 2015 ("2015 JDA").[286]

The 2015 JDA reflects the new alignments of counsel once the CNBM/BNBM and Taishan Defendants re-evaluated their strategy following this Court's July 17, 2014 Contempt Order, and decided to appear in the litigation.  In 2015, Taishan has been represented by Alston & Bird, not Hogan Lovells.  The CNBM Entities are now represented by Orrick, Herrington & Sutcliffe LLP and White & Case LLP, but White & Case never formally entered its appearance in these proceedings.  And, interestingly, the BNBM Entities are represented by Dentons US LLP and Beijing Dacheng Law Offices.

---

[284] *See* Course of Events Memo (redacted version of Exhibit 323) & Memorandum (redacted version of Exhibit 331).

[285] *See*, *generally*, Hogan Lovells Privilege Log.

[286] *See* Common Interest, Joint Defense and Commonality Agreement dated March, 2015 [BNBMPLC0007605-7625] (Exhibit 310) at BNBMPLC0007625 (attached hereto as FSIA Ex. "94").

According to a recent article in ABA JOURNAL, the Dentons firm is in the midst of acquiring the Dacheng Law Firm in China,[287] which happens to be run by CNBM Group's independent Director PENG Xuefeng, who was appointed by SASAC.[288]  The article states:

> Dentons faces a major integration challenge with Dacheng in particular, which operates in a legal market where there are no strong ethical guidelines and where the predominant culture at firms has been one in which partners cooperate rather than compete.  Dacheng founder Peng Xuefeng, who will serve as chairman of the combined firm's global board and head of its global advisory board, says the firms have agreed on a three-year transition period to bring their practices and procedures in line.[289]

In effect, the merger between Dentons and Dacheng will cause PENG Xuefeng to be an independent Director of CNBM Group _and_ an employee of BNBM Group's and BNBM PLC's legal counsel.

The significance of this merger is yet another example of an interconnected high-level officer between and among the CNBM/BNBM and Taishan Defendant companies (_see_ Section II.A, _supra_), as shown through PENG Xuefeng's participation at CNBM Group's Board of Directors meetings.  For example, PENG Xuefeng was in attendance at CNBM Group's Seventeenth Meeting of the Third Board of Directors held on July 11, 2014 where the resolution was deliberated on and passed to permit Taishan to withdraw from the U.S. ligation.[290]  The

---

[287] Anthony Lin, _The Rise of the Megafirm_, ABA JOURNAL, Vol. 101, Sept. 2015 at 55-60.

[288] SONG Dep. at 85:20-21.  _See also_ CNBM Group website Biography of PENG Xuefeng, , http://www.cnbm.com.cn/EN/c_0000001600070003/d_26385.html (attached hereto as FSIA Ex. "95").

[289] _Id._

[290] _See_ CNBM Group Resolution No. 17.

72

resolution was unanimously passed, as a SASAC-appointed independent Director of CNBM Group, PENG Xuefeng, is included as one of the 11 voters.[291]  Further, at the Eighteenth Meeting of the Third Board of Directors of BNBMG, held on August 15, 2014, PENG Xuefeng participated in discussions that concerned the U.S. Drywall litigation and the cost of attorney's fees following a statement by CAO Jianglin that SASAC found the costs too high.[292]  The Dacheng/Dentons merger is the latest example in an already interwoven story of key players having key roles between and among the CNBM/BNBM and Taishan Defendant companies.

In all, it took five years and nine months from the formation of MDL 2047 for counsel to finally enter their appearance for the BNBM Entities, and even a few weeks more for counsel for the CNBM Entities to do the same.[293]

### 4. CNBM Group was Directly Involved in and Controlled the Decision for Taishan Not to Appear at the Court-Ordered Judgment Debtor Examination on July 17, 2014

Despite CNBM Group's self-serving claim that Taishan acted independently when it refused to appear for its court-ordered Judgment Debtor Examination on July 17, 2014,[294] there

---

[291] *Id.*

[292] *See* CNBM Group 18th Meeting of the Third Session of the Board of Directors of CNBM Group dated 8/15/2014 ("18th Meeting") [CNBMGRP00346624-6636] (Exhibit 356) [Rec. Doc. No. 19492-3] (attached hereto as FSIA Ex. "96").

[293] *See* Transcript of Special Hearing, dated 2/12/2015; Rec. Doc. Nos. 18430, 18352, 18397, 18406, 18410, 18411, 18427, 18428, 18431, 18444, 18445, 18582, 18568, 18675, 18676, 18677, 19115) (Entries of Appearance by Counsel for the CNBM Entities, BNBM Entities, and Taishan Defendants).

[294] *E.g.*, SONG Dep. at 93:5 ("This is a decision made by Taishan Gypsum."); ZHOU Dep. at 314:20-315:4 ("As far as my understanding was that the decision was approved by independent votes by the directors of the board of directors of Taishan Company.").

is even more evidence demonstrating that CNBM Group was directly involved in and controlled its subsidiary's decision to withdraw from the litigation.  On July 7, 2014, CNBM Group issued a "Notice on Holding the Seventeenth Meeting of the Third Session of the Board of Directors of China National Building Material Group Corporation"[295]  Therein, CNBM Group summoned Taishan's Chairman JIA Tongchun to appear at its Board of Directors meeting scheduled for July 11, 2014.[296]  The third item on the agenda was unambiguous:  "Deliberating on the proposal on strategies of coping with the event of gypsum boards transported to the U.S."[297]

At the July 11, 2014 CNBM Group Board of Directors meeting, CNBM Group deliberated on and signed a unanimous resolution – 11 to 0 – authorizing Taishan's decision "not to attend the judgment debtor hearing on July 17, 2014,"[298] in direct violation of a valid order of this Court.  CNBM Group's Chairman SONG Zhiping admitted that on that day, only six days before Taishan's Judgment Debtor hearing, the Board of Directors for CNBM Group

---

[295] *See* CNBM Group Notice of 17th Meeting of Third Session of the Board of Directors of CNBM Group dated 11/7/2014 ("Notice of 17th Meeting") [CNBMGRP00010052-53] (attached hereto as FSIA Ex. "98").

[296] *Id*.

[297] *Id.*  Chairman JIA testified that he did not recall attending CNBM Group's Board of Directors meeting on that particular date – July 11, 2014, but he did recollect being summoned in unprecedented fashion to provide a status report on the U.S. litigation to a CNBM Group Board of Directors meeting "[p]erhaps a month or two months prior, approximately."  *See* JIA Dep. at 189:7-190:11; 195:18-196:1; 197:3-198:19; 211:1-212:6.  The written Notice of 17th Meeting from CNBM Group's business records provides a more accurate recitation of the facts than Chairman JIA's approximate misremembrance.

[298] *See* CNBM Group Resolution No. 17; SONG Dep. at 91:12-93:17.  ZHANG Jian, who helped coordinate the response to the U.S. Drywall litigation on behalf of CNBM Group (*see* Course of Events Memo (redacted version of Exhibit 323), was played an integral part in this decision as he is listed as one of the signers on CNBM Group Resolution No. 17.

unanimously resolved to "respect" the decision for Taishan not to appear before this Court, but he disclaimed any "support" for the decision.[299]

CNBM Group's direct involvement in and control over Taishan's withdrawal from the litigation is supported by the Company's directive to its subsidiaries also on July 11, 2014 – with awareness of the Plaintiffs' efforts to collect on the final *Germano* judgment and in anticipation of the repercussions of Taishan's contempt of court – to cease depositing any funds in N.Y. banks and to have personnel use their own personal email accounts, rather than company emails, when doing business internationally.[300]

The emails produced by Taishan's former counsel of record Hogan Lovells, following the denial of the law firm's Petition for Mandamus by the Fifth Circuit Court of Appeals,[301] vividly demonstrate the open contempt for this Court collectively contemplated by Taishan and its controlling CNBM/BNBM parents. The documents make clear that the ultimate decision to ignore this Court's orders and engage in contempt of court was made at the highest levels of CNBM Group. In particular, on July 7, 2014, DONG Chungang (who was involved in the plan to avoid this litigation from the start[302] and is a non-designated signatory to the 2015 JDA[303])

---

[299] *See* SONG Dep. at 92:8-15 ("It is not support but rather respect, respect the decision made by Taishan Gypsum."). This appears to be a distinction without a difference. According to Webster's Dictionary, to "respect" means to "hold in esteem or honor." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE, at 1640 (1996). As explained, "Respect is commonly the result of admiration and approbation, together with deference." *Id*.

[300] Requirements for International Business Risk Prevention.

[301] *In re Hogan Lovells US LLP*, Case No. 15-30114, Order denying Petition for Writ of Mandamus (5th Cir. Feb. 20, 2015).

[302] *See* Hogan Lovells Privilege Log; "Course of Events Memo" (redacted version of Exhibit 323).

informed Hogan Lovells that:  "It's not Mr. Jia who can make the decision. This case involves

many high-level officers at CNBM group now."[304] ███████████████████████████████

███████████████████████████████████████████████ [305]

     Also on July 7, 2014, PENG Wenlong (Taishan's former employee turned consultant in

charge of the U.S. Drywall litigation) wrote to Eugene Chen at Hogan Lovells to make clear that

the decision whether Taishan would '███████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████'"[306]

     Following entry of the Contempt Order in this case, CNBM Group continued to monitor

these proceedings from the sidelines and discuss participation therein by the CNBM/BNBM and

---

[303] 2015 JDA.

[304] *See* Email from DONG Chungang to Joe Cyr and Eugene Chen at Hogan Lovells dated 7/7/2014 (part of Exhibit 1) [HL00000026 and HL00000026A] (attached hereto as FSIA Ex. "99").

[305] *Id.*; *see also* JIA Dep. at 177:20-21.  Mr. DONG was regularly involved in communications between Taishan, Taishan's former counsel, and leadership of CNBM and BNBM. ██████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████ HL_00000306 (part of Exhibit 1) (attached hereto as FSIA Ex. "100").  These "high-level officers at CNBM Group" would necessarily include Chairman SONG, who has been the Chairman of CNBM Group and CNBM since 2005, as well as Chairman of BNBM Group since 1996.  *See* SONG Dep. at 11:23-12:14; Chart of Overlapping Executives and Officers (Exhibit 23-1).

[306] *See* Email from PENG Wenlong to Eugene Chen dated 7/7/2014 [HL00000104-105] (Exhibits 40 & 40A) (attached hereto as FSIA Ex. "101").

Taishan Defendants.[307]  During the Eighteenth Meeting of the Third Board of Directors of CNBM Group on August 15, 2014,[308] for example, ZHANG Jian reported that after inquiry with the Supreme People's Court, CNBM Group did not need to be concerned about an American judgment:  "Regardless of the ruling in the United States, the domestic assets will not be subject to enforcement…."[309]  The minutes from this meeting reflect that "China National Building Material will respond in four ways.  The enterprise should make preparations for media promotions."[310]  Noteworthy comments from CNBM Group participants at the 18th Meeting include:

- CAO Jianglin: "The attorneys are familiar with the case and with American law."[311]

- YAN Guozhe: "On July 18, Beijing New Building Materials made a public announcement, which could have caused massive losses…."[312]

- CAO Jianglin: "The joint stock company [CNBM] has to prepare too, otherwise the effects will be even bigger."[313]

---

[307] Rec. Doc. No. 17869.

[308] *See* 18th Meeting dated 8/15/2014.

[309] *Id.* at 9.

[310] *Id*. (redactions follow these comments).

[311] *Id*.

[312] *Id*. at 12.

[313] *Id*. at 12.

77

- <u>CAO Jianglin</u>: "I think whenever JIA Tongchun leaves the country, there is risk."[314]

- <u>ZHU Yanfu</u>: "It's more likely to detain the ship than to detain the person."[315]

- <u>SONG Zhiping</u>: "State-owned Assets Supervision and Administration Commission wrote a letter to have us engage in litigation.  Engage in limited response to the lawsuit, dealing with an order of over 2 million [presumably referring to the *Germano* judgment].  Now we really can't engage.

- <u>ZHUANG Laiyou</u>:  "We'll keep ignoring them.  What else is there to do?"[316]

- <u>CAO Jianglin</u>: "There is one thing we need preliminary decision on: Beijing New Building Materials is not going to respond to the lawsuit."[317]

### D.  CNBM Group Through Directly and Through Its Controlled Subsidiaries Uses the U.S. Market for Commercial Purposes

CNBM Group directly, and through its controlled subsidiaries, has actively pursued the United States market for commercial purposes and has engaged in a multitude of commercial endeavors, which conduct clearly encompasses the commercial activity exception of the FSIA.

---

[314] *Id*. at 12.

[315] *Id*. at 13.

[316] *Id*. at 15-16.

[317] *Id*. at 16.

Examples of these commercial efforts, without limitation, include the participation of United States banks through their investments in CNBM, and CNBM's active investment participation in lumber sales and commensurate litigation in the federal judiciary based upon the fall-out of several transactions involving its lumber activities.

CNBM reports major U.S. banks as substantial shareholders.[318]  Among the substantial shareholders of CNBM's H shares are JPMorgan Chase & Co., which holds 230,688,831 H shares or 4.27% of CNBM's total shares.[319]  Citigroup Inc. holds 172,345,713 H shares or 3.19% of total shares of CNBM.[320]  (As of October 28, 2015, CNBM's stock traded around 4.84 HKD, with a market capitalization of 26.67 billion HKD.)[321]

Beginning around 2009 or 2010, American west coast lumber yards began seeking Chinese markets.[322]  As it pertained to one of its suppliers, the Hampton Affiliates of Portland, Oregon, CNBM Group actively monitored this producer.  Representatives of CNBM Group regularly traveled to Portland to meet with Hampton Affiliates, most recently in November 2014.[323]  As the Chief Executive Officer of the Hampton Affiliates explained, CNBM Group was

---

[318] *See* 2014 CNBM Annual Report at 163.

[319] *Id.*

[320] *Id.*

[321] *See* https://www.google.com/?gws_rd=ssl#q=how+much+is+CNBM+stock+worth, last accessed on October 28, 2015.

[322] *See* Deposition of Steven Zika dated 5/18/2015 ("Zika Dep.") (Exhibit 43-1(S)) (attached hereto as FSIA Ex. "126") at 11-12.

[323] *Id.* at 12-13, 58.

Hampton's largest Chinese customer.[324]  CNBM Group purchased hundreds of thousands of dollars of lumber from the Hampton Companies during the injunctive period of this Court's Contempt Order, and the business relationship, memorialized in a Memorandum of Understanding, is ongoing today.[325]

Two CNBM subsidiaries, CNBM Import and Export and CNBM Forest (Canada)[326] instituted a lawsuit in federal court in Oregon against Westerlund and Murphy/Astoria, in an attempt to recover monies allegedly owed from a series of business transactions dating back to 2011, involving the purchase and handling of logs in Oregon, which were intended for shipment to China.[327]  In related litigation in Oregon, these same CNBM companies were named as defendants by the same American companies with whom they were doing business.[328]  Although the Oregon litigation was commenced prior to entry of the Contempt Order, after July 17, 2014, the CNBM entities continued not only to litigate their claims in Oregon but also to resolve those

---

[324] *Id*. at 18.

[325] *Id*. at 20, 26, 32.  *See also* Memorandum of Understanding [HAMPTON020423-424] (Exhibit 5 to Zika Dep.) (attached hereto as FSIA Ex. "127").

[326] CNBM Forest (Canada) is a subsidiary of CNBM Forest Products, Ltd. ("CNBM Forest"), which is a wholly-owned subsidiary of CNBM Import & Export, which, in turn, is a wholly-owned subsidiary of CNBM Group [Rec. Doc. Nos. 18433-4, 18433-17, 18433-18]; *see also* ZHOU Dep. at 250:25-251:8.

[327] *See CNBM Import & Export v. Murphy Overseas USA Astoria Forest Products, LLC, et al.*, No. 14-cv-00746 (D. Ore.) (Amended Complaint alleging breach of contract and interference with contractual relations, at ¶¶ 9-30 & Article V) [Rec. Doc. No. 18302-8] (Exhibit 508) (attached hereto as FSIA Ex. "123").

[328] *See Murphy Overseas USA Astoria Forest Products, LLC v. CNBM Import & Export, et al.*, No. 14-cv-00752 (D. Ore.); *Westerlund Log Handlers, LLC, et al. v. CNBM Import & Export, et al.*, No. 14-cv-00618 (Clatsop Cty. Cir. Ct. Ore.) (attached hereto as FSIA Ex. "128").

claims through the American legal system while the Contempt Order was in effect, in violation of this Court's injunction.

CNBM Import & Export and CNBM Forest (Canada) settled their dispute with Westerlund and Murphy/Astoria in August, 2014, executing a stipulation and agreement to dismiss all three Oregon lawsuits in exchange for their cooperation in shipping approximately 15.4 million board feet of logs to China for CNBM and a payment of $2.55 million to CNBM, among other things.[329]  In accordance with this settlement, Murphy/Astoria "participated in the sale and/or shipment of 3 ship loads of logs at the direction of the CNBM entities" in September, 2014, November, 2014, and March, 2015, respectively.[330]  This conduct evidences a clear violation of the Court's Order enjoining Taishan's Affiliates entities from doing business in the United States during Taishan's contempt of court.  Further proof of CNBM Forest (Canada) doing business in the United States was obtained by the recent deposition of DENG Jianjun, conducted on October 28, 2015.[331]  Mr. DENG was designated as CNBM Forest (Canada)'s corporate witness pursuant to Rule 30(b)(6).  Mr. DENG was questioned regarding payments it received during the Contempt period (July 17, 2014-March, 2015) for business activity

---

[329] *See* Joint Post-Hearing Memorandum of Clarification [Rec. Doc. No. 18302-9] (attached hereto as FSIA Ex. "129").

[330] *See* Letter from counsel for Murphy/Astoria dated 4/3/2015, Stipulation dated 8/8/2014, Settlement Agreement dated 11/10/2014, and related materials [Rec. Doc. No. 18671-2] (attached hereto as FSIA Ex. "130").

[331] *See* Deposition of CNBM Forest (Canada) (DENG Jianjun) dated 10/28/2015 ("DENG Dep.") (attached hereto as FSIA Ex. "4") at 123.

conducted in the United States.  He confirmed that CNBM Group's subsidiary CNBM Forest

(Canada) company received actual payments as a result of doing business in the U.S.[332]

Litigation with CNBM was also brewing in Texas.  On July 20, 2014, just days after the

Court's Contempt Order was entered, China National Building Material Investment Co., Ltd.

("CNBMI") (a wholly-owned subsidiary of CNBM and an affiliate of Taishan)[333] filed a civil

lawsuit in the United States District Court for the Western District of Texas (Austin Division),

*China National Building Material Investment Co., Ltd. v. BNK International, LLC and Jeffrey*

*Chang*, No. No. 14-701 (W.D. Tex.).[334]  CNBMI's complaint alleges, among other things that:

(i) Defendant BNK Int'l - a Texas resident - was CNBMI's agent for sales of CNBMI products

in the United States from 2004-2008; (ii) BNK owes CNBMI over $7.6 million in connection

with their 2004-2008 agency relationship and U.S. sales; (iii) through BNK Int'l, CNBMI sold

more than $20 million worth of product (to Lumber Liquidators) in the U.S.; and (iv) BNK Int'l

is personally liable to CNBMI pursuant to theories of "alter ego" and "piercing the corporate

veil."[335]

---

[332] *See* CNBM Forest Products (Canada) Co., Ltd. "Contracts Status Check") [Partial Translation CNBMFP00001663] (Exhibit 511) (attached hereto as FSIA Ex. "133") ██████████████

[333] *See* Plaintiff China National Building Material Investment Co., Ltd.'s (f/k/a BND Co., Ltd.) Corporate Disclosure Statement filed in *CNBMI v. BNK Int'l*, No. 14-701 (W.D. Tex.) [part of Rec. Doc. No. 18671-13] (attached hereto as FSIA Ex. "131") ("Plaintiff China National Building Material Investment Co., Ltd. (f/k/a BND Co., Ltd.) is a corporation whose shares owned by China National Building Material Company Limited, a company whose shares are publicly traded on the Hong Kong Stock Exchange, stock code 3323, ticker CNBM.").

[334] *See* Complaint and exhibits thereto in *CNBMI v. BNK Int'l*, No. 14-701 (W.D. Tex.) [Rec. Doc. No. 18671-13] (attached hereto as FSIA Ex. "132").

[335] *Id.*; *see also* Deposition of Jeffrey J. Chang dated 5/20/2015 (attached hereto as FSIA Ex. "124").

E. **The Untimely Productions of CNBM Group and the Other Defendants Left the PSC at a Distinct and Realized Disadvantage with Respect to Learning CNBM Group's True Relationship with BNBM Group, CNBM, BNBM, and Taishan**

CNBM Group has long advocated that the PSC has had more than ample time to prepare an opposition to its FSIA dismissal motion and that the Group has more than satisfied its discovery duties to the PSC and this Court.[336]  There is no dispute by the PSC that CNBM Group has participated in the discovery process; however, the strategic timing of Group's participation severely prejudiced the PSC with thousands of documents available for use only *after* the deposition of CNBM Group's 30(b)(6) witness ZHOU Guoping.

CNBM Group offered the deposition of ZHOU Guoping in June, 2015, with ultimate dates of June 16-18.[337]  The PSC received three productions of documents prior to ZHOU's deposition that consisted of Chinese originals, Chinese .txt files, and English machine translations.[338]  As quickly and comprehensively as possible, the PSC worked with the productions provided in order to prepare for the deposition of CNBM Group, which sought to

---

[336] *See* Transcript of Motion Hearing Proceedings dated 10/6/2015 (attached hereto as FSIA Ex. "66") at 26:19-23 ("Your Honor, particularly in the context where they have had ample time to do this discovery already, they've got more than enough time to write their brief, and they've gotten more discovery than they are entitled to under the law.") (Statement by Christopher Vejnoska); *see also* Transcript of Phone Conference Proceedings dated 9/17/2015 (attached hereto as FSIA Ex. "114") at 19:2-3 ("we have cooperated in the discovery process … there is no reason to defer or delay a hearing on … [CNBM Group's FSIA motion]") (statement by James L. Stengel).

[337] *See* Notice of Deposition for CNBM Group [Rec. Doc. No. 19006].

[338] The three productions occurred on May 1, 2015, May 11, 2015 and June 11, 2015.  *See* Chart of CNBM Group Document Productions *Before* and *After* 30(b)(6) Deposition (attached hereto as FSIA Ex. "102").

cover not only the issue of contempt, but also issues related to CNBM Group's relationship with

BNBM Group, CNBM, BNBM, and Taishan.[339]  The PSC relied on the documents produced in

advance of the deposition to learn the corporate testimony of CNBM Group related to these

issues.  Unbeknownst to the PSC, the productions *prior to* the deposition of CNBM Group would

total a mere 3.52% of the ultimate CNBM Group production.[340]

Following the Group's deposition, CNBM Group produced an additional 379,575 pages

of documents over the course of seven separate productions.[341]  Within these productions, the

PSC discovered relevant pieces of correspondence from CNBM Group to CNBM, BNBM and

Taishan employees related to the CNBM Group's press releases discussing the U.S. Drywall

litigation,[342] CNBM Group Board of Directors Meeting Resolutions that revealed CNBM

Group's acknowledgment of Taishan's decision to withdraw from the litigation in advance of the

July 17, 2014 Judgment Debtor Examination,[343] and International Trade Reports of the Group

Corporations' International holdings.[344]  These three examples are but a very small fraction of

---

[339] Minute Entry and Order dated 3/17/2015, at 2-3 [Rec. Doc. No. 18493]; *see also* Minute Entry dated 4/24/2015, at 2 [Rec. Doc. No. 18757].

[340] Chart of CNBM Group Document Productions *Before* and *After* 20(b)(6) Deposition.

[341] *Id.*

[342] *See*, *e.g.*, Email chain among CNBM Group, Taishan, BNBM and CNBM employees dated 8/19/2014 [CNBMGRP00346665] (Exhibit 342) (attached hereto as FSIA Ex. "103").

[343] *See* CNBM Group Resolution No. 17 dated 7/11/2014 (CNBM Group 11-0 vote to respect decision for Taishan to withdraw from litigation).

[344] *See*, *e.g.*, First Quarter 2012, CNBM Group International Trade Report [CNBMGRP00117685-117696] (attached hereto as FSIA Ex. "104").

the relevant materials withheld by CNBM Group until <u>after</u> the deposition of its corporate witness.

Except for BNBM PLC, the remaining CNBM/BNBM and Taishan document productions were not much better, and in some cases they were worse. CNBM, for example, produced more than 96% of its documents <u>after</u> the deposition of its corporate witness CHANG Zhangli.[345] Incredibly, Taishan Gypsum produced only 2.5% of its documents prior to the deposition of its corporate witness/designee CHE Gang on June 2, 2015, and when the PSC made plans to take JIA Tongchun's deposition in Hong Kong on June 17, 2015, the company produced only another 10.5% of its documents. Since the depositions of its corporate witnesses, Taishan, pursuant to Court order, produced 87% of its documents in this matter.[346] BNBM Group produced only ~57% of its documents before the 30(b)(6) deposition of its corporate witness ZHAO Yanming on July 15, 2015.[347]

Because of these late productions, the PSC was prejudiced and unfairly deprived of the opportunity to fully and adequately question the Company regarding its relationship and control over BNBM Group, CNBM, BNBM, and Taishan.

---

[345] *See* Chart of CNBM Document Productions *Before* and *After* 30(b)(6) Deposition (attached hereto as FSIA Ex. "105").

[346] *See* Chart of Taishan Document Productions *Before* and *After* 30(b)(6) Deposition (attached hereto as FSIA Ex. "106").

[347] *See* Chart of BNBM Group Document Productions *Before* and *After* 30(b)(6) Deposition (attached hereto as FSIA Ex. "107").

## III.      ARGUMENT

### A.   CNBM Group Is Not Entitled to FSIA Immunity

#### 1.   Historical and Statutory Background

Enacted in 1976, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1601-11, "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610 (1992).  "Prior to 1952, the State Department followed a general practice of requesting immunity in all actions against friendly sovereigns," but in that year the State Department, in the so-called "Tate Letter" (named after its author, the Department's then-Acting Legal Adviser, Jack B. Tate) to Acting Attorney General  Philip B. Perlman, "announced its adoption of the 'restrictive' theory of sovereign immunity." *Samantar v. Yousuf*, 560 U.S. 305, 312 (2010) (citations omitted); *see generally Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711-15 (1976) (reprinting letter); *Exp.-Imp. Bank of the Republic of China v. Grenada*, 768 F.3d 75, 84 & n.10 (2d Cir. 2014).  Under the "restrictive" theory of foreign sovereign immunity, "'immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts.'" *Id.* (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487 (1983)).

The change in State Department policy "had little, if any, impact on federal courts' approach to immunity analyses" because "initial responsibility for deciding questions of sovereign immunity [had fallen] primarily upon the Executive [Branch] acting through the State Department, and courts continued to abid[e] by that Department's suggestions of immunity." *Republic of Austria v. Altmann*, 541 U.S. 677, 690 (2004) (quoting *Verlinden*, 461 U.S. at 487)

86

(internal quotation marks omitted).  Still, the change did "throw immunity determinations into some disarray, as foreign nations often placed diplomatic pressure on the State Department, and political considerations sometimes led the Department to file suggestions of immunity in cases where immunity would not have been available under the restrictive theory."  *Id.* at 690 (quoting *Verlinden*, 461 U.S. at 487) (internal quotation marks omitted).  "An additional complication was posed by the fact that foreign nations did not always make requests to the State Department.  In such cases, the responsibility fell to the courts to determine whether sovereign immunity existed, generally by reference to prior State Department decisions."  *Verlinden*, 461 U.S. at 487 (citing law review article).  As a result, "sovereign immunity determinations were made in two different branches, subject to a variety of factors, sometimes including diplomatic considerations. Not surprisingly, the governing standards were neither clear nor uniformly applied."  *Id.* at 488 (citing law review articles).

Congress responded to the inconsistent application of sovereign immunity by enacting the FSIA in 1976.  *Samantar*, 560 U.S. at 312 (citing cases).  It did so "in order to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to assur[e] litigants that . . . decisions are made on purely legal grounds and under procedures that [e]nsure due process[.]"  *Verlinden*, 461 U.S. at 488 (quoting H.R. Rep. No. 94-1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6606.

Title 28, section 1602 of the U.S. Code lays out the FSIA's two primary purposes:  (1) "to endorse and codify the restrictive theory of sovereign immunity," as first embraced by the Tate Letter; and (2) "to transfer primary responsibility for deciding 'claims of foreign states to immunity' from the State Department to the courts."  *Samantar*, 560 U.S. at 313 (quoting statute);

*see* 28 U.S.C. § 1602 (congressional findings that, "[u]nder international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities[,]" and that "[c]laims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter"); *Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 286 n.5 (2d Cir. 2011) (noting that FSIA codifies "restrictive" view of sovereign immunity first enunciated in Tale Letter).  After its enactment, the FSIA, "and not the pre-existing common law – indisputably governs the determination of whether a foreign state is entitled to sovereign immunity."  *Samantar*, 560 U.S. at 313.

As is relevant here, the FSIA provides that "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of [the statute] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" except as provided in 28 U.S.C. §§ 1605-07.   28 U.S.C. § 1604.  The FSIA defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in" the statute.  *Id.* § 1603(a).  In turn, the statute defines an "agency or instrumentality of a foreign state" as any entity

> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

*Id.* § 1603(b).

Thus, inasmuch as it is plainly not a political subdivision of China, the threshold question presented by the instant motion is whether CNBM Group is "an agency or instrumentality of" China.[348]

### 2.   CNBM Group Is Not a Foreign Agency or Instrumentality for Purposes of the FSIA

CNBM Group claims to be an agency or instrumentality of China because it is directly and wholly owned by the Chinese Government.   Am. Mem. of Law in Support of Defendants CNBM Group, CNBM Co., CNBM USA, CNBMIT, and United Suntech's Motion to Dismiss [Rec. Doc. No. 19527-2] ("Mem.") at 9.   That contention is unavailing.

Although CNBM Group treats state ownership as dispositive of the threshold question under the FSIA (*see* Mem. at 10), it is not.   The Fifth Circuit has adopted a five-part framework for assessing whether an entity is an organ or instrumentality of a foreign government.   A court looks to

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds

---

[348] There is some significance that attaches to this distinction, for while it defines the term "foreign state" to include agencies or instrumentalities thereof, *id.* § 1603(a), "the FSIA provides weaker immunity protection for the property of foreign-state instrumentalities because 'instrumentalities engaged in commercial activities are akin to commercial enterprises.'" *Rubin v. The Islamic Republic of Iran*, 637 F.3d 783, 798 n.13 (7th Cir. 2011) (quoting Restatement (Third) of the Law of Foreign Relations of the United States § 460 cmt. b (1987)).

> exclusive rights to some right in the [foreign] country; and (5) how
> the entity is treated under foreign state law.

*Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846-47 (5th Cir. 2000); *Bd. of Regents of Univ. of Tex. Sys. v. Nippon Tel. & Tel. Corp.*, 478 F.3d 274, 279 (5th Cir. 2007) (citing cases).[349]

Contrary to CNBM Group's assumption, "[i]t is not enough to show that various government entities or officials represent a majority of the shareholders or constitute a majority of the board of directors of the applicable agency or instrumentality." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 440 (D.C. Cir. 1990).

Here, evidence shows that CNBM Group was formed specifically to fulfill commercial, not political, functions. Article 7 of CNBM Group's "Articles of Association" states that, "the company legally engages in independent business activities." Jianglin Cao Decl., Ex. B (Rec. Doc. No. 19527-6) (emphasis added). Moreover, CNBM Group directly holds shares in companies that engage in commercial enterprises, including exporting drywall (BNBM Group). *Id.* at 3 (Jianglin Cao Decl. ¶ 11). There is no indication that the company performs sovereign or regulatory functions. To the contrary, both its Business License and Article 12 of its Articles of Association list CNBM Group's scope of its businesses as including the "[m]anufacturing of building materials and related raw and auxiliary materials"; "research, development and sales of production technology and equipment"; "design, sales and construction of complete sets of housing"; "sales of decoration materials"; "design [and] construction of housing"; "investment

---

[349] Other courts have adopted the Fifth Circuit's framework. *E.g.*, *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 144 (2d Cir. 2014) (quoting *Kelly*, 213 F.3d at 846-47), *cert. granted*, No. 15-138, 2015 WL 4575964 (U.S. Oct. 1, 2015); *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 206-07 (3d Cir. 2003) (same).

and asset operation of building materials and related fields" and  "information services and

exhibition services" related to the foregoing; and "processing and sales of minerals."  *Id*. at 3

(Jianglin Cao Decl., Exs. A & B).   This is consistent with what BNBM's annual reports have

consistently said about the business of its "Actual Controller" (*i.e.*, CNBM Group), noting that

"[i]t is mainly engaged in the development, production, wholesale and retail of building

materials (including steel and wood"; "undertakes the design and construction of buildings,

factories and decoration and renovation projects using new building materials"; and "runs a

sideline business centered on new building materials in real estate and provides technology

consulting and information services related to its main and sideline business."[350]  Equally

consistent with these founding documents is CNBM Group's behavior.  As set forth in Section

II.A. *supra*, CNBM Group directly or through its subsidiaries engaged in litigation in the United

States intended to protect or preserve its contractual rights developed through the commercial

activity these entities engaged in various locations throughout the United States.

CNBM Group's Articles of Association further reflect that the company's Board of

Directors have "strategy and investment" and "audit and risk management" committees (arts. 30,

32, 35), and they formulate "profit distribution plans" (art. 18(5)).   Rec. Doc. No. 19527-6

(Jianglin Cao Decl., Ex. B).  The company enjoys the status of being a legal person and is liable

for its debts with its own assets (art. 5).  *Id*.  It is empowered to issue corporate bonds (arts. 5 &

18(6)).  *Id*.  In addition, the overwhelming evidence of CNBM Group's status as the alter ego of

---

[350] *See* 2005 BNBM Annual Report at 7; 2006 BNBM Annual Report, at 10-11; 2007 BNBM
Annual Report at 10-11, 104; 2008 BNBM Annual Report at 10-11, 107; 2009 BNBM Annual
Report at 9; 2010 BNBM Annual Report at 8; 2011 BNBM Annual Report at 9; 2012 BNBM
Annual Report at 46-47; 2013 BNBM Annual Report at  53; 2014 BNBM Annual Report at 52.

its various commercial subsidiaries and affiliates further confirms that it exists for a commercial purpose.  *See* Section II.A, *supra*.

Because it was created for commercial purposes rather than a national purpose, CNBM Group cannot legitimately claim to be an organ of the Chinese Government.  *See Ocean Line Holdings Ltd. v. China Nat'l Chartering Corp.*, 578 F. Supp. 2d 621, 626 (S.D.N.Y. 2008) (Chinese company was not sovereign instrumentality "because it was not formed to perform governmental functions, but rather to engage[ ] in the shipping industry as agents, charterers, managers and operators of ocean going vessels and other functions related to the industry generally") (citation and internal quotation marks omitted); *Santilli v. Cardone*, No. 807-CV-308-T-23MSS, 2008 WL 2790242, at *2 (M.D. Fla. July 18, 2008) (defendant Italian university held not to be foreign organ where there was no evidence that its purpose of teaching and conducting research served national purpose); *Welch v. PUC Servs., Inc.*, No. 2:06-CV-230, 2007 WL 2818805, at *7 (W.D. Mich. Sept. 25, 2007) (defendant was not organ of foreign government where its function, treatment of waste water, although traditionally a public activity, could also be conducted by private entities and it was operated for profit, and was not subsidized or not run by civil servants); *cf. Gang Chen v. China Cent. Television*, 320 F. App'x 71, 73 (2d Cir. 2009) (defendant held to be organ of Chinese Government because it was "the sole national broadcasting entity in China, as established by the government of the [PRC]") (citation and internal quotation marks omitted); *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, 476 F.3d 140, 143 (2d Cir. 2007) (Republic of Korea's Financial Supervisory Service was sovereign instrumentality where it was created "for the national purpose of examining, supervising, and investigating Korean financial institutions"); *EIE Guam Corp. v. Long Term*

*Credit Bank of Japan, Ltd.*, 322 F.3d 635, 640 (9th Cir. 2003) (Japanese corporation held to be foreign organ because Japanese Government formed it "expressly . . . to perform a public function" of purchasing non-performing loans from failed financial institutions in order to "revitaliz[e] . . . the Japanese financial system"); *Kelly*, 213 F.3d at 848 (petroleum company was created for national purpose "because it was formed by government decree to develop and explore Syria's mineral resources, control over which is a basic aspect of sovereignty; and it had the exclusive right to develop those resources"); *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, No. 97 Civ. 6124 (JGK), 1999 WL 307666, at *8-9 (S.D.N.Y. May 17, 1999) (entity created to advance Brazilian government's monopoly over national oil industry, actively supervised by that government, and granted monopoly over that industry held to be instrumentality of foreign state), *aff'd*, 199 F.3d 94 (2d Cir. 1999); *Glencore, Ltd. v. Chase Manhattan Bank, N.A.*, No. 92 Civ. 6214 (JFK), 1998 WL 74294, at *3 (S.D.N.Y. Feb. 20, 1998) (state bank held to be government organ where its purpose was "to expand Government-supported banking throughout India").

Moreover, CNBM Group was not created pursuant to government edict or to serve as an instrument of Chinese government policy, and there is no indication that it follows detailed government direction.  *See RSM Prod. Corp. v. Petroleos de Venezuela Societa Anonima (PDVSA)*, 338 F. Supp. 2d 1208, 1215 (D. Colo. 2004) (defendant national, state-owned oil company was organ  of Venezuelan government where it "was created under a resolution issued by the Venezuelan Ministry of Energy and Mines"; "created as an instrument of the Venezuelan state's oil policy"; and had to "follow in detail the polices, guidelines, and direction of the Venezuelan government, making its activities public in nature").

Although it makes some "big picture" decisions regarding CNBM Group, SASAC does not exercise day-today control over it, CNBM Group is not exclusively run by government appointees, and the company's employees are not treated as civil servants. *See* Rec. Doc. No. 19527-6 (Jianglin Cao Decl., Ex. B, arts. 14-15); *see Patrickson v. Dole Food Co.*, 251 F.3d 795, 808 (9th Cir. 2001) (Israeli chemical companies held not to be government organs where, *inter alia*, they were not run by government appointees and their employees were not treated as civil servants), *aff'd in part and cert. dismissed in part*, 538 U.S. 468 (2003); *In re 650 Fifth Ave. & Related Properties*, 881 F. Supp. 2d 533, 552 (S.D.N.Y. 2012) (Iranian foundation held to be organ of Iranian Government where it was established for national purpose, regime chose its board members and actively supervised it, and foundation had "no true independent discretion" regarding its operations); *Santilli*, 2008 WL 2790242, at *2 (no evidence that Italian Government actively supervised university or required it to hire public employees).

On these facts, it is plain that CNBM Group does not qualify as an organ or instrumentality of the Chinese Government.

**3.  Even If CNBM Group Was a Foreign Agency or Instrumentality Covered by the FSIA, The Statutory Exceptions to Immunity Apply**

**a.  The Burden of Proving That the Commercial Activity Is Inapplicable Ultimately Rests with CNBM Group**

CNBM Group correctly notes that once a defendant establishes that it is an agency or instrumentality of a foreign state (which CNBM Group has failed to do here), the burden of showing the applicability of the commercial activity exception shifts to Plaintiffs. *See* Mem. at 9.  CNBM Group, though, conveniently leaves out the other half of the equation.  The burden only *initially* shifts to the plaintiff.   CNBM Group conspicuously fails to mention that the

burden of proving the inapplicability of the commercial activity exception ultimately rests with the party claiming immunity from suit. *Pere v. Nuovo Pignone, Inc.*, 150 F.3d 477, 481 (5th Cir. 1998); *Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 896 (5th Cir. 1998); *Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo Gen. del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C.*, 923 F.2d 380, 390 n.14 (5th Cir. 1991) (citing cases); *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 n.6 (5th Cir. 1989) (citing authorities); *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 176 n.4 (5th Cir. 1989). Its suggestion that the burden rests at all times with Plaintiffs is thus inaccurate.

### b.  The FSIA's Commercial Activity Exception Applies to CNBM Group Directly

Even assuming, however, that CNBM Group were deemed an agency or instrumentality of the People's Republic of China, CNBM's claim of immunity still fails. As the Congress that enacted the FSIA recognized, "the fact that an entity is an agency or instrumentality of a foreign state does not in itself establish an entitlement to sovereign immunity." H.R. Rep. No. 94-1487, at 15, *reprinted in* 1976 U.S.C.C.A.N. 6614 (internal quotation marks omitted). One of the FSIA's explicit carve-outs – the "commercial activity" exception – applies here and dooms CNBM Group's motion.

The FSIA explicitly provides that

> (a) [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case –
>
> * * *
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act

95

> performed in the United States in connection with a commercial
> activity of the foreign state elsewhere; or upon an act outside the
> territory of the United States in connection with a commercial
> activity of the foreign state elsewhere and that act causes a direct
> effect in the United States[.]

28 U.S.C. § 1605(a)(2) (emphasis added).  The statute defines "commercial activity" as "either a

regular course of commercial conduct or a particular commercial transaction or act."  *Id.* §

1603(d).  Whether the commercial activity exception applies is a determination to be made on a

case-by-case basis.  *See id.* ("The commercial character of an activity shall be determined by

reference to *the nature of the course of conduct or particular transaction* or activity[.]")

(emphasis added); *Can-Am Int'l, LLC v. Republic of Trinidad & Tobago*, 169 F. App'x 396, 404

n.7 (5th Cir. 2006); *Bowers ex rel. NYSA-ILA Pension Trust Fund v. Transportes Navieros*

*Ecuadorianos (Transnave)*, 719 F. Supp. 166, 169 (S.D.N.Y. 1989).

The Supreme Court has explained that "a state engages in commercial activity under the

restrictive theory where it exercises only those powers that can also be exercised by private

citizens, as distinct from those powers peculiar to sovereigns.  Put differently, a foreign state

engages in commercial activity for purposes of the restrictive theory only where it acts "in the

manner of a private player within" the market."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 360

(1993) (citing authorities; internal citations and quotation marks omitted); *accord Republic of*

*Argentina*, 504 U.S. at 612 ("[T]he question is not whether the foreign government is acting with

a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.  Rather, the

issue is whether the particular actions that the foreign state performs (whatever the motive

behind them) are the *type* of actions by which a private party engages in trade and traffic or

commerce.")  (citation and internal quotation marks omitted; emphasis in original).  "[W]hen a

96

foreign government acts, not as regulator of a market, but in the manner of a private player

within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA" *Id.*

at 614.[351]

Thus, the salient inquiry in the commercial activity analysis is, as the Seventh Circuit has

described it, "whether a private person could have engaged in similar conduct.  If a private

person could have engaged in the same *type* of activity, then the sovereign has presumptively

engaged in 'commercial activity' within the meaning of the FSIA; however, if no private party

could have engaged in the challenged conduct, then the conduct is a sovereign act, and the

foreign state is immune from suit."  *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic*

*Republic*, 877 F.2d 574, 578 (7th Cir. 1989) (footnote omitted; emphasis in original).

This recognition of the dichotomy between sovereign and commercial functions has

longstanding roots.  *See Alfred Dunhill of London*, 425 U.S. at 707 ("[T]he commercial and

private activities of foreign states do not give rise to sovereign immunity."); *Bank of United*

*States v. Planters' Bank of Ga.*, 22 U.S. 904, 907 (1824) ("It is, we think, a sound principle, that

when a government becomes a partner in any trading company, it d[i]vests itself, so far as

concerns the transactions of that company, of its sovereign character, and takes that of a private

citizen.  Instead of communicating to the company its privileges and its prerogatives, it descends

to a level with those with whom it associates itself, and takes the character which belongs to its

associates, and to the business which is to be transacted.").

---

[351] *Accord Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 417 (S.D.N.Y. 1998) ("Commercial activities in this context involve actions by states that exercise only those powers that can also be exercised by private citizens," as opposed to "powers peculiar to sovereigns.  The purpose of the commercial [activities] exception [is] to prevent foreign states from taking refuge behind their sovereignty when they act as market participants[.]") (citing cases; internal citations and quotation marks omitted).

Importantly, the Fifth Circuit has embraced similar reasoning, stating that "[i]n determining whether the commercial activity exception applies, the critical question is usually whether the relevant activity is commercial or sovereign in nature—whether it is a *jure gestionis* or a *jure imperii*, a private or a public act." *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1108 (5th Cir. 1985) (footnote omitted).[352]  Other circuits have adopted the same view.[353]

The FSIA's legislative history underscores that the statute is not designed to shield the types of commercial activities undertaken by CNBM Group and its affiliates and subsidiaries.[354] To the contrary, the commercial activity exception is designed to hold governments and their

---

[352] Thus, for example, "a contract to purchase military supplies, although clearly undertaken for public use, is commercial in nature and therefore subject to the commercial activity exception." *Joseph*, 830 F.2d at 1023; see *Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1384-85 (5th Cir. 1992) ("[C]ourts typically hold that contracts for the procurement of goods and services are commercial rather than governmental in nature.")  (citing cases).

[353] *See Guevara v. Republic of Peru*, 468 F.3d 1289, 1298 (11th Cir. 2006) ("a foreign state loses its immunity if it engages in commercial activity . . . because then it is exercising the same powers that a private citizen might be exercising,"  and it "is commercially engaged when it acts like an ordinary private person, not like a sovereign, in the market") (citations and internal quotation marks omitted); *Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1024 (9th Cir. 1987) ("An activity is public and 'noncommercial' if it is one which only a sovereign state can perform.") (citing cases).

[354] Defendants' operation of gypsum mines and sale of drywall to customers in the United States clearly constitutes the type of conduct the commercial activity exception of the Foreign Sovereign Immunities Act is intended to carve out.  *See* H.R. Rep. No. 94-1487 at 16, 1976 U.S.C.C.A.N. 6604, 6614-15 ("Paragraph (c) of section 1603 defines the term 'commercial activity' as including a broad spectrum of endeavor, from an individual commercial transaction or act to a regular course of commercial conduct.  *A 'regular course of commercial conduct' includes the carrying on of a commercial enterprise such as a mineral extraction company, an airline or a state trading corporation. Certainly, if an activity is customarily carried on for profit, its commercial nature could readily be assumed*.") (emphasis added).  *See also id.* at 6615 ("The courts would have a great deal of latitude in determining what is a 'commercial activity' for purposes of this bill. . . .. *Activities such as a foreign government's sale of a service or a product*, its leasing of property, its borrowing of money, its employment or engagement of laborers, clerical staff or public relations or marketing agents, or its investment in a security of an American corporation, *would be among those included within the definition*.") (emphasis added).

instrumentalities liable where they engage in such commercial activities.  In testifying before the Subcommittee on Administrative Law and Governmental Relations of the Committee of the Judiciary, the State Department's Legal adviser, Monroe Leigh, highlighted that the statute is intended to provide for liability when governments and their instrumentalities engage in ordinary commercial activities.  *See Jurisdiction of U.S. Courts in Suits Against Foreign States*:  *Hearing on H.R. 11315 before the Subcomm. on Admin. Law and Governmental Relations of the Comm. of the Judiciary*, 94th Cong. 24 (1976) ("What function would the bill serve?  On its surface, H.R. 11315 may seem somewhat technical.  *But the general purpose is simple:  To assure that American citizens are not deprived of normal legal redress against foreign states who engage in ordinary commercial transactions or who otherwise act as a private party would*.") (emphasis added); *see also* H.R. Rep. No.  94-1487 at 8, 1976 U.S.C.C.A.N. 6605 ("In a modern world where foreign state enterprises are every day participants in commercial activities, H.R. 11315 is urgently needed legislation.").  This same purpose is clearly recognized in House Report 94-1487, which stated that the purpose of the bill was to

> codify the so-called 'restrictive' principle of sovereign immunity, as presently recognized in international law. Under this principle, the immunity of a foreign state is 'restricted' to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis). This principle was adopted by the Department of State in 1952 and has been followed by the courts and by the executive branch ever since. Moreover, it is regularly applied against the United States in suits against the U.S. Government in foreign courts.

*Id.*, 1976 U.S.C.C.A.N. at 6605-06.[355]

---

[355] H.R. Rep. No. 94-1487 at 14, 1976 U.S.C.C.A.N. 6613 ("There is . . . a wide acceptance of the so-called restrictive theory of sovereign immunity; that is, that the sovereign immunity of foreign states should be 'restricted' to cases involving acts of a foreign state which are sovereign or

Thus, the FSIA plainly draws a distinction between public acts, for which sovereign immunity shields foreign governments from liability, and commercial and private acts, which are not subject to protection from liability under the Act.  This distinction is in keeping with the development of the modern international economy and the fact that governments now frequently participate in commercial activities.  Allowing governments or their instrumentalities to escape liability for such activities is an archaic concept that has no place in the modern international economy.  Monroe Leigh's testimony before the Subcommittee on Administrative Law and Governmental Relations artfully captured this purpose behind the FSIA:

> The purpose of sovereign immunity in modern international law is not to protect the sensitivities of 19th-century monarchs or the prerogatives of the 20th-century state.  Rather, it is to promote the functioning of all governments by protecting a state from the burden of defending law suits abroad which are based on its public acts.
>
> However, when the foreign state enters the marketplace or when it acts as a private party, there is no justification in modern international law for allowing the foreign state to avoid the economic costs of the agreements which it may breach or the accidents which it may cause.  The law should not permit the foreign state to shift these everyday burdens of the marketplace onto the shoulders of private parties.

*Jurisdiction of U.S. Courts in Suits Against Foreign States* at 27.

Numerous courts have recognized that the promotion of products or involvement in their export is a commercial activity that comes within the section 1605(a)(2) exception.  *E.g.*, *Guevara*, 468 F.3d at 1300 (contract for shipment of oil was" quintessentially commercial," even if conditioned on granting of export license); *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,

---

governmental in nature, as opposed to acts which are either commercial in nature or those which private persons normally perform.").

528 F.3d 934, 948 (D.C. Cir. 2008) (contacts for publishing and sale of historical materials);
*Altmann v. Republic of Austria*, 317 F.3d 954, 969 (9th Cir. 2002) (marketing of art exhibition
and related materials); *Holden v. Canadian Consulate*, 92 F.3d 918, 922 (9th Cir. 1996)
(consulate not entitled to immunity where nature of activity was promotion of products,
something "regularly done by private persons"); *Marathon Int'l Petroleum Supply Co. v. I.T.I.
Shipping, S.A.*, 728 F. Supp. 1027, 1030 (S.D.N.Y. 1990) ("In drafting the FSIA, Congress
intended that 'commercial activity' encompass 'import-export transactions involving sales to or
purchases from concerns in the United States.'") (quoting H.R. Rep. No. 94-1487, at 17,
*reprinted in* 1976 U.S.C.C.A.N. 6615); *Hatzlachh Supply Inc. v. Savannah Bank of Nigeria*, 649
F. Supp. 688, 690 (S.D.N.Y. 1986) (same); *Ministry of Oil of Republic of Iraq v. 1,032,212
Barrels of Crude Oil Aboard United Kalavrvta*, No. G-14-249, 2015 WL 93900, at *9 (S.D. Tex.
Jan. 7, 2015) (claims stemming from regional government's conversion and sale of country's oil
implicated commercial activity), *appeal dismissed as moot*, 2015 WL 5530272 (5th Cir. Sept. 21,
2015); *see also Farhang v. Indian Inst. of Tech.*, No. C-08-02658 RMW, 2012 WL 113739, at *8
(N.D. Cal. Jan. 12, 2012) (joint venture agreement for development and marketing of technology
held commercial activity), *vacated in part and dismissed in part on other grounds*, 529 F. App'x
812 (9th Cir. 2013); *Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332 EGS, 2006
WL 2711527, at *5 (D.D.C. Sept. 21, 2006) (awarding of contracts to engage in production and
marketing of oil and natural gas held commercial activity).

This is in contrast to the sovereign activity of *regulating* exports, *e.g.*, *Cmty. Fin. Grp.,
Inc. v. Republic of Kenya*, 663 F.3d 977, 981 (8th Cir. 2011) (regulation of exports a
governmental rather than a commercial activity); *In re Potash Antitrust Litig.*, 686 F. Supp. 2d

816, 823 (N.D. Ill. 2010) (Belarusian state company's decision to reduce potash exports was

sovereign decision and hence outside the FSIA's commercial activity exception; dismissing

antitrust claims pursuant to FSIA); *MOL, Inc. v. Peoples Republic of Bangladesh*, 572 F. Supp.

79, 83 (D. Or. 1983) (revocation of license for export of game a sovereign activity), *aff'd*, 736

F.2d 1326, 1329 (9th Cir. 1984), or generally promoting a country's commerce, *e.g.*, *Kato v.*

*Ishihara*, 360 F.3d 106, 112 (2d Cir. 2004) (Tokyo Metropolitan Government's provision of

"general business development assistance," including product promotion, to Japanese firms

seeking to do business in the United States was not commercial activity within FSIA's meaning;

"[a]lthough a private Japanese business might engage in these activities on its own behalf – for

example, by sending its representatives to trade shows in the United States to promote its

products – such a business would not typically undertake the promotion of other Japanese

businesses, or the promotion of Japanese business interests in general."); *Best Med. Belgium, Inc.*

*v. Kingdom of Belgium*, 913 F. Supp. 2d 230, 237-38 (E.D. Va. 2012) (promotion of commercial

and investment opportunities in country's region not commercial activity); *Kim v. Korea Trade*

*Promotion-Inv. Agency*, No. 13-CV-7576 (RJS), 2014 WL 4494136, at *6 (S.D.N.Y. Sept. 11,

2014) (provision of market research services, including identification of buyers and marketing

support).

Given this recognized dichotomy, the commercial activity exception is applicable here.

CNBM Group's activities were plainly not sovereign in nature.  Notably, CNBM Group was not

involved in regulating drywall exports or in generally promoting Chinese business overseas.  It

oversaw activity carried on solely for profit:  the marketing of drywall to the United States.  Even

if all of its conduct occurred outside the U.S., CNBM Group actively managed subsidiaries and

affiliates that marketed the defective drywall here and oversaw that marketing.  *See* Sections II.A

& II.B, *supra*. *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F.

Supp. 3d 550, 558 (S.D.N.Y. 2014) (commercial activity applied where defendant created

subsidiary to market notes to U.S. investors), *certificate of appealability granted*, No. 12 Civ.

8852 (JMF), 2014 WL 1881075 (May 9, 2014).

CNBM Group's contention that Plaintiffs' product liability claims are not "based upon"

the exportation of the defective drywall is unavailing.  *See* Mem. at 11-12.   It is true that the

commercial activity exception requires a "sufficient nexus" – there must be "a connection

between the plaintiff's cause of action and the commercial acts of the foreign sovereign."  *Stena*

*Rederi AB*, 923 F.2d at 386-87 (citing cases).   The Fifth Circuit, though, has squarely rejected an

interpretation of the commercial activity exception that would require the defendant's activity to

either "constitute[] or [have] directly cause[d] the occurrence of an element of the cause of

action."  *Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De*

*Navigation (C.N.A.N.)*, 730 F.2d 195, 200 (5th Cir. 1984); *accord Stena Rederi AB*, 923 F.2d at

387 (FSIA does not "require a *direct causal* connection") (emphasis in original).  The connection

between the cause of action and the defendant's commercial acts in the United States must

simply be material.  *Stena Rederi AB*, 923 F.2d at 387.   Simply put, the commercial activity

exception looks to "a connection between the lawsuit and the United States."  *Vencedora*

*Oceanica Navigacion*, 730 F.2d at 203.

That is the case here.  The evidence shows that CNBM Group had direct involvement in

analyzing the volume of Taishan's sales of Chinese Drywall to the United States, including

shipments to Virginia, Florida, New York, and New Jersey.  *See* Section II, *supra*.  Moreover, it

was CNBM Group that orchestrated a comprehensive, unified strategy for Defendants' response to the U.S. drywall litigation, entering into joint defense agreements with them, controlling their participation (or lack thereof) in the litigation, and its board unanimously blessing Taishan's conscious default. *See* Section II.C, *supra*.

### c.   <u>The Tort Exception to FSIA Immunity Also Applies</u>

In addition to the commercial activities exception, the FSIA also includes a "tortious activities" exception to the general rule of immunity. See 28 U.S.C. § 1605(a)(5). The tortious acts exception to the FSIA provides:

> (a) A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case—
>
> *          *          *
>
> (5) . . . in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; . . .

28 U.S.C. § 1605(a)(5).  In other words, "[t]his exception provides that a foreign state is not immune from suit where money damages are sought for losses of property or personal injury caused by the tortious acts or omissions of its officers or employees." *Moran v. Kingdom of Saudi Arabia,* 27 F.3d 169, 173 (5th Cir. 1994) (citing *De Sanchez v. Banco Central De Nicaragua,* 770 F.2d 1385, 1398 (5th Cir. 1985)). Under the foregoing language of the statute, the claims at issue have to be related to the alleged tortious conduct.  Here, the record clearly establishes the interrelatedness of the claims asserted with the tortious conduct.

### d.   Both the Tortious Activity and Commercial Conduct Exceptions Apply on the Basis of the Actions of CNBM Group's Affiliates, Which Can Be Imputed to It

That the Plaintiffs before the Court have suffered damages due to the tortious conduct of Taishan as the manufacturer/distributor of defective drywall, is now established as the law of the case.  That Plaintiffs' causes of action all arise out of the tortious and commercial activities of Taishan within the jurisdiction of this Court, likewise is now the established law of the case.  The imputation of these tortious and commercial activities from Taishan to CNBM group as an entity with control over Taishan, makes <u>both</u> exceptions to FSIA immunity applicable to CNBM Group.

The question whether to impute the contacts and activities of one corporate entity to another for jurisdictional purposes, is also part of the law of this case.  Overruling the *in personam* jurisdiction challenges of Taishan and its subsidiary, Taian Taishan Plasterboard ("TTP"), this Court imputed the forum contacts and activities of TTP to Taishan.  *See Chinese Drywall*, 894 F. Supp. 2d 819 (E.D. La. 2012).[356]  That decision addressed four cases transferred into the MDL:  *Germano*, originally filed in Virginia on behalf of Virginia Plaintiffs; *Mitchell*, originally filed in Florida on behalf of homebuilder Plaintiffs in Louisiana, Texas, Georgia and

---

[356] In its decision, the Court recognized that the U.S. Supreme Court in *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925), had declined to recognize the possibility of imputing forum contacts of a subsidiary to a parent for personal jurisdiction purposes, but noted that subsequent jurisprudence has established that such an imputation is no longer prohibited. *See id.* at 867 and cases cited therein.  This erosion of the so-called "*Cannon* doctrine" also has been recognized in the professional literature.  *See, e.g.,* Brown, "Jurisdiction Over A Corporation On The Basis Of The Contacts Of An Affiliated Corporation: Do You Have To Pierce The Corporate Veil?" 61 U. Cin. L. Rev. 595 (1992).  To the extent *Cannon* rested on a "physical presence doctrine" for *in personam* jurisdiction before that doctrine was jettisoned in *International Shoe* and other Supreme Court decisions post-*Cannon*, it is generally accepted that *Cannon* "no longer has constitutional significance."  *See id.* at 618.

Florida; *Gross*, originally filed in the Eastern District of Louisiana as a nationwide class of property owners; and *Wiltz*, likewise filed in the Eastern District of Louisiana as a nationwide class of homeowners.  No imputation-of-contacts analysis was deemed necessary as to *Germano*, since TTP had no activities or contacts in Virginia, leaving no forum contacts to impute to Taishan.  *See id.* at 861.  But, as to Florida and Louisiana, it first was necessary for the Court to decide whether Chinese law should govern the analysis.  Instead applying Florida (*Mitchell*) and Louisiana (*Gross* and *Wiltz*) law, together with the law of the MDL Circuit (the Fifth), the Court adopted an approach "overwhelmingly supported by both the jurisprudence and legal scholarship."  *See id.* at 837, and cases cited therein.[357]

With respect to Florida law, the Court summarized the legal test for imputing contacts as based principally on control:

> [A] plaintiff may establish personal jurisdiction in the forum over a non-resident parent corporation by virtue of its subsidiary's activities in the forum when 'the parent exercises sufficient control over the subsidiary to render the subsidiary an agent or alter-ego of the parent.'"  [Citation omitted].

*Chinese Drywall*, 894 F. Supp. 2d at 869.  Affirming on appeal, the Fifth Circuit agreed that where a *de facto* principal-agent relationship between a foreign parent and a subsidiary company is shown to exist, the forum contacts of the agent should be considered imputable to the parent

---

[357] The defendants Taishan and TTP had argued for the application of Chinese law; but, in the later appeal which affirmed this Court's decision to apply the laws of these states as opposed to Chinese law, the Fifth Circuit observed that Taishan itself had conceded that "Chinese law is not materially different on this issue [imputing contacts for personal jurisdiction purposes] from Florida law, and the outcome should be the same under either law.  *See Chinese Drywall*, 753 F.3d at 530.  Under the "false conflict" rule, therefore, domestic law is applicable to the issue.  This Court should, as it did in its earlier jurisdictional opinion, apply the state law of the forum to determine whether a subsidiary's forum contacts may be imputed to a parent company for purposes of jurisdiction.  *See Chinese Drywall*, 894 F. Supp. 2d at 869 (citation omitted).

for jurisdictional purposes. *See Chinese Drywall*, 753 F.3d at 530. The appellate panel further noted that such a principal-agent relationship exists when the principal has effectively acknowledged the right of the agent to act, the agent has undertaken action, and, most critically and importantly, there is shown to have been control by the principal over the actions of the agent. *Id.*

Here, there is ample evidence in the record to date to establish that CNBM Group stood in a principal-agent relationship with Taishan. CNBM Group oversaw the shipment and export of drywall manufactured by Taishan. *See* discussion *supra*. The degree of continuing control became clear when the material proved defective. CNBM Group had monitored these proceedings as a bystander in default in order to see if the Court would exercise jurisdiction over Taishan before deciding to make an appearance in the case. Then, still not appearing but still monitoring the litigation to protect its interests, CNBM Group expressly approved the criminally contemptuous decision of Taishan to defy a Court order by not appearing for a Judgment Debtor examination. Under the control test recognized in Florida, therefore, the tortious and commercial activities of Taishan are imputable to CNBM Group for the purposes of applying both exceptions to FSIA immunity.

Turning to Louisiana law for purposes of the *Gross* and *Wiltz* jurisdictional issues before it in its earlier Taishan/TTP decision, the Court concluded that, like Florida, this forum's law recognizes the possibility of imputing the contacts of a subsidiary to a parent for purposes of personal jurisdiction when the subsidiary is an alter-ego of the parent. *See Chinese Drywall*, 894 F. Supp. 2d 819, 895 (citations omitted). Any number of factors are deemed relevant to consider whether one entity is an alter-ego or "single business enterprise" of another, as set forth in the

107

Louisiana appellate court decision of *Green v. Champion Insurance Company*, 577 So.2d 249 (La. App. 1991). These factors in *Green* are not meant to be exclusive, but rather an illustrative list of relevant considerations. *See Chinese Drywall*, 894 F. Supp. 2d at 895. On appeal, the Fifth Circuit embraced the Court's analysis, finding that under Louisiana law "courts may impute contacts between two entities under either an alter-ego or agency theory." *Chinese Drywall*, 753 F.3d at 546 (citation omitted). Importantly, the appellate decision also noted that "the alter-ego task for attribution of contacts, i.e., personal jurisdiction, is less stringent than that for liability." *See id.* (citation omitted).

The *Green* factors for alter-ego/single business enterprise, as now recognized by the Fifth Circuit, are:

1. corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control;

2. common directors or officers;

3. unified administrative control of corporations whose business functions are similar or supplementary;

4. directors and officers of one corporation act independently in the interest of that corporation;

5. corporation financing another corporation;

6. inadequate capitalization ("thin incorporation");

7. corporation causing the incorporation of another affiliated corporation;

8. corporation paying the salaries and other expenses or losses of another corporation;

9.  receiving no business other than that given to it by its affiliated corporations;

10. corporation using the property of another corporation as its own;

11. noncompliance with corporate formalities;

12. common employees;

13. services rendered by the employees of one corporation on behalf of another corporation;

14. common offices;

15. centralized accounting;

16. undocumented transfers of funds between corporations;

17. unclear allocation of profits and losses between corporations; and

18. excessive fragmentation of a single enterprise into separate corporations.

*See Chinese Drywall*, 753 F.3d at 547.

A common thread runs through the law of both Florida and Louisiana in the imputation of contacts for jurisdictional purposes.  In the *Green* Court's own discussion prior to identifying the above factors for the "single business enterprise" test, that panel characterized Louisiana law as "similar" to that of other states, and noted that all such laws ultimately focus on whether, despite formalities of separateness, one corporation is sufficiently under another's control, so that "the mere fact that it is set up as a separate entity does not relieve the parent from accountability."  *See* 577 So.2d at 257.  In short, it is for courts to "look to the substance of the corporate structure rather than its form."  *See id.*  Indeed, in its Taishan/TTP jurisdictional opinion, this Court's survey of states' laws on the subject led to a similar conclusion:

> Generally, the jurisprudence considers a number of factors to determine if the level of "control" or "importance" between the corporate entities is sufficient for the imputation of forum contacts.

*See Chinese Drywall*, 894 F. Supp. 2d at 869, and cases cited therein.

If the Court were now to consider Virginia law for the present analysis, the same "control test" would be determinative.  Under Virginia law, Courts will impute contacts between a subsidiary and parent for jurisdictional purposes "if the plaintiff's evidence demonstrates that the subsidiary is a fictitious shield erected by the parent to protect itself from liability."  *Long v. Chevron Corp.*, 2011 WL 3903066, *7 (E.D. Va. Sept. 2, 2011).  Among the important factors to consider for imputing liability of a subsidiary to a parent company is the "degree of control exercised by the parent over the subsidiary."  *Id.* The other factors include, whether the corporations maintain the necessary formalities, have separate books, have separate officers, directors, and employees, and separately manage their own day to day affairs.  *Id.*  The dominance of CNBM Group over its subsidiaries is striking. Not only did CNBM Group have its subsidiary, BNBM PLC install the same directors into Taishan as those in BNBM PLC, but it insured that Taishan report to it regularly.  Lest there be any doubt of the degree of control exercised by CNBM Group over Taishan, Chairman JIA did not hesitate to comply with CNBM Group's summons to appear at the July 11, 2014 Board of Directors Meeting.  And the proof is that CNBM Group's validation and endorsement of the decision to commit contempt was essential to Taishan's execution of the plan.

These facts, and the many others discussed above, demonstrate the intertwined relationship between CNBM Group and its subsidiaries and affiliates – and, in particular, its

intimate, active control of them on a day-to-day basis – which easily provides the basis for invoking both the commercial activity and tortious conduct exceptions.

CNBM's discourse that the conduct of its affiliates cannot be attributed to it plainly fails. *See* Mem. at 18-22.  It cites a slew of inapposite cases discussing the presumption of independent status of instrumentalities, but all of those cases involved the issue of whether the conduct of an instrumentality could be imputed to a *sovereign state*. *E.g*., *Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1382 (5th Cir. 1992) (Mem. at 19) (plaintiff sued Republic of the Philippines in connection with sale of aircraft).  Plaintiffs, though, have not sued the People's Republic of China.  *See*, *e.g.*, *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 626-27 (1983) ("[G]overnment instrumentalities established as juridical entities distinct and independent *from their sovereign* should normally be treated as such.") (emphasis added).  CNBM is not entitled to any presumption that it is independent of its corporate affiliate co-defendants, and the cases that it cites do not stand for such a bald proposition.

If anything, as CNBM Group concedes (Mem. at 19), its own cases acknowledge the rule that "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created . . . one may be held liable for the actions of the other." *First Nat'l City Bank*, 462 U.S. at 629 (1983) (citing *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 402-04 (1960)).  At any rate, any presumption of independent status can be overcome by demonstrating that the instrumentality is the agent or alter ego of the foreign state or organ.  *Dale v. Colagiovanni*, 443 F.3d 425, 429 (5th Cir. 2006).  The inquiry in that context is whether there is an exercise of day-to-day control.  *Id*.

111

Here, the record resoundingly demonstrates that CNBM Group is the alter ego of its subsidiaries and affiliates.  It has shared common officers and directors, and routinely and continuously exercised control over the internal business operations and affairs of its subsidiaries, including, but not limited to, CNBM, BNBM Group, BNBM PLC, and Taishan.  It dictated and controlled the business operations and decision-making of its subsidiaries, issuing directives and business policies, appointing and controlling its subsidiaries' board members, training senior- and middle-level managers, sharing and controlling similar functions, controlling internal business operations, controlling financing, and transferring assets for nil consideration.  *See* Section II.A, *supra*.  In particular, the evidence shows that at the time the defective drywall was shipped to the U.S., CNBM Group controlled Taishan, and it had direct involvement in analyzing the volume of Taishan's sales of Chinese Drywall to the United States, including shipments to Louisiana, Virginia, Florida, New York, New Jersey, and elsewhere.  *See* Sections II.A.2 & II.B, *supra*; *Chinese Drywall*, 753 F.3d at 534, 546. (regarding Florida and Louisiana)

The extensiveness of CNBM Group's control over its subsidiaries and affiliates easily distinguishes this case from such decisions cited by CNBM Group as *Freund v. Republic of France*, 592 F. Supp. 2d 540, 559 (S.D.N.Y. 2008), *aff'd sub nom. Freund v. Societe Nationale des Chemins de fer Francais*, 391 F. App'x 939 (2d Cir. 2010) (cited in Mem. at 21), where the plaintiffs offered no evidence that the defendant controlled its distant affiliated entities "in a manner that would give rise to an agency relationship" and, in fact, d*id not even argue* that the subsidiaries were the defendant's alter egos.

### 4. In the Alternative, Plaintiffs Are Entitled to Additional Discovery on the Issue of Whether the Commercial Activity Exception Applies

At a minimum, the Court should permit further discovery directed to the issue of the applicability of the commercial activity exception and the imputation of CNBM Group's subsidiaries' acts to it on the basis of the alter ego doctrine. Although discovery in cases where immunity is claimed on the basis of the FSIA is somewhat circumscribed,[358] nonetheless plaintiffs facing a motion to dismiss on the basis of foreign sovereign immunity have a right to take discovery, as long as it is "reasonably calculated to elucidate whether an FSIA jurisdictional exception applies." *Millicom Int'l Cellular v. Republic of Costa Rica*, No. 96-315(RMU), 1997 WL 527340, at \*4 (D.D.C. Aug. 18, 1997) (citing cases).[359]

To be sure, when immunity pursuant to the FSIA is claimed, jurisdictional discovery is not warranted "where a plaintiff fails to allege facts which, if true, would show that a particular defendant was not entitled immunity." *First Inv. Corp. of the Marshall Islands v. Fujian Mawei Shipbuilding, Ltd. of People's Republic of China*, 858 F. Supp. 2d 658, 681 (E.D. La.) (citing

---

[358] *E.g.*, *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 261 n.10 (5th Cir. 2002) (district court should order discovery "circumspectly and only to verify allegations of specific facts crucial to [the] immunity determination") (citation and internal quotation marks omitted).

[359] *Accord Box v. Dallas Mexican Consulate Gen.*, 487 F. App'x 880, 884 (5th Cir. 2012) ("[W]hen there is a factual question regarding a foreign sovereign's entitlement to immunity [under the FSIA], and thus a factual question regarding a district court's jurisdiction, the district court must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.") (citing cases; internal quotation marks omitted); *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990) (plaintiffs may be allowed limited jurisdictional discovery where they have "shown a reasonable basis for assuming jurisdiction"); *Compania del Bajo Caroni (Caromin) v. Bolivarian Republic of Venezuela*, 556 F. Supp. 2d 272, 282 (S.D.N.Y. 2008) (citing *Millicom*,1997 WL 527340, at \*4), *aff'd*, 341 F. App'x 722 (2d Cir. 2009); *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 185 F. Supp. 2d 335, 338 (S.D.N.Y. 2002) ("To determine whether the [commercial activity] exception applies, parties are entitled to some discovery.") (citing cases).

cases), *aff'd*, 703 F.3d 742 (5th Cir. 2012).[360]  And where permitted, FSIA jurisdictional

discovery is not unlimited.  *See Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 849 (5th

Cir. 2000) (citing cases); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992)

(discovery permitted "circumspectly and only to verify allegations of specific facts crucial to

[FSIA] immunity determination").

Nevertheless, more discovery is appropriate where, as here, Plaintiffs have "shown a

reasonable basis for assuming jurisdiction."  *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332

(2d Cir. 1990); *cf. Kelly*, 213 F.3d at 852 (district court acted within its discretion in denying

FSIA-related discovery given plaintiffs' failure to diligently seek it and "to allege specific facts

crucial to immunity which demonstrated a need for discovery"); *Arriba Ltd.*, 962 F.2d at 536-37

("generalized conspiratorial allegations" insufficient to justify "massive discovery" of foreign

government instrumentality).  This Court has so found.  *In re Chinese-Manufactured Drywall*

*Prod. Liab. Litig.*, 2015 WL 4477910, *5 (E.D. La. July 22, 2015) (Rec. Doc. No. 19323) (The

Court recognized that, "[a]though the status of CNBM Group may be devoid of factual dispute

and able to be decided as a matter of law, the presence, nature, and extent of the exceptions

under FSIA are factually pregnant and some discovery is needed.").[361]  The Fifth Circuit has held

that "when there is a factual question regarding a foreign sovereign's entitlement to immunity

---

[360] *Accord Evans v. Pemex*, 390 F. Supp. 2d 587, 590 (S.D. Tex. 2005) (plaintiff "not entitled to burden a foreign sovereign with discovery requests unless he can at least first allege an adequate basis for an applicable exception under the FSIA"), *aff'd*, No. 05-20434, 2006 WL 952265, at *2 (5th Cir. Apr. 13, 2006) (because facts he alleged were insufficient to satisfy § 1605(a)(2) exception, plaintiff was not entitled to burden defendants with discovery).

[361] Notably, this Court already has established a discovery track for the development of a record as to alter ego/ "affiliate" relationships involving defendants, a track which remains open and active until the end of this year. Some of this discovery clearly may inform the decision whether CNBM Group has had, at all times pertinent, sufficient control over Taishan to warrant the imputation of Taishan's tortious and commercial activities to CNBM Group.

[under the FSIA], and thus a factual question regarding a district court's jurisdiction, the district court must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Box v. Dallas Mexican Consulate Gen.*, 487 F. App'x 880, 884 (5th Cir. 2012) (citing cases; internal quotation marks omitted; editorial alteration made by court).

Here, the foregoing discussion demonstrates that there is a reasonable basis for assuming jurisdiction. Furthermore, although there has been some discovery, the strategic timing of CNBM Group's participation severely prejudiced the PSC. Many thousands of documents became available to the PSC only *after* the deposition of CNBM Group's Rule 30(b)(6) designee. CNBM Group's late production of huge quantities of documents prejudiced the PSC, unfairly depriving it of the opportunity to fully and adequately question CNBM Group concerning its relationship and control over BNBM Group, CNBM, BNBM, and Taishan. *See* Section II.D, *supra*.

For this reason, if the Court is unable to determine on the present record that CNBM Group is not an organ or instrumentality of China or, alternatively, that the FSIA's commercial activity exception applies, it should permit further targeted discovery. *E.g.*, *Hansen v. PT Bank Negara Indonesia (Persero), TBK*, 601 F.3d 1059, 1064 (10th Cir. 2010) (district court allowed limited jurisdictional discovery as to defendant bank conducted commercial activity); *Wahba v. Nat'l Bank of Egypt*, 457 F. Supp. 2d 721, 733 (E.D. Tex. 2006) (court permitted discovery "to establish an act outside the United States; to connect the act to commercial activity outside the United States; and to establish a direct effect in the United States") (internal quotation marks omitted); *Southway v. Cent. Bank of Nigeria*, 994 F. Supp. 1299, 1311 (D. Colo. 1998) (allowing limited discovery on questions of agency and whether defendants "actually participated in the

115

alleged conduct"), *aff'd and remanded*, 198 F.3d 1210 (10th Cir. 1999).  In particular, CNBM Group and CNBM, should be required to make available again a corporate designee/Rule 30(b)(6) witness to testify regarding the mother-lode of documents produced *after* their original designees testified.

## IV.     **CONCLUSION**

CNBM Group is not a governmental entity.  It is not entitled to sovereign immunity. Even if it were a foreign sovereign, CNBM Group is the alter ego of BNBM Group, CNBM, BNBM, and Taishan.  Because the Chinese Drywall manufactured by BNBM and Taishan is the subject of Plaintiffs' claims in the U.S., these Defendants' conduct is imputed to CNBM Group, which triggers the commercial activity and tortious conduct exceptions of the FSIA.  In the alternative, due to the untimeliness of CNBM Group's document productions (>96% produced after the Company's 30(b)(6) witness testified), Plaintiffs are entitled to conduct to additional discovery.

Therefore, the FSIA Motion should be denied.

Dated: October 29, 2015                       Respectfully Submitted,

                                              BY: /s/ Russ M. Herman
                                              Russ M. Herman (La Bar No. 6819) (on the Brief)
                                              Leonard A. Davis (La Bar No. 14190) (on the Brief)
                                              Stephen J. Herman (La Bar No. 23129)
                                              Madelyn O. Breerwood (La Bar No. 35538) (on the Brief)
                                              Herman, Herman & Katz, LLC
                                              820 O'Keefe Avenue
                                              New Orleans, LA 70113
                                              Phone: (504) 581-4892
                                              Fax: (504) 561-6024
                                              ldavis@hhklawfirm.com
                                              *Plaintiffs' Liaison Counsel MDL 2047*

Arnold Levin (on the Brief)
Fred S. Longer (on the Brief)
Sandra L. Duggan (on the Brief)
Matthew Gaughan (on the Brief)
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm, LLC
425 W. Airline Highway, Suite B
Laplace, LA 70068
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Peter Prieto
Podhurst Orseck, PA
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com

Bruce William Steckler
Steckler LLP
12720 Hillcrest Road, Suite 1045
Dallas, TX 75230
Phone: (972) 387-4040
Fax: (972) 387-4041
bruce@stecklerlaw.com

Ervin A. Gonzalez
Colson, Hicks, Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, PA
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
The Lambert Firm
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@thelambertfirm.com

Jerrold Seth Parker
Parker Waichman, LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Myers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves
Reeves & Mestayer, PLLC
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@attorneys4people.com

Christopher Seeger
Diogenes P. Kekatos (on the Brief)
Seeger Weiss, LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
Whitfield, Bryson & Mason, LLP
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5002
dan@wbmllp.com

Richard J. Serpe
Law Offices of Richard J. Serpe
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

Victor M. Diaz, Jr.
V.M. Diaz and Partners, LLC
119 Washington Ave., Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

Gerald E. Meunier (on the Brief)
Rachel A. Sternlieb (on the Brief)
Gainsburgh, Benjamin, David,
  Meunier & Warshauer, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2800
Phone:  (504) 522-2304
Fax:  (504) 528-9973
gmeunier@gainsben.com

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
rlewis@hausfeldllp.com

Anthony D. Irpino (on the Brief)
Pearl A. Robertson (on the Brief)
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been FILED UNDER SEAL and served on the appropriate parties and the Clerk of Court, pursuant to the UNDER SEAL procedures of the Court this 29th day of October, 2015.

Respectfully Submitted,

BY:  */s/ Leonard A. Davis*
Leonard A. Davis
Herman, Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
ldavis@hhklawfirm.com

*Plaintiffs' Liaison Counsel MDL 2047*